# Exhibit 87

B 10 Modified (Official Form 10) (12/11)

| Claim #5847   Date Filed: 11/16/2012 |

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK** | **PROOF OF CLAIM**

| Name of Debtor: **Residential Capital, LLC** | Case Number: **12-12020** |

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**MBIA Insurance Corporation**

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:
MBIA Insurance Corporation
c/o Cadwalader, Wickersham & Taft LLP
Attn: Gregory M. Petrick, Esq.
One World Financial Center                          - and -
New York, New York 10281

MBIA Insurance Corporation
Attn: David Glehan
113 King Street
Armonk, New York 10504

**Court Claim Number:** _____
*(If known)*
Filed on: _____

Telephone number: (212) 504-6000        email: gregory.petrick@cwt.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):
MBIA Insurance Corporation
Attn: David Glehan
113 King Street
Armonk, New York 10504
Telephone number: (914) 765-3225        email: david.glehan@mbia.com

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

**1. Amount of Claim as of Date Case Filed: Not less than $2.2 billion. See Annex.**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim: See Annex**
(See instruction #2)

| **3.** Last four digits of any number by which creditor identifies debtor: | **3a.** Debtor may have scheduled account as: | **3b.** Uniform Claim Identifier (optional): |
| ___ ___ ___ ___ | (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**
Value of Property: $_____   Annual Interest Rate_____% ☐ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**Priority under 11 U.S.C. §507(a):**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**9. Signature:** (See instruction #9) Check the appropriate box.
☑ I am the creditor.   ☐ I am the creditor's authorized agent.
(Attach copy of power of attorney, if any.)
☐ I am the trustee, or the debtor, or their authorized agent.
(See Bankruptcy Rule 3004.)
☐ I am a guarantor, surety, indorser, or other codebtor.
(See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: **David Glehan**
Title: **Managing Director**
Company: **MBIA Insurance Corporation**
Address and telephone number (if different from notice address above):
113 King Street
Armonk, New York 10504
Telephone number: (914) 765-3225        Email: david.glehan@mbia.com

_(Signature)_        _(Date)_   11/13/12

**RECEIVED**
NOV 21 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both
B 10 Modified (Official Form 10) (12/11) cont.

**INSTRUCTIONS FOR PROOF OF**

12120201211160000000000169

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                     :

In re:                                           :

                                                :        **Chapter 11**

                                                 :

**RESIDENTIAL CAPITAL, LLC,**          :        **Case No. 12-12020 (MG)**

                                                 :

                           **Debtor.**         :

                                                 :
------------------------------------------------------------x

## ANNEX TO PROOF OF CLAIM HELD BY MBIA INSURANCE CORPORATION

      This is an <u>Annex</u> to the proof of claim (the "<u>Proof of Claim</u>") filed by MBIA Insurance Corporation ("<u>MBIA</u>"), 113 King Street, Armonk, New York 10504. MBIA is the holder of claims (collectively, the "<u>Claim</u>") against Residential Capital LLC ("<u>ResCap</u>," and together with its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases, the "<u>Debtors</u>") described on the Proof of Claim to which this <u>Annex</u> relates and as set forth in further detail herein. As detailed herein, MBIA, a financial guaranty insurer for certain residential mortgage-backed securities sponsored by certain of the Debtors, asserts an unsecured claim of not less than $2.2 billion against ResCap[1] relating to MBIA's claims for fraudulent inducement of the Insurance Agreements, material breach of contract in respect of the Insurance Agreements, breach of the Debtors' repurchase obligations to repurchase loans and breaches of servicing obligations, and the Debtors' obligation to reimburse or indemnify MBIA for all liabilities, losses, costs, and expenses incurred in connection with the foregoing.

      THIS ANNEX (INCLUDING THE EXHIBITS ATTACHED HERETO) CONSTITUTES A PART OF THE PROOF OF CLAIM AND IS INCORPORATED THEREIN BY REFERENCE. Copies of the supporting transaction documents relating to the Claim set forth below and referenced in Exhibit A hereto are voluminous and are readily available to the Debtors. MBIA will furnish the Debtors with copies of any pertinent transaction documents upon request or as otherwise required by order of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

    1.      **<u>Background of MBIA Claims</u>**

        (a)      <u>The Eight ResCap Securitizations</u>

      MBIA is the plaintiff in two civil actions currently pending against Residential Funding Company, LLC ("<u>RFC</u>") and GMAC Mortgage LLC ("<u>GMAC Mortgage</u>," and together with

---

[1] MBIA has filed claims against the following Debtors: ResCap; Residential Funding Company, LLC; GMAC Mortgage LLC; Residential Funding Mortgage Securities II, Inc.; Residential Asset Mortgage Products, Inc.; and Homecomings Financial, LLC.

RFC, the "ResCap Securitization Sponsors"), respectively:  MBIA Ins. Corp. v. Residential Funding Co., LLC, Index No. 603552/2008 (Sup. Ct. N.Y. Co.) (the "RFC Action") and MBIA Ins. Corp. v. GMAC Mortgage, LLC, Index No. 600837/2010 (Sup. Ct. N.Y. Co.) (the "GMAC Mortgage Action").  The actions relate to certain financial guaranty insurance policies issued by MBIA between October 28, 2004 and May 30, 2007 in connection with eight home equity loan RMBS securitizations, five of which RFC sponsored (the "RFC Securitizations"), and three of which GMAC Mortgage sponsored (the "GMAC Mortgage Securitizations").  MBIA also provided financial guaranty insurance for another transaction relating to the Debtors, referred to as GSR 2007-HEL1 (the "GSR Securitization," and together with the RFC Securitizations and the GMAC Mortgage Securitizations, the "Securitizations"), although MBIA had not commenced any litigation with respect to the GSR Securitization prior to the commencement of the Debtors' chapter 11 cases and the imposition of the automatic stay.  A series of agreements governed each of the Securitizations, including, without limitation, (i) Insurance Agreements entered into by and among MBIA and the ResCap Securitization Sponsors, (ii) Purchase Agreements entered into by and among the ResCap Securitization Sponsors and depositors (and incorporated by reference into the Insurance Agreements) and (iii) Servicing Agreements entered into by and among the ResCap Securitization Sponsors and the Trustee.  The collateral underlying the Securitizations consisted primarily of Home Equity Lines of Credit ("HELOCs") and Closed End Second Loans ("CES").  As of September 30, 2012, in accordance with its obligations under the insurance policies, MBIA has made payments and incurred other expenses related to the Securitizations in excess of $1.65 billion.  That number will continue to grow as the transactions continue to run toward their maturity dates.  Additional pertinent details relating to the Securitizations, including the operative documents regarding MBIA's financial guaranty insurance, are set forth in Exhibits A and B, attached hereto.

(b)     MBIA's Claims Against the ResCap Securitization Sponsors

Beginning in late 2007, MBIA learned that the mortgage loans underlying the RFC Securitizations were experiencing extraordinary delinquency rates, which resulted in a significant amount of charge-offs (when a servicer determines that value of a loan is less than the loan amount, the servicer writes down that portion of the loan as a loss), and ultimately triggered MBIA's obligation to make claims payments for the benefit of RMBS investors.  MBIA conducted a review of certain loans in the RFC Securitizations and concluded that numerous mortgage loans underlying the RFC Securitizations should not have been included in the transactions because they evidence breaches of RFC's representations and warranties to MBIA.  In 2009, MBIA obtained similar information with respect to the GMAC Mortgage Securitizations (and the GSR Securitization, discussed in further detail below).  The insurance and purchase agreements provided MBIA with various remedies to address the ResCap Securitization Sponsors' breaches of their representations and warranties.  One such remedy was the repurchase or "put back" remedy, which provided MBIA with the right to demand that the ResCap Securitization Sponsors repurchase any mortgage loan where the loan evidences a breach of a representation or warranty that materially and adversely affected MBIA's interest in the mortgage loan.  However, despite the overwhelming evidence entitling MBIA to its repurchase remedy, the ResCap Securitization Sponsors refused to repurchase the vast majority of mortgage loans as requested by MBIA.  See First Amended Complaint, MBIA Ins. Corp. v. Residential Funding Co., LLC, Index No. 603552/2008 (Sup. Ct. N.Y. Co.) (the "RFC Complaint," attached hereto as Exhibit C), ¶¶ 91-104; Complaint MBIA Ins. Corp. v. GMAC

Mortgage, LLC, Index No. 600837/2010 (Sup. Ct. N.Y. Co.) (the "GMAC Mortgage
Complaint," attached hereto as Exhibit D), ¶¶ 44-152.

MBIA ultimately commenced two civil actions against the ResCap Securitization
Sponsors. Copies of the currently operative complaints in each of the RFC Action and the
GMAC Mortgage Action are attached hereto as Exhibits C and D and are incorporated herein by
reference as a further explanation of the bases for MBIA's claims. Although the two actions are
currently stayed, they are more procedurally advanced than any similar litigation against the
Debtors. Prior to the imposition of the automatic stay arising out of the Debtors' chapter 11
filings, MBIA completed fact discovery in the RFC Action and the parties exchanged their initial
expert reports. In the GMAC Mortgage Action, substantial discovery had occurred, but had not
yet been completed, prior to the imposition of the automatic stay. Further, in both the RFC and
GMAC Mortgage Actions, MBIA has already defeated motions to dismiss the respective
complaints. As demonstrated below, the evidence obtained to date through discovery in the
litigations overwhelmingly substantiates MBIA's claims.

(c)     MBIA's Claims Relating to the GSR Securitization

The structure of the GSR Securitization differs from that of the other Securitizations in
that RFC first sold the underlying mortgage loans to a third party, affiliates of which in turn
served as the depositor and sponsor for the transaction. MBIA has essentially the same claims
against RFC in connection with the GSR Securitization as it does in connection with the RFC
Securitizations: fraudulent inducement, pervasive breach of contractual representations and
warranties, and breach of RFC's contractual obligation to repurchase mortgage loans.

RFC provided pre-transaction loan-level information that it knew would be passed on to
MBIA for the purpose of inducing MBIA to issue financial guaranty insurance for the GSR
Securitization, including loan tapes, schedules of pool-wide loan characteristics, and prospectus
supplement information regarding the mortgage loans and the underwriting standards pursuant to
which they were originated or acquired. RFC also made express representations and warranties
to MBIA in the transaction documents regarding loan-level characteristics and the characteristics
of the loan pool as a whole, and agreed to repurchase all defective loans identified by MBIA.
Discovery will uncover the same type of overwhelming evidence that has been produced in the
RFC Action and the GMAC Mortgage Action concerning RFC's flawed underwriting and
origination processes. Thus, based on these facts, MBIA has claims against RFC.

(d)     MBIA's Claims Against Homecomings Financial, LLC

MBIA also holds claims against Homecomings Financial, LLC, f/k/a Homecomings
Financial Network, Inc. ("Homecomings") (i) for aiding and abetting the ResCap Securitization
Sponsors' fraud by originating loans that were not in substantial compliance with the ResCap
Securitization Sponsors' underwriting guidelines or with the representations and warranties
contained in the transaction documents, and (ii) for servicing breaches Homecomings committed
as a sub-servicer for the Securitization Sponsors. Homecomings, a wholly-owned subsidiary of
RFC and an indirect wholly-owned subsidiary of ResCap, specialized in the origination and sub-
servicing of home equity loans and thus constituted an integral part of ResCap's single,
integrated mortgage business. ResCap, through RFC, exercised complete domination over

Homecomings and controlled its day-to-day operations. Homecomings both originated and sub-serviced a significant percentage of the loans at issue in the RFC Action, and it also originated loans at issue in the GMAC Mortgage Action. Homecomings provided substantial assistance to the fraud committed by the ResCap Securitization Sponsors by systematically originating loans that did not comply with the ResCap Securitization Sponsors' underwriting guidelines or with the ResCap Securitization Sponsors' representations and warranties contained in the transaction documents. Homecomings originated these non-compliant loans with actual knowledge that the ResCap Securitization Sponsors would fraudulently induce financial guaranty insurers like MBIA to insure securities backed by these non-compliant loans. As one of RFC's primary sub-servicers, Homecomings also contributed to RFC's failure to fulfill its obligations under the operative servicing agreements, including RFC's failures to properly monitor, service and administer the loans.

2.   **Claim Detail**

(a)   Claims Related to the Insurance Agreements

MBIA seeks combined rescissory and compensatory damages that reflect the total approximate insurance claims that MBIA has paid to date, and is expected to pay in the future, for the benefit of RMBS investors in connection with the Securitizations. MBIA also seeks punitive damages against the ResCap Securitization Sponsors.

(i)   Rescissory Damages

MBIA has a claim for rescissory damages with respect to its fraudulent inducement and material breach of contract claims in the amount of MBIA's claims paid (and expected to be paid) plus interest, minus the premiums that MBIA received.

(ii)   Compensatory Damages

MBIA has a claim for compensatory damages plus interest with respect to its claims that the ResCap Securitization Sponsors breached their obligations to repurchase loans that evidence breaches of representations and warranties, which breaches materially and adversely affect MBIA's interest in the loans.

(iii)   Punitive Damages

MBIA has claims for punitive damages, in respect of the fraudulent inducement claims, and consequential damages plus interest relating to all of the foregoing claims.

(b)   Servicing Claims

MBIA holds servicing claims against RFC and Homecomings.

(c)    Reimbursement or Indemnification of Costs

(i)    Legal Basis for Claims

Pursuant to the insurance agreements concerning the RFC Securitizations and the GMAC Mortgage Securitizations, the ResCap Securitization Sponsors are obligated to reimburse MBIA for "any and all charges, fees, costs and expenses that [MBIA] may reasonably pay or incur, including, but not limited to, reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents [as defined therein], including defending, monitoring or participating in any litigation or proceeding (including any insolvency or bankruptcy proceeding in respect of any Transaction [as defined therein] participant or any affiliate thereof) relating to any of the Transaction Documents, any party to any of the Transaction Documents, in its capacity as such a party, or the Transaction." See, e.g., Section 3.03(c) of Insurance Agreement, dated as of July 28, 2006, among MBIA, RFC, Home Equity Loan Trust 2006-HSA4, and Residential Funding Mortgage Securities II, Inc.

Moreover, the ResCap Securitization Sponsors agreed to "protect, indemnify and save harmless" MBIA "from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or reasonable expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) or obligations whatsoever paid by" MBIA relating to "the breach by [the ResCap Securitization Sponsors] of any representation or warranty . . . or covenant under any of the Transaction Documents [as defined therein]." See, e.g., Section 3.04(a) of Insurance Agreement, dated as of July 28, 2006, among MBIA, RFC, Home Equity Loan Trust 2006-HSA4, and Residential Funding Mortgage Securities II, Inc.

The amount of fees and expenses incurred by MBIA will continue to increase until the resolution of MBIA's claims.

3.    **MBIA May Assert the Full Amount of its Claims at Multiple Debtor Entities**

(a)    MBIA's Claims Against The ResCap Securitization Sponsors For Aiding and Abetting One Another

In addition to the claims alleged in the complaints, each of RFC and GMAC Mortgage are liable for aiding and abetting each other's fraud against MBIA. RFC and GMAC Mortgage have admitted that they were part of a single, integrated mortgage business. See, e.g., Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6] (the "Whitlinger Affidavit"), at ¶ 190 ("the mortgage loan origination, servicing and related securitization operations of AFI are an integrated business involving the Debtors and Ally Bank"). Thus, the fraud committed by RFC with respect to its Securitizations was aided and abetted by GMAC Mortgage, and vice versa. As a result, MBIA is entitled to assert the full amount of its allowed claims – an amount in excess of $2.2 billion – in each of the RFC and GMAC Mortgage estates for losses incurred, and expected to be incurred, in the GMAC Mortgage and RFC Securitizations.

-5-

(b)    MBIA's Claims Against ResCap

MBIA also holds alter ego and aiding and abetting claims against ResCap. ResCap was, at all relevant times, the alter ego of the ResCap Securitization Sponsors. ResCap exercised complete domination of the ResCap Securitization Sponsors in respect to the Securitizations, and ResCap's domination was used to commit a fraud or wrong against MBIA, which resulted in MBIA's injury. For example:

1.    ResCap used the ResCap Securitization Sponsors as vehicles to shield itself from potential liability, knowing that the ResCap Securitization Sponsors' fraudulent schemes would eventually collapse and leave the ResCap Securitization Sponsors unable to comply with their obligations to the victims, including MBIA, of the fraud perpetrated by the RFC Securitization Sponsors.

2.    ResCap carried out virtually all of its RMBS business through the ResCap Securitization Sponsors.

3.    ResCap operated the ResCap Securitization Sponsors and their affiliates as a single enterprise.

4.    ResCap completely dominated the day-to-day operations of the ResCap Securitization Sponsors.

5.    ResCap operated the ResCap Securitization Sponsors to benefit ResCap.

6.    ResCap and the ResCap Securitization Sponsors used common office space and shared personnel.

7.    The ResCap Securitization Sponsors were instrumentalities of ResCap and they lacked corporate independence.

8.    ResCap was the sole and controlling member of the ResCap Securitization Sponsors.

9.    ResCap and its officers did not distinguish between ResCap and the ResCap Securitization Sponsors.

All of these facts are supported by Whitlinger Affidavit, as well as other pleadings filed in these cases and evidence obtained in discovery in the RFC Action and the GMAC Mortgage Action, and other discovery expected to be obtained, which establish that ResCap and Ally Bank conducted a fully integrated, unitary mortgage business.[2]

---

[2]    See, e.g., Whitlinger Affidavit, at ¶ 190 ("the mortgage loan origination, servicing and related securitization operations of AFI are an integrated business involving the Debtors and Ally Bank"); Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. Nunc Pro Tunc to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Businesses [Docket No. 41],at ¶ 11 ("in the ordinary course

ResCap further is liable to MBIA for aiding and abetting the fraud perpetrated by the ResCap Securitization Sponsors. ResCap had "actual knowledge" of the fraud perpetrated by the ResCap Securitization Sponsors and provided them with "substantial assistance" in their fraud. Among other things, ResCap oversaw and controlled day-to-day operations of the ResCap Securitization Sponsors and provided extensive managerial and strategic assistance to them. For example, in early 2007, ResCap managers participated in numerous meetings with RFC employees concerning RFC's acquisition practices, underwriting standards and securitization plans. As such, ResCap was aware of the details of RFC's fraudulent scheme. Instead of putting an end to the fraudulent scheme, ResCap assisted and encouraged RFC with its strategy to sell as many of the risky non-compliant loans in its inventory as quickly as possible into securitizations.

The Debtors have acknowledged that their RMBS creditors hold alter ego claims against ResCap that "could cause ResCap to be liable for the [ResCap Securitization Sponsors'] and [ResCap Securitization Depositors'] repurchase obligations." See Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the RMBS Settlement Agreements [Docket No. 1176], at ¶ 20. Indeed, ResCap's liability extends beyond just repurchase claims to all of MBIA's claims on account of its domination of the ResCap Securitization Sponsors and complete disregard for formal corporate distinctions, as discussed above.

(c)    MBIA's Claims Against The ResCap Securitization Depositors

MBIA also holds claims against each of Residential Funding Mortgage Securities II, Inc. and Residential Asset Mortgage Products, Inc. (together, the "ResCap Securitization Depositors"). Pursuant to the Insurance Agreements (see, e.g., Section 3.08 of 2006-HSA4 Insurance Agreement) and as the Debtors acknowledge in section 5.01 of the Third Amended and Restated RMBS Trust Settlement Agreement, dated September 21, 2012, by and between the Debtors and the Institutional Investors (as defined therein), the "Depositor Entities," which include the ResCap Securitization Depositors, are jointly and severally liable for the RMBS-related claims asserted against the ResCap Securitization Sponsors. Thus, MBIA may assert the full amount of its claims against each of the ResCap Securitization Depositors.

4.    **Reservation of Rights**

(a)    Without limiting any of the foregoing, MBIA reserves all of its rights to assert claims for interest (including, without limitation, at the default rate), fees, costs, charges, expenses, disbursements, liabilities, losses, damages, indemnification, reimbursement and/or contribution, and other amounts, including, without limitation, legal fees and expenses (including, without limitation, in connection with the preparation, filing and prosecution of the Proof of Claim), that exist or arise as of or after the date of the filing of the Proof of Claim, whether prior to, on or subsequent to the Petition Date, in each case to the extent or as may be permitted, provided and/or contemplated in the transaction documents and under applicable law.

---

of business, ResCap, AFI and certain of their affiliates provided various financial, operational and administrative services to each other . . . . Historically, the[se] services . . . were provided on an undocumented basis").

(b)    In filing its Proof of Claim, MBIA expressly reserves all rights and causes of action, including, without limitation, contingent or unliquidated rights that it may have against ResCap. This description and classification of claims by MBIA is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of MBIA. MBIA expressly reserves all rights to assert that all or a portion of the claims described herein may be entitled to administrative priority. Furthermore, MBIA expressly reserves all rights to amend, modify and/or supplement the Proof of Claim in any respect, including, without limitation, with respect to the filing of an amended proof of claim for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim for additional claims, including, without limitation, claims for interest, fees and related expenses (including, without limitation, attorneys' fees) that are not ascertainable at this time.

(c)    MBIA's Proof of Claim is filed without prejudice to the filing by MBIA of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of any of the Debtors. MBIA does not, by its Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

(d)    By filing the Proof of Claim, MBIA does not waive any rights under chapter 5 of the Bankruptcy Code.

(e)    In executing and filing its Proof of Claim, MBIA does not submit itself to the jurisdiction of the Bankruptcy Court for any purpose other than with respect to its Claim against ResCap and does not waive or release: (i) its rights and remedies against any other person or entity that may be liable for all or part of the Claim set forth herein, whether an affiliate or subsidiary of ResCap, an assignee, guarantor or otherwise; (ii) any obligation owed to it, or any right to any security that may be determined to be held by it or for its benefit; (iii) any past, present or future defaults (or events of default) by the Debtors or others; or (iv) any right to the subordination, in favor of MBIA, of indebtedness or liens held by other creditors of the Debtors. The filing of the Proof of Claim is not, and shall not be construed as, an election of remedies or limitation of rights or remedies.

(f)    Nothing contained in the Proof of Claim nor any subsequent appearance, pleading, claim or suit is intended to be a waiver or release of: (i) the right of MBIA to have final orders in non-core matters (or any other matters over which the Bankruptcy Court does not have jurisdiction to enter a final order) entered only after de novo review by a district court judge; (ii) the right of MBIA to a jury trial in any proceeding so triable herein or, in any case, any controversy or proceeding related hereto; (iii) the right of MBIA to have the reference withdrawn by the United States District Court for the Southern District of New York in any matter subject to mandatory or discretionary withdrawal; (iv) the right of MBIA to have any unliquidated portions of the Claim determined by applicable nonbankruptcy courts; or (v) any other rights, claims, actions, defenses, setoffs or recoupments to which MBIA is or may be entitled under agreements, documents or instruments, in law or equity, all of which rights, claims, actions, defenses, setoffs and recoupments are expressly reserved.

5.    **Notices**

All notices with respect to the Claim should be sent to:

> MBIA Insurance Corporation
> Attn:  David Glehan
> 113 King Street
> Armonk, New York 10504
> Phone:          (914) 765-3225
> Facsimile:      (914) 765-3259

with copies to:

> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York 10281
> Attention:  Gregory M. Petrick, Esq.
>                    Ingrid Bagby, Esq.
> Phone:          (212) 504-6000
> Facsimile:      (212) 504-6666

-and-

> Cadwalader, Wickersham & Taft LLP
> 700 Sixth Street, N.W.
> Washington, DC 20001
> Attention:  Mark C. Ellenberg
> Phone:          (202) 862-2200
> Facsimile:      (202) 862-2400

Dated:  November 16, 2012

## **Exhibit A**

A.    The RFC Securitizations

Between July 28, 2006 and May 30, 2007, MBIA issued five financial guaranty insurance policies in connection with the RFC Securitizations. The following is a summary of the RFC Securitizations, including, among other things, their closing dates, the aggregate initial loan balance, the type of collateral, the total losses suffered to date, and the amount that MBIA has paid to date.

- **2006-HSA4** is a securitization transaction that was issued on or about July 28, 2006, containing 8,954 HELOCs with an approximate original collateral balance of $400,118,372. As of September 30, 2012, MBIA had paid more than $88 million in claims and expenses associated with 2006-HSA4. The securitization to date has experienced cumulative losses in excess of $123 million representing 31% of the original collateral balance.

- **2006-HSA5** is a securitization transaction that was issued on or about September 28, 2006, containing 5,124 HELOCs with an approximate original collateral balance of $294,177,689. As of September 30, 2012, MBIA had paid more than $85 million in claims and expenses associated with 2006-HSA5. The securitization to date has experienced cumulative losses in excess of $111 million representing 38% of the original collateral balance.

- **2007-HSA1** is a securitization transaction that was issued on or about February 27, 2007, containing 9,484 HELOCs with an approximate original collateral balance of $546,774,309. As of September 30, 2012, MBIA had paid more than $190 million in claims and expenses associated with 2007-HSA1. The securitization to date has experienced cumulative losses in excess of $239 million representing 44% of the original collateral balance.

- **2007-HSA2** is a securitization transaction that was issued on or about April 27, 2007, containing 24,092 CES with an approximate original collateral balance of $1,300,997,943. As of September 30, 2012, MBIA had paid more than $584 million in claims and expenses associated with 2007-HSA2. The securitization to date has experienced cumulative losses in excess of $701 million representing 54% of the original collateral balance.

- **2007-HSA3** is a securitization transaction that was issued on or about May 30, 2007, containing two mortgage-loan pools: 11,268 CES with an approximate original collateral balance of $827,796,388 and 4,146 HELOCs with an approximate initial mortgage loan principal balance of $239,848,000. As of September 30, 2012, MBIA had paid more than $325 million in claims and expenses associated with 2007-HSA3. The securitization to date has experienced

cumulative losses in excess of $407 million representing 48% of the original collateral balance.

All five transactions received investment grade shadow ratings from the Rating Agencies, including shadow ratings issued by S&P of BBB- for 2006-HSA4, 2006-HSA5 and 2007-HSA1, and shadow ratings of BBB for 2007-HSA2 and 2007-HSA3, and shadow ratings issued by Moody's of Baa2 for all five RFC Securitizations.

B.    The GMAC Mortgage Securitizations

Between October 28, 2004 and March 3, 2007, MBIA issued three financial guaranty insurance policies in connection with the GMAC Mortgage Securitizations. The following is a summary of the GMAC Mortgage Securitizations, including, among other things, their closing dates, the aggregate initial loan balance, the type of collateral, the total losses suffered to date, and the amount that MBIA has paid to date.

- **2004-HE4** is a securitization transaction that was issued on or about October 28, 2004, containing 42,753 loans, mostly HELOCs, with an approximate original collateral balance of $1,000,000,000. As of September 30, 2012, MBIA had paid more than $27 million in claims and expenses associated with 2004-HSE4. The securitization to date has experienced cumulative losses in excess of $94 million representing 9% of the original collateral balance.

- **2006-HE4** is a securitization that was issued on or about September 27, 2006, containing 31,475 loans, mostly HELOCs, with an approximate original collateral balance of $1,141,931,562. As of September 30, 2012, MBIA had paid more than $182 million in claims and expenses associated with 2006-HE4. The securitization to date has experienced cumulative losses in excess of $304 million representing 27% of the original collateral balance.

- **2007-HE1** is a securitization transaction that was issued on or about March 29, 2007, containing 22,132 loans, mostly CES, with an approximate original collateral balance of $1,185,871,169. As of September 30, 2012, MBIA had paid more than $116 million in claims and expenses associated with 2007-HE1. The securitization to date has experienced cumulative losses in excess of $205 million representing 17% of the original collateral balance.

All three transactions received investment grade shadow ratings from the Rating Agencies, including shadow ratings issued by S&P of BBB- for 2004-HE4, BBB- for 2006-HE4, and BBB for 2007-HE1, and shadow ratings issued by Moody's of Baa1 for 2004-HE4, Baa3 for 2006-HE4, and Baa3 for 2007-HE1.

C.    The GSR Securitization

On April 17, 2007, MBIA issued a financial guaranty insurance policy in connection with the GSR Securitization. The following is a summary of the GSR Securitization, including,

among other things, its closing date, the aggregate initial loan balance, the type of collateral, the total losses suffered to date, and the amount that MBIA has paid to date.

- **GSR 2007-HEL1** is a securitization transaction that was issued on or about April 17, 2007, containing 2,707 loans, mostly CES, with an approximate original collateral balance of $137,276,021. As of June 30, 2012, MBIA had paid more than $49 million in claims and expenses associated with GSR 2007-HEL1. The securitization to date has experienced cumulative losses in excess of $54 million representing 41% of the original collateral balance.

## Exhibit B
## Index of Relevant Transaction Documents

2006 HSA4 Transaction

1.      Prospectus, dated July 19, 2006, and Preliminary Prospectus Supplement, dated July 21, 2006, relating to the issuance and sale of the Notes.

2.      Prospectus, dated July 19, 2006, and Prospectus Supplement, dated July 27, 2006, relating to the issuance and sale of the Notes.

3.      Home Equity Loan Purchase Agreement, dated as of July 28, 2006, between Residential Funding Company, LLC ("RFC"), as seller, and Residential Funding Mortgage Securities II, Inc. ("RFMSII"), as purchaser.

4.      Amended and Restated Trust Agreement, dated as of July 28, 2006, between RFMSII and Wilmington Trust Company, as owner trustee (the "Owner Trustee"), together with the Certificates issued thereunder.

5.      Servicing Agreement, dated as of July 28, 2006, among RFC, as master servicer, Home Equity Loan Trust 2006-HSA4, as issuer, (the "HSA4 Issuer") and JPMorgan Chase Bank, National Association, as indenture trustee (the "HSA4 Trustee").

6.      Indenture, dated as of July 28, 2006, between the HSA4 Trustee and the HSA4 Issuer, together with the Notes issued thereunder.

7.      Underwriting Agreement, dated as of July 21, 2006, among RFC, RFMSII and Citigroup Global Markets, Inc. ("Citigroup").

8.      Custodial Agreement, dated as of July 28, 2006, among RFC, the HSA4 Trustee and Wells Fargo Bank, National Association, as custodian ("Wells Fargo").

9.      Note Guaranty Insurance Policy (Policy Number 48335), issued by MBIA, dated as of July 28, 2006.

10.     Insurance Agreement, dated as of July 28, 2006, among MBIA, the HSA4 Issuer, RFMSII and RFC, relating to the Policy.

11.     Indemnification Agreement, dated as of July 28, 2006, by and among MBIA, RFC, RFMSII, Citigroup, as an underwriter and Residential Funding Securities, LLC ("RFS"), as an underwriter.

12.     Premium Letter, dated as of July 28, 2006, between MBIA and RFC, relating to the Policy.

## 2006-HSA5 Transaction

1.      Prospectus, dated September 19, 2006, and Preliminary Prospectus Supplement, dated September 19, 2006, relating to the issuance and sale of the Notes.

2.      Prospectus, dated September 25, 2006, and Prospectus Supplement, dated September 25, 2006, relating to the issuance and sale of the Notes.

3.      Home Equity Loan Purchase Agreement, dated as of September 28, 2006, between RFC, as seller, and RFMSII, as purchaser.

4.      Amended and Restated Trust Agreement, dated as of September 28, 2006, between RFMSII and the Owner Trustee, together with the Certificates issued thereunder.

5.      Servicing Agreement, dated as of September 28, 2006, among RFC, as master servicer, Home Equity Loan Trust 2006-HSA5, as issuer, (the "HSA5 Issuer") and JPMorgan Chase Bank, National Association, as indenture trustee (the "HSA5 Trustee").

6.      Indenture, dated as of September 28, 2006, between the HSA5 Trustee and the HSA5 Issuer, together with the Notes issued thereunder.

7.      Underwriting Agreement, dated as of September 19, 2006, among RFC, RFMSII and Goldman, Sachs & Co. ("Goldman").

8.      Custodial Agreement, dated as of September 28, 2006, among RFC, the HSA5 Trustee and Wells Fargo.

9.      Note Guaranty Insurance Policy (Policy Number 48572), issued by MBIA, dated as of September 28, 2006.

10.     Insurance Agreement, dated as of September 28, 2006, among MBIA, the HSA5 Issuer, RFMSII and RFC, relating to the Policy.

11.     Indemnification Agreement, dated as of September 28, 2006, by and among MBIA, RFC, RFMSII, Goldman, as an underwriter and RFS, as an underwriter.

12.     Premium Letter, dated as of September 28, 2006, between MBIA and RFC, relating to the Policy.

## 2007-HSA1 Transaction

1.      Prospectus, dated December 15, 2006, and Preliminary Prospectus Supplement, dated February 20, 2007, relating to the issuance and sale of the Notes.

2.      Prospectus, dated December 15, 2006, and Prospectus Supplement, dated February 23, 2007, relating to the issuance and sale of the Notes.

3.      Home Equity Loan Purchase Agreement, dated as of February 27, 2007, between RFC, as seller, and RFMSII, as purchaser.

4.    Amended and Restated Trust Agreement, dated as of February 27, 2007, between RFMSII and the Owner Trustee, together with the Certificates issued thereunder.

5.    Servicing Agreement, dated as of February 27, 2007, among RFC, as master servicer, Home Equity Loan Trust 2007-HSA1, as issuer, (the "HSA1 Issuer") and LaSalle Bank National Association, as indenture trustee (the "HSA1 Trustee").

6.    Indenture, dated as of February 27, 2007, between the HSA1 Trustee and the HSA1 Issuer, together with the Notes issued thereunder.

7.    Underwriting Agreement, dated as of February 20, 2007, among RFC, RFMSII and RFS.

8.    Custodial Agreement, dated as of February 27, 2007, among RFC, the HSA1 Trustee and Wells Fargo.

9.    Note Guaranty Insurance Policy (Policy Number 492240), issued by MBIA, dated as of February 27, 2007.

10.    Insurance Agreement, dated as of February 27, 2007, among MBIA, the HSA1 Issuer, RFMSII and RFC, relating to the Policy.

11.    Indemnification Agreement, dated as of February 27, 2007, by and among MBIA, RFC, RFMSII, Deutsche Bank Securities Inc., as an underwriter and RFS, as an underwriter.

12.    Premium Letter, dated as of February 27, 2007, between MBIA and RFC, relating to the Policy.

2007-HSA2 Transaction

1.    Prospectus, dated April 23, 2007, and Preliminary Prospectus Supplement, dated April 23, 2007, relating to the issuance and sale of the certificates.

2.    Prospectus, dated April 23, 2007, and Prospectus Supplement, dated April 25, 2007, relating to the issuance and sale of the certificates.

3.    Underwriting Agreement, dated as of April 23, 2007, among RFC, RFMSII and RFS.

4.    Pooling and Servicing Agreement, dated as of April 1, 20076, among RFC, as master servicer, RFMSII, as depositor and LaSalle Bank National Association, as trustee (the "HSA2 Trustee"), and the Class A Certificates issued thereunder.

5.    Custodial Agreement, dated as of April 1, 2007, among RFC, the HSA2 Trustee and Wells Fargo.

6.    Assignment and Assumption Agreement, dated as of April 27, 2007, between RFC, as Seller, and RFMSII, as purchaser.

7.      Financial Guaranty Insurance Policy (Policy Number 495140), issued by MBIA, dated as of April 27, 2007.

8.      Insurance Agreement, dated as of April 27, 2007, among MBIA, RFMSII and RFC, relating to the Policy.

9.      Indemnification Agreement, dated as of April 25, 2007, by and among MBIA, RFC, RFMSII, Greenwich Capital Markets, Inc., as an underwriter, Citigroup, as an Underwriter and RFS, as an underwriter.

10.     Premium Letter, dated as of April 27, 2007, between MBIA and RFC, relating to the Policy.

2007-HSA3 Transaction

1.      Prospectus, dated April 23, 2007, and Preliminary Prospectus Supplement, dated May 22, 2007, relating to the issuance and sale of the Notes.

2.      Prospectus, dated April 23, 2007, and Prospectus Supplement, dated May 25, 2007, relating to the issuance and sale of the Notes.

3.      Home Equity Loan Purchase Agreement, dated as of May 30, 2007, between RFC, as seller, and RFMSII, as purchaser.

4.      Amended and Restated Trust Agreement, dated as of May 30, 2007, between RFMSII and the Owner Trustee, together with the Certificates issued thereunder.

5.      Servicing Agreement, dated as of May 30, 2007, among RFC, as master servicer, Home Equity Loan Trust 2007-HSA3, as issuer, (the "HSA3 Issuer") and LaSalle Bank National Association, as indenture trustee (the "HSA3 Trustee").

6.      Indenture, dated as of May 30, 2007, between the HSA3 Trustee and the HSA3 Issuer, together with the Notes issued thereunder.

7.      Underwriting Agreement, dated as of May 22, 2007, among RFC, RFMSII and RFS.

8.      Custodial Agreement, dated as of May 30, 2007, among RFC, the HSA1 Trustee and Wells Fargo.

9.      Note Guaranty Insurance Policy (Class I Notes)(Policy Number 496850), issued by MBIA, dated as of May 30, 2007.

10.     Note Guaranty Insurance Policy (Class A-II Notes)(Policy Number 496860), issued by MBIA, dated as of May 30, 2007.

11.     Insurance Agreement, dated as of May 30, 2007, among MBIA, the HSA3 Issuer, RFMSII and RFC, relating to the Policy.

-4-

12.      Indemnification Agreement, dated as of May 30, 2007, by and among MBIA, RFC, RFMSII, Credit Suisse Securities (USA) LLC, as an underwriter and RFS, as an underwriter.

13.      Premium Letter, dated as of May 30, 2007, between MBIA and RFC, relating to the Policy.

GMACM 2004-HE4 Transaction

1.      Prospectus, dated August 12, 2004, and Prospectus Supplement, dated October 25, 2004, relating to the issuance and sale of the Notes.

2.      Mortgage Loan Purchase Agreement, dated as of October 28, 2004, among GMAC Mortgage Corporation ("GMACM") and Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove"), as sellers, Residential Asset Mortgage Products, Inc. ("RAMP"), as purchaser, GMACM Home Equity Loan Trust 2004-HE4, as issuer (the "2004-HE4 Issuer") and Wells Fargo Bank, N.A., as indenture trustee (the "2004-HE4 Trustee"), together with each Subsequent Transfer Agreement thereto.

3.      Trust Agreement, dated as of October 28, 2004, between RAMP and the Owner Trustee, together with the Certificates issued thereunder.

4.      Servicing Agreement, dated as of October 28, 2004, among GMACM, as servicer, the 2004-HE4 Issuer and the 2004-HE4 Trustee.

5.      Indenture, dated as of October 28, 2004, between the 2004-HE4 Trustee and the 2004-HE4 Issuer, together with the Notes issued thereunder.

6.      Underwriting Agreement, dated as of October 25, 2004, among GMACM, RAMP and Bear, Stearns & Co. Inc. ("Bear Stearns").

7.      Custodial Agreement, dated as of October 28, 2004, among GMACM, the 2004-HE4 Trustee and GMAC Bank, as custodian ("GMAC Bank").

8.      Note Guaranty Insurance Policy (Policy Number 45174), issued by MBIA, dated as of October 28, 2004.

9.      Insurance Agreement, dated as October 1, 2004, among MBIA, the 2004-HE4 Issuer, RAMP, GMACM, Walnut Grove, the Owner Trustee and the 2004-HE4 Trustee, relating to the Policy.

10.      Indemnification Agreement, dated as of October 25, 2004, by and among MBIA, GMACM, RAMP, Bear Stearns, as underwriter and as representative of Greenwich Capital Markets, Inc. and Lehman Brothers Inc. and RFS as an underwriter.

11.      Premium Letter, dated as of October 28, 2004, between MBIA and GMACM, relating to the Policy.

GMACM 2006-HE4 Transaction

1.      Prospectus, dated August 9, 2006, and Preliminary Prospectus Supplement, dated September 21, 2006, relating to the issuance and sale of the Notes.

2.      Prospectus, dated August 9, 2006, and Prospectus Supplement, dated September 25, 2006, relating to the issuance and sale of the Notes.

3.      Mortgage Loan Purchase Agreement, dated as of September 27, 2006 among GMACM and Walnut Grove, as sellers, RAMP, as purchaser, GMACM Home Equity Loan Trust 2006-HE4, as issuer (the "2006-HE4 Issuer") and JPMorgan Chase Bank, National Association, as indenture trustee (the "2006-HE4 Trustee"), together with each Subsequent Transfer Agreement thereto.

4.      Trust Agreement, dated as of September 27, 2006, between RAMP and the Owner Trustee, together with the Certificates issued thereunder.

5.      Servicing Agreement, dated as of September 27, 2006, among GMACM, as servicer, the 2006-HE4 Issuer and the 2006-HE4 Trustee.

6.      Indenture, dated as of September 27, 2006, between the 2006-HE4 Trustee and the 2006-HE4 Issuer, together with the Notes issued thereunder.

7.      Underwriting Agreement, dated as of September 21, 2006, among GMACM, RAMP and Bear, Stearns & Co. Inc. ("Bear Stearns").

8.      Custodial Agreement, dated as of September 27, 2006, among GMACM, the 2006-HE4 Trustee and GMAC Bank.

9.      Note Guaranty Insurance Policy (Policy Number 48573), issued by MBIA, dated as of September 27, 2006.

10.     Insurance Agreement, dated as September 1, 2006, among MBIA, the 2006-HE4 Issuer, RAMP, GMACM, Walnut Grove, the Owner Trustee and the 2006-HE4 Trustee, relating to the Policy.

11.     Indemnification Agreement, dated as of September 25, 2006, by and among MBIA, GMACM, RAMP, Bear Stearns, as underwriter and as representative of J.P. Morgan Securities Inc., Greenwich Capital Markets, Inc. and Deutsche Bank Securities, Inc. and RFS as an underwriter.

12.     Premium Letter, dated as of September 27, 2006, between MBIA and GMACM, relating to the Policy.

GMACM 2007-HE1 Transaction

1.      Prospectus, dated December 4, 2006, and Preliminary Prospectus Supplement, dated March 22, 2007, relating to the issuance and sale of the Notes.

2.      Prospectus, dated December 4, 2006, and Prospectus Supplement, dated March 28, 2007, relating to the issuance and sale of the Notes.

3.      Mortgage Loan Purchase Agreement, dated as of March 29, 2007, among GMACM and Walnut Grove, as sellers, RAMP, as purchaser, GMACM Home Equity Loan Trust 2007-HE1, as issuer (the "HE1 Issuer") and The Bank of New York Trust Company, N.A., as indenture trustee (the "HE1 Trustee"), together with each Subsequent Transfer Agreement thereto.

4.      Trust Agreement, dated as of March 29, 2007, between RAMP and the Owner Trustee, together with the Certificates issued thereunder.

5.      Servicing Agreement, dated as of March 29, 2007, among GMACM, as servicer, the HE1 Issuer and the HE1 Trustee.

6.      Indenture, dated as of March 29, 2007, between the HE1 Trustee and the HE1 Issuer, together with the Notes issued thereunder.

7.      Underwriting Agreement, dated as of March 26, 2007, among GMACM, RAMP and J.P. Morgan Securities Inc. ("JPMorgan").

8.      Custodial Agreement, dated as of March 29, 2007, among GMACM, the HE1 Trustee and GMAC Bank.

9.      Note Guaranty Insurance Policy (Policy Number 493870), issued by MBIA, dated as of March 29, 2007.

10.     Insurance Agreement, dated as March 1, 2007, among MBIA, the HE1 Issuer, RAMP, GMACM, Walnut Grove, the Owner Trustee and the HE1 Trustee, relating to the Policy.

11.     Indemnification Agreement, dated as of March 28, 2007, by and among MBIA, GMACM, RAMP, JPMorgan, as underwriter and as representative of Greenwich Capital Markets, Inc. and RFS as an underwriter.

12.     Premium Letter, dated as of March 29, 2007, between MBIA and GMACM, relating to the Policy.

GSR 2007-HEL1 Transaction

1.      Master Home Equity Lines of Credit Purchase and Servicing Agreement, dated as of December 1, 2006, between RFC, as seller and servicer, and Goldman Sachs Mortgage Company ("GSMC"), as purchaser.

2.      Prospectus Supplement, dated April 16, 2007, the Prospectus, dated February 13, 2007 and the Free Writing Prospectus Supplement, dated April 5, 2007, relating to the issuance and sale of the Notes.

3.      Amended and Restated Trust Agreement, dated as of April 17, 2007, among GS Mortgage Securities Corp., as depositor (the "Depositor"), Wilmington Trust Company, as owner trustee (the "Owner Trustee") and Deutsche Bank National Trust Company, as indenture trustee (the "HEL1 Trustee")

4.      Indenture, dated as of April 17, 2007, between GSR Trust 2007-HEL1 (the "HEL1 Issuer") and the HEL1 Trustee, together with the Notes issued thereunder.

5.      Sale and Servicing Agreement, dated as of April 17, 2007, among the Depositor, the HEL1 Issuer, the HEL1 Trustee, RFC, as original loan seller and servicer, and GSMC, as sponsor.

6.      Underwriting Agreement, dated as of April 5, 2007, between the Depositor and Goldman, Sachs & Co. ("Goldman Sachs").

7.      Custodial Agreement, dated as of April 17, 2007, among the HEL1 Trustee, the Depositor, GSMC, as seller and sponsor, and Wells Fargo Bank, N.A., as custodian.

8.      Administration Agreement, dated as of April 17, 2007, among the HEL1 Issuer, the HEL1 Trustee, the Owner Trustee and the Depositor.

9.      Financial Guaranty Insurance Policy (Policy Number 494530), issued by MBIA, dated as of April 17, 2007.

10.     Insurance Agreement, dated as of April 17, 2007, among MBIA, RFC, the HEL1 Issuer, GSMC, as sponsor, and the Depositor.

11.     Indemnification Agreement, dated as of April 16, 2007, among MBIA, GSMC, as sponsor, the Depositor, and Goldman Sachs, as underwriter.

12.     Premium Letter, dated as of April 17, 2007, between MBIA and GSMC, relating to the Policy.

**Exhibit C**
**RFC COMPLAINT**

FILED: NEW YORK COUNTY CLERK 02/01/2013    Entered 02/01/13 16:43:05    INDEX NO. 603552/2008
NYSCEF DOC. NO. 28                          Pg 24 of 140                   Exhibit 87

RECEIVED NYSCEF: 03/19/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MBIA INSURANCE CORPORATION,

                    Plaintiff,

          -against-

RESIDENTIAL FUNDING COMPANY, LLC,

                  Defendant.

Index No. 603552/2008 (Fried, J.)

**FIRST AMENDED COMPLAINT**

Plaintiff MBIA Insurance Corporation ("MBIA") for its First Amended Complaint against defendant Residential Funding Company, LLC ("RFC") alleges, on information and belief as to all facts other than as to itself, as follows:

### NATURE OF THE ACTION

1.      This action arises from defendant RFC's fraudulent inducement of plaintiff MBIA to provide financial guaranty insurance policies (each a "Policy" and, collectively, the "Policies") for five securitization transactions sponsored by RFC and RFC's pervasive breach of contract representations and warranties made to MBIA in connection with those five securitizations.

2.      RFC, a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota, is engaged in the business of, among other things, originating and acquiring residential mortgage loans and selling those loans through securitization programs. During 2006 and 2007, RFC sought to sell certain of its residential home equity loans by means of securitization transactions and approached MBIA to provide the Policies for certain of these securitization transactions. These Policies were intended to insure

timely payments of interest and ultimate principal to investors who purchased the securities that were issued through the securitization transactions.

3.      Among other representations and warranties, RFC represented to MBIA that the mortgage loans underlying the securitization transactions were of a certain quality and had been underwritten in accordance with RFC's underwriting guidelines and policies. RFC made this representation to assure MBIA that for each individual mortgage loan there was a reasonable expectation that the borrower would be able to repay the mortgage debt.

4.      In reality, and contrary to RFC's representations and warranties, the portfolios of mortgage loans that RFC included in the securitization transactions were of a fundamentally different quality and character than RFC represented to MBIA. A material number of mortgage loans included in the mortgage loan pools underlying the securitizations were made to borrowers who could not reasonably have been expected to be able to repay the mortgage loans, and the risks inherent in the portfolios were significantly higher than as represented to MBIA. Moreover, there were fundamental, material and consistent violations of RFC's underwriting guidelines and policies in connection with the underwriting of the mortgage loans that RFC included in the securitization transactions. The undisclosed and misrepresented risks were pervasive throughout the mortgage loan portfolios for the securitization transactions. Had MBIA been aware of the condition of the mortgage loan portfolios and RFC's material disregard of its underwriting guidelines and policies, MBIA would not have issued the Policies for the securitization transactions.

5.      MBIA's agreement to issue the Policies with respect to the securitizations was based on representations and warranties from RFC that constituted an intentional scheme to defraud MBIA into providing financial guaranty insurance in connection with the securitization transactions sponsored by RFC. MBIA, as the financial guaranty insurer, has now paid hundreds

of millions of dollars in claims, and is now exposed to significant further liability incurred directly as a result of RFC's pervasive misrepresentations with respect to the mortgage loans.

6.     Subsequent to its fraud in inducing MBIA into writing the policies, RFC also has breached its contractual obligations and acted in bad faith by refusing to cure, repurchase or otherwise remedy the material deficiencies in respect of individual mortgage loans. In fact, RFC has stopped responding altogether to MBIA's requests that RFC repurchase such deficient mortgage loans and has repudiated the contractual remedy process, thereby repudiating its obligations under the contracts.

## PARTIES

7.     Plaintiff MBIA Insurance Corporation is a New York stock insurance corporation with its principal place of business in Armonk, New York.

8.     Defendant Residential Funding Company, LLC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. Residential Funding Company, LLC is successor-in-interest to Residential Funding Corporation, a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this proceeding pursuant to CPLR § 301.

10.     RFC is a registered limited liability company within the State of New York, has appointed an agent for service of process and has consented to the jurisdiction of Courts within the State. RFC transacts business within the State. Further, actions that led to the transactions that give rise to the claims in this Complaint occurred within the State.

11.     Venue is proper in this Court pursuant to CPLR § 503. RFC has designated New York County as its county of residence in the State of New York. Further, RFC has agreed that courts in the State of New York located in the City and County of New York are

the appropriate venue for all actions arising out of the transactions that give rise to the claims in the Complaint. Moreover, substantial activities relating to the transactions that give rise to the claims in the Complaint occurred within New York County.

**FACTUAL ALLEGATIONS**

**A.    RFC**

12.    RFC is engaged in the acquisition of residential mortgage loans under several loan purchase programs from individual mortgage loan originators or sellers nationwide. RFC, through its affiliates, also originates residential mortgage loans. Further, RFC acts as a servicer for mortgage loans.

13.    RFC's practice is to sell, by means of securitization transactions, mortgage loans that it has acquired, as well as mortgage loans it originated through its affiliates. RFC has sponsored securitizations of mortgage loans secured by first liens on one- to four- family residential properties since 1986. In 1995, RFC expanded its business to include second lien mortgage loans. From 2002 through the first quarter of 2007, RFC sponsored securitizations of 1,313,052 first lien mortgage loans with an aggregate principal balance of $243,493,046,962. During the same period, RFC sponsored securitizations of 338,441 second lien mortgage loans with an aggregate principal balance of $14,393,392,561.

14.    As of December 4, 2008, RFC was a wholly-owned subsidiary of Residential Capital LLC ("ResCap"), a Delaware limited liability company, which was itself a wholly-owned subsidiary of GMAC LLC ("GMAC"), a Delaware limited liability company registered as a foreign limited liability company in the State of New York.

**B.    The Securitization Of Residential Mortgage Loans**

15.    Acquirers and originators of mortgage loans may sponsor securitization transactions to sell mortgage loans and to enable the acquisition or origination of additional

-4-

mortgage loans. Securitization is the act of using a financial asset, such as a mortgage loan, as security for another instrument.

16.    Securitizations can take various forms. The most common form used for mortgage loans involves the creation of a trust, to which the sponsoring entity sells a portfolio of mortgage loans. The trust will then divide the cash flows from the portfolio of mortgage loans into various pieces or tranches and issue securities, which are sold to investors. Those pieces or tranches underlying the securities have different economic rights to principal and interest, among other things, and have different attributes of repayment risk. As the United States Securities and Exchange Commission ("SEC") has observed, in many instances the transfer of assets to the trust "is a two-step process: the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor for a securitization program and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions." SEC Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1,506-1,631.

17.    Because the mortgage loans, and their underlying cash flows, are sold to an entity, such as a trust, in connection with the securitization, the appointment of a servicer is also necessary. The servicer's primary responsibilities are (1) collecting mortgage payments on performing mortgage loans, (2) engaging in loss mitigation efforts to increase collection efforts on delinquent mortgage loans, (3) initiating foreclosure proceedings, (4) charging-off mortgage loans when appropriate, (5) reporting key information about the mortgage loans to the trustee for dissemination to the other transaction participants and (6) transferring collections to the trustee for distribution to the investors. The trustee is responsible for administering the funds of the trust, determining the adequacy of the trust's funds to satisfy the trust's obligations in connection with the securities issued by the trust and making payments to the investors.

18.    Mortgage loans may consist of, among others, closed-end second lien mortgage loans ("Closed-End Mortgage Loans") and home equity lines of credit ("Home Equity Loans"). For Closed-End Mortgage Loans, a borrower receives the full borrowed amount of the loan at the time of origination. For Home Equity Loans, a borrower receives the right to draw upon a line of credit, which is collateralized by a mortgage lien, for a period of time after origination of the Home Equity Loan up to the full amount of the Home Equity Loan. The amount of a Home Equity Loan that has been drawn upon as of any date of determination is known as the "Utilization."

19.    The financial viability of an investment in a securitization is based on the quality of the underlying mortgage loans. If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, risk increases. This risk manifests itself through delinquencies on mortgage loan payments eventually leading to defaults on these mortgage loans. After a mortgage loan is in default, if a servicer of a mortgage loan determines that the value of net recoveries to be achieved by foreclosing upon, or comparably converting, the mortgage loan are unlikely to equal or exceed the outstanding principal balance of the delinquent mortgage loan, plus certain costs and expenses related thereto, the servicer will charge-off such delinquent mortgage loan, meaning that the servicer will write down or recognize the outstanding principal balance of such mortgage loan as zero, without a corresponding payment or receipt of principal. These delinquencies, defaults and charge-offs have the potential to result in significant shortfalls of anticipated cash flows to the trust and, consequently, a shortfall in cash flows payable to the investors.

20.    To increase marketability, lower interest costs and mitigate the risk to the investors of a potential shortfall in anticipated cash flows to the trust, many securitizations historically have included the purchase of a financial guaranty insurance policy from a financial

guaranty insurer, such as MBIA. Under the terms of such a policy, a financial guaranty insurer, in consideration of a premium and subject to the terms and conditions of the policy, will unconditionally and irrevocably guarantee to the investors that, in the event there is a shortfall in cash flows to the trust, the financial guaranty insurer will insure certain payments with respect to current interest and ultimate principal to the trustee for the benefit of the investors. In this way, the risk to the investors of a shortfall in the anticipated cash flows to the trust is mitigated, thus increasing the marketability and pricing of the securities.

21.    To satisfy both the investors and the financial guaranty insurer as to the quality of a particular portfolio of mortgage loans, the sponsor of a securitization typically makes disclosures and representations regarding the quality and character of the underlying mortgage loans and the underwriting standards used to underwrite the mortgage loans. While these disclosures and representations do not entirely remove the risk of delinquency and/or charge-off, they are intended to assure the financial guaranty insurer that risks are known to the insurer and that the financial guaranty insurer does not face additional, hidden risks.

22.    A sponsor's disclosures and representations in a residential mortgage-backed securitization are extremely important because of the sponsor's unique and special knowledge and expertise regarding the underwriting of mortgage loans. The sponsor's disclosures and representations regarding the quality and character of the mortgages included in the mortgage loan portfolios and the underwriting standards used to underwrite the mortgage loans are necessary because it is neither practical nor feasible for the financial guaranty insurer to review the many thousands of mortgage loans in the loan portfolios. Individual loan files are typically voluminous, containing mortgage applications, credit reports, income and employment verifications, the lender's internal documentation and many other forms of documentation necessary to support underwriting decisions. In addition, sponsors typically require a bid from a

-7-

financial guaranty insurer within a few days of the sponsor's initial solicitation, and the securitization's closing date is often only a few weeks later.

23.    Because the review of all the loan files underlying a securitization is impractical and infeasible, a sponsor instead will provide to the financial guaranty insurer and the rating agencies, among others, schedules and data tapes that set forth general financial characteristics of the mortgage loans that will be transferred by the sponsor to the securitization trust. The rating agencies rely upon the data contained in the schedules and data tapes to create expected loan level default and loss assumptions. The loan level default and loss assumptions are then used to create cash flow projections – that is, estimates of potential losses – for the securitizations.    The rating agencies then provide shadow ratings for the securitization transactions, which shadow ratings are based on the expected losses for the proposed securitization structure. A financial guaranty insurer must rely on the sponsor's representations and data with respect to the quality of the mortgage loan portfolio underlying the securitizations as well as the integrity of the sponsor's underwriting policies and practices.    Further, the financial guaranty insurer must also rely on the shadow ratings provided by the ratings agencies, which are based on the same representations, warranties and data provided to the financial guaranty insurer. In addition, it is infeasible and impractical for a financial guaranty insurer to confirm based on schedules or data tapes whether a sponsor has underwritten the mortgage loans in compliance with its underwriting criteria. The sponsor's unique and special knowledge, and expertise regarding its underwriting practices, cannot be duplicated by the financial guaranty insurer, especially given the short timeframe in which the financial guaranty insurer is required to make an underwriting decision.

C.    **MBIA's Special Relationship Of Trust And Confidence With RFC**

24.    MBIA provided financial guaranty insurance policies for certain securitization transactions sponsored by RFC and its affiliates during 2003 and 2004. In late 2005 and early 2006, MBIA and RFC engaged in discussions about furthering their relationship and developing a program pursuant to which MBIA could issue financial guaranty insurance policies for securitization transactions sponsored by RFC. Because a financial guaranty insurer – like MBIA – is reliant on the integrity and veracity of the sponsor of a mortgage-backed securitization – like RFC – MBIA must trust and have confidence in the sponsor as part of its determination whether to issue a financial guaranty insurance policy for an individual securitization transaction. To further this relationship of trust and confidence with RFC, MBIA undertook a due diligence review of RFC, which included a credit and financial analysis of RFC and its affiliates.

25.    In August 2005, MBIA visited RFC's offices in Minnesota to inspect RFC's operations and to discuss the development of a program pursuant to which MBIA could compete to issue financial guaranty insurance policies for securitization transactions sponsored by RFC. In June 2006, RFC sent MBIA financial statements for RFC, its affiliate, GMAC Mortgage, LLC ("GMAC Mortgage"), and its parent company, ResCap.

26.    MBIA used this and other information provided by RFC to analyze the credit profiles and financial stability of RFC, its parent companies, including ResCap, and its affiliates. MBIA also analyzed the historical performance of securitizations sponsored by RFC and GMAC Mortgage, and evaluated RFC's corporate history, market share, management team, underwriting standards and servicing platform. In addition to publicly available information, MBIA relied on information provided by RFC to conduct its due diligence review and to analyze

-9-

whether to further a relationship of trust and confidence with RFC in respect of a program to provide financial guaranty insurance for RFC's securitization transactions.

27.     On or about June 30, 2006, MBIA's Executive Credit Committee ("ECC") approved a program pursuant to which MBIA furthered its special relationship of trust and confidence with RFC. In that regard, the ECC authorized MBIA's underwriters to incur up to $8.5 billion of gross exposure to RFC and GMAC Mortgage, with the proviso that each proposed securitization transaction be reviewed and approved in accordance with MBIA's underwriting policies and procedures. The ECC delegated authority to review and approve individual securitization transactions to MBIA's Underwriting Committee. The ECC's approval of this program and its delegation of authority to the Underwriting Committee was based on MBIA's trust and confidence in RFC, which resulted from MBIA's discussions with and analysis of RFC during 2005 and early 2006.

28.     Approximately two weeks after the ECC approved this program, RFC solicited MBIA to bid on the first of the five securitization transactions that are the subject of this action. The program was ultimately extended though June 30, 2007. The last of the securitization transactions at issue here closed on May 30, 2007.

**D.     The RFC Transactions**

29.     Starting in approximately July 2006 and pursuant to MBIA's Exposure Plan, RFC solicited MBIA to provide financial guaranty insurance policies for five securitizations sponsored by RFC: Home Equity Loan Trust 2006-HSA4 ("2006-HSA4"), Home Equity Loan Trust 2006-HSA5 ("2006-HSA5"), Home Equity Loan Trust 2007-HSA1 ("2007-HSA1"), Home Equity Loan Trust 2007-HSA2 ("2007-HSA2") and Home Equity Loan Trust 2007-HSA3 ("2007-HSA3" and, collectively with 2006-HSA4, 2006-HSA5, 2007-HSA1 and 2007-HSA2, the "RFC Transactions").

-10-

30.     2006-HSA4 is a securitization that was issued on or about July 28, 2006. The 2006-HSA4 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans. Approximately 99.05% of the Home Equity Loans in the 2006-HSA4 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.95% of the Home Equity Loans secured by first liens. As of July 1, 2006 (the "2006-HSA4 Cut-off Date"), the mortgage loan pool for 2006-HSA4 contained 8,954 Home Equity Loans with an approximate initial principal mortgage loan balance of $402,118,000 as of the 2006-HSA4 Cut-off Date. The weighted average amount of Utilization of the Home Equity Loans as of the 2006-HSA4 Cut-off Date was 77.89% of the available credit limit.

31.     2006-HSA5 is a securitization that was issued on or about September 28, 2006. The 2006-HSA5 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans. Approximately 99.2% of the Home Equity Loans in the 2006-HSA5 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.80% of the Home Equity Loans secured by first liens. As of September 1, 2006 (the "2006-HSA5 Cut-off Date"), the mortgage loan pool for 2006-HSA5 contained 5,124 Home Equity Loans with an approximate initial principal mortgage loan balance of $295,648,000 as of the 2006-HSA5 Cut-off Date. The weighted average amount of Utilization of the Home Equity Loans as of the 2006-HSA5 Cut-off Date was 87.98% of the available credit limit.

32.     2007-HSA1 is a securitization that was issued on or about February 27, 2007. The 2007-HSA1 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans. Approximately 98.3% of the home equity loans in the 2007-HSA1 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 1.7% of the Home Equity Loans secured by first liens. As of February 1, 2007 (the "2007-HSA1 Cut-off Date"), the mortgage loan pool for 2007-HSA1 contained 9,484 Home

Equity Loans with an approximate initial mortgage loan principal balance of $546,774,000 as of the 2007-HSA1 Cut-off Date. The weighted average amount of Utilization of the Home Equity Loans as of the 2007-HSA1 Cut-off Date was 85.84% of the available credit limit.

33.    2007-HSA2 is a securitization that was issued on or about April 27, 2007. The 2007-HSA2 mortgage loan pool consists of fixed rate Closed-End Mortgage Loans. Approximately 99.84% of the Closed-End Mortgage Loans in the 2007-HSA2 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.16% of the Closed-End Mortgage Loans secured by first liens. As of April 1, 2007 (the "2007-HSA2 Cut-off Date"), the mortgage loan pool for 2007-HSA2 contained 24,092 Closed-End Mortgage Loans with an approximate initial mortgage loan principal balance of $1,300,997,943 as of the 2007-HSA2 Cut-off Date.

34.    2007-HSA3 is a securitization that was issued on or about May 30, 2007. The 2007-HSA3 mortgage loan pool contains two mortgage loan groups. One loan group ("2007-HSA3 Loan Group 1") contains 11,268 fixed rate Closed-End Mortgage Loans with an aggregate initial mortgage loan principal balance of $590,465,000 as of May 1, 2007 (the "2007-HSA3 Cut-off Date"). The other loan group ("2007-HSA3 Loan Group 2") contains 4,146 adjustable rate, revolving Home Equity Loans with an aggregate initial mortgage loan principal balance of $239,848,476 as of the 2007-HSA3 Cut-off Date. Approximately 99.87% of the 2007-HSA3 Loan Group 1 loans and 99.26% of the 2007-HSA3 Loan Group 2 loans are secured by second liens on one- to four- family residential properties with the remaining approximately 0.13% and 0.74% of the respective group mortgage loans secured by first liens. As of the 2007-HSA3 Cut-off Date, the weighted average amount of Utilization of the Home Equity Loans in 2007-HSA3 Loan Group 2 was 86.0% of the available credit limit.

-12-

35.    RFC is the seller for the RFC Transactions. RFC was also the master

servicer for the RFC Transactions and outsourced certain of its servicing functions to affiliated

entities, which acted as subservicers. On November 2, 2009, RFC voluntarily relinquished its

rights and responsibilities as master servicer and allowed MBIA to appoint a new master

servicer. As such, neither RFC nor its subservicer affiliates were involved with the servicing of

the mortgage loans after November 2, 2009.

### E.    RFC's Representations And Warranties

36.    In connection with each RFC Transaction, MBIA and RFC entered into an

Insurance Agreement pursuant to which MBIA issued a Policy for the RFC Transactions. The

Policies increased the marketability of the securities by mitigating the risk to potential investors

of any shortfalls in anticipated cash flows, which allowed for better pricing of the securities for

RFC. These Insurance Agreements are: (1) an Insurance Agreement among MBIA, RFC, Home

Equity Loan Trust 2006-HSA4 and Residential Funding Mortgage Securities II, Inc. ("RFMS

II"), dated July 28, 2006 (the "2006-HSA4 Insurance Agreement"); (2) an Insurance Agreement

among MBIA, RFC, Home Equity Loan Trust 2006-HSA5 and RFMS II, dated September 28,

2006 (the "2006-HSA5 Insurance Agreement"); (3) an Insurance Agreement among MBIA,

RFC, Home Equity Loan Trust 2007-HSA1 and RFMS II, dated February 27, 2007 (the "2007-

HSA1 Insurance Agreement"); (4) an Insurance Agreement among MBIA, RFC, Home Equity

Loan Trust 2007-HSA2 and RFMS II, dated April 27, 2007 (the "2007-HSA2 Insurance

Agreement"); and (5) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust

2007-HSA3 and RFMS II, dated May 30, 2007 (the "2007-HSA3 Insurance Agreement" and,

collectively with the foregoing, the "Insurance Agreements").

37.    RFC made numerous representations and warranties to MBIA in

connection with each Insurance Agreement. RFC further made numerous representations and

-13-

warranties to the rating agencies that contributed to the issuance of incorrect shadow ratings by the rating agencies. These representations and warranties, as well as the shadow ratings, were a material inducement to MBIA to enter into the Policies.

38.    Specifically, each Insurance Agreement incorporated by reference, for the benefit of MBIA, the representations and warranties contained in the respective "Transaction Documents," as that term was defined in the Insurance Agreements. The incorporation by reference of the Transaction Documents into the Insurance Agreements was intended to allow MBIA to itself rely upon any representation and warranty that RFC made to any other entities, such as investors, in connection with each of the RFC Transactions. For 2006-HSA4, 2006-HSA5, 2007-HSA1 and 2007-HSA3, the "Transaction Documents" included, among others, the purchase agreements that set forth the terms of the sale of the mortgage loans to the relevant trust in connection with the respective transaction (the "Purchase Agreements"); the servicing agreements that set forth the terms for servicing the mortgage loans in connection with the respective transaction (the "Servicing Agreements"); and offering materials provided to potential investors and filed with the SEC in connection with the respective transaction (the "Offering Documents"). For 2007-HSA2, the "Transaction Documents" included the assignment agreement ("2007-HSA2 Assignment Agreement"), which set forth the terms of the assignment of the mortgage loans to the 2007-HSA2 Trust, the pooling and servicing agreement ("2007-HSA2 PSA"), which set forth the terms for servicing the mortgage loans for 2007-HSA2, and the Offering Documents, among others. MBIA is an express third-party beneficiary of the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA.

39.    RFC also separately represented and warranted in the Insurance Agreements that "[t]he Offering Documents did not, as of the Closing Date, contain any untrue

-14-

statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading." Further, RFC represented that "[n]either the Transaction Documents . . . nor other material information relating to the [mortgage loans] . . . furnished to the Insurer by the Issuer in writing or in electronic form contains any statement of a material fact by the Issuer which was untrue or misleading in any material respect when made." Moreover, RFC represented and warranted that its financial statements were "complete and correct in all material respects, [] present fairly the financial condition and results of operations of RFC as of the dates and for the periods indicated and [] have been prepared in accordance with generally accepted accounting principles consistently applied . . . ."

   40. By incorporating in the Insurance Agreements the representations and warranties in the Transaction Documents, RFC incorporated the following general representations and warranties regarding the underwriting of the mortgage loans contributed to the RFC Transactions, which were stated in the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA, for the benefit of MBIA:

- **Compliance With Underwriting Guidelines:** All of the mortgage loans were underwritten in substantial compliance with the criteria set forth in the relevant program guide (the "Underwriting Guidelines").

- **Accurate Loan Information:** Certain information about the Home Equity Loans or the Closed-End Mortgage Loans was true and correct in all material respects when the information was furnished by RFC to MBIA and others.

- **CLTV Ratio:** As of the Cut-off Dates, the combined loan-to-value ratio of each Home Equity Loan or Closed-End Mortgage Loan was not in excess of 100%.

-15-

- **Proper Documentation:** Except for a few specifically identified instances, each Home Equity Loan file or Closed-End Mortgage Loan file was complete, and all of the required documents and instruments were contained therein.

- **Compliance With Applicable Laws:** The loan agreements and mortgage notes underlying the RFC Transactions complied, when made, in all material respects with local, state and federal laws, including anti-predatory lending laws.

- **No High Cost Or Covered Loans:** None of the Home Equity Loans or Closed-End Mortgage Loans were loans that, under applicable state or local law in effect at the time of origination of such loans, were referred to as (1) 'high cost' or 'covered' loans or (2) any other similar designation if the law imposes greater restriction or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- **No Material Breach Or Default:** There was no material default, breach, violation or event of acceleration existing under the terms of any Mortgage Note or Mortgage and no event which, with notice and expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration under the terms of any Mortgage Note or Mortgage, and no such material default, breach, violation or event of acceleration has been waived by the Seller or by any other entity involved in originating or servicing a mortgage loan.

These representations and warranties, among others, set forth the standards governing each mortgage loan contributed to the RFC Transactions, including, significantly, the standard that each mortgage loan had been underwritten in substantial compliance with RFC's Underwriting Guidelines.

41.    RFC's Underwriting Guidelines specified criteria that the mortgage loans must meet depending upon the individual loan program and circumstances of each mortgage loan. In general, the Underwriting Guidelines stipulated what documentation was required to be included in the mortgage loan files for each loan product (which may include, depending upon the loan product, verifications of income, assets, closing funds and payment histories, among others) and criteria for eligibility, including tests for debt-to-income ("DTI") and combined loan-

-16-

to-value ("CLTV") ratios. The Underwriting Guidelines provided, for example, that for a borrower under a home equity loan program for a primary residence who applies for a loan based on the borrower's declaration of his or her income (a "stated income" loan) and has a Fair, Isaac & Co. ("FICO") credit score of 630, the maximum acceptable DTI would be 45%, the maximum CLTV would be 80%, the maximum loan amount would be $150,000 and a full appraisal of the property would be required.

42.    An important variable affecting the applicable criteria for evaluating a loan under the Underwriting Guidelines was the level of documentation of a borrower's income. Under RFC's Underwriting Guidelines, a borrower could apply for a loan by providing "full documentation" or could apply through other reduced documentation programs such as "lite doc," "stated income," or "no doc" programs, among others. The principal difference with respect to these RFC loan programs was that for loan programs other than "full documentation," RFC would not undertake to independently verify a borrower's income, if required to be stated. However, despite differing levels of necessary verification, RFC's Underwriting Guidelines required that for all the loan programs, borrowers must have a history of receiving stable income from employment or other sources and a reasonable expectation that the income will continue for the foreseeable future. Moreover, if a borrower stated his or her income, even if RFC was not required to verify the income, RFC was required to determine that a borrower's stated income was at least reasonable for the borrower's type of employment, line of work and assets. In fact, for stated income loan programs, RFC's Underwriting Guidelines clearly state that "[e]mployment stability is a critical component in evaluating the Borrower's continuing ability to meet obligations" and that "[o]ther factors in the [loan] file, including but not limited to Borrowers employment and position disclosed, geographical location, assets, and liabilities must demonstrate the reasonableness of the income stated."

-17-

43.    In addition to giving representations and warranties, RFC also provided information to MBIA with respect to the mortgage loans contributed to the RFC Transactions. This information included data tapes and schedules incorporated in the Offering Documents that contained representations regarding CLTV, DTI and FICO score statistics for mortgage loans for each RFC Transaction. RFC also conveyed information to MBIA during MBIA's discussions with RFC regarding the issuance of Policies for the RFC Transactions.

44.    Because it was impractical and infeasible for MBIA to review the almost 60,000 mortgage loans contributed to the RFC Transactions, MBIA, like all financial guaranty insurers, required these representations and warranties from RFC to ensure that risks in the RFC Transactions were known and fully disclosed to MBIA and that MBIA would not face additional risks hidden in the mortgage loan pools by RFC. MBIA relied on RFC's representations and warranties and on RFC's unique and special knowledge and expertise regarding the mortgage loans in making its decisions to issue the Policies for the RFC Transactions.

45.    RFC provided information to the rating agencies with respect to the mortgage loans contributed to the RFC Transactions. The rating agencies relied on this information to issue shadow ratings for the RFC Transactions. MBIA also relied on the shadow rating in making its decisions to issue the Policies for the RFC Transactions.

46.    RFC further covenanted, represented and warranted that it would service the mortgage loans in each of the RFC Transactions in a manner consistent with its servicing guidelines and the Servicing Agreements and would employ, in its good faith business judgment, all its "normal and usual" procedures in servicing the mortgage loans. In return, RFC collected a servicing fee equal to 0.50% per annum of the outstanding principal balance of each serviced loan, payable monthly. In addition, RFC, as the master servicer for all of the RFC Transactions, took as its master servicing fee either a percentage of the principal balance of the underlying

-18-

mortgage loans or the interest from certain accounts created in connection with the transaction, depending on the specific structure of the individual RFC Transaction. As of November 2, 2009, RFC had collected approximately $32 million in servicing and master servicing fees in connection with the RFC Transactions.

**F.      RFC's Pervasive Breaches Of Its Representations And Warranties**

47.      The RFC Transactions have performed poorly.    Delinquencies and defaults for mortgage loans in the RFC Transactions have been substantial, diminishing cash flow to the trusts, which has required and will continue to require MBIA to satisfy its obligations under the Insurance Agreements and the Policies by making payments to cover these shortfalls. As of December 2009, MBIA has paid approximately $871 million in claims in connection with the RFC Transactions.

48.      In January 2008, MBIA became concerned about the high delinquencies and default rates in the RFC Transactions.   Accordingly, MBIA requested that RFC provide MBIA and its representatives and agents access to certain documents with respect to the mortgage loans underlying the RFC Transactions.   Specifically, MBIA requested access to all relevant documentation concerning the mortgage loans that were delinquent as of December 31, 2007, that is, those mortgage loans that became delinquent less than 18 months after the closing dates of the RFC Transactions.   Pursuant to the Servicing Agreements and the Insurance Agreements, MBIA is entitled to reasonable access to the documentation regarding the mortgage loans.

49.      In May 2008, MBIA requested access to additional mortgage loans for the RFC Transactions pursuant to the Servicing Agreements and the Insurance Agreements.   RFC consistently thwarted MBIA's good faith efforts to obtain information regarding these additional mortgage loans by arbitrarily and unreasonably limiting the number of days that RFC would

permit MBIA to review the additional mortgage loan files in RFC's possession, by arbitrarily and unreasonably limiting the space available to MBIA's personnel for review of the additional mortgage loan files and by arbitrarily and unreasonably limiting the number of MBIA personnel allowed to review the additional mortgage loan files, among other actions. RFC established these arbitrary and unreasonable limitations in direct breach of its contractual obligations to provide MBIA with reasonable access to mortgage loan files. Many of the loan files provided by RFC were incomplete, in direct breach of RFC's representation and warranty that the mortgage loan files were complete, thus forcing MBIA to make supplemental requests to RFC regarding the same loan files. Further, despite MBIA's request, RFC arbitrarily and unnecessarily objected to providing MBIA with documents or information reflecting RFC's decisions or actions with respect to the servicing of delinquent or charged-off mortgage loans.

50.    MBIA ultimately obtained access to 7,913 mortgage loans that became delinquent before November 30, 2008, which MBIA reviewed for compliance with RFC's representations and warranties to MBIA. Of these 7,913 mortgage loans, at least 7,019 – more than 88% of the mortgage loans that MBIA reviewed – were not originated or acquired in material compliance with RFC's representations and warranties.

51.    As of December 25, 2009, a total of 21,237 mortgage loans, representing a staggering 34% of the mortgage loans underlying the RFC Transactions, had been charged-off or were delinquent.

52.    MBIA's review uncovered that a significant percentage of the delinquent mortgage loans were in breach of one or more of RFC's representations and warranties with respect to the underwriting of the mortgage loans contributed to the RFC Transactions. The following examples are illustrative of the substantial number of mortgage loans in the RFC

-20-

Transactions and their non-compliance with RFC's representations and warranties in connection

with the RFC Transactions:

a.   On March 8, 2006, a loan with a principal balance of $55,000 was made to a borrower in Perris, California on a property with an original appraisal value of $225,000 and a senior loan balance of $440,000. The borrower stated his income to be $9,800 per month ($117,800 per year) as a dispatcher at a freight company. Further, the borrower could only demonstrate $22,270.80 in liquid assets, the majority of which was in a 401K retirement account. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. In that regard, the borrower's credit profile indicated a prior bankruptcy filing, an existing loan against the borrower's 401K retirement account and an automobile repossession. (Loan # 10570977 – 2006-HSA4)

b.   On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567. The property subject to the loan was a non-owner occupied investment property. The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store. Further, the borrower did not demonstrate any liquid assets. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower claimed to have earned $0.00 for 2006. Further, the appraisal indicated the property failed to conform to legal standards and the loan file lacked any letter from the local authority regarding rebuilding. RFC Underwriting Guidelines require verification of 6 months of reserves for the monthly Principle, Interest, Taxes and Insurance ("PITI") payments for stated income loans on non-owner occupied investment properties yet there is no indication in the loan files that these reserves were identified or verified. Finally, RFC guidelines limit loans under the non-owner occupied loan program to $100,000, $40,000 less than was loaned. (Loan # 11169067 – 2007-HSA2).

c.   On June 9, 2006, a loan with a principal balance of $132,000 was made to a borrower in Agoura Hills, California on a property with an original appraisal value of $660,000 and a senior loan balance of $528,000. This loan was originated as a loan for an owner-occupied property. The borrower owned his prior residence for

only three months, for which he provided a two month payment history. RFC's Underwriting Guidelines, however, require documentation of a minimum of one year mortgage or rental history, and no such documentation is included in the loan file. Moreover, the final loan application states monthly income of $21,700, and the initial application states rental income of $6,750. However, the underwriting transmittal states income of $14,500, and the final loan application states rental income of $3,000. Based on these lower values, the DTI for loan is 67.37% and exceeds the maximum DTI of 50% under RFC's Underwriting Guidelines.    Notably, the borrower could only demonstrate $34,469.41 in liquid assets. (Loan # 10776379 – 2006-HSA5).

d.    On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000. The borrower is retired and receives a fixed income that was stated as $6,450 per month. The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%. Because the borrower receives a fixed income, the borrower does not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines. Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines. (Loan # 11434381 – 2007-HSA3).

e.    On July 24, 2006, a loan with a principal balance of $29,500 was made to a borrower in Flint, Michigan on a property with an original appraisal value of $57,497 and a senior loan balance of $24,676. The borrower stated income of $3,700 per month and had a FICO score of 650. The CLTV for the mortgage loan was 94.2%. Pursuant to RFC's Underwriting Guidelines, the borrower was required to have monthly income of $4,000 and the CLTV for the loan could not exceed 80%. Further, the loan file lacks evidence of a full appraisal for the property as well as evidence of 2 months of PITI reserves, both of which are required by RFC's Underwriting Guidelines. (Loan # 11147061 – 2007-HSA1).

f.    On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value of $540,000.00 and a senior loan balance of $405,000.00. The borrower stated income of $11,000 per month as a sales manager at a concrete company, however, the borrower could only demonstrate assets of $11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in

connection with which the borrower claimed to have actually earned $43,523 for 2006 and $20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan. (Loan # 11165457 – 2007-HSA3).

53.     The mortgage loans identified above – examples of a much larger universe of non-compliant mortgage loans – all fail to comply with the general representations and warranties regarding the underwriting of the mortgage loans contributed to the RFC Transactions, which were stated in the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA, for the benefit of MBIA and identified in paragraph 40, *supra*. These mortgage loans are illustrative of the pervasive breaches of RFC's representations to MBIA throughout the portfolios for the RFC Transactions. In that regard:

a.     RFC breached its representation and warranty that the mortgage loans were underwritten in substantial compliance with RFC's Underwriting Guidelines. A significant number of mortgage loans have DTI ratios far in excess of RFC's Underwriting Guidelines, have CLTV ratios far in excess of RFC's Underwriting Guidelines and were made on the basis of "stated incomes" that were grossly unreasonable. In certain circumstances, CLTV ratios not only exceeded the permissible ratio pursuant to RFC's Underwriting Guidelines, but they even exceeded 100%, in breach of RFC's explicit representation and warranty in the Purchase Agreements and the 2007-HSA2 Assignment Agreement that the CLTV ratio for each of the mortgage loans was not in excess of 100%. Moreover, contrary to RFC's Underwriting Guidelines, RFC failed, with respect to a significant number of mortgage loans, to verify employment for mortgage loan borrowers where required to do so, failed to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with credit scores that are ineligible under the Underwriting Guidelines and closed mortgage loans without verifying that the borrower had sufficient funds or reserves as required by the Underwriting Guidelines.

b.     RFC breached its representations and warranties that the mortgage loan files contained all necessary documents and complied with applicable law. Numerous mortgage loan files are missing

-23-

necessary mortgage loan documents and are missing certain disclosures, such as disclosures relating to loan transfers, which are necessary under applicable law. The absence of these documents from the loan files may greatly impede the ability of the trustees for the respective RFC Transactions to enforce their rights and remedies with respect to delinquent mortgages.

c.     RFC breached its representation and warranty that the RFC Transactions would not contain high cost loans. In fact, RFC even contributed mortgage loans to the mortgage loan pools that violated either, or both, the federal Home Ownership and Equity Protection Act ("HOEPA") and state predatory lending laws. These laws are designed to protect borrowers from abusive lending practices. Among other violations of these laws, the mortgage loan pools include mortgage loans for which the finance charges were materially understated, the annual percentage rate ("APR") was materially understated or exceeded the maximum cap and high cost thresholds were exceeded. Notably, it is standard in the mortgage loan industry to test for HOEPA compliance by means of a simple mathematical calculation. RFC's failure to identify HOEPA violations indicates that RFC failed to perform the calculation, incompetently performed the calculation or performed the calculation but purposely ignored the result.

54.     RFC also breached its representation and warranty in the Insurance Agreements that "[t]he Offering Documents did not, as of the Closing Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading." In the Offering Documents, RFC made a number of untrue statements of material fact, including that the mortgage loans contributed to the RFC Transactions were underwritten in compliance with RFC's Underwriting Guidelines, that the mortgage loans complied with local, state and federal laws and that the RFC Transactions did not contain high cost loans. These statements are materially false because a significant number of mortgage loans have DTI or CLTV ratios far in excess of RFC's Underwriting Guidelines, were made on the basis of "stated incomes" that were unreasonable or were originated in violation of federal and state predatory lending laws.

55.    Moreover, the information RFC provided MBIA in the data tapes and the
schedules included in the prospectus was materially false and misleading.  RFC provided MBIA
data tapes regarding each of the RFC Transactions on numerous occasions.  Specifically:

a.    On July 12, 2006, Lonnie Proechel of RFC sent a data tape to
MBIA by e-mail with respect to mortgage loans included in the
mortgage loan pool for 2006-HSA4 that included materially false
and misleading information regarding the mortgage loans
contributed to the 2006-HSA4 mortgage loan pool.

b.    On August 1, 2006, Lonnie Proechel of RFC sent a data tape to
MBIA by e-mail with respect to mortgage loans included in the
mortgage loan pool for 2006-HSA5 that included materially false
and misleading information regarding the mortgage loans
contributed to the 2006-HSA5 mortgage loan pool.

c.    On January 30, 2007, Jesse J. Roth of RFC sent a data tape to
MBIA by e-mail with respect to mortgage loans included in the
mortgage loan pool for 2007-HSA1 that included materially false
and misleading information regarding the mortgage loans
contributed to the 2007-HSA1 mortgage loan pool.

d.    On March 1, 2007, Joseph Orning of RFC sent a preliminary data
tape to MBIA by e-mail with respect to mortgage loans to be
included in the mortgage loan pool for 2007-HSA2 that included
materially false and misleading information regarding the
mortgage loans contributed to the 2007-HSA2 mortgage loan pool.
This preliminary data tape was supplemented with additional data
tapes sent by Lonnie Prochel of RFC to MBIA by e-mail on April
4, 2007 that included materially false and misleading information
regarding the mortgage loans contributed to the 2007-HSA2
mortgage loan pool.

e.    On May 8, 2007, Jeffrey Blaschko of RFC sent data tapes to MBIA
by e-mail with respect to mortgage loans included in the mortgage
loan pool for 2007-HSA3 that included materially false and
misleading information regarding the mortgage loans contributed
to the 2007-HSA3 mortgage loan pool.

56.    These data tapes and schedules indicated characteristics of the mortgage
loans sold to the RFC Transactions; however, the data on these data tapes was materially false
and misleading as a result of RFC's breaches of its representations and warranties.  For example,

-25-

mortgage loan statistics such as DTI and CLTV were materially understated as a result of RFC's failure to underwrite the mortgage loans in compliance with its Underwriting Guidelines. Further, there was no way for MBIA to confirm based on schedules or data tapes whether RFC had underwritten the mortgage loans in compliance with its underwriting criteria. MBIA did not have the special and unique knowledge and expertise that RFC had regarding the mortgage loans.

57.    RFC's breaches of its representations and warranties establish that the information conveyed to MBIA, including the schedules in the Offering Documents containing DTI and CLTV statistics for the mortgage loan pools, as well as specific loan information provided to MBIA by RFC, was materially false. Notably, the DTI and CLTV statistics for the mortgage loan pools contained in the Offering Documents are based on "stated incomes" and appraisals that are grossly inflated and unreasonable.    Further, RFC's breaches of its representations and warranties establish that the information conveyed to the rating agencies was materially false, causing the rating agencies to issue incorrect shadow ratings for the RFC Transactions.

58.    RFC has admitted to MBIA that it was aware that mortgage loans contributed to the mortgage loan pools for the RFC Transactions failed to comply with RFC's Underwriting Guidelines and, thus, were in breach of RFC's contractual representations and warranties. In that regard, RFC underwrote or purchased a significant number of non-compliant mortgage loans by purporting to grant "exceptions" to RFC's Underwriting Guidelines.  The Underwriting Guidelines, however, only allowed RFC to make such exceptions in specifically defined and limited circumstances. For example, the Underwriting Guidelines state that certain loans with a DTI exceeding the standards for its individual loan program "may be eligible for purchase as an exception under a non-standard Loan Program or will be slotted to a Loan

-26-

Program that accepts higher DTIs regardless of credit grade." Further, RFC's Underwriting Guidelines required that a form – Form 1600 – be completed and approved for any exceptions made to the Underwriting Guidelines in connection with the underwriting or purchase of a mortgage loan.

59.     For a significant number of non-compliant mortgage loans, RFC did not identify any specifically defined exception that was permitted under the Underwriting Guidelines. Further, for a significant number of mortgage loans, RFC failed to document the alleged exceptions on a Form 1600, as required by the Underwriting Guidelines. Instead, RFC engaged extensively in three improper underwriting practices that were not permitted under the Underwriting Guidelines. As a result of these practices, RFC deliberately contributed a significant number of non-compliant mortgage loans to the RFC Transactions.

60.     The first improper practice engaged in by RFC was called a "negotiated commitment." In a "negotiated commitment," RFC prospectively entered into an agreement with a loan originator whereby RFC agreed that the loan originator could in the future originate mortgage loans that failed to comply with RFC's Underwriting Guidelines and that RFC would still purchase these mortgage loans, notwithstanding the fact that RFC understood that these mortgage loans would not comply with RFC's Underwriting Guidelines.

61.     Even though RFC knew that mortgage loans acquired from the loan originators through the "negotiated commitments" did not comply with RFC's Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans, in fact, were underwritten in substantial compliance with RFC's Underwriting Guidelines. Further, RFC wrongfully attempted to justify its conduct by claiming that mortgage loans purchased in connection with "negotiated commitments" were excepted from the Underwriting Guidelines.

-27-

To the contrary, the Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitting RFC to make exceptions to the Underwriting Guidelines on the basis of "negotiated commitments."

62.    The second improper practice engaged in by RFC was called a "bulk purchase program." In a "bulk purchase program," RFC entered into a transaction with a loan seller – that is, an entity that owned mortgage loans – whereby RFC agreed to purchase a bulk amount of mortgage loans that had already been originated and were owned by that loan seller. In connection with these "bulk purchases," RFC did not undertake to "re-underwrite" or confirm that the mortgage loans being acquired complied with RFC's Underwriting Guidelines. Instead, RFC agreed with the loan seller that RFC would acquire mortgage loans from that loan seller regardless of whether the mortgage loans complied with RFC's Underwriting Guidelines. In many instances, the mortgage loans, in fact, did not comply with RFC's Underwriting Guidelines.

63.    Notwithstanding that RFC knew that mortgage loans acquired through the "bulk purchase programs" did not comply with RFC's Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans, in fact, were underwritten in substantial compliance with RFC's Underwriting Guidelines. Further, RFC wrongfully attempted to justify its conduct by claiming that mortgage loans purchased in connection with "bulk purchase programs" are excepted from the Underwriting Guidelines. The Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitting RFC to make exceptions on this basis.

-28-

64.    RFC also underwrote or purchased mortgage loans that failed to comply with the Underwriting Guidelines but were approved for purchase by RFC's proprietary automated electronic loan underwriting program known as "Assetwise." Assetwise was used by loan originators as a tool to assist in the underwriting of mortgage loans that would be acceptable to RFC. Assetwise is a software program in which a loan originator inputs certain characteristics of a proposed mortgage loan. The program then permits the user to determine whether the loan meets the pre-specified underwriting criteria that are set up in the program. MBIA understood, based on the Underwriting Guidelines, that Assetwise was programmed so that the characteristics of proposed mortgage loans would be analyzed to determine whether they complied with the Underwriting Guidelines.

65.    RFC used Assetwise to originate mortgage loans through its affiliates. RFC also made Assetwise available to unaffiliated loan originators, which would sell the mortgage loans to RFC.

66.    The Assetwise program utilized by RFC, either as an originator or as made available to unaffiliated originators, did not analyze proposed mortgage loans on the basis of the RFC Underwriting Guidelines. Indeed, a significant number of mortgage loans originated or purchased by RFC on the basis of Assetwise did not comply with RFC's Underwriting Guidelines.

67.    Moreover, RFC's reliance on Assetwise itself was a violation of the Underwriting Guidelines. RFC's Underwriting Guidelines expressly state that "clients who use the Assetwise electronic services are still bound by the representations and warranties as set forth in the [Underwriting Guidelines]. Additionally, use of Assetwise does not relieve Clients of loan eligibility and underwriting requirements set forth in [the Underwriting Guidelines]." The Underwriting Guidelines further state that "[t]he loan must conform to the [Underwriting

-29-

Guidelines] and Loan eligibility requirements. Assetwise provides program eligibility grading and slotting. Clients are responsible to ensure the Loan conforms to [the Underwriting Guidelines]." RFC never stated in the Underwriting Guidelines or in its representations and warranties to MBIA its intention to allow Assetwise to approve mortgage loans that failed to comply with RFC's Underwriting Guidelines.

68.     Notwithstanding that RFC knew that numerous mortgage loans underwritten by use of the Assetwise program failed to comply with the Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans in fact were underwritten in substantial compliance with RFC's Underwriting Guidelines. RFC wrongfully attempted to justify its conduct by claiming that loans underwritten by use of the Assetwise program are excepted from the Underwriting Guidelines. The Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitted RFC to make exceptions on this basis.

69.     As a result of its "negotiated commitments," "bulk purchases" and use of Assetwise, RFC deliberately contributed a substantial and material number of loans to the RFC Transactions that failed to comply with its Underwriting Guidelines. RFC's claim that these mortgage loans were issued through "exceptions" to the Underwriting Guidelines or "substantially" complied with the Underwriting Guidelines essentially eliminated any meaningful role that RFC's Underwriting Guidelines would serve in the mortgage loan origination and purchase process for mortgage loans contributed to the RFC Transactions.

70.     Through its egregious and pervasive breaches of its representations and warranties, including, without limitation, RFC's representation and warranty that the mortgage

-30-

loans were underwritten "in substantial compliance with [the Underwriting Guidelines]," RFC

knowingly misled MBIA into issuing the Policies for the RFC Transactions without disclosing

their substantial, hidden risks, thereby passing those risks to MBIA. By misleading MBIA into

issuing the Policies, RFC was able to sell mortgage loans it held at a higher price to investors in

the RFC Transactions for an inflated price and to then earn fees for servicing the mortgage loans

underlying the RFC Transactions.

71.    Further, through its egregious and pervasive breaches of its representations

and warranties, RFC caused the rating agencies to issue incorrect shadow ratings for the RFC

Transactions, on which MBIA relied.

72.    RFC's pervasive breaches of its representations and warranties materially

undermine and distort the fundamental basis upon which MBIA agreed to issue the Policies. The

substantial and hidden risks present in the RFC Transactions, which were hidden by RFC's

misrepresentations, have caused the mortgage loans in the RFC Transactions to become

delinquent and subsequently charged-off at a severe and unexpected rate, thus causing significant

shortfalls in cash flows to the trusts and, consequently, causing MBIA to incur losses in honoring

its obligations under the Policies issued for the RFC Transactions. Further, RFC's failure to

minimize losses on the mortgage loans through its normal and usual mortgage loan servicing

procedures has exacerbated shortfalls to the trusts for the RFC Transactions. Consequently,

MBIA has incurred, and will continue to incur, significant losses in connection with its

obligations under the Policies to insure certain shortfalls in payments to investors in the RFC

Transactions, all as a result of RFC's pervasive misrepresentations and misleading conduct.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (FRAUD)

73.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 72.

74.    In connection with MBIA's issuance of the Policies, RFC had a duty to communicate accurate and complete information to MBIA.

75.    RFC intentionally misrepresented existing material facts with respect to the RFC Transactions.

76.    RFC knew that its representations were materially false and that its false representations were essential and material to MBIA's decisions to issue the Policies in connection with the RFC Transactions. MBIA was not aware and could not reasonably have been aware of the falsity of RFC's representations. Accordingly, RFC acted intentionally and purposefully in making the materially false representations to MBIA with respect to the RFC Transactions.

77.    Additionally, RFC intentionally and purposely misled MBIA by making representations with respect to the underwriting of the mortgage loans that were contributed to the mortgage loan pools underlying the RFC Transactions that RFC knew were untrue. RFC materially misrepresented to MBIA that the mortgage loans in the RFC Transactions were underwritten in substantial compliance with its Underwriting Guidelines and failed to disclose RFC's consistent violations and manipulations of its Underwriting Guidelines. RFC falsely misled MBIA into believing that RFC's Underwriting Guidelines employed appropriate underwriting standards.

-32-

78.     To the contrary, RFC underwrote mortgage loans by intentionally and consistently issuing improper "exceptions" to its Underwriting Guidelines, including by issuing purported "exceptions" in connection with RFC's use of "negotiated commitments," "bulk purchase programs" and the use of Assetwise in blatant violation of the Underwriting Guidelines. RFC knew that the purported "exceptions" would cause the mortgage loans to fail to comply with its Underwriting Guidelines, yet knowingly contributed these non-compliant mortgage loans to the mortgage loan pools for the RFC Transactions notwithstanding their failure to comply with the Underwriting Guidelines. RFC knowingly defrauded MBIA by representing to MBIA that the mortgage loans contributed to the RFC Transactions were underwritten in substantial compliance with the Underwriting Guidelines.

79.     As a result of its knowing misrepresentations, RFC intended to, and, in fact, did defraud MBIA into issuing the Policies for the RFC Transactions. RFC defrauded MBIA so that it could earn both proceeds on the securitization and sale of the mortgage loans underlying the RFC Transactions and fees for servicing those loans after their securitization while passing the risks inherent in the poorly-underwritten mortgage loans to MBIA.

80.     MBIA reasonably relied to its detriment on RFC's misrepresentations. Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

81.     As a direct result of, and in reliance upon, RFC's misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

82.     As a result of RFC's fraud, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

-33-

83. A justiciable controversy exists as to (a) whether RFC fraudulently induced MBIA to issue the Policies in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## SECOND CAUSE OF ACTION

### (MATERIAL BREACH OF THE INSURANCE AGREEMENTS)

84. MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 83.

85. The Insurance Agreements are valid and enforceable contracts between MBIA and RFC that give rise to certain obligations on the part of RFC in connection with the mortgage loans and the RFC Transactions. MBIA has fully complied with its obligations under the Insurance Agreements and the Policies.

86. In the Insurance Agreements, RFC made numerous representations and warranties to MBIA, including the representation that none of the material information that RFC supplied to MBIA regarding the mortgage loans or the "operations of RFC" contained an untrue or misleading statement of material fact. Additionally, the Insurance Agreements incorporate by reference, for the benefit of MBIA, each of RFC's representations and warranties in the Transaction Documents, including the representation that the mortgage loans that RFC contributed to the RFC Transactions were underwritten in substantial compliance with RFC's Underwriting Guidelines.

87. These representations and warranties were material to MBIA's decisions to enter into the Insurance Agreements and to issue the Policies. RFC's compliance with its representations and warranties was and is necessary to assure MBIA the benefit of its bargain.

88. RFC, however, has pervasively and extensively breached its representations and warranties to MBIA. Tens of thousands of the mortgage loans underlying

-34-

the RFC Transactions failed to comply with RFC's Underwriting Guidelines. Moreover, a substantial number of mortgage loans breached one or more of RFC's representations and warranties to MBIA. The non-compliant mortgage loans in the mortgage loan pools with multiple breaches of representations and warranties are so pervasive that RFC has deprived MBIA of the benefit of its bargain in connection with the Insurance Agreements and the Policies, taken as a whole.

89.    A justiciable controversy exists as to (a) whether RFC has materially breached the Insurance Agreements and (b) MBIA's entitlement to damages as a result thereof.

90.    Accordingly, MBIA seeks an award of damages, in amount to be proved at trial, for RFC's material breaches of the Insurance Agreements.

### THIRD CAUSE OF ACTION

### (BREACH OF CONTRACT: FAILURE TO COMPLY WITH AND REPUDIATION OF THE LOAN BREACH REMEDY PROCEDURE)

91.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 90.

92.    Pursuant to the Purchase Agreements and the 2007-HSA2 Assignment Agreement, if MBIA determines that RFC breached its representations and warranties in a manner that "materially and adversely affects the interests of [MBIA]," including, without limitation, by contributing a mortgage loan to the RFC Transactions that did not comply with RFC's representations and warranties or with RFC's Underwriting Guidelines, MBIA can give notice to RFC of the presence of the non-compliant mortgage loan, after which RFC will have 90 days to cure the breach. Alternatively, RFC can repurchase the mortgage loan or, if substitution can be completed within two years of the closing date of the RFC Transaction in question, RFC can substitute a performing, compliant mortgage loan for the non-compliant mortgage loan (the

"Loan Breach Remedy Procedure"). The Loan Breach Remedy Procedure is not an exclusive remedy and does not apply to breaches of the Insurance Agreements.

93.    The parties established the Loan Breach Remedy Procedure because they recognized the possibility that an isolated and limited number of mortgage loans, among the thousands of mortgage loans underlying the RFC Transactions, may not comply with RFC's representations and warranties or with RFC's Underwriting Guidelines. Because of this possibility with respect to an isolated and limited number of mortgage loans, the parties intended, through the Loan Breach Remedy Procedure, to establish an agreed-upon mechanism whereby MBIA could give notice to RFC of an isolated and limited number of non-compliant mortgage loans and RFC could repurchase such non-compliant mortgage loans without implicating an event of default for the RFC Transactions in their entirety.

94.    On several occasions during 2008 and 2009, MBIA sent notices to RFC identifying numerous mortgage loans underlying the RFC Transactions that were in breach of one or more of RFC's representations and warranties, pursuant to Section 3.1(b) of the Purchase Agreements and Section 4 of the 2007-HSA2 Assignment Agreement, and notifying RFC that such breaches materially and adversely affected the interests of MBIA (the "Remedy Notices"). Specifically, MBIA sent the following Remedy Notices to RFC:

| Date | Transaction(s) | Number of Loans |
|---|---|---|
| May 22, 2008 | HSA4, HSA5 | 194 |
| May 22, 2008 | HSA2 | 359 |
| May 22, 2008 | HSA1, HSA3 | 139 |
| September 2, 2008 | HSA4, HSA5 | 310 |
| September 5, 2008 | HSA2 | 57 |

| September 17, 2008 | HSA1 | 293 |
| September 25, 2008 | HSA3 | 484 |
| December 30, 2008 | HSA4, HSA5 | 202 |
| December 30, 2008 | HSA1 | 246 |
| December 30, 2008 | HSA3 | 416 |
| January 22, 2009 | HSA2 | 736 |
| | **Total** | 3,436 |

95.     The mortgage loans identified in the Remedy Notices were included in the Remedy Notices because they failed to comply with one or more of RFC's representations and warranties. For example, many of the mortgage loans were underwritten on the basis of "stated incomes" that were clearly unreasonable for the circumstances of the individual borrower or were based on DTI or CLTV ratios that exceeded the Underwriting Guidelines. In addition, the files for the mortgage loans lacked necessary documents including mortgage notes, disclosures relating to the sale of the mortgage loan, disclosures relating to the transfer of servicing for the mortgage loan, documents confirming appropriate reserves and documents necessary for compliance with the Patriot Act.

96.     Initially, RFC participated in the Loan Breach Remedy Procedure by responding to the two Remedy Notices that MBIA sent to RFC on May 22, 2008. While MBIA and RFC were able to reach agreements with respect to approximately 24% of the 692 mortgage loans identified in those Remedy Notices, RFC refused to cure, substitute for or repurchase the remaining non-compliant mortgage loans, as required by the Loan Breach Remedy Procedure.

97.     RFC refused to cure the material breaches for the vast majority of the non-compliant mortgage loans that MBIA identified in the Remedy Notices that MBIA sent to RFC in September 2008, and on information and belief, RFC does not intend cure any of those

-37-

breaches nor will it substitute for or repurchase any of the non-compliant mortgage loans. In addition, RFC has completely ignored and never responded to the Remedy Notices that MBIA sent to RFC in December 2008 and January 2009, which identified more than 1,600 non-complaint mortgage loans with an unpaid principal balance of more than $106 million. As such, RFC, by its conduct, has abandoned its contractual repurchase obligations, and such abandonment constitutes a wrongful repudiation of RFC's obligations under the Loan Breach Remedy Procedure.

98.    Moreover, the existing Remedy Notices do not identify all of the mortgage loans that fail to comply with RFC's representations and warranties. For example, RFC obstructed MBIA's right to access certain documents and information concerning the mortgage loans. Pursuant to the Servicing Agreements and the Insurance Agreements, MBIA is contractually entitled to such information, and RFC's refusal to provide it constitutes an independent breach of contract, which prevented MBIA from pursuing appropriate remediation efforts and damaged MBIA in an amount to be proved at trial.

99.    Moreover, additional mortgage loans continue to become delinquent and are charged-off every month. For example, in December 2009 alone, 3,762 mortgage loans were delinquent by 60 or more days. On information and belief, such delinquencies and charge-offs will continue through the date of trial in this action and beyond. However, because RFC has abandoned and wrongfully repudiated the Loan Breach Remedy Procedure by its conduct, it would be futile for MBIA to generate and send additional Remedy Notices.

100.    As a result of RFC's failure to comply with its obligations under the Loan Remedy Breach Procedure with respect to the mortgage loans identified in the Remedy Notices and RFC's abandonment and wrongful repudiation of the Loan Breach Remedy Procedure in its entirety, MBIA has incurred, and will continue to incur, damages in an amount to be proved at

-38-

trial. MBIA has been, and will continue to be, required to make payments to investors as a result of shortfalls in cash flow to the trusts in the RFC Transactions. By failing to cure the defective aspects of the non-compliant mortgage loans identified in the Remedy Notices, to repurchase or substitute for those non-compliant mortgage loans and by abandoning and wrongfully repudiating its obligations under the Loan Breach Remedy Procedure, RFC has caused MBIA to incur payments for certain shortfalls in cash flows to investors when, in fact, such shortfalls should have been properly paid by RFC as a result of RFC's repurchase of or substitution for non-compliant mortgage loans.

101.    In addition, MBIA has incurred, and will continue to incur, significant fees for professional services, including attorneys' fees, to engage in, and enforce RFC's obligations under, the Loan Breach Remedy Procedure with RFC. Pursuant to Section 3.03 of the Insurance Agreements, RFC agreed to indemnify MBIA for (i) damages as a result of RFC's failure to comply with the Transaction Documents, including, without limitation, RFC's failure to comply with its obligations under the Loan Breach Remedy Procedure, with interest, and (ii) reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA reasonably incurs, in connection with the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents.

102.    RFC has failed to indemnify MBIA, pursuant to Section 3.03 of the Insurance Agreements, for the damages it has incurred, and will continue to incur, as a result of RFC's failure to comply with its obligations under the Loan Breach Remedy Procedure, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred and continues to incur.

103.    MBIA has fully complied with its obligations under the Transaction Documents, the Insurance Agreements and the Policies.

104.    A justiciable controversy exists as to (a) RFC's obligation to comply with the Loan Breach Remedy Procedure; (b) RFC's wrongful repudiation of the Loan Breach Remedy Procedure; and (c) MBIA's entitlement to damages as a result of RFC's breaches of its representations and warranties, RFC's failure to comply with the Loan Breach Remedy Procedure and RFC's wrongful repudiation of its obligations under the Loan Breach Remedy Procedure. Accordingly, MBIA seeks a declaratory judgment that (a) RFC is required to comply with its obligations under the Loan Breach Remedy Procedure; (b) RFC has wrongfully repudiated its obligations under the Loan Breach Remedy Procedure; and (c) RFC is required to indemnify MBIA for any and all damages it has incurred, and that MBIA incurs, as a result of RFC's breaches of its representations and warranties, including RFC's failure to comply with and wrongful repudiation of its obligations under the Loan Breach Remedy Procedure.

## FOURTH CAUSE OF ACTION

### (BREACH OF CONTRACT – SERVICING)

105.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 104.

106.    RFC was the initial Master Servicer for the RFC Transactions. On November 2, 2009, RFC voluntarily relinquished its rights and responsibilities under the Servicing Agreements and allowed MBIA to appoint a new Master Servicer. As such, RFC is not presently involved with the servicing of the mortgage loans underlying the RFC Transactions.

107.    Between the closing date of each of the RFC Transactions and November 2, 2009, RFC was required to service the mortgage loans underlying the RFC Transactions in a manner consistent with RFC's servicing guidelines and the Servicing Agreements. As Master Servicer, RFC was required to employ, in its good faith business judgment, all of its "normal and

-40-

usual" servicing procedures. Because RFC was required to use its good faith business judgment, RFC's servicing procedures must have been prudent and must have materially complied with industry standards. RFC also outsourced some of its servicing duties to certain of its affiliates as subservicers – namely, GMAC Mortgage and Homecomings Financial Network, Inc. (later Homecomings Financial, LLC and, collectively, "Homecomings"). As Master Servicer, however, RFC had ultimate responsibility for servicing the mortgage loans underlying the RFC Transactions.

108.    In fact, RFC's manner of servicing suffered from a number of material deficiencies and areas of serious concern that, in many instances, amounted to a breach of the Servicing Agreements and an abdication by RFC of its servicing responsibilities. These material deficiencies included, among other things, (a) failing to contact borrowers prior to charging-off loans, (b) failing to charge-off loans that were substantially delinquent, (c) failing to initiate proper skip tracing activities, (d) failing to discuss loss mitigation with borrowers and to obtain borrower financial information to conduct a proper workout analysis, (e) failing to offer properly designed modifications to reduce re-defaults, (f) failing to provide authority to early stage collection offices to offer loss mitigation options, (g) failing to initiate and document contact with borrowers, (h) failing to conduct timely property inspections, instead relying excessively on broker price opinions, (i) failing to monitor loss mitigation deal compliance and (j) failing to properly monitor foreclosure sale activities. In addition, RFC (a) unduly and improperly relied upon automated calling rather than establishing and maintaining human contact with borrowers, (b) serviced the loans in a low cost minimal effort manner with long periods of inaction, (c) serviced the loans in a passive manner that relied upon borrower-initiated contact rather than servicer action, and (d) experienced a significant downturn in servicing capacity and activities, especially during 2008.

109.    These numerous and material breaches of the Servicing Agreements and RFC's own servicing guidelines between RFC's appointment as Master Servicer and November 2, 2009 have both accelerated and increased MBIA's losses.   Had RFC complied with its contractual obligations and employed more rigorous servicing and remediation procedures, the payments that MBIA has been required to make pursuant to its financial guaranty insurance policies for the RFC Transactions would have been significantly smaller.   As such, MBIA has been damaged by RFC's breach of its responsibilities as Master Servicer in an amount to be determined at trial.

110.    MBIA has fully complied with its obligations under the Transaction Documents and the financial guarantee insurance policies with respect to the RFC Transactions.

## FIFTH CAUSE OF ACTION

### (NEGLIGENT MISREPRESENTATION)

111.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 110.

112.    In connection with MBIA's issuance of the Policies, RFC had a duty to communicate accurate and complete information to MBIA because of MBIA's special relationship of trust and confidence with RFC.

113.    MBIA had issued financial guaranty insurance policies for securitization transactions sponsored by RFC and its affiliates during 2003 and 2004.   In late 2005 and early 2006, MBIA and RFC engaged in discussions to further their relationship and develop a program pursuant to which MBIA would issue financial guaranty insurance policies for securitization transactions sponsored by RFC.   As part of these discussions, MBIA visited RFC's offices and analyzed RFC's credit profile and financial stability based on, among other things, information provided by RFC.   After performing this analysis, MBIA authorized its underwriters to incur up

-42-

to $8.5 billion of gross exposure to securitization transactions sponsored by RFC and its affiliate, GMAC Mortgage, subject to each proposed securitization transaction being reviewed and approved in accordance with MBIA's underwriting policies and procedures. MBIA's Executive Credit Committee also delegated authority to approve transactions to MBIA's Underwriting Committee based on MBIA's trust and confidence in RFC. The special relationship between MBIA and RFC predated MBIA's contractual relationship with RFC in connection with the RFC Transactions.

114.    In addition, MBIA's special relationship with RFC is demonstrated by RFC's unique and special knowledge and expertise regarding both the underwriting of mortgage loans, generally, and the underwriting of the mortgage loans in the loan pools for the RFC Transactions. While MBIA may be viewed in certain contexts as a "sophisticated" party, it is not a mortgage loan originator. Moreover, it did not originate any of the mortgage loans underlying the RFC Transactions and could not reasonably have reviewed those loans before issuing the Policies. MBIA's inability to reasonably review and underwrite the mortgage loans is demonstrated by the fact that MBIA was provided only a few days to bid on the RFC Transactions, which often closed less than a month after RFC's initial invitation to submit a bid. As such, MBIA was entirely reliant on RFC's unique and special knowledge and expertise.

115.    RFC misrepresented existing material facts with respect to the RFC Transactions.

116.    RFC possessed clear and reasonable grounds for believing or determining that its representations were materially false and should have known that its representations were materially false. Moreover, RFC knew or should have known that MBIA would rely on RFC's materially false representations. Accordingly, RFC acted negligently in making the materially

false representations to MBIA with respect to the underwriting of the mortgage loans contributed to the mortgage loan pools for the RFC Transactions.

117.    RFC knew or should have known that RFC's false representations were essential and material to MBIA's decision to issue the Policies in connection with the RFC Transactions. MBIA was not aware and could not reasonably have been aware of the falsity of RFC's representations.

118.    MBIA reasonably relied to its detriment on RFC's misrepresentations. Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

119.    As a proximate result of its reasonable reliance on RFC's negligent misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

120.    As a result of RFC's negligent misrepresentations, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

121.    A justiciable controversy exists as to (a) whether RFC made negligent misrepresentations to MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## SIXTH CAUSE OF ACTION

### (BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING) (PRESERVED FOR APPEAL)

122.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 121.

123.    Under the Insurance Agreements, the Purchase Agreements and the 2007-HSA2 Assignment Agreement, RFC is required to comply with the covenant or duty of good faith and fair dealing that is implied in all contracts.

124.    By entering into the Insurance Agreements with MBIA, which incorporated by reference the representations and warranties stated in the Purchase Agreements and the 2007-HSA2 Assignment Agreement, RFC agreed to act in good faith with respect to its contribution of mortgage loans to the mortgage loan pools underlying the RFC Transactions.

125.    RFC breached its implied covenant or duty of good faith and fair dealing. In that regard, RFC represented and warranted to MBIA that the mortgage loans contributed to the mortgage loan pools underlying the RFC Transactions were underwritten in substantial compliance with RFC's Underwriting Guidelines, among other representations and warranties. However, RFC, in bad faith, knowingly and systematically contributed mortgage loans to the mortgage loan pools underlying the RFC Transactions that RFC knew breached one or more of RFC's representations and warranties. RFC further breached its implied covenant or duty of good faith and fair dealing by failing to employ mortgage loan servicing procedures consistent with mortgage loan servicing industry standards, and otherwise failing to comply with its obligations, pursuant to the Transaction Documents, to service, in good faith, the mortgage loans for the RFC Transactions.

126.    RFC's breach of its implied covenant or duty of good faith and fair dealing deprived MBIA of its right to receive the full benefits of the Insurance Agreements by compelling MBIA to make payments on insurance claims that would not have arisen but for RFC's bad faith conduct. Further, RFC, in bad faith, has denied MBIA reasonable access to information necessary to evaluate RFC's actions as servicers for the mortgage loans or to enforce MBIA's contractual rights in connection with the RFC Transactions.

-45-

127.    Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

128.    As a result of RFC's material breach of the implied covenant of good faith and fair dealing, MBIA has incurred, and will continue to incur, damages, including, without limitation, interest and reasonable attorneys' and accountants' fees and expenses. Because MBIA would not have issued the Policies if MBIA had known the true risk profile of the loan portfolios in the RFC Transactions, RFC is responsible for all losses incurred by MBIA whether or not such losses relate directly to non-compliant mortgage loans.

129.    MBIA has fully complied with its obligations under the Transaction Documents and the financial guarantee insurance policies with respect to the RFC Transactions.

130.    A justiciable controversy exists as to (a) whether RFC breached the covenant or duty of good faith and fair dealing implied in the Transaction Documents in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## SEVENTH CAUSE OF ACTION

### (EQUITABLE OR IMPLIED INDEMNIFICATION)
### (PRESERVED FOR APPEAL)

131.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 130.

132.    In connection with the RFC Transactions, RFC made representations and warranties to MBIA and provided information with respect to the mortgage loans contributed to the mortgage loan pools for the RFC Transactions to MBIA. RFC's representations and warranties were materially false. In reliance upon RFC's representations and warranties and

-46-

other information with respect to the mortgage loans, MBIA issued the Policies in connection with the RFC Transactions.

133.    RFC's breaches of its representations and warranties materially undermined and distorted the fundamental basis upon which MBIA agreed to issue the Policies for the RFC Transactions. Moreover, the substantial and hidden risks present in the RFC Transactions, which were hidden by RFC's representations and warranties and were pervasive to the mortgage loan pools for the RFC Transactions, have caused the mortgage loans in the RFC Transactions to become delinquent and subsequently charged-off at a severe and unexpected rate, thus causing significant shortfalls in cash flows to investors in the RFC Transactions. Further, RFC's failure to minimize losses on the mortgage loans through normal and usual mortgage loan servicing procedures, and as otherwise required pursuant to the Transaction Documents, has exacerbated shortfalls to investors in the RFC Transactions and, accordingly, losses to MBIA.

134.    Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

135.    As a result of having issued the Policies, MBIA is contractually liable to the trusts, and, in that regard, the investors in the RFC Transactions, to insure the payment of certain cash flows or losses as a result of charge-offs to the investors in the RFC Transactions in the event of shortfalls in the cash flows to the trust for the RFC Transactions.

136.    MBIA has paid and will continue to pay all insurance claims made in connection with the RFC Transactions pursuant to the terms of the Policies.

137.    MBIA, however, is in whole or in part, discharging a duty which is owed by MBIA to investors in the RFC Transactions pursuant to the Policies but which, as between

-47-

MBIA and RFC, should in equity and good conscience be discharged by RFC because the
Policies were procured based on RFC's providing MBIA materially false representations and
warranties.

138.    MBIA has incurred, and will continue to incur, damages in an amount to
be determined at trial as a result of discharging a duty which is owed by MBIA to investors in
the RFC Transactions but which, as between MBIA and RFC, should in equity and good
conscience have been discharged by RFC. Because MBIA would not have issued the insurance
policies had it known the true risk profile of the loan portfolios in the RFC Transactions, RFC is
responsible for all losses incurred by MBIA whether or not such losses relate directly to non-
compliant mortgage loans.

139.    A justiciable controversy exists as to (a) whether RFC, in equity and good
conscience, is liable for all insurance claims against MBIA and other losses incurred by MBIA
with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b)
MBIA's entitlement to damages as a result thereof.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
### (PRESERVED FOR APPEAL)

140.    MBIA repeats, re-alleges and incorporates each and every allegation
contained in paragraphs 1 through 139.

141.    MBIA has conferred a benefit on RFC by issuing the Policies with the
reasonable expectation of receiving the full rights and value negotiated in connection with that
benefit.

142.    RFC was unjustly enriched at MBIA's expense and equity and good
conscience require RFC to compensate MBIA for the unjust benefit conferred on RFC. In that

regard, had MBIA known about RFC's significant and substantial breaches of its representations

and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

     143.   If MBIA had not issued the Policies, RFC would have had to follow either

of two courses of action:

         a.    RFC may have sold the securities issued in connection with the RFC Transactions without the Policies. In this scenario, RFC would have received a substantially lower amount from the sale of the securities than it did because the investors in the RFC Transactions would demand a discount in the purchase price of the securities or a higher interest rate on the securities to compensate for the additional, uninsured risk of shortfalls in cash flows; or

         b.    RFC may not have been able to consummate the RFC Transactions. In this scenario, RFC would not have sold the mortgage loans by means of the RFC Transactions. RFC may have sold the mortgage loans to another purchaser, possibly for a lesser purchase price. If RFC was unable to sell the mortgage loans, all of the losses with respect to the mortgage loans would have been borne by RFC, and only RFC. Further, if the RFC Transactions were not consummated, RFC and its affiliate would not have been entitled to servicing fees for servicing the mortgage loans in connection with the RFC Transactions.

     144.   By improperly and unjustly inducing MBIA to issue the Policies as a

result of its materially false representations and warranties, RFC was able to obtain payments

under the Policies for investors in the RFC Transactions in the event of shortfalls of cash flows

or losses to the trusts for the RFC Transactions. Consequently, investors in the RFC

Transactions were willing to pay more to RFC for securities issued in connection with the RFC

Transactions because of the presence of the MBIA insurance policies. Thus, RFC was able to

receive a higher payment for the securities issued in connection with the RFC Transactions by

causing the risk of liability for insuring certain cash flows for the RFC Transactions to pass to

MBIA. Further, RFC earned servicing fees in connection with the servicing of the mortgage

loans for the RFC Transactions while passing the risk of shortfalls in cash flows to investors in

the RFC Transactions to MBIA. RFC earned these servicing fees despite failing to utilize good faith business judgment to employ its normal and usual mortgage loan servicing procedures, and otherwise comply with its obligations pursuant to the Transaction Documents, to service the mortgage loans for the RFC Transactions.

145.    As a result of RFC's improper and unjust actions, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

146.    As a result of RFC's improper and unjust actions, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

147.    A justiciable controversy exists as to (a) whether RFC was unjustly enriched with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

**RELIEF DEMANDED**

WHEREFORE, plaintiff MBIA Insurance Corporation demands judgment against defendant Residential Funding Company, LLC, as follows:

1.    With respect to the First Cause of Action, a judgment (a) declaring that RFC fraudulently induced MBIA to issue the Policies in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses and liabilities relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any

-50-

other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

2.      With respect to the Second Cause of Action, a judgment (a) declaring that RFC has materially breached the Insurance Agreements and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial, including interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, in an amount to be determined at trial; and

3.      With respect to the Third Cause of Action, a judgment (a) declaring that RFC is required to comply with its obligations under the Loan Breach Remedy Procedure; (b) declaring that RFC has wrongfully repudiated its obligations under the Loan Breach Remedy Procedure; and (c) declaring that RFC is required to indemnify MBIA for any and all damages it has incurred, and that MBIA incurs, as a result of RFC's breaches of its representations and warranties, including RFC's failure to comply with and its wrongful repudiation of its obligations under the Loan Breach Remedy Procedure; and (d) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to RFC's breaches and ultimate repudiation of the Loan Breach Remedy Procedure, including damages, interest, reasonable attorneys' and accountants' fees and expenses, and any other fees and expenses that MBIA incurred or incurs, in an amount to be determined at trial; and

4.      With respect to the Fourth Cause of Action, a judgment (a) declaring that RFC breached the Servicing Agreements when RFC was acting as Master Servicer by failing to property service the mortgage loans underlying the RFC Transactions and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, as a result of RFC's breaches of the Servicing Agreements, including interest, reasonable attorneys' and

-51-

accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, in an amount to be determined at trial; and

       5.      With respect to the Fifth Cause of Action, a judgment (a) declaring that RFC made negligent misrepresentations to MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses and liabilities relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

       6.      With respect to the Sixth Cause of Action, a judgment (a) declaring that RFC has breached the covenant or duty of good faith and fair dealing implied in the Transaction Documents in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses and liabilities resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and

expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

7.      With respect to the Seventh Cause of Action, a judgment (a) declaring that RFC is liable for all insurance claims against MBIA and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

8.      With respect to the Eighth Cause of Action, a judgment (a) declaring that RFC has been unjustly enriched with respect to the Policies issued by MBIA in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses and

-53-

liabilities relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

        9.      The full amount of MBIA's attorneys' fees and expenses with respect to this action; and

        10.    Punitive and consequential damages; and

        11.    For such other and further relief as the Court may deem just and proper.

Dated:    March 19, 2010

CADWALADER, WICKERSHAM & TAFT LLP

By:  /s/ Howard R. Hawkins, Jr.

Gregory M. Petrick
Howard R. Hawkins, Jr.
Jonathan M. Hoff
One World Financial Center
New York, New York 10281
(212) 504-6000

*Attorneys for Plaintiff
MBIA Insurance Corporation*

**Exhibit D**
**GMAC MORTGAGE COMPLAINT**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MBIA INSURANCE CORPORATION,

Index No. 10600831

Plaintiff,

Date of Filing: 4/1/10

-against-

GMAC MORTGAGE, LLC (F/K/A GMAC
MORTGAGE CORPORATION),

**SUMMONS**

NEW YORK
COUNTY CLERK'S OFFICE
APR 01 2010
NOT COMPARED
WITH COPY FILE

Defendant.

TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an

answer to the complaint in this action within twenty (20) days after the service of this summons,

exclusive of the day of service, or within thirty (30) days after service is complete if this

summons was not personally delivered to you within the State of New York. In case of your

failure to answer, judgment will be taken against you by default for the relief demanded in the

complaint.

The bases for venue are CPLR §§ 501 and 503, because the Defendant agreed that the

Courts within the County and State of New York are an appropriate venue and substantial acts

giving rise to the Plaintiff's claims occurred in New York County.

DATED:  New York, New York
        April 1, 2010

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:
    Peter E. Calamari
    Philippe Z. Selendy
    Christine H. Chung

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849 7000

*Attorneys for MBIA Insurance Corporation*

TO:    GMAC Mortgage, LLC
       1100 Virginia Drive
       Fort Washington, PA 19034

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK CITY

| | |
|---|---|
| MBIA INSURANCE CORPORATION, | Index No. 1060083† |
| Plaintiff, | **COMPLAINT** |
| -against- | |
| GMAC MORTGAGE, LLC (f/k/a GMAC MORTGAGE CORPORATION), | |
| Defendant. | |

Plaintiff MBIA Insurance Corporation ("MBIA"), by its attorneys, Quinn
Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against GMAC Mortgage, LLC
(formerly known as GMAC Mortgage Corporation) ("GMAC Mortgage" or "Defendant")
alleges as follows:

## NATURE OF THE ACTION

1.    This action arises out of the fraudulent acts and breaches of contract of GMAC
Mortgage in connection with three publicly offered securitizations of residential mortgages. All
of the mortgage loans underlying the securitizations were originated or acquired by GMAC
Mortgage, a subsidiary of lending giant GMAC Inc. This Complaint alleges that, in its dealings
with MBIA, GMAC Mortgage affirmatively misrepresented the quality of tens of thousands of
mortgage loans, with a total original principal balance of more than $4 billion, as a means of
unfairly shifting to investors and MBIA risks that GMAC Mortgage should have borne itself.

2.    In particular, GMAC Mortgage pooled and conveyed mortgage loans into trusts,
which in turn issued residential mortgage-backed securities ("RMBS") to investors in three
offerings, in 2004, 2006, and 2007. The three mortgage loan securitization transactions at issue
are:  GMAC Mortgage Corporation Home Equity Loan Trust 2004-HE4 (the "2004

Transaction"), GMAC Mortgage Corporation Home Equity Loan Trust 2006-HE4 (the "2006

Transaction"), and GMAC Mortgage Corporation Home Equity Loan Trust 2007-HE1 (the

"2007 Transaction") (collectively, the "Transactions"). In each of the Transactions, the loans at

issue were collateralized by second mortgages and were represented to be prime because of the

purportedly creditworthy nature of the borrowers and loans.

      3.    To make the securities more marketable in each of the three offerings, GMAC

Mortgage sought a financial guaranty insurer to guarantee the trusts' payments to investors in the

event that cash flows to the trusts were impaired by the failure of mortgage borrowers to make

payments of principal and interest. To secure MBIA's agreement to provide this insurance,

GMAC Mortgage made a comprehensive set of representations about the securitizations. These

representations included loan-level representations about key attributes of individual loans and

transaction-level representations about the characteristics of the pools of loans that were

securitized.

      4.    While GMAC Mortgage was soliciting MBIA to provide financial guaranty

insurance, and before each Transaction closed, GMAC Mortgage provided to MBIA: (1) loan

"tapes" that included data about each borrower and loan, including measurements of each

borrower's creditworthiness; (2) schedules that set forth key statistics about the loan pools,

including averages of measures contained in the loan tapes; and (3) initial and final Prospectus

Supplements that represented that all of the loans in the pools had been originated in compliance

with GMAC Mortgage's Underwriting Guidelines, which supposedly had been developed to

ensure that borrowers were creditworthy and that the mortgage loans would be repaid. Using the

same loan tapes it provided to MBIA, and summary data conveying key characteristics of the

loan pool, GMAC Mortgage also procured from rating agencies "shadow ratings"—credit ratings

the Transactions would carry without financial guaranty insurance. GMAC Mortgage knew that

MBIA would rely on these shadow ratings, as well as the loan tapes, schedules, and initial and

final Prospectus Supplements, in determining whether to insure the Transactions.

     5.     As part of the Transactions, GMAC Mortgage also made to MBIA, and for

MBIA's benefit, extensive contractual representations and warranties. GMAC Mortgage

represented and warranted, among other things, that: (1) all of the information it provided to

MBIA about the mortgage loans was accurate and not misleading; (2) all of the mortgage loans

in the pools were underwritten in accordance with GMAC Mortgage's underwriting standards;

and (3) in the case of each loan, after receiving all applicable employment, credit, and property

information, a determination had been made that the borrower was able to meet his or her

monthly payments, including loan payments.

     6.     In reality, however, GMAC Mortgage originated and sold loans into the trusts that

contradicted the pre-closing representations it made to MBIA and blatantly violated its

contractual representations and warranties. In 2009, faced with mounting claims payments

caused by delinquent and so-called "charged-off" loans—loans deemed uncollectible and thus

written down to zero—MBIA began examining loan files and documentation associated with

thousands of loans. The results of this review made clear that GMAC Mortgage had wholly

abandoned its own underwriting policies and instead routinely approved loans to borrowers who

failed to meet basic risk criteria. At least 89% of the 4,104 delinquent or charged-off loans

reviewed by MBIA were not originated in material compliance with GMAC Mortgage's

3

Underwriting Guidelines or the contractual representations and warranties made by GMAC Mortgage.[1]

7.     MBIA's review demonstrated that GMAC Mortgage had misrepresented the quality of the mortgage loans consistently from its first contacts with MBIA. Loan tapes and schedules—including those attached to GMAC Mortgage's first solicitations of bids from MBIA—contained false data about borrowers, loans, and the characteristics of the loan pools. GMAC Mortgage had used the same false loan tapes and other false pool-level information derived from the false data on the loan tapes to procure from the rating agencies inflated shadow ratings, which it then furnished to MBIA. GMAC Mortgage was able to carry out its fraudulent scheme by virtue of its unique and superior knowledge about the mortgage loans, its false representations about the quality of those loans, and the trust that MBIA placed in GMAC Mortgage. The relationship of trust and confidence existed between MBIA and GMAC Mortgage as a result of MBIA having provided insurance in at least eight prior GMAC Mortgage-sponsored securitizations of RMBS, beginning in 1999.

8.     GMAC Mortgage succeeded in concealing from MBIA the loans' hidden risks, and as a result MBIA has suffered tremendous harm. In agreeing to provide financial guaranty insurance, MBIA assumed only the risk that loans conforming to GMAC Mortgage's Underwriting Guidelines would not perform as expected. It did not, however, assume the risk that GMAC Mortgage would flagrantly ignore prudent underwriting standards and stock the securitizations with non-compliant loans. As of December 31, 2009, MBIA had received

---

[1]     As discussed below, although GMAC Mortgage has repeatedly and unreasonably denied MBIA access to complete versions of the GMAC Mortgage Underwriting Guidelines, there is little dispute as to the content of the Guidelines relevant to this action. In responses to correspondence in which MBIA sought to enforce contractual remedies, GMAC Mortgage has not challenged MBIA's contentions about the standards set forth in the Guidelines.

4

premiums of approximately $12.5 million. These premiums were supposed to be commensurate
with risks associated with loan pools that conformed to GMAC Mortgage's representations. As
of December 31, 2009, MBIA had paid approximately $132 million in claims and remains
exposed to millions in further liabilities.

9.      GMAC Mortgage has compounded MBIA's losses by breaching an express
representation and warranty to cure, repurchase, or replace non-compliant mortgage loans with
loans conforming to the representations made by GMAC Mortgage. To date, MBIA has
requested that GMAC Mortgage cure, repurchase, or replace approximately 3,669 non-compliant
loans. In response, GMAC Mortgage agreed to repurchase or replace only 28 of these loans. In
an obvious and improper attempt to prevent MBIA from exercising its contractual rights, GMAC
Mortgage has also refused to provide complete versions of GMAC Mortgage Underwriting
Guidelines and has failed to provide information that would enable MBIA to gain full knowledge
of the historical performance of the loans, including loan-level data dating from the closing of
each Transaction to early 2008.

10.      GMAC Mortgage's refusal to participate in good faith in the so-called "putback"
process leaves MBIA uncompensated for its losses. At a more fundamental level, the repurchase
obligation was never intended to provide an adequate remedy where non-compliant loans
pervade the pools rather than constitute isolated exceptions. Had GMAC Mortgage told the truth
about the risks associated with the mortgage loans, MBIA never would have agreed to insure the
securitizations.

11.      GMAC Mortgage's deception enabled it to sell pools of mortgage loans it
represented to be worth billions of dollars, while transferring the risks embedded in those loan
pools to investors and, ultimately, MBIA. Because GMAC Mortgage's fraud, concealment, and

5

breaches of contract have deprived MBIA of the benefit of its bargain, MBIA is entitled to recover from GMAC Mortgage, at a very minimum, the value of payments that MBIA has made and will make in the future.

## PARTIES

12.    Plaintiff MBIA Insurance Corporation is a New York corporation with its principal place of business at 113 King Street, Armonk, New York. MBIA is one of the nation's oldest and largest monoline insurers, and provides financial guaranty insurance and other forms of credit protection, generally on financial obligations, which are sold in the new issue and secondary markets.

13.    Defendant GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation, is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania. Upon information and belief, the members of GMAC Mortgage, LLC include at least one New York resident. In the period relevant to this action, GMAC Mortgage acquired, originated, and serviced residential mortgage loans. GMAC Mortgage also sponsored securitizations of mortgage loans.

14.    GMAC Mortgage is a wholly owned subsidiary of Residential Capital, LLC ("ResCap"), which in turn is a wholly owned subsidiary of GMAC Inc. In September 2008, ResCap announced that it was closing much of its business of acquiring mortgage loans. At or about this time, GMAC Mortgage closed all of its retail locations, locations at which home buyers or owners could obtain mortgages. GMAC Mortgage remains one of the largest residential mortgage servicers in the nation.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this proceeding pursuant to CPLR §§ 301 and 302. GMAC Mortgage is authorized to do business in New York, has appointed an agent for

6

service of process and has consented to the jurisdiction of the Courts within the State. In

addition, GMAC Mortgage expressly consented to the jurisdiction of this Court over all claims

arising out of the Transactions. GMAC Mortgage participated in negotiations and other

activities within the State which led to the transactions that give rise to the claims in the

Complaint, and the transactions themselves occurred within the State. GMAC Mortgage has also

regularly transacted business within the State.

16.    Venue is proper in this Court pursuant to CPLR §§ 501 and 503. GMAC

Mortgage expressly agreed that the Courts within the County and State of New York are an

appropriate venue for all actions arising out of the transactions that give rise to the claims in the

Complaint. In addition, negotiations and other substantial activities relating to the transactions

that give rise to the claims in this Complaint occurred within New York County.

### RELEVANT NON-PARTIES

17.    GMAC Inc. ("GMAC"), the ultimate parent company of GMAC Mortgage, is a

Delaware corporation with its principal place of business in Detroit, Michigan. GMAC

specializes in automotive financings, residential mortgage financings and services, and insurance

services. GMAC is the indirect parent company of all GMAC and GMAC-affiliated entities

relevant to this action.

18.    GMAC Bank, formerly an indirect, wholly owned subsidiary of GMAC, was at

all times relevant to this Complaint a loan originator. GMAC Bank sold loans it originated to

GMAC Mortgage to be securitized. GMAC Bank was renamed Ally Bank in May 2009. Ally

Bank is an online bank chartered under Utah law.

19.    Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove") is a Delaware

statutory trust established by an affiliate of GMAC Mortgage. Beginning in 2003, GMAC

Mortgage sold to Walnut Grove mortgage loans it had originated or purchased from GMAC

7

Bank. At the time of each of the three securitizations at issue in this case, Walnut Grove sold

mortgage loans to Residential Asset Mortgage Products, Inc. ("RAMP").

20.    RAMP, a special purpose vehicle, is an indirect, wholly owned subsidiary of

GMAC and a Delaware corporation with its principal place of business in Minnesota. In

connection with each securitization at issue in this case, RAMP purchased mortgage loans from

GMAC Mortgage and Walnut Grove and deposited those loans into a "GMAC Mortgage Home

Equity Loan Trust" arranged by GMAC Mortgage. Each trust then issued securities to

underwriters to be sold to investors.

21.    GMAC RFC Securities, an entity incorporated in Delaware, is an affiliate of

GMAC Mortgage and RAMP and a registered broker-dealer under the Securities Act of 1934.

GMAC RFC Securities, also known as Residential Funding Securities, LLC, served as an

underwriter of the securities issued in each of the securitizations at issue in this case.

## FACTUAL ALLEGATIONS

**A.    The Securitization of Mortgage Loans**

22.    Asset-backed securitization is the process by which risk is distributed by pooling

cash-producing financial assets, such as mortgage loans, and issuing securities backed by the

pool.

23.    The most common form of securitization of mortgage loans involves a sponsor—

the original owner of the mortgages—and the creation of a trust, to which the sponsor sells a

portfolio of mortgage loans. In many instances, the transfer of assets to a trust "is a two-step

process: the financial assets are transferred by the sponsor first to an intermediate entity, often a

limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the

depositor will transfer the assets to the [trust] for the particular asset-backed transactions." SEC

8

Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1,506-1,631 (Jan. 7, 2005).

24.    After receiving the portfolio of mortgage loans, the trust will issue debt securities using the pool of loans as collateral. Investors acquire rights to the income flowing from the mortgage pools. This income is generated by homeowners' payments of principal and interest on the mortgage loans held by the trust.

25.    A servicer is also necessary to manage the collection of proceeds from the mortgage loans. The servicer is responsible for maximizing homeowners' mortgage loan payments, which the servicer remits to the trust after deducting a monthly servicing fee. The servicer is also responsible for minimizing potential losses to the trust when homeowners fail to make required payments. The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance to zero. The servicer reports key information about the loans to the trustee, which administers the trust funds and delivers payments due each month on the investors' notes.

26.    To decrease the risk to investors of a shortfall in cash flows to the trust, and to make the securitization more attractive to investors, many securitizations include additional credit "enhancement" in the form of a financial guaranty insurance policy. Under the terms of such a policy, a financial guaranty insurer, in consideration of a premium and subject to the terms and conditions of the policy, will guarantee to investors that in the event there is a shortfall in cash flows to the trust, the insurer will insure certain payments with respect to current interest and ultimate principal to the trustee for the benefit of the investors. In this way, the risk to the investors of a shortfall in the anticipated cash flows to the trust is mitigated, thus increasing the marketability and pricing of the securities.

9

27.    The financial viability of an investment in a securitization, or an insurance policy issued on that investment, is a function of the quality of the underlying mortgage loans. If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, risk increases. Among the factors that determine the interest rate of a loan are the degree to which the borrower is required to verify his or her income, the borrower's credit score and employment history, and the amount of equity the borrower has in the mortgaged property. For example, a borrower who is not required to verify income and has little or no equity in his or her home typically pays a higher interest rate. Likewise, the value of a pool of mortgage loans depends on the quality of the loans, because a pool in which there is a higher risk of delinquencies and charge-offs is deemed more likely to suffer impaired cash flows. Based on its assessment of the risk of impaired cash flows, an insurer may decide not to provide insurance on a particular transaction, ask that the transaction be structured to provide additional protection against losses, or increase premiums to reflect the risk.

28.    Accordingly, the ability of the market, or of a potential financial guaranty insurer, to accurately assess risk depends on the information it has regarding the quality of the underlying mortgage loans and the standards used to originate those loans. Sponsors of securitizations thus make extensive disclosures to investors in publicly filed offering documents and make separate and additional disclosures, representations, and warranties to the providers of financial guaranty insurance.

29.    The sponsor possesses unique and special knowledge and expertise regarding the characteristics of the loans and the underwriting. At all times relevant to this Complaint, it was standard in the industry for sponsors to require financial guaranty insurers to submit bids within weeks of a sponsor's initial solicitation, for a securitization that would close only weeks later.

10

Because of this compressed time frame, it also became the practice in the industry that insurers did not undertake to re-underwrite the thousands or tens of thousands of loans that might be contributed to the pool. Instead, sponsors provided potential insurers with comprehensive representations and warranties about the quality of the underlying loans and the standards under which they had been originated and encouraged reliance on those representations and warranties. Sponsors also bore the risk that their representations and warranties would be proven untrue; they routinely undertook to cure, repurchase, or replace loans that were found before or after closing to fail to conform to its representations and warranties in a manner that materially and adversely affected the insurer's interests.

30.     Also because sponsors do not expect potential insurers to undertake a loan-by-loan review, they furnish to potential insurers loan tapes and schedules, or spreadsheets and charts, respectively, that contain data regarding key characteristics of the mortgage loans to be included in the securitization, including borrowers' Fair Isaac Corporation, or "FICO," scores; the appraised value of the mortgaged properties; and statistics such as combined loan-to-value ("CLTV"), the ratio of the sum of the first and second mortgage amounts to the appraised value of the property; and debt-to-income ("DTI"), the ratio of the borrower's monthly debt to income. Underwriters—typically investment banks responsible for selling the mortgage-backed securities—also provide potential insurers with due diligence performed by a third-party accounting or underwriting firm on a sample of the loans in the pool. The due diligence is intended to assess whether the characteristics of the sampled loans, and the underwriting used to originate them, conform to the sponsor's disclosures and representations.

31.     Sponsors also provide to rating agencies, as part of the securitization process, loan tapes and pool-level data based on the loan-level information contained in the loan tapes. Rating

11

agencies use that information to create expected loan-level default and loss estimates. These estimates, in turn, are used to generate cash flow projections for the securitization. On the basis of the expected losses for the proposed securitization, the rating agency will provide a so-called "shadow rating" for the securitization, the credit rating the securitization would carry without financial guaranty insurance. Sponsors cause these shadow ratings to be provided to potential insurers, knowing that the insurers will rely on the shadow ratings when determining whether to insure a securitization.

32.     In sum, the ability of the investor or insurer to accurately assess the risks associated with an RMBS securitization depends entirely on the truthfulness of the sponsor's disclosures and representations about the quality of the loan pools and underwriting standards. The investor or insurer takes responsibility for certain risks not within the sponsor's control, such as risks created by changes in interest rates or the economic climate. However, the sponsor alone is responsible for the risks hidden by its own fraudulent misrepresentations.

**B.     GMAC Mortgage and the Securitization of Mortgage Loans**

33.     GMAC Mortgage first began acquiring, originating, and servicing residential mortgage loans in 1985 when it purchased other companies in those lines of business. By the mid-2000s, GMAC Mortgage was originating tens of billions of dollars' worth of mortgage loans per year, or consistently over 500,000 mortgage loans annually. It also sponsored publicly offered securitizations of mortgage loans. For each year from 2002 to 2006, the aggregate principal balance of the mortgage loans backing GMAC Mortgage-sponsored securitizations ranged from $5 billion to $7 billion.

34.     Second-lien mortgage loans represented a rapidly growing portion of GMAC Mortgage's mortgage loan business during this same period. A second-lien mortgage is

12

subordinate to the main or first mortgage; if the homeowner/borrower defaults, the holder of the

first mortgage must be satisfied first from any proceeds from sale of the collateral or the home.

From 2002 to 2006, the value of GMAC Mortgage-sponsored securitizations of second-lien

mortgage loans more than doubled, from $2.4 billion to $5.7 billion.

     35.    Securitization played an important role in GMAC Mortgage's business model.

Pooling mortgage loans and selling them into securitizations enabled GMAC Mortgage to reduce

the credit risk on its balance sheet and acquire funds with which it could originate new loans to

be pooled in future securitizations.  GMAC Mortgage also enriched other GMAC affiliates by

sponsoring securitizations.  GMAC entities participated in each of the key steps in the

securitization process, and recorded gains and earned fees at each of those steps.  In the

Transactions at issue here, for example:

- GMAC Bank gained fees for originating loans and proceeds from selling those loans to GMAC Mortgage;

- GMAC Mortgage, because it originated and aggregated the loans before selling them to RAMP, gained loan origination fees as well as proceeds from selling the loans;

- Walnut Grove purchased a portion of the loans from GMAC Mortgage, and then gained proceeds from selling the loans to RAMP;

- RAMP established the trusts, transferred the loans to the trusts, and charged fees to cover its operating expenses;

- GMAC RFC Securities made fees for underwriting GMAC Mortgage-sponsored securities offerings; and

- GMAC Mortgage gained fees for acting as Servicer for loan pools that were securitized, after it sold the pooled loans to be deposited into the securitizing trust.

     36.    To promote demand for the lucrative securitizations, GMAC Mortgage touted its

experience in acquiring, originating, and servicing the underlying mortgage loans.  It represented

that the loans it sold into securitizations "were originated generally in accordance with the

underwriting standards of GMAC Mortgage, LLC." GMAC Mortgage assured potential buyers of RMBS that in the case of each loan within the pool, an underwriter had made an assessment, after receiving all applicable employment, credit, and property information, that the borrower had the ability to repay his or her loan.

37.    As described below, GMAC Mortgage failed to fulfill these promises in a series of transactions that involved a significant portion of GMAC Mortgage's securitization of prime, second-lien loans from 2004 to 2007. In truth, GMAC Mortgage routinely extended loans to borrowers whose ability and willingness to repay could not be verified and regularly purchased loans that were not originated in compliance with its own purported origination standards. GMAC Mortgage then schemed to off-load billions of dollars worth of debt by misrepresenting facts uniquely within its knowledge.

38.    The collapse of the housing market has exposed the hidden risks embedded in the loan pools GMAC Mortgage repeatedly pooled and sold. Today, an extremely high percentage of GMAC Mortgage-originated loans have suffered delinquencies or been charged-off. It is widely known that the mortgage lending practices of GMAC's subsidiaries have led GMAC— now majority-owned by the U.S. Government—to the brink of financial ruin. GMAC recently announced that it is seeking a buyer for all or parts of ResCap, the subsidiary of GMAC that houses GMAC's mortgage operations, including GMAC Mortgage.

39.    This suit seeks to prevent GMAC Mortgage, which banked billions of dollars from the sale and servicing of defective loans, and at the time enriched other GMAC entities through its sponsorship of securitizations, from walking away from its responsibility for the harm it has foisted on others.

14

## C.    The Transactions

40.    The Transactions at issue in this action involve securitizations of pools of second-lien mortgage loans.  The 2004 and 2006 Transactions involved pools of mostly home equity lines of credit ("HELOCs").  A HELOC allows a borrower to draw upon a line of credit, collateralized by a mortgage, for a fixed period of time after the origination of the HELOC, in any amount up to limit of the credit line, and at an adjustable interest rate.  The 2007 Transaction involved a pool of mostly closed-end mortgages, loans in which the borrower receives the full amount of the loan at origination at a fixed interest rate.  Certain of the basic characteristics of each of the Transactions at the time of closing are set forth in the following table:

| Transaction | Date of Closing | Number of Loans at Closing | Aggregate Note Balance Issued at Closing | Type of Loans Securitized |
|---|---|---|---|---|
| 2004 | 10/28/04 | 23,428 | $1,018,000,000 | 91.82% HELOCs |
| 2006 | 09/27/06 | 17,342 | $1,159,060,631 | 94.10% HELOCs |
| 2007 | 03/29/07 | 16,638 | $1,185,871,000 | 94.55% Closed-End Seconds |
| Totals | | 57,408 | $3.363 billion | |

In each Transaction, the aggregate note balance represented the face value of the notes issued at closing, an amount which should not be exceeded by the aggregate principal balance of the mortgage loans backing those notes.

41.    The Transactions were structured to permit GMAC Mortgage to add mortgage loans to the pool during specified periods after closing.  In each Transaction, the mortgage loan pool was not fully populated at closing.  Rather, GMAC Mortgage was permitted to sell loans to the pool for a three-month Pre-Funding Period immediately after closing, in exchange for payments made by the trust, until the aggregate principal balance of the loans in the pool

15

approached the aggregate note balance. The 2004 and 2006 Transactions also permitted GMAC

Mortgage to sell loans during specified periods—called Revolving and Managed Amortization

Periods, the latter of which ended five years after closing—on the condition that the aggregate

principal balance of the pool at any given time never exceeded the balance at closing.

42.    The feature of the so-called "Subsequent Mortgage Loans" thus enabled GMAC

Mortgage for a number of years past closing to continue to shift credit risk to investors and to

MBIA, in exchange for immediate gains on the loans it sold. In creating the Revolving and

Managed Amortization periods, in particular, the parties agreed that as the aggregate loan

balance of each pool fell—a characteristic that is usually the result of borrowers paying off their

loans—GMAC Mortgage could sell new loans to the pool and MBIA would continue to insure

payments to holders of the RMBS for which the pool served as collateral. Critical to MBIA's

acceptance of the feature of the "Subsequent Mortgage Loans" were GMAC Mortgage's

representations and warranties that any loan added to a pool after closing would conform to the

same contractual representations and warranties GMAC Mortgage made about the quality and

underwriting of the loans in the pool at closing.

43.    The approximate number and dollar amount of loans in each Transaction over the

entire life of the transactions are set forth in the following table:

| Transaction | Date of Closing | Aggregate Number of Loans in Pool During Life of Transaction | Aggregate Principal Balance of Loans in Pool During Life of Transaction |
|---|---|---|---|
| 2004 | 10/28/04 | 42,753 | $1,662,888,882 |
| 2006 | 09/27/06 | 30,730 | $1,550,141,454 |
| 2007 | 03/29/07 | 22,132 | $1,185,871,165 |
| Totals | | 95,615 | $4.399 billion |

The figure of 30,730 loans in the pool over the life of the 2006 Transaction is, if anything,

understated because GMAC Mortgage has failed to provide loan-level data that spans the life of

16

any of the Transactions, and the number of Subsequent Mortgage Loans for the 2006 Transaction could not be determined using other information.

44.    GMAC Mortgage and other wholly owned subsidiaries of GMAC and affiliates of GMAC Mortgage carried out the steps of each Transaction, as described above. Nearly 90% of the mortgage loans in the pools were originated by GMAC Bank and GMAC Mortgage. GMAC Mortgage then conveyed, directly or indirectly, mortgage loans it had originated or acquired from GMAC Bank to RAMP, the special purpose vehicle that acted as the depositor and transferred the loans to the trust created by GMAC Mortgage for each securitization. In each of the Transactions, GMAC RFC Securities was one of the underwriters that marketed the securities issued by the trusts.

45.    In addition to its role as the sponsor in each Transaction, GMAC Mortgage was also appointed the Servicer for each of the pools. The Servicing Agreements provided that GMAC Mortgage would collect prorated monthly fees equal to 0.50% per year of the outstanding principal balance of each loan it serviced, in exchange for servicing the loan pool in compliance with its "normal and usual" procedures, which included making reasonable efforts to collect all payments due from borrowers.

**D.    GMAC Mortgage's Fraudulent Inducement of the Transactions**

46.    For each Transaction, GMAC Mortgage sought credit enhancement in the form of financial guaranty insurance provided by MBIA. GMAC Mortgage solicited a bid from MBIA a matter of weeks before it planned to close each Transaction. In each case, the insurance GMAC Mortgage obtained from MBIA enabled it to market the RMBS on the basis of an AAA credit rating, rather than the lower credit quality of the collateral and structure of the Transaction alone.

17

47.    In order to induce MBIA to write financial guaranty insurance for the Transactions, GMAC Mortgage provided to MBIA, directly or indirectly, information including: (1) loan tapes detailing attributes of individual borrowers and loans; (2) schedules that set forth statistics about the loan pool; (3) registered initial and final Prospectus Supplements summarizing GMAC Mortgage's Underwriting Guidelines and loan origination criteria; and (4) shadow ratings that GMAC Mortgage represented characterized the credit quality of each loan pool.

48.    In connection with each Transaction, GMAC Mortgage sent or caused to be sent to MBIA, by email, bid requests, loan tapes, and schedules. Specifically:

- On October 12, 2004, MBIA received a loan tape and schedule for the 2004 Transaction;

- On September 11, 2006, MBIA received a bid request, loan tape, and schedule for the 2006 Transaction;

- On September 13, 2006, MBIA received a revised loan tape for the 2006 Transaction;

- On March 8, 2007, MBIA received a bid request, loan tape, and schedule for the 2007 Transaction; and

- On March 12, 2007, MBIA received a revised loan tape for the 2007 Transaction.

The loan tapes provided by GMAC Mortgage set forth, on a loan-by-loan basis, such statistics as the borrower's FICO score, DTI, and CLTV. The schedules purported to describe—at the level of the pool as a whole—key characteristics also relevant to the assessment of risk, including weighted averages of FICO scores and DTI and CLTV ratios.

49.    Further, GMAC Mortgage provided MBIA with Prospectus Supplements that also would be filed with the SEC on or before the day each Transaction closed. In the Prospectus Supplements, GMAC Mortgage made specific representations describing GMAC Mortgage's

18

underwriting standards, including the criteria set forth in GMAC Mortgage's Underwriting

Guidelines applicable to the GMAC Mortgage Home Equity Program. According to the

Prospectus Supplements, the Underwriting Guidelines set forth the types of documentation

which borrowers must provide and should be included in the mortgage loan file, under each loan

program. This documentation can include the loan application, verifications of income, assets,

funds available to the borrower at closing, and mortgage payment histories. The GMAC

Mortgage Underwriting Guidelines also require appraisals of the mortgaged property and an

underwriter's assessment of whether the applicable thresholds for DTI and CLTV are met.

50.    For example, according to the Prospectus Supplements, the Underwriting

Guidelines provide that to qualify for a "Standard" program loan—one requiring full

documentation—a borrower applying for a loan mortgaged by his primary residence must fill out

a detailed application providing pertinent credit information, including tax returns, pay stubs, or

a W-2, and must provide authorization for GMAC Mortgage to obtain a credit report. The

borrower is also required to provide an appraisal of the subject property, or collateral.

51.    The Prospectus Supplements also state that an important variable in evaluating a

loan under the GMAC Mortgage Underwriting Guidelines is the level of documentation of a

borrower's income and assets. According to the Prospectus Supplements, a borrower can apply

for a loan through programs that require significantly less documentation from the borrower than

that required under the "Standard" full documentation program. These reduced documentation

programs—which typically charge higher interest rates—include the "Stated Income," "Stated

Value," and "No Income/No Appraisal" programs, among others. For these loan programs, and

unlike the "Standard" full documentation program, GMAC Mortgage does not independently

verify a borrower's income (in the case of "Stated Income" loans), the value of the collateral (in

19

the case of "Stated Value" loans), or either income or collateral value (in the case of "No Income/No Appraisal" loans).

52.     Critically, although income is not independently verified in Stated Income loans, such loans remain subject to the requirement that the borrower's income be reasonable in light of three main factors: employment, credit, and assets. For every program, GMAC Mortgage's Underwriting Guidelines, and prevailing mortgage origination industry standards, require an underwriter to determine, after receiving all applicable employment, credit, and property information, whether the borrower is able to meet his or her monthly loan payments and other expenses related to the home, such as taxes, insurance, and debt service on senior liens.

53.     Each Prospectus Supplement provided to MBIA expressly states that all mortgage loans contributed to the pools had been underwritten generally in compliance with GMAC Mortgage's underwriting standards.

54.     A final, key representation that GMAC Mortgage sent or caused to be sent to MBIA, and upon which MBIA relied in each Transaction, was the shadow rating GMAC Mortgage procured from rating agencies. GMAC Mortgage knew that MBIA would not agree to provide the requested financial guaranty insurance unless each Transaction carried a shadow rating of at least BBB- or the equivalent. GMAC Mortgage approached Moody's Investors Service and Standard & Poor's and provided them with the same loan tapes GMAC Mortgage provided to MBIA, together with pool-level data derived from the loan-level information on the loan tapes. These rating agencies relied on the information furnished by GMAC Mortgage to issue shadow ratings for each Transaction to MBIA. MBIA received shadow ratings from the rating agencies on or about the following dates, among others:

- On September 27, 2006, MBIA received a letter from Standard & Poor's assigning a shadow rating of BBB- for the 2006 Transaction;

20

- On September 27, 2006, MBIA received a letter from Moody's
  Investors Service assigning a shadow rating of Baa3 for the 2006
  Transaction;

- On March 28, 2007, MBIA received an email from Standard & Poor's
  assigning a shadow rating of BBB for the 2007 Transaction; and

- On March 29, 2007, MBIA received a facsimile from Moody's
  Investors Service assigning a shadow rating of Baa3 for the 2007
  Transaction.

55.     GMAC Mortgage was well aware that MBIA would rely on GMAC Mortgage's

representations in deciding whether to enter into the Insurance Agreements.  MBIA had no

contractual right to review loan origination files before the Transactions closed, nor any

meaningful opportunity to do so.  In addition, and in accordance with the custom and practice of

financial guaranty insurers at the time, MBIA relied on representations and warranties made by

the loan originator and/or owner to ensure that risks in the loan pools were known and fully

disclosed and that it would not face additional risks hidden in the pools.  MBIA relied on the

unique and special knowledge and expertise of GMAC Mortgage regarding the mortgage loans,

and the standards under which they were originated, in deciding to insure the Transactions.

56.     The relationship of trust and confidence GMAC Mortgage and MBIA had forged

in the preceding five years also fostered MBIA's reliance on the representations GMAC

Mortgage made.  The 2004 Transaction was the ninth GMAC Mortgage-sponsored securitization

of second-lien mortgage loans for which MBIA had provided insurance since 1999.  The eight

prior GMAC Mortgage-sponsored securitizations also involved specifically prime HELOC or

closed-end second-lien mortgages.  MBIA thus had been relying on GMAC Mortgage's unique

and special knowledge for many years preceding the first Transaction.  Its longstanding

relationship with GMAC Mortgage caused MBIA to trust that GMAC Mortgage would conduct

itself in good faith.

21

57.    Based on the representations made by GMAC Mortgage to MBIA in the loan tapes, schedules, Prospectus Supplements, and by means of the shadow ratings issued by the rating agencies, and because of the special trust that MBIA placed in GMAC Mortgage, MBIA decided to provide financial guaranty insurance for each Transaction.  MBIA insured the trusts' payments to investors, and received in return an annual premium, based on a small, fixed percentage (tenths of one percent) of the aggregate principal balance of each loan pool.  The existence of financial guaranty insurance enhanced the ability of GMAC Mortgage and GMAC RFC Securities, among others, to market the securities issued in each Transaction as AAA, the highest possible investment grade.

**E.    The Contractual Terms**

**1.    The Representations and Warranties**

58.    In each Transaction, pursuant to insurance agreements it made with GMAC Mortgage, among other entities, on the closing date (the "Insurance Agreements"), MBIA issued a financial guaranty insurance policy (collectively, the "Policies").  These Insurance Agreements are:

- Insurance Agreement among MBIA, GMAC Mortgage, Walnut Grove, Home Equity Loan Trust 2004-HE4, RAMP, Wilmington Trust and Wells Fargo, dated October 1, 2004;

- Insurance Agreement among MBIA, GMAC Mortgage, Walnut Grove, Home Equity Loan Trust 2006-HE4, RAMP, Wilmington Trust and JP Mortgage Chase, dated September 1, 2006; and

- Insurance Agreement among MBIA, GMAC Mortgage, Walnut Grove, Home Equity Loan Trust 2007-HE1, RAMP, Wilmington Trust and The Bank of New York, dated March 1, 2007.

59.    Through the provisions of the Insurance Agreements, GMAC Mortgage made representations and warranties to MBIA concerning:  (1) the key characteristics of the mortgage loans that backed the securities issued in the Transaction; and (2) the underwriting standards

22

used by GMAC Mortgage, GMAC Bank, and any other originator whose loans were acquired by GMAC Mortgage and sold into the pools of loans to be securitized.

60.    Specifically, the Insurance Agreements incorporated by reference, and for MBIA's benefit, the representations and warranties contained in the "Transaction Documents," as that term was defined in the Insurance Agreements. The incorporation by reference of the Transaction Documents into the Insurance Agreements granted to MBIA the right to rely upon representations and warranties that GMAC Mortgage made to other entities who were parties to the Transactions and also to investors. For each Transaction, "Transaction Documents" was defined to include, among other documents:

- the Mortgage Loan Purchase Agreements that set forth the terms of the sale of the mortgage loans to the relevant trust (the "Purchase Agreements");

- the Servicing Agreements that set forth the terms for servicing the relevant pool of mortgage loans (the "Servicing Agreements"); and

- the offering materials provided to potential investors and filed with the SEC to market the securities issued by the trusts (the "Offering Documents").

MBIA is an express third-party beneficiary of the Purchase Agreements and the Servicing Agreements.

61.    GMAC Mortgage made two representations and warranties directly to MBIA in the Insurance Agreements that are particularly relevant to this action.

62.    First, GMAC Mortgage represented and warranted that all representations and warranties in each of the Transaction Documents to which it was a party were "true and correct in all material respects," and that it made all of those representations and warranties "to, and for the benefit of, the Insurer as if the same were set forth in full herein [*i.e.*, in the Insurance Agreement itself]." GMAC Mortgage thus re-made for MBIA's benefit the representations and

23

warranties that it had initially made in, *inter alia*, the Purchase Agreements. These

representations and warranties included, but were not limited to, the following:

- **Proper Documentation**: Each mortgage loan file was complete, and all of the required documents and instruments were contained therein.

- **Accurate Loan Information**: Information furnished in Mortgage Loan Schedules provided by GMAC Mortgage was true and correct in all material respects, and as to each loan, as of the date when GMAC Mortgage provided the information.

- **No Offset, Defense or Counterclaim of a Borrower**: To the best of GMAC Mortgage's knowledge, there was no valid offset, defense or counterclaim of any obligor under any loan agreement or mortgage.

- **CLTV Ratio Not in Excess of 100%**: The combined loan-to-value ratio of each mortgage loan—*i.e.*, the ratio of the combined value of the first and second mortgages to the appraised value of the property—was not in excess of 100%, as of the relevant "Cut-Off Date" (defined in the Transaction Documents to be a date a few weeks before the closing of the Transaction or, for a Subsequent Mortgage Loan, the date upon which it may be added to the pool).

- **No Delinquent Loans**: No mortgage loan was 30 days or more delinquent in payment of principal or interest, as of the relevant "Cut-Off Date."

- **No Adverse Selection**: GMAC Mortgage used no selection procedures that identified the mortgage loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by GMAC Mortgage under the GMAC Mortgage Home Equity Program, and the mortgage loans are representative of GMAC Mortgage's portfolio of home equity lines of credit that were originated under the GMAC Mortgage Home Equity Program.

- **Compliance with Applicable Laws**: To the best of GMAC Mortgage's knowledge, the loan agreements and mortgages at the time made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, applicable predatory lending laws.

- **No Material Breach Or Default**: There was no material default, breach, violation or event of acceleration existing under the terms of any Loan Agreement or Mortgage and, to the best of GMAC Mortgage's knowledge, no event which, with notice and expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration under the terms of any Loan Agreement or Mortgage, and no such material default, breach, violation or event of acceleration has been waived by GMAC Mortgage involved in originating or servicing the related Mortgage Loan.

24

63.    Second, GMAC Mortgage represented and warranted that any information it
furnished or supplied for inclusion in the Transaction Documents, and any information relating
to the mortgage loans that it furnished to MBIA, was accurate and not misleading. Specifically,
GMAC Mortgage represented and warranted that:

> Neither the information supplied by [GMAC Mortgage] contained
> in the Transaction Documents to which it is a party nor any other
> material information relating to the Mortgage Loans . . . furnished
> to the Insurer by [GMAC Mortgage] . . . contains any statement of
> material fact made by [GMAC Mortgage] which was untrue or
> misleading in any material respect as of the date reflected therein.

Through this provision, GMAC Mortgage represented and warranted that the specific
information it provided for inclusion in the Prospectus Supplements issued at or around the time
that each Transaction closed was accurate and not untrue or misleading in any material respect.
These representations and warranties included, but were not limited to, the following:

- **Compliance with Underwriting Guidelines**: All of the mortgage loans were
  underwritten generally in accordance with GMAC Mortgage's underwriting
  standards.

- **DTI Ratio Not in Excess of 45%**: Loans were generally originated with a
  maximum total monthly DTI ratio of 45%.

- **CLTV Ratio Not in Excess of 100%**: Loans were generally originated
  subject to a maximum CLTV ratio of 100%.

- **Determination Made as to Borrower's Ability To Repay**: Once all
  applicable employment, credit, and property information was received, a
  determination was made as to whether the prospective borrower had sufficient
  monthly income available to meet the borrower's monthly obligations on the
  proposed mortgage loan and other expenses and other financial obligations.

64.    Under the Purchase Agreements and the Servicing Agreements, MBIA is entitled
to notify GMAC Mortgage if it learns that any loan fails to conform to the above representations
and warranties in a manner that "materially and adversely affects" MBIA's interests. Within 90
days of such notice, GMAC Mortgage is obligated to cure the breach, repurchase the defective

25

loan, or substitute a conforming loan. Because GMAC Mortgage had complete control over
information about the origination of the loans, the Servicing Agreements also obligated GMAC
Mortgage to give prompt written notice to MBIA if GMAC Mortgage was aware that any such
non-conforming loans were in the pools. In addition, GMAC Mortgage represented and
warranted in the Insurance Agreements that it would promptly provide all data reasonably
requested by MBIA, and would not "interfere in any material respect with the enforcement of
any rights of [MBIA] under or with respect to any of the Transaction Documents."

65.    The Insurance Agreements also incorporated the representations and warranties
that GMAC Mortgage made in the Servicing Agreements in its capacity as Servicer. In the
Servicing Agreements, GMAC Mortgage covenanted, represented, and warranted that it would
service the mortgage loans in each of the Transactions in a manner consistent with its own
servicing guidelines. It also covenanted, represented, and warranted that it would use all of its
"normal and usual" procedures in servicing the mortgage loans, which included making
reasonable efforts to collect all payments due from borrowers.

### 2.    MBIA's Remedies

66.    The Insurance Agreements entitle MBIA to broad remedies for breaches by
GMAC Mortgage of its representations and warranties.

67.    As described above at paragraph 64, the Purchase and Servicing Agreements
grant MBIA the right to notify GMAC Mortgage of any loan failing to conform to GMAC
Mortgage's representations and warranties in a manner that "materially and adversely affects"
MBIA's interests, an event that in turn triggers a 90-day period during which GMAC Mortgage
is obligated to cure the breach, repurchase the loan, or substitute a conforming loan (the
"Putback Procedure").

26

68.    The Insurance Agreements also provide that upon an "Event of Default," MBIA is entitled to "take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under the Transaction Documents or to enforce performance and observance of any obligation, agreement or covenant of [GMAC Mortgage]." An "Event of Default" occurs when "any representation or warranty" made by GMAC Mortgage in the Insurance Agreements or the Transaction Documents is materially untrue or incomplete, or when GMAC Mortgage fails to perform any covenant in any material respect.

69.    In addition, the Insurance Agreements require GMAC Mortgage to reimburse MBIA for any payments it makes as a result of GMAC Mortgage's failure to comply with its obligations under the Putback Procedure and "any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including, but not limited to, reasonable attorneys' and accountants' fees and expenses, in connection with . . . the enforcement, defense, or preservation of any rights in respect of any of the Transaction Documents." The Insurance Agreements also require GMAC Mortgage to pay and indemnify MBIA for any losses or liabilities "arising out of or relating to," among other things, any breach of a representation or warranty made to MBIA in the Purchase Agreements or the Insurance Agreements.

**F.    GMAC Mortgage's Misconduct Is Revealed**

      **1.    MBIA's Review Demonstrates GMAC Mortgage's Breach of Contract**

70.    Since closing, the Transactions have performed extremely poorly. Delinquencies and charge-offs for mortgage loans in the loan pools have been much higher than would be expected for loan pools allegedly of the "prime" quality that GMAC Mortgage represented and warranted, even taking into account the downturn in the housing market. By the end of 2009, for example, loans representing over 15% of the initial aggregate pool balance in the 2006

27

Transaction had defaulted and been charged off. A total of at least $326 million has been lost from the original aggregate pool balances of the three Transactions due to defaulted and charged-off loans.

71.    In January 2009, concerned about the high delinquencies and charge-off rates, MBIA asked GMAC Mortgage to provide MBIA and its representatives and agents access to documents relating to the mortgage loans underlying the Transactions.

72.    MBIA requested access to documentation that would facilitate a review of the loan files for all mortgage loans that were 60 or more days delinquent and/or charged-off. MBIA requested copies of the relevant loan files and also of the relevant GMAC Mortgage Underwriting Guidelines. It made these requests under the provisions in the Insurance Agreements requiring GMAC Mortgage to comply with MBIA's reasonable requests for data and not to interfere in any material respect with MBIA's attempts to enforce its rights under the Transaction Documents.

73.    GMAC Mortgage's response to these basic requests has been wholly unsatisfactory. GMAC Mortgage has repeatedly and unreasonably denied MBIA access to complete versions of the GMAC Mortgage Underwriting Guidelines. Also, in many instances, the loan files provided by GMAC Mortgage were incomplete and MBIA has been forced to make supplemental requests. As a result, to conduct the evaluation that would enable MBIA to enforce rights explicitly granted to it under the Insurance Agreements, MBIA has been compelled to refer to: (1) portions of certain GMAC Mortgage Underwriting Guidelines that GMAC Mortgage has made available to the public; (2) the underwriting guidelines of GMAC Mortgage affiliate Residential Funding Corporation, which is also a major mortgage loan

28

originator and acquirer; and (3) reasonable and prudent underwriting standards that are customary in the industry.

74.     Despite GMAC Mortgage's obstructive conduct, there is little dispute about the content of the Underwriting Guidelines, insofar as those Guidelines relate to this action. GMAC Mortgage's responses to MBIA's requests, pursuant to the Putback Procedure, that GMAC Mortgage cure, repurchase, or substitute loans found not to comply with its representations and warranties are described below in paragraphs 86 and 87. These responses have not challenged MBIA's claims about the standards set forth in GMAC Mortgage's Underwriting Guidelines.

75.     To date, MBIA has been able to obtain and review loan files associated with 4,104 delinquent and charged-off loans. The review has uncovered that the overwhelming majority of the delinquent or charged-off loans—at least 89%—were in breach of one or more of GMAC Mortgage's representations and warranties. The aggregate original principal balance of just this modest portion of non-compliant loans is over $246 million.

76.     Most of the loans found by MBIA to be non-compliant with GMAC Mortgage's representations and warranties contain multiple breaches of those representations and warranties. As a result of these breaches, the real risk profile of these loans was materially understated. The most prevalent and troubling of the breaches identified by MBIA in the loan pools of the Transactions include the following:

- GMAC Mortgage egregiously and routinely breached its representation and warranty that the mortgage loans were underwritten generally in compliance with GMAC Mortgage's underwriting standards.

- A significant number of mortgage loans were made on the basis of "stated incomes" that were grossly unreasonable or were approved despite DTI or CLTV ratios in excess of the cut-offs stated in GMAC Mortgage's Underwriting Guidelines or the Purchase Agreements or Prospectus Supplements.

29

- Moreover, contrary to its Underwriting Guidelines, GMAC Mortgage failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with ineligible credit scores, and approved loans without verifying that the borrower had sufficient funds or reserves.

- GMAC Mortgage used its proprietary automated electronic loan underwriting program, known as "Assetwise," to approve loans that did not comply with its Underwriting Guidelines. Assetwise assisted in the underwriting of mortgage loans by automating the process of determining whether a loan met pre-specified underwriting criteria set up in the program. GMAC Mortgage used the program itself and also made the program available to its affiliates. Assetwise, however, failed to analyze proposed mortgage loans using the criteria set forth in GMAC Mortgage's Underwriting Guidelines. As a result, GMAC Mortgage routinely contributed loans to the Transactions that failed to comply with its own underwriting standards.

- GMAC Mortgage routinely breached its representation and warranty that the mortgage loan files were complete and contained all required documents and instruments. The vast majority of mortgage loan files are missing necessary mortgage loan documents, such as disclosures relating to loan transfers and notes establishing the first lien. The absence of these and other necessary documents from the loan files impedes the ability of the trustees for the Transactions to enforce their rights and remedies with respect to delinquent mortgages. The failure to maintain the required loan documentation also impairs proper servicing.

- GMAC Mortgage breached its representation and warranty that all mortgage loans would comply with all local, state and federal laws, by furnishing, among other things, mortgage loans to the pools that violated state predatory lending laws. These laws are designed to protect borrowers from abusive lending practices by, for example, prohibiting the approval of a loan to a borrower who lacks the ability to repay.

77.    MBIA's review has demonstrated that notwithstanding its representation and warranty that all loans in the pools had been underwritten generally in compliance with the Underwriting Guidelines, GMAC Mortgage in fact had failed to ensure conformity with those Guidelines. GMAC Mortgage regularly contributed loans to the pools that failed to satisfy representations and warranties setting maximum permissible DTI and CLTV ratios and requiring the maintenance of complete loan files. Most important, GMAC Mortgage routinely breached

30

the representation and warranty that each mortgage loan had been made to a borrower who was able to repay his or her mortgage loan.

78.    The following examples illustrate the types of breaches that pervade the loan pools for the Transactions:

- On January 25, 2006, a loan in the amount of $210,000 was made to a borrower in Vacaville, California on a property with an original appraisal value of $460,000 and a senior loan balance of $368,150. The borrower was employed as a correctional officer by the State of California. The loan was approved based on a DTI that was calculated using the borrower's highest reported monthly income, rather than his average income over a 33-month period, as is required by the Underwriting Guidelines. As a result, the true DTI on the loan was 65.56%, which exceeded the maximum ratio of 50% permitted under the applicable loan program. The CLTV ratio of 125.68% also exceeded the maximum CLTV ratio of 100% permitted under the Guidelines. The loan has been charged-off. (Loan # 8601487693 – 2004 Transaction.)

- On April 20, 2007, a loan in the amount of $40,000 was made to co-borrowers in Vernon, New Jersey on a property with an original appraisal value of $305,000 and a senior loan balance of $244,000. The loan file is incomplete and lacks, among other documents, verbal verification of either borrower's employment, evidence of sufficient closing funds and reserves, an appraisal, a copy of the note from the senior lien, and the borrowers' credit reports. Further, the loan was approved even though the income stated by each borrower was unreasonable. One claimed to earn $4,583 per month as a counter manager at a discount tire store though, for example, salary.com, a website which maintains a national salary database based on job title and zip code, reports that the income at the 90th percentile for such a position is only $2,801 per month. The second borrower claimed to earn $59,592 annually as a sales associate at a home improvement store, but an income verification database showed that the borrower earned only $28,092 in 2006 and $32,977 in 2007. The loan has been charged-off. (Loan # 1000117685 – 2006 Transaction.)

- On December 15, 2006, a loan in the amount of $22,000 was made to a borrower in Medford, Oregon on a property with an original appraisal value of $220,000 and a senior loan balance of $176,000. The loan file is missing many documents that bear upon the borrower's ability to repay and are required to be included in the file, including: verification of down payment funds, a CPA letter, an appraisal, a twelve-month housing history, a copy of the first mortgage, a preliminary title commitment, a credit report, and the final loan application. Moreover, although the borrower, an operator at a drywall company, had declared bankruptcy prior to applying for the loan, the

31

loan file lacks documentation that the bankruptcy had been discharged for at least three years, as required by the Guidelines. The loan has been charged-off. (Loan # 8254682837 – 2007 Transaction.)

- On January 23, 2007, a loan with a principal balance of $100,000 was made to a borrower in Yuma, Arizona on a property with an original appraisal value of $298,000 and a senior loan balance of $129,035. The borrowers claimed on their loan application that their combined income was $113,520 per year. However, on May 12, 2009, the borrowers jointly filed for bankruptcy under Chapter 7, and their court filings indicated that they earned only $13,085 in 2007 and $17,650 in 2008. Moreover, no record of the borrower's claimed employer can be located on websites commonly used to verify the existence of a business: manta.com or yellowpages.com. The loan has been charged-off. (Loan # 8254730412 – 2007 Transaction.)

79.     The gross underwriting deficiencies MBIA identified in its review establish that GMAC Mortgage breached not only its representations and warranties setting criteria for the underwriting of the mortgage loans, but also the representations and warranties in the Insurance Agreements that information about the mortgage loans furnished by GMAC Mortgage—either for inclusion in the Transaction Documents or directly to MBIA—was accurate and not untruthful or misleading in any material respect, as of the date of the information.

## 2.     MBIA's Review Demonstrates GMAC Mortgage's Scheme To Defraud

80.     The information that GMAC Mortgage provided to MBIA from its first solicitations of MBIA to provide financial guaranty insurance, was indeed false and misleading, and intentionally so. MBIA's review has made clear that the defects in the loan pools are not isolated or accidental. To the contrary, the incidence of violations of GMAC Mortgage's Underwriting Guidelines is so extraordinarily high—at least 89% of the loan files reviewed by MBIA for delinquent or charged-off loans—that it could not have been result of mere error. GMAC Mortgage induced MBIA to provide insurance for the Transactions based on blatant misrepresentations of the true state of the characteristics of the loans and loan pools.

32

81.    MBIA's review demonstrates that the loan tapes GMAC Mortgage provided to MBIA, as a means of inducing MBIA's participation in the Transactions, are replete with false statistics relating to individual loans. In many instances, DTI and CLTV ratios are falsely understated in the tapes. Schedules provided to MBIA, which also were reproduced in the Offering Documents, contain pool-level statistics about DTI and CLTV ratios that are likewise materially false. The DTI ratios are materially false and misleading because the monthly income has been falsely overstated or monthly debt obligations falsely understated. The CLTV ratios are materially false and misleading because, among other things, the value of the underlying collateral has been falsely overstated.

82.    The Prospectus Supplements provided to MBIA also contain representations that are materially false and misleading. They reproduce schedules that purport to describe the loan pool but contain false data about FICO scores, DTI and CLTV. They falsely state that the mortgage loans contributed to the Transactions were underwritten generally in compliance with GMAC Mortgage's underwriting standards and fail to disclose that GMAC Mortgage regularly contributed non-compliant loans to the pools. The Prospectus Supplements represent that loans were generally originated subject to a maximum total monthly DTI ratio of 45% and a maximum CLTV ratio of 100%, when in truth GMAC Mortgage frequently added to the pools loans with DTI and CLTV ratios exceeding these cut-offs.

83.    The Prospectus Supplements also falsely state that once all applicable employment, credit, and property information had been received, a determination had been made as to the borrower's ability to meet his or her monthly obligations. MBIA's review of loan files establishes that instead, the loan underwriter routinely failed to collect applicable employment,

33

credit, and property information and also regularly failed to make determinations that the borrower had the ability to repay his or her mortgage loan.

84.    The shadow ratings GMAC Mortgage caused to be provided to MBIA, with knowledge MBIA would rely on them, were also intended to deceive. GMAC Mortgage obtained shadow ratings of the level it knew that MBIA would require—BBB- or the equivalent—by knowingly providing to the rating agencies the same false loan tapes and pool-level data that it provided to MBIA. GMAC Mortgage knew that the rating agencies would rely on the false information, including false data about key characteristics of the mortgage loans and the loan pools, and as a result issue falsely inflated shadow ratings. By supplying false information to Moody's Investors Service and Standard & Poor's, GMAC Mortgage ensured that MBIA would be provided with artificial shadow ratings that concealed from MBIA the true risk in the loan pools.

85.    Importantly, GMAC Mortgage knew that MBIA would not only rely on GMAC Mortgage's false representations but would be unable to detect any falsity. MBIA was prevented from discovering the scheme to defraud before being induced to enter the Insurance Agreements because: (1) MBIA had no contractual right or meaningful opportunity to review loan origination files before closing; (2) MBIA followed the industry practice of relying on the sponsor's representations and warranties about the matters within the sponsor's special expertise and unique knowledge, namely the mortgage loans and the Underwriting Guidelines under which they were originated; and (3) MBIA placed trust and confidence in GMAC Mortgage, as a result of a business relationship based upon on MBIA having provided insurance in connection with eight prior GMAC Mortgage-sponsored securitizations in the preceding five years. GMAC Mortgage capitalized on MBIA's inability to discover the falsity of GMAC Mortgage's

34

representations by passing the risks embedded in the loan pools to unwitting investors and,

ultimately, to MBIA.

### 3.    MBIA Is Entitled To Recover All Past and Future Claims Payments, at a Minimum

86.    Beginning in May 2009, in an attempt to recoup some of the massive losses that

GMAC Mortgage had transferred to it, MBIA initiated the Putback Procedure. MBIA began

notifying GMAC Mortgage, in writing and with specificity, of the nature of the contract breaches

MBIA had discovered and the factual support for its conclusions. As of today, MBIA has sent

25 letters to GMAC Mortgage, requesting that GMAC Mortgage cure, repurchase, or replace

with eligible loans a total of 3,669 mortgage loans that were found not to be in compliance with

GMAC Mortgage's representations and warranties. These loans have an aggregate initial

principal balance of approximately $244 million.

87.    To date, GMAC Mortgage has agreed to repurchase a token 28 of these 3,669

loans. In its responses to MBIA's letters, GMAC Mortgage takes positions that are contrary to

the representations it made in the Transaction Documents. As just one example, and as

described above in paragraph 78, GMAC Mortgage now claims that loans originated through use

of its automated underwriting program are excused from that representation and warranty,

despite having represented and warranted that *all* of the mortgage loans were underwritten in

general compliance with GMAC Mortgage's underwriting standards.

88.    GMAC Mortgage's unreasonable and arbitrary refusal to fulfill its obligations of

cure, repurchase, or substitution highlights the inadequacy of the Putback Procedure to redress

the harm suffered by MBIA. The Putback Procedure assumes isolated and accidental breaches

of loan-level representations and warranties. By contrast, GMAC Mortgage's deliberate

contribution of non-compliant loans to the Transactions breached representations and warranties

35

so fundamental that the very heart of the bargain struck by the parties has been pierced. GMAC
Mortgage breached transaction-level representations and warranties, contained in the Insurance
Agreements that it would furnish information to MBIA and for inclusion in the Transaction
Documents about the mortgage loans that was accurate and not untruthful or misleading in any
material respect. GMAC Mortgage's breach of its representation and warranty about the quality
of the underwriting used to originate the loans has also been so pervasive and extreme that it has
deprived MBIA of any benefit of having entered into the Insurance Agreements.

89.     Moreover, GMAC Mortgage's conduct in fraudulently inducing MBIA to provide
insurance for the Transactions, based on representations about the loans and loan pools that
GMAC Mortgage knew to be untrue, entitles MBIA to be returned to the position it would have
been in had it not entered into the Insurance Agreements. MBIA has been, and will continue to
be, required to satisfy its obligations under the Insurance Agreements and Policies by making
payments to cover shortfalls in cash flows to the trusts. As of December 31, 2009, MBIA had
paid approximately $132 million in claims in connection with the Transactions, while receiving
approximately $12.5 million in premiums. MBIA is exposed to additional claims because
additional loans continue to go delinquent or be charged off every month. To place MBIA in the
position it would have occupied absent GMAC Mortgage's fraud and breaches of contract,
GMAC Mortgage must pay to MBIA, at a very minimum, all claims payments made to date and
all future claims payments under the Policies.

G.     **GMAC Mortgage's Breaches of Its Servicing Obligations**

90.     Finally, GMAC Mortgage has compounded the harm it has inflicted on MBIA by
breaching its representations and warranties that as Servicer, it would:  (1) provide prompt
written notice to MBIA if it was aware of loans in the pools that failed to conform with GMAC

36

Mortgage's representations and warranties in a manner that materially and adversely affected MBIA's interests; and (2) make reasonable efforts to collect all payments due from borrowers and service loans in a manner consistent with its own servicing guidelines.

91.    GMAC Mortgage has not provided MBIA with notice of the non-conforming loans MBIA uncovered through its review, although as originator, owner, and servicer of the loans, GMAC Mortgage was well aware that such loans pervaded the pools and materially and adversely affected MBIA's interests.

92.    In October 2009, MBIA exercised its right under the Servicing Agreements to terminate GMAC Mortgage as Servicer on all three Transactions. The termination was based on the occurrence of a Servicing Default on the part of GMAC Mortgage, which was triggered when a certain measure of loss of aggregate principal balance exceeded a limit specified in the Servicing Agreements.

93.    Since the termination of GMAC Mortgage as Servicer, MBIA has reviewed records relating to the servicing of the loans contributed to the Transactions. While again MBIA has yet to gain access to all relevant records, this review has brought to light that GMAC Mortgage employed wholly deficient servicing practices and made only perfunctory efforts to service the loans properly. In essence, after deliberately and routinely selling non-compliant loans into the pools and fraudulently procuring insurance to protect investors from shortfalls in payments to the trust, GMAC Mortgage walked away from its contractual obligation to make reasonable efforts to collect payments from borrowers to be used as cash flows for the trusts. It collected fees as Servicer, while providing loan servicing so defective that it *increased* the losses inflicted on the trust, investors, and ultimately MBIA by GMAC Mortgage's fraud and breaches of representations and warranties relating to the quality of the loans and loan pools.

37

94.    MBIA's review revealed, most fundamentally, that GMAC Mortgage allocated resources and staff that were entirely inadequate to service and administer the loans in the Transactions effectively. As a result, servicing of the mortgage loans was overly passive. GMAC Mortgage failed to treat borrowers and loans individually, and failed to maintain records sufficient to support reasonable servicing efforts. Delinquent loans advanced to the stage of charge-off without adequate exploration of means of collecting some part of the payments owed.

95.    Among the host of unreasonable and substandard practices that have been revealed by MBIA's review are GMAC Mortgage's: (1) failure to initiate and document contact with borrowers, or to follow up after successful initial contact; (2) failure to discuss loss mitigation with borrowers when delinquency was reasonably foreseeable; (3) failure to monitor and record information bearing on loss mitigation, such as the reasons for delinquency or default, the status of the senior lien holder, and the progress of loss mitigation efforts; (4) failure to conduct property inspections as a means of, among other things, locating the borrower or valuing the property; (5) over-reliance on mass offerings of settlements, often with the result that a non-responsive borrower was rewarded with increasingly favorable terms; and (6) failure to monitor foreclosure sale activities.

96.    GMAC Mortgage neglected its duties as Servicer in order to further its own interests at the expense of MBIA, among others. GMAC Mortgage's decision to allocate inadequate resources and staff to service the loan pools allowed it to minimize its own operating costs without suffering adverse consequences itself, because GMAC Mortgage no longer bore the risk of losses from delinquencies and charge-offs that it had fraudulently induced MBIA to accept. In the meantime, GMAC Mortgage collected servicing fees equal to 0.50% per annum of the outstanding principal balance of the loan pools, or at least $42 million. It collected late

38

payment fees and charges that likely were increased through its own inactivity, including its failure to modify loans so as to maximize collections.

97.    MBIA has suffered significant harm as a result of GMAC Mortgage's breaches of the Servicing Agreements, and it is entitled to be compensated for the damages inflicted by GMAC Mortgage.

## FIRST CAUSE OF ACTION

### (Fraud)

98.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

99.    GMAC Mortgage intentionally misrepresented existing material facts to induce MBIA to enter into the Insurance Agreements, both in documentation provided to MBIA before each Transaction closed and also at the time of execution of each Insurance Agreement.

100.    GMAC Mortgage intentionally misrepresented existing material facts, before closing and while soliciting MBIA's participation in the Transactions, in requests for bids, loan tapes, and loan schedules that GMAC Mortgage either transmitted or caused to be transmitted to MBIA. Among these transmittals of requests for bids, loan tapes, and loan schedules to GMAC Mortgage were:

- a materially false and misleading loan tape for the 2004 Transaction, by email dated October 12, 2004;

- a materially false and misleading schedule for the 2004 Transaction, by email dated October 12, 2004;

- a materially false and misleading bid request, loan tape, and schedule for the 2006 Transaction, by email dated September 11, 2006;

- a materially false and misleading revised loan tape for the 2006 Transaction, by email dated September 13, 2006;

39

- a materially false and misleading bid request, loan tape, and schedule for the 2007 Transaction, by email dated March 8, 2007; and

- a materially false and misleading revised loan tape for the 2007 Transaction, by email dated March 12, 2007.

101.    The materially false and misleading information contained in the loan tapes that

GMAC Mortgage provided to MBIA included misrepresentations related to the characteristics of

individual mortgage loans and borrowers, including FICO scores, DTI, and CLTV. The loan

schedules presented materially false and misleading pool-level data, including weighted averages

of FICO scores, DTI, and CLTV. In both loan tapes and schedules, statistics relating to DTI and

CLTV were materially understated. In particular, the DTI ratios were materially false and

misleading because the monthly income had been falsely overstated or monthly debt obligations

falsely understated. The CLTV ratios were materially false and misleading because, among

other things, the value of the underlying collateral was falsely overstated.

102.    GMAC Mortgage also intentionally misrepresented existing material facts, before

closing and while soliciting MBIA's participation in the Transactions, in Prospectus

Supplements that it either transmitted or caused to be transmitted to MBIA. Among these

transmittals of Prospectus Supplements were:

- a materially false and misleading initial Prospectus Supplement for the 2006 Transaction, by email dated September 19, 2006;

- a materially false and misleading final Prospectus Supplement for the 2006 Transaction, by email dated September 25, 2006;

- a materially false and misleading initial Prospectus Supplement for the 2007 Transaction, by email dated March 21, 2007; and

- a materially false and misleading final Prospectus Supplement for the 2007 Transaction, by email dated March 28, 2007.

103.    The materially false and misleading information contained in the initial and final

Prospectus Supplements that GMAC Mortgage provided to MBIA included reproductions of the

40

same schedules that GMAC Mortgage provided to MBIA, containing false data about FICO scores, DTI, and CLTV. The Prospectus Supplements falsely state that the mortgage loans contributed to the Transactions were underwritten generally in compliance with GMAC Mortgage's standards and fail to disclose that GMAC Mortgage regularly contributed non-compliant loans to the pools. The Prospectus Supplements falsely represent that loans were generally originated subject to a maximum total monthly DTI ratio of 45% and a maximum CLTV ratio of 100%, when in truth GMAC Mortgage frequently contributed loans with DTI and CLTV ratios exceeding these cut-offs to the pools. The Prospectus Supplements falsely state that once all applicable employment, credit, and property information had been received, a determination had been made as to the borrower's ability to meet his or her monthly obligations. In truth, GMAC Mortgage routinely failed to collect applicable employment, credit, and property information and also regularly failed to make determinations that the borrower had the ability to repay his or her mortgage loan.

104.    MBIA reasonably relied to its detriment on GMAC Mortgage's representations in the bid requests, loan tapes, schedules, and initial and final Prospectus Supplements. As GMAC Mortgage knew, MBIA did not have a contractual right to review loan origination files before closing, nor any meaningful opportunity to do so. GMAC Mortgage also knew that the industry practice was for a financial guaranty insurer to rely upon the representations and warranties of the sponsor regarding the quality of the mortgage loans and the standards under which they were originated, rather than to carry out a loan-by-loan review of thousands or tens of thousands of loan origination files.

105.    GMAC Mortgage further intentionally misrepresented existing material facts, while soliciting MBIA's participation in the Transactions, by either transmitting or causing to be

41

transmitted to MBIA false and misleading shadow ratings upon which MBIA reasonably relied.
GMAC Mortgage knew that MBIA would not furnish financial guaranty insurance unless the
rating agencies provided credit ratings of BBB- or the equivalent for each Transaction. GMAC
Mortgage thus deliberately procured falsely inflated shadow ratings by conveying to Moody's
Investors Service and Standard & Poor's the same false and misleading loan tapes that it had
transmitted to MBIA, together with false pool-level data derived from the loan-level information
in the tapes. GMAC Mortgage well knew that the rating agencies would rely on the false
information and data in generating estimates of potential losses and thus issue false and inflated
shadow ratings. The rating agencies thus issued to MBIA shadow ratings based on GMAC
Mortgage's false representations on the following occasions, among others:

- shadow rating of BBB- for the 2006 Transaction, by letter from Standard & Poor's dated September 27, 2006;

- shadow rating of Baa3 for the 2006 Transaction, by letter from Moody's Investors Service dated September 27, 2006;

- shadow rating of BBB for the 2007 Transaction, by email from Standard & Poor's dated March 28, 2007; and

- shadow rating of Baa3 for the 2007 Transaction, by facsimile from Moody's Investors Service dated March 29, 2007.

106.    GMAC Mortgage's false representations in the requests for bids, loan tapes,
schedules, initial and final Prospectus Supplements, and shadow ratings, were material—indeed
essential—to MBIA's decision to enter into the Insurance Agreements. MBIA never would have
agreed to provide any of the Policies had it known that GMAC Mortgage's representations about
characteristics of the mortgage loans and mortgage loan pools were false. It would not have
entered into the Insurance Agreements had it been aware that GMAC Mortgage had omitted to
state that it had routinely contributed loans to the Transactions: (1) that were not originated
generally in compliance with GMAC Mortgage's Underwriting Guidelines; (2) that failed to

meet cut-offs set out in the initial and final Prospectus Supplements and Purchase Agreements for DTI and CLTV ratios; and as to which (3) there had been no determination, once all applicable employment, credit, and property information had been received, that the borrower had the ability to repay the loan. Absent a shadow rating of at least BBB- or the equivalent, MBIA would not have agreed to provide the Policies.

107.    GMAC Mortgage also intentionally misrepresented existing material facts with respect to and at the time of execution of each Insurance Agreement. Specifically, GMAC Mortgage falsely represented:

- All of the mortgage loans were underwritten generally in accordance with GMAC Mortgage's underwriting standards;

- Under GMAC Mortgage's Underwriting Guidelines, the mortgage loans were generally originated with a maximum total monthly DTI ratio of 45%;

- Under GMAC Mortgage's Underwriting Guidelines, the CLTV ratio of each mortgage loan was generally not in excess of 100%; and

- For each of the mortgage loans in the Transactions, and after all applicable employment, credit, and property information was received, a determination had been made that the borrower was able to meet his or her monthly loan payments and other expenses related to the home, such as taxes, insurance, and debt service on senior liens.

108.    These representations—like the misrepresentations GMAC Mortgage made before closing—were materially false. In truth, GMAC Mortgage consistently originated and acquired mortgage loans that failed to comply with its Underwriting Guidelines, and routinely and deliberately contributed such non-compliant loans to the Transactions. These misrepresentations of existing fact conveyed by means of the Insurance Agreements were material—indeed essential—to MBIA's decision to enter into the Insurance Agreements. MBIA never would have agreed to provide any of the Policies had it known that the pools were replete with loans that were not originated in compliance with GMAC Mortgage's Underwriting

43

Guidelines, that GMAC Mortgage had routinely failed to ensure that loans contributed to the pools satisfied DTI and CLTV cut-offs set forth in the Transaction Documents, or that there had been routine failures to make determinations of a borrower's ability to satisfy his or her monthly obligations, before originating the loans.

109.    As a result of knowing misrepresentations it made before and at closing, GMAC Mortgage intended to, and did, defraud MBIA into issuing the Policies for the Transactions. GMAC Mortgage defrauded MBIA so that it could sell mortgage loans it had acquired or originated and also earn fees for servicing those loans after their securitization, while simultaneously passing the risks embedded in the non-compliant loans to MBIA.

110.    As a direct result of, and in reliance upon, GMAC Mortgage's misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, insurance claims in an amount in excess of $132 million. MBIA is exposed to further liabilities because delinquencies and charge-offs continue to occur in the loan pools.

111.    Due to GMAC Mortgage's fraud, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial. Further, MBIA is entitled to recover punitive damages, because GMAC Mortgage committed its fraudulent acts maliciously, wantonly, and oppressively, and with knowledge that the consequences of its conduct would affect the general public.

### SECOND CAUSE OF ACTION

#### (Negligent Misrepresentation)

112.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

113.    In connection with MBIA's issuance of the Policies, GMAC Mortgage had a duty to communicate accurate and complete information to MBIA. This duty arose out of GMAC

44

Mortgage's special relationship of trust and confidence with MBIA. By late 2004, when MBIA was deciding whether to provide insurance for the 2004 Transaction, MBIA had provided insurance for eight GMAC Mortgage-sponsored securitizations of second-lien mortgage loans since 1999. These prior securitizations also involved specifically prime HELOC or closed-end second-lien mortgages.

114.   GMAC Mortgage misrepresented existing material facts with respect to the Transactions. It misrepresented that loans contributed to the pools were generally originated in compliance with GMAC Mortgage's Underwriting Guidelines and that data regarding the mortgage loans, including statistics relating to the borrower's FICO score, DTI, and CLTV, were accurate. It misrepresented that after all applicable employment, credit, and property information was received, a determination had been made that the borrower was able to meet his or her monthly loan payments and other expenses related to the home.

115.   GMAC Mortgage possessed clear and reasonable grounds for believing or determining that its representations were materially false and should have known that its representations were materially false. GMAC Mortgage was the originator and/or owner of all loans contributed to the pools and indeed had unique knowledge and expertise about the manner in which the loans had been originated.

116.   GMAC Mortgage knew or should have known that MBIA would rely on GMAC Mortgage's materially false representations and that those representations were essential and material to MBIA's decision to issue the Policies. GMAC Mortgage knew that the information it provided to MBIA, including the requests for bids, loan tapes, loan schedules, and initial and final Prospectus Supplements, was critical to MBIA's decision whether to enter into the Insurance Agreements. GMAC Mortgage knew that MBIA was not aware and could not

45

reasonably have been aware of the falsity of GMAC Mortgage's representations, because GMAC Mortgage's knowledge and expertise were unique and special. GMAC Mortgage had unique and special knowledge and expertise regarding both the underwriting of mortgage loans generally, and the underwriting of the mortgage loans in the loan pools for the Transactions. MBIA is not a mortgage loan originator and did not originate any of the loans contributed to the Transactions. GMAC Mortgage also knew that MBIA followed the industry practice of requiring the sponsor to provide representations and warranties about the mortgage loans and the Underwriting Guidelines under which they were originated.

117.    Accordingly, GMAC Mortgage acted either recklessly or negligently in making the materially false representations to MBIA with respect to the underwriting of the mortgage loans GMAC Mortgage contributed to the mortgage loan pools.

118.    MBIA reasonably relied to its detriment on GMAC Mortgage's misrepresentations. MBIA had no contractual right to review loan origination files before closing, nor any meaningful opportunity to do so. MBIA reasonably followed the industry standard of relying on a sponsor's representations and warranties regarding the quality of the loans and the standards under which loans were originated, rather than attempting to re-underwrite thousands or tens of thousands of loans before closing. Finally, MBIA placed trust and confidence in GMAC Mortgage, as a result of a business relationship based upon at least eight prior GMAC Mortgage-sponsored securitizations for which MBIA had provided insurance since 1999.

119.    Had MBIA known about GMAC Mortgage's significant and substantial misrepresentations, MBIA would not have issued the Policies.

46

120.    As a proximate result of its reasonable reliance on GMAC Mortgage's reckless or negligent misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to remain exposed to future liabilities.

121.    As a result of GMAC Mortgage's negligent misrepresentations, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (Breach of Contract:  Insurance Agreements)

122.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

123.    In the Insurance Agreements GMAC Mortgage made extensive representations and warranties concerning the loans that GMAC Mortgage contributed to the pools, the accuracy of the information that it provided for inclusion in the Transaction Documents or to MBIA, and the remedies to which MBIA would be entitled if GMAC Mortgage breached its representations and warranties.

124.    GMAC Mortgage's representations and warranties were material to MBIA's decision to insure each of the Transactions.  GMAC Mortgage's compliance with its representations and warranties was and is necessary to assure MBIA of the benefit of its bargain.

125.    GMAC Mortgage has materially breached the Insurance Agreements.  In Section 2.01(j) of the Insurance Agreements, GMAC Mortgage represented and warranted that any information relating to the mortgage loans that it furnished for inclusion in the Transaction Documents, or to MBIA, was accurate and not misleading, as of the dates reflected therein. GMAC Mortgage breached these representations and warranties by: (1) furnishing for inclusion in the Transaction Documents false and misleading statements, including the statement that the mortgage loans contributed to the Transactions were underwritten generally in accordance with

47

GMAC Mortgage's underwriting standards; and (2) giving MBIA false and misleading information, including requests for bids, loan tapes, schedules, and initial and final Prospectus Supplements that provided materially false statistics relating to DTI and CLTV, among other false information, and shadow ratings that were artificially inflated.

126.    GMAC Mortgage breached its representation and warranty, contained in Section 2.01(m) of the Insurance Agreements, that each of the representations and warranties contained in the Transaction Documents to which it is a party is true and correct in all material respects. Specifically, GMAC Mortgage breached numerous representations and warranties it made in the Purchase Agreements, including that each mortgage loan file was complete, that the information in schedules furnished by GMAC Mortgage was true and correct in all material respects, and that the CLTV ratio for each mortgage loan was not in excess of 100%. It breached representations and warranties made in the initial and final Prospectus Supplements that all of the mortgage loans were underwritten generally in accordance with GMAC Mortgage's underwriting standards, that loans were generally originated with a maximum DTI ratio of 45% and CLTV ratio of 100%, and that once all applicable employment, credit, and property information had been received, a determination had been made that the borrower had sufficient monthly income available to meet monthly obligations, including payments on the proposed mortgage loan.

127.    These breaches of GMAC Mortgage's transaction-level representations and warranties strike at the heart of the Insurance Agreements. Had MBIA known that GMAC Mortgage had furnished false and misleading information for inclusion in the Transaction Documents or to MBIA, or had routinely contributed loans to the Transactions that had not been originated generally in compliance with GMAC Mortgage's Underwriting Guidelines, MBIA would not have entered into the Insurance Agreements.

48

128.    GMAC Mortgage has also materially breached the Insurance Agreements by: (1) failing to provide MBIA with access to information reasonably requested by MBIA; and (2) failing to honor its covenant not to interfere with MBIA's enforcement of its rights under the Transaction Documents.  Specifically, GMAC Mortgage has breached the Insurance Agreements by refusing MBIA's requests for copies of complete versions of the GMAC Mortgage Underwriting Guidelines.  It has failed to provide, for each Transaction and despite MBIA's written request, monthly loan-level collateral performance tapes for each month preceding early 2008.

129.    GMAC Mortgage's breaches constitute Events of Default under the Insurance Agreements.

130.    MBIA has fully complied with its obligations under the Transaction Documents, the Insurance Agreements, and the Policies.

131.    MBIA has incurred and will continue to incur damages, including without limitation interest and reasonable attorneys' and accountants' fees and expenses in an amount to be determined at trial.

132.    Pursuant to Section 3.04 of the Insurance Agreements, GMAC Mortgage agreed to indemnify MBIA for these liabilities when they arise out of "the breach by [GMAC Mortgage] . . . of any representation or warranty . . . under any of the Transaction Documents to which it is a party."

133.    Accordingly, MBIA seeks declaratory judgment that GMAC Mortgage is required: (1) to reimburse MBIA for all claims payments made to date and all future claims payments under the Policies; and (2) to indemnify MBIA for any and all payments made as a

result of GMAC Mortgage's breaches of its representations and warranties in the Insurance Agreements.

## FOURTH CAUSE OF ACTION

### (Breach of Contract: Servicing Agreement)

134.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

135.    In October 2009, MBIA exercised its right under the Servicing Agreements to terminate GMAC Mortgage as Servicer, in all three Transactions. Since that time, GMAC Mortgage has not serviced the mortgage loans underlying the Transactions.

136.    In each Transaction, GMAC Mortgage was required to give MBIA prompt, written notice if it became aware that loans failed to conform with its representations and warranties in the Purchase Agreements in a manner that "materially and adversely affects" MBIA's interests.

137.    In each Transaction, GMAC Mortgage was required to make reasonable efforts to collect all payments due from borrowers and service loans in a manner consistent with its own servicing guidelines. As Servicer, GMAC Mortgage was required to employ, in its good faith business judgment, all of its "normal and usual" servicing procedures.

138.    GMAC Mortgage failed to give notice of loans failing to conform with its representations and warranties in the Purchase Agreements, and materially and adversely affecting MBIA's interests, even though it was fully aware, from the inception of the Transactions, that the pools were replete with non-conforming loans that materially and adversely affected MBIA's interests.

139.    GMAC Mortgage also failed to make reasonable efforts to collect all payments due from borrowers. GMAC Mortgage employed wholly deficient servicing practices and made

50

only perfunctory efforts to collect payments from borrowers. The resources that GMAC

Mortgage allocated to servicing the loan pools fell far short of being adequate to fulfill its

contractual obligation. As a result of the lack of resources, the servicing of the mortgage loans

was overly passive. GMAC Mortgage failed to treat borrowers and loans individually, and failed

to maintain records sufficient to support reasonable servicing efforts.

140.    The material deficiencies in GMAC Mortgage's servicing included: (1) failure to

initiate and document contact with borrowers, or to follow up after successful initial contact; (2)

failure to discuss loss mitigation with borrowers when delinquency was reasonably foreseeable;

(3) failure to monitor and record information bearing on loss mitigation, such as the reasons for

delinquency or default, the status of the senior lien holder, and the progress of loss mitigation

efforts; (4) failure to conduct property inspections as a means of, among other things, locating

the borrower or valuing the property; (5) over-reliance on mass offerings of settlements, often

with the result that a non-responsive borrower was rewarded with increasingly favorable terms;

and (6) failure to monitor foreclosure sale activities.

141.    GMAC Mortgage's improperly inactive approach resulted in delinquent loans

advancing to the stage of charge-off without adequate exploration of means of collecting some

part of the payments owed. GMAC Mortgage's failure to devote adequate resources to

collection efforts also exploited its role as a collector of funds for the trusts, because GMAC

Mortgage made gains at the expense of MBIA and investors. GMAC Mortgage wrongly

minimized the expense to itself while disregarding its obligation to seek returns for the trusts, for

the benefit of investors.

142.    MBIA has fully complied with its obligations under the Transaction Documents

and the Insurance Agreements.

51

143.    GMAC Mortgage's breaches of the Servicing Agreements have caused substantial

harm and damages to MBIA, in an amount to be proved at trial, but at a minimum including

substantially higher claims on Policies and other losses and expenses.

### FIFTH CAUSE OF ACTION

### (Breach of Contract: Repurchase Obligation)

144.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the

preceding paragraphs.

145.    Pursuant to the Servicing Agreements, if MBIA determines that, with respect to

any loan, GMAC Mortgage breached its representations and warranties in the Purchase

Agreements in a manner that "materially and adversely affect[ed] the interests of the

Securityholders or the Enhancer [*i.e.*, MBIA]," MBIA may notify GMAC Mortgage of the

presence of such breach. Upon such notice, GMAC Mortgage has 90 days to: (1) cure the

breach; (2) repurchase the mortgage loan; or (3) substitute one or more eligible loans for the

mortgage loan. Under the terms of the Putback Procedure, however, substitution is only

permitted within a two-year period following the closing date of the Transaction. The Putback

Procedure is not an exclusive remedy and does not apply to breaches of the Insurance

Agreements.

146.    MBIA has provided GMAC with 25 notices of breach by letters dated May 15,

2009; May 19, 2009; May 26, 2009; June 4, 2009; June 10, 2009; June 15, 2009; June 22, 2009;

June 30, 2009; July 7, 2009; July 28, 2009; July 29, 2009; August 6, 2009; August 12, 2009;

August 18, 2009; August 26, 2009; September 1, 2009; September 9, 2009; September 15, 2009;

September 22, 2009; September 30, 2009; October 9, 2009; October 14, 2009; February 16,

2010; February 22, 2010; and March 10, 2010. MBIA notified GMAC of specific deficiencies in

3,669 individual loans in these putback requests, which are hereby incorporated by reference.

52

These letters notified GMAC Mortgage of loans that were in breach of one or more of GMAC Mortgage's representations and warranties set forth in the Purchase Agreements and that such breaches materially and adversely affected the interests of MBIA.

147.    MBIA continues to notify GMAC Mortgage of additional loans that are discovered to be in breach of one or more of GMAC Mortgage's representations and warranties. Additional loans continue to become delinquent or are charged-off every month. On information and belief, such delinquencies and charge-offs will continue through the date of trial in this action and beyond.

148.    The mortgage loans identified in MBIA's notices failed to comply with one or more of the representations and warranties made by GMAC Mortgage in the Purchase Agreements. For example, many of the loan files relating to the mortgage loans were incomplete and lacked required documentation and instruments, including mortgage notes, disclosures relating to the sale of the mortgage loans, disclosures relating to the transfer of servicing for the mortgage loans, documents confirming appropriate reserves, and documents relating to the appraisal. Mortgage loans were underwritten in violation of the representation and warranty that the CLTV ratio would not exceed 100%. GMAC Mortgage also approved loans that did not comply with applicable local, state, and federal laws, including applicable predatory lending laws.

149.    MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial. For the vast majority of the mortgage loans identified in MBIA's letters, GMAC Mortgage has neither cured the material breaches nor repurchased or substituted eligible mortgage loans as required by the Putback Procedure. By failing either to cure the defective aspects of the non-compliant mortgage loans identified in MBIA's letters or to repurchase or

53

substitute those non-compliant mortgage loans, GMAC Mortgage has caused MBIA to incur

payments for shortfalls in cash flows to investors when, in fact, such shortfalls should properly

be paid by GMAC Mortgage.  In addition, MBIA expects that because delinquencies and charge-

offs continue to occur, it will continue to make payments under the Insurance Agreements due to

the true quality of the mortgage loans, which GMAC Mortgage misrepresented to MBIA in

obtaining the Policies.

150.    MBIA also has incurred, and will continue to incur, significant fees for

professional services, including attorneys' fees, to engage in, and enforce GMAC Mortgage's

obligations under, the Putback Procedure.  Pursuant to Section 3.03 of the Insurance

Agreements, GMAC Mortgage agreed to indemnify MBIA for these payments, when made as a

result of GMAC Mortgage's failure to comply with the Transaction Documents, including,

without limitation, GMAC Mortgage's failure to comply with the Putback Procedure.

151.    MBIA has fully complied with its obligations under the Transaction Documents,

the Insurance Agreements, and the Policies.

152.    Accordingly, MBIA seeks declaratory judgment that GMAC Mortgage is

required:  (1) to repurchase the mortgage loans identified in MBIA's notices; (2) to repurchase

any additional mortgage loans that breach the applicable representations and warranties; and (3)

to indemnify MBIA for any and all payments made as a result of GMAC Mortgage's breaches of

its representations and warranties, including GMAC Mortgage's failure to comply with the

Putback Procedure.

54

## SIXTH CAUSE OF ACTION

### (Breach of Contract – Good Faith and Fair Dealing)

153.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

154.    Under the Insurance Agreements, the Purchase Agreements, and the Servicing Agreements, GMAC Mortgage is required to comply with the covenant or duty of good faith and fair dealing that is implied in all contracts.

155.    The Insurance Agreements and the Transaction Documents incorporated therein are built on the premise that, as GMAC Mortgage affirmatively represented, the mortgage loans had been evaluated consistently with the underwriting standards of GMAC Mortgage.  The Insurance and Servicing Agreements are founded on the understanding that GMAC Mortgage, as Servicer, would make reasonable servicing efforts.  GMAC Mortgage encouraged trust and reliance on its underwriting and servicing precisely because of its expertise and experience.

156.    The implied duty of good faith and fair dealing required application of underwriting and servicing standards consistent with MBIA's understanding and with GMAC Mortgage's awareness of what MBIA had understood about those standards.

157.    GMAC Mortgage breached its duty of good faith and fair dealing by knowingly, and in bad faith, deliberately and routinely contributing mortgage loans to the pools that had not been originated in accordance with GMAC Mortgage's underwriting standards.

158.    GMAC Mortgage further breached its implied duty of good faith and fair dealing by failing in good faith to employ loan servicing procedures consistent with servicing industry standards, or make efforts to collect all payments due from borrowers.

55

159.   GMAC Mortgage also breached its implied duty of good faith and fair dealing by failing to provide MBIA with access to information reasonably requested by MBIA, such as the complete versions of the GMAC Mortgage Underwriting Guidelines. The Insurance Agreements are based on the premise that GMAC Mortgage will not affirmatively frustrate MBIA's ability to enforce its contractual rights. GMAC Mortgage's bad faith withholding of information relating to the mortgage loans, and the standards under which those loans were underwritten, has impermissibly interfered with MBIA's enforcement of its rights.

160.   Had MBIA known of the true risk profile of the loan pools in the Transactions, or that GMAC Mortgage would fail to undertake reasonable servicing efforts or refuse access to information necessary for MBIA to enforce its contractual rights, MBIA would not have issued the Policies. GMAC Mortgage's breach of its implied duty of good faith and fair dealing has deprived MBIA of the benefit of having entered into the Insurance Agreements.

161.   MBIA has fully complied with its obligations under the Transaction Documents, the Insurance Agreements, and the Policies.

162.   As a result of GMAC Mortgage's breach of the implied covenant of good faith and fair dealing, MBIA has incurred, and will continue to incur, damages including, without limitation, interest and reasonable attorneys' and accountants' fees and expenses. GMAC Mortgage is responsible for all losses incurred by MBIA whether or not such losses relate directly to non-compliant mortgage loans.

56

## PRAYER FOR RELIEF

WHEREFORE MBIA prays for relief as follows:

a.     For an award of damages against GMAC Mortgage, in an amount to be proven at trial, but including at a minimum:

i.     MBIA's payments on current and future claims under the Policies;

ii.     MBIA's compensatory and consequential losses, including lost profits and business opportunities;

iii.     Indemnification for MBIA's attorneys' fees, costs, and expenses associated with enforcing its legal rights under the Transaction Documents;

iv.     Punitive damages; and

v.     Pre-judgment interest at the maximum legal rate.

b.     For a declaratory judgment that GMAC Mortgage is required:  (1) to repurchase the mortgage loans identified in MBIA's notices; (2) to repurchase any additional mortgage loans that breach the applicable representations and warranties; and (3) to indemnify MBIA for any and all payments made as a result of GMAC Mortgage's failure to comply with the Putback Procedure.

c.     For a declaratory judgment that GMAC Mortgage is required to reimburse MBIA for all claims payments made to date and all future claims payments under the Policies, and to indemnify MBIA for any and all payments made as a result of GMAC Mortgage's breaches of the representations and warranties in the Insurance Agreements.

d.     Such other and further relief as the Court may deem just and proper.

57

DATED: New York, New York
       April 1, 2010

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____

Peter E. Calamari
Philippe Z. Selendy
Christine H. Chung

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849 7000

*Attorneys for MBIA Insurance Corporation*

58

Index No.

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

MBIA INSURANCE CORPORATION,

Plaintiff,

-against-

GMAC MORTGAGE, LLC (F/K/A GMAC
MORTGAGE CORPORATION)

Defendant.

### SUMMONS AND COMPLAINT

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Peter E. Calamari
Philippe Z. Selendy
Christine H. Chung

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff*
*MBIA Insurance Corporation*