# Exhibit 90

EXECUTION COPY

MBIA INSURANCE CORPORATION,
as Insurer,

RESIDENTIAL FUNDING COMPANY, LLC,
as Seller and Master Servicer,

HOME EQUITY LOAN TRUST 2007-HSA3,
as Issuer,

and

RESIDENTIAL FUNDING MORTGAGE SECURITITES II, INC.,
as Depositor

INSURANCE AGREEMENT

$796,432,000
Home Equity Loan Trust 2007-HSA3
Home Equity Loan-Backed Term Notes, Series 2007-HSA3
Class I Notes and Class II Notes

Dated as of May 30, 2007

4818-7097-7537.2

# TABLE OF CONTENTS

Page

## ARTICLE I

DEFINITIONS ........................................................................................................ 2

## ARTICLE II
### REPRESENTATIONS, WARRANTIES AND COVENANTS

| | | |
|---|---|---|
| Section 2.01. | Representations and Warranties of RFC | 5 |
| Section 2.02. | [Reserved] | 8 |
| Section 2.03. | Representations and Warranties of the Issuer | 8 |
| Section 2.04. | Representations and Warranties of the Depositor | 11 |
| Section 2.05. | Affirmative Covenants of RFC | 14 |
| Section 2.06. | [Reserved] | 19 |
| Section 2.07. | Affirmative Covenants of the Issuer | 19 |
| Section 2.08. | Affirmative Covenants of the Depositor | 21 |
| Section 2.09. | Negative Covenants of RFC | 24 |
| Section 2.10. | [Reserved] | 25 |
| Section 2.11. | Negative Covenants of the Issuer | 25 |
| Section 2.12. | Negative Covenants of the Depositor | 25 |
| Section 2.13. | Additional Covenants of the Insurer Relating to Regulation AB | 27 |

## ARTICLE III
### THE POLICIES; REIMBURSEMENT

| | | |
|---|---|---|
| Section 3.01. | Issuance of the Policies | 28 |
| Section 3.02. | Payment of Fees and Premium | 30 |
| Section 3.03. | Reimbursement and Additional Payment Obligation | 30 |
| Section 3.04. | Indemnification with Respect to RFC and the Issuer | 32 |
| Section 3.05. | Indemnification with Respect to the Depositor | 34 |
| Section 3.06. | Indemnification with Respect to Insurer | 37 |
| Section 3.07. | Payment Procedure | 38 |
| Section 3.08. | Joint and Several Liability | 38 |

## ARTICLE IV
### FURTHER AGREEMENTS

| | | |
|---|---|---|
| Section 4.01. | Effective Date; Term of the Insurance Agreement | 39 |
| Section 4.02. | Further Assurances and Corrective Instruments | 39 |
| Section 4.03. | Obligations Absolute | 39 |
| Section 4.04. | Assignments; Reinsurance; Third-Party Rights | 41 |
| Section 4.05. | Liability of the Insurer | 41 |
| Section 4.06. | Parties Will Not Institute Insolvency Proceedings | 42 |
| Section 4.07. | Depositor, the Issuer, and RFC To Join in Enforcement Action | 42 |
| Section 4.08. | Use of Insurer's Name | 42 |

4818-7097-7537.2

Confidential

## ARTICLE V
## DEFAULTS; REMEDIES

Section 5.01.    Defaults ................................................................................................ 42
Section 5.02.    Remedies; No Remedy Exclusive ........................................................ 43
Section 5.03.    Waivers ................................................................................................. 44

## ARTICLE VI
## MISCELLANEOUS

Section 6.01.    Amendments, Etc ................................................................................ 45
Section 6.02.    Notices ................................................................................................. 45
Section 6.03.    Severability .......................................................................................... 46
Section 6.04.    Governing Law .................................................................................... 47
Section 6.05.    Consent to Jurisdiction ....................................................................... 47
Section 6.06.    Consent of the Insurer ......................................................................... 47
Section 6.07.    Counterparts ......................................................................................... 47
Section 6.08.    Headings ............................................................................................... 47
Section 6.09.    Trial by Jury Waived ........................................................................... 48
Section 6.10.    Limited Liability .................................................................................. 48
Section 6.11.    Entire Agreement ................................................................................. 48

Confidential

## INSURANCE AGREEMENT

This INSURANCE AGREEMENT (this "Insurance Agreement"), dated as of May 30, 2007 by and among **MBIA INSURANCE CORPORATION,** as Insurer (the "Insurer"), **RESIDENTIAL FUNDING COMPANY, LLC** ("RFC"), as Seller and Master Servicer, **HOME EQUITY LOAN TRUST 2007-HSA3** (the "Issuer"), as Issuer, and **RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.** (the "Depositor").

## RECITALS

WHEREAS, RFC, as Seller, has transferred and assigned all of its rights, title and interest to the Depositor, and the Depositor has accepted from RFC the transfer and assignment of such rights, title and interest, in the Home Equity Loans, including any rights to Additional Balances, on a servicing retained basis, pursuant to the Home Equity Loan Purchase Agreement dated as of May 30, 2007 (the "Purchase Agreement"), by and between the Depositor and RFC;

WHEREAS, a Servicing Agreement dated as of May 30, 2007, by and among RFC, as Master Servicer, the Issuer and the Indenture Trustee (as may be amended, modified or supplemented from time to time as set forth therein, the "Servicing Agreement") provides for the administration and servicing of the Home Equity Loans;

WHEREAS, an Amended and Restated Trust Agreement dated as of May 30, 2007, by and between the Depositor and the Owner Trustee (as may be amended, modified or supplemented from time to time as set forth therein, the "Trust Agreement") provides for, among other things, the formation of the Home Equity Loan Trust 2007-HSA3 (the "Issuer" or the "Trust"), the sale of the Home Equity Loans by the Depositor to the Issuer and the issuance of Class R and Class SB Home Equity Loan-Backed Certificates, Series 2007-HSA3 (the "Certificates") representing undivided beneficial ownership interests in the Trust;

WHEREAS, an Indenture dated as of May 30, 2007 (the "Indenture"), by and between the Issuer and the Indenture Trustee (as may be amended, modified or supplemented from time to time as set forth therein, the "Indenture") provides for, among other things, the issuance of the Home Equity Loan Trust 2007-HSA3, Home Equity Loan-Backed Term Notes, Series 2007-HSA3 Class I Notes and Class II Notes (collectively, the "Notes"), representing indebtedness of the Trust;

WHEREAS, the Notes will be secured by all of the Issuer's right, title and interest in the Home Equity Loans, and certain other accounts and funds;

WHEREAS, the Insurer has issued the Policies, pursuant to which it has agreed to pay in favor of the Indenture Trustee on behalf of the Issuer and for the benefit of the applicable Owners of the Notes certain payments as set forth in the Policies;

WHEREAS, the Insurer shall be paid a Premium as set forth herein; and

WHEREAS, each of RFC, the Issuer and the Depositor has undertaken certain obligations in consideration for the Insurer's issuance of the Policies;

4818-7097-7537.2

Confidential

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

The terms defined in this Article I shall have the meanings provided herein for all purposes of this Insurance Agreement, unless the context clearly requires otherwise, in both singular and plural form, as appropriate. Unless the context clearly requires otherwise, all capitalized terms used herein and not otherwise defined in this Article I shall have the meanings assigned to them in Appendix A to the Indenture. All words used herein shall be construed to be of such gender or number as the circumstances require. This "Insurance Agreement" shall mean this Insurance Agreement as a whole and as the same may, from time to time hereafter, be amended, supplemented or modified. The words "herein," "hereby," "hereof," "hereto," "hereinabove" and "hereinbelow," and words of similar import, refer to this Insurance Agreement as a whole and not to any particular paragraph, clause or other subdivision hereof, unless otherwise specifically noted.

"*Business Day*" means any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the States of New York, California, Minnesota, Illinois or Delaware are required or authorized by law or executive order to be closed.

"*Certificates*" means the Class R and Class SB Home Equity Loan-Backed Certificates, Series 2007-HSA3 issued pursuant to the Trust Agreement.

"*Closing Date*" means May 30, 2007.

"*Commission*" means the Securities and Exchange Commission.

"*Custodial Agreement*" means the Custodial Agreement dated as of May 30, 2007 among the Indenture Trustee, the Issuer, RFC, as Master Servicer, and the Custodian, as the Custodian, as the same may be amended or supplemented from time to time in accordance with the terms thereof.

"*Custodian*" means Wells Fargo Bank, National Association, and its successors and assigns.

"*Default*" means any event which results, or which with the giving of notice or the lapse of time or both would result, in an Event of Default.

"*Depositor Documents*" has the meaning in Section 2.04(i).

"*Event of Default*" means any event of default specified in Section 5.01 of this Insurance Agreement.

Confidential

"*Financial Statements*" means, with respect to RFC, the consolidated statements of financial condition and the statements of operations, stockholders' equity and cash flows and the notes thereto which have been provided to the Insurer.

"*Fiscal Agent*" means the Fiscal Agent, if any, designated pursuant to the terms of the Policies.

"*Indenture*" has the meaning in the Recitals.

"*Indenture Trustee*" means LaSalle Bank National Association, a national banking association, as Indenture Trustee under the Indenture, and any successor to the Indenture Trustee under the Indenture.

"*Insurance Agreement*" has the meaning in the initial paragraph hereof.

"*Insurer*" means MBIA Insurance Corporation or any successor thereto, as the issuer of the Policies.

"*Insurer Information*" shall have the meaning in Section 2.12A hereof.

"*Investment Company Act*" means the Investment Company Act of 1940, including, unless the context otherwise requires, the rules and regulations thereunder, as amended.

"*Issuer*" has the meaning in the Recitals.

"*Late Payment Rate*" means, for any date of determination, the rate of interest as it is publicly announced by Citibank, N.A. at its principal office in New York, New York as its prime rate (any change in such prime rate of interest to be effective on the date such change is announced by Citibank, N.A.) plus 3%. The Late Payment Rate shall be applied to the amounts due and owing the Insurer hereunder and computed on the basis of a year of 365 days and calculating the actual number of days elapsed. In no event shall the Late Payment Rate exceed the maximum rate permissible under any applicable law limiting interest rates.

"*Liabilities*" shall have the meaning in Section 3.04(a) hereof.

"*Material Adverse Change*" means, in respect of any Person, a material adverse change in the ability of such Person to perform its obligations under any of the Transaction Documents, including any material adverse change in the business, financial condition, results of operations or properties of such Person on a consolidated basis with its subsidiaries which might have such effect.

"*Moody's*" means Moody's Investors Service, Inc., a Delaware corporation, and any successor thereto, and, if such corporation shall for any reason no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized rating agency designated by the Insurer.

"*Note*" means any one of the Securities designated as a Note, substantially in the form of Exhibit A-1 or A-2 to the Indenture.

4818-7097-7537.2                                              3

Confidential

"*Offering Documents*" means the Prospectus dated April 23, 2007, the Preliminary Prospectus Supplement dated May 22, 2007 and the Prospectus Supplement thereto dated May 25, 2007, in respect of the Notes (and any amendment or supplement thereto) and any other offering document in respect of the Securities prepared by or on behalf of RFC that makes reference to the Policies.

"*Owner Trustee*" means Wilmington Trust Company, a banking corporation organized and existing under the laws of Delaware, as owner trustee under the Trust Agreement, and any successor thereto under the Trust Agreement.

"*Owners*" means registered holders of the Notes.

"*Person*" means an individual, joint stock company, trust, unincorporated association, joint venture, corporation, business or owner trust, limited liability company, partnership or other organization or entity (whether governmental or private).

"*Policies*" means the Note Guaranty Insurance Policy Nos. 496850 and 496860 issued by the Insurer in favor of the Indenture Trustee, for the benefit of the Owners of the Class I Notes and the Class II Notes, respectively.

"*Preliminary Prospectus Supplement*" means the Preliminary Prospectus Supplement dated May 22, 2007 in respect of the Notes.

"*Premium*" means the premium payable in accordance with Section 3.02 hereof.

"*Premium Letter*" means the Premium Letter from the Insurer to RFC dated May 30, 2007.

"*Premium Percentage*" shall have the meaning ascribed to such term in Section 3.02 hereof.

"*Purchase Agreement*" has the meaning given such term in the Recitals.

"*Registration Statement*" means the registration statement on Form S-3, including the form of prospectus, relating to the Notes, as amended or supplemented to the date hereof.

"*Regulation AB*" means Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

"*RFC Documents*" has the meaning in Section 2.01(j).

"*RFC Information*" has the meaning in Section 3.05A(a).

"*Securities*" means the Notes and the Certificates.

Confidential

"*Securities Act*" means the Securities Act of 1933, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"*Securities Exchange Act*" means the Securities Exchange Act of 1934, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"*Servicing Agreement*" has the meaning given to such term in the Recitals.

"*S&P*" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto, and, if such corporation shall for any reason no longer perform the functions of a securities rating agency, "S&P" shall be deemed to refer to any other nationally recognized rating agency designated by the Insurer.

"*Term of the Insurance Agreement*" shall be determined as provided in Section 4.01 hereof.

"*Transaction*" means the transactions contemplated by the Transaction Documents, including the transactions described in the Offering Documents.

"*Transaction Documents*" means this Insurance Agreement, the Premium Letter, the Indenture, the Servicing Agreement, the Offering Documents, the Securities, the Purchase Agreement, the Underwriting Agreement, the Custodial Agreement and the Indemnification Agreement.

"*Trust*" means the Home Equity Loan Trust 2007-HSA3 created pursuant to the Trust Agreement.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"*Underwriters*" means Credit Suisse Securities (USA) LLC and Residential Funding Securities, LLC.

"*Underwriter Information*" means the statements under the caption "METHOD OF DISTRIBUTION" in the Prospectus Supplement, insofar as such information relates to the Underwriters.

"*Underwriting Agreement*" means the Underwriting Agreement between the Depositor and the Underwriters with respect to the offer and sale of the Notes, as the same may be amended from time to time.

## ARTICLE II

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 2.01. Representations and Warranties of RFC.** RFC represents and warrants as of the Closing Date as follows:

Confidential

(a) *Due Organization and Qualification*.  RFC is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  RFC is, or will become, duly qualified to do business, is, or will be, in good standing and has obtained, or will obtain, all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Documents and the performance of its obligations under the Transaction Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Transaction Document to which it is a party unenforceable in any respect or would have a material adverse effect upon the Transaction, the Owners or the Insurer.

(b) *Power and Authority*.  RFC has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Documents, to execute, deliver and perform its obligations under the Transaction Documents to which it is a party and to consummate the Transaction.

(c) *Due Authorization*.  The execution, delivery and performance of the Transaction Documents to which it is a party by RFC have been duly authorized by all necessary corporate action and do not require any additional approvals or consents of, or other action by or any notice to or filing with, any Person, including, without limitation, any governmental entity or the sole member of RFC, which have not previously been obtained or given by RFC.

(d) *Noncontravention*.  The execution and delivery by RFC of the Transaction Documents to which it is a party, the consummation of the Transaction and the satisfaction of the terms and conditions of the Transaction Documents to which it is a party do not and will not:

    (i)    conflict with or result in any breach or violation of any provision of the applicable organizational documents of RFC or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to RFC or any of its material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over RFC, which conflict, breach or violation might reasonably result in a Material Adverse Change;

    (ii)    constitute a default by RFC under, result in the acceleration of any obligation under, or breach any provision of any loan agreement, mortgage, indenture or other agreement or instrument to which RFC is a party or by which any of its properties is or may be bound or affected, which default, acceleration or breach reasonably could result in a Material Adverse Change; or

    (iii)    result in or require the creation of any lien upon or in respect of any assets of RFC, which lien reasonably could result in a Material Adverse Change, other than any lien created by the Transaction Documents.

Confidential

(e) *Legal Proceedings*.   There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting RFC or any of its subsidiaries, any properties or rights of RFC or any of its subsidiaries or any of the Home Equity Loans pending or, to RFC's knowledge after reasonable inquiry, threatened, which, in any case, if decided adversely to RFC or any such subsidiary could reasonably be expected to result in a Material Adverse Change with respect to RFC.

(f) *Valid and Binding Obligations*.  The Transaction Documents (other than the Securities) to which it is a party, when executed and delivered by RFC, will constitute the legal, valid and binding obligations of RFC enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws.

(g) *Financial Statements*.  The Financial Statements of RFC, copies of which have been furnished to the Insurer, (i) are, as of the dates and for the periods referred to therein, complete and correct in all material respects, (ii) present fairly the financial condition and results of operations of RFC as of the dates and for the periods indicated and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied, except as noted therein (subject as to interim statements to normal year-end adjustments).  Since the date of the most recent Financial Statements, there has been no Material Adverse Change in respect of RFC.   Except as disclosed in the Financial Statements, RFC is not subject to any contingent liabilities or commitments that, individually or in the aggregate, have a material possibility of causing a Material Adverse Change in respect of RFC.

(h) *Compliance With Law, Etc*.  No practice, procedure or policy employed, or proposed to be employed, by RFC in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to RFC that, if enforced, could result in a Material Adverse Change with respect to RFC.

(i) *Taxes*.  RFC has filed prior to the date hereof all federal and state tax returns that are required to be filed and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due. Any taxes, fees and other governmental charges payable by RFC in connection with the Transaction, the execution and delivery of the Transaction Documents to which it is a party and the issuance of the Securities have been paid or shall have been paid at or prior to the Closing Date if such taxes, fees or other governmental charges were due on or prior to the Closing Date.

(j) *Accuracy of Information*.  Neither the information supplied by RFC contained in the Transaction Documents to which it is a party nor other material information relating to the Home Equity Loans, the operations of RFC or the financial condition of RFC (collectively, the "RFC Documents"), as amended, supplemented or superseded, furnished to the Insurer by RFC in writing or in electronic form by RFC contains any

Confidential

statement of a material fact made by RFC which was untrue or misleading in any material respect as of the date reflected therein. RFC has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to RFC. Since the furnishing of the RFC Documents, there has been no change nor any development or event involving a prospective change known to RFC that would render any of the RFC Documents untrue or misleading in any material respect as of the Closing Date.

(k) [Reserved]

(l) [Reserved.]

(m) *Transaction Documents.* Each of the representations and warranties of RFC contained in the Transaction Documents to which it is a party is true and correct in all material respects as of the date reflected therein, and RFC hereby makes each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein; provided, however, that the remedy for any breach of a representation and warranty of RFC in Section 3.1 of the Purchase Agreement and the remedy with respect to any defective Home Equity Loans under Section 3.1 of the Purchase Agreement shall be limited to the remedies specified in the Purchase Agreement.

(n) *Solvency; Fraudulent Conveyance.* RFC is solvent and will not be rendered insolvent by the Transaction and, after giving effect to the Transaction, RFC will not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business, and RFC does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. RFC does not contemplate the commencement of insolvency, bankruptcy, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of RFC or any of its assets. The amount of consideration being received by RFC upon the sale of the Home Equity Loans to the Depositor constitutes reasonably equivalent value and fair consideration. RFC is not transferring the Home Equity Loans to the Depositor, as provided in the Transaction Documents, with any intent to hinder, delay or defraud any of RFC's creditors.

(o) *Principal Place of Business.* The principal place of business of RFC is located in Minneapolis, Minnesota, and RFC is a limited liability company organized under the laws of the State of Delaware. "Residential Funding Company, LLC" is the correct legal name of RFC indicated on the public records of RFC's jurisdiction which shows RFC to be organized.

**Section 2.02.** [Reserved]

**Section 2.03. Representations and Warranties of the Issuer**. The Issuer represents and warrants as of the Closing Date as follows:

(a) *Due Organization and Qualification.* The Issuer is a statutory trust duly organized, validly existing and in good standing under the laws of Delaware. The Issuer is, or will become, duly qualified to do business, is, or will be, in good standing and has

Confidential

obtained, or will obtain, all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Documents and the performance of its obligations under the Transaction Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Transaction Document to which it is a party unenforceable in any respect or would have a material adverse effect upon the Transaction.

(b) *Power and Authority*. The Issuer has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Documents, to execute, deliver and perform its obligations under the Transaction Documents to which it is a party and to consummate the Transaction.

(c) *Due Authorization*. The execution, delivery and performance by the Issuer of the Transaction Documents to which it is a party by the Issuer have been duly authorized by all necessary action and do not require any additional approvals or consents of, or other action by or any notice to or filing with, any Person, including, without limitation, any governmental entity or any of the beneficial owners of the Issuer, which have not previously been obtained or given by the Issuer.

(d) *Noncontravention*. The execution and delivery by the Issuer of the Transaction Documents to which it is a party, the consummation of the Transaction and the satisfaction of the terms and conditions of the Transaction Documents to which it is a party do not and will not:

(i) conflict with or result in any breach or violation of any provision of the applicable organizational documents of the Issuer or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to the Issuer or any of its material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over the Issuer, which conflict, breach or violation reasonably could result in a Material Adverse Change;

(ii) constitute a default by the Issuer under, result in the acceleration of any obligation under, or breach any provision of any loan agreement, mortgage, indenture or other agreement or instrument to which the Issuer is a party or by which any of its properties is or may be bound or affected, which default, acceleration or breach reasonably could result in a Material Adverse Change; or

(iii) result in or require the creation of any lien upon or in respect of any assets of the Issuer, which lien reasonably could result in a Material Adverse Change, other than any lien created by the Transaction Documents.

(e) *Legal Proceedings*. There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting the Issuer, any properties or rights of the Issuer or any of the Mortgage Loans pending or,

Confidential

to the Issuer's knowledge after reasonable inquiry, threatened, which, in any case, if decided adversely to the Issuer could reasonably be expected to result in a Material Adverse Change with respect to the Issuer.

(f) *Valid and Binding Obligations.* The Transaction Documents (other than the Securities) to which it is a party, when executed and delivered by the Issuer, will constitute the legal, valid and binding obligations of the Issuer, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws. The Notes, when executed, authenticated and delivered in accordance with the Indenture, will be validly issued and outstanding and entitled to the benefits of the Indenture, and the Certificates, when executed, authenticated and delivered in accordance with the Trust Agreement, will be validly issued and outstanding and entitled to the benefits of the Trust Agreement.

(g) *Compliance With Law, Etc.* No practice, procedure or policy employed, or proposed to be employed, by the Issuer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to the Issuer that, if enforced, could result in a Material Adverse Change with respect to the Issuer.

(h) *Taxes.* The Issuer has filed prior to the date hereof all federal and state tax returns that are required to be filed and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due. Any taxes, fees and other governmental charges payable by the Issuer in connection with the Transaction, the execution and delivery of the Transaction Documents to which it is a party and the issuance of the Securities have been paid or shall have been paid at or prior to the Closing Date if such taxes, fees or other governmental charges were due on or prior to the Closing Date.

(i) *Accuracy of Information.* Neither the Transaction Documents to which it is a party nor other material information relating to the Home Equity Loans, the operations of the Issuer or the financial condition of the Issuer (collectively, the "Issuer Documents"), as amended, supplemented or superseded, furnished to the Insurer by the Issuer in writing or in electronic form by the Issuer contains any statement of a material fact by the Issuer which was untrue or misleading in any material respect when made. The Issuer has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to the Issuer. Since the furnishing of the Issuer Documents, there has been no change nor any development or event involving a prospective change known to Issuer that would render any of the Issuer Documents untrue or misleading in any material respect as of the Closing Date. For the avoidance of doubt "Transaction Documents" in this Section 2.03(i) shall not include Offering Documents.

(j) *Compliance With Securities Laws.* The Offering Documents did not, as of the Closing Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; provided, however, that no representation is made

Confidential

with respect to the RFC Information, the Depositor Information, the Underwriter Information or the Insurer Information. The offer and the sale of the Notes has not been and will not be in violation of the Securities Act or any other federal or state securities laws. Based upon the advice of legal counsel, the Trust Agreement is not required to be qualified under the Trust Indenture Act and the Trust is not required to be registered as an "investment company" under the Investment Company Act. The Issuer will satisfy in all material respects any of the information reporting requirements of the Securities Exchange Act arising out of the Transaction to which it is subject.

(k) *Transaction Documents*. Each of the representations and warranties of the Issuer contained in the Transaction Documents to which it is a party is true and correct in all material respects as of the date reflected therein, and the Issuer hereby makes each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein.

(l) *Solvency; Fraudulent Conveyance*. The Issuer is solvent and will not be rendered insolvent by the Transaction and, after giving effect to the Transaction, the Issuer will not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business, and the Issuer does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. The Issuer does not contemplate the commencement of insolvency, bankruptcy, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of the Issuer or any of its assets. The amount of consideration being received by the Issuer upon the sale of the Securities constitutes reasonably equivalent value and fair consideration for the ownership and/or debt interest evidenced by the Securities. The Issuer is not selling the Securities, as provided in the Transaction Documents, with any intent to hinder, delay or defraud any of the Issuer's creditors.

(m) *Principal Place of Business*. The principal place of business of the Issuer is located in Wilmington, Delaware, and the Issuer is a statutory trust organized under the laws of the State of Delaware. "Home Equity Loan Trust 2007-HSA3" is the correct legal name of the Issuer indicated on the public records of the Issuer's jurisdiction which shows the Issuer to be organized.

**Section 2.04. Representations and Warranties of the Depositor**. The Depositor represents and warrants as of the Closing Date as follows:

(a) *Due Organization and Qualification*. The Depositor is a corporation, duly organized, validly existing and in good standing under the laws of Delaware. The Depositor is, or will become, duly qualified to do business, is, or will be, in good standing and has obtained, or will obtain, all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Documents and the performance of its obligations under the Transaction Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Transaction Document to which it is a party unenforceable in any respect or would have a material adverse effect upon the Transaction, the Owners or the Insurer.

11

Confidential

(b) *Power and Authority.* The Depositor has all necessary corporate power and authority to conduct its business as currently conducted and as described in the Offering Documents, to execute, deliver and perform its obligations under the Transaction Documents to which it is a party and to consummate the Transaction.

(c) *Due Authorization.* The execution, delivery and performance of its obligations under the Transaction Documents to which it is a party by the Depositor have been duly authorized by all necessary corporate action and do not require any additional approvals or consents of, or other action by or any notice to or filing with, any Person, including, without limitation, any governmental entity or any of the stockholders of the Depositor, which have not previously been obtained or given by the Depositor.

(d) *Noncontravention.* The execution and delivery by the Depositor of the Transaction Documents to which it is a party, the consummation of the Transaction and the satisfaction of the terms and conditions of the Transaction Documents to which it is a party do not and will not:

(i)    conflict with or result in any breach or violation of any provision of the applicable organizational documents of the Depositor or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to the Depositor or any of its material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over the Depositor, which conflict, breach, or violation reasonably could result in a Material Adverse Change;

(ii)    constitute a default by the Depositor under, result in the acceleration of any obligation under, or breach any provision of any loan agreement, mortgage, indenture or other agreement or instrument to which the Depositor is a party or by which any of its properties is or may be bound or affected, which default, acceleration or breach might reasonably result in a Material Adverse Change; or

(iii)    result in or require the creation of any lien upon or in respect of any assets of the Depositor, which lien might reasonably result in a Material Adverse Change.

(e) *Legal Proceedings.* There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting the Depositor or any of its subsidiaries, any properties or rights of the Depositor or any of its subsidiaries or any of the Home Equity Loans pending or, to the Depositor's knowledge after reasonable inquiry, threatened, which, in any case, if decided adversely to the Depositor or any such subsidiary could reasonably be expected to result in a Material Adverse Change with respect to the Depositor.

(f) *Valid and Binding Obligations.* The Transaction Documents (other than the Securities) to which it is a party, when executed and delivered by the Depositor, will

Confidential

constitute the legal, valid and binding obligations of the Depositor, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws.

(g) *Compliance With Law, Etc.* No practice, procedure or policy employed, or proposed to be employed, by the Depositor in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to the Depositor that, if enforced, could result in a Material Adverse Change with respect to the Depositor.

(h) *Taxes.* The Depositor has filed prior to the date hereof all federal and state tax returns that are required to be filed and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due. Any taxes, fees and other governmental charges payable by the Depositor in connection with the Transaction, the execution and delivery of the Transaction Documents to which it is a party and the issuance of the Securities have been paid or shall have been paid at or prior to the Closing Date if such taxes, fees or other governmental charges were due on or prior to the Closing Date.

(i) *Accuracy of Information.* Neither the material information supplied by the Depositor contained in the Transaction Documents to which it is a party nor other material information relating to the Home Equity Loans supplied by the Depositor, the operations of the Depositor or the financial condition of the Depositor (collectively, the "Depositor Documents"), as amended, supplemented or superseded, furnished to the Insurer by the Depositor in writing or in electronic form by the Depositor contains any statement of a material fact by the Depositor which was untrue or misleading in any material respect when made. The Depositor has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to the Depositor. Since the furnishing of the Depositor Documents, there has been no change nor any development or event involving a prospective change known to the Depositor that would render any of the Depositor Documents untrue or misleading in any material respect as of the Closing Date.

(j) *Reserved.*

(k) *Transaction Documents.* Each of the representations and warranties of the Depositor contained in the Transaction Documents to which it is a party is true and correct in all material respects as of the date reflected therein, and the Depositor hereby makes each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein.

(l) *Solvency; Fraudulent Conveyance.* The Depositor is solvent and will not be rendered insolvent by the Transaction and, after giving effect to the Transaction, the Depositor will not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business, and the Depositor does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. The

Confidential

Depositor does not contemplate the commencement of insolvency, bankruptcy, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of the Depositor or any of its assets. The Depositor is not transferring the Home Equity Loans to the Trust nor, to the best of the Depositor's knowledge, is the Trust selling the Securities, as provided in the Transaction Documents, with any intent to hinder, delay or defraud any of the Depositor's creditors.

(m)*Principal Place of Business.*  The principal place of business of the Depositor is located in Minneapolis, Minnesota, and the Depositor is a corporation organized under the laws of the State of Delaware. "Residential Funding Mortgage Securities II, Inc." is the correct legal name of the Depositor indicated on the public records of the Depositor's jurisdiction which shows the Depositor to be organized.

**Section 2.05. Affirmative Covenants of RFC.**  RFC hereby agrees that during the Term of the Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a) *Compliance With Agreements and Applicable Laws.*  RFC shall comply in all material respects with the terms and conditions of and perform its obligations under the Transaction Documents to which it is a party in all cases in which the failure to so comply or perform would result in a default thereunder and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could result in a Material Adverse Change. RFC will not at any time in the future deny that the Transaction Documents to which it is a party constitute the legal, valid and binding obligations of RFC.

(b) *Corporate Existence.*  RFC and its successors and permitted assigns, shall maintain its limited liability company existence and shall at all times continue to be duly organized under the laws of its jurisdiction of organization and duly qualified and duly authorized (as described in Section 2.01(a), (b) and (c) hereof) and shall conduct its business in accordance with the terms of its applicable organizational documents. Notwithstanding anything to the contrary set forth herein, any Person into which the Master Servicer may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Master Servicer shall be a party, or any Person succeeding to the business of the Master Servicer, shall be the successor of the Master Servicer, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(c) *Financial Statements; Accountants' Reports; Other Information.*  RFC shall keep or cause to be kept in reasonable detail books and records of account of its assets and business relating to the Transaction, and shall, as applicable, clearly reflect therein the sale of the Home Equity Loans to the Depositor and the sale of the Certificates as a sale of the Home Equity Loans by RFC to the Depositor, and a sale of the equity interest in the Trust to the holders of the Certificates. RFC shall furnish or cause to be furnished to the Insurer:

(i)    *Annual Financial Statements.*  As soon as available, and in any event within 105 days after the close of each fiscal year of RFC, the audited

Confidential

consolidated statements of financial condition of RFC and its subsidiaries as of the end of such fiscal year and the related audited consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles consistently applied and accompanied by the audit opinion of RFC's independent accountants (which shall be a nationally recognized independent public accounting firm or otherwise acceptable to the Insurer) and by the certificate specified in Section 2.05(d) hereof.

(ii)    *Quarterly Financial Statements.*   Upon the reasonable request of the Insurer, the unaudited consolidated statement of financial condition of RFC and its subsidiaries as of the end of the first three fiscal quarters of each fiscal year of RFC and the related unaudited consolidated statements of operations, stockholders' equity and cash flows for the portion of the fiscal year then ended, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments), and each delivery of quarterly financial statements shall be accompanied by a certificate of one (or more) corporate officers stating that the quarterly financial statements are correct in all material respects and present fairly the financial condition and results of operations of RFC and its subsidiaries as of the dates and for the periods indicated, in accordance with generally accepted accounting principles, consistently applied (subject to normal year-end adjustments).

(iii)    *Initial and Continuing Reports.*   On or before the Closing Date, RFC will provide the Insurer a copy of the magnetic tape or Home Equity Loan Schedule to be delivered to the Indenture Trustee on the Closing Date, setting forth, as to each Home Equity Loan, the information required under the definition of "Home Equity Loan Schedule" in Appendix A to the Indenture.

(iv)    *Certain Information.*   Upon the reasonable request of the Insurer, RFC shall promptly provide copies of any requested proxy statements, financial statements, reports and registration statements which RFC files with, or delivers to, the Commission or any national securities exchange.

(v)    *Other Information.*   (A) Promptly upon receipt thereof, RFC shall provide copies of all schedules, financial statements or other similar reports delivered to or by RFC pursuant to the terms of any of the Transaction Documents, including all reports provided to either the Indenture Trustee, any Noteholder or holder of a Certificate pursuant to the Indenture or the Servicing Agreement, (B) promptly upon request, such other data as the Insurer may reasonably request and (C) all information required to be furnished to the Owner Trustee, the Indenture Trustee, the Noteholders or the holders of the Certificates

Confidential

simultaneously with the furnishing thereof to the Owner Trustee, the Indenture Trustee, the Noteholders or the holders of the Certificates, as the case may be.

The Insurer agrees that it and its agents, accountants and attorneys shall keep confidential all financial statements, reports and other information delivered by RFC pursuant to this Section 2.05(c) to the extent provided in Section 2.05(e) hereof.

(d) *Compliance Certificate.* RFC (in its capacity as Master Servicer) shall deliver to the Insurer, concurrently with the delivery of the financial statements required pursuant to Section 2.05(c)(i) and (ii) hereof, one or more certificates signed by an officer of RFC authorized to execute such certificates on behalf of RFC stating that:

(i)     a review of RFC's performance under the Transaction Documents to which it is a party during such period has been made under such officer's supervision;

(ii)     to the best of such officer's knowledge following reasonable inquiry, no Default or Event of Default has occurred or, if a Default or Event of Default has occurred, specifying the nature thereof and, if RFC has a right to cure pursuant to Section 7.01 of the Servicing Agreement, stating in reasonable detail (including, if applicable, any supporting calculations) the steps, if any, being taken by RFC to cure such Default or Event of Default or to otherwise comply with the terms of the agreement to which such Default or Event of Default relates;

(iii)     the attached financial statements submitted in accordance with Section 2.05(c)(i) or (ii) hereof, as the case may be, are complete and correct in all material respects and present fairly the financial condition and results of operations of RFC as of the dates and for the periods indicated, in accordance with generally accepted accounting principles consistently applied (subject as to interim statements to normal year-end adjustments); and

(iv)     RFC, as Master Servicer, has in full force and effect a fidelity bond (or direct surety bond) and an errors and omissions insurance policy in accordance with the terms and requirements of Section 3.13 of the Servicing Agreement.

So long as RFC shall continue to act as Master Servicer, the annual servicer compliance certificate prepared by RFC as Master Servicer pursuant to Section 3.10 of the Servicing Agreement shall be deemed to satisfy RFC's obligations as imposed by clauses (i) and (ii) of this Section 2.05(d).

(e) *Access to Records; Discussions With Officers and Accountants.* On an annual basis, or upon the occurrence of a Material Adverse Change, RFC shall, upon the reasonable request of the Insurer, permit the Insurer or its authorized agents:

(i)     to inspect the books and records of RFC as they may relate to the Securities, the obligations of RFC under the Transaction Documents to which it is a party, and the Transaction;

Confidential

(ii)    to discuss the affairs, finances and accounts of RFC with the chief financial officer of RFC; and

(iii)    if the Insurer reasonably believes that a Material Adverse Change may have occurred and with RFC's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of RFC with RFC's independent accountants, provided that an officer of RFC shall have the right to be present during such discussions.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of RFC. The books and records of RFC shall be maintained at the address of RFC designated herein for receipt of notices, unless RFC shall otherwise advise the parties hereto in writing.

The Insurer agrees that it and its shareholders, directors, agents, accountants and attorneys shall keep confidential any matter of which it becomes aware through such inspections or discussions (unless readily available from public sources), except as may be otherwise required by regulation, law or court order or requested by appropriate governmental authorities or as necessary to preserve its rights or security under or to enforce the Transaction Documents, provided that the foregoing shall not limit the right of the Insurer to make such information available to its regulators, securities rating agencies, reinsurers, credit and liquidity providers, counsel and accountants.

(f)  *Notice of Material Events.*  RFC shall be obligated (which obligation shall be satisfied if performed by RFC or the Issuer) promptly to inform the Insurer in writing of the occurrence of any of the following to the extent any of the following relate to it:

(i)    the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation in any federal, state or local court or before any arbitration board or rule making or disciplinary proceeding by or against RFC that (A) would be required to be disclosed to the Commission or to RFC's sole member or (B) could result in a Material Adverse Change with respect to RFC, or the promulgation of any proceeding or any proposed or final rule which would likely result in a Material Adverse Change with respect to RFC or any of its subsidiaries;

(ii)    any change in the location of RFC's principal office or the principal office of any of its subsidiaries, RFC's jurisdiction of organization, legal name as indicated on the public records of RFC's jurisdiction of organization which shows RFC to be organized, or any change in the location of RFC's books and records;

(iii)    the occurrence of any Default or Event of Default or of any Material Adverse Change in respect of RFC;

(iv)    the commencement of any proceedings by or against RFC under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a

Confidential

receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for RFC or any of its assets; or

(v)    the receipt of notice that (A) RFC is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval necessary for the conduct of RFC's business is to be, or may be, suspended or revoked or (C) RFC is to cease and desist any practice, procedure or policy employed by RFC in the conduct of its business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change with respect to RFC.

(g) *Financing Statements and Further Assurances.*  RFC will cause to be filed all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to preserve and protect fully the interest of the Indenture Trustee in the Trust Estate.  RFC shall, upon the reasonable request of the Insurer, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within 10 days of such request, such amendments hereto and such further instruments and take such further action as may be reasonably necessary to effectuate the intention, performance and provisions of the Transaction Documents to which it is a party.  In addition, RFC agrees to cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof and to provide all information reasonably requested by S&P and Moody's.

(h) *Maintenance of Licenses.*  RFC, and any successors thereof, shall maintain or cause to be maintained all licenses, permits, charters and registrations the loss or suspension of which could result in a Material Adverse Change.

(i) *Disclosure Document.*  Any Offering Document delivered with respect to the Notes shall clearly disclose that the Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

(j) *Servicing of Home Equity Loans.*  All Home Equity Loans will be serviced in all material respects in compliance with the Servicing Agreement and the Indenture and RFC, as Master Servicer, agrees that the Servicing Agreement shall provide that RFC's obligations under this Insurance Agreement shall be binding on any successor servicers thereunder but only to the extent of RFC's obligations as Master Servicer under the Servicing Agreement and from the effective time of any such succession.

(k) *Closing Documents.*  RFC shall provide or cause to be provided to the Insurer an executed original copy of each document executed in connection with the Transaction within 60 days after the Closing Date.

(l) *Limited Liability Company Formalities.*  RFC shall observe all limited liability company formalities necessary to preserve its existence under the laws of the

1818-09-2537.2

18

Confidential

State of its organization, including the obligation to prepare and file annual income, franchise and other tax returns.

(m)*Due Diligence.* The Insurer shall have the right, so long as any of the Notes remain outstanding, to conduct an ongoing review of RFC's practices as Master Servicer through reviews of the Home Equity Loans, reappraisals of Mortgaged Properties and reviews of servicing practices. Such ongoing due diligence shall be conducted at the expense of the Insurer and shall be conducted in a reasonable manner convenient to both RFC and the Insurer.

**Section 2.06.** [Reserved]

**Section 2.07. Affirmative Covenants of the Issuer.** The Issuer hereby agrees that during the Term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a) *Compliance with Agreements and Applicable Laws.* The Issuer shall comply in all material respects with the terms and conditions of and perform its obligations under the Transaction Documents to which it is a party in all cases in which the failure to so comply or perform would result in a default thereunder and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could result in a Material Adverse Change. The Issuer will not at any time in the future deny that the Transaction Documents to which it is a party constitute the legal, valid and binding obligations of the Issuer.

(b) *Trust Existence.* The Issuer and its successors and permitted assigns shall maintain its trust existence and shall at all times continue to be duly organized under the laws of its formation and duly qualified and duly authorized (as described in Sections 2.03(a), (b) and (c) hereof) and shall conduct its business in accordance with the terms of its applicable organizational documents.

(c) *Financial Statements; Accountants' Reports; Other Information.* The Issuer shall keep or cause to be kept in reasonable detail books and records of account of its assets and business relating to the Transaction and shall, as applicable, clearly reflect therein of the Home Equity Loans by the Depositor to the Trust and the sale of the Certificates, respectively, as a sale of the Home Equity Loans by the Depositor to the Trust and a sale of the equity interest in the Trust to the holders of the Certificates. The Issuer shall furnish or cause to be furnished to the Insurer:

(i) *Certain Information.* Upon the reasonable request of the Insurer, copies of any proxy statements, financial statements, reports and registration statements that the Issuer files with, or delivers to, the Commission or any national securities exchange.

(ii) *Other Information.* (A) Promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by the Issuer pursuant to the terms of any of the Transaction Documents, including all reports to be provided either to the Indenture Trustee or to any Noteholder or

Confidential

holder of the Certificates pursuant to the Servicing Agreement, (B) promptly upon request, such other data as the Insurer may reasonably request and (C) all information required to be furnished to the Owner Trustee, the Indenture Trustee, the Owners or the holders of the Certificates, as the case may be.

(iii)    *[Reserved]*.

(d) *Access to Records; Discussions with Officers and Accountants.* On an annual basis, or upon the occurrence of a Material Adverse Change, the Issuer shall, upon the reasonable request of the Insurer, permit the Insurer or its authorized agents:

(i)    to inspect the books and records of the Issuer as they may relate to the Securities, the obligations of the Issuer under the Transaction Documents to which it is a party, and the Transaction;

(ii)    to discuss the affairs, finances and accounts of the Issuer with an officer of the Issuer;  and

(iii)    if the Insurer reasonably believes that a Material Adverse Change may have occurred and with the Issuer's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of the Issuer with the Issuer's independent accountants; provided that an officer of the Issuer shall have the right to be present during such discussions.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of the Issuer.  The books and records of the Issuer shall be maintained at the address of the Owner Trustee, unless the Issuer shall otherwise advise the parties hereto in writing.

(e) *Notice of Material Events.*  The Issuer shall be obligated (which obligation shall be satisfied if performed by RFC or the Issuer) promptly to inform the Insurer in writing of the occurrence of any of the following to the extent any of the following relate to it:

(i)    the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation in any federal, state or local court or before any arbitration board or rule making or disciplinary proceeding by or against the Issuer that (A) would be required to be disclosed to the Commission or to the Issuer's beneficial owners or (B) could result in a Material Adverse Change with respect to the Issuer, or the promulgation of any proceeding or any proposed or final rule which would likely result in a Material Adverse Change with respect to the Issuer;

(ii)    any change in the location of the Issuer's principal office, jurisdiction of organization, legal name as indicated on the public records of the Issuer's jurisdiction of organization which shows the Issuer to be organized, or any change in the location of the Issuer's books and records;

Confidential

(iii)    the occurrence of any Default or Event of Default or of any Material Adverse Change in respect of the Issuer;

(iv)    the commencement of any proceedings by or against the Issuer under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for the Issuer or any of its assets; or

(v)    the receipt of notice that (A) the Issuer is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval necessary for the conduct of the Issuer's business is to be, or may be, suspended or revoked, or (C) the Issuer is to cease and desist any practice, procedure or policy employed by the Issuer in the conduct of its business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change with respect to the Issuer.

(f) *Further Assurances.*   The Issuer shall, upon the reasonable request of the Insurer, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within 10 days of such request, such amendments hereto and such further instruments and take such further action as may be reasonably necessary to effectuate the intention, performance and provisions of the Transaction Documents to which it is a party.  In addition, the Issuer agrees to cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof.

(g) *Maintenance of Licenses.*   The Issuer shall maintain all licenses, permits, charters and registrations the loss or suspension of which could result in a Material Adverse Change.

(h) *Retirement of Notes.*   The Issuer shall instruct the Indenture Trustee, upon a retirement or other payment of all of the Notes, to surrender the Policy to the Insurer for cancellation.

(i) *Observation of Formalities.*  The Issuer shall observe all formalities necessary to preserve its existence under the laws of the State of its formation, including (i) the obligation to hold annual meetings of its beneficial owners or its board of directors and (ii) the obligation to prepare and file annual income, franchise and other tax returns.

RFC, in its capacity as Master Servicer, shall use commercially reasonable efforts to cause the Issuer to observe the provisions of this Section 2.07.

**Section 2.08.  Affirmative Covenants of the Depositor**.  The Depositor hereby agrees that during the Term of this Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a) *Compliance With Agreements and Applicable Laws.*   The Depositor shall comply in all material respects with the terms and conditions of and perform its

Confidential

obligations under the Transaction Documents to which it is a party in all cases in which the failure to so comply or perform would result in a default thereunder and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could result in a Material Adverse Change. The Depositor will not at any time in the future deny that the Transaction Documents to which it is a party constitute the legal, valid and binding obligations of the Depositor.

(b) *Corporate Existence*. The Depositor and its successors and permitted assigns shall maintain its corporate existence and shall at all times continue to be duly organized under the laws of the jurisdiction of incorporation and duly qualified and duly authorized (as described in Section 2.04(a), (b) and (c) hereof) and shall conduct its business in accordance with the terms of its applicable organizational documents.

(c) *Books and Records; Other Information*. The Depositor shall keep or cause to be kept in reasonable detail books and records of account of its assets and business relating to the Transaction, and shall, as applicable, clearly reflect therein the sale of the Home Equity Loans to the Depositor, the transfer of the Home Equity Loans to the Trust and the sale of the Certificates, respectively, as a sale of the Home Equity Loans by RFC to the Depositor, a sale of the Home Equity Loans by the Depositor to the Trust and a sale of the beneficial interests in the Trust to the holders of the Certificates. The Depositor shall furnish or cause to be furnished to the Insurer: (i) promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by the Depositor pursuant to the terms of any of the Transaction Documents, including all reports to be provided either to the Indenture Trustee, the Owner Trustee or any Noteholder or holder of the Certificates pursuant to any of the Transaction Documents to which it is a party, (ii) promptly upon request, such other data relating to the Transaction as the Insurer may reasonably request and (iii) all information required to be furnished by the Depositor to the Owner Trustee, the Indenture Trustee, the Noteholders or the holders of the Certificates, as the case may be.

(d) *Securities Exchange Act Filings*. If the Depositor shall prepare and file with the Commission any reports required to be filed under the Securities Exchange Act with respect to the Notes, upon the request of the Insurer, the Depositor shall deliver or cause to be delivered to the Insurer copies of any such filings.

(e) *Access To Records; Discussions with Officers and Accountants*. On an annual basis, or upon the occurrence of a Material Adverse Change, the Depositor shall, upon the reasonable request of the Insurer, permit the Insurer or its authorized agents:

      (i)    to inspect the books and records of the Depositor as they may relate to the Securities, the obligations of the Depositor under the Transaction Documents to which it is a party, and the Transaction;

      (ii)    to discuss the affairs, finances and accounts of the Depositor with the Chief Operating Officer and the Chief Financial Officer of the Depositor; and

Confidential

(iii)    if the Insurer reasonably believes that a Material Adverse Change may have occurred and with the Depositor's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of the Depositor with the Depositor's independent accountants, provided that an officer of the Depositor shall have the right to be present during such discussions.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of the Depositor. The books and records of the Depositor with respect to the Transaction shall be maintained at the address of the Depositor designated herein for receipt of notices, unless the Depositor shall otherwise advise the parties hereto in writing.

(f) *Notice of Material Events.* The Depositor shall be obligated promptly to inform the Insurer in writing of the occurrence of any of the following to the extent any of the following relate to it:

(i)    the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation in any federal, state or local court or before any arbitration board or rule making or disciplinary proceeding by or against the Depositor that that (A) would be required to be disclosed to the Commission or to the Depositor's shareholders or (B) could result in a Material Adverse Change with respect to the Depositor, or the promulgation of any proceeding or any proposed or final rule which would likely result in a Material Adverse Change with respect to the Depositor or any of its subsidiaries;

(ii)    any change in the location of the Depositor's principal office or the principal office of any of its subsidiaries, the Depositor's jurisdiction of organization, legal name as indicated on the public records of the Depositor's jurisdiction of organization which shows the Depositor to be organized, or any change in the location of the Depositor's books and records;

(iii)    the occurrence of any Default or Event of Default or of any Material Adverse Change in respect of the Depositor;

(iv)    the commencement of any proceedings by or against the Depositor under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for the Depositor or any of its assets; or

(v)    the receipt of notice that (A) the Depositor is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval necessary for the conduct of the Depositor's business is to be, or may be, suspended or revoked, or (C) the Depositor is to cease and desist any practice, procedure or policy employed by the Depositor in the conduct of its business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change with respect to the Depositor.

Confidential

(g) *Further Assurances.* The Depositor shall, upon the reasonable request of the Insurer, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within 10 days of such request, such amendments hereto and such further instruments and take such further action as may be reasonably necessary to effectuate the intention, performance and provisions of the Transaction Documents to which it is a party. In addition, the Depositor agrees to cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof and to provide all information reasonably requested by S&P and Moody's.

(h) *Maintenance of Licenses.* The Depositor and any successors thereof, shall maintain or cause to be maintained all licenses, permits, charters and registrations the loss or suspension of which could result in a Material Adverse Change.

(i) *Corporate Formalities.* The Depositor shall observe all corporate formalities necessary to preserve its existence under the laws of the State of its incorporation, including (i) the obligation to hold annual meetings of its shareholders or its board of directors and (ii) the obligation to prepare and file annual income, franchise and other tax returns.

**Section 2.09. Negative Covenants of RFC.** RFC hereby agrees that during the Term of the Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a) *Impairment of Rights.* RFC shall not take any action, or fail to take any action, if such action or failure to take action may result in a Material Adverse Change with respect to RFC, or may interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Transaction Documents. RFC shall give the Insurer written notice of any such action or, to the best of the knowledge of RFC, any such failure to act on the earlier of (i) the date upon which any publicly available filing or release is made with respect to such action or failure to act and (ii) promptly prior to the date of consummation of such action or failure to act. RFC shall furnish to the Insurer all information reasonably requested by the Insurer that is reasonably necessary to determine compliance with this Section 2.09(a).

(b) *Waiver, Amendments, Etc.* RFC shall not modify, waive or amend, nor consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of any of the Transaction Documents to which it is a party (other than any amendment to any Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

(c) *Limitation on Mergers, etc.* RFC shall not consolidate with or merge with or into any Person or transfer all or substantially all of its assets to any Person or liquidate or dissolve except as provided in the Transaction Documents or as permitted hereby. RFC shall furnish to the Insurer all information requested by the Insurer that is reasonably necessary to determine compliance with this Section 2.09(c).

Confidential

(d) *Successors.*   RFC shall not terminate or designate, nor consent to the termination or designation of, any successor Master Servicer, Paying Agent, Indenture Trustee or Owner Trustee without the prior written approval of the Insurer, which approval shall not be unreasonably withheld, conditioned or delayed.

**Section 2.10.**  [Reserved]

**Section 2.11.  Negative Covenants of the Issuer.**  The Issuer hereby agrees that during the Term of the Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

(a) *Impairment of Rights.*  The Issuer shall not take any action, or fail to take any action, if such action or failure to take action may result in a Material Adverse Change with respect to the Issuer, or may interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Transaction Documents. The Issuer shall give the Insurer written notice of any such action or, to the best of the knowledge of the Issuer, any such failure to act on the earlier of:  (i) the date upon which any publicly available filing or release is made with respect to such action or failure to act and (ii) promptly prior to the date of consummation of such action or failure to act.  The Issuer shall furnish to the Insurer all information reasonably requested by the Insurer that is reasonably necessary to determine compliance with this Section 2.11(a).

(b) *Waiver, Amendments, Etc.*  The Issuer shall not modify, waive or amend, nor consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of any of the Transaction Documents to which it is a party (other than any amendment to any Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

(c) *Limitations on Mergers, etc.*  The Issuer shall not consolidate with or merge with or into any Person or transfer all or substantially all of its assets to any Person or liquidate or dissolve except as provided in the Transaction Documents or as permitted hereby.  The Issuer shall furnish to the Insurer all information required by the Insurer that is reasonably necessary to determine compliance with this Section 2.11(c).

(d) *Successors.*  The Issuer shall not terminate or designate, nor consent to the termination or designation of, any successor Master Servicer, Paying Agent, Indenture Trustee or Owner Trustee without the prior written approval of the Insurer, which approval shall not be unreasonably withheld, conditioned or delayed.

RFC, in its capacity as Master Servicer, shall use commercially reasonable efforts to cause the Issuer to observe the provisions of this Section 2.11.

**Section 2.12.  Negative Covenants of the Depositor**.  The Depositor hereby agrees that during the Term of the Insurance Agreement, unless the Insurer shall otherwise expressly consent in writing:

Confidential

(a) *Impairment of Rights.* The Depositor shall not take any action, or fail to take any action, if such action or failure to take action may result in a Material Adverse Change with respect to the Depositor, or may interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Transaction Documents. The Depositor shall give the Insurer written notice of any such action or, to the best of the knowledge of the Depositor, any such failure to act on the earlier of: (i) the date upon which any publicly available filing or release is made with respect to such action or failure to act and (ii) promptly prior to the date of consummation of such action or failure to act. The Depositor shall furnish to the Insurer all information reasonably requested by the Insurer that is reasonably necessary to determine compliance with this Section 2.12(a).

(b) *Waiver, Amendments, Etc.* The Depositor shall not modify, waive or amend, nor consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of any of the Transaction Documents to which it is a party (other than any amendment to any Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

(c) *Limitation on Mergers, etc.* The Depositor shall not consolidate with or merge with or into any Person or transfer all or substantially all of its assets to any Person or liquidate or dissolve except as provided in the Transaction Documents or as permitted hereby. The Depositor shall furnish to the Insurer all information requested by the Insurer that is reasonably necessary to determine compliance with this Section 2.12(c).

(d) *Successors.* The Depositor shall not terminate or designate, nor consent to the termination or designation of, any successor Master Servicer, Paying Agent, Indenture Trustee or Owner Trustee without the prior written approval of the Insurer, which approval shall not be unreasonably withheld, conditioned or delayed.

## Section 2.12A. Representations and Warranties of RFC and the Depositor.

(a)    RFC and the Depositor represent and warrant, jointly and severally, as of the Closing Date that the RFC Information in the Offering Documents did not, as of the Closing Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading; provided, however, that no representation is made with respect to the Underwriter Information or the information regarding the Insurer set forth under the captions "DESCRIPTION OF THE POLICIES" and "THE CREDIT ENHANCER" or the consolidated financial statements of the Insurer incorporated by reference in the Offering Documents (the "Insurer Information"). RFC hereby agrees that it will satisfy in all material respects any of the information reporting requirements of the Securities Exchange Act arising out of the Transaction to which it is subject.

(b)    RFC and the Depositor further represent and warrant, jointly and severally, as of the Closing Date that the offer and sale of the Notes complies or will

Confidential

comply in all material respects with all requirements of law, including the registration requirements of applicable securities laws. Based upon the legal advice of counsel, the Trust Agreement is not required to be qualified under the Trust Indenture Act and the Trust is not required to be registered as an "investment company" under the Investment Company Act. The Depositor will satisfy in all material respects any of the information reporting requirements of the Securities Exchange Act arising out of the Transaction to which it is subject.

### Section 2.13.    Additional Covenants of the Insurer Relating to Regulation AB

(a)    The Insurer hereby authorizes the Depositor to incorporate into reports filed pursuant to the Exchange Act relating to this transaction the Insurer's quarterly and annual financial statements for so long as such financial statements may be required for the Depositor to comply with its reporting requirements under the Exchange Act. All written notices to the Insurer under this Section 2.13 shall be sent to the Insurer via electronic mail at IPMSTFMortgageBacked@mbia.com.

(b) The Insurer shall give the Depositor written notice in the event (i) MBIA Inc. no longer files reports with the Commission pursuant to section 13(a) or 15(d) of the Exchange Act or (ii) the Insurer determines that it otherwise fails to satisfy the conditions set forth for incorporation by reference in Item 1100(c) under Regulation AB. If the Insurer gives the Depositor any such written notice, upon the written request of the Depositor, the Insurer shall furnish to the Depositor the Insurer's unaudited financial statements for each of the March, June and September fiscal quarters and audited financial statements for each fiscal year (the "Insurer Financial Statements") as soon as reasonably practical after the release thereof for the period specified below in this Section 2.13(b). Subject to the provisions of this Section 2.13(b), (i) the Insurer Financial Statements shall be delivered in electronic form via electronic mail to SFRegABCoordinator@gmacrfc.com, or such other address that has been designated by the Depositor and provided in writing to the Insurer, and (ii) the Insurer shall continue to furnish Insurer Financial Statements to the Depositor as soon as reasonably practical after the release thereof for so long as the Depositor is subject to reporting requirements under the Exchange Act in relation to the Notes and such Insurer Financial Statements are required for the Depositor to comply with such reporting requirements.

(c)    If the Depositor is required to include information required by Item 1119 of Regulation AB in the Depositor's Report on Form 10-K and the Depositor provides written notice to the Insurer via electronic mail, referencing "Reg AB Item 1119 Reporting" (i) identifying the relevant parties to the transaction as required under paragraph (a) of Item 1119 of Regulation AB (such parties, the "Transaction Parties") and (ii) requesting that the Insurer identify whether the Insurer is an affiliate of any of the Transaction Parties, then the Insurer shall provide the following information to the Depositor in electronic form via electronic mail to SFRegABCoordinator@gmacrfc.com, or such other address that has been designated by the Depositor, not later than 30 days after such request by the Depositor:  (x) any Transaction Party that directly controls, or is directly controlled by the Insurer and (y) any Transaction Party that, to the knowledge of

Confidential

senior management of the Insurer, indirectly controls, is indirectly controlled by, or is under common control with, the Insurer.

(d)    The requirements for the delivery of notices, financial statements and information pursuant to this Section 2.13 shall be satisfied to the extent that the Insurer provided such items pursuant to any similar transaction in which RFC is acting as "Seller."    The Insurer shall use commercially reasonable efforts to identify each transaction to which the deliveries relate, provided that the failure to denote such transactions shall not be deemed a failure to deliver an item pursuant to this Section 2.13.

## ARTICLE III

## THE POLICIES; REIMBURSEMENT

**Section 3.01.  Issuance of the Policies**.  The Insurer agrees to issue the Policies on the Closing Date subject to satisfaction of the conditions precedent set forth below on or prior to the Closing Date:

(a) *Payment of Initial Premium and Expenses*.  RFC shall agree to reimburse or pay directly the fees and expenses identified in Section 3.02 hereof as payable.

(b) *Transaction Documents*.  The Insurer shall have received a fully executed copy of the Premium Letter and a copy of each of the Transaction Documents, in form and substance satisfactory to the Insurer, duly authorized, executed and delivered by each party thereto.

(c) *Certified Documents and Resolutions*.  The Insurer shall have received (i) a copy of the applicable organizational documents of RFC, the Issuer and the Depositor and (ii) the certificate of the Secretary or Assistant Secretary of RFC, the Issuer and the Depositor dated the Closing Date stating that attached thereto is a true, complete and correct copy of resolutions duly adopted by the Board of Directors or other governing body, as applicable, of RFC, the Issuer and the Depositor authorizing the sale of the Home Equity Loans, the issuance of the Securities and the execution, delivery and performance by RFC, the Issuer and the Depositor, respectively, of the Transaction Documents to which it is a party and the consummation of the Transaction and that such applicable organizational documents and resolutions are in full force and effect without amendment or modification on the Closing Date.

(d) *Incumbency Certificate*.  The Insurer shall have received a certificate of the Secretary or an Assistant Secretary of each of RFC, the Depositor and the Issuer certifying the names and signatures of the officers of RFC, the Depositor and the Issuer authorized to execute and deliver the Transaction Documents to which it is a party and that shareholder, member or beneficial owner consent to the execution and delivery of such documents is not necessary or has been obtained.

(e) *Representations and Warranties; Certificate*.    The representations and warranties of RFC, the Issuer and the Depositor set forth or incorporated by reference in this Insurance Agreement shall be true and correct on and as of the Closing Date as if

Confidential

made on the Closing Date, and the Insurer shall have received a certificate of appropriate officers of RFC, the Depositor and the Issuer to that effect.

(f) *Opinions of Counsel.*  The Insurer shall have received all the opinions of counsel addressed to Moody's, S&P, the Indenture Trustee, the Owner Trustee, RFC, the Issuer, the Depositor and the Underwriter, in respect of RFC, the Issuer and the Depositor or any other parties to the Transaction Documents and the Transaction dated the Closing Date in form and substance reasonably satisfactory to the Insurer and its counsel, addressed to the Insurer and addressing such matters as the Insurer may reasonably request, and the counsel providing each such opinion shall have been instructed by its client to deliver such opinion to the addressees thereof.

(g) *Approvals, Etc.*  The Insurer shall have received true and correct copies of all approvals, licenses and consents, if any, including, without limitation, any required approval of the shareholders, the members or the beneficial owners, as applicable, of RFC, the Issuer and the Depositor, required in connection with the Transaction.

(h) *No Litigation, Etc.*  No suit, action or other proceeding, investigation or injunction, or final judgment relating thereto, shall be pending or threatened before any court, governmental or administrative agency or arbitrator in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with any of the Transaction Documents or the consummation of the Transaction.

(i) *Legality.*  No statute, rule, regulation or order shall have been enacted, entered or deemed applicable by any government or governmental or administrative agency or court that would make the transactions contemplated by any of the Transaction Documents illegal or otherwise prevent the consummation thereof.

(j) *Satisfaction of Conditions of the Underwriting Agreement.*  All conditions in the Underwriting Agreement relating to the Underwriters' obligations, if any, to purchase the Notes shall have been satisfied, without taking into account any waiver by the Underwriters of any condition unless such waiver has been approved by the Insurer. The Insurer shall have received copies of each of the documents, and shall be entitled to rely on each of the documents, required to be delivered to the Underwriter pursuant to the Underwriting Agreement.

(k) *Issuance of Ratings.*  The Insurer shall have received confirmation that the risk secured by the Policy constitutes at least "BBB+" by S&P and "Baa2" by Moody's and that the Notes, when issued, will be rated "AAA" by S&P and "Aaa" by Moody's.

(l) *No Default.*  No Default or Event of Default shall have occurred.

(m) *Additional Items.*  The Insurer shall have received such other documents, instruments, approvals or opinions requested by the Insurer or its counsel as may be reasonably necessary to effect the Transaction, including, but not limited to, evidence satisfactory to the Insurer and its counsel that the conditions precedent, if any, in the Transaction Documents have been satisfied.

Confidential

(n) *Satisfactory Documentation.*  The Insurer and its counsel shall have reasonably determined that all documents, certificates and opinions to be delivered in connection with the Securities conform to the terms of the Transaction Documents.

(o) *Indemnification Agreement.*  The Insurer shall have received from the Underwriters an indemnification agreement with respect to securities law matters in form and substance reasonably satisfactory to the Insurer.

(p) *Compliance With Premium Letter.*  All other terms, conditions and requirements of the Premium Letter shall have been satisfied.

## Section 3.02.  Payment of Fees and Premium.

(a) *Legal and Accounting Fees.*  RFC shall pay or cause to be paid to the Insurer, on the Closing Date, legal fees and disbursements incurred by the Insurer in connection with the issuance of the Policies and fees of the Insurer's auditors in accordance with the terms of the Premium Letter.  Any fees of the Insurer's auditors payable in respect of any amendment or supplement to the Offering Documents or any other Offering Document incurred after the Closing Date shall be paid by RFC on demand.

(b) *Premium.*  In consideration of the issuance by the Insurer of the Policies, the Insurer shall be entitled to receive the Premium as and when due in accordance with the terms of the Premium Letter (i) in the case of Premium due on or before the Closing Date, directly from RFC and (ii) in the case of Premium due after the Closing Date pursuant to Section 3.05(a) of the Indenture.  For purposes of the Indenture, the term "Premium Percentage" shall have the applicable meaning set forth in paragraph 1(a) of the Premium Letter.  The Premium shall be calculated according to paragraph 1(a) of the Premium Letter for the amount due on the Payment Date in June 2007 and paragraph 1(b) of the Premium Letter for the amount due on each subsequent Payment Date.  The Premium paid hereunder or under the Indenture shall be nonrefundable without regard to whether the Insurer makes any payment under the Policies or any other circumstances relating to the Notes or provision being made for payment of the Notes prior to maturity.  Each of RFC and the Indenture Trustee shall make its respective payments of Premium by wire transfer to an account designated from time to time by the Insurer by written notice to RFC and the Indenture Trustee.

## Section 3.03.  Reimbursement and Additional Payment Obligation.

(a) In accordance with the priorities established in Section 3.05(a) of the Indenture, the Insurer shall be entitled to reimbursement for any payment made by the Insurer under the Policies, which reimbursement shall be due and payable on the date that any amount is to be paid pursuant to a Notice (as defined in the Policies), in an amount equal to the amount to be so paid and all amounts previously paid that remain unreimbursed, together with interest on any and all amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

Confidential

(b) Notwithstanding anything in Section 3.03(a) to the contrary, RFC agrees to reimburse the Insurer as follows: (i) for payments made under the Policies arising as a result of RFC's failure to substitute for or deposit an amount in respect of any defective Home Equity Loan as required pursuant to Section 3.1 of the Purchase Agreement, together with interest on any and all amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate, and (ii) for payments made under the Policies arising as a result of (A) RFC's failure to pay or deposit any amount required to be so paid or deposited pursuant to the Transaction Documents or (B) RFC's failure to honor any demand made by the Indenture Trustee under Section 3.12 of the Indenture, together with interest on any and all amounts remaining unreimbursed (to the extent permitted by law, if in respect to any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(c) RFC agrees to pay to the Insurer as follows: any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including, but not limited to, reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency or bankruptcy proceeding in respect of any Transaction participant or any affiliate thereof) relating to any of the Transaction Documents, any party to any of the Transaction Documents, in its capacity as such a party, or the Transaction or (ii) any amendment, waiver or other action with respect to, or related to, any Transaction Document, whether or not executed or completed. Provided that three Business Days' written notice of the intended payment or incurrence shall have been given to RFC by the Insurer, such reimbursement shall be due on the dates on which such charges, fees, costs or expenses are paid or incurred by the Insurer.

(d) The Depositor agrees to pay to the Insurer any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents as such may involve the Depositor, including defending, monitoring or participating in any litigation or proceeding (including any insolvency proceeding in respect of any Transaction participant or any affiliate thereof) relating to any of the Transaction Documents, any party to any of the Transaction Documents (in its capacity as such a party) or the Transaction or (ii) any amendment, waiver or other action with respect to, or related to, any Transaction Document that may involve the Depositor, whether or not executed or completed. Provided that three Business Days' written notice of the intended payment or incurrence shall have been given to the Depositor by the Insurer, such reimbursement shall be due on the dates on which such charges, fees, costs or expenses are paid or incurred by the Insurer.

(e) RFC agrees to pay to the Insurer as follows: interest on any and all amounts described in subsections (b), (c) and (g) of this Section 3.03 from the date payable or paid

Confidential

by such party until payment thereof in full, and interest on any and all amounts described in Section 3.02 hereof from the date due until payment thereof in full, in each case payable to the Insurer at the Late Payment Rate per annum.

(f) The Depositor agrees to pay to the Insurer interest on any and all amounts described in Section 3.03(d) and (i) and Section 3.05 from the date such amounts become due or, in the case of Sections 3.03(d) or (i) or Section 3.05, are incurred or paid by the Insurer until payment thereof in full (after as well as before judgment), at the Late Payment Rate.

(g) RFC agrees to pay to the Insurer as follows: any payments made by the Insurer on behalf of, or advanced to RFC or the Issuer on behalf of RFC, including, without limitation, any amounts payable by RFC pursuant to the Notes or any other Transaction Document, on the date any such payment is made or advanced by the Insurer.

(h) [Reserved].

(i) The Depositor agrees to pay to the Insurer as follows: any payments made by the Insurer on behalf of, or advanced to, the Depositor, including any amounts payable by the Depositor pursuant to the Notes or any Transaction Documents, on the date any such payment is made or advanced by the Insurer.

**Section 3.04.  Indemnification with Respect to RFC and the Issuer.**

(a) In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, RFC and the Issuer agree, jointly and severally, to pay, and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or reasonable expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) or obligations whatsoever paid by the Insurer (herein collectively referred to as "Liabilities") of any nature arising out of or relating to the breach by RFC or the Issuer of any of the representations or warranties contained in Sections 2.01 (except for any representation or warranty contained in Section 2.01(m)) or 2.03 (except for the first sentence of Section 2.03(j)) or arising out of or relating to the transactions contemplated by the Transaction Documents by reason of:

(i)    any omission or action (other than of or by the Insurer) in connection with the offering, issuance, sale, remarketing or delivery of the Securities by RFC, the Issuer, the Owner Trustee or the Indenture Trustee;

(ii)    the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of RFC, the Issuer, the Owner Trustee or the Indenture Trustee in connection with any Transaction arising from or relating to the Transaction Documents;

4818-7097-7537.2

Confidential

(iii)    the violation of RFC or the Issuer of any domestic or foreign law, rule or regulation, or any judgment. order or decree applicable to it, which violation reasonably could result in a Material Adverse Change; or

(iv)    the breach by RFC or the Issuer of any representation or warranty (other than a representation in respect of the Home Equity Loans in Section 3.1 of the Purchase Agreement or a representation or warranty contained in Section 2.01(m) of this Insurance Agreement) or covenant under any of the Transaction Documents to which it is a party or the occurrence, with respect to RFC or the Issuer, under any of the Transaction Document of any "event of default."

(b) If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect to which the indemnity provided in Section 3.04(a) may be sought from RFC or the Issuer (each, an "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the expense of the Indemnified Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of the Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the Indemnifying Party shall have received notice in accordance with this subsection (b), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment.

4818-7097-7537.2

Confidential

(c) To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to the application of this Section 3.04), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party on the one hand, and the Indemnified Party, on the other hand.

## Section 3.05. Indemnification with Respect to the Depositor.

(a) In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, the Depositor agrees to pay, and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or reasonable expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) or obligations whatsoever paid by the Insurer of any nature arising out of or relating to the breach by the Depositor of any of the representations or warranties contained in Section 2.04 or arising directly out of or relating directly to the Transaction contemplated by the Transaction Documents by reason of:

(i) the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of the Depositor in connection with any Transaction arising from or relating to the Transaction Documents;

(ii) the violation by the Depositor of any domestic or foreign law, rule or regulation, or any judgment, order or decree applicable to it, which violation reasonably could result in a Material Adverse Change; or

(iii) the breach by the Depositor of any of its representations, warranties or covenants under any of the Transaction Documents to which it is a party or the occurrence, in respect of the Depositor, under any of the Transaction Documents to which the Depositor is a party of any "event of default" or any event which, with the giving of notice or the lapse of time or both, would constitute any "event of default."

(b) If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect to which the indemnity provided in Section 3.05(a) may be sought from the Depositor (the "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The Indemnified Party shall have the right to employ separate counsel in any such action

Confidential

and to participate in the defense thereof at the expense of the Indemnified Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of the Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the Indemnifying Party shall have received notice in accordance with this subsection (b), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment.

To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to the application of this Section 3.05), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party on the one hand, and the Indemnified Party, on the other hand.

### Section 3.05A.  Indemnification with Respect to RFC and the Depositor.

(a)    In addition to any and all of the Insurer's rights of reimbursement, indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law or in equity, RFC and the Depositor agree, jointly and severally, to pay, and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or reasonable expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) or obligations whatsoever paid by the Insurer (herein collectively referred to as "Liabilities") of any nature arising out of or relating to the

Confidential

breach by RFC or the Depositor of any of the representations or warranties contained in Section 2.12A or arising out of or relating to the transactions contemplated by the Transaction Documents by reason of any untrue statement or alleged untrue statement of a material fact contained in any Offering Document other than the Insurer Information and the Underwriter Information (the "RFC Information") or any omission or alleged omission to state in the RFC Information a material fact required to be stated in the RFC Information or necessary to make the statements in the RFC Information, in light of the circumstances under which they were made, not misleading) except insofar as such claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact or omission or alleged omission of a material fact in the Insurer Information or the Underwriter Information.

(b)    If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect to which the indemnity provided in Section 3.05A(a) may be sought from RFC or the Depositor (each, an "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the expense of the Indemnified Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of the Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the

Confidential

Indemnifying Party shall have received notice in accordance with this subsection (b), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment.

(c)    To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to the application of this Section 3.05A), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party on the one hand, and the Indemnified Party, on the other hand.

### Section 3.06.  Indemnification with Respect to Insurer.

(a)    In addition to any and all of the rights of RFC and the Depositor pursuant hereto or under law or in equity, the Insurer agrees to pay, and to protect, indemnify and save harmless, each of RFC and the Depositor and their officers, directors, shareholders, employees, agents and each Person, if any, who controls RFC or the Depositor within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or reasonable expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) or obligations whatsoever paid by them (herein collectively referred to as "Liabilities") of any nature arising out of or relating to the breach by the Insurer of any of the covenants contained in Section 2.13 or arising out of or relating to the transactions contemplated by the Transaction Documents by reason of any untrue statement or alleged untrue statement of a material fact contained in the information delivered by the Insurer pursuant to Section 2.13 (the "Insurer Regulation AB Information") or any omission or alleged omission to state in the Insurer Regulation AB Information a material fact required to be stated in the Insurer Regulation AB Information or necessary to make the statements in the Insurer Regulation AB Information, in light of the circumstances under which they were made, not misleading.

(b)    If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect to which the indemnity provided in Section 3.06(a) may be sought from the Insurer (the "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the expense of the Indemnified Party; provided, however, that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties)

1818-7097-7537.2

Confidential

include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of the Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the Indemnifying Party shall have received notice in accordance with this subsection (b), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment.

(c)    To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to the application of this Section 3.06), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party on the one hand, and the Indemnified Party, on the other hand.

**Section 3.07. Payment Procedure**. In the event of any payment by the Insurer, RFC, the Issuer and the Depositor agree to accept the voucher or other evidence of payment as prima facie evidence of the propriety thereof and the liability, if any, described in Section 3.03 therefor to the Insurer. All payments to be made to the Insurer under this Insurance Agreement shall be made to the Insurer in lawful currency of the United States of America in immediately available funds at the notice address for the Insurer as specified in Section 6.02 hereof on the date when due or as the Insurer shall otherwise direct by written notice to the other parties hereto. In the event that the date of any payment to the Insurer or the expiration of any time period hereunder occurs on a day that is not a Business Day, then such payment or expiration of time period shall be made or occur on the next succeeding Business Day with the same force and effect as if such payment was made or time period expired on the scheduled date of payment or expiration date. Payments to be made to the Insurer under this Insurance Agreement shall bear interest at the Late Payment Rate from the date when due to the date paid.

**Section 3.08. Joint and Several Liability**. RFC and the Issuer shall be jointly and severally liable for all amounts due and payable to the Insurer hereunder by any such parties.

Confidential

# ARTICLE IV

## FURTHER AGREEMENTS

**Section 4.01. Effective Date; Term of the Insurance Agreement**. This Insurance Agreement shall take effect on the Closing Date and shall remain in effect until the later of (a) such time as the Insurer is no longer subject to a claim under the Policies and the Policies shall have been surrendered to the Insurer for cancellation and (b) all amounts payable to the Insurer by RFC, the Issuer, or the Depositor hereunder or from any other source hereunder or under the Transaction Documents and all amounts payable under the Notes have been paid in full; provided, however, that the provisions of Sections 3.02, 3.03, 3.04, 3.05, 3.05A, 3.06 and 4.06 hereof shall survive any termination of this Insurance Agreement; provided, with respect to Section 4.06, that Section 4.06 shall survive the termination of this Insurance Agreement for the period of time specified in Section 4.06.

**Section 4.02. Further Assurances and Corrective Instruments**.

(a) Except at such times as a default in payment under the Policies shall exist or shall have occurred, none of RFC, the Issuer, or the Depositor shall grant any waiver of rights under any of the Transaction Documents to which any of them is a party without the prior written consent of the Insurer, which shall not be unreasonably withheld, conditioned or delayed, and any such waiver without the prior written consent of the Insurer shall be null and void and of no force or effect.

(b) To the extent permitted by law, each of RFC, the Issuer, and the Depositor agrees that it will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements hereto and such further instruments as the Insurer may reasonably request and as may be required in the Insurer's reasonable judgment to effectuate the intention of or facilitate the performance of this Insurance Agreement.

**Section 4.03. Obligations Absolute**.

(a) So long as no Credit Enhancer Default shall have occurred and be continuing, the obligations of RFC, the Issuer, and the Depositor hereunder shall be absolute and unconditional and shall be paid or performed strictly in accordance with this Insurance Agreement under all circumstances irrespective of:

(i) any lack of validity or enforceability of, or any amendment or other modifications of, or waiver, with respect to any of the Transaction Documents or the Securities that have not been approved by the Insurer;

(ii) any exchange or release of any other obligations hereunder;

(iii) the existence of any claim, setoff, defense, reduction, abatement or other right that RFC, the Issuer, or the Depositor may have at any time against the Insurer or any other Person;

4818-7097-7537.2

39

Confidential

(iv)    any document presented in connection with the Policies proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)    any payment by the Insurer under the Policies against presentation of a certificate or other document that does not strictly comply with terms of the Policies;

(vi)    any failure of RFC, the Issuer, or the Depositor to receive the proceeds from the sale of the Securities;

(vii)    any breach by RFC, the Issuer, or the Depositor of any representation, warranty or covenant contained in any of the Transaction Documents; or

(viii)    any other circumstances, other than payment in full, that might otherwise constitute a defense available to, or discharge of, RFC, the Issuer, or the Depositor.

(b) So long as no Credit Enhancer Default shall have occurred and be continuing, RFC, the Issuer, or the Depositor and any and all others who are now or may become liable for all or part of the obligations of RFC, the Issuer, or the Depositor under this Insurance Agreement agree to be bound by this Insurance Agreement and (i) to the extent permitted by law, waive and renounce any and all redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness and obligations evidenced by any Transaction Document or by any extension or renewal thereof; (ii) waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor and notice of protest; (iii) waive all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default or enforcement of any payment hereunder, except as required by the Transaction Documents; (iv) waive all rights of abatement, diminution, postponement or deduction, or any defense other than payment, or any right of setoff or recoupment arising out of any breach under any of the Transaction Documents by any party thereto or any beneficiary thereof, or out of any obligation at any time owing to RFC, the Issuer, or the Depositor; (v) agree that its liabilities hereunder shall, except as otherwise expressly provided in this Section 4.03, be unconditional and without regard to any setoff, counterclaim or the liability of any other Person for the payment hereof; (vi) agree that any consent, waiver or forbearance hereunder with respect to an event shall operate only for such event and not for any subsequent event; (vii) consent to any and all extensions of time that may be granted by the Insurer with respect to any payment hereunder or other provisions hereof and to the release of any security at any time given for any payment hereunder, or any part thereof, with or without substitution, and to the release of any Person or entity liable for any such payment; and (viii) consent to the addition of any and all other makers, endorsers, guarantors and other obligors for any payment hereunder, and to the acceptance of any and all other security for any payment hereunder, and agree that the addition of any such obligors or security shall not affect the liability of the parties hereto for any payment hereunder.

Confidential

Nothing herein shall be construed as prohibiting RFC, the Issuer, or the Depositor from pursuing any rights or remedies it may have against any other Person in a separate legal proceeding.

**Section 4.04.  Assignments; Reinsurance; Third-Party Rights**.

(a) This Insurance Agreement shall be a continuing obligation of the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  None of RFC, the Issuer, or the Depositor may assign its rights under this Insurance Agreement, or delegate any of its duties hereunder, without the prior written consent of the Insurer.  Any assignment made in violation of this Insurance Agreement shall be null and void.

(b) The Insurer shall have the right to give participations in its rights under this Insurance Agreement and to enter into contracts of reinsurance with respect to the Policies upon such terms and conditions as the Insurer may in its discretion determine; provided, however, that no such participation or reinsurance agreement or arrangement shall relieve the Insurer of any of its obligations hereunder or under the Policies or create any additional obligations on RFC, the Issuer or the Depositor.

(c) In addition, the Insurer shall be entitled to assign or pledge to any bank or other lender providing liquidity or credit with respect to the Transaction or the obligations of the Insurer in connection therewith any rights of the Insurer under the Transaction Documents or with respect to any real or personal property or other interests pledged to the Insurer, or in which the Insurer has a security interest, in connection with the Transaction.

(d) Except as provided herein with respect to participants and reinsurers, nothing in this Insurance Agreement shall confer any right, remedy or claim, express or implied, upon any Person, including, particularly, any Owner, other than the Insurer against RFC, the Issuer, or the Depositor, and all the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the parties hereto and their successors and permitted assigns.  Neither the Indenture Trustee nor any Owner shall have any right to payment from any Premiums paid or payable hereunder or under the Indenture or from any other amounts paid by RFC, the Issuer, or the Depositor pursuant to Sections 3.02, 3.03, 3.04, 3.05, 3.05A and 3.06 hereof.

(e) RFC, the Depositor and the Issuer agree that the Insurer shall have all rights of a third-party beneficiary in respect of the Indenture and each other Transaction Document to which it is not a signing party and hereby incorporate and restate their representations, warranties and covenants as set forth therein for the benefit of the Insurer.

**Section 4.05.  Liability of the Insurer**.  Neither the Insurer nor any of its officers, directors or employees shall be liable or responsible for (a) the use that may be made of the Policies by the Indenture Trustee or for any acts or omissions of the Indenture Trustee in connection therewith or (b) the validity, sufficiency, accuracy or genuineness of documents delivered to the Insurer (or its Fiscal Agent) in connection with any claim under the Policies, or

Confidential

of any signatures thereon, even if such documents or signatures should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged (unless the Insurer shall have actual knowledge thereof). In furtherance and not in limitation of the foregoing, the Insurer (or its Fiscal Agent) may accept documents that appear on their face to be in order, without responsibility for further investigation.

**Section 4.06. Parties Will Not Institute Insolvency Proceedings**. So long as this Agreement is in effect, and for one year following its termination, none of the parties hereto will file any involuntary petition or otherwise institute any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding or other proceedings under any federal or state bankruptcy or similar law against the Depositor or the Issuer.

**Section 4.07. Depositor, the Issuer, and RFC To Join in Enforcement Action**. To the extent necessary to enforce any right of the Insurer in or remedy of the Insurer under any Home Equity Loan, each of the Depositor, the Issuer, and RFC agrees to join in any action initiated by the Trust or the Insurer for the protection of such right or exercise of such remedy; provided, however, to the extent RFC incurs expenses, fees and costs related to an enforcement action that are not reimbursable to RFC in its capacity as Master Servicer, the Insurer hereby agrees that it shall reimburse RFC for any expenses, fees and costs incurred by RFC with respect to an enforcement action that have not been previously reimbursed to RFC as Master Servicer.

**Section 4.08. Use of Insurer's Name**. Each of the Depositor, the Issuer, and RFC agree not to use the Insurer's name in any public document including, without limitation, a press release or presentation, announcement or forum without the Insurer's prior consent; provided however, such prohibition on the use of the Insurer's name shall not relate to the use of the Insurer's standard approved form of disclosure in public documents issued in connection with the Securities to be issued in accordance with the terms of the Premium Letter; and provided further such prohibition shall not apply to the use of the Insurer's name in order to comply with public notice, public meeting or public reporting requirements.

## ARTICLE V

## DEFAULTS; REMEDIES

**Section 5.01. Defaults**. The occurrence of any of the following events shall constitute an Event of Default hereunder:

(a) any representation or warranty made by RFC, the Issuer, or the Depositor hereunder or under the Transaction Documents, or in any certificate furnished hereunder or under the Transaction Documents, shall prove to be untrue or incomplete in any material respect;

(b) (i) RFC, the Issuer, or the Depositor shall fail to pay when due any amount payable by RFC, the Issuer, or the Depositor hereunder or (ii) a legislative body has enacted any law that declares or a court of competent jurisdiction shall find or rule that any Transaction Document is not valid and binding on RFC; provided that with respect to any law or judicial action within the scope of this clause (ii), RFC, the Issuer, or the

Confidential

Depositor shall have 30 days to reinstate the binding effect of such Transaction Document and the Insurer agrees to take such actions as may be reasonably required, at the expense of the requesting party, to facilitate the reinstatement of such binding effect;

(c) the occurrence and continuance of an "event of default", or any event which given the lapse of time or notice would constitute an "event of default," under any Transaction Document;

(d) any failure on the part of RFC, the Issuer, or the Depositor duly to observe or perform in any material respect any other of the covenants or agreements on the part of RFC, the Issuer, or the Depositor contained in this Insurance Agreement or in any other Transaction Document which continues unremedied for a period of 30 days with respect to this Insurance Agreement, or, with respect to any other Transaction Document, beyond any cure period provided for therein, after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer, the Issuer, or the Depositor, as applicable, by the Insurer (with a copy to the Indenture Trustee) or by the Indenture Trustee (with a copy to the Insurer);

(e) a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against RFC, the Issuer or the Depositor and such decree or order shall have remained in force undischarged or unstayed for a period of 90 consecutive days;

(f) RFC, the Issuer or the Depositor shall consent to the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to RFC, the Issuer or the Depositor or of or relating to all or substantially all of their respective property;

(g) RFC, the Issuer or the Depositor shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of or otherwise voluntarily commence a case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(h) the Issuer shall become subject to an entity level tax or to registration as an investment company under the Investment Company Act.

**Section 5.02.  Remedies; No Remedy Exclusive**.

(a) Upon the occurrence of an Event of Default, the Insurer may exercise any one or more of the rights and remedies set forth below:

Confidential

(i)    declare all indebtedness of every type or description then owed by RFC, the Issuer, or the Depositor to the Insurer to be immediately due and payable, and the same shall thereupon be immediately due and payable;

(ii)    exercise any rights and remedies under the Transaction Documents in accordance with the terms of the Transaction Documents or direct the Indenture Trustee or the Owner Trustee to exercise such remedies in accordance with the terms of the Transaction Documents;

(iii)    take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under the Transaction Documents or to enforce performance and observance of any obligation, agreement or covenant of RFC, the Indenture Trustee, the Issuer, the Owner Trustee or the Depositor under the Transaction Documents;

(iv)    exercise any rights and remedies under the Indenture in accordance with the terms thereof or direct the Indenture Trustee to exercise such remedies in accordance with the terms of the Indenture; or

(v)    exercise any rights and remedies under the Servicing Agreement in accordance with the terms thereof or direct RFC to exercise such remedies in accordance with the terms of the Servicing Agreement.

(b) Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under the Transaction Documents or existing at law or in equity. No delay or omission to exercise any right or power accruing under the Transaction Documents upon the happening of any event set forth in Section 5.01 hereof shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Insurer to exercise any remedy reserved to the Insurer in this Article V, it shall not be necessary to give any notice other than such notice as may be required in this Article V.

**Section 5.03.  Waivers**.

(a) No failure by the Insurer to exercise, and no delay by the Insurer in exercising, any right hereunder shall operate as a waiver thereof. The exercise by the Insurer of any right hereunder shall not preclude the exercise of any other right, and the remedies provided herein to the Insurer are declared in every case to be cumulative and not exclusive of any remedies provided by law or equity.

(b) The Insurer shall have the right, to be exercised in its complete discretion, to waive any Event of Default hereunder, by a writing setting forth the terms, conditions and extent of such waiver signed by the Insurer and delivered to RFC, the Issuer, and the Depositor. Unless such writing expressly provides to the contrary, any waiver so granted shall extend only to the specific event or occurrence which gave rise to the Event of

Confidential

Default so waived and not to any other similar event or occurrence which occurs subsequent to the date of such waiver.

## ARTICLE VI

## MISCELLANEOUS

**Section 6.01. Amendments, Etc.**  This Insurance Agreement may be amended, modified, supplemented or terminated only by written instrument or written instruments signed by the parties hereto.  RFC agrees promptly to provide a copy of any amendment to this Insurance Agreement to the Indenture Trustee, S&P. and Moody's.  No act or course of dealing shall be deemed to constitute an amendment, modification, supplement or termination hereof.

**Section 6.02. Notices.**  All demands, notices and other communications to be given hereunder shall be in writing (except as otherwise specifically provided herein) and shall be mailed by registered mail or personally delivered or telecopied to the recipient as follows:

(a)  To the Insurer:

> MBIA Insurance Corporation
> 113 King Street
> Armonk, NY  10504
> Attention:  Insured Portfolio Management-Structured Finance (IPM-SF)
> (Home Equity Loan Trust 2007-HSA3)
> Telecopy No.:   (914) 765-3810
> Telephone No.:  (914) 765-3781

> (in each case in which notice or other communication to the Insurer refers to an Event of Default, a claim on the Policies or with respect to which a failure on the part of the Insurer to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of each of the general counsel and the Insurer and shall be marked to indicate "URGENT MATERIAL ENCLOSED.")

(b)  To RFC:

> Residential Funding Company. LLC
> 8400 Normandale Lake Boulevard
> Minneapolis, Minnesota 55437
> Attention:  President (Home Equity Loan Trust 2007-HSA3)
> Telecopy No.:   (952) 857-7442
> Telephone No.:  (952) 857-7000

> (in each case in which notice or other communication to RFC refers to an Event of Default, a claim against RFC or with respect to a failure on the part of RFC to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication shall also

Confidential

be sent to the attention of the general counsel of RFC, and, in all cases, both any original and all copies shall be marked to indicate "URGENT MATERIAL ENCLOSED")

(c) To the Depositor:

Residential Funding Mortgage Securities II, Inc.
8400 Normandale Lake Boulevard
Minneapolis, Minnesota 55437
Attention: President (Home Equity Loan Trust 2007-HSA3)
Telecopy No.: (952) 857-7442
Telephone No.: (952) 857-7000

(in each case in which notice or other communication to the Depositor refers to an Event of Default, a claim against the Depositor or with respect to which a failure on the part of the Depositor to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of each of the general counsel of the Depositor and shall be marked to indicate "URGENT MATERIAL ENCLOSED.")

(d) To the Issuer:

Home Equity Loan Trust 2007-HSA3
c/o Wilmington Trust Company
1100 N. Market Street – 9th Floor
Wilmington, DE 19890-0001
Attention:     Corporate Trust Administration
Telecopy No.: (302) 636-4148
Telephone No.: (302) 651-8882

(in each case in which notice or other communication to the Issuer refers to an Event of Default, a claim against the Issuer or with respect to which a failure on the part of the Issuer to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication shall also be sent to the attention of RFC and the general counsel of RFC and, in all cases, both any original and any copies shall be marked to indicate "URGENT MATERIAL ENCLOSED.")

A party may specify an additional or different address or addresses by writing mailed or delivered to the other parties as aforesaid. All such notices and other communications shall be effective upon receipt.

**Section 6.03. Severability.** In the event that any provision of this Insurance Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the parties hereto agree that such holding shall not invalidate or render unenforceable any other provision hereof. The parties hereto further agree that the holding by any court of competent jurisdiction that any

Confidential

remedy pursued by any party hereto is unavailable or unenforceable shall not affect in any way the ability of such party to pursue any other remedy available to it.

**Section 6.04. Governing Law.** THIS INSURANCE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CHOICE OF LAW PROVISIONS.

**Section 6.05. Consent to Jurisdiction.**

(a) The parties hereto hereby irrevocably submit to the jurisdiction of the United States District Court for the Southern District of New York and any court in the State of New York located in the City and County of New York, and any appellate court from any thereof, in any action, suit or proceeding brought against it and to or in connection with any of the Transaction Documents or the transactions contemplated thereunder or for recognition or enforcement of any judgment. and the parties hereto hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard or determined in such New York state court or, to the extent permitted by law, in such federal court. The parties hereto agree that a final nonappealable judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. To the extent permitted by applicable law, the parties hereto hereby waive and agree not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts.

(b) To the extent permitted by applicable law, the parties hereto shall not seek and hereby waive the right to any review of the judgment of any such court by any court of any other nation or jurisdiction which may be called upon to grant an enforcement of such judgment.

Except as provided in Section 4.06 herein, nothing contained in this Insurance Agreement shall limit or affect the Insurer's right to serve process in any other manner permitted by law or to start legal proceedings relating to any of the Transaction Documents against any party hereto or its or their property in the courts of any jurisdiction.

**Section 6.06. Consent of the Insurer.** In the event that the consent of the Insurer is required under any of the Transaction Documents, the determination whether to grant or withhold such consent shall be made by the Insurer in its sole discretion without any implied duty towards any other Person except as otherwise expressly provided herein.

**Section 6.07. Counterparts.** This Insurance Agreement may be executed in counterparts by the parties hereto, and all such counterparts shall constitute one and the same instrument.

**Section 6.08. Headings.** The headings of Articles and Sections and the Table of Contents contained in this Insurance Agreement are provided for convenience only. They form

4818-309-7537 2                                  47

Confidential

no part of this Insurance Agreement and shall not affect its construction or interpretation. Unless otherwise indicated, all references to Articles and Sections in this Insurance Agreement refer to the corresponding Articles and Sections of this Insurance Agreement.

**Section 6.09. Trial by Jury Waived**. Each party hereto hereby waives, to the fullest extent permitted by law, any right to a trial by jury in respect of any litigation arising directly or indirectly out of, under or in connection with any of the Transaction Documents or any of the transactions contemplated thereunder. Each party hereto (a) certifies that no representative, agent or attorney of any party hereto has represented, expressly or otherwise, that it would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into the Transaction Documents to which it is a party by, among other things, this waiver.

**Section 6.10. Limited Liability**. No recourse under any Transaction Document shall be had against, and no personal liability shall attach to, any officer, employee, director, affiliate or shareholder of any party hereto, as such, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute or otherwise in respect of any of the Transaction Documents, the Securities or the Policies, it being expressly agreed and understood that each Transaction Document is solely a corporate obligation of each party thereto, and that any and all personal liability, either at common law or in equity, or by statute or constitution, of every such officer, employee, director, affiliate or shareholder for breaches by any party hereto of any obligations under any Transaction Document is hereby expressly waived as a condition of and in consideration for the execution and delivery of this Insurance Agreement.

**Section 6.11. Entire Agreement**. The Transaction Documents and the Policies set forth the entire agreement between the parties with respect to the subject matter thereof, and this Insurance Agreement supersedes and replaces any agreement or understanding that may have existed between the parties prior to the date hereof in respect of such subject matter.

[Remainder of page intentionally blank; signature page follows]

Confidential

RESIDENTIAL FUNDING MORTGAGE
SECURITIES II, INC., as Depositor,

By _____

Title    Jeffrey Blaschko / Vice President

[EXECUTION PAGE OF DEPOSITOR TO INSURANCE AGREEMENT]

Confidential

RESIDENTIAL FUNDING COMPANY, LLC,
as Master Servicer and as Seller,

By

Title   Joseph Orning / Associate

[EXECUTION PAGE OF MASTER SERVICER AND SELLER TO INSURANCE
AGREEMENT]

Confidential

HOME EQUITY LOAN TRUST 2007-HSA3,
as Issuer,

By:    Wilmington Trust Company, not in its
individual capacity but solely as Owner
Trustee,

By
Title

James P. Lawler
Vice President

[EXECUTION PAGE OF ISSUER TO INSURANCE AGREEMENT]

Confidential