# Exhibit 92

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

FINANCIAL GUARANTY INSURANCE                )
COMPANY,                                     )
                                             )
        **Plaintiff,**                        )
                                             )
        -against-                            )
                                             )
ALLY FINANCIAL, INC. F/K/A GMAC,             )
LLC; RESIDENTIAL CAPITAL, LLC                )
F/K/A RESIDENTIAL CAPITAL                    )
CORPORATION; ALLY BANK F/K/A                 )
GMAC BANK; GMAC MORTGAGE,                     )
LLC F/K/A GMAC MORTGAGE                       )
CORPORATION,                                 )
                                             )
        **Defendants.**                       )

-------------------------------------------------- x

**12 CV**      **1658**

Civil Action No. _____

**COMPLAINT**

RECEIVED
U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff Financial Guaranty Insurance Company ("FGIC"), by and through its attorneys,

Jones Day, for its Complaint against defendants, Ally Financial, Inc., formerly known as GMAC,

LLC ("Ally Financial"), Residential Capital, LLC, formerly known as Residential Capital

Corporation ("ResCap"), Ally Bank, formerly known as GMAC Bank ("Ally Bank"), and

GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation ("GMACM"),

alleges as follows:

**NATURE OF THE ACTION**

      1.     This action arises in connection with a financial guaranty insurance policy (the

"2006-HE3 Policy" or the "Policy") issued by FGIC in relation to a GMACM-sponsored

transaction (the "2006-HE3 Transaction" or the "Transaction"), in which GMACM Home

Equity Loan Trust 2006-HE3 (the "2006-HE3 Trust" or the "Trust") issued and sold to

investors over $1.14 billion aggregate principal amount of insured residential mortgage-

backed securities (the "2006-HE3 Notes"). As the sponsor of the 2006-HE3 Transaction,

GMACM procured the Policy from FGIC in order to enhance the ratings and marketability of

the 2006-HE3 Notes. GMACM fraudulently induced FGIC's agreement to provide this

insurance through willful and material misrepresentations and omissions concerning, among

other things, the nature of its business practices and the credit quality and characteristics of

the tens of thousands of mortgage loans (individually the "Mortgage Loans," and collectively

the "Loan Pool") that provided the collateral for the 2006-HE3 Notes. In short, the Mortgage

Loans were different—and demonstrably worse—than GMACM had represented them to be.

FGIC's issuance of the Policy enabled the 2006-HE3 Notes to receive a triple-A rating from

the rating agencies, which in turn made the 2006-HE3 Transaction viable, and enabled

GMACM and its affiliates to earn millions of dollars in transaction fees.

2.      Since the closing of the 2006-HE3 Transaction, GMACM has compounded its

misconduct by repeatedly and materially breaching its contractual obligations to FGIC. From

the very inception of the 2006-HE3 Transaction, GMACM has violated the essential terms of

its agreement with FGIC. GMACM has also breached the essential terms of the other

operative documents incorporated therein.

3.      To induce FGIC to enter into the Transaction, GMACM made material

representations and warranties to FGIC about the manner in which the Mortgage Loans were

selected and evaluated and the characteristics of the Loan Pool generally. Among the

numerous misrepresentations and omissions made by GMACM regarding the characteristics

of the Loan Pool was the representation that, of the Mortgage Loans transferred to the 2006-

HE3 Trust at the time of the closing of the Transaction (the "Initial Mortgage Loans"), no

more than 7.61% of the aggregate principal amount of those loans would be balloon mortgage

loans. As explained more fully below, the credit risk inherent in a balloon mortgage loan is typically much higher than that of a non-balloon mortgage loan. Accordingly, the representations and warranties GMACM made in respect of the balloon mortgage loans were a crucial component in assessing the true credit risk of the Transaction. In this Transaction, while GMACM represented and warranted in several instances that no more than 7.61% of the aggregate principal amount of the Initial Mortgage Loans would be balloon mortgage loans, in fact more than 26% of the aggregate principal amount of those loans consisted of these substantially higher-risk mortgages. Indeed, the Loan Pool as measured at closing (the "Initial Loan Pool") contained over 3,000 more balloon mortgage loans than GMACM's representations indicated it would contain.

4.     The wholesale misrepresentation by GMACM regarding the balloon mortgage loans in the offering and operative documents governing the Transaction, and the gross over-inclusion of thousands more such mortgage loans in the Initial Loan Pool, provide the most obvious and egregious—but by no means the only—examples of the myriad ways in which GMACM (i) fraudulently induced FGIC to issue the Policy and (ii) materially breached its contractual obligations to FGIC.

5.     The wrongdoing committed by GMACM, as detailed more fully below, was directed by Ally Financial, acting directly or indirectly through its wholly-owned subsidiary, ResCap. Ally Financial is the ultimate parent of ResCap, which owns GMACM. Ally Financial, as the ultimate parent of ResCap and GMACM, has the practical ability, which it has repeatedly exercised, to direct and control the activities of these (and other) subsidiaries. In many instances—including in this Transaction—Ally Financial's direction and control was effected by using ResCap as an intermediary instrument to achieve its goals. For example,

- 3 -

many of the material contractual breaches committed by GMACM, concerning, primarily,
FGIC's right to access information in GMACM's possession and GMACM's failure to
repurchase or cure certain of the Mortgage Loans backing the 2006-HE3 Notes that FGIC
sought to have repurchased, were carried out by ResCap at the direction and control of Ally
Financial.

6.    GMACM was also substantially assisted in fraudulently inducing FGIC to
issue the Policy by another Ally Financial subsidiary, Ally Bank, then doing business as
GMAC Bank.  Ally Bank and GMACM were the two principal originators of loans that
became the collateral for the 2006-HE3 Transaction, and as such had intimate knowledge of
the quality of the Loan Pool.  In total, Ally Bank sold over $750 million in loans—accounting
for approximately 88% of the Initial Loan Pool—that it had originated or acquired to
GMACM to be securitized in the 2006-HE3 Transaction.  Further, Ally Bank agreed to serve
as custodian of the 2006-HE3 Transaction (the "Custodian")—one of the critical parties
charged with certain oversight and maintenance duties with respect to the 2006-HE3 Trust—
and received certain key operative documents with respect to the Transaction.  With
knowledge of GMACM's material misrepresentations and omissions regarding the Mortgage
Loans, Ally Bank separately made representations and warranties regarding those loans for
the purpose of aiding GMACM's inducement of FGIC to issue the Policy.  By assisting
GMACM in inducing FGIC to issue the Policy, Ally Bank was able to collect substantial fees
as custodian and perpetuate its lucrative loan origination business.

7.    Ally Bank has materially breached its own separate contractual agreement
regarding its duties as Custodian, in particular by failing to ensure that essential documents

were included in the loan file and failing to notify FGIC of breaches of representations and warranties by GMACM of which Ally Bank was aware.

8.      The 2006-HE3 Transaction is a mortgage loan securitization: a complex arrangement comprising multiple interdependent agreements among GMACM and several other parties whereby tens of thousands of home equity loans were pooled together and transferred to the 2006-HE3 Trust, which then issued to investors securities (*i.e.*, the 2006-HE3 Notes) collateralized by those loans.

9.      In August 2006, FGIC and several other parties entered into the 2006-HE3 Transaction.  The 2006-HE3 Transaction was sponsored by GMACM.  To facilitate the Transaction, GMACM pooled together over sixteen thousand Mortgage Loans to provide collateral for the 2006-HE3 Notes.  All of the Mortgage Loans were either originated or acquired by GMACM or Ally Bank.

10.     After pooling the Mortgage Loans originated or acquired by GMACM and Ally Bank, GMACM transferred the Mortgage Loans directly or indirectly to another Ally Financial subsidiary, Residential Asset Mortgage Products, Inc. ("RAMP").  RAMP then deposited the Mortgage Loans it received from GMACM into the 2006-HE3 Trust.  The 2006-HE3 Trust, in turn, issued the 2006-HE3 Notes to investors.  The 2006-HE3 Trust was a legal entity created by GMACM solely for the purposes of the 2006-HE3 Transaction to hold the Mortgage Loans and to issue the 2006-HE3 Notes to investors in a registered public offering.

11.     The periodic mortgage payments made by the borrowers under the Mortgage Loans held by the Trust are used to pay, among other things, principal and interest due on the 2006-HE3 Notes, and the fees and expenses of GMACM and other participants in the Transaction.

12.     GMACM also acted as servicer of the 2006-HE3 Transaction (the "Servicer"). As Servicer, GMACM supervised the collection of borrower payments and performed other duties related to servicing the Mortgage Loans. As discussed in more detail below, all of GMACM's servicing operations have since been integrated into ResCap. Yet another Ally Financial subsidiary, Ally Securities, LLC ("Ally Securities" f/k/a GMAC RFC Securities), was co-manager of the 2006-HE3 Transaction. In addition, JPMorgan Chase Bank, N.A ("JPMorgan") agreed to act as indenture trustee of the Trust (the "Indenture Trustee").

13.     GMACM, directed and controlled by Ally Financial, is, therefore, the hub of the 2006-HE3 Transaction: it is the sponsor of the securitization, the originator and seller of many of the Mortgage Loans, and has acted as servicer of all the loans that collateralize the 2006-HE3 Notes. The primary victim of the 2006-HE3 Transaction—which turned out to be backed by inferior loans that did not meet the underwriting standards or loan characteristics warranted by GMACM—is FGIC, which has already paid out tens of millions of dollars in losses under the Policy, with further material losses still to come.

14.     FGIC, a monoline financial guaranty insurance company, was in the business of writing financial guaranty insurance policies with respect to asset-backed and debt securities, including residential mortgage-backed notes ("RMBS Notes"). At the time of the 2006-HE3 Transaction, FGIC's financial strength was rated triple-A by Moody's Investors Services, Inc. ("Moody's"), Standard and Poor's Ratings Services (a division of The McGraw-Hill Companies, Inc.) ("S&P"), and Fitch, Inc., which enabled securities that were insured by FGIC to be rated triple-A as well. FGIC's financial guaranty insurance policies for RMBS Notes typically guaranteed the timely payment of the principal and interest due on the insured securities, including the amount, if any, of principal losses allocated to the RMBS

Notes. FGIC's insurance policies thus enhanced the credit quality, and marketability, of the insured securities.

15.    To enhance the ratings and marketability of the 2006-HE3 Notes, and to increase the profit that GMACM would derive from the 2006-HE3 Transaction, GMACM sought to have FGIC issue the Policy to JPMorgan, as Indenture Trustee for the 2006-HE3 Notes for the benefit of the holders of the 2006-HE3 Notes.

16.    As noted, to induce FGIC to issue the Policy, GMACM, *inter alia*, offered certain material representations and warranties to FGIC regarding the Transaction. These representations and warranties were false when stated, and FGIC reasonably relied on such warranties, among others, when deciding to enter into the 2006-HE3 Transaction. Additionally, those representations and warranties were false when they were restated by GMACM (for example, when GMACM added new loans to the mortgage pool). As a result, FGIC was fraudulently induced to enter the Transaction, and the credit risk assumed by FGIC in connection with the Transaction was far greater than it would have been had GMACM's representations and warranties been true, as demonstrated by the overwhelming number of claims that have been subsequently presented to FGIC.

17.    GMACM received substantial assistance from Ally Bank in fraudulently inducing FGIC to issue the Policy. Ally Bank was aware of the material misrepresentations GMACM had made to FGIC, and further represented to FGIC that it would undertake duties to monitor and certify the accuracy and completeness of certain material aspects of the Mortgage Loan files, as well as inform FGIC of certain failures by GMACM to comply with its obligations under the 2006-HE3 Transaction documents. Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would

not comply—with its representations and warranties to FGIC. As such, Ally Bank actively aided and abetted GMACM's fraudulent inducement of FGIC to issue the Policy.

18.    Moreover, both GMACM and Ally Bank received substantial assistance from Ally Financial in fraudulently inducing FGIC to issue the Policy. Ally Financial took actions and made statements to boost investor confidence in, and otherwise finance and support, its mortgage securitization business, which was carried out by its subsidiaries. Ally Financial was aware of the material misrepresentations GMACM and Ally Bank had made to FGIC. As a result of its dominance over ResCap, Ally Bank, and GMACM, Ally Financial knew that the representations and warranties GMACM and Ally Bank made to FGIC, prior to and at the closing, upon which FGIC reasonably relied, were false. As such, Ally Financial actively aided and abetted GMACM's and Ally Bank's fraudulent inducement of FGIC to issue the Policy.

19.    The increased credit risk inherent in the Mortgage Loans—as a result, in part, of the high percentage of the aggregate principal amount of the Initial Loan Pool that was comprised of balloon and other high-risk Mortgage Loans—has resulted in extremely high levels of delinquencies, defaults, and losses on the Mortgage Loans, and the resultant claims presented to FGIC have been far in excess of what FGIC reasonably expected when it decided to issue the Policy in reliance on the (presumed) accuracy and truthfulness of GMACM's representations and warranties and affirmative covenants. In fact, the levels of defaults and losses, and the resulting amount of claims presented to FGIC have been overwhelming. Had FGIC been told the truth about the nature of GMACM's underwriting and business practices and/or the true characteristics of the Mortgage Loans, it would never have agreed to issue the

Policy, and would thereby have avoided the significant losses and liabilities it has incurred, and will incur, as a result of GMACM's misconduct.

20.     Certain of the material contractual breaches committed by GMACM and Ally Bank—including, but not limited to, its refusal to honor FGIC's right to access information in GMACM's possession—were directed by Ally Financial, acting directly or indirectly through ResCap.

21.     Through this Complaint, FGIC seeks relief against GMACM, Ally Bank, ResCap, and Ally Financial for GMACM's fraudulent inducement of FGIC, and for GMACM's material breaches of its insurance agreement with, and contractual obligations owed to, FGIC in connection with the 2006-HE3 Transaction.

22.     Further, FGIC seeks relief against Ally Financial and Ally Bank for aiding and abetting GMACM's fraudulent inducement, as well as for Ally Bank's material breaches of its contractual obligations to FGIC.

23.     FGIC also seeks a declaration from the Court that Ally Financial, ResCap and GMACM were and continue to be alter egos of each other.

## THE PARTIES

24.     Plaintiff FGIC is a New York stock insurance corporation with its principal place of business at 125 Park Avenue, New York, New York 10017.

25.     Defendant Ally Financial is a Delaware corporation with its principal place of business in Detroit, Michigan.  Ally Financial is the parent company of ResCap, GMACM, and all GMACM-affiliated entities relevant to this action.

26.     Defendant GMACM is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania.  In the period relevant to this action,

GMACM originated, acquired, and serviced residential mortgage loans, and sponsored securitizations of mortgage loans.

27.     Since 2005, GMACM has been an indirect wholly-owned subsidiary of ResCap; prior to that time, GMACM was an indirect, wholly-owned subsidiary of Ally Financial.

28.     Defendant ResCap is a Delaware limited liability corporation and an indirect wholly owned subsidiary of Ally Financial.  ResCap is the indirect corporate parent of GMACM and its business includes originating, acquiring, selling, and servicing mortgage loans.

29.     In September 2008, ResCap announced that it was closing much of its mortgage loan acquisition business.

30.     Defendant Ally Bank (f/k/a GMAC Bank), an indirect, wholly-owned subsidiary of Ally Financial, was at all times relevant to this Complaint a loan originator.  To facilitate the 2006-HE3 Transaction, Ally Bank sold to GMACM over $750 million in mortgage loans that it had originated or acquired to be securitized in the Transaction.  These loans comprised nearly 88% of the initial Mortgage Loans.  GMAC Bank was renamed Ally Bank in May 2009.  Ally Bank is an online bank chartered under Utah law.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

32.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred within this judicial district.  Moreover, at

least one of the defendants in this action, GMACM, has agreed to submit to the jurisdiction of this Court, and has agreed not to challenge venue in this Court.

## RELEVANT NON-PARTIES

33.     RAMP, a special purpose vehicle, is an indirect, wholly owned subsidiary of Ally Financial and a Delaware corporation with its principal place of business in Minnesota. To facilitate the 2006-HE3 Transaction, RAMP purchased mortgage loans from GMACM and Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove") and deposited those loans into the 2006-HE3 Trust. The trust then issued the 2006-HE3 Notes to the underwriters, including Ally Securities (then doing business as GMAC RFC Securities), to be sold to investors.

34.     Ally Securities, an entity incorporated in Delaware, is an affiliate of GMACM and RAMP and a registered broker-dealer under the Securities Exchange Act of 1934, and is registered to do business in New York. Prior to 2007, Ally Securities was known as Residential Funding Securities Corporation, and was doing business as GMAC RFC Securities. Ally Securities served as an underwriter of the 2006-HE3 Notes and, on information and belief, participated in the preparation of certain of the key offering documents for the 2006-HE3 Transaction.

35.     Walnut Grove is a Delaware statutory trust established by an affiliate of GMACM. Beginning in 2003, GMACM sold to Walnut Grove second-lien mortgage loans that it had originated or acquired. To facilitate the 2006-HE3 Transaction, Walnut Grove sold certain of the Mortgage Loans to RAMP.

## FACTUAL ALLEGATIONS

### A.     Ally Financial and its Subsidiaries

36.     In the period relevant to this action, GMACM originated, acquired, sold, and serviced residential mortgage loans and, from time to time, arranged for the securitization of

those mortgage loans and the sale of securities collateralized by those mortgage loans to investors, often in the form of RMBS Notes.

37.     The Mortgage Loans have suffered extremely high rates of delinquencies, defaults and losses, and it is a matter of public knowledge that the business practices of Ally Financial's subsidiaries, including those of GMACM, Ally Bank, and ResCap, led Ally Financial to seek a bailout by the federal government in 2008.

### (1)     GMACM, GMAC-RFC, and RFC

38.     GMACM is a subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC") which in turn is a subsidiary of ResCap, which in turn is a subsidiary of the ultimate parent, Ally Financial.

39.     Residential Funding Corporation, LLC ("RFC") is also a subsidiary of GMAC-RFC and ResCap.  Like its affiliate GMACM, RFC engaged in the business of originating, acquiring, servicing, and securitizing mortgage loans during the period relevant to this action.

40.     GMAC-RFC companies issued $42.34 billion of non-agency mortgage-backed securities in 2004, $56.93 billion in 2005, $66.19 billion in 2006, and $32.43 billion in 2007, according to Inside Mortgage Finance Publications, Inc.  *See 2011 Mortgage Market Statistical Annual: Volume II* at 38-41.  GMAC-RFC was the fifth largest issuer of non-agency mortgage-backed securities in 2005, the fourth largest in 2006, and the eighth largest in 2007. *Id.*

41.     GMAC-RFC was the largest issuer of private mortgage-backed securities in 2002, when it issued $11.5 billion of private mortgage-backed securities, according to the *Financial Crisis Inquiry Report, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (the "FCIC Report"), published in

- 12 -

January 2011. *See* FCIC Report at 462. GMAC-RFC was also the fourth largest subprime mortgage lender in 2004, when it loaned $26 billion to subprime borrowers. *See id.* at 504.

42.     The FCIC Report pointedly notes the widespread failure among the mortgage-backed security industry generally to adhere to basic standards in loan origination, selection, and evaluation—a truth FGIC would come to learn specifically in its dealings with GMACM. The FCIC Report concludes that:

> [F]irms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

*Id.* at 187.

43.     The FCIC Report further notes that, in light of Ally Financial and its subsidiaries' systemic failure to ensure the credit quality of the mortgage loans backing its securitizations, repurchase demands against GMAC/Ally Financial have mounted. From 2007 to 2010, the Federal National Mortgage Association ("Fannie Mae") has forced Ally Financial to buy back approximately $838 million worth of mortgage loans. *Id.* at 225. And in 2009 and 2010, the Federal Home Loan Mortgage Corporation ("Freddie Mac") forced Ally Financial to buy back approximately $453 million worth of mortgage loans. *Id.*

**(2)    Ally Financial's Securitization Business**

44.     Ally Financial's business model depended on securitizations, which were conducted by its business units, including GMACM. Pooling mortgage loans and selling them into securitizations enabled GMACM to fund its ongoing mortgage loan originations and acquisitions, earned it significant fees from the resulting transactions, and reduced the credit risk it retained with respect to those loans.

- 13 -

45.     In order to gain additional fees for performing certain administrative duties under the various transaction agreements, including collecting mortgage payments and determining whether a mortgage loan is in default based on the transaction documents, GMACM generally acted as servicer of its own securitizations.  GMACM thereby earned servicing fees that normally amounted to 0.50% per annum of the aggregate principal balance of the mortgage loans, as well as collected fees in the range of approximately 20%-35% of any subsequent recoveries from charged-off loans.

46.     GMACM also enriched Ally Financial and its other subsidiaries through its sponsorship of securitizations.  Ally Financial entities typically participated in each of the key steps in the securitization process, and recorded gains and earned fees at each of those steps.  For example, in the 2006-HE3 Transaction:

- Ally Bank gained fees for originating nearly 88% of the loans initially comprising the 2006-HE3 Trust, and proceeds from selling those loans to GMACM; Ally Bank also gained fees as custodian of the 2006-HE3 Trust for holding certain documents;

- Walnut Grove received the proceeds from selling certain of the Mortgage Loans to RAMP (after purchasing over 28% of the loans from GMACM);

- RAMP received payments for serving as the depositor of the Mortgage Loans to the 2006-HE3 Trust; and

- Ally Securities received fees for underwriting the 2006-HE3 Notes.

### (3)     Ally Financial, GMACM, and RFC Face Numerous Investigations and Lawsuits Relating to Their RMBS Securitizations

47.     GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection

- 14 -

with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

48.    Additionally, on September 2, 2011, the Federal Housing Finance Authority ("FHFA"), as conservator for Freddie Mac, filed suit in the Supreme Court of the State of New York, New York County against Ally Financial and several of its subsidiaries for claims arising in connection with its role in the public filing of offering documents containing false and misleading statements.  These claims arise from Freddie Mac's purchase of over $6 billion in certificates issued through twenty-one transactions similar to the transaction at issue here.  Among other claims, FHFA brought suit for common law fraud against various Ally Financial subsidiaries and aiding and abetting fraud against Ally Financial for its intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the subject certificates.

49.    The FHFA also alleges violations of state and federal securities laws by Ally Financial and several of its subsidiaries stemming from false and misleading statements contained in publicly filed prospectuses, prospectus supplements, registration statements, and other offering documents.  Additionally, FHFA also alleges aiding and abetting fraud against Ally Financial and certain of its affiliates for their intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the certificates.  The FHFA action seeks relief in the form of rescission and recovery of the $6 billion purchase price of the certificates, including lost principal and interest, as well as punitive damages and attorneys' fees and costs.  In October 2011, Ally Financial and its co-

defendants removed the FHFA action to the U.S. District Court for the Southern District of New York.

50.     In addition, GMACM is currently facing a lawsuit brought by MBIA Insurance Corporation ("MBIA") in New York Supreme Court in which MBIA alleges that in connection with three transactions similar to the one at issue here, GMACM affirmatively misrepresented the credit quality of tens of thousands of mortgage loans, with a total original principal balance of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that GMACM should have borne itself.  On December 15, 2010, the New York Supreme Court issued a ruling denying GMACM's motion to dismiss, which allowed both the breach of representations and warranties and fraud claims, among others, to proceed to trial.

51.     GMACM's sister company, RFC, is also currently facing a lawsuit brought by MBIA in New York Supreme Court for, among other things, fraud and breach of representations and warranties in connection with RMBS transactions.  In December 2009, the New York Supreme Court rejected RFC's motion to dismiss certain of the claims brought against it, allowing both the breach of contract and fraud claims, among others, to proceed.

52.     Additionally, according to Ally Financial's quarterly report for the third quarter of 2011, as of November 4, 2011, there were twenty-two suits in various jurisdictions pending against Ally Financial's mortgage-related business units and subsidiaries arising from numerous mortgage-backed securities offerings.  The plaintiffs in those suits have alleged, among other things, that Ally Financial's various mortgage subsidiaries made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to RMBS offerings.  The alleged misstatements typically concern underwriting standards. *See* Ally Fin. Inc., Quarterly Report (Form 10-Q), at 159 (Nov. 4,

2011).  Further, in its 2011 annual report, Ally Financial stated that it expects additional

similar claims  to be brought against Ally Financial and/or its subsidiaries in the future.  *See*

Ally Fin. Inc., Annual Report (Form 10-K), at 20 (Feb. 28, 2011).

53.    Since the filing of its November 2011 quarterly report, moreover, Ally

Financial and its subsidiaries have been sued by additional plaintiffs, including HSH

Nordbank AG, which have alleged, *inter alia*, material misrepresentations and omissions

about the loans backing RMBS securities issued by Ally Financial's affiliates.

54.    Moreover, Ally Financial has disclosed that it expects additional RMBS

lawsuits from monoline insurers like FGIC given that Ally Financial and its subsidiaries sold

$42.7 billion of loans into monoline-wrapped securitizations from 2004 to 2007.  During

2011, Ally Financial and its subsidiaries have received repurchase claims from monoline

insurers for $265 million worth of mortgages related to securitizations it consummated

between 2004 and 2007.  Ally Financial evidently clearly recognizes its exposure because,

according to Ally Financial's CEO, Michael Carpenter, ResCap has already reserved $829

million for representations and warranties claims and, according to its own Securities and

Exchange Commission ("SEC") filings, Ally Financial confirms that "litigation with . . .

monolines is likely."  Ally Fin. Inc., Annual Report (Form 10-K), at 98 (Feb. 28, 2012).

55.    Indeed, according to Ally Financial's 2011 annual report, Ally Financial,

GMACM's parent, also believes that "[t]he total exposure . . .  to mortgage representation and

warranty claims is most significant for loans originated and sold between 2004 through 2008,

specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced

underwriting standards and risk-mitigation actions implemented in 2008 and forward."  Ally

Fin. Inc., Annual Report (Form 10-K), at 224 (Feb. 28,, 2012). The 2006-HE3 Transaction is,

as its name implies, of the 2006 vintage.

56.     Additionally, Ally Financial also disclosed that the SEC served a subpoena on

Ally Financial in June 2011, requesting documentation regarding certain "bulk settlements"

relating to securitized mortgage loans as well as a request for materials provided to investors

and prospective investors in mortgage securitization transactions. *See* Ally Fin. Inc.,

Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form

S-1/A), at 23 (June 29, 2011).

### (4)     The Mortgage Loan Servicing Misconduct of Ally Financial and GMACM Has Come Under Scrutiny and Resulted in Severe Sanctions

57.     On February 9, 2012, the Federal Reserve Board announced that Ally

Financial, its subsidiaries, and several other mortgage loan servicers would be required to pay

$766.5 million in monetary sanctions for "unsafe and unsound processes and practices in

residential mortgage loans servicing and foreclosure processing." Press Release, Federal

Reserve Board (February 9, 2011). On February 12, 2012, the Federal Reserve Board

imposed well over $200 million of this fine against Ally Financial, ResCap, and GMACM

pursuant to an Assessment Order, which requires that the sanctions be paid into various

borrower assistance programs and nonprofit programs established to help victims of improper

servicing and foreclosure practices. *See* Order of Assessment of a Civil Money Penalty Issued

Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, FRB Docket No.

12-006-CMP-HC (February 12, 2012) (the "Assessment Order"). According to the Federal

Reserve Board, the sanction "takes into account the maximum amount prescribed for unsafe

and unsound practices under the applicable statutory limits, the comparative severity of the

institutions' misconduct, and the comparative sizes of the institutions' foreclosure activities."
*See* Press Release, Federal Reserve Board (February 9, 2011).

58.     Further, also on February 9, 2012, the U.S. Attorney General announced that
Ally Financial will take part in a $25 billion settlement to resolve claims brought by the
government in response to the "reckless and abusive mortgage practices" of Ally Financial
and four similarly situated bank holding companies. *See* Eric Holder, U.S. Attorney General,
Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the
settlement releases Ally Financial from certain civil claims brought by the DOJ and multiple
state attorneys general, *see id.*; National Mortgage Settlement Website, Settlement Documents
> Servicing Standard Highlights, *available at* http://www.nationalmortgagesettlement.com/
(last visited Feb. 12, 2012), the settlement was not designed to resolve any other liabilities that
Ally Financial has incurred through its improper origination, securitization, and servicing
practices, *see id.*, About the Settlement, *available at*
http://www.nationalmortgagesettlement.com/about (last visited Feb. 12, 2012).

59.     According to the U.S. Attorney General, the $25 billion settlement and $766.5
million sanction are just "the latest step forward" in holding Ally Financial and others
accountable for "egregious mortgage loan servicing abuses." *See* Attorney General Holder,
Remarks at the Mortgage Servicers Settlement Press Conference.

60.     Similarly, the New York Attorney General recently announced a $136 million
settlement with the nation's five largest mortgage servicers—including GMAC/Ally
Financial. *See* Office of the New York Attorney General Press Release, *Schneiderman
Secures Major Settlement That Allows Sweeping Mortgage Investigations To Proceed*,
*available at* http://www.ag.ny.gov/media_center/2012/feb/feb9b_12.htm. As the New York

Attorney General noted, the settlement principally addressed "foreclosure abuses" by

GMAC/Ally Financial and other banks, and "[i]n addition to penalties for past abuses, the

settlement includes direct relief to victims of wrongful foreclosure conduct" and "imposes

strong national standards for mortgage servicing" that had previously been lacking. *Id.*

Additionally, the New York Attorney General's office will lead the new Residential

Mortgage-Backed Securities Working Group, a component of the interagency Financial Fraud

Enforcement Task Force led by the DOJ, which "brings together the Department of Justice,

several state law enforcement officials, and other federal agencies to investigate those

responsible for misconduct contributing to the financial crisis through the pooling and sale of

residential mortgage-backed securities." *Id.*

61.     In addition to these recent settlements and Assessment Order, the Federal

Reserve Board and the Federal Deposit Insurance Corporation (the "FDIC") previously

ordered Ally Financial, GMACM, and several other Ally Financial subsidiaries to adopt new

procedures and practices in relation to mortgage loan servicing. *See* Consent Order, FRB

Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").

62.     The Consent Order notes that Ally Financial's mortgage servicing subsidiaries,

including GMACM, have been accused, *inter alia*, of (1) failing to properly increase financial,

staffing, and managerial resources in order to meet an increasing number of foreclosures; (2)

failing to properly put in place "adequate internal controls, policies and procedures,

compliance risk management, internal audit, training, and oversight of the foreclosure

process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure

proceedings without "confirming that the promissory note and mortgage document were

properly endorsed or assigned." *Id.* at 3-4.

63.     Furthermore, under the Consent Order, Ally Financial must direct GMACM and its other mortgage servicing subsidiaries to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id* at 4. Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors. . . [to assess the performance of] residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations . . . ." *Id.* at 8.

64.     In connection with the enforcement of the Consent Order, as of November 2011, the Federal Reserve Board is permitting mortgage borrowers who were financially harmed by the foreclosure processes of GMACM to request an independent review of their files. *See* Press Release, Federal Reserve Board (November 1, 2011). This independent review will determine whether errors and misrepresentations in GMACM's foreclosure processes indeed caused financial harm to the borrower. *See id.* If the foreclosure process is found to have caused financial injury to the borrower, GMACM will then be required to provide full compensation. *See id.*

65.     As a result of servicing misconduct, Ally Financial and other bank holding companies will now be required to adhere to new, heightened servicing standards. *See* Press Release, Federal Reserve Board (February 9, 2011). The Federal Reserve Board has ordered Ally Financial to remedy its servicing practices by, *inter alia*, "strengthen[ing] the coordination of communications with borrowers by providing borrowers the name of the person at the service who is their primary point of contact, establish[ing] limits on foreclosures where loan modifications have been approved, establish[ing] robust third party vendor controls, strengthen[ing] compliance programs, and provid[ing] appropriate

remediation to borrowers who suffered financial injury as a result of errors by the servicers."

*See id.*

66.    Moreover, the servicing and foreclosure improprieties of Ally Financial and its

subsidiaries is a matter of public record.  According to the sworn testimony of an Ally

Financial/GMACM employee, Ally Financial's mortgage servicing subsidiaries have

routinely filed false affidavits in thousands of foreclosure actions across the country.  *See*

Jeffrey Stephan Dep. *Federal National Mortgage Association v. Bradbury*, BRI-RE-09-65

(Me. Dist. Ct., Dist. Nine, Div. N. Cumberland) (June 7, 2010).  Indeed, according to the

FCIC Report:

> [L]enders have relied on "robo-signers" who substituted speed for
> accuracy by signing, and sometimes backdating, hundreds of
> affidavits claiming personal knowledge of facts about mortgages
> that they did not actually know to be true. One such "robosigner,"
> Jeffrey Stephan of GMAC, said that he signed 10,000 affidavits in
> a month—roughly 1 per minute, in a 40-hour workweek—making
> it highly unlikely that he verified payment histories in each
> individual case of foreclosure.

FCIC Report at 407.

67.    Stephan also testified that, when executing summary judgment affidavits to be

used in judicial foreclosure actions, he was acting in accordance with policies and procedures,

and never in fact inspected any of the exhibits to the affidavits or even ensured that the

exhibits were attached, despite swearing that he had done so in the affidavits themselves.

Stephan Dep. Tr. at 54:12-25.  Such exhibits would generally include (or at least should have

included), among other things, the mortgage note and documents relating to the assignment of

the mortgage.  *See id.* at 51:15-23.  Stephan further testified that when he signed an affidavit

affirming that the foreclosure was proper, all he knew was the borrower's name and whether

he had signing authority for the GMAC entity foreclosing on the property.  *Id.* at 62:23-25,

63:2-6. Stephan testified that the process he followed in signing summary judgment affidavits was in accordance with the policies and procedures required by GMACM. *Id.* at 64:8-14.

68.     Additionally, in October 2010, the Ohio Attorney General filed suit against GMACM and Ally Financial, alleging, *inter alia*, that employees of GMACM had executed thousands of false affidavits in connection with foreclosures on properties in that state. *See State of Ohio v. GMAC Mortgage LLC*, CI0201006984, Court of Common Pleas, Lucas County, Ohio (Toledo). Although some of the claims brought by the Ohio Attorney General's suit have been resolved by the $25 billion multi-party settlement, many additional claims not encompassed by the settlement, including those relating to the improper assignment of mortgage notes, have survived. As of February 2012, the action remains pending in Ohio.

69.     Similarly, in December 2011, the Massachusetts Attorney General filed suit against GMACM for, among other things, engaging in unfair and deceptive foreclosure practices. *See Commonwealth of Massachusetts v. Bank of America NA*, 11-4363, Suffolk County Superior Court (Boston). Days after filing suit, the Massachusetts Attorney General sent a letter to the United States Senate Committee on Banking, Housing and Urban Affairs, and the United States House Committee on Financial Services asking that the federal government investigate Ally Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false documents related to property seizures. *See* Boston Globe, *Attorney General Martha Coakley Urges Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices*, Dec. 6, 2011. Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions
> against homeowners in Massachusetts and across the country, I
> respectfully request that your committees investigate Ally
> [Financial]'s serious misconduct and consider what actions the

federal government can take to ensure that Ally [Financial] adheres
to the law.

*Id.*

70.    While the $25 billion settlement ultimately resolved certain claims brought by
the Massachusetts Attorney General in this action, several claims relating to improper
foreclosure practices and abuse of certain state recordation systems have survived and will
continue to be prosecuted. *See* Press Release, Office of the Attorney General of
Massachusetts, *Massachusetts Homeowners to Receive $318 Million in Relief as Part of State-Federal Agreement Over Unlawful Foreclosures and Loan Servicing*, Feb. 9, 2012.

### (5)    Significant Possibility of Ally Financial Seeking Bankruptcy Protection for ResCap, GMAC-RFC, and GMACM

71.    Since at least as far back as November 2011, Ally Financial has been
considering filing for bankruptcy protection for ResCap, its wholly-owned subsidiary, which
has reportedly lost $555 million since 2009, according to multiple published reports.
GMACM is a wholly-owned, indirect subsidiary of ResCap.

72.    Around that time, the financial industry was "betting that Ally [Financial] will
place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of
supporting the business as the bank prepares for an initial public offering." Bloomberg News,
*Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance*," November 14, 2011.

73.    As the article notes, Ally Financial has the power to decide whether its
"mortgage unit," ResCap, should file for bankruptcy. *See id.*

74.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a
significant risk that ResCap will not be able to meet its debt service obligations and other
funding obligations in the near term." Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb.
28, 2012).

75.     That risk ultimately came to pass as Ally Financial recently disclosed that the penalties assessed by the federal government and numerous state attorneys general regarding the foreclosure practices of Ally Financial and its subsidiaries "resulted in our Mortgage operations recording a $230 million charge in the fourth quarter of 2011." *Id.* at 31. As Ally Financial detailed in its previous public filing, the "[t]he majority of [the charge] was recorded at Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in certain of ResCap's credit facilities." Ally Financial, Current Report (Form 8-K) (January 31, 2012). Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated net worth . . . of $250 million at the end of each month under the terms of certain of its credit facilities. . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was $92 million at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb. 28, 2012). ResCap's substantial shortfall, however, was "immediately remediated by Ally through a capital contribution of $197 million, which was provided through forgiveness of intercompany debt during January 2012." *Id.*

76.     Moreover, in February 2012, it was reported that Ally Financial had contacted buyout firms such as Fortress Investment Group LLC and Cerberus Capital Management LP regarding a potential sale of ResCap through a pre-packaged bankruptcy to be effectuated by the end of March as ResCap faces financing and liquidity deadlines. *See* Bloomberg Businessweek, *Ally's ResCap Said to Seek Buyers for Prearranged Bankruptcy*, Feb. 8, 2012.

77.     According to the report, "[p]otential bidders are being told that a pre-packaged bankruptcy filing would allow the buyer to leave behind liabilities such as [RMBS] securitizations that have been the subject of litigation." *Id.* To that end, Ally Financial's CEO, Michael Carpenter, has stated that he will not pursue the aforementioned initial public

offering for Ally Financial "until [these] legacy mortgage issues are resolved." *Id.*

Nevertheless, a bondholder group representing holders of approximately $800 million in

ResCap debt has expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the

bankruptcy, based in part on the belief that "Ally [Financial] can't legally separate itself from

ResCap because it has stripped assets from the unit." Bloomberg News, *Paulson, Tepper Said*

*Among Investors Urging Ally to Back ResCap*, Jan. 10, 2012.

78.     Indeed, as Ally Financial has pointedly noted in its most recent annual report:

"In light of ResCap's liquidity and capital needs combined with volatile conditions in the

marketplace, there is substantial doubt about ResCap's ability to continue as a going concern."

Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

**B.      GMACM's Securitizations and Financial Guaranty Insurance Generally**

        **(1)      Financial Guaranty Insurance Policies**

79.     To improve the marketability and ratings of the RMBS Notes issued as part of

its securitizations, GMACM from time to time sought credit enhancement for the RMBS

Notes from FGIC, a financial guaranty insurer, in the form of financial guaranty insurance

policies.  Under the terms of a financial guaranty insurance policy like the one FGIC issued

here, the insurer unconditionally and irrevocably guarantees to the trustee for the benefit of

the holders of the insured RMBS Notes that, if there is a shortfall in cash available to make

required payments on the insured securities, the financial guaranty insurer will pay the amount

of the shortfall to the trustee for the benefit of the holders of the insured securities.

80.     For a trust that issues RMBS Notes, the primary source of funds is the

remittance of payments on the underlying residential mortgage loans.  Delinquencies by

borrowers in making their mortgage loan payments will, by definition, reduce cash flows to

the trust, which will directly impair the ability of the trust to make required payments on the

RMBS Notes.  Delinquencies, if not cured, will eventually result in losses on the mortgage loans, which reduce the aggregate principal amount of the Loan Pool held by the trust.  In this manner, high levels of mortgage loan delinquencies and defaults can lead to shortfalls in cash available to pay RMBS investors.  Such shortfalls result in claims on FGIC's policies.

### (2)   Securitization Sponsor's Disclosures and Representations and Warranties

81.    The risk FGIC assumes when it agrees to issue a policy for RMBS Notes depends upon the credit quality of the underlying mortgage loans, which in turn depends on the underwriting practices of the loan originators and the characteristics of the loans.  If, for instance, GMACM and other loan originators employ substandard underwriting practices or include a significant number of balloon mortgage loans in a particular transaction, the underlying mortgage loan pool as a whole would be of inferior credit quality. Consequently, the credit risk—the risk of delinquency or default—of the underlying mortgages, and of the mortgage portfolio as a whole, would be materially increased.

82.    Accordingly, FGIC generally required securitization sponsors, like GMACM, to provide substantial representations and warranties about the underlying mortgage loans, such as the ratio of the borrower's monthly debt payments to monthly income ("DTI ratio"), the ratio of the mortgage loan principal balance to the value of the mortgaged property at origination—plus, in the case of a junior lien mortgage loan, the principal balance of the senior mortgage loan on the related mortgaged property—("LTV ratio"), and the borrower's credit score ("FICO score"). Even where GMACM did not originate a particular loan, it nonetheless is typically required to make representations about that loan, thereby assuming the risk that those representations might not be accurate.  GMACM's representations and warranties, including representations about the standards and procedures used to underwrite

the loans, were intended to allow FGIC to assess the credit risk inherent in the mortgage loan pool before deciding to commit to the transaction.

83.     GMACM's representations and warranties in its RMBS transactions regarding the characteristics of the loans included in the mortgage loan portfolios, and the underwriting standards used to evaluate those mortgage loans, are particularly vital because each loan pool comprised thousands of mortgage loans, each of which was in itself a complex legal transaction. Each loan file typically contains (or at least is supposed to contain) a mortgage application, a credit report, income and employment verifications, an appraisal, the lender's internal documentation and a wide variety of other documentation necessary to support proper loan underwriting decisions. Moreover, in seeking financial guaranty insurance from FGIC for the 2006-HE3 Transaction, GMACM demanded that FGIC commit to the pricing and other material terms within a very limited time frame. Both GMACM and FGIC understood and intended that FGIC would rely on the information supplied by GMACM as sponsor, as well as GMACM's representations and warranties concerning that information, in assessing the credit risk of the mortgage loan pool.

84.     Further, on information and belief, for each of its securitizations, GMACM as sponsor supplied the same data it provided to FGIC to one or several rating agencies in order for those agencies to create expected loan level default and loss estimates. The loan level default and loss estimates were then used by the rating agencies to create cash flow projections and potential loss estimates for the entire transaction. Finally, the rating agencies delivered to the sponsor and to FGIC a private credit assessment for the transaction (sometimes referred to as a "shadow rating") without considering the effect of FGIC's policy. The shadow rating provided an overall evaluation of the likelihood of default on the securities

FGIC would be insuring in the securitization. As sponsor, GMACM arranged for the shadow

rating to be provided to FGIC knowing that it was an essential condition to FGIC's

willingness to issue a financial guaranty insurance policy.

### C.    The GMACM 2006-HE3 Transaction

85.    On August 30, 2006, GMACM pooled together and deposited many thousands

of fixed rate Home Equity Loans ("HELs") into the 2006-HE3 Trust. The 2006-HE3 Trust

served as the Issuer of $1,142,334,000 aggregate principal amount of 2006-HE3 Notes. Home

equity loans are essentially second-lien mortgage loans, which are generally funded entirely at

the closing of the loan.

86.    The initial conveyance to the 2006-HE3 Trust by RAMP (acting as Depositor)

contained over 16,500 HELs with an aggregate principal balance of approximately $862

million. Investors in the GMACM-sponsored 2006-HE3 Transaction were issued five classes

of securities (*i.e.*, the 2006-HE3 Notes)—Class A-1 Notes, Class A-2 Notes, Class A-3 Notes,

Class A-4 Notes, and Class A-5 Notes (formally termed the GMACM Home Equity Loan-

Backed Term Notes, Series 2006-HE3)—which were collateralized by the Mortgage Loans

transferred to and held by the 2006-HE3 Trust. In addition, approximately $287 million was

deposited into a pre-funding account at closing, which was used to acquire additional

Mortgage Loans in the 90 days following the closing.

87.    To enhance the ratings and marketability of the 2006-HE3 Notes, GMACM

sought a financial guaranty insurance policy from FGIC for the purpose of insuring the

transaction for the benefit of the certificate holders. On August 30, 2006, GMACM and FGIC

executed an Insurance and Indemnity Agreement (the "I&I Agreement"), under which FGIC

agreed to and did issue Policy number 06030099 to insure the 2006-HE3 Notes. The I&I

Agreement was signed by FGIC (as the "Insurer" of the Transaction); GMACM (as the

"Servicer" and a "Seller" for the Transaction); RAMP (as the "Depositor" for the Transaction); Walnut Grove (as a "Seller" for the Transaction); and JPMorgan (as the "Indenture Trustee" for the Transaction). The Bank of New York Trust Company, N.A., later became the successor in interest to JPMorgan as Indenture Trustee.

88.    Also on August 30, 2006, Ally Bank (using its then-current name, GMAC Bank) entered into a Custodial Agreement whereby it agreed to serve as Custodian of the underlying mortgage loan notes on behalf of the 2006-HE3 Trust. FGIC is an express third party beneficiary of that agreement. *See* Custodial Agreement § 5.6.

89.    The I&I Agreement provides that FGIC (the Insurer) is a third-party beneficiary of, and shall have all of the rights provided for in, the "Operative Documents." I&I Agreement § 2.02(k). "Operative Documents" are defined to include, among other documents: (i) the 2006- HE3 Notes; (ii) the Mortgage Loan Purchase Agreement dated as of August 30, 2006 among GMACM, RAMP, Walnut Grove and JPMorgan (the "MLPA"); (iii) the Servicing Agreement dated as of August 30, 2006 among GMACM, the 2006-HE3 Trust and JPMorgan; (iv) the Indenture dated as of August 30, 2006 between the 2006-HE3 Trust and JPMorgan; and (v) the Custodial Agreement dated as of August 30, 2006 among GMACM, JPMorgan, and Ally Bank. *See* I&I Agreement § 1.01. FGIC is referred to as the "Enhancer" under certain of the Operative Documents.

90.    Pursuant to the I&I Agreement, FGIC insured $1,142,334,000 aggregate principal amount of the 2006-HE3 Notes. The Policy improved the marketability of the 2006-HE3 Notes by mitigating risk for potential investors and making the 2006-HE3 Notes eligible to receive a credit rating of triple-A by the rating agencies at closing.

91.     GMACM and the Depositor offered the 2006-HE3 Notes for sale pursuant to a prospectus, dated August 9, 2006 (the "Prospectus"), and a prospectus supplement, dated August 28, 2006 (the "Prospectus Supplement"), which touted the Policy and the "triple-A" initial rating of the 2006-HE3 Notes, which was made possible by the Policy. The Prospectus and Prospectus Supplement, together with certain preliminary offering documents, each as further supplemented by any subsequent amendment or supplement thereto, and any other offering document that makes reference to the Policy, are referred to collectively as the "Offering Documents."

92.     On August 30, 2006, an Ally Financial subsidiary, Ally Securities, sold the 2006-HE3 Notes to investors, and FGIC issued the Policy in accordance with the terms of the I&I Agreement.

**D.      GMACM Fraudulently Induces FGIC to Insure the 2006-HE3 Notes with Substantial Assistance from Ally Financial and Ally Bank**

**(1)      GMACM's Fraudulent Inducement of FGIC**

93.     FGIC's participation in the 2006-HE3 Transaction was an essential component of the 2006-HE3 Transaction and enhanced GMACM's ability to market the securitization effectively. The Policy allowed GMACM to sell the 2006-HE3 Notes with an initial triple-A credit rating, making them more attractive to a broader pool of potential investors.

94.     In order to induce FGIC to write financial guaranty insurance for the 2006-HE3 Transaction, GMACM represented to FGIC, among other things, that the percentage of the aggregate principal amount of the Initial Loan Pool that was composed of balloon mortgage loans did not exceed 7.61%; that the weighted average original term to scheduled maturity of the Initial Loan Pool was 272 months; and that the weighted average remaining term to scheduled maturity of the Initial Loan Pool was 270 months. Those representations,

among others, were formally stated in the Offering Documents, restated in the Operative

Documents, and further reflected in the loan tape and other information that GMACM

provided to FGIC, directly or indirectly.

95.    Additionally, GMACM provided further material information, on which FGIC

relied in determining whether and on what terms to issue the Policy.

96.    *First*, GMACM provided to FGIC initial and final Prospectus Supplements,

which summarized, among other material information, the credit quality and characteristics of

the Mortgage Loans, and GMACM's loan underwriting guidelines and loan origination

criteria.

97.    *Second*, GMACM provided a document (generally referred to as a "loan tape"

or "magnetic tape") detailing material characteristics of individual borrowers and loans

expected to be included in the 2006-HE3 Transaction, together with representations regarding

material statistics about the Initial Loan Pool as a whole.

98.    *Third*, GMACM provided to FGIC credit ratings for the 2006-HE3 Notes

determined on the basis of information concerning the characteristics of the Mortgage Loans

supplied to the rating agencies by GMACM, but without considering the effect of the Policy.

These ratings, which GMACM procured from the credit rating agencies, are known as

"shadow ratings."

99.    *Fourth*, as discussed in detail in Section E below, GMACM provided to FGIC

representations, warranties, and affirmative covenants in the Operative Documents and the

I&I Agreement regarding the Mortgage Loans specifically and the Loan Pool generally.

100.    ***Balloon Mortgage Loans.***  Included in the Prospectus Supplement and the

MLPA was the representation—on which FGIC relied in deciding to issue the Policy on the

agreed terms—that, as at closing, "[a]pproximately 7.61%" of the Mortgage Loans "are not fully amortizing over their terms to maturity and, thus, will require substantial principal payments, sometimes called a balloon amount, at their stated maturity." Prospectus Supplement at S-17; *see also* MLPA § 3.1(b)(xxii).

101.    In a balloon mortgage, the amount of the monthly payments to be made by the borrower are generally based on the same amortization schedule as applies to non-balloon mortgages—*e.g.*, a 30-year term—but the maturity date of the mortgage loan is fixed for some date before the expiration of the term used to set the payment schedule. The balloon mortgage loans at issue had maturity dates of approximately 15 years from the due date of the first monthly payment, while having their monthly payment amounts determined according to a 30-year amortization schedule. Since the monthly payments are based on a 30-year schedule, but the maturity date occurs some time in advance of 30 years, a balloon mortgage loan will not have fully amortized by the maturity date, leaving a significant portion of the principal outstanding at that date. The outstanding principal amount, which can be orders of magnitude larger than the borrower's usual monthly payment, must nevertheless be paid by the borrower at maturity. Thus, as the Prospectus Supplement pointedly concedes: "Mortgage loans which require payment of a balloon amount involve a greater degree of risk because the ability of a mortgagor to pay a balloon amount typically will depend upon the mortgagor's ability either to timely refinance the loan or to sell the related mortgaged property." Prospectus Supplement at S-17.

102.    GMACM also represented that the weighted average remaining term to scheduled maturity for the Initial Loan Pool—including the balloon mortgage loans—would

be 270 months, and that the weighted average original term to scheduled maturity of the

Initial Loan Pool would be 272 months. *See id.* at S-9; *see also* MLPA § 3.1(b)(xxii).

103.    Additionally the mortgage loan tape provided to FGIC by GMACM included a

"Balloon Indicators" column, which purported to flag as "N" all regularly amortizing loans

(*i.e.*, all non-balloon mortgage loans), and the aggregate principal balance of balloon mortgage

loans flagged as such in the Balloon Indicators column roughly corresponded with the

percentage of the aggregate principal amount of the Initial Loan Pool warranted to be

comprised of balloon mortgages by GMACM in the Prospectus Supplement and MLPA (*i.e.*,

7.61%).

104.    ***Prospectus Supplement and Other Operative Documents.***  In determining

whether to insure the 2006-HE3 Notes, FGIC relied in part upon representations and

warranties regarding GMACM's loan underwriting standards made by GMACM in the

Prospectus and Prospectus Supplement. The Prospectus, as supplemented by the Prospectus

Supplement, was filed with the SEC and became effective on August 30, 2006.  A Preliminary

Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about

August 23, 2006, in an email sent by Marty Howard, on behalf of GMACM.  The Final

Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about

August 29, 2006, in an email sent by Jeffrey Wittenberg on GMACM's behalf.

105.    In the Offering Documents, GMACM represented that, based on the data

provided in the borrower's application and certain other applicable verifications, "a

determination will have been generally made by the original lender that the borrower's

monthly income, if required to be stated, would be sufficient to enable the borrower to meet

its monthly obligations on the loan and other expenses related to the property." Prospectus at

23. Further, in the Prospectus Supplement, GMACM also represented to FGIC that:

> The mortgage loans were selected for inclusion in the mortgage
> pool from among mortgage loans originated or purchased in
> connection with [GMACM's] Underwriting Standards . . . based
> on [GMACM's] assessment of investor preferences and rating
> agency criteria.

Prospectus Supplement at S-29.

106.    The Prospectus Supplement expressly states that GMACM's "underwriting

standards with respect to the mortgage loans generally will  conform to those published in the

GMAC Mortgage Corporation underwriting guidelines, including the provisions of the

GMAC Mortgage Corporation underwriting guidelines applicable to the GMAC Mortgage

Home Equity Program."  Prospectus Supplement at S-31.

107.    GMACM publishes its loan underwriting standards in a document referred to

in the Prospectus Supplement as "the GMAC Mortgage Corporation underwriting guidelines"

(and referred to herein as the "Underwriting Guidelines"). *Id.* In general, the Underwriting

Guidelines specify documentation requirements, and substantive criteria for key credit-related

characteristics, that borrowers must satisfy in order to qualify for a particular mortgage loan.

Depending upon the particular type of loan, these requirements and criteria may include asset

verification, income verification, employment verification, bank statements, payment histories

and/or evidence of closing funds, among other things.  The substantive criteria for eligibility

address material characteristics of the proposed loan, such as DTI ratios, Combined Loan-to-

Value ("CLTV") ratios (a ratio comparing the aggregate principal balance of first and second

mortgages on a covered property to the value of the property), and occupancy status.

108.    The Prospectus Supplement sets forth, among other information, the following

important characteristics of the Initial Loan Pool:  the ranges of and weighted average FICO

- 35 -

scores, the ranges of and weighted average CLTV ratios, the ranges of and weighted average outstanding principal balances of the loans, the DTI ratios of the borrowers, the geographic distribution of the loans, and the occupancy status of the borrowers (*i.e.*, whether the property securing a mortgage is: (i) the borrower's primary residence; (ii) a second home; or (iii) an investment property). *See* Prospectus Supplement at A-I-1 - A-I-7.

109.     In particular, GMACM represented in the Prospectus Supplement that the loans had generally been originated with a maximum DTI ratio of 45% and a maximum CLTV ratio of 100%. *See* Prospectus Supplement at S-33. GMACM also represented that for each Mortgage Loan it had made a determination based upon all applicable employment, credit and property information regarding whether the prospective borrower had sufficient monthly income available to meet the borrower's monthly obligations. *See* Prospectus at 23 and Prospectus Supplement at S-34.

110.     GMACM also represented in the Offering Documents that, with respect to occupancy status, 98.68% of the Mortgage Loans would be secured by the borrower's primary residence. *See* Prospectus Supplement at A-1-4.

111.     Further, as discussed, the Prospectus Supplement contained material representations in respect of the balloon mortgage loans and the maturity characteristics of the Initial Loan Pool.

112.     ***Loan Tapes.*** The loan tapes provided by GMACM set forth, for each loan in the Initial Loan Pool, key characteristics such as the borrower's FICO score, DTI ratio and the CLTV ratio for the loan. GMACM also disclosed in the Prospectus Supplement—with respect to the Loan Pool as a whole—aggregate characteristics also relevant to the assessment of the credit risk of the pool, including weighted averages of FICO scores, DTI ratios and

CLTV ratios. The loan tape also contained certain key maturity date characteristics of the Initial Loan Pool, as well as information pertaining to the number of balloon mortgage loans among the Initial Mortgage Loans. The loan tape was provided to FGIC prior to the closing of the Transaction on August 11, 2006.

113.    *Shadow Rating Letters*. GMACM, on information and belief, provided Moody's and S&P with, at a minimum, the same mortgage loan tape that it also provided to FGIC. As requested by GMACM, Moody's and S&P provided the shadow ratings to FGIC on the closing date of the Transaction. In its letter to FGIC describing the shadow rating for the 2006-HE3 Transaction, Moody's noted that it reviewed the documentation provided by GMACM and that the rating "is based primarily on the credit quality of the loans backing the transaction." Similarly, in its letter to FGIC, S&P noted that it too relied on the information provided to it by GMACM and that the shadow rating "relies on the issuer . . . for the accuracy and completeness of the information submitted in connection with the private credit assessment." Based on the information supplied by GMACM, Moody's assessed the credit quality of the Initial Loan Pool and assigned a shadow rating of Baa2 to the 2006-HE3 Notes, while S&P assigned the 2006-HE3 Notes a shadow rating of BBB-.

114.    These shadow ratings, which were based, in part, on GMACM's representations in respect of the balloon mortgage loans and the maturity characteristics of the Initial Loan Pool, met FGIC's minimum requirements and were required by FGIC as an essential condition to its willingness to participate in the 2006-HE3 Transaction and issue the Policy.

### (2) GMACM's Fraudulent Inducement of FGIC is Carried Out with Substantial Assistance from Ally Bank

115.  Ally Bank provided substantial assistance to GMACM in fraudulently procuring the Policy from FGIC.  As it originated or acquired nearly 88% of the Mortgage Loans, Ally Bank was well aware of the true characteristics of the majority of the Loan Pool.

116.  Additionally, on August 29, 2006, prior to the closing of the 2006-HE3 Transaction, several representatives of Ally Bank—including Michael Hebling, Donna Harkness, Dave Chiodo, Eleanor Whittall, Linda Rogers, Lauren Coffman, and Tiffany Toale—received an e-mail sent from Jeffrey Wittenberg on behalf of GMACM that attached a true and correct copy of the MLPA.

117.  As a result of its affiliate status with GMACM, its role as Custodian for the 2006-HE3 Transaction—for which it received substantial fees— and having directly received the MLPA prior to closing, Ally Bank was aware of the representations and warranties GMACM made to FGIC regarding the nature of GMACM's business practices and the characteristics of the Mortgage Loans (including the many thousands of Mortgages Loans that were originated by Ally Bank).

118.  With full knowledge that GMACM had not complied—and would not comply—with the representations and warranties it made to FGIC, and direct knowledge of the many thousands of loans it had originated and sold to GMACM, which formed a substantial part of the collateral for the 2006-HE3 Transaction, Ally Bank represented to FGIC that, as Custodian, it would inform FGIC if it discovered any non-compliant Mortgage Loans or non-compliance with GMACM's obligations under the Operative Documents.  By offering FGIC this false comfort, despite knowing that GMACM was fraudulently inducing

FGIC to provide financial guaranty insurance for the 2006-HE3 Transaction, Ally Bank provided material assistance to GMACM's fraud.

(3)    <strong>GMACM's Fraudulent Inducement of FGIC is Carried Out with Substantial Assistance from Ally Financial</strong>

119.    Ally Financial provided substantial assistance to its subsidiaries GMACM and Ally Bank in fraudulently inducing FGIC to participate in the 2006-HE3 Transaction and, ultimately, issue the Policy.  Ally Financial knew that the Mortgage Loans underlying the 2006-HE3 Transaction were of a substantially poorer quality than was represented to FGIC and other participants in the Transaction, including investors.  Ally Financial further knew that the Mortgage Loans were not underwritten to the standards represented in the Offering Documents and warranted in the Operative Documents.  Moreover, on information and belief, as a result of its dominance over ResCap, Ally Bank, and its other subsidiaries, Ally Financial knew that the representations and warranties GMACM made to FGIC prior to and at the closing, upon which FGIC reasonably relied, were false.

120.    Ally Financial, at the direction of its board of directors, took a number of actions in 2005 to engender investor confidence in, and otherwise finance and support, its mortgage securitization business, which was carried out by its subsidiaries.  Ally Financial substantially restructured its subsidiaries in 2005.  ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly-owned subsidiaries—were transferred to it in March 2005.  Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

121.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

- 39 -

Case 1:12-cv-01608-PAC    Document 1    Filed 03/06/12    Page 45 of 58

122.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."

123.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business.  This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants, such as FGIC.

124.    Ally Financial's corporate restructuring also allowed GMACM to explicitly represent and warrant to FGIC in the I&I Agreement that GMACM "is solvent, and will not be rendered insolvent by the Transaction. . . . [GMACM] shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business." I&I Agreement § 2.01(m).  This statement—on which FGIC materially relied—could not have been made absent Ally Financial's decision to prop up its subsidiary GMACM.

125.    Additionally, Ally Financial was aware that the true characteristics of the Mortgage Loans in the 2006-HE3 Transaction—and other securitization transactions—were far worse than was represented to FGIC and were not underwritten to the standards that were represented and warranted to FGIC.  This is true in that Ally Financial's subsidiaries were, in

many cases, the acquirers, sellers, and servicers of those very loans.  Indeed, the driving factor in the separation of Ally Financial from General Motors Corporation ("GM") and the creation, in particular, of ResCap, was to create an entity, the sole focus of which was the home mortgage business.

126.    Moreover, as a result of its domination and control over ResCap, GMACM, and Ally Bank, as well as the shared officers and directors among and between Ally Financial and its subsidiaries, Ally Financial was aware of GMACM's representations and warranties to FGIC—and that they were untrue when stated—as well as the substantial assistance Ally Bank was rendering GMACM in aid of its fraudulent inducement of FGIC.  For example, Eric A. Feldstein was Ally Financial's CEO and Chairman of its board of directors and also served as Chairman of ResCap's board of directors.  Furthermore, Sanjiv Khattri has served as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO of ResCap.  Numerous other individuals served as Directors and Officers of both Ally Financial and ResCap, with many serving in roles directly related to the mortgage operations of both companies.  ResCap and its own subsidiaries, including GMACM, shared numerous directors and senior management as well.  Similarly, William F. Muir, Ally Financial's President, has served in that capacity since at least 2004 (first at GMAC and then at Ally Financial) while also serving as President and Chairman of the Board of IB Finance Holding Company, LLC—the direct parent of Ally Bank—and as a director of Ally Bank.

127.    David C. Walker is another example of the many employees who had overlapping responsibilities at Ally Financial and its subsidiaries, including GMACM and RAMP.  Walker joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group.  Walker has also served as a director at ResCap,

GMACM, RFC, and RAMP, among other ResCap subsidiaries.  In the 2006-HE3 Transaction, acting as a director of RAMP, Walker was a signatory to RAMP's December 20, 2005 "Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors," which was included among the closing documents of the 2006-HE3 Transaction.

128.  As a result of the overlapping personnel, intertwined business operations, and the free flow of information among Ally Financial, ResCap, Ally Bank, and GMACM, it is more than reasonable to conclude that information regarding the representations and warranties being made to FGIC by GMACM was shared among and between GMACM and its parent ResCap, ResCap and its parent Ally Financial, and Ally Bank and its parent and affiliates.  Indeed, at least one Ally Financial employee who was involved in the 2006-HE3 Transaction appeared on the Transaction's working group list and received all distributions that were sent to the group, including all drafts, final versions, and communications concerning the Operative and Offering Documents.

129.  Ally Financial, by (1) representing that its mortgage loan practices were sound and that its securitization transactions were supported by mortgage loans that met the criteria to which they were purportedly underwritten, (2) providing financial, managerial, and strategic assistance to its subsidiaries, and (3) modifying its corporate structure to control and direct its subsidiaries, provided substantial assistance to GMACM in fraudulently inducing FGIC to participate in the Transaction and issue the Policy.  Further, the issuance of the Policy, which made the 2006-HE3 Transaction possible, inured to the significant financial benefit of Ally Financial and its subsidiaries.

**E.  GMACM's Representations, Warranties and Affirmative Covenants**

130.  In connection with the 2006-HE3 Transaction, GMACM, at the direction of Ally Financial, either directly or indirectly through ResCap, gave numerous representations,

warranties and affirmative covenants to FGIC. These representations and warranties were

material and concerned, among other things, the way GMACM conducted its loan origination,

selection and evaluation process, the characteristics of the Mortgage Loans and the Initial and

complete Loan Pool, the percentage of the aggregate principal amount of the Initial Loan Pool

to be made up of balloon mortgage loans, and the accuracy and completeness of the

information supplied to FGIC. These and other characteristics of the Mortgage Loans

included in the Initial Loan Pool were detailed in a schedule attached to the Servicing

Agreement and provided to FGIC by GMACM in the form of the loan tape (the "Mortgage

Loan Schedule"). Moreover, these same representations and warranties were restated by

GMACM when it transferred additional Mortgage Loans to the 2006-HE3 Trust after the

closing of the Transaction (as was permitted for a short period following closing).

131.    GMACM further promised to provide FGIC with a variety of information,

including access to GMACM's books and records and to GMACM's Chief Financial Officer

and its independent accountants.

132.    GMACM's representations and warranties, and particularly GMACM's

representation that the information supplied to FGIC was not materially inaccurate or

misleading, induced FGIC to enter into the 2006-HE3 Transaction and to issue the Policy on

the agreed terms. Further, the I&I Agreement's incorporation and restatement of the

representations and warranties in the Operative Documents was intended to allow FGIC to

rely upon each and every one of the representations and warranties that GMACM made in

connection with the 2006-HE3 Transaction.

133.    FGIC, for its part, reasonably relied on the information available to it regarding

the underlying Mortgage Loans and the representations and warranties provided by GMACM.

Since FGIC had neither the right under the Operative Documents, nor the practical ability, to review the thousands of underlying Mortgage Loan files, GMACM knew that FGIC had no choice but to rely on GMACM's representations regarding the underlying loans in determining whether to issue the Policy. Further, FGIC had no reason to believe that those representations were not true and accurate.

134.    Indeed, GMACM included more than 16,500 individual Mortgage Loans in the 2006-HE3 Transaction at closing, and several thousand more Mortgage Loans post-closing. Typically, each Mortgage Loan has its own voluminous file containing, among other items, mortgage applications, credit reports, income and employment verifications, the lender's internal documentation and other forms of documentation necessary to support each underwriting decision. Unlike GMACM, FGIC was under no contractual duty whatsoever to review the more than 16,500 Initial Mortgage Loans or the thousands of Mortgage Loans subsequently transferred after closing. Instead, FGIC, as contemplated by the many representations, warranties, and affirmative covenants by GMACM regarding its loan origination, selection, and evaluation practices, and the credit quality of the Mortgage Loans, reasonably relied on GMACM to conduct its underwriting processes according to the promised standards, and FGIC had no basis to conclude that GMACM's representations and warranties were false. Thus, FGIC reasonably believed that truthful and accurate information had been provided and that it would not face additional, hidden risk by virtue of material omissions or positive misrepresentations having been made.

135.    Based on the information received by FGIC and the representations and warranties given by GMACM, FGIC entered into the I&I Agreement and agreed to issue the Policy to the Indenture Trustee for the benefit of the holders of the 2006-HE3 Notes. In return

for doing so, FGIC received a modest annual premium, based on a small, fixed percentage of the aggregate principal balance of the 2006-HE3 Notes. Specifically, FGIC received 0.12% per annum of the aggregate balance of the 2006-HE3 Notes for serving as insurer, a figure commensurate with the risk that FGIC believed it was accepting, based on the representations, warranties, and affirmative covenants provided by GMACM.

136.   As discussed below, GMACM's information, representations and warranties were materially false when disclosed and/or provided by GMACM. GMACM knew that this information, and its representations and warranties, were materially false when made. GMACM also knew that this information and the representations and warranties were essential to FGIC's decision to issue the Policy. Indeed, GMACM intentionally made these material misrepresentations to induce FGIC to enter into the I&I Agreement and issue the Policy. The issuance by FGIC of the Policy—induced by GMACM's fraudulent misrepresentations and substantial assistance by Ally Financial—made the 2006-HE3 Notes eligible to receive an initial triple-A credit rating, thus greatly improving their marketability to potential investors.

### (1)   Breaches of Representations and Warranties Regarding Balloon Mortgage Loans

137.   As the Transaction began to perform poorly, FGIC conducted a review of the Mortgage Loans and discovered that thousands of Mortgage Loans in the Initial Loan Pool that were in fact balloon mortgages were not characterized as such by GMACM. Instead, the "Balloon Indicators" column in the Mortgage Loan Schedule provided at closing falsely flagged those thousands of Initial Mortgage Loans as "N"—indicating to FGIC they were regularly amortizing loans and not balloon loans.

138.    Despite conceding the higher degree of credit risk inherent in balloon mortgage

loans, and affirmatively representing that only 7.61% of the aggregate principal amount of the

Initial Loan Pool (corresponding to approximately 1,292 Mortgage Loans with an

approximate aggregate principal balance of $65 million) would be comprised of balloon

mortgages, in fact over 26% of the aggregate principal amount of the Initial Mortgage Loans

(corresponding to approximately 4,300 Mortgage Loans with an aggregate principal balance

of more than $226 million) were balloon mortgages. Each of these balloon mortgage loans

had been originated or acquired and transferred to the 2006-HE3 Trust, by GMACM, , or one

of its affiliates.

139.    In sum, the 2006-HE3 Trust contained at least 3,013 more high-risk balloon

mortgage loans—accounting for at least $160 million in aggregate principal amount—than

FGIC could have reasonably expected in reliance on the percentages regarding this type of

loan that GMACM represented and warranted in the Offering Documents and the MLPA, thus

constituting a material breach of the I&I Agreement.

140.    Additionally, the mischaracterization and omissions regarding the undisclosed

balloon mortgage loans on the Mortgage Loan Schedule and/or the loan tape represent further

material breaches of the I&I Agreement by GMACM.

141.    Moreover, FGIC has determined that, the weighted average remaining term to

scheduled maturity and the weighted average original term to scheduled maturity of the Initial

Loan Pool—taking into account the previously undisclosed and misidentified balloon

mortgage loans—differ materially from the figures represented to FGIC by GMACM. The

true weighted average remaining term to scheduled maturity of the Initial Loan Pool was in

fact approximately 236 months, and not 270 months, as stated in the Offering Documents and

the MLPA. Additionally, the true weighted average original term to scheduled maturity for the Initial Loan Pool was in fact approximately 238 months, and not 272 months, as represented in the Offering Documents. These misrepresentations by GMACM, separately and apart from the misrepresentation of the balloon loan status of the Mortgage Loans, are material breaches of the I&I Agreement.

142.    Further, FGIC has determined that the rate of Mortgage Loan non-performance (*i.e.*, loans that were delinquent for more than 60 days, in foreclosure, charged-off, or liquidated) in the 2006-HE3 Transaction for the over 3,000 undisclosed and mis-flagged balloon mortgage loans was almost 50% greater than the non-performance rate of the non-balloon mortgage loans in the 2006-HE3 Transaction.

### (2)   Other Representations, Warranties and Affirmative Covenants Relating to the Operative and Offering Documents

143.    Under Section 2.01 of the I&I Agreement, GMACM made the following representations and warranties, among others (emphasis added in each case):

- *Accuracy of Information.* **Neither the Operative Documents to which it is a party nor other information relating to the Mortgage Loans**, the operations of GMACM. . . or the financial condition of GMACM . . . furnished to [FGIC] . . . by GMACM . . . including the Offering Documents . . . **contains any statement of a material fact which was untrue or misleading in any material respect when made** . . . . GMACM  . . . has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to GMACM . . . Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to GMACM . . . that would render any of the Documents untrue or misleading in any material respect.

- *Compliance with Securities Laws.* The offering and sale of the Securities complies in all material respects with all requirements of law, including the registration requirements of the Securities Act and any other applicable securities laws. **The Offering Documents do not contain any untrue statement of a material fact and do not omit to state material fact necessary to make the statements made therein,**

**in light of the circumstances under which they were made, not misleading** . . . .

- *Operative Documents.* **Each of the representations and warranties of GMACM . . . contained in the applicable Operative Documents and the Underwriting Agreement is true and correct in all material respects** [and] GMACM . . . hereby makes each such representation and warranty to, and for the benefit of, [FGIC] as if the same were set forth in full herein.

- *Solvency; Fraudulent Conveyance.* GMACM . . . is solvent and will not be rendered insolvent by the Transaction and . . . **GMACM . . . shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business**, and . . . GMACM . . . does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature. . . . GMACM . . . is not transferring the Mortgage Loans . . . with any intent to hinder, delay or defraud . . . creditors.

144.    *First*, in the I&I Agreement, GMACM represented and warranted to FGIC that "[n]either the Operative Documents to which it is a party nor other information relating to the Mortgage Loans. . . including the Offering Documents . . . contains any statement of a material fact which was untrue or misleading in any material respect when made." I&I Agreement § 2.01(j). Through these Operative and Offering Documents, GMACM communicated several material facts about the characteristics of the mortgage loans sold to the 2006-HE3 Trust.

145.    *Second*, in the I&I Agreement, GMACM represented and warranted that "[t]he Offering Documents do not contain any untrue statement of a material fact and do not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading." *Id.* § 2.01(k).

146.    As discussed above, in the Prospectus Supplement, GMACM represented that all of the mortgage loans sold to the 2006-HE3 Trust had been underwritten generally in

accordance with GMACM's underwriting standards, including the GMAC Mortgage Home Equity Program. Prospectus Supplement at S-31.

147.    Additionally, as discussed above, GMACM also made express representations that only 7.61% of the aggregate principal amount of the Initial Mortgage Loans would be balloon mortgages, and that the Initial Loan Pool in the aggregate had a weighted average remaining term to scheduled maturity of 270 months and a weighted average original term to scheduled maturity of 272 months. *See* Prospectus Supplement at S-9; *see also* MLPA § 3.1(b)(xxii).

148.    *Third*, the I&I Agreement incorporated by reference, for the benefit of FGIC, the representations and warranties contained in the "Operative Documents," as that term was defined in the I&I Agreement: "[e]ach of the representations and warranties . . . contained in the applicable Operative Documents . . . is true and correct in all material respects[.]" *See* I&I Agreement §§ 1.01, 2.01(l).  The incorporation by reference of the Operative Documents into the I&I Agreement was intended to allow FGIC to rely on any representation and warranty that GMACM made to other entities, such as investors or the Indenture Trustee, in connection with the 2006-HE3 Transaction.  Indeed, the I&I Agreement expressly identifies FGIC as a third-party beneficiary with respect to the related Operative Documents. *See* I&I Agreement § 2.02(k).

149.    *Fourth*, GMACM also provided information to FGIC concerning the Mortgage Loans in the Loan Pool for the 2006-HE3 Transaction. *See* I&I Agreement § 2.02(c)(iii). This information included loan tapes that set forth statistics about the Loan Pool.  The loan tapes purported to describe key characteristics relevant to the assessment of risk, including DTI ratios, CLTV ratios, occupancy status and FICO scores, and an identification of whether

a particular Mortgage Loan was a balloon mortgage loan. *See* MLPA § 2.1(d). On information and belief, the loan tape FGIC received at closing contains the same information as is contained in the Mortgage Loan Schedule referred to in the MLPA.

150.    In turn, in the MLPA, GMACM represented that all the information in that Mortgage Loan Schedule "is true and correct in all material respects as of the date or dates respecting which such information is furnished." MLPA § 3.1(b)(i).

151.    As a result of incorporating into the I&I Agreement the representations and warranties in the related Operative Documents, GMACM incorporated representations and warranties regarding the underwriting of the Mortgage Loans included in the 2006-HE3 Transaction. These representations and warranties set forth the standards governing each Mortgage Loan, including, significantly, the representation that the Mortgage Loans had been underwritten in compliance with GMACM's underwriting guidelines. *See* MLPA § 3.1(b)(xxxvi).

152.    In particular, in the MLPA, GMACM represents and warrants that:

- The information set forth in the Mortgage Loan Schedule with respect to each Mortgage Loan or the Mortgage Loans is true and correct in all material respects as of the date or dates respecting which such information is initially furnished;

- As of the Cut-Off Date or related Subsequent Cut-Off Date, no Mortgage Loan was 30 days or more delinquent in payment of principal or interest;

- With respect to the GMACM Initial Mortgage Loans or, as applicable, any Subsequent Mortgage Loans sold by GMACM, the related Mortgage File contains or will contain, in accordance with the definition of "Mortgage File" in Appendix A to the Indenture, each of the documents and instruments specified to be included therein;

- As of the Cut-Off Date or Subsequent Cut-Off Date, the CLTV for each Mortgage Loan was not in excess of 100.00%;

- GMACM used no selection procedures that identified the Mortgage Loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by GMACM under the GMACM Home Equity Program;

- Only 7.61% of the aggregate principal amount of the Initial Loan Pool would be comprised of balloon mortgage loans; and

- The weighted average remaining term to scheduled maturity of the Initial Mortgage Loans was 270 months.

153.    Moreover, in the I&I Agreement—which expressly identifies FGIC as a third-party beneficiary with respect to the related Operative Documents—GMACM specifically covenants that it will "comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party . . . ." I&I Agreement § 2.02(a).

**(3)    Representations, Warranties, and Affirmative Covenants Regarding Servicing and Access to Information**

154.    The I&I Agreement also incorporates the representations and warranties that GMACM made in the Servicing Agreement in its capacity as Servicer.  *See* I&I Agreement § 2.02(l).  Under the I&I Agreement, GMACM covenanted that "[a]ll Mortgage Loans will be serviced in all material respects in compliance with the [Servicing Agreement]." I&I Agreement § 2.02(l).  In the Servicing Agreement, GMACM covenanted, represented, and warranted that, so long as it acted as Servicer, it would service the Mortgage Loans in the 2006-HE3 Transaction in a manner consistent with its own servicing guidelines.  *See* Servicing Agreement § 3.01(a).

155.    Additionally, the Servicing Agreement entered into by GMACM as the original Servicer of the Transaction provides that, "documents contained in the Mortgage File . . . shall be held by the Servicer in trust as agent for the Indenture Trustee on behalf of the Noteholders."  Servicing Agreement § 3.01(c).  As such, and as the Servicing Agreement

- 51 -

makes plain, the information and documents regarding the Mortgage Loans are not the property of or otherwise owned by GMACM, but rather such files are to be held by the servicer of the Transaction—whether that party be GMACM or a third party.   Moreover, through the Servicing Agreement, GMACM expressly covenanted that, in the event GMACM's servicing duties are terminated and transferred to another party, GMACM "agrees to cooperate with the Issuer, the Enhancer [*i.e.*, FGIC] and Indenture Trustee, as the case may be, in effecting the termination of the responsibilities and rights of the Servicer." *Id.* at § 7.01(a).  FGIC is an express third-party beneficiary of the Servicing Agreement. *See id.* at § 8.05.

156.    The I&I Agreement affords FGIC the express right to "inspect the books and records of GMACM . . . [and to] discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and with GMACM's consent, which consent shall not be unreasonably, withheld or delayed, to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants."  I&I Agreement § 2.02(e)(i)-(iii).

157.    The I&I Agreement further provides that GMACM shall furnish to FGIC, promptly upon request, such data as FGIC may reasonably request. *See* I&I Agreement § 2.02(c)(v).

**F.    GMACM's Breaches of Its Representations, Warranties and Affirmative Covenants**

158.    As discussed above, FGIC relied on material representations and warranties made by GMACM regarding the manner in which the Mortgage Loans were originated, selected, and evaluated, the characteristics of those loans, and the accuracy and completeness of information GMACM supplied to FGIC, including in respect of the balloon mortgage loans.  Based on those representations and warranties, FGIC agreed to issue the Policy.  In

fact, as demonstrated by the extreme levels of delinquencies and losses detailed below, the risk that FGIC assumed when it issued the Policy was many times greater than the risk disclosed by GMACM's representations and warranties. GMACM breached its representations and warranties to FGIC, and FGIC has been damaged as a result of those breaches.

159.     The 2006-HE3 Transaction has performed poorly, and delinquencies and defaults for Mortgage Loans in the 2006-HE3 Transaction have been substantial. As of December 2011, a staggering 2,600 mortgage loans, had been liquidated or were delinquent. As discussed above, by making these extensive representations and warranties to FGIC, and thereby inducing FGIC to issue the Policy, which covers, *inter alia*, shortfalls in amounts paid to noteholders arising from liquidated Mortgage Loans, GMACM assumed and allocated to itself all risk associated with the Mortgage Loans failing to comply with GMACM's own representations and warranties.

160.     The poor performance of the Mortgage Loans has reduced the cash flow to the 2006-HE3 Trust, which has caused, and will continue to cause, substantial claims to be presented to FGIC under the Policy to cover these shortfalls. As of February 2012, more than $82.9. million in claims had been presented to FGIC in connection with the 2006-HE3 Transaction. FGIC expects tens of millions of dollars more in claims to be presented to it under the 2006-HE3 Transaction in the future.

161.     As an increasingly high percentage of the 2006-HE3 Mortgage Loans enter delinquency and default, FGIC has uncovered a wealth of material breaches of GMACM's representations and warranties regarding the characteristics of the loans and the standards to which they were underwritten.

- 53 -

### (1)    Breaches Identified Through Initial Review

162.    When FGIC became concerned about the high delinquencies and default rates in the 2006-HE3 Transaction, FGIC requested that GMACM provide it with certain Mortgage Loan files underlying the 2006-HE3 Transaction.

163.    FGIC selected for review a number of non-performing (*i.e.*, non-current or charged-off) loans that had resulted in a loss to the 2006-HE3 Trust.  To perform this review, FGIC hired an independent outside consultant with particular skill, experience, and expertise in the review, evaluation, and re-underwriting of mortgage loans.

164.    That review revealed that GMACM had breached one or more material representations and warranties with respect to approximately 97% of the loans reviewed.

### (2)    Breaches Identified Through Additional Review

165.    In 2010, as the 2006-HE3 Transaction continued to perform poorly, FGIC again retained a professional mortgage loan review team to identify, review, and evaluate a statistically significant sample of mortgage loans in the 2006-HE3 Transaction.

166.    FGIC's independent loan consultant reviewed 120 loan files received by FGIC. That review revealed that GMACM had breached one or more material representations, including those concerning balloon mortgages, with respect to 117, or an astounding 97.5%, of these loans.

### (3)    GMACM's Pervasive and Material Breaches of Its
### Representations and Warranties and Affirmative Covenants

167.    FGIC ultimately obtained access to 164 Mortgage Loan files, which FGIC's independent consultant reviewed to evaluate and re-underwrite the Mortgage Loans.  These reviews revealed that GMACM breached one or more material representations with respect to 160—or a shocking 97.6%—of the Mortgage Loans reviewed.

168.    A small sample of these material breaches and underwriting violations are listed below:

- Loan Number 8656112510: due to an income misrepresentation, the loan closed with a DTI of 301.92%. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE3 pool, the relevant guidelines for the particular type of loan underwritten permit a maximum DTI ratio of 50%.

- Loan Number 89646124: the loan was appraised using a comparable property that was sold 9 months prior to the closing date. Further, the loan was not disclosed in the Mortgage Loan Schedule as being a balloon mortgage loan. The Mortgage Loan Schedule reported the term and maturity date for the loan as 360 months and July 1, 2036, however the mortgage note states a term of 180 months and a maturity date of July 1, 2021, indicating a balloon mortgage loan.

- Loan Number 8253572070: the loan was refinanced as an owner occupied property, however the borrower's credit report did not list the property address as their current or previous address. In order for this mortgage loan to have been eligible for inclusion in the 2006-HE3 pool, the relevant guidelines for the particular type of loan underwritten require that the property is owner-occupied.

169.    These examples of underwriting violations are but a small smattering of the extensive defects among the Mortgage Loans, and evidence significant breaches of the MLPA. *See* MLPA § 3.1. And it is reasonable to conclude—based on what is now known by FGIC—that a substantial majority of the Mortgage Loans that were ultimately transferred to the 2006-HE3 Trust evidence similar breaches of GMACM's representations and warranties.

170.    The pervasive and overwhelming defects in the Mortgage Loan files reviewed to date indicate clear breaches of GMACM's contractual representations, warranties and affirmative covenants relating to, among other things, the characteristics of the Mortgage Loans and the Initial and final Loan Pool, including the guidelines to which the Mortgage Loans were underwritten and key statements regarding the balloon mortgage loans included in the 2006-HE3 Trust.

171.   Specifically, with respect to the 2006-HE3 Transaction, GMACM made—and breached—representations and warranties stating, as of the closing date, that:

- neither the Operative Documents nor any information related to the Mortgage Loans contain any untrue or misleading statement of material fact;

- the Offering Documents (*i.e.* the Prospectus and Prospectus Supplement) contain no untrue or misleading statement of material fact;

- each representation and warranty of GMACM in the Operative Documents (including each representation and warranty in the MLPA) is true and correct in all material respects;

- the information set forth in the Mortgage Loan Schedule is true and correct in all material respects;

- no Mortgage Loan was 30 days or more delinquent as of August 1, 2006 (or the date the loan was transferred to the 2006-HE3 Trust);

- each Mortgage File contains all required documents and instruments;

- the CLTV of each Mortgage Loan did not exceed 100%;

- GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (*i.e.* the Home Equity Loan Program);

- only 7.61% of the aggregate principal amount of the Initial Loan Pool would be comprised of balloon mortgage loans;

- the weighted average remaining term to scheduled maturity of the Initial Mortgage Loans was 270 months; and

- the weighted average original term to scheduled maturity of the Initial Mortgage Loans was 272 months.

172.   Many of these representations were repeated in connection with the subsequent transfer of additional Mortgage Loans, and were also breached with respect to those additional Mortgage Loans.

(4)     **Breaches for GMACM's Refusals to Repurchase, Substitute, or
Cure Improper or Non-conforming Mortgage Loans**

173.    Following the discovery of high defect rates among the Mortgage Loans and

the 3,013 additional balloon mortgage loans improperly transferred to the 2006-HE3 Trust,

FGIC, demanded that GMACM repurchase the non-compliant Mortgage Loans—including

the thousands of undisclosed and mis-flagged balloon mortgage loans—pursuant to the I&I

Agreement and the MLPA.

174.    Of the 160 (non-balloon) loans that FGIC requested be repurchased by

GMACM, only 15 (or 9%) of the non-conforming Mortgage Loans were repurchased—in

clear contravention of the I&I Agreement and the Operative Documents incorporated therein.

175.    Additionally, FGIC initiated a stream of correspondence with GMACM and

ResCap after FGIC discovered the massive excess of high-risk balloon mortgages in the Initial

Loan Pool.  FGIC wrote to GMACM, as Sponsor, as well as the ResCap Repurchase

Operations Department, in order to raise the issue of the balloon mortgages and demand their

repurchase pursuant to FGIC's rights under the I&I Agreement and MLPA.

176.    In response, GMACM and ResCap—acting for the first time through shared

counsel—did not reject or deny FGIC's assertions regarding the illegitimate inclusion of

thousands of excess balloon mortgage loans, and yet expressly refused to repurchase the

relevant loans.

177.    Indeed, GMACM and ResCap, through counsel, refused to even attempt to

ascertain whether *any* of the more than 3,000 unaccounted-for balloon mortgage loans

specifically identified by FGIC were improperly included in the 2006-HE3 Trust.  Rather,

GMACM and ResCap sought to shift the burden on to FGIC to explain why the inclusion of

these Mortgage Loans was problematic before GMACM and ResCap would agree to begin to address this glaring breach of the Operative Documents (which they continue to refuse to do).

178.    The bad faith and recalcitrance of GMACM in particular in this regard is all the more egregious in light of the fact that GMACM knew, or should have known, of the over-inclusion of thousands of previously undisclosed and misidentified balloon mortgage loans in the 2006-HE3 Transaction at least as early as November 2009.  Around that time, servicing duties for the 2006-HE3 Transaction were transferred from GMACM to a third party.  During that process, GMACM provided spreadsheets and other information to the new servicer regarding, *inter alia*, the Mortgage Loans and the Loan Pool.  The information GMACM provided to the new servicer correctly detailed the true number of balloon mortgage loans among the Initial Loan Pool.  As such, at least as early as November 2009, GMACM had (or should have) discovered its breach of several representations and warranties in respect of the balloon mortgage loans and the characteristics of the Initial Loan Pool.  And yet, GMACM did nothing to notify FGIC of the error or attempt to rectify it, as is required under the Operative Documents.

179.    Moreover, on information and belief, GMACM is and has been aware that many of the Mortgage Loans, whether acquired at the closing or thereafter, were nonconforming for reasons unrelated to being balloon mortgage loans and, thus, failed to comply with its own representations and warranties.  Despite this knowledge, GMACM has failed to repurchase the nonconforming loans or substitute them with conforming loans, as is required under the Operative Documents.

**(5)    GMACM's Denial of FGIC's Access To Books and Records, GMACM's CFO, and GMACM's Independent Accountants**

180.    On December 8, 2011, in accordance with its express rights under Sections 2.02(e)(i)-(iii) of the I&I Agreement, FGIC requested to (i) inspect the books and records of GMACM; (ii) discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and (iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants.

181.    To date, GMACM has failed to respond to this request, in violation of the I&I Agreement.

**(6)    GMACM's Frustration of FGIC's Right to Access Information Regarding the Mortgage Loans**

182.    As discussed, in or around November 2009, servicing duties for the 2006-HE3 Transaction were transferred from GMACM to a third party servicer.  As FGIC became aware of increasing numbers of material defects among the Mortgage Loans, as well as the gross over-inclusion in the Transaction of thousands of unidentified and mis-flagged balloon mortgage loans, FGIC sought information regarding the Mortgage Loan files from the successor (and current) servicer of the Transaction.

183.    FGIC has been made aware that the current servicer of the Transaction is unable to provide the information FGIC has sought due to GMACM's repeated refusals to provide its successor with certain Mortgage Loan files and other crucial information. GMACM's refusal to turn over information in its possession to, and otherwise cooperate with, its successor servicer is a clear violation of the Servicing Agreement that GMACM entered into as the then-Servicer of the 2006-HE3 Transaction and to which FGIC is a third-party beneficiary, as well as a breach by GMACM of its obligations under the I&I Agreement to

comply with the terms of the Operative Documents. *See* Servicing Agreement §§ 3.01(c), 7.01(a), 8.05; I&I Agreement 2.02.

184. Additionally, GMACM has an independent obligation under the I&I Agreement to provide FGIC such information as FGIC may reasonably request. *See* I&I Agreement § 2.02(c)(v). As such, through its obstinate refusal to provide either FGIC or the successor servicer with material information—admittedly within its possession—regarding the Mortgage Loans, GMACM has further breached its obligations to FGIC.

185. Moreover, on information and belief, the Mortgage Loan information that GMACM refuses to provide either to FGIC or the successor servicer will evidence further material breaches of representations and warranties made by GMACM. Accordingly, FGIC reserves its rights to assert additional causes of action regarding GMACM's breaches of its representations and warranties.

### G. Ally Bank's Breaches of The Custodial Agreement

186. Under the Custodial Agreement, to which FGIC is an express third party beneficiary, *see* Custodial Agreement § 5.6, and through which Ally Bank received substantial fees, Ally Bank undertook several obligations to FGIC concerning the manner in which Ally Bank would ensure that the Mortgage Loans contained complete and accurate information and that GMACM was in compliance with its representations and warranties regarding the origination, selection, and characteristics of those loans.

187. Ally Bank agreed that it would "hold the Mortgage Notes and any Loan Agreement relating to any Subsequent Mortgage Loan," and that it would review the Mortgage Notes and deliver to FGIC a certification of "the completeness of the receipt of the Mortgage Notes." *Id.* §§ 2.1, 2.2.

188.    Ally Bank further agreed to notify FGIC of breaches of the MLPA by GMACM, by providing that: "Upon discovery by the Custodian of a breach of any representation or warranty made by [GMACM] in the Purchase Agreement . . .with respect to a Mortgage Loan . . .  the Custodian shall give prompt written notice to [FGIC]." *Id.* § 2.3.

189.    Additionally, as discussed, Ally Bank was provided with a copy of the MLPA by GMACM prior to closing.

190.    An initial review of a small percentage of defective Mortgage Loans has revealed that in many instances the Mortgage Note was not included in the loan file.  The lack of a Mortgage Note within a particular file constitutes a breach of the representations and warranties given by GMACM in the MLPA.  Ally Bank should have been aware of the fact that Mortgage Notes were missing from certain Mortgage Loan files, and that this was a breach of the MLPA representations and warranties.  Consequently, it should have notified FGIC pursuant to its own obligations under the Custodial Agreement. *See id.* §§ 2.1-2.3. Ally Bank has, however, failed to provide FGIC with any notices regarding defects in any Mortgage Loan file, and has further provided inaccurate and/or incomplete certifications regarding the Mortgage Loans, thereby breaching the Custodial Agreement to which FGIC is an express third party beneficiary.

191.    Moreover, Ally Bank had an obligation to notify FGIC of any breach by GMACM of the MLPA representations and warranties that it discovered, not just those pertaining to the Mortgage Note.  Since Ally Bank originated nearly 88% of the Mortgage Loans in the 2006-HE3 Transaction—which have suffered astounding defect rates—it must have been keenly aware of the breadth and scope of the underwriting failures with respect to those loans.  Ally Bank, which had received the MLPA, thus, must have known that GMACM

was in breach of the representations and warranties in the MLPA. As such, its failure to so notify FGIC was a further breach of the Custodial Agreement.

### H.      GMACM's Fraud

192.    The material breaches of GMACM's representations and warranties, including the extensive underwriting failures by GMACM, and the poor credit quality of almost all of the Mortgage Loans—including, but not limited to the balloon mortgage loans—demonstrate the knowing and wanton disregard of the material representations and warranties and affirmative covenants GMACM made to FGIC to induce its participation in the Transaction. The extraordinarily high defect and default rate among the Mortgage Loans and the inclusion of thousands more high-risk balloon mortgage loans than had been represented demonstrates not merely that GMACM breached its representations and warranties as a contractual matter, but that it did not—and never intended to—comply with them, despite representing to FGIC that, if FGIC issued the Policy, it (GMACM) would make the representations and warranties set forth in the Operative Documents, and that those representations and warranties would be true.

193.    All of the Mortgage Loans underlying the 2006-HE3 Transaction were originated or acquired by GMACM and its affiliate Ally Bank. As such, GMACM had the access and ability to evaluate the Mortgage Loan files and to determine if the loans were in substantial compliance with the applicable GMACM underwriting guidelines and if the loans breached other representations and warranties made by GMACM, including those in respect of the balloon mortgage loans to be included in the 2006-HE3 Trust, as well as the weighted average remaining term to scheduled maturity and weighted average original term to scheduled maturity of the Initial Loan Pool.

194.     To induce FGIC to enter into the 2006-HE3 Transaction, GMACM provided
FGIC with a loan tape, which contained false and misleading information regarding, among
other things, the CLTV and DTI ratios, occupancy status, and FICO scores of the borrowers,
as well as an indication of the number of balloon mortgage loans contained in the Initial Loan
Pool.

195.     In addition, GMACM made critical misrepresentations to FGIC with respect to
the credit rating agencies' assessment of the loans that were to comprise the 2006-HE3 Trust.
GMACM was well aware that FGIC would not agree to insure the 2006-HE3 Notes unless
GMACM obtained shadow ratings from the rating agencies that satisfied FGIC's minimum
requirements.  To this end, upon information and belief, GMACM provided Moody's and
S&P with the same false information regarding the credit quality of the underlying Mortgage
Loans that it also provided to FGIC—including material information in regard to balloon
mortgage loans and the maturity characteristics of the Initial Loan Pool.  Based on this faulty
information, Moody's and S&P assigned shadow ratings regarding the credit quality of the
2006-HE3 Notes that met FGIC's minimum requirements—Baa2 and BBB-, respectively.  In
this way, GMACM made both direct and indirect misrepresentations to FGIC—first, by
providing faulty information to the rating agencies to provide a risk assessment that GMACM
would pass on to FGIC, and second, by causing shadow ratings of the 2006-HE3 Notes to be
delivered to FGIC without disclosing to FGIC that those ratings were based on incomplete
and inaccurate loan-level data.

196.     GMACM was well aware that FGIC would rely on the shadow ratings—
prepared with information supplied by GMACM—as the I&I Agreement specifically
contemplated as a condition to issuance of the Policy that FGIC "shall have received

confirmation that the Notes insured by the Policy are rated" by S&P and Moody's at a specified minimum level "without regard to the Policy."  I&I Agreement § 3.01(k).

197.    As noted, the issuance of the Policy enabled the Notes to receive a triple-A rating from the rating agencies.  Moreover, the receipt of a triple-A rating for the Notes, which depended on the issuance of the Policy, which in turn depended on the shadow ratings formulated using (inaccurate) information supplied by GMACM, was a critical component of the Transaction.  As GMACM expressly noted in the Prospectus Supplement: "It is a condition to the issuance of the notes that they be rated 'Aaa' by Moody's . . . and 'AAA' by Standard & Poor's."  Prospectus Supplement at S-98.

198.    Had the information provided to the ratings agencies by GMACM been accurate and truthful, Moody's and S&P would almost certainly have assigned very different (and lower) shadow ratings to the 2006-HE3 Transaction, and FGIC, in turn, would not have issued the Policy on the agreed terms, or would have refused to issue the Policy altogether.

199.    GMACM also made material misrepresentations to FGIC, on which FGIC relied, about the characteristics of the Mortgage Loans, including the guidelines and standards to which the Mortgage Loans were underwritten, the percentage of the aggregate principal amount of the Initial Mortgage Loans that would consist of balloon mortgages, and the weighted average remaining term to scheduled maturity and weighted average original term to scheduled maturity of the Initial Loan Pool.

200.    For example, in the Prospectus Supplement (and in the I&I Agreement by incorporation) GMACM assured FGIC that the Mortgage Loans "were originated generally in accordance with the underwriting standards of GMAC Mortgage Corporation."  Prospectus

Supplement at S-29.  GMACM provided FGIC with GMACM's Underwriting Guidelines themselves, which contained extensive underwriting standards and requirements.

201.    In fact, as confirmed by the overwhelming defect rates described above regarding the Loan Pool, all of which are due to Mortgage Loans that are inconsistent with GMACM's own underwriting guidelines, GMACM was well aware at the closing of the 2006-HE3 Transaction that those representations were false.  In other words, at the time of the closing of the 2006-HE3 Transaction, GMACM either (1) knew or should have known that its representations were materially false because GMACM had not, among other things, determined if the Mortgage Loans were originated "generally in accordance" with its own underwriting guidelines, or (2) had reviewed whether the Mortgage Loans were originated "generally in accordance" with the its underwriting guidelines, had determined that they were not, but nonetheless materially misrepresented to FGIC that the Mortgage Loans were originated "generally in accordance" with those guidelines.

202.    Moreover, GMACM represented to FGIC that, in the case of each loan within the Loan Pool, an underwriter had made an assessment that the borrower had the ability to repay his or her loan, after receiving and reviewing all applicable employment, credit, and property information.  In fact, GMACM was not verifying the ability of borrowers to repay their loans in compliance with its own underwriting guidelines accurately or at all.  As a result, GMACM misrepresented facts that were uniquely within its knowledge.

203.    Additionally, the Prospectus Supplement and MLPA provided to FGIC by GMACM represented that, at closing, only a relatively small percentage (7.61%) of the aggregate principal amount of the Initial Loan Pool would be composed of balloon mortgages, when in fact more than 26% of the aggregate principal amount of the Initial Loan Pool was

comprised of these much higher risk mortgage loans. Indeed, despite providing
representations in the MLPA and the Offering Documents to investors, ratings agencies, and
FGIC that indicated that the Initial Loan Pool would contain approximately 1,292 balloon
mortgage loans, GMACM and its affiliates transferred to the 2006-HE3 Trust more than three
times that number of balloon mortgage loans. As FGIC would later discover as the 2006-HE3
Transaction began to perform poorly, at least 4,309 of the 16,558 Initial Mortgage Loans were
balloon mortgage loans—accounting for more than $226 million of the $862 million
aggregate principal amount of the Initial Loan Pool.

204.    GMACM also misrepresented to FGIC that the weighted average remaining
term to scheduled maturity of the Initial Mortgage Loans at closing was 270 months, when in
fact, GMACM was well aware that the true number was closer to 236 months. Similarly,
despite representing to FGIC that the weighted average original term to scheduled maturity of
the Initial Mortgage Loans was 272 months, GMACM was aware that the actual number was
approximately 238 months.

205.    Moreover, the MLPA (and the I&I Agreement by incorporation) contained
other false and misleading representations about the Mortgage Loans. In particular, GMACM
misrepresented that, as of the closing: (i) the information set forth in the Mortgage Loan
Schedule is true and correct in all material respects; (ii) no Mortgage Loan was 30 days or
more delinquent as of August 1, 2006; (iii) each Mortgage File contains all required
documents and instruments; (iv) the CLTV of each Mortgage Loan did not exceed 100%; and
(v) GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (*i.e.*
the Home Equity Loan Program). The true information regarding these loans—as known by
GMACM—simply could not substantiate GMACM's assurances. In short, no amount of

GMACM promising that the loans met certain standards, despite knowing otherwise, actually made those promises true.

206.    GMACM knew that its representations were materially false and that these false representations were essential to FGIC's decision to issue the Policy on the terms to which FGIC agreed.  GMACM intentionally made these material misrepresentations to induce FGIC to enter into the I&I Agreement and to issue the Policy.

207.    GMACM knew when making the representations and warranties regarding the Mortgage Loans to FGIC prior to FGIC agreeing to issue the Policy that GMACM never intended to honor those representations and warranties, as is evidenced, *inter alia*, by the extraordinary breadth and depth of the problems FGIC has uncovered with respect to the underwriting and characteristics of those loans, the overwhelming number of undisclosed and mis-flagged balloon mortgage loans, and the poor performance of the 2006-HE3 Trust.  In short, in order to induce FGIC to issue the Policy, GMACM represented to FGIC that, if FGIC issued the Policy, GMACM would comply with its contractual representations and warranties, despite knowing that it had not complied—and would not comply—with those very same obligations.

208.    GMACM's repeated fraudulent acts have exposed it to investigations by the DOJ and the SEC, including the receipt of a subpoena served in connection with GMACM's suspected fraudulent origination and underwriting practices, as well as to a multitude of suits and the potential for more litigation to come.

209.    Consistent with this pattern of behavior, GMACM defrauded FGIC into issuing the Policy, through its knowing misrepresentations.

- 67 -

I.      **Ally Bank Aids and Abets GMACM's Fraud**

210.    Ally Bank provided substantial assistance to GMACM in fraudulently inducing FGIC to issue the Policy. In its role as Custodian—for which it received substantial fees—Ally Bank undertook to provide "prompt written notice" to FGIC of any breaches of the representations and warranties in the MLPA that it discovered.

211.    The MLPA, *see supra* at ¶ 152, contained several representations and warranties regarding the characteristics of the underlying Mortgage Loans as well as loans subsequently transferred to the 2006-HE3 Trust. And, as noted, prior to the closing of the 2006-HE3 Transaction, several representatives of Ally Bank received a copy of the MLPA from GMACM.

212.    Furthermore, as an originator of nearly 88% of the Mortgage Loans, Ally Bank was well aware of the true nature of the Loan Pool. As a result of being a key part of the 2006-HE3 Transaction, its affiliate status with GMACM, and receipt by several of its employees of the MLPA, Ally Bank surely must have been aware of the representations and warranties GMACM routinely made to financial guaranty insurers—and did make here to FGIC—regarding the nature of GMACM's business practices and the quality of the mortgage loans that collateralized its many RMBS transactions, including the 2006-HE3 Transaction.

213.    Against this backdrop, Ally Bank represented to FGIC that, if the 2006-HE3 Transaction was consummated, it (Ally Bank) would hold and monitor certain key information and documentation regarding the Mortgage Loans, and would provide notice to FGIC of any breaches by GMACM of which it was aware with respect to GMACM's representations and warranties to FGIC. As must have been known to Ally Bank, those representations and warranties made by GMACM directly concerned the Mortgage Loans, including the 88% of them that Ally Bank itself had originated or acquired. Ally Bank made

- 68 -

these representations to FGIC with full knowledge that GMACM had not complied—and would not comply—with its relevant representations and warranties, and, accordingly, that they were false. By representing to FGIC that it would (a) hold and certify the accuracy of certain key information and documentation regarding the Mortgage Loans, the majority of which it had originated itself, and (b) inform FGIC of any failure by GMACM to comply with its obligations, Ally Bank materially aided GMACM's fraudulent inducement of FGIC to issue the Policy. The issuance of the Policy, which made the 2006-HE3 Transaction possible, inured to the significant financial benefit of Ally Bank, given that it collected substantial fees as Custodian and also perpetuated the market for its loan origination and sales business.

### J.  Ally Financial Aids and Abets GMACM's Fraud

214.    Ally Financial provided substantial assistance to GMACM in fraudulently inducing FGIC to issue the Policy. As the ultimate parent of an intertwined corporate enterprise, the subsidiaries of which were substantially involved in every aspect of Ally Financial's securitization business, Ally Financial was well aware of the true nature of the Mortgage Loans. Moreover, as discussed above, Ally Financial was aware of the representations and warranties GMACM made regarding the nature of GMACM's business practices and the quality of the Mortgage Loans and that such representations and warranties were false.

### K.  GMACM's Breach of Obligations as Servicer

215.    When acting in its capacity as Servicer, GMACM failed in numerous material respects to properly perform its duties to service and administer the Mortgage Loans in accordance with the provisions of the relevant Operative Documents for the 2006-HE3 Transaction, including, but not limited to, its obligations to follow proper servicing procedures.

216.    GMACM had responsibility for the servicing of the Mortgage Loans and
thereby undertook certain related contractual obligations under the I&I Agreement and the
Servicing Agreement with respect to the 2006-HE3 Transaction.  Under the I&I Agreement,
GMACM covenanted that "[a]ll Mortgage Loans will be serviced in all material respects in
compliance with the [Servicing Agreement]."  I&I Agreement § 2.02(l).  Under the Servicing
Agreement, GMACM is liable to FGIC for the servicing and administering of the Mortgage
Loans, and in doing so is required to "follow such collection procedures as shall be normal
and usual in its general mortgage servicing activities and consistent with the procedures the
Servicer employs in servicing all other Mortgage Loans in the servicing portfolio with
characteristics similar to those of the Mortgage Loans."  Servicing Agreement § 3.02(a).

217.    During 2007, the servicing operations of GMACM were integrated into
ResCap.  Following the integration, on information and belief, GMACM breached these
obligations by, among other things, being deficient in its borrower contact, collections, and
loss mitigation standards, and by failing to honor FGIC's contractual rights to information.  In
particular, an onsite review of the Ally Financial servicing arm's headquarters, including
those of GMACM, on March 25, 2009 by FGIC and a third party firm, and subsequent
analysis, revealed inter alia: (i) inadequate call center staffing—staffing unable to handle
increased incoming and outgoing call volumes; (ii) call center staffing turnovers as high as
40% in a single year; (iii) a calling campaign that does not attempt to contact borrowers
through other means when GMACM does not have a viable number or the borrower is
continuously unresponsive to messages left; (iv) a lack of effort to hire personnel to visit the
mortgaged property to discuss loss mitigation strategies with borrowers in default; and (v)
severely infrequent use of alternative loss mitigation strategies as compared to the industry,

GMACM, as servicer, also had an obligation to notify FGIC of any material breaches of representations and warranties, and to cause GMACM, as seller, to repurchase the affected Mortgage Loans.

218.    On information and belief, GMACM has failed to remedy any of its deficient servicing practices.

219.    In addition, GMACM disclosed to FGIC for the first time in March 2009 that it classified loans into one of three categories or "Risk Tiers" under a servicing protocol ("Risk Protocol"). Such an approach was, upon information and belief, part of the further cost-cutting measures implemented under the direction of Ally Financial when all of the servicing operations were integrated.

220.    FGIC was damaged by the use of the Risk Protocol following the Ally-directed integration. Under the Risk Protocol, the timing and frequency of calls made with respect to a loan are determined in accordance with the loan's assigned category or Risk Tier. GMACM disclosed to FGIC that all of the mortgage loans in FGIC-insured, GMACM-serviced transactions (over 90,000 mortgage loans), including all of the Mortgage Loans in the 2006-HE3 Transaction, were placed in the lowest category of risk. For such mortgage loans, regardless whether they were (i) first- or second- lien, (ii) underwritten under less stringent guidelines, or (iii) originated by non-GMAC entities—all of which are factors that require more attentive servicing—delinquent borrowers were called at a later stage of delinquency and less frequently than loans in higher risk categories. As the purchaser of the Mortgage Loans, however, GMACM clearly knew that such Mortgage Loans, by their very nature, required particularized servicing before the implementation of the Risk Protocol. The Mortgage Loans were therefore knowingly miscategorized and neglected, and intentionally

received much less care than if they had been properly categorized and appropriately serviced. Consequently, the failure by GMACM to ensure that the Mortgage Loans were serviced and administered in accordance with "procedures as shall be normal and usual in its general mortgage servicing activities" constitutes a breach of the Servicing Agreement and the I&I Agreement. *See* Servicing Agreement § 3.02(a); I&I Agreement § 2.02(l).

221.    On July 8, 2009, FGIC requested: (1) additional information concerning the various Risk Tiers generally, and (2) documentation in order to assess whether or not FGIC was being harmed as a result of being placed in the lower risk tier. To date, GMACM has failed to provide such information in breach of Section 2.02(c)(v) of the I&I Agreement.

**L.    Ally Financial's Domination and Control of its Subsidiaries Results in an Integrated, Single Corporate Enterprise**

222.    As discussed in greater detail below, Ally Financial is the ultimate parent of all of the other Defendants to this action. Ally Financial owns ResCap, which owns GMACM and RFC. Ally Financial—as the ultimate parent of ResCap, GMACM, Ally Bank, and RFC—has the practical ability, which it has repeatedly and admittedly exercised, to direct and control the actions of its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC.

223.    As also discussed below, Ally Financial has exercised such domination and control over its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC. Ally Financial exercised its direction and control in connection with the 2006-HE3 Transaction. At times, Ally Financial performed such direction and control by using ResCap as an instrument to effect its goals.

224.    As mentioned above, Ally Financial has recently admitted to the Federal Reserve Board and FDIC that it "indirectly owns and controls . . . numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC . . . ('ResCap'), and its

direct and indirect subsidiaries." *See* Consent Order, *In the Matter of Ally Financial Inc., et al.*, FRB Docket No. 11020-B-HC (Apr. 13, 2011) (emphasis added).

225.    As further discussed below, Ally Financial's public statements and actions at or around the time of the Transaction's close until present, also demonstrate that Ally Financial: (i) owns a majority of its subsidiaries' stock; (ii) shares resources, management and employees with its subsidiaries; (iii) considers its mortgage businesses to be "units" of its business; and (iv) has a business relationship with its subsidiaries designed to benefit itself at the expense of its subsidiaries.

### (1)    Evidence of Ally Financial's Domination of GMACM Directly and Indirectly Through its Control of ResCap

226.    From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap as an extension of itself, rather than a subsidiary whose dealings were at arm's length.

227.    ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly-owned subsidiaries—were transferred to it in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

228.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

229.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its

subsidiaries." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005 Operating Agreement").

230.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business.  This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants, such as FGIC.

231.    On December 1, 2006, Ally Financial, had its inaugural conference call with investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations, "welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global financial services company."  On the same investor call, Eric Feldstein, Ally Financial's then CEO, demonstrated how Ally Financial was going to take initial steps to actively control its subsidiaries.  For instance, Feldstein declared that one of Ally Financial's first acts as controlling parent was "to integrate certain of GMAC mortgage operations . . . with RFC operations . . . to drive some cost efficiencies."  *Id.*

232.    At all times since Ally Financial caused ResCap to be incorporated, it has owned 100% of ResCap.[1]  Since incorporation, the ownership of ResCap has not changed—

---

[1] GM had created a shell company, GMAC Mortgage Group Inc., which was the direct parent of ResCap. However, there is no indication that this company conducted any business independent from Ally Financial.  In fact, Ally Financial's first Annual Report as an independent entity, which was filed with the SEC on March 3, 2007, included a corporate hierarchy chart that evidenced Ally Financial's corporate structure.  There was a direct line from Ally Financial to ResCap.  *See* Ally Fin. Form 10-K, at 2 (March 3, 2007).  In addition, there is no indication that Ally Financial ever discusses ResCap as an "indirect subsidiary."  To the contrary, as discussed, below, Ally has publicly stated on numerous occasions that it is the owner of ResCap.

Ally Financial still "owns 100% of ResCap . . . ." Ally Financial Earnings Call dated Nov.

2011, statement by Michael Carpenter, Ally Financial's CEO.

233.     Ally Financial has continued to exert its domination and control over ResCap

via shared resources, management and employees.  For example, Ally Financial and ResCap

shared at least three common board members, including two individuals who were active

participants with respect to the intertwined relationship between Ally Financial and ResCap:

(1) ResCap's chairman and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's

CFO and a director of ResCap, Sanjiv Khattri.  In fact, the 2005 Operating Agreement,

between ResCap and Ally Financial, which Ally Financial filed with the SEC, and which

upon information and belief is still currently in effect, "require[s] that [ResCap's] board of

directors include at least two independent directors, to be selected by GMAC."  Proposed

Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (emphasis added).

234.     Moreover, on April 26, 2007, "ResCap Investor Relations" announced the

release of Ally Financial's 2007 first quarter financial results to investors in an email bearing

the ResCap logo.  That announcement stated that Ally Financial's financial results were found

on both Ally Financial's and ResCap's websites.

235.     Moreover, David C. Walker, as discussed above, has served as Vice President

of GMAC Group and CFO of GMAC Mortgage Group, and as of September 29, 2005, was a

director at ResCap, GMACM, RFC, and RAMP, among other Ally Financial subsidiaries.

236.     Similarly, as noted above, William F. Muir, Ally Financial's President, has

also served as President and Chairman of the Board of IB Finance Holding Company, LLC—

the direct parent of Ally Bank—and as a director of Ally Bank.

237.    Ally Financial's domination and control of its subsidiaries, and in particular its use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who, according to publicly available information, has served as in-house counsel at Ally Financial since October 2006.  According to an e-mail sent from ResCap to FGIC, Ruckdaschel has served as "internal legal counsel for all [] securitizations" since at least May 2008.  Although purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using a ResCap e-mail address.  Further, an employee of ResCap specifically instructed FGIC that all "official letters" regarding several Ally Financial subsidiaries—including  GMACM, RFC, RAMP, and others—should be sent not to the relevant (and supposedly independent) subsidiary, but rather to Ruckdaschel, Ally Financial's internal counsel.  Additionally, Ruckdaschel—using his Ally Financial e-mail address—received correspondence relating to the Operative Documents at issue in this Transaction.

238.    In this Transaction, Ruckdaschel was included by GMACM's counsel on key correspondence regarding the repurchase of the undisclosed and misidentified balloon mortgage loans.

239.    As further evidence of Ally Financial's domination over ResCap, the 2005 Operating Agreement also indicates that Ally Financial has expressly "restrict[ed] ResCap's ability to declare dividends or prepay subordinated indebtedness owed to [Ally Financial] or its other affiliates."  *See id.*

240.    Conversely, Ally Financial has also agreed to directly pay the losses or expenses of ResCap.  In the same 2005 Operating Agreement, Ally Financial stated that it would stand behind ResCap and "indemnify, defend and hold [ResCap] harmless from and

against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." *Id.*

241.    Ally Financial has continued to make additional public statements that further demonstrate its willingness to support and fund ResCap.  For instance, in May 2007, during an investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take whatever reasonable efforts that need to be done to maintain [ResCap's] earnings." Ally Financial's Q1 2007 Earnings Call at 24 (May 2, 2007).  Khattri pointed to the fact that "the [Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of equity when it was appropriate . . . ."  Ally Financial's Q2 2007 Earnings Call at 9 (July 30, 2007).  Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part of our plan and a key part of our value creation."  *Id.* (emphasis added).  Thus, Ally Financial's senior management assured the market that Ally Financial was supporting ResCap for the purposes of Ally Financial's own "value creation."

242.    The financial support Ally Financial gave to ResCap began as far back as May 2005 and has persisted over many years.  Upon information and belief, Ally Financial continued to prop up ResCap, an undercapitalized entity, by channeling capital and liquidity into ResCap even as its condition continued to deteriorate as the housing market crashed.  In addition to the direct financial support Ally Financial contributed to ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally Financial announced to the market that it renewed a funding facility with Citibank, which provided "funding of up to $13.8 billion."  Ally Fin. Inc., Form 8-K (Sept.

19, 2008).  A portion of such funding was specifically earmarked for "mortgage assets across the [Ally Financial] and [ResCap] businesses."  *Id.*

243.     Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily dependent on [Ally Financial] and its affiliates for funding and capital support."  Ally. Fin. Inc., Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

244.     Additionally, Annual Reports prepared by Ally Financial further note its pursuit of strategic alternatives with ResCap, and highlight the extent to which Ally Financial manipulated its control over its subsidiaries to enhance its own financial health.  According to Ally Financial: "On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy GMAC's current and future liquidity, we decided to pursue strategic alternatives with respect to ResCap and committed to a plan . . . related to management's intent to sell certain ResCap related assets and businesses. . . .   In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions . . . [that we believe] should minimize the impact of any significant future losses related to ResCap's legacy mortgage business . . . ."  Ally Fin. Inc., Annual Report (Form 10-K), at 3-4 (Feb. 26, 2010).

245.     There is also substantial evidence that billions of dollars of TARP funds meant to stabilize Ally Financial were given to ResCap by Ally Financial.  See TARP Report dated March 10, 2010, at 41, 44 (hereinafter "TARP Report").  Upon information and belief, the TARP funds were commingled among a variety of entities within Ally Financial's mortgage family, including ResCap.

246.     Further, Ally Financial has established a "Mortgage Repurchase Reserve" to account for the potentially significant liabilities stemming from repurchase demands made on

its mortgage-related subsidiary business units.  The balance of the Mortgage Repurchase

Reserve was $825 million as of the fourth quarter of 2011.  *See* Ally Financial's Q4 2011

Earnings Presentation at 16.  Although these repurchase demands are generally made on Ally

Financial's subsidiaries—such as GMACM—in discussing the reserve on an earnings call,

Ally Financial CFO Jim Mackey made clear that it was Ally Financial that was recording

"repurchase expense[s]" related to mortgages, as he stated that Ally Financial "had lower

mortgage repurchase expense of $44 million."  Ally Financial's Q4 2011 Earnings Call at 4

(Feb. 2, 2012).

247.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on

Ally Financial's third quarter 2011 earnings call, Mackey further described losses attributable

mortgage loan repurchases as belonging to Ally Financial, when he stated:  "<u>Our</u> mortgage

repurchase reserve is [as it then stood] $829 million . . . .  <u>Our</u> loss experience improved

during the quarter due to the fact that we had fewer mortgage insurance rescission payments

that we experienced last quarter and that did not repeat this quarter."  Ally Financial's Q3

2011 Earnings Call at 6 (Nov. 2, 2011) (emphases added).  On the same call, Ally Financial

CEO Carpenter explained that "<u>we</u> have routinely repurchased problem loans voluntarily and

by contract . . . ."  *Id.* at 8 (emphasis added).

248.    Additionally, as discussed above, Ally Financial recorded a $230 million

charge in the fourth quarter of 2011, $212 million of which was recorded at its controlled

subsidiary, ResCap.  As a result of the penalties assessed against ResCap by government

regulators, and the fact that ResCap failed to maintain sufficient tangible net worth to comply

with the requirements of the terms of certain credit facilities, Ally Financial propped up its

subsidiary ResCap with a $197 million capital contribution in the form of intercompany debt

forgiveness.  *See* Ally Fin. Inc., Form 10-K, at 31-32 (Feb. 28, 2012).

### (2) Ally Financial Has Disregarded Corporate Formalities and Treated Its Businesses as a Single Enterprise

249.    Ally Financial describes its subsidiaries as its own business units rather than

separate and distinct entities.  For example, Ally Financial declares, in a section of its website

specifically intended to inform investors, that GMACM is a "business unit" of Ally Financial,

rather than an indirect subsidiary owned by ResCap.  *See* Ally Financial Website, Ally Home

> About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last

visited Dec. 9, 2011).

250.    In line with Ally Financial's current classification of its mortgage businesses as

"units" of Ally Financial, it has consistently been involved in the day-to-day operations of its

subsidiaries.  For example, at least one individual, who was identified at various times as

being a GM and/or Ally Financial employee, was on the working group list for transactions

involving ResCap subsidiaries that FGIC insured, including this Transaction.  He was

included on communications surrounding the deal document drafting processes from

commencement to close.  Such communications sent to him concerned both the negotiation of

the various Operative and Offering Documents, as well as the final executed versions of the

Operative and Offering Documents, including the fraudulent representations, warranties, and

affirmative covenants that are at issue in this action.

251.    The origination and securitization of mortgage loans by ResCap and its

subsidiaries have long been integral parts of Ally Financial's core business.  In its 2006

Annual Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading

real estate finance company focused primarily on the residential real estate market.  <u>Our</u>

business activities include the origination, purchase, servicing, sale and securitization of residential mortgage loans." GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007) (emphasis added). Ally Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy." *Id*. at 5 (emphasis added).

252.   Ally Financial continued to publicly report on its own business and that of its subsidiaries in later filings on an integrated basis: "We engage in the origination, purchase, servicing, sale, and securitization of consumer (i.e., residential) mortgage loans and mortgage-related products. Mortgage operations include the Residential Capital, LLC (ResCap) legal entity, [and] the mortgage operations of Ally Bank . . . ." Ally Fin. Inc., Annual Report (Form 10-K), at 3 (Feb. 26, 2010). More recently, continuing to discuss its various mortgage operations as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading originators of conforming and government-insured residential mortgage loans in the United States. We are one of the largest residential mortgage loan servicers in the United States and we provide collateralized lines of credit to other mortgage originators." Ally Fin. Inc., Annual Report (Form 10-K), at 4 (Feb. 28, 2012)..

253.   Moreover, as discussed above, Ally Financial—at least in the view of certain of ResCap's bondholders—is believed to have stripped assets from its subsidiary.

254.   In addition to the dominance and control Ally Financial exerted over its mortgage units, ResCap also viewed GMACM and RFC as part of its own business. For example, in its investor presentation from 2007, ResCap declares that GMACM and RFC "are owned and *operated* by GMAC Residential Capital Company, LLC [ResCap]." It further states that ResCap "is part of the [Ally Financial] family of companies." As discussed above,

- 81 -

Ally Financial exerted its dominance and control over ResCap.  Upon information and belief, when Ally Financial was not directly controlling GMACM and RFC, it was using ResCap as an instrument to do so.

255.    Ally Financial is currently using its subsidiaries' resources as its own in order to earn favorable ratings by credit rating agencies.  For instance, a report put out by Moody's in November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is evident from that report that Ally Financial obtained such a rating by providing information related to its mortgage units, including GMACM and Ally Bank.  Ally Financial itself is not engaged in the origination business.  Instead, it is using its mortgage units as instruments to obtain favorable ratings.

256.    Such disregard for the corporate form has persisted over time.  For instance, Fitch Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage servicing businesses—which include [GMACM, RFC], and HomeComings Financial Network—have been integrated into" ResCap.  Moreover, Moody's reported that in 2007, "ResCap combined all servicing operations under one servicing entity . . . under common management [and] common systems . . . ."  There is no indication that either RFC or GMACM has ceased operations or been sold to other entities or investors.  Thus, upon information and belief, ResCap has conflated various businesses that currently have extensive third-party contractual relationships, such as the one GMACM has with respect to the 2006-HE3 Transaction as Servicer.

257.    Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference.  For example, Thomas F. Marano, served as an officer of Ally Financial as well as

Chairman and CEO of ResCap. His responsibilities include overseeing the mortgage lending and servicing in ResCap. In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage." Upon information and belief, Marano—in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap—directed and controlled the actions of GMACM and RFC.

258.     In another example, Larry Hipp, a member of ResCap's Risk Analyst/Investor Repurchase Department, communicated with FGIC regarding rescission requests using an Ally Financial email address, but in those very same emails, lists his ResCap contact information, including a ResCap email address. In addition, Ally Financial/ResCap used to send FGIC secure communications bearing a "GMAC ResCap" header, but those secure communications now have an Ally Financial header.

259.     A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans. He was asked the following questions at his deposition:

> Q:     Could you please state your name for the record.
> A:     My name is Jeffrey Stephan.
> Q:     Okay. And who do you work for?
> A:     GMAC, LLC [Ally Financial].
> Q:     And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?
> A:     GMAC, LLC – I'm trying to think of the word to use – the most recent name.
> Q:     Okay.
> A:     It's GMCA [sic] Mortgage Corporation.
> Q:     Okay.
> A:     I'm not sure how you would word that.
> Q.     Okay. So are they -- does GMAC, LLC -- now has that basically taken over these other entities --
> A.     Yes.
> Q.     -- that formerly existed?

| A. | Yes. |
|---|---|
| Q. | So these entities no longer currently exist? |
| A. | Right. |
| Q. | Okay.  And how long then have you been employed by GMAC, LLC? |
| A. | Five years. |

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, 4:25-5:22, Dec. 10, 2009, Case No.

50 2008 CA 040805, (15th Cir. Ct., Palm Beach, Fl.).

## M.    FGIC's Contractual Remedies Under The I&I Agreement

260.    The I&I Agreement provides FGIC with broad remedies for GMACM's

breaches of its representations and warranties.  The breadth of these remedies provided further

material inducement for FGIC to issue the Policy.  Specifically, Section 5.02(b) of the I&I

Agreement provides:

> Unless otherwise expressly provided, no remedy herein conferred
> or reserved is intended to be exclusive of any other available
> remedy, but each remedy shall be cumulative and shall be in
> addition to other remedies given under this Insurance Agreement,
> the Indenture, or existing at law or in equity.

261.    Moreover, the I&I Agreement provides that, upon an "Event of Default"—

which is defined to include when "[a]ny representation or warranty" made by GMACM in the

I&I Agreement or the Operative Documents is materially untrue or incomplete—FGIC can

"take whatever action at law or in equity as may appear necessary or desirable in its judgment

to collect the amounts, if any, then due under [the I&I Agreement] or any other Operative

Document or to enforce performance and observance of any obligation, agreement or

covenant of [GMACM]."  I&I Agreement §§ 5.01(a), 5.02(a)(vi).

262.    In addition, GMACM agreed:

> to pay,  and  to protect,  indemnify  and  save  harmless
> [FGIC] . . . from and against, any and all claims, losses, liabilities
> (including penalties), actions, suits, judgments, demands, damages
> costs or expenses (including reasonable fees and expenses of
> attorneys . . . ) of any nature arising out of or relating to the breach

by GMACM . . . of any of the representations or warranties contained in Section 2.01 [of the I&I Agreement] or arising out of or relating to the transactions contemplated by the Operative Documents . . . .

I&I Agreement § 3.04(a).

263.    Moreover, consistent with its obligation to select Mortgage Loans that met its published criteria, GMACM agreed to repurchase or substitute Mortgage Loans that did not conform to GMACM's representations and warranties, and to indemnify FGIC for claims and losses arising from GMACM's breach of any representation or warranty.  *See* I&I Agreement § 3.03(b), 3.04(a).

## FIRST CAUSE OF ACTION

**(As Against Ally Financial, ResCap, GMACM: Declaratory Relief Regarding GMACM's Indemnification Obligations)**

264.    FGIC re-alleges and incorporates by reference paragraphs 1 through 263 of this Complaint.

265.    The I&I Agreement is a valid and binding agreement between the parties.

266.    FGIC has performed its obligations under the I&I Agreement.

267.    GMACM's representations and warranties were material to FGIC's decision to insure the 2006-HE3 Notes and to issue the 2006-HE3 Policy.

268.    GMACM's pervasive and material breaches of its representations and warranties, from the very inception of the Transaction and in the years since, constitute a material breach of the I&I Agreement that has deprived FGIC of the purpose of the parties' bargain.

269.    Pursuant to Section 3.04(a) of the I&I Agreement, GMACM must indemnify FGIC for any and all claims, losses, liabilities, demands, damages, costs or expenses of any nature arising out of or relating to the breach by GMACM of any of the representations or

warranties contained in Section 2.01 of the I&I Agreement or arising out of or related to the transactions contemplated by the related Operative Documents by reason of, among other things: (i) the breach by GMACM of any representation, warranty, or covenant under any of the related Operative Documents; or (ii) any untrue statement or alleged untrue statement of a material fact contained in the related Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

270.     As explained above, GMACM has breached numerous representations, warranties, and covenants in the 2006-HE3 Offering and Operative Documents. These breaches have caused FGIC to pay claims and to incur losses, costs, and expenses; and it will continue to do so.

271.     Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

272.     FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM must jointly and severally indemnify and reimburse FGIC for all sums arising out of the 2006-HE3 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the 2006-HE3 Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the 2006-HE3 Policy as and when such sums fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the I&I Agreement or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and an order giving effect to such indemnification.

273.     In addition, FGIC seeks a declaration that GMACM must indemnify FGIC for

all sums arising out of the 2006-HE3 Transaction for which FGIC has or will become liable,

and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the

2006-HE3 Policy and to the payment of all future amounts that may fall due or claims that

may be presented for payment by FGIC under the 2006-HE3 Policy as and when such sums

fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches

of the representations, warranties, and covenants of the I&I Agreement or any of the related

Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and an

order giving effect to such indemnification.

## SECOND CAUSE OF ACTION

**(As Against Ally Financial, ResCap, GMACM: Fraudulent Inducement — I&I Agreement)**

274.     FGIC re-alleges and incorporates by reference paragraphs 1 through 273 of this

Complaint.

275.     GMACM induced FGIC to enter into the I&I Agreement and to issue the

Policy by making false representations and warranties about its business practices and the

Mortgage Loans, and by agreeing to broad remedies (including indemnification) for any

breach of those representations and warranties.

276.     As explained above, GMACM knowingly made materially false statements to

FGIC and/or omitted material facts from its statements to FGIC, with the intent to induce

reliance by FGIC.

277.     GMACM intended for FGIC to rely on GMACM's material false statements

and/or omissions.  FGIC had no reason to believe that GMACM's representations were false,

and reasonably and justifiably relied on GMACM's material false statements and/or omissions

regarding information uniquely in the possession of GMACM when it decided to enter into

the I&I Agreement and to issue the Policy for the 2006-HE3 Notes.

278.    As a result of GMACM's material false statements and omissions, FGIC

entered into the I&I Agreement, issued the Policy, and thereby agreed to insure Notes backed

by a pool of Mortgage Loans that was, in actuality, materially different from the Loan Pool

that GMACM represented would collateralize the 2006-HE3 Transaction.

279.    Ally Financial, acting directly and/or indirectly through ResCap, directed

GMACM's actions as set forth in this cause of action.

280.    As a result of GMACM's material false statements and material omissions

from its statements, FGIC has been damaged and will continue to be damaged in an amount to

be determined at trial.

281.    GMACM, ResCap and Ally Financial are jointly and severally liable for such

damages.

282.    Alternatively, GMACM is liable for such damages.

### THIRD CAUSE OF ACTION

**(As Against Ally Financial and Ally Bank:
Aiding and Abetting Fraudulent Inducement — I&I Agreement)**

283.    FGIC re-alleges and incorporates by reference paragraphs 1 through 282 of this

Complaint.

284.    As explained above, Ally Financial provided substantial assistance to its

subsidiary GMACM in fraudulently inducing FGIC to enter the I&I Agreement and issue the

Policy.

285.    GMACM could not have perpetrated its fraudulent scheme against FGIC

without the substantial assistance of Ally Financial.

286.     Ally Financial knew that GMACM fraudulently induced FGIC to issue the Policy for the 2006-HE3 Transaction.

287.     Ally Financial's statements materially aided GMACM's fraudulent inducement.

288.     As a result of Ally Financial's aiding and abetting GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

289.     Moreover, as explained above, Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently inducing FGIC to issue the Policy.

290.     Ally Bank originated nearly 88% of the Mortgage Loans (amounting to over $500 million in loans), which form a substantial part of the collateral for the 2006-HE3 Transaction. Ally Bank was therefore aware of the characteristics of the Loan Pool. Ally Bank was also an affiliate of GMACM, received a copy of the MLPA, and served as Custodian of the 2006-HE3 Transaction, for which it received substantial fees. As such, Ally Bank was aware of the material misrepresentations GMACM had made to FGIC to fraudulently induce FGIC to issue the Policy. Ally Bank further represented to FGIC that it would undertake duties to monitor and certify the accuracy and completeness of the Mortgage Loan files, as well as inform FGIC of failures by GMACM to comply with its obligations under the Operative Documents. Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would not comply—with its representations and warranties.

291.     Ally Bank's representations to FGIC materially aided GMACM's fraudulent inducement of FGIC to issue the Policy.

292.     As a result of Ally Bank's aiding and abetting of GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Contract—Representations, Warranties, and Affirmative Covenants)

293.     FGIC re-alleges and incorporates by reference paragraphs 1 through 292 of this Complaint.

294.     The I&I Agreement is a valid and binding agreement between the parties.

295.     FGIC has performed its obligations under the I&I Agreement.

296.     As explained above, GMACM has materially breached its representations and warranties and affirmative covenants under Sections 2.01 and 2.02 of the I&I Agreement.

297.     Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

298.     As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

299.     GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

300.     Alternatively, GMACM is liable for such damages.

## FIFTH CAUSE OF ACTION

### (As Against Ally Bank: Breach of Custodial Agreement)

301.     FGIC re-alleges and incorporates by reference paragraphs 1 through 300 of this Complaint.

302.     The Custodial Agreement is a valid and binding agreement between the parties thereto.

303. FGIC is an express third party beneficiary of the Custodial Agreement.

304. As explained above, Ally Bank has materially breached its obligations under Sections 2.1, 2.2, and 2.3 of the Custodial Agreement.

305. Ally Financial, acting directly and/or indirectly through ResCap, directed Ally Bank's actions as set forth in this cause of action.

306. As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and GMACM: Breach of Repurchase Obligation)**

307. FGIC re-alleges and incorporates by reference paragraphs 1 through 306 of this Complaint.

308. The I&I Agreement is a valid and binding agreement between the parties.

309. FGIC has performed its obligations under the I&I Agreement.

310. Pursuant to the terms of the I&I Agreement, and the provisions of the MLPA incorporated therein, FGIC has demanded that GMACM repurchase non-complying Mortgage Loans, including the more than 3,000 illegitimately included and undisclosed balloon mortgage loans. GMACM has refused to repurchase numerous non-conforming Mortgage Loans and all of the excess balloon mortgage loans.

311. GMACM has breached the I&I Agreement, and the provisions of the MLPA incorporated therein, by failing to repurchase any and all Mortgage Loans that violated GMACM's representations and warranties.

312. Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

313.    As a result of these breaches of contract, FGIC has been damaged and will
continue to be damaged in an amount to be determined at trial.

314.    GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

315.    Alternatively, GMACM is liable for such damages.

## SEVENTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and GMACM: Breach of Contract – Declaratory
Relief Regarding Access to Information)**

316.    FGIC re-alleges and incorporates by reference paragraphs 1 through 315 of this
Complaint.

317.    The I&I Agreement is a valid and binding agreement between the parties.

318.    FGIC has performed its obligations under the I&I Agreement.

319.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreement, GMACM agreed to
permit FGIC, upon its reasonable request, to (i) inspect the books and records of GMACM;
(ii) discuss the affairs, finances and accounts of GMACM with GMACM's Chief Financial
Officer; and (iii) discuss the affairs, finances and accounts of GMACM with GMACM's
independent accountants.

320.    On December 8, 2011, FGIC made a reasonable written request that GMACM
permit FGIC or its authorized agent to conduct an inspection of the books and records of
GMACM, as well as permit FGIC to (i) discuss the affairs, finances and accounts of GMACM
with the Chief Financial Officer of GMACM, and (ii) with GMACM's consent, which
consent shall not be unreasonably withheld or delayed, discuss the affairs, finances, and
accounts of GMACM with GMACM's independent accountants.

321.    GMACM has failed to make available such persons or to produce such information.

322.    GMACM has failed to comply with its contractual obligations and breached the I&I Agreement by failing to make available the persons requested or to provide the information requested pursuant to the I&I Agreement, Section 2.02(e)(i)-(iii).

323.    Pursuant to Section 2.02(c)(v) of the I&I Agreement, GMACM agreed to furnish to FGIC, promptly upon request, such data as FGIC may reasonably request.  Further, pursuant to Section 7.01(a) of the Servicing Agreement, to which FGIC is an express third-party beneficiary and the provisions of which are incorporated by reference into the I&I Agreement, GMACM agreed to provide information regarding the Mortgage Loans to, and otherwise cooperate with, the successor servicer of the 2006-HE3 Transaction.

324.    GMACM has failed to comply with its contractual obligations and breached the I&I Agreement and Servicing Agreement by failing to make available to FGIC and/or the successor servicer the Mortgage Loan files and other related material information.

325.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

326.    Accordingly, FGIC seeks a declaration that GMACM has failed to comply with Sections 2.02(e)(i)-(iii) and 2.02(c)(v) of the I&I Agreement and Section 7.01(a) of the Servicing Agreement, and an order requiring GMACM to promptly remedy those breaches and therefore comply with FGIC's and/or the successor servicer's requests and notices to GMACM pursuant to the relevant provisions, as detailed above.

### EIGHTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and GMACM: Breach of Servicer Obligations)**

327.     FGIC re-alleges and incorporates by reference paragraphs 1 through 326 of this Complaint.

328.     The I&I Agreement is a valid and binding agreement between the parties.

329.     FGIC has performed its obligations under the I&I Agreement.

330.     Moreover, as explained above, GMACM has breached its affirmative covenant under the I&I Agreement to have serviced all Mortgage Loans in all material respects in compliance with the Servicing Agreement.

331.     GMACM's breaches of the I&I Agreement has caused substantial harm and damages to FGIC, in an amount to be proved at trial, but at a minimum including substantially higher claims on Policies and other losses and expenses.

332.     Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

333.     As a result of this breach of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

334.     GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

335.     Alternatively, GMACM is liable for such damages.

### NINTH CAUSE OF ACTION

**(As Against Ally Financial, ResCap, and GMACM: Declaratory Relief)**

336.     FGIC re-alleges and incorporates by reference paragraphs 1 through 335 of this Complaint.

337.    As discussed above, Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this complaint.

338.    For the reasons set forth in paragraphs 222 through 259, among others, Ally Financial, ResCap, and GMACM were and continue to be alter egos of each other.

339.    FGIC has been damaged as a result of the actions Ally Financial, ResCap and GMACM.

340.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM were and continue to be alter egos of each other, and therefore are jointly and severely liable for each other's liabilities.

## TENTH CAUSE OF ACTION

### (As Against GMACM: Attorneys' Fees and Costs)

341.    FGIC re-alleges and incorporates by reference paragraphs 1 through 340 of this Complaint.

342.    The I&I Agreement is a valid and binding agreement between the parties.

343.    FGIC has performed its obligations under the I&I Agreement.

344.    Pursuant to Section 3.03(c) of the I&I Agreement, GMACM agreed to reimburse FGIC for any and all costs or expenses "including reasonable attorneys' . . . fees and expenses" in connection with the enforcement, defense or preservation of any rights in respect of any of the Operative Documents. Further, pursuant to Section 3.04(a) of the I&I Agreement, GMACM agreed to pay FGIC any and all costs or expenses "including reasonable fees and expenses of attorneys" arising out of or relating to the breach by GMACM of any of the representations or warranties contained in Section 2.01 of the I&I Agreement or arising out of or relating to the 2006-HE3 Transaction.

345.    FGIC has incurred and will continue to incur substantial costs and expenses, including but not limited to attorneys' fees in filing and prosecuting this lawsuit, arising out of GMACM's failure to provide Mortgage Loan files, Servicing Reports, and financial information and its breach of the representations and warranties contained in Section 2.01 of the I&I Agreement and other representations, warranties, and its covenants within the Operative Documents, such as Section 2.02 of the I&I Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Financial Guaranty Insurance Company demands judgment in its favor and against defendant GMAC Mortgage Company, LLC, with respect to (1), (2), (4) through (6), and (8) through (12) below, and in its favor and against Residential Capital, LLC, with respect to (1), (2), (4) through (6), (9), (11), and (12) below, and in its favor and against Ally Bank, with respect to (3), (7), and (12) below, and in its favor and against Ally Financial, Inc., with respect to (1) through (6), (9), (11), and (12) below, and the following relief:

(1)    A declaration that, pursuant to GMACM's obligations under the I&I Agreement, GMACM must solely and/or Ally Financial, ResCap, and GMACM must jointly and severally reimburse and indemnify FGIC for all sums arising out of the 2006-HE3 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate reimbursement: (i) for all sums it has paid to date under the Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the Policy as and when such sums fall due or such claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the I&I Agreement or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and (iv) an order giving effect to that declaration;

(2)    Further or alternatively, an award of all legal, rescissory, equitable and punitive damages, to be proven at trial, for GMACM's fraudulent inducement of FGIC to enter into the 2006-HE3 Transaction and to issue the Policy;

(3)    Further or alternatively, an award of all legal, rescissory, equitable, and punitive damages, to be proven at trial, for Ally Financial's and Ally

Bank's aiding and abetting of GMACM's fraudulent inducement of FGIC to enter into the 2006-HE3 Transaction and to issue the Policy;

(4)     Further or alternatively, an award of all legal, rescissory, and equitable damages, to be proven at trial for GMACM's material breaches of the 2006-HE3 Transaction;

(5)     Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's pervasive and material breaches of its representations, warranties, and affirmative covenants, which constitute material breaches of the I&I Agreement and frustration of the parties' bargain, including, but not limited to, those in respect of the more than 3,000 misidentified and undisclosed balloon mortgage loans;

(6)     Further or alternatively, a declaration that GMACM must repurchase all Mortgage Loans that are in breach of GMACM's representations and warranties in the 2006-HE3 Transaction, including, but not limited to, the more than 3,000 misidentified and undisclosed balloon mortgage loans, and an order giving effect to that declaration;

(7)     Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for Ally Bank's material breaches of its obligations under the Custodial Agreement;

(8)     Further or alternatively, a declaration that GMACM must allow FGIC to inspect the books and records of GMACM, to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants; and that GMACM must comply with its obligations to provide FGIC and/or the successor servicer information pertaining to the Mortgage Loan files; and an order giving effect to that declaration;

(9)     Further or alternatively, a declaration that Ally Financial, ResCap, and GMACM are alter egos of each other;

(10)    An award of FGIC's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the I&I Agreement and other Operative Documents, as defined in the I&I Agreement;

(11)    An award of prejudgment interest at the statutory rate; and

(12)    Any other and further relief that the Court deems just and proper.

## JURY DEMAND

FGIC demands a trial by jury for all issues so triable as a matter of right.

Dated: March 6, 2012

JONES DAY

_____

Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
Patrick J. Smith
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*