# Exhibit 93

Confidential

FINANCIAL GUARANTY INSURANCE COMPANY,
as Insurer,


RESIDENTIAL FUNDING CORPORATION
as Master Servicer,


RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,
as Depositor


and


JPMORGAN CHASE BANK, N.A.
as Trustee


INSURANCE AND INDEMNITY AGREEMENT


MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES,
SERIES 2005-RS9


Dated as of November 29, 2005

CONFIDENTIAL

RC00067566

# TABLE OF CONTENTS

*(This Table of Contents is for convenience of reference only and shall not be deemed to be part of this Insurance Agreement. All terms used in this Insurance Agreement and not otherwise defined shall have meanings set forth in Article I of this Insurance Agreement.)*

Page

ARTICLE I DEFINITIONS .................................................................................................1
    Section 1.01.   Defined Terms. ..........................................................................1
    Section 1.02.   Other Definitional Provisions. ..................................................4
ARTICLE II REPRESENTATIONS, WARRANTIES AND COVENANTS................................5
    Section 2.01.   Representations and Warranties..................................................5
    Section 2.02.   Affirmative Covenants of RFC and the Depositor. ...................8
    Section 2.03.   Negative Covenants of RFC and the Depositor....................12
    Section 2.04.   Representations, Warranties and Covenants of the Insurer. .....................13
ARTICLE III THE POLICY; REIMBURSEMENT ................................................................14
    Section 3.01.   Issuance of the Policy. ..........................................................14
    Section 3.02.   Payment of Fees and Premium. ..............................................15
    Section 3.03.   Reimbursement Obligation. ...................................................16
    Section 3.04.   Indemnification. ....................................................................17
    Section 3.05.   Payment Procedure. ..............................................................19
    Section 3.06.   Liability of RFC.....................................................................20
ARTICLE IV FURTHER AGREEMENTS ...........................................................................20
    Section 4.01.   Effective Date; Term of the Insurance Agreement. ..................20
    Section 4.02.   Further Assurances and Corrective Instruments......................20
    Section 4.03.   Obligations Absolute. ............................................................20
    Section 4.04.   Assignments; Reinsurance; Third-Party Rights......................22
    Section 4.05.   Liability of the Insurer. ..........................................................22
ARTICLE V DEFAULTS AND REMEDIES.........................................................................23
    Section 5.01.   Defaults. ................................................................................23
    Section 5.02.   Remedies; No Remedy Exclusive............................................24
    Section 5.03.   Waivers. ................................................................................24
ARTICLE VI MISCELLANEOUS ......................................................................................25
    Section 6.01.   Amendments, Etc....................................................................25
    Section 6.02.   Notices. ..................................................................................25
    Section 6.03.   Severability. ...........................................................................26
    Section 6.04.   Governing Law. .....................................................................26
    Section 6.05.   Consent to Jurisdiction...........................................................27
    Section 6.06.   Consent of the Insurer.............................................................27
    Section 6.07.   Counterparts............................................................................27
    Section 6.08.   Headings. ...............................................................................27
    Section 6.09.   Trial by Jury Waived. ............................................................28
    Section 6.10.   Limited Liability. ...................................................................28
    Section 6.11.   Entire Agreement. ..................................................................28

i

INSURANCE AND INDEMNITY AGREEMENT (as amended, modified or supplemented from time to time, this "Insurance Agreement"), dated as of November 29, 2005, by and among FINANCIAL GUARANTY INSURANCE COMPANY, as Insurer, RESIDENTIAL FUNDING CORPORATION, as Master Servicer, RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC., as Depositor and JPMORGAN CHASE BANK, N.A. as Trustee with respect to the Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS9 (the "Certificates").

## WITNESSETH:

WHEREAS, the Depositor has transferred and assigned its entire interest to the Trustee pursuant to that certain Pooling and Servicing Agreement dated as of November 1, 2005 (as may be amended, modified or supplemented from time to time as set forth therein, the "Pooling and Servicing Agreement") by and among the Depositor, the Master Servicer and the Trustee, for the benefit of the holders of the Certificates, in certain first lien, residential Mortgage Loans (as defined herein). The Pooling and Servicing Agreement also provides for, among other things, the issuance of the Certificates and the servicing of the Mortgage Loans by the Master Servicer;

WHEREAS, the Insurer has agreed to issue the Policy, as provided in Article III of this Insurance Agreement, pursuant to which it will agree to pay in favor of the Trustee for the benefit of the Holders of the Class A Certificates (as defined herein), certain payments in respect of the Class A Certificates;

WHEREAS, the Insurer shall be paid a Premium for the Policy as set forth herein; and

WHEREAS, each of RFC, the Depositor and the Master Servicer has undertaken certain obligations in consideration for the Insurer's issuance of the Policy;

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

### Section 1.01.  Defined Terms.

Unless the context clearly requires otherwise, all capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Policy or, if not defined therein, in the Pooling and Servicing Agreement.  For purposes of this Insurance Agreement, the following terms shall have the following meanings:

"Assignment Agreement" means the Assignment and Assumption Agreement, dated as of November 29, 2005, between RFC and the Depositor.

"Certificates" has the meaning given such term in the recitals to this Insurance Agreement.

- 1 -

CONFIDENTIAL

RC00067568

"Class A Certificates" means collectively, the Class A-I-1, Class A-I-2, Class A-I-3, Class A-I-4 and Class A-II Certificates.

"Closing Date" means November 29, 2005.

"Custodial Agreement" means that certain Custodial Agreement, dated as of November 1, 2005, among the Master Servicer, the Trustee, the Depositor, and Wells Fargo Bank, National Association, as custodian.

"Default" means any Event of Default or any event or circumstance that, with the giving of notice or the lapse of time or both, would result in an Event of Default.

"Depositor" means Residential Asset Mortgage Products, Inc., a Delaware corporation, or any successor thereto.

"Documents" has the meaning given such term in Section 2.01(a)(x) herein.

"Event of Default" means any event of default specified in Section 5.01 of this Insurance Agreement.

"Financial Statements" means, with respect to RFC, the consolidated statements of financial condition as of December 31, 2003 and December 31, 2004 and the statements of operations, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2004 and the notes thereto and the unaudited statement of financial condition of RFC as of September 30, 2005 and the related unaudited statements of operations, stockholders' equity and cash flows for the portion of the fiscal year then ended..

"Holder" has the meanings given such term in the Policy.

"Insurance Agreement" has the meaning given such term in the preamble hereof.

"Insurer" means Financial Guaranty Insurance Company, or any successor thereto, as issuer of the Policy.

"Insurer Information" information in the Offering Document regarding the Insurer and the Policy, which consists solely of the information set forth under the captions "The Certificate Insurer" and "Description of the Certificates — Description of the Certificate Guaranty Insurance Policy" and the financial statements of the Insurer referred to in and incorporated by reference into the Offering Document as of December 31, 2004 and December 31, 2003 and for each of the years in the three-year period ended December 31, 2004, and the unaudited financial statements of the Insurer incorporated by reference in the Offering Document as of September 30, 2005 and for the three-month and nine-month periods ended September 30, 2005.

"Investment Company Act" means the Investment Company Act of 1940, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

CONFIDENTIAL

RC000067569

Confidential

"Late Payment Rate" means the lesser of (a) the greater of (i) the per annum rate of interest publicly announced from time to time by Citibank, N.A. as its prime or base lending rate (any change in such rate of interest to be effective on the date such change is announced by Citibank, N.A.), and (ii) the then applicable highest rate of interest on the Class A Certificates and (b) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days.

"Material Adverse Change" means, in respect of any Person, a material adverse change in the ability of such Person to perform its obligations under any of the Operative Documents, including any material adverse change in the business, financial condition, results of operations or properties of such Person on a consolidated basis with its subsidiaries that might have such effect. References herein to a Material Adverse Change that do not refer to a particular Person mean a Material Adverse Change with respect to either of RFC or the Depositor.

"Moody's" means Moody's Investors Service, Inc., and any successor thereto.

"Mortgage Loans" means the mortgage loans included in the Trust Fund.

"Offered Certificates" means the Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS9, Class A Certificates.

"Offering Document" means the Base Prospectus, dated July 26, 2005, as supplemented by the Prospectus Supplement, dated November 23, 2005, in respect of the Offered Certificates.

"Operative Documents" means this Insurance Agreement, the Certificates, the Assignment Agreement, the Custodial Agreement and the Pooling and Servicing Agreement.

"Person" means an individual, joint stock company, trust, unincorporated association, joint venture, corporation, business or owner trust, partnership or other organization or entity (whether governmental or private).

"Policy" means the Financial Guaranty Insurance Policy, No. 05030145, together with all endorsements thereto, issued by the Insurer in favor of the Trustee, for the benefit of the Holders of the Class A Certificates.

"Pooling and Servicing Agreement" has the meaning set forth in the recitals to this Insurance Agreement.

"Premium" means the premium payable in accordance with the Policy, which shall be payable on each Payment Date in arrears in an amount equal to (A) on the first Distribution Date, an amount calculated by multiplying the Premium Percentage converted to a daily rate by the aggregate initial Certificate Principal Balance of the related Class A Certificates for the number of days from and including the Closing Date to but excluding the first Distribution Date, and (B) for subsequent Distribution Dates, one twelfth of the product of (i) the Premium Percentage and (ii) the aggregate Certificate Principal Balance of the related Certificates on the previous Distribution Date (after giving effect to any distributions of principal to be made on such previous Distribution Date).

Confidential

CONFIDENTIAL

RC00067570

Confidential

"Premium Percentage" shall mean sixteen (16) basis points per annum.

"RFC" means Residential Funding Corporation, a Delaware corporation, as Master Servicer under the Pooling and Servicing Agreement, and includes any successor Master Servicer.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"Securities Act" means the Securities Act of 1933, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Securities Exchange Act" means the Securities Exchange Act of 1934, including, unless the context otherwise requires, the rules and regulations thereunder, as amended from time to time.

"Shortfall Event" means, on any Distribution Date after the first Distribution Date on which the Overcollateralization Amount is equal to or greater than the Required Overcollateralization Amount, the failure of the Overcollateralization Amount to be equal to or greater than 85% of the Required Overcollateralization Amount.

"Transaction" means the transactions contemplated by the Operative Documents, including the transactions described in the Offering Document.

"Trust" means the trust created pursuant to the terms of the Pooling and Servicing Agreement.

"Trust Fund" has the meaning given such term in the Pooling and Servicing Agreement.

"Underwriters" means Bear, Stearns & Co. Inc., Credit Suisse First Boston LLC, Greenwich Capital markets, Inc. and Residential Funding Securities Corporation.

"Underwriting Agreement" means the Underwriting Agreement, dated November 23, 2005 among the Underwriters, or their representative, Bear, Stearns & Co. Inc., and the Depositor with respect to the Offered Certificates, as amended, modified or supplemented from time to time.

**Section 1.02. Other Definitional Provisions.**

The words "hereof," "herein" and "hereunder" and words of similar import when used in this Insurance Agreement shall refer to this Insurance Agreement as a whole and not to any particular provision of this Insurance Agreement. Section, subsection, Schedule and Exhibit references are to this Insurance Agreement unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."

- 4 -

CONFIDENTIAL

RC00067571

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS

### Section 2.01.  Representations and Warranties.

(a)    *Representations and Warranties of RFC and the Depositor.* Each of RFC, in its capacity as Master Servicer, and the Depositor represents and warrants as of the Closing Date, as follows:

(i)    *Due Organization and Qualification.* It is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation. It is duly qualified to do business, is in good standing and has obtained all necessary licenses, permits, charters, registrations and approvals (together, "approvals") necessary for the conduct of its business as currently conducted and as described in the Offering Document and the performance of its obligations under the Operative Documents to which it is a party in each jurisdiction in which the failure to be so qualified or to obtain such approvals would render any Operative Document to which it is a party unenforceable in any material respect or would result in a Material Adverse Change.

(ii)    *Power and Authority.* It has all necessary power and authority to conduct its business as currently conducted and as described in the Offering Document, to execute, deliver and to perform its obligations under, the Operative Documents to which it is a party and to consummate the Transaction.

(iii)    *Due Authorization.* The execution, delivery and performance of the Operative Documents to which it is a party have been duly authorized by all necessary actions and does not require any additional approvals or consents, or other action by or any notice to or filing with any Person, including any governmental entity or any of its stockholders or beneficial owners, as applicable, which it has not previously obtained or given.

(iv)    *Noncontravention.* Its execution and delivery of the Operative Documents to which it is a party, the consummation of the Transaction and the satisfaction of the terms and conditions of the Operative Documents do not and will not:

(1)    conflict with or result in any breach or violation of any provision of its organizational documents or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to it or any of its material properties, including regulations issued by any administrative agency or other governmental authority having supervisory powers over it, which conflict, breach or violation reasonably could be expected to result in a Material Adverse Change;

(2)    constitute a default by it under, result in the acceleration of any of its obligations under, or breach any provision of, any loan agreement, mortgage, indenture or other agreement or instrument to which it is a party or by which any

- 5 -

CONFIDENTIAL

RC00067572

of its properties is or may be bound or affected, which default, acceleration or breach reasonably could be expected to result in a Material Adverse Change; or

     (3)    result in or require the creation of any lien upon or in respect of any of its assets, which lien reasonably could be expected to result in a Material Adverse Change, except as otherwise contemplated by the Operative Documents.

     (v)    *Legal Proceedings*. There is no action, proceeding or investigation by or before any court, governmental or administrative agency or arbitrator against or affecting it or any of its subsidiaries, or any properties or rights of itself or any of its subsidiaries, or any of the Mortgage Loans, either pending or, to its knowledge after reasonable inquiry, threatened, that could, if decided adversely to it or any such subsidiary, result in a Material Adverse Change.

     (vi)    *Valid and Binding Obligations*. The Operative Documents to which it is a party, when executed and delivered by itself and the other parties thereto, will constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and general equitable principles and public policy considerations as to rights of indemnification for violations of federal securities laws. The Class A Certificates, when executed, authenticated and delivered in accordance with the Pooling and Servicing Agreement, will be validly issued and outstanding and entitled to the benefits of the Pooling and Servicing Agreement. So long as no Insurer Default shall have occurred and continued beyond any grace period applicable thereto, it will not at any time in the future deny that the Operative Documents to which it is a party constitute its legal, valid and binding obligations.

     (vii)    *Financial Statements*. RFC has furnished copies of its Financial Statements to the Insurer, (1) those Financial Statements: (i) are, as of the dates and for the periods referred to therein, complete and correct in all material respects, (ii) present fairly its financial condition and results of operations as of the dates and for the periods indicated and (iii) have been prepared in accordance with generally accepted accounting principles consistently applied, except as noted therein (subject as to interim statements to normal year-end adjustments) and (2) since the date of the most recent of those Financial Statements, there has been no Material Adverse Change in respect of RFC.

     (viii)    [RESERVED].

     (ix)    *Taxes*. It has filed prior to the date hereof all federal and state tax returns it is required to have filed, and has paid all taxes, including any assessments received by it that are not being contested in good faith, to the extent that such taxes have become due, except with respect to any failures to file or pay that, individually or in the aggregate, will not result in a Material Adverse Change.

     (x)    *Accuracy of Information*. None of the Operative Documents nor any other material information relating to the Mortgage Loans, the operations of RFC or the

CONFIDENTIAL

RC00067573

Depositor or the financial condition of RFC or the Depositor (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by RFC or the Depositor, including the Offering Documents (other than the Insurer Information) contains any statement of a material fact which was untrue or misleading in any material respect when made. It has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change. Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to RFC or the Depositor that would render any of the Documents untrue or misleading in any material respect.

(xi)     *Compliance with Securities Laws.*  The offering and sale of the Class A Certificates complies in all material respects with all requirements of law, including the registration requirements of the Securities Act and any other applicable securities laws. The Offering Document does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; *provided, however,* that no representation is made with respect to the Insurer Information.  The offering of the Class A Certificates has not been and will not be in violation of the Securities Act or any other federal or state securities laws.

(xii)     *Operative Documents.*  Each of the representations and warranties of RFC and the Depositor contained in the applicable Operative Documents and the Underwriting Agreement is true and correct in all material respects; *provided, however,* that the remedy for any breach of a representation and warranty of RFC in Section 4 of the Assignment Agreement and the remedy with respect to any defective Mortgage Loan or any Mortgage Loan as to which there has been a breach of a representation or warranty under Section 4 or Section 5 of the Assignment Agreement shall be limited to the remedies specified in the Assignment Agreement.

(xiii)     *Solvency; Fraudulent Conveyance.*  It is solvent, and will not be rendered insolvent by the Transaction.  After giving effect to the Transaction, it will not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business.  It does not intend to incur, and does not believe that it has incurred, debts beyond its ability to pay as they mature.  It does not contemplate the commencement of insolvency, liquidation or consolidation proceedings or the appointment of a receiver, liquidator, conservator, trustee or similar official in respect of RFC or the Depositor or any of their respective assets.  The amount of consideration it will receive upon the sale of the Mortgage Loans or the Class A Certificates, as applicable, pursuant to the terms and conditions of the related Operative Documents constitutes reasonably equivalent value and fair consideration for the Mortgage Loans or the Class A Certificates, as the case may be.  It is not entering into the Operative Documents, or transferring any of its assets in connection with the Transaction, with any intent to hinder, delay or defraud any of its creditors.

(xiv)     *Accounting Treatment.* RFC will treat the transfer of the Mortgage Loans pursuant to the Assignment Agreement as a financing in accordance with generally accepted accounting principles.

- 7 -

CONFIDENTIAL

RC00067574

**FGIC–RAMP 2005-RS9**
**Insurance Agreement**

(b) *Representations and Warranties of the Trustee.* The Trustee represents and warrants as of the Closing Date, as follows and covenants with the other parties hereto as follows:

(i) *Due Organization and Qualification.* The Trustee is duly organized, existing and authorized to engage in the business of banking as a New York banking corporation.

(ii) *Due Authorization.* The Trustee has full power, authority and right to execute, deliver and perform the Operative Documents to which it is a party, and has taken all necessary steps to authorize the execution, delivery and performance by it of the Operative Documents to which it is a party.

(iii) *Due Execution.* The Operative Documents to which the Trustee is a party have been duly executed and delivered by the Trustee.

**Section 2.02. Affirmative Covenants of RFC and the Depositor.**

Each of RFC and the Depositor hereby agrees that during the term of this Insurance Agreement, it will comply with the following covenants, unless the Insurer shall otherwise expressly consent in writing:

(a) *Compliance With Agreements and Applicable Laws.* It shall comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party and shall comply with all requirements of any law, rule or regulation applicable to it in all circumstances where non-compliance reasonably could be expected to result in a Material Adverse Change.

(b) *Existence.* Except in the case of a merger or other business combination that is consummated in compliance with the Operative Documents, it will at all times (i) maintain its existence as a corporation or a statutory trust, (ii) be duly organized under the laws of its jurisdiction of incorporation or organization and duly qualified and duly authorized (as described in subsections 2.01(a), (b) and (c) hereof) and (iii) conduct its business in accordance with the terms of its organizational documents.

(c) *Financial Statements; Accountants' Reports; Other Information.* It shall keep or cause to be kept, in reasonable detail, books and records of account of its assets and business relating to the Transaction. RFC will furnish or cause to be furnished to the Insurer:

(i) *Annual Financial Statements.* As soon as available, and in any event within 120 days after the close of each fiscal year, the audited consolidated statement of financial condition for RFC and its subsidiaries as of the end of such fiscal year of RFC and the related audited consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles, consistently applied, and accompanied by the audit opinion of RFC's independent accountants (which shall be a nationally recognized independent public accounting firm or otherwise

- 8 -

CONFIDENTIAL

RC00067575

Confidential

acceptable to the Insurer) and by a certificate relating to such statements equivalent to the certificate required by Section 2.02(a)(ii).

(ii) *Quarterly Financial Statements.* Upon the reasonable request of the Insurer, and as soon as reasonably practicable, the unaudited consolidated statement of financial condition of RFC and its subsidiaries as of the end of the first three quarters of each fiscal year of RFC and the related unaudited consolidated statements of operations, stockholders' equity and cash flows for the portion of the fiscal year then ended, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the preceding fiscal year, prepared in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments); each delivery of quarterly financial statements shall be accompanied by a certificate of one (or more) corporate officers stating that the quarterly financial statements are correct in all material respects and present fairly the financial condition and results of operations of RFC and its subsidiaries as of the dates and for the periods indicated, in accordance with generally accepted accounting principles consistently applied (subject to normal year-end adjustments).

(iii) *Initial Report.* On or before the Closing Date, a copy of the magnetic tape or Mortgage Loan Schedule in the form of an electronic database or spreadsheet file, using database or spreadsheet software that is readily available to the Insurer, to be delivered to the Trustee on the Closing Date setting forth, as to each Mortgage Loan, the information required under the definition of "Mortgage Loan Schedule" in the Pooling and Servicing Agreement, and on each Distribution Date, RFC will ensure that updated Mortgage Loan data is available to the Insurer on RFC's or the Depositor's internet website, including changes to information discovered to have been incorrect.

(iv) *Servicing Reports.* Promptly upon receipt thereof, copies of all schedules, financial statements or other similar reports delivered to or by RFC, the Depositor or the Trustee pursuant to the terms of any of the Operative Documents, including all reports provided to either the Trustee or any Holder pursuant to the Pooling and Servicing Agreement.

(v) *Other Information.* (A) Promptly upon request, such other data as the Insurer may reasonably request relating to the Mortgage Loans, the servicing of the Mortgage Loans (including, without limitation, a detailed accounting on a loan-by-loan basis as to amounts advanced by, sold, pledged or assigned to, and reimbursed to any Advancing Person), the Transaction or the ability of any of RFC or the Depositor to perform its obligations under the Operative Documents, and (B) all information required to be furnished to the Trustee or the Holders, as the case may be.

All financial statements specified in clauses (i) and (ii) of this subsection (c) will be furnished in consolidated form for RFC and all its subsidiaries in the event that RFC consolidates its financial statements with its subsidiaries. To the extent available, the information supplied pursuant to clauses (iii), (iv) or (v) will be in Excel or Word format or another form of an electronic data file accessible by the Insurer by means of standard application software.

Confidential

CONFIDENTIAL

RC00067576

Confidential

(d)    [RESERVED].

(e)    *Access to Records; Discussions with Officers and Accountants.*  On an annual basis, or at any time when a Shortfall Event shall have occurred and be continuing, upon the reasonable request of the Insurer, it will permit the Insurer or its authorized agents, or cause the Insurer or its authorized agents to be permitted:

(i)    to inspect the books and records of RFC or the Depositor as they may relate to the Class A Certificates, its respective obligations under the Operative Documents to which it is a party and the Transaction (including, without limitation, access to information reasonably required for purposes of complying with FASB Financial Interpretation No. 46; provided that the Insurer will maintain confidentiality with respect to such information in accordance with its internal policies);

(ii)    to discuss the affairs, finances and accounts of RFC or the Depositor as they relate to the Mortgage Loans, the Transaction or the ability to perform their respective obligations under the Operative Documents with a Servicing Officer, in the case of RFC, or its responsible officers and employees, in the case of the Depositor; and

(iii)    if the Insurer reasonably believes that a Material Adverse Change may have occurred and with RFC's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of RFC or the Depositor with the independent accountants of such Person; *provided, however*, that officers of RFC shall have the right to be present during such discussions.

In addition, if requested by the Insurer, on an annual basis, or otherwise when reasonably requested by the Insurer, RFC will cause the Custodian to deliver to the Insurer an updated certification, in the form of the "Interim Certification" required under the Custody Agreement, with an exceptions list attached thereto, to enable the Insurer to track the progress of recording of Mortgages and Assignments with respect to the Mortgage Loans.

Such inspections and discussions shall be conducted during normal business hours and shall not unreasonably disrupt the business of RFC or the Depositor, and no such inspections or discussions shall be commenced more frequently than three times in any twelve month period and each shall be concluded within a reasonable period of time after commencement.  The books and records of RFC or the Depositor shall be maintained at the address of RFC designated herein for receipt of notices, except to the extent that RFC shall otherwise advise the parties hereto in writing.

(f)    *Notice of Material Events.*  It will promptly inform the Insurer in writing of the occurrence of any of the following:

(i)    the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation, or the initiation of any proceeding or disciplinary proceeding by or against it that (A) it is required to disclose to the Commission (or that it would be required to disclose to the Commission if the Certificates were registered under the Securities Exchange Act and its reporting obligations under the Securities Exchange Act were not suspended) or to its shareholders

- 10 -

CONFIDENTIAL

RC00067577

Confidential

**FGIC–RAMP 2005-RS9**
**Insurance Agreement**

or beneficial owners that relates to the Mortgage Loans, the Transaction or RFC's or the Depositor's ability to perform its obligations under any Operative Documents or (B) could result in a Material Adverse Change;

      (ii)    the promulgation by any governmental agency of any proposed or final rule (but only if it has actual knowledge thereof) which would likely result in a Material Adverse Change;

      (iii)    any change in its jurisdiction of organization;

      (iv)    the occurrence of any Default or Event of Default or any Material Adverse Change;

      (v)    the commencement of any proceedings with respect to RFC or the Depositor under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for it or any of its assets; or

      (vi)    the receipt by RFC or the Depositor of notice that (A) it is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval materially necessary for the conduct of its business is to be, or may be, suspended or revoked or (C) it is to cease and desist any practice, procedure or policy it employs in the conduct of its business, and such suspension, revocation or cessation may reasonably be expected to result in a Material Adverse Change.

      (g)    *Financing Statements and Further Assurances.*  It will file all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to preserve and protect fully the interest of the Trustee in the Trust Fund.  Upon the reasonable request of the Insurer, from time to time, it will execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, within ten days of such request, such amendments hereto and such further instruments, and will take or cause to be taken such further action, as may be reasonably necessary to effectuate the intention, performance and provisions of the Operative Documents.

      (h)    *Maintenance of Licenses.*  Each of RFC and the Depositor and any successors thereof, has and shall maintain all licenses, permits, charters and registrations the loss or suspension of which, or the failure to hold which, could reasonably be expected to result in a Material Adverse Change.

      (i)    *Retirement of Class A Certificates.*  RFC and the Depositor shall instruct the Trustee upon a retirement or other payment of all of the Class A Certificates, to surrender the Policy to the Insurer for cancellation.

      (j)    *Rating Agencies.*  It and any of its successors will cooperate with S&P and Moody's in connection with any review of the Transaction that may be undertaken by S&P and Moody's after the date hereof.

- 11 -

CONFIDENTIAL

RC00067578

Confidential

(k)    *Third-Party Beneficiary*.  It agrees that the Insurer shall have all rights provided to the Certificate Insurer in the Operative Documents and that the Insurer will constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents and hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer; *provided, however,* that the remedy for any breach of a representation and warranty of RFC in Section 4 of the Assignment Agreement and the remedy with respect to any defective Mortgage Loan or any Mortgage Loan as to which there has been a breach of a representation or warranty under Section 4 or 5 of the Assignment Agreement shall be limited to the remedies specified in the Assignment Agreement.

(l)    *Servicing of Mortgage Loans*.  All Mortgage Loans will be serviced in all material respects in compliance with the Pooling and Servicing Agreement.

(m)    *Due Diligence*.  If in the Insurer's reasonable judgment circumstances so warrant, based on the performance of the Transaction, the Insurer shall have the right, so long as the Class A Certificates remain outstanding, to conduct reviews of RFC's practices as Master Servicer through reviews of the Mortgage Loans, reappraisals of Mortgaged Properties and reviews of servicing practices, at the Insurer's expense and in a reasonable manner convenient to both RFC and the Insurer.  This due diligence right is in addition to the access provided and the other rights provided for in Section 2.02(e) of this Insurance Agreement.

(n)    *Closing Documents; Post Closing Matters*.  The Depositor shall cause to be delivered as soon as possible (but in no event later than 120 days of the Closing Date) two closing sets to the Insurer and one closing set to its counsel, which closing sets may be delivered in electronic form and shall include execution copies of each of the Operative Documents other than the Certificates.

(o)    *Disclosure Document*.  Upon the written direction of the Insurer prior to the delivery of such Offering Document, each Offering Document delivered with respect to the Class A Certificates shall clearly disclose that the Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

**Section 2.03.  Negative Covenants of RFC and the Depositor.**

Each of RFC and the Depositor hereby agrees that during the term of this Insurance Agreement it will comply with the following covenants, unless the Insurer shall otherwise expressly consent in writing:

(a)    *Impairment of Rights*.  It will not take any action, or fail to take any action, if such action or failure to take action may result in a material adverse change as described in clause (i) of the definition of Material Adverse Change, or interfere in any material respect with the enforcement of any rights of the Insurer under or with respect to any of the Operative Documents.  It will give the Insurer written notice when any event, action or, to its knowledge, omission to act, may result in a material adverse change as described in the definition of Material Adverse Change, on the earlier of:  (i) the date upon which any publicly available filing or release is made with respect to such event, action or omission to act and (ii) promptly prior to the date of occurrence of such event, action or failure to act or, if such notice cannot be given at or

Confidential

CONFIDENTIAL

RC00067579

Confidential

before such time, as soon as possible thereafter. It will furnish to the Insurer all information reasonably requested by it that is necessary to demonstrate compliance with this paragraph.

(b)    *Waiver, Amendments, Etc.*  Except as provided in and in accordance with the Operative Documents, it will not modify, waive or amend, or consent to any modification, waiver or amendment of, any of the terms, provisions or conditions of the Operative Documents to which it is a party (other than any amendment to the Offering Document required by law) without the prior written consent of the Insurer thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

### Section 2.04.  Representations, Warranties and Covenants of the Insurer.

The Insurer represents, warrants and covenants to each of RFC, the Depositor and the Trustee as follows:

(a)    *Organization and Licensing.*  The Insurer is duly incorporated, validly existing and in good standing New York as a stock insurance company duly qualified to conduct an insurance business in any jurisdiction where qualification may be necessary to accomplish the Transaction.

(b)    *Corporate Power.*  The Insurer has the corporate power and authority to issue the Policy and execute and deliver this Insurance Agreement and to perform all of its obligations hereunder and thereunder.

(c)    *Authorization; Approvals.*  Proceedings legally required for the issuance and execution of the Policy and the execution, delivery and performance of this Insurance Agreement have been taken and licenses, orders, consents or other authorizations or approvals of any governmental boards or bodies legally required for the enforceability of the Policy and the conduct by the Insurer of the business and activities contemplated by the Transaction have been obtained; any proceedings not taken and any licenses, authorizations or approvals not obtained are not material to the enforceability of the Policy.

(d)    *Enforceability.*  The Policy, when issued, and this Insurance Agreement, will constitute a legal, valid and binding obligation of the Insurer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, receivership and other similar laws affecting creditors' rights generally and to general principles of equity and subject to principles of public policy limiting the right to enforce the indemnification provisions contained therein and herein, insofar as such provisions relate to indemnification for liabilities arising under federal securities laws.

(e)    *Financial Information.*  The balance sheet of the Insurer as of December 31, 2002, and the related statements of income, stockholder's equity and cash flows for those years, and the accompanying notes, together with an opinion thereon of KPMG LLP, independent certified public accountants, a copy of which is incorporated by reference into the registration statement relating to the Offering Document, fairly present in all material respects the financial condition of the Insurer as of such dates and for the periods covered by such statements in accordance with generally accepted accounting principles consistently applied. The balance sheets of the Insurer as of December 31, 2003 and December 31, 2004, and for the year ended December 31, 2004

- 13 -

CONFIDENTIAL    RC00067580

Confidential

and the periods from December 18, 2003 through December 31, 2003, and from January 1, 2003 through December 17, 2003, and the related statements of income and cash flows for the periods, and the accompanying footnotes, together with an opinion thereon of Ernst & Young LLP, independent auditors, a copy of which is incorporated by reference into the registration statement relating to the Offering Document, present fairly in all material respects the financial condition of the Insurer as of such dates and for the periods covered by such statements in accordance with generally accepted accounting principles consistently applied.  The unaudited balance sheet of the Insurer as of September 30, 2005 and the related statements of income for the three-month and nine-month periods ended September 30, 2005 and September 30, 2004, and the related statements of cash flows for the nine-month periods ended September 30, 2005 and September 30, 2004, and the accompanying footnotes, a copy of which is incorporated by reference into the registration statement relating to the Offering Document, present fairly in all material respects the financial condition of the Insurer as of such dates and for the periods covered by such statements in accordance with generally accepted accounting principles consistently applied. Since September 30, 2005, there has been no material change in such financial condition of the Insurer that would materially and adversely affect its ability to perform its obligations under the Policy.

(f)    *Insurer Information.*  The Insurer Information is true and correct in all material respects and does not contain any untrue statement of a material fact.

(g)    *No Litigation.*  There are no actions, suits, proceedings or investigations pending or, to the best of the Insurer's knowledge, threatened against it at law or in equity or before or by any court, governmental agency, board or commission or any arbitrator which, if decided adversely, would materially and adversely affect its ability to perform its obligations under the Policy or this Insurance Agreement.

(h)    *Confidential Information.*  The Insurer agrees that it shall comply with the terms of the Confidentiality Agreement dated September 4, 2000, between RFC and the Insurer.

(i)    *Compliance with Law, Etc.*  No practice, procedure or policy employed, or proposed to be employed, by the Insurer in the conduct of its business violates any law, regulation, judgment, agreement, order or decree applicable to the Insurer that, if enforced, could result in a Material Adverse Change with respect to the Insurer.

## ARTICLE III
## THE POLICY; REIMBURSEMENT

**Section 3.01.  Issuance of the Policy.**

The Insurer agrees to issue the Policy on the Closing Date subject to satisfaction of the conditions precedent set forth below on or prior to the Closing Date:

(a)    [RESERVED];

(b)    *Operative Documents.*  The Insurer shall have received a copy of each of the Operative Documents, in form and substance reasonably satisfactory to the Insurer, duly authorized, executed and delivered by each party thereto;

- 14 -

CONFIDENTIAL

Confidential

(c)    [RESERVED];

(d)    *Representations and Warranties.*  The representations and warranties of RFC and the Depositor made as of the Closing Date and set forth or incorporated by reference in this Insurance Agreement shall be true and correct on and as of the Closing Date as if made on the Closing Date;

(e)    *Opinions of Counsel.*  The law firm of Mayer, Brown, Rowe & Maw LLP shall have delivered its opinion or opinions of counsel substantially in the form previously reviewed by and found acceptable by the Insurer's counsel; the Insurer shall have received such other opinions of counsel, addressed to the Insurer and in form and substance acceptable to the Insurer, addressing such other matters as the Insurer may reasonably request;

(f)    [RESERVED];

(g)    *No Litigation, Etc.*  No suit, action or other proceeding, investigation or injunction, or final judgment relating thereto, shall be pending or threatened before any court, governmental or administrative agency or arbitrator in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with any of the Operative Documents or the consummation of the Transaction;

(h)    *Legality.*  No statute, rule, regulation or order shall have been enacted, entered or deemed applicable by any government or governmental or administrative agency or court that would make the Transaction illegal or otherwise prevent the consummation thereof;

(i)    *Satisfaction of Conditions of the Underwriting Agreement.*  All conditions in the Underwriting Agreement relating to the Underwriters' obligation to purchase the Offered Certificates shall have been satisfied, unless waived by the Underwriters and approved by the Insurer;

(j)    *Issuance of Ratings.*  The Insurer shall have received confirmation that (i) the Class A Certificates are rated at least "BBB-" by S&P and at least "Baa3" by Moody's, without regard to the Policy, and (ii) the Class A Certificates, when issued, will be rated "AAA" by S&P and "Aaa" by Moody's;

(k)    *No Default.*  No Default or Event of Default shall have occurred;

(l)    *Satisfactory Documentation.*  The Insurer and its counsel shall have reasonably determined that all documents, certificates and opinions to be delivered in connection with the Class A Certificates conform to the terms of the Pooling and Servicing Agreement and this Insurance Agreement and the descriptions thereof in the Offering Document.

**Section 3.02. Payment of Fees and Premium.**

(a)    *Legal, Accounting and Due Diligence Fees.*  RFC shall pay or cause to be paid to the Insurer, at the Closing Date, legal fees, due diligence expenses and accounting fees incurred by the Insurer in connection with the issuance of the Policy in an amount equal to $35,000.

- 15 -

CONFIDENTIAL

RC00067582

Confidential

(b)   Premium.

(i)   In consideration of the issuance by the Insurer of the Policy, the Insurer shall be entitled to receive the Premium with respect to that Policy, in the amount set forth herein, as and when due and from the funds specified by Section 4.02 of the Pooling and Servicing Agreement.

(ii)   The Premiums paid under the Pooling and Servicing Agreement shall be nonrefundable without regard to whether the Insurer makes any payment under any Policy or any other circumstances relating to the Class A Certificates or provision being made for payment of the Class A Certificates prior to maturity.

(c)   *Rating Agency Fees.*   RFC shall promptly pay the initial fees of S&P and Moody's with respect to the Class A Certificates and the transaction following receipt of a statement with respect thereto.   All periodic and subsequent fees of S&P or Moody's with respect to, and directly allocable to, the Class A Certificates shall be for the account of, and shall be billed to, RFC.   The fees for any other rating agency shall be paid by the party requesting such other agency's rating unless such other agency is a substitute for S&P or Moody's in the event that S&P or Moody's is no longer rating the Class A Certificates, in which case the fees for such agency shall be paid by RFC.

### Section 3.03.  Reimbursement Obligation.

(a)   As and when due in accordance with and from the funds specified in Section 4.02 of the Pooling and Servicing Agreement, the Insurer shall be entitled to reimbursement for any payment made by the Insurer under the Policy, which reimbursement shall be due and payable on the date that any amount is paid under the Policy, in an amount equal to the amount to be so paid and all amounts previously paid that remain unreimbursed, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(b)   Anything in Sections 2.01(1) and 3.03(a) hereof or in any Operative Document to the contrary notwithstanding, the Insurer shall be entitled to full reimbursement from RFC for (i) any payment made under the Policy arising as a result of RFC's failure to substitute for or deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section 4 and Section 5 of the Assignment Agreement, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate, and (ii) any payment made under the Policy arising as a result of RFC's or the Depositor's failure to pay or deposit any amount required to be paid or deposited pursuant to the Operative Documents, together with interest on any and all such amounts remaining unreimbursed (to the extent permitted by law, if in respect of any such unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

- 16 -

Confidential

CONFIDENTIAL

RC00067583

Confidential

**FGJ**
**I**

(c)    RFC agrees to pay to the Insurer any and all reasonable char
expenses that the Insurer may reasonably pay or incur, including reason
accountants' fees and expenses, in connection with (i) the enforcement, def
of any rights in respect of any of the Operative Documents, including defe
participating in any litigation or proceeding (including any insolvency prc
any Transaction participant or any affiliate thereof) relating to any of the Operaᵥ__
any party to any of the Operative Documents (in its capacity as such a party) or the Transactiou···
or (ii) any amendment, waiver or other action with respect to, or related to, any Operative
Document, whether or not executed or completed.  Provided that three Business Days written
notice of the intended payment or incurrence shall have been given to RFC by the Insurer, such
reimbursement shall be due on the dates on which such charges, fees, costs or expenses are paid
or incurred by the Insurer.

(d)    RFC agrees to pay to the Insurer interest (without duplication) on any and all
amounts described in subsections 3.03(b), 3.03(c) and 3.03(e) and Sections 3.02 and 3.04 from
the date such amounts become due or, in the case of subsection 3.03(c) or Section 3.04, are
incurred or paid by the Insurer until payment thereof in full (after as well as before judgment), at
the Late Payment Rate.

(e)    RFC agrees to pay to the Insurer as follows: any payments made by the Insurer on
behalf of, or advanced to, RFC or the Depositor including any amounts payable by RFC or the
Depositor pursuant to any of the Operative Documents on the date any such payment is made or
advanced by the Insurer.  Notwithstanding the foregoing, in no event shall the Insurer have any
recourse under this subsection against RFC or the Depositor with respect to any payments the
Insurer has made in respect of principal or interest distributions on the Class A Certificates
(except pursuant to Section 3.03(b) above).

(f)    The Insurer shall have no right to set-off payments to be made under the Policy
against payments to be made to the Insurer by RFC or the Depositor (or any person or
organization acting on their behalf), the Trustee or any Holder or any affiliate, officer or director
of any of them.

### Section 3.04.  Indemnification.

(a)    In addition to any and all of the Insurer's rights of reimbursement,
indemnification, subrogation and to any other rights of the Insurer pursuant hereto or under law
or in equity, RFC and the Depositor agree to pay, and to protect, indemnify and save harmless,
the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any,
who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section
20 of the Securities Exchange Act from and against, any and all claims, losses, liabilities
(including penalties), actions, suits, judgments, demands, damages, costs or expenses (including
reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of
investigations) of any nature arising out of or relating to the breach by RFC or the Depositor of
any of the representations or warranties contained in Section 2.01 or arising out of or relating to
the transactions contemplated by the Operative Documents by reason of:

- 17 -

CONFIDENTIAL

RC00067584

Confidential

(i)  any omission or action (other than of or by the Insurer) in connection with the offering, issuance or delivery of the Offered Certificates by RFC, the Depositor or the Trustee, other than those covered by subparagraph (v) below;

(ii)  the misfeasance or malfeasance of, or gross negligence or theft committed by, any director, officer, employee or agent of RFC, the Depositor or the Trustee in connection with any Transaction arising from or relating to the Operative Documents;

(iii)  the violation by RFC or the Depositor of any federal or state law, rule or regulation, or any judgment, order or decree applicable to it, which violation reasonably could result in a material adverse change as described in the definition of Material Adverse Change;

(iv)  the breach by RFC or the Depositor of any representation, warranty (other than a representation or warranty in respect of the Mortgage Loans contained in Section 4 of the Assignment Agreement, or covenant under any of the Operative Documents or the occurrence, in respect of RFC or the Depositor, under any of the Operative Documents of any "event of default"; or

(v)  any untrue statement or alleged untrue statement of a material fact contained in the Offering Document or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided, however*, that this Section 3.04(a)(v) does not cover the Insurer Information.

(b)  The Insurer agrees to pay, and to protect, indemnify and save harmless, RFC and the Depositor and their respective officers, directors, shareholders, employees, agents and each Person, if any, who controls RFC and the Depositor within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against, any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or by reason of (i) any untrue statement or alleged untrue statement of a material fact contained in the Insurer Information or any omission or alleged omission to state in the Insurer Information a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; (ii) any failure of the Insurer to make a payment required to be made under the Policy; or (iii) a breach of any of the representations and warranties of the Insurer contained in Section 2.04.

(c)  If any action or proceeding (including any governmental investigation) shall be brought or asserted against any Person (individually, an "Indemnified Party" and, collectively, the "Indemnified Parties") in respect of which the indemnity provided in Section 3.04(a) or (b) may be sought from RFC or the Depositor, on the one hand, or the Insurer, on the other (each, an "Indemnifying Party") hereunder, each such Indemnified Party shall promptly notify the Indemnifying Party in writing, and the Indemnifying Party shall assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all expenses. The omission so to notify the Indemnifying Party will not relieve it

- 18 -

CONFIDENTIAL

RC00067585

from any liability which it may have to any Indemnified Party except to the extent the Indemnifying Party is prejudiced thereby. The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the expense of the Indemnified Party; *provided, however*, that the fees and expenses of such separate counsel shall be at the expense of the Indemnifying Party if (i) the Indemnifying Party has agreed in writing to pay such fees and expenses, (ii) the Indemnifying Party shall have failed within a reasonable period of time to assume the defense of such action or proceeding and employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such action or proceeding on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Parties, which firm shall be designated in writing by the Indemnified Party and shall be reasonably satisfactory to the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such action or proceeding effected without its written consent, which consent shall not be unreasonably withheld, conditioned or delayed, but, if settled with its written consent, or if there is a final judgment for the plaintiff in any such action or proceeding with respect to which the Indemnifying Party shall have received notice in accordance with this subsection (c), the Indemnifying Party agrees to indemnify and hold the Indemnified Parties harmless from and against any loss or liability by reason of such settlement or judgment. Notwithstanding anything in this paragraph to the contrary, the consent of such Indemnified Party shall not be required if such settlement fully discharges, with prejudice against the plaintiff, the claim or action against such Indemnified Party.

(d)    To provide for just and equitable contribution if the indemnification provided by the Indemnifying Party is determined to be unavailable or insufficient to hold harmless any Indemnified Party (other than due to application of this Section), each Indemnifying Party shall contribute to the losses incurred by the Indemnified Party on the basis of the relative fault of the Indemnifying Party, on the one hand, and the Indemnified Party, on the other hand.

**Section 3.05. Payment Procedure**.

In the event of any payment by the Insurer, RFC and the Depositor agree to accept the voucher or other evidence of payment as prima facie evidence of the propriety thereof and the liability, if any, described in Section 3.03 therefor to the Insurer. All payments to be made to the Insurer under this Insurance Agreement shall be made to the Insurer in lawful currency of the United States of America in immediately available funds at the notice address for the Insurer as specified in the Servicing Agreement on the date when due or as the Insurer shall otherwise direct by written notice to the other parties hereto. In the event that the date of any payment to the Insurer or the expiration of any time period hereunder occurs on a day that is not a Business

CONFIDENTIAL

RC00067586

Confidential

Day, then such payment or expiration of time period shall be made or occur on the next succeeding Business Day with the same force and effect as if such payment was made or time period expired on the scheduled date of payment or expiration date.

### Section 3.06. Liability of RFC.

RFC shall be liable for all amounts due and payable by the Depositor to the Insurer hereunder.

## ARTICLE IV
## FURTHER AGREEMENTS

### Section 4.01. Effective Date; Term of the Insurance Agreement.

This Insurance Agreement shall take effect on the Closing Date and shall remain in effect until the later of (a) such time as the Insurer is no longer subject to a claim under the Policy and the Policy shall have been surrendered to the Insurer for cancellation and (b) all amounts payable to the Insurer by RFC or the Depositor hereunder or from any other source hereunder or under the Operative Documents and all amounts payable under the Class A Certificates have been paid in full; *provided, however*, that the provisions of Sections 3.02, 3.03 and 3.04 hereof shall survive any termination of this Insurance Agreement.

### Section 4.02. Further Assurances and Corrective Instruments.

(a)    Except at such times as a default in payment under the Policy shall exist or shall have occurred, none of RFC, the Depositor or the Trustee shall grant any waiver of rights under any of the Operative Documents to which any of them is a party without the prior written consent of the Insurer, which shall not be unreasonably withheld, conditioned or delayed and any such waiver without prior written consent of the Insurer shall be null and void and of no force or effect.

(b)    To the extent permitted by law, each of RFC and the Depositor agrees that it will, from time to time, following good faith negotiations in connection therewith, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements hereto and such further instruments as the Insurer may reasonably request and as may be required in the Insurer's reasonable judgment to effectuate the intention of or facilitate the performance of this Insurance Agreement.

### Section 4.03. Obligations Absolute.

(a)    So long as no Insurer Default shall have occurred and shall have continued beyond any period of cure applicable thereto, the obligations of RFC and the Depositor hereunder shall be absolute and unconditional and shall be paid or performed strictly in accordance with this Insurance Agreement under all circumstances irrespective of:

(i)    any lack of validity or enforceability of any of the Operative Documents or the Certificates, or any amendment or other modifications of, or waiver, with respect

- 20 -

Confidential

CONFIDENTIAL

to any of the Operative Documents or the Certificates, that have not been approved by the Insurer;

      (ii)     any exchange or release of any other obligations hereunder;

      (iii)    the existence of any claim, setoff, defense, reduction, abatement or other right that RFC or the Depositor may have at any time against the Insurer or any other Person;

      (iv)    any document presented in connection with the Policy proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

      (v)     any payment by the Insurer under the Policy against presentation of a certificate or other document that does not strictly comply with terms of that Policy;

      (vi)    any failure of RFC or the Depositor to receive the proceeds from the sale of the Class A Certificates; and

      (vii)   any other circumstances, other than payment in full, that might otherwise constitute a defense available to, or discharge of, RFC or the Depositor in respect of any Operative Document.

      (b)    So long as no Insurer Default shall have occurred and shall have continued beyond any period of cure applicable thereto, RFC and the Depositor and any and all others who are now or may become liable for all or part of the obligations of RFC or the Depositor under this Insurance Agreement, to the extent permitted by law, irrevocably renounce the right to assert as a defense to the performance of their respective obligations each of the following: (i) any and all redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness and obligations evidenced by any Operative Document or by any extension or renewal thereof; (ii) presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor and notice of protest; (iii) all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default or enforcement of any payment hereunder, except as required by the Operative Documents; and (iv) all rights of abatement, diminution, postponement or deduction, or to any defense other than payment, or to any right of setoff or recoupment arising out of any breach under any of the Operative Documents, by any party thereto or any beneficiary thereof, or out of any obligation at any time owing to RFC or the Depositor.

      (c)    RFC and the Depositor and any and all others who are now or may become liable for all or part of the obligations of RFC or the Depositor under this Insurance Agreement, to the extent permitted by law, agree to be bound by this Insurance Agreement and (i) agree that any consent, waiver or forbearance hereunder with respect to an event shall operate only for such event and not for any subsequent event; (ii) consent to any and all extensions of time that may be granted by the Insurer with respect to any payment hereunder or other provisions hereof and to the release of any security at any time given for any payment hereunder, or any part thereof, with or without substitution, and to the release of any Person or entity liable for any such payment; and (iii) consent to the addition of any and all other makers, endorsers, guarantors and other

CONFIDENTIAL

RC00067588

obligors for any payment hereunder, and to the acceptance of any and all other security for any payment hereunder, and agree that the addition of any such obligors or security shall not affect the liability of the parties hereto for any payment hereunder.

(d)    Nothing herein shall be construed as prohibiting RFC or the Depositor from pursuing any rights or remedies it may have against any Person in a separate legal proceeding.

**Section 4.04.  Assignments; Reinsurance; Third-Party Rights.**

(a)    This Insurance Agreement shall be a continuing obligation of the parties hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.   Neither RFC nor the Depositor may assign any of their respective rights under this Insurance Agreement or the Policy, or delegate any of their respective duties hereunder or thereunder, without the prior written consent of the Insurer, which consent shall not be unreasonably withheld.   Any assignments made in violation of this Insurance Agreement shall be null and void.

(b)    The Insurer shall have the right to give participations in its rights under this Insurance Agreement and to enter into contracts of reinsurance with respect to the Policy upon such terms and conditions as the Insurer may in its discretion determine; *provided, however*, that no such participation or reinsurance agreement or arrangement shall relieve the Insurer of any of its obligations hereunder or under the Policy, nor shall RFC or the Depositor be required to deal directly with any such parties.

(c)    Except as provided herein with respect to participants and reinsurers, nothing in this Insurance Agreement shall confer any right, remedy or claim, express or implied, upon any Person, including, particularly, any Holder, other than the Insurer against RFC or the Depositor, or RFC or the Depositor against the Insurer, and all the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the parties hereto and their successors and permitted assigns.   Neither the Trustee nor any Holder shall have any right to payment from any Premiums paid or payable hereunder or under the Pooling and Servicing Agreement or from any amounts paid by RFC pursuant to Sections 3.02, 3.03 or 3.04.

**Section 4.05.  Liability of the Insurer.**

Neither the Insurer nor any of its officers, directors or employees shall be liable or responsible for:  (a) the use that may be made of the Policy by the Trustee or for any acts or omissions of the Trustee in connection therewith; or (b) the validity, sufficiency, accuracy or genuineness of documents delivered to the Insurer in connection with any claim under the Policy, or of any signatures thereon, even if such documents or signatures should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged (unless the Insurer shall have actual knowledge thereof).   In furtherance and not in limitation of the foregoing, the Insurer may accept documents that appear on their face to be in order, without responsibility for further investigation.

- 22 -

CONFIDENTIAL

## ARTICLE V
## DEFAULTS AND REMEDIES

**Section 5.01. Defaults.**

The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)    Any representation or warranty made by RFC or the Depositor hereunder or under the Operative Documents, or in any certificate furnished hereunder or under the Operative Documents, shall prove to be untrue or incorrect in any material respect unless remedied within the cure period, if any, provided under the applicable Operative Document; *provided, however,* that a breach of a representation or warranty by RFC or the Depositor under Section 4 of the Assignment Agreement shall not constitute an Event of Default under this Section 5.01(a); *provided, further, however,* that the preceding proviso shall not affect the Insurer's rights as a third party beneficiary under the Pooling and Servicing Agreement or the existence of an Event of Default under Section 5.01(c) or (d) of this Insurance Agreement;

(b)    (i) RFC or the Depositor shall fail to pay when due any amount payable by it hereunder or (ii) a legislative body has enacted any law that declares or a court of competent jurisdiction shall find or rule that this Insurance Agreement or any other Operative Document is not valid and binding on RFC or the Depositor; *provided* that, with respect to any law or judicial action within the scope of this clause (ii), RFC and the Depositor shall have 30 days to reinstate the binding effect of this Insurance Agreement or any other Operative Document, and the Insurer agrees to take such actions as may be reasonably requested of it to facilitate the reinstatement of such binding effect;

(c)    The occurrence and continuance of an "event of default" or "Event of Default," under any Operative Document;

(d)    Any failure on the part of RFC or the Depositor duly to observe or perform in any material respect any other of the covenants or agreements on the part of RFC or the Depositor contained in this Insurance Agreement which continues unremedied for a period of 30 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to RFC by the Insurer (with a copy to the Trustee) or by the Trustee (with a copy to the Insurer);

(e)    A decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against RFC or the Depositor and such decree or order shall have remained in force undischarged or unstayed for a period of 90 consecutive days;

(f)    RFC or the Depositor shall consent to the appointment of a conservator or receiver or liquidator or other similar official in any bankruptcy, insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to RFC or the Depositor or of or relating to all or substantially all of their respective property;

- 23 -

CONFIDENTIAL

RC00067590

(g)     RFC or the Depositor shall become insolvent or admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of or otherwise voluntarily commence a case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations; or

(h)     the Trust Fund shall become subject to an entity level tax or to registration as an investment company under the Investment Company Act.

**Section 5.02.  Remedies; No Remedy Exclusive.**

(a)     Upon the occurrence of an Event of Default, the Insurer may exercise any one or more of the rights and remedies set forth below:

(i)     declare all indebtedness with respect to the Transaction of every type or description then owed by RFC or the Depositor to the Insurer to be immediately due and payable, and the same shall thereupon be immediately due and payable;

(ii)     exercise any of its rights and remedies under the Pooling and Servicing Agreement in accordance with the terms thereof or direct the Trustee, RFC and/or the Depositor to exercise their respective rights and remedies under the Operative Documents in accordance with the terms thereof; or

(iii)     take whatever action at law or in equity may appear necessary or desirable in its judgment to collect the amounts, if any, then due under this Insurance Agreement or any other Operative Document or to enforce performance and observance of any obligation, agreement or covenant of RFC or the Depositor under this Insurance Agreement or any other Operative Documents.

(b)     Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement, the Pooling and Servicing Agreement or the other Operative Documents, or existing at law or in equity.  No delay or omission to exercise any right or power accruing under this Insurance Agreement, the Pooling and Servicing Agreement or any other Operative Document, or otherwise, upon the happening of any event set forth in Section 5.01 shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.  In order to entitle the Insurer to exercise any remedy reserved to the Insurer in this Article, it shall not be necessary to give any notice, other than such notice as may be required by this Article.

**Section 5.03.  Waivers.**

(a)     No failure by the Insurer to exercise, and no delay by the Insurer in exercising, any right hereunder shall operate as a waiver thereof.  The exercise by the Insurer of any right hereunder shall not preclude the exercise of any other right, and the remedies provided herein to the Insurer are declared in every case to be cumulative and not exclusive of any remedies provided by law or equity.

- 24 -

CONFIDENTIAL                                                     RC00067591

Confidential

(b)    The Insurer shall have the right, to be exercised in its complete discretion, to waive any Event of Default hereunder, by a writing setting forth the terms, conditions and extent of such waiver signed by the Insurer and delivered to RFC.  Unless such writing expressly provides to the contrary, any waiver so granted shall extend only to the specific event or occurrence which gave rise to the Event of Default so waived and not to any other similar event or occurrence which occurs subsequent to the date of such waiver.

**ARTICLE VI**
**MISCELLANEOUS**

### Section 6.01.  Amendments, Etc.

This Insurance Agreement may be amended, modified, supplemented or terminated only by written instrument or written instruments signed by the parties hereto.  RFC agrees to provide a copy of any amendment to this Insurance Agreement promptly to the Trustee and the rating agencies maintaining a rating on the Offered Certificates.  No act or course of dealing shall be deemed to constitute an amendment, modification, supplement or termination hereof.

### Section 6.02.  Notices.

All demands, notices and other communications to be given hereunder shall be in writing (except as otherwise specifically provided herein) and shall be mailed by registered mail or personally delivered and telecopied to the recipient as follows:

(a)    To the Insurer:

> Financial Guaranty Insurance Company
> 125 Park Avenue
> New York, New York  10017
> Attention:  Structured Finance Surveillance
> Facsimile:  (212) 312-3231
> Confirmation:  (800) 352-0001

> (in each case in which notice or other communication to the Insurer refers to an Event of Default, a claim on the Policy or with respect to which failure on the part of the Insurer to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of the general counsel of each of RFC, the Insurer and the Trustee and, in all cases, both any original and all copies shall be marked to indicate "URGENT MATERIAL ENCLOSED.")

(b)    To RFC:

> Residential Funding Corporation
> 8400 Normandale Lake Boulevard
> Suite 250
> Minneapolis, MN  55437

- 25 -

CONFIDENTIAL
RC00067592

Attention: Managing Director Structured Finance
Facsimile: (952) 857-7442
Confirmation: (952) 857-7000

Notice to RFC shall also constitute notice to the Depositor to the extent the party providing such notice is required to provide notice to both parties (in each case in which notice or other communication to RFC refers to an Event of Default, a claim against RFC or the Depositor or with respect to which failure on the part of RFC or the Depositor to respond shall be deemed to constitute consent or acceptance, then a copy of such notice or other communication should also be sent to the attention of the general counsel of each of RFC, the Insurer and the Trustee and, in all cases, both any original and all copies shall be marked to indicate "URGENT MATERIAL ENCLOSED.").

(c)    To the Trustee, at its Corporate Trust Office; and

(d)    To the Depositor:

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attention: President (RAMP)
Facsimile: (952) 857-7442
Confirmation: (952) 857-7048

A party may specify an additional or different address or addresses by writing mailed or delivered to the other parties as aforesaid. All such notices and other communications shall be effective upon receipt.

**Section 6.03. Severability**.

In the event that any provision of this Insurance Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the parties hereto agree that such holding shall not invalidate or render unenforceable any other provision hereof. The parties hereto further agree that the holding by any court of competent jurisdiction that any remedy pursued by any party hereto is unavailable or unenforceable shall not affect in any way the ability of such party to pursue any other remedy available to it.

**Section 6.04. Governing Law**.

This Insurance Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws provisions thereof other than Sections 5-1401 and 5-1402 of the General Obligations Law, which the parties hereto expressly rely upon as the governing law hereunder).

CONFIDENTIAL

RC00067593

FGIC–RAMP 2005-RS9
Insurance Agreement

### Section 6.05.  Consent to Jurisdiction.

(a)    The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and any court in the State of New York located in the City and County of New York, and any appellate court from any thereof, in any action, suit or proceeding brought against it and to or in connection with any of the Operative Documents or the Transaction or for recognition or enforcement of any judgment, and the parties hereto irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard or determined in such New York state court or, to the extent permitted by law, in such federal court.  The parties hereto agree that a final unappealable judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. To the extent permitted by applicable law, the parties hereto hereby waive and agree not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts.

(b)    To the extent permitted by applicable law, the parties hereto shall not seek and hereby waive the right to any review of the judgment of any such court by any court of any other nation or jurisdiction which may be called upon to grant an enforcement of such judgment.

(c)    Nothing contained in this Insurance Agreement shall limit or affect any party's right to serve process in any other manner permitted by law or to start legal proceedings relating to any of the Operative Documents against any other party or its properties in the courts of any jurisdiction.

### Section 6.06.  Consent of the Insurer.

In the event that the consent of the Insurer is required under any of the Operative Documents, the determination whether to grant or withhold such consent shall be made by the Insurer in its sole discretion without any implied duty towards any other Person, except as otherwise expressly provided therein, and such consent is only effective when and if given by the Insurer in writing.

### Section 6.07.  Counterparts.

This Insurance Agreement may be executed in counterparts by the parties hereto, and all such counterparts shall constitute one and the same instrument.

### Section 6.08.  Headings.

The headings of Articles and Sections and the Table of Contents contained in this Insurance Agreement are provided for convenience only.  They form no part of this Insurance Agreement and shall not affect its construction or interpretation.

CONFIDENTIAL    RC00067594

Confidential

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE
COMPANY,
    as Insurer

By:_____
    Name:
    Title:

RESIDENTIAL FUNDING CORPORATION,
    as Master Servicer

By:_____
    Name:  Pieter VanZyl
    Title:   Associate

RESIDENTIAL ASSET MORTGAGE
PRODUCTS, INC.,
    as Depositor

By:_____
    Name:  Joseph Orning
    Title:   Vice President

JPMORGAN CHASE BANK, N.A.
    as Trustee

By:_____
    Name:
    Title:

- 29 -
*{Signature Page}*
*Insurance Agreement*

CONFIDENTIAL

Confidential

FGIC–RAMP 2005-RS9
Insurance Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, all as of the day and year first above mentioned.

FINANCIAL GUARANTY INSURANCE COMPANY,
   as Insurer

By:_____
   Name:
   Title:

RESIDENTIAL FUNDING CORPORATION,
   as Master Servicer

By:_____
   Name:
   Title:

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.,
   as Depositor

By:_____
   Name:
   Title:

JPMORGAN CHASE BANK, N.A.
   as Trustee

By:_____
   Name: Joanne Murray
   Title: Asst. Vice President

- 29 -
*{Signature Page}*
*Insuarace Agreement*

Confidential

CONFIDENTIAL

CONFIDENTIAL

RC00067597