**HEARING DATE: MARCH 18, 2013**
**OBJECTION DEADLINE: DECEMBER 3, 2012**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National*
*Association, as Indenture Trustee for the Senior*
*Unsecured Notes Issued by Residential Capital, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                            :
In re                                       :         **Chapter 11 Case No.**
                                            :
**RESIDENTIAL CAPITAL, LLC, et al.,**         :         **12-12020 (MG)**
                                            :
                    Debtors.                :         **(Jointly Administered)**
                                            :
                                            :
------------------------------------------------------------X

**OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION TO THE
DEBTORS' SECOND SUPPLEMENTAL MOTION PURSUANT TO FED. R. BANKR. P.
9019 FOR APPROVAL OF RMBS TRUST SETTLEMENT AGREEMENTS**

# TABLE OF CONTENTS

                                                                                                    **Page**

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ..................................................................................................... 3

LEGAL STANDARD............................................................................................... 3

OBJECTION............................................................................................................. 4

A.    The Negotiation And Approval Process Was Hopelessly Flawed And Resulted
      In An Indefensible Outcome ....................................................................... 4

      i.     RMBS Settlement Negotiations Were Controlled by AFI, Which Placed
             Its Own Interests Ahead of the Debtors and Residential Capital's Creditors ... 5

      ii.    The Board Voted to Approve the RMBS Settlement Under Unreasonable
             Time Constraints After Receiving Inadequate and Misleading Information .... 6

      iii.   The Board Relied on False Assumptions When Approving the RMBS
             Settlement.............................................................................................. 7

      iv.    The $8.7 billion RMBS Settlement Figure Was Not Negotiated at Arm's
             Length.................................................................................................... 9

      v.     The $750 Million AFI Contribution, Which Constituted a Key Feature
             of the RMBS Settlement Process, Was Not Negotiated at Arm's Length ...... 10

      vi.    Subsequent Amendments of the RMBS Settlement Further Demonstrate
             the Complete Absence of Any Legitimate Process ........................................ 11

      vii.   Residential Capital's Decision Makers Failed to Address Conflicts of
             Interest and the Unique Interests of Residential Capital's Creditors .............. 12

      viii.  The Debtors' Discovery Failures Require that an Adverse Inference Be
             Be Drawn Against the Settlement's Approval ................................................ 13

B.    The RMBS Investors Have No Standing To Enter Into The RMBS Settlement ........ 14

C.    The Provisions Of The RMBS Settlement Relating To The Payment of Attorneys
      Fees Create Insurmountable Hurdles to Approval ...................................................... 17

D.    The Representation and Warranty Claims Are Subject to Statutory Subordination
      Under § 501(b) ........................................................................................................... 21

CONCLUSION.......................................................................................................... 23

i

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 101(a)(2)...................................................................................... 22

11 U.S.C. § 1109(b) ....................................................................................... 16

11 U.S.C. § 1129(a)(4)..................................................................................... 18

11 U.S.C. § 330.........................................................................................19-20

11 U.S.C. § 510(b) ..................................................................................... 21, 23

Fed. R. Civ. P. 23 ........................................................................................... 16

**Cases**

*CIT Group Inc. v Tyco Int'l Ltd.*,
460 B.R. 633 (S.D.N.Y. 2011)........................................................................... 23

*Cordes and Co. Fin. Serv. Inc. v. A.G. Edwards and Sons, Inc.*,
502 F. 3d 91(2d Cir. 2007)............................................................................... 15

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012).................................................................. 22

*In re Chateaugay Corp.*,
80 B.R. 279 (S.D.N.Y. 1987)............................................................................. 20

*In re Comcoach Corp.*,
698 F.2d 571 (2d Cir. 1983)......................................................................... 16, 17

*In re Dewey & LeBoeuf LLP*,
478 B.R. 627 (Bankr. S.D.N.Y. 2012) ................................................................. 4

*In re Hendrick*,
45 B.R. 976 (Bankr. M.D. La. 1985) .................................................................. 19

*In re Innkeepers USA Trust*,
448 B.R. 131 (S.D.N.Y. Bankr. 2011)................................................................. 17

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989).................................................................. 20

*In re Iridium Op. LLC*,
478 F.3d 452 (2d Cir. 2007).............................................................................3-4

**Page(s)**

*In re Lehman Bros.,*
No. 11 Civ. 3760, 2012 WL 1057952 (S.D.N.Y. Mar. 26, 2012) .......................................... 16, 17

*In re Med Diversified Inc. v. Dufrayne,*
461 F.3d 251 (2d Cir. 2006).................................................................................................... 21, 22-23

*In re Talley,*
97 B.R. 312 (Bankr. W.D. La. 1989 ......................................................................................... 19

*In re VF Brands, Inc.,*
275 B.R. 725 (Bankr. D.Del. 2002) ......................................................................................... 23

*In re Washington Mutual, Inc.,*
462 B.R. 137 (Bankr. W.D. La. 1989)...................................................................................... 22

*Johnson v. Geico Cas. Co.,*
673 F. Supp. 2d 244 (D. Del. 2009).......................................................................................... 15

*Krys v. Off. Comm. Of Unsec. Cred., (In re Refco Inc.),*
505 F.3d 109 (2d Cir. 2007)...................................................................................................... 16

*Leiman v. Guttman,*
336 U.S. 1 (1949)....................................................................................................................... 18-19

*Ruggles v. Wellpoint, Inc.,*
272 F.R.D. 320 (S.D.N.Y. 2011) .............................................................................................. 15

*S. Boulevard Inc. v. Martin Paint Stores,*
207 B.R. 57 (S.D.N.Y. 1997).................................................................................................... 17

*Schlesinger v. Reservists Comm. to Stop the War,*
418 U.S. 208 (1974)................................................................................................................... 15

*Walnut Place LLC v. Countrywide Home Loans, Inc.,*
951 N.Y.S. 2d 84 (Sup. Ct. 2012), *aff'd*, 96 A.D. 3d 648 (2012) ................................................. 14

*Waltzer v. Nisselson (In re Marketxt Holdings Corp.),*
346 F. App'x. 744 (2d Cir. 2009) ............................................................................................. 23

*Warth v. Seldin,*
422 U.S. 490 (1975)................................................................................................................... 15

**Other Authorities**

15 U.S.C. §77b(a)(4)................................................................................................................. 21

15 U.S.C. §78c(a)(8)................................................................................................................. 21

iii

**Page(s)**

17 C.F.R. §230.191 ................................................................................................ 21

17 C.F.R. §240.3b-19(a) ......................................................................................... 21

Asset-Backed Securities, SEC Release No. 8515, 2004 WL 2964659 (Dec. 22, 2004)............... 21

iv

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Wilmington Trust, National Association (the "Trustee"), solely in its capacity as

indenture trustee for various series of senior unsecured notes in the outstanding aggregate

principal amount of approximately $1 billion (the "Notes," and the holders thereof, the

"Noteholders") issued by Residential Capital, LLC ("Residential Capital," and with its debtor-

affiliates, the "Debtors"), under that certain indenture dated as of June 24, 2005,[1] respectfully

submits this objection to the Debtors' motion (as supplemented, the "Motion") for approval of a

proposed settlement (the "RMBS Settlement") pursuant to two settlement agreements (the

"RMBS Settlement Agreements") that seek to resolve potential residential mortgage-backed

securities ("RMBS") representation and warranty ("R&W") claims against certain Debtors held

by securitization trusts sponsored by the Debtors (the "Trusts"). In support of the objection, the

Trustee represents as follows:

### PRELIMINARY STATEMENT

1.    Discovery conducted by the Trustee, the Official Committee of Unsecured

Creditors (the "Committee"), and other interested parties has exposed that the RMBS Settlement

was not the product of arm's length negotiation between the Debtors and the RMBS investors (the

"RMBS Investors"). The Debtors wholly failed to adhere to any process in negotiating, analyzing,

or approving the RMBS Settlement that would have protected the rights and interests of the

Debtors or any of their legitimate creditor constituencies. Instead, the real parties that benefit from

the RMBS Settlement are the RMBS Investors and the Debtors' parent company, Ally Financial,

---

[1]    The Notes include $1,250,000,000 6.5% notes due 2012, $1,750,000,000 6.5% notes due 2013, $750,000,000 6.875% notes due 2015, €750,000,000 5.125% notes due 2012, £400,000,000 6.375% notes due 2013, and £400,000,000 7.875% notes due 2014, with a total aggregate outstanding principal amount of approximately $1 billion (based on the foreign exchange rate as of the petition date, May 14, 2012).

Inc. ("AFI"), which, in exchange for an inadequate contribution of cash to the Debtor estates, hopes to receive a complete release from the Debtors and of any third-party liability.

2.      On April 27, 2012, AFI's consolidated first-quarter report disclosed a reserve of $811 million for R&W liability and an estimate of $0 to $4 billion in additional potential liability. *See* Ex. A at 73.[2] On May 1, 2012, the Audit Committee of Residential Capital's Board of Directors (the "Audit Committee" and the "Board") was given a presentation showing the "top-end of the range" of potential mortgage-related liability for Residential Capital's subsidiaries, including both R&W claims and federal securities law claims as $4 billion above the current reserve. *See* Ex. B at RC40022334, RC40022351. Only eight days later, the Board approved a settlement of $8.7 billion covering only the R&W claims. The Board had no legitimate basis for approving such a settlement, which dramatically exceeded any estimate the Board had previously received relating to the potential liability for these claims.

3.      The Board, nevertheless, rubber stamped the RMBS Settlement for the simple reason that it viewed the settlement as a negotiated business deal, which was not intended to replicate the resolution of a lawsuit. The RMBS Settlement, along with a related settlement with AFI (the "AFI Settlement"), which granted AFI a release of the Debtors' third-party claims in exchange for a limited cash contribution, were to pave the way for an orderly chapter 11 case that would solve AFI's Residential Capital problem. In settling with AFI, the Residential Capital independent directors who negotiated the AFI Settlement only sought a "headline number" that would have "credibility" with the Court and the public to facilitate a quick bankruptcy.

---

[2]      Unless otherwise noted, references to exhibits contained in this objection are to the Declaration of Mark A. Lightner dated December 3, 2012 in Support of the Objection of Wilmington Trust, National Association To The Debtors' Second Supplemental Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RBMS Trust Settlement Agreements, which was submitted contemporaneously herewith.

2

4.      In objecting to the RMBS Settlement, the Trustee joins in and incorporates herein the arguments made by the Committee in its objection to the Motion. In addition, the Trustee outlines (1) specific details as to why the flawed process prohibits approval of the RMBS Settlement, (2) why the RMBS Investors lack standing, which prevents the Court from approving the RMBS Settlement, (3) why the fees to be paid in connection with the RMBS Settlement pose hurdles to approval, (4) why any claim for R&W liability must be subordinated under § 510(b) of the Bankruptcy Code, and (5) why due to the Debtors' own discovery failures, there should be an inference against approving the RMBS Settlement.

## BACKGROUND

5.      On May 14, 2012, the Debtors commenced voluntary cases under chapter 11, title 11, of the United States Bankruptcy Code (the "Bankruptcy Code").

6.      On May 14, 2012, the Court authorized joint administration, and the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## LEGAL STANDARD

7.      Bankruptcy Rule 9019 provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The Second Circuit has stated that the purpose of Rule 9019 is to "prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court." *In re Iridium Operating LLC*, 478 F.3d 452, 461 (2d Cir. 2007) (citing *In re Masters, Inc.*, 141 B.R. 13, 16 (Bankr. E.D.N.Y. 1992)). Settlements must be fair and equitable, and the Second Circuit has identified the following factors to be used in making that determination: "(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the

3

judgment; (3) the paramount interests of the creditors, including each affected class's relative

benefits and the degree to which creditors either do not object to or affirmatively support the

proposed settlement; (4) whether other parties in interest support the settlement; (5) the

competency and experience of counsel supporting, and the experience and knowledge of the

bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be

obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's

length bargaining." *Id.* at 462 (internal quotations omitted) (citing *In re WorldCom, Inc.*, 347 B.R.

123, 137 (Bankr. S.D.N.Y. 2006)).  In addition to applying these tests, the Court must "canvass the

issues and see whether the settlement falls below the lowest point in the range of reasonableness."

*In re Dewey & LeBoeuf LLP*, 475 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (citing *In re Adelphia

Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)).

## OBJECTION

### A.    The Negotiation And Approval Process Was Hopelessly Flawed And Resulted In An Indefensible Outcome

8.    The RMBS Settlement fails the *Iridium* test because, *inter alia*, it was not the result

of arm's length negotiations, does not result in a resolution that is within the range of reasonable

outcomes, and lacks creditor support.  Documents and deposition testimony demonstrate that the

$8.7 billion settlement figure was primarily negotiated by Ms. Kathy Patrick, an attorney

representing a limited number of RMBS Investors, and Mr. Timothy Devine, AFI's chief of

litigation, as part of an "elegant" arrangement in which AFI obtained valuable litigation releases

for a $750 million settlement contribution.  *See* Ex. C at 84:5-14; Ex. D at 248:12-21; 281:12-

282:8.  In exchange, the Debtors were forced to agree to a higher-than-reasonable settlement figure

of $8.7 billion.  The Debtors' counsel played a comparatively passive role, and the Board approved

the deal after only a half-hour discussion based on inaccurate and misleading information, under

4

the assumption that the settlement was negotiated by its own lawyers (it was not) and that it included both R&W claims and federal securities law claims when in fact it was only a settlement of R&W claims. The boards of GMAC Mortgage LLC ("GMACM") and Residential Funding Corporation ("RFC"), the two principal Debtors that made the R&Ws, have never approved the RMBS Settlement. The following highlights some of the critical flaws in the settlement process:

i.      **RMBS Settlement Negotiations Were Controlled by AFI, Which Placed Its Own Interests Ahead of the Debtors and Residential Capital's Creditors**

9.      AFI controlled the settlement process despite the fact that it was not a party to the RMBS Settlement Agreement and had a clear interest in obtaining a cheap release for itself, even if the Debtors had to pay more to reach a settlement. *See, e.g.*, Ex. E. Devine testified that he was responsible for "driving the deal to conclusion," and confirmed that the "deal" included both the RMBS Settlement and support by the settling investors for AFI's release in exchange for the $750 million cash contribution, a feature Devine described to Patrick as non-negotiable. *See* Ex. D at 248:12-21; 281:12-282:8. *See also* Ex. F. Residential Capital's independent directors had no role in negotiating the RMBS Settlement (they mistakenly believed its own lawyers negotiated the deal) and the Board "had no idea" that AFI had any role in the negotiations with Patrick. *See* Ex. C at 36:9-37:13; 41:9-25. One of Residential Capital's independent directors, Mr. John Mack, testified he would have been concerned had he known that it was Devine and AFI, who were leading the negotiations. *Id.* at 44:2-13; 126:18-127:15. Not surprisingly, given Patrick's position that AFI bore the ultimate liability for her clients' losses, *see* Ex. G; Ex. H, and AFI's consequent interest in ensuring that it obtained a release of those claims no matter what it cost the Debtors, Mack's concerns have proven justified as the proposed settlement bears no resemblance to a fair compromise.

5

ii.     **The Board Voted to Approve the RMBS Settlement Under Unreasonable Time Constraints After Receiving Inadequate and Misleading Information**

10.     The Board was given inadequate time, notice, and information regarding the RMBS Settlement before being asked to approve it, and the little information the Board did receive was inaccurate and misleading. Despite the fact that Patrick and other investor groups first asserted their R&W claims in October 2011, *see* Ex. G; Ex. I, Mack did not learn about the RMBS negotiations until late April or May 2012. *See* Ex. C at 34:20-35:16.

11.     On May 1, 2012, the Audit Committee received an update on RMBS litigation from Devine and also met to discuss Residential Capital's first-quarter financial statements. Materials provided to the Audit Committee estimated the "top-end of the range of reasonably possible losses" at $4.041 billion above the $811 million reserve, including securities claims and accounting for legal defenses. *See* Ex. B at RC40022276. Residential Capital's financial statements reported a "reasonably possible range of loss" of zero to $4 billion. *Id.* at RC40022334, RC40022352; *see also* Ex. C at 49:4-51:16. As late as the fourth quarter of 2011, Debtors' analysts recommended recording reserves of less than $1 billion for RMBS liability. *See* Ex. J at 59:21-60:2. Indeed, Debtors have never set a reserve for RMBS liability in excess of $1 billion. *See id.* at 59:2-8.

12.     On May 9, 2012, the Board met to approve the $8.7 billion RMBS Settlement, an amount more than twice the high-end estimate reviewed by the Audit Committee just eight days earlier. The May 9, 2012 meeting was the first time the Board members had heard the $8.7 billion figure. *See* Ex. K at 47:13-48:7. Twenty-two minutes before the meeting, the Board was provided a two-page presentation created at the direction of the Debtors' counsel. *See* Ex. L. The Board received no other materials in connection with the settlement. The two-page presentation included a misleading chart comparing the RMBS Settlement's stated 19.72% defect rate and the $8.7 billion settlement amount to supposedly similar settlements by Bank of America ("BofA") and

6

Lehman Brothers ("Lehman"). *Id.* The presentation purported the BofA and Lehman defect rates

to be 36% and 35% and implied these rates had led to settlement amounts of $15.882 billion and

$15.441 billion, respectively. *Id.* The materials also listed key assumptions, including that the

RMBS Settlement liability would be borne by GMACM and RFC only. *Id.* The Board approved

the RMBS Settlement after a discussion lasting approximately half an hour, *see* Ex. M at 164:16-

165:14, and with one of the Board's independent directors absent. *See* Ex. K at 52:18-21.

**iii.    The Board Relied on False Assumptions When Approving the
RMBS Settlement**

13.    In approving the RMBS Settlement, the Board relied on: (1) the comparison made

to the BofA and Lehman settlements, and (2) the assertion that the stated 19.72% defect rate fell

within Residential Capital's historical range. *See* Ex.C at 67:24-69:2. The Board did not,

however, appear to take into account several basic and highly relevant considerations. First, the

Board was not informed that the supposed defect rates reflected on the presentation for BofA and

Lehman, 36% and 35% respectively, had no correlation to the ultimate amount of the BofA

settlement and Lehman reserve (there has yet to be a settlement involving Lehman). *See* Ex. L.

For example, the Board was never told that BofA had actually settled its R&W claims for $8.5

billion, rather than the $15.882 billion listed on the presentation. *See* Ex. C at 72:4-73:25; Ex. K at

93:13-94:8. Furthermore, the Board did not know that BofA's actual settlement was less than the

RMBS Settlement amount despite the fact that BofA purportedly had a higher defect rate and had

issued double the original issue balance of RMBS securitizations, exposing it to larger actual and

anticipated losses than Residential Capital. *See* Ex. C at 75:23-76:10; 78:6-22; Ex. N.

14.    Second, the Board was not informed that the 36% defect rate listed for the BofA

settlement came directly from Patrick, and that no independent analysis was done by the Debtors to

confirm the validity of either the 36% BofA rate or the 35% Lehman rate. *See* Ex. J at 183:21-

7

185:18; *see also* Ex. C at 80:15-19. The Board members believed that these numbers were generated by Jeff Cancelliere, Residential Capital's "number cruncher" who was responsible for valuing loans and identifying losses. *See* Ex. K at 33:16-34:8. However, Cancelliere, who drafted the May 9, 2012 Board presentation at the direction of Debtors' counsel, believed the 36% BofA defect rate was a false comparison because it was the product of a review of only non-performing loans. *See* Ex. J at 113:13-114:13; 183:4-10; 205:17-206:19. Cancelliere raised this concern to the Debtors' counsel, but no one ever informed the Board of these concerns and, instead, the 36% was presented to the Board as a valid comparison to the RMBS Settlement. *See* Ex. K at 43:5-22; Ex. J at 182:11-185:4; 206:3-208:19.

15.    Third, the 19.72% Residential Capital defect rate was derived without any loan-by-loan analysis, review of any loan files, or making any reductions in the settlement amount for potential litigation defenses. *See* Ex. J at 189:15-190:2; Ex. C at 69:20-70:5. In fact, the Board was not given any guidance as to what the dollar amount of liability would be if the claims were actually litigated. *See* Ex. C at 67:19-23. Mr. James Whitlinger, a Board member and Residential Capital's CFO, testified that he believed, mistakenly, that the 19.72% rate included litigation defenses, *see* Ex. K at 116:15-117:8, and noted that the Board had "always talked about [the] statute of limitations" defense in its discussions of R&W liability. *Id.* at 118:15-25. Instead, the Board was never told the truth: that the 19.72% defect rate was reverse-engineered to support the $8.7 billion settlement amount and was supported by no objective analysis of any kind. *See* Ex. J at 181:4-25, 193:14-22.

16.    Finally, at the May 9 meeting, the Board was told the RMBS Settlement included securities claims. *See* Ex. O. Subsequent negotiations resulted in dropping securities claims from the settlement. *See* Ex. P. The Board, however, was never told that the ultimate deal did not, in

fact, include securities claims. *See* Ex. C at 108:25-109:11. There was also uncertainty as to

whether the RMBS Settlement included monoline claims. Devine, the key negotiator of the

settlement for AFI, believed that monoline claims were included. *See* Ex. D at 270:5-11; 307:22-

308:25. This issue remains unresolved; however, a plain reading of the agreement suggests that it

includes such claims to the extent they arise under the Trust. *See, e.g.*, Third Am. and Rest. Trust

Settlement Agreement with the Steering Committee Group, Dkt. No. 1887-2 §§ 7.01, 8.03.

### iv.    The $8.7 billion RMBS Settlement Figure Was Not Negotiated at Arm's Length

17.    The $8.7 billion settlement amount was not the result of fair negotiations based on

objective evidence and analysis; it was even substantially greater than the outer edge of the range

presented by the Debtors to Patrick's group on May 8, 2012, just one day before the Board

approved the settlement. *See* Ex. Q at 184:2-5. Rather than being reached after arm's length

negotiations and based on objective information, the $8.7 billion amount was an almost-total

capitulation to Patrick's demand for a $10 billion claim, so her clients could receive a greater

portion of AFI's cash contribution, which was interjected into the settlement process without any

evidentiary support, but with maximum leverage, just two days before the Board's May 9 meeting,

and one week before the scheduled bankruptcy filing. *See* Ex. R. In order to avoid the risk that

Patrick might seek to increase AFI's cash contribution, the Debtors not only inflated, but also

skewed, the settlement to favor Patrick's clients so they would receive the lion's share of any AFI

contribution. *See* Ex. S; Ex. O. The very next day, following Patrick's outrageous demand,

Cancelliere was asked to back into the 19.72% defect rate to justify the $8.7 billion settlement

amount. *See* Ex. J at 181:4-9, 193:14-22, 195:7-23; *see also* Ex. T.

9

v.    **The $750 Million AFI Contribution, Which Constituted a Key Feature of the RMBS Settlement Process, Was Not Negotiated at Arm's Length**

18.    While causing Residential Capital to agree to an unsupported $8.7 billion settlement figure, AFI also arranged to gain its own release from all liability for $750 million in cash, an amount much lower than any reasonable estimate, based on an even more egregiously flawed process. Documents show that the Debtors had significant claims against AFI, leading them to ask for an initial $8-9 billion contribution. *See* Ex. C at 130:18-131:12; *see also* Ex. U; Ex. V; Ex. W. Marano testified that he believed AFI would need to pay at least $2 billion to settle claims and satisfy creditors, and that "no one was going to do a deal for 750." Ex. M at 93:19 - 94:12. Emails show that AFI considered a similar range. *See* Ex. V. Mack, who acted as one of the two independent directors negotiating for Residential Capital along with Mr. Jonathan Ilany, acknowledged that the negotiations he led based on discussions with Mr. Michael Carpenter, AFI's CEO, without the aid of any legal or business advisors, were not focused on assessing legal claims against AFI, but rather were simply intended to achieve a "headline number" that would be "credible." *See* Ex. C at 91:20-93:4; 83:9-17; 99:20-100:21. Mack felt that something around a billion dollars would be credible. *See id.* at 105:2-5. He, however, agreed that $2 billion, the amount contemplated by Marano, would have also been a fair number. *Id.* at 115:21-116:22. Marano testified that he ultimately agreed to the AFI release because he knew it would be challenged and reviewed by a judge. *See* Ex. M at 192:3-15. Finally, it is worth noting for the record that it is quite unclear who actually negotiated the $750 million figure. It appears that the figure would have been higher if Patrick had insisted in her negotiations with Devine on a greater contribution. *See* Ex. E. But because of the inflated claim and lopsided allocation agreed to by the Debtors in the RMBS Plan Support Agreements, she apparently concluded that there was no need for her to do so.

10

### vi.    Subsequent Amendments of the RMBS Settlement Further Demonstrate the Complete Absence of Any Legitimate Process

19.    After the RMBS Settlement, permitting an allowed claim of $8.7 billion against

GMACM and RFC, was approved by the Board on May 9, material provisions of the settlement

were subsequently amended twice. In mid-August the Debtors filed a first amended settlement.

*See* Am. and Rest. RMBS Trust Settlement Agreement with the Steering Committee Group, Dkt.

No. 1176-2; Am. and Rest. RMBS Trust Settlement Agreement with the Talcott Franklin Group,

Dkt. No. 1176-3 (the "Am. and Rest. RMBS Trust Settlement Agreements"). This amendment

took the drastic step of stripping away the release in favor of Residential Capital for all R&W

liability and replacing the release with the so-called "Holdco Election," which exposed Residential

Capital to billions in previously released liability. *Id.* Debtors' counsel initially refused this

reapportionment of liability because it was a change in the deal and "it could dilute and alter

recoveries." Ex. X. In exchange for exposing Residential Capital to billions of potential liability,

Residential Capital received nothing in return. The same was not true of Residential Capital's

outside directors.[3] In conjunction with the addition of the Holdco Election, the outside directors

were granted a release that had previously only been extended to inside directors. As Debtors'

counsel explained in an email to the Board on the night the first amended settlement was filed with

the Court: "Previously in the release provisions, the Institutional Investors had refused to extend

the scope of the releases to cover Rescap's non-interlocking (i.e. non-AFI) Ds and Os. In this

amended agreement, we were able to get the Institutional Investors to expand the scope of the

releases to cover such Ds and Os, and, importantly, this was done with the consent of the trustees."

---

[3]    While Residential Capital received nothing for this concession, a revised provision granted a release to its directors. *Compare* Am. and Rest. RMBS Trust Settlement Agreements, § 7.01 to RMBS Trust Settlement Agreement *with* the Steering Committee Group, Dkt. No. 320-2, § 7.01 *and* RMBS Trust Settlement Agreement with the Talcott Franklin Group, Dkt. No. 320-4.

11

Ex. Z. Thus, at the same time Residential Capital's release was bargained away, the independent

directors gained a release for themselves.

20.    Despite the significance of the Holdco Election amendment, there is no evidence

that the first amended settlement was ever discussed or approved by the Board.[4]   A second

amended settlement was later filed, which removed the Holdco Election but did not reinstate

Residential Capital's release from R&W liability. *See* Third Am. and Rest. Trust Settlement

Agreement with the Steering Committee Group, Dkt. No. 1887-2; Third Am. and Rest. Trust

Settlement Agreement with the Talcott Franklin Group, Dkt. No. 1887-3. It is unclear whether the

Board ever met to approve this additional subsequent amendment. The final amendment raises the

distinct possibility that the "resolved" R&W claims may very well have to be litigated in

connection with Residential Capital's purported liability, thus undercutting the rationale of entering

into the RMBS Settlement in the first place.[5]

### vii.    Residential Capital's Decision-Makers Failed to Address Conflicts of Interest and the Unique Interests of Residential Capital's Creditors

21.    Although each Debtor is situated differently in respect of both R&W liability and

its legal entitlement to any allocation from the AFI contribution, neither Residential Capital nor its

Board or counsel considered the unique interests of Residential Capital's own creditors, or possible

conflicts vis-à-vis other Debtors when negotiating and approving the RMBS Settlement and AFI

---

[4]    No minutes of any meeting of the Board where this amendment could have been discussed or approved have ever been produced, and no other documents indicate that there ever was such a meeting. Marano testified that although he believed that the amendment was only a "technical agreement," he believed there had been a meeting to discuss the change. *See* Ex. M at 215:22-216:15. But Tammy Hamzehpour, Residential Capital's general counsel who signed the first amended settlement on behalf of Residential Capital, testified that there was no Board meeting. *See* Ex. Y at 89:15-90:4. Mack testified that there was no meeting to discuss the first amended settlement because the changes had been deemed "administerial" and did not change the "economics" of the settlement. *See* Ex. C at 107:9-20; 135:17-136:2.

[5]    The Board ultimately ratified the final version of the Settlement Agreement in September after it had already been presented to the Court. *See* Ex. C at 134:8-135:8.

Settlement. Although the RMBS Settlement affects each Debtor and its creditors differently, it is

telling that the GMACM and RFC boards have never met to consider and approve it. *See* Ex. K at

146:22-147:23. Meanwhile, Board members failed to acknowledge the divergent interests of

creditors. For example, Mack gave no consideration to the unique legal claims of the Noteholders

during the negotiations. *See* Ex. C at 84:19-89:12; 131:13-24. Whitlinger testified there was no

discussion of conflicts of interests among the various Debtors. *See* Ex. K at 58:20-59:15. And,

Marano never considered conflicts as he saw his sole duty as trying to get the best deal without

regard to how it would impact each Debtor. *See* Ex. M at 207:4-209:14.

22.     Residential Capital's creditors were uniquely harmed as a result of the Board's

failure to evaluate conflicts and address the unique interests of different creditor groups. For

example, the first amended settlement stripped Residential Capital of its release and exposed it to

the Holdco Election without Residential Capital receiving anything of value in return and without

the Board even considering or approving the change.  It is clear that no one took into account the

fact that Residential Capital, as a mere holding company, was not a party to the trust agreements,

did not make any R&Ws, and lacked any legal nexus tying it to the RMBS Investors' claims. In

their failure to consider the specific interests of Residential Capital and its creditors, those

responsible for negotiating and approving the RMBS Settlement and its amendments exposed

Residential Capital to unknown liability and further undermined the validity of the already flawed

RMBS Settlement process.

### viii.    The Debtors' Discovery Failures Require that an Adverse Inference Be Drawn Against the Settlement's Approval

23.     During his deposition taken on November 14, 2012, Mack testified that he was not

aware of the Trustee's subpoena seeking his documents and had not searched his documents, both

electronic and hardcopy, in response to the subpoena. *See* Ex. C at 22:7-24:14. Mack also testified

that he used text messaging to negotiate crucial aspects of the AFI Settlement with Michael

Carpenter, AFI's CEO, and other business people. *See* Ex. C at 102:14-103:5. During the

deposition, as well as in a subsequent letter dated November 16, 2012, the Trustee called for the

immediate search and production of Mack's electronic and hardcopy documents, including text

messages, in compliance with the Trustee's subpoena. Mack did not respond to this demand until

his counsel sent counsel for the Trustee a letter on the evening of November 27, 2012, almost two

weeks after his deposition and just before the objection deadline. In an attempt to avoid production

of his documents, the November 27, 2012 letter misrepresents Mack's testimony. The Trustee

believes that Mack is now in contempt of the Trustee's subpoena for failure to search and produce

his documents. As a result, the Trustee requests an adverse inference to be drawn against the

RMBS Settlement.

**B.    The RMBS Investors Have No Standing To Enter Into The RMBS Settlement**

24.    This Court has no authority to approve the RMBS Settlement because it is an

agreement between certain Debtor entities and the RMBS Investors, who have no standing to bring

R&W claims. *See Walnut Place LLC v. Countrywide Home Loans, Inc.*, 951 N.Y.S. 2d 84 (Sup.

Ct. 2012), *aff'd*, 96 A.D. 3d 648 (2012) (dismissing claims brought by RMBS certificateholders for

failing to comply with the provisions of the pooling and services agreements based as their lack of

standing to bring such claims). They are also not even creditors or parties in interest with standing

to appear in these chapter 11 cases in respect of such claims. No trustee (the alleged injured party)

is a party to the RMBS Settlement or has actually brought any of the claims being settled.

Accordingly, the RMBS Settlement is substantively identical to the situation where a class-action

plaintiff without personal standing attempts to settle on behalf of an injured class. The law is

absolutely clear that the Court has no authority to approve such a settlement.

14

25.    It is axiomatic that before a court renders a decision, the court must first determine

that a plaintiff has standing to pursue its claim. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975).  In

addition to constitutional standing requirements, the Supreme Court has also created prudential

limitations on the types of claims that plaintiffs may assert. That is, a "plaintiff generally must

assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or

interests of third parties." *Id.* at 499.  For example, this limitation dictates that in order to sue as a

class representative under Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), "it is

essential that a plaintiff must be a part of that class, that is, he must possess the same interest and

suffer the same injury shared by all members of the class he represents." *See Schlesinger v.*

*Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974); *Cordes and Co. Fin. Serv. Inc. v.*

*A.G. Edwards and Sons, Inc.*, 502 F.3d 91, 100-01 (2d Cir. 2007).  In other words, "a named

plaintiff cannot represent a class against a defendant if he lacks standing to sue that defendant in

his own right," *Johnson v. Geico Cas. Co.*, 673 F. Supp. 2d 244, 253 (D. Del. 2009), because the

plaintiff's suit would otherwise be dismissed for lack of standing, *id.* at 255. *See also Ruggles v.*

*Wellpoint, Inc.*, 272 F.R.D. 320, 333 (N.D.N.Y. 2011).  It follows *a fortiori* that a person cannot

settle an action that it cannot bring in its own name.

26.    Here, the RMBS Investors have no standing under the Governing Agreements (as

defined in the Motion) to sue the Debtors for R&W liability.  Yet they are attempting to settle a

claim that they cannot bring in their own name.  Like class representatives with no redressable

injury, the RMBS Investors have no standing to settle.  Moreover, the proposed settlement order

requests that the Court make a finding that it has no authority to make:  that the settlement is "fair

and reasonable to, *and in the best interest of,* all interested parties," including the investors for each

trust. *See* Motion, Ex. 1, at 4 (emphasis added).  It is only in the context of proceedings in actual

15

cases or controversies, however, that a court in a class action settlement context is permitted by Rule 23 of the FRCP to make findings relating to whether a settlement is "fair, reasonable, and *adequate*." *See* Fed. R. Civ. P. 23 (emphasis added). Even in the class action context, courts are not authorized to make a "best interest" finding, which improperly usurps a litigant's responsibility to make that determination on its own. The proposed finding sought here is not authorized by any Bankruptcy Rule or substantive provision of the Bankruptcy Code and does not even purport to take place in the context of any real action. Accordingly, the Court also has no authority to make such a finding whatsoever.

27.    In addition to prudential standing, Section 1109(b) of the Bankruptcy Code creates "an independent standing hurdle for parties wishing to appear or be heard in bankruptcy proceedings." *See In re Lehman Bros. Holdings*, No. 11 Civ. 3760, 2012 WL 1057952, at *3 (S.D.N.Y. Mar. 26, 2012) (citing *In re Motors Liquidation Co.*, 430 B.R. 65, 92 (S.D.N.Y. 2010)). Under Section 1109(b), only "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). Although "party in interest" is not defined within the Bankruptcy Code, this term has been interpreted to mean only "[the party] who, under the applicable substantive law, has the legal right which is sought to be enforced or is the party entitled to bring suit." *See Lehman*, 2012 WL 1057952, at *3; *see also In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983). Importantly, "party in interest" standing under Section 1109(b) "does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding." *Krys v. Off. Comm. Of Unsec. Cred., (In re Refco Inc.)*, 505 F.3d 109, 117 n.9 (2d Cir. 2007).

16

28.    Here, as explained above, the RMBS Investors are not seeking to enforce their own rights, but rather are asserting rights that belong to the Trustees and are "purely derivative of another party's rights" in the proceeding. Further, the Second Circuit has limited "party in interest" to mean either a creditor or debtor and further defined "creditor" to mean a creditor of the debtor. *See Comcoach*, 698 F. 2d at 573. Specifically, the concept of a party in interest "does not, according to the Second Circuit, encompass a creditor of one of the debtor's creditors." *See S. Boulevard Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997) (citing *Roslyn Sav. Bank v. Comcoach Corp.* 698 F.2d 571, 573 (2d Cir. 1983)). In both *Lehman* and *Innkeepers*, the courts rejected the standing of a beneficial owner in a special purpose entity to challenge a Rule 9019 settlement on the basis that they had an interest in the special purpose entity, itself a creditor of the estate, but they were not themselves creditors of the estate. *See Lehman*, 2012 WL 1057952, at *5; *In re Innkeepers USA Trust*, 448 B.R. 131, 144 (S.D.N.Y. Bankr. 2011) (Chapman, J.) (noting that "in a securitization, the investors' relationship is with the special purpose vehicle holding the assets" and the investor has "no privity or other relationship with the Debtors which would confer on it standing to be heard"). Similarly, the RMBS Investors here are not creditors of the Debtors, but rather are "creditors of creditors" and thus are not parties in interest and lack standing even to appear in these cases and are certainly not entitled to invoke Bankruptcy Rule 9019 to purport to resolve one of the most significant economic issues in these cases.

C.    **The Provisions Of The RMBS Settlement Relating To The Payment of Attorneys Fees Create Insurmountable Hurdles to Approval**

29.    The fee provisions of the RMBS Settlement (the "Fee Provisions") give counsel to the RMBS Investors (the "Investor Counsel") their own independent claims against certain Debtors up to 11.4% of the claim (the "Legal Fee Allowed Claim") ultimately received by the Accepting

17

Trusts (as defined in the Motion) .[6] *See* Motion Ex. 2 § 6.03(a); Ex. 3 § 6.03(a). The Fee

Provisions are "an integrated and nonseverable part" of the RMBS Settlement Agreements and

therefore are an integral and necessary component that the Court must review when considering

the Motion. Thus, if these provisions are legally inappropriate the RMBS Settlement cannot be

approved. And they are inappropriate because: (1) the payment of the Legal Fee Allowed Claim

would violate § 1129(a)(4) of the Bankruptcy Code because it is not subject to the Court's approval

for reasonableness, (2) such approval would be denied because the proposed fee is not reasonable,

and (3) the proposed early payment of the Legal Fee Allowed Claim would provide for an

unlawful interim distribution from the Debtors' estates.[7]

      30.    First, in order for the Court to confirm a plan of reorganization, all fees paid by the

Debtors in connection with the bankruptcy case must be scrutinized. Section 1129(a)(4) provides

that "[a]ny payment made or to be made . . . by the debtor . . . for services or for costs and expenses

in or in connection with the case, or in connection with the plan and incident to the case, has been

approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).

Courts interpret the scope of §1129(a)(4) broadly. *See Leiman v. Guttman*, 336 U.S. 1, 8 (1949)

(noting that similar language in §221(4) of the Bankruptcy Act, the precursor to §1129(a)(4), was

---

[6]    The actual amount of the Legal Fee Allowed Claim is ambiguous. Exhibit C to the RMBS Settlement Agreements provides that the fees shall constitute a "Percentage of the Allowed Claim (being the sum of the Allocated Allowed Claims) allocable to trusts that accept the settlement, subject to adjustment pursuant to section 6.02(b) for trusts other than original 'Covered Trusts.'" The term "Allocated Allowed Claim" is not defined in the RMBS Settlement Agreements; however, an "Allocated Claim" is defined as the appropriate claim allocated by the allocation expert to each "Accepting Trust," which in turn is defined as the trusts that accept the RMBS Settlement. The Allowed Claim is the aggregate claim to be provided to the Accepting Trusts. Accordingly, it appears that counsel to each of the principal groups who have signed an RMBS Settlement Agreement receive a percentage of the Allowed Claim, the maximum amount of which is $8.7 billion.

[7]    It is also troubling that the RMBS Settlement makes the Investor Counsel creditors pursuant to a "separate claim stipulation" even though they have no claims against any Debtor. The Investor Counsel, acting on their own behalf, and with their own pecuniary interests in mind, will now occupy a critical position in plan negotiations. Moreover, Investor Counsel may have the ability to vote their claims for their own benefit (and not necessarily at the direction of their clients), which could create an additional and unwanted layer of conflict in these cases.

written in "pervasive terms—it applies to 'all payments' for services 'in connection with' the

proceeding or 'in connection with' the plan and 'incident to' the reorganization, whoever pays

them"); *In re Talley*, 97 B.R. 312, 315 (Bankr. W.D. La. 1989) ("Section 1129(a)(4) is similar to

and derived from Section 221(4) of the Bankruptcy Act of 1898, . . . [and noting that] the Supreme

Court gave a very broad reading to Sec. 221(4)'s language."); *see also In re Hendrick*, 45 B.R.

976, 985 (Bankr. M.D. La. 1985) (noting that even if the "payment does not deplete the estate . . .

the statutory requirement is explicit" and therefore payments made in connection with the case

were subject to § 1129(a)(4)).

31.    Here, the Legal Fees Allowed Claim falls squarely within the text of § 1129(a)(4)

because it obligates the Debtors to allocate and pay, "without conveyance to the Trusts," a claim

"for work relating to these cases and the [RMBS Settlement]." *See* Motion, Ex. 2, § 6.02; Ex. 3

§ 6.02. *See also* Ex. C at 84:5-18 (noting that the RMBS Settlement and the various plan support

agreements were all part of an "elegant" plan that the Debtors were attempting to achieve).  Yet

despite the Bankruptcy Code's explicit requirement for judicial scrutiny, the Fee Provisions are an

attempt to obfuscate § 1129(a)(4)'s critical creditor protection:  no fee applications will be filed; no

review by this Court or the United States Trustee will be required; no public notification will be

given.

32.    Second, apart from the procedural protections noted above, on its face the potential

$1 billion allowed claim does not appear reasonable.  Not only have the Debtors not asserted the

reasonableness of the Legal Fees Allowed Claim, they have articulated that they never considered

it and that it "didn't really matter." *See* Ex. K at 124:16-125:1. *See also* Ex. Y at 113: 3-16; 114:

4-9; Ex. M at 200:22-201:8.  The Investor Counsel should provide critical information to permit

interested parties (and the Court) to evaluate the reasonableness of their fees, which include the

19

time expended, the terms of any fee or contingency fee arrangement, and the qualifications and experience of each attorney performing the relevant services. *See, e.g.*, 11 U.S.C. § 330. Moreover, the Debtors' proposed order approving the RMBS Settlement contains an ordered paragraph finding that the RMBS Settlement is "fair and reasonable to, and in the best interest of, all interested parties," including the investors for each trust. This factual finding necessarily requires an analysis of the reasonableness of the Fee Provisions and the Legal Fee Allowed Claim.

33.    Third, the cash payment of the Legal Fee Allowed Claim before confirmation of a plan of reorganization, before distributions to unsecured creditors are made, and at the sole discretion of the Debtors and the Investor Counsel, has no authority under the Bankruptcy Code. To the contrary, the payment of pre-petition claims is an extraordinary remedy and requires clear demonstration that "such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (articulating and expounding on the "necessity of payment" doctrine). Indeed, the rationale for the doctrine of necessity—to "permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"—is inapplicable in a liquidating chapter 11 case particularly if the core business has already been sold. *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987).

34.    Here, no such "necessity" has been asserted by the Debtors. Nor could such necessity possibly exist: the Investor Counsel are neither owed money by the Debtors nor are they essential to the Debtors' continued operations. In fact, the Fee Provisions undermine a proportionate distribution among unsecured creditors because they provide for no Court scrutiny to prevent the Investor Counsel from receiving a larger distribution than the unsecured pro rata distribution, and there is no mechanism to retroactively address over-distributions. In short, the

RMBS Settlement should be denied because it provides for an unlawful interim distribution of the

Debtors' estates.[8]

**D.      The Representation and Warranty Claims Are Subject to Statutory Subordination Under § 510(b)**

35.      Any allowed claim for R&W liability should clearly preserve the issue of whether

any such claim should be subordinated under § 510(b) of the Bankruptcy Code. Section 510(b)

provides that, for purpose of distribution under the Bankruptcy Code, "a claim arising from

rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, [or] for

damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims

or interests that are senior to or equal the claim or interest represented by such security, except that

if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. §

510(b). For § 510(b) to apply, the claim to be subordinated must satisfy each element of the

statute, and the Second Circuit, like most federal appellate courts, construes its terms broadly. *See*

*In re Med Diversified Inc. v. Dufrayne*, 461 F.3d 251, 255, 259 (2d Cir. 2006).

36.      First, for § 510(b) to apply, the claim must arise from securities "of the debtor" (or

"of an affiliate of the debtor"). It is well understood that securities representing interests in asset-

based securitization trusts are "issued by" the legal entity that deposits the assets into the trust and

not the trust itself. *See* Securities Act of 1933, § 2(4), 15 U.S.C. § 77b(a)(4); Securities Exchange

Act of 1934, § 3(a)(8), 15 U.S.C. § 78c(a)(8); 17 C.F.R. § 230.191; 17 C.F.R. § 240.3b-19(a); *see*

*also Asset-Backed Securities*, SEC Release No. 8518, 2004 WL 2964659 (Dec. 22, 2004) at

*38,106, 212, 222. This makes sense because asset-backed trusts are no more than investment

---

[8]      The Investor Counsel could not be paid fees under the substantial contribution provisions of § 503(b) because their clients are not creditors. In addition, the RMBS Investors are not entitled to such fees because they have not demonstrated that they have made a substantial contribution to the estates outside of pursuing their own economic interests.

21

vehicles created by "sellers" and "depositors" at the end of the securitization process to offload

assets to investors. This framework applies in the context of RMBS securitizations. *See Fed.*

*Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 333-34 (S.D.N.Y. 2012). Here,

while there is no question that the RMBS trusts are not Debtors, the inquiry is whether trust

securities are "of the debtor" (*i.e.*, the "depositor") and clearly based on the principles of the

federal securities laws they are.[9]

37.    Second, for § 510(b) to apply, the claim must be for rescission or damages "arising

from" the purchase of securities of the debtor. Here, the claim being settled, at bottom, rests on

damages allegedly resulting from the purchase of the trust securities, notably the R&W claims.

The leading Second Circuit case on the phrase "arising from" in the context of § 510(b), *In re Med*

*Diversified*, 461 F.3d 251, is consistent with this result. There, the court addressed whether a claim

for damages based on the debtor's failure to issue shares of its common stock in exchange for a

former employee's stock in another company, pursuant to a termination agreement, should be

subordinated under § 510(b). *Id.* at 254. The court concluded that the phrase "arising from," in the

unique context of the arguments made before it, was ambiguous, and therefore, the court resorted

to legislative history. The court relied on the statute's policy rationale in determining that the

employee's claim must be subordinated—that is, whether the claimant took on investment rather

---

[9]    Alternatively, if the Court determines that the "depositors" are not the "issuers" of the trust securities, or that the securities are not "of the debtor," the trusts are unquestionably "affiliates" of the Debtors because they are controlled by an operating agreement with a Debtor. *See* 11 U.S.C. § 101(a)(2). The relationship between the master servicer (a Debtor) and the Trusts evidence an affiliate relationship. As a threshold matter, the master servicer (which is often the "seller" in the securitization process) signed and is a party to the relevant pooling and servicing agreements ("PSAs"). The PSAs generally grant the Debtor-servicers discretion to act in their business judgment for critical decisions involving the Trusts and their assets, including conveying of mortgages for repurchase, modifying or re-recording mortgages, registering mortgages with MERS, and commencing, prosecuting and completing foreclosure actions. The relationship between the Debtors and Trusts in this case are materially different from the relationship as described in *In re Washington Mutual, Inc.*, 462 B.R. 137 (Bankr. D. Del. 2011) ("WaMu"), the only published decision to address this issue. Additionally, the WaMu Court did not consider the federal securities law issues addressed above.

than a creditor risk. *Id.* at 256. Importantly, nothing in the statute requires the security in question to be an equity interest. *See CIT Group Inc. v. Tyco Int'l Ltd.*, 460 B.R. 633, 639 (S.D.N.Y. 2011).

38.    Here, of course, the security holders are not creditors of any Debtor (see discussion *supra* ¶¶ 26-27) and the return they were obtaining was an investment return. The Second Circuit has also affirmed decisions subordinating claims where the lower courts relied exclusively on the text of § 510(b) and not necessarily on the policy rationales identified in *In re Med Diversified.* *See Waltzer v. Nisselson (In re Marketxt Holdings Corp.)*, 346 F. App'x. 744, 745-46 (2d Cir. 2009).    As noted, the claims here fall within the plain meaning of the statute because absent the sale and purchase by investors of RMBS securities the Trusts would have suffered no damages justifying the R&W claims.    Accordingly, the claims must be subordinated against the "depositor" entities, but also against the "seller" entities, which are "affiliate[s] of the debtor." 11 U.S.C. § 510(b); *see also In re VF Brands, Inc.*, 275 B.R. 725 (Bankr. D.Del. 2002).

## CONCLUSION

39.    For the foregoing reasons, the Trustee respectfully requests that the Court deny the Motion.

23

Dated: New York, New York
December 3, 2012

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By:    /s/ Sean A. O'Neal
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
A Member of the Firm
One Liberty Plaza
New York, NY 10006
*(212) 225-2000*

*Special Counsel for Wilmington Trust, National*
*Association, as Indenture Trustee for the Senior*
*Unsecured Notes Issued by Residential Capital, LLC*