# EXHIBIT A

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☑ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2012, or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: 1-3754

# ALLY FINANCIAL INC.
*(Exact name of registrant as specified in its charter)*

| **Delaware** | **38-0572512** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I R S Employer Identification No.)* |

**200 Renaissance Center
P.O. Box 200, Detroit, Michigan
48265-2000**
*(Address of principal executive offices)*
*(Zip Code)*

**(866) 710-4623**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing for the past 90 days.

Yes ☑    No ☐

Indicate by checkmark whether the registrant has submitted electronically and posted on its corporate Web site, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232 405 of this chapter) during the preceding 12 months (or for a shorter period that the registrant was required to submit and post such files).

Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a nonaccelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one)

| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☑ | Smaller reporting company ☐ |
|---|---|---|---|
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)

Yes ☐    No ☑

At April 27, 2012, the number of shares outstanding of the Registrant's common stock was 1,330,970 shares

# Notes to Condensed Consolidated Financial Statements (unaudited)

Ally Financial Inc • Form 10-Q

GSEs and generally impose higher burdens on parties seeking repurchase. In order to successfully assert a claim, it is our position that a claimant must prove a breach of the representations and warranties that materially and adversely affects the interest of the investor in the allegedly defective loan Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally is required to coordinate with other investors in that class comprising not less than 25%, and in some cases, 50%, of the percentage interest constituting a class of securities of that class issued by the trust to pursue claims for breach of representations and warranties. In addition, our private-label securitizations generally require that the servicer or trustee give notice to the other parties whenever it becomes aware of facts or circumstances that reveal a breach of representation that materially and adversely affects the interest of the certificate holders.

Regarding our securitization activities, certain of our Mortgage Companies have exposure to potential losses primarily through two avenues. First, investors, through trustees to the extent required by the applicable agreements (or monoline insurers in certain transactions), may request pursuant to applicable agreements that the applicable Mortgage Company repurchase loans or make the investor whole for losses incurred if it is determined that the applicable Mortgage Company violated representations and warranties made at the time of the sale, provided that such violations materially and adversely impacted the interests of the investor. Contractual representations and warranties are different based on the specific deal structure and investor. It is our position that litigation of these matters must proceed on a loan by loan basis This issue is being disputed throughout the industry in various pending litigation matters. Similarly in dispute, as a matter of law, is the degree to which claimants will have to prove that the alleged breaches of representations and warranties actually caused the losses they claim to have suffered. Ultimate resolution by courts of these and other legal issues will impact litigation and treatment of non-litigated claims pursuant to similar contractual provisions. Second, investors in securitizations may attempt to achieve rescission of their investments or damages through litigation by claiming that the applicable offering documents were materially deficient If an investor properly made and proved its allegations, the investor might attempt to claim that damages could include loss of market value on the investment even if there were little or no credit loss in the underlying loans.

### *Insured PLS (Monolines)*

Historically, the applicable Mortgage Companies securitized loans where the monolines insured all or some of the related bonds and guaranteed the timely repayment of bond principal and interest when the issuer defaults Typically, any alleged breach requires the insurer to have both the ability to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holders or the insurer. Generally, most claims in connection with private-label securitizations come from Monoline Insurers and continue to represent the majority of outstanding repurchase demands. For the period 2004 through 2007, the Mortgage Companies sold $42.7 billion of loans into these monoline-wrapped securitizations During the three months ended March 31, 2012, the Mortgage Companies received repurchase claims related to $28 million of original unpaid principal balance from the monolines associated with the 2004 through 2007 securitizations The Mortgage Companies have resolved repurchase demands through indemnification payments related to $2 million of original unpaid principal balance.

We are currently in litigation with MBIA and FGIC, and additional litigation with other monolines is likely

### *Uninsured PLS*

Historically, the applicable Mortgage Companies securitized loans where all or some of the related bonds were uninsured. These entities are required to make customary representations and warranties about the loans to the investor and/or securitization trust Though particular application of the language is in dispute in various litigation, the contracts typically require claimants to demonstrate that an alleged breach of representations and warranties has had a material and adverse effect on the interest of the security holder. During the period 2004 through 2007, the Mortgage Companies sold $182.1 billion of loans into these uninsured private-label securitizations. Claims associated with uninsured PLS were historically self identified and constituted an immaterial portion of new claims. They historically were included within the Whole loan/other category. During the three months ended March 31, 2012, we received a repurchase request from a bond trustee with respect to one uninsured PLS deal for loans originated in 2006 relating to $70 million of original unpaid principal balance The Mortgage Companies are currently reviewing this repurchase request.

### Whole-loan Sales

In addition to the settlements with the GSEs noted earlier, certain of our Mortgage Companies have settled with whole-loan investors concerning alleged breaches of underwriting standards For the three months ended March 31, 2012, certain of our Mortgage Companies have received $22 million of original unpaid principal balance in repurchase claims, all of which are associated with the 2004 through 2008 vintages of loans sold to whole-loan investors. Certain of our Mortgage Companies resolved claims related to $10 million of original unpaid principal balance, including settlements, repurchases, indemnification payments, and rescinded claims

### Private Mortgage Insurance

Mortgage insurance is required for certain consumer mortgage loans sold to the GSEs and certain securitization trusts and may have been in place for consumer mortgage loans sold to whole-loan investors. Mortgage insurance is typically required for first-lien consumer mortgage loans having a loan-to-value ratio at origination of greater than 80 percent. Mortgage insurers are, in certain circumstances, permitted to rescind existing mortgage insurance that covers consumer loans if they demonstrate certain loan underwriting requirements have not been met Upon receipt of a rescission notice, the applicable Mortgage Companies will assess the notice and, if appropriate, refute the notice, or if the notice cannot be refuted, the applicable Mortgage Companies attempt to remedy the defect. In the event the mortgage insurance cannot be reinstated, the applicable Mortgage Companies may be obligated to repurchase the loan or provide an indemnification payment in the event of a loss, subject to contractual limitations. While the applicable Mortgage Companies make every effort to reinstate the mortgage insurance,

Table of Contents

# Notes to Condensed Consolidated Financial Statements (unaudited)
Ally Financial Inc • Form 10-Q

they have had limited success and as a result, most of these requests result in rescission of the mortgage insurance At March 31, 2012, the applicable Mortgage Companies have approximately $173 million in original unpaid principal balance of outstanding mortgage insurance rescission notices where we have not received a repurchase demand. However, this unpaid principal amount is not representative of expected future losses.

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are involved in governmental proceedings arising in connection with our respective businesses. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the payments can be reasonably estimated Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims The following information supplements the disclosures in Note 31 to the Consolidated Financial Statements in our 2011 Annual Report on Form 10-K.

### FGIC Litigation

The Financial Guaranty Insurance Company (FGIC) filed three complaints on November 29, 2011, against several of Ally's mortgage subsidiaries in New York County Supreme Court. In two of these cases, both entitled Financial Guaranty Insurance Company v. Residential Funding Company LLC (RFC), et al., FGIC alleges that defendants RFC and ResCap breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured MBS offerings. FGIC further alleges that the defendants breached their contractual obligations to permit access to loan files and certain books and records

In the third case, entitled Financial Guaranty Insurance Company v. GMAC Mortgage LLC (GMAC Mortgage), et al , FGIC makes similar contract allegations against GMAC Mortgage and ResCap, as well as a claim against GMAC Mortgage for fraudulent inducement In addition, FGIC alleges aiding and abetting fraudulent inducement against Ally Bank, which originated a large portion of the loans in the disputed pool, and breach of the custodial agreement for failing to notify FGIC of the claimed breaches of representations and warranties In each of these cases, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages.

On December 15, 2011, FGIC filed a fourth complaint in New York County Supreme Court related to insurance policies issued in connection with an RFC-sponsored transaction. This complaint, entitled Financial Guaranty Insurance Company v. Ally, et al , names Ally, RFC, and ResCap, and seeks various forms of declaratory and monetary relief. The complaint alleges that the defendants are alter egos of one another, fraudulently induced FGIC's agreement to provide insurance by misrepresenting the nature of RFC's business practices and the credit quality and characteristics of the underlying loans, and have now materially breached their agreement with FGIC by refusing its requests for information and documents.

On December 27, 2011, FGIC filed three additional complaints in New York County Supreme Court against Ally, RFC, and ResCap. These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same

Since January 1, 2012, FGIC has filed five new complaints in federal court naming some combination of Ally, ResCap, Ally Bank, RFC, and GMAC Mortgage The five complaints were filed on January 31, 2012, March 5, 2012, March 6, 2012, March 12, 2012 and March 13, 2012, respectively. These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same In addition, FGIC amended its first-filed complaint to name Ally Financial as a defendant

All of the FGIC cases are now venued in the U S. District Court for the Southern District of New York, and the defendants have asked the Court for leave to file motions to dismiss each such case

### Mitchell Litigation

In this statewide class action, plaintiffs alleged that Mortgage Capital Resources, Inc. (MCR) violated the Missouri Second Mortgage Loan Act by charging Missouri borrowers fees and interest not permitted by the Act. RFC and Homecomings Financial LLC (HFN), among others, were named as defendants in their role as assignees of certain of the MCR loans Following a trial concluded in January 2008, the jury returned verdicts against all defendants, including an award against RFC and HFN for $4 million in compensatory damages (plus pre- and post-judgment interest and attorneys' fees) and against RFC for $92 million in punitive damages In a November 2010 decision, the Missouri Court of Appeals affirmed the compensatory damages but ordered a new trial on punitive damages. Upon remand, we paid $12.8 million in compensatory damages (including interest and attorneys' fees). At the end of February 2012, RFC entered into an agreement in principle to settle all of plaintiffs' remaining claims, including plaintiffs' already-awarded attorneys' fees on appeal, for a total of $17.3 million. The agreement was preliminarily approved on April 16, 2012. The hearing on final approval is scheduled for May 18, 2012

# Notes to Condensed Consolidated Financial Statements (unaudited)
Ally Financial Inc • Form 10-Q

## Potential Losses - Litigation, Repurchase Obligations, and Related Claims
**Litigation**

As described under Legal Proceedings above, Ally and certain of its subsidiaries have been named as defendants in several cases relating to their various roles in MBS offerings.

**Private-label Securitizations — Other Potential Repurchase Obligations**

When our Mortgage Companies sell mortgage loans through whole-loan sales or securitizations, these entities are required to make customary representations and warranties about the loans to the purchaser and/or securitization trust. These representations and warranties relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, ability to deliver required documentation, and compliance with applicable laws. Generally, the representations and warranties described above may be enforced against the applicable Mortgage Companies at any time over the life of the loan, subject to applicable statutes of limitations and other similar limitations. Breaches of these representations and warranties have resulted in a requirement that the applicable Mortgage Companies repurchase mortgage loans. As the mortgage industry continues to experience higher repurchase requirements and additional investors begin to attempt to put back loans, a significant increase in activity beyond that experienced today could occur, resulting in additional future losses at our Mortgage Companies.

**Potential Losses**

We currently estimate that ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims described above could be between $0 and $4 billion over existing accruals. This estimated range is based on significant judgment and numerous assumptions that are subject to change, and which could be material. However, as a result of ResCap's current financial position, we believe ResCap's ability to pay for any such losses is very limited. Refer to Note 1 to the Condensed Consolidated Financial Statements for a discussion of reasonably possible losses in connection with a ResCap bankruptcy filing.

## Other Contingencies

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies. We establish reserves for these contingencies when the item becomes probable and the costs can be reasonably estimated. The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item. Based on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse impact on our results of operations, financial position, or cash flows.

## 25. Subsequent Events
### Declaration of Quarterly Dividend Payments

On April 4, 2012, the Ally Board of Directors declared quarterly dividend payments on certain outstanding preferred stock. This included a cash dividend of $1 125 per share, or a total of $134 million, on Fixed Rate Cumulative Mandatorily Convertible Preferred Stock, Series F-2; a cash dividend of $17 50 per share, or a total of $45 million, on Fixed Rate Cumulative Perpetual Preferred Stock, Series G; and a cash dividend of $0.53 per share, or a total of $22 million, on Fixed Rate/Floating Rate Perpetual Preferred Stock, Series A. The dividends are payable on May 15, 2012.

### Chrysler Exclusivity Agreement

We are currently party to an agreement with Chrysler, pursuant to which Chrysler is obligated to provide us with exclusivity privileges related to certain of its retail financing subvention programs. On April 25, 2012, Chrysler provided us with notification of non-renewal, and as a result the agreement will expire on April 30, 2013

# Management's Discussion and Analysis
Ally Financial Inc • Form 10-Q

## Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

### Selected Financial Data

The selected historical financial information set forth below should be read in conjunction with Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations, our Condensed Consolidated Financial Statements, and the Notes to Condensed Consolidated Financial Statements. The historical financial information presented may not be indicative of our future performance.

The following table presents selected statement of income data.

| ($ in millions) | Three months ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Total financing revenue and other interest income | $ 2,400 | $ 2,478 |
| Interest expense | 1,438 | 1,664 |
| Depreciation expense on operating lease assets | 293 | 270 |
| Net financing revenue | 669 | 544 |
| Total other revenue | 1,187 | 1,008 |
| Total net revenue | 1,856 | 1,552 |
| Provision for loan losses | 140 | 113 |
| Total noninterest expense | 1,350 | 1,340 |
| Income from continuing operations before income tax expense (benefit) | 366 | 99 |
| Income tax expense (benefit) from continuing operations | 64 | (70) |
| Net income from continuing operations | 302 | 169 |
| Income (loss) from discontinued operations, net of tax | 8 | (23) |
| Net income | $ 310 | $ 146 |
| *Basic and diluted earnings per common share:* | | |
| Net income (loss) from continuing operations | $ 76 | $ (2) |
| Net income (loss) | 82 | (19) |
| *Non-GAAP financial measures (a):* | | |
| Net income | $ 310 | $ 146 |
| Add: Original issue discount amortization expense (b) | 108 | 326 |
| Add: Income tax expense (benefit) from continuing operations | 64 | (70) |
| Less: Income (loss) from discontinued operations, net of tax | 8 | (23) |
| Core pretax income (a) | $ 474 | $ 425 |

(a) Core pretax income is not a financial measure defined by accounting principles generally accepted in the United States of America (GAAP). We define core pretax income as earnings from continuing operations before income taxes, original issue discount amortization expense primarily associated with our 2008 bond exchange, and the gain on extinguishment of debt related to the 2008 bond exchange. We believe that the presentation of core pretax income is useful information for the users of our financial statements in understanding the earnings from our core businesses. In addition, core pretax income is the primary measure that management uses to assess the performance of our operations. We believe that core pretax income is a useful alternative measure of our ongoing profitability and performance, when viewed in conjunction with GAAP measures. The presentation of this additional information is not a substitute for net income determined in accordance with GAAP.

(b) Primarily represents original issue discount amortization expense associated with the 2008 bond exchange, including accelerated amortization of $30 million for the three months ended March 31, 2011 that was reported as a loss on extinguishment of debt in the Condensed Consolidated Statement of Comprehensive Income.

# Management's Discussion and Analysis
Ally Financial Inc • Form 10-Q

The following table presents selected balance sheet and ratio data

| ($ in millions) | At and for the three months ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| *Selected period-end balance sheet data:* | | |
| Total assets | $ 186,350 | $ 173,704 |
| Long-term debt | $ 93,990 | $ 88,139 |
| Preferred stock/interests | $ 6,940 | $ 6,940 |
| Total equity | $ 19,667 | $ 20,407 |
| **Financial ratios** | | |
| Efficiency ratio (a) | 72.74% | 86.34% |
| Core efficiency ratio (a) | 68.74% | 71.35% |
| Return on assets | | |
| Net income from continuing operations | 0.66% | 0.39% |
| Net income | 0.68% | 0.34% |
| Core pretax income | 1.03% | 0.99% |
| Return on equity | | |
| Net income from continuing operations | 6.24% | 3.36% |
| Net income | 6.40% | 2.90% |
| Core pretax income | 9.78% | 8.45% |
| Equity to assets | 10.56% | 11.72% |
| Net interest spread (b) | 1.24% | 0.85% |
| Net interest spread excluding original issue discount (b) | 1.60% | 1.86% |
| Net yield on interest-earning assets (c) | 1.67% | 1.46% |
| Net yield on interest-earning assets excluding original issue discount (c) | 1.94% | 2.26% |
| **Regulatory capital ratios** | | |
| Tier 1 capital (to risk-weighted assets) (d) | 13.50% | 14.68% |
| Total risk-based capital (to risk-weighted assets) (e) | 14.53% | 15.97% |
| Tier 1 leverage (to adjusted quarterly average assets) (f) | 11.65% | 12.78% |
| Total equity | $ 19,667 | $ 20,407 |
| Goodwill and certain other intangibles | (494) | (533) |
| Unrealized gains and other adjustments | (317) | (272) |
| Trust preferred securities | 2,542 | 2,541 |
| Tier 1 capital (d) | 21,398 | 22,143 |
| Preferred equity | (6,940) | (6,940) |
| Trust preferred securities | (2,542) | (2,541) |
| Tier 1 common capital (non-GAAP) (g) | $ 11,916 | $ 12,662 |
| Risk-weighted assets (h) | $ 158,460 | $ 150,814 |
| Tier 1 common (to risk-weighted assets) (g) | 7.52% | 8.40% |

(a) The efficiency ratio equals total other noninterest expense divided by total net revenue The core efficiency ratio equals total other noninterest expense divided by total net revenue excluding original issue discount amortization expense
(b) Net interest spread represents the difference between the rate on total interest-earning assets and the rate on total interest-bearing liabilities, excluding discontinued operations for the periods shown
(c) Net yield on interest-earning assets represents net financing revenue as a percentage of total interest-earning assets
(d) Tier 1 capital generally consists of common equity, minority interests, qualifying noncumulative preferred stock, and the fixed rate cumulative preferred stock sold to Treasury under TARP, less goodwill and other adjustments
(e) Total risk-based capital is the sum of Tier 1 and Tier 2 capital Tier 2 capital generally consists of preferred stock not qualifying as Tier 1 capital, limited amounts of subordinated debt and the allowance for loan losses, and other adjustments The amount of Tier 2 capital may not exceed the amount of Tier 1 capital
(f) Tier 1 leverage equals Tier 1 capital divided by adjusted quarterly average total assets (which reflects adjustments for disallowed goodwill and certain intangible assets) The minimum Tier 1 leverage ratio is 3% or 4% depending on factors specified in the regulations
(g) We define Tier 1 common as Tier 1 capital less noncommon elements, including qualifying perpetual preferred stock, minority interest in subsidiaries, trust preferred securities, and mandatorily convertible preferred securities Ally considers various measures when evaluating capital utilization and adequacy, including the Tier 1 common equity ratio, in addition to capital ratios defined by banking regulators This calculation is intended to complement the capital ratios defined by banking regulators for both absolute and comparative purposes Because GAAP does not include capital ratio measures, Ally believes there are no comparable GAAP financial measures to these ratios Tier 1 common equity is not formally defined by GAAP or codified in the federal banking regulations and, therefore, is considered to be a non-GAAP financial measure Ally believes the Tier 1 common equity ratio is important because we believe analysts and banking regulators may assess our capital adequacy using this ratio Additionally, presentation of this measure allows readers to compare certain aspects of our capital adequacy on the same basis to other companies in the industry
(h) Risk-weighted assets are defined by regulation and are determined by allocating assets and specified off-balance sheet financial instruments into several broad risk categories