# EXHIBIT C
# (REDACTED)

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------x

In Re:                          Case No.

RESIDENTIAL CAPITAL, LLC, et. al,   12-12020(MG)

Debtors.

----------------------------------x

VIDEOTAPE DEPOSITION OF JOHN MACK

New York, New York

November 14, 2012

9:53 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27647-A

20

JOHN MACK

1

2 because I'm a Comcast customer.  I have

3 another one at Microsoft that's 33 Iron

4 Mask Road, something like that.

5        I don't use any of them, I just

6 have them.

7    Q.    Okay.  Now, what e-mail address

8 did you use for correspondence, e-mail

9 correspondence related to ResCap?

10    A.    Only John_E_Mack.

11    Q.    As a matter of practice, being a

12 director of a number of boards, how do you

13 deal with, in terms of maintaining, if you

14 do, the hard copy and electronic materials

15 you receive related to the various board

16 positions you hold?

17    A.    It varies with boards.  One of

18 my boards uses a service called Board

19 Books to provide board information to the

20 directors.  Otherwise, I just use the MSN

21 e-mail address, and I would have folders

22 within the MSN e-mail address to store

23 items related to a particular company.

24    Q.    How about physical materials

25 that are sent out, like board books and

21

                    JOHN MACK

1

2   things like that, what do you do with

3   those?

4       A.    Well, usually we get them at

5   meetings, and I tend to just leave them at

6   the meetings, so I don't have to carry

7   them home.

8       Q.    If they're sent to you in

9   advance, what do you do with them?

10      A.    I might still have them.

11          A lot of times I take the

12  materials out and use the binders for

13  other things.

14      Q.    Do you maintain any type of

15  notebook or diary?

16      A.    No.

17      Q.    Do you have a physical or

18  electronic calendar?

19      A.    Yes, I have, I use Outlook.

20      Q.    And do you ever retain hard copy

21  materials?

22      A.    I won't say that I don't, but I

23  generally speaking do not.

24      Q.    Would you look at the subpoena

25  which is Exhibit 91 in front of you, which

22

JOHN MACK

1

2   is the second document.

3           (9019 Exhibit 91, subpoena,

4       marked for identification, as of this

5       date.)

6       A.    This document, yes.

7       Q.    Did you understand that you were

8   served a subpoena to appear today?

9       A.    No, this is the first I heard

10  about it.

11      Q.    Did you make an effort to look

12  for any of the documents that were called

13  for by the subpoena?

14      A.    I have been asked by the

15  attorneys, do I have any documents, and I

16  have responded to that that I don't.

17          But I was not aware of the

18  subpoena per se, so.

19      Q.    When you said you don't, you are

20  saying you didn't have an e-mail file that

21  related to your service on ResCap?

22      A.    I usually delete the e-mails.

23      Q.    I'm sorry, the question is, do

24  you have an e-mail file --

25      A.    Yes, I do.

23

1              JOHN MACK

2        Q.    -- that relates to your service

3   on ResCap.

4        A.    Yes.

5        Q.    And when did you delete the

6   e-mails that were in that e-mail file?

7              MR. PIEDRA:  Object to the form.

8        A.    Well, I mean kind of as you go

9   along.

10       Q.    So you are saying it's a file

11  that never has anything in it?

12       A.    No, it has things in it.  But,

13  you know, a lot of it is just meeting

14  notices and so on and so forth.  When the

15  meetings happened, I could delete it.  I

16  mean it's...

17       Q.    Did you look at your computer

18  and look at your, to see whether or not

19  you had a file related to ResCap, in

20  response to the subpoena?

21       A.    No, because I didn't know I had

22  the subpoena.

23       Q.    Okay.  So you've not searched

24  your computer for that purpose; is that

25  fair?

24

JOHN MACK

A.    For that purpose, yes.

Q.    Okay.

RQ        MR. MOLONEY:  We would call for

a review of those documents and their

production.

Q.    Did you look in your, to see

whether or not you had any hard copy

materials related to ResCap in your home?

A.    No.

Q.    Because you didn't know that you

were subject to a subpoena request to do

so?

A.    Correct.

Q.    How are you compensated for your

ResCap-related work?

A.    There is a fixed fee retainer

paid monthly.  There are meeting

attendance fees.  There are fees for

committee memberships.  And then, of

course, we are reimbursed for our direct

expenses, travel expenses and so forth.

Q.    Do you have any additional

incentive arrangements concerning other

compensation?

25

1                         JOHN MACK

2          A.    No.

3          Q.    What type of insurance and/or

4    indemnification arrangements are in place,

5    related to your service on the ResCap

6    board?

7          A.    There is a D&O policy that all

8    the board members have.

9          Q.    Do you understand that you're,

10   whether or not you are indemnified by Ally

11   Financial, Inc. or AFI?

12         A.    I believe they are part of the

13   D&O policy.

14         Q.    Do you understand whether or not

15   you have an indemnity from them?

16         A.    I believe we do, yes.

17         Q.    Okay.  If you look at, back at

18   the prior exhibit.

19         A.    Exhibit -- the first one?

20         Q.    Exhibit 90.

21         A.    Okay.

22         Q.    This is an e-mail that relates

23   to your appointment.  And paragraph 2 at

24   the bottom of the page says, "It will help

25   insulate Ally Financial from liability for

26

JOHN MACK

indemnifying these individuals, if they

are ever sued in connection with their

services as directors on the ResCap

board."

He's talking about basically

employment being done by ResCap itself,

rather than Ally, because it goes on to

say, under the AFI bylaws, if AFI asks

someone to serve, they're covered.

Do you know whether or not

you've secured a request from AFI that

requested you to serve?

MR. PRINCI:  Objection as to

form.

If you understand the question,

you can answer it.

A.    Yes.  I understood that the Ally

board approved, and I don't want to be too

technical here, approved my service as a

director.  They are the shareholder, or

were the shareholder at the time.

Q.    So it would be your position

that they actually, you are serving at the

request of Ally Financial and subject to

33

JOHN MACK

1

2      Q.      You may answer.

3             MR. PRINCI:  You can answer, if

4      you understand the question.

5      A.      Yes, I knew that it was a

6      difficult situation and that it would be

7      challenging.  But as I tell people, nobody

8      invites me on the country club board.  I

9      get invited on the boards that need help.

10     Q.      Help doing what, though?

11     A.      Restructuring, if necessary,

12     financial management, financing.

13     Q.      Okay.  I'd like to show you the

14     next exhibit which is Exhibit 92.

15             (9019 Exhibit 92, 10/19/11

16             e-mail from Michael Carpenter, Bates

17             ALLY 0142018 through 022, marked for

18             identification, as of this date.)

19     A.      Okay.

20     Q.      You are not shown as being

21     copied on this, but it creates a timeline.

22     It's an e-mail from Michael Carpenter

23     dated Wednesday, October 19, 2011.  And

24     you see he says, "This letter is from the

25     law firm and the lawyer that pursued BofA

34

1                    JOHN MACK

2    and negotiated the $8.5 billion

3    settlement.  Let the games begin."

4              And you see it attaches a letter

5    from a woman by the name of Kathy Patrick.

6         A.    Uh-hum.

7         Q.    And so my question is, first,

8    have you ever seen this e-mail or letter

9    before?

10        A.    No.

11        Q.    Were you told, before joining

12   the ResCap board, about Ms. Patrick's

13   demand?

14        A.    No.

15        Q.    Were you told the games had

16   begun?

17        A.    No.

18             MR. PRINCI:  Objection as to

19        form.

20        Q.    At what point after joining the

21   ResCap board did you learn about this

22   demand and about this issue?

23        A.    Well, Ms. Patrick's name came

24   up, it would have been in late April, mid

25   to late April or early May of this year,

35

JOHN MACK

2  before the petition was filed.

3       Q.    So between -- between

4  October 19th, 2011, when this e-mail,

5  which is Exhibit 92, is dated, and April

6  or May, you never heard that there was a

7  demand being made for a settlement of the

8  RMBS claims?

9            MR. PRINCI:  Objection as to

10      form.

11           MR. PIEDRA:  Objection to form.

12      A.    Yeah, I think that's correct.  I

13  don't think I knew about it, other than,

14  broadly speaking, that we would have been

15  in conversations with some investors; but

16  beyond that, no, nothing specific.

17      Q.    When you say --

18      A.    And nothing with her name

19  attached it to until very late in the

20  process.

21      Q.    So you knew nothing specific and

22  nothing with her name attached to it,

23  until basically April, May; is that fair?

24      A.    Correct.

25      Q.    What did you know earlier than

36

JOHN MACK

1  that, and when?

3      A.    About?

4      Q.    About this general topic of

5  potential settlement of the RMBS claims.

6      A.    Very little about settlement of

7  the RMBS claims.  That they were out

8  there, yes.

9      Q.    Right.  Okay.  And so when did

10  you first learn that there was a serious

11  effort being made to try to settle those

12  claims?

13      A.    That would have been --

14          MR. PRINCI:  Objection as to

15      form.

16      A.    -- in late April or May.

17      Q.    Thank you.

18          Now, were you ever involved in

19  any negotiations with Ms. Patrick

20  concerning the RMBS settlement?

21      A.    No.

22      Q.    Have you ever spoken to

23  Ms. Patrick?

24      A.    I introduced myself at the

25  bankruptcy court hearing, first day or

37

JOHN MACK

1

2    second day.  I was introduced.

3        Q.    So I take it it's fair to say

4    you never directly participated in any of

5    the negotiations of that settlement?

6            MR. PIEDRA:  Objection to form.

7        A.    That is correct.

8        Q.    And did you indirectly

9    participate in some way in those

10   negotiations?

11           MR. PRINCI:  Objection as to

12       form.

13       A.    No.

14       Q.    Okay.  When you learned about

15   them in April or May, at that point it

16   was -- is it fair to say, was it

17   understood by the ResCap board that any

18   resolution of these claims for a

19   settlement would have to be accomplished

20   in a Chapter 11 proceeding?

21           MR. PIEDRA:  Object to the form.

22       A.    They would have been part of the

23   bankruptcy process.  I think I can say

24   that --

25       Q.    Okay.

38

JOHN MACK

1

2       A.    -- from my standpoint as a

3   director.  I don't know what other members

4   of the board thought.

5       Q.    At that time you were already

6   far along with something called Project

7   Bounce, right?

8       A.    Yes.

9       Q.    And you had already been talking

10  about DIP financing, and you had been

11  talking about stalking horse bidders,

12  right?

13      A.    That's correct.

14      Q.    So you understood this was going

15  to be folded in, this was going to be part

16  of a bankruptcy process, right?

17      A.    It would have -- it was not

18  certain until very close to the petition

19  day.  The sense that I had was that this

20  was going to be difficult, if not, and was

21  unlikely, until very close to the petition

22  date, even though conversations had been

23  going on.

24      Q.    Okay.  But if it happened, it

25  was going to be part of the bankruptcy?

39

JOHN MACK

1

2    A.    It was desirable.  It would be

3    desirable, but it was not thought likely,

4    until very close to the petition date.

5    Q.    Is it also fair to say that by

6    April or May, based on the stalking horse

7    bids you had received and the information

8    you knew about ResCap's financial

9    situation at that point in time, that you

10   knew that, as a result of this bankruptcy

11   process, it was at least unlikely that AFI

12   would end up being a shareholder of ResCap

13   on a go-forward basis?

14        MR. PRINCI:  Objection as to

15        form.

16        MR. PIEDRA:  Objection to form.

17        MR. PRINCI:  If you understand

18        the question, you can answer.

19   A.    By mid-April, yes, that was well

20   understood.

21   Q.    Right.  And so would you agree

22   with me that in such circumstances, that

23   there was at least a risk that AFI might

24   perceive its primary objective to be

25   obtaining a release from the RMBS

40

JOHN MACK

1

2    claimants, even if the price for such a

3    release was a higher-than-justified claim

4    against ResCap's subsidiaries?

5            MR. PRINCI:  Objection as to

6        form.

7            MR. PIEDRA:  Objection to form.

8    Q.    You may answer.

9    A.    I don't know that.

10   Q.    Well, if ResCap is going to have

11   no continuing interest in the company,

12   what interest would they have, as a result

13   of the outcome of these --

14           MR. MOLONEY:  Rephrase.

15   Q.    If AFI is going to have no

16   continuing interest in ResCap, what

17   interest would they have, other than

18   obtaining a release from a settlement with

19   Ms. Patrick's group?

20           MR. PRINCI:  Objection as to

21       form.

22           MR. PIEDRA:  Objection to form.

23   A.    I can't speak for them, being

24   AFI.

25   Q.    Okay.  Did the board take any

41

1                           JOHN MACK

2       steps to protect against the risk that I

3       just identified?

4                MR. PIEDRA:  Objection to form.

5                MR. PRINCI:  Objection as to

6            form.

7       A.      Could you -- I'm not sure I

8       understand your question.

9       Q.      Okay.  I identified what I

10      believe is a risk, which is, which is that

11      to the extent that AFI controlled the

12      negotiations with Ms. Patrick, their

13      primary objective would be to obtain a

14      settlement, rather than a lower claim.

15      And I'm asking whether the board took any

16      steps to protect against that risk.

17               MR. PRINCI:  Objection, assumes

18           a facta not in evidence.  Object to

19           the form.

20               But if you understand the

21           question, you may answer.

22      A.      Well, I can't speak for AFI.  I

23      can only say that at ResCap, I didn't know

24      AFI was having conversations with

25      Ms. Patrick.  I had no idea.

42

JOHN MACK

Q.    Now, what did you understand --
who did you understand was the business
person that was taking the leading role in
the RMBS settlement negotiations with
Ms. Patrick?

A.    At ResCap, it would have been
Tom Marano.

Q.    Was your understanding that he
was the one taking the lead in the
negotiations?

A.    No.

Q.    Who did you understand was
taking the lead in the negotiations?

A.    Our advisors.  In this case, it
would have been people at, attorneys at
MoFo.

Q.    Okay.  And what attorney?

A.    I don't recall, specifically,
but I would have to -- I would have to say
Gary Lee, probably.

Q.    Is it fair to say that you
viewed MoFo and Gary Lee as the attorneys
for ResCap?

A.    Oh, they are.

43

JOHN MACK

1

2      Q.    What about K&E and Timothy

3  Devine, did you view them as your lawyers

4  or as AFI's lawyers or something else?

5           MR. PRINCI:  Objection as to

6      form.

7      A.    AFI's lawyers.

8           MR. PRINCI:  Excuse me one

9      second.  Just pause for one second,

10     Tom.

11          MR. MOLONEY:  Wait a second.

12     You can just tell them that he needs

13     to wait -- I'll put it on the record

14     that you need to wait to allow

15     Mr. Princi to state his objection.

16          I think we should note now that

17     counsel is conferring with the

18     witness, and it's not appropriate.

19     Q.    What did you understand Timothy

20  Devine's position to be?

21     A.    I don't know Timothy Devine.

22     Q.    Okay.  Do you know whether or

23  not he had a role in negotiating the RMBS

24  deal with Ms. Patrick?

25     A.    No.

44

JOHN MACK

1

2      Q.    Did it concern you, if he was

3      the chief of litigation for AFI, and he

4      took the lead in the settlement

5      negotiations and negotiated material terms

6      of the RMBS with Kathy Patrick, without

7      the involvement of Morrison & Foerster?

8              MR. PIEDRA:  Objection to form.

9              MR. PRINCI:  Objection to form.

10             MR. MOLONEY:  Noted.

11     Q.    You may answer.

12     A.    Generically speaking, yes, I

13     would not understand that.

14     Q.    As of May 2012, was there any

15     real connection between the amount that

16     the ResCap board was going to require AFI

17     to contribute to a Chapter 11 resolution

18     and the size of the RMBS claim that was

19     negotiated with Ms. Patrick?

20     A.    No.

21     Q.    So at least as of May 2012,

22     there was no additional cost to AFI in

23     agreeing to a larger claim from

24     Ms. Patrick's clients, in return for an

25     AFI release, correct?

45

1              JOHN MACK

2          MR. PIEDRA:  Objection to form.

3          MR. PRINCI:  Objection to form.

4      A.    I'm not sure I understand.  I'm

5   not -- I'm ResCap, I'm not part of AFI.

6   So I don't understand why -- I just don't

7   understand.

8      Q.    That's okay.  Let's change

9   topics.

10          As a member of the ResCap audit

11   committee, what involvement, if any, did

12   you have in reviewing AFI or ResCap group

13   financial statements?

14      A.    We met at least quarterly to

15   review that quarter's financial

16   statements.

17      Q.    And I take it when you joined

18   the board in 2011, ResCap was no longer

19   filing public financial statements itself,

20   correct?

21      A.    Correct.

22      Q.    It was still preparing financial

23   statements, correct?

24      A.    Correct.

25      Q.    Was it preparing stand-alone

JOHN MACK

financial statements, as well as

consolidated financial statements?

    MR. PIEDRA:  Object to the form.

A.    We prepared consolidated ResCap

financial statements.

Q.    And was there also -- were

stand-alone ResCap financial statements

also prepared --

    MR. PRINCI:  Objection as to

    form.

Q.    -- and reviewed by the board

that showed nonconsolidated financial

statements for just the parent company?

A.    For just -- no, not to my

knowledge.

Q.    Okay.

A.    They may be prepared, I just

don't know.

Q.    Okay.  Did you also, in your

capacity as a member of the ResCap audit

committee or otherwise, review the

publicly-filed financial statements of the

parent company, AFI?

A.    No.

47

JOHN MACK

Q.    Okay.  Now I'm going to ask you,

you may not have seen it, but if you have,

would you look at what we marked as

Exhibit Number, what is it, 97?

MR. PIEDRA:  93.

MR. PRINCI:  Tom, are you

talking about this?

MR. MOLONEY:  93, yeah, 93.

(9019 Exhibit 93, Ally 10-Q,

marked for identification, as of this

date.)

Q.    I'm just going to have -- first,

you don't need to read the whole thing,

but is this a document you would have

reviewed, or no?

A.    No.

Q.    Okay.  I'm going to focus you

just on one page, which is at the end of

the document which is page 73.  Page 73.

A.    Yes.

Q.    Now, looking at page 73 you see

the line that says "potential losses"?

A.    Yes.

Q.    Could you read that to yourself

48

```
 1                    JOHN MACK

 2      for a moment.

 3              MR. PRINCI:  You are talking

 4         about the heading "Potential Losses"?

 5              MR. MOLONEY:  Yeah, the

 6         paragraph that follows.

 7         Q.    Just read it to yourself.

 8              (Witness complies.)

 9         A.    Okay.

10         Q.    Were you aware that something

11      like this was being put in AFI's public

12      financial statements?

13         A.    Yes, this has been brought to my

14      attention.  I can't remember under what

15      the context was.

16         Q.    Okay.  Now, do you know what

17      work was done to create this zero to

18      $4 billion estimate?

19         A.    No.

20         Q.    Okay.  Let's look at the next

21      document, which is a document I think you

22      would have been familiar with, which is

23      the ResCap board materials.

24              (9019 Exhibit 94, ResCap audit

25         committee minute dated 5/1/12, Bates
```

49

JOHN MACK

1

2       RC 40022273 through 367, marked for

3       identification, as of this date.)

4           Q.    This is Exhibit 94.  And this is

5    a minute of the audit committee that

6    occurred on May 1, 2002?

7           A.    Uh-hum -- 2002?

8                 2012.

9           Q.    2012, thank you.

10                Now I'm going to focus in on the

11   fourth page of the document, which is

12   page number 2 of the audit committee.

13                First, did you attend this audit

14   committee meeting?

15          A.    Yes.

16          Q.    You see the presentation of

17   ResCap, "Reasonably possible range of

18   loss"?

19          A.    You are on which page?

20          Q.    It's actually, starting from the

21   front, go to the second page, the back of

22   the second page.  Page 2 of the

23   presentation.

24          A.    Yes, yes, I have it.  Sorry.

25          Q.    It's bearing Bates stamp number

50

JOHN MACK

1
2    RC 40022276.

3            So looking at that page, do you

4    know why that was prepared for the audit

5    committee at this point in time?

6        A.    This page was an explanation of

7    the changes in the reported reserve that

8    had been in the financial statements.

9    Well, it says "Third quarter 2011."  And

10   then this was going to be the number that

11   was then in the 4 billion, the zero to 4

12   billion change.  This was the supporting

13   document.

14       Q.    So this was the supporting

15   document for the AFI entry in their

16   consolidated financial statements; is that

17   fair?

18           MR. PRINCI:  Objection as to the

19       form.

20       A.    Perhaps.  Again, I'm focused

21   more, as a director, I focused more on the

22   ResCap number, as opposed to the AFI

23   number.

24       Q.    This number was really coming

25   from ResCap, in terms of the R&W

51

JOHN MACK

liability, right?

A.    Yes.  And if it ends up in AFI,
that's one thing; but I'm focused on it as
a ResCap number.

Q.    Right.  I take it you both used
Deloitte as your accountants, that's both
boards?

A.    I don't know who they used.  We
used Deloitte.

Q.    And this is giving you a range.
Basically, the range of liability could be
somewhere between 829 million, and outside
range is going to be $4 billion; is that
fair?

A.    Yes.

Q.    And it says in footnote C, you
see that?  It says, "Estimated lifetime
losses multiplied by risk funds' audit
defect rate and adjusted for litigation
defense."

That's how they computed the
exposure behind 2013, of potentially
1.255 billion, do you see that?

A.    Yes.

52

1                          JOHN MACK

2          Q.    Can you tell us what they used

3      as the audit defect rate?

4          A.    No, I cannot tell you.  From

5      this schedule, I cannot tell you.

6                 Our defect rate was a range of

7      something like 9 to 29 percent.

8          Q.    Okay.  And there's a reference

9      to adjusted for litigation defenses.

10                Do you know what litigation

11     defenses are being referred to there?

12         A.    No.

13         Q.    Did you ever get an explanation

14     as to what the litigation defenses were to

15     this claim?

16         A.    I don't recall.

17         Q.    You don't recall ever receiving

18     an explanation about the defenses to this

19     claim?

20                MR. PRINCI:  Objection, asked

21         and answered.

22                You can answer again.

23         A.    I don't specifically recall a

24     number being attached to it.

25         Q.    I'm not asking for a number.

53

JOHN MACK

1

2          I'm asking, did you ever get an

3   explanation of what litigation defenses

4   might be available to ResCap to defend

5   against these potential claims?

6          MR. PIEDRA:  Object to the form.

7      A.    No.

8      Q.    For example, were you ever

9   informed that a number of the claims could

10  be eliminated, due to statute of

11  limitations defenses?

12         MR. PRINCI:  Just to the extent

13     that you were informed of any such

14     thing by counsel, then I'm going to

15     direct you not to answer.

16         MR. MOLONEY:  Okay.  I'm just

17     withdrawing my question.  We will go

18     on to another area.

19     Q.    Now, if we look at the -- before

20  we leave this page, if we look at the

21  number 400, that's -- this estimate

22  includes securities litigation, right?

23     A.    Yes, it says so.

24     Q.    Okay.  Thank you.

25         And now, going on in the same

65

1          JOHN MACK

2          MR. PIEDRA:  Objection as to

3     form.

4          MR. PRINCI:  Misstates the

5     facts.

6     A.    Yes.  I was going to say no,

7     that's not the liability to ResCap.

8     Q.    Isn't that the amount that

9     ResCap is agreeing to pay, the settlement

10    plan the ResCap group is agreeing to pay

11    $8.7 billion to settle the claim?

12         MR. PRINCI:  Objection as to

13    form.

14    A.    That is correct, they are

15    agreeing to pay that.

16    Q.    Right.  And why -- if their

17    maximum exposure could only be $4 billion,

18    why would they agree to pay 8.7 billion?

19         MR. PRINCI:  Objection as to

20    form.

21    A.    I don't know that the 4 -- the 4

22    billion is not the maximum, that's just an

23    estimate.  This number is supposed to be,

24    it is negotiated; it is a cap, in essence.

25    Q.    Okay.  You are saying the

66

JOHN MACK

$4 billion was an estimate, but this was a
negotiated number, the 8.7?

    A.    Correct.

    Q.    Now, it wasn't determined by a
court that ResCap was liable for $8.7
billion, right?

    A.    That is correct.

    Q.    So it was just determined by two
human beings who negotiated a number, $8.7
billion, right?

        MR. PRINCI:  Objection as to
    form.

    A.    It was a negotiated number.

    Q.    Who were the two people who
negotiated the number?

        MR. PRINCI:  Objection as to
    form.

    A.    Our advisors from MoFo, and
Kathy Patrick, representing the investors.

    Q.    Now, the person who was
representing you, your advisor for MoFo,
you would think that they should negotiate
a number that's consistent with what they
think are their potential liabilities, if

67

1                      JOHN MACK

2       they go to court, right?

3                  MR. PIEDRA:  Objection to form.

4                  MR. PRINCI:  Objection as to

5             form.

6             A.    No.

7             Q.    No?  Why?

8             A.    They can negotiate a number that

9       is in the best interests of trying to get

10      a transaction accomplished.

11            Q.    Even if it doesn't bear any

12      resemblance to what the outcome would be,

13      if the case was actually tried in court?

14                 MR. PIEDRA:  Objection to form.

15            A.    I don't know that it would or

16      wouldn't bear any resemblance to what the

17      actual number would be.  I couldn't

18      predict the future like that.

19            Q.    Did you get any guidance at the

20      board meeting as to what the number would

21      be, if this claim was actually litigated

22      rather than settled?

23            A.    No, not that I recall.

24            Q.    So this was just a number needed

25      to do a transaction, is what you are

68

JOHN MACK

saying, like an M&A deal?

     MR. PIEDRA:  Objection to form.

     MR. PRINCI:  Objection as to

  form.

A.   No.

Q.   How was it different?

A.   It was different, because we

were, we thought the number was -- well,

it was, by evidence, lower than two other

settlements, one of which Ms. Patrick had

been engaged with.  That was the Bank of

America.  And it was within the range of

defects that we his -- we, ResCap,

historically had.  It was kind of the

midpoint of that range.  So in a market

sense, it seemed to be a reasonable

number.

Q.   Other than those two criteria,

were there any other criteria that you

relied on, in terms of approving the

settlement?

     MR. PIEDRA:  Object to the form.

     MR. PRINCI:  Objection as to

  form.

69

1            JOHN MACK

2      A.    Not that I recall at the time.

3      Q.    Okay.  Let's see if we can

4  understand whether it's lower than the

5  BofA settlement.

6  ████████████████████  ███████

7  ███████████████████████████

8  █████████  █████████████

9    ██   ██████████████  ████

10   ██  █ ████████████████████

11 ██████████████████████████

12 █████████  ████████████████████

13    ██  ███████████  ██████  ████

14      Q.    Okay.  And now, when we looked

15  at Exhibit -- the prior exhibit, there was

16  also a further discount of the number for

17  legal defenses.

18           Do you recall seeing that?

19      A.    Uh-hum, uh-hum.

20      Q.    Was a legal defense discount

21  applied to the number that's on this page?

22           MR. PIEDRA:  Object to the form.

23      A.    Not that I recall.

24      Q.    Okay.  So no consideration of

25  legal defenses?

70

1           JOHN MACK

2           MR. PIEDRA:  Objection to form.

3           MR. PRINCI:  Objection.

4       A.    No, I don't think that was part

5    of what my consideration was.

6       Q.    Now, you say it was less than

7    the BofA settlement; is that what you are

8    telling us?

9       A.    The defect rate, our defect

10   rate.

11      Q.    I know your defect rate.  But

12   the settlement amount actually was,

13   ironically, more than the BofA settlement,

14   right?

15          MR. PIEDRA:  Objection to the

16      form.

17      Q.    BofA settled for $8.5 billion,

18   we saw in the prior exhibit.

19          MR. PIEDRA:  Do you want an

20      answer to the last question?

21          MR. PRINCI:  Which question do

22      you want him to answer?

23      Q.    The settlement amount proposed

24   to be paid by ResCap is actually more than

25   the amount proposed to be paid by BofA to

71

1                    JOHN MACK

2     settle its claims, correct?

3               MR. PIEDRA:  Objection to form.

4               MR. PRINCI:  Objection as to

5          form.

6          A.    The BofA defect rate was higher.

7     That's what I was looking at.

8          Q.    Putting aside -- that's not my

9     question.

10              Did you hear my question?

11              MR. PRINCI:  You asked a

12         multiple number of questions.

13              MR. MOLONEY:  I did not, I asked

14         one question.

15         Q.    You may answer it.

16         A.    I'm not sure I see on this

17    schedule what the BofA settlement number

18    was.

19         Q.    Well, if you go back to the

20    prior -- you have an exhibit in your pile

21    that says that, for Michael Carpenter, the

22    one we looked at earlier.  It says BofA

23    negotiated the $8.5 billion settlement.

24              Do you recall seeing that?

25         A.    In this room?

72

JOHN MACK

1

2    Q.    Yeah.

3    A.    Yes.

4    Q.    You know that as a matter of

5    just public knowledge, that BofA

6    settlement was for $8.5 billion, right?

7         MR. PRINCI:  Objection to form.

8    Q.    You don't?  You don't keep up

9    with your old bank?

10   A.    I actually don't.

11   Q.    Okay, fair enough.

12        Now, it has a number here, next

13   to BofA, of $15 billion.  BofA is --

14   assume it's correct, it's $8.5 billion.

15        BofA is not settling its claim

16   for $15 billion, right?

17        MR. PIEDRA:  Objection to form.

18        MR. PRINCI:  Objection as to

19   form.

20   A.    I don't know.

21   Q.    Take it as a given with the 8.5.

22   So the $15 billion number, what does that

23   represent?

24        MR. PRINCI:  Objection as to

25   form.

73

JOHN MACK

1

2      A.    I'm assuming that is 36 percent

3   times a protected loss number.

4      Q.    Now, do you know whether or not

5   the BofA settlement bore any resemblance

6   to what you call the defect rate here, or

7   is there any correlation between the

8   defect rate and the amount that BofA

9   actually paid to settle its lawsuit?

10          MR. PIEDRA:  Objection to form.

11          MR. PRINCI:  Objection as to

12      form.

13      A.    The answer is no.

14      Q.    You don't know?

15      A.    No.

16      Q.    If there was no correlation

17   between the amount that BofA paid to

18   settle its lawsuit and the defect rate,

19   then this chart is basically useless,

20   right?

21          MR. PIEDRA:  Objection to form.

22          MR. PRINCI:  Objection as to

23      form.

24      A.    I don't know.  I don't

25   understand that.

74

JOHN MACK

It's not useless, but...

Q.    Well, let's take it logically,
okay.  The fact that there's a defect in a
mortgage doesn't mean that the mortgage is
actually -- there's going to be a loss
associated with the mortgage, correct?

A.    That is correct.

Q.    And even if there's a loss
associated with the mortgage and there's a
defect, doesn't necessarily mean that
ResCap is going to be liable to buy it
back, right?

MR. PRINCI:  Objection as to
form.

Q.    They could have legal defenses,
statue of limitations, causation, right?

MR. PRINCI:  Objection as to
form.

Which question are you asking,
the first one or the second one?

Q.    The fact that there's a loss
associated with the mortgage, which is a
defect, doesn't necessarily mean that
there's a liability to a ResCap group,

1                       JOHN MACK

2     with respect to that mortgage, to buy it

3     back, correct?

4             MR. PRINCI:  Objection as to

5         form.

6         Q.    You may answer.

7         A.    We could be obligated to buy it

8     back.  Depends on the agreements.

9         Q.    Correct, you may or may not be,

10    right?

11        A.    Right.

12        Q.    I'm saying on the information

13    you have here, you can't draw any

14    correlation between defect rate and what

15    your liability is.  There's no correlation

16    between those two variables, right?

17            MR. PIEDRA:  Objection to form.

18            MR. PRINCI:  Objection as to

19        form.

20        A.    Well, the defect rate -- we have

21    a historical defect rate which is, created

22    actual losses.

23        Q.    Okay.  Let me try it a different

24    way.

25            Do you know BofA actually issued

76

JOHN MACK

2   twice the amount of bonds that ResCap did

3   and the amount of home loans it had

4   outstanding was a number that was twice as

5   large as ResCap?

6         MR. PIEDRA:  Objection to form.

7         MR. PRINCI:  Objection as to

8     form.

9     Q.    Did you know that?

10     A.    No.

11     Q.    Okay.  Assume, for purposes of

12   my question, that that's a fact, okay?

13     A.    Okay.

14     Q.    And assume that their defect

15   rate is twice as -- for purposes of

16   analysis, it's almost as twice as high as

17   ours, right?  ResCap's, right?

18         MR. PRINCI:  Objection as to

19     form.

20     Q.    Assume that, right?

21     A.    Yes.

22     Q.    They should have paid an amount

23   twice as large as ResCap, then, to settle

24   their liability, right?

25         MR. PRINCI:  Objection as to

77

1                      JOHN MACK

2        form.

3        Q.    It's a matter of logic, right?

4             MR. PRINCI:  Objection as to

5        form.

6        A.    I'm not sure that -- it would

7    have been negotiated.  I'm not sure that

8    all the facts are totally comparable in

9    every respect, so.

10       Q.    Sitting here today, do you

11   really feel that you can draw any comfort

12   from the fact that the defect rate was

13   35 percent for BofA, to justify the

14   settlement that occurred here?

15            MR. PIEDRA:  Objection to the

16       form.

17       Q.    What comfort do you get to

18   justify your settlement from the fact that

19   BofA settled for a different amount of

20   money involving a different amount of

21   bonds with a higher defect rate?  What

22   comfort do you get that that supports your

23   settlement?

24            MR. PIEDRA:  Objection.

25            MR. PRINCI:  Hold on.  There's

78

1              JOHN MACK

2        three questions in sequence.

3              Which one do you want him to

4        answer?

5              MR. MOLONEY:  I'll rephrase.

6        Q.    Assume BofA settled for a

7    different amount of money than ResCap, had

8    a larger amount of bonds, had a

9    significantly larger amount of lifetime

10   losses and was using a larger defect rate.

11   And assume further that the amount of

12   money was smaller, by BofA.

13             Why would that support this

14   settlement?

15             MR. PRINCI:  Objection as to

16        form.

17             MR. PIEDRA:  Objection as to the

18        form.

19        A.    I'm not sure that it would.

20             I was looking primarily at

21   whether this number made sense for us, and

22   I thought that it did.

23        Q.    Why?

24        A.    It seemed to be --

25             MR. PRINCI:  Objection, asked

JOHN MACK

2  and answered.

3         You may answer again.

4    A.    It seemed to be, given our

5  defect rate, it was within -- it was the

6  average of our range of defect rates times

7  our projected estimated lifetime losses.

8         MR. PRINCI:  Tom, just --

9    Q.    If you took that same analysis,

10  and BofA had a larger set of estimated

11  lifetime losses, if I were to tell you

12  that the estimated lifetime losses for

13  BofA were substantially higher than --

14         If I were to tell you, based on

15  ResCap's own expert, the estimated

16  lifetime losses for BofA were a number

17  between $61 billion and $76.8 billion and

18  that, as a percentage, its settlement of

19  lifetime losses was between 11.1 to 13.9,

20  while the percentage pursuant to lifetime

21  losses of the ResCap settlement was

22  between 17 and 19 percent, why would you

23  draw any comfort from that?

24         MR. PIEDRA:  Objection to form.

25         MR. PRINCI:  Objection as to

80

JOHN MACK

1

2      form.

3      A.     Again, I think it's very

4  difficult to compare to BofA, in some

5  respects, because of their portfolio

6  having been originated largely by the

7  company they acquired.

8      Q.     BofA had actually a worse

9  portfolio than ResCap, right?

10         MR. PIEDRA:  Objection to form.

11         MR. PRINCI:  Objection as to

12     form.

13     A.     I would suspect so, but I don't

14  have facts.  I'm not...

15     Q.     And the Lehman analysis, do you

16  know whether Lehman has actually settled

17  any claims on the basis of a 35 percent

18  defect rate?

19     A.     No, I do not.

20         MR. MOLONEY:  Okay, you can take

21     a break now.

22         MR. PRINCI:  Thank you.

23         THE VIDEOGRAPHER:  The time is

24     10:52 a.m. and we are off the record.

25         (Whereupon, there was a recess

81

1              JOHN MACK

2       in the proceedings.)

3            THE VIDEOGRAPHER:  The time is

4       11:04 a.m. and we are back on the

5       record.

6       Q.    Are you ready, Mr. Mack?

7       A.    Yes.

8       Q.    Okay.  Good.  Looking still at

9    95.  I want to go on to under the key

10   assumptions, the first key assumption,

11   ███████████   █████████████████

12   ██████████████   ██████████████████

13   ████████████████████

14   ████████████████████████████

15   ███████████████████████████

16            Do you see that sentence?

17   A.    Yes.

18   Q.    Okay.  Who negotiated that

19   number, the 1 million -- 1 billion 50

20   million dollar number?

21            MR. PRINCI:  Objection as to

22       form.

23   A.    The Ally settlement was

24   primarily Jonathan Ilany and myself.  But

25   at this point this was an assumption.

82

                          JOHN MACK

1

2   This was not an actual number.  It was not

3   a fact.

4        Q.    Okay.  Did this represent the

5   settlement that was negotiated between you

6   and -- who represented Ally in the

7   negotiations or AFI?

8             MR. PRINCI:  Objection.  You got

9        two questions again, Tom.

10       Q.    Let me ask the question who

11  represented AFI in the negotiation of the

12  settlement?

13       A.    Mike Carpenter and Lenard

14  Tessler.

15       Q.    And just for the record, who are

16  they?

17       A.    Mike Carpenter is the CEO.

18  Lenard Tessler is with Cerberus and I

19  believe is the director of AFI.

20       Q.    And you are saying this

21  assumption number is not the same as the

22  number that you negotiated by way of the

23  settlement; is that correct?

24       A.    At this point in time it was

25  still an assumption.  We did not have an

83

JOHN MACK

agreement.

Q.   Okay.  At this point in time
what would have been the ask.  What were
you and Mr. Ilany asking for on behalf
of -- of ResCap?

MR. PRINCI:  Objection as to
form.

A.   I think that what I would say is
that we were still in negotiation and that
as opposed to having -- calling it an ask,
let us say that I was -- my argument was
that it needed to be a headline number
that came in at about this range, about
this size, to be credible.  Now, you can
call that an ask but I wasn't phrasing it
as an ask.

Q.   Okay.  Now, I want to break that
down.  The headline number around this
size, the "this" is referring to the
billion 50?

A.   About a billion.  I wouldn't
have been as precise as a billion 50.

Q.   And when you say in order for it
to be credible, credible to whom and based

84

1              JOHN MACK

2    on what?

3              MR. PRINCI:  Objection as to

4        form.

5        A.    The overall idea here is that we

6    were trying to do a more elegant, if

7    that's a good word, bankruptcy.  That we

8    were trying to put together a package that

9    included a plan, a contribution from Ally,

10   a DIP financing, stalking horse bids, a

11   transaction -- a deal with -- with the

12   RMBS trustees so that we had a package

13   that would accrete value to the process

14   and ultimately to the creditors.

15       Q.    Okay.  And one element of that

16   package was the -- was the Ally

17   contribution, fair to say?

18       A.    Correct.

19       Q.    Now, in terms of -- in terms of

20   how you figured out what the right amount

21   for Ally to bid, what criteria -- to pay,

22   what criteria did you use?

23       A.    Well, I don't know that I would

24   phrase it that way.  It was a negotiation.

25       Q.    What was the rationale for the

JOHN MACK

2  payment?

3      A.    Well, on our side we, we the

4  estate, would be getting cash.  And on

5  their side they would be getting releases.

6      Q.    Okay.  Okay.  And specifically

7  what -- what claims of what ResCap

8  entities and end creditors -- I want -- I

9  want to get a list of what ResCap entity

10  claims and what -- and what individual

11  creditor claims were valued for purposes

12  of this exercise by you?

13          MR. PRINCI:  Objection as to

14      form.

15      A.    I think I'm answering your

16  question here, I'm not sure.  I was

17  working in a consolidated sense not in any

18  specific debtor.  There are a number of

19  subsidiaries in ResCap.  I was thinking of

20  this as a consolidated effort for ResCap.

21      Q.    Well, did you give any

22  consideration to the unique claims that

23  the company which you were a director of

24  might have against -- against AFI?

25          MR. PRINCI:  Objection as to

86

JOHN MACK

1

2      form.

3      A.    I think, again, it was a

4   consolidated thought process not a thought

5   process of this particular legal entity

6   against another company.

7      Q.    Okay.  What about in terms of

8   the claims of individual creditors that

9   were going to be settled by, as a part of

10   this process, how did you value those?

11          MR. PRINCI:  Objection as to

12      form.

13      A.    I was aware that there were a

14   number of different classes of creditors.

15   However, my thought process was to try to

16   be as comprehensive as I could in terms of

17   the amount of money we raised in the

18   process without specific regard to any

19   class of creditor.

20      Q.    Okay.  Without getting into a

21   specific entity what were the -- what were

22   the specific claims that you thought

23   against AFI that you thought had value

24   that they were paying to resolve, if any?

25          MR. PRINCI:  Just want to make

87

JOHN MACK

1

2      sure that if your answer comes from

3      advice of counsel, I don't want you to

4      share anything that's solely based on

5      advice of counsel otherwise you can

6      answer.

7              THE WITNESS:  It pretty much is

8      based on advice of counsel.

9      A.    It was the result of a meeting

10     in which we received a presentation by

11     counsel as to the types of claims they

12     thought they could bring.

13     Q.    Okay.  And beyond whatever you

14     got in terms of types of claims at that

15     meeting, was that the complete universe of

16     claims that you had in your arsenal when

17     you went to negotiate with Mr. Carpenter

18     or did you think of additional claims or

19     learn of other claims other than what you

20     got at that meeting?

21     A.    There would not have been --

22     that was a comprehensive presentation.  So

23     I would say there was nothing that would

24     have been outside of that presentation.

25     Q.    Now, when you joined the ResCap

88

JOHN MACK

1

2    board, did you note that it had public

3    debt outstanding?

4        A.    Yes.

5        Q.    Do you know about almost a

6    billion dollars of unsecured notes were

7    outstanding at ResCap LLC?

8        A.    No.

9        Q.    Do you know that now?

10        A.    I know we had some, yes.

11        Q.    Did you feel that you had a

12    fiduciary -- when you were negotiating

13    this deal, did you feel you had a

14    fiduciary duty to those noteholders?

15        A.    Specifically those noteholders?

16        Q.    Yes.

17        A.    No.

18        Q.    Did you feel you had a specific

19    duty specifically to creditors of the

20    entity which you were a director of?

21        A.    Again, I was not -- I was

22    looking at it on a consolidated basis and

23    not on a legal entity basis.  The debt --

24    the debt that is on the balance sheet of

25    ResCap is on a deconsolidated basis with

89

JOHN MACK

1

2    several of our subs and with the parent

3    company.

4        Q.    But as a director of ResCap LLC

5    wasn't it your primary duty to direct

6    creditors of ResCap LLC?

7            MR. PRINCI:  Objection as to

8        form.

9        Q.    You may answer.

10       A.    I viewed our responsibility to

11   the consolidated group, ResCap and its

12   subsidiaries.

13       Q.    Okay.  In terms of thinking of

14   claims, did you think of -- were you

15   informed about a claim based on a breach

16   of the indenture related to the unsecured

17   notes, you can just answer yes or no,

18   based on the sale of substantially all of

19   the assets of ResCap LLC?

20           MR. PRINCI:  I'm going to direct

21       him not to answer.  I think his

22       earlier testimony was that his

23       understanding of claims was

24       comprehensive --

25           MR. MOLONEY:  He can answer was

JOHN MACK

1

2      he aware of this claim, he can say yes

3      or no.  I'm not asking for any legal

4      advice.

5            MR. PRINCI:  That would indicate

6      information that was transmitted to

7      him by counsel because he's testified

8      that his basis for this came from

9      counsel.  So I'm instructing him not

10     to answer that.  But you can explore

11     anything he said with the

12     counterparty.  Maybe it comes out that

13     way.

14        Q.    All right.  When you met with

15  Mr. Carpenter to negotiate this deal, what

16  was your opening ask?

17        A.    We did not make an opening ask.

18        Q.    What did you tell him you wanted

19  him to pay?

20            MR. PRINCI:  Objection as to

21        form.

22        A.    At the meeting in which we

23  started this conversation Mr. Carpenter

24  made a presentation and we listened,

25  Jonathan and I listened.  We did not

91

                    JOHN MACK

counter.  We did not negotiate in that

meeting.

    Q.    Okay.  Let's see if we can put a

time and place on this meeting.

            MR. MOLONEY:  Do we have this?

    Is this part of the exhibits?

    Q.    Would you look at Exhibit 98 in

your pile.

            (9019 Exhibit 98, meeting

    minutes, Bates RC40020213-214, marked

    for identification, as of this date.)

    A.    Uh-hum.

            MR. PRINCI:  Excuse me.  Just

    give me one second.  Bear with me.

    Okay, Mr. Moloney.

    Q.    Did you attend this meeting on

or about January 25, 2012?

    A.    Yes, I did.

    Q.    And did you -- if you look at

the minutes of meeting there's a reference

under Executive Session to the fact that

there's a presentation given to the ResCap

board essentially about potential claims

against Ally and an indication of certain

92

1                          JOHN MACK

2      materials to provide to the board in

3      advance of the meeting.

4              Do you see that?

5          A.    Yes.

6          Q.    Did you obtain those materials?

7          A.    If they were provided to the

8      board I did.

9          Q.    Did you keep those materials?

10         A.    No.

11         Q.    What did you do with them?

12         A.    I left them in the board room.

13         Q.    You left them in the board room

14     when you left the meeting?

15         A.    Yes.

16         Q.    On a go-forward basis when you

17     were negotiating with Mr. Carpenter did

18     you need to consult the materials from

19     time to time?

20         A.    No.

21         Q.    Is it fair to say your

22     negotiations with Mr. Carpenter really had

23     nothing to do with the legal arguments in

24     those materials?

25              MR. PRINCI:   Objection as to

93

                    JOHN MACK

1

2        form.

3        A.    Yes.  I'm not going to negotiate

4    on legal issues.

5        Q.    Okay.  And then there's a

6    reference here to a meeting that occurs

7    with Mr. Carpenter right after this board

8    meeting.  This board meeting starts at

9    12:25 and there's a reference to a meeting

10    with Mr. Carpenter right after it, right?

11    It says approximately 3:00 the meeting was

12    adjourned.  At approximately --

13        A.    Yes, I see that.

14        Q.    Half hour meeting with

15    Carpenter.  Is that the meeting -- does

16    that kick it off, the process of these

17    negotiations?

18        A.    No.

19        Q.    Okay.  When was the kick-off

20    meeting?

21        A.    It was after this.

22        Q.    Okay.  I'm going to show you a

23    document which we have marked as

24    Exhibit 99.

25                (9019 Exhibit 99, series of

94

1                         JOHN MACK

2          e-mails, Bates ALLY 0142489; 0142535;

3          0142547; 0142563-565, marked for

4          identification, as of this date.)

5          Q.    Take a look at 99.  It's just a

6     series of e-mails that indicate setting up

7     various meetings between yourself and

8     Mr. Ilany and Mr. Mack.  And the reason

9     I'm just doing this is if it's helpful to

10    you in terms of the timeline.  If it

11    doesn't help you -- but that's what we

12    found in terms of timeline.

13         A.    Uh-hum.

14         Q.    But can you tell us when

15    approximately the meeting, the first

16    kick-off meeting was that you had with

17    Mr. Mack to discuss -- with Mr. Carpenter

18    rather, to discuss the Ally contribution?

19         A.    Well, I would have said March or

20    April.  And I think that's about when we

21    started.  As I say, it was after the

22    January meeting.

23         Q.    There's one of the documents

24    refers to an April 4th -- if you look at

25    the third one in, it might be on the third

95

1                    JOHN MACK

2    tab in, refers to a meeting confirmation

3    on April 4, 2012, in this building

4    actually on the 16th floor?

5         A.    Yes.

6         Q.    Is that the kick-off meeting?

7              MR. PRINCI:  Excuse me one

8         moment, Mr. Moloney.  What Bates

9         number is --

10             MR. MOLONEY:  Ally 014457.

11             MR. PRINCI:  Just give me a

12        moment.  I'm sorry.  Go right ahead.

13        Q.    Is that the kick-off meeting?

14        A.    I don't recall.  And I'm not

15   sure that this is clear enough for me to

16   say that it absolutely was the kick-off

17   meeting.

18        Q.    But it's approximately around

19   this time period?

20        A.    Yes.

21        Q.    And did the meeting actually

22   take place in this building?

23        A.    Yes.

24        Q.    Okay.  You don't need to look at

25   that any more then.  Tell me best your

97

JOHN MACK

1

2      Q.     Now, the proposal.  What was the

3      numbers that he gave?

4      A.     As I recall, he had a three --

5      $350 million number.  And again, there

6      were some ancillary items which in our

7      view ultimately didn't really have

8      value -- add value, so.

9      Q.     Did you take notes at this

10     meeting?

11     A.     Probably not.

12     Q.     Did you report what was, what

13     you learned at the meeting to the other

14     directors or anyone else?

15     A.     Yes.

16     Q.     And in what format?

17     A.     Verbal conversation with our

18     attorneys at MoFo.

19     Q.     So you reported verbally to the

20     attorneys at MoFo.  Anything else?

21     A.     Well, Mr. Ilany was with me so

22     the two of us made the report.  We walked

23     back up the street to MoFo's office to do

24     that.

25     Q.     And were the other directors

98

JOHN MACK

present so that they heard the

presentation?

    A.   No.

    Q.   So how did other directors learn

about the status at that point?

        MR. PRINCI:  Objection as to

    form.

    Q.   If they did.

    A.   Well, we would have discussed it

at a subsequent meeting of the directors.

I should have added we regularly had

director, independent director meetings

with our independent counsel.  And so that

would have been a possible timeline.  But

it was done -- we did communicate

verbally.  I never put anything in

writing.  I don't believe Jonathan did

either.

    Q.   Were you told not to put

anything in writing?

    A.   No.

    Q.   Now, you said you didn't make a

counter at this meeting; is that correct?

    A.   That's correct.

99

1                      JOHN MACK

2          Q.    So what -- what happens next?

3          MR. PRINCI:  Objection as to

4      form.

5          A.    We discussed the proposal.

6      We -- there were -- again there was some

7      items in the proposal that he made that

8      were of no value as we -- as we viewed the

9      situation.  And so at a subsequent meeting

10     Jonathan and I went back.  Again, it was

11     the same four principals and only the four

12     principals.  We went back with a

13     counterproposal seeking to emphasize that

14     we liked and preferred the third

15     alternative, that is I'm going to use the

16     word "elegant," the more elegant process,

17     involving a plan.

18         Q.    And what was your

19     counterproposal?

20         A.    Well, we wanted -- we pointed

21     out why we didn't contribute or didn't

22     assign value to certain parts of his

23     proposal.  We discussed the need to have

24     a, you know, reasonable but I don't

25     believe we were specific as to number, a

100

JOHN MACK

1    
2    reasonable headline number in terms of

3    achieving credibility.  And we then

4    encouraged, the four of us, encouraged the

5    advisors who were actually sitting in the

6    next room to work on an agreement that

7    mirrored that.

8        Q.    Now, what did you say in terms

9    of the -- the reasons for a reasonable

10   headline number?  What reasons did you

11   give to them in support of why it was in

12   their reason for a reasonable headline

13   number?

14       A.    Well, it would have been very

15   simple.  If the plan was going to have any

16   credibility at all, then we needed a

17   reasonable headline number.  Otherwise

18   we'd just get mired into a process which

19   isn't going anywhere and which would in

20   fact not ascribe value to the estate and

21   to the creditors.

22       Q.    Okay.  Now when you instructed

23   the lawyers to -- to work on an agreement

24   they weren't supposed to be working on the

25   numbers, they were just working on the

101

1        JOHN MACK

2   mechanics of implementing the deal, right?

3        A.    Yeah.  We were trying to direct

4   them to the idea that we were going to go

5   for a plan as opposed to a free fall 363

6   or something like that.

7        Q.    What was -- what was his

8   response to your request?

9        A.    It was positive.

10       Q.    And did you reach an agreement

11   on a reasonable headline number at that

12   meeting?

13       A.    No.

14       Q.    Or a range of reasonable

15   headline numbers?

16       A.    No, no.

17       Q.    So what happened next in terms

18   of these negotiations?

19       A.    There would have been subsequent

20   phone calls between the principals or

21   among the principals to try to advance the

22   ball.

23       Q.    Okay.  And did you have those

24   calls?

25       A.    I had calls with Mike Carpenter.

102

JOHN MACK

1

2    And Jonathan had the calls with Lenard

3    Tessler.  There were times when I was not

4    available and Jonathan would be on lead.

5    And there would have been times when

6    Jonathan was not available and I would be

7    on lead.

8         Q.    How did you get Carpenter and he

9    got Tessler?  Did you flip a coin or

10   something else?

11             MR. PRINCI:  Objection as to

12        form.

13        A.    I don't know.

14        Q.    So was -- take me through toward

15   when you think that this kind of came

16   together in a kind of a meeting of the

17   minds.

18             MR. PRINCI:  Objection as to

19        form.

20        A.    It would have been in late

21   April.  And I pinpoint the time because I

22   was traveling and I was dealing with this

23   while riding in a shuttle the last weekend

24   of April 2012, the last weekend.  And it

25   was awkward because I couldn't -- I could

103

1                               JOHN MACK

2      not be on the phone because it's a public

3      shuttle.  And so I was texting.  And the

4      deal had gotten a little off track and I

5      had to bring it back.

6           Q.    How did the deal -- how had the

7      deal gotten off track?

8           A.    Well, in an effort to bridge a

9      difference of economics of about $150

10     million, the advisors had proposed that

11     each of three parties, that is Ally,

12     ResCap and our leading stalking horse

13     bidder at the time, Nationstar, each

14     contribute not cash necessarily but in

15     value 50 million each for a total of 150.

16     That was not consistent with the

17     understanding that Mike and I had

18     discussed.  So he got in touch with me and

19     I got back to the lawyers and said no,

20     that that was not the deal.  This is the

21     deal.  Tom Marano -- I copied Tom on the

22     e-mail.  He confirmed that that was the

23     deal, what I said, and that put people

24     back on track.

25           Q.    What involvement, if any, did

104

1                          JOHN MACK

2      Tom Marano have in these discussions?

3          A.    None.   Other than we would talk

4      to Tom about it.   But he was not involved

5      in the conversation.

6          Q.    Now, you say they had to bridge

7      a $150 million gap.   What was the gap at

8      that point in time?   What was the bid and

9      the ask at that point in time?

10         A.    Well, it would have been around,

11     you know, in the 750 to billion dollar or

12     billion 1 range.   That would have been the

13     range.   But obviously The Gap would be a

14     little narrow.   But they were still -- we

15     were still working on some of the fine

16     points.   So we were in that range.

17         Q.    Where did you end up in terms of

18     a number or a range?   Where did you end up

19     in terms of --

20         A.    Where did we end up?

21         Q.    Yeah.

22         A.    750 of cash and then there were

23     a couple of other components, some

24     financing, some loan sales.   So in total

25     it was around a billion dollars.

105

JOHN MACK

1

2      Q.    So that was the headline number

3   you were looking for a billion dollars, is

4   that fair?

5      A.    Yes.  Yes.

6      Q.    Okay.  Just going back to the

7   May 9 board meeting again.  That's

8   Exhibit --

9      A.    The which one?

10     Q.    The May 9 board meeting which is

11  Exhibit --

12          MR. PRINCI:  95?

13     Q.    -- 95.  When -- when -- when

14  you -- I take it the board approved this

15  deal at this board meeting, is that fair?

16     A.    Yes.

17     Q.    And they approved the billion 50

18  Ally settlement?

19     A.    That was not brought up at the

20  May 9 board meeting to my knowledge.

21     Q.    Well, it's part of the package

22  right here.

23     A.    It's part of the key

24  assumptions.

25     Q.    You are saying that wasn't --

106

1                         JOHN MACK

2       that wasn't approved, that was just an

3       assumption?

4            A.    That's correct.

5       ██    ████   ██████████

6       ██████  ████████████

7       ██████  ████████████  ██████

8       ██████████████████

9                 MR. PRINCI:  Objection as to

10      form.

11           A.    I actually don't know.

12           Q.    Were you involved in negotiating

13      the allocation?

14           A.    No.

15           Q.    Who negotiated the allocation?

16                 MR. PRINCI:  Objection as to

17      form.

18           A.    I don't know.

19           Q.    Has that been approved by the

20      board, the allocation?

21           A.    Well, are you talking about

22      subsequent to the filing of the petition?

23           Q.    Well, at this point in time

24      let's say was it approved?

25           A.    No.

107

1              JOHN MACK

2        Q.    At any point in time did they,

3    ███████████████████████████████████████

4    ██████████████████████████████████████

5    ████████████████████    ██████████████████

6    to the Holdco, the company you were a

7    director of?

8        A.    No.

9        Q.    So you don't think that

10   allocation has ever been approved by the

11   board as we are sitting here today?

12             MR. PRINCI:  Objection.  Asked

13        and answered.

14             You can answer again.

15       A.    There have been two amendments

16   to the agreement with the RMBS trustees.

17   The first agreement, which was deemed to

18   be administerial and therefore not

19   approved by the board, did have an

20   allocation to Holdco.

21             The second agreement, which is

22   the one that is currently in place,

23   specifically excludes an allocation to

24   Holdco.

25       Q.    I think we are talking about

1               JOHN MACK

2    apples and oranges.  Let's see if we can

3    ████████████        ██████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████

7        A.    Okay.

8        Q.    So just kind of retrace it.

9        A.    To my knowledge, no part of the

10   Ally settlement has been allocated to

11   anybody.

12       Q.    You certainly as a board didn't

13   make a judgment that -- that weighing the

14   relative merits of the claims of -- that

15   belonged to ResCap LLC versus other claims

16   that might belong to other entities that

17   ████████████████████████████████████

18   ████████████████████████████████████

19   ██████████

20            MR. PRINCI:  Objection as to

21       form.

22       Q.    You didn't make that judgment,

23   right?

24       A.    We did not make that judgment.

25       Q.    Now, did you understand that as

109

1              JOHN MACK

2    part of the settlement that was approved,

3    the $8.7 million settlement, that you were

4    also settling securities claims?

5        A.    Yes, it was reps and warranties

6    and securities claims.

7        Q.    At any point in time did you

8    ever learn that securities claims were not

9    being picked up by this $8.7 billion

10   settlement?

11       A.    No.

12       Q.    So as far as you are concerned,

13   the board has not approved the deal that

14   does not resolve securities claims as part

15   of the $8.7 billion payment?

16            MR. PRINCI:  Objection as to

17       form.

18       A.    This is a slightly technical

19   matter.  I don't know.

20       Q.    Okay.

21            (9019 Exhibit 100, e-mail with

22       attachment, Bates RC 40088324-337,

23       marked for identification, as of this

24       date.)

25       Q.    Please look at Exhibit 100 in

110

```
  1                         JOHN MACK

  2    your pile.  Is this a document you've seen

  3    before?

  4         A.    Yes.

  5         Q.    Why did you ask for this to be

  6    prepared?

  7         A.    I was trying to understand --

  8              MR. PRINCI:  Just can you -- I

  9         need to consult with my partner for a

 10         second.  Jamie, you got a moment?

 11         Excuse me before you go on.  Excuse me

 12         one moment.

 13              MR. MOLONEY:  Why don't we just

 14         go off the record for a second.

 15              THE VIDEOGRAPHER:  The time is

 16         11:37 a.m.  We're off the record.

 17              (Brief recess.)

 18              THE VIDEOGRAPHER:  The time is

 19         11:42 a.m. and we are back on the

 20         record.

 21         A.    I was trying to understand the

 22    deconsolidated liability structure of

 23    ResCap.  The schedule that I had really

 24    asked for was labeled page 8 -- is labeled

 25    page 8.  And that's the one I actually
```

111

JOHN MACK

focused on.  They gave me a lot of other

schedules, pages, in this process that I

didn't really go through.

    Q.    Okay.  We will go to that in a

minute.  But before we get to page 8 I

have a couple of questions on -- on page

5.  And it says, "The assumptions

presented below are consistent with the

assumptions used for recovery presented in

the FTI's board presentation dated

4/4/12" -- do you see that? -- "with the

exception of removing all intercreditor

settlement assumptions."

        Do you see that?

    A.    And where are you reading?

    Q.    At the top of page 5.  Just

so -- just so we can all locate ourselves.

    A.    Yes.  Dated 4/4?  I'm sorry.  I

thought I heard you say something

different.

    Q.    Okay.

    A.    Yes, I see that.

    Q.    Now, look at what they have

under Ally settlement.  They have a

112

1                  JOHN MACK

2      "payment of a billion dollars of cash;

3      assumption or payment by Ally of up to

4      $400 million regulatory costs; value of

5      $500 million provided by Ally via TSA

6      subservicing and parent financing;

7      purchase by Ally through credit bid of the

8      assets secured by Ally revolver facility."

9            Do you see those items?

10     A.    Yes.

11     Q.    What do they represent?

12           MR. PRINCI:  Objection as to

13     form.

14     A.    What do they represent.  Well,

15     again, these were conceptual ideas of what

16     might be in a settlement with Ally.  We

17     had not finalized it at this point.

18     Q.    Had Ally provided any indication

19     it was willing to do a settlement of this

20     magnitude at this point in time?

21     A.    Oh, no.  No.

22     Q.    Was this a proposal that you

23     were making at this point in time?

24     A.    We never made this as a

25     proposal.

113

JOHN MACK

1

2    Q.    Where did FTI get the -- get the

3    idea of this -- of this to include in this

4    chart?

5            MR. PRINCI:  Objection as to

6        form.

7    A.    We discussed it internally but

8    we never made this as a proposal.

9    Q.    And why not?

10           MR. PRINCI:  Objection as to

11       form.

12   A.    I don't recall.

13   Q.    Did you ask for more or less?

14           MR. PRINCI:  Objection as to

15       form.

16   A.    Well, these are different --

17   these are different items.  For instance,

18   the second one, assumption of payment by

19   Ally of up to 400 million of regulatory

20   costs.  This related to the obligations

21   under the DoJ, AG, Fed settlement.  We --

22   we were concerned about the actual amount

23   of costs.  And so that was where that --

24   that was where that concept came from.

25   Q.    I know.  Was it -- was it -- did

114

1                      JOHN MACK

2       you make that request to AFI, did they

3       pick up those costs?

4            A.    I don't know that we made the

5       400 million.  We did -- we did discuss

6       whether they should pick up the regulatory

7       costs.

8            Q.    What did they say?

9            A.    Well, they probably said no.

10      But then, again, we just racked it into

11      the overall settlement.

12           Q.    The overall settlement doesn't

13      pick up this payment, right?

14           A.    Doesn't specify that payment.

15           Q.    And it's for less than a billion

16      dollars in cash, right?

17           A.    I'm sorry, yes.

18           Q.    And you don't get the value of

19      the $500 million provided by the Ally

20      value that's listed here until this deal

21      is actually consummated?

22           A.    Well, we do have a transaction

23      services agreement and we do have

24      subservicing.  Whether you would assign

25      500 million to it or not is different.

115

JOHN MACK

1

2       Q.    You wouldn't -- you wouldn't

3    assign a 500 million value, right?

4           MR. PRINCI:  Objection as to

5       form.

6       A.    I don't think it was that much.

7       Q.    No.  And they didn't purchase

8    through credit bid the assets secured by a

9    revolver, right?

10      A.    No.  In the end we did a

11   different structure.  Those were assets

12   that went to -- they did provide -- I'm

13   sorry, they did provide a revolver as part

14   of the facility.  They just didn't

15   purchase the assets necessarily.

16      Q.    Now, did Mr. Marano indicate

17   around this point in time that he thought

18   $2 billion was required as the headline

19   number to resolve this problem?

20      A.    I'm sorry, I didn't hear you.

21      Q.    Did Mr. Marano indicate to you

22   that he thought at around this point in

23   time April of 2012 that he thought

24   $2 billion was the headline number that

25   the settlement needed to have in order to

116

JOHN MACK

have credibility?

A.    I don't think I would
characterize it that way but I do believe
that he said, I know that he said
$2 billion but I don't believe I would
characterize it that he said that's what
it would need to be.

Q.    How would you characterize it?

A.    That it would be desirable.

Q.    And did you disagree with him?

A.    No.  I didn't disagree with him.

Q.    Why did you agree with a
settlement that was worth less than half
that amount?

A.    Well, I didn't -- just because I
didn't disagree with him doesn't mean I
don't think that the number we got was the
fair number.  I think -- I think his
number was -- could also be deemed to be
fair.  But I'm not saying that that was
the only number that it could be.

Q.    Okay.  There's a discussion down
here that the reps and warranties claims
were estimated at 4.1 billion.  Do you see

117

                    JOHN MACK

1

2    that?

3        A.    Yes.

4        Q.    And was that -- was that the

5    estimate that was given by FTI to the

6    board in April 2012 or did that number

7    come from somewhere else?

8            MR. PRINCI:  Objection as to

9        form.

10       A.    I don't -- I don't know

11   specifically what the source of that

12   number was.

13       Q.    I'd like to look at Exhibit 101.

14           (9019 Exhibit 101, e-mail from

15       Michael Carpenter dated April 12,

16       2012, Bates ALLY 0142576, marked for

17       identification, as of this date.)

18       Q.    This is an e-mail from Michael

19   Carpenter dated April 12, 2012, to a

20   Caribel Ortiz-Zorn with a couple of people

21   copied.  And it refers to a conversation

22   that he purportedly had with you that day.

23   So could you read it to yourself, please.

24       A.    (Witness complies.)

25           Uh-hum.

118

1                           JOHN MACK

2          Q.    Now, do you recall there being a

3     meeting on or about April 11th where

4     Mr. Marano was present with Mr. Mack and

5     you were present?

6          A.    No.

7          Q.    Regardless of the date --

8          A.    I don't -- the reason I'm -- is

9     whether I was present.  Tom and Mike could

10    have had a meeting.  I would not have been

11    present necessarily.

12         Q.    What do you understand he's

13    talking about --

14              MR. PRINCI:  Objection as to

15         form.

16         Q.    -- in this e-mail, if you do?

17         A.    I don't, specifically, recall.

18         Q.    Do you recall, were you ever

19    present at a meeting where -- where

20    Mr. Marano said that the proposal being

21    made by -- by -- by AFI was -- was an

22    opening low ball?

23         A.    No.

24         Q.    Was there -- were you at a

25    meeting where you thought Mr. Marano

124

1              JOHN MACK

2        30, 2012, Bates RC40020521-567, marked

3        for identification, as of this date.)

4        Q.    Did you attend this board

5   meeting?

6        A.    Yes.

7        Q.    Now, if you look at the back of

8   the document, I'm just going to focus on

9   one document, which is a settlement

10  agreement in the back of this package.

11  Apparently it was part of the board

12  package.  And if you look at the black

13  line document, you see under Ally

14  contribution, which is page 6 of the black

15  line document.

16       A.    Yes.

17       Q.    You see 750 is crossed out and

18  850 is inserted?

19       A.    Yes.

20       Q.    And this is at -- as of

21  April 30th.  How did the 850 number get

22  moved down from 850 to 750?

23            MR. PRINCI:  Objection as to

24       form.

25       A.    Well, the 850 number was our

125

1                    JOHN MACK

2    effort to get a greater contribution from

3    Ally.  They never agreed to it.

4        Q.    You are saying when the 850 was

5    actually put in the agreement and 750 was

6    crossed out and delivered to the board

7    meeting there was at that point there was

8    no agreement to pay 850?

9            MR. PRINCI:  Objection as to

10        form.

11       A.    That is correct.  The 850 was a

12   number that perhaps Jonathan had, but I'll

13   take the credit for it or blame for it.

14   It was our effort to get more money.  It

15   was never an agreement with Ally that it

16   would be 850.

17       Q.    Look at Exhibit 102 in your

18   pile.

19           (9019 Exhibit 102, e-mail

20        string, RC 901900062398-400, marked

21        for identification, as of this date.)

22       Q.    You are not copied on this.

23       A.    Okay.  I got 102.

24       Q.    It's an e-mail from Tim

25   Devine --

126

1                        JOHN MACK

2        A.     Okay.

3        Q.     -- to Tammy Hamzephour.

4        A.     Uh-hum.

5        Q.     I think you indicated you don't

6   know who Tim Devine is?

7        A.     I have never met Tim Devine.

8        Q.     Were you aware that he was a,

9   the head of litigation for AFI?

10              MR. PRINCI:  Objection.  Asked

11         and answered.

12              You can answer again.

13       A.     No.  I -- I -- I'm not sure I

14   can tell you what he was or is.

15       Q.     And you know who Tammy

16   Hamzephour is, right?

17       A.     I do know Tammy, yes.

18       Q.     It says "Prep for KP," I think

19   that probably means Kathy Patrick.  But in

20   any event, looking down it says in the --

21   this is dated April 23.  It says, in the

22   second paragraph it says, "Finally I

23   recommend we use 750 rather than 1 billion

24   as potentially AFI contribution.  I don't

25   have a basis to say it should be a

127

1              JOHN MACK

2    billion, and we better leave some room for

3    negotiation.  If we want to use a billion,

4    we will need clearance from AFI and I

5    haven't spoken to Mike."

6              Do you see that?

7         A.    Yes.

8         Q.    Now, was Kathy Patrick

9    recommending -- negotiating the AFI

10   contribution or were you negotiating it?

11             MR. PRINCI:  Objection as to

12        form.

13        A.    I thought I was.

14        Q.    Okay.

15        A.    I'm unaware of this.

16        Q.    This seems to imply that they

17   would have gone up higher if Kathy Patrick

18   had asked for more, doesn't it?

19             MR. PRINCI:  Objection as to

20        form.  Lack of foundation.

21        A.    I -- I don't know.

22        Q.    The language it would be better

23   to have some room for negotiation implies

24   that you are giving an offer less than

25   your bottom line, right?

128

1          JOHN MACK

2          MR. PRINCI:  I'm not going to

3     let you argue with him on this stuff.

4          MR. MOLONEY:  He may answer.

5          MR. PRINCI:  No, I'm going to

6     direct him not to answer.  Stop

7     arguing with him.

8     Q.    You may answer.

9          MR. PRINCI:  Don't answer the

10    question.  Ask an intelligent question

11    where you are not arguing with him.

12    Q.    At this point in time, as of

13    April 23, hadn't there been an agreement,

14    general agreement, that they would put a

15    billion dollars on the table to settle the

16    ResCap situation?

17         MR. PRINCI:  Objection as to

18    form.

19    A.    I don't think so.

20    Q.    Okay.  But you are not sure?

21    A.    That's correct.

22    Q.    Okay.  I'd like to look at

23    Exhibit 104.

24         (9019 Exhibit 104, two e-mails,

25    Bates ALLY 0226069, marked for

129

JOHN MACK

1
2     identification, as of this date.)

3     Q.   And this is two e-mails.  The

4 first is dated May 5, 2012.  It's from

5 Larren M. Nashelsky to Ray Schrock at

6 Kirkland & Ellis and there's a response

7 from Kirkland & Ellis dated the same day,

8 from Mr. Schrock the same day.  You got to

9 read the bottom first and then read the

10 top to follow the chain.

11    A.   Yes.

12    Q.   Now, as of this point in time,

13 May 5, had the contribution been fixed

14 that was going to be paid by AFI?

15    A.   I honestly can't tell you

16 whether it was May 5 or a little bit later

17 or a little bit earlier but it was all

18 within the range of, you know, 750 to 850.

19 That's the number here.  I'm not sure why

20 that's the way it is.

21    Q.   Do you know, and I'm not sure

22 you would know, but if you do know, tell

23 us, do you know whether it was K&E who was

24 turning the drafts of the settlement

25 agreement as opposed to MoFo?

130

1                    JOHN MACK

2       A.    No, I don't recall.

3       Q.    Do you know why Marano would

4  feel that he would need an explanation as

5  to what the amount was at that point in

6  time?

7            MR. PRINCI:  Objection as to

8       form.  Lack of foundation.

9       A.    No.

10      Q.    Let's go to exhibit, next

11 exhibit which is exhibit --

12      A.    105?

13      Q.    Yes.

14            (9019 Exhibit 105, two e-mails,

15      Bates ALLY 0141967, marked for

16      identification, as of this date.)

17      A.    Uh-hum.

18      Q.    It's an e-mail, two e-mails the

19 top one is from Dan Soto dated May 8,

20 2012.  The bottom one is from Jeff Brown

21 dated May 8, 2012.  And I want to focus on

22 the penultimate paragraph of the e-mail,

23 of the bottom e-mail from Jeff Brown.  It

24 says "Also I think, even as Mike once

25 shared to you and Jim, originally ResCap

131

1          JOHN MACK

2     presented an 8 or $9 billion claim against

3     Ally that is now totally gone."

4          Do you see that statement?

5          A.    Yes.

6          Q.    What knowledge, if any, do you

7     have of an 8 to $9 billion claim that

8     ResCap presented to Ally?

9          A.    I would have to speculate that

10    in an early meeting between MoFo and K&E,

11    that that would have been a number that we

12    presented them.

13         Q.    Did MoFo -- did you ever present

14    an 8 or $9 billion ask?

15         A.    Did I?  No.

16         Q.    Why not?

17              MR. PRINCI:  Objection as to

18         form.

19         A.    These are legal matters.  I'm

20    not going to discuss legal matters with

21    principals.

22         Q.    Okay.  So you weren't settling

23    legal claims?

24         A.    No.

25              MR. PRINCI:  Objection as to

132

1          JOHN MACK

2      form.  Asked and answered.

3      Q.    Thank you.  Okay.  Now --

4          MR. MOLONEY:  Why don't we take

5      a short break.

6          THE VIDEOGRAPHER:  The time is

7      12:05 p.m. and we are off the record.

8          (Whereupon, there is a recess in

9      the proceedings.)

10          THE VIDEOGRAPHER:  The time is

11      12:13 p.m., and we are back on the

12      record.

13      Q.    Would you look at Exhibit 108 in

14      your pile, please.

15          (9019 Exhibit 108, e-mail, Bates

16      RC 901900093502 through 503, marked

17      for identification, as of this date.)

18      A.    Yes.

19      Q.    It's an e-mail from Jamie

20      Levitt, copying a bunch of people.  And

21      she's talking about a second amendment to

22      the settlement agreement.  This is a topic

23      we covered, I think very briefly, earlier.

24      A.    Yes.

25      Q.    And in paragraph 1 it says --

133

JOHN MACK

1

2          MR. PRINCI:  This is an e-mail

3      from Jamie Levitt?

4          MR. MOLONEY:  Yes.

5          MR. PRINCI:  Sorry.  Got it.

6      Q.    Paragraph 1 you say, "We cannot

7  agree to your addition of additional

8  debtors to the allowed claim.  Our deal is

9  that the allowed claim is against GMACM

10 and ROC.  We allocated the settlement

11 based on origination, and it can dilute

12 and alter recoveries, if we give the

13 allowed claims as you proposed."

14          Do you see that?

15     A.    Yes.

16     Q.    That's consistent with your

17 understanding as well, is that the deal,

18 the initial deal as done, was that there

19 was not going to be any of the R&W claims

20 allocated to the holding company that you

21 were a director of, right?

22          MR. PRINCI:  Objection as to

23      form, lack of foundation.

24     A.    Yes.  The Holdco was not going

25 to be engaged.

134

1                        JOHN MACK

2        Q.    And did you ever approve a

3   change to that original deal?

4        A.    This was the change that we

5   approved.  There was a previous amendment

6   which, as I say, was deemed administerial,

7   we did not approve.

8        Q.    You say the board actually

9   approved the change to eliminate the -- to

10  assume the liability for Holdco?

11       A.    Yeah.  Because, again, it was a

12  capped claim of 8.7 billion.  They were

13  released, Holdco was both released and

14  wasn't going to be engaged in the process.

15            So, yeah, that was the

16  recommendation of our advisors, both sets

17  of legal advisors, both the MoFo team and

18  the Morrison & Cohen team.

19       Q.    At what point in time did this

20  happen?

21       A.    I believe our approval, we had a

22  meeting, and we approved this in

23  September.

24       Q.    In September of, of this year?

25       A.    2000 -- yes.

135

1            JOHN MACK

2            Now, that's why this, the date

3      on this e-mail makes me question whether

4      this was the final.

5            Q.    Okay.  You approved the final

6      deal?

7            A.    We approved the final deal.  We

8      didn't approve any interim deals.

9            Q.    There was an interim deal that

10     provided for a Holdco, eliminated your

11     release and provided for a Holdco

12     election, a potential claim of

13     $1.7 million?

14           A.    I don't recall.

15           Q.    You didn't approve that deal?

16           A.    I don't recall.

17           Q.    Why did you approve any change

18     from the original deal that allowed ResCap

19     LLC to obtain a release?

20           MR. PRINCI:  Objection as to

21     form.

22           A.    Again, you are into a little bit

23     of a legal issue, and I relied on my

24     advisors with regard to the legal issues.

25     The economics didn't seem to change, to

136

JOHN MACK

1    me.

2    Q.    Well, from the perspective --

3    going back to the exhibit we looked at

4    earlier, the May 9th exhibit.  Can you

5    pull that up again?

6    A.    May 9th?

7    Q.    Yeah.

8    A.    What exhibit?

9         MR. PRINCI:  Which exhibit

10    number?

11         MR. MOLONEY:  It's the board

12    meeting.  It's Exhibit Number 95.

13    A.    Okay, I have 95.

14    Q.    Look at the executive summary,

15    key assumptions.

16         Do you see that?

17    A.    Yes.

137



JOHN MACK

138

1              JOHN MACK

2    [redacted]

3    [redacted]

4    [redacted]

5    [redacted]

6    [redacted]

7    [redacted]

8    [redacted]

9    [redacted]

10        Q.    Did you think you had a

11   fiduciary duty to those bondholders?

12        A.    I think I have a fiduciary duty

13   to all bondholders, not specifically the

14   senior unsecured noteholders.

15        Q.    In terms of your duty -- but

16   that duty didn't exclude them, I assume,

17   right?

18        A.    Correct.  It did not exclude

19   them, it would include, them, but.

20        Q.    But you never thought about

21   whether this deal was fair, from their

22   perspective?

23             MR. PRINCI:  Objection as to

24        form, lack of foundation.

25        A.    I never thought about the