# EXHIBIT D

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

Debtors.

------------------------------------x


VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

New York, New York

November 19, 2012

10:17 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

246

TIMOTHY DEVINE

1
2   today, I don't remember what that set off
3   curve ball was but I was persuaded by my
4   own counsel that it was something
5   unfavorable to us and so I said it's out,
6   no value.
7       Q.   At the time you sent your e-mail
8   at 10:05 on May 9th, did you understand
9   what setoff curve ball you were referring
10  to?
11      A.   As I sit here today, I don't
12  remember.  I confess I may very well not
13  have understood what I was talking about.
14      Q.   Is it your testimony,
15  Mr. Devine, that you were sending e-mails
16  around at this point in the negotiations,
17  May 9th, 2012, without understanding what
18  it was you were talking about?
19      MR. BRYAN:   Objection to form.
20      Argumentative.  Misstates his
21      testimony.
22      A.   What I mean to say is that it
23  occurs to me and appears to me based on
24  the cadence of these e-mails and the
25  timing, although frankly I don't -- I

247

TIMOTHY DEVINE

1
2  don't remember sitting here today what the

3  ultimate timing of a deal was, when hands

4  were shaken on final language.  I'm kind

5  of eager to see where that -- where that

6  goes and where it ends.  I wonder how

7  close we were at May 9th at 10:05.  But I

8  will tell you that I was, I had a sense

9  that a deal was doable and I didn't want

10  anything getting in the way of the

11  essential deal as I had understood it to

12  take shape.

13         So if somebody told me at some

14  time before 10:05 on Wednesday, May 9th

15  somebody was throwing a curve ball setoff

16  or otherwise into the negotiations I may

17  well have taken the time to figure out

18  what they were talking about in

19  consultation with my counsel.  If it was

20  too complicated or irrelevant to what my

21  self understood scope was, maybe I

22  listened and maybe I got half or more of

23  it.  I did recognize it as a potential

24  obstacle of getting a deal done and so I

25  was not ready to allow it to become part

248

TIMOTHY DEVINE

1

2    of the conversation, at least from my

3    perspective in the deal.

4        Q.    Mr. Devine, given what you have

5    claimed is your limited expertise, why

6    were you injecting yourself into the

7    discussion on these matters?  Why didn't

8    you just let Mr. Schrock and Mr. Lee hash

9    it out?

10            MR. BRYAN:  Objection as to

11        form.

12        A.    I was driving a deal to

13    conclusion.

14        Q.    What deal?

15        A.    The deal that is represented in

16    gross by the resolution between the ResCap

17    estate and the RMBS claimants, both the

18    Kathy Patrick and Talcott Franklin in the

19    one sense and also the tripartite

20    agreement between Ally, the ResCap

21    entities and the claimants.  And I thought

22    it was a good deal and I still to this day

23    think it's a good deal.  And I saw that to

24    my mind anyway the essential elements of a

25    deal had been worked out that were

249

TIMOTHY DEVINE

favorable and fair to all concerned and I

wanted to get the deal done as I

understood we were on a certain timeline.

    Q.    Looking at the top e-mail in the

chain from Mr. Lee to yourself, among

others, at 10:54 a.m. on May 9th, did you

receive that e-mail?

    A.    It looks like I did, yes.

    Q.    And Mr. Lee wrote, "We will be

seeking ResCap board approval today.  Does

Ally's board need to approve as it is

signing the PSA and ResCap is agreeing to

settle a claim in excess of 25 million,

which requires Ally approval under Ally's

governance framework.  Please let us

know."

        Did AFI's board need to approve?

    A.    I don't know.

    Q.    Did Mr. Lee, to your knowledge,

receive a response to his inquiry?

    A.    I don't know.

    Q.    Does Mr. Lee's reference to the

ResCap board -- his reference to seeking

ResCap board approval today, meaning

250

1                    TIMOTHY DEVINE

2      May 9th, refresh your recollection of the

3      timeline in relation to the e-mails that

4      appear below that e-mail?

5           A.    Yes, it does.

6           Q.    In what way?

7           A.    Well, it looks like that ResCap

8      or at least Gary Lee at that point

9      intended to bring the ResCap board, if I

10     understand correctly what he was referring

11     to, the RMBS -- proposed RMBS settlement

12     agreement and the PSA, on that day.

13               MR. KAUFMAN:   Let's mark as the

14          next exhibit, which is 150 an e-mail

15          chain on May 9th and May 10th, 2012,

16          between Mr. Devine and Ms. Patrick.

17               (9019 Exhibit 150, e-mail chain

18          dated May 9th and May 10th, 2012,

19          marked for identification, as of this

20          date.)

21          A.    Thank you.

22          Q.    Directing your attention to the

23     e-mail at the bottom of the first page of

24     this exhibit, and continuing over to the

25     second page, which is an e-mail from

268

1        TIMOTHY DEVINE

2            THE VIDEOGRAPHER:  The time is

3    4:57 p.m. and we are off the record.

4            (Whereupon, there is a recess in

5    the proceedings.)

6            THE VIDEOGRAPHER:  The time is

7    5:06 p.m. and we are back on the

8    record.

9    Q.    Before we --

10            MR. PRINCI:  Before you continue

11    with your questions, Mr. Kaufman, I

12    just want to note for the record that

13    when you went off the record, you

14    berated me and you said I was a jerk.

15    I believe that your conduct is

16    contrary to the rules of our

17    profession and the rules of court and

18    I would ask you not to address me like

19    that again, please, sir.

20    Q.    Okay.  Before we broke,

21    Mr. Devine, we were focusing on your

22    e-mail at 1:55 a.m. on Thursday, May 10th.

23    Let me ask it to you this way in that

24    e-mail you said "The KP settlement is for

25    everything" -- and you underlined and

269

1           TIMOTHY DEVINE

2    italicized the word "everything" --

3    "except securities claims," do you see

4    that?

5        A.    Yes, I do.

6        Q.    So you were making clear in that

7    statement that the KP settlement and by

8    that I mean the RMBS Trust Settlement did

9    not include securities claims, right?

10       A.    What I was saying was, it's my

11   understanding of from my perspective what

12   the proposed settlement in negotiation

13   represented was a release, the scope of

14   which was for everything except securities

15   claims.  I wasn't trying to say what the

16   actual settlement was or wasn't, I was

17   stating what my understanding of the

18   settlement as it evolved as a proposed

19   negotiated settlement.

20       Q.    By everything what did you

21   intend to encompass?  What did you

22   understand was being released as part of

23   that settlement?

24       A.    Any claim other than securities

25   claims that any signatory, any releasing

270

TIMOTHY DEVINE

1

2    party to the agreement has or may have at

3    any time up to and including the date of

4    the release.

5        Q.    Did you intend to include within

6    the word "everything" claims that might be

7    asserted by any of the monolines?

8        A.    My understanding at the time was

9    that the monolines would participate and

10   were contemplated to participate in the

11   settlement.

12       Q.    But by May 10th the settlement

13   was already signed up, wasn't it?

14           MR. PRINCI:   Objection as to

15       form.

16       A.    I don't know.

17       Q.    Okay.   Let's put it this way.

18   You knew it had been approved by the

19   ResCap board, didn't you?

20       A.    No.

21       Q.    You didn't?

22       A.    No.

23       Q.    So when you said everything in

24   this e-mail, did you intend or not intend

25   to include a release by the monolines of

271

TIMOTHY DEVINE

1

2    their claims?

3         MR. BRYAN:   Object to form.   I

4         knew -- I certainly knew that the

5         monolines were not a signatory party

6         to the settlement.   But it was my

7         understanding that the claims that

8         they would or could enunciate in

9         connection with the securities subject

10        of the settlement would be included

11        within the scope of the allowed claim.

12        Q.    You said, "And we can define

13   securities claims narrowly."   What do you

14   mean by that?

15        A.    What I meant by securities

16   claims was claims brought by securities

17   holders on traditional federal securities

18   law or state blue sky or the closely

19   Allied state common law fraud claims that

20   would be characterized typically as a

21   securities based claim.

22        Q.    A bit further down in your

23   e-mail you said "The circle is squared at

24   the plan.   KP can only get us the

25   everything but securities settlement

272

1                   TIMOTHY DEVINE

2   release because that is the full extent of

3   her representation.  She has been clear

4   about that.  Same as in her" BofA -- "B of

5   New York Mellon work, etc."

6             Do you see that?

7        A.    Yes, I do see that.

8        Q.    And then you said "But notice,

9   though her clients don't release

10  securities claims, they sign plan support

11  agreements and the plan includes very

12  simple comprehensive releases, which of

13  course include third-party release of all

14  claims which of course includes securities

15  claims.  Presto.  So while she can't

16  represent parties in giving up their

17  securities claims, clients face a choice,

18  either sign up with the settlement to make

19  sure your trust receives monies under the

20  waterfall in which case you need to sign

21  the plan support agreement and support the

22  plan.  And the plan wipes out all their

23  claims of any sort.  This is the beauty of

24  it."

25            Do you see that?

279

1     TIMOTHY DEVINE

2 going on at that time and I have no idea

3 whether there were any intervening e-mails

4 between me and Jamie that were responsive

5 to this one before I received this.

6   Q. Whatever, Mr. Devine, did you

7 receive the e-mail that Ms. Levitt sent at

8 1:16 a.m. on May 11th?

9   A. Looks like I did.

10   MR. KAUFMAN: Let's mark as

11  Exhibit 154 another e-mail chain, this

12  one on May 12, 2012.

13   (9019 Exhibit 154, e-mail chain

14  dated May 12, 2012, marked for

15  identification, as of this date.)

16   Q. Looking at the first e-mail in

17 the chain, which begins at the bottom of

18 the exhibit and continues over to the next

19 page.  Did you send that e-mail to

20 Ms. Levitt, Mr. Lee, Mr. Ornstein and

21 Mr. Ruckdaschel at 4:22 p.m. on May 12th?

22   A. It looks like I did.

23   Q. The subject of your e-mail was

24 the question, "Has Talcott Franklin signed

25 on without reservation to support the

280

1          TIMOTHY DEVINE

2    plan, including broad third-party release

3    of all claims against Ally, etc.,

4    including securities claims."  Right?

5        A.    That's what the subject line is.

6        Q.    And did you receive Mr. Lee's

7    e-mail at 4:26 p.m. in response to that

8    e-mail?

9        A.    I see that Gary Lee sent an

10   e-mail to pretty much the same group of

11   people at 4:26.

12       Q.    And you received that e-mail

13   from Mr. Lee, didn't you?

14       A.    That's what it looks like.

15       Q.    Okay.  And Mr. Lee said, "It's

16   complicated."  And that, "We sent Talcott

17   the agreement the way we wanted it and

18   told him he couldn't really negotiate it.

19   But if KP doesn't sign, I don't know if he

20   will."

21           Do you see that?

22       A.    I see that that's part of what

23   his e-mail says.

24       Q.    Right.  And the e-mail at the

25   top is your reply to Mr. Lee, correct?

281

TIMOTHY DEVINE

1

2      A.     Well, I sent an e-mail to Gary

3  Lee, Jamie Levitt, Noah Ornstein and John

4  Ruckdaschel, cc'd Cieri and Schrock at

5  4:29.

6      Q.     Right.  And you sent that e-mail

7  in response to Mr. Lee's e-mail at 4:26 on

8  May 12th, didn't you?

9      A.     Yeah, I'm not sure if it's in

10  response but I did send him an e-mail a

11  couple minutes later.

12      Q.     And you wrote, "Got it.  Had

13  call with KP.  We told her PSA support

14  whole hog is drop dead."  That's what you

15  wrote, right?

16      A.     That's what I wrote.

17      Q.     And is that what you told

18  Ms. Patrick?

19      A.     I don't remember if I told her

20  whole hog but if I read this sitting here

21  now, it looks like I was communicating to

22  that group that I told her that she had to

23  support the PSAs in full.  And that that

24  was a provision that Ally would insist on

25  to the extent Ally could insist on

282

TIMOTHY DEVINE

1   anything.

3   Q.   And by using the phrase "drop

4   dead" you meant it was nonnegotiable from

5   Ally's perspective, right?

6   A.   I meant that if she wanted our

7   participation in the PSA she needed to

8   support it.

9          MR. KAUFMAN:   Let's mark as the

10         next exhibit an e-mail chain on

11         May 13, 2012 between Mr. Devine and

12         Talcott Franklin.

13             (9019 Exhibit 155, e-mail chain

14         dated May 13, 2012 between Mr. Devine

15         and Talcott Franklin, marked for

16         identification, as of this date.)

17   A.   Okay.

18   Q.   Looking at the first e-mail in

19   this chain which starts at the bottom of

20   the first page, did you send that e-mail

21   to Mr. Franklin at 12:16 p.m. on

22   May 13th -- I'm sorry -- at 1:28 p.m. on

23   May 12th?

24   A.   It looks like I did.   Again, I'm

25   not sure of the timing but it looks like I

283

1                    TIMOTHY DEVINE

2      did.

3          Q.    And Mr. Franklin responded for

4      you to call him, correct?

5          A.    Yes.  That looks right.

6          Q.    And then you wrote back to

7      Mr. Franklin saying "I can try to call you

8      but on phone now with CEO and making range

9      of final decisions before 1:00 p.m. board

10     meeting.  I can't expose Ally to any

11     claims however remote."

12               That's what you wrote, correct?

13         A.    That's what that e-mail says.

14         Q.    And were you referring to Mike

15     Carpenter when you referred to being on

16     the phone with the CEO?

17         A.    I probably was, yeah.

18         Q.    And were you referring to an AFI

19     board meeting in that e-mail?

20         A.    I don't recall but that would --

21     that would make sense.

22         Q.    When you said that you couldn't

23     expose Ally to any claims however remote,

24     what did you mean?

25         A.    I just wanted to note on the

284

TIMOTHY DEVINE

1  timing here, I think my testimony was

2  probably incorrect earlier if I testified

3  that my e-mail to Talcott was at 1:28 p.m.

4  That might be an indication of his time

5  zone and not mine.  Because if you see the

6  e-mail up the chain was sent Sunday at

7  12:35 p.m.  I'm just not sure of the

8  timing.  But inside that note, inside my

9  note to Talcott it says I can try to call

10  you but I'm on the phone right now with

11  CEO making range of final decisions before

12  1:00 p.m. board meeting.  So I'm assuming

13  that the 12:35 was my time zone and that

14  the 1:00 p.m. was my time zone.

15      Q.    In any event, Mr. Devine, when

16  you said you couldn't expose Ally to any

17  claims however remote, what did you mean?

18      A.    So basically as I recall, and

19  there were a lot of moving parts at this

20  time, there were a lot of settlements

21  going on, there were a lot of

22  conversations but if I recall correctly,

23  the question was whether or not Talcott

24  Franklin could logistically accomplish

305

```
 1              TIMOTHY DEVINE

 2    copy of Exhibit 58, a document that had

 3    been previously marked.  And right now on

 4    the screen is Article 7 releases.  Do you

 5    see that on the screen?

 6        A.    I see Article 7 releases on the

 7    screen.  It's not the complete section

 8    7.01 but there's a certain amount of 7.01

 9    up there.

10        Q.    Well, as you read can we scroll

11    up and when you're done reading --

12        A.    What's the question, please, so

13    I'll know what to read?

14        Q.    What is your understanding, the

15    scope of the release as it relates to the

16    monolines claims?

17              MR. BRYAN:  Objection to form.

18              MR. PRINCI:  Objection as to

19        form.

20        A.    If you are asking me what is my

21    impression and understanding of what the

22    language in this contract means, I'm

23    struggling to find a way to answer that

24    without violating the province of my

25    client's attorney-client privilege.
```

306

TIMOTHY DEVINE

1     

2    Q.    So are you saying to me, sir,

3    that you told Ally what your understanding

4    of Article 7 is in the document that was

5    or the agreement entered between the

6    debtors and Ms. Patrick, is that the

7    nature or the basis, rather, for your

8    assertion of the privilege?

9    A.    That's part of it.

10    Q.    Okay.  I don't want to know what

11    you told Ally.  I want to understand your

12    understanding of this provision.

13    MR. BRYAN:  Objection to form.

14    A.    And so I'm trying to work with

15    you because I know you are not asking me

16    to violate the attorney-client privilege.

17    Q.    I would not ask you to do that,

18    sir.

19    A.    And so -- so that I understand

20    your question better in good faith, you

21    are asking me to comment on either a

22    present draft or a historical draft of an

23    agreement that has not been approved yet

24    and the nature of the scope of one of the

25    negotiated terms in -- in my capacity as

307

1          TIMOTHY DEVINE

2    an attorney for Ally Financial?

3          Q.    Yes.

4          A.    And that's going to -- that's

5    going to reveal attorney-client privilege

6    communications.

7          Q.    We reserve the rights --

8          MR. JURGENS:   Are you

9          instructing the witness not to answer

10         the question?

11         MR. BRYAN:   The witness answered

12         your question.

13         MR. JURGENS:   Are you

14         instructing the witness not to answer?

15         MR. BRYAN:   I instructed the

16         witness not to answer to the extent it

17         would reveal attorney-client

18         communications.

19         Q.    And, Mr. Devine, you are

20   following that instruction?

21         A.    Yes.

22         Q.    Have you discussed the scope of

23   the release as it relates to the monolines

24   claims with anyone other than your client

25   and your outside counsel?

308

1              TIMOTHY DEVINE

2        A.    Yes.

3        Q.    With whom have you discussed the

4    scope of the release with?

5        A.    I believe I have discussed those

6    terms with the parties to the agreement.

7        Q.    And what were your discussions

8    with respect to the scope of the releases

9    as it relates to the monolines claims with

10   those parties?

11       A.    I can't speak about that with

12   regard to the settlement that's currently

13   subject to the hearing that's coming up.

14   But as I recall in the negotiation I

15   indicated to the parties that it would be

16   my understanding that the monolines would

17   participate in the allowed claim that is

18   the subject of one term of that agreement.

19       Q.    And when you say participate in

20   the allowed claim, what do you mean by

21   that?

22       A.    That they would have cognizable

23   claims within the disbursement of whatever

24   funds were allocated to that allowed claim

25   for distribution.

309

TIMOTHY DEVINE

1

2   Q.    Was it your understanding

3   that -- let me withdraw that.

4        What was your understanding of

5   what would happen if the trusts in the

6   deals wrapped by the monolines didn't opt

7   into the settlement?

8   A.    Are you asking me what sort of

9   scenario might ensue if after the parties

10  to the agreements agreed to them and they

11  were presented, at least those requiring

12  court an approval were presented to the

13  court for approval and were not approved?

14  Q.    No.

15  A.    Okay, sorry.

16  Q.    Let's just cut to the chase.

17  There's two possibilities with respect to

18  the trusts in the deals that were wrapped,

19  right, either -- either those trusts will

20  opt in to the proposed settlement or the

21  trusts will opt out, right?  Are there any

22  other options that I'm missing?

23  A.    I suppose there's any other

24  number of negotiated options between

25  those.

310

1              TIMOTHY DEVINE

2        Q.    But under the terms of

3   settlement agreement the trusts are

4   presented with the option to opt in or opt

5   out, right?

6        A.    Well, I can't profess to have an

7   encyclopedic memory of what terms, what

8   the terms in the agreement indicate with

9   regard to the options that the trusts

10  faced.  I just don't.

11       Q.    Let's go back to your

12  understanding of the monolines for a

13  second.  As you sit here today, are you

14  aware of anything in the agreement that

15  would carve the monolines claims out of

16  the scope of the settlement agreement that

17  was reached between the debtors and

18  Ms. Patrick?

19       A.    I'm not aware of anything that

20  would carve the monolines claims out of

21  the $8.7 billion allowed claim.

22            MR. JURGENS:  Let's scroll to --

23       we have a hard copy now.  That's

24       wonderful.  So we don't have to

25       scroll.