# EXHIBIT J
# (REDACTED)

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                                CASE No:

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

                Debtors.

-----------------------------------x



VIDEOTAPE DEPOSITION OF JEFFREY CANCELLIERI

New York, New York

November 14, 2012

2:03 p.m.




Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27647-B

57

```
1                    JEFF CANCELLIERI
2        Q.    Okay.  Who do you believe
3   engaged in that process?
4        A.    I don't know who performed those
5   functions.
6        Q.    How often did they audit second
7   mortgage loans?
8        A.    I don't know.  I believe it was
9   monthly, but I don't know for sure.  You'd
10  have to talk to the folks in the quality
11  assurance area.
12       Q.    Do you know how many loans they
13  audited on a monthly basis?
14       A.    I do not.
15       Q.    Did you ever heard of the term
16  "target audits" within RFC?
17       A.    I have not.
18       Q.    Do you know whether target
19  audits were done for second mortgage
20  loans?
21       A.    I do not.
22       Q.    Were you aware, Mr. Cancelliere,
23  that filter rules with respect to the
24  stated income requirements for loans were,
25  fluctuated within ResCap when they were
```

58

JEFF CANCELLIERI

2  looking at loans?

3        MR. RAINS:  Objection, assumes

4        facts not in evidence.

5     A.    I was not.

6     Q.    Now, Mr. Cancelliere, when you

7  were calculating reserves with respect to

8  potential ResCap exposure for inclusion in

9  public disclosures, did you ever set a

10 reserve for RMBS liability in excess of a

11 billion dollars?

12        MR. RAINS:  Objection, assumes

13        facts not in evidence.  Calls for

14        speculation.

15        MR. NATBONY:  It has no fact --

16        well, you stated your objection.

17    Q.    Go ahead.

18    A.    Can you repeat the question.

19    Q.    Sure.  When you were calculating

20 reserves with respect to potential ResCap

21 exposure, you did you ever set a reserve

22 for RMBS liability in excess of a billion

23 dollars?

24        MR. RAINS:  Same objections.

25    A.    No.

59

1                    JEFF CANCELLIERI

2        Q.    When you were calculating

3    reserves with respect to potential ResCap

4    exposure, did you ever set a reserve for

5    RMBS liability in the range of $8 billion?

6            MR. RAINS:  Objection, assumes

7        facts not in evidence.

8        A.    No.

9        Q.    In fact, Mr. Cancelliere, your

10   reserve numbers were in the seven and $800

11   million range, weren't they?

12           MR. RAINS:  By "you," you mean

13       ResCap, or do you mean him personally?

14       Q.    Well, Mr. Cancelliere --

15           MR. NATBONY:  I'll withdraw the

16       question.

17       Q.    Mr. Cancelliere, it was your

18   group that was recommending reserves,

19   correct?

20       A.    Yes.

21       Q.    So my question is, your group,

22   in fact, recommended, in the third quarter

23   of -- fourth quarter of 2011, let's say,

24   reserves for RMBS liability of under a

25   billion dollars; isn't that correct?

60

1                    JEFF CANCELLIERI

2        A.    Yes.

3        Q.    Let me just show you something

4    that I'm going to mark as Exhibit 111.

5              (9019 Exhibit 111, 4/19/12

6        reminder document about Kathy Patrick

7        prep meeting, with attachments, Bates

8        RC 9019 00047801-982, marked for

9        identification, as of this date.)

10       Q.    I know you testified earlier --

11             MR. RAINS:  Give the witness a

12       second to look at this document.

13       Thanks.

14             This is 111?

15             MR. NATBONY:  Yes.

16             MR. RAINS:  Thank you.

17       Q.    I know you testified earlier,

18   Mr. Cancelliere, that you did not attend

19   any meeting with Kathy Patrick.  I'm just

20   showing you this document.

21             Does this appear to be an

22   indication of a reminder for prep for a

23   Kathy Patrick meeting, that was sent to

24   you on or about April 18th of 2012?

25       A.    Yes.  This is a meeting request

61

1        JEFF CANCELLIERI

2     for a prep for a discussion with Kathy

3     Patrick.

4        Q.    Do you recall participating in

5     some sort of preparation for a Kathy

6     Patrick meeting in April of 2012?

7        A.    Yes.

8        Q.    What do you recall about that

9     meeting?

10        A.    I believe it was high level

11     discussion on the deal information we may

12     have received from her and the topics that

13     they were going to discuss while meeting

14     with her.

15        Q.    Other than your characterization

16     of high level discussions, do you recall

17     anything specific that was discussed at

18     this preparatory meeting for Kathy

19     Patrick's meeting?

20        A.    I do not know.

21        Q.    And looking at what's been

22     marked as Exhibit 111, does that refresh

23     your memory as to whether you, in fact,

24     attended a subsequent meeting with Kathy

25     Patrick?

62

JEFF CANCELLIERI

1

2    A.    No.  I attended the prep

3    meeting.  I don't recall actually

4    attending the meeting with Kathy Patrick.

5    Q.    Do you recall being given any

6    assignments at this preparatory meeting?

7    A.    Only to provide similar

8    information that I had provided to Tim

9    Devine in the past, related to the deal

10    level that Kathy Patrick was believed to

11    represent and general ranges of exposure

12    for counsel's use in discussions with

13    Kathy Patrick.

14    Q.    Now, you testified earlier that

15    you provided to someone a range of

16    lifetime losses and defect rate.

17          Do you recall that?

18    A.    I did not provide a range of

19    lifetime losses, I provided a single

20    expected or estimated lifetime loss.  I

21    provided a range of potential exposure,

22    related to the estimated lifetime loss.

23    Q.    My apologies.  You are correct,

24    and I stand corrected.

25          Who did you provide that

111

1          JEFF CANCELLIERI

2          Q.    I'm sorry.  I read back, looked

3     at your answer and I'm not sure I

4     understand it so maybe I can ask it a

5     different way.  What, if any, action did

6     you take when learning of the $10 billion

7     and 22 percent numbers?

8          A.    Ultimately I ended up having a

9     conversation with Kathy Patrick discussing

10    the assumptions that they use in order to

11    calculate their allowed claim number for

12    comparison to our assumptions,

13    specifically their estimated lifetime loss

14    levels, default rates, severity rates.

15         Q.    Now, as to the $10 billion

16    number, were you aware of any concern that

17    was expressed internally at ResCap that

18    such a number might be seen as raising

19    securities disclosure risks in view of the

20    past 10-Q statements?

21         A.    I am not aware.

22         Q.    You're not aware of that today?

23         A.    I don't recall that, no.

24         Q.    You weren't aware of it back

25    then?

112

JEFF CANCELLIERI

1

2     A.    No.  I don't recall.

3     Q.    You don't -- you don't recall

4  Mr. Devine raising that issue?

5     A.    I don't.

6     Q.    Did you have a concern back in

7  April or May of 2012 that agreeing to a

8  $10 billion number might be seen as

9  raising securities disclosure risks in

10  view of the past 10-Q statements?

11     A.    No.  My only concern was the

12  default and loss assumptions that were

13  being calculated by the counterparty in

14  assessing their -- their allowed claim

15  amount.

16     Q.    You thought the 22 percent

17  defect rate was too high, didn't you?

18     MR. RAINS:  Objection.

19  Misstates the witness's testimony.

20     A.    It's not my place in settlement

21  negotiations to have an opinion on what

22  numbers.  The right number I leave that up

23  to the lawyers to work through the

24  potential risks of any of the settlement

25  negotiations and inputs into their

113

JEFF CANCELLIERI

2  discussions.

3     Q.    I appreciate that.  But you

4  previously testified you had discussions

5  with Kathy Patrick about her assumptions,

6  correct?

7     A.    That's correct.

8     Q.    Did you challenge the 22 percent

9  defect rate that Kathy Patrick was using

10  in that discussion?

11     A.    I challenged all of her

12  assumptions.

13     Q.    What assumptions did you

14  challenge?

15     A.    I challenged their use of role

16  rates for projected defaults, which were

17  based on history.  I challenged their use

18  of an average severity rate, historical

19  severity rate for future losses.  And as

20  part of the discussion around how they

21  were using the Bank of America defect rate

22  I guess as some level of guide, I didn't

23  get into specifics, but the fact that it

24  was based on an adverse selection of

25  loans.

114

JEFF CANCELLIERI

1  JEFF CANCELLIERI

2      Q.    How was it based on an adverse

3  selection of loans?

4          MR. RAINS:  Objection.  Vague

5      and ambiguous.

6      A.    Based on my discussion with her

7  she mentioned that the 36 percent that was

8  used in the Bank of America settlement was

9  provided to her based on a review that

10  Freddie Mac did of Countrywide's loans

11  based on adverse selection.  Adverse

12  selection being loans that were

13  nonperforming.

14      Q.    And in fact the defect rates

15  that ResCap was using was based on a

16  selection of loans that is only loans that

17  were sought to be repurchased, correct?

18      A.    The defect rates were used as a

19  guide.  Specific defect rates were not

20  used for any specific deals.  They were

21  used as a guide to create the range which

22  was provided to our legal experts during

23  our settlement negotiations.

24      Q.    I understand that it was used at

25  a guide.  But you were complaining to

115

1                    JEFF CANCELLIERI

2        Ms. Patrick that Bank of America's defect

3        rate was based on an adverse sample,

4        correct?

5             A.    I wouldn't categorize it as

6        complaining.  I was challenging.

7             Q.    Challenging that their defect

8        rate was based on an adverse sample,

9        correct?

10            A.    Challenging that it was based on

11       an adverse sample in order to assist our

12       legal experts to give them additional

13       guidelines on information that they can

14       use during their settlement negotiations.

15            Q.    And in fact the defect rates

16       that ResCap was using as a guide in the

17       settlement discussions were based on only

18       loans that were either sought to be

19       repurchased or independently audited

20       within ResCap, correct?

21            A.    Can you repeat the question?

22            Q.    And in fact the defect rates

23       that ResCap was using as a guide in the

24       settlement discussions were based on only

25       loans that were either sought to be

116

1              JEFF CANCELLIERI

2    repurchased or independently audited

3    within ResCap, correct?

4              MR. RAINS:  Objection.  Asked

5         and answered.

6         A.    The defect rate ranges were used

7    as a guide to create ranges of exposure in

8    order for our legal experts to have tools

9    during our settlement negotiations.

10        Q.    And those guides were based on

11   only loans that were either sought to be

12   repurchased or independently audited

13   within ResCap, right?

14             MR. RAINS:  Objection.  Asked

15        and answered.

16             MR. MOLONEY:  No he didn't

17        answer the question.

18             MR. RAINS:  He answered it 20

19        times today already.

20        A.    The defect rates used were

21   guides.

22             MR. RAINS:  He's asking you

23        where you got the defect rates.

24        A.    The defect rates came from the

25   quality assurance group where they would

179

```
 1                    JEFF CANCELLIERI
 2          Q.    Now this chart in Exhibit 60 is
 3      numbered along the left side lines 1
 4      through 15, correct?
 5          A.    Correct.  Looks like there's a
 6      number missing, but yes, you're correct.
 7          Q.    That's my next question.  It
 8      goes from lines 1 through 6 but then
 9      line 6 skips to line 13; is that right?
10          A.    That is right.
11          Q.    So it looks like there is six
12      lines missing from this chart, since there
13      are no lines 7, 8, 9, 10, 11 or 12; is
14      that right?
15          A.    That appears to be the case.
16          Q.    Why is that?
17          A.    Most likely when this was
18      created, it was using a format of a
19      different file, and I deleted the rows
20      from the other file format and never
21      updated the actual numbering on the left
22      side of this file.
23          Q.    Do you recall what was contained
24      in those six lines that you deleted?
25          A.    I don't.  I don't think it had
```

180

1          JEFF CANCELLIERI

2    anything to do with this particular

3    analysis.  It was just the shell of the

4    box that you see the information contained

5    in.

6          Q.    So you made the decision not

7    to -- excuse me, you made the decision to

8    delete whatever those six lines were, in

9    connection with your preparation of this

10   chart?

11         A.    From whatever format those lines

12   were for, yes; and never refreshed,

13   apparently never refreshed the actual

14   numbering.

15         Q.    Now, turning back to what is

16   included on this chart and what was

17   presented to the board, I would like to

18   call your attention to line 13 of this

19   chart.  This indicates that the ResCap

20   settlement was for $8.7 billion, correct?

21         A.    Correct.

22         Q.    With a 19.7 -- 19.72 percent

23   defect, correct?

24         A.    Correct.

25         Q.    And in the context of this

181

JEFF CANCELLIERI

2   chart, would you please explain what

3   "defect" means?

4        A.    In this instance, defect would

5   be -- the 19.72 percent was a backed-into

6   number, based on our estimated lifetime

7   losses, to get to the $8.7 billion.  A

8   defect would be a potential breach of a

9   representation and warranty.

10        Q.    Now, was there any discussion at

11   the board meeting about the 19.72 percent

12   defect?

13        A.    I don't recall specifics of what

14   was discussed.  There was a lot going on

15   at that point.  I'm not sure exactly how

16   much detail we went into regarding that

17   number.

18        Q.    Do you recall any detail about

19   that number being presented to the board?

20        A.    I recall the number being

21   presented, but I don't recall any specific

22   discussions surrounding that number.

23        Q.    Do you recall any questions

24   asked surrounding that number?

25        A.    I don't.

182

JEFF CANCELLIERI

1

2      Q.    Now, just under the 19.72

3   defect, the very next line, line 14

4   states, "A Lehman claim amount with a

5   35 percent defect rate," right?

6      A.    Correct.

7      Q.    And then the next line after

8   that, line 15, states, "BofA baseline,

9   36 percent defect," correct?

10     A.    Correct.

11     Q.    Now, starting with that line 15,

12  "BofA baseline, 36 percent defect," was

13  there any discussion at the board meeting

14  about the 36 percent defect?

15     A.    From what I can recall the

16  meeting, it was put in there and described

17  as a comparative point to the ResCap

18  settlement.

19     Q.    How was it described as a

20  comparative point?

21     A.    Using the 30 percent defect from

22  the BofA baseline settlement, compared to

23  where ResCap was settling, was, I guess, a

24  piece of information that was provided, at

25  the direction of our legal counsel, to

183

JEFF CANCELLIERI

1

2      provide our settlement in context with

3      other settlements in the market.

4           Q.    Who directed you to provide that

5      context and that comparison?

6           A.    Gary Lee.

7           Q.    And did Gary Lee direct you to

8      include that figure, that BofA baseline

9      36 percent defect, in this chart?

10          A.    Yes.

11          Q.    Do you recall any questions

12     being asked about the 36 percent defect at

13     the board meeting?

14          A.    I don't.

15          Q.    Is it fair to say the board

16     accepted this figure at face value?

17          MR. RAINS:   Objection, calls for

18          speculation.

19          A.    I don't know what the board's

20     thought process was.

21          Q.    Well, to your knowledge, did you

22     or anyone else do any independent

23     examination of the 36 percent defect rate?

24          A.    The only discussions I had on

25     the 36 percent defect rate were the

184

                    JEFF CANCELLIERI

1

2    initial conversations I had with Kathy

3    Patrick on the assumptions they were

4    applying to our portfolio.

5         Q.    And that was the conversation

6    you testified to earlier, on which you

7    challenged those assumptions?

8         A.    That's correct.

9         Q.    Now, did you or anyone else

10   reach out to Bank of America to confirm

11   that figure of 36 percent?

12        A.    I did not.

13        Q.    So you just relied on the figure

14   that Kathy Patrick provided?

15        A.    I relied on the information that

16   my legal counsel provided to me.

17        Q.    And it was your understanding

18   that the 36 percent stemmed from Kathy

19   Patrick?

20        A.    Correct.

21        Q.    Now, I have the same question

22   with respect to line 14, that's the line

23   that says "Lehman claim 35 percent

24   defect."

25             Was there any discussion at the

185

JEFF CANCELLIERI

2    board meeting about the 35 percent defect?

3          A.    Similar discussion, as just a

4    comparative point to the BofA 36 percent.

5          Q.    And, again, did Gary Lee direct

6    you to include the Lehman claim amount

7    35 percent defect in this chart?

8          A.    Yes.

9          Q.    Where did the Lehman figure come

10   from, to your knowledge?

11         A.    To my knowledge, it came from

12   legal documents that were a part of the

13   Lehman bankruptcy process.

14         Q.    And to your knowledge, did you

15   or anyone else do any independent

16   examination of the 35 percent defect rate

17   for Lehman?

18         A.    I did not.

19         Q.    Now, with respect to this chart

20   that you prepared in Exhibit 60, that was

21   presented to the board, just under the

22   chart in small fonts there's a list of

23   nine footnotes called Keynotes,

24   accompanying the chart; is that correct?

25         A.    That's correct.

186

1                    JEFF CANCELLIERI

2          Q.    Did you prepare these notes to

3    the chart?

4          A.    That's correct.

5          Q.    Did you draft the language in

6    these notes?

7          A.    I drafted a portion of the

8    language, with assistance from our legal

9    team.

10         Q.    Do you recall any discussion at

11   the board meeting about these footnotes?

12         A.    I don't recall any discussions,

13   specifically, about any one footnote.

14         Q.    Any questions asked about any of

15   the footnotes?

16         A.    Not that I can recall.

17         Q.    Okay.  Let's talk about key

18   footnote number 3 in Exhibit 60.  Note 3

19   states, "ResCap historical post-fund-audit

20   defect rate range is nine percent to

21   29 percent, varying by product/vintage,

22   with the weighted average defect rate at

23   19.3 percent."

24              Did I read that correctly?

25         A.    Yes.

187

JEFF CANCELLIERI

1

2    Q.    Now, could you please explain

3    what note 3 means?

4    A.    

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Q.    Now, just turning back to an

25    exhibit that you were previously shown.

188

JEFF CANCELLIERI

2    It's the exhibit marked 39.

3        A.    Yes.

4        Q.    Now, this is a chart, again,

5    followed by 100 pages of a spreadsheet.

6    For the sake of efficiency, I'm only going

7    to ask you about the first page.  This

8    chart called "PLS Summary" -- excuse me,

9    "PLS Demand Data Summary," which,

10   according to the first line, purports to

11   summarize put-back demands received late

12   2007 to May 2012, correct?

13       A.    Correct.

14       Q.    To your knowledge, were the

15   demands summarized in Exhibit 39 included

16   in the defect rate range in keynote 3 of

17   Exhibit 60?

18       A.    The only way there would be an

19   overlap would be is if, in the Exhibit 39,

20   there were loans that were part of the

21   post-fund-audit process that were

22   ultimately identified as a breach and

23   repurchased, or I should say they were

24   identified via the post-fund-audit process

25   that were repurchased, would have ended up

189

1        JEFF CANCELLIERI

2    in Exhibit 39.

3            The post-fund-audit defect rates

4    that are noted in that footnote 3 are from

5    the quality assurance group's report

6    around their audit rates.

7        Q.    Now, turning back to the

8    footnotes in Exhibit 60 that were shown to

9    the board.  Drawing your attention to

10   keynote 6, note 6 states, "There could be

11   amounts conceded, if the true defect rate

12   is below the 19.72 percent, based on

13   actual loan file reviews and application

14   of litigation defenses."

15           Now, it's fair to say that the

16   19.72 defect rate underlying the

17   $8.7 billion settlement was derived

18   without conducting a loan-by-loan

19   analysis, correct?

20       A.    Correct.

21       Q.    Without conducting a review of

22   the loan files, correct?

23       A.    That's correct.

24       Q.    And without taking into account

25   potential litigation defenses, correct?

1                    JEFF CANCELLIERI

2          A.     That's correct.

3          Q.     And with respect to the

4    statement presented to the board in

5    footnote 3 that there could be amounts

6    conceded, if the true defect rate is below

7    the 19. -- 19.72 percent, what was your

8    understanding of that?

9          A.     That was language that was

10   developed by legal counsel, understanding

11   being if you were to go through the full

12   litigation process and full repurchase

13   claim process to calculate true repurchase

14   or defect rates within each individual

15   trust, you may come out to a number that

16   is different than the 19.72 percent.

17         Q.     And in fact, this suggests that

18   the true defect rate was lower than

19   19.27 percent, correct?

20         A.     Can you repeat the question.

21                (Record read.)

22         A.     I wouldn't say it suggested it

23   is lower.  What it's saying is, if you

24   were going through the full process of

25   reviewing all the loans within each trust,

191

JEFF CANCELLIERI

1

2       based on the reps and warranties in those

3       trusts, you come out to a number that's

4       different from the 19.72 percent.

5           Q.    But footnote 6 states, "If the

6       true defect rate is below the

7       19.72 percent," correct?

8               MR. RAINS:  It says, "If the

9           true defect rate is below."

10          Q.    It says, "There could be amounts

11      conceded if the true defect rate is below

12      the 19.72 percent, based on actual loan

13      file reviews and application of litigation

14      defenses," correct?

15          A.    Correct.  It says if it were to

16      be below that number.

17          Q.    Now, I just want to make sure I

18      understand footnote 6.

19              Who would be conceding what?

20          A.    I don't know, specifically, who

21      would be conceding.  The comment is noted

22      to say that the settlement number could be

23      below the 8.7 billion, if the true defect

24      rate is below the 19.72 percent.

25          Q.    Now, do you recall any board

192

1              JEFF CANCELLIERI

2      members asking about footnote 6?

3          A.    I don't recall that.

4          Q.    And again, after this

5      presentation in Exhibit 60 was made at the

6      board meeting on May 9th, the board

7      approved the $8.7 million settlement,

8      correct?

9          A.    That's my understanding.

10         Q.    Now, Mr. Cancelliere, are you

11     aware that you've been identified as a

12     trial witness for the debtors in this

13     proceeding?

14         A.    Yes.

15         Q.    And on what subject or subjects

16     will you be testifying?

17         A.    My understanding is specifically

18     to the estimated lifetime losses and the

19     analysis that I have provided to our legal

20     experts during their settlement

21     negotiations.

22         Q.    And what is the substance of

23     your testimony concerning the estimates

24     that you provided during the settlement

25     negotiations?

193

1          JEFF CANCELLIERI

2               MR. RAINS:  Objection, calls for

3          speculation.

4          A.    I'm not sure what it's going to

5     include.

6               MS. KATZ:  Thank you,

7          Mr. Cancelliere, I don't have any

8          further questions.

9     EXAMINATION BY

10    MR. DAILEY:

11         Q.    Good evening.  My name is Mike

12    Dailey.  I represent FGIC in these

13    proceedings.

14              Mr. Cancelliere, you mentioned

15    that the defect rate of 19.72 percent was

16    backed into; is that correct?

17         A.    That's correct.

18         Q.    Who told you to back into that

19    amount?

20         A.    Legal counsel.

21         Q.    Who in legal counsel?

22         A.    Gary Lee.

23         Q.    Did Tim Devine ever tell you to

24    back into that amount, sir?

25         A.    Not that I'm aware of.

194

1          JEFF CANCELLIERI

2          Q.   Is there anything -- let's do

3     this.  Can you mark --

4               MR. RAINS:  So we think it's

5          117.

6               (9019 Exhibit 117, 5/7/12

7          e-mail, Bates RC901900060360, marked

8          for identification, as of this date.)

9          Q.   Mr. Cancelliere, I'm handing you

10    what has been marked as deposition

11    Exhibit 117.

12              MR. RAINS:  Thank you.

13         Q.   It's an e-mail from you to Tim

14    Devine, responding to an earlier e-mail

15    sent by Tim Devine.

16              Do you recognize this the

17    document?

18         A.   I recognize the e-mail, yes.

19         Q.   Do you recall receiving this

20    e-mail from Tim Devine?

21         A.   Vaguely, yes.

22         Q.   And this e-mail is dated

23    May 9th, at 5:50 a.m., correct?

24         A.   Correct.

25         Q.   The subject line is "Defect

195

JEFF CANCELLIERI

2  Rate," correct?

3      A.    Correct.

4      Q.    And in that, he asks you a

5  question, doesn't he?

6      A.    He does.

7      Q.    And that question is, "What is

8  the defect rate at 8.7 billion, according

9  to her severities, et cetera, and

10  according to ours?  Thanks, Tim."

11          Is that a fair reading, sir?

12      A.    Yes.

13      Q.    And you understood that to mean,

14  "her severities" meaning Kathy Patrick,

15  correct?

16      A.    Correct.

17      Q.    And you respond over about an

18  hour later, correct?

19      A.    Yes.

20      Q.    And you say that, "Using our

21  44.1 billion losses, the defect rate would

22  be about 19.7"; is that correct?

23      A.    That's correct.

24      Q.    And that 44.1 billion losses,

25  that's the estimated lifetime loss that

196

1              JEFF CANCELLIERI

2    you've calculated, correct?

3         A.    Correct.

4         Q.    And that's the number that you

5    said never changed during your entire --

6    during your entire analysis, correct?

7         A.    Correct.

8         Q.    But Kathy Patrick calculated a

9    separate lifetime loss, correct?

10        A.    Yes.

11        Q.    And her loss method was

12   $48.7 billion, correct?

13        A.    Yes.

14        Q.    So that number wasn't actually a

15   fixed number, was it?

16             MR. RAINS:   Which number?

17        A.    Which number?

18        Q.    Pardon.   The $44.1 billion loss

19   was not a fixed number, was it?

20        A.    My 44.1 billion was a fixed

21   number.

22        Q.    And using that number, you

23   backed into a defect rate of 19.7 percent,

24   approximately, correct?

25        A.    Approximately, yes.

197

JEFF CANCELLIERI

1

2      Q.     And that was done at the

3      direction of Timothy Devine; is that

4      correct?

5      A.     That appears to be correct.

6      Q.     And that 19.7 approximate

7      number, that actually turned out to be

8      19.72 percent, when you got -- when you

9      don't round, correct?

10      A.     I would assume so, yes.  The

11      19.72 is what showed up in the board

12      presentation.

13      Q.     So that same defect rate is

14      what's shown up in the board presentation,

15      correct?

16      A.     Correct.

17      Q.     And using -- but was the board

18      ever told that, using Kathy Patrick's

19      analysis, you could come up with a

20      17.9 percent defect rate?

21      A.     Not that I'm aware of.

22      Q.     Was the board ever told that a

23      two percent difference in the defect rate

24      is about a billion dollar difference?

25      A.     Not that I'm aware of.

203

JEFF CANCELLIERI

1

2      Q.    So it wasn't actually to

3   calculate the footprint, it was now to

4   refresh the analysis, correct?

5      A.    Correct.

6      Q.    And that was being done by the

7   direct -- at the direction of Tim Devine,

8   yes?

9      A.    It was at the direction of Tim

10  Devine and Gary Lee.  On the second page

11  of this e-mail, Gary asked Tim Devine if

12  he could speak to Kathy Patrick.

13     Q.    And then Tim Devine responds to

14  you, and says he volunteered you, correct?

15     A.    I would say he volunteered John

16  Ruckdaschel and myself to work on

17  refreshing the footprint.

18     Q.    I just have a few more

19  questions.

20          During the May 9th board meeting

21  in which the settlement, the $8.7 billion

22  settlement was agreed upon, Mr. Marano

23  asked for additional information, didn't

24  he?

25     A.    I don't recall.

204

JEFF CANCELLIERI

1

2      Q.    If you refer to deposition

3   Exhibit 61 in your pile.  It's the minutes

4   from the board meeting that day.  If you

5   notice at the bottom of the first page,

6   the second-to-last paragraph, Mr. Renzi

7   reviewed and discussed the key assumptions

8   and preliminary economic recovery analysis

9   of preliminary agreements reached in

10  certain constituencies.  During that

11  discussion Mr. Marano requested a report

12  with separate line I amounts be prepared

13  to provide the board with additional

14  details on the settlements."

15          Do you recall now that

16  Mr. Marano asked for additional

17  information regarding the proposed

18  settlement?

19      A.    I recall that was a question

20  directed to Mr. Renzi.

21      Q.    And do you recall, though, that

22  at the conclusion of the board meeting,

23  the board voted in favor of that

24  settlement?

25      A.    I believe so.

205

1              JEFF CANCELLIERI

2         Q.    And that was at the board

3    meeting before, before it concluded at

4    4:00 p.m., correct?

5         A.    As far as I can recall.

6         Q.    Do you recall if Mr. Marano ever

7    received any additional information?

8         A.    I don't recall.

9         Q.    Just give me one moment.

10             MR. DAILEY:  That's all I have

11        thank you.

12   EXAMINATION BY

13   MR. DOLAN:

14        Q.    Mr. Cancelliere, I'm Matt Dolan,

15   from Cleary Gottlieb, on behalf of

16   Wilmington Trust.

17             You previously testified that

18   you had a call with Kathy Patrick on

19   May 8th, during which you challenged a

20   number of assumptions that she had,

21   related to the defect rate?

22             MR. RAINS:  Misstates the

23        witness's testimony.

24        A.    I had a conversation with her

25   around their assumptions and discussed and

206

JEFF CANCELLIERI

2    challenged all of their assumptions.

3        Q.    And you also discussed and

4    challenged her use of the 36 percent Bank

5    of America default -- defect rate?

6        A.    In some form, yes.  And used

7    that information to provide our legal

8    team, who was working through the

9    negotiations, to have discussions with

10   Kathy Patrick.

11       Q.    So you relayed to the legal team

12   that you had challenged her use of that?

13       A.    I had relayed to the legal team

14   the items where I believe we could

15   challenge her assumptions.

16       Q.    And included in that list of

17   items was the 36 percent?

18       A.    It was all of her assumptions,

19   yes.

20       Q.    Was anyone else on that call,

21   besides you and Ms. Patrick?

22       A.    I believe David Sheeren, from

23   Kathy Patrick's side, was on the call as

24   well.

25       Q.    Do you know why you were on that

207

JEFF CANCELLIERI

call?

    A.    Gary Lee had asked me to talk to
Kathy about her specific assumptions, to
get an idea of their calculated numbers.

    Q.    And after that call, you relayed
to Gary Lee and others on the legal team
your concerns you had with her
assumptions?

    A.    Yes.  I relayed to Gary Lee her
assumptions and potential concerns with
her assumptions.

    Q.    And then you were shown a second
ago Exhibit 60, which is the board
presentation from May 9th.

        Do you recall that?

    A.    I do recall that.

    Q.    And that presentation includes
the 36 percent Bank of America default
rate?

        Do you recall that?

    A.    It includes, yes, the baseline
Bank of America defect rate.

    Q.    Was the board of directors of
ResCap ever informed that you had raised

208

1              JEFF CANCELLIERI

2      concerns about using that 36 percent

3      defect rate?

4          A.    I don't know.

5          Q.    But no -- you don't recall from

6      that --

7          A.    I don't recall from that

8      meeting.

9          Q.    Nothing, there was no discussion

10     of that?

11              MR. RAINS:  He says he doesn't

12          recall.

13         A.    I don't recall.

14         Q.    But as you previously testified,

15     that 36 percent was used as a comparison.

16     It was presented to the board as a

17     comparison to the 19.72 defect rate?

18         A.    That is correct, at the

19     direction of our legal counsel.

20              MR. DOLAN:  I don't have

21          anything else.  Thank you,

22          Mr. Cancelliere.

23              MR. RAINS:  Any other takers?

24              MR. SHEEREN:  David Sheeren from

25          Gibbs & Bruns.  Can we just take a

209

1          JEFF CANCELLIERI

2     quick break?

3          MR. RAINS:  Sure.  We are going

4     to count it against your time, though.

5          Okay, what do we have, 10 more

6     minutes?  15 minutes, I guess.

7          THE VIDEOGRAPHER:  The time is

8     6:21 p.m., and we are off the record.

9          (Whereupon, there is a recess in

10    the proceedings.)

11         THE VIDEOGRAPHER:  The time is

12    6:26 p.m., and we are back on the

13    record.

14         MR. RAINS:  No further

15    questions.  Thank you.

16         THE VIDEOGRAPHER:  The time is

17    6:26 p.m., and this marks the end of

18    today's videotaped deposition.

19         (Time noted:  6:26 p.m.)

20

21

22

23

24

25

210

1

2    STATE OF _____ )

3                           )  :ss

4    COUNTY OF _____)

5

6

7         I, JEFFREY CANCELLIERI, the witness

8    herein, having read the foregoing

9    testimony of the pages of this deposition,

10   do hereby certify it to be a true and

11   correct transcript, subject to the

12   corrections, if any, shown on the attached

13   page.

14

15                    _____

16                    JEFFREY CANCELLIERI

17

18

19

20   Sworn and subscribed to before

21   me, this          day of

22                     , 2012.

23

24   _____

25        Notary Public

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

211

1

2                    C E R T I F I C A T I O N

3       STATE OF NEW YORK          )

4                                  ) ss.:

5       COUNTY OF NEW YORK         )

6

7               I, ERICA L. RUGGIERI, RPR and a

8          Notary Public within and for the State

9          of New York, do hereby certify:

10                 That I reported the proceedings

11         in the within-entitled matter, and

12         that the within transcript is a true

13         record of such proceedings.

14                 I further certify that I am not

15         related by blood or marriage, to any

16         of the parties in this matter and

17         that I am in no way interested in

18         the outcome of this matter.

19                 IN WITNESS WHEREOF, I have

20         hereunto set my hand this 15th day

21         of November, 2012.

22

23

24                    ERICA L. RUGGIERI, RPR

25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585