# EXHIBIT K

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF JAMES WHITLINGER

New York, New York

November 15, 2012

9:39 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27649

JAMES WHITLINGER

1

2  has had plenty of experience around this

3  discussion with our advisors, with our

4  accounting policy teams and in-house

5  counsel.

6      Q.    When you say on a timing

7  perspective you agree that the board had

8  only about 22 minutes to consider this

9  before the board meeting started, right?

10     A.    Yeah.   That's what the timing of

11 the e-mail stated.

12     Q.    And what's your understanding

13 generally of the chart attached to the

14 e-mail that's entitled 2004-2007 PLS R&W

15 analysis?

16         MR. RAINS:   I'm going to have

17     to -- I apologize I'm going to stand

18     over your shoulder and look at the

19     document.   We weren't given copies so

20     I'm sorry to interrupt but this is the

21     only way I can see it.

22     A.    So this schedule shows the

23 ResCap issued deals and the original with

24 principal balance of the loans.   And so

25 that was about $226 billion.   The current

JAMES WHITLINGER

1
2   balance of the unpaid principal balance

3   was $63.3 billion.  It shows a percentage

4   of loans that were delinquent and then it

5   showed that we had had just under

6   $30 billion of -- of losses that were

7   incurred on the original $226 billion of

8   principal.  And that, you know, we

9   believed that $14.2 billion would be

10  losses that would potentially be incurred

11  in the future from this point in time.  So

12  the total lifetime losses were going to

13  be, you know, $44.1 billion.  And

14  essentially that equated to a 19.5 percent

15  lifetime loss of the $226 billion.

16          The next column over is, you

17  know, Kathy Patrick's group and it showed

18  what portion of the original 226 billion

19  for all the same -- same buckets.  And

20  then it just has a percentage of total

21  issued.  So this is what the schedule was,

22  that the ResCap settlement amount of

23  $8.7 billion was the dollar amount that --

24  that would agreed to be the claim on the

25  potential losses of $44.1 billion.

33

JAMES WHITLINGER

1

2      Q.     What's your understanding of the

3   items in the rows that refer to a ResCap,

4   Lehman and Bank of America percentage

5   defect rate?

6      A.     Right.  So the $8.7 billion

7   divided by $44 billion I believe is the

8   agreed rate of, you know, 19.7.  And the

9   Lehman claim amount in the BofA baseline I

10  think were data points or observations

11  that said that potentially those were

12  rates that were in those specific deals.

13     Q.     What are those specific deals?

14     A.     You know, I don't -- I don't

15  know their deals.

16     Q.     Do you know who provided the

17  35 percent and 36 percent, as you called

18  them, data points for this chart?

19     A.     I'm not sure.  I believe that

20  Jeff Cancelliere may have helped provide

21  information on this.

22     Q.     Who is Jeff Cancelliere?

23     A.     Jeff Cancelliere is a direct

24  report of mine today.  Jeff worked on the

25  risk team and was our number cruncher,

34

1                    JAMES WHITLINGER

2       number expert for valuing loans.  And so,

3       you know, the 226 billion, identifying

4       those, identifying the current balance,

5       cumulative losses that had occurred to

6       date, you know, what projected losses

7       could be, he would be our person that was

8       the numbers expert on that.

9           Q.    And was Mr. Cancelliere your

10      direct report on May 9, 2012?

11          A.    Somewhere in the month of, you

12      know, somewhere in thereabouts, you know,

13      Jeff was reappointed to -- to be a direct

14      report of mine.

15          Q.    And on and after the time that

16      he was appointed as a direct report of

17      yours you were responsible for supervising

18      and overseeing an ensuring the accuracy of

19      his work?

20          A.    Can you repeat or rephrase that?

21          Q.    Sure.  Once he be- -- once he

22      was appointed as a direct report of yours

23      you were then responsible for supervising

24      and ensuring the accuracy of his work?

25          A.    Yes.

35

1                    JAMES WHITLINGER

2          Q.    And who appointed him as a

3     direct report of you?

4          A.    You know, I was obviously party

5     to that conversation and Tom Marano.

6          Q.    Had Mr. -- Mr. Cancelliere

7     before he was a direct report to you, was

8     he a direct report to someone who was

9     employed by AFI?

10         A.    Yes.   There was dotted line

11    relationships.

12         Q.    And so Mr. Marano then decided

13    that Mr. Cancelliere would no longer

14    report to somebody at AFI but would now

15    report to you, correct?

16         A.    Generally speaking, you know, we

17    were separating the centers of excellence

18    that had been created over time.   We had

19    shared services.   And so we -- there was

20    an alignment process going on in April,

21    May, maybe sooner, I don't remember the

22    exact timelines, where we made sure that

23    the shared service people were repointed

24    to ResCap for our areas.

25         Q.    So it's your understanding that

36

1              JAMES WHITLINGER

2     Mr. Cancelliere prepared the information

3     in this chart for delivery to the board?

4          A.    Again, I know that Jeff worked

5     on this type of information.  I don't know

6     that he actually created this chart.

7          Q.    And to the extent there's any

8     information in this chart that

9     Mr. Cancelliere provided, that was

10    misleading or mistaken, you would take

11    responsibility for his work in that

12    regard, correct?

13              MR. RAINS:  Objection.  Assumes

14        facts not in evidence.  Calls for

15        speculation.

16         Q.    You can answer.

17              MR. RAINS:  You can still

18        answer.

19         A.    You know -- you know, we have

20    employees that work for all of us that

21    ultimately the buck stops with me.

22         Q.    Which means that if

23    Mr. Cancelliere put information in to this

24    document that was provided to the board,

25    information that was either misleading or

41

1              JAMES WHITLINGER

2    and who provided them is -- is important

3    and a consideration but it's -- it's just

4    a consideration.   Whether it came from

5    Kathy or -- or Jeff, you know, it's a data

6    point.

7         Q.    Was it important for the board

8    to determine whether or not these

9    35 percent, 36 percent defect rates were

10   valid?

11             MR. RAINS:   Objection.  Calls

12        for speculation.

13        Q.    Let me withdraw that.  Was it

14   important for the board to determine where

15   the 35 percent and 36 percent defect rates

16   came from and how they were arrived at?

17             MR. RAINS:   Objection.  Calls

18        for speculation.  Calls for a legal

19        conclusion.

20             You can still answer.

21        A.    Yeah, I don't know how to answer

22   it any different.  That when you consider

23   a settlement and you consider all the

24   facts and circumstances and things that

25   are presented, everything is a data point

42

                         JAMES WHITLINGER

1

2    and it goes into the overall

3    consideration.  So --

4         Q.    Right.

5         A.    -- I don't know how to answer

6    your question any different than I've

7    answered it.

8         Q.    So it wasn't important to you

9    where the 35 percent and 36 percent came

10   from, it was just important to you that it

11   was there?

12             MR. RAINS:  Objection.  That

13        misstates his testimony.  Go ahead.

14        A.    I don't know how to answer the

15   question any different.

16        Q.    During the May 9th board meeting

17   did you know that before the meeting your

18   direct report Mr. Cancelliere told Mr. Lee

19   that he had challenged certain of

20   Ms. Patrick's assumptions concerning

21   defect rates, including the validity of

22   using the 36 percent defect rate for Bank

23   of America that's in Exhibit 60?

24             MR. RAINS:  Objection.  Assumes

25        facts not in evidence.

43

1          JAMES WHITLINGER

2          Go ahead.

3     A.    Can you re- -- rephrase the

4  question?  I'm sorry.

5     Q.    That's okay.  During the May 9th

6  board meeting did you know that before the

7  meeting Mr. Cancelliere told Mr. Lee that

8  he had challenged certain of Ms. Patrick's

9  assumptions about defect rates including

10  the validity of using a 36 percent defect

11  rate for Bank of America that's referenced

12  and included in -- in Exhibit 60?

13          MR. RAINS:  So object to the

14      question as vague and ambiguous and it

15      also misstates the evidence.

16     A.    Okay.  So -- so my answer to

17  that is I don't recall at May 9th if I

18  knew if Jeff had conversations as I sit

19  here today.  I know that there were

20  conversations with the parties on

21  assumptions that were made throughout the

22  process.

23     Q.    On May 9th as a board member of

24  deciding whether or not to approve ResCap

25  entering into this settlement agreement,

44

JAMES WHITLINGER

1    would you have liked to know on or before

2    the meeting that Mr. Cancelliere had

3    concerns about the validity of the

4    36 percent defect rate?

5            MR. RAINS:  Objection.  The form

6        of the question is confusing and it

7        assumes facts not in evidence.  The

8        question is would you have liked to

9        have known.

10   A.    You know, it would be helpful to

11   know all the conversations that took

12   place.

13   Q.    Wouldn't it be particularly

14   important to know that Jeff Cancelliere,

15   your -- your numbers cruncher, who reports

16   directly to you was presenting a 36

17   percent number to the board that he

18   thought perhaps was not the proper number?

19           MR. RAINS:  Objection.  Assumes

20       facts not in evidence.

21   A.    I don't -- I don't know that we

22   didn't talk about that at the board

23   meeting or not.  So I -- I just don't

24   recall.  But as far as -- and whether or

45

JAMES WHITLINGER

1

2      not it's important to know where the data

3      came from and how -- how people discussed

4      it, those were all good things to -- to --

5      to have information on.

6          Q.     And if Jeff had -- Cancelliere

7      had doubts about the 36 percent, you would

8      have -- you would have wanted to know that

9      before you made your decisions on May 9th,

10     right?

11         A.     No.

12                MR. RAINS:   Again it assumes

13         facts not in evidence.

14         Q.     So --

15         A.     No.  I stated earlier that

16     that's a data point for those pieces.  We

17     had, you know, conversations regarding the

18     types of claims that could be brought

19     forth.  Our lawyers and our advisors and

20     our numbers people had talked about what

21     types of risk could come from litigation

22     and our advisors told us that this

23     settlement was a good settlement based on

24     all those risks.  It wasn't pointed to

25     just saying this Lehman claim amount

46

```
 1              JAMES WHITLINGER
 2     defect rate or this BofA baseline defect
 3     rate is the most important thing on this
 4     page.  It's a data point.
 5              You know, we have multiple legal
 6     entities that our -- our deals were issued
 7     off of.  These deals were issued in 2004
 8     to 2007, some through GMAC Mortgage, some
 9     through RFC.  I don't know how Lehman did
10     their deals.  I don't know how BofA did
11     their -- their deals, their shelves.
12     These are data points we don't know how to
13     process.  So these are data points.
14          Q.   If Mr. Cancelliere thought the
15     36 percent defect rate was wrong, you
16     would have wanted -- you would have wanted
17     him to tell you that before the board
18     meeting, right?
19              MR. RAINS:  Again it misstates
20          the evidence, assumes facts not in
21          evidence.  Calls for speculation.
22              Go ahead.
23              MR. SIEGEL:  It's a very simple
24          question.
25          A.   I don't know if we talked about
```

47

1                    JAMES WHITLINGER

2      that or we didn't talk about it is my

3      first point.  If he -- if he challenged

4      it, would I want to know that?  Yes.

5      That's fine.  I would want to know.

6          Q.    But you didn't know that on or

7      before the May 9th board meeting?

8          A.    I already answered that that I

9      don't know that we did or didn't.

10         Q.    But you have no recollection of

11     that?

12         A.    I have no recollection.

13         Q.    Was the first time that you

14     learned that the proposed settlement

15     amount was 8.7 billion the time when you

16     received this -- this board material from

17     Mr. Lee?

18         A.    Can you repeat the question?

19         Q.    Sure.  Did you first learn that

20     the proposed settlement amount that's in

21     the RMBS Trust Settlement Agreement was

22     $8.7 billion when you received Exhibit 60?

23         A.    Yes, that -- that -- that's my

24     recollection.

25         Q.    And it's your recollection that

48

1          JAMES WHITLINGER

2     when the board received Exhibit 60 that's

3     the first time that the board was informed

4     as a group that the settlement amount, the

5     proposed settlement amount was

6     8.7 billion?

7          A.    That's my recollection.

8          Q.    Now, as of May 9, 2012, you had

9     never spoken directly with Ms. Patrick, is

10    that true?

11         A.    I have never spoken with

12    Ms. Patrick.

13         Q.    May I ask you to take a look at

14    Exhibit 61.  Those are the board minutes

15    for May 9th.

16         A.    Okay.

17         Q.    And you recognize those as the

18    final minutes of the ResCap board meeting

19    from May 9, 2012, that began at 3:00?

20         A.    Yes.

21         Q.    And does Exhibit 61

22    accurately -- accurately reflect what

23    occurred at the meeting?

24         A.    Yes.  It's an -- an executive

25    summary of the -- of the meeting.

49

JAMES WHITLINGER

1

2    Q.    But you've just read the

3    exhibit, correct?

4    A.    Yes.  I've just read it.

5    Q.    And to your understanding is

6    everything in there accurate?

7    A.    Yes, I -- I believe it's

8    accurate.

9    Q.    Did you participate in this

10   meeting by phone?

11   A.    I don't recall.  I believe I was

12   in person.

13   Q.    And now, the minutes say it was

14   a telephonic meeting.

15   A.    Yeah.

16   Q.    Does that affect your

17   recollection?

18   A.    Well, what I mean by that is I

19   work out of both New York and Fort

20   Washington.  And I -- we were having a lot

21   of our board meetings at Morrison &

22   Foerster.  And I believe I was present in

23   Morrison & Foerster when we had the

24   meeting.

25   Q.    And you were in a conference

50

1                        JAMES WHITLINGER

2      room at Morrison & Foerster?

3           A.    That's my recollection.

4           Q.    And do you recall who else was

5      in the conference room with you?

6           A.    I don't remember.

7           Q.    Do you recall whether any other

8      board members were in the conference room

9      at the time?

10          A.    No.  I --

11          Q.    Mr. Marano?

12          A.    I believe Tom would have been

13     there.  Steve would have been there.

14          Q.    When you say Steve you mean

15     Steve Abreu?

16          A.    Yes.

17          Q.    And is he -- he's not a member

18     of ResCap's board of directors, is he?

19          A.    No, he is.

20          Q.    You're correct.  I was

21     momentarily confused.

22               MR. RAINS:  He's always correct.

23          No worries there.

24               MR. SIEGEL:  Depending upon his

25          testimony that may be true.

51

JAMES WHITLINGER

1

2      Q.    And the independent -- do you

3   recall whether any of the independent

4   board members, Mr. Smith, Ms. West,

5   Mr. Mack or Mr. Ilany were at MoFo during

6   the board meeting?

7      A.    I don't recall.

8      Q.    Your best recollection is that

9   to the extent they participated, they

10   par- -- those independent board members

11   participated by phone?

12         MR. RAINS:  Objection.

13   Misstates his testimony.

14      A.    You know, we had -- you know, we

15   have had so many meetings and oftentimes

16   they are there.  Oftentimes people

17   participate by phone, depending on where

18   they are at.  I just don't -- don't

19   recall.

20      Q.    During the portion of the board

21   meeting that was dedicated to discussing

22   the RMBS Trust Settlement, did you speak

23   at all?

24      A.    I don't -- I don't recall.  I

25   speak out, you know, in almost every board

52

1                    JAMES WHITLINGER

2       meeting asking questions so I would

3       presume that I did.

4            Q.    But you don't recall saying

5       anything during that portion of the

6       meeting, right?

7            A.    Nothing -- I don't recall.

8            Q.    Do you recall whether -- whether

9       the call started promptly or the meeting

10      started promptly at 3:00 or whether it was

11      delayed?

12           A.    I don't recall.

13           Q.    Okay.  And the meeting lasted

14      for about an hour and adjourned at 4:00;

15      is that right?

16           A.    The minutes indicate it

17      adjourned at 4:00 p.m.

18           Q.    Did you have any understanding

19      at the time why Mr. Ilany was unable to

20      attend the meeting?

21           A.    I don't recall.

22           Q.    Do you recall whether any of the

23      other three independent directors,

24      Mr. Smith, Ms. West and Mr. Mack, were

25      actually on a telephone conference call

53

JAMES WHITLINGER

1

2      with the rest of the board members during

3      the board meeting?

4          A.    I don't -- I don't recall.  As I

5      said, there's -- there's -- we have had so

6      many meetings and oftentimes people are in

7      person, oftentimes people participate by

8      phone.

9          Q.    And so you don't -- so you don't

10     know whether any of those three

11     independent board members actually

12     participated by phone for any or part of

13     the meeting?

14         A.    Yeah, again, I don't -- I don't

15     recall.

16         Q.    And it's at this meeting that

17     the board approved entering into the RMBS

18     Settlement Trust Agreement, correct?

19         A.    Yes.  With -- with -- subject to

20     counsel making some changes.

21         Q.    Do you know what those changes

22     were?

23         A.    I -- you know, I think there

24     were still some finer points being worked

25     out that were delegated to the ResCap

54

1                     JAMES WHITLINGER

2      management with the advice and legal

3      counsel.  I -- I can't recall specifically

4      which -- which ones they were.

5          Q.    The board resolved that if any

6      of those changes would be material, that

7      they would have to be brought back before

8      the board for the board's approval?

9          A.    Yes.

10              THE WITNESS:  Can we take a

11      break?

12              MR. SIEGEL:  Oh, yeah.  Sure.

13              THE VIDEOGRAPHER:  The time is

14      10:30 a.m. and we are off the record.

15              (Whereupon, there is a recess in

16      the proceeding.)

17              THE VIDEOGRAPHER:  The time is

18      10:42 a.m.  We are back record.

19              (Whereupon, there is a recess in

20      the proceedings.)

21              THE VIDEOGRAPHER:  The time is

22      10:42 a.m.  We are back on the record.

23          Q.    Welcome back, Mr. Whitlinger.

24      Right before the break you testified that

25      at the May 9th board meeting the board

56

1          JAMES WHITLINGER

2          Q.    But you don't have a specific

3    recollection of discussing the board's

4    fiduciary duties during the half an hour

5    or so that the board discussed the

6    settlement agreement on May 9th?

7          A.    Yeah, I -- I don't recall

8    specific to that.

9          Q.    And on May 9th as a board member

10   when you were considering the settlement,

11   in your own words what was your

12   understanding of your fiduciary duty as a

13   ResCap board member in deciding whether to

14   approve the settlement agreement?

15         A.    Generally speaking, you know, as

16   a director we have a duty of care and duty

17   of loyalty to ResCap and all its

18   affiliates or subsidiaries.  And we needed

19   to consider all creditors when making any

20   decision that we would make at all, you

21   know, that that's part of that -- that

22   process.  So.

23         Q.    So you understood on May 9th

24   that you had a fiduciary duty of care and

25   loyalty -- loyalty to ResCap and all of

57

1                    JAMES WHITLINGER

2       its creditors during that meeting?

3            A.    Yes.  And to ResCap's

4       subsidiaries.

5            Q.    Just to be clear, your answer to

6       the question was "Yes.  And to ResCap's

7       subsidiaries"?

8            A.    Yes.

9            Q.    And did that fiduciary duty

10      extend to the creditors of not just ResCap

11      but also ResCap's subsidiaries?

12           A.    Yes.

13           Q.    If a conflict arose during the

14      May 9th board meeting between the best

15      interests of ResCap's different

16      subsidiaries or the different creditors of

17      those different subsidiaries, what was

18      your understanding of how the board was

19      supposed to resolve that conflict?

20               MR. RAINS:  I object to the

21          question on the grounds that it's a

22          hypothetical and it assumes facts not

23          in evidence and so it will cause you

24          to speculate.

25               If you can answer the question,

58

JAMES WHITLINGER

1

2      go ahead.

3      A.    Can you say it one more time?

4      Q.    Sure.

5            MR. SIEGEL:   Let me withdraw the

6      question.   I'm going to ask you a

7      different question.

8      Q.    During the May 9th board meeting

9      did you or anybody on the board determine

10     or discuss whether the settlement

11     agreement was in your view in the best

12     interests of not only the creditors of

13     ResCap but also the creditors -- creditors

14     of each of ResCap's subsidiaries?

15     A.    I don't recall specific

16     conversation.   But again, you know, we've

17     had many discussions and presentations

18     about our fiduciary responsibility for all

19     the subsidiaries of ResCap.

20     Q.    If the settlement agreement that

21     you were considering on May 9th caused a

22     conflict between the interests of the

23     creditors of one ResCap subsidiary and

24     another ResCap subsidiary, how would you

25     as a board member, what's your

59

1                    JAMES WHITLINGER

2       understanding of how that conflict would

3       be resolved?

4            MR. RAINS:  The question assumes

5            facts not in evidence.  It's a

6            hypothetical question so it calls for

7            the witness to speculate.

8            A.    You know, if there was perceived

9       conflict of interest we'd have discussion

10      about it and talk to -- talk to counsel.

11           Q.    And you don't recall any such

12      discussion about that during the May 9th

13      board meeting, right?

14           A.    Yes.  As I said, I don't recall

15      having a specific conversation about it.

16           Q.    On or before May 9th did you

17      read or review a copy of the RMBS Trust

18      Settlement Agreement?

19           A.    On or before May 9th?

20           Q.    Uh-hum.

21           A.    I don't -- I don't recall.

22           Q.    Do you recall ever reading or

23      reviewing it before the petition date?

24           A.    I believe I did.

25           Q.    But it's possible that as of

60

1              JAMES WHITLINGER

2    May 9th when you participated in this

3    board meeting you might not have actually

4    read the trust settlement agreement?

5         A.   I don't recall.

6         Q.   Is your answer the same with

7    respect to the plan support agreement

8    between ResCap and the institutional

9    investors?

10        A.   Yeah, I don't -- I don't recall

11   specifically what date I read this.

12        Q.   But it's possible that you might

13   not have read that plan support agreement

14   as of May 9th, correct?

15        A.   I -- I don't -- it's possible.

16   I don't recall.

17        Q.   Do you recall whether during the

18   May 9th board meeting, whether any board

19   member asked to -- asked for a copy of the

20   RMBS settlement agreement before the board

21   was to vote on approving ResCap entering

22   into that agreement?

23        A.   I don't recall.

24        Q.   Is it your understanding that on

25   May 9th the board was presented with and

61

JAMES WHITLINGER

1   the board considered all material

2   information about the terms of the RM --

3   RMBS Trust Settlement Agreement?

4        A.    Yes, the board -- the board

5   discussed, you know, the -- the terms of

6   the settlement.

7        Q.    And to the best of your

8   recollection on May 9th what were all the

9   material terms in your mind as a board

10  member, what were all the material terms

11  of the settlement agreement?

12            MR. RAINS:  You are asking him

13       to do this by memory?

14            MR. SIEGEL:  I'm asking if he

15       recalls what he viewed on May 9th to

16       be all the material terms of the

17       settlement agreement.

18            MR. RAINS:  Then you might want

19       to show him the document.  Okay.

20            So do it by memory, that's fine.

21       As best you can.

22       A.    So it's hard to put myself back

23  on May 9th but clearly knowing the amount

24  of the allowed claim was important.

91

JAMES WHITLINGER

1

2    those securitizations.  And then we have

3    our litigation team and lawyers

4    negotiating.

5        Q.    What analysis of the potential

6    losses that you just discussed did the

7    board consider on May 9th?

8        A.    We went through the -- the page

9    that showed the potential losses in the

10   deal.

11       Q.    Was that Exhibit 60?

12       A.    That's Exhibit 60.

13       Q.    Where -- where does -- where

14   does Exhibit 60 show potential losses in

15   the deal?

16       A.    B5, estimated lifetime loss, 44

17   billion.

18       Q.    Turning back to Exhibit 61.  On

19   the first page in the second-to-last

20   paragraph.

21           MR. RAINS:  Sorry to look over

22       your shoulder.

23       Q.    Do you see where it states,

24   "During the discussion Mr. Marano

25   requested that a report with separate line

92

1                    JAMES WHITLINGER

2       items identifying the different settlement

3       amounts be prepared to provide the board

4       with additional details on the

5       settlements."

6              Did I read that correctly?

7       A.    Yes.

8       Q.    When Mr. Marano made that

9       request, did you have an understanding as

10      to what he was requesting?

11      A.    I don't recall exactly what the

12      different settlement amounts with the

13      additional details on the settlements at

14      that time were.

15      Q.    As you are sitting here right

16      now and reading that, what is your best

17      understanding as to what that means?

18      A.    At that point in time, you know,

19      showing what -- what the AFI settlement

20      would be and the dollar amounts associated

21      with that and likely what the agreements

22      that had been negotiated up to that point

23      in time with other parties for the JSBs.

24      So those would probably be some of them.

25      Q.    Does -- does the chart on

93

JAMES WHITLINGER

Exhibit 60 disclose to the board the
amount of the settlement between Bank of
America and institutional investors that
were represented by Kathy Patrick?

A.    This page?

Q.    Yes.

A.    And what was the question again?

MR. SIEGEL:  Just for the
record, we are referring to the page
of Exhibit 60 with the Bates number
that ends in 93182.

Q.    And the question was, does the
chart on that page disclose to the board
the amount of Bank of America's settlement
with institutional investors who were
represented by Ms. Patrick?

A.    It -- the -- you know, the
report is what the report is.  It has
ResCap settlement and then it has a Lehman
claim amount and a BofA baseline defect
rates that are noted.

Q.    But it doesn't disclose the
amount that Ms. Patrick and her client
settled with Bank of America, correct?

94

JAMES WHITLINGER

1

2      A.    I don't see that.

3      Q.    And that information was not

4   disclosed to the board during the May 9th

5   meeting, correct?

6      A.    Again, I don't -- I don't recall

7   all the points that were discussed on

8   that.

9      Q.    Now during the meeting did the

10  board receive the report that Mr. Marano

11  requested before the board decided to

12  approve the settlement?

13     A.    So which settlement are you

14  referring to?

15     Q.    I'm referring to on Exhibit 61

16  Mr. Marano requested a report, right?

17     A.    Mr. Marano requested that a

18  report that separates line items

19  identifying different settlements but I

20  don't know which -- you know, are you

21  talking about the RMBS trust settlement?

22     Q.    I'm asking -- I'll -- I'll try

23  to state the question more clearly.

24          Before this meeting adjourned at

25  4:00 was the board provided with the

95

1          JAMES WHITLINGER

2     report that Mr. Marano requested?

3          A.    I don't -- I don't know.  I

4     don't recall.  I wouldn't believe so

5     though.

6          Q.    Do you recall whether anybody

7     asked to adjourn the meeting or defer the

8     board's decision until that information

9     was provided to the board?

10         A.    I don't really understand the

11    thought process on the question.  This

12    relates to waterfall analyses.  It doesn't

13    relate to the RMBS agreement.

14         Q.    But isn't that under the section

15    of the board minutes that's entitled

16    Proposed Legal Settlement?

17         A.    You know, the proposed legal

18    settlement was the PLS.  This -- this

19    Mr. Renzi discussing was talking about the

20    waterfall.

21         Q.    Well, you see on the first

22    page -- withdrawn.

23              You agree that the board meeting

24    covered two agenda items, right, one was

25    the proposed legal settlement and that was

96

1              JAMES WHITLINGER

2     the RMBS Trust Settlement Agreement,

3     right?

4          A.    Yes.

5          Q.    Okay.  And then on the second

6     page you see that there was a project

7     bounce update?

8          A.    Yes.

9          Q.    And is that the second agenda

10    item for the meeting?

11         A.    Yes.

12         Q.    So everything that's under the

13    section that's Proposed Legal Settlement

14    obviously concerns the RMBS Trust

15    Settlement Agreement, right?

16         A.    No.

17              MR. RAINS:  Assumes facts not in

18         evidence.

19              Go ahead.

20         A.    No.

21         Q.    You testified before that

22    everything in here is accurate, correct?

23         A.    My statements in here are

24    accurate, yes.

25         Q.    And isn't it true that

114

JAMES WHITLINGER

2      that accept and determine what portion of

3      claims they would get.

4          Q.    Do you know how the expert will

5      make that determination of what portion of

6      the claim will be allocated?

7              MR. RAINS:  Objection.  The

8          document speaks for itself.

9          A.    I mean, you know, the document

10     lays out in some of these buckets how --

11     how to actually determine who is accepting

12     and then how the -- the claim will be

13     calculated.

14         Q.    Your understanding is just based

15     on what's in the document?

16         A.    Yeah.  I -- I -- that's my

17     understanding.

18         Q.    You can set that exhibit aside

19     for a second.  I'm going to ask you to

20     turn your attention back to Exhibit 60.

21     That's the board material that was

22     provided to the board for the May 9th

23     meeting.  And if you could take a look

24     again at the chart in Exhibit 60.  What is

25     your understanding of footnote 6 which

115

1                          JAMES WHITLINGER

2         states there could be amounts conceded if

3         the true defect rate is below the

4         19.72 percent based on actual loan file

5         reviews and application of litigation

6         defenses?

7              A.    I don't recollect what that

8         related to.

9              Q.    Doesn't that mean that the

10        19.72 percent defect rate here is not the

11        true defect rate because its not based on

12        an actual loan file review and it doesn't

13        consider litigation defenses against

14        claims that purportedly could be brought

15        by the institutional investors?

16                  MR. RAINS:   Objection.   Asked

17             and answered.   Calls for speculation.

18             A.    Can you rephrase?

19             Q.    Was there something you didn't

20        understand?

21             A.    Yeah.   I didn't -- I'm not able

22        to get the full gist of what you are

23        asking.

24             Q.    Doesn't footnote 6 mean that the

25        19.72 percent is not the true defect rate

116

JAMES WHITLINGER

because it's not based on an actual loan

file review and it's not based on an

application of litigation defenses?

    MR. RAINS:  Objection.  Calls

  for speculation.

    A.    Yeah.  I stated earlier that the

8.7 and that 19.72 is a calculation of

8.7 divided by 44.  And so application of

litigation defenses, you know, again that

would have been all considered as part of

what our professionals determined in

negotiating and coming up with

$8.7 billion.

    Q.    Was it your understanding on

May 9th that the 19.72 percent number

reflected the application of litigation

defenses?

    A.    I don't know how to answer it

different than I have answered it before

that the 8.7 is, you know, the 19.72

relates to the loss -- the lifetime loss

dollars.  And the 8.7 divided by that

number is 19.72 and yes, that considers

litigation defenses, what claims could be

117

JAMES WHITLINGER

brought by the other parties, how to

consider them and probabilities of

winning/losing in court where somebody

else decides -- you know, my understanding

was there wasn't going to be an actual

loan file review because the, that's what

a settlement is for.

Q.    Would an actual loan file review

give you a more accurate understanding of

what the proper defect rate would be for

the loans in the Kathy Patrick group?

A.    You know, I would defer to

our -- our lawyers on that.  My business

opinion would be, you know, when you look

at actual loan files and you have a party

on both sides, nobody is ever going to

agree on what was a defect rate.  One side

is going to say it's a defect.  The other

side is going to say it's not a defect.

And they are going to argue, argue, argue,

argue.  That's the whole point of

settling.

Q.    So is it your testimony that the

19.72 percent defect rate in Exhibit 60

118

1       JAMES WHITLINGER

2       takes into consideration the litigation

3       defenses and the other litigation issues

4       that you just testified about?

5            MR. RAINS:  Objection.  Asked

6         and answered.

7       A.    Again, I don't know how to

8       answer your question any differently than

9       I have -- I have answered before.

10      Q.    Did the board consider or get

11      any information about the specific

12      litigation defenses against these rep and

13      warranty claims?

14      A.    I -- I don't recall.

15      Q.    Do you recall whether or not the

16      board was given any information about

17      whether or not there were any statutes of

18      limitation that might bar some of

19      Ms. Patrick's clients purported claims?

20      A.    If -- if you're -- are you

21      asking me in this -- in the May 9th, if we

22      talked about statute of limitations, I

23      don't recall.  I know that we have always

24      talked about statute of limitations when

25      talking about rep and warrant claims.

119

JAMES WHITLINGER

1

2     Q.    But you had no recollection of a

3     discussion about statute of limitations

4     during the May 9th meeting?

5     A.    I don't recall.

6     Q.    Is it your understanding that

7     just because there's a loss associated

8     with the mortgage that is considered a

9     defect but that doesn't necessarily mean

10    that ResCap or its affiliates are liable

11    for any or all of the loss?

12    A.    Since you used the word "liable"

13    I'm going to again defer to our -- our

14    counsel.  Lawyers determine liability.

15    Q.    So was it your understanding on

16    May 9th -- withdrawn.

17        Did anyone provide the board on

18    May 9th with an analysis of how much it

19    might cost to litigate the claims

20    Ms. Patrick was -- was asserting as

21    compared to settling the claims around May

22    of 2012?

23    A.    Can you repeat the first part of

24    the question?

25    Q.    Sure.  Did anyone advise or

120

1                    JAMES WHITLINGER

2       discuss with the board on May 9th or

3       provide an analysis of how much it might

4       cost to litigate the claims being asserted

5       by Ms. Patrick rather than settling in

6       May 2012?

7           A.    I -- I don't -- the reason I

8       ask, I don't recall if it was discussed

9       but I know for sure I don't recollect

10      seeing a litigation presentation analysis

11      embedded in this -- this -- this list of

12      materials.

13          Q.    You agree it would have been

14      helpful for the board to know on May 9th

15      what counsel estimated or anticipated it

16      might cost to litigate the claims as

17      compared to settling them in the

18      settlement agreement?

19          A.    You know, again, that would be a

20      data point.  And I relied on our

21      professionals and our legal teams in

22      litigation in how those matters evolve.

23      So I think that's a data point, how much

24      would it cost, how many loan files if I

25      was going to review it.  Again, I -- I

122

JAMES WHITLINGER

1

2      Q.    -- as a result of a settlement?

3             MR. RAINS:  Objection.  Asked

4      and answered.

5      A.    I don't recall.  As I stated, I

6      don't have an analysis that I -- that I

7      know was presented on May 9th.

8      Q.    On May 9th did you know whether

9      or not any of Ms. Patrick's clients had

10     filed any rep and warranty claims against

11     ResCap or any of its affiliates?

12     A.    Can you repeat the question

13     again?

14     Q.    On May 9th did you know whether

15     or not any of Ms. Patrick's clients, the

16     institutional investors or the trusts had

17     actually filed any rep and warranty claims

18     or other claims against ResCap or its

19     affiliates?

20     A.    I don't know for sure.  We

21     obviously had multiple rep and warrant

22     claim -- claims outstanding.  So I presume

23     that some of them would have been part of

24     that Kathy Patrick group.

25     Q.    When -- when you say that there

123

JAMES WHITLINGER

2  are obviously multiple rep and warranty

3  claims outstanding, you mean claims that

4  have actually been filed or filed against

5  ResCap, litigations that have been filed

6  against ResCap or its affiliates?

7      A.    I'm sorry.  I was referring to a

8  request for a repurchase.  So a repurchase

9  request claim was made to the company in

10  following our business process to evaluate

11  the claim.

12      Q.    So you believe that some of the

13  claims you just described would have been

14  part of the Kathy Patrick group, correct?

15      A.    Yeah.  I believe it's -- it's

16  certainly possible that some of those

17  investors would have to be the same

18  investors that are bringing forth claims

19  of specific loan rep and warrant requests.

20      Q.    Do you know if any of those

21  claims to which you just referred also

22  resulted in any litigation being filed

23  against ResCap or any of its affiliates?

24      A.    I don't know for sure.  I know

25  we've had -- we have multiple cases filed.

124

JAMES WHITLINGER

1  I'd have to talk to counsel.

2  Q.    During the May 9th board meeting

3  did the board discuss that the settlement

4  agreement would provide for ResCap to pay

5  Ms. Patrick's legal fees?

6  A.    I don't recall discussing that

7  component specifically but ResCap, my

8  understanding on the contract is that

9  those legal fees would be deducted from

10  the overall $8.7 billion amount.

11  Q.    You say the contract, you mean

12  the settlement agreement?

13  A.    Yeah.  The RMBS Trust Settlement

14  Agreement.

15  Q.    But the board didn't discuss

16  this on May 9th and --

17  A.    I don't know if we did or

18  didn't.  It didn't really matter to me

19  because it's -- yeah, that was between her

20  and the institutional investors.  The

21  8.7 billion is their allowed claim.  And

22  so if it's deducted from that I'm

23  indifferent on how the agreement that she

24  may have reached or not reached with the

125

1                       JAMES WHITLINGER

2       institutional investors.

3           Q.    Would it have been more

4       reasonable and fair to the creditors of

5       ResCap and its affiliates for the

6       $8.7 billion amount to be reduced by the

7       amount of Ms. Patrick's fees --

8       Ms. Patrick's fees?

9                  MR. RAINS:  Objection.  Vague

10          and ambiguous.  Calls for speculation.

11          A.    I have already told you that as

12      a board member in and the process that was

13      followed I'm comfortable with the

14      $8.7 billion.  I don't have an opinion on

15      how the institutional investors and Kathy

16      Patrick negotiated, what portion she

17      should get.  My view as a board member was

18      that is the 8.7 billion reasonable for the

19      claims that could be brought, the

20      litigation issues and -- and that's what I

21      relied on.

22          Q.    Were you aware during the

23      May 9th board meeting that the RMBS Trust

24      Settlement Agreement provided releases to

25      inside directors like yourself and not to

126

JAMES WHITLINGER

1   the independent directors?

2   A.    Can you repeat that, please?

3   Q.    Yeah.   Were you aware during the

4   May 9th board meeting that the settlement

5   agreement provided releases to management

6   directors like yourself and Mr. Abreu and

7   Mr. Marano but not to the other board

8   members who were considered independent

9   directors?

10   A.    I don't recall that.

11   Q.    You didn't know that on May 9th?

12   A.    I don't know if I did or didn't.

13   Q.    Is that -- is that information

14   something that you think the board

15   members, including yourself, would want to

16   know and consider in making this decision

17   on May 9th?

18   MR. RAINS:   Objection.   Assumes

19   facts not in evidence.   Calls for

20   speculation.

21   A.    Again, it's another component of

22   when our lawyers talked to us about the

23   releases and the types of claims, and what

24   they considered and how they thought about

127

JAMES WHITLINGER

2    them and the probabilities of court

3    outcomes and whatnot -- probabilities of

4    outcome of the case, how that would work.

5    And so I think that's another

6    consideration.

7         Q.    Did the GMAC Mortgage LLC board

8    meet separately to approve the RMBS Trust

9    Settlement Agreement?

10        A.    I don't believe so.

11        Q.    Do you agree that Ally Bank

12   underwrote a significant percentage of the

13   loans giving rise to the rep and warranty

14   and PLS claims against ResCap?

15        A.    I agree that Ally Bank

16   underwrote loans that were subsequently

17   sold to GMAC Mortgage and potentially RFC,

18   that were subsequently part of a

19   securitization.

20        Q.    So do you disagree that Ally

21   bank underwrote a significant percentage

22   of the loans that give rise to the rep and

23   warranty claims against ResCap?

24             MR. RAINS:   Objection.   Asked

25        and answered.   Misstates his

144

JAMES WHITLINGER

you earlier was the process for how Ally

reported information as well.  Same

process.

Q.    And were you responsible as CFO

of mortgage operations for AFI for

overseeing that process?

A.    I -- no.  The -- the governing

committee had ultimate -- no one person is

allowed to control a process.  That's why

we have a governance committee.  So I am a

piece of a governance component.

Q.    How did you prepare for your

deposition today?

A.    I met with my counsel here and I

reviewed a -- the RMBS Trust Settlement

Agreement, reviewed my first day

affidavit.  Took a look at our, you know,

accounting policy memos.

Q.    When you met with your counsel

to prepare for the deposition, was anybody

present on behalf of Ally or Ally Bank?

A.    No.

Q.    Did you review any of the

deposition transcripts from this matter in

145

1                       JAMES WHITLINGER

2       including Mr. Marano and Mr. Mack?

3           A.    No.

4           Q.    Before your deposition today did

5       you discuss with anyone what anyone else

6       had testified to in depositions in this

7       matter, including testimony by Mr. Marano

8       or Mr. Mack or Mr. Cancelliere?

9           A.    No.

10              MR. SIEGEL:  Let's take a break.

11              MR. RAINS:  All right.

12              THE VIDEOGRAPHER:  The time is

13          12:57 p.m. and we are off the record.

14              (Whereupon, there is a recess in

15          the proceedings.)

16              THE VIDEOGRAPHER:  The time is

17          1:08 p.m. and we are back on the

18          record.

19      EXAMINATION BY

20      MR. DENMAN:

21          Q.    Mr. Whitlinger, I'm Harrison

22      Denman from White & Case for the ad hoc

23      group of junior secured noteholders.

24      Earlier you mentioned you are both an

25      officer and a director for Residential

146

1              ´              JAMES WHITLINGER

2    Capital LLC and for GMAC Mortgage LLC,

3    correct?

4         A.    Yes.

5         Q.    And do you also hold positions

6    at Residential Funding Company, LLC?

7         A.    Residential Funding I'm also a

8    board member and a chief financial officer

9    as Craig had asked.

10        Q.    Okay.  And can you identify the

11   other members of the board for GMAC

12   Mortgage?

13        A.    Steve Abreu and, you know, Joe

14   Pensabene, who is the head of our

15   servicing is currently a -- and is also a

16   board member.

17        Q.    And is the same individuals that

18   are members of the board of Residential

19   Funding Company?

20        A.    I believe it's only Steve Abreu

21   and myself for -- for RFC.

22        Q.    And earlier you said that you

23   don't recall there being any meetings of

24   the board of GMAC Mortgage with respect to

25   the RMBS settlement, correct?

147

1              JAMES WHITLINGER

2         A.    Correct.

3         Q.    And do you recall if there were

4    any such meetings of the board by -- of

5    the board for Residential Funding Company?

6         A.    No.   I would say the same, I

7    don't recall.

8         Q.    Being that you are one of only

9    two, or in the case of GMAC Mortgage

10   three, directors for each entity you would

11   obviously -- your attendance would be

12   necessary for any board meeting of those

13   two entities, correct?

14        A.    Yes.

15        Q.    So it's safe to assume that your

16   not recalling means that those meetings

17   never occurred?

18             MR. RAINS:   Objection.

19        Misstates his testimony.

20        A.    I don't -- I don't recall having

21   a meeting and I don't believe we had a

22   separate meeting but I don't -- I don't

23   re- -- I don't recall.

24        Q.    Okay.   Now, you attended the

25   May 9th board meeting, correct?

148

1                    JAMES WHITLINGER

2        A.    Yes.

3        Q.    And that was a board meeting for

4    Residential Capital LLC, correct?

5        A.    Yes.

6        Q.    And your attendance there was in

7    your capacity as officer and director of

8    Residential Capital LLC, correct?

9        A.    Yes.  But I was also there with

10   respect to the plan support agreement that

11   all the debtor entities were listed as

12   part of the plan support agreement.  So --

13   so I was also considering the other

14   entities in my decision.

15       Q.    But only with respect to the

16   plan support agreement because that was

17   the agreement to which those entities were

18   parties?

19       A.    That's -- that's correct.

20       Q.    Was it customary for you to

21   attend a board meeting for one entity and

22   make decisions that related to the affairs

23   of another entity at that meeting?

24       A.    I would say this, you know,

25   generally speaking, because RFC and GMAC

149

1          JAMES WHITLINGER

2    Mortgage are guarantors to many of the

3    facilities that we have that we're --

4    we're always thinking about all the -- the

5    entities that are -- that are subsidiaries

6    of the company.

7        Q.    So do those subsidiary entities

8    ever have board meetings?

9        A.    We do -- we do occasionally have

10   board meetings, you know, that -- that,

11   you know, that I would generalize as

12   things that are specific to that entity

13   for maybe a state licensing issue.

14       Q.    Okay.  Earlier you mentioned

15   that the $8.7 billion allowed claim --

16   well, let me put it different.

17            What was your understanding with

18   respect to the entities that would be

19   liable for the $8.7 billion claim as of

20   the May 9th?

21       A.    My understanding that at that

22   point in time all the entities were part

23   of the release and that the claim,

24   generally speaking, would be allocated

25   based on where the loans were at by the