# EXHIBIT M

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,   12-12020(MG)

            Debtors.

------------------------------------x



VIDEOTAPE DEPOSITION OF THOMAS MARANO

New York, New York

November 12, 2012

9:56 a.m.

.



Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27645

91

1            THOMAS MARANO

2        Q.     Did Mr. Mack and Mr. Ilany

3    inform you of their discussions with

4    Mr. Carpenter concerning discussions about

5    an AFI/ResCap settlement of claims?

6        A.     While they were working on it,

7    they never gave me specific details.  They

8    would tell me they had meetings and were

9    having phone calls, but I never got any of

10   the real details of what they discussed.

11       Q.     Are you saying that you didn't

12   learn the details or the terms of the deal

13   until one was struck?

14       A.     I was informed of what Ally was

15   willing to take at a presentation, but the

16   to and fro for the many weeks beforehand

17   that they were negotiating, I was really

18   not involved in that.

19       Q.     So what I'm saying is, when did

20   you first learn of the terms that had been

21   negotiated between AFI and ResCap

22   concerning the settlement between the two?

23       A.     When the outside directors got

24   to the point where they felt they got the

25   best deal they could --

92

1                          THOMAS MARANO

2          Q.     When was that?

3          A.     -- I was informed.

4                 I don't recall the day.  I'm

5    sure there's a board meeting for it.

6          Q.     Was it in or about May of this

7    year?

8          A.     I would say it would be

9    potentially April or May.  Certainly prior

10   to the bankruptcy.

11         Q.     Did you ever express your view

12   to Mr. Carpenter, or anyone else at AFI,

13   that AFI should make a higher payment to

14   ResCap for a settlement of claims between

15   the two?

16                MR. PRINCI:  Objection as to

17        form.

18         A.     No matter what number Michael

19   Carpenter offered, I always asked for

20   more, including as it relates to this.

21   Always asked for more.

22         Q.     In connection with a settlement

23   of claims by ResCap against AFI, what did

24   you ask him for?

25         A.     Because I didn't do the

93

1            THOMAS MARANO

2   negotiation, I didn't ask him, you know,

3   for this specific number.  So I can't -- I

4   just don't know.

5        Q.    I thought you testified a minute

6   ago that you always asked him for more.

7              Are you saying just generally?

8        A.    Whenever I negotiated anything

9   with Michael, I always asked for more.

10       Q.    Okay.  So are you saying that

11  you never had occasion to discuss with

12  Mr. Carpenter the amount that AFI was

13  willing to pay or that you thought should

14  be paid by AFI to ResCap to settle claims?

15       A.    Not in the context of

16  negotiating the deal.  But I had expressed

17  numbers that I felt were, you know, higher

18  than we were able to get.

19       Q.    What numbers did you express?

20       A.    Now, my general view was it

21  probably would take something close to

22  $2 billion to settle this.

23       Q.    And you expressed that to

24  Mr. Carpenter?

25       A.    I expressed that to

94

THOMAS MARANO

1  Mr. Carpenter, definitely.

2     Q.    Did you express it to other

3  members of the ResCap board?

4     A.    Yes.

5     Q.    Did you express it to all of the

6  other members of the ResCap board?

7     A.    I was fairly vocal in what I

8  thought it would take to get a deal done.

9  My view is it would take a couple billion

10  dollars, that no one was going to do a

11  deal for 750.

12     Q.    And during what period of time

13  or over what period of time did you

14  advocate for a number in the range of

15  $2 billion from AFI?

16     A.    I wouldn't use the phrase

17  "advocate."  I would say expressed my view

18  of how to get a settlement --

19     Q.    Fine.

20     A.    -- or, pardon me, a deal.  And

21  in that context, I would say, you know,

22  over the spring of this year.

23        MR. KAUFMAN:  Let's mark as the

24     next exhibit, Ally Financial, Inc.'s

95

1              THOMAS MARANO

2      10-Q for the first quarter 2012.

3           (9019 Exhibit 54, Ally

4      Financial, Inc.'s 10-Q for first

5      quarter 2012, marked for

6      identification, as of this date.)

7           MR. KAUFMAN:  Just for the

8      record, this document is an as-filed

9      version.  It does not have Bates

10     numbers.  This is the one that was

11     pulled off the actual filing.

12     Q.    Let me show you what we have

13  marked as Exhibit 54.

14          Do you recognize this as the

15  form 10-Q filed by AFI for the quarter

16  ending March 31, 2012?

17     A.    Yes.

18     Q.    And am I correct that the 10-Q

19  was filed on April 27, 2012, with the SEC?

20     A.    Yes.

21     Q.    And am I correct that the 10-Q

22  presented consolidated statements for AFI

23  and its subsidiaries, including ResCap?

24     A.    Yes.

25     Q.    Did you participate in the

96

1                    THOMAS MARANO

2      preparation of the 10-Q?

3          A.    It was prepared by

4      professionals; however, I did, I did

5      review it.

6          Q.    You reviewed it before it was

7      filed, right?

8          A.    Yes.

9          Q.    Did you believe its contents to

10     be true and accurate at the time it was

11     filed?

12         A.    At the time it was filed, yes, I

13     did believe the contents were true and

14     accurate.

15         Q.    Let me direct your attention to

16     page 73.  There is a section describing

17     the company's private label

18     securitizations and its possible exposure

19     to liability, as a result of those

20     activities.

21              Do you see that?

22         A.    Yes.

23         Q.    Under the heading Potential

24     Losses, the 10-Q stated, "We currently

25     estimate that ResCap's reasonably possible

162

1           THOMAS MARANO

2       and answered.

3           You can answer again.

4       A.    It's my understanding that Kathy

5   Patrick had assembled a large enough group

6   to achieve her objective and it was in the

7   interest of the estate to settle.

8       Q.    That wasn't my question.  I want

9   to know whether you understood when you

10  were asked to approve the settlement on

11  May 9th, that Ms. Patrick and her clients

12  had the power to force the trustees to

13  act?

14          MR. PRINCI:  Objection.  Asked

15      and answered.  Last go round on this

16      one.

17          Do it again.

18      A.    My understanding was she had

19  enough people to get done what she wanted

20  to get done.

21          MR. PRINCI:  Can we take a

22      break?

23          MR. KAUFMAN:  You want a break?

24          MR. PRINCI:  Yes, I do.

25          MR. KAUFMAN:  Then you can have

163

1                       THOMAS MARANO

2          one.

3                  MR. PRINCI:   Thank you.

4                  THE VIDEOGRAPHER:   The time is

5          2:56 p.m. and we are off the record.

6                      (Whereupon, there is a recess in

7          the proceedings.)

8                  THE VIDEOGRAPHER:   The time is

9          3:09 p.m., and we are back on the

10         record.

11                 MR. KAUFMAN:   Let's mark as the

12         next exhibit the minutes of a special

13         meeting of the board on May 9, 2012,

14         Bates numbers 54006 to 54007.

15                 (9019 Exhibit 61, minutes of

16         5/9/12 special meeting of board, Bates

17         numbers 54006 to 54007, marked for

18         identification, as of this date.)

19         Q.    Showing you what we have just

20         marked, Mr. Marano, are these the minutes

21         of the board meeting on May 9, 2012?

22         A.    Yes, these appear to be the

23         minutes.

24         Q.    And was the meeting held by

25         telephone?

164

THOMAS MARANO

1    A.    I have to rely on the minutes.

2    I can't recall.

3           The minutes suggest that it was

4    held by telephone.

5    Q.    Do the minutes accurately

6    reflect what occurred at the May 9th

7    meeting?

8    A.    Yes.

9    Q.    The minutes say that one of the

10   board's members, Mr. Ilany, was unable to

11   attend.

12          Why couldn't he attend?

13   A.    I'm -- I don't know why he was

14   not there.  I don't remember.

15   Q.    The minutes also reflect that

16   two matters were addressed at the meeting,

17   the proposed RMBS settlements and the

18   Project Bounce update; is that correct?

19   A.    Yes.

20   Q.    How much time was devoted to

21   each of those matters?

22   A.    There was, you know, there was a

23   considerable amount of time, you know,

24   dedicated to both matters.  I can't tell

THOMAS MARANO

1    you within the hour that the board meeting

2    transpired, whether it was 50/50; but

3    there was, you know, a fair amount of

4    time.

5        Q.    The entire meeting, according to

6    the minutes, lasted an hour, correct?

7        A.    Correct.  I just can't tell you

8    whether it was 30 and 30.  I don't recall.

9        Q.    Is it your best recollection

10   that it was split approximately equally

11   between the two matters?

12       A.    I don't recall how much time was

13   spent on each matter.

14       Q.    In the next-to-last paragraph on

15   the first page, the minutes say that

16   during the discussion you requested that a

17   report with separate line items

18   identifying the different settlement

19   amounts be prepared to provide the board

20   with additional details on the

21   settlements.

22            Do you see that?

23       A.    Yes.

24       Q.    Why did you want that

166

THOMAS MARANO

1    THOMAS MARANO

2    information?

3        A.    For purposes of clarity.

4        Q.    Clarifying what?

5        A.    To help to make sure the board

6    understood, you know, the components that

7    made up the rep and warrant and PLS

8    settlement.

9        Q.    Was that report provided during

10   the course of the hour meeting?

11       A.    I do not believe it was.

12       Q.    Why didn't you adjourn the

13   meeting until you got the information you

14   were looking for?

15       A.    I think -- my recollection of

16   this meeting is that we had enough of a

17   basis to determine whether or not the

18   settlement agreement was fair, and this

19   was just clarifying details.

20       Q.    Was there a written presentation

21   that accompanied the May 9th meeting?

22       A.    I don't recall if there was a

23   presentation.

24       Q.    Wasn't it the two-page document

25   we looked at before that you got --

167

1          THOMAS MARANO

2      A.    Oh, yes.

3      Q.    -- just about 20 minutes before?

4      A.    Yes.   This is the same meeting.

5      Q.    So that's the information that

6  the board was looking at, when it was

7  considering, on May 9th, whether to

8  approve the settlement?

9      A.    That is -- that is correct.

10      Q.    Was there anything other than

11  that two-page presentation the board was

12  looking at, when it was asked to consider

13  whether to approve the settlement?

14      A.    Not that I recall.

15      Q.    On the second page of the

16  minutes regarding the Project Bounce

17  update, it says that you and Mr. Nashelsky

18  briefed the board on the status of various

19  matters related to a potential ResCap

20  Chapter 11 filing, including but not

21  limited to the AFI settlement agreement.

22          Do you see that?

23      A.    Yes.

24      Q.    And that refers to the

25  settlement agreement between ResCap and

190

1        THOMAS MARANO

2    releases to AFI as well as full releases

3    from ResCap, right?

4        A.    That's right.

5        Q.    Tell me how you thought the

6    component of the settlement securing

7    third-party releases to, for AF -- for AFI

8    benefitted ResCap.

9              MR. PRINCI:  Just a

10             clarification.  ResCap referring now

11             to what company?

12             Earlier in the deposition I

13             asked you if ResCap would be presumed

14             to be defined to represent one

15             company, and you said no.

16             MR. KAUFMAN:  Stop talking.

17             MR. PRINCI:  So I just want to

18             know what it refers to.

19             MR. KAUFMAN:  Stop talking.

20             MR. PRINCI:  I need to know the

21             clarification; otherwise, I can't have

22             him answer.

23             MR. KAUFMAN:  Stop talking.

24             MR. PRINCI:  Can you answer that

25             question, please.

191

1          THOMAS MARANO

2          MR. KAUFMAN:  Stop talking.

3   DIR      MR. PRINCI:  Don't answer the

4      question.

5      Q.    From which companies did AFI get

6   releases?

7          All the debtors, right?

8      A.    Yeah, all of them.

9      Q.    How did the component of the

10  settlement securing third-party releases,

11  third-party releases for AFI, benefit

12  ResCap?

13          MR. PRINCI:  By ResCap, you mean

14      all the companies?

15          MR. KAUFMAN:  Yes.

16          MR. PRINCI:  Okay.

17      A.    We would not have been able to

18  get the settlement, unless Ally received

19  something in return.  Ally paid good money

20  to get the settlement.

21          We also knew there would be an

22  opportunity to challenge that settlement

23  and to have another bite at the apple.

24      Q.    What did you understand the

25  opportunity to be to challenge the

192

THOMAS MARANO

settlement between ResCap and Ally?

    A.    We were going to go before a
judge, and if the judge wasn't comfortable
with the arrangement, he would absolutely
have us try and revise it or come to a new
agreement.

    Q.    And was that a consideration of
yours and the board, in approving the
settlement?

    A.    We knew we got the best deal we
could get from Ally at the time we filed
or were about to file. And we knew that
there would be an opportunity for it to be
reviewed and challenged.

        But we felt like we had gotten a
very good deal for all parties and helped
preserve value for the platform.

    Q.    Okay. Mr. Marano, you did
understand from your advisors, didn't you,
that ResCap had potential claims against
AFI for the full amount of whatever
settlement amount you might agree to pay
to Ms. Patrick and other creditors, right?

    A.    We knew -- we certainly knew we

193

1          THOMAS MARANO

2     had that possibility.  We felt at the time

3     this was the best deal we could get, and

4     it was reasonably fair.

5          Q.    You didn't believe it was

6     reasonably fair.  You told us before you

7     thought the number should have been

8     $2 billion, didn't you?

9               MR. PRINCI:  Objection,

10         misstates his testimony.  That's not

11         what he testified to.

12         A.    With respect to my comment on

13     the $2 billion, my view was, what would it

14     take to get all of the investors or

15     vulture funds in the deal to go away.

16     That was based on 30 years of Wall Street.

17     That's a number of what I think it would

18     take to buy peace.  Doesn't mean it isn't

19     fair.

20         Q.    Isn't that what you told

21     Carpenter and what you said you repeatedly

22     told others, that that was the right

23     number?

24               MR. PRINCI:  Misstates his

25         testimony.  Objection.

194

1      THOMAS MARANO

2      A.    What I told Carpenter was it

3  would take a lot more than 750 million to

4  get a quick resolution.  Doesn't mean it

5  was fair for it to be a 2 billion charge

6  to Ally; 750 was fair.  But people are

7  going to want more.

8      Q.    What made you think that 750 was

9  the top dollar you were going to be able

10 to get from AFI?

11     A.    The -- I relied on the

12 independent directors who, you know, spent

13 weeks, if not months, negotiating with

14 Carpenter; and they told us this was the

15 best deal they could get.  And we looked

16 at what the legal professionals said were

17 valid claims, and we concluded at the

18 board meeting this was fair.

19     Q.    Based on a two-page presentation

20 you got 22 minutes before, in an hour

21 meeting?

22         MR. PRINCI:  Objection, that's

23      just argumentative.  Is there a

24      question?  Excuse me, is there a

25      question?

198

1          THOMAS MARANO

2      form.

3      A.    You know, I believe what this is

4      saying and -- 8.02 basically releases --

5      it says that the financial guarantors are

6      not released by the waivers in Article 7.

7      Q.    I see you are reading the

8      agreement.  I don't want to interrupt.  Is

9      that your answer?

10     A.    Yes.

11     Q.    So do you have an understanding

12     as to whether if the settlement agreement

13     that's Exhibit 58 becomes, is approved by

14     the court and becomes effective that

15     financial guarantee providers like MBIA

16     still will have claims to pursue against

17     the debtors?

18          MR. PRINCI:  Objection, the

19          document speaks for itself but you can

20          answer to the extent you --

21     A.    I believe you can file your own

22     claim.

23     Q.    Do you have an understanding as

24     to what types of claims financial

25     guarantee providers like MBIA could file?

199

1          THOMAS MARANO

2          A.    I can't tell you the nuances of

3     the claims because I'm not a lawyer.

4          Q.    What is your understanding as to

5     why section 8.02 of the settlement

6     agreement was included in the RMBS

7     settlement?

8          A.    I believe that Kathy Patrick had

9     not actually signed up the monolines as I

10    refer to them so the MBIA's and the FGICs

11    and this way you had the -- or the

12    monolines had flexibility.

13         Q.    Let's talk about another

14    provision in Exhibit 58, the settlement

15    agreement.  Are you aware that pursuant to

16    the settlement agreement if it gets

17    approved and it is effective that counsel

18    for the institutional -- the RMBS

19    institutional investors will have their

20    fees paid by the debtors?

21         A.    Say that last part again.

22              MS. PATRICK:  Objection, form.

23         Q.    Let me restate the question.

24    Are you aware that if the RMBS settlement

25    agreement is approved and becomes a factor

200

1              THOMAS MARANO

2    that counsel for the institutional

3    investors will have their fees paid by the

4    debtors?

5              MS. PATRICK:  Objection to form.

6              MR. PRINCI:  Objection to form.

7         A.    Yeah.  I believe that the fees

8    will be paid, yes.

9         Q.    Do you have an understanding as

10   to the amount of those fees that would be

11   paid by the debtors?

12        A.    I don't recall.  And it may be

13   in the document.  I just don't recall.

14        Q.    Okay.  When the -- I think you

15   previously discussed the May 9th board

16   meeting at which the settlement agreement

17   was considered.  Was there any discussion

18   at that meeting regarding the payment of

19   the institutional investors' counsel fees?

20        A.    I don't recall if that was a

21   matter of discussion at the board meeting.

22        Q.    Okay.  Have you or anyone else

23   on behalf of the debtors evaluated the

24   reasonableness of the fees that would be

25   paid to counsel to the institutional

201

THOMAS MARANO

2  investors pursuant to the settlement

3  agreement?

4          MS. PATRICK:  Objection to form.

5      A.    I have not looked at the

6  reasonableness.  I'm not -- again, I don't

7  recall that I even knew what that number

8  was.

9      Q.    Are you aware whether anyone on

10 behalf of the debtors has requested either

11 bills or time sheets from counsel to the

12 RMBS investors to substantiate fees that

13 will be paid to them under the settlement

14 agreement?

15         MR. PRINCI:  Objection to form.

16         MS. PATRICK:  Same objection.

17     A.    I'm not the best person to

18 answer that.  My chief financial officer

19 keeps track of all that information.  If

20 we received it, he'll have it.

21     Q.    Okay.  Is that -- that's

22 Mr. Whitlinger?

23     A.    Whitlinger.

24     Q.    Okay.  Whitlinger.  I'm sorry.

25         Give me one moment.

202

THOMAS MARANO

1

2          MS. BAGBY:  I think that's all

3     we have.  Thank you very much.

4     EXAMINATION BY

5     MR. SHORE:

6          Q.    Good afternoon, sir.  I'm Chris

7     Shore from White & Case on behalf of the

8     junior secured notes.  I really have two

9     short pages of questions.  First of all,

10    do you hold a position with Residential

11    Funding Company, LLC?

12         A.    No.

13         Q.    And do you hold a position with

14    GMAC Mortgage, LLC?

15         A.    No.

16         Q.    I want to focus on the board

17    meetings with respect to the settlement,

18    one of which was talked about, one of

19    which wasn't.  But first, yes or no, were

20    you advised at any time in your capacity

21    as an officer or director of Residential

22    Capital, LLC as to any fiduciary duties

23    you owed as an officer or director?

24         A.    Yeah, I was advised as to my

25    fiduciary responsibilities by counsel.

203

1       THOMAS MARANO

2       Q.    And when was that?

3       A.    Periodically over the years as I

4    have worked for Residential Capital.

5       Q.    Okay.  Has Morrison & Foerster

6    ever advised you as to your fiduciary

7    duties, and let me limit that in time in

8    the time, from the time they came up onto

9    the scene up until the filing of the

10   bankruptcy?

11           MR. PRINCI:  What -- what's the

12       significance of whether Morrison &

13       Foerster has advised him.  He told you

14       he's been advised by counsel.  Why

15       does it make a difference what law

16       firm did or didn't advise him on that?

17   Q.    Can you answer the question?

18           MR. PRINCI:  Don't answer it.

19           You have to answer my question

20       first.

21           MR. SHORE:  You are going to

22       instruct him not to answer?

23           MR. PRINCI:  I'm going to have

24       to know how that question and the

25       answer you are seeking to elicit falls

205

THOMAS MARANO

1

2      advised as to your fiduciary duties in the

3      context of a potential insolvency?

4          A.    Yes.

5          Q.    And when was that?  In relation

6      to the ResCap fund.

7          A.    Within the past year or so.

8          Q.    Drawing your attention to the

9      May 9th board meeting, which is 9019

10     Exhibit 61.  You can look at the minutes

11     if you want.

12         A.    You said 61, right?

13         Q.    61, yes.  I'm not asking you for

14     your legal advice but rather your state of

15     mind as an officer of ResCap LLC.  What

16     was the understanding of your fiduciary

17     duties at the time of this meeting?

18         A.    At this point in time my

19     fiduciary obligations were to the

20     creditors of ResCap.

21         Q.    And when you say ResCap, do you

22     mean ResCap LLC?

23         A.    ResCap and its subsidiaries.

24         Q.    Did you understand that you owed

25     a fiduciary duty to Ally?

206

THOMAS MARANO

1    A.    At this point in time I believe

2    my obligations to Ally were not there.

3        Q.    And what's your basis for

4    understanding that you, as an officer and

5    director of ResCap LLC, owed fiduciary

6    duties to creditors' entities other than

7    ResCap LLC?

8        A.    My understanding was that I was

9    responsible for the ResCap legal entity

10    and all of its subsidiaries.  And so that

11    would have included RFC and GMAC.  And

12    again, I felt at this point in time I

13    really had no obligation to Ally

14    whatsoever.

15        Q.    And if there were a conflict

16    between what would benefit creditors of

17    ResCap LLC versus what would benefit

18    creditors of RFC, what was your

19    understanding as to how you were to

20    resolve that conflict?

21        A.    Well, I feel like the deals we

22    struck were for everybody.  And all of us,

23    not only ResCap, but all of its

24    subsidiaries got the same deal.  So I was

207

THOMAS MARANO

1   focused on getting the same deal for

2   everybody.

3       Q.    Okay.  Can you answer my

4   question.  And maybe you just did.  But

5   just to make clear, what was your

6   understanding of what you were supposed to

7   do in the event of a conflict between what

8   would benefit creditors of ResCap LLC

9   versus what would benefit creditors, for

10  example, of RFC?

11      A.    I -- I never thought about it in

12  the context of a conflict.

13      Q.    Did you understand at the time

14  of the May 9th board meeting that there

15  were certain structures that might benefit

16  one group of creditors over another group

17  of creditors?

18          MR. PRINCI:  Objection.

19      References facts not in evidence but

20      you can answer if you understand the

21      question.

22      A.    I'm not sure I do follow.

23      Q.    Okay.  At the time of the

24  May 9th board meeting did you understand

208

1              THOMAS MARANO

2    that ResCap LLC was committing itself to

3    pay anything in connection with the

4    proposed settlement?

5              MR. PRINCI:  Objection as to

6       form.

7         A.    What -- with respect to the

8    settlement what I recall is trying to get

9    a global -- essentially buy global peace

10   for all the entities.  How any allocation

11   of monies would be, you know, chopped up,

12   I was not thinking about that.

13        Q.    At the time of the May 9th board

14   meeting did you understand that there was

15   even an assertion that ResCap LLC was a

16   potential, owed a potential claim to any

17   of the settling funds?

18        A.    I'm not sure I thought about it

19   in that context.

20        Q.    And so when the number was

21   reached, 8.7 billion, was it your

22   understanding that that 8.7 billion could

23   be asserted against every entity within

24   the ResCap enterprise?

25        A.    I believe that could have.  I

209

THOMAS MARANO

1

2    wasn't really focused on it, you know,

3    other than to get everybody the same deal.

4        Q.    So getting back to this conflict

5    point.  Do you understand that as between

6    ResCap LLC and Residential Funding

7    Company, LLC, there might be a

8    disagreement between those two entities as

9    to who was the proper party to pay the

10   claim?

11       A.    Today or back then?

12       Q.    Back then.

13       A.    Again, I don't recall thinking

14   about it at the time.

15       Q.    Okay.  Who made the decision to

16   enter into the settlement on behalf of

17   Residential Funding Company, LLC?

18       A.    That would have been the

19   directors of that entity.

20       Q.    And how was that effectuated?

21       A.    You'd have to talk to those

22   directors.

23       Q.    And who were those directors?

24       A.    I believe you've got Steve Abreu

25   and -- and Jim Whitlinger,

210

1        THOMAS MARANO

2    W-h-i-t-l-i-n-g-e-r.

3        Q.    And who acted on behalf of GMAC

4    Mortgage, LLC?

5        A.    I believe that was Steve Abreu

6    and Joe Pensabene, P-e-n-s-a-b-e-n-e.

7        Q.    And did you understand in

8    connection with the May 9th board meeting

9    that you were acting at all on behalf of

10   Residential Funding Company, LLC in a

11   legal capacity?

12            MR. PRINCI:  Objection.  Calls

13        for an expert opinion.

14            If you understand the question,

15        you can answer it.

16        A.    I'm not really sure what you

17   mean by a legal capacity.  I mean from a

18   fiduciary point of view I was trying to

19   settle for everybody, get the biggest deal

20   for the family.  How the mechanics of that

21   worked out I was not, you know, worried

22   about that detail.

23        Q.    I don't know if it has been

24   marked.  I apologize.  Let's mark this as

25   9019-62.

211

1          THOMAS MARANO

2              (9019 Exhibit 62, minutes of an

3          April 13, 2012 board meeting, Bates

4          9019_54008 through 54022, marked for

5          identification, as of this date.)

6          Q.    There's one extra one on the

7     bottom, I think.

8          A.    No.

9          Q.    No.  Here it is, sorry.  It's

10    Bates numbers of 9019-62 run from

11    9019_54008 through 54022.

12              And have you seen that document

13    before?

14         A.    I'm familiar with this agreement

15    or these minutes, I'm sorry.

16         Q.    Do you recall being in

17    attendance at a board meeting on April 13,

18    2012?

19         A.    Yes.

20         Q.    As between the board meeting on

21    April 13th and the board meeting on

22    May 9th, do you recall when it was

23    determined that the ResCap entities would

24    agree to an $8.7 billion claim?

25         A.    I believe the ResCap entities

213

1          THOMAS MARANO

2              MS. PATRICK:  Objection to form.

3      A.    No, I never thought about that.

4      Q.    And I asked before about

5  considering the $8.7 billion in formal

6  meetings.  Has there been any informal

7  discussions within the ResCap enterprise

8  since the May 9th meeting as to agreeing

9  on a different number than 8.7 billion?

10     A.     I don't recall any, no.

11     Q.     As you sit here today, do you

12 have any basis for believing that ResCap

13 LLC is indebted in the amount of

14 $8.7 billion to the settling parties?

15     A.     Until this is approved I don't

16 think we technically are.  I'd have to --

17 I'd have to defer to an expert on that.

18     Q.     All right.  And as you sit here

19 today, do you have any basis for believing

20 that ResCap LLC should be held liable to

21 the settling parties for an $8.7 billion

22 claim?

23            MS. PATRICK:  Objection, form.

24            MR. PRINCI:  Object.  It calls

25     for a legal conclusion.

214

1          THOMAS MARANO

2          A.    Yeah.  I'd have to get an

3     expert.

4          Q.    So independent any legal counsel

5     you -- legal advice you don't have any

6     view?

7          A.    No.

8     RQ        MR. SHORE:  Let me ask because I

9               don't know that we have seen

10         them, can we get copies of any minutes

11         or resolutions for both the

12         Residential Funding Company, LLC

13         entity and the GMAC Mortgage, LLC

14         entity in relation to the entry into

15         the settlement agreement.  But then,

16         in addition, to the extent any other

17         entity within the ResCap group as

18         defined by the witness has either

19         minutes or resolutions or shareholder

20         consents or other formal documentation

21         with respect to that we'd like to get

22         that as well.

23              MR. PRINCI:  I'm not going to

24         engage in discovery requests at a

25         deposition but you can proceed with

215

THOMAS MARANO

2    respect to requests for documents you

3    believe are appropriate.

4         MR. SHORE:   Thank you.

5         Q.    Were you present at any

6    post-petition board meeting to discuss an

7    amendment to the settlement agreement or

8    any amendments to the settlement

9    agreement?

10        A.    Yeah, I was at one.   There was

11   one time where the agreement came in --

12   there was one board meeting where we

13   talked about an amendment to the

14   agreement.

15        Q.    Okay.   And then independent of

16   that one board meeting, that aside, has

17   there been any other post petition board

18   meeting at any ResCap entities as far as

19   you know to discuss the settlement

20   agreement?

21        A.    Not that I'm aware of.

22        Q.    So what do you recall about the

23   meeting with respect to the amendment?

24        A.    There -- there were actually a

25   couple of attempts to amend the agreement

216

THOMAS MARANO

1

2     in an effort to deal with some complaints

3     between some of the various bondholders.

4     And in the end there was sort of a

5     technical agreement to eliminate a release

6     from one legal entity and to adjust the

7     allocation.  I'm not sure if the

8     allocation was completely eliminated or

9     not but there was a discussion about it.

10    And the change was material enough

11    including the release that -- that we made

12    a decision that we needed to go to the

13    board.

14        Q.    And that went to the board?

15        A.    Yes.

16        Q.    Again, because I'm going to ask

17    for legal advice let me just ask you to

18    answer yes or no to this.  Actually, let

19    me step back.

20            In connection with acting as an

21    officer and director of a corporate entity

22    within a family do you understand that at

23    certain times certain legal entities may

24    be the actual party on the hook with

25    respect to a claim even though they are

217

1          THOMAS MARANO

2     part of another enterprise?

3               MR. PRINCI:  Objection as to

4          form.

5          Q.     Or a larger enterprise?

6               MR. PRINCI:  Objection as to

7          form.

8          A.     The answer is yes.

9          Q.     So for example if one of your

10    subsidiaries entered into a contract, that

11    subsidiary might be liable on the contract

12    and that wouldn't necessarily make the

13    rest of the entities within the enterprise

14    liable on that claim, right?

15              MR. PRINCI:  Objection.  Calls

16         for a legal conclusion.

17              But you can answer if you

18         understand the question.

19         A.     Yeah, I mean, I would -- I would

20    get a lawyer to look at it because I would

21    assume whoever signed the contract may

22    want to go back up to the parent.

23         Q.     Right.  And in connection, this

24    is the yes or no question, in connection

25    with the entry into the settlement

218

1           THOMAS MARANO

2    agreement did you ever go to the lawyers

3    and ask them to tell you who within the

4    organization was liable on the -- liable

5    for the settlement?

6    DI        MR. PRINCI:  I'm going to direct

7         the witness not to the answer the

8         question on the grounds it calls for

9         communications with counsel.

10        Q.   Can you answer that question yes

11   or no?

12             MR. PRINCI:  I'm going to direct

13        you not to answer the question on the

14        grounds that it calls for a

15        communication with counsel.

16        Q.   Are you going to follow your

17   counsel's advice?

18        A.   I'm going to follow his advice.

19             MR. SHORE:  And the basis for

20        that, just so we are clear on the

21        record?

22             MR. PRINCI:  Attorney-client

23        privilege.

24             MR. SHORE:  And for which entity

25        are you asserting that?