Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial, Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**ALLY FINANCIAL, INC'S OMNIBUS REPLY TO THE OBJECTIONS TO THE DEBTORS' SECOND SUPPLEMENTAL MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF RMBS TRUST SETTLEMENT AGREEMENTS SUBMITTED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FINANCIAL GUARANTY INSURANCE COMPANY, MBIA INSURANCE CORPORATION, AND WILMINGTON TRUST, NATIONAL ASSOCIATION**

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Non-debtor Ally Financial, Inc. ("Ally") submits this omnibus reply to the Objections to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of RMBS Trust Settlement Agreements submitted by the Official Committee of Unsecured Creditors ("the Committee"), Financial Guaranty Insurance Company ("FGIC"), MBIA Insurance Corporation ("MBIA"), and Wilmington Trust, National Association ("Wilmington Trust") (collectively, the "Objecting Parties"). In support of its reply, Ally respectfully states as follows:

## PRELIMINARY STATEMENT

Ally submits this reply solely to respond to the Objecting Parties' misrepresentations of the factual record in this matter concerning Ally's role and participation in the negotiations leading up to the RMBS Trust Settlement Agreement between ResCap and the RMBS Trusts. Ally expects that the Debtors and the Steering Committee Group of RMBS Holders will fully demonstrate why approval of the Debtors' Rule 9019 Motion is appropriate.

Ally's agreement to support the Debtors' 9019 Motion and RMBS Trust Settlement Agreement and not contest the RMBS claims was premised upon Ally's desire to achieve a prompt, clear, fair and comprehensive solution to numerous and complex issues arising from the ResCap bankruptcy.[1] The Objecting Parties' claims that Ally controlled the negotiation of the RMBS Trust Settlement simply to exact a third party release are wholly without merit.

Despite extensive discovery conducted by the Objecting Parties, the Objecting Parties can point to no witness testimony that Ally controlled negotiations of the RMBS Trust Settlement

---

[1] As part of the RMBS Trust Settlement Agreement, the parties agreed that nothing in the RMBS Trust Settlement Agreement or connected to its approval may be construed as an admission by or evidence against Ally. (*See* Third Amended RMBS Settlement Agreement with Steering Committee, Dkt. No. 1887-2, Section 10.13).

1

Agreement. To the contrary, the record demonstrates that ResCap was represented throughout the negotiations by experienced independent counsel from Morrison & Foerster (as they continue to be). Lacking objective evidence to support their claim that Ally controlled the negotiation process, the Objecting Parties rest their objections on gross misrepresentations concerning the role of Ally's Chief Litigation Counsel, Timothy Devine, in the negotiations. The record, however, plainly demonstrates that Mr. Devine represented Ally and did not represent ResCap in the RMBS Trust Settlement negotiations, let alone control ResCap's negotiation and ratification of the RMBS Trust Settlement Agreement.

The Objecting Parties similarly misrepresent the third-party release of Ally as the nefarious ends of the alleged Ally-dominated RMBS Trust Settlement negotiation process, but this assertion is wholly unsupported and untrue. Notably, although a release of Ally was necessary and appropriate under the standards articulated by the Second Circuit in *In re Metromedia Fiber Network, Inc.*, the propriety of a third party release of Ally is not, contrary to the Objecting Parties' assertion, before the Court on Debtors' 9019 Motion. There is nothing unusual, let alone nefarious, about Ally seeking a release of claims in exchange for its substantial contributions to the Debtors' estates which benefit all creditors—including the Objecting Parties. Ally respectfully submits the true intent underlying the objections of the Committee and other parties is to leverage additional Ally contributions to the Debtors' estate.

## RESPONSE TO OBJECTIONS

**I.    Ally Was A Third-Party Participant To Negotiations Regarding The RMBS Trust Settlement Agreement Between ResCap And The Institutional RMBS Investors But Did Not Direct Or Control Those Negotiations**

A central theme in the Objecting Parties' opposition to the Debtors' Rule 9019 Motion for Approval of the RMBS Trust Settlement Agreements is grounded in a significant factual error: the unsupported claim that Ally controlled the RMBS Trust Settlement process so as to

manipulate the outcome solely to Ally's benefit.  The Objecting Parties contend that "the Debtors played no more than a supporting role in the negotiation process" (FGIC Obj. at ¶ 7) while Ally negotiated "the settlement on behalf of the Debtors [and] was primarily (if not solely) motivated by its desire to obtain a release." (Committee Obj. at 15).  But the Objecting Parties' claims in this regard are bereft of any factual basis.  Indeed, none of the evidence cited demonstrates that Ally interfered with or directed the Debtors' negotiations with the lead Trust negotiator, Kathy Patrick.  This hyperbole by the Objecting Parties should not be credited.

      **A.**    **ResCap's Outside and In-House Counsel Negotiated And Assessed The RMBS Trust Settlement.**

The Objecting Parties all but ignore a central and critical factor undercutting any claim of Ally "control" over the settlement negotiation process: ResCap retained its own experienced and independent bankruptcy litigation counsel in the form of Morrison & Foerster, which led ResCap's negotiation effort separate and apart from Ally.  Indeed, Morrison & Foerster was involved in nearly every email exchange, hosted and ran key meetings with Kathy Patrick, and independently advised the ResCap Board with respect to the RMBS Trust Settlement.

The evidence also completely undermines the Objecting Parties' claims that ResCap was a mere passive player in the RMBS Trust Settlement negotiations.  Numerous witnesses testified to the contrary.  Thomas Marano, ResCap's CEO, for example, indicated that under no circumstances was the protection of ResCap's interests outsourced to Ally: "*Gary [Lee] was there to represent our interest.  Mr. Devine could talk until he was blue in the face.*  Until we looked at the numbers . . . there was going to be no agreement." (Marano Tr. 251:13-19 (emphasis added).) James Whitlinger, a ResCap Board member, similarly confirmed that Gary Lee (of Morrison & Foerster) and Tammy Hamzehpour (of ResCap) were the lead individuals negotiating the RMBS Trust Settlement on behalf of ResCap. (Whitlinger Tr. 64:11-24.) And as

3

Mr. Marano stated, it was Lee and Hamzehpour that lead ResCap's negotiating team in its negotiations with Kathy Patrick:

> *Q. And who were those people responsible for negotiations with Ms. Patrick's group?*
>
> *A. Tammy Hamzephour from general counsel of ResCap and Gary Lee who was -- who was counsel to ResCap via Morrison & Foerster.*
>
> Q. Anyone else responsible for negotiations with Ms. Patrick?
>
> A. In the early stages when Ms. Patrick's letter first arrived Tim Devine had been present but he did not represent ResCap in that meeting.
>
> *Q. I understand but my question is something different. I'm asking you overall who was responsible for the negotiations with Ms. Patrick?*
>
> *A. Tammy and Gary Lee.*
>
> *Q. Not Mr. Devine?*
>
> *A. No. Not -- not on behalf of ResCap, no.*

(Marano Tr. 239:9-240:22 (objections omitted and emphasis added).)

Morrison & Foerster's role is further evidenced by the in-person negotiations with Kathy Patrick's group held at Morrison & Foerster's New York offices and attended by key ResCap personnel. (*See* Renzi Tr. 59:1-5; Ruckdaschel Tr. 59:11-21, 66:3-8.) For example, as Tammy Hamzehpour (ResCap's General Counsel) testified, the April 25, 2012 meeting with Kathy Patrick was led by Lee and attended by numerous ResCap personnel as well as other Morrison & Foerster attorneys. (Hamzehpour Tr. 58:21-59:11.) In short, the Objecting Parties wholly ignore the evidence demonstrating that Morrison & Foerester and in-house counsel for ResCap, not Ally, negotiated the RMBS Trust Settlement Agreement on behalf of ResCap.

    **B.**    **Ally And Its Chief Litigation Counsel Were Third-Party Participants and Potential Plan Sponsors in The RMBS Trust Settlement Negotiations.**

Ally's engagement in the RMBS Trust Settlement negotiations was that of a third-party participant separate from the negotiating principals: ResCap and the institutional RMBS

4

investors. The Objecting parties, however, erroneously claim that "Ally directed the negotiations from the Debtors' side" (Comm. Obj. at 15) and that "AFI's chief litigation counsel, Timothy Devine, dominated the settlement negotiations" (FGIC Obj. at 3; *see also* Wilmington Trust Obj. at 5). These claims are wholly unsupported. In fact, not a single witness testified that Ally or Mr. Devine dominated or directed negotiations.

As the Objecting Parties are well aware, in the years prior to ResCap's bankruptcy filing, Ally legal staff, in particular, Mr. Devine, Chief Counsel for Litigation, represented Ally *and* ResCap in all mortgage-backed securities litigation, including ResCap's representation and warranty litigation. Thus, as Mr. Devine testified during his deposition, in October 2011—when Kathy Patrick first contacted Ally's General Counsel regarding potential claims arising from ResCap's sale of mortgage-backed securities—Mr. Devine did in fact represent ResCap. (Devine Tr. 360:15-25; 363:18-364:9; 366:17-367:8) Mr. Devine also participated in meetings and discussions with Ms. Patrick in his capacity Chief Counsel for Litigation for Ally and ResCap. (Devine Tr. 359:20-361:3.) Mr. Devine, however, did not—contrary to the Objecting Parties' claims—represent both Ally and ResCap in negotiations with Ms. Patrick that ultimately lead to the proposed RMBS Trust Settlement Agreement. (Devine Tr. 363:5-11 ("I was not representing ResCap in connection with a potential resolution of claims against the ResCap estate.").)

As the prospect of a ResCap filing began to emerge, however, ResCap began to utilize its own in-house legal staff in connection with mortgage-backed securities litigation and an eventual filing. (*See* Devine Tr. 369:6-12; Ruckdaschel Tr. 22:13-16.) Ms. Hamzehpour, ResCap's General Counsel, assumed all responsibility for claims against ResCap, in particular claims arising from ResCap's sale of mortgage backed securities. (Devine Tr. 364:10-365:9; 367:9-19.)

5

Accordingly, by the time that the RMBS negotiations began in earnest in April 2012 (*see* Committee Obj. at 16), Ms. Hamzehpour and Gary Lee of Morrison & Foerester, not Mr. Devine, represented ResCap in negotiations with Kathy Patrick that lead to the proposed RMBS Trust Settlement Agreement. (Devine Tr. 364:10-365:9; *see also* Marano Tr. 251:13-19; Hamzehpour Tr. 58:21-60:25.) Indeed, as the Committee notes, there was "universal acknowledgement that [Mr. Devine] did *not* represent ResCap" during the RMBS Settlement negotiations themselves. (Committee Obj. at 15-16 (citing Devine Tr. 222-23; Ruckdaschel Tr. 142; Marano Tr. 239-41; Hamzehpour Tr. 27)).) It is no secret that Ally was appropriately focused on any settlement's impact on a plan as Ally was a potential plan sponsor. There is nothing nefarious in that focus. Simply put, there is no support for the assertion that Mr. Devine represented ResCap in its negotiations of the proposed RMBS Trust Settlement Agreement.

Nor is there any support for the claim that Mr. Devine "dominated the settlement negotiations" or "directed the negotiations from the Debtors' side" (Comm. Obj. at 15). To the contrary, as ResCap's CEO made clear, under no circumstances was Mr. Devine "pulling the strings" for ResCap in the RMBS Trust Settlement negotiations. (*See* Marano Tr. 251:13-19.) Mr. Marano also testified that updates about the status of RMBS Trust Settlement negotiations were provided by Tammy Hamzehpour and Gary Lee—not Mr. Devine—and that ResCap conducted its own analysis of its settlement position. (Marano Tr. 243:4-12.) Ms. Hamzehpour, ResCap's General Counsel, flatly rejected the notion that Mr. Devine was coordinating the negotiations but rather was one of many participants in those discussions.[2] (Hamzehpour Tr. 80:16-22.) Moreover, others testified that they took direction from Ms. Hamzehpour, not Mr.

---

[2] FGIC's reference to the deposition testimony of John Mack in its purported "chronology" is intentionally misleading. Mr. Mack was responding to the *counter-factual* hypothetical proposed by counsel and plainly did not testify that Mr. Devine dominated settlement negotiations. (*See, e.g.,* Mack Tr. 43:19-44:13 ("Q: Do you know whether or not [Devine] had a role in negotiating the RMBS deal with Ms. Patrick. A: No.").

6

Devine, in connection with settlement negotiations and evaluation of the proposed settlement. (Ruckdashel Tr. 18:5-8, 20:12-13, 24:4-19, 25:10-12; Renzi Tr. 96:19-25, 137:1-5.) In short, not a single witness supports the Objecting Parties' claims that Mr. Devine "directed" or "dominated" the negotiations of the RMBS Trust Settlement Agreement.[3]

The Objecting parties also fail to present any evidence that Mr. Devine participated in negotiations on behalf of Ally without regard to the size of the allowed claim against the Debtors' estate. (*See* Committee Obj. at 14-16; FGIC Obj. at 2; MBIA Obj. at 3, 23; Wilmington Trust Obj. at 5.) This is not surprising because the record plainly demonstrates that Mr. Devine advocated for a *lower* settlement amount. (*See* Devine Tr. 180:15-181:121 (discussing Ex. 9019-41 (May 7, 2012 Devine Email) ("If we can persuade [Kathy Patrick's] team that they are using the wrong severities, etc, and can preserve the defect rate, we can pick away at the 10 Billion.").) Indeed, the Committee acknowledges as much in its objection. (*See* Committee Obj. 16.) The Objecting Parties can point to no credible evidence that Ally or Mr. Devine sought to use the negotiation process to advance Ally's interests without regard for ResCap and the Debtors' estates.

In any event, the participation of Ally and its chief litigation counsel in the RMBS Trust negotiations does not alter the fact that the RMBS Trust Settlement was an arms-length negotiation between the *Debtors and outside third-parties*—namely, the investors in the RMBS Trusts. Indeed, the Ally releases complained of by the Objecting Parties do not appear in the RMBS Trust Settlement but rather in the Plan Support Agreements with the RMBS investors and

---

[3]  FGIC's so-called "quantitative analysis" which purports to compare "the number of emails that each individual authored and sent" to demonstrate that Mr. Devine's somehow "dominated" settlement negotiations is misleading on its face and without merit. (*See* FGIC Obj. at 7.) FGIC's comparison of the number of emails sent by Mr. Devine and Mr. Lee concerning the RMBS Trust Settlement, for example, uses differing time periods counting *eight month* more of Mr. Devine's emails than Mr. Lee's. (*Id.*)

7

accordingly are not before the Court on the Debtors' Rule 9019 Motion. (*See* Plan Support Agreement, Dkt. No. 318-3, Section 3.1(i); Plan Support Agreement, Dkt. No. 319-3, Section 3.1(i); *see also Steering Comm. Statement*, Dkt. No. 1739, at ¶¶ 34 & n.22.) The third-party RMBS Trust Settlement therefore cannot and should not itself be viewed as akin to an "insider" settlement, but rather the arms-length transaction it is. *See, e.g.*, *In re Penn Truck Lines, Inc.*, 150 B.R. 595, 600 (E.D. Pa. 1992) (declining to scrutinize affiliate releases where such releases were included in an independent agreement). Another reading would put the releases up for approval now, which they are not.

II. **The Record Demonstrates That The $750 Million Ally-ResCap Settlement Was Negotiated At Arms Length And Separately From The Proposed $8.7 Billion Allowed Claim.**

The Objecting Parties attempt to portray the $750 million Ally-ResCap Settlement as integral to the negotiation of the RMBS Trust Settlement Agreement and the proposed $8.7 billion allowed claim. However, the record demonstrates that the $750 million Ally-ResCap Settlement was negotiated at arms length and separately from the proposed $8.7 billion RMBS Trust Settlement Agreement.

As an initial matter, the $750 million Ally-ResCap settlement and RMBS Trust Settlement were negotiated by different people. As discussed above, Mr. Lee and Ms. Hamzehpour represented ResCap in negotiations of the RMBS Trust Settlement Agreement and Plan Support Agreements. The terms of the Ally-ResCap Settlement, however, were negotiated by different principals entirely. Specifically, the two independent directors of ResCap, John Mack and Jonathan Ilany, and Ally's CEO, Michael Carpenter, negotiated the terms of the Ally-ResCap Settlement. (Mack Tr. 81:18-82:19; *see also* Devine Tr. 225:14-21 ("Q: What individuals did you come to learn negotiated the settlement between AFI and ResCap? A: Well, I may or may not be correct but you are asking me for my understanding. It was Mike Carpenter

8

for AFI with the independents of the ResCap board."); Marano Tr. 194:8-18 ("I relied on the independent directors who, you know, spent weeks, if not months, negotiating with Carpenter; and they told us this was the best deal they could get. And we looked at what the legal professionals said were valid claims, and we concluded at the board meeting this was fair.").) Mr. Devine was *not* involved in the negotiation of the Ally-ResCap Settlement. (Devine Tr. 230:13-19 ("Q: Had Mr. Lee been pressing you for a larger contribution from AFI?  A: Mr. Lee knew because I told him that I was not going to negotiate that number with him. That I didn't have authority to negotiate it for him -- with him and that I didn't intend to do so.").)

Not only were the negotiations of the two agreements conducted by different people, they were separately evaluated by ResCap and neither was contingent upon execution of the other. Indeed, as ResCap's CFO, James Whitlinger, testified, the RMBS Settlement and the Ally-Rescap settlement were separate deals that were independently considered:

> So the first point that I would make is, is ***there are two separate things***. The $8.7 billion locks in based on an arm's length negotiation that happened between Kathy Patrick and our side. And irrespective of a -- settlement that $8.7 billion would stay. If you're ... Kathy Patrick, you would also want to know what you think your constituents are going to get through a waterfall analysis. And so you would want to know what Ally would want to contribute. ***But they're two separate things. Because if -- if the AFI agreement, you know, falls apart, we are still -- we still have $8.7 billion claim settled, which we think is a very good deal based on litigation facts and what -- our professionals told us***.

(Whitlinger Tr. 87:11-88:7 (emphasis added).) Similarly, Tammy Hamzehpour testified that that "there were circumstances under which we would, ResCap, the debtors would have settled with Ms. Patrick whether or not Ally was contributing in getting third party releases. So our decision to settle wasn't contingent on that." (Hamzehpour Tr. 65:4-11.)

Further, as Mr. Devine testified, although the prospect of an Ally-ResCap settlement was important to Kathy Patrick within the context of the RMBS Trust Settlement negotiations, the negotiations were not interconnected and the numbers not interdependent with one another:

9

> Kathy Patrick understood that the negotiation of a dollar number between AFI and ResCap was going on separately from the discussions over the RMBS settlement. Notwithstanding that, she understood that she had no direct role or -- or standing to bargain for a number there since the number -- since that agreement was between the estate and Ally. She did care about the number and she told me that she cared for the obvious reason that she wanted to maximize the figure from Ally Financial.

(Devine Tr. 143:10-22; *see also* Devine Tr. 95:15-25 ("[W]e were not negotiating, Kathy Patrick and me -- Kathy Patrick and I with regard to whether or not the 750 would be consideration for anything that the debtor received in connection with the debtor and Katy Patrick settlement agreement…. The 750 was not being negotiated by Kathy Patrick.").) In other words, although Kathy Patrick was interested in both securing Ally's support for the eventual RMBS Trust Settlement and maximizing the value of Ally's contribution to the Debtors' estate, the RMBS Trust negotiators were not involved in setting the figure with respect to the Ally contribution. (*See* Devine Tr. 145:4-14 ("obviously the quantum of the recovery of the estate, from whatever source, was very interesting to her and her clients"); Devine Tr. 97:11-22.)[4]

In short, the Objecting Parties' innuendo and suppositions cannot alter the evidence. The evidence demonstrates that the Ally-ResCap Settlement and Plan Support Agreements and the RMBS Trust Settlement were the product of arms-length negotiations by sophisticated parties.

---

[4] FGIC's claim that the $8.7B RMBS Trust Settlement was unfair because it "deviated" from Ally's estimation of liability for purposes of quarterly reporting is similarly off the mark. As discussed by various principals during the course of discovery in this matter, both Ally and ResCap viewed the negotiated settlement of outstanding claims on the eve of a Chapter 11 filing as substantively and significantly different from the ongoing and evolving accounting assessment of liability for purposes of corporate reserve setting. (*See* Mack Tr. 151:8-14 ("I think that 8.7 billion and the 4 [billion reserve estimate] are apples and oranges…. The 8.7 billion represents a settlement of all claims. The 4 billion is an accounting-driven answer, involving an estimation."); *id.* 65:21-66:4 ("the 4 billion is not the maximum, that's just an estimate. This number is supposed to be, it is negotiated…. Q: Okay. You are saying the $4 billion an estimate but this was a negotiated number, the 8.7? A: Correct.").)

10

## CONCLUSION

For all of these reasons, Ally respectfully requests that the Court reject the Objections of the Committee, FGIC, MBIA, and Wilmington Trust and accordingly approve the Debtors' Pursuant to Fed. R. Bankr. P. 9019 For Approval of RMBS Trust Settlement Agreements.

Dated:  __January 15, 2013___
       New York, New York

    _/s/ Daniel T. Donovan_____
Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel to Ally Financial, Inc.*