Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------
                                                )
In re:                                          )    Case No. 12-12020 (MG)
                                                )
RESIDENTIAL CAPITAL, LLC, et al.,               )    Chapter 11
                                                )
                               Debtors.         )    Jointly Administered
                                                )
-----------------------------------------------------------

**DECLARATION OF JONATHAN D. JANOW IN SUPPORT OF ALLY FINANCIAL,**
**INC'S OMNIBUS REPLY TO THE OBJECTIONS TO THE DEBTORS' SECOND**
**SUPPLEMENTAL MOTION PURSUANT TO THE FED. R. BANKR. P. 9019 FOR**
**APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

     I, JONATHAN D. JANOW, hereby declare, pursuant to 28 U.S.C. § 1746, that the

following is true and correct:

     1.     I am an associate at the law firm of Kirkland & Ellis LLP, counsel to Ally

Financial, Inc. ("Ally") in the chapter 11 cases of the above captioned matter.  I respectfully

submit this declaration in support of Ally's Omnibus Reply to the Objections to the Debtors'

Second Supplemental Motion Pursuant to the Fed. R. Bankr. P. 9019 for the Approval of the

RMBS Trust Settlement Agreements.

     2.     Attached to my Declaration are the following Exhibits in support of Ally's reply.

| EXHIBIT | DESCRIPTION OF EXHIBIT |
|---------|------------------------|
| A | Excerpts from the Deposition Testimony of Thomas Marano, dated November 12, 2012. |
| B | Excerpts from the Deposition Testimony of James Whitlinger, dated November 15, 2012. |
| C | Excerpts from the Deposition Testimony of Mark Renzi, dated November 7, 2012. |
| D | Excerpts from the Deposition Testimony of John Ruckdaschel, dated November 8, 2012. |
| E | Excerpts from the Deposition Testimony of Tammy Hamzehpour, dated November 13, 2012 |
| F | Excerpts from the Deposition Testimony of Timothy Devine, dated November 19, 2012 |
| G | Excerpts from the Deposition Testimony of John Mack, dated November 14, 2012. |
| H | Email dated May 7, 2012 from Timothy Devine to Mark Renzi, Gary Lee, Tammy Hamzehpour and others.  *See* **Ex. 9019-41.** |

Dated:       January 15, 2013
             Washington, D.C.


             ___/s/___Jonathan D. Janow_____
                 Jonathan D. Janow


2

# Exhibit A

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

            Debtors.

-----------------------------------x


    H I G H L Y   C O N F I D E N T I A L


VIDEOTAPE DEPOSITION OF THOMAS MARANO

        New York, New York

        November 12, 2012

            9:56 a.m.









Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27645

THOMAS MARANO - HIGHLY CONFIDENTIAL

194

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        A.    What I told Carpenter was it

3    would take a lot more than 750 million to

4    get a quick resolution.  Doesn't mean it

5    was fair for it to be a 2 billion charge

6    to Ally; 750 was fair.  But people are

7    going to want more.

8        Q.    What made you think that 750 was

9    the top dollar you were going to be able

10   to get from AFI?

11       A.    The -- I relied on the

12   independent directors who, you know, spent

13   weeks, if not months, negotiating with

14   Carpenter; and they told us this was the

15   best deal they could get.  And we looked

16   at what the legal professionals said were

17   valid claims, and we concluded at the

18   board meeting this was fair.

19       Q.    Based on a two-page presentation

20   you got 22 minutes before, in an hour

21   meeting?

22           MR. PRINCI:  Objection, that's

23       just argumentative.  Is there a

24       question?  Excuse me, is there a

25       question?

THOMAS MARANO - HIGHLY CONFIDENTIAL

231

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        A.    Sure.

3        Q.    That was what you testified

4    about earlier?

5        A.    Yes.

6        Q.    You would reach out to

7    Mr. Carpenter or you would have discussed

8    the solvency and liquidity situation of

9    ResCap with Mr. Carpenter?

10        A.    Correct.

11        Q.    Earlier in your testimony today

12    you testified that Mr. Ilany and Mr. Mack

13    from ResCap's board were responsible for

14    engaging with Ally Financial in the

15    negotiations with respect to a settlement

16    with Ally.  Do you recall that testimony?

17        A.    Yes.

18        Q.    Okay.  Were you kept up to date

19    on the status of negotiations with Ally?

20        A.    Not in detail.  Periodically I'd

21    be posted as to what was going on but I

22    was not informed of the details in a way

23    that I could tell you the blow-by-blow

24    descriptions.

25        Q.    Understood.  Who would provide

THOMAS MARANO - HIGHLY CONFIDENTIAL

232

THOMAS MARANO - HIGHLY CONFIDENTIAL

1  you those updates?

2      A.    I would receive those updates

3  from either Mr. Mack or Mr. Ilany but they

4  would be of a nature of we are talking to

5  Carpenter.

6      Q.    Did you ever tell Mr. Ilany or

7  Mr. Mack that you thought $2 billion was a

8  reasonable number to settle with Ally

9  Financial?

10      A.    Again, just to make sure the

11  record is clear, I communicated to many

12  people that I thought that we would not be

13  able to settle with the bondholders or buy

14  their peace for less than $2 billion.

15  That wasn't necessarily based on the

16  merits of the claims in the end when the

17  work was completed.

18      Q.    I understand but did you tell

19  Mr. Ilany and Mr. Mack that you thought $2

20  billion was a reasonable number?

21          MR. PRINCI:  Objection.  Asked

22      and answered.

23          You can answer it again.

24      A.    They knew my views.

THOMAS MARANO - HIGHLY CONFIDENTIAL

233

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        Q.    So they knew?

3        A.    (Witness nods.)

4        Q.    What was the initial ask by

5    ResCap's board to Ally in connection with

6    the Ally set of negotiations?

7              MR. PRINCI:  Objection to form.

8              You can answer the question if

9        you wish to.

10       A.    I don't actually recall but it

11   was a really big number.  It was much

12   bigger than $2 billion.

13       Q.    Was it $3 billion?

14       A.    You know, if I recalled the

15   exact number, it was very big.  Ally's

16   reaction was NFW, we'd rather litigate.

17       Q.    Do you recall if it was more

18   than $10 billion?

19       A.    No, I don't think it was over 10

20   billion.

21       Q.    Do you recall if it was more

22   than 5 billion?

23       A.    I would say, you know, it had to

24   be somewhere south of 5.  I just don't --

25   I don't recall the exact number.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

THOMAS MARANO - HIGHLY CONFIDENTIAL

234

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        Q.    Okay.  So somewhere above 2 but

3    south of 5?

4            MR. PRINCI:  Objection.  That's

5        not his testimony.

6        A.    I don't recall the exact number.

7            MR. SIDMAN:  Actually, I think

8        it was but that's fine.

9        Q.    I'm going to show you -- again I

10   apologize if it's been marked previously

11   not here but some other deposition I'll

12   mark it has 64.  And a copy for counsel.

13           (9019 Exhibit 64, e-mail chain

14       dated March 16, 2012, Bates

15       Ally-0226065, marked for

16       identification, as of this date.)

17           MR. SIDMAN:  For the record,

18       Exhibit 64 is an e-mail chain dated

19       March 16, 2012, and Bates number is

20       Ally-0226065.

21       Q.    My first question to you,

22   Mr. Marano, is, do you recall the first

23   e-mail on the e-mail chain which is an

24   e-mail from you to Mr. Solomon,

25   Ms. Hamzephour, cc'ing Mr. Carpenter, sent

THOMAS MARANO - HIGHLY CONFIDENTIAL

235

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    Friday, March 16th, 2012 at 1:47 p.m.?

3        A.    Yeah, I do recall this.

4        Q.    Okay.  Have you had a chance to

5    look at the e-mail?

6        A.    Just give me one second.

7        Q.    Let me know when you are ready.

8        A.    Yeah, go ahead.

9        Q.    So the first e-mail which was

10   sent from you to Mr. Solomon,

11   Ms. Hamzephour discusses a tolling

12   agreement between AFI and ResCap.  Do you

13   see that?

14       A.    Yes.

15       Q.    And what was the subject matter

16   of the tolling agreement between AFI and

17   ResCap?

18       A.    We were looking for a tolling

19   agreement between ResCap and AFI to cover

20   all causes of actions that ResCap may have

21   against AFI.  So we didn't have the

22   statute of limitations period expire prior

23   to reaching a settlement with AFI or a

24   bankruptcy filing.

25       Q.    And what was your understanding

THOMAS MARANO - HIGHLY CONFIDENTIAL

236

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    of the potential applicable statute of

3    limitations period that would expire in

4    March of 2012?

5            MR. PRINCI:  Object.  If your

6        understanding of that is based --

7        comes from communications with

8        counsel, I'm going to direct you not

9        to answer the question.  If it comes

10       from a source other than your

11       communications with counsel, you can

12       answer the question.

13       A.    In the context of this comes

14   from counsel.

15       Q.    Okay.

16   DI        MR. PRINCI:  I'm going to direct

17       you not to answer the question.

18       Q.    Do you have any -- other than

19   with your counsel do you have any

20   understanding as to why the statute of

21   limitations involved dealt with four years

22   as opposed to another time frame, 6 years,

23   2 years, 1 year?

24           MR. PRINCI:  Same admonition.

25           MR. SIDMAN:  I instructed -- I

THOMAS MARANO - HIGHLY CONFIDENTIAL

237

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2         told him already not to --

3         A.    The answer is no.

4         Q.    Do you see at the bottom there

5    that -- you report, second-to-last

6    paragraph, that the cost of -- the cost to

7    draft this complaint in the condensed time

8    period is likely 750,000 to $1 million.

9              Do you see that?

10        A.    Yes.

11        Q.    Okay.  And who told you that the

12   cost to draft this complaint in this time

13   period was likely to be 750,000 to

14   $1 million?

15             MR. PRINCI:  Can I ask a

16        question.  I have allowed a lot of

17        questions today that I think really

18        are the subject of the examiner's

19        inquiry and ultimately will be the

20        subject of the examiner's report.  And

21        I think some leeway has to be provided

22        to everybody here in that regard.  But

23        since you began questioning the

24        witness I think the entirety of

25        your -- of your inquiry has been in

THOMAS MARANO - HIGHLY CONFIDENTIAL

238

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        that field.  And now I think you want

3        to know who told him what the cost of

4        the complaint would be against Ally.

5        I just don't understand what this has

6        to do with the 9019 motion.  Could you

7        edify that for me?

8            MR. SIDMAN:  No.  But if you are

9        instructing him not to answer, that's

10       fine.

11   DI       MR. PRINCI:  Okay.  No, don't

12       answer.

13           MR. SIDMAN:  Okay.

14           MR. PRINCI:  Can we take a

15       break?

16           MR. SIDMAN:  Yes.

17           MR. PRINCI:  Thanks.

18           THE VIDEOGRAPHER:  The time is

19       4:48 p.m. and we are off the record.

20           (Whereupon, there is a recess in

21       the proceedings.)

22           THE VIDEOGRAPHER:  The time is

23       4:54 p.m. and we are back on the

24       record.

25           Q.   Good afternoon again,

THOMAS MARANO - HIGHLY CONFIDENTIAL

239

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    Mr. Marano.  You testified early that

3    Mr. Ilany and Mr. Mack were responsible

4    for the Ally ResCap negotiations, right,

5    and you also testified earlier that -- I'm

6    sorry the court reporter can't take down a

7    head nod.  Is that yes or no?

8        A.    Yes.

9        Q.    You also testified earlier --

10   backup.  You also testified earlier that

11   another group of people were responsible

12   for negotiations with Ms. Patrick and

13   Mr. Franklin's group; is that correct?

14       A.    Yes.

15       Q.    And who were those people

16   responsible for negotiations with

17   Ms. Patrick's group?

18       A.    Tammy Hamzephour from general

19   counsel of ResCap and Gary Lee who was --

20   who was counsel to ResCap via Morrison &

21   Foerster.

22       Q.    Anyone else responsible for

23   negotiations with Ms. Patrick?

24       A.    In the early stages when

25   Ms. Patrick's letter first arrived Tim

THOMAS MARANO - HIGHLY CONFIDENTIAL

240

THOMAS MARANO - HIGHLY CONFIDENTIAL

1   Devine had been present but he did not

2   represent ResCap in that meeting.

3       Q.    I understand but my question is

4   something different.  I'm asking you

5   overall who was responsible for the

6   negotiations with Ms. Patrick?

7       A.    Tammy and Gary Lee.

8       Q.    Not Mr. Devine?

9       A.    No.  Not -- not on behalf of

10  ResCap, no.

11      Q.    I understand but I'm not -- I'm

12  not making that distinction you are.  So

13  let me ask my question.  Who was

14  responsible for negotiating the RMBS

15  settlement with Ms. Patrick?

16          MR. PRINCI:  Objection.  Asked

17      and answered.

18          You can answer again.

19      A.    Tim Devine was there.  But Tammy

20  Hamzephour represented ResCap and Gary

21  Lee.

22      Q.    And who did Mr. Devine

23  represent?

24      A.    Mr. Devine was there as a

THOMAS MARANO - HIGHLY CONFIDENTIAL

243

1   THOMAS MARANO - HIGHLY CONFIDENTIAL

2   reasonable or the loss amount was

3   reasonable.

4       Q.    When you were provided updates

5   or information about the RMBS settlement

6   negotiations, who provided them to you?

7       A.    I would have received the

8   financial information from Jeff

9   Cancelliere, Jim Whitlinger may have been

10  on the calls.  And from a legal point of

11  view I would have gotten updates from

12  Tammy Hamzephour and Gary Lee.

13      Q.    Did you ever discuss strategy

14  with anyone at Ally Financial with respect

15  to the RMBS settlement negotiations?

16      A.    Early on I did interact with Tim

17  Devine when we were contracting for Tim's

18  services from Ally.

19      Q.    I'm sorry.  You said you

20  contracting for Tim's services?

21      A.    Well, when -- there was a period

22  of time where there was global functions.

23  And the entire legal department was under

24  the global functions of Ally.  And then

25  sometime in 2012 we began to pull those

THOMAS MARANO - HIGHLY CONFIDENTIAL

251

THOMAS MARANO - HIGHLY CONFIDENTIAL

1

2    A.    I believe that, you know, they

3    would have been working together on this.

4    I just don't know.

5    Q.    So you believe that they were

6    working together?

7    A.    Yeah.  I knew Gary was there

8    watching our interest as was Tammy.

9    Q.    But he wasn't the one

10   negotiating the deal with Ms. Patrick?

11        MR. PRINCI:  Objection.  That

12   misstates his testimony.

13   A.    Gary was there to represent our

14   interest.  Mr. Devine could talk to

15   Ms. Patrick until he was blue in the face.

16   Until we looked at the numbers that she

17   was proposing versus possible range that

18   Jeff Cancelliere came up with, there was

19   going to be no agreement.

20   Q.    But you will agree with me that

21   with respect to at least this e-mail, back

22   and forth between Mr. Devine and

23   Ms. Patrick, where numbers were exchanged,

24   the only people were talking were

25   Mr. Devine and Ms. Patrick?

# Exhibit B

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

Debtors.

-----------------------------------x




VIDEOTAPE DEPOSITION OF JAMES WHITLINGER

New York, New York

November 15, 2012

9:39 a.m.







Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27649

64

1                        JAMES WHITLINGER

2        as an allowed claim by the institutional

3        investors?

4               MR. RAINS:   Misstates his

5           testimony.

6           A.    I would say that it was

7        important to know that the 8.7 billion was

8        the maximum amount claim that could be

9        brought forth.  And you would want to know

10       what that dollar amount is.

11          Q.    Did you know how that

12       $8.7 billion number was arrived at?

13          A.    Yes.

14          Q.    How was it arrived at?

15          A.    Through our teams that

16       negotiated with Kathy Patrick.

17          Q.    And when you say -- and who are

18       the people on the team that negotiated

19       with Kathy Patrick?

20          A.    I wasn't -- wasn't at the

21       negotiations but Gary Lee and Tammy

22       Hamzephour were the people that on our

23       side that were very important to the

24       process.

25          Q.    Do you know whether Mr. Devine

87

1                    JAMES WHITLINGER

2     accept a $750 million contribution to the

3     restructure from AFI without first knowing

4     what the size -- what the settlement

5     amount would be with the institutional

6     investors?

7              MR. RAINS:  Object to the form

8         of the question.  It's vague and

9         ambiguous and assumes facts not in

10        evidence.

11        A.   So the first point that I would

12    make is, is there are two separate things.

13    The $8.7 billion locks in based on an

14    arm's length negotiation that happened

15    between Kathy Patrick and our side.  And

16    irrespective of a -- of a settlement that

17    $8.7 billion would stay.

18             If you're -- you know, this is

19    my opinion, I probably shouldn't --

20    shouldn't give opinions but if you are

21    Kathy Patrick, you would also want to know

22    what you think your constituents are going

23    to get through a waterfall analysis.  And

24    so you would want to know what Ally would

25    want to contribute.  But they're two

88

                    JAMES WHITLINGER

1

2      separate things.  Because if -- if the AFI

3      agreement, you know, falls apart, we are

4      still -- we still have $8.7 billion claim

5      settled, which we think is a very good

6      deal based on litigation facts and what

7      our -- our professionals told us.

8          Q.    Can you tell me all the reasons

9      why you concluded as a board member that

10     it was a good deal?

11         A.    First we had a process.  It was

12     negotiated with, you know, with

13     knowledgeable people on the types of

14     litigation claims that could be made on

15     our side.  It was negotiated with Kathy

16     Patrick and her group who are

17     knowledgeable on what claims they would

18     bring forth, and, you know, we had -- we

19     had independent, you know, our legal

20     counsel evaluating what those claims could

21     be versus the releases we would get and it

22     was a good process.

23             MR. RAINS:  You said first so I

24         couldn't tell whether you were

25         finished with your answer.

# Exhibit C

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                                    Case No.

RESIDENTIAL CAPITAL, LLC, et. al,        12-12020(MG)

              Debtors.

-----------------------------------x




VIDEOTAPE DEPOSITION OF MARK RENZI

New York, New York

November 7, 2012

1:08 p.m.




Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27640

59

1                    MARK RENZI

2      Most of the meetings with Kath Patrick

3      that I was -- that I attended were at

4      MoFo's offices.  I actually believe all

5      were at MoFo's offices.

6          Q.    Did you make any part of the

7      presentation to Ms. Patrick that day?

8          A.    Yes.

9          Q.    Did you make the entire

10     presentation?

11         A.    No.

12         Q.    Who else made part of the

13     presentation?

14         A.    Excuse me.  Marc Puntus was

15     available from Centerview Partners.

16         Q.    He was present?

17         A.    I believe so.  On the 25th, I

18     believe so.  Although he's not cc'd in

19     this e-mail, I believe so.

20         Q.    Okay.  Looking at the

21     presentation attached to your e-mail --

22         A.    Yes.

23         Q.    -- was this a document that you

24     prepared?

25         A.    Not in its entirety but portions

96

1                          MARK RENZI

2        including the many audits that we

3        described before, to understand what would

4        be a reasonable allocation between the two

5        legal entities that are reflected on this

6        page.

7            Q.    Mr. Renzi, I don't mean to

8        misstate anything you've said but I seem

9        to recall your saying that the 3 billion,

10       4 billion and 6 billion dollar valuations

11       that were used for purposes of this

12       presentation to Ms. Patrick, came from

13       Morrison Foerster and representatives from

14       ResCap, is that true?

15           A.    I can't remember specifically

16       what I said but we collectively discussed

17       what range to present for these

18       negotiations.

19           Q.    Was Mr. Devine a participant in

20       that discussion?

21           A.    Mr. Devine was involved in these

22       meetings certainly.  That specific

23       discussion I'm sure he e-mailed what he

24       thinks but I don't -- I don't work for

25       Mr. Devine.

137

                      MARK RENZI

1

2      additional waterfall numbers to Kathy

3      Patrick?

4          A.    It would not be -- I don't work

5      for Tim Devine.

6          Q.    I didn't ask you that.

7          A.    I'm not --

8          Q.    Didn't you send this response to

9      his request?

10             MR. RAINS:  Let him finish his

11         answer.

12         A.    I wasn't done with my response.

13         Q.    Go ahead.

14         A.    Thank you.  So you are asking me

15     about chronology.  So the chronology is --

16     may I grab these other ones?

17         Q.    You can grab anything you like.

18         A.    Thank you.  So you are asking me

19     about an e-mail that went out at 6:00 p.m.

20     on Sunday.  In between 6:00 p.m. and

21     10:00 p.m. there's approximately four

22     hours.  What I likely did because I don't

23     work for Tim Devine is I talked to Gary

24     Lee and Jamie Levitt and discussed what

25     scenarios made sense to run.  Tim Devine

**Exhibit D**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

            Debtors.

----------------------------------x

VIDEOTAPE DEPOSITION OF JOHN RUCKDASCHEL

New York, New York

November 8, 2012

9:37 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27643

18

JOHN    RUCKDASCHEL

1

2    consider yourself a ResCap employee and

3    not an Ally employee?

4        A.    That is correct.

5        Q.    Who did you report to as an

6    in-house lawyer in structured finance?

7        A.    Today I report to Tammy

8    Hamzephour.

9        Q.    Prior to the petition date who

10   did you report to?

11       A.    I reported to John Cooney who

12   was in a different role from when I

13   originally started at RFC.  I reported to

14   him up until sometime in the first quarter

15   of 2012.

16       Q.    Which corporate entity pays your

17   salary?

18       A.    The check is deposited

19   electronically.  And so I, all I get is a

20   receipt.  I ultimately don't know which

21   entity is paying for it.

22       Q.    So you don't know?

23       A.    Well, I mean again I'm an

24   employee of GMAC Mortgage and my client is

25   ResCap.

20

                    JOHN   RUCKDASCHEL

1

2      office.

3          Q.    Is Tim Devine in that office

4      also?

5          A.    No.

6          Q.    Is Bill Solomon in that office?

7          A.    No.

8          Q.    Is Tammy Hamzephour in that

9      office?

10         A.    Tammy splits her time between

11     Fort Washington and Minneapolis.

12         Q.    Do you report to Tim Devine?

13         A.    I do not report to Tim Devine.

14         Q.    So is it -- just so I make sure

15     I'm understanding correctly, at all times

16     you have been a ResCap employee as opposed

17     to Ally?

18         A.    You know, the -- we were a

19     global and integrated legal department.

20     I -- I don't know up until, you know,

21     during the time that we were integrated,

22     you know, where HR, you know, which

23     spreadsheet my name sat on.  But I do know

24     that in twenty -- I believe it would be

25     2011 or even 2010 it was made clear to me

22

JOHN   RUCKDASCHEL

1

2    charge of deciding which department you

3    would be in?

4        A.    He's the general counsel of

5    Ally.

6        Q.    So is he your boss ultimately?

7        A.    When we were an integrated legal

8    department, we would report up the chain

9    all the way to Bill.

10       Q.    And when did you stop being an

11   integrated legal department?

12       A.    The representation for me was

13   always ResCap.  In the first quarter as

14   the bankruptcy planning began to

15   accelerate, the legal departments began to

16   separate.  But I think the important thing

17   to remember is that -- who your client

18   was.  And the client for me was always

19   ResCap.

20       Q.    Do you remember a date when the

21   integrated legal departments began to

22   separate or was it a process?

23       A.    It was a process because of the

24   nature of preparing for a bankruptcy.

25       Q.    So there wasn't a particular

24

1          JOHN   RUCKDASCHEL

2     things were going, my only concern was who

3     is my client.  And my client was ResCap.

4         Q.    I'm not sure you answered my

5     question.  My question was, was there any

6     date by which you were told you should no

7     longer report up the chain to Bill

8     Solomon?

9         A.    You know, that's a good

10    question.  I don't recall the official

11    date on which I began reporting to Tammy

12    Hamzephour.  But there was a point where

13    that was clear.  And I think it was even

14    before they sort of made some, sent around

15    an e-mail saying, you know, we have these

16    departments, these separate legal

17    departments.  I was reporting to her

18    already I think, I think by March but I'm

19    not sure.

20        Q.    So there was at some point an

21    e-mail that was sent around saying we have

22    a different legal department?

23        A.    Yes, I believe that's correct.

24        Q.    And you don't recall the date of

25    that e-mail?

25

1                    JOHN   RUCKDASCHEL

2          A.    I think it was.  I think it was

3     sometime in April.

4          Q.    Do you recall if it was the

5     beginning of April or end of April?

6          A.    I think it was, you know,

7     towards the end of April.  But again, I

8     can't emphasize enough, the client is

9     ResCap.

10         Q.    And you were already reporting

11    to Tammy Hamzephour starting in March?

12         A.    I think that's right, yeah.

13         Q.    So what is the title of your

14    current position at ResCap?

15         A.    Associate general counsel.

16         Q.    Can you describe your

17    responsibilities in your current position?

18         A.    Primarily, you know, it's --

19    I'll give you the sort of, the textbook

20    answer, right, because the bankruptcy has

21    sort of, you know, moved everything

22    around.  It's not like we are doing

23    transactions today.  But all things being

24    equal, I would support, if we were

25    actually engaging in, for example, loan

59

1                     JOHN   RUCKDASCHEL

2          A.     Right, I don't know.

3          Q.     Did you ever hear of anyone

4     meeting with Kathy Patrick between

5     November 2012 and April 2012?

6          A.    No, I don't recall hearing of

7     meetings.

8          Q.    In April 2012 when you met with

9     Kathy Patrick was that an in-person

10    meeting?

11         A.    Yes.  It was here in New York.

12         Q.    And who else was there?

13         A.    It was at the offices of our

14    lawyers at Morrison & Foerster.  For

15    ResCap it was the Morrison & Foerster

16    lawyers, Tammy Hamzephour, Bill Thompson

17    and myself.  Tim Devine was there.  And

18    I -- I don't recall if -- I think Kirkland

19    & Ellis, they sent a lawyer at one -- but

20    I don't know if they were able to stay the

21    whole time that's why I'm just not sure.

22         Q.    Now, when Tim Devine was at this

23    meeting in April 2012, was he representing

24    Ally, ResCap or had there not yet been a

25    division?

66

1                        JOHN   RUCKDASCHEL

2      met with her in the room.

3          Q.    Did you subsequently meet with

4      someone else from Gibbs & Bruns?

5          A.    I think there was a subsequent

6      meeting.  It was prior to the bankruptcy.

7      I assume it was sometime in May and I

8      think it was their co-counsel bankruptcy

9      lawyers.

10         Q.    Was that Ropes & Gray?

11         A.    Yes, yes.

12         Q.    And who else -- who was at that

13     meeting?

14         A.    I don't recall all of the folks

15     who were there.  It was held at Morrison &

16     Foerster's office as counsel to ResCap.  I

17     believe Tammy was there, I was there and I

18     recall Tim was there.  And maybe Bill

19     Thompson but I'm not 100 percent sure on

20     that.

21         Q.    Did you understand that

22     Mr. Devine was representing Ally at that

23     point?

24         A.    My understanding is in

25     connection with the, these RMBS

142

1                    JOHN   RUCKDASCHEL

2        A.    The --

3              MR. RAINS:  Wait for a question.

4              THE WITNESS:  Okay.  Sorry.

5        Q.    Did you understand Mr. Devine in

6    that conversation to be representing Ally

7    or ResCap?

8        A.    As I said earlier, my

9    understanding is that in the RMBS

10   settlement discussions that Tim was

11   representing Ally.

12       Q.    Do you recall Mr. Devine's

13   response to your indemnification issue

14   that you raised?

15       A.    I don't -- I don't recall the

16   specifics.

17       Q.    Do you recall if he agreed or

18   disagreed?

19       A.    I think he -- I think he agreed

20   with me that it was -- it was a good idea

21   but as I recall I think it wasn't

22   something that we were -- that the parties

23   wanted to, you know, have the deal fall

24   apart just on a trustee indemnity issue.

25       Q.    So it wasn't drop dead for the

# Exhibit E

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,        12-12020(MG)

                 Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF TAMMY HAMZEPHOUR

New York, New York

November 13, 2012

9:43 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27903

27

1                    TAMMY HAMZEPHOUR

2      the Minneapolis office.  Also my capital

3      markets partner, John Ruckdaschel, was

4      there, and Tim Devine from Ally.

5          Q.    How long did the meeting last?

6          A.    Three hours, maybe.  I don't

7      remember exactly.

8          Q.    Can you please describe for me,

9      in as much detail as you can remember,

10     what the discussion was?

11         A.    Ms. Patrick did most of the

12     talking in the beginning of meeting.  She

13     talked to us a bit about who her investor

14     clients were and their holdings that were

15     represented across the spectrum of our

16     securitization deals.  She indicated that

17     they believed they have claims against us

18     and against Ally.

19              We talked about some of the work

20     she had done in preparation for the

21     meeting, and she mentioned that she had

22     reviewed our prospectuses for the deals,

23     that she had reviewed loan and servicing

24     agreements, that she was familiar with the

25     structure and the language and the

58

                        TAMMY HAMZEPHOUR

1

2      Ms. Patrick take place on April 25, 2012?

3           A.    Yes.

4           Q.    And was a waterfall presentation

5      given to her during that meeting?

6           A.    Yes.

7           Q.    Did the presentation incorporate

8      the 3, 4, 6 numbers recommended by

9      Mr. Devine for the low, medium and high

10     valuations of ResCap's RMBS exposure?

11          A.    Yes, I believe it did.

12          Q.    Did it also incorporate

13     Mr. Devine's recommendation to use

14     $750 million rather than $1 billion as

15     AFI's potential contribution towards a

16     settlement?

17          A.    I believe there were a range of

18     potential AFI contributions reflected.

19     750 would have been the highest one in the

20     range.

21          Q.    Okay.  Who attended the meeting

22     on April 25th with Ms. Patrick?

23          A.    There were a lot of people.

24     Maybe as many as are in this room.  I'll

25     tell you the ones I can remember.  Gary

59

1                    TAMMY HAMZEPHOUR

2      Lee was there, Tim Devine, Mark Renzi from

3      FTI, I believe John Ruckdaschel was

4      present, Ms. Patrick.  At least one, maybe

5      two of her colleagues.  I believe Marc

6      Puntus or Sam Greene, one or the other,

7      from Centerview Partners was there for at

8      least part of the meeting.  I don't

9      remember if they stayed for the whole

10     meeting.  And there may have been one or

11     more MoFo lawyers there, I don't recall.

12          Q.   You were there?

13          A.   Sure.  I was there.  I couldn't

14     tell you who was in the room if I weren't

15     there.

16          Q.   Who led the meeting?

17          A.   Gary Lee.

18          Q.   Did you --

19          A.   From a legal perspective Gary

20     Lee.  There were parts of the meeting that

21     different people were handling so.

22          Q.   What part, if any, did you

23     handle?

24          A.   I didn't take the lead on any of

25     the issues other than we had a short

60

TAMMY HAMZEPHOUR

1

2    discussion on servicing standards.  And we

3    talked about part of Ms. Patrick's

4    interest and that of her clients was in

5    not only achieving a monetary settlement

6    but also a settlement that would provide

7    enhanced servicing standards for their

8    investors' continuing interest in these

9    loans.

10        Q.    Who made the waterfall

11    presentation?

12        A.    I believe Mark Renzi from FTI

13    did that.

14        Q.    What was Mr. Devine's role

15    during the meeting as you understood it?

16        A.    What was his role?

17        Q.    What did he do?

18        A.    He was in the meeting.  I don't

19    remember specific parts of the

20    conversation that he led.  There were --

21    there was discussion around the waterfall

22    and the ranges of recoveries, losses, et

23    cetera, that were the topic of discussion

24    around the settlement.  He participated in

25    that.

65

```
 1                    TAMMY HAMZEPHOUR

 2      different?

 3           A.    Yes.

 4           Q.    In what way?

 5           A.    Because there were circumstances

 6      under which we would, ResCap, the debtors

 7      would have settled with Ms. Patrick

 8      whether or not Ally was contributing in

 9      getting third-party releases.  So our

10      decision to settle wasn't contingent on

11      that.

12                MR. KAUFMAN:  Let's mark as the

13           next exhibit two e-mails from

14           Mr. Devine on May 1, 2012.  Bates

15           number RC 9019_00048984.

16                (9019 Exhibit 81, two e-mails

17           from Mr. Devine on May 1, 2012, Bates

18           RC 9019_00048984, marked for

19           identification, as of this date.)

20           Q.    Looking at the exhibit we have

21      just marked.  Did you receive each of

22      these e-mails from Mr. Devine?

23           A.    Yes.

24           Q.    The subject of both e-mails was

25      meeting with KP Steering Committee,
```

80

1                    TAMMY HAMZEPHOUR

2          A.    No.

3          Q.    You weren't coordinating that,

4     were you?

5          A.    No.  Gary Lee was coordinating

6     that.

7          Q.    Who was the one who was

8     communicating with Ms. Patrick about the

9     status of the documents?

10              MR. RAINS:  Objection.  Assumes

11         facts not in evidence.

12         Q.    To your knowledge?

13         A.    Gary was communicating with her

14    and Tim as well.  I assume K&E was

15    involved for Ally.

16         Q.    Okay.  Was Mr. Devine

17    coordinating the negotiations with

18    Ms. Patrick concerning the amount of the

19    allowed claims she would get in a

20    settlement?

21         A.    No.  He participated in those

22    discussions.

23         Q.    What was your participation in

24    that discussion?

25         A.    I was present for some of the

**Exhibit F**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

                      Debtors.

-----------------------------------x


        VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

                New York, New York

                November 19, 2012

                  10:17 a.m.








Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

95

1                    TIMOTHY DEVINE

2        Q.    I'm not asking you to speculate.

3   I'm asking you to tell me at the time that

4   you were preparing to provide this

5   waterfall presentation to Ms. Patrick in

6   connection with proposed settlement with

7   her, wasn't it your understanding that AFI

8   in return for whatever contribution it

9   would be making to that settlement was

10  going to require releases from both the

11  PLS claimants as well as ResCap?

12       A.    Couple -- couple points in

13  response.  One, I wasn't preparing the

14  waterfall.

15            Two, we were not negotiating,

16  Kathy Patrick and me -- Kathy Patrick and

17  I with regard to whether or not the 750

18  would be consideration for anything that

19  the debtor received in connection with the

20  resolution of a debtor and Kathy Patrick

21  settlement agreement.

22       Q.    Weren't those things all being

23  negotiated together, Mr. Devine?

24       A.    The 750 was not being negotiated

25  with Kathy Patrick.

143

```
 1              TIMOTHY DEVINE

 2       Q.     Yes.

 3       A.     No, she did not indicate that to

 4   me.

 5       Q.     Did she indicate that it was

 6   important?

 7       A.     Yes.

 8       Q.     Okay.  What did she say about

 9   that?

10       A.     Kathy Patrick understood that

11   the negotiation of a dollar number between

12   AFI and ResCap was going on separately

13   from the discussions over the RMBS

14   settlement.  Notwithstanding that, she

15   understood that she had no direct role

16   or -- or standing to bargain for a number

17   there since the number -- since that

18   agreement was between the estate and Ally.

19   She did care about the number and she told

20   me that she cared about the number for the

21   obvious reason that she wanted to maximize

22   that figure from Ally Financial.

23       Q.     But as of May 4th, had she

24   expressed an amount that she expected from

25   AFI if she were going to proceed with a
```

180

```
 1            TIMOTHY DEVINE
 2       discussed or what was agreed to with
 3       respect to the court.  Perhaps we
 4       should go off the record and discuss
 5       this and resolve it.
 6            MR. KAUFMAN:  Okay.  Let's go
 7       off the record.
 8            THE VIDEOGRAPHER:  The time is
 9       2:48 p.m. and we are off the record.
10            (Brief recess.)
11            THE VIDEOGRAPHER:  The time is
12       2:51 p.m. and we are back on the
13       record.
14            THE WITNESS:  Thanks.
15       Q.   Please look at the e-mail that
16   you sent at 10:14 p.m. on May 7th which
17   begins at the bottom of the first page of
18   Exhibit 41 and continues over to the
19   second page.  Do you see that?
20       A.   I see that e-mail, yeah.
21       Q.   And did you send that e-mail?
22       A.   Yes.  It looks like I sent that
23   e-mail.
24       Q.   The first part of your e-mail
25   was addressed specifically to Mark Renzi
```

181

                    TIMOTHY DEVINE

1

2    and Jeff Cancelliere, right?

3         A.    Yes.

4         Q.    And you said "KP needs defect

5    rate.  If we can persuade her team that

6    they are using wrong severities, etc., and

7    can preserve the defect rate, we can pick

8    away at the $10 billion."

9              Why did you believe Ms. Patrick

10   needed a certain defect rate for her

11   settlement?

12        A.    I believe that she told me that

13   her analysis and assessment of the loans

14   at issue had indicated a certain defect

15   rate.  And notwithstanding the very

16   natural process of negotiation I

17   understood that she was reaching a point

18   where she wasn't going to compromise with

19   regard to what defect rate applied to this

20   loan population based on the analysis of

21   her team.

22        Q.    What did you understand the term

23   "defect rate" to mean?

24        A.    It -- the simplest way to

25   understand it is the rate at which loans

222

1          TIMOTHY DEVINE

2          Q.    Did the information

3    Mr. Cancelliere gave to you in this e-mail

4    make you comfortable with an allowed claim

5    at $8.7 billion?

6          MR. BRYAN:   Object to form.

7          A.    What do you mean by comfortable?

8          Q.    Willing to go along with it.

9          A.    All right.  So with that

10   understanding in terms -- willing to go

11   along with it in the context of the

12   negotiation of a settlement by ResCap of

13   an allowed claim based on that number?

14         Q.    Yes.

15         A.    I'm not sure as of 5/9/2012 at

16   that time whether I was comfortable with

17   it or not.  Because it was only one term

18   in a very complicated series of

19   transactions.  And it would have been

20   within that much, much larger context as

21   to whether or not I would have advised the

22   client or not that that was a comfortable

23   number.

24         Q.    Were you representing ResCap on

25   May 9th, 2012?

223

1              TIMOTHY DEVINE

2        A.    In connection with the

3    resolution with Kathy Patrick, no.

4        Q.    Were you -- okay.  So what you

5    just said is incorrect, right?  It had

6    nothing to do with your advising the

7    client on that number.  I'm asking you

8    whether you were comfortable as Ally's

9    lawyer with an $8.7 billion number based

10   on the information Mr. Cancelliere gave to

11   you in his May 9th e-mail?

12           MR. PRINCI:  Objection as to

13       form.

14           MR. BRYAN:  Objection as to

15       form.

16       A.    That's how I understood your

17   question.

18       Q.    Right, okay.  So that was the

19   client, AFI?

20       A.    Correct.

21       Q.    Okay.  Do you recall one way or

22   another whether an $8.7 billion allowed

23   claim had been agreed to as of May 9th,

24   2012, at 7:17 a.m.?

25       A.    Do I recall that right now

225

TIMOTHY DEVINE

1

2      Q.    Okay.  Did there come a time

3  when you learned who it was, what

4  individuals were negotiating a settlement

5  between ResCap and AFI?

6      A.    Yes.

7      Q.    Okay.  When did you learn that?

8      A.    I don't remember when I learned

9  that.

10      Q.    Did you learn it before or after

11  the ResCap board gave its approval to the

12  settlement with Kathy Patrick?

13      A.    I don't know.

14      Q.    Okay.  What individuals did you

15  come to learn negotiated the settlement

16  between AFI and ResCap?

17      A.    Well, I may or may not be

18  correct but you are asking me for my

19  understanding.  It was Mike Carpenter for

20  AFI with the independents of the ResCap

21  board.

22      Q.    During the course of the

23  negotiations with Ms. Patrick, up until

24  May 9th, weren't you -- weren't you being

25  kept advised about the progress of

230

```
 1              TIMOTHY DEVINE
 2    will support the $8.7 billion allowed
 3    claim.  There is no new Ally money.  Hard
 4    stop at 750 plus 200 plus 100.  Thanks,
 5    Tim."  Right?
 6         A.    Yes.  That's what it says.
 7         Q.    At the time you sent this e-mail
 8    to Mr. Lee, had the amount of AFI's
 9    contribution to a settlement been agreed
10    upon to your knowledge?
11         A.    As I said before, I don't know
12    when that amount was agreed upon.
13         Q.    Had Mr. Lee been pressing you
14    for a larger contribution from AFI?
15         A.    Mr. Lee knew because I told him
16    that I was not going to negotiate that
17    number with him.  That I didn't have
18    authority to negotiate it for him -- with
19    him and that I didn't intend to do so.
20         Q.    But you did make clear to him,
21    did you not, in this e-mail, that there
22    was not going to be more Ally money, isn't
23    that what you say?
24         A.    The e-mail here does not refer
25    to -- it does not constitute an e-mail
```

359

1                 TIMOTHY DEVINE

2    describe as the RMBS or put back

3    litigation, and I'd include in that

4    definition both the monoline claims that

5    were in litigation and any put back claims

6    that -- that might have been asserted?

7         A.    The first substantial contact I

8    had within my job duties with the mortgage

9    business was in the summer of 2010 when

10   the FHFA propounded 64 subpoenas across

11   the industry and I was asked to coordinate

12   the response to the subpoenas that were

13   issued to the company.

14        Q.    Did you supervise outside

15   counsel with respect to the monoline

16   litigation either MBIA or FGIC litigation?

17        A.    Have I done that?

18        Q.    Yes.

19        A.    Yes.

20        Q.    When you were representing AFI

21   from the time of the October letter that

22   Ms. Patrick sent to the signing of the

23   settlement agreement, were you solely

24   representing AFI or were you also

25   representing ResCap during that time

360

1               TIMOTHY DEVINE

2     period from October forward?

3          A.    Well, we should probably be

4     careful with regard to what you mean by

5     representing.  The -- as I recall, the

6     first communication from Kathy Patrick

7     came in to Bill Solomon in his capacity as

8     general counsel of Ally Financial, Inc.

9     He responded by indicating to Ms. Patrick

10    that Ally Financial, Inc. did not have

11    exposure of the variety that she wanted to

12    talk about settling.  And referred her to

13    Tammy Hamzephour, general counsel for

14    ResCap.

15              What -- my participation in

16    connection with meeting with Ms. Patrick,

17    I think Mr. Sheeren was there at the first

18    meeting in Minnesota, I don't recall

19    exactly.  But in any event, I was there in

20    my capacity as chief counsel for

21    litigation for ResCap, given that

22    Ms. Patrick purported to represent clients

23    who purported to have rep and warrant

24    essentially contract claims against the

25    contracting parties, all of whom were

361

                TIMOTHY DEVINE

1

2    within the ResCap structure and none of

3    whom were within the Ally structure.

4        Q.    So at that time in that meeting,

5    if I understand, it took place sometime

6    between October, November, December,

7    sometime in 2011, the last quarter?

8        A.    I don't recall when it took

9    place.  I think we have had some testimony

10   on it today.  If there's a document we

11   could refer to it.

12       Q.    I'm going to try to do this

13   without -- without taking the time to go

14   back to the documents.

15       A.    Okay, thank you.

16       Q.    So initially you were

17   representing ResCap in what I will call

18   the Kathy Patrick negotiations with

19   respect to her claims?

20       A.    Well --

21            MR. BRYAN:  Objection to form.

22       A.    I -- I understand that you would

23   call them negotiations.  So I think that

24   term is going to end up being understood

25   in a number of different ways.  What --

363

1              TIMOTHY DEVINE

2    a compromise of those claims within the

3    context of a ResCap filing.

4         Q.    At any point?

5         A.    Yeah.  So I believe that she did

6    at one point in the negotiations but now

7    this was within the context of a potential

8    ResCap filing at which time I was not

9    representing ResCap in connection with a

10   potential resolution of claims against the

11   ResCap estate.

12        Q.    Okay.  So if I understand your

13   testimony correctly, you initially started

14   out representing ResCap and then at some

15   point you were no longer representing

16   ResCap.  Could you explain to me when your

17   role and responsibility changed?

18        A.    I think you've slightly

19   misunderstood but I don't blame you.  At

20   some point -- because it wasn't entirely

21   clear, right.  At some point -- look, when

22   we started the discussions with Kathy

23   Patrick, I was representing the ResCap

24   entities in connection with the assertion

25   that they had -- that Kathy Patrick did

364

                    TIMOTHY DEVINE

1

2    represent clients who did or did not under

3    the relevant documents have contract

4    claims against ResCap.  And that was

5    natural because I had been dealing with

6    that kind of assertion of claim, although

7    not by investors and trustees but rather

8    by the monolines against the ResCap

9    entities theretofore.

10            At some point ResCap began to

11   consider a Chapter 11 restructuring.  I

12   did not represent ResCap at all in

13   connection with this Chapter 11

14   restructuring, unless you consider the

15   nature of our discussions according to the

16   common interest or joint defense privilege

17   in which case that's why I don't blame you

18   for misunderstanding the nature of what I

19   just talked about.  But so, yes, I did

20   represent ResCap in connection with the

21   sort of bilateral claim of Kathy Patrick's

22   clients against the ResCap entities and

23   rep and warrant.  Once the context of the

24   restructuring became a part of that

25   dialogue, ResCap was represented by Gary

365

1          TIMOTHY DEVINE

2     Lee of MoFo.  I never represented ResCap

3     on a bankruptcy related resolution.  At

4     least unless you -- as I say, I did

5     continue to advise ResCap in connection

6     with plain sort of legal analysis on rep

7     and warrant issues but not so much as

8     would be implicated in connection with the

9     filing.

10         Q.    Thank you for that and let me

11    try to make sure I understand correctly.

12    To try to summarize.  In the beginning of

13    from October for some period of time in

14    the initial stages that you've described

15    as essentially information gathering

16    stages, you were representing ResCap.  By

17    the end, by the April and May time period

18    that we have looked at a variety of

19    e-mails by that time period you were no

20    longer representing ResCap, you would have

21    solely been representing AFI, is that

22    correct, am I bracketing the change in

23    role correctly?

24         A.    No.  I think you are missing one

25    part of it.  But it's -- it's

366

```
1                 TIMOTHY DEVINE

2      directionally correct.  So first of all,

3      the difficulty with the word

4      "representing" given that there were no

5      pleadings in the matter, nobody appeared

6      as counsel of record, et cetera.  So let's

7      for a moment agree that the term

8      "representing" is somewhat subject to a

9      variety of definitions and understandings.

10         Q.    I would use representing as

11     representing in the context of the

12     negotiations.  Representing a client, be

13     it AFI or ResCap, in dealing with

14     Ms. Patrick or the Talcott Franklin group

15     that came in at the end.  If you

16     understand that.

17         A.     Uh-hum.  So there -- there were

18     certainly throughout the relevant period

19     transactions and discussions,

20     communications -- transactions meaning

21     information exchange, et cetera, between

22     the ResCap parties and Kathy Patrick on

23     the one hand or Talcott Franklin on the

24     other, which I assisted and advised ResCap

25     in accomplishing.
```

367

1                TIMOTHY DEVINE

2            At the same time I was

3    representing -- I was chief counsel to

4    Ally as well so of course I was advising

5    both ResCap and Ally in connection with

6    the -- the claims that Kathy Patrick

7    purported to make on behalf of those

8    clients.

9        Q.    When you were representing

10   ResCap in the initial stages of this

11   discussions and negotiations with

12   Ms. Patrick, who did you report to at

13   ResCap?

14       A.    I certainly included Tammy

15   Hamzephour in any discussions.  She was

16   general counsel to the ResCap entities.  I

17   had conversations with and gave advice to

18   and took input from a variety of business

19   clients.

20       Q.    So in addition to Ms. Hamzephour

21   you spoke to other not -- not in-house

22   counsel but other business representatives

23   at ResCap?

24       A.    Yes.

25       Q.    Do you recall who that would be

369

TIMOTHY DEVINE

1

2    that you would no longer represent ResCap

3    and solely be representing AFI?

4        A.    I'm going to answer your

5    question without revealing privileged

6    communications.  At some point it was

7    determined that people performing

8    functions like the one I was performing,

9    which spanned across -- across the Ally,

10   the nondebtor to the debtor line, should

11   reorient so that they were aligned with

12   one or the other.  And that was a process

13   that took place across the various

14   business units and functions to the extent

15   that there was any overlap.

16       Q.    Do you know when that was?

17       A.    With regard to my own role?

18       Q.    Yes.

19       A.    I don't know exactly when it

20   was.  I understand you would think I would

21   have an exact date and hour.  I don't.

22   But because -- the reason I don't is

23   because it's probably accurate to say that

24   in some measure I continued to be a

25   resource for the ResCap client even as

# Exhibit G

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

        Debtors.

------------------------------------x


H I G H L Y   C O N F I D E N T I A L


VIDEOTAPE DEPOSITION OF JOHN MACK

New York, New York

November 14, 2012

9:53 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27647-A

43

1       JOHN MACK - HIGHLY CONFIDENTIAL

2       Q.    What about K&E and Timothy

3   Devine, did you view them as your lawyers

4   or as AFI's lawyers or something else?

5           MR. PRINCI:  Objection as to

6       form.

7       A.    AFI's lawyers.

8           MR. PRINCI:  Excuse me one

9       second.  Just pause for one second,

10      Tom.

11          MR. MOLONEY:  Wait a second.

12      You can just tell them that he needs

13      to wait -- I'll put it on the record

14      that you need to wait to allow

15      Mr. Princi to state his objection.

16          I think we should note now that

17      counsel is conferring with the

18      witness, and it's not appropriate.

19      Q.    What did you understand Timothy

20  Devine's position to be?

21      A.    I don't know Timothy Devine.

22      Q.    Okay.  Do you know whether or

23  not he had a role in negotiating the RMBS

24  deal with Ms. Patrick?

25      A.    No.

JOHN MACK - HIGHLY CONFIDENTIAL

44

1      JOHN MACK - HIGHLY CONFIDENTIAL

2          Q.      Did it concern you, if he was

3      the chief of litigation for AFI, and he

4      took the lead in the settlement

5      negotiations and negotiated material terms

6      of the RMBS with Kathy Patrick, without

7      the involvement of Morrison & Foerster?

8              MR. PIEDRA:  Objection to form.

9              MR. PRINCI:  Objection to form.

10             MR. MOLONEY:  Noted.

11         Q.      You may answer.

12         A.      Generically speaking, yes, I

13     would not understand that.

14         Q.      As of May 2012, was there any

15     real connection between the amount that

16     the ResCap board was going to require AFI

17     to contribute to a Chapter 11 resolution

18     and the size of the RMBS claim that was

19     negotiated with Ms. Patrick?

20         A.      No.

21         Q.      So at least as of May 2012,

22     there was no additional cost to AFI in

23     agreeing to a larger claim from

24     Ms. Patrick's clients, in return for an

25     AFI release, correct?

JOHN MACK - HIGHLY CONFIDENTIAL

65

1      JOHN MACK - HIGHLY CONFIDENTIAL

2              MR. PIEDRA:  Objection as to

3          form.

4              MR. PRINCI:  Misstates the

5          facts.

6          A.    Yes.  I was going to say no,

7      that's not the liability to ResCap.

8          Q.    Isn't that the amount that

9      ResCap is agreeing to pay, the settlement

10     plan the ResCap group is agreeing to pay

11     $8.7 billion to settle the claim?

12             MR. PRINCI:  Objection as to

13         form.

14         A.    That is correct, they are

15     agreeing to pay that.

16         Q.    Right.  And why -- if their

17     maximum exposure could only be $4 billion,

18     why would they agree to pay 8.7 billion?

19             MR. PRINCI:  Objection as to

20         form.

21         A.    I don't know that the 4 -- the 4

22     billion is not the maximum, that's just an

23     estimate.  This number is supposed to be,

24     it is negotiated; it is a cap, in essence.

25         Q.    Okay.  You are saying the

66

1      JOHN MACK - HIGHLY CONFIDENTIAL

2    $4 billion was an estimate, but this was a

3    negotiated number, the 8.7?

4        A.    Correct.

5        Q.    Now, it wasn't determined by a

6    court that ResCap was liable for $8.7

7    billion, right?

8        A.    That is correct.

9        Q.    So it was just determined by two

10   human beings who negotiated a number, $8.7

11   billion, right?

12             MR. PRINCI:  Objection as to

13       form.

14       A.    It was a negotiated number.

15       Q.    Who were the two people who

16   negotiated the number?

17             MR. PRINCI:  Objection as to

18       form.

19       A.    Our advisors from MoFo, and

20   Kathy Patrick, representing the investors.

21       Q.    Now, the person who was

22   representing you, your advisor for MoFo,

23   you would think that they should negotiate

24   a number that's consistent with what they

25   think are their potential liabilities, if

JOHN MACK - HIGHLY CONFIDENTIAL

81

1      JOHN MACK - HIGHLY CONFIDENTIAL

2        in the proceedings.)

3            THE VIDEOGRAPHER:  The time is

4        11:04 a.m. and we are back on the

5        record.

6        Q.    Are you ready, Mr. Mack?

7        A.    Yes.

8        Q.    Okay.  Good.  Looking still at

9    95.  I want to go on to under the key

10   assumptions, the first key assumption,

11   which says, REDACTED

12   REDACTED

13   REDACTED

14   REDACTED

15   REDACTED

16            Do you see that sentence?

17       A.    Yes.

18       Q.    Okay.  Who negotiated that

19   number, the 1 million -- 1 billion 50

20   million dollar number?

21            MR. PRINCI:  Objection as to

22       form.

23       A.    The Ally settlement was

24   primarily Jonathan Ilany and myself.  But

25   at this point this was an assumption.

JOHN MACK - HIGHLY CONFIDENTIAL

82

JOHN MACK - HIGHLY CONFIDENTIAL

1    This was not an actual number.  It was not

2

3    a fact.

4        Q.    Okay.  Did this represent the

5    settlement that was negotiated between you

6    and -- who represented Ally in the

7    negotiations or AFI?

8            MR. PRINCI:  Objection.  You got

9        two questions again, Tom.

10        Q.    Let me ask the question who

11    represented AFI in the negotiation of the

12    settlement?

13        A.    Mike Carpenter and Lenard

14    Tessler.

15        Q.    And just for the record, who are

16    they?

17        A.    Mike Carpenter is the CEO.

18    Lenard Tessler is with Cerberus and I

19    believe is the director of AFI.

20        Q.    And you are saying this

21    assumption number is not the same as the

22    number that you negotiated by way of the

23    settlement; is that correct?

24        A.    At this point in time it was

25    still an assumption.  We did not have an

JOHN MACK - HIGHLY CONFIDENTIAL

151

1        JOHN MACK - HIGHLY CONFIDENTIAL

2     discussions, not with counsel, but with

3     any other board members, non-privileged

4     discussions about why there was this

5     disparity?

6              MR. PRINCI:  Objection as to

7         form.  Misstates the record.

8         A.    Again, I think that the

9     8.7 billion and the 4 are apples and

10    oranges.  They are slightly different.

11    The 8.7 billion represents a settlement of

12    all claims.  The 4 billion is an

13    accounting-driven answer, involving an

14    estimation.

15        Q.    Was that the result of

16    discussions you had with other people or

17    your own opinion?

18        A.    It was -- these were discussions

19    held in audit committee.

20        Q.    And do you recall any,

21    specifically, any individuals who held

22    that opinion, the opinion you just

23    expressed about the difference?

24        A.    Well, I think the audit

25    committee presentations on accounting

**Exhibit H**

REDACTED

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00049157

REDACTED

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

REDACTED

CONFIDENTIAL – PROFESSIONALS' EYES ONLY