Richard L. Wynne
Howard F. Sidman
JONES DAY
222 East 41st Street
New York, NY 10017.6702
Telephone:     212-326-3939
Facsimile:     212-755-7306

Attorneys for Creditor
Financial Guaranty Insurance Company

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                         )
In re:                         )        Case No. 12-12020 (MG)
                         )
RESIDENTIAL CAPITAL, LLC, et al.,   )        Chapter 11
                         )
        Debtors.                )        Jointly Administered
                         )
                         )
------------------------------------------------------- x

**OBJECTION OF FINANCIAL GUARANTY INSURANCE COMPANY TO THE
DEBTORS' SECOND SUPPLEMENTAL MOTION PURSUANT TO FED. R. BANKR. P.
9019 FOR APPROVAL OF RMBS TRUST SETTLEMENT AGREEMENTS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .................................................................................................................... 3

I.    The Debtors Allowed AFI to Control the Settlement Negotiations................................... 3

    A.    AFI's Chief Litigation Counsel, Timothy Devine, Dominated the
        Settlement Negotiations.......................................................................................... 3

    B.    ResCap's Personnel Were Passive Players in the Settlement Negotiations .......... 5

    C.    A Quantitative Analysis of Communications Surrounding the Settlement
        Negotiations Reinforces that Devine Was in Control............................................. 7

    D.    The Debtors Misrepresented AFI's and Devine's Role in the Negotiations ......... 8

II.   The Institutional Investors Were Required to Support the Still Pending PSA .................. 9

III.  The Settlement Negotiations Failed to Produce a Fair Deal............................................. 9

    A.    The Debtors Rushed the Settlement Negotiations and Agreed to Terms
        that Drastically Deviated From Their Own Recent Analysis ................................. 9

    B.    The Debtors Did Not Raise Arguments that Would Have Dramatically
        Reduced the Settlement Value of the Institutional Investors' Claims ................. 11

IV.   The ResCap Board Inadequately Evaluated the Settlement Before Approving it ........... 12

    A.    The ResCap Board Received Only Last-minute Notice of the May 9
        Meeting ................................................................................................................ 12

    B.    The Information Provided to the ResCap Board Was Insufficient ...................... 13

    C.    The Debtors' Management and the ResCap Board Failed to Establish
        Proper Risk Management Procedures or Corporate Governance Practices......... 16

OBJECTION ...................................................................................................................... 17

V.    The Debtors Cannot Prove that the Settlement is Fair, Equitable, and in the Best
    Interests of Their Estates................................................................................................. 17

VI.   The Iridium Factors Do Not Favor Approval of the Settlement. .................................... 18

    A.    The Settlement Was Not the Product of Arm's-length Bargaining ..................... 18

    B.    The Debtors and ResCap Board Breached Their Fiduciary Duty to
        Creditors by Agreeing to the $8.7 Billion Settlement Amount Without a
        Thorough Analysis of the Facts and the Validity of the Institutional
        Investors' Claims ................................................................................................. 19

    C.    The Settlement is Against the Paramount Interests of Creditors ........................ 20

        1.    The $8.7 Billion Settlement Amount is Unreasonably High ................... 20

        2.    The Settlement Contains Various Vague and Improper Provisions ........ 20

            a.    Section 7.01 is Unclear and May Operate as an
                Impermissible Third-Party Release.............................................. 20

**TABLE OF CONTENTS**
**(continued)**

b.    The Releases and Purported Carveout in the Settlement Are Vague and Ambiguous.................................................................. 21

VII.    The Debtors' Post Hoc "Expert" Analysis is Flawed ..................................................... 23

VIII.    Reservation of Rights and Defenses ............................................................................. 24

CONCLUSION........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*In re Adelphia Commc'ns Corp.*,
    323 B.R. 345 (Bankr. S.D.N.Y. 2005) .......................................................................17

*In re Drexel Burnham Lambert Grp., Inc.*,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) .......................................................................18

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007)..............................................................................17, 18

*In re Metromedia Fiber Networks, Inc.*,
    416 F.3d 136 (2d Cir. 2005)..............................................................................20, 21

*Mastr Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.*,
    No. 11-2542, 2012 WL 4511065 (D. Minn. Oct. 1, 2012) ....................................25

STATUTES

11 U.S.C. § 101(2) .............................................................................................................17

11 U.S.C. § 101(31)(B).......................................................................................................17

11 U.S.C. § 101(31)(E)........................................................................................................17

OTHER AUTHORITIES

Federal Rule of Bankruptcy Procedure 9019 .......................................................20, 25

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Financial Guaranty Insurance Company ("FGIC"),[1] a creditor with at least $1.85 Billion in claims against several of the debtors (collectively, the "Debtors" or "ResCap"), objects to the Debtors' 9019 Motion.[2]  In support of this objection, FGIC respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors seek approval of an $8.7 Billion allowed claim (the "Allowed Claim"), one of the largest claim settlements ever brought before a Bankruptcy Court.  But this RMBS Trust settlement (the "Settlement")[3] is only the first step in the plan of reorganization process and is inextricably intertwined with another settlement and a plan support agreement (the "PSA") with AFI.  The day before filing for Chapter 11, ResCap agreed to settle all claims against AFI for a $750 million plan contribution, and give AFI releases from both estate causes of action and third party creditor claims.  This allowed AFI to extol the virtues of the Settlement and the financial benefit of the releases, as compared to the cost:  "originally ResCap presented a $8 or $9 B claim against Ally-that is now totally gone."[4]

---

[1] FGIC filed proofs of claim in connection with twelve civil actions filed against the Debtors, the Debtors' ultimate parent entity, Ally Financial, Inc. ("AFI"), and certain of their affiliates.  FGIC's claims arise from various bilateral Insurance and Indemnity  Agreements ("I&I Agreements") whereby FGIC issued financial guaranty insurance policies as credit enhancement for the Debtors' residential mortgage-backed securitization ("RMBS") transactions. FGIC's claims include breaches of contract and fraudulent inducement related to those agreements and policies.

[2] The Debtors filed three versions in total of the Motion For Approval of RMBS Trust Settlement Agreements (collectively, the "9019 Motion").  See Docket Nos. 320, 1176, 1887.

[3] FGIC presumes the Court's familiarity with the general background of these cases as set forth, among other places, in the Committee Objection.  This objection also refers to various prepetition agreements between the Debtors, AFI, and two investor groups: the "Steering Committee Group" represented by Kathy Patrick and the "Talcott Franklin Group" (collectively the "Institutional Investors") represented by Talcott Franklin. FGIC has prepared a narrative summary of the key emails and documents that were exchanged by the parties, supplemented by deposition excerpts (the "Chronology").  Also filed with this objection is an appendix, cited to herein as "A. __.", containing the documents and deposition excerpts referenced herein.  Unless otherwise noted, "Tr." citations refer to transcripts of the depositions taken in connection with the 9019 Motion.

[4] AFI's plan and goals were explained in an e-mail from Jeff Brown, AFI's Senior Executive Vice President of Finance and Corporate Planning, describing the cost-benefit to AFI of the settlement structure for the ResCap bankruptcy. See Ex. 9019-105 (A. 43).

2.      ResCap also allowed AFI to make agreeing to the PSA a pre-requisite to the

Settlement and allowance of the Institutional Investors' claim, as AFI dominated the negotiation

of the Settlement.  It is therefore critical that the Debtors demonstrate that they negotiated these

linked settlements at arm's length on terms that are fair to all creditors.

3.      The Debtors cannot make this showing.  From the outset, AFI took control of the

settlement process and used the process to advance its own interests.  AFI's goals were clear: to

obtain broad releases from ResCap and third party creditors at the lowest possible cost.  As long

as AFI's contribution was capped at $750 million or less, AFI had little interest in limiting the

amount of the Institutional Investors' claims.

4.      After an inadequate and AFI-dominated negotiation process, Residential Capital,

LLC's board of directors (the "ResCap Board") was presented with an incomplete and inaccurate

two page presentation a mere 22 minutes before a board meeting, at which they spent only 30

minutes rubber stamping the Settlement.  The ResCap Board failed to consider key facts,

including the contemporaneous public 10-Q estimate of these same claims at less than half the

$8.7 Billion amount, and any legal factors and defenses, while it also ignored the conflicts of

interest and significant flaws in the negotiation process.

5.      The Institutional Investors were the direct beneficiary.  Without even filing a

lawsuit before negotiating their windfall, they are to obtain a claim almost $5 Billion more than

the maximum amount AFI and ResCap had publicly estimated a mere two weeks earlier[5].

6.      As demonstrated herein and in the objection (the "Committee Objection")[6] filed

by the Official Committee of Unsecured Creditors (the "Committee"), the $8.7 Billion claim

---

[5] In AFI's April 27, 2012 10-Q, it had raised the estimate of potential liability for ResCap on RMBS issues to $0-$4
Billion, an estimate that included additional claims than are provided for in the Settlement, as it included both
securities claims and monoline claims.  *See* Ex. 9019-54 (A. 27).

[6] As the Committee Objection acknowledges, the specific elements of the Committee Objection and its
accompanying expert reports do not reflect the views of individual Committee members, including FGIC.  Although
FGIC supports the Committee Objection and refers to the Committee Objection to further support certain factual
issues, it does not join in or adopt the arguments and positions set forth in the Committee Objection or its
accompanying expert reports.  In particular, FGIC does not endorse any application to its own claims of the potential

amount is excessive and unreasonable. The contemporaneous documentary record reveals a settlement process that was deeply flawed: it was tainted by conflicts of interest, AFI's overarching control, and breaches of fiduciary duties by the ResCap Board and management. The Court should not condone the efforts of AFI—a ResCap insider—to undermine the interests of all creditors (other than those obtaining the windfall) to advance its own. Accordingly, the Court should deny the Debtors' 9019 Motion[7].

## BACKGROUND

I.    **THE DEBTORS ALLOWED AFI TO CONTROL THE SETTLEMENT NEGOTIATIONS.**

   A.    **AFI's chief litigation counsel, Timothy Devine, dominated the Settlement negotiations.**

7.    Notwithstanding the fact that the Settlement burdens the Debtors—and effectively their creditors—with an excessive $8.7 Billion claim, the Debtors played no more than a supporting role in the negotiation process. AFI—and in particular Timothy Devine—played the central role. Devine and AFI's litigation team met early on to "develop a recommended approach for dealing with" Kathy Patrick, counsel for the Steering Committee Group. *See* Ex. 9019-48 (A. 80). The AFI team went on to implement their approach, dictating the terms of the Settlement and obtaining a cheap release. Devine's early and constant control of the negotiations enabled him to require, as a precondition to the Settlement, that the Institutional Investors sign onto a plan support agreement releasing AFI from all claims relating to ResCap. *See* Ex 9019-154 (A. 61) ("**We told [Patrick] that PSA support-whole hog-is drop dead.**").[8]

---

legal defenses to the claims purported to be settled by the Settlement as set forth by the Committee in its Objection, and expressly reserves its rights with respect thereto. *See infra* ¶ 56.

[7] FGIC joins in and will not therefore repeat the well-reasoned threshold objections of MBIA to the Settlement, that it is in essence an illusory agreement to only seek to make an offer to the RMBS Trustees who are the only parties legally vested with authority to settle these claims, and that the Debtors seek an improper advisory opinion. *See* MBIA Objection, pages 8-11.

[8] Devine explained the linkage in his deposition: "What I was explaining [to the Institutional Investors] is that in signing up for the settlement agreement . . . with ResCap those parties were committing to sign a plan support agreement simultaneously." *See* Devine Tr. 271:22-273:20 (A. 8).

8.    The record is replete with instances of Devine leading the settlement process and putting AFI's interests first.[9]  Devine acknowledges that, as he himself put it, he was "driving [the] deal to conclusion."[10]  A particularly egregious example involved a very serious dispute between ResCap and Patrick as to the scope of the releases in the Settlement.  Right after the ResCap Board approved the Settlement, Lee wrote to Patrick that:

> My understanding of our deal is that the $8.7bn number settles all claims arising from the sale and servicing of the RMBS. . . .  So when Ross tells me an unknown amount of securities claims comes on top of this I get spooked – because **that renders a deal at $8.7bn illusory. . . . [T]his is the deal I sold to our board and thought we had.**[11]

Patrick responded not to Lee, but to Devine:

> **I need your help.**  [Lee] is claiming he was "told" that our clients would release securities claims in the plan.  We never told him that and we have never offered or agreed to release securities claims.  We've been very clear about that from the very beginning.  It's the basis on which I got my clients to approve it, it's what I've told the Trustees this morning, it's also what I assured Freddie Mac, as you and I discussed:  a release of securities claims is not part of this putback settlement.
>
> [Lee]'s misunderstanding—or his effort to extract something that we never offered and don't have to give—is impeding getting the deal documented.
>
> **Would you please intercede with him and tell him to move on?**  Insisting on this will destroy any chance of the deal happening.  I understand his determination to try again, but we need to move on.
>
> I'm sorry to bother you, but **we need you to intercede here.**[12]

Devine responded: "I'll try to straighten everything out. . . . Let me work on it."  *Id.*  He then sent an e-mail to MoFo and AFI's outside counsel, without copying Hamzehpour or anyone else at ResCap, explaining the strategy and the relationship between the Settlement and the PSA:

---

[9] *See generally*, Chronology.

[10] *See* Devine Tr. 248:4-249:4 (A. 8).  *See also id.* 53:25-54:9 ("Q: Weren't you the one who was coordinating the discussion with Mr. Franklin much as you were with Ms. Patrick? A: I – I did correspond with and communicate with Talcott Franklin on behalf of the – the ResCap clients, yes."); *id.* 285:8-15.

[11] *See* Ex. 9019-151 (A. 57) (emphasis added).

[12] *See* Ex. 9019-150 (A. 56) (emphasis added).

The circle is squared at the Plan. [Patrick] can only get us the "everything-but-securities" settlement release because that is the full extent of her representation. She has been clear about that. Same as in her BoA/BoNYM work. Etc. But notice: though her clients don't release securities claims, they sign Plan Support Agreements, and the Plan includes very simple comprehensive releases, which of course include third party release of all claims, which of course includes securities.

Presto.

So while she can't represent parties in giving up their securities claims, clients face a choice: either sign up with the settlement to make sure your trust receives monies under the waterfall, in which case you need to sign the Plan Support Agreement and support the Plan. And the Plan wipes out all their claims of any sort.

This is the beauty of it.[13]

9.     MoFo immediately agreed to Devine's view, and the ResCap Board was never informed about this change. *See* Mack Tr. 108:25-109:11 (A. 4). As a result of Devine's ironclad control over the process, AFI's interests were allowed to dominate the Settlement.

**B.     ResCap's personnel were passive players in the Settlement negotiations.**

10.     The record makes clear that the Debtors did not really negotiate the Settlement at all. For example, ResCap's general counsel, Hamzehpour, played at best a passive role in the negotiation of the Settlement. Hamzehpour did not have a single telephone call with Patrick during all of 2012 (while Devine had many). *See* Hamzehpour Tr. 90:17-23 (A. 3); *see generally* Chronology. And while Devine often copied Hamzehpour on settlement-related emails—along with many others—she rarely initiated communications of her own accord, and her role was distinctly secondary. *See* Hamzehpour Tr. 29:3-21 (A.3) (Hamzehpour did not recall speaking at the Debtors' initial meeting with Patrick); *id.* 59:22-60:9 (at the next meeting, Hamzehpour "didn't take the lead on any of the issues" other than servicing standards); *id.* 80:23-81:6 (Hamzehpour "was present for some of the discussions [with Patrick], not all of them" and was merely "kept informed"); *id.* 83:2-7, 96:16-25 (regarding certain key aspects of the negotiations,

---

[13] *See* Ex. 9019-151 (A. 57).

Hamzehpour "was involved in some of them, not all of them.").[14]  ResCap's other business personnel, employees, and independent directors also played—at best—a supporting role in the settlement process.  Jeff Cancelliere, who worked in risk management for ResCap repeatedly testified that although he provided <u>Devine</u> with information for use in the negotiations, he was not involved in the negotiations at all.[15]  Everyone believed someone else was watching the store.  Mack had "no idea" that "AFI was having conversations with Patrick" and thought ResCap CEO Marano was playing a significant role in the negotiations, which he was not— Marano had only general awareness of the "fluid" nature of the negotiations.[16]

11.     In mid-April, rather than involving Lipps, outside counsel who represented ResCap and AFI on monoline litigation and RMBS issues, ResCap turned to its outside bankruptcy counsel, Lee.  And even Lee's role appears to have been limited to executing the existing strategy and working with or for Devine.  As shown in the dispute on May 9-10 above, Lee ultimately took direction directly from Devine.[17]

---

[14] For instance, on April 23, 2012, Devine emailed Hamzehpour (i) suggesting that for a presentation toPatrick, the Debtors use $3, $4, and $6 Billion as the low, medium, and high ranges of the  liability for the Investor Claims, and (ii) proffering "750 million rather than one billion as potential AFI contribution."  *See* Ex. 9019-79 (A. 72).  There is no evidence that Hamzehpour pushed back on this suggestion—even though ResCap's own estimates contemplated, at most $4 Billion in liability and it was in ResCap's interests to have AFI contribute a higher settlement amount. Two days later, the Debtors made a presentation to Patrick using precisely the numbers provided by Devine.  *See* Ex. 9019-19 at 11 (A. 78).  *See also* Ex. 9019-44 (A. 79) (4/27/12 Devine email reporting on a conversation with Patrick and discussing next steps for both AFI and ResCap).

[15] *See* Cancelliere Tr. 107:22-108:22 (A. 5); *see also*, Ex. 9019-117 (A. 52); Ex. 9019-142 (A. 38); Mack Tr. 37:8-13 (A. 4).

[16] *See* Mack Tr. 41:9-45:7(A. 4); Marano Tr. 148:13-18 (A. 2).

[17] *See, e.g.*, Ex. 9019-34 (A. 34) (May 1, 2012 email from Devine to representatives of ResCap, AFI's outside counsel, and MoFo directing them on how to prepare for an upcoming meeting with Patrick); Ex. 9019-147 (A. 53) (May 9, 2012 Devine email to Lee stating "as I told you on the phone, [AFI] will support the $8.7 Billion allowed claim.  There is no new [AFI] money.  Hard stop at 750 + 200 + 100").

### C.    A quantitative analysis of communications surrounding the Settlement negotiations reinforces that Devine was in control.

12.    The communications between the settlement participants tell the story, both qualitatively and quantitatively[18].  The analysis of emails vividly demonstrates the limited roles played by Hamzehpour and Lee as compared to Devine.  *See* Brady Decl. ¶¶ 6-11 (summarizing the emails sent to, copied to, and from Hamzehpour, Devine, and Lee).  Most significant in relative activity level is the quantity of emails that each individual authored and sent: Hamzehpour sent 65 emails, Lee sent 135, and Devine, commensurate with his role, sent 401.[19]



13.    While quantity alone is not dispositive, it is indicative of the relative roles of the key ResCap parties.  A review of the actual documents in the Chronology further emphasizes that Devine was directing the efforts of the others involved, providing the strategic guidance to the effort, and ensuring that AFI's goals were paramount and would be met.  Devine's emails repeatedly stress the importance of AFI receiving releases, including third party releases.  No one

---

[18] FGIC's quantitative analysis of the emails sent and received by the three key participants in the negotiations for ResCap and AFI: Devine, Hamzehpour and Lee is summarized in the Declaration of Erin Brady, filed concurrently herewith, and the charts attached thereto as Brady Exhibits A through J.

[19] Of Hamzehpour's 65 emails, 24 were addressed first to Devine and 14 to Lee, but only 4 went to Patrick or Patrick's firm, and 2 went to Franklin's firm. *See* Exhibit Brady Decl. ¶ 8.  A deeper analysis reveals that 3 of Hamzehpour's 65 emails in the database pre-dated the Settlement negotiations and most are non-substantive.

played a similar role for ResCap, in either emphasizing the need or desire to keep the amount agreed to in the Settlement as low as possible, protecting the interests of the Debtors or their creditors, or obtaining the largest possible recovery from AFI. Those goals are as conspicuously absent from the written, contemporaneous record, as they are from the negotiated agreements.

> **D.    The Debtors misrepresented AFI's and Devine's role in the negotiations.**

14.    At the September 19, 2012 status conference, the Debtors minimized AFI's role in the settlement negotiations to being present for negotiations and having an associate "be there just so that we get the document done." Counsel for AFI confirmed the Debtors' representation and stated that AFI was "kept up to date" as it was "interested."[20] ResCap later emphasized in a letter to the Court[21] that AFI and ResCap's legal functions had been "formally severed" and while Devine negotiated "aggressively to obtain support for a plan including third party releases. That is not surprising. AFI had every right to seek to advance its own interests." However, the Debtors emphasized: "AFI's in-house lawyers did *not* provide legal representation to the Debtors in connection with the [Settlement]. In the settlement negotiations, as well as in the negotiations surrounding the related plan support agreements, AFI's in-house lawyers represented AFI's interests."

15.    Not only do the documents summarized in the Chronology contradict this assertion, Devine admitted that he also represented ResCap in negotiating the Settlement. With respect to the first meeting with Patrick, Devine said, "I was there in my capacity as chief counsel for litigation for ResCap." *See* Devine Tr. 360:15-361:3 (A. 8). Devine could not even recall when he stopped representing ResCap in connection with the negotiations: "I don't know exactly when it was" but "I continued to be a resource for the ResCap client even as they retained MoFo to represent them." Devine Tr. 363:12-365:9, 368:25-370:18 (A.8).

---

[20] September 19, 2012 Transcript (A. 85)

[21] Docket No. 2051 (A. 70) (Nov. 4, 2012 letter from ResCap's outside counsel).

Unfortunately, the key fact is that the Debtors' interests were not adequately represented by anyone in the negotiations due to Devine's overarching role and dominant influence.

## II. THE INSTITUTIONAL INVESTORS WERE REQUIRED TO SUPPORT THE STILL PENDING PSA.

16.    A key deal point for AFI was that the Institutional Investors be required to sign the PSA—to give AFI broad estate and third party releases—as a precondition to the Debtors granting them the $8.7 Billion Allowed Claim. Devine was able to tell Patrick that this was a "drop dead" requirement. And, the executed Settlement was explicitly tied to the PSA.[22] While the Debtors subsequently removed the cross-references to the PSA, that cosmetic change did nothing to alter the fact that the agreements were negotiated and executed as a package deal. In fact, the Debtors' motion to approve the PSA [Docket No. 318] is still subject to Court approval, and the Institutional Investors still support the Debtors' plan and AFI releases.[23]

## III. THE SETTLEMENT NEGOTIATIONS FAILED TO PRODUCE A FAIR DEAL.

### A. The Debtors rushed the Settlement negotiations and agreed to terms that drastically deviated from their own recent analysis.

17.    By mid April 2012, discussions with the Steering Committee Group had progressed such that Devine sent Patrick a new confidentiality agreement in order to provide additional information.[24] Meanwhile, on April 27, ResCap's audit committee finalized a change in its disclosures with respect to possible representation and warranty ("R&W") claims, substantially increasing them from the prior reserves of $829 million. The meeting materials indicated that the "Reasonably Possible Range of Loss" related to R&W claims totaled a high of

---

[22] *See, e.g.,* Docket No. 318, Ex. 3 (initial Settlement) at Recitals ("ResCap and the Institutional Investors have reached agreement on a plan support agreement . . . pursuant to which the Institutional Investors will support confirmation of a chapter 11 plan for ResCap."); *id.* § 4.01 (requiring the Institutional Investors to extensively cooperate with the Debtors' restructuring under section 3.1 of the PSA).

[23] *See* Steering Committee Investors' Statement in Support of Settlement and Response to Settlement Objections ¶ 6 [Docket No. 1739] (citing the PSA and stating that the Settlement is "an important step toward the overall resolution of Debtors' cases").

[24] *See* Ex. 9019-136 (A. 83).

$4.041 Billion.[25]  AFI subsequently filed its first quarter Form 10-Q with the SEC, which

estimated the Debtors' R&W claims liability at $0-4 Billion.[26]  During his deposition, Devine

testified that the $0 to $4 Billion estimate included securities law claims, while the Settlement

excludes securities claims.  Devine, among others, was responsible for calculating this

estimate.[27]  *See*; Ex. 9019-137 (A. 32) (email from AFI CEO Mackey stating, "███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████").

18.      Just two days before filing the 10-Q, however, the Debtors gave a presentation to

the Steering Committee Group in which they asserted that the reasonable range of liability was

$3 to $6 billion, also based on Devine's suggestion.  *See* Ex. 9019-19 (A. 78).  Notwithstanding

these estimates, a mere two weeks later, the Debtors meekly agreed to an $8.7 Billion Allowed

Claim.  This amount also seems to have been suggested by Devine, when on May 8, he wrote a

group email: "Light bulb moment: Isn't the obvious answer that [Patrick] states her 22% – 11

billion or whatever – and then takes an appropriate haircut (analogous to the 36% to 14% haircut

she took in BoA) to get to a lower $ number ($8B?) as stipulated allowed claim.?"  *See* Ex.

9019-146 (A. 83).  Unfortunately for the Debtors' creditor body, Devine's light bulb moment

seems to have resulted in the parties agreement the very next day to an $8.7 Billion Allowed

Claim, a discount of only 13% from Patrick's demand of $10 Billion and a far cry from the 75%

discount her clients apparently took in the Bank of America settlement.  *See infra* ¶ 20.

19.      The Settlement negotiations with the Talcott Franklin Group were equally

compressed but involved even less ResCap participation.  Devine held off on negotiating with

them until he had a deal with the Steering Committee Group.  At that point, the Settlement was

---

[25] *See* Ex. 9019-55 (A. 35).

[26] *See* Ex. 9019-54 (A. 27).

[27] Devine Tr. 102:20-103:4, 136:9-137:15 (A. 8).

presented to Franklin in a take-it-or-leave-it fashion.  *See* Ex. 9019-148 (A. 47) (May 9, 2012

email chain wherein Devine states that he pushed Franklin to sign the Settlement and PSA that

day, and that Franklin would be sent copies of the agreements as negotiated with Patrick).

Devine was often the only person who dealt with the Franklin.[28]  *See Brady Decl.* ¶¶ 8-10.

### B.    The Debtors did not raise arguments that would have dramatically reduced the settlement value of the Institutional Investors' claims.

20.    Fundamentally, the Debtors failed to push Patrick to lower her settlement

demand.  In a May 8, 2012 email, Patrick argued that the demand was comparable to an earlier

settlement she made with Bank of America.  *See* Ex. 9019-146 (A. 83).  According to Patrick, in

the Bank of America settlement, a 36% defect rate was used,[29] which resulted in a $32.5 Billion

claim.  The parties then agreed to settle the claim for $8.5 Billion, or 25.7% of the $32.5 Billion

claim amount.  *Id.*  Here, the parties agreed that the Institutional Investors' claims were worth

$8.7 Billion (itself an inflated amount), and that the Debtors would agree to that full amount,

without discount.[30]  This is hardly the result of an aggressive negotiation.

---

[28] Devine made it crystal clear what he was trying to achieve in his negotiations with Franklin, as the subject line read: "Has Talcott Franklin signed on without reservation to support the Plan, including broad third party release of all claims against Ally etc including security claims?"  *See* Ex. 9019-154 (A. 61).  *See also* Devine Tr. 279:16-280:5 (A. 8).

[29] The Debtors could not independently verify the accuracy of the 36% defect rate, and in fact, ResCap's employees challenged it, a fact not disclosed to the ResCap Board.  *See infra* note 39.  Likewise, the Debtors' own expert witness believed that the Bank of America settlement utilized a 14% defect rate.  *See infra* ¶ 28.

[30] The Debtors do not appear to have negotiated the terms of the AFI settlement agreement with any degree of force either.  ResCap CEO Thomas Marano believed that the Debtors should not settle with AFI for less than $2 Billion.  *See* Marano Tr. 93:20-22; 232:7-15 (A. 2).  In fact, Marano stated: "My view is that would take a couple billion dollars, that no one was going to do a deal for 750."  *Id.* 94:8-12.  Nevertheless, ResCap, ultimately agreed to settle with AFI for $750 million, even though ResCap originally sought $8-9 Billion, *see* Ex. 9019-105 (A. 43), later sought between $3 Billion and $5 Billion from AFI, and ResCap's CEO believed that $2 Billion was a reasonable figure.  *Id.* 233:4-25.

In his deposition, John Mack (who negotiated the AFI settlement agreement) explained why ResCap was willing to accept such a low contribution from AFI.  Simply put, ResCap was willing to accept a deal — any deal — as long as it obtained a contribution from AFI that was a "reasonable headline number in terms of achieving credibility."  *See* Mack Tr. 99:18-100:21 (A. 4).  Mack stated that any number was appropriate, as long as it helped "get a transaction complete."  *Id.* 66:21-67:23.  In fact, Mack was so fixated on getting a deal done that he believed that the "headline number" need not be at all related to AFI's actual liability to ResCap.  *Id.* 66:21-67:23 ("Q: Now, the person who was representing you, your advisor for MoFo, you would think that they should negotiate a number that's consistent with what they think are their potential liabilities, if they go to court, right? A: No.").

21.     ResCap failed to raise several applicable defenses to the Institutional Investors'
claims, some of which could reduce the Debtors' maximum liability by billions of dollars, or
even to consult with its own litigation counsel regarding defenses.  *See* Committee Objection at
4-6; 25-41.  Indeed, at his deposition, the Debtors' counsel in monoline litigation clearly stated:
"I didn't give advice to anybody about the [S]ettlement."  *See* Lipps Tr. 98:3-4 (A. 7).

22.     The Debtors did not consider that, at the time of entry into the Settlement, no
Institutional Investor had ever filed suit for the types of claims being settled.  *See* Lipps Tr. 46:7-
13 (A. 7).  Nor did they consider that approval of 25% of the investors in a specific trust was
required before the trustee could file suit, and the investors would have to indemnify the
Trustees.  *See* Ruckdaschel Tr. 117:21-118:9 (A. 75).  This made it inherently difficult for the
Institutional Investors to sue, and thus, many of the settled claims would likely never have been
properly asserted.  In fact, this appears to be precisely what occurred.  Many of the alleged
claims were never filed and are now time-barred because the Institutional Investors were unable,
or unwilling, to file a timely lawsuit asserting such claims.  *See* Committee Objection at 35-37.

**IV.     THE RESCAP BOARD INADEQUATELY EVALUATED THE SETTLEMENT
BEFORE APPROVING IT.**

23.     After AFI completed negotiations with the Institutional Investors, the ResCap
Board met and approved the Settlement in half an hour.  *See* Ex. 9019-61 (A. 50).

**A.     The ResCap Board received only last-minute notice of the May 9 Meeting.**

24.     The May 9, 2012 Meeting was scheduled for 3:00 PM, and the ResCap Board
only received notice of the meeting and an agenda at 2:08 PM.[31]    At 2:38 PM, a mere 22
minutes before the May 9 Meeting began, Lee sent two pages of materials (the "May 9
Presentation") for the meeting.[32]  Prior to this email from Lee, the ResCap Board had not

---

[31] *See* Exs. 9019-60 (A. 49), 9019-95 (A. 30).

[32] *See* Ex. 9019-60 (A. 49).

received any materials analyzing the Settlement.[33]  The ResCap Board was not previously aware
that the amount of the Settlement was $8.7 Billion.[34]  Whitlinger, in fact, did not even know to
what the "Proposed Legal Settlement" in the agenda referred.[35]

25.     Once the meeting began, the ResCap Board spent only half an hour deliberating
before it approved the terms of the Settlement.[36]  As explained by Dr. Clifford Rossi in his expert
report (the "Rossi Report"), the approval of the Settlement on such an expedited time frame and
without adequate consideration of relevant information violated fundamental principles of
corporate governance and risk management procedures that should have been in place at a
sophisticated financial institution like ResCap.  *See* Rossi Report ¶¶ 16-29 (ResCap was
"severely handicapped" in its ability to evaluate the Settlement).

**B.     The information provided to the ResCap Board was insufficient.**

26.     The May 9 Presentation was incomplete and inaccurate.  The first page included a
chart, the main purposes of which were to identify the defect rate used and to compare that to
rates used in other Patrick settlements.  Establishing an accurate defect rate is crucial; as
Cancelliere pointed out, lowering the rate by only 2% reduces the $8.7 Billion Settlement by a
billion dollars.[37]

27.     Rather than establishing an accurate defect rate and using that rate to calculate a
reasonable settlement amount, the Debtors did the opposite.  They agreed to $8.7 Billion without
any meaningful consideration of its reasonableness and backed into the 19.72% defect rate.[38]

---

[33] *See* Marano Tr. 146:12-147:11 (A. 2); Whitlinger Tr. 29:11-16, 30:6-12 (A. 6).

[34] *See* Whitlinger Tr. 47:19-48:7 (A. 6).

[35] *See* Whitlinger Tr. 26:18-23 (A. 6).

[36] *See* Ex. 9019-61 (A. 50); Marano Tr. 165:6-9 (A. 2); Whitlinger Tr. 25:24-27:4 (A. 6).

[37] *See* Cancelliere Tr. 198:7-12 (A. 5).

[38] *See* Whitlinger Tr. 105:8-13 (A. 6); Ex. 9019-117 (A. 52).

28.     The May 9 Presentation contained a chart setting forth a comparison of the agreed-upon 19.72% defect rate to the 35% and 36% rates allegedly used in the Bank of America and Lehman settlements.  This chart was unconscionably deceptive.[39]  Even the Debtors' own expert acknowledges that those other settlements did not utilize rates nearly that high.  Rather, the relevant defect rate in the Bank of America settlement was only 14%, and in Lehman Brothers, a range of 9% to 14% was used.  *See* First Sillman Decl. ¶ 65 [Docket No. 22].[40]

29.     The second page was an "executive summary" sheet with the AFI contribution, a description of the allocation of the $8.7 Billion Allowed Claim, and a preliminary waterfall recovery.[41]  Like the chart, the executive summary did <u>not</u> disclose critical facts, namely (i) how the 19.72% defect rate was derived or that it did not account for litigation defenses, (ii) that the Debtors had challenged the 35% and 36% defect rates provided by Patrick, (iii) that Cancelliere had used a 13-14% defect rate for the Debtors when calculating reserves for R&W claims, or (iv) even how the parties arrived at the $8.7 Billion Settlement amount.  *See* Ex. 9019-60 (A. 49).

30.     Armed only with the chart and the executive summary, in approving the Settlement, the ResCap Board failed to give any weight to many of these relevant factors which are necessary to evaluate any settlement, especially one so huge:

- Legal defenses to the claims were not considered and ResCap's outside counsel was not consulted.  *See* Mack Tr. 53:2-7 (A. 4).[42]  Board member and ResCap CEO Thomas Marano himself knew that there were potential statute of limitations defenses to the settled claims.[43]  Nonetheless, the ResCap Board did not consider

---

[39] The ResCap Board also had no basis to evaluate the accuracy of these numbers.  *See* Whitlinger Tr. 33:2-34:8, 37:5-38:9, 79:7-80:11 (A. 6) (stating that Cancelliere did not discuss the 19.72%, 35%, or 36% defect rates at the May 9 Meeting).  *See also* Cancelliere Tr. 113:13-115:6 (A. 5) (Cancelliere knew that Patrick's assertion that a 36% defect rate was used in the Bank of America settlement was incorrect).

[40] And, as discussed above, even if Patrick's 36% defect rate in the Bank of America settlement is to be believed, Patrick accepted a settlement amount that was significantly less than the product of the defect rate and the total lifetime losses.  *See supra* ¶ 20.

[41] *See* Ex. 9019-60 (A. 49).

[42] *See also* Lipps Tr. 97:20-98:23 (A. 7) (noting that Lipps had no involvement in the Settlement negotiations, provided no advice to the ResCap Board or anyone else, and only was asked by the Debtors to offer his views on the reasonableness of the Settlement in August, three months after the Settlement was finalized).

[43] *See* Marano Tr. 113:12-15; 115:17-118:17 (A. 2).

this defense or any other legal defenses to the settled claims when it approved the Settlement.[44]

- The ResCap Board was not given any information about the potential value of the settled claims if those claims were litigated. *See* Mack Tr. 67:19-23 (A. 4) ("Q: Did you get any guidance at the board meeting as to what the number would be, if this claim was actually litigated rather than settled? A: No, not that I recall.").

- In fact, Mack felt that this information was irrelevant and that it would be appropriate to approve a settlement amount that bore no relationship to the potential litigation liability. *See* Mack Tr. 66:21-67:23 (A. 4) ("Q: Now, the person who was representing you, . . . you would think that they should negotiate a number that's consistent with what they think are their potential liabilities, if they go to court, right? A: No.").

31.    These problems were compounded by a fundamental misunderstanding of key Settlement terms.  Whitlinger, for example, could not recall whether the Settlement settled securities claims.[45]  And Mack affirmatively, but wrongly, believed that securities claims were in fact among the settled claims.[46]  That the members of the ResCap Board did not understand this key point is alarming, but unsurprising, as AFI was driving the settlement process.  In fact, Mack, even as of the date of his deposition (November 14, 2012), did not know who Timothy Devine was, notwithstanding Devine's central role in the Settlement negotiations.[47]

32.    In short, the ResCap Board did not have enough information to intelligently evaluate the Settlement, and did not make any serious effort to obtain additional information.[48] The ResCap Board was content to accept whatever bare minimum of information AFI and the Debtors' management were willing to provide them, only receiving such information 22 minutes before a half-hour consideration of an $8.7 Billion settlement.  The ResCap Board failed to properly investigate the facts and legal issues.  It rubber-stamped an $8.7 Billion settlement of

---

[44] *See* Mack Tr. 69:24-70:5 (A. 4); Whitlinger Tr. 118:10-119:5 (A. 6).

[45] *See* Whitlinger Tr. 68:12-18 (A. 6).

[46] *See* Mack Tr. 108:25-109:6 (A. 4).

[47] *See* Mack Tr. 43:2-21 (A. 4); *see also id.* 41:22-25; *id.* 42:1-21.

[48] One board member, Marano, did request additional information.  That information was not provided, and the ResCap Board proceeded to approve the Settlement anyway.  *See* Marano Tr. 165:15-166:19 (A. 2).

claims based on bare-bones, inaccurate, and last-minute information, ignoring that the Settlement

was negotiated by and for the benefit of the Debtors' parent entity.

**C.      The Debtors' management and the ResCap Board failed to establish proper
risk management procedures or corporate governance practices.**

33.      In the rush to conclude a deal pre-filing, there is no evidence that the Debtors

made any serious effort to determine whether $8.7 Billion was a reasonable Settlement amount

or to seriously negotiate a lower amount.  The Debtors seemingly take pride in having negotiated

Patrick down from the demand of $10 Billion to "only" $8.7 Billion.  This ignores that $8.7

Billion is more than double the Debtors' own publicly-stated estimates from two weeks earlier,

which estimates themselves were 400% higher than the Debtors' reserves for the same claims.

This Settlement was the result of the deeply flawed process employed by ResCap.  As set forth in

greater detail in the Expert Report of Dr. Clifford Rossi, ResCap:

- failed to provide the ResCap Board with adequate information or time to make a decision regarding the Settlement;

- improperly relied on Cancelliere for analysis of the Institutional Investors' claims instead of a risk review committee or a senior risk officer;

- should have performed a detailed assessment of R&W exposure by conducting a random sampling of a targeted audit on the actual RMBS deals in question;

- created a conflict of interest by allowing Cancelliere, a ResCap employee, to report to Todd Kushman, an AFI employee;

- failed to consider Cancelliere's legitimate concerns with Patrick's assumptions and information that ultimately drove the Settlement negotiations;

- should have provided the ResCap Board with an analysis of the assumptions used by Patrick and ResCap risk management's estimates of defect rates and potential losses, as well as R&W reserve estimates; and

- allowed AFI personnel to dominate and control the negotiations notwithstanding the clear conflict of interest between AFI and ResCap.

*See* Rossi Report ¶ 15-34.

34.     In accordance with standard risk management practices, ResCap should have

established an independent risk management committee to evaluate the potential liability and to

take the lead in negotiating the Settlement.  *Id.* ¶¶ 25-26.  A senior risk executive should have

independently evaluated all of the information and assumptions provided by Patrick, analyzed a

sample of the 392 RMBS deals in question, and performed due diligence to understand material

deviations between the Settlement and the Patrick settlement with Bank of America.  *Id.* ¶¶ 15,

25-27.  The failure to take these necessary actions resulted in a deficient process and contributed

to the ResCap Board's improper approval of the Settlement.  *Id.* ¶¶ 30-34.

## **OBJECTION**

## V.    **THE DEBTORS CANNOT PROVE THAT THE SETTLEMENT IS FAIR, EQUITABLE, AND IN THE BEST INTERESTS OF THEIR ESTATES.**

35.     The Debtors have not established that the Settlement is fair, equitable, and in the

best interests of their estates.  *In re Iridium Operating LLC*, 478 F.3d 452, 461-62 (2d Cir. 2007).

In fact, even if the Court concludes that $8.7 Billion is a reasonable settlement amount, other

factors still warrant denial of the 9019 Motion:

> [The Debtors] assert . . . that simply because the amount is within the range of
> reasonableness, the Court is required to approve the settlement.  I don't read
> *Iridium* that way.  I don't read *TMT Trailer Ferry* that way.  I don't read the other
> cases regarding approval of 9019 settlements that way. . . . 8.7 could be a dollar
> value within the range of reasonableness, but the other settlement terms may be
> such that the settlement should not be approved.

Hearing Transcript (Oct. 10, 2012) at 23:21-24:17 (A. 74).

36.     Here, the Settlement was not negotiated at arm's length because the negotiations

were dominated by AFI, a non-debtor insider.[49]  Thus, the Debtors must show not only that the

*Iridium* factors favor settlement, but that the Settlement is reasonable from a standpoint of

"entire fairness."  *See In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 384-89 (Bankr. S.D.N.Y.

---

[49] As an affiliate of the Debtors, and an entity in control of the Debtors, AFI is a statutory insider under the
Bankruptcy Code.  *See* 11 U.S.C. §§ 101(2), 101(31)(B), 101(31)(E).

2005) (applying the entire fairness test where a transaction involved insiders); *In re Drexel*

*Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (transactions involving

insiders required "closer scrutiny"). *See also* Committee Objection at 13-15.

37.     Whether the Court applies the *Iridium* test or a heightened standard of review, the

Debtors have failed to establish that the Settlement is reasonable or in the best interests of the

Debtors' estates.

## VI.    THE IRIDIUM FACTORS DO NOT FAVOR APPROVAL OF THE SETTLEMENT.[50]

### A.    The Settlement was not the product of arm's-length bargaining.

38.     A review of the evidence leads to the inescapable conclusion that it was Devine,

and not a ResCap representative who drove the negotiations.  ResCap's attorneys, Hamzehpour

and Lee, played a secondary role and took their orders from Devine from the start.  *See supra*

¶¶ 7-11.  The Institutional Investors relied on Devine to maintain control over the negotiations

and to keep ResCap's attorneys in line.  *See supra* ¶¶ 8-9.  Devine admitted that at times he was

representing ResCap in the Settlement negotiations, a clear conflict of interest.  *See supra* ¶ 15.

Devine was substantially more involved in the substance of the negotiations than any ResCap

representative.  *See generally* Chronology; *see also* Brady Decl. ¶¶ 6-11.  And Devine's control

of the negotiations gave him the power to require the Institutional Investors to support AFI's bid

for broad estate and third party releases at a considerable discount.  *See supra* ¶¶ 7.

39.     The Institutional Investors began by strongly asserting that AFI was liable for

their damages, but they did not vigorously pursue AFI.  Instead, they were able to capitalize on

AFI's control of the process to quickly obtain an agreement for an excessively large allowed

claim.  When questioned about the negotiations concerning AFI's liability, Devine testified that:

---

[50] To avoid duplication with the objections of the Committee and other parties in interest, FGIC does not address each of the *Iridium* factors herein, but instead focuses on those that are most relevant to the facts of these cases. Consideration of these factors alone demands rejection of the 9019 Motion.

-18-

I told her that AFI had no liability, that these were contract claims. AFI wasn't a party to the contracts. And that there are clauses in the contracts which specifically exclude contractual responsibility outside of the privity of the contractual relationship. . . . I don't know how much she did respond to that. We—we didn't have, you know, an extended debate over the topic.

Devine Tr. 373:10-24 (A-8).

40.    ResCap's representatives did not negotiate with the Institutional Investors at arm's length because, essentially, they did not negotiate very much-- Devine did. This factor alone warrants denial of the Debtors' 9019 Motion.

**B.    The Debtors and ResCap Board breached their fiduciary duty to creditors by agreeing to the $8.7 Billion settlement amount without a thorough analysis of the facts and the validity of the Institutional Investors' claims.**

41.    Less than an hour after receiving notice that the Debtors had agreed to the terms of the Settlement, the ResCap Board met for 30 minutes, reviewed a two page document that contained incomplete and misleading information, and rubber-stamped an $8.7 Billion settlement of claims that have never been, and were unlikely to be, the subject of a lawsuit against the Debtors. *See supra* ¶¶ 23-31. This inadequate process was a direct result of the Debtors' failure to implement appropriate risk management and corporate governance procedures that are designed to ensure meaningful, thorough, and deliberate evaluation of complex transactions like the Settlement. *See supra* ¶¶ 33-34.

42.    The ResCap Board was denied, or failed to request, significant relevant information, including (i) how much the Institutional Investors' claims might be worth if litigated, (ii) how the parties arrived at the $8.7 Billion settlement amount, (ii) whether the agreement accounted for litigation defenses that could potentially reduce the value of the Allowed Claim by billions of dollars, (iii) how the 19.72% defect rate allegedly justifying the settlement amount was calculated, (iv) that the Debtors used only a 13-14% defect rate when establishing reserves for R&W claims, (v) whether securities claims were included in the Settlement, or (vi) how the Debtors could explain the disparity between the $0-4 Billion estimate

in the April 27 10-Q for a larger universe of potential claims and a settlement amount that was more than double the high end of that estimate. *See supra* ¶¶ 29-30.

43.    Failure to consider this information and numerous other material factors rendered the ResCap Board's approval of the Settlement meaningless. This Court cannot approve the Settlement in the face of this fundamental breach of fiduciary duty.

**C.    The Settlement is against the paramount interests of creditors.**

**1.    The $8.7 Billion settlement amount is unreasonably high.**

44.    As set forth in the Committee Objection, $8.7 Billion grossly overstates the value of the settled claims. Only two weeks before the Debtors believed that the <u>maximum</u> liability they could face was $4 Billion. The Debtors initially asserted that the Settlement had to be approved before the sale of ResCap's servicing platform, and also seek to use the sanctity of the sale as a justification for this Settlement. This ignores the key facts shown above as to what motivated the Settlement, as well as that this Settlement was not entered into with the RMBS Trustees who have the legal right to control the claims (see footnote 7, *supra*), the RMBS Trustees did assert significant objections to the servicing platform sale which the Debtors had to resolve, and the sale preceded the approval motion and was nonetheless successful.

**2.    The Settlement contains various vague and improper provisions.**

**(a)    Section 7.01 is unclear and may operate as an impermissible third-party release.**

45.    Section 7.01 of the Settlement releases certain claims "by, through or on behalf of [an] Accepting Trust or the Trustees of such trusts." To the extent such releases include any third-party releases, they cannot be approved in the context of a settlement agreement under Rule 9019. Rather, they must be included in the Debtors' plan and must satisfy the standards set forth by the Second Circuit in *In re Metromedia Fiber Networks, Inc.*, 416 F.3d 136, 141-43 (2d Cir.

2005) (third-party releases are permitted only in "truly unusual circumstances" such that the releases are "important to the success of the plan").

>    **(b)**    **The releases and purported carveout in the Settlement are vague and ambiguous.**

46.    The Settlement is vague and ambiguous as to which claims it actually releases. FGIC has separate and independent breach of contract and fraudulent inducement claims and remedies against the Debtors, as well as AFI and certain of its affiliates, based on, among other things, I&I Agreements between FGIC and the Debtors.

47.    Section 7.01 provides third-party releases limited to claims arising under the "Governing Agreements" (which do not include FGIC's I&I Agreements).  But the releases extend to claims brought by "any Persons claiming by, through or on behalf of [an] Accepting Trust or the Trustees of such trust."  Section 8.03 to the Settlement[51] provides that the releases contained in Article VII of the Settlement do not apply to a financial guaranty provider's "rights or obligations independent of the rights or obligations of the Institutional Investors, the Trustees, or the Settlement Trusts."

48.    However, neither the Settlement Agreements nor the 9019 Motion provides any guidance as to (i) what particular claims might be deemed to be brought "by, through or on behalf of an Accepting Trust" and released by Section 7.01 or (ii) what particular "rights or obligations" of a financial guaranty insurer are "independent of the rights or obligations of the Institutional Investors, the Trustees, or the Settlement Trusts" and therefore excluded from the Settlement.  If a Trust with financial guaranty insurance provided by FGIC opts in[52] to the

---

[51] In the initial Settlement at Docket No. 320, this section was section 8.02, and thus, it is referred to as section 8.02 in several parties' deposition testimony because the individuals were being asked about their interpretation of the Settlement at the time it was initially approved.

[52] FGIC expressly reserves its rights with respect to whether a Trust that it insured can opt in to the Settlement without FGIC's express consent.

Settlement (assuming the Settlement is approved) and accepts the release in Section 7.01, it is unclear which of FGIC's claims could still be asserted against the Debtors and AFI and affiliates.

49.     It appears that the intent of the Debtors was to exclude the claims of financial guaranty insurers, such as FGIC, from the Settlement.  Hamzehpour understood "the releases provided don't act to release claims of financial guarantee providers."[53]  She elaborated that "this document does not release any claims that those insurance providers have against the debtors with respect to those participating trusts."[54]  Moreover, Marano, ResCap's CEO and a board member, testified that "the financial guarantors are not released by the waivers in Article 7."[55]

50.     However, AFI at least at the time had a different view.  On May 13, Devine wrote that "$8.7 billion is the allowed claim for all takers, including monolines," and "If there is any discussion about the total $ for allowed claims arising out of these issuances – wrapped, unwrapped, monoline, trust, whatever (excepting securities law claims) – going over $8.7 Billion then we have no deal.  [AFI] did not, and cannot and will not approve it."[56]

51.     Devine first testified that he was "not aware of anything that would carve out the monolines claims out of the $8.7 billion allowed claim."[57]  After reviewing the document however, he recalled that "the parties didn't take a position as to whether or not the financial guarantee provider as subject to section 8.02 did or did not have rights independent of the rights or obligations of the Institutional Investors, the trustees or the trusts. . . . if it was determined that they did have such independent rights that they would not be covered by Article 7."[58]

---

[53] *See* Hamzehpour Tr. 114:11-23 (A. 3).

[54] *See* Hamzehpour Tr. 122:2-8 (A. 3).

[55] Marano Tr. 198:3-6.

[56] *See* RC-9019_00061255 (A. 69), RC-9019_00051061 (A. 67).

[57] Devine Tr. 310:11-21 (A. 8).

[58] *Id*. 312:20-314:5.

52.    The impact of the Settlement on FGIC's claims should not be a guessing game.

The vague and ambiguous language of Sections 7.01 and 8.03 puts financial guaranty insurers

like FGIC at risk of losing their ability to pursue certain claims.   At a minimum, the language of

Section 7.01 and 8.03 should be clarified to provide certainty that FGIC's rights and claims as

asserted in its proofs of claim are "independent" of the Trustees' rights.

## VII.    THE DEBTORS' POST HOC "EXPERT" ANALYSIS IS FLAWED.

53.    The Debtors have offered declarations from Frank Sillman and Jeffrey Lipps, both

of whom were asked to opine on the reasonableness of the Settlement after it was executed.[59]

54.    Among other flaws, Sillman's analysis fails to account for the following: (i) the

Trustees will receive more than double what they would recover if they litigated their claims

(which they have never done) and won; (ii) to whatever extent the Allowed Claim is inflated,

other creditors' recoveries are reduced in kind; and (iii) the Debtors have colorable defenses to

the Institutional Investors' claims, including defenses that would bar the claims entirely.

Sillman's analysis is also unreliable because: (i) credible publicly-available data and the Debtors'

own repurchase history regarding the loans was not considered in his analysis, (ii) he presumes

the ultimate question at issue, calculating the range of potential losses "[a]ssuming . . .

liability,"[60] (iii) the analysis contains computational errors[61] and unverifiable analysis calculated

"in his head" or relying on his "professional experience," (iv) Sillman relied almost exclusively

on data provided by the Debtors that he did not independently evaluate, and (v) Sillman justifies

the Settlement with a basic tautology: it was reasonable because the Debtors agreed to it.[62]

---

[59] See Sillman Tr. 25:21-23, 104:16-23, 267:21-268:21 (A. 76); Lipps Tr. 159:12-19 (A. 7).

[60] As AFI's outside counsel specifically instructed, Sillman "make[s] clear throughout his declaration that he is assuming liability for purposes of his analysis."  See Ex. 9019-Expert-14 (A. 82).

[61] At ¶ 17 of his Supplemental Declaration, Sillman calculates that the $8.7 Billion amount was reasonable  applying an estimated 19% loss rate to the Trusts' $45 Billion in total potential losses.  However, arithmetic teaches that $45,000,000,000 x 0.19 = $8,550,000,000—a $150 million discrepancy.

[62] See Sillman Tr. 67:8-69:19; Sillman Decl. ¶ 39; ¶ 40; Sillman Tr. 117:12-119:7 (A. 76), Sillman Tr. 291:4-292:22; 225:18-228:1 (A. 76); Sillman Tr. 122:7-128:16; Sillman Tr. 184:8-19 (A. 76).

55.    The testimony of the Debtors' defense counsel, Lipps, is almost entirely

unsupported by objective, quantifiable criteria: Lipps did not base his analysis on any

percentages or probabilities of litigation outcomes,  *see* Lipps Tr. 142:14-144:24 (A. 7), and, like

Sillman, quantified crucial data "in [his] mind," *id*. 133:9-134:10.

## VIII.   RESERVATION OF RIGHTS AND DEFENSES

56.    As stated in the Proofs of Claim it filed in these cases, FGIC entered into I&I

Agreements, which provides that FGIC is a third party beneficiary of the operative documents

governing certain of the Debtors' RMBS transactions (*i.e.*, the transactions for which FGIC

issued financial guaranty insurance policies for the benefit of the related RMBS holders).  The

I&I Agreements incorporate by reference for the benefit of FGIC the representations and

warranties, covenants and other provisions of such operative documents.  The I&I Agreements

provide FGIC with separate and  distinct rights and remedies against the Debtors, including the

right to reimbursement and indemnification for its losses in connection with the related RMBS

transactions, which are in addition to, and not exclusive of, any other remedies available to

FGIC.  FGIC's rights and remedies under the I&I Agreements are distinct from rights and

remedies available to FGIC as a third party beneficiary of the operative documents for the related

RMBS transactions, pursuant to which documents the Debtors also owe loan repurchase and

other contractual obligations to the related Trusts.  Moreover, as an insurance company, FGIC

also has substantial rights reflected in both statutory and common law that are not available to

the Trustees and Institutional Investors.  In accordance with the rights and remedies for which

FGIC expressly contracted in the I&I Agreements, as well as New York state insurance laws not

applicable to the potential claims of the Trustees and Institutional Investors, courts have

established distinct considerations for analyzing and evaluating claims for breach of contract and

fraudulent inducement asserted by monoline financial guaranty insurers, like FGIC.  *First*,

financial guaranty insurers asserting fraudulent inducement and breach of contract claims based

on false representations in connection with RMBS transactions are entitled to seek rescissory damages—a broad equitable remedy not available to Institutional Investors or Trustees. *Second*, to demonstrate loss causation, financial guaranty insurers need only show that breaches or misrepresentations made by sellers/sponsors increased the insurer's risk of loss. Separate from these significant differences in the law, which are uniquely applicable to monoline RMBS claims, there are important factual differences between FGIC's claims and the claims of the Trusts and Institutional Investors, which make particular legal defenses referenced by the Committee in its objection inapplicable to FGIC's claims. Notably, for example, FGIC timely filed twelve separate lawsuits with respect to the twenty securitizations in which it suffered material losses; consequently, FGIC does not face meaningful statute of limitations defenses. Moreover, among other things, the Debtors own significant repurchase history with respect to loans in FGIC-insured securitizations belies any purported application to FGIC of the so-called election of remedies rule, as articulated in the recent decision of the U.S. District Court for Minnesota. *See Mastr Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.*, No. 11-2542, 2012 WL 4511065 (D. Minn. Oct. 1, 2012).

## **CONCLUSION**

For the foregoing reasons, the Court should conclude that the Settlement does not satisfy the requirements under Bankruptcy Rule 9019, and deny approval.

Dated: December 3, 2012

_____/s/ Richard L. Wynne_____
Richard L. Wynne
Howard F. Sidman
JONES DAY
222 East 41st Street
New York, NY 10017.6702
Telephone:    212-326-3939
Facsimile:    212-755-7306

Attorneys for Creditor
Financial Guaranty Insurance Company
