# ALLY/RESCAP – CHRONOLOGY OF SETTLEMENT NEGOTIATIONS

This chronology provides a narrative of the settlement negotiations between AFI, ResCap, and groups of RMBS certificate holders represented by Patrick and Franklin. For ease of reference, all parties, and the defined terms assigned thereto, are included in the chart immediately below.

| Defined Terms | First Name | Last Name | Company/Entity Name | Role/Title |
|---|---|---|---|---|
| Abreu | Steven | Abreu | Residential Capital, LLC | Board member |
| AFI | | | Ally Financial, Inc. | Parent company of Debtors |
| Board | | | Residential Capital, LLC | Board of Directors |
| Brown | Jeff | Brown | Ally Financial, Inc. | Senior Executive VP of Finance and Corporate Planning |
| Cancelliere | Jeff | Cancelliere | Residential Capital, LLC | Employee |
| Carpenter | Michael | Carpenter | Ally Financial, Inc. | CEO |
| Devine | Timothy | Devine | Ally Financial, Inc. | AFI Chief of Litigation |
| Fed | | | | Federal Reserve Board |
| FTI | | | FTI Consulting | Expert |
| Franklin | Talcott | Franklin | Talcott Franklin PLC | Talcott Franklin Group Counsel |
| Hagens | David | Hagens | Residential Capital, LLC | ResCap in-house attorney |
| Hamzehpour | Tammy | Hamzehpour | Residential Capital, LLC | ResCap General Counsel |
| Ilany | Jonathan | Ilany | Residential Capital, LLC | Independent Director |
| Kirkland | | | Kirkland & Ellis LLP | AFI Counsel |
| Kushman | Todd | Kushman | Ally Financial, Inc. | Chief Mortgage Risk Officer |
| Lee | Gary | Lee | Morrison & Foerster | ResCap Counsel |
| Levitt | Jamie | Abreu | Morrison & Foerster | ResCap Counsel |
| Lipps | Jeffrey | Lipps | Carpenter Lipps & Leland LLP | ResCap counsel in monoline litigation |
| Mack | John | Mack | Residential Capital, LLC | Independent Director |
| Mackey | Jim | Mackey | Ally Financial, Inc. | CFO |
| Marano | Thomas | Marano | Residential Capital, LLC | CEO and Board member |
| Martin | Ross | Martin | Ropes & Gray LLP | Counsel to Steering Committee Group |
| MoFo | | | Morrison & Foerster | ResCap Counsel |
| Ornstein | Noah | Ornstein | Kirkland & Ellis LLP | AFI Counsel |
| Patrick | Kathy | Patrick | Gibbs & Bruns LLP | Counsel to Steering Committee Group |

| Defined Terms | First Name | Last Name | Company/Entity Name | Role/Title |
|---|---|---|---|---|
| PSA(s) | | | | Agreement(s) among Debtors, AFI, and either the Steering Committee Group or the Talcott Franklin Group, whereby the investors agree to direct the RMBS Trustees to support the Debtors' plan of reorganization in exchange for release their claims against AFI, among other things. |
| Princi | Anthony | Princi | Morrison & Foerster | ResCap Counsel |
| PLS claims | | | | Private label securitization claims |
| Proposed Settlement(s) | | | | Settlement(s) between Debtors and either the Steering Committee Group or the Talcott Franklin Group. |
| R&W claims | | | | Representation and warranty claims |
| Renzi | Mark | Renzi | FTI Consulting | Expert |
| ResCap | | | Residential Capital, LLC | Debtors |
| Ropes & Gray | | | Ropes & Gray LLP | Counsel to Steering Committee Group |
| Ruckdaschel | John | Ruckdaschel | Residential Capital, LLC | ResCap in-house attorney supporting structured finance |
| Settlement Agreement(s) | | | | Settlement agreement(s) between Debtors and either the Steering Committee Group or the Talcott Franklin Group. |
| Sheeren | David | Sheeren | Gibbs & Bruns LLP | Counsel to Steering Committee Group |
| Sillman | Frank | Sillman | | ResCap Expert |
| Smith | Edward | Smith | Residential Capital, LLC | Board member |
| Solomon | William | Solomon | Ally Financial, Inc. | AFI General Counsel |
| Steering Committee Group | | | Steering Committee Group of ResCap Certificate Holders | |
| Talcott Franklin Group | | | Group of ResCap Certificate Holders | |
| West | Pamela | West | Residential Capital, LLC | Board member |
| Whitlinger | James | Whitlinger | Residential Capital, LLC | CFO and Board member |
| Wilder | Patrick | Wilder | Federal Reserve Board | |

**October 2011**

    Patrick contacted AFI in a letter addressed to Solomon dated October 17, 2011. **RC-9019_00048950-53 (A. 9);** *see also* **Ex. 9019-48 (A. 80)**.[1] In this letter, Patrick requested a meeting to discuss her clients' repurchase and servicing claims. On October 19, 2011, Solomon e-mailed a group of individuals, which included Hamzehpour. Solomon informed the group that he received an October 17 letter from Patrick and was ███████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ **RC-9019_00084876 (A. 10)**. No representative of ResCap appears to have attended the meeting. In a subsequent e-mail, Carpenter stated that "████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ **RC-9019_00084876 (A. 10)**.

    On October 21, 2011, Solomon responded to Patrick's letter and noted that "[n]one of the transactions you describe in your letter involved AFI, so it would be inappropriate to engage you on the issues" and directed Patrick to contact Hamzehpour. **Ex. 9019-121 (A. 11).** Patrick responded to Solomon on October 25, 2011, noting that she would forward the October 17 letter to Hamzehpour. She also noted that her clients disagreed with AFI's assertion that it did not ultimately bear the liability associated with the repurchase and servicing claims. **RC-9019_00048948 (A. 12);** *see also* **Ex. 9019-51 (A. 62)**.

**November 2011**

    From November 2011 through April 2012, Cancelliere, a ResCap employee responsible for mortgage risk, for analyzing the reserve for R&W claims and who provided support for the negotiations, reported to Kushman, Chief Mortgage Risk Officer for AFI. **Cancelliere Tr. 20:12-21, Nov. 14, 2012 (A. 5)**.

    On November 2, 2011, Devine prepared the following talking points for Carpenter for a securities analyst call, regarding RMBS and securities law claims:



---

[1] Documents and testimony cited herein are annexed in an Appendix to the Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements.

**RC-9019_0084074 (A. 13)**. ███████████████████████████
████████ **RC-9019_0084074 (A. 13)**.

On November 21, 2011, Patrick, Hamzehpour, Ruckdaschel, Hagens and Devine met for approximately three hours to discuss Patrick's clients' claims. **Hamzehpour Tr. 26:17-30:15, Nov. 13 (A. 3).** Hamzehpour identified Devine as being from AFI, **Hamzehpour Tr. 26:21-27:4 (A. 3)**, although Devine testified that he was initially representing ResCap in dealing with Patrick. **Devine Tr. 360:15-21 (A 8).** Hamzehpour summarized the meeting, what the various participants said, as well as the fact that Patrick had not told the RMBS Trustees that she was meeting with ResCap. **Hamzehpour Tr. 27:8-30:15 (A. 3).** When asked about the inputs from AFI and ResCap attendees at this meeting, Hamzehpour testified:

> I remember [] Ruckdaschel asking her some questions about deal structures, certain provisions in the agreements, and they compared views on what those might be, what the answers to those issues might be. [Devine] asked her what she would see as success from a discussion . . . there was the normal back and forth of any meeting. I don't remember anything more specific than that.

**Hamzehpour Tr. 29:3-21 (A. 3).** Notably, Hamzehpour did not recall anything that she said at the meeting.

**December 2011**

On December 1, Devine informed Hamzehpour that he would reach out to Patrick to "pick up the dialogue." **ALLY_0209271-72 (A. 14).** On December 7, 2012, Sheeren sent Hamzehpour a draft confidentiality agreement and draft tolling agreement. **Ex. 9019-73 (A. 17).** Hamzehpour simply forwarded to Devine the draft confidentiality and tolling agreements for him to handle. **Ex. 9019-124, ALLY_PEO_0042503 (A. 71).** On December 14, Devine replied to Sheeren, stating that Hamzehpour had asked him to follow-up on the draft agreements. **Ex. 9019-73 (A. 17).** On December 15, 2011, Devine responded to Hamzehpour that "pursuant to our plan, I will reach out to [] Patrick by e-mail. . . ." **Ex. 9019-124, ALLY_PEO_0042503 (A. 71).**

On December 19, 2011, Devine sent a letter to Patrick thanking her for her candid and constructive preliminary discussion regarding settlement. **RC-9019_00058226-27 (A. 16).** Devine asked Patrick to provide the identities of her clients. **RC-9019_00058226-27 (A. 16).** Later that day, Patrick sent a response letter to Devine identifying her clients. **RC-9019_00057131-36 (A. 15).** In the cover e-mail transmitting this letter, Patrick asked that Devine contact her regarding a confidentiality agreement and "other preliminary matters." **RC-9019_00057131-36 (A. 15).**

**January 2012**

Hamzehpour testified that in 2012 she had no one-on-one calls with Patrick. **Hamzehpour Tr. 90:17-23 (A. 3).**

-4-

On January 9, Devine contacted Patrick with comments on the draft confidentiality and tolling agreements drafted by Gibbs & Bruns. **Ex. 9019-73 (A. 17).** Devine noted that some of the settlement discussions may have to be disclosed due to regulatory or contractual requirements. He also noted that the tolling agreement should provide for the particular interests of Patrick's clients in order to reduce ambiguity. **Ex. 9019-73 (A. 17).** In response to a deposition question as to "[w]as [] Devine responsible for the markups," Hamzehpour testified, "I don't remember if he was the only person that provided comments or not, but he had the pen. He was doing the markup." **Hamzehpour Tr. 38:6-11 (A. 3).** She also testified that Devine assumed a similar role in planning how to deal with Franklin after he surfaced. **Hamzehpour Tr. 38:12-15 (A. 3).**

Four days later, on January 13, Sheeren informed Devine that Gibbs & Bruns was "fine with most of" Devine's edits to the draft agreements. **RC-9019_00058305-14 (A. 18).**

At a January 25, Board meeting, a presentation was given to ResCap's Board regarding potential claims against AFI and materials were provided. ResCap has asserted that such materials are privileged, but the Board minutes were produced. **Ex. 9019-98 (A. 19).** Independent Directors Mack and Ilany became responsible for the negotiations between AFI and ResCap for the AFI contribution and settlement. **Mack Tr. 91:17-93:4, Nov. 14, 2012 (A. 4)**. However, Mack did not keep the materials following the January 25 Board meeting. Nor did he consult them as he negotiated with AFI's Carpenter over the ResCap-AFI settlement, which did not even begin until March or April 2012. When asked, "Is it fair to say your negotiations with Carpenter really had nothing to do with the legal arguments in those materials," Mack responded "Yes. I'm not going to negotiate on legal issues." **Mack Tr. 91:17-93:4, Nov. 14, 2012 (A. 4)**.

**February 2012**

In the period after the presentation to ResCap's Board concerning claims that ResCap held against AFI, ResCap sought to obtain a tolling agreement from AFI. Tensions rose between AFI and ResCap's counsel, as AFI questioned the ability of ResCap's outside counsel to effectively represent ResCap's interests. On February 19, Mackey e-mailed Carpenter and stated " ███████████████████████████████████████████████ **ALLY_0142440-41 (A. 20)**.

**March 2012**

On March 6, Devine e-mailed Patrick stating, "I got your voice-mail . . . . Can we schedule a time next week?" **RC-9019_00090060-61 (A. 21).** On March 7, Devine also scheduled a call with Franklin regarding two transactions referred to as "QO3 and QA13." **TFPC_0000016-17 (A. 22).** On March 22, Franklin sent a letter to Devine stating that despite his clients' good faith efforts to negotiate, AFI has failed to respond to offers of compromise. **TFPC_0000088-89 (A. 25).**

On March 16, Marano sent Devine an e-mail, copying Solomon and Carpenter and asked for a tolling agreement "for ResCap claims against [AFI]." **ALLY_0226063-64 (A. 24)**. In a separate e-mail to Solomon and Hamzehpour, copying Carpenter, Marano pointed out that

-5-

potential statutes of limitation might run as of the end of March, 2012, and that if a tolling agreement were not reached, then ResCap would have to begin drafting a complaint to file at a cost of "$750,000 to $1 million." **Ex. 9019-64 (A. 84).** Marano concluded by stating "I will reach out to Michael [Carpenter] today in order to avoid further unnecessary expense and embarrassment to Ally of a lawsuit filed against the parent by its subsidiary or filed in conjunction with. . . our bondholders against our parent." **Ex. 9019-64 (A. 84).**

Solomon responded on March 16, with an attack on MoFo. *See* **Ex. 9019-64 (A. 84).** At this point, MoFo had yet not participated in the discussions or negotiations with Patrick or Franklin.

On March 27, Marano sent an e-mail to Carpenter, Devine, and Hamzehpour forwarding an analysis performed by Elliot Management regarding statutes of limitations as a potential defense to repurchase claims. The analysis stated, " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" **Ex. 9019-56 (A. 26)**.

**April 2012**

On April 16, Ruckdaschel transmitted to Patrick a spreadsheet "populated with aggregated data we have been able to pull together over the past few weeks." **RC-9019_00060789-90 (A. 28).**

On April 17, Devine contacted Lee and Hamzehpour. This is the first time that Lee was copied on an e-mail or became involved in the negotiations. Devine states that "[Lee] and I had very constructive talk yesterday on number of issues. On Patrick next steps, I don't think we should share dollar range of potential AFI contribution . . . . I think it's premature given that business has not got to a number yet." **RC-9019_00061424-25 (A. 29).** Devine recommended that Lee and Hamzehpour indicate to Patrick "clarity of purpose for comprehensive third party releases." **RC-9019_00061424-25 (A. 29).**

Notwithstanding Lee's involvement, Devine continued to play a central role in the settlement negotiation process. On April 23, Devine e-mailed Hamzehpour regarding "Prep for Patrick," stating that he recommended "3, 4, 6 rather than 4, 5, 6 [billion dollars] as low medium high" settlement numbers. **Ex. 9019-79 (A. 72).** He noted that while these figures were "unrealistically low," Hamzehpour should lead with them for strategic reasons. **Ex. 9019-79 (A. 72).** In the same e-mail, Devine recommended using "750 million rather than one billion as potential AFI contribution." **Ex. 9019-79 (A. 72)**. Hamzehpour concurred and noted that, "I can't speak as to the proposed settlement with AFI, as MoFo is much closer to that than I am." **Ex. 9019-79 (A. 72)**. Devine's recommendations were also used by Renzi in the waterfall presentations for Patrick. **Renzi Tr. 100:4-13, Nov. 7, 2012 (A. 1).**

On April 25, Devine, Renzi, Ruckdaschel, Hamzehpour, and advisors from Centerview Partners met with Patrick, to review the presentation. **Hamzehpour Tr. 58:21-59:11 (A. 3).** At the meeting, Hamzehpour "didn't take the lead on any of the issues other than . . . a short discussion on servicing standards," despite being ResCap's General Counsel. **Hamzehpour Tr.**

-6-

**59:16-21 (A. 3).** Instead, Hamzehpour testified that Lee led the meeting. **Hamzehpour Tr. 58:21-59:11 (A. 3).** *See also* **Hamzehpour Tr. 60:14-25** (discussing Devine's role at the April 25, 2012 meeting).

On April 27, Devine e-mailed representatives of AFI, ResCap, MoFo, and Kirkland regarding a discussion he had with Patrick. **RC-9019_00048970-71 (A. 33).** Devine stated that Patrick's group is committed to working toward a resolution within the bankruptcy and that Patrick was authorized to work with "us" on an accelerated schedule. **RC-9019_00048970-71 (A. 33).**

Also on April 27, ResCap's audit committee held a meeting and finalized a change in its disclosures with respect to possible R&W claims, substantially in excess of the prior reserves of $829 million. The materials distributed at this meeting indicated the "Reasonably Possible Range of Loss" related to R&W claims totaled a high of $4.041 billion. **Ex. 9019-55 (A. 35).** AFI subsequently filed a form 10-Q that contained this higher estimate of possible liability for R&W claims. **Ex. 9019-54 (A. 27).** During his deposition, Devine testified that the up to $4 billion estimate also included securities law claims. Devine and others were responsible for calculating this estimate. *See* **Devine Tr. 136:9-137:15 (A. 8)** (discussing presentation to ResCap's Audit Committee regarding ResCap's reasonably possible range of loss). According to an e-mail sent the same day from Mackey to senior AFI and ResCap management, Devine and others were responsible for finalizing this estimate. **Ex. 9019-137 (A. 32)**.

Despite the several months of settlement activity, and the fact that AFI had designed a "plan" for this process, ResCap's independent directors did not learn about Patrick and the negotiations until late April or early May of 2012. **Mack Tr. 34:20-35:2 (A. 4).** Furthermore, the independent directors remained unaware of either AFI or Devine's significant involvement in negotiating the Proposed Settlements with Patrick. At his deposition, Mack testified that he didn't know AFI was having conversations with Patrick or even who Devine was:(Q. What did you understand [] Devine's position to be? A. I don't know [] Devine. Q. Okay. Do you know whether or not he had a role in negotiating the RMBS deal with [] Patrick? A. No.) **Mack Tr. 43:19-25 (A. 4)**. *See infra*, Deposition Testimony regarding the Board's Understanding of the Settlement Negotiations Process, and role of Timothy Devine and AFI.

Independent Directors Mack and Ilany were asked to lead the negotiations with AFI to obtain an AFI contribution and settle ResCap's claims against AFI. Mack and the independent directors understood from CEO Marano that $2 billion was his view of an appropriate amount for the settlement between AFI and ResCap. **Mack Tr. 115:21-116:12 (A. 4)**. Sometime during the spring of 2012, the ResCap Board presented an initial asking price for a settlement between AFI and ResCap at "much bigger than $2 billion" but still "somewhere south of [$5 billion]." **Marano Tr. 233:4-25 (A. 2)**. According to Marano, AFI's response to this proposal was "NFW, we'd rather litigate." **Marano Tr. 233:14-16 (A. 2).**

Mack described the first meeting on this subject, possibly taking place in April, as follows: "At the meeting in which we started this conversation [] Carpenter made a presentation and we listened, [Ilany] and I listened. We did not counter. We did not negotiate in that meeting." **Mack Tr. 90:18-91:3 (A. 4).** At the meeting, Carpenter presented three options, though Mack only recalled two: (i) a free-fall bankruptcy with a 363 sale, or (ii) a plan settlement

-7-

where "there would be a greater contribution by [AFI] in that process . . . . he had a three--$350 million number." **Mack Tr. 95:24-97:8 (A. 4).**

During the subsequent discussions with AFI, Mack pursued only a "reasonable headline number in terms of achieving credibility" and did not pursue either the $8 to $9 billion claim that ResCap at some point presented to AFI, or the $2 billion suggested by Marano, or the "south of $5 [billion]" amount. *See* **Mack Tr. 99:18-100:7; 130:18-131:15 (A. 4)**. Mack also did not consult the presentation to the Board outlining the claims ResCap had against AFI, nor did he "negotiate legal claims." **Mack Tr. 92:9-93:4. (A. 4)**. It is not known if this presentation valued ResCap's claims against AFI as being worth $8 to $9 billion; there is only the reference to a claim in that range being asserted in a May 8, e-mail sent by Brown, described below in the May 8 section.

Mack's rationale that he explained to AFI for seeking the "reasonable headline number" was that "[i]f the plan was going to have any credibility at all, then we needed a reasonable headline number. Otherwise we'd just get mired into a process which isn't going anywhere and which would in fact not ascribe value to the estate and to the creditors." **Mack Tr. 100:8-21 (A. 4).**

According to Marano, "At one point [in the ResCap/AFI negotiations] in order to get more money from [AFI], something above 750, there apparently was a discussion of [AFI] selling their MSR [mortgage servicing rights] and contributing some portion of the MSR to ResCap." **Marano Tr. 133:15-135:3 (A. 4)**. "When this was brought to [Marano's] attention [he] thought it was an interesting idea because it added more value to the estate not only from the cash value but it maintained a servicing asset that could have been sold away from the estate." **Marano Tr. 133:15-135:3 (A. 4)**. Ultimately, however, ResCap accepted a settlement that did not include this extra consideration. **Marano Tr. 135:4-14 (A. 4).**

**May 2012**

*May 1, 2012*

On May 1, Devine arranged for a web meeting with Patrick and the Steering Committee Group to be held on May 3. **Ex. 9019-34 (A. 34)**. The discussion materials that ResCap prepared for the meeting (sent to Patrick on May 2) estimated the anticipated R&W and PLS claims to range from $3 to $6 billion. **Ex. 9019-34 (A. 34)**. The materials further explored various scenarios of AFI monetary contributions in connection with the settlement, ranging from none to $750 million. **Ex. 9019-34 (A. 34).**

*May 3, 2012*

During this period, Devine often contacted Patrick without representatives from ResCap being present or copied. For example, on May 3, Devine e-mailed Patrick and said "we don't need the big group call but if you have 10 minutes between 3 and 4 I would like to touch base." **ALLY_0143695 (A. 36)**.

-8-

*May 4, 2012*

After the web meeting on May 3, 2012, the negotiations progressed, and the framework involving the PSA was established. On May 4, Lee reported to Devine and Hamzehpour that Patrick and the Steering Committee Group had proposed to settle all claims other than securities claims and enter into the PSA, provided that AFI contributed a certain amount of cash, in exchange for an allowed claim. **Ex. 9019-83 (A. 37).** Lee further reported that Patrick was willing "to do a back-stop deal with [AFI] in the event the plan fails (*i.e.*, only a sale occurs and the releases fail). In other words she is willing to agree to a deal with [AFI] even if the third party releases-settlement through a plan fail." **Ex. 9019-83 (A. 37).**

*May 6, 2012*

On May 6, Devine asked Ruckdaschel to review the recitals in the Settlement Agreements. **RC-9019_00060884 (A. 39).** At 6:30 pm the same day, Devine reported that he had just spoken to Patrick and he asked Cancelliere and Renzi to prepare waterfall numbers assuming "750 [AFI] cash, plus 200 for HFS plus 100 for origination constitute [AFI] 'cash' contribution to the settlement." **Ex. 9019-142 (A. 38).** Devine also stated that Patrick "will be in a much better position to deliver for us if I can give the revised waterfalls, below, to her by bedtime tonight. She walks into the key meeting at 9 am tomorrow." **Ex. 9019-142 (A. 38).**

*May 7, 2012*

On the evening of May 7, Patrick told Lee that "[a]t a defect rate of 22 percent, the stated claim is 10.0 billion. That insulates the settlement substantially from objectors because it is certainly within the realm of reason." **RC-9019_00049153 (A. 41).**

Lee e-mailed a large group, including Devine and Hamzehpour to report on the Patrick conversations and her $10 billion ask. **Ex. 9019-41 (A. 40).** Devine responded requesting several action items from various parties. **Ex. 9019-41 (A. 40).**



**Ex. 9019-41 (A. 40).**

**Ex. 9019-41 (A. 40).**

**Ex. 9019-41 (A. 40).**

**Ex. 9019-41 (A. 40).**

**Ex. 9019-41 (A. 40).**

Devine also had discussions with Patrick on the same evening regarding the calculation of the $10 billion figure. **Ex. 9019-144 (A. 44).** Patrick explained that although the Bank of

-9-

America/Countrywide settlement was for $8.5 billion, the actual claim size against Bank of America was $32 billion at a defect rate of 36%, and her group settled for 25.7 cents on the dollar. **Ex. 9019-144 (A. 44).**

*May 8, 2012*

On May 8, 2012, Devine reported that he spoke with Franklin and told him that "timing is extremely short and that if he wants to improve the chances of the Plan he should get his clients' consent and sign the draft Settlement Agreement and PSA today." **Ex. 9019-86 (A. 42).** Devine also reported that he spoke with Patrick the previous evening and informed her that "her footprint alone is not big enough and that Talcott Franklin ought to sign on." **Ex. 9019-86 (A. 42).**

In a separate e-mail sent to a similar group of MoFo, Kirkland, AFI, and ResCap representatives, Devine stated: "Light bulb moment: Isn't the obvious answer that [Patrick] states her 22% – 11 billion or whatever – and then takes an appropriate haircut (analogous to the 36% to 14% haircut she took in BoA) to get to a lower $ number ($8B?) as stipulated allowed claim?" **RC-9019_00060347-49 (A. 46).**

Devine also e-mailed Lee and AFI's counsel at Kirkland that he and Kirkland were "talking to [D]avis [P]olk and [Wardwell LLP] about disclosures." **RC-9019_00049175-78 (A. 45).**



**Ex. 9019-105 (A. 43).**

**Ex. 9019-105 (A. 43).**

**Ex. 9019-105 (A. 43).**

**Ex. 9019-105 (A. 43).**

**Ex. 9019-105 (A. 43) (emphasis added).**

*May 9, 2012*

On the morning of May 9, Devine e-mailed Lee and said that "as I told you on the phone, AFI will support the $8.7 billion allowed claim. There is no new AFI money. Hard stop at 750 + 200 + 100." **Ex. 9019-147 (A. 53).** On the same day, Patrick e-mailed Lee to inform him that AFI had confirmed that morning that it would support $8.7 billion for the stipulated claim. **RC-9019_00049218 (A. 54).** Later that morning, Patrick e-mailed both Lee and Devine and noted that she understood that ResCap would approach its Board that day for approval of execution and filing of a settlement that included a stipulated claim of $8.7 billion and that AFI

-10-

would not object to the course of action and would execute a plan support agreement. **RC-9019_00049221 (A. 55).** Additionally, Devine e-mailed Cancelliere and asked "what is the defect rate at 8.7 billion, according to her severities etc and according to ours?" **Ex. 9019-117 (A. 52).** Cancelliere responded with the 19.7% figure ultimately presented to the Board. **Ex. 9019-117 (A. 52).;** *see* **also Cancelliere Tr. 196:22-197:5 (A. 5)** ("Q. And using that number, you backed into a defect rate of 19.7 percent, approximately, correct? A. Approximately, yes. Q. And that was done at the direction of [] Devine; is that correct? A. That appears to be correct.").

Also on May 9, Devine e-mailed representatives of ResCap, Kirkland, MoFo, and FTI and stated that he had spoken with Franklin, who was favorably inclined to support and participate in the settlement. **Ex. 9019-87 (A. 51).** In concluding this e-mail, Devine states: "I think he would like to sign something pre-petition. I certainly am not the right person to negotiate that with him. As you recall, we sent him a draft of the settlement agreement and PSA early on. I would appreciate feedback as to next steps." **Ex. 9019-87 (A. 51)***.*

On May 9, ResCap held a special meeting of the Board at 3:00 p.m., attended by the following Board members: Abreu, Mack, Marano, Smith, West, and Whitlinger. **Ex. 9019-61 (A. 50).** Mack and West were independent directors not affiliated with AFI. Ilany, another independent director, was absent from this meeting. *See* **Ex. 9019-61 (A. 50).** Prior to the Board meeting, the Board members received an agenda attaching a three-page presentation (only two pages of which contained any substantive information) discussing the proposed R&W and PLS claims settlement. **Ex. 9019-04 (A. 48).** The presentation appears to have been prepared by Centerview Partners and FTI, and it provided a chart of R&W and PLS claims liability analysis for ResCap's 2004-2007 issuances. **Ex. 9019-04 (A. 48).** According to the chart, the 2004-2007 issuances had an estimated lifetime loss of approximately $44.1 billion, and the $8.7 billion settlement figure represented a 19.72% defect rate. **Ex. 9019-04 (A. 48).** The presentation also provided an executive summary of key assumptions, including that the total AFI settlement would be $1.05 billion, with 10% allocated to Holdco and the remaining 90% allocated between RFC (65%) and GMACM (35%) based on total liabilities. **Ex. 9019-04 (A. 48).** The agenda stated that supporting materials would be distributed "just before the meeting." **Ex. 9019-04 (A. 48).**

The Board received these materials via an e-mail from Lee at 2:38 p.m. on May 9, twenty-two minutes prior to the start of the Board meeting. **Ex. 9019-60 (A. 49); Marano Tr. 146:12-147:11 (A. 2)**; **Whitlinger Tr. 29:11-16, 30:6-12, 31:6-11, Nov. 15, 2012 (A. 6).**

Prior to receiving these materials, Marano was only aware of the "general concepts" of the settlement due to the "extremely fluid" nature of the negotiations which went "down to the wire." **Marano Tr. 148:10-18 (A. 2).** According to the testimony of Whitlinger, the first time the Board learned that the settlement amount would be $8.7 billion was when its members received this documentation twenty-two minutes before the 3:00 p.m. May 9 Board meeting. **Whitlinger Tr. 47:19-48:7 (A. 6).**

At the meeting, the Board discussed the proposed R&W and PLS claims settlement with its advisers, including MoFo, FTI and attorneys from Morrison Cohen LLP, who represented the independent directors. **Ex. 9019-61 (A. 50).** Beginning at 3:00 p.m., the Board spent

-11-

approximately 30 minutes discussing the terms of the settlement before voting to approve the Settlement Agreements with the Institutional Investors. **Whitlinger Tr. 26:24-27:4 (A. 6); Ex. 9019-04 (A. 48).** At the time the Settlement Agreements were approved, ResCap was "having multiple meetings and getting updates on the status of various conversations that were going on with various parties," and there were many things the Board was considering during this period of time. **Whitlinger Tr. 28:9-24 (A. 6).**

The Board seemingly failed to completely understand the defect rate that purportedly drove the settlement amount. According to Mack's testimony, the 19.72% number represents the middle of the ▮▮▮ percent (the Debtors' historical post fund audit defect rate as presented to the Board at the May 9, 2012 Board meeting); but the Board was not informed as to the source of the ▮▮▮ percent range and did not apparently ask. **Mack Tr. 154:16-155:25 (A. 4).** Cancelliere testified that he did not recall the Board being informed that he raised concerns over using the baseline Bank of America defect rate as a comparison in the presentation to the Board. **Cancelliere Tr. 207:13-208:13 (A. 5).**

The Board was also not informed about the Debtors' legal defenses that could lower the proposed settlement amount, such as the potentially applicable statute of limitations, and did not consult with Lipps, counsel who was defending ResCap in the related monoline litigation, and who was experienced in RMBS putback claim litigation. At his deposition, Lipps stated: "I didn't give advice to anybody about the settlement." **Lipps Tr. 98:2-4 (A. 7).** *See also* **Mack Tr. 52:25-53:7 (A. 4)** ("Q. . . . I'm asking, did you ever get an explanation of what litigation defenses might be available to ResCap to defend against these potential claims. A. No."); **Mack Tr. 69:24-70:5 (A. 4)** ("Q. Okay. So no consideration of legal defenses? . . . A. No, I don't think that was part of what my consideration was."); **Whitlinger Tr. 118:10-119:5 (A. 6).** *Accord* **Mack Tr. 67:19-23 (A. 4)** ("Q. Did you get any guidance at the board meeting as to what the number would be, if this claim was actually litigated rather than settled? A. No, not that I recall.").

Notwithstanding the approval, there was confusion as to the actual scope of the settlement. Mack believed that the Settlement Agreements included R&W and securities claims, and at no point in time did Mack learn that securities claims were not included in the settlement amount. **Mack Tr. 108:25-109:11 (A. 4).**

The very night after the Board approved the Settlement Agreements, on May 10, Lee wrote Patrick that "[m]y understanding of our deal is that the $8.7bn number settles all claims arising from the sale and servicing of the RMBS. . . . So when [Martin] tells me an unknown amount of securities claims comes on top of this I get spooked – because **that renders at a deal at $8.7bn illusory. . . . the deal I sold to our board and thought we had. Ex. 9019-151 (A. 57) (emphasis added).**

Patrick responded not to Lee, but to Devine:

> Tim [Devine], I need your help. Gary [Lee] is claiming he was "told" that our clients would release securities claims in the plan. We never told him that and we have never offered or agreed to release securities claims. We've been very clear about that from

-12-

> the very beginning.  It's the basis on which I got my clients to approve it, it's what I've told the Trustees this morning, it's also what I assured Freddie Mac, as you and I discussed:  a release of securities claims is not part of this putback settlement.
>
> [Lee]'s misunderstanding—or his effort to extract something that we never offered and don't have to give—is impeding getting the deal documented.
>
> Would you please intercede with him and tell him to move on?  Insisting on this will destroy any chance of the deal happening.  I understand his determination to try again, but we need to move on.
>
> I'm sorry to bother you, but we need you to intercede here.

**Ex. 9019-150 (A. 56).**

Devine responded:  "I'll try to straighten everything out.  I noticed some strange questions coming from Freddie's counsel this evening.  Let me work on it."  **Ex. 9019-150 (A. 56).**

*May 10, 2012*

In an e-mail to MoFo and Kirkland attorneys dated May 10, but not copied to anyone at ResCap, including Hamzehpour, Devine "straightened it out," and explained the strategy guiding the settlement and the relationship between the settlement agreement and the PSA and his view on the question as to whether or not securities claims were included or excluded:

> [T]he circle is squared at the Plan.  [Patrick] can only get us the "everything-but-securities" settlement release because that is the full extent of her representation.  She has been clear about that. Same as in her BoA/BoNYM work. Etc.  But notice: though her clients don't release securities claims, they sign [PSAs], and the Plan includes very simple comprehensive releases, which of course include third party release of all claims, which of course includes securities.  Presto.  So while she can't represent parties in giving up their securities claims, clients face a choice: either sign up with the settlement to make sure your trust receives monies under the waterfall, in which case you need to sign the [PSA] and support the Plan. And the Plan wipes out all their claims of any sort.  This is the beauty of it.

**Ex. 9019-151 (A. 57).**

There is no evidence that this was ever explained to the Board at least some of whom (*e.g.*, Mack) believed that the original settlement agreement released securities claims.

-13-

In response to this explanation from Devine, Levitt responds to it as a direction, stating that "[c]onsistent with what you state below, we have accepted their revision to the release in the settlement agreement to exclude securities law claims." **Ex. 9019-151 (A. 57).** In a later e-mail, Levitt explains that this draft was for Devine's and others' review, that they had not yet let Patrick know that they were not releasing securities claims. Critically, Levitt, although acting as ResCap's counsel, does not copy Hamzehpour, the Board who had "been sold" the deal by Lee, or any other ResCap representative; the explanatory e-mails were only sent to Devine, his boss, and his outside counsel, as well as others at MoFo. **Ex. 9019-151 (A. 57).**

Later on May 10, Ornstein, at Kirkland, e-mailed attorneys at MoFo and stated that "[a]ny claim that can come back to [AFI]/ResCap needs to be released. Re [AFI], while we are looking for third-party releases in the plan, rather not rely on the plan but cut it off in the settlement." **RC-9019_00050246-48 (A. 58).**

*May 11, 2012*

On May 11, Devine e-mailed Levitt requesting an update regarding whether AFI/ResCap had turned the draft Settlement Agreement and [PSA] over to "Ropes/[Patrick]." **Ex. 9019-153 (A. 59).** Levitt responds that AFI/ResCap has done so and noted that "[w]e are heavily negotiating, but also making progress . . . ." **Ex. 9019-153 (A. 59).**

In a May 10-11 e-mail chain between Ornstein and Martin regarding "[o]ne concept for PSA not captured yet (I don't believe)." **ALLY_0182657-58 (A. 60).** Ornstein stated, "[i]f, in the case of a section 363, the Debtors seek approval of release of Ally via a 9019, Consenting Claimants have to support (Presuming their settlement is in place). Presuming you have no issue with that concept, kindly have your team work it into the draft." When Martin raised doubt regarding the concept, Ornstein responded that "[i]t is a baseline requirement." **ALLY_0182657-58 (A. 60).**

*May 12, 2012*

On May 12, Devine e-mailed representatives of MoFo, Kirkland, and ResCap, asking "[h]as [] Franklin signed on without reservation to support the Plan, including broad third party release of all claims against [AFI] etc including security claims?" **Ex. 9019-154 (A. 61).** Lee responded that "[i]t's complicated" and indicated that Franklin likely would not sign the agreement if the Steering Committee group did not. **Ex. 9019-154 (A. 61).**

Devine responded: "We told her [i.e. Patrick] [that] PSA support – whole hog – is drop dead." **Ex. 9019-154 (A. 61).**

*May 13, 2012*

On Sunday, May 13, Levitt e-mailed Devine and Ornstein, stating that "[Franklin's] clients instructed the trustee a month ago to sue [AFI] -- he confirmed they will change that instruction as part of this agreement. We thought it would be best not to have that information as a whereas or otherwise in the agreement because you [*i.e.*, AFI] don't want that public." **RC-9019_00048597-612 (A. 65).** On the same day, Devine e-mailed Franklin to finalize the Talcott Franklin Group's involvement in the settlement. Devine stated that he was talking with the CEO

-14-

(presumably of AFI) and making a range of final decisions before a 1 p.m. Board meeting, and noted that he "can't expose [AFI] to any claims however remote." **RC-9019_00050824-25 (A. 66).** Two hours later, Devine e-mailed Franklin again, saying "this is my last chance to get you in the deal pre-filing-and in my mind that makes a ton of difference for you and your clients." **RC-9019_00050824-25 (A. 66).**

In a mid-afternoon e-mail to Devine and Levitt, Ornstein stated that Franklin "has refused the indemnification piece. So, think now it is below compromise or tell him to choose between the deal and his third party pursuits." **ALLY_0144343 (A. 23)**.

Devine responded to Ornstein, Levitt, and Ruckdaschel, copying Lee and Princi. Devine states that "I think we need to tell [Franklin] that we can't sign a deal that permits lawsuits to be filed which might logically lead to someone turning to us for ultimate responsibility." **ALLY_0144343 (A. 23)**. Thus, it is evident that unless AFI was satisfied, the Talcott Franklin Group would not be permitted to "sign [on to the] deal." **(A. 23).**

Later that afternoon, Lee e-mailed Patrick and representatives of Kirkland, AFI, and Ropes & Gray discussing proposed Allowed Claim language. In connection with the proposed language, Lee states that, "[t]he notion is that the monolines [sic] claims (other than indemnity) are captured in their entirety in 5.01." **RC-9019_00055348-49 (A. 68).** Patrick confirms this understanding of monoline indemnity claims in an e-mail sent to Levitt, Devine, and others later on the evening of May 13, 2012, stating:

> As . . .discussed this morning: a) the monolines have rights as subrogated certificateholders when they pay claims, those arise under the Trust agreements (which contain that language) so all you need to do for that is to say the Trusts; b) separately, the Credit Enhancers have separate indemnity claims, and those arise under separate agreements. This is exactly what we discussed on the earlier call and it corrects an error in your draft which, otherwise, would have put the indemnity claims in the 8.7 billion. Simple enough to explain and not a reason for this to go sideways.

**Ex. 9019-158 (A. 63).**

At 5:30 p.m., ResCap held a special meeting of the Board, resolved to commence the bankruptcy and, among other things, officially enter into the Settlement Agreements and PSA. **Ex. 9019-61 (A. 50).**

On the evening of May 13, after seeing revisions to the PSA from Patrick, Devine responded that "[i]f there is any discussion about the total $ for allowed claims arising out of these issuances – wrapped, unwrapped, monoline, trust, whatever (excepting securities law claims) – going over $8.7 billion then we have no deal. [AFI] did not, cannot and will not approve it." **RC-9019_00051061 (A. 67).** Later that evening, Ornstein e-mailed Levitt asking whether "indemnity claims are or are not covered by the $8.7 billion?" **Ex. 9019-159 (A. 64).** Levitt responded that she would call Ornstein to explain but that she had spoken to Devine and "it's all good." **Ex. 9019-159 (A. 64).**

-15-

At 9:25 p.m. on May 13, Devine e-mailed representatives of MoFo, Kirkland, Carpenter, Lipps, and ResCap stating:

> No matter what, the allocation details cannot be the least bit ambiguous or tricky on this point: $8.7 billion is the allowed claim for all takers, including monolines as well as trustees. There's no separate bite at the apple for monolines, no matter how they designate their claims. Trustees and monolines need to resolve amongst themselves how the water flows through the trusts. No separate indemnity claims by monolines against some other part of the estate. It's all here. Thanks. If the language does not support this, the actual deal, then we need to fix the language.

**RC-9019_00061255-58 (A. 69).**

*May 14, 2012*

ResCap filed for chapter 11 bankruptcy protection.

Post-Bankruptcy Filing

ResCap has submitted the testimony of an expert witness, Sillman, to justify the $8.7 billion settlement amount. The Sillman analysis was done after the parties had already entered into the Settlement Agreements and after the Debtors had filed these Chapter 11 Cases. ResCap has also offered the testimony of their own defense counsel in RMBS litigation, Lipps, as an expert in support of the reasonableness of the settlement amount. But, Lipps was first asked to review the reasonableness of the settlement in August 2012, **Lipps Tr. 98:9-99:11 (A. 7),** and, like Sillman, only reviewed the Settlement Agreement after it was "executed and submitted," **Lipps Tr. 159:12-19 (A. 7)**. Thus, none of the directors on the Board could have relied on Lipps's analysis in determining for themselves that the settlement amount fell within a reasonable and fair range.

After the filing, the Board was not informed of a subsequent amendment to the Proposed Settlements, and in fact did not approve an interim iteration of the Proposed Settlements that would have eliminated the releases of claims against ResCap, LLC, the holding company. *See* **Mack Tr. 135:9-136:2 (A. 4).** Because this would be a material term to the agreement it should have required Board review and approval: "if such changes are material they will be reviewed with the Board." **Ex. 9019-61 (A. 50).**

### **Role of Timothy Devine, AFI Chief Litigation Counsel in the Settlement Negotiations**

Timothy Devine, AFI's chief litigation counsel, who was involved in representing ResCap in RMBS related matters, appears to have been put in charge of the Settlement negotiations for both ResCap and AFI. Tammy Hamzehpour ResCap's General Counsel was also involved, but less than Devine. For example, Hamzehpour testified that during 2012 she had no phone calls directly with Patrick, while as shown in the chronology, Devine had a series

-16-

of phone calls with Patrick. **Hamzehpour Tr. 90:17-23 (A. 3).** In addition, as reflected in the Chronology and in the exhibits to Erin Brady's Declaration, Devine had much more frequent and substantive e-mail communications with Patrick and Talcott Franklin and ResCap representatives than did Hamzehpour.

ResCap however has improperly attempted to minimize the role of AFI in the pre-petition settlement negotiations, and the facts, as now revealed through discovery. At the September 19, 2012, status conference, the court asked Mr. Princi, Debtors' counsel, if "either Kirkland or AFI ha[d] anyone present during [settlement] negotiations." Mr. Princi responded, that "yes. . . an associate at Kirkland & Ellis who we asked to be there just so that we get the document done. . . . And then prior to that, Your Honor, I wasn't involved, and so I'd have to consult, but I'm being told yes." **Sept. 19, 2012 Hear'g Tr., 38:14-39:1 Docket No. 1616. (A. 85).**

Later in that same conference, counsel for Ally confirmed Debtors' counsel's statement and merely stated that Ally was "kept up to date . . . we were interested . . ." without further elaboration:

> Fifth, you asked what was Ally's role related to the RMBS trust settlement agreement. And I think Mr. Princi had it right. We were kept up to date, primarily Mr. Devine, also, my colleague Noah Ornstein, from Kirkland & Ellis. We were kept up to date; we were interested, and we were kept up to date, primarily by Morrison & Foerster and others.

**Sept. 19, 2012 Hear'g Tr., 45:24-46:4, Docket No. 1616. (A. 85).**

In a November 4, 2012 letter, Docket No. 2051 (A. 70), ResCap stated:

> Before the ResCap entities filed petitions in bankruptcy, AFI's legal department-and, in particular, Tim Devine, AFI's chief of litigation-provided legal advice directly to the Debtors in connection with litigation involving third parties. ResCap's own legal department worked with in-house litigation lawyers from their parent company on RMBS litigation matters.
>
> .    .    .
>
> In anticipation of the filing of bankruptcy petitions, AFI's legal department formally severed all legal connections to the Debtors. Neither Mr. Devine nor any other member of AFI's in-house legal department has had an attorney-client relationship with the Debtors since then. But, in light of this separation, the Debtors and AFI have entered into a joint defense agreement with regard to ongoing litigation, and they continue to cooperate in a limited fashion regarding the defense of cases involving third parties. AFI and the Debtors share common legal interests with regard to the defense of these matters.

>   But AFI's in-house lawyers did not provide legal representation to the Debtors in connection with the RMBS settlement. In the RMBS settlement negotiations, as well as in the negotiations surrounding the related [PSAs], AFI's in-house lawyers represented AFI's interests. The Debtors' interests were represented by the Debtors' own in-house attorneys-Tammy Hamzehpour, John Ruckdaschel, and Bill Thompson-and the Debtors lawyers at Morrison & Foerster.

(emphasis in original).

This letter appears to be inaccurate from a review of the documentation attached to the Chronology, and Devine's own testimony. MoFo (principally Gary Lee) became involved in the negotiations for ResCap in mid-April, 2012. There was no bright line change in Devine's role with respect to the Patrick negotiations after Lee became involved in mid-April 2012. In fact, Devine testified as follows: "My participation with meeting with Ms. Patrick . . . [was] in my capacity as chief counsel for litigation for ResCap . . ." **Devine Tr. 360:15-21 (A. 8)**; "At some point –because it wasn't entirely clear, right. At some point- - look, when we started the discussions with Kathy Patrick, I was representing the ResCap entities in connection with [Patrick's contract claims] . . . I did not represent ResCap at all in connection with this Chapter 11 restructuring . . . [but] I did continue to advise ResCap in connection with plain sort of legal analysis on rep and warrant issues but not so much as would be implicated in connection with the filing." **Devine Tr. 363:12-365:9 (A. 8).**

When asked when he stopped representing ResCap in connection with the Settlement negotiations, Devine responded "I don't know exactly when it was. I understand you would think I would have an exact date and hour. I don't. But because—the reason I don't is because it's probably accurate to say that in some measure I continued to be a resource for the ResCap client even as they retained MoFo to represent them . . . because [I] had a great deal of experience in connection with the claims that were being asserted . . . and because . . . many of us believed that we had a common interest in joint defense." **Devine Tr. 363:12-365:9; 368:25-370:18 (A. 8).**

As described in the April and May sections of the chronology, Mr. Devine remained very heavily involved throughout the negotiations and it is difficult to discern any shifting in roles from the documents or even testimony. Devine continued to take the lead role in discussing the strategic and tactical options, and directing the negotiations right up until the Chapter 11 filing, often without the participation of any other ResCap representative. Devine himself described his own actions and the process even after Lee was involved for ResCap as "driving a deal to conclusion." **Devine Tr. 248:4-249:4 (A. 8)**.

The Board's understanding of the negotiations, and ignorance of Mr. Devine's role is excerpted below from the deposition of John Mack, a ResCap independent director.

-18-

**Deposition Testimony regarding the Board's Understanding of the**
**<u>Settlement Negotiations Process and the role of Timothy Devine and AFI</u>**

      Mack was asked at his deposition about the negotiations with Patrick and her clients.  He was also asked what measures if any the Board took to ensure that there was not a conflict with AFI, which acknowledged it would not retain an equity or other interest in ResCap after the Chapter 11 case.  Mack testified as follows (objections and colloquy of counsel omitted):

Q.    Okay.  I identified what I believe is a risk, which is, which is that to the extent that AFI controlled the negotiations with [] Patrick, their primary objective would be to obtain a settlement, rather than a lower claim.  And I'm asking whether the [B]oard took any steps to protect against that risk.

. . .

A.    Well, I can't speak for AFI.  I can only say that at ResCap, I didn't know AFI was having conversations with [] Patrick.  I had no idea.

Q.    Now, what did you understand --who did you understand was the business person that was taking the leading role in the RMBS settlement negotiations with [] Patrick?

A.    At ResCap, it would have been [] Marano.

Q.    Was your understanding that he was the one taking the lead in the negotiations?

A.    No.

Q.    Who did you understand was taking the lead in the negotiations?

A.    Our advisors.  In this case, it would have been people at, attorneys at MoFo.

Q.    Okay.  And what attorney?

A.    I don't recall, specifically, but I would have to -- I would have to say [] Lee, probably.

Q.    Is it fair to say that you viewed MoFo and [] Lee as the attorneys for ResCap?

A.    Oh, they are.

Q.    What about [Kirkland] and [] Devine, did you view them as your lawyers or as AFI's lawyers or something else?

A.    AFI's lawyers.

. . .

Q    What did you understand [] Devine's position to be?

A.    I don't know [] Devine.

Q.    Okay.  Do you know whether or not he had a role in negotiating the RMBS deal with [] Patrick?

A.    No.

Q.    Did it concern you, if he was the chief of litigation for AFI, and he took the lead in the settlement negotiations and negotiated material terms of the RMBS with [] Patrick, without the involvement of [MoFo]?

. . .

A.    Generically speaking, yes, I would not understand that.

> Q. As of May 2012, was there any real connection between the amount that the ResCap board was going to require AFI to contribute to a Chapter 11 resolution and the size of the RMBS claim that was negotiated with [] Patrick?
>
> A. No
>
> Q. So at least as of May 2012 there was no additional cost to AFI in agreeing to a larger claim from [] Patrick's clients, in return for an AFI release, correct?
>
> .    .    .
>
> A. I'm not sure I understand. I'm not -- I'm ResCap, I'm not part of AFI. So I don't understand why -- I just don't understand.

**Mack Tr. 41:9-45:7 (A. 4)**.