A. 1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                                    Case No.

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

            Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF MARK RENZI

New York, New York

November 7, 2012

1:08 p.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27640

2

1

2

3

4          November 7, 2012

5          1:08 p.m.

6

7          Deposition of MARK RENZI, held

8     at the offices of Kramer, Levin, Naftalis

9     & Frankel, 1177 Avenue of the Americas,

10    New York, New York, pursuant to Notice,

11    before Erica L. Ruggieri, Registered

12    Professional Reporter and Notary Public of

13    the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

100

1                    MARK RENZI

2        A.    Could you repeat exactly the way

3    you said that.

4        Q.    Mr. Devine recommended using 3

5    billion, 4 billion and 6 billion dollar

6    valuations as the low, medium and high

7    valuations, correct?

8        A.    That's what the first sentence

9    says, yes.

10       Q.    And those are the very

11   valuations that appear in the April 25th

12   presentation, correct?

13       A.    Yes, they are.

14       Q.    Okay.  In addition, Mr. Devine

15   recommended in his second paragraph using

16   a $750 million contribution from AFI as

17   opposed to a $1 billion contribution,

18   correct?

19       A.    I see that in the first sentence

20   of his second paragraph.

21       Q.    And the April 25th presentation

22   in fact used a maximum of a $750 billion

23   contribution from AFI, correct?

24       A.    He does use 750 million as one

25   of the, one of the scenarios.

A. 2

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                                Case No.

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

             Debtors.

-----------------------------------x


     H I G H L Y    C O N F I D E N T I A L


     VIDEOTAPE DEPOSITION OF THOMAS MARANO

               New York, New York

               November 12, 2012

                  9:56 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27645

THOMAS MARANO - HIGHLY CONFIDENTIAL

2

1

2

3

4                       November 12, 2012

5                       9:56 a.m.

6

7

8           Deposition of THOMAS MARANO,

9       held at the offices of Kramer, Levin,

10      Naftalis & Frankel, 1177 Avenue of the

11      Americas, New York, New York, pursuant

12      to Notice, before Erica L. Ruggieri,

13      Registered Professional Reporter and

14      Notary Public of the State of New

15      York.

16

17

18

19

20

21

22

23

24

25

THOMAS MARANO - HIGHLY CONFIDENTIAL

93

1   THOMAS MARANO - HIGHLY CONFIDENTIAL

2   negotiation, I didn't ask him, you know,

3   for this specific number.  So I can't -- I

4   just don't know.

5      Q.   I thought you testified a minute

6   ago that you always asked him for more.

7         Are you saying just generally?

8      A.   Whenever I negotiated anything

9   with Michael, I always asked for more.

10      Q.   Okay.  So are you saying that

11   you never had occasion to discuss with

12   Mr. Carpenter the amount that AFI was

13   willing to pay or that you thought should

14   be paid by AFI to ResCap to settle claims?

15      A.   Not in the context of

16   negotiating the deal.  But I had expressed

17   numbers that I felt were, you know, higher

18   than we were able to get.

19      Q.   What numbers did you express?

20      A.   Now, my general view was it

21   probably would take something close to

22   $2 billion to settle this.

23      Q.   And you expressed that to

24   Mr. Carpenter?

25      A.   I expressed that to

THOMAS MARANO - HIGHLY CONFIDENTIAL

94

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    Mr. Carpenter, definitely.

3         Q.    Did you express it to other

4    members of the ResCap board?

5         A.    Yes.

6         Q.    Did you express it to all of the

7    other members of the ResCap board?

8         A.    I was fairly vocal in what I

9    thought it would take to get a deal done.

10   My view is it would take a couple billion

11   dollars, that no one was going to do a

12   deal for 750.

13        Q.    And during what period of time

14   or over what period of time did you

15   advocate for a number in the range of

16   $2 billion from AFI?

17        A.    I wouldn't use the phrase

18   "advocate."  I would say expressed my view

19   of how to get a settlement --

20        Q.    Fine.

21        A.    -- or, pardon me, a deal.  And

22   in that context, I would say, you know,

23   over the spring of this year.

24             MR. KAUFMAN:  Let's mark as the

25        next exhibit, Ally Financial, Inc.'s

THOMAS MARANO - HIGHLY CONFIDENTIAL

113

1   THOMAS MARANO - HIGHLY CONFIDENTIAL

2   aware that certain minimum thresholds of

3   investors had to be aggregated in order to

4   bring a successful claim against ResCap as

5   it related to securities litigation.

6        Q.   So you understood that in order

7   for a claim even to be asserted there had

8   to be at least some aggregation of

9   investors that had some influence over the

10  trusts?

11       A.   Yes.

12       Q.   Did you also understand that

13  there were potential statute of

14  limitations defenses to those claims?

15       A.   Yes.  Under the same basis.

16       Q.   Okay.  And did you also

17  understand that there was a legal

18  requirement that in order to recover on

19  such claims the claimants would have to

20  demonstrate that their losses were caused

21  by breaches of representations and

22  warranties in the governing agreements?

23            MR. JURGENS:  Objection to form.

24            MS. PATRICK:  Objection to form.

25       A.   That's a level of complexity I

THOMAS MARANO - HIGHLY CONFIDENTIAL

115

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        first.

3            Let's mark instead an e-mail

4        dated March 27, 2012, from Mr. Marano

5        to Michael Carpenter, Timothy Devine

6        and Tammy Hamzephour.  Bates numbers

7        00092054 to 2056.

8            (9019 Exhibit 56, e-mail dated

9        March 27, 2012, Bates 00092054 to

10        2056, marked for identification, as of

11        this date.)

12            MS. PATRICK:  ResCap?

13            MR. KAUFMAN:  Yes.

14            MR. PRINCI:  This is 56?

15            MR. KAUFMAN:  I think this is

16        56.

17        Q.    Let me show you what we just

18    marked.  Did you send this e-mail to

19    Mr. Carpenter, Mr. Devine, Ms. Hamzephour,

20    Mr. Solomon and Jeff Brown on March 27,

21    2012?

22        A.    Yes.

23        Q.    And did your e-mail forward to

24    them an e-mail you had received a few

25    minutes earlier from Didric Cederholm of

116

1      THOMAS MARANO - HIGHLY CONFIDENTIAL

2      Elliott Management?

3          A.    Yes.

4          Q.    And Mr. Cederholm's e-mail

5      summarized a telephone conversation he had

6      with you regarding the statute of

7      limitations defenses to put-back claims,

8      correct?

9          A.    Yes.

10         Q.    Mr. Cederholm pointed out,

11     didn't he, that put-back claims are based

12     on alleged breaches of contract and that

13     if the claimed breach is in the reps and

14     warranties made in the contract the

15     claimant must assert the breach within the

16     applicable limitations period?

17         A.    What was the question?

18             MR. KAUFMAN:  Read it back,

19         please.

20             (Record read.)

21         A.    That is what he asserts in this

22     e-mail and it is generally what he

23     discussed on the telephone, yes.

24         Q.    And did you understand from what

25     Mr. Cederholm was telling you that

117

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    applying a six-year statute of limitations

3    that exists in New York, that should in

4    2012 bar any put-back claims based on

5    contracts made before 2006?

6             MR. PRINCI:  Objection as to

7        form.

8        A.    I understood his position and I

9    understood what his opinion was but he was

10   not counsel and I'm not even sure if he's

11   a lawyer.  He's just a guy who bought

12   bonds who is trying to make an argument

13   for what the bonds were worth.  I relied

14   on counsel.

15       Q.    I wasn't asking what you relied

16   or even if you relied on it.  I just

17   wanted to know when you received the

18   e-mail and read it you understood that's

19   what he was saying?

20       A.    I understood that's what his

21   assertion was.

22       Q.    Okay.  So did you understand

23   from what he was telling you, at least

24   from his view, that in light of the

25   statute of limitations there should be

THOMAS MARANO - HIGHLY CONFIDENTIAL

118

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    zero put-back liability for PLS deals done

3    in 2004 and 2005?

4            MR. PRINCI:  Objection as to

5        form.

6        A.    Again, that was his opinion.

7    The reason why I copied, as you can see,

8    the attorneys on the top here was I was

9    interested in their opinion.

10       Q.    Did any of those to whom you

11   sent Mr. Cederholm's e-mail ever get back

12   to you and express a view as to what he

13   said to you?

14       A.    I do believe there was

15   discussion with Tim Devine on this matter

16   and probably Tammy as well.  And my

17   recollection of the discussion was he --

18           MR. PRINCI:  No, don't.

19           THE WITNESS:  Oh, counsel.  I'm

20       sorry.

21       Q.    Shifting gears.  Mr. Marano, you

22   knew that the settlement being negotiated

23   with Kathy Patrick and Talcott Franklin

24   was contingent on their signing plan

25   support agreements with ResCap, didn't

THOMAS MARANO - HIGHLY CONFIDENTIAL

133

1   THOMAS MARANO - HIGHLY CONFIDENTIAL

2   agreement.

3       Q.    Mr. Schrock wrote back to

4   Mr. Nashelsky that AFI would make a cash

5   contribution to the debtors of

6   $750 million and would agree to share the

7   proceeds of any sale of Ally's mortgage

8   servicing rights if the buyer paid at

9   least $1.1 billion and assumed rep and

10  warranty liability associated with those

11  rights, correct?

12      A.    He describes -- he describes

13  what would happen if they did sell the

14  MSR, yes.

15      Q.    Was that consistent with your

16  understanding at the time as to the amount

17  AFI was offering to pay for a settlement

18  of its claims or ResCap's claims against

19  it?

20      A.    Yeah.  I want to be clear.  My

21  recollection was there had been talk of a

22  750 settlement.  Then there was an effort

23  to try and get additional proceeds above

24  the 750.  Keep in mind Mr. Mack and Ilany

25  did most of this negotiation or all this

THOMAS MARANO - HIGHLY CONFIDENTIAL

134

1  THOMAS MARANO - HIGHLY CONFIDENTIAL

2  negotiation.  At one point in order to get

3  more money from Ally, something above 750,

4  there apparently was a discussion of Ally

5  selling their MSR and contributing some

6  portion of the MSR to ResCap.  When this

7  was brought to my attention I thought it

8  was an interesting idea because it added

9  more value to the estate not only from the

10  cash value but it maintained a servicing

11  asset that could have been sold away from

12  the estate.

13         So in looking at the e-mail what

14  I see is an agreement where they either

15  give 750 or what will happen is they will

16  sell their MSR which they believe to have

17  a value of somewhere around a billion one.

18  And the first 850 of proceeds would go

19  to -- the first 850 I believe would go to

20  ResCap.  Then anything between 850 and a

21  billion one would go to Ally.  And then

22  anything between a billion one and a

23  higher number would be split 50/50.  And I

24  was trying to understand if this was a

25  concept -- you know, what this concept was

THOMAS MARANO - HIGHLY CONFIDENTIAL

135

1   THOMAS MARANO - HIGHLY CONFIDENTIAL

2   and if it was going to make it into the

3   plan support agreement.

4        Q.    And did the terms set forth in

5   Mr. Schrock's e-mail in fact become the

6   terms of the agreement between AFI and

7   ResCap?

8        A.    No, I don't believe they did.

9        Q.    What aspects of what's in his

10  e-mail did not?

11       A.    The 750 did.  The sale of the

12  MSR and the allocation of those proceeds I

13  do not believe made it into the plan

14  support agreement.

15       Q.    Do you know why not?

16       A.    I think it became too complex to

17  incorporate into the document.

18       Q.    From what source do you obtain

19  that understanding?

20       A.    It's just, you know,

21  recollection there was debate about could

22  you sell it, could you not sell it, what

23  would it be worth, and in the end

24  Mr. Ilany and Mr. Mack decided, I believe,

25  to take the 750 or Mr. Carpenter decided

THOMAS MARANO - HIGHLY CONFIDENTIAL

146

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        dated May 9, 2012, notifying the board

3        of a meeting on May 9, 2012, at

4        3:00 p.m., attached to which is a

5        several page analysis that was

6        presented at that meeting.  Bates

7        numbers RC 9019_0093180 through 3183.

8            (9019 Exhibit 60, e-mail from

9        Gary Lee dated May 9, 2012, Bates RC

10       9019_0093180 through 3183, marked for

11       identification, as of this date.)

12       Q.    Let me show you what we have

13   marked.  Did you receive this e-mail and

14   the attachment from Mr. Lee on May 9,

15   2012?

16           MR. PRINCI:  Just give me one

17       minute to read the document.

18       A.    Yes.

19       Q.    And Mr. Lee attached or sent his

20   e-mail at 2:38 p.m. on May 9th.  Do you

21   see that?

22       A.    Yes.

23       Q.    And that was 22 minutes before

24   the scheduled meeting at 3:00 p.m., right?

25       A.    Yes.

THOMAS MARANO - HIGHLY CONFIDENTIAL

147

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        Q.    Is that when you first received

3    the supporting materials he attached to

4    his e-mail?

5        A.    I honestly couldn't tell you but

6    I'm sure I got them at that time.

7        Q.    Okay.  Were any other written

8    materials besides the ones attached as

9    part of this exhibit provided to the board

10   in advance of the meeting?

11       A.    Not that I can recall.

12       Q.    Were you and other members of

13   the board told before the May 9th meeting

14   the terms of the proposed settlement with

15   Ms. Patrick?

16       A.    My recollection was that the

17   discussion with Ms. Patrick was fluid up

18   until the board meeting.  And so I

19   can't -- I can't recall, you know, if --

20   you know, it was just fluid.  It was

21   ongoing.  We were apprised periodically.

22   But it was a fluid negotiation.

23       Q.    Wasn't the board being asked to

24   approve the settlement at the May 9th

25   meeting?

THOMAS MARANO - HIGHLY CONFIDENTIAL

148

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2         A.    Yes.

3         Q.    So my question is -- well, let

4    me see if I understood your answer.  Are

5    you telling me that until the meeting was

6    actually held neither you nor the other

7    board members knew the terms that had been

8    negotiated and agreed upon in principal?

9         A.    No, that's not what I'm saying.

10        Q.    Okay.  So my question is did you

11   know the terms of the negotiated deal

12   prior to the May 9th board meeting?

13        A.    I was aware of the general

14   concepts.  Negotiations were going down to

15   the wire.  I don't know if it moved a

16   little bit between my prior knowledge and

17   the time of the board meeting.  It was

18   extremely fluid.

19        Q.    How much prior to the May 9th

20   meeting could you have been aware of the

21   final negotiated terms as fluid as you've

22   described the negotiations?

23             MR. PRINCI:  Objection to form.

24        Q.    What's the earliest you could

25   have been aware?

THOMAS MARANO - HIGHLY CONFIDENTIAL

165

1   THOMAS MARANO - HIGHLY CONFIDENTIAL

2   you within the hour that the board meeting

3   transpired, whether it was 50/50; but

4   there was, you know, a fair amount of

5   time.

6        Q.    The entire meeting, according to

7   the minutes, lasted an hour, correct?

8        A.    Correct.  I just can't tell you

9   whether it was 30 and 30.  I don't recall.

10       Q.    Is it your best recollection

11  that it was split approximately equally

12  between the two matters?

13       A.    I don't recall how much time was

14  spent on each matter.

15       Q.    In the next-to-last paragraph on

16  the first page, the minutes say that

17  during the discussion you requested that a

18  report with separate line items

19  identifying the different settlement

20  amounts be prepared to provide the board

21  with additional details on the

22  settlements.

23            Do you see that?

24       A.    Yes.

25       Q.    Why did you want that

THOMAS MARANO - HIGHLY CONFIDENTIAL

166

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    information?

3        A.    For purposes of clarity.

4        Q.    Clarifying what?

5        A.    To help to make sure the board

6    understood, you know, the components that

7    made up the rep and warrant and PLS

8    settlement.

9        Q.    Was that report provided during

10    the course of the hour meeting?

11        A.    I do not believe it was.

12        Q.    Why didn't you adjourn the

13    meeting until you got the information you

14    were looking for?

15        A.    I think -- my recollection of

16    this meeting is that we had enough of a

17    basis to determine whether or not the

18    settlement agreement was fair, and this

19    was just clarifying details.

20        Q.    Was there a written presentation

21    that accompanied the May 9th meeting?

22        A.    I don't recall if there was a

23    presentation.

24        Q.    Wasn't it the two-page document

25    we looked at before that you got --

197

1   THOMAS MARANO - HIGHLY CONFIDENTIAL

2   release and resolve claims of certain

3   institutional investors; is that correct?

4       A.   Yes.

5       Q.   Do you have an understanding as

6   to whether the RMBS settlement agreement,

7   if approved and becomes effective, would

8   also release claims of financial guarantee

9   providers like MBIA?

10      A.   I'd have to review the document

11  to be sure if that's in there or not.

12      Q.   Okay.  Why don't we look at

13  Exhibit 58 and specifically section 8.02

14  of that agreement.  And I believe that's

15  on page 8, I think.

16      A.   Yes.  Okay, I'm looking at that.

17      Q.   Have you seen section 8.02 of

18  the RMBS settlement agreement previously?

19      A.   Yes, I have.

20      Q.   What is your understanding of

21  the claims of financial guarantee

22  providers that would not be released under

23  the settlement pursuant to section 8.02 of

24  the agreement?

25          MR. PRINCI:  Objection as to

THOMAS MARANO - HIGHLY CONFIDENTIAL

198

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2        form.

3        A.    You know, I believe what this is

4    saying and -- 8.02 basically releases --

5    it says that the financial guarantors are

6    not released by the waivers in Article 7.

7        Q.    I see you are reading the

8    agreement.  I don't want to interrupt.  Is

9    that your answer?

10       A.    Yes.

11       Q.    So do you have an understanding

12   as to whether if the settlement agreement

13   that's Exhibit 58 becomes, is approved by

14   the court and becomes effective that

15   financial guarantee providers like MBIA

16   still will have claims to pursue against

17   the debtors?

18           MR. PRINCI:  Objection, the

19       document speaks for itself but you can

20       answer to the extent you --

21       A.    I believe you can file your own

22   claim.

23       Q.    Do you have an understanding as

24   to what types of claims financial

25   guarantee providers like MBIA could file?

THOMAS MARANO - HIGHLY CONFIDENTIAL

232

1    THOMAS MARANO - HIGHLY CONFIDENTIAL

2    you those updates?

3        A.    I would receive those updates

4    from either Mr. Mack or Mr. Ilany but they

5    would be of a nature of we are talking to

6    Carpenter.

7        Q.    Did you ever tell Mr. Ilany or

8    Mr. Mack that you thought $2 billion was a

9    reasonable number to settle with Ally

10   Financial?

11       A.    Again, just to make sure the

12   record is clear, I communicated to many

13   people that I thought that we would not be

14   able to settle with the bondholders or buy

15   their peace for less than $2 billion.

16   That wasn't necessarily based on the

17   merits of the claims in the end when the

18   work was completed.

19       Q.    I understand but did you tell

20   Mr. Ilany and Mr. Mack that you thought $2

21   billion was a reasonable number?

22           MR. PRINCI:  Objection.  Asked

23       and answered.

24           You can answer it again.

25       A.    They knew my views.

THOMAS MARANO - HIGHLY CONFIDENTIAL

233

1     THOMAS MARANO - HIGHLY CONFIDENTIAL

2         Q.    So they knew?

3         A.      itness nods.

4         Q.     hat was the initial ask by

5     ResCap's board to Ally in connection with

6     the Ally set of negotiations?

7             MR. PRINCI:  Objection to form.

8             You can answer the  uestion if

9        you wish to.

10        A.    I don't actually recall but it

11    was a really big number.  It was much

12    bigger than $2 billion.

13        Q.     as it $3 billion?

14        A.     You know, if I recalled the

15    e act number, it was very big.  Ally's

16    reaction was NF , we'd rather litigate.

17        Q.    Do you recall if it was more

18    than $10 billion?

19        A.    No, I don't think it was over 10

20    billion.

21        Q.    Do you recall if it was more

22    than 5 billion?

23        A.    I would say, you know, it had to

24    be somewhere south of 5.  I just don't --

25    I don't recall the e act number.

A. 3

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

              Debtors.

-----------------------------------x


H I G H L Y    C O N F I D E N T I A L


VIDEOTAPE DEPOSITION OF TAMMY HAMZEPHOUR

New York, New York

November 13, 2012

9:43 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27903

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2

1

2

3

4                    November 13, 2012

5                    9:43 a.m.

6

7

8          Deposition of TAMMY HAMZEPHOUR,

9     held at the offices of Kramer, Levin,

10    Naftalis & Frankel, 1177 Avenue of the

11    Americas, New York, New York, pursuant

12    to Notice, before Erica L. Ruggieri,

13    Registered Professional Reporter and

14    Notary Public of the State of New

15    York.

16

17

18

19

20

21

22

23

24

25

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

26

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2        A.    I believe it was the 21st.  I

3    don't know for sure.

4            MR. KAUFMAN:  Let's mark, as the

5        next exhibit, an e-mail chain on

6        November 19, 2011, Bates number ResCap

7        0000097 and 98.

8            (9019 Exhibit 69, 11/19/11

9        e-mail chain, Bates number ResCap

10       0000097 and 98, marked for

11       identification, as of this date.)

12       Q.    Looking at the e-mail appearing

13   at the top of the first page of the

14   exhibit, you were the author of that

15   e-mail, were you not?

16       A.    Yes.

17       Q.    And does that confirm to you

18   that the meeting with Ms. Patrick was on

19   November 21st?

20       A.    Yes, that's right.

21       Q.    Who attended that meeting?

22       A.    Ms. Patrick was there.  One or

23   two people were with her, I don't remember

24   their names.  I was there, my litigation

25   colleague, David Hagens, was there from

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

27

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2     the Minneapolis office.  Also my capital

3     markets partner, John Ruckdaschel, was

4     there, and Tim Devine from Ally.

5         Q.    How long did the meeting last?

6         A.    Three hours, maybe.  I don't

7     remember exactly.

8         Q.    Can you please describe for me,

9     in as much detail as you can remember,

10    what the discussion was?

11        A.    Ms. Patrick did most of the

12    talking in the beginning of meeting.  She

13    talked to us a bit about who her investor

14    clients were and their holdings that were

15    represented across the spectrum of our

16    securitization deals.  She indicated that

17    they believed they have claims against us

18    and against Ally.

19            We talked about some of the work

20    she had done in preparation for the

21    meeting, and she mentioned that she had

22    reviewed our prospectuses for the deals,

23    that she had reviewed loan and servicing

24    agreements, that she was familiar with the

25    structure and the language and the

28

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2    disclosures as across those deals, and

3    that she had created a matrix of rep and

4    warranty language, basically, among the

5    deals.

6              She spoke a little bit about her

7    pending settlement with Bank of America.

8              She mentioned that she had not

9    notified any of the trustees about the

10   meeting we were having, because we asked

11   if the trustees knew that she was there,

12   and she said no.

13             Talked about her theory of the

14   case.  She felt that she had claims, rep

15   and warranty breaches, also servicing

16   claims; and she felt that they had

17   extended both to GMAC Mortgage and RFC,

18   who were sponsors of different

19   securitizations in which her investors had

20   an interest.

21             And also that they viewed Ally,

22   likewise, as responsible.

23       Q.    Who said what on the ResCap and

24   Ally side, as best you can remember?

25             MR. RAINS:  Objection.  Vague

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

29

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

1

2      and ambiguous.

3         Q.    Can you remember anything that

4      you, Mr. Devine, Mr. Hagens, and

5      Mr. Ruckdaschel said during the course of

6      the meeting?

7         A.    I remember Mr. Ruckdaschel

8      asking her some questions about deal

9      structures, certain provisions in the

10     agreements, and they compared views on

11     what those might be, what the answers to

12     those issues might be.  Tim asked her what

13     she would see as success from a

14     discussion.  She was clearly there asking

15     for a settlement negotiation, and so he

16     asked her what her view of success would

17     look like.

18            We just -- you know, there was

19     the normal back and forth of any meeting.

20     I don't remember anything more specific

21     than that.

22        Q.    When Mr. Devine asked

23     Ms. Patrick what her view of success was,

24     what did she say?

25        A.    That she would like to arrive at

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

30

1  TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2  an agreed settlement with us and would

3  like to start that out by getting access

4  to data and information to help refine

5  their exposure analysis.

6      Q.    Have you now given us your best

7  recollection of everything that was

8  discussed during the course of the

9  November 21st meeting?

10     A.    We talked about next steps and

11  follow-up, in terms of her giving us some

12  specifics of what sort of data she would

13  be looking for and whether or not we could

14  provide it.  Yeah, that's my best

15  recollection of the substance of meeting.

16             MR. KAUFMAN:  Let's mark, as the

17         next exhibit, an e-mail chain between

18         November 30, 2011 and December 5,

19         2011, Bates number ALLY 0209275.

20             (9019 Exhibit 70, e-mail chain

21         between 1/30/11 and 12/5/11, Bates

22         number ALLY 0209275, marked for

23         identification, as of this date.)

24     Q.    The first e-mail in the chain at

25  the bottom of the page, on November 30,

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

38

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2         A.    That's right.

3         Q.    And he explained some of the

4    reasons for the markups, did he not?

5         A.    Yes.

6         Q.    Was Mr. Devine responsible for

7    the markups?

8         A.    I don't remember if he was the

9    only person that provided comments or not,

10   but he had the pen.  He was doing the

11   markup.

12        Q.    And did Mr. Devine assume a

13   similar role in planning how to deal with

14   Talcott Franklin, after he surfaced?

15        A.    Yes.

16             MR. KAUFMAN:  Let's mark, as the

17        next exhibit, an e-mail chain between

18        February 10th and February 28, 2012,

19        Bates numbers ALLY 0210969 through

20        971.  Is that right?  Yeah.

21             (9019 Exhibit 74, e-mail chain,

22        Bates numbers ALLY 0210969 through

23        971, marked for identification, as of

24        this date.)

25        Q.    Let me show you what we have

12-12020-mg   Doc 2820-1   Filed 02/01/13   Entered 02/01/13 19:12:06   Vol. 1: A.1 - A.26   Pg 36 of 258
TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

58

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2    Ms. Patrick take place on April 25, 2012?

3        A.    Yes.

4        Q.    And was a waterfall presentation

5    given to her during that meeting?

6        A.    Yes.

7        Q.    Did the presentation incorporate

8    the 3, 4, 6 numbers recommended by

9    Mr. Devine for the low, medium and high

10   valuations of ResCap's RMBS exposure?

11       A.    Yes, I believe it did.

12       Q.    Did it also incorporate

13   Mr. Devine's recommendation to use

14   $750 million rather than $1 billion as

15   AFI's potential contribution towards a

16   settlement?

17       A.    I believe there were a range of

18   potential AFI contributions reflected.

19   750 would have been the highest one in the

20   range.

21       Q.    Okay.  Who attended the meeting

22   on April 25th with Ms. Patrick?

23       A.    There were a lot of people.

24   Maybe as many as are in this room.  I'll

25   tell you the ones I can remember.  Gary

59

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2    Lee was there, Tim Devine, Mark Renzi from

3    FTI, I believe John Ruckdaschel was

4    present, Ms. Patrick.  At least one, maybe

5    two of her colleagues.  I believe Marc

6    Puntus or Sam Greene, one or the other,

7    from Centerview Partners was there for at

8    least part of the meeting.  I don't

9    remember if they stayed for the whole

10   meeting.  And there may have been one or

11   more MoFo lawyers there, I don't recall.

12       Q.    You were there?

13       A.    Sure.  I was there.  I couldn't

14   tell you who was in the room if I weren't

15   there.

16       Q.    Who led the meeting?

17       A.    Gary Lee.

18       Q.    Did you --

19       A.    From a legal perspective Gary

20   Lee.  There were parts of the meeting that

21   different people were handling so.

22       Q.    What part, if any, did you

23   handle?

24       A.    I didn't take the lead on any of

25   the issues other than we had a short

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

60

1   TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2   discussion on servicing standards.  And we

3   talked about part of Ms. Patrick's

4   interest and that of her clients was in

5   not only achieving a monetary settlement

6   but also a settlement that would provide

7   enhanced servicing standards for their

8   investors' continuing interest in these

9   loans.

10       Q.    Who made the waterfall

11   presentation?

12       A.    I believe Mark Renzi from FTI

13   did that.

14       Q.    What was Mr. Devine's role

15   during the meeting as you understood it?

16       A.    What was his role?

17       Q.    What did he do?

18       A.    He was in the meeting.  I don't

19   remember specific parts of the

20   conversation that he led.  There were --

21   there was discussion around the waterfall

22   and the ranges of recoveries, losses, et

23   cetera, that were the topic of discussion

24   around the settlement.  He participated in

25   that.

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

80

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2        A.    No.

3        Q.    You weren't coordinating that,

4    were you?

5        A.    No.  Gary Lee was coordinating

6    that.

7        Q.    Who was the one who was

8    communicating with Ms. Patrick about the

9    status of the documents?

10            MR. RAINS:  Objection.  Assumes

11        facts not in evidence.

12        Q.    To your knowledge?

13        A.    Gary was communicating with her

14    and Tim as well.  I assume K&E was

15    involved for Ally.

16        Q.    Okay.  Was Mr. Devine

17    coordinating the negotiations with

18    Ms. Patrick concerning the amount of the

19    allowed claims she would get in a

20    settlement?

21        A.    No.  He participated in those

22    discussions.

23        Q.    What was your participation in

24    that discussion?

25        A.    I was present for some of the

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

81

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2    discussions, not all of them, as they

3    shaped up over a week or two of

4    negotiations.  I was aware, I was kept

5    informed by Gary of what was going on and

6    the developments as they were happening.

7        Q.    So if I understand you

8    correctly, the people who were

9    communicating with Ms. Patrick over the

10   amount of the allowed claim would have

11   been Mr. Devine and Mr. Lee?

12       A.    And Mark Renzi and Jeff

13   Cancelliere and other folks who were in

14   the meetings where these things were being

15   discussed.

16       Q.    Okay.

17           MR. KAUFMAN:  Let's mark as the

18       next exhibit an e-mail chain on May 7,

19       2012.  Bates numbers RC 9019_00049157

20       through 59.

21           (9019 Exhibit 85, e-mail chain

22       dated May 7, 2012, Bates RC

23       9019_00049157 through 59, marked for

24       identification, as of this date.)

25       Q.    Please take however long you

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

83

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2        Q.    Do you recall weighing in, if

3    not in writing, orally, in direct response

4    to Mr. Devine's 10:14 p.m. e-mail on

5    May 7th?

6        A.    I don't remember weighing in on

7    it.  He wasn't asking me a question either

8    so.

9        Q.    Okay.

10            MR. KAUFMAN:  Let's mark as the

11       next exhibit a May 8, 2012 e-mail from

12       Mr. Devine.  Bates number RC

13       9019_00047906.

14            (9019 Exhibit 86, May 8, 2012

15       e-mail from Mr. Devine, Bates RC

16       9019_00047906, marked for

17       identification, as of this date.)

18       Q.    Looking at the exhibit we just

19    marked, did you receive a copy of this

20    e-mail?

21       A.    Yes.

22       Q.    And in this e-mail Mr. Devine

23    reported on a conversation he had that

24    morning with Talcott Franklin, correct?

25       A.    Yes.

90

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2         Q.    Who authorized you to sign it?

3         A.    I don't think anyone gave a

4    specific direction to sign it.

5              MR. KAUFMAN:  Just take a few

6         minute break.

7              THE VIDEOGRAPHER:  The time is

8         11:36 a.m. and we are off the record.

9              (Whereupon, there is a recess in

10        the proceedings.)

11             THE VIDEOGRAPHER:  The time is

12        11:55 a.m. and we are back on the

13        record.

14        Q.    Ms. Hamzephour, I just have a

15   couple of questions more.

16        A.    Sure.

17        Q.    I understand that you may have

18   had one or two telephone calls with

19   Ms. Patrick in or around November of 2011

20   in connection with the first meeting with

21   her in Minneapolis.  Did you have any

22   telephone calls with her in 2012?

23        A.    Not one-on-one that I remember.

24        Q.    You have been identified as the

25   debtors -- one of the debtors fact

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

96

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2         A.    That was my understanding.

3         Q.    Why was that method chosen?

4              MR. RAINS:  Can I, just to be

5         clear, you are asking her

6         understanding back in August when she

7         signed this?

8              MR. BULL:  Correct.  As the

9         signatory of the document.

10             MR. RAINS:  I mean, it's been

11        replaced.  That's the point of my

12        question.  You are asking what her

13        understanding was at the time she

14        signed the agreement.  But go ahead.

15             THE WITNESS:  Okay.

16        Q.    Why was this method chosen?

17        A.    The method of allocation was the

18    subject of negotiation between the

19    parties.

20        Q.    Were you part of those

21    negotiations?

22        A.    I was involved in some of them,

23    not all of them.  Not present for every

24    negotiation -- not present for every

25    conversation.

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2    claim.

3         A.    That's right.

4         Q.    Okay.  Do you know if anybody at

5    ResCap made any determination as to

6    whether the legal fees in provision RMBS

7    settlement agreement was -- provided

8    reasonable fees for the Steering

9    Committee's counsel?

10        A.    I don't believe so.

11        Q.    Let's turn to section 8.02.  Are

12   you familiar with -- section 8.02 is

13   entitled Financial Guarantee Provider

14   Rights and Obligations.  Do you see that?

15        A.    Yes.

16        Q.    Are you familiar with this

17   section of the agreement?

18        A.    Yes.

19        Q.    What is your understanding of

20   this section of the agreement.

21        A.    That the releases provided don't

22   act to release claims of financial

23   guarantee providers.

24        Q.    Is that any claims of financial

25   guarantee providers or certain claims?

TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

122

1    TAMMY HAMZEPHOUR - HIGHLY CONFIDENTIAL

2         A.    If we don't have -- in my view,

3    in my understanding if we don't have a

4    settlement with the insurance provider

5    this document does not release any claims

6    that those insurance providers have

7    against the debtors with respect to those

8    participating trusts.  Is that what you

9    are --

10        Q.    That's --

11        A.    I'm trying to understand.  I

12   think that's what you are asking.

13        Q.    That is what I'm asking.  And

14   that is -- that is -- if that's your

15   understanding, that's what I want to know.

16        A.    That's my understanding.

17             MR. SIDMAN:  Give me one second.

18             THE WITNESS:  Okay.

19             MR. RAINS:  Somebody got mad at

20        that answer and hung up on you.

21             MR. SIDMAN:  Just give me one

22        second.  I want to look at my notes.

23             THE WITNESS:  Sure.

24             MR. SIDMAN:  Can we go off the

25        record just for one second.

A. 4

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------x

In Re:                                Case No.

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

            Debtors.

----------------------------------x

VIDEOTAPE DEPOSITION OF JOHN MACK

New York, New York

November 14, 2012

9:53 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27647-A

2

1

2

3

4          November 14, 2012

5          9:53 a.m.

6

7

8          Deposition of JOHN MACK, held at

9     the offices of Kramer, Levin, Naftalis

10    & Frankel, 1177 Avenue of the

11    Americas, New York, New York, pursuant

12    to Notice, before Erica L. Ruggieri,

13    Registered Professional Reporter and

14    Notary Public of the State of New

15    York.

16

17

18

19

20

21

22

23

24

25

34

1                    JOHN MACK

2      and negotiated the $8.5 billion

3      settlement.  Let the games begin."

4              And you see it attaches a letter

5      from a woman by the name of Kathy Patrick.

6          A.    Uh-hum.

7          Q.    And so my question is, first,

8      have you ever seen this e-mail or letter

9      before?

10         A.    No.

11         Q.    Were you told, before joining

12     the ResCap board, about Ms. Patrick's

13     demand?

14         A.    No.

15         Q.    Were you told the games had

16     begun?

17         A.    No.

18             MR. PRINCI:  Objection as to

19         form.

20         Q.    At what point after joining the

21     ResCap board did you learn about this

22     demand and about this issue?

23         A.    Well, Ms. Patrick's name came

24     up, it would have been in late April, mid

25     to late April or early May of this year,

35

1              JOHN MACK

2      before the petition was filed.

3           Q.   So between -- between

4      October 19th, 2011, when this e-mail,

5      which is Exhibit 92, is dated, and April

6      or May, you never heard that there was a

7      demand being made for a settlement of the

8      RMBS claims?

9               MR. PRINCI:  Objection as to

10          form.

11              MR. PIEDRA:  Objection to form.

12          A.   Yeah, I think that's correct.  I

13     don't think I knew about it, other than,

14     broadly speaking, that we would have been

15     in conversations with some investors; but

16     beyond that, no, nothing specific.

17          Q.   When you say --

18          A.   And nothing with her name

19     attached it to until very late in the

20     process.

21          Q.   So you knew nothing specific and

22     nothing with her name attached to it,

23     until basically April, May; is that fair?

24          A.   Correct.

25          Q.   What did you know earlier than

1                    JOHN MACK

2      second day.  I was introduced.

3           Q.    So I take it it's fair to say

4      you never directly participated in any of

5      the negotiations of that settlement?

6                MR. PIEDRA:  Objection to form.

7           A.    That is correct.

8           Q.    And did you indirectly

9      participate in some way in those

10     negotiations?

11               MR. PRINCI:  Objection as to

12          form.

13          A.    No.

14          Q.    Okay.  When you learned about

15     them in April or May, at that point it

16     was -- is it fair to say, was it

17     understood by the ResCap board that any

18     resolution of these claims for a

19     settlement would have to be accomplished

20     in a Chapter 11 proceeding?

21               MR. PIEDRA:  Object to the form.

22          A.    They would have been part of the

23     bankruptcy process.  I think I can say

24     that --

25          Q.    Okay.

41

1                   JOHN MACK

2    steps to protect against the risk that I

3    just identified?

4            MR. PIEDRA:  Objection to form.

5            MR. PRINCI:  Objection as to

6        form.

7        A.    Could you -- I'm not sure I

8    understand your question.

9        Q.    Okay.  I identified what I

10   believe is a risk, which is, which is that

11   to the extent that AFI controlled the

12   negotiations with Ms. Patrick, their

13   primary objective would be to obtain a

14   settlement, rather than a lower claim.

15   And I'm asking whether the board took any

16   steps to protect against that risk.

17           MR. PRINCI:  Objection, assumes

18       a facta not in evidence.  Object to

19       the form.

20           But if you understand the

21       question, you may answer.

22       A.    Well, I can't speak for AFI.  I

23   can only say that at ResCap, I didn't know

24   AFI was having conversations with

25   Ms. Patrick.  I had no idea.

42

1            JOHN MACK

2       Q.    Now, what did you understand --

3   who did you understand was the business

4   person that was taking the leading role in

5   the RMBS settlement negotiations with

6   Ms. Patrick?

7       A.    At ResCap, it would have been

8   Tom Marano.

9       Q.    Was your understanding that he

10   was the one taking the lead in the

11   negotiations?

12       A.    No.

13       Q.    Who did you understand was

14   taking the lead in the negotiations?

15       A.    Our advisors.  In this case, it

16   would have been people at, attorneys at

17   MoFo.

18       Q.    Okay.  And what attorney?

19       A.    I don't recall, specifically,

20   but I would have to -- I would have to say

21   Gary Lee, probably.

22       Q.    Is it fair to say that you

23   viewed MoFo and Gary Lee as the attorneys

24   for ResCap?

25       A.    Oh, they are.

43

1          JOHN MACK

2     Q.    What about K&E and Timothy

3  Devine, did you view them as your lawyers

4  or as AFI's lawyers or something else?

5          MR. PRINCI:  Objection as to

6     form.

7     A.    AFI's lawyers.

8          MR. PRINCI:  Excuse me one

9     second.  Just pause for one second,

10    Tom.

11         MR. MOLONEY:  Wait a second.

12    You can just tell them that he needs

13    to wait -- I'll put it on the record

14    that you need to wait to allow

15    Mr. Princi to state his objection.

16         I think we should note now that

17    counsel is conferring with the

18    witness, and it's not appropriate.

19    Q.    What did you understand Timothy

20  Devine's position to be?

21    A.    I don't know Timothy Devine.

22    Q.    Okay.  Do you know whether or

23  not he had a role in negotiating the RMBS

24  deal with Ms. Patrick?

25    A.    No.

44

1                    JOHN MACK

2        Q.    Did it concern you, if he was

3    the chief of litigation for AFI, and he

4    took the lead in the settlement

5    negotiations and negotiated material terms

6    of the RMBS with Kathy Patrick, without

7    the involvement of Morrison & Foerster?

8              MR. PIEDRA:  Objection to form.

9              MR. PRINCI:  Objection to form.

10             MR. MOLONEY:  Noted.

11       Q.    You may answer.

12       A.    Generically speaking, yes, I

13   would not understand that.

14       Q.    As of May 2012, was there any

15   real connection between the amount that

16   the ResCap board was going to require AFI

17   to contribute to a Chapter 11 resolution

18   and the size of the RMBS claim that was

19   negotiated with Ms. Patrick?

20       A.    No.

21       Q.    So at least as of May 2012,

22   there was no additional cost to AFI in

23   agreeing to a larger claim from

24   Ms. Patrick's clients, in return for an

25   AFI release, correct?

45

1              JOHN MACK

2          MR. PIEDRA:  Objection to form.

3          MR. PRINCI:  Objection to form.

4      A.    I'm not sure I understand.  I'm

5  not -- I'm ResCap, I'm not part of AFI.

6  So I don't understand why -- I just don't

7  understand.

8      Q.    That's okay.  Let's change

9  topics.

10          As a member of the ResCap audit

11  committee, what involvement, if any, did

12  you have in reviewing AFI or ResCap group

13  financial statements?

14      A.    We met at least quarterly to

15  review that quarter's financial

16  statements.

17      Q.    And I take it when you joined

18  the board in 2011, ResCap was no longer

19  filing public financial statements itself,

20  correct?

21      A.    Correct.

22      Q.    It was still preparing financial

23  statements, correct?

24      A.    Correct.

25      Q.    Was it preparing stand-alone

53

JOHN MACK

1

2          I'm asking, did you ever get an

3     explanation of what litigation defenses

4     might be available to ResCap to defend

5     against these potential claims?

6          MR. PIEDRA:  Object to the form.

7     A.    No.

8     Q.    For example, were you ever

9     informed that a number of the claims could

10    be eliminated, due to statute of

11    limitations defenses?

12         MR. PRINCI:  Just to the extent

13         that you were informed of any such

14         thing by counsel, then I'm going to

15         direct you not to answer.

16         MR. MOLONEY:  Okay.  I'm just

17         withdrawing my question.  We will go

18         on to another area.

19    Q.    Now, if we look at the -- before

20    we leave this page, if we look at the

21    number 400, that's -- this estimate

22    includes securities litigation, right?

23    A.    Yes, it says so.

24    Q.    Okay.  Thank you.

25         And now, going on in the same

66

1                    JOHN MACK

2     $4 billion was an estimate, but this was a

3     negotiated number, the 8.7?

4          A.    Correct.

5          Q.    Now, it wasn't determined by a

6     court that ResCap was liable for $8.7

7     billion, right?

8          A.    That is correct.

9          Q.    So it was just determined by two

10    human beings who negotiated a number, $8.7

11    billion, right?

12               MR. PRINCI:  Objection as to

13         form.

14         A.    It was a negotiated number.

15         Q.    Who were the two people who

16    negotiated the number?

17               MR. PRINCI:  Objection as to

18         form.

19         A.    Our advisors from MoFo, and

20    Kathy Patrick, representing the investors.

21         Q.    Now, the person who was

22    representing you, your advisor for MoFo,

23    you would think that they should negotiate

24    a number that's consistent with what they

25    think are their potential liabilities, if

1              JOHN MACK

2      they go to court, right?

3              MR. PIEDRA:  Objection to form.

4              MR. PRINCI:  Objection as to

5      form.

6      A.    No.

7      Q.    No?  Why?

8      A.    They can negotiate a number that

9      is in the best interests of trying to get

10     a transaction accomplished.

11     Q.    Even if it doesn't bear any

12     resemblance to what the outcome would be,

13     if the case was actually tried in court?

14             MR. PIEDRA:  Objection to form.

15     A.    I don't know that it would or

16     wouldn't bear any resemblance to what the

17     actual number would be.  I couldn't

18     predict the future like that.

19     Q.    Did you get any guidance at the

20     board meeting as to what the number would

21     be, if this claim was actually litigated

22     rather than settled?

23     A.    No, not that I recall.

24     Q.    So this was just a number needed

25     to do a transaction, is what you are

69

1                        JOHN MACK

2        A.     Not that I recall at the time.

3        Q.     Okay.  Let's see if we can

4   understand whether it's lower than the

5   BofA settlement.

6              Before we get there, the defect

7   rate assumed for this settlement was

8   19 percent; is that correct?

9        A.     19.72 is what it says, yes.

10       Q.     ████████████████████████████████

    ██ ████████████████████████████████████████

    ██ ████████████████████████████████████████

13       A.     That's what I said, yes.

14       Q.     Okay.  And now, when we looked

15  at Exhibit -- the prior exhibit, there was

16  also a further discount of the number for

17  legal defenses.

18             Do you recall seeing that?

19       A.     Uh-hum, uh-hum.

20       Q.     Was a legal defense discount

21  applied to the number that's on this page?

22             MR. PIEDRA:  Object to the form.

23       A.     Not that I recall.

24       Q.     Okay.  So no consideration of

25  legal defenses?

70

                    JOHN MACK

1

2          MR. PIEDRA:  Objection to form.

3          MR. PRINCI:  Objection.

4     A.    No, I don't think that was part

5  of what my consideration was.

6     Q.    Now, you say it was less than

7  the BofA settlement; is that what you are

8  telling us?

9     A.    The defect rate, our defect

10  rate.

11     Q.    I know your defect rate.  But

12  the settlement amount actually was,

13  ironically, more than the BofA settlement,

14  right?

15          MR. PIEDRA:  Objection to the

16     form.

17     Q.    BofA settled for $8.5 billion,

18  we saw in the prior exhibit.

19          MR. PIEDRA:  Do you want an

20     answer to the last question?

21          MR. PRINCI:  Which question do

22     you want him to answer?

23     Q.    The settlement amount proposed

24  to be paid by ResCap is actually more than

25  the amount proposed to be paid by BofA to

1              JOHN MACK

2    counter.  We did not negotiate in that

3    meeting.

4         Q.    Okay.  Let's see if we can put a

5    time and place on this meeting.

6              MR. MOLONEY:  Do we have this?

7         Is this part of the exhibits?

8         Q.    Would you look at Exhibit 98 in

9    your pile.

10             (9019 Exhibit 98, meeting

11        minutes, Bates RC40020213-214, marked

12        for identification, as of this date.)

13        A.    Uh-hum.

14             MR. PRINCI:  Excuse me.  Just

15        give me one second.  Bear with me.

16        Okay, Mr. Moloney.

17        Q.    Did you attend this meeting on

18   or about January 25, 2012?

19        A.    Yes, I did.

20        Q.    And did you -- if you look at

21   the minutes of meeting there's a reference

22   under Executive Session to the fact that

23   there's a presentation given to the ResCap

24   board essentially about potential claims

25   against Ally and an indication of certain

92

1                        JOHN MACK

2       materials to provide to the board in

3       advance of the meeting.

4              Do you see that?

5       A.    Yes.

6       Q.    Did you obtain those materials?

7       A.    If they were provided to the

8       board I did.

9       Q.    Did you keep those materials?

10      A.    No.

11      Q.    What did you do with them?

12      A.    I left them in the board room.

13      Q.    You left them in the board room

14      when you left the meeting?

15      A.    Yes.

16      Q.    On a go-forward basis when you

17      were negotiating with Mr. Carpenter did

18      you need to consult the materials from

19      time to time?

20      A.    No.

21      Q.    Is it fair to say your

22      negotiations with Mr. Carpenter really had

23      nothing to do with the legal arguments in

24      those materials?

25              MR. PRINCI:  Objection as to

93

1                    JOHN MACK

2         form.

3         A.    Yes.  I'm not going to negotiate

4    on legal issues.

5         Q.    Okay.  And then there's a

6    reference here to a meeting that occurs

7    with Mr. Carpenter right after this board

8    meeting.  This board meeting starts at

9    12:25 and there's a reference to a meeting

10   with Mr. Carpenter right after it, right?

11   It says approximately 3:00 the meeting was

12   adjourned.  At approximately --

13        A.    Yes, I see that.

14        Q.    Half hour meeting with

15   Carpenter.  Is that the meeting -- does

16   that kick it off, the process of these

17   negotiations?

18        A.    No.

19        Q.    Okay.  When was the kick-off

20   meeting?

21        A.    It was after this.

22        Q.    Okay.  I'm going to show you a

23   document which we have marked as

24   Exhibit 99.

25             (9019 Exhibit 99, series of

96

1                    JOHN MACK

2    recollection what Mr. Carpenter said at

3    this meeting.  What did he say in the

4    presentation?

5         A.    Mr. Carpenter made a

6    presentation in which he outlined there

7    were three possible paths forward.  One

8    path was just to do a free fall 363

9    bankruptcy.  There was a middle path,

10    which I don't really recall many of the

11    details.  And the third path was if we

12    could achieve a plan settlement, there

13    would be a greater contribution by Ally in

14    that process.  All three involved

15    bankruptcy.

16         Q.    Okay.  And in connection with

17    that third alternative, did he indicate

18    what the level of contribution would be?

19         A.    Yes.  He had -- he proposed some

20    numbers and some ancillary items such as a

21    subsidiary which had some cash in it.

22    That subsidiary it turns out had

23    absolutely no value to ResCap.  And so,

24    you know, it wasn't part of the, it wasn't

25    part of the equation.

97

JOHN MACK

Q.    Now, the proposal.  What was the

numbers that he gave?

A.    As I recall, he had a three --

$350 million number.  And again, there

were some ancillary items which in our

view ultimately didn't really have

value -- add value, so.

Q.    Did you take notes at this

meeting?

A.    Probably not.

Q.    Did you report what was, what

you learned at the meeting to the other

directors or anyone else?

A.    Yes.

Q.    And in what format?

A.    Verbal conversation with our

attorneys at MoFo.

Q.    So you reported verbally to the

attorneys at MoFo.  Anything else?

A.    Well, Mr. Ilany was with me so

the two of us made the report.  We walked

back up the street to MoFo's office to do

that.

Q.    And were the other directors

1              JOHN MACK

2       Q.    So what -- what happens next?

3             MR. PRINCI:  Objection as to

4       form.

5       A.    We discussed the proposal.

6    We -- there were -- again there was some

7    items in the proposal that he made that

8    were of no value as we -- as we viewed the

9    situation.  And so at a subsequent meeting

10   Jonathan and I went back.  Again, it was

11   the same four principals and only the four

12   principals.  We went back with a

13   counterproposal seeking to emphasize that

14   we liked and preferred the third

15   alternative, that is I'm going to use the

16   word "elegant," the more elegant process,

17   involving a plan.

18      Q.    And what was your

19   counterproposal?

20      A.    Well, we wanted -- we pointed

21   out why we didn't contribute or didn't

22   assign value to certain parts of his

23   proposal.  We discussed the need to have

24   a, you know, reasonable but I don't

25   believe we were specific as to number, a

100

JOHN MACK

1

2    reasonable headline number in terms of

3    achieving credibility.  And we then

4    encouraged, the four of us, encouraged the

5    advisors who were actually sitting in the

6    next room to work on an agreement that

7    mirrored that.

8        Q.    Now, what did you say in terms

9    of the -- the reasons for a reasonable

10   headline number?  What reasons did you

11   give to them in support of why it was in

12   their reason for a reasonable headline

13   number?

14       A.    Well, it would have been very

15   simple.  If the plan was going to have any

16   credibility at all, then we needed a

17   reasonable headline number.  Otherwise

18   we'd just get mired into a process which

19   isn't going anywhere and which would in

20   fact not ascribe value to the estate and

21   to the creditors.

22       Q.    Okay.  Now when you instructed

23   the lawyers to -- to work on an agreement

24   they weren't supposed to be working on the

25   numbers, they were just working on the

108

1             JOHN MACK

2     apples and oranges.  Let's see if we can

3     ████████████   █████████████████

      ██████████████████████████████

      ██████████████████████████████

      ████████████████████

7         A.    Okay.

8         Q.    So just kind of retrace it.

9         A.    To my knowledge, no part of the

10    Ally settlement has been allocated to

11    anybody.

12        Q.    You certainly as a board didn't

13    make a judgment that -- that weighing the

14    relative merits of the claims of -- that

15    belonged to ResCap LLC versus other claims

16    that might belong to other entities that

17    its claims were only worth 10 percent of

18    the claims belonging to other entities,

19    right?

20             MR. PRINCI:  Objection as to

21        form.

22        Q.    You didn't make that judgment,

23    right?

24        A.    We did not make that judgment.

25        Q.    Now, did you understand that as

109

                        JOHN MACK

1

2     part of the settlement that was approved,

3     the $8.7 million settlement, that you were

4     also settling securities claims?

5         A.    Yes, it was reps and warranties

6     and securities claims.

7         Q.    At any point in time did you

8     ever learn that securities claims were not

9     being picked up by this $8.7 billion

10    settlement?

11        A.    No.

12        Q.    So as far as you are concerned,

13    the board has not approved the deal that

14    does not resolve securities claims as part

15    of the $8.7 billion payment?

16            MR. PRINCI:  Objection as to

17        form.

18        A.    This is a slightly technical

19    matter.  I don't know.

20        Q.    Okay.

21            (9019 Exhibit 100, e-mail with

22        attachment, Bates RC 40088324-337,

23        marked for identification, as of this

24        date.)

25        Q.    Please look at Exhibit 100 in

115

1                    JOHN MACK

2        Q.    You wouldn't -- you wouldn't

3    assign a 500 million value, right?

4              MR. PRINCI:  Objection as to

5        form.

6        A.    I don't think it was that much.

7        Q.    No.  And they didn't purchase

8    through credit bid the assets secured by a

9    revolver, right?

10       A.    No.  In the end we did a

11   different structure.  Those were assets

12   that went to -- they did provide -- I'm

13   sorry, they did provide a revolver as part

14   of the facility.  They just didn't

15   purchase the assets necessarily.

16       Q.    Now, did Mr. Marano indicate

17   around this point in time that he thought

18   $2 billion was required as the headline

19   number to resolve this problem?

20       A.    I'm sorry, I didn't hear you.

21       Q.    Did Mr. Marano indicate to you

22   that he thought at around this point in

23   time April of 2012 that he thought

24   $2 billion was the headline number that

25   the settlement needed to have in order to

116

JOHN MACK

1

2   have credibility?

3      A.    I don't think I would

4   characterize it that way but I do believe

5   that he said, I know that he said

6   $2 billion but I don't believe I would

7   characterize it that he said that's what

8   it would need to be.

9      Q.    How would you characterize it?

10      A.    That it would be desirable.

11      Q.    And did you disagree with him?

12      A.    No.  I didn't disagree with him.

13      Q.    Why did you agree with a

14   settlement that was worth less than half

15   that amount?

16      A.    Well, I didn't -- just because I

17   didn't disagree with him doesn't mean I

18   don't think that the number we got was the

19   fair number.  I think -- I think his

20   number was -- could also be deemed to be

21   fair.  But I'm not saying that that was

22   the only number that it could be.

23      Q.    Okay.  There's a discussion down

24   here that the reps and warranties claims

25   were estimated at 4.1 billion.  Do you see

130

1                    JOHN MACK

2        A.    No, I don't recall.

3        Q.    Do you know why Marano would

4    feel that he would need an explanation as

5    to what the amount was at that point in

6    time?

7             MR. PRINCI:  Objection as to

8        form.  Lack of foundation.

9        A.    No.

10       Q.    Let's go to exhibit, next

11   exhibit which is exhibit --

12       A.    105?

13       Q.    Yes.

14            (9019 Exhibit 105, two e-mails,

15       Bates ALLY 0141967, marked for

16       identification, as of this date.)

17       A.    Uh-hum.

18       Q.    It's an e-mail, two e-mails the

19   top one is from Dan Soto dated May 8,

20   2012.  The bottom one is from Jeff Brown

21   dated May 8, 2012.  And I want to focus on

22   the penultimate paragraph of the e-mail,

23   of the bottom e-mail from Jeff Brown.  It

24   says "Also I think, even as Mike once

25   shared to you and Jim, originally ResCap

131

1                    JOHN MACK

2    presented an 8 or $9 billion claim against

3    Ally that is now totally gone."

4           Do you see that statement?

5        A.   Yes.

6        Q.   What knowledge, if any, do you

7    have of an 8 to $9 billion claim that

8    ResCap presented to Ally?

9        A.   I would have to speculate that

10   in an early meeting between MoFo and K&E,

11   that that would have been a number that we

12   presented them.

13       Q.   Did MoFo -- did you ever present

14   an 8 or $9 billion ask?

15       A.   Did I?  No.

16       Q.   Why not?

17           MR. PRINCI:  Objection as to

18       form.

19       A.   These are legal matters.  I'm

20   not going to discuss legal matters with

21   principals.

22       Q.   Okay.  So you weren't settling

23   legal claims?

24       A.   No.

25           MR. PRINCI:  Objection as to

135

1                    JOHN MACK

2              Now, that's why this, the date

3     on this e-mail makes me question whether

4     this was the final.

5         Q.    Okay.  You approved the final

6     deal?

7         A.    We approved the final deal.  We

8     didn't approve any interim deals.

9         Q.    There was an interim deal that

10    provided for a Holdco, eliminated your

11    release and provided for a Holdco

12    election, a potential claim of

13    $1.7 million?

14        A.    I don't recall.

15        Q.    You didn't approve that deal?

16        A.    I don't recall.

17        Q.    Why did you approve any change

18    from the original deal that allowed ResCap

19    LLC to obtain a release?

20             MR. PRINCI:  Objection as to

21        form.

22        A.    Again, you are into a little bit

23    of a legal issue, and I relied on my

24    advisors with regard to the legal issues.

25    The economics didn't seem to change, to

136

1               JOHN MACK

2    me.

3        Q.   Well, from the perspective --

4    going back to the exhibit we looked at

5    earlier, the May 9th exhibit.  Can you

6    pull that up again?

7        A.   May 9th?

8        Q.   Yeah.

9        A.   What exhibit?

10            MR. PRINCI:  Which exhibit

11       number?

12            MR. MOLONEY:  It's the board

13       meeting.  It's Exhibit Number 95.

14       A.   Okay, I have 95.

15       Q.   Look at the executive summary,

16   key assumptions.

17            Do you see that?

18       A.   Yes.

19       ██        ██████████████████████

██   ████████████████████████████

██   ███████████████████████

22       A.   Yes.

23       Q.   That's the senior unsecured

24   notes, that's the bondholders.

25            Do you understand that?

148

                    JOHN MACK

1

2       Q.    Mr. Mack, I'm Harrison Denman

3   from White & Case, for the ad hoc group.

4           Earlier you mentioned that you

5   perceived your role as on behalf of the

6   consolidated group of ResCap debtors; is

7   that correct?

8       A.    Correct.

9       Q.    And how was that perception of

10  yours informed?

11      A.    Generally speaking, I mean

12  that's -- I am an independent director,

13  that is my profession now.  And I take

14  that view with all of my clients or the

15  companies that I work for, that is, I am a

16  director of the consolidated company, and

17  that is the company that I have the

18  fiduciary duty to.

19      Q.    So it was based --

20      A.    And that company is responsible

21  for all of its subsidiaries.

22      Q.    Okay.  So that conclusion was

23  not reached as the result of discussions

24  with counsel?

25      A.    No.  No, it's a view I hold

154

1            JOHN MACK

2        Q.    And I don't mean to misstate any

3    of the testimony, but I think you

4    testified that you understood that this

5    essentially presented the $8.7 billion

6    amount as a percentage of the total losses

7    based on a defect rate of 19.72 percent.

8            Is that accurate?

9        A.    Yes.

10       Q.    So you understood in this

11   presentation that the $8.7 billion number

12   was derived arithmetically, essentially,

13   based upon a percentage of the total

14   estimated loss?

15       A.    Yes.

16       Q.    Did anybody explain to you,

17   either before or at the board meeting,

18   where that 19.72 percent defect rate came

19   from?

20       A.    It's 19.72 number, as I recall,

21   ████████████████████████████

     ████████████████████████████

     ██████████████████████████

     ████████████████████████████

     ██████████   ████████████████

155

JOHN MACK

1

2      negotiated number, so.

3          Q.    The defect rate was a negotiated

4      number?

5          A.    The utilization of the 19.72

6      leading to the 8.7 billion was negotiated.

7          Q.    Who negotiated a defect rate?  I

8      thought that was based on some historical

9      analysis.

15         A.    No.

16         Q.    There's reference in note 3 to a

17     historical post-fund audit.

18             Was there no explanation given

19     as to what that audit might have consisted

20     of?

21         A.    No, we didn't discuss that in

22     detail.

23         Q.    And did anybody ask, during the

24     course of the meeting, what that meant?

25         A.    No.  I don't recall.

A. 5

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re:                                 Case No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

             Debtors.

------------------------------------x




VIDEOTAPE DEPOSITION OF JEFFREY CANCELLIERI

New York, New York

November 14, 2012

2:03 p.m.




Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27647-B

2

1

2

3

4                              November 14, 2012

5                              2:03 p.m.

6

7

8                   Deposition of JEFFREY

9          CANCELLIERI, held at the offices of

10         Kramer, Levin, Naftalis & Frankel,

11         1177 Avenue of the Americas, New York,

12         New York, pursuant to Notice, before

13         Erica L. Ruggieri, Registered

14         Professional Reporter and Notary

15         Public of the State of New York.

16

17

18

19

20

21

22

23

24

25

20

1                     JEFF CANCELLIERI

2          Q.    What do you mean by, "if there

3     was activity"?

4          A.    The reserving logic is for

5     actual repurchase claims that have been

6     received.  It's not related to a

7     litigation reserve.

8          Q.    Have you ever had a role at

9     ResCap in determining reserves with

10    respect to litigated claims?

11         A.    No.

12         Q.    Have you ever reported to Todd

13    Kushman?

14         A.    Yes.

15         Q.    Todd Kushman is at Ally, is he

16    not?

17         A.    Yes.

18         Q.    When did you report to

19    Mr. Kushman?

20         A.    November of 2011 through around

21    April of 2012.

22         Q.    Did your reporting structure

23    change after April of 2012?

24         A.    Yes.  I currently report to Jim

25    Whitlinger.

21

1                    JEFF CANCELLIERI

2          Q.    And where is Mr. Whitlinger

3     employed?

4          A.    ResCap.

5          Q.    Okay.  Why -- do you know why

6     your reporting structure changed in

7     April 2012?

8          A.    It had to do with the bankruptcy

9     proceedings.

10         Q.    What do you mean by that?

11         A.    They were, as they were

12    preparing to file for bankruptcy, they

13    were rebadging employees from AFI to

14    ResCap or ResCap to AFI.

15         Q.    And I apologize, if I'm slightly

16    repetitive, but just to be clear, even

17    though you were reporting to Mr. Kushman

18    between November of 2011 to April of 2012,

19    you were still employed by ResCap,

20    correct?

21         A.    That's correct.

22         Q.    What were your responsibilities

23    in your position, starting in November of

24    2011?

25         A.    Reserving for rep and warranty

107

                    JEFF CANCELLIERI

1

2        potential risk exposure numbers that were

3        presented to Kathy Patrick by ResCap

4        increased over time?

5                    MR. RAINS:  Objection.  Assumes

6              facts not in evidence.

7              A.    I am not aware of what the

8        settlement negotiations were.

9              Q.    And were you ever asked by FTI

10       or anyone at ResCap to provide any

11       additional information beyond your initial

12       submission of the 3 to $14 billion

13       exposure range and 5 to 30 percent defect

14       rate?

15             A.    Not to my knowledge, no.

16             Q.    Do you have an understanding as

17       to how the 8 point -- do you have an

18       understanding today that the ultimate

19       settlement number for allowed claim in the

20       settlement number was $8.7 billion?

21             A.    I'm sorry, repeat the question.

22             Q.    Do you have an understanding

23       that the ultimate number that was set

24       forth in the settlement agreement as a

25       total allowed claim was $8.7 billion?

108

1                    JEFF CANCELLIERI

2          A.     Yes.

3          Q.     Do you have an understanding as

4     to how that number was calculated?

5          A.     I do not.

6          Q.     Are you aware that ResCap

7     identified you as the person with the most

8     knowledge about how that number was

9     calculated?

10         A.     What I provided --

11              MR. RAINS:  Objection.  Assumes

12         facts not in evidence.

13         A.     What I provided to our legal

14    experts who were negotiating the

15    transaction was a total expected lifetime

16    loss on the 392 trusts with a general

17    range of exposure percentages to give them

18    tools during their settlement

19    negotiations.  I was not part of the

20    actual settlement negotiations.  That was

21    left up to the legal experts to go through

22    that process.

23         Q.     So at any time during the

24    settlement negotiations did you provide to

25    anyone at FTI or ResCap your opinion as to

113

1              JEFF CANCELLIERI

2       discussions.

3            Q.    I appreciate that.  But you

4       previously testified you had discussions

5       with Kathy Patrick about her assumptions,

6       correct?

7            A.    That's correct.

8            Q.    Did you challenge the 22 percent

9       defect rate that Kathy Patrick was using

10      in that discussion?

11           A.    I challenged all of her

12      assumptions.

13           Q.    What assumptions did you

14      challenge?

15           A.    I challenged their use of role

16      rates for projected defaults, which were

17      based on history.  I challenged their use

18      of an average severity rate, historical

19      severity rate for future losses.  And as

20      part of the discussion around how they

21      were using the Bank of America defect rate

22      I guess as some level of guide, I didn't

23      get into specifics, but the fact that it

24      was based on an adverse selection of

25      loans.

114

1              JEFF CANCELLIERI

2        Q.    How was it based on an adverse

3    selection of loans?

4              MR. RAINS:  Objection.  Vague

5         and ambiguous.

6        A.    Based on my discussion with her

7    she mentioned that the 36 percent that was

8    used in the Bank of America settlement was

9    provided to her based on a review that

10   Freddie Mac did of Countrywide's loans

11   based on adverse selection.  Adverse

12   selection being loans that were

13   nonperforming.

14       Q.    And in fact the defect rates

15   that ResCap was using was based on a

16   selection of loans that is only loans that

17   were sought to be repurchased, correct?

18       A.    The defect rates were used as a

19   guide.  Specific defect rates were not

20   used for any specific deals.  They were

21   used as a guide to create the range which

22   was provided to our legal experts during

23   our settlement negotiations.

24       Q.    I understand that it was used at

25   a guide.  But you were complaining to

115

1          JEFF CANCELLIERI

2     Ms. Patrick that Bank of America's defect

3     rate was based on an adverse sample,

4     correct?

5          A.    I wouldn't categorize it as

6     complaining.  I was challenging.

7          Q.    Challenging that their defect

8     rate was based on an adverse sample,

9     correct?

10          A.    Challenging that it was based on

11     an adverse sample in order to assist our

12     legal experts to give them additional

13     guidelines on information that they can

14     use during their settlement negotiations.

15          Q.    And in fact the defect rates

16     that ResCap was using as a guide in the

17     settlement discussions were based on only

18     loans that were either sought to be

19     repurchased or independently audited

20     within ResCap, correct?

21          A.    Can you repeat the question?

22          Q.    And in fact the defect rates

23     that ResCap was using as a guide in the

24     settlement discussions were based on only

25     loans that were either sought to be

196

JEFF CANCELLIERI

1

2      you've calculated, correct?

3          A.    Correct.

4          Q.    And that's the number that you

5      said never changed during your entire --

6      during your entire analysis, correct?

7          A.    Correct.

8          Q.    But Kathy Patrick calculated a

9      separate lifetime loss, correct?

10         A.    Yes.

11         Q.    And her loss method was

12     $48.7 billion, correct?

13         A.    Yes.

14         Q.    So that number wasn't actually a

15     fixed number, was it?

16             MR. RAINS:   Which number?

17         A.    Which number?

18         Q.    Pardon.   The $44.1 billion loss

19     was not a fixed number, was it?

20         A.    My 44.1 billion was a fixed

21     number.

22         Q.    And using that number, you

23     backed into a defect rate of 19.7 percent,

24     approximately, correct?

25         A.    Approximately, yes.

197

JEFF CANCELLIERI

1

2      Q.    And that was done at the

3      direction of Timothy Devine; is that

4      correct?

5      A.    That appears to be correct.

6      Q.    And that 19.7 approximate

7      number, that actually turned out to be

8      19.72 percent, when you got -- when you

9      don't round, correct?

10      A.    I would assume so, yes.  The

11      19.72 is what showed up in the board

12      presentation.

13      Q.    So that same defect rate is

14      what's shown up in the board presentation,

15      correct?

16      A.    Correct.

17      Q.    And using -- but was the board

18      ever told that, using Kathy Patrick's

19      analysis, you could come up with a

20      17.9 percent defect rate?

21      A.    Not that I'm aware of.

22      Q.    Was the board ever told that a

23      two percent difference in the defect rate

24      is about a billion dollar difference?

25      A.    Not that I'm aware of.

198

1                    JEFF CANCELLIERI

2          Q.    Are you aware that a two percent

3     shift in the defect rate could equal a

4     2 -- a $2 billion difference?

5                MR. RAINS:  Say that last one

6          again?

7          Q.    Are you aware that a two percent

8     difference in the defect rate could amount

9     to a billion dollar difference in the

10    settlement value?

11         A.    If you do the calculation, it

12    could.

13         Q.    And at the meeting you --

14    pardon.  At the May 9th board presentation

15    or board meeting, you, you were in

16    attendance, as you've previously

17    testified, correct?

18         A.    Correct.

19         Q.    And at that meeting the board

20    was only given -- was only given that

21    19.72 percent range, correct?

22         A.    Correct.

23                MR. RAINS:  I'm going to make a

24          belated objection, vague and

25          ambiguous.  I mean we know the board

207

JEFF CANCELLIERI

1

2      call?

3            A.    Gary Lee had asked me to talk to

4      Kathy about her specific assumptions, to

5      get an idea of their calculated numbers.

6            Q.    And after that call, you relayed

7      to Gary Lee and others on the legal team

8      your concerns you had with her

9      assumptions?

10           A.    Yes.  I relayed to Gary Lee her

11     assumptions and potential concerns with

12     her assumptions.

13           Q.    And then you were shown a second

14     ago Exhibit 60, which is the board

15     presentation from May 9th.

16                 Do you recall that?

17           A.    I do recall that.

18           Q.    And that presentation includes

19     the 36 percent Bank of America default

20     rate?

21                 Do you recall that?

22           A.    It includes, yes, the baseline

23     Bank of America defect rate.

24           Q.    Was the board of directors of

25     ResCap ever informed that you had raised

208

1                    JEFF CANCELLIERI

2       concerns about using that 36 percent

3       defect rate?

4           A.    I don't know.

5           Q.    But no -- you don't recall from

6       that --

7           A.    I don't recall from that

8       meeting.

9           Q.    Nothing, there was no discussion

10      of that?

11              MR. RAINS:  He says he doesn't

12          recall.

13          A.    I don't recall.

14          Q.    But as you previously testified,

15      that 36 percent was used as a comparison.

16      It was presented to the board as a

17      comparison to the 19.72 defect rate?

18          A.    That is correct, at the

19      direction of our legal counsel.

20              MR. DOLAN:  I don't have

21          anything else.  Thank you,

22          Mr. Cancelliere.

23              MR. RAINS:  Any other takers?

24              MR. SHEEREN:  David Sheeren from

25          Gibbs & Bruns.  Can we just take a

A. 6

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

                Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF JAMES WHITLINGER

New York, New York

November 15, 2012

9:39 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27649

2

1

2

3

4                    November 15, 2012

5                    9:39 a.m.

6

7

8          Deposition of JAMES WHITLINGER,

9     held at the offices of Kramer, Levin,

10    Naftalis & Frankel, 1177 Avenue of the

11    Americas, New York, New York, pursuant

12    to Notice, before Erica L. Ruggieri,

13    Registered Professional Reporter and

14    Notary Public of the State of New

15    York.

16

17

18

19

20

21

22

23

24

25

25

1           JAMES WHITLINGER

2       A.    I don't know.

3       Q.    And this e-mail has two

4   attachments, one of which is a notice of a

5   telephonic meeting of the ResCap board to

6   be held the same day at 3:00 p.m.?

7       A.    Correct.

8       Q.    And the second attachment is an

9   agenda for that meeting?

10       A.    Yes.

11       Q.    And so this e-mail and the

12   notice was informing the board that in

13   less than an hour there would be a board

14   meeting, a telephonic board meeting,

15   correct?

16       A.    Yes.

17       Q.    And the meeting notice tells you

18   and the other board meeting -- board

19   members, that supporting materials will be

20   distributed just before the meeting?

21       A.    Yes.

22       Q.    And on -- the agenda lists two

23   items, the first of which is proposed

24   legal settlement; is that correct?

25       A.    That's correct.

26

1                       JAMES WHITLINGER

2          Q.    And you understand that proposed

3      legal settlement refers to a discussion of

4      the RMBS Trust Settlement Agreement?

5          A.    I do today.

6          Q.    Did you -- you understand that

7      today?

8          A.    Yeah.  It says proposed legal

9      settlement.  And after looking at the

10     materials, you know, and looking at what

11     was in the materials it was regarding the

12     RMBS Trust Settlement.

13         Q.    But at the time you received

14     this notice you hadn't received those two

15     other documents, Exhibit 60 and 61,

16     correct?

17         A.    Correct.

18         Q.    And so at the time you received

19     this e-mail with the attached agenda you

20     didn't know what the proposed legal

21     settlement referred to?

22         A.    Correct.  It could have been

23     multiple legal settlements.

24         Q.    And the time allotted for

25     discussion during the board meeting about

27

1                    JAMES WHITLINGER

2      that proposed legal settlement was

3      30 minutes, correct?

4          A.    Correct.

5          Q.    And you recall that the board

6      spent about 30 minutes discussing that

7      item on May 9th?

8          A.    I don't recall how much time we

9      spent on it.

10         Q.    Do you know who decided that the

11     board would hold a meeting at 3:00 on

12     Wednesday, May 9th?

13         A.    I don't know.

14         Q.    Generally did you know who was

15     responsible for deciding when and how

16     ResCap board meetings would be convened?

17         A.    Yeah.  I mean we had Tom Marano

18     or our lead counsel would, you know,

19     regularly schedule board meetings.

20         Q.    When you say your lead counsel,

21     to whom are you referring?

22         A.    For the case is Larren Nashelsky

23     at the time and Gary Lee as well.

24         Q.    And Mr. Nashelsky and Mr. Lee

25     are outside counsel for ResCap at Morrison

28

                        JAMES WHITLINGER

1

2      & Foerster?

3          A.    Yes.

4          Q.    And so they would sometimes

5      schedule board meetings?

6          A.    They would let us know that they

7      wanted to have a topic discussed, as well

8      as our legal counsel Tammy Hamzephour.

9          Q.    And do you have any reason --

10     withdrawn.

11              Do you have any knowledge as to

12     why the board was informed about this

13     meeting less than an hour before the

14     meeting was scheduled to start?

15         A.    Yeah, generally speaking, at

16     that point in time we were having multiple

17     meetings and getting updates on the status

18     of various conversations that were going

19     on with various parties.

20         Q.    There was a lot of -- there were

21     a lot of things going on that the board

22     were considering during this period of

23     time?

24         A.    Yes.

25         Q.    Take a look at Exhibit 60,

29

1                    JAMES WHITLINGER

2        please.  Do you recognize Exhibit 60 as an

3        e-mail that Mr. Lee or that you and the

4        board, other board members received from

5        Mr. Lee on May 9th, 2012, at 2:38 p.m.?

6             A.    Yes.

7             Q.    And Mr. Lee attached to his

8        e-mail the supporting information for the

9        May 9th board meeting?

10            A.    Yes.

11            Q.    Now, these are the only board

12       materials that were provided to the board

13       for the May 9th board meeting, correct?

14            A.    Per the -- per the documents

15       here that I'm looking at here that -- that

16       sounds right.

17            Q.    Do you recall whether there were

18       any other documents that provided to the

19       board on or before the May 9th board

20       meeting in connection with that meeting?

21            A.    Well, you know this topic for

22       PLS rep and warrant and discussion, there

23       had been many documents that the board had

24       seen over time related to PLS, rep and

25       warrant type topics, not necessarily a

30

                        JAMES WHITLINGER

1

2      settlement, but, generally speaking, PLS

3      rep and warrant, the board's seen, you

4      know, plenty, plenty of documents relating

5      to this general area of rep and warrant.

6           Q.    Can you recall any single

7      document that the board had ever received

8      before this that pertained to an analysis

9      of the rep and warranty claims that were

10     proposed being settled with Ms. Patrick

11     and Talcott Franklin's clients?

12          A.    I don't -- I don't recall.

13          Q.    All right.  The board never

14     received any such documents before this

15     day, correct?

16          A.    I don't recall if they did or

17     didn't.

18          Q.    You agree that the board had

19     only about 22 minutes before the 3:00

20     meeting to read and understand these

21     board -- board materials before the board

22     meeting was scheduled to start?

23          A.    On a timing perspective.  But

24     again, I would tell you that when we talk

25     about rep and warrant topics, the board

31

1                    JAMES WHITLINGER

2      has had plenty of experience around this

3      discussion with our advisors, with our

4      accounting policy teams and in-house

5      counsel.

6          Q.    When you say on a timing

7      perspective you agree that the board had

8      only about 22 minutes to consider this

9      before the board meeting started, right?

10         A.    Yeah.  That's what the timing of

11     the e-mail stated.

12         Q.    And what's your understanding

13     generally of the chart attached to the

14     e-mail that's entitled 2004-2007 PLS R&W

15     analysis?

16             MR. RAINS:  I'm going to have

17         to -- I apologize I'm going to stand

18         over your shoulder and look at the

19         document.  We weren't given copies so

20         I'm sorry to interrupt but this is the

21         only way I can see it.

22         A.    So this schedule shows the

23     ResCap issued deals and the original with

24     principal balance of the loans.  And so

25     that was about $226 billion.  The current

32

1                    JAMES WHITLINGER

2       balance of the unpaid principal balance

3       was $63.3 billion.  It shows a percentage

4       of loans that were delinquent and then it

5       showed that we had had just under

6       $30 billion of -- of losses that were

7       incurred on the original $226 billion of

8       principal.  And that, you know, we

9       believed that $14.2 billion would be

10      losses that would potentially be incurred

11      in the future from this point in time.  So

12      the total lifetime losses were going to

13      be, you know, $44.1 billion.  And

14      essentially that equated to a 19.5 percent

15      lifetime loss of the $226 billion.

16                  The next column over is, you

17      know, Kathy Patrick's group and it showed

18      what portion of the original 226 billion

19      for all the same -- same buckets.  And

20      then it just has a percentage of total

21      issued.  So this is what the schedule was,

22      that the ResCap settlement amount of

23      $8.7 billion was the dollar amount that --

24      that would agreed to be the claim on the

25      potential losses of $44.1 billion.

33

1                    JAMES WHITLINGER

2         Q.    What's your understanding of the

3    items in the rows that refer to a ResCap,

4    Lehman and Bank of America percentage

5    defect rate?

6         A.    Right.  So the $8.7 billion

7    divided by $44 billion I believe is the

8    agreed rate of, you know, 19.7.  And the

9    Lehman claim amount in the BofA baseline I

10   think were data points or observations

11   that said that potentially those were

12   rates that were in those specific deals.

13        Q.    What are those specific deals?

14        A.    You know, I don't -- I don't

15   know their deals.

16        Q.    Do you know who provided the

17   35 percent and 36 percent, as you called

18   them, data points for this chart?

19        A.    I'm not sure.  I believe that

20   Jeff Cancelliere may have helped provide

21   information on this.

22        Q.    Who is Jeff Cancelliere?

23        A.    Jeff Cancelliere is a direct

24   report of mine today.  Jeff worked on the

25   risk team and was our number cruncher,

34

1                    JAMES WHITLINGER

2        number expert for valuing loans.  And so,

3        you know, the 226 billion, identifying

4        those, identifying the current balance,

5        cumulative losses that had occurred to

6        date, you know, what projected losses

7        could be, he would be our person that was

8        the numbers expert on that.

9             Q.    And was Mr. Cancelliere your

10       direct report on May 9, 2012?

11            A.    Somewhere in the month of, you

12       know, somewhere in thereabouts, you know,

13       Jeff was reappointed to -- to be a direct

14       report of mine.

15            Q.    And on and after the time that

16       he was appointed as a direct report of

17       yours you were responsible for supervising

18       and overseeing an ensuring the accuracy of

19       his work?

20            A.    Can you repeat or rephrase that?

21            Q.    Sure.  Once he be- -- once he

22       was appointed as a direct report of yours

23       you were then responsible for supervising

24       and ensuring the accuracy of his work?

25            A.    Yes.

35

1                    JAMES WHITLINGER

2        Q.    And who appointed him as a

3   direct report of you?

4        A.    You know, I was obviously party

5   to that conversation and Tom Marano.

6        Q.    Had Mr. -- Mr. Cancelliere

7   before he was a direct report to you, was

8   he a direct report to someone who was

9   employed by AFI?

10       A.    Yes.  There was dotted line

11   relationships.

12       Q.    And so Mr. Marano then decided

13   that Mr. Cancelliere would no longer

14   report to somebody at AFI but would now

15   report to you, correct?

16       A.    Generally speaking, you know, we

17   were separating the centers of excellence

18   that had been created over time.  We had

19   shared services.  And so we -- there was

20   an alignment process going on in April,

21   May, maybe sooner, I don't remember the

22   exact timelines, where we made sure that

23   the shared service people were repointed

24   to ResCap for our areas.

25       Q.    So it's your understanding that

36

JAMES WHITLINGER

1

2      Mr. Cancelliere prepared the information

3      in this chart for delivery to the board?

4          A.   Again, I know that Jeff worked

5      on this type of information.  I don't know

6      that he actually created this chart.

7          Q.   And to the extent there's any

8      information in this chart that

9      Mr. Cancelliere provided, that was

10     misleading or mistaken, you would take

11     responsibility for his work in that

12     regard, correct?

13            MR. RAINS:  Objection.  Assumes

14        facts not in evidence.  Calls for

15        speculation.

16     Q.   You can answer.

17            MR. RAINS:  You can still

18        answer.

19     A.   You know -- you know, we have

20     employees that work for all of us that

21     ultimately the buck stops with me.

22     Q.   Which means that if

23     Mr. Cancelliere put information in to this

24     document that was provided to the board,

25     information that was either misleading or

1                    JAMES WHITLINGER

2        mistaken, you take responsibility for

3        that?

4            A.    Yes.

5            Q.    Now, you understand that -- that

6        Mr. Cancelliere did not independently

7        determine that there should be a

8        35 percent defect rate for the Lehman

9        claims referenced here and the 36 percent

10       defect rate for the Bank of America claims

11       referenced here, right?

12           A.    Can you -- can you rephrase

13       that?

14           Q.    Sure.  You understand -- the

15       35 percent and 36 percent numbers here,

16       you know that those were not independently

17       determined by Mr. Cancelliere, right?

18           A.    I don't know if they were or

19       they weren't.

20           Q.    You understand that those

21       percentages were provided to him and

22       others at ResCap by Ms. Patrick?

23           A.    I don't recall how -- how those

24       numbers were determined.

25           Q.    Did you, during the May 9th

38

1                    JAMES WHITLINGER

2          board meeting, did you or any of the board

3          members ask Mr. Cancelliere or anyone

4          where the 35 percent and 36 percent defect

5          rates came from?

6               A.    I don't recall.

7               Q.    No, you don't recall asking

8          that?

9               A.    I don't recall.

10              Q.    And would it have been important

11         to you as a board member in making

12         decisions on May 9th to know that these

13         35 percent and 36 percent defect rates

14         were provided by Kathy Patrick with whom

15         ResCap was negotiating and were not

16         independently determined by ResCap?

17              A.    It's a data point.

18              Q.    I understand that it's a data

19         point.  But would it have been important

20         to you as a board member in making your

21         decisions on May 9th to know that the

22         35 percent and 36 percent figures came

23         from Kathy Patrick and were not

24         independently created by Mr. Cancelliere

25         or anyone at ResCap?

47

1                    JAMES WHITLINGER

2       that or we didn't talk about it is my

3       first point.  If he -- if he challenged

4       it, would I want to know that?  Yes.

5       That's fine.  I would want to know.

6           Q.    But you didn't know that on or

7       before the May 9th board meeting?

8           A.    I already answered that that I

9       don't know that we did or didn't.

10          Q.    But you have no recollection of

11      that?

12          A.    I have no recollection.

13          Q.    Was the first time that you

14      learned that the proposed settlement

15      amount was 8.7 billion the time when you

16      received this -- this board material from

17      Mr. Lee?

18          A.    Can you repeat the question?

19          Q.    Sure.  Did you first learn that

20      the proposed settlement amount that's in

21      the RMBS Trust Settlement Agreement was

22      $8.7 billion when you received Exhibit 60?

23          A.    Yes, that -- that -- that's my

24      recollection.

25          Q.    And it's your recollection that

                    JAMES WHITLINGER

1

2       when the board received Exhibit 60 that's

3       the first time that the board was informed

4       as a group that the settlement amount, the

5       proposed settlement amount was

6       8.7 billion?

7           A.    That's my recollection.

8           Q.    Now, as of May 9, 2012, you had

9       never spoken directly with Ms. Patrick, is

10      that true?

11          A.    I have never spoken with

12      Ms. Patrick.

13          Q.    May I ask you to take a look at

14      Exhibit 61.  Those are the board minutes

15      for May 9th.

16          A.    Okay.

17          Q.    And you recognize those as the

18      final minutes of the ResCap board meeting

19      from May 9, 2012, that began at 3:00?

20          A.    Yes.

21          Q.    And does Exhibit 61

22      accurately -- accurately reflect what

23      occurred at the meeting?

24          A.    Yes.  It's an -- an executive

25      summary of the -- of the meeting.

68

1                    JAMES WHITLINGER

2        settlement were -- were good based on

3        their legal opinion.

4             Q.    During the May 9th meeting were

5        you advised whether the settlement

6        agreement would release potential

7        securities law claims against ResCap and

8        its subsidiaries?

9             A.    I don't -- I don't recall.

10            Q.    So on May 9th did you --

11       withdrawn.

12                  So on May 9th you did -- is it

13       true that you did not know whether or not

14       the settlement agreement included or

15       excluded a release for securities law

16       claims that the institutional investors

17       and their trustees could bring?

18            A.    I don't recall.

19            Q.    On May 9th did you believe that

20       all the rep and warranty claims that the

21       institutional investors or the trustees

22       could bring were being released against

23       ResCap and its subsidiaries?

24            A.    Yes.  But, you know, that they

25       would be released but there was the

79

JAMES WHITLINGER

1

2          MR. RAINS:  Here you are

3      referring to Exhibit 60?

4          A.    Yeah, I'm referring to

5      Exhibit 60.  I recall Jeff Cancelliere

6      talking through those numbers.

7          Q.    When you say those numbers, what

8      numbers are you referring to, the numbers

9      on the chart in Exhibit 60?

10          A.    The original balance, the

11      current balance, the projected lifetime

12      losses, et cetera.

13          Q.    Do you recall anything that he

14      explained in connection with the rows that

15      pertain to the 19.72 percent, the

16      35 percent and the 36 percent defect rate?

17          MR. RAINS:  Objection.  Asked

18      and answered.

19          Go ahead.

20          A.    I know that we talked about the

21      $8.7 billion and I don't know that it was

22      Jeff Cancelliere or somebody from -- Gary,

23      you know, Gary or Tammy Hamzephour.  But

24      that the $8.7 billion represented an

25      agreed rate, if you will, of about

80

```
 1              JAMES WHITLINGER

 2      19.7 percent based on the lifetime losses

 3      that we had put forth.

 4          Q.    My question was you don't recall

 5      Mr. Cancelliere specifically discussing

 6      any of these percentages in connection

 7      with the spread- -- in connection with the

 8      defect rates, right?

 9              MR. RAINS:  Objection.  Asked

10          and answered.

11          A.    I don't recall.

12          Q.    In the paragraph after that

13      there's a reference in the first sentence

14      to Mr. Renzi reviewing and discussing the

15      key assumptions in the preliminary

16      economic recovery analysis of preliminary

17      agreements reached with certain

18      constituencies.  This is an exhibit -- I'm

19      sorry, I have gone back to Exhibit 61.

20              MR. RAINS:  I know.  Focus on

21          this sentence first, okay.  Mr. Renzi.

22          A.    Yes.

23          Q.    What is your understanding of

24      that sentence?

25              MR. RAINS:  Objection.  The
```

105

1                    JAMES WHITLINGER

2        Q.    Right.  So the parties --

3    withdrawn.

4              Go ahead.  I didn't mean to

5    interrupt you.

6        A.    The ResCap settlement amount is

7    that that 19.72 is that calculation.

8        Q.    So it's your understanding that

9    the -- the 19.72 percent was derived by

10   taking the $8.7 billion settlement amount

11   and dividing it by the estimated lifetime

12   loss?

13       A.    That's my understanding, yes.

14       Q.    It was -- it was not derived by

15   ResCap independently determining that

16   19.72 percent was the, was a valid or a

17   reasonable defect rate to be applied to

18   the settlement, correct?

19             MR. RAINS:  Objection.

20        Misstates his testimony.

21        A.    ███████████████████████████

██     ███████████████████████████████

██     ███████████████████████████████

██     ████████████████████████████████████

██     ██████████████████  And that there was a

1                    JAMES WHITLINGER

2        takes into consideration the litigation

3        defenses and the other litigation issues

4        that you just testified about?

5                    MR. RAINS:  Objection.  Asked

6            and answered.

7            A.    Again, I don't know how to

8        answer your question any differently than

9        I have -- I have answered before.

10           Q.    Did the board consider or get

11       any information about the specific

12       litigation defenses against these rep and

13       warranty claims?

14           A.    I -- I don't recall.

15           Q.    Do you recall whether or not the

16       board was given any information about

17       whether or not there were any statutes of

18       limitation that might bar some of

19       Ms. Patrick's clients purported claims?

20           A.    If -- if you're -- are you

21       asking me in this -- in the May 9th, if we

22       talked about statute of limitations, I

23       don't recall.  I know that we have always

24       talked about statute of limitations when

25       talking about rep and warrant claims.

119

1                    JAMES WHITLINGER

2          Q.    But you had no recollection of a

3    discussion about statute of limitations

4    during the May 9th meeting?

5          A.    I don't recall.

6          Q.    Is it your understanding that

7    just because there's a loss associated

8    with the mortgage that is considered a

9    defect but that doesn't necessarily mean

10   that ResCap or its affiliates are liable

11   for any or all of the loss?

12         A.    Since you used the word "liable"

13   I'm going to again defer to our -- our

14   counsel.  Lawyers determine liability.

15         Q.    So was it your understanding on

16   May 9th -- withdrawn.

17               Did anyone provide the board on

18   May 9th with an analysis of how much it

19   might cost to litigate the claims

20   Ms. Patrick was -- was asserting as

21   compared to settling the claims around May

22   of 2012?

23         A.    Can you repeat the first part of

24   the question?

25         Q.    Sure.  Did anyone advise or

169

1                    JAMES WHITLINGER

2       say we are in or we are out, right?

3              MR. RAINS:  Objection.  Calls

4          for a legal conclusion.

5          A.    I -- I would rely on Tammy

6       Hamzephour for that.

7          Q.    As you sit here today, if the

8       trustee in a wrapped deal opts in to the

9       settlement, what is your understanding of

10      what would happen to any other claims with

11      the monoline for that wrapped deal would

12      have?

13             MR. RAINS:  Objection.  Calls

14         for a legal conclusion.

15         A.    I'm going to defer you to Tammy.

16      Those are good questions for Tammy

17      Hamzephour.

18         Q.    I want your understanding,

19      Mr. Whitlinger.  I understand you are a

20      lay person.  I want your understanding.

21             MR. RAINS:  Objection.  Calls

22         for a legal conclusion.

23         Q.    I'd still like your

24      understanding.  Mr. Rains can object on

25      that grounds but it's not a valid

170

1                    JAMES WHITLINGER

2       objection that prevents you from answering

3       the question.

4               MR. RAINS:  It's a valid

5           objection.

6           Q.    There's no instruction not to

7       answer it.  So you can answer the

8       question.

9           A.    Can you repeat the question?

10      I'm sorry.

11          Q.    Sure.  In the context of a

12      wrapped deal, if the trustee from that

13      wrapped deal elects to opt into this

14      settlement, what effect, if any, would the

15      trustee's decision to opt into the

16      settlement agreement have on the monoline

17      from that wrapped deal's claims against

18      ResCap and its affiliates?

19              MR. RAINS:  Objection.  Vague

20          and ambiguous.  And it calls for a

21          legal conclusion.

22              Go ahead and answer it.

23          A.    I don't know the answer, the

24      specific answer to that question.

25          Q.    Did you know the answer to that

A. 7

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,       12-12020(MG)

             Debtors.

-----------------------------------x

DEPOSITION OF JEFFREY A. LIPPS

New York, New York

November 19, 2012

10:13 a.m.

Reported by:
JENNIFER OCAMPO-GUZMAN, CRR, CLR
JOB NO: 27971



2

1

2

3

4

5

6

7

8              November 15, 2012

9              10:13 a.m.

10

11        Deposition of JEFFREY A. LIPPS,

12    held at the offices of Kramer, Levin,

13    Naftalis & Frankel, 1177 Avenue of the

14    Americas, New York, New York, pursuant

15    to Notice, before Jennifer

16    Ocampo-Guzman, a Certified Real-Time

17    Shorthand Reporter and Notary Public of

18    the State of New York.

19

20

21

22

23

24

25

46

                          Lipps

1

2       those suits in which affiliated nondebtor

3       entities were named.

4           Q.   Are there any suits filed against

5       the debtors --

6                MR. BENTLEY:  Let me start again.

7           Q.   Have any suits been filed against

8       the debtors by RMBS trustees?

9           A.   Prepetition?

10          Q.   Correct.

11          A.   I don't -- I don't believe there

12      were any suits in which a trustee was the

13      plaintiff.

14          Q.   And just so we're clear, no trustee

15      suits have been filed against the debtors

16      post petition, have they?

17          A.   I think that would violate the

18      automatic stay.

19          Q.   That's fine.

20          A.   I just wanted precision in your

21      questioning.  Sorry.

22          Q.   Now, the principles that govern

23      monoline suits differ, in some respects, from

24      the principles that govern suits by RMBS

25      trustees?

97

1                         Lipps

2      filled in.  But I don't know whether the

3      amount was ever filled in while I was aware

4      of it.

5              I then went off on other projects.

6              MR. RAINS:  The question was

7          conversations.

8          A.   Well, the conversations would only

9      be in the context of a draft agreement.

10         Q.   Were you at any point asked to give

11     any advice, in connection with the potential

12     settlement with Ms. Patrick?

13         A.   I was not.

14         Q.   Did you ever at any point give any

15     advice in that regard?

16         A.   Well, I've offered an opinion here

17     as to whether I think the settlement is fair

18     and reasonable.

19         Q.   Let me try again.

20              At any time before the execution of

21     that settlement, did you give any advice to

22     anybody about it?

23         A.   No.  As I told you, we weren't

24     involved in negotiations.  We were not

25     involved in any presentations to the board.

98

1                    Lipps

2         Q.   Or giving advice to anybody?

3         A.   I didn't give advice to anybody

4    about the settlement.

5         Q.   At either the debtors or at Ally?

6         A.   I had no discussions with Ally

7    about the situation we're talking about right

8    now.

9         Q.   When did you first begin to

10   consider the issues addressed in your

11   settlement declaration?

12        A.   You know, I've thought about that,

13   because I knew you were going to go ask me

14   that.  And I seem to recall that I had been

15   asked by Morrison & Foerster to do the

16   analysis that is reflected in my supplemental

17   declaration sometime maybe in August, I want

18   to say, just because I think there was a

19   deadline that was then extended to the end of

20   September.

21            And so I would have had some early

22   first discussion about this exercise, and I

23   want to say it was sometime around August;

24   but with the schedule then changed, I started

25   working on it over, you know, the course

99

1                        Lipps

2        leading up to when it was filed.

3                MR. BENTLEY:  I assume we are going

4           to break for lunch.  This is probably a

5           good time, because I'm between topics.

6                Should we take a brief break for

7           lunch?

8                MR. RAINS:  Only come back at

9           1 o'clock.

10               MR. BENTLEY:  It's up to you.

11               MR. RAINS:  Well, less than that.

12           What do you need?

13               MR. BENTLEY:  Should we take

14           20 minutes?

15               MR. RAINS:  Good.  Fantastic.

16               (Lunch recess taken at 12:25 p.m.)

17

18

19

20

21

22

23

24

25

133

Lipps

1

2          be a lot quicker and more efficient if

3          you listen to my question and answer the

4          question I'm asking.

5               MR. RAINS:  Sir, the problem is

6          entirely with the questions and not with

7          you, you are doing fine.

8               Ask a new question.

9          Q.   Did you make any attempt to

10     quantify the rate of breaches in the loans

11     covered by the settlement?

12          A.   Yes.  And what I did was I looked

13     at, from my experience in litigating these

14     claims, which included claims that were in

15     this settlement, trusts that were in this

16     settlement, I knew firsthand that there were

17     assertions that had been made of breach rates

18     at 80 to 90, even approaching 100 percent,

19     I'm somewhat bound by confidentiality because

20     the litigation was in MBIA, for example, had

21     a confidentiality order and there were some

22     preliminary expert report -- well, not

23     preliminary -- there were expert reports that

24     were submitted that had much information

25     about what the plaintiff was contending in

134

Lipps

1

2       terms of the percentages of loans that were

3       subject to material breaches.

4              So, yes, I did quantify that in my

5       mind, because that was the upper end of the

6       exposure.  If they were right and if a

7       plaintiff is right, and this thing went to

8       litigation and the projected losses are 45

9       billion and the breach rate is 100 percent,

10      then that's $45 billion worth of exposure.

11          Q.   So this was the plaintiff's

12      position, correct?  MBIA's position?

13          A.   Right.

14          Q.   Now, you had your own view, didn't

15      you, which you discuss in paragraph 120 of

16      your supplemental declaration?

17              MR. RAINS:  Take a moment to read

18          paragraph 120 please.

19          A.   I wrote paragraph 120.

20              MR. RAINS:  And you should look at

21          121 as well.

22              MR. BENTLEY:  Darryl, you don't

23          need to coach the witness.  He doesn't

24          need your help and it's improper and you

25          know that.

142

1                    Lipps

2      whether or not 8.7 billion was a fair and

3      reasonable resolution of that exposure.

4          Q.   In reaching your conclusion, I take

5      it, you considered a number of disputed legal

6      issues?

7          A.   I did.

8          Q.   And you identified in your

9      supplemental declaration the principal legal

10     issues you considered, correct?

11         A.   I wrote extensively on the various

12     issues that I took into account.

13         Q.   You certainly did.

14              Did you assign percentages to the

15     potential outcomes on any of these issues?

16         A.   I don't think, I don't think that

17     would have been meaningful to do that,

18     because I don't think any of those were a

19     legal issue that would be dispositive on the

20     entirety of the settlement in determining

21     whether or not it was fair and reasonable.

22         Q.   So is the simple answer to my

23     question you did not assign any such

24     percentages?

25         A.   Well, I weighed the importance of

143

1              Lipps

2      the legal issue in my own mind to the case,

3      and as I said, I didn't conclude any of them

4      was dispositive, but in combination, they

5      created the legal environment within which I

6      evaluated the settlement.

7          Q.   I'm not asking you about the

8      relative importance of different issues.  I'm

9      asking you about your assessment of different

10     outcomes.

11          Did you assign percentages to any

12     potential outcomes on these disputed legal

13     issues?

14          A.   Are we back to what you called

15     litigation risk analysis?

16          Q.   It's sort of like that.

17          A.   I did not engage in that, no.

18          Q.   You didn't assign any percentages

19     to any possible outcomes?

20          A.   No.  If you're saying whether I

21     believe that I could prevail on causation at

22     a certain percentage or certain amount of

23     times, I did not do that.

24          Q.   Did you, as part of your analysis,

25     merely identify disputed issues or did you

1                    Lipps

2      take into account probabilities, if not

3      actual percentages, but probabilities of some

4      sort as to the potential outcomes?

5           A.   I mean I considered probabilities

6      to the extent that I identified the issue,

7      and then I surveyed, based on my own

8      experience in the state of the law, what was

9      evolving on that issue and tried to assess

10     whether or not it was decided, for example,

11     in a way that would allow for some certainty

12     in evaluating that issue, or whether it was

13     undecided, and I think on all the key issues,

14     the state of the law was such, there were

15     good arguments or at least arguments that had

16     been presented and not dispositively ruled on

17     on both sides of the issue.  So assigning

18     probabilities would have been meaningless to

19     evaluating the reasonableness itself.

20          Q.   So you didn't try to assign any

21     probabilities?

22          A.   Based on the analysis I just

23     described, I concluded that assigning

24     probabilities would have been meaningless.

25          Q.   Is that true --

159

1                         Lipps

2       the settlement, did you have an understanding

3       of what claims would be released against the

4       debtors?

5            A.   I believe I testified earlier that

6       I saw the settlement agreement itself, the

7       release language which discussed claims that

8       were subject to the release as a result of

9       the settlement, and I believe there was a

10      provision or two that made it clear certain

11      claims were not being settled.

12           Q.   And in addition to your review of

13      the settlement agreement, did any

14      representative of the debtors tell you to

15      assume that certain claims would be released?

16           A.   In connection with this assignment?

17           Q.   Yes.

18           A.   I looked at the executed and

19      submitted settlement agreement.

20           Q.   And did you seek any advice from

21      anyone representing the debtors or anyone

22      else as to what would be included in the

23      claims that were being released under the

24      settlement agreement?

25           A.   I read the settlement agreement and

# A. 8

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

Debtors.

-----------------------------------x


VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

New York, New York

November 19, 2012

10:17 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

2

1

2

3

4                    November 19, 2012

5                    10:17 a.m.

6

7

8          Videotape Deposition of TIMOTHY

9     DEVINE, held at the offices of Kramer,

10    Levin, Naftalis & Frankel, 1177 Avenue

11    of the Americas, New York, New York,

12    pursuant to Notice, before Erica L.

13    Ruggieri, Registered Professional

14    Reporter and Notary Public of the

15    State of New York.

16

17

18

19

20

21

22

23

24

25

53

1              TIMOTHY DEVINE

2    was forward -- it looks like she was

3    forwarding something to Talcott Franklin.

4    I -- I don't see an exhibit attached to

5    the e-mails here.

6         Q.    Looking at the e-mail at the

7    bottom of the first page from Mr. Franklin

8    to you on December 23, 2011, you received

9    that e-mail?

10        A.    It looks like I did.

11        Q.    And it related to a tolling

12   agreement, correct?

13        A.    The subject line is FWD: Tolling

14   Agreement.

15        Q.    Mr. Franklin says "Here it is.

16   Added agreement date, fixes spelling on

17   company and accepted your changes.  I will

18   get my client to sign."

19             Does that refresh your

20   recollection that you had received a draft

21   tolling agreement and had made some

22   changes to it?

23        A.    I don't remember that in

24   particular.

25        Q.    Weren't you the one who was

54

1              TIMOTHY DEVINE

2     coordinating the discussion with

3     Mr. Franklin much as you were with

4     Ms. Patrick?

5              MR. BRYAN:  Objection to form.

6              MR. PRINCI:  Objection to form.

7        A.    I -- I did correspond with and

8     communicate with Talcott Franklin on

9     behalf of the -- the ResCap clients, yes.

10       Q.    In the last e-mail in this

11    chain, which appears at the top of the

12    exhibit, the e-mail is from you to

13    Mr. Franklin on January 6, 2012.

14             Do you see that?

15       A.    Yes.

16       Q.    And you sent that e-mail, didn't

17    you?

18       A.    It looks like I did.

19       Q.    And in that e-mail you suggested

20    dates for a meeting with Mr. Franklin,

21    correct?

22       A.    That's what it looks like.

23       Q.    Did you thereafter schedule a

24    meeting with Mr. Franklin?

25       A.    I believe a meeting was

102

1           TIMOTHY DEVINE

2    period ended March 31, 2012.  But I -- but

3    I'm in no position to authenticate that

4    this document is what the front page of it

5    indicates it is.  That's not in my job.

6        Q.   It's already been authenticated,

7    Mr. Devine.  You saw the 10-Q at the time

8    it was filed?

9        A.   I can't say I saw the 10-Q.  I

10   probably saw parts of it.

11       Q.   Did you participate in its

12   preparation?

13       A.   I gave advice to the client in

14   connection with its preparation.

15       Q.   The 10-Q was filed on April 27,

16   2012, right?

17       A.   I don't know.

18       Q.   Take a look at page 73.

19       A.   Okay.

20       Q.   And directing your attention to

21   the heading Potential Losses, Litigation

22   Repurchase Obligations and Related Claims.

23   Do you see that?

24       A.   Yes.

25       Q.   Did you participate in the

103

1           TIMOTHY DEVINE

2     preparation of any of the material under

3     this heading?

4        A.    Yes.

5        Q.    The paragraphs under that

6     heading, until you get to the number 25

7     that says Subsequent Events, up until

8     that, those are part of note 24, which

9     begins on page 66, correct?

10       A.    It may be a copying issue but I

11    have a blank page at page 66.

12       Q.    Okay.  On the other side of it.

13    On the other side of what appears on this

14    copy of the exhibit to be a blank, you see

15    the notes?  This is all part of note 24,

16    right, that runs from that page, and it

17    doesn't have -- it's a copying error, the

18    66 which is on the back.  It runs from

19    there to page 73.  Can we agree on that?

20       A.    I -- I -- what are we agreeing

21    on, sorry?

22       Q.    That note 24 -- let's -- let's

23    do it this way.  That the material on page

24    73 up until you get to the note 25 begins

25    on the page following page number 65 in

136

1           TIMOTHY DEVINE

2    of a defect rate of a nonloan level for

3    those populations.

4        Q.    Okay.  And the next line under

5    Additional Items says "Potential

6    investor/securities litigation."  Do you

7    see that?

8        A.    Yes, I see it.

9        Q.    Is the amount shown for that

10   item $400 million, the estimate of

11   exposure for securities fraud claims at

12   that point?

13       A.    No.

14       Q.    Okay.  What does it represent?

15       A.    As I sit here today, my memory

16   is that it represents the estimated top

17   end of the range of reasonably possible

18   losses for ResCap over time related to

19   litigation and -- repurchase obligation of

20   related claims.  Meaning, as I understand,

21   that would have been subject to certain

22   stresses beyond what the estimated

23   exposure would have been.

24       Q.    Mr. Devine, I was only focusing

25   on the line that says "Potential

```
 1              TIMOTHY DEVINE

 2    investor/securities litigation."  And

 3    there's a $400 million number next to

 4    that.  Wasn't that some estimate of the

 5    possible or reasonably possible range of

 6    loss for securities litigation?

 7              MR. BRYAN:  Object to form.

 8        A.    Yeah.  Well, there's a lot of

 9    detail behind that line.  And as I sit

10    here today, I just can't remember the

11    detail.  But as I recall, that would have

12    been a number subject to a variety of

13    stresses that were imposed on the process

14    from outside of this sort of legal

15    advisory function.

16        Q.    Right.  Okay.

17        A.    That's the more complete answer.

18        Q.    Let me show you what's been

19    marked previously as Exhibit 83.

20        A.    Thank you.

21        Q.    Which is an e-mail chain on May

22    4, 2012.  There are two e-mails in this

23    exhibit.  Did you receive the one from

24    Mr. Lee on May 4?

25        A.    Yeah, it looks like I did.  Yes.
```

248

1          TIMOTHY DEVINE

2    of the conversation, at least from my

3    perspective in the deal.

4        Q.   Mr. Devine, given what you have

5    claimed is your limited expertise, why

6    were you injecting yourself into the

7    discussion on these matters?  Why didn't

8    you just let Mr. Schrock and Mr. Lee hash

9    it out?

10          MR. BRYAN:  Objection as to

11      form.

12      A.   I was driving a deal to

13   conclusion.

14      Q.   What deal?

15      A.   The deal that is represented in

16   gross by the resolution between the ResCap

17   estate and the RMBS claimants, both the

18   Kathy Patrick and Talcott Franklin in the

19   one sense and also the tripartite

20   agreement between Ally, the ResCap

21   entities and the claimants.  And I thought

22   it was a good deal and I still to this day

23   think it's a good deal.  And I saw that to

24   my mind anyway the essential elements of a

25   deal had been worked out that were

249

1              TIMOTHY DEVINE

2    favorable and fair to all concerned and I

3    wanted to get the deal done as I

4    understood we were on a certain timeline.

5        Q.    Looking at the top e-mail in the

6    chain from Mr. Lee to yourself, among

7    others, at 10:54 a.m. on May 9th, did you

8    receive that e-mail?

9        A.    It looks like I did, yes.

10        Q.    And Mr. Lee wrote, "We will be

11    seeking ResCap board approval today.  Does

12    Ally's board need to approve as it is

13    signing the PSA and ResCap is agreeing to

14    settle a claim in excess of 25 million,

15    which requires Ally approval under Ally's

16    governance framework.  Please let us

17    know."

18              Did AFI's board need to approve?

19        A.    I don't know.

20        Q.    Did Mr. Lee, to your knowledge,

21    receive a response to his inquiry?

22        A.    I don't know.

23        Q.    Does Mr. Lee's reference to the

24    ResCap board -- his reference to seeking

25    ResCap board approval today, meaning

1                TIMOTHY DEVINE

2       their claims?

3                MR. BRYAN:  Object to form.  I

4           knew -- I certainly knew that the

5           monolines were not a signatory party

6           to the settlement.  But it was my

7           understanding that the claims that

8           they would or could enunciate in

9           connection with the securities subject

10          of the settlement would be included

11          within the scope of the allowed claim.

12          Q.   You said, "And we can define

13      securities claims narrowly."  What do you

14      mean by that?

15          A.   What I meant by securities

16      claims was claims brought by securities

17      holders on traditional federal securities

18      law or state blue sky or the closely

19      Allied state common law fraud claims that

20      would be characterized typically as a

21      securities based claim.

22          Q.   A bit further down in your

23      e-mail you said "The circle is squared at

24      the plan.  KP can only get us the

25      everything but securities settlement

272

1          TIMOTHY DEVINE

2     release because that is the full extent of

3     her representation.  She has been clear

4     about that.  Same as in her" BofA -- "B of

5     New York Mellon work, etc."

6              Do you see that?

7         A.    Yes, I do see that.

8         Q.    And then you said "But notice,

9     though her clients don't release

10    securities claims, they sign plan support

11    agreements and the plan includes very

12    simple comprehensive releases, which of

13    course include third-party release of all

14    claims which of course includes securities

15    claims.  Presto.  So while she can't

16    represent parties in giving up their

17    securities claims, clients face a choice,

18    either sign up with the settlement to make

19    sure your trust receives monies under the

20    waterfall in which case you need to sign

21    the plan support agreement and support the

22    plan.  And the plan wipes out all their

23    claims of any sort.  This is the beauty of

24    it."

25              Do you see that?

273

1          TIMOTHY DEVINE

2      A.    I see that.

3      Q.    So you were explaining how

4  execution of the plan support agreement

5  achieved releases of securities claims

6  even if the settlement agreement itself

7  did not, correct?

8      A.    What I was explaining is that in

9  signing up for the settlement agreement

10  between ResCap and -- with ResCap those

11  parties were committing to sign a plan

12  support agreement simultaneously, which to

13  my understanding represented their

14  valuation of the securities claims they

15  were giving up and therefore they were

16  supporting a plan which would include

17  release of securities claims against the

18  debtor and release of securities claims,

19  such as they might be, against Ally

20  Financial.

21      Q.    And you thought that was pretty

22  clever, didn't you?

23          MR. BRYAN:  Object to form.

24          MR. PRINCI:  Objection as to

25      form.

279

1             TIMOTHY DEVINE

2    going on at that time and I have no idea

3    whether there were any intervening e-mails

4    between me and Jamie that were responsive

5    to this one before I received this.

6        Q.    Whatever, Mr. Devine, did you

7    receive the e-mail that Ms. Levitt sent at

8    1:16 a.m. on May 11th?

9        A.    Looks like I did.

10            MR. KAUFMAN:  Let's mark as

11        Exhibit 154 another e-mail chain, this

12        one on May 12, 2012.

13            (9019 Exhibit 154, e-mail chain

14        dated May 12, 2012, marked for

15        identification, as of this date.)

16        Q.    Looking at the first e-mail in

17    the chain, which begins at the bottom of

18    the exhibit and continues over to the next

19    page.  Did you send that e-mail to

20    Ms. Levitt, Mr. Lee, Mr. Ornstein and

21    Mr. Ruckdaschel at 4:22 p.m. on May 12th?

22        A.    It looks like I did.

23        Q.    The subject of your e-mail was

24    the question, "Has Talcott Franklin signed

25    on without reservation to support the

280

1              TIMOTHY DEVINE

2     plan, including broad third-party release

3     of all claims against Ally, etc.,

4     including securities claims."  Right?

5          A.     That's what the subject line is.

6          Q.     And did you receive Mr. Lee's

7     e-mail at 4:26 p.m. in response to that

8     e-mail?

9          A.     I see that Gary Lee sent an

10    e-mail to pretty much the same group of

11    people at 4:26.

12         Q.     And you received that e-mail

13    from Mr. Lee, didn't you?

14         A.     That's what it looks like.

15         Q.     Okay.  And Mr. Lee said, "It's

16    complicated."  And that, "We sent Talcott

17    the agreement the way we wanted it and

18    told him he couldn't really negotiate it.

19    But if KP doesn't sign, I don't know if he

20    will."

21              Do you see that?

22         A.     I see that that's part of what

23    his e-mail says.

24         Q.     Right.  And the e-mail at the

25    top is your reply to Mr. Lee, correct?

285

1              TIMOTHY DEVINE

2      getting authority from his clients to sign

3      the plan support agreement and I was

4      indicating to him in that last sentence, I

5      can't expose Ally to any claims however

6      remote, the importance of including all

7      claims of any type in the plan support

8      agreement.  And the reference to however

9      remote was with regard to the frequent and

10     consistent communication I had -- had had

11     with Talcott Franklin and with Kathy

12     Patrick, for that matter, from the

13     beginning that rep and warrant claims as

14     against Ally are -- were not viable

15     legally or factually.  And that we also

16     did not believe that there was exposure to

17     Ally in the securities claims.

18         Q.   That was your position.  But you

19     needed the same release provisions for

20     Mr. Franklin as you had with Ms. Patrick,

21     right?

22              MR. PRINCI:  Objection as to

23         form.

24         A.   When you say I needed them, what

25     did you mean.

310

1           TIMOTHY DEVINE

2      Q.    But under the terms of

3   settlement agreement the trusts are

4   presented with the option to opt in or opt

5   out, right?

6      A.    Well, I can't profess to have an

7   encyclopedic memory of what terms, what

8   the terms in the agreement indicate with

9   regard to the options that the trusts

10  faced.  I just don't.

11     Q.    Let's go back to your

12  understanding of the monolines for a

13  second.  As you sit here today, are you

14  aware of anything in the agreement that

15  would carve the monolines claims out of

16  the scope of the settlement agreement that

17  was reached between the debtors and

18  Ms. Patrick?

19     A.    I'm not aware of anything that

20  would carve the monolines claims out of

21  the $8.7 billion allowed claim.

22          MR. JURGENS:  Let's scroll to --

23      we have a hard copy now.  That's

24      wonderful.  So we don't have to

25      scroll.

311

1          TIMOTHY DEVINE

2          (Handing.)

3     A.    Thank you.

4     Q.    If you can flip to section 8.02

5     of the agreement, please.

6     A.    For the record, this has

7     previously been marked as 120; is that

8     correct?

9     Q.    This document has been marked

10    several times but 120 sounds right to me.

11    A.    I just want a clean record.

12    Q.    No.  Thank you.

13    A.    Section 8.02?

14    Q.    Yes, please.  I'll just read it

15    for you, Mr. Devine, while you were

16    flipping through.  It says "Financial

17    guarantee provider rights and obligations.

18    To the extent that any third-party

19    guarantor or financial guarantee provider

20    with respect to any trust has rights or

21    obligations independent of the rights or

22    obligations of the investors, the trustees

23    or the trusts, the releases and waivers in

24    Article 7 are not intended to and shall

25    not release such rights."

312

1          TIMOTHY DEVINE

2              Do you see that?

3      A.    I see that.

4      Q.    As you sit here today, what is

5  your understanding of section 8.02?

6              MR. BRYAN:  Object to form.

7      A.    I don't -- I haven't formed an

8  understanding of that provision.

9      Q.    A few moments ago you said it

10  was your understanding that the monolines

11  claims would come out of the 8.7 billion,

12  right?

13      A.    That's correct.

14      Q.    Can you reconcile that testimony

15  with the words we see in section 8.02?

16      A.    You've asked me to pick one

17  provision out of this agreement and it

18  just feels to me unfair.  It's totally out

19  of context.

20      Q.    So do you have any reason to

21  believe that if we sat here on the record

22  and you sifted through the balance of that

23  agreement and looked at every single word,

24  sentence and paragraph in there, that

25  you'd find something that would be able to

313

1          TIMOTHY DEVINE

2    reconcile your testimony that the

3    monolines claims would have to come out of

4    the $8.7 billion settlement with section

5    8.02?

6          MR. BRYAN:  Objection to form.

7      A.    Well, it says here and it's

8    phrased fairly carefully, "To the extent

9    that any third-party guarantor or

10   financial guarantee provider with respect

11   to any trust has rights or obligations

12   independent of the rights or obligations

13   of the investors, then the release and

14   waivers in Article 7 are not intended to

15   and shall not release."

16          By which I understand that the

17   parties didn't take a position as to

18   whether or not the financial guarantee

19   provider as subject to section 8.02 did or

20   did not have rights independent of the

21   rights or obligations of the investors,

22   the trustees or the trusts but came to

23   perhaps agreed to disagree as to whether

24   such financial guarantee providers did or

25   did not have such rights and determined

314

1          TIMOTHY DEVINE

2     that to the extent that eventually it was

3     determined that they did have such

4     independent rights that they would not be

5     covered by Article 7.

6          Q.    You just used the phrase

7     "independent rights."  What independent

8     rights would a monoline have?  I'm just

9     looking for your understanding.

10          A.    I'm not going to enunciate any

11     rights, independent rights a monoline has.

12     You asked me to reconcile section 8.02

13     with my understanding that the monolines

14     would take within the $8.7 billion claim.

15          Q.    So is it your testimony --

16          A.    And I did.

17          Q.    Is it your testimony then that

18     you don't believe that the monolines have

19     any rights that are independent of the

20     rights of the investors as trustees or the

21     trusts?

22          MR. BRYAN:  Objection to form.

23          A.    Why are you asking me what

24     rights the monolines have?

25          Q.    May I have an answer to my

1          TIMOTHY DEVINE

2     describe as the RMBS or put back

3     litigation, and I'd include in that

4     definition both the monoline claims that

5     were in litigation and any put back claims

6     that -- that might have been asserted?

7          A.    The first substantial contact I

8     had within my job duties with the mortgage

9     business was in the summer of 2010 when

10    the FHFA propounded 64 subpoenas across

11    the industry and I was asked to coordinate

12    the response to the subpoenas that were

13    issued to the company.

14         Q.    Did you supervise outside

15    counsel with respect to the monoline

16    litigation either MBIA or FGIC litigation?

17         A.    Have I done that?

18         Q.    Yes.

19         A.    Yes.

20         Q.    When you were representing AFI

21    from the time of the October letter that

22    Ms. Patrick sent to the signing of the

23    settlement agreement, were you solely

24    representing AFI or were you also

25    representing ResCap during that time

360

1          TIMOTHY DEVINE

2    period from October forward?

3        A.    Well, we should probably be

4    careful with regard to what you mean by

5    representing.  The -- as I recall, the

6    first communication from Kathy Patrick

7    came in to Bill Solomon in his capacity as

8    general counsel of Ally Financial, Inc.

9    He responded by indicating to Ms. Patrick

10   that Ally Financial, Inc. did not have

11   exposure of the variety that she wanted to

12   talk about settling.  And referred her to

13   Tammy Hamzephour, general counsel for

14   ResCap.

15          What -- my participation in

16   connection with meeting with Ms. Patrick,

17   I think Mr. Sheeren was there at the first

18   meeting in Minnesota, I don't recall

19   exactly.  But in any event, I was there in

20   my capacity as chief counsel for

21   litigation for ResCap, given that

22   Ms. Patrick purported to represent clients

23   who purported to have rep and warrant

24   essentially contract claims against the

25   contracting parties, all of whom were

361

1          TIMOTHY DEVINE

2    within the ResCap structure and none of

3    whom were within the Ally structure.

4       Q.    So at that time in that meeting,

5    if I understand, it took place sometime

6    between October, November, December,

7    sometime in 2011, the last quarter?

8       A.    I don't recall when it took

9    place.  I think we have had some testimony

10   on it today.  If there's a document we

11   could refer to it.

12      Q.    I'm going to try to do this

13   without -- without taking the time to go

14   back to the documents.

15      A.    Okay, thank you.

16      Q.    So initially you were

17   representing ResCap in what I will call

18   the Kathy Patrick negotiations with

19   respect to her claims?

20      A.    Well --

21           MR. BRYAN:  Objection to form.

22      A.    I -- I understand that you would

23   call them negotiations.  So I think that

24   term is going to end up being understood

25   in a number of different ways.  What --

362

1                    TIMOTHY DEVINE

2    what went on for some period of time with

3    Kathy Patrick was an exchange of

4    communications designed to understand the

5    nature of her representation, who her

6    clients were, what kind of claims they

7    were purporting to make.  And so to the

8    extent that that is a prelude to or a part

9    of or a type of negotiation, yes.  So for

10   a period of time I was supporting those

11   discussions in my capacity in support of

12   the ResCap entities.

13       Q.    You understood that Ms. Patrick

14   was asserting that ResCap owed her clients

15   a substantial amount of money?

16       A.    Yes.

17       Q.    So you -- did she at some

18   point -- what was the first, her first

19   demand or her first claim that she made

20   against ResCap, do you recall?

21       A.    As I sit here today, I don't

22   recall her first demand.

23       Q.    Did she ask for $10 billion?

24       A.    Now, you are talking about once

25   the discussions started to take place for

363

1           TIMOTHY DEVINE

2    a compromise of those claims within the

3    context of a ResCap filing.

4         Q.    At any point?

5         A.    Yeah.  So I believe that she did

6    at one point in the negotiations but now

7    this was within the context of a potential

8    ResCap filing at which time I was not

9    representing ResCap in connection with a

10   potential resolution of claims against the

11   ResCap estate.

12        Q.    Okay.  So if I understand your

13   testimony correctly, you initially started

14   out representing ResCap and then at some

15   point you were no longer representing

16   ResCap.  Could you explain to me when your

17   role and responsibility changed?

18        A.    I think you've slightly

19   misunderstood but I don't blame you.  At

20   some point -- because it wasn't entirely

21   clear, right.  At some point -- look, when

22   we started the discussions with Kathy

23   Patrick, I was representing the ResCap

24   entities in connection with the assertion

25   that they had -- that Kathy Patrick did

364

1                TIMOTHY DEVINE

2      represent clients who did or did not under

3      the relevant documents have contract

4      claims against ResCap.  And that was

5      natural because I had been dealing with

6      that kind of assertion of claim, although

7      not by investors and trustees but rather

8      by the monolines against the ResCap

9      entities theretofore.

10                At some point ResCap began to

11     consider a Chapter 11 restructuring.  I

12     did not represent ResCap at all in

13     connection with this Chapter 11

14     restructuring, unless you consider the

15     nature of our discussions according to the

16     common interest or joint defense privilege

17     in which case that's why I don't blame you

18     for misunderstanding the nature of what I

19     just talked about.  But so, yes, I did

20     represent ResCap in connection with the

21     sort of bilateral claim of Kathy Patrick's

22     clients against the ResCap entities and

23     rep and warrant.  Once the context of the

24     restructuring became a part of that

25     dialogue, ResCap was represented by Gary

365

1          TIMOTHY DEVINE

2    Lee of MoFo.  I never represented ResCap

3    on a bankruptcy related resolution.  At

4    least unless you -- as I say, I did

5    continue to advise ResCap in connection

6    with plain sort of legal analysis on rep

7    and warrant issues but not so much as

8    would be implicated in connection with the

9    filing.

10        Q.    Thank you for that and let me

11   try to make sure I understand correctly.

12   To try to summarize.  In the beginning of

13   from October for some period of time in

14   the initial stages that you've described

15   as essentially information gathering

16   stages, you were representing ResCap.  By

17   the end, by the April and May time period

18   that we have looked at a variety of

19   e-mails by that time period you were no

20   longer representing ResCap, you would have

21   solely been representing AFI, is that

22   correct, am I bracketing the change in

23   role correctly?

24        A.    No.  I think you are missing one

25   part of it.  But it's -- it's

366

```
 1              TIMOTHY DEVINE

 2     directionally correct.  So first of all,

 3     the difficulty with the word

 4     "representing" given that there were no

 5     pleadings in the matter, nobody appeared

 6     as counsel of record, et cetera.  So let's

 7     for a moment agree that the term

 8     "representing" is somewhat subject to a

 9     variety of definitions and understandings.

10          Q.    I would use representing as

11     representing in the context of the

12     negotiations.  Representing a client, be

13     it AFI or ResCap, in dealing with

14     Ms. Patrick or the Talcott Franklin group

15     that came in at the end.  If you

16     understand that.

17          A.    Uh-hum.  So there -- there were

18     certainly throughout the relevant period

19     transactions and discussions,

20     communications -- transactions meaning

21     information exchange, et cetera, between

22     the ResCap parties and Kathy Patrick on

23     the one hand or Talcott Franklin on the

24     other, which I assisted and advised ResCap

25     in accomplishing.
```

367

1            TIMOTHY DEVINE

2            At the same time I was

3     representing -- I was chief counsel to

4     Ally as well so of course I was advising

5     both ResCap and Ally in connection with

6     the -- the claims that Kathy Patrick

7     purported to make on behalf of those

8     clients.

9        Q.   When you were representing

10    ResCap in the initial stages of this

11    discussions and negotiations with

12    Ms. Patrick, who did you report to at

13    ResCap?

14       A.    I certainly included Tammy

15    Hamzephour in any discussions.  She was

16    general counsel to the ResCap entities.  I

17    had conversations with and gave advice to

18    and took input from a variety of business

19    clients.

20       Q.    So in addition to Ms. Hamzephour

21    you spoke to other not -- not in-house

22    counsel but other business representatives

23    at ResCap?

24       A.    Yes.

25       Q.    Do you recall who that would be

368

1           TIMOTHY DEVINE

2      in the initial stages?

3           A.    Sure.  So but in what capacity,

4      as sort of an information source, as a --

5      as a normal business client or in sort of

6      a decision-making --

7           Q.    In any capacity you were

8      representing them in the initial stages of

9      these discussions and negotiations with

10     Ms. Patrick.

11          A.    I had communications with Tom

12     Marano, with Jim Whitlinger, with Jeff

13     Blashco (ph), Jeff Cancelliere.  This was

14     my -- as in-house counsel I had naturally

15     the information and expertise relating to

16     the rep and warrant claims that Kathy

17     Patrick and her clients purport to make.

18     It was all contained within ResCap.  That

19     was my resource base, that was my client

20     base, that's where the decision-making

21     authority with regard to whether or not to

22     engage in real settlement discussions or

23     not.  That's -- that's where all that took

24     place with the ResCap client.

25          Q.    Why was it decided at some point

369

1          TIMOTHY DEVINE

2     that you would no longer represent ResCap

3     and solely be representing AFI?

4          A.    I'm going to answer your

5     question without revealing privileged

6     communications.  At some point it was

7     determined that people performing

8     functions like the one I was performing,

9     which spanned across -- across the Ally,

10    the nondebtor to the debtor line, should

11    reorient so that they were aligned with

12    one or the other.  And that was a process

13    that took place across the various

14    business units and functions to the extent

15    that there was any overlap.

16         Q.    Do you know when that was?

17         A.    With regard to my own role?

18         Q.    Yes.

19         A.    I don't know exactly when it

20    was.  I understand you would think I would

21    have an exact date and hour.  I don't.

22    But because -- the reason I don't is

23    because it's probably accurate to say that

24    in some measure I continued to be a

25    resource for the ResCap client even as

370

1          TIMOTHY DEVINE

2    they retained MoFo to represent them in

3    connection with rep and warrant and in

4    connection with rep and warrant in a

5    bankruptcy context, simply because I had a

6    great deal of experience in connection

7    with the claims that were being asserted

8    against the estate and because, as you

9    know, many of us believed that we had a

10   common interest in joint defense.  And in

11   fact at some point a document was executed

12   to that effect.

13          So it's not a straight line,

14   drop dead date after which I was no longer

15   providing advice to either a client of

16   sorts or a co, sort of a party subject to

17   a common defense or joint defense

18   agreement.

19       Q.    I think I understand.  To your

20   knowledge, when did ResCap become

21   insolvent, and I would define that on a

22   balance sheet basis when its total assets

23   were less than its total liabilities?

24       A.    I don't know.

25          MR. BRYAN:  Objection.

A. 9

Confidential



Kathy D. Patrick
kpatrick@gibbsbruns.com
713.751.5253

October 17, 2011

<u>Via Federal Express</u>

William B. Solomon, Jr., Esq.
    General Counsel
Ally Financial Inc.
200 Renaissance Center
Detroit, Michigan 48265

Dear Mr. Solomon:

This firm represents investment advisers and holders of Residential Mortgage Backed Securities (RMBS) issued and/ or underwritten by Ally Financial Inc. and/or its affiliates ("Ally"). The aggregate outstanding balance of the 242 Ally deals in which our clients collectively hold 25% or more of the voting rights of a class in that deal, exceeds $51 billion. The aggregate outstanding balance of the 173 Ally deals in which our clients collectively hold 50% or more of the voting rights of a class in that deal, exceeds $36 billion.

There is widespread, readily available evidence suggesting that large numbers of mortgages securing the certificates held by our clients were sold or deposited into the RMBS pools based on false and/or fraudulent representations and warranties by the mortgage originators, sellers and/or depositors. This evidence includes, but is certainly not limited to:

- excessive early default and foreclosure rates experienced in the underlying mortgage pools;

- a loan-level analysis of Ally RMBS conducted by the Federal Housing Finance Agency (FHFA), which revealed that up to 13% of the mortgage loans in Ally RMBS breached owner-occupancy representations and warranties, and that up to 49% of the mortgage loans in Ally RMBS breached Loan-to-Value representations and warranties[1];

---

[1] Our clients collectively hold 25% or more of the voting rights of a class in 18 of the 21 Ally deals which FHFA analyzed.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

Confidential

RC-9019_00048950

- MBIA's lawsuits against Ally, reporting that its loan-level analysis of various Ally RMBS showed that high numbers of mortgages in the pools were ineligible at origination[2];

- detailed allegations in securities cases against Ally, which suggest widespread deficiencies in Ally's underwriting practices, including inaccurate representations and warranties regarding important loan characteristics such as borrower incomes and home appraisals[3];

- substantial downgrades of the certificates by credit rating agencies; and

- Ally's own apparent acknowledgement that it is potentially liable for violations of representations and warranties in Ally RMBS, evidenced by its $829 million reserve for repurchase liabilities as of June 30, 2011, which relates "primarily" to non-GSE exposure,[4] as well as its statement that such liabilities are "most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages *that were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 and forward*."[5]

In addition, there is widespread, readily available evidence suggesting that Ally, as servicer and/or master servicer of mortgage loans securing the certificates held by our clients, has failed to observe and perform the covenants and agreements imposed on it by the governing agreements, and has failed to meet its duty to prudently service those mortgage loans, including, but certainly not limited to:

- Ally's admittedly flawed and "embarrassing"[6] mortgage loan servicing and foreclosure practices, including deficient document signing practices, leading to Ally's foreclosure suspension and review in Fall 2010;

- Ally's April 2011 consent order with the Board of Governors of the Federal Reserve System and the FDIC, which alleged that, in connection with certain

---

[2] MBIA has reported that 89% of adversely selected loans from 3 separate GMAC securitizations were not originated in material compliance with GMAC's underwriting guidelines or representations and warranties. *See* Complaint ¶ 6, *MBIA Ins. Co. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct.). MBIA has also reported that 93% of adversely selected loans from 5 separate RFC securitizations were not originated or acquired in material compliance with RFC's representations and warranties. *See* Complaint ¶ 46, *MBIA Ins. Co. v. Residential Funding Co., LLC*, No. 603552/2008 (N.Y. Sup. Ct.).

[3] *See, e.g.*, Complaint, *Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, LLC, No. 3:11-cv-30035 (D. Mass.).

[4] *See* Ally Financial Inc.'s Second Quarter 2011 Form 10-Q at 83.

[5] *See id.* at 81 (emphasis added).

[6] *See* Dakin Campbell and Natalie Doss, *Ally Will Keep ResCap, 'Screwed Up' Using Robosigners*, BLOOMBERG NEWS, Nov. 3, 2010.

Gibbs & Bruns LLP · 1100 Louisiana  Suite 5300 · Houston, Texas 77002 · T 713.650.8805 · F 713.750.0903 · www.gibbsbruns.com

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

Confidential

3

foreclosures of loans in Ally's servicing portfolio, Ally engaged in "unsafe or unsound banking practices" because, among other reasons, Ally filed or caused to be filed in courts inaccurate affidavits, filed or caused to be filed in courts or in land record offices improperly notarized mortgage-related documents, litigated or initiated foreclosure proceedings without ensuring proper assignment and possession of promissory notes or mortgage documents, failed to devote adequate resources to foreclosure processes, failed to ensure timely, effective, and efficient communication with borrowers with respect to loss mitigation and foreclosure activities, failed to subject its foreclosure processes to adequate oversight, internal controls, policies, and procedures, and failed to sufficiently oversee third parties handling foreclosure-related services;

- ongoing investigations by state attorneys general and other government agencies into Ally's mortgage loan servicing and foreclosure-related practices;

- evidence of wholly avoidable and unnecessary servicing fees to maintain mortgaged property, which have resulted from Ally's flawed mortgage loan servicing and foreclosure practices; and

- Ally's apparent failure to notify other parties to the governing agreements of mortgage loans in the pools that violated representations and warranties at the time they were sold into the pools, and its apparent failure to enforce the sellers' obligations to cure, substitute, or repurchase such loans, as Ally is required to do under the governing agreements.

Based on this and other evidence, our clients believe that large numbers of ineligible loans were sold or deposited into, and remain in, the RMBS pools securing the certificates. Under the governing agreements, Ally has substantial repurchase liability for such loans. Our clients further believe that Ally's failure to observe and perform the covenants and agreements imposed on it by the governing agreements, and to meet its duty to prudently service those mortgages, may constitute a servicer event of default under the governing agreements.

Our clients are not willing to suffer further losses resulting from ineligible loans in the pools and improper servicing of the loans in the pools, and they wish to seek a resolution of repurchase and servicing claims with Ally. As such, our clients hope and anticipate that Ally will begin a constructive dialogue with them regarding the concerns raised by this letter. If, however, Ally proves to be an obstacle to their efforts to mitigate such losses, our clients fully intend to exercise their rights under the governing agreements—including the issuance of binding instructions to Trustees—to pursue enforcement of repurchase and servicing claims against Ally.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY        RC-9019_00048952

Confidential

4

Should Ally wish to begin a constructive dialogue regarding these issues, please make appropriately senior legal and business personnel available to meet with me and various of our clients on Thursday, October 27, 2011. To arrange the details of this meeting, please contact me as soon as possible.

Very truly yours,

Kathy Patrick

Gibbs & Bruns LLP · 1100 Louisiana · Suite 5300 · Houston, Texas 77002 · T 713.650.8805 · F 713.750.0903 · www.gibbsbruns.com

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                RC-9019_00048953

# A. 10

REDACTED

# A. 11



William B. Solomon, Jr.
Group Vice President and General Counsel

October 21, 2011

<u>Via Federal Express</u>

Kathy Patrick, Esq.
Gibbs & Bruns LLP
1100 Louisiana
Suite 5300
Houston, TX  77002

Dear Ms. Patrick:

I am in receipt of your October 17, 2011 letter.  None of the transactions that you describe in your letter involved Ally Financial Inc., so it would be inappropriate to engage you on the issues.

For your information, the General Counsel of Residential Funding Corporation and GMAC Mortgage is Tammy Hamzehpour, whose address is 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.

Sincerely,



EXHIBIT
9019-121
11/19/12

| | | |
|---|---|---|
| 200 Renaissance Center<br>Phone: 313-656-6128 | Mail Code: 482-B09-B11<br>Fax: 313-656-6124 | Detroit, MI  48265<br>E-mail: william.b.solomon@ally.com |

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00048954

# A. 12

Confidential



Kathy D. Patrick
kpatrick@gibbsbruns.com
713.751.5253

October 25, 2011

<u>Via Federal Express</u>

William B. Solomon, Jr., Esq.
    General Counsel
Ally Financial Inc.
200 Renaissance Center
Detroit, Michigan 48265

Dear Mr. Solomon:

    I am in receipt of your October 21st, 2011 letter. As you know, Ally Financial Inc. ("Ally") is the parent and 100% owner of GMAC Mortgage Group, Inc. ("GMACM"). Residential Capital, LLC ("ResCap"), in turn, is a wholly-owned subsidiary of GMACM. ResCap is the direct or indirect parent of the parties to the pooling and servicing agreements at issue, including GMAC Mortgage and Residential Funding, to which you referred in your letter.

    In response to your suggestion, I will forward my October 17th, 2011 letter to Ms. Hamzehpour, who appears to be the General Counsel of Ally's Mortgage Operations, as well as the General Counsel of ResCap.

    Our clients do not, however, accept your assertion that Ally Financial Inc. does not ultimately bear the liability associated with the repurchase and servicing claims described in my October 17th letter. Ally does.

            Very truly yours,

            Kathy Patrick

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00048948

A. 13

REDACTED

# A. 14

**From:**                 Devine, Timothy
**Sent:**                 Monday, December 05, 2011 6:38 PM
**To:**                    Hamzehpour, Tammy; Hagens, David; Ruckdaschel, John
**Subject:**           Re: Kathy Patrick

Still silence from Kathy? I had the distinct impression she was going to reach out to us.

---

**From:** Hamzehpour, Tammy
**To:** Devine, Timothy; Hagens, David; Ruckdaschel, John
**Sent**: Mon Dec 05 13:07:51 2011
**Subject**: RE: Kathy Patrick

Kathy's contact information is:

kpatrick@gibbsbruns.com
713-751-5253

---

**From:** Devine, Timothy
**Sent:** Thursday, December 01, 2011 7:59 AM
**To:** Hamzehpour, Tammy; Hagens, David; Ruckdaschel, John
**Subject:** RE: Kathy Patrick

Tammy: will you please fwd Kathy's email contact info? I will reach out to her in the next day or so to pick up the dialogue.  Thanks. Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Hamzehpour, Tammy
**Sent:** Wednesday, November 30, 2011 4:36 PM
**To:** Devine, Timothy; Hagens, David; Ruckdaschel, John
**Subject:** RE: Kathy Patrick

I've not heard anything.

---

**From:** Devine, Timothy
**Sent:** Wednesday, November 30, 2011 3:29 PM
**To:** Hamzehpour, Tammy; Hagens, David; Ruckdaschel, John
**Subject:** Kathy Patrick

All: as I understood it, we were going to hear from Kathy Patrick next.  Am I right?  Have we heard anything?

Thanks.

Tim

Confidential

ALLY_0209271

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

Confidential

ALLY_0209272

A. 15

| | |
|---|---|
| **From:** | Kathy D. Patrick |
| **Sent:** | Monday, December 19, 2011 6:11 PM |
| **To:** | Hamzehpour, Tammy; Rosten, Linda; Devine, Timothy |
| **Cc:** | David Sheeren; Scott A. Humphries; Francis.Chlapowski@gs.com; Jon.Yoder@gs.com; Neena.Reddy@gs.com; BBaltich@fhlbatl.com; roshields@fhlbatl.com; paul.defrancisci@nb.com; Monica.Sherer@nb.com; Sean.Plater@tcw.com; cwoods@aegonusa.com; dmineck@aegonusa.com; rick.lebrun@pimco.com; david.flattum@pimco.com; Stephen.Venable@westernasset.com; jeffrey.kupor@invesco.com; Tim.Meehan@Americas.ING.com; marcy.cohen@americas.ing.com; paul.howell@us.ing.com; Bridget.healy@us.ing.com; rlaws@ingdirect.com; kwellman@ingdirect.com; jmccally@tiaa-cref.org; maureen_cronin@nylim.com; Ronald_Brandon@nylim.com; cnass@KoreCapital.com; LBriganti@bayernlbny.com; VDolan@bayernlbny.com; wding@metlife.com; dlarocca@metlife.com; kfinnegan@metlife.com; tshenkin@metlife.com; robert.lawrence@prudential.com; tina.smith@thrivent.com; arthur.rublin@blackrock.com; stephen.ahrens@blackrock.com; peter.vaughan@blackrock.com; sheris@bgi-group.com; miker@bgi-group.com; LaurieS@bgi-group.com; Steffen.nies@lbbw.de; frank.damerow@lbbw.de; James.Walters@commerzbank.com; Ron.Raffan@commerzbank.com; Jonathan.Banks@commerzbank.com; Simon.Bowmer@commerzbank.com; Matthew.McCabe@commerzbank.com; CPryor@tiaa-cref.org; stephanie.heller@ny.frb.org; Scott A. Humphries; Robert J. Madden; Kathy D. Patrick; David Sheeren |
| **Subject:** | RE: Letter from Tim Devine |
| **Attachments:** | 12-19-11 Letter to Timothy Levine - Ally.pdf |

Good Evening:


A letter confirming the identities of the clients we represent is attached.  Our clients are
also copied on this email, to confirm that they are aware of this communication and have
authorized us to act on their behalf in these discussions.


Please contact me promptly concerning the confidentiality agreement and any other preliminary
matters so that we may move this matter forward.
We look forward to continuing our discussions and hope they will be productive.


Best regards,


Kathy


Kathy Patrick

Gibbs & Bruns LLP | 1100 Louisiana Suite 5300 | Houston TX  77002

713.751.5253 o. | 713.750.0903 f. | www.gibbsbruns.com

1

PROFESSIONALS' EYES ONLY                                                    RC-9019_00057131

kpatrick@gibbsbruns.com

From: Hamzehpour, Tammy [mailto:Tammy.Hamzehpour@ally.com]
Sent: Monday, December 19, 2011 5:16 PM
To: Kathy D. Patrick; Rosten, Linda
Cc: Devine, Timothy; David Sheeren; Scott A. Humphries
Subject: RE: Letter from Tim Devine

Kathy,

I know Tim is traveling this evening, but I can confirm to you that we will hold your
clients' identities in confidence.

Best regards,

Tammy Hamzehpour
General Counsel, Mortgage Operations
1100 Virginia Drive
Fort Washington, PA  19034
T + 215 682 1307| M + 952 270 8470 | F + 866 572 7524 tammy.hamzehpour@gmacrfc.com
<mailto:tammy.hamzehpour@gmacrfc.com>

```
*******************************************************************
*******************************************************************
```

PROFESSIONALS' EYES ONLY

RC-9019_00057132

********************************
THIS MESSAGE CONTAINS INFORMATION WHICH MAY BE CONFIDENTIAL AND PRIVILEGED.  UNLESS YOU ARE
THE ADDRESSEE (OR AUTHORIZED TO RECEIVE FOR THE ADDRESSEE), YOU MAY NOT USE, COPY OR DISCLOSE
TO ANYONE THE MESSAGE OR ANY INFORMATION CONTAINED IN THE MESSAGE OR ITS ATTACHMENTS.  IF YOU
HAVE RECEIVED THE MESSAGE IN ERROR, PLEASE ADVISE THE SENDER BY REPLY E-MAIL AT
tammy.hamzehpour@gmacrfc.com AND DELETE THE MESSAGE.
******************************************************************************
******************************************************************************
********************************

---

From: Kathy D. Patrick [mailto:kpatrick@gibbsbruns.com]
Sent: Monday, December 19, 2011 5:48 PM
To: Rosten, Linda
Cc: Devine, Timothy; Hamzehpour, Tammy; David Sheeren; Scott A.
Humphries; Kathy D. Patrick
Subject: RE: Letter from Tim Devine

Mr. Devine:


Thank you for this letter.  We were awaiting Ally's execution of the confidentiality
agreement, so that we could send you a formal list of our clients' names and confirmation of
the holdings held by the group.
If you will kindly respond to this email confirming that you will hold our clients'
identities in confidence, we will immediately respond with a letter—copied to our clients—
confirming we are acting on their behalf.


Best regards,


Kathy


Kathy Patrick

Gibbs & Bruns LLP | 1100 Louisiana Suite 5300 | Houston TX  77002

713.751.5253 o.| 713.750.0903 f. | www.gibbsbruns.com

kpatrick@gibbsbruns.com




From: Rosten, Linda [mailto:Linda.Rosten@ally.com]

3

Sent: Monday, December 19, 2011 4:09 PM
To: Kathy D. Patrick
Cc: Devine, Timothy; Hamzehpour, Tammy; David Sheeren; Scott A. Humphries
Subject: Letter from Tim Devine


Ms. Patrick,


Attached is a letter from Tim Devine dated December 19, 2011 for your review.  If you have any questions or concerns, please feel free to contact Tim directly.


Thank you.


Best regards,


Linda Rosten

Ally Financial | Legal Staff

200 Renaissance Center, MC:  482-B09-B11, Detroit, MI  48265

T +313 656 6146

F +313 656 6124 or 313 566 0930

Linda.Rosten@ally.com

4

PROFESSIONALS' EYES ONLY



Kathy D. Patrick
kpatrick@gibbsbruns.com
713.751.5253

December 19, 2011

Mr. Timothy A. Devine
Office of General Counsel
Ally
200Renaissance Center
M/C: 482-B09-B11
P.O. Box 200
Detroit, MI  48265-2000

Dear Mr. Devine:

   In response to your letter of this afternoon, and in reliance on Ms. Hamzehpour's assurance that Ally will hold our clients' identities in confidence pending the execution of a confidentiality agreement, our clients in this matter are listed below:

1.   BlackRock Financial Management Inc. and its advisory affiliates
2.   Kore Advisors, L.P.
3.   Maiden Lane, LLC; Maiden Lane II, LLC; and Maiden Lane III, LLC by Federal Reserve Bank of New York, as managing member
4.   Metropolitan Life Insurance Company
5.   Trust Company of the West and affiliated companies controlled by The TCW Group, Inc.
6.   Neuberger Berman Europe Limited
7.   Pacific Investment Management Company LLC
8.   Goldman Sachs Asset Management, L.P., as adviser to its funds and accounts
9.   Teachers Insurance and Annuity Association of America
10.  Thrivent Financial for Lutherans
11.  Landesbank Baden-Württemberg
12.  LBBW Asset Management (Ireland) plc, Dublin
13.  ING Entities
14.  New York Life Investment Management LLC, as investment manager
15.  AEGON USA Investment Management LLC, authorized signatory for various AEGON affiliates
16.  Bayerische Landesbank, acting through its New York Branch

PROFESSIONALS' EYES ONLY
RC-9019_00057135

December 19, 2011
Page 2

17.    Prudential Investment Management, Inc.
18.    Western Asset Management Company
19.    Federal Home Loan Bank of Atlanta
20.    Cascade Investment, LLC

We have copied representatives of each institution on this letter, so that you will be aware that they have received this confirmation that we are acting on their behalf. We trust that this confirmation is sufficient to permit Ally to move forward *promptly* to execute the confidentiality agreement we previously forwarded to you, so that we may move forward with more substantive discussions.

Very truly yours,

Kathy Patrick

Cc:    Mr. Stephen Ahrens (Blackrock)
Mr. Cory Nass (Kore Capital)
Ms. Stephanie Heller (Federal Reserve Bank of New York)
Mr. Kevin Finnegan (MetLife)
Mr. Sean Plater (Trust Company of the West)
Mr. Paul deFrancisci (Neuberger Berman Europe, Ltd.)
Mr. Rick LeBrun (PIMCO)
Mr. Francis Chaplowski (Goldman Sachs Asset Management)
Mr. John McCally (TIAA-CREF)
Ms. Tina Smith (Thrivent Financial for Lutherans)
Mr. Frank Damerow (LBBW)
Ms. Maureen Cronin (New York Life)
Mr. Clint Woods (AEGON USA)
Ms. Lorraine Briganti (Bayern LB)
Mr. Robert Lawrence (Prudential Investment Management, Inc.)
Mr. Stephen Venable (Western Asset Management Company)
Mr. Reggie O'Shields (Federal Home Loan Bank of Atlanta)
Ms. Sheri Symonds (Cascade Investments LLC)
Ms. Tammy Hamzehpour

PROFESSIONALS' EYES ONLY

A. 16

| | |
|---|---|
| **From:** | Rosten, Linda [Linda.Rosten@ally.com] |
| **Sent:** | Monday, December 19, 2011 4:09 PM |
| **To:** | Kathy D. Patrick |
| **Cc:** | Devine, Timothy; Hamzehpour, Tammy; David Sheeren; Scott A. Humphries |
| **Subject:** | Letter from Tim Devine |
| **Attachments:** | SKMBT_C360-11121916540.pdf |

Ms. Patrick,


Attached is a letter from Tim Devine dated December 19, 2011 for your review.  If you have
any questions or concerns, please feel free to contact Tim directly.


Thank you.


Best regards,


Linda Rosten

Ally Financial | Legal Staff

200 Renaissance Center, MC:  482-B09-B11, Detroit, MI  48265

T +313 656 6146

F +313 656 6124 or 313 566 0930

Linda.Rosten@ally.com

1

PROFESSIONALS' EYES ONLY                                    RC-9019_00058226



Timothy A. Devine
Office of General Counsel
200 Renaissance Center
M/C:  482-B09-B11
P.O. Box 200
Detroit, MI  48265-2000

December 19, 2011

T + 1 313-656-3477
F + 1 313-566-0930

<u>VIA FEDERAL EXPRESS</u>
<u>and E-mail</u>

Kathy Patrick, Esq.
Gibbs & Bruns LLP
1100 Louisiana, Ste. 5300
Houston, TX  77002

Dear Kathy:

Thank you again for the candid and constructive preliminary discussion in Minneapolis.  And thank you also for following up with your draft Confidentiality Agreement and Tolling Agreement.

As you know, our clients are generally inclined to pursue confidential discussions exploring possible negotiated settlements of the claims you have generally described, so long as we can design a workable process.  We are confident we can do so.  As we said during our preliminary discussion in Minneapolis, we will need to proceed step by step in an orderly manner to ensure such a process has best chance of success.

As a first step, during our preliminary discussions we took some notes regarding the identity of the clients referenced in your letter, and the scope of your firm's representation of them.  It is very important for us to confirm your firm's representation as to each of the clients, and the scope of the respective engagements.  Please understand that though we recognize the somewhat extraordinary nature of the discussions you propose, we still owe it to the clients to take care of the basics.  We note, for example, that to date there has been no communication from you cc'ing your clients.  We note also, again for example, that the draft Agreements you have forwarded nowhere identify much less provide for execution by your clients as parties to the agreements.

We may have some flexibility with regard to the type and extent of written confirmation we require of the firm's engagement by the clients you identified at our meeting and are willing to consider your suggestions in this regard.

Very truly yours,

Timothy A. Devine
Chief Counsel - Litigation

cc:    Scott Humphries
       David Sheeren
       Tammy Hamzehpour

# A. 17

Outlook E-mail

**From:** Devine, Timothy
**Sent:** 1/9/2012 6:45:27 PM
**To:** Kathy D. Patrick; 'dsheeren@gibbsbruns.com'
**Cc:** Hamzehpour, Tammy; Ruckdaschel, John; Hagens, David
**Subject:** RE: Confi and Tolling Agreement
**Attachments** Tolling Gibbs Brun ResCap (5).docx; Confidentiality Agreement Gibbs Brun Clients ResCap (3).docx

CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY

Kathy and David:

Please see the attached markups of the draft Confi and Tolling Agreement you had sent over.

The rationale for some of the markups will be self-evident.  There are some I would like to walk through with you at your convenience.

Among the points we're addressing by markups to the Confi are potential that the talks may need to be disclosed in public financial filings, as apparently some banks may have done.  Also that we may contractually be required to disclose them if we are approached by a Trustee or other claimant asserting standing to challenge us on the applicable contract.  Finally, should we all proceed to a production of loan files or similar records containing customer or investor information, we may need to enter additional agreements protecting the PII or other info more expressly.

Biggest point in the markups to the draft Tolling Agreement I think is that we ought to have the particular interests of your clients identified as against particular deals, so that all parties involved have a clear and unambiguous meeting of the minds as to what particular claims are covered by the agreements and the discussions.  Also need to address risk that other parties or counsel may bring claims or inquiries relating to the same investments which are the basis of the interests under discussion here – whether such claims come for example from a monoline, a trustee, a government agent or agency of any sort, etc. – which of course we would need to address and/or defend.

I'm out of town tomorrow, back in the office the rest of the week.  Happy to discuss, to answer questions.

Looking forward to next steps.

Thanks.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Devine, Timothy
**Sent:** Wednesday, December 14, 2011 9:46 PM
**To:** dsheeren@gibbsbruns.com
**Cc:** Hamzehpour, Tammy; Ruckdaschel, John; Hagens, David
**Subject:** FW: Confi and Tolling Agreement

David:

Tammy has asked me to follow up on your email.  I will do so shortly.  Will you please send me email contact info for Kathy and Scott?

Thanks.

Tim

Timothy A. Devine


EXHIBIT
9019-73
11/13/12

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

RC-9019_00089373

Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** David Sheeren [mailto:dsheeren@gibbsbruns.com]
**Sent:** Wednesday, December 07, 2011 11:24 AM
**To:** Hamzehpour, Tammy
**Cc:** Kathy D. Patrick; Scott A. Humphries
**Subject:** Confi and Tolling Agreement

Tammy,

Attached for your review, please find a draft Confidentiality Agreement and a draft Tolling Agreement.

Best regards,
David

**David Sheeren**
**Gibbs & Bruns LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
713.751.5207 (o)
713.459.6278 (c)

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

RC-9019_00089374

## Tolling Agreement

WHEREAS, Residential Capital, LLC, and various of its subsidiaries and affiliates, including, without limitation, GMAC Mortgage, LLC, Residential Funding Company, LLC, Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Asset Securities Corp., Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., and Homecomings Financials, LLC (collectively, "ResCap Mortgage Companies"), are parties to Pooling and Servicing Agreements, or other similar agreements ("PSAs"), governing Residential Mortgage Backed Securities issued and/or underwritten by ResCap Mortgage Companies ("RMBS"); and

WHEREAS, in a letter dated October 17, 2011, Gibbs & Bruns LLP, on behalf of its clients ("Gibbs and Bruns"), notified Ally Financial Inc. that its clients held (or managed accounts which held) 25% of the voting rights of a class in 242 RMBS, which are identified in Exhibit A hereto ; and

WHEREAS, in the October 17 letter, Gibbs & Bruns notified Ally Financial Inc. that its clients believe that large numbers of mortgage loans which violate representations and warranties were sold or deposited into, and remain in, the RMBS pools, and that, under the PSAs, Ally Financial Inc. and its affiliates have substantial repurchase liability for such loans ("Repurchase Claims"); and

WHEREAS, in the October 17 letter, Gibbs & Bruns notified Ally Financial Inc. that its clients believe that Ally Financial Inc. and its affiliates, as master servicer and/or servicer of the mortgage loans underlying the RMBS, have failed to observe and perform their servicing obligations under the PSAs ("Servicing Claims"); and

WHEREAS Ally Financial Inc. responded to the October 17 letter rejecting exposure to or liability of Ally Financial Inc. for any of the Repurchasing or Servicing Claims on grounds stated therein, but referred Gibbs & Brun to counsel for ResCap Mortgage Companies;

WHEREAS Ally Financial Inc. flatly rejects assertions of Gibbs & Bruns or others that Ally Financial Inc. has exposure to or liability for any Repurchase Claims or Servicing Claims; and

WHEREAS neither the ResCap Mortgage Companies nor Ally Financial Inc. accept, adopt or ratify any of the assertions of Gibbs & Bruns with regard to the Repurchase Claims or the Servicing Claims; and

WHEREAS, Gibbs & Bruns exchanged various correspondence with Ally Financial Inc. and ResCap Mortgage Companies regarding the October 17 letter; and

WHEREAS, on November 21, 2011, Gibbs & Bruns met with ResCap Mortgage Companies to discuss the issues raised by the October 17 letter; and

WHEREAS, Gibbs & Bruns and ResCap Mortgage Companies wish to continue a constructive dialogue regarding the issues raised by the October 17 letter ("Constructive Dialogue"); and

WHEREAS, Ally Financial Inc. may be interested in participating in some measure in the Constructive Dialogue; and



**Deleted:** of Ally Financial Inc.

**Deleted:** Residential Capital, LLC,

**Deleted:** Ally

**Deleted:** Ally

**Deleted:** Ally

**Deleted:** Ally

**Deleted:** ,

**Deleted:** Ally Financial Inc.,

**Deleted:** Ally

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

WHEREAS, Gibbs & Bruns has identified, subject to a Confidentiality Agreement executed by the Parties hereto, each of the clients it represents in connection with the Settlement Dialogue ("Gibbs & Bruns Clients"); and

WHEREAS, Gibbs & Bruns has identified, subject to a Confidentiality Agreement executed by the Parties hereto, for each of the Gibbs & Bruns Clients, the ownership interest the Gibbs & Bruns Client has in each of the respective RMBS in which such Gibbs & Bruns Client has an interest (collectively, the "Covered Interests");

NOW therefore, each of the undersigned, on behalf of themselves and/or their respective clients, confirms and agrees as follows:

1.    In consideration of Gibbs & Bruns' Clients forbearing to assert the Repurchase and Servicing Claims as to their respective Covered Interests in this time period, and consistent with New York General Obligations Law § 17-103, any statutes of limitation, repose, or laches applicable only to the Repurchase Claims and/or the Servicing Claims as to only such Covered Interests shall be tolled, and Ally Financial Inc. and ResCap Mortgage Companies waive and covenant and agree not to assert such statutes of limitation, repose, or laches, for a period of 120 days, commencing on January ___, 2012 (that is, until the end of ___) (the "Forbearance and Tolling Period"), terminable by Gibbs & Bruns, Ally Financial Inc., or ResCap Mortgage Companies upon 30 days' written notice to the other parties to this Agreement.

2.    This Tolling Agreement shall apply only to the Repurchase Claims and/or the Servicing Claims as to only the Covered Interests regardless of whether such claims are asserted by a Trustee or by Certificateholders, who may endeavor, under certain circumstances, to assert such claims in a derivative capacity, for the common benefit of all Certificateholders.

3.    Nothing in this Agreement waives, impairs or otherwise in any way limits the rights of Ally Financial Inc. or any of the ResCap Mortgage Companies or the affiliates of any of them from responding to, addressing or defending (1) any Repurchase Claims, Servicing Claims or any similar, related or overlapping claims of any sort at any time, whether relating to the Covered Interests or not, or (2) any claims or inquiries whatsoever arising out of or in connection with any of the RMBS, including during the period of this Agreement.

4.    Nothing in this Agreement waives or impairs the rights of any Party to raise and assert any statutes of limitation, statutes of repose, or laches, or any similar or related defenses of any sort, available to such Parties prior to or after the Forbearance and Tolling Period.

5.    Nothing in this Agreement is or shall be construed to be an admission of any of the Parties as to the merits of any claims relating to the Covered Interests or to any Repurchase Claims or Servicing Claims as to any of them.

ACKNOWLEDGED AND AGREED this ___ day of January, 2012:



Deleted: c

Deleted: Ally

Deleted: December
Deleted: 2011
Deleted: Ally

Formatted: Font: 12 pt, Character scale: 105%

Formatted: Bullets and Numbering

Formatted: Font: 12 pt, Character scale: 105%

Formatted: Bullets and Numbering

Formatted: Font: 12 pt, Character scale: 105%

Formatted: Bullets and Numbering

Deleted: December
Deleted: 2011

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

By:_____
　　　　Kathy D. Patrick

For Gibbs & Bruns and its clients

By:_____
Name:
Title:

For Ally Financial Inc.

By:_____
Name:
Title:

For ResCap Mortgage Companies

**Deleted:** Ally

### Confidentiality Undertaking

WHEREAS, Gibbs & Bruns LLP ("Gibbs & Bruns") and its clients listed on Exhibit A ("Gibbs & Bruns Clients"), Residential Capital, LLC and various of its subsidiaries and affiliates, including, without limitation, GMAC Mortgage, LLC, Residential Funding Company, LLC, Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Asset Securities Corp., Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., and Homecomings Financial, LLC (collectively, "ResCap Mortgage Companies"), and Ally Financial Inc., are interested in discussing potential resolutions of alleged issues regarding certain Residential Mortgage Backed Securities, identified in Exhibit B, issued and/or underwritten by various of the ResCap Mortgage Companies ("RMBS");

NOW therefore, each of the undersigned, on behalf of themselves and/or their respective clients, confirms and agrees, effective January [▒], 2012, as follows:

    1.    Any discussions that take place between Gibbs & Bruns, Gibbs & Bruns Clients, Ally Financial Inc. and ResCap Mortgage Companies while this Agreement is in effect ("Discussions") are in the nature of compromise and settlement discussions, such that all of the protections of Rule 408 of the Federal Rules of Evidence and Section 4547 of New York's Civil Practice Law and Rules, as well as those applicable protections provided under any and all analogous evidentiary rules and/or privileges of the laws of any other applicable jurisdiction, shall apply to such Discussions.

    2.    Gibbs & Bruns, Gibbs & Bruns Clients, Ally Financial Inc., and ResCap Mortgage Companies will not disclose the existence or contents of such Discussions to anyone beyond those individuals (employees, counsel, experts and/or agents) actively engaged in considering and/or discussing the potential resolutions of the alleged issues between or among them, without the advance written consent of the other parties.

    3.    If required by applicable law or if Gibbs & Bruns, Gibbs & Bruns Clients, Ally Financial Inc., or ResCap Mortgage Companies receive a subpoena, court order, or other similar process for the purpose of disclosing the existence or contents of such Discussions, Gibbs & Bruns, Gibbs & Bruns Clients, Ally Financial Inc., and ResCap Mortgage Companies are not prohibited from disclosing the existence or contents of such Discussions; provided that, unless prohibited, the entity required by applicable law to make disclosure or that received the subpoena, court order, or similar process notifies the other parties of said subpoena, court order, or similar process within seven days of receiving it, or promptly if the disclosure must be made sooner, and to the extent practicable provides the other parties an opportunity to exercise their legal options to prohibit or limit such disclosure. Gibbs & Bruns is permitted, however, to disclose the existence, but not the contents, of such Discussions on a



**Deleted:** collectively
**Deleted:** Ally Financial Inc.,
**Deleted:** of Ally Financial Inc.
**Deleted:** Residential Capital, LLC,
**Deleted:** s
**Deleted:** Ally
**Deleted:** Ally
**Deleted:** December
**Deleted:** 1
**Deleted:** Ally
**Deleted:** Ally
**Deleted:** Ally
**Deleted:** Ally

RC-9019_00089378

confidential basis to a conservator, regulator or government oversight body in response to a general or specific request by such conservator, regulator or government oversight body without any notice to or consent by Ally Financial Inc. or ResCap Mortgage Companies. Ally Financial Inc. and ResCap Mortgage Companies are permitted to disclose the existence, but not the contents, of such Discussions on a confidential basis to bank regulators in response to a general or specific request by such regulators, without any notice to or consent by Gibbs & Bruns.  Ally Financial Inc., and ResCap Mortgage Companies are permitted, at their sole discretion, to disclose the existence of the Discussions as they may deem advisable in connection with any regulatory or financial disclosures or similar disclosures.  Ally Financial Inc. and ResCap are permitted, at their sole discretion, to disclose the Discussions as they may deem advisable in the event they or affiliates of either are approached by or otherwise receive communications, demands or requests from a Trustee or other interested party in connection with any of the RMBS.

4.    The purpose of this Agreement is to reflect the parties' intentions and to confirm the parties' entire agreement as to the confidentiality of such Discussions.  Nothing in this Agreement shall require either party to produce information.  To the extent the ResCap Mortgage Companies or Ally Financial Inc. decide at their sole discretion to produce certain records in connection with the Discussions, they reserve the right to seek express contractual and other protections and limitations on access to such information separate from this Agreement.

5.    Nothing in this Agreement shall preclude Gibbs & Bruns from filing suit against Ally Financial Inc. and/or ResCap Mortgage Companies should such Discussions be terminated. This Agreement is terminable by either party on thirty (30) days written notice; provided, however, that the obligations herein to keep confidential such Discussions shall survive the termination of this Agreement.

6.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to its choice of law provisions.

7.    Entry into this Agreement does not waive any rights, including but not limited to any rights to information, that the parties may have under the Pooling and Servicing Agreements or other similar agreements ("PSAs") for each of the RMBS covered by the Tolling Agreement dated January [██], 2012, and the parties expressly reserve all rights, arguments and defenses (and nothing herein shall limit the ability to assert such rights, arguments and defenses), including but not limited to all rights, arguments and defenses under those PSAs.



**Deleted:** Ally

**Deleted:** Ally

**Deleted:** Ally

**Deleted:** December

**Deleted:** 2011

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

8.      The parties hereto represent and warrant that they are authorized to enter this Agreement and, in the case of Gibbs & Bruns, that Gibbs & Bruns is expressly authorized to sign on behalf of and to bind the Gibbs & Bruns Clients to this Agreement.

9.      Nothing in this Agreement is intended to or shall constitute an admission of any liability by any party to it.  Ally Financial Inc. expressly rejects exposure to and/or liability for any of the RMBS.

ACKNOWLEDGED AND AGREED this __ day of January, 2012:

By:_____
         Kathy D. Patrick

For Gibbs & Bruns and its Clients

By:_____
Name:
Title:

For Ally Financial Inc.

By:_____
Name:
Title:

For ResCap Mortgage Companies

**Formatted:** Bullets and Numbering

**Deleted:** December

**Deleted:** 2011

**Deleted:** clients

**Deleted:** Ally

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

A. 18

| | |
|---|---|
| **From:** | David Sheeren |
| **Sent:** | Friday, January 13, 2012 3:57 PM |
| **To:** | Devine, Timothy; Kathy D. Patrick; Scott A. Humphries |
| **Cc:** | Hamzehpour, Tammy; Ruckdaschel, John; Hagens, David |
| **Subject:** | RE: Confi and Tolling Agreement |
| **Attachments:** | Ally Confidentiality Agreement_1.13.docx; Ally Tolling Agreement_1.13.docx |

Tim,


Please see attached. We are fine with most of your edits to the draft Confidentiality Agreement and draft Tolling Agreement. We have made some additional changes in these versions.


Thanks,

David



From: Devine, Timothy [mailto:Timothy.Devine@ally.com]
Sent: Monday, January 09, 2012 5:45 PM
To: Kathy D. Patrick; David Sheeren
Cc: Hamzehpour, Tammy; Ruckdaschel, John; Hagens, David
Subject: RE: Confi and Tolling Agreement


CONFIDENTIAL

FOR SETTLEMENT PURPOSES ONLY


Kathy and David:

Please see the attached markups of the draft Confi and Tolling Agreement you had sent over.


The rationale for some of the markups will be self-evident.  There are some I would like to walk through with you at your convenience.


Among the points we're addressing by markups to the Confi are potential that the talks may need to be disclosed in public financial filings, as apparently some banks may have done. Also that we may contractually be required to disclose them if we are approached by a Trustee or other claimant asserting standing to challenge us on the applicable contract.

1

RC-9019_00058305

Finally, should we all proceed to a production of loan files or similar records containing customer or investor information, we may need to enter additional agreements protecting the PII or other info more expressly.


Biggest point in the markups to the draft Tolling Agreement I think is that we ought to have the particular interests of your clients identified as against particular deals, so that all parties involved have a clear and unambiguous meeting of the minds as to what particular claims are covered by the agreements and the discussions.  Also need to address risk that other parties or counsel may bring claims or inquiries relating to the same investments which are the basis of the interests under discussion here - whether such claims come for example from a monoline, a trustee, a government agent or agency of any sort, etc. - which of course we would need to address and/or defend.


I'm out of town tomorrow, back in the office the rest of the week.
Happy to discuss, to answer questions.


Looking forward to next steps.


Thanks.


Tim


Timothy A. Devine

Chief Counsel - Litigation

Ally Financial Inc. Legal Staff

200 Renaissance Center

M/C: 482-B09-B11

Detroit, MI  48265

(313) 656-3477

_____

From: Devine, Timothy
Sent: Wednesday, December 14, 2011 9:46 PM
To: dsheeren@gibbsbruns.com
Cc: Hamzehpour, Tammy; Ruckdaschel, John; Hagens, David
Subject: FW: Confi and Tolling Agreement

2

PROFESSIONALS' EYES ONLY

RC-9019_00058306

David:


Tammy has asked me to follow up on your email. I will do so shortly.
Will you please send me email contact info for Kathy and Scott?


Thanks.


Tim


Timothy A. Devine

Chief Counsel - Litigation

Ally Financial Inc. Legal Staff

200 Renaissance Center

M/C: 482-B09-B11

Detroit, MI  48265

(313) 656-3477


_____

From: David Sheeren [mailto:dsheeren@gibbsbruns.com]
Sent: Wednesday, December 07, 2011 11:24 AM
To: Hamzehpour, Tammy
Cc: Kathy D. Patrick; Scott A. Humphries
Subject: Confi and Tolling Agreement

Tammy,


Attached for your review, please find a draft Confidentiality Agreement and a draft Tolling
Agreement.


Best regards,

3

    RC-9019_00058307

David


David Sheeren

Gibbs & Bruns LLP

1100 Louisiana, Suite 5300

Houston, Texas 77002

713.751.5207 (o)

713.459.6278 (c)

PROFESSIONALS' EYES ONLY
RC-9019_00058308

## Confidentiality Undertaking

WHEREAS, Gibbs & Bruns LLP ("Gibbs & Bruns") and its clients listed on Exhibit A ( "Gibbs & Bruns Clients"), Residential Capital, LLC and various of its subsidiaries and affiliates, including, without limitation, GMAC Mortgage, LLC, Residential Funding Company, LLC, Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Asset Securities Corp., Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., and Homecomings Financial, LLC (collectively, "ResCap Mortgage Companies"), and Ally Financial Inc., are interested in discussing potential resolutions of alleged issues regarding certain Residential Mortgage Backed Securities, identified in Exhibit B, issued and/or underwritten by various of the ResCap Mortgage Companies ("RMBS");

NOW therefore, each of the undersigned, on behalf of themselves and/or their respective clients, confirms and agrees, effective January [____], 2012, as follows:

1.      Any discussions that take place between Gibbs & Bruns, Gibbs & Bruns Clients, Ally Financial Inc. and ResCap Mortgage Companies while this Agreement is in effect ("Discussions") are in the nature of compromise and settlement discussions, such that all of the protections of Rule 408 of the Federal Rules of Evidence and Section 4547 of New York's Civil Practice Law and Rules, as well as those applicable protections provided under any and all analogous evidentiary rules and/or privileges of the laws of any other applicable jurisdiction, shall apply to such Discussions.

2.      Gibbs & Bruns, Gibbs & Bruns Clients, Ally Financial Inc., and ResCap Mortgage Companies will not disclose the existence or contents of such Discussions to anyone beyond those individuals (employees, counsel, experts and/or agents) actively engaged in considering and/or discussing the potential resolutions of the alleged issues between or among them, without the advance written consent of the other parties.

3.      If required by applicable law or if Gibbs & Bruns, Gibbs & Bruns Clients, Ally Financial Inc., or ResCap Mortgage Companies receive a subpoena, court order, or other similar process for the purpose of disclosing the existence or contents of such Discussions, Gibbs & Bruns, Gibbs & Bruns Clients,  Ally Financial Inc., and ResCap Mortgage Companies are not prohibited from disclosing the existence or contents of such Discussions; provided that, unless prohibited, the entity required by applicable law to make disclosure or that received the subpoena, court order, or similar process notifies the other parties of said subpoena, court order, or similar process within seven days of receiving it, or promptly if the disclosure must be made sooner, and to the extent practicable provides the other parties an opportunity to exercise their legal options to prohibit or limit such disclosure.  Gibbs & Bruns is permitted, however, to disclose the existence, but not the contents, of such Discussions on a

PROFESSIONALS' EYES ONLY

confidential basis to a conservator, regulator or government oversight body in response to a general or specific request by such conservator, regulator or government oversight body without any notice to or consent by Ally Financial Inc. or ResCap Mortgage Companies. Ally Financial Inc. and ResCap Mortgage Companies are permitted to disclose the existence, but not the contents, of such Discussions on a confidential basis to bank regulators in response to a general or specific request by such regulators, without any notice to or consent by Gibbs & Bruns. Ally Financial Inc., and ResCap Mortgage Companies are permitted, at their sole discretion, to disclose the existence of the Discussions as they may deem advisable in connection with any regulatory or financial disclosures. Ally Financial Inc. and ResCap are permitted, at their sole discretion, to disclose the existence, but not the contents, of the Discussions as they may deem advisable in the event they or affiliates of either are approached by or otherwise receive communications, demands or requests from a Trustee in connection with any of the RMBS.

4.    The purpose of this Agreement is to reflect the parties' intentions and to confirm the parties' entire agreement as to the confidentiality of such Discussions. Nothing in this Agreement shall require either party to produce information. To the extent the ResCap Mortgage Companies or Ally Financial Inc. decide at their sole discretion to produce certain records in connection with the Discussions, they reserve the right to seek express contractual and other protections and limitations on access to such information separate from this Agreement.

5.    Nothing in this Agreement shall preclude Gibbs & Bruns from filing suit against Ally Financial Inc. and/or ResCap Mortgage Companies should such Discussions be terminated. This Agreement is terminable by either party on thirty (30) days written notice; provided, however, that the obligations herein to keep confidential such Discussions shall survive the termination of this Agreement.

6.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to its choice of law provisions.

7.    Entry into this Agreement does not waive any rights, including but not limited to any rights to information, that the parties may have under the Pooling and Servicing Agreements or other similar agreements ("PSAs") for each of the RMBS covered by the Tolling Agreement dated January [___], 2012, and the parties expressly reserve all rights, arguments and defenses (and nothing herein shall limit the ability to assert such rights, arguments and defenses), including but not limited to all rights, arguments and defenses under those PSAs.

PROFESSIONALS' EYES ONLY

RC-9019_00058310

8.    The parties hereto represent and warrant that they are authorized to enter into this Agreement and, in the case of Gibbs & Bruns, that Gibbs & Bruns is expressly authorized to sign on behalf of and to bind the Gibbs & Bruns Clients to this Agreement.

9.    Nothing in this Agreement is intended to or shall constitute an admission of any liability or defense by any party to it.  Ally Financial Inc. expressly rejects exposure to and/or liability for any of the RMBS.

ACKNOWLEDGED AND AGREED this __ day of January, 2012:

By:_____
        Kathy D. Patrick

For Gibbs & Bruns and its Clients

By:_____
Name:
Title:

For Ally Financial Inc.

By:_____
Name:
Title:

For ResCap Mortgage Companies

PROFESSIONALS' EYES ONLY

# Tolling Agreement

WHEREAS, Residential Capital, LLC, and various of its subsidiaries and affiliates, including, without limitation, GMAC Mortgage, LLC, Residential Funding Company, LLC, Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Asset Securities Corp., Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., and Homecomings Financials, LLC (collectively, "ResCap Mortgage Companies"), are parties to Pooling and Servicing Agreements, or other similar agreements ("PSAs"), governing Residential Mortgage Backed Securities issued and/or underwritten by ResCap Mortgage Companies ("RMBS"); and

WHEREAS, in a letter dated October 17, 2011, Gibbs & Bruns LLP, on behalf of its clients ("Gibbs and Bruns"), notified Ally Financial Inc. that its clients held (or managed accounts which held) 25% of the voting rights of a class in 242 RMBS, which are identified in Exhibit A hereto ; and

WHEREAS, in the October 17 letter, Gibbs & Bruns notified Ally Financial Inc. that its clients believe that large numbers of mortgage loans which violate representations and warranties were sold or deposited into, and remain in, the RMBS pools, and that, under the PSAs, Ally Financial Inc. and its affiliates have substantial repurchase liability for such loans ("Repurchase Claims"); and

WHEREAS, in the October 17 letter, Gibbs & Bruns notified Ally Financial Inc. that its clients believe that Ally Financial Inc. and its affiliates, as master servicer and/or servicer of the mortgage loans underlying the RMBS, have failed to observe and perform their servicing obligations under the PSAs ("Servicing Claims"); and

WHEREAS Ally Financial Inc. responded to the October 17 letter rejecting exposure to or liability of Ally Financial Inc. for any of the Repurchasing or Servicing Claims on grounds stated therein, but referred Gibbs & Bruns to counsel for ResCap Mortgage Companies;

WHEREAS Ally Financial Inc. flatly rejects assertions of Gibbs & Bruns or others that Ally Financial Inc. has exposure to or liability for any Repurchase Claims or Servicing Claims; and

WHEREAS neither the ResCap Mortgage Companies nor Ally Financial Inc. accept, adopt or ratify any of the assertions of Gibbs & Bruns with regard to the Repurchase Claims or the Servicing Claims; and

WHEREAS, Gibbs & Bruns exchanged various correspondence with Ally Financial Inc. and ResCap Mortgage Companies regarding the October 17 letter; and

WHEREAS, on November 21, 2011, Gibbs & Bruns met with Ally Financial Inc. and ResCap Mortgage Companies to discuss the issues raised by the October 17 letter; and

WHEREAS, Gibbs & Bruns and ResCap Mortgage Companies wish to continue a constructive dialogue regarding the issues raised by the October 17 letter ("Constructive Dialogue"); and

WHEREAS, Ally Financial Inc. may be interested in participating in some measure in the Constructive Dialogue; and

PROFESSIONALS' EYES ONLY

WHEREAS, Gibbs & Bruns has identified, subject to a Confidentiality Agreement executed by the Parties hereto, each of the clients it represents in connection with the Settlement Dialogue ("Gibbs & Bruns Clients"); and

WHEREAS, Gibbs & Bruns has identified, subject to a Confidentiality Agreement executed by the Parties hereto, the collective ownership interest the Gibbs & Bruns Clients have in each of the respective RMBS in which such Gibbs & Bruns Clients have an interest (collectively, the "Covered Interests");

NOW therefore, each of the undersigned, on behalf of themselves and/or their respective clients, confirms and agrees as follows:

1.    In consideration of Gibbs & Bruns' Clients forbearing to assert the Repurchase and Servicing Claims as to their Covered Interests in this time period, and consistent with New York General Obligations Law § 17-103, any statutes of limitation, repose, or laches applicable only to the Repurchase Claims and/or the Servicing Claims as to only such Covered Interests shall be tolled for a period of 120 days, commencing on January ____, 2012 (that is, until the end of _____) (the "Forbearance and Tolling Period"), terminable by Gibbs & Bruns, Ally Financial Inc., or ResCap Mortgage Companies upon 30 days' written notice to the other parties to this Agreement, and Ally Financial Inc. and ResCap Mortgage Companies waive and covenant and agree not to assert such statutes of limitation, repose, or laches for that time period.

2.    This Tolling Agreement shall apply only to the Repurchase Claims and/or the Servicing Claims as to only the Covered Interests regardless of whether such claims are asserted by a Trustee or by Certificateholders, who may endeavor, under certain circumstances, to assert such claims in a derivative capacity, for the common benefit of all Certificateholders.

3.    Nothing in this Agreement waives, impairs or otherwise in any way limits the rights of Ally Financial Inc. or any of the ResCap Mortgage Companies or the affiliates of any of them from responding to, addressing or defending (1) any Repurchase Claims, Servicing Claims or any similar, related or overlapping claims of any sort at any time, whether relating to the Covered Interests or not, or (2) any claims or inquiries whatsoever arising out of or in connection with any of the RMBS, including during the period of this Agreement.

4.    Nothing in this Agreement waives or impairs the rights of any Party to raise and assert any statutes of limitation, statutes of repose, or laches, or any similar or related defenses of any sort, available to such Parties prior to or after the Forbearance and Tolling Period.

5.    Nothing in this Agreement is or shall be construed to be an admission of any of the Parties as to the merits of any claims or defenses relating to the Covered Interests or to any Repurchase Claims or Servicing Claims as to any of them.

ACKNOWLEDGED AND AGREED this __ day of January, 2012:

PROFESSIONALS' EYES ONLY

By:_____
          Kathy D. Patrick

For Gibbs & Bruns and its clients

By:_____
Name:
Title:

For Ally Financial Inc.

By:_____
Name:
Title:

For ResCap Mortgage Companies

PROFESSIONALS' EYES ONLY

A. 19

# ResCap

Steve Abreu
Jonathan Ilany
John Mack
Tom Marano
Ted Smith
Pam West
Jim Whitlinger

**Residential Capital, LLC – Claims Analysis Meeting**
**Wednesday, January 25, 2012, 12:00 to 5:00 pm (ET)**

Morrison & Foerster LLP will meet with the ResCap Board of Directors to discuss its claims analysis and independent review process on Wednesday, January 25, 2012, from 12:00 to 5:00 pm (ET). The meeting will be held in the offices of Morrison & Foerster LLP.

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

Lunch will be available at 12:00 pm. Supporting materials, if any, will be distributed prior to the meeting. Please confirm that you plan to attend the meeting in person. Also please note that the tentative ResCap Board meeting date of Thursday, January 26, 2012 (9:00 to 10:00 am) has been removed from the draft 2012 Board meeting schedule.

Please feel free to contact me by phone (313-656-6301) or email (cathy.quenneville@ally.com) should you have any questions. Thank you.

Cathy Quenneville
Secretary
1/17/12

cc:  Tammy Hamzehpour
Morrison Cohen
Morrison & Foerster

**ResCap Confidential**

CONFIDENTIAL

RC40020213

EXHIBIT
9019-98
1/14/12
PENGAD 800-631-6989

MINUTES of a Special Meeting the Board of Residential Capital, LLC ("ResCap" or the "Company"), held on due notice at 1290 Avenue of the Americas, New York, New York, on January 25, 2012, at 12:24 p.m. (ET).

PRESENT:        Steven M. Abreu
                        Jonathan Ilany
                        John E. Mack
                        Thomas F. Marano
                        Edward F. Smith III
                        Pamela E. West
                        James M. Whitlinger

constituting all of the Board.  Mr. Smith participated by telephone.

Invited guest in attendance was Tammy Hamzehpour.

Invited advisers in attendance were Michael Connolly and Joseph T. Moldovan from Morrison Cohen LLP, and Nilene R. Evans, Gary S. Lee, Larren M. Nashelsky, Jamie A. Levitt, Anna T. Pinedo and James R. Tanenbaum from Morrison & Foerster LLP.

Additional invited guests in attendance were William J. Nolen and Mark Renzi from FTI Consultants, Inc.

The Chairman, Mr. Marano, presided; he requested that Ms Evans record the minutes.

Mr. Marano immediately moved the meeting into Executive Session.

*Executive Session*

Mr. Lee, Ms. Levitt and Ms. Pinedo presented the initial results of their independent review of historical transactions between ResCap and Ally Financial Inc. ("Ally"), its predecessors and affiliates, including Cerberus entities. The Board was provided with presentation materials prior to the meeting.  They also discussed their initial analysis of potential claims that could be made against Ally in a potential Rule 9019 settlement discussion with Ally in connection with a potential bankruptcy filing by ResCap as well as the overall Rule 9019 process. The Board and advisers engaged in considerable and robust discussion regarding this presentation.

At approximately 3:00 p.m., the Meeting was adjourned, all the advisers left the meeting and the members of the Board met with Michael Carpenter, Chief Executive Officer of Ally.  At approximately 3:33 p.m., after Mr. Carpenter had left, the advisers re-entered the meeting and the Executive Session resumed.

CONFIDENTIAL

Messrs. Marano, Whitlinger and Abreu then discussed, among other topics, the status of the proposed settlement with the Department of Justice and States Attorneys General ("DOJ/AG Settlement"), the status of the negotiations with Ally regarding its support letter relating to the potential civil money penalty from the Federal Reserve Board arising out of its Consent Order (the "FRB Fine") as well as the DOJ/AG Settlement, and their meetings on January 23, 2012 with the U.S. Treasury, Federal Housing Finance Agency and Federal Housing Administration. The Board members engaged in a robust discussion of these matters. During the discussion, at approximately 4:50 p.m., Mr. David DeBrunner joined the meeting to respond to questions from the members of the Board regarding certain related accounting considerations. He was then excused from the meeting.

*Authorization Regarding Federal Reserve Board Consent Assessment Order*

At approximately 5:25 p.m., the Board moved out of Executive Session in order to consider a resolution authorizing Mr. Marano to take certain actions with respect to the FRB Fine. Upon motion duly made and seconded, it was unanimously

RESOLVED, that this Board delegates full authority to and directs Thomas F. Marano, in his capacity as Chief Executive Officer of Residential Capital, LLC, to enter into a Consent Assessment Order by and among Ally Financial Inc., Residential Capital, LLC, GMAC Mortgage, LLC, and the Board of Governors of the Federal Reserve System, in substantially the form and on the terms set forth in the draft thereof previously delivered to the Board members (with the blank information completed), on behalf of Residential Capital, LLC, and, upon the full execution of the Consent Assessment Order by all parties thereto, consents to compliance with each and every applicable provision of the Consent Assessment Order and waives any and all rights that ResCap may have pursuant to section 8 of the FDI Act (12 U.S.C. § 1818).

Mr. Mack and Mr. Ilany abstained from voting on the foregoing resolution.

ADJOURNMENT

There being no further business to come before the Board, the meeting was adjourned at 5:30 p.m.

DATED January 25, 2012.

Nilene R. Evans, Recording Secretary

CONFIDENTIAL

RC40019195

# A. 20

REDACTED

# A. 21

Outlook E-mail

**From:**      Hamzehpour, Tammy
**Sent:**      3/7/2012 10:16:04 AM
**To:**        Devine, Timothy; Thompson, William - Legal Dept - PA; Ruckdaschel, John; Zellmann, Patty - MN; Solomon, William Legal
**Subject:**   RE: ResCap Discussions

---

# Redacted

---

-----Original Message-----
From: Devine, Timothy
Sent: Tuesday, March 06, 2012 11:39 PM
To: Hamzehpour, Tammy; Thompson, William - Legal Dept - PA; Ruckdaschel, John; Zellmann, Patty - MN; Solomon, William Legal
Subject: FW: ResCap Discussions

# Redacted

-----Original Message-----
From: Kathy D. Patrick [mailto:kpatrick@gibbsbruns.com]
Sent: Tuesday, March 06, 2012 11:12 PM
To: Devine, Timothy
Cc: Rosten, Linda; Kathy D. Patrick; Scott A. Humphries
Subject: RE: ResCap Discussions

Certainly.  Please look at your schedule and let me know a time that works.  Wednesday and Thursday are generally open for me, but morning is preferable.

---

From: Devine, Timothy [mailto:Timothy.Devine@ally.com]
Sent: Tue 3/6/2012 9:27 PM
To: Kathy D. Patrick
Cc: Rosten, Linda
Subject: ResCap Discussions

CONFIDENTIAL PER AGREEMENT

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

RC-9019_00090060

Kathy:


I got your voicemail.  I have been out of the country since Thursday and will conclude meetings this Friday night, landing in Detroit Saturday morning.  Like running a marathon.  Can we schedule a time next week?


Thanks.


Tim


Timothy A. Devine

Chief Counsel - Litigation

Ally Financial Inc. Legal Staff

200 Renaissance Center

M/C: 482-B09-B11

Detroit, MI  48265

(313) 656-3477

CONFIDENTIAL-PROFESSIONALS' EYES ONLY

A. 22

| | |
|---|---|
| **From:** | Talcott J. Franklin <Tal@talcottfranklin.com> |
| **Sent:** | Wednesday, March 7, 2012 1:19 PM |
| **To:** | Devine, Timothy <Timothy.Devine@ally.com> |
| **Subject:** | Re: Call |

That would be helpful.  I look forward to your call.  If you cannot reach me on my direct line, please try my cell.

Tal Franklin
Talcott Franklin P.C.
208 North Market Street
Suite 200
Dallas, Texas 75202
214.321.3838 direct
214.736.8730 main
214.642.9191 cell
877.577.1356 fax
tal@talcottfranklin.com
www.talcottfranklin.com

**From:** "Devine, Timothy" <Timothy.Devine@ally.com>
**Date:** Wed, 7 Mar 2012 13:02:00 -0600
**To:** Talcott Franklin <tal@talcottfranklin.com>
**Subject:** RE: Call

PRIVILEGED AND CONFIDENTIAL

I will phone you but it may not be until tomorrow.  Out of country in meetings.  I apologize.

I won't be surprised at all if the client counters on those deals but it's a slow process.  I can perhaps give some process
generalities to help manage your client's expectations.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

**From:** Talcott J. Franklin [mailto:Tal@talcottfranklin.com]
**Sent:** Wednesday, March 07, 2012 1:58 PM
**To:** Devine, Timothy
**Subject:** Call

Tim:
Could you please call me?  A couple of my clients are getting antsy and we need to show some progress or I'm concerned about escalation.  Is there a chance someone can get back to me with a counter on Q03 and QA13?  If so, when?
Tal

Tal Franklin
Talcott Franklin P.C.
208 North Market Street
Suite 200
Dallas, Texas 75202
214.321.3838 direct
214.736.8730 main
214.642.9191 cell
877.577.1356 fax
tal@talcottfranklin.com
www.talcottfranklin.com

**CONFIDENTIAL**

DISCLAIMER:
The information contained in this message may be privileged, confidential, and protected from disclosure. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. If you are not the intended recipient, or an employee, or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message. Re-disclosure without additional consent or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.

IRS Circular 230 disclosure: ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED BY THE WRITER TO BE USED, AND NOTHING CONTAINED HEREIN CAN BE USED, BY YOU OR ANY OTHER PERSON, FOR THE PURPOSE OF (1) AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED TRANSACTION OR MATTER ADDRESSED HEREIN.

DISCLAIMER:
The information contained in this message may be privileged, confidential, and protected from disclosure. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. If you are not the intended recipient, or an employee, or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message. Re-disclosure without additional consent or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.

IRS Circular 230 disclosure: ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED BY THE WRITER TO BE USED, AND NOTHING CONTAINED HEREIN CAN BE USED, BY YOU OR ANY OTHER PERSON, FOR THE PURPOSE OF (1) AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED TRANSACTION OR MATTER ADDRESSED HEREIN.

A. 23

| | |
|---|---|
| **From:** | Devine, Timothy |
| **Sent:** | Sunday, May 13, 2012 3:53 PM |
| **To:** | Ornstein, Noah; Levitt, Jamie A.; Ruckdaschel, John |
| **Cc:** | Lee, Gary S.; Princi, Anthony |
| **Subject:** | RE: RMBS Trust Settlement - Rule 408 Communication |

I think we need to tell him that we can't sign a deal that permits lawsuits to be filed which might logically lead to someone turning to us for ultimate responsibility.  If, on the other hand, we do enter such a deal, we need those persons with discretion to file such suits to be responsible to us for any harm we might suffer.  His choice.

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Ornstein, Noah [mailto:nornstein@kirkland.com]
**Sent:** Sunday, May 13, 2012 11:48 AM
**To:** Devine, Timothy; 'Levitt, Jamie A.'; Ruckdaschel, John
**Cc:** 'Lee, Gary S.'; 'Princi, Anthony'
**Subject:** RE: RMBS Trust Settlement - Rule 408 Communication

He has refused the indemnification piece. So, think now it is below compromise or tell him to choose between the deal and his third party pursuits

---

**From:** Devine, Timothy [mailto:Timothy.Devine@ally.com]
**Sent:** Sunday, May 13, 2012 11:46 AM
**To:** Ornstein, Noah; 'Levitt, Jamie A.'; Ruckdaschel, John
**Cc:** 'Lee, Gary S.'; 'Princi, Anthony'
**Subject:** RE: RMBS Trust Settlement - Rule 408 Communication

Yes – and that ResCap or Ally shall be indemnified for any loss resulting from any such action.

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Ornstein, Noah [mailto:nornstein@kirkland.com]
**Sent:** Sunday, May 13, 2012 10:08 AM
**To:** 'Levitt, Jamie A.'; Devine, Timothy; Ruckdaschel, John
**Cc:** 'Lee, Gary S.'; 'Princi, Anthony'
**Subject:** RE: RMBS Trust Settlement - Rule 408 Communication

Would propose at minimum (or something to this effect):

7.05: Servicing of the Mortgage Loans. Except as provided in Section 8.01, the release and waiver in Article VII includes all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or

1

Confidential

Subservicer as to the servicing of the Mortgage Loans held by the Trusts. **The foregoing language is not intended to release any claims against any person other than ResCap and Ally; provided, Consenting Claimants are not permitted to bring claims against any Master Servicer, Servicer, or Subservicer if doing so in any way adversely effects ResCap or Ally.**

---

**From:** Levitt, Jamie A. [mailto:JLevitt@mofo.com]
**Sent:** Sunday, May 13, 2012 10:02 AM
**To:** Devine, Timothy; John.Ruckdaschel@ally.com; Ornstein, Noah
**Cc:** Lee, Gary S.; Princi, Anthony
**Subject:** RE: RMBS Trust Settlement - Rule 408 Communication
**Importance:** High

Tim and John,

Talcott Franklin will settle with one clarification -- but because I know you have been dealing with this issue I really need your input (asap bc he is talking to his clients this morning.  He wants the agreement to be specific that the release does <u>not</u> release claims against non-Rescap entities relating to servicing.  So in particular he talked to us about claims against Auroro or David Stern (attorneys) or Northwest.  He will instruct the trusees to bring claims against these entities whom he claims overcharged for services and harmed Rescap (not his concern) or the Trusts (ie for reimbursed advances).  His argument is that these claims are more valuable potentially than the additional recovery he'll get in the settlement and he does not know why his clients should be forced to release against third parties (other than Ally).

The current language says:

7.05: Servicing of the Mortgage Loans. Except as provided in Section 8.01, the release and waiver in Article VII includes **all claims based** in whole or in part **on any** actions, inactions, or practices of the **Master Servicer**, Servicer, or **Subservicer** as to the servicing of the Mortgage Loans held by the Trusts.

He wants to add a sentence that says this provision "**is not intended to release any claims against any person other than ResCap.**"  (and he doesn't mean to sue any Ally entity)

I explained that the problem is we don't want him to bring claims that are going to find their way back to ResCap for indemnification or in other ways.  He said others are going to instruct the trustees even if he settles so these cases are not going away anyway.  He said he has discussed this with you from the time of his first call.

Can we agree to this with Tal so he preserves his Aurora type claims or should I tell him we are in fact trying to get him to waive these third party claims and he can take it or leave it?

---

**From:** Devine, Timothy [mailto:Timothy.Devine@ally.com]
**Sent:** Sunday, May 13, 2012 9:06 AM
**To:** Princi, Anthony; rcieri@kirkland.com; Levitt, Jamie A.
**Cc:** nornstein@kirkland.com; Lee, Gary S.; Newton, James A.; Clark, Daniel E.; Jeffrey A. Lipps
**Subject:** RE: RMBS Trust Settlement - Rule 408 Communication

MoFo and Kirkland:

I am out of pocket from now until about noon.  I apologize.

I have an AFI Bd Mtg at 1 pm, at which time I will have to report as to whether we have a deal or not.

I recommend that the teams meet in the mean time to close down to the final final language all other items.  Keep banging them on the concept Tony describes below.  Then we can together try to close that deal.

I will say this – we can't close the deal unless we get something very much like what Tony has described.

Jeff Lipps will update as to status of discussion with opposing counsel on  the Thrivent deal.  We intend to have a term sheet binding between counsel as the embodiment of that agreement.  There's no time to do a complete settlement agreement by today.

Confidential

ALLY_0144344

Thanks.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

......................................................................................................................................................................

**From:** Princi, Anthony [mailto:APrinci@mofo.com]
**Sent:** Sunday, May 13, 2012 8:50 AM
**To:** kpatrick@gibbsbruns.com; rcieri@kirkland.com; Levitt, Jamie A.; Ross.Martin@ropesgray.com; SHumphries@gibbsbruns.com
**Cc:** nornstein@kirkland.com; Lee, Gary S.; Devine, Timothy; Newton, James A.; Clark, Daniel E.
**Subject:** Re: RMBS Trust Settlement - Rule 408 Communication


Kathy, we need to make conceptual progress on the lock-up point before the 11:30 call otherwise we will likely not get to an agreement in time.

First, this is not simply an Ally board position, it is very much a ResCap position as well (and, indeed, it was we that proposed the concept of the 25% holding condition as a way to reconcile the points you have been making with our need to assure that we are not running a fool's errand nor, worse, inviting market players to buy in and attempt to upend us).

The conceptual starting point for this is that it is conventional in any deal like this for the parties investing the money/agreeing to an allowed claim, to get assurance that they will not get "double dealt." One of the main, conventional protections in that regard is to make sure that if the counter-party demands a right to transfer their interests (which is a common demand), that any transfer require that the buyer adopt the terms of the deal.

You have told us that for a variety of business reasons your clients can/will not agree to this restriction in trading. In telling us this you have on a number of occasions informed us that it is unlikely that your clients will engage in any material trades (and consistent with that you below describe our concerns as "theoretical").

One of the linchpins of this deal for us is whether your clients can "deliver" the trustees and have them agree to these terms. In that regard the 25% threshold for holdings is critical. As a result, while we're prepared to accommodate your clients' position that they can/will not agree to any restriction in trading, for this deal to not be illusory for us we need to assure that regardless of what trading your clients engage in, their holdings don't drop below the 25% threshold necessary to deliver the trustees. Put differently, it is your clients -- and not ours -- that control the trading, and accordingly your clients should be prepared to assure that their trading does not eliminate a critical component of the bargain for us, and correspondingly accept the reality that we will need to terminate the agreement if they do.

I hope the foregoing helps to move us towards a resolution of this issue on our 11:30 call. I can not speak to the Maiden Lane issues as I was not on that call with you, but I trust you/Ally will work that out.

Tony

----- Original Message -----
From: Kathy D. Patrick <kpatrick@gibbsbruns.com>
To: Cieri, Richard M. <rcieri@kirkland.com>; Princi, Anthony; Levitt, Jamie A.; Ross.Martin@ropesgray.com <Ross.Martin@ropesgray.com>; Scott A. Humphries <SHumphries@gibbsbruns.com>
Cc: Ornstein, Noah <nornstein@kirkland.com>; Lee, Gary S.; Timothy.Devine@ally.com <Timothy.Devine@ally.com>; Newton, James A.; Clark, Daniel E.; Kathy D. Patrick <kpatrick@gibbsbruns.com>
Sent: Sun May 13 08:22:49 2012
Subject: RE: RMBS Trust Settlement - Rule 408 Communication

All:

This morning's revision does not address the lockout issue in a way that can work; indeed, you have moved backwards by including a requirement that we maintain 25% holdings in each covered trust--holdings that our clients do not have now, as you well know.  The statement you have asked Maiden Lane to make - that Maiden Lane I and Maiden Lane III each represent to the best of its knowledge that the Federal Reserve Board of Governors has taken and anticipates taking no action to require it to liquidate any of its holdings-- is exactly the opposite of

Confidential

ALLY_0144345

what we discussed last night, namely, that the Fed would need a special accommodation because it had been instructed by the Board to liquidate its holdings and so could not anticipate when that might occur.

With all due respect to Ally's board counsel, they are about to crater this deal over an issue that is theoretical and not real. If they persist, they will destroy any prospect that our clients will support a third party release for Ally and its board, because our clients cannot agree to a lockout.

Perhaps, by 11:30, Ally's board counsel will see the jeopardy in which the Board has now placed the Debtor's proposed consensual restructuring. The language from our draft is the language we need.

We'll talk at 11:30.

Kathy

_____

From: Cieri, Richard M. [mailto:rcieri@kirkland.com]
Sent: Sun 5/13/2012 6:27 AM
To: Kathy D. Patrick; 'APrinci@mofo.com'; 'JLevitt@mofo.com'; 'Ross.Martin@ropesgray.com'; Scott A. Humphries'
Cc: Ornstein, Noah; 'glee@mofo.com'; 'Timothy.Devine@ally.com'; 'JNewton@mofo.com'; 'DClark@mofo.com'
Subject: Re: RMBS Trust Settlement - Rule 408 Communication


Kathy, what message? Cannot find it. Rick


From: Kathy D. Patrick [mailto:kpatrick@gibbsbruns.com]
Sent: Sunday, May 13, 2012 06:23 AM
To: APrinci@mofo.com <APrinci@mofo.com>; Kathy D. Patrick <kpatrick@gibbsbruns.com>; JLevitt@mofo.com <JLevitt@mofo.com>; Ross.Martin@ropesgray.com <Ross.Martin@ropesgray.com>; Scott A. Humphries <SHumphries@gibbsbruns.com>
Cc: Cieri, Richard M.; Ornstein, Noah; GLee@mofo.com <GLee@mofo.com>; Timothy.Devine@ally.com <Timothy.Devine@ally.com>; JNewton@mofo.com <JNewton@mofo.com>; DClark@mofo.com <DClark@mofo.com>
Subject: Re: RMBS Trust Settlement - Rule 408 Communication


Yes, we'll be ready. So long as what was sent this morning aligns with my message to Tim and Rick last night, we should be in good shape.

Kathy D. Patrick
Gibbs & Bruns, L.L.P.


From: Princi, Anthony [mailto:APrinci@mofo.com]
Sent: Sunday, May 13, 2012 06:10 AM
To: Kathy D. Patrick; Levitt, Jamie A. <JLevitt@mofo.com>; Ross.Martin@ropesgray.com <Ross.Martin@ropesgray.com>; Scott A. Humphries
Cc: rcieri@kirkland.com <rcieri@kirkland.com>; nornstein@kirkland.com <nornstein@kirkland.com>; Lee, Gary S. <GLee@mofo.com>; Timothy.Devine@ally.com <Timothy.Devine@ally.com>; Newton, James A. <JNewton@mofo.com>; Clark, Daniel E. <DClark@mofo.com>
Subject: Re: RMBS Trust Settlement - Rule 408 Communication


Kathy, to assure that with time running out we don't encounter any miscommunications, we will move the call to 11:30 am Central/12:30 pm Eastern so that you can be on the call. In view of our timing we ask that your side be prepared to work with us during the call to finalize all terms and language in both agreements so that we can shortly thereafter circulate final versions for signature. Thanks. Best, Tony

_____

From: Kathy D. Patrick <kpatrick@gibbsbruns.com>
To: Levitt, Jamie A.; Ross.Martin@ropesgray.com <Ross.Martin@ropesgray.com>; Kathy D. Patrick <kpatrick@gibbsbruns.com>; Scott A. Humphries <SHumphries@gibbsbruns.com>
Cc: rcieri@kirkland.com <rcieri@kirkland.com>; nornstein@kirkland.com <nornstein@kirkland.com>; Lee, Gary S.; Princi, Anthony; Timothy.Devine@ally.com <Timothy.Devine@ally.com>
Sent: Sun May 13 02:49:01 2012
Subject: Re: RMBS Trust Settlement - Rule 408 Communication

4

Jamie and All -

The earliest I could do a call is 1130 Central.

KP

Kathy D. Patrick
Gibbs & Bruns, L.L.P.

From: Levitt, Jamie A. [mailto:JLevitt@mofo.com]
Sent: Sunday, May 13, 2012 12:55 AM
To: Ross.Martin@ropesgray.com <Ross.Martin@ropesgray.com>; Kathy D. Patrick; Scott A. Humphries
Cc: rcieri@kirkland.com <rcieri@kirkland.com>; Ornstein, Noah <nornstein@kirkland.com>; Lee, Gary S. <GLee@mofo.com>; Princi,
Anthony <APrinci@mofo.com>; Devine, Timothy <Timothy.Devine@ally.com>
Subject: RMBS Trust Settlement - Rule 408 Communication

Thank you for the mark-ups.  Attached are our revisions.  We would like to suggest an all-hands (or as many hands as necessary) call at 9am on
Sunday to discuss these last changes and finalize the agreements.  If that time does not work, please let us know what other time tomorrow
morning would.  We need to see your exhibits, including the allocation schedule, preferably with enough time before the morning call so that
we can review them.

The call-in number is 800-650-4949, code 4688203#

Thanks.

Jamie

_____

From: Scott A. Humphries <SHumphries@gibbsbruns.com>
To: rcieri@kirkland.com <rcieri@kirkland.com>; Devine, Timothy <Timothy.Devine@ally.com>; Lee, Gary S.
Cc: Ross.Martin@ropesgray.com <Ross.Martin@ropesgray.com>; Kathy D. Patrick <kpatrick@gibbsbruns.com>; Scott A. Humphries
<SHumphries@gibbsbruns.com>
Sent: Sat May 12 22:52:54 2012
Subject: RE: RMBS Trust Settlement - Rule 408 Communication

Gentlemen,

Attached are the revisions Kathy mentioned.  These also include the other, minor comments that were discussed among Ropes and Mofo today.

Thanks, Scott

From: Kathy D. Patrick
Sent: Saturday, May 12, 2012 7:50 PM
To: rcieri@kirkland.com; Devine, Timothy; Gary S. Lee (GLee@mofo.com)
Cc: Kathy D. Patrick; Scott A. Humphries; Martin, D. Ross [Ross.Martin@ropesgray.com]
Subject: RMBS Trust Settlement - Rule 408 Communication

Rick, Gary and Tim:

5

Confidential                                                                                                ALLY_0144347

We spent a long time on the phone with our clients this afternoon and evening. Scott will shortly send you revisions that reflect where our clients landed. There were many issues of great sensitivity to them, but I believe we have arrived at a resolution that is consistent with what I discussed this afternoon with Rick and Tim. Specifically:

1. Plan Support

Our clients are prepared to sign a plan support agreement that includes the contemplated release of individual investors' securities or fraud claims against Ally, provided that: a) all parties acknowledge the right of individual investment advisers' clients to intervene to contest any such release, and b) all parties acknowledge that the investment advisors do not own those claims and thus are neither compromising nor releasing them in any of the agreements they sign. This will permit all of our clients and the investment advisers to:

a. Ensure they do not release or purport to release what they do not own;

b. Express their support for a settlement that they believe is in the best interests of all Certificateholders; and,

c. Ensure that any release granted to Ally affects all investors equally and, if granted, will be implemented only upon Ally's performance of its commitments under the Plan.

This is the most we can do given the limitations on our clients' authority, but it was sufficient in Bank of America. We believe it should be sufficient here.

We also understand, and Thrivent will require, that its separate resolution with you will be accomplished before the Plan Support Agreement is signed. Please confirm this will happen.

2. Maintenance of Holdings

Your lockup proposal is a deal breaking issue for our clients. Our clients have thousands of individual clients; others have portfolios that must be managed to meet stated investment objectives. A prospective lockup of bonds simply will not (and can never) work for them. Though there are many reasons why a sale might be necessary, our clients do not intend to pursue sales for the purpose of defeating or undermining their obligations under these agreements. History has also demonstrated that our clients have been entirely faithful to the obligations they assumed under the Bank of America settlement agreement. They have advocated zealously for the approval of that settlement for over a year. This has been true even of those investors who are advisers for others and who stand to gain nothing for themselves from the exercise. With the exception of the Maiden Lane Portfolios, whose liquidation was contemplated by the Bank of America settlement, we confirmed this afternoon that our clients have not engaged in large scale selling of their portfolios even though their Countrywide securities have gone up in price.

Our clients can and will agree to do what they did in Bank of America: they will maintain holdings in at least one trust so as to ensure they retain standing. Though it should not be necessary, they also can and will agree that they will not sell for the purpose of undermining their obligations under the Plan Support Agreement. Our clients can and will agree to advocate publicly and openly for this settlement in court. Our clients cannot, and will not, do more than that.

3. Fortress Sale

The Fortress Sale is a condition to the Ally Settlement. The Ally Settlement is--in turn--a condition to the Plan our clients are agreeing to

6

support. So long as the termination of the Ally Settlement or the Fortress Settlement are events of termination for our clients, and are made express (not inherent) termination events, that should largely suffice to address our earlier concerns. We therefore propose that we: a) make those conditions express, such that their failure permits our clients or the Trustees to terminate; and, b) that we agree on a simple, mechanical process in which we send you our clients' signatures in trust, pending the execution of the Fortress and Ally Agreements. Once the Fortress Agreement is signed, we will authorize you to affix our clients' signatures to it and we can all proceed.

4. Rule 2019 Confidentiality

The disclosure of our clients' holdings is a matter of confidential and proprietary information. We had earlier requested that the Debtors undertake to seek an order providing that those holdings would be confidential for all creditors; though this request was refused at the time, we trust this will not be an ongoing problem given the matters discussed above. It would be most unfortunate if obduracy on this essential requirement were to become an impediment to what otherwise appears capable of being accomplished.

Please advise us promptly whether these changes will work. I have one final call with my clients tomorrow at 1:30 Central and we must have final terms before that time.  If you need to reach me this evening, please send me an email and I will call you back.

Thanks,

Kathy

--------------------------------------------------------------------
To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

===================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

--------------------------------------------------------------------


--------------------------------------------------------------------
To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

===================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

Confidential    ALLY_0144349

**********************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
**********************************************************


-------------------------------------------------------------------
To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

======================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.


-------------------------------------------------------------------


-------------------------------------------------------------------
To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

======================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

Confidential

ALLY_0144350

--------------------------------------------------------------------

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Confidential

ALLY_0144351

# A. 24

**From:** Marano, Tom
**Sent:** Friday, March 16, 2012 8:32 PM
**To:** Devine, Timothy
**Cc:** Solomon, William Legal; Carpenter, Michael
**Subject:** RE: CONFIDENTIAL ATTORNEY CLIENT PRIVILIGED WORK PRODUCT

Ill see your tolling agreement and raise you one. Please have bill send me one for ResCap claims against Ally.

Seriously, I am fine with a DB tolling agreement if you can get one while you work through various issues

# Redacted

# Redacted

Confidential

ALLY_0226064

# A. 25

| **From:** | Ginger Cavanaugh <Ginger@talcottfranklin.com> |
| **Sent:** | Thursday, March 22, 2012 11:00 PM |
| **To:** | Timothy.Devine@Ally.com |
| **Subject:** | RFC |
| **Attach:** | Negotiations Letter to Ally updated (2).pdf |

Mr. Devine:

Attached please find a letter from Talcott Franklin.  Please confirm your receipt of same.  Thank you.

--
Ginger L. Cavanaugh
Director of Firm Administration
Talcott Franklin P.C.
214.506.1088 direct
214.736.8730 main
214.326.5349 cell
Ginger@talcottfranklin.com
www.talcottfranklin.com

DISCLAIMER:
The information contained in this message may be privileged, confidential, and protected from disclosure. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. If you are not the intended recipient, or an employee, or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message. Re-disclosure without additional consent or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.

IRS Circular 230 disclosure: ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED BY THE WRITER TO BE USED, AND NOTHING CONTAINED HEREIN CAN BE USED, BY YOU OR ANY OTHER PERSON, FOR THE PURPOSE OF (1) AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED TRANSACTION OR MATTER ADDRESSED HEREIN.

# TALCOTT FRANKLIN P.C.

208 NORTH MARKET STREET
SUITE 200
DALLAS, TEXAS 75202
214.736.8730
WWW.TALCOTTFRANKLIN.COM

SENDER'S DIRECT DIAL:
214.321.3838

March 22, 2012

Timothy A. Devine                    **Via email to Timothy.Devine@Ally.com**
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265

Re:    Residential Funding Corporation ("RFC") as Seller and Master Servicer

Dear Tim:

I write concerning our effort at negotiations regarding the attached Trusts (the "Trusts"), which are established pursuant to various Pooling and Servicing Agreements ("PSAs"). Terms not otherwise defined have the meanings set forth in the PSAs.

This firm represents a significant number of clients with beneficial interests in the Trusts. The firm has approached RFC and its parent Ally seeking to negotiate solutions to problems respecting the Trusts. I think you will agree that in our attempt at negotiations, the firm and its clients have been forthright, courteous, and respectful. We have avoided posturing. We have offered to serve as a resource for solutions rather than a source of problems.

Unfortunately, meetings have been delayed, and Ally has failed to provide responses to offers of compromise. To move negotiations forward, we have offered various paths for solutions. Ally has not provided any indication as to whether one or more of those paths offer hope for resolution.

Meanwhile, we continue to hear rumors and see media reports that Ally is engaged in extensive negotiations with entities that have interests adverse to, or that will affect those of, our clients. We have heard a bankruptcy filing is being contemplated no later than the end of the month. Our clients are justifiably concerned that Ally may be holding out on us so it can place RFC in bankruptcy and force an untenable resolution on our clients (the "Potential Strategy").

I write to remind Ally of several things that it should consider if it intends to pursue the Potential Strategy outlined above. *First*, Ally is ultimately largely owned by the United States taxpayers, and should conduct itself with the same business ethics that most Americans would apply to their

TALCOTT FRANKLIN P.C.
March 22, 2012
Page 2

daily affairs.    The Potential Strategy, if pursued by Ally, is both underhanded and entirely inconsistent with the ethics most Americans expect from themselves and their children.

*Second*, the Potential Strategy is also inconsistent with Ally's recent advertising campaign, and any pursuit of the Potential Strategy will directly and forcefully undermine Ally's recent effort to re-brand itself, including the widely circulated pony commercial that concludes: "Even kids know it's wrong to hold out on somebody. Why don't banks?"

*Third*, the firm's clients have instructed the Trustee of each RALI Trust to not engage in any settlement discussions affecting our clients' interests without also involving our clients in the negotiations.  It is therefore pointless to avoid negotiations with the firm's clients, as the Trustee at issue is unlikely to favor one group of Certificateholders over another or ignore a reasonable instruction.

I repeat that our clients are interested in engaging in a substantive dialogue that resolves the issues respecting RFC's repurchase obligations and servicing.  I look forward to a response no later than Monday as to when such negotiations can take place.

Sincerely,


Talcott J. Franklin

**CONFIDENTIAL**

TALCOTT FRANKLIN P.C.
March 22, 2012
Page 3

## TRUSTS

RALI 2002-QS19

RALI 2003-QS14

RALI 2003-QS15

RALI 2004-QA1

RALI 2004-QS1

RALI 2004-QS3

RALI 2004-QS4

RALI 2004-QS5

RALI 2005-QA12

RALI 2005-QA2

RALI 2005-QA8

RALI 2005-QO1

RALI 2005-QO4

RALI 2005-QS9

RALI 2005-QS13

RALI 2005-QS15

RALI 2005-QS16

RALI 2005-QS17

RALI 2005-QS2

RALI 2005-QS3

RALI 2005-QS5

RALI 2006-QA3

RALI 2006-QA8

RALI 2006-QH1

RALI 2006-QO1

RALI 2006-QO3

RALI 2006-QO4

RALI 2006-QO5

RALI 2006-QO8

RALI 2006-QS10

RALI 2006-QS11

RALI 2006-QS14

RALI 2006-QS16

RALI 2006-QS17

RALI 2006-QS3

RALI 2006-QS4

RALI 2006-QS5

RALI 2006-QS6

RALI 2006-QS7

RALI 2006-QS8

RALI 2006-QS9

RALI 2007-QA2

RALI 2007-QA3

RALI 2007-QH2

RALI 2007-QH3

RALI 2007-QH4

RALI 2007-QH6

RALI 2007-QH7

RALI 2007-QH9

RALI 2007-QO2

RALI 2007-QS1

RALI 2007-QS2

RALI 2007-QS5

RALI 2007-QS6

RFMSI 2007-S4

**CONFIDENTIAL**

A. 26

# REDACTED