A. 66

Outlook E-mail

| | |
|---|---|
| **From:** | Devine, Timothy |
| **Sent:** | 5/13/2012 2:36:01 PM |
| **To:** | Levitt, Jamie A.; Ruckdaschel, John; Ornstein, Noah; 'rschrock@kirkland.com'; 'RCieri@kirkland.com'; Lee, Gary S. |
| **Subject:** | FW: great news and very important note |

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Devine, Timothy
**Sent:** Sunday, May 13, 2012 2:28 PM
**To:** Devine, Timothy; 'Talcott J. Franklin'
**Subject:** RE: great news and very important note

Tal: need to close now – you have all my apologies – the machine is grinding – ceo will give embargoed interviews etc – final 8Ks – it's all going in – this is my last chance ot get you in the deal pre-filing – and in my mind that makes a ton of difference for you and your clients…

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Devine, Timothy
**Sent:** Sunday, May 13, 2012 12:35 PM
**To:** Talcott J. Franklin
**Subject:** RE: great news and very important note

I can try to call you but on phone now with CEO and making range of final decisions before 1pm bd mtg.  I can't expose Ally to any claims however remote.

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Talcott J. Franklin [mailto:Tal@talcottfranklin.com]
**Sent:** Sunday, May 13, 2012 12:16 PM
**To:** Devine, Timothy
**Subject:** Re: great news and very important note

Please call me.  214.642.9191.

Sent from my iPhone

On May 12, 2012, at 1:28 PM, "Devine, Timothy" <Timothy.Devine@ally.com> wrote:

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

Confidential

Tal: first – great news that your clients are on board. As you all said, this deal is starkly superior to any of the alternative scenarios for all concerned.  And thank you for speedy work.  I know that you invested a great deal of effort to be prepared for a speedy turn on the documents.

Second – very, very important: we need the cusip level holdings of the clients – like yesterday.  The value of this settlement is that we have X% footprint out of all the certificates issued.  And X is big.  So that increases the chances that it will actually be approved.  And we need 100% reliability and credibility, for all of us, when we represent the holdings of the consenting claimants.  I know you get this but I'm reaching out to you personally because we need absolute full court press to get all this lined up so our folks can bake maximum X with accuracy and credibility into their very first statements that support the Plan, tomorrow.

Thanks again.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

DISCLAIMER:
The information contained in this message may be privileged, confidential, and protected from disclosure. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. If you are not the intended recipient, or an employee, or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message. Re-disclosure without additional consent or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.

IRS Circular 230 disclosure: ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED BY THE WRITER TO BE USED, AND NOTHING CONTAINED HEREIN CAN BE USED, BY YOU OR ANY OTHER PERSON, FOR THE PURPOSE OF (1) AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED TRANSACTION OR MATTER ADDRESSED HEREIN.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

A. 67

Outlook E-mail

| | |
|---|---|
| **From:** | Princi, Anthony |
| **Sent:** | 5/13/2012 7:25:47 PM |
| **To:** | 'Devine, Timothy'; Scott A. Humphries; Kathy D. Patrick; Levitt, Jamie A. |
| **Cc:** | Lee, Gary S.; Clark, Daniel E.; Newton, James A.; nornstein@kirkland.com; Ross.Martin@ropesgray.com; Keith.Wofford@ropesgray.com |
| **Subject:** | RE: Settlement documents -- confidential |

Don't believe the terms of the agreements allow for that but if K&E disagrees please let us know ASAP.

We spoke to Kathy and resolved the issues and are going to be circulating final, execution versions of the agreements soon.

---

**From:** Devine, Timothy [mailto:Timothy.Devine@ally.com]
**Sent:** Sunday, May 13, 2012 7:09 PM
**To:** Princi, Anthony; Scott A. Humphries; Kathy D. Patrick; Levitt, Jamie A.
**Cc:** Lee, Gary S.; Clark, Daniel E.; Newton, James A.; nornstein@kirkland.com; Ross.Martin@ropesgray.com; Keith.Wofford@ropesgray.com
**Subject:** RE: Settlement documents -- confidential

If there is any discussion about the total $ for allowed claims arising out of these issuances – wrapped, unwrapped, monoline, trust, whatever (excepting securities law claims) – going over $8.7 billion then we have no deal.  Ally did not, cannot and will not approve it.

I am sure I misunderstood the notes below.

Thanks.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Princi, Anthony [mailto:APrinci@mofo.com]
**Sent:** Sunday, May 13, 2012 7:05 PM
**To:** Scott A. Humphries; Kathy D. Patrick; Levitt, Jamie A.
**Cc:** Lee, Gary S.; Clark, Daniel E.; Newton, James A.; nornstein@kirkland.com; Devine, Timothy; Ross.Martin@ropesgray.com; Keith.Wofford@ropesgray.com
**Subject:** RE: Settlement documents -- confidential

Gary is calling Kathy to deal with all this.

---

| | |
|---|---|
| **From:** | Scott A. Humphries [mailto:SHumphries@gibbsbruns.com] |
| **Sent:** | Sunday, May 13, 2012 7:05 PM |
| **To:** | Scott A. Humphries; Princi, Anthony; Kathy D. Patrick; Levitt, Jamie A. |
| **Cc:** | Lee, Gary S.; Clark, Daniel E.; Newton, James A.; nornstein@kirkland.com; Timothy.Devine@ally.com; Ross.Martin@ropesgray.com; Keith.Wofford@ropesgray.com |
| **Subject:** | RE: Settlement documents -- confidential |

<< File: 30507447-v11-Revised Plan Support Agreement (RG 513 draft).docx >>  << File: Change-Pro Redline - 30507447-v10-Revised Plan Support Agreement (MoFo 513 draft) and 30507447-v11-Revised Plan Support Agreement (RG 513 draft).pdf >>

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

---

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

========================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

---------------------------------------------------------------------

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00051062

A. 68

Outlook E-mail

| | |
|---|---|
| **From:** | Lee, Gary S. |
| **Sent:** | 5/13/2012 2:42:58 PM |
| **To:** | 'Ornstein, Noah'; Levitt, Jamie A.; 'Ross.Martin@ropesgray.com'; 'Kathy D. Patrick'; 'Scott A. Humphries' |
| **Cc:** | Princi, Anthony; 'Devine, Timothy'; Cieri, Richard M. |
| **Subject:** | RE: Settlement documents -- confidential |

Kathy, as you and your team look at this can you make sure we have properly captured the mechanics for the allowed claim definition to encompass the Credit Enhancers and whether the following language in section 5.01 reflects the way the claim is to be calculated.

"The amount of the Allowed Claim shall equal (i) $8,700,000,000, multiplied by (ii) the percentage represented by (a) the total dollar amount of original principal balance for the Accepting Trusts, divided by (b) the total dollar amount of original principal balance for all Trusts."

The notion is that the monolines claims (other than indemnity) are captured in their entirty in 5.01 and that the claim calculation works. I am not convinced this language is perfect.


Gary S. Lee
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104-0050
T. 212.468.8042
F. 212.468.7900
glee@mofo.com


---

**From:** Ornstein, Noah [mailto:nornstein@kirkland.com]
**Sent:** Sunday, May 13, 2012 2:11 PM
**To:** Levitt, Jamie A.; 'Ross.Martin@ropesgray.com'; 'Kathy D. Patrick'; 'Scott A. Humphries'
**Cc:** Princi, Anthony; Lee, Gary S.; 'Devine, Timothy'; Cieri, Richard M.
**Subject:** RE: Settlement documents -- confidential

All,

Please find attached a blacklilne of each of the settlement agreement and PSA showing just those changes discussed on the phone for which MOFO was to turn the draft. These drafts remain subject to FRE 408.

Noah

---

**From:** Levitt, Jamie A. [mailto:JLevitt@mofo.com]
**Sent:** Sunday, May 13, 2012 2:02 PM
**To:** Ross.Martin@ropesgray.com; Kathy D. Patrick; Scott A. Humphries
**Cc:** Ornstein, Noah; Princi, Anthony; Lee, Gary S.; Devine, Timothy; Cieri, Richard M.
**Subject:** Settlement documents -- confidential

Kathy and Scott,

Attached are the settlement documents redlined against the documents Scott sent last night.  I thought you might want to see the changes we think exist from last night and this morning.  Noah will separately send a set of redlines against what we sent last night in case you prefer to review that way.  Please let us know if you have changes on the monoline references as Gary discussed.  We have not addressed the sale/transfer point because that language is being revised by you and I understand you will be sending the allocation exhibit including the bypass language you propose.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

Our goal needs to be to get your additions and thoughts and get these documents finalized asap.

Thanks.

Jamie

-----------------------------------------------------------------

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

===============================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

-----------------------------------------------------------------

***********************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
***********************************************************

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

A. 69

Outlook E-mail

**From:**      Cieri, Richard M.
**Sent:**      5/13/2012 9:26:06 PM
**To:**        Devine, Timothy
**Cc:**        Lee, Gary S.; Princi, Anthony; Levitt, Jamie A.; Ornstein, Noah; Jeffrey A. Lipps; Ruckdaschel, John
**Subject:**      Re: Settlement documents -- confidential

---

Needs to be clear all in.

Sent from my iPad

On May 13, 2012, at 9:25 PM, "Devine, Timothy" <Timothy.Devine@ally.com> wrote:

> All: no matter what, the allocation details cannot be the least bit ambiguous or tricky on this point: $8.7 billion is the allowed claim for all takers, including monolines as well as trustees.  There's no separate bite at the apple for monolines, no matter how they designate their claims.  Trustees and monolines need to resolve amongst themselves how the water flows through the trusts.  No separate indemnity claims by monolines against some other part of the estate.  It's all in here.  Thanks.  If the language does not support this, the actual deal, then we need to fix the language.   Tim

> Timothy A. Devine

> Chief Counsel - Litigation

> Ally Financial Inc. Legal Staff

> 200 Renaissance Center

> M/C: 482-B09-B11

> Detroit, MI  48265

> (313) 656-3477

---

**From:** Princi, Anthony [mailto:APrinci@mofo.com]
**Sent:** Sunday, May 13, 2012 9:20 PM
**To:** kcrost@orrick.com; Levitt, Jamie A.; Ruckdaschel, John; lipps@CarpenterLipps.com
**Cc:** Devine, Timothy; Lee, Gary S.
**Subject:** Re: Settlement documents -- confidential

Thanks Kathy

----- Original Message -----
From: Crost, Katharine I. <kcrost@orrick.com>
To: Levitt, Jamie A.; 'John.Ruckdaschel@ally.com' <John.Ruckdaschel@ally.com>; 'lipps@CarpenterLipps.com' <lipps@CarpenterLipps.com>
Cc: 'Timothy.Devine@ally.com' <Timothy.Devine@ally.com>; Lee, Gary S.; Princi, Anthony
Sent: Sun May 13 21:10:57 2012
Subject: Re: Settlement documents -- confidential

My thoughts - I'm sure you have thought of many of these points already.

Para 1 - Allocating the Allowed Claim on a pro rata basis in accordance with losses in each trust does not attempt to

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00061255

allocate the Allowed Claim based on harm to the respective trusts based on possible breaches of reps and warranties by ResCap.

Other holders and monolines could object that their deals had a greater concentration of harm from breaches of reps and warranties.
In addition, the various trustees could make a similar objection (in the BofA settlement, only BNY was a trustee, I believe) .

I would delete para 1(iii). The distribution rules that they mandate under para 2 might be inconsistent.

Para 2 -

There would be a potential REMIC issue if you deposit into the trust and distribute more than the actual amount of losses incurred by that trust to date. The Allowed Claim may not be large enough for that to occur, but if substantial losses are projected in the future for certain trusts, this might be a possibility.  If any trust receives more than losses incurred to date, the solution would be to deposit the excess in a reserve account to be drawn upon as losses are incurred.

Para 2 - 4 . Some provisions in this agreement are or may be inconsistent with the documents. I realize there are trade offs between trying to get a settlement with KP and tracking the documents as closely as possible to try to avoid objections by trustees, monolines, etc. Examples of possible inconsistencies are: holding money that would otherwise go to REMIC residuals, [treating the Credit Support Depletion Date as having occurred notwithstanding these payments - this may be consistent with deals - I will check a sample], last sentence in para 4, and para 6. I think most of the terms in para 4 conform to the document provisions with the Subsequent  Recovery term, but we don't have any concept of writing up principal balances of securities when there is not such a term. It makes sense to write up balances as we did when we added the Subsequent Recovery concept, but it wasn't contemplated in the earlier deals.

Para 3 - some deals with no REMIC residuals have another subordinate interest (usually called SB) that KP may not want $ going to. Maybe not our issue.

Para -4 5th line "previously allocated AND  UNREIMBURSED Realized Losses" if this language stays in the agreement.

Last sentence is not clear. I think the intent is that the distribution of Claims will be made before giving effect to the balance increase.

Para 5 - is this intended to offset any amount of this recovery the monoline receives against their fraudulent inducement claims?  If not, it might be worth clarifying what it is intended.

Para 6 - could be written more clearly. I think they are trying to say that any triggers that are determined by the amount of losses will not be recalculated as a result of these payments.

Please let me know if you have any questions or would like additional information.

Kathy
Katharine I. Crost
Attorney at Law
ORRICK, HERRINGTON & SUTCLIFFE LLP
tel 212-506-5070
fax 212-506-5151
Kcrost@orrick.com
www.orrick.com

----- Original Message -----
From: Levitt, Jamie A. [mailto:JLevitt@mofo.com]
Sent: Sunday, May 13, 2012 05:50 PM
To: John.Ruckdaschel@ally.com <John.Ruckdaschel@ally.com>; Crost, Katharine I.; lipps@CarpenterLipps.com <lipps@CarpenterLipps.com>
Cc: Timothy.Devine@ally.com <Timothy.Devine@ally.com>; Lee, Gary S. <GLee@mofo.com>; Princi, Anthony <APrinci@mofo.com>
Subject: FW: Settlement documents -- confidential

                                 RC-9019_00061256

John, Kathy and Jeff,

Attached is Kathy Patrick's proposed allocation methodology -- she said
it comes largely from BoA.  Can you give us your thoughts asap.

Thanks.

-----Original Message-----
From: Scott A. Humphries [mailto:SHumphries@gibbsbruns.com]
Sent: May 13, 2012 6:16 PM
To: Kathy D. Patrick; Princi, Anthony; Levitt, Jamie A.
Cc: Lee, Gary S.; Clark, Daniel E.; Newton, James A.;
nornstein@kirkland.com; Timothy.Devine@ally.com;
Ross.Martin@ropesgray.com; Keith.Wofford@ropesgray.com; Scott A.
Humphries
Subject: RE: Settlement documents -- confidential

This is the allocation methodology revised.  Paras 2-6 are new.

--------------------------------------------------------------------
To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any
advice concerning one or more U.S. Federal tax issues is contained in this communication (including any
attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding
penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any
transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

=================================================================
======

This message contains information which may be confidential and privileged.  Unless you are the addressee (or
authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any
information contained in the message. If you have received the message in error, please advise the sender by reply
e-mail @mofo.com, and delete the message.


--------------------------------------------------------------------


======================================================
IRS Circular 230 disclosure: To ensure compliance with requirements
imposed by the IRS, we inform you that any tax advice contained in this
communication, unless expressly stated otherwise, was not intended or
written to be used, and cannot be used, for the purpose of (i) avoiding
tax-related penalties under the Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any tax-related matter(s)
addressed herein.
======================================================
NOTICE TO RECIPIENT: THIS E-MAIL IS MEANT FOR ONLY
THE INTENDED RECIPIENT OF THE TRANSMISSION, AND
MAY BE A COMMUNICATION PRIVILEGED BY LAW. IF YOU
RECEIVED THIS E- MAIL IN ERROR, ANY REVIEW, USE,
DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS
E-MAIL IS STRICTLY PROHIBITED. PLEASE NOTIFY US
IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND
PLEASE DELETE THIS MESSAGE FROM YOUR SYSTEM.
THANK YOU IN ADVANCE FOR YOUR COOPERATION.
For more information about Orrick, please visit http://www.orrick.com/<http://www.orrick.com>
======================================================

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

================================================================
======

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

-----------------------------------------------------------------------

************************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
************************************************************

A. 70

MORRISON | FOERSTER

755 PAGE MILL ROAD
PALO ALTO
CALIFORNIA  94304-1018

TELEPHONE: 650.813.5600
FACSIMILE: 650.494.0792

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

November 4, 2012

Writer's Direct Contact
650.813.5866
DRains@mofo.com

The Honorable Martin Glenn
United States Bankruptcy Court
One Bowling Green
New York, New York 10004

Re:   In re Residential Capital, LLC, et al. (Case No. 12-12020 MG)

Dear Judge Glenn:

The Debtors write in response to the letters sent to the Court late Friday by counsel for
MBIA Insurance Corporation ("MBIA") and Financial Guaranty Insurance Company
("FGIC").

Both letters join in the arguments made by the Official Committee of Unsecured Creditors
(the "Committee") for the production of 367 documents that were the subject of a claw back
request initiated by Ally Financial, Inc. ("AFI").  The letters also make new arguments about
the respective roles of counsel for AFI and the Debtors, and about the merits of the RMBS
settlement now under consideration by the Court.

On the first issue – the claw back request – the Debtors largely incorporate by reference their
response to the Committee's letter.  The Debtors then separately address the second and third
issues – AFI's and the Debtors' representation by counsel, and the merits of the RMBS
settlement.

## I.   MBIA and FGIC Have Breached Their Obligations Under Their Confidentiality Agreements By Refusing to Honor the Claw Back Request.

MBIA's and FGIC's letters largely repeat the arguments made by the Committee concerning
the claw back request.  Their arguments are misleading for the same reasons as the
Committee's.

Both letters, for example, resist AFI's effort to claw back 367 documents, even though
MBIA and FGIC knew, before sending their letters, that AFI had shortened its list to 109
documents.  Both MBIA and FGIC, like the Committee, are parties to confidentiality
agreements with the Debtors and, like the Committee, both MBIA and FGIC had immediate

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Two

and automatic obligations to return or destroy the documents identified in the claw back request regardless of their views about the merits of that request. MBIA and FGIC are both in breach of their obligations under their agreements for failure to comply with AFI's claw back request. MBIA's and FGIC's letters both improperly cite to and disclose privileged information in further breach of their confidentiality agreements. And both MBIA and FGIC, like the Committee, have failed to engage in any meet-and-confer discussion with the Debtors regarding the arguments contained in their letters. They have completely by-passed the Debtors and made their arguments, asserted for the first time, directly to the Court.

For these reasons, explained more fully in the Debtors' response to the Committee, the Debtors respectfully request that the Court compel MBIA and FGIC to:

- Immediately comply with their obligations under their confidentiality agreements by returning or destroying the documents subject to the claw back request;

- Immediately withdraw their disclosures of privileged documents and take all steps necessary to protect those documents from further disclosure;

- Withdraw their current requests for the production of privileged information until they have complied with their meet-and-confer obligations.

## II. MBIA and FGIC Misrepresent the Facts Regarding the Debtors' and AFI's Legal Representation.

Large portions of FGIC's and MBIA's letters are devoted to setting up, and then knocking down, a straw man. The straw man is the false notion that Tim Devine – AFI's chief of litigation – acted as the legal counsel for the Debtors in negotiating the RMBS settlement.

Both MBIA and FGIC base their arguments on this fiction. According to MBIA, the Debtors' "current position" is "that Mr. Devine acted as an attorney on the Debtors' behalf in connection with the analysis and negotiation of the proposed RMBS settlement agreement." (MBIA Letter, dated November 2, 2012, at p. 2.) FGIC's letter makes the same assertion: "several members of Ally's legal department jointly represented Ally and Debtors in connection with various matters including the negotiation of the RMBS Settlement Agreement pre-petition as well as other matters post-petition." (FGIC Letter, dated November 2, 2012, at p. 1.)

The truth is very different. It has not changed, and it has been consistently explained to all parties, including MBIA, FGIC, and the Committee.

Before the ResCap entities filed petitions in bankruptcy, AFI's legal department – and, in particular, Tim Devine, AFI's chief of litigation – provided legal advice directly to the

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Three

Debtors in connection with litigation involving third parties. ResCap's own legal department
worked with in-house litigation lawyers from their parent company on RMBS litigation
matters.

It was, of course, entirely appropriate for the Debtors to have attorney-client relationships
with AFI's in-house lawyers in connection with litigation matters as to which AFI and the
Debtors shared common legal interests. In those cases, the Debtors and AFI shared interests
in assessing their risks and litigation exposure, and in coordinating their common defense
strategy. *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 491 (S.D.N.Y.
1993) ("courts have upheld the privilege for communications shared by the parent with its
wholly-owned subsidiary . . . upon a showing that a common attorney was representing both
corporate entities or that the two corporations shared a common legal interest"); *Gulf Islands
Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 474 (S.D.N.Y. 2003) (no waiver
of privilege for shared communication with affiliated corporation where "the entities were
represented by a common attorney, or shared a common legal interest").

In anticipation of the filing of bankruptcy petitions, AFI's legal department formally severed
all legal connections to the Debtors. Neither Mr. Devine nor any other member of AFI's in-
house legal department has had an attorney-client relationship with the Debtors since then.
But, in light of this separation, the Debtors and AFI have entered into a joint defense
agreement with regard to ongoing litigation, and they continue to cooperate in a limited
fashion regarding the defense of cases involving third parties. AFI and the Debtors share
common legal interests with regard to the defense of these matters.

But AFI's in-house lawyers did *not* provide legal representation to the Debtors in connection
with the RMBS settlement. In the RMBS settlement negotiations, as well as in the
negotiations surrounding the related plan support agreements, AFI's in-house lawyers
represented AFI's interests. The Debtors' interests were represented by the Debtors' own in-
house attorneys – Tammy Hamzehpour, John Ruckdaschel, and Bill Thompson – and the
Debtors' lawyers at Morrison & Foerster.

MBIA, FGIC, and the Committee know all these facts. The Debtors have consistently
informed all parties that, in the Debtors' view, a line must be drawn between matters as to
which AFI and the Debtors shared counsel and/or a common legal interest, on the one hand,
and matters relating to the negotiation of the RMBS settlement agreement, on the other. The
Debtors have consistently asserted the attorney-client privilege and common interest doctrine
to protect communications regarding the Debtors' and AFI's litigation against third parties.
And the Debtors have consistently acknowledged that no privilege protects communications
between the Debtors and AFI regarding the negotiation of the RMBS settlement, because
AFI's in-house lawyers did not represent the Debtors in those negotiations, and because AFI
and the Debtors did not share common legal interests in those negotiations.

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Four

The Debtors' view on these matters is well-known to MBIA, FGIC, and the Committee, because the Debtors informed them that it disagreed with AFI's initial efforts to assert common interest protection with regard to the RMBS settlement negotiations. The Debtors even gave the Committee a chart showing that, with regard to the 367 documents on AFI's original claw back list, the Debtors believed only 109 documents were properly subject to privilege, while the remaining 258 documents – including all those concerning the RMBS settlement negotiations -- were not covered by privilege.

Only by ignoring these well-known facts can MBIA and FGIC argue that Tim Devine "simultaneously represented" both AFI and the Debtors. (FGIC Letter, dated November 2, 2012, at p. 3.) Only by ignoring these facts can FGIC argue that the Debtors' joint defense agreement with AFI is "directly contrary to the prior representations Debtors and Ally have made to the Court." (*Id.*, at p. 2.)

MBIA's and FGIC's arguments, then, do not advance their position. They argue for the production of 367 documents on the ground that, with regard to the RMBS settlement negotiations, the Debtors and AFI could not properly have had privileged communications. But the Debtors never asserted they did, and AFI came around to this view before MBIA and FGIC submitted their letters. MBIA's and FGIC's letters thus succeed only in knocking down a straw man.

### III. FGIC Misrepresents the Debtors' and AFI's Goals In Negotiating the RMBS Settlement, Plan Support Agreements, and the Debtors' Settlement With AFI.

FGIC's letter goes on to make an argument not included in either MBIA's or the Committee's submissions. FGIC contends that the Debtors' "paramount goal" in the RMBS negotiations was "obtaining a third party release, as well as an estate release, for Ally's benefit." (FGIC Letter, dated November 2, 2012, at p. 4.)

Now is not the right time for a full rebuttal of this charge. But the very documents cited in FGIC's letter refute FGIC's allegations. So a brief review of those documents, and what they say, is in order.

The RMBS settlement negotiations involved three parties with different interests. The institutional investors wanted to obtain the largest possible allowed claim against the estate. AFI wanted support for a plan that would include a release from the Debtors as well as releases in its favor as against third parties. It also wanted to minimize the size of its payment to the Debtors.

The Debtors wanted to obtain the best outcome for creditors, which involved (i) obtaining the smallest possible allowed claim against the estate, (ii) obtaining the largest possible contribution to the estate from AFI, and (iii) concluding as many pre-negotiated elements of

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Five

the bankruptcy filling as possible, so as to ensure a clean sale of the Debtors' operating businesses. The documents referenced in FGIC's letter demonstrate that the Debtors achieved these goals.

The documents show that the Debtors and AFI worked together to negotiate for the smallest possible allowed claim for the institutional investors. The Debtors, with AFI's help, argued strenuously with the institutional investors over the proper ways to assess the size and risks of their claims, including arguing for lower defect rates, lower breach rates, lower projected future losses, larger discounts for litigation risks, and the like. The Debtors succeeded in negotiating the institutional investors down from initial demands of from $11 to $13 billion to the final agreed-upon $8.7 billion allowed claim.

These facts are devastating to the creditors objecting to the proposed settlement. Their theory is that the Debtors' settlement is too high, and that the Debtors proposed it as a favor to AFI. But the documents show the Debtors and AFI worked together to achieve the lowest possible allowed claim. The documents referenced in FGIC's letter put the lie to the creditors' theory of the case.

FGIC's documents also demonstrate that the Debtors achieved the best possible contribution from AFI. AFI initially refused to offer any money in return for a release from the Debtors. By the time the negotiations had ended, AFI offered a "Hard stop at 750 + 200 + 100." (FGIC Letter, dated November 2, 2012, at p. 3.) The Debtors successfully negotiated for a $1.05 billion contribution from AFI as its contribution to the Debtors. All this money inures directly to the benefit of the creditors.

A key inducement to AFI for this contribution, of course, was the Debtors' agreement to propose a plan offering releases, including third party releases, in favor of AFI, and also the Debtors' success in obtaining plan support agreements from the institutional investors. The documents referenced in FGIC's letter show AFI's in-house attorney, Tim Devine, negotiating aggressively to obtain support for a plan including third party releases. That is not surprising. AFI had every right to seek to advance its own interests, and AFI was, at the same time, responding to the Debtors' demands for an increased contribution from AFI.

The Debtors believe that AFI's $1.05 billion support contribution is fair value for the releases to be included in the Debtors' plan. It is worth noting, moreover, that the RMBS settlement is not conditioned upon approval of the Debtors' plan. The Court may approve the proposed settlement without approving the Debtors' plan, or without approving third party releases in favor of AFI. The settlement will remain in place regardless of the outcome of the Debtors' plan.

The documents also show the Debtors were successful in concluding key pre-petition agreements so as to ensure a clean sale of the Debtors' operating businesses. Those

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Six

agreements, including the RMBS settlement agreement and related plan support agreements, were critical to the success of the sale of the operating businesses, the proceeds of which inure to the direct benefit of the creditors. The results of the Debtors' strategy, and the recent auction and sale, speak for themselves.

FGIC's letter, then, does not show that the Debtors' "paramount goal" was "obtaining a third party release, as well as an estate release, for Ally's benefit." (FGIC Letter, dated November 2, 2012, at p. 4.) Quite the opposite. The documents referenced in FGIC's letter show the Debtors successfully getting the lowest possible allowed claim for the institutional investors, while getting the maximum available contribution to the estate from AFI and achieving the greatest recovery from the sales of the Debtors' operating assets.

MBIA and FGIC have not offered any valid argument for lifting the protection of the attorney-client privilege, work product doctrine, or common interest doctrine. They have not shown any conflict of interest regarding the Debtors' legal representation, and they have not succeeded in undercutting the merits of the proposed RMBS settlement. Their requests for production of documents should be denied.

Respectfully submitted,

Darryl P. Rains

A. 71

| | |
|---|---|
| **From:** | Devine, Timothy |
| **Sent:** | Thursday, December 15, 2011 2:43 AM |
| **To:** | Hamzehpour, Tammy |
| **Cc:** | Solomon, William Legal; Hagens, David; Ruckdaschel, John |
| **Subject:** | FW: Confi and Tolling Agreement |

Pursuant to our plan, I will reach out to Kathy Patrick by email letting her know that Tammy has forwarded me the correspondence and asked me to follow up.  First step: requesting confirmation of her representation by clients.  Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Hamzehpour, Tammy
**Sent:** Wednesday, December 07, 2011 12:53 PM
**To:** Devine, Timothy; Hagens, David; Ruckdaschel, John
**Subject:** FW: Confi and Tolling Agreement

fyi

---

**From:** David Sheeren [mailto:dsheeren@gibbsbruns.com]
**Sent:** Wednesday, December 07, 2011 11:24 AM
**To:** Hamzehpour, Tammy
**Cc:** Kathy D. Patrick; Scott A. Humphries
**Subject:** Confi and Tolling Agreement

Tammy,

Attached for your review, please find a draft Confidentiality Agreement and a draft Tolling Agreement.

Best regards,
David

**David Sheeren**
**Gibbs & Bruns LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
713.751.5207 (o)
713.459.6278 (c)



1

Confidential Professional Eyes Only

A. 72

**Outlook E-mail**

**From:**     Hamzehpour, Tammy
**Sent:**     4/23/2012 8:54:01 PM
**To:**        Devine, Timothy
**Subject:**   RE: Prep for KP

Yes, let's walk through it tomorrow. I'm fine with not raising her expectations, so long as (to your point) there are analytics to support what we would show her. I can't speak as to the proposed settlement with AFI, as MoFo is much closer to that than I am. We can cover in the same conversation.

Tammy

-----Original Message-----
From: Devine, Timothy
Sent: Monday, April 23, 2012 8:38 PM
To: Hamzehpour, Tammy
Subject: Prep for KP

Tammy:

Thinking of waterfall for KP.

Would like to recommend 3, 4, 6 rather than 4, 5, 6 as low medium high. Thought is that we creat flexibility for discussion re potential losses beyond reserves. I will provide analytics to demonstrate how one could get to 3, 4 or 6. Point is not to persuade KP that such range is correct. She will have strong instinct to dispute it as unrealistically low. We are ok with her informing us otherwise, so long as she comes away knowing that ratcheting up those ranges leads automatially to lower percentage recoveries, by simple math in light of afact that there will only be X or Y real dollars available. What we will sell, though, is basedon strength of Gary's waterfall presentation as btwn GMACM and RFC in the two scenarios. The message to her will be clear - get on board.

Finally, I recommend we use 750 million rather than one billion as potential AFI contribution. I don't have basis to say it should be a billion, and it would be better to leave some room for negotiation. If we want to use a billion we will need clearance from AFI and I haven't spoken to Mike.

I recommend we take advantage of tomorrow's meeting of you, me, Kirkland and MoFo to run through the KP draft slides. Your thoughts?

Thanks.

Tim



PENGAD 800-631-6989

EXHIBIT

9019-79

11/13/12

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00061443

A. 73

Outlook E-mail

**From:**      Devine, Timothy
**Sent:**      5/13/2012 2:36:01 PM
**To:**        Levitt, Jamie A.; Ruckdaschel, John; Ornstein, Noah; 'rschrock@kirkland.com'; 'RCieri@kirkland.com'; Lee, Gary S.
**Subject:**   FW: great news and very important note

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Devine, Timothy
**Sent:** Sunday, May 13, 2012 2:28 PM
**To:** Devine, Timothy; 'Talcott J. Franklin'
**Subject:** RE: great news and very important note

Tal: need to close now – you have all my apologies – the machine is grinding – ceo will give embargoed interviews etc – final 8Ks – it's all going in – this is my last chance ot get you in the deal pre-filing – and in my mind that makes a ton of difference for you and your clients…

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Devine, Timothy
**Sent:** Sunday, May 13, 2012 12:35 PM
**To:** Talcott J. Franklin
**Subject:** RE: great news and very important note

I can try to call you but on phone now with CEO and making range of final decisions before 1pm bd mtg.  I can't expose Ally to any claims however remote.

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

**From:** Talcott J. Franklin [mailto:Tal@talcottfranklin.com]
**Sent:** Sunday, May 13, 2012 12:16 PM
**To:** Devine, Timothy
**Subject:** Re: great news and very important note

Please call me.  214.642.9191.

Sent from my iPhone

On May 12, 2012, at 1:28 PM, "Devine, Timothy" <Timothy.Devine@ally.com> wrote:

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

Tal: first – great news that your clients are on board.  As you know, this deal is starkly superior to any of the alternative scenarios for all concerned.  And thank you for speedy work.  I know that you invested a great deal of effort to be prepared for a speedy turn on the documents.

Second – very, very important: we need the cusip level holdings of the clients – like yesterday.  The value of this settlement is that we have X% footprint out of all the certificates issued.  And X is big.  So that increases the chances that it will actually be approved.  And we need 100% reliability and credibility, for all of us, when we represent the holdings of the consenting claimants.  I know you get this but I'm reaching out to you personally because we need absolute full court press to get all this lined up so our folks can bake maximum X with accuracy and credibility into their very first statements that support the Plan, tomorrow.

Thanks again.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477

---

DISCLAIMER:
The information contained in this message may be privileged, confidential, and protected from disclosure. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. If you are not the intended recipient, or an employee, or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message. Re-disclosure without additional consent or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.

IRS Circular 230 disclosure: ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED BY THE WRITER TO BE USED, AND NOTHING CONTAINED HEREIN CAN BE USED, BY YOU OR ANY OTHER PERSON, FOR THE PURPOSE OF (1) AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TAX-RELATED TRANSACTION OR MATTER ADDRESSED HEREIN.

A. 74

# In Re:

*RESIDENTIAL CAPITAL, LLC, et al.*

*Case No. 12-12020-mg*

---

*October 10, 2012*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



Min-U-Script® with Word Index

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10                  Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  October 10, 2012

19                  10:04 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                                    21

1          THE COURT:  Mr. Bentley?

2          MR. BENTLEY:  -- we are satisfied with the new hearing

3   date, Your Honor.

4          THE COURT:  All right.  I know you wanted more than

5   the three days, though, I gather?

6          MR. BENTLEY:  That's correct, Your Honor.  We don't

7   completely agree with the way our position was characterized,

8   but that is an issue we wanted to raise.

9          THE COURT:  Okay.  All right.

10          Come on up to the microphone.

11          MR. LEMAY:  Your Honor, David LeMay for the examiner.

12   I think all I'd like to do right now is just put a pin in an

13   issue relating to timing of the examination as it relates to

14   this process.  And perhaps if I could bother Your Honor for

15   about three minutes when all is done --

16          THE COURT:  It's not a bother.

17          MR. LEMAY:  -- I'd like to talk to you, at that time.

18          THE COURT:  All right.

19          MR. LEMAY:  Thank you.

20          THE COURT:  Okay; all right.

21          MR. PRINCI:  Your Honor, with respect to the specific

22   issues -- and as you correctly point out, that they are issues

23   having to do with how we get from here to there; "there" being

24   the new proposed dates for the hearing of January 14, 15, and

25   16 -- what I'd like to do is address the one matter that Mr.

1  Bentley raised, and that's the time for the hearing.  And then

2  I'm going to ask my partner, Mr. Rains to address the other

3  particular issues, since he was closer to the negotiations that

4  occurred over the last twenty-four hours.

5          Judge, with respect to the amount of time for the

6  hearing, two things.  Number one is we heard the Court, or so

7  we understood the Court to be saying that this hearing was

8  going to be three days.  The reality is, Judge, this is either

9  a hearing on the 8.7 with the all Iridium factors -- and we

10  understand that one of them is the question of whether the

11  negotiations were arm's-length -- or it's going to be some sort

12  of duplication of the efforts the examiner is doing, and an

13  opportunity for people to try to use this hearing for that

14  purpose.

15          The seventh factor in the Iridium factors, the arm's-

16  length negotiations, in this case, given the facts, doesn't

17  pertain to the negotiations between the two parties, i.e., the

18  ResCap debtors and the counterparties and institutional

19  investors.  What people are complaining -- and Your Honor knows

20  this and we know this -- those people are alleging that, in

21  essence, Ally, our parent company, was a puppeteer; we were the

22  puppet; and they used the puppet to promote a settlement with

23  the institutional investors that wasn't meritorious on its

24  face, wasn't designed for that purpose, and was designed

25  instead to procure the consent of the institutional investors

1  to enter into the plan support agreement which has third-party

2  releases proposed in connection with the plan.  So that's --

3  those are the allegations.

4         Those allegations are being reviewed by the examiner.

5  We have a concern, Judge, that there is a disproportionality

6  now, and to a great degree, with respect to that one factor in

7  the Iridium factors.  And we say this, Judge, because at the

8  end of the day, it seems to us, and we submit to the Court,

9  that if we were to prove to the Court that 8.7 falls within the

10 range of reasonableness for both parties, and yet let's just

11 hypothesize, Judge, that Your Honor should conclude that the

12 reason we really did that, wasn't because we were interested in

13 the interests of the estate, but we were only interested in

14 trying to get the parent company a release; at the end of the

15 day, we would submit, Your Honor, that the way the Iridium

16 factors work, it would still be appropriate and indeed

17 necessary for the Court to hold that the 8.7 is a fair

18 settlement.

19         THE COURT:  I disagree.

20         MR. PRINCI:  Okay.

21         THE COURT:  The seven Iridium factors, some of which

22 may or may not be applicable in each case, are seven

23 nonexclusive factors; and no one is determinative.  So when I

24 say I disagree, your -- the proposition you assert -- have

25 asserted that simply because the amount is within the range of

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                24

1  reasonableness, the Court is required to approve the

2  settlement, I don't read Iridium that way.  I don't read TMT

3  Trailer Ferry that way.  I don't read the other cases regarding

4  approval of 9019 settlements that way.

5          It is -- that isn't to say that I would conclude it

6  can't be approved.  You seem to be arguing that the Court has

7  no alternative at that point, but to approve it.  I don't agree

8  with that statement.

9          MR. PRINCI:  Understood, Your Honor.  I think the way

10  we -- what the debtors would argue, Your Honor, Iridium stands

11  for, is that --

12          THE COURT:  Because -- wait a second --

13          MR. PRINCI:  Yes.

14          THE COURT:  -- Mr. Princi.  8.7 could be a dollar

15  value within the range of reasonableness, but the other

16  settlement terms may be such that the settlement should not be

17  approved.  Okay?  I don't know whether that's the case.  I'm

18  not making any determination.  The parties will lay out their

19  positions.  But you shouldn't think you're going to come into

20  the hearing and simply -- because you've asserted this position

21  and you can carry forward with it, if you wish.  But it's not

22  my understanding of the law.

23          You've been consistent in articulating the view that

24  the only issue for the Court at the settlement hearing is

25  whether the 8.7 billion dollars is above the lowest point in

A. 75

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

          Debtors.

------------------------------------x




VIDEOTAPE DEPOSITION OF JOHN RUCKDASCHEL

New York, New York

November 8, 2012

9:37 a.m.






Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27643

2

1

2

3

4                          November 8, 2012

5                          9:37 a.m.

6

7            Deposition of JOHN RUCKDASCHEL,

8     held at the offices of Kramer, Levin,

9     Naftalis & Frankel, 1177 Avenue of the

10    Americas, New York, New York, pursuant to

11    Notice, before Erica L. Ruggieri,

12    Registered Professional Reporter and

13    Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

117

1            JOHN   RUCKDASCHEL

2    settlement and the ResCap settlement?

3        A.    I was not.

4        Q.    On a different topic for a

5    second.

6            The RMBS settlement was executed

7    with the institutional investors and not

8    the trustees, that's right?

9        A.    That's -- that's my

10   understanding how it works.

11       Q.    Is your understanding that only

12   the trustee has the authority to make the

13   claim?

14       A.    To make the?

15       Q.    The claim.

16       A.    The claim?

17       Q.    Yeah.

18       A.    I don't have an understanding

19   one way or another on that point.  I

20   haven't -- I haven't given it any thought.

21       Q.    In analyzing the governing

22   contracts, did you look at who has the

23   authority to make the claim?

24       A.    The -- the way that the PSAs

25   read is it says no -- no bondholder shall

118

1               JOHN   RUCKDASCHEL

2     have any rights other than if they, as we

3     discussed earlier, satisfy certain

4     conditions, one of which is that they are

5     a 25 percent or greater holder of that

6     class and they have to -- that gets

7     them -- they can direct the trustee if

8     they provide the trustee some form of

9     indemnification.  And I think it goes on

10    to say and the trustee doesn't take any

11    additional -- additional action.

12             So if you are asking -- go

13    ahead.

14        Q.    So my question is they have the

15    ability to direct the trustee if they

16    provide the trustees with some form of

17    indemnification.  Do you know if --

18        A.    That's not what the document

19    says.

20        Q.    I thought that's what you just

21    said.

22        A.    It says no bondholder shall have

23    any -- any right unless the following has

24    occurred and unless the trustee isn't

25    taking any action.  So the -- the advice

A. 76

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                            Case No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

                    Debtors.

-----------------------------------x


DEPOSITION OF FRANK SILLMAN

New York, New York

November 20, 2012

9:35 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27687

2

1

2

3

4          November 20, 2012

5              9:35 a.m.

6

7

8          Deposition of FRANK SILLMAN,

9     held at the offices of Kramer, Levin,

10    Naftalis & Frankel, 1177 Avenue of the

11    Americas, New York, New York, pursuant

12    to Notice, before Erica L. Ruggieri,

13    Registered Professional Reporter and

14    Notary Public of the State of New

15    York.

16

17

18

19

20

21

22

23

24

25

25

1          FRANK SILLMAN

2          Q.    You've done some work for the

3     debtors, is that correct, prior to your

4     engagement in this matter?

5          A.    Yes.

6          Q.    Tell me what work you've done

7     for the debtors.

8          A.    We did some consulting work with

9     them.  We also reviewed loan files for

10    them in relation to some potential

11    litigation and -- litigation they had at

12    the time.

13         Q.    Over what period -- over what

14    period have you done work for the debtors

15    prior to -- strike that.  Let me start

16    again and try to be a little clearer.

17              In this matter, when were you

18    first contacted?

19         A.    I believe it was May of this

20    year.

21         Q.    It was after the settlement

22    agreement had been executed?

23         A.    Yes.

24         Q.    Prior to that time, over what

25    period had you been doing work for the

67

1                    FRANK SILLMAN

2     to come to any conclusions on breach

3     rates.

4          Q.    Is part of the problem that an

5     awful lot of this data is simply not

6     publicly available?

7          A.    Yes.

8          Q.    And let me now broaden the

9     question.  Suppose the question is if you

10    are asked to determine how the rates of

11    alleged rep and warranty breaches compare

12    as between any particular types of loan

13    products, is that a question that can be

14    answered using publicly available data?

15         A.    Again you are asking for

16    industry wide comparisons?

17         Q.    Correct.

18         A.    I'm not aware of any publicly

19    available data that would allow for a

20    credible comparison between originators.

21         Q.    I'm talking about loan types?

22         A.    I'm sorry.

23              MR. RAINS:  Products.

24         A.    Yeah, products.  You are talking

25    about rep and warrant violations.

68

FRANK SILLMAN

1

2      Q.    Correct.  And suppose now we

3      modify the question so we are not asking

4      about alleged breach rates but instead

5      we're asking about what you call loss

6      share rates.  Could that question be

7      addressed using publicly available data?

8      A.    There have been some expert

9      reports that you can discern the loss

10     share rates from.  The issues with that is

11     the underlying data you don't have access

12     to so I can't opine on whether or not

13     that's comparative to the debtors proposed

14     settlement because the data behind those

15     reports are not publicly available.

16     Q.    And which expert reports are you

17     referring to?

18     A.    The Bank of America expert

19     report and the Lehman expert declaration.

20     Q.    Now, I'm not asking you about

21     discerning loss share rates as to any

22     particular seller but rather as to

23     industry averages.  Is there publicly

24     available data from which one could reach

25     meaningful conclusions about average

69

1              FRANK SILLMAN

2    industry loss share rates?

3        A.    On a product by product basis?

4        Q.    Yes.

5        A.    I'm not aware of any credible

6    sources that I have been able to evaluate

7    their underlying data that provide that

8    information.

9        Q.    And now let me ask the same

10   question but as to vintages.  Is there

11   publicly available data from which one

12   could reach meaningful conclusions about

13   how loss share rates varied depending on

14   the loan's vintage?

15       A.    Again, I'm not aware of any data

16   that's available that you can reach

17   credible conclusions and that I have been

18   able to view the underlying data behind

19   that.

20       Q.    In your -- strike that.

21            So now let's turn away from

22   industry averages and turn back to your

23   personal experience.  In your personal

24   experience is the vintage of a loan a

25   factor that can affect the likelihood of a

104

1                    FRANK SILLMAN

2        this paragraph is what I'm going to focus

3        on.  It says, "I was asked to provide an

4        independent assessment of the total

5        allowed claim as defined in the RMBS Trust

6        Settlement Agreements and opine as to its

7        reasonableness."

8                    Do you see that?

9            A.   Yes.

10           Q.   And the total allowed claim,

11       that's $8.7 billion?

12           A.   Yes.

13           Q.   Who first contacted you about

14       this matter?

15           A.   Jen Battle.

16           Q.   When did she contact you?

17           A.   I believe it was early May but,

18       you know, I'm not positive as to the date.

19       But that's around the time.

20           Q.   She contacted you after the

21       debtors had entered into the RMBS Trust

22       Settlement Agreement?

23           A.   Yes.

24           Q.   And I can tell you that that

25       agreement was executed on May 13th.

117

                    FRANK SILLMAN

1

2    files.

3        Q.    And anything -- anything else

4    other than the documents you already

5    mentioned, plus loan files?  That is, are

6    your clients -- are your colleagues going

7    outside the loan files?

8        A.    You know, I'd have to look at

9    the audit strategy document for this

10   review to answer that question.  I just

11   don't recall whether we are or are not.

12       Q.    Let's turn back to paragraph 5.

13   And I'm going to ask you about the third

14   sentence of the paragraph which states,

15   "However, I take no position on the

16   ability of any party to prove a breach of

17   representations and warranties under the

18   governing agreements and I assume for the

19   purposes of this declaration that such a

20   showing can be made against the debtors."

21            Do you see that?

22       A.    Yes.

23       Q.    Can you explain what you mean by

24   that?

25       A.    I don't know.  I think I have

118

1              FRANK SILLMAN

2    said it in the paragraph.

3         Q.    So is it fair to say you are not

4    opining as to whether any of the claims

5    have legal merit?

6         A.    Whether they would be able to

7    prove breaches of reps and warrants, yeah,

8    under the governing agreements.

9         Q.    Or prove the requirements of put

10   back?

11        A.    Correct.

12        Q.    And by the way, you don't claim

13   to have any expertise in that issue, do

14   you?

15             MR. RAINS:  Objection, vague and

16        ambiguous.

17        A.    Which area is that?

18        Q.    Whether put back is legally

19   required?

20        A.    I didn't render any legal -- I

21   don't have any legal training and didn't

22   provide any legal recommendations under

23   this work.

24        Q.    And you don't claim to have the

25   expertise needed to provide legal

119

1                    FRANK SILLMAN

2       opinions, right?

3           A.     Correct.

4           Q.     And you are not expressing a

5       view, I take it, as to whether any of the

6       debtors' legal defenses have merit?

7           A.     Correct.

8           Q.     And you are also not expressing

9       a view as to whether the facts relating to

10      any of the loans in the pool being settled

11      would legally warrant put back?

12          A.     Yeah.  I'm not making a legal

13      assessment.

14          Q.     Am I correct you've made no

15      attempt to determine the, what portion of

16      the loans in the pool actually breach reps

17      and warranties?

18          A.     The work that I'm depending on

19      or relying on is the repurchased, GSE

20      repurchase rate work that was done between

21      Fannie, Freddie and the debtor where they

22      reviewed thousands of loans over a number

23      of years and looked at the actual loan by

24      loan file review and availed themselves to

25      the defenses of the governing agreements

122

```
 1              FRANK SILLMAN

 2              (Record read.)

 3              MR. RAINS:  Same objections.

 4        A.    I relied on the GSE repurchase

 5   work that the debtor did with Fannie and

 6   Freddie.

 7        Q.    To date have you looked at any

 8   loan file for any of the loans within the

 9   pool that's being settled?

10        A.    We are in the process of

11   reviewing the loan files.

12        Q.    Have you yet looked at any loan

13   files?

14              MR. RAINS:  You mean him

15        personally or Fortace?

16        Q.    Let's break it into pieces.

17   Have you personally looked at any loan

18   file?

19        A.    I have not looked at the loan

20   files.

21        Q.    Prior to your signing your

22   June 11 declaration, did anybody at

23   Fortace look at any of the loan files for

24   the loans being settled?

25        A.    I relied on, we relied on, the
```

123

1                    FRANK SILLMAN

2       work that the debtor did with the GSE

3       repurchases in forming the assumptions and

4       conclusions in my original declaration.

5            Q.   So that's a no?

6            A.   I relied on --

7                 MR. BENTLEY:  Read back my

8       question.

9            Q.   It's a very simple factual

10      question.  I'm not asking you what you

11      relied on.  I'm asking you whether you

12      looked at any loan files?

13                MR. BENTLEY:  Read it back,

14      please.

15                (Record read.)

16                MR. RAINS:  Objection, vague and

17      ambiguous.  Asked and answered.

18           A.   I relied on the work that was

19      done by the debtor as part of their GSE

20      repurchase for the conclusions and

21      assumptions made in my original

22      declaration.

23           Q.   And you didn't look at any loan

24      files?

25           A.   I relied on the GSE repurchase

124

1              FRANK SILLMAN

2     work.

3        Q.    Did that involve looking at any

4     loan files?

5        A.    It revolved relying on the loan

6     file reviews that the debtor performed.

7        Q.    Is there a reason you are

8     resisting answering a simple question?

9             MR. RAINS:  Objection.

10            Argumentative.  Asked and answered.

11            MR. BENTLEY:  It's not asked and

12            answered for Christ's sake, Darryl.

13            Read it back.

14            MR. RAINS:  Of course it has.

15            It's been asked 15 times and --

16            MR. BENTLEY:  Is the answer no?

17            Because I sure can't tell what the

18            answer is.

19            MR. RAINS:  I think his answer

20            is very clear.

21            MR. BENTLEY:  The answer is he

22            did something else, it's not whether

23            he did this or not.

24            MR. RAINS:  That's his answer.

25            You don't like his answer but it's his

125

1          FRANK SILLMAN

2     answer.

3          MR. BENTLEY:  I'm fine with his

4     answer, he just hasn't answered my

5     question.

6          Can you read it back, please.

7          MR. RAINS:  Let's do this, let's

8     take a quick break.

9          MR. BENTLEY:  You know what, I

10    want an answer to my question before

11    you speak --

12         MR. RAINS:  I'm going to talk to

13    him about his answer to your question.

14         MR. BENTLEY:  I object.  You are

15    not supposed to talk to the witness

16    while a question is pending.

17         (Whereupon, there is a recess in

18    the proceedings.)

19         MR. RAINS:  I think we have

20    succeeded in clearing up some of the

21    ambiguities and confusion caused by

22    your question.  Why don't you put the

23    question to him again.

24    Q.   I know it's very confusing but

25    I'll state it again.  In connection with

1              FRANK SILLMAN

2      forming the opinions expressed in your

3      June 11 declaration, did you or any of

4      your colleagues look at any of the files

5      for the loans in the pool being settled.

6          A.    For the, my original declaration

7      I relied on the work that was done by

8      ResCap and the repurchase activity.  We

9      are now looking at loan files.  We are

10     currently looking at loan files.

11         Q.    So let's just unpack what you

12     just said.  You relied on the work that

13     was done by ResCap.  What work are you

14     referring to?

15         A.    To GSE and private label

16     repurchase activity work ResCap did.

17         Q.    Understood.  But was that as to

18     any of the loans that are in this pool

19     that's being settled?

20         A.    There may be in the private

21     label securities work loans that are

22     included in this settlement.  The vast

23     majority of the loans were related to

24     their GSE originations.

25         Q.    And none of the GSE deals

127

1          FRANK SILLMAN

2     overlap in any way with this settlement,

3     right?

4          A.    Correct.

5          Q.    Were you relying, when you

6     prepared this report, on any work that RFC

7     had done in looking at the loans that are

8     part of this settlement?

9          A.    Yes.  We did review some

10    information regarding their private label

11    securitization repurchase work.  What we

12    found, I think there's an exhibit, that

13    the vast majority of those repurchase

14    demands were unresolved.

15         Q.    So I'm going to return to that.

16    I know what you are referring to.  Putting

17    aside any loan reviews that RFC may have

18    done in connection with its prepetition

19    put back experience, did you or any of

20    your colleagues look at any loan files in

21    connection with the work that went into

22    your June 11 report?

23         A.    We relied on the company's work

24    for the information in the original

25    declaration and we are now looking at loan

128

```
 1                    FRANK SILLMAN

 2       files that are contained within the 392

 3       trusts.

 4           Q.    And when you say the company's

 5       work, are you referring to anything other

 6       than the work the company did prepetition

 7       in connection with its prepetition put

 8       back negotiations?

 9           A.    Yeah.  It was prepetition work.

10           Q.    In connection with -- done by

11       the debtor in connection with its

12       prepetition put back experience?

13           A.    Yes.

14           Q.    And no other review of loan

15       files went into your, the conclusions

16       expressed in your June 11 declaration?

17           A.    That's right.

18           Q.    Okay.  We are there.  We got an

19       answer.  Thank you.  Let's move on.

20           A.    I would say no additional loan

21       work.

22               MR. BENTLEY:  I'm about to

23           change topics.  If people want to take

24           a break, this is fine or we can keep

25           going.
```

184

1          FRANK SILLMAN

2     claim for 8.7 billion.  So I took into

3     consideration the 1.3 billion and the fact

4     that the trustees had also negotiated an

5     allowed claim of 8.7.  So I had to take

6     into consideration the fact that there was

7     a claim.

8          Q.   So one of the things you took

9     into consideration in forming your

10    conclusion was that the debtors had agreed

11    to an aggregate settlement of

12    $8.7 billion?

13         A.   We are talking about the PLS

14    demand data.  I could not ignore the fact

15    that in addition to the 1.3 billion in

16    demands there was also a proposed

17    settlement of 8.7 billion.  So it was a

18    factor in the development of my

19    declaration.

20         Q.   Let's go back to paragraph 5 of

21    your declaration.

22              MS. PATRICK:  5?

23              MR. BENTLEY:  Correct.

24              MR. RAINS:  I'm sorry, where?

25              MS. PATRICK:  5.

225

1              FRANK SILLMAN

2    were referring to a few minutes ago?

3         A.   Yes.

4         Q.   The calculations you used to

5    derive the audit rate ranges shown in the

6    table on paragraph 53 of your report?

7         A.   Right.  The total average of

8    65 percent and 69 percent.

9         Q.   Okay.  But how did you compute

10   each of the individual ranges shown on

11   this table?  For example, the first line,

12   trusts, liquidated loans, a range of 70 to

13   75 percent.  How did you compute those

14   numbers?

15        A.   That was based on my

16   professional experience with audit rate

17   percentages.

18        Q.   So do you compute it or did you

19   just -- does that number -- is that number

20   the product of any calculations?

21        A.   It's the product of my

22   professional experience.  There's not an

23   additional calculation.

24        Q.   You just came up with that

25   number?

226

1              FRANK SILLMAN

2         A.    I didn't just come up with it.

3    It's based on my professional experience.

4         Q.    How did you come up with it?

5              MR. RAINS:  Objection.  Asked

6         and answered.

7         Q.    How did you pick 70 percent

8    rather than 60 or 80 percent?

9              MR. RAINS:  Asked and answered.

10        A.    I came up with it based on my

11   professional experience.  I developed a

12   range to take into consideration the

13   variability of each one of these

14   categories.

15        Q.    Did you compute any of the

16   numbers shown in paragraph 53 other than

17   the average that's shown at the bottom of

18   the table?

19        A.    The assumptions for each

20   wouldn't delinquency buckets were based on

21   my professional experience.

22        Q.    But you didn't perform any

23   calculations to derive any of these

24   numbers?

25              MR. RAINS:  Which numbers?

227

1          FRANK SILLMAN

2          MR. BENTLEY:  All of the numbers

3     in the table in paragraph 53 other

4     than the total average numbers shown

5     on the last line.

6     A.    The numbers for each of those

7     are assumptions based on my professional

8     experience.  So I developed those

9     assumptions and input them into the model.

10    Q.    How did you develop them?  Were

11    there any steps that went into the

12    development?

13    A.    Based on my professional

14    experience for these categories of loans

15    that's how I developed the assumptions.

16    Q.    Did you start with the total

17    average range of 65 to 69 and then back

18    into the component ranges?

19    A.    I did not.

20    Q.    And can you shed any more light

21    on how you came up with the various ranges

22    shown here, other than the total average

23    range?

24    A.    Based on my professional

25    experience.

228

1            FRANK SILLMAN

2      Q.    It wasn't a quantitative

3   calculation?

4      A.    It wasn't a -- you are asking me

5   is this a product of a mathematical

6   equation?

7      Q.    Correct.

8      A.    It was -- these individual

9   assumptions were not the product of an

10  additional mathematical equation.  They

11  were based on my professional experience.

12     Q.    And there's no backup to these

13  numbers?

14     A.    There is no -- there's no other

15  data to support these numbers other than

16  my professional experience.

17     Q.    If I ask you the same questions

18  about the numbers shown in the table on

19  paragraph -- in paragraph 56 of your

20  report are your answers the same?

21         MR. RAINS:  Objection.  Vague

22      and ambiguous.  Compound.

23         MR. BENTLEY:  You can walk

24      through all these questions again,

25      Darryl.

267

1           FRANK SILLMAN

2      don't recall -- I didn't receive this

3      e-mail.  I don't recall whether or not I

4      received any red line comments regarding

5      assuming liability for purposes of his

6      analysis.  So I don't recall whether or

7      not I did or didn't.  But I did not

8      receive this e-mail.

9          Q.   Were you aware during the course

10     of receiving comments on your declaration

11     that comments were coming in from Kirkland

12     & Ellis, who represents Ally, and from

13     Kathy Patrick, who represents a group of

14     trustees?

15              MS. PATRICK:  Objection, form.

16         A.   I was aware that Jen Battle was

17     reviewing my declaration.  I was not aware

18     of any comments from Kathy Patrick.

19              MR. RAINS:  Or Kirkland & Ellis.

20         A.   Or Kirkland & Ellis, I'm sorry.

21         Q.   One last question.  When was it

22     conveyed to you that the settlement was

23     for $8.7 billion?  At what point following

24     your retention was that information

25     conveyed to you?

1                    FRANK SILLMAN

2          A.    I don't recall the date.  We met

3      in New York.  I don't recall the date.

4      But I can get you that date.  I just don't

5      have it off the top of my head where we

6      discussed retaining Fortace to be the

7      expert on this engagement.  I don't recall

8      when the $8.7 billion figure of the

9      allowed claim was provided to me.  It's

10     possible that I received at that meeting a

11     copy of the settlement agreement or it may

12     have been e-mailed to me after that

13     meeting.  Somewhere around that time that

14     we met in New York.  But I don't remember

15     when.

16          Q.    So at the outset or very early

17     on before the analysis?

18          A.    Early in my engagement, yes.

19     Before my -- yes, before I began my

20     analysis I received a copy of the

21     settlement agreement.

22          Q.    Okay.

23               MS. BRADY:  That's all I have

24          for you, Mr. Sillman.  Thank you.

25     BY MR. BENTLEY:

291

1            FRANK SILLMAN

2       A.    I did the calculations to come

3    up with the 7 to 9 percent.

4       Q.    Can you show me the calculation?

5       A.    I don't have them written

6    anywhere.  I did the calculations to

7    determine what I thought the assumptions

8    should be.

9       Q.    Did you do in your head?

10      A.    Yes.

11      Q.    Wow.  Can you repeat it for me,

12   please.  Because you are way better than

13   me at math I think.

14      A.    I looked at the agree rate

15   differences between the two.

16      Q.    I understand the concepts you

17   explained.  But what I'm trying to ask you

18   is was there then a calculation, a series

19   of numbers, addition, subtraction,

20   division, anything like that?

21      A.    There was assumption I developed

22   from that information that I discussed to

23   come up with the 7 to 9 percent.

24      Q.    So did you just take the

25   percentages in Exhibit A that we were

292

1              FRANK SILLMAN

2    discussing and then apply your

3    professional judgment based on your

4    experience to get to 7 to 9 percent?

5         A.    Yes.

6         Q.    With no calculations that you

7    could point to?

8         A.    No written calculations.

9         Q.    Or any mental calculations that

10   you could describe beyond the general

11   process you just -- you've testified

12   about?

13        A.    I described the process that I

14   went through to come up with the 7 to

15   9 percent.

16        Q.    And there were no specific steps

17   to get from the several numbers in Exhibit

18   A to the 7 to 9 percent?

19             MR. RAINS:  Objection.

20        Misstates the witness's testimony.

21        A.    I utilized that information to

22   derive an assumption of 7 to 9 percent.

23        Q.    And you can't tell me any

24   further the steps in that process?

25        A.    I did many steps to come up with

A. 77

## Outlook E-mail

**From:**   Lee, Gary S.
**Sent:**   4/18/2012 1:28:59 PM
**To:**   Rosten, Linda; Cancelliere, Jeff - PA; Hamzehpour, Tammy
**Cc:**   Devine, Timothy
**Subject:**   Re: Prep for Kathy Patrick Meeting

I am. We need mark renzi from fti as well as he is doing the waterfall models and charting on pls. Should I ask him?


Gary S. Lee
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104-0050
T. 212.468.8042
F. 212.468.7900
glee@mofo.com

---

**From:** Rosten, Linda
**To:** Lee, Gary S.; Cancelliere, Jeff - PA ; Hamzehpour, Tammy
**Cc:** Devine, Timothy
**Sent:** Wed Apr 18 13:25:52 2012
**Subject:** Prep for Kathy Patrick Meeting

Are you available tomorrow morning for this prep meeting any time between 9:00 a.m. and 10:30 a.m. EDT?

Please let me know as soon as possible.

Thank you.

Best regards,

Linda Rosten
**Ally Financial | Legal Staff**
200 Renaissance Center, MC: 482-B09-B11, Detroit, MI 48265
T +313 656 6146
F +313 656 6124 or 313 566 0930
Linda.Rosten@ally.com

--------------------------------------------------------------
To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

=======================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

--------------------------------------------------------------

EXHIBIT
9019-14
11/7/12

A. 78

## Outlook E-mail

**From:**        Renzi, Mark
**Sent:**        4/30/2012 9:07:56 PM
**To:**          Timothy.Devine@ally.com; Levitt, Jamie A.; Lee, Gary S.
**Cc:**          Nolan, William; Park, Liz; Szymik, Filip; Renzi, Mark
**Subject:**     RE: Bounce - Discussion Materials (04-25-12)_Distribution File.pptx
**Attachments**    Bounce - Discussion Materials (04-25-12)_Distribution File v1.pdf

_____

Tim, Jamie and Gary,

Attached please find the presentation that we reviewed with Kathy Patrick last week and please forward to the appropriate parties.  Please note the following caveats:

•        The presentation has been prepared based upon financial and other data provided to FTI Consulting, Inc. ("FTI") from the management and staff of Residential Capital, LLC. ("ResCap" or the "Company"),

•        The presentation is preliminary and for illustrative purposes only and is subject to further revision which may result in material changes.

•        The presentation contains material nonpublic information regarding the Company and is being provided on a strictly confidential and privileged basis.

Let us know if this is ok to send out or if you have any changes.

Regards,

**Mark A. RENZI** <<Bounce - Discussion Materials (04-25-12)_Distribution File v1.pdf>>
Managing Director | Corporate Finance

**F T I Consulting**
617.897.1528 direct
617.785.0177 mobile
617.897.1510 fax
Mark.Renzi@FTIConsulting.com

200 State Street, 8th Floor

Boston, MA 02109

www.fticonsulting.com

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.



CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                                    RC-9019_00047830

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*

# GMAC ResCap

## Discussion Materials

### For Settlement Purposes Only – Subject to FRE 408
### April 25, 2012

RC-9019_00047831

CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*



CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047832

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

2



CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047833

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

3



CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047834

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

4

FTI
CONSULTING

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047835

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047836



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

6



CONFIDENTIAL – PROFESSIONALS' EYES ONLY

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

7



RC-9019_00047837

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047838

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

8



CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047839

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

9

FTI
CONSULTING

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER|VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

10



RC-9019_00047840

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00047841

*FOR SETTLEMENT DISCUSSION PURPOSES ONLY*
*SUBJECT TO MATERIAL CHANGE*



CENTER VIEW PARTNERS

*ATTORNEY – CLIENT PRIVILEGE*
*PREPARED IN ANTICIPATION OF LITIGATION*

11

F T I
CONSULTING

A. 79

**Outlook E-mail**                                    Confidential

| | |
|---|---|
| **From:** | Devine, Timothy |
| **Sent:** | 4/27/2012 8:50:10 PM |
| **To:** | Solomon, William Legal; Hamzehpour, Tammy; Lee, Gary S.; 'RCieri@kirkland.com'; 'rschrock@kirkland.com'; Ruckdaschel, John |
| **Subject:** | RE: next steps |

Thanks Bill.

This has been an exemplary team effort, with expert support from both "sides".

Lots to do, and have to manage all client expectations since KP's clients will take several hacks at us.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI  48265
(313) 656-3477



**EXHIBIT**
9019 44
1|8|12

---

**From:** Solomon, William Legal
**Sent:** Friday, April 27, 2012 8:48 PM
**To:** Devine, Timothy; Hamzehpour, Tammy; 'GLee@mofo.com'; 'RCieri@kirkland.com'; 'rschrock@kirkland.com'; Ruckdaschel, John
**Subject:** Re: next steps

Very encouraging. Thanks to all, but especially Tim and John! Let's continue to drive this hard. Good momentum, development and dynamic -- so far.

---

**From:** Devine, Timothy
**To:** Solomon, William Legal; Hamzehpour, Tammy; 'GLee@mofo.com' <GLee@mofo.com>; Cieri, Richard M. <rcieri@kirkland.com>; 'rschrock@kirkland.com' <rschrock@kirkland.com>; Ruckdaschel, John
**Sent:** Fri Apr 27 20:22:25 2012
**Subject:** RE: next steps

Just spoke with KP.  Good news overall.  Lots more work in short timing.

She told me that she met with her steering committee for 90 minutes today in preliminary session re: our deal.

She told me that the group is committed to working toward a resolution within the bankruptcy.  I asked her whether she presented the "input" dollars as we had presented to her and she confirmed that she did.  She said that they have authorized her to keep working with us on an accelerated schedule and they are looking forward to a meeting with us directly.  I have the clear impression they are at this point at least favorably disposed.

I asked Kathy to send us specific questions her steering committee has so we can work to address them.

When I get those questions I'll forward them to all on this email so we can have both teams collaborate in drafting responses, ensuring alignment at every step.

Couple details: Monoline issue: Kathy and her steering committee understand that some of the monolines will get in line for recovery and thereby deviate some of the water flowing down the waterfall.  She is ok with that.  To KP's understanding, the monolines get a supersenior position in the waterfall to the extent of their payments to the trust.  That's different from the more nuanced understanding we're getting from John R.  John R and Orrick are going to do a deep dive this weekend on some deals and educate all of us as to how a settlement would flow in a wrapped deal.

Kathy also asked us to be more clear with regard to who will "take" under the waterfall – all trusts, or only such trusts as present and prove 25% + authority?  She is clearly biased to the latter.  To that end, she asked that we clarify the FTI waterfalls to indicate whether the percentages indicate takeaways for only such trusts as are "empowered" by 25% + claimants, or all trusts.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                   Confidential                   RC-9019_00048974

Confidential

KP asked us to let her know as soon as we can when we would be ready for a steering committee presentation.

She asked me to pass along thanks to John R and his team for all their work on the GSE data and also asked me to request John R to reach out again for a couple follow up questions.

Thanks again to all for support of this conversation.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Kathy D. Patrick [mailto:kpatrick@gibbsbruns.com]
**Sent:** Friday, April 27, 2012 7:11 PM
**To:** Devine, Timothy
**Cc:** Kathy Patrick; Scott Humphries
**Subject:** Re: next steps

Tim - I just returned your email and got voicemail.  Please feel free to call me at home when you are free.  The number is 713 680 3270.  I'm available most of the weekend, except Sunday morning, if you want to choose a time.

Thanks,

Kathy

Kathy Patrick
Gibbs & Bruns LLP
713.751.5253

On Apr 27, 2012, at 5:44 PM, "Devine, Timothy" <Timothy.Devine@ally.com> wrote:

> Kathy:
>
> Will you please phone me at your convenience?  I want to touch base on next steps and am conscious of the clock.
>
> Thanks again.
>
> Timothy A. Devine
> Chief Counsel - Litigation
> Ally Financial Inc. Legal Staff
> 200 Renaissance Center
> M/C: 482-B09-B11
> Detroit, MI 48265
> (313) 656-3477

A. 80

| | |
|---|---|
| **From:** | Solomon, William Legal |
| **Sent:** | Wednesday, October 19, 2011 1:47 PM |
| **To:** | Carpenter, Michael; Yastine, Barbara; Marano, Tom; Hamzehpour, Tammy; Brown, Jeff; Mackey, James; Pinkston, Corey |
| **Subject:** | PLS Claimant |

Yesterday, I received the attached letter from Kathy Patrick, a Houston attorney, requesting to meet with Ally representatives next week to "seek a resolution of repurchase and servicing claims with Ally".  Ms Patrick represented the claimants in the $8.5 billion settlement with BofA.

I am meeting with Tim Devine and the litigation team later today to develop a recommend approach for dealing with this.



EXHIBIT

9019-40

11/22/12

PENGAD 800-631-6989

1

Confidential

ALLY_0212895



Kathy D. Patrick
kpatrick@gibbsbruns.com
713.751.5253

October 17, 2011

<u>Via Federal Express</u>

William B. Solomon, Jr., Esq.
General Counsel
Ally Financial Inc.
200 Renaissance Center
Detroit, Michigan 48265

Dear Mr. Solomon:

This firm represents investment advisers and holders of Residential Mortgage Backed Securities (RMBS) issued and/ or underwritten by Ally Financial Inc. and/or its affiliates ("Ally"). The aggregate outstanding balance of the 242 Ally deals in which our clients collectively hold 25% or more of the voting rights of a class in that deal, exceeds $51 billion. The aggregate outstanding balance of the 173 Ally deals in which our clients collectively hold 50% or more of the voting rights of a class in that deal, exceeds $36 billion.

There is widespread, readily available evidence suggesting that large numbers of mortgages securing the certificates held by our clients were sold or deposited into the RMBS pools based on false and/or fraudulent representations and warranties by the mortgage originators, sellers and/or depositors. This evidence includes, but is certainly not limited to:

- excessive early default and foreclosure rates experienced in the underlying mortgage pools;

- a loan-level analysis of Ally RMBS conducted by the Federal Housing Finance Agency (FHFA), which revealed that up to 13% of the mortgage loans in Ally RMBS breached owner-occupancy representations and warranties, and that up to 49% of the mortgage loans in Ally RMBS breached Loan-to-Value representations and warranties[1];

---

[1] Our clients collectively hold 25% or more of the voting rights of a class in 18 of the 21 Ally deals which FHFA analyzed.

Confidential

- MBIA's lawsuits against Ally, reporting that its loan-level analysis of various Ally RMBS showed that high numbers of mortgages in the pools were ineligible at origination[2];

- detailed allegations in securities cases against Ally, which suggest widespread deficiencies in Ally's underwriting practices, including inaccurate representations and warranties regarding important loan characteristics such as borrower incomes and home appraisals[3];

- substantial downgrades of the certificates by credit rating agencies; and

- Ally's own apparent acknowledgement that it is potentially liable for violations of representations and warranties in Ally RMBS, evidenced by its $829 million reserve for repurchase liabilities as of June 30, 2011, which relates "primarily" to non-GSE exposure,[4] as well as its statement that such liabilities are "most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages *that were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 and forward.*"[5]

In addition, there is widespread, readily available evidence suggesting that Ally, as servicer and/or master servicer of mortgage loans securing the certificates held by our clients, has failed to observe and perform the covenants and agreements imposed on it by the governing agreements, and has failed to meet its duty to prudently service those mortgage loans, including, but certainly not limited to:

- Ally's admittedly flawed and "embarrassing"[6] mortgage loan servicing and foreclosure practices, including deficient document signing practices, leading to Ally's foreclosure suspension and review in Fall 2010;

- Ally's April 2011 consent order with the Board of Governors of the Federal Reserve System and the FDIC, which alleged that, in connection with certain

---

[2] MBIA has reported that 89% of adversely selected loans from 3 separate GMAC securitizations were not originated in material compliance with GMAC's underwriting guidelines or representations and warranties. *See* Complaint ¶ 6, *MBIA Ins. Co. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct.). MBIA has also reported that 93% of adversely selected loans from 5 separate RFC securitizations were not originated or acquired in material compliance with RFC's representations and warranties. *See* Complaint ¶ 46, *MBIA Ins. Co. v. Residential Funding Co., LLC*, No. 603552/2008 (N.Y. Sup. Ct.).

[3] *See, e.g.*, Complaint, *Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, LLC, No. 3:11-cv-30035 (D. Mass.).

[4] *See* Ally Financial Inc.'s Second Quarter 2011 Form 10-Q at 83.

[5] *See id.* at 81 (emphasis added).

[6] *See* Dakin Campbell and Natalie Doss, *Ally Will Keep ResCap, 'Screwed Up' Using Robosigners*, BLOOMBERG NEWS, Nov. 3, 2010.

Gibbs & Bruns LLP · 1100 Louisiana    Suite 5300 · Houston, Texas 77002    T 713.650.8805 · F 713.750.0903    www.gibbsbruns.com

Confidential

ALLY_0212897

foreclosures of loans in Ally's servicing portfolio, Ally engaged in "unsafe or unsound banking practices" because, among other reasons, Ally filed or caused to be filed in courts inaccurate affidavits, filed or caused to be filed in courts or in land record offices improperly notarized mortgage-related documents, litigated or initiated foreclosure proceedings without ensuring proper assignment and possession of promissory notes or mortgage documents, failed to devote adequate resources to foreclosure processes, failed to ensure timely, effective, and efficient communication with borrowers with respect to loss mitigation and foreclosure activities, failed to subject its foreclosure processes to adequate oversight, internal controls, policies, and procedures, and failed to sufficiently oversee third parties handling foreclosure-related services;

- ongoing investigations by state attorneys general and other government agencies into Ally's mortgage loan servicing and foreclosure-related practices;

- evidence of wholly avoidable and unnecessary servicing fees to maintain mortgaged property, which have resulted from Ally's flawed mortgage loan servicing and foreclosure practices; and

- Ally's apparent failure to notify other parties to the governing agreements of mortgage loans in the pools that violated representations and warranties at the time they were sold into the pools, and its apparent failure to enforce the sellers' obligations to cure, substitute, or repurchase such loans, as Ally is required to do under the governing agreements.

Based on this and other evidence, our clients believe that large numbers of ineligible loans were sold or deposited into, and remain in, the RMBS pools securing the certificates. Under the governing agreements, Ally has substantial repurchase liability for such loans. Our clients further believe that Ally's failure to observe and perform the covenants and agreements imposed on it by the governing agreements, and to meet its duty to prudently service those mortgages, may constitute a servicer event of default under the governing agreements.

Our clients are not willing to suffer further losses resulting from ineligible loans in the pools and improper servicing of the loans in the pools, and they wish to seek a resolution of repurchase and servicing claims with Ally. As such, our clients hope and anticipate that Ally will begin a constructive dialogue with them regarding the concerns raised by this letter. If, however, Ally proves to be an obstacle to their efforts to mitigate such losses, our clients fully intend to exercise their rights under the governing agreements—including the issuance of binding instructions to Trustees—to pursue enforcement of repurchase and servicing claims against Ally.

Confidential

ALLY_0212898

4

Should Ally wish to begin a constructive dialogue regarding these issues, please make appropriately senior legal and business personnel available to meet with me and various of our clients on Thursday, October 27, 2011. To arrange the details of this meeting, please contact me as soon as possible.

Very truly yours,

Kathy Patrick

Confidential

ALLY_0212899

A. 81

EXECUTION COPY

## RMBS TRUST SETTLEMENT AGREEMENT

This RMBS Trust Settlement Agreement is entered into as of May 13, 2012, by and between Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap" or the "Debtors"), on the one hand, and the Institutional Investors (as defined below), on the other hand (the "Settlement Agreement"). Each of ResCap and the Institutional Investors may be referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, certain ResCap entities were the Seller, Depositor, Servicer and/or Master Servicer for the securitizations identified on the attached Exhibit A (the "Trusts");

WHEREAS, certain ResCap entities are parties to certain applicable Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the Trusts (the "Governing Agreements"), and certain ResCap entities have, at times, acted as Master Servicer and/or Servicer for the Trusts pursuant to certain of the Governing Agreements;

WHEREAS, pursuant to the Governing Agreements, certain ResCap entities have contributed or sold loans into the Trusts (the "Mortgage Loans");

WHEREAS, the Institutional Investors have alleged that certain loans held by the Trusts were originally contributed in breach of representations and warranties contained in the Governing Agreements, allowing the Investors in such Trusts to seek to compel the trustee or indenture trustee (each, a "Trustee") to take certain actions with respect to those loans, and further have asserted past and continuing covenant breaches and defaults by various ResCap entities under the Governing Agreements;

WHEREAS, the Institutional Investors have indicated their intent under the Governing Agreements for each Trust in which the Institutional Investors collectively hold or are authorized investment managers for holders of at least 25% of a particular tranche of the Securities (as defined below) held by such Trust either to seek action by the Trustee for such Trust or to pursue claims, including but not limited to claims to compel ResCap to cure the alleged breaches of representations and warranties, and ResCap disputes such claims and allegations of breach and waives no rights, and preserves all of its defenses, with respect to such allegations and putative cure requirements;

WHEREAS, the Institutional Investors are jointly represented by Gibbs & Bruns, LLP ("Gibbs & Bruns") and Ropes & Gray LLP ("Ropes & Gray") and have, through counsel, engaged in arm's length settlement negotiations with ResCap that included the exchange of confidential materials;

WHEREAS, ResCap contemplates filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

ny-1040888



CONFIDENTIAL

II_RESCAP0000186

EXECUTION COPY

WHEREAS, ResCap and the Institutional Investors have reached agreement on a plan support agreement (the "Plan Support Agreement") pursuant to which the Institutional Investors will support the confirmation of a chapter 11 plan for ResCap;

WHEREAS, Ally Financial Inc. and its subsidiaries and affiliates, other than ResCap (collectively, "Ally") have agreed to a settlement with ResCap in return for releases of any alleged claims held by ResCap and certain third parties against Ally;

WHEREAS, ResCap and the Institutional Investors have reached agreement concerning all claims under the Governing Agreements; and

WHEREAS, the Parties therefore enter into this Settlement Agreement to set forth their mutual understandings and agreements for terms for resolving the disputes regarding the Governing Agreements.

## AGREEMENT

NOW, THEREFORE, after good faith, arm's length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

ARTICLE I.    DEFINITIONS.

As used in this Settlement Agreement, in addition to the terms otherwise defined herein, the following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Settlement Agreement).  Any capitalized terms not defined in this Settlement Agreement shall have the definition given to them in the Governing Agreements.

Section 1.01    "Bankruptcy Code" shall mean title 11 of the United States Code;

Section 1.02    "Direction" shall mean the direction by the Institutional Investors, to the extent permitted by the Governing Agreements, directing any Trustee to take or refrain from taking any action; provided, however, that in no event shall the Institutional Investors be required to provide a Trustee with any security or indemnity for action or inaction taken at the direction of the Institutional Investors and the Institutional Investors shall not be required to directly or indirectly incur any costs, fees, or expenses to compel any action or inaction by a Trustee, except that the Institutional Investors shall continue to retain contingency counsel;

Section 1.03    "Effective Date" shall have the meaning ascribed in Section 2.01;

Section 1.04    "Governmental Authority" shall mean any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to the foregoing, or any other authority, agency, department, board, commission, or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal, or arbitrator(s) of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency, or

-2-

ny-1040888

CONFIDENTIAL

II_RESCAP0000187

**EXECUTION COPY**

authority (including the New York Stock Exchange, Nasdaq, and the Financial Industry Regulatory Authority);

Section 1.05    "Institutional Investors" shall mean the authorized investment managers and Investors identified in the attached signature pages;

Section 1.06    "Investors" shall mean all certificateholders, bondholders and noteholders in the Trusts, and their successors in interest, assigns, pledgees, and/or transferees;

Section 1.07    "Person" shall mean any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a Governmental Authority;

Section 1.08    "Petition Date" means the date on which ResCap files petitions under chapter 11 of the Bankruptcy Code;

Section 1.09    "Plan" has the meaning ascribed to it in the Plan Support Agreement; and

Section 1.10    "Restructuring" shall have the meaning ascribed to it in the Plan Support Agreement.

## ARTICLE II.    SETTLEMENT PROCESS.

Section 2.01    Effective Date. This Settlement Agreement shall be effective immediately except as to the granting of allowed claims to the Trusts and the releases set forth herein. The claims allowance and releases shall only be effective, with respect to Trusts that timely accept the compromise, on the date on which the Bankruptcy Court enters an order approving the settlement contemplated hereby (the "Effective Date").

Section 2.02    Bankruptcy Court Approval. The Debtors shall (a) orally present this Settlement Agreement in court on the Petition date, including the agreed amount of the Allowed Claim (as defined below), (b) file a motion in the Bankruptcy Court as soon as practicable, but in no event later than fourteen (14) days after the Petition Date, seeking authority to perform under this Settlement Agreement and for approval of this Settlement Agreement and the compromise contained herein, and (c) obtain an order from the Bankruptcy Court approving such motion by the earlier of (i) 60 days after the Petition Date and (ii) the date on which the Disclosure Statement is approved by the Bankruptcy Court. The Trustee for each Trust may accept the offer of a compromise contemplated by this Settlement Agreement in writing pursuant to a form of acceptance to be included in the proposed order for approval of this Settlement Agreement to be submitted to the Bankruptcy Court.

Section 2.03    Standing. The Debtors agree that the Institutional Investors are parties in interest in the chapter 11 cases of ResCap for the purposes of enforcing rights and complying with obligations under this Settlement Agreement and the Plan Support Agreement.

-3-

**CONFIDENTIAL**

EXECUTION COPY

## ARTICLE III. REPRESENTATIONS AND WARRANTIES.

Section 3.01    Holdings and Authority. Lead counsel to the Institutional Investors, Gibbs & Bruns, has represented to ResCap that the Institutional Investors have or advise clients who have aggregate holdings of securities of greater than 25% of the voting rights in one or more classes of the securities, certificates or other instruments backed by the mortgages held by each of the Covered Trusts (as defined in the Plan Support Agreement). Each Institutional Investor represents that (i) it has the authority to take the actions contemplated by this Settlement Agreement, to the extent that it has the authority with respect to any other entities, account holders, or accounts for which or on behalf of which it is signing this Settlement Agreement, and (ii) it holds, or is the authorized investment manager for the holders of, the securities listed in the schedule attached to the Plan Support Agreement as Exhibit F thereto, in the respective amounts set forth therein by CUSIP number, that such schedule was accurate as of the date set forth for the respective institution, and that since the date set forth for the Institutional Investor, the Institutional Investor has not, in the aggregate, materially decreased the Institutional Investor's holdings in the Securities. The Parties agree that the aggregate amounts of Securities collectively held by the Institutional Investors for each Trust may be disclosed publicly, but that the individual holdings shall remain confidential, subject to review only by ResCap, Ally, the Bankruptcy Court, the Office of the United States Trustee, and any official committee of creditors that may be appointed in the Chapter 11 Cases.

Section 3.02    Holdings Retention. The Institutional Investors currently and collectively hold Securities representing in aggregate 25% of the voting rights in one or more classes of Securities of not less than 290 of the Covered Trusts. The Institutional Investors, collectively, shall maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 235 of the Covered Trusts ("Requisite Holdings") until the earliest of: (i) confirmation of the Plan, (ii) December 31, 2012, (iii) a Consenting Claimant Termination Event, (iv) a Debtor Termination Event, or (v) an Ally Termination Event (as terms (iii), (iv) and (v) are defined in the Plan Support Agreement); provided, however, that any reduction in Requisite Holdings caused by: (a) sales by Maiden Lane I and Maiden Lane III; or (b) exclusion of one or more trusts due to the exercise of Voting Rights by a third party guarantor or financial guaranty provider, shall not be considered in determining whether the Requisite Holdings threshold has been met. If the Requisite Holdings are not maintained, each of Ally and ResCap shall have the right to terminate the Settlement Agreement, but neither Ally nor ResCap shall terminate the Settlement Agreement before it has conferred in good faith with the Institutional Investors concerning whether termination is warranted. For the avoidance of doubt, other than as set forth above, this Settlement Agreement shall not restrict the right of any Institutional Investor to sell or exchange any Securities issued by a Trust free and clear of any encumbrance. The Institutional Investors will not sell any of the Securities for the purpose of avoiding their obligations under this Settlement Agreement, and each Institutional Investor (except Maiden Lane I and Maiden Lane III) commits to maintain at least one position in one of the Securities in one of the Trusts until the earliest of the dates set forth above. If the Debtor or Ally reach a similar agreement to this with another bondholder group, the Debtor and Ally will include a substantially similar proportionate holdings requirement in that agreement as contained herein.

-4-

ny-1040888

**EXECUTION COPY**

ARTICLE IV. <u>DIRECTION TO TRUSTEES AND INDENTURE TRUSTEES.</u>

Section 4.01    <u>Direction to Trustees and Indenture Trustees.</u>  The relevant Institutional Investors for each Trust shall, by the time of the filing of a motion to approve this Settlement Agreement, provide the relevant Trustee with Direction to accept the settlement and compromises set forth herein. The Institutional Investors hereby agree to confer in good faith with ResCap as to any further or other Direction that may be reasonably necessary to effectuate the settlement contemplated herein, including those actions listed in Section 3.1 of the Plan Support Agreement, filing motions and pleadings with the Bankruptcy Court and making statements in open court in support of the Restructuring.

Section 4.02    <u>No Inconsistent Directions.</u>  Except for providing instructions in accordance with Section 4.01, the Institutional Investors agree that (i) between the date hereof and the Effective Date, with respect to the Securities on the Holdings Schedule, they will not, individually or collectively, direct, vote for, or take any other action that they may have the right or the option to take under the Governing Agreements or to join with any other holders or the trustee of any note, bond or other security issued by the Trusts, to cause the Trustees to enforce (or seek derivatively to enforce) any representations and warranties regarding the Mortgage Loans or the servicing of the Mortgage Loans, and (ii) to the extent that any of the Institutional Investors have already taken any such action, the applicable Institutional Investor will promptly rescind or terminate such action. Nothing in the foregoing shall restrict the ability of the Institutional Investors to demand that any other Investor who seeks to direct the Trustee for a Trust post any indemnity or bond required by the Governing Agreements for the applicable Trust.

Section 4.03    <u>Amendments to Governing Agreements Regarding Financing of Advances.</u>  The Institutional Investors agree to use commercially reasonable efforts (which shall not require the giving of any indemnity or other payment obligation or expenditure of out-of-pocket funds) to negotiate any request by the Debtors or the Trustees for Trusts that are being assumed, and if any Trustee shall require a vote of the certificate or note holders with respect thereto, shall vote in favor of (to the extent agreement is reached) any amendment to the relevant Governing Agreements and related documents requested by the Debtors in order to permit "Advances" (as it or any similar term may be defined in the Governing Agreements) to be financeable and to make such other amendments thereto as may be reasonably requested by the Debtors in accordance with any agreement to acquire all or substantially all of the Debtors' servicing assets pursuant to the Restructuring and the Plan, so long as such changes would not cause material financial detriment to the Trusts, their respective trustees, certificate or note holders, or the Institutional Investors.

ARTICLE V. <u>ALLOWANCE OF CLAIM.</u>

Section 5.01    <u>The Allowed Claim.</u>  ResCap hereby makes an irrevocable offer to settle, expiring at 5:00 p.m. prevailing New York time on the date that is forty five (45) days after the Petition Date, with each of the Trusts that timely agrees to the terms of this Settlement Agreement (the "<u>Accepting Trusts</u>"). In consideration for such agreement, ResCap will provide a general unsecured claim of $8,700,000,000 (the "<u>Total Allowed Claim</u>"). For the avoidance of doubt, the Total Allowed Claim shall be shared among any Trusts accepting the offer contained

-5-

ny-1040888

**CONFIDENTIAL**                                                                                                          **II_RESCAP0000190**

**EXECUTION COPY**

in this Section 5.01, subject to the provisions of this Settlement Agreement. Any Trusts accepting the offer contained in this Section 5.01, subject to the provisions of this Settlement Agreement shall be allowed claims in an amount calculated as set forth below (the "Allowed Claim"), but in no case shall the amount of the Allowed Claim exceed $8,700,000,000. The amount of the Allowed Claim shall equal (i) $8,700,000,000, less (ii) $8,700,000,000 multiplied by the percentage represented by (a) the total dollar amount of original principal balance for the Trusts not accepting the offer outlined above, divided by (b) the total dollar amount of original principal balance for all Trusts.

Section 5.02    Waiver of Setoff and Recoupment.  By accepting the offer to settle contained in Section 5.01, each accepting Trust irrevocably waives any right to setoff and/or recoupment such Trust may have against Ally and ResCap.

ARTICLE VI. ALLOCATION OF ALLOWED CLAIM.

Section 6.01    The Allocation Schedule.  The allocation of the amounts of the Allowed Claim as to each Trust (each, an "Allocated Allowed Claim"), is set forth on Exhibit B hereto.

Section 6.02    Legal Fees.

(a)  ResCap and the Institutional Investors agree that Gibbs & Bruns and Ropes & Gray shall, on the Effective Date of the Plan, be paid legal fees as follows, as an integrated and nonseverable part of this Settlement Agreement. First, Gibbs & Bruns and Ropes & Gray, as counsel to the Institutional Investors, shall be allocated by ResCap without conveyance to the Trustees the percentages of the Allowed Claim set forth on Exhibit C, without requirement of submitting any form of estate retention or fee application, for their work relating to these cases and the settlement. Second, the Debtors and Institutional Investors may further agree at any time, that the Debtors may pay Gibbs & Bruns and Ropes & Gray in cash, in an amount that Gibbs & Bruns and Ropes & Gray respectively agree is equal to the cash value of their respective portions of the Allowed Claim, and in any such event, no estate retention application, fee application or further order of the Bankruptcy Court shall be required as a condition of the Debtors making such agreed payment. Third, the Debtors agree and the settlement approval order shall provide that the amount of the Allowed Claim payable to Gibbs & Bruns and Ropes & Gray may be reduced to a separate claim stipulation for convenience of the parties.

(b)  In the event that, prior to acceptance of this compromise by a Trustee for a Trust other than an original Covered Trust (as defined in the Plan Support Agreement), counsel to Investors in such Trust cause a direction to be given by more than 25% of the holders of a tranche of such Trust to accept this compromise, then the same provisions as contained in Section 6.02(a) shall apply to such counsel, solely as to the amounts allocated to such Trust. Such counsel shall be entitled to a share of the fee for such trust equal to the ratio of (a) 25% minus the percentage of such tranche held by Institutional Investors divided by (b) 25%. Counsel would be required to identify itself and satisfy the Debtors and Institutional Investors as to the holdings of client-investors and that counsel caused such directions.

-6-

ny-1040888

CONFIDENTIAL

**EXECUTION COPY**

## ARTICLE VII.    RELEASES.

Section 7.01    Releases.  Except as set forth in Article VIII, as of the Effective Date, with respect to each and every Trust for whom the Trustee accepts the compromise contemplated by this Settlement Agreement, the Investors, Trustee, Trust, and any Persons claiming by, through or on behalf of such Trustee (including Institutional Investors claiming derivatively) or such Trust (collectively, the "Releasors"), irrevocably and unconditionally grant a full, final, and complete release, waiver, and discharge of all alleged or actual claims, demands to repurchase, demands to cure, demands to substitute, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, losses, debts, costs, expenses, obligations, demands, claims for accountings or audits, alleged events of default, damages, rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct or derivative, arising under law or equity, against ResCap that arise under the Governing Agreements.  Such released claims include, but are not limited to, claims arising out of and/or relating to (i) the origination, sale, or delivery of Mortgage Loans to the Trusts, including the representations and warranties made in connection with the origination, sale, or delivery of Mortgage Loans to the Trusts or any alleged obligation of ResCap to repurchase or otherwise compensate the Trusts for any Mortgage Loan on the basis of any representations or warranties or otherwise or failure to cure any alleged breaches of representations and warranties, (ii) the documentation of the Mortgage Loans held by the Trusts including with respect to allegedly defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, or any alleged failure to provide notice of such defective, incomplete or non-existent documentation, (iii) the servicing of the Mortgage Loans held by the Trusts (including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers, advances, servicing advances, or claims that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by the applicable Master Servicer, Seller, or any other Person), (iv) setoff or recoupment under the Governing Agreements against ResCap, and (v) any loan seller that either sold loans to ResCap or AFI that were sold and transferred to such Trust or sold loans directly to such Trust, in all cases prior to the Petition Date (collectively, all such claims being defined as the "Released Claims").  For the avoidance of doubt, this release does not include individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities.

Section 7.02    Release of Claims Against Investors.  Except as set forth in Article VIII, as of the Effective Date, ResCap irrevocably and unconditionally grants to the Investors a full, final, and complete release, waiver, and discharge of all alleged or actual claims from any claim it may have under or arising out of the Governing Agreements.  For the avoidance of doubt, nothing in this provision shall affect Ally's rights in any way.

Section 7.03    Agreement Not to Pursue Relief from the Stay.  The Institutional Investors agree that neither they nor their successors in interest, assigns, pledges, delegates, affiliates, subsidiaries, and/or transferees, will seek relief from the automatic stay imposed by section 362 of the Bankruptcy Code in order to institute, continue or otherwise prosecute any action relating to the Released Claims; provided, however, nothing contained herein shall preclude the

ny-1040888

**CONFIDENTIAL**

**II_RESCAP0000192**

**EXECUTION COPY**

Institutional Investors or their advised clients from seeking any such relief with respect to direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities. ResCap reserves its rights and defenses therewith.

Section 7.04    Inclusion of Accepting Trustees in Plan Exculpation Provisions. The Trustees of any Trust accepting the offer to settle described in Section 5.01 and their respective counsel shall be entitled to the benefit of any plan exculpation provision, if any, included in the Plan, which exculpation shall be no less favorable than the plan exculpation provisions extended to similarly situated creditors or parties in interest who are parties to any plan support agreement with ResCap.

Section 7.05    Servicing of the Mortgage Loans. Except as provided in Section 8.01, the release and waiver in Article VII includes all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts prior to the Petition Date.

### ARTICLE VIII.    CLAIMS NOT RELEASED

Section 8.01    Administration of the Mortgage Loans. The releases and waivers in Article VII herein do not include claims that first arise after the Effective Date which are based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts in their aggregation and remittance of Mortgage Loan Payments, accounting for principal and interest, and preparation of tax-related information, in connection with the Mortgage Loans and the ministerial operation and administration of the Trusts and the Mortgage Loans held by the Trusts, for which the Master Servicer, Servicer, or Subservicer received servicing fees, unless, as of the date hereof, the Institutional Investors, have or should have knowledge of the actions, inactions, or practices of ResCap in connection with such matters.

Section 8.02    Financial-Guaranty Provider Rights and Obligations. To the extent that any third party guarantor or financial-guaranty provider with respect to any Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Trusts, the releases and waivers in Article VII are not intended to and shall not release such rights.

Section 8.03    Settlement Agreement Rights. The Parties do not release or waive any rights or claims against each other to enforce the terms of this Settlement Agreement or the Allowed Claim.

Section 8.04    Disclosure Claims. The releases and waivers in Article VII do not include any claims based on improper disclosures under federal or state securities law.

Section 8.05    Reservation of Rights. Notwithstanding anything in this Settlement Agreement to the contrary, the Institutional Investors have not waived their right to file an objection to a motion of the holders of the ResCap 9 5/8% bonds requesting payment of any interest on account of their ResCap 9 5/8% bond claims that may be due and owing after the Petition Date.

-8-

ny-1040888

**CONFIDENTIAL**

EXECUTION COPY

ARTICLE IX. <u>RELEASE OF UNKNOWN CLAIMS</u>.

Each of the Parties acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The Parties acknowledge that inclusion of the provisions of this Article IX to this Settlement Agreement was a material and separately bargained for element of this Settlement Agreement.

ARTICLE X.  <u>OTHER PROVISIONS</u>

Section 10.01 <u>Voluntary Agreement</u>. Each Party acknowledges that it has read all of the terms of this Settlement Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Settlement Agreement voluntarily and without duress.

Section 10.02 <u>No Admission of Breach or Wrongdoing</u>. ResCap has denied and continues to deny any breach, fault, liability, or wrongdoing. This denial includes, but is not limited to, breaches of representations and warranties, violations of state or federal securities laws, and other claims sounding in contract or tort in connection with any securitizations, including those for which ResCap was the Seller, Servicer and/or Master Servicer. Neither this Settlement Agreement, whether or not consummated, any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, whether or not consummated, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap with respect to any claim or of any breach, liability, fault, wrongdoing, or damage whatsoever, or with respect to any infirmity in any defense that ResCap has or could have asserted.

Section 10.03 <u>No Admission Regarding Claim Status</u>. ResCap expressly states that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, then neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap that any claims asserted by the Institutional Investors are not contingent, unliquidated or disputed. The Institutional Investors expressly state that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the

ny-1040888

CONFIDENTIAL

II_RESCAP0000194

**EXECUTION COPY**

Institutional Investors that any claims asserted by the Institutional Investors and Trustees are not limited to the amounts set forth in this Settlement Agreement or are of any particular priority.

Section 10.04 <u>Counterparts</u>. This Settlement Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Settlement Agreement. Delivery of a signature page to this Settlement Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Settlement Agreement.

Section 10.05 <u>Joint Drafting</u>. This Settlement Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Settlement Agreement, no provision shall be construed and interpreted for or against any of the Parties because such provision or any other provision of the Settlement Agreement as a whole is purportedly prepared or requested by such Party.

Section 10.06 <u>Entire Agreement</u>. This document contains the entire agreement between the Parties, and may only be modified, altered, amended, or supplemented in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Settlement Agreement and the Plan Support Agreement.

Section 10.07 <u>Specific Performance</u>. It is understood that money damages are not a sufficient remedy for any breach of this Settlement Agreement, and the Parties shall have the right, in addition to any other rights and remedies contained herein, to seek specific performance, injunctive, or other equitable relief from the Bankruptcy Court as a remedy for any such breach. The Parties hereby agree that specific performance shall be their only remedy for any violation of this Agreement.

Section 10.08 <u>Authority</u>. Each Party represents and warrants that each Person who executes this Settlement Agreement on its behalf is duly authorized to execute this Settlement Agreement on behalf of the respective Party, and that such Party has full knowledge of and has consented to this Settlement Agreement.

Section 10.09 <u>No Third Party Beneficiaries</u>. There are no third party beneficiaries of this Settlement Agreement.

Section 10.10 <u>Headings.</u> The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

Section 10.11 <u>Notices</u>. All notices or demands given or made by one Party to the other relating to this Settlement Agreement shall be in writing and either personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, or by electronic mail transmission, and shall be deemed to be given for purposes of this Settlement Agreement on the earlier of the date of actual receipt or three days after the deposit thereof in the mail or the electronic transmission of the message. Unless a different or additional address for

-10-

ny-1040888

**CONFIDENTIAL**

**II_RESCAP0000195**

**EXECUTION COPY**

subsequent notices is specified in a notice sent or delivered in accordance with this Section, such notices or demands shall be sent as follows:

> To:   Institutional Investors
>       c/o Kathy Patrick
>       Gibbs & Bruns LLP
>       1100 Louisiana
>       Suite 5300
>       Houston, TX 77002
>       Tel: 713-650-8805
>       Email: kpatrick@gibbsbruns.com
>       -and-
>       Keith H. Wofford
>       D. Ross Martin
>       Ropes & Gray LLP
>       1211 Avenue of the Americas
>       New York, NY 10036
>       Tel: 212-841-5700
>       Email: keith.wofford@ropesgray.com
>               ross.martin@ropesgray.com

> To:   ResCap
>       c/o Gary S. Lee
>       Jamie A. Levitt
>       Morrison & Foerster LLP
>       1290 Avenue of the Americas
>       New York, NY 10104
>       Tel: 212-468-8000
>       Email: glee@mofo.com
>               jlevitt@mofo.com

Section 10.12    Disputes.  This Settlement Agreement, and any disputes arising under or in connection with this Settlement Agreement, are to be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of laws principles thereof.  Further, by its execution and delivery of this Settlement Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Settlement Agreement, *provided, however*, that, upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Settlement Agreement.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

-11-

ny-1040888

CONFIDENTIAL    II_RESCAP0000196

**EXECUTION COPY**

Dated the 13 day of May, 2012.

Residential Capital, LLC
for itself and its direct and indirect subsidiaries

Signature: _____

Name: _Tammy Hamzehpour_

Title: _General Counsel_

-12-

ny-1040888

**CONFIDENTIAL**

_Western Asset Management Company_

Name:       W. Stephen Venable, **Jr.**

Title:        **Attorney**

Dated: May ___, 2012

**CONFIDENTIAL**

**II_RESCAP0000198**

*Thrivent Financial for Lutherans*

Name: David S. Royal

Title:  Vice President and Deputy General
Counsel

Dated:  May 11, 2012

*Teachers Insurance and Annuity Association of America*

Name:  SANJEEV  HANDA

Title:  MANAGING  DIRECTOR

Dated: May 13, 2012

*The TCW Group, Inc. on behalf of itself and its
subsidiaries*

Name:  Michael E. Cahill

Title:    Executive Vice President

Name:  David S. DeVito

Title:    Executive Vice President

Dated: May ___, 2012

*Pacific Investment Management Company LLC*

Name:  Douglas M. Hodge

Title:  Chief Operating Officer

Dated:  May 13, 2012

CONFIDENTIAL

*Maiden Lane LLC and Maiden Lane III LLC by
Federal Reserve Bank of New York, as
managing member*

Name:   Stephanie Heller

Title:    Senior Vice President and Deputy General Counsel

Dated:  May ___, 2012

CONFIDENTIAL

*Neuberger Berman Europe Limited*

Name: HEATHER ZUCKERMAN

Title: DIRECTOR

Dated: May 13, 2012

Nancy Mueller Handal

*Metropolitan Life Insurance Company*

Name:  Nancy Mueller Handal

Title:  Managing Director

Dated:  May __13_, 2012

_Kore Advisors, L.P._

Name: Cory B. Nass

Title: General Counsel

Dated: May ___, 2012

ING Investment Management Co. LLC

Name: *Gerald T. Lins*

Title: *Managing Director and Secretary*

Dated:  May 13, 2012

*ING Investment Management LLC*

Name: Christine Hurtsellers

Title: Executive Vice President

Dated:  May 11, 2012

*Goldman Sachs Asset Management, L.P.*

Name:

Title:

Dated:  May 10, 2012

CONFIDENTIAL