A. 82

Outlook E-mail

**From:** Bryan, Patrick M.
**Sent:** 6/8/2012 9:17:07 PM
**To:** Levitt, Jamie A.; Donovan, Daniel T.; Ornstein, Noah
**Cc:** Powell, Jeff; Princi, Anthony; Lee, Gary S.; Clark, Daniel E.
**Subject:** RE: Final drafts 9019 motion with declarations - CONFIDENTIAL
**Attachments** ResCap 9019 - FTI Declaration - 4_KE comments.DOC; ResCap 9019 Motion - Sillman Decl - 5_KE comments.DOC

Jamie ·· Here are our comments on the Sillman and FTI declarations. Sillman needs to make clear throughout his declaration that he is assuming liability for purposes of his analysis. I've added language to that effect. I also struck his comments about what he would have done had he had more time to complete his analysis. That just invites objectors and the Court to delay until your expert has adequate time to complete his analysis and support the record.

I've attached comments on the FTI declaration as well. I think the FTI declaration needs substantial work to focus on the facts of this case. Right now it reads as a series of generalities. The litigation cost analysis boils down to a tautology that cases with more litigation have higher litigation costs. Nowhere in the declaration is there any discussion of the facts of this case (apart from paragraphs that simply repeat portions of the Lipps declaration) and how the settlement fits into the overall restructuring plan. And nowhere does FTI conclude that anything "would" happen absent the settlement. Instead, FTI generalizes what "could" happen. Similarly, the description of the benefits of the settlement is just a series of generalities that reads like a supplemental brief.

We're happy to jump on a call to discuss further tonight or anytime tomorrow.

Thanks,
Patrick

Patrick M. Bryan | Partner | Kirkland & Ellis LLP
655 Fifteenth Street, N.W. | Suite 1200 | Washington , D.C. 20005
Direct: (202) 879-5285 | Cellular : (202) 834-9043 | patrick.bryan@kirkland.com

**From:** Levitt, Jamie A. [mailto:JLevitt@mofo.com]
**Sent:** Friday, June 08, 2012 3:59 PM
**To:** Donovan, Daniel T.; Ornstein, Noah; Bryan, Patrick M.
**Cc:** Powell, Jeff; Princi, Anthony; Lee, Gary S.; Clark, Daniel E.
**Subject:** Final drafts 9019 motion with declarations - CONFIDENTIAL

Dan, Noah and Patrick:

Attached is what we hope is the final 9019 motion, redlined against what I sent you on Sunday and incorporating your comments and some other revisions. Also attached are the FTI declaration (FTI will let us know shortly who will be their declarant) and the Fortace/Sillman declaration. I have also attached the Whitlinger affidavit and Lipps declaration, from other filings, for reference.

We are finalizing and putting the papers together this weekend, so we are only looking for comments on glaring errors/problems. If there are any, please let us know asap.

Thanks.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY



EXHIBIT
Expert
9019-14
1/2/2012

RC-9019_00053182

<<ResCap - KPTF 9019 Motion - 3.DOC>> <<WS_BinaryComparison_FOR REDLINE-NEW YORK-#1044351-v3-ResCap_-
_KP_TF_9019_Motion.doc>> <<ResCap 9019 Motion - Sillman Decl. - 5.DOC>> <<ResCap 9019 - FTI Declaration - 4.DOC>>
<<06 - Lipps Declaration.pdf>> <<Docket No 6 - Whit .pdf>>

--------------------------------------------------------------------

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230/

====================================================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

--------------------------------------------------------------------

*******************************************************
IRS Circular 230 Disclosure:
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.
*******************************************************

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053183

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:     (212) 468-7900
Gary S. Lee
Anthony Princi
Jamie Levitt

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF FRANK SILLMAN IN SUPPORT OF DEBTORS'
MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL
OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

I, Frank Sillman, being duly sworn, depose and say:

1.    I serve as Managing Partner for Fortace, LLC ("Fortace")[1] an

advisory and consulting firm to banks, mortgage companies, insurance companies,

trustees and other investors. I am authorized to submit this declaration (the

"Declaration") on behalf of the Debtors in connection with their motion pursuant to Rule

9019 of the Federal Rules of Bankruptcy Procedure for approval of RMBS Trust

---

[1] Capitalized terms not otherwise defined herein or if not defined therein, as defined in the RMBS Trust Settlement
Agreement, or in the Governing Agreements for each of the Debtors' securitizations, or in the defined terms
incorporated by reference therein.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053200

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

Settlement Agreements. This Declaration reflects the work performed to date and I reserve the right to augment and refine the analysis as my work is ongoing.

2.     A key area of my work with Fortace relates to reviewing and opining on the reasonableness of repurchase demands.  I have performed repurchase demand work for insurers and lenders who have issued repurchase demands to Sellers, as defined below, based on alleged breaches of representations and warranties.  As part of this work I helped develop the loan audit selection criteria, reviewed contractual obligations, performed loan level audits, made recommendations as to whether or not a repurchase demand should be issued and participated in the negotiations with the Sellers on discussions to repurchase loans. I have also performed work for Sellers who have received repurchase demands from Trustees, insurers and lenders for alleged breaches of representations and warranties.  As part of this work I have reviewed contractual obligations, reviewed the repurchase demands and the related findings and supporting evidence, performed loan level audits, made recommendations to Sellers as to whether or not the alleged breaches were contractual breaches, and participated in the negotiations with Trustees on discussions to repurchase loans.

3.     I have approximately twenty five years of experience in the mortgage banking industry.  I have held senior executive positions at a federally insured bank, a Wall Street investment bank and at privately held mortgage banking companies. During those 25 years, I have managed residential mortgage origination and loan operations, secondary marketing, capital markets, treasury and warehouse lending.  In particular, I have extensive experience in the residential mortgage market, including origination, securitization, loss reserves, and repurchase-related activities related to

2

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00053201

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

Fannie Mae, Freddie Mac, FHA, Prime Jumbo, Alt A, Subprime, HELOC and Second

Lien residential mortgage loans.

4.    The RMBS Trust Settlement Agreement seeks to resolve a large

number of breach of representation and warranty claims.  I was asked to provide an

independent assessment of the Total Allowed Claim as defined in the RMBS Trust

Settlement Agreement and opine as to its reasonableness.  For purposes of this

Declaration, I was asked to assume the Trusts were capable of proving a breach of

representations and warranties under the Governing Agreements.  In conjunction with

selected Fortace personnel under my supervision, I have therefore performed a review of

the following data and agreements related to the securitization trusts identified in Exhibit

A to the RMBS Trust Settlement Agreement (the "Trusts"): (1) the Actual Liquidated

Losses,[2] (2) the actual Severity Rates for the Trusts based on the Liquidated Loans, (3)

Frequency Rates from one Trust for each of the representative Shelves, (4) the payment

status and delinquency data for the Trusts as of March 31, 2012, (5) the Debtors'

repurchase experience with Freddie Mac and Fannie Mae's repurchase demand data, and

(6) Governing Agreements from one Trust from each of the Shelves.  Additionally, in

those areas where actual data for the Trusts is not available, such as Audit Rates, Demand

Rates, Breach Rates and Agree Rates as defined and detailed below, I utilized

assumptions and developed my own models based on my own experience and industry

data, where available; which takes into consideration the Payment Status, Shelf and loan

---

[2] In this Declaration, all references to percentages are rounded to the nearest whole percentage (e.g., 98.5% is rounded up to 99%, and 98.4% is rounded down to 98%).  Some percentage totals will not equal 100% due to rounding.

3

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00053202

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

product types, including Prime Jumbo, Alt A, Subprime, HELOC and Second Lien
(collectively, "Mortgage Loan Products").

5.      The first step in estimating the range of potential repurchase
liability for the Debtors ("Potential Repurchase Liability") is first developing the
potential cumulative lifetime loss ranges for the Trusts ("Estimated Lifetime Losses").
The next step necessary to understand the Potential Repurchase Liability is to develop the
percentage of Estimated Lifetime Losses that the Debtors might agree to share with the
Trusts ("Loss Share Rate") as a result of potential breaches of representations and
warranties.

6.      For purposes of this Declaration, I developed Estimated Lifetime
Loss assumptions in the aggregate based on the Payment Status, Shelf, and Mortgage
Loan Product, as defined and detailed below.

7.      For purposes of this Declaration, I developed my Demand Rate,
Breach Rate and Agree Rate assumptions utilizing the Debtors' actual GSE repurchase
demand data, industry repurchase demand data and my own repurchase demand
experience. Those assumptions were then applied at the Payment Status, Shelf and
Mortgage Loan Product level not at the individual Trust level as defined and detailed
below. The Audit Rate, Demand Rate and Breach Rate for the Trusts were not available
publically or from the Debtors. Additionally, the vast majority of the Trusts PLS
repurchase demands received by the Debtors to date are unresolved, so I could not
ascertain a meaningful PLS Agree Rate or Loss Share Rate assumption for use in this
Declaration. Instead I focused on the more robust, complete and reliable information
available regarding the Debtors' actual GSE repurchase demand data.

**Deleted:** , instead of utilizing more detailed cash flow and loss assumptions for each individual Trust. Based on the limited time allotted to prepare my Declaration,

**Deleted:** I have not yet performed separate cash flow models utilizing more nuanced assumptions to determine the Estimated Lifetime Loss ranges for each of the Trusts.

**Comment [p1]:** I understand that he may have to do a few things differently with more time but repeating his that I have enough time to do a complete analysis anyway (maybe putting off the hearing until he can complete full analysis and complete factual record is prepared).

**Deleted:** Based on the limited time allotted to prepare my Declaration, I have not

**Deleted:** yet performed loan level audits on a statistically valid sample of loans from of each of the Trusts in order to assist in developing my Demand Rate, Breach Rate and Agree Rate assumptions.

4

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

8.    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Deleted:** Although the time constraints imposed for the development of this Declaration before the required filing date limited the type and depth of the analysis I was able to perform to develop my assumptions, it is my professional opinion that the process, assumptions and methodology I utilized were sound and thorough.

9.    If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## OVERVIEW OF THE MORTGAGE SECURITIZATION PROCESS

10.    The creation, sale and servicing of a Residential Mortgage Backed Security ("RMBS") is a multi-stage process comprising of numerous steps and utilizing various entities to discharge the required duties.[3] The RMBS securitization process detailed below is consistent with the process utilized by the Debtors in the creation, sale and servicing of the Trusts.

11.    First, the "Seller" of the RMBS, also known as the Sponsor, Issuer and/or Depositor, accumulates or pools the mortgage loans it originated and/or purchased from other Lenders. Various of the Debtors acted as Sellers to the Trusts. The Seller arranges to sell those mortgage loans into a "Special Purpose Entity" created exclusively for the purpose of issuing an RMBS, often referred to as an "RMBS Trust." If the Seller planned to offer a large quantity of a similar type of securities, the Seller would file a registration statement with the SEC to allow it to offer Trusts without SEC review of each supplement ("Shelf" or "Shelves"). The Debtors offered RMBS Trusts under eight different Shelves[4], covering a wide range of different mortgage products. In connection with the securitization, an Underwriter(s), Trustee, Servicer, Master Servicer, REMIC Administrator and Custodian are selected to handle various duties on behalf of the RMBS

---

[3]  A mortgage related Asset Backed Security ("ABS") transaction is similar in nature and is comparable for purposes of this discussion.

[4]  There were the "RALI" shelf (Alt-A); "RFSMI" (Jumbo A); "RASC" (subprime); "RFMSII" (second lien); "RAAC" (seasoned loans); "RAAC-RP" (subprime) and "RAMP" (non-conforming products) and "GMACM" (various products).

5

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053204

**DRAFT 6/8/12**
**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

Trust. In addition to being the Seller of Trusts, the Debtors, at times, acted as the Servicer and/or Master Servicer of the Trusts.

12.    Second, prior to the closing of the sale of loans to the RMBS Trust, the parties negotiate all the applicable RMBS Trust agreements ("Governing Agreements") involved in the creation, sale and loan servicing of the RMBS Trust. Generally, the key Governing Agreements are the Mortgage Loan Purchase Agreement ("MLPA"), the Pooling and Servicing Agreement ("PSA"), and the Assignment, Assumption and/or Indenture Agreements, as applicable. Under the Governing Agreements, Sellers typically provide certain representations and warranties, which may vary from RMBS Trust to RMBS Trust, but can include requirements that the Sellers comply with the following: a) accuracy of the loan level data provided on the securitization data tape, b) seller's underwriting guidelines, c) origination and loan servicing policy and procedures, d) documents required to be contained in the mortgage file, e) accuracy of the valuation of collateral, f) federal, state and local regulations, and g) various degrees of fraud provisions. The Trusts utilized the standard Governing Agreements and typically, but not always, contained similar representations and warranties to those detailed above.

13.    As a way to further enhance the credit rating of RMBS Trust Certificates, a Seller may choose to obtain Bond Insurance ("Bond Wrap"), from a monoline bond insurance company ("Monoline"). The Bond Wrap is a non-cancelable and binding obligation of the Monoline to guarantee full, complete and timely principal and interest payments to the RMBS Trust. For this guarantee, the Monoline charges the Seller a premium or fee for the issuance of the Bond Wrap. The presence of the Bond

6

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

Wrap is an added third party guarantee to the Certificate Holders in addition to the underlying credit structure of the RMBS Trust, which reduces the overall risk to the Certificate Holders and allows the credit rating agencies to increase the credit ratings of the Certificates. The Debtors utilized Bond Wraps on 61 of the 392 Trusts.

14.    One or more credit rating agencies, such as Standard & Poor's and Moody's, review the data about the underlying mortgage loans, the Seller, the Servicer, the Master Servicer, the Trustees, and Governing Agreements, and Monoline Bond Wraps, if applicable, and assign credit ratings to each of the tranches of mortgage backed pass-through certificates ("Certificates"). The Trusts were all rated by one of more of the credit rating agencies.

15.    The Certificates are then created and sold to investors through the Underwriter(s), who are typically Wall Street investment banks but also may be an affiliate of the Seller. The Trusts may have utilized a Wall Street Investment Banks and/or the Debtors affiliate GMAC RFC Securities to underwrite the Trusts.

16.    Finally, the Servicer administers the mortgage loans in accordance with the Governing Agreements and the Trustee distributes the remittances to the Certificate Holders in accordance with the Governing Agreements and Certificates. Certain of the Debtors did act as Servicer, at times, for the Trusts.

## ALLEGED BREACHES OF REPRESENTATIONS AND WARRANTIES

17.    The Governing Agreements authorize certain parties, such as the Trustees, to notify the Seller of any alleged breaches of representations and warranties. If any such party notifies the Seller of an alleged breach of one or more of the

7

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

representations and warranties the following analysis is required in order to assess the Seller's repurchase or loss reimbursement obligation under the Governing Agreements.

18.    Generally, the standard for analyzing a breach of a representation and warranty requires an assessment of: (a) whether the alleged loan defect or alleged breach is an actual breach of representations and warranties, and (b) whether the breach was material and adverse to the interests of the Certificate Holders in the mortgage loans (cumulatively the "R&W Repurchase Standard"). If the R&W Repurchase Standard is met, the Seller is required to repurchase non-liquidated loans at the purchase price, as defined in the applicable Governing Agreements, or to reimburse the RMBS Trust for any losses incurred in the liquidation of the loan, as defined in the applicable Governing Agreements ("Potential Repurchase Liability"). If the R&W Repurchase Standard is not met, the Seller does not have an obligation to repurchase the loan or reimburse the RMBS Trust for liquidated losses. I offer no opinion on whether the Trusts would be able to prove liability, i.e., meet the R&W Repurchase Standard. Rather, for purposes of this Declaration, I have assumed that the Trust would be capable of meeting the R&W Repurchase Standard.

## LOAN REPURCHASE TRENDS

19.    Beginning in late 2007, the US economy entered the worst recession since the great depression. This recession has inflicted tremendous damage to all sectors of the economy including employment, credit, gross domestic product, and the housing market. As the recession worsened, growing unemployment and the resulting loss of income had a devastating effect on the housing market, loan performance and housing prices. Rising delinquencies and plummeting housing prices have had and

8

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00053207

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

continue to have a profoundly negative impact on the performance and resulting losses on all mortgage securitizations.

20.    As a result, the government-sponsored entities, including Fannie Mae and Freddie Mac ("GSEs"), Monolines, and investors have began to pursue claims for alleged breach of representations and warranties at elevated rates to help offset their RMBS losses. The GSE's have requested sellers to repurchase approximately $66 billion in loans as noted in their recent SEC filings as summarized in Inside Mortgage Finance's Special Report ("IMF Special Report")[5], while industry estimates forecast that sellers of non-GSE securities, known as private label securities ("PLS"), will repurchase hundreds of billions in loans resulting in seller losses of approximately $133 billion according to Compass Point Research.[6]

## RECENT INDUSTRY SETTLEMENTS

21.    As way to more efficiently resolve the billions of dollars in repurchase demands, Fannie Mae, Freddie Mac and some investors have reached global repurchase settlements with certain Sellers.

22.    In preparation for this Declaration, I reviewed the publically available settlement information relating to the following settlements:

| Seller/Originator | Securitization type | Settlement Amount | Date |
|---|---|---|---|
| Bank of America | PLS | $8,500,000,000 | June 2011[7] |
| Lehman | PLS | $40,000,000 | November 2011 |

[5] As reported in Inside Mortgage Finance's Special Report Analyzing GSE Mortgage Buyback Demands regarding Fannie Mae and Freddie Mac's Regulation AB 15-G repurchase related SEC filings dated 2012. In this Special Report, the Debtor is referred to as GMAC Mortgage / Ally.

[6] Compass Point Research on Mortgage Repurchases Part II: Private Label RMBS Investors Take Aim dated August 17, 2010.

[7] Bank of America settlement for 530 trusts is pending court approval.

1044780                                    9

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

| Bank of America | Fannie Mae | $1,520,000,000 | January 2012 |
| Bank of America | Freddie Mac | $1,280,000,000 | January 2012 |

23.    Both the Bank of America ("BofA") and Lehman PLS settlements and the corresponding RMBS Trusts are similar in terms of the securitization structure, issuance years, Mortgage Loan Product mix, Governing Agreements and R&W Repurchase Standards.

### THE DEBTORS' REPURCHASE HISTORY

24.    I reviewed the Debtors' 2006-2008 GSE historical repurchase data, based on both Fannie Mae and Freddie Mac's Regulation AB 15-G SEC filings, as summarized in the IMF Special Report[8].  The repurchase data was as follows:

| Seller/Originators | Repurchase Demands (millions) | Repurchased ("Agree Rate") | Pending | Disputed | Withdrawn ("Rescind Rate") |
|---|---|---|---|---|---|
| GMAC Mortgage / Ally (the Debtors) | $1,537.81 | 67.56% | 2.60% | .50% | 35.62% |
| All Seller / Originators | $65,836.91 | 49.54% | 12.58% | 4.15% | 35.75% |

### DETERMINATION OF THE TRUSTS ESTIMATED LIFETIME LOSSES

25.    The "Estimated Lifetime Losses" for the Trusts are determined by adding (a) the actual losses that are incurred when a loan is foreclosed, sold through a short sale, REO or other final disposition and the losses are allocated to the trust ("Actual

Comment [p2]: How is this helpful?

Deleted: <#>The Debtors' significantly higher GSE Repurchased or Agree Rate of 67.56% as compared to 49.54% for all Seller/Originators is likely a result of higher than the industry average representation and warranty breaches on its GSE mortgage loan originations.¶

---

[8] As noted above, the Debtors' PLS repurchase data is incomplete due to the large number of PLS repurchase demands that have not completed the repurchase process, largely due to pending litigation. Accordingly, I focused on the GSE repurchase experience instead.

10

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

Liquidated Losses"), and (b) the losses forecasted on the remaining outstanding unpaid

principal balance ("Outstanding UPB") for the remaining life of the Trusts ("Forecasted

Remaining Lifetime Losses").  The analysis below is based on data obtained from the

Debtors, from Intex,[9] from the Debtors' Vision website[10] ("Vision"), and from other

industry sources including SEC filings.  From these sources, I have estimated the Trusts

Estimated Lifetime Losses and the Potential Repurchase Liability ranges based on Actual

Liquidated Losses plus Forecasted Remaining Lifetime Losses by Payment Status, by

Shelf, and by Mortgage Loan Product utilizing "Frequency Rate" and "Severity Rate"

assumptions as described below.

      26.     The Actual Liquidated Losses for the Trusts is $30.3 billion.  This

figure was obtained from Intex and the unpaid principal balance ("UPB") of the

liquidated loans at the time of liquidation ("Trusts Liquidated Loans") was obtained from

the Debtors.

      27.     The "Forecasted Remaining Lifetime Losses" for the Trusts are

determined by multiplying (i) the Outstanding UPB, (ii) the Frequency Rate assumptions,

and (iii) the Severity Rate assumptions.

**A. OUTSTANDING UPB FOR THE TRUSTS**

      28.     For purposes of this Declaration, the data for the Outstanding UPB

of the Trust was as of March 31, 2012 ("Cut-Off Date").

---

[9] Intex is a subscription based provider of RMBS loan level data and cash flow models.  Intex data was
provided by the Debtors.

[10] The Debtors' Vision website contains RMBS Trust information monthly servicing certificate statements,
prospectus supplements, operating documents in addition to loan level data files.

1844282                                                11

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

29.    Fortace obtained and stratified the Trusts Outstanding UPB data by Payment Status obtained from Intex and by Shelf and by Mortgage Loan Product Group obtained from both Vision and the Debtors.  The "Payment Status" buckets used for this analysis were as follows: (a) "Current", the mortgage payments are paid up to date, (b) "30-59 Days Delinquent", the mortgage payments are 30-59 days past due, (c) "60-89 Days Delinquent", the mortgage payments are 60-89 days past due, (d) 90+ Days Delinquent & REO, the mortgage payments are 90 or more days past due or the property has been acquired through foreclosure; often referred to as real estate owned ("REO"), and (e) "Foreclosure", the Servicer is in the legal process of acquiring the property from the defaulted borrower.

30.    The Trusts Outstanding UPB as of the Cut-Off Date is $62.4 billion.

## B. FREQUENCY RATE ASSUMPTIONS

31.    The "Frequency Rate" is defined as the percentage of loans in a mortgage portfolio that are projected to be liquidated with a loss through foreclosure sale, REO sale, short sale or charge-off.  The Frequency Rate, also known in the industry as the "Roll Rate", represents the  projected likelihood that a group of loans will "roll" from current or delinquent status to defaulted and liquidated.  The Frequency Rate in conjunction with the Severity Rate are industry standards utilized to forecast future losses for an RMBS Trust and are two key assumptions utilized by credit rating agencies when rating RMBS Certificates, by mortgage investors when evaluating RMBS Certificates and by Banks when evaluating loan loss reserves.

12

RC-9019_00053211

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

32.    I reviewed the February 2012 Frequency Rates for one Trust from each of the eight Debtors Shelves. I then compared the Trusts Frequency Rates to Frequency Rates provided by other industry available sources, such as the BofA Expert Report[11] and the Lehman Expert Declaration[12] to develop our Frequency Rate assumptions. The Frequency Rate assumptions utilized in this Declaration are similar to those used in the BofA Expert Report and the Lehman Expert Declaration.

33.    These Frequency Rates were then applied first by Payment Status, then by Shelf, then by Mortgage Loan Product for both the lower and higher ranges. These Frequency Rates were then assumed to have a flat roll rate to liquidation, which means the Frequency Rates were not varied with the passage of time or other variables.

34.    The average Frequency Rates for the Trusts assumed in this analysis are 36% at the lower range and 41% at the higher range.

## C. SEVERITY RATE ASSUMPTIONS

35.    The "Severity Rate", also known as the "Default Rate", represents the percentage of losses associated with a loan or group of loans when the loan defaults and is liquidated though foreclosure sale, REO sale, short sale or charge-off.

36.    I reviewed the actual Severity Rates to date, based on the Actual Liquidated Losses for the Trusts by Shelf and by Mortgage Loan Product, and adjusted them to current market conditions based on the latest three month actual Severity Rates obtained from Intex, by Shelf and by Mortgage Loan Product.

---

[11] The RRMS Advisors Opinion Concerning Contemplated Settlement Amount for 530 Trusts dated June 7, 2011.

[12] The Lehman Brothers Holdings Inc. Declaration of Zachary Trumpp filed January 12, 2012.

13

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00053212

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

37.    Once we determined our Severity Rates they were then applied by

Shelf and by Mortgage Loan Product on a flat severity basis.

38.    The average Severity Rates for the Trusts assumed in this analysis

are 68% at the lower range and 78% at the higher range.

## D.  FORECASTED REMAINING LIFETIME LOSSES

39.    Applying the Frequency Rate and Severity Rate assumptions to the

Outstanding UPB, I determined a potential range for such Forecasted Remaining Lifetime

Losses for the Trusts. The lower end of possible range for such losses, calculated using

the metrics and assumptions are shown in the following chart, was $15.3 billion.

Comment [n3]: Assuming liability?

| LOWER RANGE (in billions) | | | | |
|---|---|---|---|---|
| Payment Status As of March 31, 2012 | Trusts Outstanding UPB | Frequency Rate | Severity Rate | Forecasted Remaining Lifetime Loss |
| Current (Non-Modified) | $34.1 | 11% | 72% | $2.8 |
| Current (Modified) | $11.3 | 36% | 68% | $2.8 |
| 30-59 Days Delinquent | $2.2 | 15% | 68% | $0.2 |
| 60 – 89 Days Delinquent | $1.0 | 84% | 66% | $0.6 |
| 90+ Days Delinquent & REO | $6.3 | 96% | 67% | $4.0 |
| Foreclosure | $7.5 | 99% | 67% | $5.0 |
| Total | $62.4 | 36% | 68% | $15.3 |

40.    The higher end of possible range for such losses for the Trusts,

calculated using the metrics and assumptions are shown in the following chart, was $19.5

billion.

| HGHER RANGE (in billions) | | | | |
|---|---|---|---|---|
| Payment Status As of March 31, 2012 | Trusts Outstanding UPB | Frequency Rate | Severity Rate | Forecasted Remaining Lifetime Loss |
| Current (Non-Modified) | $34.1 | 17% | 80% | $4.6 |

14

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

| | | | |
|---|---|---|---|
| Current (Modified) | $11.3 | 41% | 78% | $3.6 |
| 30-59 Days Delinquent | $2.2 | 20% | 77% | $0.3 |
| 60 – 89 Days Delinquent | $1.0 | 87% | 75% | $0.7 |
| 90+ Days Delinquent & REO | $6.3 | 97% | 75% | $4.6 |
| Foreclosure | $7.5 | 99% | 77% | $5.7 |
| **Total** | **$62.4** | **41%** | **78%** | **$19.5** |

41.    The following chart shows a comparison of the assumptions made

for the Frequency Rate and Severity Rate to those used in the BofA Expert Report and

Lehman Expert Declaration.

| Description | Frequency Rate assumptions | | Severity Rate assumptions | |
|---|---|---|---|---|
| | Lower Range | Higher Range | Lower Range | Higher Range |
| Trusts | 36% | 41% | 68% | 78% |
| BofA Expert Report | 44% | 47% | 45% | 60% |
| Lehman Expert Declaration | 25% | 45% | 45% | 55% |

42.    The Frequency Rate assumptions for the lower range are similar in

this Declaration and the BofA Expert Report with the Lehman Expert Declaration lower

range assumption being an outlier.  The Frequency Rate assumptions for the higher range

are all similar.  The Severity Rate assumptions utilized in this Declaration are primarily

driven by the actual Severity Rates for the Trusts Liquidated Loans which are

meaningfully higher in both the lower ranges and higher ranges than those used in the

BofA Expert Report and the Lehman Expert Declaration.  I concluded that the actual

Severity Rates for the BofA loans and Lehman loans must be meaningfully lower than

the Trusts actual Severity Rates, thus justifying BofA's and Lehman's lower Severity

Rate assumptions.  Given the above, these Frequency Rate assumptions and Severity Rate

assumptions are in my professional opinion reasonable for the Trusts.

15

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053214

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## E.  ESTIMATED LIFETIME LOSSES

43.    By adding the Actual Liquidated Losses to the range of Forecasted Remaining Lifetime Losses, I determined that the Estimated Lifetime Losses for the Trusts range between $45.5 billion on the lower end, and $49.8 billion on the higher end. The calculation of these numbers is expressed in the following chart:

| (in billions) | Lower Range | Higher Range |
|---|---|---|
| Actual Liquidated Losses | $30.3 | $30.3 |
| Forecasted Remaining Lifetime Loss | $15.3 | $19.5 |
| Trusts Estimated Lifetime Losses | $45.5 | $49.8 |



Comment [b5]: Clarify that these are gross losses, expected and not limited to losses based on R&W. Standard and severity liability cut or proven

### LOSS SHARE RATE

44.    As defined above, the Loss Share Rate is the percentage of Estimated Lifetime Losses that the Debtors might agree to share with the Trusts as a result of potential breaches of representations and warranties.

45.    For the purposes of this Declaration, the Loss Share Rate is defined as the product of (a) the " Breach Rate," and (b) the " Agree Rate."

46.    The  Breach Rate is defined as the product of (a) the " Audit Rate" and (b) the " Demand Rate."

## A.  AUDIT RATE

47.    The  Audit Rate is defined as the percentage of loans in a given mortgage portfolio that are audited by the Trustee or other parties authorized under the Governing Agreements for the purpose of finding alleged representation and warranty breaches.  To make this calculation, one must first determine the Audit Rate on a group

1844380                              16

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053215

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

of loans or the Trustee loan audit selection criteria designed to identify loans with a high

likelihood of representation and warranty breaches.

48.    Since a Trustee's audit selection methodology is proprietary to the

Trustee and not shared with the Seller, there is very little publically available information

regarding GSE or PLS Trustee's Audit Rates or loan audit selection criteria. I did find

one recent report from September 2011 from the FHFA OIG[13] that provides some unique

insight into both Fannie Mae's and Freddie Mac's Audit Rate and loan audit selection

criteria.

49.    The FHFA OIG reported that Freddie Mac reviews for repurchase

claims only those loans that go into foreclosure or experience payment problems during

the first two years following origination. Loans that default after the first two years are

reviewed at dramatically lower rates. The report goes on to note that a Freddie Mac

senior examiner believed that this narrower selection criteria resulted in a lower

population of loans with defects than would have been discovered if all loans that go into

foreclosure or liquidation were considered.

50.    Additionally, the FHFA OIG report contained an FHFA

Memorandum, written by Jeffrey Spohn, which stated that the longstanding business

practice for both Fannie Mae and Freddie Mac has been to review non performing loans

principally but not exclusively on mortgages that default in the first few years. This

business practice stems from the belief that defaults that occur in the first few years

provide the best opportunity to learn why loans go into default, while most later defaults

---

[13] The FHFA OIG Evaluation of the Federal Housing Finance Agency's Oversight of Freddie Mac's
Repurchase Settlement with Bank of America dated September 27, 2011.

17

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

are unlikely to be related to manufacturing defects (they more typically reflect life events such as unemployment, divorce or health issues) and that manufacturing defects become harder to prove with the passage of time.

51.    In his memo, Mr. Spohn agreed with the FHFA OIG report that Freddie Mac and FHFA needed to reassess their loan audit selection criteria with the potential to broaden their selection criteria to include a larger population of loans that go into foreclosure or liquidation.

52.    It has been my experience working with mortgage insurance companies and for banks issuing repurchase demands to their wholesale and correspondent sellers, that it is a standard industry practice to select more than just loans that go to foreclosure or liquidation in the first two years for loan audits.  A more prevalent industry practice is to first evaluate all loans that go to foreclosure or liquidation and then exclude a portion of the loans that defaulted due to a documented hardship (or life event as noted in the FHFA Memorandum) such as loss of a job, reduction of income, major illness or those loans that defaulted after 24-36 months of perfect pay history.  The reasoning behind this reduction or discount is that these excluded loans likely defaulted because of the borrower hardship or some other reason other than a loan defect. This is consistent with the reasoning utilized by FHFA, Fannie Mae and Freddie Mac in their Audit Rate selection criteria.  Even the mortgage insurance companies, who have been among the most aggressive pursuers of insurance rescissions, have often excluded loans with perfect pay histories from their Audit Rate selection criteria.  I have observed with my clients Audit Rates ranging from approximately 65% to

18

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

90% of Forecasted Liquidated Loans with reductions in the Audit Rates for perfect loan payment histories and borrower hardships.

53.    Based on my Audit Rate experience and the FHFA OIG findings and recommendations, I have assumed for purposes of this Declaration the following Audit Rate assumptions:

| Description | Audit Rate assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts Liquidated Loans | 70% | 75% |
| Current (Non-Modified) | 15% | 30% |
| Current (Modified) | 45% | 50% |
| 30-59 Days Delinquent | 70% | 75% |
| 60 – 89 Days Delinquent | 70% | 75% |
| 90+ Days Delinquent & REO | 70% | 75% |
| Foreclosure | 70% | 75% |
| **Total Average** | **65%** | **69%** |

54.    I note that neither the BofA Expert Report nor the Lehman Expert Declaration discussed their Audit Rate assumptions and simply provided the Breach Rate which, as defined above, is the is the product of (a) the Audit Rate and (b) the Demand Rate.

## B.  DEMAND RATE AND DEMAND PROCESS

55.    As part of the Trustee's loan level audit and repurchase demand decision process, the Trustee requires the loan auditor to perform the following review as part of the loan level audit: (1) identify any potential contractual breaches (such as failure to comply with the seller's underwriting guidelines), (2) document the alleged breach facts, (3) opine as to whether or not the alleged breach is material and (4) opine as to whether or not the alleged breach was adverse to the interests of the Certificate Holders.

104/280                                    19

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053218

**DRAFT 6/8/12**
**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

As we discussed above, the alleged breach must meet the R&W Repurchase Standard in order to contractually require the Seller to repurchase the loan.

56.     The Demand Rates for the GSE's are not publically available. There are Demand Rates that have been alleged in some PLS repurchase related litigation against various Sellers, including the Debtors. These PLS litigation Demand Rates are unsubstantiated, appear to be inflated and are vigorously disputed by the Sellers. Lastly, neither the BofA Expert Report nor the Lehman Expert Declaration discussed their Demand Rate assumptions. Therefore, I based my Demand Rate assumptions on my repurchase demand experience I have assumed for purposes of this Declaration the following Demand Rate assumptions:

| Description | Demand Rate assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts Liquidated Loans | 55% | 65% |
| Current (Non-Modified) | 30% | 40% |
| Current (Modified) | 50% | 60% |
| 30-59 Days Delinquent | 55% | 65% |
| 60 – 89 Days Delinquent | 55% | 65% |
| 90+ Days Delinquent & REO | 55% | 65% |
| Foreclosure | 55% | 65% |
| **Total Average** | **54%** | **64%** |

**C. BREACH RATE**

57.     The Breach Rate was determined by multiplying the Audit Rate assumptions multiplied by the Demand Rate assumptions. Based on this calculation, I determined that the Breach Rate assumptions for the Trusts range between 36% and 44%. The following chart shows a comparison of this Breach Rate to that used in the BofA Expert Report and Lehman Expert Declaration.

| Description | Breach Rate assumptions | |
|---|---|---|
| | Lower Range | Higher Range |

1044783                                     20

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053219

**DRAFT 6/8/12**
**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

| | | |
|---|---|---|
| Trusts | 36% | 44% |
| BofA Expert Report | 36% | 36% |
| Lehman Expert Declaration | 30% | 35% |

58.    The Breach Rate assumptions for the lower range are the same in this Declaration and the BofA Expert Report with the Lehman Expert Declaration lower range assumption being an outlier. The Breach Rate assumptions for the higher range utilized in this Declaration are higher than both than those used in the BofA Expert Report and the Lehman Expert Declaration.  I concluded that higher Breach Rate assumption is this Declaration is the result of my more conservative view of potential Breach Rates.  Given the above, these Breach Rate assumptions are in my professional opinion reasonable for the Trusts.



**D.  AGREE RATE**

59.    The  Agree Rate is the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole.  While the Trustee may issue a Demand alleging one or more representation and warranty breaches, the Seller may not agree with the alleged breach facts. Then, even if the Seller does agree on the alleged breach facts, the Seller will not always agree that the breach meets the R&W Repurchase Standard as described above.

60.    Prior to March 2012, there was not much in terms of public disclosures with any insight into Agree Rates for alleged breaches of representations and warranties.  However, beginning in March of 2012, Fannie Mae, Freddie Mac and over a dozen Private Label Sellers have filed Regulation AB 15-G repurchase demand data with the SEC, including Agree Rates.

21

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                        RC-9019_00053220

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

61.    Based on the IMF Special Report, the average GSE Agree Rates for all Sellers was 49.54% and 67.56% for the Debtors. In our assumptions, we discount the GSE Agree Rates based on the less stringent representations and warranties found in the Trusts Governing Agreements when compared to the stronger representations and warranties found in the Fannie Mae and Freddie Mac agreements.  For example, in many of Trusts Governing Agreements there is little to no fraud representation or warranty language and the requirement to confirm to the Underwriting Guidelines are often qualified with "Generally" or "Substantially" in compliance with the Underwriting Guidelines which are both lower standards than found in Fannie Mae or Freddie Mac agreements.

62.    Based on the above and in consideration of the costs, risks and uncertainties if the parties do not mutually agree on the repurchase population and have to resort to litigation to resolve their differences, we have discounted the Debtors GSE Agree Rates and have assumed Trusts Agree Rate ranges between a low of 41% and a high of 47%. The following chart shows a comparison of this Agree Rate to that used in the BofA Expert Report and Lehman Expert Declaration:

| Description | Agree Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts | 41% | 47% |
| BofA Expert Report | 40% | 40% |
| Lehman Expert Declaration | 30% | 40% |

63.    The Agree Rate assumptions for the lower range are similar in this Declaration and the BofA Expert Report with the Lehman Expert Declaration lower

1844389                                    22

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

range assumption being an outlier.  The Agree Rate assumptions for the higher range

utilized in this Declaration are higher than both than those used in the BofA Expert

Report and the Lehman Expert Declaration.  I concluded that higher Agree Rate

assumption in this Declaration is correlated to the Debtors' substantially higher actual

Agree Rates with the GSE's when compared to the industry as a whole, 67.56% versus

49.54%.  Given the above, these Agree Rate assumptions are in my professional opinion

reasonable for the Trusts.

**E.  LOSS SHARE RATE AND POTENTIAL LIABILITY**

64.    The Loss Share Rate was determined by multiplying the Breach

Rate times the Agree Rate.  Based on this calculation, I determined that the Loss Share

Rate for the Trusts ranges between 15% and 21%.

65.    The following chart shows a comparison of the calculated Loss

Share Rates used in the BofA Expert Report and Lehman Expert Declaration.

| Description | Loss Share Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts | 15% | 21% |
| BofA Expert Report | 14% | 14% |
| Lehman Expert Declaration | 9% | 14% |

66.    The explanation for the higher Loss Share Rate assumptions in this

Declaration when compared to the Loss Share Rate assumptions in both the BofA Expert

Report and the Lehman Expert Declaration is the result of the higher assumed Trust

Agree Rates which results in the higher Debtors' Loss Share Rates.

**POTENTIAL REPURCHASE REQUIREMENTS**

23

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                RC-9019_00053222

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

67.    For purposes of this Declaration, I was asked to assume the Trusts were capable of proving a breach of representations and warranties under the Governing Agreements.  Assuming liability, I calculated the Potential Repurchase Requirements. This calculation is the product of the (a) Trusts Estimated Lifetime Losses, and (b) the Loss Share Rate.

68.    Utilizing the figures stated above in this Declaration, the range of Potential Repurchase Requirements is $6.7 to $10.3 billion.  The following chart shows the metrics for determining the low end of the range for the Debtors' Loss Share Rate and corresponding Potential Repurchase Liability.

| LOWER RANGE (in billions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current Outstanding Trusts UPB | Frequency Rate | Severity Rate | Trusts' Estimated Lifetime Losses | Breach Rate | Agree Rate | Loss Share Rate | Potential Repurchase Liability |
| Trusts Liquidated Loans | | | | $30.3 | 39% | 42% | 16% | $4.9 |
| Current (Non-Modified) | $34.1 | 11% | 72% | $2.8 | 5% | 13% | .6% | $0.02 |
| Current (Modified) | $11.3 | 36% | 68% | $2.8 | 23% | 32% | 7% | $0.2 |
| 30-59 Days Delinquent | $2.2 | 15% | 68% | $0.2 | 39% | 42% | 16% | $0.04 |
| 60 – 89 Days Delinquent | $1.0 | 84% | 66% | $0.6 | 39% | 42% | 16% | $0.09 |
| 90+ Days Delinquent & | $6.3 | 96% | 67% | $4.0 | 39% | 42% | 16% | $0.6 |
| Foreclosure | $7.5 | 99% | 67% | $5.0 | 39% | 42% | 16% | $0.8 |
| | | | | | | | 15% | $6.7 |

Comment [p8]: This will be Exhibit in any FLS save that it is not subject to the automatic stay and will be used to show that the Debtors own experts concluded liability so Silliman will more clearly and repeatedly that he is not rendering an opinion on liability for R&W claims asserted under the conclusion on potential repurchase requirements based on historical and other data points assuming liability

Deleted: The

Deleted: Liability

Deleted: Liability

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053223

DRAFT 6/8/12
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

69.    The following chart shows the metrics for determining the high

end of the range for the Debtors' Loss Share Rate and corresponding Potential

Repurchase Liability.

| Description | Current Outstanding Trusts UPB | Frequency Rate | Severity Rate | Trusts' Estimated Lifetime Losses | Breach Rate | Agree Rate | Loss Share Rate | Potential Repurchase Liability |
|---|---|---|---|---|---|---|---|---|
| **HIGHER RANGE** (in billions) | | | | | | | | |
| Trusts Liquidated Loans | | | | $30.3 | 49% | 48% | 23% | $7.1 |
| Current (Non-Modified) | $34.1 | 17% | 80% | $4.6 | 12% | 23% | 3% | $0.1 |
| Current (Modified) | $11.3 | 41% | 78% | $3.6 | 30% | 43% | 13% | $0.4 |
| 30-59 Days Delinquent | $2.2 | 20% | 77% | $0.3 | 49% | 48% | 23% | $0.08 |
| 60 – 89 Days Delinquent | $1.0 | 87% | 75% | $0.7 | 49% | 48% | 23% | $0.2 |
| 90+ Days Delinquent & | $6.3 | 97% | 75% | $4.6 | 49% | 48% | 23% | $1.1 |
| Foreclosure | $7.5 | 99% | 77% | $5.7 | 49% | 48% | 23% | $1.2 |
| | | | | | | | 21% | $10.3 |

## CONCLUSION

70.    In summary, based on the methodology and the assumptions

utilized in my analysis described above, it is my opinion that proposed settlement amount

of $8.7 billion appears to be in the range of reasonableness. I swear under penalty of

perjury that the foregoing is true and correct.

Dated:  June 11, 2012

                                    _____draft_____
                                      Frank Sillman

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00053224