# A. 83

Outlook E-mail

**From:** Devine, Timothy
**Sent:** 5/8/2012 11:15:02 AM
**To:** Lee, Gary S.; rcieri@kirkland.com
**Cc:** Ruckdaschel, John; Cancelliere, Jeff - PA; rschrock@kirkland.com; Levitt, Jamie A.; mark.renzi@fticonsulting.com; Solomon, William Legal
**Subject:** RE: Are you available

Gary: let's talk again with KP, but as I understand it the 22% is her raw defect rate on ResCap investments. While it may be accurate to say that she has been flexible downward with that number in light of the circumstance, I do not believe that it includes a formal deus ex machina haircut. If we can articulate the proper haircut, she can get her defect rate and we can get a reasonable dollar number.

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Lee, Gary S. [mailto:GLee@mofo.com]
**Sent:** Tuesday, May 08, 2012 11:00 AM
**To:** Devine, Timothy; rcieri@kirkland.com
**Cc:** Ruckdaschel, John; Cancelliere, Jeff - PA; rschrock@kirkland.com; Levitt, Jamie A.; mark.renzi@fticonsulting.com; Solomon, William Legal; Lee, Gary S.
**Subject:** Re: Are you available

Jeff is trying to understand her BoA exhibit and then we may have a clearer view. In reality - lehman was 35pc, she says boa was 36, and 22pc is lower than we thought we would end up with. She is taking the discount already because its bk dollars not boa dollars.


Gary S. Lee
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104-0050
T. 212.468.8042
F. 212.468.7900
glee@mofo.com

---

**From:** Devine, Timothy
**To:** Devine, Timothy ; Lee, Gary S.; 'rcieri@kirkland.com'
**Cc:** Ruckdaschel, John ; Cancelliere, Jeff - PA ; 'rschrock@kirkland.com' ; Levitt, Jamie A.; 'Renzi, Mark' ; Solomon, William Legal
**Sent:** Tue May 08 10:46:04 2012
**Subject:** RE: Are you available

Folks:

Light bulb moment:

Isn't the obvious answer that KP states her 22% - 11 billion or whatever – and then takes an appropriate haircut (analogous to the 36% to 14% haircut she took in BoA) to get to a lower $ number ($8B?) as stipulated allowed claim?

If you all agree, please help me enunciate in simple terms what the haircut is based on and we can work out who talks it through with KP.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

EXHIBIT
9019 146
11/19/12

RC-9019_00049179

Tim

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Devine, Timothy
**Sent:** Tuesday, May 08, 2012 7:15 AM
**To:** Lee, Gary S.; 'rcieri@kirkland.com'
**Cc:** Ruckdaschel, John; Cancelliere, Jeff - PA; 'rschrock@kirkland.com'; JLevitt@mofo.com; Renzi, Mark; Solomon, William Legal
**Subject:** FW: Are you available

Here's KP's version – the BoA settlement was not at 14% but at 36% -- and then haircut to the risk that BoA would not be responsible for Countrywide if the matter was litigated rather than settled.

Timothy A. Devine
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
(313) 656-3477

---

**From:** Kathy D. Patrick [mailto:kpatrick@gibbsbruns.com]
**Sent:** Tuesday, May 08, 2012 1:19 AM
**To:** Devine, Timothy
**Subject:** Re: Are you available

No, that's wrong: the BofA defect rate was over 30%. BofA ARGUED with us that the defect rate was 14%, which is why that is scenario 1 in the spreadsheet that BNY's expert used--but the ACTUAL defect rate we used, and settled on, was 36%. That would be scenario 3 or 4 in our spreadsheet, which is in the BNY expert report, too. I'm at a loss to understand why ResCap and Ally won't just look at the spreadsheet we used in BofA--because the scenarios in it track exactly what I've said. BofA argued for a vastly lower defect rate, which we rejected; they paid based on our much higher defect rate, which we accepted.

Importantly, the 36% defect rate we used for BofA was before litigation discounts, a primary one of which was the risk--which has obtained here--that Countrywide would go into bankruptcy. But for that risk, and the insolvency of Countrywide, the size of the CLAIM that we calculated against BofA was $32 billion. That's why I keep telling you that what we got from them was 25.7 cents on the dollar: the CLAIM size was $32 billion against them, and we settled for $8.5 billion, which is a recovery of 25.7 cents on the dollar based on a defect rate of 36%. Here, we've got a CLAIM size of more than $10 billion on which, as a practical matter, the recovery will be far less due to ResCap's bankruptcy.

Below is the relevant set of comparisons:

| | |
|---|---|
| BofA Original Face: $432 billion | ResCap OF: $220 billion |
| BofA Current Face at Settlement: $163 billion | ResCap CF: $63 billion |
| BofA Claim Size:    $32.5 billion | ResCap Claim Size: $10 billion |
| BofA Defect vs. Losses: 36% | ResCap Defect vs. Losses  22.2% |
| BofA Settlement: $8.5 billion | ResCap Settlement:  whatever is distributed |
| BofA Settlement vs. Claim Size: 25.7 cents | ResCap Settlement: distrib. amt / $10 billion |

That's why the numbers you're giving me don't make any sense, either with regard to our BofA Settlement--because the

---

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

the numbers you have are just wrong--or by virtue what we know about ResCap. We've analyzed and assessed what we think is ResCap's actual exposure: if we were using the same, 36% defect rate we used with Bank of America, the claim size for ResCap would be well in excess of $18 billion. Instead, we've offered to resolve by agreeing to a claim size of $10 billion.

Thus, the claim size is not just ratably lower based on issuance size, it is actually lower as a result of our analysis of the the ResCap defect rate vs. Countrywide's. ResCap will have problems not just with us but with every investor if you try to suggest that the defect rate is a lot lower than where we've analyzed it: you can't reconcile that with the data, the accrued losses or the allegations in existing and future lawsuits.

Bottom line: you are getting a lower defect rate, but it's a realistic rate based on accurate data and using the same methodology we used before.

Kathy Patrick
Gibbs & Bruns LLP
713.751.5253

On May 8, 2012, at 12:12 AM, "Devine, Timothy" <Timothy.Devine@ally.com> wrote:

> I'm getting lots of pressure on valuation now. BoA 8.5 billion represents 14 defect rate, correct? Everything we know about our our product - from origination through pooling through reps and diligence throughg servicing - makes our folks believe we are better (lower) than Countrywide by a large margin. I am being asked to explain how we could agree to a defect rate 150 of Countrywide's.
>
> ----- Original Message -----
> From: Kathy D. Patrick <kpatrick@gibbsbruns.com>
> To: Devine, Timothy; Kathy D. Patrick <kpatrick@gibbsbruns.com>
> Sent: Mon May 07 21:15:14 2012
> Subject: Re: Are you available
>
> Sure.  713 972 4695
>
> Kathy D. Patrick
> Gibbs & Bruns, L.L.P.
>
> ----- Original Message -----
> From: Devine, Timothy [mailto:Timothy.Devine@ally.com]
> Sent: Monday, May 07, 2012 08:10 PM
> To: Kathy D. Patrick
> Subject: Re: Are you available
>
> May I call you in 15 minutes? Sorry.
>
> ----- Original Message -----
> From: Kathy D. Patrick <kpatrick@gibbsbruns.com>
> To: Devine, Timothy
> Sent: Mon May 07 19:57:18 2012
> Subject: Are you available
>
> At 830 Eastern tonight?
> Where can I reach you?
>
> Kathy D. Patrick
> Gibbs & Bruns. L.L.P.

---

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                                                                                          RC-9019_00049181

For information about this legend, go to
http://www.mofo.com/Circular230/

================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.

----------------------------------------------------------------

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                                                    RC-9019_00049182

A. 84

# REDACTED

# A. 85

# In Re:

*RESIDENTIAL CAPITAL, LLC, et al.*

*September 19, 2012*

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

```
                                                                              1
 1
 2   UNITED STATES BANKRUPTCY COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Case No. 12-12020-mg
 5   - - - - - - - - - - - - - - - - - - - - - - -x
 6   In the Matter of:
 7
 8   RESIDENTIAL CAPITAL, LLC, et al.,
 9
10                 Debtors.
11
12   - - - - - - - - - - - - - - - - - - - - - - -x
13
14                 United States Bankruptcy Court
15                 One Bowling Green
16                 New York, New York
17
18                 September 19, 2012
19                 10:10 AM
20
21
22   B E F O R E:
23   HON. MARTIN GLENN
24   U.S. BANKRUPTCY JUDGE
25
```

2

Doc# 1429 Conference on the Status of Discovery and Other Matters Related to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements (related document(s)320)

Transcribed by:  Zipporah Geralnik

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

(973)406-2250

operations@escribers.net

1  MR. PRINCI:  All righty.

2  THE COURT:  I'll ask Mr. Schrock or one of his
3  colleagues this question, but let me ask it of you.  What was
4  the role of AFI and Kirkland & Ellis in the RMBS settlement
5  negotiations?

6  MR. PRINCI:  We discussed with Kirkland & Ellis the
7  terms that were being negotiated of the RMBS settlement
8  agreement.

9  THE COURT:  Did either Kirkland --

10 MR. PRINCI:  In a real-time basis.

11 THE COURT:  Did either Kirkland or AFI have anyone
12 present during negotiations?

13 MR. PRINCI:  I'm sorry; say again, please?

14 THE COURT:  Did either Kirkland or AFI have anyone
15 present during negotiations?

16 MR. PRINCI:  I believe -- I believe --

17 THE COURT:  I don't know that -- whether these -- go
18 ahead.

19 MR. PRINCI:  I believe the answer to that, Judge, I --
20 from firsthand knowledge, I know the answer to that, like,
21 right before the petition was filed is yes, because there was
22 an associate at Kirkland & Ellis who we asked to be there just
23 so that we get the document done, so he came to our offices,
24 Morrison & Foerster's offices.  And then prior to -- okay.  And
25 then prior to that, Your Honor, I wasn't involved, and so I'd

| | RESIDENTIAL CAPITAL, LLC, ET AL. | 39 |
|---|---|---|

1  have to consult, but I'm being told, yes.
2          THE COURT:  You identified Mr. Cancelliere, a mortgage
3  risk officer, as being substantially involved in the settlement
4  negotiations on behalf of the debtors.  Was there any other
5  person employed by any of the debtors who was substantially
6  involved in the settlement negotiations of the RMBS settlement?
7          MR. PRINCI:  Yes, Your Honor.
8          THE COURT:  Who else?
9          MR. PRINCI:  Ms. Hamzehpour.
10         THE COURT:  Give me -- hang on; let me find -- I'm
11 switching between the notes I prepared before and -- what is
12 the name?
13         MR. PRINCI:  It's Hamzehpour.
14         THE COURT:  Could you spell it for me?
15         MR. PRINCI:  I will in just one second, Judge.  H-A-M-
16 Z-E-H-P-O-U-R, H-A-M-Z, as in zebra, E-H-P, as in Peter, O-U-R.
17         THE COURT:  And what is Ms. Hamzehpour's position with
18 the debtors?
19         MR. PRINCI:  She's general counsel.
20         THE COURT:  And what was her role in the negotiations?
21         MR. PRINCI:  She was one of our principal contacts,
22 directives.
23         THE COURT:  All right.  Was there anyone else employed
24 by any of the debtors that was substantially involved in the
25 settlement negotiations?

                    **RESIDENTIAL CAPITAL, LLC, ET AL.**                    45

 1  expense and burden on everybody.

 2          Let me hear from the other parties.

 3          MR. DONOVAN:  Good morning, Your Honor.  Daniel
 4  Donovan from Kirkland & Ellis for Ally Financial.  Your Honor,
 5  you asked Mr. Princi five questions, and I want to answer those
 6  for you.

 7          First you asked, who from AFI, if anyone, should be
 8  deposed?  It would be Mr. Timothy Devine, chief counsel of
 9  litigation for Ally; that's one.

10          Two, you asked Mr. Princi when he would, and I assume
11  you'd asked me, when would Ally complete their e-mail
12  production.  On or before September 24th of 2012.

13          Third, you asked when a privilege log would be
14  produced.  We're going to produce our initial privilege log
15  September 28th, and plan to supplement that October 5th, and be
16  done on that date, October 5th, 2012.

17          Fourth, you asked Mr. Princi, whether ResCap's
18  production is searchable.  Ally's is searchable.  We produced
19  as TIFFs with load files; we've heard nothing from the
20  committee.  They've been unable to search it.  And I'm going to
21  come back -- I hope they have searched the settlement
22  negotiation documents we produced in July of 2012, but I'll
23  come back to that.

24          Fifth, you asked what was Ally's role related to the
25  RMBS trust settlement agreement.  And I think Mr. Princi had it

1  right.  We were kept up to date, primarily Mr. Devine, also, my
2  colleague Noah Ornstein, from Kirkland & Ellis.  We were kept
3  up to date; we were interested, and we were kept up to date,
4  primarily by Morrison & Foerster and others.
5           So I believe those were five questions you asked, but
6  I wanted to give you Ally's response at the outset.
7           THE COURT:  You gave me the date by which e-mail
8  production will be completed.  What about any other document
9  production other than e-mails, electronic or paper?
10          MR. DONOVAN:  And I'm putting those together, Your
11 Honor.  So I believe both --
12          THE COURT:  Okay.  All production.
13          MR. DONOVAN:  All of our discovery, and just for the
14 record, we have searched and are searching thirteen custodians,
15 four of which are from Kirkland.  The four Kirkland custodians
16 were searched and produced back in July 2012, July 26th to be
17 precise.  And those documents were e-mails of which MOFO was
18 on, Ms. Patrick was on, and others if we were CCed, if any of
19 those four Kirkland custodians were CCed.
20          So when the committee's report last night said
21 settlement negotiations that we were at least copied on -- I
22 know they happened without us -- those have been produced.
23 There's going to be some more, but they've been produced.  And
24 that's because, Your Honor, since June, the committee served
25 2004 requests, as you know, and at least three of them, if not