WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

    - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................ 5

I    The Court Should Not Approve The RMBS Trust Settlement Because It Is
Unreasonable And Not In The Best Interests Of GMAC Mortgage, RFC, Or HoldCo ..... 8

    A.    GMAC Mortgage And RFC Failed To Exercise Any Independent Business Judgment
With Respect To The RMBS Trust Settlement Either Pre- Or Post-Petition ............. 15

    B.    The Exercise Of Business Judgment By HoldCo In Entering Into the RMBS Trust
Settlement Was Unreasonable Under The Present Circumstances .............................. 20

II    In The Alternative, Any Order Granting The Motion Should Preserve The Ability Of
Parties In Interest To Seek To Subordinate The Allowed Claim Pursuant To Section
510(b) Of The Bankruptcy Code ....................................................................... 25

    A.    Overview Of The Structure Of The Securitizations And The RMBS Trust Settlement
Agreement ...................................................................................................... 27

    B.    Subordination Of Any RMBS Rep and Warranty Claim Is Required Under Section
510(b) ............................................................................................................ 28

CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

## CASES

Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.),
    240 F.3d 823 (9th Cir. 2001) ............................................................................29

Anchorage Police & Fire Ret. Sys. v. Official Comm. Of Unsecured Creditors of the
    Holding Co. Debtors (In re Anchorage Police & Fire Ret. Sys.),
    Case Nos. 03-CV-7054, 02-B-49672, 2004 WL 1459270 (N.D. Ill. June 25, 2004) ..............25

Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.),
    No. 05-60200, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007)....................................29

Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.),
    281 F.3d 133 (3d Cir. 2002)..........................................................................28, 29

Cadle Co. v. Mims (In re Moore),
    608 F.3d 253 (5th Cir. 2010) ...........................................................................7

CML V, LLC v. Bax,
    28 A.3d 1037, 1046 (Del. 2011) ..............................................................14, 18, 22

CNL-AB LLC v. E. Prop. Fund I SPE (MS REF) LLC,
    No. 6137-VCP, 2011 WL 353529 (Del. Ch. Jan. 28, 2011)...............................14, 22

Fed. Hous. Fin. Agency v. UBS Ams., Inc.,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012)................................................................34

Federal Housing Finance Agency, as Conservator for the Federal Home Loan Mortgage
    Corporation v. Ally Financial Inc. et. al.,
    Case No. 652441-2011 (N.Y. Supr. Ct. 2011)......................................................29

Gowan v. Xerion Master Fund II (In re Dreier LLP), Adv. No. 10-04277 (MG) at *9
    (Bankr. S.D.N.Y. June 16, 2011)......................................................................5

HSBC Bank USA v. Fane (In re MF Global Inc.),
    466 B.R. 244 (Bankr. S.D.N.Y. 2012)..............................................................5, 7

In re Applied Theory Corp.,
    No. 02-11868 (REG), 2008 WL 1869770 (Bankr. S.D.N.Y. 2008) ..........................6

In re Dewey & LeBoeuf LLP,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...............................................................6

In re Enron Corp.,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006) ..................................................................29, 32

In re Granite Partners, L.P.,
    208 B.R. 332 (Bankr. S.D.N.Y. 1997) ..........................................................................33

In re Int'l Wireless Comm'cns Holdings, Inc.,
    257 B.R. 739 (Bankr. D. Del. 2001), aff'd, 279 B.R. 463 (D. Del. 2002), aff'd, 68
    Fed. Appx. 275 (3d Cir. 2003) .....................................................................................29

In re Kaiser Grp. Int'l, Inc. v. Pippin (In re Kaiser Grp. Int'l, Inc.),
    326 B.R. 265 (D. Del. 2005) .........................................................................................29

In re Med Diversified, Inc.,
    461 F.3d 251 (2d Cir. 2006) .........................................................................................28

In re Periman Producers Drillers, Inc.,
    263 B.R. 510 (W.D. Tex. 2000) ...................................................................................25

In re Raytech Corp.,
    261 B.R. 350 (Bankr. D.Conn. 2001) .............................................................................8

In re Spansion, Inc.,
    No. 09-10690, 2009 WL 1531788 (Bankr. D. Del. June 2, 2009) ..................................5

Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating
    LLC),
    478 F.3d 452 (2d Cir. 2007) ...........................................................................................6

Myers v. Martin (In re Martin),
    91 F.3d 389 (3d Cir. 1996) .............................................................................................6

N. Am. Catholic. Educ. Programming Found., Inc. v. Gheewalla,
    930 A.2d 92 (Del. 2007) .................................................................................14, 18, 22

Northview Motors, Inc. v. Chrysler Motors Corp.,
    186 F.3d 346 (3d Cir. 1999) ...........................................................................................6

Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.
    (In re Chateaugay Corp.),
    973 F.2d 141 (2d Cir. 1992) ...........................................................................................8

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
    390 U.S. 414 (1968) ........................................................................................................6

Pub. Sch. Teachers' Pension & Ret. Fund of Chicago v. Ambac Fin. Grp., Inc. (In re
    Ambac Fin. Grp., Inc.),
    Case No. 11-4643, 2012 WL 2849748 (2d Cir. July 12, 2012) ...................................18

Talcott J. Franklin & Thomas F. Nealon III, Mortgage and Asset Backed Securities
    Litigation Handbook, Appendix A (2011) .................................................................34

Tronox Inc. v. Andarko Petroleum Corp. (In re Tronox Inc.),
    450 B.R. 432 (Bankr. S.D.N.Y. 2011) .....................................................................22

Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo
    Baking Company, Ltd.),
    860 F.2d 515 (2d Cir. 1988) ...............................................................................7, 8

## STATUTES AND OTHER AUTHORITIES

11 U.S.C. § 101(49) ......................................................................................................27

11 U.S.C. § 107 .............................................................................................................2

11 U.S.C. § 363 ........................................................................................................6, 7

11 U.S.C. § 510(b) ................................................................................................. passim

11 U.S.C. § 1106 .........................................................................................................19

11 U.S.C. § 1107 .........................................................................................................19

15 U.S.C. § 77b(2)(a)(4) ..............................................................................................34

17 C.F.R. § 229.1101(e) ...............................................................................................34

17 C.F.R. § 230.191 .....................................................................................................34

Fed. R. Bankr. P. 9019 ........................................................................................... passim

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"),[1] by and

through its undersigned counsel, hereby files this objection (the "Objection")[2] to the Motion[3] of

Residential Capital, LLC ("HoldCo") and its debtor subsidiaries (each, a "Debtor," and,

collectively, the "Debtors") for approval of the RMBS Trust Settlement Agreements.  In support

of its Objection, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In any bankruptcy case, the allowance of $8.7 billion in claims resolving massive

potential litigation exposure would be an extraordinary event.  What makes the settlement at bar

*more extraordinary* is that it was fully negotiated prior to the filing of any of these cases, was

driven in large part by the non-debtor shareholder of the Debtors (which was itself actively

seeking a comprehensive settlement in exchange for a third-party release of the same litigation

claims), will potentially have far-reaching and critical implications on the plan processes in these

cases, and has to date engendered universal outcry from the Debtors' main creditor

constituencies.  But what may be *most extraordinary* about the Motion is just how little any of

---

[1] The Ad Hoc Group is comprised of certain entities that hold or manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 (the "Junior Secured Noteholders") issued under that certain Indenture dated as of June 6, 2008.  The Junior Secured Noteholders' claim is now equal to 112.9% of the face amount of the bonds and is currently increasing by virtue of the accrual of post-petition interest at the rate of approximately $250 million per year.

[2] Contemporaneously herewith, the Ad Hoc Group has filed the Declaration of Harrison Denman in Support of the Ad Hoc Group's Objection to Debtors' Motion for Approval of RMBS Trust Settlement Agreements, dated February 1, 2013 (the "Denman Decl.").

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Debtors' Motion Pursuant to Fed R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 320], Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 1176] and Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements (the "Second Supplemental Motion") [Docket No. 1887] (together, the "Motion").

the individual officers, directors and their advisors considered whether, when, how or why they would settle the litigation claims beyond what they perceived to be the task at hand immediately prior to filing these cases – allowing potential litigation claims as a means of obtaining sufficient support for a pre-arranged global plan settlement.

2.    There can be no real dispute that the settlement process here was designed to coincide with the execution of various prepetition plan support agreements of the settling parties in the hours before these cases were filed. There can also be no real dispute that the last-minute environment in which management considered the issues led to material oversights in the terms of the various versions of the RMBS Trust Settlement. The original agreement, for example, did not specify which Debtor entity would actually be liable for the Allowed Claim, and the officers approving the settlement for the Debtors appear to have incorrectly thought that *each* Debtor entity would be allowing a claim for $8.7 billion regardless of whether a particular entity was even alleged to be liable in any prepetition RMBS litigation.[4] When the issue of the need to tie particular claims to particular estates was raised, the "HoldCo Election" appeared suddenly in the documents (without any input from any of the Debtors' boards or their estates' creditors) and then disappeared even more suddenly when creditors objected to the arbitrary nature of that construct. As it currently stands, the extent of HoldCo's potential liability is completely unresolved and resolution of claims asserted against that estate will require HoldCo to defend itself against the very same litigation claims that the settlement seeks to resolve. Even for those Debtor estates receiving closure, the final RMBS Trust Settlement fails to map the allocation of allowed claims between GMAC Mortgage and RFC – the two potential Debtor defendants in any

---

[4] The Ad Hoc Group is filing a redacted version of this Objection due to the Debtors' refusal to waive any confidentiality designations that may apply to certain information discussed and/or cited herein. The Ad Hoc Group disagrees that any of the information so designated is in fact "commercial information" under section 107 of the Bankruptcy Code or is otherwise protected by that statute or any other rule of law and will, in due course, be seeking to unseal this Objection in its entirety.

RMBS litigation – and instead improperly indirectly delegates to *claimants* the ability to determine which of the two estates will owe what. Finally, a critical bankruptcy issue raised by the settlement of any RMBS litigation claims – whether any of the claims arise from "the purchase or sale of a security of a debtor or of an affiliate of a debtor" and thus are subject to subordination under section 510(b) of the Bankruptcy Code – appears not to have been considered at all by any of the fiduciaries at the time the initial RMBS Trust Settlement was reached, and the priority of allowed claims remains unaddressed in the documents.[5]

3.      Ultimately, these and other inadequacies of the RMBS Trust Settlement appear to be the unfortunate byproduct of a toxic combination of (1) a dogged pursuit by HoldCo and its parent Ally Financial, Inc. ("Ally") to obtain creditor support for a pre-arranged plan term sheet and (2) an inexplicable lapse in post-petition corporate governance. Indeed, the deposition testimony in this contested matter shows a keen lack of appreciation by any of the Debtors' management as to their shifting duties to their stakeholders. Prior to filing these cases, that management may in fact have been free to pursue plan structures and litigation settlements that were designed to "ring fence" Ally from continued RMBS exposure – indeed, the Delaware law governing the key Debtors makes clear that their management owed duties solely to Ally. That fealty, however, ended the moment these cases were filed, when each of the Debtors and their professionals became charged with a statutory duty to maximize the value of its own estate for the benefit of its particular creditors and stakeholders. Thus, as of the Petition Date, each Debtor and its management was required to assure itself that a decision as to when, whether and why to settle billions of dollars of prepetition litigation was based on a rigorous process, the best advice available from unconflicted professionals, and the thorough vetting of all relevant

---

[5] As set forth in section II, infra, the Court's approval of any aspect of the RMBS Trust Settlement should explicitly preserve the subordination issue for a later date.

considerations, both business and legal, as they would impact each individual estate going forward. The "good for most at the expense of some" approach embodied in the settlement and championed in the Motion is misplaced, even in these jointly-administered chapter 11 cases.

4.    When one analyzes the RMBS Trust Settlement on an estate-by-estate basis, the Motion simply falls apart. The current RMBS Trust Settlement largely concerns GMAC Mortgage and RFC, the two Debtors that are likely to be alleged to be primarily liable for the litigation claims being settled. The boards of managers of those two Delaware limited liability companies have *never* convened to discuss or to vote on any resolution as to whether to enter into any version of the RMBS Trust Settlement or to pursue the Motion. Indeed, the officers deposed in discovery testified that they had not considered the propriety of the settlement from the individual perspective of either GMAC Mortgage or RFC. That lack of any deliberation at the operating debtor level is perhaps the only legitimate explanation for why either board would willingly delegate to a creditor constituency the right to dictate the amount of a claim against its estate, why the boards missed the issue of claim priority (which will have a drastic impact on their estates but not the estate of HoldCo[6]) and why the boards would ever allow $8.7 billion in claims outside the context of a plan of reorganization.

5.    With respect to the other Debtor at issue – HoldCo – its board has, in fact, met to approve the RMBS Trust Settlement and the filing of the Motion. (In fact, it is the only board of any Debtor that has met to deliberate over the settlement.) Under the settlement, however, HoldCo actually receives no benefit – it obtains no support for any plan, it is not resolving any of the litigation claims asserted against it, it is not obtaining a release, and it remains liable on a

---

[6] Given its sheer magnitude, the Allowed Claim will likely leave the equityholder in GMAC Mortgage and RFC (i.e., HoldCo) out-of-the-money. Accordingly, the priority of the Allowed Claim is irrelevant from HoldCo's perspective. As noted below, HoldCo's board was the only Debtor board to evaluate the RMBS Trust Settlement, perhaps explaining the omission of the Allowed Claim's priority from the RMBS Trust Settlement.

potential contingent claim of up to $8.7 billion even if the Motion is approved. Indeed, HoldCo

gets worse than nothing in that it is (1) releasing the very claimants whose litigation claims

against HoldCo are preserved in the settlement and (2) affirmatively consenting to allow its two

most material subsidiaries – GMAC Mortgage and RFC – to incur claims that indisputably cut

off any residual equity value which might otherwise flow to HoldCo in any distribution

waterfall.

6.      In short, even though the bar to approve a settlement under Bankruptcy Rule 9019

can be a low one, there has to be some process, some act by a fiduciary, some tangible benefit,

and some basis for the Court to determine for itself that the timing, reasons and results for a

settlement are reasonable, particularly given the size, plan impact and nature of the claims being

allowed here. Because no such showing can be made with respect to any of the three Debtors at

issue, the Court should deny the Motion.

## ARGUMENT

7.      Each of the Debtors bears the burden of demonstrating to the Court that the

RMBS Trust Settlement is fair and equitable and in the best interests of its estate. See Fed. R.

Bankr. P. 9019; HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.), 466 B.R. 244,

247 (Bankr. S.D.N.Y. 2012) (Glenn, J.) ("[a] court must determine that a settlement under

Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before it may

approve a settlement."); Gowan v. Xerion Partners II Master Fund (In re Dreier LLP), No. 10-

04277 at *9 (Bankr. S.D.N.Y. June 16, 2011) (Glenn, J.) [Docket No. 41] (same). See also In re

Spansion, Inc., No. 09-10690, 2009 WL 1531788, at *4 (Bankr. D. Del. June 2, 2009) ("The

Debtors carry the burden of persuading the court that the compromise falls within the reasonable

range of litigation possibilities."). Such a determination should be based on "the probabilities of

ultimate success should the claim be litigated" and "an educated estimate of the complexity,

expense and likely duration of such litigation, the possible difficulties of collecting on any

judgment which might be obtained, and all other factors relevant to a full and fair assessment of

the wisdom of the proposed compromise." Protective Comm. for Indep. Stockholders of TMT

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). In making this determination, the

Court should consider the wide range of factors identified in Motorola, Inc. v. Official

Committee of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir.

2007).

       8.      Though the Debtors cite only Bankruptcy Rule 9019 as their statutory basis for

relief, courts have acknowledged that Bankruptcy Rule 9019 is only "a rule of procedure, [that]

cannot, by itself, create a substantive requirement of judicial approval" for a settlement of

claims. Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 351 n.4 (3d Cir. 1999).

Instead section 363 of the Bankruptcy Code is the substantive provision that gives the basis for

approval of a settlement. See id. ("Section 363 of the Code is the substantive provision requiring

court approval."); Myers v. Martin (In re Martin), 91 F.3d 389, 394 n.2 (3d Cir. 1996) ("Section

363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy

Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a

controversy."). Accordingly, the Court can only approve the RMBS Trust Settlement if each of

the settling Debtors can satisfy its respective burden under section 363 of the Bankruptcy Code

of demonstrating that the RMBS Trust Settlement is the product of proper business judgment of

the settling Debtors. [7] See generally In re Dewey & LeBoeuf LLP, 478 B.R. 627, 641 (Bankr.

---

[7] To the extent the Court agrees with the assessment in In re Applied Theory Corp., No. 02-11868 (REG), 2008 WL
1869770 (Bankr. S.D.N.Y. Apr. 24, 2008) (Gerber, J.), that a motion brought pursuant to Bankruptcy Rule 9019
need not necessarily implicate section 363, the Ad Hoc Group requests that the Court still consider the extent to
which the settling Debtors have expressed sound business justifications for, and exercised business judgment and

S.D.N.Y. 2012) (Glenn, J.) (recognizing that under Bankruptcy Rule 9019 a debtor's business judgment is one factor to consider); MF Global, 466 B.R. at 247 ("Although courts have discretion to approve settlements, the business judgment of the debtor should be factored into the Court's analysis . . . . 'At the same time a court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the effort.'") (citations omitted); Cadle Co. v. Mims (In re Moore), 608 F.3d 253, 264 (5th Cir. 2010) (agreeing with courts from the Third, Sixth and Seventh Circuits that a Bankruptcy Rule 9019 settlement in which there is a disposition of estate property may trigger the requirements of section 363).

9.    Finally, when analyzing the propriety of this settlement the Court must do so on an estate-by-estate basis, consistent with the Second Circuit's ruling in Union Savings Bank v. Augie/Restivo Baking Company, Ltd. (In re Augie/Restivo Baking Company, Ltd.), 860 F.2d 515 (2d Cir. 1988), and its progeny. In that seminal case, the Second Circuit reversed a bankruptcy court decision ordering substantive consolidation as a means to confirm a joint plan that "would benefit the creditors of both companies." Id. at 520. In reversing, the Second Circuit found a "benefit for all" approach was inappropriate even in a jointly-administered case, noting that creditors of one estate should not be made to sacrifice the priority of their claims to creditors of another estate based upon a bankruptcy court's speculation that it knows the creditors' interests better than do the creditors themselves. Id. Citing to a decision authored by Judge Friendly, the Augie/Restivo court highlighted that, while substantive consolidation might permit "the quick consummation" of a restructuring, that desirable consequence cannot come "at the cost of sacrificing the rights" of creditors. See id. at 520-21 (quoting Flora Mir Candy Corp.

---

their fiduciary duties in respect of, the RMBS Trust Settlement. See TMT Trailer, 390 U.S. at 424 ("Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.") (emphasis added).

v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.), 432 F.2d 1060, 1063 (2d Cir. 1970)).

While not a Bankruptcy Rule 9019 case, Augie/Restivo stands for the important proposition that

each of the Debtors and their respective creditor bodies must be considered when analyzing a

transaction involving multiple Debtors.  Cf. Official Comm. of Unsecured Creditors of LTV

Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir.

1992) ("The court also held that 'the Debtors [had] advanced good business reasons' for the sale

and that it was 'a reasonable exercise of *each of the Debtors' business judgment* to consummate

a transfer of the Transferred Assets on the terms and conditions set forth in the Agreement.'")

(emphasis added); In re Raytech Corp., 261 B.R. 350, 359-61 (Bankr. D.Conn. 2001) (analyzing

the impact of settlement between jointly administered estates on each of the settling estates).

**I      The Court Should Not Approve The RMBS Trust Settlement Because It Is
        Unreasonable And Not In The Best Interests Of GMAC Mortgage, RFC, Or HoldCo**

        10.     At the outset of the legal analysis of the RMBS Trust Settlement, it bears noting

that the resolution of litigation here is not the product of the normal and routine assessment and

evaluation of claims in a debtor's claims resolution process.  Rather, the settlement of RMBS

litigation here was negotiated almost entirely prepetition by HoldCo and Ally, which used the

promise of claims allowance against the Debtors to fulfill their desire to file "elegant" chapter 11

cases.  See Puntus[8] Dep. Tr. 23:14–17 (Mr. Puntus states, "a settlement with Ally was one of the

cornerstones of trying to get an elegant chapter 11 case [on] file") (A copy of the relevant

portions of the Puntus deposition transcript are attached to the Denman Decl. as Exhibit 1);

Marano[9] Dep. Tr. 168:11–170:25 (A copy of the relevant portions of the Marano deposition

transcript are attached to the Denman Decl. as Exhibit 2).

---

[8] Marc D. Puntus, Co-Head of the Restructuring Group at Centerview Partners LLC, Financial Advisor to the Debtors.

[9] Thomas Marano, Chairman of the Board and Chief Executive Officer of HoldCo.

11.     That "elegant" plan for these cases had three key components. <u>First</u>, HoldCo's
board viewed as critical, and actively sought out, the immediate support of Ally for any filing,
given Ally's extensive and intertwined relationships with the Debtors in nearly all aspects of
their businesses. (<u>See</u> Aff. of James Whitlinger [Docket No. 6] ¶¶ 187-89); Puntus Dep. Tr.
30:20–31:25.

12.     <u>Second</u>, Ally's price for its support of the Debtors' chapter 11 cases was the entry
into a global settlement whereby Ally would contribute cash to the estates in exchange for a
rapid consummation of a chapter 11 plan containing third-party releases for Ally. (<u>See</u> Ally Plan
Support Agreement [Docket No. 6, Ex. 8] §§ 2.1, 3.1(d)(ii)) (third party releases granted to Ally
include releases from all claims arising from Debtors' sale of RMBS) By early 2012, months
before the filing of these cases, Ally was already prioritizing the negotiation of a prepetition plan
support agreement with HoldCo. Marano Dep. Tr. 81:20-85:19.

13.     <u>Third</u>, because Ally's demand was for a quick plan, HoldCo management viewed
obtaining creditor support for that chapter 11 plan as a critical component of the Debtors'
strategy. <u>See</u> Hamzephour Dep. Tr. 76:8-13 (commenting that she recognized that Ally was
seeking plan support from the Settling Investors). Thus, in the weeks before the Petition Date,
the Debtors began discussions in earnest with certain Junior Secured Noteholders about
obtaining plan support and with two groups of investors in the RMBS Trusts (the "<u>Settling</u>
<u>Investors</u>") about the economics of a consensual settlement of the RMBS-related litigation and
the allowance of a claim in the Debtors' bankruptcy cases. <u>See</u> Renzi[10] Dep. Tr. 64:17–65:17

████████████████████████████████████████████████████

████ (A copy of the relevant portions of the Renzi deposition transcript are attached to the
Denman Decl. as <u>Exhibit 3</u>). At the same time, HoldCo negotiated with Ally the terms of plan

---

[10] Mark Renzi, Managing Director at FTI Consulting, Inc., Financial Advisor to the Debtors.

support agreements with the Settling Investors (the "Settling Investor PSAs").[11]  See RC-9019_00049082 (e-mail dated May 4, 2012 from Mr. Lee to Mr. Devine,[12] Ex. 83) (discussing terms on which Settling Investors would enter into plan support agreement) (A copy of this document is attached to the Denman Decl. as Exhibit 4); Devine Dep. Tr. 151:6-20 (Mr. Devine acknowledges that the draft plan support agreement and draft settlement were drafted together) (A copy of the relevant portions of the Devine deposition transcript are attached to the Denman Decl. as Exhibit 5).  In negotiating the Settling Investor PSAs, Ally primarily intended to limit the amount of its cash contribution to the Debtors' estates to $750 million. See RC-9019_00049196 (e-mail dated May 9, 2012 from Mr. Devine to Mr. Lee, Ex. 147) ("Gary, as I told you on the phone, Ally will support the $8.7 billion allowed claim.  There is no new Ally money.  Hard stop at 750 . . . .") (A copy of this document is attached to the Denman Decl. as Exhibit 6); Devine Dep. Tr. 233:13-16 ("The question arose as to whether or not Ally intended to put any additional money into the Ally/ResCap settlement.  And the answer was no.").

14.    Given the interrelation of the three pillars of an elegant filing, the negotiations of the RMBS Trust Settlement and the Settling Investor PSAs were inevitably intertwined.  Each occurred simultaneously, and the Debtors considered the RMBS Trust Settlement to be a "necessary precursor" for Settling Investor plan support.  (See Decl. of William J. Nolan [Docket No. 320, Ex. 7] ¶ 29) ("The RMBS Trust Settlement was a necessary precursor to the Institutional Investors' commitment to the Plan Support Agreements.").  Indeed, it was Ally's focus on obtaining support from the Settling Investors for its preferred plan term sheet that shaped the negotiation of the RMBS Trust Settlement with the Settling Investors, and from start

---

[11] In parallel with their negotiations with the Settling Investors, the Debtors and Ally also negotiated a plan support agreement with certain Junior Secured Noteholders, which plan support agreement has since been terminated.

[12] Timothy Devine, Chief Counsel - Litigation, at Ally.

to finish, Ally, not the Debtors, played the primary role in negotiating the RMBS Trust

Settlement with the Settling Investors:

- The first meeting between the parties arose from correspondence between, and was set up by, Kathy Patrick, counsel to one group of the Settling Investors, and William Solomon, Ally's general counsel, in November 2011. See Devine Dep. Tr. 360:3-14;

- Mr. Devine, Ally's chief litigation counsel, took the lead role in communicating with the Settling Investors on the RMBS Trust Settlement. See Ruckdaschel[13] Dep. Tr. 55:22-24 (A copy of the relevant portions of the Ruckdaschel deposition transcript are attached to the Denman Decl. as Exhibit 7); RC-9019_00048956-7 (e-mail dated April 17, 2012) (Mr. Devine sets strategy for dealing with Ms. Patrick, deals directly with Mr. Lee re: RMBS) (A copy of this document is attached to the Denman Decl. as Exhibit 8); Hamzephour[14] Dep. Tr. 48:6–49:5 (same) (A copy of the relevant portions of the Hamzephour deposition transcript is attached to the Denman Decl. as Exhibit 9); RC-9019_0048974-5 (e-mail dated April 27, 2012, Ex. 80) (e-mail from Mr. Devine to Ms. Patrick: nobody from HoldCo copied) (A copy of this document is attached to the Denman Decl. as Exhibit 10); RC-9019_00049016-7 (e-mails dated May 2, 2012 and May 3, 2012, Ex. 82) (Mr. Devine to Talcott Franklin, counsel to a group of Settling Investors; no one from HoldCo copied) (A copy of this document is attached to the Denman Decl. as Exhibit 11); RC-9019_00047906 (e-mail dated May 8, 2012, Ex. 86) (Mr. Devine reports on conversation with Ms. Patrick and Mr. Franklin) (A copy of this document is attached to the Denman Decl. as Exhibit 12); RC-9019_00047942 (e-mail dated May 9, 2012, Ex. 87) (Mr. Devine reports on conversation with Mr. Franklin) (A copy of this document is attached to the Denman Decl. as Exhibit 13);

- 

  See RC-9019_00061443 (e-mail dated April 23, 2012, Ex. 79) (A copy of this document is attached to the Denman Decl. as Exhibit 14).

---

[13] John Ruckdaschel, in-house counsel to the Debtors, specializing in securitizations.

[14] Tammy Hamzephour, Debtors' General Counsel.



See RC-9019_60880-81 ▮▮▮▮ (A copy of this document is attached to the Denman Decl. as Exhibit 15); RC-9019_93302 (May 7 presentation) p. 7 (A copy of this document is attached to the Denman Decl. as Exhibit 16).

See Cancellieri[15] Dep. Tr. 196:22–197:4 ▮▮▮▮ ▮▮▮▮ (A copy of the relevant portions of the Cancellieri deposition transcript are attached to the Denman Decl. as Exhibit 17).

See Ruckdaschel Dep. Tr. 114:5-10; Renzi Dep. Tr. 141:16–143:10

15.    During negotiations of the RMBS Trust Settlement with the Settling Investors, Mr. Devine made clear that the Settling Investors' support for Ally's preferred plan term sheet was an essential precondition to any settlement with respect to their allowed claim. In an e-mail to HoldCo's officers and advisors, Mr. Devine reports that he told Ms. Patrick that support from the Settling Investors for Ally's third party release was a critical and necessary part of the settlement: "We told [Ms. Patrick] that PSA support – whole hog – is drop dead." See RC-9019_0050455 (e-mail dated May 12, 2012) (A copy of this document is attached to the Denman Decl. as Exhibit 18). See also RC-9019_00060931 (e-mail dated May 8, 2012) (Mr. Devine (Ally) cautions Mr. Ruckdaschel (HoldCo) "to be careful – by current arrangement, [Ms. Patrick] gets an allowed claim, a fixed number, even if the plan is not approved. We need to

---

[15] Jeffrey Cancellieri, Debtor employee with responsibilities including forecasting losses attributable to Rep & Warranty Claims.

make sure that the trustees end up acting to approve and support the plan.") (A copy of this document is attached to the Denman Decl. as Exhibit 19).

16.     While Ally was negotiating for claims allowance, HoldCo's managers and officers fully appreciated that Ally was also focused on obtaining Settling Investor support for its preferred plan term sheet. Hamzephour Dep. Tr. 67:24–68:7 (Q: "Was [Ally] negotiating the settlement with Kathy Patrick? A: They were negotiating to the extent that if they were making a contribution to us in a settlement separately, they wanted third-party releases from her. So the two things were related to each other somewhat"). These managers and officers evidently failed to recognize, however, the strategic danger posed by permitting Ally to assume the lead role in negotiating the allowance of $8.7 billion in claims against Debtor estates while simultaneously negotiating for itself a release of its own liability. Ally would obviously have been incentivized to "trade" a large allowed claim against its insolvent subsidiaries in exchange for the Settling Investors' support for a plan support agreement granting Ally a broad third party release and capping Ally's contribution at $750 million. The only parties that would lose by allowing an overly large claim would be the Debtors' creditors, to whom Ally owed no duties.

17.     Even had these HoldCo managers and officers appreciated Ally's divergent interest with respect to the negotiation of the Allowed Claim, they were incapable of correcting the asymmetry and adequately representing the interests of HoldCo, GMAC Mortgage, and RFC during these negotiations. In the prepetition period, these HoldCo managers and officers, many of whom were conflicted with respect to Ally,[16] continued to owe fiduciary duties only to Ally.

---

[16] In the months before the Petition Date, HoldCo employees underwent a "rebadging" process whereby they were stripped of their Ally titles and deemed only to work for HoldCo or HoldCo affiliates. Marano Dep. Tr. 17:20–25 (Mr. Marano states that between May 2009 and the Petition Date Mr. Marano served as chief capital markets officer and chief mortgage officer for Ally); Ruckdaschel Dep. Tr. 20:14-25:7 (Mr. Ruckdaschel discusses the gradual separation of Ally and Debtor legal departments in first quarter 2012 and official pronouncement of separation in April 2012). As a result, during this key period the HoldCo employees were no longer directly employed by Ally. But several key HoldCo managers and officers, including Mr. Marano, remained conflicted with respect to Ally due

See CML V, LLC v. Bax, 28 A.3d 1037, 1046 (Del. 2011) (dismissing derivative suit alleging

breach of fiduciary duties brought by creditor of limited liability company and noting "the LLC

Act, by its plain language, limits LLC derivative standing to 'member[s]' or 'assignee[s],' and

thereby denies derivative standing to LLC creditors.") (citation omitted); N. Am. Catholic Educ.

Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 99 (Del. 2007) ("It is well established that

the directors owe their fiduciary obligations to the corporation and its shareholders. While

shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded

protection through contractual agreements, fraud and fraudulent conveyance law, implied

covenants of good faith and fair dealing, bankruptcy law, general commercial law and other

sources of creditor rights. Delaware courts have traditionally been reluctant to expand existing

fiduciary duties. Accordingly, 'the general rule is that directors do not owe creditors duties

beyond the relevant contractual terms.'") (citations omitted); CNL-AB LLC v. E. Prop. Fund I

SPE (MS REF) LLC, No. 6137-VCP, 2011 WL 353529, at *8 n.76 (Del. Ch. Jan. 28, 2011)

(noting that in corporate context, absent limited circumstances, corporations generally do not

owe fiduciary duties to creditors and defendant failed to articulate "any reason for applying more

expansive rules in the alternative entity context of LLCs," where "[i]n fact, such rules likely are

stricter in that context.").

  18. In some respects, the management was clearly aware of, and sought to minimize,

its conflicts. For example, at the HoldCo level those managers of the board who held stock in

Ally or were employed by Ally were excluded from negotiating Ally's potential contribution to

---

to their massive financial interest in Ally's success, both by holding Ally stock and by compensation arrangements
which provided for future payment in the form of Ally stock. Marano Dep. Tr. 18:7–19:20 (Mr. Marano concedes
that his compensation arrangement is tied to Ally's financial performance, noting that "[b]roadly, if [Ally] does well,
I'll do well."); Supplemental Disclosure by George Crowley, Senior Human Resources Director, Concerning
Debtors' Employee Compensation Practices [Docket No. 426] (disclosing compensation of certain ResCap senior
officers in Ally stock); Ally Financial Inc. Form S-1/A, dated April 12, 2012, pp. 193-4 (compensation table
showing that a large portion of Mr. Marano's compensation was in Ally stock for the years 2009-2011).

the Debtors' estates. <u>See</u> Mack[17] Dep. Tr. 81:18-24 (A copy of the relevant portions of the Mack

deposition transcript is attached to the Denman Decl. as <u>Exhibit 20</u>). Notably, however, a similar

restriction was never installed with respect to the RMBS Trust Settlement, even though a critical

justification for that document was to secure Ally's support for the Debtors' bankruptcy process.

19.     In short, the wisdom of management agreeing to the RMBS Trust Settlement

during the prepetition period has always been questionable. Surely, the justification for

proceeding with that agreement has eroded now that the underlying premise – obtaining Ally

support for an "elegant" and expedited chapter 11 process – has become moot. Some benefits of

support have largely been achieved – Ally served as DIP lender to the Debtors' estates, stalking

horse bidder with respect to the marketing of the Debtors' held-for-sale mortgage loan assets,

and supporter of the Debtors' efforts to obtain Court approval to continue their ordinary course

business relationship with Ally, including the compensation of Debtor employees and the

subservicing business arrangement. Other potential benefits – such as Ally support for a quick

plan – have evaporated. Either way, there is no good reason for the Court to overlook the RMBS

Trust Settlement's serious flaws in the name of protecting an "elegant" plan that simply has not

materialized.

### A.     GMAC Mortgage And RFC Failed To Exercise Any Independent Business Judgment With Respect To The RMBS Trust Settlement Either Pre- Or Post-Petition

20.     Fundamentally, the claims at issue in the RMBS Trust Settlement concern the

Debtors' prepetition securitization business.[18] In connection with that business, GMAC

Mortgage and RFC sold residential mortgage loans to certain RMBS Trusts, in some cases

---

[17] John Mack, Independent Member of HoldCo's Board of Managers.

[18] A more fulsome discussion of the Debtors' securitization business with relevant defined terms is set forth <u>infra</u> in section II.A.

through another Debtor acting as a depositor. These RMBS Trusts, in turn, issued certificates to investors. The sale of loans into the trusts by GMAC Mortgage and RFC was conducted pursuant to certain Pooling and Servicing Agreements (as defined below). Many of these Pooling and Servicing Agreements contained certain Contractual Representations made by the selling entity (GMAC Mortgage or RFC) to the purchasing trust. Claims for breach of these Contractual Representations (including the claims to be released under the RMBS Trust Settlement) are enforceable by each respective RMBS Trust for the ultimate economic benefit of that trust's certificateholders. In connection with the severe correction in the U.S. residential housing market, many of the mortgage loans sold into the RMBS Trusts have defaulted, giving rise to potential claims under the Pooling and Servicing Agreements (collectively, the "Rep and Warranty Claims"). The RMBS Trust Settlement would grant the RMBS Trusts up to an $8.7 billion[19] allowed claim against GMAC Mortgage and RFC in exchange for the release of the Rep and Warranty Claims. While the Debtors state that these claims represent "tens of billions of dollars in potential claims against the Debtors' estates," the various Debtors' ultimate liability on any such claims is far from certain, as even the Motion recognizes. (Second Supplemental Motion ¶ 1).

21.    GMAC Mortgage and RFC—as the two entities that sold the mortgage loans to the RMBS Trusts and the counterparties to the Pooling and Servicing Agreements—are the principal targets of any claims for breach of representations and warranties in those contracts. Indeed, RFC and/or GMAC Mortgage were named in nearly every Debtor-related prepetition

---

[19] This Objection does not address whether the amount of the Allowed Claim contemplated by the RMBS Trust Settlement is excessively high. The Ad Hoc Group understands that issue to be addressed in the objection to the Motion to be filed by the Official Committee of Unsecured Creditors, in which the Ad Hoc Group joins. Rather, this Objection focuses primarily on issues central to the Ad Hoc Group, whose members hold secured claims against several Debtor entities and are thus keenly interested in seeing each of the Debtors maximize value for the benefit of its individual creditor body.

RMBS lawsuit. (See Decl. of Jeffrey A. Lipps [Docket No. 508, Ex. 2] ¶¶ 7-14, Appendix). It follows, then, that GMAC Mortgage and RFC would be the primary targets of any allowed claim granted to the RMBS Trusts on account of Rep and Warranty Claims. (See RMBS Trust Settlement Agreements [Docket No. 1887, Ex. 2 & 3] § 5.01) ("ResCap will provide a general unsecured claim against each of [RFC and GMAC Mortgage] . . ."). GMAC Mortgage and RFC, however, have never exercised any independent business judgment concerning the RMBS Trust Settlement.

22. First, even now, neither of GMAC Mortgage nor RFC has executed the RMBS Trust Settlement Agreements. Those documents are instead signed solely by HoldCo "on behalf of" GMAC Mortgage and RFC. Yet, there are no written resolutions, consents or other arrangements permitting HoldCo to act on either's behalf, and one would have to question the legal effect of having an out-of-the-money shareholder purport to bind a debtor in a pending case. Tellingly, each of the Debtors has refused to respond to the Ad Hoc Group's multiple requests for the production of board meeting minutes, resolutions or consents at the GMAC Mortgage or RFC level.[20] The absence of any GMAC Mortgage or RFC documentation is fully consistent with the absence of any witnesses' recollection of any board meetings at GMAC Mortgage or RFC with respect to the RMBS Trust Settlement. For example, Mr. Marano and

---

[20] On September 12 and 18, 2012, counsel to the Ad Hoc Group wrote to the counsel to the Debtors requesting limited discovery - primarily minutes from post-petition meetings of the boards of HoldCo, RFC and GMAC Mortgage in which the HoldCo Election or alter ego claims against HoldCo were discussed. In response, counsel to the Debtors directed the Ad Hoc Group's counsel to review the materials in the Debtors' RMBS data room, which contained countless pages of documents. The Ad Hoc Group was unable to find any materials responding to their request in that room. The Ad Hoc Group later reiterated and expanded its request. On November 12 and again on November 14 and 19, 2012, the Ad Hoc Group requested that the Debtors produce any notes, minutes, or other records evidencing any subsidiary board meetings in connection with the RMBS Trust Settlement. Counsel for the Debtors has not responded to these repeated requests.

Mr. Whitlinger[21] both testified that they did not have any recollection of any board meetings of

any subsidiary Debtors relating to the RMBS Trust Settlement. See Marano Dep. Tr. 215:15–21

("Q: Okay. And then independent of that one board meeting [removing the HoldCo election],

that aside, has there been any other post-petition board meeting at any ResCap entities as far as

you know to discuss the settlement agreement? A: Not that I'm aware of."); Whitlinger Dep. Tr.

146:22–147:7 ("Q: And earlier you said that you don't recall there being any meetings of the

board of GMAC Mortgage with respect to the RMBS settlement, correct? A: Correct. Q: And

do you recall if there were any such meetings of the board by – of the board for Residential

Funding Company? A: No. I would say the same, I don't recall.")[22] (A copy of the relevant

portions of the Whitlinger deposition transcript are attached to the Denman Decl. as Exhibit 21).

Cf. Whitlinger Dep. Tr. 145:21–147:23; 149:7–13.

      23.     Second, even if GMAC Mortgage and RFC had approved the RMBS Trust

Settlement prior to the bankruptcy filing, those pre-petition approvals would still have been

legally deficient as a matter of state and federal law. Each of GMAC Mortgage and RFC are

Delaware LLCs. As such, the members of these entities owed no duty to any of their respective

creditors outside of bankruptcy. See Bax, 28 A.3d at 1046; Gheewalla, 930 A.2d at 99; CNL-AB

LLC, 2011 WL 353529 at *8 n.76. Instead, their duties ran to maximizing value for their

shareholder, HoldCo, not their creditors.

---

[21] James Whitlinger, Chief Financial Officer and Member of the HoldCo Board of Members and Member of the Board of Members at both RFC and GMAC Mortgage.

[22] GMAC Mortgage's board of members consists of only three members, Steve Abreu, Joe Pensabene, and James Whitlinger. See Whitlinger Dep. Tr. 146:13-16. RFC's board of members consists of only two members, Steve Abreu and James Whitlinger. Id. at 146:17-21. Of these subsidiary board members, only Mr. Whitlinger – the Chief Financial Officer for several Debtor entities, including GMAC Mortgage and RFC – was offered for deposition in connection with the Motion. Mr. Whitlinger's presence would have been necessary for either board to hold a meeting. Id. at 147:8-147:14. Mr. Whitlinger, however, could not remember whether the boards of GMAC Mortgage and RFC met in connection with the 9019 Settlement. Id. at 147:3–23. Neither could Mr. Marano, the Chief Executive Officer of HoldCo. See Marano Dep. Tr. 209:15-22.

24.    <u>Third</u>, the commencement of these chapter 11 cases caused each respective

Debtor's management to become a fiduciary for its own estate, including all of its stakeholders.

See 11 U.S.C. §§ 1106, 1107; <u>Pub. Sch. Teachers' Pension & Ret. Fund of Chicago</u> v. <u>Ambac</u>

<u>Fin. Grp., Inc. (In re Ambac Fin. Grp., Inc.)</u>, No. 11-4643, 2012 WL 2849748, at *1 (2d Cir. July

12, 2012) ("[T]he filing of [a] bankruptcy petition immediately alter[s] the rights of the

[c]orporation and the manner in which its rights [can] be asserted. [W]hile normally the fiduciary

obligation of officers, directors and shareholders is enforceable directly . . . through a

stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by

the trustee or debtor-in-possession.") (citations and quotations omitted). Nevertheless, the

managers and officers of GMAC Mortgage and RFC still continue to pursue the Motion without

any authorization or consideration by the debtor-in-possession itself charged with the duties of

determining whether the relief is appropriate.

25.    These three deficiencies are only exacerbated by the fact that the relative

allocation of the Allowed Claim as against GMAC Mortgage and RFC, respectively, remains

unsettled. Rather, the RMBS Trust Settlement Agreements state that each "Accepting Trust shall

be allocated a share of the Allowed Claim against its Seller Entity and its Depositor Entity . . .,

calculated as set forth on Exhibit B hereto, for which such Seller Entity and Depositor Entity are

jointly liable." (RMBS Trust Settlement Agreements § 6.01). Exhibit B to each of the RMBS

Trust Settlement Agreements, in turn, states that the precise amount and allocation of the

Allowed Claim is to be determined by a "qualified financial advisor" using a series of complex

allocation formulas driven primarily by the identity of the RMBS Trusts ultimately opting into

each of the RMBS Trust Settlement Agreements. (<u>See</u> <u>id.</u> at <u>Ex. B</u>). The Motion provides no

support for the proposition that a non-judicial officer can allow claims against a debtor, and, as it

stands, currently neither GMAC Mortgage nor RFC can determine precisely how much of the

Allowed Claim will ultimately be allocated to it.[23] By pursuing approval of the RMBS Trust

Settlement without any precision on such a fundamental issue, the boards of each of GMAC

Mortgage and RFC have failed in their respective duties to identify whether the RMBS Trust

Settlement is in the best interest of their respective estates.

**B.    The Exercise Of Business Judgment By HoldCo In Entering Into the RMBS Trust Settlement Was Unreasonable Under The Present Circumstances**

26.    The Motion should also be rejected because the RMBS Trust Settlement is

actually detrimental to the other key Debtor involved – HoldCo.  Of all the Debtors, HoldCo was

the only entity to convene its board to approve the RMBS Trust Settlement.  See RC-

9019_00054006 ███████████████████████████████

███████ (A copy of this document is attached to the Denman Decl. as Exhibit 23); RC-

9019_00054008 ██████████████████████████████

████████████ (A copy of this document is attached to the Denman Decl. as Exhibit 24).  In

these meetings, however, HoldCo managers inappropriately believed themselves to be

representing the interests of the consolidated group, not the interests of HoldCo's estate or its

stakeholders.  See Marano Dep. Tr. 210:7–22 ("I mean from a fiduciary point of view I was

trying to settle for everybody, get the biggest deal for the family"); Mack Dep. Tr. 148:4–18;

Whitlinger Dep. Tr. 56:9–57:12 (Mr. Whitlinger acknowledges that he believed that he owed

---

[23] ████████████████████████████████████
████████████████████████████████████
████████████████████ See Ex. 60, RC-9019_00093183 ████████
████████████████████ (A copy of this document is attached to the Denman Decl. as
Exhibit 22).  For one thing, neither Debtor entity could know at this time which RMBS Trusts will ultimately opt
into the RMBS Trust Settlement, and therefore cannot know the amount by which the $8.7 billion Allowed Claim
will be commensurately reduced.  Moreover, neither Debtor entity could know at this time whether, and how many,
of the Accepting Trusts that do opt into the RMBS Trust Settlement purchased loans from it, and would therefore
have an allocable portion of that reduced Allowed Claim against it at that time.

duties of care and loyalty to Holdco and all of its subsidiaries).  This understanding conforms to

the RMBS Trust Settlement Agreements themselves, which were executed only by "Residential

Capital, LLC for itself and its direct and indirect subsidiaries."

    27.    Consistent with their incorrect enterprise-level focus, the HoldCo managers did

not consider the relative projected or actual liability of any particular Debtor entity with respect

to the underlying Rep and Warranty Claims.  Marano Dep. Tr. 208:13–19 ("Q: At the time of

the May 9th board meeting, did you understand that there was even an assertion, that ResCap

LLC was a potential, owed a potential claim to the settling funds?  A: I'm not sure I thought

about it in that context").  Nor did HoldCo's managers consider the relative portion of the $8.7

billion Allowed Claim that would ultimately be asserted by each RMBS Trust against each

settling Debtor.  Marano Dep. Tr. 208:7–12 ("What - with respect to the settlement what I recall

is trying to get a global – essentially buy global peace for all the entities.  How any allocation of

monies would be, you know, chopped up, I was not thinking about that."); Whitlinger Dep. Tr.

72:8–73:18 (Mr. Whitlinger acknowledges that details of allocation were unknown at the time of

approval).  Instead, the HoldCo managers simply thought they were approving an $8.7 billion

Allowed Claim against each of the Debtor entities, regardless as to whether any individual

Debtor had liability on the underlying Rep and Warranty Claims.  (See initial RMBS Trust

Settlement Agreement with the Steering Committee Group [Docket No. 320, Ex. 2] § 5.01)

(granting Allowed Claim against "ResCap," defined to include HoldCo and its subsidiaries).  Mr.

Marano admitted as much on the record: "… was it your understanding that the 8.7 billion could

be asserted against every entity within the ResCap enterprise?  A: I believe that could have.  I

wasn't really focused on it you know other than to get everybody the same deal".  Marano Dep.

Tr. 208:20–209:3.

28.    But HoldCo's adoption of a "benefit for all" approach is wrong in two critical respects.  First, the notion that a parent shareholder such as HoldCo owes any duties to its subsidiaries or creditors of its subsidiaries to maximize their benefits is simply incorrect as a matter of law.  In the absence of a minority shareholder problem, managers of Delaware LLCs do not owe duties to their subsidiaries or the creditors of their subsidiaries.  See Bax, 28 A.3d at 1046; see also Gheewalla, 930 A.2d at 99; CNL-AB LLC, 2011 WL 353529 at *8 n.76; Tronox Inc. v. Andarko Petroleum Corp. (In re Tronox Inc.), 450 B.R. 432, 438 (Bankr. S.D.N.Y. 2011) ("Under Delaware law, a wholly owned subsidiary is not owed fiduciary duties by its corporate parent under normal circumstances.").  Thus, whether or not a particular settlement might benefit its subsidiaries, HoldCo's officers and managers solely had a duty to maximize value for the HoldCo estate and could not consent to relief that harmed HoldCo merely to benefit subsidiaries.

29.    Second, HoldCo is not actually benefitted by the settlement.  HoldCo was not a party to the Pooling and Servicing Agreements which contain the contractual language giving rise to the Rep and Warranty Claims.  (See Sample Pooling and Servicing Agreement [Docket No. 320, Ex. 6]) (does not identify HoldCo as a party).  As a result, HoldCo could not expect to have any contractual liability whatsoever on the Rep and Warranty Claims and could only theoretically be exposed to veil piercing-type claims.  (See Supplemental Decl. of Jeffrey A. Lipps (the "Lipps Supp. Decl.") [Docket No. 1887, Ex. 4] ¶ 18) (stating that the transaction documents provide that the seller entity (GMAC Mortgage or RFC) is obligated to repurchase mortgage loans).  HoldCo's managers, however, failed to appreciate the keen need to distinguish between various theories of, and exposures to, litigation claims against various Debtors.  Marano Dep. Tr. 209:4–14 ("Q: So, getting back to this conflict point.  Do you understand that as between ResCap LLC and Residential Funding Company, LLC, there might be a disagreement

between those two entities as to who was the proper party to pay the claim? ... A: I don't recall thinking about it at the time"); Id. at 206:22–207:3 ("Well, I feel like the deals were struck for everybody. And all of us, not only ResCap, but all of its subsidiaries got the same deal. So I was focused on getting the same deal for everybody").

30.    The conflicted nature of the HoldCo managers with respect to their enterprise approach is further evident from the addition of the ill-fated Holdco Election to the RMBS Trust Settlement Agreements. As noted, at the May 2012 HoldCo board meetings, HoldCo's managers apparently intended to approve the allowance of the entire $8.7 billion Allowed Claim against HoldCo. Marano Dep. Tr. 208:20-25. Yet only a few weeks later, HoldCo's General Counsel agreed to cap HoldCo's liability for those claims at 20% of the total $8.7 billion Allowed Claim in exchange for a release of HoldCo from any liability for the Alter Ego Claims. Hamzephour Dep. Tr. 89:12-25 (Ms. Hamzephour states that she signed the amendment to the settlement that featured the HoldCo Election, and did so without HoldCo board approval). Ms. Hamzephour herself admitted, however, that she had not viewed or participated in any analysis attempting to quantify the amount of HoldCo's exposure to the Settling Investors for Alter Ego Claims. See Hamzephour Dep. Tr. 106:5–21; 109:7-21 (stating that she was never involved with the experts contracted to analyze exposure in connection with the Motion, never read their reports, and was unaware of their conclusions). That course of events makes no sense – how could HoldCo management properly exercise its fiduciary duties by allowing an $8.7 billion claim against HoldCo and then, weeks later, agree that the actual HoldCo exposure was only 20% of that amount? That board clearly should have stopped pushing the Motion and considered what it was doing.

31.    Instead, the HoldCo Election was deemed so "administerial" that it was never

presented for approval to the board of HoldCo or any other Debtor. See Mack Dep. Tr. 107:15–

20; Hamzephour Dep. Tr. 89:15–25 (stating that she signed the HoldCo amendment without

HoldCo board approval). ███████████████ ▬ ███████████████

███████████ See Ex. 88, RC-9019_00093188███████████

███████████████████████████ (A copy of this document is attached to the

Denman Decl. as Exhibit 25).

32.     Things continued to get worse, and the subsequent removal of the Holdco

Election heightens, rather than obviates, questions with respect to the reasonableness of

HoldCo's board's decision to press forward with the Motion. On September 21, 2012, HoldCo's

board convened and agreed to remove the HoldCo Election from the RMBS Trust Settlement

Agreements and to accept a carveout of releases for HoldCo, including potential Rep and

Warranty Claims and Alter Ego Claims. See Mack Dep. Tr. 134:8–135:8. As a result, HoldCo –

the only Debtor entity to have had its board actually approve the Allowed Claim – no longer

receives any benefit whatsoever from the RMBS Trust Settlement. In fact, HoldCo is in a far

worse position than if it never agreed to anything:

1)  HoldCo is not released of any potential liability of any of the claimants. See
RMBS Trust Settlement Agreements § 7.01 ("Notwithstanding any provision of
this Section 7.01, the Releasors do not release, waive, or discharge any Claims
against ResCap LLC."). In the absence of a subsequent settlement or the
Accepting Claimants' unlikely decision to not file ResCap LLC Claims, HoldCo
and its estate will find itself alone mired in litigation potentially more complex
than that which is to be settled by the instant Motion.

2)  Though it is not receiving a release, HoldCo is actually giving the Accepting
Trusts and their Trustees and Investors a release of all claims that it might have
under the Governing Agreements. See RMBS Trust Settlement Agreements
§7.02 ("ResCap [defined to include HoldCo] irrevocably and unconditionally
grants to the Accepting Trusts, Trustees in respect of such trusts, and Investors in
such trusts, as well as such Accepting Trusts', Trustees' and Investors' respective
officers, directors, and employees, a full final, and complete release, waiver, and
discharge of all alleged or actual claims from any claim it may have under or

arising out of the Governing Agreements."). The effect of this release is potentially significant as it could restrict HoldCo's ability to assert counterclaims and affirmative defenses in respect of RMBS-related claims filed against it.

3) HoldCo has agreed to have the $8.7 billion Allowed Claim asserted against two of its most material subsidiaries. Notwithstanding the significant assets at the GMAC Mortgage and RFC estates, the Allowed Claim will likely consume all of the residual equity of at least one, if not both, of GMAC Mortgage and RFC.

4) Given (1) the diminished value of the HoldCo estate caused by the diversion of subsidiary equity, (2) the significant number and size of RMBS-related claims that could be asserted against HoldCo, and (3) HoldCo's failure to receive binding support from any of the Settling Investors for a HoldCo plan, approval of the Motion will necessarily have material impacts on the type of plan that can be proposed and consummated at the HoldCo level.

33. In short, when this Court views the RMBS Trust Settlement on an estate-by-estate basis, as it must, there is no reason, much less a good one, to approve that agreement at this time.

**II    In The Alternative, Any Order Granting The Motion Should Preserve The Ability Of Parties In Interest To Seek To Subordinate The Allowed Claim Pursuant To Section 510(b) Of The Bankruptcy Code**

34. To the extent the Court is inclined to approve the Motion and grant the Allowed Claim, the Ad Hoc Group requests that any order granting such relief preserve the rights of any party in interest to seek to subordinate the Allowed Claim pursuant to section 510(b) of the Bankruptcy Code. The Motion does not request, and the RMBS Trust Settlement Agreements do not provide, that the Allowed Claim, once approved, be precluded from disallowance or subordination, and the Settling Investors did not negotiate for language that the Allowed Claim would expressly not be subject to disallowance or subordination. Instead, the RMBS Trust Settlement Agreements simply state that "ResCap will provide a general unsecured claim of $8,700,000,000 in the aggregate against the Seller Entities and the Depositor Entities." (RMBS Trust Settlement Agreements § 5.01).

35. Because the RMBS Trust Settlement Agreements do not contemplate that the Allowed Claim would be free from subordination, approval of the Allowed Claim pursuant to the

Motion would not preclude a party in interest from seeking subordination under section 510(b) at

a later date. See In re Periman Producers Drillers, Inc., 263 B.R. 510, 520 (W.D. Tex. 2000)

("Rather than having preclusive effects, the decision to allow a claim is a prerequisite to eventual

prioritization of that claim in the hierarchy of allowed claims."); Anchorage Police & Fire Ret.

Sys. v. Official Comm. Of Unsecured Creditors of the Holding Co. Debtors (In re Conseco, Inc.),

Case No. 03-CV-7054, 2004 WL 1459270, at * 3 (N.D. Ill. June 25, 2004) (finding that "[t]here

is no rational explanation why a settlement agreement consummated just months prior to the

bankruptcy should dramatically alter the nature, let alone the treatment, of the underlying claim,

particularly given the plain terms and purpose of §510(b).").

36.    The preservation of the right to subordinate is critical, as the Allowed Claim is, on

its face, subject to section 510(b) of the Bankruptcy Code.  Section 510(b) provides, in relevant

part, that:

> For the purpose of distribution under this title, *a claim . . . for damages arising*
> *from the purchase or sale of such security . . . shall be subordinated to all*
> *claims or interests that are senior to or equal the claim or interest represented*
> *by such security*, except that if such security is common stock, such claim has the
> same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).  Each of the requirements for mandatory subordination of

the Allowed Claim pursuant to section 510(b) of the Bankruptcy Code is met here:  (a) the

mortgage loans and the related RMBS certificates or bonds[25] sold in connection with the Pooling

and Servicing Agreements constitute "securities" as defined under section 101(49) of the

Bankruptcy Code; (b) the mortgage loans and the related RMBS certificates or bonds constitute

---

[25] The mortgage loans and the related RMBS certificates or bonds deposited into each RMBS Trust constitute
"securities" for purposes of section 510(b) of the Bankruptcy Code.  The Bankruptcy Code broadly defines
"security" to include notes, bonds and debentures as well as any "other claim or interest commonly referred to as a
'security.'"  11 U.S.C. § 101(49).  Moreover, the Ad Hoc Group believes that certain of the Pooling and Servicing
Agreements are investment contracts and thus securities for the purposes of section 510(b).

securities "of the debtor or of an affiliate of the debtor";[26] (c) the Allowed Claim to be asserted

by the RMBS Trusts is on account of damages arising from the purchase or sale of those

securities; and (d) alternatively, the Allowed Claim to be asserted by the RMBS Trusts is a claim

arising from the partial rescission of a purchase of securities.  See 11 U.S.C. § 510(b).

A.    **Overview Of The Structure Of The Securitizations And The RMBS Trust Settlement Agreements**

37.    As noted supra, prior to the Petition Date, a principal business of the Debtors was

the securitization of residential mortgage loans.  In connection with the securitization process,

the RMBS Trusts were created to act as conduits for the sole purpose of financing pools of

mortgage loans, which mortgage loans had been originated or acquired by Debtors RFC or

GMAC Mortgage (together, the "Sellers").  For each securitization, a Seller, through an affiliate

known as a "Depositor," sold mortgage loans into an RMBS Trust.  To purchase these mortgage

loans, the RMBS Trusts used capital concurrently provided by outside investors (the "Security

Holders").  In return, the Security Holders received either (i) trust certificates representing their

respective beneficial interests in the mortgage loans purchased by the trusts or (ii) bonds backed

by those mortgage loans.  These securitizations were effectuated through various governing

documents (the "Governing Documents") including pooling and servicing agreements (the

"Pooling and Servicing Agreements"), assumption and assignment agreements, indentures,

mortgage purchase agreements and other documents governing the RMBS Trusts.

38.    The Governing Documents contain contractual representations and warranties (the

"Contractual Representations") relating to, among other things, (a) the mortgage pool-

---

[26] Each Depositor (described below) is either a Debtor or an affiliate of the Debtors.  (See Second Supplemental Motion ¶ 19) (defining "Depositor Entities" to include debtors Residential Funding Mortgage Securities I, Residential Funding Mortgage Securities II, Residential Asset Securities Corp., Residential Accredit Loans, Inc., and Residential Asset Mortgage Products, Inc.).  As discussed in greater detail herein, for purposes of section 510(b) and of the Securities Act, Depositor Entities are the "issuers" of the mortgage loans and the RMBS certificates or bonds.

underwriting guidelines, (b) creditworthiness of the borrowers on the mortgage loans, (c) the

percentage of mortgage loans with certain characteristics, including owner/occupancy and

document type, (d) disclosure of information regarding loan type, (e) the accuracy and

completeness of mortgage loans, (f) compliance with applicable laws, and (g) characteristics of

each mortgage loan such as loan-to-value ratios and debt-to-income ratios. (See Second

Supplemental Motion ¶ 11 n.18). The Governing Agreements contain provisions that impose a

joint obligation on the Seller and Depositor to repurchase or substitute mortgage loans sold to a

RMBS Trust that materially breach the Contractual Representations when certain conditions are

met. (See id. at ¶ 12 n.19). These mortgage loans belong to the RMBS Trusts, which hold the

loans for the benefit of the Security Holders. (See id. at ¶ 13 n.22). Similarly, any contractual

mortgage repurchase claims belong to the RMBS Trusts, and the trustee for each RMBS Trust

(each a "RMBS Trustee") is authorized to pursue claims based on the Contractual

Representations and to collect proceeds from any repurchase of mortgage loans for which there

has been a breach of a Contractual Representation. (See id. at ¶ 13 n.24). The RMBS Trust

Settlement Agreements agree to permit an Allowed Claim for certain of the RMBS Trusts on

account of their alleged and potential claims for the breach of the representations and warranties

arising from the Governing Documents.

**B.    Subordination Of Any RMBS Rep and Warranty Claim Is Required Under Section 510(b)**

39.    Subordination of the Allowed Claim here is perfectly consistent with, and in fact

mandatory under, section 510(b) of the Bankruptcy Code. The statutory language does not itself

limit subordination to securities fraud or fraud of any kind. Nor does the statute exclude claims

that arise under a contract. Rather, section 510(b) subordinates, among other things, "a claim

arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the

debtor, [or] for damages arising from the purchase or sale of such a security . . . ." 11 U.S.C. § 510(b). The Allowed Claim easily falls within this language, as it would be the direct result of, and intended to compensate for, damages sustained on account of having purchased the RMBS.

  40. Many courts have reached the conclusion that contractual claims can be subordinated under section 510(b). See, e.g., In re Med Diversified, Inc., 461 F.3d 251, 254-59 (2d Cir. 2006) (claim for breach of termination agreement for failure to issue stock); Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133 (3d Cir. 2002) (claims for breach of contractual requirement to use best efforts to register stock); Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.), 240 F.3d 823 (9th Cir. 2001) (claim for failure to convey stock in breach of merger agreement); Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.), No. 05-60200, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) (claim for loss of conversion rights based on breach of indenture); In re Kaiser Grp. Int'l, Inc. v. Pippin (In re Kaiser Grp. Int'l, Inc.), 326 B.R. 265 (D. Del. 2005) (claim for breach of "fill up" provision in merger agreement based on stock price); In re Int'l Wireless Comm'ens Holdings, Inc., 257 B.R. 739, 746 (Bankr. D. Del. 2001), aff'd, 279 B.R. 463 (D. Del. 2002), aff'd, 68 Fed. Appx. 275 (3d Cir. 2003) (claim for breach of stock purchase agreement); In re Enron Corp., 341 B.R. 141, 161 (Bankr. S.D.N.Y. 2006) (contract claims based on loss of stock options). Indeed, nothing in the legislative history surrounding the enactment of section 510(b) suggests that the application of section 510(b) was intended to be limited to securities-fraud claims. See Telegroup, 281 F.3d at 138-41 (citing the Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt. 2, at 116 (1973)).

  41. Moreover, subordination of the Allowed Claim under section 510(b) would be appropriate here because although the underlying Rep and Warranty Claims are based in

contract, their allegations are substantively identical to claims alleging fraud in the issuance of

securities. Numerous Security Holders have sued various Debtor and Ally entities for securities

fraud on the ground that the prospectuses inaccurately described the pertinent mortgages. See,

e.g., Summons and Complaint, Federal Housing Finance Agency, as Conservator for the Federal

Home Loan Mortgage Corporation v. Ally Financial Inc. et. al., Case No. 652441-2011 (N.Y.

Supr. Ct. 2011) [Docket No. 1]. The Debtors have consistently maintained that they will be

moving to subordinate under section 510(b) any claims alleging fraud in the issuance of the

RMBS certificates (the "Fraud Claims"). (See, e.g., Second Supplemental Motion n. 37) ("With

regard to any allegedly improper disclosures under federal or state securities laws, the Debtors

intend to pursue the subordination of such claims under Section 510 of the Bankruptcy Code").

See also June 6, 2012 Hr'g Tr. 22:23-25 (Glenn, J.) ("I know there are securities claims and I

know you say you're going to apply 510 into that, you're not asking to get a release of those

claims"); Id. at 55:22-25 (Glenn, J.) ("...understand the debtor's going to argue 510. They're not

seeking a release of any of those claims. They're going to seek subordination under 510 of the

securities claims"). A comparison of the Fraud Claims with the Rep and Warranty Claims that

form the basis of the Allowed Claim reveals no substantive difference. Certain of the Security

Holders have similarly concluded that there are no substantive differences between the Fraud

Claims and the Rep and Warranty Claims. (See Motion of AIG Asset Management [Docket No.

2284] pgs. 12-13) (stating that "[b]oth the [Rep and Warranty Claims] and the [Fraud Claims]

are based on nearly identical misrepresentations made about the same Mortgage Loans; the only

distinction is that the misrepresentations underlying the two varieties of claims were made in

documents relating to two different points in the same securitization process" and providing a

detailed comparison of the underlying representations on which the Fraud Claims and the Reps

and Warranty Claims are based.).[27]

42.     For one thing, the Contractual Representations underlying the Rep and Warranty

Claims heavily overlap with the substance of the claims alleging fraud in the securities issuance

representations in the prospectuses (the "Prospectus Representations"), which are the

quintessential claims subject to subordination under section 510(b).[28]  In fact, the Debtors have

suggested that the Contractual Representations are so similar and intertwined that the latter

should be consulted to interpret the former.  See Lipps Supp. Decl. ¶ 15 ("[A]dditional insight

regarding the interpretation of certain representations and warranties may be found in other,

related transaction documents, such as the Prospectus and Prospectus Supplement"); Id. at ¶ 27

("[O]ther materials in the package of transaction documents relating to each Trust shed

additional light on how potentially ambiguous representations and warranties should be

interpreted, including the extensive risk disclosure included in the Prospectus and Prospectus

Supplement for each securitization.").

43.     In addition to their common factual bases, the objective of each of the Fraud

Claims and the Rep and Warranty Claims is also identical – each seeks reimbursement for losses

suffered by the RMBS Trust's certificate holders.  Under sections 11(e), 12(a)(2) or 15 of the

_____

[27] On November 27, 2012, AIG Asset Management (U.S.), LLC and affiliated entities, Allstate Insurance Company
and affiliated entities, Massachusetts Mutual Life Insurance Company , and Prudential Insurance Company of
America and affiliated entities filed a motion seeking the entry of an order determining that, for purposes of any
chapter 11 plan concerning the Debtors, (i) the Fraud Claims and the Rep and Warranty Claims should be classified
together, and (ii) cannot be classified in a class of claims that are subject to Bankruptcy Code section 510(b).
[Docket No. 2284].  The Ad Hoc Group's submission of this Objection does not prejudice its rights to object to the
AIG Motion.

[28] A comparison of Contractual Representations and the Prospectus Representations in a sampling of four RMBS
offerings reveals heavy overlap.  See Lipps Supp. Decl. ¶ 16.  For example, four of the seven Contractual
Representations, which mainly relate to the value of the mortgage pool-underwriting guidelines, loan-to-value ratios,
owner/occupancy information and accuracy of mortgage loans, are substantially similar to the Prospectus
Representations; two of the Contractual Representations, which relate to compliance with law and tributes of
appraisers, are substantially similar to the Prospectus Representations for one of the four sample transactions; and
the final Contractual Representation, which relates to completeness of loan files, does not correspond to any of the
Prospectus Representations.  The comparison is attached to the Denman Decl. as Exhibit 26.

Securities Act, a fraudulent description of mortgages in a prospectus would entitle Security

Holders to recover damages or rescind their investment. Similarly, a material breach of the

Contractual Representations would entitle the RMBS Trust to rescind its purchase of the

deficient mortgages and either receive a substitution of eligible mortgages, which is not feasible,

or a refund of the purchase price. Pursuant to the Governing Documents, the RMBS Trusts are

required to distribute any recoveries on the Rep and Warranty Claims to the Security Holders in

accordance with the prescribed waterfalls. Accordingly, both the Rep and Warranty Claims and

the Fraud Claims seek to restore the Security Holders to the same position they would have been

in had the mortgages been represented properly at the time of the securitization.

44.    In a similar situation, former Chief Judge Gonzalez recognized that section 510(b)

may require subordination of contractual claims, such as the Rep and Warranty Claims here,

when they are substantively similar to claims for fraudulent issuance. See Enron, 341 B.R. at

144 (subordinating claims, including breach of contract, of employees with stock option

components to their compensation packages). In connection with the breach of contract claim at

issue in Enron, the Court determined that the claimants' primary criticism was that Enron

fraudulently misrepresented the value of the stock options that it offered to its employees. Id. at

162. Therefore, the Court held that the breach of contract claim was a disguised claim of fraud

in the issuance and that such fraud claims are clearly subject to subordination under section

510(b) of the Bankruptcy Code. Id.

45.    The application of section 510(b) to the Allowed Claim dovetails with common

sense. It would be illogical to subordinate Fraud Claims but not to subordinate substantively

identical Rep and Warranty Claims. To allow such a result would permit purchasers in securities

offerings to circumvent section 510(b) of the Bankruptcy Code simply by incorporating a

contractual right designed to achieve substantially the same result as securities fraud claims.

46.     Likewise, the fact that the RMBS Trusts were interposed between the Seller
Entities/Depositor Entities and the Security Holders should have no bearing on the application of
section 510(b) to the Allowed Claim.  First, the Rep and Warranty Claims belong to, and the
Allowed Claim would be granted in favor of, the RMBS Trusts that acquired the mortgage loans
directly from Seller Entities/Depositor Entities.  Second, the RMBS Trusts are effectively
conduits that enable Seller Entities/Depositor Entities to issue RMBS certificates or bonds to
Security Holders.  These RMBS Trusts were established by and for the benefit of Debtors and
their issuance of RMBS was done effectively on behalf of the Sellers, which continue to retain
interests and obligations in respect of the RMBS Trusts.

47.     For purposes of section 510(b), then, the mortgage loans, RMBS certificates and
bonds should be deemed to be securities issued by the Depositor Entities, not the RMBS Trusts.
Section 510(b) of the Bankruptcy Code limits its applicability to the subordination of certain
claims relating to the purchase or sale of securities "of the debtor or of an affiliate of the debtor."
Id.  In applying that language to the asset-backed trust context, it is appropriate for the Court to
look to securities law for guidance.  See In re Granite Partners, L.P., 208 B.R. 332, 339-340
(Bankr. S.D.N.Y. 1997) ("In searching for Congress's intent, a court may also look to similar
language in unrelated statutes that apply to similar persons, things or relationships. The use of
similar language strongly indicates that the two statutes should be interpreted pari passu,
particularly where they share the same raison d'etre.") (internal citations omitted).

48.     Securities law, in turn, deems the entity that deposits assets into an asset-backed
trust to be the "issuer" of securities. Section 2(a)(4) of the Securities Act provides that "[t]he
term "issuer" means every person who issues or proposes to issue any security; except that with

respect to . . . collateral-trust certificates, or with respect to certificates of interest . . . , the term "issuer" means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued . . . ." 15 U.S.C. § 77b(2)(a)(4).  See SEC Rule 191, 17 C.F.R. § 230.191 (2005) ("The depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity."); Item 1101 of Regulation AB, 17 C.F.R. § 229.1101(e) (2005) ("For asset-backed securities transactions where the person transferring or selling the pool assets is itself a trust, the depositor of the issuing entity is the depositor of that trust."); Talcott J. Franklin & Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook, Appendix A (2011) (stating that "the Depositor is considered the statutory issuer of CMBS, although technically CMBS are issued by the Trust"); see also Fed. Hous. Fin. Agency v. UBS Ams., Inc., 858 F. Supp. 2d 306, 334 (S.D.N.Y. 2012) (finding that SEC Rule 191 applies to residential mortgage-backed securities).  Consistent with the Court's duty to not allow substance to give way to form and authority to look to non-bankruptcy sources of law to inform its decision-making, the same securities law principles should ring true in these chapter 11 cases. See Pepper v. Litton, 308 U.S. 295, 305 (1939).

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Group requests that the Court

deny the Motion and grant such further relief as it deems just.

Dated: February 1, 2013                          Respectfully submitted,
        New York, New York

                                                 By: /s/ J. Christopher Shore
                                                 J. Christopher Shore

                                                 WHITE & CASE LLP
                                                 1155 Avenue of the Americas
                                                 New York, New York 10036-2787
                                                 Telephone: (212) 819-8200
                                                 Facsimile: (212) 354-8113
                                                 J. Christopher Shore (JCS – 6031)
                                                 Harrison L. Denman (HD – 1945)

                                                    - and -

                                                 MILBANK, TWEED, HADLEY & MCCLOY LLP
                                                 1 Chase Manhattan Plaza
                                                 New York, New York 10005
                                                 Telephone:  (212) 530-5000
                                                 Facsimile:  (212) 530-5219
                                                 Gerard Uzzi (GU – 2297)

                                                 Attorneys for the Ad Hoc Group of Junior
                                                 Secured Noteholders