**Hearing Date: March 18, 2013 at 9:00 a.m. (ET)**
**Objection Deadline: December 3, 2012 (Service Date)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip Bentley
Philip S. Kaufman
Jeffrey S. Trachtman
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- x
In re:                                             :    Chapter 11
                                                   :
RESIDENTIAL CAPITAL, LLC, et al.,                  :    Case No. 12-12020 (MG)
                                                   :
                        Debtors.                   :    Jointly Administered
                                                   :
-------------------------------------------------- x
```

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR**
**APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

REDACTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ......................................................................................................................... 7

    A.    The RMBS Trusts ........................................................................................ 7

    B.    The Pre-Petition Put-Back Claims Against the Debtors ................................ 8

    C.    The RMBS Trust Settlement ...................................................................... 10

ARGUMENT ............................................................................................................. 11

I.    THE RMBS TRUST SETTLEMENT DOES NOT SATISFY THE *IRIDIUM* FACTORS ............................................................................................................ 11

    A.    The Settlement Was Not the Product of Arm's Length Bargaining .............. 14

        1.  Ally directed the negotiations ................................................................ 15

        2.  Ally's primary – or sole – motivation was to obtain a release ................. 17

        3.  The Board rubber-stamped the Settlement after reviewing only a cursory and deeply flawed analysis ................................................... 18

    B.    The Settlement Is Opposed By Every Major Impaired Creditor Group Besides the Plaintiffs ................................................................................. 21

    C.    The $8.7 Billion Settlement Amount is Unreasonably High ......................... 22

        1.  The Debtors have presented no reliable evidence to support the reasonableness of the $8.7 billion settlement amount ....................... 23

        2.  The Committee's analysis demonstrates that a non-conflicted fiduciary likely could have negotiated a substantially lower settlement of the put-back liability ................................................... 28

            (a) Defense # 1:  The Trusts must show causation of injury ............. 31

            (b) Defense # 2:  The statute of limitations further reduces the claims ................................................................................ 36

            (c) Defense # 3:  Election of remedies bars put-back of foreclosed loans ................................................................. 38

D.      The Prospect of a Litigation Armageddon is a Straw Man............................ 41

E.      The RMBS Trust Settlement Contains Other Provisions That Must Be
        Stricken or Modified Before the Motion Could be Granted .......................... 43

        1.   The Settlement's allocation of the Allowed Claim is flawed .................. 44

        2.   The language providing that the Settlement cannot be used as
             evidence against Ally should be stricken........................................... 45

        3.   The Debtors should not be able to pay the legal fees of the
             Institutional Investors in cash without a Court order......................... 46

II.    THE COURT SHOULD DENY APPROVAL OF THE SETTLEMENT AND
       DIRECT GLOBAL NEGOTIATIONS ....................................................................47

CONCLUSION...........................................................................................................48

# TABLE OF AUTHORITIES

**Page**

CASES

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,*
No. 11-2375, 2012 WL 4373327 (S.D.N.Y. Sept. 25, 2012) ............................... 34-35, 44

*Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC,*
No. 5140-CS, 2012 WL 3201139 (Del. Ch. Aug. 7, 2012) ........................................ 32-33

*Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.),*
68 F.3d 914 (5th Cir. 1995) ................................................................................... 13, 22

*Daubert v. Merrell Dow Pharmaceuticals,*
509 U.S. 579 (1993).......................................................................................... 4, 23, 27

*Ely-Cruikshank Co. v. Bank of Montreal,*
81 N.Y. 2d 399 (1993) ................................................................................................ 36

*First Nationwide Bank v. Gelt Funding Corp.,*
27 F.3d 763 (2d Cir. 1994).................................................................................... 33 n.26

*First Place Bank v. Skyline Funding, Inc.,*
No. 10-2044, 2011 WL 3273071 (N.D. Ill. July 27, 2011) ............................................ 38

*Freund v. Washington Square Press, Inc.,*
34 N.Y.2d 379 (1974) ................................................................................................. 31

*Groesbeck v. Morgan,*
206 N.Y. 385 (1912) ................................................................................................... 33

*Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co.,*
18 N.Y. 3d 765 (2012) .......................................................................................... 37 n.30

*HSBC Bank USA, N.A. v. Fane (In re MF Global Inc.),*
466 B.R. 244 (Bankr. S.D.N.Y. 2012)...................................................................... 11-12

*In re Adelphia Commc'ns Corp.,*
368 B.R. 140 (Bankr. S.D.N.Y. 2007)........................................................................... 14

*In re Armstrong World Indus., Inc.,*
348 B.R. 111 (D. Del. 2006).................................................................................. 42 n.36

*In re Chemtura Corp.,*
439 B.R. 561 (Bankr. S.D.N.Y. 2010)...................................................................... 38 n.32

*In re Dewey & LeBoeuf LLP,*
    478 B.R. 627 (Bankr. S.D.N.Y. 2012)......................................................13 n.11, 22 n.18

*In re Drexel Burnham Lambert Group, Inc.,*
    134 B.R. 493 (Bankr. S.D.N.Y. 1991)................................................................13

*In re General Motors Corp.,*
    407 B.R. 463 (Bankr. S.D.N.Y. 2009)................................................................12

*In re Matco Electronics Group, Inc.,*
    287 B.R. 68 (Bankr. N.D.N.Y. 2002) ..........................................................13, 22

*In re The Present Co.,*
    141 B.R. 18 (Bankr. W.D.N.Y. 1992) ................................................................13

*In re W.R. Grace & Co.,*
    355 B.R. 462 (Bankr. D. Del. 2006) ............................................................42 n.34

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns),*
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)................................................................13

*Kiser v. Bryant Electric (In re Beverly Hills Fire Litig.),*
    695 F.2d 207 (6th Cir. 1982) ...................................................................42 n.34

*LaSalle Bank, N.A. v. CIBC Inc.,*
    No. 08-8426, 2011 WL 4943341 (S.D.N.Y. Oct. 17, 2011).............................................32

*LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.,*
    No. 01-4389, 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002)................................................32

*Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.,*
    793 F. Supp. 2d 1189 (W.D. Wash. 2011)....................................................36-37, 37 n.30

*Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas,*
    No. 10-02012, 2012 WL 2389868 (E.D. Ark. June 25, 2012)....................................37 n.30

*Mastr Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.,*
    843 F. Supp. 2d 996 (D. Minn. 2012) ...........................................................38-39

*Mastr Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.,*
    No. 11-2542, 2012 WL 4511065 (D. Minn. Oct. 1, 2012) .............................34 n.28, 38-40

*Menard-Sanford v. Mabey (In re A.H. Robins Co.),*
    880 F.2d 694 (4th Cir. 1989) ...................................................................42 n.35

*Mission Iowa Wind Co. v. Enron Corp.,*
    291 B.R. 39 (S.D.N.Y. 2003)........................................................................12

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) .......................................................................... passim

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank,*
   392 F.3d 520 (2d Cir. 2004)...................................................................................31 n.24

*Owens Corning v. Credit Suisse First Boston,*
   322 B.R. 719 (D. Del. 2005)..................................................................................42 n.36

*Pesa v. Yoma Development Group, Inc.,*
   18 N.Y.3d 527 (2012) ...............................................................................................31

*Savasta v. 470 Newport Assocs.,*
   579 N.Y.S. 2d 167 (App. Div. 1992)............................................................................40

*Simon v. Electrospace Corp.,*
   28 N.Y. 2d 136 (1971) .........................................................................................33 n.27

*Structured Mortgage Trust 1997-2 v. Daiwa Finance Corp.,*
   No. 02-3232, 2003 WL 548868 (S.D.N.Y. Feb. 25, 2003)...............................................36

*Syncora Guarantee Inc. v. EMC Mortgage Corp.,*
   No. 09-3106, 2012 WL 2326068 (S.D.N.Y. June 19, 2012) ...............................34-35, 44

*T&N PLC v. Fred S. James & Co. of N.Y., Inc.,*
   29 F.3d 57 (2d Cir. 1994)..........................................................................................36

*United States v. All Funds Distributed to Weiss,*
   345 F.3d 49 (2d Cir. 2003).........................................................................................37

### STATUTES

C.P.L.R. § 213(2)...........................................................................................................36

N.Y. Ins. L. § 3106 .......................................................................................................35

### OTHER AUTHORITIES

3 COLLIER ON BANKRUPTCY (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) .............13

E. Allan Farnsworth, CONTRACTS (3d ed. 2004) ........................................................31 n.24

Fed. R. Evid. 706 ..........................................................................................................42

Fed. R. Evid. 408 ..........................................................................................................45

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby submits this objection (the "**Objection**") to the Debtors' motion (as supplemented, the "**9019 Motion**") [Dkt. Nos. 320, 1176, 1887] for approval of a proposed settlement (the "**RMBS Trust Settlement**" or the "**Settlement**") that seeks to resolve potential residential mortgage backed securities ("**RMBS**") representation and warranty ("**R&W**") claims against certain of the Debtors held by up to 392 securitization trusts (the "**Trusts**") in exchange for an allowed claim of up to $8.7 billion, in accordance with the terms and conditions of the settlement agreements attached to the 9019 Motion. In support of its Objection, the Committee respectfully states as follows:[1]

### PRELIMINARY STATEMENT

Over the past four months, the Committee has exercised its duty as an estate fiduciary to investigate and analyze the merits of the RMBS Trust Settlement, with the assistance of an experienced team of experts led by Professor Brad Cornell. In aid of its review, the Committee has taken discovery regarding the Debtors' own analysis of their liability and the process they used to negotiate and approve the Settlement. The Committee is dismayed by what it has found. As previously reported to the Court, discovery has revealed that the settlement negotiations were dominated and controlled by the Debtors' corporate parent, Ally Financial, Inc. ("**Ally**"), which appears to have been far less concerned with the size or merits of the Trusts'

---

[1] Each of the RMBS Trustees that serves on the Committee (*i.e.*, The Bank of New York Mellon Trust Company, N.A., Deutsche Bank Trust Company Americas, and U.S. Bank National Association) has abstained from all Committee votes on and deliberations concerning this Objection. In addition, while each of the Committee's other members has voted to object to the RMBS Trust Settlement, the specific elements of this Objection do not reflect the views of individual Committee members, several of which are filing individual objections of their own. MBIA objects to the Settlement for the reasons set forth in the separate pleading it will be filing in opposition to the 9019 Motion. MBIA does not join in or adopt the arguments set forth in the Committee's Objection.

allowed claim against the Debtors than with the amount it would need to pay to resolve its own liability to the estates and third parties. The end result of this process was the Debtors' agreement to a settled claim amount that appears to be considerably higher than any non-conflicted fiduciary would have reached.

In light of the Settlement's glaring procedural and substantive flaws, the Committee opposes the 9019 Motion and urges the Court to deny it. The Debtors' attempt to impose on all other constituents an Ally-driven resolution of their purportedly largest single exposure – without the involvement of the Committee or other impaired creditors, and before the other elements of a plan or the Settlement's effects on other constituencies' recoveries could be determined – has created unnecessary polarization. The Committee believes that the best way to remedy this dislocation and maximize the prospects for a successful resolution of these cases is to address the Trusts' claims through a global negotiation process, which would encompass all major issues in the case and include all major creditor constituencies – with the assistance of an independent fiduciary if the Court believes that would be beneficial. If all settlement efforts fail, the Trusts' claims can and should be resolved on the merits through estimation.

However views may differ on the best way forward, there can be little doubt as to the merits of the Motion now before the Court. As a matter of both process and substance, the Debtors do not come close to satisfying the standards for approval of a settlement set forth in *Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)* ("*Iridium*"), 478 F.3d 452, 462 (2d Cir. 2007).

*First*, the Court can have no confidence in the process that led to the RMBS Trust Settlement. Discovery has demonstrated that negotiation of the Settlement was engineered by counsel for Ally and that an essential condition of the Settlement was an agreement by the

investors represented by Kathy Patrick of Gibbs & Bruns LLP to a Plan Support Agreement that provides Ally broad estate and third-party releases in exchange for a capped $750 million contribution to the estates, dedicated primarily to the investors. To lock in support for releases on those terms, Ally agreed to endorse an $8.7 billion RMBS allowed claim against the Debtors *billions of dollars higher* than the Debtors' own recent valuations of their RMBS liability had indicated was reasonable, and the Debtors – without due consideration, contemporaneous expert analysis or advice, or any real basis at all – agreed to such an allowed claim despite having few resources to satisfy it.

In view of this history, it should not be surprising that no other major impaired creditor constituency stands with the Debtors in supporting the Settlement. As a result, the Settlement fails to satisfy *Iridium*'s two key "process" factors: the existence of arm's length negotiations and broad creditor support. These failings should doom virtually any settlement, particularly one of such great consequence to these cases. The domination of the process by Ally – a party with little motivation to minimize the size of claims against the Debtors' estates – vitiates any reliance the Court might otherwise have been able to place on the fact of hard-fought, independent negotiations. The absence of support by *any* other major creditor constituency should sound a further alarm.

*Second*, the Debtors have not met their burden of establishing the reasonableness of the allowed claim, and the Committee's independent analysis suggests that the $8.7 billion value is well above the settlement figure that a true arm's length process would have generated. The settlement amount, in other words, is "probably higher than [an independent debtor] otherwise would have [agreed to] because of the benefits it confers on AFI." Oct. 10, 2012 Hearing Tr. 25 (Glenn, J.).

The Debtors' failure to justify the settlement amount is reason enough to deny the 9019 Motion. The Debtors have presented two experts on the merits of the Settlement, and neither has offered a rigorous analysis employing methodologies sufficient to satisfy the reliability requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The Debtors' principal expert, Frank Sillman, does not even attempt to assess the merits of the Trusts' claims, much less to quantify the actual incidence of R&W breaches or the amount of loan losses caused by those breaches. Instead, he purports to compare the proposed Settlement to outcomes he has witnessed in his personal experience advising clients in put-back negotiations. But his informal and unscientific comparisons to other put-back outcomes, while dressed up in quantitative garb, rest on little real analysis – little more, at bottom, than the sort of conclusory invocations of "professional judgment" that *Daubert* condemns. The Debtors' other expert – their lead litigation counsel, Jeffrey Lipps – does address the legal and factual merits of the Trusts' claims, and does so in a detailed and sophisticated manner. However, like Mr. Sillman, Mr. Lipps provides no real basis to assess the proper *amount* of an R&W settlement. If anything, Mr. Lipps's detailed overview highlights the many potent RMBS defenses the Debtors could have wielded to reduce the Settlement amount, had they sought to do so.

In sharp contrast, the Committee's experts have reviewed and "re-underwritten" a random sample of more than 1,000 loans, and have estimated the incidence of material defects and the impact of such defects on loan losses. At the same time, the Committee's counsel has conducted extensive legal research, considering both the limited case law on RMBS put-back claims and basic principles of contract law applicable to the claims. Based on this factual and legal analysis, the Committee and its professionals have concluded that the Trusts' claims are subject to a number of strong potential defenses that the Debtors appear not to have advanced in

settlement negotiations. A non-conflicted fiduciary would have vigorously asserted each of the following defenses and, thus armed, should have been able to reach a settlement at a level considerably below $8.7 billion:

a.    <u>Loss Causation</u>.    For years after their creation, the Trusts suffered relatively modest losses, even though a number of the loans they held breached representations and warranties given by the Debtors. It was only after the collapse of the housing and financial markets, followed by the "Great Recession" of 2009, that the collateral losses in many of the Trusts began to balloon. The Committee's experts have examined these losses and concluded that most of the harm suffered by the Trusts was caused not by any defects in the loans' underwriting, but instead by such factors as the steep decline in housing prices and the sharp rise in unemployment. While the law governing the calculation of put-back damages in bankruptcy is hotly contested, a non-conflicted fiduciary would have argued that the Trusts' aggregate allowed claim should be limited to the portion of loan losses actually caused by R&W breaches. Such an argument would rest on the black letter principle that breach of contract remedies should not put a plaintiff in a better position than it would have been in absent a breach. This defense, alone, could reduce the Debtors' liability to less than half of the proposed settlement amount.

b.    <u>Statute of Limitations</u>.    Put-back claims are subject to the six year statute of limitations applicable to breach of contract claims in New York. Because New York embraces an "accrual at breach" rule, a non-conflicted fiduciary would have argued that the statute of limitations on put-back claims began to run at the earliest time the Trusts could have claimed breach, *i.e.*, the date each Trust was created, and that many claims are therefore time-barred.

c.    <u>Election of Remedies</u>.    Prior to these chapter 11 cases, the great majority of the Trusts made no put-back demands at all on the Debtors. Instead, the Trusts acquiesced in, and

arguably ratified, the decisions of RFC and GMACM (as the Trusts' master servicers) to foreclose on delinquent loans. Because, as the Debtors recognize (9019 Motion ¶ 28), put-back requires the existence of a mortgage loan, a non-conflicted fiduciary would have argued that foreclosure bars the Trusts' ability to seek put-back under the applicable transaction documents. That is the conclusion of both courts that have considered this issue in the context of similar trust language. While the issue would be contested, it poses a real risk of dramatically reducing the Trusts' R&W claims and is highly relevant to an assessment of the Settlement's reasonableness.[2]

The Committee recognizes that an R&W settlement is a desired building block for a chapter 11 plan in these cases. However, the Settlement now before the Court – the tainted product of a settlement process hijacked by the Debtors' corporate parent – cannot provide the sound foundation this case needs. The 9019 Motion therefore should be denied, and the Court should direct the parties to engage in global negotiations of a revised settlement in conjunction with an overall plan of reorganization. Such negotiations should involve all constituencies and should address the spectrum of plan issues, including the amount of Ally's plan contribution, the allocation of assets and liabilities (including the RMBS put-back claims) among the different Debtors, the priority of various claims, and the treatment of each significant creditor group. Only if these negotiations fail should the Court undertake to quantify the aggregate allowed amount of the Trusts' put-back claims through an estimation process.

---

[2] Apart from the size of the Allowed Claim, the Settlement contains a number of specific objectionable provisions, concerning such matters as the allocation of the Allowed Claim among the Trusts, language purporting to preclude use of Settlement-related materials as evidence in court proceedings against Ally, and payment of attorneys' fees in cash without Court approval. We discuss these provisions in section I.E below.

## FACTS

### A.    The RMBS Trusts

   The Trusts whose alleged claims are addressed by the Settlement were created in securitization transactions in the years 2004 through 2007.  Debtors Residential Funding Company LLC ("**RFC**") and GMAC Mortgage, LLC ("**GMACM**") originated or acquired residential mortgage loans that were subsequently securitized.  Residential Capital LLC ("**ResCap LLC**," "**ResCap**" or "**HoldCo**") is the parent company of RFC and GMACM, but was not party to any of the RMBS agreements.  Non-debtor Ally is the owner of 100% of ResCap LLC's equity.

   In most of the securitization transactions, RFC or GMACM, pursuant to an Assignment and Assumption Agreement ("**Assignment Agreement**"),[3] assigned mortgage loans it had originated or acquired to one of five depositors – affiliates of RFC or GMACM established for this purpose – and made various representations and warranties to the depositor concerning the loans.  The depositor then assigned the loans to a Trust pursuant to a Pooling and Servicing Agreement ("**P&SA**"),[4] which among other things assigned the depositor's rights and remedies under the Assignment Agreement (including with respect to the representations and warranties) to the Trust.  To complete the transaction, the Trust then issued certificates to the depositor, which sold the certificates to investors pursuant to a series of agreements, all as described in the

---

[3] Approximately 10% of the transactions ("**Indenture Transactions**") subject to the RMBS Settlement are structured using a mortgage loan purchase agreement or home loan purchase agreement (an "**MLPA**").  The purpose of the MLPA is the same as an Assignment Agreement – to assign mortgage loans to a depositor and to make various representations and warranties concerning such loans.  In these deals, the loans and the rights in respect of the representations and warranties were then assigned to a Delaware statutory trust pursuant to a trust agreement (a "**Trust Agreement**"), and that trust issued notes secured by the mortgage loans and rights in respect of the representations and warranties pursuant to an indenture (an "**Indenture**").  GMACM or RFC entered into a separate servicing agreement (a "**Servicing Agreement**") pursuant to which it agreed to service the mortgage loans.  The Trust Agreement, Indenture, and Servicing Agreement collectively serve essentially the same purpose as a P&SA.

[4] Technically, under the P&SA structure, loans were assigned to the trustee to be held in trust for certificateholders.  We use the "Trust" terminology for the sake of simplicity.

prospectus accompanying the transaction (the "**Prospectus**," and together with the Assignment Agreement, the P&SA, and other transaction documents, the "**Governing Agreements**"). Pursuant to the P&SA, RFC or GMACM agreed to act as master servicer for the mortgage loans. For 61 of the 392 Trusts, the Debtors obtained financial guaranty insurance from so-called "monoline" insurers.[5]

As relevant to the R&W claims, the Governing Agreements provide as follows:

- Material and adverse. A breach of a representation or warranty is covered by the put-back provisions only if it "materially and adversely affects the interests of the Certificateholders in any Mortgage Loan." P&SA §§ 2.03(a), 2.04.[6]

- Prompt notice. The party discovering a breach of a representation or warranty (whether RFC/GMACM or the Trustee) is required to give "prompt written notice" to the other parties. P&SA §§ 2.03(a), 2.04.

- Sole remedy. In the event of a breach of a representation or warranty, the "sole remedy" available to the Trustees is for RFC or GMACM, as applicable, to cure the breach, substitute a conforming loan (if put-back is requested within two years after the securitization closed) or repurchase the loan. P&SA §§ 2.03(a), 2.04.

## B.    The Pre-Petition Put-Back Claims Against the Debtors

Prior to 2012, the great majority of the Trusts made no put-back demands at all against the Debtors, electing instead to permit RFC or GMACM (as the Trusts' master servicers) to foreclose on delinquent loans. While the Debtors claim to have "repurchased approximately $1.16 billion in loans out of $30.3 billion cumulative losses to date," 9019 Motion ¶ 1, this number is misleading. Relatively few of these loan repurchases were from "private label" securitization ("**PLS**") trusts; instead, most were from the government-sponsored entities

---

[5] In these insured (or "wrapped") transactions, if the cash flow from the mortgage loans is insufficient to pay principal and interest on the insured tranche(s) of Certificates, the monoline insurer is required to make up the shortfall. In exchange, the monoline insurer is paid an insurance premium from the Trust's collections on its mortgage assets and typically enters into an insurance agreement with one or more Debtors.

[6] Unless otherwise indicated, citations to the P&SA are to the P&SA attached as Exh. 6 to the original 9019 Motion.

("**GSEs**"), Fannie Mae and Freddie Mac. The Debtors' loan repurchases from the GSEs are of limited relevance to this Motion, since the agreements governing the GSE deals contain different representations and warranties – which the Debtors consider significantly stronger – than those that govern PLS deals. *See* Declaration of Frank Sillman, dated June 11, 2012 [Dkt. No. 320 Ex. 8] ¶ 61 ("**Initial Sillman Decl.**").

Putting aside the inapposite GSE experience, the most striking aspect of the Debtors' put-back history is how *few* repurchase demands they received from PLS trusts: From 2007 on (the first year for which the Debtors still have records), loans with original principal balances of only $1.8 billion were either voluntarily repurchased by the Debtors or presented to them for repurchase. This amounts to only 4% of the Trusts' estimated $45 billion of losses – that is, a "breach rate" of at most 4%, *one-tenth* of the 40% breach rate that serves as a cornerstone of Mr. Sillman's opinion that the Settlement is reasonable. *See* Exh. C;[7] *see also* Expert Report of Bradford Cornell, Ph.D., dated December 3, 2012, served contemporaneously with this Objection ("**Cornell Rpt.**") ¶ 81. Moreover, the Debtors paid only a modest fraction of this already-small number of claims: They agreed to repurchase only 18.6% (by dollar balances) of the PLS loans for which they completed put-back reviews. *See* Cornell Rpt. ¶ 81. And this low payment rate was notwithstanding the fact that almost all of these PLS put-back demands were made by monoline insurers on behalf of "wrapped" trusts. *See, e.g.,* Cancelliere Tr. 42, 75 (Exh. B) (no put-back requests were made by non-wrapped trusts prior to 2012).[8] As noted in section I.C.2(a) below, the put-back claims of wrapped trusts are governed by different

---

[7] Exhibits referenced herein are annexed to the accompanying Declaration of Kenneth H. Eckstein, dated December 3, 2012 ("**Eckstein Declaration**").

[8] References to "[witness name] Tr." herein are to the transcripts of depositions taken in connection with the 9019 Motion.

contractual provisions and legal principles (including New York's insurance statutes) than those of uninsured trusts, leading some courts to apply more favorable legal standards to their claims.

The Debtors' put-back *litigation* experience is even more limited. Not one put-back suit has been brought against the Debtors by an uninsured trust. Thirteen R&W lawsuits have been brought against the Debtors by monoline insurers (ten of which also name Ally as a defendant), and only two of those had proceeded to the discovery stage by the time of the Debtors' bankruptcy filings. *See* Declaration of Jeffrey A. Lipps, dated May 24, 2012 [Dkt. No. 320 Ex. 9] ("**Lipps Decl.**") at ¶¶ 9, 22, 26, Appendix. None of these cases has yet yielded a decision on the merits. *Id.* ¶¶ 26, 28. Consequently, there has not been a single verdict or finding of liability on the part of RFC, GMACM, or any other Debtor in *any* RMBS case, much less one involving the Trusts. *See* Marano Tr. 157-59 (Exh. E).

Even outside of the Debtors' own experience, litigation regarding RMBS claims has not produced much guidance for resolving the Trustees' put-back claims, because much of the decisional law has concerned claims by monoline insurers, which, as noted, are governed by legal standards that may be significantly different. And in bankruptcy cases involving RMBS claims, such as *Lehman*, courts have not endeavored to liquidate individual claims on the merits, but rather have confirmed plans that left liquidation to a later date (*see* section I.D below).

## C.    The RMBS Trust Settlement

Following a settlement negotiation and approval process that, as discussed below, was dominated by Ally from beginning to end and was deeply flawed as a result, the Debtors entered into the RMBS Trust Settlement on May 13, 2012, one day before the filing of their bankruptcy petitions.

The Settlement includes two substantially similar agreements with two sets of institutional investors – a group represented by Gibbs & Bruns LLP (the "**Steering Committee**

Investors") and another represented by Talcott Franklin, P.C. (together with the Steering

Committee Investors, the "**Institutional Investors**"). Each agreement provides that, upon the

Bankruptcy Court's approval of the RMBS Settlement, the Institutional Investors will "direct or

otherwise persuade," 9019 Motion ¶ 14, the trustees of their respective Trusts to opt into the

settlement and to receive their pro rata share of the $8.7 billion unsecured claim (the "**Allowed**

**Claim**"). Each Trust opting into the settlement (an "**Accepting Trust**") will, in exchange for its

pro rata share of the Allowed Claim, release its claims against all Debtors other than ResCap

LLC,[9] including claims for (i) breaches of representations and warranties as to the mortgage

loans, (ii) failure to notify or enforce such breaches, and (iii) set-off and recoupment. The

Settlement does not release (i) servicing-related claims (other than origination-related

obligations) unless assumed pursuant to Section 365 of the Bankruptcy Code, (ii) direct claims

for securities fraud or arising from the purchase or sale of securities, or (iii) independent claims

of monoline insurers. The RMBS Settlement also contains several other objectionable

provisions, discussed in more detail in section I.E below.

## ARGUMENT

### I.
### THE RMBS TRUST SETTLEMENT DOES NOT SATISFY THE *IRIDIUM* FACTORS

Before approving a settlement pursuant to Rule 9019, a bankruptcy court must

determine that it is "fair, equitable, and in the best interests of the estate." *HSBC Bank USA,*

---

[9] The agreement carves ResCap LLC out of the release that settling Trusts will be giving, but caps its potential liability at an amount equal to each Trust's claim against its Seller and Depositor Entities less any amounts paid to the Trust by those entities. This preservation of claims against ResCap LLC is troubling, given that (i) such claims were fully released under the May 13, 2012 Settlement Agreement, (ii) no such claims had ever been alleged against ResCap LLC, and (iii) the Board was never told there was any legal basis for ResCap LLC to have any liability, *see* Mack Tr. 168 (Exh. V). In addition, the carve-out of these claims raises the possibility that, even if the Court were to approve the Settlement, the very put-back claims supposedly resolved by the Settlement would still have to be fully litigated or estimated at or after confirmation.

*N.A. v. Fane (In re MF Global Inc.)*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012). The proponents of the proposed settlement bear the burden of persuading the court that this standard has been met. *Id.* at 248. In determining whether to approve a settlement, a bankruptcy court will consider a variety of factors, including the probability of success in the litigation, the extent to which the settlement is the product of arm's length bargaining, and the degree of creditor support for the settlement. *See Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).[10]

As the foregoing factors suggest, the reasonableness of a proposed settlement depends in important part on the context in which it is negotiated, and certain types of circumstances warrant heightened scrutiny – for example, where, as here, a settlement by its sheer size has obvious centrality to the future course of the proceedings. As in the case of a sale of substantially all of a debtor's assets prior to and without the protections of the chapter 11 plan process, a pre-plan settlement such as this one that commits an overwhelmingly significant sum to a single creditor constituency should be closely scrutinized. *See In re General Motors Corp.*, 407 B.R. 463, 492 n.54 (Bankr. S.D.N.Y. 2009) (giving pre-plan sale "close factual scrutiny" where "the proportionate value of the assets being sold is high"); *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003) ("more than cursory scrutiny" of major asset sale required, particularly where debtor's parent negotiated deal and parent may have been "infected

---

[10] *Iridium* directs that a court consider the following factors in evaluating the reasonableness of a settlement: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (iii) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (iv) whether other parties in interest support the settlement; (v) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which the settlement is the product of arm's length bargaining. *Iridium*, 478 F.3d at 462.

by self-dealing"); 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that "courts closely scrutinize such sales").

In addition, settlements involving insiders, such as Ally, are subject to a heightened level of scrutiny. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable."); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 240 (Bankr. S.D.N.Y. 2009) (subjecting plan settlement with controlling shareholder to "heightened scrutiny"); *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 919 (5th Cir. 1995) ("The court's scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims.").

If a settlement appears to be the product of a conflicted process not endorsed by independent estate fiduciaries, a court will not hesitate to invalidate it. *See, e.g., In re Matco Electronics Group, Inc.*, 287 B.R. 68, 76, 78 (Bankr. N.D.N.Y. 2002) (denying approval of settlement where, among other things, principal signing settlement agreement on behalf of debtors was also shareholder of counterparty to settlement and was himself beneficiary of a release and where debtors' counsel took "little, if any, part" in negotiations); *In re The Present Co.*, 141 B.R. 18, 23-24 (Bankr. W.D.N.Y. 1992) (denying approval of settlement where settling parties, who were insiders, were its only proponents and committee was opposed).[11]

---

[11] In *In re Dewey & LeBoeuf LLP*, 478 B.R. 627 (Bankr. S.D.N.Y. 2012), this Court declined to apply the "entire fairness" standard of review to a proposed settlement. *Id.* at 641-42. The Court, however, said nothing to contradict the view, expressed in the cases discussed above, that the Rule 9019 standard itself allows for heightened scrutiny of insider transactions; it merely rejected misplaced case law cited in support of the "entire fairness" standard and (footnote continued)

Consistent with these principles, this Court has already noted that, even if it concludes that the proposed $8.7 billion settlement is within the potential range of reasonableness, it will still consider whether the settlement amount is "probably higher than [the Debtors] otherwise would have [agreed to] because of the benefits it confers on AFI." Oct. 10, 2012 Hearing Tr. 25 (Exh. A). This comment encapsulates both of the main reasons for disapproving this settlement: the negotiations were not, in fact, arm's length but were dominated by Ally for its own purposes, and the resulting settlement number is substantially too high. These issues, along with the other *Iridium* factors, are addressed in sections I.A through I.D below. In section I.E, we address certain specific objectionable settlement provisions that would have to be stricken or modified before the 9019 Motion could be granted.

## A.    The Settlement Was Not the Product of Arm's Length Bargaining

The existence of truly arm's length negotiations is crucial to the *Iridium* analysis, because it permits a court to place some faith in the workings of the adversarial process. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 246 (Bankr. S.D.N.Y. 2007) (discussing arm's length bargaining "at length" because court "thought it important to have the comfort that the proposed Settlement was the result of a vigorously negotiated process").

The circumstances surrounding negotiation of the RMBS Trust Settlement provide no such comfort. Rather than seeking a fair settlement that would be in the best interests of all creditors, it appears that the Debtors (or, in fact, Ally) negotiated the deal with one overriding objective in mind: obtaining the Institutional Investors' support for a release of all

---

found that the "Partner Contribution Plans" at issue were not, in fact, related party transactions. *Id.* Moreover, the facts in *Dewey* differed starkly from the current situation. The *Dewey* settlement was negotiated *after* commencement of the case, with the active participation of the debtor's independent chief restructuring officer and financial advisor, as well as counsel to the creditors' committee and the secured lenders. The *Dewey* settlement also enjoyed broad creditor support. *See id.* at 642-43.

estate and third-party claims against Ally based on a capped settlement payment of $750 million. In exchange for this support, the Debtors agreed to an Allowed Claim some *4 billion more* than the highest value they had ever publicly attributed to their R&W liability, the effect of which would be to swamp the Debtors' unsecured creditor classes. The evidence shows little effort by the Debtors to advocate independently for the interests of their other constituents by establishing an appropriate but not inflated Allowed Claim amount. Instead, the Debtors took a back seat and allowed the negotiations to be led by their corporate parent, which had little to lose by giving a large allowed claim against its bankrupt subsidiaries in return for a cap on its own contribution to the estates.

Discovery regarding negotiation and approval of the RMBS Trust Settlement has confirmed three critical facts: first, Ally directed the negotiations from the Debtors' side; second, Ally, in negotiating the settlement on behalf of the Debtors, was primarily (if not solely) motivated by its desire to obtain a release; and third, the ResCap Board rubber-stamped the Ally-negotiated settlement based on an analysis that was both extraordinarily cursory and fundamentally flawed. We summarize here only some of the evidence that will be presented at trial:

### 1. **Ally directed the negotiations**

- In October 2011, Kathy Patrick contacted William Solomon, General Counsel to *Ally*, to demand a meeting to discuss her clients' purported repurchase and servicing claims. Exh. F. Mr. Solomon responded with a letter that denied any liability on Ally's part and suggested that Ms. Patrick reach out to Tammy Hamzehpour, General Counsel for the Debtors. Exh. G. Kathy Patrick responded that her clients believed that Ally bore the liability associated with the repurchase and servicing claims. Exh. H; *see also* Hamzehpour Tr. 28 (Exh. I).

- Subsequently, Timothy Devine, *Ally's* Chief Counsel-Litigation, was "asked to interface with Kathy Patrick." Devine Tr. 43 (Exh. J). Despite the universal

recognition that he did not represent ResCap,[12] Mr. Devine testified that he was the one "driving a deal to conclusion. . . . [T]he deal that is represented in gross by the resolution between the ResCap estate and the RMBS claimants, both the Kathy Patrick and Talcott Franklin in the one sense and also the tripartite agreement between Ally, the ResCap entities, and the claimants." *Id.* at 248.

- *ResCap's* General Counsel, Ms. Hamzehpour, on the other hand, was largely a spectator in the negotiations, having no one-on-one calls with Ms. Patrick in 2012. Hamzehpour Tr. 90 (Exh. I). While Ms. Hamzehpour claims to have been "kept informed" of the negotiations, she admittedly did not participate in many of the discussions or meetings. *Id.* at 80-81.

- Negotiations with Ms. Patrick did not begin in earnest until April 16, 2012, three weeks before the settlement was approved by the ResCap Board. Oct. 4, 2012 Hearing Tr. 47 (Exh. K). On April 17, 2012, Mr. Devine stated in an email to Ms. Hamzehpour and Gary Lee of Morrison & Foerster that he did not believe they should share with Ms. Patrick at that point a dollar range of potential Ally contribution, but should instead focus on "the structure of the proposed outcomes, the potential for substantial contribution from AFI, fragility of the goal but *clarity of purpose for comprehensive third party releases*." Exh. L (emphasis added).

- In a series of emails on April 23, 2012, Mr. Devine urged Ms. Hamzehpour to present Ms. Patrick with a range of private label R&W claim sizes of $3 billion/$4 billion/$6 billion, representing the low/medium/high range, and to use $750 million rather than $1 billion as Ally's potential contribution. Ms. Hamzehpour replied without objection. Exh. M.

- In a decisive communication on May 9, 2012, Mr. Devine wrote to Mr. Lee that "[a]s I told you on the phone, Ally will support the $8.7 billion allowed claim. There is no new Ally money. Hard stop at 750 + 200 + 100."[13]

---

[12] *See, e.g.*, Devine Tr. 222-23 (Exh. J) (Ally was his client); Ruckdaschel Tr. 142 (Exh. N) ("my understanding is that in the RMBS settlement discussions that Tim was representing Ally"); Marano Tr. 239-41 (Exh. E) ("Tim Devine had been present but he did not represent ResCap. . . . Mr. Devine was there as a representative of Ally I believe."); Hamzehpour Tr. 27 (Exh. I) (Mr. Devine was representing Ally).

[13] Exh. P. The Committee understands that this refers to $750 million in cash; $200 million in credit for Ally's $1.6 billion bid for the HFS portfolio of loans (which Ally alleged was worth only $1.4 billion); and $100 million in credit relating to the Debtors' ongoing origination and subservicing relationship with Ally. As we now know, the proposed additional credits were illusory: the HFS portfolio was ultimately sold to Berkshire Hathaway for more than $1.6 billion, and the ongoing agreements between the Debtors and Ally required the Debtors to pay tens of millions of dollars to Ally Bank (for the benefit of Ally) in connection with certain loan modifications being performed in connection with the DOJ/AG settlement – something Ally appears not to have considered when determining that the ongoing agreements would benefit the Debtors by $100 million.

### 2.  **Ally's primary – or sole – motivation was to obtain a release**

- Ally made clear to Kathy Patrick that it would support the Settlement only if Ms. Patrick would agree to support Ally's release as part of the plan.  As Mr. Devine testified, "[w]hat I communicated to Kathy Patrick was that in connection with the settlement agreement she was trying to reach with the debtor, for which she sought Ally's support and assurance that Ally wouldn't object to it, Ally would seek a release – Ally would seek the support of her clients of the plan that was being negotiated between ResCap and Ally at the time." Devine Tr. 98 (Exh. J).

- On May 7, 2012, Mr. Devine asked Mr. Lee and attorneys from Kirkland & Ellis, Ally's outside counsel, "what percentage of R&W claimants do we need to be able to cram down or otherwise neutralize the AIGs or other likely objectors." Exh. O.

- The amount that Ally would be paying for the releases from ResCap and third parties was of primary importance to Ally.  Devine Tr. 145 (Exh. J).  Ms. Hamzehpour conceded that "[i]t was clear to everyone internally" that "third-party releases would be required in order to achieve a substantial contribution from AFI." Hamzehpour Tr. 50 (Exh. I).

- In an email dated May 10, 2012, the day after the Board approved the Settlement (see below), Mr. Devine explained to Morrison & Foerster that the tripartite agreement had been structured to release claims against Ally even though the RMBS Trust Settlement Agreement itself technically did not:

  > The circle is squared at the Plan.  KP can only get us the "everything-but-securities" settlement release because that is the full extent of her representation.  She has been clear about that.  Same as in her BoA/BoNYM work.  Etc.

  > But notice: though her clients don't release securities claims, they sign Plan Support Agreements, and the Plan includes very simple comprehensive releases, which of course include third party release of all claims, which of course includes securities claims.  Presto.

  > So while she can't represent parties in giving up their securities claims, clients face a choice: either sign up with the settlement to make sure your trust receives monies under the waterfall, in which case you need to sign the Plan Support Agreement and support the Plan.  And the Plan wipes out all their claims of any sort.  This is the beauty of it.

  Exh. T.

- In a May 12, 2012 email from Noah Ornstein of Kirkland & Ellis to Morrison & Foerster regarding the Ally release, Mr. Ornstein wrote:

> Spoke with T. Devine this morning. He is adamant that Ally get a
> release from Trusts in the settlement agreement. Notwithstanding
> that Ally is not a party to that agreement, I think we can get there.
> Consider a third party beneficiary provision running to Ally that is a
> full release of Ally upon the Effective Date . . . .

Exh. Q.

- In an email dated May 12, 2012, Mr. Devine wrote to Morrison & Foerster and
  Kirkland & Ellis that he "Had call with KP. We told her PSA support – whole hog –
  is drop dead." Mr. Devine explained that he had informed Ms. Patrick that Ally
  would insist – as much as it was able to insist – on her support of the Plan. Exh. R;
  *see also* Devine Tr. 281-82 (Exh. J).

### 3. The Board rubber-stamped the Settlement after reviewing only a cursory and deeply flawed analysis

- Ally's Form 10-Q, filed April 27, 2012, stated:

  > We currently estimate that ResCap's reasonably possible losses over
  > time related to the litigation matters and potential repurchase
  > obligations and related claims described above could be between $0
  > and $4 billion over existing accruals.

  Exh. S at 73. The same Form 10-Q disclosed a reserve of $811 million. *Id.* at 69. No
  one has questioned the accuracy of this disclosure.[14]

- A presentation by Mr. Devine to ResCap's Audit Committee on May 1, 2012
  summarized the "estimated top-end of the range of reasonably possible losses for
  ResCap over time related to litigation, repurchase obligations, and related claims over
  existing reserves as of 1Q 2012" at $4.041 billion. Exh. U at 3.

- A week later, the ResCap Board was asked to approve a settlement nearly *double* that
  amount. The $8.7 billion settlement was presented to the Board the same day that
  Ally's counsel Mr. Devine declared that Ally would support that number but was
  enforcing a "hard stop" at the $750 million base amount for Ally's plan contribution.
  ResCap went along with this deal even though ResCap Chairman and CEO Thomas
  Marano had expressed to the ResCap Board that "it probably would take something
  close to $2 billion to settle this" and that "no one was going to do a deal for 750."
  Marano Tr. 93-94 (Exh. E). In fact, ResCap's claims against Ally were initially
  estimated to be $8 or $9 billion. Mack Tr. 131 (Exh. V); Exh. W.

---

[14] John Mack, a ResCap board member on the audit committee, believed that this estimate was accurate and that "$4 billion was the upper end of the range," including securities claims. Mack Tr. 57-60 (Exh. V). *See also* Devine Tr. 199 (Exh. J) (disclosures in 10-Q "were accurate and appropriate and lawful at the time and they stand the same today.").

REDACTED

- Mr. Marano received the May 9, 2012 board materials – a two-page handout provided by counsel – 22 minutes before the scheduled 3 pm telephonic board meeting. Prior to the May 9 meeting, he was aware of "general concepts," but stated that the settlement discussions with Ms. Patrick were "fluid" until the meeting. Marano Tr. 146-48 (Exh. E); *see also* Mack Tr. 62-63 (Exh. V) (Mack not informed before meeting that deal had been reached); Whitlinger Tr. 24-27 (Exh. X). The Board was provided with no expert opinion as to the fairness of the settlement, no estimate of the likely outcome of actually litigating the claims, and no meaningful legal or factual analysis that in any way supported the huge leap in the amount of the allowed claim. Mack Tr. 67 (Exh. V) (board not told what number would be if claim actually litigated rather than settled); *see also* Whitlinger Tr. 119-20 (Exh. X). It nevertheless approved the settlement, after spending less than an hour on the subject. Marano Tr. 164-67 (Exh. E); Exh. Y; Exh. BB.

- The two-page handout on which the Board based its approval (which stated on its cover that it was prepared by Ally as well as ResCap) contained the barest analysis imaginable of the merits underlying the proposed $8.7 billion settlement. The analysis did not address any litigation defenses, nor did it consider any data derived from actual loan file reviews (since none had been conducted). Exh. Y. Instead, the presentation noted that the proposed settlement embodied a 19.72% "defect" rate (that is, the $8.7 billion settlement amount comprised 19.72% of the Trusts' $44 billion in estimated lifetime losses), which it purported to justify by comparing two other purported rates – namely, the 35% and 36% defect rates supposedly associated with the RMBS claims asserted in the Lehman bankruptcy and with Bank of America's recent $8.5 billion RMBS settlement, respectively. *Id.* These two comparisons, plus a footnoted reference to a [REDACTED] "weighted average defect rate" supposedly derived from ResCap's "historical post fund audit" experience, constituted the presentation's *only* support for the proposed settlement amount.

- Discovery has revealed, however, that each of these comparisons was fundamentally flawed – a conclusion reached by the Debtors' own expert, Mr. Sillman, who was engaged only *after* the Board had approved the Settlement and the Debtors had executed it, Sillman Tr. 104-05 (Exh. D):

  ○ In his analysis of the reasonableness of the $8.7 billion Allowed Claim amount, Mr. Sillman compared the "loss share rate" that he estimated for the Debtors with the loss share rate implicit in the Lehman and Bank of America cases. (Mr. Sillman's "loss share" rate is identical in substance to the "defect" rate used in the May 9 Board presentation, namely, the settlement amount as a percentage of the trusts' estimated lifetime losses.) He concluded that the correct rates for these two settlements were 9%-14% and 14%, respectively – a fraction of the 35% and 36% rates used in the Board presentation. Initial Sillman Decl. ¶ 65; Sillman Tr. 233-34, 236 (Exh. D).

  ○ Without any assistance from Mr. Sillman (who had not yet been retained), the Debtors' Mortgage Risk Officer, Jeff Cancelliere, reached the same conclusion about the Bank of America settlement. Mr. Cancelliere told counsel, prior to the

May 9 Board meeting, that he had "concerns" with using a 36% defect rate. Cancelliere Tr. 205-08 (Exh. B).

○ Even the [REDACTED] historical "weighted average defect rate" referred to in a footnote to the May 9 Board presentation was not reliable, according to Mr. Sillman. He testified that he relied on none of the Debtors' pre-petition PLS experience in forming his opinions, because he determined that the Debtors had insufficient available information to permit a meaningful assessment of that experience, including their historical "post fund audit" experience. Sillman Tr. 142-46 (Exh. D).[15]

• Although ResCap had two independent directors supposedly responsible for negotiating at arm's length with Ally, at least one of them, Mr. Mack, appears to have been largely uninformed. He testified, among other things, that he never received an explanation of what litigation defenses might be available to ResCap against these potential claims, Mack Tr. 53 (Exh. V), and that the $8.7 billion settlement was not necessarily consistent with ResCap's potential liability, but was simply a "negotiated number." *Id.* at 66-67. He also had "no idea" that Ally was having conversations with Ms. Patrick, but stated that he "would not understand" why Ally's chief litigation counsel would have taken the lead in the settlement negotiations and negotiated material terms. *Id.* at 41, 44.[16]

In short, the RMBS Trust Settlement was not "the product of arm's length bargaining," one of the key factors that the Court must consider in approving any settlement under *Iridium*. Rather, the Settlement was negotiated principally between Ally (speaking directly through its in-house counsel or by instructing the Debtors) and Kathy Patrick, and Ally's main concern was to lock in constituencies to a Plan Support Agreement in return for the lowest possible plan contribution. This deal – at bottom, the trade-off of an excessive $8.7 billion allowed claim for an inadequate $750 million plan contribution – was sold to ResCap's board on

---

[15] Board members do not remember being informed of any of the shortcomings in the analysis on which they relied to approve the Settlement. Whitlinger Tr. 43, 46-47 (Exh. X); *see also* Cancelliere Tr. 205-08 (Exh. B).

[16] Further demonstrating that the Board was not fully informed regarding the details of the Settlement, the settlement agreement that the Board approved on May 9, 2012 was *different* from the one that was ultimately executed. Mr. Lee wrote in an email to Ms. Patrick later on May 9 that he was "spooked" to learn that "the deal I sold to our board" did not include the release of securities claims. Exh. T. Mr. Mack therefore believed – and apparently still believes – that the $8.7 billion settlement he approved includes securities claims. Mack Tr. 108-09 (Exh. V). Yet, the final RMBS Trust Settlement Agreement specifically *excludes* the release of securities claims, *see* § 7.01, and for good reason: Ms. Patrick could not release such claims because she did not represent her clients with respect to those claims. *See* Exh. T; *see also* Devine Tr. 271-73 (Exh. J).

the basis of information that both the Debtors' Mortgage Risk Officer and the Debtors' own

expert consider inaccurate.[17]

### B.    The Settlement Is Opposed By Every Major
### Impaired Creditor Group Besides the Plaintiffs

The *Iridium* factors relating to support for the RMBS Trust Settlement by

creditors and other parties in interest further militate against approval here, particularly in

combination with the lack of arm's length negotiations.    The Settlement was negotiated

unilaterally with Ms. Patrick and Talcott Franklin, who represent a fraction of the Trusts'

investors, and it has yet to be demonstrated how widely the Settlement will be supported even

within that investor class.    What *is* clear is that the Settlement has provoked widespread

opposition by all other major creditor groups, each of which is legitimately concerned about the

potential dilution of its recovery at either the HoldCo or OpCo levels and the prospect of Ally

---

[17] In addition to the facts discussed above, the Settlement itself, in its various iterations, confirms that Ally engineered the process with the goal of obtaining releases and that the Debtors paid scant attention to their fiduciary obligations:

- The linkage with the Plan Support Agreement was express in the original Settlement Agreement (attached as Exhibit 2 to the original 9019 Motion, filed at Dkt. No. 320), which recited in its "whereas" clauses both Ally's settlement with the Debtors fixing its plan contribution in return for a release and the Institutional Investors' agreement to support the Plan Support Agreement. After the Committee objected to the linkage, the Debtors amended the 9019 Motion to facially sever the two agreements (*see* Supplemental Motion available at Dkt. No. 1176, page 1) – without, of course, changing the historical fact that Ally had, in the negotiation process, expressly conditioned its agreement to the $8.7 billion allowed claim on Ms. Patrick's support for the PSA.

- Ally's status as the central party in interest is confirmed by remarkable language included in the proposed order submitted in connection with the 9019 Motion, providing that neither the Settlement nor any of the factual or expert materials generated in connection with the 9019 Motion may be used in the future against *Ally* – a non-party to the Settlement. This provision is discussed below at section I.E.2.

- Additional troubling evidence of the Debtors' casual approach to their fiduciary obligations is provided by the Debtors' agreement, without any apparent Board analysis or consideration, to amend the Settlement to give the Trusts an election to assert up to $1.74 billion of their Allowed Claim against ResCap LLC, rather than against RFC and GMACM, even though no R&W claims had ever been alleged against the HoldCo. *See* Mack Tr. 168 (Exh. V) (Board never told there was any legal basis for ResCap LLC to have any liability); Hamzehpour Tr. 89 (Exh. I) (Board did not approve amendment).    Then, after the Committee and creditors of ResCap LLC protested, the Debtors just as abruptly amended the agreement again to remove this "HoldCo election," although without restoring the full release that the initial Settlement Agreement had given to ResCap LLC.

using approval of the RMBS Settlement to cram down a plan including an Ally release without support of other unsecured creditor constituencies.

This lack of widespread creditor support is a significant factor weighing against approval of the settlement. *See, e.g., In re Matco Electronics Grp., Inc.*, 287 B.R. 68, 77 (Bankr. N.D.N.Y. 2002) (denying Rule 9019 motion where "a major consideration for the Court is the interests of the unsecured creditors, who in this case have through the Committee expressed serious objections to the Settlement Agreement"). Indeed, the Committee has been unable to locate a case approving a contested settlement under Rule 9019 despite *both* a lack of arm's length negotiations *and* the absence of widespread support by other stakeholders. *Cf. Foster Mortgage*, 68 F.3d at 918 (lower court abused its discretion by giving "no consideration to issues we find dispositive: that nearly all creditors in interest opposed this settlement and that the settlement was reached between insiders without the participation of the creditors").[18]

## C.    The $8.7 Billion Settlement Amount is Unreasonably High

Heightened scrutiny of the Settlement's merits is warranted here for the reasons discussed above. But whatever standard of review the Court applies, the Settlement fails *Iridium*'s merits prong for two independent reasons: the Debtors' failure to meet their burden of demonstrating an evidentiary basis to conclude that a settlement of their R&W liability at $8.7 billion is within the range of reasonableness, and the Committee's independent analysis showing that a non-conflicted fiduciary would have insisted on a substantially lower settlement.

---

[18] The importance of creditor consensus as a confirmation of the legitimacy of the negotiation process is reflected in this Court's recent *Dewey* decision. There, the Court approved the proposed settlement only after finding that the debtor's chief restructuring officer, financial advisor, and counsel had negotiated the settlement "with substantial input from counsel for the Unsecured Creditors Committee and the Secured Lenders, and without interference from the Wind-Down Committee, or any Dewey partners." *Dewey*, 478 B.R. at 642. The Court highlighted as "[m]ost telling" the fact that the creditors' committee and the secured lenders supported the settlement. *Id.* at 643. Here, in stark contrast, the Committee and all major creditor groups other than the Trustees were excluded from negotiations and oppose the Settlement.

1.    **The Debtors have presented no reliable evidence to support
the reasonableness of the $8.7 billion settlement amount**

The Debtors have presented the declarations of two purported experts, Messrs.
Lipps and Sillman, in support of the Settlement. Neither expert provided any analysis to the
Debtors prior to their execution of the Settlement; rather, each was asked to opine as to the
Settlement's reasonableness only *after* it had been agreed to. *See* Lipps Tr. 97-98 (Exh. Z);
Sillman Tr. 104 (Exh. D). Their efforts thus amounted to reverse-engineering a desired result,
and their resulting opinions as to the Settlement's reasonableness should carry limited weight for
this reason alone. But the shortcomings of these experts' analyses are far more extensive than
this. At bottom, the conclusion of each that the Settlement is reasonable rests on no reliable
methodology nor, indeed, on the rigorous application of *any* principles or methods to the facts of
this case. Each expert's opinion therefore fails to satisfy the governing standards for the
admissibility of expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.
579 (1993).

The declaration of Mr. Lipps reads in most respects like a legal brief or an
examiner's report concerning the legal and factual issues that arise in R&W litigation, *see
generally* Supplemental Declaration of Jeffrey A. Lipps ("**Lipps Supp. Decl.**") [Dkt. No. 1664-
7] – and the Committee has little quarrel with the soundness of many of Mr. Lipps's legal and
factual conclusions. Indeed, the thrust of Mr. Lipps's observations undercuts rather than
supports the reasonableness of the Settlement, by demonstrating that the Debtors have potentially
strong defenses to the put-back claims that, if properly presented in negotiations, could have
substantially reduced the agreed amount of their put-back liability:

- The "overwhelming majority" of loans have no R&W breaches. Mr. Lipps
explains that litigating the issue of whether a representation or warranty has
been breached poses evidentiary challenges, that the Debtors would "hotly
contest" any allegations of breach, and that it is his "belief based on the

available evidence to date that the *overwhelming majority* of the loans in each collateral pool did not breach any representations and warranties." Lipps Supp. Decl. ¶¶ 47-59, 120 (emphasis added).

- <u>Many R&W breaches are not actionable</u>. Mr. Lipps opines that the "material and adverse" effect language of the governing agreements may create significant litigable issues regarding what breaches are actually material and actionable. *Id.* ¶¶ 60-73.

- <u>Most losses were caused by the market collapse</u>. In Mr. Lipps's opinion, the market collapse, rather than the Debtors' actions, caused most of the Trusts' losses: "There is ample evidence that the true cause of the losses to these Trusts was the massive economic downturn beginning in late 2007 and escalating through 2008 and into 2009." He adds that it is his belief that "the housing crisis is the greatest single cause for the poor performance of the Trusts." *Id.* ¶¶ 74-82, 104, 108.

- Underline{Statutes of limitations may bar the claims}. Mr. Lipps explains that New York's six year statute of limitations may bar many of the put-back claims. *Id.* ¶¶ 91-98.

Notwithstanding these defenses, Mr. Lipps purports to conclude that the Settlement is reasonable, apparently based on his view that the factual and legal issues involved are so complex and burdensome that settlement is the only solution. *See id.* ¶¶ 11, 23, 123. But Mr. Lipps offers absolutely no analysis that would support any conclusion regarding the proper *amount* of the Settlement.[19] He admits that he has made no attempt to value the Trusts' put-back claims by developing a litigation risk analysis of the sort lawyers often prepare, assigning dollar amounts and percentage likelihoods to a range of potential outcomes. Lipps Tr. 30-34 (Exh. Z). Nor has he made any attempt to quantify either the extent of R&W breaches or the magnitude of the Trusts' resulting collateral losses. *Id.* at 136-42. Consequently, Mr. Lipps's analysis, by itself, no more supports the reasonableness of an $8.7 billion settlement amount than it would

---

[19] Nor does he present any support for his apparent view that settlement is the only feasible way to resolve the Trusts' claims. Indeed, he acknowledges that he has no familiarity with, much less expertise concerning, the techniques available to a bankruptcy court to streamline protracted and unwieldy litigation, such as estimation. Lipps Tr. 37-43 (Exh. Z). Moreover, he appears to ignore the fact that even approval of the Settlement would not eliminate the possibility of protracted litigation over the Trusts' put-back claims, since the Settlement resolves those claims only against RFC and GMAC Mortgage and not also against ResCap LLC. *See* above at 11 n.9.

- 24 -

support a settlement half that amount.  His declaration does nothing to meet the Debtors' burden of justifying *this* settlement on its merits.

The Debtors offer a purported quantification of a reasonable settlement range only through their other expert, Mr. Sillman, who argues that the Settlement is reasonable principally because it is in line with his personal experience advising clients in loan put-back negotiations. But Mr. Sillman presents no more of a basis for concluding that the Settlement is reasonable than does Mr. Lipps.

In the first place, it is important to stress what Mr. Sillman does *not* do:  He makes no attempt to evaluate the merits of the Trusts' put-back claims against the Debtors.  In addition to giving no consideration to any legal defenses, he (like Mr. Lipps) does not purport to quantify the actual incidence of R&W breaches with respect to the loans in the Trusts.  While he estimates the Trusts' aggregate lifetime losses (future as well as current), he makes no attempt to estimate what portion of those losses were caused by R&W breaches or would result in put-back liability.  Instead, he attempts to estimate the aggregate settlement amount to which the Debtors "might agree," primarily by reference to the "[alleged] breach rates" and "agree rates" that he has observed when advising clients in other put-back negotiations.  Initial Sillman Decl. ¶¶ 44-69; Sillman Tr. 192-94 (Exh. D).  By multiplying what he believes is the average alleged breach rate (41%) by the supposed average agree rate (46%), he derives a "loss share rate" of 19%, which he then multiplies by the Trusts' $45 billion in estimated lifetime losses to conclude that the $8.7 billion settlement amount is reasonable.  *See* Declaration of Frank Sillman, dated September 28, 2012 [Dkt. No. 1664-3] ¶ 17 ("**Sillman Supp. Decl.**").

While a settlement-based approach might be entitled to some weight if it were based on a reliable methodology and a careful analysis of the data, Mr. Sillman's opinion rests

REDACTED

on only the most casual sort of quantitative analysis. He admits that it is not possible, due to the paucity of publicly available data, to compute average put-back rates for private label RMBS sponsors. Sillman Tr. 68-69 (Exh. D). He therefore attempts to derive put-back averages in large part from his own personal experience – that is, from the average breach rates and agree rates he has observed in put-back negotiations. Initial Sillman Decl. ¶¶ 52-53, 56; Sillman Tr. 272, 276-77 (Exh. D).[20] But his consideration of these averages is highly subjective:

- For example, he derives his alleged breach rate by multiplying his "audit rate" by his "demand rate." Initial Sillman Decl. ¶ 57. Remarkably, however, he acknowledges that he has no back-up whatsoever – no calculations, no spreadsheet, but just his undocumented recollection – for the very precise percentages he offers as his imputed audit rate (65% to 69%) and demand rate (54% to 64%). Initial Sillman Decl. ¶¶ 53, 56; Sillman Tr. 225-30, 281-82 (Exh. D).

- Moreover, Mr. Sillman admitted at deposition that he computed these ranges of percentages based not on all of his clients, but rather on a        REDACTED

- Mr. Sillman admitted further that he has made no comprehensive attempt to review the factors affecting put-back liability – *e.g.*, loan type, vintage, strength of reps and warranties, wrapped vs. unwrapped, number of years elapsed prior to put-back demands – as they apply to his clients and to the Debtors. *Id.* at 277-80, 296-97. Although he acknowledges the importance of these factors, *id.* at, *e.g.*,

---

[20] Mr. Sillman also cites the Debtors' higher than average "agree rate" with respect to GSE repurchase demands as support for his conclusions concerning the Debtors' PLS agree rate. Initial Sillman Decl. ¶¶ 61-62. However, he offers no opinion as to the reasons why the Debtors' GSE agree rate is higher than average, or whether those reasons would apply in the very different PLS context. Nor does he provide any reasoned basis for his conclusion that, as a result, the Debtors' PLS agree rate should be 46%, rather than a fraction of that amount.

63-64, 69-70, he has performed no evaluation of how they might affect the validity of his conclusions.

In other words, the surface precision of Mr. Sillman's analysis – the litany of specific percentage ranges for audit rate, demand rate, agree rate, and the like – masks an opinion that, at bottom, is entirely subjective. His conclusions rest not on data that can be verified, calculations that can be checked, or hypotheses that can be tested, but merely on his unsupported say-so – exactly the sort of unscientific opinion that *Daubert* condemns.

Moreover, Mr. Sillman simply ignores key data that is inconsistent with his conclusions:

- Although Mr. Sillman tabulated the Debtors' pre-petition PLS repurchase history (Exh. C), his report states that he did not rely on it in forming his conclusions. *See* Initial Sillman Decl. ¶ 8. As a result, his report fails to consider the key aspects of that history noted above: that (i) it involved a "breach rate" of only 4%, *one-tenth* the 40% breach rate on which his opinion rests; and (ii) the Debtors agreed to repurchase only 18.6% (by dollar balances) of the PLS loans for which they completed put-back reviews, a fraction of Mr. Sillman's 44% "agree rate." *See* p. 9 above; *see also* Cornell Rpt. ¶ 81.

- Mr. Sillman compares the proposed Settlement to the recent Bank of America settlement and to proceedings in the Lehman Brothers bankruptcy, concluding that the BofA and Lehman experiences reflect "loss share rates" of 14% and 9%-14% (with a midpoint of 11.5%), respectively. *See* Sillman Initial Decl. ¶ 65. But he appears to overlook the significance of these conclusions: Application of those loss share rates to his own $45 billion estimate of the Trusts' lifetime losses yields "repurchase obligations" for the Debtors of $6.3 billion and $5.2 billion, respectively – amounts significantly smaller than the $8.7 billion Settlement that he finds to be reasonable. *See* Cornell Rpt. ¶¶ 82-83.

Finally, it is clear that very large downward adjustments to Mr. Sillman's conclusions are required due to several key legal considerations that he admits he did not take into account. *See* Sillman Tr. 13, 118-19 (Exh. D) (he made no attempt to take any legal defenses into account, and he lacks the expertise to do so). As discussed below, the Debtors have potential loss causation, statute of limitations and election of remedies defenses arising from the unusual circumstances of this case – including the Trusts' failure to assert their put-

back claims until after many years had passed, the real estate and other markets had crashed, and most of the loans for which put-back is sought had already been liquidated. Mr. Sillman's analysis takes no account of these crucial considerations, which have the potential to greatly reduce the Debtors' liability.

For all of these reasons, Mr. Sillman's opinion, like that of Mr. Lipps, provides no support for the conclusion that the Settlement is reasonable. The Debtors have offered no reliable evidence to support the reasonableness of the settlement amount, and on that basis alone, the Court may find that the Settlement fails the merits-review prong of *Iridium*.

### 2.    The Committee's analysis demonstrates that a non-conflicted fiduciary likely could have negotiated a substantially lower settlement of the put-back liability

In contrast to the Debtors' approach, the Committee undertook to assess the actual merits of the put-back claims against the Debtors to determine the arguments that could have been advanced by a non-conflicted fiduciary in an arm's length negotiation. The results of this analysis are telling. The Committee's work shows that a settlement negotiated at arm's length would most likely have come out substantially lower – probably at a level more in line with the Debtors' own earlier publicly disclosed estimate of zero to $4 billion (over existing accruals).

Unlike Mr. Sillman, the Committee's experts reviewed the Debtors' actual loan files and based their conclusions on that review.[21] A team of economists led by Professor Bradford Cornell drew a random, statistically significant sample of 1500 loan files, which was reviewed and "re-underwritten" by a team of loan reviewers led by J F. Morrow, an experienced mortgage loan professional. Professor Cornell and his colleagues then analyzed the incidence of

---

[21] Mr. Lipps himself noted that "[t]he only reliable way to determine whether a loan in fact complies with an underwriting-related representation or warranty . . . is to review and re-underwrite the actual loan files." Lipps Supp. Decl. ¶ 47. Similarly, counsel's presentation to the Board at the May 9, 2012 meeting specifically stated that the Debtors might be overpaying "if the true defect rate is below the 19.72% based on actual loan file reviews." Exh. Y. Despite these admissions by the Debtors' counsel, neither Mr. Lipps nor Mr. Sillman reviewed a single loan file as part of their evaluation of the Settlement. Lipps Tr. 121 (Exh. Z); Sillman Tr. 125-28 (Exh. D).

material defects in the underwriting of those loans and the impact of those defects on eventual loan losses, and extrapolated from those findings to estimate the Debtors' aggregate put-back liability for the entire loan pool. *See generally* Cornell Rpt. ¶¶ 29-75; Expert Report of J F. Morrow, dated December 3, 2012, served contemporaneously with this Objection.

As a first step in his analysis, Professor Cornell concluded that the gross losses suffered with respect to loans with material defects total approximately $16.5 billion. *Id.* ¶ 68.[22] Professor Cornell then applied several different legal rules based on issues identified by Mr. Lipps and Committee counsel, concluding that the application of available defenses could have a large impact on the Debtors' put-back exposure in the event the claims were actually litigated. *Id.* ¶¶ 15, 26-27, 64-68, 72-75. The three major defenses, and the aggregate expected R&W liability estimated to be associated with the successful assertion of each, can be summarized as follows:

| Defense | Potential Liability |
|---|---|
| 1. Loss Causation: Assuming the availability of put-back, the Debtors are responsible only for loan losses actually caused by R&W breaches. | Approximately $3.8 billion |
| 2. Statute of Limitations: Assuming the availability of put-back and application of the loss causation rule, the Debtors' liability is further limited by New York's six-year statute of limitations. | Approximately $2.7 billion - $3.3 billion |
| 3. Election of Remedies: Put-back claims are unavailable with respect to mortgages that have been foreclosed. | Substantial additional reduction in liability, in an amount to be determined |

---

[22] This figure – and not the $40 billion claim that has been threatened absent a settlement – would represent the theoretical extreme upper range of the Debtors' potential liability, if (i) the Trusts had no burden to prove loss causation, (ii) no claims were barred by statutes of limitations, (iii) the election of remedies defense was not available, and (iv) no other defenses operated to reduce the total liability.

Absent litigation, it is uncertain whether and to what extent each of these defenses would operate to reduce the Debtors' RMBS liability, and the Committee does not take a position on the ultimate rules that should apply if these claims were to be litigated, or indeed whether the same defenses would apply to R&W claims asserted by differently situated plaintiffs.[23] The key point, for present purposes, is that if the Debtors had been motivated to negotiate the most appropriate number to protect the interests of other creditors of the estates, they would have considered and evaluated each of these defenses *before* agreeing to the Settlement – and the negotiation record would show the Debtors vigorously asserting them. Instead, it appears that the Debtors raced headlong into a settlement not based on the merits but instead at the direction of Ally, which was satisfied with its own favorable deal. There is no evidence that the Debtors ever considered, much less presented to the ResCap Board, *any* analysis of the potential impact of these defenses. In fact, one Board member conceded that he did not even consider the legal defenses in approving a settlement that nearly doubled the upper limit of liability presented to the Board's Audit Committee a week earlier. Mack Tr. 53, 69-70 (Exh. V).

On this evidentiary record, the Debtors' defenses need not be sure-fire winners, but need only be credible, to call into doubt the merits of the Settlement. As discussed below, they are that, at the very least.

---

[23] For purposes of evaluating the Settlement, which includes an allocation formula that does not distinguish between wrapped and unwrapped Trusts, it is not necessary to seek to resolve the issue of whether wrapped Trusts have stronger put-back claims than unwrapped Trusts – and Professor Cornell's analysis therefore does not distinguish between the two. If the claims of the wrapped Trusts are substantially stronger, then the Settlement must be rejected on the ground that its allocation formula is defective. *See* section I.E.1 below. If and when a revised settlement is proposed that accounts for these differences in its allocation, consideration of this issue may be appropriate.

### (a)    Defense # 1: The Trusts must show causation of injury

A non-conflicted fiduciary would have emphasized the loss causation issue in order to leverage a more moderate settlement. To support this argument, the Debtors could have pointed out that the Trusts (and the Institutional Investors who purport to control them) in some cases waited many years to bring their put-back claims, and in the meantime, the financial and real estate markets crashed, triggering a severe recession and causing massive Trust losses that otherwise would not have occurred. As discussed in Professor Cornell's accompanying expert report, there is strong evidence that a large portion of the alleged losses that the Trusts and the Debtors would have the Court attribute to R&W breaches were, in fact, caused by these market forces. A non-conflicted fiduciary would have argued that under black-letter principles of causation and damages – not to mention the language of the agreements themselves – a Trust can recover damages only for losses specifically traceable to breach, and not harm caused by other factors. The Committee's experts have estimated that the application of this rule would reduce the Debtors' total R&W liability to about approximately **$3.8 billion,** even without considering the statute of limitations or election of remedies defenses discussed below. Cornell Rpt. ¶ 48.

The causation argument begins with the established principle that, to recover damages for breach of contract, a plaintiff must show, first, that its damages were actually caused by the alleged breach, and second, that the requested damages will not put the plaintiff in a better position than it would have occupied had the contract been fully performed. *See, e.g., Pesa v. Yoma Development Group, Inc.*, 18 N.Y.3d 527, 532 (2012) ("It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach – *i.e.*, where the transaction would have failed, and the damage would have been suffered, even if no breach occurred."); *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974) (It is

"fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed.").[24]

In the put-back context, application of these principles would mean that a Trust could not recover damages for an R&W breach if the Trust's losses were caused not by that breach but instead by some other event – such as the collapse of the housing market – that would have led to a loss even if the Trust had been provided with a fully conforming loan. *See LaSalle Bank, N.A. v. CIBC Inc.*, No. 08-8426, 2011 WL 4943341, at *4-6 (S.D.N.Y. Oct. 17, 2011) (denying summary judgment on breach claims where alleged breaches of a second mortgage on the property, inaccurate appraisal and deviations from underwriting standards may not have caused material and adverse effect); *LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 01-4389, 2002 WL 181703, at *4 (S.D.N.Y. Feb. 5, 2002) (denying motion to dismiss only after finding that alleged breach "was at least a partial cause of [the borrower's] eventual default on the loan").[25] The potential relevance of such intervening causes in the repurchase context was aptly summarized by Chancellor Strine of the Delaware Chancery Court:

> Central Mortgage's failure to review and investigate the loan files *for years* after buying the servicing rights from Morgan Stanley takes much of the "reasonable conceivability" out of Central Mortgage's assertion that all the problems with the loans that went into default were caused by fraud and other misstatements made by the borrower

---

[24] *See also Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525-26 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately* caused his or her damages. . . . Moreover, damages 'may be so remote as not to be directly traceable to the breach, or they may be the result of *other intervening causes*, and then they cannot be allowed.'") (citation omitted, emphasis original); E. Allan Farnsworth, CONTRACTS (3d ed. 2004), § 12.1, at 150 ("There is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss.") and § 12.8, at 194-95 ("[I]t is a fundamental tenet of the law of contract remedies that an injured party should not be put in a better position than had the contract been performed.").

[25] Indeed, the Debtors applied this rule in negotiating their prior put-back settlements. Mr. Ruckdaschel testified that the "repurchase group would not repurchase a loan where . . . the loss was not caused by a breach of a representation or warranty." Ruckdaschel Tr. 38 (Exh. N). He explained that the Debtors declined to repurchase loans where "the breach in question did not cause the loss" because the transaction did not include a "guarantee." *Id.* at 37-38.

and other factors at origination, which were not vetted out by Morgan Stanley. As Central Mortgage and the rest of the world know, a debacle occurred in our economy. No doubt loans went into default because they never would or should have been made if the real economic facts were set forth. But, loans also went into default because borrowers lost their jobs, and because lenders, not just borrowers, bet on rising real estate prices and endless refinancing opportunities. *In short, there could be many reasons for a loan to have become non-performing, and the length of time that passed between the underwriting of the loans and default on the loans makes it become more conceivable that independent economic factors, not breaches in the origination process and representations and warranties of Morgan Stanley, caused default.*

*Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, LLC*, No. 5140-CS, 2012 WL 3201139, at *23 (Del. Ch. Aug. 7, 2012) (second emphasis added).[26]

The Trusts would argue that the foregoing principles of contract law do not apply because the governing agreements entitle them to a specific remedy – namely, the repurchase of materially breached loans at par. Outside of bankruptcy, they would say, they would have been entitled to specific performance of this remedy. Because specific performance is not available in bankruptcy, the Trusts would claim they are entitled to the monetary equivalent of this remedy, without any reduction.

But a non-conflicted estate fiduciary would have argued that, outside of bankruptcy, a court would not award specific performance of a put-back right asserted by a Trust that delayed seeking such relief. Specific performance is an equitable remedy, which a court will deny if it determines that, due to the passage of time, the remedy would result in a windfall. *See Groesbeck v. Morgan*, 206 N.Y. 385, 389 (1912) ("No doctrine of equity jurisprudence is better

---

[26] *Accord First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim. Similarly, when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases.") (citation omitted).

settled than the rule that specific performance is not a strict legal right and is never granted when the lapse of time renders such relief inequitable . . . .").[27] Based on this principle, the Debtors could argue that permitting the Trusts to enforce contractual put-back rights now – long after origination of the loans, after the real estate and other markets had crashed, and without regard to loss causation – would put them in a far better position than they would have been in had there been no R&W breaches at all. *See* Cornell Rpt. ¶¶ 25, 27-28.[28]

The Institutional Investors stress two recent decisions that have deviated from an actual damages approach to liability to suggest – in the context of R&W litigation brought by monoline insurers – that proof of a material breach of a warranty or representation may be enough, without further proof of harm *caused* by the breach, to make out a viable put-back claim. *See* Steering Committee Br. ¶¶ 22-24 [Dkt. No. 1739] (discussing *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 09-3106, 2012 WL 2326068 (S.D.N.Y. June 19, 2012), and *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, No. 11-2375, 2012 WL 4373327 (S.D.N.Y. Sept. 25, 2012)). The Committee recognizes that these cases introduce an element of uncertainty regarding the application of the black letter damage causation rule discussed above. However, a non-conflicted fiduciary would have available several arguments why these

---

[27] *See also Simon v. Electrospace Corp.*, 28 N.Y. 2d 136, 146 (1971) (denying specific performance of agreement to deliver shares of stock in connection with merger where stock was worth far less at time of breach than at time of subsequent suit, reasoning that plaintiff's cause of action "should not and may not be converted into carrying a market 'call' or 'warrant' to acquire stock on demand if the price rose").

[28] As further support for this argument, the Debtors could have cited the language of the governing documents, which require a Trustee to give "prompt written notice" of its "discovery" of a breach of a representation or warranty. P&SA §§ 2.03(a), 2.04. As a district court recently observed, the prompt notice requirement gives loan sellers a fair opportunity to attempt to cure alleged breaches or otherwise mitigate their damages – *e.g.*, by substituting conforming loans for defective ones. *See Mastr Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.*, No. 11-2542, 2012 WL 4511065 at *7 (D. Minn. Oct. 1, 2012) ("*WMC Mortgage II*") (notice was not prompt when delay "functionally deprived [defendant] of a meaningful opportunity to attempt to cure the alleged breaches or mitigate its losses in any way").

decisions would not control in the event the Debtors' private label RMBS R&W claims were to be litigated.

First, the holdings of these cases are premised on insurance law, under which insurers have an interest in receiving complete information before deciding to issue a policy, and a mere increase in the *risk* of loss therefore constitutes a material and adverse effect on the insurer. *See Syncora*, 2012 WL 2326068, at *4; *Flagstar*, 2012 WL 4373327, at *4-5 (both cases citing N.Y. Ins. L. § 3106, among other New York insurance law authorities). To the extent *Flagstar* more broadly suggests that causation may cease to be an essential element of damages where a contract purports to provide a remedy not tied to loss causation, *see Flagstar*, 2012 WL 4373327, at *3, this discussion constitutes non-controlling (and arguably erroneous) dicta as applied to non-insurance cases.

Second, the Debtors could point to language in the applicable prospectuses here suggesting that put-back was intended to be available only for breaches causing actual harm:

> [T]he master servicer will not be required to enforce any purchase obligation of [RFC or other sellers] arising from any misrepresentation . . . if the master servicer determines in the reasonable exercise of its business judgment that the matters related to the misrepresentation . . . *did not directly cause or are not likely to directly cause a loss* on the related mortgage loan.

Prospectus at 18-19 (emphasis added) (Exh. AA). This language was not addressed by the court in either *Syncora* or *Flagstar* and may not even have appeared in the prospectuses in those cases. A non-conflicted fiduciary would have argued that the inclusion of this language in the Trusts' prospectuses would have made no sense had the parties – including the Trustees, the Institutional Investors, and the Debtors – intended put-back to be available for breaches that did not "directly cause a loss" *Id.*

In sum, while the case law is not without doubt, a non-conflicted fiduciary would have argued that specific performance of the put-back remedy would not have been available outside of bankruptcy, and that the proper approach is simply to calculate the Trusts' damages under the general causation and damages principles discussed above. And even if specific performance *were* available outside of bankruptcy, the Debtors could have argued that, because specific performance cannot be enforced in bankruptcy, the Trusts' damages should be calculated by applying traditional contract principles to measure their true losses.

**(b)    Defense # 2:  The statute of limitations further reduces the claims**

In agreeing to the $8.7 billion settlement amount, it appears that the Debtors failed to give much, if any, weight to the argument that many of the Trusts' claims may be barred by the statute of limitations.[29]  The Committee's experts have estimated that the application of New York's "accrual at breach" rule of limitations could reduce the Debtors' total R&W liability to an approximate range of **$2.7 billion** to **$3.3 billion**. *See* Cornell Rpt. ¶¶ 48, 64-67.

Put-back claims, like other contract claims, are subject to New York's six year statute of limitations. N.Y. C.P.L.R. § 213(2). New York embraces an "accrual at breach" rule rather than "accrual at injury." *See Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993) (statute runs from time of breach even though damage may occur later); *T&N PLC v. Fred S. James & Co. of N.Y., Inc.*, 29 F.3d 57, 59-60 (2d Cir. 1994) (same). Because the Trusts' put-back claims are based on purported R&W breaches existing as of the date each Trust was created, it may be argued that the six year statute of limitations began to run from that date, whether or not the Trusts were aware of a breach at that time. *See Structured Mortgage Trust 1997-2 v. Daiwa Finance Corp.*, No. 02-3232, 2003 WL 548868, at *2 (S.D.N.Y. Feb. 25, 2003)

---

[29] Mr. Marano, ResCap's Chairman and CEO, was aware of the limitations-based argument that there should be zero put-back liability for PLS deals done in 2004 and 2005, but chose to disregard it. *See* Marano Tr. 116-18 (Exh. E).

(put-back statute of limitations began to run from earliest date plaintiff could have made demand, *i.e.*, date of loan); *Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1194 (W.D. Wash. 2011) (same).[30]  Therefore, the Debtors could have argued, R&W claims on 2004 loans, 2005 loans and some 2006 loans are time-barred.[31]

The Steering Committee Investors have argued that the limitations period should be tolled on equitable grounds – a remedy reserved for "extraordinary or exceptional circumstances." *United States v. All Funds Distributed to Weiss*, 345 F.3d 49, 54 (2d Cir. 2003) (citation omitted).  But the Debtors could have responded that the "adverse domination" cases relied on by the Steering Committee Investors (*see* Steering Committee Br. ¶ 26) – in which courts have tolled a statute of limitations on the grounds that the plaintiff corporation could not have been expected to sue defendants who controlled it – are inapplicable here, where the Debtors (as the Trusts' master servicers) were not the only parties who could have demanded repurchase.  *See* P&SA §§ 2.03, 2.04 (permitting Trustees to demand repurchase as well).

---

[30] One court has held differently, *see Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas*, No. 10-02012, 2012 WL 2389868 (E.D. Ark. June 25, 2012), but that decision appears to be contrary to prevailing New York law – and for good reason:  As another District Court recently observed, the rule applied in *National Bank of Arkansas* "would allow [a trust] to essentially circumvent the statute of limitations by indefinitely deferring its demand for payment." *Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d at 1194 (citing *Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co.*, 18 N.Y. 3d 765, 771 (2012)).

[31] Shortly before the petition date (in most instances less than a year before that date), the Debtors entered into tolling agreements with the Institutional Investors, a small number of other investors, and two of the Trustees.  The Committee's experts have estimated that, if all of these tolling agreements were given effect, application of New York's accrual at breach rule could reduce the Debtors' total put-back liability to approximately $3.3 billion.  *See* Cornell Report ¶¶ 15, 48, 64-65.  A non-conflicted debtor could argue, though, that the Court should give effect only to tolling agreements between the Debtors and the Trustees:  The Debtors were insolvent at the time they executed these agreements, and they received little or no value from their tolling agreements with investors – because investors lack standing to bring put-back claims or even to compel the Trustees to bring such claims,  Consequently, under Bankruptcy Code section 548(a)(1)(B), a non-conflicted debtor would seek to avoid the investor tolling agreements on constructive fraudulent transfer grounds.  According to the Committee's experts, this could reduce the Debtors' total put-back liability, under New York's accrual at breach rule, to approximately $2.7 billion.  *See* Cornell Report ¶¶ 15, 48, 66-67.

(c)    **Defense # 3:  Election of remedies bars put-back of foreclosed loans**

The Debtors have yet another argument at their disposal that could have helped

leverage a more moderate settlement: that the put-back remedy is simply unavailable for any

loan that has been foreclosed.  This argument follows from the logical proposition that put-back

or repurchase of a mortgage loan is a remedy that appears to require the actual existence of the

loan.  *See* 9019 Motion ¶ 28 ("Any repurchase claim necessarily involves the conveyance of an

existing home mortgage out of the collateral pool and back to the seller.").  And, in fact, a recent

decision recognized that there can be no put-back remedy with respect to loans that have been

foreclosed.  *See Mastr Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.*, No.

11-2542, 2012 WL 4511065 at *6 (D. Minn. Oct. 1, 2012) ("*WMC Mortgage II*") (dismissing

plaintiff's specific performance claim to put back 80 foreclosed mortgages); *see also First Place

Bank v. Skyline Funding, Inc.*, No. 10-2044, 2011 WL 3273071, at *4 (N.D. Ill. July 27, 2011)

("In Illinois . . . a default order or foreclosure decree merges the real estate mortgage and the

mortgage indebtedness into a judgment.  Thus, plaintiff could not have repurchased loans that

had gone to foreclosure, and Skyline could not have breached the Agreement by failing to

repurchase loans that plaintiff did not own when it demanded that Skyline repurchase them.")

(citation omitted).  Applying the rule of these cases to bar put-back for loans that have been

foreclosed could substantially reduce the Debtors' R&W liability.[32]

---

[32] Because the *WMC Mortgage II* decision was issued after negotiation of the RMBS Trust Settlement, it appears
that the Settlement gave this potential defense no weight.  *See* Lipps Tr. 151-58 (Exh. Z) (admitting Debtors did not
analyze effect of decision).  Contrary to the Steering Committee Investors' assertion (*see* Steering Committee Br. ¶
3), it is proper for the Court to consider developments in the law occurring after a settlement agreement has been
reached but before it is approved.  *See In re Chemtura Corp.*, 439 B.R. 561, 600 (Bankr. S.D.N.Y. 2010) (in context
of 9019 settlement, quoting *Newman v. Stein*, 464 F.2d 689, 696 (2d Cir. 1972), for proposition that "it would be
inappropriate for a reviewing court to freeze matters as of the moment at which the parties entered into an agreement
and ignore subsequent developments which either reinforce or undermine the original decision to settle").

A non-conflicted fiduciary could have advanced several arguments under the Governing Documents applicable to the Trusts for application of the rules subsequently applied by the court in *WMC Mortgage II.* By separate opinion in that case, the court dismissed the trustee's claim for damages, pointing to language in the purchase agreement providing that the trustee's "sole remedy" was cure, substitution, or repurchase of the loan. *See Mastr Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012) ("*WMC Mortgage I*"). Here, similarly, there is a "sole remedy" provision applicable to the Trusts' put-back claims, *see* P&SA §§ 2.03(a), 2.04, providing the Debtors with a strong argument that damages are unavailable once the loan is foreclosed. *WMC Mortgage II* also turned in part on rejection of the argument that since the term "Mortgage Loan" was defined to include the proceeds of a loan's liquidation, the loan itself was still available to be repurchased following foreclosure – an argument the court characterized as "tortured." *WMC Mortgage II*, 2012 WL 4511065, at *5. And even that argument is not available here: the definition of "Mortgage Loan" in the ResCap agreements does *not* include proceeds of foreclosure, *see* P&SA § 1.01, thereby eliminating the most serious argument for post-foreclosure put-back in *WMC Mortgage II.*

The Institutional Investors would likely argue that it is unfair to penalize the Trustees for the decision of RFC or GMACM to foreclose upon a loan. But the Debtors could have responded that, in fact, the Master Servicer is explicitly permitted to elect *either* foreclosure *or* put-back under the language of the governing documents. *See* P&SA § 3.14(a) (Master Servicer "not required to continue to pursue both foreclosure (or similar remedies) with respect to the Mortgage Loans and remedies in connection with a breach of a representation and

warranty [*i.e.*, put-back] if the Master Servicer determines in its reasonable discretion that one such remedy is more likely to result in a greater recovery as to the Mortgage Loan").

The Debtors could further have argued that the Trustees and their certificateholders (including the Institutional Investors) are estopped from contesting the decision to foreclose. These parties receive monthly reports concerning foreclosures, have been informed of every foreclosure undertaken by the Debtors, and up to now, have not contested that course of action. The Debtors could have taken the position that, having been aware of and accepted the benefits of foreclosure (which almost certainly yielded a higher percentage recovery than will be available in bankruptcy), the Trustees were estopped from claiming that the Debtors should instead have pursued put-back. *See, e.g., Savasta v. 470 Newport Assocs.*, 579 N.Y.S. 2d 167, 169 (App. Div. 1992) (plaintiffs who did not contest transfer of partnership asset to affiliate and thereafter received monthly accountings and payments of partnership profits on 18 occasions without complaining were estopped from terminating partnership on basis of alleged improper transfer of asset).

The election of remedies rule embodied in the recent *WMC Mortgage II* decision, if applied here, would eliminate all liability for all loans that have already been foreclosed, and much of the potential liability associated with loans that have not been. Mr. Sillman estimates losses to date of $30 billion and future losses of $15 billion – and he has acknowledged that every dollar of the $30 billion is for loans that have already been liquidated, *i.e.*, either foreclosed upon or otherwise sold or terminated. Sillman Tr. 175-77 (Exh. D); Sillman Initial Decl. ¶ 25. For the loans that have already been liquidated, there would be no possibility of put-back under *WMC Mortgage II* and the election of remedies rule. As to the remaining loans, it appears likely that any master servicer, such as Ocwen Financial Corp., will foreclose rather than

seek put-back – because the great majority of the remaining loans are RFC loans, and RFC is

expected to pay its creditors (including the Trusts) pennies on the dollar. Moreover, future losses

will, by definition, be removed by a minimum of five years from the date of each Trust's

creation, permitting the Debtors to argue that a loss occurring so many years after the date of

origination of the loan is highly unlikely to have been caused by any R&W breach. *See* Cornell

Rpt. ¶¶ 72-75.

*   *   *

In short, there are myriad complex legal issues that may affect the outcome of the

R&W claims, and little evidence that the Debtors engaged in a nuanced analysis of these issues

in arriving at the settlement number. This settlement affects 1.6 million loans covered by 392

separate trusts, and while the sheer volume and complexity of the issues may support the need to

settle, a settlement must properly reflect a fair balance of the authorities cutting both ways and

fall within the range of reasonableness. The apparent failure to give weight to so many

independent arguments that *each* could reduce the Debtors' R&W liability strongly suggests that

this fundamental principle was ignored here in the expedient pursuit of support for locking in a

low price for Ally's release. Certainly, on this record, the Debtors have not met their burden of

showing a reasonable basis for agreeing to so large an allowed claim.[33]

## D.    **The Prospect of a Litigation Armageddon is a Straw Man**

The Debtors hold out the threat of a litigation Armageddon as the only alternative

to approving the Settlement. 9019 Motion ¶¶ 47-51. Similarly, the Steering Committee

---

[33] The Committee understands that certain parties may argue that the Settlement fails to account for the argument that all or a part of the Allowed Claim may be subject to subordination under section 510(b) of the Bankruptcy Code. The Committee agrees that the Debtors do not appear to have taken this issue into account when negotiating the Settlement. The Committee does not believe, however, that the Court need resolve the priority of the Allowed Claim at this time (should it decide to approve the Settlement). The 9019 Motion deals only with allowance, not priority, and the priority of the Allowed Claim should be determined in the context of a plan or by separate motion.

Investors cite *Lehman* and *Washington Mutual* for the proposition that failure to resolve the

R&W claims now could delay the efficient resolution of these chapter 11 cases and plunge the

parties into protracted litigation (a reference to the second *Iridium* factor).  Steering Committee

Br. ¶¶ 28-32.  This, of course, is a false dichotomy, and the threat of litigation chaos is a red

herring.  The Court has broad discretion to deploy estimation techniques to resolve the claims or

foster a better settlement – including, among other things, the ability to rule on key legal or

factual issues affecting liability (either on summary judgment motions following a proof of claim

process or more informally in connection with denying the 9019 Motion);[34] the power to appoint

the Court's own expert under Fed. R. Evid. 706;[35] and the ability, if necessary, to hold a full-

scale estimation trial either prior to or in connection with plan confirmation.[36]  These tools may

be wielded strategically to encourage the parties to reach a comprehensive, global settlement.[37]

The experiences in *Lehman* and *Washington Mutual* hardly establish that

approving *this* settlement is the only alternative to litigation chaos.  In *Washington Mutual* (an

---

[34] *Cf., e.g., Kiser v. Bryant Electric (In re Beverly Hills Fire Litig.)*, 695 F.2d 207, 216 (6th Cir. 1982) (approving trial court's decision, in class action litigation, to hold preliminary trial limited to question of causation); *In re W.R. Grace & Co.*, 355 B.R. 462, 466 (Bankr. D. Del. 2006) (court held "science trial" to determine whether debtor's attic insulation product created unreasonable risk of harm to inform decisions concerning claims process).

[35] *See, e.g., Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 698-99 (4th Cir. 1989).

[36] *See, e.g., Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005); *In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006).

[37] Consideration of the "litigation burden" prong is not advanced by the Debtors' third expert offering, the Declaration of William J. Nolan ("**Nolan Decl.**") [Dkt. No. 1712-6], which argues that the RMBS Trust Settlement will benefit the estate because litigation would result in great expense and delay. Mr. Nolan reaches this conclusion by (i) identifying a pool of recent large bankruptcy cases, (ii) determining which of these cases had relatively more litigation activity, and (iii) analyzing the fee applications in these cases to demonstrate that litigation-related expenses were higher in cases with more litigation than in cases with less litigation. *See* Nolan Decl. ¶¶ 15-17. To no-one's surprise, Mr. Nolan concludes that "bankruptcy matters which involve disputes that result in litigation had significantly increased fees," *id.* ¶ 17; and he adds that "there is a significant time saving to consensual resolution of cases," a conclusion he supports by observing that pre-packaged bankruptcies tend to be quicker than the non-pre-packaged variety, *id.* ¶¶ 20, 26. What is perhaps surprising is that Mr. Nolan limits himself to these self-evident points. He does not even begin to consider the range of negotiation, mediation, and estimation tools discussed above that could be used to avoid the costs and delays he decries. Nor does he consider whether the substantial time and expense now being devoted to litigating the present Motion might have been avoided had the Debtors chosen to include the Committee and other key constituencies in their settlement negotiations.

FDIC receivership rather than a bankruptcy), R&W claims apparently have not been resolved for reasons the Steering Committee Investors nowhere explain. And *Lehman*, in fact, demonstrates a perfectly viable model for addressing R&W claims in the context of a liquidating debtor: to estimate, in an open and arm's length process, a reserve for R&W claims; confirm a plan incorporating the concept of a reserve and commence distributions thereunder; and postpone liquidation of the R&W claims until after confirmation in accordance with either mediation, valuation protocols, or litigation.[38] There is no evidence that the R&W claims (as opposed to the other complex issues in the case) delayed development of the *Lehman* plan or the commencement of distributions thereunder – which are already underway[39] notwithstanding the Steering Committee Investors' assertion that mediation of the R&W claims continues.

E.     **The RMBS Trust Settlement Contains Other Provisions That Must Be Stricken or Modified Before the Motion Could be Granted**

In the event that, notwithstanding the defects discussed above, the Court determines to approve the RMBS Trust Settlement on the merits, several specific aspects of the settlement would need to be eliminated or modified before the 9019 Motion could be granted.

---

[38] *See generally* Mot. Pursuant to § 8.4 of the Modified 3d Am. J. Ch. 11 Plan of Lehman Bros. Holdings, Inc. and Its Affiliated Debtors and §§ 105(a), 502(c) and 1142(b) of the Bankr. Code to Estimate the Amounts of Claims Filed by Indenture Trs. ex rel. Issuers of Residential Mortgage-Backed Secs. for Purposes of Establishing Reserves, *In re Lehman Bros. Holdings, Inc.*, Ch. 11 Case No. 08-13555, ECF No. 24254 (Bankr. S.D.N.Y. Jan. 12, 2012); Order Pursuant to § 8.4 of the Modified 3d Am. J. Ch.11 Plan of Lehman Bros. Holdings, Inc. and Its Affiliated Debtors and §§ 105(a), 502(c) and 1142(b) of the Bankr. Code Estimating the Amounts of Claims Filed by Indenture Trs. ex rel. Issuers of Residential Mortgage-Backed Secs. for Purposes of Establishing Reserves, *In re Lehman Bros. Holdings, Inc.*, Ch. 11 Case No. 08-13555, ECF No. 25643 (Bankr. S.D.N.Y. Feb. 22, 2012).

[39] *See* Notice Regarding Initial Distributions Pursuant to the Modified 3d Am. J. Ch. 11 Plan of Lehman Bros. Holdings, Inc. and its Affiliated Debtors, *In re Lehman Bros. Holdings, Inc.*, Ch. 11 Case No. 08-13555, ECF No. 27312 (Bankr. S.D.N.Y. Apr. 11, 2012).

1.    **The Settlement's allocation of the Allowed Claim is flawed**

The Settlement's mechanism for allocating the Allowed Claim – under which each Trust's share of the claim is based solely on its pro rata share of the Net Losses (*i.e.*, total losses for all Trusts) – is flawed in at least two important respects, and should not be approved.

First, the allocation method makes sense only if every Trust's claim is roughly as strong or weak as every other's. Since that is surely not true, by using Net Losses as the sole determinant of a Trust's claim, the Settlement encourages Trusts with weak R&W claims to opt into the settlement and Trusts with strong R&W claims to opt out – thereby minimizing the value of the settlement and in fact increasing claims against the estates. The concern is not abstract, because there are real reasons to believe that some Trust's claims are stronger than others:

- Monoline insurers have argued that the put-back claims for Trusts they have insured are governed by different legal rules and that they therefore have stronger put-back claims – an argument that the case law may support. *See Syncora*, 2012 WL 2326068 at * 4, *7, and *Flagstar*, 2012 WL 4373327 at *4-5.

- Trusts created earlier in time are subject to stronger statute of limitations defenses. *See* section I.C.2.b above.

- Other factors also may be sufficiently important to be built into the allocation formula. For example, Trusts with certain types of loans may have higher breach rates (*e.g.*, subprime loans or those created in more recent years) or higher loss severity rates (*e.g.*, HELOCs or other second lien loans).

The strength of a Trust's potential claims therefore must be built into the allocation formula.

Second, because the aggregate amount of the Allowed Claim is determined by the original issue balance of all accepting Trusts, while the individual allowed claim of each Trust that opts in is determined by its pro rata share of the Net Losses, there is a potential for distortion of the aggregate claim amount that could prejudice other creditors. In the event that a Trust with a low original issue balance, but high losses, opts out of the Settlement, the remaining aggregate allowed claim may be inflated, relative to the losses of the Accepting Trusts, to the detriment of

other creditor classes. The RMBS Trust Settlement should be modified so that the methodology

used for calculating the aggregate claim under the settlement is consistent with the methodology

for calculating each individual Trust's claim.

**2.    The language providing that the Settlement cannot
be used as evidence against Ally should be stricken**

As noted above at note 17, Ally's status as the real party in interest in negotiation

of the RMBS Trust Settlement is confirmed by the broad provision included in the proposed

order (the "**Proposed Order**") seeking to protect it from any collateral consequences of the 9019

Motion process. The provision would be inappropriate even if Ally were the settling defendant,

because it does not simply bar drawing any inference from the *fact* of settlement (a disclaimer

included in many settlements) but purports to declare inadmissible, in advance, a vast array of

factual material that may be highly relevant and probative in continuing litigation against Ally:

> Nothing contained in the RMBS Trust Settlement Agreement, this
> Order, and any associated expert reports, including exhibits,
> schedules, declarations, and other documents attached thereto or
> referenced therein, or in any declarations, pleadings, or other
> documents or evidence submitted to, or filed in, the Bankruptcy
> Court in connection therewith, shall be construed as an admission
> of, or to prejudice in any way, Ally Financial Inc. and its non-
> Debtor direct and indirect subsidiaries and affiliates (collectively,
> "Ally") and may not be used as evidence in any court proceeding.

Proposed Order ¶ 11.

The Committee is currently investigating potential causes of action against Ally,

including in connection with the R&W claims. If Ally, which directed negotiation of the

Settlement, believed that $8.7 billion was a fair amount to pay to resolve the put-back claims (as

its support for the Settlement implies), that is likely to be highly relevant to setting Ally's own

potential R&W liability. Nor is there any good reason to preclude use of expert reports and

evidence submitted in connection with the 9019 Motion. To require these experts to duplicate

their work in further proceedings would be needlessly wasteful, and hardly required by fairness, since Ally is a full participant in the current proceedings.

Ally will retain whatever rights it has under Fed. Rule Evid. 408 (or any other applicable legal rule) to seek the exclusion of such materials if and when they are offered against it in other proceedings, but there is no reason to prejudge future evidentiary issues through language in an order approving a settlement to which Ally is not even a party.

### 3. The Debtors should not be able to pay the legal fees of the Institutional Investors in cash without a Court order

The Court should not approve section 6.03 of the Agreement because it permits the Debtors to cash out the unsecured claims allocated to counsel for the Institutional Investors outside of a chapter 11 plan or court approval. Counsel are slated to receive an unsecured claim of as much as $450-$500 million (based on an Allowed Claim of $8.7 billion),[40] but the Debtors under section 6.03 may pay counsel in cash instead, in any amount that they and counsel "agree is equal to the cash value" of the allowed claim – an amount that could total $50 million or more, according to recent estimates. The agreement is devoid of any explanation or parameters on how the parties will determine the amount of cash to be paid in lieu of an allowed claim.[41] Thus, in theory, the Debtors and counsel to the Institutional Investors could agree, without court oversight, to pay counsel to the Institutional Investors cash at 100% of the claim amount, whereas unsecured creditors are set to receive a substantially lower percentage recovery on

---

[40] The provisions concerning the amount of the legal fees are ambiguous. First, it is not clear whether counsel will get a percentage of the Allowed Claim only for those Trusts they can "direct" or all 392 Trusts. Second, the agreement is not clear on whether the law firms for each group may receive fees on account of the same Trusts – e.g., whether fees stated to be equal to 5.7% of the Allowed Claim would in fact be equal to 11.4% of the claim (or approximately $1 billion).

[41] Moreover, it is not clear that the legal fees are reasonable – and it appears that the Debtors have not considered whether they are. See Marano Tr. 200-01 (Exh. E) (Marano did not consider reasonableness of attorneys' fees); Hamzehpour Tr. 113 (Exh. I) (Hamzehpour did not consider analysis of whether these were reasonable fees because she believed mistakenly that "they weren't fees that the debtors were paying").

account of their claims. This lack of oversight lends itself to abuse and should be stricken. Counsel must either take the claim or seek relief from the court – on notice to the parties and with an opportunity to object – should they elect to take the cash option instead.

## II.
## THE COURT SHOULD DENY APPROVAL OF THE
## SETTLEMENT AND DIRECT GLOBAL NEGOTIATIONS

By pushing forward with a tainted settlement before laying the groundwork for comprehensive plan negotiations, the Debtors have created unnecessary polarization rather than fostering the consensus that is the goal of the bankruptcy process. A settlement of this magnitude, attempting to resolve the Debtors' largest single category of alleged liability, should not come before the Court without the support of *any* other major affected constituency. But that was inevitable here – given the Ally-driven settlement negotiation process, the uncertainty the settlement creates about potential dilution of other creditor groups (which may be affected by the shifting and uncertain allocation of the allowed claim among different Debtors), and concern about creating momentum for prematurely locking in the amount of Ally's plan contribution.

The Committee understands that the Court may be reluctant to deny approval of a settlement that appears to resolve significant issues in the case – but as demonstrated above, approval here is simply not appropriate, because the Settlement meets neither the procedural nor the substantive standards of *Iridium*. In any event, denial of the 9019 Motion need not slow down the case. The Committee recommends that the Court not simply disapprove the settlement, but direct the sort of global, all-hands plan negotiations that the Court long ago urged the Debtors to commence. These negotiations should address all of the major issues in the case, because the amount of this allowed claim should not be determined in a vacuum, but instead should be considered in conjunction with the value of the claims against Ally, the resulting

appropriate plan contribution to achieve the release of those claims, and how the assets of the estates will be allocated among different Debtors and creditor groups.

If such negotiations do not succeed on their own, the Court has available to it a range of estimation-related tools (described above at I.D.) that may help focus the issues and motivate all parties to settle the claims on an appropriate basis.  Failing that, the value of the claims can be fixed at confirmation or through a separate estimation hearing.

### CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an Order denying the 9019 Motion and grant such other and further relief as may be just and proper.[42]

Dated: New York, New York
      December 3, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Philip Bentley_____
Kenneth H. Eckstein
Philip Bentley
Philip S. Kaufman
Jeffrey S. Trachtman
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

*Counsel for the Official*
*Committee of Unsecured Creditors*

---

[42] Pursuant to the parties' agreement and the Court's fourth revised joint omnibus scheduling order, the Committee served this Objection on December 3, 2012 but deferred filing it until February 1, 2013.  The filed version of the Objection is identical in all material respects to the previously-served version; it has been corrected in certain immaterial respects pursuant to paragraph 10 of that scheduling order.