# Exhibit 2

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

              Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF THOMAS MARANO

New York, New York

November 12, 2012

9:56 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27645

2

1

2

3

4                          November 12, 2012

5                          9:56 a.m.

6

7

8              Deposition of THOMAS MARANO,

9        held at the offices of Kramer, Levin,

10       Naftalis & Frankel, 1177 Avenue of the

11       Americas, New York, New York, pursuant

12       to Notice, before Erica L. Ruggieri,

13       Registered Professional Reporter and

14       Notary Public of the State of New

15       York.

16

17

18

19

20

21

22

23

24

25

17

1                    THOMAS MARANO

2      have been responsible for the overall

3      leadership and management of the debtors

4      and their nondebtor subsidiaries; is that

5      true?

6           A.    That is correct.

7           Q.    And you've been familiar with

8      the debtor's day-to-day operations, their

9      financial condition, their business

10     affairs and their books and records; is

11     that correct?

12          A.    Yes.

13          Q.    In addition to being ResCap's

14     CEO, you are also a member of the

15     company's board of directors, correct?

16          A.    Yes.

17          Q.    And, in fact, you are the

18     chairman of the board, right?

19          A.    Yes.

20          Q.    Between May of 2009 and the

21     petition date, which I believe is May 13,

22     2012, you also served as chief capital

23     markets officer and chief mortgage officer

24     of Ally Financial, Inc., correct?

25          A.    Yes.

18

THOMAS MARANO

1

2    Q.    So for much of the time that you

3    had served as ResCap's CEO and chairman,

4    you have been an officer of AFI as well,

5    right?

6    A.    Yes.

7    Q.    Since becoming ResCap's CEO in

8    July of 2008, how have you been

9    compensated?

10   A.    I have been compensated in a

11   combination of cash and deferred cash and

12   TARP stock.

13   Q.    And under TARP, has there been a

14   cap on the amount of cash that you were

15   able to receive?

16   A.    Yes.

17   Q.    And when you say in noncash, is

18   that essentially stock or warrants of AFI?

19   A.    I would characterize it more as

20   salary, stock of AFI and incentive award

21   stock.

22   Q.    Okay.  Is it fair to say that

23   under your compensation structure, the

24   total amount of your compensation is tied

25   to the financial success of AFI?

```
 1              THOMAS MARANO

 2         MR. PRINCI:  Objection as to

 3     form.

 4     A.    Could you repeat the question.

 5     Q.    Is it fair to say that under

 6  your compensation structure, the total

 7  amount of your compensation is tied to the

 8  financial success of AFI?

 9     A.    My compensation is actually tied

10  to my performance in my role as chief

11  markets capital officer and chief mortgage

12  officer; and that compensation is set and

13  established and approved by the management

14  of Ally, and it is ultimately approved by

15  the paymaster in TARP.

16     Q.    Are you saying that your

17  compensation bears no relationship to

18  AFI's financial performance?

19     A.    Broadly, if AFI does well, I'll

20  do well.  But AFI has a very large number

21  of components that affect their

22  profitability.

23     Q.    Okay.

24         MR. KAUFMAN:  This is the first

25     exhibit.  This is the last exhibit, I
```

81

                    THOMAS MARANO

1
2     K&E would blame it on ResCap, meaning the

3     management of ResCap.  MoFo would blame it

4     on the management of Ally.

5              And I think what he was

6     referring to here is that we had poor

7     communication between the law firms and

8     their clients, and we needed to get it

9     clear and settled, in order to determine

10    what we were all going to try and do.

11        Q.    You recognized, didn't you, that

12    the interests of ResCap and AFI might be

13    potentially adverse?

14        A.    At times they were.

15        Q.    And so you knew that there

16    wasn't necessarily going to be a common

17    understanding between AFI and ResCap and

18    their respective counsel, right?

19        A.    Yeah.

20        Q.    In your response to

21    Mr. Carpenter, you said, "An observation.

22    ResCap repeatedly said DIP first and

23    stalking horse second, then 9019 third.

24    Ally tried repeatedly to make 9019 first."

25              Did I read that correctly?

82

THOMAS MARANO

1      A.    Correct.

2      Q.    And by DIP, you were referring

3   to ResCap's lining up DIP financing for a

4   bankruptcy, right?

5      A.    Correct.

6      Q.    And by your reference to

7   stalking horse, you were talking about

8   lining up a stalking horse bidder for

9   ResCap's assets in a bankruptcy auction?

10     A.    Correct.

11     Q.    And the reference to 9019 was to

12  a settlement of claims in a bankruptcy

13  between ResCap and AFI, right?

14     A.    Correct.

15     Q.    And did you understand at the

16  time that any such settlement would

17  involve releases to AFI from both ResCap

18  itself and third-party claimants?

19     A.    Yes.

20     Q.    When you told Mr. Carpenter in

21  what order ResCap prioritized those three

22  matters, you were talking about your own

23  views?

24     A.    I was referring to the fact that

83

1                    THOMAS MARANO

2        the ResCap management team and board had

3        decided that if we needed to be prepared

4        for bankruptcy, we needed to have a DIP

5        first, because that would provide us with

6        the working capital we would need to

7        preserve value for the estate; that we

8        would also need a stalking horse bid so

9        that we could have some certainty as to

10       somebody potentially being able to buy us.

11             And I was not going to go down

12       the road of -- by the way, I wasn't

13       involved in it, but none of us were going

14       to go down the road, actively, of a 9019

15       settlement.  So that from our perspective,

16       ResCap's board and management had

17       concluded, get the liquidity you need to

18       live first, get a second -- get a stalking

19       horse bid second.

20             And we had outsourced or kind of

21       created a separate committee to deal with

22       the 9019 so that those of us running the

23       business could obtain the liquidity and

24       the stalking horse bid.  Which we did, and

25       that strategy worked.

84

1          THOMAS MARANO

2      Q.    And according to your e-mail to

3    Mr. Mackey, that was something that ResCap

4    repeatedly said, right?

5      A.    Yes.

6      Q.    And you reminded Mr. Mackey that

7    Ally was the one that had repeatedly tried

8    to make the 9019 settlement its number one

9    priority, correct?

10     A.    Yes.

11     Q.    What was your understanding as

12   to why AFI prioritized the settlement with

13   ResCap over DIP financing and an asset

14   sale for ResCap?

15     A.    I don't know why they made it

16   their first priority.  But it wasn't

17   relevant to me, because my responsibility

18   was to make sure we could provide a soft

19   landing for this company and preserve

20   asset value for the estate.  I don't

21   really know why they tried to make it

22   their first priority.

23     Q.    I wasn't asking you to read

24   their minds.  But it was your

25   understanding, wasn't it, that AFI was

85

1                    THOMAS MARANO

2    interested in benefiting AFI and not

3    necessarily ResCap.  That's why it was

4    pressing for the 9019 settlement between

5    ResCap and Ally, right?

6              MR. PRINCI:  Objection as to

7         form.

8         Q.   Isn't that what you knew?

9         A.   No.

10             MR. PRINCI:  Objection as to

11        form.

12        Q.   Isn't that what you thought?

13        A.   I --

14             MR. PRINCI:  Objection as to

15        form.

16        A.   I knew that they kept raising

17   this as an issue, and we kept saying, we

18   are not focused on it.  We are focused on

19   the DIP and the stalking horse bid.

20             MR. PRINCI:  Just give me a

21        chance to register an objection.

22             THE WITNESS:  Sure.

23             MR. PRINCI:  Thank you.

24             MR. KAUFMAN:  Let's mark as the

25        next exhibit an e-mail dated April 12,

168

                    THOMAS MARANO

1

2      AFI, settling ResCap's claims against AFI,

3      right?

4          A.    Yes.

5          Q.    What was the board told about

6      that agreement at the May 9th meeting?

7          A.    Mr. Nashelsky gave the --

8              MR. PRINCI:  You can answer.

9              THE WITNESS:  I can say that?

10             MR. PRINCI:  Yeah.

11         A.    Mr. Nashelsky, basically gave a

12     summary of what Ally was willing to do as

13     part of a settlement agreement, whether it

14     was compensation or provide various forms

15     of support, to enable a soft landing in

16     bankruptcy.

17         Q.    What were the terms that were

18     reported to the board by Mr. Nashelsky or

19     yourself?

20         A.    There was discussion about

21     origination, being able to continue to

22     originate while in bankruptcy, which was

23     critical to enhancing the value of the

24     platform.  It put the platform in a

25     position where it would not be sold

THOMAS MARANO

1

2       basically just on asset value, but it

3       would be sold on enterprise value, which

4       is clearly what we saw with the $3 billion

5       bid.

6               We also talked about dollar

7       amount of settlement.  And I believe there

8       may have been a small DIP that was going

9       to be provided as well for, to allow us to

10      continue to do Ginnie Mae originations.

11              And that DIP, sorry, for

12      clarification, that DIP was provided by

13      Ally, not related to the Barclays DIP.

14          Q.    What was the board told about

15      the AFI/ResCap settlement agreement?

16          A.    I believe Mr. Nashelsky shared

17      the terms of that settlement agreement

18      with the board, you know, the basic

19      details of it.

20          Q.    Was that the first time you had

21      heard the final details?

22          A.    It was not the first time that I

23      had heard of the settlement agreement.

24      I'm not sure if this was the final

25      agreement.

170

1                     THOMAS MARANO

2          I don't -- I'm not sure if we

3     had reached final agreement with Ally at

4     the time Mr. Nashelsky reported this.  I

5     can't tell from looking at this, if we

6     had.

7          Q.    Were those negotiations likewise

8     fluid, from your recollection?

9          A.    They were -- they were very

10    fluid.  And because I wasn't directly

11    involved in those settlement negotiations,

12    there were sometimes -- actually almost

13    all the time there were conversations

14    going on that I was not privy to until,

15    you know, we got to a final agreement.

16         Q.    Is it your recollection that as

17    of the time the May 9th agreement

18    occurred, and the board approved the RMBS

19    settlement, the final terms of the

20    agreement between AFI and ResCap had not

21    yet been fixed?

22         A.    Again, I'm telling you, I don't

23    recall they were.

24         Q.    You don't recall one way or

25    another?

206

1                THOMAS MARANO

2        A.    At this point in time I believe

3    my obligations to Ally were not there.

4        Q.    And what's your basis for

5    understanding that you, as an officer and

6    director of ResCap LLC, owed fiduciary

7    duties to creditors' entities other than

8    ResCap LLC?

9        A.    My understanding was that I was

10   responsible for the ResCap legal entity

11   and all of its subsidiaries.  And so that

12   would have included RFC and GMAC.  And

13   again, I felt at this point in time I

14   really had no obligation to Ally

15   whatsoever.

16       Q.    And if there were a conflict

17   between what would benefit creditors of

18   ResCap LLC versus what would benefit

19   creditors of RFC, what was your

20   understanding as to how you were to

21   resolve that conflict?

22       A.    Well, I feel like the deals we

23   struck were for everybody.  And all of us,

24   not only ResCap, but all of its

25   subsidiaries got the same deal.  So I was

1          THOMAS MARANO

2     focused on getting the same deal for

3     everybody.

4          Q.   Okay.  Can you answer my

5     question.  And maybe you just did.  But

6     just to make clear, what was your

7     understanding of what you were supposed to

8     do in the event of a conflict between what

9     would benefit creditors of ResCap LLC

10    versus what would benefit creditors, for

11    example, of RFC?

12         A.   I -- I never thought about it in

13    the context of a conflict.

14         Q.   Did you understand at the time

15    of the May 9th board meeting that there

16    were certain structures that might benefit

17    one group of creditors over another group

18    of creditors?

19         MR. PRINCI:  Objection.

20      References facts not in evidence but

21      you can answer if you understand the

22      question.

23         A.   I'm not sure I do follow.

24         Q.   Okay.  At the time of the

25    May 9th board meeting did you understand

208

1                    THOMAS MARANO

2      that ResCap LLC was committing itself to

3      pay anything in connection with the

4      proposed settlement?

5              MR. PRINCI:  Objection as to

6          form.

7          A.    What -- with respect to the

8      settlement what I recall is trying to get

9      a global -- essentially buy global peace

10     for all the entities.  How any allocation

11     of monies would be, you know, chopped up,

12     I was not thinking about that.

13         Q.    At the time of the May 9th board

14     meeting did you understand that there was

15     even an assertion that ResCap LLC was a

16     potential, owed a potential claim to any

17     of the settling funds?

18         A.    I'm not sure I thought about it

19     in that context.

20         Q.    And so when the number was

21     reached, 8.7 billion, was it your

22     understanding that that 8.7 billion could

23     be asserted against every entity within

24     the ResCap enterprise?

25         A.    I believe that could have.  I

209

1              THOMAS MARANO

2    wasn't really focused on it, you know,

3    other than to get everybody the same deal.

4         Q.   So getting back to this conflict

5    point.  Do you understand that as between

6    ResCap LLC and Residential Funding

7    Company, LLC, there might be a

8    disagreement between those two entities as

9    to who was the proper party to pay the

10   claim?

11        A.   Today or back then?

12        Q.   Back then.

13        A.   Again, I don't recall thinking

14   about it at the time.

15        Q.   Okay.  Who made the decision to

16   enter into the settlement on behalf of

17   Residential Funding Company, LLC?

18        A.   That would have been the

19   directors of that entity.

20        Q.   And how was that effectuated?

21        A.   You'd have to talk to those

22   directors.

23        Q.   And who were those directors?

24        A.   I believe you've got Steve Abreu

25   and -- and Jim Whitlinger,

210

1                    THOMAS MARANO

2    W-h-i-t-l-i-n-g-e-r.

3        Q.    And who acted on behalf of GMAC

4    Mortgage, LLC?

5        A.    I believe that was Steve Abreu

6    and Joe Pensabene, P-e-n-s-a-b-e-n-e.

7        Q.    And did you understand in

8    connection with the May 9th board meeting

9    that you were acting at all on behalf of

10   Residential Funding Company, LLC in a

11   legal capacity?

12           MR. PRINCI:  Objection.  Calls

13       for an expert opinion.

14           If you understand the question,

15       you can answer it.

16       A.    I'm not really sure what you

17   mean by a legal capacity.  I mean from a

18   fiduciary point of view I was trying to

19   settle for everybody, get the biggest deal

20   for the family.  How the mechanics of that

21   worked out I was not, you know, worried

22   about that detail.

23       Q.    I don't know if it has been

24   marked.  I apologize.  Let's mark this as

25   9019-62.

215

1                  THOMAS MARANO

2       respect to requests for documents you

3       believe are appropriate.

4            MR. SHORE:  Thank you.

5       Q.    Were you present at any

6    post-petition board meeting to discuss an

7    amendment to the settlement agreement or

8    any amendments to the settlement

9    agreement?

10       A.    Yeah, I was at one.  There was

11   one time where the agreement came in --

12   there was one board meeting where we

13   talked about an amendment to the

14   agreement.

15       Q.    Okay.  And then independent of

16   that one board meeting, that aside, has

17   there been any other post petition board

18   meeting at any ResCap entities as far as

19   you know to discuss the settlement

20   agreement?

21       A.    Not that I'm aware of.

22       Q.    So what do you recall about the

23   meeting with respect to the amendment?

24       A.    There -- there were actually a

25   couple of attempts to amend the agreement