# Exhibit 9

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

            Debtors.

------------------------------------x

VIDEOTAPE DEPOSITION OF TAMMY HAMZEPHOUR

New York, New York

November 13, 2012

9:43 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27903

2

November 13, 2012

9:43 a.m.


    Deposition of TAMMY HAMZEPHOUR, held at the offices of Kramer, Levin, Naftalis & Frankel, 1177 Avenue of the Americas, New York, New York, pursuant to Notice, before Erica L. Ruggieri, Registered Professional Reporter and Notary Public of the State of New York.

48

1            TAMMY HAMZEPHOUR
2              MR. RAINS:  Objection, calls for
3       speculation.
4              MR. KAUFMAN:  I was just
5       following up on her testimony.
6       A.   I don't -- I don't know that I
7   would say likely, but it's certainly
8   possible that she communicated to Tim.
9       Q.   In the top e-mail of the exhibit
10  sent by Mr. Devine to Gary Lee and you,
11  Mr. Devine asks whether 11 a.m. would work
12  for the conversation he suggested and
13  summarized a discussion he had had with
14  Mr. Lee the day before, correct?
15      A.   Yes.  That's what it looks like.
16      Q.   And am I correct that you were
17  not a party to that discussion between
18  Mr. Devine and Mr. Lee that's referenced
19  in his e-mail?
20      A.   I don't know.  But probably not,
21  given the fact that there were two of us,
22  and he was telling me what happened in the
23  call.  So probably I wasn't there.
24      Q.   Okay.  Regarding that
25  discussion, Mr. Devine stated, "On KP next

49

1         TAMMY HAMZEPHOUR

2    steps I don't think we should share dollar

3    range of potential AFI contribution (Gary

4    and I had discussed including some

5    figures)."

6            Do you see that?

7       A.   Yes.

8       Q.   Do you know what potential AFI

9    contribution Mr. Devine had discussed with

10   Mr. Lee during their conversation?

11      A.   No, I don't.

12      Q.   Nobody told you?

13      A.   If they did, I don't remember.

14      Q.   Mr. Devine went on to say, "I

15   think it's premature, given that business

16   has not got to a number yet.  Can always

17   share with her at next round of

18   discussion.  Would recommend we simply

19   indicate all the rest, the structure of

20   the proposed outcomes, the potential for

21   substantial contribution from AFI,

22   fragility of the goal, but clarity of

23   purpose for comprehensive third-party

24   releases, et cetera."

25           Do you see that?

67

1                         TAMMY HAMZEPHOUR
2         over each other.
3              Q.    I apologize.  Let me correct.
4         What Mr. Devine said in his 4:44 p.m.
5         e-mail, "Let's book Thursday 4 to 6 for
6         web meeting.  Only presentation material
7         will be the waterfall deck."  Correct?
8              A.    That's correct.
9              Q.    Do I understand correctly from
10        these e-mails that Mr. Devine was the one
11        who coordinated this next meeting with
12        Ms. Patrick?
13             A.    Yes.
14             Q.    Among those Mr. Devine copied on
15        his e-mails were Rick Cieri and Ray
16        Schrock, correct, right?
17             A.    Correct.
18             Q.    And both of them are partners at
19        Kirkland & Ellis, right?
20             A.    Yes.
21             Q.    And they represented AFI, didn't
22        they?
23             A.    Yes.
24             Q.    Was AFI negotiating the
25        settlement with Kathy Patrick?

68

1               TAMMY HAMZEPHOUR

2         A.    They were negotiating to the

3    extent that if they were making a

4    contribution to us in a settlement

5    separately, they wanted third-party

6    releases from her.  So the two things were

7    related to each other somewhat.

8         Q.    They also wanted third-party

9    releases -- sorry, they also wanted

10   releases from ResCap, right?

11        A.    They wanted releases from ResCap

12   and they wanted third-party releases from

13   Kathy Patrick.

14        Q.    Okay.

15        A.    And others.

16              MR. KAUFMAN:  Let's mark as the

17        next exhibit an e-mail chain on

18        May 2nd and May 3, 2012.  Bates

19        numbers RC 9019_00049016 to 7.

20              (9019 Exhibit 82, e-mail chain

21        on May 2nd and May 3, 2012, Bates RC

22        9019_00049016 to 7, marked for

23        identification, as of this date.)

24        Q.    Feel free to take your time

25   reviewing this exhibit, Ms. Hamzephour.

76

1            TAMMY HAMZEPHOUR

2        A.    No.

3        Q.    So when Mr. Lee said that
4   Ms. Patrick had proposed to support the
5   plan releases "Provided that Ally
6   contributes no less than X dollars in
7   cash," what did you understand that meant?

8        A.    Ally was looking for plan
9   support agreement from her clients that
10  would include third-party releases.  And
11  that she would support that at some level
12  contribution from Ally which had not yet
13  been determined.

14       Q.    In the top e-mail from
15  Mr. Devine he said, "Our notes match."  Do
16  you see that?

17       A.    Yes.

18       Q.    Do you know whether Mr. Devine
19  was on the call or meeting summarized in
20  Mr. Lee's e-mail?

21       A.    I don't know.

22       Q.    His comments suggest to you that
23  he was, doesn't it?

24            MR. RAINS:  Objection.  Calls
25       for speculation.

89

1              TAMMY HAMZEPHOUR

2      20 percent of their allowed claim to

3      ResCap LLC.  This provision was added to

4      protect the investors in the event that a

5      larger than expected portion of the Ally

6      settlement proceeds is allocated to ResCap

7      LLC based on alter ego type claims (as

8      opposed to RFC and GMACM as we

9      anticipate)."

10              Do you see that?

11          A.   Yes.

12          Q.   That was a description of the

13      so-called Holdco election, wasn't it?

14          A.   Yes.

15          Q.   Was ResCap's board of directors

16      asked to consider and approve that

17      amendment to the RMBS trust settlement

18      agreement?

19          A.   I don't remember that there

20      were.

21          Q.   Weren't you the one who approved

22      that?

23          A.   I approved it -- I signed it

24      after discussing with counsel and

25      Mr. Marano.

106

TAMMY HAMZEPHOUR

2  discussions about the board's fiduciary
3  obligations?
4     A.   Yes.
5     Q.   Are you familiar with a
6  gentleman by the name of Frank Sillman?
7     A.   No.
8     Q.   Okay.  Do you know if debtors
9  engaged any experts in connection with
10 evaluating or analyzing the RMBS
11 settlement in connection with the Rule
12 9019 motion?
13    A.   Yes.  We have experts.
14    Q.   Do you know if Mr. Sillman is
15 one of those experts?
16    A.   I don't recognize the name.
17    Q.   Okay.  Do you know if -- were
18 you involved in the expert engagement
19 process in connection with the Rule 9019
20 motion?
21    A.   No.
22    Q.   Who was involved with that?
23    A.   Morrison & Foerster.
24    Q.   Was anybody at ResCap consulted
25 with -- by Morrison & Foerster in

109

1              TAMMY HAMZEPHOUR
2     Foerster.
3         Q.   And do you recall -- how did you
4     find out about what the experts were
5     working on?
6         A.   In conversations with counsel.
7         Q.   Have you read the report by
8     Fortis?
9         A.   No, I have not.
10        Q.   Do you think that was an
11    important thing for you to do in
12    connection with the Rule 9019 motion?
13        A.   No.
14        Q.   Why not?
15        A.   I just didn't think it was.
16        Q.   Do you know what Fortis
17    concluded in connection with their report?
18        A.   I didn't read the report.
19        Q.   I know.  I'm asking you a
20    different question.  Do you know what
21    their conclusions were?
22        A.   No, I don't know what their
23    conclusions were.
24        Q.   I'm just going to grab the pile
25    of exhibits in front of you.  I just want