# Exhibit 21

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

        Debtors.

------------------------------------x

VIDEOTAPE DEPOSITION OF JAMES WHITLINGER

New York, New York

November 15, 2012

9:39 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27649

2

November 15, 2012

9:39 a.m.

    Deposition of JAMES WHITLINGER, held at the offices of Kramer, Levin, Naftalis & Frankel, 1177 Avenue of the Americas, New York, New York, pursuant to Notice, before Erica L. Ruggieri, Registered Professional Reporter and Notary Public of the State of New York.

56

1      JAMES WHITLINGER

2      Q.   But you don't have a specific

3  recollection of discussing the board's

4  fiduciary duties during the half an hour

5  or so that the board discussed the

6  settlement agreement on May 9th?

7      A.   Yeah, I -- I don't recall

8  specific to that.

9      Q.   And on May 9th as a board member

10  when you were considering the settlement,

11  in your own words what was your

12  understanding of your fiduciary duty as a

13  ResCap board member in deciding whether to

14  approve the settlement agreement?

15      A.   Generally speaking, you know, as

16  a director we have a duty of care and duty

17  of loyalty to ResCap and all its

18  affiliates or subsidiaries.  And we needed

19  to consider all creditors when making any

20  decision that we would make at all, you

21  know, that that's part of that -- that

22  process.  So.

23      Q.   So you understood on May 9th

24  that you had a fiduciary duty of care and

25  loyalty -- loyalty to ResCap and all of

57

1            JAMES WHITLINGER
2    its creditors during that meeting?
3        A.   Yes.  And to ResCap's
4    subsidiaries.
5        Q.   Just to be clear, your answer to
6    the question was "Yes.  And to ResCap's
7    subsidiaries"?
8        A.   Yes.
9        Q.   And did that fiduciary duty
10   extend to the creditors of not just ResCap
11   but also ResCap's subsidiaries?
12       A.   Yes.
13       Q.   If a conflict arose during the
14   May 9th board meeting between the best
15   interests of ResCap's different
16   subsidiaries or the different creditors of
17   those different subsidiaries, what was
18   your understanding of how the board was
19   supposed to resolve that conflict?
20            MR. RAINS:  I object to the
21        question on the grounds that it's a
22        hypothetical and it assumes facts not
23        in evidence and so it will cause you
24        to speculate.
25            If you can answer the question,

72

1  JAMES WHITLINGER

2  dialogue had been occurring with parties.

3  So that process to further vet and discuss

4  how legal entities to your question would

5  be allocated was subsequent conversations

6  that took place and subsequent -- and

7  manifested in subsequent agreements.

8      Q.   So do I understand correctly

9  that on May 9th when the board approved

10  the settlement agreement it had not been

11  fully determined the extent to which any

12  of the $8.7 billion in claims would be

13  allowed against RFC or GMAC Mortgage or

14  ResCap itself, is that true?

15      A.   I don't recall the exact

16  conversation that we had but the maximum

17  claim across all entities at that point in

18  time was 8.7.  I think there were

19  presumably some beliefs that based on the

20  entity that did the issuance, the claims

21  would align potentially there.  And that's

22  what manifested itself in some other

23  conversations to try and get that more

24  definitive so that people understood where

25  would the claims be brought forth.

73

```
 1                  JAMES WHITLINGER
 2        Q.    And those conversations and the
 3    sorting of that out occurred after
 4    May 9th, right?
 5        A.    Yes.
 6        Q.    So on May 9th when the board
 7    approved the settlement agreement, it did
 8    not know the extent to which either RFC or
 9    GMAC Mortgage or ResCap might have an
10    allowed claim, a portion of the
11    8.7 billion allowed claim against each of
12    those different entities?
13        A.    Again, in total 8.7 billion was
14    a claim.  All entities were released and,
15    you know, between the expert and
16    subsequent conversations how those claims
17    were allocated were -- were part of what
18    was being worked out.
19        Q.    Wasn't it important for you and
20    the board to -- to decide before you
21    approved the settlement agreement how
22    those claims would be allocated among the
23    different ResCap affiliates?
24        A.    I would tell you everything is
25    important on working out the $8.7 billion
```

145

JAMES WHITLINGER

including Mr. Marano and Mr. Mack?

    A.    No.

    Q.    Before your deposition today did you discuss with anyone what anyone else had testified to in depositions in this matter, including testimony by Mr. Marano or Mr. Mack or Mr. Cancelliere?

    A.    No.

        MR. SIEGEL:  Let's take a break.

        MR. RAINS:  All right.

        THE VIDEOGRAPHER:  The time is 12:57 p.m. and we are off the record.

        (Whereupon, there is a recess in the proceedings.)

        THE VIDEOGRAPHER:  The time is 1:08 p.m. and we are back on the record.

EXAMINATION BY
MR. DENMAN:

    Q.    Mr. Whitlinger, I'm Harrison Denman from White & Case for the ad hoc group of junior secured noteholders. Earlier you mentioned you are both an officer and a director for Residential

146

1     JAMES WHITLINGER

2     Capital LLC and for GMAC Mortgage LLC,

3     correct?

4         A.   Yes.

5         Q.   And do you also hold positions

6     at Residential Funding Company, LLC?

7         A.   Residential Funding I'm also a

8     board member and a chief financial officer

9     as Craig had asked.

10        Q.   Okay. And can you identify the

11    other members of the board for GMAC

12    Mortgage?

13        A.   Steve Abreu and, you know, Joe

14    Pensabene, who is the head of our

15    servicing is currently a -- and is also a

16    board member.

17        Q.   And is the same individuals that

18    are members of the board of Residential

19    Funding Company?

20        A.   I believe it's only Steve Abreu

21    and myself for -- for RFC.

22        Q.   And earlier you said that you

23    don't recall there being any meetings of

24    the board of GMAC Mortgage with respect to

25    the RMBS settlement, correct?

                                                                    147

1                JAMES WHITLINGER

2        A.    Correct.

3        Q.    And do you recall if there were

4   any such meetings of the board by -- of

5   the board for Residential Funding Company?

6        A.    No.  I would say the same, I

7   don't recall.

8        Q.    Being that you are one of only

9   two, or in the case of GMAC Mortgage

10  three, directors for each entity you would

11  obviously -- your attendance would be

12  necessary for any board meeting of those

13  two entities, correct?

14       A.    Yes.

15       Q.    So it's safe to assume that your

16  not recalling means that those meetings

17  never occurred?

18            MR. RAINS:  Objection.

19       Misstates his testimony.

20       A.    I don't -- I don't recall having

21  a meeting and I don't believe we had a

22  separate meeting but I don't -- I don't

23  re- -- I don't recall.

24       Q.    Okay.  Now, you attended the

25  May 9th board meeting, correct?

148

```
1                JAMES WHITLINGER
2       A.   Yes.
3       Q.   And that was a board meeting for
4  Residential Capital LLC, correct?
5       A.   Yes.
6       Q.   And your attendance there was in
7  your capacity as officer and director of
8  Residential Capital LLC, correct?
9       A.   Yes.  But I was also there with
10 respect to the plan support agreement that
11 all the debtor entities were listed as
12 part of the plan support agreement.  So --
13 so I was also considering the other
14 entities in my decision.
15      Q.   But only with respect to the
16 plan support agreement because that was
17 the agreement to which those entities were
18 parties?
19      A.   That's -- that's correct.
20      Q.   Was it customary for you to
21 attend a board meeting for one entity and
22 make decisions that related to the affairs
23 of another entity at that meeting?
24      A.   I would say this, you know,
25 generally speaking, because RFC and GMAC
```

149

JAMES WHITLINGER

Mortgage are guarantors to many of the facilities that we have that we're -- we're always thinking about all the -- the entities that are -- that are subsidiaries of the company.

Q. So do those subsidiary entities ever have board meetings?

A. We do -- we do occasionally have board meetings, you know, that -- that, you know, that I would generalize as things that are specific to that entity for maybe a state licensing issue.

Q. Okay. Earlier you mentioned that the $8.7 billion allowed claim -- well, let me put it different.

What was your understanding with respect to the entities that would be liable for the $8.7 billion claim as of the May 9th?

A. My understanding that at that point in time all the entities were part of the release and that the claim, generally speaking, would be allocated based on where the loans were at by the