# EXHIBIT D

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No:

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

                    Debtors.

-----------------------------------x


DEPOSITION OF FRANK SILLMAN

New York, New York

November 20, 2012

9:35 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27687

2

1

2

3

4          November 20, 2012

5          9:35 a.m.

6

7

8          Deposition of FRANK SILLMAN,

9     held at the offices of Kramer, Levin,

10    Naftalis & Frankel, 1177 Avenue of the

11    Americas, New York, New York, pursuant

12    to Notice, before Erica L. Ruggieri,

13    Registered Professional Reporter and

14    Notary Public of the State of New

15    York.

16

17

18

19

20

21

22

23

24

25

63

1          FRANK SILLMAN

2          Am I right when you refer to

3     prime, jumbo, Alt-A and subprime, those

4     labels as you understand them generally

5     apply to first lien loans?

6          A.    Yes.

7          Q.    And then HELOC is a form of

8     second lien loan?

9          A.    In most cases, not always.

10    There are first mortgage HELOCs but

11    predominantly I believe the HELOCs are

12    second mortgages.

13         Q.    And in your experience do Alt-A

14    and subprime mortgage loans tend to yield

15    higher rep and warranty breaches than

16    prime jumbo?  And I'll refer you to

17    paragraph 58 of your declaration if you

18    want to look at that.  I'm going to object

19    to the form of the question as vague and

20    ambiguous?

21         A.    Can you restate the question for

22    me.

23         Q.    In your experience do Alt-A and

24    subprime mortgages tend to yield higher

25    rep and warranty breaches than prime jumbo

64

1              FRANK SILLMAN

2    mortgages?

3         A.    They tend to yield higher

4    alleged rep and warrant breaches.

5         Q.    And how much higher, can you

6    quantify that at all?

7         A.    I don't have the numbers in

8    front of me to be able to give you any

9    type of percentage differences.

10        Q.    Suppose you were asked by your

11   client to quantify that.  Could you do

12   that and how would you go about it?

13        A.    I wouldn't be able to quantify

14   it without looking at and doing more work

15   on what the actual experience is.  I do

16   know that it is -- my experience has been

17   it's higher, there's been a higher rate of

18   alleged rep and warrant breaches, but I

19   couldn't put a percentage on it.

20        Q.    Are there any publications that

21   address that to your knowledge?

22        A.    There may be that address it.

23   I'm not aware of them.

24        Q.    Do you know if anybody has

25   attempted to address that issue on an

68

1                    FRANK SILLMAN

2         Q.    Correct.  And suppose now we

3    modify the question so we are not asking

4    about alleged breach rates but instead

5    we're asking about what you call loss

6    share rates.  Could that question be

7    addressed using publicly available data?

8         A.    There have been some expert

9    reports that you can discern the loss

10   share rates from.  The issues with that is

11   the underlying data you don't have access

12   to so I can't opine on whether or not

13   that's comparative to the debtors proposed

14   settlement because the data behind those

15   reports are not publicly available.

16        Q.    And which expert reports are you

17   referring to?

18        A.    The Bank of America expert

19   report and the Lehman expert declaration.

20        Q.    Now, I'm not asking you about

21   discerning loss share rates as to any

22   particular seller but rather as to

23   industry averages.  Is there publicly

24   available data from which one could reach

25   meaningful conclusions about average

69

1          FRANK SILLMAN

2     industry loss share rates?

3          A.     On a product by product basis?

4          Q.     Yes.

5          A.     I'm not aware of any credible

6     sources that I have been able to evaluate

7     their underlying data that provide that

8     information.

9          Q.     And now let me ask the same

10    question but as to vintages.  Is there

11    publicly available data from which one

12    could reach meaningful conclusions about

13    how loss share rates varied depending on

14    the loan's vintage?

15         A.     Again, I'm not aware of any data

16    that's available that you can reach

17    credible conclusions and that I have been

18    able to view the underlying data behind

19    that.

20         Q.     In your -- strike that.

21              So now let's turn away from

22    industry averages and turn back to your

23    personal experience.  In your personal

24    experience is the vintage of a loan a

25    factor that can affect the likelihood of a

70

                    FRANK SILLMAN

1

2    put back?

3        A.    Yes.  There is some correlation

4    between the vintage of the loan and the

5    potential for an alleged rep-warrant

6    breach.

7        Q.    What correlation have you

8    observed?

9        A.    There's a segment of loans

10   originated from 2005 to 2007 that tended

11   to have higher alleged breach rates in the

12   work that I have done for my clients.

13       Q.    I want to understand what you

14   said.  You referred to a segment of loans

15   originated from '05 to '07.  Are you

16   saying that loans originated during that

17   period generally tend to have higher

18   alleged breach rates in your experience?

19            MR. RAINS:  Objection.

20       Misstates the witness's testimony.

21            MR. BENTLEY:  I'm trying to

22       understand it.

23       A.    Loans originated in that period

24   may have higher alleged breach rates or

25   reps and warrant violations than loans

104

1                          FRANK SILLMAN

2        this paragraph is what I'm going to focus

3        on.  It says, "I was asked to provide an

4        independent assessment of the total

5        allowed claim as defined in the RMBS Trust

6        Settlement Agreements and opine as to its

7        reasonableness."

8                   Do you see that?

9        A.    Yes.

10       Q.    And the total allowed claim,

11       that's $8.7 billion?

12       A.    Yes.

13       Q.    Who first contacted you about

14       this matter?

15       A.    Jen Battle.

16       Q.    When did she contact you?

17       A.    I believe it was early May but,

18       you know, I'm not positive as to the date.

19       But that's around the time.

20       Q.    She contacted you after the

21       debtors had entered into the RMBS Trust

22       Settlement Agreement?

23       A.    Yes.

24       Q.    And I can tell you that that

25       agreement was executed on May 13th.

105

1                    FRANK SILLMAN

2          A.    Okay.

3          Q.    And the debtors filed bankruptcy

4     the next day.

5                When she contacted you, had the

6     debtors filed bankruptcy?

7          A.    Contacted me to discuss

8     retaining me for this expert work?

9          Q.    When she contacted you to

10    discuss this expert work the first time.

11         A.    You know, I don't recall.

12    Because we were an ongoing -- we were

13    doing ongoing work and then they suspended

14    that work, I don't recall when.  I believe

15    it was -- we didn't have any discussions

16    regarding this potential work until after

17    they filed bankruptcy but I don't recall

18    exactly.

19         Q.    Turning back to the sentence I

20    quoted a moment ago.  The opinion you were

21    asked to provide was as to whether or not

22    the total allowed claim was reasonable; is

23    that correct?

24         A.    Yes.

25         Q.    So you were not asked to come up

118

1                          FRANK SILLMAN

2          said it in the paragraph.

3              Q.    So is it fair to say you are not

4          opining as to whether any of the claims

5          have legal merit?

6              A.    Whether they would be able to

7          prove breaches of reps and warrants, yeah,

8          under the governing agreements.

9              Q.    Or prove the requirements of put

10         back?

11             A.    Correct.

12             Q.    And by the way, you don't claim

13         to have any expertise in that issue, do

14         you?

15                 MR. RAINS:  Objection, vague and

16             ambiguous.

17             A.    Which area is that?

18             Q.    Whether put back is legally

19         required?

20             A.    I didn't render any legal -- I

21         don't have any legal training and didn't

22         provide any legal recommendations under

23         this work.

24             Q.    And you don't claim to have the

25         expertise needed to provide legal

119

FRANK SILLMAN

1

2      opinions, right?

3          A.    Correct.

4          Q.    And you are not expressing a

5      view, I take it, as to whether any of the

6      debtors' legal defenses have merit?

7          A.    Correct.

8          Q.    And you are also not expressing

9      a view as to whether the facts relating to

10     any of the loans in the pool being settled

11     would legally warrant put back?

12         A.    Yeah.  I'm not making a legal

13     assessment.

14         Q.    Am I correct you've made no

15     attempt to determine the, what portion of

16     the loans in the pool actually breach reps

17     and warranties?

18         A.    The work that I'm depending on

19     or relying on is the repurchased, GSE

20     repurchase rate work that was done between

21     Fannie, Freddie and the debtor where they

22     reviewed thousands of loans over a number

23     of years and looked at the actual loan by

24     loan file review and availed themselves to

25     the defenses of the governing agreements

120

1                 FRANK SILLMAN

2      or any other legal arguments as part of

3      that process.  So it's that work and the

4      results of that work that's incorporated

5      in my work, in my declaration.

6          Q.    I understand you are drawing

7      inferences from the debtors' put back

8      history with the GSEs, among other things?

9          A.    Correct.

10         Q.    So I just want to be clear, am I

11     correct you haven't looked at any one loan

12     within the pool that's being settled to

13     try to reach a view or express an opinion

14     as to whether that loan actually breaches

15     any reps and warranties?

16         A.    We have not completed our loan

17     level review work.  And I'm relying on the

18     thousands of loans that went through the

19     debtors' repurchase process as the basis

20     for my original declaration.

21         Q.    So I think I'm hearing the

22     answer to my question but I just want to

23     be clear.  In your June 11 declaration you

24     are not expressing any opinion as to

25     whether any particular loan breaches any

121

```
 1                    FRANK SILLMAN

 2      reps and warranties?

 3              MR. RAINS:  Objection.  Vague

 4         and ambiguous.  Asked and answered.

 5         A.    I utilized the repurchase work

 6      the debtor did with the GSEs to form the

 7      basis for my original declaration.

 8         Q.    And in reaching the conclusions

 9      in your initial declaration you didn't

10      look at any individual loan file in the

11      pool that's being settled?

12         A.    I relied on the thousands of

13      loans that were reviewed by the debtor as

14      part of their process prelitigation.

15         Q.    With respect, Mr. Sillman, I

16      don't think you answered my question.

17              MR. BENTLEY:  Let me ask the

18         reporter to read it back.

19              MR. RAINS:  I think you answered

20         the question.  It's been asked and

21         answered.

22              MR. BENTLEY:  You know, Darryl,

23         it's a yes or no question and I got a

24         nonanswer.

25              Read it back, please.
```

122

1              FRANK SILLMAN

2         (Record read.)

3         MR. RAINS:  Same objections.

4    A.    I relied on the GSE repurchase

5    work that the debtor did with Fannie and

6    Freddie.

7    Q.    To date have you looked at any

8    loan file for any of the loans within the

9    pool that's being settled?

10   A.    We are in the process of

11   reviewing the loan files.

12   Q.    Have you yet looked at any loan

13   files?

14        MR. RAINS:  You mean him

15        personally or Fortace?

16   Q.    Let's break it into pieces.

17   Have you personally looked at any loan

18   file?

19   A.    I have not looked at the loan

20   files.

21   Q.    Prior to your signing your

22   June 11 declaration, did anybody at

23   Fortace look at any of the loan files for

24   the loans being settled?

25   A.    I relied on, we relied on, the

123

1                      FRANK SILLMAN

2       work that the debtor did with the GSE

3       repurchases in forming the assumptions and

4       conclusions in my original declaration.

5            Q.    So that's a no?

6            A.    I relied on --

7                 MR. BENTLEY:  Read back my

8       question.

9            Q.    It's a very simple factual

10      question.  I'm not asking you what you

11      relied on.  I'm asking you whether you

12      looked at any loan files?

13                MR. BENTLEY:  Read it back,

14         please.

15                (Record read.)

16                MR. RAINS:  Objection, vague and

17         ambiguous.  Asked and answered.

18           A.    I relied on the work that was

19      done by the debtor as part of their GSE

20      repurchase for the conclusions and

21      assumptions made in my original

22      declaration.

23           Q.    And you didn't look at any loan

24      files?

25           A.    I relied on the GSE repurchase

124

1          FRANK SILLMAN

2     work.

3          Q.    Did that involve looking at any

4     loan files?

5          A.    It revolved relying on the loan

6     file reviews that the debtor performed.

7          Q.    Is there a reason you are

8     resisting answering a simple question?

9               MR. RAINS:  Objection.

10          Argumentative.  Asked and answered.

11               MR. BENTLEY:  It's not asked and

12          answered for Christ's sake, Darryl.

13               Read it back.

14               MR. RAINS:  Of course it has.

15          It's been asked 15 times and --

16               MR. BENTLEY:  Is the answer no?

17          Because I sure can't tell what the

18          answer is.

19               MR. RAINS:  I think his answer

20          is very clear.

21               MR. BENTLEY:  The answer is he

22          did something else, it's not whether

23          he did this or not.

24               MR. RAINS:  That's his answer.

25          You don't like his answer but it's his

125

1              FRANK SILLMAN

2        answer.

3              MR. BENTLEY:  I'm fine with his

4        answer, he just hasn't answered my

5        question.

6              Can you read it back, please.

7              MR. RAINS:  Let's do this, let's

8        take a quick break.

9              MR. BENTLEY:  You know what, I

10        want an answer to my question before

11        you speak --

12              MR. RAINS:  I'm going to talk to

13        him about his answer to your question.

14              MR. BENTLEY:  I object.  You are

15        not supposed to talk to the witness

16        while a question is pending.

17              (Whereupon, there is a recess in

18        the proceedings.)

19              MR. RAINS:  I think we have

20        succeeded in clearing up some of the

21        ambiguities and confusion caused by

22        your question.  Why don't you put the

23        question to him again.

24        Q.    I know it's very confusing but

25        I'll state it again.  In connection with

126

1                    FRANK SILLMAN

2      forming the opinions expressed in your

3      June 11 declaration, did you or any of

4      your colleagues look at any of the files

5      for the loans in the pool being settled.

6          A.    For the, my original declaration

7      I relied on the work that was done by

8      ResCap and the repurchase activity.  We

9      are now looking at loan files.  We are

10     currently looking at loan files.

11         Q.    So let's just unpack what you

12     just said.  You relied on the work that

13     was done by ResCap.  What work are you

14     referring to?

15         A.    To GSE and private label

16     repurchase activity work ResCap did.

17         Q.    Understood.  But was that as to

18     any of the loans that are in this pool

19     that's being settled?

20         A.    There may be in the private

21     label securities work loans that are

22     included in this settlement.  The vast

23     majority of the loans were related to

24     their GSE originations.

25         Q.    And none of the GSE deals

127

1                    FRANK SILLMAN

2      overlap in any way with this settlement,

3      right?

4           A.    Correct.

5           Q.    Were you relying, when you

6      prepared this report, on any work that RFC

7      had done in looking at the loans that are

8      part of this settlement?

9           A.    Yes.  We did review some

10     information regarding their private label

11     securitization repurchase work.  What we

12     found, I think there's an exhibit, that

13     the vast majority of those repurchase

14     demands were unresolved.

15          Q.    So I'm going to return to that.

16     I know what you are referring to.  Putting

17     aside any loan reviews that RFC may have

18     done in connection with its prepetition

19     put back experience, did you or any of

20     your colleagues look at any loan files in

21     connection with the work that went into

22     your June 11 report?

23          A.    We relied on the company's work

24     for the information in the original

25     declaration and we are now looking at loan

128

```
 1              FRANK SILLMAN

 2    files that are contained within the 392

 3    trusts.

 4        Q.    And when you say the company's

 5    work, are you referring to anything other

 6    than the work the company did prepetition

 7    in connection with its prepetition put

 8    back negotiations?

 9        A.    Yeah.  It was prepetition work.

10        Q.    In connection with -- done by

11    the debtor in connection with its

12    prepetition put back experience?

13        A.    Yes.

14        Q.    And no other review of loan

15    files went into your, the conclusions

16    expressed in your June 11 declaration?

17        A.    That's right.

18        Q.    Okay.  We are there.  We got an

19    answer.  Thank you.  Let's move on.

20        A.    I would say no additional loan

21    work.

22            MR. BENTLEY:  I'm about to

23        change topics.  If people want to take

24        a break, this is fine or we can keep

25        going.
```

142

1              FRANK SILLMAN

2      what?

3          A.    Where they reviewed the loan

4      file internally, possibly as part of a

5      post funding QC process where they

6      identified loans that they felt met the

7      repurchase standard and notified the

8      appropriate trustee or insurer.

9          Q.    What is a post funding QC

10     process?

11         A.    That's where lenders review a

12     sample of loans that close to see if there

13     are any underwriting compliance or other

14     errors in the origination process.

15         Q.    And what's the -- do you have an

16     understanding as to what the debtors

17     purpose was in doing that?

18         A.    It's standard in the industry to

19     select a group of loans post closing.

20     One, it's a requirement for the GSEs to do

21     that and it's typically because the GSEs

22     make up such a large percentage of their

23     volume, it's typically utilized for all

24     types of loans to review the origination

25     process.

143

1                    FRANK SILLMAN

2          Q.    And is there a reason the debtor

3     does this for PLS?

4               MR. JURGENS:  Objection to form.

5               MR. RAINS:  Calls for

6          speculation.  Go ahead.

7          A.    I'm not aware of, you know, why

8     they chose these loans and what their

9     policies are for QC'ing loans that go into

10    PLS securities.

11         Q.    Did you or your team make any

12    effort to try to understand the nature of

13    the debtors practices and procedures in

14    that regard?

15              MR. RAINS:  Objection, vague and

16         ambiguous.

17         A.    We discussed when they provided

18    this data what these various categories

19    were.  And they could not tell us under

20    what initiative these voluntary loans were

21    selected.  So their records -- they

22    explained to us their records didn't

23    reflect you how the loans were created as

24    voluntary demands.

25         Q.    Who participated in these

144

1          FRANK SILLMAN

2      discussions?

3          A.     I did, Michelle Minier and Jeff

4      Cancelliere.

5          Q.     Who is Mr. Cancelliere?

6          A.     He works for the debtor.

7          Q.     Do you know what he does there

8      or what he did at the time of these

9      discussions?

10         A.     Yeah.  He -- my understanding

11     was he was involved in the risk group for

12     the company.

13         Q.     So did he, to your knowledge,

14     did he participate in the post funding QC

15     process?

16         A.     That -- in my conversations with

17     him that wasn't my understanding.  I

18     interfaced with him in this regard.  He

19     was the person that collected this

20     information for us at the company.

21         Q.     So were you able to ascertain

22     what portion of the loans that you

23     described as voluntary, were reviewed as

24     part of the post funding QC process?

25             MR. JURGENS:  Objection to form.

145

        FRANK SILLMAN

1    A.    I answered that already.  In

2 that they did not have the data available

3 to ascertain under what program these

4 voluntary demands were developed.

5    Q.    Did you have any understanding

6 what other programs may have given rise to

7 these voluntary repurchases?

8    A.    We had some discussions around

9 trying to better understand the types of

10 loans that would be included in the

11 voluntary.  And Jeff was not able to give

12 us any data around how these were created.

13    Q.    And just so we are clear.  I

14 meant to ask you about other programs, not

15 types of loans.  Do you have any

16 understanding of what programs other than

17 post funding QC programs led to these

18 voluntary repurchases?

19        MR. SHEEREN:  Objection to form.

20    A.    In my conversations with him

21 they didn't discuss the types of programs

22 that led to these voluntary because the

23 data was not available.  So they weren't

24 able to speak to how these loans came to

146

1                    FRANK SILLMAN

2    be categorized as voluntary.

3         Q.    And do you know if it would be

4    possible now to reconstruct or come up

5    with that information?

6         A.    I don't know if anything has

7    changed.  They were not able to provide

8    that information at the time that we

9    requested this data.

10        Q.    Did you reach a conclusion about

11   whether the voluntary repurchases had any

12   bearing on the issues you were analyzing?

13        A.    We looked at all of the PLS

14   demands including the voluntary in

15   developing the conclusions that we had in

16   my report.

17        Q.    What weight -- strike that.

18             Table 2 addresses nonvoluntary

19   repurchases only.  Why did you isolate out

20   the nonvoluntary?

21        A.    I wanted to understand better

22   the state of the repurchase demands that

23   were made by trustees or insurers.

24        Q.    Am I right the only difference

25   between the Table 1 box relating to

175

                    FRANK SILLMAN

1

2           MR. RAINS:  He said put back

3       demands.

4           Q.    Let me try it again because my

5       question wasn't very clear.  You've

6       computed that the debtors -- sorry, that

7       the trusts -- let me start again.  You've

8       computed that the loans subject to the

9       proposed settlement have losses,

10      liquidated losses to date of about

11      $30 billion, correct?

12          A.    Correct.

13          Q.    And by the way, by liquidated

14      losses what do you mean?

15          A.    It means when there's a loss

16      that's passed on to the trust when the

17      loan is liquidated.

18          Q.    So are all of those losses on

19      account of either foreclosure or some

20      other sale?

21          A.    Short sale, yes.  There's a

22      number of categories that would consider

23      the loan liquidated.  And any losses

24      associated with that are reported as

25      liquidated losses.

176

1              FRANK SILLMAN

2        Q.    So it would be a sale in

3    satisfaction of the mortgage?

4        A.    I'm not sure that I'm the

5    expert.  Mortgages work differently in

6    each of the states.  When the property is

7    liquidated, the losses associated with

8    that are passed on to the trust.

9        Q.    So let me just show you your

10   report so we don't have to go back and

11   forth on this.  Look at paragraph 25 of

12   your initial declaration.  And item A in

13   the first sentence refers to, "The actual

14   losses that are incurred when a loan is

15   foreclosed and sold through a short sale,

16   REO or other final disposition."

17           Do you see that?

18       A.    Yes.

19       Q.    And that's what you've defined

20   as the actual liquidated loss?

21       A.    Yes.

22       Q.    Okay.  And do you have any way

23   of knowing whether after a liquidation of

24   that sort the trust would still hold the

25   mortgage?

177

1              FRANK SILLMAN

2       A.    That would be a --

3             MR. JURGENS:  Objection to form.

4             MS. PATRICK:  Objection to form.

5       A.    -- a legal question that may be

6    discussed in the governing agreements but

7    outside the scope of what -- what I looked

8    at for my declaration.

9       Q.    Okay.  Fair enough.  But you've

10   computed that the debtors -- the

11   liquidated losses on the loans in the

12   trusts to date are approximately

13   $30 billion?

14      A.    That's the information that I

15   received from Intex and LP, loan

16   performance.

17      Q.    And does Table 2 of Exhibit 7

18   show that, tell you the dollar value of

19   put back demands made against the debtors

20   with respect to these trusts from late

21   2007 until the petition -- until May 2012?

22      A.    I'm not sure -- you are asking

23   the detailed schedule information?

24      Q.    Exhibit 7, the cover page.

25      A.    Oh, the cover page.

192

1                  FRANK SILLMAN

2       this next step in estimating the loss

3       share rate ranges.

4            Q.   So all of your calculations on

5       pages 16 to 23, the upshot of those

6       calculations is the loss share rate,

7       correct?

8            A.   Yes.  The result of the work

9       that's done starting on page 16, paragraph

10      44 and ending on page 23, paragraph 66.

11           Q.   There's a number of different

12      components, retrade, agree rate and audit

13      rate and demand rate.  But the purpose of

14      all of those is to come up with the -- the

15      collective result of all of those is the

16      loss share rate?

17           A.   Right.

18           Q.   Now, going back to paragraph 6

19      in the second sentence describing loss

20      share rate, you describe loss share rate

21      as, "The percentage of estimated lifetime

22      losses that the debtors might agree to

23      share with the trusts."

24                Do you see that?

25           A.   Yes.

193

                    FRANK SILLMAN

1

2      Q.    So was it deliberate on your

3   part to use the word "might" rather than

4   would?

5      A.    What I was developing -- what I

6   developed for this is a range of

7   reasonable loss share rates.  And whether

8   or not the debtor would agree to a loss

9   share rate ultimately agree to a loss

10   share rate or an allowed claim that you

11   could calculate a loss share rate is

12   something for the others to decide, not me

13   to impose by using the word "would."

14      Q.    For example, your calculations

15   are all predicated on the assumption that

16   a breach of rep and warranties can be

17   proved against the debtors as a legal

18   matter, right?  We talked about that

19   earlier.

20      A.    Let me get to -- what paragraph

21   are you referring --

22      Q.    5.  Third sentence.

23          MR. RAINS:  What was the

24   question again?

25      Q.    You assume for purposes of your

225

1                    FRANK SILLMAN

2      were referring to a few minutes ago?

3           A.    Yes.

4           Q.    The calculations you used to

5      derive the audit rate ranges shown in the

6      table on paragraph 53 of your report?

7           A.    Right.  The total average of

8      65 percent and 69 percent.

9           Q.    Okay.  But how did you compute

10     each of the individual ranges shown on

11     this table?  For example, the first line,

12     trusts, liquidated loans, a range of 70 to

13     75 percent.  How did you compute those

14     numbers?

15          A.    That was based on my

16     professional experience with audit rate

17     percentages.

18          Q.    So do you compute it or did you

19     just -- does that number -- is that number

20     the product of any calculations?

21          A.    It's the product of my

22     professional experience.  There's not an

23     additional calculation.

24          Q.    You just came up with that

25     number?

226

1                    FRANK SILLMAN

2          A.    I didn't just come up with it.

3      It's based on my professional experience.

4          Q.    How did you come up with it?

5              MR. RAINS:  Objection.  Asked

6          and answered.

7          Q.    How did you pick 70 percent

8      rather than 60 or 80 percent?

9              MR. RAINS:  Asked and answered.

10         A.    I came up with it based on my

11     professional experience.  I developed a

12     range to take into consideration the

13     variability of each one of these

14     categories.

15         Q.    Did you compute any of the

16     numbers shown in paragraph 53 other than

17     the average that's shown at the bottom of

18     the table?

19         A.    The assumptions for each

20     wouldn't delinquency buckets were based on

21     my professional experience.

22         Q.    But you didn't perform any

23     calculations to derive any of these

24     numbers?

25              MR. RAINS:  Which numbers?

227

1          FRANK SILLMAN

2          MR. BENTLEY:  All of the numbers

3      in the table in paragraph 53 other

4      than the total average numbers shown

5      on the last line.

6      A.    The numbers for each of those

7  are assumptions based on my professional

8  experience.  So I developed those

9  assumptions and input them into the model.

10     Q.    How did you develop them?  Were

11  there any steps that went into the

12  development?

13     A.    Based on my professional

14  experience for these categories of loans

15  that's how I developed the assumptions.

16     Q.    Did you start with the total

17  average range of 65 to 69 and then back

18  into the component ranges?

19     A.    I did not.

20     Q.    And can you shed any more light

21  on how you came up with the various ranges

22  shown here, other than the total average

23  range?

24     A.    Based on my professional

25  experience.

228

1          FRANK SILLMAN

2          Q.    It wasn't a quantitative

3    calculation?

4          A.    It wasn't a -- you are asking me

5    is this a product of a mathematical

6    equation?

7          Q.    Correct.

8          A.    It was -- these individual

9    assumptions were not the product of an

10   additional mathematical equation.  They

11   were based on my professional experience.

12         Q.    And there's no backup to these

13   numbers?

14         A.    There is no -- there's no other

15   data to support these numbers other than

16   my professional experience.

17         Q.    If I ask you the same questions

18   about the numbers shown in the table on

19   paragraph -- in paragraph 56 of your

20   report are your answers the same?

21              MR. RAINS:  Objection.  Vague

22         and ambiguous.  Compound.

23              MR. BENTLEY:  You can walk

24         through all these questions again,

25         Darryl.

229

1               FRANK SILLMAN

2        A.    I followed the same process

3    based on my professional experience in

4    determining the assumptions for each of

5    the lower and higher ranges in paragraph

6    56.

7        Q.    Did you prepare any calculations

8    that went in to the derivation of these

9    numbers, that is on paragraph -- in

10   paragraph 56?

11       A.    There aren't any additional

12   calculations to derive the assumptions

13   other than the calculations for the total

14   average.

15       Q.    Let me try to be clear.  The

16   total average numbers you derived from the

17   numbers above it in -- in the table?

18       A.    And they are weighted against

19   the estimated trust lifetime losses.  So

20   they are a function of a calculation in

21   the model.

22       Q.    But each of the numbers other

23   than the total average has no calculation

24   backing it up?

25       A.    That's right.  It's an

230

1                    FRANK SILLMAN

2      assumption based on my professional

3      experience.

4          Q.    And there's no backup documents

5      or data supporting these numbers?

6          A.    That's correct.

7          Q.    Let's move on to breach rate.

8      And as we discussed before, breach rate is

9      simply the product of audit rate and

10     demand rate, correct?

11         A.    Correct.

12         Q.    So the derivation of this was

13     simply math?

14         A.    That's correct.  And then again

15     weighted against the estimated trust

16     lifetime losses for the averages.

17         Q.    Now, in paragraphs 57 and 58,

18     you refer to the breach rates used in the

19     BofA expert report and the Lehman expert

20     report, right?

21         A.    Yes.  I discussed them.

22         Q.    So you attempted to determine

23     what breach rate had been used in

24     connection with the BofA settlement,

25     right?

234

1              FRANK SILLMAN

2      an expert, a loss share rate, excuse me.

3      We calculated that by taking the estimated

4      losses divided by their higher and lower

5      range in the settlement columns.  I

6      believe that was in our spreadsheet.  We

7      can take a look at that.

8          Q.    Maybe this will help you.  Did

9      you -- to compute the 14 percent loss

10     share rate shown in your table in

11     paragraph 65 did you derive that from the

12     36 percent breach rate and the 40 percent

13     success rate shown on page 8 --

14         A.    Yes.

15         Q.    -- of the BofA expert report?

16         A.    Yeah, the same amount.

17         Q.    You simply multiplied 36 percent

18     by 40 percent?

19         A.    Yes, I believe that's the case.

20         Q.    And to get your Lehman agree

21     rates --

22         A.    I'm sorry.

23         Q.    I have got to review that.  So

24     I'm going to ask you now about how you

25     derived the breach rate, agree rate and

236

1                    FRANK SILLMAN

2      expert report?

3           A.    Yes.

4           Q.    And turn now to paragraph 65 of

5      your report, which shows certain Lehman

6      loss share rate assumptions.  Did you

7      derive those by simply multiplying your

8      Lehman breach rate by your Lehman agree

9      rate?

10          A.    Yes.  They are not mine but,

11     yes, from the --

12          Q.    Understood.

13          A.    From Lehman's, yes.

14          Q.    The numbers you put in your

15     tables for the Lehman breach rate and

16     agree rate?

17          A.    Yes.

18          Q.    Did you know whether the ResCap

19     board of directors, when it approved the

20     settlement, considered the BofA settlement

21     and the Lehman settlement?

22          A.    I don't have any information

23     about what the board considered as part of

24     the settlement.

25          Q.    We will move on.

272

FRANK SILLMAN

1

2       anything relating in any way to agree

3       rates on page 2 of this document?

4           A.    No.   That column referred here

5       as formula column H is where I calculate

6       the overall trust agree rate assumptions

7       for the lower and higher ranges.

8           Q.    But nothing in this document

9       shows how you got to the lower and higher

10      agree rate numbers shown for the various

11      buckets?

12          A.    That's correct.   Those were

13      based on my professional experience with

14      agree rates for these buckets adjusted for

15      the repurchase experience the debtor had

16      and the higher agree rates than the

17      industry as a whole for their GSE

18      repurchases.

19          Q.    Let's take it step by step.   I'm

20      going to ask you more about Exhibit 15 in

21      a moment.   But just to jump to the bottom

22      line, does Exhibit 15 show how you

23      computed the 41 to 47 percent agree rate

24      range?

25          A.    This was a validation step that

278

1         FRANK SILLMAN

2        A.    I did not as part of this

3    analysis.

4        Q.    Did you attempt to quantify the

5    vintages of their loans as part of this

6    analysis?

7        A.    The vintages were similar

8    vintages to the vintages, the same time

9    period majority from 2005 to 2007.

10       Q.    Did you attempt to quantify how

11   the vintages broke out as between the

12   different years within that time frame?

13       A.    I did not do the further

14   analysis.  I didn't feel that was

15   necessary as part of my assumption

16   development.

17       Q.    Did you make any attempt to

18   compare how the reps and warranties

19   governing those loans compared to the reps

20   and warranties in the governing agreements

21   for the debtors?

22       A.    In general I did do that.

23   That's one of the discounts applied in my

24   Exhibit 15 document.

25       Q.    Okay.  So we will turn back to

279

1                    FRANK SILLMAN

2      that in a moment.  And over what years

3      were the put back demands and put back

4      responses that -- of the three clients you

5      are referring to?

6           A.    And the IndyMac experience.

7      They related to originations primarily

8      from 2005 to 2007.

9           Q.    I'm actually asking a different

10     question which is when were the put back

11     demands?  How long after origination?

12          A.    They were 2008 -- let me step

13     back.  IndyMac they were 2006 through

14     2008.  At my Fortace clients they were

15     2009 through part of 2012.

16          Q.    And did you attempt to -- did

17     you give any consideration to the length

18     of time between the origination and the

19     put back demands in the client experience

20     that you were basing your opinion on?

21          A.    I did not, with my experience

22     with, at IndyMac Bank and with my Fortace

23     clients, did not see any differences in

24     when the demand was presented and the

25     agree rates.

280

1              FRANK SILLMAN

2        Q.    Did you make any attempts to

3   quantify the length of time between

4   originations and demands?

5              MR. JURGENS:  Objection to form.

6        A.    I didn't see that as a factors

7   that influenced the agree rates in the

8   work that I had been involved with.

9        Q.    So you didn't do any such

10  calculation?

11       A.    It was not included in my agree

12  rate calculation.

13       Q.    Now, what were the agree rates

14  of these three clients that you are

15  referring to?

16       A.    And IndyMac.  They ranged in

17  general from a low of around 37 to a high

18  of 42 percent.

19       Q.    One of the three clients was 37

20  and another was --

21       A.    No.  At different times the

22  agree rates, depending on who the demander

23  was, when the demands were made might

24  change how they negotiated and came to

25  agree rates.  So in general I would see

282

1              FRANK SILLMAN

2      forming your conclusions, did you consult

3      any documents?

4          A.    I did not consult any documents.

5          Q.    You just knew those numbers by

6      memory?

7          A.    I do know those numbers by

8      memory.

9          Q.    This was the experience of three

10     clients.  Were they sell side or buy side?

11         A.    And IndyMac.

12         Q.    Sure.  Were the three Fortace

13     clients sell side?

14         A.    Yes.

15         Q.    How many sell side clients did

16     you have altogether who you advised on --

17     with respect to put back demands?

18         A.    For what period?  I mean, we had

19     clients come and go so.

20         Q.    From '09 through this year.

21         A.    Five clients.

22         Q.    About five sell side clients?

23         A.    Yes.

24         Q.    Why did you pick these three and

25     not the other two?

283

1                    FRANK SILLMAN

2        A.    Just because of the volume of

3    work that we did for them or have done for

4    them is not significant.  The three --

5        Q.    The two --

6        A.    Yeah.  Two of the five we have

7    not done significant work for.

8        Q.    Did you consider including your

9    buy side clients in doing this analysis?

10       A.    Give me a second.  Let me just

11   recall.  The work we did for the buy side

12   was, in many cases, we did not receive

13   back the ultimate agree rate data for

14   those clients.  The three clients I picked

15   were ones where I received back agree rate

16   feedback.

17       Q.    Did you receive the ultimate

18   agree rate data for any of your buy side

19   clients?

20       A.    I may have received agree rate

21   data for those clients but I'm not sure.

22       Q.    Did you give any consideration

23   to including them in your analysis?

24       A.    I did consider them in

25   determining my analysis but felt that the

284

1              FRANK SILLMAN

2     data from the three that I selected and my

3     IndyMac experience was more on point and

4     more robust than the information that was

5     provided to me.

6          Q.    What was the basis for that

7     conclusion?

8          A.    The amount of loans that we did

9     for them and the data that was provided to

10    us regarding the agree rates.

11         Q.    That explains how you concluded

12    it was more robust.  But how about more on

13    point?

14         A.    They were sell side clients,

15    very similar in structure to ResCap.

16         Q.    In what sense?

17         A.    In that they sold

18    securitizations with Alt-A, subprime,

19    jumbo A loans.

20         Q.    And that wasn't true of your buy

21    side clients?

22         A.    Some of the buy side clients

23    sold whole loan to companies like ResCap.

24    Some didn't have as robust of a

25    correspondent or conduit business as

296

1                    FRANK SILLMAN

2    shelf they may have changed.

3        Q.    Did you perform any system --

4    did you attempt to review the reps and

5    warrants of those clients in any

6    systematic way?

7        A.    I based it on my professional

8    experience and actual repurchase agree

9    rate experience with them in regards to

10   their reps and warrants.

11       Q.    And are there -- is there any

12   work product that you or your team

13   generated reflecting your review of the

14   reps and warrants of these other clients?

15       A.    There isn't any information that

16   I relied on that we did not provide to the

17   data room or in the exhibits.  It's

18   confidential information.  So we didn't

19   document any of the work.  This was based

20   on my professional experience with the

21   Fortace clients.

22       Q.    Let's just try to make sure we

23   have a clear record.  Did you go back and

24   look at the reps and warrants of these

25   other clients for purposes of performing

297

                    FRANK SILLMAN

1

2    your analysis or did you instead simply

3    rely on your general experience in

4    representing those clients?

5              MR. RAINS:  Or something else.

6         Tell him what you did.

7         A.    I relied on my familiarity with

8    the reps and warrants from my other

9    clients in comparing them to the reps and

10   warrants in the governing agreements that

11   I reviewed.

12        Q.    So you didn't conduct any rep

13   and warrant review of those other clients

14   for purposes of this analysis?

15        A.    I didn't do any additional rep

16   and warrant review other than the rep and

17   warrant review that I explained to you

18   that I did.

19        Q.    That you had done previously in

20   connection with your work for those other

21   clients?

22        A.    Correct.

23        Q.    And same question with respect

24   to IndyMac.  Did you go back and look at

25   the reps and warrants for any IndyMac