# EXHIBIT E

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

          Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF THOMAS MARANO

New York, New York

November 12, 2012

9:56 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27645

2

1

2

3

4                          November 12, 2012

5                          9:56 a.m.

6

7

8          Deposition of THOMAS MARANO,

9     held at the offices of Kramer, Levin,

10    Naftalis & Frankel, 1177 Avenue of the

11    Americas, New York, New York, pursuant

12    to Notice, before Erica L. Ruggieri,

13    Registered Professional Reporter and

14    Notary Public of the State of New

15    York.

16

17

18

19

20

21

22

23

24

25

93

```
 1                    THOMAS MARANO

 2      negotiation, I didn't ask him, you know,

 3      for this specific number.  So I can't -- I

 4      just don't know.

 5           Q.   I thought you testified a minute

 6      ago that you always asked him for more.

 7                Are you saying just generally?

 8           A.   Whenever I negotiated anything

 9      with Michael, I always asked for more.

10           Q.   Okay.  So are you saying that

11      you never had occasion to discuss with

12      Mr. Carpenter the amount that AFI was

13      willing to pay or that you thought should

14      be paid by AFI to ResCap to settle claims?

15           A.   Not in the context of

16      negotiating the deal.  But I had expressed

17      numbers that I felt were, you know, higher

18      than we were able to get.

19           Q.   What numbers did you express?

20           A.   Now, my general view was it

21      probably would take something close to

22      $2 billion to settle this.

23           Q.   And you expressed that to

24      Mr. Carpenter?

25           A.   I expressed that to
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

94

                    THOMAS MARANO

1

2    Mr. Carpenter, definitely.

3        Q.    Did you express it to other

4    members of the ResCap board?

5        A.    Yes.

6        Q.    Did you express it to all of the

7    other members of the ResCap board?

8        A.    I was fairly vocal in what I

9    thought it would take to get a deal done.

10   My view is it would take a couple billion

11   dollars, that no one was going to do a

12   deal for 750.

13       Q.    And during what period of time

14   or over what period of time did you

15   advocate for a number in the range of

16   $2 billion from AFI?

17       A.    I wouldn't use the phrase

18   "advocate."  I would say expressed my view

19   of how to get a settlement --

20       Q.    Fine.

21       A.    -- or, pardon me, a deal.  And

22   in that context, I would say, you know,

23   over the spring of this year.

24           MR. KAUFMAN:  Let's mark as the

25       next exhibit, Ally Financial, Inc.'s

116

1              THOMAS MARANO

2     Elliott Management?

3          A.    Yes.

4          Q.    And Mr. Cederholm's e-mail

5     summarized a telephone conversation he had

6     with you regarding the statute of

7     limitations defenses to put-back claims,

8     correct?

9          A.    Yes.

10         Q.    Mr. Cederholm pointed out,

11    didn't he, that put-back claims are based

12    on alleged breaches of contract and that

13    if the claimed breach is in the reps and

14    warranties made in the contract the

15    claimant must assert the breach within the

16    applicable limitations period?

17         A.    What was the question?

18             MR. KAUFMAN:   Read it back,

19         please.

20             (Record read.)

21         A.    That is what he asserts in this

22    e-mail and it is generally what he

23    discussed on the telephone, yes.

24         Q.    And did you understand from what

25    Mr. Cederholm was telling you that

117

1                    THOMAS MARANO

2      applying a six-year statute of limitations

3      that exists in New York, that should in

4      2012 bar any put-back claims based on

5      contracts made before 2006?

6                    MR. PRINCI:  Objection as to

7         form.

8         A.     I understood his position and I

9      understood what his opinion was but he was

10     not counsel and I'm not even sure if he's

11     a lawyer.  He's just a guy who bought

12     bonds who is trying to make an argument

13     for what the bonds were worth.  I relied

14     on counsel.

15        Q.     I wasn't asking what you relied

16     or even if you relied on it.  I just

17     wanted to know when you received the

18     e-mail and read it you understood that's

19     what he was saying?

20        A.     I understood that's what his

21     assertion was.

22        Q.     Okay.  So did you understand

23     from what he was telling you, at least

24     from his view, that in light of the

25     statute of limitations there should be

118

THOMAS MARANO

1   zero put-back liability for PLS deals done

2

3   in 2004 and 2005?

4           MR. PRINCI:  Objection as to

5       form.

6       A.    Again, that was his opinion.

7   The reason why I copied, as you can see,

8   the attorneys on the top here was I was

9   interested in their opinion.

10      Q.    Did any of those to whom you

11  sent Mr. Cederholm's e-mail ever get back

12  to you and express a view as to what he

13  said to you?

14      A.    I do believe there was

15  discussion with Tim Devine on this matter

16  and probably Tammy as well.  And my

17  recollection of the discussion was he --

18          MR. PRINCI:  No, don't.

19          THE WITNESS:  Oh, counsel.  I'm

20      sorry.

21      Q.    Shifting gears.  Mr. Marano, you

22  knew that the settlement being negotiated

23  with Kathy Patrick and Talcott Franklin

24  was contingent on their signing plan

25  support agreements with ResCap, didn't

146

1          THOMAS MARANO

2       dated May 9, 2012, notifying the board

3       of a meeting on May 9, 2012, at

4       3:00 p.m., attached to which is a

5       several page analysis that was

6       presented at that meeting.  Bates

7       numbers RC 9019_0093180 through 3183.

8             (9019 Exhibit 60, e-mail from

9       Gary Lee dated May 9, 2012, Bates RC

10      9019_0093180 through 3183, marked for

11      identification, as of this date.)

12      Q.    Let me show you what we have

13   marked.  Did you receive this e-mail and

14   the attachment from Mr. Lee on May 9,

15   2012?

16            MR. PRINCI:  Just give me one

17      minute to read the document.

18      A.    Yes.

19      Q.    And Mr. Lee attached or sent his

20   e-mail at 2:38 p.m. on May 9th.  Do you

21   see that?

22      A.    Yes.

23      Q.    And that was 22 minutes before

24   the scheduled meeting at 3:00 p.m., right?

25      A.    Yes.

147

THOMAS MARANO

1

2      Q.    Is that when you first received

3   the supporting materials he attached to

4   his e-mail?

5      A.    I honestly couldn't tell you but

6   I'm sure I got them at that time.

7      Q.    Okay.  Were any other written

8   materials besides the ones attached as

9   part of this exhibit provided to the board

10  in advance of the meeting?

11     A.    Not that I can recall.

12     Q.    Were you and other members of

13  the board told before the May 9th meeting

14  the terms of the proposed settlement with

15  Ms. Patrick?

16     A.    My recollection was that the

17  discussion with Ms. Patrick was fluid up

18  until the board meeting.  And so I

19  can't -- I can't recall, you know, if --

20  you know, it was just fluid.  It was

21  ongoing.  We were apprised periodically.

22  But it was a fluid negotiation.

23     Q.    Wasn't the board being asked to

24  approve the settlement at the May 9th

25  meeting?

148

THOMAS MARANO

1

2      A.    Yes.

3      Q.    So my question is -- well, let

4  me see if I understood your answer.  Are

5  you telling me that until the meeting was

6  actually held neither you nor the other

7  board members knew the terms that had been

8  negotiated and agreed upon in principal?

9      A.    No, that's not what I'm saying.

10     Q.    Okay.  So my question is did you

11 know the terms of the negotiated deal

12 prior to the May 9th board meeting?

13     A.    I was aware of the general

14 concepts.  Negotiations were going down to

15 the wire.  I don't know if it moved a

16 little bit between my prior knowledge and

17 the time of the board meeting.  It was

18 extremely fluid.

19     Q.    How much prior to the May 9th

20 meeting could you have been aware of the

21 final negotiated terms as fluid as you've

22 described the negotiations?

23          MR. PRINCI:  Objection to form.

24     Q.    What's the earliest you could

25 have been aware?

149

1          THOMAS MARANO

2          MR. PRINCI:  Objection as to

3      form.

4      A.    Well, I -- I knew there was some

5   level of negotiation going on back in

6   October.

7      Q.    That wasn't my question.  Since

8   you've testified that the negotiations

9   with Ms. Patrick were so fluid right up to

10   the May 9th meeting that you are not sure

11   when you found out about the terms that

12   were agreed upon, I'm trying to find out

13   what's the earliest possible time before

14   May 9th, given how fluid everything was

15   when you could have learned --

16          MR. PRINCI:  Objection as to

17      form.

18      Q.    -- what the terms were?

19          MR. PRINCI:  Misstates his

20      testimony.

21      A.    The earliest possible time would

22   have been within a few days or hours.

23      Q.    Okay.  Could have been as late

24   as a few hours before the meeting is what

25   you are saying?

1                    THOMAS MARANO

2        A.    Could very easily have been.

3        Q.    Okay.  Prior to the proposed

4    agreement with Ms. Patrick being presented

5    to the board for formal approval did you

6    authorize an agreement in principal on the

7    terms that were ultimately presented?

8             MR. PRINCI:  Objection to form.

9        A.    I was kept appraised of the

10   negotiations that were going on with

11   Ms. Patrick by Gary Lee and Tammy

12   Hamzephour.  And I told them to keep

13   working on trying to get the best deal

14   possible.

15       Q.    My question was prior to the

16   time the agreement was formally presented

17   to the board for approval, had you

18   authorized -- had you authorized an

19   agreement in principal on the terms that

20   were ultimately presented to the board?

21            MR. PRINCI:  Objection as to

22       form.

23       A.    I -- I don't think so.  I

24   authorized negotiations.

25       Q.    Okay.  We have seen that as of

157

1                    THOMAS MARANO

2              You can answer it.

3        A.    I agree that's what page 73

4    says.

5        Q.    So you understood as of May 9,

6    2012, that it had been publicly disclosed

7    that the estimated or the estimate of

8    reasonably possible losses over time

9    relating to the matters that were being

10   settled was 0 to $4 billion?

11             MR. PRINCI:  Objection.

12       Misstates the record.

13             MS. PATRICK:  Same objection.

14       A.    Give me the date you just used.

15       Q.    I'm saying as of May 9th, you

16   knew that it had been publicly disclosed

17   on April 27 that the estimate of

18   reasonable -- reasonably possible losses

19   over time related to -- relating to

20   put-back claims or repurchase claims was 0

21   to $4 billion?

22       A.    That is correct.

23       Q.    Okay.  As of May 9, 2012,

24   exactly how many repurchase claims had

25   actually been asserted against ResCap by

158

1                    THOMAS MARANO

2    any RMBS trust?

3         A.    I can't recall the exact number

4    that had been asserted.  I believe, you

5    know, there was an FHFA lawsuit.

6         Q.    Is that a trust?

7         A.    I don't know.  Actually I can't

8    answer that question.  I don't know.

9         Q.    Isn't the answer 0?

10        A.    I don't know.

11        Q.    You don't know.  Did you ever

12   ask anyone prior to the May 9th meeting at

13   which you were being asked to approve an

14   $8.7 billion settlement whether anyone,

15   whether any trust or certificate holder

16   had actually sued ResCap for repurchase

17   obligations?

18             MR. PRINCI:  Just don't include

19        counsel in the answer to that

20        question, please.

21             MR. KAUFMAN:  That's a fact.

22        That's not a legal advice.

23        Q.    Did anybody tell you that as a

24   fact that any lawsuit like that had been

25   filed?

159

1                    THOMAS MARANO

2        A.    Yeah.  I don't -- I do not

3    believe -- I actually think he's right.

4    There had been no trust -- trustees that

5    filed suits.

6        Q.    So as of May 9, what you were

7    settling you knew what you were settling

8    was threatened claims not real claims,

9    right?

10           MS. PATRICK:  Objection to form.

11       A.    On May 9th we knew that Kathy

12   had, Kathy Patrick had aggregated enough

13   investors to break the threshold at which

14   she could order the trustees to file a

15   claim.  And that's why the scope of the

16   settlement was much larger than was in the

17   Q.

18       Q.    Was it your understanding,

19   Mr. Marano, that whatever amount

20   Ms. Patrick had aggregated, her clients

21   actually had the right to order the

22   trustees to do something or did you

23   understand they could merely request that

24   the trustees do something?

25       A.    My -- my understanding was that

164

```
 1                    THOMAS MARANO
 2        A.    I have to rely on the minutes.
 3   I can't recall.
 4             The minutes suggest that it was
 5   held by telephone.
 6        Q.    Do the minutes accurately
 7   reflect what occurred at the May 9th
 8   meeting?
 9        A.    Yes.
10        Q.    The minutes say that one of the
11   board's members, Mr. Ilany, was unable to
12   attend.
13             Why couldn't he attend?
14        A.    I'm -- I don't know why he was
15   not there.  I don't remember.
16        Q.    The minutes also reflect that
17   two matters were addressed at the meeting,
18   the proposed RMBS settlements and the
19   Project Bounce update; is that correct?
20        A.    Yes.
21        Q.    How much time was devoted to
22   each of those matters?
23        A.    There was, you know, there was a
24   considerable amount of time, you know,
25   dedicated to both matters.  I can't tell
```

165

1                    THOMAS MARANO

2      you within the hour that the board meeting

3      transpired, whether it was 50/50; but

4      there was, you know, a fair amount of

5      time.

6          Q.    The entire meeting, according to

7      the minutes, lasted an hour, correct?

8          A.    Correct.  I just can't tell you

9      whether it was 30 and 30.  I don't recall.

10          Q.    Is it your best recollection

11      that it was split approximately equally

12      between the two matters?

13          A.    I don't recall how much time was

14      spent on each matter.

15          Q.    In the next-to-last paragraph on

16      the first page, the minutes say that

17      during the discussion you requested that a

18      report with separate line items

19      identifying the different settlement

20      amounts be prepared to provide the board

21      with additional details on the

22      settlements.

23              Do you see that?

24          A.    Yes.

25          Q.    Why did you want that

166

THOMAS MARANO

1    information?

2        A.    For purposes of clarity.

3        Q.    Clarifying what?

4        A.    To help to make sure the board

5    understood, you know, the components that

6    made up the rep and warrant and PLS

7    settlement.

8        Q.    Was that report provided during

9    the course of the hour meeting?

10       A.    I do not believe it was.

11       Q.    Why didn't you adjourn the

12   meeting until you got the information you

13   were looking for?

14       A.    I think -- my recollection of

15   this meeting is that we had enough of a

16   basis to determine whether or not the

17   settlement agreement was fair, and this

18   was just clarifying details.

19       Q.    Was there a written presentation

20   that accompanied the May 9th meeting?

21       A.    I don't recall if there was a

22   presentation.

23       Q.    Wasn't it the two-page document

24   we looked at before that you got --

167

```
 1                THOMAS MARANO

 2        A.    Oh, yes.

 3        Q.    -- just about 20 minutes before?

 4        A.    Yes.  This is the same meeting.

 5        Q.    So that's the information that

 6    the board was looking at, when it was

 7    considering, on May 9th, whether to

 8    approve the settlement?

 9        A.    That is -- that is correct.

10        Q.    Was there anything other than

11    that two-page presentation the board was

12    looking at, when it was asked to consider

13    whether to approve the settlement?

14        A.    Not that I recall.

15        Q.    On the second page of the

16    minutes regarding the Project Bounce

17    update, it says that you and Mr. Nashelsky

18    briefed the board on the status of various

19    matters related to a potential ResCap

20    Chapter 11 filing, including but not

21    limited to the AFI settlement agreement.

22              Do you see that?

23        A.    Yes.

24        Q.    And that refers to the

25    settlement agreement between ResCap and
```

200

1                      THOMAS MARANO

2       that counsel for the institutional

3       investors will have their fees paid by the

4       debtors?

5              MS. PATRICK:  Objection to form.

6              MR. PRINCI:  Objection to form.

7           A.    Yeah.  I believe that the fees

8       will be paid, yes.

9           Q.    Do you have an understanding as

10      to the amount of those fees that would be

11      paid by the debtors?

12          A.    I don't recall.  And it may be

13      in the document.  I just don't recall.

14          Q.    Okay.  When the -- I think you

15      previously discussed the May 9th board

16      meeting at which the settlement agreement

17      was considered.  Was there any discussion

18      at that meeting regarding the payment of

19      the institutional investors' counsel fees?

20          A.    I don't recall if that was a

21      matter of discussion at the board meeting.

22          Q.    Okay.  Have you or anyone else

23      on behalf of the debtors evaluated the

24      reasonableness of the fees that would be

25      paid to counsel to the institutional

201

1                       THOMAS MARANO

2      investors pursuant to the settlement

3      agreement?

4              MS. PATRICK:  Objection to form.

5         A.   I have not looked at the

6      reasonableness.  I'm not -- again, I don't

7      recall that I even knew what that number

8      was.

9         Q.   Are you aware whether anyone on

10     behalf of the debtors has requested either

11     bills or time sheets from counsel to the

12     RMBS investors to substantiate fees that

13     will be paid to them under the settlement

14     agreement?

15             MR. PRINCI:  Objection to form.

16             MS. PATRICK:  Same objection.

17        A.   I'm not the best person to

18     answer that.  My chief financial officer

19     keeps track of all that information.  If

20     we received it, he'll have it.

21        Q.   Okay.  Is that -- that's

22     Mr. Whitlinger?

23        A.   Whitlinger.

24        Q.   Okay.  Whitlinger.  I'm sorry.

25             Give me one moment.

239

1                    THOMAS MARANO

2     Mr. Marano.  You testified early that

3     Mr. Ilany and Mr. Mack were responsible

4     for the Ally ResCap negotiations, right,

5     and you also testified earlier that -- I'm

6     sorry the court reporter can't take down a

7     head nod.  Is that yes or no?

8          A.    Yes.

9          Q.    You also testified earlier --

10    backup.  You also testified earlier that

11    another group of people were responsible

12    for negotiations with Ms. Patrick and

13    Mr. Franklin's group; is that correct?

14         A.    Yes.

15         Q.    And who were those people

16    responsible for negotiations with

17    Ms. Patrick's group?

18         A.    Tammy Hamzephour from general

19    counsel of ResCap and Gary Lee who was --

20    who was counsel to ResCap via Morrison &

21    Foerster.

22         Q.    Anyone else responsible for

23    negotiations with Ms. Patrick?

24         A.    In the early stages when

25    Ms. Patrick's letter first arrived Tim

240

THOMAS MARANO

1

2  Devine had been present but he did not

3  represent ResCap in that meeting.

4      Q.   I understand but my question is

5  something different.  I'm asking you

6  overall who was responsible for the

7  negotiations with Ms. Patrick?

8      A.   Tammy and Gary Lee.

9      Q.   Not Mr. Devine?

10     A.   No.  Not -- not on behalf of

11 ResCap, no.

12     Q.   I understand but I'm not -- I'm

13 not making that distinction you are.  So

14 let me ask my question.  Who was

15 responsible for negotiating the RMBS

16 settlement with Ms. Patrick?

17         MR. PRINCI:  Objection.  Asked

18     and answered.

19         You can answer again.

20     A.   Tim Devine was there.  But Tammy

21 Hamzephour represented ResCap and Gary

22 Lee.

23     Q.   And who did Mr. Devine

24 represent?

25     A.   Mr. Devine was there as a

241

THOMAS MARANO

1

2    representative of Ally I believe.

3        Q.    So Mr. Devine represented Ally?

4        A.    Yes.

5        Q.    Did anyone else to your

6    knowledge have significant involvement

7    with the negotiations with Ms. Patrick?

8        A.    Our risk team was involved, Jeff

9    Cancelliere.

10       Q.    Anyone else?

11       A.    No.

12       Q.    And Jeff Cancelliere, who did he

13   work for?

14       A.    He -- he worked for the risk

15   group.

16       Q.    I understand.  Was that risk

17   group with Ally or risk group with ResCap?

18       A.    Within -- within ResCap.

19       Q.    So he did not work for Ally?

20       A.    Again, there was a period --

21   there was a period in 2012 where the roles

22   of the various global functions began to

23   disengage from Ally.  For a period of time

24   Jeff would have reported to Todd Cushman.

25   At some point I believe Jeff would have