# EXHIBIT I

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,        12-12020(MG)

Debtors.

----------------------------------x

VIDEOTAPE DEPOSITION OF TAMMY HAMZEPHOUR

New York, New York

November 13, 2012

9:43 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27903

2

1

2

3

4                    November 13, 2012

5                    9:43 a.m.

6

7

8           Deposition of TAMMY HAMZEPHOUR,

9      held at the offices of Kramer, Levin,

10     Naftalis & Frankel, 1177 Avenue of the

11     Americas, New York, New York, pursuant

12     to Notice, before Erica L. Ruggieri,

13     Registered Professional Reporter and

14     Notary Public of the State of New

15     York.

16

17

18

19

20

21

22

23

24

25

27

TAMMY HAMZEHPOUR

1

2      the Minneapolis office.  Also my capital

3      markets partner, John Ruckdaschel, was

4      there, and Tim Devine from Ally.

5          Q.    How long did the meeting last?

6          A.    Three hours, maybe.  I don't

7      remember exactly.

8          Q.    Can you please describe for me,

9      in as much detail as you can remember,

10     what the discussion was?

11         A.    Ms. Patrick did most of the

12     talking in the beginning of meeting.  She

13     talked to us a bit about who her investor

14     clients were and their holdings that were

15     represented across the spectrum of our

16     securitization deals.  She indicated that

17     they believed they have claims against us

18     and against Ally.

19              We talked about some of the work

20     she had done in preparation for the

21     meeting, and she mentioned that she had

22     reviewed our prospectuses for the deals,

23     that she had reviewed loan and servicing

24     agreements, that she was familiar with the

25     structure and the language and the

28

TAMMY HAMZEPHOUR

1

2    disclosures as across those deals, and

3    that she had created a matrix of rep and

4    warranty language, basically, among the

5    deals.

6        She spoke a little bit about her

7    pending settlement with Bank of America.

8        She mentioned that she had not

9    notified any of the trustees about the

10    meeting we were having, because we asked

11    if the trustees knew that she was there,

12    and she said no.

13        Talked about her theory of the

14    case.  She felt that she had claims, rep

15    and warranty breaches, also servicing

16    claims; and she felt that they had

17    extended both to GMAC Mortgage and RFC,

18    who were sponsors of different

19    securitizations in which her investors had

20    an interest.

21        And also that they viewed Ally,

22    likewise, as responsible.

23    Q.    Who said what on the ResCap and

24    Ally side, as best you can remember?

25        MR. RAINS:  Objection.  Vague

50

1                    TAMMY HAMZEPHOUR

2          A.    Yes.

3          Q.    Did you understand what

4     Mr. Devine was referring to by "clarity of

5     purpose or comprehensive third-party

6     releases"?

7          A.    Yes.

8          Q.    What was your understanding?

9          A.    That third-party releases would

10    be required, in order to achieve a

11    substantial contribution from AFI.

12         Q.    And Mr. Devine had made that

13    clear to you, had he not?

14         A.    It was clear to everyone

15    internally, in the context of the

16    discussions that were beginning to take

17    shape at this, in this time frame.

18         Q.    So as far as you were concerned,

19    or I should say as far as you knew, there

20    would be no contribution from AFI without

21    third-party releases to AFI; is that

22    correct?

23              MR. RAINS:  Objection.

24         Misstates her testimony.

25         A.    No, that's not what I said.

51

1                      TAMMY HAMZEPHOUR

2        There may be a contribution, but a

3        substantial contribution would need

4        comprehensive third-party releases.

5             Q.    Okay.  Did you speak with

6        Mr. Devine and Mr. Lee at or about

7        11:00 a.m. that morning?

8             A.    I don't remember.

9             Q.    Do you recall whenever the

10       meeting occurred or -- well, let me ask

11       you this:  Was there a conversation

12       following up on this e-mail chain?

13            A.    I'm sure there were -- there

14       were many conversations taking place

15       around this topic.  So I don't know if

16       this one happened at 11:00 a.m. or not.

17            Q.    Okay.  When you received

18       Mr. Devine's April 17th e-mail, the one

19       sent at 9:57 a.m., did you express then or

20       thereafter any disagreement with

21       Mr. Devine's recommendation as to how to

22       deal with Ms. Patrick?

23            A.    I don't remember if I did.

24            Q.    You don't remember one way or

25       the other?

80

                        TAMMY HAMZEPHOUR

1

2          A.    No.

3          Q.    You weren't coordinating that,

4     were you?

5          A.    No.  Gary Lee was coordinating

6     that.

7          Q.    Who was the one who was

8     communicating with Ms. Patrick about the

9     status of the documents?

10              MR. RAINS:  Objection.  Assumes

11         facts not in evidence.

12         Q.    To your knowledge?

13         A.    Gary was communicating with her

14     and Tim as well.  I assume K&E was

15     involved for Ally.

16         Q.    Okay.  Was Mr. Devine

17     coordinating the negotiations with

18     Ms. Patrick concerning the amount of the

19     allowed claims she would get in a

20     settlement?

21         A.    No.  He participated in those

22     discussions.

23         Q.    What was your participation in

24     that discussion?

25         A.    I was present for some of the

81

1           TAMMY HAMZEPHOUR

2     discussions, not all of them, as they

3     shaped up over a week or two of

4     negotiations.  I was aware, I was kept

5     informed by Gary of what was going on and

6     the developments as they were happening.

7           Q.    So if I understand you

8     correctly, the people who were

9     communicating with Ms. Patrick over the

10    amount of the allowed claim would have

11    been Mr. Devine and Mr. Lee?

12          A.    And Mark Renzi and Jeff

13    Cancelliere and other folks who were in

14    the meetings where these things were being

15    discussed.

16          Q.    Okay.

17              MR. KAUFMAN:  Let's mark as the

18          next exhibit an e-mail chain on May 7,

19          2012.  Bates numbers RC 9019_00049157

20          through 59.

21              (9019 Exhibit 85, e-mail chain

22          dated May 7, 2012, Bates RC

23          9019_00049157 through 59, marked for

24          identification, as of this date.)

25          Q.    Please take however long you

89

1              TAMMY HAMZEPHOUR

2      20 percent of their allowed claim to

3      ResCap LLC.  This provision was added to

4      protect the investors in the event that a

5      larger than expected portion of the Ally

6      settlement proceeds is allocated to ResCap

7      LLC based on alter ego type claims (as

8      opposed to RFC and GMACM as we

9      anticipate)."

10             Do you see that?

11      A.    Yes.

12      Q.    That was a description of the

13      so-called Holdco election, wasn't it?

14      A.    Yes.

15      Q.    Was ResCap's board of directors

16      asked to consider and approve that

17      amendment to the RMBS trust settlement

18      agreement?

19      A.    I don't remember that there

20      were.

21      Q.    Weren't you the one who approved

22      that?

23      A.    I approved it -- I signed it

24      after discussing with counsel and

25      Mr. Marano.

90

                    TAMMY HAMZEPHOUR

1

2          Q.    Who authorized you to sign it?

3          A.    I don't think anyone gave a

4      specific direction to sign it.

5              MR. KAUFMAN:  Just take a few

6          minute break.

7              THE VIDEOGRAPHER:  The time is

8          11:36 a.m. and we are off the record.

9              (Whereupon, there is a recess in

10         the proceedings.)

11             THE VIDEOGRAPHER:  The time is

12         11:55 a.m. and we are back on the

13         record.

14         Q.    Ms. Hamzephour, I just have a

15     couple of questions more.

16         A.    Sure.

17         Q.    I understand that you may have

18     had one or two telephone calls with

19     Ms. Patrick in or around November of 2011

20     in connection with the first meeting with

21     her in Minneapolis.  Did you have any

22     telephone calls with her in 2012?

23         A.    Not one-on-one that I remember.

24         Q.    You have been identified as the

25     debtors -- one of the debtors fact

113

1                     TAMMY HAMZEPHOUR

2          Q.    Do you recall -- withdrawn.

3                In reviewing the settlement

4     agreement and section 6.04, did you make

5     any assessment of whether or not the legal

6     fees provided for for the Steering

7     Committee counsel were reasonable?

8          A.    No.  I didn't -- I didn't

9     determine it one way or the other.

10         Q.    You didn't do it at all?

11         A.    No.  I mean I didn't -- I didn't

12    consider an analysis of whether I thought

13    they were reasonable fees.

14         Q.    Do you think that was an

15    important thing to do?

16         A.    No.

17         Q.    Why not?

18         A.    They weren't -- they weren't

19    fees that the debtors were paying.  So I'm

20    not sure why I would set the fees for

21    these investors between themselves and

22    their lawyer.

23         Q.    Right.  But you testified

24    earlier that the fees that they received

25    were going to come out of the allowed