# EXHIBIT J

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

                Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

New York, New York

November 19, 2012

10:17 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

2

November 19, 2012

10:17 a.m.

Videotape Deposition of TIMOTHY DEVINE, held at the offices of Kramer, Levin, Naftalis & Frankel, 1177 Avenue of the Americas, New York, New York, pursuant to Notice, before Erica L. Ruggieri, Registered Professional Reporter and Notary Public of the State of New York.

43

1        TIMOTHY DEVINE

2            MR. BRYAN:  You know that

3    production of a document has nothing

4    to do with where to draw the line on

5    attorney-client communications.

6    Mr. Devine is not going to disclose

7    his communications with his clients

8    and the legal advice he provided.

9            MR. KAUFMAN:  Okay.

10       Q.    In any event, you said the first

11   step was to get confirmation of

12   Ms. Patrick's representation, right?

13       A.    That's what the e-mail reflects.

14       Q.    And you were the one who was

15   coordinating that effort; is that correct?

16           MR. BRYAN:  Objection to form.

17       A.    I had been asked to interface

18   with Kathy Patrick.

19       Q.    And did you follow up and

20   request that information from Ms. Patrick?

21       A.    I don't remember doing so but I

22   presume that I did.  It looks here that

23   Tammy asked me to do that and I was doing

24   that.

25       Q.    Do you have some specific

98

1           TIMOTHY DEVINE

2   require releases both from the R&W

3   claimants as well as from ResCap?

4           MR. BRYAN:  Object to form.

5       A.   So if -- if I understand your

6   question, what I communicated to Kathy

7   Patrick was that in connection with the

8   settlement agreement she was trying to

9   reach with the debtor, for which she

10  sought Ally's support and assurance that

11  Ally wouldn't object to it, Ally would

12  seek a release -- Ally would seek the

13  support of her clients of the plan that

14  was being negotiated between ResCap and

15  Ally at the time.

16      Q.   And that plan would include

17  releases both from third-party claimants

18  such as her clients and ResCap, right?

19      A.   The plan being negotiated

20  between ResCap and Ally?

21      Q.   Yes.

22      A.   The plan being negotiated

23  between ResCap and Ally would include a

24  debtor release as well as a provision for

25  third-party nonconsensual releases, that's

144

1            TIMOTHY DEVINE
2    settlement?
3        A.    I don't remember as of May 4th.
4        Q.    Okay.
5        A.    The days -- it's going to be
6    very difficult for me to remember the
7    particular days.  Those conversations were
8    very concentrated during that time.
9        Q.    Well, the amount of AFI's
10   contribution towards this settlement was
11   important to AFI, wasn't it?
12       A.    Toward the -- toward the ResCap
13   settlement?
14       Q.    In this settlement.
15       A.    Well, we weren't -- we weren't
16   contributing to this settlement.
17       Q.    Yeah, okay.  I guess technically
18   that may have been true, Mr. Devine, but
19   you certainly understood as both
20   negotiations were proceeding that the
21   money, whatever it might be, that AFI was
22   going to settle with ResCap for was going
23   to wind up in a settlement with
24   Ms. Patrick, right?
25             MR. PRINCI:  Objection as to

145

1          TIMOTHY DEVINE
2     form.
3         MR. BRYAN:  Same objection.
4     A.    What -- I certainly understood
5     that Kathy Patrick was negotiating with
6     ResCap for an allowed claim which would
7     govern or -- govern in part or would
8     potentially go toward resolution of the
9     eventual disbursement to her clients and
10    the class that are clients were in in the
11    estate.  And that obviously the quantum of
12    the recovery of the estate, from whatever
13    source, was very interesting to her and
14    her clients.
15    Q.    And the amount that AFI would be
16    paying for the releases from ResCap and
17    third parties was important to AFI, was it
18    not?
19    A.    Yes.
20        MR. BRYAN:  Object to the form.
21    Q.    Okay.
22        MR. KAUFMAN:  Why don't we take
23    a lunch break now.  It's 1:30.
24        MR. BRYAN:  What time do you
25    want to reconvene?

197

1      TIMOTHY DEVINE
2  for PLS rep and warrants at about 4
3  billion when you add and subtract for
4  other contingencies and whether or not we
5  create any securities law/disclosure
6  exposure if we stipulate to a claim by KP
7  at 10, meaning 10 billion.
8      Q.   And on that issue you wrote,
9  "Need an answer as to whether
10 stipulated allowed claim creates
11 securities/SEC/disclosure risk for us on
12 these facts and if yes, how much risk
13 really in comparison to the risk that will
14 blow the chance to get third-party
15 releases," right, that's what you said?
16     A.   Are you asking me what the
17 e-mail says?
18     Q.   Did I just read that correctly?
19     A.   You read that correctly.
20     Q.   Okay.  And you were weighing the
21 relative risks to AFI of facing securities
22 law violations based on what AFI had said
23 in its 10-Q or blowing AFI's chances of
24 getting third-party releases as part of a
25 settlement with Ms. Patrick, right?

198

1         TIMOTHY DEVINE

2              MR. BRYAN:  Objection to form.

3       The document speaks for itself.

4       Q.    Those are the two risks you were

5  weighing, securities law violation

6  exposure or blowing chance to get

7  third-party releases as part of the Kathy

8  Patrick settlement?

9              MR. BRYAN:  Objection to form.

10      A.    It's really a false comparison.

11  They answer two different questions.

12      Q.    I'm just asking you whether that

13  was what you were asking Mr. Cieri and

14  Mr. Lee.  You needed an answer as to the

15  relative risks on the one hand of exposure

16  to the SEC or the investing public and on

17  the other hand blowing chance to get

18  third-party releases?

19      A.    No.

20             MR. BRYAN:  Objection to form.

21             MR. PRINCI:  Objection as to

22       form.  Asked and answered.

23      A.    No.  What -- at that time and at

24  every moment from then to and through

25  today I have been confident that there is

199

1       TIMOTHY DEVINE

2   no risk of a securities claw -- securities

3   law/SEC disclosure risk and that there was

4   no such risk.  The securities disclosures

5   had been made appropriately, according to

6   all the appropriate processes, and were

7   then and are now in my view accurate and

8   fully compliant with all the law and

9   regulations.  The question was not whether

10  there was any defect, legal or otherwise,

11  in connection with AFI's consolidated

12  disclosures from a securities/SEC

13  disclosure or any other risk, those are --

14  those were accurate and appropriate and

15  lawful at the time and they stand the same

16  today.

17          The question to these people was

18  not with regard to what had already taken

19  place, because I had no doubt and do not

20  have any doubt today as to the lawfulness

21  of those 10-Qs, it was whether or not in

22  undertaking to resolve a disputed claim in

23  a compromise setting, whether there was

24  any potential exposure to that settlement

25  or whether that settlement created any

222

1           TIMOTHY DEVINE

2      Q.    Did the information
3 Mr. Cancelliere gave to you in this e-mail
4 make you comfortable with an allowed claim
5 at $8.7 billion?
6           MR. BRYAN:  Object to form.
7      A.    What do you mean by comfortable?
8      Q.    Willing to go along with it.
9      A.    All right.  So with that
10 understanding in terms -- willing to go
11 along with it in the context of the
12 negotiation of a settlement by ResCap of
13 an allowed claim based on that number?
14     Q.    Yes.
15     A.    I'm not sure as of 5/9/2012 at
16 that time whether I was comfortable with
17 it or not.  Because it was only one term
18 in a very complicated series of
19 transactions.  And it would have been
20 within that much, much larger context as
21 to whether or not I would have advised the
22 client or not that that was a comfortable
23 number.
24     Q.    Were you representing ResCap on
25 May 9th, 2012?

223

1           TIMOTHY DEVINE
2     A.    In connection with the
3  resolution with Kathy Patrick, no.
4     Q.    Were you -- okay.  So what you
5  just said is incorrect, right?  It had
6  nothing to do with your advising the
7  client on that number.  I'm asking you
8  whether you were comfortable as Ally's
9  lawyer with an $8.7 billion number based
10 on the information Mr. Cancelliere gave to
11 you in his May 9th e-mail?
12           MR. PRINCI:  Objection as to
13      form.
14           MR. BRYAN:  Objection as to
15      form.
16    A.    That's how I understood your
17 question.
18    Q.    Right, okay.  So that was the
19 client, AFI?
20    A.    Correct.
21    Q.    Okay.  Do you recall one way or
22 another whether an $8.7 billion allowed
23 claim had been agreed to as of May 9th,
24 2012, at 7:17 a.m.?
25    A.    Do I recall that right now

248

1           TIMOTHY DEVINE
2   of the conversation, at least from my
3   perspective in the deal.
4        Q.   Mr. Devine, given what you have
5   claimed is your limited expertise, why
6   were you injecting yourself into the
7   discussion on these matters?  Why didn't
8   you just let Mr. Schrock and Mr. Lee hash
9   it out?
10            MR. BRYAN:  Objection as to
11       form.
12       A.   I was driving a deal to
13  conclusion.
14       Q.   What deal?
15       A.   The deal that is represented in
16  gross by the resolution between the ResCap
17  estate and the RMBS claimants, both the
18  Kathy Patrick and Talcott Franklin in the
19  one sense and also the tripartite
20  agreement between Ally, the ResCap
21  entities and the claimants.  And I thought
22  it was a good deal and I still to this day
23  think it's a good deal.  And I saw that to
24  my mind anyway the essential elements of a
25  deal had been worked out that were

271

1        TIMOTHY DEVINE
2   their claims?
3        MR. BRYAN:  Object to form.  I
4     knew -- I certainly knew that the
5     monolines were not a signatory party
6     to the settlement.  But it was my
7     understanding that the claims that
8     they would or could enunciate in
9     connection with the securities subject
10    of the settlement would be included
11    within the scope of the allowed claim.
12       Q.   You said, "And we can define
13   securities claims narrowly."  What do you
14   mean by that?
15       A.   What I meant by securities
16   claims was claims brought by securities
17   holders on traditional federal securities
18   law or state blue sky or the closely
19   Allied state common law fraud claims that
20   would be characterized typically as a
21   securities based claim.
22       Q.   A bit further down in your
23   e-mail you said "The circle is squared at
24   the plan.  KP can only get us the
25   everything but securities settlement

272

1       TIMOTHY DEVINE

2  release because that is the full extent of

3  her representation.  She has been clear

4  about that.  Same as in her" BofA -- "B of

5  New York Mellon work, etc."

6            Do you see that?

7       A.   Yes, I do see that.

8       Q.   And then you said "But notice,

9  though her clients don't release

10 securities claims, they sign plan support

11 agreements and the plan includes very

12 simple comprehensive releases, which of

13 course include third-party release of all

14 claims which of course includes securities

15 claims.  Presto.  So while she can't

16 represent parties in giving up their

17 securities claims, clients face a choice,

18 either sign up with the settlement to make

19 sure your trust receives monies under the

20 waterfall in which case you need to sign

21 the plan support agreement and support the

22 plan.  And the plan wipes out all their

23 claims of any sort.  This is the beauty of

24 it."

25            Do you see that?

273

1                TIMOTHY DEVINE

2       A.    I see that.

3       Q.    So you were explaining how
4  execution of the plan support agreement
5  achieved releases of securities claims
6  even if the settlement agreement itself
7  did not, correct?

8       A.    What I was explaining is that in
9  signing up for the settlement agreement
10 between ResCap and -- with ResCap those
11 parties were committing to sign a plan
12 support agreement simultaneously, which to
13 my understanding represented their
14 valuation of the securities claims they
15 were giving up and therefore they were
16 supporting a plan which would include
17 release of securities claims against the
18 debtor and release of securities claims,
19 such as they might be, against Ally
20 Financial.

21      Q.    And you thought that was pretty
22 clever, didn't you?

23           MR. BRYAN:   Object to form.

24           MR. PRINCI:   Objection as to
25      form.

281

1       TIMOTHY DEVINE
2       A.   Well, I sent an e-mail to Gary
3  Lee, Jamie Levitt, Noah Ornstein and John
4  Ruckdaschel, cc'd Cieri and Schrock at
5  4:29.
6       Q.   Right.  And you sent that e-mail
7  in response to Mr. Lee's e-mail at 4:26 on
8  May 12th, didn't you?
9       A.   Yeah, I'm not sure if it's in
10 response but I did send him an e-mail a
11 couple minutes later.
12      Q.   And you wrote, "Got it.  Had
13 call with KP.  We told her PSA support
14 whole hog is drop dead."  That's what you
15 wrote, right?
16      A.   That's what I wrote.
17      Q.   And is that what you told
18 Ms. Patrick?
19      A.   I don't remember if I told her
20 whole hog but if I read this sitting here
21 now, it looks like I was communicating to
22 that group that I told her that she had to
23 support the PSAs in full.  And that that
24 was a provision that Ally would insist on
25 to the extent Ally could insist on

282

1              TIMOTHY DEVINE

2     anything.

3          Q.   And by using the phrase "drop

4     dead" you meant it was nonnegotiable from

5     Ally's perspective, right?

6          A.   I meant that if she wanted our

7     participation in the PSA she needed to

8     support it.

9               MR. KAUFMAN:  Let's mark as the

10          next exhibit an e-mail chain on

11          May 13, 2012 between Mr. Devine and

12          Talcott Franklin.

13               (9019 Exhibit 155, e-mail chain

14          dated May 13, 2012 between Mr. Devine

15          and Talcott Franklin, marked for

16          identification, as of this date.)

17         A.   Okay.

18         Q.   Looking at the first e-mail in

19    this chain which starts at the bottom of

20    the first page, did you send that e-mail

21    to Mr. Franklin at 12:16 p.m. on

22    May 13th -- I'm sorry -- at 1:28 p.m. on

23    May 12th?

24         A.   It looks like I did.  Again, I'm

25    not sure of the timing but it looks like I