# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The following table summarizes the carrying value of assets pledged and the amount of related debt outstanding by our secured borrowing types.

| ($ in thousands) | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | Total assets restricted as collateral | Related secured debt | Total assets restricted as collateral | Related secured debt |
| Borrowings from parent and affiliate | | | | |
| Ally Inc. Senior Secured Credit facility | $1,326,032 | $749,873 | $1,340,954 | $755,769 |
| Ally Inc. LOC | 1,553,328 | 410,000 | 1,582,033 | 183,595 |
| BMMZ Repo | 377,645 | 250,000 | 401,118 | 250,000 |
| Collateralized borrowings in securitization trusts | 912,434 | 828,418 | 918,232 | 830,318 |
| Other secured borrowings | | | | |
| Junior Secured Notes (a) | — | 2,340,680 | — | 2,366,600 |
| Mortgage servicing rights facility | 675,544 | 158,000 | 634,345 | 323,000 |
| Servicer advance funding facilities | 1,083,408 | 727,838 | 1,086,011 | 780,385 |
| Home equity funding facility | 147,042 | 127,294 | 153,191 | 135,800 |
| Other secured facility | 6,052 | 2,377 | 6,284 | 2,830 |
| Total | $6,081,485 | $5,594,480 | $6,122,168 | $5,628,297 |

(a)   The Junior Secured Notes are secured by the same collateral that secures the Ally Inc. Senior Secured Credit facility.

## 9. Other Liabilities

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Fair value of derivative instruments | $3,928,437 | $5,113,531 |
| Liability for option to repurchase assets (a) | 2,359,323 | 2,386,734 |
| Liability for representation and warranty obligations | 810,805 | 824,776 |
| Collateral received from derivative counterparties | 604,836 | 656,109 |
| Accounts payable | 317,493 | 360,726 |
| Interest payable | 126,803 | 62,225 |
| Reserve for legal proceedings | 99,646 | 94,516 |
| Mortgage foreclosure settlement | 92,061 | 204,000 |
| Reserve for insurance losses | 86,716 | 91,615 |
| Employee compensation and benefits | 67,966 | 87,542 |
| Liability for assets sold with recourse | 32,592 | 32,156 |
| Ally Inc. management fee (b) | 14,878 | 31,020 |
| Income taxes | 3,899 | — |
| Restructuring reserve | 1,901 | 4,342 |
| Payable to Ally Bank | — | 21,001 |
| Other | 21,805 | 25,733 |
| Total other liabilities | $8,569,161 | $9,996,026 |

(a)   We recognize a liability for the conditional repurchase option on certain assets held by off-balance sheet securitization trusts. The corresponding asset is recorded in mortgage loans held for sale. See Note 2 — Mortgage Loans Held-for-Sale and Note 4 — Securitizations and Variable Interest Entities for additional information.
(b)   Includes costs for personnel, information technology, communications, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to us. See Note 17 — Related Party Transactions for additional information.

CONFIDENTIAL

RC40022317

# Notes to Condensed Consolidated Financial Statements

Residential Capital, LLC

## 10. Other Revenue, net

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Change due to fair value option elections | | |
| Consumer mortgage finance receivables and loans, net | $36,037 | $19,246 |
| Collateralized borrowings | (52,127) | (36,148) |
| Loan broker fee from Ally Bank | 23,343 | 9,496 |
| Insurance income | 4,343 | 6,357 |
| Gain on interests retained in financial assets sales | — | 3,430 |
| Other | 8,436 | 3,650 |
| Total other revenue, net | $20,032 | $6,031 |

## 11. Other Noninterest Expense, net

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Ally Inc. management fees (a) | $29,053 | $16,915 |
| Legal fees | 23,473 | 10,191 |
| Loan administration fees | 22,928 | 18,244 |
| Equipment and supplies | 6,868 | 8,126 |
| Insurance losses | 4,126 | 12,577 |
| Other | 13,056 | 16,048 |
| Total other noninterest expense, net | $99,504 | $82,101 |

(a)   Includes allocated costs for personnel, information technology, communication, corporate marketing, procurement, and services related to facilities incurred by Ally Inc. and allocated to us. See Note 17 — Related Party Transactions for additional information.

## 12. Income Tax

We are a division of Ally Inc, a corporation, for income tax purposes. We are subject to corporate U.S. Federal, state and local taxes and are included in the consolidated Ally Inc. U.S Federal and unitary and/or consolidated state income tax returns. We provide for our U.S. Federal and state taxes on a stand alone basis, which is consistent with the applicable tax sharing agreements with direct and indirect parent companies up through Ally Inc. The tax sharing agreement requires taxes to be based on the income tax liability determined as if we were a separate affiliated group of corporations filing consolidated U.S. Federal and state income tax returns. Our foreign businesses have been and continue to operate as corporations and are subject to, and provide for, U.S. Federal, state, and/or foreign income tax.

At March 31, 2012 and December 31, 2011 we have current income taxes payable of $11.1 million and $(1.7) million, respectively, to Ally Inc. pursuant to the tax sharing agreements.

We continue to be in a net deferred tax asset position, which is fully offset by a deferred tax asset valuation allowance. The net deferred tax asset includes a significant tax net operating loss carryforward. Thus, the year to date tax expense has been largely offset by the decrease of the applicable deferred tax asset valuation allowance. Tax expense from continuing operations of $5.9 million and $8.9 million for the three months ended March 31, 2012 and 2011 relates primarily to certain taxes that are not eligible for offset by U.S. net operating losses, including those on foreign income.

Gross unrecognized tax benefits totaled $7.6 million and $11.7 million at March 31, 2012 and 2011. The amount of unrecognized tax benefits that, if recognized, would affect our effective tax rate at March 31, 2012 and 2011 is approximately $5.3 million and $9.4 million, respectively. Related interest and penalties accrued for uncertain income tax positions are recorded in interest expense and other operating expenses, respectively. As of March 31, 2012 and 2011, we had approximately $2.3 million and $2.3 million, respectively, accrued for the payment of interest and penalties. We are generally no longer subject to U.S. federal, state, local, or foreign income tax examinations by tax authorities for years before 2007. A significant change in the unrecognized tax benefits is not expected within the next 12 months.

28

CONFIDENTIAL

RC40022318

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

## 13. Fair Value

### Fair Value Measurements

Fair value is defined as the exchange price that would be received to sell an asset or paid to transfer a liability (exit price) in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. Fair value is based on the assumptions market participants would use when pricing an asset or liability. Additionally, entities are required to consider all aspects of nonperformance risk, including the entity's own credit standing, when measuring the fair value of a liability.

A three-level hierarchy is used when measuring and disclosing fair value. The fair value hierarchy gives the highest priority to quoted prices available in active markets (i.e., observable inputs) and the lowest priority to data lacking transparency (i.e., unobservable inputs). An instrument's categorization within the fair value hierarchy is based on the lowest level of significant input to its valuation. The following is a description of the three hierarchy levels.

Level 1     Inputs are quoted prices in active markets for identical assets or liabilities at the measurement date. Additionally, we must have the ability to access the active market, and the quoted prices cannot be adjusted by us.

Level 2     Inputs are other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices in active markets for similar assets or liabilities; quoted prices in inactive markets for identical or similar assets or liabilities; or inputs that are observable or can be corroborated by observable market data by correlation or other means for substantially the full term of the assets or liabilities.

Level 3     Unobservable inputs are supported by little or no market activity. The unobservable inputs represent management's best assumptions of how market participants would price the assets or liabilities. Generally, Level 3 assets and liabilities are valued using pricing models, discounted cash flow methodologies, or similar techniques that require significant judgment or estimation.

Transfers     Transfers into or out of any hierarchy level are recognized at the end of the reporting period in which the transfer occurred. There were no material transfers between any levels during the three months ended March 31, 2012.

Following are descriptions of the valuation methodologies used to measure material assets and liabilities at fair value and details of the valuation models, key inputs to those models and significant assumptions utilized.

- *Mortgage loans held-for-sale* – We originate and purchase residential mortgage loans that we intend to sell to the GSEs. We also own nonagency eligible residential mortgage loans that were originated or purchased in prior years. Consumer mortgage loans we intend to sell to the GSEs are carried at fair value as a result of a fair value election. Our nonagency eligible residential mortgage loans are accounted for at the lower of cost or fair value. We elected to fair value nongovernment eligible mortgage loans held-for-sale subject to conditional repurchase options recognized on or after January 1, 2011. Only those non-fair value elected loans that are currently being carried at fair value are included within our nonrecurring fair value measurement tables. Mortgage loans held-for-sale account for 9.7% of all recurring and nonrecurring assets reported at fair value at March 31, 2012.

Mortgage loans held-for-sale are typically pooled together and sold into certain exit markets, depending upon underlying attributes of the loan, such as agency eligibility, product type, interest rate, and credit quality. Two valuation methodologies are used to determine the fair value of mortgage loans held-for-sale. The methodology used depends on the exit market as described below.

*Loans valued using observable market prices for identical or similar assets (a Level 2 fair value)* - Includes all agency-eligible mortgage loans carried at fair value due to fair value option election, which are valued predominantly using published forward agency prices. Also includes any domestic loans and foreign loans where recently negotiated market prices for the loan pool exist with a counterparty (which approximates fair value) or quoted market prices for similar loans are available. As of March 31, 2012, we classified 34.3% of our mortgage loans held-for-sale that are being carried at fair value on a recurring basis as Level 2.

*Loans valued using internal models (a Level 3 fair value)* - Includes all conditional repurchase option loans carried at fair value due to the fair value option election and all nonagency eligible residential mortgage loans that are accounted for at the lower of cost or fair value. The fair value of these residential mortgage loans are determined using internally developed valuation models because observable market prices were not available. The loans are priced on a discounted cash flow basis utilizing cash flow projections from internally developed models that utilize prepayment, default, and discount rate assumptions. To the extent available, we utilize market observable inputs

29

CONFIDENTIAL

RC40022319

# Notes to Condensed Consolidated Financial Statements

Residential Capital, LLC

such as interest rates and market spreads. If market observable inputs are not available, we are required to utilize internal inputs, such as prepayment speeds, credit losses, and discount rates. While numerous controls exist to calibrate, corroborate, and validate the internal inputs, they require the use of judgment by us and can have a significant impact on the determination of the loan's fair value. As of March 31, 2012, 100.0% of our mortgage loans held-for-sale that are currently being carried at fair value on a nonrecurring basis and 65.7% of our mortgage loans held-for-sale that are carried at fair value on a recurring basis are classified as Level 3.

- *Consumer Finance receivables and loans, net* — We elected the fair value option for consumer mortgage finance receivables and loans related to our on-balance sheet securitizations. A complete description of these securitizations is provided in the *On-balance sheet securitization debt* section later in this Note. The remaining balance of our consumer finance receivables and loans are reported on the balance sheet at their principal amount outstanding, net of charge-offs, allowance for loan losses, and net premiums/discounts.

  For the securitization trusts for which we elected fair value option, the loans are measured at fair value using a portfolio approach. The values for loans held on an in-use basis may differ considerably from loans held-for-sale that can be sold in the whole-loan market. This difference arises primarily due to the liquidity of the ABS/MBS market and is evident in the fact that spreads applied to lower rated ABS/MBS are considerably wider than spreads observed on senior bond classes and in the whole-loan market. The objective in linking the fair value of these loans to the fair value of the related securitization debt is to properly account for our retained economic interest in the securitizations. As of March 31, 2012, we classified 100.0% of our fair value elected consumer mortgage finance receivables and loans as Level 3. These loans account for 12.9% of all recurring and nonrecurring assets reported at fair value at March 31, 2012.

- *Mortgage servicing rights* — MSRs currently do not trade in an active market with observable prices, therefore we use internally developed discounted cash flow models to estimate the fair value of MSRs. These internal valuation models estimate net cash flows based on internal operating assumptions that we believe would be used by market participants combined with market-based assumptions for loan prepayment rates, interest rates, and discount rates that management believes approximate yields required by investors in this asset. Cash flows primarily include servicing fees, float income, and late fees, in each case less estimated operating costs to service the loans. The estimated cash flows are discounted using an option-adjusted spread derived discount rate. At March 31, 2012, 100.0% of our MSRs are classified as Level 3 and account for 19.5% of all recurring and nonrecurring assets reported at fair value.

- *Derivative instruments* — We enter into a variety of derivative financial instruments as part of our risk management strategies. Derivative assets account for 56.3% of all recurring and nonrecurring assets and derivative liabilities account for 82.1% of all recurring and nonrecurring liabilities reported at fair value at March 31, 2012.

  Certain of these derivatives are exchange traded, such as Eurodollar futures. To determine the fair value of these instruments, we utilize the exchange prices for the particular derivative contract; therefore, we classified these contracts as Level 1. We classified less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value as Level 1 at March 31, 2012.

  We also execute over-the-counter derivative contracts, such as interest rate swaps, swaptions, forwards, caps, floors and agency-to-be-announced (TBAs) securities. We utilize third-party-developed valuation models that are widely accepted in the market to value our over-the-counter derivative contracts. The specific terms of the contract and market observable inputs (such as interest rate forward curves and interpolated volatility assumptions) are used in the model. We classified 99.1% of the derivative assets and 98.8% of the derivative liabilities reported at fair value as Level 2 at March 31, 2012.

  We also hold certain derivative contracts that are structured specifically to meet a particular hedging objective. These derivative contracts often are utilized to hedge risks inherent within certain on-balance sheet securitizations. To hedge risks on particular bond classes or securitization collateral, the derivative's notional amount is often indexed to the hedged item. As a result, we typically are required to use internally developed prepayment assumptions as an input into the model to forecast future notional amounts on these structured derivative contracts. Accordingly, we classified these derivative contracts as Level 3. These derivative contracts accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at March 31, 2012.

  At March 31, 2012, we were counterparty to a forward flow agreement with Ally Bank, which effectively transfers the exposure to changes in fair value of specified pools of Ally Bank's mortgage loans held-for-sale and interest rate lock commitments to us. In addition, at March 31, 2012 we were counterparty to a total return swap agreement with Ally Bank that effectively transfers the total economic return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. The underlying reference assets that

30

CONFIDENTIAL

RC40022320

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

support the value of the swap agreements are valued using internally developed valuation assumptions; therefore the swaps are classified as Level 3. These agreements accounted for less than 1% of the derivative assets and less than 1% of the derivative liabilities reported at fair value at March 31, 2012. Both of these agreements were terminated on April 30, 2012. See Note 17 — Related Party Transactions for additional information.

We are required to consider all aspects of nonperformance risk, including our own credit standing, when measuring fair value of a liability. We reduce credit risk on the majority of our derivatives by entering into legally enforceable agreements that enable the posting and receiving of collateral associated with the fair value of our derivative positions on an ongoing basis. In the event that we do not enter into legally enforceable agreements that enable the posting and receiving of collateral, we will consider our credit risk and the credit risk of our counterparties in the valuation of derivative instruments through a credit valuation adjustment (CVA), if warranted.

- *On-balance sheet securitizations* — We elected the fair value option for certain consumer mortgage finance receivables and loans, and securitization debt for certain of our on-balance sheet securitizations. The objective in measuring these loans and related securitization debt at fair value is to approximate our economic exposure to the collateral securing the securitization debt. The remaining on-balance sheet securitization debt that was not fair value option-elected is reported on the balance sheet at cost, net of premiums or discounts and all issuance costs.

We value securitization debt that was fair value option-elected, as well as any trading securities or interests retained in financial asset sales, using market observable prices whenever possible. The securitization debt is principally in the form of asset-backed and mortgage-backed securities collateralized by the underlying consumer mortgage finance receivables and loans. Due to the attributes of the underlying collateral and current capital market conditions, observable prices for these instruments are typically not available in active markets. We base valuations on internally developed discounted cash flow models that use a market-based discount rate. In order to estimate cash flows, we utilize various significant assumptions, including market observable inputs such as forward interest rates, as well as internally developed inputs such as prepayment speeds, delinquency levels, and credit losses. As a result of the reliance on significant assumptions and estimates for model inputs, at March 31, 2012, 100.0% of fair value option-elected securitization debt is classified as Level 3. On-balance sheet securitization debt accounts for 17.3% of all recurring and nonrecurring liabilities reported at fair value at March 31, 2012.

31

CONFIDENTIAL

RC40022321

# Notes to Condensed Consolidated Financial Statements

Residential Capital, LLC

### Recurring Fair Value

The following tables display the assets and liabilities measured at fair value on a recurring basis, including financial instruments for which we elected the fair value option. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The table below displays the hedges separately from the hedged items and, therefore, does not directly display the impact of our risk management activities.

| March 31, 2012        ($ in thousands) | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Mortgage loans held-for-sale (a) | $— | $15,925 | $30,494 | $46,419 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 832,094 | 832,094 |
| Mortgage servicing rights | — | — | 1,254,497 | 1,254,497 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 3,145 | 3,588,513 | 29,790 | 3,621,448 |
| Trading securities | | | | |
| Mortgage and asset backed residential | — | 417 | 31,885 | 32,302 |
| Total assets | $3,145 | $3,604,855 | $2,178,760 | $5,786,760 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | $— | $— | ($828,418) | ($828,418) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (18,708) | (3,882,257) | (27,107) | (3,928,072) |
| Foreign currency contracts | — | (365) | — | (365) |
| Liability for option to repurchase assets (a) | — | — | (29,603) | (29,603) |
| Total liabilities | ($18,708) | ($3,882,622) | ($885,128) | ($4,786,458) |

(a) Carried at fair value due to fair value option election.

| December 31, 2011    ($ in thousands) | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Mortgage loans held-for-sale (a) | $— | $27,253 | $29,723 | $56,976 |
| Consumer mortgage finance receivables and loans, net (a) | — | — | 835,192 | 835,192 |
| Mortgage servicing rights | — | — | 1,233,107 | 1,233,107 |
| Other assets | | | | |
| Fair value of derivative contracts in receivable position | | | | |
| Interest rate contracts | 61,025 | 4,780,995 | 35,038 | 4,877,058 |
| Foreign currency contracts | — | 139 | — | 139 |
| Trading securities | | | | |
| Mortgage and asset backed residential | — | 434 | 32,869 | 33,303 |
| Interests retained in financial asset sales | — | — | 23,102 | 23,102 |
| Total assets | $61,025 | $4,808,821 | $2,189,031 | $7,058,877 |
| **Liabilities** | | | | |
| Collateralized borrowings | | | | |
| On-balance sheet securitization debt (a) | $— | $— | ($829,940) | ($829,940) |
| Other liabilities | | | | |
| Fair value of derivative contracts in liability position | | | | |
| Interest rate contracts | (18,445) | (5,089,201) | (24) | (5,107,670) |
| Foreign currency contracts | — | (5,861) | — | (5,861) |
| Liability for option to repurchase assets (a) | — | — | (28,504) | (28,504) |
| Total liabilities | ($18,445) | ($5,095,062) | ($28,528) | ($5,142,035) |

(a) Carried at fair value due to fair value option election.

CONFIDENTIAL

RC40022322

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The following table presents quantitative information regarding the significant unobservable inputs used in material Level 3 assets and liabilities measured at fair value on a recurring basis.

| March 31, 2012 *($ in thousands)* | Level 3 recurring measurements | Valuation technique | Unobservable input | Range |
|---|---|---|---|---|
| **Assets** | | | | |
| Consumer mortgage finance receivables and loans, net (a) | $832,094 | Discounted cash flow | Prepayment rate | 2.52-12.91% |
| | | | Default rate | 1.08-34.75% |
| | | | Loss severity | 40.0-100.0% |
| Mortgage servicing rights | 1,254,497 | (b) | (b) | (b) |
| **Liabilities** | | | | |
| Collaterlized borrowings | | | | |
| On-balance sheet securitization debt (a) | ($828,418) | (a) | (a) | (a) |

(a)  A portfolio approach links the value of the consumer mortgage finance receivables and loans, net to the on-balance sheet securitization debt; therefore, the valuation technique, unobservable inputs, and related range for the debt is the same as the loans. Increases in prepayments, which would primarily be driven by any combination of lower projected mortgage rates and higher projected home values, would result in higher fair value measurement. These drivers of higher prepayments (increased ability to refinance due to lower rates and higher property values) have an opposite impact on the default rate, creating an inverse relationship between prepayments and default frequency on the fair value measurements. Generally factors that contribute to higher default frequency also contribute to higher loss severity.

(b)  Refer to Note 5 – Servicing Activities for information related to the significant unobservable inputs and valuation techniques used in the mortgage servicing rights fair value measurement.

33

CONFIDENTIAL

RC40022323

## Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The following tables present the reconciliation for all Level 3 assets and liabilities measured at fair value on a recurring basis. Transfers into or out of Level 3 are recognized as of the end of the reporting period in which the transfer occurred. In certain cases we economically hedge the fair value change of our assets or liabilities with derivatives and other financial instruments. The Level 3 items presented below may be hedged by derivatives and other financial instruments that are classified as Level 1 or Level 2. Thus, the following tables do not fully reflect the impact of our risk management activities.

| | | Level 3 recurring fair value measurements | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Net gains/(losses) included in earnings | | | | | | | March 31, 2012 Level 3 fair value |
| ($ in thousands) | January 1, 2012 Level 3 fair value | realized gains (losses) | unrealized gains (losses) | Other comprehensive income (loss) | Purchases | Sales | Issuances | Settlements | |
| **Assets** | | | | | | | | | |
| Mortgage loans held-for-sale | $29,723 | ($37) | $250 | $— | $8,923 (a) | $— | $— | ($8,365) | $30,494 |
| Consumer mortgage finance receivables and loans, net | 835,192 | 51,328 (b) | 35,448 (b) | — | — | — | — | (89,874) | 832,094 |
| Mortgage servicing rights | 1,233,107 | — | 10,817 (c) | — | — | — | 10,573 | — | 1,254,497 |
| Other assets | | | | | | | | | |
| Fair value of derivative contracts in receivable position, net | | | | | | | | | |
| Interest rate contracts | 35,014 | 66,983 (d) | (59,479) (d) | — | — | — | — | (40,835) | 2,683 |
| Trading securities | | | | | | | | | |
| Mortgage and asset backed residential | 32,869 | (1,214) (e) | 3,627 (e) | — | — | — | 103 | (3,500) | 31,885 |
| Interests retained in financial asset sales | 23,102 | (501) (f) | (5) (f) | — | — | — | — | (22,596) | — |
| **Total assets** | $2,189,007 | $116,559 | ($8,342) | $— | $8,923 | $— | $10,676 | ($165,170) | $2,151,653 |
| **Liabilities** | | | | | | | | | |
| Collateralized borrowings | | | | | | | | | |
| On-balance sheet securitization debt | ($829,940) $ | (43,820) (b) $ | (39,386) (b) | $— | $— | $— | $— | $84,728 | ($828,418) |
| Other liabilities | | | | | | | | | |
| Liability for option to repurchase assets | (28,504) | 37 | (250) | — | (8,923) (a) | — | — | 8,037 | (29,603) |
| **Total liabilities** | ($858,444) | ($43,783) | ($39,636) | $— | ($8,923) | $— | $— | $92,765 | ($858,021) |

(a)    Includes newly recognized fair value option elected conditional repurchase loans and the related liability. See Note 4  Securitizations and Variable Interest Entities for additional information.
(b)    Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.
(c)    Fair value adjustment reported in servicing asset valuation and hedge activity, net.
(d)    See Note 14 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Condensed Consolidated Statement of Income.
(e)    Fair value adjustment reported in gain (loss) on investment securities, net. Interest accretion on these assets is reported in interest income.
(f)    Fair value adjustment reported in other revenue, net, and interest accretion on these assets is reported in interest income.

34

CONFIDENTIAL

RC40022324

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

| ($ in thousands) | January 1, 2011 Level 3 fair value | Net gains/(losses) included in earnings | | Other comprehensive income (loss) | Purchases | Sales | Issuances | Settlements | March 31, 2011 Level 3 fair value |
|---|---|---|---|---|---|---|---|---|---|
| | | realized gains (losses) | unrealized gains (losses) | | | | | | |
| **Assets** | | | | | | | | | |
| Mortgage loans held–for–sale | $4,084 | ($27) | $98 | $— | $14,189 (a) | ($388) | $— | $— | $17,956 |
| Consumer mortgage finance receivables and loans, net | 1,014,703 | 57,458 (b) | 15,809 (b) | — | — | — | — | (117,313) | 970,657 |
| Mortgage servicing rights | 1,991,586 | 66 (c) | 36,489 (c) | — | — | (139) | 18,370 | (67) | 2,046,305 |
| Other assets | | | | | | | | | |
| Fair value of derivative contracts in receivable (liability) position, net | | | | | | | | | |
| Interest rate contracts | 69,353 | 212,905 (d) | 137,723 (d) | — | — | — | — | (422,563) | (2,582) |
| Trading securities | | | | | | | | | |
| Mortgage– and asset– backed residential | 44,128 | (1,362) (e) | 2,052 (e) | — | — | — | 131 | (4,871) | 40,078 |
| Available for sale securities | | | | | | | | | |
| Debt securities | | | | | | | | | |
| Mortgage-backed residential | 989 | — | — | 543 | — | — | — | (104) | 1,428 |
| Interests retained in financial asset sales | 20,588 | — | 4,353 (f) | — | — | — | — | (599) | 24,342 |
| **Total assets** | $3,145,431 | $269,040 | $196,524 | $543 | $14,189 | ($527) | $18,501 | ($545,517) | $3,098,184 |
| **Liabilities** | | | | | | | | | |
| Collateralized borrowings | | | | | | | | | |
| On-balance sheet securitization debt | ($972,068) | $ (71,650) (b) | $4,702 (b) | $— | $— | $— | $— | $117,413 | ($921,603) |
| Other liabilities | | | | | | | | | |
| Liability for option to repurchase assets | — | — | — | — | (14,284) (a) | — | — | — | (14,284) |
| **Total liabilities** | ($972,068) | ($71,650) | $4,702 | $— | ($14,284) | $— | $— | $117,413 | ($935,887) |

Header: Level 3 recurring fair value measurements

(a)  Includes newly recognized fair value option elected conditional repurchase loans and the related liability. See Note 4 — Securitizations and Variable Interest Entities for additional information.
(b)  Fair value adjustment reported in other revenue, net, and related interest on loans and debt are reported in interest income and interest expense, respectively.
(c)  Fair value adjustment reported in servicing asset valuation and hedge activities, net.
(d)  See Note 14 — Derivative Instruments and Hedging Activities for location of fair value adjustments in our Condensed Consolidated Statement of Income.
(e)  Fair value adjustment reported in gain (loss) on investment securities, net. Interest accretion on these assets is reported in interest income.
(f)  Fair value adjustment reported in other revenue, net, and interest accretion on these assets is reported in interest income.

CONFIDENTIAL

RC40022325

## Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### Nonrecurring Fair Value

We may be required to measure certain assets or liabilities at fair value from time-to-time. These periodic fair value measures typically result from application of lower of cost or fair value or certain impairment measures. These items would constitute nonrecurring fair value measures. The table below presents those items which we measured at fair value on a nonrecurring basis.

| March 31, ($ in thousands) | Nonrecurring fair value measures | | | Total estimated fair value | Lower of cost or fair value or valuation allowance | Total gains included in income from continuing operations for the three months ended | |
|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | | | | |
| **2012** | | | | | | | |
| Mortgage loans held-for-sale (a) | $— | $— | $579,914 | $579,914 | ($56,780) | n/m | (e) |
| Commercial finance receivables and loans, net (b) | — | 1,591 | 22,949 | 24,540 | (16,605) | n/m | (e) |
| Other assets | | | | | | | |
| Foreclosed assets (c) | — | 30,091 | 13,830 | 43,921 | (12,050) | n/m | (e) |
| Total | $— | $31,682 | $616,693 | $648,375 | ($85,435) | $— | |
| **2011** | | | | | | | |
| Mortgage loans held-for-sale (a) | $— | $— | $597,363 | $597,363 | ($50,477) | n/m | (e) |
| Commercial finance receivables and loans, net (b) | — | 13,042 | 59,793 | 72,835 | (16,137) | n/m | (e) |
| Other assets | | | | | | | |
| Foreclosed assets (c) | — | 38,160 | 22,918 | 61,078 | (8,776) | n/m | (e) |
| Real estate and other investments (d) | — | 1,579 | — | 1,579 | n/m | 16 | (f) |
| Total | $— | $52,781 | $680,074 | $732,855 | ($75,390) | $16 | |

n/m = not meaningful

(a) Represents loans or pools of loans held-for-sale that are required to be measured at lower of cost or fair value. Only loans or pools of loans with fair values below cost are included in the table above. The related valuation allowance represents the cumulative adjustment to fair value of those loans and pool of loans.

(b) Represents the portion of the commercial portfolio that has been specifically impaired. The related valuation allowance represents the cumulative adjustment to fair value of those specific commercial finance receivables and loans and represents the most relevant indicator of the impact on earnings caused by the fair value measurement. The carrying values are inclusive of the respective loan loss allowance.

(c) The allowance provided for foreclosed assets represents any cumulative valuation adjustments recognized to adjust the assets to fair value less costs to sell.

(d) Certain assets within the model home portfolio have been impaired and are being carried at (a) estimated fair value if the model home is under lease or (b) estimated fair value less costs to sell if the model home is being marketed for sale.

(e) We consider the applicable valuation to be the most relevant indicator of the impact on earnings caused by the fair value measurement. Accordingly, the table above excludes total gains and losses included in earnings for these items. The carrying values are inclusive of the respective valuation.

(f) The total loss included in earnings is the most relevant indicator of the impact on earnings caused by the fair value measurement.

The following table presents quantitative information regarding the significant unobservable inputs used in significant Level 3 assets measured at fair value on a nonrecurring basis.

| March 31, 2012    ($ in thousands) | Level 3 nonrecurring measurements | Valuation technique | Unobservable input | Range (weighted average) |
|---|---|---|---|---|
| **Assets** | | | | |
| Mortgage loans held-for-sale, net | $   579,914 | Discounted cash flow | Prepayment speeds | 0.0-13.8% |
| | | | Default rate | 2.2-17.4% |
| | | | Loss severity | 47.5-98.5% |
| | | | Discount Rate | 14.55% |

36

RC40022326

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### Fair Value Option for Financial Assets and Financial Liabilities

We have elected to value certain financial assets and liabilities at fair value consistent with our intent to mitigate a divergence between our accounting results and our retained economic exposure related to these assets and liabilities.

Financial assets and liabilities elected to be measured at fair value are as follows.

- *On-balance sheet securitizations* – We elected the fair value option for domestic on-balance sheet securitization trusts in which we estimated that the credit reserves pertaining to securitized assets could have exceeded or already had exceeded our economic exposure or were required to be consolidated upon the adoption of ASU 2009-17. The fair value option election was made at a securitization level and thus the election was made for both the consumer mortgage finance receivable and loans and the related securitization debt.

  The fair value elected loan balances are recorded within consumer finance receivables and loans, net, unless they are repurchased from a securitization trust in which case they are recorded in mortgage loans held-for-sale. Our policy is to separately record interest income on these fair value elected loans. The fair value adjustment recorded for consumer finance receivables and loans is classified as other revenue, net, and the fair value adjustment for mortgage loans held-for-sale is classified as gain on mortgage loans.

  The fair value elected securitization debt balances are recorded within collateralized borrowings in securitization trusts. Our policy is to separately record interest expense on the fair value elected securitization debt, which is classified as interest expense. The fair value adjustment recorded for this debt is classified as other revenue, net.

- *Government – and agency – eligible loans* – We elected the fair value option for government– and agency–eligible consumer mortgage loans held–for–sale. This election includes government– and agency–eligible loans we fund directly to borrowers and government– and agency–eligible loans we purchase from Ally Bank. The fair value option was elected to mitigate earnings volatility by better matching the accounting for the assets with the related hedges and to maintain consistency with the fair value option election by Ally Bank given the level of affiliate loan purchase and sale activity between the entities. See Note 17 — Related Party Transactions for additional information.

  We carry fair value option–elected government– and agency–eligible loans within mortgage loans held–for–sale. Our policy is to separately record interest income on these fair value elected loans. Upfront fees and costs related to the fair value elected loans are not deferred or capitalized. The fair value adjustment recorded for these fair value option–elected loans is reported in gain on mortgage loans, net. The fair value option election is irrevocable once the loan is funded even if it is subsequently determined that a particular loan cannot be sold.

- *Conditional repurchase option loans and liabilities* – As of January 1, 2011, we elected the fair value option for both nongovernment eligible mortgage loans held–for–sale subject to conditional repurchase options and the related liability. The conditional repurchase option allows us to repurchase a transferred financial asset if certain events outside our control are met. The typical conditional repurchase option is a delinquent loan repurchase option that gives us the option to purchase the loan if it exceeds a prespecified delinquency level. We have complete discretion regarding when or if we will exercise these options, but generally, we would do so only when it is in our best interest. We are required to record the asset and the corresponding liability on our balance sheet when the option becomes exercisable. The fair value option election must be made at initial recording. As such, the conditional repurchase option loans and liabilities that were recorded prior to January 1, 2011, were not fair value elected.

  The fair value elected conditional repurchase option loans are recorded within mortgage loans held–for–sale. The fair value adjustment is classified as other revenue, net. We do not recognize interest income on conditional repurchase option loans until the option is exercised and the loan is repurchased.

  The corresponding fair value elected liability is recorded in other liabilities. The fair value adjustment recorded for this liability is classified as other revenue, net.

37

CONFIDENTIAL

RC40022327

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The following table summarizes the fair value option elections and information regarding the amounts recognized in earnings for each fair value option-elected item.

| March 31, ($ in thousands) | Interest income (expense) (a) | Gain on mortgage loans, net | Other revenue, net | Total included in net income | Change in fair value due to credit risk (b) | |
|---|---|---|---|---|---|---|
| **2012** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (c) | $286 | $243,407 | $— | $243,693 | ($490) | (d) |
| Consumer mortgage finance receivables and loans, net | 44,139 | — | 42,637 | 86,776 | (27,220) | (e) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | | | | | | |
| On-balance sheet securitizations | (25,900) | — | (57,306) | (83,206) | (7,306) | (f) |
| Liability for option to repurchase assets | — | — | (213) | (213) | 490 | (f) |
| Total | | | | $247,050 | | |
| **2011** | | | | | | |
| **Assets** | | | | | | |
| Mortgage loans held–for–sale (c) | $221 | $51,498 | $98 | $51,817 | ($18) | (d) |
| Consumer mortgage finance receivables and loans, net | 54,021 | — | 19,246 | 73,267 | (17,444) | (e) |
| **Liabilities** | | | | | | |
| Collateralized borrowings | (30,801) | — | (36,148) | (66,949) | 26,927 | (f) |
| Total | | | | $58,135 | | |

(a)   Interest income on consumer mortgage finance receivables and loans and mortgage loans held–for–sale is measured by multiplying the unpaid principal balance on the loans by the coupon rate and the number of days of interest due. Interest expense on the on-balance sheet securitizations is measured by multiplying the bond principal by the coupon rate and days interest due to the investor.

(b)   Factors other than credit quality that impact the fair value include changes in market interest rates and the liquidity or marketability in the current marketplace. Lower levels of observable data points in illiquid markets generally result in wide bid/offer spreads.

(c)   Includes the gain/loss recognized on fair value option-elected government- and agency-eligible assets purchased from Ally Bank.

(d)   The credit impact for mortgage loans held–for–sale that are currently agency eligible is currently zero because the fair value option-elected GSE loans are salable, and any unsalable assets are currently covered by a government guarantee. The credit impact for non-agency eligible loans and related liability was quantified by applying internal credit loss assumptions to cash flow models.

(e)   The credit impact for consumer mortgage finance receivables and loans was quantified by applying internal credit loss assumptions to cash flow models.

(f)   The credit impact for on-balance sheet securitization debt is assumed to be zero until our economic interests in a particular securitization is reduced to zero, at which point the losses in the underlying collateral will be expected to be passed through to third-party bondholders. Losses allocated to third-party bondholders, including changes in the amount of losses allocated, will result in fair value changes due to credit. We also monitor credit ratings and may make credit adjustments to the extent any bond classes are downgraded by rating agencies.

CONFIDENTIAL

RC40022328

## Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

The table below provides the fair value and the unpaid principal balance for our fair value option–elected loans and related collateralized borrowings.

| ($ in thousands) | March 31, 2012 Unpaid principal balance | Fair value (a) | December 31, 2011 Unpaid principal balance | Fair value (a) |
|---|---|---|---|---|
| Mortgage loans held-for-sale | | | | |
| Total loans | $76,796 | $46,419 | $84,099 | $56,975 |
| Nonaccrual loans | 57,916 | 28,293 | 53,502 | 27,297 |
| Loans 90+ days past due (b) | 57,789 | 28,140 | 53,312 | 27,179 |
| Consumer mortgage finance receivables and loans, net | | | | |
| Total loans | $2,385,658 | $832,094 | $2,436,218 | $835,192 |
| Nonaccrual loans | 510,437 | 213,935 (c) | 506,300 | 209,371 (c) |
| Loans 90+ days past due (b) | 383,837 | 172,611 (c) | 362,002 | 162,548 (c) |
| Collateralized borrowings | | | | |
| On-balance sheet securitizations | ($2,513,734) | ($828,418) | ($2,559,093) | ($829,940) |
| Other liabilities | | | | |
| Liability for option to repurchase assets | ($61,490) | ($29,603) | ($56,568) | ($28,504) |

(a)  Excludes accrued interest receivable.
(b)  Loans 90+ days past due are also presented within the nonaccrual loans and total loans except those that are government insured and still accruing.
(c)  The fair value of consumer mortgage finance receivables and loans is calculated on a pooled basis; therefore, we allocated the fair value of nonaccrual loans and 90+ days past due to individual loans based on the unpaid principal balances.

## 14. Derivative Instruments and Hedging Activities

We transact interest rate and foreign currency swaps, futures, forwards, options, swaptions, and TBAs in connection with our risk management activities.  Our primary objective for executing these financial instruments is to mitigate our economic exposure to future events that are outside our control.  These financial instruments are utilized principally to manage market risk and cash flow volatility associated with mortgage loans held–for–sale and MSRs, including our total return and forward flow agreements with Ally Bank. See Note 17 — Related Party Transactions for additional information.  We do not transact derivative instruments for reasons beyond risk management.

In addition to derivatives transacted as part of our risk management activities, we create derivative contracts as part of our ongoing operations.  In particular, we frequently execute forward mortgage loan purchase and sale commitments with Ally Bank and financial institutions, respectively, principally to provide a future source of mortgage volume and dedicated exit channels.

Additionally, we enter into commitments with mortgage borrowers that require us to originate a mortgage at a stated amount and rate; these are derivative contracts if our intent is ultimately to hold the originated loan for sale. We refer to commitments to purchase mortgage loans from Ally Bank and commitments to originate mortgage loans held–for–sale, collectively, as interest rate lock commitments (IRLCs).

The following summarizes our significant asset and liability classes, the risk exposures for these classes, and our risk management activities utilized to mitigate certain of these risks.  The discussion includes both derivative and nonderivative financial instruments utilized as part of these risk management activities.

### Interest Rate Sensitive Assets/Liabilities

*   *Mortgage loan commitments and loans held–for–sale* — We are exposed to interest rate risk from the time an IRLC is made, either directly or indirectly through the forward flow agreement with Ally Bank, until the time the mortgage loan is sold.  Changes in interest rates impact the market price for the mortgage loan; as market interest rates decline, the value of existing IRLCs and mortgage loans held–for–sale increase and vice versa. The primary objective of our risk management activities related to IRLCs and mortgage loans held–for–sale is to eliminate or reduce any interest rate risk associated with these assets.

We enter into forward sale contracts of mortgage-backed securities, primarily agency TBAs, as our primary strategy to mitigate this risk.  These contracts are typically entered into at the time the interest rate lock commitment is made.  The value of the forward sales contracts moves in the opposite direction of the value of our IRLCs and mortgage loans held–for–sale. We may also use other derivatives, such as options, and futures, to economically hedge certain portions of the portfolio.  Nonderivative instruments, such as short positions on U.S. Treasuries, may also be used to economically hedge

39

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

the portfolio. We monitor and actively manage our risk on a daily basis; therefore trading volume can be significant.

We do not apply hedge accounting to our derivative portfolio held to economically hedge our IRLCs and mortgage loans held–for–sale. Included in the derivatives on IRLCs and mortgage loans held–for–sale is the forward flow agreement with Ally Bank having a fair value of $(27.1) million and an outstanding notional of $6.3 billion at March 31, 2012. Under the terms of the forward flow agreement, Ally Bank transfers the exposure to changes in fair value of specified pools of assets, in this case IRLCs and mortgage loans held–for–sale, to us. This agreement was terminated on April 30, 2012. See Note 17 — Related Party Transactions for additional information.

- *Mortgage servicing rights and other retained interests* — Our MSRs and retained interests are generally subject to loss in value when mortgage rates decline. Declining mortgage rates generally result in an increase in refinancing activity, which increases prepayments and results in a decline in the value of MSRs and other retained interests. To mitigate the impact of this risk, we maintain a portfolio of financial instruments, primarily derivatives, which increase in value when interest rates decline. The primary objective is to minimize the overall risk of loss in the value of MSRs and other retained interests due to the change in fair value caused by interest rate changes and their interrelated impact to prepayments.

We use a variety of derivative instruments to manage the interest rate risk related to MSRs and other retained interests. These include, but are not limited to, interest rate futures, call or put options on U.S. Treasuries, swaptions, mortgage-backed securities (MBS) futures, U.S. Treasury futures, interest rate swaps, interest rate floors and caps. While we do not currently utilize nonderivative instruments (i.e., U.S. Treasuries) to hedge this portfolio, we have utilized them in the past and may utilize them again in the future. We monitor and actively manage our risk on a daily basis, and therefore trading volume can be significant.

Included in the derivatives hedging MSRs and retained interests is a total return swap with Ally Bank having a fair value of $29.4 million at March 31, 2012. Under the terms of the total return swap, Ally Bank transfers the total economic return of a specified portfolio of mortgage servicing rights owned by Ally Bank to us in exchange for a variable payment based on a fixed spread to LIBOR. This agreement was terminated on April 30, 2012. See Note 17 — Related Party Transactions for additional information.

- *Debt* — We monitor our mix of fixed and floating rate debt in relation to the rate profile of our assets. When it is cost effective to do so, we may enter into interest rate swaps to manage the interest rate composition of our debt portfolio. Typically, the significant terms of the interest rate swaps match the terms of the underlying debt resulting in an effective conversion of the rate of the related debt.

In addition to these economic hedges, we also hold interest rate swaps that are hedging a portion of our fixed-rate senior unsecured notes. We utilize the interest rate swaps to hedge the fair value of the hedged debt balances. We elected to designate these as fair value hedges at inception. At December 31, 2011, we dedesignated our fair value swaps due to ineffectiveness.

## Foreign Currency Risk

We have operations outside the United States. Our foreign subsidiaries maintain both assets and liabilities in local currencies that are deemed to be the functional currencies of these subsidiaries for accounting purposes. Foreign currency exchange rate gains and losses arise when assets or liabilities are denominated in currencies that differ from the entities functional currency and are revalued into the functional currency. In addition, our equity is impacted by the cumulative translation adjustments recognized in other comprehensive income resulting from the translation of foreign subsidiary results to U.S. dollars. Foreign currency risk is reviewed as part of our risk management process. The principal currencies creating foreign exchange risk are the U.K. Sterling and the Euro.

Our current strategy is to economically hedge foreign currency risk related to assets and liabilities that are denominated in currencies on our U.S. dollar functional currency entities. The principal objective of the foreign currency hedges is to mitigate the earnings volatility specifically created by foreign currency exchange rate gains and losses. We hold forward currency contracts to mitigate risk against currency fluctuation in the U.K. Sterling and the Euro. We have not elected to treat any foreign currency swaps as hedges for accounting purposes, principally because the changes in the fair values of the foreign currency swaps are substantially offset by the foreign currency revaluation gains and losses of the underlying assets and liabilities.

40

CONFIDENTIAL

RC40022330

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### Credit Risk and Collateral Arrangements

Derivative financial instruments contain an element of credit risk if counterparties, including affiliates, are unable to meet the terms of their agreements. Credit risk associated with derivative financial instruments is measured as the net replacement cost should the counterparties that owe us under the contracts completely fail to perform under the terms of those contracts, assuming there are no recoveries of underlying collateral, as measured by the fair value of the derivative financial instruments. At March 31, 2012 and December 31, 2011, the fair value of derivative financial instruments in an asset, or receivable position, were $3.6 billion and $4.9 billion, including $2.2 billion and $3.2 billion with affiliates, respectively. See Note 17 — Related Party Transactions for additional information.

We minimize the credit risk exposure by limiting our counterparties to those major banks and financial institutions that meet established credit guidelines and transacting with and through affiliates. Additionally, we reduce credit risk on the majority of our derivative financial instruments by entering into legally enforceable agreements that permit the closeout and netting of transactions with the same counterparty upon occurrence of certain events. To further mitigate the risk of counterparty default, we execute collateral agreements with counterparties. The agreements require both parties to maintain cash deposits in the event the fair values of the derivative financial instruments meet established thresholds. We have received cash deposits from counterparties totaling $578.7 million and $656.1 million at March 31, 2012 and, December 31, 2011, respectively, for derivative positions in an asset position to us. We have placed cash deposits totaling $1.1 billion and $1.1 billion at March 31, 2012 and December 31, 2011, respectively, in accounts maintained by counterparties for derivative positions in a liability position to us. The cash deposits placed and received are included in accounts receivable, other assets, and other liabilities.

We are not exposed to credit risk related contingent features in any of our derivative contracts that could be triggered and potentially could expose us to future loss.

### Condensed Consolidated Balance Sheet Presentation

The following table summarizes the location and fair value amounts of derivative instruments reported on our Condensed Consolidated Balance Sheet. The fair value amounts are presented on a gross basis and are segregated between derivatives that are designated and qualifying as hedging instruments and those that are not and further segregated by type of contract within those two categories.

| | March 31, 2012 | | | December 31, 2011 | | |
| | Fair value of derivative contracts in | | | Fair value of derivative contracts in | | |
| ($ in thousands) | receivable position (a) | payable position (b) | Notional amount | receivable position (a) | payable position (b) | Notional amount |
|---|---|---|---|---|---|---|
| Economic hedges | | | | | | |
| Interest rate risk | | | | | | |
| MSRs and retained interests | $3,554,216 | ($3,893,704) | $418,931,706 | $4,811,804 | ($5,011,576) | $523,142,192 |
| Mortgage loans held-for-sale | 16,115 | (7,260) | 9,040,618 | 8,770 | (96,077) | 17,323,000 |
| Debt | 18,887 | — | 251,122 | 21,066 | — | 251,790 |
| Total interest rate risk | 3,589,218 | (3,900,964) | 428,223,446 | 4,841,640 | (5,107,653) | 540,716,982 |
| Foreign exchange risk | 2,439 | (365) | 160,748 | 520 | (5,873) | 3,157,000 |
| Non-risk management derivatives | | | | | | |
| Bank MSR swap | 29,442 | — | 1,407,351 | 17,681 | — | 1,384,835 |
| Bank forward flow agreement | — | (27,105) | 6,269,576 | 16,423 | ---- | 9,825,783 |
| Mortgage loan commitments | 349 | (3) | 27,542 | 933 | (5) | 77,633 |
| Total derivatives | $3,621,448 | ($3,928,437) | $436,088,663 | $4,877,197 | ($5,113,531) | $555,162,233 |

(a)  Presented in other assets.
(b)  Presented in other liabilities.

41

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### Condensed Consolidated Statement of Income Presentation

The following table summarizes the location and amount of gains and losses from continuing operations reported in our Condensed Consolidated Statement of Income related to derivative instruments. Gains and losses are presented separately for derivative instruments designated and qualifying as hedging instruments in fair value hedges and non-designated hedging instruments. We currently do not have qualifying cash flow or foreign currency hedges.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Qualifying accounting hedges | | |
| Gain (loss) recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Interest income | $— | ($1,535) |
| Gain (loss) recognized in earnings on hedged item | | |
| Interest rate contracts | | |
| Interest expense | — | 1,813 |
| Total qualifying accounting hedges | — | 278 |
| Economic hedges | | |
| Risk management derivatives | | |
| Gain (loss) recognized in earnings on derivatives | | |
| Interest rate contracts | | |
| Interest expense | (1,633) | (1,672) |
| Gain on mortgage loans, net | (52,099) | (43,622) |
| Servicing asset valuation and hedge activities, net | 8,075 | (203,625) |
| Other revenue, net | (369) | — |
| Total interest rate contracts | (46,026) | (248,919) |
| Foreign exchange contracts | | |
| Other noninterest expense, net | 6,274 | (1,298) |
| Non-risk management derivatives | | |
| Gain on mortgage loans, net | (87,921) | 134,512 |
| Servicing asset valuation and hedge activities, net | 96,424 | 216,048 |
| Total derivatives | ($31,249) | $100,621 |

Our derivative portfolios generally are reflected in the operating activities section of our Condensed Consolidated Statement of Cash Flows. Derivative fair value adjustments are captured in our Condensed Consolidated Statement of Income line items described in the table above and, accordingly, are generally reflected within the respective line items within the reconciliation of net income (loss) to net cash provided by operating activities section of our Condensed Consolidated Statement of Cash Flows. The remaining changes in derivative portfolio values are generally reflected within the "net change in other assets" or "net change in other liabilities" line items on our Condensed Consolidated Statement of Cash Flows.

### 15. Higher Risk Mortgage Loans and Credit Quality

Historically, we originated and purchased mortgage loans that had contractual features that may increase our exposure to credit risk and thereby result in a concentration of credit risk. These mortgage loans include loans that may subject borrowers to significant payment increases in the future, have negative amortization of the principal balance or have high loan-to-value ratios.

The following table summarizes the gross carrying value of our higher-risk mortgage loans classified as held-for-sale and finance receivables and loans.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| High loan-to-value (greater than 100%) mortgage loans | $475,415 | $488,627 |
| Payment option adjustable rate mortgage loans | 13,176 | 12,140 |
| Interest-only mortgage loans | 286,740 | 293,975 |
| Below market initial rate mortgage loans | 250,517 | 259,177 |
| Total carrying value of higher-risk mortgages | $1,025,848 | $1,053,919 |

Included in the table above are $350.7 million and $362.5 million of high-risk mortgage loans held in on-balance sheet securitizations at March 31, 2012 and December 31, 2011, respectively. Our exposure on these loans is limited to the value of our retained interest.

42

RC40022332

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

As part of our loss mitigation efforts and participation in certain governmental programs (e.g., the Making Home Affordable program), we may offer loan restructurings to borrowers. Due to the nature of restructurings, these loans are generally considered higher risk. Loan modifications can include any or all of the following; principal forgiveness, maturity extensions, delinquent interest capitalization and changes to contractual interest rates. Modifications can be either temporary or permanent. Temporary loan modifications are generally used to monitor the borrower's ability to perform under the revised terms over a specified trial period; if the borrower performs, it may become a permanent loan modification. We have historically performed loan modifications under our private modification program; however, more recently the majority of loan modifications are completed under government programs. The carrying value of our on-balance sheet modified mortgage loans was $1.4 billion and $1.2 billion as of March 31, 2012 and December 31, 2011, respectively. These modified mortgage loans are included within mortgage loans held–for–sale and consumer finance receivables and loans.

## Nonperforming Assets

Nonperforming assets include nonaccrual loans and foreclosed assets. The classification of a loan as nonperforming does not necessarily indicate that the principal amount of the loan is ultimately uncollectible in whole or in part. In certain cases, borrowers make payments to bring their loans contractually current and, in all cases, our mortgage loans are collateralized by residential real estate. As a result, our experience has been that any amount of ultimate loss for mortgage loans other than home equity loans is substantially less than the unpaid principal balance of a nonperforming loan.

Delinquent loans expose us to higher levels of credit losses and therefore are considered higher risk loans. The determination as to whether a loan falls into a particular delinquency category is made as of the close of business on the balance sheet date. The following table sets forth information concerning the delinquency experience in our mortgage loans held–for–sale and consumer finance receivable and loans at carrying value.

| ($ in thousands) | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | Amount | % of total | Amount | % of total |
| Current | $2,065,619 | 39.2% | $2,003,928 | 38.0% |
| Past due | | | | |
| 30 to 89 days | 136,907 | 2.6% | 137,590 | 2.6% |
| 90 days or more and still accruing interest (a) | 72,727 | 1.4% | 73,661 | 1.4% |
| 90 days or more conditional repurchase option loans (b) | 2,352,657 | 44.7% | 2,379,926 | 45.1% |
| Nonaccrual | 639,475 | 12.1% | 677,250 | 12.9% |
| Total | 5,267,385 | 100% | 5,272,355 | 100% |
| Allowance for loan losses | (12,183) | | (13,638) | |
| Total, net | $5,255,202 | | $5,258,717 | |

(a)  Loans that are 90 days or more delinquent and still accruing interest are government insured.
(b)  We do not record interest income on conditional repurchase option loans. If these options were exercised and we acquired the loans, $2.3 billion and $2.3 billion would be classified as 90 days or more and still accruing due to government guarantees at March 31, 2012 and December 31, 2011, respectively. The private-label conditional repurchase option loans of $99.3 million and $105.8 million would be classified as nonaccrual at March 31, 2012 and December 31, 2011, respectively.

The following table presents the net carrying value of nonperforming assets.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Nonaccrual consumer | | |
| 1st Mortgage | $440,963 | $462,275 |
| Home equity | 57,823 | 71,787 |
| Foreign | 140,689 | 143,188 |
| Total nonaccrual consumer (a) | 639,475 | 677,250 |
| Nonaccrual commercial | | |
| Domestic | — | — |
| Foreign | 41,145 | 12,534 |
| Total nonaccrual commercial | 41,145 | 12,534 |
| Foreclosed assets | 63,987 | 71,485 |
| Total nonperforming assets | $744,607 | $761,269 |

(a)  Excludes loans subject to conditional repurchase options of $2.3 billion and $2.3 billion sold to Ginnie Mae guaranteed securitizations and $99.3 million and $105.8 million sold to off-balance sheet private-label securitization trusts at March 31, 2012 and December 31, 2011, respectively. The corresponding liability is recorded in other liabilities. See Note 5 — Securitizations and Variable Interest Entities for additional information.

43

CONFIDENTIAL

RC40022333

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### 16. Contingencies and Other Risks

We currently estimate that it is reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims described herein could be between $0.0 billion and $4.0 billion over amounts already recorded. This estimate is based on significant judgment and numerous assumptions that are subject to change, which could be material.

#### Mortgage Foreclosure Matters

#### Settlements with Federal Government and State Attorneys General

*Agreement*

On February 9, 2012, Ally Inc., ResCap, and certain of our subsidiaries reached an agreement in principle with respect to investigations into procedures followed by mortgage servicing companies and banks in connection with mortgage origination and servicing activities and foreclosure home sales and evictions (the Settlement). On March 12, 2012, the Settlement was filed as a consent judgment in the U.S. District Court for the District of Columbia. In addition, we separately reached an independent settlement with Oklahoma, which did not participate in the broader settlement described below, and agreements with two other states for other releases.

In connection with the settlement we paid $109.6 million to a trustee, for distribution to federal and state governments in March 2012. In addition, we also paid $2.3 million in connection with the separate state agreements. We are also obligated to provide $200.0 million towards borrower relief, subject to possible upward adjustments as described below. This obligation for borrower relief will include loan modifications, including principal reductions, rate modifications, and refinancing for borrowers that meet certain requirements, and participation in certain other programs. Generally, if certain basic criteria are met, borrowers that are either delinquent or at imminent risk of default and owe more on their mortgages than their homes are worth could be eligible for principle reductions, and borrowers that are current on their mortgages but who owe more on their mortgage than their homes are worth could be eligible for refinancing opportunities. Further, we have agreed to solicit borrowers that are eligible for rate and principal modifications as of March 1, 2012. We are committed to provide loan modifications to all borrowers who accept a modification offer within three months of the solicitation. We have also agreed to provide loan modifications to borrowers who accept a modification offer within six months of the solicitation, unless and until total borrower relief provided exceeds $250.0 million. As of March 31, 2012, no loan modifications have been completed. However, we are currently in the process of soliciting eligible borrowers and expect modifications to begin in the second quarter of 2012.

The Settlement provides incentives for borrower relief that is provided within the first twelve months, and all obligations must be met within three years from the date the consent judgment is filed. In addition to the foregoing, we will be required to implement new servicing standards relating to matters such as foreclosure and bankruptcy information and documentation, oversight, loss mitigation, limitations on fees, and related procedural matters. Compliance with these obligations will be overseen by an independent monitor, who will have authority to impose additional penalties and fines if we fail to meet established timelines or fail to implement required servicing standards.

The Settlement generally resolves potential claims arising out of origination and servicing activities and foreclosure matters, subject to certain exceptions. The Settlement does not prevent state and federal authorities from pursuing criminal enforcement actions, securities-related claims (including actions related to securitization activities and Mortgage Electronic Registration Systems, or MERS), loan origination claims, claims brought by the FDIC, and certain other matters. The Settlement also does not prevent claims that may be brought by individual borrowers.

#### Federal Reserve Board Civil Money Penalty

On February 9, 2012, Ally Inc. and ResCap agreed with the Board of Governors of the Federal Reserve (FRB) on a civil money penalty (CMP) of $207.0 million related to the same activities that were the subject of the Settlement. This amount will be reduced dollar-for-dollar in connection with certain aspects of our satisfaction of the required monetary payment and borrower relief obligations included within the Settlement, as well as our participation in other similar programs that may be approved by the FRB. While additional future cash payments related to the CMP are possible if we are unable to satisfy the borrower relief requirements of the Settlement within two years, we currently expect that the full amount of the CMP will be satisfied through our commitments in connection with the Settlement.

44

CONFIDENTIAL

RC40022334

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### Other Mortgage Foreclosure Matters

#### Consent Order

As a result of an examination conducted by the FRB and FDIC, on April 13, 2011 we entered into a Consent Order (the Consent Order) with the FRB and the FDIC. The Consent Order requires that we make improvements to various aspects of our residential mortgage loan-servicing business, including compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight by our Board of Directors.

The Consent Order further requires GMAC Mortgage to retain independent consultants to conduct a risk assessment related to mortgage servicing activities and, separately, to conduct a review of certain past residential mortgage foreclosure actions. We cannot reasonably estimate the ultimate impact of any deficiencies that have been or may be identified in our historical foreclosure procedures. There are potential risks related to these matters that extend beyond potential liability on individual foreclosure actions. Specific risks could include, for example, claims and litigation related to foreclosure remediation and resubmission; claims from investors that hold securities that become adversely impacted by continued delays in the foreclosure process; the reduction in foreclosure proceeds due to delay, or by challenges to completed foreclosure sales to the extent, if any, not covered by title insurance obtained in connection with such sales; actions by courts, state attorneys general, or regulators to delay further the foreclosure process after submission of corrected affidavits, or to facilitate claims by borrowers alleging that they were harmed by our foreclosure practices (by, for example, foreclosing without offering an appropriate range of alternative home preservation options); additional regulatory fines, sanctions, and other additional costs; and reputational risks. To date we have borne all out-of-pocket costs associated with the remediation rather than passing any such costs through to investors for whom we service the related mortgages, and we expect that we will continue to do so.

### Loan Repurchases and Obligations Related to Loan Sales

#### Overview

We sell loans that take the form of securitizations guaranteed by the GSEs, securitizations sold to private investors, and to whole-loan investors. In connection with a portion of our private-label securitizations, the monolines insured all or some of the related bonds and guaranteed timely repayment of bond principal and interest when the issuer defaults. In connection with securitizations and loan sales, the trustee for the benefit of the related security holders and, if applicable, the related monoline insurers are provided various representations and warranties related to the loans sold. The specific representations and warranties vary among different transactions and investors but typically relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, the ability to deliver required documentation and compliance with applicable laws. In general, the representations and warranties described above may be enforced at any time unless a sunset provision is in place. Upon discovery of a breach of a representation or warranty, the breach is corrected in a manner conforming to the provisions of the sale agreement. This may require us to repurchase the loan, indemnify the investor for incurred losses, or otherwise make the investor whole. We have entered into settlement agreements with both Fannie Mae and Freddie Mac that, subject to certain exclusions, limit our remaining exposure with the GSEs. See *Government-sponsored Enterprises* below. We assume all of the customary representation and warranty obligations for loans purchased from Ally Bank and subsequently sold into the secondary market, generally through securitizations guaranteed by the GSEs.

#### Originations

The total exposure to mortgage representation and warranty claims is most significant for loans originated and sold between 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 and forward. Since 2009, we have focused primarily on purchasing prime conforming and government-insured mortgages. In addition, we ceased offering interest-only jumbo mortgages in 2010. Representation and warranty risk mitigation strategies include, but are not limited to, pursuing settlements with investors where economically beneficial in order to resolve a pipeline of demands in lieu of loan-by-loan assessments that could result in repurchasing loans, aggressively contesting claims we do not consider valid (rescinding claims), and seeking recourse against correspondent lenders from whom we purchased loans wherever appropriate.

#### Demand/Claim Process

After receiving a claim under representation and warranty obligations, we review the claim to determine the appropriate response (e.g. appeal, and provide or request additional information) and take appropriate action (rescind, repurchase the loan, or remit indemnification payment). Historically, repurchase demands were generally related to loans that became delinquent within the first few years following origination. As a result of market developments over the past several years, investor repurchase demand behavior has changed significantly. GSEs and investors are more likely to submit claims for loans at any point in the loans life cycle. Representation and warranty claims are generally reviewed on a loan-by-loan basis to validate if there has been a breach requiring

45

CONFIDENTIAL

RC40022335

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

a potential repurchase or indemnification payment. We actively contest claims to the extent they are not considered valid. We are not required to repurchase a loan or provide an indemnification payment where claims are not valid.

The risk of repurchase or indemnification, and the associated credit exposure, is managed through our underwriting and quality assurance practices and by servicing mortgage loans to meet investor standards. We believe that, in general, the longer a loan performs prior to default, the less likely it is that an alleged breach of representation and warranty will be found to have a material and adverse impact on the loan's performance. When loans are repurchased, we bear the related credit loss on the loans. Repurchased loans are classified as held–for–sale and initially recorded at fair value.

The following table includes amounts paid to investors and monolines with respect to representation and warranty obligations.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Loan repurchases (UPB) | | |
| GSEs | $19,005 | $43,582 |
| Private–label securitizations insured (monolines) | 4,038 | 14 |
| Private–label securitizations uninsured | — | — |
| Whole–loan investors | 2,468 | 4,642 |
| Total | $25,511 | $48,238 |
| Indemnifications (make wholes) by investor | | |
| GSEs | $20,971 | $15,517 |
| Private–label securitizations insured (monolines) | — | 1,835 |
| Private–label securitizations uninsured | — | — |
| Whole–loan investors | 6,402 | 24 |
| Total | $27,373 | $17,376 |

The following table presents the total number and original unpaid principal balance of loans related to unresolved representation and warranty demands (indemnification claims and/or repurchase demands). The table includes demands that we have requested be rescinded but which have not yet been agreed to by the investor.

| | March 31, 2012 | | December 31, 2011 (a) | |
|---|---|---|---|---|
| ($ in millions) | Number of loans | Original UPB of loans | Number of loans | Original UPB of loans |
| Unresolved repurchase demands previously received | | | | |
| GSEs | 457 | $89 | 357 | $71 |
| Insured private-lable securitizations | | | | |
| MBIA Insurance Corporation | 7,314 | 491 | 7,314 | 490 |
| Financial Guaranty Insurance Company | 4,826 | 382 | 4,608 | 369 |
| Other | 937 | 70 | 730 | 58 |
| Uninsured private-lable securitizations | 294 | 78 | 38 | 7 |
| Whole Loan Investors | 561 | 85 | 475 | 74 |
| Total unpaid principal balance | 14,389 | $1,195 | 13,522 | $1,069 |

(a)  Excludes $59.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.

We are currently in litigation with MBIA Insurance Corporation (MBIA) and Financial Guaranty Insurance Company (FGIC) with respect to certain representation and warranty matters related to certain of our private-label securitizations. Historically we have requested that most of the demands be rescinded, consistent with the claim/demand process described above. As the litigation process proceeds, additional loan reviews are expected and will likely result in additional repurchase demands.

### Liability for Representation and Warranty Obligations

The liability for representation and warranty obligations reflects management's best estimate of probable lifetime loss. We consider historical and recent demand trends in establishing the reserve. The methodology used to estimate the reserve considers a variety of assumptions including borrower performance (both actual and estimated future defaults), repurchase demand behavior, historical loan defect experience, historical mortgage insurance rescission experience, and historical and estimated future loss experience, which includes projections of future home price changes as well as other qualitative factors including investor behavior. In cases where we do not have or have limited current or historical demand experience with an investor, it is difficult to predict and estimate the level and timing of any potential future demands. In such cases, we may not be able to reasonably estimate losses, and a liability is not recognized. Management monitors the adequacy of the overall reserve and makes adjustments to the level of reserve,

CONFIDENTIAL

RC40022336

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

as necessary, after consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

At the time a loan is sold, an estimate of the fair value of the liability is recorded and classified in other liabilities and recorded as a component of gain on mortgage loans, net. We recognize changes in the liability when additional relevant information becomes available. Changes in the estimate are recorded as representation and warranty expense, net. At March 31, 2012, the liability relates primarily to non-GSE exposure.

The following table summarizes the changes in our liability for representation and warranty obligations.

| ($ in thousands) | 2012 | 2011 |
|---|---|---|
| Balance at January 1, | $824,776 | $830,021 |
| Provision for representation and warranty obligations | | |
| Loan sales | 4,410 | 5,895 |
| Change in estimate | 19,459 | 26,000 |
| Total additions | 23,869 | 31,895 |
| Realized losses (a) | (42,181) | (33,692) |
| Recoveries | 4,341 | 2,063 |
| Balance at March 31, | $810,805 | $830,287 |

(a)  Includes principal losses and accrued interest on repurchased loans, indemnification payments, and settlements with investors.

### Government-sponsored Entities

Between 2004 and 2012, we sold $441.0 billion of loans to the GSEs. Each GSE has specific guidelines and criteria for sellers and servicers of loans underlying their securities. In addition, the risk of credit loss of the loans sold was generally transferred to investors upon sale of the securities into the secondary market. Conventional conforming loans were sold to either Freddie Mac or Fannie Mae, and government insured loans were securitized with Ginnie Mae. Our representation and warranty obligation liability with respect to the GSEs considers the existing unresolved claims and the best estimate of future claims that could be received. We consider our experiences with the GSEs in evaluating our liability.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our GSE exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $71 | $170 |
| New claims | 128 | 102 |
| Resolved claims (b) | (60) | (133) |
| Rescinded claims/other | (50) | (41) |
| Balance at March 31, | $89 | $98 |

(a)  Excludes $22.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b)  Includes settlements, repurchased loans and claims under which indemnification payments are made.

We have settled our repurchase obligations relating to most of the mortgage loans sold to Freddie Mac prior to January 1, 2009. This agreement does not release any of our obligations with respect to exposure for private-label MBS in which Freddie Mac had previously invested, loans where our affiliate, Ally Bank is the owner of the servicing, as well as defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Freddie Mac, including all indemnification obligations that may arise in connection with the servicing of the mortgages. These other specified categories include (i) loans subject to certain state predatory lending and similar laws; (ii) groups of 25 or more mortgage loans purchased, originated, or serviced by one of our subsidiaries, the purchase, origination, or sale of which all involve a common actor who committed fraud; (iii) "non-loan-level" representations and warranties which refer to representations and warranties that do not relate to specific mortgage loans (examples of such non-loan-level representations and warranties include the requirement that our subsidiaries meet certain standards to be eligible to sell or service loans for Freddie Mac or our subsidiaries sold or serviced loans for market participants that were not acceptable to Freddie Mac); and (iv) mortgage loans that are ineligible for purchase by Freddie Mac under its charter and other applicable documents. If, however, a mortgage loan was ineligible under Freddie Mac's charter solely because mortgage insurance was rescinded (rather than for example, because the mortgage loan is secured by a commercial property), and Freddie Mac required us or our subsidiary to repurchase that loan because of the ineligibility, Freddie Mac would pay any net loss we suffered on any later liquidation of that mortgage loan.

47

CONFIDENTIAL

RC40022337

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

We have received subpoenas from the Federal Housing Finance Agency (FHFA), which is the conservator of Fannie Mae and Freddie Mac. The subpoenas relating to Fannie Mae investments have been withdrawn with prejudice. The FHFA indicated that documents provided in response to the remaining subpoenas will enable the FHFA to determine whether they believe issuers of private-label MBS are potentially liable to Freddie Mac for losses they might have incurred. Although Freddie Mac has not brought any representation and warranty claims against us with respect to private-label securities subsequent to the settlement, they may do so in the future. The FHFA has commenced securities and related common law fraud litigation against us and certain of our subsidiaries with respect to certain of Freddie Mac's private-label securities investments.

We have settled our repurchase obligations related to most of the mortgage loans we sold to Fannie Mae prior to June 30, 2010. The agreement also covers potential exposure for private-label MBS in which Fannie Mae had previously invested. This agreement does not release any of our obligations with respect to loans where our affiliate, Ally Bank, is the owner of the servicing, as well as for defects in certain other specified categories of loans. Further, we continue to be responsible for other contractual obligations we have with Fannie Mae, including all indemnification obligations that may arise in connection with the servicing of the mortgages, and we continue to be obligated to indemnify Fannie Mae for litigation or third party claims (including by borrowers) for matters that may amount to breaches of selling representations and warranties. These other specified categories include, among others, (i) those that violate anti-predatory laws or statutes or related regulations or that otherwise violate other applicable laws and regulations; (ii) those that have non-curable defects in title to the secured property, or that have curable title defects, to the extent our subsidiaries do not cure such defects at our subsidiary's expense; (iii) any mortgage loan in which title or ownership of the mortgage loan was defective; (iv) groups of 13 or more mortgage loans, the purchase, origination, sale or servicing of which all involve a common actor who committed fraud; and (v) mortgage loans not in compliance with Fannie Mae Charter Act requirements (e.g., mortgage loans on commercial properties or mortgage loans without required mortgage insurance coverage). If a mortgage loan falls out of compliance with Fannie Mae Charter Act requirements because mortgage insurance coverage has been rescinded and not reinstated or replaced, upon the borrower's default our subsidiaries would have to pay to Fannie Mae the amount of insurance proceeds that would have been paid by the mortgage insurer with respect to such mortgage loan. If the amount of the loss exceeded the amount of insurance proceeds, Fannie Mae would be responsible for such excess.

*Private-label Securitizations (PLS)*

In general, representations and warranties provided as part of our private-label securitization activities are less rigorous than those provided to the GSEs and generally impose higher burdens on investors seeking repurchase. In order to successfully assert a claim, it is our position that a claimant must prove a breach of the representations and warranties that materially and adversely affects the interest of the investor in the allegedly defective loan. Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally are required to coordinate with other investors in that class comprising no less than 25% and in some cases 50% of the percentage interest constituting a class of securities of that class issued by the trust to pursue claims for breach of representations and warranties. In addition, our private-label securitizations generally require that the servicer or trustee give notice to the other parties whenever it becomes aware of facts or circumstances that reveal a breach of representation that materially and adversely affects the interest of the certificate holders.

Regarding our securitization activities, we have exposure to potential losses primarily through two avenues. First, investors, through trustees to the extent required by the applicable agreements (or monoline insurers in certain transactions), may request pursuant to applicable agreements that we repurchase loans or make the investor whole for losses incurred if it is determined that we violated representations and warranties made at the time of the sale, provided that such violations materially and adversely impacted the interest of the investor. Contractual representations and warranties are different based on the specific deal structure and investor. It is our position that litigation of these matters must proceed on a loan by loan basis. This issue is being disputed throughout the industry in various pending litigation matters. Similarly in dispute as a matter of law is the degree to which claimants will have to prove that the alleged breaches of representations and warranties actually caused the losses they claim to have suffered. Ultimate resolution by courts of these and other legal issues will impact litigation and treatment of non-litigated claims pursuant to similar contractual provisions. Second, investors in securitizations may attempt to achieve rescission of their investments or damages through litigation by claiming that the applicable offering documents were materially deficient. If an investor properly made and proved its allegations, the investor might attempt to claim that damages could include loss of market value on the investment even if there were little or no credit loss in the underlying loans.

*Insured Private-label Securitizations (Monoline)*

Historically, we have securitized loans where the monolines insured all or some of the related bonds and guaranteed the timely repayment of bond principal and interest when the issuer defaults. Typically, any alleged breach requires the insurer to have both the ability to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holders or the insurer. Generally, most claims in connection with private-label securitizations come from Monoline Insurers and continue to represent the majority of outstanding repurchase demands. For the period 2004 through 2007, we sold $42.7 billion of loans into these monoline-wrapped securitizations.

48

CONFIDENTIAL

RC40022338

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

We are currently in litigation with MBIA and FGIC in connection with our representation and warranty obligations, and additional litigation with other monolines is likely.

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect our Monoline exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $917 | $661 |
| New claims (b) | 28 | 14 |
| Resolved claims (c) | (2) | (8) |
| Rescinded claims/other | — | |
| Balance at March 31, | $943 | $667 |

(a)   Excludes $9.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b)   Substantially all relate to claims associated with the 2004 through 2007 vintages.
(c)   Includes settlements, repurchased loans and claims under which indemnification payments are made.

### Uninsured Private-label Securitizations

Historically, we securitized loans where all or some of the related bonds were uninsured. We are required to make customary representations and warranties about the loans to the investors and/or securitization trust. Typically, any alleged breach of representations and warranties requires the holder of the security to assert a claim as well as evidence that a defect has had a material and adverse effect on the interest of the security holder. During the period 2004 through 2007, we sold $182.1 billion of loans into these uninsured private-label securitizations. Claims associated with uninsured PLS were historically self identified and constituted an immaterial portion of new claims. These claims were historically included within the 'Whole loan/other' category. During the three months ended March 31, 2012, we received a repurchase request from a bond trustee with respect to one of our uninsured private-label securitizations for loans originated in 2006 with an original unpaid principal balance $70.0 million. This unpaid principal balance is not representative of expected future losses.

The following table summarizes the changes in our original unpaid principal balance related to unresolved repurchase demands with respect to our uninsured PLS exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| Three months ended March 31, ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $8 | $3 |
| New claims | 75 | 3 |
| Resolved claims (b) | (4) | — |
| Rescinded claims/other | (1) | |
| Balance at March 31, | $78 | $6 |

(a)   Excludes $4.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b)   Includes losses, settlements, impairments on repurchased loans, and indemnification payments.

### Whole-loan Sales

The following table summarizes the changes in the original unpaid principal balance related to unresolved repurchase demands with respect to our whole-loan exposure. The table includes demands that we have requested be rescinded but which have not been agreed to by the investor.

| ($ in millions) | 2012 | 2011 (a) |
|---|---|---|
| Balance at January 1, | $73 | $85 |
| New claims (b) | 22 | 13 |
| Resolved claims (c) | (6) | (7) |
| Rescinded claims/other | (4) | (24) |
| Balance at March 31, | $85 | $67 |

(a)   Excludes $25.0 million of original UPB on loans where counterparties have requested additional documentation as part of individual loan file reviews.
(b)   Includes $21.9 million and $13.0 million in new claims associated with the 2004 through 2007 vintages in 2012 and 2011, respectively.
(c)   Includes settlements, repurchased loans and claims under which indemnification payments are made.

49

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

*Private Mortgage Insurance*

Mortgage insurance is required for certain consumer mortgage loans sold to the GSEs and certain securitization trusts and may have been in place for consumer mortgage loans sold to whole-loan investors. Mortgage insurance is typically required for first-lien consumer mortgage loans having a loan-to-value ratio at origination of greater than 80 percent. Mortgage insurers are, in certain circumstances, permitted to rescind existing mortgage insurance that covers consumer loans if they demonstrate certain loan underwriting requirements have not been met. Upon receipt of a rescission notice, we assess the notice and if appropriate, we refute the notice, or if the notice cannot be refuted, we attempt to remedy the defect. In the event the mortgage insurance cannot be reinstated, we may be obligated to repurchase the loan or provide an indemnification payment in the event of a loss, subject to contractual limitations. While we make every effort to reinstate the mortgage insurance, we have had limited success and as a result, most of these requests result in rescission of the mortgage insurance. At March 31, 2012, we have approximately $173.4 million in original unpaid principal balance of outstanding mortgage insurance rescission notices where we have not received a repurchase demand. However, this unpaid principal amount is not representative of expected future losses.

## Legal Proceedings

We are subject to potential liability under various governmental proceedings, claims, and legal actions that are pending or otherwise asserted against us. We are named as defendants in a number of legal actions, and we are occasionally involved in governmental proceedings arising in connection with our respective businesses. Some of the pending actions purport to be class actions, and certain legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. We establish reserves for legal claims when payments associated with the claims become probable and the payments can be reasonably estimated. Given the inherent difficulty of predicting the outcome of litigation and regulatory matters, it is generally very difficult to predict what the eventual outcome will be, and when the matter will be resolved. The actual costs of resolving legal claims may be higher or lower than any amounts reserved for the claims. We recorded a liability for probable legal claims of $99.6 million and $94.5 million at March 31, 2012 and December 31, 2011, respectively.

*FGIC Litigation*

On November 29, 2011, FGIC filed three complaints against ResCap in New York County Supreme Court. In two of these cases, both entitled Financial Guaranty Insurance Company v. RFC et al., FGIC alleges that defendants breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured MBS offerings. FGIC further alleges that the defendants breached their contractual obligations to permit access to loan files and certain books and records.

In the third case, entitled Financial Guaranty Insurance Company v. GMAC Mortgage LLC, et al., FGIC makes similar contract allegations against GMAC Mortgage and ResCap, as well as a claim against GMAC Mortgage for fraudulent inducement. In addition, FGIC alleges aiding and abetting fraudulent inducement against Ally Bank, which originated a large portion of the loans in the disputed pool, and breach of the custodial agreement for failing to notify FGIC of the claimed breaches of representations and warranties. In each of these cases, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages.

On December 15, 2011, FGIC filed a fourth complaint in New York County Supreme Court related to insurance policies issued in connection with a RFC-sponsored transaction. This complaint, entitled Financial Guaranty Insurance Company v. Ally Financial, Inc., et al., names RFC and ResCap, and seeks various forms of declaratory and monetary relief. The complaint alleges that the defendants are alter egos of one another, fraudulently induced FGIC's agreement to provide insurance by misrepresenting the nature of RFC's business practices and the credit quality and characteristics of the underlying loans, and have now materially breached their agreement with FGIC by refusing its requests for information and documents.

On December 27, 2011, FGIC filed three additional complaints in New York County Supreme Court against ResCap and RFC. These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations. In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same.

Since January 1, 2012, FGIC has filed five new complaints in federal court naming some combination of Ally Inc., ResCap, Ally Bank, RFC, and GMAC Mortgage. The five complaints were filed on January 31, 2012, March 5, 2012, March 6, 2012, March 12, 2012 and March 13, 2012, respectively. These complaints seek relief nearly identical to that of FGIC's previously filed cases and contain substantially similar allegations. In particular, FGIC alleges that the defendants, acting as alter egos of each other, fraudulently induced FGIC to enter into seven separate insurance and indemnity agreements and breached their contractual obligations under same. In addition, FGIC amended its first-filed complaint to name Ally Inc. as a defendant.

All of the FGIC cases are now venued in the U.S. District Court for the Southern District of New York, and the defendants have asked the Court for leave to file motions to dismiss each such case.

50

RC40022340

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

*Mitchell Litigation*

In this statewide class action, plaintiffs alleged that Mortgage Capital Resources, Inc. (MCR) violated the Missouri Second Mortgage Loan Act by charging Missouri borrowers fees and interest not permitted by the Act. RFC and Homecomings, among others, were named as defendants in their role as assignees of certain of the MCR loans. Following a trial concluded in January 2008, the jury returned verdicts against all defendants, including an award against RFC and Homecomings for $4.0 million in compensatory damages (plus pre- and post-judgment interest and attorneys' fees) and against RFC for $92.0 million in punitive damages. In a November 2010 decision, the Missouri Court of Appeals affirmed the compensatory damages but ordered a new trial on punitive damages. Upon remand, we paid $12.8 million in compensatory damages (including interest and attorneys' fees). At the end of February 2012, RFC entered into an agreement in principle to settle all of plaintiffs' remaining claims, including plaintiffs' already-awarded attorneys' fees on appeal, for a total of $17.3 million. The agreement was preliminarily approved on April 16, 2012. The hearing on final approval is scheduled for May 18, 2012.

*Private-label Securitizations – Other Potential Repurchase Obligations*

When we sell mortgage loans through whole-loan sales or securitizations, we are required to make customary representations and warranties about the loans to the purchaser and/or securitization trust. These representations and warranties relate to, among other things, the ownership of the loan, the validity of the lien securing the loan, the loan's compliance with the criteria for inclusion in the transaction, including compliance with underwriting standards or loan criteria established by the buyer, ability to deliver required documentation, and compliance with applicable laws. Generally, the representations and warranties described above may be enforced at any time over the life of the loan. Breaches of these representations and warranties have resulted in a requirement that we repurchase mortgage loans. As the mortgage industry continues to experience higher repurchase requirements and additional investors begin to attempt to put back loans, a significant increase in activity beyond that experienced today could occur, resulting in additional future losses.

*Private-label Securities Litigation*

We and certain of our subsidiaries have been named as defendants in several cases relating to our various roles in MBS offerings. The plaintiffs generally allege that the defendants made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to the MBS offerings. The alleged misstatements and omissions typically concern underwriting standards for residential mortgage loans. Plaintiffs generally claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud. Plaintiffs seek monetary damages and rescission. Set forth below are descriptions of the most significant of these legal proceedings.

## Regulatory

Our origination, purchase, sale, securitization and servicing business activities expose us to risks of noncompliance with extensive federal, state, local and foreign laws, rules and regulations. Our business activities are also governed by, among other contracts, primary and master servicing agreements that contain covenants and restrictions regarding the performance of our servicing activities. Our failure to comply with these laws, rules, regulations and contracts can lead to, among other things, loss of licenses and approvals, an inability to sell or securitize loans, demands for indemnification or loan repurchases from purchasers of loans, demands for indemnification or other compensation from investors in our securitizations, fines, penalties, litigation, including class action lawsuits, and governmental investigations and enforcement actions, including, in the case of some violations of law, possible criminal liability.

GMAC Financiera, our wholly-owned subsidiary operating in Mexico, incurred losses during the year which reduced its capital stock and its shareholders equity by more than two-thirds. At March 31, 2012, the amount of the deficiency is $71.4 million. Until this deficiency is cured, GMAC Financiera falls within one of the causes for dissolution under Mexican law.

## Other Contingencies

We are subject to potential liability under various other exposures including tax, nonrecourse loans, self-insurance, and other miscellaneous contingencies. We establish reserves for these contingencies when the item becomes probable and the costs can be reasonably estimated. The actual costs of resolving these items may be substantially higher or lower than the amounts reserved for any one item. Based on information currently available, it is the opinion of management that the eventual outcome of these items will not have a material adverse effect on our consolidated financial condition, results of operations, or cash flows.

51

CONFIDENTIAL

RC40022341

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### 17. Related Party Transactions

### Balance Sheet

A summary of the balance sheet effect of our transactions with Ally Inc., Ally Bank, and other affiliates were as follows.

| ($ in thousands) | March 31, 2012 | December 31, 2011 |
|---|---|---|
| **Assets** | | |
| Mortgage loans held–for–sale — purchased from Ally Bank | $23,624 | $13,518 |
| Mortgage loans held-for-sale — contributions from Ally Inc. (carry value) (a) | 620,611 | 645,357 |
| Other Assets | | |
| Restricted cash deposits — Ally Bank | 81,879 | 112,458 |
| Derivative collateral placed with Ally IM | 1,079,022 | 1,008,262 |
| Fair value of derivative instruments | | |
| MSR swap — Ally Bank | 29,442 | 17,681 |
| Receivable (Payable), net — Ally Bank | 20,785 | (21,001) |
| Receivable from other affiliates | 2,125 | 2,046 |
| **Liabilities** | | |
| Borrowings — Ally Inc. Senior Secured Credit Facility (b) | $751,849 | $757,767 |
| Borrowings — Ally Inc. LOC (b) | 430,696 | 185,064 |
| Borrowings — BMMZ Repo (b) | 250,416 | 250,351 |
| Other Liabilities | | |
| Liability for loans sold with recourse — Ally Bank (c) | 5,976 | 6,773 |
| Fair value of derivative instruments | | |
| Forward flow agreement — Ally Bank | 27,105 | (16,423) |
| Ally IM (d) | 954,824 | 1,049,420 |
| Payable to Ally Inc. (e) | 4,194 | 31,019 |
| **Other activity** | | |
| Loans (UPB) sub-serviced — Ally Bank | $140,799,853 | $143,172,634 |
| Servicing escrow/deposits for off-balance sheet loans — Ally Bank | 2,273,975 | 2,003,745 |
| Home Equity Loans (UPB) subject to indemnifications — Ally Bank (c) | 56,571 | 58,512 |
| Income tax (receipt) payment — Ally Inc. (f) | (4,550) | 37,498 |

(a)   Amount represents the carrying value of the loans contributed from Ally Inc. in 2009.  The UPB of these loans is $1.5 billion and $1.6 billion at March 31, 2012 and December 31, 2011, respectively.
(b)   Includes principal balance of debt outstanding plus accrued interest.
(c)   Relates to an indemnification agreement with respect to a portfolio of second lien home equity loans with an original UPB of $166.0 million. This agreement expired in April 2012.
(d)   Includes the fair value of forwards, TBAs and swaptions executed in connection with hedging of our mortgage loans held–for–sale, retained interests and MSRs. Also includes the fair value of hedges related to our foreign currency exposure.  See Note 14 — Derivative Instruments and Hedging Activities for additional information.
(e)   Includes costs for personnel, information technology, communications, corporate marketing, procurement and services related to facilities incurred by Ally Inc. and allocated to us.
(f)   See Note 12 - Income taxes for additional information.

CONFIDENTIAL

RC40022342

## Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

### Statement of Comprehensive Income

A summary of the income statement effect of our transactions with Ally Inc., Ally Bank and other affiliates were as follows.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| **Net financing revenue** | | |
| Interest income on cash deposits — Ally Bank | $221 | $290 |
| Interest expense — Ally Inc. Senior Secured Credit Facility | 5,746 | 6,234 |
| Interest expense — Ally Inc. LOC | 2,223 | 4,177 |
| Interest expense    BMMZ Repo | 3,169 | |
| Interest expense — Ally Bank | 385 | — |
| **Other revenue** | | |
| (Loss) gain on mortgage loans, net — derivative instruments with Ally IM | (58,889) | 56,980 |
| (Loss) gain on mortgage loans, net — Ally Bank | (87,339) | 134,468 |
| Gain on mortgage loans, net — Ally Securities, LLC (c) | — | 4,501 |
| Servicing fees — Ally Bank | 11,767 | 7,614 |
| Servicing assets valuation and hedge activities, net — derivative instruments with Ally IM | (32,246) | (174,499) |
| Servicing assets valuation and hedge activities, net — derivative instruments with Ally Bank | 96,424 | 216,048 |
| Loan brokerage fees    Ally Bank (a) | 23,343 | 9,496 |
| Provision expense — Ally Bank (b) | (8) | 860 |
| **Noninterest expense** | | |
| (Loss) on foreign currency — derivative instruments with Ally Inc. | (7,330) | (169) |
| Management fees — Ally Inc. | 29,558 | 16,915 |
| Custodial fees — Ally Bank | 1,985 | 1,846 |
| Allocated expenses — Ally Bank | 72 | 125 |
| **Other activity** | | |
| Loans purchased (UPB) under the MMLPSA — Ally Bank (d) | $10,137,301 | $14,640,058 |
| Loans sold (UPB) under the MMLPSA — Ally Bank | 43,052 | 7,543 |

(a)   Under the terms of a broker agreement with Ally Bank, we provide loan processing services to support Ally's loan origination and purchase activities as well as loan closing services.
(b)   Relates to provision expenses associated with the indemnification agreement with respect to a portfolio of second lien home equity loans. This agreement expired in April 2012.
(c)   Relates to mortgage and asset-backed securities brokered to Ally Securities, LLC for underwriting, distribution and capital markets liquidity services.
(d)   Includes repurchased loans of $0.6 million and $4.2 million as of March 31, 2012 and 2011, respectively.

### Statement of Changes in Equity

A summary of the changes to the statement of equity related to our transactions with Ally Inc., Ally Bank and other affiliates were as follows.

| Three months ended March 31, ($ in thousands) | 2012 | 2011 |
|---|---|---|
| **Equity** | | |
| Capital contributions — Ally Inc. (a) | $196,500 | $109,405 |

(a)   Represents capital contributions from Ally Inc. through the forgiveness of Ally Inc. LOC borrowings.

### Other Significant Affiliate Agreements

We are party to an ISDA 2002 Master Agreement with Ally IM, a subsidiary of Ally Inc., whereby we enter into foreign exchange and interest rate hedging transactions (the ISDA Agreement) and a Master Securities Forward Transaction Agreement (the Forward Agreement and with the ISDA Agreement, the Derivative Agreements) whereby we agree to sell certain mortgage-backed securities to Ally IM from time to time on a forward basis. We also entered into a Guarantee and Master Netting Agreement with Ally IM whereby the parties agreed to aggregate, net, and set off the Derivative Agreements and the Ally Inc. LOC. In connection with the Derivative Agreements, we cross-collateralize the respective obligations and have granted a security interest to Ally IM in any cash or other property posted, or required to be posted, as collateral by us. We expect to transact virtually all of our hedging transactions

53

RC40022343

## Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

with Ally IM in the future.

On December 5, 2011, we entered into an agreement with Ally Inc. and GMAC Mortgage Group (the Agreement), whereby we agreed to certain terms and conditions in respect of ongoing loan sales by Ally Bank to us under the terms of our Master Mortgage Loan Purchase and Sale Agreement (MMLPSA) with Ally Bank. In accordance with the Agreement, we have instructed the GSEs to deliver, free and clear of all liens and encumbrances, mortgage-backed securities received from the GSEs in connection with our loan sales to them (New MBS) directly upon issuance into an account of Ally IM for the benefit of Ally Bank and GMAC Mortgage Group. We have granted Ally Bank and GMAC Mortgage Group security interests in loans purchased from Ally Bank and all proceeds from the sale of the New MBS. All proceeds from the sale of the New MBS are paid without setoff, recoupment or other reduction by Ally IM directly to Ally Bank. Ally Bank remits to us proceeds, if any, in excess of the purchase price of loans sold to us under the MMLPSA, and we remit to Ally Bank the amount of any shortfall in such proceeds necessary to pay the purchase price of the loans. On April 25, 2012, we entered into a Pledge and Security Agreement among ResCap, GMAC Mortgage, Ally Inc., GMAC Mortgage Group, Ally Bank and Ally IM (the Pipeline Security Agreement) in connection with these conditions. See *Transactions with Ally Bank*, below, for additional information regarding the MMLPSA agreements.

### Transactions with Ally Bank

Under the terms of our Broker Agreement with Ally Bank, we act in a broker capacity and provide loan processing services to Ally Bank to support its origination and purchase of loans, as well as loan closing services. The Broker Agreement has no mandatory expiration date and can be terminated by either party with 30 days notice. Under the terms of the Broker Agreement, loans meeting the underwriting standards of Ally Bank are originated (funded) by Ally Bank, while loans not meeting those standards may be originated by us and sold directly into the secondary market. We also provide certain representations and warranties and indemnifications to Ally Bank with respect to brokered loans. The Broker Agreement was amended April 30, 2012 and is effective May 1, 2012.

Under the terms of the MMLPSA with Ally Bank, we purchase first- and second-lien mortgage loans held-for-sale from Ally Bank. We sell and deliver such mortgage loans into the secondary market primarily through Fannie Mae and Freddie Mac securitizations and Ginnie Mae insured securitizations. The MMLPSA has no mandatory expiration date and can be terminated on 30 days notice by Ally Bank or immediately if agreed by both parties. Under the MMLPSA, we purchase loans from Ally Bank and recognize gains or losses on the sale of mortgage loans as they are sold by us into the secondary market. Loans purchased by us pursuant to the MMLPSA include mortgage loans originated by third parties and purchased by Ally Bank (correspondent lending), loans originated directly by Ally Bank; and mortgage loans originated by us and sold to Ally Bank pursuant to a loan sale agreement (the Client Agreement). Effective May 1, 2012, the MMLPSA and Client Agreement were amended and restated. Under the terms of the New MMLPSA, effective May 2012, we have an obligation to purchase all FHA and VA Ginnie Mae insurable loans originated or purchased by Ally Bank. We will no longer purchase Fannie Mae and Freddie Mac eligible loans that Ally Bank originates or purchases. Loans purchased under the New MMLPSA are on a nonrecourse, service released basis. To the extent any loan purchased by us under the new MMLPSA is determined to be ineligible or uninsurable for purposes of Ginnie Mae certification, Ally Bank will cure the defect, if curable, or repurchase the loan at the current unpaid principal balance plus accrued interest.

We were counterparty to a forward flow agreement for mortgage loans held-for-sale and interest rate lock commitments held by Ally Bank that ultimately were sold to us under the MMLPSA. The forward flow agreement transferred the exposure to changes in fair value of Ally Bank's mortgage loans held-for-sale and interest rate lock commitments to us. We hedged our exposure to the forward flow agreement consistent with the hedging of our own mortgage loans held-for-sale and interest rate lock commitments. The forward flow agreement was terminated effective April 30, 2012.

We were counterparty to a MSR Total Return Swap (the MSR Swap) which transferred the total economic return of MSRs owned by Ally Bank to us in exchange for a variable payment based upon a fixed spread to LIBOR. The fixed spread to LIBOR is periodically evaluated against available market data. We hedged our exposure to the MSR Swap consistent with the hedging of our own MSRs. The MSR Swap was terminated effective April 30, 2012.

We were party to an ISDA 2002 Master Agreement with Ally Bank governing the forward flow agreement and MSR Swap. We also entered into an Agreement to Set Off Obligations (the Netting Agreement) which provided Ally Bank the right, but not the obligation, to set off any obligation that we had to Ally Bank against any obligation of Ally Bank to us. The ISDA 2002 Master Agreement and the Netting Agreement were terminated effective April 30, 2012.

Under the GSE servicer guides, the seller and servicer of mortgage loans equally share in customary representation and warranty obligations. We assume all of the representation and warranty obligations for loans we purchased from Ally Bank under the MMLPSA that we subsequently sell through an Agency securitization or otherwise sell into the secondary market. To the extent these loans were originated by third parties and purchased by Ally Bank and subsequently sold to us under the MMLPSA we pursue recovery of losses from the third parties under breach of customary representation and warranties. Pursuant to the Client Agreement, we also

54

# Notes to Condensed Consolidated Financial Statements
Residential Capital, LLC

provide certain representations and warranties and indemnifications to Ally Bank with respect to those loan transactions. For loans that are not eligible to be sold to the GSEs that reach certain delinquency thresholds or which are otherwise in breach of sale representations and warranties contained in the Client Agreement, we repurchase loans from Ally Bank at their carrying cost.

GMAC Mortgage is designated as subservicer for loans held by Ally Bank and loans sold to us under the MMLPSA where Ally Bank retained the servicing rights (Servicing Agreement). Under the Servicing Agreement, GMAC Mortgage performs all customary mortgage loan servicing activities, including but not limited to, collection of borrower remittances, loss mitigation and foreclosure processing activities. The term of the Servicing Agreement automatically renews for a one year term on an annual basis, unless notice of termination is provided by either party with 120 days prior notice. We receive subservice fees which are generally based on the average daily balance of subserviced loans which differ by loan type and delinquency status.

In the first quarter of 2008, Ally Bank purchased a portfolio of second-lien home equity loans from us. We provided an indemnification to Ally Bank whereby we reimburse Ally Bank at such time as any of the loans covered by this agreement are charged off, typically when the loan becomes 180 days delinquent. The indemnification expired in April 2012.

In connection with our Settlement obligations Ally Bank has agreed to participate in borrower relief programs and activities with respect to their loan portfolios. We have recorded a liability of $83.5 million at March 31, 2012, in connection with losses Ally Bank is expected to incur in connection with the programs. To the extent activities under the borrower relief programs are consistent with activities currently permitted under our sub-servicing agreement, Ally Bank will not seek to be reimbursed or indemnified for any losses it incurs in connection with these borrower relief activities. See Note 16 – Contingencies and Other Risks for additional information related to the Settlement.

## 18. Regulatory Matters

Certain subsidiaries associated with our mortgage and real estate operations are required to maintain regulatory net worth requirements. See Note 8 — Borrowings for additional information. Failure to meet minimum capital requirements can initiate certain mandatory actions by federal, state, and foreign agencies that could have a material effect on our results of operations and financial condition. These entities were in compliance with these requirements as of March 31, 2012.

Certain of our foreign subsidiaries operate in local markets as either banks or regulated finance companies and are subject to regulatory restrictions. These regulatory restrictions, among other things, require that our subsidiaries meet certain minimum capital requirements and may restrict dividend distributions and ownership of certain assets. As of March 31, 2012, compliance with these various regulations has not had a material adverse effect on our financial condition, results of operations or cash flows.

## 19. Subsequent Events

Events subsequent to March 31, 2012, were evaluated through May 1, 2012, the date on which these Condensed Consolidated Financial Statements were issued.

55

CONFIDENTIAL

RC40022345

CONFIDENTIAL

# Deloitte

RESCAP

## Residential Capital, LLC
## Report on First Quarter Review

**Audit Committee Meeting**

**May 1, 2012**

This document is intended solely for the information and internal use of Residential Capital,
LLC and is not intended to be and should not be distributed to any other parties.



RC40022346

CONFIDENTIAL

# Table of Contents

RESCAP

Deloitte.

| | |
|---|---|
| Status of First Quarter 2012 Interim Review | 2 |
| Interim Review Results | 3 |
| Appendix A – Draft of Interim Review Report | 10 |
| Appendix B – Overview Interim Review Procedures | 11 |
| Appendix C – Summary of Audit Committee Communications | 12 |

Attachment I – Draft of Management Representation Letter for Q1, dated May 1, 2012

As used in this document, "Deloitte" means Deloitte LLP and its subsidiaries. Please see www.deloitte.com/us/about for a detailed description of the legal structure of Deloitte LLP and its subsidiaries.

1    Residential Capital, LLC

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022347

CONFIDENTIAL

RC40022348

## Status of First Quarter Review



As of April 30 (the mailing date of this report), our review of Residential Capital, LLC's ("ResCap" or the Company") condensed consolidated interim financial statements for the period ended March 31, 2012 is substantially complete.

The most significant items that remain open as of April 30 are:

- Final review of the interim financial statements
- Inquiries of Management regarding subsequent events and strategic alternatives
- Receipt of Management's signed representation letter
- Receipt of our signed engagement letter

This document provides a summary of our status as of April 30.  Matters discussed may change due to further analysis by Deloitte and Management, or additional matters may arise during the completion of our review procedures and through the date on which the financial statements are made available to the Company's bondholders.  We will inform the Audit Committee of any significant matters that arise prior to the delivery of our review report.

Copyright © 2012 Deloitte Development LLC. All rights reserved.

CONFIDENTIAL

# Review Results



In accordance with standards established by the American Institute of Certified Public Accountants (AICPA), we have prepared the following comments to assist you in fulfilling your obligation to oversee the financial reporting and disclosure process for which Management of ResCap is responsible.

| Matters to be Communicated | Results |
|---|---|
| **Our responsibility under the standards of the AICPA** | Our responsibility under the standards of the AICPA with respect to a review of interim financial information has been described to you in our engagement letter dated April 20, 2012. As described in that letter, the objective of a review of interim financial information performed in accordance with interim review standards is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").<br><br>Based on the results of our review procedures to date, we are not aware of any material modifications that should be made to the Company's interim financial statements or disclosures for them to be in conformity with generally accepted accounting standards.<br><br>Appendix A contains a draft of the interim review report we expect to issue. |

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022349

CONFIDENTIAL

## Review Results (cont.)



| Matters to be Communicated | Results |
|---|---|
| Selected critical accounting estimates and other matters | We have comments on the following areas that Management has identified as critical accounting estimates, as well as other matters:<br><br>**Mortgage Servicing Rights (MSRs)**<br>The MSR asset value increased from $1.23 billion at December 31, 2011 to $1.25 billion at March 31, 2012. New production during the period resulted in a corresponding increase in the value of the asset. Changes in assumptions and other changes in fair value during the period did not have a material impact on the value of the MSR asset.<br><br>Based on inquiries of Management and review of documentation, including MSR roll-forward schedules and Management's quarterly benchmarking presentation, we noted no significant changes to the methodology or process for developing assumptions used to estimate the MSR value.<br><br>In addition, we have made inquiries of internal mortgage valuation specialists regarding their observations of market activity. |

RC40022350

4    Residential Capital, LLC

Copyright © 2012 Deloitte Development LLC. All rights reserved.

CONFIDENTIAL

# Review Results (cont.)



| Matters to be Communicated | Results |
|---|---|
| Selected critical accounting estimates and other matters | **Representation and Warranty Reserves**<br><br>The balance of the representation and warranty reserve decreased from $825 million at December 31, 2011 to $811 million at March 31, 2012. Representation and warranty expense was $19 million for the three-months ended March 31, 2012, compared to $26 million for the three-months ended March 31, 2011.<br><br>Management's process for determining the reserve takes into account historic and recent demand trends, interactions with the monolines, private-label investors, and other parties, and various other assumptions. During the quarter, the Company received a demand request from a private-label trustee/investor, which was considered by Management in the determination of the reserve. Actual losses may differ significantly from the amounts recorded, based on the behavior of the counterparties in the future, including potential settlements, and industry, legal, and other developments.<br><br>Based on our inquiries of management and review of documentation, no significant changes to the methodology for determining the reserve were made during the quarter.<br><br>Management has determined that reasonably possible losses over time related to litigation matters and potential repurchase obligations and related claims could be between zero and $4 billion over existing accruals. |

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022351

CONFIDENTIAL

## Review Results (cont.)



| Matters to be Communicated | Results |
|---|---|
| Selected critical accounting estimates and other matters | **Litigation**<br>As disclosed in Note 16 to the financial statements, the Company is subject to potential liability under various governmental proceedings, claims and legal actions that are pending or otherwise asserted. Management establishes reserves for such claims as they become probable and are reasonably estimable.<br><br>During Q1 2012, the Company updated its estimate of probable loss associated with settlements reached with the federal government and various state attorneys generals which resulted in no significant change to management's estimate of loss.<br><br>Management has determined that reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims could be between zero and $4 billion over existing accruals. |
| Transactions with affiliates | **Parent Company Debt Forgiveness and Amendments to Affiliate Agreements**<br>During the quarter, Ally Financial Inc. contributed $196.5 million to ResCap through forgiveness of indebtedness.<br><br>As disclosed in the Notes to the financial statements, the Company has or is in the process of amending/terminating certain affiliate agreements. |

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022352

CONFIDENTIAL

# Review Results (cont.)



| Matters to be Communicated | Results |
|---|---|
| Selected critical accounting estimates and other matters | **Accounting for Income Taxes**<br>At March 31, 2012, the Company's deferred tax asset was largely offset by a valuation allowance. Management has determined that the valuation allowance remains necessary, as the Company has not yet demonstrated the ability to generate taxable ordinary income or capital gains for a sustained period.<br><br>There were no existing valuation allowances reversed or new valuation allowances recorded this quarter.<br><br>We performed analytical review procedures on income tax related accounts and also reviewed the Company's schedules supporting the tax provision and related disclosures. Based on our inquiries of Management and review of documentation, no significant changes to the methodology for accounting for income taxes were made during the quarter. |

7    Residential Capital, LLC

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022853

CONFIDENTIAL

# Review Results (cont.)



RESCAP

Deloitte.

| Matters to be Communicated | Results |
|---|---|
| Significant accounting policies | No accounting policies with a material impact were adopted in the quarter ended March 31, 2012, other than those matters disclosed in the notes to the condensed consolidated interim financial statements. |
| Going Concern | Having taken ResCap's financial condition and other factors into consideration, Management has concluded and disclosed in the interim financial statements, that there remains substantial doubt about the Company's ability to continue as a going concern. Management has enhanced its disclosure regarding the Company's ability to continue as a going concern and has disclosed that is determining whether it would be in the best interests of its creditors and other stakeholders to file for protection under the federal bankruptcy laws. |
| Control Related Matters - Significant deficiencies or material weaknesses relating to internal control | Management has separately reported the status of significant deficiencies to you. |
| Communication of the auditors' internal quality control procedures | We reported such information to you at your meetings on April 3 and April 24, 2012. |

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022354

CONFIDENTIAL

# Review Results (cont.)



| Matters to be Communicated | Results |
|---|---|
| Audit adjustments, either individually or in the aggregate, that we believe could have a significant effect on the Company's financial reporting and disclosure process | Our review was performed to provide limited assurance on the interim financial statements and not to form an opinion about whether the financial statements are free of material misstatement, whether caused by error or fraud.<br><br>We have been provided with the Company's Preliminary Materiality Analysis as of, and for the period ended, March 31, 2012, which includes matters identified during our review. We have compared Management's analysis to our own and agree with their conclusions. |
| Disagreements with Management about matters that could be significant to the entity's financial statements or our audit reports | Nothing to report. |
| Alternative treatments in U.S. GAAP for accounting policies and practices related to material items that have been discussed with Management | We had no discussions with Management regarding alternative accounting treatments within U.S. GAAP for policies and practices related to material items, including recognition, measurement, and disclosure considerations related to the accounting for specific transactions as well as general accounting policies, related to the quarter ended March 31, 2012. |

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022355

CONFIDENTIAL

# Appendix A
# Draft of Interim Review Report

RESCAP

Deloitte.

To the Board of Directors of Residential Capital, LLC:

We have reviewed the condensed consolidated balance sheet of Residential Capital, LLC (the "Company") (a wholly-owned subsidiary of Ally Financial Inc.) as of March 31, 2012, and the related condensed consolidated statements of comprehensive income, changes in equity, and of cash flows for the three-month periods ended March 31, 2012 and March 31, 2011. This condensed financial information is the responsibility of the Company's management.

We conducted our reviews in accordance with standards established by the American Institute of Certified Public Accountants for reviews of interim financial information. A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial information taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial information for it to be in conformity with accounting principles generally accepted in the United States of America.

The accompanying condensed consolidated interim financial information has been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the condensed consolidated interim financial information, there remains substantial doubt about the Company's ability to continue as a going concern. Management's plans concerning this matter are also discussed in Note 1 to the condensed consolidated interim financial information.

We have previously audited, in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States), and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of the Company as of December 31, 2011, and the related consolidated statements of income, comprehensive income, changes in equity, and cash flows for the year then ended (not presented herein); and in our report dated March 28, 2012, we expressed an unqualified opinion on those consolidated financial statements and included explanatory paragraphs that stated (1) that the Company has entered into a number of significant agreements and transactions with its affiliates and (2) that the Company's liquidity and capital needs, combined with conditions in the marketplace, raise substantial doubt about its ability to continue as a going concern. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2011 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

This report is intended solely for the information and use of management and the board of directors of the Company and is not intended to be and should not be used by anyone other than these specified parties.

May 1, 2012

10    Residential Capital, LLC

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022356

CONFIDENTIAL

# Appendix B
# Overview of Interim Review Procedures



A review of interim financial information is substantially less in scope than an audit conducted in accordance with auditing standards generally accepted in the United States of America, the objective of which is the expression of an opinion regarding the financial information taken as a whole. Accordingly, we will not express an opinion on the interim financial information.

The objective of a review of interim financial information performed in accordance with standards established by the AICPA is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").

A review consists principally of performing analytical procedures and making inquiries of persons responsible for financial and accounting matters, and does not contemplate (a) tests of accounting records through inspection, observation, or confirmation; (b) tests of controls to evaluate their effectiveness; (c) the obtainment of corroborating evidence in response to inquiries; or (d) the performance of certain other procedures ordinarily performed in an audit. A review may bring to our attention significant matters affecting the interim financial information, but it does not provide assurance that we will become aware of all significant matters that would be identified in an audit.

A review also includes obtaining sufficient knowledge of the Company's business and its internal control as it relates to the preparation of both annual and interim financial information to:

- Identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence.

- Select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles.

A review is not designed to provide assurance on internal control or to identify significant deficiencies and material weaknesses in internal control.

    Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022357

CONFIDENTIAL

# Appendix C
# Summary of Audit Committee Communications



ResCAP

Deloitte.

Our formal communications will occur via periodic meetings with the Audit Committee at various stages during the year. In addition to our scheduled meetings, we are also available, at any time, to respond to Audit Committee members' questions. We anticipate the following topics will be discussed during the year:

| Description of communications | 2012 | | | | | | | | | | 2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | M | A | M | J | J | A | S | O | N | D | J | F | M |
| Qualifications to serve ResCap | | ✓ | | | | | | | | | | | |
| Status of interim review procedures | | | ✓ | | | | □ | | | | | | |
| | | | | □ | | | | | | | | | |
| Results of interim review procedures | | | ✓ | | | □ | | | □ | | | | |
| Required quarterly Audit Committee communications | | | ✓ | | | □ | | | □ | | | | |
| Delivery of the audit service plan | | | | | □ | | | | | | | | |
| Review estimated audit and audit related fees | | ✓ | | | | | | | | | | | |
| Review progress of financial statement audit | | | | | | | □ | | □ | | | | |
| Required fraud inquiries | | | | | | | □ | | | | | | |
| Review results of financial statement audit | | | | | | | | | | | | □ | |
| Review independence of audit firm | | | | | | | | | | | | □ | |
| Required annual Audit Committee communications | | | | | | | | | | | | □ | |

✓ Communication completed          □ Scheduled communication

Copyright © 2012 Deloitte Development LLC. All rights reserved.

RC40022358

CONFIDENTIAL

# Deloitte

**About Deloitte**

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see www.deloitte.com/about for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms. Please see www.deloitte.com/us/about for a detailed description of the legal structure of Deloitte LLP and its subsidiaries.

Copyright © 2012 Deloitte Development LLC. All rights reserved.
Member of Deloitte Touche Tohmatsu Limited

RC40022359

May 1, 2012

Deloitte & Touche LLP
200 Renaissance Center, Suite 3900
Detroit, Michigan 48243

We are providing this letter in connection with your review of the condensed consolidated balance sheet of Residential Capital, LLC (the "Company" or "ResCap") as of March 31, 2012, and the related condensed consolidated statements of comprehensive income, changes in equity, and of cash flows for the three-month periods ended March 31, 2012 and March 31, 2011, for the purpose of determining whether any material modifications should be made to the condensed consolidated interim financial statements for them to conform with accounting principles generally accepted in the United States of America ("generally accepted accounting principles" or "GAAP").

We confirm that we are responsible for the following:

a.  The fair presentation in the condensed consolidated interim financial statements in conformity with GAAP

b.  The design, implementation and maintenance of programs and controls to prevent and detect fraud

c.  Establishing and maintaining effective internal control over financial reporting.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief, as of May 1, 2012, the following representations made to you during your review.

1.  The interim financial statements referred to above have been prepared and presented in conformity with GAAP applicable to condensed consolidated interim financial information for a non-SEC (private) reporting entity.

2.  Note 1 to the condensed consolidated financial statements discloses all pertinent facts related to the Company's ability to continue as a going concern.

3.  Although management has determined that there is substantial doubt about the Company's ability to continue as a going concern, we have determined that the condensed consolidated financial statements should be prepared on a going concern basis. Management's plans for continuing as a going concern are disclosed in Note 1 to the condensed consolidated financial statements. Management and the Board have not approved a plan of liquidation and nor is liquidation of the Company anticipated. Additionally, Management has not filed for bankruptcy.

4.  The Company has made available to you all relevant information and access granted in the

CONFIDENTIAL

RC40022360

      terms of the audit engagement letter including:

    a.   Financial records and related data

    b.   Minutes of the meetings of the Board of Directors and Audit Committee; or drafts of minutes in cases where final minutes have not been approved; or agendas and meeting materials of meetings in cases where draft minutes have not yet been prepared

    c.   Regulatory examination reports, supervisory correspondence or agreements, enforcement actions, and similar materials from applicable regulatory agencies (particularly, communications concerning supervisory actions or noncompliance with, or deficiencies in, rules and regulations). Further, we have advised you of any regulatory examination in progress or completed for which reports have not yet been issued.

5.   There have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices. Further, we have advised you of any regulatory examination in progress or completed for which reports have not yet been issued.

6.   We have completed our procedures to evaluate the accuracy and completeness of the disclosures in our interim financial statements. There are no disclosures that while required by GAAP have been omitted from our condensed consolidated interim financial statements.

7.   We have disclosed to you any significant change in the results, design, or operation of internal control over financial reporting as it relates to the preparation of the condensed consolidated interim financial information that has occurred during the most-recent fiscal quarter.

8.   We have no knowledge of any fraud or suspected fraud affecting the Company involving

    a.   Management

    b.   Employees who have significant roles in the Company's internal control over financial reporting.

    c.   Others where the fraud could have a material effect on the condensed consolidated interim financial statements which has not been previously disclosed.

9.   We have disclosed to you our knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, former employees, analysts, regulators, or others.

10.  There are no unasserted claims or assessments that legal counsel has advised us are probable of assertion and must be disclosed in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 450, *Contingencies*.

11.  Significant assumptions used by us with respect to our critical accounting estimates are reasonable.

Except where otherwise stated below, immaterial matters less than $2,500,000 collectively are not considered to be exceptions that require disclosure for the purpose of the following

2

CONFIDENTIAL

representations. This amount is not necessarily indicative of amounts that would require adjustment to or disclosure in the financial statements.

12. There are no transactions that have not been properly recorded in the accounting records underlying the condensed consolidated interim financial information.

13. The Company has no plans or intentions that may affect the carrying value or classification of assets and liabilities.

14. The following, to the extent applicable, have been appropriately identified, properly recorded, and disclosed in the condensed consolidated interim financial statements:

   a.  Related-party transactions and associated amounts receivable or payable, including sales, purchases, loans, transfers, leasing arrangements, and guarantees or other commitments (written or oral)

   b.  Guarantees, whether written or oral, under which the Company is contingently liable.

15. In preparing the condensed consolidated interim financial statements in conformity with GAAP, management uses estimates. All estimates have been disclosed in the condensed consolidated interim financial statements for which known information available prior to the issuance of the condensed consolidated interim financial statements indicates that both of the following criteria are met:

   a.  It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events

   b.  The effect of the change would be material to the financial statements.

16. There are no:

   a.  Violations or possible violations of laws or regulations whose effects should be considered for disclosure in the condensed consolidated interim financial statements or as a basis for recording a loss contingency, except as disclosed in Note 16 to the condensed consolidated interim financial statements.

   b.  Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by FASB ASC 450, *Contingencies*.

17. The Company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, other than as disclosed in the condensed consolidated interim financial statements.

18. Except for the deferral of certain semi-annual interest payments as disclosed in Notes 1 and 8 to the condensed consolidated financial statements, the Company has complied with all aspects of contractual agreements that may have an effect on the condensed consolidated interim financial statements in the event of noncompliance.

**Loans and Receivables**

3

CONFIDENTIAL

RC40022362

19. The Company has properly classified loans on the condensed consolidated interim balance sheets as held-for-sale or held-for-investment, based on the Company's intent with respect to those loans. Specifically, the Company classifies those loans that management has the intent to sell as held-for-sale. Loans for which the Company has the intent and ability to hold for the foreseeable future or until maturity are classified as held-for-investment.

20. All impaired loans receivables have been properly recorded and disclosed in the condensed consolidated interim financial statements.

21. Risks associated with concentrations (including but not limited to those related to high risk mortgage loans), based on information known to management, that meet all of the following criteria have been disclosed in the condensed consolidated interim financial statements:

    a.  The concentration exists at the date of the condensed consolidated interim financial statements

    b.  The concentration makes the Company vulnerable to the risk of a near-term severe impact

        It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

**Capitalized Servicing Rights**

22. For transfers of financial assets where the right to service the transferred assets was retained, we have performed the servicing of these assets in accordance with the terms and provisions of the applicable agreement that governs the servicing of these assets.

**Transfers and Servicing of Financial Assets and Extinguishment of Liabilities**

23. The Company has accounted for all transfers of financial assets in accordance with FASB ASC 860, *Transfers and Servicing*, or previously applicable guidance as appropriate. The Company has taken no actions and no events have occurred that would necessitate a change in the accounting for the transfers of financial assets.

24. Provision has been made for any loss that is probable from representation and warranty obligations associated with the sale of mortgage loans. We believe that such estimate is reasonable based on available information.

**Derivative Instruments**

25. The Company has properly identified all derivative instruments and any financial instruments that contain embedded derivatives. The Company's hedging activities, if any, are in accordance with its documented and approved hedging and risk management policies, and all appropriate hedge documentation was in place at the inception of the hedge in accordance with FASB ASC 815, *Derivatives and Hedging*.

26. Financial instruments with significant individual or group concentration of credit risk have been properly identified, properly recorded and disclosed in the condensed consolidated interim financial statements.

**Taxes**

4

CONFIDENTIAL

RC40022363

27. The valuation allowance has been determined pursuant to the provisions of FASB ASC 740, *Income Taxes*, including the Company's estimation of future taxable income, and is adequate to reduce the total deferred tax asset to an amount that will more likely than not be realized.

**Other Liabilities**

28. We are subject to potential liability under laws and government regulations, various claims, and legal actions that are pending or may be asserted against us. We are named as defendants in a number of legal actions and are, from time to time, involved in regulatory proceedings arising in connection with our various businesses. Some of the pending actions purport to be class actions. We establish reserves for litigation and regulatory matters when payments associated with the claims become probable and the costs can be reasonably estimated. The actual costs of resolving these claims may be substantially higher or lower than the amounts reserved for these claims. Provision has been made for all losses that are probable and estimable.

We have appropriately disclosed all such matters, where the possibility of loss is more than remote, in Note 16 to the condensed consolidated interim financial statements and have accrued our best estimate of the losses to be incurred as a result of these matters as of March 31, 2012 to the extent the loss is probable and estimable. Except as disclosed in Note 16, there are no unasserted claims or assessments that legal counsel has advised us are probable of assertion and must be disclosed in accordance with FASB ASC 450, *Contingencies*.

29. We believe it is reasonably possible that losses beyond amounts currently reserved for the litigation matters and potential repurchase obligations and related claims could occur, and such losses could have a material adverse impact on our results of operations, financial position, or cash flows. We currently estimate that the Company's reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims could be between $0 and $4 billion over existing accruals.

30. A provision has been made by the Company for any loss that is probable and estimable from foreclosure related matters or exposures in accordance with GAAP. We believe that such estimate is reasonable based on available information and that the liabilities, related loss contingencies, and expected outcome of uncertainties have been adequately described in the financial statements.

**Other**

31. Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, line of credit, or similar arrangements have been properly disclosed in the condensed consolidated interim financial statements.

32. Agreements (whether written, oral, or implied) to repurchase loans, real estate, or other assets previously sold have been properly disclosed in the condensed consolidated interim financial statements.

33. With regard to the fair value measurements and disclosures of certain assets, liabilities, and specific components of equity, we believe that:

5

CONFIDENTIAL

RC40022364

a.  The measurement methods, including the related assumptions, used in determining fair value, consistent with market participant assumptions where available without undue cost and effort, were appropriate and consistently applied in accordance with GAAP.

b.  The completeness and adequacy of the disclosures related to fair values are in conformity with GAAP. The Company has appropriately classified its assets and liabilities into the appropriate levels (Levels 1, 2 and 3) as described in the condensed consolidated interim financial statements, as prescribed by FASB ASC 820, *Fair Value Measurements and Disclosures*.

c.  No events have occurred after March 31, 2012 but before the date of this letter that require adjustment to the fair value measurements and disclosures included in the condensed consolidated interim financial statements.

We have identified the significant assumptions and factors influencing the measurement of fair value as described in the condensed consolidated interim financial statements. The significant assumptions used in measuring fair value, taken individually and as a whole, provide a reasonable basis for the fair value measurements and disclosures in the condensed consolidated financial statements. The assumptions are reflective of management's intent and ability to carry out specific courses of action and the significant assumptions used are consistent with the Company's plans.

The methods and significant assumptions used to determine fair values of financial instruments are disclosed in the condensed consolidated interim financial statements. The descriptions are accurate and complete and the methods and the assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes in accordance with GAAP.

34. We have disclosed to you all changes to affiliate agreements that may have a material impact on the Company.

35. To the best of our knowledge and belief, all events that have occurred subsequent to the balance-sheet date and through the date of this letter have been disclosed in the condensed consolidated interim financial statements.

6

CONFIDENTIAL

RC40022365

_____

Thomas F. Marano
Chairman and Chief Executive Officer
Residential Capital, LLC


_____

James M. Whitlinger
Chief Financial Officer
Residential Capital, LLC


_____

Catherine M. Dondzila
Controller and Chief Accounting Officer
Residential Capital, LLC


_____

David J. DeBrunner
Controller and Chief Accounting Officer
Ally Financial, Inc.

7

CONFIDENTIAL

RC40022366

# ResCap

## Executive Session:

i.   **Management**
ii.  **Deloitte**
iii. **Audit Director**

**ResCap Audit Committee Meeting**

May 1, 2012

ResCap Confidential

CONFIDENTIAL

RC40022367