# EXHIBIT X

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

            Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF JAMES WHITLINGER

New York, New York

November 15, 2012

9:39 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  27649

2

1

2

3

4                            November 15, 2012

5                            9:39 a.m.

6

7

8              Deposition of JAMES WHITLINGER,

9        held at the offices of Kramer, Levin,

10       Naftalis & Frankel, 1177 Avenue of the

11       Americas, New York, New York, pursuant

12       to Notice, before Erica L. Ruggieri,

13       Registered Professional Reporter and

14       Notary Public of the State of New

15       York.

16

17

18

19

20

21

22

23

24

25

24

1                    JAMES WHITLINGER

2              MR. SIEGEL:  Okay, sure.  The

3       Bates numbers for Exhibit 60 are RC

4       9019_00093180 through 93183.  And the

5       Bates numbers for Exhibit 61 are RC

6       9019_00054006 to 07.

7       A.    Okay.

8       Q.    Have you had a chance to review

9    the documents?

10      A.    Yes.

11      Q.    Please take a look at

12   Exhibit 119.  Do you recognize that as an

13   e-mail that you and the other members of

14   the ResCap board of directors received

15   from April Ellenburg on May 9, 2012, at

16   2:08 p.m.?

17      A.    That's what it says.

18      Q.    And do you recall receiving this

19   e-mail?

20      A.    I recall being at the board

21   meeting.

22      Q.    You have no reason to doubt that

23   you received the e-mail?

24      A.    No.

25      Q.    Who is April Ellenburg?

25

```
 1                    JAMES WHITLINGER

 2         A.    I don't know.

 3         Q.    And this e-mail has two

 4    attachments, one of which is a notice of a

 5    telephonic meeting of the ResCap board to

 6    be held the same day at 3:00 p.m.?

 7         A.    Correct.

 8         Q.    And the second attachment is an

 9    agenda for that meeting?

10         A.    Yes.

11         Q.    And so this e-mail and the

12    notice was informing the board that in

13    less than an hour there would be a board

14    meeting, a telephonic board meeting,

15    correct?

16         A.    Yes.

17         Q.    And the meeting notice tells you

18    and the other board meeting -- board

19    members, that supporting materials will be

20    distributed just before the meeting?

21         A.    Yes.

22         Q.    And on -- the agenda lists two

23    items, the first of which is proposed

24    legal settlement; is that correct?

25         A.    That's correct.
```

26

1                  JAMES WHITLINGER

2        Q.    And you understand that proposed

3   legal settlement refers to a discussion of

4   the RMBS Trust Settlement Agreement?

5        A.    I do today.

6        Q.    Did you -- you understand that

7   today?

8        A.    Yeah.  It says proposed legal

9   settlement.  And after looking at the

10  materials, you know, and looking at what

11  was in the materials it was regarding the

12  RMBS Trust Settlement.

13       Q.    But at the time you received

14  this notice you hadn't received those two

15  other documents, Exhibit 60 and 61,

16  correct?

17       A.    Correct.

18       Q.    And so at the time you received

19  this e-mail with the attached agenda you

20  didn't know what the proposed legal

21  settlement referred to?

22       A.    Correct.  It could have been

23  multiple legal settlements.

24       Q.    And the time allotted for

25  discussion during the board meeting about

27

1                    JAMES WHITLINGER

2        that proposed legal settlement was

3        30 minutes, correct?

4             A.    Correct.

5             Q.    And you recall that the board

6        spent about 30 minutes discussing that

7        item on May 9th?

8             A.    I don't recall how much time we

9        spent on it.

10            Q.    Do you know who decided that the

11       board would hold a meeting at 3:00 on

12       Wednesday, May 9th?

13            A.    I don't know.

14            Q.    Generally did you know who was

15       responsible for deciding when and how

16       ResCap board meetings would be convened?

17            A.    Yeah.  I mean we had Tom Marano

18       or our lead counsel would, you know,

19       regularly schedule board meetings.

20            Q.    When you say your lead counsel,

21       to whom are you referring?

22            A.    For the case is Larren Nashelsky

23       at the time and Gary Lee as well.

24            Q.    And Mr. Nashelsky and Mr. Lee

25       are outside counsel for ResCap at Morrison

43

1              JAMES WHITLINGER

2         Go ahead.

3    A.    Can you re- -- rephrase the

4    question?  I'm sorry.

5    Q.    That's okay.  During the May 9th

6    board meeting did you know that before the

7    meeting Mr. Cancelliere told Mr. Lee that

8    he had challenged certain of Ms. Patrick's

9    assumptions about defect rates including

10   the validity of using a 36 percent defect

11   rate for Bank of America that's referenced

12   and included in -- in Exhibit 60?

13        MR. RAINS:  So object to the

14     question as vague and ambiguous and it

15     also misstates the evidence.

16   A.    Okay.  So -- so my answer to

17   that is I don't recall at May 9th if I

18   knew if Jeff had conversations as I sit

19   here today.  I know that there were

20   conversations with the parties on

21   assumptions that were made throughout the

22   process.

23   Q.    On May 9th as a board member of

24   deciding whether or not to approve ResCap

25   entering into this settlement agreement,

46

1                      JAMES WHITLINGER

2       defect rate or this BofA baseline defect

3       rate is the most important thing on this

4       page.  It's a data point.

5                You know, we have multiple legal

6       entities that our -- our deals were issued

7       off of.  These deals were issued in 2004

8       to 2007, some through GMAC Mortgage, some

9       through RFC.  I don't know how Lehman did

10      their deals.  I don't know how BofA did

11      their -- their deals, their shelves.

12      These are data points we don't know how to

13      process.  So these are data points.

14          Q.    If Mr. Cancelliere thought the

15      36 percent defect rate was wrong, you

16      would have wanted -- you would have wanted

17      him to tell you that before the board

18      meeting, right?

19                MR. RAINS:  Again it misstates

20          the evidence, assumes facts not in

21          evidence.  Calls for speculation.

22                Go ahead.

23                MR. SIEGEL:  It's a very simple

24          question.

25          A.    I don't know if we talked about

47

1                    JAMES WHITLINGER

2      that or we didn't talk about it is my

3      first point.  If he -- if he challenged

4      it, would I want to know that?  Yes.

5      That's fine.  I would want to know.

6           Q.    But you didn't know that on or

7      before the May 9th board meeting?

8           A.    I already answered that that I

9      don't know that we did or didn't.

10          Q.    But you have no recollection of

11     that?

12          A.    I have no recollection.

13          Q.    Was the first time that you

14     learned that the proposed settlement

15     amount was 8.7 billion the time when you

16     received this -- this board material from

17     Mr. Lee?

18          A.    Can you repeat the question?

19          Q.    Sure.  Did you first learn that

20     the proposed settlement amount that's in

21     the RMBS Trust Settlement Agreement was

22     $8.7 billion when you received Exhibit 60?

23          A.    Yes, that -- that -- that's my

24     recollection.

25          Q.    And it's your recollection that

119

1                    JAMES WHITLINGER

2         Q.    But you had no recollection of a

3    discussion about statute of limitations

4    during the May 9th meeting?

5         A.    I don't recall.

6         Q.    Is it your understanding that

7    just because there's a loss associated

8    with the mortgage that is considered a

9    defect but that doesn't necessarily mean

10   that ResCap or its affiliates are liable

11   for any or all of the loss?

12        A.    Since you used the word "liable"

13   I'm going to again defer to our -- our

14   counsel.  Lawyers determine liability.

15        Q.    So was it your understanding on

16   May 9th -- withdrawn.

17             Did anyone provide the board on

18   May 9th with an analysis of how much it

19   might cost to litigate the claims

20   Ms. Patrick was -- was asserting as

21   compared to settling the claims around May

22   of 2012?

23        A.    Can you repeat the first part of

24   the question?

25        Q.    Sure.  Did anyone advise or

120

```
 1                    JAMES WHITLINGER

 2      discuss with the board on May 9th or

 3      provide an analysis of how much it might

 4      cost to litigate the claims being asserted

 5      by Ms. Patrick rather than settling in

 6      May 2012?

 7          A.    I -- I don't -- the reason I

 8      ask, I don't recall if it was discussed

 9      but I know for sure I don't recollect

10      seeing a litigation presentation analysis

11      embedded in this -- this -- this list of

12      materials.

13          Q.    You agree it would have been

14      helpful for the board to know on May 9th

15      what counsel estimated or anticipated it

16      might cost to litigate the claims as

17      compared to settling them in the

18      settlement agreement?

19          A.    You know, again, that would be a

20      data point.  And I relied on our

21      professionals and our legal teams in

22      litigation in how those matters evolve.

23      So I think that's a data point, how much

24      would it cost, how many loan files if I

25      was going to review it.  Again, I -- I
```