# EXHIBIT Z

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No.

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

Debtors.

-----------------------------------x

DEPOSITION OF JEFFREY A. LIPPS

New York, New York

November 19, 2012

10:13 a.m.

Reported by:
JENNIFER OCAMPO-GUZMAN, CRR, CLR
JOB NO: 27971



2

1

2

3

4

5

6

7

8                           November 15, 2012

9                           10:13 a.m.

10

11            Deposition of JEFFREY A. LIPPS,

12       held at the offices of Kramer, Levin,

13       Naftalis & Frankel, 1177 Avenue of the

14       Americas, New York, New York, pursuant

15       to Notice, before Jennifer

16       Ocampo-Guzman, a Certified Real-Time

17       Shorthand Reporter and Notary Public of

18       the State of New York.

19

20

21

22

23

24

25

30

Lipps

1

2      how, well, I actually have described how I

3      went about assessing the reasonableness.  I

4      surveyed the issues and tried to determine

5      whether or not there were dispositive rulings

6      out there that would impact what your likely

7      exposure was, and then you evaluate what the

8      top line exposure is and a baseline exposure,

9      which could be, if you want to approach it

10     from a pure defense verdict standpoint, zero.

11          Q.   So in this methodology that you

12     typically apply in evaluating a settlement,

13     do you assign numbers to any issues?

14               MR. RAINS:  Objection, vague and

15          ambiguous.

16          A.   I'm not sure what you mean by

17     numbers, do I assign numbers.

18          Q.   Are you familiar with the term

19     "litigation risk analysis"?

20          A.   I don't know.  I may.  Just depends

21     on what you mean by that term.

22          Q.   Are you familiar with --

23               MR. BENTLEY:  Strike that.

24          Q.   In analyzing a settlement, one

25     thing you do, I think, is you try to

1                        Lipps

2       determine possible outcomes, right?

3            A.    That's a way that you do that.

4       That's certainly what I looked at here.

5            Q.    And you mentioned a broken leg

6       case.  Possible outcomes might have different

7       dollar figures associated with them, right?

8            A.    There could be different verdicts,

9       there could be different settlements,

10      correct.

11           Q.    Do you then sometimes assign

12      percentage likelihoods to different possible

13      outcomes?

14           A.    Do I sometimes do that?

15           Q.    Correct.

16           A.    I've done that before in

17      settlements.

18           Q.    Do you have a term that you use to

19      describe that kind of approach?

20           A.    No.

21           Q.    Would litigation risk analysis be,

22      if I used the term "litigation risk

23      analysis," would you recognize it to relate

24      to that kind of analysis?

25                MR. RAINS:  Objection, no

32

                           Lipps

1

2        foundation.

3        A.    No, I can't associate that word

4    with what you've described.

5            I mean I have been in situations

6    with judges, where they try and force you to

7    say you have a 90 percent chance, and you

8    could lose X percent or 10 percent chance, if

9    that's what you're talking about, there are

10   certainly various judges or mediators that

11   have approached it that way.

12       Q.    And do you sometimes find it's

13   useful to use that kind of approach?

14       A.    Depending on the case and the

15   certainty that you could have associated with

16   the numbers, numbers can be used.

17       Q.    And is that an approach that's

18   commonly used among litigators?

19       A.    I can't speak as to how other

20   litigators approach analyzing settlements.

21       Q.    Have clients sometimes asked you to

22   prepare that kind of an analysis of a

23   proposed, of a potential settlement?

24       A.    I'm not going to have perfect

25   memory of what clients ask me to do, but I

33

1                          Lipps

2      don't have a clear recollection of going

3      through that type of an analysis,

4      specifically, in a request from a client.

5           Q.   Have you ever done that kind of an

6      analysis in an RMBS-related matter?

7           A.   No.

8           Q.   And I take it you didn't do that

9      kind of an analysis, in connection with this

10     settlement?

11          MR. RAINS:   Objection, vague and

12          ambiguous.

13          A.   I don't know that I can say that.

14     I don't know that I can say that.

15          Q.   Did you assign any percentage

16     likelihoods to different, to any different

17     possible outcomes in this case?

18          A.   I don't think, as you can tell in

19     this report, I don't think -- let me take a

20     step back.

21               As you can tell in this report,

22     this area of the law is in, at best, its

23     formative stages.  It's -- it's still

24     evolving, it's still developing.  And there

25     is so much uncertainty on so many issues that

34

                          Lipps

1

2    I don't think it would be meaningful to sit

3    and try and assess a percentage attached to a

4    particular outcome.

5            I think you have to look at the

6    two points, which is, what's your maximum

7    exposure out there and then what is your

8    likely exposure, to try and evaluate a range

9    of reasonableness.

10       Q.   And --

11          MR. BENTLEY:  Strike that.

12       Q.   Do you claim to have any expertise

13   in quantitative matters?

14          MR. RAINS:  Objection, vague and

15       ambiguous.

16       A.   I don't know what it is.

17       Q.   Do you claim to have any expertise

18   in the field of statistics?

19       A.   I don't think I'm offering myself

20   as an expert statistician, if that's what

21   you're asking.

22       Q.   Do you have any education or

23   training in statistics?

24       A.   I certainly, I took statistics back

25   when I was in school, and I've also been

37

1                          Lipps

2          A.   Not beyond college.

3          Q.   Do you claim any expertise in

4     bankruptcy law or any aspect of the

5     bankruptcy process?

6          A.   I think the expertise I'm claiming

7     and identifying in this case is in the report

8     itself.  I don't know that I've opined on any

9     particular bankruptcy procedure or rule here

10    in this supplemental declaration.

11         Q.   Do you have any particular

12    expertise in bankruptcy law?

13         A.   Well, as I told you, I litigated

14    issues in the context of bankruptcies,

15    specifically in some of my younger years

16    where I looked more like my picture, for

17    Federated Department Stores.  And we have, my

18    firm has been approved for retention in this

19    bankruptcy, so we have some experience in

20    that context.

21         Q.   Are you offering yourself as an

22    expert in any matters of bankruptcy law or

23    practice?

24         A.   Actually, I'm offering myself as an

25    expert of what's in the supplemental

38

Lipps

1    declaration.  And, you know, it's in the

2    context of a settlement that will have an

3    impact on the estate and creditors, so to

4    that extent, yes, I am offering an opinion as

5    to whether or not this is a fair and

6    reasonable settlement, within an acceptable

7    range.

8         Q.   Are you familiar with the

9    bankruptcy court's powers under bankruptcy

10   code section 502(c)?

11        A.   What are you asking me, whether

12   I've heard of 502(c)?

13        Q.   Let's start with that.

14        A.   I may or may not have.

15        Q.   You can't tell me what it is?

16        A.   Off the top of my head, no.  I

17   would have to go look.

18        Q.   Are you familiar with the

19   bankruptcy court's estimation powers?

20        A.   I am aware of that procedure being

21   available, and in fact, I think it was

22   utilized in the Lehman bankruptcy, with

23   respect to RMBS clients.

24        Q.   You're not sitting here claiming

39

Lipps

1

2     any expertise, are you, in what the

3     bankruptcy court's -- sorry -- what

4     principles would govern an estimation

5     proceeding, are you?

6         A.   I don't believe I've offered any

7     opinions on that.

8         Q.   Do you have an understanding as to

9     what legal rules a bankruptcy court would

10    apply in estimating a claim against the

11    debtors?

12        A.   I don't believe I'm offering any

13    opinion on this.

14        Q.   Do you have any familiarity with

15    that?

16        A.   I have not been involved in

17    advising or analyzing the legal powers in the

18    estimation process in a bankruptcy.

19        Q.   And you don't know in any detail

20    what they are, do you?

21        A.   Not beyond what I've looked at in

22    connection with the Lehman estimation

23    process.

24        Q.   Do you have any knowledge of the

25    sorts of procedures bankruptcy courts have

40

1                            Lipps

2      applied to estimate mass tort claims?

3           A.   Now I'm getting into your

4      wheelhouse with asbestos.

5                No, I don't have any direct

6      involvement in that.

7           Q.   You wouldn't claim to have any

8      expertise in that area, correct?

9           A.   Not on the powers of the bankruptcy

10     court with respect to those.

11          Q.   Or how the process would likely

12     play out in bankruptcy, an estimation

13     process?

14          A.   I have not been directly involved

15     in it.

16          Q.   Do you have any understanding --

17               MR. BENTLEY:  Strike that.

18          Q.   In this case, is it your

19     understanding that if the settlement were to

20     be rejected and this matter were to be

21     litigated --

22               MR. BENTLEY:  Sorry.  Let me start

23          again.

24          Q.   Let me ask you to assume that the

25     bankruptcy court rejects this settlement and

41

1                         Lipps

2       the matter is then adjudicated in bankruptcy

3       court.

4                 In that scenario, do you have any

5       understanding of what process the bankruptcy

6       court might apply to adjudicate the claims?

7                 MR. RAINS:  Objection, incomplete

8           hypothetical.

9           A.   I haven't looked into those issues,

10      and I haven't been asked to opine or even

11      advise on it, so I can't answer your

12      question.

13          Q.   And you don't claim any particular

14      expertise in what principles a bankruptcy

15      court might apply or what processes it might

16      follow in that connection?

17          A.   If the settlement that I think is

18      fair and reasonable and within a range of

19      acceptability is rejected by the bankruptcy

20      court --

21          Q.   Correct.

22          A.   -- what the options are after that?

23          Q.   Correct.

24          A.   I'm not offering any opinion on

25      that.  I haven't even looked into that.

42

                              Lipps

1

2              Now, some of my expertise may

3    translate into such procedures, if somebody

4    were to present procedural options to me and

5    ask me to assess and evaluate what, for

6    example, what burdens and costs would be

7    associated with that, what risks would be

8    associated with it; but I'm not here offering

9    any opinion on what happens, if the

10   bankruptcy court were to reject the

11   settlement.

12        Q.   For example, do you have any

13   understanding whether the bankruptcy court

14   would itself rule on any of the disputed

15   substantive legal issues governing the RMBS

16   claims?

17        A.   Can you ask me that again?

18             MR. BENTLEY:  Can you read that

19        back.

20             (A portion of the record was read.)

21        A.   What do you mean, some of the

22   substantive issues?  You mean some of the

23   legal issues that I've identified in here?

24        Q.   Yes.

25        A.   Are you asking me whether, in any

43

1                          Lipps

2        context, the bankruptcy judge could rule on

3        those issues?

4            Q.   In connection with a litigation of

5        the RMBS claims in the bankruptcy court.

6            A.   I'm not here offering an opinion on

7        that, but I would suspect that in the claims

8        process or some other process where there is

9        trying to be, reach a determination on a

10       claim or a group of claims, that there would

11       be the potential for the court to make

12       decisions on substantive legal issues.

13           Q.   Let's turn to a different topic.

14               Let me ask you to turn to your

15       second declaration, your supplemental

16       declaration.  And I'm going to be asking you

17       some questions about --

18               MR. BENTLEY:  I'm sorry.  Let me

19           start again.

20           Q.   I want to ask you about your first

21       declaration.

22           A.   Okay.

23           Q.   And I'm going to be asking you some

24       questions about paragraphs 7 through 10.

25               MR. RAINS:  Take a minute, then, to

93

1                            Lipps

2          Q.   Okay.  Let's use that.  I want to

3     make sure we're talking the same language.

4               Focusing on that, did you make any

5     attempt to look at the language of the sale

6     agreements for the 392 trusts?

7          A.   In the course of defending these

8     cases, I imagine I've looked at many, many

9     different sale agreements with warranties and

10    reps in them.  For purposes of doing my

11    analysis in paragraph 16 of my supplemental

12    declaration, I identified the commonly

13    claimed reps and warranties upon which this

14    liability and the battle over liability is

15    being fought.

16         Q.   So is it your view that in order to

17    meaningfully evaluate the debtors' R & W

18    exposure for the 392 trusts, one doesn't have

19    to look sale agreement by sale agreement but

20    instead rely on the commonly claimed reps and

21    warranties?

22         A.   Yes, I did not feel the need to

23    evaluate all 392 sales agreements and all of

24    the reps and warranties, loan level reps and

25    warranties in each of those agreements, but,

94

1                              Lipps

2       rather, understood from my experience in

3       litigating these cases that there were

4       essentially seven or so common paths to

5       liability that were being pursued in this

6       litigation and would be commonly pursued in

7       any one of the 392 trust cases, were they to

8       be filed.

9           Q.   When did you first speak to anyone

10      at the Morrison & Foerster law firm about the

11      debtors' RMBS exposure?

12          A.   Before I answer that question, can

13      I confer for a minute with Mr. Rains?

14          Q.   Sure.

15               (Discussion off the record.)

16               THE WITNESS:  Can I have the

17          question read back.

18               (A portion of the record was read.)

19          A.   I'm not going to remember the

20      precise date, but I could probably get it at

21      some point; but I'm thinking it was in the

22      March time frame, March of 2012.

23          Q.   And what were the circumstances?

24          A.   I was asked by ResCap to bring my

25      team to a meeting in Minneapolis.  There were

97

1                           Lipps

2      filled in.  But I don't know whether the

3      amount was ever filled in while I was aware

4      of it.

5               I then went off on other projects.

6               MR. RAINS:  The question was

7         conversations.

8         A.   Well, the conversations would only

9      be in the context of a draft agreement.

10        Q.   Were you at any point asked to give

11     any advice, in connection with the potential

12     settlement with Ms. Patrick?

13        A.   I was not.

14        Q.   Did you ever at any point give any

15     advice in that regard?

16        A.   Well, I've offered an opinion here

17     as to whether I think the settlement is fair

18     and reasonable.

19        Q.   Let me try again.

20               At any time before the execution of

21     that settlement, did you give any advice to

22     anybody about it?

23        A.   No.  As I told you, we weren't

24     involved in negotiations.  We were not

25     involved in any presentations to the board.

98

1                          Lipps

2          Q.   Or giving advice to anybody?

3          A.   I didn't give advice to anybody

4     about the settlement.

5          Q.   At either the debtors or at Ally?

6          A.   I had no discussions with Ally

7     about the situation we're talking about right

8     now.

9          Q.   When did you first begin to

10    consider the issues addressed in your

11    settlement declaration?

12         A.   You know, I've thought about that,

13    because I knew you were going to go ask me

14    that.  And I seem to recall that I had been

15    asked by Morrison & Foerster to do the

16    analysis that is reflected in my supplemental

17    declaration sometime maybe in August, I want

18    to say, just because I think there was a

19    deadline that was then extended to the end of

20    September.

21              And so I would have had some early

22    first discussion about this exercise, and I

23    want to say it was sometime around August;

24    but with the schedule then changed, I started

25    working on it over, you know, the course

121

1                          Lipps

2      indicated in both the declarations, some

3      80-plus depositions with respect to practices

4      of RFC as it related to securitizations,

5      principally in the second lien arena, but

6      with respect to their securitization

7      practices, so "general" may be a little bit

8      understated.

9          Q.   In connection with preparing your

10     supplemental declaration, did you consider

11     any specific documents or information beyond

12     the documents and information that you were

13     already generally familiar with?

14         A.   I'm not sure that I understand that

15     question.

16         Q.   Did you -- for example, did you

17     look at any loan files for any of the loans

18     in the 392 trusts?

19         A.   I did not for purposes of this

20     opinion go look at loan files.

21         Q.   Did you, for purposes of this

22     opinion, look at any of the sale agreements

23     with respect to the 392 trusts?

24         A.   As I've said this morning, I have

25     looked at many different transaction

136

                          Lipps

1

2        plaintiffs' position on the one hand and your

3        view on the other hand?

4              A.    I think that's what I've been

5        describing most of the morning is that you, I

6        took into account at the low end the

7        voluntary repurchase experience and the fact

8        that if I hit every one of these issues that

9        I've identified from a defense standpoint,

10       there would still be liability out there, and

11       then I, you know, considered the top in range

12       and then evaluated whether 8.7 billion or 19

13       to 20 percent was a fair and reasonable

14       settlement given the totality of the

15       circumstances surrounding the prosecution and

16       defense of these claims.

17             Q.    You didn't look at any loan files

18       to determine where on this spectrum the

19       breach rates were, the recovered loans would

20       fall, did you?

21             A.    I think I indicated I did not look

22       at loan files, and I did not need to for

23       purposes of this opinion.

24             Q.    Did you form any quantitative

25       analysis to determine where on this spectrum

137

1                       Lipps

2      the breach rate for these loans fell?

3              MR. RAINS:  Objection, vague and

4          ambiguous.

5          A.   Mr. Bentley, I don't know how I can

6      be any more responsive with respect to

7      quantitative analysis than what I have.  I've

8      identified the various data points that may

9      in some people's minds be the byproduct of

10     the quantitative analysis that I took into

11     account.  I did not look at individual loan

12     files, nor did I go into trying to determine

13     what a particular breach rate was in a

14     particular trust or whether a breach was

15     material or not.

16         Q.   You do believe, don't you, that the

17     only reliable way to determine whether a loan

18     in fact complies with a rep or warranty is to

19     review and re-underwrite the actual loan

20     file?

21             MS. PATRICK:  Objection, form.

22         A.   That's certainly a position that I

23     have taken in defending these cases --

24         Q.   Is it your view --

25         A.   -- but I will tell you -- well --

138

1                          Lipps

2          Q.    And let me ask you to look at

3     paragraph 47 of your supplemental

4     declaration.

5          A.    And I will do that, but in the

6     question you asking me, is it my view --

7     well, let me look at paragraph 47.  Maybe I

8     will answer my own question.

9               MR. RAINS:  Which paragraph?

10              MR. BENTLEY:  47.

11         Q.    When you are finished reviewing it,

12    let me know and I will ask my next question.

13         A.    I have reviewed it.

14         Q.    Is the first sentence of this

15    paragraph an accurate statement of your view?

16         A.    I would stand by what I said in

17    this statement.

18         Q.    Let me ask you a related subject.

19              In forming your opinion, did you

20    make any attempt to quantify the losses

21    suffered by the trusts with respect to the

22    loans covered by the settlement?

23         A.    You mean losses at an individual

24    trust level?

25              MR. BENTLEY:  Actually let me start

139

1                          Lipps

2           again because that was a bad question.

3           Q.   Did you make any attempt to

4     quantify the losses suffered by the trust

5     with respect to any loans in the pool that

6     had material breaches?

7                MS. PATRICK:  Objection, form.

8           A.   I'm still not sure I understand

9     what the question is.  I clearly took into

10    account the losses --

11          Q.   The $45 billion?

12          A.   -- that were being projected the 45

13    billion.

14          Q.   But I'm asking --

15          A.   But it was an aggregate number

16    based on projections with respect of 392

17    trusts.

18          Q.   And what I'm asking -- did you make

19    any attempt --

20               MR. BENTLEY:  And apologies,

21          because it was a bad question.

22          Q.   Did you make any attempt to

23    determine what portion of that $45 billion

24    was suffered with respect to loans that had

25    material breaches?

140

Lipps

A.   Probably, because I started with

about the maximum exposure, which was the 45

billion and if, in the claim, it could be

proven that all 45 billion was based on a

material breach, then that would be what

would happen were you to litigate those

claims.

Q.   But I'm not asking you to tell me

what the plaintiffs' position was.  I'm

asking whether you made any attempt to reach

a conclusion about what losses were actually

suffered by loans with material breaches?

A.   I didn't do a loan-by-loan analysis

to reach a definitive conclusion as to

whether or not a loan that had losses had

material breaches or not.  What I did was

look at the aggregate of the maximum exposure

being advanced by the plaintiffs and looked

at the experience, the data points with

respect to voluntary repurchase, and knowing

that somewhere in between is where I had to

assess whether or not the 8.7 billion was

reasonable and fair.

Q.   Did you make any attempt to

141

1                          Lipps

2      quantify the portion of the 45 billion that

3      was caused by material breaches of reps and

4      warranties?

5              MR. RAINS:  Objection, asked and

6          answered.

7              MR. BENTLEY:  Absolutely not,

8          Darryl.

9              MR. RAINS:  Listen, I'm going to

10         make my objections, whether you like

11         them or not.  I'm not going to withdraw

12         it because you find it objectionable.

13         A.   Can you read back the question?

14         Q.   Sure.

15              Did you make any attempt to

16     quantify what portion of the $45 billion was

17     caused by material breaches of reps and

18     warranties?

19         A.   I did not make a specific

20     determination as to what amount of that 45

21     billion was, was caused by material breaches.

22     What I did was take into account that as the

23     maximum exposure, and then evaluated based on

24     that and other data points and in an

25     understanding of the state of the law,

1                     Lipps

2       whether or not 8.7 billion was a fair and

3       reasonable resolution of that exposure.

4            Q.   In reaching your conclusion, I take

5       it, you considered a number of disputed legal

6       issues?

7            A.   I did.

8            Q.   And you identified in your

9       supplemental declaration the principal legal

10      issues you considered, correct?

11           A.   I wrote extensively on the various

12      issues that I took into account.

13           Q.   You certainly did.

14                Did you assign percentages to the

15      potential outcomes on any of these issues?

16           A.   I don't think, I don't think that

17      would have been meaningful to do that,

18      because I don't think any of those were a

19      legal issue that would be dispositive on the

20      entirety of the settlement in determining

21      whether or not it was fair and reasonable.

22           Q.   So is the simple answer to my

23      question you did not assign any such

24      percentages?

25           A.   Well, I weighed the importance of

151

1                          Lipps

2        believe based on your analysis of the facts

3        that the housing crisis is the single

4        greatest cause for the poor performance of

5        the trust?

6              A.   I said "I," I believe that.

7              Q.   And what's your basis for that,

8        what's the analysis that supports that?

9              A.   Litigating these cases, working

10       with the expert I mentioned, reviewing

11       filings in other cases, attending hearings,

12       hearing argument, reviewing various opinions

13       that talk about the economic downturn and the

14       impact on mortgage performance.  But I will

15       also tell you I haven't seen a plaintiffs'

16       lawyer across the table that doesn't reach

17       the exact opposite conclusion.

18             Q.   At the time you --

19                  MR. BENTLEY:  Strike that.

20             Q.   Are you familiar with the recent

21       decision of a Minnesota District Court in a

22       case called MASTR Asset Backed Securities

23       Trust versus WMC Mortgage?

24             A.   I may be.  Is it my report?

25             Q.   It's not, because it was handed

152

1                    Lipps

2       down after you filed your report.

3            A.   Is this the one that deals with a

4       foreclosed loan?

5            Q.   Yes, it is.

6            A.   Then I am somewhat familiar with

7       it.

8            Q.   Does it refresh you that the

9       Minnesota court held that a loan that has

10      been foreclosed cannot be put back?

11           MS. PATRICK:   Objection, form.

12           A.   I don't know whether that was the

13      holding or not, but I do remember that was

14      one of the core contentions, and that the

15      court would not allow foreclosed loans to be

16      put back, since the loan doesn't exist once

17      there is foreclosure.   At least that was the

18      opinion of the court.

19           Q.   Have you evaluated the merits of

20      that ruling?

21           A.   I have done nothing more, as I sit

22      here today, other than note that I've read

23      it.   I really haven't had sufficient time to

24      even factor it in to see what impact, if any,

25      it has on the analysis.   It didn't change

153

1                           Lipps

2      anything as I looked at it.

3           Q.   Why didn't it change anything?

4           A.   Because I was looking at aggregate

5      exposure out there, and we know what the

6      projected losses are, we were looking at

7      losses and losses by their nature take into

8      account, you know, severities and things like

9      that.  So I just didn't see it having an

10     impact on what I was analyzing.

11          Q.   Do you have any understanding of

12     what portion of the $45 billion of losses is

13     with respect to loans that have already been

14     foreclosed?

15          A.   No.

16          Q.   If I tell you that the answer is

17     $30 billion, would that affect your

18     conclusion as to whether the Minnesota

19     decision has any bearing on your opinion?

20          A.   Well, the bearing it has is it's

21     another argument out there that the defense

22     would have available to them in a put-back

23     demand, but the Minnesota court doesn't,

24     isn't the only court to weigh in on this.

25          Q.   Are you aware of what other courts

154

1                          Lipps

2      have ruled on that issue?

3           A.   I don't know.  I didn't write on it

4      in my report.

5           Q.   Do you think that's an issue that

6      may be significant with respect to your

7      opinion?

8                MS. PATRICK:  Objection, form.

9           A.   I didn't see anything in the

10     Minnesota decision to indicate that was a

11     dispositive basis on which you could

12     eliminate liability.

13          Q.   Was the court applying New York

14     law?

15          A.   I don't recall.

16          Q.   Does that matter?

17          A.   No, I don't have an opinion on that

18     as I sit here.

19          Q.   What state's law governs the

20     trusts, what state's law governs the sale

21     agreements for the trusts?

22          A.   The trusts I'm familiar with, I

23     think it's New York law.

24          Q.   Are you aware of any trust that is

25     governed by the law of a state other than New

155

1            Lipps

2    York?

3         A.   I don't think in the litigation

4    that I saw any trusts that were other than

5    New York law.

6         Q.   Are you aware that if this rule of

7    law applied in this case, it would eliminate

8    liability for at least $30 billion out of the

9    $45 billion?

10            MS. PATRICK:  Objection, form.

11            Objection, form.

12         A.   If you're representing --

13            MR. RAINS:  Hold on, hold on.  It's

14            an incomplete hypothetical.  It assumes

15            facts not in evidence.

16         A.   Right, you're representing

17    something to me that I don't have sufficient

18    information to even respond.

19         Q.   You made no attempt to evaluate

20    that issue at any point since the Minnesota

21    decision was handed down; is that correct?

22         A.   I told you I had read the opinion.

23    It was not -- it was not out at the time I

24    offered my opinion, and I have also indicated

25    that in this, even in this opinion that I've

156

                              Lipps

1

2      offered that there are cases out there that

3      if that is the one and only rule of law that

4      exists out there, it could eliminate it, but

5      the problem is there is uncertainty in this

6      area of the law.

7           Q.   Have you made any attempt to

8      evaluate whether this argument has merit and

9      is likely to be followed by other courts?

10          A.   The decision was just issued.

11          Q.   It was issued on October 1st.  Have

12     you made any attempt to evaluate --

13          A.   I read the decision.  That's the

14     extent of what I've done.

15          Q.   Okay.  So preparing for your

16     deposition, you made no attempt to evaluate

17     whether the decision is likely to be followed

18     by other courts?

19          A.   The simple answer is, no, but it

20     wouldn't impact the opinion because in any

21     one of these issues there are decisions that,

22     from a plaintiffs' standpoint or from a

23     defense standpoint, you would like, if it

24     would become the all encompassing, binding

25     rule of law.

157

1                          Lipps

2          Q.    Have you made any attempt to

3     determine how the language in the sale

4     agreements, covered by this settlement,

5     compared to the language on which the court,

6     the Minnesota court relied?

7          A.    I haven't reviewed the -- I've

8     reviewed the opinion.  I've reviewed, to the

9     extent they're available, any of the

10    underlying sales agreements.

11         Q.    Have you made any attempt to

12    determine what impact this decision would

13    have on the debtors' aggregate R&W liability

14    if it were applied by the bankruptcy court in

15    this case?

16         A.    I told you, I have not looked into

17    that.  You've made a representation, but I'm

18    not in a position to say whether I agree or

19    disagree with that representation as to the

20    number.

21         Q.    Have you made any attempt to

22    evaluate that issue?

23         A.    I've read the opinion.

24         Q.    Nothing further?

25         A.    I think that's what I've said now

158

1                        Lipps

2        three times.  I've read the opinion.

3                MR. BENTLEY:  Thank you, Mr. Lipps.

4            Why don't we take a short break.  I may

5            be done, and then I know that others may

6            have questions as well.

7                THE WITNESS:  All right.

8                (A brief recess was taken.)

9                MR. RAINS:  Thank you.

10               MR. BENTLEY:  Thank you, Mr. Lipps,

11           I have nothing further.  But I believe

12           one or two of my colleagues may have

13           some questions.  One or two friends in

14           the room.

15       EXAMINATION BY

16       MR. NATBONY:

17           Q.   Good afternoon, Mr. Lipps.

18           A.   Good afternoon, Mr. Natbony.

19           Q.   I'm here today representing MBIA a

20       potential objector to the settlement, and I

21       just have a few questions for you today, if

22       you don't mind.

23           A.   Certainly.

24           Q.   Now, in connection with reaching

25       your opinion concerning the reasonableness of

185

1                              Lipps

2      perspective is I was taking a settlement

3      amount for an aggregate set of trusts in

4      trying to figure out if that was a fair and

5      reasonable settlement with that issue in

6      borrower fraud.

7           Q.   And is it fair to say that the

8      varying degree of litigation risk dependent

9      on rep and warranty language would be the

10     same for all rep and warranties?

11               MR. RAINS:  Objection, vague and

12          ambiguous.

13          A.   Yeah, I don't know I could answer

14     that.

15          Q.   Well, for example, wouldn't you say

16     that there would be varying degrees of

17     litigation risk depending on the language of

18     a particular underwriting fraud

19     representation?

20          A.   For purposes of valuing the

21     settlement, I didn't need to, in my opinion,

22     go down into whether or not trust A had

23     greater or less litigation risk than just B,

24     based on a particular rep and warranty.

25          Q.   I understand that's not what you

186

1                          Lipps

2       did, but that's a different question.  What

3       I'm asking you is whether you believe,

4       setting aside what you did, that the

5       litigation risk can vary dependent upon the

6       language of a particular rep and warranty?

7             A.   I can't answer it any differently

8       than I did before with respect to borrower

9       fraud.  Perhaps on a granular case level, you

10      may be able to reach a conclusion that a

11      litigation risk was marginally better or

12      worse based on a particular set of facts, but

13      for purposes of evaluating this settlement,

14      and whether it was within the range of

15      reasonableness, I was able to take the core

16      group of claims that are being asserted here

17      for the basis for alleging rep and warranty

18      which was common to all of them; and then

19      assess the risks and the reasonableness of

20      that amount given those risk.

21            Q.   And similarly, wouldn't you agree

22      that the level of litigation risk could be

23      different if there was the, either the

24      existence or absence of particular

25      representation language in an agreement?

187

1                         Lipps

2          A.    Not for purposes of this

3     settlement.

4          Q.    Generally?

5          A.    Did I evaluate that?

6               Again on a granular level there may

7     be marginal differences on a trust A versus

8     trust B, but again for purposes of evaluating

9     this settlement involving 392 trusts, all I

10    needed to do was assess it at the aggregate

11    level.

12         Q.    Did you confirm that there, in

13    fact, was an underwriting representation in

14    each of the 392 trusts?

15         A.    I think I've already answered that.

16    In my writing that no matter whether those

17    words were in there or not, every case I've

18    been involved in involving these

19    securitizations, which are in this

20    settlement, there has been a claim that there

21    was a violation of an underwriting rep.

22         Q.    How about with respect to any rep

23    and warranty, did you do any analysis to

24    determine whether each of the 392 trusts had

25    any particular rep and warranty?