KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Philip Bentley
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

---------------------------------------------------------- x

**NOTICE OF FILING OF CORRECTED EXHIBIT D TO**
**DECLARATION OF KENNETH H. ECKSTEIN IN SUPPORT**
**OF OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019**
**FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.    On February 1, 2013 the Official Committee of Unsecured Creditors (the "**Committee**") of the above captioned debtors and debtors-in-possession filed the *Declaration of Kenneth H. Eckstein in Support of the Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements* [Docket No. 2828] (the "**Declaration**").

2.    The Committee hereby submits a corrected copy of the Sillman Deposition transcript, which appears as Exhibit D to the Declaration and is attached hereto as **Exhibit A**.

Dated:    February 6, 2013
          New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Philip Bentley
Kenneth H. Eckstein
Douglas H. Mannal
Philip Bentley
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee
of Unsecured Creditors*

**EXHIBIT A**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

                    Debtors.

-----------------------------------x


            DEPOSITION OF FRANK SILLMAN

              New York, New York

              November 20, 2012

                 9:35 a.m.








Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27687

2

1

2

3

4                    November 20, 2012

5                    9:35 a.m.

6

7

8          Deposition of FRANK SILLMAN,

9     held at the offices of Kramer, Levin,

10    Naftalis & Frankel, 1177 Avenue of the

11    Americas, New York, New York, pursuant

12    to Notice, before Erica L. Ruggieri,

13    Registered Professional Reporter and

14    Notary Public of the State of New

15    York.

16

17

18

19

20

21

22

23

24

25

13

                    FRANK SILLMAN

1

2   of any sort since college, putting aside

3   your professional experience, just

4   focusing on formal training?

5        A.    No additional formal training.

6        Q.    So let's turn to -- strike that.

7              I take it you don't have any --

8   you haven't had any legal education?

9        A.    I have not.

10       Q.    And you don't consider yourself

11  to have any expertise in legal matters?

12       A.    No, I do not.

13       Q.    Let's turn to your employment

14  experience.  You started out at Shearson

15  Lehman?

16       A.    Correct.

17       Q.    And you were in the mortgage

18  business at Shearson?

19       A.    Yes.

20       Q.    It looks to me like you've been

21  in mortgage related businesses all of your

22  careers, do I have that right?

23       A.    Yes.

24       Q.    Can you briefly summarize for me

25  the principal aspects of your career that

43

1                    FRANK SILLMAN

2         A.    Correct.

3         Q.    -- correct?

4               So if I refer to this as your

5    first declaration or your initial

6    declaration, you'll know what I mean?

7         A.    Okay.

8         Q.    So please turn to paragraph 2 of

9    your initial declaration.  And as we have

10   already discussed to some degree, this

11   paragraph describes work you've done both

12   for sellers and for buy side clients?

13        A.    Correct.

14        Q.    Tell me a bit about your buy

15   side clients.  You referred to insurers

16   and lenders.  Can you describe that in a

17   bit more detail for me?

18        A.    They are -- they are or were

19   predominantly banks that purchased loans

20   or originated loans through their retail,

21   wholesale or correspondent origination

22   channels.

23        Q.    Can you identify those clients

24   or is that confidential?

25        A.    That's confidential.

44

1                    FRANK SILLMAN

2         Q.    And tell me about the insurers

3    you've represented?

4         A.    We also did work with two

5    mortgage insurance companies that had us

6    review loans for potential insurance

7    rescission.

8         Q.    And same question as before.

9    Can you identify those clients or is that

10   confidential?

11        A.    That's confidential.

12        Q.    Can you help me understand a

13   little bit, again this is my ignorance in

14   the field, how those mortgage insurers

15   differed from monoline insurers like MBIA

16   or FGIC?

17        A.    The mortgage insurance, and I'm

18   not an insurance expert, but in general --

19        Q.    I'm not either.

20        A.    -- from my mortgage experience,

21   the mortgage insurance is typically issued

22   on a loan by loan basis.  So they issue a

23   certificate for each loan.  The monoline

24   insurers tended to secure -- insure

25   securitizations so they insured a pool of

45

                    FRANK SILLMAN

1

2      loans.  So it's kind of an individual

3      versus a pool process.

4          Q.    And these insurer clients you

5      represented, when you've been reviewing

6      possible put back demands they might make,

7      would this generally be when they are

8      reviewing a number of potential put back

9      demands against one particular company?

10         A.    The loans that we worked on were

11     typically from many originators not just

12     one particular originator.

13         Q.    But these mortgage insurers

14     would have insured a number of loans

15     provided by a particular originator and

16     they would then ask you to look at that

17     group of loans and consider making put

18     back demands; is that right?

19         A.    The way they allocated the loans

20     to us, it may have been for one particular

21     originator or may have been for multiple

22     originators.

23         Q.    But would they generally have

24     provided this mortgage insurance in bulk

25     as it were, that is to a whole bunch of

46

                    FRANK SILLMAN

1

2    loans at the same time?

3        A.    The mortgage insurers had

4    relationships with originators.  So they

5    may have done work with one particular

6    originator.  What's typical in the

7    industry is that the originator has

8    multiple mortgage insurance relationships.

9    How they allocate those depends on lots of

10   corporate objectives.  But there's

11   typically not a 1 to 1 relationship

12   between a mortgage insurer and an

13   originator.  So mortgage originators wrote

14   insurance for multiple originators.  And

15   originators got insurance from multiple

16   mortgage insurers.

17       Q.    They spread the business around?

18       A.    Yes.

19       Q.    And the loans that your clients

20   insured, were they generally loans that --

21   were they often loans that had been sold

22   into securitizations?

23       A.    They were both private label

24   securitization loans and GSE, Fannie,

25   Freddie originated loans.

47

1          FRANK SILLMAN

2          Q.    Your sell side clients, was that

3    mostly the debtors or what were portion of

4    your work for sell side clients was for

5    the debtors?

6          A.    That's confidential.

7          Q.    Okay.  Can you tell me whether

8    it's most of the work?

9          A.    Sell side work.  I'd have to

10   look at the numbers.  It's a large

11   portion.  I don't know that it's most.  I

12   don't have those numbers in front of me.

13         Q.    What can you tell me about -- I

14   don't mean to ask you to disclose

15   confidential information.  Without doing

16   that what can you tell me about the nature

17   of those other sellers?

18         A.    Many cases similar in the

19   origination and sales process to the

20   debtors.  So they originated loans,

21   purchased loans, originated their own

22   loans, gathered those loans, securitized

23   those loans, both to the GSEs and in

24   private label securitizations.

25         Q.    And just like with the debtors

63

1                   FRANK SILLMAN

2              Am I right when you refer to

3     prime, jumbo, Alt-A and subprime, those

4     labels as you understand them generally

5     apply to first lien loans?

6         A.    Yes.

7         Q.    And then HELOC is a form of

8     second lien loan?

9         A.    In most cases, not always.

10    There are first mortgage HELOCs but

11    predominantly I believe the HELOCs are

12    second mortgages.

13        Q.    And in your experience do Alt-A

14    and subprime mortgage loans tend to yield

15    higher rep and warranty breaches than

16    prime jumbo?  And I'll refer you to

17    paragraph 58 of your declaration if you

18    want to look at that.  I'm going to object

19    to the form of the question as vague and

20    ambiguous?

21        A.    Can you restate the question for

22    me.

23        Q.    In your experience do Alt-A and

24    subprime mortgages tend to yield higher

25    rep and warranty breaches than prime jumbo

64

                    FRANK SILLMAN

 1

 2     mortgages?

 3         A.    They tend to yield higher

 4     alleged rep and warrant breaches.

 5         Q.    And how much higher, can you

 6     quantify that at all?

 7         A.    I don't have the numbers in

 8     front of me to be able to give you any

 9     type of percentage differences.

10         Q.    Suppose you were asked by your

11     client to quantify that.  Could you do

12     that and how would you go about it?

13         A.    I wouldn't be able to quantify

14     it without looking at and doing more work

15     on what the actual experience is.  I do

16     know that it is -- my experience has been

17     it's higher, there's been a higher rate of

18     alleged rep and warrant breaches, but I

19     couldn't put a percentage on it.

20         Q.    Are there any publications that

21     address that to your knowledge?

22         A.    There may be that address it.

23     I'm not aware of them.

24         Q.    Do you know if anybody has

25     attempted to address that issue on an

65

1                    FRANK SILLMAN

2      industry wide basis?

3          A.    It's -- it's possible in this

4      environment that that type of analysis has

5      been done -- I don't recall reading

6      anything or relying on anything that I

7      felt had a credible and reliable data

8      around that.

9          Q.    Have you attempted to search the

10     literature and determine whether anybody

11     has made a credible attempt to determine

12     that?

13            MR. RAINS:  Have you searched

14         the literature, that's the question.

15         A.    I have done some searches

16     relating to that and didn't find any work

17     that I believed had credible results.

18         Q.    Do you think that work could be

19     done or is there just not enough publicly

20     available data for anybody to reach

21     meaningful conclusions?

22            MR. RAINS:  Objection.  Vague

23         and ambiguous.

24         A.    Can you rephrase that.

25         Q.    Sure.  Suppose a client asks you

66

                    FRANK SILLMAN

1

2    generally speaking as a matter of industry

3    averages how much higher are the alleged

4    rep and warranty breaches for Alt-A and

5    subprime mortgages compared to other kinds

6    of loan products?

7         A.    I don't believe I have --

8              MR. RAINS:  Hold on.  He hasn't

9         asked a question yet.

10         Q.    Do you think you could undertake

11    to answer that question?

12         A.    I have not seen information

13    available that would allow me to study

14    that question.

15         Q.    Have you attempted to determine

16    whether that question can be answered in a

17    meaningful way?

18         A.    I did do some work I discussed

19    in my, on agree rates that are publicly

20    available so I did do research as part of

21    the work I did on my declaration to

22    determine if there are other publicly

23    available information regarding breach

24    rates and agree rates and did not find any

25    credible information that would allow me

67

1                    FRANK SILLMAN

2      to come to any conclusions on breach

3      rates.

4          Q.    Is part of the problem that an

5      awful lot of this data is simply not

6      publicly available?

7          A.    Yes.

8          Q.    And let me now broaden the

9      question.  Suppose the question is if you

10     are asked to determine how the rates of

11     alleged rep and warranty breaches compare

12     as between any particular types of loan

13     products, is that a question that can be

14     answered using publicly available data?

15         A.    Again you are asking for

16     industry wide comparisons?

17         Q.    Correct.

18         A.    I'm not aware of any publicly

19     available data that would allow for a

20     credible comparison between originators.

21         Q.    I'm talking about loan types?

22         A.    I'm sorry.

23              MR. RAINS:  Products.

24         A.    Yeah, products.  You are talking

25     about rep and warrant violations.

68

1                    FRANK SILLMAN

2        Q.    Correct.  And suppose now we

3    modify the question so we are not asking

4    about alleged breach rates but instead

5    we're asking about what you call loss

6    share rates.  Could that question be

7    addressed using publicly available data?

8        A.    There have been some expert

9    reports that you can discern the loss

10   share rates from.  The issues with that is

11   the underlying data you don't have access

12   to so I can't opine on whether or not

13   that's comparative to the debtors proposed

14   settlement because the data behind those

15   reports are not publicly available.

16       Q.    And which expert reports are you

17   referring to?

18       A.    The Bank of America expert

19   report and the Lehman expert declaration.

20       Q.    Now, I'm not asking you about

21   discerning loss share rates as to any

22   particular seller but rather as to

23   industry averages.  Is there publicly

24   available data from which one could reach

25   meaningful conclusions about average

69

FRANK SILLMAN

1

2      industry loss share rates?

3          A.      On a product by product basis?

4          Q.      Yes.

5          A.      I'm not aware of any credible

6      sources that I have been able to evaluate

7      their underlying data that provide that

8      information.

9          Q.      And now let me ask the same

10     question but as to vintages.  Is there

11     publicly available data from which one

12     could reach meaningful conclusions about

13     how loss share rates varied depending on

14     the loan's vintage?

15         A.      Again, I'm not aware of any data

16     that's available that you can reach

17     credible conclusions and that I have been

18     able to view the underlying data behind

19     that.

20         Q.      In your -- strike that.

21             So now let's turn away from

22     industry averages and turn back to your

23     personal experience.  In your personal

24     experience is the vintage of a loan a

25     factor that can affect the likelihood of a

70

1                    FRANK SILLMAN

2    put back?

3         A.    Yes.  There is some correlation

4    between the vintage of the loan and the

5    potential for an alleged rep-warrant

6    breach.

7         Q.    What correlation have you

8    observed?

9         A.    There's a segment of loans

10   originated from 2005 to 2007 that tended

11   to have higher alleged breach rates in the

12   work that I have done for my clients.

13        Q.    I want to understand what you

14   said.  You referred to a segment of loans

15   originated from '05 to '07.  Are you

16   saying that loans originated during that

17   period generally tend to have higher

18   alleged breach rates in your experience?

19             MR. RAINS:  Objection.

20        Misstates the witness's testimony.

21             MR. BENTLEY:  I'm trying to

22        understand it.

23        A.    Loans originated in that period

24   may have higher alleged breach rates or

25   reps and warrant violations than loans

104

1                   FRANK SILLMAN

2    this paragraph is what I'm going to focus

3    on.  It says, "I was asked to provide an

4    independent assessment of the total

5    allowed claim as defined in the RMBS Trust

6    Settlement Agreements and opine as to its

7    reasonableness."

8              Do you see that?

9       A.    Yes.

10      Q.    And the total allowed claim,

11   that's $8.7 billion?

12      A.    Yes.

13      Q.    Who first contacted you about

14   this matter?

15      A.    Jen Battle.

16      Q.    When did she contact you?

17      A.    I believe it was early May but,

18   you know, I'm not positive as to the date.

19   But that's around the time.

20      Q.    She contacted you after the

21   debtors had entered into the RMBS Trust

22   Settlement Agreement?

23      A.    Yes.

24      Q.    And I can tell you that that

25   agreement was executed on May 13th.

105

1          FRANK SILLMAN

2       A.    Okay.

3       Q.    And the debtors filed bankruptcy

4    the next day.

5          When she contacted you, had the

6    debtors filed bankruptcy?

7       A.    Contacted me to discuss

8    retaining me for this expert work?

9       Q.    When she contacted you to

10   discuss this expert work the first time.

11      A.    You know, I don't recall.

12   Because we were an ongoing -- we were

13   doing ongoing work and then they suspended

14   that work, I don't recall when.  I believe

15   it was -- we didn't have any discussions

16   regarding this potential work until after

17   they filed bankruptcy but I don't recall

18   exactly.

19      Q.    Turning back to the sentence I

20   quoted a moment ago.  The opinion you were

21   asked to provide was as to whether or not

22   the total allowed claim was reasonable; is

23   that correct?

24      A.    Yes.

25      Q.    So you were not asked to come up

117

                    FRANK SILLMAN

1

2    files.

3        Q.    And anything -- anything else

4    other than the documents you already

5    mentioned, plus loan files?  That is, are

6    your clients -- are your colleagues going

7    outside the loan files?

8        A.    You know, I'd have to look at

9    the audit strategy document for this

10   review to answer that question.  I just

11   don't recall whether we are or are not.

12       Q.    Let's turn back to paragraph 5.

13   And I'm going to ask you about the third

14   sentence of the paragraph which states,

15   "However, I take no position on the

16   ability of any party to prove a breach of

17   representations and warranties under the

18   governing agreements and I assume for the

19   purposes of this declaration that such a

20   showing can be made against the debtors."

21            Do you see that?

22       A.    Yes.

23       Q.    Can you explain what you mean by

24   that?

25       A.    I don't know.  I think I have

118

                    FRANK SILLMAN

1

2   said it in the paragraph.

3       Q.    So is it fair to say you are not

4   opining as to whether any of the claims

5   have legal merit?

6       A.    Whether they would be able to

7   prove breaches of reps and warrants, yeah,

8   under the governing agreements.

9       Q.    Or prove the requirements of put

10  back?

11      A.    Correct.

12      Q.    And by the way, you don't claim

13  to have any expertise in that issue, do

14  you?

15          MR. RAINS:  Objection, vague and

16      ambiguous.

17      A.    Which area is that?

18      Q.    Whether put back is legally

19  required?

20      A.    I didn't render any legal -- I

21  don't have any legal training and didn't

22  provide any legal recommendations under

23  this work.

24      Q.    And you don't claim to have the

25  expertise needed to provide legal

119

1                  FRANK SILLMAN

2    opinions, right?

3        A.    Correct.

4        Q.    And you are not expressing a

5    view, I take it, as to whether any of the

6    debtors' legal defenses have merit?

7        A.    Correct.

8        Q.    And you are also not expressing

9    a view as to whether the facts relating to

10   any of the loans in the pool being settled

11   would legally warrant put back?

12       A.    Yeah.  I'm not making a legal

13   assessment.

14       Q.    Am I correct you've made no

15   attempt to determine the, what portion of

16   the loans in the pool actually breach reps

17   and warranties?

18       A.    The work that I'm depending on

19   or relying on is the repurchased, GSE

20   repurchase rate work that was done between

21   Fannie, Freddie and the debtor where they

22   reviewed thousands of loans over a number

23   of years and looked at the actual loan by

24   loan file review and availed themselves to

25   the defenses of the governing agreements

120

1          FRANK SILLMAN

2     or any other legal arguments as part of

3     that process.  So it's that work and the

4     results of that work that's incorporated

5     in my work, in my declaration.

6          Q.    I understand you are drawing

7     inferences from the debtors' put back

8     history with the GSEs, among other things?

9          A.    Correct.

10         Q.    So I just want to be clear, am I

11    correct you haven't looked at any one loan

12    within the pool that's being settled to

13    try to reach a view or express an opinion

14    as to whether that loan actually breaches

15    any reps and warranties?

16         A.    We have not completed our loan

17    level review work.  And I'm relying on the

18    thousands of loans that went through the

19    debtors' repurchase process as the basis

20    for my original declaration.

21         Q.    So I think I'm hearing the

22    answer to my question but I just want to

23    be clear.  In your June 11 declaration you

24    are not expressing any opinion as to

25    whether any particular loan breaches any

121

```
 1              FRANK SILLMAN

 2    reps and warranties?

 3              MR. RAINS:  Objection.  Vague

 4         and ambiguous.  Asked and answered.

 5         A.    I utilized the repurchase work

 6    the debtor did with the GSEs to form the

 7    basis for my original declaration.

 8         Q.    And in reaching the conclusions

 9    in your initial declaration you didn't

10    look at any individual loan file in the

11    pool that's being settled?

12         A.    I relied on the thousands of

13    loans that were reviewed by the debtor as

14    part of their process prelitigation.

15         Q.    With respect, Mr. Sillman, I

16    don't think you answered my question.

17              MR. BENTLEY:  Let me ask the

18         reporter to read it back.

19              MR. RAINS:  I think you answered

20         the question.  It's been asked and

21         answered.

22              MR. BENTLEY:  You know, Darryl,

23         it's a yes or no question and I got a

24         nonanswer.

25              Read it back, please.
```

122

1                    FRANK SILLMAN

2              (Record read.)

3              MR. RAINS:  Same objections.

4         A.    I relied on the GSE repurchase

5    work that the debtor did with Fannie and

6    Freddie.

7         Q.    To date have you looked at any

8    loan file for any of the loans within the

9    pool that's being settled?

10        A.    We are in the process of

11   reviewing the loan files.

12        Q.    Have you yet looked at any loan

13   files?

14             MR. RAINS:  You mean him

15        personally or Fortace?

16        Q.    Let's break it into pieces.

17   Have you personally looked at any loan

18   file?

19        A.    I have not looked at the loan

20   files.

21        Q.    Prior to your signing your

22   June 11 declaration, did anybody at

23   Fortace look at any of the loan files for

24   the loans being settled?

25        A.    I relied on, we relied on, the

123

1                    FRANK SILLMAN

2      work that the debtor did with the GSE

3      repurchases in forming the assumptions and

4      conclusions in my original declaration.

5           Q.    So that's a no?

6           A.    I relied on --

7                 MR. BENTLEY:  Read back my

8      question.

9           Q.    It's a very simple factual

10     question.  I'm not asking you what you

11     relied on.  I'm asking you whether you

12     looked at any loan files?

13                MR. BENTLEY:  Read it back,

14     please.

15                (Record read.)

16                MR. RAINS:  Objection, vague and

17     ambiguous.  Asked and answered.

18          A.    I relied on the work that was

19     done by the debtor as part of their GSE

20     repurchase for the conclusions and

21     assumptions made in my original

22     declaration.

23          Q.    And you didn't look at any loan

24     files?

25          A.    I relied on the GSE repurchase

124

1              FRANK SILLMAN

2    work.

3         Q.    Did that involve looking at any

4    loan files?

5         A.    It revolved relying on the loan

6    file reviews that the debtor performed.

7         Q.    Is there a reason you are

8    resisting answering a simple question?

9              MR. RAINS:  Objection.

10         Argumentative.  Asked and answered.

11              MR. BENTLEY:  It's not asked and

12         answered for Christ's sake, Darryl.

13              Read it back.

14              MR. RAINS:  Of course it has.

15         It's been asked 15 times and --

16              MR. BENTLEY:  Is the answer no?

17         Because I sure can't tell what the

18         answer is.

19              MR. RAINS:  I think his answer

20         is very clear.

21              MR. BENTLEY:  The answer is he

22         did something else, it's not whether

23         he did this or not.

24              MR. RAINS:  That's his answer.

25         You don't like his answer but it's his

125

```
 1              FRANK SILLMAN
 2      answer.
 3              MR. BENTLEY:  I'm fine with his
 4      answer, he just hasn't answered my
 5      question.
 6              Can you read it back, please.
 7              MR. RAINS:  Let's do this, let's
 8      take a quick break.
 9              MR. BENTLEY:  You know what, I
10      want an answer to my question before
11      you speak --
12              MR. RAINS:  I'm going to talk to
13      him about his answer to your question.
14              MR. BENTLEY:  I object.  You are
15      not supposed to talk to the witness
16      while a question is pending.
17              (Whereupon, there is a recess in
18      the proceedings.)
19              MR. RAINS:  I think we have
20      succeeded in clearing up some of the
21      ambiguities and confusion caused by
22      your question.  Why don't you put the
23      question to him again.
24      Q.   I know it's very confusing but
25      I'll state it again.  In connection with
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

126

1                    FRANK SILLMAN

2       forming the opinions expressed in your

3       June 11 declaration, did you or any of

4       your colleagues look at any of the files

5       for the loans in the pool being settled.

6            A.    For the, my original declaration

7       I relied on the work that was done by

8       ResCap and the repurchase activity.  We

9       are now looking at loan files.  We are

10      currently looking at loan files.

11           Q.    So let's just unpack what you

12      just said.  You relied on the work that

13      was done by ResCap.  What work are you

14      referring to?

15           A.    To GSE and private label

16      repurchase activity work ResCap did.

17           Q.    Understood.  But was that as to

18      any of the loans that are in this pool

19      that's being settled?

20           A.    There may be in the private

21      label securities work loans that are

22      included in this settlement.  The vast

23      majority of the loans were related to

24      their GSE originations.

25           Q.    And none of the GSE deals

127

1              FRANK SILLMAN

2     overlap in any way with this settlement,

3     right?

4         A.    Correct.

5         Q.    Were you relying, when you

6     prepared this report, on any work that RFC

7     had done in looking at the loans that are

8     part of this settlement?

9         A.    Yes.  We did review some

10    information regarding their private label

11    securitization repurchase work.  What we

12    found, I think there's an exhibit, that

13    the vast majority of those repurchase

14    demands were unresolved.

15        Q.    So I'm going to return to that.

16    I know what you are referring to.  Putting

17    aside any loan reviews that RFC may have

18    done in connection with its prepetition

19    put back experience, did you or any of

20    your colleagues look at any loan files in

21    connection with the work that went into

22    your June 11 report?

23        A.    We relied on the company's work

24    for the information in the original

25    declaration and we are now looking at loan

128

1                    FRANK SILLMAN

2     files that are contained within the 392

3     trusts.

4          Q.    And when you say the company's

5     work, are you referring to anything other

6     than the work the company did prepetition

7     in connection with its prepetition put

8     back negotiations?

9          A.    Yeah.  It was prepetition work.

10         Q.    In connection with -- done by

11    the debtor in connection with its

12    prepetition put back experience?

13         A.    Yes.

14         Q.    And no other review of loan

15    files went into your, the conclusions

16    expressed in your June 11 declaration?

17         A.    That's right.

18         Q.    Okay.  We are there.  We got an

19    answer.  Thank you.  Let's move on.

20         A.    I would say no additional loan

21    work.

22              MR. BENTLEY:  I'm about to

23         change topics.  If people want to take

24         a break, this is fine or we can keep

25         going.

142

```
 1              FRANK SILLMAN

 2    what?

 3         A.    Where they reviewed the loan

 4    file internally, possibly as part of a

 5    post funding QC process where they

 6    identified loans that they felt met the

 7    repurchase standard and notified the

 8    appropriate trustee or insurer.

 9         Q.    What is a post funding QC

10    process?

11         A.    That's where lenders review a

12    sample of loans that close to see if there

13    are any underwriting compliance or other

14    errors in the origination process.

15         Q.    And what's the -- do you have an

16    understanding as to what the debtors

17    purpose was in doing that?

18         A.    It's standard in the industry to

19    select a group of loans post closing.

20    One, it's a requirement for the GSEs to do

21    that and it's typically because the GSEs

22    make up such a large percentage of their

23    volume, it's typically utilized for all

24    types of loans to review the origination

25    process.
```

143

1            FRANK SILLMAN

2       Q.   And is there a reason the debtor

3   does this for PLS?

4            MR. JURGENS:  Objection to form.

5            MR. RAINS:  Calls for

6       speculation.  Go ahead.

7       A.   I'm not aware of, you know, why

8   they chose these loans and what their

9   policies are for QC'ing loans that go into

10  PLS securities.

11      Q.   Did you or your team make any

12  effort to try to understand the nature of

13  the debtors practices and procedures in

14  that regard?

15           MR. RAINS:  Objection, vague and

16      ambiguous.

17      A.   We discussed when they provided

18  this data what these various categories

19  were.  And they could not tell us under

20  what initiative these voluntary loans were

21  selected.  So their records -- they

22  explained to us their records didn't

23  reflect you how the loans were created as

24  voluntary demands.

25      Q.   Who participated in these

144

1                    FRANK SILLMAN

2       discussions?

3            A.    I did, Michelle Minier and Jeff

4       Cancelliere.

5            Q.    Who is Mr. Cancelliere?

6            A.    He works for the debtor.

7            Q.    Do you know what he does there

8       or what he did at the time of these

9       discussions?

10           A.    Yeah.  He -- my understanding

11      was he was involved in the risk group for

12      the company.

13           Q.    So did he, to your knowledge,

14      did he participate in the post funding QC

15      process?

16           A.    That -- in my conversations with

17      him that wasn't my understanding.  I

18      interfaced with him in this regard.  He

19      was the person that collected this

20      information for us at the company.

21           Q.    So were you able to ascertain

22      what portion of the loans that you

23      described as voluntary, were reviewed as

24      part of the post funding QC process?

25                 MR. JURGENS:  Objection to form.

145

1          FRANK SILLMAN

2          A.    I answered that already.  In

3    that they did not have the data available

4    to ascertain under what program these

5    voluntary demands were developed.

6          Q.    Did you have any understanding

7    what other programs may have given rise to

8    these voluntary repurchases?

9          A.    We had some discussions around

10   trying to better understand the types of

11   loans that would be included in the

12   voluntary.  And Jeff was not able to give

13   us any data around how these were created.

14         Q.    And just so we are clear.  I

15   meant to ask you about other programs, not

16   types of loans.  Do you have any

17   understanding of what programs other than

18   post funding QC programs led to these

19   voluntary repurchases?

20              MR. SHEEREN:  Objection to form.

21         A.    In my conversations with him

22   they didn't discuss the types of programs

23   that led to these voluntary because the

24   data was not available.  So they weren't

25   able to speak to how these loans came to

146

1                    FRANK SILLMAN

2       be categorized as voluntary.

3            Q.    And do you know if it would be

4       possible now to reconstruct or come up

5       with that information?

6            A.    I don't know if anything has

7       changed.  They were not able to provide

8       that information at the time that we

9       requested this data.

10           Q.    Did you reach a conclusion about

11      whether the voluntary repurchases had any

12      bearing on the issues you were analyzing?

13           A.    We looked at all of the PLS

14      demands including the voluntary in

15      developing the conclusions that we had in

16      my report.

17           Q.    What weight -- strike that.

18                Table 2 addresses nonvoluntary

19      repurchases only.  Why did you isolate out

20      the nonvoluntary?

21           A.    I wanted to understand better

22      the state of the repurchase demands that

23      were made by trustees or insurers.

24           Q.    Am I right the only difference

25      between the Table 1 box relating to

175

1          FRANK SILLMAN

2          MR. RAINS:  He said put back

3     demands.

4     Q.    Let me try it again because my

5     question wasn't very clear.  You've

6     computed that the debtors -- sorry, that

7     the trusts -- let me start again.  You've

8     computed that the loans subject to the

9     proposed settlement have losses,

10     liquidated losses to date of about

11     $30 billion, correct?

12     A.    Correct.

13     Q.    And by the way, by liquidated

14     losses what do you mean?

15     A.    It means when there's a loss

16     that's passed on to the trust when the

17     loan is liquidated.

18     Q.    So are all of those losses on

19     account of either foreclosure or some

20     other sale?

21     A.    Short sale, yes.  There's a

22     number of categories that would consider

23     the loan liquidated.  And any losses

24     associated with that are reported as

25     liquidated losses.

176

FRANK SILLMAN

1

2      Q.    So it would be a sale in

3      satisfaction of the mortgage?

4      A.    I'm not sure that I'm the

5      expert.  Mortgages work differently in

6      each of the states.  When the property is

7      liquidated, the losses associated with

8      that are passed on to the trust.

9      Q.    So let me just show you your

10     report so we don't have to go back and

11     forth on this.  Look at paragraph 25 of

12     your initial declaration.  And item A in

13     the first sentence refers to, "The actual

14     losses that are incurred when a loan is

15     foreclosed and sold through a short sale,

16     REO or other final disposition."

17            Do you see that?

18     A.    Yes.

19     Q.    And that's what you've defined

20     as the actual liquidated loss?

21     A.    Yes.

22     Q.    Okay.  And do you have any way

23     of knowing whether after a liquidation of

24     that sort the trust would still hold the

25     mortgage?

177

```
 1              FRANK SILLMAN

 2       A.    That would be a --

 3              MR. JURGENS:  Objection to form.

 4              MS. PATRICK:  Objection to form.

 5       A.    -- a legal question that may be

 6    discussed in the governing agreements but

 7    outside the scope of what -- what I looked

 8    at for my declaration.

 9       Q.    Okay.  Fair enough.  But you've

10    computed that the debtors -- the

11    liquidated losses on the loans in the

12    trusts to date are approximately

13    $30 billion?

14       A.    That's the information that I

15    received from Intex and LP, loan

16    performance.

17       Q.    And does Table 2 of Exhibit 7

18    show that, tell you the dollar value of

19    put back demands made against the debtors

20    with respect to these trusts from late

21    2007 until the petition -- until May 2012?

22       A.    I'm not sure -- you are asking

23    the detailed schedule information?

24       Q.    Exhibit 7, the cover page.

25       A.    Oh, the cover page.
```

191

1                        FRANK SILLMAN

2       losses, you then calculated loss share

3       rate and you multiplied the one by the

4       other?

5           A.   That's correct.  In ranges so

6       it's not a single number.  It's a lower

7       range and a higher range.

8           Q.   Understood.  And your

9       computation of estimated lifetime losses

10      is contained in the section starting on

11      page 11 of your report, correct?

12          A.   Yes.  That's the section.

13          Q.   And your computation of loss

14      share rate is addressed in the section

15      starting on page 16 of your report?

16          A.   Yes.  Paragraph 44.

17          Q.   So this is basically --

18      paragraph 6 is basically a nutshell

19      summary of computations you performed?

20              MR. RAINS:  Objection.  Vague

21          and ambiguous.  Misstates the

22          witness's testimony.

23          A.   It discusses the two steps that

24      I utilized first in developing the

25      estimated lifetime loss ranges and then

192

1                    FRANK SILLMAN

2      this next step in estimating the loss

3      share rate ranges.

4          Q.    So all of your calculations on

5      pages 16 to 23, the upshot of those

6      calculations is the loss share rate,

7      correct?

8          A.    Yes.  The result of the work

9      that's done starting on page 16, paragraph

10     44 and ending on page 23, paragraph 66.

11         Q.    There's a number of different

12     components, retrade, agree rate and audit

13     rate and demand rate.  But the purpose of

14     all of those is to come up with the -- the

15     collective result of all of those is the

16     loss share rate?

17         A.    Right.

18         Q.    Now, going back to paragraph 6

19     in the second sentence describing loss

20     share rate, you describe loss share rate

21     as, "The percentage of estimated lifetime

22     losses that the debtors might agree to

23     share with the trusts."

24              Do you see that?

25         A.    Yes.

193

1                    FRANK SILLMAN

2        Q.    So was it deliberate on your

3    part to use the word "might" rather than

4    would?

5        A.    What I was developing -- what I

6    developed for this is a range of

7    reasonable loss share rates.  And whether

8    or not the debtor would agree to a loss

9    share rate ultimately agree to a loss

10   share rate or an allowed claim that you

11   could calculate a loss share rate is

12   something for the others to decide, not me

13   to impose by using the word "would."

14       Q.    For example, your calculations

15   are all predicated on the assumption that

16   a breach of rep and warranties can be

17   proved against the debtors as a legal

18   matter, right?  We talked about that

19   earlier.

20       A.    Let me get to -- what paragraph

21   are you referring --

22       Q.    5.  Third sentence.

23            MR. RAINS:  What was the

24   question again?

25       Q.    You assume for purposes of your

194

1                    FRANK SILLMAN

2      declaration that a showing can be made

3      against the debtors that reps and

4      warranties were breached under the

5      governing agreements, correct?

6          A.    Let me reread the sentence.

7                What was your question?

8                MR. BENTLEY:  Can you read it

9      back.

10               (Record read.)

11         A.    What I said was however, I take

12     no position on the ability of any party to

13     prove a breach of representations and

14     warranties under the governing agreements.

15     And I assume for the purposes of this

16     declaration that a showing can be made

17     against the debtors.

18         Q.    Now, as an expert you are

19     familiar with the use of assumptions in

20     forming your conclusions?

21         A.    Yes.

22         Q.    An assumption is something that

23     somebody gives to you and you accept

24     without vouching for it, fair?

25         A.    That someone gives to me as the

223

1                      FRANK SILLMAN

2              MR. BENTLEY:  Let's mark as

3         Exhibit 9 a three-page spreadsheet

4         bearing Bates numbers ending in -- I

5         guess it's just one Bates number on

6         all three pages.  30.1.612

7         RC-9019_00000001.  This is the very

8         first document put into the data room.

9              (Expert 9019 Exhibit 9,

10        three-page spreadsheet, Bates 30.1.612

11        RC-9019_00000001, marked for

12        identification, as of this date.)

13             MR. BENTLEY:  It's a three-page

14        spreadsheet and the heading on the

15        first page says Fortace Trusts

16        Analysis Comparisons.

17        A.    Also if it's possible to pull it

18   up just so I can.

19        Q.    Yes.

20        A.    Actually I believe there's a

21   subsequent version of this also.

22        Q.    Is the subsequent version

23   similar in format?

24        A.    I believe so, yes.

25        Q.    Just some of the numbers are

224

                    FRANK SILLMAN

1

2    different?

3        A.    Yes.

4        Q.    So is this the street or is this

5    or the subsequent version of it the

6    spreadsheet you were referring to when you

7    said you had a spreadsheet that calculated

8    the --

9        A.    Let me look at it to make sure

10   that --

11       Q.    -- the audit rate assumptions

12   set forth in the table in paragraph 53 of

13   your report.

14       A.    We also have -- I believe

15   there's a subsequent one also.  Let me

16   review the spreadsheet.

17       Q.    Sure, take your time.

18       A.    Yes, so this is -- I don't know

19   if this is the latter version but it still

20   has the information we are discussing here

21   which is the projected audit rate at the

22   lower and higher ranges.

23       Q.    Okay.  So just to be clear,

24   Exhibit 9 or possibly a later version of

25   Exhibit 9 contains the calculations you

225

1                    FRANK SILLMAN

2      were referring to a few minutes ago?

3          A.    Yes.

4          Q.    The calculations you used to

5      derive the audit rate ranges shown in the

6      table on paragraph 53 of your report?

7          A.    Right.  The total average of

8      65 percent and 69 percent.

9          Q.    Okay.  But how did you compute

10     each of the individual ranges shown on

11     this table?  For example, the first line,

12     trusts, liquidated loans, a range of 70 to

13     75 percent.  How did you compute those

14     numbers?

15         A.    That was based on my

16     professional experience with audit rate

17     percentages.

18         Q.    So do you compute it or did you

19     just -- does that number -- is that number

20     the product of any calculations?

21         A.    It's the product of my

22     professional experience.  There's not an

23     additional calculation.

24         Q.    You just came up with that

25     number?

226

                    FRANK SILLMAN

1

2          A.    I didn't just come up with it.

3     It's based on my professional experience.

4          Q.    How did you come up with it?

5                MR. RAINS:  Objection.  Asked

6          and answered.

7          Q.    How did you pick 70 percent

8     rather than 60 or 80 percent?

9                MR. RAINS:  Asked and answered.

10         A.    I came up with it based on my

11    professional experience.  I developed a

12    range to take into consideration the

13    variability of each one of these

14    categories.

15         Q.    Did you compute any of the

16    numbers shown in paragraph 53 other than

17    the average that's shown at the bottom of

18    the table?

19         A.    The assumptions for each

20    wouldn't delinquency buckets were based on

21    my professional experience.

22         Q.    But you didn't perform any

23    calculations to derive any of these

24    numbers?

25                MR. RAINS:  Which numbers?

227

          FRANK SILLMAN

1

2          MR. BENTLEY:  All of the numbers

3      in the table in paragraph 53 other

4      than the total average numbers shown

5      on the last line.

6          A.    The numbers for each of those

7      are assumptions based on my professional

8      experience.  So I developed those

9      assumptions and input them into the model.

10         Q.    How did you develop them?  Were

11     there any steps that went into the

12     development?

13         A.    Based on my professional

14     experience for these categories of loans

15     that's how I developed the assumptions.

16         Q.    Did you start with the total

17     average range of 65 to 69 and then back

18     into the component ranges?

19         A.    I did not.

20         Q.    And can you shed any more light

21     on how you came up with the various ranges

22     shown here, other than the total average

23     range?

24         A.    Based on my professional

25     experience.

228

                     FRANK SILLMAN

1
2       Q.    It wasn't a quantitative

3    calculation?

4       A.    It wasn't a -- you are asking me

5    is this a product of a mathematical

6    equation?

7       Q.    Correct.

8       A.    It was -- these individual

9    assumptions were not the product of an

10   additional mathematical equation.  They

11   were based on my professional experience.

12      Q.    And there's no backup to these

13   numbers?

14      A.    There is no -- there's no other

15   data to support these numbers other than

16   my professional experience.

17      Q.    If I ask you the same questions

18   about the numbers shown in the table on

19   paragraph -- in paragraph 56 of your

20   report are your answers the same?

21          MR. RAINS:  Objection.  Vague

22       and ambiguous.  Compound.

23          MR. BENTLEY:  You can walk

24       through all these questions again,

25       Darryl.

229

1                        FRANK SILLMAN

2          A.     I followed the same process

3     based on my professional experience in

4     determining the assumptions for each of

5     the lower and higher ranges in paragraph

6     56.

7          Q.     Did you prepare any calculations

8     that went in to the derivation of these

9     numbers, that is on paragraph -- in

10    paragraph 56?

11         A.     There aren't any additional

12    calculations to derive the assumptions

13    other than the calculations for the total

14    average.

15         Q.     Let me try to be clear.  The

16    total average numbers you derived from the

17    numbers above it in -- in the table?

18         A.     And they are weighted against

19    the estimated trust lifetime losses.  So

20    they are a function of a calculation in

21    the model.

22         Q.     But each of the numbers other

23    than the total average has no calculation

24    backing it up?

25         A.     That's right.  It's an

230

1              FRANK SILLMAN

2     assumption based on my professional

3     experience.

4          Q.    And there's no backup documents

5     or data supporting these numbers?

6          A.    That's correct.

7          Q.    Let's move on to breach rate.

8     And as we discussed before, breach rate is

9     simply the product of audit rate and

10    demand rate, correct?

11         A.    Correct.

12         Q.    So the derivation of this was

13    simply math?

14         A.    That's correct.  And then again

15    weighted against the estimated trust

16    lifetime losses for the averages.

17         Q.    Now, in paragraphs 57 and 58,

18    you refer to the breach rates used in the

19    BofA expert report and the Lehman expert

20    report, right?

21         A.    Yes.  I discussed them.

22         Q.    So you attempted to determine

23    what breach rate had been used in

24    connection with the BofA settlement,

25    right?

233

1                    FRANK SILLMAN

2      paragraph 62 of your declaration.  It

3      compares your agree rate to the one used

4      in the BofA and Lehman expert reports.

5                    Do you see that?

6          A.    Yes.

7          Q.    And it shows a BofA agree rate

8      of 40 percent?

9          A.    Correct.

10         Q.    And you base that on the

11     number -- you base that on the, what the

12     BofA expert called his success rate?

13         A.    Correct.

14         Q.    And that's the number shown in

15     his table on page 8 --

16         A.    Correct.

17         Q.    -- of Exhibit C?

18         A.    Under breach rate and success

19     rate.

20         Q.    And then on page 23, paragraph

21     65 of your declaration, you compare your

22     loss share rate to the loss share rate

23     shown in the BofA expert report.  Do you

24     see that?

25         A.    I don't believe the BofA shows

234

1               FRANK SILLMAN

2       an expert, a loss share rate, excuse me.

3       We calculated that by taking the estimated

4       losses divided by their higher and lower

5       range in the settlement columns.  I

6       believe that was in our spreadsheet.  We

7       can take a look at that.

8           Q.    Maybe this will help you.  Did

9       you -- to compute the 14 percent loss

10      share rate shown in your table in

11      paragraph 65 did you derive that from the

12      36 percent breach rate and the 40 percent

13      success rate shown on page 8 --

14          A.    Yes.

15          Q.    -- of the BofA expert report?

16          A.    Yeah, the same amount.

17          Q.    You simply multiplied 36 percent

18      by 40 percent?

19          A.    Yes, I believe that's the case.

20          Q.    And to get your Lehman agree

21      rates --

22          A.    I'm sorry.

23          Q.    I have got to review that.  So

24      I'm going to ask you now about how you

25      derived the breach rate, agree rate and

235

1                    FRANK SILLMAN

2      loss share rate you used for Lehman.  You

3      derived those from the Lehman expert

4      report attached as Exhibit D to your

5      declaration?

6          A.    Let me take a look at that

7      report.

8          Q.    And take your time but when you

9      are done I'm going to focus you on

10     paragraphs 19, 20 and 21 of that document.

11         A.    Okay.

12               Okay.

13         Q.    Let me focus you first on the

14     table shown in paragraph 57 of your

15     declaration, and specifically the line

16     relating to Lehman.  Did you derive these

17     Lehman breach rate assumptions from

18     paragraphs 19 and 21 of the Lehman expert

19     declaration?

20         A.    Yes.

21         Q.    And turn now to paragraph 62 of

22     your report.  And look at the Lehman

23     numbers in the table there.  Did you

24     derive those Lehman agree rate assumptions

25     from paragraphs 20 and 21 of the Lehman

236

                    FRANK SILLMAN

1

2      expert report?

3          A.    Yes.

4          Q.    And turn now to paragraph 65 of

5      your report, which shows certain Lehman

6      loss share rate assumptions.  Did you

7      derive those by simply multiplying your

8      Lehman breach rate by your Lehman agree

9      rate?

10         A.    Yes.  They are not mine but,

11     yes, from the --

12         Q.    Understood.

13         A.    From Lehman's, yes.

14         Q.    The numbers you put in your

15     tables for the Lehman breach rate and

16     agree rate?

17         A.    Yes.

18         Q.    Did you know whether the ResCap

19     board of directors, when it approved the

20     settlement, considered the BofA settlement

21     and the Lehman settlement?

22         A.    I don't have any information

23     about what the board considered as part of

24     the settlement.

25         Q.    We will move on.

271

FRANK SILLMAN

1

2      Q.    And that's simply the same agree

3  rate percentages that show up in your

4  report?

5      A.    That's correct.

6      Q.    Is agree rate addressed anywhere

7  else in this exhibit?

8      A.    I can't read the third page.

9          MR. BENTLEY:  Can you bring it

10     up on the screen?

11     A.    Let me look it up here.  Yes, in

12  this model it's just page 1 and 2.

13     Q.    Are there any -- is there

14  anything in this document that shows you

15  how you derived your agree rates?

16     A.    The average agree rates again

17  were the weighted average calculation of

18  the agree rates by the delinquency buckets

19  for both the lower and higher so.

20     Q.    So let me just see if I

21  understand.  Page 2 of Exhibit 9 shows low

22  and high ranges of agree rates both as a

23  total number and broken out by buckets?

24     A.    Yes.

25     Q.    And other than that is there any

272

1          FRANK SILLMAN

2    anything relating in any way to agree

3    rates on page 2 of this document?

4         A.    No.  That column referred here

5    as formula column H is where I calculate

6    the overall trust agree rate assumptions

7    for the lower and higher ranges.

8         Q.    But nothing in this document

9    shows how you got to the lower and higher

10   agree rate numbers shown for the various

11   buckets?

12        A.    That's correct.  Those were

13   based on my professional experience with

14   agree rates for these buckets adjusted for

15   the repurchase experience the debtor had

16   and the higher agree rates than the

17   industry as a whole for their GSE

18   repurchases.

19        Q.    Let's take it step by step.  I'm

20   going to ask you more about Exhibit 15 in

21   a moment.  But just to jump to the bottom

22   line, does Exhibit 15 show how you

23   computed the 41 to 47 percent agree rate

24   range?

25        A.    This was a validation step that

273

1                 FRANK SILLMAN

2      I went through to validate the assumptions

3      that I utilized in Exhibit 9, in the model

4      in Exhibit 9, to calculate the agree

5      rates.

6          Q.    When did you prepare Exhibit 15?

7          A.    This actual sheet in this

8      condition was produced after the filing of

9      my original declaration but based on

10     calculations that I did prior to my

11     original declaration.

12         Q.    Is there any reason that this

13     document refers in the heading to

14     supplemental declaration?

15         A.    I don't know whether or not

16     timing wise when this was added to the

17     data room.  That might be during the time,

18     you know, when the supplemental

19     declaration was filed.

20         Q.    Did you compute the 41 to

21     47 percent range in the method shown on

22     Exhibit 15 and then back into the

23     component parts shown on page 2 of

24     Exhibit 9 or did you do it the other way

25     around?

274

1          FRANK SILLMAN

2      A.    I did it the other way around.

3  So I first went through and input

4  assumptions regarding the projected agree

5  rates for the lower and higher ranges by

6  these delinquency buckets.

7      Q.    So how did you calc- -- and you

8  are referring now, I believe, to

9  Exhibit 9, page 2, column H.

10     A.    Correct.  It's column P in the

11  spreadsheet but the calculation call it

12  column H, yeah.

13     Q.    So I'm going to focus on column

14  H on page 2 of Exhibit 9.  And let's focus

15  first on the lower range.  So this shows,

16  the first number in this column is

17  42 percent.  And the number at the bottom

18  is 41 percent.  How do those numbers

19  relate to each other?

20     A.    The bottom number is a weighted

21  average.  And since -- in this scenario on

22  the estimated trusts lifetime losses the

23  vast majority of the losses had already

24  occurred in what I call trust liquidated

25  losses.  That number weights the weighted

275

                    FRANK SILLMAN

1

2      average more than the other categories,

3      the other line items.

4          Q.    Is the 42 percent also a total

5      and it's different from 41 just because of

6      rounding issues?

7          A.    No.  Independently -- the 41 is

8      just a product of the projected agree

9      rates for each one of the buckets times

10     the corresponding estimated trust's

11     lifetime losses.  So the 41 is just a

12     result of those calculations.

13         Q.    And what is the 42 percent?

14         A.    Which 42 percent?

15         Q.    At the top of column H.

16         A.    So the row 21 in column P.

17     Yeah.  The one associated on the line

18     trusts, liquidated loans 42 percent?

19         Q.    Correct.

20         A.    So that is my assumption for the

21     agree rate for trusts liquidated loans.

22     And the next is my assumption for current

23     nonmodified loans.

24         Q.    I see.

25         A.    And so on down the line.  So I

276

1                    FRANK SILLMAN

2     developed these assumptions by buckets

3     first.

4          Q.    How did you develop these

5     percentages?

6          A.    So I took my experience with

7     agree rates by these bucket categories and

8     I adjusted them for the higher experience,

9     agree rate experience the debtor had with

10    the GSEs versus the industry as a whole.

11    And then I further adjusted it for the

12    debtors rep and warrants overall

13    comparative to other industry PLS reps and

14    warrants.

15         Q.    Now, the three steps you just

16    described are shown on Exhibit 15,

17    correct?

18         A.    In aggregate, correct.

19         Q.    And you are saying that you

20    applied those same three steps to derive

21    the percentage for each of the buckets in

22    column H?

23         A.    That's correct.

24         Q.    Let's turn to Exhibit 15 then

25    and go step-by-step.

277

                    FRANK SILLMAN

1

2          A.    Okay.

3          Q.    Step one was you referred to

4    your personal experience at Fortace

5    advising both sell side and buy side

6    clients?

7          A.    Yes.  Also including my

8    experience at IndyMac Bank.

9          Q.    And how many Fortace clients did

10   you consider in doing this calculation?

11         A.    Three.

12         Q.    Can you identify them?

13         A.    No, I cannot.

14         Q.    Because they are confidential?

15         A.    Yes.

16         Q.    Okay.  Can you tell me about

17   characteristics of the loans that you

18   advised them on and how they compare to

19   the characteristics of the loans in the

20   pools being settled?

21         A.    In general they were Alt-A,

22   jumbo A, subprime, and HELOC originators.

23         Q.    Did you do any attempt to

24   quantify what portion of their loans fell

25   into each of those categories?

278

1                    FRANK SILLMAN

2        A.    I did not as part of this

3    analysis.

4        Q.    Did you attempt to quantify the

5    vintages of their loans as part of this

6    analysis?

7        A.    The vintages were similar

8    vintages to the vintages, the same time

9    period majority from 2005 to 2007.

10       Q.    Did you attempt to quantify how

11   the vintages broke out as between the

12   different years within that time frame?

13       A.    I did not do the further

14   analysis.  I didn't feel that was

15   necessary as part of my assumption

16   development.

17       Q.    Did you make any attempt to

18   compare how the reps and warranties

19   governing those loans compared to the reps

20   and warranties in the governing agreements

21   for the debtors?

22       A.    In general I did do that.

23   That's one of the discounts applied in my

24   Exhibit 15 document.

25       Q.    Okay.  So we will turn back to

279

1                    FRANK SILLMAN

2        that in a moment.  And over what years

3        were the put back demands and put back

4        responses that -- of the three clients you

5        are referring to?

6            A.    And the IndyMac experience.

7        They related to originations primarily

8        from 2005 to 2007.

9            Q.    I'm actually asking a different

10       question which is when were the put back

11       demands?  How long after origination?

12           A.    They were 2008 -- let me step

13       back.  IndyMac they were 2006 through

14       2008.  At my Fortace clients they were

15       2009 through part of 2012.

16           Q.    And did you attempt to -- did

17       you give any consideration to the length

18       of time between the origination and the

19       put back demands in the client experience

20       that you were basing your opinion on?

21           A.    I did not, with my experience

22       with, at IndyMac Bank and with my Fortace

23       clients, did not see any differences in

24       when the demand was presented and the

25       agree rates.

280

1                        FRANK SILLMAN

2          Q.    Did you make any attempts to

3     quantify the length of time between

4     originations and demands?

5                MR. JURGENS:  Objection to form.

6          A.    I didn't see that as a factors

7     that influenced the agree rates in the

8     work that I had been involved with.

9          Q.    So you didn't do any such

10    calculation?

11         A.    It was not included in my agree

12    rate calculation.

13         Q.    Now, what were the agree rates

14    of these three clients that you are

15    referring to?

16         A.    And IndyMac.  They ranged in

17    general from a low of around 37 to a high

18    of 42 percent.

19         Q.    One of the three clients was 37

20    and another was --

21         A.    No.  At different times the

22    agree rates, depending on who the demander

23    was, when the demands were made might

24    change how they negotiated and came to

25    agree rates.  So in general I would see

281

1              FRANK SILLMAN

2    the agree rates fluctuate which is why I

3    came up with this concept of ranges so

4    that I could take into consideration the

5    variability in all of these assumptions.

6         Q.    Now, a low of 37, high of 42,

7    those are very specific numbers.  Where

8    did you get those numbers from?

9         A.    They are based on my

10   professional experience in working with

11   repurchases.

12        Q.    But each of those numbers had to

13   be calculated, right?  It's not a number

14   you walked around carrying in your head,

15   is it?

16        A.    It's a number -- it's an

17   important number for your clients.  It's

18   one of the factors that they evaluate

19   various audit firms for as ultimately what

20   types of agree rates do they get based on

21   certain audit firms, all other things

22   being held equal.  So it is one that I am

23   familiar with from a global perspective.

24        Q.    So in computing this 37 to

25   42 percent range that you used in your, in

282

1                    FRANK SILLMAN

2    forming your conclusions, did you consult

3    any documents?

4         A.    I did not consult any documents.

5         Q.    You just knew those numbers by

6    memory?

7         A.    I do know those numbers by

8    memory.

9         Q.    This was the experience of three

10   clients.  Were they sell side or buy side?

11        A.    And IndyMac.

12        Q.    Sure.  Were the three Fortace

13   clients sell side?

14        A.    Yes.

15        Q.    How many sell side clients did

16   you have altogether who you advised on --

17   with respect to put back demands?

18        A.    For what period?  I mean, we had

19   clients come and go so.

20        Q.    From '09 through this year.

21        A.    Five clients.

22        Q.    About five sell side clients?

23        A.    Yes.

24        Q.    Why did you pick these three and

25   not the other two?

283

FRANK SILLMAN

1

2      A.     Just because of the volume of

3   work that we did for them or have done for

4   them is not significant.  The three --

5      Q.     The two --

6      A.     Yeah.  Two of the five we have

7   not done significant work for.

8      Q.     Did you consider including your

9   buy side clients in doing this analysis?

10      A.     Give me a second.  Let me just

11   recall.  The work we did for the buy side

12   was, in many cases, we did not receive

13   back the ultimate agree rate data for

14   those clients.  The three clients I picked

15   were ones where I received back agree rate

16   feedback.

17      Q.     Did you receive the ultimate

18   agree rate data for any of your buy side

19   clients?

20      A.     I may have received agree rate

21   data for those clients but I'm not sure.

22      Q.     Did you give any consideration

23   to including them in your analysis?

24      A.     I did consider them in

25   determining my analysis but felt that the

284

1                    FRANK SILLMAN

2      data from the three that I selected and my

3      IndyMac experience was more on point and

4      more robust than the information that was

5      provided to me.

6          Q.    What was the basis for that

7      conclusion?

8          A.    The amount of loans that we did

9      for them and the data that was provided to

10     us regarding the agree rates.

11         Q.    That explains how you concluded

12     it was more robust.  But how about more on

13     point?

14         A.    They were sell side clients,

15     very similar in structure to ResCap.

16         Q.    In what sense?

17         A.     In that they sold

18     securitizations with Alt-A, subprime,

19     jumbo A loans.

20         Q.    And that wasn't true of your buy

21     side clients?

22         A.    Some of the buy side clients

23     sold whole loan to companies like ResCap.

24     Some didn't have as robust of a

25     correspondent or conduit business as

296

1                          FRANK SILLMAN

2       shelf they may have changed.

3           Q.    Did you perform any system --

4       did you attempt to review the reps and

5       warrants of those clients in any

6       systematic way?

7           A.    I based it on my professional

8       experience and actual repurchase agree

9       rate experience with them in regards to

10      their reps and warrants.

11          Q.    And are there -- is there any

12      work product that you or your team

13      generated reflecting your review of the

14      reps and warrants of these other clients?

15          A.    There isn't any information that

16      I relied on that we did not provide to the

17      data room or in the exhibits.  It's

18      confidential information.  So we didn't

19      document any of the work.  This was based

20      on my professional experience with the

21      Fortace clients.

22          Q.    Let's just try to make sure we

23      have a clear record.  Did you go back and

24      look at the reps and warrants of these

25      other clients for purposes of performing

297

                    FRANK SILLMAN

1

2      your analysis or did you instead simply

3      rely on your general experience in

4      representing those clients?

5              MR. RAINS:  Or something else.

6          Tell him what you did.

7          A.    I relied on my familiarity with

8      the reps and warrants from my other

9      clients in comparing them to the reps and

10     warrants in the governing agreements that

11     I reviewed.

12         Q.    So you didn't conduct any rep

13     and warrant review of those other clients

14     for purposes of this analysis?

15         A.    I didn't do any additional rep

16     and warrant review other than the rep and

17     warrant review that I explained to you

18     that I did.

19         Q.    That you had done previously in

20     connection with your work for those other

21     clients?

22         A.    Correct.

23         Q.    And same question with respect

24     to IndyMac.  Did you go back and look at

25     the reps and warrants for any IndyMac

300

1              FRANK SILLMAN

2           MR. JURGENS:  Can we take a

3      break?  Is this a good time.

4           MR. RAINS:  We only have like

5      five minutes so.  Whether it's 5 or 7

6      or whatever let's not take a break

7      now.  Let's push through the end.

8           MR. BENTLEY:  Let's push through

9      and --

10          MR. JURGENS:  Then I'm just

11     going to say for the record that MBIA

12     is very unhappy that we got no time at

13     all despite the fact that we were

14     promised approximately an hour at the

15     beginning of the deposition.  I'm also

16     reserving MBIA's right to compel

17     Mr. Sillman to identify the three

18     clients that he's referred to several

19     times today in light of the fact that

20     he relied on his experience doing work

21     for those clients in rendering the

22     expert opinions that were the subject

23     of his declarations.

24          MR. BENTLEY:  Let's go off the

25     record.

301

                    FRANK SILLMAN

1

2          MR. RAINS:  Who promised you one

3     hour today?

4          MR. JURGENS:  Mr. Bentley.

5          MR. BENTLEY:  Let's go off the

6     record.  Can we go off the record for

7     a minute, Darryl?

8          MR. RAINS:  The witness has been

9     here since 9:00, right?  It's now 6:30

10    and I'd like to get him out.  We only

11    have a few number of minutes left.

12         MR. BENTLEY:  What do we have on

13    your clock?

14         MR. RAINS:  I wrote down we

15    should stop at 6:30.  I'm not

16    counting --

17         MR. BENTLEY:  Can we go off the

18    record?

19         MR. RAINS:  Sure.

20         (Whereupon, there is a recess in

21    the proceedings.)

22   BY MR. BENTLEY:

23    Q.   Exhibit A to your report

24   addresses GSE buyback experience?

25         MR. RAINS:  Actually can I

321

1                        FRANK SILLMAN

2      take into consideration independent of

3      whatever the companies may have done, or

4      not the companies really, the GSEs, right,

5      took into consideration?

6                     MR. RAINS:  Objection.  Vague

7          and ambiguous.

8                     MR. JURGENS:  Fair enough.  I

9          withdraw the question.

10         Q.    My last question and my last

11     minute.  Focusing on your three clients at

12     Fortace whose -- focusing on the three

13     clients at Fortace whose repurchase

14     experience and agree rate experience you

15     considered in connection with preparing

16     your report, did any of the repurchase

17     work that you did for them involve first

18     liens?

19         A.    Yes.

20         Q.    Could you put a percentage on

21     the first liens versus second liens that

22     you considered for your three clients?

23         A.    I considered both, IndyMac and

24     the Fortace clients.  But I can't put a --

25         Q.    Put aside IndyMac for a second.

322

                    FRANK SILLMAN

1

2      Just focusing on the three clients.  Is

3      one of the three clients the debtors RFC

4      or --

5           A.    I cant disclose.

6           Q.    Well, no, but just when you say

7      there are three clients, does that include

8      the debtors or is that exclusive of the

9      debtors?

10          A.    That includes the debtors and --

11          Q.    And are you treating GMAC and

12     RFC as two of the three?

13          A.    We treated those clients

14     separately and they were considered

15     separately and --

16          Q.    So when you were telling

17     Mr. Bentley earlier that in making your

18     assumptions about different things that

19     you looked to your experience with three

20     clients, it's really the debtors plus one

21     other client; is that right?

22          A.    That's correct.

23          Q.    And for that one other client,

24     did you evaluate repurchase demands made

25     with respect to first liens?

323

1            FRANK SILLMAN

2      A.    They were predominantly first

3   liens.

4      Q.    Okay.

5            MR. JURGENS:  Okay.  That's all

6   the questions that I have.

7            MR. RAINS:  Thanks everyone.

8            (Time noted:  7:01 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25