**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No.: 12-12020 (MG) |
| Debtors. | Jointly Administered |

**SUPPLEMENTAL DECLARATION OF R. BRUCE CARLSON IN SUPPORT OF**
**MOTION TO APPLY BANKRUPTCY RULE 7023 AND TO CERTIFY CLASS CLAIMS**

1.    I, R. Bruce Carlson, am an adult individual and I make this declaration based upon my own personal knowledge and under all applicable penalties for perjury.

2.    While Claimants believe that their Original Declaration is sufficient to demonstrate that the claims in dispute easily satisfy all of the elements of Fed. R. Civ. P. 23 consistent with the Second Circuit's analysis in *Shahriar v. Smith & Wollensky Restaurant Group, Inc.,* 659 F.3d 234, 251-253 (2d Cir. 2011), wherein the Second Circuit panel provided a detailed roadmap regarding the evidentiary showing that must be made to support the elements of Rule 23, they respectfully offer this Supplemental Declaration to the Court to reinforce the propriety of class certification.[1]

---

[1] The Court should note that by now opposing class certification, the Debtor is taking precisely the opposite position from the position it took in the MDL litigation in the Western District of Pennsylvania and the Third Circuit, wherein it argued vociferously that class certification of the claims at issue is wholly appropriate. In those proceedings, the Debtor's subsidiary Residential Funding Company, LLC ("RFC"), was represented by Reed Smith LLP. *See* Settling Parties Brief in Support of Certification of a Settlement Class and Approval of Proposed Modified Settlement attached as **Exhibit 1**. The Court should further note that K. Lee Marshall—who submitted a Declaration in opposition to class certification in these bankruptcy proceedings—is a veritable stranger to the litigation that occurred in the Western District of Pennsylvania and the Third Circuit. He and his law firm (Bryan Cave LLP) assumed primary responsibility for the representation of RFC in the WDPA in the spring of 2011—more than six months after *Community Bank II* was issued by Third Circuit.

1

3.      The genesis of this case derives from the identification of a material discrepancy between the characterization of the cost and allocation of loan origination fees disclosed to residential borrowers (i.e. Class Claimants) in uniform standardized federal loan documents and the characterization of the cost and allocation of those same loan origination fees in financial reporting to the Securities and Exchange Commission. ("SEC").

4.      Specifically, I and my prior law firm were first retained in the late 1990s to represent a number of residential mortgage borrowers who had obtained second mortgage loans from two different originating lenders:  1)  Community Bank of Northern Virginia; and, 2) Guaranty National Bank of Tallahassee.  In the course of those engagements, I reviewed an extensive number of loan settlement documents generated in connection with the closing of each loan transaction.

5.      All of the loans shared a similar profile and all of the borrowers were being charged extremely high settlement fees.  For example, materially all of the borrowers received HUD-1 settlement forms indicating that the originating lender for the loan (either Community Bank of Northern Virginia or Guaranty National Bank of Tallahassee) was retaining origination fees approximating 10% of the original balance of the loan.  See, HUD-1 Settlement Statements for Rowena Drennen, Flora Gaskin, and John and Rebecca Picard attached as **Exhibits 2-4**. Every named Claimant and every putative class member received a HUD-1 form at closing which demonstrated a similar allocation of settlement fees.

6.      From the inception of our investigation into these loans, we strongly suspected that they included multiple unlawful features.  As part of that initial investigation, my office pulled all of the SEC filings that had been submitted on behalf of the originating lenders. We then compared the information that was being reported to the SEC with the standardized

2

disclosures that were being made to borrowers at loan closing and noted a critical and very much material discrepancy.

7.      Specifically, we noted that while all of the borrowers were provided with HUD-1 Settlement Forms at closing indicating that origination fees of 10% or more were being collected from each borrower and paid to the originating lenders (Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee), those same originating lenders were reporting to the SEC that they were only retaining only 1 to 2 percent from each loan in origination fees and that the remainder was being paid to a third-party entity that was never disclosed to the borrowers at any time (i.e. the Shumway/Bapst Organization).  See excerpts from Community Bank of Northern Virginia 1998 and 1999 Annual Reports attached as **Exhibits 5 and 6**.

8.      Subsequently, as our investigation continued, we learned that though the majority of the origination fees were being kicked-back to the Shumway/Bapst Organization, the Shumway/Bapst Organization was not providing settlement services in connection with the loans.

9.      Ultimately, we learned that not only was the Shumway/Bapst Organization not performing any settlement services in connection with the loans at issue (notwithstanding that it was receiving the bulk of the settlement fees), but that it was ***contractually precluded from providing any settlement services***.

10.      We concluded that this arrangement—whereby the bulk of the settlement fees charged in connection with the closing of a residential mortgage loan are being paid to an entity that is not only failing to provide any settlement services in connection with the loans at issue---but is indeed contractually precluded from providing any settlement services—is an unambiguous and fundamental violation of RESPA and corollary consumer protection laws.

11.    The propriety of class certification in cases where borrowers have paid settlement fees to a party that has not provided any settlement services (a prerequisite to eligibility to receive the fee under federal law) was discussed at length in *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1325-26 (11th Cir. 2008), and is discussed in our Reply Brief in Support of Class Certification. S*ee also, Weil v. The Long Island Savings Bank*, 200 F.R.D. 164, 174 (E.D.N.Y. 2001).

12.    As was the case in *Busby,* liability with respect to the predicate claims at issue here (i.e. the RESPA origination claims) can be established by way of a simple binary analysis: did the Shumway/Bapst Organization provide settlement services in exchange for the fees that it received?  The answer to this question is a resounding no, given that they were contractually precluded from providing settlement services. *See* Consulting Agreement between Shumway/Bapst Organization and Community Bank of Northern Virginia attached as **Exhibit 7**; Consulting Agreement between Shumway/Bapst Organization and Guaranty National Bank of Tallahassee attached as **Exhibit 8**; and, Supplemental Pre-Filed Testimony of David B. Shuway submitted to the Commonwealth of Virginia State Corporation Commission attached as **Exhibit 9**.

13.    Contrary to the suggestions of the Debtors, then, it is a straightforward exercise to provide sufficient information to satisfy Claimants' evidentiary burden under Rule 23, consistent with applicable Second Circuit authority.  *See, e.g.  Shahriar v. Smith & Wollensky Restaurant Group, Inc., supra.*

## Evidence Establishing That Claimants' Satisfy Rule 23

14.     **Numerosity.**   Under Fed. R. Civ. P. 23(a)(1), Claimants must establish by a preponderance of the evidence that the "class is so numerous that joinder is impracticable." There are in excess of 44,000 class loans at issue involving in excess of 60,000 borrowers. Numerosity is not contested and, as the Third Circuit recognized in both *Community Bank I and II*, this element is easily satisfied.

15.     **Commonality.**     Consistent with the discussion of commonality in Class Claimant's Original Brief and Reply Brief, commonality is easily demonstrated by a consideration of the evidence before the Court regarding Claimant's RESPA origination fee claim, as follows:  Substantially all of the HUD-1 Settlement Forms distributed to the named Claimants and the borrowers in the putative class indicate that the origination fees listed in Section 800 of those forms—which totaled on average more than 10% of the original balance of the loans—were being paid to the originating lenders (i.e. either Community Bank of Northern Virginia or Guaranty National Bank of Tallahassee).  *See* Drennan, Gaskin and Picard HUD-1 Settlement Statements (Exhibits 2-4) .  However, the representations in the HUD-1s were demonstrably false.  The amount being retained by the originating lenders was actually much smaller (1 to 2 points on each loan).  *See* Excerpt from Community Bank of Northern Virginia Annual Statements (Exhibits 5 and 6);  *see also*, Community Bank of Northern Virginia Consulting Agreement at Paragraph 8, and Addenda A, B and D (Exhibit 7);  Guaranty National Bank of Tallahassee Consulting Agreement at Paragraph 8, and Addenda (Exhibit 8).  As noted, the Shumway/Bapst organization was not performing *any* settlement services in connection with the loans at issue, was contractually precluded from performing any settlement services, and, therefore could not lawfully share in the settlement fees that were generated when the loans

closed.  *See* CBNV Consulting Agreement at Paragraph 3, listing duties of "Consultant" (none of the services listed are "settlement services," a defined term under applicable federal law) (Exhibit 7); GNBT Consulting Agreement at Paragraph 2 (Exhibit 8);  and, Pre-Filed Testimony of David B. Shumway at P. 8, lines Q56-A58 ("Q:  When Equity Guaranty had a consulting agreement with Guaranty National Bank, were any employees of Equity Guaranty involved in originating mortgage loans?  A:  No;  Q:  When Equity Guaranty had a consulting agreement with Guaranty National Bank of Tallahassee were any employees of Equity Guaranty involved with processing mortgage loans?  A:  No; Q:  Did Equity Guaranty ever directly or indirectly originate or make mortgage loans while acting as a consultant to Guaranty National Bank?  A: No) (Exhibit 9).  As applicable law requires, the resolution of the claims alleged by Claimants and the putative Class are susceptible to common proof.  Either the origination fees at issue were paid to the Shumway/Bapst Organization or they were not.  Similarly, either the Shumway/Bapst Organization was contractually precluded from providing any settlement services in exchange for the settlement fees at issue, or it was not. Contrary to the representation of the Debtors, then, resolution of the legal questions at issue is ***not*** dependent upon a tedious file by file review of "the individual loan information contained on the forms."  The whole point is that every loan transaction was identical in material part.[2]

16.    **Typicality.**    Under Fed. R. Civ. P. 23(a)(3), Claimants must establish by a preponderance of the evidence that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Here again, typicality is not contested. The claims of the named representatives are identical to the claims of the putative class members.  As the Third Circuit recognized in *Community Bank I and II*, typicality is not an issue.

---

[2] All of the claims being asserted by Claimants are susceptible to this same type of common analysis.

17.     **Adequacy.**   Under Fed. R. Civ. P. 23(a)(4), Claimants must establish by a preponderance of the evidence that they will "fairly and adequately protect the interests of the class."   The evidence regarding this element of Rule 23 is set forth at length below, following the discussion of the two remaining elements of Rule 23(b).

18.     **Predominance**.   In addition to the elements of Rule 23(a) that are discussed above, Claimants must also satisfy the elements of Fed. R. Civ. P. 23(b)(3).   Specifically, Claimants must establish by a preponderance of evidence that "questions of law or fact common to class members predominate over any questions affecting only individual members."   The same evidence that was discussed in the context of commonality, *supra*., establishes that common claims predominate.   For example, substantially all class members paid thousands of dollars in origination fees –after receiving false federal loan documents indicating that the fees were being paid to the originating lenders—when in reality the fees generated in connection with each loan were being kicked-back to an unidentified entity that was not performing any settlement services and therefore not eligible to receive the fees.   There are no individualized loan specific inquiries that are relevant to whether this conduct was occurring (it either was, or was not).

19.     **Superiority**.   The second element of Rule 23(b)(3) requires that the Claimants establish by a preponderance of the evidence that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   The Debtors assert that there is no superiority here because "systemic considerations favor the bankruptcy claims process over class action litigation . . . ."  Debtors' Opposition at 25.  This statement represents a fundamental distortion of the record before the Court, as is discussed at length in our Reply Brief, and class adjudication is the only viable alternative if these Claimants are to stand any chance of recovery.

**Adequacy**

20.    I have been counsel on behalf of plaintiffs in class action litigation for approximately the past fifteen years.

21.    In June of 2004 I became a founding partner at Carlson Lynch Ltd. Since its inception, Carlson Lynch has represented plaintiffs in consumer, labor and employment and wage and hour class action litigation in state and federal courts throughout the country.  In the course of this practice, I and my firm have been approved as class counsel many times.  A Firm Resume describing my relevant experience—as well as my firm's relevant experience—is attached to this Supplemental Declaration as **Exhibit 10**.

22.    No court has ever ruled that I was not adequate to serve as class counsel. Similarly, no court has ever ruled that any lawyer in my firm was not adequate to serve as class counsel.

23.     If my request to be appointed as class counsel in this matter is granted, I and my firm will commit whatever resources are necessary to vigorously pursue the interests of the entire class.

24.    I have been prosecuting class-based claims on behalf of Plaintiffs/Claimants related to the conduct in dispute since approximately 2000 and I am intimately familiar with the factual basis of the claims and the legal theories that have been invoked to prosecute the claims.

25.    I am aware of no conflict of interest between me or my firm and any class member.  I, my firm and our co-counsel in this bankruptcy proceeding—Walters Bender Strohbehn & Vaughan, P.C., are fully motivated to maximize the potential recovery from the Debtors on behalf of the named Claimants and all of the putative class members.

26.    Similarly, I am aware of no conflict of interest among any of the class members.

27.     Instead, all of the named Claimants are similarly motivated to maximize their potential monetary recoveries from the Debtors on behalf of the class.

28.     As noted above in this Supplemental Declaration, for more than ten years I have been representing residential borrowers in connection with litigation related to the second mortgage loans at issue pending in the United States District Court for the Western District of Pennsylvania (the "WDPA Litigation").

29.     The WDPA litigation spawned two separate class action settlements related to the residential mortgage loans at issue.

30.     In December 2003 Judge Lancaster (now Chief Judge Lancaster) issued an opinion and order certifying the proposed class and approving the proposed settlement.  The Debtors' subsidiary RFC—which had been named as a party defendant in its own right and as an assignee which purchased all of the loans at issue from the originating lenders—agreed to fund most of the settlement and supported both certification of the class and final approval of the settlement before the WDPA.

31.     There were objections to the settlement and lead counsel for the objectors was Fred Walters from the Kansas City law firm Walters Bender Strohbehn & Vaughan, P.C.  The objectors' primary argument in opposition to the settlement was that the settlement amount was inadequate because it failed to take into account potential claims under the Truth in Lending Act ("TILA") and the Home Ownership Equity Protection Act ("HOEPA") which, if successful, could lead to substantial additional damages.

32.     The objectors appealed the final order and judgment certifying the class and approving the settlement to the United States Court of Appeals for the Third Circuit.

33.     I argued the position of the settling plaintiffs and the class before the Third Circuit.

34.     On August 11, 2005, the Third Circuit issued an opinion and order vacating the WDPA's order certifying the class and approving the settlement, and remanded the case to the WDPA for further proceedings consistent with the opinion.  *See In re Community Bank of Northern Virginia, et al.*, 418 F.3d 277 (3d Cir. 2005)(*In re Community Bank I*).

35.     After protracted proceedings on remand in the WDPA, and mediation with a former judge from United States Court of Appeals for the Third Circuit, the parties to the original settlement agreed to a modified-enhanced class settlement ("Modified Settlement").  The WDPA entered an Order certifying the class and granting final approval of the Modified Settlement on August 14, 2008.

36.     Subsequently, the same group of objectors who opposed the original settlement—again represented by Fred Walters and Walters, Bender, Strohbehn & Vaughan—appealed the approval of the Modified Settlement to the Third Circuit.

37.     On October 20, 2010, the Third Circuit issued a lengthy opinion again vacating the WDPA's order certifying the class and granting final approval of the Modified Settlement. In its opinion, the Third Circuit expressly held that the proposed settlement class satisfied every applicable element of Fed. R. Civ. P. 23 with the possible exception of adequacy of representation under Fed. R. Civ. P. 23(a)(4).  In the context of its discussion of Rule 23(a)(4), the Third Circuit expressed its belief that the proposed class could in fact be properly certified and provided detailed guidance regarding how the parties could satisfy any concerns regarding the adequacy issue and again remanded the case to the WDPA for further proceedings consistent

with its opinion. *See In re Community Bank of Northern Virginia, et al.*, 622 F.3d 275 (3d Cir.

2010)("*In re Community Bank II*").

38.    As set forth in *Community Bank II* the Third Circuit's overarching concern

regarding adequacy was that the settling plaintiffs had not asserted the TILA/HOEPA claims

advocated by the objectors.

39.    Following remand, counsel for the Debtors' subsidiary RFC urged that with minor

changes and a more fully developed record, the same Modified Settlement which was rejected by

the Third Circuit in *Community Bank II* could be successfully supported for what would have

been a third request for final approval from the WDPA, and presumably, on what would have

been an inevitable appeal to the Third Circuit.

40.    As lead counsel for the named plaintiffs, I rejected RFC's attempt to revive the

Modified Settlement and determined that the best interests of the class dictated that all plaintiffs,

and all counsel for plaintiffs, join forces, so that all of the interests of the putative class members

were fully aligned and there could be no credible claim that the interests of the class were not

being adequately represented.  To that end, on February 22, 2011, on behalf of the previously

settling Plaintiffs we filed Plaintiffs' Motion for Multidistrict Case Management Order, which

stated in relevant part, "[t]o the extent that the Third Circuit's Opinion and Order [i.e.

*Community Bank II*] did not nullify the Modified Settlement, the Modification Plaintiffs have

notified Defendants that they are invoking Paragraph 7 of the Modification Agreement, which

states as follows:

> Plaintiffs' Counsel agree that they shall make all reasonable, good faith efforts to
> seek and obtain Court approval of the Settlement Agreement as modified,
> provided however, that Plaintiffs' Counsel shall be free at all times to use their
> independent judgment to take such action as is in the best interests of the Class.
> Plaintiffs' Counsel further agree, however, that if in their independent judgment
> the Settlement Agreement as modified is no longer in the best interests of the

Class, they shall so notify Defendants prior to taking any action to notify the Court. Defendant shall, in that case, have the right to, within a reasonable amount of time under the circumstances then in existence, require Plaintiffs' Counsel to enter into non-binding mediation regarding that issue and the issue of the manner of any notification to the Court of Plaintiffs' Counsels' determination, before the Hon. Timothy K. Lewis or such other mediator mutually agreeable to the Settling Parties.

*See* Plaintiffs' Motion for Multidistrict Case Management Order, and proposed Multidistrict Case Management Order, attached as **Exhibit 11**. On the next day, counsel for the objecting plaintiffs filed a separate Objector Plaintiffs' Motion for Multidistrict Case Management Order Number One, wherein they expressed their agreement with our Motion for Multidistrict Case Management Order, but noted the additional following point:

The Objector Plaintiffs disagree that any attempt at further mediation should precede the entry of a Case Management Order. Instead, the Objector Plaintiffs believe that the interests of all MDL Plaintiffs and the putative classes they represent and even the Defendants will all best be served by the immediate entry of a Case Management Order, in the form attached (which form is identical to that proposed by the Kessler Plaintiffs in regard to the appointment of co-lead plaintiffs' counsel). The Objector Plaintiffs and Kessler Plaintiffs are in complete agreement as to the appointment of co-lead plaintiffs' counsel and interim class counsel for the MDL. Objector Plaintiffs respectfully believe that immediate entry of the Case Management Order and appointment of co-lead counsel is necessary to avoid the adequacy of representation issues that underlie the Third Circuit's rejection of the two previous attempts to settle these matters and creates a structure that is necessary for any successful resolution of these matters . . . .

*See* Objector Plaintiffs' Motion for Multidistrict Case Management Order Number One attached as **Exhibit 12**.

41.    Following the Third Circuit's issuance the *Community Bank II* opinion, the initial post-remand status conference in the WDPA occurred on February 23, 2011, at which time the court was apprised of the fact that I and the other counsel who had represented the plaintiffs supporting the Modified Settlement would thereafter be working with Fred Walters and the other

12

counsel who had, to that point, been representing the objectors to the Modified Settlement. *See*
Minute Order dated February 23, 2013, attached as **Exhibit 13**.

42.    By letter dated March 18, 2011, counsel for RFC apprised me that as permitted
by Paragraph 7 of the Modification Agreement, it was invoking its right to require Plaintiffs'
Counsel to enter into non-binding mediation. *See* March 18, 2011, letter from Tom Allen to
Bruce Carlson attached as **Exhibit 14**.

43.    Subsequently, counsel for RFC apprised me that RFC agreed that Mr. Walters and
his firm could participate in the mediation. *See* Stipulation of Counsel Regarding Matters
Addressed at Status Conference on February 23, 2011, at Paragraph 2, attached as **Exhibit 15**.

44.    On May 13, 2011, prior to the proposed global mediation of the claims at issue,
my firm and Mr. Walter's firm filed Plaintiffs' Motion for Leave to File Joint Consolidated
Amended Class Action Complaint, which stated, *inter alia*:  "Now, upon this second remand
from the Third Circuit, those class members and their counsel that previously sought settlement
and those class members and their counsel that previously objected to the settlements seek to
collaboratively litigate the class claims, which joint effort moots the noted adequacy of
representation concerns." *See* Plaintiffs' Motion for Leave to File Joint Consolidated Amended
Class Action Complaint attached as **Exhibit 16**, at page 3.

45.    The global mediation occurred in New York on June 9, 2011.  The mediation was
unsuccessful.

46.    On June 21, 2011, my firm, along with Walters Bender, filed a pleading styled as,
All Plaintiffs' Joint Motion for Multidistrict Case Management Order Number One, which
stated, in relevant part:  "[a]ll Plaintiffs notify the Court that their mediation conducted on June
9, 2011 was unsuccessful," and that "[t]he jointly Proposed Case Management Order No. 1 . . .

consolidates in one document the provisions from the prior separately proposed Case

Management Orders . . . that all Plaintiffs now agree upon." *See* All Plaintiffs' Joint Motion for

Multidistrict Case Management Order Number One attached as **Exhibit 17**.

47.    RFC opposed Plaintiffs' Motion for an MDL CMO.  In the Reply Brief in support

of the Motion, we explained in detail why I no longer believed that the Modified Settlement was

in the best interests of the class, as follows:

> Defendant's hollow rhetoric notwithstanding, it is difficult to conceive of more adequate counsel for the Class in this case than Carlson Lynch and WBSV.

> Defendants chide Bruce Carlson because he initially questioned the strategic desirability of asserting TILA/HOEPA claims on behalf of Plaintiffs, and now proposes to champion those same claims.  However, a significant event occurred that caused Carlson to reconsider his position on that issue:  The Third Circuit issued a lengthy opinion which strongly intimates that the claims are likely viable on a class basis.

> Defendants further accuse Carlson of "abandoning" the Class because he no longer supports a class settlement that he once deemed to be fair, adequate and reasonable.  Carlson has not "abandoned" the Class.  Instead, the Third Circuit has reversed the Order certifying the Class, and thus there is no "Class" to abandon.

> Further, the occurrence of events since the time of the modified settlement has caused Carlson to reevaluate his position regarding the fairness and adequacy of the Modified Settlement.  First, the Third Circuit has reinforced its initial suggestion that class certification of the claims in dispute should be granted so long as Plaintiffs can satisfy the adequacy of representation requirements of Rule 23(a)(4).  Plaintiffs will take all steps necessary to satisfy that deficiency and obtain certification of the Class.

> In addition, Third Circuit law regarding the RESPA claims at issue has evolved in a manner that is favorable to Plaintiffs.  Specifically, it is now settled law in the Third Circuit that the proper damage calculation regarding the RESPA claims at issue requires mandatory trebling of **_all_** of the settlement fees at issue, not just the amount that reflects an arguable overcharge. *Alston v. Countrywide Financial Corporation*, 585 F.3d 753 (3d Cir. 2009).   This calculus causes the RESPA claims in dispute to have a value in excess of $600,000,000.00.

14

Relatedly, Plaintiffs have confirmed additional facts regarding the conduct at issue which significantly reinforces their ability to prove Defendants' liability under Section 8(a) of RESPA.

Specifically, the structure that was in place during the majority of the time when most of the residential mortgage loans at issue were made resulted in the vast majority of the settlement fees being kicked-back to an entity that was contractually precluded from providing any compensable settlement services in connection with the loan.

In short, Carlson's view of what constitutes a "fair, adequate and reasonable" settlement has evolved consonant with the variables set forth above— all of which make Plaintiffs' claims much more valuable currently than they were at the time that the Modified Settlement was negotiated. Given the evolution of these cases, prudence and good judgment suggest that Plaintiffs' counsel must take into account the change in circumstances that has occurred in order to best serve the interests of the class.

See Plaintiffs' Reply Brief in Support of Motion for Entry of Multidistrict Case Management Order Number One attached as **Exhibit 18**. The WDPA issued a Memorandum and Case Management Order on September 20, 2011, appointing me and Fred Walters as interim class counsel in the WDPA litigation. *See* Memorandum and Case Management Order attached as **Exhibit 19**.

48.    I attest that the language above describing the basis for my change of position with respect to whether the Modified Settlement was in the best interests of the class, my decision to become co-counsel with Fred Walters and Walters Bender and my decision to file the Joint Consolidated Amended Class Action Complaint in the WDPA which included claims under TILE/HOEPA is factually accurate.

15

Under penalty of perjury, I declare that the above statements, are true and correct to the best of my knowledge.

Executed at Pittsburgh, Pennsylvania this 8th day of February, 2013.

R. Bruce Carlson