# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THIS DOCUMENT RELATES TO THESE ACTIONS:

| | |
|---|---|
| In re:<br>COMMUNITY BANK OF NORTHERN VIRGINIA<br>MORTGAGE LENDING PRACTICES<br>LITIGATION | MDL No. 1674<br><br>Hon. Gary L. Lancaster<br><br>Electronically Filed |
| In re:<br>COMMUNITY BANK OF NORTHERN VIRGINIA<br>AND GUARANTY NATIONAL BANK OF<br>TALLAHASSEE SECOND MORTGAGE LOAN<br>LITIGATION | Case No. 03-425 |

---

## SETTLING PARTIES' BRIEF IN SUPPORT OF CERTIFICATION OF A SETTLEMENT CLASS AND APPROVAL OF PROPOSED MODIFIED SETTLEMENT

---

A. Hoyt Rowell, III
Daniel Myers
**RICHARDSON, PATRICK,**
**WESTBROOK & BRICKMAN, LLC**
1037 Chuck Dawley Blvd. Bldg A
Mt. Pleasant, SC 29464
**Counsel For The Named Plaintiffs And**
**The Class**

R. Bruce Carlson
Gary Lynch
**CARLSON LYNCH LTD.**
P.O. Box 367
231 Melville Lane
Sewickley, PA  15143
(412) 749-1677
**Counsel For The Named Plaintiffs And**
**The Class**

Thomas L. Allen
Roy W. Arnold
Donna M. Doblick
**REED SMITH LLP**
435 Sixth Avenue
Pittsburgh, PA  15219
Phone:  412.288.3066/3916/7274
Fax:  412.288.3063
**Counsel for Residential Funding**
**Company, LLC**

F. Douglas Ross
**ODIN FELDMAN & PITTLEMAN, P.C.**
9302 Lee Highway, Suite 1100
Fairfax, VA  22031
(703) 218-2127
**Counsel For Community Bank of**
**Northern Virginia**

William A Dyess
Legal Division, Commercial Litigation Unit
**Federal Deposit Insurance Corporation**
1717 H Street, N.W., Room H-10166
Washington, D.C.  20429
**Counsel for FDIC, As Receiver for**
**Guaranty National Bank of Tallahassee**

# TABLE OF CONTENTS

I.  Introduction ............................................................................................................................1

II.  Relevant Procedural History of This Litigation ..................................................................2

    A.  The Six Underlying Actions ........................................................................................2

    B.  The Parties Settle, And The Court Conditionally Certifies
        A Nationwide Settlement Class .....................................................................................5

        1.  The terms of the Original Settlement ..............................................................5

        2.  The Court preliminarily approves the Original Settlement and
            directs the issuance of Class-wide notice........................................................8

    C.  The Court Exercises Its Responsibility To Ensure That Class
        Members Who Had Been Solicited By Plaintiffs' Lawyers To
        Opt-Out Of The Class Or Object To The Settlement Were In A
        Position to Make Informed Decisions .........................................................................9

    D.  The Consolidation Of Claims, The Fairness Hearing, And The
        Final Approval Of The Settlement ............................................................................10

        1.  The Consolidated Amended Class Action Complaint ...............................10

        2.  The evidence and arguments in support of and in opposition
            to the Original Settlement ............................................................................10

        3.  The Court makes findings of fact and conclusions of law, and
            ultimately gives its final approval to the Original Settlement .................12

    E.  The Court Of Appeals Remands For Further Consideration
        Under Fed. R. Civ. P. 23(a)(4) ..................................................................................12

    F.  The Parties Brief the Viability of the TILA/HOEPA Claims And
        Also Negotiate a Modification of the Original Settlement .....................................14

    G.  After Extensive Briefing, This Court Concludes That The
        Objectors' Theorized TILA/HOEPA Claims Are Not Viable ..............................17

III.  Overview Of The Court's Role ..........................................................................................17

IV.  The Proposed Settlement Class Satisfies The Requirements Of Rules 23(a)
    and 23(b), And Should Again Be Certified .......................................................................18

    A.  The Settlement Class Meets The Rule 23(a) Requirements of Numerosity,
        Commonality, and Typicality ...................................................................................19

    B.  The Third Circuit Correctly Noted That The Settlement Class
        Meets The Rule 23 (b)(3) Requirements of Predominance and
        Superiority ...................................................................................................................20

C.      The Settlement Class Also Satisfies The Rule 23(a)(4)
"Adequacy of Representation" Requirement .......................................................22

D.      No Subclasses Are Appropriate .........................................................................23

      1.      No subclass is warranted for Class members who have
alleged TILA/HOEPA claims, because none of them do ..........................24

      2.      No subclass is warranted for Class members with alleged
claims under North Carolina law .............................................................24

            a.      The *Bumpers* plaintiffs have waived any right
they may have had to argue for the creation of a subclass.............25

            b.      The Third Circuit did not, as the *Bumpers* plaintiffs contend,
mandate or even suggest the creation of a subclass of
borrowers with alleged state-law claims ........................................26

                  (1)      The Original Settlement expressly accounts for
Class members' potential state law claims (including
potential claims under North Carolina law) ......................27

                  (2)      The posited claims under North Carolina law
are preempted by federal law ..............................................27

            c.      There is no conflict of interest that would warrant the
creation of a North Carolina subclass .............................................30

V.      The Modified Settlement Is Fair, Reasonable, and Adequate ..........................................31

A.      The Factors Identified in the Manual for Complex Litigation..............................32

B.      The Third Circuit's *Girsh* Factors.........................................................................32

C.      Applying the MCL Factors And The *Girsh* Factors to The
Proposed Settlement.............................................................................................33

      1.      The litigation was long and complex, and it would have been
complicated and expensive to try..............................................................33

      2.      The parties settled at an appropriate stage of the proceedings
when the issues were sufficiently mature and known to
Class Counsel...........................................................................................33

      3.      The settlement negotiations that culminated in the modification
to the Original Settlement were mediated by a former federal judge ........36

      4.      The Class reacted favorably to the Original Settlement: there
were few requests for exclusion, and the objections were few
and not well-founded ................................................................................37

            a.      As this Court has recognized, the objections that
challenged Class Counsel's decision not to pursue
TILA/HOEPA claims were unfounded...........................................38

(1) Evidence regarding title exams and title abstracts............39

(2) Evidence regarding the HOEPA "three business day notice" requirement...........................................................40

b. The objections that challenged Class Counsel's strategic decision not to plead claims under Missouri or Illinois law also are not well-founded ......................................41

(1) The hypothetical Missouri SMLA claim ..........................42

(2) The hypothetical Illinois law claim...................................43

5. The plaintiffs faced substantial risks in establishing Defendants' liability for the conduct of the Shumway/Bapst Operations.....................44

a. Defendants have many defenses to the RESPA claims ................45

(1) Considerable legal dispute exists over the scope of RESPA's "kickback" liability............................................45

(2) Defendants have compelling statute of limitations and statute of repose defenses to the RESPA claims.........46

(3) RFC also has an "assignee liability defense" to the RESPA claims...................................................................48

b. Defendants also have substantial defenses to the state-law claims .........................................................................................49

(1) National Bank Act preemption .........................................49

(2) Depository Institutions Deregulation and Monetary Control Act preemption ....................................................51

c. Defendants had compelling defenses to the RICO claims as well ..........................................................................................52

(1) The Third Circuit did not direct this Court to independently assess the viability of the RICO claims......52

(2) The Named Plaintiffs would face significant obstacles in establishing any alleged violation of RICO..................53

(a) No allegations or evidence that RFC participated in the "operation or management" of a RICO enterprise .............................................54

(b) No allegations or evidence that RFC participated in the conduct of an enterprise through a "pattern of racketeering activity"...........................55

6. Plaintiffs also faced significant risks in establishing damages .................56

7.      Plaintiffs faced a significant risk that they would not be able to maintain class action status through trial if they had not settled, especially if they attempted to assert TILA/HOEPA claims ....................56

        a.      Plaintiffs would have faced significant challenges litigating the RESPA claims on a class-wide basis .......................................57

        b.      Plaintiffs would have faced even greater challenges maintaining a class action through trial if they had attempted to assert claims for damages under TILA/HOEPA.......................58

        c.      Claims for rescission of the loans would not be susceptible to class-wide treatment, either .......................................60

        d.      Lack of manageability..................................................................61

8.      Defendants' abilities to withstand a greater judgment is a neutral factor ................................................................................................62

9.      The Settlement is reasonable and intrinsically fair, both in light of the best possible recovery and in light of all attendant risks of continued litigation ...................................................................................62

        a.      This is not a $1 billion case...........................................................63

        b.      The Settlement reflects a fair and balanced assessment of claimed damages, and provides monetary value to all members of the Settlement Class ...............64

                (1)     The base calculation for RESPA claims (an automatic payment) ...........................................................................64

                (2)     Additional compensation for arguably time-barred RESPA claims (on a claims-made basis)..........................66

                (3)     Additional compensation for state-law claims (an automatic payment)....................................................66

                (4)     Additional compensation for TILA/HOEPA claims (on a claims-made basis)...................................................66

        c.      The scope of the Release is supported under established law .......66

10.     The attorneys' fees available to be paid to Class Counsel are reasonable and fair ...................................................................................67

11.     Summary ................................................................................................68

VI.     The Modification of the Original Settlement Does Not Warrant The Re-Issuance of Class-wide Notice ................................................................68

        A.      Class Members at Large Already Have Received Adequate Notice And An Opportunity to Opt-Out of or Object to the Settlement ..........69

B.      Because The Modification Of The Original Settlement Enhances The
        Benefits Available to The Class, No New Class-Wide Notice
        Is Warranted..........................................................................................................70

VII.    Summary ...........................................................................................................................73

# TABLE OF AUTHORITIES

## Cases

*Adkison v. FirstPlus Bank*,
   143 S.W.3d 29 (Mo. App. May 18, 2004),
   *motion to transfer denied* (Mo. Sept. 28, 2004)....................................................43

*Amchem Products Inc. v. Windsor*,
   521 U.S. 591 (1997)........................................................................................ *passim*

*Annuli v. Panikkar*,
   200 F.3d. 189 (3d Cir. 1999)....................................................................54, 56

*Austin v. Pennsylvania Dep't of Corrections*,
   876 F. Supp. 1437 (E.D. Pa. 1995) .............................................................71

*Avila v. Community Bank of Northern Va.*,
   Case No. 01CV215815, 2003 WL 22002779
   *judgment of dismissal aff'd*, 143 S.W.3d 1(Mo. App. 2003),
   *motion to transfer denied* (Mo. Sept. 28, 2004)........................................... *passim*

*Baby Neal v. Casey*,
   43 F.3d 48 (3d Cir. 1994) ..............................................................................20

*Baker v. Century Financial Group, Inc.*,
   2001 U.S. Dist. Lexis 24320 (W. D. Mo. 2001) .........................................49

*Bank of New York v. Heath*,
   No. 98-CH-8721,
   2001 WL 1771825 (Ill. Cir. Ct. Oct. 26, 2001),
   *rev'd in part on other grounds*, *U.S. Bank Nat'l Ass'n v. Clark*,
   807 N.E.2d 1109 (2004).................................................................................49

*Barber v. Fairbanks Capital Corp.*,
   266 B.R. 309, (Bankr. E.D. Pa. 2001) .........................................................49

*Barnett Bank of Marion County, N.A. v. Nelson*,
   517 U.S. 25 (1996).........................................................................................51

*Bauer v. Guaranty National Bank of Tallahassee*,
   No. 3:02 cv 02220 (D.C. Conn. 2004) .........................................................22

*Bell Atlantic Corp. v. Bolger*,
   2 F.3d 1304 (3d Cir. 1993).............................................................................39

*Beneficial National Bank v. Anderson*,
   539 U.S. 1 (2003)....................................................................................30, 50

*Berkman v. Sinclair Oil Corp.*,
   59 F.R.D. 602 (N. D. Ill. 1973)......................................................................64

*Bjustrom v. Trust One Mortgage Corp.*,
    322 F.3d 1201 (9th Cir. 2003) ...................................................................................58

*Boulware v. Crossland Mortgage Corp.*,
    291 F.3d 261 (4th Cir. 2002) ....................................................................................46

*Bryant v. Mortgage Capital Resource Corp.*,
    197 F. Supp. 2d 1357 (N.D. Ga. 2002) ...................................................9, 49, 50

*Caton v. Community Bank of No. Va.*,
    Case No. 1:02CV1762 (N.D. Ohio Feb. 23, 2003) ....................................6, 48

*Chevalier v. Baird Sav. Ass'n*
    72 F.R.D. 140 (E.D. Pa. 1976) ..................................................................................62

*Clark Equipment Co. v. Int'l Union, Allied Industrial Workers, AFL-CIO*,
    803 F.2d 878 (6th Cir. 1986) ....................................................................................24

*Cooper v. First Gov't Mortgage & Investors Corp.*,
    238 F. Supp. 2d 50 (D.D.C. 2002) ...........................................................................50

*County of Suffolk v. Long Island Lighting Co.*,
    907 F.2d 1295 (2d Cir. 1990) ...................................................................................66

*Cronkleton v. Hall*,
    66 F.2d 384 (8th Cir. 1933) .......................................................................................29

*Currie v. Diamond Mortgage Corp. of Illinois*,
    859 F.2d 1538 (7th Cir. 1988) ..................................................................................44

*Dash v. FirstPlus Home Loan Owner Trust 1996-2*,
    248 F. Supp. 2d 489 (M.D.N.C. 2003) ...................................................................49

*Deffner v. Corestates Bank of Delaware*,
    92 F.3d 1170 (3d Cir. 1996) ......................................................................................50

*Denney v. Jenkins & Gilchrist*,
    230 F.R.D. 317 (S.D.N.Y. 2005),
    *aff'd in relevant part, sub nom., Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ...............................................................................71, 72

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ...............................................................................65, 66

*Dongelewicz v. PNC Bank Nat'l Ass'n*,
    104 Fed. Appx. 811, 2004 WL 1661863,
    RICO Bus. Disp. Guide 10,270 (3d Cir. 2004) .............................................54, 55

*Dowdy v. First Metro. Mortgage Co.*,
    No. 01C7211,
    2002 WL 745851 (N.D. Ill. Jan. 29, 2002) ..........................................................49

*Echevarria v. Chicago Title & Trust Co.*,
  256 F.3d 623 (7th Cir. 2001) ............................................................46

*Elliott v. ITT Corp.*
  150 F.R.D. 569 (N.D. Ill. 1992)........................................................61

*Evans v. Nat'l Bank of Savannah*,
  251 U.S. 108 (1919).........................................................................50

*Faircloth v. National Home Loan Corp.*,
  313 F. Supp. 2d 544 (M.D.N.C. 2003),
  *aff'd*, 87 Fed. Appx. 314 (4th Cir. 2004) ........................................49

*Fisher v. First National Bank of Omaha*,
  548 F.2d 255 (8th Cir. 1977) ...........................................................64

*Forness v. Cross Country Bank, Inc.*,
  No. 05-CV-417-DRH, 2006 WL 240535 (S.D. Ill. Jan. 13, 2006).........28

*Georgine v. Amchem Prods., Inc.*,
  No. 93-0215, 1995 WL 251402 (E.D. Pa. Apr. 26, 1995).....................26

*Gibbons v. Interbank Funding Group*
  208 F.R.D. 278 (N.D. Cal. 2002)......................................................62

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975)...................................................... *passim*

*Glover v. Standard Federal Bank*,
  283 F.3d 953 (8th Cir. 2002)........................................................46, 58

*Greenwood Trust Co. v. Massachusetts*,
  971 F.2d 818 (1st Cir. 1992)........................................................29, 52

*Guise v. BMW Mortgage, LLC*
  377 F.3d 795 (7th Cir. 2004) ...........................................................60

*Haug v. Bank of America, N.A.*,
  317 F.3d 832 (8th Cir. 2003) ...........................................................46

*Helms v. ConsumerInfo.com, Inc.*
  236 F.R.D. 561 (N. D. Ala. 2005)......................................................64

*Hill v. Chemical Bank*,
  799 F. Supp. 948 (D. Minn. 1992).....................................................29

*Hillis v. Equifax Consumer Services, Inc.*
  237 F.R.D. 491 (N. D. Ga. 2006ۜ.......................................................64

*Hudson v. Ace Cash Express, Inc.*,
  No. IP 01-1336-C,
  2002 WL 1205060 (S.D. Ind. May 30, 2002)......................................52

*Hyderi v. Washington Mutual Bank, FA*,
   235 F.R.D. 390 (N.D. Ill. March 28, 2006) ...........................................................58

*In re ATI Technologies, Inc. Securities Litig.*,
   No. 01-2541, 2003 WL 1962400 (E.D. Pa. Apr. 28, 2003)...................................34

*In re Barber (Fairbanks Capital Corp.)*
   266 B.R. 309 (Bankr. E.D. Pa. 2001) ...................................................................49

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)...........................................................................34, 70

*In re Chambers Development Securities Litig.*,
   912 F. Supp. 822 (W.D. Pa. 1995).......................................................................46

*In re Community Bank of Northern Virginia*,
   418 F.3d 277 (3d Cir. 2005)........................................................................ *passim*

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981) ................................................................................35

*In re Diet Drugs Product Liability Litig.*,
   2002 U.S. Dist. Lexis 24771 (E.D. Pa. Dec. 11, 2002) ..................................71, 72

*In re Domestic Air Transp. Antitrust Litig.*,
   148 F.R.D. 297 (N.D. Ga. 1993)..........................................................................57

*In re Flat Glass Antitrust Litig.*,
   No. 97-550-MC (W.D. Pa. Feb. 9, 2000) ............................................................65

*In re Foundation for New Era Philanthropy Litigation*,
   175 F.R.D. 202 (E.D. Pa. 1997)...........................................................................31

*In re Gen. Motors Corp., Prods. Liab.*,
   55 F.3d 768 (3d Cir. 1995),
   *aff'd*, 134 F.3d 133 (3d Cir. 1998) ................................................................34, 38

*In re Ikon Office Solutions, Inc, Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000)...........................................................................31

*In re Integra Realty Resources, Inc.*,
   262 F.3d 1089 (10th Cir. 2001) ...........................................................................71

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   205 F.R.D. 369 (D.D.C. 2002)........................................................................35, 65

*In re Metropolitan Life Insurance Company Sales Practices Litig.*,
   No. 96-179-MC, 1999 WL 33957871 (W.D. Pa. December 28, 1999)......................21, 22, 39

*In re Prudential Insurance Co. of America Sales Practices Litig.*
   962 F. Supp. 450 (D.N.J. 1997)
   *aff'd*, 148 F.3d 283 (3d Cir. 1998) ...........................................................21, 57, 65

*In re Prudential Insurance Co. of America Sales Practices Litig.*,
    148 F.3d 283 (3rd Cir. 1998) ........................................................................ *passim*

*In re Prudential Insurance Co. of America Sales Practices Litig.*,
    177 F.R.D. 216 (D. N.J. 1997).........................................................................26

*In re Prudential Secs. Inc. Ltd. Partnerships Litig.*,
    164 F.R.D. 362 (S.D.N.Y.),
    *aff'd mem.*, 107 F.3d 3 (2d Cir. 1996) .................................................................26

*In re Trans Union Corp. Privacy Litig.*,
    211 F.R.D. 328 (N.D. Ill. 2002).......................................................................64

*In re Trump Casino Securities Litig.*,
    7 F.3d 357 (3d Cir. 1993) ..............................................................................60

*In re VMS Ltd. P'ship Secs. Litig.*,
    No. 90 C 2412, 1995 WL 355722 (N.D. Ill. June 12, 1995) ..................................26

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ........................................................................65

*James v. Home Constr. Co. of Mobile, Inc.*
    621 F.2d 727 (5th Cir. 1980) ........................................................................62

*Jefferson v. Security Pacific Financial Services, Inc.*
    161 F.R.D. 63 (N.D. Ill. 1995).....................................................................61, 62

*Kline v. Coldwell Banker & Co.*,
    508 F.2d 226 (9th Cir. 1974) ..........................................................................64

*Krzalic v. Republic Title Co.*,
    314 F.3d 875 (7th Cir. 2002) ..........................................................................46

*Krone v. 125 Home Loan Owner Trust*,
    No. 01-CV-0691-MJR, (S.D. Ill. Aug. 27, 2003) ................................................44

*Kruse v. Wells Fargo Home Mortg., Inc.*
    383 F.3d 49 (2d Cir. 2004)............................................................................47

*Lazy Oil, Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997),
    *aff'd*, 166 F.3d 581 (3rd Cir. 1999).............................................................24, 63

*Link v. Mercedes-Benz of N. America, Inc.*,
    550 F.2d 860 (3d Cir. 1997); ..........................................................................57

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004)....................................................................54, 56, 57

*M. Nahas & Co., Inc. v. First Nat'l Bank of Hot Springs*,
    930 F.2d 608 (8th Cir. 1991) ..........................................................................50

*Marquette Nat'l Bank v. First of Omaha Service Corp.*,
   439 U.S. 299 (1978)..........................................................................................50, 52

*McCollum v. Hamilton Nat'l Bank of Chattanooga*,
   303 U.S. 245 (1938).................................................................................................50

*Mercado v. Calumet Federal Savings & Loan Assoc.*,
   763 F.2d 269 (7th Cir. 1985) ...............................................................................46, 47

*MorEquity, Inc. v. Naeem*,
   118 F. Supp. 2d 885 (N.D. Ill. 2000) ..................................................................29, 52

*Nelson v. United Credit Plan, Inc.*
   77 F.R.D. 54, 58 (E.D. La. 1978)...........................................................................62

*O'Brien v. J.I. Kislak Mortgage Corp.*
   934 F. Supp. 1348 (S.D. Fla. 1996) .........................................................................61

*Ohio Public Interest Campaign v. Fisher Foods, Inc.*,
   546 F. Supp. 1 (N. D. Ohio 1982)...........................................................................66

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)................................................................................................31

*O'Sullivan v. Countrywide Home Loans, Inc.*,
   319 F.3d 732 (5th Cir. 2003) ..................................................................................58

*Parker v. Time Warner Entertainment Co.*,
   331 F.3d 13 (2d Cir. 2003).....................................................................................64

*Pedraza v. United Guaranty Corp.*,
   114 F. Supp. 2d 1347 (S.D. Ga. 2000).....................................................................48

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)................................................................................................22

*Phipps v. F.D.I.C.*
   417 F.3d 1006 (8th Cir. 2005) ......................................................................29, 30, 51

*Phipps v. Guaranty National Bank of Tallahassee*,
   No. 03-420-CV-W-GAF,
   2003 WL 22149646 (W.D. Mo. Sept. 17, 2003),
   *aff'd sub nom. Phipps v. F.D.I.C.*, 417 F.3d 1006 (8th Cir. 2005)**,**
   *rehearing and rehearing en banc denied*...................................................... *passim*

*Porter v. Nationscredit Consumer Discount Co.*
   229 F.R.D. 497 (E.D. Pa. 2005)...............................................................................61

*Ratner v. Chemical Bank New York Trust Co.*,
   54 F.R.D. 412 (S.D.N.Y. 1972) ...............................................................................64

*Reiser v. Residential Funding Corp.*,
   380 F.3d 1027 (7th Cir. 2004) ...............................................................44, 45

*Reiser v. Residential Funding Corporation*,
   236 F.R.D. 425 (S.D.Ill. 2005) ...........................................................58

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993).............................................................................55

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ............................................................31

*Rolo v. City Investing Co. Liquidating Trust*,
   155 F.3d 644 (3d Cir. 1998).................................................................55

*Santiago v. GMAC Mortgage Group, Inc.*,
   No. 02-CV-04048, 2002 WL 32173572 (E.D. Pa. Sept. 30, 2003),
   *aff'd in part, vacated in part,*
   *rev'd in part*, 417 F.3d 384 (3d Cir. 2005) ............................................47

*Schuetz v. Banc One Mortgage Corp.*,
   292 F.3d 1004 (9th Cir. 2002) ...........................................................58

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)..............................................................................54

*Shearin v. E.F. Hutton Group, Inc.*,
   885 F.2d 1162 (3d Cir. 1989)...............................................................54

*Shlensky v. Dorsey*,
   574 F.2d 131 (3d Cir. 1978)................................................................39

*Shroder v. Suburban Coastal Corp.*,
   729 F.2d 1371 (11th Cir. 1984) .........................................................64

*Smiley v. Citibank*,
   517 U.S. 735 (1996).............................................................................29

*Sosa v. Chase Manhattan Mortg. Corp.*
348 F.3d 979 (11th Cir. 2003) .............................................................47

*Spann v. Community Bank of No. Va.*,
   No. 03 C 7022,
   2004 WL 691785 (N.D. Ill. Mar. 30, 2004),
   *reconsideration denied* (N.D. Ill. Sept. 27, 2004) ................................45

*TBK Partners, Ltd. v. Western Union Corp.*,
   675 F.2d 456 (2d Cir. 1982).................................................................67

*Terry v. CBNV*,
   No. 02-2534-GV (W.D. Tenn.)...............................................................6

*Tikkanen v. Citibank (South Dakota), N.A.*,
   801 F. Supp. 270 (D. Minn. 1992) ...................................................................................29

*Todd & Co. v. S.E.C.*,
   637 F.2d 154 (3d Cir. 1980)...........................................................................................70

*Townsend v. GMAC Residential Funding Corp.*,
   No. 03L742 (Circuit Ct. St. Clair Cty., Ill.) ...................................................................45

*U.S. Bank Nat'l Ass'n v. Clark*,
   807 N.E. 2d 1109 (Ill. App. 1st Dist. 2004),
   *rev'd in part on other grounds*, 837 N.E.2d 74 (Ill. 2005) ................................................45, 49

*United States v. 412.93 Acres of Land*,
   455 F.2d 1242 (3d Cir. 1972)..........................................................................................57

*University of Maryland v. Peat, Marwick, Main & Co.*,
   996 F.2d 1534 (3d Cir. 1993)......................................................................................54, 55

*Vandenbroeck v. ContiMortgage Corp.*,
   53 F. Supp.2d 965 (W. D. Mich. 1999) ..........................................................................49

*Warburton v. Foxtons, Inc.*,
   No. 04-2474, 2005 WL 1398512 (D.N.J. 2005) ........................................................57, 58

*Watkins v. Simmons & Clark Inc.*,
   618 F.2d 398 (6th Cir. 1980) ..........................................................................................64

*Wilcox v. Commerce Bank of Kansas City*,
   474 F.2d 336 (10th Cir. 1973) .........................................................................................64

*Wilson v. American Cablevision of Kansas City, Inc*.,
   133 F.R.D. 573 (W.D. Mo. 1990).....................................................................................64

*Wolfert v. Transamerica Home First, Inc.*,
   439 F.3d 165 (2nd Cir. 2006).........................................................................................31

**Statutes**

12 U.S.C. § 24 ................................................................................................................................51

12 U.S.C. § 85 .............................................................................................................29, 43, 50, 52

12 U.S.C. § 86 ....................................................................................................................43, 50

12 U.S.C. § 371 ..............................................................................................................................51

12 U.S.C. § 1831d ...................................................................................................................28, 52

12 U.S.C. § 2607 ......................................................................................................3, 47, 57, 58

12 U.S.C. § 2607(a) .......................................................................................................................46

12 U.S.C. § 2607(b) .......................................................................................................................46

12 U.S.C. § 2614 ......................................................................................................7, 47, 48

15 U.S.C. § 1635 ............................................................................................................................61

15 U.S.C. § 1639(b)(1) ..................................................................................................................41

15 U.S.C. § 1641(d)(1) .............................................................................................................3, 49

18 U.S.C. § 1341 ............................................................................................................................56

18 U.S.C. § 1843 ............................................................................................................................56

18 U.S.C. § 1961 .....................................................................................................................54, 56

18 U.S.C. § 1961(1) .......................................................................................................................54

18 U.S.C. § 1961(5) .......................................................................................................................54

18 U.S.C. § 1962(c) .............................................................................................................4, 54, 55, 56

18 U.S.C. § 1962(c)(1) ...................................................................................................................54

18 U.S.C. § 1962(c)(2) ...................................................................................................................54

18 U.S.C. § 1962(c)(3) ...................................................................................................................55

18 U.S.C. § 1962(c)(4) ...................................................................................................................55

18 U.S.C. § 1962(d) ...............................................................................................................4, 56

28 U.S.C. § 1331 ...........................................................................................................................3

12 C.F.R. § 7.4001 .........................................................................................................................29

12 C.F.R. § 7.4001(a) .....................................................................................................................29

12 C.F.R. § 226.14 ............................................................................................................60

815 ILCS § 205/4.1a(f) ...........................................................................................42, 44

Mo. R.S. §§ 408.231, *et seq.* ..............................................................................................42

Mo. R.S. §§ 408.231.1 ........................................................................................................43

N.C. Gen. Stat. § 24-1 *et seq.* ...........................................................................................28

N.C. Gen. Stat. § 53-238 ....................................................................................................28

N.C. Gen. Stat. § 75-1 *et seq.* ..........................................................................................28

**Rules**

Fed. R. Civ. P. 9(b) .............................................................................................................56

Fed. R. Civ. P. 12(b)(6) ......................................................................................................56

Fed. R. Civ. P. 23 .............................................................................13, 22, 62, 69, 70

Fed. R. Civ. P. 23(a) ...................................................................................................18, 19

Fed. R. Civ. P. 23(a)(1) ......................................................................................................19

Fed. R. Civ. P. 23(a)(2) ...............................................................................................19, 20

Fed. R. Civ. P. 23(a)(3) ...............................................................................................19, 20

Fed. R. Civ. P. 23(a)(4) ..........................................................................13, 14, 18, 22, 23

Fed. R. Civ. P. 23(b) ..........................................................................................................18

Fed. R. Civ. P. 23(b)(3) ..............................................................................18, 19, 20, 21

Fed. R. Civ. P. 23(c) .....................................................................................................9, 70

Fed. R. Civ. P. 23(e) ....................................................................................................70, 71

Fed. R. Civ. P. 23(e)(3) ......................................................................................................72

Fed. R. Civ. P. 23(h) ..........................................................................................................70

**Other Authorities**

David H. Herr, *Manual for Complex Lit.* (4th ed.)
  (§ 21.61 & § 21.62) ................................................................................... *passim*

O.C.C. Interp. Ltr. 744, 1996 WL 636765 (8/21/96) .................................................29

O.C.C. Interp. Ltr. 803, 1997 WL 662683 (10/7/97)..........................................................29

O.C.C. Interp. Ltr. 817, 1998 WL 107261 (1/6/98)...........................................................29

Opinion of FDIC General Counsel William F. Kroener, III (3/24/98),
    1998 FDIC Interp. Ltr. LEXIS 59 (6/4/98)..................................................................29

68 Fed. Reg. 46119-2, 2003 WL 21785071.....................................................................51

68 Fed. Reg. 46264, 46265, Preemption Determination and Order ..............................51

Pub. L. No. 96-221, 94 Stat. 132 (1980).........................................................................52

7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane,
    *Federal Practice & Procedure* §§ 1786-87 (2006) ...................................................70

7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane,
    *Federal Practice & Procedure* § 1797.6 (2006)........................................................70

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THIS DOCUMENT RELATES TO THESE ACTIONS:

| | |
|---|---|
| In re:<br>COMMUNITY BANK OF NORTHERN VIRGINIA<br>MORTGAGE LENDING PRACTICES<br>LITIGATION | MDL No. 1674<br><br>Hon. Gary L. Lancaster<br><br>Electronically Filed |
| In re:<br>COMMUNITY BANK OF NORTHERN VIRGINIA<br>AND GUARANTY NATIONAL BANK OF<br>TALLAHASSEE SECOND MORTGAGE LOAN<br>LITIGATION | Case No. 03-425 |

**SETTLING PARTIES' BRIEF IN SUPPORT OF CERTIFICATION OF A
SETTLEMENT CLASS AND APPROVAL OF PROPOSED MODIFIED SETTLEMENT**

The Named Plaintiffs,[1] individually and as representatives of the Plaintiff Class, together
with Defendants Mercantile Safe-Deposit & Trust Company, as successor to Community Bank
of Northern Virginia ("CBNV"); the Federal Deposit Insurance Corporation (FDIC), as receiver
for Guaranty National Bank of Tallahassee ("GNBT") (GNBT and CBNV, collectively, the
"Banks"); and Residential Funding Company, LLC ("RFC") (collectively, the "Settling
Parties"), submit this brief in support of certification of the Settlement Class and approval of the
proposed Settlement, as modified.

**I.      Introduction**

The Class Action Settlement that is before this Court for approval is reasonable,
adequate, and fair in all respects to all members of the Class.  Events in the litigation since the
Third Circuit issued its decision remanding the Settlement to this Court for further consideration

---

[1]      Brian and Carla Kessler, Ruth J. Davis, John and Rebecca Picard, Nora Miller, William
and Ellen Sabo, Robert and Rebecca Clark, Edward Kruska, Russell and Kathleen Ulrich,
Thomas Mathis, Stephen and Amy Haney, and Patrice Porco.

have confirmed in all respects both that the Settlement Class this Court conditionally certified in
July 2003 should be certified again, and that the Settlement, as modified, should be approved.

## II.      Relevant Procedural History of This Litigation

### A.      The Six Underlying Actions

This litigation is the consolidation of six actions against two banks – Community Bank of
Northern Virginia ("CBNV") and Guaranty National Bank of Tallahassee ("GNBT") – and a
company that acquired second mortgage loans from those banks in the secondary market,
Residential Funding Company, LLC ("RFC").  Plaintiffs alleged that a group of people
(sometimes referred to as the "Shumway/Bapst Operation") entered into arrangements with
CBNV and GNBT whereby:  (1) the Shumway/Bapst Operation agreed to solicit second
mortgage borrowers by direct mail; (2) the bank (CBNV or GNBT) agreed to make the loans and
subsequently assign them to secondary purchasers (primarily RFC); and (3) the bank would split
the origination fees with the Shumway/Bapst Operation and would receive the interest float for
the period between the date the loans were funded and the date they were purchased on the
secondary market.  Ex. 51 (Consolidated Amended Class Action Complaint (11/10/03)), ¶¶ 35-
64.

Each of the Plaintiffs had a second mortgage loan with either CBNV or GNBT.  They
alleged that, as a result of the above-described arrangement, their loans were made in violation of
federal and state laws.  Plaintiffs claimed that the Banks charged them unlawful origination fees.
*Id.,* ¶ 2.  They also alleged that the fees set forth in Section 800 of the HUD-1A Settlement
Statements they had received prior to their loans closing were false or misleading, insofar as they
indicated that all of the fees were being paid to the bank, when in fact (Plaintiffs alleged) the fees
were being split with the Shumway/Bapst Operation.[2]  *Id.,* ¶ 4, 13.  Plaintiffs also claimed that

---

[2]      HUD-1A Settlement Statements are documents that itemize the various closing costs and
fees charged in connection with residential mortgage loans.

the fees for "title services" set forth in Section 1100 of their HUD-1A Settlement Statements were unlawful. *Id.,* ¶ 13.

In addition to suing CBNV and GNBT, plaintiffs also sued RFC. Plaintiffs alleged that RFC, as the assignee of the closed loans, is derivatively liable under the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. § 1641(d)(1), for the Banks' conduct. *Id.,* ¶¶ 15-16. Plaintiffs did not allege that they had any contact or dealings with RFC.

The six separate actions that ultimately were consolidated into one action for settlement purposes were:

*Davis.*  On May 1, 2001, Ruth J. Davis and Phillip and Jeannie Kossler filed a suit on behalf of Pennsylvania borrowers in the Court of Common Pleas of Allegheny County, Pennsylvania, against CBNV, RFC, and thirteen other alleged assignees of CBNV's second mortgage loans, alleging violations of Pennsylvania law. In their Second Amended Complaint (filed June 12, 2002) (Ex. 44), which was filed on behalf of a nationwide class of CBNV borrowers (exclusive of borrowers in Missouri and Tennessee), the *Davis* plaintiffs added a claim under § 8(b) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607. On July 9, 2002, the defendants removed *Davis* to this Court based on the existence of federal question jurisdiction. *Davis* was docketed as Civil Action No. 02-1201. Ex. 39 (docket). In their Third Amended Complaint (filed July 25, 2002) (Ex. 45), the *Davis* plaintiffs expressly invoked this Court's jurisdiction under 28 U.S.C. § 1331. Defendants filed motions to dismiss the Third Amended Complaint with prejudice on statute of limitations and other grounds. Ex. 39 (docket, entries 12-17). This Court had not yet ruled on those motions at the time the cases were settled.

*Sabo*.  William and Ellen Sabo filed a putative nationwide class action complaint against CBNV and RFC in this Court on September 11, 2002 (docketed as Civil Action No. 02-1563). Ex. 46. Like the Second Amended Complaint in *Davis*, *Sabo* also alleged claims under RESPA

§ 8.  CBNV and RFC moved to dismiss the *Sabo* Complaint on statute of limitations and other

grounds.  Ex. 40 (docket, entries 3-5).  These motions were pending when the cases were settled.

*Ulrich*.  On September 19, 2002, Russell and Kathleen Ulrich filed a putative class action

complaint against GNBT and RFC in this Court.[3]  Ex. 47.  As in *Davis* and *Sabo*, the *Ulrich*

Complaint also asserted claims under RESPA § 8.  It was docketed as Civil Action No. 02-1616.

Ex. 41 (docket).  GNBT and RFC each filed motions to dismiss the *Ulrich* Complaint, once

again contending that the RESPA claims were time-barred.  Ex. 41 (docket, entries 6-7).  Those

motions were pending at the time the cases were settled.

*Picard.*  John and Rebecca Picard filed a putative nationwide class action complaint

against CBNV and RFC in the Court of Common Pleas of Allegheny County, Pennsylvania,

alleging violations of Pennsylvania law.  Defendants, relying on the complete preemption

doctrine, removed *Picard* to this Court on November 19, 2002, where it was docketed as Civil

Action No. 02-2000.  Ex. 43 (docket).  Defendants filed motions to dismiss.  Although the

*Picard* plaintiffs initially moved to remand, they subsequently expressly invoked this Court's

jurisdiction by amending the complaint on February 27, 2003 to assert claims under RESPA and

under the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c),

(d).  (Ex. 48).  The Amended Complaint, which was filed while settlement negotiations were

ongoing, also added GNBT as a defendant.

*Mathis.*  On November 16, 2002, Thomas Mathis and Stephen and Amy Haney filed a

complaint against GNBT and RFC in the Court of Common Pleas of Allegheny County,

Pennsylvania.  The *Mathis* Complaint asserted (on behalf of a putative class of borrowers whose

GNBT loans had been secured by real property located in Pennsylvania) various claims under

---

[3]    On March 12, 2004, the United States Office of the Comptroller of the Currency ("O.C.C.")
declared GNBT to be unsafe and unsound, and appointed the Federal Deposit Insurance
Corporation ("FDIC") as receiver.  Ex. 32.  For ease of reference, the FDIC (along with GNBT) will
be referred to throughout this brief as one of the Defendants.

Pennsylvania law, including a claim under Pennsylvania's usury statute. Ex. 49. On

November 19, 2002, GNBT and RFC removed *Mathis* to this Court based on the complete

preemption doctrine, where it was docketed as Civil Action No. 02-1999. Ex. 42 (docket). The

Defendants answered (and asserted affirmative defenses to) the *Mathis* Complaint on January 3,

2003. *Id.* (docket, entries 5, 6).

  *Kessler*. On February 26, 2003 (notwithstanding ongoing settlement negotiations), Brian

and Carla Kessler and Patrice Porco filed a putative class action complaint against RFC (only) in

the Court of Common Pleas of Allegheny County, Pennsylvania. Ex. 50. The *Kessler* plaintiffs

sought to represent putative classes of Pennsylvania borrowers whose loans had been assigned to

RFC by CBNV or GNBT.[4] On March 26, 2003, RFC removed *Kessler* to this Court, relying on

the complete preemption doctrine. *Kessler* was docketed as Civil Action No. 03-425. Ex. 38

(docket).

  All of these cases were assigned to the Honorable Gary L. Lancaster. The record in these

cases show that the claims were vigorously disputed and that litigation of these claims through

the class certification stage and trial (if necessary) would have been protracted and expensive.

  **B. The Parties Settle, And The Court Conditionally Certifies A Nationwide Settlement Class.**

   **1. The terms of the Original Settlement**

  After two years of litigation and eight months of extensive arms' length negotiations,[5]

CBNV, GNBT, and RFC reached a nationwide settlement with the plaintiffs in the six putative

---

[4] Brian and Carla Kessler, who obtained a second mortgage loan from CBNV, already would have been members of the classes proposed in *Davis* and *Picard*. Patrice Porco, who received a second mortgage loan from GNBT, already would have been a member of the classes proposed in *Ulrich* and *Mathis*.

[5] As counsel for RFC emphasized at the Fairness Hearing: "The settlement negotiations were long and protracted. Went out over several months of back and forth. Broke down a couple of different times." Ex. 12 (11/14/03 transcript), p.25.

class actions in July 2003 (the "Original Settlement").[6] The Original Settlement (Ex. 1) resolved

claims that the parties had vigorously disputed for two years by providing for sizeable, automatic

cash payments to every member of the proposed nationwide class.  Certain borrowers also could

receive an additional sizeable payment by submitting a claim form (discussed *infra*, pp. 7-8, 16-

17).  The proposed class covered by the Original Settlement included:

> All persons:
>
> (i)      who entered into a loan agreement with CBNV and/or GNB;
>
> (ii)     whose loan was secured by a second mortgage deed or trust on property
>          located in the United States;
>
> (iii)    whose loan was purchased by RFC; and
>
> (iv)     who were not members of the class certified in the action captioned *Baxter
>          v. Guaranty National Bank, et al.*, Case No. 01-CVS-009168, in the
>          General Court of Justice, Superior Court Division of Wake County, North
>          Carolina.

Ex. 1, ¶ 3 (the "Settlement Class").  Approximately 44,535 loans fell within the proposed

Settlement Class.  Ex. 17 (Declaration of L. Stephens Tilghman), ¶ 4.  The Original Settlement

committed the Defendants to paying up to $33 million to members of the Class.  Ex. 1, ¶ 4(n).

The way the Class is defined, borrowers whose loans closed as long ago as 1998 are entitled to

automatic payments under the Original Settlement.

Under the Original Settlement, every Class member was to receive a minimum of

$250.00, and certain Class members could receive increased amounts up to $925.00.[7]  *Id.,* ¶ 4(a).

The Original Settlement monies were allocated to Class members based on two factors:  (1) the

date on which the borrower's loan closed; and (2) the state in which the borrower resided when

the loan closed.  *Id.*  The first factor reflected a negotiated compromise based on RESPA's one-

---

[6]      The Original Settlement also settled the claims that certain borrowers had asserted in cases styled as *Terry v. CBNV*, No. 02-2534-GV (W.D. Tenn.), and *Caton v. CBNV*, Case No. 1:02CV1762 (N.D. Ohio).

[7]      Co-borrowers on a particular loan share the amounts provided under the terms of the settlement.  Each of the Named Class Representatives also was to receive an incentive payment of $1,500.00.  Ex. 1, ¶ 5(b).

year statute of limitations (12 U.S.C. § 2614):  Class members whose loans had closed within

one year of the earliest-filed applicable complaint were entitled to higher payments than Class

members whose loans closed before that date.[8]  The second factor provided higher payments to

Class members who resided in one of twenty-one "Qualifying States" when their loans closed –

states where Class Counsel determined that Class members theoretically might have been able to

pursue state-law claims against CBNV, GNBT, and/or RFC (*e.g.*, in addition to the RESPA

claims).[9]

The distribution in the Original Settlement provided that each Class member would

receive a check for at least $250.00.  Class members whose loans closed within the agreed one-

year period would receive at least $600.00.  Ex. 12 (11/14/03 transcript), p. 15.  Class members

from Qualifying States automatically would receive an *additional* $325.00.  *Id.*  No Class

member was required to submit a claim in order to receive any of these "automatic" payments.

*Id.*  The Original Settlement Agreement also specified that any Class member who was entitled

to the $250.00 automatic minimum payment also may be eligible to receive an additional

$302.00 by answering three questions appropriately in a basic claims process:

1.  At the time you obtained your CBNV [or GNB] loan, did you believe that CBNV [or GNBT] received the entire amount that you paid as an origination fee for your loan?

2.  At the time that you obtained your CBNV [or GNB] loan, did you believe that the fees that you paid for the title services were reasonable and appropriate?

3.  Within one year of obtaining your loan, did you do anything to confirm that the origination fee on your loan was paid to CBNV [or GNB], or that the title-related fees on your loan were reasonable and appropriate?

---

[8]    Although the Defendants do not concede that any claims were timely filed, the Settling Parties agreed for purposes of the Original Settlement that the applicable complaints would be the *Davis* Complaint (for CBNV borrowers) and the *Ulrich* Complaint (for GNBT borrowers).

[9]    The "Qualifying States" are:  Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Missouri, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Washington, Wisconsin, and Wyoming.  Virginia also is a Qualifying State with respect to GNBT borrowers.  Ex. 1, ¶¶ 2.1, 2.13.

Ex. 1 (Original Proposed Proof of Claim and Verification). These questions were calculated to serve as a negotiated proxy as to whether equitable tolling could conceivably apply to a borrower's otherwise time-barred claim. Ex. 1, ¶ 2.28.

The Defendants also agreed to pay attorneys' fees and costs of approximately $8.1 million and to bear the cost of settlement administration. *Id.,* ¶¶ 4(t), 5(c).

In exchange for these significant financial benefits, Class members agreed to a release of claims set forth in the Settlement Agreement, which included any claims that were asserted in, or that could have been asserted in, this litigation (the "Release"). *Id.,* ¶¶ 2.25, 6.

> ### 2.    The Court preliminarily approves the Original Settlement and directs the issuance of Class-wide notice.

On July 14, 2003, the Settling Parties filed a joint motion seeking preliminary approval of the Original Settlement. Ex. 1. By Order dated July 17, 2003, this Court preliminarily approved the Original Settlement, certified the proposed nationwide Settlement Class, appointed Class Counsel and Named Class Representatives, and directed the issuance of a Notice of Class Action Settlement and Hearing (the "Notice") to Class members. Ex. 3. The Court's Order also consolidated the *Davis*, *Sabo*, *Ulrich*, *Mathis*, and *Picard* class actions with *Kessler,* at Civil Action No. 03-425. *Id., ¶* 1.

The Notice informed Class members of the pending Original Settlement, explained their rights and obligations, and outlined the Court-approved methods for requesting exclusion from the Class and for objecting to the Original Settlement. Ex. 1. The Notice also set forth the Release in full. *Id.,* ¶¶ III, VI. The Settlement Administrator mailed the Court-approved Notice to Class members via U.S. mail (first class), and also published a Court-approved Summary Notice (Ex. 1) in the national edition of *USA Today* newspaper (on August 7 and 14, 2003). This Court expressly approved these methods of giving notice to Class members as the "best practicable notice. . . reasonably calculated, under the circumstances, to apprise Class Members

of the pendency of the Action and of their right to object or exclude themselves from the

proposed settlement," in satisfaction of Fed. R. Civ. P. 23(c) and the Due Process Clause of the

Fourteenth Amendment.  Ex. 3 (7/17/03 Findings and Order), ¶ 9.

> **C.    The Court Exercises Its Responsibility To Ensure That Class Members Who Had Been Solicited By Plaintiffs' Lawyers To Opt-Out Of The Class Or Object To The Settlement Were In A Position To Make Informed Decisions.**

In mid-September 2003, an alliance of plaintiffs' lawyers throughout the country began a

letter-writing campaign encouraging Class members either to opt-out of the Class or object to the

Original Settlement.  These solicitations were part of an organized campaign initiated by lawyers

– some of whom had *lost* cases arising out of the very same facts that underlie this litigation –

who were intent on disrupting the Original Settlement.[10]  The solicitation letters combined half-

truths, false innuendoes, and misleading inferences, mixed with a gratuitous sense of urgency.

After discovering the existence and misleading nature of those communications, Class Counsel

and Defendants' counsel raised the issue with the Court.  *See* Ex. 30 (Joint Motion to Invalidate

Solicited Opt-Outs).

On October 14, 2003, this Court responded and exercised its fiduciary responsibility to

protect the interests of unnamed Class members.  The Court created a remedial process in an

attempt to stop the flow of misleading information and ensure that Class members could make

---

[10]    For example, the Walters Bender law firm had filed, then lost, two cases in the Missouri courts that involved some of the very same second mortgage loans encompassed by the Settlement, but on different legal theories.  *Avila v. Community Bank of Northern Va.*, Case No. 01CV215815, *judgment of dismissal aff'd*, 143 S.W.3d 1(Mo. App. 2003), *motion to transfer denied* (Mo. Sept. 28, 2004); *Phipps v. Guaranty National Bank of Tallahassee*, No. 03-420-CV-W-GAF, 2003 WL 22149646 (W.D. Mo. Sept. 17, 2003), *aff'd sub nom., Phipps v. F.D.I.C.*, 417 F.3d 1006 (8th Cir. 2005)**,** *rehearing and rehearing en banc denied* (both discussed *infra*, pp. 29-30, 43-44, 51).

Another lawyer, Franklin Nix, had filed a case against RFC that, although involving a different lender, asserted a claim similar to the one Attorney Nix claims should have been asserted here.  He litigated the class certification issues, and the district court denied certification of his proposed nationwide class.  Ex. 33, *Bryant v. Mortgage Capital Resource Corp.*, No. 1:00-CV-671-BBM (N.D. Ga. May 31, 2002).

informed decisions about the Original Settlement.  The Court's October 14, 2003 Order (Ex. 4):

(1) invalidated all solicited opt-outs in the states these law firms had targeted (Alabama, Florida,

Georgia, Illinois, Maryland, and Missouri); (2) directed the Settlement Administrator to promptly

mail Court-approved Curative Notices (Ex. 31) to Class members in the affected states who had

submitted timely opt-out requests; (3) created a second opt-out period (the "Curative Opt-Out

Period") for these people (until November 3, 2003); and (4) permitted the campaigners to

continue communicating with unnamed Class members, provided that they first submitted their

proposed communications to the Court for approval.[11]

### D.    The Consolidation Of Claims, The Fairness Hearing, And The Final Approval Of The Settlement

#### 1.    The Consolidated Amended Class Action Complaint

On November 10, 2003, Class Counsel filed a Consolidated Amended Class Action

Complaint at the *Kessler* docket number (the last-filed action).  Ex. 51.  This complaint collected

in one pleading all of the federal and state law claims that had been asserted in the *Sabo*, *Ulrich*,

*Davis*, *Picard*, *Mathis*, and *Kessler* complaints.  The Consolidated Amended Complaint did not

contain any new factual allegations or any new legal theories.

#### 2.    The evidence and arguments in support of and in opposition to the Original Settlement

On November 14, 2003, the Court held a hearing to consider the Original Settlement's

fairness and to entertain any objections to it (the "Fairness Hearing").  In advance of the Fairness

Hearing, the Settling Parties filed extensive briefs, declarations, affidavits, and other materials

supporting the Original Settlement.  *See, e.g.*, Ex. 17 (Class Counsel's Compendium of Exhibits

in Support of Fairness and Reasonableness of Settlement); Ex. 38 (*Kessler* docket entry 74

---

[11]    The Third Circuit subsequently disapproved of the restraint on alleged attorney-client communications and directed this Court to make further findings in support of its order invalidating the opt-out requests of Class members who had been solicited by the law firms in question.  *See generally infra* pp. 13-14, 70.

(compendium of unpublished authority)); *Id.* (docket entry 100 (attaching Class Counsel's 89-page memorandum of law)).

In addition to hearing from Class Counsel and counsel for the Defendants, the Court also heard from attorneys representing objectors from Missouri and Illinois (Michael Vaughan of the Walters Bender law firm), Georgia (Franklin Nix), and Maryland (Scott Borison of the Legg law firm) (collectively, the "Objectors"). Ex. 12 (11/4/03 transcript), pp. 33-50. The Objectors also submitted extensive written objections in advance of the Fairness Hearing.

The objections to the Original Settlement were two-fold. First, Objectors claimed that the Original Settlement was inadequate, particularly because Class Counsel had "failed" to extract any consideration from the Defendants for alleged claims under the Truth-in-Lending Act ("TILA"), as amended by HOEPA, and had failed to extract enough consideration for alleged claims under Illinois' Interest Act and Missouri's Second Mortgage Loan Act. Second, Objectors alleged that Class Counsel had colluded with counsel for the Defendants, and with the Court's assistance, had "sold out" Class members for their own financial gain -- as illustrated in large part by their alleged failure to pursue those legal theories.

Another group of objectors (named plaintiffs in a state-wide class action that had been filed in state court in North Carolina, *Travis T. Bumpers and Troy Elliott, On Behalf Of Themselves And All Others Similarly Situated v. Community Bank of Northern Virginia, et al.*) also filed "conditional objections" to the Original Settlement. Ex. 29. The *Bumpers* Plaintiffs' conditional objections asserted that certain enhancements should be made to the way the Original Settlement would be administered. *Id.* Unlike the other Objectors, however, the *Bumpers* Plaintiffs made clear that they did "*not* contend that the settlement [was] the product of collusion or [was] fatally flawed such that it cannot be approved," provided the settlement was modified to meet their concerns. *Id.* at p. 2 (emphasis added). The *Bumpers* Plaintiffs expressly endorsed the monetary relief the Original Settlement would provide to Class members.

**3.    The Court makes findings of fact and conclusions of law, and ultimately gives its final approval to the Original Settlement.**

Three weeks after the Fairness Hearing, this Court gave final approval to the Original Settlement. Exs. 7 (12/4/03 Order), 8 (12/4/03 Final Judgment).  A Memorandum Opinion accompanied that order.  Ex. 5.  After making an independent review of the record, the Court incorporated the proposed findings of fact and conclusions of law that Class Counsel had submitted to the Court (Ex. 5) into its opinion, stating that they were "fully supported by the record."  Ex. 5, n.1.

After reviewing the strengths and weaknesses of the claims against CBNV, GNBT, and RFC, and Defendants' defenses to those claims, the Court concurred with Class Counsel's assessment of the appreciable risks associated with continuing to litigate:

> There are always very real risks associated with proving liability in such cases. Indeed, the Missouri law firm that purports to represent 131 class members and that filed objections on their behalf [Walters Bender], itself prosecuted two similar cases – and lost.  This case also posed the real danger that a majority of the class's RESPA claims, which are at the heart of the case, may be barred by the applicable statute of limitations.  Clearly, settling this claim is in the class's best interest.

*Id.*  The Court also concluded that the various objections that had been lodged against the Original Settlement – including objections to the sufficiency of the Settlement fund, the adequacy of Class Counsel, and the adequacy of the Notice – lacked merit.  *Id.*  In summarizing its evaluation of the Original Settlement, the Court found:

> [T]he competence and candor of counsel from both sides in this case convince the court that this settlement has been achieved at arms' length by counsel both intent on protecting the interests of their clients and in arriving at a fair and adequate settlement.  The court does not hesitate to approve this settlement.

*Id.*

**E.    The Court of Appeals Remands For Further Consideration Under Fed. R. Civ. P. 23(a)(4).**

Subsequently, various Objectors and Class members whose opt-out requests this Court had invalidated filed notices of appeal to the U.S. Court of Appeals for the Third Circuit.

Ultimately, in an opinion issued August 11, 2005, the Third Circuit vacated this Court's

December 4, 2003 Order approving the Original Settlement, and remanded the case for further

proceedings.  Ex. 9 (the "Remand Order," *In re Community Bank of Northern Virginia*, 418 F.3d

277 (3d Cir. 2005)).  Among other things, the Court of Appeals held that "the settlement-only

Class was never properly certified" because of this Court's "verbatim" adoption of the Proposed

Findings of Fact and Conclusions of Law that Class Counsel had submitted.  Remand Order, 418

F.3d at 300-01.  Although the panel vacated this Court's order adopting those findings and

finally certifying the Class, the panel stated:

> Our conclusion that the settlement class was not properly certified does not mean
> that the class could not be certified on remand.  Because we believe certification
> may indeed be appropriate, we examine some of the relevant factors to be
> considered on remand.

*Id*. at 302.

The panel then discussed each of the requirements for class certification under Federal

Rule of Civil Procedure 23, and agreed with the Settling Parties (and this Court) that the record

reflected that most of the requirements for certification of a settlement class *had* been met.  The

panel concluded, however, that "additional analysis" was needed on one factor – the

Rule 23(a)(4) requirement of "adequacy of representation."  *Id*. at 309.  This requirement

"encompasses two distinct inquiries designed to protect the interests of absentee class members:

'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees',

and it tests the qualifications of the counsel to represent the class."  *Id*. at 303 (quotation

omitted).

As to the first inquiry, the panel directed this Court to conduct a more in-depth analysis

of whether the Named Plaintiffs' interests were sufficiently aligned with the interests of the

unnamed Class members.  The panel focused in this regard on the Objectors' arguments that all

or some Class members purportedly had valuable claims under TILA/HOEPA.  The panel

thought it possible that, because the Named Plaintiffs' hypothesized TILA/HOEPA claims were

time-barred, the interests of the Named Plaintiffs and the interests of unnamed Class members could have been in conflict.  *Id.* at 306-07.  Although Class Counsel had informed this Court (and the Third Circuit) that they had specific reasons for not pursuing those claims, the panel directed this Court to give further consideration to the viability of the TILA/HOEPA claims the Objectors had described.  *Id.* at 305.  The panel was careful to note, however, that it was *not* suggesting that the hypothesized TILA/HOEPA claims had merit, only that the Objectors' arguments "merit more attention than they were given by the District Court as reflected in the record."  *Id.* at 306.

As to the second prong of the Rule 23(a)(4) inquiry – the adequacy of Class Counsel – the panel noted this Court's duty to ensure that Class Counsel:  "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant[s]."  *Id.* at 307.  Although the panel had "no reason to doubt" Class Counsel's experience, it directed this Court to assess whether Class Counsel's decision not to pursue these TILA/HOEPA claims reflected adversely on their representation of the unnamed Class members.  *Id.* at 307-08.  Here, too, however, the panel was careful to note that it was *not* suggesting that Class Counsel was inadequate.  *Id.* at 308.

### F.    The Parties Brief the Viability of the TILA/HOEPA Claims And Also Negotiate a Modification of the Original Settlement.

On remand, Class Counsel advised the Court that they continued to believe that the Original Settlement was fair, adequate, and reasonable, and that they therefore intended to continue pursuing Court approval of it.  Ex. 14 (11/4/05 transcript), p. 9.  Pursuant to an Agreed Scheduling Order (Ex. 10), the Settling Parties and the Objectors all filed extensive briefs and participated in oral argument (Ex. 13) on "the 'viability' of the TILA/HOEPA claims as raised in the Third Circuit opinion."  At the same time and in light of the uncertainty created by the Third Circuit opinion, Class Counsel began to explore a possible modification and enhancement to the Original Settlement.  *See* Ex. 16 (Carlson Declaration, 1/16/07).  The Settling Parties originally

involved counsel for the Objectors in those discussions and attended a mediation in Florida with retired federal district court judge Nicholas Politan.  The mediation with the Objectors was unsuccessful, however.

During the summer of 2006, with the assistance of former U.S. Court of Appeals Judge Timothy Lewis, Class Counsel and counsel for the Defendants negotiated a modification of the Original Settlement.  Ex. 2 (8/11/06 Modification to Settlement Agreement); Ex. 15 (Declaration of Hon. Timothy K. Lewis).  At the time of those negotiations, the Court had not yet held oral argument on or issued its ruling on the viability of the hypothesized TILA/HOEPA claims.

The renewed settlement negotiations considered the alleged *actual monetary damages* Class members ostensibly could have sought if the alleged TILA/HOEPA violations had occurred as the Objectors had described them.  Although the Objectors had identified several alleged TILA/HOEPA violations, they claimed that Class members suffered actual monetary harm only from two of them:  (1) the allegedly unreasonably high title examination fees; and (2) the allegedly marked-up title search/title abstract fees.  Specifically, the Objectors claimed that Class members were entitled to a refund of the entire title examination fee (on the theory that no title examinations were performed or, if they were, they were unreasonable because no title policies issued).  Ex. 38 (docket, entry 146).  The Objectors also claimed that Class members were entitled to recover as damages the allegedly "marked up" portion of the title search/title abstract fee.  In discussing a potential modification of the Original Settlement, the Settling Parties believed that those compensatory damages claims amounted to, on average, approximately $415 per loan.[12]  Moreover, the Settling Parties recognized that any actual damages that would be available for an alleged TILA/HOEPA violation would overlap with the

---

[12]    Defendants had produced the loan files of approximately 120 borrowers to the Objectors. The average title examination fee among that group of borrowers was $389.  In addition, the Objectors had calculated the claimed compensatory damages based on an assumed "markup" of the title abstract/title search fee of $25 per loan.

alleged damages potentially available under the RESPA claims previously accounted for in the Original Settlement.

Both RESPA and TILA/HOEPA have one-year statutes of limitations. Because of Defendants' perception of the strength of their statute of limitations/statute of repose defenses (which this Court later endorsed in the context of the TILA/HOEPA claims, *see infra*, pp. 17-18), Defendants refused to make additional payments to any Class member without first having some indicia that the Class member could theoretically be able to assert the fraudulent concealment doctrine to toll HOEPA's one-year limitations period.[13]  The negotiations thus produced a modification to the Original Settlement that has two principal features:  (1) Class members can recover an additional $332.00 (approximately 80% of the approximate average amount of the alleged compensatory damages attributable to the TILA/HOEPA claims);[14] but (2) to obtain this additional payment, the Class member is required to submit a claim form in which he or she attests to certain facts.[15]  *Id*.  Specifically:

1.    Did you read your Settlement Statement (Form HUD-1) prior to obtaining your loan?

2.    At the time that you obtained your CBNV [or GNBT] loan, did you believe that the Statement of Settlement Charges listed on your HUD-1 was accurate?

---

[13]    Class Counsel believe that Plaintiffs' argument in favor of equitable tolling of the statute of limitations is significantly stronger with respect to the RESPA claims than it was in the context of the hypothetical TILA/HOEPA claims.  The Defendants disagree.

[14]    This modification increases the potential total settlement amount from $33.1 million to up to $47.6 million.  Ex. 2, p. 8.  There is also a modification to the attorney's fees provision discussed below.

[15]    A similar claim requirement appears in the Original Settlement Agreement (with respect to RESPA's one-year limitations period), but it applies only to certain Class members (because RESPA claims arguably *had* been asserted on behalf of some Class members in a timely fashion).  Class Counsel, as a part of the Original Settlement, negotiated for the earliest potentially available date (e.g., May 1, 2001 for CBNV borrowers; September 19, 2002 for GNBT borrowers).

By contrast, Defendants argued that the claim requirement for the TILA/HOEPA claims should apply to *all* Class members because:  (1) no TILA/HOEPA claims had *ever* been asserted on behalf of the Class; and (2) *each* Class member therefore would need to overcome the statute of limitations defense with respect to those claims in order to survive a motion to dismiss.

3.      At the time that you obtained your CBNV [or GNBT] loan, did you believe that
        the Settlement Charges listed on your HUD-1 were for services actually
        performed?

4.      At the time that you obtained your CBNV [or GNBT] loan, did you believe that
        the Settlement Charges listed on your HUD-1 were reasonable and appropriate?

Ex. 2.

The Original Settlement otherwise remains in full force and effect, and the definition of

the Settlement Class has not changed.  The Original Settlement, as modified, will be referred to

herein as the "Settlement."

### G.      After Extensive Briefing, This Court Concludes That The Objectors' Theorized TILA/HOEPA Claims Are Not Viable.

In a Memorandum Opinion entered October 6, 2006 (Ex. 11), this Court concluded that

the Objectors' posited TILA/HOEPA claims are time-barred as to every member of the

Settlement Class.  Specifically, this Court concluded that the "proposed TILA/HOEPA claims

for damages are not viable, because no named class representative, no member of the class, no

Objector, nor any individual who opted out had a timely TILA/HOEPA claim for damages as of

the date of the relevant complaint."  Ex. 11, pp. 2-3.  The Court also concluded that the proposed

TILA/HOEPA claims for rescission of Class members' loans were not viable either, because no

rescission claims had been asserted within the three-year statute of repose.  *Id.,* p. 33.

### III.    Overview Of The Court's Role

The Court's role at this stage of the litigation is to evaluate the fairness, reasonableness

and adequacy of the proposed Settlement.  In addition, although the Third Circuit did not vacate

the Court's conditional class certification order (dated July 17, 2003), the Court has indicated

that it will reevaluate the proposed Settlement Class under Federal Rule of Civil Procedure 23(a)

and 23(b)(3).

This Court and the Settling Parties each have addressed the Third Circuit's concerns

about the purported TILA/HOEPA claims:  the Settling Parties by expressly accounting for them

-17-

in the modification of the Original Settlement; the Court by expressly ruling that those claims are time-barred as to all Class members.  Accordingly, the Settling Parties respectfully submit that the Court should (a) recertify the Settlement Class; and (b) approve, without reservation, the Settlement as reasonable, adequate, and fair to Class members.

**IV.    The Proposed Settlement Class Satisfies The Requirements Of Rules 23(a) and 23(b), And Should Again Be Certified.**

Putative class actions can, of course, be certified for settlement purposes only.  *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 618 (1997); *In re Prudential Insurance Co. of America Sales Practices Litig.*, 148 F.3d 283, 316 (3d Cir. 1998) ("*Prudential II"*).  As with any class, a settlement class must meet the requirements of Federal Rule of Civil Procedure 23(a) – numerosity, commonality, typicality, and adequacy of representation.  *Amchem*, 521 U.S. at 620.  A settlement class also must satisfy one of the requirements of Rule 23(b).  *Id.*  Here, the Settlement Class is proposed under Fed. R. Civ. P. 23(b)(3), which requires showings of predominance and superiority.

The Third Circuit has noted that the Settlement Class satisfies the numerosity, commonality, and typicality requirements of Rule 23(a), and that the record also supports the "predominance" and "superiority" requirements of Rule 23(b)(3).  Remand Order, 418 F.3d at 303, 309.  For sake of completeness, the Settling Parties nonetheless address those requirements again here (in §§ IV.A and IV.B, *infra*).  In addition, and especially in view of:  (1) this Court's subsequent finding that the purported TILA/HOEPA claims are time-barred as to all Class members; and (2) the fact that the Settlement nonetheless compensates Class members as if those claims could survive a motion to dismiss (which they could not), the Settlement Class amply satisfies the adequacy of representation requirements of Rule 23(a)(4).[16]  *See* § IV.C., *infra*.  Finally, the Settling Parties also explain (in § IV.D) why no subclass is warranted, here.

---

[16]    Of course, Defendants' position on the certification of the nationwide Class for settlement purposes is not a concession that class certification would be appropriate if these

Continued on following page

**A.    The Settlement Class Meets The Rule 23(a) Requirements of
Numerosity, Commonality and Typicality.**

As the Third Circuit correctly recognized, the proposed Settlement Class satisfies the

requirements of Rule 23(a)(1) (numerosity), 23(a)(2) (commonality), and 23(a)(3) (typicality).

*First*, given that there are more than 44,000 geographically dispersed members of the Class, the

proposed Settlement Class plainly satisfies the numerosity requirement of Rule 23(a)(1).

Remand Order, 418 F.3d at 303 (noting that there is "no dispute" but that the proposed

Settlement Class satisfies Rule 23(a)(1)).

The Settlement Class also satisfies the commonality requirement of Rule 23(a)(2), insofar

as the claims of the Named Plaintiffs share at least one common question of fact or law with the

grievances of the unnamed members of the Settlement Class.  *Id*. at 303 (noting that there also is

"no dispute" but that the proposed Settlement Class satisfies Rule 23(a)(2)).  *See also Prudential

II*, 148 F.3d at 310; *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

The Third Circuit also observed that the Settlement Class meets the "typicality"

requirement of Rule 23(a)(3).  Remand Order, 418 F.3d at 303.  The "commonality" and

"typicality" requirements both seek to ensure that the interests of all class members will be

represented by the named plaintiffs; neither requirement, however, requires all putative class

members to share identical claims.  *Id*.  The mere fact that some members of the class may have

varying state or federal claims that the named plaintiffs did not assert does not preclude a finding

of typicality if the claims all derive from the same basic factual predicates and are based upon

the same or substantially similar legal theories.  *Id*.  "Typicality" exists here because the claims

of all members of the Settlement Class depend upon the existence and conduct of the

---

Continued from previous page
claims were to be litigated.  To the contrary, litigation of these claims would present issues that
are not present for settlement purposes.  *E.g., Amchem*, 521 U.S. at 619-20 (a court need not
consider the "manageability" of a settlement class); *Prudential II*, 148 F.3d at 308 (same).

Shumway/Bapst Operation, thereby ensuring that the interests of the unnamed members of the

Settlement Class are sufficiently aligned with those of the Named Class Representatives.  *Id.*

> **B.    The Third Circuit Correctly Noted That The Settlement Class Meets
> The Rule 23(b)(3) Requirements of Predominance and Superiority.**

The Third Circuit also properly noted that the Settlement Class satisfies the requirements

of Rule 23(b)(3).  The "predominance" inquiry of Rule 23(b)(3) takes the commonality

requirement a step further, as it assesses whether the questions of law or fact that are common to

class members predominate over any questions that affect only certain members of the class.  It

tests whether the proposed settlement class is sufficiently cohesive.  Remand Order, 418 F.3d at

308-09.

As discussed above with respect to commonality, members of the Settlement Class claim

to have been wronged by the same alleged common course of conduct.  All of the complaints

allege that the Shumway/Bapst Operation was at the center of the alleged wrongdoing.  When

examining whether common issues predominate here, the focus therefore is on the

Shumway/Bapst Operation (*e.g.*, in allegedly conceiving, developing, and implementing the

challenged lending practices); the allegations of that fraudulent scheme satisfy the predominance

inquiry of Rule 23(b)(3) with respect to this Settlement Class.  *Id.* at 309.  *See In re Prudential

Insurance Co. of America Sales Practices Litigation*, 962 F. Supp. 450, 511-12 (D.N.J. 1997)

("*Prudential I*") (collecting cases), *aff'd*, 148 F.3d 283 (3d Cir. 1998).[17]

---

[17]    Judge Ambrose recently addressed the predominance analysis in the context of a
settlement class as follows:

The Court recognizes that differing state laws might have applied to certain of
plaintiffs' claims had this case been tried.  Of course, plaintiffs' claims under
federal law involve a common body of law.  Even as to state law claims, however,
the possible existence of such variations does not defeat a finding of
predominance.  In *Prudential II,* the Court of Appeals held that any variations in
state law did not defeat the district court's finding that common issues
predominated over individual ones because the potential variations "could be
overcome at trial by grouping similar state laws together and applying them as a

Continued on following page

The Settlement Class also satisfies the "superiority" requirement of Rule 23(b)(3).
Remand Order, 418 F.3d at 309 ("We find no reason, and Appellants fail to offer any, why a
Rule 23(b)(3) class action is not the superior means to adjudicate this matter.").  In the context of
a settlement class, a court need only consider three elements with respect to superiority:  (1) the
interests of the class members in individually controlling the prosecution or defense of separate
actions; (2) the extent and nature of any litigation concerning the controversy already
commenced by or against the class members; (3) the desirability or undesirability of
concentrating the litigation of the claims in the particular forum.  A court does not need to
consider the difficulties likely to be encountered in the management of a class action when
evaluating a settlement class.  *Amchem*, 521 U.S. at 620; *Prudential II*, 148 F.3d at 309.

Here, the small number of individual suits that have been filed against Defendants based
on the alleged conduct of the Shumway/Bapst Operation reflects a lack of interest in the
prosecution of individual lawsuits.  Remand Order*,* 418 F.3d at 309.  Class members who wanted
to pursue their own lawsuits had an adequate opportunity to opt out of the Original Settlement, if
he or she so desired.  *See MetLife Sales Practices Litig.*, 1999 WL 33957871, at *23.  And, most
of the claims that have been filed against these Defendants already are pending in this forum.[18]
And, of course, this Court has subject matter jurisdiction over the claims and personal
jurisdiction over the named parties (and over unnamed Class members by virtue of the settlement
Notice).  Remand Order, 418 F.3d at 298 (confirming the existence of subject matter

---

Continued from previous page
      unit."  *Prudential II*, 148 F.3d at 315. . . .  The Court therefore finds that common
      issues of law and fact predominate.

*In re Metropolitan Life Insurance Company Sales Practices Litig.,* No. 96-179-MC, 1999 WL
33957871, at *23 (W.D. Pa. December 28, 1999) ("*MetLife Sales Practices Litig.*").

[18]    The cases filed by Class Counsel have been consolidated before this Court; *Bumpers* was
transferred from the Eastern District of North Carolina to this Court at the request of *Bumpers'*
counsel; the plaintiffs and counsel in *Bauer v. Guaranty National Bank of Tallahassee*, No. 3:02
cv 02220 (D. Conn. 2004) (case dismissed without prejudice pending the resolution of this case)
support the Settlement; and the cases being pursued by counsel for the Missouri and Illinois
Objectors (*Phipps* and *Avila*) have been dismissed.

jurisdiction); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810-14 (1985) (discussing personal jurisdiction over unnamed class members); *Prudential II*, 148 F.3d at 306 (same).

### C.    The Settlement Class Also Satisfies The Rule 23(a)(4) "Adequacy of Representation" Requirement.

The only requirement of Rule 23 that the Third Circuit questioned when the Original Settlement was before it was the "adequacy of representation" requirement of Rule 23(a)(4). Remand Order, 418 F.3d at 303-08, 310.  In this regard, the Third Circuit focused almost exclusively on the purported TILA/HOEPA claims that Class Counsel had not asserted in the litigation or, ostensibly, in the negotiations that culminated in the Original Settlement.  If some class members had "viable" TILA/HOEPA claims, the Third Circuit reasoned, the Named Plaintiffs might not be adequate representatives of the entire Settlement Cass, because the Named Plaintiffs' TILA/HOEPA claims are barred by the statute of limitations.  *Id*. at 306-07.

The proceedings on remand – including in particular this Court's ruling that *all* Class members' TILA/HOEPA claims are time-barred – squarely establish that the Named Plaintiffs are adequate representatives of the Class and that Class Counsel's affirmative, strategic decision not to plead TILA/HOEPA claims was eminently reasonable.  The Court's ruling on the TILA/HOEPA claims shows that all Class members' TILA/HOEPA claims are barred, and thus, the Named Plaintiffs did not face a unique disability preventing them from asserting these claims.

Moreover, before the Court had made that ruling, Class Counsel leveraged the uncertainty the Third Circuit's opinion had engendered to extract additional consideration from the Defendants for those claims.  The fact that Class Counsel negotiated and obtained financial concessions from the Defendants based on the posited (and hotly disputed) TILA/HOEPA claims indicates that Class Counsel conscientiously addressed the Third Circuit's concern that those claims might not have been accounted for in the negotiations that culminated in the Original Settlement.  Indeed, when negotiating the modified and enhanced Settlement, Class Counsel

assumed that the TILA/HOEPA claims might survive a motion to dismiss (an assumption that this Court later debunked).  *See* Ex. 2 (Joint Motion for Settlement Modification) pp. 2-3, 6-8. That the enhancement to the settlement evolved from an extensive mediation process involving a former federal judge further demonstrates that Class Counsel vigorously represented the interests of the Settlement Class, and did so at arm's length from Defendants.  In short, by seizing upon the uncertainty engendered by the Third Circuit's opinion and obtaining up to an additional $14.6 million for claims that this Court subsequently determined are not even viable, Class Counsel has well-served the interests of the Named Class Representatives and the interests of all unnamed members of the Settlement Class.

In summary, the evolution of the record on remand should resolve any doubts that the Settlement Class amply satisfies Rule 23(a)(4).  Because that element was the only potential roadblock to the certification of the Settlement Class following the Third Circuit's Remand Order, this Court should certify the Settlement Class once again.

### D.    No Subclasses Are Appropriate.

A party advocating the creation of a subclass in the context of a class action settlement must demonstrate the need for the subclass.  *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 346 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3rd Cir. 1999).  The creation of a subclass (or not) is left to the discretion of the court, and is appropriate only "'when the court believes it will materially improve the litigation.'"  *Id.*; *(quoting Clark Equipment Co. v. Int'l Union, Allied Industrial Workers, AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986) (rejecting subclassing, in part, because it often leads to more complex and protracted litigation)).  Here, however, neither the subclass some objectors have proposed (for Class members with alleged claims under North Carolina law) nor the subclass the Third Circuit mentioned (for Class members with purported TILA/HOEPA claims) is warranted.

**1. No subclass is warranted for Class members who have alleged TILA/HOEPA claims, because none of them do.**

The Third Circuit suggested that, if the Objectors' posited TILA/HOEPA claims turned out to be viable, then this Court could consider creating subclasses to allow those Class members who have viable claims to pursue them separately.  Remand Order, 418 F.3d at 307, 310. However, as discussed *supra*, pp. 17-18, this Court subsequently has determined that *no* Class member has a viable TILA/HOEPA claim.  And, in any event (as discussed *supra*, pp. 15-17), the modification of the Original Settlement (which makes compensation available to Class members for the hypothetical TILA/HOEPA claims) fully addressed the Third Circuit's concerns as to whether the Named Class Representatives are adequate representatives of the entire Settlement Class.  This is particularly so here in light of the modified Settlement, because the enhanced payment is potentially available to *all* members of the Settlement Class.  There thus is no reason to create a subclass to address those claims.

**2. No subclass is warranted for Class members with alleged claims under North Carolina law.**

Counsel for the *Bumpers* Plaintiffs, dismayed by the delayed settlement payments to Class members that resulted directly from the Remand Order, recently have embarked on a quest for subclass treatment for North Carolina borrowers.[19]  They now argue that the Settlement does not account for their claims under North Carolina law, and that a subclass of North Carolina borrowers is warranted.

---

[19]    This Court will recall that the same counsel joined in the Original Settlement, by transferring *Bumpers* to this Court, intervening in these consolidated cases, deciding not to opt his clients out of the Original Settlement, and withdrawing their appeal.

### a.    The *Bumpers* Plaintiffs have waived any right they may have had to argue for the creation of a subclass.

The most fundamental flaw in the *Bumpers* Plaintiffs' request for subclass treatment is that they failed to seek the creation of a subclass in the fairness proceedings surrounding the Original Settlement, and they withdrew their appeal of this Court's approval of the Original Settlement. By withdrawing their appeal and endorsing the value of the Original Settlement, the *Bumpers* Plaintiffs embraced the Original Settlement. For example, a letter written by the *Bumpers'* counsel was presented at the Fairness Hearing wherein he advised the Court that he did not view the Original Settlement as being inadequate:

> When I learned of the proposed settlement, I engaged in a fair amount of research and, ultimately, decided *we would not object to the settlement on the ground that the amount was substantially too low.*
>
> . . .
>
> Prior to taking a position on the settlement, we spoke at length with Phil Lehman of the North Carolina Attorney General's Office . . . and [with] Steve Gardner (a former Assistant Attorney General in Texas, a former member of the Board of Directors of the National Association of Consumer Advocates, and one of the drafters of NACA's Class Action Settlement guidelines . . . ). Both looked at the case and the proposed settlement and concluded it was not a "sellout." Thereafter, we filed what we termed "Conditional Objections" objecting to certain aspects of the settlement, *but not the overall amount.*

Ex. 18 (Carlson Decl., 12/1/03) at pp. 51-52 (excerpts from 11/6/03 letter from *Bumpers'* counsel Jerome Hartzell) (emphasis added). *See also* Ex. 12 (11/14/03 transcript) p. 27. And, consistent with the foregoing, the *Bumpers* Plaintiffs' "conditional objections" to the Original Settlement (Ex. 29) did not complain about the lack of a subclass, either.

This Court established a deadline for objecting to or opting out of the Original Settlement (October 1, 2003), and made it clear that:

> [a]ny Class Member who does not make his or her objection in the manner provided in this Order shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, adequacy or reasonableness of the proposed settlement.

Ex. 3 at pp. 5-6. Under these circumstances, the *Bumpers* Plaintiffs are barred from now asserting – for the first time, and more than three years after the Court's deadline has passed –

belated objections to the Original Settlement based upon the absence of a subclass.  Their belated

request for special treatment is nothing more than a thinly-veiled attempt to impede the

consummation of a settlement (now enhanced) *that they previously accepted.*  The Court should

not tolerate, much less reward, these tactics.  *E.g.*, *Georgine v. Amchem Prods., Inc.*, No. 93-

0215, 1995 WL 251402, at *6 (E.D. Pa. Apr. 26, 1995); *see also In re Prudential Insurance Co.*

*of America Sales Practices Litig.*, 177 F.R.D. 216, 235-36 (D.N.J. 1997) ("*Prudential III*")

(extending opt out deadline would prejudice the defendant, in that accepting late claims would

cause a never-ending expansion of liability); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,

164 F.R.D. 362, 370 (S.D.N.Y.) (court refused to allow claims asserted past the opt-out deadline

because doing so would undermine the settlement), *aff'd mem.*, 107 F.3d 3 (2d Cir. 1996); *In re*

*VMS Ltd. P'ship Secs. Litig.*, No. 90 C 2412, 1995 WL 355722, at *2 (N.D. Ill. June 12, 1995)

(request for exclusion asserted several years after the end of the opt-out period likely would

cause the settlement to unravel, and should not be granted).

> **b.    The Third Circuit did not, as the *Bumpers* Plaintiffs contend, mandate or even suggest the creation of a subclass of borrowers with alleged state-law claims.**

The *Bumpers* Plaintiffs also rely on the Third Circuit's statement that:

> [T]he District Court should pay particular attention to the prevalence of colorable TILA, HOEPA, and other claims that the individual class members may have which were not asserted by class counsel in the consolidated complaint (or presumably in settlement negotiations).  Finally, if the District Court were to find that class certification is appropriate, the Court should determine whether subclasses are necessary or appropriate based on the above findings.

Remand Order, 418 F.3d at 309-10.  The Third Circuit did not, however, mandate the creation *of*

any subclass, much less any subclass of borrowers with potential claims under state law.

(Indeed, the passage quoted above appeared in the Third Circuit's discussion of the posited

TILA/HOEPA claims.  The Remand Order does not even speak to the various state law claims.

*Id.* at 303 n. 17.)  It bears reiterating that the Third Circuit could not have been addressing the

*Bumpers* Plaintiffs' claim because the *Bumpers* Plaintiffs abandoned their appeal and therefore

agreed to the Court's approval of the Original Settlement.

Moreover, as the above passage makes clear, the Third Circuit noted that the question of whether a subclass is warranted arises only if individual Class members have claims that were not asserted in the Consolidated Amended Complaint or accounted for in the settlement negotiations. The purported claims under North Carolina law do not satisy this criteria.

**(1)**    **The Original Settlement expressly accounts for Class members' potential state law claims (including potential claims under North Carolina law).**

*First*, the state law claims the *Bumpers* Plaintiffs now assert as warranting subclass treatment are specifically accounted for and addressed in the Settlement. North Carolina borrowers will receive automatic monetary consideration ($325.00) *for any claims they may have had under North Carolina law*. Ex. 1, ¶ 4. Accordingly, there is no reason whatsoever for this Court to create a separate subclass to "address" state law claims that already have been factored into, and paid for, in the Settlement. This fact alone should be dispositive of the Court's analysis of this issue.

**(2)**    **The posited claims under North Carolina law are preempted by federal law.**

*Second*, there also are serious issues regarding whether the posited claims under North Carolina law are "viable." These issues relate to whether those claims are preempted by federal law and whether they have any independent value at all. At bottom, the *Bumpers* Plaintiffs claim that they paid discount fees in order to receive lower interest rates on their loans, and that they believe in hindsight that they did not receive the lower rates they should have received. Defendants would argue that the proffered claim is simply another way of claiming that the interest rate is too high ("excessive") given the discount fee they paid.

As the Third Circuit recognized, usury claims asserted under state law that challenge the "interest" charged by a state chartered bank (like CBNV) are preempted by the Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1831d ("DIDA"). Remand

-27-

Order, 418 F.3d at 295-96; *see also Forness v. Cross Country Bank, Inc.*, No. 05-CV-417-DRH,

2006 WL 240535, at *3 (S.D. Ill. Jan. 13, 2006).

       In an effort to escape the preemptive effect of DIDA, the *Bumpers* Plaintiffs argue that

they are not pursuing usury claims (because they withdrew their claims under North Carolina's

Interest Law (N.C. Gen. Stat. § 24-1 *et seq.)* and have pursued claims under North Carolina's

Registration Act (N.C. Gen. Stat. § 53-238) and North Carolina's Unfair Trade Practices Act

(N.C. Gen. Stat. § 75-1 *et seq.*)).  Again, Defendants would argue that this argument elevates

form over substance, and fails as a matter of law.

       It is a bedrock principle of modern banking law that, notwithstanding what a fee is called,

it is "interest" if the lender charges the fee as compensation in connection with its extension of

credit.  "Interest" for purposes of DIDA § 521 (which applies to state-chartered banks like

CBNV) includes all charges that § 85 of the National Bank Act, 12 U.S.C. § 85, authorizes

federally-chartered banks to charge as "interest."  <u>See</u> (Opinion of FDIC General Counsel

William F. Kroener, III (3/24/98)) 1998 FDIC Interp. Ltr. LEXIS 59, at *4-13 (6/4/98).

Defendants also would point out that the O.C.C. (which regulates national banks) has broadly

defined "interest" for purposes of § 85 of the National Bank Act to include "any payment

compensating a creditor or prospective creditor for an extension of credit."  12 C.F.R.

§ 7.4001(a).  Accordingly (Defendants would note), courts repeatedly and consistently hold that

"interest" includes not only the numerical percentage rate *but other fees and charges as well.*

*See, e.g., Smiley v. Citibank,* 517 U.S. 735, 745-46 (1996) ("interest" includes late payment

fees); *Phipps v. F.D.I.C.*, 417 F.3d 1006, 1012 (8th Cir. 2005) ("interest" includes discount fees

and origination fees); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 825 (1st Cir. 1992)

("interest" includes late fees); *Cronkleton v. Hall,* 66 F.2d 384, 387 (8th Cir. 1933) ("interest"

includes bonuses or commissions paid to a lender); *MorEquity, Inc. v. Naeem,* 118 F. Supp. 2d

885, 898 (N.D. Ill. 2000) ("interest" includes excess finance charges and fees); *Hill v. Chemical*

*Bank,* 799 F. Supp. 948, 953 (D. Minn. 1992) ("interest" includes late and overlimit fees)*;*

*Tikkanen v. Citibank (South Dakota), N.A.,* 801 F. Supp. 270, 278 (D. Minn. 1992) (same).

Defendants further would argue that the O.C.C. also has expressly concluded that still

other fees – including account opening fees, fees for exercising a fixed rate option, prepayment

fees and rejected item fees – also fall within the scope of "interest" under § 7.4001 and NBA

§ 85. O.C.C. Interp. Ltr. 803, 1997 WL 662683 (10/7/97); O.C.C. Interp. Ltr. 744, 1996 WL

636765 (8/21/96); O.C.C. Interp. Ltr. 817, 1998 WL 107261 (1/6/98).

Class Counsel would agree that there are serious preemption issues regarding any

potential state law claim, as is manifest from the losses the plaintiffs in the *Phipps* and *Avila*

cases have suffered.[20]  *See infra*, pp. 43-44, 51.

In short, any attempt by the *Bumpers* Plaintiffs to characterize their claim as something

other than a challenge to "interest" would face real and substantial obstacles.[21]  *See Beneficial*

*National Bank v. Anderson*, 539 U.S. 1, 8 (2003) ("When [a] federal statute completely pre-

empts the state-law cause of action, a claim which comes within the scope of that cause of

action, *even if pleaded in terms of state law,* is in reality based upon federal law") (emphasis

added).  Because the purported claims under North Carolina law are preempted by DIDA, they

are not "viable" in the sense used by the Third Circuit and there is no reason for this Court to

create a subclass to settle those claims – particularly because the Settlement expressly includes

compensation for purported claims under North Carolina law.

---

[20]     The plaintiffs in *Avila* and *Phipps* were represented by some of the same lawyers who
represent the Objectors to this Settlement.

[21]     And, where a plaintiff complains of *several* fees, if even one of them qualifies as
"interest," the claim is preempted.  *Phipps*, 417 F.3d at 1012.

c.    **There is no conflict of interest that would warrant the
creation of a North Carolina subclass.**

The *Bumpers* Plaintiffs' bid for subclass treatment also fails because they have not

demonstrated a conflict of interest between the nationwide Settlement Class and the small subset

of Class members who live in North Carolina.  Where (as here) plaintiffs are seeking redress for

economic (as compared to physical) injuries, a single settlement class (without subclasses)

typically is appropriate.  *Prudential II*, 148 F.3d at 312-13.  Even if Class members' rights under

their respective states' laws vary, this does not create a conflict of interest requiring subclass

treatment where a settlement class is involved, since *all* Class members are seeking redress for

alleged economic injuries premised on the same wrongful course of conduct.  *Id*. at 313-15.

Indeed, if the law were otherwise, there effectively would be no way efficiently to resolve large,

complex class action litigation involving class members and claims from many different states.

*Id.*

None of the cases the *Bumpers* Plaintiffs have cited support the creation of one or more

subclasses here, for several reasons.[22]  *First*, none of them involve a situation where plaintiffs

who previously had accepted a settlement later changed course to argue that the settlement was

inadequate and press for special treatment.  *Second*, in two of those cases, subclasses were

created to address conflicts of interest among class members that arose from the fact that some

class members had *present* claims for personal injuries, while others had potential claims for

personal injuries that might occur in the *future*.  *Ortiz*, 527 U.S. at 856-57; *Amchem*, 521 U.S. at

626-27.  No such conflict is present here.  *Cf. Prudential II*, 148 F.3d at 313-15 (certifying a

single settlement class upon recognizing, *inter alia*, that there were no present and future claims

like *Amchem*, but rather, claims emanating from a common scheme to defraud).  *Third*, *Ortiz* and

*Amchem* were asbestos exposure class actions, which present unique challenges not present here.

---

22    *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *Amchem*, 521 U.S. 591; *Wolfert v.
Transamerica Home First, Inc.*, 439 F.3d 165 (2d Cir. 2006); and *Reynolds v. Beneficial Nat'l
Bank*, 288 F.3d 277 (7th Cir. 2002).

*See In re Ikon Office Solutions, Inc., Secs. Litig.*, 194 F.R.D. 166, 186-87 (E.D. Pa. 2000) (court distinguishes *Ortiz* and *Amchem* as asbestos exposure cases, refuses to create subclasses because the plaintiffs had failed to make a timely motion and had accepted the settlement amount, and approves a settlement class even though some claimants had claims that others did not); *In re Foundation for New Era Philanthropy Litigation*, 175 F.R.D. 202, 204-05 (E.D. Pa. 1997) (refusing to create a subclass for claims that were "exclusively for economic injury" rather than for personal injury as in *Ortiz* and *Amchem*).  And, *fourth*, in *Reynolds* and *Wolfert*, the courts actually *declined* to create subclasses.  *Wolfert*, 439 F.3d at 166, 173-75; *Reynolds*, 288 F.3d at 282.  In short, the controlling and most analogous case – *Prudential II* – illustrates why the single Settlement Class, without subclasses, is warranted and appropriate here.

In summary, in addition to waiving their right to argue for a subclass, the *Bumpers* Plaintiffs have failed to offer this Court any legitimate reason for creating a subclass of North Carolina borrowers.

## V.    The Modified Settlement Is Fair, Reasonable, and Adequate.

The Settlement that Class Counsel ultimately negotiated on behalf of more than 44,000 borrowers nationwide is a sizeable one:  every Class member will receive at least $250.00; many Class members will receive as much as $925.00; some Class members may receive as much as $1,257.00.  The Settlement also is an inclusive one:  it benefits even those borrowers whose claims are (or, in other instances, arguably are) time-barred.  The allocation of the Settlement funds also recognizes that some borrowers might have claims under the laws of the state in which they reside, and it compensates borrowers as if they had viable TILA/HOEPA claims, which they do not.  In short, whether viewed through the lens of the factors identified in the *Manual for Complex Litigation* (4th ed.) or through the Third Circuit's *Girsh* test, the proposed Settlement should be approved as fair, reasonable, and adequate.

## A.     The Factors Identified in the Manual for Complex Litigation

The *Manual for Complex Litigation* (4th ed.) ("MCL") identifies several factors that may

bear on a court's review of a class action settlement, namely:

1.     the likelihood of success at trial;

2.     the likelihood of class certification;

3.     the status of competing or overlapping actions;

4.     claimant's damages and value of claims;

5.     total present value of monetary and nonmonetary terms;

6.     attorney fees;

7.     cost of litigation; and

8.     defendant's ability to pay.

MCL § 21.62 at p. 320.

## B.     The Third Circuit's *Girsh* Factors

The Third Circuit has identified a slightly different list of factors a court should consider

when evaluating the fairness, reasonableness, and adequacy of a proposed class action

settlement.  *Girsh* requires this Court to consider the following factors:

1.     the complexity and duration of the litigation;

2.     the reaction of the class to the settlement;

3.     the stage of the proceedings at which the settlement was negotiated;

4.     the risks plaintiff faced in establishing liability;

5.     the risks plaintiffs faced in establishing damages;

6.     the risks of maintaining a class action through trial;

7.      the defendants' ability to withstand a greater judgment;

8.      the reasonableness of the settlement in light of the best possible recovery; and

9.      the reasonableness of the settlement in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 156-57 (3d Cir. 1975).  In view of the appreciable overlap between the MCL factors and the *Girsh* factors, the Settling Parties consolidate them below for discussion where feasible.

### C.      Applying The MCL Factors And The *Girsh* Factors to The Proposed Settlement

#### 1.      The litigation was long and complex, and it would have been complicated and expensive to try.[23]

Continued litigation of these cases would be "lengthy, complex and expensive."  Ex. 6, ¶ 92.  Fact discovery alone would have been a "massive undertaking."  *Id.*  Indeed, Walters Bender concedes that this was a complex case.  No other description is possible.  The complaints alleged multiple theories of liability, each one requiring its own particularized proof.  In addition, the Defendants had an array of significant and sophisticated legal defenses – both on the merits and to the certification of a litigation class - that also required fact-intensive and particularized proof.  Completing the necessary classwide discovery alone would have been arduous, to say nothing of the efforts that would be devoted to a classwide trial involving a nationwide class of borrowers and scores of potential party and non-party witnesses.

#### 2.      The parties settled at an appropriate stage of the proceedings when the issues were sufficiently mature and known to Class Counsel.[24]

A court considers the stage of the proceedings at which a class-wide settlement is reached in order to gauge whether class counsel "had an adequate appreciation of the merits of the case before negotiating" a settlement.  Ex. 6, ¶ 100 (citing *In re Gen. Motors Corp., Prods. Liab.*, 55

---

23      MCL factor 7; *Girsh* factor 1.

24      *Girsh* factor 3.

F.3d 768, 813 (3d Cir. 1995), *aff'd*, 134 F.3d 133 (3d Cir. 1998) ("*GM Trucks Litig.*")).  An

evaluation of class counsel's appreciation of the case does not hinge on the "artificial" measure

of how much "formal" discovery has occurred at the time the settlement was reached.  *In re*

*Cendant Corp. Litig.*, 264 F.3d 201, 236 (3d Cir. 2001) (even though discovery was at an early

stage, court concluded that class counsel "had an excellent idea of the merits of the case" at the

time of settlement).  *See also In re ATI Technologies, Inc. Securities Litig.*, No. 01-2541, 2003

WL 1962400, at *2 (E.D. Pa. Apr. 28, 2003) (acknowledging that the parties were able to

adequately assess the strengths and weaknesses of their position through investigation, not

formal discovery); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 377 (D.D.C.

2002); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (formal

discovery was not a "necessary ticket to the bargaining table").  Here, based on their

investigation and experience, Class Counsel knew the strengths and weaknesses of their claims

and were fully informed on all material issues their lawsuits encompassed well before they sat

down to negotiate a settlement with Defendants.

Class Counsel developed its cases against CBNV, GNBT, and RFC through an extensive

investigation that began in late 2000.  Ex. 17 (Carlson Declaration).  *See also* Ex. 27 (Affidavit

of Brian Thomas) (setting forth a detailed chronology regarding Class Counsel's investigation).

For example, Class Counsel and/or the investigator Class Counsel had hired:

- interviewed more than 75 borrowers in Pennsylvania, Ohio, Tennessee, Illinois, New Jersey, North Carolina, Washington, and Missouri who had obtained second mortgage loans from CBNV or GNBT;

- reviewed those borrowers' loan files;

- made extensive reviews of SEC filings and other regulatory materials related to CBNV and GNBT;

- reviewed all available documentation from an O.C.C. investigation into GNBT and sent the O.C.C. a Freedom of Information Act request for additional information;

- did substantial research on the alleged mortgage brokers who were originating the loans in question;

- performed substantial research on the title companies used to close the loans (including EquityPlus Financial, Equity Guaranty, Americas Banc Mortgage, and Fidelity First Funding, and related entitles);

- did extensive research on RFC's role in the various transactions;

- received input almost daily from a mortgage industry consultant;

- spent substantial time and effort debriefing highly-placed persons from within the Shumway/Bapst Operation who they believed to be "whistle-blowers;" and

- by November 2002, had done background checks on various potential witnesses and had interviewed key potential witnesses.

Exs. 17, 27.

Class Counsel's investigation of the case continued even after the initial complaints had been filed, and, indeed, continued while the settlement negotiations were ongoing.  Ex. 17, ¶ 44. As a result of this extensive investigation, Class Counsel was able to include a significant amount of factual detail and specificity in the final complaints.  *See, e.g.*, Ex. 48 (*Picard* Amended Complaint).

Indeed, counsel for the various Objectors *acknowledged* at the Fairness Hearing in November 2003 that Class Counsel had done an impressive investigation of the scheme that gave rise to the allegations in the complaints.  *See* Ex. 12 (11/14/03 transcript) p. 35 (Mr. Vaughan of Walters Bender:  "Certainly Mr. Carlson has to be congratulated for the efforts that he did in uncovering this scheme.  We believe that we may have been part of that, but certainly he deserves a great deal of credit for that work"); *id*. at p. 40 (Mr. Borison of the Legg Firm:  "I also applaud [Class Counsel's] efforts, they did a lot of work, I am not taking anything away from them").

Moreover, the Objectors did not take significant issue with the material *facts* alleged in the Consolidated Amended Complaint.  Rather, the crux of their objections to the Original Settlement centered on the viability of different *legal theories*.  That different lawyers looked at the same facts and evaluated them differently simply does not establish that Class Counsel

lacked an adequate appreciation of the facts of the case, or that the issues were not sufficiently "mature" to be settled in arm's length negotiations.

> **3.    The settlement negotiations that culminated in the modification to the Original Settlement were mediated by a former federal judge.**

The MCL encourages courts to consider whether any third parties – neutral third parties in particular – participated in the settlement negotiations.  MCL § 21.62, p. 317.  Here, former Third Circuit Court of Appeals Judge Timothy Lewis was involved in the negotiations that culminated in the modification of the Original Settlement in the summer of 2006.[25]  Ex. 15 (Hon. Timothy K. Lewis Declaration).  Judge Lewis met with counsel for the Settling Parties in Pittsburgh in October 2005 to discuss the Remand Order and mediate the Settling Parties' discussions concerning an appropriate course of action to address the issues that decision raised.

Then, after the parties had finished briefing this Court on the TILA/HOEPA "viability" issues, Judge Lewis presided over a follow-up mediation session with counsel for the Settling Parties.  Judge Lewis remained involved in the mediation as it continued via telephone at various times until the Settling Parties reached agreement on the material terms of the modification to the Original Settlement (on July 17, 2006).  He also subsequently presided over a separate mediation in Pittsburgh between Counsel for the Settling Parties on July 24 and 25, 2006 regarding attorneys' fees.  *See* Ex. 15, ¶ 15.

As Judge Lewis' Declaration indicates, the various negotiations and discussions between and among Counsel for the Settling Parties were conducted at arm's-length and reflected vigorous debate concerning highly contested issues.[26]

---

[25]    Judge Lewis' experience includes managing hundreds of cases as a District Judge, participating in several class actions as a Circuit Judge, and mediating numerous complex litigation matters in private practice.  Ex. 15, ¶ 9.

[26]    Indeed, as Judge Lewis' Declaration confirms, the negotiations nearly collapsed at various points as the July 18, 2006 hearing on the "viability" issues approached.  Ex. 15, ¶ 4.

4.    **The Class reacted favorably to the Original Settlement:  there were few requests for exclusion, and the objections were few and not well-founded.**[27]

Class members' reaction to the announcement of a settlement can be a significant factor under the *Girsh* paradigm.  *GM Trucks Litig.*, 55 F.3d at 812.  Here, "there has been virtually no real opposition to" the Original Settlement.  Ex. 6, ¶¶ 93, 99 (Class Members' reaction to the proposed Settlement was "overwhelmingly favorable.").  No Class member who was free from solicitations from plaintiffs' lawyers objected to the Original Settlement.

And, during the initial opt-out period, only 16 of the 44,535-person Settlement Class who were free of outside influence from the various plaintiffs' lawyers opted out of the Class.  *See generally* Ex. 6.  Even the opt-out campaign – which entailed the dissemination of false, misleading, and one-sided information about the Original Settlement and about Class Counsel - generated only 419 opt-outs during the initial opt-out period.  Ex. 6.  And, after the Court directed the mailing of a Curative Notice and established a Curative Opt-Out Period, only 94 of the original 419 solicited opt-outs opted out again.  Ex. 6.  Overall, only 110 members of the 44,535-person Settlement Class (0.2%) ultimately opted out of the Original Settlement.  *Id.,* ¶ 94.  Likewise, three of the five sets of objections to the Original Settlement that the Court received were prepared by the law firms that had participated in the "opt-out or object" campaign.  A fourth set – self-titled "conditional objections" asserted on behalf of two Class members from North Carolina – did not attack the basic fairness of the Settlement.[28]  Ex. 29.  The fifth set of objections, although filed over the name of the Attorney General of Missouri, essentially tracked the Walters Bender Objections.[29]  No other Class member came forward to object to any aspect of the Original Settlement.  In short, the reaction of Class members to the Original Settlement

---

[27]    *Girsh* factor 2.

[28]    The Court addressed and rejected these "conditional objections," (Ex. 6, ¶¶ 156-70), and the *Bumpers* Plaintiffs did not pursue an appeal of the Court's ruling.

[29]    Tellingly, the Missouri Attorney General neither appeared at the Fairness Hearing nor appealed from the Court's final order approving the Original Settlement.

was indeed "overwhelmingly favorable." Ex. 6, ¶ 99. *See Prudential II*, 148 F.3d at 318 (class

reaction was favorable and weighed in favor of approving settlement where only a limited

number of class members filed opt-out requests or objections, and the "most vociferous

objectors" were "a handful of litigants represented by counsel in cases that compete with or

overlap" the claims being settled"); *MetLife Sales Practices Litig.,* 1999 WL 33957871, at *27

(W.D. Pa. Dec. 28, 1999) (in spite of approximately 200 objections to proposed settlement, the

"overwhelmingly favorable reaction of Class Members . . . strongly suggests that the proposed

settlement should be approved"); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313-14 n.15 (3d

Cir. 1993) (a "small proportion of objectors does not favor derailing settlement"); *Shlensky v.

Dorsey*, 574 F.2d 131, 148 (3d Cir. 1978) (settlement approval is warranted where an

"overwhelming majority" do not object to the settlement).

　　　　　Furthermore, as explained below, the objections to the Original Settlement that *were*

asserted were not well-founded.

> **a.    As this Court has recognized, the objections that challenged
> Class Counsel's decision not to pursue TILA/HOEPA claims
> were unfounded.**

　　　　　One of the primary objections to the Original Settlement was that Class Counsel had

"failed" to assert claims under TILA or HOEPA.  These posited claims primarily related to:

(1) whether fees for the title exams and title abstracts were "bona fide and reasonable;" and

(2) whether borrowers were given certain statutorily required disclosures three business days

before their loans closed.  However, as this Court since has recognized – after reading

voluminous, in-depth briefs that analyzed these hypothetical TILA/HOEPA claims – any such

claims would be time-barred.  *See generally supra* pp. 15-18.

　　　　　Given this Court's conclusion that no Class member had a timely TILA/HOEPA claim

(either for damages or for rescission of their loans), the Court did not reach the Settling Parties'

other arguments (set forth in the "Viability Briefs") as to why those claims were not viable or

valuable.  Summaries of those arguments are set forth below, insofar as they further illustrate

why the objections that were asserted to the Original Settlement were not well-grounded in law

or in fact.

**(1)     Evidence regarding title exams and title abstracts**

TILA authorizes lenders to *exclude* "bona fide and reasonable" title abstract fees (HUD-1

Line 1102) and title examination fees (HUD-1 Line 1103) from the "finance charge" for

purposes of determining a loan's "annual percentage rate" ("APR").  The Objectors argued,

however, that because the title abstract fees and title examination fees that CBNV and GNBT

charged were not bona fide and not reasonable, those fees should have been *included in* the

finance charge used to calculate the APR.  As a result of the alleged wrongful exclusion of these

fees from the finance charge, the Objectors contend that the APRs on the loans were understated.

In support of that argument, the Objectors made two unsupportable assertions of fact,

namely, that:  (1) *no title examination services whatsoever* were provided for any of the 44, 000

loans at issue; and (2) the fees for title abstract services were improperly marked up on each of

these 44,000 loans.  The evidence the Settling Parties submitted to this Court flatly refutes both

assertions.

*First*, the Settling Parties came forward with undisputed evidence showing that title

examinations *were* performed on *all* of the loans at issue.  For example:

- knowledgeable managers from CBNV and GNBT during the relevant period attested that the Banks would not have closed any second mortgage loans without a title examination.  Ex. 19 (Affidavit of James P. McCroan, GNBT), ¶¶ 6-9, 24; Ex. 20 (Affidavit of Donald Schmaltz, CBNV), ¶ 10; Ex. 21 (Affidavit of Joseph Grinder, GNBT), ¶¶ 48-51;

- the Settling Parties submitted affidavits from four title companies that performed title services for the Banks (Paramount Title, Resource Title, Home Title, and First Title and Escrow), each of which stated that "[i]n each and every instance in which borrowers paid funds to [the title companies] for title services, those services were actually performed."  Ex. 22 (Affidavit of Benjamin Soto, Paramount Title); Ex. 23 (Affidavit of Millard Rubenstein, Resource Title); Ex. 24 (Affidavit of Dennis Hoover, Home Title); and Ex. 25 (Affidavit of Stephen J. Papermaster, First Title and Escrow);

- the former president of two other title companies that provided title services to CBNV and GNBT borrowers (Title America and USA Title) testified under oath (in *Bumpers*) that those firms only charged borrowers for the actual services performed. Ex. 28 (Deposition of Mary Jo Speier), p. 160.

*Second*, the evidence showed that, when the title company supposedly did "mark up" the cost of actually performing the title search or obtaining the title abstract (typically by $25.00), the markup was in consideration for services rendered by the title companies. *See, e.g.*, Ex. 28 (Speier transcript), p. 52; Ex. 23 (Rubenstein Aff.), ¶ 7; Ex. 24 (Hoover Aff.), ¶ 5; Ex. 25 (Papermaster Aff.), ¶ 7. The evidence also showed that these additional services are "typical and customary within the title industry." *E.g.*, Ex. 26 (Affidavit of Edward J. Krug), ¶ 50.

### (2)    Evidence regarding the HOEPA "three business day notice" requirement

HOEPA requires lenders to provide certain disclosures to borrowers "not less than three business days prior to the consummation of the transaction." HOEPA § 32, 15 U.S.C. § 1639(b)(1) (the "HOEPA Disclosures" or the "Section 32 Disclosures"). Although the Objectors acknowledge that the Banks did provide these HOEPA Disclosures to borrowers, they claim that the Banks did not provide them "three business days" prior to closing. The evidence showed, however, that the Banks were cognizant of the need to comply with § 1639(b)(1) and did comply with that requirement.

Well before settling this litigation, Class Counsel had investigated whether the Class realistically could allege and prove a claim under 15 U.S.C. § 1639(b)(1). After interviewing a number of witnesses, Class Counsel concluded that the evidence of any failure to comply with the HOEPA § 32 three-day rule was "mixed at best" and that "the disclosure issue turned on idiosyncratic, individual loan-specific facts and that class claims asserting this theory could not be certified." Ex. 17 (Carlson Declaration), ¶ 40. *See also Bryant*, *supra* (denying class certification on similar TILA/HOEPA claims).

The evidence the Settling Parties submitted to the Court reflected that Class Counsel's decision not to assert a HOEPA § 32 claim on behalf of the Class was prudent.  For example:

- GNBT maintained procedures to ensure that Section 32 Disclosures were sent to borrowers well in advance of the HOEPA deadline.  GNBT required that Disclosure "to be mailed to each borrower the first business day after the borrower submitted a completed loan application."  Ex. 21 (Grinder Aff.), ¶¶ 13, 33.  GNBT conducted daily audits to ensure that GNBT loan originators were complying with that policy.  *Id.*, ¶¶ 9-22.  If an amended Section 32 Disclosure arrived at the borrower's address less than three days before the closing, GNBT postponed the closing and rescheduled it so the borrower would have at least three days to review and consider it.  *Id.*, ¶¶ 34-36.  GNBT's former Quality Control Manager was unequivocal in his affidavit that he was "aware of no instance in which a borrower received an untimely Section 32 Disclosure."  *Id.*, ¶ 42.

- *98% of the loan files* the Defendants produced to the Objectors contain signed acknowledgements wherein the borrowers *attested* – directly above their signatures - that they first received the HOEPA Disclosures "at least three business days" prior to closing.  *E.g.*, Exs. 35, 36 (exemplars of signed HOEPA Disclosures).

- Various CBNV loan files contained "overnight mail" receipts, the dates of which corroborate that CBNV timely sent HOEPA Disclosures to borrowers (including Objectors) more than three days (and sometimes *weeks*) before the loans were signed and closed.  *E.g.*, Exs. 35, 36 (documents from loan files of Objectors and Class members containing signed HOEPA Disclosures and mail receipts).

- Other CBNV loan files contain a "Processor's Section 32 Certification," on which a CBNV employee documented that the HOEPA Disclosures were timely sent to the borrower.  *E.g.*, Exs. 35 (certification in Webb file), 36 (certification in Borrower No. 1 file).

      **b.**    **The objections that challenged Class Counsel's strategic decision not to plead claims under Missouri or Illinois law also are not well-founded.**

The Walters Bender Objectors also faulted Class Counsel for failing to pursue claims under Missouri's Second Mortgage Loan Act, Mo. R.S. §§ 408.231, *et seq.*, and Illinois' Interest Act, 815 ILCS § 205/4.1a(f).  Their objections notwithstanding, the absence of such claims from the Consolidated Amended Complaint in no way indicates either that Class Counsel failed adequately to investigate the case or that Class Counsel undervalued the claims of Class members from Illinois and Missouri.

(1)        **The hypothetical Missouri SMLA claim**

Missouri's Second Mortgage Loan Act (the "MSMLA") prohibits lenders from charging certain closing costs and fees on certain loans.  Mo. R.S. § 408.231.1.  The Walters Bender Objectors contend that, because Class members from Missouri allegedly were charged excessive fees and closing costs, Missouri law entitles them to recover actual damages and attorneys' fees. Walters Bender contends that CBNV, GNBT, and RFC also are statutorily barred from recovering interest on those loans.

The courts of Missouri have, however, rejected this argument in two cases in which Walters Bender represented plaintiffs whose loans were made by the same lenders involved in this Settlement.  In *Avila v. Community Bank of Northern Virginia*, the Missouri Court of Appeals upheld the trial court's dismissal of the plaintiffs' claim under the MSMLA on the grounds that the plaintiff had not alleged that her second mortgage loan carried an unlawful interest rate.  *Avila*, 143 S.W.3d 1, 2003 WL 22002779, at **3-4 (Mo. App. Aug. 26, 2003), *motion to transfer denied* (Mo. Sept. 28, 2004).  Walters Bender's subsequent efforts to obtain rehearing by the Missouri Court of Appeals and review by the Missouri Supreme Court were all rejected.[30]

The Missouri plaintiffs who had second mortgage loans with GNBT fared no better in *Phipps v. Guaranty National Bank of Tallahassee*, No. 03-420-CV-W-GAF, 2003 WL 22149646 (W.D. Mo. Sept. 17, 2003), *aff'd*, 417 F.3d 1006 (8th Cir. 2005).  There, the U.S. District Court for the Western District of Missouri held that the MSMLA was preempted by the National Bank Act (12 U.S.C. §§ 85, 86), and dismissed plaintiffs' claims; the Eighth Circuit affirmed.  2003 WL 22149646, at *7.

---

[30]    Following *Avila*, the Missouri Court of Appeals likewise affirmed the grant of summary judgment for defendants in another second mortgage case filed by Walters Bender.  *Adkison v. FirstPlus Bank*, 143 S.W.3d 29 (Mo. App. May 18, 2004), *motion to transfer denied* (Mo. Sept. 28, 2004).

In comparison, whereas Walters Bender has litigated and *lost* claims under Missouri law, Class Counsel has arranged for Class members from Missouri to receive an additional $325.00 for their potential state law claims (above and beyond the automatic payments that are available to all Class members) under the Settlement.  *See supra*, pp. 6-8.  Against this backdrop, there simply is no factual or legal basis for Walters Bender's contention that the Settlement is unfair to Missouri borrowers.

### (2)    The hypothetical Illinois law claim

Walters Bender also faults Class Counsel for failing to assert claims under the Illinois Interest Act.  Specifically, Walters Bender argues that:  (a) under § 4.1a(f) of the Illinois Interest Act (815 ILCS, § 205/4.1a(f)), a lender of mortgage loans with interest rates in excess of 8% may not charge fees in excess of 3% of the principal loan balance; and (b) GNBT and CBNV charged fees in excess of that amount.

As discussed *supra*, pp. 28-30, and *infra*, pp. 50-53, the Illinois Interest Act claims, like *all* of the posited state law claims, would be subject to preemption defenses.  The record supports Class Counsel's valuation of the state law claims for that reason alone.

Additionally, CBNV, GNBT, and RFC (but not Class Counsel) have asserted that § 4.1a(f) of the Illinois Interest Act had been impliedly repealed more than twenty years ago. There was a split of opinion on this issue between the federal courts and the state courts of Illinois at the time of the Original Settlement.  Several district courts and the U.S. Court of Appeals for the Seventh Circuit had held that § 4.1a(f) was impliedly repealed.  *Currie v. Diamond Mortgage Corp. of Illinois*, 859 F.2d 1538, 1543 (7th Cir. 1988); *Krone v. 125 Home Loan Owner Trust*, No. 01-CV-0691-MJR, slip. op. (S.D. Ill. Aug. 27, 2003).  The Seventh Circuit also later re-confirmed its holding in *Currie*, and directed a federal district court to *dismiss* a claim brought against RFC under § 4.1a(f) of the Illinois Interest Act.  *Reiser v.*

-43-

*Residential Funding Corp.*, 380 F.3d 1027 (7th Cir. 2004)).[31]  And the Supreme Court of Illinois

ultimately confirmed that the Seventh Circuit correctly had stated the law of Illinois.  *U.S. Bank*

*Nat'l Ass'n v. Clark,* 837 N.E.2d 74 (Ill. 2005).[32]

    Finally, it also bears noting that the Settlement does not value Illinois borrowers'

potential claims under Illinois law at $0.  To the contrary, in recognition of the unsettled state of

the law at the time the parties negotiated the Original Settlement, the Settlement provides that

Class members from Illinois will receive an additional automatic payment of $325.00 as

compensation for a potential claim under Illinois law.  *See supra*, pp. 6-8.  There simply is no

legal basis for the Objectors' challenge to the Settlement.

> **5.    The plaintiffs faced substantial risks in establishing
> Defendants' liability for the conduct of the Shumway/Bapst
> Operation.[33]**

    *Girsh* and the MCL both direct this Court to consider the risks Plaintiffs faced in

establishing liability against Defendants had the case gone to trial.  This Court heard detailed

presentations about the many defenses the Defendants had raised (or likely would have raised) to

---

31    Ironically, another unsuccessful suit decided since the Original Settlement was reached
was filed by Illinois borrowers who had opted out of the Original Settlement.  *Spann v.
Community Bank of Northern Virginia*, No. 03 C 7022, 2004 WL 691785, at *10 (N.D. Ill. Mar.
30, 2004) (dismissing Illinois Interest Act claim with prejudice), *reconsideration denied* (N.D.
Ill. Sept. 27, 2004).

32    Walters Bender's reference to the settlement in *Dunden v. FirstPlus Bank*, which
involves claims under the Illinois Interest Act) is unpersuasive for similar reasons.  First, *Dunden*
involved different entities and different facts.  Ex. 34, ¶ 18.  Second, *Dunden* was settled at a
markedly different stage of the proceedings, by different defendants represented by different
counsel.  Walters Bender's reliance on *Townsend v. GMAC Residential Funding Corp.*,
No. 03L742 (Circuit Ct. St. Clair Cty., Ill.), is misplaced for similar reasons.  Moreover, the
lender in *Townsend* (Mortgage Capital Resources Corp.) whose loans RFC allegedly purchased
was a private mortgage lender, not a federally insured bank with federal preemption/exportation
rights.  Moreover, *Townsend* was brought by Illinois homeowners only and the court entered
summary judgment in favor of RFC in light of *Clark*; the Supreme Court of Illinois' ruling in
*Clark* has eliminated those plaintiffs' claims under the Illinois Interest Act.

33    MCL factor 1; *Girsh* factor 4.

the claims the Class had alleged.  *See, e.g.*, Ex. 12.  It is appropriate for this Court to balance the significant risks of establishing liability against the benefits the Settlement provides to the Class, and to balance the immediacy and certainty of a substantial recovery against the risks of litigating to judgment.  *See Girsh*, 521 F.2d at 157; *In re Chambers Development Securities Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995) ("A very large bird in hand . . . is surely worth more than whatever birds are lurking in the bushes").

### a.    Defendants have many defenses to the RESPA claims.

As described *supra*, pp. 2-5, the Named Plaintiffs alleged violations of the Real Estate Settlement Procedures Act ("RESPA").  Defendants have several material factual and legal defenses to those claims.

### (1)    Considerable legal dispute exists over the scope of RESPA's "kickback" liability.

Plaintiffs had alleged that the Defendants had violated the anti-kickback provision of RESPA § 8(a), which proscribes the giving or accepting of "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service . . . shall be referred to a person."  12 U.S.C. § 2607(a). Section 8(b) of RESPA (12 U.S.C. § 2607(b)), in turn, provides:

> No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

Defendants contend, among other things, that RESPA "kickback" liability cannot attach unless a challenged fee is "split."  Ex. 6, ¶105.  Class Counsel is of the view, however, that merely collecting *or* accepting an allegedly unearned fee may be sufficient to impose liability under RESPA § 8.  *Id.*  Federal appellate authority on this issue is split.  *Compare, Krzalic v. Republic Title Co.*, 314 F.3d 875 (7th Cir. 2002); *Haug v. Bank of America, N.A.*, 317 F.3d 832 (8th Cir. 2003); *Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261 (4th Cir. 2002); *Glover v. Standard Federal Bank*, 283 F.3d 953 (8th Cir. 2002); *Echevarria v. Chicago Title & Trust Co.*,

256 F.3d 623 (7th Cir. 2001); *Mercado v. Calumet Federal Savings & Loan Assoc.*, 763 F.2d 269 (7th Cir. 1985) *with  Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 388-89  (3d Cir. 2005)(explaining difference between nonactionable alleged "overcharge" situation and actionable "kickback" and "markup" situations); *Kruse v. Wells Fargo Home Mortg.*, 383 F.3d 49 (2d Cir. 2004); *Sosa v. Chase Manhattan Mortg. Corp.*, 348 F.3d 979 (11th Cir. 2003).  In pursuing any such claims under RESPA against the Defendants here, Plaintiffs would face significant factual and legal issues concerning the value of the services performed in exchange for any challenged fee,  whether additional services were performed in exchange for any alleged "markup" and whether any particular defendant actually received payment of the allegedly marked up fee (as opposed to the settlement service provider).

Class Counsel recognized that there was an appreciable risk that this Court (or the Third Circuit) might follow the cases that support Defendants' interpretation of RESPA § 8.  If so, the Defendants likely would prevail on a motion for summary judgment or at trial, because of the difficulty the Class would face in proving either that the fees at issue had been "split" or that the Shumway/Bapst Operation (or their affiliates) had performed "little to no services" or received "duplicative" fees.  Ex. 6, ¶¶ 105, 116.  Such a result would, of course, leave the Class without any recovery on the RESPA claim.  Given the state of the law at the time of the Original Settlement, Class Counsel reached an appropriate compromise in light of the nature of the risks.

**(2)      Defendants have compelling statute of limitations and statute of repose defenses to the RESPA claims.**

Many Class members also would face limitations defenses to their RESPA claims. Defendants contend that those claims are subject to a one-year statute of limitations and a three-year statute of repose.[34]  These arguments turn on:  (1) whether the three-year period set forth in

---

[34]      RESPA, 12 U.S.C. § 2614, provides:  "Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought . . . within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation . . . ."

12 U.S.C. § 2614 is a period of repose; and (2) whether any given borrower could plead and prove facts sufficient to justify the equitable tolling of the one-year limitations period based on fraudulent concealment.  Ex. 6, ¶ 105.

Although no court of appeals has addressed the issue, two district courts have held that the three-year period in 12 U.S.C. § 2614 *is* an absolute period of repose that cannot be equitably tolled.  *Caton v. Community Bank of No. Va.*, Case No. 1:02CV1762 (N.D. Ohio Feb. 23, 2003); *Pedraza v. United Guaranty Corp.*, 114 F. Supp. 2d 1347 (S.D. Ga. 2000).  And, this Court's recent ruling that the statute of repose for TILA/HOEPA claims cannot be equitably tolled also magnifies the difficulties Class Counsel would have in attempting to toll the repose period under RESPA.

The Settling Parties also felt strongly that each had the better argument on whether the one-year limitations period set forth in 12 U.S.C. § 2614 could, as a matter of law, be tolled by fraudulent concealment.  But, Class Counsel also appreciated Defendants' arguments about the difficulty of keeping the Class intact if the Court were required to conduct the individualized inquiries that application of the equitable tolling doctrine necessarily would require.  Ex. 6, ¶ 105.  It was eminently appropriate for Class Counsel to consider these legal uncertainties when evaluating their case.

And, significantly, the Settlement neither values the potentially time-barred RESPA claims at $0 nor excludes borrowers with such potentially stale claims from the Class.  To the contrary, as explained *supra*, pp. 6-8, Class members whose loans originated more than one year from the filing of the first applicable complaint are entitled to an automatic payment under the Settlement.  In other words, far from abandoning those borrowers, Class Counsel succeeded in ensuring that they share in the Settlement.

         **(3)**         **RFC also has an "assignee liability defense" to the
RESPA claims.**

Plaintiffs' RESPA § 8 claims raise novel issues concerning the scope of RESPA liability

in light of the passage of HOEPA's "assignee liability" provision, 15 U.S.C. § 1641(d)(1).  RFC

maintained throughout the litigation that RESPA imposes liability only on those persons who

actually "violate the prohibitions or limitations" of RESPA § 8, and that the later-enacted

"assignee liability" clause of HOEPA does not trump RESPA's more specific provisions.  Ex. 6,

¶ 105.  Consistent with this reasoning, RFC maintained that its mere purchase of loans from

CBNV and GNBT did not, as a matter of law, render it liable for any RESPA § 8 violations that

GNBT or CBNV allegedly may have committed.  *See, e.g., Bank of New York v. Heath, 2001 WL

1771825, at *2-*3 (Ill. Cir. Ct. Oct. 26, 2001), rev'd in part on other grounds, U.S. Bank Nat'l

Ass'n v. Clark*, 807 N.E.2d 1109 (Ill App. Dist. 2004), *rev'd on other grounds*, 837 N.E. 2d 74

(Ill. 2005); *In re Barber (Fairbanks Capital Corp.*), 266 B.R. 309, 321 (Bankr. E.D. Pa. 2001).

This defense injects yet another element of risk into Plaintiffs' ability to establish liability against

RFC.[35]

---

[35]    The courts *are divided* on whether § 1641(d)(1) merely eliminates the holder-in-due-course defense or whether it should be interpreted somewhat more broadly.  Cases adopting a narrower interpretation of § 1641(d)(1) include: *Baker v. Century Financial Group, Inc*., 2001 U.S. Dist. Lexis 24320, *7 (W.D. Mo. 2001) (§ 1641(d) "is not an independent basis for liability, but rather a limitation of the common law holder-in-due-course rule") (citing *Vandenbroeck v. ContiMortgage Corp.*, 53 F. Supp. 2d 965, 968 (W.D. Mich. 1999)); *Bank of New York v. Heath*, 2001 WL 1771825, *2 (Cook Co. Cir. Ct. Ill. Oct. 26, 2001) ("To find that section 1641(d)(1) provides for [an Illinois] Consumer Fraud Act claim against an assignee would go beyond merely eliminating holder in due course defenses, and would create new rights and claims that did not previously exist.  The Consumer Fraud Act is not available as a remedy against an assignee, and there is no authority to suggest that section 1641(d)(1) is intended to create such a remedy."), *rev'd on other grounds, U.S. Nat'l Ass'n Bank v. Clark*, 807 N.E.2d 1109 (Ill. App. 1st Dist. 2004); *rev'd on other grounds*, 837 N.E. 2d 74 (Ill. 2005); *Dowdy v. First Metro. Mortgage Co*., No. 001C7211, 2002 WL 745851, *2 (N.D. Ill. Jan. 29, 2002) (§ 1641(d)(1) merely eliminates the holder in due course defense and therefore, does not entitle "plaintiffs to new rights or claims that would not otherwise be cognizable under the law"); *Dash v. FirstPlus Home Loan Owner Trust 1996-2*, 248 F. Supp. 2d 489, 506 (M.D.N.C. 2003) (HOEPA merely eliminates holder in due course defense and "is not intended to bestow any rights upon the borrower nor constitute an independent basis of liability"); and *Faircloth v. National Home Loan*

Continued on following page

**b.      Defendants also have substantial defenses to the state-law claims.**

Plaintiffs asserted a variety of state law claims under the laws of Pennsylvania, Ohio, Tennessee, and other states.  Ex. 17, ¶¶ 31-32.  These claims all rested on assertions that the loans at issue violated state secondary mortgage loan laws and usury laws, and, in particular, that they exceeded the caps on origination fees and/or interest rates that "non-bank" entities may charge.[36]  Defendants pleaded, and were prepared to litigate, several defenses to these state law claims, including that they were preempted by federal law, as further described below.

**(1)      National Bank Act preemption**

Defendants argued forcefully that the National Bank Act (the "NBA"), 12 U.S.C. §§ 85-86, allows national banks (like GNBT) to "export" favorable interest rates and fees from their home states when making loans to borrowers from other states.  *Marquette Nat'l Bank v. First Omaha Service Corp.*, 439 U.S. 299, 311-19 (1978).  Specifically, § 85 of the NBA, 12 U.S.C. § 85, governs the interest national banks may charge as compensation for the extension of credit.  Accordingly, whether a transaction by a national bank is usurious must be ascertained by reference to the NBA.  *Evans v. Nat'l Bank of Savannah*, 251 U.S. 108, 109 (1919).

Section 86 of the NBA provides the exclusive federal remedy for violations of § 85.  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1 (2003).  *See also McCollum v. Hamilton Nat'l Bank of Chattanooga*, 303 U.S. 245, 257 (1938); *Evans*, 251 U.S. at 111; *Deffner v. Corestates Bank of Delaware*, 92 F.3d 1170 (3d Cir. 1996); *M. Nahas & Co., Inc. v. First Nat'l Bank of Hot*

---

Continued from previous page
*Corp.*, 313 F. Supp. 2d 544 (M.D.N.C. 2003), *aff'd*, 87 Fed. Appx. 314 (4th Cir. 2004).  Cases interpreting § 1641(d) more broadly include *Bryant v. Mortgage Capital Resource Corp.*, 197 F. Supp. 2d 1357 (N. D. Ga. 2002); and *Cooper v. First Gov't Mortgage & Investors Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002).

36      For example, Plaintiffs asserted counts for violation of state usury laws, claims of illegal contract based on violation of second mortgage loan laws, common law fraud, statutory unfair trade practices claims, unjust enrichment, "money had and received," and restitution.  Ex. 51, ¶¶ 414-78.

*Springs*, 930 F.2d 608, 612 (8ᵗʰ Cir. 1991).  The claims under Missouri law that Walters Bender

had asserted against GNBT and RFC in *Phipps* failed for this very reason.  *Phipps*, 417 F.3d

1006 (the NBA preempts Missouri's Second Mortgage Loan Act).  Accordingly, Class members

face considerable risk that all of their claims that rest on alleged violations of state usury laws

would fail as a matter of law.  Ex. 6, ¶ 105.

Defendants GNBT and RFC also argued that, to the extent that Class members are

challenging "non-interest" fees (*e.g.*, fees for title searches), their claims under state secondary

mortgage loan acts are preempted by Section 24 (Seventh) and Section 371 of the NBA,

12 U.S.C. §§ 24, 371.  Ex. 12, pp. 15-16.  Section 24 (Seventh) confers on national banks "all

such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C.

§ 24.  A national bank's "powers" include the power to "make, arrange, purchase or sell loans or

extensions of credit secured by liens on interests in real estate" subject *only* to "section 1828(o)

of this title and such restrictions and requirements as the Comptroller of the Currency may

prescribe by regulation or order."  12 U.S.C. § 371.

Thus, GNBT and RFC argued, § 371 of the NBA is not conditioned on a national bank

complying with any *state* law.  To the contrary, by enacting § 371, Congress manifested its intent

that federal law "occupy the field" of the regulation of national banks' real estate lending.

GNBT and RFC stressed that these grants of enumerated and incidental powers to national banks

were "grants of authority not normally limited by, but rather ordinarily preempting, contrary

state law*."  Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996) (citations

omitted).[37]

---

[37]    Consistent with that argument, the O.C.C. ruled in August 2003 that a limitation on non-interest fees a national bank could charge that appeared in a Georgia statute was preempted by 12 U.S.C. § 24 (Seventh) and the O.C.C.'s rules.  Preemption Determination and Order, 68 Fed. Reg. 46264, 46265.  On August 5, 2003, the O.C.C. issued a proposed rulemaking that extends that analysis beyond the Georgia statute.  68 Fed. Reg. 46119-2, 2003 WL 21785071.

(2)        **Depository Institutions Deregulation and Monetary
Control Act preemption**

Defendants also asserted that the Depository Institutions Deregulation and Monetary

Control Act ("DIDA")[38] preempts Plaintiffs' state-law claims against CBNV.  Defendants

argued that § 521 of the DIDA (12 U.S.C. § 1831d) gives federally-insured, state-chartered

depository institutions (like CBNV) the right to charge interest and fees at rates and amounts

permitted under the laws of its home state when making loans in other states.[39]  *Greenwood*

*Trust Co. v. Massachusetts*, 971 F.2d 818, 826 (1st Cir. 1992); *MorEquity, Inc.  v. Naeem*, 118 F.

Supp. 2d 885, 896 (N.D. Ill. 2000).

To defeat this DIDA preemption defense, Plaintiffs would need to successfully re-

characterize the identity of the entities that actually made the loans to them.  In particular, they

would need to prove that the Shumway/Bapst Operation (which had *procured* the loans) was the

actual "lender" and that CBNV was not.  Ex. 17, ¶ 30.  However, one district court already had

considered and rejected a similar "lender re-characterization" theory.  *Hudson v. Ace Cash*

*Express, Inc.*, No. IP 01-1336-C, 2002 WL 1205060 (S.D. Ind. May 30, 2002) (involving payday

lending).  *Cf. Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299

(1978) (despite the fact that a national bank located in Nebraska allegedly used a Minnesota

credit bureau to solicit prospective cardholders in Minnesota, the bank nonetheless was allowed

to charge Minnesota cardholders the higher interest rate allowed by Nebraska law).  Class

Counsel ultimately recognized that, because their investigation had shown that CBNV (not the

Shumway/Bapst Operation) had funded the loans, this substantially lowered the odds that Class

members would prevail on these state law claims against CBNV.  *See* Ex. 17, ¶ 30.

---

[38]      Pub. L. No. 96-221, 94 Stat. 132 (1980) (codified as amended in various sections of
Titles 12 and 15 of the United States Code).

[39]      Congress enacted § 521 of the DIDA in 1980 to help level the competitive playing field
between state banks and national banks.  Indeed, the language of DIDA § 521 mirrors the
language of § 85 of the NBA.  Thus (Defendants argued), by enacting § 521, Congress extended
to federally-insured, state-chartered banks the same exportation authority as was available to
national banks under the NBA.

       **c.**       **Defendants had compelling defenses to the RICO claims as well.**

When this Court evaluated the Original Settlement, the Objectors did not raise *any* objection to it based on RICO.  Nor did the Objectors raise *any* RICO-related issue before the Third Circuit, and the Third Circuit did not express *any* concern about the adequacy of the Named Plaintiffs and Class Counsel or the fairness of the proposed Settlement based on the release of RICO claims.

The Objectors recently have asserted, however, that the Third Circuit has directed this Court to make an independent evaluation of the RICO claims.  Although the Third Circuit did not do so, and although the Objectors have waived any objections to the fairness of the Settlement based on the Settling Parties' treatment of the RICO claims in the Settlement, the Settling Parties nonetheless address those objections here.

       **(1)**       **The Third Circuit did not direct this Court to independently assess the viability of the RICO claims.**

As discussed *supra*, pp. 13-14, the Third Circuit only directed this Court to further consider  claims that were not asserted in the Consolidated Amended Complaint or accounted for in the Settlement Negotiations.  Remand Order, 418 F.3d at 309.

RICO claims first were asserted in this litigation in the *Picard* Amended Class Action Complaint against CBNV, GNBT, and RFC.  Ex. 48, ¶¶ 243-58.  The same RICO claims subsequently were re-asserted in the Consolidated Amended Complaint.  Ex. 51, ¶¶ 398-412.  RICO claims, therefore, were raised in the litigation long before the original Settlement, and the Settling Parties considered those claims when they negotiated the terms of the original Settlement.  Ex. 16 (1/16/07 Carlson Declaration).  Indeed, the alleged compensatory damages for the RICO claim overlapped with the alleged damages relating to the other alleged claims underlying the settlement.  Second, as described below, although the RICO claims had been

pleaded, Defendants would have litigated them vigorously.  Furthermore, the Settlement includes

adequate consideration for the release of those claims.

**(2)       The Named Plaintiffs would face significant obstacles in
establishing any alleged violation of RICO.**

The burden on a private plaintiff attempting even to plead an actionable civil RICO claim

is considerable, as RICO claims frequently are dismissed on the pleadings.  *See Sedima, S.P.R.L.*

*v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir.

2004); *University of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1538-39 (3d Cir.

1993); *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (3d Cir. 1989); *see also Annuli*

*v. Panikkar*, 200 F.3d. 189, 199-200 (3d Cir. 1999) (summary judgment).  And, because RICO

claims also regularly involve "extremely fact-specific" issues, it also is difficult for a plaintiff

who survives a motion to dismiss to maintain a class action through trial.  *E.g.*, *Dongelewicz v.*

*PNC Bank Nat'l Ass'n*, 104 Fed. Appx. 811, 816, 2004 WL 1661863, at *4, RICO Bus. Disp.

Guide 10,270 (3d Cir. 2004).

> To establish a violation of RICO § 1962(c), a civil plaintiff must allege and prove:
>
> (1)      the existence of an "enterprise" affecting interstate commerce (as defined by
> § 1961); and
>
> (2)      that the defendant was employed by or associated with the enterprise; and
>
> (3)      that the defendant participated in the operation or management of the enterprise;
> and
>
> (4)      that the defendant participated through a pattern of racketeering activity (as
> defined by §§ 1961(1), (5)).

*Sedima*, 473 U.S. at 496; *Lum*, 361 F.3d at 223.

Defendants contend that the Named Plaintiffs' RICO claims, if litigated, would fail for a

variety of reasons.  For example, even if the Named Plaintiffs could plead and prove the

elements of § 1962(c)(1) and (c)(2) (which Defendants dispute), Defendants maintain that the

Named Plaintiffs could not establish that RFC (1) participated in the "operation or management"

-53-

of any alleged RICO enterprise (as § 1962(c)(3) requires) or (2) as a subseqent assignee of closed loans engaged in a "pattern of racketeering activity" (as § 1962(c)(4) requires).

(a)      **No allegations or evidence that RFC participated in the "operation or management" of a RICO enterprise**

A defendant cannot be held liable under § 1962(c) unless it "participated in the operation or management of the [alleged] enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). To "participate" in the conduct of an enterprise's affairs, a defendant "must have some part in *directing* those affairs." *Id.* at 179 (emphasis added). *Accord University of Maryland*, 996 F.2d at 1538-39 (a defendant "must *knowingly* engage in '*directing* the enterprise's affairs' through a pattern of racketeering activity") (emphasis added). RICO does *not* reach persons who engage in lawful business activities and provide ordinary business services to clients, even if those ordinary activities and services inure to the benefit of an alleged RICO enterprise. *Reves*, 507 U.S. at 183 (accountants hired to audit cooperative's records and who performed ordinary accounting services did not "participate in operation or management" of the cooperative's affairs); *University of Maryland*, 996 F.2d at 1538-39 (RICO claim against accountants hired to provide computerized accounting and financial services and to audit the books of an insolvent insurer properly dismissed); *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998) (RICO claim against financiers who allegedly funded residential land development plan properly dismissed); *Dongelewicz*, 104 Fed. Appx. at 817 (same with respect to bank that financed real estate development).

Here, however, Defendants contend that the Named Plaintiffs have alleged nothing more than that RFC engaged in ordinary lawful business activities, namely, the purchase of closed mortgage loans from originating lenders. *See* Ex. 51. Those allegations fail as a matter of law to state a cognizable RICO claim.

(b)    **No allegations or evidence that RFC participated in the conduct of an enterprise through a "pattern of racketeering activity"**

Defendants maintained that the Named Plaintiffs also could not establish that RFC participated in the conduct of any alleged RICO enterprise through a "pattern of racketeering activity." A "pattern of racketeering activity" entails the commission of at least two predicate acts of racketeering, the exhaustive list of which appears at 18 U.S.C. § 1961. *Annuli*, 200 F.3d at 199-200. Moreover, where (as here) a plaintiff attempts to rely upon allegations of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1843) as the purported predicate acts of racketeering, the allegations of fraud must be pled with particularity and specificity in compliance with Federal Rule of Civil Procedure 9(b). *Lum*, 361 F.3d at 223-24. However, Defendants assert that the Named Plaintiffs do not (and cannot) allege *any* contact between RFC and any Class member that even remotely could form the basis of a claim for wire fraud or mail fraud. And, Defendants point out that, even if RFC *had* had contact with any Class member, the Plaintiffs do not plead (much less with particularity and specificity) the time, date, place, and general content of any misrepresentation RFC allegedly made to any such person or any way in which any Class member reasonably relied on any such misrepresentation.

In sum, due to these significant pleading and proof requirements, RFC submits that the alleged RICO claims would not survive a Rule 12(b)(6) motion to dismiss. Indeed, Class Counsel acknowledges that the Named Plaintiffs would have faced substantial uncertainty and risk attempting to prove that RFC participated in the conduct of any enterprise through a pattern of mail fraud and wire fraud.[40]

---

[40]    Because Plaintiffs have not pled and could not prove facts necessary to establish a primary violation of RICO under 18 U.S.C. § 1962(c), any claim based on a *conspiracy* to violate RICO (§ 1962(d)) also necessarily fails. *Lum*, 361 F.3d at 227 n. 5.

6.      **Plaintiffs also faced significant risks in establishing damages.**[41]

Even if the Class were able to establish liability, it would face equally significant risks in

proving damages.  These risks would in part derive from Plaintiffs' need to rely upon experts in

the mortgage industry and economists to testify at trial to establish damages.  *Id.*  Yet, "a jury's

acceptance of expert testimony is far from certain regardless of the expert's credentials.  And

divergent expert testimony leads inevitably to a battle of the experts."  *In re Prudential Ins. Co.

of America Sales Practices Litig.* ("*Prudential I"*), 962 F. Supp. 450, 539 (D. N.J. 1997) (citing

*United States v. 412.93 Acres of Land*, 455 F.2d 1242, 1247 (3d Cir. 1972)).  Settlement

eliminates that risk.

7.      **Plaintiffs faced a significant risk that they would not be able to
maintain class action status through trial if they had not
settled, especially if they attempted to assert TILA/HOEPA
claims.**[42]

*Girsh* and the MCL direct this Court to consider whether the proposed Settlement Class

could remain intact if the claims were litigated through trial rather than settled.  Here, if Plaintiffs

were required to litigate their claims through judgment, they would run the risks that:  (1) this

Court would not certify a litigation class at all; or, (2)  any certified class ultimately would be

decertified because of the difficulties in maintaining a class action through trial.  *Prudential I*,

962 F. Supp. at 540; *see also Link v. Mercedes-Benz of N. America, Inc.*, 550 F.2d 860, 864 (3d

Cir. 1997); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 317 (N.D. Ga. 1993).  In

fact, Walters Bender *conceded* in one of its briefs to the Third Circuit that this Court ultimately

may have determined that this matter could not be maintained as a class action through trial.

---

[41]     MCL factors 1, 4; *Girsh* factor 5.

[42]     MCL factor 2; *Girsh* factor 6.

a.    **Plaintiffs would have faced significant challenges litigating the RESPA claims on a class-wide basis.**

Indeed, courts regularly refuse to certify class actions for litigation of RESPA § 8 claims on the grounds that the relevant inquiries would be highly individualized. *E.g., Warburton v. Foxtons, Inc.*, No. 04-2474, 2005 WL 1398512 (D.N.J. 2005); *Reiser v. Residential Funding Corporation*, 236 F.R.D. 425 (S.D. Ill. 2005); *Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201 (9th Cir. 2003); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003); *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004 (9th Cir. 2002); *Glover v. Standard Federal Bank*, 283 F.3d 953 (8th Cir. 2002); *Hyderi v. Washington Mutual Bank, FA*, 235 F.R.D. 390 (N.D. Ill. 2006).

Here, Defendants would argue that a significant number of issues relevant to a RESPA § 8 claim would require individualized, transaction-by-transaction inquiry, including:

- whether the borrower paid illegal fees and what they were;

- whether the illegal fees were "split;"

- whether services were performed in return for those "split" fees;

- if the fees were "split," with whom?;

- if the fees were "split," how much CBNV or GNBT retained;

- if the fees were "split," whether CBNV or GNBT performed services for any portion of the "split" fees that it obtained, such that the portion amounted to payment for services rendered permitted by RESPA;

- whether CBNV or GNBT obtained a "kickback" for any portion of the illegal fees;

- if CBNV or GNBT obtained a "kickback," on which fees?;

- if the fees amounted to a "kickback," how much CBNV or GNBT retained; and

- whether the borrower could surmount a statute of limitations defense.

In short, Defendants would argue that individual issues would predominate over common issues in any trial of Plaintiffs' RESPA § 8 claims, and Class Counsel recognize the significance of this issue.

> **b.    Plaintiffs would have faced even greater challenges maintaining a class action through trial if they had attempted to assert claims for damages under TILA/HOEPA.**

The TILA/HOEPA claims the Objectors had posited also raise a raft of factual issues that would have required the parties and the Court to make highly individualized inquiries into more than 44,000 loans.  For example, with respect to the Objectors' argument that the APRs set forth on Class members' HOEPA Disclosures were understated, borrowers would need to prove:

- the amount of the Title Abstract/Title Search fee each borrower paid; the nature and extent of the services the title company provided in exchange for that fee; and the supposed "reasonable" charge for the services provided;

- the amount of the Title Examination fee each borrower paid; the nature and extent of the services the title company provided in exchange for that fee; and the supposed "reasonable" charges for the services that were provided; and

- the impact the "excess" portion of (a) the Title Abstract/Title Search fee and (b) the Title Examination fee would have on the amount of the Finance Charge; the impact of re-calculating the APR based on the restated Finance Charge; the extent to which each borrower's understated APR exceeded the Regulation Z tolerance; and the extent to which each borrower's APR understatement was "material" (namely, the extent to which, if any, it influenced his or her decision to accept the loan).

The evidence relevant to each of these issues would be highly individualized and would vary from borrower to borrower.

The amounts each borrower paid for each of the disputed title fees also varied widely.[43] These variations are readily apparent even in the subset of loan files the Defendants produced in

---

[43]    This is not surprising given that the loans were made by two different banks over a period of several years and involved a number of different loan offices and a number of different title companies.  For example, in the loan files the Banks produced to the Objectors, title abstract/title search fees were paid to five different companies (USA Title, Title America, GAC, Resource Title, and Nationwide Property Services, Inc.)  Title examination fees were paid to six different companies (USA Title, Title America, Advantage Title, Resource Title, First Title & Escrow, and Paramount Title).  Ex. 37.

connection with the TILA/HOEPA viability briefing.  *See* Ex. 37 (title abstract/title search fees varied from $0 to $300; title examination fees varied from $0 to $695).  Moreover, due to the wide variation in the amount of the fees charged (and the likely variation in the services that were rendered in consideration for those fees) the determination of the "reasonableness" of the disputed title fees would be highly individualized.  Similarly, the inquiry of what a "reasonable" fee would have been could well vary from borrower to borrower as well.[44]

In addition, Regulation Z to TILA sets forth an allowable tolerance for errors in the APR that is disclosed to the borrower.  12 C.F.R. § 226.14.  Errors within the tolerance range are not actionable.  Because the principal amounts, interest rates and settlement charges on Class members' loans varied widely, highly-individualized issues also would arise when attempting to determine whether the failure to include the allegedly "excess" portion of each borrower's title fees resulted in an APR understatement that exceeded the Regulation Z tolerance.  Any Class member whose "disclosed" APR was within the tolerance of the Objectors' "restated" APR would have no cause of action against the Banks or RFC for TILA damages, nor would they have any cause of action for enhanced HOEPA damages.[45]

---

[44]    For example, if Objectors argue that the title fees were unreasonable because borrowers could have obtained those same title services from different vendors at lower prices, the "reasonableness" of the fees presumably would vary depending on the location of the mortgaged property.  The cost of a title abstract/title search, particularly where done by local abstractors, may well vary throughout the country (*e.g.*, in some counties, these searches likely must be performed manually by searching court records; electronic searches may be available in other counties).

[45]    Moreover, before one even could determine whether the disclosed APRs understated the "correct" APRs in excess of the Regulation Z tolerance, the parties also would need to inquire whether any *other* settlement fees had been improperly *included* in the Finance Charge.  If they were (thereby *overstating* the APR that had been disclosed to the borrower), any such overstatement would have to be offset against the alleged understatement before the Court could determine whether the disclosed APR was within the Regulation Z tolerance.  *Guise v. BMW Mortgage, LLC*, 377 F.3d 795 (7th Cir. 2004).

    Additional individual issues would arise in determining whether any given understatement of the APR (assuming it exceeds the regulatory tolerance) was "material" enough to entitle the borrower to recover enhanced HOEPA damages.  Because "materiality" is a "relative concept," a court must evaluate a given misrepresentation or omission in the complete context in which it was made.  *In re Trump Casino Securities Litigation*, 7 F.3d 357, 369 (3d Cir.

Continued on following page

In sum, the obstacles to class certification of the Objectors' hypothetical TILA/HOEPA

claims would have been formidable.  Courts regularly refuse to certify litigation classes in TILA

cases where these types of individualized issues are present.  *E.g., O'Brien v. J.I. Kislak*

*Mortgage Corp.*, 934 F. Supp. 1348, 1356-59 (S.D. Fla. 1996) (denying class certification of

TILA finance charge disclosure action where case-specific agency issue requiring extensive

individualized inquiries predominated over common issues, and where thousands of

individualized fact inquiries regarding which fees were at issue for each loan, whether such fees

were properly disclosed, whether such fees were actually charged to the borrower, and the

amount of damages to each borrower destroyed commonality); *Porter v. Nationscredit Consumer*

*Discount Co.*, 229 F.R.D. 497, 500 (E.D. Pa. 2005) (rejecting class certification of TILA claims

because of numerous issues of fact); *Jefferson v. Security Pacific Financial Services, Inc.*, 161

F.R.D. 63 (N.D. Ill. 1995) (denying class treatment of TILA claim where rescission remedy

required factual findings too numerous to manage even though facts and issues regarding alleged

disclosure violations were common); *Elliott v. ITT Corp.*, 150 F.R.D. 569 (N.D. Ill. 1992)

(denying class certification of TILA claim involving purportedly inaccurate disclosure of finance

charge where individual questions of fact as to whether borrowers were misled predominated).

### c.    Claims for rescission of the loans would not be susceptible to class-wide treatment, either.

Also significantly, even assuming that any individual borrower could assert a rescission

claim that is not extinguished by the statute of repose (and further assuming that the borrower

has not paid off his loan), a request for rescission of the loans under TILA § 1635 could not be

obtained on a classwide basis.  *See* Memorandum Opinion dated October 9, 2006 at 32, n. 11

("we note, parenthetically, that there is a persuasive line of cases that hold that Congress did not

---

Continued from previous page

1993).  In other words, to establish an entitlement to those statutory damages, each borrower
would need to prove that the incorrect APR affected his or her decision to obtain the loan.  That,
of course, would be a highly-individualized determination, one that would require, at a
minimum, each borrower to participate in discovery.

intend that TILA/HOEPA claims for rescission, as opposed to damages, be maintained in a class action.")(citing cases).  Congress established rescission as a "personal" remedy that a borrower could exercise at his or her option.  To allow *class-wide* rescission would convert the rescission remedy "into a penal provision, a result certainly never explicitly authorized by Congress." *Jefferson*, 161 F.R.D. at 68-70 (allowing rescission on a classwide basis would "impose enormous penalties on the lender (including the loss of interest for the entire period of the loan) out of all proportion to any alleged harm done" to the borrowers).  Indeed, the federal courts regularly refuse to certify classes where the plaintiffs are seeking class-wide rescissions (or "declarations" of a right to rescind).  *See, e.g., James v. Home Constr. Co. of Mobile, Inc*., 621 F.2d 727, 730-31 (5th Cir. 1980); *Gibbons v. Interbank Funding Group*, 208 F.R.D. 278, 285-86 (N.D. Cal. 2002); *Nelson v. United Credit Plan, Inc.*, 77 F.R.D. 54, 58 (E.D. La. 1978); *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 157 (E.D. Pa. 1976).

In short, if the Court had accepted the Objectors' arguments about the viability and importance of any individual borrower's right to rescind his or her loan for a TILA violation, any such claims for rescission could not be litigated on a class-wide basis.

### d.    Lack of manageability

Lastly, although this Court is not required to evaluate the "manageability" prong of Rule 23 when certifying a class for settlement purposes (*Amchem*, 521 U.S. at 620), Defendants would have raised the spectre of lack of manageability if the case had been litigated.

**8.    Defendants' abilities to withstand a greater judgment is a neutral factor.[46]**

The Defendants' abilities' to withstand a greater judgment "should be deemed neutral in the absence of more specific evidence concerning the banks' financial status." Ex. 6, ¶ 112. Indeed, developments subsequent to the Settling Parties' execution of the Original Settlement Agreement confirms that this factor counsels in favor of *approving* the Settlement. In particular, after the Court had given final approval to the Original Settlement, GNBT was placed into receivership. *See supra*, n.4.

And, in any event, whatever RFC's relative financial strength, RFC also had additional defenses to the Plaintiffs' claims above and beyond the Banks' defenses. The Class thus faced the very real risk that RFC would prevail on some or all of the claims based on these additional defenses. And, as Class Counsel recognized when negotiating the Original Settlement, if the Class could not tag RFC with liability, the Plaintiffs' cases would be worth markedly less:

> One of the key issues is the question of the viability of our assignee liability claim against RFC. If we were not able to reach RFC as a Defendant, that had significant practical implications in that both of the bank Defendants did not have, do not have, sufficient financial resources to fund the size of a settlement offer or the type of a judgment that we were looking at. So there were threshold questions regarding our ability to reach the deep pocket in this case, and there's decidedly mixed authority on that issue. We've won that issue in some cases and we've lost that issue in some cases.

Ex. 12.

**9.    The Settlement is reasonable and intrinsically fair, both in light of the best possible recovery and in light of all attendant risks of continued litigation.[47]**

The last two *Girsh* factors require the Court to evaluate the reasonableness of the Settlement in light of (a) the "best possible recovery" and (b) all the attendant risks of litigation. The MCL similarly directs the Court to consider the the "total present value of monetary and

---

[46]    MCL factor 8; *Girsh* factor 7.

[47]    MCL factors 4, 5; Girsh *factors* 8, 9.

nonmonetary terms" of the Settlement.  *See* discussion in *Lazy Oil Co. v. Witco Corp.*, 95 F.

Supp. 2d 290, 339 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581, 584, 588 (3d Cir. 1999)..

### a.       This is not a $1 billion case.

The Objectors' noisy protestations notwithstanding, this is not (and never was) a

"$1 billion case," nor is it a case in which the Plaintiffs' ability to establish liability or damages

ever was certain.  In contrast, the Settlement provides large, automatic cash payments and the

prospect of additional payments on a claims-made basis despite the presence of many compelling

defenses to the Class members' claims.  As discussed in detail *supra*, pp. 15-18, the hypothetical

claims under TILA/HOEPA and state law that the Objectors have championed cite were never

viable and were not available on a class-wide basis.  In short, this never was (as Objectors have

claimed) a $1 billion case.[48]

---

[48]       The Objectors' characterization of this as a "$1 billion case" rests exclusively on their
accumulation of the statutory remedies and/or penalties set forth in HOEPA, RESPA, and TILA.
They do not contend that Class members paid anywhere near that amount in allegedly
"excessive" charges or fees.

It also bears noting that where (as here) applying statutory penalties on a classwide basis
produces a number that is grossly disproportionate to any actual harm sustained by an aggrieved
class member, a court may, in its discretion, refuse to certify the class.  *Ratner v. Chemical Bank
New York Trust Co.,* 54 F.R.D. 412, 416 (S.D.N.Y. 1972) (class action treatment is not an
appropriate method for fairly and efficiently adjudicating claims that may result in the
aggregation of a large number of civil penalties/statutory damage awards based on technical
violations of complex regulatory statutes; denying class certification of TILA claims); *Shroder v.
Suburban Coastal Corp.,* 729 F.2d 1371 (11th Cir. 1984) (following *Ratner*); *Watkins v. Simmons
& Clark Inc.*, 618 F.2d 398 (6th Cir. 1980) (following *Ratner*; declining to certify class action in
a TILA case); *Fisher v. First National Bank of Omaha*, 548 F.2d 255, 262 (8th Cir. 1977) (same);
*Kline v. Coldwell Banker & Co*., 508 F.2d 226, 234-35 (9th Cir. 1974); *Wilcox v. Commerce
Bank of Kansas City*, 474 F.2d 336, 341-47 (10th Cir. 1973) (same); *In re Trans Union Corp.
Privacy Litig*., 211 F.R.D. 328, 348-51 (N.D. Ill. 2002) (following *Ratner*; declining to certify
class actions based on technical violations of the Fair Credit Reporting Act); *Wilson v. American
Cablevision of Kansas City, Inc.,* 133 F.R.D. 573, 576 (W.D. Mo. 1990*)* (following *Ratner*;
declining to certify class action based on the Cable Communications Policy Act); *Berkman v.
Sinclair Oil Corp.,* 59 F.R.D. 602, 608-09 (N. D. Ill. 1973); H*elms v. ConsumerInfo.com, Inc.,*
236 F.R.D. 561, 569 (N. D. Ala. 2005) (following *Ratner*, declining to certify class based on
Credit Repair Organizations Act); *Hillis v. Equifax Consumer Services, Inc.*, 237 F.R.D. 491,
505-06 (N. D. Ga. 2006 (same).  In other words, if, hypothetically, the aggregation of statutory

Continued on following page

b.    **The Settlement reflects a fair and balanced assessment of claimed damages, and provides monetary value to all members of the Settlement Class.**

The Original Settlement reflects a fair and balanced assessment of the claimed damages, weighted by the likelihood the Plaintiffs would prevail on each claim.  The modification to the Original Settlement takes even more potential claims into consideration.  Although the Objectors undoubtedly will labor to convince this Court that a larger settlement theoretically is possible, this Court's role is not to substitute its image of the "ideal" settlement for the views of parties who compromised after protracted arms'-length negotiations.  *Prudential I*, 962 F. Supp. at 534 (a settlement is "a compromise, a yielding of the highest hopes in exchange for certainty and resolution"); *In re Flat Glass Antitrust Litig.*, No. 97-550-MC (W.D. Pa. Feb. 9, 2000) (Ziegler, J.), Slip. Op. at 6 ("the test is whether the settlement is adequate and reasonable, and not whether a better settlement is conceivable").  It also bears repeating that the negotiations that resulted in the modification to the Original Settlement were mediated by a former federal judge.

As described below, the Settlement now contains four significant (and largely cumulative) cash components that fairly balance each side's assesssments of the claimed damages.

(1)    **The base calculation for RESPA claims (an automatic payment)**

Class Counsel's damage analysis began with a valuation of damages under the RESPA claims.  Class Counsel concluded that the realistic best-case scenario for RESPA damages on a

---

Continued from previous page
fines and penalties turned this into a "$1 billion case," the likelihood is high that it would not proceed as a class action.

Alternatively, if the Court *were* to certify a class for litigation purposes in these circumstances, the Court would have discretion to award each Class member *less* than the amount provided in the statutory framework – to stave off a "due process" challenge to the award.  *See generally Parker v. Time Warner Entertainment Co.*, 331 F.3d 13, 22 (2d Cir. 2003) (Newman, J., concurring).

per-loan basis was $4,765 ($3,675 for origination charges and $1,090 for fees for title services). Ex. 6, ¶ 114.  Class-wide, this equated to estimated damages of $213,700,720.[49]  *Id.*

To arrive at that number, Class Counsel calculated single damages, not the treble damages that are potentially available under RESPA.  *Id.*  The Court concluded in the original fairness proceedings that this decision was reasonable and appropriate.  Ex. 6, ¶ 115.  *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 257-58 (D. Del. 2002); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 (D.D.C. 2002); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 458-59 (2d Cir. 1974); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) ("the district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing it to a trebled base recovery figure"); *Ohio Public Interest Campaign v. Fisher Foods, Inc.,* 546 F. Supp. 1, 9-10 (N.D. Ohio 1982).  *See also supra,* n.52 (courts have discretion not to apply the full brunt of statutory penalties on a classwide basis).

Class Counsel then concluded that there were significant differences between the ultimate merit of the RESPA "kickback" claim and the RESPA "excessive title services fees" claim. Ex. 6, ¶ 116.  Specifically, Class Counsel's investigation had developed facts that raised concern about the continued viability of the "kickback" claim.[50]  *Id.*; Ex. 17, ¶¶ 44-45.  Therefore, Class Counsel based their negotiating position primarily upon a *pro rata* allocation of the allegedly unlawful fees for title services.  Under the terms of the Settlement, all Class members

---

49      There is no material dispute as to the reasonableness of this figure, insofar as the number Walters Bender calculated as the "single damage RESPA projection" was $215,835,900. Ex. 6, ¶ 114 n.23.  The small difference is attributable to the fact that Class Counsel had access to a much larger data set of individual borrowers' loan files, and also had developed information throughout their informal investigation.  *Id.*

50      As explained *supra*, pp. 46-49, Defendants also had several persuasive *legal* defenses to the RESPA § 8 "kickback" claim.

automatically will receive either $250.00 or $600.00 for this part of the RESPA claim
(depending on whether their claims are subject to a timeliness defense, *see supra*, pp. 6-8).

>**(2)** **Additional compensation for arguably time-barred RESPA claims (on a claims-made basis)**

The individuals who automatically receive the lower amount for the RESPA claim also
are eligible to receive an additional $302.00 by participating in a simple claims submission
process and establishing facts tending to show that they might theoretically be entitled to assert a
"fraudulent concealment" defense to toll the statute of limitations if the case were litigated.  *See
supra*, pp. 6-8.

>**(3)** **Additional compensation for state-law claims (an automatic payment)**

Class members who resided in states where a state law-based statutory claim arguably
could have been asserted (*see supra*, pp.6-8) automatically are entitled to receive an additional
$325.00.  This facet of the Settlement reflects Class Counsel's view of the strength of the federal
preemption defense available to all state law claims in this case (as manifested by, for example,
the plaintiffs' losses in *Avila* and *Phipps*) (discussed *supra*, pp. 29-30, 43-44, 51).  *See* Ex. 12,
pp. 15-16 (Class Counsel had concluded that the state law claims "were ultimately
extraordinarily weak; a hypothesis which has been borne out by experience").

>**(4)** **Additional compensation for TILA/HOEPA claims (on a claims-made basis)**

Class members also may be entitled to recover an additional $332.00, which is
specifically calculated to be adequate compensation for the hypothetical TILA/HOEPA claims
that this Court since has determined are time-barred.  *See supra,* pp. 15-17.  Here, too, the claims
process is simple and straightforward.

>**c.** **The scope of the Release is supported under established law.**

In the proceedings on the fairness of the Original Settlement, the Objectors challenged
the breadth of the Release that Class members would be giving, particularly their release of the

posited TILA/HOEPA claims.  Subsequent developments have mooted that objection.  *First*, it is

well-settled that class action settlements may release all claims related to the subject matter of

the litigation, including claims that had not been specifically alleged in the pleadings.  *See, e.g.,*

*Prudential II,* 148 F.3d at 326; *TBK Partners, Ltd. v. Western Union Corp*., 675 F.2d 456, 460

(2d Cir. 1982).

    *Second*, Class Counsel had considered and valued those claims in deciding to accept the

Settlement that ultimately was negotiated.  Ex. 17 And, *third*, because the Court subsequently

has determined that those claims are time-barred (*see supra*, pp. 17-18), Class members are in no

way unfairly prejudiced by releasing those claims.

> **10.     The attorneys' fees available to be paid to Class Counsel are
> reasonable and fair.[51]**

    After the negotiations that led to the Original Settlement were concluded, counsel for the

Defendants discussed the issue of attorneys' fees and expenses with Class Counsel.  These

discussions were conducted at arm's length in good faith.  The amount of fees and costs that had

been agreed upon in the Original Settlement - $8.1 million - would have constituted 24.5% of the

$33,000,000 commitment made to Class members if counsel fees are excluded (and less than

20% if attorney fees and other expenses are included).

    Defendants agreed to pay Class Counsel that sum based on a number of factors:  (1) the

two-and-a-half years and 6,347 hours Class Counsel had dedicated to the litigation (prior to the

approval of the Original Settlement and any subequent proceedings); (2) Class Counsel's

experience and efficiency; (3) the size of the fees relative to the total Class recovery; and (4) fee

awards in similar cases.  Moreover, because counsel fees were negotiated after the resolution of

the amount to be paid to the Class, those fees did not in any way diminish the Class recovery.

---

[51]     MCL factor 6.

In the modification to the Original Settlement, the Settling Parties re-negotiated the provisions relating to attorneys' fees and costs payable by the Defendants.  Specifically, under the modified Settlement, the Defendants will create a fund for the award of attorneys' fees and costs in the amount of $7.5 million.  Class Counsel will petition the Court for an award of fees and costs in an amount not to exceed $7.5 million (down from the $8.1 million that originally had been agreed upon and awarded by the Court), to be paid from that fund.  Defendants also agree to pay up to an additional $2 million in attorneys' fees and costs, if the Court orders them to do so.  But, in no event shall the Defendants be required to pay more than $9.5 million in attorneys' fees and costs.

### 11.    Summary

In short, the Settlement before the Court satisfies both the Third Circuit's *Girsh* factors and the factors identified in the Manual for Complex Litigation (4th edition).  This Court should have no reservations about approving the Settlement as reasonable, adequate, and fair to all members of the Settlement Class.

### VI.    The Modification of the Original Settlement Does Not Warrant The Re-issuance of Class-wide Notice.

During a recent status conference, the Court raised the issue of whether, in light of the modification to the Original Settlement, the Court should direct a new notice to Class members and provide them with yet another opportunity to opt-out of the Class.  *See* Ex. 14 (12/1/06 transcript) pp. 14-15, 18-19.  After reviewing the relevant legal authorities, the Settling Parties believe that the law does *not* require the issuance of any additional notice or any additional opt-out opportunity for the Class as a whole, primarily because the modification to the Original Settlement increases the amount of money potentially available to Class members and in no way adversely affects any Class member's rights under the Original Settlement.  For these reasons, the Settling Parties agreed as a condition of the Modified Settlement that no new class-wide

notice is required and that the Defendants may terminate the Settlement Agreement if such notice is ordered.  Ex. 2, ¶ 5.

### A. Class Members at Large Already Have Received Adequate Notice And An Opportunity to Opt-Out of or Object to the Settlement.

The Class already has received a Notice of the proposed Original Settlement and an opportunity to opt-out or object that comports in all respects with the requirements of Rule 23 and the Due Process Clause.  The Third Circuit did not hold – or even suggest – that the original Notice was inadequate in any way, nor did it suggest that a new notice or opt-out opportunity should be provided to each and every Class member.[52]

The notice process the Class Administrator implemented and oversaw is described *supra*, pp. 8-9.  This Court expressly approved those methods of giving notice to Class members as the "best practicable notice … reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and of their right to object or exclude themselves from the proposed settlement," in satisfaction of Fed. R. Civ. P. 23(c) and the Due Process Clause of the Fourteenth Amendment.  Ex. 3, ¶ 9.  This Court also approved the *content* of the Notice (and the Summary Notice).  The Notice defined the Settlement Class, advised the Class of the claims being settled, described the essential terms of the proposed Settlement, explained Class members' rights and obligations, indicated the time and place of the first hearing to approve the Settlement, and told Class members about the court-approved methods for requesting exclusion from the Class and for objecting to the Settlement.  Ex. 1.  *See supra*, pp. 8-9.

---

[52]    Indeed, the Third Circuit's instructions regarding the re-issuance of notice to Class members whose opt-out requests this Court had invalidated would make no sense if the Third Circuit had believed the original Notice/opt-out opportunity was defective as to *all* Class members.  *See Todd & Co. v. S.E.C.*, 637 F.2d 154 (3d Cir. 1980) (law of the case doctrine applies to all issues raised by the parties on appeal and explicitly or implicitly considered by the appellate court in its disposition of the case, even if certain issues are not expressly addressed in the written opinion).

The content of the Notice complied fully with the requirements of Rule 23 and the Due Process Clause by providing Class members with information that would enable them to decide whether to participate in the Settlement, object, or opt-out.  Fed. R. Civ. P. 23(c), (e), and (h). *See In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001); David H. Herr, *Manual for Complex Lit.* § 21.312 (4th ed.); 7AA, 7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1786-87, § 1797.6 (2006).  Neither controlling law, the Third Circuit's Remand Order, nor the fact that the Settling Parties have enhanced the Original Settlement requires the Court to do more.

**B.     Because The Modification Of The Original Settlement Enhances The Benefits Available to The Class, No New Class-Wide Notice is Warranted.**

The modification of the Original Settlement in no way warrants the issuance of a new Class-wide notice and/or an opt-out opportunity.  Class members should receive notice and an opportunity to opt-out of a settlement only when notice and opt-out opportunities are necessary to protect absent class members from prejudice.  *In re Diet Drugs Product Liability Litig.*, 2002 U.S. Dist. Lexis 24771 (E.D. Pa. Dec. 11, 2002) (the purpose of Rule 23(e)'s notice and opt-out requirements are to protect class members); *Austin v. Pennsylvania Dep't of Corrections*, 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) (notice is not mandatory in all cases under Rule 23(e); the court has discretion to determine whether notice is necessary to protect class members from prejudice).  Indeed, the Manual for Complex Litigation impliedly recognizes that where a class-wide settlement is modified after notice was sent, additional class-wide notice is warranted only if the settlement changes substantially and in a way that adversely affects members of the Class. MCL § 21.61 p. 309 ("If the fairness hearing leads to substantial changes adversely affecting some members of the class, additional notice, followed by an opportunity to be heard, might be necessary.").

In contrast, where (as here) parties have modified a settlement agreement in order to *improve* it and provide class members with additional benefits, courts have found that the

modification poses no risk of prejudice to unnamed class members, and that the court need not

direct new notice to class members or give them another opportunity to opt-out.  *In re Diet

Drugs*, 2002 U.S. Dist. LEXIS 24771, **18-19; *Denney v. Jenkins & Gilchrist*, 230 F.R.D. 317,

345 (S.D.N.Y. 2005), *aff'd in relevant part, sub nom., Denney v. Deutsche Bank AG*, 443 F.3d

253, 271 (2d Cir. 2006); *see also In re Integra Realty Resources, Inc.*, 262 F.3d 1089 (10th Cir.

2001).

For example, in *In re Diet Drugs*, 2002 U.S. Dist. LEXIS 24771, the settling parties

moved jointly for approval and implementation of an amendment to an approved settlement that,

among other things, would have merged two separate settlement funds into one fund and

extended the time for obtaining certain benefits.  *Id.* at *7-*13.  Objectors opposed the

amendment in part because the class did not receive a supplemental notice describing the

amendment.  *Id.* at *18-*20.  The district court overruled those objections and held that

supplemental notice to every class member was *not* required under the circumstances.  *Id.*

In *Denny*, the settling parties modified a proposed settlement to increase the size of the

settlement fund and allow an insurer to allocate more funds to the defense of possible opt-out

claims.  *Denny*, 230 F.3d at 324.  Objectors demanded that the court give them a new

opportunity to opt-out of the class.  *Id.* at 344-46.  The district court rejected that demand, and

the court of appeals affirmed.  *Id.* at 344-46, *aff'd in relevant part*, 443 F.3d at 271.  As the court

correctly noted:

> Rule 23(e)(3) was not meant to require an automatic second opt-out whenever a
> proposed settlement is amended after the close of the first opt-out period. … Rule
> 23(e)(3) was intended to be applied sparingly, to a limited number of cases, and in
> particular to cases where the first opt-out period closed prior to reaching a
> settlement.

*Denney*, 230 F.R.D. at 345, *aff'd in relevant part*, 443 F.3d at 271.  The court also astutely

recognized that a second opt-out opportunity would result in "delay and uncertainty and would

pose significant risks of killing the settlement … [thereby] depriving the vast majority of the class of the benefits of the settlement." *Id.* at 346.

Here, too, there is no reason to provide any new notice or opt-out opportunity to the Class as a whole. The modification enhances the Original Settlement by increasing the amount of money potentially available to Class members. It does not adversely affect any Class member's rights under the Original Settlement.

**VII.    Summary**

In sum, for all of the reasons set forth herein, the Settling Parties respectfully ask this
Court to:

(1)    certify the Settlement Class under Fed.R.Civ.P. 23(a) and 23(b)(3); and

(2)    approve the Settlement as fair, adequate, and reasonable.

Respectfully submitted,

RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, LLC

s/ *Daniel Myers*
A. Hoyt Rowell, III
Daniel Myers
**RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC**
1037 Chuck Dawley Blvd. Bldg A
Mt. Pleasant, SC 29464
**Counsel For The Named Plaintiffs And
The Class**

CARLSON LYNCH LTD.

s/ *R. Bruce Carlson*
R. Bruce Carlson
Gary Lynch
**CARLSON LYNCH LTD.**
P.O. Box 367
231 Melville Lane
Sewickley, PA  15143
(412) 749-1677
**Counsel For The Named Plaintiffs And
The Class**

REED SMITH LLP

s/ *Thomas L. Allen*

Thomas L. Allen
Roy W. Arnold
Donna M. Doblick
**REED SMITH LLP**
435 Sixth Avenue
Pittsburgh, PA  15219
Phone:  412.288.3066/3916/7274
Fax:  412.288.3063
**Counsel for Residential Funding
Company, LLC**

MEYER UNKOVIC & SCOTT LLP

s/ *F. Douglas Ross*
David G. Oberdick
MEYER UNKOVIC & SCOTT LLP
1300 Oliver Building
Pittsburgh, PA 15222
(412) 456-2800

F. Douglas Ross
ODIN FELDMAN & PITTLEMAN, P.C.
9302 Lee Highway, Suite 1100
Fairfax, VA  22031
(703) 218-2127
**Counsel For Community Bank of Northern
Virginia**

FEDERAL DEPOSIT INSURANCE CORP.

s/ *William A. Dyess*
William A Dyess
Legal Division, Commercial Litigation Unit
Federal Deposit Insurance Corporation
1717 H Street, N.W.
Room H-10166
Washington, D.C.  20429
**Counsel for FDIC, As Receiver for Guaranty
National Bank of Tallahassee**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Settling Parties' Brief In Support of Certification of Settlement Class ands Approval of Modified Proposed Settlement was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/ *R. Bruce Carlson*

R. Bruce Carlson
Gary Lynch
**CARLSON LYNCH LTD.**
P.O. Box 367
231 Melville Lane
Sewickley, PA  15143
(412) 749-1677
**Counsel For The Named Plaintiffs And
The Class**