# Exhibit 8

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "Agreement") is made and entered into as of the 13th day of April, 2000 by and between Guaranty National Bank of Tallahassee ("Bank") and Equity Guaranty, LLC, ("Consultant").

WHEREAS, Bank is a nationally chartered banking association which is opening a mortgage banking operation that complements its products and services; and

WHEREAS, Consultant is a newly formed limited liability company under the laws of Virginia, and its principals have extensive experience in the establishment, operation and administration of mortgage banking operations, has business and marketing expertise related thereto, and is in the business of providing various business consulting and advisory services.

NOW THEREFORE, in consideration of the above premises and of the benefits to be obtained by the covenants contained herein, and for other good, valuable and legal consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

A.  AGREEMENT OF CONSULTANT AS INDEPENDENT CONTRACTOR

(1) Consulting. Bank hereby engages Consultant as an independent contractor to provide advice and consultation relating to the establishment, operation and administration of loan origination offices (the "Office") for first and subordinate lien residential mortgage loans (the "Mortgage Loans"). The offices will be located at 11417 Sunset Hills Road, Reston, VA 20190 and 8280 Greensboro Drive, Suite 900, McLean, VA 22101, and such other locations as may be mutually agreed by the parties. It is understood and agreed that Consultant has an independent business, and is not required nor expected to exclusively serve Bank. Rather, Consultant is free to be engaged by other persons or firms that Consultant may from time to time deem advisable or appropriate, while not interfering with its duties to Bank under this Agreement. It is understood and agreed that Consultant will not directly solicit customers on behalf of Bank and will not act as a mortgage broker for Bank. The Bank's mortgage originators in the Office will directly solicit customers on behalf of the Bank. The cost and expense of these employees will be paid by the Bank and reimbursed by Consultant through the action of section F. Consultant will act as an independent contractor, and will not be treated as an employee of Bank for any purpose whatsoever. Consultant agrees that employees of Consultant will not be employees of Bank and will not participate in and/or receive any of Bank's employee benefits that may be provided to Bank's employees from time to time during the term of this Agreement, and hereby waives any participation therein. It is understood that the Bank has no right to control or direct the details and means by which Consultant performs its duties under this Agreement, and that Consultant is solely responsible for the manner and nature of providing the services to Bank hereunder. However,

Consultant will perform its duties under this Agreement in a manner consistent with safe and sound commercial banking practices required or expected of national banking associations.

(2) Duties of Consultant. Consultant will provide assistance to Bank in the administration of the Office. In addition to duties of Consultant otherwise set forth in the Agreement, Consultant will be responsible for the following duties as they relate to the administration of the Office and the origination of Mortgage Loans under the Program:

    a. Recommending hardware equipment and software programs, configurations and solutions for the Office's operation and activities.

    b. Providing advice and recommendations regarding the hiring by Bank of Mortgage Loan Originators (the "Originators") in the Office.

    c. Providing advisory and consulting support and recommendations for the administration of the Office loan pipeline and managing interest rate exposures.

    d. Providing advice and recommendations regarding the establishing and maintaining of necessary and appropriate policies and procedures for the administration of the Office.

    e. Subject to section P, recommending and overseeing all advertising campaigns for the Program, including market research, marketing material design and marketing material distribution.

    f. Overseeing the Office's business systems including, but not limited to, the telephone system and computer network.

    g. Subject to section H, recommending and overseeing settlement agents and title companies to be used by the Office.

    h. Providing at no expense to Bank all hardware, software, furniture, telephone systems and other equipment and capital items deemed necessary by Bank and Consultant for use by the Office. Bank will not purchase capital items for use in the Office.

    i. Except as otherwise provided for in this Agreement, paying for all expenses incurred in the operation of the Office including without limitation courier fees, express delivery fees, equipment and software leases, late charges and recording fees, rent, maintenance, postage, stationery, supplies, telephone, advertising, marketing, appraisal fees, credit report fees, flood certification fees, legal fees arising from third party claims, accounting fees, travel, entertainment and licensing fees. In

2

all instances when Consultant is obligated to pay legal fees of Bank under this Agreement, Bank shall consult with the Consultant as to both Bank's and counsel's actions. The Bank and Consultant shall cooperate with each other in defending third party claims arising from the Office and the Program.

j.  Such other duties as Bank may request.

(3)  Special Account. Consultant shall maintain a special non-interest bearing demand deposit account at Bank, in the name of Consultant, but with the Bank as the only party authorized to withdraw funds (the "Special Account"). Consultant shall maintain a minimum balance in the Special Account of the greater of $100,000.00 or the average monthly balance of outstanding Unpurchased and Repurchased Mortgage Loans as defined in Section G below over the previous three months. After first giving Consultant two days' prior written notice by fax to those persons identified in Section O, the Bank is authorized to debit the Special Account for any right of offset it may have against the Consultant under this Agreement or debt of Consultant to Bank for any reason whatsoever, including the matters referenced in section G. The Bank is authorized to withhold compensation due Consultant under section F and deposit withheld compensation in the Special Account in order to maintain the required balance. After termination of this Agreement and immediately after the sale of all of the Pipeline Outstanding as defined in section F(1) below, the Bank shall pay Consultant the balance in the Special Account 90 days after the sale of all of the Pipeline Outstanding.

(4)  Investor Bonuses. With the prior approval of Consultant, Bank will enter into forward commitments for the sale of the Mortgage Loans. If Mortgage Loan originations under the Program fail to meet or exceed the requirements contained in any forward commitment which has been approved by Consultant, then any of Bank's expenses, cost of cover, mitigation or other damages due as a result of Bank's failure to comply with the terms of said forward commitments shall be reimbursed by Consultant. All additional bonuses for meeting or exceeding forward commitment requirements shall be paid as income to the Office.

(5)  This Agreement takes effect only once Consultant has a net worth in excess of $2,000,000.00. Consultant must provide reasonable documentation to Bank of said net worth.

B.  APPROVED PROGRAMS

Consultant is approved by Bank to consult with and provide assistance to Bank in the administration of the Office as it relates to Mortgage Loans only (the "Program").

C.  REGULATORY COMPLIANCE RESPONSIBILITIES

Consultant represents, warrants, covenants and agrees that all Mortgage Loans originated

3

by the Office and any software it uses will be in compliance with the Bank's operations manual, policies, procedures, guidelines, letters and memoranda, as amended from time to time by the Bank in its sole and absolute discretion (collectively, the "Manual"), all applicable secondary market investor guidelines, as such guidelines may be modified, altered or amended from time to time, all applicable federal, state and local statutes, ordinances, rules and regulations, including, but not limited to, all consumer protection laws, such as consumer credit laws, the Equal Credit Opportunity Act ("ECOA"), the Truth in Lending Act, state and federal usury laws, the Real Estate Settlement Procedures Act, the Privacy Act, the Fair Credit Reporting Act ("FCRA"), the Home Mortgage Disclosure Act ("HMDA") the Flood Disaster Protection Act and all regulations promulgated pursuant thereto and all regulations and directives issued by the secondary market investors of the Client, FDIC and all other state and federal governmental agencies to the extent applicable to the Mortgage Loan transactions (the "Criteria"). Consultant represents and warrants to Bank that the Office will comply with the adverse action notification requirements of ECOA, FCRA and all other requirements under state or federal law for notification to applicants for Mortgage Loans. Consultant represents, warrants, covenants and agrees that all required disclosures to the Office's applicants will be made in a timely and correct manner and in compliance with the Criteria. Until Bank notifies Consultant that the Bank operates in any other state and that the Program is operated from a branch in such state, all Mortgage Loans will comply with the laws of Florida, and thereafter with the laws of the state of the Program's branch.

D. BANK INVESTMENT

It is understood and agreed that Bank will be obtaining all legally required licenses and governmental approvals, and incurring other expenses in order for Bank to establish the Program and its Mortgage Loan operations. The foregoing expenses shall be in the nature of an investment and shall be the Bank's sole responsibility. All final decisions as to entering into agreements, hiring employees, obtaining licenses and incurring Bank expenses will be made in the sole discretion of Bank.

E. PAYMENT OF TAXES

Consultant will have full responsibility for payment of self-employment and income taxes resulting from compensation under this Agreement. Bank will periodically issue to Consultant an IRS Form 1099 showing fees paid to Consultant under this Agreement and file copies with the IRS as required by law.

F. COMPENSATION

(1) As compensation for funding Mortgage Loans, Bank will receive Funding Interest as defined below on the daily average outstanding balance of the Mortgage Loans disbursed by Bank but not yet sold to investors. The Mortgage Loans disbursed by Bank but not yet sold to investors shall hereinafter be referred to as the "Pipeline Outstanding." "Funding Interest" will be the sum of the Funding Spread, as defined below, and the Bank's Cost of Funds, as defined below. For all loans originated under Florida law interest rate limitations while such law is

4

understood by Bank and Consultant to prevent the assessment of ten origination points in addition to an 18% annual percentage interest rate to Mortgage Loan borrowers, the Funding Spread shall be as follows: (i) 275 basis points as long as the Pipeline Outstanding for the previous 30 calendar days shall be greater than or equal to $15,000,000, or (ii) 300 basis points in all other circumstances. For all Mortgage Loans originated under Florida law while legally able to assess 18% annual percentage interest rate plus ten origination points against Mortgage Loan borrowers, the Funding Spread shall be 400 basis points. For all loans originated under Nevada law interest rate limitations or under such other state law agreeable to both parties, the Funding Spread shall be 450 basis points. The Funding Spread shall be calculated daily. In funding the Mortgage Loans, the Bank shall utilize its lowest reasonably available marginal funding mechanism by first using draws under existing lines of credit with the Federal Home Loan Bank of Atlanta, second certificates of deposit, third borrowings secured by portfolio loans, and fourth sale of participation in Bank's existing loans. The Bank's "Cost of Funds" shall be defined as the average interest rate paid by the Bank (or foregone in the case of participations sold) in funding the Mortgage Loans and reported to the Consultant monthly or upon Consultant's request.

(2)   The compensation for Consultant's services under this Agreement shall be paid by Bank to Consultant as follows: Each Friday the Bank shall calculate and each following Wednesday the Bank shall deposit into an account at Bank that is held in the name of Consultant (the "Account"), the amount equal to the estimated Net Profit as defined in Section C(3) below of the Office that was earned by Bank during the previous Friday-through-Thursday calendar week. Within ten (10) days after the end of each calendar month, Bank shall determine the actual Net Profit of the Office of such calendar month and promptly thereafter shall (i) deposit to the Account the amount, if any, by which the actual Net Profit for such calendar month exceeds the aggregate amount of the weekly estimated payments previously made by Bank with respect to such calendar month, or (ii) debit the Account for the amount, if any, by which the aggregate amount of the weekly estimated payments previously made by Bank with respect to such calendar month exceeds the actual Net Profit for such calendar month.

(3)   It is understood and agreed that Bank will maintain a separate department for the Office in Bank's books and records to which all revenue related to the Office's business activities as referenced in Addendum A, attached hereto and made a part hereof, will be credited and to which all directly related expenditures allocable to the Office's business activities will be charged, and in accordance with generally accepted accounting principles consistently applied by Bank. It is understood that for a Mortgage Loan to qualify to be included as part of the Gross Income as used in Addendum A for a month or week, it must close and funds must disburse prior to the end of the month or week, as appropriate. The direct expenditures include, but are not limited to, those referenced in Addendum A. The Bank shall receive the "Funding Fees" defined to be the sum of the Funding Interest and all expenses directly arising from the operation of the Office. The term "Net Profit" for

5

purposes of this Agreement will mean the Gross Income of the Office, including the income items referenced in Addendum A included in the appropriate calculations when indicated thereon, less all expenditures (before Bank's federal and all state income taxes) directly related to and/or the indirect expenditures allocable to the Office in accordance with generally accepted accounting principles consistently applied by Bank. Net Profit or Loss of the Office will be calculated in accordance with Addendum A during the term of this Agreement with compensation payments made in accordance with Addendum A during the term of this Agreement. Any losses will be due and payable in accordance with Addendum A and deducted from the Account. As solely an example of the Net Income calculation, see attached Addendum A to this Agreement.

(4) With the consultation and leadership of the Consultant, Bank will exercise its best efforts in selling the Pipeline Outstanding to secondary market investors and will obtain the approval of Consultant for each sale. Notwithstanding the above, during a period or the event of unusual volatility in the secondary market in either pricing or liquidity, Bank will endeavor to consult with and seek the advice of Consultant; however, Bank may sell the Pipeline Outstanding without following customary approval mechanisms and without Consultant's express approval. In all events, Consultant's approval will not be unreasonably withheld.

G. REJECTED LOANS

(1) Upon Repurchase. In the event that Bank is required to repurchase a Mortgage Loan originated by or through the Office for any reason (a "Repurchased Mortgage Loan"), Bank will reduce the monthly compensation due Consultant by the amount of the principal balance advanced plus any fees and costs associated with repurchase. To the extent that the provisions of this paragraph reduce the monthly compensation to zero, Bank may debit the Account or Special Account.

(2) Unpurchased Mortgage Loans. In the event that Bank owns a Mortgage Loan originated by or through the Office that is not purchased by Bank's secondary market investors within ninety (90) days of closing, for any reason (an "Unpurchased Mortgage Loan"), Bank will reduce the monthly compensation due Consultant by the amount of the outstanding principal balance and any accrued, but unpaid interest. To the extent that the provisions of this paragraph reduce the monthly compensation to zero, Bank may debit the Account or Special Account.

(3) If Bank subsequently sells an Unpurchased Mortgage Loan or a Repurchased Mortgage Loan, Consultant will receive compensation in the amount of the Bank's net proceeds of the sale less any expenses incurred with regard to the sale to the secondary market investor which purchased the Mortgage Loan from Bank. The Consultant shall consult with, advise and assist the Bank in obtaining the best possible price and terms for such sale and Bank shall exercise its best efforts at all times in obtaining the best price and terms possible. If Bank does not sell an Unpurchased Mortgage Loan or Repurchased Mortgage Loan within ninety days

of closing or repurchase, then Bank shall assign, transfer and deliver to Consultant or a third-party of Consultant's designation all such mortgage loans including all notes, lien instruments, insurance, all loan documents and all payments received after closing on the transfer of such mortgage loans.

H.  SETTLEMENT AGENT

Bank and Consultant will choose a settlement agent or agents (the "Settlement Agent") which will conduct settlements of Mortgage Loans closed by the Office. Consultant will require Settlement Agent to open an account with Bank out of which funds for closing Mortgage loans will be disbursed and into which Bank will deposit funds for the disbursement of funds for the closing of Mortgage Loans closed by Office.

I.  AUTHORITY

At no time will Consultant have any authority to charge items or incur debts or other obligations on behalf of Bank or enter into any agreements on behalf of Bank, and Consultant agrees that it will not at any time represent that employees of Consultant are employees of Bank or that they are authorized to enter into any contract or obligations of any kind on behalf of Bank.

J.  LICENSING

Consultant will be responsible for paying and keeping current any license(s) and permit(s) necessary to engage in its business and provide services under this Agreement. Consultant represents and warrants that is possesses all necessary corporate, business and consulting licenses that are required by applicable local, state and federal law. In the event that Consultant does not have a license because it believes it is exempt from such license requirements, Consultant qualifies for such exemption and that, to the best of its knowledge and belief, it would be entitled to receive such licenses if it were required to apply therefore. Consultant further represents and warrants that it has never had an application for a license rejected and that it has never surrendered a license nor had a license suspended, revoked or terminated.

K.  INDEMNIFICATION

With regard to third party claims, Consultant hereby agrees to indemnify, defend, hold harmless and release Bank and its officers, directors, agents and employees from any claim, loss, damage, cost, fines, penalties, restitution, payments, expense (including all attorney fees) or liability arising out of or relating to (i) the performance or non-performance by Consultant of any services to be performed or provided by Consultant under this Agreement, including without limitation, compliance with section C, (ii) for Consultant's taxes or for any sums owed by Consultant to Consultant's employees, (iii) any other agreement or understanding to which Consultant is a party and Bank is not a party, or (iv) any action or inaction of Consultant in connection with any transactions with Equity Plus, Inc. All of Bank's direct ongoing costs associated with investigations, examinations, inquiries, allegations, complaints, indictments, or actions at law or equity, by or through any court, administrative agency, or governmental official, for which there is liability or expense arising from the Office shall be paid directly by Consultant

7

upon presentment, including attorneys' fees and other costs.

L.    CONFIDENTIAL AND PROPRIETARY INFORMATION

    (1) During the term of this Agreement, Bank acknowledges that any and all information emanating from or concerning this Agreement or computer software (including all files, input and output materials, the media upon which they are located or stored, and all software programs, and databases, including any related documentation, source code or codes, object codes, upgrades, revisions, modifications, and any related materials which are developed or compiled by Consultant ) used by or proposed to be used by Consultant, and any methods, systems or other elements created, learned or developed by Consultant is "Confidential and Proprietary Information," except information which is obtained by the Bank from public or other sources not bound by a confidentiality agreement in favor of Consultant. During the term of this Agreement, Bank and employees of Bank (i) will not use any such Confidential and Proprietary Information except in carrying out its responsibilities under this Agreement and (ii) will not permit the duplication or disclosure of any such Confidential and Proprietary Information to any person unless Consultant in writing specifically authorizes such duplication, use or disclosure. Violation of this Section shall entitle Consultant to an award from Bank of damages suffered by Consultant including revenue generated by Bank through use of the Confidential and Proprietary Information plus Consultant's attorneys' fees and expenses and specific performance of this Section by way of an injunction. Use of Confidential and Proprietary information as authorized by Consultant by former employees of Bank while they are employed by Consultant or its affiliate shall not be a violation of this Section.

    (2) At the Termination Date, Consultant will return to Bank any information, stored in any media, which reflects consumer data which is confidential or private to the consumer, including without limitation, credit reports, applications, and information protected by privacy regulations promulgated pursuant to the Gramm-Leach-Bliley Act or otherwise or Bank's customer Privacy Policy.

M.    TERM

    (1) The initial term of this Agreement will begin on April 17, 2000 and end on April 16, 2001 (the "Initial Term"). This Agreement shall renew automatically after the end of the Initial Term for successive terms of 180 days unless terminated as provided elsewhere in this Agreement.

    (2) At a mutually agreeable date (the "Agreed Date") after the beginning of the Initial Term in paragraph (1) above, Bank will file all necessary applications to open a branch office in Nevada (or some other state mutually acceptable to the parties) and thereafter use its best efforts to diligently pursue the opening of a branch office in such state.

8

N. TERMINATION

(1) If Consultant fails to abide by the provisions of this Agreement, the engagement of Consultant under this Agreement may be terminated by Bank after 30 days written notice during which Consultant fails to cure the breach of which it is advised in the notice. Notwithstanding the above, if Bank fails to abide by the provisions of this Agreement, the engagement of Bank under this Agreement may be terminated by Consultant after 30 days written notice during which Bank fails to cure the breach of which it is advised in the notice. The date either party gives the other notice of termination shall be the "Notice Date" and the effective date of termination shall be the "Termination Date." If the Nevada branch office or other mutually acceptable state branch office is not open for business within ninety (90) days following the Agreed Date then Consultant shall have the right to terminate its engagement as Consultant immediately at any time and without liability for doing so immediately.

(2) After the Initial Term, either the Bank or the Consultant shall have the right to terminate the term of this Agreement at any time and without liability for doing so by giving the other party at least sixty (60) days prior written notice by certified mail, return receipt requested or by a nationally recognized overnight delivery service.

(3) Termination will not otherwise affect any then-existing commitment from either party to the other. Bank will then stop funding any new originations of Mortgage Loans after the Termination Date under the Program, but will fund existing Mortgage Loan commitments and endeavor to sell and dispose of any existing inventory of Mortgage Loans, and each party will continue to compensate the other under section F until all Mortgage Loans are disposed of by the Bank.

(4) Consultant shall have the right following the Notice Date to contact any and all employees (meaning Originators and Staff) of Bank who worked in the Office at any time during the term of this Agreement, for the purposes of requesting or soliciting such persons to become employed by Consultant or any entity by whom Consultant is or intends to become employed. Following the Notice Date, Consultant shall have the right and authority to direct and control those employees of the Bank who agree to become employed by Consultant or such other entity. Following the Notice Date and up to the termination date, such employees (including Consultant) may perform duties, including loan origination, on behalf of Consultant or such other entity, provided that such employees (including the Consultant) shall be responsible for completing all remaining responsibilities to Bank during such time period.

O. NOTICES

All notices, requests, demands and other communications which are required or permitted to be given under this Agreement must be in writing and will be deemed to have been duly given

upon the delivery or three days after the mailing sent by registered or certified mail, return receipt requested, postage paid:

If to Bank, to:
Ms. Linda C. Alexionok
Chief Executive Officer
Guaranty National Bank of Tallahassee
111 S. Monroe Street
Tallahassee, Florida 32301
Fax number: (850) 224-2720

with a copy to:
Thomas P. Oldweiler, Esq.
Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, LLC
63 S. Royal Street, Thirteenth Floor
Mobile, Alabama 36602
Fax number: (334) 432-6843

If to Consultant, to:
Randy A. Bapst, President
Equity Guaranty, LLC
8280 Greensboro Drive, Suite 900
McLean, Virginia 22102
Fax number: (703) 245-6050

with a copy to:
Malcolm M. Mitchell, Jr., Esquire
Vorys, Sater, Seymour and Pease, LLP
277 South Washington Street, Suite 310
Alexandria, Virginia 22314
Fax number: (703) 518-2754

or to such other address as Bank or Consultant has specified in writing to the other.

P.    INTERNET SITE AND ADVERTISING

Consultant shall have the right to use Bank's name in Consultant's internet site and all Program advertising during the term of this Agreement. Bank shall review and approve the internet site, all advertising and marketing in all media in which the Bank's name is to appear and its approval shall not be unreasonably withheld. If Bank does not respond to Consultant's request for approval within a commercially reasonable time after receiving the faxed request, Bank shall be deemed to have approved the request.

Q.    HEADINGS

The headings in this Agreement are intended solely for convenience or reference and shall

10

be given no effect in the construction or interpretation of this Agreement.

R.  AMENDMENTS

This Agreement cannot be modified or amended, nor any of the terms and conditions waived, except by a writing signed by each of the parties, and, in such event, such waiver or consent will be effective only in such instance and for the specific purpose for which it is given.

S.  [INTENTIONALLY OMITTED]

T.  MISCELLANEOUS

(1)  During the term(s) of this Agreement Bank shall continue to have the right to originate its own mortgage loans consistent with past practices.

(2)  All representations and warranties contained herein, and all rights of the parties arising hereunder, will survive the termination of this Agreement. This Agreement constitutes the final, entire and exclusive agreement among the parties, and no representations, inducements or agreements, oral or otherwise, not contained herein will have any force or effect. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any person. While the parties intend and expect that all provisions of this Agreement are enforceable and valid, to the extent any provision hereof is deemed unenforceable, all other provisions will continue to be fully enforceable as if the unenforceable or invalid provisions were absent. Time is of the essence hereunder. This Agreement may be executed in any number of counterparts, is effective only when signed by all signatories, will be interpreted in accordance with the laws of the State of Florida and be binding upon and inure to the benefit of all parties hereto, their personal representatives, heirs, successors, and permitted assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

BANK:  
GUARANTY NATIONAL BANK  
OF TALLAHASSEE  

BY: _____ 17 April 00  
Linda C. Alexionok  
Its President/CEO

CONSULTANT:  
EQUITY GUARANTY, LLC  

By: _____ 13 APRIL 00  
Randy A. Bapst  
Its President

11

## ADDENDUM A

Sample Profit and Loss Statement

The following is a sample Profit and Loss Statement that is for illustrative purposes only and may not include all profit and loss statement entries:

Gross Income from Origination and Sale of Mortgage Loans is defined to include:

    Discount Points and Origination Fees (when paid by borrower)
    Credit Report, Appraisal and Flood Certification Fees (when paid by borrower)
    Other Lender Fees (when paid by borrower)
    Volume Bonuses (when paid by secondary market investors)
    Interest on Loans Held for Sale (when accrued)
    Investor Premiums on Sold Loans (when paid by secondary market investors)
    Bonuses earned by the Bank when meeting or exceeding forward commitment requirements (when paid by secondary market investors)

Less:

    Investor Discounts on Sold Loans
    Investor Fees
    Funding Fees
    Personnel Expenses
        Salaries and Wages
        FICA and Employee Benefits
    General & Administrative Expenses
    Other Expenses
    Principal Balance of Repurchased Loans
    Repurchase Costs
    Foreclosure Costs

---

Equals:
    Net Profit (Loss)

Example of Net Profit Calculation
Gross Income of $1,000.00 less Funding Fees of $100.00, Personnel Expenses of $500.00. General and Administrative Expenses of $100.00 and Other Expenses of $50.00 will result in a Net Profit of $250.00 payable to Consultant.

Note Regarding Volume Bonuses
The amount of Volume Bonuses received from Bank's secondary market investors and credited as Gross Income to the Office will be the actual amount of bonus received. All investor bonuses will be treated as income to Office.



## AMENDMENT NUMBER TWO TO
## CONSULTING AGREEMENT
(Trans Union Credit Pulls)

THIS AMENDMENT NUMBER TWO (this "Amendment") to that certain CONSULTING AGREEMENT dated as of April __, 2000, as amended in Amendment Number One dated May 18, 2000, (the Consulting Agreement, as amended, and this Amendment, together, the "Agreement") is made and entered into as of the 6th day of March, 2001 by and between Guaranty National Bank of Tallahassee ("Bank") and Equity Guaranty, LLC ("Consultant"). This document replaces another Amendment Number Two which was executed with interlineations.

### WITNESSETH:

WHEREAS, the Bank and the Consultant did enter into that certain Consulting Agreement and are desirous of amending the same in accordance with the provisions of Section R therein; and

WHEREAS, the Bank and the Consultant are desirous of Consultant obtaining certain credit information through Trans Union, LLC and its successors ("TU").

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein contained, and Bank's representation letter to TU regarding credit information of even date, the parties hereto do hereby agree as follows:

1. **Defined Terms.** All terms used herein which are defined in the Consulting Agreement shall have the meanings specified in the Consulting Agreement, unless otherwise specifically defined herein.

2. **Trans Union Relationship.** Consultant will promptly inform TU when this Agreement terminates. EG hereby represents, warrants and covenants with Bank that when Consultant "pulls credit" through TU in the name of Bank, i.e., when Consultant informs TU that credit information is being obtained on behalf of Bank, such credit information is in fact being obtained on behalf of Bank.

3. **Effect of Amendment.** Except as expressly modified by this Amendment, the terms, covenants, and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

BANK:
GUARANTY NATIONAL BANK
OF TALLAHASSEE

By: _____
Gary F. Linton
Its President

CONSULTANT:
EQUITY GUARANTY, LLC

By: _____
David B. Shumway
Its President

00267563.WPD

13

(Printed on Apr 10, 2003 @ 18:34)    US Department of Housing and Urban Development    OMB No. 2502-0265
## SETTLEMENT STATEMENT (Transactions Without Sellers)

| File Number: 12-00220769 | Loan Number: 397874 | Mortgage Ins. Case #: |
|---|---|---|

NAME AND ADDRESS OF BORROWER: DIEGO M. FIGUEREDO, GLORIA FIGUEREDO, 19638 RIDGE HEIGHTS DR GAITHERSBURG MD, 20879

NAME AND ADDRESS OF LENDER: Irwin Mortgage Corporation 111 Continental Drive Ste 217, Newark, DE 19713-4330

PROPERTY LOCATION: 19638 RIDGE HEIGHTS DR GAITHERSBURG MD, 20879

SETTLEMENT AGENT:
PLACE OF SETTLEMENT: USA Settlements, LLC 4501 Singer Ct Ste 104, Chantilly, VA 20151

| SETTLEMENT DATE: 04/11/2003 | | DISBURSEMENT DATE: 04/16/2003 | |
|---|---|---|---|
| **L. SETTLEMENT CHARGES** | | **M. DISBURSEMENT TO OTHERS** | |
| 800. Items Payable in Connection With Loan | | 1501. Underwriting fee to: Calusa Investments, LLC | |
| 801. Loan Origination Fee .50% to Calusa Investments, LLC | $1,104.00 | | $400.00 |
| 802. Loan Discount | | 1502. CHASE MORTGAGE | |
| 803. Appraisal Fee POC $300.00 | | | $199,166.14 |
| 804. Credit Report TO: Calusa Investments, LLC | $11.00 | 1503. CHASE NA | |
| 805. Lender's Inspection Fee | | | $12,686.00 |
| 806. Mortgage Insurance Application Fee | | 1504. CHASE NA | |
| 807. Assumption Fee | | | $2,765.00 |
| 808. Mortgage Broker Fee: POC $ 2484.00 to Calusa Inves | | 1505. | |
| 809. Application Fee to: Calusa Investments, LLC | $500.00 | | |
| 810. Flood Cert Fee to:First American | $10.00 | 1506. | |
| 811. Commitment Fee to: Calusa Investments, LLC | $425.00 | | |
| 900. Items Required By Lender To Be Paid In Advance | | 1507. | |
| 901. Interest from 15 days @ $34.78 per day | $521.70 | | |
| 902. Mortgage Insurance Premium for | | 1508. | |
| 903. Hazard Insurance Premium for | | | |
| 904. | | 1509. | |
| 905. | | | |
| 1000. Reserves Deposited With Lender | | 1510. | |
| 1001. Hazard Insurance 6 months @ $46.00 per month | $276.00 | | |
| 1002. Mortgage Insurance | | 1511. | |
| 1003. City property taxes | | | |
| 1004. County property taxes 7 months @ $201.91 per month | $1,413.37 | 1512. | |
| 1005. Annual assessments | | | |
| 1006. | | 1513. | |
| 1007. | | | |
| 1008. Aggregate Adjustment | $-201.90 | 1514. | |
| 1100. Title Charges | | | |
| 1101. Settlement or closing fee to USA Settlements, LLC | $250.00 | 1515. | |
| 1102. Abstract or title search to General American Corporation | $175.00 | | |
| 1103. Title examination to USA Settlements, LLC | $300.00 | 1516. | |
| 1104. Title insurance binder | | | |
| 1105. Document preparation | | 1517. | |
| 1106. Notary Fees | | | |
| 1107. Attorney's Fees | | 1518. | |
| (Includes above item numbers: ) | | | |
| 1108. Title Insurance To General American Corporation | $492.00 | 1519. | |
| (Includes above item numbers: ) | | | |
| 1109. Lender's coverage | | 1520. TOTAL DISBURSED (enter on line 1603) | |
| 1110. Owner's coverage | | | $215,017.14 |
| 1111. Overnight Fee to: USA Settlements, LLC | $25.00 | | |
| 1112. Disbursement Fee to: General American Corporation | $170.00 | | |
| 1113. Processing Fee to: USA Settlements, LLC | $115.00 | **N. Net Settlement** | |
| 1200. Government Recording and Transfer Charges | | | |
| 1201. Recording fees: Montgomery County Clerk of the Circuit Ct | $25.00 | 1600. Loan Amount | $220,800.00 |
| 1202. City/county tax/stamps: Montgomery County Maryland | $155.25 | | |
| 1203. State tax/stamps: | | 1601. Plus Check/Cash from Borrower | $0.00 |
| 1204. | | | |
| 1205. | | 1602. Minus total settlement charges (Line 1400) | $5,766.42 |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey | | 1603. Minus total Disbursements to Others (line 1520) | $215,017.14 |
| 1302. Pest Inspection | | | |
| 1303. | | 1604. Equals disbursements to borrower | $16.44 |
| 1304. | | | |
| 1305. | | | |
| 1400. Total settlement charges (enter on line 1602) | $5,766.42 | | |

The undersigned hereby acknowledges receipt of a completed copy of this statement. To the best of my knowledge the HUD-1A rel. RESPA Settlement Statement is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

X_____    X_____    X_____
Usa Title, L.L.C.                        DIEGO M. FIGUEREDO            GLORIA FIGUEREDO