# Exhibit 9

**COMMONWEALTH OF VIRGINIA**
**STATE CORPORATION COMMISSION**

| | |
|---|---|
| PETITION OF | ) |
| | ) |
| CALUSA INVESTMENTS, LLC | ) |
| | ) |
| | )     **CASE NO. BFI-2004-00013** |
| For approval of mortgage lender and | ) |
| broker license | ) |

## SUPPLEMENTAL PRE-FILED TESTIMONY OF DAVID B. SHUMWAY

Q1    Please state your name and occupation.

A1    David Shumway, Chief Executive Officer of Calusa Investments, LLC.

Q2    Mr. Shumway, have you previously filed testimony in this matter?

A2    Yes. I have filed testimony on two other occasions. They are designated Pre-Filed Testimony of David B. Shumway and Pre-Filed Rebuttal Testimony of David B. Shumway.

Q3    Since you last filed testimony in this matter, have there been any developments with respect to the business of Calusa Investments that you believe are important to your application for a license?

A3    Yes.

Q4    What are those developments?

A4    The State of Colorado completed an examination of Calusa.

Q5    I show you a copy of Calusa Exhibit 24. Is this a copy of the examination results that the State of Colorado issued?

A6    Yes.

Q7    What were the results of that examination?

A7    No exceptions found – a perfect examination.

Q8    Have there been any other developments with respect to the business of Calusa Investments that would be of interest to the Commission?

A8    Yes.

Q9    What were they?

A9    Calusa successfully applied for and received a mortgage banking license from the State of New Mexico.

Q10    Was Calusa previously transacting business in the state of New Mexico without a license?

A10    No. A license was previously not required for mortgage lending in New Mexico.

Q11    How did Calusa's management come to recognize that a license in New Mexico was now required?

A11    In this particular instance, we were notified of the change in regulations in New Mexico by one of the third party vendors that we subscribe to which helps Calusa ensure compliance with all federal and state laws in every state in which Calusa operates.

Q12    Were there any other developments with respect to Calusa's business?

A12    Yes. The Utah Division of Real Estate renewed Calusa's license for a second time.

Q13    How long has Calusa held a mortgage lender license in Utah?

A13    Since January 3, 2002.

Q14    Was Calusa's license renewed in Utah in 2003 without incident?

A14    Yes.

Q15    Were there any issues related to Calusa's 2004 renewal in Utah?

A15    Yes.

Q16    What were they?

A16    The Utah Division Of Real Estate inquired as to why Calusa received a License Denial by the Bureau in its home state. They requested Calusa to appear before the Mortgage Regulatory Commission in Utah and explain the facts surrounding the License Denial by the Bureau.

2

Q17    Were any other issues related to Calusa's 2004 license renewal in Utah?

A17    Yes.

Q18    What was it?

A18    Calusa was also asked to explain the 2003 settlement agreement between Calusa and the Maryland Department of Labor, Licensing and Regulation ("MDLLR") in which Calusa agreed to pay a fine of $1,200 and the matter was settled.

Q19    Which representatives from Calusa appeared before the Utah Mortgage Regulatory Commission ("UMRC")?

A19    Myself, DeVan Shumway and outside counsel Calusa retained in Utah.

Q20    What was the result of Calusa's appearance before the UMRC?

A20    Calusa explained the facts as we knew and understood them regarding Equity Guaranty's consulting arrangement with Guaranty National Bank. Calusa informed the UMRC that we had retained counsel in Virginia and would be appealing Commissioner Face's decision for the license denial to the Virginia State Corporation Commission.

Q21    What were the circumstances as explained to the UMRC related to the $1,200 fine Calusa paid to the Maryland Department of Labor, Licensing and Regulation in 2003?

A21    Calusa explained to the UMRC that the issue in Maryland was simply an administrative oversight on Calusa's initial Maryland mortgage application whereby Calusa's owner's failed to disclose that they were prior owners of an entity, Equity Plus Financial, that previously held a Maryland mortgage broker license. Furthermore, that EquityPlus Financial had also previously paid a fine to the MDLLR in 1998.

Q22    What is the status of Calusa's mortgage lender license in the state of Maryland?

A22    Calusa successfully applied for and received its initial Maryland mortgage license in 2002. The MDLLR concluded that the administrative oversight on Calusa's initial mortgage lender application was unintentional. As such, MDLLR entered into a settlement agreement with Calusa, imposed a fine of $1,200 on Calusa and subsequently renewed Calusa's mortgage lender license in Maryland until 2005.

Q23    Was the Utah Mortgage Regulatory Commission satisfied with the explanations of the two issues that brought Calusa before the Commission in Utah?

3

A23    Yes.

Q24    Were there any other issues related to Calusa's 2004 license renewal in Utah?

A24    Yes.

Q25    What was it?

A25    There was a discrepancy over the interpretation of a Utah statute about whether or not Calusa's individual loan originators needed to be "registered" with the Utah Division of Real Estate.

Q26    As part of the renewal process in 2003, did Calusa submit a list of the loan originators with its renewal application to the Utah Division of Real Estate?

A26    Yes.

Q27    As part of the renewal process in 2003, did Calusa register its individual loan originators with the Utah Division of Real Estate?

A27    No.

Q28    Was Calusa's license renewed by the Utah Division of Real Estate for 2003 despite Calusa's omission of registering the individual loan officers?

A28    Yes.

Q29    When Calusa sent in its renewal application to the Utah Division of Real Estate for 2004, was the same information included that was sent for the 2003 renewal?

A29    Yes.

Q30    Did Calusa submit to the Utah Division of Real Estate a listing of its loan originators along with its renewal application for 2004 without registering its loan originators, just as in 2003?

A30    Yes.

Q31    What was the result of Calusa not registering its loan originators in Utah with its 2004 renewal application?

A31    The Utah Division of Real Estate entered into a settlement agreement with Calusa. Calusa agreed to pay a $5,000 fine to settle the matter. Calusa's license in Utah was suspended for 8 days in May of 2004 until the requirement of registering a loan originator was met.

4

Q32    Why did Calusa fail to recognize that Utah required its loan originators to be registered with the state as part of the licensing requirements for a mortgage lender?

A32    Calusa specifically relied on legal advice from Severson & Werson, a third party law firm retained in California to not only prepare all Calusa's initial licensing applications but to ensure that Calusa's management was aware of the various initial state requirements for licensed mortgage lenders.

Q33    When Calusa's 2003 license renewal for Utah was received without exception, did Calusa have any reason to question the registering requirements for loan originators or the information provided to Calusa regarding the registration requirements in Utah from Severson & Werson?

A33    No.

Q34    When it became known to Calusa that mortgage originators in Utah needed to be registered with the state and meet certain continuing education requirements, did Calusa immediately comply?

A34    Yes.

Q35    What is the current status of Calusa's license in the state of Utah?

A35    Calusa's license was renewed by the state of Utah and is active until 2005.

Q36    Have any other developments taken place that you feel are important for Calusa's appeal with the Commission?

A36    Yes. Calusa's loan originators have successfully been individually licensed in Kentucky, Arkansas and Florida in compliance with new regulations in those states. Additionally, Calusa sponsored over 30 hours of continuing professional education courses for its loan originators as required by several states in which Calusa operates.

Q37    Since you last filed testimony, have you had an opportunity to review the Revised License Denial, dated June 30, 2004, and submitted by the Bureau as its Exhibit No. 19?

A37    Yes.

Q38    Do you agree with the conclusions reached by the Commissioner in the Revised License Denial?

A38    No.

5

Q39    I direct your attention to paragraph 1 of the Revised License Denial which alleges that you and your brother, DeVan Shumway, owned, controlled or operated companies without obtaining a mortgage broker license. Do you agree with these allegations?

A39    No. As I previously stated in my rebuttal testimony, we believed each and every one of the arrangements with Resource Bank, Community Bank and Guaranty National Bank to be in compliance with whichever regulatory agency that presided over the respective financial institution at that time. When and if there was a request to change the structure of the arrangement from any regulatory authority, we immediately complied.

Q40    What regulatory authority supervised Resource Bank?

A40    I believe it to be the Virginia Bureau of Financial Institutions.

Q41    What regulatory authority supervised Community Bank of Northern Virginia?

A41    Again, I believe it to be the Virginia Bureau of Financial Institutions.

Q42    At any point prior to the Revised License Denial, were you ever told by anyone at the BFI of the Commissioner's position that Equity Plus Financial, Inc. and EquityPlus Financial, LLC were required to be licensed as a mortgage broker?

A42    No.

Q43    Had the Commissioner or anyone at the BFI requested either EquityPlus Financial, Inc. and/or EquityPlus Financial, LLC obtain a mortgage broker license in the Commonwealth of Virginia, would you have complied?

A43    Yes.

Q44    During the Community Bank/EquityPlus Financial, Inc or EquityPlus Financial, LLC relationship, in how many states did Community Bank make mortgage loans?

A44    Approximately 45.

Q45    Did any regulatory agency at any time request that EquityPlus Financial Inc. or EquityPlus Financial, LLC be licensed as a mortgage broker?

A45    Yes, one. In 1998, the Maryland Department of Labor, Licensing and Regulation ("MDLLR") requested that EquityPlus obtain a mortgage broker license.

Q46    Did EquityPlus Financial comply with the MDLLR request in 1998?

A46    Yes. EquityPlus successfully applied for and received a mortgage broker license
in the state of Maryland as requested by the MDLLR. EquityPlus Financial
entered into a settlement agreement with the MDLLR and paid a fine of $13,000
to settle the matter.

Q47    Is this the omission on Calusa's original Maryland mortgage lender application
you referred to earlier with respect to Utah?

A47    Yes.

Q48    Do you recall the number of residential mortgage loans made by Community
Bank during the EquityPlus relationship in its various forms?

A48    Approximately 15,000 loans.

Q49    Do you know the number of loan applications handled by Community Bank for
the same time period?

A49    The applications per month were as high as 14,000.

Q50    Can you recall the number of telephone calls handled by Community Bank during
the EquityPlus relationship in its various forms?

A50    The call volume per month was as high as 20,000 calls per month.

Q51    Prior to the Revised License Denial issued on June 30, 2004, were you ever told
by anyone at the Bureau of Commissioner Face's position that Equity Guaranty,
LLC was required to have a Virginia mortgage broker's license during the time it
had a consulting agreement with Guaranty National Bank of Tallahassee?

A51    No.

Q52    Had the Commissioner or anyone at the Bureau requested that Equity Guaranty,
LLC, as a consultant to a national bank and under the supervision of the Office of
the Comptroller of the Currency, obtain a mortgage broker license for the
Commonwealth of Virginia, would Equity Guaranty have complied?

A52    Yes.

Q53    In how many states did Guaranty National Bank make mortgage loans during the
time that Equity Guaranty was a consultant?

A53    Approximately 45.

Q54    At any time that Equity Guaranty was a consultant for Guaranty National Bank of
Tallahassee, who was under the supervision of the OCC, were you ever advised

by any state regulator or federal regulator that Equity Guaranty was required to have a license in any state that licensed mortgage brokers?

A54   No.

Q55   Previously, you testified that you believed the Office of the Comptroller of Currency had approved the arrangement between Equity Guaranty and Guaranty National Bank. Did there come a time that the Office of the Comptroller of Currency ever asserted that Equity Guaranty should have been licensed as a mortgage broker in any state?

A55   No, the OCC never made any such assertion.

Q56   When Equity Guaranty had a consulting agreement with Guaranty National Bank, were any employees of Equity Guaranty involved in originating mortgage loans?

A56   No.

Q57   When Equity Guaranty had a consulting agreement with Guaranty National Bank, were any employees of Equity Guaranty involved with processing mortgage loans?

A57   No.

Q58   Did Equity Guaranty ever directly or indirectly originate or make mortgage loans while acting as a consultant to Guaranty National Bank?

A58   No.

Q59   Do you know the number of residential mortgage loans made by Guaranty National Bank during the time Equity Guaranty was a consultant?

A59   Yes. Approximately 22,000 loans.

Q60   Do you know the number of loan applications handled by Guaranty National Bank for the same time period?

A60   Approximately 20,000 per month.

Q61   Do you know the number of telephone calls handled by Guaranty National Bank during that same time period?

A61   Approximately 30,000 calls per month.

Q62   Directing your attention to paragraph 2 of the Revised License Denial, what do you understand Commissioner Face to mean when he refers to "commonly

controlled title and marketing companies"?

A62    I believe the Commissioner could only be referring to Title America, LLC
and USA Title, LLC.

Q63    Were those entities title insurance companies?

A63    No. They were Virginia limited liability companies that provided real estate
settlement services.

Q64    Were both companies appropriately licensed by the Virginia Bureau of Insurance
of the State Corporation Commission?

A64    Yes.

Q65    Were both companies registered with the Virginia State Bar?

A65    Yes.

Q66    With respect to the marketing companies, was there was an entity called
MediaPro, LLC?

A66    Yes. It was a Virginia limited liability company that provided marketing services.

Q67    Did these companies act in combination with either Equity Plus Financial, Inc.,
Equity Plus Financial, LLC or Equity Guaranty, LLC to commit numerous
violations of federal consumer protection laws as alleged by the Commissioner in
his Revised License Denial?

A67    No.

Q68    Are you aware of any consumer complaints made to the Bureau of Insurance or
the Virginia State Bar concerning the activities of Title America, LLC?

A68    No.

Q69    Are you aware of any consumer complaints made to the Bureau of Insurance or
the Virginia State Bar concerning USA Title, LLC?

A69    No.

Q70    Has Title America, LLC ever been named as a defendant in a lawsuit?

A70    Yes.

Q71    Has USA Title, LLC ever been named as a defendant in a law suit?

A71    No.

Q72    Are you aware of any violations under the federal consumer protection laws by MediaPro, LLC as alleged by the Commissioner in his Revised License Denial?

A72    No.

Q73    Has Media Pro, LLC ever been named as a defendant in a lawsuit?

A73    Yes.

Q74    What were the suits related to ?

A74    Vendor purchases.  One suit was settled; the other suit is still pending.

Q75    Did either of the lawsuits in which Media Pro, LLC was named as a defendant have anything to do with violations under the federal consumer protection laws?

A75    No.

Q76    Subparagraphs (a) through (g) of paragraph 2 of the Revised License Denial contains specific allegations regarding the alleged unlicensed mortgage brokering activities by Equity Plus Financial, Inc., Equity Plus Financial, LLC and Equity Guaranty, LLC.  I direct your attention to the first allegation: (a) misrepresenting credit offered as pre-approved or firm.  Do you have any knowledge of the basis of this allegation by Commissioner Face?

A76    The Commissioner's first allegation appears to stem from the July 2002 Report of Examination of Guaranty National Bank by the OCC.

Q77    What is your understanding on the nature of this purported violation by the OCC?

A77    The OCC appears to believe that GNB's direct mail solicitation pieces that included the term "pre-approved" were violations of the Federal Trade Commission Act – Unfair or Deceptive Acts or Practices.

Q78    In your opinion, why did the OCC make that assertion?

A78    Because the OCC believed that the criteria GNB used to obtain the prescreened list from the credit reporting agencies was different than GNB's criteria for its investor's underwriting guidelines.

Q79    Is this OCC correct in its belief?

A79    No.

Q80    Did Equity Guaranty, as consultant, provide advice to GNB related to its use of the term "pre-approved" in GNB's direct mail solicitations?

A80    Yes.

Q81    Even today, are you aware of any prohibition of the use of the term 'pre-approved' in either the FCRA or in the "Background and Summary of the FCRA," issued by the Federal Reserve in its Regulatory Service?

A81    No.

Q82    Did GNB's direct mail solicitations meet the FCRA requirements of a firm offer of credit?

A82    Yes.

Q83    How did GNB's direct mail solicitations meet the FCRA requirements of a firm offer of credit?

A83    The criteria GNB used to generate the prescreened lists obtained from the credit reporting agencies was consistent with the criteria used for GNB's investor underwriting guidelines, even if GNB didn't communicate that properly to the OCC during its examination.

Q84    If the criteria GNB used to generate the prescreened lists obtained form the credit reporting agencies was consistent with the criteria used for GNB's investor underwriting guidelines, then why does the OCC report indicate that the use of the term 'pre-approved' on GNB's direct mail solicitations was deceptive and substantially misled customers thereby violating the Federal Trade Commission Act?

A84    GNB simply did not properly disclose to the OCC all the criteria used to generate the prescreened lists obtained from the credit reporting agencies.

Q85    Do you know approximately how many direct mail solicitations Guaranty National Bank sent out during the time Equity Guaranty acted as consultant?

A85    Yes.  Approximately two-hundred million (200,000,000).

Q86    Do you know approximately how many complaints the Office of the Comptroller of the Currency received regarding Guaranty National Bank's use of the term 'pre- approved' as deceptive in its direct mail solicitations?

A86    Yes.

11

Q87    How many?

A87    One complaint was received by the OCC out of 200,000,000 direct mail
solicitations.

Q88    I direct your attention to page 2 of DeVan Shumway's original pre-filed testimony
where he indicates that Calusa's direct mail solicitation contains the use of the
term "pre-approved". Is Calusa's direct mail solicitation a firm offer of credit as
defined in the FCRA?

A88    Yes.

Q89    Does Calusa submit its direct mail solicitation pieces to the consumer reporting
agency from whom it purchases their prescreened solicitation lists from?

A89    Yes.

Q90    Why does Calusa take the additional step?

A90    The credit reporting agency requires it to ensure its own compliance and Calusa's
compliance with the FCRA requirement of a firm offer of credit.

Q91    Are you aware of any other mortgage lenders in Virginia who use the term "pre-
approved" in their direct mail solicitations?

A91    Yes. In fact, we collect them for benchmarking and a small sampling is attached
as Calusa Exhibit 25.

Q92    I direct your attention to the Revised License Denial's second allegation: (b)
obtaining credit reports for impermissible purposes. Do you have any knowledge
of the basis of this allegation by Commissioner Face?

A92    It appears to stem from the July 2002 Report of Examination of Guaranty
National Bank by the OCC as well.

Q93    What is your understanding of the purported violation by the OCC?

A93    It appears as though GNB's management for reasons unknown didn't disclose to
the OCC all relevant components of the prescreening solicitation process that
GNB utilized to generate its prescreened lists. As a result, the OCC believed the
solicitation lists GNB generated didn't comply with the FCRA firm offer of credit
requirement and as such, were obtained for impermissible purposes.

Q94    Did the prescreening solicitation process that Equity Guaranty advised Guaranty
National Bank to use comply with the FCRA requirement of a firm offer of
credit?

12

A94    Yes.

Q95    If the prescreening solicitation process GNB utilized complied with the FCRA requirement of a firm offer of credit, then how is it that the OCC's Report of Examination purports it to be a violation?

A95    It appears as though the OCC was only looking at the "second level" cut of credit criteria. There is a "first level" cut of credit criteria that includes all the items listed as lacking by the OCC in GNB's prescreening solicitation process. See Calusa Exhibit 26.

Q96    As consultants to GNB, what was Equity Guaranty's involvement in GNB's management responses to the OCC purported violations?

A96    Equity Guaranty was only tangentially involved with GNB's management responses to the OCC on the purported FCRA – Permissible Purposes of Consumer Reports violations.

Q97    If given the opportunity, would Equity Guaranty have readily provided a more thorough explanation to the OCC ensuring that both levels of the cuts of credit criteria were completely understood?

A97    Yes.

Q98    Does Calusa's prescreening solicitation process comply with the FCRA requirement of a firm offer of credit?

A98    Yes.

Q99    How does Calusa's prescreening solicitation process comply with the FCRA requirement of a firm offer of credit?

A99    Calusa's criteria for its prescreened solicitation process is consistent with Calusa's criteria for its investor's underwriting guidelines therefore, a firm offer of credit is granted and the FCRA requirement is complied with.

Q100    I direct your attention to the third allegation in Commissioner Face's Revised License Denial: (c) failing to give notification of consumer rights. Do you have any knowledge of the basis of this allegation by Commissioner Face?

A100    Yes. It appears to stem from the July 2002 Report of Examination of Guaranty National Bank by the OCC.

Q101    What is your understanding of the nature of the purported violation by the OCC?

13

A101   I believe it relates to certain disclosures of notifications when a credit report is used and adverse action notices that GNB indicated did not go out in a timely manner due to unforeseeable and extenuating circumstances.

Q102   What were those unforeseeable and extenuating circumstances that could have prevented the GNB mortgage operation from sending out adverse action notices in a timely manner?

A102   In February 2002, it became public knowledge that GNB had been put under a formal letter of agreement once again with the OCC and that single enforcement action caused a tidal wave throughout the Chantilly mortgage operation.

Q103   What else at GNB occurred during this time frame of February 2002?

A103   GNB's primary investor ceased purchasing all of GNB's mortgage loans, even the ones they had already issued commitments on.

Q104   During February 2002, approximately how many employees did GNB have at the Chantilly location?

A104   Anywhere between 300 and 400 people.

Q105   In March 2002, approximately how many employees did GNB have at the Chantilly location?

A105   As consultants, we recommended that GNB immediately lay off at least 50% of the staff. With no investor, no income stream and a substantial dollar volume of loans on GNB's warehouse line with no home, it was the only course of action that was reasonable given the circumstances.

Q106   In April 2002, approximately how many employees did GNB have at the Chantilly location?

A106   Between 50 and 100 people.

Q107   What happened to the people, the departments and the processes that had been put in place by Equity Guaranty's consulting services to GNB to ensure timely delivery of adverse action notices?

A107   Frankly, everything just sort of collapsed. GNB employees who survived the first round of layoffs were leaving in droves for other opportunities without much notification to anyone and certainly without any regard to any tasks for GNB left undone.

Q108   What type of tasks?

14

A108    Sending out adverse action notices for one. Putting the appropriate designation if a loan application was cancelled versus withdrawn versus denied so the appropriate notice could be generated and sent to the applicant. Returning phone calls to loan applicants who no longer had who a contact person as their loan officer was either laid off or simply didn't return to work are just a few examples of the tasks.

Q109    At any time did Equity Guaranty, as consultant to GNB provide advice to GNB that they should not send out adverse action notices in a timely manner?

A109    No.

Q110    At any time did Equity Guaranty, as consultant to GNB provide advice to GNB that it doesn't matter what the actual disposition is on loan application – specifically, it doesn't matter if it is a cancelled, denied or withdrawn application – they're all the same and the disclosure to the applicant is irrelevant?

A110    No.

Q111    I direct your attention to the fourth allegation in Commissioner Face's Revised License Denial: (d) failing to give, and retain evidence of giving, adverse action notices. Do you have any knowledge of the basis of this allegation by Commissioner Face?

A111    It appears to stem from the July 2002 Report of Examination of Guaranty National Bank by the OCC. It also seems to be a repeat of the Commissioner's third allegation with one addition.

Q112    We've established what your understanding is of the purported violations by the OCC in the Commissioner's third allegation. What is the additional item referenced in the fourth allegation by the Commissioner?

A112    The fourth allegation vis-à-vis the adverse action notifications is a repeat of the Commissioner's third allegation; however, the additional item in the Commissioner's forth allegation relates to retaining copies of the adverse action notices.

Q113    Did Equity Guaranty advise GNB to retain copies of adverse action notices for two years as required by ECOA?

A113    Yes.

Q114    Realizing the ECOA requirements for GNB, and the large number of loan applications, did Equity Guaranty advise GNB that the loan origination system itself could suffice for the purposes of retaining copies of the adverse action notices for a period of at least two years?

15

A114    Yes.

Q115    Were adverse action notices retained by the loan origination system?

A115    Yes.

Q116    Was there any problems with the adverse action notice retention?

A116    Yes.

Q117    What were the problems?

A117    The loan origination system defaulted to current date whenever one attempted to access the adverse action notice that was previously printed in the loan origination system.

Q118    Did Equity Guaranty recommend that GNB scan in any other documents for purposes of institutionalizing them?

A118    Yes. In fact, all loan documents were filed electronically which auditors typically appreciate for ease of access, uniformity and consistency.

Q119    I direct your attention to the fifth allegation in Commissioner Face's Revised License Denial: (e) failing to disclose the identity of affiliated settlement service providers.   Do you have any knowledge of the basis of this allegation by Commissioner Face?

A119    Again it appears to stem from the July 2002 Report of Examination of Guaranty National Bank by the OCC.

Q120    What is your understanding of the nature of the violation by the OCC?

A120    GNB did not consistently disclose the name, address and phone number of lender required settlement service providers for credit reports, flood certifications, electronic appraisals on its GFEs and TILs.

Q121    Are you familiar with GNB's management response to the OCC regarding this matter?

A121    Yes.

Q122    Did GNB's management misunderstand the nature of the violation?

A122    Yes.

16

Q123    Did Equity Guaranty as consultant to GNB attempt to correct GNB's management response to be more reflective of the actual violation as purported by the OCC?

A123    Yes.

Q124    Did GNB in fact have required providers of settlement services for credit reports, flood certifications and electronic appraisals?

A124    Yes.

Q125    Were GNB's lender required settlement service providers disclosed on the Good Faith Estimates?

A125    Yes. Unless however, there were any type of hiccup with the loan origination system.

Q126    Did Equity Guaranty advise GNB that it was not necessary to disclose the name, address and phone number of lender required settlement service providers?

A126    No.

Q127    Does Calusa have lender required settlement service providers for Credit reports, flood certifications and electronic appraisals?

A127    Yes.

Q128    Does Calusa fully disclose the lender required settlement service providers for credit reports, flood certifications and electronic appraisals on all its GFEs?

A128    Yes. Calusa includes the name, address and telephone number of each lender required settlement services provider.

Q129    I direct your attention to the sixth allegation in Commissioner Face's Revised License Denial: (f) failing to accurately disclose finance charges. Do you have any knowledge of the basis of this allegation by Commissioner Face?

A129    Again appears to stem from the July 2002 Report of Examination of Guaranty National Bank by the OCC.

Q130    What is your understanding of the nature of the violation by the OCC?

A130    By the OCC's own admission in the Report of Examination, the APRs in the transactions reviewed were not out of tolerance. There also appeared to be a discrepancy between what GNB considered to be included in the finance charges and what the OCC considered to be included in the finance charges. However, not large enough of a discrepancy to warrant reimbursement but large enough to

17

constitute a finance charge violation.

Q131    How does this violation pertain to Equity Guaranty as a consultant to GNB?

A131    It doesn't.

Q132    I direct your attention to the seventh allegation in Commissioner Face's Revised
License Denial: (g) failing to quote APRs in telephone solicitations.  Do you have
any knowledge of the basis of this allegation by Commissioner Face?

A132    Again it appears to stem from the July 2002 Report of Examination of Guaranty
National Bank by the OCC.

Q133    What is your understanding of the nature of the violation cited by the OCC?

A133    It Appears that the OCC didn't think the GNB employees were verbally quoting
the APRs when customers inquired.

Q134    Did Equity Guaranty as consultant to GNB provide advice to GNB that APRs
should not be quoted upon customer inquiries?

A134    No.

Q135    Did Equity Guaranty seek advice from outside counsel with respect to the
appropriateness or necessity of verbally quoting APRs upon customer inquiries?

A135    Yes.

Q136    What was the advice that outside counsel provided to Equity Guaranty with
respect to verbally quoting APRs upon customer inquiries?

A136    Equity Guaranty was told by outside counsel that it wasn't necessary to verbally
quote APRs upon customer inquiries.

Q137    I direct your attention to the eighth allegation in Commissioner Face's Revised
License Denial: (h) other acts and practices.   Do you have any knowledge of the
basis of this allegation by Commissioner Face?

A137    No, I would need more specifics.

Q138    Paragraph 3 of the Revised License Denial lists activities allegedly conducted by
Equity Plus Financial, Inc., Equity Plus Financial, LLC or Equity Guaranty,
LLC.  I direct your attention to the first allegation which states that the Shumway
companies, 'made deceptive offers of credit not actually available.'  Do you know
the source of these allegations?

18

A138   It appears to stem from the Report of Examination of GNB by the OCC.
In fact, it is almost exactly the same allegation referenced by the Commissioner in
paragraph 2(a).

Q139   I direct your attention to the second allegation which the Commissioner states that
the Shumway companies, 'made deceptive offers of credit not based on knowing
actual known credit capacity.' Do you know the source of these allegations?

A139   It appears to stem from the Report of Examination of GNB by the OCC.
Again, this relates back to the Commissioner's first allegation in paragraph 2(a)
regarding firm offers of credit. In fact, it is almost exactly the same allegation
referenced by the Commissioner in paragraph 2(a) as well as the same allegation
the Commissioner referenced in paragraph 3(a).

Q140   I direct your attention to the third allegation which the Commissioner states that
the Shumway companies, 'falsely disclosed credit terms.' Do you know the
source of these allegations?

A140   It appears as though it relates back to the Report of Examination of GNB by the
OCC. Moreover, it seems to specifically relate to the Commissioner's first
allegation in Paragraph 2(a) which also happens to relates to the Commissioner's
first and second allegations in Paragraph 3(a) and (b).

Q141   Is it your testimony that the Commissioner's first three allegations in Paragraph 3
are unfounded and without justification or basis?

A141   Yes. For the same reasons that the Commissioner's first and second allegations in
Paragraph 2 were unfounded and without justification or basis.

Q142   I direct your attention to the fourth allegation which the Commissioner states that
the Shumway companies, 'concealed the charging of excessive broker fees'. Do
you agree with the Commissioner's allegation?

A142   No. As I previously testified, none of entities that Commissioner Face is referring
to in his fourth allegation were in the business of brokering mortgage loans. As
such, there was never any concealment of charging excessive broker fees.
Specifically, EquityPlus Financial, Inc., EquityPlus Financial, LLC, Equity
Guaranty, LLC, Title America, LLC., USA Title,LLC., and Media Pro, LLC were
not in the business of brokering mortgage loans.

Q143   Paragraph 4 of the Commissioner's Revised License Denial states that the
applicant's principals have an "utter disdain for the compliance with the laws and
regulations applicable to the mortgage lending/brokering business". Is this an
accurate characterization of the principals of Calusa?

A143   No. I believe if that was a correct statement, Calusa Investments would not be

19

seeking to be licensed in Virginia. I do not believe Calusa Investments would be licensed in thirty states if Calusa or I did not want to comply with the laws and regulations in the various states in which Calusa operates. I do not believe that Calusa Investments would have passed examinations in all five states that have examined its operations if it had an utter disdain for compliance with laws and regulations. I do not believe that Calusa would have had its license renewed in every state in which a renewal has been required if it had an utter disdain for the compliance with the laws and regulations applicable to its business Calusa would not have spent the substantial amount of resources on computer software, training and outside legal counsel if it sought to ignore the laws and regulations applicable to this business.

Q144    Paragraph five of the Revised License Denial states that Calusa has violated various state and federal laws in the course of conducting its business under licenses issued by other states. Do you agree with this statement?

A144    No. Calusa Investments has been examined by five states. Two of those states, Georgia and Colorado, found no exceptions. All the exceptions found by Kentucky, South Carolina and Kansas were addressed to the complete satisfaction of the regulators and Calusa's license was renewed in each state.

Q145    Is this the end of your supplemental pre-filed testimony?

A145    Yes.