**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- )
 )
In re:                                                                )     Case No. 12-12020 (MG)
 )
RESIDENTIAL CAPITAL, LLC, et al.,              )     Chapter 11
 )
                                        Debtors.        )     Jointly Administered
 )
------------------------------------------------------------------------- )

**STIPULATION AND ORDER RESOLVING OCWEN LOAN SERVICING, LLC'S
RESERVATION OF RIGHTS WITH RESPECT TO DEBTORS' PROPOSED
STIPULATION AND ORDER RELATING TO THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN AGREEMENTS OF FREDDIE MAC
PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE,
APPROVING AN AMENDMENT TO THE ASSET PURCHASE
AGREEMENT AS CONTEMPLATED HEREBY,
<u>AND RELATED RELIEF</u>**

Subject to the approval of the Court, this stipulation and order (the "**<u>Stipulation and Order</u>**") is made and entered into by, between, and among the debtors and debtors in possession in the above-captioned bankruptcy cases (collectively, the "**<u>Debtors</u>**") and Ocwen Loan Servicing, LLC ("**<u>Ocwen</u>**," and collectively with the Debtors, the "**<u>Parties</u>**").

**WHEREAS**, on May 14, 2012 (the "**<u>Petition Date</u>**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**<u>Bankruptcy Code</u>**") in the United States Bankruptcy Court for the Southern District of New York (the "**<u>Court</u>**");

**WHEREAS**, on the Petition Date, the Court entered an order jointly administering the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. Since the Petition Date, the Debtors have operated and managed their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code;

WHEREAS, on the Petition Date, the Debtors filed the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (I)(A) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expenses Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 61] (the "**Sale Motion**");

WHEREAS, on May 16, 2012, the United States Trustee for the Southern District of New York appointed a nine-member official committee of unsecured creditors [Docket No. 102] (the "**Creditors' Committee**");

WHEREAS, following an auction, certain Debtors and Ocwen entered into an asset purchase agreement, dated as of November 2, 2012, for the sale of substantially all of the Debtors' loan origination and servicing platform assets (as amended from time to time, the "**Ocwen APA**").[1]

I.     **Servicing Transfer Agreement**

WHEREAS, the Federal Home Loan Mortgage Corporation ("**Freddie Mac**") filed certain objections to the Sale Motion, including Docket Nos. 1690, 2101, and

---

[1]    The Ocwen APA is attached as <u>Exhibit 1</u> to the Ocwen Sale Approval Order (defined herein).  The Ocwen APA has been amended from time to time in accordance with the terms of the Ocwen Sale Approval Order (as defined below) or as approved by order of this Court.

2196, objecting to the assumption and assignment of (i) a certain Master Agreement between GMAC Mortgage, LLC ("**GMACM**"), Residential Funding Company, LLC, Ally Bank N.A. ("**Ally Bank**"), and Freddie Mac, dated as of July 22, 2011, and prior master agreements, each of which incorporates the provisions of the Freddie Mac Single-Family Seller/Servicer Guide (the "**Guide**") and the related purchase documents, (ii) certain interim servicing agreements between these parties, and (iii) a Tri-Party Agreement, dated August 10, 2011 (collectively, the "**Freddie Mac Agreements**"), and asserting cure claims and objecting to the lack of adequate assurance of future performance;

WHEREAS, on November 21, 2012, the Court approved the sale of the Debtors' platform servicing assets and entered the *Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (I) (A) Sale Of Debtors' Assets Pursuant to Asset Purchase Agreement With Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [Docket No. 2246] (the "**Ocwen Sale Approval Order**"), approving the sale of, among other things, certain Freddie Mac Agreements to Ocwen;

WHEREAS, on February 6, 2013, the Debtors and Freddie Mac entered into a *Stipulation and Order Relating to the Assumption and Assignment of Certain Agreements of Freddie Mac Pursuant to Section 365 of the Bankruptcy Code and Related Relief* [Docket No. 2856] (the "**Freddie Mac Stipulation**") to resolve Freddie Mac's outstanding cure claims and objections to the Sale Motion upon the execution of a

3

proposed servicing transfer agreement (the "**Servicing Transfer Agreement**"), attached hereto as Exhibit A;

        **WHEREAS**, on February 12, 2013, Ocwen filed the *Ocwen Loan Servicing, LLC's Reservation of Rights with Respect to Debtors' Proposed Stipulation and Order Relating to the Assumption and Assignment of Certain Agreements of Freddie Mac Pursuant to Section 365 of the Bankruptcy Code and Related Relief* [Docket No. 2888] (the "**Ocwen RoR**") in connection with Ocwen's concern that the Freddie Mac Stipulation was predicated upon the execution of the proposed form of Servicing Transfer Agreement which required Ocwen to assume certain potential obligations and liabilities associated with the Freddie Mac Agreements to be assumed and assigned by Ocwen that Ocwen was not required to assume under the Ocwen APA, including liabilities that could arise as the result of pre-closing acts or omissions of the Debtors.  Specifically, the form of Servicing Transfer Agreement provided for Ocwen's assumption of liability related to (i) certain compensatory fees[2] for loans completing foreclosure after the Closing Date (defined below), which raised issues as to the potential magnitude of such fees; and (ii) certain foreclosure timeline penalties raising issues as to whether and to what extent certain Debtors or Ocwen would be responsible for such foreclosure timeline penalties, and the potential magnitude of such penalties.  In the Ocwen RoR, Ocwen asserted its belief that it is not required to assume these liabilities pursuant to the Ocwen APA or to execute the form of Servicing Transfer Agreement upon which Freddie Mac's consent to the transfer of

---

[2]    The Ocwen APA provides that the Debtors are responsible for all compensatory fees related to a failure to adhere to the standard foreclosure timeline required by the Guide for Freddie Mac loans for which the date occurring ninety (90) days prior to the expiration of the applicable standard foreclosure timelines occurs on or before the Closing Date.  In recent discussions with Freddie Mac, the Parties learned that Freddie Mac was requiring Ocwen to assume in the Servicing Transfer Agreement all compensatory fees accruing post-closing, which exceeded the liabilities Ocwen would have otherwise been required to assume under the Ocwen APA.

the Freddie Mac Agreements was predicated without a clarification regarding the protections afforded to Ocwen with respect to such liabilities and obligations.

    **II.**     **Ally Bank Servicing Agreement**

    **WHEREAS**, prior to the Petition Date, GMACM entered into a subservicing agreement with Ally Bank (the "**Ally Bank Servicing Agreement**") in connection with the servicing of certain loans. Under the Ally Bank Servicing Agreement, the Debtors are obligated to continue servicing these loans until such Agreement ends by its terms, which is on May 16, 2013;

    **WHEREAS**, the Ocwen APA contains a form of estate subservicing agreement (the "**Estate Subservicing Agreement**") which sets forth the terms under which Ocwen would subservice certain servicing obligations remaining in the estate post-Closing Date;

    **WHEREAS**, pursuant to Section 2.15 of the Ocwen APA, Ocwen has the right to exclude certain contracts from those being assumed and assigned under the Ocwen APA, and Ocwen opted to exercise that right to exclude the Ally Bank Servicing Agreement from those it intended to assume and assign in connection with the sale;

    **WHEREAS**, the pricing the Debtors received from Ally to continue the subservicing of these loans under the Ally Bank Servicing Agreement was lower than that which the Debtors would have to pay Ocwen to subservice these loans under the Estate Subservicing Agreement, and the Debtors requested that Ocwen agree to subservice the Ally Bank Subservicing Agreement at the price the Debtors received from Ally (*i.e.*, $8.00 per loan);

**WHEREAS**, absent Ocwen's agreement to reduce the pricing associated with the subservicing the loans under the Ally Bank Subservicing Agreement and the entry into this Stipulation and Order, this subservicing pricing differential would have resulted in a loss to the estates of approximately $7.5 million, assuming a February 15, 2013 Closing Date;

**WHEREAS**, the Debtors seek to complete the transfer under the Ocwen Sale Approval Order as set forth in the Ocwen APA on February 15, 2013 (the "**Closing Date**"[3]);

**WHEREAS**, the Parties have engaged in good-faith negotiations with the objective of resolving outstanding issues set forth herein on the terms and conditions set forth in this Stipulation and Order;

**WHEREAS**, the Debtors have discussed with the Creditors' Committee the Stipulation and Order and resolutions contained herein;

**WHEREAS**, the Ocwen Sale Approval Order provides, in pertinent part, that the Ocwen APA and related documents may be modified, amended, or supplanted by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement dot not have any adverse effect on the Debtors' estates (Ocwen Sale Approval Order ¶ 30);

**WHEREAS**, the Debtors do not believe that the resolution upon the terms set forth in  this Stipulation and Order and an amendment to the Ocwen APA embodying

---

[3]    The Closing Date as used herein is subject to change, and all references to the Closing Date shall reflect any such change in date.  Additionally, pursuant to the Ocwen Sale Approval Order and the Ocwen APA, certain assets are subject to transfer at a later date pursuant to the agreement of the Parties.

the terms hereof would have any adverse effect on the Debtors' estates but seek entry of this Stipulation and Order out of an abundance of caution;

WHEREAS, the Debtors and the Creditors Committee believe that entry into this Stipulation and Order is in the best interests of the estates;

WHEREAS, venue of this proceeding and the Sale Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

NOW THEREFORE, it is hereby STIPULATED and AGREED by the Parties that:

1.      The recitals form an integral part of this Stipulation and Order and are fully incorporated herein.

2.      In connection with the transfer of the Freddie Mac Agreements and conditioned upon the approval of the terms set forth in this Stipulation and Order, prior to the Closing Date, certain Debtors, Ocwen and Freddie Mac will execute the Servicing Transfer Agreement to memorialize and effectuate the transfer of the Freddie Mac Agreements from the Debtors to Ocwen.

3.      The Parties hereby agree that the Debtors shall reduce the portion of the Purchase Price (as defined in and determined by the Ocwen APA) which Owcen is to pay in respect of the assets relating to the Freddie Mac Agreements by $49.5 million.  In exchange for this reduction in the Purchase Price, Ocwen agrees to enter into the Servicing Transfer Agreement and assume (i) any and all foreclosure delay-related costs, fees and penalties of any kind (including, without limitation, compensatory fees) for loans completing foreclosure after the Closing Date, and (ii) any and all additional costs and penalties of any kind assessed by Freddie Mac after the Closing Date in connection with

foreclosure (including, without limitation, foreclosure penalties and repurchase claims).

Ocwen shall have no liability for (i) any and all foreclosure delay-related costs, fees and

penalties of any kind (including, without limitation, compensatory fees) for loans

completing foreclosure on or before the Closing Date, and (ii) any and all additional costs

and penalties of any kind assessed by Freddie Mac on or before the Closing Date in

connection with foreclosure (including, without limitation, foreclosure penalties and

repurchase claims), as the costs, fees and penalties described in the foregoing clauses (i)

and (ii) shall be Retained Liabilities pursuant to the Ocwen APA, which such liabilities the

Debtors assert have been settled pursuant to the Freddie Mac Stipulation.

4.      Additionally, Ocwen agrees that (i) Ocwen shall not be entitled to

any Purchase Price reduction with respect to expenses incurred in connection with any

PSA Amendment, provided that Ocwen reserves all rights under the Ocwen APA with

respect thereto, and (ii) there will be no further reduction in the Purchase Price in

connection with the consummation of the transactions contemplated by the Ocwen APA on

the Closing Date, except as previously provided for in the Ocwen APA or as otherwise

agreed to by the Parties.

5.      Ocwen agrees to modify the Estate Subservicing Agreement with

respect to the Ally Bank portfolio of loans to be serviced pursuant to the Ally Bank

Servicing Agreement, and will subservice these loans on behalf of the estate at the same

pricing levels set forth in the Ally Bank Servicing Agreement (*i.e.*, $8.00 per loan).

6.      The Stipulation and Order constitutes the entire agreement and

understanding between the Parties with regard to the matters addressed herein, and

supersede all prior and contemporaneous discussions, negotiations, understandings and

agreements, whether oral or written, express or implied, between and among the Parties hereto regarding the subject matter of the Stipulation and Order.

7.      The Debtors are authorized to execute any other necessary documents with Ocwen to memorialize and/or effectuate the resolution provided for in this Stipulation and Order, including an amendment to the Ocwen APA.

8.      The Parties shall use their good faith efforts to hold the Closing Date of the sale of assets to Ocwen on February 15, 2013.

9.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Stipulation and Order.

10.     Notwithstanding, anything herein to the contrary, this Stipulation and Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System/Federal Deposit Insurance Corporation Consent Order, dated April 13, 2011, by and among Ally Financial Inc., Ally Bank, ResCap, GMACM, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012 by the United States District Court for the District of Columbia, dated February 9, 2012, and (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012.

11.     Except as expressly provided herein, nothing in this Stipulation and Order is intended or shall be construed to modify or affect the terms and provisions of, or Ocwen's rights pursuant to, the Ocwen Sale Approval Order.

12.     This Stipulation and Order is not intended to and shall not modify

the terms of the Servicing Transfer Agreement between Ocwen and Freddie Mac or between Freddie Mac and the Debtors, and to the extent of any conflict between the Stipulation and Order and the Servicing Transfer Agreement, the terms of the Servicing Transfer Agreement shall govern the rights and obligations between Freddie Mac and the Debtors and between Freddie Mac and Ocwen after the Closing Date; *provided, however*, solely as between the Debtors and Ocwen, to the extent of an inconsistency between the Servicing Transfer Agreement and any of the Stipulation and Order, the Ocwen APA, and the Ocwen Sale Approval Order, the Stipulation and Order, the Ocwen APA, and the Ocwen Sale Approval Order, as applicable, shall govern.

13.    Nothing in this Stipulation and Order is intended or shall be construed to modify or affect the terms and provisions of the *Stipulation and Order Reserving Rights with Respect to Debtors' Motion for Interim and Final Orders Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business* [Docket No. 1420].

14.    The Stipulation and Order may not be altered, modified, changed or vacated without the prior written consent of the Parties.

15.    This Stipulation and Order shall be binding upon the Parties as well as any successor, trustee or receiver appointed in these chapter 11 cases and upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases to cases under chapter 7.  No provision in any plan of reorganization or liquidation subsequently confirmed in these chapter 11 cases shall contain any provisions inconsistent with the terms of this Stipulation and Order.

16.     This Stipulation and Order may be executed in any number of counterparts by the Parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement.  Any of the Parties may execute this Stipulation and Order by signing any such counterpart, and each such counterpart, including a facsimile or other electronic copy of a signature, shall for all purposes be deemed to be an original.

17.     The Stipulation and Order is subject to the approval of the Court, and shall become effective upon the Court's entry of this Stipulation and Order.  The terms of this Stipulation and Order specifically remain subject to the approval of the Boards of Directors of the applicable Debtors.   No other or further notice to creditors or parties-in-interest is required to effectuate the Stipulation and Order.

[*Remainder of Page Intentionally Left Blank*]

18.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Stipulation and Order.

Dated:  February 14, 2013

/s/ Todd M. Goren
Gary S. Lee
Todd M. Goren
Meryl L. Rothchild
**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel to the Debtors and*
*Debtors in Possession*

Dated:  February 14, 2013

/s/ Jennifer C. DeMarco
Jennifer C. DeMarco
Adam Lesman
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, New York  10019
Telephone: (212) 878-8000
Facsimile: (212) 878-8375

*Counsel to Ocwen Loan Servicing, LLC*

Dated:  February 14, 2013

**ACKNOWLEDGEMENT AND CONSENT:**
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

/s/ Stephen Zide
Kenneth Eckstein
Douglas Mannal
Stephen Zide
**Kramer Levin Naftallis & Frankel LLP**
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel to the Official Committee of Unsecured
Creditors*

**IT IS SO ORDERED**

Dated:  February 15, 2013
        New York, New York

**     /s/Martin Glenn     **
MARTIN GLENN
United States Bankruptcy Judge

## **<u>EXHIBIT A</u>**

Servicing Transfer Agreement

**EXECUTION COPY**

## SERVICING TRANSFER AGREEMENT

  This Servicing Transfer Agreement (the "Agreement") is dated as of February 15, 2013 (the "Effective Date"), by and between the Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States ("Freddie Mac"); Residential Capital, LLC , a limited liability company formed and existing under the laws of the State of Delaware (together with its affiliates, including without limitation GMAC Mortgage, LLC,  a limited liability company formed and existing under the laws of the State of Delaware ("GMACM"), and Residential Funding Company, LLC, a limited liability company formed and existing under the laws of the State of Delaware ("RFC"), jointly and severally "Transferor"); and Ocwen Loan Servicing, LLC, a limited liability company formed and existing under the laws of the State of Delaware ("Transferee"); the foregoing are hereinafter referred to individually as a "Party" and collectively as the "Parties".

  WHEREAS, GMACM and RFC are the Servicers of certain Mortgages pursuant to one or more master servicing contracts, pursuant to the *Freddie Mac Single-Family Seller/Servicer Guide* (as amended from time to time, the "Guide") and pursuant to the other "Purchase Documents" as defined in the Guide; and

  WHEREAS, on May 14, 2012, Residential Capital, LLC ("ResCap") and certain of its subsidiaries, including GMACM and RFC, commenced voluntary cases under chapter 11 of title 11 of the United States Code before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), styled as In Re: Residential Capital, LLC, et. al., Case No. 12-12020 (MG) (the "Bankruptcy Proceeding"); and

  WHEREAS, Transferor and Transferee entered into that certain Asset Purchase Agreement (the "Servicing Sale Agreement"), dated as of November 2, 2012 (a true and correct, fully executed copy of which has been provided to Freddie Mac on or before the Effective Date), pursuant to which Transferor has agreed to assign, sell, convey and transfer the Servicing (the "Servicing Sale") with respect to certain of the Mortgages (the "Transferred Mortgages") as of February 15, 2013 (the "Servicing Sale Date"); and

  WHEREAS, Transferee is acquiring certain assets of Transferor, including Transferor's servicing platform, and Transferee has offered employment to certain of Transferor's employees. The transfer of legal and beneficial ownership of Servicing with respect to the Transferred Mortgages accomplished by the Servicing Sale, and Transferee's incurring of liability for certain obligations with respect to the Transferred Mortgages, all on the terms and conditions set forth in this Agreement (collectively the "Transfer of Servicing"), shall occur on the Servicing Sale Date. The Servicing Sale Date shall also be the Effective Date of Transfer, as defined in the Guide; and

  WHEREAS, on November 21, 2012, the Bankruptcy Court approved the Servicing Sale Agreement, subject to the satisfaction of various conditions including the consent of Freddie Mac to the Servicing Sale; and

1

WHEREAS, Section 51.24 of the Guide provides that Transferor may not transfer its Servicing portfolio (in whole or in part) without Freddie Mac's prior written consent, and Freddie Mac has not yet granted such consent; and

WHEREAS, Transferor and Freddie Mac have entered into that certain Stipulation and Order dated February __, 2013 (the "Cure Amount Stipulation"), pursuant to which Freddie Mac and Transferor stipulated to an allowed aggregate amount of Freddie Mac's proofs of claim filed in the Bankruptcy Proceeding and provided for mutual releases of certain obligations as more fully set forth therein; and

WHEREAS, the Parties have now agreed to the terms and conditions pursuant to which Freddie Mac will grant its consent to the Transfer of Servicing from Transferor to Transferee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      **Incorporation of Recitals and Exhibits; Capitalized Terms.**

(a)     The foregoing Recitals, together with the exhibits attached hereto, are hereby incorporated herein by reference.

(b)     The Transferred Mortgages are all of the residential mortgage loans associated with the following Seller/Servicer numbers:  996000, 128256, 106953, 101026, 155936, 114736, 148353, 815105 and 277105.  For purposes of clarification, the Transferred Mortgages are also identified in the electronic file (the "Electronic File") that was e-mailed by Franny Landue of Transferor to Tricia McKitty, of Freddie Mac, on February 4, 2013 (a copy of that e-mail is attached hereto as Exhibit A-1); a copy of the responding e-mail from Tricia McKitty at Freddie Mac to Franny Landue of Transferor on February 4, 2013, confirming receipt of Transferor's e-mail identifying the Transferred Mortgages, is attached hereto as Exhibit A-2.  The Electronic File contains two (2) columns, which are (i) the Freddie Mac loan number, and (ii) the applicable Transferor Seller/Servicer loan number.  The Freddie Mac loan number listed in the Electronic File will be the determinative identifier in the event there is any conflict between the two (2) columns for a particular Transferred Mortgage.

(c)     All capitalized terms used in this Agreement and not otherwise defined shall have the respective meanings set forth in the Guide and/or the other Purchase Documents.

2.      **Consent to Servicing Transfer.**

(a)     Freddie Mac hereby grants its consent to the Transfer of Servicing, effective upon execution and delivery of this Agreement and in reliance upon satisfaction of the following requirements: (x) the execution of the Servicing Sale Agreement, including all amendments thereto (all in form and substance acceptable to Freddie Mac in its sole and absolute discretion) by Transferor and Transferee, and delivery of the same to Freddie Mac on or before the Effective Date; (y) Transferee's

2

delivery to Freddie Mac of a detailed description of Transferee's proposed acquisition structure, together with evidence, satisfactory to Freddie Mac in its sole and absolute discretion, of Transferee's financing terms for the Transfer of Servicing; and (z) the receipt and acceptance by Freddie Mac of the following documentation and information required by Freddie Mac for this transaction (the "Transfer Documentation"): a completed and fully executed Form 1107 SF (Seller/Servicer Change Notification) delivered in the timeframe required pursuant to Guide Section 4.11, and multiple originals of the following completed and fully executed Forms: (uu) Form 479A (Servicing Agent Certification), (vv) Form 902 (Authorized User Roles Form), (ww) Form 1035 (Designated Custodian Agreement), (xx) Form 1057 (Letter Agreement for Servicer's Single-Family Principal and Interest, or P&I Disbursement Clearing Custodial Account), (yy) Form 1058 (Letter Agreement for Servicer's Single-Family Buydown or Escrow Custodial Account), and (zz) Form 1132 (Authorization for Automatic Transfer of Funds Through the Automated Clearing House), all prior to the Servicing Sale Date, as determined by Freddie Mac in its sole and absolute discretion. Transferee covenants to, promptly upon request, execute and deliver such other and further documentation as Freddie Mac deems reasonably necessary or appropriate to accomplish the Transfer of Servicing, consistent with Section 7 of this Agreement.

(b)    Freddie Mac's consent to the Transfer of Servicing, granted pursuant to Section 2(a) above, is expressly conditioned upon, and granted in reliance upon satisfaction of the following:

(i)    Freddie Mac's completion of an evaluation and counterparty review of Transferee, prior to the Servicing Sale Date;

(ii)    Freddie Mac's performance of on-site due diligence, acceptable to Freddie Mac in its discretion, of Transferee's operations and personnel, prior to the Servicing Sale Date;

(iii)    Transferee's compliance, from and after the Servicing Sale Date, with the servicing platform plan submitted to Freddie Mac on or about November 15, 2012, approved by Freddie Mac with regard to the use of Transferor's servicing platform on a going-forward basis, including without limitation, Transferee's covenant to maintain Transferor's servicing platform through at least September 16, 2013; the approved servicing platform plan is part of the "Presentation to Freddie Mac, Homeward Residential and ResCap Operational Plan, November 2012" attached hereto as Exhibit E (the "Platform Plan"), provided however, that Transferee may from time to time, with Freddie Mac's consent (not to be unreasonably withheld), amend the Platform Plan to address circumstances (A) arising after the Servicing Sale Date, or (B) unknown to Transferee at the time of the Servicing Sale Date, such that the Platform Plan will in all material respects continue to comply with Transferee's covenant to maintain Transferor's servicing platform through at least September 16, 2013;

3

(iv)  Transferee's compliance, from and after the Servicing Sale Date, with the employee engagement, retention and integration plan submitted to Freddie Mac on or about November 15, 2012, approved by Freddie Mac with regard to engagement and retention of Transferor's employees, and integration of Transferor's management team into Transferee's management team, including without limitation Transferee's covenant to retain the specified percentage of Transferor's employees and management team for the specified period of time, all as set forth in the Servicing Sale Agreement (the terms of which, to the extent the same pertain to management and staffing, are incorporated herein by this reference); the approved employee engagement, retention and integration plan is part of the "Presentation to Freddie Mac, Homeward Residential and ResCap Operational Plan, November 2012" attached hereto as Exhibit E (the "Retention Plan"), provided however, that Transferee may from time to time, with Freddie Mac's consent (not to be unreasonably withheld), amend the Retention Plan based upon circumstances (A) arising after the Servicing Sale Date, or (B) unknown to Transferee at the time of the Servicing Sale Date, such that the Retention Plan will, in all material respects, continue to comply with Transferee's covenant to retain the specified percentage of Transferor's employees and management team for the specified period of time, all as set forth in the Servicing Sale Agreement (the terms of which, to the extent the same pertain to management and staffing, are incorporated herein by this reference);

(v)  Transferee's compliance, from and after the Servicing Sale Date, with the loan migration plan submitted to Freddie Mac on or about November 15, 2012, approved by Freddie Mac (or as subsequently amended with Freddie Mac's prior express written consent), with regard to migrating loans off of Transferor's platform and onto Transferee's platform, in a timeframe consistent with such plan; the approved loan migration plan is part of the "Presentation to Freddie Mac, Homeward Residential and ResCap Operational Plan, November 2012" attached hereto as Exhibit E (the "Loan Migration Plan"), provided however, that Transferee may from time to time, with Freddie Mac's consent (not to be unreasonably withheld), amend the Loan Migration Plan to address circumstances (A) arising after the Servicing Sale Date, or (B) unknown to Transferee at the time of the Servicing Sale Date, such that the Loan Migration Plan will in all material respects continue to comply with the original Loan Migration Plan timeframe;

(vi)  Transferor's and Freddie Mac's execution and delivery of the Cure Amount Stipulation, and the Bankruptcy Court's approval of such stipulation, all prior to the Effective Date, stipulating to an allowed amount and/or other satisfactory treatment of Freddie Mac's Proofs of Claim numbers 4875 and 4899, filed in the Bankruptcy Proceeding;

(vii)  Transferee's prompt reimbursement of fifty percent (50%) of Freddie Mac's costs arising out of or relating to maintaining Cenlar (or its replacement) as a stand-by interim servicer ("Hot Servicing Back-Up Arrangement"), which fifty percent (50%) share is stipulated as a monthly fee of Twenty-Five Thousand Dollars ($25,000) due and payable on the first Business Day of each month

4

beginning March 1, 2013 and continuing through the earlier of the date the migration of the Transferred Mortgages off the GMAC platform is complete or December 31, 2013, provided that Transferee may replace Cenlar as the stand-by interim servicer, with another Freddie Mac–approved interim servicer and pay all start-up and monthly fees directly to the replacement interim servicer, or Transferee may negotiate its own monthly fee with Cenlar as the stand-by interim servicer;

(viii)  Transferee's implementation of and compliance with, from and after the Servicing Sale Date, the plan attached hereto as <u>Exhibit D</u> (the "<u>Servicing Remediation and Mitigation Plan</u>") previously submitted to and approved by Freddie Mac, with regard to mitigation or remediation of all existing Servicing operational and CORE audit deficiencies (including without limitation, chronic reporting issues), such that the identified deficiencies shall be mitigated or remediated to Freddie Mac's satisfaction in its sole and absolute discretion, prior to the dates specified in the Servicing Remediation and Mitigation Plan, <u>provided however</u>, that Transferee may from time to time, with Freddie Mac's consent (which shall be granted or withheld in Freddie Mac's sole and absolute discretion), amend the Servicing Remediation and Mitigation Plan to address circumstances (A) arising after the Servicing Sale Date, or (B) unknown to Transferee at the time of the Servicing Sale Date, such that the Servicing Remediation and Mitigation Plan will continue to ensure that the identified deficiencies shall be mitigated or remediated to Freddie Mac's satisfaction in its sole and absolute discretion, prior to the dates specified in the Servicing Remediation and Mitigation Plan;

(ix)  Transferee's and Ally Bank's execution and delivery, prior to the Servicing Sale Date, of Form 479A pursuant to which Transferee will assume the contract obligations for which GMACM is currently acting as Servicing Agent and otherwise sub-service the portfolio of Freddie Mac-owned loans for which Ally Bank is the Servicer of record, pursuant to one or more existing Master Agreements, <u>provided that</u> Transferee's liability as Servicing Agent shall be limited to its acts or omissions from and after the Servicing Sale Date;

(x)  Transferee's execution and delivery, on or before February 28, 2013, of written agreements with Freddie Mac, in form and substance acceptable to Freddie Mac in its sole and absolute discretion, with respect to performance metrics pertaining to Servicing the Transferred Mortgages; Transferee shall otherwise service the Transferred Mortgages pursuant to one or more existing Master Agreements and the Guide;

(xi)  Freddie Mac's receipt, prior to the Servicing Sale Date, of Ally Financial Inc.'s (as successor in interest to GMAC, Inc.) written reaffirmation of its guaranty for the benefit of Freddie Mac, pursuant to a guaranty dated on or about March 17, 2010, with respect to those obligations not released pursuant to the Settlement Agreement (defined in <u>Section 3(a)(i)</u> of this Agreement);

(xii)  Freddie Mac's receipt, prior to the Servicing Sale Date, of Ally Financial Inc.'s written reaffirmation of two guarantees it issued for the benefit of Freddie Mac with respect to the Servicing obligations of Ally Bank as to Mortgages which are not a part of the Transferred Mortgages, pursuant to a guaranty agreement dated May 1, 2012 (with respect to Master Agreement # 12032349) and a guaranty agreement effective August 1, 2012 (with respect to renewal Master Agreement # 12060449);

(xiii)  Transferee's execution and delivery, prior to the Servicing Sale Date, of all documents necessary or appropriate to accomplish Transferee's assumption of the interim servicing contract obligations for which GMACM is currently liable, with respect to approximately five hundred eleven (511) Mortgages under Seller/Servicer numbers 122250 (US Mortgage), 174206 (Merit Mortgage) and 111990 (Community Banks of Colorado) which Mortgages are identified on Exhibits A-3 and A-4, which Mortgages are not a part of the Transferred Mortgages;

(xiv)  Freddie Mac's receipt, on or prior to the Effective Date, of all amounts due and payable by Transferor pursuant to the Cure Amount Stipulation;

(xv) Transferee agrees to hold a summit meeting with Freddie Mac on or before March 31, 2013 for the purpose of discussing in detail Transferee's servicing practices as the same relate to Freddie Mac's non-agency Private Label Securities servicing portfolio Mortgages as set forth in Exhibit B (as the same may be modified in the event Transferee acquires Servicing for other Mortgages which are a part of securities in which Freddie Mac is an investor, collectively the "PLS Mortgages");

 (xvi)  Transferee shall deliver the following monthly reports relating to the prior monthly period, to Freddie Mac or to Freddie Mac's vendor, with respect to PLS Mortgages serviced, directly or indirectly, by Transferee:

 (A) beginning May 15, 2013, and continuing on the fifteenth (15th) day of each month (or the next Business Day, if the 15th of any month is not a Business Day) until April 15, 2014, key performance indicator reports with respect to loss mitigation, default management and other servicing practices for all PLS Mortgages, in the form which Transferee provided to Freddie Mac in December 2012, subject to modifications as mutually agreed upon by Freddie Mac and Transferee on or before February 28, 2013; and (B) beginning May 15, 2013, and continuing on the fifteenth (15th) day of each month (or the next Business Day, if the 15th of any month is not a Business Day) until April 15, 2014, data extract of loan level data (including outstanding advances) with respect to all PLS Mortgages, including a data dictionary and including fields as mutually agreed upon by Transferee and Freddie Mac on or before February 28, 2013. Transferee's failure to comply with any provision of this Section 2(b)(xvi) shall not affect Freddie Mac's consent to the Transfer of Servicing granted pursuant to Section

2(a) of this Agreement, unless such failure continues unremedied for twenty (20) calendar days following the date on which written notice of such failure was provided to Transferee consistent with Section 12 of this Agreement. All materials to be delivered to Freddie Mac pursuant to this Section 2(b)(xvi) shall be delivered via ftp to Freddie Mac or Freddie Mac's vendor. For the avoidance of doubt, Freddie Mac's vendor is subject to the confidentiality requirements set forth in Section 8 of this Agreement, and Freddie Mac's vendor shall execute an agreement with Freddie Mac binding such vendor to the confidentiality, non-disclosure, use and disclosure obligations consistent with the terms of Section 8 of this Agreement. Transferee's compliance with the provisions of this Section 2(b)(xvi) shall be performed at Transferee's sole expense. Transferee shall have no obligation to provide any information pursuant to this Section 2(b)(xvi) if (x) delivery of such information to Freddie Mac would violate the terms of any agreement related to the Private Label Securities or applicable law, or (y) the information is otherwise publicly available. Any information provided by Transferee to Freddie Mac pursuant to this Section 2(b)(xvi) shall be subject in all respects to Section 8 of this Agreement;

(xvii) Transferee's compliance, prior to and from and after the Servicing Sale Date, with each and every term of the Consent Order (the "Consent Order") attached hereto as Exhibit C, entered into on December 5, 2012 with the New York State Department of Financial Services ("NYSDFS") to the extent applicable to any Transferred Mortgage, including without limitation, Transferee's prompt delivery to Freddie Mac of any written notice received by Transferee from NYSDFS or its designee pursuant to the Consent Order, finding that Transferee is not in compliance with the Consent Order, but only to the extent disclosure of such findings is not prohibited by applicable law, provided that NYSDFS alone shall make any determination of Transferee's compliance or non-compliance with the Consent Order;

(xviii) Freddie Mac's receipt, prior to the Effective Date, of required approvals for the transactions contemplated by this Agreement, including, without limitation, approval by its board of directors and approval by the Federal Housing Finance Agency, to the extent applicable; and

(c) Freddie Mac's consent specifically recognizes that:

    (i)    The Transfer of Servicing with respect to the Transferred Mortgages (under the Guide and the other Purchase Documents) shall occur on the Servicing Sale Date;

    (ii)    On the Servicing Transfer Date, Transferee is acquiring certain assets of Transferor, including Transferor's servicing platform, and has offered employment to certain of Transferor's employees, such that there will not be any physical transfer of the Servicing of the Transferred Mortgages;

7

(iii)  Transferee is authorized to utilize any waiver, special underwriting provision, or other amendment of a Guide section (each a "Term of Business" and collectively, the "Terms of Business") included in the Purchase Documents and applicable to Servicing the Transferred Mortgages, such that if the Terms of Business, by their express terms, apply to one or more Transferred Mortgages before the Servicing Sale Date, then such Terms of Business will apply to the Transferred Mortgages (but not to any other Mortgages) on and after the Servicing Sale Date;

(iv)  Transferor shall not be required or permitted to repurchase, from Transferee, the legal and beneficial ownership of the Servicing with respect to the Transferred Mortgages;

(v)  As set forth in Section 3(b) of this Agreement, Transferee shall not be liable to Freddie Mac, and Freddie Mac shall not assert claims against Transferee for any and all losses, damages, deficiencies, claims, costs or expenses and any right to indemnification, repurchase and any other remedy with respect to the Transferor Obligations (defined below), subject to the terms of Sections 4(d) and 6(b) of this Agreement; and

(vi)  Freddie Mac shall execute and deliver, prior to the Servicing Sale Date, documents, in form and substance acceptable to Freddie Mac in its sole and absolute discretion, consenting to Transferee's pledge of its rights to reimbursement advances and its legal and beneficial ownership of the Servicing with respect to the Transferred Mortgages, to lenders financing the Transfer of Servicing.

3.  **Transferor's Representations, Warranties and Covenants.**

(a)  The parties comprising Transferor have been released from liability to Freddie Mac with respect to the obligations set forth in the Cure Amount Stipulation approved in the Bankruptcy Proceeding, including the "Transferor Obligations" defined as follows:

(i)  GMACM's and RFC's joint and several liability under the Partial Release of Liability Agreement dated as of March 17, 2010 (the "Settlement Agreement"). The obligations of GMACM and RFC under the Settlement Agreement are collectively herein called the "Settlement Obligations");

(ii)  Liability under the Purchase Documents with respect to the Transferred Mortgages, as to the "Origination and Sale Obligations" defined to include (without limitation):

(A)  representations, warranties, covenants and agreements regarding loan instruments and documentation, legal enforceability, first lien priority status, the Borrower's income and credit qualifications, the Borrower's source and amount of down payment, the value and

acceptability of collateral, the verification and documentation of the Transferred Mortgages, the contents of the Transferred Mortgage file, and the investment quality and overall eligibility of each Transferred Mortgage for sale to Freddie Mac; and

(B)    repurchase, indemnification and any other remedies available to Freddie Mac under the Purchase Documents  with respect to a breach of any representations, warranties, covenants or agreements as described in Section 3(a)(ii)(A) above; and

(iii)    Liability under the Purchase Documents with respect to the Transferred Mortgages, as to the "Prior Servicing Obligations" defined to include, without limitation, the representations, warranties, covenants and agreements relating to GMACM's, RFC's or any other prior Servicer's servicing obligations and duties that arose or existed (under the Guide and related provisions of other Purchase Documents, whether or not identified prior to the Servicing Sale Date) prior to the Servicing Sale Date, including, but not limited to, requirements relating to day-to-day loan administration activities, reporting and remitting, and foreclosure and loss mitigation activities with respect to the Transferred Mortgages prior to the Servicing Sale Date.

(b)    Transferee shall not be liable to Freddie Mac, and Freddie Mac shall not assert claims against Transferee for any and all losses, damages, deficiencies, claims, costs or expenses and any right to indemnification, repurchase and any other remedy with respect to the Transferor Obligations, subject to the terms of Sections 4(d) and 6(b) of this Agreement; and

(c)    Except as may be explicitly set forth in this Agreement, nothing herein is intended to add to, subtract from, or otherwise amend the (i) the Settlement Obligations; (ii) the Origination and Sale Obligations with respect to the Transferred Mortgages; (iii) the Prior Servicing Obligations, or (iv) the obligations pursuant to the Purchase Documents applicable to any particular Party, it being understood that Transferor shall be released from the foregoing obligations to the extent expressly provided in the Cure Amount Stipulation.

**4.    Transferee's Obligations, Agreements, Representations, Warranties and Covenants.**

(a)    INTENTIONALLY OMITTED

(b)    Transferee covenants to perform or comply (as applicable) with the following, from and after the Servicing Sale Date and, subject to the terms of Sections 4(d) and 6(b) of this Agreement, Transferee shall be liable to Freddie Mac for any and all losses, damages, deficiencies, claims, costs or expenses and Freddie Mac may assert its rights (which shall be cumulative) to repurchase, indemnification, and/or any other remedy at law, in equity or pursuant to the Guide and the other Purchase Documents, for Transferee's failure to perform or comply (from and after the

9

Servicing Sale Date) with the following, all with respect to the Transferred Mortgages:

(i)       Performance of the Servicing representations, warranties, covenants and agreements (the "Servicing Obligations") arising out of or relating to the servicing obligations and duties (under the Guide and related provisions of other Purchase Documents) for acts or omissions occurring on or after the Servicing Sale Date with respect to the Transferred Mortgages, such Servicing Obligations to include, without limitation, requirements relating to day-to-day loan administration activities, reporting and remitting, and foreclosure and loss mitigation activities;

(ii)      (A)  Compliance with performance metrics and Terms of Business set forth in all existing agreements between Transferor and Freddie Mac, as the same may have been modified pursuant to Section 2(b)(x) of this Agreement; and

(B)  Compliance with performance metrics and Terms of Business set forth in all agreements between Transferee and Freddie Mac, including without limitation those referenced in Section 2(b)(x) of this Agreement;

(C)  Continuation of the defense and prosecution, as applicable, of all pending pre-foreclosure litigation related to the Transferred Mortgages, to which any party comprising Transferor is a party; and

(D) Compliance with the provisions of Section 2(b) of this Agreement;

(iii)     Payment and performance, from and after the Servicing Sale Date, of the Servicing Obligations under the Purchase Documents between Transferee and Freddie Mac with respect to the Transferred Mortgages;

(iv)      Transferee shall be liable to Freddie Mac for its obligations under any Collateral Pledge Agreement pertaining to the Transferred Mortgages (the "Pledge Agreement"), executed and delivered after the Effective Date, between Freddie Mac and Transferee;

(v)       Transferee shall be liable to Freddie Mac for its obligations under any Collateral Account Control Agreement pertaining to the Transferred Mortgages (the "Control Agreement"), executed and delivered after the Effective Date, by and among Transferee, Freddie Mac and Bank of New York Mellon;

(vi)      Transferee shall be liable to Freddie Mac for its obligations under any Acknowledgement Agreement pertaining to the Transferred Mortgages (the "Acknowledgment Agreement"), executed and delivered after the Effective Date, by and among Transferee, Freddie Mac, and Transferee's lender;

(vi)    Transferee shall be liable for to Freddie Mac for its obligations under any Consent Agreement pertaining to the Transferred Mortgages (the "Consent Agreement"), executed and delivered after the Effective Date, by and among Transferee, Freddie Mac, the Depositor, the Assignee, and the Administrative Agent, as those terms are defined in the Consent Agreement; and

(all of the obligations described in this Section 4(b), are collectively referred to herein as the "Transferee Obligations"). Transferor shall not be liable to Freddie Mac, and Freddie Mac shall not assert any losses, damages, deficiencies, claims, costs or expenses and any right to indemnification, repurchase or any other remedy against any party comprising Transferor or any of their respective direct and indirect affiliates, investors, officers, directors, employees or agents with respect to the Transferee Obligations, subject to the terms of Sections 4(d) and 6(b) of this Agreement. As set forth in Section 3(b) of this Agreement, Transferee shall not be liable to Freddie Mac, and Freddie Mac shall not assert claims against Transferee for any and all losses, damages, deficiencies, claims, costs or expenses and any right to indemnification, repurchase and any other remedy against any Transferee or any of its direct and indirect affiliates, investors, officers, directors, employees or agents with respect to the Transferor Obligations, subject to the terms of Sections 4(d) and 6(b) of this Agreement.

(c)    Transferee represents, warrants and (as applicable) covenants that:

(i)    except for the express provisions of this Agreement, it is not relying upon any information provided by Freddie Mac in entering into this transaction, nor is it relying on Freddie Mac to identify any deficiencies with respect to the Transferred Mortgages, or the prior servicing thereof;

(ii)    it has performed a due diligence review of a sampling of the Servicing to be transferred hereunder before entering into this Agreement, including without limitation, such review of the Transferred Mortgage files and the Custodial Accounts as Transferee deems appropriate; Transferee acknowledges that (A) it and its legal counsel have had a reasonable opportunity to perform the due diligence deemed by Transferee to be reasonable or customary in a transaction of the nature contemplated herein, and (B) Transferee has not given any notice to Freddie Mac of any negative findings resulting from any due diligence conducted by Transferee;

(iii)    it has performed whatever due diligence review of any outstanding, continuing, released or extinguished Transferor Obligations that it deems appropriate to the extent that such Transferor Obligations are reasonably likely to affect Transferee's performance of its obligations under the Guide (and other Purchase Documents) and/or this Agreement; and

(iv)    in order to perform the Transferee Obligations, Transferee may be required to address and remediate Prior Acts of prior Servicers, consistent with <u>Section 6(b)</u> of this Agreement, including, without limitation, those of Transferor, and Transferee agrees to do so.

(d)

(i)    Any compensatory fees (as defined in the Purchase Documents) assessed by Freddie Mac with respect to the Transferred Mortgages on or after the Servicing Sale Date shall be treated as a Servicing Obligation for which Transferee shall be liable.  Without limiting the generality of the foregoing, the Parties acknowledge and agree that, assuming a Servicing Sale Date of February 15, 2013, Transferee shall be liable for any compensatory fees assessed with respect to any Transferred Mortgage, related to any foreclosure sales occurring on or after February 15, 2013.

(ii)    Notwithstanding <u>Section 4(d)(i)</u> above, this <u>Section 4(d)(ii)</u> shall apply to the two hundred fifty-six (256) Mortgages (the "<u>Timeline Mortgages</u>") listed on <u>Exhibit F</u> attached hereto.  The Parties acknowledge that Freddie Mac has received, from Transferor, Twenty-Seven Million Dollars ($27,000,000) as part of the amounts due and payable by Transferor pursuant to the Cure Amount Stipulation, representing Transferor's settlement of its liability to Freddie Mac for foreclosure timeline penalties and related indemnification amounts (the "<u>Default Timeline Paid Amount</u>") solely with respect to the Timeline Mortgages.  Freddie Mac agrees that (A) Transferee shall not be liable for any Transferor Obligations with respect to the Timeline Mortgages, whether or not accrued or assessed after the Servicing Sale Date, and (B) Freddie Mac shall not exercise its repurchase remedy as to the Timeline Mortgages, for foreclosure timeline violations which occurred prior to the Servicing Sale Date.  Transferee shall, from and after the Servicing Sale Date, service the Timeline Mortgages with the same care and diligence as it is required to service the other Transferred Mortgages pursuant to the Guide and the other Purchase Documents.  Transferee shall not be entitled to any credit for the Default Timeline Paid Amount.

5.    <u>Mortgage Repurchases.</u>

If Freddie Mac determines that one or more Transferred Mortgages must be repurchased due to a breach of the Transferee Obligations, then Freddie Mac will notify Transferee in writing of this determination.  Transferee shall be liable for such repurchase obligations as set forth in <u>Section 4</u> of this Agreement.  Transferee shall have any and all appeal rights regarding such repurchase as set forth in the Guide and the other Purchase Documents between Transferee and Freddie Mac.  Transferee shall remit any and all repurchase funds directly to Freddie Mac within the time frame and to the bank accounts specified by Freddie Mac.  Transferee will be responsible for reporting the repurchase data to Freddie Mac in accordance with the Guide and the Purchase Documents.  Transferee acknowledges and agrees that it will not be entitled to any termination fee as Servicer in connection with any Transferred Mortgage that is repurchased.

12

6.    **Additional Terms.**

(a)    In the event of a conflict between the Guide and this Agreement, the terms of this Agreement shall prevail.  In the event of a conflict between the Servicing Sale Agreement and this Agreement, the terms of this Agreement shall prevail.  In the event of a conflict between the Purchase Documents and this Agreement, the terms of this Agreement shall prevail.

(b)    If Freddie Mac determines that a Servicing breach with respect to a Transferred Mortgage has occurred (for example, but not by way of limitation, a document necessary for the Servicing of the Transferred Mortgage is lost or misplaced shortly before, during, or after the Transfer of Servicing, or errors occur in collection activities), notwithstanding anything to the contrary in the Guide and/or related Purchase Documents, and regardless of whether the initial acts, errors or omissions (collectively, the "Prior Acts") upon which the declaration of a breach is based occurred (A) prior to the Servicing Sale Date, or (B) on or after the Servicing Sale Date, then Freddie Mac shall notify Transferee of such determination (along with Freddie Mac's determination, pursuant to the Guide, of how such breach should be remedied or cured); provided that Freddie Mac reserves the right, based upon information that subsequently becomes available to it, to change such initial determination.  If Freddie Mac determines (taking into account all facts and circumstances brought to its attention) that the Prior Acts occurred prior to the Servicing Sale Date, then the obligation and liability to cure or remedy the breach shall be part of the Prior Servicing Obligations.  If Freddie Mac determines (taking into account all facts and circumstances brought to its attention) that the Prior Acts occurred on or after the Servicing Sale Date, then the obligation and liability to cure or remedy the breach shall be part of the Transferee Obligations.  To the extent that Transferee is obligated to cure or remedy the breach, Transferee hereby agrees to discharge such obligation and liability within the time frame set forth in the Guide and the other applicable Purchase Documents (subject to any right of appeal as set forth in the Guide and such applicable Purchase Documents).

(c)    The Parties agree that the provisions of this Agreement as between Freddie Mac and Transferee shall not be affected or impaired by any discharge of the obligations of Transferor, or any of the parties comprising Transferor, in the Bankruptcy Proceeding.

(d)    This Agreement shall be a Purchase Document.

(e)    No future assignment of Servicing related to the Transferred Mortgages, shall operate to alter or extinguish the Transferee Obligations, except as may be expressly set forth in a servicing transfer agreement executed and delivered at the time of such future assignment.

(f)    Transferee covenants to reasonably cooperate with Freddie Mac, promptly upon request, with respect to Freddie Mac's efforts to enforce Ally Financial, Inc.'s guaranty of the Settlement Obligations.

## 7.    **Further Assurances.**

The Parties will promptly upon request, from time to time, execute, acknowledge and deliver such supplements to this Agreement and such further instruments as may reasonably be required for carrying out the intention of or facilitating the performance of this Agreement, including but not limited to any amendments to agreements between Transferor, Transferee, and/or Freddie Mac that any Party may reasonably deem necessary to conform those agreements to the terms of this Agreement.

## 8.    **Confidentiality Generally; Confidentiality of PLS Information Specifically.**

(a)    No Party to this Agreement shall issue or cause to be issued any announcement, press release, or other statement, or shall voluntarily disclose (x) information concerning this Agreement, (y) information regarding any of the other agreements, executed contemporaneously herewith, referred to herein and specifically relating to the Servicing Sale, or (z) information provided pursuant to this Agreement, to the press, the general public, or any other person or entity, without the prior written consent of the other Parties hereto.  The foregoing shall not be deemed to prevent a Party from disclosing this Agreement, the terms hereof, or information provided pursuant to this Agreement (except for the PLS Information defined in Section 8(b) of this Agreement):  (i) with the Bankruptcy Court as part of the approval of the Servicing Sale; (ii) in response to a court order, subpoena, or other demand or request made in accordance with applicable law by a governmental or quasi-governmental body having jurisdiction over such Party (including, without limitation, the Federal Housing Finance Agency and the Office of the Comptroller of Currency), or as otherwise required by applicable law (including, without limitation, applicable Federal securities law), or as that Party may deem reasonably necessary as part of its filings of SEC Forms 8-K, 10-Q or 10-K and related disclosures to investors (each Party will provide an advance copy to the other Parties of any such disclosure relating to this Agreement except for non-public disclosures to private investors on a confidential basis); (iii) to such Party's

14

subsidiaries, affiliates, officers, agents, representatives, attorneys, accountants, auditors, successors, and assigns, and to qualified bidders or investors in connection with the sale of such Party or its assets, who have a need to know, and who are subject to confidentiality, non-disclosure, use and disclosure obligations consistent with the terms of this Section 8.

(b)     Freddie Mac shall not disclose the information provided by Transferee to Freddie Mac pursuant to Section 2(b)(xvi) of this Agreement (the "PLS Information") to the press, the general public, or any other person or entity, without the prior written consent of Transferee. The foregoing shall not be deemed to prevent Freddie Mac from disclosing the PLS Information: (i) in response to a court order, subpoena, or other demand or request made in accordance with applicable law by a governmental or quasi-governmental body having jurisdiction over Freddie Mac (including, without limitation, the Federal Housing Finance Agency and the Office of the Comptroller of Currency), or as otherwise required by applicable law (including, without limitation, applicable Federal securities law), or as Freddie Mac may deem reasonably necessary as part of its filings of SEC Forms 8-K, 10-Q or 10-K and related disclosures to investors (Freddie Mac will provide an advance copy to Transferee of any such disclosure relating to this Agreement except for non-public disclosures to private investors on a confidential basis); (ii) to the trustee(s) of any applicable non-agency Private Label Securities mortgage pools; (iii) to a governmental or quasi-governmental body having jurisdiction over Freddie Mac (including without limitation, the Federal Housing Finance Agency, the Comptroller of Currency, the Department of Treasury, the Securities and Exchange Commission, the Justice Department and the Office of the Inspector General); (iv) to Freddie Mac's subsidiaries, affiliates, officers, agents, representatives, attorneys, accountants, auditors, successors, and assigns, and to qualified bidders or investors in connection with the sale of Freddie Mac or its assets, who have a need to know, and who are subject to confidentiality, non-disclosure, use and disclosure obligations consistent with the terms of this Section 8. Freddie Mac acknowledges and agrees that some or all of the PLS Information may contain material, non-public information and that the trading of securities while in possession of such non-public information may be restricted under applicable Federal and state securities laws. Freddie Mac agrees that it will not purchase, sell or trade any securities in violation of applicable Federal and state securities laws.

(c)     Freddie Mac further acknowledges and agrees that certain of the PLS Information may constitute Consumer Information (as defined below) and that the privacy and security of Consumer Information may be subject to various Federal and state laws and regulations. Freddie Mac agrees, with respect to the PLS Information, in addition to any other restrictions expressly imposed by this Agreement, that (i) it shall comply with any applicable laws, rules and regulations regarding the privacy and security of Consumer Information, including but not limited to the Gramm-Leach-Bliley Act; (ii) it shall maintain the confidentiality of Consumer Information and it shall not reuse or re-disclose such Consumer Information to the extent prohibited by this Agreement or applicable Federal, State or local law; (iii)

15

it shall maintain adequate physical, technical and administrative safeguards to preserve the confidentiality of Consumer Information in accordance with all applicable laws, including without limitation the safeguards and protections required by the Gramm-Leach-Bliley Act; (iv) it shall promptly notify Transferee of any actual or suspected unauthorized access to Consumer Information or any actual or suspected breach of the confidentiality of Consumer Information; and (v) it shall cooperate with Transferee in connection with any investigation or notification that may be required.  For purposes of this Agreement, "Consumer Information" means all non-public personal information as that term is defined in the Gramm-Leach-Bliley Act of 1999, the regulations promulgated thereunder, and all amendments or supplements thereto.

9.    **Governing Law.**

This Agreement shall be construed, and the rights and obligations of the Parties determined, in accordance with and governed by the laws of the United States.  Insofar as there may be no applicable precedent, and insofar as to do so will not frustrate the purposes of this Agreement or the transactions governed hereby, the local laws of the State of New York shall be deemed reflective of the laws of the United States (without reference to the conflicts of laws principles thereof other than Sections 5-1401 and 5-1402 of the New York General Obligations Law, as the same may be amended or superseded).

10.    **Construction of Agreement.**

In the event of a dispute regarding the meaning of any language contained in this Agreement, the Parties agree that the same should be accorded a reasonable construction and should not be construed more strongly against one Party than against any other Party.

11.    **Entire Agreement.**

This Agreement and the other documents expressly referenced herein constitute the entire agreement between the Parties hereto with respect to the subject matter hereof, and supersede any and all prior representations, statements, discussions and negotiations concerning this Agreement and the subject matter hereof which may have been made or which may have occurred prior to or contemporaneously with the execution of this Agreement.  This Agreement may not be amended, and none of its terms may be amended or waived, except by a writing that specifically refers to this Agreement and that expressly states that it constitutes an amendment, modification or waiver of this Agreement, and which is signed by the Party or Parties against whom enforcement of the amendment, modification or waiver is sought.

12.    **Notices.**

All notices that are required or are permitted hereunder shall be in writing and shall be: (i) hand-delivered, (ii) mailed by certified or registered U.S. Mail, return receipt requested, first class postage prepaid, or (iii) sent via facsimile transmission to the Parties as follows:

16

if to Freddie Mac:                    Freddie Mac
Single Family Servicing and REO
8200 Jones Branch Drive
McLean, VA  22102-3110
Attention:  Senior Vice President, Servicing and REO
Facsimile Number: (703) 903-3465

with a copy to:                    Freddie Mac
Legal Division
8200 Jones Branch Drive
McLean, VA  22102-3110
Attention:  Vice President and Deputy General Counsel,
        Single Family Real Estate Department
Facsimile Number: (703) 903-2559

if to Transferee:                 Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 110
West Palm Beach, FL 33409
Attention:  Paul Koches
Facsimile Number: (561) 682-8177

With a copy to:                  Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60603
Attention:  Jon D. Van Gorp, Esq.
Facsimile Number: (312) 701-7091

if to Transferor:                 Residential Capital, LLC
1177 Avenue of the Americas
New York, NY 10036
Attention:  Thomas Marano
Facsimile Number:  (646) 257-2703

With a copy to:                  Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
Attention:  Gary S. Lee, Esq.
Facsimile Number:  (212) 468-8163

And a copy to:                  Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  Tammy Hamzehpour, Esq., General Counsel
Facsimile Number:  (866) 572-7524

17

And a copy to:           GMAC Mortgage, LLC
                               1100 Virginia Drive
                               Fort Washington, PA
                               Attention: Jim Whitlinger, CFO
                               Facsimile Number: (866) 572-7524

or to such other address or facsimile number as any Party shall designate by written notice to the other Parties in the manner provided herein.

**13.**    **Counterparts; Effective Date.**

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original) and all of which when taken together shall constitute one and the same agreement, with the same effect as if the signatures thereto and hereto were upon the same instrument. The Parties hereto agree that delivery of a counterpart of a signature page to this Agreement by facsimile or electronic transmission shall be effective as delivery of an original executed counterpart of this Agreement. The Parties agree to exchange original executed signature pages within seven (7) calendar days after the date such pages are exchanged by facsimile or electronic transmission.

**14.**    **Approvals.**

Transferor and Transferee each represents and warrants that all approvals and authorizations required by law, corporate bylaw, limited liability company operating agreement or resolution for the execution or enforceability of this Agreement, including without limitation, express approval of the Bankruptcy Court, have been obtained.

**15.**    **Successors and Assigns; No Third Party Beneficiaries.**

(a)    All terms and conditions of this Agreement shall be binding upon and inure to the benefit of successors and permitted assigns of the Parties.

(b)    Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity other than the Parties, their respective successors and permitted assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement, or any provisions contained herein or therein, it being the intention of the Parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Parties, their respective successors and permitted assigns, and for the benefit of no other person or entity.

(c)    Notwithstanding the foregoing, neither Transferor nor Transferee may assign its rights or obligations under this Agreement without Freddie Mac's prior written consent and the consent of the other Party, which consent may be granted or withheld by Freddie Mac's or by the other Party's, sole and absolute discretion.

18

16.    **Captions**.

The captions assigned to provisions of this Agreement are for convenience only and shall be disregarded in construing this Agreement.

17.    **Reservation of Rights.**

Freddie Mac expressly reserves all rights it has, by contract, at law or in equity, to pursue claims against one or more of the parties comprising Transferor, through the auspices of the Bankruptcy Court or otherwise.

[Signatures appear on following page]

Signature page continued from page 19 of that certain Servicing Transfer Agreement dated as of February 15, 2013.

IN WITNESS WHEREOF, intending to be legally bound hereby, the Parties have executed this Agreement as of the day and year first above written.

**FEDERAL HOME LOAN MORTGAGE CORPORATION**


By: _____(SEAL)
Name:
Title:


**RESIDENTIAL CAPITAL, LLC**


By: _____(SEAL)
Name: _____
Title: _____


**GMAC MORTGAGE, LLC**


By: _____(SEAL)
Name: _____
Title: _____


**RESIDENTIAL FUNDING COMPANY, LLC**


By: _____(SEAL)
Name: _____
Title: _____


**OCWEN LOAN SERVICING, LLC**


By: _____(SEAL)
Name: _____
Title: _____

EXHIBIT A-1

E-MAIL FROM TRANSFEROR TO FREDDIE MAC IDENTIFYING MORTGAGES

EXHIBIT A-2

E-MAIL FROM FREDDIE MAC TO TRANSFEROR CONFIRMING IDENTIFIED
MORTGAGES

EXHIBIT A-3

E-MAIL FROM TRANSFEROR TO FREDDIE MAC IDENTIFYING INTERIM SERVICED
MORTGAGES

EXHIBIT A-4

E-MAIL FROM FREDDIE MAC TO TRANSFEROR CONFIRMING IDENTIFIED INTERIM
SERVICED MORTGAGES

EXHIBIT B

FREDDIE MAC'S NON-AGENCY PRIVATE LABEL SECURITIES PORTFOLIO

EXHIBIT C

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES DECEMBER 5, 2012
CONSENT ORDER

EXHIBIT D

SERVICING REMEDIATION AND MITIGATION PLAN

EXHIBIT E

"PRESENTATION TO FREDDIE MAC,
HOMEWARD RESIDENTIAL AND RESCAP OPERATIONAL PLAN, NOVEMBER 2012"

(Including the Servicing Platform Plan, the Employee Engagement, Retention and Integration
Plan, and the Loan Migration Plan)

EXHIBIT F
TIMELINE MORTGAGES