1   **Richard Sax  (SBN 80632)** *richard@rsaxlaw.com*
    **LAW OFFICES OF RICHARD SAX**
2   448 Sebastopol Avenue
    Santa Rosa, CA.  95401
3   Telephone: (707) 525-1824
    Facsimile:  (707) 525-8119
4

5   Attorney for Movant/Creditor Julio Solano

6

7                    UNITED STATES BANKRUPTCY COURT
8                    SOUTHERN DISTRICT OF NEW YORK
9

10  In re RESIDENTIAL CAPITAL, LLC,        CASE NO.:  12-12020-MG
11                Debtor.                  Chapter 11
12
13                                         Jointly Administered
14

15      DECLARATION OF RICHARD SAX IN SUPPORT OF MOTION FOR
        PERMISSION TO EXTEND DEADLINE FOR JULIO SOLANO
16                      TO FILE PROOF OF CLAIM
17
        I, Richard Sax, declare:
18
        1.      I am the attorney for Movant/Creditor Julio Solano in the above entitled
19
    action. I make this declaration in support of Solano's Motion for Permission to Extend
20
    Deadline to File Proof of Claim.   Except as to matters stated on information and belief,
21
    which I am informed and believe to be true, I have personal knowledge of the matters
22
    set forth herein. If called as a witness, I am competent to testify to the following facts.
23
        2.      Attached as Exhibit 1 is a copy of Solano's proposed Proof of Claim.
24
        3.      The debtor has known about Solano's action all along as we received
25
    notice of these proceedings from counsel for GMAC. Solano learned of these
26
    proceedings when the Sax Law Office received Notice of Stay of Proceedings dated May
27
    25, 2012, Exhibit 2.
28

4.    My offices reviewed the Order dated July 13, 2012 and I was advised that the Solano case was the type of case that we were granted relief from the automatic stay pursuant to paragraph 14(a). Whereupon Solano sent the California trial court a Notice of Relief from the Automatic Stay, Exhibit 3, so that the matter could be placed on the Case Management Calendar for trial setting.

5.    In open court on November 29, 2012, it was first brought to my attention that it was GMAC's position that Solano did not have relief from the automatic stay on all of our causes of action and that we did not have relief from the automatic stay to pursue monetary damages. Thereafter I filed Motion for Relief from Automatic Stay on January 10, 2013.

6.    On January 29, 2013, attorney for debtor, James Newton, advised me and I understood for the first time that it was the position of the debtor that Solano could not pursue his claims for monetary damages due to failure to file a Proof of Claim.

7.    I considered filing a Proof of Claim but did not think it was required since the July 13, 2012 Order provided for relief from the automatic stay.

8.    I did not plan on litigating this case in the bankruptcy court.

9.    A copy of Solano's operative Second Amended Complaint in the state court action is attached as Exhibit 4.

10.    I intend to file an Adversary Proceeding against ResCap and GMAC.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on February 13, 2013 at Santa Rosa, California.

Richard Sax

# EXHIBIT 1

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY **COURT FOR THE SOUTHERN DISTRICT OF NEW YORK** | PROOF OF CLAIM |
|---|---|

Name of Debtor:
**GMAC Mortgage LLC**

Case Number:
**12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Law Offices of Richard Sax**

Name and address where notices should be sent:      NameID: 10854624
Law Offices of Richard Sax
**JULIO SOLANO VS GMAC MORTGAGE LLC**
448 Sebastopol Avenue
Santa Rosa, CA 95401

Telephone number: **(707) 525-1824**      email: **richard@rsaxlaw.com**

☐ Check this box if this claim amends a previously filed claim.

Court Claim
Number:
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:      email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ **485,000.00**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Monetary damages from loss of equity arising out of
(See instruction #2) illegal foreclosure plus emotional distress in an
amount according to proof

**3. Last four digits of any number by which creditor identifies debtor:**

**3a. Debtor may have scheduled account as:**

(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**

(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

**Value of Property:** $_____   **Annual Interest Rate**_____%  ☐ Fixed ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any:** $_____      **Basis for perfection:** _____

**Amount of Secured Claim:** $_____      **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature: (See instruction #9)** Check the appropriate box.
☐ I am the creditor.  ☑ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or  ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
(See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Richard Sax
Title:  Attorney
Company:  Law offices of Richard Sax (Signature)      (Date)
Address and telephone number (if different from notice address above):

Telephone number:      Email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

COURT USE ONLY

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

001KC0002_51765-3_domestic_19/021433/128594      12120201208301742591467641

# EXHIBIT 2

CM-180

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| DASKA P. BABCOCK (State Bar No. 215172)<br>SEVERSON & WERSON, a P.C.<br>One Embarcadero Center, Suite 2600<br><br>San Francisco, CA 94111<br>    TELEPHONE NO.: (415) 398-3344   FAX NO. *(Optional):* (415) 956-0439<br>    E-MAIL ADDRESS *(Optional):* dpb@severson.com<br>    ATTORNEY FOR *(Name):* Defendant, | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sonoma
   STREET ADDRESS: 3055 Cleveland Avenue
   MAILING ADDRESS:
   CITY AND ZIP CODE: Santa Rosa, CA 95403
   BRANCH NAME:

PLAINTIFF/PETITIONER: JULIO SOLANO

DEFENDANT/RESPONDENT: GMAC MORTGAGE LLC, et al.

| NOTICE OF STAY OF PROCEEDINGS | CASE NUMBER:<br>SCV249801 |
|---|---|
| | JUDGE: Arthur A. Wick<br>DEPT.: 19 |

**To the court and to all parties:**

1. Declarant *(name):*  DASKA P. BABCOCK

   a. [x] is [ ] the party [x] the attorney for the party who requested or caused the stay.

   b. [ ] is [ ] the plaintiff or petitioner [ ] the attorney for the plaintiff or petitioner. The party who requested the stay
      has not appeared in this case or is not subject to the jurisdiction of this court.

   This case is stayed as follows:

   a. [ ] With regard to all parties.

   b. [x] With regard to the following parties *(specify by name and party designation):* GMAC MORTGAGE LLC

3. Reason for the stay:

   a. [x] Automatic stay caused by a filing in another court. *(Attach a copy of the Notice of Commencement of Case, the
      bankruptcy petition, or other document showing that the stay is in effect, and showing the court, case number,
      debtor, and petitioners.)*

   b. [ ] Order of a federal court or of a higher California court. *(Attach a copy of the court order.)*

   c. [ ] Contractual arbitration under Code of Civil Procedure section 1281.4. *(Attach a copy of the order directing
      arbitration.)*

   d. [ ] Arbitration of attorney fees and costs under Business and Professions Code section 6201. *(Attach a copy of the
      client's request for arbitration showing filing and service.)*

   e. [x] Other: NOTICE OF BANKRUPTCY AND EFFECT OF AUTOMATIC STAY, ATTACHED

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: May 25, 2012

DASKA P. BABCOCK
   (TYPE OR PRINT NAME OF DECLARANT)

▶ *Daska P. Babcock* (SIGNATURE)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-180 [Rev. January 1, 2007] | NOTICE OF STAY OF PROCEEDINGS | Legal<br>Solutions<br>℠ Plus | Cal. Rules of Court, rule 3.650 |

# EXHIBIT 3

1  Richard Sax (SBN 80632) *richard@rsaxlaw.com*
   **LAW OFFICES OF RICHARD SAX**
2  448 Sebastopol Avenue
   Santa Rosa, CA. 95401
3  Telephone: (707) 525-1824
   Facsimile:  (707) 525-8119
4
5  **William Matz (SBN 99059)** *matz@sonic.net*
   8979 Conde Lane, Suite A
6  Windsor, CA 95492
7  Telephone: (707) 837-2161 ext. 121
8
   Attorney for Plaintiff,
9  JULIO SOLANO
10
11                **SUPERIOR COURT OF STATE OF CALIFORNIA**
                          **COUNTY OF SONOMA**
12
13  JULIO SOLANO,                        )   CASE NO.:  SCV-249801
                                         )
14                   Plaintiff,          )   **NOTICE OF RELIEF FROM**
                                         )   **AUTOMATIC STAY**
15  v.                                   )
                                         )
16                                       )
    GMAC MORTGAGE LLC and DOES 1-        )
17  50, inclusive,                       )
                                         )
18                                       )
                     Defendants.         )
19                                       )
20
21         TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:
22         PLEASE TAKE NOTICE that JULIO SOLANO, plaintiff herein, has been granted
23  relief from the Automatic Stay regarding In re: Residential Capital, et al., United States
24  Bankruptcy Court, Southern District of New York, Case No. 12-12020(MG). Item 14 on
25  page 7 of the Final Supplemental Order, entered on July 13, 2012, grants plaintiff relief
26  from the automatic stay.  A copy of the Final Supplemental Order is attached as Exhibit
27  1.
28

ENDORSED
FILED
SEP 2 1 2012
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

1

1

Dated: September 21, 2012

2

_Richard Sax, Attorney for Plaintiff_

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

Notice Of Relief From Automatic Stay

123443.doc

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**FINAL SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019 (I) AUTHORIZING THE DEBTORS TO CONTINUE IMPLEMENTING LOSS MITIGATION PROGRAMS; (II) APPROVING PROCEDURES FOR COMPROMISE AND SETTLEMENT OF CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF ACTION; (III) GRANTING LIMITED STAY RELIEF TO PERMIT FORECLOSURE AND EVICTION PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE DISPUTES TO PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE DEBTORS TO PAY SECURITIZATION TRUSTEE FEES AND EXPENSES**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of a supplemental order under Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108, and Bankruptcy Rule 9019 (i) authorizing the Debtors to continue implementing loss mitigation programs; (ii) approving procedures for the compromise and settlement of certain claims, litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct claims and counter-claims in foreclosure and eviction proceedings (including in states in which non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net/rescap for additional information.

they service senior mortgage loans and own the junior mortgage loans on the underlying

property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions

involving the amount, validity or priority of liens on properties subject to foreclosure

proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee

fees and expenses; and the Court having considered the Whitlinger Affidavit and the Bocresion

Declaration; and the Court having entered the Interim Supplemental Order on June 15, 2012

[Docket No. 391]; and the Court having entered a final order on June 15, 2012 granting the GA

Servicing Motion on a final basis [Docket No. 401]; and the Court having entered a final order

on June 15, 2012 granting the Non-GA Servicing Motion on a final basis [Docket No. 402]; and

it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this proceeding on the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion

having been given and it appearing that no other or further notice need be provided; and the

National Association of Consumer Bankruptcy Attorneys, on its own behalf and in a

representative capacity, two individuals who are debtors under Chapter 13, and Edward Boltz,

counsel for those individuals, having filed jointly the Limited Omnibus Objection To The

Servicing Orders And Debtors' May 31, 2012 Motion For A Supplemental Order [Docket No.

221] (the "NACBA Objection"); and the Committee having filed the Omnibus Response And

Reservation Of Rights Of The Official Committee Of Unsecured Creditors To Certain Of The

Debtors' First Day Motions [Docket No. 240]; and the Debtors having filed the Omnibus Reply

To Objections To Entry Of Final Orders For Specific "First Day" Motions And Related Relief

[Docket. No. 254]; and upon the record of the hearing; and it appearing that the relief requested

2

by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and after due deliberation thereon; and any objections to the Motion, including the

NACBA Objection, having been withdrawn, resolved, or overruled on the merits; and sufficient

cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED on a final basis, as set forth herein, and any

objections to the Motion are hereby overruled;

Loss Mitigation Programs

2.      The Debtors are authorized, but not directed in their sole and absolute

discretion and subject to available funding, to continue developing and implementing loss

mitigation programs and procedures in the ordinary course of their businesses *nunc pro tunc* to

the Petition Date, including, but not limited to, making incentive payments to borrowers in

connection with the closing of short sales, or vacating properties in lieu of foreclosure or eviction

proceedings, or in the form of borrower rebates for loan payoffs including honoring all

obligations related thereto that accrued in whole or in part prior to the Petition Date (collectively,

the "Loss Mitigation Programs"); provided, however, that the aggregate cash payments made by

the Debtors to individual borrowers under the Loss Mitigation Programs that are not reimbursed

to the Debtors shall not exceed $550,000 per month (the "Monthly Cap"), absent consent of the

Committee or further order of the Court; provided, further, however, that to the extent the

Debtors do not exceed the Monthly Cap in any month they shall be entitled to utilize the

difference between the actual amount and the Monthly Cap in any succeeding month.  The

Debtors shall provide monthly reports to the Committee and the Office of the United States

Trustee for the Southern District of New York (the "U.S. Trustee"), which reports shall be in a

3

ny-1046923

form agreed to by the Debtors and the Committee and such additional information as shall be reasonably requested by the Committee, in each case, concerning the Loss Mitigation Programs.

       3.    Cash payments made by the Debtors to individual borrowers under the Loss Mitigation Programs for which the Debtors are not reimbursed shall not exceed $4.2 million in the aggregate, absent consent of the Committee or further order of the Court. For the avoidance of doubt, the limitation on the amount of cash payments provided for in this paragraph 3 is in addition to the limitation on the amount of cash payments provided for in paragraph 12 hereof.

Settlement Procedures

       4.    The Debtors are authorized, but not directed to compromise and settle certain claims brought by the Debtors against any non-insider third parties in connection with foreclosure, eviction, or borrower bankruptcy proceedings (each a "Settling Party") or by a Settling Party against any of the Debtors (each, a "Claim") in accordance with the following two-tiered procedures (the "Settlement Procedures"):

> Tier I: The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts not to exceed $40,000 in full settlement of such Claim (each, a "Tier I Settlement").

> Tier II: The Debtors may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts exceeding $40,000 but less than $100,000 in full settlement of such Claims (each, a "Tier II Settlement"); provided, that in each case:

> (a) The Debtors must provide advance written notice (by formal or informal means, including by e-mail correspondence) of the terms of any Tier II Settlement to (x) the U.S. Trustee, 33

4

Whitehall Street, 21st Floor, New York, New York 10004, Attn:
Brian S. Masumoto, (y) counsel for the Committee, Kramer Levin
Naftalis & Frankel LLP, 1177 Avenue of the Americas New York,
NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal;
and (z) counsel to the administrative agent for the Debtors'
providers of debtor in possession financing, Skadden, Arps, Slate,
Meagher & Flom LLP, 4 Times Square, New York, New York
10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer
(collectively the "Notice Parties")

    (b) Those Notice Parties wishing to object to any proposed
Tier II Settlement must serve a written objection (by formal or
informal means, including by e-mail correspondence) on the
Debtors, so that it is received by no later than 4:00 p.m. (prevailing
Eastern Time) on the day that is seven (7) calendar days from the
date the Notice Parties received written notice of such Tier II
Settlement (the "Settlement Objection Deadline"). Objections
should be addressed to the proposed attorneys for the Debtors,
Morrison & Foerster LLP, 1290 Avenue of the Americas, New
York, New York 10104, Attn: Larren M. Nashelsky
(LNashelsky@mofo.com) and Norman S. Rosenbaum
(NRosenbaum@mofo.com).

    (c) If the Debtors receive a timely objection from a Notice
Party, the parties will confer and attempt to resolve any
differences. Failing that, the Debtors may petition the Court for
approval of the Tier II Settlement in accordance with any case
management orders entered in the Chapter 11 cases. An objection
by a Notice Party with respect to a given Tier II Settlement shall
not delay the finality or effectiveness of any other settlement to
which an objection has not timely been delivered.

    (d) If the Debtors do not receive a written objection to a
Tier II Settlement from a Notice Party by the Settlement Objection
Deadline, then such Tier II Settlement shall be deemed approved
and the Debtors and Settling Parties may carry out the terms of
such Tier II Settlement without further notice or Court approval.

5.    The Debtors shall be required to seek approval from the Court in order to

enter into and consummate any proposed settlement of a Claim with a settlement amount in

excess of $100,000.

6.    The Debtors are authorized in their sole discretion, but not directed, to

settle claims where some or all of the consideration is being provided by a third party and/or

where the Debtors are releasing claims against creditors or third parties provided the Debtors

otherwise comply with the Settlement Procedures.

    7.    The Settlement Procedures are without prejudice to the right of the

Debtors to seek an order of this Court approving additional or different procedures with respect

to specific claims or categories of claims. For claims relating to matters specified in paragraphs

14(a) and 15(a) of this Order that were resolved pursuant to a settlement prior to the Petition

Date, but where such settlement has not been consummated, the Debtors are authorized, but not

directed to, consummate said settlements in accordance with the Settlement Procedures set forth

in this Order.

    8.    Notwithstanding anything to the contrary contained herein, this Order

shall not affect, impair, impede or otherwise alter the right of the Debtors to resolve any

prepetition or postpetition controversy arising in the ordinary course of the Debtors' businesses,

or resolve any controversy authorized by any other order of the Court.

    9.    Nothing in this Order or the Motion shall constitute a determination or

admission of liability or of the validity or priority of any claim against the Debtors, and the

Debtors reserve their rights to dispute the validity or priority of any claim asserted.

    10.    The authority granted in this Order shall not replace or obviate the need to

comply with the Debtors' internal procedures, legal or otherwise, for authorizing the settlements

contemplated in the Motion. All settlements made pursuant to the Settlement Procedures shall,

to the extent applicable, be made in accordance with the Debtors' settlement procedures in effect

as of the Petition Date (the "Internal Settlement Protocol") and as may be amended from time;

provided, however, that the Debtors shall provide the Committee and the U.S. Trustee with

notice of any material changes to the Internal Settlement Protocol.

6

11.    The Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning settlements of any Claims pursuant to the Settlement Procedures.

12.    Cash payments made by the Debtors under the Settlement Procedures shall not exceed $4 million in the aggregate, absent consent of the Committee or further order of the Court.

13.    Any period prescribed or allowed by the Settlement Procedures shall be computed in accordance with Bankruptcy Rule 9006.

Limited Relief from Automatic Stay

*Borrower Foreclosure And Eviction Proceedings*

14.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to (a) pending and future foreclosure actions initiated by the Debtors or in those states providing for non-judicial foreclosures, by a borrower; and (b) pending and future eviction proceedings with respect to properties for which a foreclosure has been completed or is pending, is hereby modified pursuant to the following terms and conditions:

(a)    except as set forth herein, a borrower, mortgagor, or lienholder (each, an "Interested Party") shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor for the purposes of defending, unwinding, or otherwise enjoining or precluding any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction proceeding, where a final judgment (defined as any judgment where the right to appeal or seek reconsideration has expired or has been exhausted) permitting the foreclosure or

7

eviction has not been awarded or, with respect to completed foreclosure sales in Non-Judicial States, where any applicable challenge period has not yet expired, and to prosecute appeals with respect to any such direct claims or counter-claims;

(b)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Interested Party direct claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the Debtors, except where a monetary claim must be plead in order for an Interested Party to a assert a claim to defend against or otherwise enjoin or preclude a foreclosure (each a "Mandatory Monetary Claim"); (ii) for relief that if granted, would not terminate or preclude the prosecution and completion of a foreclosure or eviction; or (iii) asserted in the form of a class action or collective action;

(c)    absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Interested Party on behalf of any other Interested Party or class of Interested Parties;

(d)    under no circumstances shall an Interested Party be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order, including, without limitation, a Mandatory Monetary Claim;

(e)    the Debtors shall retain the right, upon appropriate motion and notice to any affected Interested Party, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the

8

Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

      (f)    nothing set forth herein shall preclude or limit any Interested Party from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Borrower Bankruptcy Proceedings*

     15.    The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who currently has filed, or in the future files, for bankruptcy protection under any chapter of the Bankruptcy Code (a "Bankruptcy Borrower"), is hereby modified pursuant to the following terms and conditions:

      (a)    except as set forth herein, a Bankruptcy Borrower or a trustee duly appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a "Bankruptcy Trustee") shall be entitled to: (i) assert and prosecute or continue to prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to determine the validity, priority or extent of a Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce (including to reduce to $0) or fix the amount of the Debtors' claim or lien against the Bankruptcy Borrower's property; (v) prosecute appeals with respect to items (i) through (iv) above; (vi) seek an accounting from the Debtors with respect to the Bankruptcy

9

Borrower's loan; and (vii) enter into, execute and consummate a written agreement of

settlement with the Debtors where the Debtors elect to enter into such settlement in their

sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (vi)

above;

        (b)      except as set forth herein, a Bankruptcy Borrower shall be entitled to

(i) engage in court-supervised or court-authorized loss-mitigation programs regarding the

Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a

modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and

consummate settlements of claims and liens in accordance with the ordinary course of the

Debtors' business and applicable law;

        (c)      absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's

direct claims, counter-claims, motions or adversary proceedings: (i) for monetary relief of

any kind and of any nature against the Debtors; (ii) for violation of any local, state or

federal statute or other law in connection with the origination of the Bankruptcy

Borrower's loan; (iii) for relief that if granted, would have no effect on the amount,

validity or priority of the Debtors' claim or lien against a Bankruptcy Borrower or the

property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or

(iv) asserted in the form of a class action or collective action; provided however, a

Bankruptcy Trustee or Bankruptcy Borrower, solely in connection with their objections to

Debtors' proof of claim permitted by paragraph 15(a)(i) or proceedings permitted by

15(a)(iii), may assert claims of the type covered by subsection (i) or (ii) of this paragraph

15(c);

10

(d)    absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to any party seeking to intervene to assert related claims

against the Debtors or any class action or collective action brought by any Bankruptcy

Borrower on behalf of any other class of borrowers;

(e)    with the sole exception of objections to Debtors' proofs of claim

permitted by paragraph 15(a)(i) above and proceedings described in 15(a)(iii) above and

solely for purposes of reducing any such claim and not for the purpose of obtaining an

affirmative recovery or award, under no circumstances shall a Bankruptcy Borrower or

Bankruptcy Trustee be entitled to recoup, setoff or collect from the Debtors any judgment

or award related to any direct claim or counter-claim for which the automatic stay has been

lifted by the terms of this Order;

(f)    the Debtors shall retain the right, upon appropriate motion and

notice to any Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any

provision of section 362(a) of the Bankruptcy Code modified by this Order and to the

extent such relief is sought, the Debtors will not object to the Interested Party's telephonic

participation at any hearing on the motion; and

(g)    nothing set forth herein shall preclude or limit any Bankruptcy

Borrower or Bankruptcy Trustee from seeking relief from the automatic stay under section

362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties

in interest.

*Foreclosures By The Debtors On Senior Loans*

16.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to

pending and future foreclosure actions initiated by the Debtors in cases where they act as

11

ny-1046923

servicer for the Senior Loan and also own (or for which the applicable public land records otherwise reflect that the Debtors hold an interest) the Junior Loan with respect to the underlying property (collectively, the "Junior Foreclosure Actions") is hereby modified pursuant to the following terms and conditions:

> (a)    except as otherwise set forth herein, the Debtors shall be entitled to assert and prosecute Junior Foreclosure Actions, whether in a Judicial State or a Non-Judicial State;

> (b)    the Debtors shall be entitled to take such actions as are necessary to extinguish the lien with respect to a Junior Loan or to otherwise ensure clear and marketable title with respect to the property underlying a Senior Loan in connection with any sale or other disposition of such property;

> (c)    the Debtors shall be entitled to seek all appropriate relief with respect to a Senior Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without further order of the Court; and

> (d)    the Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning Junior Foreclosure Actions.

D.    *Actions Involving Amount, Validity Or Priority Of Liens*

> 17.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to

12

properties that are subject to mortgages owned or serviced by the Debtors ("Title Disputes") is

hereby modified pursuant to the following terms and conditions:

(a)    except as otherwise set forth herein, a Third Party Claimant shall be

entitled to assert and prosecute direct claims and counter-claims relating exclusively to the

property that is the subject of the loan owned or serviced by a Debtor in connection with

any Title Dispute, and to prosecute appeals with respect to any such direct claims or

counter-claims;

(b)    absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all pending and future Third Party Claimant direct

claims and counter-claims: (i) for monetary relief of any kind and of any nature against the

Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or

(iii) asserted in the form of a class action or collective action;

(c)    absent further order of the Court, the stay shall remain in full force

and effect with respect to any party seeking to intervene to assert related claims against the

Debtors or any class action or collective action brought by any Third Party Claimant on

behalf of any other Third Party Claimant or class of Third Party Claimants;

(d)    under no circumstances shall a Third Party Claimant be entitled to

enforce against, recoup, setoff or collect from the Debtors any judgment or award related

to any direct claim or counter-claim for which the automatic stay has been lifted by the

terms of the Order;

(e)    the Debtors shall be entitled to take such actions as are necessary to

clear title with respect to property that is subject to a Title Dispute or to otherwise ensure

13

clear and marketable title with respect to such property in connection with any sale,

foreclosure or other disposition of such property;

(f)   the Debtors shall retain the right, upon appropriate motion and

notice to any affected Third Party Claimant, to seek to impose any provision of section

362(a) of the Bankruptcy Code modified by the Order; and

(g)   nothing set forth herein shall preclude or limit any Third Party

Claimant from seeking relief from the automatic stay under section 362(a) of the

Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

<u>Payment of Securitization Trustee Fees and Expenses</u>

18.   The Debtors shall continue to perform all of their respective servicing

duties and servicing related duties, including, but not limited to, their duties as master servicer,

under all the governing agreements (including, without limitation, pooling and servicing

agreements, servicing agreements, or any other agreements concerning or relating to the Debtors'

obligations to reimburse and/or indemnify for reasonable fees, costs, expenses, liabilities, and/or

losses) (collectively, the "<u>Agreements</u>") relating to Debtor-sponsored securitization transactions

and non-Debtor sponsored securitization transactions to which any of The Bank of New York

Mellon Trust Company, N.A., Wells Fargo Bank, N.A., Deutsche Bank Trust Company

Americas, Deutsche Bank National Trust Company, or U.S. Bank National Association, or any

affiliate of such entities acts as trustee for which any Debtor performs servicing duties, in each of

their respective capacities as trustee (collectively, the "<u>Trustees</u>") and one or more of the Debtors

is a party, including but not limited to, making all principal, interest or other servicing advances

(including property protection advances) and reimbursing, indemnifying, defending and holding

harmless the Trustees and the securitization trusts for any liability, loss, or reasonable fees, cost

14

or expense (including fees and disbursements of counsel or agents) incurred by any of the
Trustees in the performance of their duties or their administration of the trusts or other agencies
under the Agreements to the extent required by the Agreements. For the avoidance of doubt, the
Debtors shall pay the reasonable, actual out-of-pocket costs and expenses of the Trustees in
connection with reviewing and analyzing the request by the Debtors to approve the MBS
Settlement Agreement, and in connection with reviewing and analyzing amendments to the
Agreements as necessary or appropriate in connection with any proposed Chapter 11 plan, the
MBS Settlement Agreement or the Platform Sale. Notwithstanding the foregoing, nothing in this
paragraph 18 shall require any Debtor (i) to repurchase any mortgage loans on the basis of
alleged breaches of representations, warranties or other requirements of the Agreements, or make
any make-whole payments with respect to any mortgage loans pursuant to the Agreements; or
(ii) to enforce, as against any other Debtor entity or any non-Debtor affiliate, any provision of the
Agreements under which such other Debtor entity or non-Debtor affiliate are required to
repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or
other requirements of the Agreements, or make any make-whole payments with respect to any
mortgage loans pursuant to the Agreements; and nothing in this paragraph 18 shall be deemed to
impose liability on any Debtor with respect to such alleged breaches or make-whole payment
requirements.

19.    The Trustees shall submit invoices to (a) counsel to the Debtors,
(b) counsel to the Committee, and (c) the U.S. Trustee, and all such invoices shall include (i) an
itemization of all professional fees by task with a detailed description of the work performed in
connection with such task, (ii) a description of related expenses, and (iii) a description of any
indemnity claims. Thereafter, within thirty (30) days of presentment of such invoices, if no

15

written objections to the reasonableness of the fees and expenses charged in any such invoice (or

portion thereof) is made by the Debtors, the Committee, or the U.S. Trustee, the Debtors are

authorized and directed to pay all reasonable fees, costs and expenses and all indemnity claims

referred to in paragraph 18 (including without limitation, attorney, financial advisor, consultant

and expert fees and costs) incurred postpetition by any of the Trustees relating to the

performance of each of the Trustees' duties or the administration of the trusts or other agencies

under the Agreements (the "Trustee Expenses") that are not subject to an objection by the

Debtors, the Committee, or the U.S. Trustee without further order from the Court. Any objection

to the payment of the Trustee Expenses shall be made only on the basis of "reasonableness," and

shall specify in writing the amount of the contested fees and expenses and a detailed basis for

such objection. To the extent an objection only contests a portion of an invoice, the undisputed

portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any

portion thereof) is not otherwise resolved between the Debtors, the Committee, or the U.S.

Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a

determination as to the reasonableness of the disputed amounts. This Court shall resolve any

dispute as to the reasonableness of any fees and expenses.

20.    To the extent either the Committee, or the RMBS Trustees determine that

the Trustee Expenses were improperly or mistakenly allocated to an RMBS trust or to the

Debtors' estates, the Committee and the RMBS Trustees reserve the right to seek to correct the

allocation of the Trustee Expenses as between the RMBS trusts or the Debtors' estates in

accordance with the applicable Agreement, and such adjustment shall be the Committee's and

RMBS Trustees' sole remedy arising from a misallocation. All Trustee Expenses for which

(a) no objection under paragraph 19 has been interposed, or (b) where such an objection has been

16

interposed and the amount of Trustee Expenses determined by the Court to be reasonable, shall

be entitled to administrative expense priority in the Debtors' Chapter 11 cases notwithstanding

the entry of an order authorizing the assumption and assignment or rejection of any Agreement.

However, the Debtors will not be responsible for any fees, costs and expenses incurred with

respect to any Agreement after the entry of an order in the Debtors' Chapter 11 cases authorizing

the rejection of such Agreement.

21.    If any or all of the provisions of this Order are hereafter reversed,

modified, limited, vacated or stayed, such reversal, stay, modification or vacatur shall not affect

the validity, priority or enforceability of any Trustee Expenses incurred prior to the actual receipt

of written notice by the Trustees of the effective date of such reversal, stay, modification or

vacatur (the "Notice Date"). Notwithstanding any such reversal, stay, modification or vacatur,

the payment of any Trustee Expenses incurred prior to the Notice Date and reimbursed prior to

or after the Notice Date by the Debtors shall be governed in all respects by the original

provisions of this Order, and the Trustees shall be entitled to all of the rights, remedies,

privileges and benefits granted in this Order with respect to payment of Trustee Expenses.

22.    Notwithstanding the Debtors' obligations set forth in paragraphs 18 and

19, nothing in this Order shall be deemed to limit, extinguish, or prejudice the Debtors' rights in

any way to assume and assign or reject any Agreement in accordance with Bankruptcy Code

section 365.

Other Relief

23.    Any disputes regarding the extent, application and/or effect of the

automatic stay under this Order shall be heard and determined in the Debtors' jointly

administered bankruptcy cases pending in the United States Bankruptcy Court for the Southern

ny-1046923

District of New York, Case No. 12-12020 in accordance with the Case Management Order entered in the Debtors' cases [Docket No. 141] and such other and further orders as may be entered by the Court.

24.    The Debtors are authorized and empowered to take all actions and execute such documents as may be necessary or appropriate to carry out the relief granted herein.

25.    Nothing herein shall be deemed to limit the rights of the Debtors to operate their business in the ordinary course, and no subsequent order shall be required to confirm such rights.

26.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

27.    Notwithstanding anything to the contrary in this Order, any action to be taken pursuant to the relief authorized in this Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings. All amounts authorized to be paid pursuant to this Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement). To the extent that there is any inconsistency between the terms of this Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

28.    Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

ny-1046923

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

      29.    Nothing in this Order shall discharge, release, or otherwise preclude any

setoff or recoupment right of the United States of America, its agencies, departments, or agents.

      30.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

      31.    Notwithstanding the possible applicability of Bankruptcy Rules

2002(a)(3), 6004(h), 7062 or 9014, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

      32.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.


Dated:      July 13, 2012
             New York, New York


                                /s/Martin Glenn
                                 MARTIN GLENN
                 United States Bankruptcy Judge

19

## PROOF OF SERVICE

I declare that: I am employed in the County of Sonoma, California. I am over the age of eighteen (18) years and not a party to the within case; my business address is 448 Sebastopol Ave, Santa Rosa, CA 95401. On September 21, 2012 I served **NOTICE OF RELIEF FROM AUTOMATIC STAY** on the interested party in said cause by U.S. mail at Santa Rosa, California, addressed as follows:

Daska D. Babcock, Esq.

Severson & Werson

One Embarcadero Center, Suite 2600

San Francisco, CA 94111

Facsimile: (415) 956-0439

Attorneys for Defendant GMAC Mortgage LLC

( )    BY OVERNIGHT DELIVERY, PURSUANT TO CCP § 1013 (c): I placed such sealed envelope for collection and mailing by overnight delivery at Santa Rosa, California, within the ordinary business practices. I am readily familiar with the practices of the Law Offices of Richard Sax, said practice being that in the ordinary course of business; correspondence is either picked up by or delivered to the delivery company the same day as it is placed for processing.

(XX)    BY MAIL: I placed said document in a sealed envelope, with postage thereon fully prepaid for first class mail, for collection and mailing at Santa Rosa, California, following ordinary business practices. I am readily familiar with the practice of The Law Offices of Richard Sax for the processing of correspondence, said practice being that in the ordinary course of business, correspondence is deposited with the United States Postal Service the same day as it is placed for processing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Santa Rosa, California, on September 21, 2012.

Joanne Miller

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I declare that: I am employed in the County of Sonoma, California. I am over the age of eighteen (18) years and not a party to the within case; my business address is 448 Sebastopol Ave, Santa Rosa, CA 95401. On September 21, 2012 I served **NOTICE OF RELIEF FROM AUTOMATIC STAY** on the interested party in said cause by U.S. mail at Santa Rosa, California, addressed as follows:

Daska D. Babcock, Esq.
Severson & Werson
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Facsimile: (415) 956-0439
Attorneys for Defendant GMAC Mortgage LLC

( )    BY OVERNIGHT DELIVERY, PURSUANT TO CCP § 1013 (c): I placed such sealed envelope for collection and mailing by overnight delivery at Santa Rosa, California, within the ordinary business practices. I am readily familiar with the practices of the Law Offices of Richard Sax, said practice being that in the ordinary course of business; correspondence is either picked up by or delivered to the delivery company the same day as it is placed for processing.

**(XX)**    BY MAIL:  I placed said document in a sealed envelope, with postage thereon fully prepaid for first class mail, for collection and mailing at Santa Rosa, California, following ordinary business practices.  I am readily familiar with the practice of The Law Offices of Richard Sax for the processing of correspondence, said practice being that in the ordinary course of business, correspondence is deposited with the United States Postal Service the same day as it is placed for processing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at Santa Rosa, California, on September 21, 2012.

Joanne Miller

1

# EXHIBIT 4

1  **Richard Sax (SBN 80632)** *richard@rsaxlaw.com*
2  **LAW OFFICES OF RICHARD SAX**
   448 Sebastopol Avenue
3  Santa Rosa, CA. 95401
4  Telephone: (707) 525-1824

5  **William Matz (SBN 99059)** *matz@sonic.net*
6  8979 Conde Lane, Suite A
   Windsor, CA 95492
7  Telephone: (707) 837-2161 ext. 121

8
9  Attorneys for Plaintiff Julio Solano

ENDORSED
FILED
APR - 2 2012
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

10           **SUPERIOR COURT OF STATE OF CALIFORNIA**
                      **COUNTY OF SONOMA**
11

12  Julio Solano,                          **CASE NO.:   SCV-249801**
13
                        Plaintiff,         **SECOND AMENDED COMPLAINT**
14                                          **FOR:**
    v.
15                                          1. **To Set Aside Trustee's Sale or for**
16  GMAC Mortgage, LLC, fka GMAC               **Monetary Damages for**
    Mortgage Corporation;  Executive          **Illegal, Willful and Oppressive**
17  Trustee Services, LLC dba ETS Services,    **Sale of Real Property**
    LLC; The Bank of New York Mellon        2. **To Cancel Written Instrument**
18  Trust Company, National Association,    3. **Unfair Competition Under Business**
    fka The Bank of New York Trust            **& Professions Code § 17200 et seq.**
19  Company, N.A. as successor to             **(Unfair Business Act or Practice)**
20  JPMorgan Chase Bank, N.A. as Trustee   4. **Promissory Estoppel**
    for MARM 2004-7; and DOES 1-50,        5. **Negligence**
21  inclusive,                             6. **Negligent Infliction of Emotional**
22                                            **Distress**
23                       Defendants.
24
25                      **Preliminary Allegations**
26  1.      At all times relevant herein, plaintiff JULIO SOLANO (hereinafter "plaintiff")
27  was over the age of 18; a resident of Sonoma County, California; and an owner in fee of
28

1

1   real property and improvements located at 695 Monte Bello Drive, Santa Rosa,

2   California 95403.

3   2.      At all times relevant to this Complaint, defendant GMAC Mortgage, LLC, fka

4   GMAC Mortgage Corporation ("GMAC"), was a California Limited Liability

5   Corporation actively conducting business in the State of California, and the servicer of

6   plaintiff's first mortgage loan on the subject Real Property within the provisions of

7   RESPA [12 USC §2601 et seq.] and the Federal FDCPA [15 USC §1652 et seq.].

8   3.      At all times relevant to this Complaint, defendant Executive Trustee Services,

9   LLC dba ETS Services, LLC ("ETS"), the Foreclosing Trustee of the subject Trustee's

10  Deed Upon Sale, was a Limited Liability Corporation and GMAC company actively

11  conducting business as a provider of non-judicial foreclosure services in the State of

12  California.

13  4.      At all times relevant to this Complaint, defendant The Bank of New York Mellon

14  Trust Company, National Association, fka The Bank of New York Trust Company, N.A.

15  as successor to JPMorgan Chase Bank, N.A. as Trustee for MARM 2004-7 ("Bank of

16  New York Mellon Trust Co."), the Foreclosing Beneficiary of the subject Trustee's Deed

17  Upon Sale, was a nationally chartered trust company that provides trust and custody

18  services to issuers of debt, institutional investors, and individuals, with offices

19  throughout the United States. Bank of New York Trust Co. is based in Miami, Florida,

20  and operates as a subsidiary of The Bank of New York Mellon Corporation.

21  5.      Plaintiff designates all persons unknown claiming any interests in the real

22  property as defendants DOES 1 through 50, inclusive.  Plaintiff is ignorant of the true

23  names, capacities, or basis for liability of defendants sued as DOES 1 through 50 and

24  therefore sues defendants by such fictitious names. DOES 1 through 50 are in some

25  manner liable to plaintiff, or claims some right, title, or interest in the subject property,

26  or both.  Plaintiff will amend this complaint to allege their true names and capacities

27  when ascertained.

28

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

F3to65.doc

6.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Does 1 through 50 were the agents and employees of defendants, and, in doing the things herein described and referred to, were acting within the course and scope of their authority as such agents and employees, and in the transaction of the business of the employment or agency. Defendants are therefore liable to plaintiff for the acts of Does 1 through 50 as herein alleged.

7.    Plaintiff is informed and believes and thereon alleges that, in doing the acts as herein alleged, defendants knew, or in the exercise of reasonable diligence should have known, that Defendants Does 1 through 50 were incompetent and unfit to perform the duties for which they were employed, and that an undue risk to persons such as plaintiff would exist because of the employment.

8.    Defendants, their agents and employees, and their officers, directors, and managing agents, have a duty of due care in the hiring, training, and supervision of employees. Defendants, their agents and employees, and their officers, directors, and managing agents, have a further duty of due care to investigate the background of their employees, especially in light of the particular risk or hazard that the breach of that duty poses to customers within their care.

9.    Defendants, their agents and employees, and their officers, directors, and managing agents, knew, or had reason to know, that their employees and agents, including Does 1-50, because of their qualities, were likely to harm customers.

10.    Defendants, their agents and employees, and their officers, directors, and managing agents, failed to exercise due care in the interviewing, selection, training and supervision of their employees and agents, such that their employees and agents, including Does 1-50, were likely to harm customers.

11.    Defendants, their agents and employees, and their officers, directors, and managing agents, knew, or had reason to know, that their employees and agents had a

3

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

121665.doc

1   history of or propensity to fail to use due care, such that their employees and agents,

2   including Does 1-50, were likely to harm customers.

3   12.     Plaintiff is informed and believes and thereon alleges that Defendants, after

4   being informed of the actions of Does 1 through 50, ratified the employees' conduct by

5   failing to fully investigate, repudiate, and redress the harm done by the employees'

6   conduct, and by letting the transactions proceed and retaining the employees in

7   employment.

8   13.     Plaintiff is informed and believes and thereon alleges that, at all times herein

9   mentioned, each defendant sued herein in relation to the real property plaintiff claims

10   an interest in was the agent and/or employee of each of the remaining defendants

11   thereof, and at all times was acting within the purpose and scope of such agency

12   and/or employment.

13   14.     Whenever in this Complaint an act or omission of a corporation, partnership or

14   other business entity is alleged, the allegation shall be deemed to mean and include an

15   allegation that the corporation, partnership or other business entity acted or omitted to

16   act through its authorized officers, directors, agents, servants and/or employees, acting

17   within the course and scope of their duties, that the act or omission was authorized by

18   the officers and directors of the corporation or business entity.

**FIRST CAUSE OF ACTION**
**TO SET ASIDE TRUSTEE'S SALE OR FOR MONETARY DAMAGES**
**FOR ILLEGAL, WILLFUL AND OPPRESSIVE SALE OF REAL PROPERTY**
**Julio Solano v. All Defendants**

15.     Plaintiff realleges and incorporates by reference paragraphs 1 through 14, above,
as though fully set forth in this action.

16.     On or about October 25, 2002, plaintiff purchased real property and
improvements located at 695 Monte Bello Drive, Santa Rosa, California 95403 (the
subject "Real Property"), which is more particularly described as:

4

PARCEL ONE: LOT 10 AS SHOWN UPON THE MAP ENTITLED WIKIUP ACRES SUBDIVISION, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SONOMA COUNTY ON MAY 30, 2000 IN BOOK 608 OF MAPS, PAGE(S) 34 THROUGH 41, INCLUSIVE, SONOMA COUNTY RECORDS.

PARCEL TWO: AN EASEMENT FOR PUBLIC UTILITIES, PUBLIC SANITARY SEWER, PUBLIC EMERGENCY VEHICLE, PRIVATE DRAINAGE AND PRIVATE INGRESS AND EGRESS PURPOSES AS SHOWN UPON THE MAP ENTITLED WIKIUP ACRES SUBDIVISION FILED IN THE OFFICE OF THE COUNTY RECORDER OF SONOMA COUNTY ON MAY 30, 2000 IN BOOK 608 OF MAPS, PAGE(S) 34 THROUGH 41, INCLUSIVE, SONOMA COUNTY RECORDS.

APN 039-410-010.

17.     On or about May 10, 2004, plaintiff executed a Deed of Trust in the amount of $649,950.00 in favor of beneficiaries Loan Center of California Incorporated and Mortgage Electronic Registration System ("MERS"). The Deed of Trust was recorded in the Official Records of Sonoma County as Instrument No. 2004074831 on May 18, 2004. A copy is attached as Exhibit 1. Paragraph 22 provides for attorneys fees for enforcement of that section.

18.     Plaintiff made payments of approximately $2,900.00 per month on the adjustable rate first mortgage loan, including taxes and insurance. The loan was serviced by defendant GMAC. For approximately seven (7) years after his purchase of the Real Property, plaintiff remained current on his loan payments.

### The Loan Modification Agreement

19.     In on about 2009, in anticipation of the fact that the interest rate on his first mortgage loan was due to adjust upward, plaintiff contacted GMAC to apply for a loan modification. Plaintiff told GMAC that he would continue to make his loan payments and keep his payments current while GMAC considered his application for a loan modification.

5

20.     However, plaintiff was informed by representatives of GMAC that he could not obtain a loan modification because he was current in his loan payments, and therefore was "not struggling." Plaintiff was told that he had to be at least two (2) months behind on his mortgage payments to be considered for a loan modification.

21.     In order to obtain a loan modification, plaintiff fell two (2) months behind in his loan payments and dutifully sent GMAC requested documents and information, spending countless hours on the telephone asking for clarification.

22.     Finally, GMAC offered plaintiff a loan modification, which would keep his payment at approximately $2,900.00 for five (5) more years. Plaintiff was told he must send a payment of approximately $4,800.00 to confirm this loan modification, which plaintiff did.

23.     GMAC then contacted plaintiff and asked for an additional payment of $4,200.00 to begin the loan modification.   Plaintiff asked a representative of GMAC whether he had to send another $4,200.00, since he had just made a payment of $4,800.00. The representative told him that under the circumstances, he did not have to send another payment of $4,200.00.

24.     On or about May of 2009, plaintiff made his first payment under the loan modification. However, his nightmare began when GMAC returned the check with which he had made his payment. Representatives of GMAC told plaintiff that his loan modification was no longer valid, because he did not comply with the request to send the additional $4,200.00. Therefore, plaintiff was in default.

25.     Plaintiff contacted the representative of GMAC who had told him not to pay the additional $4,200.00. The representative told plaintiff not to worry, that it would be alright. However, only about one week later, plaintiff contacted GMAC and was told by other employees that the aforementioned representative of GMAC was "no longer with the company."

//

6

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

121665.doc

### The Notice of Default

26.     On May 20, 2009, Old Republic Default Management Services recorded a Notice of Default in the official records of Sonoma County, California as instrument No. 2009048413, alleging that (a) a breach of the obligation secured by the Deed of Trust had occurred, consisting of plaintiff's alleged failure to pay certain monthly installments of principal and interest, and (b) defendant beneficiary elected to sell, or caused to be sold, the trust property to satisfy that obligation. (Exhibit 2: Notice of Default and Election to Sell.) The foreclosing trustee was ETS, which asked plaintiff to contact MERS in care of ETS for information about the Real Property.

27.     On or about September 9, 2009, plaintiff sent a letter to GMAC stating that he and his wife had both seen their income substantially reduced in the previous three years due to the recession. Plaintiff had four children, with two in college, and was struggling to keep his house, children in college, and business above water. However, plaintiff promised to pay any modification fee that was applicable and the payments monthly.

28.     On or about June 29, 2010, ETS recorded a second Notice of Default in the official records of Sonoma County, California as instrument No. 2010053559, alleging that (a) a breach of the obligation secured by the Deed of Trust had occurred, consisting of plaintiff's alleged failure to pay certain monthly installments of principal and interest, and (b) defendant beneficiary elected to sell, or caused to be sold, the trust property to satisfy that obligation. (Exhibit 3: Notice of Default and Election to Sell recorded on June 29, 2010.) The foreclosing trustee was ETS, which asked plaintiff to contact MERS in care of ETS for information about the Real Property.

### The Notice of Trustee's Sale

29.     On or about September 30, 2010, ETS recorded a Notice of Trustee's Sale in the official records of Sonoma County, California as instrument No. 2010083872, stating that plaintiff's home would be sold at a public action on October 22, 2010 at 10:00 a.m.

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

121565.doc

The unpaid balance and other charges were stated to be $696,840.00. (Exhibit 4: Notice of Trustee's Sale recorded on September 30, 2010.)

### Plaintiff's Tender of the Reinstatement Amount

30.    On or about this time, after making many improvements, plaintiff had at least $500,000.00 in equity in the Real Property, or according to proof, which represents the difference between the fair market value and all encumbrances on the Real Property on the date of the Trustee's Sale.

31.    In or about December of 2010, plaintiff received a letter from GMAC representing that the reinstatement amount due was $53,114.11, which was also reflected on plaintiff's December 20, 2010 Mortgage Account Statement. (See Exhibit 5: a true and correct copy of an invoice from GMAC showing an unpaid amount of $53,114.11.)

32.    Plaintiff confirmed the reinstatement amount with a GMAC employee/agent on or about January 5, 2011.

33.    On or about January 7, 2011, plaintiff tendered the reinstatement amount to GMAC, by remitting a cashier's check for $53,114.11 to GMAC by overnight mail. GMAC received the reinstatement amount of $53,114.11 on January 8, 2011. (See Exhibit 6: a true and correct copy of a cashier's check for $53,114.11 issued by Redwood Credit Union on January 7, 2011; Exhibit 7: a true and correct copy of a Fed Ex label showing shipment by Priority Overnight of the cashier's check to the Payment Processing Department of GMAC Mortgage; Exhibit 8: a true and correct copy of a Fed Ex Shipment Receipt showing shipment by Priority Overnight of the cashier's check to the Payment Processing Department of GMAC Mortgage on January 7, 2011.) As a result, plaintiff was not in default.

34.    On or about January 11, 2011, plaintiff contacted GMAC, which confirmed possession of the cashier's check in the remittance amount of $53,114.11.

8

35.    However, on or about January 11, 2011, employees/agents of GMAC illegally and unlawfully rejected plaintiff's tender and represented to plaintiff that he owed an additional amount of approximately $1,400.00 in order to reinstate his account. GMAC employees and agents represented to plaintiff that the additional funds were necessary to pay attorney fees.

36.    Plaintiff immediately tendered the additional payment of approximately $1,400.00 over the telephone by way of a credit card.

37.    However, GMAC employees and agents refused to accept Plaintiff's credit card payment and tender, which would have reinstated Plaintiff's account and brought his house payments current. The plaintiff was not in default.

38.    GMAC employees and agents insisted that they needed a new cashier's check that included both the reinstatement amount of $53,114.11 and approximately $1,400.00 for attorney fees in the total amount of $54,514.11.

39.    Plaintiff found himself in a "Catch-22" situation as his fervent attempts to tender the reinstatement funds to GMAC, and thus save his home, were stymied and rebuffed by GMAC.

40.    Although GMAC representatives demanded a new cashier's check, they failed and refused to return in a timely manner plaintiff's cashier's check for $53,114.11 that he had sent them and that remained in their possession. Therefore, plaintiff was prevented from forwarding a new cashier's check that would include both the $53,114.11 and the approximately $1,400.00 in attorney's fees that they demanded, thereby avoiding the foreclosure sale of his Real Property.

41.    GMAC intentionally held plaintiff's cashier's check in its possession, and failed and refused to return plaintiff's $53,114.11 for approximately four (4) weeks, from January 8, 2011 to well into February, 2011, after the foreclosure sale of plaintiff's Real Property, so that GMAC and The Bank of New York Mellon Trust Co. could foreclose and obtain the equity in the Real Property.

9

42.    Prior to the Trustee's Sale on February 15, 2011, plaintiff had made many verbal requests to GMAC to honor his tendered reinstatement payments or return his cashier's check, so that he could send a new cashier's check to GMAC that would add and incorporate the demanded attorney fees, thereby preventing the foreclosure sale of his Real Property. As a result, plaintiff was not in default.

43.    On at least January 15, January 20, January 30, and February 5 or 10, 2011, plaintiff sought the aid of Redwood Credit Union, which had issued his $53,114.11 cashier's check, to request that GMAC honor the cashier's check or return the funds, so that he could obtain a new cashier's check in order to again tender the reinstatement funds. The Branch Manager and Supervisor of Redwood Credit Union and two bank tellers contacted GMAC and sought to void the cashier's check in GMAC's possession in order to issue a new cashier's check. Plaintiff also signed a Claim for Refund or Replacement of Official Check Affidavit form given to him by Redwood Credit Union, made to the attention of GMAC Mortgage. (See Exhibit 9: Claim for Refund or Replacement of Official Check Affidavit form issued by Redwood Credit Union and signed by Plaintiff.)

44.    However, GMAC intentionally concealed and refused to provide a facsimile number or other contact information that would allow them to receive the Claim for Refund or Replacement of Official Check Affidavit form in a timely manner, and thereby avoid the foreclosure sale of his Real Property, so that GMAC and The Bank of New York Mellon Trust Co. could obtain the valuable equity in the Real Property.

45.    Finally, on February 24, 2011, GMAC returned plaintiff's above-referenced cashier's check, after the foreclosure sale of his home had been held, with correspondence which stated, in pertinent part, as follows:

> "This letter serves as our response to the correspondence...regarding the above-referenced account dated February 1, 2011 and received in our office on February 7, 2011.

10

"We sincerely apologize for any inconvenience or frustration you have experienced. The correspondence indicates you received a letter reflecting the reinstatement amount due was $53,114.11, which amount was reflected on the December 20, 2010 Mortgage Account Statement and which amount was confirmed with a Bankruptcy Department Representative on January 5, 2011. However, a Motion for Relief from the automatic stay placed by the Chapter 7 bankruptcy filing was granted on January 8, 2011, and foreclosure proceedings resumed.

"Due to the foreclosure status, the amount quoted was no long sufficient to reinstate the account...The check was received by GMAC Mortgage and subsequently returned to you...

"The above-listed property went to trustee sale on February 15, 2011. If you wish to discuss the process of foreclosure, please contact Executive Trustee Services..."

(Exhibit 10: a true and correct copy of a letter dated February 24, 2011.)

46.    On March 11, 2011, ETS requested that a Trustee's Deed Upon Sale be recorded in the official records of Sonoma County, California as instrument No. 2011023076, indicating that plaintiff's home was sold at a public action on February 15, 2011 to The Bank of New York Mellon Trust Co. (Exhibit 11: Notice of Trustee's Deed Upon Sale recorded on March 11, 2011.)

47.    After the Trustee's Sale, plaintiff and his wife and children, who were in a state of shock, immediately moved out of the Real Property and into a motel room, because of their fear of being evicted from their home on the Real Property by the Sonoma County Sheriff.

48.    The Trustee's Sale was improperly held and the Trustee's Deed Upon Sale was wrongfully executed, delivered, and recorded, because there was arguably no breach of the obligation; there were invalid, irregular, and improper presale procedures; and the trustee illegally, fraudulently, and oppressively sold plaintiff's Real Property under a

11

1  power of sale contained in the deed of trust to defendant The Bank of New York Mellon

2  Trust Co.

3  49.    The Trustee's Sale was improper and illegal because plaintiff tendered the

4  reimbursement amounts that GMAC demanded, but GMAC rejected and wrongfully

5  retained plaintiff's tender. On or about January 7, 2011, plaintiff tendered by cashier's

6  check to GMAC the full amount that GMAC demanded to bring his loan current, thus

7  extinguishing the Notice of Default and making the subsequent Trustee's Sale void. On

8  or about January 11, 2011, Plaintiff offered to tender to GMAC by telephone all of the

9  additional monies that GMAC had subsequently claimed were due, which would have

10  cured the alleged problem, if any, with plaintiff's initial tender; but GMAC refused

11  plaintiff's good faith offer. Then GMAC wrongfully withheld plaintiff's cashier's check

12  for over a month, until after the foreclosure, making a new tender by plaintiff

13  impossible.

14  50.    GMAC rejected plaintiff's tender in order to make it impossible for plaintiff to

15  reimburse the amounts that GMAC claimed were due and owing before plaintiff's Real

16  Property was sold at the Trustee's Sale, by withholding plaintiff's cashier's check and

17  refusing to allow plaintiff to reimburse GMAC for the attorney fees by credit card.

18  51.    The Trustee's Sale was improperly held, in violation of the terms and conditions

19  of the promissory note and deed of trust and in violation of the duties and obligations

20  of defendant beneficiary and defendant trustee to plaintiff, all to plaintiff's loss and

21  damage, in that plaintiff has been wrongfully deprived of at least $500,000.00, or

22  according to proof, of equity in the Real Property, the beneficial use and enjoyment of

23  the Real Property, and legal title by forfeiture.

24  52.    Plaintiff has offered, and offers to tender, to defendant beneficiary or defendant

25  trustee all amounts due and owing so that the claimed default may be cured and

26  plaintiff may be reinstated to all former rights and privileges under the promissory

27  note and deed of trust. Plaintiff is ready, willing, and able to tender those sums, if any,

28

12

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

1   that the Court finds due and owing on rendering the accounting requested in this First

2   Amended Complaint.

3   53.   Plaintiff properly tendered the reinstatement amount to defendants and was not

4   in default.   Defendants knew this and nevertheless illegally rejected plaintiff's tender

5   and sold plaintiff's home.   The acts alleged above were willful, wanton, malicious, and

6   oppressive, were undertaken with the intent to defraud, and justify the awarding of

7   exemplary and punitive damages.

8                      **SECOND CAUSE OF ACTION**
                       **To Cancel Written Instrument**
9       **Julio Solano v. Bank of New York Mellon Trust Co.**

10

11   54.   Plaintiff realleges and incorporates by reference paragraphs 1 through 53, above,

12   as though fully set forth in this action.

13   55.   Defendant The Bank of New York Mellon Trust Co. claims an estate or interest in

14   the Real Property described in paragraph 16 of this Second Amended Complaint

15   adverse to that of plaintiff, but defendant's claims are without any right; defendant has

16   no estate, right, title, or interest in the Real Property.

17   56.   The claims of defendant The Bank of New York Mellon Trust Co. are based upon

18   the Trustee's Deed Upon Sale (Exhibit 11), described in paragraph 42 of this First

19   Amended Complaint, purporting to have been executed by defendant ETS and

20   delivered to The Bank of New York Mellon Trust Co., and purporting to convey the

21   Real Property to The Bank of New York Mellon Trust Co. after a public action on

22   February 15, 2011, at which The Bank of New York Mellon Trust Co. was the highest

23   bidder.

24   57.   Although the Trustee's Deed Upon Sale (Exhibit 11) appears valid on its face, it

25   is invalid, void, voidable, and of no force or effect regarding plaintiff's interests in the

26   Real Property described in paragraph 16 of this First Amended Complaint, because the

27   Trustee's Sale was improperly held and the Trustee's Deed Upon Sale was wrongfully

28   executed, delivered, and recorded, in that there was no breach of the obligation and

13

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

121665.doc

1  there were invalid and improper presale procedures, as set forth in the First Cause of

2  Action.

3  58.    The estate or interest in the described Real Property claimed by defendant The

4  Bank of New York Mellon Trust Co., based on the Trustee's Deed Upon Sale, is a cloud

5  upon plaintiff's title in and to the Real Property, tends to depreciate its market value,

6  restricts plaintiff's full use and enjoyment of the Real Property, and hinders plaintiff's

7  right to unrestricted use and enjoyment of it. If the Trustee's Deed Upon Sale is not

8  delivered and cancelled, there is a reasonable fear that plaintiff will suffer serious

9  injury.

**THIRD CAUSE OF ACTION**
**Unfair Competition Under Business & Professions Code § 17200 et seq.**
**(Unfair Business Act or Practice)**
**Julio Solano v. All Defendants**

13  59.    Plaintiff hereby incorporates by reference paragraphs 1 through 59, inclusive, as

14  though fully set forth herein.

15  60.    Plaintiff alleges that by engaging in the following and the above-described acts

16  and practices, GMAC has committed one or more acts of unlawful business practices

17  within the meaning of California Business and Professions Code § 17200, et seq.  These

18  unlawful business practices include, without limitation as to the matters that may be

19  revealed through discovery:

20  61.    In on or about 2009, plaintiff contacted GMAC to apply for a loan modification,

21  promising that he would continue to make his loan payments and keep his payments

22  current while GMAC considered his application for a loan modification. However,

23  plaintiff was informed by representatives of GMAC that he could not obtain a loan

24  modification because he was current in his loan payments, and was "not struggling."

25  Plaintiff was told that he had to be at least two (2) months behind on his mortgage

26  payments to be considered for a loan modification. In order to obtain a loan

27  modification, plaintiff fell two (2) months behind in his loan payments and dutifully

28

14

1  sent GMAC requested documents and information, spending countless hours on the

2  telephone asking for clarification.

3  62.     Finally, GMAC offered plaintiff a loan modification, which would keep his

4  payment at approximately $2,900.00 for five (5) more years. Plaintiff was told he must

5  send a payment of approximately $4,800.00 to receive a loan modification, which

6  plaintiff did. GMAC then contacted plaintiff and asked for an additional payment of

7  $4,200.00 to begin the loan modification.  Plaintiff asked a representative of GMAC

8  whether he had to send another $4,200.00, since he had just made a payment of

9  $4,800.00. The representative told him that under the circumstances, he did not have to

10  send another payment of $4,200.00.

11  63.     On or about May of 2009, plaintiff made his first payment under the loan

12  modification. However, his nightmare began when GMAC returned the check with

13  which he had made his payment. Representatives of GMAC told plaintiff that his loan

14  modification was no longer valid, because he did not comply with the request to send

15  the additional $4,200.00. Therefore, plaintiff was in default.

16  64.     Plaintiff contacted the representative of GMAC who had told him not to pay the

17  additional $4,200.00. The representative told plaintiff not to worry, that it would be

18  alright. However, only about one week later, plaintiff contacted GMAC and was told

19  by other employees that the aforementioned representative of GMAC was "no longer

20  with the company."

21  65.     GMAC's subsequent actions made it impossible for plaintiff to tender the

22  amounts that GMAC claimed were due and owing before the subject Real Property was

23  sold at the Trustee's Sale.

24  66.     In or about December, 2010, plaintiff received a letter from GMAC representing

25  that the reinstatement amount due was $53,114.11, which was also reflected on

26  plaintiff's December 20, 2010 Mortgage Account Statement. (See Exhibit 5.)

27

28

1   67.   Plaintiff confirmed the reinstatement amount with a GMAC employee/agent on
2   or about January 5, 2011.

3   68.   On or about January 7, 2011, plaintiff tendered the reinstatement amount to
4   GMAC, by remitting a cashier's check for $53,114.11 to GMAC by overnight mail.
5   GMAC received the reinstatement amount of $53,114.11 on January 8, 2011. (See Exhibit
6   6, Exhibit 7, and Exhibit 8.)

7   69.   On or about January 11, 2011, plaintiff contacted GMAC, which confirmed
8   possession of the cashier's check in the remittance amount of $53,114.11.

9   70.   However, GMAC illegally and unlawfully rejected plaintiff's tender and
10  represented to plaintiff that he owed an additional amount of approximately $1,400.00
11  in order to reinstate his account. GMAC represented to plaintiff that the additional
12  funds were necessary to pay their attorney fees.

13  71.   Plaintiff immediately tendered the additional payment of approximately
14  $1,400.00 over the telephone by way of a credit card.

15  72.   However, GMAC employees and agents illegally and unlawfully refused to
16  accept Plaintiff's credit card payment and tender, which would have reinstated
17  Plaintiff's account and brought his house payments current.

18  73.   GMAC employees and agents insisted that they needed a new cashier's check
19  that included both the reinstatement amount of $53,114.11 and approximately $1,400.00
20  for attorney fees.

21  74.   Plaintiff found himself in a "Catch-22" situation as his fervent attempts to tender
22  the reinstatement funds to GMAC, and thus save his home, were stymied and rebuffed.

23  75.   Although GMAC representatives demanded a new cashier's check, they failed
24  and refused to return in a timely manner plaintiff's cashier's check for $53,114.11 that
25  he had sent them and that remained in their possession. Therefore, plaintiff was
26  prevented from forwarding a new cashier's check that would include both the

27
28

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

1   $53,114.11 and the approximately $1,400.00 in attorney's fees that they demanded,

2   thereby avoiding the foreclosure sale of his Real Property.

3   76.    GMAC held plaintiff's cashier's check in their possession, and failed and refused

4   to return plaintiff's $53,114.11 for approximately four (4) weeks, from January 8, 2011 to

5   well into February, 2011, after the foreclosure sale of plaintiff's Real Property.

6   77.    Plaintiff made many requests to GMAC to honor his tendered reinstatement

7   payments or return his cashier's check so that he could send a new cashier's check that

8   would add and incorporate the demanded attorney fees, thereby preventing the

9   foreclosure sale of his Real Property.

10  78.    On at least January 15, January 20, January 30, and February 5 or 10, 2011,

11  plaintiff sought the aid of Redwood Credit Union, which had issued his $53,114.11

12  cashier's check, to request that GMAC honor the cashier's check or return the funds, so

13  that he could obtain a new cashier's check in order to again tender the reinstatement

14  funds. The Branch Manager and Supervisor of Redwood Credit Union and two bank

15  tellers contacted GMAC and sought to void the cashier's check in GMAC's possession

16  in order to issue a new cashier's check. Plaintiff signed a Claim for Refund or

17  Replacement of Official Check Affidavit form given to him by Redwood Credit Union,

18  made to the attention of GMAC Mortgage. (See Exhibit 9.)

19  79.    However, GMAC concealed and refused to provide a facsimile number or other

20  contact information that would allow them to receive the Claim for Refund or

21  Replacement of Official Check Affidavit form in a timely manner, and thereby avoid

22  the foreclosure sale of his Real Property.

23  80.    Finally, on February 24, 2011, GMAC returned plaintiff's above-referenced

24  cashier's check with correspondence which stated, in pertinent part, as follows:

25          "This    letter    serves    as    our    response    to    the
26          correspondence...regarding the above-referenced account
27          dated February 1, 2011 and received in our office on
            February 7, 2011.

28

17

"We sincerely apologize for any inconvenience or frustration you have experienced. The correspondence indicates you received a letter reflecting the reinstatement amount due was $53,114.11, which amount was reflected on the December 20, 2010 Mortgage Account Statement and which amount was confirmed with a Bankruptcy Department Representative on January 5, 2011. However, a Motion for Relief from the automatic stay placed by the Chapter 7 bankruptcy filing was granted on January 8, 2011, and foreclosure proceedings resumed.

"Due to the foreclosure status, the amount quoted was no long sufficient to reinstate the account...The check was received by GMAC Mortgage and subsequently returned to you...

"The above-listed property went to trustee sale on February 15, 2011. If you wish to discuss the process of foreclosure, please contact Executive Trustee Services..."

(Exhibit 10.)

81.    On March 11, 2011, ETS requested that a Trustee's Deed Upon Sale be recorded in the official records of Sonoma County, California as instrument No. 2011023076, indicating that plaintiff's home was sold at a public action on February 15, 2011 to The Bank of New York Mellon Trust Co. (Exhibit 11.)

82.    Defendant has failed and refused to accede to plaintiff's request for a restoration of his interest and equity in the Real Property that defendant has acquired from plaintiff by means of such unfair competition.

83.    By virtue of the fraudulent and wrongful acts of defendants, and each of them, defendants received the benefit and unjustly retained the benefit of plaintiff's Real Property, and/or the value of plaintiff's equity in the Real Property, at the expense of plaintiff.

84.    The defendants' acts hereinabove alleged constitute acts of unfair competition within the meaning of Business and Professions Code § 17200, et seq. Plaintiff is

18

1    informed and believes that the defendant will continue to do those acts unless the

2    Court orders the defendant to cease and resist.

3    85.    Each of these unlawful business practices has caused Plaintiff substantial harm,

4    all to plaintiff's loss and damage.

5    86.    As a further direct and proximate result of defendant's wrongful acts, plaintiff

6    has suffered and will continue to suffer substantial pecuniary losses and irreparable

7    injury to his reputation and goodwill. As such, plaintiff's remedy at law is not adequate

8    to compensate for injuries inflicted by defendant. Accordingly, plaintiff is entitled to

9    temporary, preliminary, and permanent injunctive relief.

10    87.    By reason of such wrongful acts, as alleged above, plaintiff was, and will be in

11    the future, deprived of the beneficial use and enjoyment of the Real Property, and

12    plaintiff has been deprived of legal title by forfeiture. Defendants have wrongfully

13    obtained profits and benefits in an amount to conform to proof at trial, but in no event

14    less than the jurisdictional minimum of this Court.

15    88.    The willful, wanton, reckless misrepresentations, deceit, and concealment of

16    known material facts by defendants, with the intention of thereby depriving plaintiff of

17    property or legal rights or otherwise causing injury, was despicable conduct that

18    subjected plaintiff to a cruel and unjust hardship, in conscious disregard of his rights, so

19    as to justify an award of exemplary and punitive damages.

20                           **FOURTH CAUSE OF ACTION**
21                           **Promissory Estoppel**
                             **Julio Solano v. GMAC**

22    89.    Plaintiff hereby incorporates the preliminary allegations and paragraphs 1

23    through 88 of this First Amended Complaint as though fully set forth herein.

24    90.    In on or about 2009, plaintiff contacted GMAC to apply for a loan modification,

25    promising that he would continue to make his loan payments and keep his payments

26    current while GMAC considered his application for a loan modification. However,

27    plaintiff was informed by representatives of GMAC that he could not obtain a loan

28

                                      19
                          Second Amended Complaint
                     Solano v. GMAC Mortgage, LLC, et al.
                                 SCV-249801
                                 121065.doc

modification because he was current in his loan payments, and was "not struggling." Plaintiff was told that he had to be at least two (2) months behind on his mortgage payments to be considered for a loan modification.

91.    In reliance on the promises of GMAC employee/agents, in order to obtain a loan modification, plaintiff fell two (2) months behind in his loan payments and dutifully sent GMAC requested documents and information, spending countless hours on the telephone asking for clarification.

92.    Finally, GMAC offered plaintiff a loan modification, which would keep his payment at approximately $2,900.00 for five (5) more years. Plaintiff was told he must send a payment of approximately $4,800.00 to receive a loan modification, which plaintiff did. GMAC then contacted plaintiff and asked for an additional payment of $4,200.00 to begin the loan modification.  Plaintiff asked a representative of GMAC whether he had to send another $4,200.00, since he had just made a payment of $4,800.00. The representative told him that under the circumstances, he did not have to send another payment of $4,200.00.

93.    In reliance on the promises of GMAC employee/agents, on or about May of 2009 plaintiff made his first payment under the loan modification. However, his nightmare began when GMAC returned the check with which he had made his payment. Representatives of GMAC told plaintiff that his loan modification was no longer valid, because he did not comply with the request to send the additional $4,200.00. Therefore, plaintiff was in default.

94.    Plaintiff contacted the representative of GMAC who had told him not to pay the additional $4,200.00. The representative told plaintiff not to worry, that it would be alright. Plaintiff relied upon the promise of the GMAC employee/agent. However, only about one week later, plaintiff contacted GMAC and was told by other employees that the aforementioned representative of GMAC was "no longer with the company."

20

95.    Plaintiff further relied upon the promises of GMAC's employee/agents, but subsequent actions by GMAC made it impossible for plaintiff to tender the amounts that GMAC claimed were due and owing before plaintiff's Real Property was sold at a Trustee's Sale on February 15, 2011:

a.    In or about December, 2010, plaintiff received a letter from GMAC representing that the reinstatement amount needed to bring his loan on the Real Property current was $53,114.11, which was also reflected on plaintiff's December 20, 2010 Mortgage Account Statement. (Exhibit 5.) Plaintiff confirmed the reinstatement amount with a GMAC bankruptcy department employee/agent on or about January 5, 2011.

b.    In reliance on the promises of GMAC employee/agents, on or about January 7, 2011, plaintiff tendered the total reinstatement amount by remitting a cashier's check for $53,114.11 to GMAC by overnight mail, which GMAC received on January 8, 2011. (Exhibits 6, 7, 8.)

c.    On or about January 11, 2011, plaintiff contacted GMAC, which confirmed possession of the cashier's check in the remittance amount of $53,114.11. However, GMAC represented to plaintiff that he owed an additional amount of approximately $1,400.00 in order to reinstate his account. GMAC represented to plaintiff that the additional funds were necessary to pay their attorney fees.

d.    In reliance on the promises of GMAC employee/agents, plaintiff immediately tendered the additional payment of approximately $1,400.00 over the telephone by way of a credit card. However, GMAC employees and agents refused to accept Plaintiff's credit card payment and tender, which would have reinstated Plaintiff's account and brought his house payments current. GMAC employees and agents insisted that they needed a new cashier's check that included both the reinstatement amount of $53,114.11 and approximately $1,400.00 for attorney fees.

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801
121665.doc

e.    After relying on the promises of GMAC employees and agents, plaintiff found himself in a "Catch-22" situation. Although GMAC representatives demanded a new cashier's check, they failed and refused to return in a timely manner plaintiff's cashier's check for $53,114.11 that he had sent them and that remained in their possession. Therefore, plaintiff was prevented from forwarding a new cashier's check that would include both the $53,114.11 and the approximate $1,400.00 in attorney's fees that they demanded, thereby avoiding the foreclosure sale of his Real Property.

f.    GMAC held plaintiff's cashier's check for $53,114.11 in their possession, failing and refusing to return plaintiff's cashier's check for approximately four (4) weeks, from January 8, 2011 to well into February, 2011, *after* the foreclosure sale of plaintiff's Real Property.

g.    Plaintiff made many requests to GMAC employees and agents to honor his tendered reinstatement payments or return his cashier's check so that he could send a new cashier's check that would add and incorporate the demanded attorney fees, thereby preventing the foreclosure sale of his Real Property. On or about January 15, January 20, January 30, and February 5 or 10, 2011 plaintiff sought the aid of Redwood Credit Union, which had issued his $53,114.11 cashier's check, to request that GMAC honor the cashier's check or return the funds, so that he could obtain a new cashier's check in order to once again tender the reinstatement funds. The Branch Manager and Supervisor of Redwood Credit Union and two bank tellers contacted GMAC and sought to void plaintiff's cashier's check in GMAC's possession in order to issue a new cashier's check. Plaintiff signed a Claim for Refund or Replacement of Official Check Affidavit form given to him by Redwood Credit Union, made to the attention of GMAC Mortgage. (Exhibit 9.)

h.    However, GMAC even refused to provide a facsimile number or other contact information that would allow them to receive the Claim for Refund or

22

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

{21665.doc}

Replacement of Official Check Affidavit form in a timely manner, and thereby avoid the foreclosure sale of his Real Property.

i.    Finally, on February 24, 2011, GMAC returned plaintiff's above-referenced cashier's check, *after* the Trustee's Sale of plaintiff's Real Property. (Exhibit 10.)

j.    On March 11, 2011, ETS requested that a Trustee's Deed Upon Sale be recorded in the official records of Sonoma County, California as instrument No. 2011023076, indicating that plaintiff's home was sold at a public action on February 15, 2011 to The Bank of New York Mellon Trust Co. (Exhibit 11.)

96.    At the time the subject loan modification agreement was entered into, the loan modification agreement was fair, just, and reasonable as to GMAC, and the consideration accruing to GMAC was adequate.

97.    At the time plaintiff tendered the reinstatement amount to GMAC, by remitting a cashier's check for $53,114.11 to GMAC by overnight mail, the reinstatement amount was fair, just, and reasonable as to GMAC, and the consideration accruing to GMAC was adequate.

98.    GMAC made the above-described promises to induce definite and substantial action on the part of plaintiff. The promises of GMAC employees and agents induced such definite and substantial action on the part of plaintiff. Only the enforcement of the promise by GMAC employees and agents to modify plaintiff's loan and accept plaintiff's tender as reimbursement to bring his loan current will avoid injustice.

### FIFTH CAUSE OF ACTION
### NEGLIGENCE
### Julio Solano v. GMAC

99.    Plaintiff realleges and incorporates by reference paragraphs 1 through 98, above, as though fully set forth in this action.

100.    On or about September, 2010 until February 15, 2011, plaintiff was the owner of the subject Real Property, located at 695 Monte Bello Drive, Santa Rosa, California

23

1  95403, APN 039-410-010, and GMAC was the servicer of plaintiff's first mortgage loan

2  on the subject Real Property.

3  101.   As the servicer of plaintiff's first mortgage loan on the subject Real Property,

4  GMAC had a duty not to act in violation of the terms and conditions of the promissory

5  note and deed of trust, and a duty not to reject a valid tender of the of the

6  reimbursement amounts that it demanded for plaintiff to bring his loan on the Real

7  Property current.

8  102.   However, GMAC negligently and carelessly rejected plaintiff's tenders of the

9  reimbursement amounts, and foreclosed upon plaintiff's Real Property, causing

10  plaintiff's loss and damages.

11  103.   As a direct and proximate result of defendant's negligence, plaintiff has been

12  damaged in that he was wrongfully deprived of over $500,000.00 in equity in the Real

13  Property, the beneficial use and enjoyment of the Real Property, and legal title by

14  forfeiture.

15
16
17
### SIXTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### Julio Solano v. All Defendants

18  104.   Plaintiff realleges and incorporates by reference paragraphs 1 through 103,

19  above, as though fully set forth in this action.

20  105.   Defendants knew, or should have known, that their failure to exercise due care

21  in the foreclosure of plaintiff's Real Property would cause plaintiff and his family

22  severe emotional distress.

23  106.   The Trustee's Sale was improperly held and the Trustee's Deed Upon Sale was

24  wrongfully executed, delivered, and recorded, because there was arguably no breach of

25  the obligation; there were invalid, irregular, and improper presale procedures; and the

26  trustee illegally, fraudulently, and oppressively sold plaintiff's Real Property under a

27  power of sale contained in the deed of trust to defendant The Bank of New York Mellon

28  Trust Co.

24

107.    The Trustee's Sale was improper and illegal because plaintiff tendered the reimbursement amounts that GMAC demanded, but GMAC rejected and wrongfully retained plaintiff's tender. On or about January 7, 2011, plaintiff tendered by cashier's check to GMAC the full amount that GMAC demanded to bring his loan current, thus extinguishing the Notice of Default and making the subsequent Trustee's Sale void. On or about January 11, 2011, Plaintiff offered to tender to GMAC by telephone all of the additional monies that GMAC had subsequently claimed were due, which would have cured the alleged problem, if any, with plaintiff's initial tender; but GMAC refused plaintiff's good faith offer. Then GMAC wrongfully withheld plaintiff's cashier's check for over a month, until after the foreclosure, making a new tender by plaintiff impossible.

108.    GMAC rejected plaintiff's tender in order to make it impossible for plaintiff to reimburse the amounts that GMAC claimed were due and owing before plaintiff's Real Property was sold at the Trustee's Sale, by withholding plaintiff's cashier's check and refusing to allow plaintiff to reimburse GMAC for the attorney fees by credit card.

109.    The Trustee's Sale was improperly held, in violation of the terms and conditions of the promissory note and deed of trust and in violation of the duties and obligations of defendant beneficiary and defendant trustee to plaintiff, all to plaintiff's loss and damage, in that plaintiff has been wrongfully deprived of at least $500,000.00, or according to proof, of equity in the Real Property, the beneficial use and enjoyment of the Real Property, and legal title by forfeiture.

110.    As a proximate result of the actions by defendants, and each of them, as described above, after the Trustee's Sale on February 15, 2011, plaintiff and his wife and children, who were in a state of shock, immediately moved out of the Real Property and into a motel room, because of their fear of being evicted from their home on the Real Property by the Sonoma County Sheriff.

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

121665.doc

111.    All of the consequences proximately caused by defendants' actions, as herein alleged, caused plaintiff to suffer severe emotional distress and mental suffering, all to his damage.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as follows:

### FIRST CAUSE OF ACTION
**To Set Aside Trustee's Sale Or For Monetary Damages**
**For Illegal, Willful And Oppressive Sale Of Real Property**
**Julio Solano v. All Defendants**

1.    That the Court issue (a) a declaration that the sale of the subject Real Property is null and void and of no force or effect, and (b) an order setting aside the Trustee's Sale of the subject Real Property;

2.    That the loans be reinstated; or,

3.    That plaintiff be permitted to redeem the property or

4.    In the alternative for damages for the difference between the fair market value of the real property and encumbrances thereon;

5.    For general damages according to proof;

6.    For punitive damages according to proof;

### SECOND CAUSE OF ACTION
**To Cancel Written Instrument**
**Julio Solano v. Bank of New York Mellon Trust Co.**

7.    For a declaration that the purported Trustee's Deed Upon Sale is invalid, void, voidable, and of no force or effect regarding plaintiff's interests in the Real Property;

8.    For a declaration that defendants deliver the purported Trustee's Deed Upon Sale forthwith to the clerk of the Court for cancellation;

### THIRD CAUSE OF ACTION
**Unfair Competition Under Business & Professions Code § 17200 et seq.**
**(Unfair Business Act or Practice)**
**Julio Solano v. All Defendants**

26

Second Amended Complaint
Solano v. GMAC Mortgage, LLC, et al.
SCV-249801

121665.doc

9.    That the actions of defendants be determined to be unfair and deceptive business practices in violation of California Statutes, and that this Court award all such relief to Plaintiff as he may be entitled, including injunctive relief, treble damages, and an award of costs and attorney's fees;

10.    For general damages including loss of equity in the real property according to proof;

11.    For an award of exemplary and punitive damages against each defendant named therein, in a sum sufficient to punish and make an example of said defendant;

## FOURTH CAUSE OF ACTION
### Promissory Estoppel
### Julio Solano v. GMAC

12.    For general damages or restitution according to proof;

## FIFTH CAUSE OF ACTION
### NEGLIGENCE
### Julio Solano v. GMAC

13.    For general damages according to proof;

## SIXTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### Julio Solano v. All Defendants

14.    For general damages for severe emotional distress and mental suffering according to proof;

15.    For medical and related expenses according to proof;

## ALL CAUSES OF ACTION

16.    For costs of suit herein incurred including reasonable attorneys' fees; and,

17.    For such other and further relief as the court may deem proper.


Dated: April 2, 2012

_Richard Sax_

Richard Sax
Attorney for Plaintiff JULIO SOLANO

27

# EXHIBIT 1

Recording Requested By:
LOAN CENTER OF CALIFORNIA, INC.

And After Recording Return To:
LOAN CENTER OF CALIFORNIA, INC.
ONE HARBOR CENTER, SUITE 188
SUISUN CITY, CALIFORNIA 94585
Loan Number: 04-15946

**2004074831**

OFFICIAL RECORDS OF
SONOMA COUNTY
EEVE T. LEWIS

NORTH BAY TITLE CO.
05/18/2004 14:23 TRD
RECORDING FEE: 73.00
PAID

**23** PGS



——————————— [Space Above This Line For Recording Data] ———————————

# DEED OF TRUST

**MIN: 1001906-0000415946-8**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated  MAY 10, 2004                          , together with all Riders to this document.
**(B)** "Borrower" is JULIO SOLANO, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument.
**(C)** "Lender" is LOAN CENTER OF CALIFORNIA, INC.

Lender is a CALIFORNIA CORPORATION                                                    organized
and existing under the laws of  CALIFORNIA
Lender's address is ONE HARBOR CENTER, SUITE 188, SUISUN CITY, CALIFORNIA 94585

**(D)** "Trustee" is NORTH BAY TITLE COMPANY
431 E STREET, SANTA ROSA, CALIFORNIA 95404

**(E)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)** "Note" means the promissory note signed by Borrower and dated  MAY 10, 2004
The Note states that Borrower owes Lender SIX HUNDRED FORTY-NINE THOUSAND NINE HUNDRED FIFTY AND 00/100          Dollars (U.S. $ 649,950.00          ) plus interest.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 1 of 14

DocMagic eForms 800-649-1362
www.docmagic.com

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
JUNE 1, 2034

(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | INTEREST ONLY RIDER, PREPAYMENT RIDER, RIDER TO SECURITY INSTRUMENT |

(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)  "Escrow Items" means those items that are described in Section 3.

(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY  of        SONOMA                :

[Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 039-410-010-000

which currently has the address of 695 MONTEBELLO DRIVE

                                                                    [Street]

SANTA ROSA                              , California      95403          ("Property Address"):
        [City]                                           [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of

its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying

the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.  Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                    Page 6 of 14                          DocMagic *eFarms* 800-649-1362
                                                                                          www.docmagic.com

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further: .

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                           Page 9 of 14                    DocMagic *eRorms* 800-649-1362
www.docmagic.com

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JULIO SOLANO                     -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

Witness:                         Witness:

_____        _____

State of California                          )
                                             ) ss.
County of  SONOMA                            )

   On  May 11, 2004          before me,    Kathleen L. Engler

personally appeared   JULIO SOLANO

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

KATHLEEN L. ENGLER
COMM. #1423815
NOTARY PUBLIC -CALIFORNIA
SONOMA COUNTY
My Comm Expires July 9, 2007
MC11     MC1

NOTARY SIGNATURE

   Kathleen L. Engler
   (Typed Name of Notary)

       NOTARY SEAL

DocMagic <i>eRomns</i>  800-649-1362
www.docmagic.com

Loan Number: 04-15946

Date: MAY 10, 2004

Property Address: 695 MONTEBELLO DRIVE, SANTA ROSA, CALIFORNIA 95403

## EXHIBIT "A"

## LEGAL DESCRIPTION

SEE PRELIM REPORT
A.P.N. #: 039-410-010-000

MIN: 1001906-0000415946-8                    Loan Number: 04-15946

# ADJUSTABLE RATE RIDER
## (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps Accrued Interest Only for Fixed Rate Period)

THIS ADJUSTABLE RATE RIDER is made this 10th day of MAY 2004
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to LOAN CENTER OF CALIFORNIA,
INC., A CALIFORNIA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

695 MONTEBELLO DRIVE, SANTA ROSA, CALIFORNIA 95403
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES
IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE
NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN
CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE
BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of        5.375 %. The Note provides for changes
in the interest rate and the monthly payments, as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A)    Change Dates
The interest rate I will pay may change on the 1st    day of  JUNE 2009
and on that day every 6th   month thereafter. Each date on which my interest rate could change is called
a "Change Date."
(B)    The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the first
business day of the month immediately preceding the month in which the Change Date occurs is called the
"Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
10/27/03                              Page 1 of 3

DocMagic *eRoms* 800-649-1362
www.docmagic.com

**(C)    Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000                                        percentage points (    2.250    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)    Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than     10.375 % or less than     2.250   %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000                                        percentage points (    1.000    %) from the rate of interest I have been paying for the preceding  6      months. My interest rate will never be greater than     10.375   %.

**(E)    Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)    Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

---

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX          DocMagic *eF*ₐₙₐₐ  800-649-1362
(AS PUBLISHED IN *THE WALL STREET JOURNAL)*                                        www.docmagic.com
10/27/03                                        Page 2 of 3

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
JULIO SOLANO              -Borrower                                -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower


MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
10/27/03                          Page 3 of 3

DocMagic *eForms* 800-649-1382
www.docmagic.com

Loan Number: 04-15946

# PREPAYMENT RIDER
# (SECURITY INSTRUMENT)

This Prepayment Rider is incorporated into and shall be deemed to amend and supplement the Mortgage, Trust Deed, Deed of Trust or Security Deed (the "Security Instrument") of the same date executed by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note or Adjustable Rate Note, as applicable (the "Note") payable to    LOAN CENTER OF CALIFORNIA, INC.
("Lender").

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and the Lender further covenant and agree as follows.

Paragraph 1 of the Security Instrument shall be modified by adding the following to the end of Section 1 entitled "Payment of Principal and Interest, Escrow Items, Prepayment Charges and Late Charges":

Borrower shall have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When Borrower makes a prepayment, Borrower will tell the Lender in writing that Borrower is doing so. Borrower may not designate a payment as a prepayment if Borrower has not made all the monthly payments due under the Note.

The first    60        months of the loan term is called the "Penalty Period." In any consecutive twelve month period during the Penalty Period, Borrower may prepay up to 20% of the original principal amount of the Note without paying a penalty. If the Borrower makes a prepayment in excess of 20% of the original principal balance within any consecutive twelve month period during the Penalty Period, Borrower will pay a penalty. The penalty will be equal to six (6) months advance interest on the amount prepaid in excess of 20% of the original principal amount of the Note.

No prepayment penalty will be assessed for any prepayment made after the Penalty Period. Lender will waive the prepayment penalty if (a) the prepayment is concurrent with the sale of the Property, (b) the prepayment is made after the first twelve months of the loan term, and (c) Borrower provides evidence satisfactory to the Lender of such sale. A penalty will be assessed in connection with any prepayment in excess of 20% of the original principal balance made during the first twelve months of the loan term, regardless of whether the Property has been sold.

The Lender will use prepayments to reduce the amount of principal that is owed under the Note. However, the Lender may apply a prepayment to the accrued and unpaid interest on the prepayment amount, before applying the prepayment to reduce the principal amount of the Note. If Borrower makes a partial prepayment, there will be no changes in the due dates of Borrower's monthly payments unless the Lender agrees in writing to those changes. If the Note provides for periodic increases or decreases in the interest rate and adjustments to the monthly payments, Borrower's partial prepayment may reduce the amount of Borrower's monthly payments after the first payment change date following the partial prepayment. However, any reduction due to Borrower's partial prepayment may be offset by an interest rate increase.

The Lender's failure to collect a prepayment penalty at the time a prepayment is received shall not be deemed a waiver of such penalty and any such penalty shall be payable upon demand.

Loan Number    04-15946

DocMagic *eForms* 800-649-1362
www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Prepayment Rider.



_____ (Seal)
JULIO SOLANO            -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

Loan Number:

PREPAYMENT RIDER (SECURITY INSTRUMENT)        Page 2 of 2

DocMagic €Ferms 800-649-1362
www.docmagic.com

File No. **00127102-001-KLE**

### Schedule C
### Legal Description

Situated in the State of California, Unincorporated Area, County of Sonoma, and described as follows:

Parcel One:

Lot 10 as shown upon the map entitled Wikiup Acres Subdivision, filed in the office of the County Recorder of Sonoma County on May 30, 2000 in Book 608 of Maps, Page(s) 34 through 41, inclusive, Sonoma County Records.

Parcel Two:

An easement for Public Utilities, Public Sanitary Sewer, Public Emergency Vehicle Access, Private Drainage and Private Ingress and Egress purposes as shown upon the map entitled Wikiup Acres Subdivision, filed in the office of the County Recorder of Sonoma County on May 30, 2000 in Book 608 of Maps, Page(s) 34 through 41, inclusive, Sonoma County Records.

(039-410-010-000)

# EXHIBIT 2



RECORDING REQUESTED BY:

**Old Republic Default Management Services**

**WHEN RECORDED MAIL TO:**
ETS Services, LLC
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**



**2009048413**

OFFICIAL RECORDS OF
SONOMA COUNTY
JANICE ATKINSON

GENERAL PUBLIC
05/20/2009 11:25 NTDF      **2**      PGS
RECORDING FEE: 11.00
PAID



SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No.: GM-180963-C    Loan No.: 0359012026
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE
## IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,
and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

  This amount is **$22,684.49** as of  **5/18/2009**,  and will increase until your account becomes current.  While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

  Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact,
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
C/O ETS Services, LLC
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**
**(818) 260-1600 phone**

TS NO.: GM-180963-C          LOAN NO.: 0359012026

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

### Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN:  That **Executive Trustee Services, LLC dba ETS Services, LLC** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated  **5/10/2004** , executed by **JULIO SOLANO, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**, as Trustor, to secure certain obligations in favor of  **"MERS" MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., SOLELY AS NOMINEE FOR LOAN CENTER OF CALIFORNIA, INC.**, as beneficiary, recorded **5/18/2004**, as Instrument No. **2004074831**, in Book , Page ,  of Official Records in the Office of the Recorder of **Sonoma** County, California describing land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including **ONE NOTE FOR THE ORIGINAL** sum of **$649,950.00** ; that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of Principal and Interest plus impounds and/or advances which became due on 2/1/2009 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The undersigned declares that the beneficiary or its authorized agent has declared that they have complied with California Civil Code Section 2923.5 by making contact with the borrower or tried with due diligence to contact the borrower as required by California Civil Code Section 2923.5.

Dated: 5/18/2009

ETS Services, LLC AS AGENT FOR
BENEFICIARY

BY:_____

Diana Kilislian
TRUSTEE SALE OFFICER

# EXHIBIT 3

Page 1 of 2



**2010053559**

OFFICIAL RECORDS OF
SONOMA COUNTY
JANICE ATKINSON

**RECORDING REQUESTED BY:**

**FIRST AMERICAN TITLE**

TITLE COURT SERVICES
06/29/2010 11:12 NTDF
RECORDING FEE: $16.00
PAID

**2** PGS



**WHEN RECORDED MAIL TO:**
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No. : GM-250671-C    Loan No.: 0359012026

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE
**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$16,914.79** as of **6/25/2010**, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact,
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
**C/O ETS Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**
**(818) 260-1600 phone**

Page 2 of 2

NO.: GM-250671-C                    LOAN NO.: 0359012026

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

**Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That **Executive Trustee Services, LLC dba ETS Services, LLC** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated  **5/10/2004** ; executed by **JULIO SOLANO, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**, as Trustor, to secure certain obligations in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS") AS NOMINEE FOR LOAN CENTER OF CALIFORNIA, INC.**, as beneficiary, recorded 5/18/2004, as Instrument No. **2004074831**, in Book , Page ,  of Official Records in the Office of the Recorder of **Sonoma** County, California describing land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including **ONE NOTE FOR THE ORIGINAL** sum of  **$649,950.00** ; that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

In  payment of Principal and Interest plus impounds and/or advances which became due on 3/1/2010 plus late charges, and all  subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The undersigned declares that the beneficiary or its authorized agent has declared that they have complied with California Civil Code Section 2923.5 by making contact with the borrower or tried with due diligence to contact the borrower as required by California Civil Code Section 2923.5.

Dated:  6/25/2010

                              ETS Services, LLC as Agent for Beneficiary

                              BY: _____

                              Neda Cayco
                              TRUSTEE SALE OFFICER

# EXHIBIT 4

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
AS AN ACCOMMODATION ONLY

RECORDING REQUESTED BY
ETS Services, LLC

AND WHEN RECORDED MAIL TO:
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120



**2010083872**

OFFICIAL RECORDS OF
SONOMA COUNTY
JANICE ATKINSON
**2** PGS

GENERAL PUBLIC
09/30/2010 10:26 NTTS
RECORDING FEE: $16.00
PAID



T.S. No. GM-250671-C
Loan No. 0359012026

4474878

SPACE ABOVE THIS LINE FOR RECORDER'S Use

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 5/10/2004. UNLESS YOU TAKE
ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN
EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT
A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank,
check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan
association, or savings association, or savings bank specified in Section 5102 of the Financial Code and
authorized to do business in this state, will be held by the duly appointed trustee. The sale will be made,
but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to
satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for
any incorrectness of the property address or other common designation, if any, shown herein.

TRUSTOR: **JULIO SOLANO, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**
Recorded 5/18/2004 as Instrument No. 2004074831 in Book , page  of
Official Records in the office of the Recorder of **Sonoma** County, California,
Date of Sale: **10/22/2010 at 10:00 AM**
Place of Sale:    **In the Plaza at Fremont Park located at 860 Fifth Street, Santa Rosa, CA 95401**

Property Address is purported to be:     **695 MONTEBELLO DRIVE
SANTA ROSA, California 95403-0000**

APN #:  **039-410-010-000**

The total amount secured by said instrument as of the time of initial publication of this notice is
**$696,840.00**, which includes the total amount of the unpaid balance (including accrued and unpaid
interest) and reasonable estimated costs, expenses, and advances at the time of initial publication of this
notice.

Pursuant to California Civil Code §2923.54 the undersigned, on behalf of the beneficiary, loan servicer or
authorized agent, declares as follows:

[ 1 ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of
exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed;
[ 2 ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not
apply pursuant to Section 2923.52 or 2923.55.

T.S. No. **GM-250671-C**
Loan No. **0359012026**

Date: **9/28/2010**

**ETS Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**
**Sale Line: 714-730-2727**

**Christine Gomez-Schwab, TRUSTEE SALE OFFICER**

# EXHIBIT 5

| unt Number | Payment Date | Payment Amount | Late Fee | Payment Amount With Late Fee | Unpaid Amount | **GMAC** Mortgage |
|---|---|---|---|---|---|---|
| 59012026 SOLANO | 03/01/10 | $4,541.34 | | $4,541.34 | $53,114.11 | |

This statement is being furnished for informational purposes only.

**Please assist GMAC Mortgage in applying your payment**

| | |
|---|---|
| Full Payment(s) | $ _____ |
| *ADDITIONAL* Principal | $ _____ |
| *ADDITIONAL* Escrow | $ _____ |
| Late Charge | $ _____ |
| Other Fees (please specify) | $ _____ |
| Total Amount Enclosed | $ 53,114.11 |

Sign here to enroll in monthly ACH.
(See back for details.)

GMAC MORTGAGE
PO BOX 79135
PHOENIX AZ 85062-9135

02    0310    0359012026    00454134    00000    22222    2

# EXHIBIT 6



**OFFICIAL CHECK**

12477544

Issued By: MONEYGRAM PAYMENT SYSTEMS, INC.
P.O. Box 9476, Minneapolis, MN 55480
Drawee:  The Bank of New York Mellon, Everett, MA

5-709/110

CORPORATE OFFICE
3033 Cleveland Avenue, Suite 100
P.O. Box 6104
Santa Rosa, CA 95406-6104
(707) 545-4000  (800) 479-7928

DATE:  01/07/11      CHECK AMOUNT:    $53,114.11

PAY  ** FIFTY THREE THOUSAND ONE HUNDRED FOURTEEN DOLLARS AND 11 CENTS **

TO THE
ORDER
OF    GMAC MORTGAGE

DRAWER:  REDWOOD CREDIT UNION

SUPERVISOR SIGNATURE IF $50,000 OR OVER

Authorized Signature

RE: ACCOUNT #0359012026
*Julio Solano*

⑀2477544⑀ ⑃011007092⑃016001006831 2⑀

---

| Account Number | Payment Date | Payment Amount | Late Fee | Payment Amount With Late Fee | Unpaid Amount | GMAC Mortgage |
|---|---|---|---|---|---|---|
| 0359012026 JLIO SOLANO | 03/01/10 | $4,541.34 | | $4,541.34 | $53,114.11 | |

This statement is being furnished for informational purposes only.

| Please assist GMAC Mortgage in applying your payment | |
|---|---|
| Full Payment(s) | $ |
| *ADDITIONAL* Principal | $ |
| *ADDITIONAL* Escrow | $ |
| Late Charge | $ |
| Other Fees (please specify) | $ |
| Total Amount Enclosed | $ 53,114.11 |

Sign here to enroll in monthly ACH.
(See back for details.)

GMAC MORTGAGE
PO BOX 79135
PHOENIX AZ 85062-9135

02   0310   0359012026   00454134   00000   22222   2

**EXHIBIT 7**

From:    Origin ID: STSA   (707) 545-1220
Global Interprint
GLOBAL INTERPRINT, INC
2200 RANGE AVENUE
SUITE 101
SANTA ROSA, CA 95403



Ship Date: 07JAN11
ActWgt: 1.0 LB
CAD: 1633017/INET3090

Delivery Address Bar Code

SHIP TO:    (319) 236-5400          BILL SENDER
PAYMENT PROCESSING DEPARTMENT
GMAC MORTGAGE
3451 HAMMOND AVE

WATERLOO, IA 50702

Ref #     gooch solano
Invoice #
PO #
Dept #



TRK#
0201   7942 9869 4648

MON - 10 JAN   A2
PRIORITY OVERNIGHT

50702

IA-US

CID

SE ALOA



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT 8

**FedEx**          Shipment Receipt
                   Address Information

**Ship to:**                  **Ship from:**
PAYMENT PROCESSING   Global Interprint
DEPARTMENT
GMAC MORTGAGE         GLOBAL INTERPRINT, INC
3451 HAMMOND AVE      2200 RANGE AVENUE
                      SUITE 101
WATERLOO, IA          SANTA ROSA, CA
50702-5345            95403
US                    US
319-236-5400          7075451220

**Shipping Information**
Tracking number: 794298694648
Ship date: 01/07/2011
Estimated shipping charges: 22.31

**Package Information**
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 1LBS
Declared value: 0.00USD
Special Services:
Pickup/Drop-off: Use an already scheduled pickup at my location

**Billing Information**
Bill transportation to: 102950569-569
Your reference:  gooch solano
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with Fedex ShipManager at fedex.com.

**Please Note**
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits. Consult the applicable FedEx Service Guide for details. The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.



**Redwood**
**Credit Union**

# CLAIM FOR REFUND OR REPLACEMENT
# OF OFFICIAL CHECK AFFIDAVIT

To: Redwood Credit Union          Attention: GMAC Mortgage
P.O. Box 6104
Santa Rosa, CA 95406

---

**TO BE COMPLETED BY CHECK PURCHASER:**

____ I request that Redwood Credit issue a replacement check.

X I request that Redwood Credit Union place the funds in my account #_____    share 01

Purchaser Signature _____          Date: _____

**TO BE COMPLETED BY CHECK PAYEE**

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. I

declare that Redwood Credit Union check number _____

Dated _____ payable to _____ amount _____ has been:

**Initial the appropriate item:** _____ Lost _____ Stolen _____ Destroyed _____ Not Received by Payee

What was the estimated date that the item was lost, stolen or destroyed? _____

Please describe what happened to the check:

_____

_____

If the item was stolen was a police report filed? _____ Yes  (Attach Copy)     _____ No

Payee Signature _____          Date: _____
*For checks of $5,000 or more, signature must be notarized.  Please attach notorial acknowledgement*

---

**CU Use Only:**
Check appropriate box: ☐ Member has received credit or ☐ Replacement Check Issued.
Date Fee Charged: _____ Share ID _____          User ID / Initials _____ Date _____
Stop payment placed by: _____ on _____

ps - 513
12/21/2007

# EXHIBIT 10

# GMAC Mortgage

February 24, 2011


Julio Solano
695 Monte Bello Drive
Santa Rosa CA  95403


RE:    Account Numbers        0359012026
       Property Address       695 Monte Bello Drive
                              Santa Rosa CA  95403


Dear Julio Solano:

This letter serves as our response to the correspondence from Guillermo Cobar regarding the above-referenced account dated February 1, 2011 and received in our office February 7, 2011.

We sincerely apologize for any inconvenience or frustration you have experienced. The correspondence indicates you received a letter reflecting the reinstatement amount of $53,114.11. This amount was reflected on the December 20, 2010 Mortgage Account Statement and confirmed with a Bankruptcy Department Representative on January 5, 2011. However, a Motion for Relief from the automatic stay placed by the Chapter 7 bankruptcy filing was granted on January 8, 2011, and foreclosure proceedings resumed.

Due to the foreclosure status, the amount quoted was no longer sufficient to reinstate the account. Unfortunately, we are unable to sign the form submitted with the correspondence. The check was received by GMAC Mortgage and subsequently returned to you; therefore the form is not applicable.

The above-listed property went to trustee sale February 15, 2011. If you wish to discuss the process of foreclosure, please contact Executive Trustee Services at 1-800-665-3932.

If you have additional questions or concerns, please contact Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

KAB

# EXHIBIT 11

RECORDING REQUESTED BY:
**Executive Trustee Services, LLC dba ETS Services, LLC**

WHEN RECORDED MAIL TO:
**GMAC MORTGAGE, LLC FKA
GMAC MORTGAGE CORPORATION
1100 VIRGINIA DRIVE
FORT WASHINGTON, PA 19034**

**Forward Tax Statements to
the address given above**

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
AS AN ACCOMMODATION ONLY


**2011023076**



OFFICIAL RECORDS OF
SONOMA COUNTY
FIRST AMERICAN TITLE CO. JANICE ATKINSON
03/11/2011 02:07 TDEED    **3** PGS
RECORDING FEE: $19.00
PAID

TRA # : 120-028
TS # GM-250671-C
LOAN # 0359012026
TITLE ORDER # 4474878

SPACE ABOVE LINE FOR RECORDER'S USE

INVESTOR #: 0000000000000

# TRUSTEE'S DEED UPON SALE

APN 039-410-010-000          TRANSFER TAX: $00.00
"THIS TRANSACTION IS EXEMPT FROM THE REQUIREMENTS OF THE REVENUE AND TAXATION CODE, SECTION 480.3"
The Grantee Herein Was The Foreclosing Beneficiary.
The Amount Of The Unpaid Debt was $713,388.07
The Amount Paid By The Grantee Was $713,388.07
Said Property Is In The City Of SANTA ROSA, County of Sonoma

Executive Trustee Services, LLC dba ETS Services, LLC, as Trustee, (whereas so designated in the Deed of Trust hereunder
more particularly described or as duly appointed Trustee) does hereby GRANT and CONVEY to

**The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust
Company, N.A. as successor to JPMorgan Chase Bank, N.A. as Trustee for MARM 2004-7**

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed
to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of Sonoma, State of
California, described as follows:

See exhibit "A" attached hereto and made a part hereof

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by JULIO SOLANO,
A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY as Trustor, dated 5/10/2004 of the Official Records in
the office of the Recorder of Sonoma, California under the authority and powers vested in the Trustee designated in the
Deed of Trust or as the duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of
Default and Election to Sell under the Deed of Trust recorded on 5/18/2004 , instrument number 2004074831 (or Book ,
Page )
of Official records. Trustee having complied with all applicable statutory requirements of the State of California and
performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days
after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to
each person entitled to notice in compliance with California Civil Code 2924b.

[Page 1 of 2]

## TRUSTEE'S DEED UPON SALE

Trustee's Deed
T.S.# **GM-250671-C**
Loan # 0359012026
Title Order # 4474878

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies
of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting
of copies of Notice of Trustee's Sale have been complied with.  Trustee, in compliance with said Notice of
Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction
on **2/15/2011**.  Grantee, being the highest bidder at said sale became the purchaser of said property
for the amount bid, being **$713,388.07**, in lawful money of the United States, in pro per, receipt there
of is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof, **Executive Trustee Services, LLC dba ETS Services, LLC**, as Trustee, has this day, caused its
name
to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws

Date: **3/8/2011**

**LLC**

**Executive Trustee Services, LLC dba ETS Services,**

By: _Kathleen Gowen_

**Kathleen Gowen, Authorized Officer**

**State of California          } S.S.**
**County of Los Angeles  }**
On _____ before me, **Sally Beltran**  Notary Public, personally appeared **Kathleen Gowen**  who proved to me on
the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SALLY BELTRAN
Commission # 1777085
Notary Public - California
Los Angeles County
My Comm. Expires Oct 30, 2011

Signature _____ (Seal)
**Sally Beltran**

[Page 2 of 2]

Legal (Reference: GM-250671-C) for Order Number 4474878

EXHIBIT "A"

PARCEL ONE:

LOT 10 AS SHOWN UPON THE MAP ENTITLED WIKIUP ACRES SUBDIVISION, FILED IN
THE OFFICE OF THE COUNTY RECORDER OF SONOMA COUNTY ON MAY 30, 2000 IN
BOOK 608 OF MAPS, PAGE(S) 34 THROUGH 41, INCLUSIVE, SONOMA COUNTY
RECORDS.

PARCEL TWO:

AN EASEMENT FOR PUBLIC UTILITIES, PUBLIC SANITARY SEWER, PUBLIC
EMERGENCY VEHICLE ACCESS, PRIVATE DRAINAGE AND PRIVATE INGRESS AND
EGRESS PURPOSES AS SHOWN UPON THE MAP ENTITLED WIKIUP ACRES
SUBDIVISION, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SONOMA
COUNTY ON MAY 30, 2000 IN BOOK 608 OF MAPS, PAGE(S) 34 THROUGH 41, INCLUSIVE,
SONOMA COUNTY RECORDS.