**Hearing Date and Time:  March 5, 2013 at 10:00 a.m. (prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Gary S. Lee
Joel C. Haims
*Counsel to the Debtors and Debtors in Possession*
*With Respect to Allstate Insurance Company and affiliated entities,*
*and National Credit Union Administration Board*

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559
Steven J. Reisman
Theresa A. Foudy
Maryann Gallagher
*Conflicts Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et</u> <u>al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**OPPOSITION TO MOTION OF AIG ASSET MANAGEMENT (U.S.), LLC, THE
ALLSTATE ENTITIES, MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,
AND THE PRUDENTIAL ENTITIES FOR AN ORDER UNDER BANKRUPTCY RULE
<u>3013 CONCERNING SUBORDINATION OF INVESTORS' SECURITIES CLAIMS</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 4

    A.    The Debtors and Their Securitization Business ...................................................... 4

    B.    The Chapter 11 Cases ......................................................................................... 10

ARGUMENT ......................................................................................................................... 12

I.    THE INVESTOR CLAIMS ARE SUBORDINATED PURSUANT TO
    SECTION 510(B) OF THE BANKRUPTCY CODE ...................................................... 13

    A.    The Certificates Purchased by the Investors Are Securities "of" the
        Debtors .............................................................................................................. 14

    B.    If the Certificates Purchased by the Investors Are Not Securities of the
        Debtors, They Are Securities of "Affiliates" of the Debtors .............................. 17

    C.    Subordination of the Investor Claims Comports with the Policies and the
        Purpose of Section 510(b) of the Bankruptcy Code ........................................... 21

II.    THE INVESTOR CLAIMS SHOULD BE SUBORDINATED PURSUANT TO
    SECTION 510(A) OF THE BANKRUPTCY CODE ...................................................... 25

    A.    The Express Agreement Among Certificateholders to Each Securitization
        Requires Subordination of the Investor Claims .................................................. 26

    B.    The Implied Subordination Agreement Among Former Certificateholders
        and Subsequent Purchasers Requires Subordination of the Investor Claims ...... 28

III.    THE INVESTOR CLAIMS SHOULD BE SUBORDINATED PURSUANT TO
    SECTION 510(C) OF THE BANKRUPTCY CODE ...................................................... 29

IV.    THE INVESTOR CLAIMS ARE FUNDAMENTALLY DIFFERENT FROM
    THE TRUST CLAIMS AND SHOULD NOT BE SIMILARLY CLASSIFIED ........... 31

CONCLUSION ...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aetna Cas. & Sur. Co. v. U.S. Bankr. Court (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996)……………………………………………...……………32, 33

*Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*,
    281 F.3d 1173 (10th Cir. 2002)……………………………………...……………22, 24

*Anchor Sav. Bank, FSB v. United States*,
    597 F.3d 1356 (Fed. Cir. 2010)…………………………………………..……………26

*Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*,
    281 F.3d 133 (3d Cir. 2002)……………………………………………….……13, 24

*CIT Grp. Inc. v. Tyco Int'l Ltd. (In re CIT Grp. Inc.)*,
    460 B.R. 633 (Bankr. S.D.N.Y. 2011)……………………………………………13, 23

*Benjamin v. Diamond (In re Mobile Steel Co.)*
    563 F.2d 692 (5th Cir. 1977)…………………………………………….……........29

*Envirodyne Indus. Inc. v. Am. Express (In re Envirodyne Indus., Inc.)*,
    176 B.R. 825 (Bankr. N.D. Ill. 1995),
    *aff'd*, 79 F.3d 579 (7th Cir. 1996)…………………………………………….…30

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
    910 N.E.2d 976 (N.Y. 2009)……………………………………………..…………34

*Flomenbaum v. N.Y U.*,
    71 A.D. 3d 80 (N.Y. App. Div. 2009),
    *aff'd*, 929 N.E.2d 403 (N.Y. 2010)…………………………………………………34

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)…………………………………...……31, 32, 33

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994)………………………………………….………25

*In re Century Inv. Fund VII Ltd. P'ship*,
    96 B.R. 884 (Bankr. E.D. Wis. 1989)…………………………………………………18

*In re Consol. Cos.*,
    113 B.R. 269 (Bankr. N.D. Tex. 1989)……………………………………………18, 19

14202894

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004)……………………………………..……………33

*In re Credit Indus. Corp.*,
   366 F.2d 402 (2d Cir. 1966)……………………...…………………….......…….27

*In re Draiman*,
   450 B.R. 777 (Bankr. N.D. Ill. 2011)……………………………………………......…33

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992)……………………………………………...……32

*In re Einstein/Noah Bagel Corp.*,
   257 B.R. 499 (Bankr. D. Ariz. 2000)……………………………………….……………14

*In re Emergency Monitoring Techs.*,
   366 B.R. 476 (W.D. Pa. 2007)…………………………………………………..……….30

*In re Enron Corp.*,
   341 B.R. 141 (Bankr. S.D.N.Y. 2006)…………………………………….......…….24

*In re Minton Grp., Inc.*,
   27 B.R. 385 (Bankr. S.D.N.Y. 1983), *aff'd*, 46 B.R. 222 (S.D.N.Y. 1985)……………..18

*In re Reynolds*,
   13 B.R. 658 (Bankr. N.D. Ga. 1981)………………………………………….……19

*In re Simon*, No. 07-031414-KRH, 2008 Bankr. LEXIS 2787
   (Bankr. E.D. Va. July 29, 2008)…………………………………………………………33

*In re VF Brands, Inc.*,
   275 B.R. 725 (Bankr. D. Del. 2002)…………………………………………………..18

*In re Wash. Mut., Inc.*,
   462 B.R. 137 (Bankr. D. Del. 2011)……………………………………16, 17, 19, 20

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011)……………......................................……….18

*In re Wisconsin Barge Line, Inc.*,
   76 B.R. 142 (Bankr. E.D. Mo. 1987)………………………………………….....…..18

*Jenkins v. Tomlinson (In re Basin Res. Corp.)*,
   190 B.R. 824 (Bankr. N.D. Tex. 1996)………………………………….…………….18

-ii-

*Jezarian v. Raichle (In re Stirling Homex Corp.)*,
    579 F.2d 206 (2d Cir. 1978)……………………………………………...………………30

*Kirke La Shelle Co. v. Paul Armstrong Co.*,
    188 N.E. 163 (N.Y. 1933)……………………………………………………………28, 29

*Minority Equity Capital Co. v. Jackson*,
    798 F. Supp. 200 (S.D.N.Y. 1992)……………………………………………………25

*NationsBank, N.A. v. Commercial Fin. Servs., Inc.*
    *(In re Commercial Fin. Servs., Inc.)*,
    268 B.R. 579 (Bankr. N.D. Okla. 2001)……………………………...……………14, 24

*Official Comm. Of Unsecured Creditors v. Bay Harbour Master Ltd.*
    *(In re BH S&B Holdings LLC)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009),
    *aff'd sub nom., Geltzer v. Bay Harbour Mgmt. LC (In reBH S&B Holdings LLC)*,
    807 F.Supp.2d 199 (S.D.N.Y. 2011)…………………………………….…………29

*Republic Bank & Trust Co. v. Bear Stearns & Co.*,
    683 F.3d 239 (6th Cir. 2012)……………………………………………….…………26

*Robinson v. Howard Bank (In re Kors, Inc.)*,
    819 F.2d 19 (2d Cir. 1987)………………………………………………….…………25

*Rombro v. Dufrayne (In re Med Diversified, Inc.)*,
    461 F.3d 251 (2d Cir. 2006)……………………………………………….…………13, 22

*SeaQuest Gen. Holdings LLC v. S & J Diving Inc. (In re Seaquest Diving LP)*,
    579 F.3d 411 (5th Cir. 2009)……………………………………………….…………13

*SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*,
    224 B.R. 27 (6th Cir. 1998)……………………………………………………...………30

*United States v. Noland*,
    517 U.S. 535 (1996)………………………………………………………….…………29, 30

*United States v. York*,
    112 F.3d 1218 (D.C. Cir. 1997)…………………………………………………...………15

*Wyo. State Treasurer v. Moody's Investors Serv., Inc.*
    *(In re Lehman Bros. Mortg.-Backed Secs. Litig.)*,
    650 F.3d 167 (2d Cir. 2011)………………………………………………...…………26

## **Statutes**

11 U.S.C. § 101(2)(c)…………………………………………………...………2, 17, 19

14202894

11 U.S.C. § 101(49)(A)…………………………………………...……………...………13

11 U.S.C. § 510(a)……………………………………………………………2, 12, 25, 29

11. U.S.C. § 510(b)……………………………...…………2, 12-14, 17, 20-22, 24-25, 30, 33

11 U.S.C. § 510(c)………………………………………………...………....…2, 12, 29-31

11 U.S.C. § 1122…………………………………………………………….……………13,. 31

15 U.S.C. § 77b(a)(4)………………………………………………………...…14, 15

15 U.S.C. § 78c(a)(8)………………………………………………………...………14

15 U.S.C. § 775(a)……………………………………………………...……15

N.Y.U.C.C. § 1-203…………………………………………….…………………28

N.Y.U.C.C. § 8-102(a)(10)……………………………………………...………29

## Rules

Fed. R. Civ. P. 9(b)……………………………...………………….……………………34

Fed. R. Bankr. P. 3013……………………………………………………….…1, 12

Fed. R. Bankr. P. 7001(8)………………………………………………………………1

Fed. R. Bankr. P. 7001(9)……………………...………..……………………………1

Fed. R. Bankr. P. 7042……………………...………..……………………………1

## Regulations

17 C.F.R. § 230.191(a)………………………………………………………………14

17 C.F.R. § 240.3b-19……………………………………………………………14

## Miscellaneous

7 Collier on Bankruptcy ¶ 1122.03[1][a]
    (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2012)……………….……..……32

124 Cong. Rec. 32398, 33998 (1978)…………………………………….…………….………30

14202894

Hr'g Tr., *In re Wash. Mut., Inc.*, No. 08-12229 (MFW)
    (Bankr. D. Del. May 7, 2012) [Docket No. 10154]…………………..……………………16

H.R. Rep. No. 85, 73 Cong., 1st Sess. 13 (1933)………………………………..…..…………15, 18

H.R. Rep. No. 95–595 (1978)………………………………………………………………………21

John J. Slain & Homer Kripke, *The Interface Between Securities Regulation
    and Bankruptcy—Allocating the Risk of Illegal Securities Issuance
    Between Securityholders and the Issuer's Creditors*,
    48 N.Y.U. L. Rev. 261 (1973)………………………………………………..………21, 22

Order Approving Stipulation and Agreement, *In re Wash. Mut., Inc.*,
    No. 08-12229 (MFW) (Bankr. D. Del. Feb. 16, 2012) [Docket No. 9698]……………...17

Order Den. Classification, *In re Wash. Mut., Inc.*, No. 08-12229 (MFW)
    (Bankr. D. Del. May 16, 2012) [Docket No. 10182]……………………………………17

Order Granting Mot. for Summ. J., *In re Commercial Fin. Servs. Inc.*,
    Case No. 98-05162-R, Adv. Case No. 98-0356-R
    (Bankr. N.D. Okla. July 11, 2003) [Docket No. 174]…………………..………20, 21

Third Am. and Restated RMBS Trust Settlement Agreement
    with the Steering Committee Group § 7.01 [Docket No. 1887, Ex. 2]…………………..34

The debtors and debtors-in-possession (collectively, the "Debtors" or "ResCap")

in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"),

respectfully submit this opposition (the "Opposition") to the motion brought by AIG, Allstate,

Mass Mutual, Prudential, and the National Credit Union Administration Board (collectively, the

"Investors"), for an order under concerning the subordination of their claims pursuant to Rule

3013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[1]

## PRELIMINARY STATEMENT

Pursuant to the Bankruptcy Rules, the appropriate procedural vehicle for seeking

declaratory relief (as the Investors do in their Motion), or subordination outside of a chapter 11

plan, is an adversary proceeding.  *See* Bankruptcy Rule 7001(8) & (9).  Accordingly,

contemporaneously herewith, the Debtors are commencing an adversary proceeding to address

this dispute.  The Court should deny the Motion and consider the issue in that context.[2]

Turning to the merits, there are three independent reasons why the Investors'

securities claims (the "Investor Claims") should be subordinated to the claims of general

---

[1] The Debtors are listed in the *Affidavit of James A. Whitlinger*, dated May 14, 2012 [Docket No. 6] ("Whitlinger Aff.").  The Debtors also incorporate the definitions for each Investor set forth in the *Investors' Motion for an Order Under Bankruptcy Rule 3013 (i) Classifying RMBS Fraud Claims in the Same Class as the Securitization Trusts' Claims for Purposes of any Chapter 11 Plan for the Debtors and (ii) Directing That Misrepresentation Claims Cannot Be Placed in a Plan Class That Will Be Subordinated Under Bankruptcy Code Section 510(b)* [Docket No. 2284] (the "Motion" or "Mot."), except that "Investors" also includes the National Credit Union Administration Board (the "NCUAB") due to its joinder to the Motion [Docket No. 2555] (the "Joinder").

[2] Should the Court not deny the Motion on this basis, the Debtors request that, pursuant to Bankruptcy Rule 7042, the Court consolidate the Motion with the adversary proceeding.  The Debtors reserve their rights to object to the validity, amount or classification of any Investor Claims (defined below) on all grounds, whether legal, factual, procedural, substantive or non-substantive, including on the ground of whether any Investor has standing to bring any or all of the securities claims that each is currently purporting to assert.

unsecured creditors pursuant to Section 510 of title 11 of the United States Code (the

"Bankruptcy Code"):

- ***First,*** under Section 510(b), the Investor Claims arise out of the purchase of securities of the Debtors (*see* Section I.A). Alternatively, the Investor Claims arise out of the purchase of securities of "affiliates" of the Debtors as that term is defined by the Bankruptcy Code (*see* Section I.B);

- ***Second,*** Section 510(a) requires subordination in order to enforce the subordination agreements among certificateholders, by ensuring that recovery flows through the agreed-upon waterfall (*see* Section II); and

- ***Third,*** "no fault" equitable subordination pursuant to Section 510(c) is appropriate in order to prevent a series of inequitable consequences that would otherwise result absent subordination (*see* Section III).

The Investors do not dispute that their claims arise from the purchase or sale of

securities within the meaning of Section 510(b) (Mot. at 2), but they attempt to evade

subordination by arguing that their securities are not "of" the Debtors or "of an affiliate" of the

Debtors. This argument fails, because the securities were created by the Debtors, marketed by

the Debtors, and backed by assets originated or purchased and serviced by the Debtors. In short,

the Debtors are the issuers of the residential mortgage-backed securities ("RMBS" or

"Certificates") in every meaningful sense, and they are recognized as such under applicable

securities laws. Thus, the securities are "of" the Debtors. In addition, the RMBS securitization

trusts (the "Trusts" or "PLS Trusts") are "affiliates" of the Debtors as defined in Section

101(2)(c), because, at the time of issuance when the Investor Claims arose, the Debtors operated

the business and substantially all of the property of the Trusts pursuant to Pooling and Servicing

Agreements (the "PSAs"). The Investor Claims are thus subordinated under Section 510(b).

Moreover, subordination is also required under Section 510(a), in order to enforce

the certificateholders' contractually agreed-upon waterfall of payments among tranches. This

waterfall constitutes a subordination agreement, which should be enforced under Section 510(a).

2

14202894

Not only is subordination required, it is the only fair and equitable result. Contractual claims by the trustees on behalf of the RMBS Trusts based upon alleged breaches of representation and warranties concerning the mortgage loans (the "Trust Claims") are expected to be included within the pool of general unsecured claims. Each RMBS holder will receive its pro rata portion of the Trust Claims' recovery according to the priority scheme expressly agreed to among certificateholders within each securitization waterfall. The Investors are seeking to recover for investment losses on many of the same Certificates, based upon complaints of fraud that mirror the Trust Claims. As a result, elevating the securities claims to the same priority as general unsecured creditors will have numerous inequitable effects if those contingent and disputed securities fraud litigation claims are ever ultimately allowed in any amount.

*First*, proceeds available to pay general unsecured creditors will be divided among more claimants, thereby diminishing recoveries for all general unsecured creditors, *except* for current certificateholders with securities claims, who would receive two recoveries (one for their securities claim, and a second from the Trust Claims brought by their trustee(s)).

*Second*, equal priority of the securities claims with the Trust Claims would violate the express subordination agreements between junior and senior tranches of Certificates, because the junior Certificates would recover on their securities claims on equal priority with all other general unsecured creditors, before more senior tranches are made whole.

*Third*, granting equal priority to the securities claims (brought on behalf of only a subset of senior certificateholders) would violate the allocation of rights within the most senior tranches. Including those securities claims in the same pool would reduce the recovery that other senior certificateholders receive from the Trusts, leading to unequal recovery within the same tranche of Certificates even though the PSAs provide for pro rata distribution among them.

3

*Fourth*, failure to subordinate the securities claims would prejudice secondary purchasers of Certificates. Under the PSAs, current certificateholders are entitled to receive any recovery for past losses. Absent subordination, the current holders' recovery from the Trust Claims would be diluted so that former certificateholders who sold the right to recover past losses on the instruments could nevertheless share in the funds by virtue of the securities claims, thus depriving the secondary purchasers of Certificates of the benefits of their bargain.

Section 510 provides for subordination in order to prevent these sorts of inequitable consequences. The Investors' arguments to the contrary do not hold up to scrutiny.

## BACKGROUND

### A.    The Debtors and Their Securitization Business

From 2004 to 2007, the Debtors issued RMBS in 392 separate private label securitizations with an aggregate original principal balance of more than $226 billion. (*See Decl. of William J. Nolan in Supp. of Debtors' Mot. Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements*, dated June 11, 2012 [Docket No. 320], Ex. 7 ("Nolan Decl."), ¶ 9.) In these securitizations, the Debtors pooled non-conforming mortgage loans and conveyed each pool to a newly formed PLS Trust, in exchange for the Certificates that were then sold to investors. (Whitlinger Aff. ¶ 23 & n.15.) The Certificates entitle holders to receive the principal and interest collected on the mortgage loans in the Trust. (*Id.*)

### 1.    Mechanics of the Debtors' Private Label Securitizations

The RALI Series 2006-QO3 RMBS offering, in which Allstate invested, is a useful example.[3] In that securitization, Debtor Residential Funding Corporation ("RFC"), as

---

[3] For convenience, the Debtors will use the Investors' example deal, RALI Series 2006-QO3, for illustrative purposes. *See Decl. of Eric D. Winston*, dated Nov. 27, 2012 [Docket No. 2285], Ex. A (Standard Terms of Pooling and Servicing Agreement, Mortgage Asset-Backed Pass-Through Certificates Series 2006-QO3, dated Mar. 1, 2006 (the "PSA")), Ex. B at 2-117 (Prospectus

sponsor, purchased a pool of mortgage loans and then sold the pool to another affiliate, Debtor

Residential Accredit Loans, Inc. ("RALI"), who was the depositor to the PLS Trust.  (ProSupp at

S-8.)  RALI then transferred the pool of loans to the trustee, Deutsche Bank Trust Companies

Americas ("Deutsche Bank"), on behalf of the PLS Trust, in exchange for the Certificates.  (*Id.*)

RALI, through underwriters, then sold the Certificates to investors.

   As part of the offering, RFC, RALI, and Deutsche Bank entered into the PSA.

Among other things, the PSA (consistent with PSAs generally) governs the conveyance of the

mortgage loans from RALI as depositor to the Trust, the issuance of Certificates to investors, and

the respective rights and obligations of the parties.  (*See* PSA.)  In addition, the PSA includes

representations and warranties made by the Debtors to the Trust.  (*Id.*)

   The prospectus and prospectus supplement — the primary offering documents —

set forth the material aspects of the investment including, among others:  the structure of the

securitizations, the risk factors of the investment, the roles and experience of the Debtors as

sponsor and Master Servicer (defined below), the characteristics of the mortgage pool, and the

nature of the Certificates.  The Debtors prepared the prospectus, prospectus supplement, and

other offering documents for each of their securitizations.  (*See* First Am. Compl., *Allstate Ins.

Co. v. GMAC Mortg., LLC*, No. 27-cv-11-3480 (Minn. Dist. Ct. Apr. 15, 2011) ("Allstate FAC"),

attached as Ex. 6 to the *Decl. of Bryan M. Kotliar in Supp. of Debtors' Opp. to Mot.*, dated Feb.

19, 2013 (the "Kotliar Decl."), ¶ 2 ("defendants made numerous material misrepresentations and

omissions . . . in registration statements, prospectuses, prospectus supplements").)

---

Supplement, dated Mar. 28, 2006 ("ProSupp")), & Ex. B at 118-231 (Prospectus for Mortgage
Asset-Backed and Manufactured Housing Contract Pass-Through Certificates, dated Mar. 3,
2006 ("Prospectus" or "Pros.")); *see also Decl. of Tammy Hamzehpour in Supp. of the Debtors'
Opp. to Mot.*, dated Feb. 19, 2013 ("Hamzehpour Decl."), Ex. 1 ("Securitization Flow Chart").

14202894

## 2.    The Nature of the Debtors' RMBS

The Certificates represent each certificateholder's agreement to a carefully delineated interrelationship of payment priorities among the various tranches of Certificates. That allocation of payment rights and priorities, commonly referred to as a "waterfall," is set out in the governing documents.  Generally speaking, more senior tranches get paid first, while losses are first allocated to the junior tranches.  (*See* PSA § 1.01 (defining classes of Certificates); § 4.02 (providing for "Distributions" in sequential order); § 4.05 (allocating "Realized Losses" in reverse order).)  Within each tranche, distributions are made "pro rata, until the certificate principal balances thereof have been reduced to zero."  (ProSupp at S-64.)  In exchange for additional risk, lower tranche Certificates receive a higher rate of return.

The return on the Certificates was far from guaranteed.  The ProSupp explained, for example, that "[t]he yield on your certificates will vary depending on the rate of prepayments," which "is one of the most important and least predictable" of the factors affecting yield.  (*Id.* at S-23.)  The governing documents also assign priority for distributions of a host of potential funds that flow to the Trust, including not just principal and interest, but "prepayments on the mortgage loans, Insurance Proceeds, Liquidation Proceeds and Subsequent Recoveries, and proceeds from repurchases."  (*Id.* at S-49-50.)

Particularly relevant here, the documents address breach of representations and warranties.  Specifically, if the Master Servicer (defined below) or subservicer receives a subsequent recovery "in connection with a related breach of a representation or warranty or otherwise, such subsequent recovery shall be distributed to the certificateholders in the same manner as repurchase proceeds received in the prior calendar month, to the extent that the related Realized Loss was allocated to any class of certificates" and then down the waterfall of tranches

6

to which "Realized Losses" have been allocated.  (Pros. at 41; *see also* PSA at 68 ("Subsequent

Recoveries" include any "recoveries in respect of the representations and warranties.").)

Moreover, pursuant to the PSA, the certificateholders agreed that:

> ***no one or more Holders*** of Certificates of any Class ***shall have any
> right*** in any manner whatever by virtue of any provision of this
> Agreement ***to affect, disturb or prejudice the rights of the Holders of
> any other of such Certificates*** of such Class or any other Class, ***or to
> obtain or seek to obtain priority over or preference to any other such
> Holder***, or to enforce any right under this Agreement, ***except in the
> manner herein provided and for the common benefit of
> Certificateholders*** of such Class or all Classes, as the case may be.

(PSA § 11.03(c) (emphasis added).)

### 3.    Additional Investment Features of the RMBS

The Certificates provide numerous investment benefits to holders.  One

fundamental benefit, as with many securities, is liquidity.  Allstate, for example, alleges that it

"purchased these securities with the expectation that the investments could be — and indeed

some would be and were — sold on the secondary market."  (Allstate FAC ¶ 4; *see also* ProSupp

at S-87 (describing how Certificates are "transferable and exchangeable").)  As is typically the

case for securities, the Certificates thus expose investors to both the benefits and the risks —

including interest rate risk — associated with fluctuations in market value.  (*See, e.g.,* ProSupp at

S-16-24 (describing "Risk Factors" affecting "the value of your certificates").)

Beyond the liquidity provided by a secondary market, the securitization structure

provides certificateholders with numerous forms of protection.  First, the securitizations provide

certificateholders with exclusive rights to a pool of mortgage loans segregated from the assets

available to the Debtors' general unsecured creditors.  Second, the securitizations provide three

primary forms of structural protection, or "credit enhancement":  excess cash flow,

overcollateralization, and subordination.  (*Id.* at S-13.)  The Certificates also benefit from

servicer advances, in the case of RALI Series 2006-QO3 from the Debtor RFC, "to cover the

amount of the scheduled [mortgage] payment that was not made . . . if [the Master Servicer]

determines that the advance would be recoverable." (*Id*.)  Certain securitizations are further

benefited by insurance policies obtained by the Debtors.  (Pros. at 45-46.)

 Finally, the certificateholders benefited indirectly from the Debtors'

representations and warranties backed by a repurchase obligation.  (*See* ProSupp at S-10.)  The

Debtors' repurchase obligations transfer certain risks of non-conforming mortgage loans from

the certificateholders to the Debtors.  The sponsor's expected ability, or inability, to satisfy its

repurchase obligations presumably was reflected in the price of the Certificates.

  **4.**  **The Debtors' Marketing of RMBS**

 To distinguish their RMBS offerings from those of competitors, the Debtors

carefully branded and marketed them based on the broad array of services they offered.  For

example, a 2007 "Overview of ABS/MBS Products" available to all investors on the GMAC-

RFC Vision$^{SM}$ website, prominently featured the ResCap logo on every page.  (*See* Hamzehpour

Decl. Ex. 2.)  That document provided extensive data concerning the Debtors' securitization

experience and market share, and differentiated the Debtors from their competitors by noting that

"GMAC ResCap provides investors with more options by bringing a variety of asset types to the

market."  (*Id.*, Ex. 2, at 2.)  The overview also explained that the segregation of offerings into

specific asset types "provides a deeper understanding of the underlying product and risk profile

of GMAC ResCap securities—and helps investors make better-informed decisions."  (*Id.*) [4]

 The Debtors also prominently featured the services they provided to investors,

including "the GMAC-RFC Investor Services Web site to help [investors] manage their

---

[4] Our example deal, RALI 2006-QO3, was dedicated to Alt-A mortgages, and the QO sub-
classification, dedicated to payment option adjustable-rate mortgages.  (*Id.*, at Ex. 2, 4.)

14202894

portfolios and make fast, informed decisions" and GMAC-RFC Vision[SM], the Debtors' online

"data access and analysis" tools that allowed investors to "compare performance in greater

detail." (*Id.* at 3.)

The Debtors also met directly with investors and participated in events with the

investing community generally. (*See* Hamzehpour Decl. ¶ 4.) For example, contemporaneous

records reflect that Allstate, AIG, and Prudential attended servicing and operations reviews with

the Debtors, and that ResCap met with Allstate several times in connection with Allstate's

investment in ResCap's RMBS. (*See* Hamzehpour Decl. ¶ 4 & Exs. 3, 4.) The Debtors'

presentations to potential investors highlighted their RMBS issuance history, as well as the

Debtors' corporate structure, including its "vertically integrated business model" and ResCap's

"investment grade credit ratings." (Hamzehpour Decl. ¶ 3 & Ex. 5, at 4-5, 7.)

### 5.    The Debtors' Ongoing Management of Trust Business and Property

Following the offerings, the Debtors effectively controlled all of the day-to-day

operations of the PLS Trusts, which had no employees, and managed the mortgage loans, as

Trust property. For example, RFC, in addition to being the sponsor of the RALI Series 2006-

QO3 offering, is also the Master Servicer (the "Master Servicer"). In this role, RFC is

responsible for "servic[ing] and administer[ing] the Mortgage Loans in accordance with [the

terms of the PSA] . . . and shall have ***full power and authority . . . to do any and all things***

***which it may deem necessary or desirable in connection with such servicing and***

***administration***." (PSA § 3.01(a) (emphasis added).) Article 3 of the PSA sets forth the

functions that the Master Servicer performs. (*Id*. at § 3.01.)[5] In short, at the time of issuance, the

---

[5] These servicing duties include, among others, calculating remittance amounts to the
certificateholders, sending remittances to trustees for distribution to certificateholders, investor
and tax reporting, coordinating loan repurchases, oversight of all servicing activity, approving
loss mitigation strategies, and managing and liquidating mortgaged properties acquired by

9

Debtors performed virtually all of the functions necessary to manage the Trust business and property.  In contrast, the trustee's obligations are essentially limited to:  (i) pursuing remedies for a default; (ii) maintaining various Certificates, statements, and opinions, and distributing them when necessary; and (iii) paying taxes for the Trusts.  (PSA § 8.01.)

### B.    The Chapter 11 Cases

As of the Petition Date, the Debtors were named in dozens of lawsuits asserting claims based upon the Debtors' sale of RMBS.  The magnitude of the Debtors' potential liability, and the burden and expense of litigating those claims, was one of the primary factors that led the Debtors to file these Chapter 11 Cases.  (*See* Whitlinger Aff. ¶¶ 12, 33.)

### 1.    "Trust Claims"

The trustees of the PLS Trusts have asserted Trust Claims, which are the subject of the proposed settlement (the "Trust Settlement").  (*See Debtors' Second Supp. Mot. Pursuant to Fed. R. Bankr. P. 9019 for Approval of Trust Settlement Agreements* [Docket No. 1887] (the "Settlement Motion").)  The Trust Settlement would resolve Trust Claims brought by up to 392 Trusts and, if approved, would result in an allowed claim of $8.7 billion.  (*Id.*)

The mechanics of the Trust Settlement are based on the structure of the Trusts themselves.  Should the Trust Settlement be approved by the Court, when distributions are made by the Debtors' estates, all certificateholders of each Trust that signs on will be entitled to receive the proceeds according to the priority reflected in the PLS Trust's waterfall.  The Trust

---

foreclosure.  (ProSupp at S-87-88.)  The Master Servicer also has the right to assign a subservicer.  (PSA at § 3.02.)  In the RALI Series 2006-QO3 offering, RFC appointed Debtor Homecomings Financial Network, Inc. ("Homecomings") to act as "Subservicer."  (ProSupp at S-88.)  As Subservicer, Homecomings is responsible for a variety of tasks related to operating the mortgage loans including, among others, communicating with borrowers, collecting borrower payments, calculating and reporting payoffs and liquidations, and maintaining insurance.  (*Id.* at S-88-89.)

10

Settlement is structured this way in order to "prevent a windfall to any one Trust or Institutional

Investor, treat the Holders equitably and in accordance with their contractual rights under the

Governing Agreements, and maximize recoveries for all Investors."  (*Id.* at 12.)

### 2.    "Investor Claims"

The Investor Claims have been brought by both current and former

certificateholders based on their purchase of RMBS.  The Investor Claims allege damages arising

from the purchase or sale of their securities under the federal securities laws, state blue sky laws,

and pursuant to tort theories, seeking to recoup investment losses allegedly suffered due to

material misstatements in the offering documents.  (*See* Mot. at 2-3; *see also* Am. Compl., *Mass*

*Mutual Life Ins. Co. v. Residential Funding Co.*, No. 3:11-cv-30035-MAP (D. Mass. May 17,

2012) [Docket No. 86] ("Mass Mutual AC"), attached as Ex. 7 to the Kotliar Decl., ¶ 61 (alleged

misstatements are the breaches of representations and warranties)); Allstate FAC ¶¶ 6, 150

(same).)  The Investors also seek to rescind their purchases.  (*See, e.g.*, Allstate FAC ¶ 251; Mass

Mutual AC ¶ 7.)

The Investors include many of the same certificateholders who will be the

beneficiaries of the Trust Claims (*see* Mot. at n.2 (noting that Investors still hold some of the

Certificates)) and represent holdings at various levels of seniority.  For example, Allstate, AIG,

Mass Mutual, and Prudential assert that they collectively purchased $1.785 billion of the

RMBS.  (Mot. at 3.)  The NCUAB asserts that it holds over $300 million in claims relating to the

Debtors' securitizations.  (Joinder at 2.)  Together, those five Investors have asserted proofs of

claim relating to their purchase of securities for securities ranging in seniority from Class A to

14202894

Class M9, from 104 different securitizations, including 88 securitizations with investors joining the Trust Settlement.[6]

### 3.    The Investors' Motion

On November 27, 2012, the Investors filed the Motion seeking: (i) a declaration that, for purposes of any chapter 11 plan, the Investor Claims should be classified in the same class as the Trust Claims; and (ii) a declaration that the Investor Claims are not subordinated under Section 510(b).  (*See* Mot. at 3-4.)  The NCUAB joined the Motion.

## ARGUMENT

The Investors seek to use Bankruptcy Rule 3013 to pre-emptively jockey for position prior to the filing of a disclosure statement or soliciting of any plan.  The Debtors have concurrently filed an adversary proceeding, because that is the appropriate procedure for seeking declaratory relief or subordination outside a chapter 11 plan.  Regardless of the procedural posture, the Motion is meritless.

Section 510(b) requires that the Investor Claims be subordinated, because they "arise from" the purchase of securities of the Debtors or affiliates of the Debtors.  (*See* Section I.)  In addition, the Investor Claims should be subordinated pursuant to Section 510(a) in order to enforce the express and implied subordination agreements among certificateholders.  (*See* Section II.)  Lastly, to the extent that the Investor Claims are not subordinated pursuant to Sections 510(a) or 510(b) — which they should be — they should alternatively be equitably subordinated pursuant to Section 510(c) to prevent the series of inequitable consequences that would otherwise result.  (*See* Section III.)  At bottom, the Investors are seeking two bites at the apple from the Debtors — a general unsecured claim based on their securities claims, and a

---

[6] *See* Kotliar Decl. ¶ 4.  Not every proof of claim identifies the specific tranche from which its claim arises.  (*Id.*)

separate recovery based on any proceeds they would be entitled to under the Trust Settlement.

Ultimately, the Investor Claims are fundamentally different from the Trust Claims, and therefore

cannot be similarly classified pursuant to Section 1122.  (*See* Section IV.)

I.      **THE INVESTOR CLAIMS ARE SUBORDINATED PURSUANT TO SECTION
        510(B) OF THE BANKRUPTCY CODE**

Under Section 510(b), any claim for rescission or for "damages arising from the

purchase or sale of" a "security of the debtor or of an affiliate of the debtor" is "subordinated to

all claims or interests that are senior to or equal the claim or interest represented by such

security." 11 U.S.C. § 510(b).[7]  The Investors concede that their claims arise from the purchase

or sale of a security, but claim that their securities are not "of" a Debtor or "of an affiliate" of a

Debtor.  The Investors are wrong.

Congress enacted Section 510(b) to preclude holders of securities issued by a

debtor from elevating their claims to that of unsecured creditors through claims for rescission.

*See SeaQuest Gen. Holdings LLC v. S & J Diving Inc. (In re Seaquest Diving LP)*, 579 F.3d 411,

418-19 (5th Cir. 2009); *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2d

Cir. 2006).  Section 510(b) subordinates the claims of securities holders to enforce the "absolute

priority rule," under which securities holders who enjoy the benefits of ownership of a security

— benefits beyond those of a general unsecured creditor — must also bear greater risk from

insolvency.  *CIT Grp. Inc. v. Tyco Int'l Ltd. (In re CIT Grp. Inc.)*, 460 B.R. 633, 640 (Bankr.

S.D.N.Y. 2011) (citing *Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281

F.3d 133, 139-40 (3d Cir. 2002)).  "While the expectation of a general unsecured creditor is

---

[7] As noted above, the Investors do not dispute that the Certificates they purchased are
"securities."  (Mot. at 18; *see also* 11 U.S.C. § 101(49)(A) (defining "security" to include not
just equity but also any note, bond, debenture, transferable share, or "other claim or interest
commonly known as a 'security'").)  And the Investors do not contest that their claims are for
rescission and "for damages arising from the purchase or sale" of securities.

13

merely to be paid for a good or service, or to be repaid with interest, the expectation of a purchaser of a security can include an interest in proceeds or profits or other benefits unavailable to general unsecured creditors." *NationsBank, N.A. v. Commercial Fin. Servs., Inc. (In re Commercial Fin. Servs., Inc.)*, 268 B.R. 579, 592 (Bankr. N.D. Okla. 2001).  Section 510(b) is, consistent with Congressional intent, to be given "a liberal construction."  *In re Einstein/Noah Bagel Corp*., 257 B.R. 499, 508 (Bankr. D. Ariz. 2000).

     **A.**     **The Certificates Purchased by the Investors Are Securities "of" the Debtors**

Contrary to the Investors' argument, the RMBS are securities "of" the Debtors. The securities laws recognize that the Debtors, not the passive trusts created by them, are the issuers of the securities, and the facts unambiguously support the same conclusion.

     **1.**     **The Depositor/Debtors Are the Issuers of the Certificates**

In the context of mortgage-backed securities, the Securities Act of 1933 and the Securities Exchange Act of 1934 both provide that the "'issuer' means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued."  Securities Act § 2(a), 15 U.S.C. § 77b(a)(4); Exchange Act § 3(a)(8), 15 U.S.C. § 78c(a)(8) (verbatim). The federal regulations promulgated under both the Securities Act and the Exchange Act, SEC Rules 191 and 3b-19, respectively, similarly provide that "[t]he depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity."  17 C.F.R. § 230.191(a); 17 C.F.R. § 240.3b-19(a) (verbatim).  Thus, while the trusts are also "issuing entit[ies]" (*id.*), the securities laws recognize that the depositor, not the passive trust, is the responsible entity.

The legislative history confirms Congress' understanding that "the depositor is the person responsible for the flotation of the issue" and "information relative to the depositor and to

14202894

the basic securities is what chiefly concerns the investor." H.R. Rep. No. 85, 73 Cong., 1st Sess.

13 (1933). "[T]he duty of furnishing this information is placed upon the actual manager of the

trust and not the passive trustee, and this purpose is accomplished by defining 'issuer' as in such

instances referring to the depositor or manager." *Id.*

        Not surprisingly, the law recognizes that it is the depositors in securitizations who

are the issuers, and the Investors concede as much. *See, e.g., United States v. York*, 112 F.3d

1218, 1219-20 (D.C. Cir. 1997) ("The banking institutions that originate mortgage loans and

issue mortgage-backed securities are known as 'issuers.'"); Allstate FAC ¶ 20 ("The Depositors

are considered issuers of the Certificates within the meaning of Section 2(a)(4) of the Securities

Act of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 775(a).")

        The Debtors are issuers not just by the technical definition. As described above

(*supra* pp. 4-5, 8-9) and as acknowledged by Allstate and Mass Mutual, the Debtors "controlled

. . . every aspect of the securitization process, from loan origination through sale to Allstate."

(Allstate FAC ¶ 64.) The Debtors "acquired and pooled the mortgage loans, *created the*

*securities*, and marketed and sold the Certificates at issue." (*Id.* (emphasis added); *see also*

¶ 37.) After the loans are placed into tranches, "the issuing trust passes the securities or

certificates back to the depositor, *who becomes the issuer of the securities*." (*Id.* ¶ 38 (emphasis

added).) "The depositor then passes the securities to one or more underwriters, who offer and

sell the securities to investors in exchange for cash that is passed back to the depositor." (*Id.*; *see*

*also* Mass Mutual AC ¶ 219 ("The Sponsor (Residential Funding), Depositors (RALI, RAMP,

and RASC), and Underwriters (Residential Securities and UBS) *qualify as sellers of the*

*Certificates* because they *issued*, marketed and/or *sold* the Certificates to the public." (emphasis

added).)

15

After the Certificates were sold, the Debtors' involvement continued as Master Servicer and subservicer pursuant to PSAs. (*See supra* pp. 9-10.) In the RALI 2006-QO3 offering, RFC, as Master Servicer, was responsible for "servic[ing] and administer[ing] the Mortgage Loans in accordance with [the terms of the PSA] . . . and shall have full power and authority . . . to do any and all things which it may deem necessary or desirable in connection with such servicing and administration." (PSA § 3.01(a); *see also supra* pp. 9-10.)

### 2.  The Investors' Countervailing Arguments Are Misguided

Ignoring both the securities laws and their own allegations, the Investors argue that the RMBS are not securities "of" any Debtor, because the Trusts themselves are not Debtors. But that makes no difference. The Trusts were simply passive vehicles that the Debtors used to structure the RMBS. The Trusts do not have employees. They did not originate mortgage loans or make any decisions as to how the mortgage loans would be pooled or securitized, nor did they prepare any of the offering materials. The Trusts do not service the underlying mortgages.

The Investors also argue that they "have no contractual relationship with the Debtors." (Mot. at 18.) That is both wrong and irrelevant. The initial Investors purchased the Certificates from the Debtors or from the underwriters who purchased Certificates from the Debtors, as acknowledged by the allegations recounted immediately above.

Last, the Investors' reliance on *In re Washington Mutual, Inc.*, 462 B.R. 137 (Bankr. D. Del. 2011) is misplaced because that opinion was subsequently called into question by the court that issued it, and because it is factually inapposite. First, the *Washington Mutual* court itself declined to follow the opinion when denying other claimants' motion to reclassify claims based on the same underlying securities. (*See* Kotliar Decl. Ex. 8 (Hr'g Tr., *In re Wash. Mut., Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. May 7, 2012) [Docket No. 10154]), at 125:8-15 ("I don't think the MBS plaintiffs can rely on that. . . . [I]t was not a final decision at all

16

because of the pendency of the motion for reconsideration.  I did not get the chance to address

that motion or make any ruling on those arguments.  So, quite frankly, it is not law of the case.

If it were, I would exercise my discretion not to apply it to this claim."); *see also* Kotliar Decl.

Ex. 9 (Order Approving Stipulation and Agreement, *In re Wash. Mut., Inc.*, No. 08-12229

(MFW) (Bankr. D. Del. Feb. 16, 2012) [Docket No. 9698]), at 2; Kotliar Decl. Ex. 10 (Order

Den. Classification, *In re Wash. Mut., Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. May 16, 2012)

[Docket No. 10182]), at 3.)

   Second, in *Washington Mutual*, the securities claimant invested in residential

mortgage-backed securities sponsored by the debtor's *non-debtor* subsidiaries.  462 B.R. at 139.

In other words, the Washington Mutual entities that structured and sold the RMBS — *i.e.*, the

issuers — were not debtors.  Here, however, the Depositor/issuers that solicited, offered, and

sold the ResCap RMBS are all Debtors.[8]

  **B.**  **If the Certificates Purchased by the Investors Are Not Securities of the Debtors, They Are Securities of Affiliates of the Debtors**

   If the Certificates purchased by the Investors are viewed only as securities "of"

the Trusts and not the Debtors, the Investor Claims should nonetheless be subordinated under

Section 510(b) because the Trusts are "affiliates" of the Debtors.  Under the Bankruptcy Code,

an "affiliate" includes a "person whose business is operated under a lease or operating agreement

by a debtor, or person substantially all of whose property is operated under an operating

agreement with the debtor."  11 U.S.C. § 101(2)(c).  Under this definition, the PLS Trusts are

---

[8] The *Washington Mutual* court also premised its reasoning on the notion that the investors "did
not assume the risk (and potential rewards)" of a security holder.  462 B.R. at 147.  Putting aside
whether that was an accurate statement in the case before that court, it is certainly not the case
here for the reasons explained below.  (*See infra* p. 21-25.)  In addition, the hypothetical posed
by the *Washington Mutual* court (462 B.R. at 147) and repeated by the Investors (Mot. at 20) —
a scenario in which Washington Mutual sold a customer Apple stock — has no applicability
here.  The Debtors did not sell stock in an unrelated third-party company.

affiliates, because the Debtors operate substantially all of the business and property of the PLS

Trusts under an operating agreement.  *See* H.R. Rep. No. 85, 73 Cong., 1st Sess. 13 (1933)

(noting that the "depositor" is "the actual manager of the trust").

      The property being held in trust for the benefit of the certificateholders consists

primarily of a pool of mortgage loans, and the business of the PLS Trust is to manage that

property for the benefit of the certificateholders.  At the time of issuance, the Debtors managed

every aspect of the mortgage loans under the PSAs.  (PSA § 3.01(a) ("[T]he Master Servicer

shall service and administer the Mortgage Loans and "shall have full power and authority . . . to

do any and all things which it may deem . . . desirable in connection with such servicing and

administration."); *see also supra* p. 9 (itemizing Master Servicer responsibilities).)

      Because the Debtors operated substantially all of the business and property of the

Trusts at the time the Investors' claims arose,[9] the Trusts are affiliates of the Debtors.  *See*

*Jenkins v. Tomlinson (In re Basin Res. Corp.)*, 190 B.R. 824, 825-27 (Bankr. N.D. Tex. 1996)

(holding that joint venture is affiliate of debtor where debtor was manager of joint venture's

properties); *In re Minton Grp., Inc.*, 27 B.R. 385, 389 (Bankr. S.D.N.Y. 1983), *aff'd*, 46 B.R. 222

(S.D.N.Y. 1985) (limited partnership was affiliate of debtor where debtor operated business and

managed property under limited partnership agreement); *In re Consol. Cos.*, 113 B.R. 269, 272-

73 (Bankr. N.D. Tex. 1989) (property management company that managed debtor's properties

and business was affiliate); *In re Century Inv. Fund VII Ltd. P'ship*, 96 B.R. 884, 892 (Bankr.

E.D. Wis. 1989) (CMG was affiliate of debtor, because CMG managed all of debtor's property);

---

[9] *See In re Wash. Mut., Inc.*, 442 B.R. 314, 363 (Bankr. D. Del. 2011) ("the relevant time for determining whether the security was issued by an affiliate, is at the time the claim arose (i.e., when the security was bought or sold)") (citing *In re VF Brands, Inc.*, 275 B.R. 725, 728 (Bankr. D. Del. 2002)); *see also In re Wisconsin Barge Line, Inc.*, 76 B.R. 142, 144 (Bankr. E.D. Mo. 1987) (same).

*In re Reynolds*, 13 B.R. 658, 659 (Bankr. N.D. Ga. 1981) (non-debtor business was affiliate where debtor was general manager of, and designated to operate, the business).[10]

The Investors incorrectly assert that the PSAs cannot be operating agreements, because the trusts purportedly "retained material responsibilities." (Mot. at 22.) First, even assuming that is true, the retention by the Trusts of certain material responsibilities is entirely consistent with their being an "affiliate" for purposes of the Bankruptcy Code. The statutory definition expressly includes an entity whose business *or* "substantially all of whose property is operated" by a Debtor (11 U.S.C. § 101(2)(c)), leaving open that some responsibilities might be retained. For example, in *Consolidated Companies*, the court found that an entity operated substantially all of a debtor's business and therefore was an affiliate, even though the debtor had its own employees and continued to undertake certain actions on its own. 113 B.R. at 272.

Second, the responsibilities of the RMBS trustees are primarily ministerial tasks, such as examining documents, maintaining a website for investors to access SEC filings, and replacing lost or stolen Certificates. (Mot. at 6 n.4.) None of these responsibilities involves operating or managing the property of the Trusts (*i.e.*, the underlying mortgage loans).

Here, again, the Investors' reliance on *Washington Mutual* is misplaced. The debtor in that case "was not a party to [the Pooling and Servicing] agreements."[11] *Wash. Mut.*,

---

[10] It makes no difference whether the PSAs are titled "operating agreements." Courts look beyond the title and examine whether the agreement provides for the management of substantially all of the property or business of the trusts. *See Consol. Cos.*, 113 B.R. at 272-73 (where debtor managed property of another, the other party was an affiliate, even though contract specified that debtor did not have right to manage or control the business or assets of the other).

[11] The *Washington Mutual* court did *not* conclude that PSAs were not operating agreements. Rather, the court concluded only that it had not yet been proven, at the early stages of litigation, that the particular PSAs were operating agreements. 462 B.R. at 145-46.

19

462 B.R. at 146.  Thus, the court observed that the agreements were "between two non-debtors," and "cannot provide a basis for subordination."  *Id.*  That is not the case here.

The Investors attempt to cast doubt on this plain-language reading of the statutory term "affiliate" by posing an inapt hypothetical.  They note that servicers of some RMBS (not those at issue here) are unrelated to the underlying securitization process, and assert, without more, that it would be odd to call a Trust an affiliate of a servicer "where [that servicer] had no role in the trust's creation, the pooling of the loans, or in the marketing of the trust's certificates." (Mot. at 22.)  That hypothetical is directly contrary to the facts before this Court and need not be considered at all, but if it is, the natural takeaway is the converse:  It is odd to *deny* that the Trust is an affiliate where, as here, the Debtors *did* control the Trust's creation, the pooling of the loans, and the marketing of the trust's Certificates, in addition to performing all of the servicing.

*In re Commercial Fin. Servs. Inc.* is directly on point.  There, the court subordinated pursuant to Section 510(b) securities claims involving bankruptcy-remote securitization trusts formed by, and serviced by, the debtors.  (*See* Kotliar Decl. Ex. 11 (Order Granting Mot. for Summ. J., *In re Commercial Fin. Servs. Inc.*, Case No. 98-05162-R, Adv. Case No. 98-0356-R (Bankr. N.D. Okla. July 11, 2003) [Docket No. 174]).)  Just as here, the underlying assets — loans and credit card receivables — were securitized:

> through a series of transactions in which [the debtors] packaged the [l]oans and transferred such packages to an affiliate of [the debtor], which in turn sold the [l]oan packages to a trust.  [The debtor] and its affiliate agreed to sell securities backed by the [l]oan packages to specific investors or to a placement agent.  [The debtor] simultaneously contracted to service the [l]oans in all respects and to manage the operations of the securitizations that it had established and sponsored.  [The debtor], or one of its affiliates, received the net proceeds from the sale of the securities, a fee for servicing the [l]oans, and a right to any residual value of the [l]oans when and if the securities were paid in full.

*Id*. at 15.

20

After the debtors filed for bankruptcy, one of the purchasers of the securities —

Bank of America, N.A. ("BoA") — brought an adversary proceeding seeking to rescind the

purchase to establish a constructive trust over certain sale proceeds it asserted were traceable to a

specific account of the debtor.  *Id*. at 4.  BoA's claims were "based upon [its] allegation that

fraud infected the disclosures upon which it based its decision to purchase securities."  *Id*. at 49.

The court subordinated BoA's claims pursuant to Section 510(b), because the

trusts were affiliates of the debtors.  *Id*. at 84.[12]  In reaching that conclusion, the court noted that

the debtor was "contractually obligated to perform not only all duties of the Servicer," but also

that "[v]irtually all other activities contemplated by the [trust] were performed by the [debtor]."

*Id*. at 81.  As a result, the debtors were "operating the 'property' of the [trust]" under "an

operating agreement."  *Id*. at 83.  For all the same reasons, Section 510(b) mandates

subordination of the Investor Claims here.

### C.    Subordination of the Investor Claims Comports with the Policies and the Purpose of Section 510(b) of the Bankruptcy Code

The principles underlying Section 510(b) confirm why subordination of the

Investor Claims is required.  In enacting Section 510(b), Congress endorsed the view that risk of

fraud or other illegality in the issuance of securities should be borne by securities holders, not

other creditors.  (*See* H.R. Rep. No. 95–595, at 196 (1978) ("The bill generally adopts the

Slain/Kripke position."); Kotliar Decl. Ex. 12 (John J. Slain & Homer Kripke, *The Interface*

*Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities*

*Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 288 (1973)

("Slain & Kripke")) ("It is difficult to conceive of any reason for shifting even a small portion of

the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor,

---

[12] The court did not address whether the securities were also securities "of the debtor."

21

that the stock is offered."").)  Slain and Kripke gave two central reasons for this rule.  First,

"allowing equity-holders to become effectively creditors—by treating these two classes as

though they were one—gives investors the best of both worlds . . ." — upside potential and

downside protection.  *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1176

(10th Cir. 2002) (citing Slain & Kripke).  Second, it "dilutes the capital reserves available to

repay general creditors, who rely on investment equity for satisfaction of their claims."  *Id.*

       Notably, Slain & Kripke focused solely upon equity and subordinated debt

securities, because the authors assumed that holders of securities representing general unsecured

debt would not attempt to use a securities claim to better their position vis-à-vis other general

creditors.[13]  Nonetheless, in enacting Section 510(b), Congress chose language that made clear

its intention to cover securities claims bought by all securities of a debtor (or of an affiliate) —

including securities that already enjoyed the same priority as general unsecured debt.  Consistent

with the purpose of Section 510(b), the Second Circuit has held that subordination is required if

the claimants (i) took on the risk and return expectations of a securities holder, rather than a

creditor, or (ii) seek to recover a contribution to the equity pool presumably relied upon by

creditors in deciding whether to extend credit to the debtor.  *Med Diversified*, 461 F.3d at 256.

---

[13] Specifically, Slain and Kripke stated:

> Some securityholders may not benefit from their securities law rights, since their
> contracts with the issuer often provide for equal or superior remedies.  For
> example, the note evidencing a bank loan made to an issuer is a security, and if
> the loan has been obtained by misrepresentation, securities law remedies may be
> available to the bank.  Since, however, the bank is already a creditor, these
> remedies will not ordinarily improve the bank's position vis-à-vis the issuer's
> general creditors.

Slain & Kripke, at 267-68.  Here, in contrast, the Investors are trying to use the securities law to
improve their position vis-à-vis the Debtors' general creditors.  Specifically, not content with
being the beneficiaries of the Trusts' contractual claims against the Debtors, the Investors seek to
assert a duplicative claim for securities fraud that will place them in a better position than the
Debtors' general unsecured creditors.

Here, there can be no question that the Investors took on the risk and return expectations of a securities holder.  The Certificates have all the standard features of investment risk.  For example, the prospectuses warned that, "[i]f the performance of the mortgage loans is substantially worse than assumed by the rating agencies," that would "reduce the value of th[e] certificates" on the secondary market.  (ProSupp at S-21.)  Similarly, if prepayments of the loans were higher than expected that could reduce the yield.  (*Id.* at S-23.)  Conversely, if the loans performed better than expected, that could increase the value of the Certificates on the secondary market and create an opportunity to sell at a profit.  That liquidity and potential upside is the "crucial difference between creditor and investor expectations."  *CIT Grp.*, 460 B.R. at 640.

Beyond the liquidity and potential upside provided by a secondary market for certificateholders, the Certificates contained down-side protection that was not available to general unsecured creditors.  The Investors could select varying degrees of protection by purchasing different tranches, with correspondingly higher or lower rates of return.

Purchases of the Debtors' RMBS were also effectively an investment in the Debtors' brand.  A primary distinction among the numerous RMBS issuers was the experience and reputation of the sponsoring and servicing entities.  This is demonstrated by the extensive disclosures in the ProSupp concerning RFC as sponsor and Master Servicer, including a description of its affiliation with other Debtor entities as well as pages of financial data describing RFC's securitization and servicing experience.  (ProSupp at S-28-34.)  This emphasis on brand is also reflected in the Debtors' marketing materials, which prominently featured the Debtors' branding and actively promoted the Debtors':  (i) business structure and vertical integration; (ii) independent credit ratings; (iii) extensive track record of issuing and servicing RMBS; (iv) specific origination and risk management policies; (v) division of securitizations into

23

distinct shelves and sub-classifications by asset-type; and (vi) proprietary data access and analysis services provided to investors.  (*See* Hamzehpour Decl., Exs. 2, 5.).  This is further confirmed by the Investors' meetings with the Debtors to review their underwriting and servicing operations.  (*See id.*, Exs. 3, 4.)

In addition, the Certificates benefited from the Debtors' ongoing ability to provide servicing advances (PSA § 4.04), as well as the Debtors' mortgage repurchase obligations in the event of a breach of certain representations and warranties.  (*Id.* at § 2.03.)  This reliance on the Debtors' ability to fulfill certain monetary obligations reflects direct exposure to the Debtors' solvency.  In short, the value of the Certificates was inextricably tied to the Debtors.

Nonetheless, the Investors contend that the Investor Claims should be treated as general unsecured claims.  "[H]aving watched [their] investment gamble turn sour, [the Investors] would shift [their] losses to" the Debtors' creditors.  *Geneva Steel*, 281 F.3d at 1180.  That "effort clashes with the legislative policies that Section 510(b) purports to advance."  *Id.*  "Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding."  *In re Enron Corp.*, 341 B.R. 141, 158 (Bankr. S.D.N.Y. 2006) (quoting *Baroda Hill Invs.*, 281 F.3d at 142).

The Investors' argument that they "never contributed to the equity pool of the Debtors" (Mot. at 24), is wrong.  *See Commercial Fin. Servs.*, 268 B.R. at 594 (in assessing whether, under Section 510(b), claim of holder of securities of securitization trust sponsored by debtor should be subordinated, court noted that funds invested via the securitization provided an equity cushion to the debtor's general creditors).  As noted by the *Commercial Fin. Servs.* court, when an investor in a securitization provides financing to a debtor in exchange for securities with

24

recourse against certain of the debtors' assets that none of the debtors' general unsecured

creditors can reach, it would be "inequitable" to permit the securities claimant "to make a claim

against [the debtor/sponsor's] *unsegregated* assets, diluting the general unsecured creditors'

recovery yet a second time." *See id.* at 599-600 (emphasis in original).

Just as the *Commercial Fin. Servs.* court subordinated under Section 510(b) the

claim of an investor in the debtor's securitization of credit card receivables in that case, so too

here, should the Investors Claims be recognized as subordinated under Section 510(b).

## II.    THE INVESTOR CLAIMS SHOULD BE SUBORDINATED PURSUANT TO SECTION 510(A) OF THE BANKRUPTCY CODE

Subordination of the Investor Claims is also required under Section 510(a) as a

means of enforcing the subordination agreements *among* certificateholders.  Under Section

510(a), a "subordination agreement is enforceable" in bankruptcy "to the same extent that such

agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  Where a

claim holder has agreed that its claim will be junior to the claims of others, that agreement is

uniformly enforced in bankruptcy.  *See Robinson v. Howard Bank (In re Kors, Inc.)*, 819 F.2d

19, 24 (2d Cir. 1987).

There are two distinct forms of subordination agreements that require

subordination of the Investor Claims:  (i) the express subordination agreements among senior

and junior tranches of Certificates (including the corollary agreement that holders of the same

tranche are not subordinate to each other); and (ii) the implied subordination of former

certificateholders to subsequent purchasers, inherent in the sale of the Certificates.

A subordination agreement is any "contractual arrangement whereby one creditor

agrees to subordinate its claim against a debtor in favor of the claim of another."  *In re Best*

*Prods. Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994); *see also Minority Equity Capital Co. v.*

25

*Jackson*, 798 F. Supp. 200, 202 (S.D.N.Y. 1992) ("The purpose of a subordination agreement is

[to] set out the relative positions of lenders in respect to their right to receive payments from the

borrower.").  Current and former holders of Certificates should not be able to avoid the

subordination provisions through pursuit of securities claims.

A.       **The Express Agreement Among Certificateholders to Each Securitization
         Requires Subordination of the Investor Claims**

The RMBS documentation constitutes subordination agreements among

certificateholders.  (*See supra* p. 6; ProSupp at S-10-13, S-64–69 (describing waterfall of

subordinated payment priorities).)  Indeed, subordination is a fundamental principle

underpinning securitization and the entire purpose of the complex waterfall of payments to the

different tranches of certificates.  *See Wyo. State Treasurer v. Moody's Investors Serv., Inc. (In

re Lehman Bros. Mortg.-Backed Secs. Litig.)*, 650 F.3d 167, 171 n.1 (2d Cir. 2011)

("Subordinating the bonds creates a tiered structure known as a 'waterfall.'"); *see also Republic

Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 244 (6th Cir. 2012) ("Often, a single

trust issues different levels, or 'tranches,' of certificates, normally based on subordination rights .

. . ."); *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1359 n.1 (Fed. Cir. 2010)

("Credit enhancement typically occurs through a 'senior-subordinated structure . . . .").

Enforcing the waterfall structure of the Certificates requires that the Investor

Claims be subordinated to the Trust Claims.  The Investor Claims are brought on behalf of

holders of Certificates throughout the Trust tranches, each seeking to recoup their purported

investment losses on equal priority with one another.  (*See supra* pp. 12-13.)  If Investor Claims

based on *either* the subordinate *or* the senior Certificates were granted equal priority with the

Trust Claims, it would frustrate the allocation of rights set forth in the detailed subordination

agreements reflected in the PSAs and other offering documents.

14202894

First, if the junior certificateholders' securities claims are not subordinated, they will effectively be paid out in equal priority with the most senior tranches under the Trust Claims. The result would be fundamentally at odds with the junior certificateholders' agreement to be subordinate to the senior tranches with respect to any "Subsequent Recoveries." (Pros. at 41; PSA § 1.01.)

Second, if the senior certificateholders' securities claims are not subordinated, they will run afoul of the corollary principle that creditors that agreed *not* to be subordinated to each other should not be. *See, e.g., In re Credit Indus. Corp.*, 366 F.2d 402, 408 (2d Cir. 1966) ("It is, of course, true that 'the theme of the Bankruptcy Act is equality of distribution.' These same equitable considerations, however, require that the concept of equal distribution be applied only to creditors of equal rank, i.e., creditors who are similarly situated.") (internal citations omitted). The Certificates reflect not only an agreement to be subordinate to or senior to other tranches, but also to share "pro rata" with other holders in the same tranche. (PSA § 1.01.) Allowing the Investor Claims to share equally with the Trust Claims would run afoul of this agreement because the Investor Claims do not include all certificateholders within any particular tranche. (*See, e.g.*, Allstate FAC (representing only the holdings of the named plaintiffs).) Therefore, the effect of classifying the Investor Claims on par with the Trust Claims would be to dilute the recovery of all senior certificateholders through the Trust Claims in order to enhance the recovery of only the subset of them who brought Investor Claims.

In short, subordination of the Investor Claims is the only way to ensure that recoveries for certificateholders flow equitably through the Trust, in the first instance, according the express terms of the subordination agreements among certificateholders.

14202894

B.    **The Implied Subordination Agreement Among Former Certificateholders and Subsequent Purchasers Requires Subordination of the Investor Claims**

In addition to the inequality among current certificateholders, granting equal priority to the Investor Claims would violate the implied agreement between former certificateholders and those to whom they sold their Certificates.  This implied subordination agreement is a natural consequence of warranties and duties that the common law and New York's Uniform Commercial Code (the "N.Y.U.C.C.") impose on all sales of securities.

The N.Y.U.C.C. and the common law of contracts impose on the seller the implied covenant of good faith and fair dealing.  N.Y.U.C.C. § 1-203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."); *see also Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933) ("in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract").

The Certificates reflect an agreement between the former and current certificateholders.  Specifically, the securitization documents provide that if there is any recovery "in connection with a related breach of a representation or warranty or otherwise, such subsequent recovery shall be distributed to certificateholders in the same manner as repurchase proceeds received in the prior calendar month" and then down the waterfall of tranches to which "Realized Losses"[14] have been allocated.  (Pros. at 41; *see also* PSA at 68 (including in the definition of "Subsequent Recoveries" any "recoveries in respect of the representations and warranties made by the related Seller").)  Presumably, the right to any such recovery was part of the value that the purchaser and seller considered in determining the price of the Certificate. Allowing former certificateholders to share in the recovery through Investor Claims, on equal

---

[14] *See* Pros. at 111 (defining "Realized Loss").

14202894

priority with the purchaser of their Certificates, will dilute the recovery to the subsequent

purchaser.  Allowing a seller to capture such gain at the expense of the purchaser is

fundamentally at odds with any "reasonable commercial standards of fair dealing" (N.Y.U.C.C.

§ 8-102(a)(10)) and would deprive the subsequent holder of the "fruits of the contract."  *Kirke La*

*Shelle Co.*, 188 N.E. at 167.[15]

The only way to ensure that recovery flows to the party entitled to receive it,

without dilution at the hands of former holders from whom the current certificateholder

reasonably expects to have purchased such right, is to subordinate the Investor Claims so that

recovery flows through the Trusts according to the terms of the certificateholders' agreements.

## III.    THE INVESTOR CLAIMS SHOULD BE SUBORDINATED PURSUANT TO SECTION 510(C) OF THE BANKRUPTCY CODE

Even if the Investor Claims did not fall within the ambit of Sections 510(a) or

510(b) — which they do — the Investor Claims still should be equitably subordinated under

Section 510(c).  *See* 11 U.S.C. § 510(c).  Equitable subordination typically involves a showing

that (i) a creditor has engaged in inequitable conduct, (ii) that results in injury to other creditors

or confers an unfair advantage on the claimant, and (iii) that subordination would not be

inconsistent with provisions of the Code.  *United States v. Noland*, 517 U.S. 535, 538-39 (1996)

(citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)); *see*

*also Official Comm. Of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B*

*Holdings LLC)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, *Geltzer v. Bay*

---

[15] Moreover, beyond the fact that former certificateholders transferred their rights to recoveries based on alleged breach of representations and warranties, some or all of the former certificateholders may have also transferred their rights to bring the Investor Claims to current certificateholders, either explicitly or implicitly.  The Debtors expressly reserve the right to object to the allowance of some or all of the Investor Claims on this basis, as well as any other basis.

14202894

*Harbour Mgmt. LC (In reBH S&B Holdings LLC)*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (Glenn, J.). However, courts have recognized circumstances involving securities claims in which "no fault" equitable subordination remains appropriate in order to achieve an equitable result. *See In re Emergency Monitoring Techs.*, 366 B.R. 476, 506-08 (W.D. Pa. 2007) (no-fault equitable subordination of stock redemption claim that effectively elevated equity interest to debt and diluted distribution to other creditors); *see also SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27 (6th Cir. 1998) (affirming no-fault equitable subordination of redemption of former stockholders' stock interests).[16]

No-fault equitable subordination is appropriate on a case-by-case inquiry into "the nature and origin of the claim" and "the substance of the transaction, as opposed to its form." *In re Structurlite Plastics*, 224 B.R. at 35-36 (quoting *Envirodyne Indus. Inc. v. Am. Express (In re Envirodyne Indus., Inc.)*, 176 B.R. 825, 831 (Bankr. N.D. Ill. 1995), *aff'd*, 79 F.3d 579 (7th Cir. 1996)). Here, the nature and substance of the Investor Claims clearly favor subordination —they are precisely the sort of claim that Congress intended to subordinate under Section 510(b).

The Investors already occupy a favored position as compared to any general unsecured creditor. First, certificateholders will receive a recovery through the Trust Claims, so they already start on equal footing subject only to whatever subordination they have agreed to

---

[16] The Court of Appeals for the Second Circuit has not addressed no-fault equitable subordination since *Noland*. However, prior to *Noland*, the Second Circuit recognized no-fault equitable subordination and noted that the "fundamental aim" of equitable subordination is to "undo or offset any inequity in the position of a creditor or stockholder which will produce injustice or unfairness to the other creditors or stockholders in terms of reorganization results." *Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 213 (2d Cir. 1978) (subordinating stock redemption claims) (citations omitted). *Noland* explained that "Congress 'intended that the term 'principles of equitable subordination' [in Section 510(c)] follow existing case law '" (517 U.S. at 539 (quoting 124 Cong. Rec. 32398, 33998 (1978)), and courts have continued to cite *In re Stirling Homex* when allowing no-fault equitable subordination. *See, e.g., In re Structurlite Plastics Corp.*, 224 B.R. at 35-36.

among themselves within each securitization waterfall.  Beyond this, however, the

certificateholders maintain the rights to future payments from the segregated pool of mortgage

loans underlying their securities, which remain unavailable to other creditors.  Alternatively, the

certificateholders can sell their Certificates (as some have already) to receive the expected value

of these collective rights.  Now the Investors are seeking a third source of recovery on equal

priority with, and thus diluting, the only payments that will go to general unsecured creditors.

That inequity alone is more than ample grounds to subordinate the Investor Claims pursuant to

Section 510(c).

   In addition, as outlined above, failure to subordinate the Investor Claims would

lead to myriad inequitable consequences, including:  (i) enhanced recovery for subordinate

Certificates at the expense of more senior Certificates (*see supra* Section II.A); (ii) unequal

recovery within each tranche of Certificates (*see id.*); and (iii) reduced recovery for subsequent

purchasers of Certificates to the benefit of the seller of that right to recovery (*see supra* Section

II.B).  Subordination of the Investor Claims will avoid this series of inequitable consequences

and allow the recoveries relating to the Certificates to flow through the Trusts pursuant to the

expressly agreed upon distribution waterfall.

## IV. THE INVESTOR CLAIMS ARE FUNDAMENTALLY DIFFERENT FROM THE TRUST CLAIMS AND SHOULD NOT BE SIMILARLY CLASSIFIED

   The Investors attempt to evade subordination by asserting that their claims are

substantially similar to, and thus must be placed in the same class as, the Trust Claims for plan

purposes.  However, even were the claims substantially similar (which, they are not, as explained

below), nowhere does the Bankruptcy Code require that substantially similar claims be placed in

the same class.  *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 246 (Bankr. S.D.N.Y.

2007) ("section 1122(a), by its terms, doesn't require that all similarly-situated claims be

14202894

classified together"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr.

S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical

classification of dissimilar claims.  It does not require that similar classes be grouped together,

but merely that any groups be homogenous or share some attributes." (citations omitted)); 7

Collier on Bankruptcy ¶ 1122.03[1][a]  (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.

2012) ("[A]lthough the Code requires all claims *within* a class be substantially similar, courts . . .

generally do not require that all substantially similar claims be placed in the same class."

(emphasis added)).  Rather, "[d]issimilar claims may not be classified together," but "similar

claims may be classified separately" if the debtor has "a legitimate reason" or a "legitimate

business reason" to do so, and is not motivated solely by a desire to gerrymander an assenting

class of impaired creditors.  *Aetna Cas. & Sur. Co. v. U.S. Bankr. Court (In re Chateaugay

Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996); *see also Adelphia*, 368 B.R. at 246-47 (holding separate

classification permissible where a "reasonable basis" exists for doing so).

       Here, there are numerous legitimate reasons to classify the Investor Claims

differently from the Trust Claims.  There is also no evidence that separate classification is

intended to gerrymander an assenting class of impaired creditors.  At a minimum, as explained in

Sections I, II and III, *supra*, separate classification (and subordination) is required to prevent

inequitable dilution of the Debtors' general unsecured creditors.  Moreover, the Trust Settlement,

which provides considerable benefits to the estates, resulted from extensive negotiations, settles

billions of dollars in potential claims, and avoids considerable litigation costs.  Separate

classification is necessary to provide the Trust Claims with agreed-upon treatment, and therefore

has a clear business purpose and legitimate reason.  If the Settlement Motion is approved, the

Trust Claims will be allowed and liquidated, while the Investors Claims will remain disputed and

14202894

unliquidated.  In such circumstances, courts recognize that there are valid business reasons for a separate classification.  *See In re Draiman*, 450 B.R. 777, 790 (Bankr. N.D. Ill. 2011) (permitting separate classification of creditor with unliquidated and disputed litigation claim); *Adelphia*, 368 B.R. at 247 (permitting separate classification of liquidated trade claims and unliquidated litigation claims so as to protect the liquidated recovery of trade creditors); *see also In re Simon*, No. 07-031414-KRH, 2008 Bankr. LEXIS 2787, at *13-15 (Bankr. E.D. Va. July 29, 2008) (same) (collecting cases).

But even more fundamentally, the Investor Claims are fundamentally different from the Trust Claims.  Indeed, the Bankruptcy Code's treatment of these claims is entirely distinct — the Investor Claims are subordinated under Section 510(b).  While the Investors argue that similar evidence would be used at trial to prove both types of claims, that does not make them substantially similar.  *See In re Chateaugay Corp.*, 89 F.3d at 949 (holding that claims were dissimilar even though they were all based on the debtor's workers' compensation obligations).  The proper focus for classification is "on the nature of the claims," *i.e.*, their "legal attributes."  *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004).  Here, the Investor Claims are subordinated pursuant to Section 510, and are therefore not of the same priority as general unsecured claims, such as the Trust Claims, and cannot be classified with them.  (*See supra* Sections I- III).

In addition, there are other important distinctions between the Investor Claims and the Trust Claims.  First, while some of the Investors may overlap with holders who will benefit from the Trust Claims, the claimants are not identical, so any recovery would not be distributed equally – and some holders of Certificates would recover twice.  In addition, the holders of Investor Claims seek to treat certificateholders of various tranches on equal priority with one

33

another.  Together, these facts place the Investor Claims in the dramatically distinct situation of

seeking relief that would frustrate, rather than adhere to, the agreed upon allocation of funds

among certificateholders.  (*See supra* Sections II, III.)

Second, the factual and legal bases of the claims are also different.  The Trust

Claims are contract claims based on breaches of representations and warranties *and* on claimed

servicing breaches after the securities were sold.  (*See* Third Am. and Restated RMBS Trust

Settlement Agreement with the Steering Committee Group § 7.01 [Docket No. 1887, Ex.

2].)  The Investor Claims are tort claims alleging fraud relating to the Debtors' pre-issuance

statements and alleged omissions in separate offering documents.  (*See, e.g.,* Allstate FAC

¶¶ 83-89.)

The legal elements of the tort claims underlying the Investor Claims are also very

different than those of the Trusts' contract claims.  In order to prove their contract claims, the

Trusts would have to meet four basic elements:  a valid contract between the parties,

performance by the Trusts, failure of the Debtors to perform, and resulting damages.

*Flomenbaum v. N.Y.U.*, 71 A.D. 3d 80, 91 (N.Y. App. Div. 2009), *aff'd*, 929 N.E.2d 403 (N.Y.

2010).  The Investors' tort claims, by contrast, require proof of entirely different

elements.  Allstate, for example, alleges numerous causes of action sounding in fraud, which

requires additional proof of knowledge of the purported misrepresentation's falsity, intent to

deceive, and justifiable reliance.  *See Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910

N.E.2d 976, 979 (N.Y. 2009).  And of course, claims for fraud are subject to a heightened

pleading standard.  *See e.g.,* Fed. R. Civ. P. 9(b).

In short, the Trust Claims and the Investor Claims are asserted for the benefit of

dissimilar groups of certificateholders, assert different theories of liability, involve different legal

14202894

elements and pleading standards, and are premised on different underlying conduct. The only

similarity — that the Investor Claims seek to recover losses on some of the same underlying

Certificates — is precisely why Section 510 requires subordination and does not weigh against it.

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Dated:  February 19, 2013
      New York, New York

*/s/* Gary S. Lee
Gary S. Lee
Joel C. Haims

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and Debtors in Possession*
*With Respect to Allstate Insurance*
*Company and affiliated entities,*
*and National Credit Union Administration Board*


/s/ Steven J. Reisman
Steven J. Reisman
Theresa A. Foudy
Maryann Gallagher

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559

*Conflicts Counsel to the Debtors and Debtors in*
*Possession*

35

14202894