WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

- and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, et al., | ) ) ) | Case No. 12-12020 (MG) |
| Debtors. | ) ) | (Jointly Administered) |

**LIMITED OBJECTION OF THE AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO THE MOTION OF AIG ASSET MANAGEMENT (U.S.), LLC, THE ALLSTATE ENTITIES, MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, AND THE PRUDENTIAL ENTITIES FOR AN ORDER UNDER BANKRUPTCY RULE 3013 (i) CLASSIFYING RMBS FRAUD CLAIMS IN THE SAME CLASS AS THE SECURITIZATION TRUSTS' CLAIMS FOR PURPOSES OF ANY CHAPTER 11 PLAN FOR THE DEBTORS AND (ii) DIRECTING THAT MISREPRESENTATION CLAIMS CANNOT BE PLACED IN A PLAN CLASS THAT WILL BE SUBORDINATED <u>UNDER BANKRUPTCY CODE SECTION 510(b)</u>**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"),[1] by and through its undersigned counsel, hereby files this limited objection (the "Limited Objection") to the Motion[2] of the Securities Fraud Claimants[3] seeking the entry of an order pursuant to section 1122 of Title 11, United States Code (the "Bankruptcy Code") and Rule 3013 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") determining that, for purposes of any chapter 11 plan concerning the above-captioned debtors (the "Debtors"), (i) the Misrepresentation Claims and the Rep and Warranty Claims should be classified together, and (ii) the Misrepresentation Claims cannot be classified in a class of claims that are subject to Bankruptcy Code section 510(b). In support of its Limited Objection, the Ad Hoc Group respectfully states as follows:

## ARGUMENT

Bankruptcy Rule 3013 permits a court, in its discretion, to "determine classes of creditors and equity security holders." Fed. R. Bankr. P. 3013 ("[T]he court **may**, on motion and hearing

---

[1] The Ad Hoc Group is comprised of certain entities that hold or manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated as of June 6, 2008. The Junior Secured Noteholders' claim is now equal to 113.4% of the face amount of the bonds and is currently increasing by virtue of the accrual of post-petition interest at the rate of approximately $250 million per year.

[2] Motion of AIG Asset Management (U.S.), LLC, the Allstate Entities, Massachusetts Mutual Life Insurance Company, and the Prudential Entities for an Order under Bankruptcy Rule 3013 (i) Classifying RMBS Fraud Claims in the Same Class as the Securitization Trusts' Claims for Purposes of any Chapter 11 Plan for the Debtors and (ii) Directing that Misrepresentation Claims Cannot be Placed in a Plan Class that Will be Subordinated Under Bankruptcy Code Section 510(b), [Docket No. 2284] (Nov. 27, 2012) (the "Motion"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the Ad Hoc Group's objection to the Debtors' motion for approval of the RMBS Settlement [Docket No. 2824] (Feb. 1, 2013) (the "RMBS Settlement Objection"), as applicable.

[3] The "Securities Fraud Claimants" are those holders of RMBS certificates or bonds that filed the Motion: AIG Asset Management (U.S.), LLC and affiliated entities, Allstate Insurance Company and affiliated entities, Massachusetts Mutual Life Insurance Company and Prudential Insurance Company of America and affiliated entities. These Securities Fraud Claimants purport to hold Misrepresentation Claims in the aggregate amount of approximately $1.785 billion. See Motion at 3, 7.

as the court may direct, determine classes of creditors and equity security holders. . .") (emphasis added); Cmty. Nat'l Bank and Trust Co. of N.Y. v. Persky (In re Persky), 893 F.2d 15, 18 (2d Cir. 1989) (noting that a trustee's discretion under section 363(h)(3) of the Bankruptcy Code is "implied by the word 'may'"); Lovelace v. Higgins (In re Higgins), 220 B.R. 1022, 1025 (10th Cir. B.A.P. 1998) (noting that use of the word "may" in Bankruptcy Rule 8002(c) "clearly indicates that the court has discretion").  When determining a matter committed to its discretion, a court has significant flexibility and as a result its conclusions generally receive substantial deference.  See Adelphia Business Solutions, Inc. v. Abnos, 482 F.3d 602, 607 (2d Cir. 2007) ("Assuming that the bankruptcy court had equitable authority…we review the exercise of that equitable authority only for abuse of discretion.")

A court will typically exercise its discretion to grant a motion under Bankruptcy Rule 3013 when necessary to resolve a particular concrete issue after a plan has been filed but prior to a confirmation hearing.  See, e.g., In re Am. Family Enters., 256 B.R. 377, 401 (D. N.J. 2000) (noting that "Bankruptcy Rule 3013 permits the Court to make determinations on the classification of claims before the Confirmation Hearing."); In re Barnes Bay Dev. Ltd., No. 11-10792, 2011 WL 3607880 at *8 (Bankr. D. Del. 2011) (finding that the determination of whether the separation of general unsecured claims into four separate classes was inappropriate should not be determined at a Bankruptcy Rule 3013 hearing and that "it is an issue best reserved for the confirmation hearing").

I.  **THE COURT SHOULD DENY THE MOTION AS PREMATURE**

As an initial matter, the Court should deny the Motion without prejudice as being premature.  Bankruptcy Rule 3013 permits, but does not require, a court to consider classification issues under section 1122 before plan confirmation for the "purposes of *the* plan

and its acceptance." Fed. R. Bankr. P. 3013 (emphasis added). Here, there are multiple reasons why this Court should decline to reach the merits of the Motion.

<u>First</u>, to date, not a single Misrepresentation Claim has been allowed against any Debtor in any amount. Given that, in the absence of a settlement, the allowance of such claims would have to be based upon a judicial determination of often-difficult and always fact-intensive issues such as scienter and loss causation, it is entirely unclear when, if ever, there will be an actual claimant to populate a particular class of claims at any Debtor. Further, even if some modicum of Misrepresentation Claims were allowed at a particular Debtor, it is entirely unclear at this point that the quantum of such claims will be sufficiently material to the global plan process so as to justify an advance ruling on classification.

<u>Second</u>, the only "plan" before the Court is an incomplete draft outline of a potential chapter 11 plan of reorganization filed six months ago as an exhibit to the Debtors' initial motion to extend exclusivity. <u>See</u> Draft Plan of Reorganization, [Docket No. 1248, Ex. 1] (Aug. 23, 2012). That draft plan fails to mention the Misrepresentation Claims, although it does provide for a class of subordinated claims under section 510(b) of the Bankruptcy Code. <u>Id.</u> at 19-20. Whether or not that draft plan invites a dispute over subordination issues, that plan will almost certainly be overtaken by subsequent negotiations. Indeed, as part of the ongoing mediation process being administered by Judge Peck, there are ongoing discussions between the Debtors and their key creditor constituencies over multiple potential plan structures, and the precise contours of any plan of reorganization for these chapter 11 cases, to the extent such a plan ever arises,[4] remain uncertain. <u>See</u> Order Appointing Mediator, [Docket No. 2519] (December 26,

---

[4] Were it not for the unresolved issue of whether Ally will settle in exchange for a third party release, there might be little need to consider a chapter 11 plan in lieu of a liquidating chapter 7 process. These estates are rapidly transitioning away from going-concern operations. <u>See</u> Press Release, ResCap Complete Sale of Whole Loan Portfolio to Berkshire Hathaway, http://www.streetinsider.com/Press+Releases/ResCap+Completes+Sale+of

2012). Moreover, absent progress in mediation before February 28th, the Debtors' exclusive period for proposing a chapter 11 plan may expire, enabling the filing and prosecution of one or more alternative plan structures by entities other than the Debtors. See Transcript for Hearing on Dec. 20, 2012, [Docket No. 2523] at 45:1-19 (Glenn, J.) (indicating that the Court expects "hard negotiation" by parties). Thus, while the Debtors' professionals may have publicly indicated support for a plan that subordinates the Misrepresentation Claims, see, e.g., Second Supplemental RMBS Motion n.37 ("With regard to any allegedly improper disclosures under federal or state securities laws, the Debtors intend to pursue the subordination of such claims under section 510 of the Bankruptcy Code"), it is entirely unclear whether a plan will ever be filed that requires the Court to address the subordination issue framed in the Motion.

Third, a substantive ruling on the Motion, even one that properly denies the relief requested on the merits, will potentially upset the nature of the ongoing plan mediation. Among other things, regardless of how this Court rules, one or more aggrieved parties will likely seek appellate review of a decision on the merits. Multiplication of litigation and judicial intervention by multiple courts is precisely the outcome that the Securities Fraud Claimants assumedly sought to avoid by agreeing to support global plan mediation in the first place. See Response of Securities Fraud Claimants [Docket No. 2403] ("the Investors support the appointment of a mediator who can facilitate a discussion among **all** interested parties") (emphasis in original); Transcript for Hearing on Dec. 20, 2012, [Docket No. 2523] at 58:19-25 (counsel to Securities Fraud Claimants) (agreeing to adjourn the hearing on the Motion pending mediation ostensibly "because we're not here to really get in the way of progress"). Thus, given the present status of

---

+Whole+Loan+Portfolio+to+Berkshire+Hathaway/8061763.html (Feb. 5, 2013). Chapter 7 trustees are generally capable of resolving the claims and inter-debtor issues and conflicts that typically characterize liquidating estates.

these cases, the Court should exercise its discretion under Bankruptcy Rule 3013 and, for the time being, avoid interfering in the global plan negotiation process.

II.    **ANY CHAPTER 11 PLAN OF A DEBTOR AGAINST WHOM MISREPRESENTATION CLAIMS HAVE BEEN ALLOWED MUST PROVIDE FOR THE SUBORDINATION OF SUCH CLAIMS UNDER SECTION 510(b)**

To the extent that the Securities Fraud Claimants insist that this Court must judicially determine, before the filing of any plan and while mediation is ongoing, the one legal issue that is most pressing to their particular needs and concerns, the Court should rule that subordination of Misrepresentation Claims is mandatory under section 510(b) of the Bankruptcy Code.[5]

Section 510(b) requires that a Court subordinate, among other claims, "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, [or] for damages arising from the purchase or sale of such a security . . . ." 11 U.S.C. § 510(b). The Misrepresentation Claims easily fall within the ambit of Section 510(b), as they are the direct result of, and intended to compensate for, damages sustained on account of the Securities Fraud Claimants' purchase of RMBS bonds and certificates, which are securities of one or more Debtors.

A.    **The RMBS bonds and certificates are securities "of the Debtor"**

Section 510(b) of the Bankruptcy Code limits its applicability to the subordination of certain claims relating to the purchase or sale of securities "of the debtor or of an affiliate of the debtor." 11 U.S.C. § 510(b). The Securities Fraud Claimants assert that the RMBS Certificates are securities "of" the RMBS Trusts, not the Debtors. See Motion at 19-21. With respect to asset-backed securities such as the RMBS bonds and certificates, however, the "issuers" are the

---

[5] As discussed in its RMBS Settlement Objection, the Ad Hoc Group believes that the Misrepresentation Claims and the Reps and Warranty Claims are substantively identical and should be classified together for plan purposes, and that those claims should be subordinated under section 510(b). In the event that the Court declines to approve of the classification of these claims together, however, the Ad Hoc Group reserves its right to argue that each class of claims remains subject to subordination under section 510(b) of the Bankruptcy Code.

Seller and Depositor Entities,[6] not the RMBS Trusts themselves. Section 2(a)(4) of the Securities Act and section 3(a)(8) of the Exchange Act of 1934 (the "Exchange Act") provide, in relevant part, as follows:

> When used in this title, unless the context otherwise requires - . . . The term "issuer" means every person who issues or proposes to issue any security; except that with respect to . . . collateral-trust certificates, or with respect to certificates of interests . . . **the term "issuer" means the person or persons performing the acts and assuming the duties of depositor** or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued. . .

15 U.S.C. § 77b(2)(a)(4) (emphasis added); 15 U.S.C. § 78c(3)(a)(8) (emphasis added). SEC Rules 191 and 3b-19 expressly expand this definition of "issuer" with respect to asset-backed securities, and provide that "[t]he depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the 'issuer' for purpose of the asset-backed securities of that issuing entity." See 17 C.F.R. § 230.191 (providing that the definition of "issuer" provided by section (2)(a)(4) of the Securities Act applies with respect to asset-back securities); 17 C.F.R. § 240.3b-19 (providing that the definition of "issuer" provided by section (3)(a)(8) of the Exchange Act applies with respect to asset-back securities). This remains true when, as here, the asset-backed trust consists of mortgage loans. Fed. Hous. Fin. Agency v. UBS Ams., Inc., 858 F. Supp. 2d 306, 334 (S.D.N.Y. 2012) (finding that SEC Rule 191 applies to residential mortgage-backed securities); Talcott J. Franklin & Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook, Appendix A (2011) (stating that "the

---

[6] For each securitization, a "Seller Entity" through an affiliate known as a "Depositor Entity" sold mortgage loans into an RMBS Trust. All of the Seller Entities and Depositor Entities were Debtors, as the Securities Fraud Claimants concede. See Debtors' Second Supplemental Motion for Approval of the RMBS Trust Settlements, [Docket No. 1887], at ¶ 10 (Oct. 19, 2012); Motion at 5 (conceding same).

Depositor is considered the statutory issuer of CMBS, although technically CMBS are issued by the Trust").

The securities-law rationale for deeming a depositor to be the "issuer" applies equally to the instant dispute over the priority of the Misrepresentation Claims. Securities law deems the depositor to be the "issuer" because it, not the special purpose trust, is the responsible party with respect to the transaction:

> [A]lthough the actual issuer is the trustee, the depositor is the person responsible for the flotation of the issue. Consequently, information relative to the depositor and to the basic securities is what chiefly concerns the investor—information respecting the assets and liabilities of the trust rather than of the trustee. For these reasons the duty of furnishing this information is placed upon the actual manager of the trust and not the passive trustee, and this purpose is accomplished by defining "issuer" is in such instances referring to the depositor or manager.

H.R. Rep. No. 85, 73 Cong., 1st Sess. 13 (1933) (legislative history of section 2(a)(4) of the Securities Act). Here, certain of the Debtors[7] originated or purchased mortgage loans, deposited those loans into the RMBS Trusts in connection with the securitization, and prepared the Offering Materials containing information relative to the mortgage loans. See Motion at 7 (describing the preparation of the Offering Materials). When making their investments, the Securities Fraud Claimants relied upon this information when analyzing the mortgage loans underlying their RMBS investments. See id. In fact, the inaccurate nature of some of this information presumably forms the basis for their Misrepresentation Claims.

Indeed, the fact that the RMBS Trusts were interposed between the Seller Entities/Depositor Entities and the Security Holders should have no bearing on the application of section 510(b) to the Misrepresentation Claims. The RMBS Trusts are effectively conduits that

---

[7] As noted above, all of the Seller Entities and Depositor Entities were Debtors. See Debtors' Second Supplemental Motion for Approval of the RMBS Trust Settlements, [Docket No. 1887], at ¶ 10 (Oct. 19, 2012).

enable Seller Entities/Depositor Entities to issue RMBS certificates or bonds to the Securities Fraud Claimants. These RMBS Trusts were established by and for the benefit of Debtors and their issuance of RMBS was done effectively on behalf of these entities.

The Securities Fraud Claimants' reliance on In re Washington Mutual, 462 B.R. 137 (Bankr. D. Del. 2011) is unavailing. See Motion at 20-21 (relying on Washington Mutual in arguing that the "issuer" of RMBS Certificates for purposes of 510(b) is the relevant RMBS Trust). The court there issued that decision without the benefit of any briefing as to the securities-law treatment of issuers of RMBS securities. Recognizing this error of law, the official committee of unsecured creditors in those chapter 11 cases moved to alter or amend the judgment (the "Reconsideration Motion") given that, with respect to asset-backed securities, the "issuer" is the depository entity.[8] Although the parties to that dispute settled before adjudication of the Reconsideration Motion, the Court later recognized that the settlement "does not purport to change or affect any arguments that the MBS plaintiffs may have regarding the applicability of [the court's] decision to their claims, nor does it affect the arguments of the committee and debtor that [the court's] decision was incorrect . . . The debtor did not withdraw or the committee did not withdraw their motion. It was continued." Transcript at 37:1-7, In re Washington Mutual, Inc., No. 08-12229 (Bankr. D. Del. Feb. 16, 2012). While continued, an order was never entered regarding the Reconsideration Motion. The Washington Mutual decision thus is neither binding nor even persuasive to the Court with respect to the present dispute.

To the extent the Court finds that the RMBS bonds and certificates are not "securities of" the Debtors, the Misrepresentation Claims would still be subject to mandatory subordination under section 510(b) because the RMBS Trusts are "affiliates" of the Debtors. These RMBS

---

[8] See Motion of the Official Committee of Unsecured Creditors to Alter or Amend the Court's Opinion and Order Regarding Subordination of the Claim of Tranquility Master Fund, Ltd., In re Washington Mutual, Inc., Case No. 08-12229, Docket No. 9301 (Bankr. D. Del. Jan. 1, 2012).

Trusts are controlled by operating agreements – the pooling and servicing agreements – with the Debtors, and thus, the RMBS bonds and certificates are securities of affiliates of the Debtors. See 11 U.S.C. § 101(a)(2).

      **B.    Section 510(b) by its plain language applies to subordinate claims "arising from" all "securities" not just equity investments**

With respect to the scope of the investment giving rise to a claim, the plain language of section 510(b) is unambiguous – it subordinates claims arising from the purchase or sale of "securities." See 11 U.S.C. § 510(b) (mandating subordination for claims for damages arising from the "purchase or sale of a *security* of the debtor or of an affiliate of the debtor") (emphasis added). Section 101(49) of the Bankruptcy Code, in turn, defines "securities" to include debt as well as equity. 11 U.S.C. § 101(49) (defining "securities" to include, among other things, notes, bonds, debentures and "other claims and interests known as 'securities'").

Indeed, courts interpreting the "securities" prong of section 510(b) have similarly concluded that it plainly applies to claims arising from the purchase and sale of debt securities as well as equity securities. See, e.g., Levine v. Resolution Trust Corp. (In re Coronet Capital Co.), Nos. 90 B 13646, 94 Civ. 1187, 1995 WL 429494, at *8 (S.D.N.Y. July 20, 1995) (finding that section 510(b) is not restricted to claims of equity security holders because "[s]ection 510(b) refers to 'security', and § 101(49)(A)(i) of the Code defines 'security' to include 'note'.").

The RMBS bonds and certificates giving rise to the Misrepresentation Claims indisputably constitute "securities" for purposes of sections 510(b) and 101(49)(A). See, e.g., Allen v. Geneva Steel Co. (In re Geneva Steel Co.), 260 B.R. 517, 525-26 (10th Cir. BAP 2001) (affirming a bankruptcy court decision to subordinate claims arising from the purchase or sale of notes under section 510(b)); NationsBank, N.A. v. Commercial Fin. Servs., Inc. (In re Commercial Fin. Servs., Inc.), 268 B.R. 579, 600 (Bankr. N.D. Okla. 2001) (finding that a note

issued by a trust on account of certificates, which were issued by an asset-backed trust to the trust, constituted a "security" for purposes of section 510(b)).

Given the lack of ambiguity in the plain language of section 510(b)'s use of the term "securities," the Court need not examine whether the subordination of the Misrepresentation Claims is otherwise supported by the legislative history of section 510(b).  Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 7 (2000) (finding that when a "statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotations omitted)); U.S. v. Ron Pair Enters., Inc., 489 U.S. 235, 240-41 (1989) (finding that "as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.").  The arguments raised by the Securities Fraud Claimants with respect to "the purposes" of section 510(b) are therefore beside the point – the plain language of section 510(b) requires the subordination of the Misrepresentation Claims.  See Motion at 23-28.

> C.   **The legislative history of section 510(b) supports the subordination of the Misrepresentation Claims**

As discussed above, the plain language of section 510(b) requires the subordination of the Misrepresentation Claims without any examination into the underlying intent of that statutory provision.  Nonetheless, an examination of the legislative history reveals that it supports, rather than undermines, the application of that section to subordinate the Misrepresentation Claims.

Congress intended section 510(b) to subordinate claims that would, in effect, re-allocate a claimant's investment risks:

> ***The two risks to be considered are the risk of insolvency and the risk of an unlawful issuance of securities***.  While both security holders and general creditors assume the risk of insolvency, Slaine and Kirpe conclude that ***the risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors.***  Placing rescinding shareholders on parity with

> general creditors shifts the risk of an illegal stock offering to general creditors. The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.

H. Rep. No. 595, 95th Cong., 1st Sess, at 195 (1977) (emphasis added) (the "House Report"). The academic article cited in the legislative history shares this overarching concern for risk allocation. John J. Slain and Homer Kirpe, The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Security Holders and Issuer's Creditors, 48 N.Y.U.L. Rev. 261, 286 (1973) (the "Risk Article") ("We suggest that it would advance analysis if the problem were reconceptualized as one of risk allocation"); id. at 288 ("[i]t is difficult to conceive any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not the creditor, that the stock is offered.").

The Securities Fraud Claimants, however, argue that subordination of the Misrepresentation Claims would not serve the "purposes" of section 510(b) for a simple reason – that the Securities Fraud Claimants, as creditors rather than shareholders, are incapable of "trying to bootstrap a claim up the Debtors' capital structure." See Motion at 23-27. Indeed, the Securities Fraud Claimants principally rely on cases that, in examining the legislative history of section 510(b), focused on whether the claimant "took on the risks and return expectations of a shareholder…" Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 256 (2d Cir. 2006); see also CIT Group Inc. v. Tyco Int'l Ltd. (In re CIT Group Inc.), 479 Fed. Appx. 393, 394 (2d Cir. 2012) (summary order).[9]

---

[9] Most of these cases consulted the legislative history of section 510(b), and emphasized its "shareholder risk" rationale, after concluding that section 510(b)'s phrase "arising from" was ambiguous with respect to its application to claims that indirectly related to the issuance process. See, e.g., In red Med Diversified, Inc., 461 F.3d at 254-56 (analyzing whether a claim based on debtor's failure to issue its common stock was one "arising from" the purchase

Reducing the "purpose" of section 510(b) to such a simple test, however, is inconsistent with the plain language of the Bankruptcy Code. Section 510(b) by its plain terms applies to "securities" including debt as well as equity – meaning that the purpose of section 510(b) cannot be unfulfilled merely because a claimant purchased debt rather than equity. See, e.g., In re Mid-Am. Waste Sys., Inc., 228 B.R. 816, 825 (Bankr. D. Del. 1999) (concluding that "[t]he legislative history of the original § 510(b) reflects Congress's intent to include security holders' claims generally—both debtholder claims as well as shareholder claims."); see also In re Patriot Aviation Servs., Inc., 396 B.R. 780, 787-89 (Bankr. S.D. Fla. 2008) (noting that "[a]lthough Congress primarily focused in § 510(b) on the concern that equity not be able to reap a benefit in bankruptcy by elevating an equity interest through recession to a general unsecured status, the statute clearly applies more broadly. . ." and subordinating a claim for damages for the breach of a letter of intent related to the sale of debt).

Instead, the more appropriate inquiry for determining whether subordination of the Misrepresentation Claims comports with the purposes of section 510(b) is whether the Securities Fraud Claimants, as opposed to other general unsecured creditors, were in the best position to allocate the "risk of illegality" associated with investing in the RMBS bonds and certificates. Risk Article at 88. For example, in In re Jacom Computer Services Inc., the court subordinated unsecured indemnification claims asserted by an underwriter for litigation costs that it incurred defending a class action challenging the initial offering of the debtor's stock. 280 B.R. 570, 571-73 (Bankr. S.D.N.Y. 2002). The court recognized that

---

and sale of a security, and consulting the legislative history); CIT Group Inc. v. Tyco Int'l Ltd. (In re CIT Group Inc.), 460 B.R. 644, 637-38 (Bankr. S.D.N.Y. 2011), aff'd, 479 Fed. Appx. 393 (2d Cir. 2012) (analyzing whether a claim for breach of a tax agreement that "had some connection with a stock issuance" was one "arising from" the sale of a security, and consulting the legislative history). Here, however, the Misrepresentation Claims indisputably "arise from" the purchase and sale of the RMBS bonds and certificates.

> [i]t is readily apparent that the rationale for section 510(b) is not limited to preventing shareholder claimants from improving their positions vis-à-vis general creditors; Congress also made the decision to subordinate based on risk allocation.

Id. at 572 (quoting Mid-Am. Waste Sys., 228 B.R. at 824-26).  Ultimately, the court concluded that the underwriters were in a

> better position to allocate risks associated with the issuance of securities and that it is inconsistent with the policies articulated in the legislative history of section 510(b) to force unsecured creditors to subsidize the underwriters' litigation costs.

Id. at 572.

Viewed in light of the foregoing, then, the subordination of the Misrepresentation Claims would be fully consonant with the purposes of section 510(b).  The Securities Fraud Claimants are sophisticated parties who elected to purchase the RMBS bonds and certificates notwithstanding the risks of illegality of disclosures made in connection with their investments.  Through the Misrepresentation Claims, the Securities Fraud Claimants are trying to reallocate the "risk of illegality" of their investments in the RMBS bonds and certificates by obtaining treatment on par with the Debtors' other general unsecured creditors.  The policy underlying section 510(b) requires that the risk of illegality in the issuance of the RMBS bonds and certificates be borne by the investors in those securities – i.e., by the Securities Fraud Claimants, not by the Debtors' unsecured creditors.

Indeed, only these Securities Fraud Claimants, and not the Debtors' other general unsecured creditors could have reaped the benefits of the ownership of the RMBS bonds and certificates – namely, the income flow attributable to the underlying mortgage loans.  See In re Commercial Fin. Servs., Inc., 268 B.R. at 599-600 (concluding that a note issued by a trust on account of certificates, which were issued by an asset-backed trust to the trust, constituted a

"security" for purposes of section 510(b) and noting that the investor "obtained a significant benefit not accorded to [the company's] general unsecured creditors. The Series Note entitled [the investor] to be repaid from pools of Loans that were transferred by [the company] into a remote entity, which shielded those assets from [the company's] general unsecured creditors."). It would be contrary to the policies underlying section 510(b) to now shift the Securities Fraud Claimants loss to the Debtors' general unsecured creditors by allowing the Misrepresentation Claims to share *pro rata* on any recovery to the Debtors' general unsecured creditors.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Group requests that the Court deny the Motion to the extent requested herein and grant such further relief as it deems just.

Dated: February 19, 2013
      New York, New York

Respectfully submitted,

By: /s/ J. Christopher Shore
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

  - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group of Junior Secured Noteholders