## Exhibit 6

**First Amended Complaint,**
***Allstate Ins. Co. v. GMAC Mortg. LLC*,**
**No. 27-cv-11-3480 (Minn. Dist. Ct. Apr. 15, 2011)**

FILED PSL

11 APR 15 PM 4: 21

BY._____DEPUTY
HENN. CO. DISTRICT
COURT ADMINISTRATOR

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                              FOURTH JUDICIAL DISTRICT
                                                CASE TYPE: OTHER/CIVIL

---

Allstate Insurance Company, Allstate Life
Insurance Company, Allstate Bank (f/k/a
Allstate Federal Savings Bank), Allstate New
Jersey Insurance Company, American              Civil File No. 27-CV-11-3480
Heritage Life Insurance Company, First          Honorable Margaret A. Daly
Colonial Insurance Company, Allstate Life
Insurance Company of New York, Allstate
Retirement Plan, and Kennett Capital, Inc.,

        Plaintiffs,

v.

GMAC Mortgage, LLC (f/k/a GMAC                   **FIRST AMENDED COMPLAINT**
Mortgage Corporation), Residential Funding
Company, LLC (f/k/a Residential Funding
Corporation), Residential Funding Securities,
LLC (d/b/a GMAC RFC Securities, f/k/a
Residential Funding Securities Corporation),
Residential Accredit Loans, Inc., Residential
Asset Mortgage Products, Inc., Residential
Funding Mortgage Securities I, Inc.,
Residential Funding Mortgage Securities II,
Inc., and Residential Asset Securities
Corporation,

        Defendants.

---

NATURE OF ACTION .................................................................................................1

PARTIES ....................................................................................................................6

JURISDICTION AND VENUE ..................................................................................12

BACKGROUND .......................................................................................................12

SUBSTANTIVE ALLEGATIONS ............................................................................16

I.      THE DEFENDANTS ABUSED THEIR CONTROL OF THE RAPIDLY-
        EXPANDING SECURITIZATION PROCESS ..................................................16

        A.      Evidence of a Rise in Securitization Volume Leading to a Decline in
                Underwriting Standards ........................................................................16

        B.      The Defendants' Control Over the Vertically-Integrated Process .........22

II.     THE DEFENDANTS' MATERIAL MISREPRESENTATIONS AND
        OMISSIONS ....................................................................................................25

        A.      The Defendants' Misrepresentations Regarding Underwriting Guidelines...........25

        B.      The Defendants' Misrepresentations Regarding Due Diligence Results...............26

        C.      The Defendants' Misrepresentations Regarding Case-by-Case
                Underwriting Exceptions ......................................................................27

        D.      The Defendants' Misrepresentations Regarding Owner-Occupancy
                Statistics .............................................................................................28

        E.      The Defendants' Misrepresentations Regarding Loan-to-Value Ratios................29

        F.      The Defendants' Misrepresentations Regarding the Sufficiency of
                Borrower Income .................................................................................30

        G.      The Defendants' Misrepresentations Regarding Credit Enhancements .............31

        H.      The Defendants' Misrepresentations Regarding Credit Ratings ..........................32

        I.      Documentary Basis for the Loan Approval ............................................33

III.    EVIDENCE THAT ALL OF THE DEFENDANTS' REPRESENTATIONS
        WERE UNTRUE AND MISLEADING ..............................................................34

        A.      Evidence of the Securities' High Default Rates and Plummeting Credit
                Ratings ................................................................................................36

i

B.    Loan-Level Evidence That Borrowers Did Not Actually Occupy the
Mortgage Properties as Represented ............................................................... 39

C.    Loan-Level, Independent Evidence That the LTV Ratios Were Materially
Misrepresented ............................................................................................... 43

D.    Evidence From A Former Senior Underwriter That GMAC Accepted
Absurd Income Claims .................................................................................... 48

E.    Evidence From the Defendants' Own Insurers' Review of Loan Files at
Issue Here ....................................................................................................... 49

F.    Documentary and Testimonial Evidence that Due Diligence Flagged Many
Problem Loans That Were "Waived In" Anyway ................................................ 54

G.    Evidence That the Ratings Were Meaningless ...................................................... 60

H.    Evidence of Serious and Repeated Problems at the Affiliated Originator
Homecomings Financial ................................................................................... 61

       (1)    Confidential witness:  Automated system manipulated to obtain
approvals ............................................................................................. 61

       (2)    Confidential witnesses:  QC group overridden ........................................ 64

       (3)    Other evidence of problems at Homecomings ......................................... 65

I.    Evidence that the Loans Were Approved Based on Incomplete Loan Files .......... 67

J.    Evidence that Residential Funding Itself Believes Loans it Purchased
Were Non-Compliant ....................................................................................... 67

IV.    THE DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE ............... 68

A.    The Statistical Evidence is Itself Persuasive Evidence the Defendants
Knew of the Falsity of Their Representations – Particularly Given They
Origianted Many of the Loans .......................................................................... 68

B.    Evidence From Third-Party Due Diligence Firms Demonstrates That
Defendants Knew Defective Loans Were Being Securitized ............................... 70

C.    Other Confidential Witness Testimony Further Confirms' Defendants'
Knowledge ...................................................................................................... 73

D.    Evidence of Residential Fundings' Improper "Bulk Buying" Procedures ............ 75

E.    Evidence That the Defendants Knew the Appraisals Were Falsely Inflated ........ 76

V.    ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES ................................... 79

FIRST CAUSE OF ACTION ...................................................................................83

SECOND CAUSE OF ACTION .............................................................................84

THIRD CAUSE OF ACTION ..................................................................................86

FOURTH CAUSE OF ACTION ..............................................................................87

PRAYER FOR RELIEF ...........................................................................................89

JURY TRIAL DEMANDED ....................................................................................90

Plaintiffs Allstate Insurance Company, Allstate Life Insurance Company, Allstate Bank

(f/k/a Allstate Federal Savings Bank), Allstate New Jersey Insurance Company, American

Heritage Life Insurance Company, First Colonial Insurance Company, Allstate Life Insurance

Company of New York, Allstate Retirement Plan, and Kennett Capital, Inc. (collectively,

"Allstate"), by and through their attorneys, bring this action against GMAC Mortgage, LLC

(f/k/a GMAC Mortgage Corporation), Residential Funding Company, LLC (f/k/a Residential

Funding Corporation), Residential Funding Securities, LLC (d/b/a GMAC RFC Securities, f/k/a

Residential Funding Securities Corporation), Residential Accredit Loans, Inc., Residential Asset

Mortgage Products, Inc., Residential Funding Mortgage Securities I, Inc., Residential Funding

Mortgage Securities II, Inc., and Residential Asset Securities Corporation, and allege as follows:

## NATURE OF ACTION

1.     This action arises out of the defendants' fraudulent sale of residential mortgage-

backed securities (the "Certificates") to Allstate.  Whereas Allstate was made to believe it was

buying highly-rated, safe securities backed by pools of loans with specifically-represented risk

profiles, in fact the defendants knew the pool was a toxic mix of loans given to borrowers that

could not afford the properties, and thus were highly likely to default.

2.     The defendants made numerous material misrepresentations and omissions

regarding the riskiness and credit quality of the Certificates in registration statements,

prospectuses, prospectus supplements, preliminary term sheets, final term sheets, and other

written materials (the "Offering Materials").  For example:

(i)     ***Underwriting guidelines.***  The Offering Materials each represented that a

particular, reasonable underwriting process was followed to ensure that only loans that the

borrower could repay would be included in the pool underlying the Certificates (the "Mortgage

Loans").  In fact, the defendants systematically ignored the disclosed underwriting standards in

originating or otherwise acquiring non-compliant loans. Confidential witness testimony

confirms that senior executives at the defendants' affiliated lender were trained on how to

manipulate the data fed into the system (including by submitting as many as twenty-five different

applications) until the loan was approved. It confirms that defendants instructed its affiliated

lender to increase the number of applications that used less documentation – which, of course, is

the type of applications that can be even more easily manipulated. It also confirms underwriters

within the defendants would review files to determine if they could be "tweaked" enough to get a

loan approved – including by making undocumented assumptions about the borrower's debt-to-

income ratios. It is not surprising, then, that a recent review of the loan files underlying some of

Allstate's Certificates by the defendants' own insurer revealed a pervasive lack of proper

documentation, facially absurd (yet unchecked) claims about the borrower's purported income,

and the routine use of at least three different programs that circumvented the underwriting

guidelines altogether. Based on data compiled from third-party due diligence firms, the federal

Financial Crisis Inquiry Commission ("FCIC") noted (at 187) in its January 2011 report:

> The Commission concludes that firms securitizing mortgages failed to perform
> adequate due diligence on the mortgages they purchased and at times knowingly
> waived compliance with underwriting standards. ***Potential investors were not
> fully informed or were misled*** about the poor quality of the mortgages contained
> in some mortgage-related securities. ***These problems appear to be significant.***

      (ii)    ***Percentage of Known Non-Conforming Loans.*** The defendants

fraudulently omitted the fact that both the underwriters' internal due diligence, as well as third-

party due diligence firms, had identified numerous loans that did not conform to the stated

underwriting guidelines. Nor did they disclose that many of those same non-conforming loans

had been "waived" into the collateral pools underlying the Certificates despite not having any

purported "compensating" factors. Data recently made available from one of the largest due

diligence firms – which worked for many of the underwriters here – confirms this was occurring

on a staggering scale. This not only confirms the results of Allstate's statistical analysis of the loans at issue, but also confirms the defendants' knowledge of those underwriting violations.

(iii)    ***Owner Occupancy Statistics.*** The Offering Materials made specific representations regarding the percentage of borrowers who would be occupying the property being mortgaged – a key risk characteristic given that borrowers are less likely to walk away from properties they live in, as compared to properties being used as a vacation home or as an investment. Confidential witness testimony confirms underwriters had what information they needed in the loan files (which Allstate was not given access to) to double-check these figures. But analytical tools recently made available to investors confirm that in truth, a far greater percentage of the loans underlying Allstate's Certificates were in fact given to borrowers who lived elsewhere.

(iv)    ***Loan-to-Value Ratios.*** The Offering Materials represented that the underlying loans had specific loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios. The LTV and CLTV represent the size of the borrower's obligations as compared to the value of the property being used as collateral. The CLTV is the LTV after all loans are considered, not just the first mortgage. These are also key risk metrics, because they represent the equity "cushion" that borrowers have and the likelihood of repayment to lenders upon foreclosure. Analytical tools recently made available to investors confirm that the Offering Materials vastly overstated the value of the collateral being included in the loan pools, and hid additional liens that had been placed on the properties. Confidential witness testimony confirms defendants were relying on facially absurd "comp" calculations – such as treating a house on a canal the same as a beach house – and were relying on arbitrary comp 'mark-ups' which could increase the purported value by as much as 25%. It also confirms that certain appraisers

3

submitted the same exact analysis for every application – indicating no investigative work was

actually being done – yet those companies' appraisals were still approved for use in these

calculations.

　　　　(v)　　***Purpose and Use of Exceptions.***　The Offering Materials represented that

loans that did not meet certain criteria were approved as "exceptions" only on the basis of

countervailing features of the borrowers' risk profiles that 'made up' for negative aspects of the

risk profile. In fact, "exceptions" were instead used as a way to increase loan volume by

circumventing the applicable underwriting guidelines. And a recent review of the loan files

underlying some of Allstate's Certificates by the defendants' own insurer revealed that non-

compliant Mortgage Loans did not have any identified countervailing features, and that the

defendants abused at least three bulk-purchase and bulk-approval procedures to create loan pools

outside of the disclosed underwriting guidelines.

　　　　3.　　As summarized below, Allstate purchased over ***half a billion dollars*** in the

defendants' mortgage-backed securities in reliance on these and the other misrepresentations and

omissions. The purchases are further detailed in the exhibits to this complaint, which are all

incorporated as if set forth fully herein.

| Transaction | Total Investment | Further Details |
|---|---|---|
| RALI 2005-QA2 | $24,371,448 | Exh. A, B, C, & D |
| RALI 2005-QS6 | $7,710,938 | Exh. A, B, C, & E |
| RALI 2006-QO3 | $15,000,000 | Exh. A, B, C, & F |
| RALI 2006-QS14 | $52,343,814 | Exh. A, B, C, & G |
| RALI 2007-QH6 | $29,974,320 | Exh. A, B, C, & H |
| RAMP 2004 RZ4 | $10,520,000 | Exh. A, B, C, & I |
| RAMP 2004-RZ2 | $20,596,062 | Exh. A, B, C, & J |
| RAMP 2005-RS4 | $22,338,000 | Exh. A, B, C, & K |
| RAMP 2006-RS3 | $33,000,000 | Exh. A, B, C, & L |
| RAMP 2006-RZ3 | $12,003,750 | Exh. A, B, C, & M |
| RASC 2005-KS3 | $14,065,000 | Exh. A, B, C, & N |
| RASC 2005-KS4 | $10,000,000 | Exh. A, B, C, & O |
| RFMSI 2005-S8 | $10,031,192 | Exh. A, B, C, & P |

| Transaction | Total Investment | Further Details |
|---|---|---|
| RFMSI 2006-S6 | $22,031,492 | Exh. A, B, C, & Q |
| RFMSII 2005-HI3 | $6,076,086 | Exh. A, B, C, & R |
| RFMSII 2005-HS1 | $18,229,692 | Exh. A, B, C, & S |
| RFMSII 2005-HS2 | $44,020,893 | Exh. A, B, C, & T |
| RFMSII 2005-HSA1 | $6,471,308 | Exh. A, B, C, & U |
| RFMSII 2006-HI4 | $30,317,751 | Exh. A, B, C, & V |
| RFMSII 2006-HI5 | $38,468,851 | Exh. A, B, C, & W |
| RFMSII 2007-HI1 | $29,985,573 | Exh. A, B, C, & X |
| RFMSII 2007-HSA2 | $21,996,880 | Exh. A, B, C, & Y |
| RFMSII 2007-HSA3 | $24,991,433 | Exh. A, B, C, & Z |
| GMACM 2005-HE1 | $20,000,000 | Exh. A, B, C, & AA |
| GMACM 2006-HE3 | $29,999,622 | Exh. A, B, C, & BB |

4.      Allstate invested in the Certificates as part of a broader plan to invest in a diverse array of mortgage-backed securities. Allstate typically purchased senior classes of mortgage-backed securities (i.e., those rated AAA/Aaa or AA/Aa by the rating agencies Standard & Poor's and Moody's Investors Service). Allstate purchased the Certificates to generate income and total return through safe investments. But Allstate also purchased these securities with the expectation that the investments could be – and indeed some would be and were – sold on the secondary market.

5.      The systemic (but hidden) abandonment of the disclosed underwriting guidelines has predictably led to soaring default rates in the mortgage loans underlying the Certificates, resulting in a drastic drop in the value of the Certificates. For instance, despite the fact that most of the of the Certificates started out with AAA ratings -- the same rating given to treasury bills backed by the full faith and credit of the United States government – over 75% are now not even rated as investment-grade securities. These problems are so drastic and their onset was so rapid (in comparison to the long-term security of the investments Allstate thought it was purchasing) that the poor performance to date of the Certificates is itself powerful evidence that the Mortgage Loans were not underwritten according to the procedures represented to Allstate. With the

5

underlying loans performing so poorly, the value of Allstate's Certificates has plummeted,

causing Allstate to incur significant losses. These losses were not caused by the downturn in the

U.S. housing market, but by defendants' faulty underwriting.

      6.     As the FCIC concluded in its January 2011 report (at 224):

> As mortgage securities lost value, investors found significant deficiencies in
> securitizer's due diligence on the mortgage pools underlying the mortgage-backed
> securities as well as in their disclosure about the characteristics of those deals. As
> private mortgage insurance companies found similar deficiencies in the loans they
> insured, they have denied claims to an unprecedented extent . . .

The report also recounted (at 224) that investigations by the government-sponsored entities

Fannie Mae and Freddie Mac similarly found loan disclosures consistently lacking. For instance,

"Freddie reviewed $76.8 billion of loans . . . and found $21.7 billion to be ineligible, meaning

they did not meet representations and warranties."

PARTIES

      7.     ***The Plaintiffs.*** Plaintiff Allstate Insurance Company is an insurance company

formed under the laws of, and domiciled in, the State of Illinois, with its principal place of

business in Northbrook, Illinois. It is the nation's largest publicly-held personal-lines insurer,

selling property and casualty insurance. Allstate Insurance Company is licensed in the state of

Minnesota and writes insurance products within this State. Allstate Insurance Company is a

wholly-owned subsidiary of Allstate Insurance Holdings, LLC, which is a Delaware limited

liability company. Allstate Insurance Holdings, LLC is a wholly-owned subsidiary of The

Allstate Corporation, which is a Delaware corporation.

      8.     Plaintiff Allstate Life Insurance Company is an insurance company formed under

the laws of, and domiciled in, the State of Illinois, with its principal place of business in

Northbrook, Illinois. It is licensed in the State of Minnesota and sells life, accident, and health

6

insurance products in this State. Allstate Life Insurance Company is a wholly-owned subsidiary
of Allstate Insurance Company.

9.    Plaintiff Allstate Bank, formerly known as Allstate Federal Savings Bank, is a
federally-chartered thrift institution that provides retail bank products and services. It is a
wholly-owned subsidiary of The Allstate Corporation, and has its registered office in
Northbrook, Illinois.

10.    Plaintiff Allstate New Jersey Insurance Company is an insurance company
formed under the laws of, and domiciled in, the State of Illinois, with its statutory office in
Northbrook, Illinois. It is licensed in the states of Illinois and New Jersey, writing property and
casualty insurance products in New Jersey.

11.    Plaintiff American Heritage Life Insurance Company is an insurance company
formed under the laws of, and domiciled in, the State of Florida, with its principal place of
business in Jacksonville, Florida. It sells life, accident, and health insurance and annuity
products. American Heritage Life Insurance Company is a wholly-owned subsidiary of
American Heritage Life Investment Corporation, which is a Delaware corporation. American
Heritage Life Investment Corporation is a wholly-owned subsidiary of The Allstate Corporation.

12.    Plaintiff First Colonial Insurance Company is an insurance company formed
under the laws of, and domiciled in, the State of Florida, with its principal place of business in
Jacksonville, Florida. It sells property and casualty insurance products. It is a wholly-owned
subsidiary of American Heritage Life insurance Company

13.    Plaintiff Allstate Life Insurance Company of New York is an insurance company
formed under the laws of, and domiciled in, the State of New York, with its principal place of
business in Hauppauge, New York. It sells life, accident and health insurance and annuity

7

products. Allstate Life Insurance Company of New York is a wholly-owned subsidiary of

Allstate Life Insurance Company.

14. Plaintiff Allstate Retirement Plan is an ERISA plan sponsored by Allstate

Insurance Company.

15. Plaintiff Kennett Capital, Inc. is a Delaware corporation and an indirect wholly-

owned subsidiary of The Allstate Corporation.

16. *The Defendants.* All of the defendants in this action are part of the same

corporate family, and acted together to control the entire creation, marketing, and sale of the

Certificates at issue here, from loan origination, to mortgage pooling, to securities underwriting,

to sale to Allstate. Allstate is not seeking relief against any bankrupt entity. It is, however,

seeking relief from the defendants, including their successors-in-interest (if any), by reason of a

sale or transfer of all or a portion of its assets.

17. *Seller, Sponsor, and Servicer Defendants.* Defendant Residential Funding

Company, LLC, formerly known as Residential Funding Corporation, is a Delaware limited

liability company with its principal place of business in Minneapolis, Minnesota. It is engaged

in the business of, among other things, originating and acquiring residential mortgage loans and

selling those loans through securitization programs.

18. Defendant GMAC Mortgage, LLC, formerly known as GMAC Mortgage

Corporation, is a Delaware limited liability company with its principal place of business in

Horsham, Pennsylvania. It acquired, originated, and serviced residential loans, and sponsored

the securitization of some of the mortgage loans at issue here.

19. *Affiliated Underwriter Defendant.* Defendant Residential Funding Securities,

LLC, doing business as GMAC RFC Securities and formerly known as Residential Funding

Securities Corporation, is a Delaware limited liability company and registered broker-dealer with

its principal place of business in Minneapolis, Minnesota. Residential Funding Securities, LLC's

banking operations are limited to broker-dealer functions in the issuance and underwriting of

residential and commercial mortgage-backed securities. It served as a co-underwriter for the

offerings at issue here except RALI 2005-QA2, RALI 2006-QS14, RALI 2006-QO3, RAMP

2004-RZ4, RAMP 2006-RS3, RASC 2005-KS3, RASC 2005-SK4, and RFMSI 2006-S6.

20. *__Depositor Defendants.__* The Depositors are considered issuers of the Certificates

within the meaning of Section 2(a)(4) of the Securities Act of 1933, 15 U.S.C. §77b(a)(4), and in

accordance with Section 11(a), 15 U.S.C. §77k(a).

21. Defendant Residential Accredit Loans, Inc. is a Delaware corporation and a

limited-purpose indirect subsidiary of Residential Capital with its principal place of business in

Minneapolis, Minnesota. It was the Depositor for certain of the offerings in which Allstate

invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of

certain mortgage-backed Certificates purchased by Allstate.

22. Defendant Residential Asset Mortgage Products, Inc. is a Delaware corporation

and a limited-purpose indirect subsidiary of Residential Capital with its principal place in

Minneapolis, Minnesota. It was the Depositor for certain of the offerings in which Allstate

invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of

certain mortgage-backed Certificates purchased by Allstate.

23. Defendant Residential Funding Mortgage Securities I, Inc. is a Delaware

corporation and a limited-purpose subsidiary of Residential Capital with its principal place of

business in Minneapolis, Minnesota. It was the Depositor for certain of the offerings in which

Allstate invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

24.      Defendant Residential Funding Mortgage Securities II, Inc. is a Delaware corporation and a limited purpose subsidiary of Residential Capital with its principal place of business in Minneapolis, Minnesota. It was the Depositor for certain of the offerings in which Allstate invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

25.      Defendant Residential Asset Securities Corporation is a Delaware corporation and limited purpose subsidiary of Residential Capital with its principal place of business in Minneapolis, Minnesota. It was the Depositor for certain of the offerings in which Allstate invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

26.      ***Relevant Non-Parties.*** Ally Financial Inc. is a Delaware corporation with its principal place of business in Detroit, Michigan. On November 30, 2006, General Motors sold a 51% interest in General Motors Acceptance Corporation to FIM Holdings LLC, and changed its name to GMAC, LLC. On June 30, 2009, GMAC, LLC changed its name to GMAC, Inc., and on May 10, 2010, GMAC, Inc. changed its name to Ally Financial Inc. It is now a lending, independent, globally-diversified financial services firm. It is the direct or indirect parent of all the defendants in this action.

27.      GMAC Mortgage Group, LLC, formerly known as GMAC Mortgage Group, Inc., is a Delaware limited liability company with its principal place of business in Horsham, Pennsylvania. It is a wholly-owned subsidiary of Ally Financial Inc., and the direct parent of Residential Capital, LLC.

10

28.    Residential Capital, LLC, formerly known as Residential Capital Corporation, is a

Delaware limited liability company, an indirect subsidiary of Ally Financial Inc., and a direct

subsidiary of GMAC Mortgage Group, LLC, with its principal place of business in Minneapolis,

Minnesota. Residential Capital LLC is the direct or indirect parent company of the depositor

defendants, Residential Funding Securities, LLC, Residential Funding Company, LLC, and

GMAC Mortgage, LLC. Residential Capital and its subsidiaries originate, purchase, sell, and

securitize residential mortgage loans primarily in the United States, provide primary and master

servicing to investors in residential mortgage loans and securitizations, and provide collateralized

lines of credit (referred to as warehouse lending facilities) to other originators.

29.    Homecomings Financial, LLC, formerly known as Homecomings Financial

Network, Inc., was an affiliate of defendants. Before its lending operations were shut down, it

was a Delaware limited liability company with its principal place of business in Minneapolis,

Minnesota. It originated loans for securitization by the Residential Funding defendants.

30.    The Certificates for each securitization relevant to this action were issued by a

trust. The issuing trusts are identified in Exhibit A along with other details regarding Allstate's

purchases.

31.    At all relevant times, the defendants committed the acts, caused or directed others

to commit the acts, or permitted others to commit the acts alleged in this complaint. Any

allegation about acts of the corporate defendants means that those acts were committed through

their officers, directors, employees, agents, and/or representatives while those individuals were

acting within the actual or implied scope of their authority.

11

## JURISDICTION AND VENUE

32.     This Court has personal jurisdiction over the defendants because the defendants

transact business in Minnesota and because they committed acts in Minnesota causing injury to

the plaintiffs.

33.     Venue in this Court is proper under Minn. Stat. § 542.09 (2010) because the cause

of action arose, in part, in Hennepin County and because defendants Residential Funding

Company, LLC, Residential Funding Securities, LLC, Residential Accredit Loans, Inc.,

Residential Asset Mortgage Products, Inc., Residential Funding Mortgage Securities I, Inc.,

Residential Funding Mortgage Securities II, Inc., and Residential Asset Securities Corporation

reside within this county.

34.     On information and belief, based on, among other things, the defendants'

principal place of businesses, a majority of the acts giving rise to the claims set forth in this

complaint occurred in Minnesota.  Specifically, on information and belief:  (a) the

representations at issue were prepared and/or approved in Minnesota; (b) decisions regarding

which loans to securitize were made in and directed from Minnesota; (c) the defendants'

underwriting policies and practices were set and implemented in Minnesota; and (d) many of the

collateral loans were originated or acquired in Minnesota.  Further, on information and belief,

many of the key witnesses and documents still reside here in Minnesota.

## BACKGROUND

35.     *The Mechanics of Mortgage Securitization.*  Mortgage pass-through securities or

certificates represent interests in a pool of mortgage loans; the securities are "shares" in the pool

that are sold to investors.  The pass-through securities entitle the holder to payments from the

pool of mortgages.  Although the structure and underlying collateral may vary by offering, the

basic principle of pass-through securities remains the same:  the cash flow from the pool of

mortgages is "passed through" to the securities holders when payments are made by the
underlying mortgage borrowers.

36.    The initial step in creating a mortgage pass-through security is the acquisition by
a "depositor" of an inventory of loans from a "sponsor" or "seller," which either originates the
loans or acquires the loans from other mortgage originators.  This "sponsor" of a mortgage-
backed security ("MBS") was often created by a financial institution, such as the defendants.

37.    Upon acquisition, the depositor transfers, or deposits, the acquired pool of loans
to an "issuing trust."  The depositor then securitizes the pool of loans in the issuing trust so that
the rights to the cash flows from the pool can be sold to investors.  The securitization
transactions are structured such that the risk of loss is divided among different levels of
investment, or "tranches."  Tranches consist of multiple series of related securities offered as part
of the same offering, each with a different level of risk and reward.  Any losses on the underlying
loans – whether due to default, delinquency, or otherwise – are generally applied in reverse order
of seniority.  As such, the most senior tranches of pass-through securities receive the highest
credit ratings.  Junior tranches, being less insulated from risk, typically obtain lower credit
ratings.

38.    Once the tranches are established, the issuing trust passes the securities or
certificates back to the depositor, who becomes the issuer of the securities.  The depositor then
passes the securities to one or more underwriters, who offer and sell the securities to investors in
exchange for cash that is passed back to the depositor, minus any fees owed to the underwriters.

39.    The underwriters, such as defendants, play a critical role in the securitization
process by purchasing the securities from the issuing trust through a depositor and then selling

them to investors. Significantly, the underwriters provide the information that potential investors like Allstate use to decide whether to purchase the securities.

40.    Because the cash flow from the loans in the collateral pool of a securitization is the source of payments to holders of the securities issued by the trust, the credit quality of the securities depends upon the credit quality of the loans in the collateral pool. The most important information about the credit quality of the loans is contained in the "loan files" that the mortgage originator develops while making the loans.

41.    For residential mortgage loans, each loan file normally contains documents including the borrower's application for the loan; verification of the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for measures of credit quality, such as loan-to-value ratios; and a statement of the occupancy status of the property. The loan file also typically contains the record of the investigation by the loan originator of the documents and information provided by the borrower, as well as the detailed notes of the underwriter setting forth the rationale for the making of each loan. Investors like Allstate were not given access to the loan files and they must rely on the representations made by the sponsors and underwriters in the Offering Materials.

42.    The collateral pool for each securitization usually includes thousands of loans. Instead of having each potential investor reviewing all of these loan files, the underwriters are generally responsible for gathering, verifying, and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited into the issuing trust. In accordance with industry standards, this involves performing due diligence on the loan pool and the originators to ensure the representations being made to

14

investors are accurate. Investors, like Allstate, rely on the offering materials to correctly

describe the quality and nature of the loans that form the security for their investments.

43.    Traditionally, mortgage originators financed their mortgage business through

customer deposits, retained ownership of the loans they originated, and directly received the

mortgage payment streams. When an originator held a mortgage through the term of the loan,

the originator also bore the risk of loss if the borrower defaulted and the value of the collateral

was insufficient to repay the loan. As a result, the originator had a strong economic incentive to

verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate

appraisal of the value of the underlying property before making the mortgage loan.

44.    Mortgage loan securitization, however, shifted the traditional "originate to hold"

model to an "originate to distribute" model, in which originators sell residential mortgages and

transfer credit risk to investors through the issuance and sale of RMBS (residential MBS). Under

the new model, originators no longer hold the mortgage loans to maturity. Instead, by selling the

mortgages to trusts, which provide their securities to investors, the originators obtain the funds to

make more loans. Securitization also enables originators to earn most of their income from

transaction and loan-servicing fees, rather than from the spread between interest rates paid on

deposits and interest rates received on mortgage loans, as in the traditional model. Thus,

securitization gives originators an incentive to increase the number of mortgages they issue

regardless of credit quality. However, contractual terms, adherence to solid underwriting

standards, and good business practices obligate originators to underwrite loans in accordance

with their stated policies and to obtain accurate appraisals of the mortgaged properties.

45.    Originally, most mortgage securitizations were conducted through the major

Government Sponsored Enterprises (the "Agencies"), *i.e.*, the Federal National Mortgage

Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"),

and the Government National Mortgage Association ("Ginnie Mae"). The Agencies purchased

loans from originators and securitized the loans. These Agency securitizations had high credit

quality because the Agencies required the underlying loans to be originated in accordance with

strict underwriting guidelines. Most non-Agency mortgage securitizations during this period

also had relatively high credit quality because they typically complied with the Agencies'

underwriting standards.

## SUBSTANTIVE ALLEGATIONS

### I.    THE DEFENDANTS ABUSED THEIR CONTROL OF THE RAPIDLY-EXPANDING SECURITIZATION PROCESS

#### A.    Evidence of a Rise in Securitization Volume Leading to a Decline in Underwriting Standards

46.    The FCIC "reviewed millions of pages of documents, interviewed more than 700

witnesses, and held 19 days of public hearings in New York, Washington, D.C., and

communities across the country." In the resulting January 2011 report, the FCIC stated (at xvi):

> In this report, we detail the events of the crises . . . [I]t was the collapse of the
> housing bubble – fueled by low interest rates, easy and available credit, scant
> regulation, and toxic mortgages – that was the spark that ignited a string of events,
> which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky
> mortgages had become embedded throughout the financial system, as mortgage-
> related securities were packaged, repackaged, and sold to investors around the
> world.

47.    The report noted (at 22-23): "[I]t has been estimated that ultimately as many as

13 million households in the United States may lose their homes to foreclosure." Already,

according to the report, "four million families have lost their homes to foreclosure and another

four and a half million have slipped into the foreclosure process or are seriously behind on their

mortgage payments."

16

48.    As above, in a securitization, mortgages are aggregated, then securities are sold

that are backed by the resulting mortgage pools. The cash flows from the pooled loans, in the

form of payments of interest and principal, are used to make payments on the securities. The

purchase of each Certificate here was thus the purchase of a right to participate in the cash flows

generated by the pool of Mortgage Loans. The *Wall Street Journal* has summarized the

securitization process as follows:



49.    Also as above, traditional securitizations were primarily done in conjunction with

the government-sponsored entities Fannie Mae and Freddie Mac. Those entities limited the

types of loans that could be securitized through them, and their perceived government backing

simultaneously lowered the risk.

50.    In the early 2000s, as interest rates at historic lows were pushing down the profits

of traditional lending and even securitization through Fannie Mae or Freddie Mac, banks began

to look for ways to increase the fees they could generate. Banks, lenders, and securitizers began

increasingly focusing on creating products outside the traditional lending guidelines, expanding

the number of borrowers who could purportedly qualify for loans while also enabling themselves

17

to charge those borrowers much higher fees than they would have realized on conforming loan terms.

51.    For instance, Confidential Witness 2 ("CW2") worked as a director of GMAC RFC Securities for three years, until 2005. According to CW2, in the 2004-2005 time frame, "people were very focused on increasing volume production," and not much else. "Every year was projected to be a record year." The only way to achieve those projections, according to CW2, was to "loosen the underwriting guidelines." According to CW2, people at GMAC RFC Securities "didn't see the forest for the trees."

52.    Similarly, Confidential Witness 4 ("CW4") was a Senior Underwriter at GMAC from 1997 to 2008. According to CW4, GMAC was "always being compared to Countrywide" and "we wanted to be number one," and so GMAC "did what Countrywide did" to keep up with this main competitor.

53.    A larger perceived potential borrower base and higher profits per borrower created a huge incentive to increase lending volume. The number of loans issued on terms riskier than those that could be securitized through Fannie Mae or Freddie Mac skyrocketed. For instance, according to an April 7, 2010 report by the FCIC, non-conforming loans went from around $670 billion in 2004 to over $2 trillion in 2006. The same report indicates that Residential Funding Corporation was the eighth-largest sponsor of non-agency mortgage-backed securities in 2007.

54.    Such a huge increase in mortgage volume in a short period of time also created the problem of where the money to actually fund those loans would come from, and who would bear the risk. As the FCIC put it in its January 2011 report (at 7): "under the radar, the lending and financial services industry had mutated." It found (at 70) that "[s]ecuritization and subprime

18

origination grew hand in hand," as (at 125) "[t]he nonprime mortgage securitization process created a pipeline through which risky mortgages were conveyed and sold throughout the financial system. The pipeline was essential to the origination of the burgeoning numbers of high-risk mortgages."

55.    In other words, simultaneous with a shift away from non-traditional loans was a focus on an "originate and distribute" business model. In a traditional "originate and hold" business model, the lender is economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property, as it would be stuck with any resulting losses. In an "originate and distribute" model, the incentives are vastly different. The risk of non-payment was transferred to the investors, and thus the only incentive for the originators, underwriters, and others in the securitization chain was to pump out as many loans as possible, the more exotic (and thus the higher-fees) the better – as long as they could be sold. The defendants were willing to abandon sound underwriting practices because they were routinely placing the risk onto investors like Allstate by misrepresenting the resulting loans to ensure their marketability. As the FCIC concluded (at 125): "The originate-to-distribute model undermined responsibility and accountability for the long-term viability of the mortgages and mortgage-related securities and contributed to the poor quality of mortgage loans."

56.    Because the underlying loans were on non-traditional terms, the banks could offer investors higher rate of returns on the securitized pools even as the deal's structure (such as, for instance, including "extra" Mortgage Loans in the collateral pool) purportedly made the investments safe. Unknown to investors like Allstate, however, they were in fact much riskier because the defendants misrepresented many aspects of the Mortgage Loans. For instance, though the defendants may have disclosed that the loan pool included adjustable-rate mortgages

19

(which may be riskier than fixed-rate as the borrower may be unable to afford his or her monthly payment should interest rates rise), they overstated how many loans were owner-occupied (owner-occupied properties have lower risks), understated the loan pools' average loan-to-value ratios (suggesting the owners had more of an equity "cushion" than they did), misrepresented the amount of verification of the borrower's assets and income that had been done (understating the risk that the borrower could not actually afford the monthly payments), and omitted to inform Allstate about the high number of rejected loans that were "waived" in by the underwriters (making representations regarding the quality of the underwriting process even more misleading).

57.    Each misrepresentation and omission created an additional, hidden layer of risk well beyond that known to be associated with an "adjustable rate mortgage" or a "home equity loan" in the abstract. In short, by misrepresenting the true risk profile of the loan pools, the defendants defrauded investors like Allstate into accepting the risks created by the defendants' shoddy lending and underwriting practices. A managing director of a financial services analyst quoted in the FCIC's report (at 6) described the financial products created at this time as being a lot like "cheap sangria," "[a] lot of cheap ingredients repackaged to sell at a premium . . . it might taste good for a while, but then you get headaches later and you have no idea what's really inside."

58.    The FCIC report summarized (at 28, emphasis added):

[W]e follow the profound changes in the mortgage industry, from the sleepy days when local lenders took full responsibility for making and servicing 30-year loans to a new era in which the idea was to sell the loans off as soon as possible, so that they could be packaged and sold to investors around the world. New mortgage products proliferated, and so did new borrowers. *Inevitably, this became a market in which the participants – mortgage brokers, lenders, and Wall Street firms – had a greater stake in the quantity of mortgages signed up and sold than in their quality.*

59.     The perverse incentives created by the move to "originate and distribute" did not just operate on an entity level, but flowed down to the individual decisionmakers within the defendants.  The FCIC's January 2011 report noted (at 6) that "[b]ondsalesman earned multi-million dollar bonuses packaging and selling new kinds of loans, offered by new kinds of lenders, into new kinds of investment products that were deemed safe but possessed complex and hidden risks."  It also found (at 64) that "[c]ompensation structures were skewed all along the mortgage securitization chain."

60.     In a section discussing "employee compensation," the chair of the FDIC provided a statement to an investigative panel in January 2010 that:

> The standard compensation practice of mortgage brokers and bankers was based on the volume of loans originated rather than the performance and quality of the loans made.  From the underwriter's perspective, it was not important that consumers be able to pay their mortgages when interest rates reset . . . . The long-tail risk posed by these products did not affect mortgage brokers and bankers' incentives because these mortgages were sold and securitized.  The lack of a downside in these compensation schemes ultimately hurt both those who could not pay their risky mortgages and the economy.

61.     The testimony of CW4 similarly confirms here that GMAC loan officers, executives, and even the underwriters had compensation packages tied to loan volume.

62.     To make matters worse, the FCIC found (at 14) that the explosion also created a surging demand for people to carry out the paperwork – a void that was filled, according to a study cited by the FCIC, with thousands of newly-minted "mortgage brokers" with criminal records, including thousands with convictions for fraud, racketeering, and extortion.  The FCIC also found (at 162) that "despite the underreporting" of fraud, there was a 20-fold increase in "suspicious activity reports" related to mortgage fraud between 1996 and 2006, numbers that kept climbing during the time the Mortgage Loans at issue here were originated.

. . .

63.   In short, as summarized by the President's Working Group in March 2008, there

was a "significant erosion of market discipline by those involved in the securitization

process . . . related in part to failures to provide . . . adequate risk disclosures." It also found that

the "turmoil in the financial markets was triggered by a dramatic weakening of underwriting

standards for U.S. subprime mortgages . . ." Similarly, the Comptroller of Currency's written

statement for a Special Seminar on International Banking and Finance in November 2009 stated

that a lethal combination of poor practices "produced, on a nationwide scale, the worst

underwritten mortgages in our history." And the FCIC's January 2010 report concluded (at 101)

that "there was untrammeled growth in risky mortgages. *Unsustainable, toxic loans polluted*

*the financial system and fueled the housing bubble.*" (Emphasis added.)

**B.    The Defendants' Control Over the Vertically-Integrated Process**

64.   The defendants and their affiliates controlled, and thus had actual knowledge of or

were indifferent to the truth or falsity about, every aspect of the securitization process, from loan

origination through sale to Allstate. In particular, the defendants controlled every aspect of

originating and servicing the underlying Mortgage Loans, providing them with unique and

special knowledge regarding the characteristics of the Mortgage Loans and the quality of the

underwriting and servicing practices. The defendants also acquired and pooled the mortgage

loans, created the securities, and marketed and sold the Certificates at issue using purported

disclosures that were wrongful and fraudulent. On information and belief, the fraudulent

representations and omissions took place in and/or were directed from Minnesota. All but one of

the defendants had their principal place of business in Minnesota.

a.   Many of the Mortgage Loans came from the defendants' affiliates. Every

Certificate was backed in part by loans from Homecomings Financial, GMAC Mortgage LLC, or

GMAC Bank (an affiliate of GMAC Mortgage LLC). According to the Offering Materials, such affiliated originators were often the single largest source of Mortgage Loans:

| Asset | Percent of Affiliated Loans |
| --- | --- |
| RALI 2005-QA2 | 15% |
| RALI 2005-QS6 | 65.5% |
| RALI 2006-QO3 | 47.6% |
| RALI 2006-QS14 | 36.9% |
| RALI 2007-QH6 | 43.0% |
| RAMP 2004 RZ4 | 42.1% |
| RAMP 2004-RZ2 Gr. I/II | 28.3%/19.1% |
| RAMP 2005-RS4 | 24.1% |
| RAMP 2006-RS3 | 85.5% |
| RAMP 2006-RZ3 | 100% |
| RASC 2005-KS3 | 35.2% |
| RASC 2005-KS4 | 36.6% |
| RFMSI 2005-S8 | 33.2% |
| RFMSI 2006-S6 | 39.4% |
| RFMSII 2005-HI3 | 7.7% |
| RFMSII 2005-HS1 | 7.9% |
| RFMSII 2005-HS2 Gr. I/II | 9.5%/42.3% |
| RFMSII 2005-HSA1 Gr. I/II | 10.8%/41.0% |
| RFMSII 2006-HI4 | 43.5% |
| RFMSII 2006-HI5 | 21.3% |
| RFMSII 2007-HI1 | 18.8% |
| RFMSII 2007-HSA2 | 22.4% |
| RFMSII 2007-HSA3 Gr. I/II | 34.9%/40.3% |
| GMACM 2005-HE1 | 75.68% |
| GMACM 2006-HE3 | 100% |

b.   Defendants or their affiliates acted as the sponsor, seller, and servicer for the loans underlying the securities. GMAC Mortgage LLC was sponsor, seller, and servicer for GMACM 2005-HE1 and GMACM 2006-HE3, with Residential Funding Company, LLC assuming these roles for the remaining Certificates. Defendants first obtained the Mortgage Loans from originators or sellers, including from its affiliates, as described above. Defendants then pooled the Mortgage Loans in the securitizations and conveyed those loans to the Depositor pursuant to Pooling and Servicing Agreements. The Pooling and Servicing Agreements also

established defendants or their affiliates as Master Servicer of the Mortgage Loans underlying
each security.

        c.     Defendants or their affiliates were underwriters for many of the securities
marketed and sold to Allstate. Residential Funding Securities, LLC was co-underwriter for
seventeen of the twenty-five offerings at issue here. In that role, it shared responsibility for
underwriting and managing the securitizations' sale of Certificates to Allstate and other investors,
including screening the Mortgage Loans for compliance with the defendants' underwriting
guidelines.

        d.     Residential Accredit Loans, Inc., Residential Asset Mortgage Products,
Inc., Residential Funding Mortgage Securities I, Residential Funding Mortgage Securities II, and
Residential Asset Securities Corporation were the Depositors for the offerings. The Depositors
purchased the Mortgage Loans, including large amounts of the Mortgage Loans from
defendants' affiliates as above, pursuant to the Pooling and Servicing Agreements. The
Depositors then conveyed the Mortgage Loans to the Trustees, which held the Mortgage Loans
in the Trusts for the benefit of Allstate and other Certificateholders. The Depositors then issued
the Certificates, which represent interests in the Mortgage Loans held by the Trusts, to Allstate
and other investors. The Depositors, Sellers, and Underwriters marketed and sold the
Certificates to investors such as Allstate. The Certificates were sold in classes according to their
expected credit ratings, and were expected to provide interest on the income stream generated by
the Mortgage Loans in the collateral pools. The Depositors were established as limited-purpose
finance subsidiaries of the other defendants.

        65.     Defendants' involvement in and control over each aspect of the securitization
process provided them with unique and special knowledge and expertise regarding the

application of any purported standards or procedures for originating, acquiring, underwriting, and servicing the Mortgage Loans, as well as the loan characteristics of the loan pools securing each Certificate at issue.

## II. THE DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

66.    The Offering Materials made repeated representations regarding the risk profile of the Mortgage Loans. Because payments to investors are based on the stream of payments from borrowers, if enough loans in the pool default, investors will not be paid the interest returns promised and may even lose their principal. The market value for the Certificates also decreases as the perceived risk of the underlying pool increases, because the prospects for eventually receiving a full payment stream over the life of the investment decreases. As such, any representation bearing on the riskiness of the underlying Mortgage Loans was material to investors, including Allstate.

67.    The Offering Materials for each of the securitizations at issue here had similar representations to those highlighted below. A larger sample of the representations on which Allstate relied are found in Exhibits D through BB.

### A. The Defendants' Misrepresentations Regarding Underwriting Guidelines

68.    Proper underwriting of the Mortgage Loans underlying Allstate's Certificates was material to Allstate because, as discussed above, the quality of loans in the pool determines the risk of the certificates backed by those loans. If a reasonable underwriting process was not actually followed, the chances that the loans had riskier features than the defendants claimed greatly increased, making the entire loan pool much riskier. A systemic underwriting failure would decrease the reliability of *all* the information investors had about the loans, and thus would significantly increase the perceived and actual risk to investors, while materially decreasing the value of the Certificates.

69.    The Offering Materials all represented that the Mortgage Loans had been vetted to
ensure that they had been originated according to a reasonable, consistent underwriting program.
For example, the Offering Materials for RALI 2006-QS14 represented: "All of the mortgage
loans in the mortgage pool were originated in accordance with the underwriting criteria of
Residential Funding . . . Residential Funding will review each mortgage loan for compliance
with its underwriting standards prior to purchase." It also represented that the "applicable
underwriting standards include a set of specific criteria by which the underwriting evaluation is
made. . . ." Further similar representations for each Certificate are set forth in Exhibits D
through BB.

70.    These representations were false. As confirmed by a statistical analysis of the
Mortgage Loans at issue here, information provided by confidential witnesses, a review of the
defendants' loan files by their own insurer, and other facts referenced below, the guidelines were
systematically ignored.

**B.    The Defendants' Misrepresentations Regarding Due Diligence Results**

71.    The defendants' representations regarding the underwriting process would be
understood by any reasonable investor, including Allstate, to mean that non-compliant loans
would not be included in the mortgage pools. Indeed, the underwriting disclosures would be
pointless if read to mean only that the some (but not all) of a pool of loans met the given
standards, but the defendants approved all the loans together for securitization, including many
that failed the applicable standards.

72.    The loan pools were subject to review by defendants and/or third-party due
diligence firms. The defendants, however, did not disclose that: (1) the defendants were
informed from those loan-level review processes that a substantial percentage of loans in the
collateral pools were defective; (2) the defendants and other underwriters nonetheless had

26

waived the defects as to a substantial percentage of these loans; (3) underwriters had instead used

the due diligence reports to negotiate a lower price for the loan pools, while retaining the toxic

loans for inclusion in the loan pools; and (4) the defendants improperly failed to adjust their

investigations (such as by increasing their sampling size or refusing to continue to work with

problem originators) given the high number of non-conforming loans the due diligence process

had in fact identified.

73.    That defendants were including loans that their due diligence procedures had

flagged as being defective has been confirmed by information provided by confidential

witnesses, by the recent release of documents from the defendants' third-party due diligence

firm, Clayton Holdings, and other facts set forth below.

74.    The defendants' failure to disclose that high numbers of loans had been rejected

by the due diligence process, yet "waived" into the collateral pools anyway, was a fraudulent

omission, and rendered the disclosures regarding underwriting even more misleading.

**C.    The Defendants' Misrepresentations Regarding Case-by-Case Underwriting Exceptions**

75.    Whether the defendants and those from which defendants were purchasing its

loans were making case-by-case (rather than bulk) exceptions to the otherwise-applicable

underwriting guidelines was material to Allstate and other investors.  A disclosed guideline is

factually irrelevant – and indeed misleading – from a risk-analysis perspective if large numbers

of loans were excused from those standards.

76.    The defendants represented that they made only case-by-case exceptions to the

disclosed underwriting standards, based on compensating factors that increased the quality of a

loan application.  For example, the Offering Materials for RALI 2006-QA14 represented that

"[a] mortgage loan may be considered to comply with the underwriting standards described

27

above, even if one or more specific criteria included in the underwriting standards were not

satisfied, if other factors positively compensated for the criteria that were not satisfied." And the

Offering Materials for RFMSII 2006-HI4 represented that "normally, in order to be eligible for a

reduced loan documentation program, a borrower must have a good credit history, and other

compensating factors, including a relatively low combined LTV ratio or other favorable

underwriting factors, must be present." Further similar representations for each Certificate are

set forth in Exhibits D through BB.

77.    These representations were false. As confirmed by, among other things, a review

of the defendants' loan files by their own insurer, underwriting "exceptions" were not given

based on any positive compensating factors. This is further supported by a statistical analysis of

the Mortgage Loans at issue here, and other facts referenced below.

**D.    The Defendants' Misrepresentations Regarding Owner-Occupancy Statistics**

78.    Owner-occupancy statistics were material to Allstate because high owner-

occupancy rates should have made the Certificates safer investments than certificates backed by

second homes or investment properties. Homeowners who reside in mortgaged properties are

less likely to default than owners who purchase homes as investments or vacation homes.

79.    The Offering Materials contained detailed statistics regarding the Mortgage Loans

in the collateral pool, including the reported owner-occupancy characteristics of the Mortgage

Loans. For example, in the Offering Materials for RALI 2007-QH6, it was claimed that among

the 1,549 loans, 1,282 were purportedly owner-occupied properties. Further similar

representations for each Certificate are set forth in Exhibits D through BB.

80.    These representations were false. In truth, a much lower percentage of the loans

were owner-occupied. Occupancy was being misrepresented first to get the borrower approved

for the loan, then being misrepresented to investors to get the loan sold. A material amount of

the loans were not in fact owner-occupied, and the defendants omitted that the given statistics

were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a

statistical analysis of the Mortgage Loans at issue here, and other facts described below.

**E.    The Defendants' Misrepresentations Regarding Loan-to-Value Ratios**

81.    The loan-to-value ("LTV") ratio is the ratio of a mortgage loan's original

principal balance to the appraised value of the mortgaged property. The related Combined LTV

("CLTV") takes into account other liens on the property (such as "second" mortgage and home

equity loans). These ratios were material to Allstate and other investors because higher ratios are

correlated with a higher risk of default. A borrower with a small equity position in a property

has less to lose if he or she defaults on the loan. There is also a greater likelihood that a

foreclosure will result in a loss for the lender if the borrower fully leveraged the property. These

are common metrics for analysts and investors to evaluate the price and risk of mortgage-backed

securities.

82.    The Offering Materials contained detailed statistics regarding these ratios for the

Mortgage Loans in the collateral pool. For example, the Offering Materials for RALI 2007-QH6

represented that the weighted-average loan-to-value ratio at origination was 73.89%. Similarly,

the Offering Materials for RFMSII 2005-HS2 represented that no loan had a CLTV ratio greater

than 100%. Further similar representations for each Certificate are set forth in Exhibits D

through BB.

83.    These representations were false. The underlying data was being manipulated in

order to get loans approved, making the LTV and CLTV ratios baseless. The defendants did not

genuinely believe the appraisal values used in these statistics because they knew that the property

values were being artificially inflated in order to increase the amount of money that could be

given to a borrower. The defendants had access to detailed information about the borrowers and

about all the loans the borrowers were receiving. The CLTV ratios also omitted the effect of additional liens on the underlying properties, rendering them even further from the truth. The defendants also misleadingly omitted that the disclosed statistics were baseless and that the appraisers were systematically pressured to inflate their appraisals. Thus, the defendants knew that the LTV and CLTV ratios were false and misleading. This is confirmed not only by the statements of a confidential witness who worked within GMAC and testimony showing widespread appraisal fraud, but by a loan-level analysis of the specific Mortgage Loans at issue here, and other facts set forth below.

**F.    The Defendants' Misrepresentations Regarding the Sufficiency of Borrower Income**

84.    The sufficiency of a borrower's income to cover the mortgage payments is of facial importance to investors. One way this is measured is through the use of debt-to-income ratios. The Offering Materials represented that the underwriting process was designed to ensure that borrowers could afford the loan, and often made specific representations as to the borrower's debt-to-income ratios.

85.    For example, the Offering Documents for RALI 2006-QA14 represented that mortgagers were generally (subject to limited exceptions) required to furnish "information regarding its assets, liabilities, income . . . , credit history and employment history, and to furnish an authorization to apply for a credit report . . ." Based on all of this data, "a determination" was to be made "that the mortgagor's monthly income" was sufficient to "meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." And the Offering Materials for GMACM 2005-HE1 represented that the weighted debt-to-income ratio was 38%,

and the loans were generally originated with a maximum ratio of 45%. Further similar representations for each Certificate are set forth in Exhibits D through BB.

86.    These representations were false. The abandonment of sound underwriting practices facilitated the widespread falsification of these statistics within the Offering Materials. This abandonment is evidenced by all the facts set forth below, including Allstate's statistical analysis into the loans at issue here and statements provided by a confidential witness. In reality, the borrowers' claimed income was regularly inflated, such that the true debt-to-income ratios were materially higher than they were represented to be. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

### G.    The Defendants' Misrepresentations Regarding Credit Enhancements

87.    Credit enhancement represents the amount of "cushion" or protection from loss exhibited by a given security. This cushion is intended to improve the likelihood that holders of highly-rated certificates receive the interest and principal they expect. The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral pool. Riskier pools necessarily need higher levels of credit enhancement to ensure payment to senior certificate holders. Credit enhancements for a given trust also impact the overall credit rating a given tranche of certificates receives. The level of credit enhancement for the Certificates was material to Allstate because it represented the protection purportedly afforded from loss.

88.    The Offering Materials represented that the Certificates had certain credit enhancements used to improve the likelihood that holders of such certificates would receive regular principal and interest payments thereon. For instance, the Offering Documents for RALI

2006-QO3 represented that "Credit enhancements for the offered certificates consists of: excess cash flow; overcollateralization; and subordination." And the Offering Materials for RFMSII 2005-HS2 represented: "Credit enhancements for the term notes consists of: excess interest; overcollateralization; and two financial guaranty insurance policies . . ."

89.     "Excess cash flow," "excess interest," and "overcollateralization" all generally refer to the purported affects of including in the collateral pool more mortgage loans than would be strictly necessary to pay off all investors, assuming that every borrower made every payment on time. "Subordination" refers to the fact that, should loans become delinquent or default, not all investors are treated equally. Rather, generally, certain investors are paid out of what funds are available despite those losses first. Any leftover funds from what was actually received then "waterfall" into the next class of investors, and so on.

90.     The representations regarding the purported credit enhancements were untrue and misleading. All of the purported "enhancements" depended on or derived from the false representations regarding the quality of the Mortgage Loans underlying the Certificates. Highly risky, misrepresented loans piled on top of other highly risky, misrepresented loans is not a true "enhancement" as represented.

**H.    The Defendants' Misrepresentations Regarding Credit Ratings**

91.     Each of the Certificates received a rating purportedly indicating the rating agencies' view of the risk profile of the securities. The initial and current ratings given to each Certificate are contained in Exhibit C. The ratings were material to reasonable investors, including Allstate, because the ratings provide additional assurances that the investors would receive the expected interest and principal payments. But for the provision of these ratings, the Certificates would have been unmarketable to many institutional investors such as Allstate, and likely would not have been issued.

32

92.     The Offering Materials represented that the rating agencies conducted an analysis
designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools.
For example, the Offering Materials for RALI 2006-QA14 represented: "When issued, the
offered certificates will receive ratings which are not lower than those listed in the table . . . The
ratings on the offered certificates address the likelihood that holders of the offered certificates
will receive all distributions on the underlying mortgage loans to which they are entitled."
Further similar representations for each Certificate are set forth in Exhibits D through BB.

93.     These representations were false and misleading.  Unknown to Allstate, the rating
agencies were fed baseless and false statistics regarding the loans (including the same statistics
and other representations discussed herein), as evidenced by a statistical analysis of the Mortgage
Loans at issue here.  This made representations regarding the ratings process false (as a rigged
process is not designed to "address the likelihood that holders" would receive distributions), and
rendered the "ratings" themselves similarly false and misleading (as they only represented the
credit rating agencies' analysis of a non-existent mortgage pool that had no relation to that truly
underlying Allstate's Certificates).

I.    **Documentary Basis for the Loan Approval**

94.     Whether the information in a loan file was fully documented, or whether it was
instead approved pursuant to a reduced or no-documentation procedure, was material to Allstate.
Reduced-documentation loans are riskier because the borrower provides less substantiating
information for criteria such as his or her income and assets.  With less confirmation, it is more
likely that there are errors or misrepresentations in the loan file.

95.     The Offering Materials contained detailed statistics regarding the documentation
procedures purportedly used for the Mortgage Loans.  For example, the Offering Materials for
RFMSII 2006-HI4 represented that 5,223 of the 5,513 loans were based on "full documentation,"

33

while only 16 were based on "no documentation." Further similar representations for each

Certificate are set forth in Exhibits D through BB.

96.    These representations were false. A review by the defendants' own insurer found

many files incomplete, and Residential Funding itself has accused its originators of using

incomplete loan files.

## III.    EVIDENCE THAT ALL OF THE DEFENDANTS' REPRESENTATIONS WERE UNTRUE AND MISLEADING

97.    The Mortgage Loans were not originated according to the underwriting standards

disclosed in the relevant Offering Materials. Instead of focusing on assessing an applicant's

credit standing and repayment ability, the defendants subordinated loan quality to the goal of

originating and securitizing as many loans as possible to generate fees in the secondary mortgage

market. That the disclosed underwriting standards were systematically ignored rendered all of

the above representations false or misleading at the time they were made.

98.    The representations regarding the underwriting processes, underwriting quality,

loan selection, and use of exceptions were untrue. The loans did not comply with the

underwriting standards the Offering Materials described, as those standards were systemically

ignored. In originating or acquiring the loans, the defendants ignored borrowers' actual

repayment ability and the value and adequacy of mortgaged property used as collateral in issuing

loans. Systematic, bulk exceptions were used without consideration of any compensating

factors. The defendants also misleadingly omitted that the defendants were systematically

abusing "exceptions" in order to further circumvent their purported underwriting standards.

99.    The defendants' representations regarding the underwriting and due diligence

processes were made even more misleading by their fraudulent omission of information

34

regarding the number of rejected loans that that process did identify, and the high number of

such loans that were "waived" into the collateral pools anyway.

100.    The representations regarding owner-occupancy and the sufficiency of the

borrower's income were untrue.  The abandonment of sound underwriting practices facilitated

the widespread falsification of these statistics within the Mortgage Loans.  In reality, a far greater

percentage of properties were not owner-occupied, and the borrowers' claimed income was

regularly inflated.  The defendants also failed to disclose that the representations were baseless.

101.    The representations regarding loan-to-value and combined loan-to-value ratios

were untrue.  The defendants did not genuinely believe the appraisal values used in these

statistics because they knew that the property values were being artificially and baselessly

inflated in order to increase the amount of money that could be given to a borrower.  The CLTV

ratios also omitted the effect of additional liens on the underlying properties, rendering them

even further from the truth.  Additionally, the defendants misleadingly omitted that the disclosed

statistics were baseless and that appraisers were systematically pressured to inflate their

appraisals.

102.    The representations regarding the purported credit enhancements were untrue and

misleading.  All of the purported "enhancements" depended on or derived from the (false)

representations regarding the quality of the Mortgage Loans.  Highly risky, misrepresented loans

piled on top of other highly risky, misrepresented loans is not a true "enhancement" as

represented.  Even representations regarding the presence of such enhancements as insurance or

similar agreements with third parties was misleading, in that the defendants' fraudulently omitted

to disclose that, on information and belief, they procured those contracts making similar

misrepresentations as the defendants made to Allstate, calling into doubt whether their terms will ultimately be honored.

103.    The representations regarding the credit ratings were also untrue.  The defendants fed baseless loan statistics to the credit rating agencies, essentially pre-determining the ratings that would be given.  The use of baseless statistics also made representations about the ratings process being designed to assess credit risk false, as the entire ratings process was rigged from the start through the use of incorrect data.  The defendants thus did not genuinely believe that the ratings the agencies assigned to these Certificates reflected their actual risk.

A.    **Evidence of the Securities' High Default Rates and Plummeting Credit Ratings**

104.    The drastic rise in default rates on the Mortgage Loans underlying Allstate's Certificates is itself cogent evidence of faulty underwriting.  Absent fraud, even in the face of a mortgage crisis, true AAA paper with adequate credit protection should not have experienced the drastic loss in value that was experienced by most of the Certificates.

105.    Even though the Certificates were supposed to be long-term, stable investments, just years after their issuance, the underlying Mortgage Loans have already shown serious deterioration in performance.  For instance, for RALI 2007-QH6, *55% of the loans from the original pool have either already had to be written off at a loss or are currently delinquent*. Similarly, for RAMP 2006-RS3, RAMP 2006-RZ3, RFMSII 2007-HSA2, and RFMSII 2007-HSA3, *over 40% of the loans from each deal's original pool have either already had to be written off at a loss or are currently delinquent*.

106.    Overall, approximately *24% of the original Mortgage Loans have already had to be written off at a loss*, and of the remaining loans, approximately *25% are currently delinquent*.

107.    Relatedly, the ratings given to the Certificates have significantly deteriorated. Most of Allstate's investments initially received the highest possible ratings – S&P's AAA rating or their equivalent from the other rating agencies. According to S&P's website: "An obligation rated 'AAA' has the highest rating assigned by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is extremely strong." Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk." These are the same ratings typically given to bonds backed by the full faith and credit of the United States government, such as treasury bills. Historically, an AAA rated security had an expected loss rate of less than .05%.

108.    Because of the high delinquency and default rates and other factors, most of Allstate's Certificates have been downgraded from the highest possible ratings to junk-bond ratings. *Despite two-thirds of the purchases being for Certificates that had the same rating given to treasury bills (i.e., AAA), currently over 75% of the purchases are backed by Certificates currently rated by at least one of the major agencies as being non-investment grade.* Indeed, *over half have fallen even further*, falling into the "C" and "D" ranges of the agencies' scales. According to S&P's website, far from having the "extremely strong capacity" to meet commitments required by AAA-rated investments, instead these ratings now indicate that the Certificates are "*currently vulnerable* and dependent on favorable business, financial and economic conditions to meet financial commitments."

109.    The ratings history for the Certificates is set forth in Exhibit C. Most downgrading actions take place after March 2008, and the most serious downgrades (i.e., to non-investment grade) did not take place until mid-2008 or later.

37

110.    The drastic rise in default rates on the Mortgage Loans underlying Allstate's

Certificates reflects the defendants' faulty underwriting. The Certificates were supposed to be

long-term, stable investments, yet they have already experienced payment problems significantly

beyond what was expected for loan pools that were properly underwritten and that contained

loans that actually had the characteristics the Offering Materials claimed.

111.    It is usually a large and unexpected disruption to a borrower's income that causes

an actual payment default. In a properly underwritten pool of loans, one would thus not expect

to see a large spike of defaults occurring shortly after origination, since it is unlikely that many

borrowers would all incur a sudden and unexpected change to their payment ability so soon after

purchasing a home.

112.    Indeed, economic studies have confirmed that high default rates early in a loan's

life are highly correlated with misrepresentations in the loan files. This makes sense – as

borrowers are put in loan products they cannot actually afford, they quickly and predictably fall

behind on their payments. For instance, the F.B.I. studied three million residential mortgages

that found that between *30% and 70% of early payment defaults were linked to significant

misrepresentations in the original loan applications.* Loans containing egregious

misrepresentations were *five times* as likely to default in the first six months than loans that did

not. The FCIC's "examination found [at xxii], according to one measure, that the percentage of

borrowers who defaulted on their mortgages within just a matter of months after taking a loan

*nearly doubled from the summer of 2006 to late 2007.* This data indicates they likely took out

mortgages that they *never had the capacity or intention to repay.*" (Emphasis added).

113.    In short, the dismal performance of the Mortgage Loans is itself strong evidence

that they were improperly underwritten, and that they did not have the credit risk characteristics

the Offering Materials claimed. The defaults and related drop in value thus are due to the

defendants' wrongdoing, and not due to the general change in economic conditions.

**B.    Loan-Level Evidence That Borrowers Did Not Actually Occupy the
Mortgage Properties as Represented**

114.    As above, the defendants repeatedly represented that the loan pools underlying the

Certificates had high percentages of loans issued to borrowers that were living in the mortgaged

properties. The Certificates here were in fact backed by Mortgage Loans that had a far higher

percentage of non-owner occupied properties.

115.    According to a January 2011 *Business Week* report, loan files often

misrepresented the owner-occupancy status of the mortgaged properties. The study, which

looked at a loan's history for 16 months before labeling it "misreported," found that 23% of

mortgages that were securitized as being "owner occupied" were either never moved into or were

quickly vacated by the borrower.

116.    Allstate need not rely solely on such industry-wide studies to support its

allegation that the Mortgage Loans here were misrepresented. Allstate selected a random sample

of the specific loans underlying the Certificates here to test the defendants' representations on a

loan-level basis. Using techniques and methodologies that only recently became available to

investors, Allstate conducted loan-level analyses on over 30,000 Mortgage Loans underlying its

Certificates.

117.    For each offering tested, Allstate attempted to analyze 800 defaulted loans and

800 randomly-sampled loans from within the collateral pool. Where the loan pool contained

fewer than 1,600 loans, Allstate tested every loan associated with that transaction.

118.    These sample sizes are more than sufficient to provide statistically-significant

data to demonstrate the degree of misrepresentation of the Mortgage Loans' characteristics.

Analyzing data for each Mortgage Loan in each Offering would have been cost-prohibitive and unnecessary for purposes of Allstate's complaint. Statistical sampling is an accepted method of establishing reliable conclusions about broader data sets, and is routinely used by courts, government agencies, and private businesses. As the size of a sample increases, the reliability of its estimations of the total population's characteristics increase as well. Experts in RMBS cases have found that a sample size of just 400 loans can provide statistically significant data, regardless of the size of the actual loan pool, because it is unlikely that so large a sample would yield results vastly different from results for the entire population.

119.    To determine whether a given borrower actually occupied the property as claimed, Allstate investigated tax information for the sampled loans. One would expect that a borrower residing at a property would have the tax bills sent to that address, and would take all applicable tax exemptions available to residents of that property. If a borrower had his or her tax records sent to another address, that is good evidence that that borrower was not actually residing at the mortgaged property. If a borrower declined to make certain tax exemption elections that depend on the borrower living at the property, that also is strong evidence the borrower was living elsewhere.

120.    A review of credit records was also conducted. One would expect that people have bills sent to their primary address. If a borrower was telling creditors to send bills to another address, even six months after buying the property, it is good evidence the borrower was living elsewhere.

121.    A review of property records was also conducted. It is less likely that a borrower lives in any one property if in fact that borrower owns multiple properties. It is even less likely

the borrower resides at the mortgaged property if a concurrently-owned separate property did not have its own tax bills sent to the property included in the mortgage pool.

122.    A review of other lien records was also conducted. If the property was subject to additional liens but those materials were sent elsewhere, that is good evidence the borrower was not living at the mortgaged property. If the other lien involved a conflicting declaration of residency, that too would be good evidence that the borrower did not live in the subject property.

123.    Though the availability to gather such information for large numbers of loans and run these tests was only recently made available to investors like Allstate, these tests draw from data contemporaneous with the transactions at issue. They thus are evidence that a then-existing fact – owner occupancy – was misrepresented. Further, even though this recently-available technique draws on contemporaneous information, and thus provides a robust 'test' of the defendants' representations for pleading purposes – it still does not represent the level of information that was uniquely in defendants' control, such as the loan files. As above, Allstate did not and does not have access to the loan files.

124.    The results of Allstate's loan-level analysis of true owner-occupancy rates on the Mortgage Loans underlying its Certificates are set forth below and are further detailed in Exhibits D through BB. Failing multiple of the above tests is strong evidence the borrower did not in fact reside at the mortgaged properties. These statistics thus show that, despite the defendants' representations, a much higher percentage of borrowers did not occupy the mortgaged properties:

| Asset | Percentage of Owner-Occupied Properties in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|---|---|---|---|
| RALI 2005-QA2 | 81.5% | 71.3% | 10.2% |
| RALI 2005-QS6 | 67.3% | 57.0% | 10.3% |

41

| Asset | Percentage of Owner-Occupied Properties in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|---|---|---|---|
| RALI 2006-QO3 | 84.7% | 73.1% | 11.5% |
| RALI 2006-QS14 | 73.0% | 62.3% | 10.7% |
| RALI 2007-QH6 | 82.8% | 66.7% | 16.1% |
| RAMP 2004-RZ4 | 85.4% | 74.7% | 10.7% |
| RAMP 2004-RZ2 | 85.0% | 75.4% | 9.5% |
| RAMP 2005-RS4 | 74.1% | 64.2% | 9.9% |
| RAMP 2006-RS3 | 57.5% | 48.7% | 8.8% |
| RASC 2005-KS3 | 91.1% | 80.7% | 10.43% |
| RASC 2005-KS4 | 90.4% | 79.6% | 10.7% |
| RFMSI 2005-S8 | 97.0% | 85.2% | 11.9% |
| RFMSI 2006-S6 | 96.2% | 82.4% | 13.8% |
| RFMSII 2005-HI3 | 100% | 93.6% | 6.4% |
| RFMSII 2005-HS2 | 92.9% | 83.9% | 9.0% |
| RFMSII 2005-HSA1 | 90.3% | 78.9% | 11.4% |
| RFMSII 2006-HI5 | 99.7% | 92.0% | 7.7% |
| RFMSII 2007-HI1 | 99.3% | 91.8% | 7.50% |
| RFMSII 2007-HSA2 | 77.4% | 66.7% | 10.6% |
| RFMSII 2007-HSA3 | 81.7% | 70.4% | 11.3% |

125.    The facts alleged in this complaint show the defendants' problems were systemic, and such is confirmed by the consistency of the results set forth above – the results of reviewing over 30,000 loans across twenty of the twenty-five Certificates at issue here.  The untested Certificates involved the same parties, the same affiliated originators, nearly identical disclosures, and both the underlying loans and the certificates themselves were being generated around the same time purportedly according to the same processes.  As such, on information and belief, the Offering Materials for the Certificates that Allstate was not able to test on a loan-level basis also misrepresented the owner-occupancy information at approximately the same, material rate as seen in the large sample of Certificates discussed above.

**C.    Loan-Level, Independent Evidence That the LTV Ratios Were Materially
Misrepresented**

126.    As above, the defendants made representations about the Mortgage Loans' LTV

and CLTV ratios.  These ratios compare the amount of the loan to the value of the mortgaged

property, theoretically calculated using an appraisal process.  An inflated appraisal would thus

directly result in false and misleading LTV and CLTV ratios.

127.    Using techniques and methodologies that only recently became available to

investors, Allstate had the underlying property valued, using data contemporaneous with the

original valuation the defendants would have done, by an industry-standard automated valuation

model ("AVM").  AVMs are routinely used in the industry as a way of valuing properties during

prequalification, origination, portfolio review, and servicing.  AVMs have become so ubiquitous

that their testing and use is specifically outlined in regulatory guidance, and is discussed in the

Dodd-Frank Act.  AVMs rely upon similar data as appraisers – primarily county assessor

records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-

derived valuation estimates by applying modeling techniques to this data.  The AVM that

Allstate used incorporates a database of 500 million mortgage transactions covering zip codes

that represent more than 97% of the homes, occupied by more than 99% of the population, in the

United States.  Independent testing services have determined that this AVM is the most accurate

of all such models.

128.    The results of this analysis for each Certificate tested is set forth in Exhibits D

through BB.  Applying the AVM to the available data for the loans underlying the Certificates

shows that the value used by the defendants in the represented LTVs were materially and

consistently inflated.  This caused the disclosed LTV and CLTV ratios to be lower than they

really were, i.e., the owners were represented to have more of an equity "cushion" than they

really did, and the prospects for recovery of any funds upon a foreclosure were represented to be
much higher than they really were.

129.    As with owner-occupancy, though the availability to gather such information and
run these tests was only recently made available to investors like Allstate, these tests draw from
data contemporaneous with the transactions at issue. They thus are evidence that the LTV and
CLTV ratios were misrepresented at the time the representations were made, but still do not
represent the level of information that was uniquely in defendants' control, such as the loan files.
As above, Allstate did not and does not have access to the loan files.

130.    Overall, for those tested Offering Materials that focused on LTV (rather than
CLTV) statistics, 37% of the loans sampled had recalculated LTV ratios understated by more
than 10%, and *12% of the loans sampled had LTV ratios understated by more than 25%*. This
overvaluation affected numerous statistics in the Offering Materials.

131.    For instance, the Offering Materials made representations about the percent of
loans that had LTVs higher than 90%. LTVs in excess of 90% provide the lender little value
cushion to protect against borrower default and loss upon foreclosure. However, the AVM
indicates that a much higher percentage of the loans had LTVs higher than 90%:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 90% | Actual Percentage of Loans With LTVs Greater than 90% | Prospectus Understatement of Percent of Loans With High LTVs |
|---|---|---|---|
| RALI 2005-QA2 | 1.55% | 18.94% | 17.39% |
| RALI 2005-QS6 | 8.63% | 29.25% | 20.62% |
| RALI 2006-QO3 | 1.42% | 32.77% | 31.35% |
| RALI 2006-QS14 | 4.36% | 30.96% | 26.60% |
| RALI 2007-QH6 | 2.07% | 53.62% | 51.55% |
| RAMP 2006-RS3 | 14.14% | 44.43% | 30.29% |
| RASC 2005-KS3 | 19.04% | 47.65% | 28.61% |
| RASC 2005-KS4 | 17.53% | 45.33% | 27.80% |
| RFMSI 2005-S8 | 2.33% | 18.12% | 15.79% |
| RFMSI 2006-S6 | 0.42% | 21.03% | 20.61% |

132.    The Offering Materials also made representations about how many of the

Mortgage Loans had LTV ratios greater than 100 percent, meaning the size of the loan is greater

than the value of the property. (This is known as being "underwater," where a borrower owes

more on the property than it is worth.) Loans with over 100% LTV afford the lender no equity

cushion and leave the lender with inadequate collateral from the outset of the loan. Allstate's

analysis has found that, despite the defendants representations, a substantial number of the

Mortgage Loans had LTVs greater than 100%:

| Asset | Percentage of Loans Represented to Have LTVs Greater than 100% | Actual Percentage of Loans With LTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| RALI 2005-QA2 | 0% | 6.94% | 6.94% |
| RALI 2005-QS6 | 0% | 12.80% | 12.80% |
| RALI 2006-QO3 | 0% | 13.36% | 13.36% |
| RALI 2006-QS14 | 0% | 15.23% | 15.23% |
| RALI 2007-QH6 | 0% | 28.60% | 28.60% |
| RAMP 2004-RZ4 | 54.41% | 68.96% | 14.55% |
| RAMP 2004-RZ2 | 55.65% | 62.31% | 6.66% |
| RAMP 2005-RS4 | 2.24% | 46.31% | 44.07% |
| RAMP 2006-RS3 | 0% | 23.25% | 23.25% |
| RASC 2005-KS3 | 0% | 24.49% | 24.49% |
| RASC 2005-KS4 | 0% | 23.59% | 23.59% |
| RFMSI 2005-S8 | 0% | 7.00% | 7.00% |
| RFMSI 2006-S6 | 0% | 9.79% | 9.79% |

133.    Allstate has also analyzed the weighted average LTV of the Mortgage Loans in

each pool and has found that the weighted average LTV was also understated:

| Asset | Represented Weighted Average LTV | Actual Weighted Average LTV | Prospectus Understatement |
|---|---|---|---|
| RALI 2005-QA2 | 76.93% | 81.89% | 4.96% |
| RALI 2005-QS6 | 77.32% | 83.46% | 6.14% |
| RALI 2006-QO3 | 74.31% | 85.79% | 11.48% |
| RALI 2006-QS14 | 77.46% | 84.92% | 7.46% |

| Asset | Represented Weighted Average LTV | Actual Weighted Average LTV | Prospectus Understatement |
|---|---|---|---|
| RALI 2007-QH6 | 73.89% | 91.94% | 18.05% |
| RAMP 2004-RZ4 | 102.19% | 106.81% | 4.62% |
| RAMP 2004-RZ2 | 102.13% | 104.03% | 1.9% |
| RAMP 2005-RS4 | 93.55% | 100.07% | 6.52% |
| RAMP 2006-RS3 | 80.22% | 92.07% | 11.85% |
| RASC 2005-KS3 | 82.31% | 89.09% | 6.78% |
| RASC 2005-KS4 | 83.03% | 88.79% | 5.76% |
| RFMSI 2005-S8 | 68.73% | 75.59% | 6.86% |
| RFMSI 2006-S6 | 69.98% | 81.16% | 11.18% |

134.    Other Offering Materials, particularly for those deals with large numbers of second-lien loans, also focused on the CLTV statistics of the underlying loans. This is because the quality of such a loan should take into account the pre-existing "senior" lien on the property, as that eats into the owner's equity and has to be paid first upon foreclosure. (Deals that purport to not contain many loans subject to a second lien often do not contain CLTV representations.) As with the LTV statistics, the defendants misrepresented the CLTV statistics, seriously understating the riskiness of the Mortgage Loans underlying the Certificates.

135.    Overall, for those Offering Materials that focused on CLTV statistics, 49% of the loans sampled had recalculated CLTV ratios of more than 10% higher than what was claimed in the Offering Materials, and *18% of the loans sampled had CLTV ratios understated by more than 25%.* This overvaluation affected numerous statistics in the Offering Materials.

136.    Certain Offering Materials made representations about the percent of loans that had CLTVs higher than 100%. Just as with LTVs, CLTVs in excess of 100% provide the lender no cushion to protect against borrower default and loss upon foreclosure. Using both the AVM to recalculate the value of the property and researching the existence of additional, hidden liens revealed that a much higher percentage of the loans had CLTVs higher than 100%:

| Asset | Percentage of Loans Represented to Have CLTVs Greater than 100% | Actual Percentage of Loans With CLTVs Greater than 100% | Prospectus Understatement of Percent of Loans Already Underwater |
|---|---|---|---|
| RFMSII 2005-HS2 | 0% | 50.05% | 50.05% |
| RFMSII 2005-HSA1 | 0% | 52.11% | 52.11% |
| RFMSII 2006-HI5 | 85.21% | 87.21% | 2.00% |
| RFMSII 2007-HI1 | 90.66% | 93.76% | 3.10% |
| RFMSII 2007-HSA2 | 0% | 62.22% | 62.22% |
| RFMSII 2007-HSA3 | 0% | 64.85% | 64.85% |

137.    Even when the Offering Materials disclosed that the Mortgage Loans had high CLTV ratios, it significantly understated *how* high. For instance, as above the Offering Materials for RFMSII 2006-HI5 and 2007-HI1 "only" understated the number of loans underwater by 2-3%. But that is only part of the story. In these instances, the Offering Materials represented that less than ten loans out of each pool had a CLTV ratio higher than 125%. Yet the true *weighted average for both deals was over 125%.* For RFMSII 2007-HI1, *over half of the loans had their CLTVs materially understated, with nearly a fifth being understated by more than 25%.* Thus, even when certain Offering Materials disclosed that some loans were underwater, they still materially misrepresented how much of the collateral pool was underwater, *and* how far underwater those loans were.

138.    The Offering Materials similarly misrepresented the weighted-average of the CLTVs:

| Asset | Represented Weighted Average CLTV | Actual Weighted Average CLTV | Prospectus Understatement |
|---|---|---|---|
| RFMSII 2005-HI3 | 117.76% | 129.40% | 11.64% |
| RFMSII 2005-HS2 | 91.45% | 101.71% | 10.26% |
| RFMSII 2005-HSA1 | 91.98% | 104.21% | 12.23% |
| RFMSII 2006-HI5 | 114.81% | 126.53% | 11.72% |
| RFMSII 2007-HI1 | 117.32% | 131.00% | 13.68% |
| RFMSII 2007-HSA2 | 93.60% | 107.31% | 13.71% |
| RFMSII 2007-HSA3 | 91.98% | 108.20% | 16.22% |

139.    The defendants did not genuinely believe the appraised values were reasonable estimations of the properties' values at the time they were given.  The defendants knew that the appraisals were being inflated to allow borrowers to be approved for loans that they could not afford.  As such, they knew the LTV and CLTV statistics were baseless.  Further, the CLTV statistics above were inflated in part because of the presence of hidden liens, which do not turn on any purported difference in the appraisal "opinion."

140.    The facts alleged in this complaint show the defendants' problems were systemic, and such is confirmed by the consistency of the results set forth above -- the results of reviewing over 30,000 loans across twenty of the twenty-five Certificates at issue here.  The untested Certificates involved the same parties, the same affiliated originators, nearly identical disclosures, and both the underlying loans and the certificates themselves were being generated around the same time purportedly according to the same processes.  As such, on information and belief, the Offering Materials for the Certificates that Allstate was not able to test on a loan-level basis also misrepresented the LTV and CLTV statistics at approximately the same, material rate as seen in the large sample of Certificates discussed above.

**D.    Evidence From A Former Senior Underwriter That GMAC Accepted Absurd Income Claims**

141.    According to CW4, a former Senior Underwriter at GMAC, the share of "stated income" loans went up in the 2004-2007 time frame.  CW4 "hated" these, which "drove [CW4] insane," because CW4 "had to accept" whatever income was given.  CW4 gave an example of a city bus driver that provided a stated income of $9,000 *per month*.  As below, a review by the defendants' own insurer, of defendants' loan files at issue here, found similar, numerous problems infected Allstate's Certificates.

48

142.    According to CW4, only a human could really judge the facial reasonableness of a "stated income" amount as against the claimed occupation. Nonetheless, according to CW4, GMAC relied on its automated systems to underwrite stated-income loans, and there was no system in place for otherwise evaluating the reasonableness of the income claims.

143.    When CW4 raised such concerns, CW4's supervisor responded that 'this is what we pay you to do.' CW4 felt that "short of walking out, we didn't have a choice."

**E.    Evidence From the Defendants' Own Insurers' Review of Loan Files at Issue Here**

144.    MBIA Insurance Corporation had access to some of the complete loan files for certain of the defendants' securitizations – including some of the Certificates at issue here. Its analyses – the first part of which was only made public in December 2008 – provides additional strong evidence that essential characteristics of the Mortgage Loans underlying the Certificates were misrepresented, and that the problems in the defendants' underwriting practices were systemic.

145.    MBIA is a monoline insurer that wrote insurance on certain Residential Funding and GMAC mortgage-backed securities. MBIA conducted an investigation into certain loan files after it was asked to make payments on its insurance policies. MBIA's analysis included at least two deals that Allstate invested in: RFMSII 2007-HSA2 and RFMSII 2007-HSA3. The other deals that MBIA analyzed are also probative of problems underlying Allstate's Certificates because the defendants' problems were systemic, and because the collateral pools for the securitizations that MBIA investigated were composed of the same type of collateral underlying some of Allstate's Certificates.

146.    In carrying out its review of the approximately 12,000 Residential Funding/GMAC loan files – *including loans that were securitized and sold to Allstate* – MBIA

49

found that *88% of the defaulted or delinquent loans in those securitizations contained material deviations from the stated underwriting guidelines.* MBIA's report showed that a material number of mortgage loans included in the mortgage loan pools underlying the securitizations were made to borrowers who could not reasonably have expected to be able to repay the mortgage loans, and the risks inherent in the portfolios was significantly higher than as represented. Indeed, *MBIA claims that Residential Funding admitted to it that it knew mortgage loan pools failed to comply with Residential Funding's guidelines.*

147.    MBIA also found that "there were fundamental, material, and consistent violations of [Residential Funding's] underwriting guidelines and policies in connection with the underwriting of the mortgage loans . . . The undisclosed and misrepresented risks were pervasive throughout the mortgage loan portfolios for the securitization transactions." Similarly, the results of its GMAC-focused review "made clear that GMAC Mortgage had wholly abandoned its own underwriting policies and instead routinely approved loans to borrowers who failed to meet basic risk criteria."

148.    MBIA gave examples of individual loans that diverged from the stated underwriting guidelines. Below is just a small sample of the problems MBIA found, some of which came from the very loan files that were used to originate the loans pooled into the Certificates at issue here:

- "On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567. The property subject to the loan was a non-owner occupied investment property. The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store. Further, the borrower did not demonstrate any liquid assets. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower

claimed to have earned $0.00 for 2006. Further, the appraisal indicated the property failed to conform to legal standards and the loan file lacked any letter from the local authority regarding rebuilding. RFC Underwriting Guidelines require verification of 6 months of reserves for the monthly Principle, Interest, Taxes and Insurance ('PITI') payments for stated income loans on non-owner occupied investment properties yet there is no indication in the loan files that these reserves were identified or verified. Finally, RFC guidelines limit loans under the non-owner occupied loan program to $100,000, $40,000 less than was loaned. (Loan # 11169067 – 2007-HSA2)."

- "On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000. The borrower is retired and receives a fixed income that was stated as $6,450 per month. The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%. Because the borrower receives a fixed income, the borrower does not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines. Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines. (Loan # 11434381 – 2007-HSA3)."

- "On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value of $540,000.00 and a senior loan balance of $405,000.00. The borrower stated income of $11,000 per month as a sales manager at a concrete company, however, the borrower could only demonstrate assets of $11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in connection with which the borrower claimed to have actually earned $43,523 for 2006 and $20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan. (Loan # 11165457 – 2007-HSA3)."

- "On April 20, 2007, a loan in the amount of $40,000 was made to co-borrowers in Vernon, New Jersey on a property with an original appraisal value of $305,000 and a senior loan balance of $244,000. The loan file is incomplete and lacks, among other documents, verbal verification of either borrower's employment, evidence of sufficient closing funds and reserves, an appraisal, a copy of the note from the senior lien, and the borrowers' credit reports. Further, the loan was approved even though the income stated by each borrower was unreasonable. One claimed to earn $4,583 per month as a counter manager at a discount tire store though, for example, salary.com, a website which maintains a national salary database based on job title and zip code, reports that the income at the 90th

percentile for such a position is only $2,801 per month. The second
borrower claimed to earn $59,592 annually as a sales associate at a home
improvement store, but an income verification database showed that the
borrower earned only $28,092 in 2006 and $32,977 in 2007. The loan has
been charged-off. (Loan # 1000117685 – [GMAC] 2006 Transaction.)"

- "On January 23, 2007, a loan with a principal balance of $100,000 was
made to a borrower in Yuma, Arizona on a property with an original
appraisal value of $298,000 and a senior loan balance of $129,035. The
borrowers claimed on their loan application that their combined income
was $113,520 per year. However, on May 12, 2009, the borrowers jointly
filed for bankruptcy under Chapter 7, and their court filings indicated that
they earned only $13,085 in 2007 and $17,650 in 2008. Moreover, no
record of the borrower's claimed employer can be located on websites
commonly used to verify the existence of a business: manta.com or
yellowpages.com. The loan has been charged-off. (Loan # 8254730412 –
[GMAC] 2007 Transaction.)"

149.    In short, in its review of Residential loan files – files that underlie some of the

Certificates at issue here – Residential Funding's own insurer found:

- "A significant number of mortgage loans have DTI ratios far in excess of
RFC's Underwriting Guidelines, have CLTV ratios far in excess of RFC's
Underwriting Guidelines and were made on the basis of 'stated incomes'
that were grossly unreasonable."

- "[C]ontrary to RFC's Underwriting Guidelines, RFC failed, with respect
to a significant number of mortgage loans, to verify employment for
mortgage loan borrowers where required to do so, failed to verify prior
rental or mortgage payment history, approved mortgage loans with
ineligible collateral, approved mortgage loans to borrowers with credit
scores that are ineligible under the Underwriting Guidelines and closed
mortgage loans without verifying that the borrower had sufficient funds
or reserves as required by the Underwriting Guidelines."

- "Numerous mortgage loan files are missing necessary mortgage loan
documents and are missing certain disclosures, such as disclosures
relating to loan transfers, which are necessary under applicable law."

- "RFC even contributed mortgage loans to the mortgage loan pools that
violated either, or both, the federal Home Ownership and Equity
Protection Act ('HOEPA') and state predatory lending laws . . . RFC's
failure to identify HOEPA violations indicates that RFC failed to perform
the calculation, incompetently performed the calculation or performed the
calculation but purposely ignored the result."

150.   Similarly, MBIA's review of GMAC's loan files found that, among other things:

- "GMAC Mortgage egregiously and routinely breached its representation and warranty that the mortgage loans were underwritten generally in compliance with GMAC Mortgage's underwriting standards."

- "A significant number of mortgage loans were made on the basis of 'stated incomes' that were grossly unreasonable or were approved despite DTI or CLTV ratios in excess of the cut-offs stated in GMAC Mortgage's Underwriting Guidelines or the Purchase Agreements or Prospectus Supplements."

- "Moreover, contrary to its Underwriting Guidelines, GMAC Mortgage failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with ineligible credit scores, and approved loans without verifying that the borrower had sufficient funds or reserves."

- "GMAC Mortgage used its proprietary automated electronic loan underwriting program, known as 'Assetwise,' to approve loans that did not comply with its Underwriting Guidelines . . . Assetwise, however, failed to analyze proposed mortgage loans using the criteria set forth in GMAC Mortgage's Underwriting Guidelines."

- "The vast majority of mortgage loan files are missing necessary mortgage loan documents, such as disclosures relating to loan transfers and notes establishing the first lien."

- "GMAC Mortgage . . . furnish[ed] . . . mortgage loans to the pools that violated state predatory lending laws. These laws are designed to protect borrowers from abusive lending practices by, for example, prohibiting the approval of a loan to a borrower who lacks the ability to repay."

151.   MBIA reviewed loans associated with some of the very deals at issue here. Even for deals that were not identical, some were in the same series of offerings – for instance MBIA analyzed GMACM 2006-HE4 (prospectus supplement dated September 25, 2006), while Allstate purchased certificates in GMACM 2006-HE3 (prospectus supplement dated August 28, 2006). For the deals MBIA analyzed, the parties, structure, timing, and disclosures made all significantly overlapped with – if were not identical to – those present here. In addition, MBIA's findings are consistent with, and confirmed by, Allstate's statistical analyses of the Certificates

53

here, discussed above. Thus, on information and belief, all of the findings of the defendants'
own insurer, made upon a review of the defendants' own loan files, apply equally to all of the
Certificates at issue here.

> **F.**    **Documentary and Testimonial Evidence that Due Diligence Flagged Many
> Problem Loans That Were "Waived In" Anyway**

152.    The defendants wore multiple hats in connection with the Offerings at issue here,
acting in various capacities including sponsor and underwriter of the offered securities. In its
overlapping capacities, and through their affiliates, they were was responsible for originating and
purchasing large blocks of mortgage loans from third-party originators, repackaging those loans
into securities, and selling the newly-created securities to investors like Allstate.

153.    In connection with the purchase of the Mortgage Loans from the loan originators,
and consistent with industry practice, the defendants performed due diligence to determine the
quality of the Loans they were purchasing.

154.    Specifically, on information and belief, the defendants operated quality assurance
and risk management departments tasked with ensuring that loans met the stated guidelines. The
defendants conducted due diligence on the loans included in each offering to ensure compliance
with defendant-created or approved underwriting guidelines. To make this determination, the
defendants employed a team of underwriters who reviewed a sample of the purchased loans to
confirm that they both conformed with the representations made by the originators and complied
with the defendants' own credit policies.

155.    On information and belief, the defendants' own due diligence revealed that a
significant percentage of loans purchased from their affiliated and even third-party originators
failed to meet applicable underwriting standards, yet were provided unjustified exceptions. This
is evidenced by the amount of defective loans Allstate's analysis, as well as that of the

defendants' own insurer, have found – as well as evidence from how underwriters who worked on these deals reacted when they outsourced their due diligence obligations.

156.    Sometimes, the underwriters relied on outside firms to conduct the requisite due diligence. One of the largest such firms is Clayton. As the FCIC put it (at 166): "Because of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying – and that securitizers were willing to accept."

157.    For each loan pool they were hired to review, Clayton checked for: (1) adherence to seller-credit underwriting guidelines and client-risk tolerances; (2) compliance with federal, state and local regulatory laws; and (3) the integrity of electronic loan data provided by the seller to the prospective buyer. This review was commonly referred to as a "credit and compliance review." Contract underwriters reviewed the loan files, compared tape data with hard copy or scanned file data to verify loan information, identified discrepancies in key data points, and graded loans based on seller guidelines and client tolerances. This included answering such questions as whether the "loans meet the underwriting guidelines," "comply with federal and state laws, notably predatory-lending laws and truth-in-lending requirements," and "were the reported property values accurate." (FCIC Report at 166.) It also "critically" analyzed whether, to the extent a loan was deficient, there were any "compensating factors." (*Id.*)

158.    Each day, Clayton generated reports that summarized its findings, including summaries of the loan files that failed to meet the relevant underwriting standards. This included giving loans three grades – a Grade 3 loan "failed to meet guidelines and were not approved." Importantly, these Grade 3 loans did not contain any "compensating factors." Tellingly, only 54% of the nearly one-million loans reviewed by Clayton "met guidelines," a number that its

former president admitted indicated "there [was] a quality control issue in the factory" for mortgage-backed securities.

159.    Clayton Holdings performed work on Residential Funding and GMAC transactions. Indeed, most all of the unaffiliated underwriters for the Certificates here – including JPMorgan, Bear Stearns, Lehman Brothers, Citigroup, Barclays, Goldman Sachs, Credit Suisse, Banc of America Securities, Deutsche Bank, and Morgan Stanley – have been directly linked to Clayton Holdings through documents made public in September 2010 by the government's investigation into the financial crisis.

160.    According to an internal Clayton Holdings "Trending Report" made public by the government in conjunction with testimony given in September 2010, many of the underwriters who handled the Certificates here routinely found that high percentages of the loans they underwrote were outside the given underwriting guidelines, but waived them in in large numbers anyway.

161.    These high percentage of problem loans were identified despite, on information and belief, underwriters pressuring Clayton to provide reports in a very short time frame, and with only limited re-verification of data. Thus, on information and belief, the percent of loans that were truly problematic was in fact higher than the astounding rates Clayton's reports managed to discover.

162.    With such high failure rates, the proper response would be to reject the pool outright, and seriously investigate whether that originator could be considered a trusted source of loans in the future. Even assuming the defendants incredibly believed the high rates could be chalked up to 'sampling error' (due to the fact that Clayton did not review every loan in a pool),

the proper response would be to increase the sample size to test that hypothesis or to cease doing business with the problematic originators. The defendants did neither.

163.    As set forth above, there is ample evidence that the Mortgage Loans at issue here were not, in fact, properly underwritten. Indeed, the recent review of the loan files by MBIA demonstrated that the defendants' loan files were missing information and were full of other red flags. Many of those types of errors were exactly the type that the third-party due diligence firms were supposed to detect. The third-party due diligence reports that were generated here, then, would have showed high levels of loans being rejected, and similarly high levels of those flagged loans being waved in as set forth above.

164.    JP Morgan, who was an underwriter in GMACM 2005-HE1 and GMACM 2006-HE3, was informed that 27% of the loans it had reviewed "failed to meet guidelines." It intervened to "waive" 51% of those rejected loans anyway. On information and belief, JP Morgan was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

165.    Bear Stearns, who was an underwriter in RAMP 2004-RZ4, RAMP 2006-RZ3, RFMSII 2005-HS2, RFMSII 2005-HSA1, RFMSII 2005-HI3, RFMSII 2006-HI4, RFMSII 2007-HI1, GMACM 2005-HE1, and GMACM 2006-HE3, was informed that 16% of the loans it had reviewed "failed to meet guidelines." It intervened to "waive" 42% of those rejected loans anyway. On information and belief, Bear Sterns was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

166.    Lehman Brothers, who was an underwriter in GMACM 2005-HE1, was informed that 26% of the loans it had reviewed "failed to meet guidelines." It intervened to "waive" 37% of those rejected loans anyway. On information and belief, Lehman Brothers was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

167.    Citigroup, who was an underwriter in RALI 2005-QA2, RALI 2005-QS6, and RFMSI 2005-S8, RFMSII 2007-HSA2, was informed that 42% of the loans it had reviewed "failed to meet guidelines." Citigroup intervened to "waive" 31% of those rejected loans anyway. On information and belief, it was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

168.    Barclays, who was an underwriter in RALI 2006-QS14, was informed that 27% of the loans it had reviewed "failed to meet guidelines." It intervened to "waive" 28% of those rejected loans anyway. On information and belief, Barclays was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

169.    Goldman Sachs, who was an underwriter in RALI 2006-QO3 and RALI 2007-QH6, was informed that 23% of the loans it had reviewed "failed to meet guidelines." Goldman Sachs intervened to "waive" 29% of those rejected loans anyway. On information and belief, it was similarly informed of the high number of problematic Mortgage Loans at issue here, and

similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

170.    Credit Suisse, who was an underwriter in RASC 2005-KS4, RALI 2005-RS4, RFMSII 2005-HS1, RFMSII 2005-HSA1, RFMSII 2007-HSA3, and RFMSI 2006-S6, was informed that 32% of the loans it had reviewed "failed to meet guidelines." Credit Suisse intervened to "waive" 33% of those rejected loans anyway. On information and belief, it was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

171.    Bank of America, who was an underwriter in RAMP 2004-RZ2, RAMP 2006-RZ3, RFMSII 2005-HS2, RFMSII 2005-HSA1, and RFMSII 2005-HS1, was informed that 31% of the loans it had reviewed "failed to meet guidelines." Bank of America intervened to "waive" 27% of those rejected loans anyway. On information and belief, it was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

172.    Deutsche Bank, who was an underwriter in RFMSII 2006-HI5, was informed that 35% of the loans it had reviewed "failed to meet guidelines." Deutsche Bank intervened to "waive" 50% of those rejected loans anyway. On information and belief, it was similarly informed of the high number of problematic Mortgage Loans at issue here, and similarly wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-backed securities purchased by Allstate.

173.    Morgan Stanley, who was an underwriter in RFMSI 2006-S6, was informed that

37% of the loans it had reviewed "failed to meet guidelines." Morgan Stanley intervened to

"waive" 56% of those rejected loans anyway. On information and belief, it was similarly

informed of the high number of problematic Mortgage Loans at issue here, and similarly

wrongfully waived in high numbers of those loans into the loan pools underlying the mortgage-

backed securities purchased by Allstate.

174.    In sum, on information and belief, the underwriters' due diligence identified high

numbers of problematic loans, but those loans were "waived" into the collateral pools at issue

here at a materially high rate. The hidden "waiver" of rejected loans that were not subject to any

compensating factors was a fraudulent omission, and rendered the disclosures regarding the

underwriting and due diligence processes even more misleading. As the FCIC report concluded

(at 167, 170) (emphasis added):

> [M]any prospectuses indicated that the loans in the pool either met guidelines
> outright or had compensating factors, even though Clayton's records show that
> only a portion of the loans were sampled, and that of those that were sampled, a
> substantial percentage of Grade 3 Even loans were waived in.
>
> . . . .
>
> [O]ne could reasonably expect [the untested loans] to have many of the same
> deficiencies, at the same rate, as the sampled loans. *Prospectuses for the ultimate
> investors in the mortgage-backed securities did not contain this information, or
> information on how few of the loans were reviewed, raising the question of
> whether the disclosures were materially misleading, in violation of the securities
> laws.*

### G.    Evidence That the Ratings Were Meaningless

175.    The defendants fed the same misrepresentations found in the Offering Materials

to the ratings agencies in an attempt to manufacture predetermined ratings. This not only

rendered false the defendants' representations about how the ratings process really functioned,

but also assured that the ratings themselves in no way reflected the actual risk underlying the

Certificates.

**H.    Evidence of Serious and Repeated Problems at the Affiliated Originator
Homecomings Financial**

176.    As set forth above, many of the Mortgage Loans were generated by the

defendants' affiliate, Homecomings Financial.  It originated or acquired large portions of loans

in all but two of the Certificates.  For instance, in RALI 2006-QO3 it was responsible for 47.6%

of the loans, and in RALI 2007-QH6 it was responsible for 43%.  In twenty-three of the twenty-

five transactions, it was responsible for at least 15% of the Mortgage Loans.  It is thus in many

respects the most pivotal originator at issue in this case, and evidence showing Homecomings

Financial had problems at the origination stage is further evidence loans that loans included in

Allstate's collateral pools were riskier than represented.

177.    Not surprisingly given what is known about the actual Mortgage Loans at issue

here, government investigations and statements provided by insiders in fact further confirm that

the defendants' own originator was churning out problematic loans.

**(1)    Confidential witness:  Automated system manipulated to obtain
approvals**

178.    Confidential Witness 5 ("CW5") worked as a Regional Account Executive at

Homecomings from 2003 to 2005, then worked in the Wholesale Lending Department within

GMAC until early 2006.  CW5 knew Correspondent Lending sales managers personally, and

attended meetings with Residential Capital's Correspondent Lending personnel.

179.    Part of CW5's duties included training loan brokers on how to use Homecomings'

automated loan system.  Based on CW5's personal experience, daily conversations with other

Account Executives, automated Help Desk personnel, and others, according to CW5, *Account*

*Executives were trained by senior management how to teach outside mortgage brokers how to manipulate borrower data to generate an approval.*

180.    According to CW5, training people on how to use the automated system involved "loading data in AssetWise with the intent of getting an approval. They could run it through a number of times with different data until it got an approval." Indeed, the automated system allowed multiple applications to be submitted on the same borrower. According to CW5, *"there were brokers running [the automated system] twenty-five times for the same borrower."*

181.    Even though brokers were trained on how to do this data manipulation, according to CW5 brokers sometimes would just fax their changes to Account Executives. However, as this would leave the Account Executive's user ID on the loan file, senior management tried to crack down on this practice. Rather than stressing how data manipulation should not take place at all, according to CW5, they simply wanted more training so the brokers could enter the data themselves, leaving less of a 'paper trail' leading back to the Account Executives.

182.    However, because certain Account Executives did not want the social awkwardness of asking brokers to do the data entry themselves, according to CW5 many continued to perform the data changes on behalf of larger clients. Others simply would email the brokers instructions regarding the data changes, or talk them through the process on the phone.

183.    In these ways, according to CW5, *"there was complicity on the part of employees, a lot of employees, in manipulating AssetWise until loan applications were approved."* According to CW5, *"this was sanctioned behavior."*

184.    Homecomings even had a Help Desk. Rather than being just for technical support, according to CW5, this desk was designed to inform brokers why a particular loan was

being denied by the automated program. An explanation was provided as to what minimum change would be required to generate an approval.

185.    According to CW5, the most commonly manipulated data included income, assets, and debt-to-income ratios.

186.    CW5 believes that Homecomings' underwriters could see all the prior versions of the loan applications put through the system. Thus, if the first application claimed a borrower was a carpenter making $6,000, they could see that even if the fifth claimed $16,000. According to CW5, underwriters could get "trapped by the guidelines." That is, even if they noticed that income levels were changing in such a way, because the automated system was generating an approval on the last version of the application, the underwriters would be told they could not decline the application.

187.    According to CW5, in the 2004-2005 timeframe, the parent company RFC capped the percentage of loans that could be generated using "full documentation" procedures. It made a push to increase loan volumes elsewhere because "that's where the profits were" and wanted the loans for its mortgage-backed securities operations. Around 2004 and 2005, CW5 noticed an unannounced change to the automated systems. Whereas before, users had to input the product the loan application was being submitted under (full documentation, Al-A, etc.), the automated program instead began approving the loan under any program that it qualified for.

188.    Despite the manipulation – which, according to CW5, could be done even more so with loans given through low-doc procedures – the automated system initially was ill-suited to the parent company's demand for more subprime products as at first it was rejecting many loans. Though according to CW5 seven of ten of the loans rejected by their own automated program

63

were eventually given a pass through manual underwriting, that process took time. Because that
delay caused the company to lose business, Residential Funding turned to "bulk" purchases.

(2)    **Confidential witnesses: QC group overridden**

189.    Confidential Witness 3 ("CW3") worked as a Pre-Funding Quality Control
Supervisor at Homecomings from 1997 to 2005. This review was supposed to identify missing
information and documents. However, according to CW3, pre-funding reviews covered only
5%-10% of the approved mortgages.

190.    According to CW3, 30-35% of the loans CW3's QC team reviewed resulted in a
"inconclusive" recommendation, meaning that the underwriter needed to make further proof that
the loan file was reliable. According to CW3, 5% received a "misrepresentation with certainty"
recommendation.

191.    According to CW3, there was no formal channel for the QC group to challenge
and overturn an underwriter's decision to approve a mortgage – area managers even had the
power to disregard QC's rejection of a mortgage, which, according to CW3, did occur even when
the recommendation was "misrepresentation with certainty." According to CW3, Homecomings
"gave a lot of loans they shouldn't have." CW3 considered the stated-income loans "all lies."

192.    Confidential Witness 6 ("CW6") worked at Homecomings from 2002 to 2007.
Until 2006, CW6 worked as a Post-Funding QC Auditor. Thus, unlike CW3's team, CW6 would
review loan files of mortgages that had already been funded. Around 2006, CW6's role changed
to fixing deficiencies in mortgages that had been identified as "unsellable," and CW6's title
changed to "Resolutions Coordinator." According to CW6, this change occurred around the
same time changes were occurring within the GMAC organization, and around that time
Homecomings "started to spiral downward."

193.    By 2005, according to CW6, the borrower qualifying process had gotten "more

lax, they took more risks, and got greedy." This caused CW6 to wonder how certain borrowers

got loans at all.

### (3)    Other evidence of problems at Homecomings

194.    In mid-2008, the FTC began an investigation into Homecomings Financial, after a

staff review had found evidence of discriminatory lending practices. The FTC found that

Homecomings Financial "originated the vast majority of its loans through independent brokers"

that were allowed to assess discretionary charges on borrowers. The FTC found that disparities

in the fees were "substantial, statistically significant, and cannot be explained by any legitimate

underwriting or credit characteristics in violation of the ECOA and the FTC Act."

195.    On September 3, 2009, Residential Capital announced it was shutting down its

wholesale mortgage origination operations, thereby closing down the lending operations of both

Homecomings Financial and the other affiliated originator at issue here, GMAC Mortgage LLC.

In a January 22, 2009 letter, the FTC explained it was closing its investigation into

Homecomings Financial because it had ceased originating loans, and that according to

Residential Capital "the ability of [Homecomings Financial] to continue as a going concern is in

substantial doubt," in part because Homecomings Financial "is heavily dependent on its own

indirect parent, GMAC, LLC, for funding and capital support and that there can be no assurance

that such support will continue."

196.    A March 5, 2009 article in the *Portland Tribune* discussed the massive failures in

the lending industry. It quoted Tim Boyd, who worked at Homecomings Financial for seven

years, as saying that: "In order to keep your market share, you had to be more aggressive."

According to the article, he knew of loan officers who would tell title agents to "keep quiet about

Option ARM loan provisions during document-signing time. 'They'd tell the title officer, 'Don't

go over this, just glean through it quickly and get the thing signed.'"

197.    Pay-option loans give the borrower the choice of what to pay each month – but if

they choose a low amount, the principal loan balance actually *increases*, eventually causing the

"minimum" payment to jump. Option ARMs combine this with another confusing, risky feature:

an initially low teaser interest rate that will reset after a certain period. The counterintuitive

nature of an increasing principal is a risk many borrowers may not fully understand, particularly

when combined with the complex calculation of interest-rate risk. Obviously, a borrower that

does not understand the loan terms is more likely to default as it is more likely the borrower

cannot properly determine whether it can afford the loan, or plan for and adjust for any

unexpected change of circumstances. The FCIC's report (at 90) recounted a study that found

that *38% of borrowers with adjustable-rate mortgages did not understand* how much their

interest rates could reset at one time, and *more than half underestimated* how high their rates

could reach over the years.

198.    According to CW5, by the end of 2006, 50% of Homecomings' loans were

option-ARMS. CW6 noted that borrowers who were given ARMs were only qualified at the

initial, low rate – without consideration of whether they could afford any changes that might

occur after the initial fixed period expired.

199.    These same and other types of exotic loans were included in many of the loan

pools at issue here. On information and belief, the loans at issue here were similarly,

deliberately given to borrowers who were deceived about the risks they presented. This

represented yet another deliberate end-run around proper underwriting standards, and created yet

another layer of hidden, undisclosed risk.

I.    **Evidence that the Loans Were Approved Based on Incomplete Loan Files**

200.    According to the FCIC's report (at 110-11), traditionally, low-documentation

loans were used for the particular borrowers with fluctuating or hard-to-verify incomes, such as

longtime customers with strong credit.  Lenders later realized they could charge borrowers more

and approve more borrowers using those processes: "Around 2005 . . . low- and no-

documentation loans took on an entirely different character . . . [F]raud specialists described

stated income loans as 'an open invitation for fraud' that justified the industry term 'liar loans.'"

It also concluded (at 160): "Across the mortgage industry, with the bubble at its peak, standards

had declined, documentation was no longer verified, and warnings from internal audit

departments and concerned employees were ignored.  These conditions created an environment

ripe for fraud."

201.    As above, a review of the defendants' actual loan files here found many to be

incomplete.  As below, Residential Funding is itself suing its originators based in part on

incomplete loan files.  On information and belief, the Offering Materials at issue here similarly

materially overstated the percent of underlying loans that were based on a fully-documented

basis, and thus materially understated the risk associated with Allstate's Certificates.

J.    **Evidence that Residential Funding Itself Believes Loans it Purchased Were**
       **Non-Compliant**

202.    According to news reports from early January 2009, Residential Funding *tripled*

the number of lawsuits it had filed against unaffiliated originators, alleging that they had

wrongfully refused to buy back non-compliant loans that they had sold Residential Funding for

use in its securitizations.

203.    These suits are based on Residential Funding's originators' alleged breach of their

contracts with Residential Funding to abide by the terms of the Seller Guide, representations that

the loans were prudently underwritten, and that all loan documents were complete and accurate.

204.    These are thus necessarily admissions that Residential Funding was acquiring

loans that were based on insufficient documentation and not in compliance with Residential

Funding's underwriting guidelines, including around the same time that loans Residential

Funding were acquiring were being shuffled into securitizations such as those at issue here.

## IV.    THE DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE

### A.    The Statistical Evidence is Itself Persuasive Evidence the Defendants Knew of the Falsity of Their Representations – Particularly Given They Originated Many of the Loans

205.    As above, the Certificates have significantly underperformed.  For instance, for

RALI 2007-QH6, *55% of the loans have either already had to be written off at a loss or are*

*currently delinquent.*  And overall, *approximately 30% of the Mortgage Loans underlying the*

*Certificates have already had to be written off at a loss or are currently delinquent.*

206.    Allstate's analysis also shows that the loans were consistently misrepresented –

by large margins.  On average, *owner occupancy was overstated by over 10%.*  The analysis also

shows a *18% understatement of the amount of loans had had LTVs over 100% and 37%*

*understatement of the loans that had CLTVs over 100% (i.e., of loans that were underwater).*

207.    In addition, MBIA's similar and overlapping review of thousands of the

defendants' actual loan files demonstrates systemic problems in the loans underlying the

Certificates.

208.    The remarkable default and delinquency rates, understated LTV and CLTV ratios,

overstated owner occupancy statistics, and the problem files uncovered by the defendants'

insurer are not only evidence that the Mortgage Loans underlying the Offerings were defective.

They are themselves strong evidence that the defendants knew the Mortgage Loans underlying

the Offerings were grossly defective when they made contrary representations to Allstate.

Simply put, they could not have pooled these Mortgage Loans without knowing that, contrary to

their representations, the loans were widely defective.

209.    That the Mortgage Loans could have made it to the securitization market without

their knowledge of the problems is made all the less improbable by the fact that, as above, many

of the loans were originated by defendants' own affiliates.  Residential Funding transactions

involved affiliated Residential Funding originators, sellers, sponsors, servicers, underwriters, and

depositors.  Similarly, the GMAC transactions involved affiliated GMAC originators, sponsors,

servicers, underwriters, and depositors.  All of the defendants involved in the Certificates were

related directly or indirectly through Ally Financial Inc., Residential Capital, LLC, and/or

GMAC Mortgage Group, LLC.  Indeed, starting in 2007, CW6 (who, as above, worked at

Homecomings) started receiving an "unsellable report" that reflected *all* funded loans enterprise-

wide (i.e., including mortgages originated by GMAC entities other than Homecomings.)

210.    This vertical integration between originators and issuers heightened the already-

perverse incentives created by the move to the "originate and distribute" business model.  The

originator, secure with a pipeline to the market, would have even more incentive to loosen its

practices.  Those responsible for the securitization, focused on volume, would push them to do so

even more.  Indeed, according to CW5, Residential Funding mandated that Homecomings limit

the share of loans approved on a fully-documented basis, and instead focus on the more-

profitable low-doc products.  And once the loans were issued, those responsible for securitization

would have significant incentives to ignore problem loans because rejecting a loan would saddle

an affiliated company with a toxic loan.

211.    As purchasers of the loans, the defendants had extensive business relationships with the originators (even the unaffiliated ones), had access to the originators mortgage origination personnel and internal information, and conducted due diligence into the originators through their own personnel and third-party loan review firms.

212.    Thus, regardless of the originator, the defendants were either aware of the falsity of their representations, or made representations without knowing their truth. In short, the defendants' relationships with the originators, particularly their own affiliates who originated the bulk of the loans at issue here, gave them yet another source of actual knowledge of the falsity of the representations it made to Allstate. Because of those ties, the defendants had a direct window into the lax practices that led to the creation of the toxic pools of loans to begin with.

213.    The prevalence of such problems as evidence of the defendants' knowledge is further magnified when one considers the size of the defendants' operations. As above, Residential Funding was the eighth-largest sponsor of non-agency mortgage backed securities in 2007. It is inconceivable that problems on the scale at issue here could be anything but the result of knowing conduct with regard to the true risk profiles of the Mortgage Loans, or conduct undertaken with no regard to the truth or falsity of information uniquely within defendants' knowledge. Indeed, as above, MBIA claims that Residential Funding admitted to it that it knew mortgage loan pools failed to comply with Residential Funding's guidelines.

**B.    Evidence From Third-Party Due Diligence Firms Demonstrates That Defendants Knew Defective Loans Were Being Securitized**

214.    Not only *must* the defendants have known that the Mortgage Loans were widely defective; they *did* know.

215.    As above, many of the loans at issue here originated from the defendants' affiliated companies, where they had a direct window into the lax origination processes. Further,

70

the defendants represented that they reviewed the loans they were purchasing both through

automated and manual procedures "for conformity with the applicable underwriting standards."

Even for those loans not generated in-house, the Offering Materials for RALI 2005-QA2

represented that "[p]rior to assigning the mortgage loans to the depositor, *Residential Funding*

*will have reviewed* the underwriting information provided by the mortgage collateral sellers *for*

*most of the loans* and, in those cases, determined that the mortgage loans were generally

originated with or in a manner generally consistent with the underwriting standards described in

the Seller Guide." Similarly, the Offering Materials for RALI 2006-QS14 represented that

"Residential Funding Corporation *evaluates many of the mortgage loans* that it purchases

through the use of one or more automated underwriting systems. In general, these systems are

programmed to review *most of the information* set forth in Residential Funding Corporation's

Seller Guide as the underwriting criteria necessary to satisfy each underwriting program."

216.    In other words, the defendants represented that they undertook their own due

diligence procedures. This review, if properly performed, would necessarily have revealed the

pervasive deficiencies in the Mortgage Loans at issue here.

217.    The defendants' willingness to include knowingly defective loans in securitization

pools is confirmed by the testimony of CW4, who testified that *half* of all applications that were

flagged as falling meaningfully short of underwriting guidelines were funding through

underwriting "exceptions." It is also confirmed by the testimony of CW5 who, as above,

testified of systemic, senior-level-approved manipulation of the data being put into the

automated underwriting system, and by the testimony of CW1, discussed in detail further below.

218.    It is further demonstrated by data recently revealed by one of the firms hired to

carry out the underwriting due diligence. As noted above, underwriters typically hire third-party

71

due diligence firms, such as Clayton Holdings, Inc., to conduct a review of the proposed loan

pool for the underwriters. Clayton Holdings would identify loans that "failed to meet

guidelines" and that did *not* contain any "compensating factors." Based on the information

released in conjunction with the government's investigation as well as the other facts set forth

above, on information and belief the underwriters here were informed by their third-party due

diligence firms that high percentages of the Mortgage Loans underlying Allstate's Certificates

"failed to meet guidelines," yet the underwriters waived in high numbers of such rejected loans.

219.    Such third-party due-diligence data not only supports the fact the Mortgage Loans

were defective, but also shows they knew the defendants knew the representations were false.

According to the September 2010 testimony of Clayton's Vice President Vicky Beal, the third-

party due diligence firms' "exception reports" were provided not just to the underwriter, but also

to the sellers. Further, according to the September 2010 testimony before the FCIC by Clayton's

former president, D. Keith Johnson, the investment banks would use the exception reports to

force a lower price from loan originators.

220.    On information and belief, then, the defendants here through their numerous roles

of co-underwriter in many of these deals (GMAC RFC Securities), originators (through their

affiliates GMAC Bank, GMAC Mortgage LLC and Homecomings Financial, LLC), and sellers

(GMAC Mortgage LLC and Residential Funding Company, LLC), thus were aware of the due

diligence reports that would have been generated by the third-party due diligence firms. On

information and belief, their own due diligence revealed similar problems even apart from

Clayton Holdings' review.

221.    Thus, the defendants were made well aware by the underwriters' third-party due

diligence reports, as well as from their own due diligence, that a high number of the Mortgage

Loans had been red-flagged by those third-party reviews, yet were waived for inclusion in the

securitizations anyway by the underwriters. In other words, they knew the Offering Materials

were false and misleading.

### C.    Other Confidential Witness Testimony Further Confirms' Defendants' Knowledge

222.    Confidential Witness 1 ("CW1") was a Senior Mortgage Operator within GMAC

during 2004 and 2005. CW1's team was responsible for reviewing loan applications and files

before closing, in order to approve GMAC's funding of the loan. CW1 believes that the loans

CW1's group worked on were designated for sale in loan pools.

223.    The loans CW1's team reviewed had already been flagged by automated

underwriting systems as being outside normal guidelines. CW1's team, and those like it, were to

manually review the file to determine if they could be "tweaked" enough to allow approval of the

loan. According to CW1, "There were ways to get any loan approved," and CW1's job was "to

make a loan look to be a much prettier package" than it really was.

224.    According to CW1, beginning in 2005 there was a pressure to approve loans that

did not meet guidelines, and that lacked any compensating features. Whereas things "made

sense" before, according to CW1, room was made for a new supervisor that "threw all [CW1]

knew out the window."

225.    CW1 informed the supervisor that such changes would result in the exposure for

the company by way of "buy-backs," but the supervisor did not care and just wanted to "make

deals work." CW1 felt pressure and was told such things as "don't be such a hard ass."

226.    In addition to the explicit pressure, a change was made that CW1's underwriting

team could no longer use other personnel to help complete and clear loan files. This lead to

additional time demands on the underwriters, causing underwriters to let missing paperwork

(such as recent pay stubs) in the loan files slide in order to keep up with the expected turn times.

Further, the policy was changed such that loan officers – who were paid by GMAC on

commission – were allowed to contact underwriters directly – making the environment even

more like a boiler room.

227.    According to CW1, though other underwriters bent to the new pressure and

approved loans despite a lack of compensating features, CW1 left.

228.    CW1 gave a particular example of how debt-to-income figures could be

manipulated to justify approval. One DTI standard excluded car loans that were less than six

months to be paid off. If a credit report was outdated, the underwriter would assume that

additional payments had been made in the time since the credit report – then further assume the

borrower would make additional payments in the time before loan closing. Making such

assumptions, the underwriters would then leave out the car loan from the DTI calculation.

229.    As to owner-occupancy, CW1 said that the loan files contained information that

could be used to verify owner-occupancy declarations. For instance, CW1 would look for letters

from prior landlords confirming they had received a Notice to Vacate, or would call landlords

directly. Or, borrowers who owned prior properties were required to show that the first home

had been sold. CW1 looked to confirm declarations of other properties being "second homes"

(with the property being currently mortgaged the occupied one) by comparing the value of the

"vacation home" to the value of the property being mortgaged.

230.    As above, CW6 worked within Homecomings. However, according to CW6,

there were also auditors in other parts of the GMAC organization that reviewed Homecomings'

loan files for underwriting guideline compliance, including within the "investor sales teams,"

who conducted a "more intense" review of the loans that were to be sold to third parties. This

74

further confirms defendants would have been knowledgeable about the lax practices of its affiliated-originator.

**D.     Evidence of Residential Funding's Improper "Bulk Buying" Procedures**

231.    MBIA's review of the loan files and other parts of its investigation undertaken in its role as the defendants' insurer found that the non-compliant nature of many of the loans it reviewed was due to the systemic abuse of underwriting "exceptions." According to MBIA, a "significant number" of the "exception" loan files MBIA reviewed did not even identify which supposed exception was being relied upon, let alone contain sufficient documentation to justify the use of such an exception. In addition, MBIA found that for a "significant number" of the loans it reviewed were instead approved based on the secret abuse of three practices that resulted in large numbers of non-compliant loans being contributed into securitization programs.

232.    According to MBIA, first, Residential Funding improperly abused "negotiated commitments," where it agreed to buy future loans from the originator that failed to comply with Residential Funding's underwriting guidelines. Second, it improperly abused a "bulk purchase program" where it agreed to purchase a large amount of pre-existing loans that Residential Funding would not then confirm whether they had been originated in compliance with Residential Funding's underwriting guidelines. Finally, Residential Funding underwrote or purchased loans using an automated system, Assetwise, that did not in fact analyze the proposed mortgages in accordance with Residential Funding's underwriting guidelines. According to MBIA, these practices all helped contribute to the "substantial and material" number of non-compliant loans that were found in the reviewed securitization pools.

233.    On information and belief, based in part on the overlapping nature of the certificates studied by MBIA and those at issue here, these same practices were also used and abused with respect to the Mortgage Loans at issue here. Such practices represent conscious

decisions by the defendants to pool loans that they had no idea as to whether they in fact met any of their claimed underwriting guidelines. As such, these practices show the defendants knew of, or were indifferent to, the falsity of the Offering Materials.

234.    The results of MBIA's study is corroborated by the testimony of CW5. As discussed above, in 2004-2005, according to CW5, Residential Funding dictated that its affiliated originator Homecomings produce no more than fifty percent of its loans through fully-documented processes. According to CW5, it did this because it felt other products were more profitable, and wanted the alternative products for use in its securitizations.

235.    As also discussed above, according to CW5, even though the automated underwriting system was being manipulated, and even though low-doc loans could be manipulated even more, the system was still rejecting too many loans. The resulting delay in approval by having to manually approve the rejected loans caused the company to lose business. Thus, according to CW5, it turned to "bulk buy" procedures.

236.    According to CW5, Residential Funding would buy hundreds of millions of fully-funded loans at a time. The loans were not put through the automated system until Residential Funding won the "bid." Only then did Residential Funding conduct due diligence. However, it would not perform due diligence on all the files, but only a small sample. The sample would decrease with each successive purchase from that seller – eventually such that no testing was done. According to CW5, this allowed Residential Funding to pursue fewer and fewer repurchase demands from the bulk-sellers. "It makes for a better relationship if you're not kicking back a lot of loans."

**E.    Evidence That the Defendants Knew the Appraisals Were Falsely Inflated**

237.    As above, the appraised value of a mortgaged property is a key component in the LTV and CLTV ratios. Defendants knew at the time the appraisals were false and baseless, and

thus did not genuinely believe at the time the disclosed statistics were accurate. This is supported, as above, by the consistency of the wide disparities in Allstate's Certificates, discovered through use of loan-level, contemporaneous information. It is also supported by evidence of the systemic problems within defendants' underwriting operations, and by statements provided by a confidential witness, and other testimony that has been provided by industry insiders.

238.    CW1 received appraisals that CW1 knew were inflated, but was pressured to approve loans anyway. For instance, appraisals would come in using "comparables" (or "comps") that were in no way comparable to the property being mortgages – such as a home sitting on a canal being compared to a beachside property. In addition, appraisers were allowed to make the comp values even higher using "line adjustments," increasing the aggregate total comp value by as much as 25%.

239.    Also, according to CW1, GMAC required that appraisals be obtained from a specific-pre-approved list. CW1 said that some of the appraisers should have been kicked off for consistently submitting inflated appraisals, or submitting the same exact appraisal analysis on every appraisal they submitted – indicating they were not actually doing any independent analysis on each unique property.

240.    In addition, according to CW3, the QC team at Homecomings was supposed to ensure that the underwriters had run the appraisal's recommendation through an automated valuation model. As above, an industry-accepted AVM model, using the same type of contemporaneous data that would have likely been used in defendants' models, shows large discrepancies from what figures Defendants put into the Offering Materials.

241.    Further, on information and belief, the defendants used their economic leverage over the appraisal process to make the appraised values fit the loan they wanted to approve, rather than to fit the true value of the property.  This further establishes that they knew the LTV and CLTV statistics were false.

242.    That the misstatements go heavily in one direction – seriously inflated values leading to materially understated LTV and CLTV statistics – is itself persuasive evidence that the overstatements revealed by Allstate's recent analysis were not mere errors or differences of opinion, but conscious misrepresentations.  This is further confirmed by Congressional testimony and other statements made by those in the industry about the widespread corruption in the appraisal processes during all times relevant to this Complaint.

243.    For instance, Richard Bitner, a former executive of a subprime lender for fifteen years, testified in April 2010 that "the appraisal process [was] highly susceptible to manipulation," and that the rise in property values was in part due to "the subprime industry's acceptance of overvalued appraisals."  Similarly, Patricia Lindsay, a former wholesale lender, testified in April 2010 that in her experience appraisers were "often times pressured into coming in 'at value,'" i.e., at least the amount needed for the loan to be approved.  The appraisers "fearing" their "future business and their livelihoods" would choose properties "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."

244.    And Jim Amorin, President of the Appraisal Institute, testified in April 2009 that "in many cases, appraisers are ordered or severely pressured to doctor their reports to convey a particular, higher value for a property, or else never see work from those parties again . . . [T]oo often state licensed and certified appraisers are forced into making a "Hobson's Choice.'"

78

245.    The FCIC's January 2011 report recounts (at 91) the similar testimony of Dennis

J. Black, an appraiser with 24 years of experience who held continuing education services across

the country. "He heard complaints from appraisers that they had been pressured to ignore

missing kitchens, damaged walls, and inoperable mechanical systems. Black told the FCIC,

'The story I have heard most often is the client saying he could not use the appraisal because the

value was [not] what they needed.' The client would hire somebody else."

## V.    ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES

246.    In making the investments, Allstate relied upon the defendants' representations

and assurances regarding the quality of the mortgage collateral underlying the Certificates,

including the quality of their underwriting processes. Allstate received, reviewed, and relied

upon the Offering Materials, which described in detail the Mortgage Loans underlying each

offering. Offering Materials containing the representations outlined above and in the Exhibits

(or nearly identical, materially similar counterparts thereto) were obtained, reviewed, and relied

upon before any purchase was made.

247.    In purchasing the Certificates, Allstate justifiably relied on the defendants' false

representations and omissions of material fact detailed above, including the misstatements and

omissions in the Offering Materials. These representations materially altered the total mix of

information upon which Allstate made its purchasing decisions.

248.    But for the misrepresentations and omissions in the Offering Materials, Allstate

would not have purchased or acquired the Certificates as it ultimately did, because those

representations and omissions were material to its decision to acquire the Certificates, as

described above.

249.    Allstate's losses on the Certificates have been much greater than they would have

been if the Certificates and the loans underlying them were as the defendants described them to

be. The false and misleading statements of material facts and omissions of material facts in the

Offering Materials directly caused Allstate damage, because the Certificates were in fact far

riskier than the defendants described them to be, and that risk has actually already materialized.

For example, the fact that the loans were not secured by owner-occupied properties at their

claimed rate made them more prone to default. Owners who do not occupy their properties are

more likely to default on their loans, which made the Certificates poorer investments, accelerated

the Certificates' decline in value, and greatly worsened Allstate's losses.

250.    In fact, the loans underlying the Certificates have experienced default and

delinquency at extraordinarily high rates due to the abandonment of the disclosed underwriting

guidelines. These rates of default are much higher than what a pool of loans that had the features

defendants' described would have experienced in the same economic conditions. The income

and principal payments that Allstate received have been less than Allstate expected under the

"waterfall" provisions of the securitizations. Further, the higher default rates have eaten into the

safety "buffer" such features as overcollateralization were supposed to provide, meaning the

prospects for full receipt of the payments once expected have dropped significantly.

251.    The high rates of default, the lower safety "buffer" left in its wake, and the

discovery of fundamental irregularities in the defendants' underwriting practices all signal

increased risk in the Certificates. As a fundamental financial principle, the diminished prospect

of continued cash flows – i.e., perceived and actual risk – dictates that the Certificates are

currently less valuable than they would have been but not for the misrepresentations. Thus,

Allstate is not seeking recovery for (or, in the alternative, to rescind based on) future potential

losses, but recovery based on its past and current damages.

252.    Even in the context of the real estate crisis, the Certificates would have held most,
if not all, their value had the security underlying the loans been as represented by the defendants
in their Offering Materials, because such mortgage pools would not have defaulted at nearly the
same high rate. This decreased value is evidenced collectively by, but need not be measured
solely by, among other things: (a) the high rates of default and delinquency of the Mortgage
Loans; (b) the Certificates' plummeting ratings; (c) lower-than-expected past and current income
streams from the Certificates; and (d) lower market value.

253.    There are several potential ways of valuing a mortgage-backed security. One of
the potential ways that lower value can be measured, and part of the evidence that Allstate has
been damaged, can be found in secondary-market pricing. Though the market may have
temporarily "seized up" during the financial crisis, it has since recovered and there was and is a
functioning, liquid secondary market for mortgage-backed securities such as the Certificates
here. Numerous brokers are active in, and have trading desks specifically dedicated to, the
secondary.market for RMBS, including without limitation Credit Suisse, Barclays, Bank of
America, Citigroup, Deutsche Bank, Goldman Sachs, Royal Bank of Scotland, J.P. Morgan,
Nomura, and Morgan Stanley. Indeed, Allstate has already sold some of these Certificates on the
secondary market.

254.    According to data provided to the FCIC, between May 2007 and November 2008
Goldman Sachs alone bought and sold $17 billion worth of RMBS cash securities, and $32
billion worth of credit default swaps linked to RMBS securities, representing a total of 7,000
trades. These figures demonstrate the liquidity in the secondary market for RMBS.

255.    The *Wall Street Journal* recently reported that "AIG Bonds are in Demand,"
finding that the Federal Reserve Bank of New York's "much anticipated" auction of $1.5 billion

in subprime bonds was "deemed successful by industry participants." "Industry participants said dealers saw solid interest from investors." According to a CEO quoted by the article, "The overwhelming majority of the list [of bonds] traded at more than the estimated price, indicating healthy demand by dealers and investors."

256.    The *Wall Street Journal* separately also recently quoted the Federal Reserve Bank of Dallas President Richard Fisher as saying that "there is plenty of liquidity" in the markets to drive growth. One of the signs he pointed to was the "rejuvenation of the subprime markets."

257.    Allstate purchased the Certificates not only for their income stream, but held them on a "available for sale" basis, with the expectation that some of Allstate's RMBS portfolio could and would be sold on the existing secondary market. Some of these Certificates have already been sold on the secondary market. Allstate thus viewed market value as a critical aspect of the Certificates it purchased. Allstate has lost much of the market value in these securities – much more than it would have lose if the Certificates had been backed by loans of the quality the defendants' represented, which would have held up to the recent economic downturn much better than those loans the defendants actually included in these Certificates.

258.    In short, defaults were much higher than they would have been if the Mortgage Loans had been properly underwritten. This has caused the value of the Certificates to plummet. This is evidenced by, but not contingent entirely upon, the drop in market value of the securities. As loans which were properly underwritten would have withstood the same economic conditions much better than those defendants offloaded onto Allstate here, and thus securities backed by loans with the features defendants describe would currently have a much higher value than Allstate's Certificates, Allstate was damaged by defendants' wrongdoing.

259.    Allstate's damages here are separate and severable from Allstate's losses caused
by the economic downturn, and such could be reliably measured through the discovery process.
For instance, but without limitation, upon discovery of the full extent of defendants'
misrepresentations, expert testimony may compare the performance of the *actual* Certificates
and/or loan pools here, with the performance of securities and/or loan pools that had the features
described in the Offering Materials, with Allstate's damages being the difference.  However, it is
well beyond Allstate's pleading burden to perform such analysis here, and in any event the full
extent of the defendants' misrepresentations is unknown as Allstate does not have access to the
loan files.

### FIRST CAUSE OF ACTION
### (Common-law Fraud)

260.    Allstate realleges each allegation above as if fully set forth herein.

261.    The material representations set forth above were fraudulent, and the defendants'
representations falsely and misleadingly misrepresented and omitted material statements of fact.
The representations at issue are identified above, further identified in Exhibits D through BB,
and are summarized in Section II above.

262.    Each of the defendants knew their representations and omissions were false
and/or misleading at the time they were made, or made such representations and omissions
without knowledge of their truth or falsity.

263.    Each made the misleading statements for the purpose of inducing Allstate to
purchase the Certificates.

264.    Allstate justifiably relied on the defendants' false representations and misleading
omissions.

83

265.    Had Allstate known the true facts regarding the defendants' underwriting

practices and quality of the loans making up the securitizations, it would not have purchased the

Certificates as it ultimately did.

266.    As a result of the foregoing, Allstate has suffered damages according to proof or,

in the alternative, Allstate has the right to rescind the fraudulently induced Certificate purchases

and to require the defendants to repurchase the Certificates at their original cost, plus interest.

### SECOND CAUSE OF ACTION
(Negligent Misrepresentation)

267.    Allstate realleges each allegation above as if fully set forth herein.

268.    Including not only the Certificates at issue here but others not part of this action,

Allstate made forty-nine purchases in numerous offerings of mortgage-backed securities that the

defendants securitized and sold.

269.    Because the defendants arranged the securitizations, and originated or acquired,

underwrote, and serviced all of the underlying mortgage loans, they had unique and special

knowledge about the loans in the offerings.  In particular, they had unique and special knowledge

and expertise regarding the quality of the underwriting of those loans as well as the servicing

practices employed as to such loans.

270.    Because Allstate could not evaluate the loan files for the Mortgage Loans

underlying its Certificates, and because Allstate could not examine the underwriting quality or

servicing practices for the Mortgage Loans in the securitizations on a loan-by-loan basis, it was

heavily reliant on the unique and special knowledge of these defendants regarding the Mortgage

Loans when determining whether to make each investment of Certificates.  Allstate was entirely

reliant on the defendants to provide accurate information regarding the loans in engaging in that

84

analysis. Accordingly, the defendants were uniquely situated to evaluate the economics of each Securitization.

271.    Going back seven years over forty-nine separate purchases, Allstate relied on the defendants' unique and special knowledge regarding the quality of the underlying Mortgage Loans and their underwriting when determining whether to invest in the Certificates at issue in this action. This longstanding relationship, coupled with their unique and special knowledge about the underlying loans, created a special relationship of trust, confidence, and dependence between the defendants and Allstate.

272.    The defendants were aware that Allstate relied on their unique and special expertise and experience and depended upon them for accurate and truthful information. They also knew that the facts regarding their compliance with their underwriting standards were exclusively within their knowledge.

273.    Based on their expertise, superior knowledge, and relationship with Allstate, the defendants owed a duty to Allstate to provide complete, accurate, and timely information regarding the Mortgage Loans and the offerings. These defendants breached their duty to provide such information to Allstate.

274.    They likewise made misrepresentations in order to induce Allstate's investment in the offerings. The misrepresentations are set forth above and in Exhibits D through BB. At the time they made these misrepresentations, the defendants knew, or at a minimum were negligent in not knowing, that these statements were false, misleading, and incorrect. Such information was known to the defendants but not known or readily known to Allstate, and the defendants knew that Allstate was acting in reliance on mistaken information.

275.    Allstate reasonably relied on the information the defendants did provide and was damaged as a result of these misrepresentations. Had Allstate known the true facts regarding the defendants' underwriting practices and the quality of the loans making up the securitizations, it would not have purchased the Certificates as it ultimately did.

276.    The defendants were in the business of providing information for use by others, including Allstate. Specifically but without limitation, they were in the business of providing information by way of the Offering Materials so that investors could rely on them in deciding whether to invest in the securities being offered. Though this information was publically available, due to the complexities of these Certificates and the nature of the market for mortgage-backed securities, the Offering Materials were primarily intended for the much smaller circle of institutional purchasers.

277.    The defendants' material misrepresentations and omissions set forth above were made without any reasonable ground for believing that the representations were true.

278.    As a result of the foregoing, Allstate has suffered damages according to proof.

### THIRD CAUSE OF ACTION
#### (Fraudulent Inducement)

279.    Allstate realleges each allegation above as if fully set forth herein.

280.    Allstate was fraudulently induced to purchase the Certificates by the defendants' misrepresentations and omissions of material facts. The materially untrue statements and omissions of material fact in the Offering Materials are summarized above and are further set forth in the Exhibits.

281.    Each of the defendants knew their representations and omissions were false and/or misleading at the time they were made. Each made the misleading statements with an intent to induce Allstate to purchase the Certificates.

282.    Allstate justifiably relied on the defendants' false representations and misleading

omissions in purchasing the Certificates.

283.    Had Allstate known the true facts, it would not have purchased the Certificates as

it ultimately did.

284.    As a result of the foregoing, Allstate has the right to rescind the fraudulently

induced Certificate purchases and to require the defendants to repurchase the Certificates at their

original cost, plus interest.

### FOURTH CAUSE OF ACTION
#### (Consumer Fraud Act)

285.    The Certificates at issue in this case are "merchandise" as defined under the

Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68 ("any objects, wares, goods,

commodities, intangibles, real estate, loans, or services").

286.    By way of the acts, representations, and omissions set forth above, the defendants

used "fraud, false pretense[s], false promise[s], misrepresentation[s], misleading statement[s], or

deceptive practice[s], with the intent that others rely thereon in connection with the sale of"

merchandise, in violation of Minn. Stat. § 325F.69.

287.    The Minnesota Consumer Fraud Act and the Minnesota Private Attorney General

statute, Minn. Stat. § 8.31, allow "any person injured," regardless of their alleged sophistication,

to bring suit. *See, e.g., Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 8 (Minn.

2001) ("In describing who may bring an action, subdivision 3a does so in the broadest terms,

stating that '*any person* injured by a violation . . . may bring a civil action and recover

damages' . . . . Neither the private remedies statute nor the substantive statutes contains any

language restricting those who may sue to purchasers or consumers.") (emphasis in original,

citations omitted).

288.    Though Allstate's investing activities are designed to protect its stakeholders

(including insureds in the state of Minnesota) through the use of safe and sound investing

practices, Allstate purchased the Certificates on its own account. Allstate was not acting as a

broker or merchant in connection with the purchase or potential resale of the Certificates.

289.    As above, because it was the defendants that arranged the securitizations, and

originated or acquired, underwrote, and serviced all of the underlying mortgage loans, they had

unique and special knowledge about the loans in the offerings. In particular, they had unique and

special knowledge and expertise regarding the quality of the underwriting of those loans as well

as the servicing practices employed as to such loans. Allstate could not evaluate the loan files

for the Mortgage Loans underlying its Certificates because those files were not provided to it.

Nor could Allstate examine the underwriting quality or servicing practices for the Mortgage

Loans in the securitizations on a loan-by-loan basis. The disproportionate access to the

information at issue in this case between defendants and Allstate was substantial, regardless of

any allegations of Allstate's more generalized level of sophistication.

290.    This claim is brought for the public benefit under the Minnesota Private Attorney

General statute, Minn. Stat. § 8.31, subd. 3a. The number securities at issue here, all containing

the same types of misrepresentations, and the other facts set forth above all demonstrate a wide,

repeated pattern of deceit by one of the country's largest issuers of these types of securities.

291.    Further, even though the securities were largely purchased by institutional

investors, they were publically offered, and the ramifications of fraudulent activities in the

securitization market quickly spread throughout the economy. Acts such as those by defendants

has spawned numerous governmental and regulatory investigations. As above, the President's

88

Working Group concluded that the "turmoil in the financial markets was triggered by a dramatic

weakening of underwriting standards for U.S. subprime mortgages . . ."

292.    Also as above, the FCIC has noted estimates that nearly thirteen million homes

may eventually be lost to foreclosure. Soaring foreclosure rates do not just depress local

property values, but have also been linked to such additional local problems as increases in arson

rates and vandalism, including in Minnesota.

293.    Enjoining defendants and discouraging others from engaging in fraudulent

activities that, due to their sheer size and importance, impact everything from the world's

macroeconomic status to the local neighborhood's quality of life would provide public benefits

far beyond compensating Allstate's numerous stakeholders (including those in Minnesota).

294.    Allstate was injured by the defendants' violations. The defendants' wrongful acts

have a causal nexus to Allstate's losses incurred in connection with the Certificates it purchased.

295.    As a result of the foregoing, Allstate has the right to recover its damages

according to proof or, in the alternative, rescission under the Minnesota Consumer Fraud Act and

the Minnesota Private Attorney General statute. In addition, pursuant to Minn. Stat. § 8.31,

subd. 3a, it is entitled to its costs and attorney's fees. Allstate further requests an injunction

barring defendants from continuing to engage in deceptive practices such as those described

herein.

## PRAYER FOR RELIEF

WHEREFORE Allstate prays for relief as follows:

An award of damages against the defendants in favor of Allstate, jointly and severally,

for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at

trial, but including at a minimum:

a.    Allstate's monetary losses, including loss of value and loss of principal and

interest payments;

b.    Attorneys' fees and costs;

c.    Prejudgment interest at the maximum legal rate;

d.    Entry of a permanent injunction enjoining the defendants and their respective

successors, agents, officers, directors, employees, and all persons acting in

concert with them from engaging in the deceptive practices complained of herein;

and

e.    Such other and further relief as the Court may deem just and proper.

In the alternative, in addition to injunctive relief, Allstate demands rescission and

recovery of the consideration paid for the Certificates, with interest thereon.  Allstate is prepared

to tender the Certificates in the event the Court grants such relief.

### JURY TRIAL DEMANDED

Allstate hereby demands a trial by jury on all issues triable by jury.

Dated:  April 15, 2011

*Michael G. Taylor*

Michael G. Taylor (#161950)
Arthur G. Boylan (#338229)
LEONARD, STREET AND DEINARD
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota  55402
Telephone:  (612) 335-1500
Fax:  (612) 335-1657

Of Counsel:

Daniel L. Brockett  (*pro hac to be submitted*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100

90

Jeremy Andersen (*pro hac to be submitted*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax:  (213) 443-3100

*Attorneys for Plaintiffs*

91

Exhibit A - Certificate Information

| Offering | Full Name of Offering | Issuing Entity | Depositor | Seller/Sponsor | Servicer |
|---|---|---|---|---|---|
| RALI 2005-QA2 | Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QA2 | RALI Series 2005-QA2 Trust | Residential Accredit Loans, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RALI 2005-QS6 | Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS6 | RALI Series 2005-QS6 Trust | Residential Accredit Loans, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RALI 2006-QO3 | Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO3 | RALI Series 2006-QO3 Trust | Residential Accredit Loans, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RALI 2006-QS14 | Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS14 | RALI Series 2006-QS14 Trust | Residential Accredit Loans, Inc. | Residential Funding Company, LLC | Residential Funding Company, LLC |
| RALI 2007-QH6 | Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH6 | RALI Series 2007-QH6 Trust | Residential Accredit Loans, Inc. | Residential Funding Company, LLC | Residential Funding Company, LLC |
| RAMP 2004 RZ4 | Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ4 | RAMP Series 2004-RZ4 Trust | Residential Asset Mortgage Products, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RAMP 2004-RZ2 | Mortgage Asset-Backed Pass-Through Certificates, Series 2004-RZ2 | RAMP Series 2004-RZ2 Trust | Residential Asset Mortgage Products, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RAMP 2005-RS4 | Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS4 | RAMP Series 2005-RS4 Trust | Residential Asset Mortgage Products, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RAMP 2006-RS3 | Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS3 | RAMP Series 2006-RS3 Trust | Residential Asset Mortgage Products, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RAMP 2006-RZ3 | Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RZ3 | RAMP Series 2006-RZ3 Trust | Residential Asset Mortgage Products, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RASC 2005-KS3 | Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS3 | RASC Series 2005-KS3 Trust | Residential Asset Securities Corporation | Residential Funding Corporation | Residential Funding Corporation |
| RASC 2005-KS4 | Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS4 | RASC Series 2005-KS4 Trust | Residential Asset Securities Corporation | Residential Funding Corporation | Residential Funding Corporation |
| RFMSI 2005-S8 | Mortgage Pass-Through Certificates, Series 2005-S8 | RFMSI Series 2005-S8 Trust | Residential Funding Mortgage Securities I, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RFMSI 2006-S6 | Mortgage Pass-Through Certificates, Series 2006-S6 | RFMSI Series 2006-S6 Trust | Residential Funding Mortgage Securities I, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RFMS2 2005-HI3 | Home Loan-Backed Notes, Series 2005-HI3 | Home Loan Trust 2005-HI3 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RFMS2 2005-HS1 | Home Equity Loan-Backed Term Notes, Series 2005-HS1 | Home Equity Loan Trust 2005-HS1 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RFMS2 2005-HS2 | Home Equity Loan-Backed Term Notes, Series 2005-HS2 | Home Equity Loan Trust 2005-HS2 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RFMS2 2005-HSA1 | Home Equity Loan-Backed Term Notes, Series 2005-HSA1 | Home Equity Loan Trust 2005-HSA1 | Residential Mortgage Securities II, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RFMS2 2006-HI4 | Home Loan-Backed Notes, Series 2006-HI4 | Home Loan Trust 2006-HI4 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Corporation | Residential Funding Corporation |
| RFMS2 2006-HI5 | Home Loan-Backed Notes, Series 2006-HI5 | Home Loan Trust 2006-HI5 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Company, LLC | Residential Funding Company, LLC |
| RFMS2 2007-HI1 | Home Loan-Backed Notes, Series 2007-HI1 | Home Loan Trust 2007-HI1 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Company, LLC | Residential Funding Company, LLC |

## Exhibit A - Certificate Information

| | | | | | |
|---|---|---|---|---|---|
| RFMS2 2007-HSA2 | Home Equity Loan Pass-Through Certificates, Series 2007-HSA2 | Home Equity Loan Trust 2007-HSA2 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Company, LLC | Residential Funding Company, LLC |
| RFMS2 2007-HSA3 | Home Equity Loan-Backed Term Notes, Series 2007-HSA3 | Home Equity Loan Trust 2007-HSA3 | Residential Funding Mortgage Securities II, Inc. | Residential Funding Company, LLC | Residential Funding Company, LLC |
| GMACM 2005-HE1 | GMACM Home Equity Loan-Backed Term Notes, Series 2005-HE1 | GMACM Home Equity Loan Trust 2005-HE1 | Residential Asset Mortgage Products, Inc. | GMAC Mortgage Corporation | GMAC Mortgage Corporation |
| GMACM 2006-HE3 | GMACM Home Equity Loan-Backed Term Notes, Series 2006-HE3 | GMACM Home Equity Loan Trust 2006-HE3 | Residential Asset Mortgage Products, Inc. | GMAC Mortgage Corporation | GMAC Mortgage Corporation |

## Exhibit B - Purchase Information

| Offering and Class | Purchaser | Purchase Date | Purchase Price |
|---|---|---|---|
| RALI 2005-QA2 A1 II | Allstate Life Insurance Co. | 5/26/05 | $ 24,371,448 |
| RALI 2005-QS6 A6 | Allstate Life Insurance Co. | 6/21/05 | $ 7,710,938 |
| RALI 2006-Q03 A2 | Allstate Bank | 3/21/06 | $ 15,000,000 |
| RALI 2006-QS14 A13 | Kennett Capital, Inc. | 9/21/07 | $ 52,343,814 |
| RALI 2007-QH6 A1 | Allstate New Jersey Insurance Co. | 6/21/07 | $ 19,982,880 |
| RALI 2007-QH6 A1 | Allstate Bank | 6/21/07 | $ 9,991,440 |
| RAMP 2004 RZ4 M1 | Allstate Life Insurance Co. | 4/6/05 | $ 10,520,000 |
| RAMP 2004-RZ2 AI6 | Allstate Life Insurance Co. | 4/10/07 | $ 6,931,367 |
| RAMP 2004-RZ2 AI6 | Allstate Life Insurance Co. | 4/10/07 | $ 6,931,367 |
| RAMP 2004-RZ2 AI6 | Allstate Insurance Co. | 4/10/07 | $ 6,733,328 |
| RAMP 2005-RS4, M1 | Allstate Life Insurance Co. | 4/28/05 | $ 14,175,000 |
| RAMP 2005-RS4, M2 | Allstate Life Insurance Co. | 4/28/05 | $ 5,163,000 |
| RAMP 2005-RS4, M3 | Allstate Life Insurance Co. | 4/28/05 | $ 3,000,000 |
| RAMP 2006-RS3 A-I-2 | Allstate Life Insurance Company of New York | 5/5/06 | $ 3,000,000 |
| RAMP 2006-RS3 A-I-2 | Allstate Retirement Plan | 5/5/06 | $ 9,000,000 |
| RAMP 2006-RS3 A-I-2 | Allstate Insurance Co. | 5/5/06 | $ 21,000,000 |
| RAMP 2006-RZ3, M3 | Allstate Life Insurance Co. | 5/22/07 | $ 3,501,094 |
| RAMP 2006-RZ3, M3 | Allstate Insurance Co. | 5/22/07 | $ 3,501,094 |
| RAMP 2006-RZ3, M4 | Allstate Life Insurance Co. | 5/22/07 | $ 2,500,781 |
| RAMP 2006-RZ3, M4 | Allstate Insurance Co. | 5/22/07 | $ 2,500,781 |
| RASC 2005-KS3, M2 | Allstate Life Insurance Co. | 3/29/05 | $ 7,065,000 |
| RASC 2005-KS3, M3 | Allstate Life Insurance Co. | 3/29/05 | $ 5,000,000 |
| RASC 2005-KS3, M4 | Allstate Life Insurance Co. | 3/29/05 | $ 2,000,000 |
| RASC 2005-KS4-M1 | Allstate Life Insurance Co. | 4/21/05 | $ 10,000,000 |
| RFMSI 2005-S8 A2 | American Heritage Life Insurance Co. | 11/2/06 | $ 10,031,192 |
| RFMSI 2006-S6 A12 | Allstate Insurance Co. | 8/7/07 | $ 22,031,492 |
| RFMS2 2005-HI3, MI | Allstate Life Insurance Co. | 12/15/06 | $ 3,038,043 |
| RFMS2 2005-HI3, MI | Allstate Life Insurance Co. | 12/15/06 | $ 3,038,043 |
| RFMS2 2005-HS1, AI2 | Allstate Insurance Co. | 9/13/05 | $ 18,229,692 |
| RFMS2 2005-HS2, AI2 | Allstate Insurance Co. | 11/18/05 | $ 16,998,803 |
| RFMS2 2005-HS2, AI3 | Allstate Insurance Co. | 11/18/05 | $ 10,499,528 |
| RFMS2 2005-HS2, AI4 | Allstate Life Insurance Co. | 8/1/06 | $ 16,522,563 |
| RFMS2 2005-HSA1 AI5 | Allstate Insurance Co. | 10/27/06 | $ 6,471,308 |
| RFMS2 2006-HI4, A4 | Allstate Life Insurance Co. | 9/25/06 | $ 30,317,751 |
| RFMS2 2006-HI5, A4 | Allstate Life Insurance Co. | 12/18/06 | $ 10,248,096 |
| RFMS2 2006-HI5, A4 | Allstate Life Insurance Co. | 12/18/06 | $ 10,224,100 |
| RFMS2 2006-HI5, A4 | Allstate Insurance Co. | 6/7/07 | $ 17,996,656 |
| RFMS2 2007-HI1 A4 | Allstate Life Insurance Co. | 3/23/07 | $ 14,992,787 |
| RFMS2 2007-HI1 A4 | Allstate Life Insurance Co. | 3/23/07 | $ 14,992,787 |
| RFMS2 2007-HSA2 A6 | Allstate Life Insurance Co. | 4/24/07 | $ 21,996,880 |
| RFMS2 2007-HSA3 AI6 | Allstate Life Insurance Co. | 5/23/07 | $ 14,994,860 |
| RFMS2 2007-HSA3 AI6 | American Heritage Life Insurance Co. | 5/23/07 | $ 4,998,287 |
| RFMS2 2007-HSA3 AI6 | First Colonial Insurance Company | 5/23/07 | $ 4,998,287 |
| GMACM 2005-HE1, A3 | Allstate Insurance Co. | 3/17/05 | $ 20,000,000 |
| GMACM 2006-HE3, A3 | Allstate Life Insurance Co. | 8/25/06 | $ 29,999,622 |
| | | Total Investment | $ 554,544,106 |

Exhibit C - Ratings Information

| Offering and Class | Original Moody's Rating | Current Moody's Rating | Original S&P Rating | Current S&P Rating | Original Fitch Rating | Current Fitch Rating |
|---|---|---|---|---|---|---|
| RALI 2005-QA2 A1 II | Aaa | Caa3 (sf) | AAA | CCC (sf) | | |
| RALI 2005-QS6 A6 | Aaa | Caa1 (sf) | | | AAA | Bsf |
| RALI 2006-Q03 A2 | Aaa | Caa3*- (sf) | AAA | CCC (sf) | | |
| RALI 2006-QS14 A13 | Aaa | Caa2*- (sf) | AAA | D (sf) | AAA | Dsf |
| RALI 2007-QH6 A1 | Aaa | Ba2*- (sf) | AAA | B- (sf) | | |
| RAMP 2004 RZ4 M1 | Aaa | Aa1*-(sf) | AAA | Aa+ | | |
| RAMP 2004-RZ2 AI6 | Aaa | Caa1 | AAA | D | | |
| RAMP 2005-RS4, M1 | Aa1*- | Baa3*- (sf) | | | AA+sf | AA+sf |
| RAMP 2005-RS4, M2 | A2 | Caa1 (sf) | | | Aasf | Aasf |
| RAMP 2005-RS4, M3 | A1 | C (sf) | | | AA- | Asf |
| RAMP 2006-RS3 A-I-2 | Aaa | B3 | AAA | D | AAA | Dsf |
| RAMP 2006-RZ3, M3 | Aa3 | C | | | AA- | Csf |
| RAMP 2006-RZ3, M4 | A1 | C (sf) | | | A+ | Dsf |
| RASC 2005-KS3, M2 | Aa1 | Aa1 | AA+ | AA+ | | |
| RASC 2005-KS3, M3 | Aa2 | Ba1 | AA | AA | | |
| RASC 2005-KS3, M4 | Aa3 | CAA2 | AA | AA- (sf) | | |
| RASC 2005-KS4-M1 | Aa | Baa2 | AA | AA | | |
| RFMSI 2005-S8 A2 | Aaa | Caa3 | AAA | CCC | | |
| RFMSI 2006-S6 A12 | Aaa | Caa1 (sf) | AAA | CCC (sf) | AAA | CCCsf |
| RFMS2 2005-HI3, MI | Aa1 | A3 (sf) | AA+ | AA+ | | |
| RFMS2 2005-HS1, AI2 | Aaa | Aa2 (sf) | AAA | BBB- | | |
| RFMS2 2005-HS2, AI2 | Aaa | Baa2 (sf) | AAA | CC (sf) | | |
| RFMS2 2005-HS2, AI3 | Aaa | Caa3 | AAA | CC (sf) | | |
| RFMS2 2005-HS2, AI4 | Aaa | C (sf) | AAA | CC (sf) | | |
| RFMS2 2005-HSA1 AI5 | Aaa | Ca | AAA | D (sf) | | |
| RFMS2 2006-HI4, A4 | Aaa | C (sf) | AAA | CC (sf) | | |
| RFMS2 2006-HI5, A4 | Aaa | C (sf) | AAA | CC (sf) | | |
| RFMS2 2007-HI1 A4 | Aaa | C (sf) | AAA | CC (sf) | | |
| RFMS2 2007-HSA2-A6 | Aaa | B3*- | AAA | BB+ (sf) | AAA | WD |
| RFMS2 2007-HSA3-AI6 | Aaa | B3 (sf) | AAA | BB+ (sf) | AAA | WD |
| GMACM 2005-HE1, A3 | Aaa | Caa2 | AAA | D (sf) | | |
| GMACM 2006-HE3, A3 | Aaa | Caa3 | AAA | D (sf) | | |

## Exhibit D
### Misrepresentations in the Offering Documents for RALI 2005-QA2

**Collateral type:** Hybrid adjustable-rate mortgage loans secured by first liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 1,934.

1.   **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.   "Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus Supplement at S-95.

   b.   "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income." Prospectus Supplement at S-95. *See also* Prospectus at 14.

   c.   "Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for most of the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide." Prospectus Supplement at S-96.

d.   "The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit and repayment ability and/or the value and adequacy of the related collateral." Prospectus at 12.

e.   "With respect to the depositor's underwriting standards, as well as any other underwriting standards that may be applicable to any mortgage loans, such underwriting standards typically include a set of specific criteria by which the underwriting evaluation is made." Prospectus at 14.

f.   "The underwriting standards with respect to the mortgage loans purchased pursuant to the Expanded Criteria Program will in most cases conform to those published in Residential Funding Corporation's Expanded Criteria Seller Guide . . . The Seller Guide will describe underwriting standards relating to mortgage loans . . ." Prospectus at 15.

g.   "Residential Funding Corporation evaluates many of the mortgage loans that it purchases through the use of one or more automated underwriting systems.  In general, these systems are programmed to review most of the information set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria necessary to satisfy each underwriting program." Prospectus at 16.

h.   "Except in the case of a Designated Seller Transaction or unless otherwise specified in the accompanying prospectus supplement, with respect to any mortgage loan, including Expanded Criteria Program loans, or contracts constituting a part of the trust, in most cases Residential Funding Corporation will generally represent and warrant that . . . . as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects . . . In a Designated Seller Transaction, unless otherwise specified . . . the designated seller will have made representations and warranties regarding the loans to the depositor in most cases similar to those made by Residential Funding Corporation and described above." Prospectus at 20.

i.   "The level of review by Residential Funding Corporation, if any, will vary depending on several factors.  Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any." Prospectus at 14.

j.   "A portion of the mortgage loans typically will be reviewed by Residential Funding Corporation or by a designated third party for compliance with applicable underwriting criteria." Prospectus at 15.

k.    "For most mortgage collateral sellers, Residential Funding Corporation will verify the accuracy of the information with respect to a sample of that mortgage collateral seller's mortgage loans." Prospectus at 16.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.    "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." Prospectus at 14.

b.    "In the case of the Expanded Criteria Program, the system may make adjustments for some compensating factors . . ." Prospectus at 16.

3.    **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a.    The Prospectus Supplement represented (at S-89) that 1,576 loans (81.5%) were for primary residences.

b.    Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

    i.    Of the 1,299 loans reviewed that were allegedly secured by owner-occupied properties, 82 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

    ii.    Of the 1,299 loans reviewed that were allegedly secured by owner-occupied properties, 81 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

    iii.    Of the 1,299 loans reviewed that were allegedly secured by owner-occupied properties, 54 were loans on which the borrower owned other

properties during the same time period of ownership as the securitized property.

iv.    Of the 1,299 loans reviewed that were allegedly secured by owner-occupied properties, 154 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

v.    Of the 1,299 loans reviewed that were allegedly secured by owner-occupied properties, 359 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

vi.    In sum, of the 1,299 loans reviewed that were allegedly secured by owner-occupied properties, a total of 163, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 12.5% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a.    The Prospectus Supplement represented (at S-87) that:

i.    The weighted average LTV ratio was 76.93%;

ii.    Only 126 loans (6.51%) had an LTV higher than 80%.

iii.    Only 30 loans (1.55%) had an LTV higher than 90%.

iv.    No loan had an LTV higher than 100%.

b.    "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide . . . The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed aplicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property." Prospectus Supplement at S-96.

    c.    "The appraisal will have considered a market data analysis of recent sales of comparable properties . . . The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . currently supports and is anticipated to support in the future the outstanding loan balance." Prospectus at 13.

    d.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

        i.    The weighted average LTV ratio was 81.89%.

        ii.    57.41% of the loans had an LTV higher than 80%.

        iii.    18.94% of the loans had an LTV higher than 90%.

        iv.    6.94% of the loans had an LTV higher than 100%.

        v.    20.65% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

        vi.    4.63% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

    a.    "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." Prospectus Supplement at S-95.

    b.    "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." Prospectus at 15.

    c.    "The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations,

underwriting procedures intended to evaluate the borrower's credit and repayment
ability and/or the value and adequacy of the related collateral." Prospectus at 12.

6.  **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

  a.  "When issued, the offered certificates will receive ratings which are not lower
than those listed in the table on page S-6 of this prospectus supplement. The
ratings on the offered certificates address the likelihood that holders of the offered
certificates will receive all distributions on the underlying mortgage loans to
which they are entitled." Prospectus Supplement at S-14.

  b.  "It is a condition of the issuance of the Senior Certificates, other than the Class
A2-I Certificates and the Class A2-II Certificates, that they be rated 'AAA' by
Standard & Poor's . . . and 'Aaa' by Moody's . . . Standard & Poor's ratings on
mortgage pass-through certificates address the likelihood of the receipt by
certificateholders of payments required under the pooling and servicing
agreement. Standard & Poor's ratings take into consideration the credit quality of
the mortgage pool, structural and legal aspects associated with the certificates,
and the extent to which the payment stream in the mortgage pool is adequate to
make payments required under the certificates . . . The rating assigned by
Moody's to the offered certificates address the likelihood of the receipt by the
offered certificateholders of all distributions to which they are entitled under the
pooling and servicing agreement. Moody's ratings reflect its analysis of the
riskiness of the mortgage loans and the structure of the transaction as described in
the pooling and servicing agreement." Prospectus Supplement at S-146.

  c.  The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.  **All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

  a.  The Prospectus Supplement represented (at S-89) 735 loans (38%) were issued
under full-documentation procedures.

  b.  "In most cases, under a traditional 'full documentation' program, each mortgagor
will have been required to complete an application designed to provide to the
original lender pertinent credit information concerning the mortgagor. As part of
the description of the mortgagor's financial condition, the mortgagor will have
furnished information, which may be supplied solely in the application, with
respect to its assets, liabilities, income (except as described below), credit history,

employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verification of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus at 13.

8.  **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.  "Credit enhancement for all of these certificates will be provided by additional subordination." Prospectus Supplement at S-1, S-149.

**Exhibit E**
**Misrepresentations in the Offering Documents for RALI 2005-QS6**

**Collateral type:** Fixed rate mortgage loans secured by first liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 1,529.

1.  **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.  "Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus Supplement at S-29, S-30.

    b.  "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income." Prospectus Supplement at S-30. *See also* Prospectus at 15.

    c.  "Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for most of the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide." Prospectus Supplement at S-30.

d.   "The depositor expects that the originator of each of the mortgage loans will have
applied, consistent with applicable federal and state laws and regulations,
underwriting procedures intended to evaluate the borrower's credit and repayment
ability and/or the value and adequacy of the related collateral." Prospectus at 12.

e.   "With respect to the depositor's underwriting standards, as well as any other
underwriting standards that may be applicable to any mortgage loans, such
underwriting standards typically include a set of specific criteria by which the
underwriting evaluation is made." Prospectus at 14.

f.   "The underwriting standards with respect to the mortgage loans purchased
pursuant to the Expanded Criteria Program will in most cases conform to those
published in Residential Funding Corporation's Expanded Criteria Seller
Guide . . . The Seller Guide will describe underwriting standards relating to
mortgage loans . . ." Prospectus at 15.

g.   "Residential Funding Corporation evaluates many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems. In
general, these systems are programmed to review most of the information set
forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria necessary to satisfy each underwriting program." Prospectus at 16.

h.   "Except in the case of a Designated Seller Transaction or unless otherwise
specified in the accompanying prospectus supplement, with respect to any
mortgage loan, including Expanded Criteria Program loans, or contracts
constituting a part of the trust, in most cases Residential Funding Corporation will
generally represent and warrant that . . . . as of the cut-off date, the information
described in a listing of the related mortgage loan or contract was true and correct
in all material respects . . . In a Designated Seller Transaction, unless otherwise
specified . . . the designated seller will have made representations and warranties
regarding the loans to the depositor in most cases similar to those made by
Residential Funding Corporation and described above." Prospectus. p. 20.

i.   "The level of review by Residential Funding Corporation, if any, will vary
depending on several factors. Residential Funding Corporation, on behalf of the
depositor, typically will review a sample of the mortgage loans purchased by
Residential Funding Corporation for conformity with the applicable underwriting
standards and to assess the likelihood of repayment of the mortgage loan from the
various sources for such repayment, including the mortgagor, the mortgaged
property, and primary mortgage insurance, if any." Prospectus. at 14.

j.   "A portion of the mortgage loans typically will be reviewed by Residential
Funding Corporation or by a designated third party for compliance with
applicable underwriting criteria." Prospectus at 15.

k.    "For most mortgage collateral sellers, Residential Funding Corporation will verify the accuracy of the information with respect to a sample of that mortgage collateral seller's mortgage loans." Prospectus at 16.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.    "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." Prospectus at 14.

b.    "In the case of the Expanded Criteria Program, the system may make adjustments for some compensating factors . . ." Prospectus at 16.

3.    **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181.  A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless.  This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

a.    The Prospectus Supplement represented (at S-24) that 1,029 loans (67.3%) were for primary residences.

b.    Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

i.    Of the 828 loans reviewed that were allegedly secured by owner-occupied properties, 66 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

ii.    Of the 828 loans reviewed that were allegedly secured by owner-occupied properties, 79 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

   iii.    Of the 828 loans reviewed that were allegedly secured by owner-occupied properties, 50 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

   iv.    Of the 828 loans reviewed that were allegedly secured by owner-occupied properties, 144 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

   v.    Of the 828 loans reviewed that were allegedly secured by owner-occupied properties, 133 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

   vi.    In sum, of the 828 loans reviewed that were allegedly secured by owner-occupied properties, a total of 127, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 15.3% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

   a.    The Prospectus Supplement represented (at S-28) that:

      i.    The weighted average LTV ratio was 77.32%;

      ii.    Only 396 loans (25.9%) had an LTV higher than 80%.

      iii.    Only 132 loans (8.63%) had an LTV higher than 90%.

      iv.    No loan had an LTV higher than 100%.

   b.    "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide . . . The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income

generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property." ·Prospectus Supplement at S-30.

c.  "The appraisal will have considered a market data analysis of recent sales of comparable properties . . . The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . currently supports and is anticipated to support in the future the outstanding loan balance." Prospectus at 13.

d.  Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

    i.  The weighted average LTV ratio was 83.46%.

    ii.  55.03% of the loans had an LTV higher than 80%.

    iii.  29.25% of the loans had an LTV higher than 90%.

    iv.  12.80% of the loans had an LTV higher than 100%.

    v.  27.79% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

    vi.  8.96% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

**5.  All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.  "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." Prospectus Supplement at S-30. *See also* Prospectus at 15.

b.  "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including

property taxes and hazard insurance, and other financial obligations and monthly living expenses." Prospectus at 15.

    c.    "The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit and repayment ability and/or the value and adequacy of the related collateral." Prospectus at 12.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

    a.    "When issued, the offered certificates will receive ratings which are not lower than those listed in the table on page S-6 of this prospectus supplement. The ratings on the offered certificates address the likelihood that holders of the offered certificates will receive all distributions on the underlying mortgage loans to which they are entitled." Prospectus Supplement at S-11.

    b.    "It is a condition of the issuance of the Senior Certificates (other than the Class A-7 Certificates) that they be rated 'AAA' by Fitch . . . and 'Aaa' by Moody's . . . The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the transaction structure . . . The rating assigned by Moody's to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement." Prospectus Supplement at S-78.

    c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

    a.    The Prospectus Supplement represented (at S-26) 744 loans (48.7%) were issued under full-documentation procedures.

    b.    "In most cases, under a traditional 'full documentation' program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local

merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verification of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus at 13.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for all of these certificates will be provided by additional subordination." Prospectus Supplement at S-1.

**Exhibit F**
**Misrepresentations in the Offering Documents for RALI 2006-QO3**

**Collateral type:** Adjustable-rate mortgage loans secured by first liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 1,897.

1.  All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint. *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.  "Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus Supplement at S-44.

    b.  "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been made by the original lender that the mortgagor's monthly income, if required to be stated, would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . The originator's guidelines for mortgage loans will, in most cases, specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective mortgagor's gross income." Prospectus Supplement at S-44. *See also* Prospectus at 13-14.

    c.  "All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding. . . . Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase . . . ." Prospectus Supplement at S-46.

Amended Complaint                                    F-1                                    RALI 2006-QO3

d.   "Prior to assigning the mortgage loans to the depositor, Residential Funding will
have reviewed the underwriting information provided by the mortgage collateral
sellers for the mortgage loans and, in those cases, determined that the mortgage
loans were generally originated in accordance with or in a manner generally
consistent with the underwriting standards described in the Seller Guide."
Prospectus Supplement at S-45.

e.   "The depositor expects that the originator of each of the mortgage loans will have
applied, consistent with applicable federal and state laws and regulations,
underwriting procedures intended to evaluate the borrower's credit standing and
repayment ability and/or the value and adequacy of the related property as
collateral." Prospectus at 12.

f.   "With respect to the depositor's underwriting standards, as well as any other
underwriting standards that may be applicable to any mortgage loans, such
underwriting standards typically include a set of specific criteria by which the
underwriting evaluation is made." Prospectus at 14.

g.   "The specific underwriting standards with respect to the mortgage loans
purchased pursuant to the Expanded Criteria Program will in most cases conform
to those published in Residential Funding Corporation's Expanded Criteria Seller
Guide as it applies to the Expanded Criteria Program, or Seller Guide, as modified
from time to time." Prospectus at 15.

h.   "Residential Funding Corporation evaluates many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems. In
general, these systems are programmed to review most of the information set
forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria necessary to satisfy each underwriting program." Prospectus at 16.

i.   "Residential Funding Corporation will generally represent and warrant that: as of
the cut-off date, the information described in a listing of the related mortgage loan
or contract was true and correct in all material respects." Prospectus at 19.

j.   "The level of review by Residential Funding Corporation, if any, will vary
depending on several factors. Residential Funding Corporation, on behalf of the
depositor, typically will review a sample of the mortgage loans purchased by
Residential Funding Corporation for conformity with the applicable underwriting
standards and to assess the likelihood of repayment of the mortgage loan from the
various sources for such repayment, including the mortgagor, the mortgaged
property, and primary mortgage insurance, if any." Prospectus at 14.

k.   "A portion of the mortgage loans typically will be reviewed by Residential
Funding Corporation or by a designated third party for compliance with
applicable underwriting criteria." Prospectus at 15.

l.    "For most mortgage collateral sellers, Residential Funding Corporation will verify
the accuracy of the information with respect to a sample of that mortgage
collateral seller's mortgage loans." Prospectus at 16.

2.    **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.    "[A] mortgage loan may be considered to comply with the underwriting standards
described above, even if one or more specific criteria included in the underwriting
standards were not satisfied, if other factors positively compensated for the
criteria that were not satisfied." Prospectus Supplement at S-46. *See also*
Prospectus at 14.

b.    "In the case of the Expanded Criteria Program, the system may make adjustments
for some compensating factors . . ." Prospectus at 16.

3.    **All of the following representations regarding whether the mortgaged property was
owner-occupied were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact
owner-occupied, and the defendants omitted that the given statistics were (due to their
abandonment of their underwriting standards) baseless. This is evidenced by a statistical
analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a.    The Prospectus Supplement represented (at I-5) that 1,606 loans (84.7%) were for
primary residences.

b.    Allstate's subsequent loan-level analysis has determined that the defendants
drastically overstated the percentage of owner-occupied properties secured by the
Mortgage Loans.

i.    Of the 1,271 loans reviewed that were allegedly secured by owner-
occupied properties, 70 were loans on which the owner of the property
instructed tax authorities to send property tax bills to a different address,
or listed a different address as the one for the property owner's property
tax exemption.

ii.    Of the 1,271 loans reviewed that were allegedly secured by owner-
occupied properties, 109 were loans on which creditors reported a
different property address as the customer's mailing address six months
after the origination of the securitized loan.

iii.    Of the 1,271 loans reviewed that were allegedly secured by owner-
occupied properties, 105 were loans on which the borrower owned other

properties during the same time period of ownership as the securitized property.

    iv.    Of the 1,271 loans reviewed that were allegedly secured by owner-occupied properties, 174 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

    v.    Of the 1,271 loans reviewed that were allegedly secured by owner-occupied properties, 148 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

    vi.    In sum, of the 1,271 loans reviewed that were allegedly secured by owner-occupied properties, a total of 173, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 13.6% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    The Prospectus Supplement represented (at I-3) that:

        i.    The weighted average LTV ratio was 74.31%.

        ii.    Only 103 loans (5.43%) had an LTV higher than 80%.

        iii.    Only 27 loans (1.42%) had an LTV higher than 90%.

        iv.    No loan had an LTV higher than 100%.

    b.    "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide. . . . The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property." Prospectus Supplement at S-45.

c.    "The appraisal will have considered a market data analysis of recent sales of comparable properties. . . . The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . . currently supports and is anticipated to support in the future the outstanding loan balance." Prospectus at 13.

d.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

   i.    The weighted average LTV ratio was 85.79%.

   ii.    62.24% of the loans had an LTV higher than 80%.

   iii.    32.77% of the loans had an LTV higher than 90%.

   iv.    13.36% of the loans had an LTV higher than 100%.

   v.    38.20% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

   vi.    10.33% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." Prospectus Supplement at S-44. See also Prospectus at 13.

b.    "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." Prospectus at 15.

c.      "The depositor expects that the originator of each of the mortgage loans will have
applied, consistent with applicable federal and state laws and regulations,
underwriting procedures intended to evaluate the borrower's credit standing and
repayment ability and/or the value and adequacy of the related property as
collateral." Prospectus at 12.

6.      **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

a.      "When issued, the offered certificates will receive ratings which are not lower
than those listed in the table on page S-6 of this prospectus supplement.  The
ratings on the offered certificates address the likelihood that holders of the offered
certificates will receive all distributions on the underlying mortgage loans to
which they are entitled." Prospectus Supplement at S-14.

b.      "It is a condition of the issuance of the offered certificates that they be rated as
indicated on page S-6 of this prospectus supplement." Prospectus Supplement at
S-102.

c.      "Standard & Poor's ratings on mortgage pass-through certificates address the
likelihood of the receipt by certificateholders of payments required under the
pooling and servicing agreement.  Standard & Poor's ratings take into
consideration the credit quality of the mortgage pool, structural and legal aspects
associated with the certificates. . . . The rating assigned by Moody's to the offered
certificates address the likelihood of the receipt by the offered certificateholders
of all distributions to which they are entitled under the pooling and servicing
agreement.  Moody's ratings reflect its analysis of the riskiness of the mortgage
loans and the structure of the transaction as described in the pooling and servicing
agreement." Prospectus Supplement at S-102.

d.      The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.      **All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

a.      The Prospectus Supplement represented (at I-5) that 242 loans (13%) were issued
under full/alternate documentation procedures.

b.      "In most cases, under a traditional 'full documentation' program, each mortgagor
will have been required to complete an application designed to provide to the
original lender pertinent credit information concerning the mortgagor.  As part of
the description of the mortgagor's financial condition, the mortgagor will have

furnished information, which may be supplied solely in the application, with
respect to its assets, liabilities, income (except as described below), credit history,
employment history and personal information, and furnished an authorization to
apply for a credit report that summarizes the borrower's credit history with local
merchants and lenders and any record of bankruptcy. The mortgagor may also
have been required to authorize verifications of deposits at financial institutions
where the mortgagor had demand or savings accounts." Prospectus at 12-13.

8.      **All of the following misrepresentations regarding credit enhancements were false
and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
here, the collateral was significantly riskier than presented, rendering representations
regarding the efficacy or sufficiency of any structural 'credit enhancements' that
depended on or were derived from the quality of those loans false and misleading.

   a.      "Credit enhancement for the offered certificates consists of:  excess cash flow;
           overcollateralization; and subordination provided to the Class A Certificates by
           the Class M Certificates, and subordination provided to the Class M Certificates
           by each class of Class M Certificates with a lower payment priority." Prospectus
           Supplement at S-1.

   b.      "The credit enhancement for the benefit of the offered certificates consists of:
           Excess Cash Flow.  Because more interest with respect to the mortgage loans is
           payable by the mortgagors than is expected to be necessary to pay the interest on
           the offered certificates each month and related expenses, there may be excess cash
           flow.  Some of this excess cash flow may be used to protect the offered
           certificates against some realized losses by making an additional payment of
           principal up to the amount of the realized losses.  Overcollateralization.  On the
           closing date, the trust will issue an aggregate principal amount of offered
           certificates which is approximately equal to 99.20% of the aggregate principal
           balance of the mortgage loans as of the cut-off date.  On each distribution date, to
           the extent not used to cover realized losses, excess cash flow, if necessary, will be
           used to pay principal to the offered certificates, reducing the aggregate certificate
           principal balance of those certificates below the aggregate principal balance of the
           mortgage loans to the extent necessary to maintain the required
           overcollateralization amount.  The excess amount of the balance of the mortgage
           loans represents overcollateralization, which may absorb some losses on the
           mortgage loans to the extent not covered by excess cash flow." Prospectus
           Supplement at S-13.

**Exhibit G**
**Misrepresentations in the Offering Documents for RALI 2006-QS14**

**Collateral type:** Conventional, fixed rate loans that are secured by first liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 3,026.

1.    All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint. *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus Supplement at S-45.

   b.    "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income. The originator may also consider the amount of liquid assets available to the mortgagor after origination." Prospectus Supplement at S-45. *See also* Prospectus at 13.

   c.    "All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under '—The Program' in this prospectus supplement. Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase as

described under 'The Trusts—Underwriting Policies—Automated Underwriting'
in the prospectus." Prospectus Supplement at S-46.

d.    "Prior to assigning the mortgage loans to the depositor, Residential Funding will
have reviewed the underwriting information provided by the mortgage collateral
sellers for most of the mortgage loans and, in those cases, determined that the
mortgage loans were generally originated in accordance with or in a manner
generally consistent with the underwriting standards described in the Seller
Guide." Prospectus Supplement at S-46.

e.    "The depositor expects that the originator of each of the loans will have applied,
consistent with applicable federal and state laws and regulations, underwriting
procedures intended to evaluate the borrower's credit standing and repayment
ability and/or the value and adequacy of the related property as collateral."
Prospectus at 12.

f.    "With respect to the depositor's underwriting standards, as well as any other
underwriting standards that may be applicable to any mortgage loans, such
underwriting standards typically include a set of specific criteria by which the
underwriting evaluation is made." Prospectus at 14.

g.    "The underwriting standards with respect to the mortgage loans purchased
pursuant to the Expanded Criteria Program will in most cases conform to those
published in Residential Funding Corporation's Expanded Criteria Seller Guide."
Prospectus at 15.

h.    "Residential Funding Corporation evaluates many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems. In
general, these systems are programmed to review most of the information set
forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria necessary to satisfy each underwriting program." Prospectus at 16.

i.    "Residential Funding Company, LLC will generally represent and warrant that:
as of the cut-off date, the information described in a listing of the related
mortgage loan or contract was true and correct in all material respects;. . ."
Prospectus at 20.

j.    "The level of review by Residential Funding Corporation, if any, will vary
depending on several factors. Residential Funding Corporation, on behalf of the
depositor, typically will review a sample of the mortgage loans purchased by
Residential Funding Corporation for conformity with the applicable underwriting
standards and to assess the likelihood of repayment of the mortgage loan from the
various sources for such repayment, including the mortgagor, the mortgaged
property, and primary mortgage insurance, if any." Prospectus. at 14.

k.    "A portion of the mortgage loans typically will be reviewed by Residential
Funding Corporation or by a designated third party for compliance with
applicable underwriting criteria." Prospectus at 15.

1.    "For most mortgage collateral sellers, Residential Funding Corporation will verify
the accuracy of the information with respect to a sample of that mortgage
collateral seller's mortgage loans." Prospectus at 16.

2.    **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.    "[A] mortgage loan may be considered to comply with the underwriting standards
described above, even if one or more specific criteria included in the underwriting
standards were not satisfied, if other factors positively compensated for the
criteria that were not satisfied to comply with the underwriting standards
described above, even if one or more specific criteria included in the underwriting
standards were not satisfied, if other factors positively compensated for the
criteria that were not satisfied." Prospectus Supplement at S-46; *see also*
Prospectus at 14.

b.    "In the case of the Expanded Criteria Program, the system may make adjustments
for some compensating factors . . ." Prospectus at 16.

3.    **All of the following representations regarding whether the mortgaged property was
owner-occupied were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.*, ¶¶ 73-181. A material amount of the loans were not in fact
owner-occupied, and the defendants omitted that the given statistics were (due to their
abandonment of their underwriting standards) baseless. This is evidenced by a statistical
analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a.    The Prospectus Supplement represented (at S-12) that 2,210 of the loans (73.03%)
were for primary residences.

b.    Allstate's subsequent loan-level analysis has determined that the defendants
drastically overstated the percentage of owner-occupied properties secured by the
Mortgage Loans.

i.    Of the 1,184 loans reviewed that were allegedly secured by owner-
occupied properties, 77 were loans on which the owner of the property
instructed tax authorities to send property tax bills to a different address,
or listed a different address as the one for the property owner's property
tax exemption.

ii.    Of the 1,184 loans reviewed that were allegedly secured by owner-
occupied properties, 112 were loans on which creditors reported a
different property address as the customer's mailing address six months
after the origination of the securitized loan.

     iii.    Of the 1,184 loans reviewed that were allegedly secured by owner-occupied properties, 79 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

     iv.    Of the 1,184 loans reviewed that were allegedly secured by owner-occupied properties, 184 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

     v.    Of the 1,184 loans reviewed that were allegedly secured by owner-occupied properties, 267 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

     vi.    In sum, of the 1,184 loans reviewed that were allegedly secured by owner-occupied properties, a total of 174, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 14.7% of the Mortgage Loans that were tested.

**4.    All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    The Prospectus Supplement represented (at I-7) that:

     i.    The weighted average LTV ratio was 77.46%;

     ii.    Only 323 loans (10.67%) had LTVs higher than 80%.

     iii.    Only 132 loans (4.36%) had LTVs higher than 90%.

     iv.    No loan had an LTV higher than 100%.

    b.    "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide . . . The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current

cost of constructing or purchasing a similar property. In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." Prospectus Supplement at S-45, S-46.

c.    "The appraisal will have considered a market data analysis of recent sales of comparable properties . . . The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . currently supports and is anticipated to support in the future the outstanding loan balance." Prospectus at 13.

d.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

    i.    The weighted average LTV ratio was 84.92%.

    ii.    61.12% of the loans had an LTV higher than 80%.

    iii.    30.96% of the loans had an LTV higher than 90%.

    iv.    15.23% of the loans had an LTV higher than 100%.

    v.    34.92% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

    vi.    9.95% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." Prospectus Supplement at S-45.

b.    "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including

property taxes and hazard insurance, and other financial obligations and monthly living expenses." Prospectus at 15.

c.  "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." Prospectus at 12.

6.  **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

a.  "When issued, the offered certificates will receive ratings which are not lower than those listed in the table on pages S-8 and S-9 of this prospectus supplement. The ratings on the offered certificates address the likelihood that holders of the offered certificates will receive all distributions on the underlying mortgage loans to which they are entitled." Prospectus Supplement at S-17.

b.  "It is a condition of the issuance of the Senior Certificates that they be rated 'AAA' by Fitch Ratings . . . 'AAA' by Standard & Poor's Ratings Services . . . and 'Aaa' by Moody's . . . The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the transaction structure. Fitch's ratings reflect its analysis of the riskiness of the underlying mortgage loans and the structure of the transaction as described in the operative documents . . . The ratings assigned by Standard & Poor's to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. Standard & Poor's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the certificates . . . The ratings assigned by Moody's to the Senior Certificates address the likelihood of the receipt by the Senior Certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement." Prospectus Supplement at S-127.

c.  The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.  **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶

73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

a.    The Prospectus Supplement represented (at I-4) that 874 loans (29%) were issued under full/alternate documentation procedures.

b.    "In most cases, under a traditional 'full documentation' program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verification of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus at 12-13.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for all of these certificates will be provided by additional classes of subordinated certificates which are not offered hereby." Prospectus Supplement at S-1.

**Exhibit H**
**Misrepresentations in the Offering Documents for RALI 2007-QH6**

**Collateral type:** Payment option, hybrid adjustable-rate mortgage loans secured by first liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 1,549.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus Supplement at S-47.

   b.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been made by the original lender that the mortgagor's monthly income, if required to be stated, would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property. Examples of other expenses include property taxes, utility costs, standard hazard and primary mortgage insurance, maintenance fees and other levies assessed by a Cooperative, if applicable, and other fixed obligations other than housing expenses. The originator's guidelines for mortgage loans will, in most cases, specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective mortgagor's gross income." Prospectus Supplement at S-48. *See also* Prospectus at 19.

   c.    "All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding Company, LLC. . . .

Amended Complaint                                    H-1                                    RALI 2007-QH6

Residential Funding Company, LLC will review each mortgage loan for compliance with its underwriting standards prior to purchase . . . ." Prospectus Supplement at S-49.

d.  "Prior to assigning the mortgage loans to the depositor, Residential Funding Company, LLC will have reviewed the underwriting information provided by the mortgage collateral sellers for the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide." Prospectus Supplement at S-48.

e.  "The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. All of the mortgage loans constituting the mortgage pool for a series of certificates will have been acquired either directly or indirectly by the depositor through the Expanded Criteria Program . . . ." Prospectus at 17.

f.  "With respect to the depositor's underwriting standards, as well as any other underwriting standards that may be applicable to any mortgage loans, such underwriting standards typically include a set of specific criteria by which the underwriting evaluation is made." Prospectus at 20.

g.  "The specific underwriting standards with respect to the mortgage loans purchased pursuant to the Expanded Criteria Program will in most cases conform to those published in Residential Funding Company, LLC's Expanded Criteria Seller Guide as it applies to the Expanded Criteria Program, or Seller Guide, as modified from time to time." Prospectus at 21.

h.  "Residential Funding Company, LLC evaluates many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In general, these systems are programmed to review most of the information set forth in Residential Funding Company, LLC's Seller Guide as the underwriting criteria necessary to satisfy each underwriting program." Prospectus at 22.

i.  "Residential Funding Company, LLC will generally represent and warrant that: as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects." Prospectus at 27.

j.  "The level of review by Residential Funding Corporation, if any, will vary depending on several factors. Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged

property, and primary mortgage insurance, if any. Such underwriting reviews will generally not be conducted with respect to any individual mortgage pool related to a series of certificates . . . In addition, Residential Funding Company, LLC may conduct additional procedures to assess the current value of the mortgaged properties. Those procedures may consist of drive-by appraisals, automated valuations or real estate broker's price opinions. The depositor may also consider a specific area's housing value trends. These alternative valuation methods may not be as reliable as the type of mortgagor financial information or appraisals that are typically obtained at origination. In its underwriting analysis, Residential Funding Company, LLC may also consider the applicable Credit Score of the related mortgagor used in connection with the origination of the mortgage loan, as determined based on a credit scoring model acceptable to the depositor." Prospectus at 19.

k.    "A portion of the mortgage loans typically will be reviewed by Residential Funding Corporation or by a designated third party for compliance with applicable underwriting criteria." Prospectus at 22.

l.    "For most mortgage collateral sellers, Residential Funding Corporation will verify the accuracy of the information with respect to a sample of that mortgage collateral seller's mortgage loans." Prospectus at 23.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.    "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." Prospectus Supplement at S-49. *See also* Prospectus at 20.

b.    "In the case of the Expanded Criteria Program, the system may make adjustments for some compensating factors . . ." Prospectus at 22.

3.    **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a.    The Prospectus Supplement represented (at I-6) that 1,282 loans (82.8%) were for primary residences.

b.   Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

  i.    Of the 1,229 loans reviewed that were allegedly secured by owner-occupied properties, 100 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

  ii.   Of the 1,229 loans reviewed that were allegedly secured by owner-occupied properties, 168 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

  iii.  Of the 1,229 loans reviewed that were allegedly secured by owner-occupied properties, 158 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

  iv.   Of the 1,229 loans reviewed that were allegedly secured by owner-occupied properties, 242 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

  v.    Of the 1,229 loans reviewed that were allegedly secured by owner-occupied properties, 151 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

  vi.   In sum, of the 1,229 loans reviewed that were allegedly secured by owner-occupied properties, a total of 239, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 19.4% of the Mortgage Loans that were tested.

4.   **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a.   The Prospectus Supplement represented (at I-4) that:

  i.    The weighted average LTV ratio was 73.89%.

    ii.      Only 139 loans (8.97%) had an LTV higher than 80%.

    iii.     Only 32 loans (2.07%) had an LTV higher than 90%.

    iv.     No loan had an LTV higher than 100%.

b.    "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide. . . . The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property." Prospectus Supplement at S-48.

c.    "The appraisal will have considered a market data analysis of recent sales of comparable properties. . . . The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . currently supports and is anticipated to support in the future the outstanding loan balance." Prospectus at 19.

d.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

    i.       The weighted average LTV ratio was 91.94%.

    ii.      74.22% of the loans had an LTV higher than 80%.

    iii.     53.62% of the loans had an LTV higher than 90%.

    iv.     28.60% of the loans had an LTV higher than 100%.

    v.      64.06% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

    vi.     23.14% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a. "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." Prospectus Supplement at S-48. See also Prospectus at 19.

b. "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." Prospectus at 21.

c. "The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." Prospectus at 17.

6. **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

a. "When issued, the offered certificates will receive ratings which are not lower than those listed in the table on page S-7 of this prospectus supplement. The ratings on the offered certificates address the likelihood that holders of the offered certificates will receive all distributions on the underlying mortgage loans to which they are entitled." Prospectus Supplement at S-16.

b. "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-7 of this prospectus supplement." Prospectus Supplement at S-110.

c. "Ratings assigned by Standard & Poor's Rating Services . . . on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. Standard & Poor's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates. . . . The rating assigned by Moody's . . . to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction

as described in the pooling and servicing agreement." Prospectus Supplement at S-110.

    d.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

    a.    The Prospectus Supplement represented (at I-6) that 227 loans (15%) were issued under full/alternate documentation procedures.

    b.    "In most cases, under a traditional 'full documentation' program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus at 18.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

    a.    "Credit enhancement for the offered certificates consists of: net monthly excess cash flow; overcollateralization; a swap agreement; and subordination provided to the Class A Certificates by the Class M Certificates and the Class B Certificates, and subordination provided to the Class M Certificates by each class of Class M Certificates with a lower payment priority and the Class B Certificates." Prospectus Supplement at S-1.

    b.    "The credit enhancement for the benefit of the offered certificates consists of: Excess Cash Flow. Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the Class A, Class M and Class B Certificates each month and related expenses, there may be excess cash flow. Some of this excess cash flow may be used to protect the offered certificates against some realized losses by making an additional payment of principal up to the amount of the realized losses.

Amended Complaint           H-7           RALI 2007-QH6

Overcollateralization. On the closing date, the trust will issue an aggregate
principal amount of Class A, Class M and Class B Certificates which is
approximately equal to 99.50% of the aggregate principal balance of the mortgage
loans as of the cut-off date. On each distribution date, to the extent not used to
cover realized losses, excess cash flow, if necessary, will be used to pay principal
to the Class A, Class M and Class B Certificates, reducing the aggregate
certificate principal balance of those certificates below the aggregate principal
balance of the mortgage loans to the extent necessary to maintain the required
overcollateralization amount. The excess amount of the balance of the mortgage
loans represents overcollateralization, which may absorb some losses on the
mortgage loans to the extent not covered by excess cash flow. Subordination. As
long as the Class B Certificates and Class M Certificates remain outstanding,
losses on the mortgage loans which are not covered by excess cash flow, net swap
payments received by the supplemental interest trust or overcollateralization will
be allocated to the Class B Certificates and then to the class of Class M
Certificates with the lowest payment priority, and the other classes of certificates
will not bear any portion of such losses, except as described in this prospectus
supplement. If none of the Class B Certificates or Class M Certificates are
outstanding, all such losses will be allocated first to the Class A-3 Certificates and
then to Class A-2 Certificates, as described in this prospectus supplement. See
'Description of the Certificates—Allocation of Losses; Subordination' in this
prospectus supplement. Swap Agreement. The holders of the Class A, Class M
and Class B Certificates may benefit from a swap agreement." Prospectus
Supplement at S-15.