<u>Exhibit I</u>
<u>Misrepresentations in the Offering Documents for RAMP 2004-RZ4</u>

**Collateral type:** Fixed-rate and adjustable-rate mortgage loans secured by first liens on one- to two- family residential properties.

**Initial number of mortgage loans:** 1,915.

1.      **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.      "Evaluation Standards for Negotiated Conduit Asset Program Loans: Most negotiated conduit asset program loans are evaluated by Residential Funding Corporation to determine whether the characteristics of the loan, the borrower and the collateral, taken as a whole, represent a prudent lending risk. The factors considered include: the mortgage loan's payment terms and characteristics; the borrower's credit score; the value of the mortgaged property, which may be estimated using a broker's price opinion or a statistical valuation; the credit and legal documentation associated with the loan; the seasoning of the loan; an evaluation of the financial capacity, eligibility and experience of the seller and/or servicer of the loan; and the representations and warranties made by the seller. In most cases, Residential Funding Corporation orders an updated credit score for each loan reviewed. For seasoned loans, an updated credit score is ordered for the primary borrower as reported on the tape data or loan file submitted by the seller. Periodic quality control reviews are performed. Broker's price opinions are obtained if, among other reasons, the loan is delinquent or the principal balance of the mortgage loan exceeds $400,000. In addition, statistical property valuations and drive-by appraisals may be used, or a review may be done of the original appraisal." Prospectus at 25.

   b.      "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The depositor expects that any FHA loans or VA loans will have been originated in compliance with the underwriting policies of the FHA or VA, respectively." Prospectus at 19.

   c.      "All of the mortgage loans were originated and underwritten in accordance with the Home Solution Program. Prior to assignment to the Company, Residential Funding reviewed the underwriting of each of the mortgage loans and determined that it was in conformity with the standards set forth below." Prospectus Supplement at S-48.

d.    "Residential Funding's underwriting of the mortgage loans generally consisted of
analyzing the following as standards applicable to the mortgage loans:  the
creditworthiness of a mortgagor, the income sufficiency of a mortgagor's
projected family income relative to the mortgage payment and to other fixed
obligations (including in certain instances rental income from investment
property), and the adequacy of the mortgaged property (expressed in terms of
Loan-to-Value Ratio), to serve as the collateral for a mortgage loan.  In addition,
Credit Scores are obtained and debt-to-income ratios are calculated and are
considered in the underwriting of the loan." Prospectus Supplement at S-55.

e.    "The mortgage collateral sellers that participate in the Home Solution Program,
referred to as Home Solution Program Sellers, have been selected by Residential
Funding on the basis of various criteria set forth in Residential Funding's Home
Solution Seller Guide. For those mortgage loans that Residential Funding
purchased from Home Solution Program Sellers, each mortgage loan determined
by Residential Funding to be acceptable for purchase would have been originated
in accordance with, or would have been determined to be generally consistent
with the provisions of, the Home Solutions Seller Guide." Prospectus
Supplement at S-54.

f.    "Residential Funding, as seller, will represent and warrant, as of the date of
issuance of the certificates, the following: . . . [e]ach mortgage loan at the time it
was originated complied in all material respects with applicable local, state and
federal laws, including, but not limited to, all applicable anti-predatory lending
laws . . . ." Prospectus Supplement at S-23.

g.    "Based on the data provided in the application, certain verifications, and the
appraisal or appraisals of the mortgaged property, a determination was made by
the original lender that the mortgagor's monthly income would be sufficient to
enable the mortgagor to meet its monthly obligations on the mortgage loan,
including property taxes and standard hazard insurance, with at least $1,500 per
month remaining." Prospectus Supplement at S-55; see also Prospectus at 22.

h.    "In general, these [automated] systems are programmed to review most of the
information that is set forth in Residential Funding Corporation's underwriting
criteria that is necessary to satisfy each underwriting program." Prospectus at 23.

i.    "Residential Funding Corporation, on behalf of the depositor, typically will
review a sample of the loans purchased by Residential Funding Corporation for
conformity with Residential Funding Corporation's underwriting standards or
applicable underwriting standards specified in this prospectus or the
accompanying prospectus supplement, and to assess the likelihood of repayment
of the loan from the various sources for such repayment, including the borrower,
the mortgaged property, and primary mortgage insurance, if any . . . In reviewing
seasoned loans, or loans that have been outstanding for more than 12 months,
Residential Funding Corporation may take into consideration, in addition to or in
lieu of the factors described above, the borrower's actual payment history in

assessing a borrower's current ability to make payments on the loan. In addition, Residential Funding Corporation may conduct additional procedures to assess the current value of the mortgaged properties. Those procedures may consist of statistical valuations, drive-by appraisals or real estate broker's price opinions. The depositor may also consider a specific area's housing value trends." Prospectus at 23.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.    "[A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards." Prospectus at 19.

3.    **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

    a.    The Prospectus Supplement represented (at S-31) that 1,635 loans (85.4%) were for primary residences.

    b.    Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

        i.    Of the 1,133 loans reviewed that were allegedly secured by owner-occupied properties, 72 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

        ii.    Of the 1,133 loans reviewed that were allegedly secured by owner-occupied properties, 78 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

iii.    Of the 1,133 loans reviewed that were allegedly secured by owner-occupied properties, 34 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

iv.    Of the 1,133 loans reviewed that were allegedly secured by owner-occupied properties, 135 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

v.    Of the 1,133 loans reviewed that were allegedly secured by owner-occupied properties, 269 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

vi.    In sum, of the 1,229 loans reviewed that were allegedly secured by owner-occupied properties, a total of 142, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 12.5% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a.    The Prospectus Supplement represented (at S-29) that:

i.    The weighted average LTV ratio was 102.19%.

ii.    Only 1,042 loans (54.41%) had an LTV higher than 100%.

iii.    No loan had an LTV higher than 107%.

b.    "The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal . . . The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost

analysis based on the current cost of constructing or purchasing a similar property." Prospectus at 20.

c.  "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . currently supports . . . and is anticipated to support in the future, the outstanding loan balance." Prospectus at 21.

d.  Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

  i.  The weighted average LTV ratio was 106.81%.

  ii.  68.96% of the loans had an LTV higher than 100%.

  iii.  26.40% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

  iv.  6.46% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.  **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.  "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property . . . The originator's guidelines for loans will, in most cases, specify that scheduled payments on a loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective borrower's gross income." Prospectus at 22.

6.  **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

    a.    "When issued, the offered certificates will receive the ratings listed on page S-6 of this prospectus supplement." Prospectus Supplement at S-11.

    b.    "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement by Standard & Poor's and Moody's . . . The ratings assigned by Moody's to the offered certificates address the structural, legal and issuer-related aspects associated with the certificates, including the nature and quality of the underlying mortgage loans . . . Standard & Poor's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of distributions required under the pooling and servicing agreement." Prospectus Supplement at S-109, S-110.

    c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

    a.    The Prospectus Supplement represented (at S-32) that 1,612 loans (84.2%) were issued under full-documentation procedures.

    b.    "In most cases, under a traditional 'full documentation' program, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of bankruptcy." Prospectus at 19.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

    a.    "Credit enhancement for the offered certificates consists of: excess cash flow and overcollateralization; and subordination provided to the Class A Certificates by the Class M Certificates and the Class B Certificates, and subordination provided to the Class M Certificates by each class of Class M Certificates with a lower distribution priority and the Class B Certificates." Prospectus Supplement at S-1.

    b.    "The credit enhancement for the benefit of the offered certificates consists of: Excess Cash Flow. Because more interest with respect to the mortgage loans is

payable by the mortgagors than is expected to be necessary to pay the interest on the Class A, Class M and Class B Certificates each month and related expenses, there may be excess cash flow. Some of this excess cash flow may be used to protect the Class A, Class M and Class B Certificates against some realized losses by making an additional distribution of principal up to the amount of the realized losses. Overcollateralization. On each distribution date, to the extent not used to cover realized losses, excess cash flow will be used to pay principal to the Class A, Class M and Class B Certificates, to the extent necessary to reach the required overcollateralization amount for that distribution date. This overcollateralization may absorb some losses on the mortgage loans if not covered by excess cash flow." Prospectus Supplement at S-10.

**Exhibit J**
**Misrepresentations in the Offering Documents for RAMP 2004-RZ2**

**Collateral type:** Two groups of fixed-rate and adjustable-rate mortgage loans secured by first liens on one- to two- family residential properties.

**Initial number of mortgage loans:** Group I: 2,120. Group II: 1,132.

1.      **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.      "Evaluation Standards for Negotiated Conduit Asset Program Loans: Most negotiated conduit asset program loans are evaluated by Residential Funding Corporation to determine whether the characteristics of the loan, the borrower and the collateral, taken as a whole, represent a prudent lending risk. The factors considered include: the mortgage loan's payment terms and characteristics; the borrower's credit score; the value of the mortgaged property, which may be estimated using a broker's price opinion or a statistical valuation; the credit and legal documentation associated with the loan; the seasoning of the loan; an evaluation of the financial capacity, eligibility and experience of the seller and/or servicer of the loan; and the representations and warranties made by the seller. In most cases, Residential Funding Corporation orders an updated credit score for each loan reviewed. For seasoned loans, an updated credit score is ordered for the primary borrower as reported on the tape data or loan file submitted by the seller. Periodic quality control reviews are performed. Broker's price opinions are obtained if, among other reasons, the loan is delinquent or the principal balance of the mortgage loan exceeds $400,000. In addition, statistical property valuations and drive-by appraisals may be used, or a review may be done of the original appraisal." Prospectus at 23-24.

   b.      "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The depositor expects that any FHA loans or VA loans will have been originated in compliance with the underwriting policies of the FHA or VA, respectively." Prospectus at 18.

   c.      "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following: . . . [e]ach mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws . . . ." Prospectus Supplement at S-26.

d.    "The mortgage collateral sellers that participate in the Home Solution Program, referred to as Home Solution Program Sellers, have been selected by Residential Funding on the basis of various criteria set forth in Residential Funding's Home Solution Seller Guide. For those mortgage loans that Residential Funding purchased from Home Solution Program Sellers, each mortgage loan determined by Residential Funding to be acceptable for purchase would have been originated in accordance with, or would have been determined to be generally consistent with the provisions of, the Home Solutions Seller Guide." Prospectus Supplement at S-48.

e.    "All of the mortgage loans were originated and underwritten in accordance with the Home Solution Program. Prior to assignment to the Company, Residential Funding reviewed the underwriting of each of the mortgage loans and determined that it was in conformity with the standards set forth below." Prospectus Supplement at S-48.

f.    "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans: the creditworthiness of a mortgagor, the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations (including in certain instances rental income from investment property), and the adequacy of the mortgaged property (expressed in terms of Loan-to-Value Ratio), to serve as the collateral for a mortgage loan. In addition, Credit Scores are obtained and debt-to-income ratios are calculated and are considered in the underwriting of the loan." Prospectus Supplement at S-49.

g.    "Based on the data provided in the application, certain verifications, and the appraisal or appraisals of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan, including property taxes and standard hazard insurance, with at least $1,500 per month remaining." Prospectus Supplement at S-49; *see also* Prospectus at 21.

h.    "In general, these [automated] systems are programmed to review most of the information that is set forth in Residential Funding Corporation's underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 22.

i.    "Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the loans purchased by Residential Funding Corporation for conformity with Residential Funding Corporation's underwriting standards or applicable underwriting standards specified in this prospectus or the accompanying prospectus supplement, and to assess the likelihood of repayment of the loan from the various sources for such repayment, including the borrower, the mortgaged property, and primary mortgage insurance, if any . . . In reviewing seasoned loans, or loans that have been outstanding for more than 12 months, Residential Funding Corporation may take into consideration, in addition to or in lieu of the factors described above, the borrower's actual payment history in

assessing a borrower's current ability to make payments on the loan. In addition, Residential Funding Corporation may conduct additional procedures to assess the current value of the mortgaged properties. Those procedures may consist of statistical valuations, drive-by appraisals or real estate broker's price opinions. The depositor may also consider a specific area's housing value trends." Prospectus at 22.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "[A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards." Prospectus at 18.

3.    **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

   a.    The Prospectus Supplement represented (at S-34) that 1,767 loans (83.3%) of Group I Loans were for primary residences.

   b.    The Prospectus Supplement represented (at S-43) that 996 loans (88.0%) of Group II Loans were for primary residences.

   c.    Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

      i.    Of the 1,373 loans reviewed that were allegedly secured by owner-occupied properties, 78 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

      ii.    Of the 1,373 loans reviewed that were allegedly secured by owner-occupied properties, 101 were loans on which creditors reported a

different property address as the customer's mailing address six months after the origination of the securitized loan.

iii. Of the 1,373 loans reviewed that were allegedly secured by owner-occupied properties, 36 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

iv. Of the 1,373 loans reviewed that were allegedly secured by owner-occupied properties, 150 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

v. Of the 1,373 loans reviewed that were allegedly secured by owner-occupied properties, 271 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

vi. In sum, of the 1,373 loans reviewed that were allegedly secured by owner-occupied properties, a total of 142, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 11.2% of the Mortgage Loans that were tested.

4. **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a. The Prospectus Supplement represented (at S-32) that, for Group I Loans:

i. The weighted average LTV ratio was 102.49%;

ii. Only 1,260 loans (59.4%) had an LTV higher than 100%;

iii. No loan had an LTV higher than 107%.

b. The Prospectus Supplement represented (at S-41) that, for Group II Loans:

i. The weighted average LTV ratio was 101.47%;

ii. Only 550 loans (48.6%) had an LTV higher than 100%;

iii.    No loan had an LTV higher than 107%.

c.    "The adequacy at origination of a mortgaged property as security for repayment
of the related loan will typically have been determined by an appraisal . . . The
appraisal procedure guidelines in most cases will have required the appraiser or an
agent on its behalf to personally inspect the property and to verify whether the
property was in good condition and that construction, if new, had been
substantially completed. The appraisal will have considered a market data
analysis of recent sales of comparable properties and, when deemed applicable, an
analysis based on income generated from the property or replacement cost
analysis based on the current cost of constructing or purchasing a similar
property." Prospectus at 20.

d.    "The underwriting standards applied by an originator typically require that the
underwriting officers of the originator be satisfied that the value of the property
being financed . . . currently supports . . . and is anticipated to support in the
future, the outstanding loan balance." Prospectus at 21.

e.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
that the LTV ratios were higher than represented. Of the sampled loans that had
sufficient data to test:

i.    The weighted average LTV ratio was 104.03%.

ii.    62.31% of the loans had an LTV higher than 100%.

iii.    26.02% of the loans had an LTV that was at least 10% higher than those
loans supposedly had.

iv.    7.82% of the loans had an LTV that was at least 25% higher than those
loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the
borrower's income were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.*, ¶¶ 73-181. As the defendants systematically abandoned their
underwriting guidelines, the representations were baseless. Their falsity is confirmed by
a review of the defendants' loan files by their own insurer, and is further confirmed by
the rising delinquency rates for the Mortgage Loans, which shows borrowers were put
into loans they could not afford.

a.    "Based on the data provided in the application and certain verifications, if
required, and the appraisal or other valuation of the mortgaged property, a
determination will have been generally made by the original lender that the
borrower's monthly income would be sufficient to enable the borrower to meet its
monthly obligations on the loan and other expenses related to the property . . . The
originator's guidelines for loans will, in most cases, specify that scheduled
payments on a loan during the first year of its term plus taxes and insurance,
including primary mortgage insurance, and all scheduled payments on obligations

that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective borrower's gross income." Prospectus at 21.

b.  The Prospectus Supplement also gave specific representations as to the weighted average debt-to-income ratio. Prospectus Supplement at S-30, S-39.

6.  **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

a.  "When issued, the offered certificates will receive the ratings not lower than those listed on page S-6 of this prospectus supplement." Prospectus Supplement at S-13.

b.  "It is a condition of the issuance of the Class A Certificates that they be rated 'Aaa' by Moody's . . . and 'AAA' by Standard & Poor's . . . . The ratings assigned by Moody's to the offered certificates address the structural, legal and issuer-related aspects associated with the certificates, including the nature and quality of the underlying mortgage loans . . . Standard & Poor's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of distributions required under the pooling and servicing agreement." Prospectus Supplement at S-109, S-110.

c.  The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.  **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

a.  The Prospectus Supplement represented (at S-35) that 1,866 loans (88.0%) of Group I Loans were issued under full-documentation procedures.

b.  The Prospectus Supplement represented (at S-44) that 912 loans (80.6%) of Group II Loans were issued under full-documentation procedures.

c.  "In most cases, under a traditional 'full documentation' program, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the

borrower's available credit history with local merchants and lenders and any record of bankruptcy." Prospectus at 19.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for the offered certificates consists of: excess cash flow and overcollateralization; cross-collateralization; and two certificate guaranty insurance policies issued by Financial Guaranty Insurance Corporation." Prospectus Supplement at S-1.

b.    "The credit enhancement for the benefit of the offered certificates consists of: Excess Cash Flow. Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the Class A, Class M and Class B Certificates each month and related expenses, there may be excess cash flow. Some of this excess cash flow may be used to protect the Class A, Class M and Class B Certificates against some realized losses by making an additional distribution of principal up to the amount of the realized losses. Overcollateralization. On each distribution date, to the extent not used to cover realized losses, excess cash flow will be used to pay principal to the Class A, Class M and Class B Certificates, to the extent necessary to reach the required overcollateralization amount for that distribution date. This overcollateralization may absorb some losses on the mortgage loans if not covered by excess cash flow. Certificate Guaranty Insurance Policy. On the closing date, the certificate insurer will issue two certificate guaranty insurance policies in favor of the trustee, one policy for the benefit of the holders of the Class AI Certificates and the other policy for the benefit of the holders of the Class A-II Certificates. Each certificate guaranty insurance policy will unconditionally and irrevocably guarantee shortfalls in amounts available to pay the interest distribution amounts for the related offered certificates on any distribution date, will cover any losses allocated to the related offered certificates if not covered by excess cash flow, overcollateralization or the crosscollateralization described in this prospectus supplement and will guarantee amounts due on the related offered certificates, other than the Class A-IO Certificates, on the distribution date in July 2034. However, the certificate guaranty insurance policies will not provide coverage for some interest shortfalls as described in this prospectus supplement." Prospectus Supplement at S-12.

Amended Complaint                              J-7                              RAMP 2004-RZ2

**Exhibit K**
**Misrepresentations in the Offering Documents for RAMP 2005-RS4**

**Collateral type:**  Fixed-rate and adjustable-rate mortgage loans secured by first liens on one- to four- family residential properties.

**Initial number of mortgage loans:**  3,611.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "The mortgage loans included in the trust were acquired and evaluated under Residential Funding's 'Negotiated Conduit Asset Program' or NCA program.  For a description of the NCA program and the evaluation standards for mortgage loans acquired under this program, see 'Trust Asset Program—The Negotiated Conduit Asset Program' in the prospectus." Prospectus Supplement at S-37.

   b.    "Evaluation Standards for Negotiated Conduit Asset Program Loans:  Most negotiated conduit asset program loans are evaluated by Residential Funding Corporation to determine whether the characteristics of the loan, the borrower and the collateral, taken as a whole, represent a prudent lending risk.  The factors considered include:  the mortgage loan's payment terms and characteristics; the borrower's credit score; the value of the mortgaged property, which may be estimated using a broker's price opinion or a statistical valuation; the credit and legal documentation associated with the loan; the seasoning of the loan; an evaluation of the financial capacity, eligibility and experience of the seller and/or servicer of the loan; and the representations and warranties made by the seller. In most cases, Residential Funding Corporation orders an updated credit score for each loan reviewed. For seasoned loans, an updated credit score is ordered for the primary borrower as reported on the tape data or loan file submitted by the seller. Periodic quality control reviews are performed.  Broker's price opinions are obtained if, among other reasons, the loan is delinquent or the principal balance of the mortgage loan exceeds $400,000.  In addition, statistical property valuations and drive-by appraisals may be used, or a review may be done of the original appraisal." Prospectus at 23-24.

   c.    "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The depositor expects that any FHA loans or VA loans will have been originated in compliance with the underwriting policies of the FHA or VA, respectively." Prospectus at 18.

d.  "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following: . . . [e]ach mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws . . ." Prospectus Supplement at S-36.

e.  "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property." Prospectus at 22.

f.  "In general, these [automated] systems are programmed to review most of the information that is set forth in Residential Funding Corporation's underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 23.

g.  "Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the loans purchased by Residential Funding Corporation for conformity with Residential Funding Corporation's underwriting standards or applicable underwriting standards specified in this prospectus or the accompanying prospectus supplement, and to assess the likelihood of repayment of the loan from the various sources for such repayment, including the borrower, the mortgaged property, and primary mortgage insurance, if any . . . In reviewing seasoned loans, or loans that have been outstanding for more than 12 months, Residential Funding Corporation may take into consideration, in addition to or in lieu of the factors described above, the borrower's actual payment history in assessing a borrower's current ability to make payments on the loan. In addition, Residential Funding Corporation may conduct additional procedures to assess the current value of the mortgaged properties. Those procedures may consist of statistical valuations, drive-by appraisals or real estate broker's price opinions. The depositor may also consider a specific area's housing value trends." Prospectus at 23.

2.  **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.  "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." Prospectus at 19.

3.    **All of the following representations regarding whether the mortgaged property was
owner-occupied were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact
owner-occupied, and the defendants omitted that the given statistics were (due to their
abandonment of their underwriting standards) baseless. This is evidenced by a statistical
analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

    a.    The Prospectus Supplement represented (at S-29) that 2,676 loans (74.1%) were
for primary residences.

    b.    Allstate's subsequent loan-level analysis has determined that the defendants
drastically overstated the percentage of owner-occupied properties secured by the
Mortgage Loans.

        i.    Of the 1,160 loans reviewed that were allegedly secured by owner-
occupied properties, 79 were loans on which the owner of the property
instructed tax authorities to send property tax bills to a different address,
or listed a different address as the one for the property owner's property
tax exemption.

        ii.    Of the 1,160 loans reviewed that were allegedly secured by owner-
occupied properties, 101 were loans on which creditors reported a
different property address as the customer's mailing address six months
after the origination of the securitized loan.

        iii.    Of the 1,160 loans reviewed that were allegedly secured by owner-
occupied properties, 41 were loans on which the borrower owned other
properties during the same time period of ownership as the securitized
property.

        iv.    Of the 1,160 loans reviewed that were allegedly secured by owner-
occupied properties, 149 were loans on which other properties owned by
the borrower did not list the securitized property as the owner's primary
residence.

        v.    Of the 1,160 loans reviewed that were allegedly secured by owner-
occupied properties, 280 were loans on which other properties owned by
the borrower had liens that did not list the securitized property as the
owner's primary residence.

        vi.    In sum, of the 1,160 loans reviewed that were allegedly secured by owner-
occupied properties, a total of 155, non-duplicative, appear to be not
owner-occupied based on their failure of at least two of Allstate's
analytical tests. This represents 13.4% of the Mortgage Loans that were
tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The

defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a.    The Prospectus Supplement represented (at S-27) that:

    i.    The weighted average LTV ratio was 93.55%;

    ii.    Only 81 loans (2.24%) had an LTV higher than 100%.

    iii.    No loan had an LTV higher than 110%.

b.    "The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal . . . The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." Prospectus at 20.

c.    "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . currently supports . . . and is anticipated to support in the future, the outstanding loan balance." Prospectus at 20.

d.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

    i.    The weighted average LTV ratio was 100.07%.

    ii.    46.31% of the loans had an LTV higher than 100%.

    iii.    30.42% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

    iv.    10.22% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by

a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

    a.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property . . . The originator's guidelines for loans will, in most cases, specify that scheduled payments on a loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective borrower's gross income." Prospectus at 22.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

    a.    "When issued, the offered certificates will receive ratings which are not lower than those listed in the table on page S-6 of this prospectus supplement." Prospectus Supplement at S-11.

    b.    "It is a condition of the issuance of the Class A Certificates that they be rated 'Aaa' by Moody's . . . The rating assigned by Moody's to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement . . . The ratings assigned by Fitch to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Fitch's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement." Prospectus Supplement at S-101, 102.

    c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

a.    The Prospectus Supplement represented (at S-29) that 2,707 loans (75%) were
      issued under full-documentation procedures.

b.    "In most cases, under a traditional 'full documentation' program, each borrower
      will have been required to complete an application designed to provide to the
      original lender pertinent credit information concerning the borrower. As part of
      the description of the borrower's financial condition, the borrower will have
      furnished information, which may or may not be verified, describing the
      borrower's assets, liabilities, income, credit history and employment history, and
      furnished an authorization to apply for a credit report that summarizes the
      borrower's available credit history with local merchants and lenders and any
      record of bankruptcy." Prospectus at 19.

8.    **All of the following misrepresentations regarding credit enhancements were false
      and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
      confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
      here, the collateral was significantly riskier than presented, rendering representations
      regarding the efficacy or sufficiency of any structural 'credit enhancements' that
      depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for the offered certificates consists of: excess cash flow and
      overcollateralization; a swap agreement for the Class A, Class M and Class B
      Certificates; and subordination provided to the Class A Certificates by the Class
      M Certificates and Class B Certificates, and subordination provided to the Class
      M Certificates by each class of Class M Certificates with a lower payment priority
      and the Class B Certificates." Prospectus Supplement at S-1.

b.    "The credit enhancement for the benefit of the offered certificates consists of:
      Excess Cash Flow. Because more interest with respect to the mortgage loans is
      payable by the mortgagors than is expected to be necessary to pay the interest on
      the Class A, Class M and Class B Certificates each month and related expenses,
      there may be excess cash flow. Some of this excess cash flow may be used to
      protect the Class A, Class M and Class B Certificates against some realized losses
      by making an additional distribution of principal up to the amount of the realized
      losses. Overcollateralization. On each distribution date, to the extent not used to
      cover realized losses, excess cash flow will be used to pay principal to the Class
      A, Class M and Class B Certificates, to the extent necessary to reach the required
      overcollateralization amount for that distribution date. This overcollateralization
      may absorb some losses on the mortgage loans if not covered by excess cash
      flow. Subordination. Except as described below, if the Class B Certificates
      remain outstanding, losses on the mortgage loans which are not covered by the
      swap agreement, excess cash flow or overcollateralization will be allocated to the
      class of Class B Certificates with the lowest payment priority, and the other
      classes of certificates will not bear any portion of such losses. If none of the Class
      B Certificates are outstanding and Class M Certificates remain outstanding, all
      such losses will be allocated to the Class M Certificates with the lowest payment
      priority, and the other classes of certificates will not bear any portion of such

losses. If none of the Class B Certificates are outstanding and none of the Class M
Certificates are outstanding, all such losses will be allocated to the Class A
Certificates as described in this prospectus supplement. <u>The Swap Agreement</u>.
The holders of the Class A, Class M and Class B Certificates will benefit from a
swap agreement." Prospectus Supplement at S-10.

**Exhibit L**
**Misrepresentations in the Offering Documents for RAMP 2006-RS3**

**Collateral type:**  Fixed-rate and adjustable-rate mortgage loans secured by first liens on one- to four- family residential properties.

**Initial number of mortgage loans: 3,499.**

1.      **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

       a.      "Evaluation Standards for Negotiated Conduit Asset Program Loans:  Most negotiated conduit asset program loans are evaluated by Residential Funding Corporation to determine whether the characteristics of the loan, the borrower and the collateral, taken as a whole, represent a prudent lending risk.  The factors considered include:  the mortgage loan's payment terms and characteristics; the borrower's credit score; the value of the mortgaged property, which may be estimated using a broker's price opinion or a statistical valuation; the credit and legal documentation associated with the loan; the seasoning of the loan; an evaluation of the financial capacity, eligibility and experience of the seller and/or servicer of the loan; and the representations and warranties made by the seller. In most cases, Residential Funding Corporation orders an updated credit score for each loan reviewed.  For seasoned loans, an updated credit score is ordered for the primary borrower as reported on the tape data or loan file submitted by the seller.  Periodic quality control reviews are performed.  Broker's price opinions are obtained if, among other reasons, the loan is delinquent or the principal balance of the mortgage loan exceeds $400,000.  In addition, statistical property valuations and drive-by appraisals may be used, or a review may be done of the original appraisal."  Prospectus at 25.

       b.      "All of the mortgage loans in the mortgage pool were originated generally in accordance with the underwriting criteria of Residential Funding described under '—The Negotiated Conduit Asset Program' in this prospectus supplement.  Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase as described under 'Trust Asset Program' in the accompanying prospectus.  The underwriting standards include a set of specific criteria by which the underwriting evaluation is made."  Prospectus Supplement at S-46.

       c.      "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The

depositor expects that any FHA loans or VA loans will have been originated in compliance with the underwriting policies of the FHA or VA, respectively." Prospectus at 20.

d.    "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following: . . . [e]ach mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws . . . ." Prospectus Supplement at S-43.

e.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property." Prospectus at 23.

f.    "In general, these [automated] systems are programmed to review most of the information that is set forth in Residential Funding Corporation's underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 24.

g.    "Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the loans purchased by Residential Funding Corporation for conformity with Residential Funding Corporation's underwriting standards or applicable underwriting standards specified in this prospectus or the accompanying prospectus supplement, and to assess the likelihood of repayment of the loan from the various sources for such repayment, including the borrower, the mortgaged property, and primary mortgage insurance, if any . . . In reviewing seasoned loans, or loans that have been outstanding for more than 12 months, Residential Funding Corporation may take into consideration, in addition to or in lieu of the factors described above, the borrower's actual payment history in assessing a borrower's current ability to make payments on the loan. In addition, Residential Funding Corporation may conduct additional procedures to assess the current value of the mortgaged properties. Those procedures may consist of statistical valuations, drive-by appraisals or real estate broker's price opinions. The depositor may also consider a specific area's housing value trends." Prospectus at 24.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.    "[A] mortgage loan may be considered to comply with the underwriting standards described below, even if one or more specific criteria included in the underwriting

standards were not satisfied, if other factors positively compensated for the
criteria that were not satisfied." Prospectus Supplement at S-46; *see also*
Prospectus at 20.

3.  **All of the following representations regarding whether the mortgaged property was
    owner-occupied were false and misleading for the reasons set forth in the
    Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact
    owner-occupied, and the defendants omitted that the given statistics were (due to their
    abandonment of their underwriting standards) baseless. This is evidenced by Allstate's
    analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were
    generated and underwritten by the same defendants, at the same time, purportedly using
    the same procedures as those represented in this offering.

    a.  The Prospectus Supplement represented (at II-5) that 2,012 loans (57.5%) were
        for primary residences.

    b.  Allstate's subsequent loan-level analysis has determined that the defendants
        drastically overstated the percentage of owner-occupied properties secured by the
        Mortgage Loans.

        i.    Of the 976 loans reviewed that were allegedly secured by owner-occupied
              properties, 78 were loans on which the owner of the property instructed
              tax authorities to send property tax bills to a different address, or listed a
              different address as the one for the property owner's property tax
              exemption.

        ii.   Of the 976 loans reviewed that were allegedly secured by owner-occupied
              properties, 101 were loans on which creditors reported a different property
              address as the customer's mailing address six months after the origination
              of the securitized loan.

        iii.  Of the 976 loans reviewed that were allegedly secured by owner-occupied
              properties, 36 were loans on which the borrower owned other properties
              during the same time period of ownership as the securitized property.

        iv.   Of the 976 loans reviewed that were allegedly secured by owner-occupied
              properties, 150 were loans on which other properties owned by the
              borrower did not list the securitized property as the owner's primary
              residence.

        v.    Of the 976 loans reviewed that were allegedly secured by owner-occupied
              properties, 271 were loans on which other properties owned by the
              borrower had liens that did not list the securitized property as the owner's
              primary residence.

        vi.   In sum, of the 976 loans reviewed that were allegedly secured by owner-
              occupied properties, a total of 149, non-duplicative, appear to be not
              owner-occupied based on their failure of at least two of Allstate's

analytical tests. This represents 15.3% of the Mortgage Loans that were
tested.

4.  **All of the following representations regarding the loan-to-value ratios were false and
    misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The
    defendants knowingly used inflated appraisal values and excluded additional liens in
    order to get more loans approved. This is evidenced by Allstate's analysis of 30,000
    Mortgage Loans discussed herein and in the Complaint, which were generated and
    underwritten by the same defendants, at the same time, purportedly using the same
    procedures as those represented in this offering. This is further evidenced by testimony
    regarding the rampant conflicts of interest within the appraisal process at the time the
    Certificates were issued.

    a.  The Prospectus Supplement represented (at II-3) that:

        i.    The weighted average LTV ratio was 80.22%;

        ii.   Only 1,279 loans (36.5%) had an LTV higher than 80%;

        iii.  Only 495 loans (14.14%) had an LTV higher than 90%;

        iv.   No loan had an LTV higher than 95%.

    b.  "The adequacy at origination of a mortgaged property as security for repayment
        of the related loan will typically have been determined by an appraisal . . . The
        appraisal procedure guidelines in most cases will have required the appraiser or an
        agent on its behalf to personally inspect the property and to verify whether the
        property was in good condition and that construction, if new, had been
        substantially completed. The appraisal will have considered a market data
        analysis of recent sales of comparable properties and, when deemed applicable, an
        analysis based on income generated from the property or replacement cost
        analysis based on the current cost of constructing or purchasing a similar
        property." Prospectus at 21.

    c.  "The underwriting standards applied by an originator typically require that the
        underwriting officers of the originator be satisfied that the value of the property
        being financed . . . currently supports . . . and is anticipated to support in the
        future, the outstanding loan balance." Prospectus at 22.

    d.  Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
        that the LTV ratios were higher than represented. Of the sampled loans that had
        sufficient data to test:

        i.    The weighted average LTV ratio was 92.07%.

        ii.   71.63% of the loans had an LTV higher than 80%.

        iii.  44.43% of the loans had an LTV higher than 90%.

iv.    23.25% of the loans had an LTV higher than 100%.

v.    33.10% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

vi.    12.71% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property . . . The originator's guidelines for loans will, in most cases, specify that scheduled payments on a loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective borrower's gross income." Prospectus at 23.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

a.    "When issued, the offered certificates will receive the ratings listed on page S-6 of this prospectus supplement." Prospectus Supplement at S-14.

b.    "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement by Moody's . . . Standard & Poor's . . . and Fitch Ratings . . . The ratings assigned by Moody's to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement . . . The ratings assigned by Fitch to the offered certificates address the likelihood of the receipt by the offered certificateholders of all distributions to which they are entitled under the transaction structure. Fitch's ratings reflect its

Amended Complaint                        L-5                        RAMP 2006-RS3

analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the operative documents . . . Standard & Poor's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement." Prospectus Supplement at S-118.

    c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

    a.    The Prospectus Supplement represented (at II-5) that 723 loans (20.7%) were issued under full-documentation procedures.

    b.    "In most cases, under a traditional 'full documentation' program, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of bankruptcy." Prospectus at 21.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

    a.    "Credit enhancement for the offered certificates consists of: excess cash flow from the mortgage loans and overcollateralization; a mortgage pool insurance policy; and subordination provided to the Class A Certificates by the Class M Certificates and Class B Certificates, and subordination provided to the Class M Certificates by each class of Class M Certificates with a lower payment priority. The trust will also enter into a swap agreement for the Class A Certificates and Class M Certificates." Prospectus Supplement at S-1.

    b.    "The credit enhancement for the benefit of the offered certificates consists of: <u>Excess Cash Flow</u>. Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the Class A, Class M and Class B Certificates each month and related expenses, there may be excess cash flow. Some of this excess cash flow may be used to

protect the Class A, Class M and Class B Certificates against some realized losses
by making an additional distribution of principal up to the amount of the realized
losses. <u>Overcollateralization</u>. On each distribution date, to the extent not used to
cover realized losses, excess cash flow will be used to pay principal to the Class
A, Class M and Class B Certificates, to the extent necessary to reach the required
overcollateralization amount for that distribution date. This overcollateralization
may absorb some losses on the mortgage loans if not covered by excess cash
flow. <u>Subordination</u>. If the Class M Certificates remain outstanding, losses on
the mortgage loans which are not covered by amounts received under the swap
agreement, excess cash flow or overcollateralization, as and to the extent
described in this prospectus supplement, will be allocated to the class of Class M
Certificates with the lowest payment priority, and the other classes of offered
certificates will not bear any portion of such losses . . . . <u>Mortgage Pool Policy</u>
<u>Mortgage Pool Policy</u>: The mortgage loans will be insured by a mortgage pool
insurance policy issued by the pool insurer. Such policy will cover losses on the
mortgage loans to the extent that such losses exceed 3.6% of the aggregate
principal balance . . . <u>The Swap Agreement</u>. The holders of the offered
certificates will benefit from any payments made by the swap counterparty under
a swap agreement." Prospectus Supplement at S-12.

**Exhibit M**

**Misrepresentations in the Offering Documents for RAMP 2006-RZ3**

**Collateral type:** Fixed-rate and adjustable-rate mortgage loans secured by first liens on one- to four- family residential properties.

**Initial number of mortgage loans:** 4,596.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.    "Evaluation Standards for Negotiated Conduit Asset Program Loans: Most negotiated conduit asset program loans are evaluated by Residential Funding Corporation to determine whether the characteristics of the loan, the borrower and the collateral, taken as a whole, represent a prudent lending risk. The factors considered include: the mortgage loan's payment terms and characteristics; the borrower's credit score; the value of the mortgaged property, which may be estimated using a broker's price opinion or a statistical valuation; the credit and legal documentation associated with the loan; the seasoning of the loan; an evaluation of the financial capacity, eligibility and experience of the seller and/or servicer of the loan; and the representations and warranties made by the seller. In most cases, Residential Funding Corporation orders an updated credit score for each loan reviewed. For seasoned loans, an updated credit score is ordered for the primary borrower as reported on the tape data or loan file submitted by the seller. In addition, statistical property valuations and drive-by appraisals may be used, or a review may be done of the original appraisal." Prospectus at 25-26.

    b.    "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. The depositor expects that any FHA loans or VA loans will have been originated in compliance with the underwriting policies of the FHA or VA, respectively." Prospectus at 20.

    c.    "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following: . . . [e]ach mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws . . . ." Prospectus Supplement at S-38.

d.    "All of the mortgage loans were originated in accordance with the underwriting
standards of Residential Funding as described under '—Underwriting Standards'
above." Prospectus Supplement at S-42.

e.    "Prior to assignment to the Company, Residential Funding reviewed the
underwriting of each of the mortgage loans and determined that it was in
conformity with the standards set forth below . . . ." Prospectus Supplement at S-
40.

f.    "Residential Funding's underwriting of the mortgage loans generally consisted of
analyzing the following as standards applicable to the mortgage loans:  the
creditworthiness of a mortgagor, the income sufficiency of a mortgagor's
projected family income relative to the mortgage payment and to other fixed
obligations (including in certain instances rental income from investment
property), and the adequacy of the mortgaged property (expressed in terms of
Loan-to-Value Ratio), to serve as the collateral for a mortgage loan.  In addition,
Credit Scores are obtained and debt-to-income ratios are calculated and are
considered in the underwriting of the loan." Prospectus Supplement at S-41.

g.    "Based on the data provided in the application and certain verifications, if
required, and the appraisal or other valuation of the mortgaged property, a
determination will have been generally made by the original lender that the
borrower's monthly income would be sufficient to enable the borrower to meet its
monthly obligations on the loan and other expenses related to the property."
Prospectus at 23.

h.    "In general, these [automated] systems are programmed to review most of the
information that is set forth in Residential Funding Corporation's underwriting
criteria that is necessary to satisfy each underwriting program." Prospectus at 24.

i.    "Residential Funding Corporation, on behalf of the depositor, typically will
review a sample of the loans purchased by Residential Funding Corporation for
conformity with Residential Funding Corporation's underwriting standards or
applicable underwriting standards specified in this prospectus or the
accompanying prospectus supplement, and to assess the likelihood of repayment
of the loan from the various sources for such repayment, including the borrower,
the mortgaged property, and primary mortgage insurance, if any . . . In reviewing
seasoned loans, or loans that have been outstanding for more than 12 months,
Residential Funding Corporation may take into consideration, in addition to or in
lieu of the factors described above, the borrower's actual payment history in
assessing a borrower's current ability to make payments on the loan.  In addition,
Residential Funding Corporation may conduct additional procedures to assess the
current value of the mortgaged properties.  Those procedures may consist of
statistical valuations, drive-by appraisals or real estate broker's price opinions.
The depositor may also consider a specific area's housing value trends."
Prospectus at 24.

2.    **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

    a.    "[A] loan may be considered to comply with the underwriting standards, even if
one or more specific criteria included in the underwriting standards were not
satisfied, if other factors compensated for the criteria that were not satisfied or if
the loan is considered to be in substantial compliance with the underwriting
standards." Prospectus at 20.

3.    **All of the following representations regarding whether the mortgaged property was
owner-occupied were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact
owner-occupied, and the defendants omitted that the given statistics were (due to their
abandonment of their underwriting standards) baseless. This is evidenced by Allstate's
analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were
generated and underwritten by the same defendants, at the same time, purportedly using
the same procedures as those represented in this offering.

    a.    The Prospectus Supplement represented (at III-5) that 3,683 loans (80.1%) were
for primary residences.

    b.    Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized
by the same parties at the same time using similar disclosures, on information and
belief the true rate of owner occupancy was only 69.9% i.e., the Offering
Materials overstated the amount of owner occupancy by 10.2%.

4.    **All of the following representations regarding the loan-to-value ratios were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The
defendants knowingly used inflated appraisal values and excluded additional liens in
order to get more loans approved. This is evidenced by Allstate's analysis of 30,000
Mortgage Loans discussed herein and in the Complaint, which were generated and
underwritten by the same defendants, at the same time, purportedly using the same
procedures as those represented in this offering. This is further evidenced by testimony
regarding the rampant conflicts of interest within the appraisal process at the time the
Certificates were issued.

    a.    The Prospectus Supplement represented (at III-3) that:

        i.    The weighted average LTV ratio was 100.25%;

        ii.    Only 379 loans (8.25%) had an LTV higher than 100%;

        iii.    No loan had an LTV higher than 107%.

b.    "The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal . . . The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." Prospectus at 21.

c.    "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . currently supports . . . and is anticipated to support in the future, the outstanding loan balance." Prospectus at 22-23.

d.    Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i.    The weighted average LTV ratio was understated by 7.57%.

    ii.    The number of loans that had an LTV higher than 100% was understated by 18.11%.

    iii.    33.60% of the loans had an LTV that was at least 10% higher than those loans supposedly had.

    iv.    10.18% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income, if required to be stated, would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property . . . . The originator's guidelines for loans will, in most cases, specify that scheduled payments on a loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned

above and other fixed obligations, would equal no more than specified
percentages of the prospective borrower's gross income." Prospectus at 23.

6.    **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

   a.    "When issued, the offered certificates will receive the ratings listed on page S-6 of
this prospectus supplement." Prospectus Supplement at S-13.

   b.    "It is a condition of the issuance of the offered certificates that they be rated as
indicated on page S-6 of this prospectus supplement by Moody's . . . Standard &
Poor's . . . and Fitch Ratings . . . The ratings assigned by Moody's to the offered
certificates address the likelihood of the receipt by the offered certificateholders
of all distributions to which they are entitled under the pooling and servicing
agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage
loans and the structure of the transaction as described in the pooling and servicing
agreement . . . The ratings assigned by Fitch to the offered certificates address the
likelihood of the receipt by the offered certificateholders of all distributions to
which they are entitled under the transaction structure. Fitch's ratings reflect its
analysis of the riskiness of the mortgage loans and the structure of the transaction
as described in the operative documents." Prospectus Supplement at S-103.

   c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.    **All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

   a.    The Prospectus Supplement represented (at S-9) that 3,549 loans (77.2%) were
issued under full documentation procedures.

   b.    "In most cases, under a traditional 'full documentation' program, each borrower
will have been required to complete an application designed to provide to the
original lender pertinent credit information concerning the borrower. As part of
the description of the borrower's financial condition, the borrower will have
furnished information, which may or may not be verified, describing the
borrower's assets, liabilities, income, credit history and employment history, and
furnished an authorization to apply for a credit report that summarizes the
borrower's available credit history with local merchants and lenders and any
record of bankruptcy." Prospectus at 21.

8.    **All of the following misrepresentations regarding credit enhancements were false
and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As

confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for the offered certificates consists of: excess cash flow from the mortgage loans and overcollateralization; a mortgage pool insurance policy; and subordination provided to the Class A Certificates by the Class M Certificates and Class B Certificates, and subordination provided to the Class M Certificates by each class of Class M Certificates with a lower payment priority. The trust will also enter into a swap agreement for the Class A Certificates and Class M Certificates." Prospectus Supplement at S-1.

b.    "The credit enhancement for the benefit of the offered certificates consists of: Excess Cash Flow. Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the Class A, Class M and Class B Certificates each month and related expenses, there may be excess cash flow. Some of this excess cash flow may be used to protect the Class A, Class M and Class B Certificates against some realized losses by making an additional distribution of principal up to the amount of the realized losses. Overcollateralization. On each distribution date, to the extent not used to cover realized losses, excess cash flow will be used to pay principal to the Class A, Class M and Class B Certificates, to the extent necessary to reach the required overcollateralization amount for that distribution date. This overcollateralization may absorb some losses on the mortgage loans if not covered by excess cash flow. Subordination. So long as the Class M Certificates remain outstanding, losses on the mortgage loans which are not covered by amounts received under the swap agreement, excess cash flow or overcollateralization, as and to the extent described in this prospectus supplement, will be allocated to the class of Class M Certificates with the lowest payment priority, and the other classes of offered certificates will not bear any portion of such losses . . . . The Yield Maintenance Agreement: The holders of the Class A Certificates and Class M Certificates may benefit from a series of interest rate cap payments from the yield maintenance agreement provider pursuant to a yield maintenance agreement as described in this prospectus supplement. Any amounts received by the trust under the yield maintenance agreement will be distributed as part of excess cash flow as and to the extent described under '—Excess Cash Flow and Overcollateralization.'" Prospectus Supplement at S-12.

<u>Exhibit N</u>
<u>Misrepresentations in the Offering Documents for RASC 2005-KS3</u>

**Collateral type:** Fixed and adjustable-rate loans secured by first or second liens on one- to four-family residential properties.

**Initial number of home equity loans:** 3,089.

1.     **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

     a.     "The depositor's underwriting standards with respect to AlterNet loans and Credit Gap loans will in most cases conform to those published in Residential Funding Corporation's Client Guide . . ." Prospectus at 18.

     b.     "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates . . . [e]ach mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-21.

     c.     "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner." Prospectus Supplement at S-22.

     d.     "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:  the creditworthiness of a mortgagor; the income sufficiency of a mortgagor's projected family income; relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and; the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan." Prospectus Supplement at S-39.

     e.     "Residential Funding has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors . . . For those mortgage loans that Residential Funding purchased from sellers in this program, each mortgage loan determined by Residential Funding to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." Prospectus Supplement at S-42.

f.    "Prior to assignment to the depositor, Residential Funding reviewed the
underwriting standards for the mortgage loans and purchased all the mortgage
loans from mortgage collateral sellers who participated in or whose loans were in
substantial conformity with the standards set forth in Residential Funding's
AlterNet Program or which are otherwise in conformity with the standards set
forth in the description of credit grades set forth in this prospectus supplement."
Prospectus Supplement at S-38.

g.    "[I]n most cases Residential Funding Corporation will generally represent and
warrant that as of the cut-off date, the information described in a listing of the
related mortgage loan or contract was true and correct in all material respects . . ."
Prospectus at 22.

h.    "The underwriting standards with respect to AlterNet loans and Credit Gap loans
will, in most cases, conform to those published in Residential Funding
Corporation's Client Guide . . . ." Prospectus at 18.

i.    "Residential Funding Corporation underwrites many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems.  In
general, these systems are programmed to review most of the information that is
set forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria that is necessary to satisfy each underwriting program." Prospectus at 19.

j.    "Generally, each mortgagor would have been required to complete an application
designed to provide to the original lender pertinent credit information concerning
the mortgagor.  As part of the description of the mortgagor's financial condition,
each mortgagor would have been required to furnish information with respect to
the mortgagor's assets, liabilities, income, credit history, employment history and
personal information, and furnished an authorization to apply for a credit report
which summarized the borrower's credit history with local merchants and lenders
and any record of bankruptcy." Prospectus Supplement at S-39.

k.    "Residential Funding Corporation, on behalf of the depositor, typically will
review a sample of the mortgage loans purchased by Residential Funding
Corporation for conformity with the applicable underwriting standards and to
assess the likelihood of repayment of the mortgage loan from the various sources
for such repayment, including the mortgagor, the mortgaged property, and
primary mortgage insurance, if any." Prospectus at 16.

2.    **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors.  This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.  "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification. Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted. Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." Prospectus Supplement at S-40.

b.  "The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors. Examples of compensating factors include strong residual income, strong prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." Prospectus Supplement at S-42.

3.  **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

a.  The Prospectus Supplement represented (at S-33) that 2,814 loans (91.1%) were for primary residences.

b.  Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

   i.  Of the 1,468 loans reviewed that were allegedly secured by owner-occupied properties, 115 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

   ii.  Of the 1,468 loans reviewed that were allegedly secured by owner-occupied properties, 117 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

   iii.  Of the 1,468 loans reviewed that were allegedly secured by owner-occupied properties, 35 were loans on which the borrower owned other

properties during the same time period of ownership as the securitized
property.

    iv.    Of the 1,468 loans reviewed that were allegedly secured by owner-
occupied properties, 213 were loans on which other properties owned by
the borrower did not list the securitized property as the owner's primary
residence.

    v.    Of the 1,468 loans reviewed that were allegedly secured by owner-
occupied properties, 121 were loans on which other properties owned by
the borrower had liens that did not list the securitized property as the
owner's primary residence.

    vi.    In sum, of the 1,468 loans reviewed that were allegedly secured by owner-
occupied properties, a total of 168, non-duplicative, appear to be not
owner-occupied based on their failure of at least two of Allstate's
analytical tests. This represents 11.4% of the Mortgage Loans that were
tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. The
defendants knowingly used inflated appraisal values and excluded additional liens in
order to get more loans approved. This is evidenced by Allstate's analysis of 30,000
Mortgage Loans discussed herein and in the Complaint, which were generated and
underwritten by the same defendants, at the same time, purportedly using the same
procedures as those represented in this offering. This is further evidenced by testimony
regarding the rampant conflicts of interest within the appraisal process at the time the
Certificates were issued.

    a.    The Prospectus Supplement represented (at S-31) that:

        i.    The weighted average LTV ratio was 82.31%.

        ii.    Only 1,197 loans (38.7%) had an LTV higher than 80%.

        iii.    Only 588 loans (19.04%) had an LTV higher than 90%.

        iv.    No loan had an LTV higher than 100%.

    b.    "The appraisal procedure guidelines generally will have required the appraiser or
an agent on its behalf to personally inspect the property and to verify whether the
property was in good condition and that construction, if new, had been
substantially completed. The appraisal would have considered a market data
analysis of recent sales of comparable properties and, when deemed applicable, an
analysis based on income generated from the property or replacement cost
analysis based on the current cost of constructing or purchasing a similar
property." Prospectus Supplement at S-40.

c. "Under Credit Grade Category A4 . . . [a] maximum LTV ratio of 95% is
permitted for a mortgage loan on a single family owner-occupied property or 80%
for a mortgage loan originated under a stated income documentation program. A
maximum LTV ratio of 90% is permitted for a mortgage loan on a non-owner
occupied property or 70% for mortgage loans originated under a stated income
documentation program . . . Under Credit Category Ax . . . [a] maximum LTV
ratio of 90% is permitted for a mortgage loan on a single family owner-occupied
property or 85% for a mortgage loan originated under a stated income
documentation program . . ." Prospectus Supplement at S-40, S-41.

d. "The underwriting standards applied by an originator typically require that the
underwriting officers of the originator be satisfied that the value of the property
being financed, as indicated by an appraisal or other acceptable valuation method
as described below, currently supports and is anticipated to support in the future
the outstanding loan balance." Prospectus at 16.

e. Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
that the LTV ratios were higher than represented. Of the sampled loans that had
sufficient data to test:

   i. The weighted average LTV ratio was 89.09%.

   ii. 68.77% of the loans had an LTV higher than 80%.

   iii. 47.65% of the loans had an LTV higher than 90%.

   iv. 24.49% of the loans had an LTV higher than 100%.

   v. 33.87% of the loans had an LTV that was at least 10% higher than those
   loans supposedly had.

   vi. 9.09% of the loans had an LTV that was at least 25% higher than those
   loans supposedly had.

5. **All of the following representations regarding the purported sufficiency of the
borrower's income were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their
underwriting guidelines, the representations were baseless. Their falsity is confirmed by
a review of the defendants' loan files by their own insurer, and is further confirmed by
the rising delinquency rates for the Mortgage Loans, which shows borrowers were put
into loans they could not afford.

a. "Residential Funding's underwriting of the mortgage loans generally consisted of
analyzing the following as standards applicable to the mortgage loans" including
"the income sufficiency of a mortgagor's projected family income relative to the
mortgage payment and to other fixed obligations, including in certain instances
rental income from investment property." Prospectus Supplement at S-38.

b.  "Based on the data provided in the application and certain verifications, if
    required, and the appraisal or other valuation of the mortgaged property, a
    determination will have been made by the original lender that the mortgagor's
    monthly income would be sufficient to enable the mortgagor to meet its monthly
    obligations on the mortgage loan and other expenses related to the property.
    Examples of other expenses include property taxes, utility costs, standard hazard
    and primary mortgage insurance, maintenance fees and other levies assessed by a
    Cooperative, if applicable, and other fixed obligations other than housing
    expenses including, in the case of junior mortgage loans, payments required to be
    made on any senior mortgage." Prospectus at 16.

c.  "Once all applicable employment, credit and property information is received, a
    determination is made as to whether the prospective borrower has sufficient
    monthly income available to meet the borrower's monthly obligations on the
    proposed mortgage loan and other expenses related to the home, including
    property taxes and hazard insurance, and other financial obligations and monthly
    living expenses." Prospectus at 18.

6.  **All of the following representations regarding the credit ratings were false and
    misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181.  Unknown
    to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
    as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
    ratings relied upon meaningless.

a.  "It is a condition of the issuance of the offered certificates that they be rated as
    indicated on page S-6 of this prospectus supplement by Standard & Poor's and
    Moody's . . . . A securities rating addresses the likelihood of the receipt by the
    holders of the offered certificates of distributions on the mortgage loan."
    Prospectus Supplement at S-104.

b.  The initial ratings for the Certificates Allstate purchased are contained in Exhibit
    C.

7.  **All of the following representations regarding the documentation basis for the loans
    were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶
    73-181.  A review by the defendants' own insurer found many files incomplete, and
    Residential Funding itself has accused its originators of using incomplete loan files.

a.  The Prospectus Supplement represented (at S-33) that 2,214 loans (71.7%) were
    originated under full documentation procedures.

8.  **All of the following misrepresentations regarding credit enhancements were false
    and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181.  As
    confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
    here, the collateral was significantly riskier than presented, rendering representations
    regarding the efficacy or sufficiency of any structural 'credit enhancements' that
    depended on or were derived from the quality of those loans false and misleading.

a.  "Credit enhancement for the offered certificates consists of: excess cash flow
    from the mortgage loans and overcollateralization; and subordination provided to
    the Class A Certificates by the Class M Certificates and Class B Certificates, and
    subordination provided to the Class M Certificates by each class of Class M
    Certificates with a lower payment priority and the Class B Certificates."
    Prospectus Supplement at S-1.

b.  "The credit enhancement for the benefit of the offered certificates consists of:
    Excess Cash Flow.  Because more interest with respect to the mortgage loans is
    payable by the mortgagors than is expected to be necessary to pay the interest on
    the Class A, Class M and Class B Certificates each month and related expenses,
    there may be excess cash flow. Some of this excess cash flow may be used to
    protect the Class A, Class M and Class B Certificates against some realized losses
    by making an additional distribution of principal up to the amount of the realized
    losses.  Overcollateralization.  On each distribution date, to the extent not used to
    cover realized losses, excess cash flow will be used to pay principal to the Class
    A, Class M and Class B Certificates, to the extent necessary to reach the required
    overcollateralization amount for that distribution date. This overcollateralization
    may absorb some losses on the mortgage loans if not covered by excess cash
    flow.  Subordination.  So long as the Class M Certificates remain outstanding,
    realized losses on the mortgage loans which are not covered by amounts received
    under the swap agreement, excess cash flow or overcollateralization, as and to the
    extent described in this prospectus supplement, will be allocated to the class of
    Class M Certificates with the lowest payment priority, and the other classes of
    offered certificates will not bear any portion of such losses . . . The Yield
    Maintenance Agreement:  The holders of the offered certificates may benefit from
    a series of interest rate cap payments from Bear Stearns Financial Products Inc.
    pursuant to a yield maintenance agreement provider as described in this
    prospectus supplement. T he yield maintenance agreement is intended to partially
    mitigate the interest rate risk that could result from the difference between one-
    month LIBOR plus the related margin and the net WAC rate cap as described in
    this prospectus supplement." Prospectus Supplement at S-12.

**Exhibit O**
**Misrepresentations in the Offering Documents for RASC 2005-KS4**

**Collateral type:** Fixed and adjustable-rate loans secured by first liens on one- to four-family residential properties.

**Initial number of home equity loans:** 2,932.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "The depositor's underwriting standards with respect to AlterNet loans and Credit Gap loans will in most cases conform to those published in Residential Funding Corporation's Client Guide . . ." Prospectus at 14.

   b.    "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates . . . [e]ach mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-21.

   c.    "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner." Prospectus Supplement at S-22.

   d.    "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:  the creditworthiness of a mortgagor; the income sufficiency of a mortgagor's projected family income; relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and; the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan." Prospectus Supplement at S-39.

   e.    "Residential Funding has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors . . . For those mortgage loans that Residential Funding purchased from sellers in this program, each mortgage loan determined by Residential Funding to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." Prospectus Supplement at S-43.

f.    "Prior to assignment to the depositor, Residential Funding reviewed the underwriting standards for the mortgage loans and purchased all the mortgage loans from mortgage collateral sellers who participated in or whose loans were in substantial conformity with the standards set forth in Residential Funding's AlterNet Program or which are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement." Prospectus Supplement at S-38.

g.    "[I]n most cases Residential Funding Corporation will generally represent and warrant that as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects . . ." Prospectus at 19.

h.    "The underwriting standards with respect to AlterNet loans and Credit Gap loans will in most cases conform to those published in Residential Funding Corporation's Client Guide . . . ." Prospectus at 14.

i.    "Residential Funding Corporation underwrites many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In general, these systems are programmed to review most of the information that is set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 15.

j.    "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy." Prospectus Supplement at S-39.

k.    "In most cases, under a traditional 'full documentation' program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts." Prospectus at 11.

l.    "Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to

assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any." Prospectus at 12.

2. **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted. Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." Prospectus Supplement at S-40.

   b.    "The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors. Examples of compensating factors include strong residual income, strong prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." Prospectus Supplement at S-42.

3. **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

   a.    The Prospectus Supplement represented (at S-33) that 2,650 loans (90.4%) were for primary residences.

   b.    Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

      i.    Of the 1,448 loans reviewed that were allegedly secured by owner-occupied properties, 88 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

      ii.    Of the 1,448 loans reviewed that were allegedly secured by owner-occupied properties, 141 were loans on which creditors reported a

Amended Complaint                         O-3                         RASC 2005-KS4

different property address as the customer's mailing address six months after the origination of the securitized loan.

    iii.    Of the 1,448 loans reviewed that were allegedly secured by owner-occupied properties, 62 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

    iv.    Of the 1,448 loans reviewed that were allegedly secured by owner-occupied properties, 189 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

    v.    Of the 1,448 loans reviewed that were allegedly secured by owner-occupied properties, 167 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

    vi.    In sum, of the 1,448 loans reviewed that were allegedly secured by owner-occupied properties, a total of 172, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 11.9% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    The Prospectus Supplement represented (at S-31) that:

        i.    The weighted average LTV ratio was 83.03%.

        ii.    Only 1,721 loans (58.7%) had an LTV higher than 80%.

        iii.    Only 514 loans (17.53%) had an LTV higher than 90%.

        iv.    No loan had an LTV higher than 100%.

    b.    "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal would have considered a market data

analysis of recent sales of comparable properties and, when deemed applicable, an
analysis based on income generated from the property or replacement cost
analysis based on the current cost of constructing or purchasing a similar
property." Prospectus Supplement at S-39.

c.    "Under Credit Grade Category A4 . . . [a] maximum LTV ratio of 95% is
permitted for a mortgage loan on a single family owner-occupied property or 80%
for a mortgage loan originated under a stated income documentation program. A
maximum LTV ratio of 90% is permitted for a mortgage loan on a non-owner
occupied property or 70% for mortgage loans originated under a stated income
documentation program . . . . For all credit grade categories, non-mortgage credit
may include prior defaults, and different levels of major adverse credit."
Prospectus Supplement at S-40, S-41.

d.    "The underwriting standards applied by an originator typically require that the
underwriting officers of the originator be satisfied that the value of the property
being financed, as indicated by an appraisal or other acceptable valuation method
as described below, currently supports and is anticipated to support in the future
the outstanding loan balance." Prospectus at 12.

e.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
that the LTV ratios were higher than represented. Of the sampled loans that had
sufficient data to test:

i.     The weighted average LTV ratio was 88.79%.

ii.    68.30% of the loans had an LTV higher than 80%.

iii.   45.33% of the loans had an LTV higher than 90%.

iv.    23.59% of the loans had an LTV higher than 100%.

v.     31.57% of the loans had an LTV that was at least 10% higher than those
loans supposedly had.

vi.    8.48% of the loans had an LTV that was at least 25% higher than those
loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the
borrower's income were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their
underwriting guidelines, the representations were baseless. Their falsity is confirmed by
a review of the defendants' loan files by their own insurer, and is further confirmed by
the rising delinquency rates for the Mortgage Loans, which shows borrowers were put
into loans they could not afford.

a.    "Residential Funding's underwriting of the mortgage loans generally consisted of
analyzing the following as standards applicable to the mortgage loans" including

"the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property." Prospectus Supplement at S-38.

b.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property. Examples of other expenses include property taxes, utility costs, standard hazard and primary mortgage insurance, maintenance fees and other levies assessed by a Cooperative, if applicable, and other fixed obligations other than housing expenses including, in the case of junior mortgage loans, payments required to be made on any senior mortgage." Prospectus at 12.

c.    "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." Prospectus at 14.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

a.    "It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement by Standard & Poor's, Moody's and Fitch . . . A securities rating addresses the likelihood of the receipt by the holders of the offered certificates of distributions on the mortgage loan." Prospectus Supplement at S-98.

b.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

a.    The Prospectus Supplement represented (at S-33) that 2,141 loans (73.0%) were originated under full documentation procedures.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue

here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for the offered certificates consists of: excess cash flow and overcollateralization; and subordination provided to the Class A Certificates by the Class M Certificates and Class B Certificates, and subordination provided to the Class M Certificates by each class of Class M Certificates with a lower payment priority and the Class B Certificates." Prospectus Supplement at S-1.

b.    "The credit enhancement for the benefit of the offered certificates consists of: Excess Cash Flow. Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the Class A, Class M and Class B Certificates each month and related expenses, there may be excess cash flow. Some of this excess cash flow may be used to protect the Class A, Class M and Class B Certificates against some realized losses by making an additional distribution of principal up to the amount of the realized losses. Overcollateralization. On each distribution date, to the extent not used to cover realized losses, excess cash flow will be used to pay principal to the Class A, Class M and Class B Certificates, to the extent necessary to reach the required overcollateralization amount for that distribution date. This overcollateralization may absorb some losses on the mortgage loans if not covered by excess cash flow. Subordination. So long as the Class M Certificates remain outstanding, realized losses on the mortgage loans which are not covered by amounts received under the swap agreement, excess cash flow or overcollateralization, as and to the extent described in this prospectus supplement, will be allocated to the class of Class M Certificates with the lowest payment priority, and the other classes of offered certificates will not bear any portion of such losses . . . The Yield Maintenance Agreement: The holders of the Class A Certificates and the Class M Certificates and Class B Certificates may benefit from a series of interest rate cap payments from Bear Stearns Financial Products Inc. pursuant to two separate yield maintenance agreements as described in this prospectus supplement. The yield maintenance agreements are intended to partially mitigate the interest rate risk that could result from the difference between one-month LIBOR plus the related margin and the net WAC rate cap as described in this prospectus supplement." Prospectus Supplement at S-10.

**Exhibit P**
**Misrepresentations in the Offering Documents for RFMSI 2005-S8**

**Collateral type:** Fixed rate loans secured by first liens on one- to four-family residential properties or interests in shares issued by cooperative apartment corporations.

**Initial number of mortgage loans:** 643.

1.     **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.     "Residential Funding will generally represent and warrant that: . . . each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination . . . ." Prospectus at 16.

   b.     "All of the mortgage loans in the mortgage pool were originated generally in accordance with the underwriting standards of Residential Funding described under 'Mortgage Loan Program—Underwriting Standards' in the prospectus." Prospectus Supplement at S-39.

   c.     "Residential Funding Corporation will generally represent and warrant that: as of the cut-off date, the information set forth in a listing of the related mortgage loans is true and correct in all material respects . . . ." Prospectus at 16.

   d.     "Residential Funding Corporation's Jumbo A Program is designed for borrowers with good credit . . . The depositor's underwriting standards with respect to the mortgage loans will generally conform to those published in Residential Funding Company, LLC's Client Guide, as application to the 'Jumbo A' program." Prospectus at 10.

   e.     "Residential Funding Company, LLC evaluates many of the mortgage loans that it purchases through the use of one or more automated underwriting systems.  In general, these systems are programmed to review most of the information set forth in Residential Funding Company, LLC's Client Guide as the underwriting criteria necessary to satisfy each underwriting program." Prospectus at 15.

   f.     "The following is a brief description of the underwriting standards set forth in the Client Guide for full documentation loan programs . . . . Initially, a prospective borrower . . . is required to fill out a detailed application providing pertinent credit information.  As part of the application, the borrower is required to provide a current balance sheet describing assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with merchants and lenders and any record of bankruptcy.  In addition, an employment verification is obtained which

reports the borrower's current salary and may contain the length of employment and an indication as to whether it is expected that the borrower will continue that employment in the future." Prospectus at 13.

2.   **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.   "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied." Prospectus Supplement at S-39.

3.   **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless.  This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

   a.   The Prospectus Supplement represented (at S-86) that 624 loans (97.0%) were for primary residences.

   b.   Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

      i.    Of the 621 loans reviewed that were allegedly secured by owner-occupied properties, 36 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

      ii.   Of the 621 loans reviewed that were allegedly secured by owner-occupied properties, 55 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

      iii.  Of the 621 loans reviewed that were allegedly secured by owner-occupied properties, 42 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

     iv.    Of the 621 loans reviewed that were allegedly secured by owner-occupied properties, 81 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

     v.    Of the 621 loans reviewed that were allegedly secured by owner-occupied properties, 70 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

     vi.    In sum, of the 621 loans reviewed that were allegedly secured by owner-occupied properties, a total of 76, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 12.2% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    The Prospectus Supplement represented (at I-3) that:

        i.    The weighted average LTV ratio was 68.73%.

        ii.    Only 23 loans (3.6%) had an LTV higher than 80%.

        iii.    Only 15 loans (2.3%) had an LTV higher than 90%.

        iv.    No loan had an LTV higher than 95%.

    b.    "The appraiser is required to verify that the property is in good condition and that construction, if new, has been completed. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus at 13.

    c.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

        i.    The weighted average LTV ratio was 75.59%.

        ii.    41.55% of the loans had an LTV higher than 80%.

    iii.    18.12% of the loans had an LTV higher than 90%.

    iv.    7.00% of the loans had an LTV higher than 100%.

    v.    27.29% of the loans had an LTV that was at least 10% higher than those
loans supposedly had.

    vi.    5.80% of the loans had an LTV that was at least 25% higher than those
loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the
borrower's income were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their
underwriting guidelines, the representations were baseless. Their falsity is confirmed by
a review of the defendants' loan files by their own insurer, and is further confirmed by
the rising delinquency rates for the Mortgage Loans, which shows borrowers were put
into loans they could not afford.

    a.    "Once all applicable employment, credit and property information is received, a
determination is made as to whether the prospective borrower has sufficient
monthly income available to meet the borrower's monthly obligations on the
proposed mortgage loan and other expenses related to the home, including
property taxes and hazard insurance, and other financial obligations and monthly
living expenses." Prospectus at 13.

    b.    "As part of the application, the borrower is required to provide a current balance
sheet describing assets and liabilities and a statement of income and expenses, as
well as an authorization to apply for a credit report which summarizes the
borrower's credit history with merchants and lenders and any record of
bankruptcy. In addition, an employment verification is obtained which reports the
borrower's current salary and may contain the length of employment and an
indication as to whether it is expected that the borrower will continue that
employment in the future." Prospectus at 13.

6.    **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

    a.    "The offered certificates have received the ratings listed in the table on page S-7
of this prospectus supplement. The ratings on the offered certificates address the
likelihood that holders of the offered certificates will receive all distributions on
the underlying mortgage loans to which they are entitled." Prospectus
Supplement at S-14.

    b.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.  **All of the following representations regarding the documentation basis for the loans
    were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
    73-181. A review by the defendants' own insurer found many files incomplete, and
    Residential Funding itself has accused its originators of using incomplete loan files.

    a.  The Prospectus Supplement represented (at I-3) that 486 loans (75.6%) were
        issued under full-documentation procedures.

8.  **All of the following misrepresentations regarding credit enhancements were false
    and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
    confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
    here, the collateral was significantly riskier than presented, rendering representations
    regarding the efficacy or sufficiency of any structural 'credit enhancements' that
    depended on or were derived from the quality of those loans false and misleading.

    a.  "Credit enhancement for these certificates will be provided by additional classes
        of subordinated certificates which are not offered hereby." Prospectus
        Supplement at S-1.

Amended Complaint                              P-5                              RFMSI 2005-S8

**Exhibit Q**
**Misrepresentations in the Offering Documents for RFMSI 2006-S6**

**Collateral type:** Fixed rate loans secured by first liens on one- to four-family residential properties or interests in shares issued by cooperative apartment corporations.

**Initial number of mortgage loans:** 1,178.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

     a.    "Residential Funding will generally represent and warrant that: . . . each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination . . . ." Prospectus at 15.

     b.    "All of the mortgage loans in the mortgage pool were originated generally in accordance with the underwriting standards of Residential Funding described under 'Mortgage Loan Program—Underwriting Standards' in the prospectus." Prospectus Supplement at S-38.

     c.    "Residential Funding Corporation will generally represent and warrant that: as of the cut-off date, the information set forth in a listing of the related mortgage loans is true and correct in all material respects . . . ." Prospectus at 15.

     d.    "Residential Funding Corporation's home equity program is designed for borrowers with good credit . . . The specific depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide, as application to the 'Jumbo A' program." Prospectus at 9-10.

     e.    "Residential Funding Corporation underwrites many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In general, these systems are programmed to review most of the information that is set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 13.

     f.    "The following is a brief description of the underwriting standards set forth in the Client Guide for full documentation loan programs . . . . Initially, a prospective borrower . . . is required to fill out a detailed application providing pertinent credit information. As part of the application, the borrower is required to provide a current balance sheet describing assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with merchants and lenders and any record of bankruptcy. In addition, an employment verification is obtained which

reports the borrower's current salary and may contain the length of employment and an indication as to whether it is expected that the borrower will continue that employment in the future." Prospectus at 11-12.

2.   **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.   "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied." Prospectus Supplement at S-38.

3.   **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

   a.   The Prospectus Supplement represented (at I-4) that 1,133 loans (96.2%) were for primary residences.

   b.   Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

      i.   Of the 982 loans reviewed that were allegedly secured by owner-occupied properties, 55 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

      ii.   Of the 982 loans reviewed that were allegedly secured by owner-occupied properties, 61 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

      iii.   Of the 982 loans reviewed that were allegedly secured by owner-occupied properties, 87 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

      iv.   Of the 982 loans reviewed that were allegedly secured by owner-occupied properties, 137 were loans on which other properties owned by the

borrower did not list the securitized property as the owner's primary residence.

v.    Of the 982 loans reviewed that were allegedly secured by owner-occupied properties, 190 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

vi.    In sum, of the 982 loans reviewed that were allegedly secured by owner-occupied properties, a total of 141, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 14.4% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a.    The Prospectus Supplement represented (at I-2) that:

i.    The weighted average LTV ratio was 69.98%.

ii.    Only 25 loans (2.12%) had an LTV higher than 80%.

iii.    Only 5 loans (0.42%) had an LTV higher than 90%.

iv.    No loan had an LTV higher than 100%.

b.    "The appraiser is required to verify that the property is in good condition and that construction, if new, has been completed. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus at 12.

c.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the LTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

i.    The weighted average LTV ratio was 81.16%.

ii.    49.92% of the loans had an LTV higher than 80%.

iii.    21.03% of the loans had an LTV higher than 90%.

iv.    9.79% of the loans had an LTV higher than 100%.

Amended Complaint                                    Q-3                                    RFMSI 2006-S6

    v.      30.82% of the loans had an LTV that was at least 10% higher than those
loans supposedly had.

    vi.     9.31% of the loans had an LTV that was at least 25% higher than those
loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the
borrower's income were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their
underwriting guidelines, the representations were baseless. Their falsity is confirmed by
a review of the defendants' loan files by their own insurer, and is further confirmed by
the rising delinquency rates for the Mortgage Loans, which shows borrowers were put
into loans they could not afford.

    a.    "Once all applicable employment, credit and property information is received, a
determination is made as to whether the prospective borrower has sufficient
monthly income available to meet the borrower's monthly obligations on the
proposed mortgage loan and other expenses related to the home, including
property taxes and hazard insurance, and other financial obligations and monthly
living expenses." Prospectus at 12.

    b.    "As part of the application, the borrower is required to provide a current balance
sheet describing assets and liabilities and a statement of income and expenses, as
well as an authorization to apply for a credit report which summarizes the
borrower's credit history with merchants and lenders and any record of
bankruptcy. In addition, an employment verification is obtained which reports the
borrower's current salary and may contain the length of employment and an
indication as to whether it is expected that the borrower will continue that
employment in the future." Prospectus at 11-12

6.    **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

    a.    "When issued, the offered certificates will receive ratings which are not lower
than those listed in the table on page S-5 of this prospectus supplement."
Prospectus Supplement at S-13.

    b.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.    **All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

a.      The Prospectus Supplement represented (at S-9, I-4) that 776 loans (66%) were issued under full-documentation procedures.

8.      **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.      "Credit enhancement for these certificates will be provided by additional classes of subordinated certificates which are not offered hereby." Prospectus Supplement at S-1.

<u>Exhibit R</u>
<u>Misrepresentations in the Offering Documents for RFMSII 2005-HI3</u>

**Collateral type:** Fixed rate loans secured by second liens on one- to four-family residential properties.

**Initial number of home equity loans:** 5,025.

1.  **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.  "The depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide . . ." Prospectus at 15.

    b.  "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following: each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-32.

    c.  "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-33.

    d.  "The home loans were underwritten as described under '—Underwriting Standards.' All of the home loans were originated under full documentation programs. All of the mortgaged properties underlying the home loans were owner-occupied." Prospectus Supplement at S-19.

    e.  "The seller will represent and warrant with respect to the home loans that, among other things: the information with respect to the home loans in the schedule attached to the home loan purchase agreement is true and correct in all material respects . . ." Prospectus Supplement at S-67.

    f.  "The depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide . . . ." Prospectus at 15.

g.    "Residential Funding Corporation underwrites many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems. In
general, these systems are programmed to review most of the information that is
set forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria that is necessary to satisfy each underwriting program." Prospectus at 17.

h.    "The following is a brief description of the underwriting standards under both the
home equity program and the 125 loan program described in the Guide for full
documentation loan programs. Initially, a prospective borrower . . . is required to
fill out a detailed application providing pertinent credit information. As part of
the description of the borrower's financial condition, the borrower will have
furnished information, which may or may not be verified, describing the
borrower's assets, liabilities, income, credit history and employment history, and
furnished an authorization to apply for a credit report that summarizes the
borrower's available credit history with local merchants and lenders and any
record of bankruptcy." Prospectus at 18.

i.    "The home equity program provides some limitations on the combined LTV ratio
for the loans and restrictions on any related underlying first lien loan. The
underwriting guidelines for the home equity program normally permit combined
LTV ratio's as high as 100%; however, the maximum permitted combined LTV
ratio may be reduced due to various underwriting criteria. In areas where
property values are considered to be declining, the maximum permitted combined
LTV ratio is 75% on owner occupied, full income documentation loans. Stated
income documentation, second vacation homes, and three- to four-unit dwellings
are not eligible where property values are declining. The underwriting guidelines
for the 125 Loan Program normally permit combined LTV ratios as high as
125%; however, the maximum permitted combined LTV ratio may be reduced
due to various underwriting criteria. The underwriting guidelines for both
programs also include restrictions based on the borrower's debt-to-income ratio.
In addition to the conditions described above, an evaluation of the prospective
borrower's credit quality will be made based on a credit scoring model approved
by Residential Funding Corporation." Prospectus at 20.

2.    **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.    "[A] loan may be considered to comply with a set of underwriting standards, even
if one or more specific criteria included in the underwriting standards were not
satisfied, if other factors compensated for the criteria that were not satisfied."
Prospectus at 16.

Amended Complaint                              R-2                              RFMSII 2005-HI3

b.  "The underwriting standards contained in the Guide may be varied in appropriate cases, including in 'limited' or 'reduced loan documentation' loan programs. Limited documentation programs normally permit fewer supporting documents to be obtained or waive income, asset and employment documentation requirements, and normally compensate for increased credit risk by placing greater emphasis on either the review of the property to be financed or the borrower's ability to repay the loan." Prospectus at 18.

3.  **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

a.  The Prospectus Supplement represented (at S-19) that "All of the mortgaged properties underlying the home loans were owner-occupied."

b.  "The mortgagor for each home loan represented at the time of origination that the related mortgaged property would be owner-occupied as a primary home." Prospectus Supplement at S-18.

c.  Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

i.  Of the 1,600 loans reviewed that were allegedly secured by owner-occupied properties, 75 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

ii.  Of the 1,600 loans reviewed that were allegedly secured by owner-occupied properties, 56 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

iii.  Of the 1,600 loans reviewed that were allegedly secured by owner-occupied properties, 34 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

iv.  Of the 1,600 loans reviewed that were allegedly secured by owner-occupied properties, 136 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

    v.    Of the 1,600 loans reviewed that were allegedly secured by owner-occupied properties, 49 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

    vi.    In sum, of the 1,600 loans reviewed that were allegedly secured by owner-occupied properties, a total of 103, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 6.4% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    The Prospectus Supplement represented (at S-25) that:

        i.    The weighted average CLTV ratio was 117.76%.

    b.    "The home loans purchased by Residential Funding and included in the home loan pool generally were originated subject to a maximum combined LTV ratio of 125% and a maximum total monthly debt to income ratio of 50%." Prospectus Supplement at S-33.

    c.    "The underwriting guidelines for the home equity program normally permit combined LTV ratios as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria." Prospectus at 20.

    d.    "The appraiser is required to inspect the property and verify that it is in good condition, and that construction, if new, has been completed . . . The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus at 19.

    e.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the CLTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

        i.    The weighted average CLTV ratio was 129.40%.

        ii.    48.32% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

      iii.     20.25% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

5. **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

    a.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-33.

    b.    "Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property." Prospectus at 20.

    c.    The Prospectus Supplement also gave specific representations as to the weighted average debt-to-income ratio, and the amount of the borrower's residual income. Prospectus Supplement at S-31.

    d.    "The home loans purchased by Residential Funding and included in the home loan pool generally were originated subject to . . . a maximum total monthly debt to income ratio of 50%." Prospectus Supplement at S-33.

6. **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

    a.    "When issued, the notes will receive ratings not lower than those listed on page S-6 of this prospectus supplement." Prospectus Supplement at S-9.

    b.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.   **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

   a.   The Prospectus Supplement represented (at S-19) that "all of the home loans were originated under full documentation procedures."

8.   **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

   a.   "Credit enhancement for the offered certificates consists of:  excess cash flow and overcollateralization; and subordination provided to the Class A Notes by the Class M Notes, and subordination provided to the Class M Notes by each class of Class M Notes with a lower payment priority."  Prospectus Supplement at S-1.

   b.   "The credit enhancement for the benefit of the offered certificates consists of: <u>Excess Cash Flow</u>.  Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the notes, along with fees and expenses of the trust each month, there may be excess cash flow.  This excess cash flow may be used to protect the notes against losses by making an additional payment of principal up to the amount of the losses.  <u>Overcollateralization</u>.  Excess cash flow that is not needed to cover losses in the current period will be used to make additional principal payments on the notes until the pool balance exceeds the aggregate note balance of the notes by a specified amount, as described in this prospectus supplement.  This excess will represent overcollateralization, which may absorb some losses on the home loans if they are not covered by excess cash flow . . . <u>Subordination</u>. If the Class M Notes remain outstanding, losses on the home loans which are not covered by excess cash flow or overcollateralization will be allocated to the class of Class M Notes with the lowest payment priority, . . . and the other classes of offered certificates will not bear any portion of such losses."  Prospectus Supplement at S-8.

Amended Complaint                    R-6                    RFMSII 2005-HI3

**Exhibit S**
**Misrepresentations in the Offering Documents for RFMS2 2005-HS1**

**Collateral type:** One group of closed-end, fixed rate loans and one group of adjustable rate revolving credit loans secured by second liens on one- to four-family residential properties.

**Initial number of home equity loans:** Group I: 12,634.  Group II: 6,413.

1.  **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.  "The seller's underwriting standards relating to the home loans generally will conform to those published in the client guide, and the provision of the guide applicable to the home equity 125 loan program." Prospectus Supplement at S-53.

    b.  "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following:  each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-22.

    c.  "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant.  Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns.  The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-53.

    d.  "The home equity loans were underwritten as described under '—Underwriting Standards' in this prospectus supplement and 'Trust Asset Program— Underwriting Standards' in the prospectus." Prospectus Supplement at S-21.

    e.  "The seller will represent and warrant to the depositor that, among other things, the information with respect to the home equity loans set forth in the schedule attached to the home equity loan purchase agreement is true and correct in all material respects . . ." Prospectus Supplement at S-100.

    f.  "The depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide . . . ." Prospectus at 15.

g.  "Residential Funding Corporation underwrites many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In general, these systems are programmed to review most of the information that is set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 17.

h.  "The following is a brief description of the underwriting standards under both the home equity program and the 125 loan program described in the Guide for full documentation loan programs . . . Initially, a prospective borrower . . . is required to fill out a detailed application providing pertinent credit information. As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of bankruptcy." Prospectus at 18.

i.  "The home equity program provides some limitations on the combined LTV ratio for the loans and restrictions on any related underlying first lien loan. The underwriting guidelines for the home equity program normally permit combined LTV ratio's as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. In areas where property values are considered to be declining, the maximum permitted combined LTV ratio is 75% on owner occupied, full income documentation loans. Stated income documentation, second vacation homes, and three- to four-unit dwellings are not eligible where property values are declining. The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 125%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. The underwriting guidelines for both programs also include restrictions based on the borrower's debt-to-income ratio. In addition to the conditions described above, an evaluation of the prospective borrower's credit quality will be made based on a credit scoring model approved by Residential Funding Corporation." Prospectus at 20.

2.  **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.  "[A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied." Prospectus at 16.

    b.    "The underwriting standards contained in the Guide may be varied in appropriate cases, including in 'limited' or 'reduced loan documentation' loan programs. Limited documentation programs normally permit fewer supporting documents to be obtained or waive income, asset and employment documentation requirements, and normally compensate for increased credit risk by placing greater emphasis on either the review of the property to be financed or the borrower's ability to repay the loan." Prospectus at 18.

3.    **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

    a.    The Prospectus Supplement represented (at S-36 and S-49) that 12,202 Group I loans (96.6%) and 6,092 Group II loans (95.0%) were for primary residences.

    b.    Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy was only 84.8% i.e., the Offering Materials overstated the amount of owner occupancy by 10.2%.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    The Prospectus Supplement represented (at S-30) that, for Group I Loans:

        i.    The weighted average CLTV ratio was 92.57%.

        ii.    Only 8,086 loans (64.0%) had a CLTV higher than 90%.

        iii.    No loan had a CLTV higher than 100%.

    b.    The Prospectus Supplement represented (at S-45) that, for Group II Loans:

        i.    The weighted average CLTV ratio was 89.79%.

        ii.    Only 3,376 loans (52.6%) had a CLTV higher than 90%.

      iii.   No loan had a CLTV higher than 100%.

c.   "The home loans purchased by Residential Funding and included in the home loan pool generally were originated subject to a maximum combined LTV ratio of 100% and a maximum total monthly debt to income ratio of 55%." Prospectus Supplement at S-53.

d.   "The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria." Prospectus at 20.

e.   "The appraiser is required to inspect the property and verify that it is in good condition, and that construction, if new, has been completed . . . The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus at 19.

f.   Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

      i.   The weighted average CLTV ratio was understated by 12.98%.

      ii.   The number of loans that had a CLTV higher than 100% was understated by 37.15%.

      iii.   46.60% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

      iv.   17.39% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

5.   **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.   "Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property." Prospectus at 20.

    b.        "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-53.

    c.        The Prospectus Supplement also gave specific representations as to the weighted average debt-to-income ratio, and the amount of the borrower's residual income. Prospectus Supplement at S-36, S-51.

6.      **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

    a.        "When issued, the term notes will receive ratings not lower than those listed under 'Ratings' in this prospectus supplement." Prospectus Supplement at S-12.

    b.        "It is a condition to issuance that the Class I Notes and Class A-II Notes be rated . . . 'Aaa' by Moody's . . . and 'AAA' by Standard and Poor's . . . A securities' rating addresses the likelihood of the receipt by holders of notes of payments on the home loans." Prospectus Supplement at S-112.

    c.        The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.      **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

    a.        The Prospectus Supplement represented (at S-26) that 91.6% of the Group I Loans were issued under full-documentation procedures.

    b.        The Prospectus Supplement represented (at S-41) that 66.8% of the Group II Loans were issued under full-documentation procedures.

8.      **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for the offered certificates consists of: excess interest;
overcollateralization; and two financial guaranty insurance policies issued by
Financial Guaranty Insurance Company, one insuring the term notes secured by
home equity mortgage loans and the other insuring the term notes secured by
revolving credit loans." Prospectus Supplement at S-1.

b.    "The credit enhancement for the benefit of the Class I Notes consists of: Excess
Interest. Because the borrowers are expected to pay more interest on the home
equity loans in loan group I than is necessary to pay the interest on the Class I
Notes, along with fees and expenses of the trust each month, there may be excess
interest. Some of this excess interest may be used to protect the Class I Notes
against some types of losses by making an additional payment of principal up to
the amount of the losses. Overcollateralization. On each payment date any
excess interest on the group I loans not used to cover current losses or previously
unpaid losses, pay premiums due on the group I policy, or reimburse the credit
enhancer for draws on the group I policy, other than draws attributable to excess
loss amounts, will be paid as principal on the Class I Notes until the aggregate
principal balance of the home equity loans relating to loan group I exceeds the
aggregate security balance of the Class I Notes by a specified amount, as
described in this prospectus supplement. This excess will represent
overcollateralization which may absorb some losses on the group I loans, if not
covered by excess interest. If the level of overcollateralization falls below what is
required, the excess interest on the group I loans, if available, will again be paid to
the Class I Notes as principal in order to increase the level of overcollateralization
to its required level. Policy. On the closing date, Financial Guaranty Insurance
Company will issue the group I policy, with respect to the Class I Notes, in favor
of the indenture trustee. The group I policy will unconditionally and irrevocably
guarantee interest on the Class I Notes at the applicable note rate, will cover the
principal portion of any losses on the group I loans allocated to the Class I Notes,
after taking into account payments from excess interest and any reduction in the
overcollateralization amount, and will guarantee amounts due on the Class A-I-1
Notes and Class A-I-2 Notes on the payment date in July 2020, on the Class A-I-3
Notes on the payment date in February 2021 and on the Class A-I-4 Notes and the
Class A-I-5 Notes on the payment date in September 2035." Prospectus
Supplement at S-9.

<u>Exhibit T</u>
<u>Misrepresentations in the Offering Documents for RFMSII 2005-HS2</u>

**Collateral type:** One group of closed-end, fixed rate loans and one group of adjustable rate revolving credit loans secured by second liens on one- to four-family residential properties.

**Initial number of home equity loans:** Group I: 7,739. Group II: 4,461.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "The seller's underwriting standards relating to the home loans generally will conform to those published in the client guide, and the provision of the guide applicable to the home equity 125 loan program." Prospectus Supplement at S-31.

   b.    "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following: each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-23.

   c.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-31.

   d.    "The home equity loans were underwritten as described under '—Underwriting Standards' in this prospectus supplement and 'Trust Asset Program— Underwriting Standards' in the prospectus." Prospectus Supplement at S-22.

   e.    "The seller will represent and warrant to the depositor that, among other things, the information with respect to the home equity loans set forth in the schedule attached to the home equity loan purchase agreement is true and correct in all material respects . . ." Prospectus Supplement at S-77.

   f.    "The depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide . . . ." Prospectus at 15.

g.    "Residential Funding Corporation underwrites many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems. In
general, these systems are programmed to review most of the information that is
set forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria that is necessary to satisfy each underwriting program." Prospectus at 17.

h.    "The following is a brief description of the underwriting standards under both the
home equity program and the 125 loan program described in the Guide for full
documentation loan programs . . . Initially, a prospective borrower . . . is required
to fill out a detailed application providing pertinent credit information. As part of
the description of the borrower's financial condition, the borrower will have
furnished information, which may or may not be verified, describing the
borrower's assets, liabilities, income, credit history and employment history, and
furnished an authorization to apply for a credit report that summarizes the
borrower's available credit history with local merchants and lenders and any
record of bankruptcy." Prospectus at 18.

i.    "The home equity program provides some limitations on the combined LTV ratio
for the loans and restrictions on any related underlying first lien loan. The
underwriting guidelines for the home equity program normally permit combined
LTV ratio's as high as 100%; however, the maximum permitted combined LTV
ratio may be reduced due to various underwriting criteria. In areas where
property values are considered to be declining, the maximum permitted combined
LTV ratio is 75% on owner occupied, full income documentation loans. Stated
income documentation, second vacation homes, and three- to four-unit dwellings
are not eligible where property values are declining. The underwriting guidelines
for the 125 Loan Program normally permit combined LTV ratios as high as
125%; however, the maximum permitted combined LTV ratio may be reduced
due to various underwriting criteria. The underwriting guidelines for both
programs also include restrictions based on the borrower's debt-to-income ratio.
In addition to the conditions described above, an evaluation of the prospective
borrower's credit quality will be made based on a credit scoring model approved
by Residential Funding Corporation." Prospectus at 20.

2.    **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.    "[A] loan may be considered to comply with a set of underwriting standards, even
if one or more specific criteria included in the underwriting standards were not
satisfied, if other factors compensated for the criteria that were not satisfied."
Prospectus at 16.

b.  "The underwriting standards contained in the Guide may be varied in appropriate cases, including in 'limited' or 'reduced loan documentation' loan programs. Limited documentation programs normally permit fewer supporting documents to be obtained or waive income, asset and employment documentation requirements, and normally compensate for increased credit risk by placing greater emphasis on either the review of the property to be financed or the borrower's ability to repay the loan." Prospectus at 18.

3.  **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a.  The Prospectus Supplement represented (at II-9, II-20) that 7,173 Group I loans (92.7%) and 4,159 Group II loans (93.2%) were for primary residences.

b.  Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

    i.  Of the 1,476 loans reviewed that were allegedly secured by owner-occupied properties, 76 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

    ii.  Of the 1,476 loans reviewed that were allegedly secured by owner-occupied properties, 91 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

    iii.  Of the 1,476 loans reviewed that were allegedly secured by owner-occupied properties, 40 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

    iv.  Of the 1,476 loans reviewed that were allegedly secured by owner-occupied properties, 162 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

    v.  Of the 1,476 loans reviewed that were allegedly secured by owner-occupied properties, 307 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

      vi.    In sum, of the 1,476 loans reviewed that were allegedly secured by owner-occupied properties, a total of 143, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 9.7% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.  This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    The Prospectus Supplement represented (at II-4) that, for Group I Loans:

        i.    The weighted average CLTV ratio was 93.04%.

        ii.    Only 5,096 loans (65.85%) had a CLTV higher than 90%.

        iii.    No loan had a CLTV higher than 100%.

    b.    The Prospectus Supplement represented (at II-16) that, for Group II Loans:

        i.    The weighted average CLTV ratio was 88.71%.

        ii.    Only 2,100 loans (47.07%) had a CLTV higher than 90%.

        iii.    No loan had a CLTV higher than 100%.

    c.    "The home loans purchased by Residential Funding and included in the home loan pool generally were originated subject to a maximum combined LTV ratio of 100% and a maximum total monthly debt to income ratio of 55%."  Prospectus Supplement at S-32.

    d.    "The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria."  Prospectus at 20.

    e.    "The appraiser is required to inspect the property and verify that it is in good condition, and that construction, if new, has been completed . . . The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements."  Prospectus at 19.

    f.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the CLTV ratios were higher than represented.  Of the sampled loans that had sufficient data to test:

    i.     The weighted average CLTV ratio was 101.17%.

    ii.    77.42% of the loans had a CLTV higher than 90%.

    iii.   50.05% of the loans had a CLTV higher than 100%.

    iv.   32.27% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

    v.    8.09% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

    a.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-31.

    b.    "Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property." Prospectus at 20.

    c.    The Prospectus Supplement also gave specific representations as to the weighted average debt-to-income ratio, and the amount of the borrower's residual income. Prospectus Supplement at II-10, 22, 23.

    d.    "The home equity loans included in the mortgage pool generally were originated subject to . . . a maximum total monthly debt to income ratio of 55%." Prospectus Supplement at S-32.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,

as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

    a.    "When issued, the term notes will receive ratings not lower than those listed under
'Ratings' in this prospectus supplement." Prospectus Supplement at S-11.

    b.    "It is a condition to issuance that the Class I Notes and Class A-II Notes be
rated . . . 'Aaa' by Moody's . . . and 'AAA' by Standard and Poor's . . . A
securities' rating addresses the likelihood of the receipt by holders of notes of
payments on the home loans." Prospectus Supplement at S-89.

    c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

**7.    All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

    a.    The Prospectus Supplement represented (at II-11) that 6,198 of the Group I Loans
(80%) were issued under full-documentation procedures. *See also* Prospectus
Supplement at S-27.

    b.    The Prospectus Supplement represented (at II-23) that 3,167 of the Group II
Loans (71%) were issued under full-documentation procedures. *See also*
Prospectus Supplement at S-31.

**8.    All of the following misrepresentations regarding credit enhancements were false
and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
here, the collateral was significantly riskier than presented, rendering representations
regarding the efficacy or sufficiency of any structural 'credit enhancements' that
depended on or were derived from the quality of those loans false and misleading.

    a.    "Credit enhancement for the term notes consists of: excess interest;
overcollateralization; and two financial guaranty insurance policies issued by
Financial Guaranty Insurance Company, one insuring the term notes secured by
home equity mortgage loans and the other insuring the term notes secured by
revolving credit loans." Prospectus Supplement at S-1.

    b.    "The credit enhancement for the benefit of the Class I Notes consists of: Excess
Interest. Because the borrowers are expected to pay more interest on the home
equity loans in loan group I than is necessary to pay the interest on the Class I
Notes, along with fees and expenses of the trust each month, there may be excess
interest. Some of this excess interest may be used to protect the Class I Notes
against some types of losses by making an additional payment of principal up to
the amount of the losses. Overcollateralization. Initially, the aggregate principal
balance of the home equity loans in loan group I will exceed the aggregate

security balance of the Class I Notes by approximately 0.65%. On each payment date any excess interest on the group I loans not used to cover current losses or previously unpaid losses, pay premiums due on the group I policy, or reimburse the credit enhancer for draws on the group I policy, other than draws attributable to excess loss amounts, will be paid as principal on the Class I Notes until the aggregate principal balance of the home equity loans relating to loan group I exceeds the aggregate security balance of the Class I Notes by a specified amount, as described in this prospectus supplement. This excess will represent overcollateralization which may absorb some losses on the group I loans, if not covered by excess interest. If the level of overcollateralization falls below what is required, the excess interest on the group I loans, if available, will again be paid to the Class I Notes as principal in order to increase the level of overcollateralization to its required level. Policy. On the closing date, Financial Guaranty Insurance Company will issue the group I policy, with respect to the Class I Notes, in favor of the indenture trustee. The group I policy will unconditionally and irrevocably guarantee interest on the Class I Notes at the applicable note rate, will cover the principal portion of any losses on the group I loans allocated to the Class I Notes, . . . and will guarantee amounts due on the Class A-I-1 Notes and Class A-I-2 Notes . . . , on the Class A-I-3 Notes . . . and on the Class A-I-4 Notes and the Class A-I-5 Notes . . ." Prospectus Supplement at S-10.

**Exhibit U**
**Misrepresentations in the Offering Documents for RFMSII 2005-HSA1**

**Collateral type:** Fixed-rate and adjustable-rate loans secured by first and second liens on one-to four-family residential properties.

**Initial number of home equity loans:** Group I: 3,652. Group II: 1,797.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.    "The seller's underwriting standards relating to the home loans generally will conform to those published in the client guide, and the provision of the guide applicable to the home equity program." Prospectus Supplement at S-31.

    b.    "Residential Funding Corporation, as seller, will represent and warrant, as of the date of issuance of the notes, the following: each home equity loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-23.

    c.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-31.

    d.    "The home equity loans were underwritten as described under '—Underwriting Standards' in this prospectus supplement and 'Trust Asset Program— Underwriting Standards' in the prospectus." Prospectus Supplement at S-21.

    e.    "The seller will represent and warrant with respect to the home loans that, among other things: the information with respect to the home loans in the schedule attached to the home loan purchase agreement is true and correct in all material respects . . . ." Prospectus Supplement at S-77.

    f.    "The depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide . . ." Prospectus at 15.

    g.    "Residential Funding Corporation underwrites many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In

general, these systems are programmed to review most of the information that is set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 17.

h.      "The following is a brief description of the underwriting standards under both the home equity program and the 125 loan program described in the Guide for full documentation loan programs . . . Initially, a prospective borrower . . . is required to fill out a detailed application providing pertinent credit information. As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of bankruptcy." Prospectus at 18.

i.      "The home equity program provides some limitations on the combined LTV ratio for the loans and restrictions on any related underlying first lien loan. The underwriting guidelines for the home equity program normally permit combined LTV ratio's as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. In areas where property values are considered to be declining, the maximum permitted combined LTV ratio is 75% on owner occupied, full income documentation loans. Stated income documentation, second vacation homes, and three- to four-unit dwellings are not eligible where property values are declining. The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 125%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. The underwriting guidelines for both programs also include restrictions based on the borrower's debt-to-income ratio. In addition to the conditions described above, an evaluation of the prospective borrower's credit quality will be made based on a credit scoring model approved by Residential Funding Corporation." Prospectus at 20.

2.      **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.      "The underwriting standards of Residential Funding may be varied in appropriate cases." Prospectus Supplement at S-32.

b.      "[A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied." Prospectus at 15.

Amended Complaint                    U-2                    RFMSII 2005-HSA1

3.     **All of the following representations regarding whether the mortgaged property was
owner-occupied were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181.  A material amount of the loans were not in fact
owner-occupied, and the defendants omitted that the given statistics were (due to their
abandonment of their underwriting standards) baseless.  This is evidenced by a statistical
analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a.     The Prospectus Supplement represented (at II-10) that 3,173 loans of the Group I
Loans (86.88%) were for primary residences.

b.     The Prospectus Supplement represented (at II-20) that 1,746 loans of the Group II
Loans (97.16%) were for primary residences.

c.     Allstate's subsequent loan-level analysis has determined that the defendants
drastically overstated the percentage of owner-occupied properties secured by the
Mortgage Loans.

i.     Of the 1,379 loans reviewed that were allegedly secured by owner-
occupied properties, 73 were loans on which the owner of the property
instructed tax authorities to send property tax bills to a different address,
or listed a different address as the one for the property owner's property
tax exemption.

ii.     Of the 1,379 loans reviewed that were allegedly secured by owner-
occupied properties, 125 were loans on which creditors reported a
different property address as the customer's mailing address six months
after the origination of the securitized loan.

iii.     Of the 1,379 loans reviewed that were allegedly secured by owner-
occupied properties, 65 were loans on which the borrower owned other
properties during the same time period of ownership as the securitized
property.

iv.     Of the 1,379 loans reviewed that were allegedly secured by owner-
occupied properties, 152 were loans on which other properties owned by
the borrower did not list the securitized property as the owner's primary
residence.

v.     Of the 1,379 loans reviewed that were allegedly secured by owner-
occupied properties, 318 were loans on which other properties owned by
the borrower had liens that did not list the securitized property as the
owner's primary residence.

vi.     In sum, of the 1,379 loans reviewed that were allegedly secured by owner-
occupied properties, a total of 174, non-duplicative, appear to be not
owner-occupied based on their failure of at least two of Allstate's
analytical tests.  This represents 12.6% of the Mortgage Loans that were
tested.

Amended Complaint                              U-3                              RFMSII 2005-HSA1

4.    **All of the following representations regarding the loan-to-value ratios were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  The
defendants knowingly used inflated appraisal values and excluded additional liens in
order to get more loans approved.  This is evidenced by a statistical analysis of the
Mortgage Loans at issue here, as described below and in the Complaint.  This is further
evidenced by testimony regarding the rampant conflicts of interest within the appraisal
process at the time the Certificates were issued.

a.    For Group I loans, the Prospectus Supplement represented (at II-4) that:

   i.    The weighted average CLTV ratio was 93.25%;

   ii.   Only 2,193 loans (60.04%) had a CLTV higher than 90%.

   iii.  No loan had a CLTV higher than 100%.

b.    For Group II loans, the Prospectus Supplement represented (at II-16) that:

   i.    The weighted average CLTV ratio was 89.39%;

   ii.   Only 705 loans (45.32%) had a CLTV higher than 90%.

   iii.  No loan had a CLTV higher than 100%.

c.    "The home equity loans included in the mortgage pool generally were originated
subject to a maximum combined LTV ratio of 100% . . ."  Prospectus Supplement
at S-32.

d.    "The underwriting guidelines for the home equity program normally permit
combined LTV ratios as high as 100%; however, the maximum permitted
combined LTV ratio may be reduced due to various underwriting criteria."
Prospectus at 20.

e.    "The appraiser is required to inspect the property and verify that it is in good
condition, and that construction, if new, has been completed . . . The appraisal is
based on various factors, including the market value of comparable homes and the
cost of replacing the improvements."  Prospectus at 19.

f.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
that the CLTV ratios were higher than represented.  Of the sampled loans that had
sufficient data to test:

   i.    The weighted average CLTV ratio was 104.21%.

   ii.   77.06% of the loans had a CLTV higher than 90%.

   iii.  52.11% of the loans had a CLTV higher than 100%.

  iv. 35.11% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

  v. 13.78% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

5. **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

  a. "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-31.

  b. "Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property." Prospectus at 19.

  c. The Prospectus Supplement also gave specific representations as to the weighted average debt-to-income ratio, and the amount of the borrower's residual income. Prospectus Supplement at II-11, 22.

  d. "The home equity loans included in the mortgage pool generally were originated subject to . . . a maximum total monthly debt to income ratio of 55%." Prospectus Supplement at S-32.

6. **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

  a. "When issued, the notes will receive ratings not lower than those listed under 'Ratings' in this prospectus supplement." Prospectus Supplement at S-11.

b.  "It is a condition to issuance that the Class I Notes and Class A-II Notes be rated 'Aaa' by Moody's . . . and 'AAA' by Standard and Poor's . . . A securities' rating addresses the likelihood of the receipt by holders of notes of payments on the home loans." Prospectus Supplement at S-89.

c.  The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.  **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.  "Credit enhancement for the term notes consists of: excess interest; overcollateralization; and two financial guaranty insurance policies issued by Financial Guaranty Insurance Company, one insuring the term notes secured by home equity mortgage loans and the other insuring the term notes secured by revolving credit loans." Prospectus Supplement at S-1.

b.  "The credit enhancement for the benefit of the Class I Notes consists of: <u>Excess Interest</u>. Because the borrowers are expected to pay more interest on the home equity loans in loan group I than is necessary to pay the interest on the Class I Notes, along with fees and expenses of the trust each month, there may be excess interest. Some of this excess interest may be used to protect the Class I Notes against some types of losses by making an additional payment of principal up to the amount of the losses. <u>Overcollateralization</u>. Initially, the aggregate principal balance of the home equity loans in loan group I will exceed the aggregate security balance of the Class I Notes by approximately 0.65%. On each payment date any excess interest on the group I loans not used to cover current losses or previously unpaid losses, pay premiums due on the group I policy, or reimburse the credit enhancer for draws on the group I policy, other than draws attributable to excess loss amounts, will be paid as principal on the Class I Notes until the aggregate principal balance of the home equity loans relating to loan group I exceeds the aggregate security balance of the Class I Notes by a specified amount, as described in this prospectus supplement. This excess will represent overcollateralization which may absorb some losses on the group I loans, if not covered by excess interest. If the level of overcollateralization falls below what is required, the excess interest on the group I loans, if available, will again be paid to the Class I Notes as principal in order to increase the level of overcollateralization to its required level. <u>Policy</u>. On the closing date, Financial Guaranty Insurance Company will issue the group I policy, with respect to the Class I Notes, in favor of the indenture trustee. The group I policy will unconditionally and irrevocably guarantee interest on the Class I Notes at the applicable note rate, will cover the principal portion of any losses on the group I loans allocated to the Class I Notes, . . . and will guarantee amounts due on the Class A-I-1 Notes and Class A-I-2

Notes . . . , on the Class A-I-3 Notes . . . and on the Class A-I-4 Notes and the
Class A-I-5 Notes . . ." Prospectus Supplement at S-10.

<u>Exhibit V</u>
<u>Misrepresentations in the Offering Documents for RFMSII 2006-HI4</u>

**Collateral type:** Fixed rate loans secured by first and second liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 5,513.

1.  **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.  "The seller's underwriting standards relating to the home loans generally will conform to those published in the client guide, and the provision of the guide applicable to the home equity 125 loan program." Prospectus Supplement at S-34.

    b.  "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following: each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-32.

    c.  "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-34.

    d.  "Substantially all of the home loans were originated with the underwriting standards of Residential Funding as described under '—Underwriting Standards' above." Prospectus Supplement at S-38.

    e.  "The seller will represent and warrant with respect to the home loans that, among other things: the information with respect to the home loans in the schedule attached to the home loan purchase agreement is true and correct in all material respects . . ." Prospectus Supplement at S-60.

    f.  "Residential Funding Corporation's home equity program is designed for borrowers with good credit . . . The specific depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide . . ." Prospectus at 12.

g.   "The seller's underwriting standards relating to the home loans generally will conform to those published in the client guide, and the provisions of the guide applicable to the home equity 125 loan program." Prospectus Supplement at S-34.

h.   "Residential Funding Corporation underwrites many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In general, these systems are programmed to review most of the information that is set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 14.

i.   "The following is a brief description of the underwriting standards under both the home equity program and the 125 loan program described in the Guide for full documentation loan programs . . . Initially, a prospective borrower . . . is required to fill out a detailed application providing pertinent credit information. As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of bankruptcy." Prospectus at 15.

j.   "The home equity program provides some limitations on the combined LTV ratio for the loans and restrictions on any related underlying first lien loan. The underwriting guidelines for the home equity program normally permit combined LTV ratio's as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. In areas where property values are considered to be declining, the maximum permitted combined LTV ratio is 75% on owner occupied, full income documentation loans. Stated income documentation, second vacation homes, and three- to four-unit dwellings are not eligible where property values are declining. The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 125%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. The underwriting guidelines for both programs also include restrictions based on the borrower's debt-to-income ratio. In addition to the conditions described above, an evaluation of the prospective borrower's credit quality will be made based on a credit scoring model approved by Residential Funding Corporation." Prospectus at 17.

2.   **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a. "[A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied." Prospectus Supplement at S-35. *See also* Prospectus at 13.

3. **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a statistical analysis of the Mortgage Loans discussed above, at the same time, purportedly using the same procedures as those represented in this offering.

a. The Prospectus Supplement represented (at II-9) that 5,428 loans (98.5%) were for primary residences.

b. Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy was only 88.3% i.e., the Offering Materials overstated the amount of owner occupancy by 10.2%.

4. **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a. The Prospectus Supplement represented (at II-2) that:

    i. The weighted average CLTV ratio was 114.67%;

    ii. Only 4,804 loans (87.14%) had a CLTV higher than 100%.

    iii. Only 8 loans (.2%) had a CLTV higher than 125%.

    iv. No loan had a CLTV higher than 130%.

b. "The home loans purchased by Residential Funding and included in the home loan pool generally were originated subject to a maximum combined LTV ratio of 125% . . ." Prospectus Supplement at S-35.

c. "The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria." Prospectus at 17.

    d.     "The appraiser is required to inspect the property and verify that it is in good condition, and that construction, if new, has been completed . . . The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus at 16.

    e.     Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

         i.     The weighted average CLTV ratio was understated by 12.98%.

         ii.     The number of loans that had a CLTV higher than 100% was understated by 37.15%.

         iii.     46.60% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

         iv.     17.39% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

**5.     All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

    a.     "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-34.

    b.     "Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property." Prospectus at 17.

    c.     "The weighted average debt-to-income ratio as of the date of origination of the home loans will be approximately 40.56%." Prospectus Supplement at II-7.

d.    "The weighted average amount of residual income as of the date of origination of
the home loans will be approximately $4,682." Prospectus Supplement at II-8.

e.    "[T]he home loans were generally subject to . . . a maximum total monthly debt-
to-income ratio of 50%." Prospectus Supplement at S-35.

6.    **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

a.    "When issued, the notes will receive ratings not lower than those listed on page S-
3 of this prospectus supplement." Prospectus Supplement at S-8.

b.    "It is a condition to issuance of the Class A Notes that the Class A notes be rated
not less than 'Aaa' by Moody's . . . and 'AAA' by Standard and Poor's . . . A
securities' rating addresses the likelihood of the receipt by holders of notes of
payments on the home loans." Prospectus Supplement at S-81.

c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.    **All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

a.    The Prospectus Supplement represented (at S-5, II-9) that 5,223 loans (94.74%)
were issued under full-documentation procedures. *See also* Prospectus
Supplement at S-27.

8.    **All of the following misrepresentations regarding credit enhancements were false
and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
here, the collateral was significantly riskier than presented, rendering representations
regarding the efficacy or sufficiency of any structural 'credit enhancements' that
depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement for the term notes consists of:  excess cash flow and
overcollateralization; and a financial guaranty insurance policy issued by
Financial Guaranty Insurance Company." Prospectus Supplement at S-1.

b.    "The credit enhancement for the benefit of the notes consists of: Excess Cash
Flow. Because the borrowers are required to pay more interest on the home loans
than is necessary to pay the interest on the notes, along with fees and expenses of
the trust each month, there may be excess cash flow. This excess cash flow may
be used to protect the notes against losses by making an additional payment of

principal up to the amount of the losses. <u>Overcollateralization.</u> As of the closing date, the pool balance will exceed the aggregate note balance of the notes by approximately 0.30% of the pool balance. In addition, excess cash flow that is not needed to cover losses in the current period will be used to make additional principal payments on the notes until the pool balance exceeds the aggregate note balance of notes by a specified amount, as described in this prospectus supplement. This excess will represent overcollateralization, which may absorb some losses on the home loans, if they are not covered by excess cash flow. Until the level of overcollateralization reaches what is required, or thereafter falls below what is required, the excess cash flow described above will be paid to the notes as additional principal, as described in this prospectus supplement, in order to reach and maintain the required level of overcollateralization. <u>Financial Insurance Guaranty Policy.</u> On the closing date, Financial Guaranty Insurance Company will issue the financial guaranty insurance policy in favor of the indenture trustee for the benefit of the holders of the Class A Notes. The financial guaranty insurance policy will unconditionally and irrevocably guarantee interest on the notes at the applicable note rate, will cover the principal portion of any losses allocated to the notes not covered by excess cash flow or overcollateralization and will guarantee amounts due on the notes on the payment date in September 2036." Prospectus Supplement at S-7, S-8.

<u>Exhibit W</u>
<u>Misrepresentations in the Offering Documents for RFMSII 2006-HI5</u>

**Collateral type:** Fixed-rate mortgage loans secured primarily by second liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 5,071.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "The seller's underwriting standards relating to the home loans generally will conform to those published in the client guide, and the provision of the guide applicable to the home equity 125 loan program." Prospectus Supplement at S-34.

   b.    "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following: each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-32.

   c.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-34.

   d.    "Substantially all of the home loans were originated with the underwriting standards of Residential Funding as described under '—Underwriting Standards' above." Prospectus Supplement at S-39.

   e.    "The seller will represent and warrant with respect to the home loans that, among other things: the information with respect to the home loans in the schedule attached to the home loan purchase agreement is true and correct in all material respects . . . ." Prospectus Supplement at S-66.

   f.    "Residential Funding Corporation's home equity program is designed for borrowers with good credit . . . The specific depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Corporation's Client Guide . . . ." Prospectus at 12.

Amended Complaint                              W-1                              RFMSII 2006-HI5

g.  "Residential Funding Corporation underwrites many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems. In
general, these systems are programmed to review most of the information that is
set forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria that is necessary to satisfy each underwriting program." Prospectus at 14.

h.  "The following is a brief description of the underwriting standards under both the
home equity program and the 125 loan program described in the Guide for full
documentation loan programs . . . Initially, a prospective borrower . . . is required
to fill out a detailed application providing pertinent credit information. As part of
the description of the borrower's financial condition, the borrower will have
furnished information, which may or may not be verified, describing the
borrower's assets, liabilities, income, credit history and employment history, and
furnished an authorization to apply for a credit report that summarizes the
borrower's available credit history with local merchants and lenders and any
record of bankruptcy." Prospectus at 15.

i.  "The home equity program provides some limitations on the combined LTV ratio
for the loans and restrictions on any related underlying first lien loan. The
underwriting guidelines for the home equity program normally permit combined
LTV ratio's as high as 100%; however, the maximum permitted combined LTV
ratio may be reduced due to various underwriting criteria. In areas where
property values are considered to be declining, the maximum permitted combined
LTV ratio is 75% on owner occupied, full income documentation loans. Stated
income documentation, second vacation homes, and three-to four-unit dwellings
are not eligible where property values are declining. The underwriting guidelines
for the 125 Loan Program normally permit combined LTV ratios as high as
125%; however, the maximum permitted combined LTV ratio may be reduced
due to various underwriting criteria. The underwriting guidelines for both
programs also include restrictions based on the borrower's debt-to-income ratio.
In addition to the conditions described above, an evaluation of the prospective
borrower's credit quality will be made based on a credit scoring model approved
by Residential Funding Corporation." Prospectus at 17.

2.  **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.  "[A] loan may be considered to comply with a set of underwriting standards, even
if one or more specific criteria included in the underwriting standards were not
satisfied, if other factors compensated for the criteria that were not satisfied."
Prospectus Supplement at S-35. *See also* Prospectus at 13.

3.  **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

    a.  The Prospectus Supplement represented (at II-9) that 5,054 loans (99.7%) were for primary residences.

    b.  Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

        i.  Of the 1,593 loans reviewed that were allegedly secured by owner-occupied properties, 69 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

        ii.  Of the 1,593 loans reviewed that were allegedly secured by owner-occupied properties, 97 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

        iii.  Of the 1,593 loans reviewed that were allegedly secured by owner-occupied properties, 37 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

        iv.  Of the 1,593 loans reviewed that were allegedly secured by owner-occupied properties, 146 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

        v.  Of the 1,593 loans reviewed that were allegedly secured by owner-occupied properties, 156 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

        vi.  In sum, of the 1,593 loans reviewed that were allegedly secured by owner-occupied properties, a total of 123, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 7.7% of the Mortgage Loans that were tested.

4.  **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The

defendants knowingly used inflated appraisal values and excluded additional liens in
order to get more loans approved. This is evidenced by a statistical analysis of the
Mortgage Loans at issue here, as described below and in the Complaint. This is further
evidenced by testimony regarding the rampant conflicts of interest within the appraisal
process at the time the Certificates were issued.

a.  The Prospectus Supplement represented (at S-5, II-2) that:

   i.   The weighted average CLTV ratio was 114.81%;

   ii.  Only 4,321 of the loans (85.21%) had a CLTV higher than 100%.

   iii. Only 7 of the loans (0.1%) had a CLTV higher than 125%.

   iv.  No loan had a CLTV higher than 130%.

b.  "The home loans purchased by Residential Funding and included in the home
    loan pool generally were originated subject to a maximum combined LTV ratio of
    125% . . ." Prospectus Supplement at S-35.

c.  "The underwriting guidelines for the 125 Loan Program normally permit
    combined LTV ratios as high as 125%; however, the maximum permitted
    combined LTV ratio may be reduced due to various underwriting criteria."
    Prospectus at 17.

d.  "The appraiser is required to inspect the property and verify that it is in good
    condition, and that construction, if new, has been completed . . . The appraisal is
    based on various factors, including the market value of comparable homes and the
    cost of replacing the improvements." Prospectus at 16.

e.  Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
    that the CLTV ratios were higher than represented. Of the sampled loans that had
    sufficient data to test:

   i.   The weighted average CLTV ratio was 126.53%.

   ii.  87.21% of the loans had a CLTV higher than 100%.

   iii. 51.82% of the loans had a CLTV that was at least 10% higher than those
        loans supposedly had.

   iv.  21.39% of the loans had a CLTV that was at least 25% higher than those
        loans supposedly had.

5.  **All of the following representations regarding the purported sufficiency of the
    borrower's income were false and misleading for the reasons set forth in the
    Complaint.** *See, e.g.*, ¶¶ 73-181. As the defendants systematically abandoned their
    underwriting guidelines, the representations were baseless. Their falsity is confirmed by

a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

    a.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-34.

    b.    "Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property." Prospectus at 17.

    c.    "The weighted average debt-to-income ratio as of the date of origination of the home loans will be approximately 40.55%." Prospectus Supplement at II-7.

    d.    "The weighted average amount of residual income as of the date of origination of the home loans will be approximately $4,285." Prospectus Supplement at II-8.

    e.    "[T]he home loans were generally subject to . . . a maximum total monthly debt-to-income ratio of 50%." Prospectus Supplement at S-35.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

    a.    "When issued, the notes will receive ratings not lower than those listed on page S-3 of this prospectus supplement." Prospectus Supplement at S-8.

    b.    "It is a condition to issuance of the Class A Notes that the Class A notes be rated not less than 'Aaa' by Moody's . . . and 'AAA' by Standard and Poor's . . . A securities' rating addresses the likelihood of the receipt by holders of notes of payments on the home loans." Prospectus Supplement at S-87.

    c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7. **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

   a. The Prospectus-Supplement represented (at S-5, S-27, II-9) that 4,879 loans (96%) were issued under full-documentation procedures.

8. **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

   a. "Credit enhancement for the term notes consists of: excess cash flow and overcollateralization; and a financial guaranty insurance policy issued by Financial Guaranty Insurance Company." Prospectus Supplement at S-1.

   b. "The credit enhancement for the benefit of the notes consists of: <u>Excess Cash Flow</u>. Because the borrowers are required to pay more interest on the home loans than is necessary to pay the interest on the notes, along with fees and expenses of the trust each month, there may be excess cash flow. This excess cash flow may be used to protect the notes against losses by making an additional payment of principal up to the amount of the losses. <u>Overcollateralization</u>. As of the closing date, the pool balance will exceed the aggregate note balance of the notes by approximately 1.05% of the pool balance. In addition, excess cash flow that is not needed to cover losses in the current period will be used to make additional principal payments on the notes until the pool balance exceeds the aggregate note balance of notes by a specified amount, as described in this prospectus supplement. This excess will represent overcollateralization, which may absorb some losses on the home loans, if they are not covered by excess cash flow. Until the level of overcollateralization reaches what is required, or thereafter falls below what is required, the excess cash flow described above will be paid to the notes as additional principal, as described in this prospectus supplement, in order to reach and maintain the required level of overcollateralization. <u>Financial Insurance Guaranty Policy</u>. On the closing date, Financial Guaranty Insurance Company will issue the financial guaranty insurance policy in favor of the indenture trustee for the benefit of the holders of the Class A Notes. The financial guaranty insurance policy will unconditionally and irrevocably guarantee interest on the notes at the applicable note rate, will cover the principal portion of any losses allocated to the notes not covered by excess cash flow or overcollateralization and will guarantee amounts due on the notes on the payment date in December 2036." Prospectus Supplement at S-7, S-8.

## Exhibit X
### Misrepresentations in the Offering Documents for RFMSII 2007-HI1

**Collateral type:** Fixed-rate mortgage loans secured primarily by second liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 5,171.

1. **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a. "The seller's underwriting standards relating to the home loans generally will conform to those published in the client guide, and the provision of the guide applicable to the home equity 125 loan program." Prospectus Supplement at S-33.

   b. "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following: each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-31.

   c. "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-33.

   d. "Substantially all of the home loans were originated in accordance with the underwriting standards of Residential Funding as described under '—Underwriting Standards' above." Prospectus Supplement at S-37.

   e. "The seller will represent and warrant with respect to the home loans that, among other things: the information with respect to the home loans in the schedule attached to the home loan purchase agreement is true and correct in all material respects . . . ." Prospectus Supplement at S-61.

   f. "Residential Funding Corporation's home equity program is designed for borrowers with good credit . . . The specific depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Company, LLC's Client Guide . . ." Prospectus at 14.

g.   "Residential Funding Corporation underwrites many of the mortgage loans that it
purchases through the use of one or more automated underwriting systems. In
general, these systems are programmed to review most of the information that is
set forth in Residential Funding Corporation's Seller Guide as the underwriting
criteria that is necessary to satisfy each underwriting program." Prospectus at 16.

h.   "The following is a brief description of the underwriting standards under both the
home equity program and the 125 loan program described in the Guide for full
documentation loan programs . . . Initially, a prospective borrower . . . is required
to fill out a detailed application providing pertinent credit information. As part of
the description of the borrower's financial condition, the borrower will have
furnished information, which may or may not be verified, describing the
borrower's assets, liabilities, income, credit history and employment history, and
furnished an authorization to apply for a credit report that summarizes the
borrower's available credit history with local merchants and lenders and any
record of bankruptcy." Prospectus at 15.

i.   "The home equity program provides some limitations on the combined LTV ratio
for the loans and restrictions on any related underlying first lien loan. The
underwriting guidelines for the home equity program normally permit combined
LTV ratio's as high as 100%; however, the maximum permitted combined LTV
ratio may be reduced due to various underwriting criteria. In areas where
property values are considered to be declining, the maximum permitted combined
LTV ratio is 75% on owner occupied, full income documentation loans. Stated
income documentation, second vacation homes, and three-to four-unit dwellings
are not eligible where property values are declining. The underwriting guidelines
for the 125 Loan Program normally permit combined LTV ratios as high as
125%; however, the maximum permitted combined LTV ratio may be reduced
due to various underwriting criteria. The underwriting guidelines for both
programs also include restrictions based on the borrower's debt-to-income ratio.
In addition to the conditions described above, an evaluation of the prospective
borrower's credit quality will be made based on a credit scoring model approved
by Residential Funding Company, LLC." Prospectus at 19.

2.   **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.   "[A] loan may be considered to comply with a set of underwriting standards, even
if one or more specific criteria included in the underwriting standards were not
satisfied, if other factors compensated for the criteria that were not satisfied."
Prospectus Supplement at S-34. *See also* Prospectus at 14.

Amended Complaint                          X-2                          RFMSII 2007-HI1

3.     All of the following representations regarding whether the mortgaged property was
owner-occupied were false and misleading for the reasons set forth in the
Complaint. *See, e.g.*, ¶¶ 73-181.  A material amount of the loans were not in fact
owner-occupied, and the defendants omitted that the given statistics were (due to their
abandonment of their underwriting standards) baseless.  This is evidenced by a statistical
analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a.     The Prospectus Supplement represented (at II-9) that 5,135 loans (99.3%) were
for primary residences.

b.     Allstate's subsequent loan-level analysis has determined that the defendants
drastically overstated the percentage of owner-occupied properties secured by the
Mortgage Loans.

i.     Of the 1,582 loans reviewed that were allegedly secured by owner-
occupied properties, 80 were loans on which the owner of the property
instructed tax authorities to send property tax bills to a different address,
or listed a different address as the one for the property owner's property
tax exemption.

ii.     Of the 1,582 loans reviewed that were allegedly secured by owner-
occupied properties, 107 were loans on which creditors reported a
different property address as the customer's mailing address six months
after the origination of the securitized loan.

iii.     Of the 1,582 loans reviewed that were allegedly secured by owner-
occupied properties, 41 were loans on which the borrower owned other
properties during the same time period of ownership as the securitized
property.

iv.     Of the 1,582 loans reviewed that were allegedly secured by owner-
occupied properties, 146 were loans on which other properties owned by
the borrower did not list the securitized property as the owner's primary
residence.

v.     Of the 1,582 loans reviewed that were allegedly secured by owner-
occupied properties, 146 were loans on which other properties owned by
the borrower had liens that did not list the securitized property as the
owner's primary residence.

vi.     In sum, of the 1,582 loans reviewed that were allegedly secured by owner-
occupied properties, a total of 120, non-duplicative, appear to be not
owner-occupied based on their failure of at least two of Allstate's
analytical tests.  This represents 7.6% of the Mortgage Loans that were
tested.

4.     All of the following representations regarding the loan-to-value ratios were false and
misleading for the reasons set forth in the Complaint. *See, e.g.*, ¶¶ 73-181.  The

defendants knowingly used inflated appraisal values and excluded additional liens in
order to get more loans approved. This is evidenced by a statistical analysis of the
Mortgage Loans at issue here, as described below and in the Complaint. This is further
evidenced by testimony regarding the rampant conflicts of interest within the appraisal
process at the time the Certificates were issued.

a.    The Prospectus Supplement represented (at II-2) that:

    i.    The weighted average CLTV ratio was 117.32%;

    ii.    Only 4,688 loans (90.66%) had a CLTV higher than 100%.

    iii.    Only 15 loans (0.29%) had a CLTV higher than 125%.

b.    "The home loans purchased by Residential Funding and included in the home
loan pool generally were originated subject to a maximum combined LTV ratio of
125% . . ." Prospectus Supplement at S-33, S-34.

c.    "The underwriting guidelines for the 125 Loan Program normally permit
combined LTV ratios as high as 100%; however, the maximum permitted
combined LTV ratio may be reduced due to various underwriting criteria."
Prospectus at 19.

d.    "The appraiser is required to inspect the property and verify that it is in good
condition, and that construction, if new, has been completed . . . The appraisal is
based on various factors, including the market value of comparable homes and the
cost of replacing the improvements." Prospectus at 17.

e.    Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
that the CLTV ratios were higher than represented. Of the sampled loans that had
sufficient data to test:

    i.    The weighted average CLTV ratio was 131.00%.

    ii.    93.76% of the loans had a CLTV higher than 100%.

    iii.    53.35% of the loans had a CLTV that was at least 10% higher than those
loans supposedly had.

    iv.    22.29% of the loans had a CLTV that was at least 25% higher than those
loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the
borrower's income were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their
underwriting guidelines, the representations were baseless. Their falsity is confirmed by
a review of the defendants' loan files by their own insurer, and is further confirmed by

the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-33.

b.    "Once all applicable employment, credit and property information is received, a determination is made by the original lender as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the home if applicable, such as property taxes, hazard insurance and maintenance fees or other levies assessed by a Cooperative, if applicable, as well as other financial obligations, including debt service on any loan secured by a senior lien on the related mortgaged property." Prospectus at 19.

c.    "The weighted average debt-to-income ratio as of the date of origination of the home loans will be approximately 40.68%." Prospectus Supplement at II-7.

d.    "The weighted average amount of residual income as of the date of origination of the home loans will be approximately $4,386." Prospectus Supplement at II-8.

e.    "[T]he home loans were generally subject to . . . a maximum total monthly debt-to-income ratio of 50%." Prospectus Supplement at S-34.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

a.    "When issued, the notes will receive ratings not lower than those listed on page S-3 of this prospectus supplement." Prospectus Supplement at S-8.

b.    "It is a condition to issuance of the Class A Notes that the Class A notes be rated not less than 'Aaa' by Moody's . . . and 'AAA' by Standard and Poor's . . . A securities' rating addresses the likelihood of the receipt by holders of notes of payments on the home loans." Prospectus Supplement at S-81.

c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶

73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

    a.    The Prospectus Supplement represented (at S-5, II-9) that 5,063 loans (98%) were
issued under full-documentation procedures.

8.    **All of the following misrepresentations regarding credit enhancements were false
and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
here, the collateral was significantly riskier than presented, rendering representations
regarding the efficacy or sufficiency of any structural 'credit enhancements' that
depended on or were derived from the quality of those loans false and misleading.

    a.    "Credit enhancement for the term notes consists of: excess cash flow and
overcollateralization; and a financial guaranty insurance policy issued by
Financial Guaranty Insurance Company." Prospectus Supplement at S-1.

    b.    "The credit enhancement for the benefit of the notes consists of: Excess Cash
Flow. Because the borrowers are required to pay more interest on the home loans
than is necessary to pay the interest on the notes, along with fees and expenses of
the trust each month, there may be excess cash flow. This excess cash flow may
be used to protect the notes against losses by making an additional payment of
principal up to the amount of the losses. Overcollateralization. As of the closing
date, the pool balance will exceed the aggregate note balance of the notes by
approximately 1.00% of the pool balance. In addition, excess cash flow that is
not needed to cover losses in the current period will be used to make additional
principal payments on the notes until the pool balance exceeds the aggregate note
balance of notes by a specified amount, as described in this prospectus
supplement. This excess will represent overcollateralization, which may absorb
some losses on the home loans, if they are not covered by excess cash flow. Until
the level of overcollateralization reaches what is required, or thereafter falls below
what is required, the excess cash flow described above will be paid to the notes as
additional principal, as described in this prospectus supplement, in order to reach
and maintain the required level of overcollateralization. Financial Insurance
Guaranty Policy. On the closing date, Financial Guaranty Insurance Company
will issue the financial guaranty insurance policy in favor of the indenture trustee
for the benefit of the holders of the Class A Notes. The financial guaranty
insurance policy will unconditionally and irrevocably guarantee interest on the
notes at the applicable note rate, will cover the principal portion of any losses
allocated to the notes not covered by excess cash flow or overcollateralization and
will guarantee amounts due on the notes on the payment date in March 2037."
Prospectus Supplement at S-7, S-8.

## Exhibit Y
### Misrepresentations in the Offering Documents for RFMSII 2007-HSA2

**Collateral type:** Fixed-rate home equity mortgage loans secured primarily by second liens on one- to four-family residential properties.

**Initial number of mortgage loans:** 24,092.

1.  **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.  "The seller's underwriting standards relating to the mortgage loans generally will conform to those published in the client guide, and the provision of the guide applicable to the home equity program." Prospectus Supplement at S-37.

    b.  "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following: each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-36.

    c.  "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-38.

    d.  "The mortgage loans were originated in accordance with Residential Funding's underwriting standards described above. See 'Description of the Mortgage Pool—Underwriting Standards.'" Prospectus Supplement at S-39.

    e.  "The seller will represent and warrant with respect to the home loans that, among other things: the information with respect to the home loans in the schedule attached to the home loan purchase agreement is true and correct in all material respects . . ." Prospectus Supplement at S-69.

    f.  "Residential Funding Company, LLC's home equity program is designed for borrowers with good credit . . . The specific depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Company, LLC's Client Guide . . ." Prospectus at 13.

g.  "Residential Funding Company, LLC underwrites many of the mortgage loans
that it purchases through the use of one or more automated underwriting systems.
In general, these systems are programmed to review most of the information that
is set forth in Residential Funding Company, LLC's Seller Guide as the
underwriting criteria that is necessary to satisfy each underwriting program."
Prospectus at 15.

h.  "The following is a brief description of the underwriting standards under both the
home equity program and the 125 loan program described in the Guide for full
documentation loan programs . . . Initially, a prospective borrower . . . is required
to fill out a detailed application providing pertinent credit information. As part of
the description of the borrower's financial condition, the borrower will have
furnished information, which may or may not be verified, describing the
borrower's assets, liabilities, income, credit history and employment history, and
furnished an authorization to apply for a credit report that summarizes the
borrower's available credit history with local merchants and lenders and any
record of bankruptcy." Prospectus at 16.

i.  "The home equity program provides some limitations on the combined LTV ratio
for the loans and restrictions on any related underlying first lien loan. The
underwriting guidelines for the home equity program normally permit combined
LTV ratio's as high as 100%; however, the maximum permitted combined LTV
ratio may be reduced due to various underwriting criteria. In areas where
property values are considered to be declining, the maximum permitted combined
LTV ratio is 75% on owner occupied, full income documentation loans. Stated
income documentation, second vacation homes, and three-to four-unit dwellings
are not eligible where property values are declining. The underwriting guidelines
for the 125 Loan Program normally permit combined LTV ratios as high as
125%; however, the maximum permitted combined LTV ratio may be reduced
due to various underwriting criteria. The underwriting guidelines for both
programs also include restrictions based on the borrower's debt-to-income ratio.
In addition to the conditions described above, an evaluation of the prospective
borrower's credit quality will be made based on a credit scoring model approved
by Residential Funding Corporation." Prospectus at 19.

2.  **All of the following representations regarding the use of exceptions were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As
confirmed by, among other things, a review of the defendants' loan files by their own
insurer, underwriting "exceptions" were not given based on any positive compensating
factors. This is further supported by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.

a.  "[A] mortgage loan may be considered to comply with the underwriting standards
described above, even if one or more specific criteria included in the underwriting
standards were not satisfied, if other factors compensated for the criteria that were
not satisfied." Prospectus Supplement at S-39. *See also* Prospectus at 14.

3.    **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

    a.    The Prospectus Supplement represented (at II-9) that 18,643 loans (77.4%) were for primary residences.

    b.    Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

        i.    Of the 1,294 loans reviewed that were allegedly secured by owner-occupied properties, 85 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

        ii.    Of the 1,294 loans reviewed that were allegedly secured by owner-occupied properties, 126 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

        iii.    Of the 1,294 loans reviewed that were allegedly secured by owner-occupied properties, 78 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

        iv.    Of the 1,294 loans reviewed that were allegedly secured by owner-occupied properties, 173 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

        v.    Of the 1,294 loans reviewed that were allegedly secured by owner-occupied properties, 250 were loans on which other properties owned by the borrower had liens that did not list the securitized property as the owner's primary residence.

        vi.    In sum, of the 1,294 loans reviewed that were allegedly secured by owner-occupied properties, a total of 178, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests.  This represents 13.8% of the Mortgage Loans that were tested.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  The

defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a.  The Prospectus Supplement represented (at II-4) that:

   i.  The weighted average CLTV ratio was 93.60%;

   ii.  Only 15,057 loans (62.50%) had a CLTV higher than 90%.

   iii.  No loan had a CLTV higher than 100%.

b.  "The mortgage loans included in the mortgage pool generally were originated subject to a maximum combined LTV ratio of 100% . . ." Prospectus Supplement at S-38.

c.  "The appraiser is required to inspect the property and verify that it is in good condition, and that construction, if new, has been completed . . . The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus at 17.

d.  Allstate's subsequent loan-level analysis of the Mortgage Loans has determined that the CLTV ratios were higher than represented. Of the sampled loans that had sufficient data to test:

   i.  The weighted average CLTV ratio was 107.31%.

   ii.  85.56% of the loans had a CLTV higher than 90%.

   iii.  62.22% of the loans had a CLTV higher than 100%.

   iv.  49.91% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

   v.  16.57% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

**5.  All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "The underwriting criteria provide for the evaluation of a loan applicant's
creditworthiness through the use of a consumer credit report, verification of
employment and a review of the debt-to-income ratio of the applicant. Income is
verified through various means, including without limitation applicant interviews,
written verifications with employers and review of pay stubs or tax returns. The
borrower must demonstrate sufficient levels of disposable income to satisfy debt
repayment requirements." Prospectus Supplement at S-38.

b.    "Once all applicable employment, credit and property information is received, a
determination is made by the original lender as to whether the prospective
borrower has sufficient monthly income available to meet the borrower's monthly
obligations on the proposed loan and other expenses related to the home if
applicable, such as property taxes, hazard insurance and maintenance fees or other
levies assessed by a Cooperative, if applicable, as well as other financial
obligations, including debt service on any loan secured by a senior lien on the
related mortgaged property." Prospectus at 18.

c.    "[T]he weighted average debt-to-income ratio of the mortgage loans was
approximately 39.80%." Prospectus Supplement at II-9.

d.    "[T]he weighted average residual income of the mortgagors for the mortgage
loans was $8,352." Prospectus Supplement at II-10.

e.    "The mortgage loans included in the mortgage pool generally were originated
subject to . . . a maximum total monthly debt to income ratio of 55%." Prospectus
Supplement at S-38.

6.    **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

a.    "When issued, the offered certificates will receive the ratings not lower than those
listed on page S-6 of this prospectus supplement." Prospectus Supplement at S-
14.

b.    "It is a condition of the issuance of the Class A Certificates that they be rated
'Aaa' by Fitch . . . , "Aaa"By Moody's . . . and 'AAA' by Standard and Poor's . .
." These ratings "address the likelihood of receipt by the offered
certificateholders of all distributions to which they are entitled . . ." Prospectus
Supplement at S-87.

c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.    **All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶

73-181. A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

    a.    The Prospectus Supplement represented (at S-10, II-9) that 6,719 loans (28%)
were issued under full-documentation procedures. *See also* Prospectus
Supplement at S-35.

**8.**    **All of the following misrepresentations regarding credit enhancements were false
and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As
confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
here, the collateral was significantly riskier than presented, rendering representations
regarding the efficacy or sufficiency of any structural 'credit enhancements' that
depended on or were derived from the quality of those loans false and misleading.

    a.    "Credit enhancement for the term notes consists of: excess interest and
overcollateralization; and a financial guaranty insurance policy issued by MBIA
Insurance Corporation for the Class A Certificates." Prospectus Supplement at S-
1.

    b.    "The credit enhancement for the benefit of the notes consists of: <u>Excess Cash
Flow</u>. Because the borrowers are required to pay more interest on the home loans
than is necessary to pay the interest on the notes, along with fees and expenses of
the trust each month, there may be excess cash flow. This excess cash flow may
be used to protect the notes against losses by making an additional payment of
principal up to the amount of the losses. <u>Overcollateralization</u>. Initially, the
aggregate principal balance of the mortgage loans will exceed the aggregate
certificate principal balance of the offered certificates by approximately 5.35%.
Beginning on the seventh distribution date, excess interest that is not necessary to
pay losses in the current period or to reimburse the credit enhancer for draws on
the policy will be used to make additional principal distributions on the offered
certificates, reducing their aggregate certificate balance faster than the aggregate
principal balance of the mortgage loans, until the aggregate principal balance of
the mortgage loans exceeds the aggregate certificate principal balance of the
offered certificates by a specified amount, as described in this prospectus
supplement. This excess will represent overcollateralization, which may absorb
some losses on the mortgage loans, if not covered by excess interest . . . .<u>Policy</u>.
On the closing date, MBIA Insurance Corporation will issue the financial
guaranty insurance policy in favor of the trustee for the benefit of the holders of
the Class A Certificates. The policy will unconditionally and irrevocably
guarantee interest on the certificates at the related pass-through rates and will
cover the principal portion of any losses allocated to the certificates . . . and will
guarantee the outstanding certificate principal balance of the related offered
certificates on the distribution date in April 2037." Prospectus Supplement at S-
13, S-14.

<u>**Exhibit Z**</u>
<u>**Misrepresentations in the Offering Documents for RFMSII 2007-HSA3**</u>

**Collateral type:** One group of fixed rate loans secured 99.87% by second liens on one- to four-family residential properties; one group of adjustable rate revolving credit loans secured 99.26% by second liens on one- to four-family residential properties.

**Initial number of mortgage loans:** Group I: 11,268; Group II: 4,146.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "The seller's underwriting standards relating to the home equity loans generally will conform to those published in the client guide, and the provisions of the guide applicable to the home equity program." Prospectus Supplement at S-46.

   b.    "Residential Funding Company, LLC, as seller, will represent and warrant, as of the date of issuance of the notes, the following: . . . each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws." Prospectus Supplement at S-36.

   c.    "The underwriting criteria provide for the evaluation of a loan applicant's creditworthiness through the use of a consumer credit report, verification of employment and a review of the debt-to-income ratio of the applicant. Income is verified through various means, including without limitation applicant interviews, written verifications with employers and review of pay stubs or tax returns. The borrower must demonstrate sufficient levels of disposable income to satisfy debt repayment requirements." Prospectus Supplement at S-46, S-47.

   d.    "The home equity loans were originated in accordance with Residential Funding Company, LLC's underwriting standards described above. See 'Description of the Home Equity Loan Pool—Underwriting Standards.'" Prospectus Supplement at S-48.

   e.    "The seller will represent and warrant with respect to the home loans that, among other things: the information with respect to the home equity loans set forth in the schedule attached to the home equity loan purchase agreement is true and correct in all material respects . . ." Prospectus Supplement at S-102.

   f.    "Residential Funding Company, LLC's home equity program is designed for borrowers with good credit . . . The specific depositor's underwriting standards for the loans will, in most cases, conform to those published in Residential Funding Company, LLC's Client Guide . . ." Prospectus at 13.

g.    "Residential Funding Company, LLC underwrites many of the mortgage loans that it purchases through the use of one or more automated underwriting systems. In general, these systems are programmed to review most of the information that is set forth in Residential Funding Company, LLC's Seller Guide as the underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 15.

h.    "The following is a brief description of the underwriting standards under both the home equity program and the 125 loan program described in the Guide for full documentation loan programs . . . Initially, a prospective borrower . . . is required to fill out a detailed application providing pertinent credit information. As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of bankruptcy." Prospectus at 16.

i.    "The home equity program provides some limitations on the combined LTV ratio for the loans and restrictions on any related underlying first lien loan. The underwriting guidelines for the home equity program normally permit combined LTV ratio's as high as 100%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. In areas where property values are considered to be declining, the maximum permitted combined LTV ratio is 75% on owner occupied, full income documentation loans. Stated income documentation, second vacation homes, and three-to four-unit dwellings are not eligible where property values are declining. The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 125%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria. The underwriting guidelines for both programs also include restrictions based on the borrower's debt-to-income ratio. In addition to the conditions described above, an evaluation of the prospective borrower's credit quality will be made based on a credit scoring model approved by Residential Funding Corporation." Prospectus at 19.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.    "[A] loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied." Prospectus at 14.

b. "The underwriting standards contained in the Guide may be varied in appropriate cases, including in 'limited' or 'reduced loan documentation' loan programs. Limited documentation programs normally permit fewer supporting documents to be obtained or waive income, asset and employment documentation requirements, and normally compensate for increased credit risk by placing greater emphasis on either the review of the property to be financed or the borrower's ability to repay the loan." Prospectus at 16.

3. **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.*, ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint.

a. For Group I Loans, the Prospectus Supplement represented (at II-9) that 8,851 loans (78.6%) were for primary residences.

b. For Group II Loans, the Prospectus Supplement represented (at II-21) that 3,735 loans (90.1%) were for primary residences.

c. Allstate's subsequent loan-level analysis has determined that the defendants drastically overstated the percentage of owner-occupied properties secured by the Mortgage Loans.

   i. Of the 1,518 loans reviewed that were allegedly secured by owner-occupied properties, 105 were loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address as the one for the property owner's property tax exemption.

   ii. Of the 1,518 loans reviewed that were allegedly secured by owner-occupied properties, 174 were loans on which creditors reported a different property address as the customer's mailing address six months after the origination of the securitized loan.

   iii. Of the 1,518 loans reviewed that were allegedly secured by owner-occupied properties, 92 were loans on which the borrower owned other properties during the same time period of ownership as the securitized property.

   iv. Of the 1,518 loans reviewed that were allegedly secured by owner-occupied properties, 215 were loans on which other properties owned by the borrower did not list the securitized property as the owner's primary residence.

   v. Of the 1,518 loans reviewed that were allegedly secured by owner-occupied properties, 212 were loans on which other properties owned by

the borrower had liens that did not list the securitized property as the owner's primary residence.

    vi.    In sum, of the 1,518 loans reviewed that were allegedly secured by owner-occupied properties, a total of 201, non-duplicative, appear to be not owner-occupied based on their failure of at least two of Allstate's analytical tests. This represents 13.9% of the Mortgage Loans that were tested.

**4.**    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described below and in the Complaint. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

    a.    For Group I Loans, the Prospectus Supplement represented (at II-3) that:

        i.    The weighted average CLTV ratio was 93.75%;

        ii.    Only 6,902 loans (61.25%) had a CLTV higher than 90%.

        iii.    No loan had a CLTV higher than 100%.

    b.    For Group II Loans, the Prospectus Supplement represented (at II-16) that:

        i.    The weighted average CLTV ratio was 87.18%;

        ii.    Only 1,598 loans (38.54%) had a CLTV higher than 90%.

        iii.    No loan had a CLTV higher than 100%.

    c.    "The mortgage loans included in the mortgage pool generally were originated subject to a maximum combined LTV ratio of 100% . . ." Prospectus Supplement at S-47.

    d.    "The underwriting guidelines for the 125 Loan Program normally permit combined LTV ratios as high as 125%; however, the maximum permitted combined LTV ratio may be reduced due to various underwriting criteria." Prospectus at 19.

    e.    "The appraiser is required to inspect the property and verify that it is in good condition, and that construction, if new, has been completed . . . The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus at 17.

f.  Allstate's subsequent loan-level analysis of the Mortgage Loans has determined
that the CLTV ratios were higher than represented. Of the sampled loans that had
sufficient data to test:

    i.  The weighted average CLTV ratio was 108.20%.

    ii.  85.88% of the loans had a CLTV higher than 90%.

    iii.  64.85% of the loans had a CLTV higher than 100%.

    iv.  54.30% of the loans had a CLTV that were at least 10% higher than those
loans supposedly had.

    v.  20.05% of the loans had a CLTV that were at least 25% higher than those
loans supposedly had.

5.  **All of the following representations regarding the purported sufficiency of the
borrower's income were false and misleading for the reasons set forth in the
Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their
underwriting guidelines, the representations were baseless. Their falsity is confirmed by
a review of the defendants' loan files by their own insurer, and is further confirmed by
the rising delinquency rates for the Mortgage Loans, which shows borrowers were put
into loans they could not afford.

a.  "The underwriting criteria provide for the evaluation of a loan applicant's
creditworthiness through the use of a consumer credit report, verification of
employment and a review of the debt-to-income ratio of the applicant. Income is
verified through various means, including without limitation applicant interviews,
written verifications with employers and review of pay stubs or tax returns. The
borrower must demonstrate sufficient levels of disposable income to satisfy debt
repayment requirements." Prospectus Supplement at S-47.

b.  "Once all applicable employment, credit and property information is received, a
determination is made by the original lender as to whether the prospective
borrower has sufficient monthly income available to meet the borrower's monthly
obligations on the proposed loan and other expenses related to the home if
applicable, such as property taxes, hazard insurance and maintenance fees or other
levies assessed by a Cooperative, if applicable, as well as other financial
obligations, including debt service on any loan secured by a senior lien on the
related mortgaged property." Prospectus at 18.

c.  For Group I Loans:

    i.  "[T]he weighted average debt-to-income ratio of the Group I Loans was
approximately 40.18%." Prospectus Supplement at II-10.

    ii.  "[T]he weighted average residual income of the mortgagors for the Group
I Loans was $8,412." Prospectus Supplement at II-10.

    d.    For Group II Loans:

        i.    "[T]he weighted average debt-to-income ratio of the Group II Loans was approximately 40.09%." Prospectus Supplement at II-9.

        ii.    "[T]he weighted average residual income of the mortgagors for the Group II Loans was $9,333." Prospectus Supplement at II-10.

    e.    "The home equity loans included in the mortgage pool generally were originated subject to . . . a maximum total monthly debt to income ratio of 55%." Prospectus Supplement at S-47.

6.    **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

    a.    "When issued, the term notes will receive ratings not lower than those listed under 'Ratings' in this prospectus supplement." Prospectus Supplement at S-15.

    b.    "It is a condition to issuance that the Class I Notes and Class A-II Notes by rated 'AAA' by Fitch . . . , 'Aaa' by Moody's . . . and 'AAA' by Standard and Poor's . . . A securities rating addresses the likelihood of the receipt by holders of term notes of distributions on the home equity loans." Prospectus Supplement at S-125.

    c.    The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.    **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

    a.    For Group I loans, the Prospectus Supplement represented (at S-9, II-11) that 3,957 loans (35%) were issued under full-documentation procedures. *See also* Prospectus Supplement at S-40.

    b.    For Group II loans, the Prospectus Supplement represented (at S-10, II-23) that 1,442 loans (35%) were issued under full-documentation procedures. *See also* Prospectus Supplement at S-44.

8.    **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations

regarding the efficacy or sufficiency of any structural 'credit enhancements' that
depended on or were derived from the quality of those loans false and misleading.

a.  "Credit enhancement for the term notes consists of: excess interest;
    overcollateralization; and two financial guaranty insurance policies issued by
    MBIA Insurance Corporation, one insuring the term notes secured by home equity
    mortgage loans and the other insuring the term notes secured by revolving credit
    loans." Prospectus Supplement at S-1.

b.  "The credit enhancement for the benefit of the notes consists of: <u>Excess Interest</u>.
    Because the borrowers are required to pay more interest on the home loans than is
    necessary to pay the interest on the notes, along with fees and expenses of the
    trust each month, there may be excess interest. Some of this excess interest may
    be used to protect the notes against losses by making an additional payment of
    principal up to the amount of the losses. <u>Overcollateralization</u>. Initially, the
    aggregate principal balance of the mortgage loans will exceed the aggregate
    certificate principal balance of the offered certificates by approximately 4.95%.
    On each payment date beginning on the payment date in December 2007, any
    excess interest on the group I loans not used to cover current losses or previously
    unpaid losses . . ..will be paid as principal on the Class I Notes until the aggregate
    principal balance of the home equity loans relating to loan group I exceeds the
    aggregate security balance of the Class I Notes by a specified amount, as
    described in this prospectus supplement. This excess will represent
    overcollateralization which may absorb some losses on the group I loans, if not
    covered by excess interest . . . . <u>Policy</u>. On the closing date, MBIA Insurance
    Corporation will issue the group I policy, with respect to the Class I Notes, in
    favor of the indenture trustee. The group I policy will unconditionally and
    irrevocably guarantee payments of interest on the Class I Notes at the applicable
    note rate, will cover the principal portion of any losses on the group I loans
    allocated to the Class I Notes . . . and will guarantee amounts due . . ." Prospectus
    Supplement at S-13, S-14.

<u>Exhibit AA</u>
<u>Misrepresentations in the Offering Documents for GMACM 2005-HE1</u>

**Collateral type:**  Adjustable-rate home equity revolving credit line loans secured by the related mortgages or deeds of trust on residential properties.

**Initial number of mortgage loans:**  18,194.

1.    **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

    a.    "All of the mortgage loans were originated generally in accordance with the underwriting standards of GMACM."  Prospectus Supplement at S-25.

    b.    "Each subsequent mortgage loan will have been underwritten substantially in accordance with the criteria set forth in this prospectus supplement under 'Description of the Mortgage Loans—Underwriting Standards.'"  Prospectus Supplement at S-41.

    c.    "All of the mortgage loans were underwritten generally in accordance with GMACM's underwriting standards . . . . GMACM's underwriting standards with respect to the mortgage loans generally will conform to those published in the GMACM underwriting guidelines, including the provisions of the GMACM underwriting guidelines applicable to the GMAC Mortgage Home Equity Program."  Prospectus Supplement at S-44.

    d.    "GMACM's underwriting standards include a set of specific criteria pursuant to which the underwriting evaluation is made."  Prospectus Supplement at S-46.

    e.    "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral."  Prospectus at 19.

    f.    "In general, these [automated] systems are programmed to review most of the information that is set forth in Residential Funding Corporation's underwriting criteria that is necessary to satisfy each underwriting program."  Prospectus at 23.

    g.    "Residential Funding Corporation generally will represent and warrant that . . . as of the cut-off date, the information set forth in a listing of the related loans was true and correct in all material respects."  Prospectus at 34.

h.  "The level of review by Residential Funding Corporation, if any, will vary depending on several factors, including its experience with the seller. Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the loans purchased by Residential Funding Corporation for conformity with Residential Funding Corporation's underwriting standards or applicable underwriting standards specified in this prospectus or the accompanying prospectus supplement, and to assess the likelihood of repayment of the loan from the various sources for such repayment, including the borrower, the mortgaged property, and primary mortgage insurance, if any." Prospectus at 23.

2.  **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.  "The underwriting standards set forth in the GMACM underwriting guidelines with respect to mortgage loans originated under the GMAC Mortgage Corporation Home Equity Program may be varied in appropriate cases." Prospectus Supplement at S-46.

b.  "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." Prospectus Supplement at S-46. *See also* Prospectus at 19.

c.  "The underwriting standards set forth in the GMACM underwriting guidelines may be varied for certain refinance transactions. . . . Limited or reduced documentation refinances generally compensate for increased credit risk by placing greater emphasis on the borrower's payment history. Generally. . . . the mortgage loan must demonstrate other compensating factors, such as a relatively low CLTV ratio or other favorable underwriting factors." Prospectus Supplement at S-47.

3.  **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

a.    The Prospectus Supplement represented (at S-32) that 17,858 loans (98.2%) were for primary residences.

b.    Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy was only 88.0% i.e., the Offering Materials overstated the amount of owner occupancy by 10.2%.

4.    **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

a.    The Prospectus Supplement represented (at S-31):

     i.    The weighted average CLTV ratio was 81.71%.

     ii.    Only 4,898 loans (26.9%) had a CLTV higher than 90%.

     iii.    No loan had a CLTV higher than 100%.

b.    "The mortgage loans included in the mortgage pool generally were originated subject to a maximum CLTV Ratio of 100.00%." Prospectus Supplement at S-45.

c.    "The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal. . . . The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed." Prospectus at 20.

d.    "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . . currently supports, . . . . and is anticipated to support in the future, the outstanding loan balance." Prospectus at 21.

e.    "If a full appraisal is required, the appraiser may be required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. If a drive-by appraisal is required, the appraiser is only required to perform an exterior inspection of the property. The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements. The GMACM underwriting standards provide that a statistical property evaluation may be completed in lieu of a drive-by appraisal by

a third-party who performs an electronic comparison of the stated value of the mortgaged properties with comparable properties in the area. GMACM believes that no more than 70% (by aggregate principal balance as of the cut-off date) of the initial mortgage loans are secured by mortgaged properties which may have been appraised using the statistical property evaluation method." Prospectus Supplement at S-46.

f.    Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i.    The weighted average CLTV ratio was understated by 12.98%.

    ii.    The number of loans that had a CLTV higher than 100% was understated by 37.15%.

    iii.    46.60% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

    iv.    17.39% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, such as property taxes and hazard insurance, and other financial obligations, including debt service on any related mortgage loan secured by a senior lien on the related mortgaged property." Prospectus Supplement at S-47.

b.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property. Examples of other expenses include property taxes, utility costs, standard hazard and primary mortgage insurance, maintenance fees and other levies assessed by a Cooperative, if applicable, and other fixed obligations other than housing expenses including, in the case of loans secured by a junior lien on the related

mortgaged property, payments required to be made on any senior mortgage."
Prospectus at 22.

   c.     "[L]oans were generally originated with a maximum total monthly debt-to-
income ratio of 45%." Prospectus Supplement at S-45.

   d.     "The weighted average debt-to-income ratio of the initial mortgage loans as of the
cut-off date is approximately 38.09%." Prospectus Supplement at S-37.

6.    **All of the following representations regarding the credit ratings were false and
misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  Unknown
to Allstate, the rating agencies were fed baseless and false statistics regarding the loans,
as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the
ratings relied upon meaningless.

   a.     "It is a condition to the issuance of the term notes that they receive the ratings
shown on page S-6 of this prospectus supplement." Prospectus Supplement at S-
15.

   b.     "It is a condition to issuance of the term notes that they be rated 'Aaa' by
Moody's . . . and 'AAA' by Standard & Poor's . . . . A securities rating addresses
the likelihood of the receipt by the holders of the term notes of distributions on
the mortgage loans." Prospectus Supplement at S-113.

   c.     The initial ratings for the Certificates Allstate purchased are contained in Exhibit
C.

7.    **All of the following representations regarding the documentation basis for the loans
were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶
73-181.  A review by the defendants' own insurer found many files incomplete, and
Residential Funding itself has accused its originators of using incomplete loan files.

   a.     The Prospectus Supplement represented (at S-32) that 15,416 loans (85%) were
issued under "Standard" full-documentation procedures.

8.    **All of the following misrepresentations regarding credit enhancements were false
and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As
confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue
here, the collateral was significantly riskier than presented, rendering representations
regarding the efficacy or sufficiency of any structural 'credit enhancements' that
depended on or were derived from the quality of those loans false and misleading.

   a.     "Credit enhancement will consist of: excess interest, to the extent described in this
prospectus supplement; overcollateralization, to the extent described in this
prospectus supplement; and an irrevocable and unconditional financial guaranty
insurance policy issued by Financial Guaranty Insurance Company insuring the
term notes, which will protect holders of the term notes against certain shortfalls

in amounts due to be distributed at the times and to the extent described in this
prospectus supplement." Prospectus Supplement at S-1.

**Exhibit BB**
**Misrepresentations in the Offering Documents for GMACM 2006-HE3**

**Collateral type:** Fixed rate, closed-end home equity loans secured primarily by second liens on residential properties.

**Initial number of mortgage loans:** 16,558.

1.   **All of the following representations regarding underwriting guidelines were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181.  As confirmed by, among other things, a review of the defendants' loan files by their own insurer, the guidelines were systematically ignored.  This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

   a.    "All of the mortgage loans were originated generally in accordance with the underwriting standards of GMAC Mortgage Corporation." Prospectus Supplement at S-29.

   b.    "Each subsequent mortgage loan will have been underwritten substantially in accordance with the criteria set forth in this prospectus supplement under 'Description of the Mortgage Loans—Underwriting Standards.'" Prospectus Supplement at S-35.

   c.    "All of the mortgage loans were underwritten generally in accordance with GMAC Mortgage Corporation's underwriting standards . . . . GMAC Mortgage Corporation's underwriting standards with respect to the mortgage loans generally will conform to those published in the GMAC Mortgage Corporation underwriting guidelines, including the provisions of the GMAC Mortgage Corporation underwriting guidelines applicable to the GMAC Mortgage Home Equity Program." Prospectus Supplement at S-31.

   d.    "GMAC Mortgage Corporation's underwriting standards include a set of specific criteria pursuant to which the underwriting evaluation is made." Prospectus Supplement at S-33.

   e.    "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." Prospectus at 20.

   f.    "In most cases, under a traditional 'full documentation' program, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and

furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts." Prospectus at 20.

g.    "In general, these [automated] systems are programmed to review most of the information that is set forth in Residential Funding Corporation's underwriting criteria that is necessary to satisfy each underwriting program." Prospectus at 24.

h.    "Residential Funding Corporation generally will represent and warrant that . . . as of the cut-off date, the information set forth in a listing of the related loans was true and correct in all material respects." Prospectus at 34.

i.    "The level of review by Residential Funding Corporation, if any, will vary depending on several factors, including its experience with the seller. Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the loans purchased by Residential Funding Corporation for conformity with Residential Funding Corporation's underwriting standards or applicable underwriting standards specified in this prospectus or the accompanying prospectus supplement, and to assess the likelihood of repayment of the loan from the various sources for such repayment, including the borrower, the mortgaged property, and primary mortgage insurance, if any." Prospectus at 24.

2.    **All of the following representations regarding the use of exceptions were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a review of the defendants' loan files by their own insurer, underwriting "exceptions" were not given based on any positive compensating factors. This is further supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

a.    "The underwriting standards set forth in the GMAC Mortgage Corporation underwriting guidelines with respect to mortgage loans originated under the GMAC Mortgage Corporation Home Equity Program may be varied in appropriate cases." Prospectus Supplement at S-33.

b.    "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." Prospectus Supplement at S-33. *See also* Prospectus at 20.

c.    "The underwriting standards set forth in the GMAC Mortgage Corporation underwriting guidelines may be varied for certain refinance transactions. . . . Limited or reduced documentation refinances generally compensate for increased credit risk by placing greater emphasis on the borrower's payment history.

Generally. . . . the mortgage loan must demonstrate other compensating factors, such as a relatively low CLTV ratio or other favorable underwriting factors." Prospectus Supplement at S-34-35.

3.   **All of the following representations regarding whether the mortgaged property was owner-occupied were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A material amount of the loans were not in fact owner-occupied, and the defendants omitted that the given statistics were (due to their abandonment of their underwriting standards) baseless. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering.

   a.   The Prospectus Supplement represented (at A-I-4) that 16,327 loans (98.6%) were for primary residences.

   b.   Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy was only 85.8%, i.e., the Offering Materials overstated the amount of owner occupancy by 12.8%.

4.   **All of the following representations regarding the loan-to-value ratios were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. The defendants knowingly used inflated appraisal values and excluded additional liens in order to get more loans approved. This is evidenced by Allstate's analysis of 30,000 Mortgage Loans discussed herein and in the Complaint, which were generated and underwritten by the same defendants, at the same time, purportedly using the same procedures as those represented in this offering. This is further evidenced by testimony regarding the rampant conflicts of interest within the appraisal process at the time the Certificates were issued.

   a.   The Prospectus Supplement represented (at A-I-4):

      i.    The weighted average CLTV ratio was 74.84%.

      ii.   Only 4,180 loans (25.2%) had a CLTV higher than 90%.

      iii.  No loan had a CLTV higher than 100%.

   b.   "The mortgage loans included in the mortgage pool generally were originated subject to a maximum CLTV Ratio of 100.00%." Prospectus Supplement at S-33.

   c.   "The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal. . . . The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed." Prospectus at 21.

Amended Complaint                    BB-3                    GMACM 2006-HE3

d.    "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed . . . . currently supports, . . . . and is anticipated to support in the future, the outstanding loan balance." Prospectus at 22-23.

e.    "If a full appraisal is required, the appraiser may be required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. . . . The appraisal is based on various factors, including the market value of comparable homes and the cost of replacing the improvements." Prospectus Supplement at S-34.

f.    Based on Allstate's analysis of 30,000 loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i.    The weighted average CLTV ratio was understated by 12.98%.

    ii.    The number of loans that had a CLTV higher than 100% was understated by 37.15%.

    iii.    46.60% of the loans had a CLTV that was at least 10% higher than those loans supposedly had.

    iv.    17.39% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

5.    **All of the following representations regarding the purported sufficiency of the borrower's income were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As the defendants systematically abandoned their underwriting guidelines, the representations were baseless. Their falsity is confirmed by a review of the defendants' loan files by their own insurer, and is further confirmed by the rising delinquency rates for the Mortgage Loans, which shows borrowers were put into loans they could not afford.

a.    "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, such as property taxes and hazard insurance, and other financial obligations, including debt service on any related mortgage loan secured by a senior lien on the related mortgaged property." Prospectus Supplement at S-34.

b.    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income, if required to be stated, would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property. Examples of other expenses include property taxes, utility

costs, standard hazard and primary mortgage insurance, maintenance fees and other levies assessed by a Cooperative, if applicable, and other fixed obligations other than housing expenses including, in the case of loans secured by a junior lien on the related mortgaged property, payments required to be made on any senior mortgage." Prospectus at 23.

c.  "[L]oans were generally originated with a maximum total monthly debt to income ratio of 45%, although variances are permitted based on compensating factors." Prospectus Supplement at S-33.

d.  "The weighted average debt-to-income ratio of the initial mortgage [loans] as of the cut-off date is approximately 38.63%." Prospectus Supplement at A-I-6.

6.  **All of the following representations regarding the credit ratings were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. Unknown to Allstate, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, rendering the ratings relied upon meaningless.

a.  "It is a condition to the issuance of the notes that they receive the ratings shown on page S-7 of this prospectus supplement." Prospectus Supplement at S-14.

b.  "It is a condition to the issuance of the notes that they be rated 'Aaa' by Moody's Investors Service, Inc., or Moody's and 'AAA' by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or Standard & Poor's .... A securities rating addresses the likelihood of the receipt by the holders of the term notes of distributions on the mortgage loans." Prospectus Supplement at S-98.

c.  The initial ratings for the Certificates Allstate purchased are contained in Exhibit C.

7.  **All of the following representations regarding the documentation basis for the loans were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. A review by the defendants' own insurer found many files incomplete, and Residential Funding itself has accused its originators of using incomplete loan files.

a.  The Prospectus Supplement represented (at A-I-5) that 9,174 loans (55%) were issued under "Standard" full-documentation procedures.

8.  **All of the following misrepresentations regarding credit enhancements were false and misleading for the reasons set forth in the Complaint.** *See, e.g.,* ¶¶ 73-181. As confirmed by, among other things, a loan-level analysis of the Mortgage Loans at issue here, the collateral was significantly riskier than presented, rendering representations regarding the efficacy or sufficiency of any structural 'credit enhancements' that depended on or were derived from the quality of those loans false and misleading.

a.    "Credit enhancement will consist of: excess interest, to the extent described in this
prospectus supplement; overcollateralization, to the extent described in this
prospectus supplement; and an irrevocable and unconditional financial guaranty
insurance policy issued by Financial Guaranty Insurance Company insuring the
term notes, which will protect holders of the term notes against certain shortfalls
in amounts due to be distributed at the times and to the extent described in this
prospectus supplement." Prospectus Supplement at S-1.

b.    "The credit enhancement provided for the benefit of the notes consists of: <u>Excess
Interest</u>. Because the mortgagors are expected to pay more interest on the
mortgage loans than is necessary to pay the interest on the notes and the premium
for the policy, there may be excess interest. Some of this excess interest may be
used to protect the notes against some losses by making an additional payment of
principal up to the amount of the losses. <u>Overcollateralization</u>. Excess interest
will be used to make additional principal payments on the notes, until the
aggregate principal balance of the mortgage loans exceeds the aggregate principal
amount of the notes by a specified amount. This excess will represent
overcollateralization, which may absorb some losses on the mortgage loans if they
are not covered by excess interest. If the level of overcollateralization falls below
what is required, the excess interest described above will be paid to the notes as
principal, until the required level of overcollateralization is reached. As of the
closing date, the sum of the aggregate principal balance of the mortgage loans
conveyed to the trust fund and the amount on deposit in the prefunding account
will exceed the aggregate outstanding principal balance of the notes by at least
$6,895,742.50. This amount represents an initial overcollateralization of the notes
relative to the mortgage loans and the initial amount on deposit in the pre-funding
account. The cashflow mechanics for the notes are intended to increase this
overcollateralization by applying all or a portion of the excess spread to the
payment of principal of the notes as further described in this prospectus
supplement. <u>Policy</u>. On the closing date, the credit enhancer will issue the
financial guaranty insurance policy in favor of the indenture trustee for the benefit
of the noteholders. The policy will unconditionally and irrevocably guarantee
interest on the notes at the note rate, other than Relief Act Shortfalls, prepayment
interest shortfalls and any amounts owing under the yield maintenance agreement,
will cover the principal portion of any losses allocated to the notes not covered by
excess interest or overcollateralization and will guarantee the outstanding note
principal balance due on the notes on the final payment date. The policy is not
cancelable for any reason." Prospectus Supplement at S-12, S-13.