**<u>Exhibit 7</u>**

**Amended Complaint,**
***Mass Mutual Life Ins. Co. v. Residential Funding Co.*,**
**No. 3:11-cv-30035-MAP (D. Mass. May 17, 2012) [Docket No. 86]**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | ) ) ) ) | Civil Action No. 3:11-30035-MAP |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **[PROPOSED] FIRST AMENDED COMPLAINT** |
| RESIDENTIAL FUNDING COMPANY, LLC (F/K/A RESIDENTIAL FUNDING CORPORATION); RESIDENTIAL ACCREDIT LOANS, INC.; RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.; RESIDENTIAL ASSET SECURITIES CORPORATION; RESIDENTIAL FUNDING SECURITIES, LLC (F/K/A RESIDENTIAL FUNDING SECURITIES CORPORATION); UBS SECURITIES LLC; BRUCE J. PARADIS; DAVEE L. OLSON; DAVID C. WALKER; KENNETH M. DUNCAN; RALPH T. FLEES; JAMES G. JONES; and DAVID M. BRICKER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) | |

Plaintiff Massachusetts Mutual Life Insurance Company ("MassMutual"), by and through

its attorneys, brings this action against Residential Funding Company, LLC (f/k/a Residential

Funding Corporation); Residential Accredit Loans, Inc.; Residential Asset Mortgage Products,

Inc.; Residential Asset Securities Corporation; and Residential Funding Securities, LLC (f/k/a

Residential Funding Securities Corporation) (collectively, "RFC" or the "RFC Defendants");

UBS Securities LLC (the "Underwriter Defendant"); and Bruce J. Paradis; Davee L. Olson;

David C. Walker; Kenneth M. Duncan; Ralph T. Flees; James G. Jones; and David M. Bricker

(collectively, the "Officer Defendants"), and alleges as follows:

## NATURE OF ACTION

1.      This action arises out of the sale of certain residential mortgage-backed securities

(the "Certificates") to MassMutual.  The Certificates were sold pursuant to public filings and

offering materials that contained untrue statements and omissions of material facts, in violation

of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410.

2.      In 2004, General Motors Acceptance Corporation formed Residential Capital,

LLC ("Residential Capital") to take advantage of the exploding market for residential mortgage-

backed securities.  Residential Capital's business focused on the origination, purchase, service,

sale, and securitization of residential mortgage loans.

3.      The RFC Defendants, all wholly owned subsidiaries of Residential Capital,

originated and purchased mortgage loans that could not be sold to the Federal Home Loan

Mortgage Corporation ("Freddie Mac") or the Federal National Mortgage Association ("Fannie

Mae").  Instead, the RFC Defendants securitized these non-conforming loans for sale to

investors, such as MassMutual.  They earned substantial profits originating and securitizing the

loans, but they did not have to bear the loss if the loans defaulted.

Case 3:11-cv-30035-MMM   Document 85   Filed 02/12/12   Page 4 of 82

4.      In marketing the Certificates to MassMutual, the RFC Defendants and Underwriter Defendant represented that the loans backing the securities were underwritten in accordance with prudent underwriting standards that ensured a borrower could repay the loan. The RFC Defendants and Underwriter Defendant also represented that the loans had certain characteristics, including defined loan-to-value ratios and specific owner-occupancy statistics.

5.      These representations were material to MassMutual's decision to purchase Certificates because the RFC Defendants and Underwriter Defendant were the exclusive source of information regarding the loans backing the securities.  Unlike the RFC Defendants and Underwriter Defendant, MassMutual did not have access to loan files.  MassMutual therefore depended on the RFC Defendants and Underwriter Defendant to perform the necessary due diligence to verify that the information presented to it and other investors was true and accurate.

6.      In reality, however, the loans backing the Certificates deviated substantially from what was represented to MassMutual.  To generate an ever-growing volume of loans to sell to investors, the RFC Defendants abandoned their disclosed underwriting guidelines, often originating or purchasing loans issued to borrowers regardless of ability to repay.  The loans were issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, and exceptions to underwriting criteria that had no proper justification.

7.      Just years after MassMutual purchased the Certificates, they now qualify as junk. In a majority of the 18 securitizations in which MassMutual purchased Certificates, over 40% of the loans backing the securities have now defaulted, been foreclosed upon, or are delinquent.  A subsequent forensic analysis commissioned by MassMutual has demonstrated that the representations about the loans in all the securitizations were materially false.  Under the

Massachusetts Uniform Securities Act, MassMutual is entitled to rescind its purchase of these securities.

**PARTIES**

### A.    Plaintiffs

8.    Plaintiff Massachusetts Mutual Life Insurance Company is a Massachusetts mutual life insurance company with its principal place of business in Springfield, Massachusetts. Founded in 1851, MassMutual is a leading, diversified financial services organization providing life insurance, disability income insurance, long-term care insurance, annuities, retirement and income products, investment management, mutual funds, and trust services to individual and institutional customers.

### B.    RFC Defendants

9.    Defendant Residential Funding Company, LLC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. Prior to approximately October 2006, Residential Funding Company, LLC operated as Residential Funding Corporation, a Delaware corporation with its principal place of business in Minneapolis, Minnesota. Residential Funding Company, LLC and its predecessor, Residential Funding Corporation, are referred to herein as "Residential Funding." Residential Funding was the Sponsor for all securitizations at issue in this action.

10.    Defendant Residential Accredit Loans, Inc. ("RALI") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. RALI was the Depositor for 10 of the 18 securitizations at issue in this action.

11.    Defendant Residential Asset Mortgage Products, Inc. ("RAMP") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. RAMP was the Depositor for 6 of the 18 securitizations at issue in this action.

12.     Defendant Residential Asset Securities Corporation ("RASC") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  RASC was the Depositor for 2 of the 18 securitizations at issue in this action.

13.     Defendant Residential Funding Securities, LLC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  Prior to approximately April 2006, Residential Funding Securities, LLC operated as Residential Funding Securities Corporation, a Delaware corporation with its principal place of business in Minneapolis, Minnesota.  Residential Funding Securities, LLC and Residential Funding Securities Corporation are referred to herein as "Residential Securities."  Residential Securities was the Underwriter for 4 of the 18 securitizations at issue in this action.

### C.     Underwriter Defendant

14.     Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company with its principal place of business in Stamford, Connecticut.  UBS was the Underwriter for 1 of the 18 securitizations at issue in this action.

### D.     Officer Defendants

15.     Defendant Bruce J. Paradis joined Residential Funding in 1983, and served in several executive positions prior to becoming its President and Chief Executive Officer in 1994.  At all relevant times, Paradis also served as President of Residential Securities.  In addition, Paradis served as President, Chief Executive Officer, and a director of each of RALI, RAMP, and RASC.  Paradis signed registration statements for 17 of the 18 securitizations at issue in this action.

16.     Defendant Davee L. Olson served as an officer of Residential Funding for over 15 years.  He served as a vice president of finance from 1987 until 1990, as a senior vice president of finance from 1990 until 1991, and as the Chief Financial Officer from 1991 to January 2005.

4

Olson also served as a director of RALI, as the Chief Financial Officer and a director of RAMP, and as a director of RASC. Olson signed registration statements for 14 of the 18 securitizations at issue in this action.

17. Defendant David C. Walker joined General Motors Acceptance Corporation, the parent company of Residential Funding, in 1985. He served as managing director, Chief Financial Officer, and a member of the board of directors of GMAC Mortgage Group since January 2000, and as director of U.S. funding and securitization at GMAC from September 1998 until December 1999. Walker also served as a director of each of Residential Funding, RALI, and RAMP. Walker signed registration statements for 4 of the 18 securitizations at issue in this action.

18. Defendant Kenneth M. Duncan served as Acting Chief Financial Officer of each of Residential Funding, RALI, RAMP, and RASC. Duncan signed registration statements for 16 of the 18 securitizations at issue in this action.

19. Defendant Ralph T. Flees served as Controller and Principal Accounting Officer of each of RALI, RAMP, and RASC. Flees signed registration statements for 17 of the 18 securitizations at issue in this action.

20. Defendant James G. Jones was President, Chief Financial Officer, and a director of RALI. Jones signed the registration statement for one securitization at issue in this action.

21. Defendant David M. Bricker was the Chief Financial Officer and a director of RALI. Bricker signed the registration statement for one securitization at issue in this action.

**E.      Relevant Non-Parties**

22. The Certificates for each securitization relevant to this action were issued by a trust established by the Depositor. The 18 issuing trusts (collectively, the "Trusts") were: RALI Series 2005-QO3 Trust, RALI Series 2005-QO4 Trust, RAMP Series 2005-RZ1 Trust, RAMP

Series 2006-EFC2 Trust, RASC Series 2006-EMX6 Trust, RALI Series 2006-QA6 Trust, RALI

Series 2006-QO1 Trust, RALI Series 2006-QO3 Trust, RALI Series 2006-QO4 Trust, RALI

Series 2006-QO5 Trust, RALI Series 2006-QO6 Trust, RALI Series 2006-QO9 Trust, RAMP

Series 2006-RS4 Trust, RAMP Series 2006-RS6 Trust, RAMP Series 2006-RZ3 Trust, RASC

Series 2007-KS3 Trust, RALI Series 2007-QH6 Trust, and RAMP Series 2007-RZ1 Trust.

23.     At all relevant times, the defendants committed the acts, caused or directed others

to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any

allegations about acts of corporate defendants means that those acts were committed through

their officers, directors, employees, agents, and/or representatives while those individuals were

acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

24.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is

complete diversity of citizenship between the parties, and the amount in controversy exceeds

$75,000, exclusive of interest and costs.

25.     This Court has personal jurisdiction over the defendants by virtue of their

securities sales in Massachusetts.

26.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391,

because substantial events giving rise to this Complaint took place in Massachusetts.

## SUBSTANTIVE ALLEGATIONS

27.     During the time that MassMutual purchased the Certificates, the RFC Defendants

were all wholly owned subsidiaries of Residential Capital, LLC, formerly Residential Capital

Corporation ("Residential Capital").  The RFC Defendants operated collectively, as an

enterprise, to structure and market the 18 securitizations at issue in this action.

6

28. Residential Capital was formed by General Motors Acceptance Corporation in 2004 to take advantage of the exploding market for residential mortgage-backed securities.

## I.  THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES

29. In the 1980's and 1990's, mortgage originators followed a traditional model for originating mortgage loans. Under the traditional model, they either held the mortgage loans they provided to borrowers through the terms of the loans, or sold the mortgage loans to governmental agencies Fannie Mae and Freddie Mac.

30. Loans held by mortgage originators were typically conservative, first-lien loans to prime borrowers because the originator would profit if the borrower made timely interest and principal payments, but would bear the loss if the borrower defaulted and the property value was insufficient to repay the loan. As a result, the originator had economic incentives to establish the creditworthiness of the borrower and the true value of the underlying property by appraising it fairly before issuing the mortgage loan.

31. Loans sold to Fannie Mae and Freddie Mac were also conservative loans to prime borrowers because the loans had to meet specific guidelines for sale. By law, Fannie Mae and Freddie Mac can purchase only those mortgage loans that conform to certain regulatory guidelines. These loans are known in the industry as conforming loans, and are historically the most conservative loans with the lowest rates of delinquency and default. Mortgage loans that fail to meet the regulatory guidelines are known in the industry as non-conforming loans.

32. In the 1980's and 1990's, Fannie Mae and Freddie Mac securitized the loans they purchased from mortgage originators and sold the securities backed by the loans, referred to as residential mortgage-backed securities, to investors. Investors in these early mortgage-backed securities were provided protections not only because the underlying loans conformed to strict regulatory guidelines, but also because Fannie Mae and Freddie Mac guaranteed that investors

would receive timely payments of principal and interest.  Because Fannie Mae and Freddie Mac

were perceived as being backed by the federal government, investors viewed the guarantees as

diminishing credit risk, if not removing it altogether.

33.     In the early 2000's, the demand for securities backed by mortgage loans

increased.  Private financial institutions stepped in to meet the demand by originating an ever-

growing number of non-conforming loans, such as loans based on reduced documentation, loans

issued to subprime borrowers, and adjustable loans where the interest rate increases after a

period of time.  These loans were then securitized for sale to private investors.  By 2001, $240

billion in residential mortgage-backed securities were issued through private securitizations.  By

2006, that amount had increased by almost five times – to $1.033 trillion.

34.     Residential Capital was formed to take advantage of this exploding market.

According to Inside Mortgage Finance, Residential Capital issued $42.336 billion in residential

mortgage-backed securities in 2004 and $56.93 billion in 2005.  In 2005, Residential Capital was

the fifth-largest issuer of securities backed by non-conforming loans.  In 2006, Residential

Capital increased its production to $66.2 billion in residential mortgage-backed securities, and

became the fourth-largest issuer of securities backed by non-conforming loans.  In 2007,

Residential Capital issued $6.6 billion of subprime residential mortgage-backed securities and an

additional $22.2 billion of Alt-A securities.

## II.     THE SECURITIZATION PROCESS

35.     To create residential mortgage-backed securities, such as the Certificates

purchased by MassMutual, a process known as mortgage securitization is used.  Mortgage loans

are acquired from mortgage originators and pooled together, with securities constituting interests

in the cash flow from the mortgage pools then sold to investors.  The securities are also referred

to as mortgage pass-through securities because the cash flow from the pool of mortgages is

8

passed through to the securities holders when payments are made by the underlying mortgage

borrowers.

36.    Each securitization involves several entities that perform distinct tasks. The first

step in creating a residential mortgage-backed security, such as the Certificates, is the acquisition

by the Depositor of an inventory of mortgage loans from a Sponsor (also referred to as a Seller),

which either originates the loans or acquires the loans from other mortgage originators in

exchange for cash. The Depositor is often a subsidiary or other affiliate of the Sponsor.

37.    The Depositor then securitizes the pool of loans by forming one or more mortgage

pools with the inventory of loans, and creating tranches of interests in the mortgage pools with

various levels of seniority. Interests in these tranches are then issued by the Depositor (who then

serves as the Issuer) through a trust in the form of bonds, or certificates.

38.    Each tranche has a different level of purported risk and reward, and, often, a

different credit rating. The most senior tranches often receive the highest investment grade

rating (triple-A). Junior tranches, which usually have lower ratings, are more exposed to risk,

but offer higher potential returns. The most senior tranches of securities will be entitled to

payment in full before the junior tranches. Conversely, losses on the underlying loans in the

asset pool – whether due to default, delinquency, or otherwise – are allocated first to the most

subordinate or junior tranche of securities, then to the tranche above that. This hierarchy in the

division of cash flows is referred to as the flow of funds or waterfall.

39.    The Depositor works with one or more of the nationally recognized credit-rating

agencies to ensure that each tranche of the mortgage-backed securities receives the rating desired

by the Depositor (and Underwriter). Once the asset pool is securitized, the certificates are issued

to one or more Underwriters (typically Wall Street banks), who resell them to investors, such as MassMutual.

40.     Because the cash flow from the loans in the mortgage pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends primarily on the credit quality of the loans in the mortgage pool, which often includes thousands of loans.  Detailed information about the credit quality of the loans is contained in the loan files developed and maintained by the mortgage originators when making the loans.  For residential mortgage loans, such as the loans that backed the Certificates purchased by MassMutual, each loan file normally contains documents including the borrower's application for the loan, verification of income, assets, and employment, references, credit reports, and an appraisal of the property that will secure the loan and provide the basis for other measures of credit quality, such as loan-to-value ratios, and occupancy status.  The loan file should also include notes from the person who underwrote the loan describing the loan's purported compliance with underwriting guidelines, and documentation of compensating factors that justified any departure from those standards.

41.     Investors do not have access to the loan files.  Instead, the Sponsor, Depositor, and Underwriter are responsible for gathering and verifying information about the credit quality and characteristics of the loans that are deposited into the trust, and presenting this information in the registration statements, prospectuses, and prospectus supplements (collectively, the "Offering Materials") prepared for potential investors.  This due diligence process is a critical safeguard for investors and a fundamental legal obligation of the Sponsor, Depositor, and Underwriter.

## III.  **MASSMUTUAL'S PURCHASES OF RFC CERTIFICATES**

42.    MassMutual purchased Certificates sponsored by Residential Funding between

March 2005 and June 2007.  MassMutual made the following purchases of Certificates,

representing a total investment of approximately $300 million, from the following defendants:

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| RAMP Series 2005-RZ1, Class M1 and Class M2 | Residential Asset Mortgage Products, Inc. Series 2005-RZ1 | 9,250,000.00 | Residential Funding Corporation (Sponsor) Residential Asset Mortgage Products, Inc. (Depositor) |
| RALI Series 2005-QO3 , Class A1 | Residential Accredit Loans, Inc. Series 2005-QO3 | 23,544,062.50 | Residential Funding Corporation (Sponsor) Residential Accredit Loans, Inc. (Depositor) Residential Funding Securities Corporation (Underwriter) |
| RALI Series 2005-QO4, Class 2A1 | Residential Accredit Loans, Inc. Series 2005-QO4 | 25,000,000.00 | Residential Funding Corporation (Sponsor) Residential Accredit Loans, Inc. (Depositor) |

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| RALI Series 2006-QO1, Class 3A1 | Residential Accredit Loans, Inc. Series 2006-QO1 | 50,000,000.00 | Residential Funding Corporation (Sponsor) Residential Accredit Loans, Inc. (Depositor) |
| RALI Series 2006-QO3, Class A1 | Residential Accredit Loans, Inc. Series 2006-QO3 | 45,000,000.00 | Residential Funding Corporation (Sponsor) Residential Accredit Loans, Inc. (Depositor) |
| RALI Series 2006-QO4, Class 2A1 | Residential Accredit Loans, Inc. Series 2006-QO4 | 40,050,000.00 | Residential Funding Corporation (Sponsor) Residential Accredit Loans, Inc. (Depositor) |
| RALI Series 2006-QO5, Class 2A1 | Residential Accredit Loans, Inc. Series 2006-QO5 | 36,094,500.00 | Residential Funding Corporation (Sponsor) Residential Accredit Loans, Inc. (Depositor) UBS Securities LLC (Underwriter) |
| RAMP Series 2006-RS4, Class M9 | Residential Asset Mortgage Products Series 2006-RS4 | 2,000,000.00 | Residential Funding Corporation (Sponsor) Residential Asset Mortgage Products, Inc. (Depositor) |

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| RALI Series 2006-QO6, Class A2 | Residential Accredit Loans, Inc. Series 2006-QO6 | 6,000,000.00 | Residential Funding Corporation (Sponsor)<br><br>Residential Accredit Loans, Inc. (Depositor) |
| RASC Series 2006-EMX6, Class M8 and Class M9 | Residential Asset Securities Corp. Series 2006-EMX6 Class M9 | 1,750,000.00 | Residential Funding Corporation (Sponsor)<br><br>Residential Asset Securities Corporation (Depositor)<br><br>Residential Funding Securities, LLC (Underwriter) |
| RALI Series 2006-QA6, Class A2 and Class A3 | Residential Accredit Loans, Inc. Series 2006-QA6 | 27,113,752.75 | Residential Funding Corporation (Sponsor)<br><br>Residential Accredit Loans, Inc. (Depositor)<br><br>Residential Funding Securities, LLC (Underwriter) |
| RAMP Series 2006-RZ3, Class M8 | Residential Asset Mortgage Products Series 2006-RZ3 | 1,000,000.00 | Residential Funding Corporation (Sponsor)<br><br>Residential Asset Mortgage Products, Inc. (Depositor) |

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| RAMP Series 2006-RS6, Class M7 | Residential Asset Mortgage Products Series 2006-RS6 | 1,375,000.00 | Residential Funding Company, LLC (Sponsor)<br><br>Residential Asset Mortgage Products, Inc. (Depositor) |
| RAMP Series 2006-ECF2, Class M8 | Residential Asset Mortgage Products, Inc. Series 2006-EFC2 | 1,200,000.00 | Residential Funding Company, LLC (Sponsor)<br><br>Residential Asset Mortgage Products, Inc. (Depositor)<br><br>Residential Funding Securities, LLC (Underwriter) |
| RALI Series 2006-QO9, Class M8 | Residential Accredit Loans, Inc. Series 2006-QO9 | 4,927,018.59 | Residential Funding Company, LLC (Sponsor)<br><br>Residential Accredit Loans, Inc. (Depositor) |
| RAMP Series 2007-RZ1, Class M6, Class M7, and Class M8 | Residential Asset Mortgage Products, Inc. Series 2007-RZ1 | 1,955,585.94 | Residential Funding Company, LLC (Sponsor)<br><br>Residential Asset Mortgage Products, Inc. (Depositor) |

| Asset | Full Name of Offering | Purchase Price | Seller Defendants |
|---|---|---|---|
| RASC Series 2007-KS3, Class M3S | Residential Asset Securities Corp. Series 2007-KS3 | 3,000,000.00 | Residential Funding Company, LLC (Sponsor)<br><br>Residential Asset Securities Corporation (Depositor) |
| RALI Series 2007-QH6, Class A1 | Residential Accredit Loans, Inc. Series 2007-QH6 | 15,808,017.00 | Residential Funding Company, LLC (Sponsor)<br><br>Residential Accredit Loans, Inc. (Depositor) |
|  |  |  |  |
| TOTAL |  | 295,067,936.78 |  |

## IV.   DEFENDANTS' ABANDONMENT OF THEIR DISCLOSED UNDERWRITING STANDARDS TO FACILITATE SALE OF LOW-QUALITY LOANS TO INVESTORS

### A.   RFC's Representations That It Consistently Followed Underwriting Standards

43.   The fundamental basis upon which residential mortgage-backed securities are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral for those loans.  If the borrowers cannot pay, and the collateral is insufficient, the investors incur losses.  For this reason, the underwriting standards and practices of the mortgage originator that issued the loans backing the certificates, and the representations in the Offering Materials regarding those standards, are critically important to the value of the securities, and to investors' decisions to purchase the securities.

44.   As Sponsor of the securitizations at issue, Residential Funding either originated the underlying mortgage loans through its wholly owned subsidiary, Homecomings Financial,

LLC, formerly Homecomings Financial Network, Inc. ("Homecomings"), or purchased them

from other originators.  Each loan was purportedly underwritten according to a set of

underwriting guidelines, which are specified criteria that the mortgage loans must meet

depending upon the individual loan program and circumstances of each mortgage loan.  In

general, the underwriting guidelines stipulated what documentation was required to be included

in the mortgage loan files for each loan product (which may include, depending upon the loan

product, verifications of income, assets, closing funds and payment histories, among others) and

criteria for eligibility, including tests for debt-to-income ("DTI") and combined loan-to-value

("CLTV") ratios.

45.    The RFC Defendants represented to investors that the securitized loans were

underwritten according to meaningful underwriting standards.

46.    From 2005 to 2007, Residential Capital consistently reported in its public filings

for itself and its subsidiaries, including all RFC Defendants, that underwriting standards were

consistently applied, even for non-conforming loans, to confirm a borrower's credit profile and

to produce performing loans:

> All mortgage loans that we originate and most of the mortgage loans we
> purchase are subject to our underwriting guidelines and loan origination
> standards.  When originating mortgage loans . . . , we follow established
> lending policies and procedures that require consideration of a variety of
> factors, including:
>
> • the borrower's capacity to repay the loan;
>
> • the borrower's credit history;
>
> • the relative size and characteristics of the proposed loan; and
>
> • the amount of equity in the borrower's property (as measured
>   by the borrower's loan-to-value ratio).

Our underwriting standards have been designed to produce loans that meet
the credit needs and profiles of our borrowers, thereby creating more
consistent performance characteristics for investors in our loans.

47.    Residential Capital also consistently reported from 2005 to 2006 that quality

control and periodic audits ensured the consistent application of underwriting standards:

We also conduct a variety of quality control procedures and periodic
audits to ensure compliance with our origination standards, including our
responsible lending standards and legal requirements. Although many of
these procedures involve manual reviews of loans, we seek to leverage our
technology in further developing our quality control procedures. For
example, we have programmed many of our compliance standards into our
loan origination systems and continue to use and develop automated
compliance technology to mitigate regulatory risk.

48.    Representations about the underwriting standards were repeated in the Offering

Materials for each of the 18 securitizations.

49.    The Offering Materials promised investors that the mortgage originators for the

loans had collected a variety of financial information about a borrower to ensure that the

borrower could repay the loan:

As part of the description of the mortgagor's financial condition, each
mortgagor is required to furnish information . . . regarding its assets,
liabilities, income (except as described below), credit history and
employment history, and to furnish an authorization to apply for a credit
report which summarizes the borrower's credit history with local
merchants and lenders and any record of bankruptcy.  The mortgagor may
also be required to authorize verifications of deposits at financial
institutions where the mortgagor had demand or savings accounts.

50.    The Offering Materials promised investors that only borrowers who could repay

loans had received them:

Based on the data provided in the application and certain verifications, if
required, and the appraisal or other valuation of the mortgaged property, a
determination will have been made by the original lender that the
mortgagor's monthly income, if required to be stated, would be sufficient
to enable the mortgagor to meet its monthly obligations on the mortgage
loan and other expenses related to the property . . . . Generally, scheduled

payments on a mortgage loan during the first year of its term plus taxes
and insurance and all scheduled payments on obligations that extend
beyond ten months, including those mentioned above and other fixed
obligations, must equal no more than specified percentages of the
prospective mortgagor's gross income.

51.     The Offering Materials also promised investors that Residential Funding itself had

reviewed the underwriting information to confirm compliance with underwriting standards:

Prior to assigning the mortgage loans to the depositor, Residential Funding
will have reviewed the underwriting information provided . . . for the
mortgage loans and, in those cases, determined that the mortgage loans
were generally originated in accordance with or in a manner generally
consistent with the underwriting standards . . . .

52.     The review by Residential Funding including sampling mortgage loans to confirm

conformity with underwriting standards and likelihood of repayment:

Residential Funding Corporation, on behalf of the depositor, typically will
review a sample of the mortgage loans purchased by Residential Funding
Corporation for conformity with the applicable underwriting standards and
to assess the likelihood of repayment of the mortgage loan from the
various sources for such repayment, including the mortgagor, the
mortgaged property, and primary mortgage insurance, if any.

53.     Finally, the Offering Materials promised investors that all loans were issued in

substantial compliance with underwriting standards, and that any deviation from a specific

criteria was justified by sufficient positive compensating factors:

[A] mortgage loan will be considered to be originated in accordance with
the underwriting standards described above if, based on an overall
qualitative evaluation, the loan is in substantial compliance with the
underwriting standards. For example, a mortgage loan may be considered
to comply with the underwriting standards described above, even if one or
more specific criteria included in the underwriting standards were not
satisfied, if other factors positively compensated for the criteria that were
not satisfied.

**B.**    **RFC's Abandonment of Underwriting Standards to Generate a Large Volume of Loans for Securitization, With Investors Bearing the Risk of Loss**

54.    The securitization process incentivized RFC to abandon underwriting standards so that it could originate and purchase huge volumes of low-quality loans to securitize.

55.    As the private residential mortgage-backed securities market expanded, the traditional "originate to hold" model morphed into the "originate to distribute" model.  Under the "originate to distribute" model, mortgage companies, such as the RFC Defendants, no longer held the mortgage loans to maturity.  Rather, they shifted the risk of loss to the investors who purchased an interest in the securitized pool of loans.

56.    The new distribution model was highly profitable for the RFC Defendants and other mortgage companies.  By securitizing and selling mortgage loans to investors through underwriters, mortgage companies received immediate payment for the loans, shifted the loans off their books, and were able to issue more loans.  The securitization process enabled the mortgage companies to earn most of their income from transaction and loan-servicing fees.  Because the mortgage companies did not have to bear the risk of loss, they had an unchecked incentive to originate more and more loans to feed into the securitization machine.

57.    The Attorney General for the Commonwealth of Massachusetts explained this unchecked incentive in her investigation into the subprime mortgage industry:

> Historically, the vast majority of home mortgages were written by banks which held the loans in their own portfolios, knew their borrowers, and earned profit by writing good loans and collecting interest over many years.  Those banks had to live with their "bad paper" and thus had a strong incentive to avoid making bad loans.  In recent years, however, the mortgage market has been driven and funded by the sale and securitization of the vast majority of loans.  Lenders now frequently make mortgage loans with the intention to promptly sell the loan and mortgage to one or more entities. ... The lenders' incentives thus changed from writing good loans to writing a huge volume of loans to re-sell, extracting their profit at the front end, with considerably less regard to the ultimate performance of the loans.

19

58.     Ben Bernanke, Chairman of the Federal Reserve Bank, also explained the

incentive to abandon underwriting standards in Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on
> the terms of the sale, much or all of the risks are passed on to the loan
> purchaser.  Thus, originators who sell loans may have less incentive to
> undertake careful underwriting than if they kept the loans. Moreover, for
> some originators, fees tied to loan volume made loan sales a higher
> priority than loan quality.  This misalignment of incentives, together with
> strong investor demand for securities with high yields, contributed to the
> weakening of underwriting standards.

59.     To take advantage of the exploding market for residential mortgage-backed

securities, the RFC Defendants abandoned their disclosed underwriting guidelines to originate

and purchase as many loans as possible for securitization.

60.     Unbeknownst to MassMutual, the RFC Defendants originated or purchased loans

that had been issued to borrowers, regardless of their ability to pay.  The loans were often issued

on the basis of overstated incomes, inflated appraisals, false verifications of employment, or

exceptions to underwriting criteria that had no proper justification.  The origination practices

engaged in by the RFC Defendants and the originators from which they purchased were in

blatant disregard of RFC's disclosed underwriting standards, and any semblance of reasonable

and prudent underwriting.

61.     The RFC Defendants' abandonment of their underwriting guidelines has been the

subject of multiple investigations and lawsuits.  For example, in the case *MBIA Insurance Co. v.

Residential Funding Corp.*, No 603552-2008 (NY State Supreme Court), MBIA states that it

obtained mortgage loans for multiple RFC transactions and found that out of 7,913 loans

examined, "at least 7,019 – more than 88% of the mortgage loans that MBIA reviewed – were

not originated or acquired in material compliance with RFC's representations and warranties."

Similarly, in *New Jersey Carpenters Health Fund, et al v. Residential Capital, LLC*, et al, 08-

CV-8781 (S.D.N.Y. 2008), plaintiff pension funds alleged violations of underwriting guidelines

and misrepresentations relating to underwriting guidelines by RFC in the Offering Materials of

10 RFC sponsored securities, including 2 at issue here—RALI 2006-QO6 and RALI 2006-QO9.

In that complaint, plaintiffs state, "The descriptions of the underwriting guidelines included in

the Offering Documents described the policies employed by RFC, by way of its wholly-owned

subsidiary [Homecomings] in examining borrower creditworthiness and verifying borrower

information . . . and in conducting appraisals of the mortgaged properties . . . .  These portions of

the Offering Documents also contained misstatements and omissions since, as has emerged only

well after issuance of the  Certificates, [Homecomings] and its correspondent lenders

systematically disregarded the stated underwriting guidelines set forth in the Offering

Documents."

### C.    Widespread Defaults That Confirm RFC's Abandonment of Its Underwriting Standards

62.    Even though the Certificates purchased by MassMutual were supposed to be long-

term, stable investments, just years after their issuance, a substantially high percentage of the

mortgage loans backing the Certificates have defaulted, been foreclosed upon, or are delinquent,

resulting in massive losses to the certificateholders, including MassMutual.  The following table

contains the most recent performance data available for the loan pools:

| Transaction | Number of Loans in Pool at Closing | Current Number of Loans in Pool | Number of Loans Liquidated or Foreclosed Upon | Number of Loans in Default or Delinquent | % of Loans Liquidated, Foreclosed Upon, in Default or Delinquent |
|---|---|---|---|---|---|
| RALI 2005-QO3 | 1414 | 254 | 348 | 91 | 31.05% |
| RALI 2005-QO4 | 2306 | 458 | 600 | 154 | 32.70% |
| RALI 2006-QA6 | 2226 | 627 | 860 | 75 | 42.00% |
| RALI 2006-QO1 | 2807 | 589 | 856 | 177 | 36.80% |
| RALI 2006-QO3 | 1897 | 422 | 644 | 154 | 42.07% |
| RALI 2006-QO4 | 2470 | 579 | 881 | 215 | 44.37% |
| RALI 2006-QO5 | 2975 | 715 | 1119 | 294 | 47.50% |
| RALI 2006-QO6 | 3651 | 926 | 1393 | 325 | 47.06% |

| RALI 2006-QO9 | 2553 | 723 | 1062 | 286 | 52.80% |
| RALI 2007-QH6 | 1549 | 563 | 603 | 222 | 53.26% |
| RAMP 2005-RZ1 | 1379 | 315 | 184 | 10 | 14.07% |
| RAMP 2006-EFC2 | 2385 | 727 | 778 | 80 | 35.97% |
| RAMP 2006-RS4 | 5288 | 1400 | 576 | 170 | 14.11% |
| RAMP 2006-RS6 | 1610 | 480 | 704 | 33 | 45.78% |
| RAMP 2006-RZ3 | 4604 | 1455 | 1704 | 152 | 40.31% |
| RAMP 2007-RZ1 | 1904 | 683 | 692 | 71 | 40.07% |
| RASC 2006-EMX6 | 3989 | 773 | 1944 | 156 | 52.64% |
| RASC 2007-KS3 | 8173 | 3022 | 2812 | 365 | 38.87% |

63.     Many of MassMutual's investments initially received the highest possible Standard & Poor's rating—AAA—which has historically represented an expected loss rate of less than .05%.  This is the same rating typically given to bonds backed by the full faith and credit of the United States government, such as treasury bills.  According to S&P's whitepaper, "Understanding Standard & Poor's Rating Definitions," a AAA rating represents an "extremely strong capacity to meet its financial commitments."

64.     Because of the high delinquency and default rates, among other things, however, most of the Certificates have been downgraded to junk-bond ratings, as can be seen in the following table:

| Certificate | Original S&P Rating | Current S&P Rating | Original Moody's Rating | Current Moody's Rating |
| --- | --- | --- | --- | --- |
| RALI 2005-QO3 A1 | AAA | CCC | Aaa | Caa2 |
| RALI 2005-QO4 2A1 | AAA | CCC | Aaa | Caa3 |
| RALI 2006-QA6 A2 | AAA | CC | Aaa | Caa3 |
| RALI 2006-QA6 A3 | AAA | CC | Aaa | Caa3 |
| RALI 2006-QO1 3A1 | AAA | CCC | Aaa | Caa3 |
| RALI 2006-QO3 A1 | AAA | CCC | Aaa | Caa2 |
| RALI 2006-QO4 2A1 | AAA | B- | Aaa | Caa3 |
| RALI 2006-QO5 2A1 | AAA | B- | Aaa | Caa3 |
| RALI 2006-QO6 A2 | AAA | CC | Aaa | Caa3 |
| RALI 2006-QO9 M8 | BBB | No Longer Rated[1] | A3 | No Longer Rated |
| RALI 2007-QH6 A1 | AAA | B- | Aaa | Caa3 |
| RAMP 2005-RZ1 M1 | AA+ | AA+ | Aaa | Aaa |
| RAMP 2005-RZ1 M2 | AA | AA | Aa1 | Aa1 |
| RAMP 2006-RS4 M9 | BBB- | No Longer Rated | Baa2 | No Longer Rated |
| RAMP 2006-RS6 M7 | BBB+ | No Longer Rated | Baa1 | No Longer Rated |

[1]  Each bond indicated "No Longer Rated" has been entirely written off due to losses.

22

| RAMP 2006-RZ3 M8 | NR | No Longer Rated | Baa2 | No Longer Rated |
| RAMP 2007-RZ1 M6 | A- | No Longer Rated | A3 | No Longer Rated |
| RAMP 2007-RZ1 M7 | BBB+ | No Longer Rated | A3 | No Longer Rated |
| RAMP 2007-RZ1 M8 | BBB+ | No Longer Rated | A3 | No Longer Rated |
| RASC 2006-EMX6 M8 | BBB | No Longer Rated | Baa2 | No Longer Rated |
| RASC 2006-EMX6 M9 | BBB- | No Longer Rated | Baa3 | No Longer Rated |
| RASC 2007-KS3 M3S | AA- | No Longer Rated | Aa3 | No Longer Rated |

65.    The poor performance of the loan pools and the rapidly dropping credit ratings of the Certificates have caused a massive decline in the market values of the Certificates. According to the most recent data, the Certificates should be worth approximately $177 million, but their market value is substantially lower – approximately $84 million.

66.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools. Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

## V.    MISREPRESENTATIONS ABOUT APPRAISALS AND LOAN-TO-VALUE RATIOS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS

### A.    Appraisal and LTV Testing

67.    MassMutual commissioned a forensic review of the mortgage loans underlying the Certificates to determine whether the characteristics of the mortgage loans, as represented in the Offering Materials, were accurate.

68.    As part of the forensic review, data relating to the collateral loans underlying each of the securitizations was gathered from multiple public sources, including assessor, DMV, credit, and tax records, as well as proprietary sources such as loan servicing, securitization, and mortgage application records. The data relating to individual mortgage loans was then compared to the representations made in the Offering Materials.

69.    The forensic review tested the appraised values and loan-to-value ratio ("LTV") of each property, as represented in the Offering Materials, through an industry-standard automated valuation model ("AVM").

70.    The LTV is the ratio of a mortgage loan's original principal balance to the appraised value of the mortgaged property.  This ratio was material to MassMutual and other investors because higher ratios are correlated with a higher risk of default.  A borrower with a small equity position in a property has less to lose if he or she defaults on the loan.  There is also a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property.  LTV is a common metric for analysts and investors to evaluate the price and risk of mortgage-backed securities.

71.    For each of the loans reviewed, the underlying property was valued by an industry-standard AVM.  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing.  AVMs have become ubiquitous enough that their testing and use is specifically outlined in regulatory guidance and discussed in the Dodd-Frank Act.  AVMs rely upon similar data as in-person appraisals— primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.  The AVM that MassMutual used incorporates a database of 500 million mortgage transactions covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States.  Independent testing services have determined that this AVM is the most accurate of all such models.

72.    For purposes of MassMutual's forensic review, a retrospective AVM was conducted for each loan to calculate the value of the underlying property at the time each loan

was originated.  The inputs for each calculation included, *inter alia*, (1) any subsequent sale prices of the target property, (2) sale prices and appraisals of comparable properties in the neighborhood, and (3) changes in home price indices over time.

73.     Applying the AVM results to the available data for the loans underlying the Certificates shows that the appraised values given to the properties were often significantly higher than what the properties were actually worth.  This affected the LTV ratios by decreasing the actual value of the properties relative to the loan amounts, which increased the overall ratios. This overvaluation affected numerous statistics in the Offering Materials, as described in detail for each transaction in Section V.B below.

**B.     Specific Misrepresentations in the Offering Materials.**

**(1)     RALI 2005-QO3**

74.     The Prospectus Supplement for the RALI 2005-QO3 securitization represented that the weighted average LTV ratio of the mortgage loans was 73.84%.  It also represented that only 8 mortgage loans would have an LTV above 90%, which was 0.51% of the collateral pool.

75.     Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2005-QO3 represented as follows:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio."  Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated

from the property or replacement cost analysis based on the current
cost of constructing or purchasing a similar property.

76.    The Prospectus also stated:

The underwriting standards applied by an originator typically
require that the underwriting officers of the originator be satisfied
that the value of the property being financed, as indicated by an
appraisal or other acceptable valuation method as described below,
currently supports and is anticipated to support in the future the
outstanding loan balance.

77.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 73.84% | 81.35% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 0.51% (8 loans) | 16.56% (221 loans) |

78.    In total, 37% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 29% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

79.    The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

### (2)    RALI 2005-QO4

80.    The Prospectus Supplement for the RALI 2005-QO4 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 74.25%.  It also represented that only 40 Mortgage Loans would have an LTV greater than 90%, which represented 1.21% of the pool.

81.    Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2005-QO4 represented as follows:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

82.    The Prospectus also stated:

The underwriting standards applied by an originator typically
require that the underwriting officers of the originator be satisfied
that the value of the property being financed, as indicated by an
appraisal or other acceptable valuation method as described below,
currently supports and is anticipated to support in the future the
outstanding loan balance.

83.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 74.25% | 83.71% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.21% (40 loans) | 19.81% (457 loans) |

84.    In total, 41% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 35% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

85.    The RFC Defendants had full access to the appraisal records and all data relating

to the collateral loans.  The Underwriter Defendant also had full access to the records and data,

along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV

and appraisal representations.  Based on these defendants' involvement in originating and

securitizing the loans and conducting due diligence, they knew that the estimations of the

properties' values bore no relationship to the actual data and characteristics of the properties.

They therefore knew that the estimations of the properties' values were not justified,

unreasonable, and inaccurate.

(3)    RALI 2006-QA6

86.    The Prospectus Supplement for the RALI 2006-QA6 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 76.97%.  It also represented that

only 24 Mortgage Loans had an LTV ratio greater than 90%, which represented 1.01% of the

pool.

87.    Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2006-QA6 represented as

follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan will typically have been determined by
> an appraisal or an automated valuation, as described above under
> "--Loan-to-Value Ratio." Appraisers may be either staff appraisers
> employed by the originator or independent appraisers selected in
> accordance with pre-established guidelines established by or
> acceptable to the originator. The appraisal procedure guidelines
> will have required the appraiser or an agent on its behalf to
> personally inspect the property and to verify whether the property
> was in good condition and that construction, if new, had been
> substantially completed. The appraisal will have considered a
> market data analysis of recent sales of comparable properties and,
> when deemed applicable, an analysis based on income generated
> from the property or replacement cost analysis based on the current
> cost of constructing or purchasing a similar property.

88.    The Prospectus also stated:

29

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described below,
> currently supports and is anticipated to support in the future the
> outstanding loan balance.

89.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 76.97% | 85.58% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.01% (24 loans) | 18.84% (395 loans) |

90.    In total, 35% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 30% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

91.    The RFC Defendants had full access to the appraisal records and all data relating

to the collateral loans.  The Underwriter Defendant also had full access to the records and data,

along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV

and appraisal representations.  Based on these defendants' involvement in originating and

securitizing the loans and conducting due diligence, they knew that the estimations of the

properties' values bore no relationship to the actual data and characteristics of the properties.

They therefore knew that the estimations of the properties' values were not justified,

unreasonable, and inaccurate.

### (4)    RALI 2006-QO1

92.    The Prospectus Supplement for the RALI 2006-QO1 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 74.51%.  It also represented that

only 55 Mortgage Loans had an LTV ratio greater than 90%, which represented just 1.61% of the

pool.

93.    Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2006-QO1 represented as

follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan will typically have been determined by
> an appraisal or an automated valuation, as described above under
> "--Loan-to-Value Ratio." Appraisers may be either staff appraisers
> employed by the originator or independent appraisers selected in
> accordance with pre-established guidelines established by or
> acceptable to the originator. The appraisal procedure guidelines
> will have required the appraiser or an agent on its behalf to
> personally inspect the property and to verify whether the property
> was in good condition and that construction, if new, had been
> substantially completed. The appraisal will have considered a
> market data analysis of recent sales of comparable properties and,
> when deemed applicable, an analysis based on income generated
> from the property or replacement cost analysis based on the current
> cost of constructing or purchasing a similar property.

94.    The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an

31

appraisal or other acceptable valuation method as described below,
currently supports and is anticipated to support in the future the
outstanding loan balance.

95.     These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 74.51% | 84.06% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.61% (55 loans) | 24.71% (694 loans) |

96.     In total, 45% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 40% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

97.     The RFC Defendants had full access to the appraisal records and all data relating

to the collateral loans.  The Underwriter Defendant also had full access to the records and data,

along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV

and appraisal representations.  Based on these defendants' involvement in originating and

securitizing the loans and conducting due diligence, they knew that the estimations of the

properties' values bore no relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

### (5)    RALI 2006-QO3

98.    The Prospectus Supplement for the RALI 2006-QO3 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 74.31%.  It also represented that only 27 Mortgage Loans would have an LTV above 90, which was 1.22% of the collateral pool.

99.    Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2006-QO3 represented as follows:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation. . . . Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

100.    The Prospectus also stated:

> The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance.

101.     These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 74.31% | 85.53% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.22% (27 loans) | 20.94% (383 loans) |

102.     In total, 46% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 39% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

103.     The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.

They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

### (6)    The RALI 2006-QO4 Securitization

104.    The Prospectus Supplement for the RALI 2006-QO4 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 74.27%.  It also represented that only 33 Mortgage Loans would have an LTV above 90, which was 0.92% of the collateral pool.

105.    Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2006-QO4 represented as follows:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation . . . .  Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

106.    The Prospectus also stated:

> The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance.

107.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false. The true LTV
ratios for the collateral loans were actually much higher than represented, as shown in the chart
below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 74.27% | 83.10% |
| Percentage of Collateral Loans with LTV of Greater than 90% | .92% (33 loans) | 21.64% (535 loans) |

108.    In total, 42% of the loans tested were shown to have appraisals that were inflated
by 10% or more, and 34% of the loans tested had LTVs that were 10 or more points less than
was represented. These results not only demonstrate that the loan statistics in the Offering
Materials were false, but also that the representations relating to appraisal practices were false.
Independent appraisers following proper practices would not systematically generate appraisals
that deviate so significantly from the true values of the appraised properties.

109.    The RFC Defendants had full access to the appraisal records and all data relating
to the collateral loans. The Underwriter Defendant also had full access to the records and data,
along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV
and appraisal representations. Based on these defendants' involvement in originating and
securitizing the loans and conducting due diligence, they knew that the estimations of the
properties' values bore no relationship to the actual data and characteristics of the properties.
They therefore knew that the estimations of the properties' values were not justified,
unreasonable, and inaccurate.

### (7)    RALI 2006-QO5

110.    The Prospectus Supplement for the RALI 2006-QO5 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 74.67%.  It also represented that

only 51 Mortgage Loans would have an LTV above 90, which was 1.26% of the collateral pool.

111.    Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2006-QO5 represented as

follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan will typically have been determined by
> an appraisal or an automated valuation. . . .  Appraisers may be
> either staff appraisers employed by the originator or independent
> appraisers selected in accordance with pre-established guidelines
> established by or acceptable to the originator.  The appraisal
> procedure guidelines will have required the appraiser or an agent
> on its behalf to personally inspect the property and to verify
> whether the property was in good condition and that construction,
> if new, had been substantially completed. The appraisal will have
> considered a market data analysis of recent sales of comparable
> properties and, when deemed applicable, an analysis based on
> income generated from the property or replacement cost analysis
> based on the current cost of constructing or purchasing a similar
> property.

112.    The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described below,
> currently supports and is anticipated to support in the future the
> outstanding loan balance.

113.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart
below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 74.67% | 84.15% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.26% (51 loans) | 19.54% (584 loans) |

114.    In total, 45% of the loans tested were shown to have appraisals that were inflated
by 10% or more, and 37% of the loans tested had LTVs that were 10 or more points less than
was represented.  These results not only demonstrate that the loan statistics in the Offering
Materials were false, but also that the representations relating to appraisal practices were false.
Independent appraisers following proper practices would not systematically generate appraisals
that deviate so significantly from the true values of the appraised properties.

115.    The RFC Defendants had full access to the appraisal records and all data relating
to the collateral loans.  The Underwriter Defendant also had full access to the records and data,
along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV
and appraisal representations.  Based on these defendants' involvement in originating and
securitizing the loans and conducting due diligence, they knew that the estimations of the
properties' values bore no relationship to the actual data and characteristics of the properties.
They therefore knew that the estimations of the properties' values were not justified,
unreasonable, and inaccurate.

(8)    **RALI 2006-QO6**

116.    The Prospectus Supplement for the RALI 2006-QO6 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 74.66%.  It also represented that

only 75 Mortgage Loans would have an LTV above 90, which was 1.56% of the collateral pool.

117.    Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2006-QO6 represented as

follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan will typically have been determined by
> an appraisal or an automated valuation. . . .  Appraisers may be
> either staff appraisers employed by the originator or independent
> appraisers selected in accordance with pre-established guidelines
> established by or acceptable to the originator.  The appraisal
> procedure guidelines will have required the appraiser or an agent
> on its behalf to personally inspect the property and to verify
> whether the property was in good condition and that construction,
> if new, had been substantially completed. The appraisal will have
> considered a market data analysis of recent sales of comparable
> properties and, when deemed applicable, an analysis based on
> income generated from the property or replacement cost analysis
> based on the current cost of constructing or purchasing a similar
> property.

118.    The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described below,
> currently supports and is anticipated to support in the future the
> outstanding loan balance.

119.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Weighted Average LTV of the Collateral Loans | 74.66% | 85.69% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.56% (75 loans) | 23.98% (861 loans) |

120.    In total, 48% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 40% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

121.    The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

(9)    **RALI 2006-QO9**

122.    The Prospectus Supplement for the RALI 2006-QO9 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 75.15%.  It also represented that

only 17 Mortgage Loans would have an LTV above 90%, which was 0.54% of the collateral

pool.

123.    Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2006-QO9 represented as

follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan will typically have been determined by
> an appraisal or an automated valuation. . . .  Appraisers may be
> either staff appraisers employed by the originator or independent
> appraisers selected in accordance with pre-established guidelines
> established by or acceptable to the originator.  The appraisal
> procedure guidelines will have required the appraiser or an agent
> on its behalf to personally inspect the property and to verify
> whether the property was in good condition and that construction,
> if new, had been substantially completed.  The appraisal will have
> considered a market data analysis of recent sales of comparable
> properties and, when deemed applicable, an analysis based on
> income generated from the property or replacement cost analysis
> based on the current cost of constructing or purchasing a similar
> property.

124.    The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described below,
> currently supports and is anticipated to support in the future the
> outstanding loan balance.

125.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 75.15% | 89.46% |
| Percentage of Collateral Loans with LTV of Greater than 90% | .54% (17 loans) | 32.42% (770 loans) |

126.    In total, 60% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 53% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

127.    The RFC Defendants had full access to the appraisal records and all data relating

to the collateral loans.  The Underwriter Defendant also had full access to the records and data,

along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV

and appraisal representations.  Based on these defendants' involvement in originating and

securitizing the loans and conducting due diligence, they knew that the estimations of the

properties' values bore no relationship to the actual data and characteristics of the properties.

They therefore knew that the estimations of the properties' values were not justified,

unreasonable, and inaccurate.

### (10)   RALI 2007-QH6

128.    The Prospectus Supplement for the RALI 2007-QH6 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 73.89%.  It also represented that

only 32 Mortgage Loans would have an LTV above 90%, which was 1.62% of the collateral

pool.

129.    Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus for RALI 2007-QH6 represented as

follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan will typically have been determined by
> an appraisal or an automated valuation. . . .  Appraisers may be
> either staff appraisers employed by the originator or independent
> appraisers selected in accordance with pre-established guidelines
> established by or acceptable to the originator.  The appraisal
> procedure guidelines will have required the appraiser or an agent
> on its behalf to personally inspect the property and to verify
> whether the property was in good condition and that construction,
> if new, had been substantially completed. The appraisal will have
> considered a market data analysis of recent sales of comparable
> properties and, when deemed applicable, an analysis based on
> income generated from the property or replacement cost analysis
> based on the current cost of constructing or purchasing a similar
> property.

130.    The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described below,
> currently supports and is anticipated to support in the future the
> outstanding loan balance.

131.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 73.89% | 90.66% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 1.62% (32 loans) | 36.07% (559 loans) |

132.    In total, 61% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

133.    The RFC Defendants had full access to the appraisal records and all data relating

to the collateral loans.  The Underwriter Defendant also had full access to the records and data,

along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV

and appraisal representations.  Based on these defendants' involvement in originating and

securitizing the loans and conducting due diligence, they knew that the estimations of the

properties' values bore no relationship to the actual data and characteristics of the properties.

They therefore knew that the estimations of the properties' values were not justified,

unreasonable, and inaccurate.

### (11)    RAMP 2005-RZ1

134.    The Prospectus Supplement for the RAMP 2005-RZ1 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 102.23%.  It also represented

that 758 Mortgage Loans would have an LTV above 100%, which was 58.07% of the collateral

pool.

135.    Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus Supplement for RAMP 2005-RZ1

represented as follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan generally has been determined by an
> appraisal in accordance with pre-established appraisal procedure
> guidelines for appraisals established by or acceptable to the
> originator. At least one full appraisal is obtained (plus a field
> review or an additional appraisal for Credit Grade A4) for the
> mortgaged property.  Appraisers are either staff appraisers
> employed by the originator or independent appraisers selected in
> accordance with pre-established guidelines established by the
> originator. The appraisal procedure guidelines generally will have
> required the appraiser or an agent on its behalf to personally
> inspect the property and to verify whether the property was in good
> condition and that construction, if new, had been substantially
> completed. The appraisal would have considered a market data
> analysis of recent sales of comparable properties and, when
> deemed applicable, an analysis based on income generated from
> the property or replacement cost analysis based on the current cost
> of constructing or purchasing a similar property.

136.    The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described above,
> currently supports, except with respect to Home Loans, and is
> anticipated to support in the future, the outstanding loan balance.

137.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 102.23% | 106.46% |
| Percentage of Collateral Loans with LTV of Greater than 100% | 58.07% (758 loans) | 62.61% (804 loans) |

138.    In total, 27% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 29% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

139.    The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

### (12)   RAMP 2006-EFC2

140.   The Prospectus Supplement for the RAMP 2006-EFC2 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 83.28%.  It also represented that

685 Mortgage Loans would have an LTV above 90%, which was 19.18% of the collateral pool.

141.   Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus Supplement for RAMP 2006-EFC2

represented as follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan generally has been determined by an
> appraisal in accordance with pre-established appraisal procedure
> guidelines for appraisals established by or acceptable to the
> originator.  Appraisers are either staff appraisers employed by the
> originator or independent appraisers selected in accordance with
> pre-established guidelines established by the originator. The
> appraisal procedure guidelines generally will have required the
> appraiser or an agent on its behalf to personally inspect the
> property and to verify whether the property was in good condition
> and that construction, if new, had been substantially completed.
> The appraisal would have considered a market data analysis of
> recent sales of comparable properties and, when deemed
> applicable, an analysis based on income generated from the
> property or replacement cost analysis based on the current cost of
> constructing or purchasing a similar property.

142.   The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described above,
> currently supports, except with respect to Home Loans, and is
> anticipated to support in the future, the outstanding loan balance.

143.   These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 83.28% | 91.71% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 19.18% (685 loans) | 38.31% (759 loans) |

144.    In total, 50% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 41% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.  Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

145.    The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties.  They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

### (13)    RAMP 2006-RS4

146.    The Prospectus Supplement for the RAMP 2006-RS4 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 88.12%.  It also represented that 2,827 Mortgage Loans would have an LTV above 90%, which was 46.23% of the collateral pool.

147.    Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus for RAMP 2006-RS4 represented as follows:

> The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal.  Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with guidelines established by or acceptable to the originator. The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

148.    The Prospectus also stated:

> The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described above, currently supports, except with respect to Home Loans, and is anticipated to support in the future, the outstanding loan balance.

149.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.  MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 88.12% | 97.02% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 46.23% (2827 loans) | 56.92% (3146 loans) |

150.    In total, 38% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 37% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

151.    The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

**(14)    RAMP 2006-RS6**

152.    The Prospectus Supplement for the RAMP 2006-RS6 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 80.68%.  It also represented that

only 69 Mortgage Loans would have an LTV above 90%, which was 3.73% of the collateral

pool.

153.     Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus for RAMP 2006-RS6 represented as

follows:

> The adequacy at origination of a mortgaged property as security
> for repayment of the related loan will typically have been
> determined by an appraisal.  Appraisers may be either staff
> appraisers employed by the originator or independent appraisers
> selected in accordance with guidelines established by or acceptable
> to the originator. The appraisal procedure guidelines in most cases
> will have required the appraiser or an agent on its behalf to
> personally inspect the property and to verify whether the property
> was in good condition and that construction, if new, had been
> substantially completed. The appraisal will have considered a
> market data analysis of recent sales of comparable properties and,
> when deemed applicable, an analysis based on income generated
> from the property or replacement cost analysis based on the current
> cost of constructing or purchasing a similar property.

154.     The Prospectus also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described above,
> currently supports, except with respect to Home Loans, and is
> anticipated to support in the future, the outstanding loan balance.

155.     These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 80.68% | 92.56% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 3.73% (69 loans) | 26.9% (380 loans) |

156.    In total, 40% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 37% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but that the representations relating appraisal practices were false as well. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

157.    The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

### (15)    RAMP 2006-RZ3

158.    The Prospectus Supplement for the RAMP 2006-RZ3 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 100.25%.  It also represented that 379 loans would have LTVs greater than 100%, which represented 8.56% of the pool.

12-12020-mg    Doc 9258-3    Filed 02/19/16    Entered 02/19/16 16:10:42    Exhibit 7

159.    Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus Supplement for RAMP 2006-RZ3 represented as follows:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  At least one full appraisal is obtained for the mortgaged property.  Appraisers are either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

160.    The Prospectus also stated:

> The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described above, currently supports, except with respect to Home Loans, and is anticipated to support in the future, the outstanding loan balance.

161.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 100.25% | 109.65% |
| Percentage of Collateral Loans with LTV of Greater than 100% | 8.56% (379 loans) | 38.56% (1499 loans) |

162.    In total, 35% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 38% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

163.    The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

### (16)   RAMP 2007-RZ1

164.   The Prospectus Supplement for the RAMP 2007-RZ1 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 99.56%.  It also represented that 71 Mortgage Loans would have an LTV above 100%, which was 3.54% of the collateral pool.

165.   Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus Supplement for RAMP 2007-RZ1 represented as follows:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  At least one full appraisal is obtained for the mortgaged property.  Appraisers are either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

166.   The Prospectus also stated:

> The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described above, currently supports, except with respect to Home Loans, and is anticipated to support in the future, the outstanding loan balance.

167.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above.  MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 99.56% | 109.2% |
| Percentage of Collateral Loans with LTV of Greater than 100% | 3.54% (71 loans) | 42.62% (672 loans) |

168.    In total, 36% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 39% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

169.    The RFC Defendants had full access to the appraisal records and all data relating

to the collateral loans.  The Underwriter Defendant also had full access to the records and data,

along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV

and appraisal representations.  Based on these defendants' involvement in originating and

securitizing the loans and conducting due diligence, they knew that the estimations of the

properties' values bore no relationship to the actual data and characteristics of the properties.

They therefore knew that the estimations of the properties' values were not justified,

unreasonable, and inaccurate.

### (17)   RASC 2006-EMX6

170.   The Prospectus Supplement for the RASC 2006-EMX6 securitization represented that the weighted average LTV ratio of the Mortgage Loans was 83.09%.  It also represented that only 1,403 Mortgage Loans would have an LTV above 90%, which was 15.61% of the collateral pool.

171.   Additionally, the Offering Materials represented that independent appraisals were obtained for certain of the Mortgage Loans.  The Prospectus Supplement for RASC 2006-EMX6 represented as follows:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

172.   The Prospectus also stated:

> The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described above, currently supports and is anticipated to support in the future the outstanding loan balance.

173.   These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV/CLTV of the Collateral Loans | 83.09% | 91.58% |

174.    In total, 45% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 29% of the loans tested had LTVs that were 10 or more points less than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly from the true values of the appraised properties.

175.    The RFC Defendants had full access to the appraisal records and all data relating

to the collateral loans.  The Underwriter Defendant also had full access to the records and data,

along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV

and appraisal representations.  Based on these defendants' involvement in originating and

securitizing the loans and conducting due diligence, they knew that the estimations of the

properties' values bore no relationship to the actual data and characteristics of the properties.

They therefore knew that the estimations of the properties' values were not justified,

unreasonable, and inaccurate.

### (18)    RASC 2007-KS3

176.    The Prospectus Supplement for the RASC 2007-KS3 securitization represented

that the weighted average LTV ratio of the Mortgage Loans was 82.63%.  It also represented that

58

2,346 of the Mortgage Loans would have an LTV above 90, which was 21.55% of the collateral

pool.

177.     Additionally, the Offering Materials represented that independent appraisals were

obtained for certain of the Mortgage Loans.  The Prospectus Supplement for RASC 2007-KS3,

RFC represented as follows:

> The adequacy of a mortgaged property as security for repayment of
> the related mortgage loan generally has been determined by an
> appraisal in accordance with pre-established appraisal procedure
> guidelines for appraisals established by or acceptable to the
> originator.  Appraisers were either staff appraisers employed by the
> originator or independent appraisers selected in accordance with
> pre-established guidelines established by the originator.
>
> The appraisal procedure guidelines generally will have required the
> appraiser or an agent on its behalf to personally inspect the
> property and to verify whether the property was in good condition
> and that construction, if new, had been substantially completed.
> The appraisal would have considered a market data analysis of
> recent sales of comparable properties and, when deemed
> applicable, an analysis based on income generated from the
> property or replacement cost analysis based on the current cost of
> constructing or purchasing a similar property.  In certain instances,
> the LTV ratio may have been based on the  appraised value as
> indicated on a review appraisal conducted by the mortgage
> collateral seller or originator.

178.     The Prospectus Supplement also stated:

> The underwriting standards applied by an originator typically
> require that the underwriting officers of the originator be satisfied
> that the value of the property being financed, as indicated by an
> appraisal or other acceptable valuation method as described below,
> currently supports and is anticipated to support in the future the
> outstanding loan balance.

179.     These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true LTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 82.63% | 92.72% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 21.55% (2,346 loans) | 38.96% (2528 loans) |

180.     In total, 51% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 42% of the loans tested had LTVs that were 10 or more points less than was represented.  These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly from the true values of the appraised properties.

181.     The RFC Defendants had full access to the appraisal records and all data relating to the collateral loans.  The Underwriter Defendant also had full access to the records and data, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations.  Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were not justified, unreasonable, and inaccurate.

## VI.    MISREPRESENTATIONS ABOUT OWNER-OCCUPANCY STATISTICS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS

### A.    Owner-Occupancy Testing

182.    The forensic review commissioned by MassMutual also tested the accuracy of the representations of owner-occupancy in the Offering Materials.

183.    Owner-occupancy statistics were material to MassMutual and other investors because high owner-occupancy rates would have made the Certificates safer investments than Certificates backed by second homes or investment properties.  Homeowners who reside in mortgaged properties are less likely to default than owners who purchase homes as investments or second homes and live elsewhere.

184.    MassMutual's forensic review tested the accuracy of the representations of owner-occupancy in the Offering Materials.  To determine whether a given borrower actually occupied the property as claimed, MassMutual investigated tax information for the loans.  One would expect that a borrower residing at a property would have the tax bills sent to that address, and would take applicable tax exemptions available to residents of that property.  If a borrower had his or her tax records sent to another address, that is evidence that that borrower was not actually residing at the mortgaged property.  If a borrower declined to make certain tax exemption elections that depend on the borrower living at the property, that also is evidence the borrower was living elsewhere.  MassMutual also reviewed: (1) borrower credit records, because one would expect that people have bills sent to their primary address.  If a borrower was telling creditors to send bills to another address, even six months after buying the property, that is evidence the borrower was living elsewhere; (2) property records, because it is unlikely that a borrower lives in any one property if in fact that borrower owns multiple properties.  It is even more unlikely that the borrower resides at the mortgaged property if a concurrently-owned

61

separate property did not have its own tax bills sent to the property included in the mortgage pool; and (3) records of other liens, because if the property was subject to additional liens but those materials were sent elsewhere, that is evidence the borrower was not living at the mortgaged property.  If the other lien involved a conflicting declaration of residency, that too would be evidence that the borrower did not live in the subject property .

185.    If a property fails more than one of the above tests, that is strong evidence the borrower did not in fact reside at the mortgaged property.  As described more fully in Section VI.B below, the results of MassMutual's loan-level analysis of true owner-occupancy rates on the mortgage loans underlying its Certificates show that, despite the prospectus representations, a much higher percentage of borrowers did not occupy the mortgaged properties than was represented.

### B.    Specific Misrepresentations in the Offering Materials.

### (1)    RALI 2005-QO3

186.    The Offering Materials for RALI 2005-QO3 represented that 1190 of the Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's subsequent loan-level analysis, however, 12.9% of the Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead of 1190 of the loans being owner occupied, as represented in the Offering Materials, only 1036 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 1190 loans (84.16%) | 1036 loans (73.26%) |

### (2)    RALI 2005-QO4

187.    The Offering Materials for RALI 2005-QO4 represented that 1836 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 14.4% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 1836 of the loans being owner occupied, as represented in the Offering Materials, only 1572

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Covering Primary Residences | 1836 loans (79.62%) | 1572 loans (68.17%) |

### (3)    RALI 2006-QA6

188.    The Offering Materials for RALI 2006-QA6 represented that 1624 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 16.5% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 1624 of the loans being owner occupied, as represented in the Offering Materials, only 1345

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Covering Primary Residences | 1624 loans (72.96%) | 1345 loans (60.42%) |

### (4)    RALI 2006-QO1

189.    The Offering Materials for RALI 2006-QO1 represented that 2292 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 13.2% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 2292 of the loans being owner occupied, as represented in the Offering Materials, only 1989

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Covering Primary Residences | 2292 loans (81.65%) | 1989 loans (70.86%) |

### (5)    RALI 2006-QO3

190.    The Offering Materials for RALI 2006-QO3 represented that 1606 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 10.8% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 1606 of the loans being owner occupied, as represented in the Offering Materials, only 1432

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Covering Primary Residences | 1606 loans (84.66%) | 1432 loans (75.49%) |

### (6)     The RALI 2006-QO4 Securitization

191.     The Offering Materials for RALI 2006-QO4 represented that 2084 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 13.5% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 2084 of the loans being owner occupied, as represented in the Offering Materials, only 1803

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Covering Primary Residences | 2084 loans (84.37%) | 1803 loans (72.98%) |

### (7)     RALI 2006-QO5

192.     The Offering Materials for RALI 2006-QO5 represented that 2538 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 11.9% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 2538 of the loans being owner occupied, as represented in the Offering Materials, only 2235

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
| --- | --- | --- |
| Number of Loans Covering Primary Residences | 2538 loans (85.31%) | 2235 loans (75.12%) |

### (8)    RALI 2006-QO6

193.    The Offering Materials for RALI 2006-QO6 represented that 3124 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 14.4% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 3124 of the loans being owner occupied, as represented in the Offering Materials, only 2673

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 3124 loans (85.57%) | 2673 loans (73.21%) |

### (9)    RALI 2006-QO9

194.    The Offering Materials for RALI 2006-QO9 represented that 2141 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 15.3% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 2141 of the loans being owner occupied, as represented in the Offering Materials, only 1813

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 2141 loans (83.86%) | 1813 loans (71.05%) |

### (10)    RALI 2007-QH6

195.    The Offering Materials for RALI 2007-QH6 represented that 1282 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 18.4% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 1282 of the loans being owner occupied, as represented in the Offering Materials, only 1046

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 1282 loans (82.76%) | 1046 loans (67.53%) |

### (11)    RAMP 2005-RZ1

196.    The Offering Materials for RAMP 2005-RZ1 represented that 1184 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 9.6% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 1184 of the loans being owner occupied, as represented in the Offering Materials, only 1070

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 1184 loans (85.86%) | 1070 loans (77.59%) |

67

### (12)    RAMP 2006-EFC2

197.    The Offering Materials for RAMP 2006-EFC2  represented that 2267 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 9.3% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 2267 of the loans being owner occupied, as represented in the Offering Materials, only 2056

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 2267 loans (93.48%) | 2056 loans (84.78%) |

### (13)    RAMP 2006-RS4

198.    The Offering Materials for RAMP 2006-RS4 represented that 3989 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 8.9% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 3989 of the loans being owner occupied, as represented in the Offering Materials, only 3634

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 3989 loans (75.43%) | 3634 loans (69.72%) |

(14)    **RAMP 2006-RS6**

199.    The Offering Materials for RAMP 2006-RS6 represented that 933 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 13.3% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 933 of the loans being owner occupied, as represented in the Offering Materials, only 809

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 933 loans (57.7%) | 809 loans (50.03%) |

(15)    **RAMP 2006-RZ3**

200.    The Offering Materials for RAMP 2006-RZ3 represented that 3683 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 8.3% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 3683 of the loans being owner occupied, as represented in the Offering Materials, only 3375

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 3683 loans (80.13%) | 3375 loans (73.43%) |

### (16)    RAMP 2007-RZ1

201.    The Offering Materials for RAMP 2007-RZ1 represented that 1460 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 10.8% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 1460 of the loans being owner occupied, as represented in the Offering Materials, only 1302

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 1460 loans (76.68%) | 1302 loans (68.38%) |

### (17)    RASC 2006-EMX6

202.    The Offering Materials for RASC 2006-EMX6 represented that 3871 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 11.9% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 3871 of the loans being owner occupied, as represented in the Offering Materials, only 3410

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 3871 loans (95.34%) | 3410 loans (83.99%) |

### (18)    RASC 2007-KS3

203.    The Offering Materials for RASC 2007-KS3 represented that 7615 of the

Mortgage Loans were for primary residences, i.e. owner-occupied properties.  In MassMutual's

subsequent loan-level analysis, however, 12.9% of the Mortgage Loans reported to be owner-

occupied failed multiple tests for owner occupancy.  Thus, as shown in the chart below, instead

of 7615 of the loans being owner occupied, as represented in the Offering Materials, only 6785

were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 7615 loans (93.20%) | 6785 loans (83.04%) |

## VII.    LIABILITY OF THE SPONSOR, DEPOSITORS, AND UNDERWRITERS AS SELLERS OF SECURITIES TO MASSMUTUAL

204.    The defendants that qualify as sellers of securities under the Massachusetts

Uniform Securities Act are the Sponsor (Residential Funding), Depositors (RALI, RAMP, and

RASC), and Underwriters (Residential Funding and UBS).  Each of these is primarily liable for

misrepresentations in the Offering Materials under Massachusetts General Laws, Chapter 110A,

Section 410(a)(2).

205.    As the Sponsor for the securitizations at issue, Residential Funding originated or

acquired the mortgage loans that were pooled together in the securitizations, and then sold,

transferred, or otherwise conveyed title to those loans to the Depositors.  Residential Funding

had responsibility for preparing the Offering Materials that were used to solicit purchases of the

Certificates, and was identified as the Sponsor or Seller on the Prospectuses and Prospectus

Supplements.  Residential Funding profited from the sales of the Certificates.

206.    As the Depositors for the securitizations at issue, RALI, RAMP, and RASC purchased the mortgage loans from Residential Funding.  The Depositors then sold, transferred, or otherwise conveyed the mortgage loans to the Trusts, which held the loans as collateral for the Certificates.  The Depositors had responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates, and were identified on the Prospectuses and Prospectus Supplements.  In addition, the Depositors were responsible for registering the offerings with the Securities and Exchange Commission.  The Depositors profited from the sales of the Certificates.

207.    The Trusts issued the Certificates that were sold to investors, including MassMutual.  The Trusts had no autonomy or assets of their own, but were mere agents of the Depositors created for the sole purposes of holding the pools of mortgage loans assembled by the Sponsor and Depositors and issuing the Certificates for sale to the investors.

208.    The Sponsor and Depositors used Residential Securities and UBS, among others, as the Underwriters to market and sell the Certificates.  The Underwriters were responsible for underwriting and managing the sale of Certificates, including screening the mortgage loans for compliance with the appropriate underwriting guidelines.  The Underwriters profited from the sales of the Certificates.

209.    The Sponsor, Depositors, and Underwriters successfully solicited MassMutual's purchase of the Certificates at issue.  The Underwriters transferred title in the Certificates to MassMutual.

## VIII.  LIABILITY OF THE REMAINING DEFENDANTS AS CONTROL PERSONS
### Bruce Paradis

210.    As President of Residential Securities (the Underwriter), Paradis was involved in and controlled the day-to-day affairs of this primary violator.  In addition, as President and Chief

Executive Officer of Residential Funding, RALI, RAMP, and RASC, Paradis was involved in

and controlled the day-to-day affairs of the Sponsor and Depositors.  Paradis also had control

over the securitizations at issue, as evidenced by his signature on the registration statements for

the following 17 securitizations:

> Residential Asset Mortgage Products, Inc. Series 2005-RZ1
> Residential Accredit Loans, Inc. Series 2005-QO3
> Residential Accredit Loans, Inc. Series 2005-QO4
> Residential Accredit Loans, Inc. Series 2006-QO1
> Residential Accredit Loans, Inc. Series 2006-QO3
> Residential Accredit Loans, Inc. Series 2006-QO4
> Residential Accredit Loans, Inc. Series 2006-QO5
> Residential Asset Mortgage Products Series 2006-RS4
> Residential Accredit Loans, Inc. Series 2006-QO6
> Residential Asset Securities Corp. Series 2006-EMX6 Class M9
> Residential Accredit Loans, Inc. Series 2006-QA6
> Residential Asset Mortgage Products Series 2006-RZ3
> Residential Asset Mortgage Products Series 2006-RS6
> Residential Asset Mortgage Products, Inc. Series 2006-EFC2
> Residential Accredit Loans, Inc. Series 2006-QO9
> Residential Asset Mortgage Products, Inc. Series 2007-RZ1
> Residential Asset Securities Corp. Series 2007-KS3

### Davee Olson

211.    As Chief Financial Officer of Residential Funding and RAMP, Olson was

involved in the day-to-day financial affairs of these primary violators.  Olson also had control

over the securitizations at issue, as evidenced by his signature on the registration statements for

the following 14 securitizations:

> Residential Asset Mortgage Products, Inc. Series 2005-RZ1
> Residential Accredit Loans, Inc. Series 2006-QO3
> Residential Accredit Loans, Inc. Series 2006-QO4
> Residential Accredit Loans, Inc. Series 2006-QO5
> Residential Asset Mortgage Products Series 2006-RS4
> Residential Accredit Loans, Inc. Series 2006-QO6
> Residential Asset Securities Corp. Series 2006-EMX6 Class M9
> Residential Accredit Loans, Inc. Series 2006-QA6
> Residential Asset Mortgage Products Series 2006-RZ3
> Residential Asset Mortgage Products Series 2006-RS6

Residential Asset Mortgage Products, Inc. Series 2006-EFC2
Residential Accredit Loans, Inc. Series 2006-QO9
Residential Asset Mortgage Products, Inc. Series 2007-RZ1
Residential Asset Securities Corp. Series 2007-KS3

### David Walker

212.    As Chief Financial Office and director of U.S. funding and securitization for

Residential Funding Corporation's parent, Walker was intimately involved with the

securitization strategy for the enterprise.  Walker used his knowledge of securitizations at RALI

and RAMP when he served as an inside director of those companies.  Walker also had control

over the securitizations at issue, as evidenced by his signature on the registration statements for

the following 4 securitizations:

Residential Asset Mortgage Products, Inc. Series 2005-RZ1
Residential Accredit Loans, Inc. Series 2005-QO3
Residential Accredit Loans, Inc. Series 2005-QO4
Residential Accredit Loans, Inc. Series 2006-QO1

### Kenneth Duncan

213.    As Acting Chief Financial Officer of each of Residential Funding, RALI, RAMP,

and RASC, Duncan was involved in the day-to-day financial affairs of these primary violators.

Duncan also had control over the securitizations at issue, as evidenced by his signature on the

registration statements for the following 16 securitizations:

Residential Accredit Loans, Inc. Series 2005-QO3
Residential Accredit Loans, Inc. Series 2005-QO4
Residential Accredit Loans, Inc. Series 2006-QO1
Residential Accredit Loans, Inc. Series 2006-QO3
Residential Accredit Loans, Inc. Series 2006-QO4
Residential Accredit Loans, Inc. Series 2006-QO5
Residential Asset Mortgage Products Series 2006-RS4
Residential Accredit Loans, Inc. Series 2006-QO6
Residential Asset Securities Corp. Series 2006-EMX6 Class M9
Residential Accredit Loans, Inc. Series 2006-QA6
Residential Asset Mortgage Products Series 2006-RZ3
Residential Asset Mortgage Products Series 2006-RS6

> Residential Asset Mortgage Products, Inc. Series 2006-EFC2
> Residential Accredit Loans, Inc. Series 2006-QO9
> Residential Asset Mortgage Products, Inc. Series 2007-RZ1
> Residential Asset Securities Corp. Series 2007-KS3

### Ralph Flees

214.    As Controller and Principal Accounting Officer of each of RALI, RAMP, and

RASC, Flees was involved in the day-to-day financial affairs of these primary violators.  Flees

also had control over the securitizations at issue, as evidenced by his signature on the registration

statements for the following 17 securitizations:

> Residential Accredit Loans, Inc. Series 2005-QO3
> Residential Accredit Loans, Inc. Series 2005-QO4
> Residential Accredit Loans, Inc. Series 2006-QO1
> Residential Accredit Loans, Inc. Series 2006-QO3
> Residential Accredit Loans, Inc. Series 2006-QO4
> Residential Accredit Loans, Inc. Series 2006-QO5
> Residential Asset Mortgage Products Series 2006-RS4
> Residential Accredit Loans, Inc. Series 2006-QO6
> Residential Asset Securities Corp. Series 2006-EMX6 Class M9
> Residential Accredit Loans, Inc. Series 2006-QA6
> Residential Asset Mortgage Products Series 2006-RZ3
> Residential Asset Mortgage Products Series 2006-RS6
> Residential Asset Mortgage Products, Inc. Series 2006-EFC2
> Residential Accredit Loans, Inc. Series 2006-QO9
> Residential Asset Mortgage Products, Inc. Series 2007-RZ1
> Residential Asset Securities Corp. Series 2007-KS3
> Residential Accredit Loans, Inc. Series 2007-QH6

### James Jones

215.    As President and Chief Executive Officer of RALI, Jones was involved in the

day-to-day affairs of a primary violator.  Jones also had control over the securitizations at issue,

as evidenced by his signature on the following registration statement:

> Residential Accredit Loans, Inc. Series 2007-QH6

### David Bricker

216.    As Chief Financial Officer of RALI, Bricker was involved in the day-to-day

financial affairs of a primary violator.  Bricker also had control over the securitizations at issue,

as evidenced by his signature on the following registration statement:

Residential Accredit Loans, Inc. Series 2007-QH6

**FIRST CAUSE OF ACTION**
**(Primary Violations of the Massachusetts Uniform Securities Act)**

217.    MassMutual incorporates by reference and realleges each and every allegation as

set forth above in paragraphs 1 through 216 as if fully set forth herein.

218.    Under Massachusetts General Laws, Chapter 110A, Section 410(a)(2), any person

who "offers or sells a security by means of any untrue statement of a material fact or any

omission to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they are made, not misleading," is liable to the purchaser of the

security.

219.     The Sponsor (Residential Funding), Depositors (RALI, RAMP, and RASC), and

Underwriters (Residential Securities and UBS) qualify as sellers of the Certificates because they

issued, marketed, and/or sold the Certificates to the public for their own financial benefit.

220.    The Sponsor, Depositors, and Underwriters offered to sell and sold the

Certificates in the State of Massachusetts.

221.    The Sponsor, Depositors, and Underwriters offered and sold the Certificates to

MassMutual by means of false and misleading statements of material fact and omissions of

material facts necessary to make the statements made not misleading.

222.    As set forth in more detail in paragraphs 43 to 203 above, the public statements of

the Sponsor, Depositors, and Underwriters, including in the Offering Materials, were materially

false and misleading because, among other things, they misrepresented the underwriting

standards applied to the mortgage loans backing the Certificates, misrepresented the LTV and appraisal information for the loans, and misrepresented the owner-occupancy information for the loans.

223.    MassMutual did not know, and in the exercise of due diligence could not have known, of the untruths and omissions.

224.    MassMutual will elect its remedy before the entry of judgment.  For each Certificate, MassMutual will seek statutory damages, including interest, or will make or arrange a tender before entry of judgment.

**SECOND CAUSE OF ACTION**
**(Joint and Several Liability Under the Massachusetts Uniform Securities Act)**

225.    MassMutual incorporates by reference and realleges each and every allegation as set forth above in paragraphs 1 through 224 as if fully set forth herein.

226.    Under Massachusetts General Laws, Chapter 110A, Section 410(b), "[e]very person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, [and] every person occupying a similar status or performing similar functions" is liable jointly and severally with and to the same extent as the seller.

227.    As set forth above, the Sponsor (Residential Funding), the Depositors (RALI, RAMP, and RASC), and the Underwriters (Residential Securities and UBS) are liable as sellers under subsection (a).

228.    Defendant Bruce Paradis is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

77

229.    Defendant Davee Olson is jointly and severally liable to the same extent as the primary violators because he was an officer and/or director of one or more primary violators and controlled their operations, including the securitizations at issue.

230.    Defendant David Walker is jointly and severally liable to the same extent as the primary violators because he was an inside director of one or more primary violators and controlled their operations, including the securitizations at issue.

231.    Defendant Kenneth Duncan is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

232.    Defendant Ralph Flees is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

233.    Defendant James Jones is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

234.    Defendant David Bricker is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

## PRAYER FOR RELIEF

WHEREFORE MassMutual prays for relief as follows:

1.    On the first cause of action, for primary violations of the Massachusetts Uniform Securities Act, relief in the form of damages and/or statutory recovery upon tender;

2.      On the second cause of action, for joint and several liability under the

Massachusetts Uniform Securities Act, relief in the form of damages and/or

statutory recovery upon tender; and

3.      Such other and further relief as the Court may deem just and proper.


## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), MassMutual hereby demands a trial

by jury on all issues triable by jury.


DATED:  February 29, 2012                EGAN, FLANAGAN AND COHEN, P.C.

                                 By:  ____/s/ Edward J. McDonough Jr._____
                                      Edward J. McDonough Jr. (BBO 331590)
                                      Stephen E. Spelman (BBO 632089)
                                      Egan, Flanagan and Cohen, P.C.
                                      67 Market Street, P.O. Box 9035
                                      Springfield, Massachusetts  01102
                                      Telephone:  (413) 737-0260
                                      Fax:  (413) 737-0121
                                      ejm@efclaw.com;
                                      ses@efclaw.com

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY

Mark Roellig (BBO 669117)
Executive Vice President and General Counsel
Bernadette Harrigan (BBO 635103)
Assistant Vice President & Counsel
Eleanor P. Williams (BBO 667201)
Assistant Vice President & Counsel
Massachusetts Mutual Life Insurance Company
1295 State Street
Springfield, Massachusetts  01111
Telephone:  (413) 788-8411
Fax:  (413) 226-4268
bharrigan@massmutual.com;
ewilliams@massmutual.com

Of counsel:

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Philippe Z. Selendy
Jennifer J. Barrett
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Fax (212) 849-7100

A. William Urquhart
Harry A. Olivar, Jr.
Molly Stephens
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Fax (213) 443-3100