**Exhibit 8**

**Transcript of Hearing,**
*In re Washington Mutual, Inc.*, **No. 08-12229 (MFW)**
**(Bankr. D. Del. May 7, 2012) [Docket No. 10154]**

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 08-12229(MFW)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6   WASHINGTON MUTUAL, INC., et al.,

7            Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9   Case No.: 10-53420 (MFW)

10  WASHINGTON MUTUAL, INC. and

11  WMI INVESTMENT CORP.,

12  Plaintiff,

13  v.

14  PETER J. AND CANDANCE R. ZAK

15  LIVING TRUST OF 2001 U/D/O

16  AUGUST 31, 2001, ET AL.,

17  Defendant

18  - - - - - - - - - - - - - - - - - - - - - - - - - - -x

19  Adv. Proc. No.: 12-50422 (MFW)

20  WASHINGTON MUTUAL, INC.

21  Plaintiff,

22  v.

23  XL SPECIALTY INSURANCE COMPANY, et al.,

24  Defendants

25  - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Page 2

```
1    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

2                      United States Bankruptcy Court

3                      824 North Market Street

4                      Wilmington, Delaware

5                      May 7, 2012

6                      10:31 a.m.

7

8    B E F O R E :

9    HON MARY F. WALRATH

10   U.S. BANKRUPTCY JUDGE

11   ECR:   BRANDON MCCARTHY

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1    Debtors' Twenty-Third Omnibus (Substantive) Objection to

2    Claims;

3

4    Debtors' Objection to Proof of Claim Filed by AT&T Corp.;

5

6    Debtors' Sixtieth Omnibus (Substantive) Objection to Claims;

7

8    Debtors' Motion to Estimate Maximum Amount of Certain Claims

9    for Purposes of Establishing Reserves Under the Debtors'

10   Confirmed Chapter 11 Plan;

11

12   Motion for a Protective Order for Claimants Al Brooks, Todd

13   Baker, Deb Horvath, John McMurray, Tom Casey, and David

14   Schneider Pursuant to Rule 26(c);

15

16   Motion of the Official Committee of Unsecured Creditors to

17   Alter or Amend the Court's Opinion and Order Regarding

18   Subordination of the Claim of Tranquility Master Fund, Ltd.;

19

20

21

22

23

24

25

Page 4

1    Motion of Washington Mutual, Inc. for an Order, Pursuant to

2    Section 105(a) of the Bankruptcy Code and Rule 9019 of the

3    Federal Rules of Bankruptcy Procedure, Approving Stipulation

4    and Agreement By and Among Washington Mutual, Inc., JPMorgan

5    Chase Bank, National Association and U.S. Bank, National

6    Association, as Successor to Union Bank, N.A. Resolving

7    Adversary Proceeding and Related Proofs of Claim;

8

9    Motion for an Order, Pursuant to Section 105(a) of the

10   Bankruptcy Code and Bankruptcy Rule 9019, Approving the

11   Stipulation and Agreement Between Washington Mutual, Inc.

12   and MSG Media Reducing and Allowing Proof of Claim Number

13   1841;

14

15   Application of (I) Wilmer Cutler Pickering Hale and Dorr,

16   LLP, (II) Pachulski Stang Ziehl & Jones, LLP, and (III)

17   Boies, Schiller & Flexner, LLP for Compensation for Services

18   Rendered and Reimbursement of Expenses as Counsel to the Ad

19   Hoc Group of WMB Senior Noteholders for the Period from the

20   Petition Date Through the Effective Date;

21

22   Washington Mutual, Inc. and WMI Investment Corp. v. Peter J.

23   and Candace R. Zak Living Trust of 2001 u/d/o August 31,

24   2001, et al. (Adversary Proceeding No. 10-53420);

25

Page 5

1    Debtors' Seventy-First Omnibus (Substantive) Objection to

2    Late Filed Claims;

3

4    Debtors' Seventy-Second Omnibus (Substantive) Objection to

5    Claims;

6

7    Motion of Deutsche Bank Trust Company Americas in its

8    capacities as Indenture Trustee and Guarantee Trustee of Two

9    Series of WMB/CCB Subordinated Notes for Entry of an Order

10   Allowing and Authorizing and Directing Payment of Its Claims

11   for Fees and Expenses;

12

13   Motion of Law Debenture Trust Company of New York, in its

14   capacity as Indenture Trustee, for Entry of an Order

15   Partially Allowing and Liquidating Proof of Claim for Fees

16   and Expenses Incurred from January 1, 2012 through and

17   Including March 31, 2012;

18

19   Motion for an Order, Pursuant to Section 105(a) of the

20   Bankruptcy Code and Bankruptcy Rule 9019, Approving

21   Stipulation and Agreement Between WMI Liquidating Trust and

22   SPCP Group, LLC Reducing and Allowing Proof of Claim Number

23   4048;

24

25

Page 6

1    Fourth Motion of Wells Fargo Bank, N.A., in its capacity as

2    Successor Indenture Trustee and Successor Guarantee Trustee,

3    for Entry of an Order Further Partially Liquidating and

4    Allowing that Aspect of its Proof of Claim Relating to the

5    Trustee's Fees and Expenses;

6

7    Fourth Motion of Wilmington Trust Company, in its capacity

8    as Trust Preferred Trustee, for Entry of an Order Further

9    Partially, Liquidating and Allowing Proofs of Claim for Fees

10   and Expenses;

11

12   Fourth Motion of The Bank of New York Mellon Trust Company,

13   N.A. in its capacity as Indenture Trustee, for Entry of an

14   Order Further Partially Liquidating and Allowing Proof of

15   Claim for Fees and Expenses;

16

17   Fourth Motion of Wilmington Trust Company, in its capacities

18   as Indenture Trustee and Guarantee Trustee for Five Series

19   of WMB/CCB Subordinated Notes, for Entry of an Order

20   Liquidating and Allowing Proof of Claim for Fees and

21   Expenses;

22

23   MBS Plaintiffs' Motion to Classify Claim as a Claim 12

24   Claim;

25

Page 7

1    Debtors' Seventieth Omnibus (Substantive) Objection to

2    Claims;

3

4    Debtors' Seventy-Third Omnibus (Substantive) Objection to

5    Late-Filed Claims;

6

7    Debtors' Seventy-Fourth Omnibus (Substantive) Objection to

8    Claims;

9

10   Motion of Examiner for Entry of Order (1) Discharging

11   Examiner; (2) Approving Disposition of Documents; and (3)

12   Granting Related Relief;

13

14   Motion of Gregory G. Camas to Extend Time to File Proof of

15   Claim, Deeming Proof of Claim Timely Filed, and Classifying

16   Claim as Class 12 Claim Under Seventh Amended Joint Plan of

17   Affiliated Debtors Pursuant to Chapter 11 of the United

18   States Bankruptcy Code;

19

20   MBS Plaintiffs' Motion for Order Certifying Class for

21   Purposes of the Class Claim Pursuant to Fed. R. Civ. P. 23

22   and Fed. R. Bankr. P. 7023 and 9014(c);

23

24   Washington Mutual, Inc. v. XL Specialty Insurance Co., et

25   al.;

Page 8

1    Tenth Interim Fee Applications.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sherri L. Breach, CERT*D-397

Page 9

```
 1   A P P E A R A N C E S :

 2   RICHARDS, LAYTON & FINGER, P.A.

 3        Attorneys for WMI Liquidating Trust

 4        One Rodney Square

 5        920 North King Street

 6        Wilmington, Delaware 19801

 7

 8   BY:  MICHAEL MERCHANT, ESQ.

 9        TRAVIS MCROBERTS, ESQ.

10

11   WEIL, GOTSHAL & MANGES, LLP

12        Attorneys for WMI Liquidating Trust

13        767 Fifth Avenue

14        New York, New York 10153

15

16   BY:  BRIAN ROSEN, ESQ.

17        ADAM STROCHAK, ESQ.

18        JARRAD WRIGHT, ESQ.

19

20   DRINKER BIDDLE

21        Attorneys for Houston Casualty Company

22        1100 North Market Street, Suite 1000

23        Wilmington, Delaware 19801

24

25   BY:  HOWARD A. COHEN, ESQ.
```

```
                                                         Page 10

 1     A P P E A R A N C E S :

 2     PEPPER HAMILTON, LLP

 3          Attorneys for Creditors' Committee

 4          Hercules Plaza

 5          Suite 5100

 6          1313 North Market Street

 7          Wilmington, Delaware 19801

 8

 9     BY:  DAVID M. FOURNIER, ESQ.

10

11     AKIN GUMP STRAUSS HAUER & FELD, LLP

12          Attorneys for Official Committee of Unsecured Creditors

13          One Bryant Park

14          New York, New York 10036

15

16     BY:  ROBERT JOHNSON, ESQ.

17

18     ROSENTHAL, MONHAIT & GODDESS

19          Attorneys for NY Mellon

20          919 North Market Street

21          Suite 1401

22          Wilmington, Delaware 19801

23

24     BY:  NORMAN MONHAIT, ESQ.

25
```

Page 11

1    A P P E A R A N C E S :

2    ASHBY & GEDDES

3          Attorneys for Equity Committee

4          500 Delaware Avenue

5          Wilmington, Delaware 19899

6

7    BY:  GREG TAYLOR, ESQ.

8

9    LOEB & LOEB, LLP

10          Attorneys for Wells Fargo

11          345 Park Avenue

12          New York, New York 10154

13

14    BY:  VADIM J. RUBINSTEIN, ESQ.

15

16    FOX ROTHSCHILD

17          Attorneys for Wells Fargo

18          Citizens Bank Center

19          919 North Market Street

20          Suite 1300

21          Wilmington, Delaware 19899

22

23    BY:  SETH A. NIEDERMAN, ESQ.

24

25

Page 12

1    A P P E A R A N C E S :

2    CROSS & SIMON, LLC

3          Attorneys for MBS Plaintiffs

4          913 North Market Street, 11th Floor

5          Wilmington, Delaware 19899

6

7    BY:  CRAIG J. SPRINGER, ESQ.

8

9    LOWENSTEIN SANDLER

10         Attorneys for MBS Plaintiffs

11         65 Livingston Avenue

12         Roseland, New Jersey 07068

13

14   BY:  JACK SHERWOOD, ESQ.

15         MICHAEL ETKIN, ESQ.

16

17   SCOTT & SCOTT

18         Attorneys for MBS Plaintiffs

19         500 5th Avenue, Floor 40

20         New York, New York 10110

21

22   BY:  BETH KASWAN, ESQ.

23

24

25

Page 13

```
 1   A P P E A R A N C E S :

 2   COHEN MILSTEIN

 3        Attorneys for MBS Plaintiffs

 4        88 Pine Street, 14th Floor

 5        New York, New York 10005

 6

 7   BY:  CHRISTOPHER LOMETTI, ESQ.

 8

 9   MORRIS JAMES, LLP

10        Attorneys for Law Debenture as Indenture Trustee

11        500 Delaware Avenue

12        Suite 1500

13        Wilmington, Delaware 19801

14

15   BY:  STEPHEN MILLER, ESQ.

16        PATRICIA WINSTON, ESQ.

17        EDWARD MCNALLY, ESQ.

18

19   MACAULEY, LLC

20        Attorneys for XL Specialty & Columbia Casualty

21        300 Delaware Avenue

22        Suite 760

23        Wilmington, Delaware 19801

24

25   BY:  THOMAS MACAULEY, ESQ.
```

Page 14

1   A P P E A R A N C E S :

2   WILEY REIN, LLP

3        Attorneys for XL Specialty & Columbia Casualty

4        1776 K Street NW

5        Washington, D.C. 20006

6

7   BY:  CHARLES LEMLEY, ESQ.

8

9   ELLIOTT GREENLEAF

10       Attorneys for Debtors' Special Counsel

11       1105 Market Street

12       Suite 1700

13       Wilmington, Delaware 19801

14

15  BY:  SHELLEY KINSELLA, ESQ.

16

17  MORRIS NICHOLS

18       Attorneys for Deutsche Bank as Indenture Trustee

19       1201 North Market Street, 18th Floor

20       Wilmington, Delaware 19899

21

22  BY:  CURTIS MILLER, ESQ.

23

24

25

Page 15

1   A P P E A R A N C E S :

2   OFFICE OF THE U.S. TRUSTEE

3        Attorneys for the U.S. Trustee

4        844 King Street

5        Suite 2207, Lockbox 35

6        Wilmington, Delaware 19899

7

8   BY:  JANE LEAMY, ESQ.

9

10  KLEE, TUCHIN, BOGDANOFF & STERN, LLP

11       Attorneys for WMI Liquidating Trust

12       1999 Avenue of the Stars

13       Thirty-Ninth Floor

14       Los Angeles, California 90067

15

16  BY:  MATTHEW C. HEYN, ESQ.

17

18  MCKENNA LONG & ALDRIDGE, LLP

19       Attorneys for the Examiner

20       303 Peachtree Street, NE

21       Suite 5300

22       Atlanta, Georgia 300308

23

24  BY:  HENRY SEWELL, ESQ.

25

Page 16

```
 1   A P P E A R A N C E S :

 2   COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

 3        Attorneys for the Examiner

 4        500 Delaware Avenue, Suite 1410

 5        Wilmington, Delaware 1801

 6

 7   BY:  KATE STICKLES, ESQ.

 8

 9   COUSINS CHIPMAN & BROWN

10        Attorneys for WMI Liquidating Trust

11        1007 North Orange Street, Suite 1110

12        Wilmington, Delaware 19801

13

14   BY:  MARK OLIVERE, ESQ.

15

16   APPEARING TELEPHONICALLY:

17

18   ALRENE R. ALVES

19   GREG ARMSTRONG

20   JAMES A. BERG

21   LEE R. BOGDANOFF

22   ROBERT J. BOLLER

23   MARK BROUDE

24   DAN BULLOCK

25   MATTHEW CANTOR
```

```
 1    APPEARING TELEPHONICALLY:

 2

 3    STEVEN CAPLOW

 4    CHRIS CARLY

 5    ELEANOR CHAN

 6    DEBORAH COLLINS

 7    LEO T. CROWLEY

 8    WALTER H. CURCHACK

 9    JEROME DEALMEIDA

10    MARIA DOUVAS

11    KENNETH ECKSTEIN

12    LEAH M. EISENBERG

13    MARGOT P. ERLICH

14    OMMID C. FARASHAHI

15    BRIAN GLUECKSTEIN

16    DAN GROPPER

17    BRIAN GUINEY

18    JULIO C. GURDIAN

19    FRED S. HODARA

20    KELLEY HUFF

21    THOMAS D. JOHNSTON

22    JOHN KAPLAN

23    ARNIE KASTENBAUM

24    MARC KIRSCHNER

25    MAYUR LAKHANI
```

Page 18

1   APPEARING TELEPHONICALLY:

2

3   JAMES C. LEDA

4   MATTHEW D. LEE

5   MICHAEL LINN

6   MICHAEL LLOYD

7   BRETT LOHOEFENER

8   KENNETH MAIMAN

9   JOE MCINNIS

10  ADITI PARANJPYE

11  JEFFREY ROTHLEDER

12  BRIAN M. ROTHSCHILD

13  ROBERT A. SACKS

14  STEVEN SIMMS

15  DAVID SIMONDS

16  MARYBETH SLEVIN

17  CHAD SMITH

18  MARY LOU SOLLER

19  DOUGLAS K. SOUTHARD

20  KEVIN J. STARKE

21  JIM TRUONG

22  AARON WERNICK

23  MARISSA B. WILEY

24  AMY WOLPER

25  MISHA ZAITZEFF

Page 19

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Good morning.

4              MR. ROSEN:  Good morning, Your Honor.  Brian

5     Rosen, Weil, Gotshal and Manges.  With me is my partner,

6     Adam Strochak and Michael Merchant from Richards, Layton and

7     Finger.  We're here on behalf of WMI Liquidating Trust, and

8     I'm guess we'll assume the capacity later on for our own

9     respective law firms, Your Honor.

10             With respect to the agenda, I think we pick up on

11    Page 14, Item Number 11, Your Honor.

12             THE COURT:  All right.  Just -- just for the

13    record I have had an opportunity to look at the Items 11-19

14    which were filed under certification of no objection.

15             MR. ROSEN:  Yes.

16             THE COURT:  And I had no problem with any of them

17    and have entered the orders.

18             MR. ROSEN:  Okay.  Thank you, Your Honor.   I

19    think that will allow certain people in the courtroom to --

20    to leave, which would take us then up to, Your Honor, Item

21    Number 20, which Your Honor -- actually, Your Honor, if we

22    could skip to Item 21 just very briefly.  There are two

23    other claims on there, if we could get rid of the claims

24    objections first.

25             THE COURT:  That would be fine.

Page 20

1           MR. ROSEN:  Okay.  Items 21 and 22, Your Honor,

2    Item Number 21 is the seventieth omnibus objection.  In this

3    objection we sought to disallow sixty-three claims which had

4    been subordinated to the level of preferred or common stock

5    --

6           THE COURT:  Could the operator mute the lines?

7    Thank you.

8           MR. ROSEN:  So pursuant to the confirmed and

9    consummated plan, Your Honor, Classes 19 or 22, and these

10   claims have been subordinated pursuant to orders granted --

11   granting the thirty-eighth through the forty-second omnibus

12   objections as well as a few others such as the sixty-second

13   omnibus objection.

14          And, Your Honor, as noted in the objection that we

15   did file here, pursuant to the plan holders of equity

16   interests are now to receive a distribution on account of

17   such equity interests, but the claimants holding the claims

18   on each to this seventieth omnibus have not provided any

19   justification why they should recover any amounts in

20   addition to their equity interests or with respect to the

21   purchases of the equity in the case.

22          And even the few that have asserted anything

23   beyond the mere value of those losses, Your Honor, from

24   holdings have not provided any support for those assertions.

25   So the debtors' respectfully request that the Court disallow

Page 21

1    each of the claims on that Exhibit A, not because we wanted

2    to get rid of their equity interests, Your Honor, but

3    because we were seeking to avoid a duplicate recovery on

4    behalf of those people that have previously filed these

5    claims.

6           There were six responses, Your Honor, that the

7    debtors' received on or before the deadline, and after that

8    the debtors' submitted under certification of counsel an

9    order which the claim -- excuse me -- the form of which

10   would have removed all of those non-responding ones.  And,

11   Your Honor, the Court entered that proposed order on April

12   2nd.  So that left us, then, with these six remaining

13   claims.

14          And if I could just briefly go through those, Your

15   Honor, for the record.

16          The first, and I apologize if I mispronounce the

17   name, Mr. Timothy Nguyen and his is Claim Number 3921 for

18   $100,000, and he said in his papers, "I invested on

19   Washington Mutual for $100,000.  All my retire savings have

20   lost when WM was transferred to Chase.  Could you help me to

21   consider my situation?  All my supporting documents were

22   lost when I moved from California to Florida."  There is

23   nothing else attached to the pleading, Your Honor.

24          Additionally, 3922 of the following claim was

25   filed by Nancy Nguyen.  Again, almost the same exact

Page 22

1    wording.  "I invested on Washington Mutual for 22,000 all my

2    retire savings have lost when WM was transferred to Chase.

3    Could you help me to consider my situation?  Thank you."

4    She attaches nothing either, Your Honor.

5            Celia Lucente, Claim 3608, for $545,000 and change

6    says, "I have had taxes withheld on compensation for w-pay"

7    -- I'm assuming work -- "I have performed, but in PD, paid

8    income I was paid in the form of stock.  Supporting

9    documentation of brokerage statements for the shares issued

10   and corresponding W2s showing withholdings filed with the

11   proof of claim."  There was nothing else filed, Your Honor.

12           Helen Burleson Kelso, Claim 3236, for 9,750, she

13   said in her response, "I oppose the disallowance of my claim

14   that is subject to the objection.  My claim was properly

15   filed previously with the claims agent and all supporting

16   documentation was included therewith.  My claim was in

17   order.  See attached."  There's nothing else to the

18   response, Your Honor.  The claim itself has only an account

19   statement showing the November 20th, 2007 market value of

20   her stock to be $9,750.

21           Ms. Adele Plotkin --

22           THE COURT:  Well, didn't she also attach her stock

23   certificate?

24           MR. ROSEN:  I -- I believe she did.  Yes, Your

25   Honor.

Page 23

```
1              THE COURT:  Okay.

2              MR. ROSEN:  Ms. Plotkin said in Claim 1431 and in

3     her response, "I am an eighty-nine-year-old senior citizen

4     and did attend a hearing on objection in 201."

5              THE COURT:  Oh, I'm sorry.  It's Ms. Plotkin who

6     attached --

7              MR. ROSEN:  I -- I think that's right, Your Honor.

8              THE COURT:  Okay.

9              MR. ROSEN:  She attaches a certificate of 553

10    shares.  "But I'm not physically able to attend the hearing

11    on 4/3/12.  I do not understand why the debtors' do not

12    consider any settlement to my proof of claim."

13             Mr. Armstrong, Claim Number 263 -- excuse me --

14    2368 filed in the amount of 41,000 and change.  This claim

15    asserted that -- the claim arose out of personal injury and

16    that was sufficient for his claim of damages.  He said he is

17    no longer a shareholder.  His claim relates only to the

18    personal losses "I suffered up to date of filing of this

19    case and the value of my property which was taken by our

20    government, and makes no mention of any equity interests I

21    may have acquired or disposed of since that time."

22             Interestingly, Your Honor, when you look at his

23    day trading, which he did attach, he bought a lot of things

24    several days after the seizure, so -- to help pump up his

25    claim.  And we also noted that when you do -- he was a day
```

Page 24

1    trader.  There's a lot of buying and selling of his claim.

2    We noted that his losses were only in the amount of around

3    $9,000 from what he did buy and sell.

4              We did actually speak to him and try and get him

5    to be part of the MBL settlement, but we noted that his --

6    his purchases actually were after the commencement -- or

7    excuse me -- after the closing of the class period.   He

8    argues Fifth Amendment; that the FDIC should pay him for

9    taking of the bank.  He says the bank -- the FDIC told him,

10   no.  He should look here.  Your Honor, he argues -- he tries

11   to reargue the subordination issue.  We have been unable to

12   come up with any reason as to why this should be paid, Your

13   Honor.

14             I do have, in the courtroom, Your Honor, Mr.

15   Maciel.  Mr. Maciel and others have testified before as to

16   the effects of WMI versus WMB, the claims process, et

17   cetera, and I could tender or proffer Mr. Maciel at this

18   time if the Court thinks it would be helpful.

19             THE COURT:  All right.  You may.

20             MR. ROSEN:  And, Your Honor, with you already

21   having granted several of these, I will just try and skip

22   over and go to the ones that are relevant.

23             THE COURT:  Thank you.

24             MR. ROSEN:  Because it would be applicable, I

25   think, to the seven -- perhaps the seventy-three as well.

Page 25

1          Your Honor, Mr. Maciel is a senior director with

2    Alvarez and Marsal.  He was formally the chief financial

3    officer of Washington Mutual, Inc. and WMI Investment Corp,

4    and he's currently the chief financial officer for the WMI

5    Liquidating Trust.  He's present in the courtroom today and

6    I make this proffer on his behalf, Your Honor.

7          He would testify that as the CFO of the debtors he

8    was one of the persons responsible for overseeing the claims

9    reconciliation and objection process in these Chapter 11

10   cases.  He would testify that in preparation for filing the

11   omnibus claims objections, each of the claims at issue was

12   carefully reviewed and analyzed in good faith using due

13   diligence by the appropriate personnel working under his

14   direction and/or supervision.

15         He would further testify that he has reviewed the

16   omnibus claims objections and the exhibits and is familiar

17   with the information contained therein.

18         With respect to the seventieth omnibus one, those

19   were the six responses we were just referring to, Your

20   Honor, Mr. Maciel would testify that each of the sixty-three

21   claims have been previously objected to and been disposed

22   of.

23         He would testify that pursuant to the seventh

24   amended plan, holders of equity interest have received

25   distributions on account of such equity interests, but the

Page 26

1    claimants holding the claims in the seventieth have not

2    provided any justification why they should recover amounts

3    in addition to their equity interests or with respect to

4    their purchases of WMI equity.

5              And even the few claimants that have asserted

6    anything beyond the mere value of their losses from the

7    holdings of equity have not provided any support for such

8    assertions, including in their responses to the objection.

9              He would testify that by -- excuse me -- that by

10   this objection the debtors are not seeking to disallow any

11   equity interest held by such claimants, but rather such

12   claimants should not recover additional amounts with respect

13   to the purchases of the equity.

14             That would be his testimony solely with respect to

15   the seventieth, Your Honor.

16             Your Honor, if you would like I could then proceed

17   with what he would say with respect to the seventy-third or

18   we could deal with that later.

19             THE COURT:  Well, with respect to those who sold

20   their shares, and I -- I guess it's Mr. Armstrong is the

21   only one --

22             MR. ROSEN:  Right.

23             THE COURT:  -- who sold his shares, he is not

24   getting a distribution as a shareholder.

25             MR. ROSEN:  No, Your Honor.

1           THE COURT:  Why is he not entitled to a

2     distribution -- a distribution as a subordinated creditor

3     for his losses?

4           MR. ROSEN:  Your Honor, we haven't seen any

5     evidence as to why he should be entitled to it.  We've asked

6     him to come forward and show us what that evidence would be.

7     Obviously, he has made allegations in his pleadings with

8     respect to directors and officers, but we haven't seen

9     anything beyond that, Your Honor.  He is just claiming gross

10    mismanagement on the part of those directors and officers in

11    allowing the bank to be seized by the government.  And then

12    he -- as I said, he turned around and said, my Fifth

13    Amendment rights; the government took it; the government

14    should pay me for the taking of my stock, which at this

15    point only the $9,000.

16          So, Your Honor, we haven't seen anything from Mr.

17    Armstrong that would warrant anything beyond this.  If Mr.

18    Armstrong would step forward and provide us with some sort

19    of evidence as to what we perceive to be the nine-thousand-

20    dollar differential between the day trading bought and

21    selling, we would, obviously, take a serious look at it.

22          THE COURT:  All right.  Well, I believe Mr.

23    Armstrong is on the line.

24          Mr. Armstrong?

25          MR. ARMSTRONG:  Yes.  Can you hear me?

Page 28

1              THE COURT:  We can hear you.

2              MR. ARMSTRONG:  Okay.  Good.

3              First, thank you for taking the time today.  And I

4    guess I need to get clarification on something that counsel

5    said because they have not contacted me at all or discussed

6    my claim in any form or fashion.  So --

7              THE COURT:  Well, just tell me, what is the basis

8    for your claim for damages?

9              MR. ARMSTRONG:  It's in two parts.  It's -- the

10   first is actual, out-of-pocket losses from Washington

11   Mutual, which is the $8,305.19.

12             And I'm -- I'm filing an open claim and not just

13   an equity interest because I believe that the management of

14   the company breached a legal duty and grossly mismanaged my

15   assets, you know, to cause me those losses.  I believe they

16   have a legal responsibility for that.

17             THE COURT:  And did you provide a calculation of

18   your actual losses as part --

19             MR. ARMSTRONG:  Yes --

20             THE COURT:  And where --

21             MR. ARMSTRONG:  -- I did.

22             THE COURT:  -- is that?

23             MR. ARMSTRONG:  With my original claim.

24             MR. ROSEN:  Your Honor --

25             THE COURT:  Do you have the --

1              MR. ROSEN:  -- if I could approach, I'll help --

2              THE COURT:  Yeah.  Please hand up the original

3     claim.

4              All right.  I'm looking at Exhibit A to your proof

5     of claim and that's the $9,000.

6              MR. ARMSTRONG:  Yeah.  That's the summary of it.

7     Correct.  And then all the individual trade confirmations

8     follow in Exhibit B.

9              THE COURT:  I have those.

10             MR. ARMSTRONG:  So Exhibits A and B to the claim

11    are the, you know, detailed support for that eight-thousand-

12    three-hundred-dollar number.

13             THE COURT:  All right.  And your -- you have

14    another claim you assert you're entitled to?

15             MR. ARMSTRONG:  Yeah.  The second part of the

16    claim is the value of the 3,800 shares that I owned as of

17    the petition date.

18             THE COURT:  And --

19             MR. ARMSTRONG:  But, you know, my cost on those is

20    not included in the $8,300.

21             THE COURT:  But you sold those --

22             MR. ARMSTRONG:  The --

23             THE COURT:  -- you sold those shares after the

24    bankruptcy.

25             MR. ARMSTRONG:  After the bankruptcy, yes, ma'am.

1           MR. ROSEN:  Your Honor, it's our understanding,

2    and -- and Mr. Armstrong can correct me if I'm wrong, but he

3    -- he's asserting that he's entitled to an imputed loss of

4    $33,000 because he thinks that the fair value of the stocks

5    should have been $8.75 per share which was the value that

6    TPG paid in April of 2008.  So he has grossed up the amount

7    of his claim.

8           MR. ARMSTRONG:  Yes.  I -- I used TPG's investment

9    amount.

10          MR. ROSEN:  Even though he didn't buy it at that

11   level.

12          MR. ARMSTRONG:  Correct.  But I've since found out

13   that -- and as I stated in my original claim, I've -- I felt

14   that was probably a very conservative estimate of the value

15   of the -- of the shares.  And as it turns out, it was a very

16   conservative estimate and I provided additional information

17   in my response to the seventieth objection that shows the

18   FDIC itself --

19          THE COURT:  Well --

20          MR. ARMSTRONG: -- valuing the shares at $15.50 a

21   piece after -- after the seizure.

22          THE COURT:  All right.  Well, as -- as a legal

23   matter, I'm going to disallow any claim for stock you sold

24   after the bankruptcy date.  That was a voluntary decision

25   made by you and I don't think that entitles you to anything

 1    from this estate.

 2              MR. ARMSTRONG:  Okay.  Even if the management of

 3    the company caused the value of my asset to basically

 4    disappear or vanish --

 5              THE COURT:  Well --

 6              MR. ARMSTRONG:  -- prior to the petition date or

 7    --

 8              THE COURT:  Well --

 9              MR. ARMSTRONG:  I mean, that's really the basis of

10    my whole claim; that I owned -- that I had property of

11    significant value and because of the management of the

12    company, that value was wiped out.

13              THE COURT:  Well, but -- but had you held your

14    claim, you would have a claim against the estate for your

15    stock, and you did not.  I -- I don't think that anything

16    that occurred after the bankruptcy entitles you to a claim

17    for stock that you voluntarily sold.

18              MR. ARMSTRONG:  Oh, I agree with that.  But -- but

19    my claim is for the property that I held prior to the

20    bankruptcy.

21              THE COURT:  Well, but I think that's incorporated

22    in your nine-thousand-dollar calculation.

23              MR. ARMSTRONG:  Actually, no.  The $9,000 or

24    $8,300, it was actual losses that I had incurred as the

25    value of the stock went down.  That does not consider the

Page 32

1   value of the 3,800 shares that I still held as of the

2   petition date, if that makes any sense.

3               THE COURT:  No.  I understand.

4               MR. ARMSTRONG:  Okay.

5               THE COURT:  Well, but to the extent that the --

6   well, let me hear the debtors' argument on this.  I mean,

7   I'm struggling to see what the --

8               MR. ROSEN:  On the -- on the eighty-three-hundred

9   piece, Your Honor?

10              THE COURT:  -- the issue is.  Yeah.

11              MR. ROSEN:  Your Honor, on the eighty-three-

12  hundred piece --

13              MR. ARMSTRONG:  No.  She's -- she's talking about

14  the twenty --

15              THE COURT:  The two --

16              MR. ARMSTRONG:  -- the 33,000 and twenty-two --

17              THE COURT:  Yeah.  The 2,000 --

18              MR. ARMSTRONG: -- portion in the claim.

19              THE COURT:  The losses on the 2,000 shares held as

20  of the petition date.

21              MR. ARMSTRONG:  Yeah.  The 3,800 shares I held as

22  of the petition date.  My claim for the value of those is

23  $33,022.

24              MR. ROSEN:  Your Honor, as I indicated, we tried

25  to break this down into, when we looked at all of the buying

Page 33

1    and selling and understanding what he -- what Mr. Armstrong

2    bought the shares of stock, and if you noted he was buying

3    them on the same day he was selling them.

4           And we -- we added up and he agrees that there was

5    about an $8,305 in losses there.  This is for the gross-up,

6    though, that he's referring to, this 8. -- times the TPG

7    value.  I honestly -- Your Honor, I'm at a loss to

8    understand why there is a relationship back to what TPG paid

9    and he's focusing on the FDIC's papers in some subsequent

10   filing that the FDIC made somewhere to say, geez, look,

11   there was value in that stock.

12          We -- I honestly -- Your Honor, I have a hard time

13   understanding it.  I don't understand it and I don't see

14   what the relationship is back to the estate.  If there is,

15   in fact, a claim that we should be talking about, it should

16   be limited to the $8,300, and at that point, then, if Mr.

17   Armstrong wants to come forward and present evidence as to

18   why the $8,300 qualifies a subordinated claim, then I think

19   that's something, Your Honor, that we can discuss with the

20   Court and, if necessary, litigate and -- and have the Court

21   decide.

22          But just to make a reference to say there was

23   gross mismanagement on the part of the directors and

24   officers and, therefore, pay me $8,300 or pay me for this

25   impeded value of $33,000 in addition to that, Your Honor,

Page 34

1  we're hard-pressed to understand how it's right.  He chose

2  to do what he did.  He chose to sell the stock.  He chose to

3  quantify his loss at the $8,300.

4          THE COURT:  Yeah.  Why isn't that correct?

5      (No verbal response)

6          THE COURT:  Mr. Armstrong.

7          MR. ARMSTRONG:  Oh, I'm sorry.  I thought you were

8  asking him.

9          THE COURT:  No.  I'm asking you why isn't counsel

10 for the debtor correct?

11         MR. ARMSTRONG:  Well, as far as the eight-

12 thousand-three-hundred-dollar out of pocket losses is

13 concerned, he is correct.  And I can see -- the way the

14 question is by alleging that that was a loss caused by a

15 breach of a legal duty by the former management of the

16 company, is it -- is it a legal and reliable claim.  If it

17 is, then I would say that it's a -- you know, it's a claim

18 which precedes the petition date and they've got to pay it

19 or treat it, handle it in -- in the estate, just like any

20 other claim.  I -- based on what I've learned, I believe

21 that that would be subordinating, the level of co-owned

22 equity.

23         THE COURT:  Yes.

24         MR. ARMSTRONG:  And the fact that I sold the

25 shares afterwards, in my mind, is really irrelevant because

Page 35

1    what my claim is for is, you know, pre-petition losses.

2            THE COURT:  Well, I think the debtor is willing to

3    concede $8,300 in out of pocket losses.

4            MR. ROSEN:  Well, Your Honor, I -- I think --

5            THE COURT:  As a calculation.

6            MR. ROSEN:  As a calculation.  That's correct.  By

7    no means are we conceding liability.

8            MR. ARMSTRONG:  By no means what?  Say -- say

9    again, please?

10           THE COURT:  They're not conceding that you lost

11   this money because of any bad acts by the debtors or its --

12           MR. ARMSTRONG:  Oh, okay.  Okay.  I guess that's

13   for you to decide then.  I really don't know what the -- you

14   know, the legal standard is for proving gross mismanagement.

15   If the fact that we're talking today isn't proof enough,

16   then I don't -- you know, I really don't know what else I

17   can provide.  I mean, the bank was a hundred-and-something-

18   year-old bank that survived the Great Depression.  It was

19   the sixth largest bank in the country and now we're sitting

20   in a bankruptcy court arguing over an eight-thousand-dollar

21   claim.

22           THE COURT:  Well, the problem --

23           MR. ARMSTRONG:  In my mind, that -- that's

24   evidence of mismanagement.  But --

25           THE COURT:  Well, I think it's not quite enough

Page 36

1    and there are any number of reasons why the stock might have

2    lost value.  I mean, I think you have to prove a little bit

3    more than that to prove a loss, even a subordinated loss.

4              MR. ROSEN:  Your Honor, if I could make a

5    suggestion.  If we could modify the order to carve Mr.

6    Armstrong's claim out of it and then allow Mr. Armstrong an

7    opportunity to submit some evidence, as the Court did

8    previously with some people who had some of the similar

9    types of assertions that he has now, and then we, perhaps,

10   have a hearing set in the future for the eighty-three-

11   hundred-dollar piece.

12             THE COURT:  All right.  I'm willing to allow that.

13   Mr. Armstrong, I suggest that you talk with counsel for the

14   debtor regarding what proof you can come forward with.

15   Okay.

16             MR. ARMSTRONG:  Okay.  I'll -- I'll -- I'll gladly

17   do that.

18             THE COURT:  All right.  I think the other claims

19   are -- are different from yours and I agree that it appears

20   that all they are asserting is really claims for shares,

21   their share ownership.

22             MR. ROSEN:  Right.

23             MR. ARMSTRONG:  Right.

24             THE COURT:  All right.  So we'll carve out Mr.

25   Armstrong.

1            MR. ARMSTRONG:  Okay.  My biggest concern,

2    honestly, is -- is the Fifth Amendment issue.

3            THE COURT:  Well, you understand that -- that the

4    taking was by the government, so am I correct that you're

5    asserting a claim against the government for taking of your

6    property, for the seizure of the bank?

7            MR. ARMSTRONG:  I believe -- my own -- my own

8    personal belief is that the government is responsible for

9    compensating the owners of that bank.  Yes.  Unfortunately,

10   I've had a similar situation on -- with -- on another

11   investment of mine and I filed a claim directly with the

12   FDIC.  They called it a third party claim, kicked it back to

13   me and said, go talk to the holding company, which is what

14   I'm doing here.  I don't understand the logic behind that,

15   but that is what I was instructed.  So --

16           THE COURT:  Well, I'm -- I'm prepared to find that

17   you do not have a Fifth Amendment claim against the debtor.

18           MR. ARMSTRONG:  Okay.

19           THE COURT:  I'll disallow that portion.

20           MR. ARMSTRONG:  Would it be -- would it be out of

21   your venue, if that's the right word, to give me a ruling

22   that we do have a Fifth Amendment claim against the

23   government?

24           THE COURT:  Yeah.  I -- that's not -- I don't have

25   jurisdiction or venue to decide that.

Page 38

1              MR. ARMSTRONG:  That's what I was afraid of.

2     Okay.  Very good.

3              THE COURT:  All right.

4              MR. ARMSTRONG:  If the debtors will just contact

5     me on this other, then we'll discuss it.

6              MR. ROSEN:  We will, Your Honor.  And thank you,

7     Mr. Armstrong.

8              MR. ARMSTRONG:  Thank you all.

9              MR. ROSEN:  Your Honor, that takes us to the

10    seventy-third omnibus objection, which is Item 22 on the

11    agenda.

12             In this objection, Your Honor, we objected to nine

13    claims on substantive grounds.  And Mr. Maciel would testify

14    that each of the proofs of claims listed in this objection

15    had also been previously objected to and disallowed on the

16    basis that they were late filed.  But, Your Honor, if you

17    recall, pursuant to the plan we -- we gave them new life.

18             THE COURT:  Yes.

19             MR. ROSEN:  Mr. Maciel would testify that the

20    debtors have determined that each such claim has been

21    asserted by a party to which the debtors have no legal

22    obligation.  He would testify that with respect to certain

23    of these claims, the claimant has attached only an invoice

24    and no case identifying either of the debtors as the

25    recipient of such services, but has not attached a contract

Page 39

1    from which the claim arises or any other supporting

2    documentation.

3              Nonetheless, the debtors searched the records for

4    any contract that might exist between them and the claimants

5    relating to such services without success, and nothing in

6    the debtors' books and records indicated a liability owed to

7    such claimant.

8              The remainder of the seventy-third omnibus

9    objection claims are miscellaneous claims that improperly

10   seek recovery against the debtors because they arise from

11   mortgages issued by WMB, the bank, and held by the

12   claimants.

13             Mr. Maciel would testify that the only two

14   responses to this objection came from holders of mortgage

15   claims.  With respect to such claims, Mr. Maciel would

16   testify that during the period implicated by these claims

17   WMI was a thrift-holding company that never directly engaged

18   in any of the mortgage operations or related activities

19   implicated by such claims.  Specifically, WMI never directly

20   originated or serviced any mortgage loan anywhere in the

21   United States or elsewhere.  As such, these claims seek a

22   recovery for conduct that is attributable to WMI.

23             Mr. Maciel would further testify that neither of

24   the responses provides any justification for why the debtor

25   -- either of the debtors should be liable for the claims

Page 40

1    arising from the mortgages issued by WMB.

2            That -- that would be his testimony today, Your

3    Honor.

4            THE COURT:  All right.  Is there anybody here for

5    either the Lloyds or the Soucek family trust?

6            MR. LLOYD:  Mike Lloyd, I'm here.

7            THE COURT:  All right.  Do you want to respond to

8    the debtors' testimony that there is no claim against the

9    debtor and, rather, your claim is against the bank?

10           MR. LLOYD:  Well, I'm not agreeing with them as

11   those separate entities and I don't think the Court did

12   either.  Already I think Your Honor has ruled that they

13   acted a single control or single person controlled that

14   entity where WMI, WMB were all one in the same.  They

15   advertised that on the internet.  They even acted in the

16   office of thrift which is responsible for mortgages seized

17   their company.  The announcements that were made on the

18   internet certainly -- and the press certainly do not

19   differentiate between WMI, WMB or any other groups that they

20   may have -- have put together.

21           So it seems like a share game for their

22   convenience to me.  But they're objecting and saying that

23   they had no responsibility toward those of us that -- while

24   they owned -- owned controlling interests in WMB and they

25   directed WMB and all their executive team controlled WMB,

Page 41

1    that just doesn't seem like there's any -- anything other

2    than a share game.  Let's play hide behind the corporate

3    vale.

4              And so that -- in that regard, in my opinion, the

5    WMI is Washington Mutual and they are related and all

6    connected.  They've harbored the same logo.  They've had the

7    same billing addresses.  When we sent payments in, it was

8    sent -- payments were sent to WaMu.  It wasn't sent to WMB.

9    It wasn't sent to anything other than WaMu.  So that seems

10   to, I guess, make their -- their claim that WMI is separate

11   from WaMu disappear.

12             THE COURT:  Debtor wish to reply?

13             MR. ROSEN:  Your Honor, we -- we've dealt with

14   this very issue several times over.  And contrary to what

15   Mr. Lloyd says, these are the wrong party claims that are

16   exactly the kind that the Court has disallowed pursuant to

17   the nineteenth, the twenty-first, the sixty-third, and

18   sixty-fifth omnibus objections where the Court found the

19   distinction between WMI and Washington Mutual Bank.

20             WMI observed all corporate formalities, Your

21   Honor, with WMB.  They were separate entities.  WMI did none

22   of these operations that Mr. Lloyd is referring to.  They

23   were either done by Washington Mutual Bank or by Washington

24   Mutual Bank's subsidiary that did the origination of the

25   mortgages.

Page 42

1           With respect to where payments are made, I don't

2    know, but I doubt that they went to the corporate offices of

3    Washington Mutual, Inc.

4           Your Honor, for this reason we would just reassert

5    the same objection that the Court has already upheld several

6    times over, to point out the wrong party nature of this and

7    the separateness of Washington Mutual, Inc. and Washington

8    Mutual Bank.  We apologize that there were these issues,

9    but, unfortunately, they are separate entities and there is

10   no claim against the debtors themselves.

11          THE COURT:  Well, I agree --

12          MR. LLOYD:  Can I --

13          THE COURT:  Go ahead, Mr. Lloyd.

14          MR. LLOYD:  I -- I was just going to say that's

15   nice if we could just waive the magic wand and tell

16   everybody that let's make a claim disappear.  But there's --

17   there's way too many egregious things that are going on here

18   that -- that they're objecting to my claim hiding under the

19   Washington Mutual Bank or Washington Mutual -- WMI and --

20   and saying that WMI is not WMB.  Well, the guy who was the

21   president of WMI wanted to be the Wal-Mart of banks.  The

22   only parts that they forgot is the whole customer service

23   thing, and when these guys have -- have the banking is their

24   business and they are -- can't seem to get a deposit put in

25   the right account and they cause damage to somebody because

Page 43

1     of breach of performance, then this -- this claim cannot be

2     dismissed according -- you know, I'm not a lawyer, but I'm

3     simply reading that, you know, that when there is

4     impropriety that goes on, you just can't get rid of a claim,

5     misconduct alleged.  You just can't throw a claim out.

6              So WMI, WMB are one in the same from the public's

7     eyes, from the operational eyes, and -- of this -- this

8     whole process.  And it's nice that they're saving that and I

9     appreciate that they've got someone there that used to work

10    for Washington Mutual that's now being paid for somebody

11    else making testimony.  But, quite frankly, I think he's

12    conflicted and not capable of making a decision for everyone

13    else.

14             This -- they're paying lawyers' fees that -- that

15    are far in excess of what -- what this claim is, not that

16    the amounts matter, but to me it seems that we're letting

17    Washington Mutual who declares bankruptcy escape without

18    having to pay any fines or fees.  And obviously there's --

19    there's no question that -- that they couldn't put a simple

20    deposit into the right account.  There's no question of

21    breach of performance.  They admit it in a letter which has

22    been submitted to you guys.  There's no question that they

23    attempted to foreclose on a mortgage that they did not own

24    and -- and in doing so damaged my personal and professional

25    reputation, not to mention my -- my financial situation.

Page 44

1          So, you know, all of that's fine and dandy that -- that

2     they want to separate out and hide behind the corporate veil

3     and play the shell game, but that's neither justice nor

4     fairness nor -- nor in agreement with what the Court's

5     already ruled.

6               THE COURT:  Well --

7               MR. LLOYD:  And Tranquility you -- Your Honor was

8     smart enough to separate out the way that it meant and you

9     were able to judge that these guys were one singly

10    controlled entity.  So in my mind that -- that should apply

11    here and that order should stand and this claim should be

12    paid.

13              THE COURT:  Well, the Tranquility decision didn't

14    find as a matter of law or of fact that the corporate veil

15    should be pierced.  I simply held that they stated a claim;

16    that if they were able to prove those facts, they stated a

17    claim.  However, I have not ruled at any point that anybody

18    has proven what you're suggesting, which is piercing the

19    corporate veil.  And -- and the burden of proof is on the

20    creditor who is asserting that.

21              In this country, corporate entities are separate

22    legal entities, and in the absence of proving why they

23    should be ignored, the corporate entity must be

24    acknowledged.  So the burden --

25              MR. LLOYD:  I --

Page 45

1           THE COURT:  -- the burden of proof is on you to

2     prove it and I'm not hearing any proof.  I think it's clear

3     that you --

4           MR. LLOYD:  Okay.

5           THE COURT:  -- dealt with the bank and the actions

6     of which you complain were those of the bank, not its

7     parent, Washington Mutual, Inc.

8           So I -- I do have to sustain the objection to your

9     claim.

10          MR. LLOYD:  Well, Your Honor, I'm reading just

11    from Wikipedia from news reports from the Wall Street

12    Journal and each of those defines WaMu as one singular

13    entity.  They don't separate out that the -- the different

14    entities that are Washington Mutual, et al.  They -- they --

15    they indicate operating under the same WaMu logo, the same

16    executive addresses, the same leadership team, the same

17    executive committee.  All of that is identical.

18          And -- and, of course, in the Tranquility order it

19    says, you know, prior to filing, WMI had directly or

20    indirectly owned all of the outstanding capital stock of

21    Washington Mutual Bank, WMB.  WMB's subsidiaries, including

22    Washington Mutual Asset Corp and WaMu Capital Corp.  You

23    know, from -- from a layperson's perspective, from somebody

24    who is being serviced by Washington Mutual, you know, it's

25    -- it's one in the same entity.  And while legally that

Page 46

1    might not be true, this -- this would -- this would allow

2    for illegalities and breach of performance to go on

3    untethered, unchecked --

4              THE COURT:  Now -- now --

5              MR. LLOYD:  -- and --

6              THE COURT:  -- Mr. Lloyd, Mr. Lloyd, you have a

7    claim against the bank.

8              MR. LLOYD:  Okay.

9              THE COURT:  All right.  But there's a difference

10   between saying you have a claim against the bank for

11   illegalities and a claim against Washington Mutual, Inc.

12   And I'm hearing no proof.  You know, something stated in the

13   press that a one trade name is used to refer to more than

14   one entity is not proof that the entities were not two

15   separate legal corporations that operated as such.

16             MR. LLOYD:  And I'm with you, Your Honor, on that.

17   I mean, I understand how -- how something about the

18   corporations and that's the way to proceed.  However, my

19   mortgage, when I took out the application, was with First

20   Trust and the bundling that occurred to allow First Trust

21   Mortgage to sell my mortgage to Washington Mutual, all I got

22   in the mail was a notice that said, pay -- pay to WaMu,

23   We're now -- your payments are now going to Washington

24   Mutual.  It didn't say Washington Mutual Bank.  It didn't

25   say Washington Mutual, Inc.  It just says, WaMu, that's --

Page 47

1    you know, it's got their letterhead on it, their logo.

2            So --

3            THE COURT:  All right.

4            MR. LLOYD:  -- what happened was --

5            THE COURT:  But your transaction was with a bank.

6    It was not with a corporate holding company.

7            MR. LLOYD:  Well, if the corporate holding company

8    controlled the assets and everything else from the bank, it

9    would seem to me that -- that they are still one in the

10   same.

11           THE COURT:  Well, it -- it's -- quite frankly,

12   your argument is not enough for me to find that the

13   corporate veil should be pierced.  They were two separate

14   corporations and I think I have to deny your claim.  Your

15   claim is against the bank, not against this corporate

16   entity.

17           MR. ROSEN:  Your Honor, may I approach?

18           MR. LLOYD:  When -- Your Honor, when we called to

19   complain with customer service and we escalated the customer

20   service issue, they sent me to what was the executive team

21   at Washington Mutual.  It wasn't -- it wasn't Washington

22   Mutual Bank.  It was the executive team with Mr. Carney in

23   charge.  And now the young lady's name, Ms. Felicia

24   Washington, who communicated with me, she was at the

25   corporate offices in -- out in -- on the west coast.

Page 48

```
 1              And so, you know, they then operated at that point

 2    as one single control entity.

 3              THE COURT:  Well, I -- what -- your argument is

 4    not sufficient proof that they did not act as separate

 5    entities.  And I am going to overrule -- excuse me --

 6    sustain the objection to your claim.

 7              MR. LLOYD:  I -- I like overrule better.

 8         (Laughter)

 9              THE COURT:  I know, but I'm -- I'm overruling your

10    claim.

11              MR. ROSEN:  Your Honor, may --

12              MR. LLOYD:  Okay.  Does that -- and then if you're

13    overruling my claim, does that allow me then to pursue the

14    bank?

15              THE COURT:  You always have --

16              MR. LLOYD:  Because, you know, we -- we were

17    deemed -- we were deemed valid claimants by being on KCC's

18    list and I guess the Court's have had in the past, if that's

19    the case, that we're valid claimants because we're on the

20    KCC list of creditors.  So it would seem to me that -- that

21    if you don't separate -- if you -- if you overrule based on

22    -- or sustain the objection based on the separate entities,

23    then we can't hardly be left out because of being left on

24    the creditor list.  And as a member of the creditor list,

25    then they're deemed to be valid creditors.  I'm just reading
```

Page 49

1    what -- what they say in the different cases that have

2    occurred.  Not being a lawyer, of course, that probably puts

3    me at a handicap, but --

4            THE COURT:  All right.  Mr. Rosen -- Mr. Rosen.

5            MR. ROSEN:  Yeah.  Sir, the KCC list was merely

6    just a registry which sets forth everybody that filed a

7    claim against the estate and what the status is.

8            To the extent that you have a claim against the

9    estate, your obligation is to file it with the FDIC as

10   receiver for the bank itself.

11           THE COURT:  To the extent you have a claim against

12   the bank.

13           MR. ROSEN:  The bank.  Yes.

14           THE COURT:  Not the estate.

15           MR. ROSEN:  I'm sorry.  The receivership.

16           THE COURT:  Yeah.

17           MR. ROSEN:  You can still file it against the --

18   with the FDIC as receiver.

19           THE COURT:  Yeah.  Any claim --

20           MR. LLOYD:  Okay.

21           THE COURT:  -- filed in this case is being

22   disallowed because it's only a claim against WMI or the

23   other debtors.

24           MR. ROSEN:  May I approach, Your Honor?

25           THE COURT:  Yes.

Page 50

1          All right.  I'll disallow the claims, then, and

2     sustain the objection.

3          MR. LLOYD:  Your Honor, I -- I object to the

4     objection and the sustaining of the objection, and -- and I

5     think that it's probably a miscarriage of justice for me to

6     be not allowed this claim simply because there's -- there's

7     way too many avenues to approach this that would suggest

8     that these guys are escaping with breach of performance that

9     rises to payment and that have damaged us, and now they get

10    to walk away from it.

11         THE COURT:  All right.  I've -- I've sustained the

12    objection to your claim and I am disallowing your claim.

13         MR. LLOYD:  Okay.  And does -- does that mean that

14    I cannot pursue the bank?

15         THE COURT:  To the extent you have a claim against

16    the bank, I am making no ruling on any claim you may have

17    against the bank.

18         MR. LLOYD:  Okay.  And so does that also mean that

19    -- that you're -- that we're not hindered by this -- this

20    objection or this disallowance and that we can pursue FDIC

21    and that sort of thing?

22         MR. ROSEN:  In the receivership.

23         THE COURT:  I'm -- I'm not making any ruling as to

24    any claim you have against the FDIC as receiver of the bank.

25         MR. LLOYD:  Okay.

Page 51

1              THE COURT:  All right.

2              MR. ROSEN:  Thank you, Your Honor.

3              That -- that takes us to Item Number 23, which is

4    the seventy-fourth omnibus objection.  In this one, Your

5    Honor, we objected to a number of claims on substantive

6    grounds.  We objected to two claims of vendors that were

7    for services provided to the bank branches pursuant to

8    contracts between the claimants and Washington Mutual Bank.

9    JPMorgan Chase actually paid such claimants in full for

10   these claims.

11             Additionally, we objected to one municipal claim

12   for fines levied on a Washington Mutual Bank branch just as

13   we had previously filed objections to similar claims.

14             Additionally, Your Honor, we sought to reduce and

15   allow two claims of former employees.  The claimants agreed

16   with us as to the amount of such claims, but were unable to

17   amend their claims prior to the start of the confirmation

18   hearing, and pursuant to the confirmation order filed on

19   February 16th, no claims can be filed, either newly asserted

20   claims or claims amending the previously filed ones.

21             Finally, there were four claims arising from

22   Washington Mutual Bank subordinated notes.  These claims

23   were filed long after the debtors had filed the fifty-fifty

24   omnibus objection in November 2010, so these claims were not

25   included in that objection.  And by this objection, we

Page 52

1    simply seek the same treatment for those claims; that they

2    would be placed in Class 17(b) pursuant to the plan.

3              There was one response by the deadline of April

4    2nd, and that was filed by Marlene Carr on account of her

5    Washington Mutual Bank subordinated note claim.  And in

6    that, Your Honor, Ms. Carr stated "I bought this bond with

7    the understanding that Washington Mutual Bank was a thriving

8    financial institution.  I feel I am entitled to a financial

9    settlement for the bond now showing nearly valueless on my

10   investment statement.  I have limited financial means and

11   having my ten-thousand-dollar bond investment drop in value

12   to zero greatly impacts my financial well-being."

13             Unfortunately, Your Honor, there was nothing in

14   this response that justifies why this claim should be in

15   anything other than in Class 17(b) with the other Washington

16   Mutual Bank subordinated note claims.  So we would ask the

17   Court to deny Ms. Carr's objection and grant the seventy-

18   fourth omnibus objection as we filed it, Your Honor.

19             THE COURT:  Is there anyone here for Ms. Carr?

20        (No verbal response)

21             THE COURT:  All right.  I will sustain the

22   objection.

23             MR. ROSEN:  May I approach, Your Honor?

24             THE COURT:  You may.

25             MR. ROSEN:  Your Honor, next is Item 24 which is

Page 53

1    the examiner's motion for an order discharging the examiner,

2    approving disposition of documents, and granting related

3    relief.

4            Mr. Sewell is here in the courtroom on behalf of

5    the examiner.  Your Honor, Mr. Sewell and I did have

6    discussions prior -- last week with respect to this relief

7    being requested.  Specifically, we pointed out that the

8    litigation subcommittee is now getting up to speed as the

9    subcommittee of the trust itself, and they may have some

10   questions or at least want to discuss some of these

11   documents or at least get their eyes on some of these

12   documents.

13           And we have worked out an understanding with Mr.

14   Sewell that there would be a thirty-day lag time;

15   specifically, Your Honor, that I think we were the only

16   party that did raise any points -- no, there were others?

17           MR. SEWELL:  I think there's one objection.

18           MR. ROSEN:  Oh, there's one objection.  With

19   respect to our point, Your Honor, we had said that as long

20   as there was a thirty-day period for the litigation

21   subcommittee to raise an issue, that that would come back to

22   the Court.  The examiner agreed to that.

23           I'll now hand it over to Mr. Sewell to address the

24   other objection.

25           THE COURT:  All right.

Page 54

1            MR. SEWELL:  Good morning, Your Honor.  Henry

2    Sewell, McKenna Long Aldridge representing the examiner.  I

3    have Kate Stickles from Cole Schotz with me today as well.

4            Your Honor, we have filed with the Court a motion

5    to formally discharge the examiner from his service in this

6    case.  We have requested relief that I believe is consistent

7    with relief granted to examiners.  In fact, I think the

8    order that we requested is pretty typical both in this

9    district as well as the Southern District of New York in

10   terms of the relief granted to an examiner at the close of

11   an examination.

12           Your Honor will recall, we were appointed in the

13   summer of 2010.  We were asked to complete a report in a

14   very short time frame.  We took one very short extension.

15   We completed our report and filed a three-hundred-and-sixty-

16   page report with exhibits with this Court on November the

17   1st.  That report is posted still on our website as publicly

18   available.  The exhibits are publicly available and we'll

19   leave the report up probably for some period of time to come

20   if anyone wants to -- to look at it.

21           We opted to wait to seek a formal discharge given

22   the significance of the issues raised in our report, the

23   fact the case was still ongoing.  We did not seek a formal

24   discharge.  We did not believe it would be appropriate to do

25   so until the case was resolved.  Now that the case is

Page 55

1    essentially resolved we have filed our motion for discharge

2    and we're essentially, Your Honor, seeking three forms of

3    relief.

4              We are requesting, obviously, that the examiner be

5    formally discharged.

6              We are requesting that we be permitted and

7    authorized to dispose of, destroy, or return documents that

8    we obtained during the course of our examination subject to

9    the carve out from Mr. Rosen and I have taken our order and

10   made some changes to it that I believe Mr. Rosen is -- is

11   happy with.

12             We seek relief from this Court to prevent third

13   parties from seeking discovery from the examiner without

14   first coming to Your Honor to determine whether discovery is

15   truly necessary.  In prior cases, Your Honor, Mr. -- Mr.

16   Hothberg (ph) has been the examiner in two other cases and

17   in each of those cases the examiner sometimes is viewed as a

18   free source of discovery.  So we request as part of the

19   discharge that we be relieved from any obligation to respond

20   to discovery.  If there is something that someone truly

21   needs from the examiner, they can come to this Court and ask

22   for this Court to determine whether or not discovery should

23   be had from the examiner.

24             We request an exculpation of the examiner and his

25   professionals; that is, a release from any claims that might

1    be made against the examiner in connection with the report

2    that was filed and the conclusions that were reached in the

3    report.  We believe, also, that that's necessary and

4    appropriate in the circumstances of -- of this case in

5    particular.

6            And, finally, Your Honor, we have filed a final

7    application for compensation.  And I apologize to Your

8    Honor.  I think I might have gotten a little bit ahead of

9    everybody in this case.  I did -- we were following the case

10   somewhat, but not in detail, and so at the time I filed that

11   I did not understand there was going to be a final fee

12   process that all the parties were going to participate in.

13   I'm happy if Your Honor wants to defer ruling on that until

14   Your Honor hears the other final applications.  That -- that

15   is certainly more than acceptable to us.

16           But just by way of reports, Your Honor, in our

17   final fee application we are requesting, essentially, final

18   approval of fees and expenses of $6.2 million, approximately

19   5.9 million of that represented the fees necessary to

20   complete the report.  That sum includes $23,907 which has

21   not yet been paid, but we seek allowance of on an interim

22   basis and payment on an interim basis, and as -- as well as

23   the 23,000 includes a ten-thousand-dollar allowance for the

24   clean-up work necessary to have this motion approved and to

25   deal with any -- any objections or issues which come up.

Page 57

1              Other than Mr. Rosen's issue which -- which I

2    think we've resolved, there was a formal written objection

3    filed by an individual named Mr. James Berg.  Mr. Berg filed

4    a written pleading with this Court objecting to the

5    discharge of the examiner.  I believe the objection -- the

6    substance of the objection is that Mr. Berg disagrees with

7    the conclusions and recommendations we made in our report.

8    We obviously stand by those conclusions.  We believe they

9    were thoroughly researched, well-founded and -- and I

10   believe they've been largely sustained by this Court during

11   the course of this case.

12              However, despite that, the fact that he might

13   disagree with our conclusions is not a basis to deny the

14   examiner discharge as we requested in this case.  So we

15   would request that that objection be overruled and -- and

16   our order, as we've agreed to the modification with Mr.

17   Rosen, be modified -- be granted as well.

18              THE COURT:  All right.  Mr. Berg.  Is Mr. Berg on

19   the line?

20       (No verbal response)

21              THE COURT:  All right.  Well, I'm prepared to

22   overrule Mr. Berg's objection.  I think not only is it

23   simply that he disagrees with the report, but I think it is

24   rehashing arguments made by Mr. Berg at the confirmation

25   hearing.

Page 58

1                    And I agree it is not a basis --

2              MR. BERG:   Hello.

3              THE COURT:   Yes.   Mr. Berg?

4              MR. BERG:   Oh, there we are.   I'm sorry.   I do not

5    object to the examiner's discharge.   I don't know why I was

6    offline there for a bit.   My main -- my main issues are

7    regarding the exculpation and the destruction of documents

8    is the -- is the large one for me.   That -- at this point we

9    -- I mean, I've got a list of documents I expected to

10   feature prominently in the examiner's report and they did

11   not.   That -- that is in large part why I disagree with the

12   -- I mean, he is -- he has painted it basically as me

13   disagreeing with the conclusions.

14             What I -- what my argument is more along the lines

15   of not so much disagreeing with the conclusions as there are

16   documents that -- that I know of that are in -- for example,

17   the PF -- PSI report that I believe should have been

18   considered by the examiner, should have been included in his

19   report and that paint an entirely different picture than

20   what he -- what he addressed in his report.

21             THE COURT:   Well, then isn't that simply

22   disagreeing with the report and the conclusions of the

23   report?

24             MR. BERG:   I -- I can -- I guess to an extent that

25   might be true.   I -- let me -- let me revise my train of

Page 59

1    thought.  I've  -- you just completely derailed it.  All

2    right.  Assuming we do that, my argument basically was to

3    hold off on the destruction of documents.  We've got --

4    let's see here, skip way ahead.

5          Basically, if the documents are destroyed, we have

6    no way of knowing whether the examiner holds other documents

7    which might indicate misconduct on the part of the examiner.

8    That -- that is my primary concern right there.  If they're

9    destroyed, obviously, the way -- if he operates in his own

10   self-interest he's going to destroy anything that might

11   essentially be damaging to him and retain anything that --

12   that could be -- could support his cause if there is any

13   later litigation regarding potential misconduct.  And if he

14   -- if he destroys these documents we have no way of knowing

15   whether -- whether any of the other documents he holds

16   justify misconduct.

17          MR. SEWELL:  Your Honor, may I address the issue

18   of the documents for a second?  I -- I think I can alleviate

19   whatever concern might be there.

20          The vast majority of documents that we obtained

21   during the course of our investigation were -- were either

22   from the database maintained by Weil Gotshal or were

23   subsequently deposited into that database as we conducted

24   our investigation.  So, essentially, the -- you know, ninety

25   percent of what we have is duplicative of what the debtor

Page 60

1    already has.

2              We did obtain some documents, pretty limited

3    documents from third parties.  We entered into

4    confidentiality agreements with those third parties which

5    obligated us to either destroy those or return those to

6    those third parties.  So, in essence, we would be complying

7    with our obligations to those third parties.

8              We filed -- Your Honor, many of our documents that

9    we relied upon were attached to the report and are still

10   available.  You can look at the exhibits that are attached

11   to the report online and pull down PDFs of those.  So the

12   reality is that the documents that we are getting rid of,

13   basically, are primarily either extra copies of what the

14   debtor already has or they're documents that we have

15   obligations with respect to the third parties to -- to

16   destroy or return them.

17             THE COURT:  Yeah. And, Mr. Berg, I -- I see

18   nothing unusual about the examiner's request.  The examiner,

19   other than his report, has no documents that aren't

20   available from other parties and I agree that the examiner

21   is not supposed to act as a free repository for discoverable

22   evidence.

23             To the extent you --

24             MR. BERG:  But the --

25             THE COURT:  To the extent you're suggesting that

Page 61

1    the -- you want the documents because you may want to

2    instigate litigation against the examiner for misconduct,

3    I'm not going to allow that.  The examiner was appointed as

4    an officer of the court to provide a report to the Court and

5    the examiner did exactly what the Court asked the examiner

6    to do.  Whether you disagree with the conclusions of the

7    report, I don't think that's relevant.  I think the fact is

8    the report was issued and that's exactly what the examiner

9    was required to do.  And the examiner is entitled to

10   exculpation to the extent his activities were conducted in

11   this case.

12            MR. BERG:  Okay.  Well, thank you, Your Honor, for

13   considering my -- my attempt at least.

14            THE COURT:  All right.  I will enter the order.

15   You've worked out the thirty-day --

16            MR. SEWELL:  Yes, Your Honor.  We'll submit that

17   order under certification of counsel.

18            How does your -- does Your Honor want me to wait

19   with respect to the final application for compensation so

20   that's heard with the other ones or -- or should we submit

21   an order on that as well?

22            THE COURT:  I -- I don't think there's any reason

23   to wait.  Do any of the other administrative professional

24   parties agree?

25            MR. ROSEN:  We have no problem with it going

Page 62

1    forward now, Your Honor.

2              THE COURT:  All right.

3              MR. SEWELL:  Okay.

4              THE COURT:  I have no problem with the fee

5    requested by the examiner.  I will approve it --

6              MR. SEWELL:  Okay.

7              THE COURT:  -- on a final basis.

8              MR. SEWELL:  Thank you, Your Honor.  I appreciate

9    that.

10             And with that, Your Honor, may I be excused?

11             THE COURT:  You may.

12             MR. SEWELL:  Thank you.

13             MR. ROSEN:  Thanks.

14             THE COURT:  And I thank the examiner for his work.

15             MR. SEWELL:  Thank you.

16             MR. ROSEN:  Thanks, Henry.

17             Your Honor, that takes us to Item Number 25, and

18   it's reflected on here as being continued.  I just want the

19   Court to note that this was the motion of Greg Camas or

20   Camas with respect to extending the time period to file a

21   claim.

22             THE COURT:  Okay.

23             MR. ROSEN:  So we're going to push that to the end

24   of May.

25             THE COURT:  Okay.

Page 63

1          MR. ROSEN:  Your Honor, what I would like to do

2     now is proceed to Item Number 28, which were all of those

3     fee applications that we had attached there or the index as

4     Exhibit H referenced.  I know that speaking from -- I know

5     that speaking from the perspective of Weil, Gotshal and

6     Manges, we have had some discussions with the United States

7     Trustee, Ms. Leamy, and as a result of that, Weil, Gotshal

8     reduced its fee application by $50,245.78.  This was a

9     voluntary reduction, but it addressed some of the concerns

10    that Ms. Leamy had.

11          I know that we have circulated to the parties a

12    chart which sets forth what the numbers are after

13    discussions with Ms. Leamy for the other professionals as

14    well, and I believe that the United Sates Trustee has no

15    objections to the entry of this form of order on an interim

16    basis subject to the final fee hearing which is going to be

17    heard, Your Honor, in the last week of July.

18          THE COURT:  Is that correct, Ms. Leamy?

19          MS. LEAMY:  Good morning, Your Honor.  Jane Leamy

20    for the United States Trustee.

21          Mr. Rosen's correct and I believe there is a

22    summary chart that he will hand up that indicates some other

23    reductions as well.

24          Thank you.

25          THE COURT:  Okay.

Page 64

1              MR. ROSEN:  Your Honor, may I approach?

2              THE COURT:  You may.

3              All right.  Well, there were some objections, I

4      think, to some of the interim fee requests.

5              MR. ROSEN:  Yes, Your Honor.  I don't know if Mr.

6      Schukfed (ph) is on the phone.  Mr. Schukfed files one to

7      the Weil Gotshal and to the Alvarez and Marsal every month

8      as well as I think he -- he may now lodge some to --

9      objections to a few others as well.  And he has been doing

10     this throughout the Chapter 11 case, Your Honor.  We've

11     never addressed them, Your Honor.  We've always said we

12     would carry it to the final.  If the Court would like to

13     address it now, obviously -- Mr. Schukfed may be on the

14     phone.  I don't know, though.

15             THE COURT:  I thought I saw -- I guess he is not.

16     I will deal with those at the -- at the final fee

17     application.  I had no other concerns and will approve the

18     fees on an interim basis.

19             MR. ROSEN:  Thank you very much, Your Honor.

20             Your Honor, I think we can get rid of one other

21     status conference on a fairly expedited basis, and this

22     would be Item Number 27 on the agenda.  It is a status

23     conference with respect to the adversary proceeding that was

24     commenced, Washington Mutual, Inc. versus XL Specialty

25     Insurance Company, et al.

Page 65

```
 1        (Pause)

 2             MR. OLIVERE:  Good morning, Your Honor.  Mark

 3   Olivere, Cousins, Chipman and Brown, counsel to WMI

 4   liquidating trust with respect to adversary proceeding 12-

 5   50422 against XL Specialty Insurance Company and eleven

 6   other insurance carriers.

 7             Your Honor, today was originally scheduled as a

 8   Rule 16(b) scheduling conference, but with the consent of

 9   chambers and the stipulation among the parties here, we have

10   agreed to go forward today as just a status conference only.

11             Your Honor, in connection with that the parties

12   filed a join status report last Friday.  A copy should have

13   been included in your binder.  If you don't, I have another

14   copy I can hand up.

15             THE COURT:  I do have that.

16             MR. OLIVERE:  Okay, Your Honor.

17             Well, Your Honor, joining me is my co-counsel,

18   Matt Heyn from the law firm of Klee, Tuchin, Bogdanoff and

19   Stern.  Mr. Heyn has previously been admitted pro hac in

20   these cases and with the Court's permission I'll just turn

21   it over to Mr. Heyn to go over the status and answer any

22   questions you have.

23             THE COURT:  Thank you.

24             MR. HEYN:  Good morning, Your Honor.  As my

25   colleague said, Matt Heyn, from Klee, Tuchin, Bogdanoff and
```

Page 66

1    Stern.

2            Your Honor, this is a adversary proceeding against

3    twelve insurance carriers seeking damages for breach of

4    contract, damages for breach of the duty of good faith, and

5    declaratory relief.

6            Pursuant to Your Honor's order, we've continued

7    the response deadline to the complaint until today.  At our

8    Rule 26(f) conference with the insurance carriers they

9    indicated that they would be filing a motion -- one or more

10   motions to dismiss today, which we will answer in five

11   weeks, and a reply will be coming shortly thereafter.

12           We would propose that the Rule 16 scheduling

13   conference be continued until about one month after Your

14   Honor decides these motions to dismiss.  Although they might

15   not have made it in the binder, there was filed a joint

16   status report signed off by all parties to this adversary

17   proceeding agreeing to this -- this course.

18           THE COURT:  Yeah.  I did see that and that is

19   fine.

20           MR. HEYN:  If Your Honor has any questions, I'm

21   happy to address them now.  I -- I don't want to unfairly

22   prejudice the defendants who may not be here.

23           THE COURT:  No.  I have no questions.

24           MR. HEYN:  Thank you, Your Honor.

25           THE COURT:  All right.  Thank you.

1          MR. ROSEN:  Your Honor, I believe that takes us

2     now to Items 20 and --

3          THE COURT:  26.

4          MR. ROSEN:  -- 26, that sounds about right, 26 and

5     I will cede the podium to Mr. Etkin or Mr. Sherwood and Ms.

6     Kaswan.

7          THE COURT:  Thank you.

8       (Pause)

9          MR. SHERWOOD:  Good morning, Your Honor.

10          THE COURT:  Could -- could the operator mute the

11     lines?  We're getting some screeching.  Thank you.

12          Go ahead.

13          MR. SHERWOOD:  Your Honor, Jack Sherwood from

14     Lowenstein Sandler.  My partner, Mickey Etkin is here.  Beth

15     Kaswan, Chris Lometti and Craig Springer for the MBS

16     plaintiffs.

17          This is our motion to allow the MBS claim as a

18     Class 12 claim.  This motion was initially filed before

19     confirmation and was postponed until after confirmation by

20     the Court and then adjourned a few times by the -- by the

21     parties until today.  Also, by stipulation with the debtors,

22     we were allowed to file a reply by Friday at noon, which we

23     filed.

24          THE COURT:  I did get that.

25          MR. SHERWOOD:  Your Honor, I think that reply and

Page 68

1   our original papers pretty well lay out our position on this

2   motion.  But I would like to emphasize a few points.

3               First, Your Honor, when we talk about the

4   stipulation of November 20th, 2010, which is a focal point

5   of this motion, that stipulation permits the MBS plaintiffs

6   to re-file their claims in the event there is a recovery for

7   holders of allowed subordinated claims as that term is

8   defined in the plan.

9               Importantly, Your Honor, that stipulation does not

10  limit the form of the recovery under the plan and nowhere in

11  that stipulation is there an agreement by the MBS plaintiffs

12  with respect to classification of the claims once they are

13  re-filed.

14              One of the interesting or important points is that

15  the amended thirty-second objection to claims which gave

16  rise to the stipulation didn't even raise the issue of

17  subordination under Section 510(b), and neither did the

18  seventh amended plan address subordination.  So I think when

19  you talk about the intent and the clear language of the

20  stipulation, it's clear on its face and the Court should

21  apply it as written.

22              The debtors argue that the term "recovery" has not

23  kicked in yet.  I'll call this the trigger argument.

24              THE COURT:  Uh-huh.

25              MR. SHERWOOD:  Has -- has the trigger occurred for

Page 69

1    the filing of the proof of claim, and we think it's clear

2    that it did.  We cite to Black's Law Dictionary on recovery.

3    It's a -- it's a pretty easy word to figure out.  The

4    trigger for re-filing the claim, Your Honor, was simply

5    recovery, not a non-contingent recovery.  There is no

6    question, Your Honor, that there was a recovery to Class 18

7    under the seventh amended plan.  We -- we make a number of

8    arguments on that point in our papers, but I think there --

9    there are two very good ones that I would like to highlight.

10        The first is if you look at Section 1126(g) of the

11   code, that provision provides that creditors who do not

12   receive any property under the plan are deemed to reject the

13   plan and they're not allowed to vote.  Under the plan, the

14   debtors here considered Class 18 to be an impaired and

15   voting class, and if holders of Class 18 claims were not

16   entitled to any recovery under the plan as the debtors now

17   allege in the context of this motion, as a matter of law

18   under Section 1126(g) they would have been deemed to reject

19   the plan and not allowed to vote.

20        Now, consistent with that, Your Honor, the plan

21   itself provides at Section 30.2 at Page 73, it describes

22   impaired classes entitled to vote on the plan.  And it says

23   the claims and equity interests in classes -- and it rattles

24   off a number of classes including Class 18 -- are impaired

25   and are receiving distributions pursuant to the plan and

Page 70

1   are, therefore, entitled to vote to accept or reject the

2   plan.

3           Likewise, Your Honor, in this Court's solicitation

4   order which was filed on January 13th, 2011, it says at

5   Paragraph K on Page 4, that Class 18 is described as

6   subordinated claims and it says "they are impaired and

7   entitled to receive distributions under the plan."

8           So, Your Honor, the record is clear, by virtue of

9   1126, that the -- that Class 18 is receiving property under

10  the plan, and by virtue of this language in the plan and the

11  solicitation order that Class 18 is receiving a distribution

12  under the plan.  I think it's clear that that also means

13  that they are getting a recovery under the plan and that

14  triggered -- that the trigger has been triggered and the

15  filing of the proof of claim was -- was warranted.

16          Next, Your Honor, let me turn quickly to the

17  argument by the objectors that somehow, somewhere in a

18  stipulation there is a presumed agreement to be in Class 18.

19  And my first response to that, Your Honor, is that when you

20  have a clear agreement you shouldn't presume anything.  The

21  parole evidence rule, the case law on contract

22  interpretation makes it pretty clear that the Court should

23  not read something into a contract that isn't there.  And,

24  here, there is nowhere in the stipulation where the MBS

25  plaintiffs agree to Class 18 treatment.

1          Again, when you highlight, Your Honor, that the

2     motion before the Court that gives right -- rise to the

3     stipulation was a motion not -- that didn't deal with

4     classification.  It dealt with the merits of the claim.  And

5     what happened back in November of 2010 was that you had a

6     situation where you had massive potential litigation to over

7     claim that may or may not have been subordinated at the

8     time, and simply the parties did what -- what parties do in

9     cases like that is -- is the MBS plaintiffs chose to

10    litigate that issue in the district court, fully reserving

11    all rights here once the trigger occur -- occurred.  But

12    there was never ever an agreement to subordinate.

13          Your Honor, we -- we -- you know, we try to

14    highlight that because this is a big case with a lot of

15    things going on.  And in this case the debtor sought and

16    obtained agreements from various parties and we -- we

17    referred to a couple of those agreements where subordination

18    was sought and obtained by the debtors.  So, certainly, if

19    the debtors intent was to get us to subordinate back in

20    November of 2010, they knew how to do that, but they didn't.

21          Your Honor, the -- we also -- we also cite the

22    Court to the comments of debtors' counsel prior to

23    confirmation in the context of the estimate -- the voting

24    motion.  We -- we cite to the quote where counsel says that

25    all the debtor had dealt with up to that point in time was

Page 72

1    whether the claim would ultimately be allowed or disallowed

2    on the merits.  And, Your Honor, I tried -- I've tried to

3    make it clear every time I've gotten up here was that we

4    never ever were seeking a full blown hearing on the merits

5    of our claim, but we just wanted to know what class we were

6    in before confirmation so that we could address that at

7    confirmation.

8            But -- but what counsel said quite clearly was

9    that the debtor never took the position at all as to whether

10   they -- that's the MBS plaintiffs -- would be treated in

11   Class 12 or Class 18.  So when he stood here and said that

12   prior to confirmation, he conceded that the debtors and the

13   estate had not obtained a concession from us with regard to

14   subordination.

15           Yet, in the context of this motion, Your Honor,

16   the debtor suggests that they had obtained such a concession

17   and that it was clear that those positions, frankly, are --

18   are very, very inconsistent.  The debtor is also -- and the

19   committee before the confirmation hearing suggested to this

20   Court when we were trying to have the issue of the class of

21   our claim heard and determined by the Court before

22   confirmation, that the issue of whether we were in Class 18

23   or Class 12 was one that would require extensive litigation.

24           Again, Your Honor, that is a hundred-and-eighty

25   degrees from the position that they now take that this

Page 73

1    agreement in November of 2010 in the stipulation is somehow

2    a clear indication that we agreed to be in Class 18.

3              If that was their position, Your Honor, I

4    respectfully submit that they should have made that clear

5    before confirmation.  But for reasons that I think I've gone

6    into before with Your Honor and -- in the papers, that's not

7    something that they wanted to do.  They deliberately took

8    the position that we were in Class 12 for voting purposes so

9    that they could turn around after confirmation, like they're

10   -- exactly like they're doing now and -- flip-flop on the

11   issue, which is interesting and creative, perhaps, but it's

12   totally unfair and unjust to my clients.

13             Your Honor, just a couple more points on -- on --

14   you know, the fact that we didn't agree to be in Class 18.

15             First, the seventh amended plan requires entry of

16   a final order determining that a claim is subordinated in

17   accordance with the Bankruptcy Code and -- and that would be

18   in plan Section 1.153, and no such final order was ever

19   entered.

20             And then, finally, Your Honor, on that issue

21   Paragraph 3 of the stipulation itself states that the

22   parties reserve all rights in all other respects, other than

23   those specifically addressed in the stipulation.  The

24   stipulation has a full integration clause, so, again, Your

25   Honor, the stipulation should be read as its written and the

1   Court should not read anything into that concerning Class

2   18.

3         I -- at this point, Your Honor, I would like to

4   turn to the Tranquility issue that -- that's addressed by

5   the debtors' papers and -- and ours.

6         First of all, Your Honor, Rule 59(e) is -- is

7   ignored largely by the debtors' papers.  That is a high

8   standard and it has to be something more than we forgot to

9   argue it the first time.  And the objection by the committee

10  and the debtor or -- or the trust does not even try to --

11  try to address the Rule 59(e) standard.  There was no newly

12  discovered evidence.  There was no newly discovered legal

13  principle or intervening legal principle.  It really is a

14  case that the estate professionals basically said, wow.  We

15  should have -- we should have argued this SEC reg, but they

16  didn't.

17        Now we -- we are -- we are raising the Rule 59(e)

18  argument because we have it, but, frankly, Your Honor, we

19  think Tranquility was right.  And whether you did or didn't

20  consider the SEC regulation, we think Your Honor would --

21  would decide the same way.  And that is because the SEC

22  regulation talk about who was a depositor and who was an

23  issuer for SEC purposes.  And, essentially, what that does

24  is it sort of spreads liability beyond, you know, in this

25  case the trust to other people who have the responsibility

Page 75

1   for reporting and so forth.

2           But that's not why Your Honor -- Your Honor's

3   decision in Tranquility and in Mobil Tool is based on the

4   principle, which isn't changed in the least by the SEC reg,

5   that here we had some -- some trusts that had pools of

6   mortgages and the investors were not investing in a debtor

7   or an affiliate of the debtor, which is what 510(b) says.

8   They were -- they were investing in these pools of mortgages

9   and they didn't enjoy the benefits of good performance by

10  debtor or an affiliate or the -- or the risks of -- of bad

11  performance by a debtor or affiliate.

12          There, the successor failure of their investment

13  rose or fell based on the performance of the mortgages.  And

14  I think in the -- in the Tranquility opinion Your Honor gave

15  the example of -- of a sale of Apple stock or a broker

16  dealer selling dealer securities and suddenly bringing --

17  having that -- those types of situation bring 510 into play,

18  and that certainly is not the intention of 510 and it

19  shouldn't be applied, whether or not you consider that --

20  that SEC reg.

21          And, Your Honor, just to wrap that up, we also

22  cited from, I think it's Judge Shannon in SemCrude where he

23  made a -- a statement that is very applicable here, and that

24  is that, you know, a word might have one meaning for SEC

25  purposes where the SEC wants accountability and maybe to

Page 76

1    spread responsibility for certain things, but another for

2    510 and -- and we think that Your Honor -- Your Honor's view

3    of Tranquility and the purpose of 510 should continue to

4    carry the day, if the Court has to get there because they

5    haven't satisfied Rule 59(e).

6           Your Honor, let me just spend one -- one more

7    brief period of time on -- on the reserve issue and the

8    release.  Of course, Your Honor, it's our view that that

9    reserve needs to stay in place while we get to the bottom of

10   this.  The four-hundred-and-thirty-five-million-dollar

11   reserve was put up by the debtor in a Class 12.  It was

12   their decision to do that, and that reserve must stand

13   throughout the pendency of this litigation until it's

14   litigated to a final order.

15          And I think if Your Honor reads the confirmation

16   order together with the language of the plan, it is beyond

17   dispute that unless and until this Court enters -- or this

18   Court or some other Court enters a final order disposing of

19   this claim, that escrow -- that -- that reserve needs to

20   stay in place.

21          So, again, Your Honor, obviously we hope that

22   doesn't become relevant for today's purposes, but if it

23   does, we -- we think that the Court cannot order the release

24   of the reserve because that would be a violation of the

25   clear terms of the confirmation and the plan pursuant to

Page 77

1    which the reserve was set up.

2           Your Honor, I -- if the Court has any questions, I

3    -- I can answer otherwise I would maybe reserve some time on

4    rebuttal.

5           THE COURT:  You may.

6           MR. SHERWOOD:  Okay.  Thank you.

7           MR. STROCHAK:  Good morning, Your Honor.  Morning

8    by just a few minutes till.  Adam Strochak, Weil, Gotshal

9    and Manges for the liquidating trust.

10          Let me start with a little background on our

11   perspective on the stipulation issue and -- and the reasons

12   why we agree to it in the first place and -- and why we

13   think its intent is -- is quite clear from the language of

14   the stipulation as well as the circumstances under which it

15   was entered.

16          We knew fairly early on in this case that -- that

17   timely distributions were going to be critical and that in

18   order to achieve timely distributions, in order to -- in

19   addition to getting past confirmation, which took longer

20   than anyone hoped or anticipated, that we were going to need

21   to make progress in the claims process because we -- we were

22   fundamentally going to have a limited fund and there were

23   going to have to be certain reserves and those reserves

24   would -- would cause delays in distributions to -- to credit

25   -- to holders of allowed claims.

Page 78

1             So we needed a priority throughout the case to

2     move as quickly as we could through the claims process and -

3     - and, obviously, as Your Honor is aware, we -- this is not

4     a case where we sat back and waited until the plan got

5     confirmed to -- to really make significant progress in

6     objecting to -- to claims and -- and moving through the

7     claims resolution process.  So -- so that was really a quite

8     critical issue early on.

9             When we filed the initial objection and then

10    resolved the initial objection to the MBS plaintiffs'

11    claims, we had a plan out there that provided for a

12    contingent distribution to subordinated creditors with a

13    very wide range on it of somewhere between zero and a

14    hundred percent recovery.

15            So what we agreed to with them was a stipulation

16    that provided for the withdrawal of their claim.  We didn't

17    simply stay the claims litigation process.  We didn't just

18    agree to a standstill.  We -- we worked out a stipulation

19    that provided for the complete withdrawal of their claims

20    with a right to re-file in the event there was a recovery

21    for -- for subordinated claims.

22            And we think it's quite clear when you look at the

23    stipulation as a whole and when you look at all the

24    circumstances under which it was entered, that implicit in

25    that and that the only reasonable way to interpret the right

Page 79

```
1    to re-file language is that the right to re-file would --

2    would only apply to a subordinated claim.  Otherwise, the

3    language regarding the timing of re-filing; that is, if

4    there is a recovery for subordinated claims, really makes no

5    sense at all.

6           If the -- if the plaintiffs were taking the

7    position that -- that -- that they were entitled to a

8    general unsecured claim, then it would have made sense to

9    proceed with that litigation and get to the point where

10   there was a judgment resolving their claim one way or the

11   other rather than deferring it until it became clearer what

12   the ultimate recovery for -- for subordinated creditors

13   would be.

14          The withdrawal has -- has meaning and -- and to

15   interpret the stipulation the way the plaintiffs are

16   suggesting now really -- really guts the meaning of the

17   stipulation from our perspective and what it achieved from

18   our perspective.

19          So fast-forward to -- to the current -- the plan

20   that was actually confirmed and we have a plan that -- that

21   provides for subordinated creditors much the same way as the

22   plan that was on file at the time of the stipulation.  The

23   plan confirmed by the Court provides for a distribution of

24   -- of liquidating trust interests to subordinated creditors

25   if -- it's a contingent distribution -- if we ever get to
```

Page 80

1     the point where there's sufficient value to clear what's

2     ahead of them in the waterfall.  So it's a wholly contingent

3     right to receive liquidation trust interest at a time in the

4     future in the event that the waterfall satisfies all -- all

5     claims ahead of them.

6               So -- so when you compare what was on file at the

7     time of the stipulation and -- and what we actually ended up

8     with in a confirmed plan, there really is no difference from

9     -- from the perspective of the stipulation and what the

10    stipulation achieved for the debtors.

11              So the interpretation that the -- that the

12    plaintiffs are now offering is one that basically says,

13    well, there really was no bargain for -- for the -- for the

14    debtors; that is, we -- we had the right to re-file at any

15    time.

16              So while the debtors gave up their right and the

17    creditors' committee and every other party interest -- party

18    in interest in the case, while they -- they gave up their

19    right to proceed in a timely fashion with adjudication of

20    this claim so that it could be resolved and not present any

21    -- any difficulties for distributions to creditors on

22    account of any reserve or -- or any other issue -- that's

23    what the debtors got -- that the -- that the plaintiffs,

24    essentially, had the right to vitiate that bargain at any

25    time.  They could come in at any time and say, well, you

Page 81

1    know, the plan provides for a contingent right of

2    distribution to subordinated creditors.  Therefore, there's

3    been a recovery and we can go ahead and -- and move forward

4    with -- with assertion of our claim.

5              And --

6              THE COURT:  Mr. Strochak --

7              MR. STROCHAK:  Uh-huh.

8              THE COURT:  -- does the plan provide that

9    liquidating trust certificates are not distributed now, but

10   only after the waterfall is satisfied?

11             MR. STROCHAK:  That's my understanding, Your

12   Honor.  Yeah.  I'm getting a lot of head nods that I got

13   that one correct.

14             THE COURT:  Yeah.

15             MR. STROCHAK:  So there's no actual distribution

16   of certificates at this time and while the liquidating

17   trustee, the trust advisory board, and -- and everyone else

18   who is involved in the process is obviously working as hard

19   as they can to get distributions as far down the waterfall

20   as -- as is possible, at this point we don't know whether

21   there ultimately will be any trust certificates distributed.

22             So we -- we made this point in our papers, Your

23   Honor, on the -- on the definition of recovery and in the

24   stipulation, of course.  As interpreting that stipulation

25   one question for the Court is, well, what does it mean for

Page 82

1    there to be a recovery, and I think, you know, Your Honor's

2    question suggests exactly where -- where we think it is, is

3    that nothing has been distributed at this point in time, so,

4    therefore, there's no recovery.

5              The plaintiffs' have cited Black's Law Dictionary

6    and they actually cite the second definition in Black's.

7    The first definition that Black's offers for recovery is --

8    is regaining or restoring something taken away.  Well, under

9    our plan and -- and, you know, obviously, everybody wishes

10   it could have been better.  But -- but nothing has been

11   regained or restored at this point.  The subordinated

12   creditors, to the extent they had claims, be they disputed

13   or -- or fixed, to the extent that they had claims, they

14   have received nothing on those claims until some as yet

15   undefined point in the future hopefully; a bit of a hope

16   certificate on -- on those.

17             And they cited the Enron decision, which while not

18   directly on point and I don't suggest that it was directly

19   on point, provides a useful analogy.  In Enron there was an

20   objection to -- to distributions -- excuse me.  There was an

21   objection to the plan on the grounds that it was providing

22   property to -- to a subordinated class or to a shareholder

23   class, when what the plan said was that it would be a

24   contingent right of distribution should -- should

25   distributions clear the rest of the waterfall.

Page 83

1         And -- and Judge Gonzalez, I believe, overruled

2    that objection and said, no.  This doesn't violate the

3    absolute priority rule. There's no distribution being made.

4    It's simply a contingent right to get something in the

5    future should -- should the waterfall fill the rest of the

6    -- of the recoveries.  And it's an analogous situation here.

7         So you may be asking, Your Honor, what -- what's

8    the harm in being early.  We often complain that people are

9    late and the Bankruptcy Code has a -- Bankruptcy Code and

10   the case law, of course, has well defined standards for

11   under what circumstances we'll allow somebody to assert a

12   right if they -- if they're late.  But what's the harm in

13   being early?

14        Well, here the harm is that it would vitiate the

15   bargain that we struck on -- on the stipulation; that we

16   bargained for the withdrawal of that claim so that we would

17   not have to deal with reserves, that we would not have to

18   deal with litigation of these issues unless and until there

19   was actually recovery for subordinated creditors.  And it

20   has a very real effect on the other creditors of the estate,

21   on senior creditors of the estate.

22        There was -- I think -- I think Mr. Sherwood may

23   have misspoken unintentionally.  The reserve is not $435

24   million, you know, cash set aside.  That's not the way the

25   reserve works under our plan.  The way the reserve works is

Page 84

1    -- is that we have to reserve for the claim as if it were an

2    allowed claim in the amount of 435.  So all -- all claims,

3    all disputed claims are reserved for as if they were allowed

4    in that amount and then that is calculated in accordance

5    with the holdbacks and everything else.

6          The effect of reserving as if they are an allowed

7    claim is -- is quite significant due to the accruance -- the

8    accruing of post-petition interest, continuing accrual of

9    post-petition interest on claims -- on allowed claims that

10   have not received their distribution, and has a particularly

11   dramatic effect due to the Court's rulings with respect to

12   the pay-over requirements of the contractually subordinated

13   creditors, in particular the peers.

14          So we have those in our papers and -- and, you

15   know, the rough calculation is that -- that continuing to

16   reserve for the MBS plaintiffs' claim as if it were an

17   allowed claim of 435 million essentially incurs $700,000 per

18   month in additional post-petition interest expense because

19   -- because that money, what's held back, can't be

20   distributed to holders of allowed claims and the interest

21   continues to accrue on what has not been distributed on

22   their claims.

23          The effect is much more significant on the peers

24   due to the contractual pay-over requirement.  The peers,

25   while they accrue interest at the federal judgment rate in

Page 85

1    accordance with the Court's order, they pay-over interest to

2    senior creditors at the contractual rate.  So the effect on

3    the peers is to reduce their recovery by -- by about $2

4    million a month.  So it's a quite significant effect on --

5    on all creditors of the estate and a very dramatic effect on

6    the peers to continue to have to hold the reserve for -- for

7    the MBS claim.

8            Let me comment briefly on the assertion that we

9    somehow, I guess, sandbagged them and -- and that the

10   comments made in connection with the temporary allowance

11   motion at the time of confirmation are some type of

12   admission that -- that we never expected that -- that the

13   stipulation would limit them only to a subordinated claim.

14           It's always been our position that the -- that the

15   stipulation limited them to a subordinated claim.  We just

16   didn't expect them to agree with it, and, obviously, they

17   haven't.  The temporary allowance motion, Your Honor

18   remembers, was -- came before the Court on the MBS

19   plaintiffs' application to -- to temporarily allow their

20   claim into a Class 12 for voting purposes.  They asked for

21   it in Class 12 and we looked at the circumstances and said,

22   okay.  We can agree to that.

23           And -- and then they took a step back and said,

24   well, we're not sure we really want what we asked for.

25   We're afraid that you might ultimately try and subordinate

Page 86

1    us, so what we really want is by -- by giving us temporary

2    allowance in Class 12, there ought to be a final

3    determination that -- that for distribution purposes we're

4    in Class 12.  And we stood up and said, no.  That's not what

5    temporary allowance is about.

6              And Your Honor ultimately agreed with us that --

7    that there was not going to be a determination of -- of the

8    classification for distribution purposes at the time of

9    confirmation; that that was an issue for later, and that

10   because the plaintiffs had asked for temporary allowance in

11   Class 12, it was appropriate to give them temporary

12   allowance for voting purposes in Class 12, notwithstanding

13   the fact that down the road there was going to be a dispute

14   over whether it was a general unsecured claim or a

15   subordinated claim, both under the stipulation and should we

16   clear the stipulation under -- under 510(b) which would --

17   which would need to be adjudicated.

18             And while the MBS plaintiffs contend -- contended

19   that that was unfair, Your Honor ultimately ruled that it

20   was not unfair; that creditors all the time bear the risk

21   that they might later be subordinated due to -- due to the

22   application of 510(b) or other principles of subordination.

23   So that's where we were on that.

24             Let me pause on the 1126 argument that -- that Mr.

25   Sherwood made in his remarks.  He is suggesting that -- that

1    under 1126 creditors who didn't get property would be deemed

2    to reject and, therefore, if we go back to the question of

3    recovery, has there been any recovery at this point for

4    subordinated creditors that would allow reassertion of the

5    claim, that we should look to 1126(g) for guidance.

6              We certainly could have, under 1126(g) said that

7    there's no distribution to subordinated creditors.  It's

8    only a contingent right in the event we clear the waterfall

9    later.  So we'll just deem them to reject the plan and --

10   and effectively cram down over them.  But that wouldn't work

11   under our plan, Your Honor.

12             Your Honor, we worked for -- for three years to

13   try and get a recovery to -- to shareholders.  We had

14   enormous litigation over that and we ended up with a -- with

15   a plan that was the product of really an extraordinarily --

16   extraordinary compromise and we wanted anyone senior to

17   shareholders to vote in order to -- to confirm that plan

18   without having to deal with Armstrong issues or absolute

19   priority issues or anything else.

20             And, ultimately, we did get to vote.  The plan was

21   confirmed in history.  That's obviously very familiar to the

22   Court.  So that's the reason why we proceeded that way.  I

23   think we probably could have gone either way under 1126 and

24   that's why we opted to go the way we did.

25             Let -- let me turn if I could to merits of the

Page 88

1   subordination argument and -- and start with the

2   reconsideration aspects.  We're here on a different claim

3   now, Your Honor.

4           Tranquility had not filed a lawsuit before

5   asserting its proof of claim.  The plaintiffs here obviously

6   had.  There certainly are similarities in the claims. There

7   are common issues.  There are also very different issues.

8   The bulk of Tranquility's claim was asserted under

9   California State Securities law.  They only had a handful of

10  -- of tranches subject to federal law, and as Your Honor is

11  familiar from the opinions and the history of that matter.

12          Even if we were to look at this through the lens

13  of reconsideration, what the plaintiffs are trying to do

14  here is to -- is to say that the Court's ruling on the

15  Tranquility matter is absolute, final law of the case, never

16  get to look at it again.  But that's not what the law of the

17  case doctrine is about, Your Honor.

18          The law of the case doctrine is about when a

19  matter is -- is kind of firmly settled, that it's going to

20  govern for the rest of the case.  There is no conceivable

21  way that the Tranquility matter could be considered resolved

22  or settled as a matter of law.  We had a timely motion for

23  reconsideration of the Court's decision pending, which the

24  creditors' committee had filed and which the debtors had

25  joined.  That matter was pending when we reached a

Page 89

1    compromise to resolve the Tranquility claim.

2             But the issues that were raised in the

3    reconsideration motion had not been adjudicated.  That

4    motion was still pending.  The MBS plaintiffs intervened in

5    that motion so that they could be heard on it, on the merits

6    presumably because if all they were going to do is step up

7    and say, too little, too late, Your Honor, that's certainly

8    an argument that Tranquility could have and -- and I'm sure

9    would have made had we -- had we litigated that motion

10   before -- before settling the claim.

11            So the matter is not settled.  The motion for

12   reconsideration remains pending and there is absolutely no

13   reason that the Court should not address that -- that is,

14   should it reach the subordination issues, there is no reason

15   that the Court should not address it in full and address all

16   the substantive issues that -- that are before the Court.

17            Even if the Court were to look at it through the

18   lens of reconsideration, our argument, Your Honor, is that

19   the Court's decision on -- on subordination is -- falls into

20   the category of a clear error of law that ought to be

21   corrected, and it's obviously with -- with all due respect

22   to the Court that -- that we suggest that.

23            You know, having read the opinion when it came

24   down and the Court's reasoning, it became apparent to the

25   creditors' committee and to the debtors that -- that

Page 90

```
 1    Tranquility had led the Court to an incorrect decision as a

 2    matter of law and that it was really incumbent on us, on

 3    behalf of the estate, to raise that and -- and make sure

 4    that we put before the Court all the information necessary

 5    so that -- so that -- in our view it was an error and if the

 6    Court concluded it was an error, it would have the benefit

 7    of all -- all the reasoning and rationale before it before

 8    that decision became final.

 9            The fundamental left turn that we think

10    Tranquility made in its analysis and -- and ended up in the

11    Court's opinion was the distinction between issuer and

12    issuing entity.  And this becomes clear in looking at the

13    MBS plaintiffs' amended complaint in the -- in the Western

14    District of Washington action as well as their amended proof

15    of claim asserted here.

16            In the very beginning of the amended complaint,

17    the plaintiffs talk about their action on -- on securities

18    issued and served by -- by WaMu Capital, the underwriter, in

19    conjunction with the depositors of the -- of the mortgage

20    assets into the trusts:  The Washington Mutual -- excuse me

21    -- WaMu Asset Acceptance Corporation and Washington Mutual

22    Mortgage Securities Corporation.

23            That filters through into the amended proof of

24    claim that they've asserted here where it alleges quite

25    clearly in Paragraph 134 -- it takes a while to get to it.
```

Page 91

1    But in 134 they make it, you know, quite clear the

2    allegation that -- that WaMu Asset Acceptance Corporation

3    served as the issuer of the mortgage-backed securities that

4    -- that the plaintiffs purchased.

5            It becomes even clearer in looking at the -- at

6    the complaint as a whole; that is, in the Western District

7    of Washington the plaintiffs didn't sue the trusts.  They

8    didn't sue the trusts at all.  They sued Washington Mutual

9    Asset Acceptance, Washington Mutual Capital Corporation.

10   Their claim; that is, their fundamental allegation that

11   there has been illegality in the issuance of the securities

12   that they purchased, that claim is one that is asserted

13   against, among other entities, the depositor, not the trust.

14           And the reason for that is -- is because of -- of

15   the principles under the securities law that we have -- that

16   we have laid out -- the creditors' committee laid out in its

17   motion to amend and we have incorporated into our response

18   to the -- to the pending motion for a determination that --

19   that plaintiffs have filed for a determination that this

20   claim is essentially not subject to subordination.  What

21   they're really seeking now in the pending motion is a

22   declaration that -- that their claim is not subject to

23   subordination as a matter of law.

24           And, you know, we've looked at that and concluded,

25   much for the  same reason that we did in -- in conjunction

Page 92

1    with Tranquility where we went ahead and Tranquility had

2    objected and -- and said that, no, you shouldn't deal with

3    subordination now, Your Honor.  We asked the Court to

4    address subordination and for the same reason that we did in

5    conjunction with Tranquility, we think it's appropriate for

6    the Court to -- to address it here and now should it --

7    should it reach the issue and not resolve it based on the --

8    on the stipulation.

9            So -- so what's the error in the Tranquility

10   analysis and why should -- should the result that the Court

11   reached in the Tranquility opinion not pertain here?

12           The real issue, obviously, goes back to 510(b) as

13   it must.  What we're -- what we're talking about is

14   fundamentally a question of statutory interpretation and

15   Section 510(b) says that -- that we subordinate a claim that

16   arises from the purchase or sale of a security of the debtor

17   or an affiliate of the debtor.  It doesn't say a security

18   for which the debtor or the affiliate is the issuing entity.

19   It says, a security of the debtor or an affiliate of the

20   debtor.

21           And the problem is this distinction, this

22   artificial distinction that says, well, if it's a security

23   for which the affiliate is the issuing entity, then -- then

24   no subordination.  If it's a security for -- if it's a

25   security of an entity that's the issuer, then -- then, yes,

Page 93

1    subordination.  And it's that distinction, that fundamental

2    distinction that we think is the -- is the error.

3            We have a situation here where the securities laws

4    provide quite unambiguously that -- that the issuer of

5    mortgage-backed securities is the depositor that deposits

6    the mortgages into the trust.  The trust is merely a

7    conduit.  The trust holds the mortgages, distributes the

8    principal and interest payments, works with the servicer to

9    make sure the mortgages get serviced.  But it's really a

10   conduit entity, and it's the -- it's the depositor, for

11   securities law purposes, that's the issuer.  It's the

12   depositor who is involved in the issuance of the security

13   and it's the depositor who the plaintiffs have asserted is

14   responsible for illegality in the issuance of the -- of the

15   securities.

16           Your Honor's opinion discussed the circumstances

17   of, well, let's think of the debtor or the affiliate was

18   just an underwriter or a broker and all it did was sell

19   stock of some third party company.  I think Your Honor used

20   Apple --

21           THE COURT:  Uh-huh.

22           MR. STROCHAK:  -- in the decision.  So -- so why

23   should this be any different.  And the reason why it's

24   different, Your Honor, is because of the securities laws and

25   because we're dealing with mortgage-backed securities here.

1            This is not a situation where -- where we have

2     truly a -- a completely third party security that has

3     nothing to do with -- with either the debtor or the

4     affiliate.  This is -- this is mortgage-backed securities.

5     We live under a different regulatory regime that -- that

6     concludes that it is the depositor that is the issuer of the

7     security.

8            So while it's undisputed that Apple would be

9     completely unrelated to this estate in the hypothetical, the

10    same conclusion cannot be reached as to -- as to the issuer

11    of the securities for securities laws purposes.  And the

12    issuer -- excuse me -- the issuer under securities laws, the

13    depositor, Washington Mutual, WaMu Asset Acceptance

14    Corporation is undisputedly an affiliate of the debtor in

15    this case.  I don't think the plaintiffs have disputed that

16    and I think it's -- it's quite clear from the record that --

17    that that's the case.

18            So we have a situation where under the securities

19    laws WaMu Asset Acceptance is the issuer.  It is the one

20    charged with responsibility for ensuring that the issuance

21    of the securities is legal.  The plaintiffs are asserting

22    claims in -- in the Western District of Washington against

23    WaMu Asset Acceptance, and WaMu Asset Acceptance is

24    indisputably an affiliate of the debtor at the time of the

25    issuance of the securities.

Page 95

1            So when you add all that up, we end up with a

2    situation that quite clearly demonstrates that the Court's

3    conclusion that -- that neither the debtors nor their

4    affiliates are issuers in -- in reaching its decision on

5    subordination, and that's a quote from Page 20 of the

6    Court's -- of the Court's opinion.  But that seems to us to

7    be quite contrary to what the securities laws provide and --

8    and we think leads inevitably to the result that these

9    claims, the MBS amended claim, must be subject to

10   subordination under Section 510(b) should we -- should we

11   get to the subordination issue on the -- on the merits.

12           I've struggled, Your Honor, and I can't find any

13   principal basis to come to the conclusion that the purposes

14   of Section 510(b) would be served any differently or there

15   should be any distinction between whether a claim is

16   asserted against an issuing entity or an issuer.  I don't

17   see any principal basis to make a distinction why the

18   policies of Section 510(b) would be applied any differently

19   to -- to a claim whether it's -- whether it's against the

20   issuer or whether it's against the issuing entity of the

21   securities.  It just doesn't make any sense to me under

22   510(b), and I've searched and scoured the case law and the

23   commentary for a rationale why they would be treated any

24   different and I -- and I simply can't -- I can't find any,

25   nor have the plaintiffs articulated any.

1        The real issue is -- is as Slane and Kripke (ph)

2    made clear and all the rest of the commentary and much of

3    the case law makes clear is, you know, are we in a situation

4    where the risk of illegality in the issuance of the security

5    should be shifted in some way.  And it -- it seems, you

6    know, patently clear here that -- that where the code very

7    specifically provides that -- that we subordinate not just

8    claims associated with the purchase or sale of equity

9    securities, but also debt securities.  That's perfectly

10   clear from the statute.  Your Honor has already ruled that

11   way in connection with the WMB bondholders' disputes.

12        Where the statute makes the distinction between

13   equity securities and debt securities and where the statute

14   clearly provides that subordination is applicable to

15   securities of affiliates as well as securities of the

16   debtor.  We are not in a world where we are talking about

17   who bears the risk of illegality of issuance as between --

18   as between the purchasers of the securities and equity

19   holders of -- of the company as you would be in a

20   traditional, you know, stock subordination argument.

21        This is not that circumstance.  This is the

22   circumstance where we're talking about the risk of

23   illegality in issuance and whether a claim should be treated

24   pari passu with general creditors of the estate or whether

25   it should fall below general creditors of the estate.

1                And for all the same reasons that -- that

2       subordination is there, we have a situation here where the

3       plaintiffs have a separate set of assets.  Their rights are

4       the mortgage-backed securities and the mortgages that

5       provide principal and interest payments for those securities

6       where those assets are separate, where -- where there is no

7       assertion whatsoever that those assets would be available

8       for distribution to general creditors of the -- of the

9       holding company estate.  Those assets are gone from the

10      system so to speak.  They're in the trust and the general

11      creditors of the estate have no access to those, nor do they

12      have any right of upside in the value that the -- that the

13      plaintiffs acquired when they bought their securities.

14               If the mortgage-backed securities that they

15      acquired did really well, if they had been underpriced in

16      the market, if they had been purchased for 100 cents on the

17      dollar and the market value increased to 105 cents -- I'm

18      just -- I'm just pulling a hypothetical here -- that

19      increase in value would have been solely for the plaintiffs

20      to -- to enjoy.  It would not have gone back to creditors of

21      the estate in any way, shape, or form.

22               So for all the same reasons that you would

23      subordinate claims relating to the purchase or sale of

24      equity securities, it's equally applicable here because they

25      enjoyed -- the plaintiffs enjoyed all of the upside here.

Page 98

1    Just like the acquirer of stock would enjoy all the upside

2    in the value of the company, the acquirer of these

3    securities enjoyed all the upside in the value of the

4    mortgage-backed securities.

5              And for those reasons there -- there simply is no

6    policy basis to distinguish here between a security of an

7    issuer, which is -- which is what we have here, or a

8    security of an issuing entity.  We just don't see the basis.

9    And because -- because we do have securities of an issuer,

10   WaMu Asset Acceptance, and because that issuer for

11   securities law purposes is an affiliate of the debtors, the

12   plain language of 510(b) requires -- requires subordination

13   in this case.

14             Let me turn to the reserve just briefly, Your

15   Honor.  The plaintiffs are kind of standing general

16   appellate principles on their head with respect to the

17   reserve.  The -- there was no assertion or no suggestion and

18   no contemplation in the plan that should the Court conclude

19   that a claim is not in a particular class, that we would

20   have to continue to reserve in that class for the claim.

21             The Court has ample authority to order release of

22   the reserve under the -- under the confirmation order.  We

23   have -- we specifically set up the reserve process in a way

24   that we could come back and estimate claims, if we needed

25   to.  If we had a claim that was -- that was resulting in

Page 99

1    prejudice to the parties on account of the reserve, that we

2    could always come back and estimate the claim in order to --

3    in order to address that issue.

4           And the suggestion that we would have to keep the

5    reserve in the wrong class, should the Court rule that the

6    claim is subordinated, until the end of the appeal process,

7    essentially, gives the plaintiffs the right to go off, file

8    appeals.  We could go all the way to the Supreme Court and

9    it could take years to get that reserve released.  To

10   suggest that the Court is without authority to order the

11   release of the reserve is -- is not consistent with -- with

12   a prompt resolution of the estate or anything else in the

13   plan or the confirmation order.

14          Now, certainly, if -- if the Court decides to

15   release the reserve, the plaintiffs have the right to come

16   back and say, we're going to appeal, Your Honor, and we

17   would like a stay.  We would like to maintain the status quo

18   pending appeal.  The rules provide an adequate mechanism for

19   that and there's no reason that they should not be required

20   to bond the costs to the estate of maintaining the reserve.

21   And as I've articulated, it cost $2 million a month to the

22   peers' recovery, $700,000 overall in increased interest

23   payments by the -- by the estate.

24          And if we get to the point where the reserve is

25   released and the plaintiffs appeal, then this issue can be

Page 100

1    adequately dealt with in the context of an application for a

2    stay pending appeal, and the Court's determination of what

3    would be an appropriate bond on that -- on that appeal,

4    given the detriment to the estate and other creditors of

5    continuing to hold the reserve.

6            I'll stop there, Your Honor.  I know Mr. Johnson

7    probably wants to say a few words on behalf of the

8    creditors' committee, unless you have any questions?

9            THE COURT:  No.  Thank you.

10           MR. STROCHAK:  Thank you.

11           MR. JOHNSON:  Good afternoon, Your Honor.  Robert

12   Johnson from Akin Gump on behalf of the official committee

13   of unsecured creditors.

14           And before I begin, I would like to disclose that

15   the liquidating trust has engaged Akin Gump for certain

16   limited purposes, including advising the trust advisory

17   board.  But I'm here today on behalf of the creditors'

18   committee, the creditors' committee which made the motion to

19   alter, amend the Tranquility decision.  We will be filing an

20   amended 2014 statement shortly regarding that other

21   engagement.

22           Also, before I begin, I'm going to make reference

23   to a diagram which comes from the MBS plaintiffs' proof of

24   claim.  It's Page 59, Claim 4069.  May I approach and hand

25   up a copy?

Page 101

1          THE COURT:  You may.

2          Thank you.

3          MR. JOHNSON:  Your Honor, I'll begin with the

4    stipulation and order point.  Much has been said on that

5    already, but I just want to highlight a few points.

6          As -- as the liquidating trust has argued, there

7    was no recovery of actual property to Class 18 at the time

8    of the sixth amended plan nor now with the seventh amended

9    plan.  And so that's why we see that the stipulation  and

10   order that was entered into in November 2010 made sense;

11   that if you were to interpret that stipulation and order as

12   saying that there was already at that time a recovery to

13   allowed subordinated claim, the MBS plaintiffs could have

14   immediately re-filed their claim.

15          It only makes sense in the context of the

16   mandatory subordination of mortgage-backed securities to

17   other bonds that would place them in Class 18 that would

18   then make sense to put off the litigation of the merits of

19   the MBS plaintiffs' claim at that time in November 2010.

20          So we contend that -- that there was -- because

21   there was no recovery at that time, and there has not yet

22   been a recovery to Class 18 at this time, that it's

23   inappropriate for the claim to be filed at this time.

24          The plaintiffs have accused us of playing fast and

25   loose with them with regard to the debating, but it simply

Page 102

1    isn't so.  As the MBS plaintiffs have -- have alleged, as

2    they have argued under Section 1126(g), if they were going

3    to get no recovery, they would have been deemed to reject.

4    They wouldn't have had to vote.  They could have stayed in

5    and -- and agreed to be in Class 18, as certain other

6    securities fraud plaintiffs did, and they they could have

7    voted in Class 18.  But they choose not to do that.

8            Then when they came back in after the Tranquility

9    decision and they filed their claim, they then, in my

10   opinion, overreached by saying they wanted to be adjudicated

11   to the Class 12 for all purposes, not merely for voting, but

12   for all purposes.  And we said at that time, if you want to

13   vote in 12, we're happy to let you vote in 12, but you can't

14   be adjudicated with a -- a shortcut approach.  You have to

15   be in Class 12 for all purposes.  And on top of that it's

16   quite clear from the stipulation and order that there had

17   been no recovery to Class 18, still there's no recovery to

18   Class 18, and that they belong in Class 18.

19           We also very clearly articulated that we, the

20   creditors' committee, disagreed with the Tranquility

21   decision.  We had made the motion to alter or amend on

22   January 3rd and we felt that when the time was appropriate,

23   we would be able to make the arguments to Your Honor to

24   explain why we believed that that Tranquility decision did

25   contain an error of law and fact, and that it would cause a

Page 103

1    manifest injustice to the creditors who were in Classes 2

2    through 16.

3              As to the issue of whether the claim was to be

4    filed as a Class 12 or as a Class 18, there's just no such

5    thing on a proof of claim.  A proof of claim form has a box

6    that you can check if you have a secured claim and it's got

7    a box that you can check if you have a priority claim.  But

8    there's no place to put on a proof of claim form that this

9    is only going to be filed a subordinated claim.  So there's

10   -- that argument is just a red herring, Your Honor.

11             I would like to move onto the subordination point

12   and to -- to the Tranquility decision.

13             First, the plaintiffs have argued that we don't

14   have an appropriate basis under Rule 59(e) for the motion to

15   alter or amend.  And I would like to highlight, Your Honor,

16   this is not a new argument.  The creditors' committee has

17   consistently argued that the mortgage-backed securities at

18   issue were the securities of WaMu Asset Acceptance Corp.

19             What happened, however, was during the argument,

20   nobody made reference to Section 2(a)(4) of the Securities

21   Act or Section 3(a)(8) of the Exchange Act.  But this is a

22   securities fraud case.  The plaintiffs are making a claim

23   under Section 15 of the Securities Act and you have to look

24   at the statute under which a cause of action arises to look

25   at the definitions.

Page 104

1        And the definitions that are in the Securities Act

2   provide very clearly in Section 204 and in Section 3(a)(8)

3   that the depositor is the issuer.  So for purposes of

4   securities fraud, it's the depositor here, WaMu Asset

5   Acceptance Corp., which is the issuer of those certificates,

6   which we then served through the underwriter, WaMu Capital

7   Corp, done through the investors.

8        And you'll see on the bag, ma'am, that the trust

9   is below.  The mortgage lines are transferred into that

10  trust and then the certificates transfer up to the

11  depositor.  The depositor then transfers those to the

12  underwriter and the underwriter sells them to the investors.

13  So you can see from this arrangement that here -- and this

14  is in the plaintiffs' own proof of claim -- it's the

15  depositor here that's at issue.

16        Your Honor, the Max's Seafood case is a case that

17  we put in our pleading to call to the Court's attention that

18  the Third Circuit has said that if an argument -- that the

19  Court must consider, on a motion to alter or amend, an

20  argument, even if the argument had not previously been made.

21  We had argued that the depositor was the issuer.  It's just

22  that those citations hadn't been provided at that time.

23        And I regret that those citations had not been

24  provided to the Court at that time.  It certainly would have

25  made things a lot clearer if we had provided citations to

Page 105

1    2(a)(4), 3(a)(8), Securities Rule 191, Rule 3(b)(19) and

2    Regulation AB.  Believe me, Your Honor, I did a lot of

3    homework between December 20th of 2011 and January 3rd when

4    we filed our motion to alter or amend.

5          But, unfortunately, Your Honor, in -- in the

6    Court's decision with the sentence that says, "neither the

7    debtors nor their affiliates are the issuers of the

8    certificates," and that is the error that we wanted to call

9    to the Court's attention because under the securities laws,

10   which is at issue for a securities fraud case, it's the

11   depositor that is the issuer, and that is WaMu Asset

12   Acceptance Corp.

13         Now this is also what distinguishes this case from

14   SemCrude that Judge Shannon decided.  In SemCrude what Judge

15   Shannon had before him was a limited partnership and he

16   looked correctly at the Bankruptcy Code and said that the

17   definition of affiliate did not include a limited

18   partnership.

19         But here, the definition of an affiliate under the

20   Bankruptcy Code clearly does include a corporation that is

21   owned by WaMu Bank and that, in turn, is owned by WaMu, Inc.

22   So here we do fall within the definition of an affiliate and

23   that is what distinguishes us from the SemCrude decision.

24         It also distinguishes us from the analogy of Apple

25   stock because what we have here in this diagram shows that

Page 106

1    what -- what we have are mortgages that were originated by

2    WaMu Bank, transferred down to this depositor, and then

3    there was the securitization process to the investors.

4    That's a far cry from a situation in which WaMu Capital Corp

5    might be buying the stock of a completely unrelated entity.

6    These are related entities as shown in the diagram that the

7    MBS plaintiffs provided.  And that shows why it's so

8    different from Apple stock.

9              I would also like to point to the issue of the

10   equity risk and the policy arguments that were made by the

11   parties and by the Court with respect to 510(b).  And what's

12   important here is that it's not a question of acquiring an

13   interest in the affiliate of the debtor when you're talking

14   about a bond as opposed to a stock.

15             So just as those people who purchased the bonds of

16   WaMu Bank did not acquire an equity interest in WaMu Bank,

17   and yet their bonds were subordinated.  The Court properly

18   found that bonds that were issued by this entity, WaMu Bank,

19   which is an affiliate of WaMu, Inc, those are subordinated

20   with respect to WaMu, Inc's creditors.  They are

21   subordinated to the creditors of WaMu, Inc.  So it's not a

22   question of the equity interest in that entity.  It's a

23   question of the bond being subordinated to other bonds.

24             I would like to speak about the harm to the estate

25   and to the creditors.  As the liquidating trust has pointed

Page 107

1    out, the clip of 435 million in reserve at the federal

2    judgment rate gets to $700,000 a month, and so that's a true

3    out-of-pocket expense to the liquidating trust.  Of course,

4    the peers suffer even more because due to their contractual

5    pay-over requirements, they have to pay up to the more

6    senior creditors, and so with respect to them, the cost is 2

7    million a month.

8              Your Honor, there may have been a mistake with

9    respect to the citation or the lack of citation of the

10   particular elements of the law and the prior arguments that

11   were made, but there's no reason why that mistake now should

12   inure to the detriment of these creditors.

13             I would also like to address the issue of the

14   reserve.  It simply makes no sense to require a reserve of

15   cash if the Court determines -- which we respectfully submit

16   the Court will after considering our arguments and our

17   provision of the authority regarding the Securities Act and

18   the regulations.  It simply would make no sense to reserve

19   cash for a claim that, as a matter of law, must be a

20   subordinated claim.

21             We think that what would make sense would be that

22   when we got to the point that liquidating trust interests

23   were being distributed to other allowed subordinated claims,

24   if at that time the MBS plaintiffs' claim is still

25   contingent, if it's still undetermined, if it's still

Page 108

1    unliquidated, then there could be a reserve of liquidating

2    trusts' interests in the tranche that corresponds to Class

3    18 at that time.  But there's no reason to hold up $435

4    million in cash which should be distributed to holders of

5    claims in Classes 2 through 16 if there's no possibility

6    that the MBS plaintiffs will end up with a claim that's in

7    Class 12.

8              And so, finally, just to sum up, Your Honor, with

9    respect to law of the case, law of the case, of course, is a

10   discretionary doctrine and, Your Honor, we have made it

11   quite clear from as soon as we -- we received the

12   Tranquility decision through our motion to alter or amend

13   that we disagreed with that.  We take the position that the

14   Tranquility decision was not a final decision because we had

15   made the motion to alter or amend and it had not been

16   decided.

17             We also believe that Your Honor should exercise

18   her discretion not to apply law of the case with respect to

19   Tranquility, but to find the law of the case that should be

20   applied here is the law of the case with respect to the bank

21   bondholders.  It's that the bonds of an affiliate of the

22   debtor must be subordinated to the other bonds.

23             Thank you, Your Honor.

24             THE COURT:  Thank you.

25             Reply.

Page 109

1          MR. SHERWOOD:  I'll try to keep my remarks limited

2     to reply.

3          First, Your Honor, let me just reemphasize that

4     the extrinsic facts and circumstances and -- and so forth at

5     the time of entering into the stipulation are irrelevant

6     when the terms of the stipulation are clear; and clearly

7     here they don't address classification; and clearly here

8     they use the word "recovery" as opposed to actual recovery;

9     and clearly here you have the debtor acknowledging that

10     there was a distribution to Class 18 and that Class 18

11     received property.

12          But, Your Honor, if you're going to --

13          THE COURT:  Well, I -- I think they said they did

14     not.  There was no issuance of litigating trust certificates

15     to Class 18.

16          MR. SHERWOOD:  They said that, but as a matter of

17     law Your Honor can and should find that Class 18 received

18     property under the plan because that's what would have to

19     happen in order for Class 18 to vote and not be deemed to

20     reject under Section 1126.

21          And, furthermore, Your Honor, it's really in black

22     and white in the debtors' plan.  The debtors' plan says that

23     Class 18 is impaired and receiving distributions pursuant to

24     the plan.  That's a recovery.  A distribution is a recovery

25     and property is a recovery.  And for them to start splitting

Page 110

1    hairs now on what the meaning of a recovery is in order to

2    keep us from filing our proof of claim --

3              THE COURT:  Well, I'm -- I'm not sure anybody in

4    Class 18 would say that they've gotten a distribution or any

5    recovery as of today.

6              MR. SHERWOOD:  Okay.  Your Honor, that raises

7    another good point.

8              First of all, at the time of the stipulation, the

9    plan that was on file at that point in time was not

10   confirmed.  And more importantly, Your Honor, at that time

11   the plan that was on file, and I think the second -- which

12   was not confirmed, and I think the second plan that was not

13   confirmed did not provide for the substantial return to

14   equity that the seventh amended plan provides.

15             So that is an additional fact and circumstance

16   that the Court should consider.  If you think about it, if

17   you want to go back and try to figure out what the facts and

18   circumstances were back in November of 2010, there was no --

19   there -- there's 100 million-plus of return to equity under

20   the seventh amended plan.

21             THE COURT:  Why is that relevant?

22             MR. SHERWOOD:  Because from the perspective of

23   Class 18, a return to equity is very relevant.  A 100

24   million -- if I'm sitting in Class 18, Your Honor --

25             THE COURT:  Okay.

Page 111

1           MR. SHERWOOD:  -- and I see no -- a contingent

2    recovery to my -- my constituency, my claim.

3           THE COURT:  Yeah.

4           MR. SHERWOOD:  Yet, I see below me a 100 million-

5    plus recovery to equity, that's -- that's very important

6    from the perspective of a Class 18 holder.

7           THE COURT:  And they voted.

8           MR. SHERWOOD:  Who voted?

9           THE COURT:  Class 18.

10          MR. SHERWOOD:  Class 18 voted and I think, Your

11   Honor, if you look at Class 18, each and every member of

12   Class 18 who voted got some other type of plan consideration

13   under this plan.  They got -- you take Tranquility, okay.

14   Tranquility got like a nine-million-dollar Class 18 claim,

15   but they also got a nine-million-dollar Class 12 claim

16   provided they vote in favor of the -- of the plan.

17          You look at it -- there was another group.  They

18   got their counsel fees paid provide -- and, again, provided

19   they vote in favor the plan.  And then there was Mr.

20   Stark's clients who was -- was thrown a Class 18 claim along

21   with substantial other consideration provided they vote in

22   favor of the plan.

23          So, yeah, they voted and we didn't vote in Class

24   18 because -- because Your Honor had decided Tranquility.

25   They had indicated that --

Page 112

1            THE COURT:  Well, you indicated you wanted to vote

2      in Class 12.

3            MR. SHERWOOD:  Correct.  But at the same time,

4      Your Honor, we indicated that if we were not going to be in

5      Class 12, it would be nice for us to learn that that was the

6      case before we voted.  And, Your Honor, we -- we pressed

7      that issue.  We pressed that issue on multiple occasions and

8      -- for the -- for the exact reason that we didn't want to be

9      standing here today saying, Judge, we voted Class 12 and

10     they're trying to put us in Class 18 under this stipulation,

11     and because they want to overrule Tranquility --

12            THE COURT:  But I overruled you on that.  I did

13     not decide the classification or amount of your claim for

14     anything other than purposes of voting.  And all parties

15     rights were reserved to argue that.

16            MR. SHERWOOD:  That's right.  I'm not -- that

17     happened and -- and it happened over my -- over my

18     objection.

19            But it -- but I think it's something that I would

20     -- would hope that the Court would consider at this point in

21     time because I don't -- I don't think I would have done it

22     any other way, even looking back.  Your Honor had decided

23     Tranquility.  If -- I mean, what gets me about it, Your

24     Honor, the change of position is what they're saying here is

25     that this -- that this trigger has not occurred, and they

Page 113

1    could have said that before confirmation.  They could have

2    asked Your Honor --

3              THE COURT:  I think they did say.

4              MR. SHERWOOD:  They could have asked Your Honor to

5    reconsider and rule whether you're going to reconsider

6    Tranquility before confirmation.

7              THE COURT:  but -- but they didn't.  They had a

8    lot of other things going on and the whole purpose really of

9    the stipulation was to not decide those issues.  Wasn't that

10   the purpose of the stipulation?

11             MR. SHERWOOD:  No.  Not from our perspective.

12             THE COURT:  Well --

13             MR. SHERWOOD:  Your Honor, the purpose of the

14   stipulation, the solicitation procedures -- I mean,

15   basically, what we did is we followed the procedures that

16   were set forth by the debtor to a T.  And they said if you

17   have filed a proof of claim and you want to allow that claim

18   not just for voting purposes, but also for classification

19   purposes to file a motion, which we did, and we filed a --

20   we said -- we contend that we have a Class 12 claim for like

21   two-hundred-and-some-million, then we amended it to the 435.

22   And it was incumbent upon the debtor at that point and the

23   estate, if they had a clear view -- I'm just -- I'm just --

24             THE COURT:  I know what your argument was, but I

25   did overrule you on that point.

Page 114

1           MR. SHERWOOD:  Okay.  So let's -- let's get --

2           THE COURT:  Where we are today.

3           MR. SHERWOOD:  Okay.  We -- just on that point and

4    -- and we voted in Class 12, but I think the Court should be

5    cognizant of the fact that had we voted in Class 18, the

6    debtor would have -- the debtors' plan would have been in

7    serious jeopardy because of the absolute priority rule.  And

8    -- and this was, to some extent -- not to some extent, but

9    clearly gainsmanship on their part to put us in Class 12 at

10   one point and then flip-flop later.

11          Your Honor, we relied on -- we relied on our Class

12   12 status in -- in exercising our rights pursuant to the

13   plan and -- and there should be some finality at

14   confirmation with respect to our treatment as a Class 12

15   creditor.

16          Let -- let me -- let me turn to the reserve issue.

17   Again, the debtor drafted the plan.  The debtor drafted the

18   confirmation order.  The terms of the plan are clear.  They

19   provide that to the extent that there is any dispute with

20   respect to this or -- or that the order disallowing this

21   claim is not resolved by a final order, the reserve has to

22   stay in place.  And the confirmation order and the plan

23   should be enforced as written, again, by the estate.  And --

24   and there's no reason to -- to deviate from that.

25          THE COURT:  I understand.

Page 115

```
 1              MR. SHERWOOD:  Getting -- getting to Tranquility,

 2      the standard for reconsideration is manifest injustice and

 3      it has to be -- the error has to be apparent to the -- to

 4      the point of being indisputable.  And, again, I think if you

 5      look at their brief on Page 18 where they cite to SEC Rule

 6      191 and the definition of -- of "issuer" and the bold part

 7      at the top of Page 18.  It says that the depositor for an

 8      asset-backed securities acting solely in its capacity as

 9      depositor to the issuing entity is the issuer for purposes

10      of the asset-backed securities of that issuing entity.

11              And then the same language is at the last part of

12      Paragraph A in Paragraph 34 that's in bold.  And I think

13      this -- this really highlights that even the SEC rules

14      recognize a distinction between a depositor in an issue and

15      the issuing entity, just like Your Honor did in Tranquility.

16      And I think that that philosophy, that rationale, is still

17      good.

18              And, you know, in terms of the basis for that, I

19      think, Your Honor, that there was that Slane and Kripke

20      article that you cite in Tranquility and I think it's clear

21      that the purpose of Section 510(b) is to guard against

22      having someone who is an equity holder in the debtor or in

23      an affiliate of the debtor being elevated to -- to the

24      position of a creditor, and that's not what's happening

25      here.
```

Page 116

1           And then finally on Tranquility, Your Honor, the

2     reported entity, the issuer, the depositor and -- and, you

3     know, all of the entities in -- in the chart that was handed

4     up by counsel to the committee, they are all included within

5     these SEC definitions really to expand liability and

6     reporting.  And just because the SEC -- just because some --

7     there is a claim under SEC law, that doesn't mean that that

8     law that governs that claim is suddenly going to govern a

9     bankruptcy court's analysis under Section 510.  And 510

10    purposes -- 510 has a completely different purpose and --

11    and Your Honor is -- and there's nothing manifestly long or

12    grossly unjust about what -- what Your Honor's rationale was

13    in Tranquility.

14           So, Your Honor, you know, based on all that we --

15    we think that -- that the language of the stipulation is

16    clear and there has been a recovery under the plan to Class

17    18, which is a class that's receiving property and

18    distributions for sure.  And a contingent right of recovery

19    is no less a recovery than an actual right.  And it wouldn't

20    make sense, also, Your Honor, to read the stipulation to

21    wait for actual cash to come in -- into hand because that

22    would be -- you know, at that point in time we don't know

23    what the facts and circumstances would be.  And, moreover,

24    we're in Class 12 anyway so it just doesn't make sense.

25           So for those reasons, Your Honor, and really just

1   before I sit down I think it -- it would be unjust for Your

2   Honor to allow the debtor and the committee to sort of play

3   the game that they did by putting us in Class 12 and sort of

4   laying down for voting purposes when they knew full well all

5   alone -- all along that they were going to change their

6   tune.  I think that's playing fast and loose with the Court,

7   certainly with me and our clients who, you know, deserve to

8   have a day on the merits of their claim.  And -- and that's

9   all we're seeking here.  We're not seeking a four-hundred-

10  and-thirty-five-million-dollar allowed claim.  We just want

11  to know that we're in Class 12.

12          Thank you.

13          MS. KASWAN:  Your Honor, could I just speak to

14  some issues --

15          THE COURT:  Okay.

16          MS. KASWAN:  Counsel did address back to what hard

17  work we did in --

18          THE COURT:  All right.

19          MS. KASWAN:  Your Honor, I'm not a bankruptcy

20  lawyer.  I'm a securities lawyers.  And -- and that's why I

21  wasn't speaking, certainly, in the first part of this

22  argument.  But the securities laws, both Section 11 and

23  Section 10(b)(5) are disclosure statutes.  They -- they

24  don't turn on who owns the securities.  They turn on who is

25  the speaker.  And in connection with Section 11, ordinarily,

Page 118

1    the issuing entity and the issuer are the same.  They are

2    the ones who file the statements with the Court.  They are

3    the speakers.

4           And so Section 11 imposes liability if the

5    disclosures are false or misleading.  And that would be

6    ordinarily on the entity that files the disclosure

7    statements, the officers who sign the disclosure statements,

8    and the underwriters who sell the securities.  That's a very

9    different concept than Section 510(b) which looks to the

10   entity that owns the securities or in connection with the

11   bond, the entity whose collectability and resources the

12   debtors are looking to for repayment of the bond.

13          So that's why, you know, I believe that the

14   regulation is irrelevant to the issue of a 510(b) question

15   and, also, the securities law for interpretation of Section

16   11 and the issue of who is liable under the disclosure

17   statutes is irrelevant to subordination under 510(b).  Both

18   of those statutes are directed to different concepts.

19          And certainly, you wouldn't say, for example, that

20   WMI and the officers are affiliates even though the

21   affiliates are speakers and, therefore, liable under Section

22   11, and WMI could be liable as a control person under

23   Section 15 for the false statements by the officers.  That's

24   what's happening here is that because the depositor is the

25   manager and the speaker, they are liable under Section 11;

Page 119

1   that is wholly unrelated to the question of whether or not

2   they are the owner of either the stock or the bonds that are

3   being issued that -- the owner of the bonds or the issuing

4   entity.  And so that's why that's the appropriate entity to

5   look to under 510(b).

6           THE COURT:  Thank you.

7           MR. JOHNSON:  Your Honor, very briefly on the

8   point that Ms. Kaswan just made. I think she hit the nail

9   right on the head.  The question of the securities laws is

10  who is the speaker and the question under the Bankruptcy

11  Code is what is the definition of an affiliate.

12          Now where that intersects is right here on this

13  chart.  I just drew a circle around all the entities that

14  are corporations and the ones that are affiliates.

15  Washington Mutual Bank is an affiliate of WMI because it's

16  one-hundred percent owned by WMI.  WaMu Asset Acceptance

17  Corp. is one-hundred percent owned by Washington Mutual

18  Bank, and under Section 101 of the Bankruptcy Code, that

19  means that WaMu Asset Acceptance Corp. is an affiliate.

20          And as Ms. Kaswan correctly pointed out, the

21  securities laws do look to who is the speaker in order to

22  determine where there is liability.  And the basis of their

23  lawsuit in Washington and their claim here is securities

24  fraud against WaMu Asset Acceptance Corp.  It's not against

25  the trust, which merely held those mortgages.

Page 120

1            So here we now have the intersection of the

2    securities law providing the definition of what is the

3    issuer and the Bankruptcy Code providing that if the issuer

4    is an affiliate, then it -- it then matches the definition

5    of what is an affiliate and, therefore, it needs to be

6    subordinated under Section 510(b).

7            Thank you.

8            THE COURT:  Thank you.

9            MR. STROCHAK:  Thank you, Your Honor.  Adam

10   Strochak.  Just -- just two very brief points.

11           Mr. Sherwood, I think, quoted from Section 22.1 of

12   the plan, the treatment of subordinated claims, and he left

13   out the key language.  The plan says that "Commencing on the

14   effective date and in the event that all allowed claims and

15   post-petition interest claims in respect of allowed claims

16   are paid in full, then each holder of an allowed

17   subordinated claim will get liquidating trust interests."

18           That's the key language.  The way the plan works

19   is that until the waterfall fills up, there is no

20   distribution of liquidating trust interests to -- to the

21   holders of allowed subordinated claims.

22           The latter point I'll just echo what -- what Mr.

23   Johnson said and perhaps put a little different slant on it.

24           You know, we -- we agree that the SEC rules do

25   make a distinction between issuer and issuing entity.  And

Page 121

1    the key point, the whole -- the whole argument that we've

2    made is that -- is that Section 510(b) doesn't make that

3    distinction.  There is no principal basis to make a

4    distinction between issuer and issuing entity in connection

5    with mortgage-backed securities.

6            And as Ms. Kaswan stated, you know, we're a little

7    bit out of the ordinary here.  This is not the ordinary

8    situation where the issuer is both the entity and the

9    speaker, as she -- as she put it.  We're in a situation

10   where -- where those were separated.

11           But what rational basis is there under 510(b) to

12   say that, well, a claim against one would be subject to

13   subordination, but a claim against another would not.  If --

14   if the -- if the allegation is that there was illegality in

15   the issuance of the securities, then -- then there's no

16   reason to say that a claim against the issuer would not be

17   subject to -- that is, a claim relating to securities of the

18   issuer would not be subject to subordination as long as the

19   issuer is an affiliate, and plainly in this case it was.

20           Thank you, Your Honor.

21           MR. ETKIN:  This has been very difficult for me to

22   just sit through --

23           THE COURT:  All right.  So --

24           MR. ETKIN:  So with the Court's indulgence just

25   two minutes.

Page 122

1          THE COURT:  Two minutes.

2          MR. ETKIN:  First of all, I think we have a basic

3    disagreement as to what provisions of the plan to -- to look

4    to to determine --

5          THE COURT:  You have to identify yourself for the

6    record.

7          MR. ETKIN:  I'm sorry, Your Honor.  Michael Etkin,

8    Lowenstein Sandler, bankruptcy counsel to the MBS

9    plaintiffs.  My apologies.

10         We're -- we're looking at different plan

11   provisions.  Your Honor, I think that Section 30.2 of the

12   plan which Mr. Sherwood pointed out earlier, and which has

13   not been the subject of comment by either the post-

14   confirmation trust or the committee, says clearly and

15   unequivocally that -- that Class 18, along with other

16   classes, are receiving distributions pursuant to the plan.

17   You can't -- you can't talk your way around that, Your

18   Honor.

19         THE COURT:  Well, you can if you look at the

20   actual language of whether they're getting distributions.

21         MR. ETKIN:  But, Your Honor, the debtors -- the

22   debtors admit in the context of the plan that they're

23   getting distributions.  That's an admission.  That's clear

24   and unequivocal.  They can't now say, well, we didn't mean

25   it.  They can't now say, well, you know, we -- we really

Page 123

1    meant that it was non-contingent distributions.  It says

2    what it says and it's clear.  So from our perspective, Your

3    Honor, that really resolves the issue.

4           And then one point on this Tranquility argument,

5    which -- which Mr. Strochak just talked about.  The fact

6    that there's no reason or no basis under 510(b) to

7    distinguish between the issuer and -- and the issuing

8    entity.  Well, the SEC makes that distinction.  They don't

9    make that distinction.  510(b) doesn't talk about

10   securities, doesn't talk about an issuer.  510(b) talks

11   about securities, whether equity or debt, of the -- of the

12   debtor or an affiliate of the debtor.

13          Now we're arguing as to who they think an

14   affiliate of the debtor is.  The fact is that the -- that

15   the securities, the asset-backed securities are securities

16   of the issuing entity.  Now why do I say that?  Because

17   that's what the SEC rule says.  It says that -- that the

18   depositor is considered the issuer for all of those issues

19   relating to reporting because they're the ones who have the

20   information and they're the ones who would stand liable for

21   misstatements with respect to that information.

22          But the rule goes further and it says, as -- as

23   the debtors quoted in their -- in their objection, it says

24   that the depositor to the issuing entity is the issuer for

25   purposes of the asset-backed securities of that issuing

Page 124

1    entity.  That parrots the language of 510(b).  The

2    securities are of the issuing entity.  They're not

3    securities of the issuer.  The assets of the issuer,

4    performance of the issuer have nothing to do with the

5    investment that was made.

6         This all makes perfect sense, especially when you

7    look at the background of 510(b) which has been appended to

8    tell the investor that you can't jump the line simply by

9    asserting a litigation claim if you bought securities of the

10   debtor or of an affiliate of the debtor.  By virtue of the

11   SEC's own language, these were asset-backed securities of

12   that issuing entity.  That issuing entity was not an

13   affiliate.  510(b) does not apply.

14        Thank you, Your Honor.

15        THE COURT:  All right.  No more.  I'll tell you

16   what I am going to decide today.

17        First of all, the trigger has not occurred for

18   purposes of the stipulation.  There has been no recovery on

19   Class 18 simply by confirmation of the plan or by the fact

20   that the debtor allowed that class to vote.  The reality is

21   there has been no distribution of any property, cash,

22   liquidating trust certificates, or anything to Class 18.

23   The stipulation provided that no claim would be filed until

24   that time and, therefore, the claim is premature.

25        With respect to the reserve, therefore, since

Page 125

1    there is no pending claim, no reserve need be provided by

2    the debtor in cash or in liquidating certificates.

3            With respect to the issue of whether there was an

4    agreement that they would only file a Class 18 claim, there

5    is nothing in the stipulation that says that.  So at the

6    time of the trigger, they are free to file a Class 12 claim.

7            With respect to the applicability of the

8    Tranquility decision, I don't think the MBS plaintiffs can

9    rely on that.  It was not a decision with respect to their

10   claim.  The claims are different.  In addition, it was not a

11   final decision at all because of the pendency of the motion

12   for reconsideration.  I did not get the chance to address

13   that motion or make any ruling on those arguments.  So,

14   quite frankly, it is not law of the case.  If it were, I

15   would exercise my discretion not to apply it to this claim.

16           But I think it's not necessary for me to decide

17   the merits of that argument at this time because I think

18   that the MBSA -- MBS plaintiffs do not have the right to

19   file or prosecute a claim now and won't have that right

20   until the -- any recovery is had on the Class 18 claims, and

21   that means a -- an actual distribution.

22           Okay.

23           MR. STROCHAK:  Your Honor, I think it quite makes

24   sense for us to reduce your ruling to an order, circulate it

25   to plaintiffs and then submit it under certification.

Page 126

1              THE COURT:  Okay.

2              MR. ROSEN:  Thank you very much, Your Honor.

3              THE COURT:  We're done with the agenda, then?

4              MR. ROSEN:  That is the agenda, Your Honor.

5              MR. SHERWOOD:  Thank you, Your Honor.

6              MR. ETKIN:  Your Honor, I think there's one more

7     thing on the agenda, which was the least -- and it could be

8     handled quickly, I guess, but it -- there was a status

9     conference in connection with the certification motion.  I

10    don't know that there's much to be said right now.  I'm --

11    given the length of the argument on the certification, I'm

12    not going to get into arguments on the objection filed.  We

13    can do that in reply papers prior to a scheduled hearing on

14    the merits.

15             With respect to timing, and I think one of the

16    issues that the debtors -- that the debtors raise is that

17    issue.  I guess we can talk to the debtor about that and see

18    whether we can reach some agreement, or we can advise the

19    Court and put it on for substantive hearing at -- at some

20    omnibus hearing date in the future.

21             THE COURT:  I think you should talk about whether

22    or not we -- and when we have it.

23             MR. STROCHAK:  We'll do that, Your Honor.

24             MR. ETKIN:  We will discuss that, Your Honor.

25             THE COURT:  All right.

1           All right.  We'll stand adjourned, then.

2           MR. STROCHAK:  Thank you, Your Honor.

3           MR. ROSEN:  Thank you.

4           MR. SHERWOOD:  Thank you.

5        (Whereupon, the proceedings concluded at 1:16 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 128

```
 1                    I N D E X

 2

 3                      RULINGS

 4    DESCRIPTION                          PAGE    LINE

 5

 6    Debtors' Twenty-Third Omnibus

 7    (Substantive) Objection to Claims     --      --

 8

 9    Debtors' Objection to Proof of

10    Claim Filed by AT&T Corp.             --      --

11

12    Debtors' Sixtieth Omnibus

13    (Substantive) Objection to Claims     --      --

14

15    Debtors' Motion to Estimate Maximum

16    Amount of Certain Claims for Purposes

17    of Establishing Reserves Under the

18    Debtors' Confirmed Chapter 11 Plan    --      --

19

20    Motion for a Protective Order for

21    Claimants Al Brooks, Todd Baker,

22    Deb Horvath, John McMurray, Tom Casey,

23    and David Schneider Pursuant to Rule 26(c)  --    --

24

25
```

1                    I N D E X (CONT.)

2

3                          RULINGS

4    DESCRIPTION                          PAGE     LINE

5

6    Motion of the Official Committee

7    of Unsecured Creditors to Alter or

8    Amend the Court's Opinion and Order

9    Regarding Subordination of the Claim

10   of Tranquility Master Fund, Ltd.        --        --

11

12   Motion of Washington Mutual, Inc. for

13   an Order, Pursuant to Section 105(a)

14   of the Bankruptcy Code and Rule 9019

15   of the Federal Rules of Bankruptcy

16   Procedure, Approving Stipulation and

17   Agreement By and Among Washington

18   Mutual, Inc., JPMorgan Chase Bank,

19   National Association and U.S. Bank,

20   National Association, as Successor to

21   Union Bank, N.A. Resolving Adversary

22   Proceeding and Related Proofs of Claim    --        --

23

24

25

Page 130

1                    I N D E X (CONT.)

2

3                         RULINGS

4    DESCRIPTION                              PAGE     LINE

5

6    Motion for an Order, Pursuant to

7    Section 105(a) of the Bankruptcy Code

8    and Bankruptcy Rule 9019, Approving

9    the Stipulation and Agreement Between

10   Washington Mutual, Inc. and MSG Media

11   Reducing and Allowing Proof of Claim

12   Number 1841                              --       --

13

14   Application of (I) Wilmer Cutler

15   Pickering Hale and Dorr, LLP,

16   (II) Pachulski Stang Ziehl & Jones, LLP,

17   and (III) Boies, Schiller & Flexner, LLP

18   for Compensation for Services Rendered

19   and Reimbursement of Expenses as Counsel

20   to the Ad Hoc Group of WMB Senior Noteholders

21   for the Period from the Petition Date

22   Through the Effective Date                --       --

23

24

25

Page 131

```
 1                    I N D E X (CONT.)

 2

 3                         RULINGS

 4    DESCRIPTION                              PAGE    LINE

 5

 6    Washington Mutual, Inc. and WMI

 7    Investment Corp. v. Peter J. and

 8    Candace R. Zak Living Trust of 2001

 9    u/d/o August 31, 2001, et al.

10    (Adversary Proceeding No. 10-53420)       --      --

11

12    Debtors' Seventy-First Omnibus

13    (Substantive) Objection to Late

14    Filed Claims                              --      --

15

16    Debtors' Seventy-Second Omnibus

17    (Substantive) Objection to Claims         --      --

18

19    Motion of Deutsche Bank Trust Company

20    Americas in its capacities as Indenture

21    Trustee and Guarantee Trustee of Two

22    Series of WMB/CCB Subordinated Notes for

23    Entry of an Order Allowing and Authorizing

24    and Directing Payment of Its Claims for

25    Fees and Expenses                         --      --
```

1                    I N D E X (CONT.)

2

3                         RULINGS

4    DESCRIPTION                              PAGE      LINE

5

6    Motion of Law Debenture Trust Company

7    of New York, in its capacity as Indenture

8    Trustee, for Entry of an Order Partially

9    Allowing and Liquidating Proof of Claim

10   for Fees and Expenses Incurred from

11   January 1, 2012 through and Including

12   March 31, 2012                           --        --

13

14   Motion for an Order, Pursuant to

15   Section 105(a) of the Bankruptcy Code

16   and Bankruptcy Rule 9019, Approving

17   Stipulation and Agreement Between WMI

18   Liquidating Trust and SPCP Group, LLC

19   Reducing and Allowing Proof of Claim

20   Number 4048                              --        --

21

22

23

24

25

1                    I N D E X (CONT.)

2

3                         RULINGS

4    DESCRIPTION                          PAGE    LINE

5

6    Fourth Motion of Wells Fargo Bank, N.A.,

7    in its capacity as Successor Indenture

8    Trustee and Successor Guarantee Trustee,

9    for Entry of an Order Further Partially

10   Liquidating and Allowing that Aspect of

11   its Proof of Claim Relating to the Trustee's

12   Fees and Expenses                      --       --

13

14   Fourth Motion of Wilmington Trust Company,

15   in its capacity as Trust Preferred Trustee,

16   for Entry of an Order Further Partially,

17   Liquidating and Allowing Proofs of Claim for

18   Fees and Expenses                      --       --

19

20   Fourth Motion of The Bank of New York Mellon

21   Trust Company, N.A. in its capacity as

22   Indenture Trustee, for Entry of an Order

23   Further Partially Liquidating and Allowing

24   Proof of Claim for Fees and Expenses    --       --

25

```
                                                    Page 134

 1                    I N D E X (CONT.)

 2

 3                         RULINGS

 4   DESCRIPTION                                PAGE     LINE

 5

 6   Fourth Motion of Wilmington Trust Company,

 7   in its capacities as Indenture Trustee

 8   and Guarantee Trustee for Five Series of

 9   WMB/CCB Subordinated Notes, for Entry of

10   an Order Liquidating and Allowing Proof

11   of Claim for Fees and Expenses              --       --

12

13   MBS Plaintiffs' Motion to Classify Claim

14   as a Claim 12 Claim                        124       15

15

16   Debtors' Seventieth Omnibus

17   (Substantive) Objection to Claims           36       12

18

19   Debtors' Seventy-Third Omnibus

20   (Substantive) Objection to Late-Filed Claims 50       1

21

22   Debtors' Seventy-Fourth Omnibus

23   (Substantive) Objection to Claims           52       21

24

25
```

Page 135

1                    I N D E X (CONT.)

2

3                       RULINGS

4    DESCRIPTION                        PAGE     LINE

5

6    Motion of Examiner for Entry of

7    Order (1) Discharging Examiner;

8    (2) Approving Disposition of Documents;

9    and (3) Granting Related Relief        61       14

10

11   Motion of Gregory G. Camas to Extend

12   Time to File Proof of Claim, Deeming

13   Proof of Claim Timely Filed, and

14   Classifying Claim as Class 12 Claim

15   Under Seventh Amended Joint Plan of

16   Affiliated Debtors Pursuant to Chapter 11

17   of the United States Bankruptcy Code      --       --

18

19   MBS Plaintiffs' Motion for Order Certifying

20   Class for Purposes of the Class Claim

21   Pursuant to Fed. R. Civ. P. 23 and

22   Fed. R. Bankr. P. 7023 and 9014(c)        --       --

23

24   Washington Mutual, Inc. v. XL Specialty

25   Insurance Co., et al.                     --       --

Page 136

1                    I N D E X (Cont.)

2

3                         RULINGS

4    DESCRIPTION                              PAGE     LINE

5

6    Tenth Interim Fee Applications          64        17

7

8

9

10

11

12

13

14

15

16

17

18

19                              9

20

21

22

23

24

25

1               C E R T I F I C A T I O N

2

3   I, Sherri L. Breach, CERT*D-397, certified that the

4   foregoing transcript is a true and accurate record of the

5   proceedings.

6

7              Sherri Breach        Digitally signed by Sherri Breach
                                    DN: cn=Sherri Breach, o=Veritext, ou,
8                                   email=digital@veritext.com, c=US
                                    Date: 2012.05.08 15:06:43 -04'00'

        SHERRI L. BREACH

9

        AAERT Certified Electronic Reporter & Transcriber

10

        CERT*D -397

11

12

13

        Veritext

14

        200 Old Country Road

15

        Suite 580

16

        Mineola, NY 11501

17

18

19

        Date:  May 8, 2012

20

21

22

23

24

25