## Exhibit 11

**Order Granting Motion for Summary Judgment,**
*In re Commercial Financial Services Inc.*, **Case No. 98-05162-R, Adv. Case No. 98-0356-R**
**(Bankr. N.D. Okla. July 11, 2003) [Docket No. 174]**

122

# FILED

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

JUL 1 1 2003

MICHAEL L. WILLIAMS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| COMMERCIAL FINANCIAL | ) | Case No. 98-05162-R |
| SERVICES, INC., | ) | Chapter 11 |
| and | ) | |
| CF/SPC NGU, INC., | ) | Case No. 98-05166-R |
| | ) | Chapter 11 Jointly Administered with |
| Debtors. | ) | Case No. 98-05162-R |
| NATIONSBANK, N.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Case No. 98-0356-R |
| | ) | |
| COMMERCIAL FINANCIAL | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS, and THE | ) | |
| OFFICIAL COMMITTEE OF ASSET- | ) | |
| BACKED SECURITYHOLDERS | ) | |
| | ) | |
| Intervenors. | ) | |

## ORDER GRANTING COMMERCIAL FINANCIAL
## SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

Before the Court are the following pleadings:

- Commercial Financial Services, Inc.'s Motion for Summary Judgment (Adv. Doc. 122) ("CFS Motion") and Memorandum of Law in Support of Motion of Commercial Financial Services, Inc. for Summary Judgment (Adv. Doc. 123) ("CFS Opening Brief"), both filed on February 7, 2002;

- Commercial Financial Services, Inc.'s Supplement in Support of Motion for Summary Judgment (Adv. Doc. 128) ("CFS Supplement"), filed on March 15, 2002;



JUL 1 1 2003
DOCKETED
Clerk, U.S. Bankruptcy Court
Northern District of Oklahoma

174

- Bank of America, N.A.'s Combined (1) Objection to Commercial Financial Services, Inc.'s February 7, 2002 Motion for Summary Judgment, and (2) Supporting Brief (Adv. Doc. 133) ("BOA Objection"), filed on May 15, 2002;

- Commercial Financial Services, Inc.'s Reply in Support of its Motion for Summary Judgment (Adv. Doc. 143) ("CFS Reply"), filed on June 14, 2002;

- Joint Statement of Intervenors in Support of Commercial Financial Services, Inc.'s Reply in Support of its Motion for Summary Judgment (Adv. Doc. 145) ("Intervenors' Statement"), filed on June 14, 2002; and

- Bank of America, N.A.'s Surreply Regarding Commercial Financial Services, Inc.'s Motion for Summary Judgment (Adv. Doc. 151) ("BOA Surreply"), filed July 19, 2002.

I.    **Jurisdiction**

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(A), (B) and (O); and Miscellaneous Order No. 128 of the United States District Court for the Northern District of Oklahoma:  Order of Referral of Bankruptcy Cases effective July 10, 1984, as amended.  Further, the Court retained post-confirmation jurisdiction to determine adversary proceedings pending on or initiated after the effective date of the Second Amended Plan of Orderly Liquidation entered in the main bankruptcy case on September 14, 2001.  See Order Confirming Second Amended Plan of Orderly Liquidation (Bankr. Doc. 3306) at 18, ¶ P(5).

II.   **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (made applicable herein by Bankruptcy Rule 7056).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses [and]

. . . it should be interpreted in a way that allows it to accomplish this purpose." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Substantive law determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. It is incumbent upon the non-movant to demonstrate that there are genuine issues of fact for trial. See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993). Or as the Seventh Circuit more pointedly articulated in Albiero v. Kankakee, 246 F.3d 927, 933 (7th Cir. 2001), quoting Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir.1999), "summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'"

"[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. Reasonable inferences that may be made from the proffered evidentiary record should be drawn in favor of the non-moving party. See Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000). However, "[i]f the [non-moving party's] evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electric Industrial Co., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

3

### III.   Procedural History

Plaintiff Bank of America, N.A., formerly known as NationsBank, N.A. ("BOA"), filed its Amended Complaint to rescind the purchase of a note (the "Series Note") that it purchased pursuant to a Note Purchase Agreement between BOA and Defendant Commercial Financial Services, Inc. ("CFS"), and to seek a declaration of a constructive trust upon proceeds of the sale of the Series Note (the "Constructive Trust Claim") that BOA claims is traceable into a CFS bank account (the "Fund").[1]

On October 15, 2001, this Court entered an Order Granting in Part and Denying in Part Motions to Dismiss First Amended Adversary Complaint ("Order Resolving Motions to Dismiss") (Adv. Doc. 101) (published as NationsBank, N.A. v. Commercial Financial Services, Inc. (In re Commercial Financial Services, Inc., 268 B.R. 579 (Bankr. N.D. Okla. 2001)), in which the Court had an opportunity to scrutinize the purposes and policies of two provisions of the Bankruptcy Code— Section 541(d), under which BOA claims the Fund is excluded from the estate because, it contends, BOA is the equitable owner of the Fund (under a constructive trust theory) while CFS has only the bare legal title (11 U.S.C. § 541(d), hereinafter "Section 541(d)"), and Section 510(b), upon which CFS relies in arguing that BOA's claim for rescission of its purchase of the Series Note and declaration of constructive trust must be subordinated to prevent BOA from obtaining a greater *pro rata* share of the estate than other similarly situated creditors (11 U.S.C. § 510(b), hereinafter "Section 510(b)"). In its Order Resolving Motions to Dismiss, the Court concluded that BOA's Constructive Trust Claim could not be dismissed as contrary to the policy of Section 510(b)— *i.e.*,

---

[1] Currently, the Fund is held in a reserve account (the "BOA Reserve") which was established to secure payment to BOA in the event that BOA prevails on its Constructive Trust Claim.

4

that rescission of security purchases must be subordinated to claims of equal or higher

priority—while there existed the possibility that BOA might be able to present evidence that Section

510(b) was not even applicable to BOA's rescission claim, inasmuch as BOA asserted that the Series

Note did not even implicate Section 510(b) because it was not a security of CFS or one of its

affiliates.  Order Resolving Motions to Dismiss at 29-30.  The Court found that the Amended

Complaint and the documents attached thereto did not definitively establish that the Series Trust was

a "person" that could qualify as an "affiliate" under the definitions given to those terms by the

Bankruptcy Code.  Id. at 30 n.31.  Thus, dismissal on the pleadings was not appropriate.

Failing to obtain dismissal of the Amended Complaint, CFS filed its Amended Answer,

Affirmative Defenses and Counterclaim of Commercial Financial Services, Inc. to First Amended

Adversary Complaint on November 8, 2001 (the "Amended Answer") (Adv. Doc. 103).  CFS's

affirmative defenses include the contention that BOA is not entitled to a constructive trust "because

such a remedy would violate the federal bankruptcy priority scheme and policies established under

Chapter 5, subchapter I of the Bankruptcy Code in general, and 11 U.S.C. § 507 in particular" and

"pursuant to 11 U.S.C. § 510(b)."  Id. at 20.  CFS also asserted the following as a counterclaim—

> The claims asserted in the First, Second and Third Causes of Action in BOA's
> Complaint, and BOA's request for equitable relief, are claims "arising from
> rescission of a purchase or sale of a security of the debtor [CFS] or of an affiliate of
> the debtor," or are claims "for damages arising from the purchase or sale of such a
> security," as those terms are used in 11 U.S.C. § 510(b).
>
> WHEREFORE, CFS requests that the Court enter judgment pursuant to Section
> 510(b) of the Bankruptcy Code subordinating BOA's claims, and BOA's request for
> equitable relief, to all claims or interests that are senior or equal to such claims.

Id. at 21-22.

5

On December 10, 2001, BOA filed its Reply of Bank of America, N.A. to Counterclaim of

Commercial Financial Services, Inc. (Adv. Doc. 106). As affirmative defenses to the counterclaim,

BOA asserted that (1) pursuant to Section 541(d), the Fund is not property of the estate and is not

subject to distribution under title 11, which makes Section 510(b) inapplicable; (2) the Series Note

was not issued by CFS or its affiliate; (3) "the types of claims and/or interests held by the Bank are

not of the type that are either required or permitted to be subordinated under § 510(b)"; (4) the

Section 510(b) issue has already been adjudicated in the Plan and Confirmation Order; and (5) all

other arguments made in BOA's briefs filed in connection with CFS's Motion to Dismiss are

incorporated therein. Id. at 1-3.

## IV.   Summary of the Arguments of the Parties

In an effort to resolve as a matter of law the outstanding question regarding whether BOA

purchased a security from CFS or an "affiliate," as the term "affiliate" is defined in the Bankruptcy

Code, CFS filed the CFS Motion, the CFS Opening Brief, and appendices containing the

securitization documents and other documentary evidence. CFS again contends that BOA's

Constructive Trust Claim against the Fund must be denied as a matter of law because it is a "claim

arising from rescission of a purchase . . . of a security of the debtor or of an affiliate of the debtor,"

and that Section 510(b) of the Bankruptcy Code requires that such a claim be subordinated to other

claims of equal priority.

First, CFS argues that the Note Purchase Agreement between and among CFS as

administrator, CF/SPC GREAT, Inc. as transferor, Kitty Hawk Funding Corporation and Enterprise

Funding Corporation, as note purchasers, and BOA, as agent and alternative note purchaser, is itself

a "security of the debtor" and that under the securitization documents, the Series Note can be

determined to be a "security" issued directly by CFS.

CFS also claims that the undisputed facts derived from the securitization documents show

that CFS managed and operated the Series Trust and/or the property of the Series Trust.

Management and/or operation of the Series Trust, or its assets, would qualify the Series Trust as an

"affiliate" of CFS under Bankruptcy Code's definition of affiliate and would render the Series Note

a security of an "affiliate of the debtor." Because the imposition of a constructive trust presupposes

rescission of BOA's purchase of the Series Note, CFS argues that BOA's Constructive Trust Claim

is a claim for rescission of the purchase of a security of the debtor or its affiliate which must be

subordinated pursuant to Section 510(b).

BOA argues that CFS's Section 510(b) subordination argument is irrelevant because the

funds BOA seeks to recover are not property of the estate inasmuch as CFS obtained legal title of

the funds by engaging in fraud, which in equity confers *equitable* title to the defrauded purchaser of

the security, BOA. Section 541(d) exempts from the estate property in which a debtor holds, as of

the commencement of the case, bare legal title and no equitable interest. See 11 U.S.C. § 541(d).

BOA also contends that CFS is precluded from asserting Section 510(b) subordination as a

defense to the Constructive Trust Claim because "[t]he Plan and Confirmation Order are *res judicata*

as to any claim for subordination under Section 510(b) of claims against the estate asserted by Asset-

backed Securityholders." BOA Objection at 13 (initial capitals omitted). It is undisputed that as part

of the overall compromise that was embodied in the Plan and Confirmation Order, the adversary

proceeding that CFS had initiated to subordinate all ABS claims (the "Section 510(b) Adversary")

was "deemed dismissed with prejudice" as of the effective date of the Plan. BOA contends that the

7

dismissal of the 510(b) Adversary, coupled with CFS's alleged failure to explicitly reserve the right to seek subordination of the Constructive Trust Claim, resulted in a final adjudication in favor of BOA on the Section 510(b) issue which, BOA contends, may not now be revived by CFS as a defense or counterclaim to the Constructive Trust Claim.

BOA also disputes that the Note Purchase Agreement is a security of CFS as the term "security" is used in Section 510(b) and denies that the Constructive Trust Claim arises from the "purchase" or "sale" of the Note Purchase Agreement.

Finally, BOA contends that disputed issues of material fact regarding the business of the Series Trust preclude a determination that the Series Note is a security of an "affiliate" of CFS. BOA takes the position that notwithstanding its registration as a "business trust," the Series Trust merely holds assets rather than operating them, and therefore it is not a "business trust" as contemplated by federal law. Since business trusts are the only type of trusts that can qualify as "persons" and only "persons" may be "affiliates," BOA argues that the Series Trust can never be an "affiliate of the debtor" and the Series Note cannot be a security of an "affiliate of the debtor."

In its Reply, CFS claims that BOA has not raised any new issue of fact or law to justify a reconsideration of the analysis of the underlying policies and legislative histories amplifying Sections 541(d) and 510(b) of the Bankruptcy Code that this Court announced in the Order Resolving Motions to Dismiss. In exasperated tones, CFS also denies that the Plan and Confirmation Order bar its continuing campaign to subordinate the Constructive Trust Claim.

In the Intervenors' Statement, the Intervenors, comprised of Lloyd Whitaker as Liquidating Trustee of the ABS Liquidating Trust and Stephen A. Jay as Liquidating Trustee of the Unsecured Creditors Liquidating Trust, join in CFS's Reply and, as representatives of the two voting classes

8

of creditors (see Plan at § 6.1), argue that the agreed dismissal of the Section 510(b) Adversary pursuant to the Plan did not adjudicate the subordination issue *on the merits* in favor of either CFS and the unsecured creditors on one hand or in favor of the ABS Trustees or Individual Claimants on the other– rather, only the issue of subordination of ABS Claims was compromised. The Intervenors also argue that the Constructive Trust Claim was a defined term in the Plan and that the Constructive Trust Claim was distinct from the ABS Claims that were compromised and distinct from the other Individual ABS Claims; that the Constructive Trust Claim was defined as a Disputed Claim, not a settled claim, and that it was not, and was not intended to be, settled or compromised in the Plan; and that CFS's subordination defense against the Constructive Trust Claim was expressly preserved in the Plan.

V.     **Material Facts as to Which No Genuine Issue Exists**

    A.     Evidentiary issues

        *1.     The Declaration of Caroline B. Benediktson.*

In support of the CFS Motion, CFS submitted, among other evidence, the Declaration of Caroline B. Benediktson to which fifteen documents are attached (the "CBB Affidavit," CFS App. A and Exhibits A-1 to A-15). In her affidavit, Ms. Benediktson states: "I have personal knowledge of the matters asserted herein." CBB Affidavit at ¶ 1. In support of that statement, she indicates that from August 1994 to December 1998, she served as general counsel of CFS, and from December 1998 to the present, she served as its in-house counsel. CBB Affidavit at ¶ 2. She further states that in the course of her duties, she reviewed the securitization documents attached to the CBB Affidavit, and she testifies that the documents "report or record acts, events, conditions, opinions, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge. Each of

these documents was kept in the course of a regularly conducted business activity,[and] [i]t was the regular practice of that business activity to make these documents." CBB Affidavit at ¶ 3. The CBB Affidavit thus provides a *prima facie* foundation for the admission of the documents and their contents pursuant to Fed. R. Evid. 803(6) and 902(11). The Court concludes that the documents have been properly authenticated and their contents are not hearsay; thus the documents are admissible.

BOA objects to the admission of the affidavit testimony of Ms. Benediktson because the affidavit "omits to indicate if the statements contained therein are made by Ms. Benediktson as a witness or participant in the acts, events and conduct described therein, or if she is stating her interpretation of portions of the documents attached thereto." BOA Objection at 5. To the extent that Ms. Benediktson's testimony reflects her personal interpretation of the documents attached to the affidavit, BOA objects to the admission of her testimony.

It is difficult to determine the precise grounds for BOA's objection to Ms. Benediktson's testimony or which particular statements are objectionable. The case cited by BOA in support of its objection, Harris v. Beneficial Oklahoma, Inc. (In re Harris), 209 B.R. 990 (B.A.P. 10th Cir. 1997), holds that unauthenticated documents attached to a summary judgment motion or brief are not admissible, and that authentication is achieved by attaching a document to an affidavit of a "competent witness through whom the document may be received into evidence." Id. at 996, *quoting* 11 James Wm. Moore, et al., MOORE'S FEDERAL PRACTICE §§ 56.10[4][c][i] & 56.14[2][c] (3d ed. 1997). As stated above, the CBB Affidavit provides testimony of a "competent witness through whom the document[s] may be received into evidence." Authentication is not a problem here.

BOA also refers to <u>Weeks v. Latter-Day Saints Hospital</u>, 418 F.2d 1035 (10th Cir. 1969), for the proposition that "if Ms. Benediktson is testifying as to the contents of the documents attached to her Affidavit, her testimony is inadmissible under Fed. R. Evid. 1002." BOA Objection at 5.[2] In <u>Weeks</u>, the trial court excluded from evidence two documents that the court concluded were misleading because they were taken out of their context.  <u>Weeks</u>, 418 F.2d at 1039.  When the defendant attempted to introduce the contents of the excluded documents into evidence through oral testimony, the trial court refused to allow the testimony, and appropriately so, said the Tenth Circuit, because the documents themselves were the best evidence of their contents.  <u>Id</u>. at 1040.  In this case, however, the Court has found that the documents attached to the CBB Affidavit are admissible; thus, Ms. Benediktson's testimony about the documents may be evaluated in light of what the documents themselves provide.  This is not a situation in which a party is attempting to place into evidence the contents of an inadmissible document or an absent document.

In the CBB Affidavit, Ms. Benedikton does two things: she authenticates the attached documents, and she provides testimony of events that occurred and actions taken by CFS and others in relation to those documents.  Ms. Benediktson stated under oath that she has personal knowledge of these events and actions.  BOA has not controverted any factual statements made by Ms. Benediktson with admissible evidence.  Thus, the CBB Affidavit and its accompanying documents will be admitted into the record for the purpose of evaluating CFS's Motion.[3]

---

[2]Rule 1002 states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress."  Fed. R. Evid. 1002.

[3]To the extent that the CBB Affidavit contains any conclusory statements, however, such statements will not be considered undisputed "facts."  In addition, to the extent that statements made by Ms. Benediktson characterize or summarize the content of any document, such statements were

2.    *Discovery*

BOA complains that it has not been given adequate opportunity for discovery prior to responding to the CFS Motion. BOA Objection at 2-3. This is nonsense. BOA filed its lawsuit on December 23, 1998, and its Amended Complaint on June 23, 1999. While it is true that various Rule 12 motions dominated the early days of this action and briefing on such motions was not closed until June 28, 2001, all preliminary motions were resolved on October 15, 2001. CFS filed its detailed Amended Answer on November 8, 2001, which clearly narrowed the issues in dispute.

CFS's sole basis for summary judgment is its assertion that BOA's Constructive Trust Claim must be subordinated pursuant to Section 510(b) of the Bankruptcy Code. BOA cannot be heard to claim surprise that CFS would file summary judgment based on this defense and counterclaim. BOA has known that CFS would rely upon Section 510(b) as its principal defense since CFS filed its Motion to Dismiss on August 3, 1999. After the Motion to Dismiss was denied in part in October 2001, CFS renewed its Section 510(b) subordination claim as an affirmative defense and a counterclaim in its Amended Answer. In the Joint Status Report filed with the Court on January 17, 2002, CFS disclosed that it intended to file a motion for summary judgment on its Section 510(b) defense. On February 7, 2002, CFS filed its summary judgment motion based on its Section 510(b) defense. BOA was granted additional time, until May 15, 2002, to file its response to the CFS Motion. Thus, to the extent that BOA believed that it required discovery concerning any facts relevant to CFS's Section 510(b) defense before filing the BOA Objection to CFS's Motion, it had ample opportunity to obtain such discovery.

---

verified by the Court by reading the document to which she refers.

On May 30, 2002, CFS filed a motion requesting that discovery be stayed while the CFS Motion was pending because in BOA's Objection, BOA denied only four of CFS's statements of fact and full-blown discovery would be wasteful if summary judgment was eventually granted in CFS's favor. As for the four "disputed" facts, BOA disagrees with CFS's characterization of certain provisions of a document that is an exhibit to the CFS Motion and points to other provisions of the same document to controvert CFS's characterization. Bank of America, N.A.'s Combined (1) Objection to [CFS's] Motion to Stay Discovery and (2) Supporting Brief (Adv. Doc. 144) at 4. BOA suggested that it would have liked to obtain testimony from Ms. Benediktson or the Trustee of the Series Trust to counter CFS's assertion that it managed or operated the property of the Series Trust. Id. at 5. However, nothing prevented BOA from attempting to obtain that testimony prior to filing its Objection.  BOA has not shown that any additional discovery would assist in disputing CFS's statements of fact.

As of May 30, 2002, BOA had done no discovery in this adversary proceeding, although it had participated in and obtained the benefit of the extensive Rule 2004 discovery production made by CFS in the main bankruptcy case.  Soon thereafter, BOA propounded discovery requests. Attachments to [CFS's] Supplemental Memorandum in Support of Motion to Stay Discovery Pending Ruling on Its Motion for Summary Judgment (Adv. Doc. 141). The Court reviewed those discovery requests and concluded that they were not specifically designed to elicit facts needed to controvert the statement of material facts asserted by CFS in its Opening Brief. On June 19, 2002, the Court stayed discovery for 120 days. That period expired on October 17, 2002. BOA has had since October 17, 2002, to conduct additional discovery and supplement its objection, if it desired.

Rule 56(f) of the Federal Rules of Civil Procedure, which is applicable in this proceeding by virtue of Bankruptcy Rule 7056, permits a party opposing a motion for summary judgment to file an affidavit stating reasons why it cannot present facts essential to justify that party's opposition and to request a continuation to permit discovery. Fed. R. Civ. P. 56(f). BOA has not complied with Rule 56(f) or requested that consideration of the CFS Motion be deferred while BOA obtained discovery. Instead, BOA filed its Objection and disputed four facts by referring to other provisions in documents supplied by CFS. In any event, to the extent that BOA desired to obtain discovery after receiving the CFS Motion, it has had since February 7, 2002 (except for the 120 day stay from June 19 to October 17, 2002) to obtain whatever testimony it believed it needed to controvert CFS's statement of facts.

BOA has not been denied time for discovery, and thus, the Court will proceed to decide the CFS Motion on its merits.

### B.   Undisputed material facts

CFS, which was incorporated in Oklahoma in 1986, was founded for the purpose of collecting loans that it purchased from the FDIC, and later, from the RTC and other financial institutions. CFS Opening Brief at 7, Statement of Uncontested Facts ("CFS Facts") ¶¶ 1, 2.[4] In 1995, CFS and/or its affiliates began purchasing delinquent credit card receivables from credit card issuers after the issuers had ceased their own collection efforts and "charged off" the receivables.

---

[4] In connection with each citation to a "CFS Fact," the Court has verified the fact by reviewing the supporting evidentiary material cited and supplied by CFS. As previously noted, BOA objected to four "facts" and in those instances, the Court reviewed the evidentiary material provided by both CFS and BOA to determine whether there was a material factual dispute. The Court has concluded that there are no disputed material facts.

CFS Facts, ¶ 3.  Thereafter, CFS's primary line of business became the acquisition and collection of charged-off credit card receivables.  CFS Facts, ¶ 4.

In 1995, CFS began to "securitize" the loans and charged-off credit card receivables ("Loans") through a series of transactions in which CFS packaged the Loans and transferred such packages to an affiliate of CFS, which in turn sold the Loan packages to a trust.  CFS Facts, ¶ 5. CFS and its affiliate agreed to sell securities backed by the Loan packages to specific investors or to a placement agent  Id.  CFS simultaneously contracted to service the Loans in all respects and to manage the operations of the securitizations that it had established and sponsored.  CFS Facts, ¶ 6. CFS, or one of its affiliates, received the net proceeds from the sale of the securities, a fee for servicing the Loans, and a right to any residual value of the Loans when and if the securities were paid in full.  CFS Facts, ¶ 7.

From 1995 to 1998, CFS promoted fifteen such securitizations.  CFS Facts, ¶ 8.  Each new securitization increased the number of Loans that CFS was required to service; thus, from 1995 to 1998, the number of CFS employees increased from 267 to approximately 3,900.  CFS Facts, ¶¶ 9, 21.

The first thirteen securitizations were accomplished from 1995 to 1998 through what CFS named Securitized Multiple Asset Rated Trusts, which were known as the SMART series of securitizations.   CFS Facts, ¶ 10.  The SMART securitizations raised over $1.5 billion from investors. CFS Facts, ¶ 11.  The final two securizations were called Global Rated Eligible Asset Trust ("GREAT") securitizations. CFS Facts, ¶ 10. Although BOA's claim arises from the GREAT 1998-B securitization, the SMART securitizations are relevant because some of the SMART securitizations were later consolidated into the GREAT securitizations.  In addition, BOA claims to

15

have relied on CFS's representations concerning the performance of the SMART securitizations in choosing to invest in the GREAT 1998-B securitization.

Each of the SMART securitizations was structured in the same general way. CFS Facts, ¶ 12. Each was documented through an integrated package of agreements called the "Basic Documents."[5] CFS Facts, ¶ 13. The SMART securitizations were effectuated as follows: Pursuant to a Contribution and Sale Agreement, CFS or one of its affiliates[6] transferred a package of Loans to a special purpose vehicle ("SPV") that was also an affiliate or wholly-owned subsidiary of CFS and was specifically structured to be "bankruptcy remote." CFS Facts, ¶ 14. The SPV then transferred the Loans to a "bankruptcy remote" trust and the trust issued securities that were secured by the Loans. CFS Facts, ¶¶ 15-16. The SPV caused the securities to be sold to investors or to a placement agent. CFS Facts, ¶ 17. CFS or its affiliates received the proceeds of the sales of the securities, net of various transactional costs and fees. CFS Facts, ¶ 18.

---

[5]CFS provides documents effecting the SMART 97-5 securitization as an example of the structure of the SMART securitizations. CFS App. Exh. A-1, A-2, A-12, A-14 and A-15. Ms. Benediktson testifies that this securitization is representative of the other SMART securitizations.

[6]In the Basic Documents, "affiliate" is a defined term meaning—

With respect to any specified Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

CFS App. Exh. A-2, Sale and Servicing Agreement, at its Appendix A [Definitions] at 1. In the undisputed facts section of this order, the Court uses the term "affiliate" consistent with the above-stated definition. Whether entities are affiliates of CFS under the definition of "affiliate" in the Bankruptcy Code is a disputed legal issue in this case, and the Court's use of the term affiliate in this section is not an indication that the entity referred to is an affiliate under the Bankruptcy Code definition.

CFS was obligated under a servicing agreement to service the Loans– that is, to collect the Loans from the account debtors and make the collection revenues available for payment to the security holders. CFS Facts, ¶ 19. In the servicing agreement, CFS agreed not to resign as servicer unless the performance of its duties under the servicing agreement was no longer permissible under applicable law. CFS Facts, ¶ 20. To discharge its servicing obligations under the servicing agreement, CFS employed thousands of employees and implemented new computer systems to keep up with the rate of growth. CFS Facts, ¶ 21. The servicing agreement also required CFS to perform all of the duties of the trust, including keeping the books of the trust. CFS Facts, ¶ 22.

Securities holders were paid as follows: CFS instructed Loan account debtors to send their payments to a designated lock-box account that CFS established for each securitization. CFS Facts, ¶ 23. On a daily basis, collections were swept from the lock-box account into a designated collection account that CFS established for the benefit of the securities holders. CFS Facts, ¶ 24. Funds in the collection account were paid by a paying agent first to CFS for its servicing fees, then to other entities owed transaction fees, and the remainder to a distribution account, from which the securities holders were paid. CFS Facts, ¶ 25, 26. The paying agent made such payments pursuant to information obtained from CFS by virtue of monthly statements which contained calculations made by CFS as to the total amount available, the amounts of fees payable and "all other amounts required to determine the amounts to be deposited in or paid from each of the Collection Account, the Reserve Account and the Distribution Account." CFS Facts, ¶ 27; CFS App. A-2, § 6.6. CFS also created the monthly statements providing collection and financial information to securities holders and annual statements that securities holders required for tax purposes. CFS App. A-2, § 6.7 and Exh. C.

Beginning in June 1998, CFS, with others, structured the GREAT securitizations, which were to be a series of securitizations based on one "Master Trust." CFS Facts, ¶ 28. The primary difference in structure between the SMART and GREAT securitizations was that the GREAT securitizations employed a second tier of related trusts, known as "series trusts." CFS Facts, ¶ 29. In the GREAT securitizations, the trustee of the series trust was called the Series Owner Trustee. The series trusts issued notes to investors that were backed by a Trust Certificate. CFS Facts, ¶ 30. The Trust Certificate, which was issued to the series trust by the Master Trust, transferred to the series trust an undivided beneficial ownership interest in the Master Trust which held legal title to all of the Loans, including each new package of Loans securitized in each new series. CFS Facts, ¶ 31. With each new addition of a package of Loans to the Master Trust, a new series trust would be formed and notes would be issued to investors (the "Securities Holders"). CFS Facts, ¶ 33.

As with the SMART securitizations, CFS serviced the Loans and performed all the administrative functions of the GREAT securitizations through a master servicing agreement, which was supplemented to take into account each new series. CFS Facts, ¶ 34. On June 30, 1998, CFS entered into the Pooling and Servicing Agreement with CF/SPC GREAT, Inc. ("SPC," as the "Transferor" of the Loans), the Global Rated Eligible Asset Trust (as the "Master Trust" and "Certificate Issuer"), and Bankers Trust Company (acting in two capacities, as Master Trustee of the Master Trust, and as backup servicer in the event CFS became unable to perform servicing under the servicing agreement) (the "GREAT Servicing Agreement"). CFS App. Exh. A-7. The execution of the GREAT Servicing Agreement itself accomplished a number of steps in the securitization process. First, the GREAT Servicing Agreement acted as an instrument of conveyance whereby SPC transferred assets to the Master Trust. CFS App. Exh. A-7, § 2.1. In consideration for the transfer

18

of assets, the Master Trust was to issue securities to be delivered "upon the written order of the Transferor [SPC] pursuant to the Master Trust Agreement and other applicable Series Basic Documents" and a deferred consideration consisting of the right to remove Loans from the Master Trust and receive the residual after all securities were fully paid. Id., §§ 2.3, 4.9. Second, the GREAT Servicing Agreement provided the framework for the administration and servicing of the Loans and "management of the Assets." Id., § 3.1. The Certificate Issuer, that is the Master Trust, appointed CFS to perform these duties. Id.; CFS Facts, ¶ 35.

With respect to these duties, the GREAT Servicing Agreement provides—

(b) The Servicer's [CFS's] duties shall be to service the Loans and manage the Assets in accordance with the provisions of this Agreement and the Servicing Standards, including, without limitation, to collect and post all payments on the Loans, to respond to inquiries of Obligors on the Loans, to investigate delinquencies, to send payment statements to Obligors, to report tax information to Obligors to the extent required by applicable law, to account for collections, and to furnish monthly and annual statements to the applicable Trustees [defined as the Series Owner Trustee, the Series Indenture Trustee and the Master Trustee][7] with respect to distributions.

GREAT Servicing Agreement, CFS App. Exh. A-7, at 10, § 3.1(b). CFS was empowered to "do or cause to be done all things" necessary to collect the Loans owned by the Master Trust, including executing documents and commencing lawsuits in the name and on behalf of the Master Trust, without the need to obtain approval from the Master Trust. Id., § 3.1(c)-(e). CFS was required to "cause all Collections received in respect of any Related Assets to be allocated ratably among the Loans." Id., § 3.1(g).

---

[7] See GREAT Servicing Agreement, CFS App. Exh. A-7, its Appendix A [Definitions] at 28.

In addition to servicing, the GREAT Servicing Agreement obligated CFS to perform all administrative duties for the Master Trust and the Series Trust. Section 11.1 of the agreement provides—

> (a) Servicer [CFS] shall perform all its duties and the duties of Certificate Issuer [the Master Trust] under the Master Trust Agreement and each Series Note Issuer [the Series Trust] under each Series Trust Agreement and shall consult with the Master Trustee and each Series Owner Trustee as Servicer deems appropriate regarding the duties of Certificate Issuer under the Master Trust Agreement and the duties of each Series Note Issuer under each Series Trust Agreement. Servicer [CFS] shall monitor the performance of Certificate Issuer and each Series Note Issuer and shall advise the Master Trustee and each Series Owner Trustee when action is necessary to comply with Certificate Issuer's duties under the Master Trust Agreement or each Series Note Issuer's duties under the applicable Series Trust Agreement. Servicer [CFS] shall prepare for execution by Certificate Issuer and each Series Note Issuer or shall cause the preparation by other appropriate Persons of all such documents, reports, filings, instruments, certificates and opinions as it shall be the duty of Certificate Issuer or such Series Note Issuer to prepare, file, or deliver pursuant to the Master Trust Agreement or Series Trust Agreement. In furtherance of the foregoing, Servicer [CFS] shall take all appropriate action that is the duty of Certificate Issuer to take pursuant to the Master Trust Agreement or any Series Note Issuer to take pursuant to the applicable Series Trust Agreement.

GREAT Servicing Agreement, CFS App. Exh. A-7 at 45, § 11.1(a). The agreement also restricted CFS from taking certain non-ministerial actions without notifying the Master Trustee and Series Owner Trustee and giving them an opportunity to withhold consent. These actions included amending or supplementing any of the Basic Documents and appointing successor agents or trustees. Id., § 11.1(b). CFS was also obligated to "maintain appropriate books of account and records relating to services performed under this Agreement, which books of account and records shall be accessible for inspection by Certificate Issuer and each Series Note Issuer at any time during normal business hours." Id., § 11.2. Additionally, CFS was required to

> (a) maintain (or cause to be maintained) the books of the Certificate Issuer [Master Trust] on a calendar year basis on the accrual method of accounting and (b) deliver

> to each Holder [defined as any Certificateholder or Noteholder], as may be required
> by the Code and applicable Treasury Regulations or otherwise, such information as
> may be required to enable each Holder to prepare its federal income tax return.

Id. at 18, § 4.5; CFS Facts, ¶ 36.

With respect to payments to Securities Holders, CFS determined the amount to be paid each

month from the collection and distribution accounts and provided a report to the Master Trustee and

the paying agent for each series. CFS Facts, ¶ 38.  Section 6.6 of the GREAT Servicing Agreement

provided—

> On or before each Delivery Date,[8] the Servicer [CFS] shall calculate the Total
> Available Amount,[9] the Servicing Fee, the Master Backup Servicing Fee for each
> Series, the Series Owner Trustee Fee for each Series, the Series Indenture Trustee Fee
> for each Series and all other amounts required to determine the amounts to be
> deposited in or paid from each Collection Account, information concerning
> Converted Loans, the Series Reserve Account for each Series and the Series
> Distribution Account for each Series, each as of the related Determination Date and
> shall provide a summary of the results of such calculations to the Master Trustee and
> each Series Paying Agent.

Id. at 30, § 6.6.  CFS was responsible for "accounting for collections, and to furnish monthly and

annual statements to the applicable Trustees with respect to distributions." Id. at 10, § 3.1(b). CFS

was also to deliver to a monthly statement to the Depository Trust Company, the backup servicer

---

[8]Delivery Date is defined at page 7 of Appendix A to the agreement as "the seventh Business
Day (but in no event later than the eleventh calendar day) after the related Determination Date for
such Monthly Period."  The Determination Date is "the last calendar day in [each] such Monthly
Period." Id. at 8.

[9]The Total Available Amount for each Monthly Period was (i) all Collections on the Loans
received during such Monthly Period, (ii) the Warranty Payment or Administrative Purchase
Payment for each Loan that was assigned to the Transferor or purchased by the Servicer during such
Monthly Period, (iii) all Investment Earnings on amounts on deposit in the Collection Account
during such Monthly Period and (iv) all other immediately available funds on deposit in the
Collection Account . . . immediately prior to such Distribution Date."  GREAT Servicing
Agreement, Appendix A [Definitions] at 27.

[Bankers Trust] and each Security Holder. Id. at 30, § 6.7(a)-(b), and Exhibit C to the agreement.

On each Distribution Date, based upon the information contained in the monthly statements delivered by CFS, the Master Trustee [Bankers Trust] was to distribute funds from the Collection Account in the following order: first to pay the Master Trustee's fee, then to pay CFS's current servicing fees and prior unpaid servicing fees and then to reimburse CFS for certain accounting fees. Id. at 18-19, § 4.7. From the remaining funds collected by CFS, and using the calculations and reports provided by CFS, a paying agent was to make payments to the Security Holders. GREAT Series Trust 1998-B Trust Agreement ("Series Trust Agreement"), CFS App. Exh. A-8 at 8, § 5.1.

Section 5.10 of the GREAT Servicing Agreement, entitled "Non-consolidation with CFS," provided that –

> CFS shall be operated in such a way that none of the Certificate Issuer [Master Trust], the Transferor [SPC], nor any Series Note Issuer [Series Trust] would be substantively consolidated in the bankruptcy estate of CFS, and the separate existence of each of the Certificate Issuer, the Transferor and each Series Note Issuer would not be disregarded in the event of CFS's bankruptcy. . . .

Id. at 22, § 5.10. This paragraph is followed by fifteen subparagraphs describing actions the entities shall or shall not take to preserve the separate nature of each entity, such as observing entity formalities, appointing independent directors, maintaining separate bank accounts, requiring consideration for services, separating assets, debts, and financial statements, maintaining arm's length relationships, and conducting business in their own names. Id. at 23-25. In that context, the agreement provides—

> None of the Certificate Issuer [Master Trust], any Series Note Issuer [Series Trust] or the Transferor [SPC], on one hand, nor CFS or any of its Affiliates (other than the Transferor, as applicable), on the other hand, will be or will hold itself out to be responsible for the debts of the other or the decisions or actions respecting the daily business and affairs of the other.

Id. at 25, § 5.10(xiii).

The GREAT Servicing Agreement was executed by Ms. Benediktson as vice president of the SPC that transferred the Loans, and by Ms. Benediktson as vice president of CFS as servicer. Id. at S-1. The First GREAT securitization, GREAT 1998-A, closed on June 30, 1998. CFS Facts, ¶ 41.

The Master Trust Agreement and GREAT Servicing Agreement also served as the basis of the "Series Basic Documents" for the GREAT 1998-B securitization. CFS Facts, ¶ 42. The GREAT 1998-B Servicing Supplement (CFS App. Exh. A-3, the "1998-B Supplement") defined the GREAT 1998-B "Series Basic Documents" as the "Contribution and Sale Agreement, the Master Trust Agreement, the Pooling and Servicing Agreement, the Lock-Box Agreement, the Series Trust Agreement, the Series Indenture, the Series Interest Rate Cap, the Securities, this Series Supplement, the Series Purchase Agreements, the Custodian Agreement and such other documents and certificates delivered in connection therewith." 1998-B Supplement at 8.

BOA invested in the GREAT 1998-B securitization by purchasing the Series Note, and thereby became a Security Holder. In early 1998, BOA and Nationsbanc Montgomery Securities LLC ("NMS") entered into discussions with CFS regarding, among other things, a commitment by BOA to invest up to $600 million in securities through a conduit facility. CFS Facts, ¶ 43. On April 1, 1998, NMS prepared an Initial Credit Approval Recommendation ("Recommendation") relating to the creditworthiness of CFS. CFS Facts, ¶ 44. The author recommended initial credit approval for a $600 million facility in which BOA and its affiliates would purchase securities backed by a pool of loans consisting of charged-off credit card receivables that would be serviced by CFS. The

Recommendation is submitted by CFS as Appendix C.[10] In arriving at its recommendation that BOA

and its affiliates enter into a transaction with CFS, the author discussed and evaluated CFS's history,

operational capacity, financial strength, sources of revenue, and ratings of its prior securitizations.

In supporting its recommendation for a $600 million facility, the author stated–

> Based on [CFS's] existing relationships with Goldman [Sachs], Chase, and [Bankers
> Trust], this transaction provides a unique opportunity for NationsBank to step into
> a dominant position as a financial advisor to the [sic] CFS. Other considerations
> include (i) the Company's dominant position in the industry, (ii) the strength of the
> credit rating of CFS's previous securitizations (A ratings by the four major agencies),
> and (iii) the potential of NMS to step into a strong position for [CFS's] initial public
> offering (anticipated in late 1998); NationsBanc Montgomery Securities LLC
> recommends the initial credit approval of NationsBank, N.A. for the transaction
> described herein.

Recommendation, CFS App. C at 13; CFS Facts, ¶ 49.

The discussions between CFS, BOA and NMS culminated in the execution of the Note

Purchase Agreement dated July 1, 1998, which committed BOA to purchase up to $430 million in

one or more series notes in the future. CFS Facts, ¶ 50; Note Purchase Agreement, CFS App. D at

11, §§ 2.1 and 2.2, and at 6 (see "Facility Limit"). The Note Purchase Agreement is a contract

between and among CFS as Administrator; CF/SPC GREAT, Inc., a special purpose vehicle wholly

owned by CFS, as Transferor of Loans ("SPC GREAT"); two commercial paper conduits

administered by BOA: Kitty Hawk Funding Corporation ("Kitty Hawk") and Enterprise Funding

Corporation ("Enterprise"), as Purchasers; and NationsBank (BOA) as Agent for the

Purchasers/conduits (and other participating financial institutions) and as Alternate Purchaser. CFS

---

[10]Although not authenticated by affidavit, BOA has not objected to the admission of CFS
Appendices B-E, and therefore the documents are admitted for the purpose of considering summary
judgment. Appendix B is a copy of a petition filed by BOA in Tulsa County District Court;
Appendices C and E appear to be documents created by BOA or its affiliates; and Appendix D is a
copy of the Note Purchase Agreement that was attached to BOA's Amended Complaint.

Facts, ¶ 52. Neither the Master Trust nor the Series Trust was a party to the Note Purchase

Agreement.

The Note Purchase Agreement provided that CFS's subsidiary, SPC GREAT, would sell (or

cause to be sold) a series note to the purchasers/conduits and BOA. Section 2.1 provided—

> Upon the terms and subject to the conditions set forth herein, (x) the Transferor [SPC
> GREAT], or the Administrator [CFS] on its behalf, may, at its option, sell or cause
> to be sold to the Agent [BOA], on behalf of the Purchasers or the Alternative
> Purchasers, as applicable, and (y) the Agent [BOA], on behalf of the Purchasers,
> may, provided that the Termination Date shall not have occurred, at each Purchaser's
> respective option, or the Agent [BOA], on behalf of the Alternative Purchasers,
> provided that the Termination Date shall not have occurred, shall, if so requested,
> purchase, without recourse except as provided herein, the Series Note, identified on
> the related Additional Note Purchase Supplement hereto for the Purchase Price set
> forth therein, not to exceed the Principal Facility Limit.

CFS App. D, Note Purchase Agreement at 11, § 2.1.[11] Section 2.2 provided for the sale of additional

series notes to Purchasers.

In conjunction with offering the series note identified above to prospective purchasers, CFS

prepared a Private Placement Memorandum (the "98-B PPM"). CFS App. Exh. A-6 at v; CFS Facts,

¶ 54. The 98-B PPM sets forth in detail CFS's role in the securitization. The 98-B PPM identified

the Master Trust as the Certificate Issuer, the Series Trust as the Series Note Issuer, CFS as the Initial

Seller and Servicer, SPC GREAT as the Transferor, and NMS as the Placement Agent and Initial

Purchaser for the 1998-B securitization. The 98-B PPM describes a proposed transaction in which

the Master Trust issues a certificate to the Series Trust, which certificate "represents[s] the right to

receive . . . on each Distribution Date, accrued and unpaid Administrative Distributions . . . for such

Series and all principal and interest on the Securities of such Series due to the holders thereof on

---

[11]The series note identified in § 2.1 is the Series Note at issue in this case.

such Distribution Date." CFS App. Exh. A-6 at ii. "The only source of funds available to the

Certificate Issuer to pay interest and principal on the Trust Certificate will be the payments in respect

of principal and interest collections and other proceeds of the Transferred Assets [the Loans]." Id.

These Loans are the receivables purchased initially by CFS or its affiliate and sold or contributed by

CFS to another affiliate, the Transferor, who transfers the Loans to the Master Trust, which has a

contract with CFS for servicing. Id. at iv.

The 98-B PPM further provides that the Series Trust would hold the Trust Certificate and

issue notes in an aggregate principal amount of up to $198,699,650. The notes were to be issued

pursuant to a 1998-B Series Indenture with Bankers Trust as Indenture Trustee. Under the Indenture,

the notes would be secured by the Trust Certificate and other assets. The 98-B PPM further stated

that the "only source of funds available to the Series Note Issuer [Series Trust] to pay interest and

principal on the Notes . . . will be the payments in respect of principal and interest that the Series

Note Issuer receives from the Certificate Issuer [Master Trust] with respect to the Trust Certificate."

Id. at iii. Again, these are CFS's collections on the Loans.

The 98-B PPM warned that CFS's servicing performance was fundamental to the

performance of the Securities and that in the event CFS is no longer able or available to service the

Loans, "[t]here may . . . be few or no successor Servicers capable of achieving comparable collection

performance." Id. at 30; CFS Facts, ¶ 58. The PPM further explained that CFS had experienced

significant growth since 1996 and that the success of the servicing the loan pools depended upon

CFS being able to hire and train sufficient personnel. "No assurance can be given as to the ability

of the Servicer to meet its future personnel requirements." CFS App. Exh. A-6 at 29.

The 98-B PPM directed prospective investors to contact CFS (rather than the Master Trust

or Series Trust) for information regarding the transaction. CFS Facts, ¶ 56.

> Investors interested in purchasing the Securities should conduct an independent
> investigation of the Securities, CFS, the Transferor, the Certificate Issuer, the Series
> Note Issuer and the Loans. Officers of CFS are available to answer questions
> concerning the Securities, CFS, the Transferor, the Certificate Issuer, the Series Note
> Issuer and the Loans and will, upon request, make available such other information
> as investors may reasonably request.

CFS App. Exh. A-6 at v. BOA conducted its due diligence directly with CFS personnel. CFS Facts,

¶ 57.

In early September 1998, CFS notified BOA that a new series note, the GREAT 1998-B

Series Note (the "Series Note"), would be issued on September 30, 1998. CFS Facts, ¶ 60. On or

about September 30, 1998, pursuant to the commitment made in the Note Purchase Agreement,

BOA, on behalf the conduits, Kitty Hawk and Enterprise, purchased the Series Note issued by the

1998-B Series Trust (the "Series Trust") for $189 million. CFS Facts, ¶ 61. This transaction

occurred as follows:

CFS transferred a package of Loans to SPC GREAT pursuant to the GREAT Contribution

and Sale Agreement (CFS App. Exh. A-11). CFS Facts, ¶ 62. SPC GREAT transferred the Loans

to the Master Trust pursuant to the GREAT Servicing Agreement (CFS App. Exh. A-7). CFS Facts,

¶ 63. The Master Trust, a Delaware business trust, entered into the Series Trust Agreement with

Wilmington Trust Company ("Wilmington"), as Series Owner Trustee, to form the Series Trust,

which was also a Delaware business trust (CFS App. Exh. A-8). CFS Facts, ¶ 64. Pursuant to

Sections 4.2(b) and 5.1 of the Master Trust Agreement and Section 2.3 of the GREAT Servicing

Agreement, and at the direction of SPC GREAT, the Master Trust issued a Trust Certificate to the

27

Series Trust, giving the Series Trust an undivided beneficial ownership interest in the Master Trust,

which held legal title to the Loans.[12]  CFS Facts, ¶ 65.  This beneficial interest related to newly

acquired Loans transferred pursuant to the 1998-B securitization, to the Loans transferred to the trust

in the 1998-A securitization, and to any future Loans from future securitizations.  CFS Facts, ¶ 66.

The parties to the Series Trust Agreement, which created the Series Trust, declared that it was

their intention that the Series Trust be a business trust under the Delaware Business Trust Statute.

CFS App. Exh. A-8, § 2.6; CFS Facts, ¶ 67.  Section 2.6 of the Series Trust Agreement states, in

part–

> It is the intention of the parties hereto that the Series Note Issuer [the Series Trust]
> constitute a business trust under the Business Trust Statute and that this Agreement
> constitute the governing instrument of such business trust. . . . Effective as of the date
> hereof, the Series Owner Trustee [Wilmington] shall have all rights, powers and
> duties set forth herein and, to the extent not inconsistent herewith, in the Business
> Trust Statute with respect to accomplishing the purposes of the Series Note Issuer
> [Series Trust].  The Series Owner Trustee shall file the Certificate of Trust
> substantially in the form of Exhibit B hereto with the Secretary of State of Delaware.

---

[12]Section 2.3 of the GREAT Servicing Agreement provides–

> In consideration of the transfer of the Transferred Assets to the Certificate Issuer [the
> Master Trust], upon request of the Transferor [SPC GREAT], the Certificate Issuer
> [the Master Trust] will cause Securities in authorized denominations to be duly
> authenticated and delivered to or upon the written order of the Transferor pursuant
> to the Master Trust Agreement and other applicable Series Basic Documents.

CFS App. Exh. A-7 at 2, § 2.3.  Section 4.2 of the Master Trust Agreement provides–

> Each Trust Certificate of each Series will represent a fractional undivided beneficial
> interest in the Certificate Issuer [the Master Trust].  The Series Note Issuer [the
> Series Trust] for each Series will be entitled to receive, on each Distribution Date, the
> Series Available Amount for such Series in accordance with the terms of the Pooling
> and Servicing Agreement.

CFS App. Exh. A-4, at 12, § 4.2(b).

CFS App. Exh. A-8 at 5, § 2.6. The Certificate of Trust of GREAT Series Trust 1998-B was filed

with the Delaware Secretary of State. CFS Facts, ¶ 68. The State of Delaware thus recognizes that

the Series Trust was "duly formed under the laws of the State of Delaware and is in good standing

and has a legal existence so far as the records of this office show, as of the thirtieth day of

September, A.D. 1998." Certificate of Good Standing, CFS App. Exh. A-10.

As previously noted, for the GREAT 1998-B transaction, the GREAT Servicing Agreement

and the Master Trust Agreement were supplemented by the 1998-B Supplement (CFS App. Exh. A-

3). CFS Facts, ¶ 77. The 1998-B Supplement, by and among SPC GREAT as Transferor, CFS as

Servicer, the Master Trust as Certificate Issuer, and Bankers Trust as Master Trustee and Backup

Servicer, provides in its recitals–

> Pursuant to the Master Trust Agreement, dated as of June 30, 1998 (. . . as
> supplemented hereby . . . ), between the Transferor and the Master Trustee, in
> connection with the issuance of a Series, the Transferor may from time to time issue,
> and direct the Master Trustee to authenticate, on behalf of the Master Trust, one or
> more Series of Certificates representing interests in the Transferred Assets.
>
> Pursuant to the Pooling and Servicing Agreement, dated as of June 30, 1998 (. . . as
> supplemented hereby . . .), among Transferor, Servicer, Master Backup Servicer and
> Master Trustee, the Series Supplement for any Series shall set forth certain terms and
> conditions with respect to such Series as shall be permitted by the Pooling and
> Servicing Agreement and otherwise required in connection with the issuance of such
> Series. Each of the Master Trust Agreement and the Pooling and Servicing
> Agreement provide that certain terms applicable to a Series are to be set forth in a
> Series Supplement. This Series Supplement is a "Series Supplement" as that term
> is defined in Appendix A to the Pooling and Servicing Agreement.
>
> Pursuant to this Series Supplement, the Transferor and the Certificate Issuer shall
> create a Series of Securities (the "Series 1998-B Securities") and specify certain of
> their terms.

1998-B Supplement at 1. This document further provides that "[c]apitalized terms used and not

otherwise defined herein are used as defined in Appendix A to the Pooling and Servicing Agreement.

If a term is defined here and in Appendix A, the definition herein shall control." Id. at § 1.1.[13] The Series Owner Trustee, Wilmington, signed the 1998-B Supplement on behalf of the Series Trust. CFS Facts, ¶ 78.

As previously noted, the GREAT Servicing Agreement and the other documents listed as Basic Documents gave CFS broad powers and imposed obligations on CFS not only to service the Loans, but also to perform all functions allocated to the trustees of the Master Trust and the Series Trust, i.e., CFS employees executed all banking transactions required under the documents, performed all necessary calculations and actions required for collection, allocation, payment and distribution of the proceeds of the Loans, generated reports to trustees and Securities Holders, issued tax statements, and generally performed all steps in the securitization process save actually making payments to the Security Holders, which was performed by a Paying Agent using information provided by CFS. CFS App. Exh. A-7, §§ 3.1 and 11.1.

## VI.    Conclusions of Law

A.    Does the treatment of the ABS claims in the Plan bar CFS's Section 510(b) defense and counterclaim in this adversary proceeding under the doctrine of *res judicata*?

BOA suggests that the Court should refrain from considering the merits of CFS's Section 510(b) defense and counterclaim because, BOA contends, the provision in the Plan and Confirmation Order that dismisses with prejudice the adversary proceeding styled Commercial Financial Services, Inc. v. Norwest Bank Minnesota, N.A., et al., Adv. Case No. 00-0002-R (the "Section 510(b)

---

[13]The Court spells out these sections of the Supplement because BOA disputes CFS's characterization that the 1998-B Supplement "incorporated" the GREAT Servicing Agreement. BOA Objection at 6. Based on the quoted recitals, the Court concludes that technically the GREAT Servicing Agreement is *supplemented* by the 1998-B Supplement, but this distinction does not appear to be material.

Adversary") constitutes *res judicata* of all Section 510(b) claims, including CFS's defense and counterclaim. BOA further contends that its *res judicata* defense to the counterclaim presents factual issues that preclude summary judgment. BOA Objection at 13. BOA has not presented evidence to frame any particular factual dispute requiring a trial on the *res judicata* issue, however. Thus, the inquiry is whether the undisputed facts that are before the Court are sufficient to preclude summary judgment in favor of CFS on BOA's *res judicata* defense.

As the proponent of an affirmative defense upon which BOA would have the burden of proof at trial, BOA has the burden, in defending against summary judgment, of coming forward with sufficient facts to establish the elements of its defense. F.D.I.C. v. Giammettei, 34 F.3d 51, 54-55 (2d Cir. 1994). In connection with its *res judicata* defense, BOA fails to comply with the Local Rule of this Court governing summary judgment which requires the non-movant to supply the Court with a statement of additional material facts in separately numbered paragraphs and supported by evidentiary materials. See Local Rule 7056(b). Instead, BOA incorporates into its argument various references to pleadings, orders and transcripts. These documents are attached as exhibits to BOA's Objection. CFS and the Intervenors have not objected to the procedure or the exhibits. The Court recognizes these exhibits as pleadings, orders and transcripts filed in either CFS's main bankruptcy case, Case No. 98-05162-R, or in the Section 510(b) Adversary. Although the Court would be justified in striking BOA's *res judicata* argument for non-compliance with the Local Rule, in the service of expediency and in recognition of the bias toward adjudicating issues on their merits, the Court will take judicial notice that BOA's exhibits are copies of documents that were filed with this Court and will consider the content of the exhibits for what they are: pleadings, orders and transcripts of hearings. Resolution of the *res judicata* issue at this juncture will advance the merits of the case

and will not prejudice any party, and in any case, no one has objected to BOA's defective procedure.[14]

Thus, the record on summary judgment for BOA's *res judicata* defense consists of the Second Amended Plan of Orderly Liquidation (Bankr. Doc. 3304) (the "Plan");[15] the Order Confirming Second Amended Plan of Orderly Liquidation (Bankr. Doc. 3306) ("Order Confirming Plan") attached to BOA Objection as Exhibit A; the First Amended Complaint to Disallow, Subordinate and/or Liquidate Asset-Backed Securities Claims ("Section 510(b) Complaint") in the case of Commercial Financial Services, Inc. v. Norwest Bank Minnesota, National Association, Adv. Case No. 00-0002-R (Adv. Doc. 15);[16] the First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (Bankr. Doc. 3069) ("Disclosure Statement");[17] and the Transcript of the Proceedings, August 29, 2001 (Bankr. Doc. 3358) (the "Transcript").[18]

In the Section 510(b) Adversary, CFS sued Norwest Bank Minnesota, N.A. ("Norwest") and Bankers Trust Company ("Bankers Trust") in their respective capacities as Trustee and Back-up Servicer of the SMART and GREAT securitization trusts. Bankers Trust was the Trustee and Back-

---

[14]The Court has the power and discretion to waive its own rules. See Local Rule 1001(c).

[15]The copy of the Plan attached as BOA's Exhibit B is incomplete; the complete Plan that was filed in the case will be considered by the Court.

[16]The copy of the Section 510(b) Complaint attached as BOA's Exhibit C is incomplete; the full complaint that was filed in the Section 510(b) Adversary will be considered by the Court.

[17]The copy of the Disclosure Statement attached as BOA's Exhibit D is incomplete; the complete Disclosure Statement that was filed in the bankruptcy case will be considered by the Court. The Court notes that CFS attached a complete copy of the Disclosure Statement to the CFS Reply as Exhibit A.

[18]The copy of the Transcript attached as BOA's Exhibit E is incomplete; the complete transcript that was filed in the bankruptcy case will be considered by the Court.

32

up Servicer of the GREAT 1998-B Series Trust, which is the Series Trust that issued the Series Note

to BOA. Section 510(b) Complaint at 2. In the Section 510(b) Complaint, CFS sought to

subordinate the claims that Bankers Trust had filed on behalf of itself and on behalf of beneficiaries

of the securitization trusts, including BOA. In paragraph 75 of the Section 510(b) Complaint, CFS

alleged—

> On or about June 11, 1999, BT [Bankers Trust] filed Proof of Claim No. 104 (the
> "GREAT 1998-B Claim") in the amount of $186,814,900.58, a copy of which
> (without exhibits) is included in the Appendix as Exhibit 61 and is incorporated
> herein by reference. The GREAT 1998-B Claim states that "[t]his Proof of Claim
> is asserted by Bankers Trust on behalf of Bankers Trust, the Noteholders and the
> Certificateholders . . ." [citation omitted]. In the GREAT 1998-B Claim, BT asserts
> claims against CFS's estate arising from CFS's purported breaches of the Servicing
> Agreement (as supplemented by the GREAT 1998-B Servicing Agreement
> Supplement) and the GREAT Contribution Agreement. . . . BT also seeks to have
> CFS repurchase the GREAT 1998-B Assets under Section 3.7(c) of the GREAT
> Servicing Agreement and Section 3.3 of the GREAT Contribution Agreement.

Section 510(b) Complaint at 36, ¶ 75. In a footnote, CFS stated: "The GREAT 1998-B Claim filed

by BT covers the same claims asserted by BOA in its adversary complaint against CFS (Adv. No.

98-0356-R) in which BOA seeks imposition of a constructive trust." Id. at 36 n.7. In Count XIV

of the Section 510(b) Complaint, CFS requested subordination of the GREAT 1998-B Claim

pursuant to Section 510(b). Id. at 96, ¶¶ 359-68. After alleging that the GREAT 1998-B is a

Delaware business trust and therefore a "corporation" that can be an "affiliate" of CFS, and that the

GREAT 1998-B Basic Documents are "securities" of CFS, CFS stated—

> Notwithstanding BT's attempt to characterize the GREAT 1998-B Claim as
> a breach of contract claim, the GREAT 1998-B Claim is a claim "arising from
> rescission of a purchase or sale of a security of the debtor [CFS] or of an affiliate of
> the debtor," or a claim "for damages arising from the purchase or sale of such a
> security," as those terms are used in 11 U.S.C. § 510(b).

> Section 510(b) of the Bankruptcy Code mandates that the GREAT 1998-B
> Claim be subordinated to all claims or interests that are senior or equal to such claim,
> including, without limitation, the claims of CFS's general unsecured creditors.

Section 510(b) Complaint at 96, ¶¶ 367-68. The predecessor of the UCLT was permitted to

intervene in the Section 510(b) Adversary in order to protect the interests of its constituents, whose

claims would be diluted by approximately $1.4 billion in additional claims if the ABS Trustees'

breach of contract claims were not subordinated. The Section 510(b) Complaint also served as an

objection to the priority of the Trustees' claims. Thus, resolution of the Section 510(b) Adversary

was crucial not only to the unsecured creditors, who were in danger of having their claims diluted,

but also to the Securities Holders, who would receive nothing under a liquidating plan if CFS

succeeded in subordinating the Trustees' claims.

BOA's *res judicata* defense is premised upon the language contained in Section VI (I) of the

Disclosure Statement, Section 5.47 of the Plan, and paragraph 23 of the Order Confirming Plan.

BOA claims that because these provisions dismiss the Section 510(b) Adversary with prejudice and

therefore bar CFS from asserting subordination against the ABS Trustees' Claims, which included

the Bankers Trust's claim arising from the GREAT 1998-B securitization, CFS is barred from

seeking subordination of the Constructive Trust Claim.

Section VI (I) of the Disclosure Statement states–

> The Plan shall constitute a compromise and settlement pursuant to Section
> 1123(b)(3)(A) of the Bankruptcy Code as set forth in the terms of the Plan with
> respect to all rights, claims, causes of action, controversies and disputes arising under
> or relating to the Section 510(b) Adversary and/or the Interim Agreement Dispute.
> CFS, the OCUC, the ABS Committee, the ABS Trustees, all holders of Claims and
> Interests, and all other parties in interest, and their respective successors and assigns,
> shall be bound by such compromise and settlement and the terms of the Plan. As of
> the Effective Date, the Section 510(b) Adversary shall be deemed dismissed with

prejudice, and the ABS Claims filed by the ABS Trustees shall be Allowed and treated as set forth in the Plan. . . .

Disclosure Statement at 52. Section 5.47 of the Plan similarly provides—

> The Plan shall constitute a compromise and settlement pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code as set forth in the terms of this Plan with respect to all rights, claims, causes of action, controversies and disputes arising under or relating to the Section 510(b) Adversary and/or the Interim Agreement Dispute. CFS, the OCUC, the ABS Committee, the ABS Trustees, all holders of Claims and Interests, and all other parties in interest, and their respective successors and assigns, shall be bound by such compromise and settlement and the terms of the Plan. As of the Effective Date, the Section 510(b) Adversary shall be deemed dismissed with prejudice, and the ABS Claims filed by the ABS Trustees shall be Allowed and treated as set forth in this Plan. . . .

Plan at 32, § 5.47. And the Order Confirming Plan provides—

> Section 1123(b)(3)(a) of the Bankruptcy Code permits the Plan to provide for the settlement or adjustment of any claim or interest belonging to CFS. Section 5.47 of the Plan provides for the compromise and settlement of all rights, claims, causes of action, controversies and disputes arising under or relating to the Section 510(b) Adversary and/or the Interim Agreement Dispute. The Court finds that the compromise and settlement of the Section 510(b) Adversary and the Interim Agreement Dispute brokered by CFS was negotiated in good faith and at arms length by the OCUC and the ABS Committee. . . . The Court finds that CFS is receiving adequate consideration for the compromises and settlements contemplated in these sections and other provisions of the Plan. The Court further finds that all compromises and agreements embodied in the Plan which have not been approved previously by Final Order of the Bankruptcy Court are, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, fair, reasonable, in the best interests of CFS and its creditors, and a reasonable exercise of CFS's business judgment; constitute substantial, integral and material elements of the Plan, essential to the consummation of the transactions contemplated by the Plan and upon which creditors relied in connection with their voting on the Plan; and are authorized under Section 1123(b)(3)(a) of the Bankruptcy Code.

Order Confirming Plan at 8-9, ¶ 23.

The Plan and Confirmation Order are binding on CFS, the Intervenors and BOA. "It is well-settled that a confirmed chapter 11 plan has a binding effect on both debtors and claimants under the

plan, and functions as a judgment with regard to the parties bound by the plan." Tor Husjord

Shipping v. Port Isabel/San Benito Navigation District (In re Burton Securities, S.A.), 202 B.R. 411,

418 (S.D. Tex. 1996), aff'd 129 F.3d 607 (5th Cir. 1997) (Table), citing Laing v. Johnson (In re

Laing), 31 F.3d 1050, 1051 (10th Cir. 1994). Further, Section 1141(a) of the Bankruptcy Code,

entitled "Effect of confirmation," provides—

> Except as provided in subsections (d)(2) [concerning debts excepted from discharge
> under section 523] and (d)(3) [concerning exceptions to discharge] of this section,
> the provisions of a confirmed plan bind the debtor, any entity issuing securities under
> the plan, any entity acquiring property under the plan, and any creditor, equity
> security holder, or general partner in the debtor, whether or not the claim or interest
> of such creditor, equity security holder, or general partner is impaired under the plan
> and whether or not such creditor, equity security holder, or general partner has
> accepted the plan.

11 U.S.C. § 1141(a). Thus, the provisions of the Plan and Confirmation Order replace and supersede

the pre-confirmation relationships between CFS and the ABS Trustees and between CFS and BOA.

The Plan and Confirmation Order also represent the terms of the settlement of the Section 510(b)

Adversary. One term of the settlement was that the Section 510(b) Adversary would be dismissed

with prejudice. But nothing in the Plan or Confirmation Order indicates any intention by CFS to

settle or otherwise compromise the Constructive Trust Claim or this litigation. As set forth herein

infra, other provisions in the Plan clearly contemplate the continuation of CFS's opposition to the

Constructive Trust Claim.

The Tenth Circuit Court of Appeals recently outlined the elements of res judicata, or claim

preclusion (the term the Tenth Circuit prefers), as follows—

> Res judicata requires the satisfaction of four elements: (1) the prior suit must have
> ended with a judgment on the merits; (2) the parties must be identical or in privity;
> (3) the suit must be based on the same cause of action; and (4) the plaintiff must have
> had a full and fair opportunity to litigate the claim in the prior suit.

36

Plotner v. AT&T Corp., 224 F.3d 1161, 1168 (10th Cir. 2000). With respect to the first element, the

appellate panel cited Clark v. Haas Group, Inc., 953 F.2d 1235, 1238 (10th Cir.), *cert. denied* 506

U.S. 832 (1992), for the proposition that a "'stipulated, voluntary dismissal of [the plaintiff's] first

suit, approved by the court with prejudice, was a judgment on the merits' for res judicata purposes."

Plotner, 224 F.3d at 1169. Thus, BOA correctly asserts that the agreed dismissal of the Section

510(b) Adversary with prejudice was a judgment on the merits. However, BOA further argues that

the dismissal is also a judgment on the merits on the issue of subordination of the Constructive Trust

Claim because (1) the Section 510(b) Adversary included a claim arising from GREAT 1998-B

transaction; (2) BOA, as the beneficiary of the Series Trust, is in privity with the Trustee, Bankers

Trust, one of the defendants in the Section 510(b) Adversary; and (3) CFS sought subordination of

claims in both the Section 510(b) Adversary and in this proceeding.[19]

BOA further relies upon Restatement (Second) of Judgments § 24 in arguing that the scope

of claims that are barred by the dismissal of the Section 510(b) Adversary includes any claim that

arose out of the GREAT 1998-B securitization. Section 24 provides—

> (1) When a valid and final judgment rendered in an action extinguishes the
> plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim
> extinguished includes all rights of the plaintiff to remedies against the defendant with
> respect to all or any part of the transaction, or series of connected transactions, out
> of which the action arose.

> (2) What factual grouping constitutes a "transaction," and what groupings constitute
> a "series," are to be determined pragmatically, giving weight to such considerations
> as whether the facts are related in time, space, origin, or motivation, whether they
> form a convenient trial unit, and whether their treatment as a unit conforms to the
> parties' expectations or business understanding or usage.

> The general rule of this Section [24] . . . is subject to the exceptions stated in § 26.

---

[19]BOA does not address the full and fair opportunity to litigate element.

37

RESTATEMENT (SECOND) OF JUDGMENTS § 24 (1982). Indeed, CFS's pursuit of subordination of

Norwest's and Bankers Trust's claims against the estate in the Section 510(b) Adversary included

the subordination of Bankers Trust's claim that arose from the GREAT 1998-B securitization, which

is the same transaction that BOA claims resulted in a constructive trust in its favor. However, the

broad transactional scope of *res judicata* set out in Section 24 of the Restatement is limited by the

exceptions contained in Section 26 of the same Restatement. Section 26(1)(a) and (b) of the

Restatement are directly applicable here. These provisions state—

> (1) When any of the following circumstances exists, the general rule of § 24 does not
> apply to extinguish the claim, and part or all of the claim subsists as a possible basis
> for a second action by the plaintiff against the defendant:
>
>> (a) The parties have agreed in terms or in effect that the plaintiff may
>> split his claim, or the defendant has acquiesced therein; or
>>
>> (b) The court in the first action has expressly reserved the plaintiff's
>> right to maintain the second action[.]

RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(a) and (b).

With respect to the first exception, the Restatement commentators explain—

> Where the plaintiff is simultaneously maintaining separate actions based upon parts
> of the same claim, and in neither action does the defendant make the objection that
> another action is pending based on the same claim, judgment in one of the actions
> does not preclude the plaintiff from proceeding and obtaining judgment in the other
> action. The failure of the defendant to object to the splitting of the plaintiff's claim
> is effective as an acquiescence in the splitting of the claim.

Id., comment a. Here, the Section 510(b) Adversary and CFS's motion to dismiss the Constructive

Trust Claim on the grounds of Section 510(b) subordination were simultaneously pending from

January 5, 2000 (the date CFS filed its original Section 510(b) Complaint to commence the Section

510(b) Adversary) to September 17, 2001 (the Effective Date of the Plan which is when the Section

510(b) Adversary was deemed dismissed). Plan at 6, ¶ 44 and 32, § 5.47. BOA was on notice that

CFS sought to dismiss or defeat the Constructive Trust Claim pursuant to Section 510(b) since at

least August 3, 1999, when CFS filed its Motion to Dismiss in this proceeding (Adv. Doc. 35, 36).

The subordination defense in this case remained pending up to and through confirmation of the Plan

and was reasserted as a defense and a counterclaim after the motions to dismiss were resolved.

Throughout the pendency of the twin litigations, BOA never argued that it was improper for CFS

to assert its subordination argument in both proceedings nor did it request consolidation of the

proceedings. The Court concludes that BOA acquiesced to CFS's "claim splitting" as a matter of

law, and therefore the dismissal of the Section 510(b) Adversary does not preclude CFS from

continuing to assert in this proceeding that the Constructive Trust Claim should be subordinated.

Section 26(1)(b) of the Restatement, the exception to the relitigation bar based upon the

express reservation of a party's right to maintain the second action by court order, is also applicable.

Because this exception requires interpretation of the Plan, the Court will recite the Plan provisions

that in the aggregate can only be interpreted as preserving CFS's ability to seek subordination of the

Constructive Trust Claim.[20]

---

[20]BOA contends that the Court cannot establish the scope of the claims barred by the
dismissal of the Section 510(b) Adversary without examining the intent of the parties and that intent
is a contested factual issue precluding summary judgment. BOA Objection at 21. When a contract
is not ambiguous, however, intent must be gleaned from the document itself and extrinsic evidence
is not admissible. "[W]hether a contract is ambiguous to require extrinsic evidence to clarify the
ambiguity is purely one of law for the court." First Nat'l Bank and Trust Co. v. Kissee, 1993 OK 96,
859 P.2d 502, 507.

   Oklahoma law states "[a] contract is ambiguous if reasonably susceptible of more
   than one interpretation." Williams v. Shearson Lehman Bros., Inc., 917 P.2d 998,
   1004 (Okla.Ct.App.1996), or "through vagueness of expression it has a double
   meaning." See Cinocca v. Baxter Labs., Inc., 400 F. Supp. 527, 532 (E.D.Okla.1975).
   In other words, a contract is ambiguous if reasonably intelligent persons, on reading

The Plan definitions provide that the "BoA Constructive Trust Claim" is —

> the Claim asserted by BoA in the BoA Adversary [defined in ¶ 23 as "NationsBank, N.A. v. Commercial Fin. Servs. Inc., Adv. No. 98-0356-R pending before the Court"] seeking imposition of a constructive and/or resulting trust against certain funds now held by CFS in a segregated account by agreement of the parties and/or by an order entered by the Court on May 25, 1999. The BoA Constructive Trust Claim is a Disputed Claim.

Plan at 4, ¶ 23, 24. A "Disputed" claim is defined as —

> with respect to a Claim . . . (i) any Claim . . . as to which CFS or any other party in interest has interposed a *timely objection or request for estimation or subordination*, whether by *contested motion* or adversary proceeding, in accordance with the Bankruptcy Code, the Bankruptcy Rules and/or this Plan, which objection or request for estimation or subordination has not been withdrawn or determined by a Final Order in favor of the holder of the Claim . . . as of the Effective Date.

Plan at 5, ¶ 42 (emphasis added). The BoA Constructive Trust Claim was still a Disputed Claim as of the Effective Date because CFS and the Intervenors had interposed a timely objection to the claim *and* a timely request for subordination in their Motions to Dismiss, which was contested by BOA and which had not been determined by a Final Order, nor had the request for subordination been withdrawn.

---

the contract, would honestly differ as to its proper meaning. See United States Fidelity & Guar. Co. v. Guenther, 281 U.S. 34, 37, 50 S.Ct. 165, 74 L.Ed. 683 (1930).

Gamble, Simmons & Co. v. Kerr-McGee Corp., 175 F.3d 762, 767 (10th Cir. 1999); cf. Bartmann v. Maverick Tube Corp., 853 F.2d 1540, 1545 (10th Cir. 1988) ("[a] term is unambiguous where it is reasonably and fairly susceptible of only one meaning").

The Court concludes that the Plan and Confirmation Order unambiguously preserve CFS's right to defend the Constructive Trust Claim by seeking its subordination and therefore extrinsic evidence of intent is inadmissible. Because parol evidence cannot be presented as to intent, BOA's contention that an issue of material fact exists regarding intent is overruled and BOA's further complaint that it has not been afforded an opportunity for discovery on the issue of intent is moot. BOA Objection at 21.

In the Plan, the BoA Constructive Trust Claim is classified as a Class 3 Claim.  Plan at 11,

§ 2.4.  BOA asserted its Constructive Trust Claim separately from BOA's other claim against CFS,

Claim No. 1901 in which BOA seeks damages for CFS's rejection its obligations under the $189

million Series Note to the extent that it is not compensated by the Constructive Trust Claim (the

"Rejection Damages Claim").[21]  BOA's unliquidated Rejection Damages Claim is an "Individual

ABS Claim" that the Plan treats as a beneficial interest in Bankers Trust's Class 5 claim.

Section 4.5 of the Plan describes the treatment of the Class 5 ABS Claims.  Claims of the

ABS Trustees (Norwest and Bankers Trust) were considered impaired, and therefore the Trustees

were entitled to vote on behalf of Class 5 to accept or reject the Plan.  Plan at 15, § 4.5(a).  Holders

of Individual ABS Claims, including BOA with respect to its Rejection Damages Claim, were not

entitled to vote directly– the ABS Trustees were required by their contracts to comply with the

instructions of their beneficiaries, however.  In general, the Plan provides that the ABS Liquidating

---

[21]Exhibit D of Plan is a list of "Individual ABS Claims."  BOA's Claim No. 1901 appears
on page 6 of Exhibit D.  A footnote to that claim states—

Claim No. 1901 filed by Bank of America, N.A., f/k/a NationsBank, N.A. ("BoA"),
is an Individual ABS Claim to the extent that it asserts a claim for rejection damages
arising under Sections 2.3 and 2.4 of the Note Purchase Agreement.  BoA asserts that
its rejection damage claim has a liquidated component ($4,728,554.36) and an
unliquidated component.  See Claim No. 1901, at ¶¶ 3-4.

BOA's Constructive Trust Claim and its Rejection Damages Claim overlap because BOA seeks
different remedies for the same loss.  In effect, BOA has protected itself by pursuing not only the
constructive trust remedy to compensate for a portion of its claim (approximately $50 million), but
a claim for rejection damages (i.e., the unpaid portion of the Note) which includes recovery of
damages for the same $50 million loss in the event that BOA is not successful in obtaining a
constructive trust remedy.

Trust, of which the two ABS Trustees are beneficiaries, will receive 55% of the net proceeds[22] of the liquidation of CFS's assets, and distributions of those proceeds are to be made by the ABS Liquidating Trust to the ABS Trustees in a *pro rata* fashion. The ABS Trustees will in turn make distributions to their beneficiaries, including BOA to the extent of its unliquidated Rejection Damages Claim. Plan at 15, § 4.5(b).

In order to prevent a double recovery to Individual ABS Claimants who are the beneficiaries of the ABS Trusts, all Individual ABS Claims, including BOA's Rejection Damages Claim, were disallowed as duplicative of the Trustees' ABS Claims. The Individual ABS Claimants will recover their share of the liquidation proceeds not from the estate, but from their respective ABS Trustees. Section 4.5(e), entitled "No Direct Distribution to Holders of Individual ABS Claims," provides–

> As provided in Section 4.5(f) below, ABS Claims [asserted by the ABS Trustees] shall be Allowed in the full amount of the total outstanding indebtedness owed under and relating to the ABS Trusts. The Allowed ABS Claims represent the aggregate of all outstanding claims of holders of notes and certificates under the ABS Trusts and, hence, subsume recoveries by holders of Individual ABS Claims. The Individual ABS Claims shall receive compensation with respect to their Claims through the allowance of the ABS Claims and distributions from the ABS Trustees. Individual ABS Claims shall receive no direct distributions under the Plan, and shall have no further right to assert Claims against CFS or the Estate.

Plan, at 16-17, § 4.5(e). The Plan provides further—

> Allowance of ABS Claims. Pursuant to and by operation of this Plan, the respective proofs of claim filed by each of the ABS Trustees [Norwest and Bankers Trust] are hereby deemed amended to withdraw claims of federal, state or common law fraud, if any, and are combined, modified and Allowed as an Allowed ABS Claim as set

---

[22]For the purpose of this dispute, it is sufficient to address in general terms how the liquidated estate will be divided between the ABS constituency on one side and the unsecured creditors on the other. The Court acknowledges that some of the estate's recoveries of cash, such as from D&O insurance policies, and the payment of certain unadjudicated claims, such as indemnification claims, are allocated between the two constituencies in a different manner.

forth immediately below.  The percentage distribution of the ABS Fund to be paid to each ABS Trust is also set forth below:

| ABS Trust | Claim Nos. | Amount of Allowed ABS Claim | Percentage (%) Distribution from ABS Fund |
|---|---|---|---|
| ***** | ***** | ***** | ***** |
| GREAT 1998-B | 104, 1993 | $185,198,043.12 [fn 2] | 11.50% [fn 3] |

Plan at 17, § 4.5(f).  The footnotes beside the amounts in the table state: "2/ The $185,198.043.12 is comprised of $179,435,229.13 for GREAT 1998-B noteholders [BOA] and $5,762,813.99 for GREAT 1998-B certificateholders [also BOA]" and "3/ The approximate percentage distribution from the ABS Fund to be paid to GREAT 1998-B shall decrease if and to the extent that the BoA Constructive Trust Claim is Allowed as set forth more fully in Section 4.3(c) of the Plan."  Plan at 17, § 4.5(f).

Section 4.3 of the Plan, explaining the treatment of the BoA Constructive Trust Claim, provides—

(a) Impairment and Voting.  Class 3 is not impaired by the Plan.  BoA, as holder of any Allowed BoA Constructive Trust Claim in Class 3, is deemed to have accepted the Plan.

(b) Payment of Claim.  The CFS Liquidating Trustee shall pay BoA in full from the BoA Reserve the amount of the BoA Constructive Trust Claim (to the extent that such Claim is Allowed by a Final Order) on the day on which such Claim becomes an Allowed Claim, or as soon thereafter as practicable.  To the extent that the BoA Constructive Trust Claim is disallowed, the corresponding amount of the BoA Reserve shall be distributed by the CFS Liquidating Trustee, fifty five percent (55%) to the ABS Liquidating Trust and forty five percent (45%) to the Unsecured Creditors Liquidating Trust, pursuant to 4.4 and 4.5 of this Plan.

(c) Effect of Payment on the Allowed ABS Claim in favor of GREAT 1998-B.  The amount of BoA's beneficial interest in the Allowed ABS Claim in favor of the ABS Trustee of GREAT 1998-B shall be reduced by the amount of any Allowed BoA

Constructive Trust Claim, and BoA shall be entitled to its Pro Rata distribution on account of such beneficial interest pursuant to Section 4.5 hereof only to the extent of such reduced amount. Unless and until the BoA Constructive Trust Claim is either Allowed or disallowed by a Final Order, BoA shall not be entitled to a distribution on account of its beneficial interest in the Allowed ABS Claim for GREAT 1998-B to the extent of the amount of the BoA Constructive Trust Claim; and the ABS Liquidating Trustee shall not establish or hold a Reserve on account of that portion of BoA's beneficial interest in the Allowed ABS Trust Claim for GREAT 1998-B.

Plan at 13-14, § 4.3.

BOA argues that because Section 4.5(f) of the Plan provides for the payment of a percentage of approximately $180 million to Bankers Trust on account of the GREAT 1998-B claim, which is the full amount of BOA's unliquidated Rejection Damages Claim, that BOA's claim is *unsubordinated* in the Plan, and because the Plan is binding, no part of BOA's claim can be subordinated at this point. BOA Objection at 22-25. Thus, BOA argues that CFS's subordination defense and counterclaim are inconsistent with BOA's treatment in the Plan. BOA ignores the difference between its Rejection Damages Claim, on which Bankers Trust will recover on an unsubordinated basis, and its Constructive Trust Claim, the subordination of which has not yet been adjudicated.

The Court finds that the Plan's treatment of the BoA Constructive Trust Claim and BOA's unliquidated Rejection Damages Claim recognizes the pendency of the subordination defense in the BOA Constructive Trust Adversary and fully anticipates and addresses all possible resolutions of the adversary, including CFS's subordination defense and counterclaim. Accordingly, if BOA is successful in establishing a constructive trust *and* in defeating CFS's subordination claim, the following will occur—

- BOA will recover the full amount of the BoA Reserve (Plan, § 4.3(b));

- Bankers Trust's Allowed ABS Claim related to the GREAT 1998-B securitization will be reduced by the amount BOA recovers on the Constructive Trust Claim and therefore its percentage of the ABS Liquidating Trust proceeds will be correspondingly reduced (Plan, §§ 4.3(c) and 4.5(f) n.3); and

- BOA's recovery from Bankers Trust (*i.e.*, BOA's Rejection Damages Claim) will be reduced to the amount that Bankers Trust obtains on account its GREAT 1998-B Allowed Claim (Plan, §§ 4.3(c) and 4.5(e)).

The Plan anticipates that some claims may be subordinated after confirmation, as a separate class, Class 6, was created for such subordinated claims. Section 4.6 of the Plan provides that a member of Class 6 "shall receive no distribution on its Class 6 Claim." Plan at 17-18, § 4.6(b).

Thus, if CFS's subordination defense and counterclaim are successful, the following will occur—

- The Constructive Trust Claim will be subordinated in priority to claims "senior to or equal the claim represented by such security" (11 U.S.C. § 510(b)). Claims equal to the Series Note are the other Individual ABS Claims who will recover through their Trustees under Class 5. Thus, the Constructive Trust Claim will be reclassified as a Class 6 Claim (Plan, §§ 4.5, 4.6).

- The BoA Reserve will be distributed by the CFS Liquidating Trustee, fifty-five percent (55%) to the ABS Liquidating Trust and forty-five percent (45%) to the Unsecured Creditors Liquidating Trust (Plan, §§ 4.3(b));

- Bankers Trust will receive a percentage of liquidation proceeds based on the full amount of its Allowed ABS Claim on account of the GREAT 1998-B securitization (Plan, § 4.5(f)); and

- BOA will recover on its Rejection Damages Claim from Bankers Trust (Plan, § 4.5(e) and (f)).

The same result flows from the situation in which BOA simply fails to establish the elements of a constructive trust—it may recover its full *pro rata* share of its Rejection Damages Claim through its ABS Trustee.

Thus, BOA's treatment in the Plan is fully consistent with allowing CFS and the Intervenors to pursue their subordination argument.

Finally, Section 8.3 of the Plan, entitled "Preservation of Claims, Causes of Action and

Objections to Claims," provides in pertinent part—

> (a)   In accordance with Section 1123(b)(3) of the Bankruptcy Code, the CFS
> Liquidating Trustee (as representative and attorney in fact of CFS and/or the Estate)
> will receive from CFS the right to prosecute any claims and causes of action against
> third parties, . . . including, without limitation, . . . *claims and causes of action
> against or involving . . . BoA, and the right to object to Claims and to file complaints
> or motions to subordinate and/or estimate Claims.* Except as otherwise expressly set
> forth in this Plan, the CFS Liquidating Trustee shall have the right and power to
> object to Claims or Interests *on any ground*, including the grounds set forth in
> Section 502 of the Bankruptcy Code.
>
> (b)   CFS's Schedules identify Creditors whose claims are Disputed . . . . Further,
> CFS has already filed numerous objections to Claims and adversary complaints to
> disallow, *subordinate* and/or estimate Claims, many of which remain pending. . . .
> **THIS PLAN DOES NOT AND IS NOT INTENDED TO RELEASE ANY
> SUCH OBJECTIONS TO CLAIMS (EXCEPT ANY OBJECTIONS TO THE
> ABS CLAIMS; *ABS CLAIMS* ARE EXPRESSLY ALLOWED PURSUANT TO
> THIS PLAN), OR CLAIMS AND CAUSES OF ACTION AGAINST THIRD
> PARTIES. ALL SUCH RIGHTS, CLAIMS AND CAUSES OF ACTION ARE
> SPECIFICALLY RESERVED AND RETAINED BY CFS AND/OR THE
> ESTATE.**

Plan at 37-38, § 8.3(a) and (b) (italics added).

The Court concludes that Section 8.3(a) and (b) constitute a clear and explicit reservation by

CFS of the right to object to and seek subordination of the Constructive Trust Claim. In subsection

(a), CFS preserved its right to object to the Constructive Trust Claim on any ground, including

subordination.  Subsection (b) expressly provides that confirmation of the Plan will not release any

pending subordination claims or objections to claims. CFS's and Intervenors' Motions to Dismiss

the Constructive Trust Claim, which asserted that BOA's claim was subject to mandatory

subordination, were pending at the time the Plan was confirmed. Therefore, the subordination

objections were preserved.

BOA argues that the language set out in bold capital letters excepts its Constructive Trust Claim from CFS's reservation of rights. The exception, however, only releases objections to the ABS Claims, which are defined in the Plan as claims asserted by any ABS Trustee. Plan at 1, ¶ 2. The Constructive Trust Claim is not a claim asserted by any ABS Trustee.

The Court concludes, as a matter of law, that the Plan and Confirmation Order *expressly preserve* CFS's and the Intervenors' right to maintain their subordination claims and objections to the Constructive Trust Claim, and as such, the dismissal of the Section 510(b) Adversary does not bar such action. See RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(b).

B.  Must the Court decide the merits of the Constructive Trust Claim before the merits of CFS's Section 510(b) defense and counterclaim?

As stated above, the CFS Motion picks up where the Order Resolving Motions to Dismiss left off insofar as the Section 510(b) verses Section 541(d) debate is concerned. In the Order Resolving Motions to Dismiss, the Court concluded generally that a claim seeking the remedy of a constructive trust over proceeds that can be traced to the purchase and sale of a security is a claim for rescission of such purchase and sale which directly implicates the application of Section 510(b) to subordinate such a claim. See Order Resolving Motions to Dismiss at 16-27 (268 B.R. at 592-98). BOA reasserts the proposition that the Court must *first* decide the merits of its Constructive Trust Claim under Oklahoma law before considering whether Section 510(b) imposes any limitations on the claim. See BOA Objection at 7-13. BOA argues that if it can prove the elements entitling it to a constructive trust remedy under state law, the Fund, now in the BoA Reserve, will be excluded from the estate pursuant to Section 541(d), and therefore would not be property subject to

distribution to CFS's creditors.[23] Because Section 510(b) states that "[f]or the purpose of distribution," a claim for rescission of a securities transaction "shall be subordinated" to claims

---

[23]BOA now argues that the Court lacks jurisdiction to subordinate BOA's claim because the Court's jurisdiction "is limited to matters affecting the estate and the parties' conflicting claims to estate property." BOA Objection at 7, *citing* U.S. v. Challenge Air Int'l, Inc. (In re Challenge Air Int'l, Inc.), 952 F.2d 384 (11th Cir. 1992). Therefore, BOA argues, if the Fund is ultimately found to be subject to a constructive trust, the Fund will no longer be property of the estate.

BOA neglects to mention that the Court has core jurisdiction to adjudicate "counterclaims by the estate against persons filing claims against the estate" (28 U.S.C. § 157(b)(C)), which includes a counterclaim to subordinate a claim for rescission of a securities transaction (11 U.S.C. § 510(b)). At this point, BOA only has a claim for rescission of a securities transaction and seeks the remedy of a constructive trust. In any event, BOA's claim and CFS's subordination defense is clearly a "matter affecting the estate" since the disposition of over $50 million of deposits in CFS bank accounts is at stake.

BOA also offers Elscint, Inc. v. First Wisconsin Financial Corp. (In re Xonics, Inc.), 813 F.2d 127 (7th Cir. 1987) for the proposition that "[o]nly after identifying the 'property of the estate' may the bankruptcy court apportion that property among creditors." BOA Objection at 7. Xonics, however, concerned the bankruptcy court's jurisdiction of a dispute between two creditors over property that the estate had *abandoned*. The court correctly held that "[t]he resolution of that dispute would not affect the creditors of the bankrupt, and there would be no source of jurisdiction." Id., 813 F.2d at 131. In this case, CFS has not abandoned the Fund, but in fact claims ownership of the Fund and seeks to subordinate BOA's rescission claim, which, if met with success, would increase the pool of liquidation proceeds to be distributed to unsecured creditors and to the ABS Claimants. The rule of Xonics is not relevant to this Court's jurisdiction.

Continental Nat'l Bank v. Sanchez (In re Toledo), 170 F.3d 1340 (11th Cir. 1999), also cited by BOA, is not applicable for the same reason. There, the debtor, who owned 50% of a partnership, did not even arguably have an interest in the partnership's real property; thus the bankruptcy court did not have core jurisdiction to determine the validity or priority of liens on this non-estate property. See also Torkelsen v. Maggio (In re The Guild and Gallery Plus, Inc.), 72 F.3d 1171 (3d Cir. 1996) (cited by BOA and also not relevant; there, it was "uncontroverted that the property [at issue] . . . was never 'property of the estate'. . . ." Id. at 1173).

BOA cites Pearlman v. Reliance Ins. Co., 371 U.S. 132 (1962), as authority for the premise that "bankruptcy law does not authorize distribution of other people's property among creditors of the debtor." BOA Objection at 7. This statement is true as a general principle. However, it is also true that in many instances, the Bankruptcy Code authorizes the reversal of otherwise effective property transfers to maximize the estate's distribution to creditors. See 11 U.S.C. §§ 544-550. Exercising rights under one of these statutes might appear to be "distributing other people's property among creditors of the debtor" in absence of the authorization to do so under the Bankruptcy Code. Similarly, Section 510(b) authorizes the subordination of certain rescission claims, even if subordination might defeat a claim to equitable ownership of funds.

represented by the security, BOA argues that it does not seek priority in "distribution" of property of the estate, but rather seeks a declaration of equitable ownership of such property under state law, and thus Section 510(b) does not apply.

The Constructive Trust Claim is based upon BOA's allegation that fraud infected the disclosures upon which it based its decision to purchase securities. In bankruptcy, claims arising from allegations of fraud in the purchase of securities are subject to subordination because claims for rescission or damages result in the elevation of the claim to a higher distribution priority than the security itself would yield in bankruptcy. One of the underlying policies of bankruptcy law is the equitable distribution of assets of the debtor. By enacting Section 510(b), Congress consciously closed potential loopholes that might allow claimants to unfairly elevate their priority in distribution over similarly situated claimants. The purpose and policy of Section 510(b) resolve the philosophical inquiry as to whether a defrauded securities purchaser who can trace some proceeds of its transaction to some asset of the estate should be entitled to recover in full prior to any recovery by other defrauded securities purchasers who cannot trace proceeds to assets of the estate. In this case Congress would have asked: Should a defrauded security purchaser be paid in full before any unsecured trade creditor receives any distribution? Who *should* shoulder the risk that these complex structured multi-million dollar securities transactions might be tainted with fraud: Unsecured trade creditors who never had any opportunity to avoid the fraud, or the party purchasing the securities who had direct access to due diligence materials and to the principals and professionals promoting the transaction?

The Court believes that the federal interest expressed by Congress when enacting Section 510(b)— that claimants who voluntarily assume the risk of fraud and insolvency by purchasing a

security in order to obtain potential benefits beyond those of an unsecured creditor should be subordinated – overrides the state's interest in creating an equitable ownership interest in property through a fictitious trust to compensate victims of fraud *when those victims are defrauded securityholders.* See Butner v. United States, 440 U.S. 48, 55 (1979) (property interests created by state law will be respected in bankruptcy unless "some federal interest requires a different result;" in footnote 10 of the opinion, the Supreme Court notes, for example, that bankruptcy laws requiring the avoidance of preferential or fraudulent transfers disturb state law property rights, including outright ownership of property, "in order to protect general creditors").

The most persuasive evidence that Congress intended that claims for rescission of securities transactions be subordinated, even claims that seek the remedy of a constructive trust, is its express adoption of the views espoused by John J. Slain & Homer Kripke in THE INTERFACE BETWEEN SECURITIES REGULATION AND BANKRUPTCY – ALLOCATING THE RISK OF ILLEGAL SECURITIES ISSUANCE BETWEEN SECURITYHOLDERS AND THE ISSUER'S CREDITORS, 48 N.Y.U. Law Rev. 261 (1973) (hereinafter "Slain & Kripke"). Slain and Kripke's article advocated that the results of two cases, Oppenheimer and Rhine, should be legislatively overruled because they resulted in a rash of securityholders attempting to elevate their claims from last priority to the priority of unsecured claims. Rhine permitted "reclamation" by defrauded investors of funds traceable from their purchase of oil and gas working interests (which Congress likened to "investment contracts," thus securities) to the seller/debtor's bank accounts. See In re Rhine, 241 F. Supp. 86, 91, *rehearing denied,* 242 F. Supp. 127 (D. Colo. 1965). Slain and Kripke sharply criticized the outcome of Rhine, stating—

> It is important to focus on the practical effects of the Rhine decision. In addition to the rescinding purchasers of working interests, the bankrupt had other creditors whose claims arose from the operation of the venture: open-account vendors, laborers

50

and other suppliers of goods and services. The result of a successful reclamation would have been the payment of all traceable assets of the estate to the former owners of the equity interest in the business, with general creditors sustaining a total loss. Thus, in any situation where tracing is possible, Rhine suggests that rescinding equity investors have a real possibility of bootstrapping their way to secured creditor status. Yet, the same rescinding investors would have received the entire benefit of the venture had it prospered. This is an enviable posture clearly contrary to the usual rule that leveraged opportunity for gain also entails leveraged, rather than sheltered, risk of loss.

Slain & Kripke, at 279. They continued–

The time has come for a reconsideration of the preference given to restitutionary interests, at least in the context of rescinding securityholder claims. There are compelling reasons why the general premise of American law that the victims of the wrongdoer should prevail over his general creditors should not apply here. . . .

The Oppenheimer-Rhine view . . . is tunnel vision. It fails to see that in any case of issuer insolvency the claims of rescinding stockholders can be satisfied only out of assets which otherwise would be allocated to making innocent parties whole. The parties did nothing to create the rescinder's problems and in the overwhelming majority of cases advanced money, labor or credit in reliance on the existence of the equity or junior debt cushion which the rescinder purported to provide. The Oppenheimer-Rhine approach can be justified only if it is assumed that the policies underlying federal and state securities law are of such transcendental importance that they necessarily displace all other doctrines of law and all considerations of simple fairness. It is our thesis that no rational basis exists for such an assumption.

Id. at 285-86. Congress concurred with Slain and Kripke's critique of the then-current law and adopted as federal bankruptcy policy the Slain/Kripke view that once bankruptcy has been filed, claims of rescinding security holders who might otherwise be entitled to recover traceable assets ahead of or untraceable assets in *para passu* with general creditors should *not* be permitted to recover any assets until general unsecured creditors have been made whole. See H.R.Rep No. 95-595, 95th Cong. 1st Sess. at 195-96 (1977), reprinted in COLLIER ON BANKRUPTCY (hereinafter "COLLIER"), App. C, Pt. 4(d)(i) at 1308-09 (Lawrence King ed., 15th ed. rev.)(1979). The policy is justified by the fact that in exchange for the upside benefits not shared with general creditors, security holders should

be allocated the risk that the security transaction was tainted by fraud, a risk that general creditors had no opportunity to avoid.

BOA's Constructive Trust Claim parallels the Rhine plaintiffs' "reclamation" claim. Congress expressly overruled the result of Rhine and iterated a policy that *all* claims for rescission by defrauded investors, even rescission claims that seek a remedy through the fiction of a constructive trust, should stand behind innocent general unsecured creditors. See id. at 195, COLLIER, App.C, Pt. 4(d)(i) at 1307, *citing* In re Rhine, 241 F.Supp. (D. Colo 1965) [sic].

Nothing in the BOA Objection persuades the Court that its earlier analysis of the language, purpose and legislative history of Section 510(b) and its application to a claim seeking rescission of a securities transaction in order to obtain the remedy of a constructive trust, or that its construction and harmonization of the two competing statutes, Sections 510(b) and 541(d), is in error. See Order Resolving Motions to Dismiss at 17-27 (268 B.R. at 592-99).[24] Since the Order Resolving Motions

---

[24]BOA sets up a false dichotomy in the BOA Objection, arguing—

    A.    If the debtor has legal *but not* equitable title to property, Section 541(d) bars the equitable interest from entering the estate via Section 541(a), thus precluding distribution of the equitable interest under Title 11, and Section 510(b) is not implicated;

*or*

    B.    if the debtor holds legal *and* equitable title to property, Section 541(d) is not implicated; the property enters the estate via Section 541(a) fully subject to distribution under Title 11, in which event Section 510(b) subordination issues become meaningful.

BOA Objection at 11 (emphasis in original). The premise of each statement assumes that the kind of title to the Fund CFS possesses – legal, equitable or both – can be determined without first assessing the nature of BOA's claim to the Fund. The status of CFS's title depends upon the resolution of the merits of the Constructive Trust Claim and in fully adjudicating the merits, the Court must first determine CFS's complete or dispositive defenses, one of which is subordination of the *claim itself.*

    Section 510(b) subordinates "claims for rescission." BOA's request for the *remedy* of

to Dismiss was entered, the Tenth Circuit Court of Appeals has decided Allen v. Geneva Steel Co.
(In re Geneva Steel Co.), 281 F.3d 1173 (10th Cir. 2002). In Geneva, the Tenth Circuit construed
Section 510(b) broadly in order to implement the intent of Section 510(b), allowing that the
"unfortunate reality behind Section 510(b) . . . is a strong congressional disapproval of investor fraud
claims in bankruptcy." Id. at 1179. Encouraged by Geneva's expansive interpretation of Section
510(b), this Court reiterates and incorporates herein the legal conclusions announced in the Order
Resolving Motions to Dismiss as if set out in full.

The Court finds further that resolution of the Section 510(b) issue could be dispositive
because if the Constructive Trust Claim is subordinated, it will be reassigned to Class 6 which
provides for no distribution, rendering the amount or allowance of the Constructive Trust Claim
moot.

C.    Is the Series Trust is an "affiliate of the debtor?"[25]

In the preliminary stages of this litigation, the Court was not able to assess whether Section
510(b) applied to the Constructive Trust Claim because BOA's Complaint and its attachments did
not contain evidence upon which the Court could conclude as a matter of law that the Series Note
was a security of CFS or of an "affiliate" of CFS.

Section 510(b) provides–

---

constructive trust presupposes rescission, and therefore this proceeding is one on a "claim for
rescission." Section 510(b) subordinates claims for rescission of "a purchase or sale of a security
of the debtor or of an affiliate of the debtor." Whether the Series Note or Note Purchase Agreement
are securities of CFS or of a CFS affiliate is the primary issue presented by CFS in CFS's Motion.

[25]The resolution of this issue eliminates the need to decide whether the Note Purchase
Agreement is a security of CFS, an alternate argument urged by CFS.

> For the purpose of distribution under this title, a claim arising from rescission of a
> purchase or sale of a security of the debtor or of an affiliate of the debtor, for
> damages arising from the purchase or sale of such a security, or for reimbursement
> or contribution allowed under section 502 on account of such a claim, shall be
> subordinated to all claims or interests that are senior to or equal the claim or interest
> represented by such security, except that if such security is common stock, such claim
> has the same priority as common stock.

11 U.S.C. § 510(b). Section 101(2)(C) states—

> [A]ffiliate means —
>
> *****
>
> (C) person whose business is operated under a lease or operating agreement by a
> debtor, or person substantially all of whose property is operated under an operating
> agreement with the debtor.

11 U.S.C. § 101(2)(C). CFS contends that the Series Trust, which issued the Series Note, was CFS's

"affiliate" because CFS operated the business and property of the Series Trust under an operating

agreement.

In order for the Series Trust to be an "affiliate" of CFS, it must first conform to the definition

of "person" under the Bankruptcy Code. "'[P]erson' includes individual, partnership, and

corporation, but does not include governmental unit . . . ." 11 U.S.C. § 101(41). Although the

Bankruptcy Code does not specifically include trusts in the realm of "persons," the definition of

"corporation," which is a "person," includes "(i) association having a power or privilege that a

private corporation, but not an individual or a partnership, possesses; . . . or (v) business trust." 11

U.S.C. § 101(9)(A).

If the Series Trust is a "business trust," then it qualifies as a "person" that may be an "affiliate

of the debtor." CFS contends that the Series Trust is a "business trust." BOA contends that the

Series Trust merely holds and protects assets and does not operate a business, and therefore it is a

trust in the generic sense rather than a "business trust." What constitutes a "business trust" is

therefore a pivotal issue that requires an examination of the nature, purpose, function and form of

the entity alleged to be a business trust.  See In re Sung Soo Rim Irrevocable Trust, 177 B.R. 673,

676-79 (Bankr. C.D. Cal. 1995).[26]

Courts that have been called on to interpret the term "business trust," as it appears in the

Bankruptcy Code, have had an opportunity to address the gamut of possible trust forms and

functions, from the traditional "business trust" wherein trustees operate an active business for the

benefit of unrelated investors, on one hand, to the testamentary or family trust in which business

property constitutes a part of the *res* of the trust, but the trustee manages the property for the benefit

of non-investors chosen by, and perhaps related to, the grantor, which is clearly not a "business

trust."  A perfectly serviceable, generic and uncomplicated definition of "business trust" is found in

In re Armstead and Margaret Wayson Trust, 29 B.R. 58, 59 (Bankr. D. Md. 1982), and provides as

follows--

> A business trust has been defined as "an unincorporated business organization
> created by an instrument by which properties to be held and managed by trustees for
> the benefit and profit of such persons as may be or may become the holders of
> transferrable certificates evidencing the beneficial interests in the trust estate." Ann.
> 88 A.L.R.3d 704, 717.  The business trust is a voluntary pooling of capital by a
> number of people who are the holders of freely transferable certificates evidencing
> the beneficial interests in the trust estate.  The holders are entitled to the same
> limitation of personal liability extended to stockholders of private corporations.
> Because of the similarity, Congress has afforded the business trust the same
> privileges in bankruptcy as a private corporation.

---

[26]Trusts that are not "business trusts" are not considered "persons" because "trust" is
specifically named as a member of a group defined as "entities," the most comprehensive of groups
identified in the Bankruptcy Code, while "business trust" is specifically named as a member of a
select species of organizations called "corporations," which is itself a member of the society of
"persons."  See 11 U.S.C. § 101(9), (15) and (41).  Section 101(15) states that "'entity' includes a
person, estate, trust, governmental unit, and United States Trustee."  A "person" is an "entity," but
an "entity" is not necessarily a "person."

Id. (citations omitted). While the Series Trust fits this definition, other courts have imposed various glosses, restrictions, conditions, qualifications, provisos and requirements on the definition of "business trust." Thus, it is necessary to examine the bases for these impositions of judicial gloss on the term "business trust" and determine whether such qualifications hold up under scrutiny and whether they are pertinent to this case.

Most published cases that interpret the term "business trust" do so for the purpose of determining whether the entity is a "person" that may be a debtor in bankruptcy under Section 109 of the Bankruptcy Code. These cases are hardly uniform in isolating the distinctive attributes of a "business trust." See, e.g., Takemi Ueno, Defining a "Business Trust": Proposed Amendment of Section 101(9) of the Bankruptcy Code, 30 HARV. J. ON LEGIS. 449 (1993).

### 1. Active/passive distinction

One line of cases makes the distinction that "trusts created with the purpose of carrying on some kind of business" are business trusts while trusts designed merely to "protect and preserve the res" for beneficiaries generally are not business trusts. Shawmut Bank Connecticut v. First Fidelity Bank (In re Secured Equipment Trust), 38 F.3d 86 (2d Cir. 1994). This is the sole distinction that BOA makes between a business and a non-business trust.

Within this line of cases is In re Heritage North Dunlap Trust, 120 B.R. 252 (Bankr. D. Mass. 1990), in which the court concluded that "nominee trusts" which held real property were "merely a tax device for holding and preserving investment property while limiting liability, simplifying title transfers and preserving anonymity of beneficiaries." Id. at 253-54. In rejecting the debtors' argument that it was a "business trust" entitled to file a bankruptcy petition, the Heritage court relied heavily on the fact that the jurisdiction had a state statute that specified the "necessary requirements

for entities to be considered business trusts" and that the debtors had not complied with the statute.

Id. at 254. The Court observed that the state statute

> recognizes the existence of business trusts as voluntary associations and imposes
> both rights and obligations. There must be a written instrument, transferable shares,
> recordation with the Secretary of State and with the Clerk in the very city or county
> where the trust has a place of business. Where the states tell you what you must do
> to be a business trust, that is what you must do!

Id. See also In re L & V Realty Trust, 61 B.R. 423, 424-25 (Bankr. D. Mass. 1986) (trust that failed

to register or otherwise comply with Massachusetts business trust law was not a business trust).

Because the Series Trust was established pursuant to the Delaware Business Trust laws (which, in

September 2002, were renamed the Delaware *Statutory* Trust laws), BOA cannot take comfort in the

"nominee trust" line of cases.[27]   See also In re Medallion Realty Trust, 103 B.R. 8, 14 (Bankr. D.

Mass. 1989), *aff'd*, 120 B.R. 245 (D. Mass. 1990) (nominee trust was determined to be a partnership

rather than a trust).

Another case noting the distinction between active businesses and passive holding vehicles

as potentially relevant to a determination of whether an entity is a business trust is In re

Constitutional Trust # 2-562, 114 B.R. 627, 631 n.12 (Bankr. D. Minn. 1990). The bizarre facts of

Constitutional Trust do not make a clear case for the proposition that a business trust must actively

operate a business rather than merely hold and preserve the trust *res*. In that case, the debtor called

itself a "revocable domestic trust" which was created by a trust-like entity that itself was purportedly

---

[27]A "nominee trust" is a non-taxable entity, which generally is used to hold bare legal title
to real estate. Essentially, the nominee trust acts as an agent for individual or entity beneficial
owners. The beneficial owner(s) are the owners for income tax purposes and are subject to all
income tax consequences arising from the action of the trustees. Roger Ritt & Michael Nathanson,
"Choice of Business Entity: Certain Federal Income Tax and Other Considerations," SF 94 ALI-
ABA 37, 44 (2001).

created under the Constitution of the Republic of Panama, whose trust document contained "a number of nonsensical and seemingly unrelated clauses concerning so-called Beneficial Interest Certificates, Privileged Recipient Interest, and Equity Credit Accumulation." Id. at 628. The trust document expressly stated that it should not "be deemed 'to be, or create, or evidence the existence of a corporation, de facto or de jure, or a Massachusetts Trust, or any other type of business trust.'" Id. The trustees of the trust were a husband and wife, and the only asset of the trust was the couple's residence. The couple created another trust to operate a machine shop that was located in the garage of the residence and which paid rent to the trust that held the residence. Id. at 629. The Court found that the debtor trust was not a business trust that was eligible for bankruptcy for several reasons, including because the trust document specifically disclaimed its status as a "business trust" and because the trust did not meet the requirements of a business trust under state law. Id. at 631. Further, the Court indicated that the trust did not transact any business and that the trust document itself stated that its purpose was "to hold title in trust property and protect and conserve such property until its sale, liquidation, or transfer." Id. at 632. The Court held that the trust was a tax shelter and "[t]o the extent that the debtor is transacting business, that business appears to be the evasion of the [couple's] taxes." Id.

The Constitutional Trust belongs in the category of trusts that are considered non-business trusts because they are personal estate planning vehicles. The Series Trust, on the other hand, is clearly a commercial rather than personal venture, and it clearly complies with the business trust laws in its state of registration. Thus, the Constitutional Trust case is not helpful to BOA.

Another case in which a court held that a non-operating trust was not a business trust is In re Treasure Island Land Trust, 2 B.R. 332 (Bankr. M.D. Fla. 1980). Again, however, the key element

upon which the Court relied in finding that the trust was not a business trust was the denial in the

trust instrument of any intention to create a business trust. The trust document provided –

> The objects and purposes of this Trust shall be to hold title to the trust property and
> to protect and conserve it until its sale or other disposition or liquidation. The
> TRUSTEE shall not manage or operate the trust property nor undertake any other
> activity not strictly necessary to the attainment of the objects and purposes stated
> herein; nor shall the TRUSTEE transact business of any kind with respect to the trust
> property within the meaning of [the Florida business trust statutes], or any other law;
> nor shall this agreement be deemed to be, or create or evidence the existence of a
> corporation de facto or de jure, or a Massachusetts Trust, or any other type of
> business trust, or an association in the nature of a corporation, or a co-partnership or
> joint venture by or between the TRUSTEE and the BENEFICIARIES, or by or
> between the BENEFICIARIES.

Id. at 334-35. In holding that the trust was not a business trust, and thus not eligible for bankruptcy

relief, the Court stated "[t]he Trust sought, at all costs, to avoid the registration requirements of the

securities laws. Now that its form has proven inadequate for its intended purposes [because the SEC

determined that the entity was required to register], the debtor seeks to abandon it and escape its

consequences altogether." Id. at 335. Invoking estoppel, the Court refused to deem the land trust

a business trust in light of the trust's contrary arguments to the SEC, the refusal to register as a

statutory business trust, and the terms of its own chartering document. "In what might otherwise be

a close question, the debtor's course of conduct since its inception causes the Court to refuse to

permit the debtor to baldly deny the language of the trust instrument. Treasure Island Land Trust

does not qualify as a business trust within the meaning of Section 101(8)(A)(v)." Id. at 336.

Again, this case does not lead to a conclusion that the Series Trust is a non-business trust.

The Series Trust was explicitly created as a "business trust" under Delaware law. The Trust

Agreement unequivocally states—

It is the intention of the parties hereto that the Series Note Issuer [previously defined as the Series Trust] constitute a business trust under the Business Trust Statute and that this Agreement constitute the governing instrument of such business trust. . . . Effective as of the date hereof, the Series Owner Trustee shall have all the rights, powers and duties set forth herein and, to the extent not inconsistent herewith, in the Business Trust Statute with respect to accomplishing the purposes of the Series Note Issuer.

GREAT Series Trust 1998-B Trust Agreement, CFS App. A-8 at 5, § 2.6. Further, the Trust

Agreement states its purposes and powers as follows—

Section 2.3 Purposes and Powers. The purpose of the Series Note Issuer [previously defined as the Series Trust] is, and Series Note Issuer shall have the power and authority, to engage in the following activities:

(a) to issue the Notes pursuant to the Series Indenture and to issue the Companion Certificate pursuant to this Agreement, and to sell the Notes and the Companion Certificate, to transfer and exchange the Notes and to pay interest on and principal of the Notes and the Companion Certificate;

(b) to acquire the Trust Certificate, the Series Interest Rate Cap and a security interest in the Series Reserve Account, to make deposits to and withdrawals from the Series Reserve Account and to pay the organizational, start-up and transactional expenses of the Series Note Issuer;

(c) to assign, grant, transfer, pledge, mortgage and convey the Series Indenture Property pursuant to the Series Indenture and to hold, manage and distribute to the Certificate Issuer [the Master Trust] pursuant to the terms of the Series Basic Documents any portion of the Series Indenture Property released from the Lien of, and remitted to the Series Note Issuer pursuant to, the Series Indenture;

(d) to enter into and perform its obligations under the Series Basic Documents to which it is a party;

(e) to establish and maintain Eligible Deposit Accounts in connection with the Series Basic Documents, in its own name or otherwise;

60

> (f) to engage in those activities, including entering into agreements, that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and
>
> (g) subject to compliance with the Series Basic Documents, to engage in such other activities as may be required in connection with the conservation of the Series Trust Property and the making of distributions to (or on behalf of) the Noteholders and the Certificate Issue as holder of the Companion Certificate.
>
> The Series Note Issuer is hereby authorized to engage in the foregoing activities. The Series Note Issuer shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement or the Series Basic Documents.

Id. at 2-3, § 2.3. Thus, unlike the trust instrument in Treasure Island, the Series Trust Agreement specifically declares itself as a business trust and sets forth business purposes and powers of the trust that extend far beyond mere holding and preserving a *res.*

BOA relies heavily upon Shawmut Bank Connecticut v. First Fidelity Bank (In re Secured Equipment Trust), 38 F.3d 86 (2d Cir. 1994), to support its argument that the relevant inquiry is whether the trust is an operating business or is merely a holding company.[28] Although the Court is not constrained to follow the precedent of the Second Circuit, the Court does find the Shawmut case useful in articulating two conflicting but equally supportable conclusions as to whether a trust put into service as a bankruptcy-remote structured financing vehicle is a "business trust" and therefore a "person" that may be a debtor in bankruptcy.

In Shawmut, a divided panel of the Second Circuit affirmed the dismissal of an involuntary petition filed against the Secured Equipment Trust of Eastern Airlines, which had been created as

---

[28]BOA contends that the Shawmut case is the "only federal appellate decision" on this issue and that it supports BOA's position. BOA Response at 37. Since the briefing in this case closed, however, the Sixth Circuit Court of Appeals has decided In re Kenneth Allen Knight Trust (Brady-Morris v. Schilling), 303 F.3d 671 (6th Cir. 2002).

a part of a secured financing to segregate a portion of Eastern's fleet of aircraft as collateral. The

trust issued $500 million in trust certificates to investors, purchased the aircraft from Eastern, and

leased the aircraft back to Eastern. Id. at 87. The amount of rent paid by Eastern to the trust

coincided precisely with the principal, interest and premium promised to the trust investors, and the

payments were collected by the Collateral Trustee and passed through a Series Trustee to the

investors on a periodic basis. Id. at 87-88. Upon payment of the trust certificates in full, title to the

aircraft was to be conveyed to Eastern; upon default by Eastern, the Collateral Trustee could take

possession of the aircraft in order to enforce the trust indenture. Id. at 88. The majority of the

Second Circuit panel characterized the transaction as a secured financing rather than a true sale and

leaseback. Id. at 87. After Eastern filed bankruptcy and defaulted on the lease, it sold some of the

collateral for $230 million, which it paid to the trust, and surrendered the remaining aircraft to the

trust. Id. at 88. The task of liquidating the returned aircraft fell to the Collateral Trustee, who hired

counsel, consultants, and accountants to assist in a liquidation effort that was expected to take

several years. Id. Three holders of trust certificates filed an involuntary chapter 11 petition against

the trust, and the Collateral Trustee moved to dismiss the petition, arguing that the trust was not an

eligible debtor pursuant to Section 109 because it was not a "business trust." Id. In reviewing the

extant lower court cases on the issue of what constitutes a "business trust," two judges of the Second

Circuit panel concluded that—

> [c]learly, most courts agree that a basic distinction between a business trust and other
> trusts is that business trusts are created for the purpose of carrying on some kind of
> business, whereas the purpose of a non-business trust is to protect and preserve the
> *res*. See, e.g., In re DeHoff Trust, 114 B.R. at 191; In re Faber Trust, 113 B.R. at
> 601; In re Treasure Island Land Trust, 2 B.R. 332, 334 (Bankr. M.D. Fla. 1980).
> Furthermore, while a trust must engage in business-like activities to qualify as a
> business trust, such activity, without more, does not necessarily demonstrate that a

trust is a business trust. See In re St. Augustine Trust, 109 B.R. 494, 496 (Bankr. M.D. Fla. 1990). Other than these two general points, "[a] uniform body of law has not resulted . . . [and] [t]he decisions are, in fact, 'hopelessly divided.'" Cutler v. The 65 Sec. Plan, 831 F. Supp. 1008, 1014 (E.D.N.Y. 1993). Ultimately, each decision is based on a very fact-specific analysis of the trust at issue.

Id. at 89. The majority did not foreclose the possibility that a trust without a profit motive could be considered a "business trust," but found that profit motive was a factor to be considered nevertheless because "most corporations are established to generate a profit." Id. at 90.[29] The decisive factor, in the majority's opinion, was that the trust indenture made clear that the trustee's sole responsibility was to protect the certificate holders' security interest, and that any post-default business transactions taken by the trustee were merely incidental to the primary purpose of safeguarding the collateral. Id. at 90-91. Thus, the majority concluded that the trust was not a business trust eligible for bankruptcy protection. Id. at 91.

Judge Kearse dissented from the majority opinion, concluding that the trust's original purchase and lease of aircraft, and its later liquidation of aircraft, was a business in which the certificate holders invested, and that the trust met the requirements of a business trust under New York law. Id. at 91-92. Judge Kearse also rejected a restrictive view of what constitutes a business trust, noting that when the Bankruptcy Code was adopted in 1978, Congress intended to *expand* the universe of business trusts eligible for bankruptcy by deleting the Bankruptcy Act's requirement that

---

[29]Several courts consider profit motive an elemental aspect of a business trust. See, e.g., Merrill v. Allen (In re Universal Clearing House Co.), 60 B.R. 985, 991 (D. Utah 1986) ("If the purpose [of the trust] is profit oriented, the trust is found to be an eligible trust."). Others reject the profit motive element. See, e.g., In re Affiliated Food Stores, Inc. Group Benefit Trust, 134 B.R. 215 (Bankr. N.D. Tex. 1991) (trust established to merely hold contributions to self-funded employee medical benefit plan and which contracted administration of the plan to a third party was nevertheless a business trust eligible for bankruptcy relief).

beneficial interests be evidenced by a written instrument. Id. at 92. She also disagreed with the

majority's view that the formation of the trust was not motivated by the goal of making a profit.

> And though the majority seems to rely most heavily on the fact that any excess profits
> generated by the purchase-and-leaseback [after payment of the certificateholders]
> would be payable to Eastern, the Trust plainly was no eleemosynary entity. Its
> operations were intended to generate a return on certificateholders' investment in the
> Trust, and while the amount of that return was contractually limited, the
> certificateholders were still to receive their agreed profit. I fail to see why the agreed
> profit limitation should remove the Trust from the Code definition of corporation.

Id. at 93. Judge Kearse, therefore, considered the activities of the trust to be sufficiently active to

render it a business rather than a passive receptacle for collateral, and thus believed that it was a

business trust eligible for bankruptcy relief. Id.[30] The question for this Court is which view, if

either, would the Tenth Circuit or United States Supreme Court have adopted if faced with the facts

in Shawmut? Or would they reject the active/passive distinction entirely and establish a different

test?

This Court notes that other entities that passively hold property for the benefit of investors

are "persons" that may be debtors under Section 109. See, e.g., Franklin Savings Corp. v. Office of

---

[30]As an interesting bonus, CFS submitted, as CFS App. F, a certified copy of the
financing/trust document interpreted in Shawmut. The document is a "Secured Equipment Indenture
and Lease Agreement" between the Indenture Trustee and Eastern (the "Indenture and Lease
Agreement"). Despite the apparent similarities between the Shawmut case and this case, it is
relevant to note that the Indenture and Lease Agreement was not formed or registered as a business
trust under state law nor does it refer to the formation of any entity called a business trust, as the
Series Trust does.

CFS also points out that in the Shawmut case, the trust certificate holders filed an involuntary
bankruptcy against the "trust" embodied in the Indenture and Lease Agreement, but the Indenture
and Lease Agreement does not specifically create a separate trust entity. Further, the court in the
Shawmut case, like courts in other business trust cases, focuses on attributes that make a trust
suitable to be eligible for bankruptcy relief, and does not have occasion to analyze the issue in the
context of a subordination argument under Section 510(b).

Thrift Supervision, 213 B.R. 596 (D. Kan. 1997) (corporation that held only bank stock was eligible debtor); In re First Financial Enterprises, Inc., 99 B.R. 751 (Bankr. W.D. Tex. 1989) (corporation that was holding company of stock in insurance companies was an eligible debtor, even though insurance companies are specifically precluded from bankruptcy eligibility); Peoples Bankshares, Ltd. v. Dept. of Banking (In re Peoples Bankshares, Ltd.), 68 B.R. 536 (Bankr. N.D. Iowa 1986) (limited partnership whose only assets were shares of stock in five banks was an eligible debtor, even though banks are not eligible for bankruptcy relief).

Even a *dissolved* corporation, which obviously does not operate a business, is a "person" that may be a debtor under Section 109. See In the Matter of Quad City Minority Broadcasters, Inc., 252 B.R. 773 (Bankr. S.D. Iowa 2000). Cf. In re A Car Rental, Inc., 166 B.R. 869 (Bankr. S.D. Tex. 1993) (corporation that forfeited its corporate charter was not an eligible "person" after the statutory three year period allowed for winding up had expired). Indeed, a liquidating trust established as a successor to a debtor corporation has been recognized as a "business trust" entitled to reorganize under chapter 11. In re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531 (Bankr. W.D. Tenn. 1986) (liquidating trust could be a debtor because it possessed the "powers and privileges of a private corporation" and was exercising the function of "winding up" the affairs of the grantor corporation); In the Matter of Captran Creditors Trust, 53 B.R. 741 (Bankr. M.D. Fla. 1985) (debtor liquidating trust was considered a business trust notwithstanding that the trust agreement stated that its primary purpose was to liquidate assets "with no objective to continue or engage in the conduct of a trade or business"); In re Tru Block Concrete Products, Inc., 27 B.R. 486 (Bankr. S.D. Cal. 1983) (under California law, "liquidating a corporation is considered doing business," thus liquidating trust was business trust).

The Sixth Circuit Court of Appeals recently adopted a "primary purpose" test, which gives

lip service to the active/passive distinction, but the result adopted by the Court does not turn on that

distinction, and in fact appears to be contrary to it. In summing up its holding, the panel stated—

> We are satisfied that the standard articulated in our prior opinion in this case is
> reasonably clear and workable, and reflects the intent of Congress. The standard
> consists in two propositions: first, "trusts created with the primary purpose of
> transacting business or carrying on commercial activity for the benefit of investors
> qualify as business trusts, while trusts designed merely to preserve the trust *res* for
> beneficiaries generally are not business trusts"; and second, "the determination is
> fact-specific, and it is imperative that bankruptcy courts make thorough and specific
> findings of fact to support their conclusions"--findings, that is, regarding what was
> the intention of the parties, and how the trust operated.

In re Kenneth Allen Knight Trust, 303 F.3d 671, 680 (6th Cir. 2002). The appellate court affirmed

the bankruptcy court's determination that the primary purpose of the subject trust was to conduct

commercial activity for its grantor/investor. The trust was created and managed by the grantor

primarily for the benefit of himself and his daughters. The trust's principal assets were the grantor's

personal residence and stock in a holding company that in turn held the stock of four subsidiary

corporations that owned and operated real estate, fast food franchises and other businesses. The trust

was essentially a *holding company* for the grantor's business enterprises; the trust itself did not

operate any business, yet it was held to be a business trust.

The relationship between the Kenneth Allen Knight Trust and its operating "subsidiaries"

is somewhat similar to the relationships between and among the Series Trust (the entity that makes

distributions to investors), the Master Trust (which holds the income producing receivables), and

CFS (the operating entity that collects the receivables). In both instances, the operations that

generate revenues for the trust beneficiaries are two times removed from the trust being analyzed for

qualities of a business trust.[31] Notwithstanding the Sixth Circuit's articulated standard, this Court is not convinced that the active/passive dichotomy is the dispositive distinction between business trusts and non-business trusts.[32]

>    2. *The Morrissey test*

Some courts test an entity for characteristics of a business trust under the rules that were established by the United States Supreme Court in an income tax case, Morrissey v. Commissioner, 296 U.S. 344 (1935). See, e.g., Mosby v. Boatmen's Bank (In re Mosby), 61 B.R. 636, 638 (E.D. Mo. 1985), aff'd, 791 F.2d 628 (8th Cir. 1986); In re Star Trust, 237 B.R. 827, 831-32 (Bankr. M.D. Fla. 1999); In re Constitutional Trust # 2-562, 114 B.R. 627, 631 n.12 (Bankr. D. Minn. 1990).

In Morrissey, the Supreme Court held that a trust that was created to purchase and develop land for the benefit of those who had purchased interests in the trust was deemed an "association" that was taxed as a "corporation" under the tax code, rather than as a "trust," because of the trust's similarity in form and function to a "corporation." After rejecting the proposition that the degree of control exercised by the trust beneficiaries over the management of the trust was the decisive factor in differentiating a trust from an association (and thus a corporation), id. at 351-56, the Court examined congressional intent in including "association" in the definition of "corporation" for the purpose of the tax laws.

---

[31]Using the Sixth Circuit's reasoning, the Series Trust is arguably an easier case for business trust status than the Kenneth Allen Knight Trust because the Series Trust has a pure business or commercial purpose while the Kenneth Allen Knight Trust possessed some characteristics of a family or estate planning trust.

[32]Even if the active/passive dichotomy survived close scrutiny, the Court concludes that the Series Trust falls within the "active business" category of trusts. See text on page 79-80, infra.

'Association' implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. This is not the characteristic of an ordinary trust– whether created by will, deed, or declaration– by which particular property is conveyed to a trustee or is to be held by the settlor, on specified trusts, *for the benefit of named or described persons.* Such beneficiaries do not ordinarily, and as mere *cestuis que trust,* plan a common effort or enter into a combination for the conduct of a business enterprise. Undoubtedly the terms of an association may make the taking or acquiring of shares or interests sufficient to constitute participation, and may leave the management, or even control of the enterprise, to designated persons. But the nature and purpose of the co-operative undertaking will differentiate it from an ordinary trust. In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type trusts, but to provide a medium for the conduct of a business and sharing its gains. Thus a trust may be created as a convenient method by which persons become associated for dealings in real estate, the development of tracts of land, the construction of improvements, and the purchase, management and sale of properties; or *for dealings in securities or other personal property;* or for the production, or manufacture, and sale of commodities; or for commerce, or *other sorts of business; where those who become beneficially interested, either by joining in the plan at the outset, or by later participation according to the terms of the arrangement, seek to share the advantages of a union of their interests in the common enterprise.*

Id. at 356-57 (emphasis added). Thus, although the Court's description of business trusts gave

examples of active businesses, it also found that "dealing with securities" was sufficiently active,

and that the true distinction required the beneficiaries to voluntarily join and invest in the enterprise

rather than be appointed by a grantor. The Court articulated the "salient features" that would render

a trust analogous to a corporation for tax purposes as follows–

A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of a trust. Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise, who act 'in much the same manner as directors,' may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous

to that of corporate activities may be achieved. An enterprise carried by means of a trust may be secure from termination or interruption by death of owners of beneficial interests and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interest without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of personal liability of participants to the property embarked in the undertaking.

Id. at 359.

The Third Circuit followed Morrissey in finding that an "investment trust" was an "association" closely analogous to a corporation to render it taxable as a corporation. See Pennsylvania Co. for Insurances on Lives and Granting Annuities v. United States, 138 F.2d 869 (3d Cir. 1943), cert. denied, 321 U.S. 788 (1944). That Court stated that although the trust did not need to have all the attributes of a corporation in order to be taxed as a corporation, it was clear that "pure trusts, that is, trusts of the traditional pattern where property is conveyed by will, deed, or declaration to a trustee or is to be retained by the settlor on specified trusts for a certain term for the benefit of named or described persons" were not business trusts. Id. at 873.

In another tax case, Commissioner v. City Nat'l Bank and Trust Co., 142 F.2d 771 (10th Cir.), cert. denied, 323 U.S. 764 (1944), the Tenth Circuit, in examining the trust instrument of a similar investment trust,[33] held—

> The garment in which this trust is clothed makes it difficult to recognize any resemblance to a traditional trust. The trust clearly was engaged in the business of buying and selling securities for income and profit for its members. Its structure, while not identical to that of a corporation, was measurably akin thereto. Being an association in the nature of a corporation, it falls within the provisions of the act and is taxable accordingly.

---

[33] These "investment trusts" differ from the Series Trust in that the investment trusts actively bought and sold securities, reaping profits from "playing the market," while the Series Trust holds securities that profit not from gains and losses on sales, but from interest.

69

Id. at 776.

The line of tax cases emanating from Morrissey are not particularly pertinent, however,

because the peculiarities of tax law and policy are not congruent with bankruptcy law.  For instance,

whether a trust is actively engaged in a trade or business or is merely a conduit for passing through

investment income to the beneficiaries is very relevant for taxation purposes because that distinction

has become the benchmark for determining whether a trust is a taxable entity.[34]  But for bankruptcy

---

[34]For instance, the 1998 tax laws regarding trusts were summarized in a private letter ruling
as follows:

Sections 671 through 678 provide rules for determining when grantors of trusts and
others are treated as substantial owners.

Section 671 provides that if the grantor or another person is treated as the owner of
any portion of a trust, there shall then be included in computing the taxable income
and credits of the grantor or the other person those items of income, deductions, and
credits against tax of the trust that are attributable to that portion of the trust to the
extent that such items would be taken into account in computing the taxable income
or credits against the tax of an individual.

Section 677(a) provides that, in general, the term "trust" as used in the [Internal
Revenue] Code refers to an arrangement whereby trustees take title to property for
the purpose of protecting or conserving it for the beneficiaries.  In general, an
arrangement will be treated as a trust if it can be shown that the purpose of the
arrangement is to vest in trustees responsibility for the protection and conservation
of property for beneficiaries who cannot share in the discharge of this responsibility
and, therefore, are not associates in a joint enterprise for the conduct of business for
profit.

Section 301.7701-4(c) provides that an "investment" trust will not be classified as a
trust if there is a power under the trust agreement to vary the investment of the
certificate holders. See Commissioner v. North American Bond Trust, 122 F.2d 545
(2d Cir.1941), cert. denied, 314 U.S. 701 (1942). An investment trust with a single
class of ownership interests, representing undivided beneficial interests in the assets
of the trust, will be classified as a trust if there is no power under the trust agreement
to vary the investment of the certificate holders.

A fixed investment trust is an organization in which a trustee holds the legal title to

eligibility purposes, taxability of the entity does not matter. Nor does taxability of an entity make any difference in determining whether the entity's investors, who assert a claim for securities fraud, should advance ahead of general unsecured creditors in the distribution line. Being a taxable entity, as opposed to a conduit, was not a prerequisite to being a business trust in 1926, when business trusts were added to the definition of "corporation" in the Bankruptcy Act. Therefore, although the Morrissey case contains language that clearly sets forth the attributes of a corporate-like entity, its progeny in the tax arena have no direct applicability to bankruptcy matters. See also In re Tru Block Concrete Products, Inc., 27 B.R. 486, 491 and n.8 (Bankr. S.D. Cal. 1983) (although IRC would not recognize the debtor as a business trust, "corporate taxation and bankruptcy do not share the same objectives and policies").

### 3. Attributes of a business trust

Then what are the essential elements of a business trust? Because "business trust" falls within the Code's definition of "corporation," it seems obvious that possessing corporate powers and attributes, such as the power to issue certificates of ownership[35] and the power as an entity to

---

investment assets for the benefit of multiple beneficiaries. The trust is not actively engaged in a trade or business, but is merely a conduit for passing through the investment income to the beneficiaries. There must be no power to vary the trust's investments, because the power would allow the certificate holders to profit from buying and selling investment assets rather than from the investments themselves. See generally, Pennsylvania Co. for Insurances on Lives and Granting Annuities v. United States, 146 F.2d 392 (3rd Cir.1944); Commissioner v. Chase National Bank, 122 F.2d 540 (2d Cir.1941); Commissioner v. Bond Trust, 122 F.2d 545 (2d Cir.1941), cert. denied, 314 U.S. 701 (1942).

Private Letter Ruling 9810015 (1998).

[35]Although the Bankruptcy Code eliminated the requirement that a business trust issue transferable certificates, the power to issue transferable certificates is still relevant in assessing whether an entity has attributes of a corporation.

sue and be sued, and the attributes of continuity of existence, liability limited to the assets of the

entity, centralization of management, and an existence that is created by authority of state law, are

all germane in the determining whether a trust should be considered a species of a "corporation."

The inclusion of business trusts in the statutory definition of "corporation" originated in 1926, when

the Bankruptcy Act's definition of "corporation" was amended to include a "business conducted by

a trustee, or trustees, wherein beneficial interest or ownership is evidenced by certificate or other

written instrument." The definition was amended in order to recognize the similarity of statutory or

common law business trusts to corporate entities.  See Highway & City Freight Drivers, Dockmen

and Helpers, Local Union No. 600 v. Gordon Transports, Inc., 576 F.2d 1285, 1290 (8th Cir.), cert.

denied, 439 U.S. 1002 (1978).  From 1926 until 1978 when the Bankruptcy Code was adopted,

Bankruptcy Act § 1(6) provided that—

> "corporations" shall mean all bodies having any of the powers and privileges of
> private corporations not possessed by individuals or partnerships, and shall include
> limited or other partnership associations organized under laws making the capital
> subscribed alone responsible for the debts of the association, joint stock companies,
> unincorporated companies and associations, and *any business conducted by a trustee,*
> *or trustees, wherein beneficial interest or ownership is evidenced by certificate or*
> *other written instrument.*

City of Lincoln v. Ricketts, 297 U.S. 373, 374 (1936) (quoting 11 U.S.C.A. § 1(6)) (emphasis

added).  In Gordon Transports, *supra,* the Eighth Circuit reasoned that in enacting the 1926

amendment that added trusts to the definition of "corporation," "Congress meant to create a clear

dichotomy between corporations and partnerships."  Id., 576 F.2d at 1290.

Some courts have concluded that Congress intended to broaden, rather than restrict, the scope

of trusts that may considered "corporations" when it replaced the above-emphasized clause in

Section 1(6) with the words "business trust" and eliminated the requirement for certificates when

the Bankruptcy Act was repealed and the Bankruptcy Code adopted in 1978.  See, e.g., In re

Affiliated Food Stores, Inc. Group Benefit Trust, 134 B.R. 215, 217 (Bankr. N.D. Tex. 1991)

("Under the Act, only those trusts 'conducted by a trustee or trustees wherein beneficial interest or

ownership [was] evidenced by certificates or other written instruments,' qualified to be debtors. The

Code's deletion of the Act's documentary requirement removed a technical restriction on bankruptcy

eligibility."). See also Shawmut v. First Fidelity Bank (In re Secured Equipment Trust of Eastern

Air Lines, Inc.), 38 F.3d 86, 92 (2d Cir. 1994) (in dissent); In re Kenneth Allen Knight Trust, 303

F.3d 671, 679-80 (6th Cir. 2002); In re Medallion Realty Trust, 103 B.R. 8, 11 (Bankr. D. Mass.

1989), aff'd, 120 B.R. 245 (D. Mass. 1990) ("that [Congress] chose to make such a change [to delete

the certificate requirement] is sufficient indication of a purpose to broaden the types of trusts which

can qualify [to file bankruptcy]"); In re Gonic Realty Trust, 50 B.R. 710, 713 (Bankr. D. N.H. 1985)

("expanded protection given under the new definition [of business trust by eliminating the certificate

requirement] is consistent with the remedial nature of the bankruptcy laws").

It is also self-evident that a "business trust" should have a business or commercial purpose

rather than a family support or estate planning purpose. Testamentary trusts and trusts established

for the benefit of someone chosen by the grantor are generally not deemed to be "business trusts,"

even if the trust operates a business. See, e.g., Mosby v. Boatmen's Bank (In re Mosby), 61 B.R.

636, 638 (E.D. Mo. 1985), aff'd, 791 F.2d 628 (8th Cir. 1986) (trust established by father for benefit

of son which held property used for hog and poultry operations was not a business trust because its

purpose was to preserve and protect assets for the benefit of the grantor's family); In re L & V Realty

Trust, 61 B.R. 423 (Bankr. D. Mass. 1986) (trust established by two men for benefit of their wives

was not a business trust in part because the wives did not contribute capital to the trust and thus were

non-investing family member beneficiaries); In re Armstead and Margaret Wayson Trust, 29 B.R.

58, 59 (Bankr. D. Md. 1982) (although the trustees of a testamentary trust operated a business for

the benefit of beneficiaries, the trust was held to be a non-business trust because it was not created by a voluntary pooling of capital by investors holding transferable interests).[36] Cf. In re Kenneth Allen Knight Trust, 303 F.3d 671 (6th Cir. 2002) (trust established by grantor for the benefit of himself and his daughters was a business trust; grantor/beneficiary had contributed the trust assets and conducted the business activities and thus the beneficiary was in fact an investor in the trust).

In these cases, the distinguishing feature of a business trust, as compared to a family or estate-planning trust, lies in the identity and contribution of the beneficiary. The beneficiary of a business trust has a commercial relationship with the trust, and has invested capital in the trust in exchange for an undivided beneficial interest in the whole. The beneficiary of a family support or estate planning trust generally has not made a contribution to the trust, but is chosen by the grantor to receive the bounty of the grantor's generosity. A family trust can actively engage in business for the benefit of beneficiaries or it may merely hold and protect property— the level of its involvement in generating income is not relevant to its exclusion from the "business trust" category of entities.

In In re Medallion Realty Trust, 103 B.R. 8 (Bankr. D. Mass. 1989), aff'd, 120 B.R. 245 (D. Mass. 1990), Judge Queenan indicated that he would extend the definition of business trust to any trust that has a business purpose (as opposed to an estate planning purpose) in which its beneficiaries have invested. Placing the distinction between a business trust and a non-business trust in a historical context, Judge Queenan explained that —

> The bankruptcy law of this country, unlike that of England, has always barred estates from relief in bankruptcy. Under both the Bankruptcy Act of 1867 . . . and the Bankruptcy Act of 1898 . . . the courts construed the word "person" in the eligibility provision to exclude to estates. As explained in Adams v. Terrell, a principal reason

---

[36]The Court in the Wayson Trust case reasoned that non-business trusts are not "persons" eligible for relief in bankruptcy court because such "trusts do not have a separate legal existence from the trustee." Wayson Trust, 29 B.R. at 59.

for doing so was the view that state probate law provides an adequate framework for the administration of insolvent estates. The continued use by Congress of the word "person" in the law's eligibility provision indicates Congressional agreement with this reasoning. In denying general eligibility to trusts, Congress presumably viewed trusts, even those of the intervivos variety, as being much like estates in that they are typically enmeshed in an estate plan and are under the control of state probate courts.

A trust which is not part of a settlor's estate plan presents different considerations. A probate court is not its traditional forum. Its beneficiaries are investors in a business enterprise rather than recipients of a settlor's largess. Congress obviously recognized these differences when in 1926 it amended what was then § 1(8) of the prior act to allow bankruptcy relief for "any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument." This opened the door to the traditional Massachusetts business trust. Because of the restrictive language, eligibility continued to be denied to a trust whose creating instrument was the only document evidencing beneficial ownership.

. . .

\*\*\*\*\*

One court has stated that the distinction should be between trusts "created for the purpose of carrying on some kind of business or commercial activity for profit and those created to preserve the trust *res*." In re Treasure Island Land Trust, 2 B.R. at 334. That dichotomy points in the right direction, but the test should be simpler—whether the trust was created to transact business for the benefit of investors. The latter test is certain to deny bankruptcy relief to the traditional donative trust created for the benefit of family members, a result which is consistent with both the history of estate ineligibility and what appears to be the core reasoning of most of the decisions. A distinction between the conduct of a business and the preservation of trust principal through investment, moreover, seems too fine for practical application, particularly where the trust invests in real estate.

I conclude, therefore, that Congress intended to permit bankruptcy relief for all trusts which are created for the purpose of transacting business and whose beneficiaries make a contribution in money or money's worth to the enterprise, without regard to whether the trust has characteristics of a corporation such as separate certificates of ownership.

Medallion Realty Trust, 103 B.R. at 11 (citations omitted). The trust in Medallion was found to be

not a trust at all, but a partnership, because the so-called trustee was allowed to act only upon the

direction of the majority of the beneficiaries, which created an agency relationship rather than a trust

relationship. Id. at 12. But, said the Court, "to the extent that the Debtor may be regarded as a trust, it is an eligible business trust." Id. at 14.

This Court finds Judge Queenan's analysis compelling. Insolvent trusts that can be administered by a probate court, such as estate-planning, family and testamentary trusts, have no need for bankruptcy protection. There is no principled reason that trusts that are created to accommodate the needs (tax and otherwise) of commercial investors, but that otherwise have attributes similar to corporate entities, should not be treated as such corporations in bankruptcy. And while it is obviously necessary to have an operating business in order to reorganize under Chapter 11 of the Bankruptcy Code, what purpose does it serve to limit the type of commercial trust that may be entitled to an orderly liquidation that Chapter 7 provides?

Thus, the Court concludes that, at a minimum, the essential characteristics that make a trust a species of corporation, and thus a "business trust" under bankruptcy law, are that (1) the trust possesses some of the attributes of a corporation; and (2) its beneficiaries have invested in or contributed capital to the trust. Other recurring themes in the catalog of "business trust" cases that may weigh in one direction or the other are: (1) whether the trust is in compliance with a state business trust law, (2) whether the purpose stated in the trust document precludes the trust from being a business trust (i.e., through estoppel), and (3) the business or commercial purpose of the trust.

### 4.   The Series Trust is a business trust.

The Series Trust was formed under and in compliance with the Delaware business trust statutes.[37] Series Trust Agreement, CFS App. Exh. A-8 at 5, § 2.6.[38] As a Delaware business trust,

---

[37]While it is undisputed that the Series Trust is a Delaware business trust, its designation as such and its organization under the Delaware domestic business trust law is not dispositive. As of

September 1, 2002, the Delaware legislature replaced all references to "business trust" in the Delaware Code with "statutory trust" and declared that any entity previously organized under the Delaware business trust statutes would now be referred to as a "statutory trust." See Del. Code tit. 12 § 3801 (2002). This revision was made for the specific "purpose of avoiding any implication that a trust formed under Chapter 38, Title 12 of the Delaware Code constitutes a 'business trust' within the meaning of Title 11 of the United States Code. Such amendments are not intended to result in any substantive change in Delaware law." Del. Laws, S.B. No. 412, ch. 329, synopsis (2002).

Accordingly, the "Definitions" article of the former Domestic Business Trust chapter of title 12 of the Delaware Code (now the "Domestic Statutory Trusts" chapter) states–

> The term "statutory trust" shall be deemed to include each trust formed under this chapter prior to September 1, 2002, as a "business trust" (as such term was then defined in this subsection). Neither use of the designation "business trust" nor a statement in a certificate of trust or governing instrument executed prior to September 1, 2002, to the effect that the trust formed thereby is or will qualify as a Delaware business trust within the meaning of or pursuant to this chapter, shall create a presumption or an inference that the trust so formed is a "business trust" for the purposes of Title 11 of the United States Code.

Del. Code Ann. tit. 12, § 3801 (2002). The revisions to the Delaware Code appear to reiterate what should be obvious: that the conclusion that an entity is a "business trust" for the purposes of determining an entity's right to seek bankruptcy protection cannot be dictated by state law, but rather is an issue of federal law. See Kenneth Allen Knight Trust, 303 F.3d at 678-79; In re Gurney's Inn Corp. Liquidating Trust, 215 B.R. 659, 661-62 (Bankr. E.D.N.Y. 1997) (whether an entity is a business trust, and thus eligible for bankruptcy relief is a question of federal law; "states have no right to open or close the door to federal bankruptcy relief").

In any event, even if the fact that the Series Trust is designated a Delaware business trust creates no presumption or inference that it is a "business trust" under the Bankruptcy Code, the fact that the parties chose the business trust form and complied with the Delaware business trust statutes remains relevant to the interpretation of the Series Trust Agreement, and in determining the intended purpose and function of the Series Trust. The Delaware business trust law in effect in 1998 was itself incorporated into the Series Trust Agreement. See Koval v. Peoples, 431 A.2d 1284, 1285 (Del. Super. Ct. 1981).

[38]Section 2.6 states, in relevant part–

> It is the intention of the parties hereto that the Series Note Issuer [the Series Trust] constitute a business trust under the Business Trust Statute and that this Agreement constitute the governing instrument of such business trust.... Effective as of the date hereof, the Series Owner Trustee [Wilmington] shall have all rights, powers and duties set forth herein and, to the extent not inconsistent herewith, in the Business Trust Statute with respect to accomplishing the purposes of the Series Note Issuer [Series Trust]. The Series Owner Trustee shall file the Certificate of Trust

the Series Trust possesses limited liability, one attribute of a corporation. See Del. Code Ann. tit. 12, § 3803 ("beneficial owners shall be entitled to the same limitation of personal liability extended to stockholders of private corporations for profit"); see also Series Trust Agreement at 5, § 2.7(b) (Noteholders have no personal liability for trust liabilities). Subject to the Basic Documents providing otherwise, the Series Trust Agreement provides for a Series Owner Trustee to provide central management of the trust, id. at 10, § 6.2, and for perpetual existence until its purpose is served (full payment of the Series Notes) or it is terminated consistent with the terms of the trust agreement, id. at 16-17, § 9.1. The Series Trust's beneficiaries (originally Kitty Hawk and Enterprise and others, but currently only BOA) contributed approximately $189 million in capital to the Series Trust in exchange for a Series Note, which evidences in writing the beneficiaries' investment in the Series Trust. Finally, unlike the trust agreement in the Treasure Island Land Trust case that emphatically denied that it was or should be deemed to be a business trust, the Series Trust Agreement specifically provides that "[i]t is the intention of the parties hereto that the Series Note Issuer constitute a business trust under the Business Trust Statute and that this Agreement constitute the governing instrument of such business trust." Id. at 5, § 2.6.

And again, the purposes and powers of the Series Trust are not limited to merely "preserving and protecting the *res*" as BOA claims. Section 2.3 of the Series Trust Agreement provides—

> Section 2.3 Purposes and Powers. The purpose of the Series Note Issuer [the Series Trust] is, and Series Note Issuer shall have the power and authority, to engage in the following activities:
>
> > (a) to issue the Notes pursuant to the Series Indenture and to issue the Companion Certificate pursuant to this Agreement, and to

substantially in the form of Exhibit B hereto with the Secretary of State of Delaware.

Series Trust Agreement, CFS App. Exh. A-8 at 5, § 2.6.

sell the Notes and the Companion Certificate, to transfer and
exchange the Notes and to pay interest on and principal of the Notes
and the Companion Certificate;

(b) to acquire the Trust Certificate, the Series Interest Rate
Cap and a security interest in the Series Reserve Account, to make
deposits to and withdrawals from the Series Reserve Account and to
pay the organizational, start-up and transactional expenses of the
Series Note Issuer;

(c) to assign, grant, transfer, pledge, mortgage and convey the
Series Indenture Property pursuant to the Series Indenture and to
hold, manage and distribute to the Certificate Issuer [the Master
Trust] pursuant to the terms of the Series Basic Documents any
portion of the Series Indenture Property released from the Lien of,
and remitted to the Series Note Issuer pursuant to, the Series
Indenture;

(d) to enter into and perform its obligations under the Series
Basic Documents to which it is a party;

(e) to establish and maintain Eligible Deposit Accounts in
connection with the Series Basic Documents, in its own name or
otherwise;

(f) to engage in those activities, including entering into
agreements, that are necessary, suitable or convenient to accomplish
the foregoing or are incidental thereto or connected therewith; and

(g) subject to compliance with the Series Basic Documents,
to engage in such other activities as may be required in connection
with the conservation of the Series Trust Property and the making of
distributions to (or on behalf of) the Noteholders and the Certificate
Issue as holder of the Companion Certificate.

The Series Note Issuer is hereby authorized to engage in the foregoing activities. The
Series Note Issuer shall not engage in any activity other than in connection with the
foregoing or other than as required or authorized by the terms of this Agreement or
the Series Basic Documents.

Id. at 2-3, § 2.3.

The Court finds that the Series Trust meets all the criteria of a "business trust," as those

criteria have been established by various courts, including the requirement that some active business

79

be transacted. The Series Trust has a business purpose and a profit-motive (to earn and distribute interest to Noteholders); payments to investors constituting return of capital and interest were contemplated. Thus, the Court concludes that the Series Trust is a "corporation" under Section 101(9) of the Bankruptcy Code.[39] As a "corporation," the Series Trust is a "person" that may be an "affiliate" under Section 101(2)(C). Thus, the next inquiry is whether CFS in fact "operated" the business or "substantially all . . . property" of the Series Trust under the terms of an "operating agreement." 11 U.S.C. § 101(2)(C).

    *5.    The Series Trust is an "affiliate" of CFS.*

Although the Court finds that the Series Trust was a commercial enterprise that was sufficiently engaged in business, the definition of "affiliate" does not require the "person" to be actively engaged in business. Under Section 101(2)(C) of the Bankruptcy Code, a person is an affiliate either if its "business" is operated by the debtor *or* its "property" is operated by the debtor. Thus, the affiliate itself need not be an operating business; it may merely own and hold *property* which is "operated" by someone else. Subsection (C) presupposes that someone other than the affiliate, *i.e.*, the debtor, operates the business or the property.[40]

---

    [39]Even if the Series Trust was not a "business trust" as historically defined, it clearly complies with the elements of the first definition of "corporation" in Section 101(9)(A) of the Bankruptcy Code, which states that a "corporation" is an "association having a power or privilege that a private corporation, but not an individual or partnership, possesses." 11 U.S.C. § 101(9)(A)(i). The Series Trust possesses limited liability, transferable shares and centralized management—all attributes of a corporation that are not possessed by a partnership or an individual.

    [40]It could be argued that the "business activity" prong of the test for a business trust should be even more relaxed when determining whether a trust should be classified as a business trust for the purpose of meeting the test of a corporation, thus person, thus affiliate under Section 510(b). In this case, the focus is on whether BOA's claim for rescission of the purchase of securities should be subordinated under Section 510(b), the intent of that statute being that investors in securities, rather than unsecured creditors, should bear the risk of fraud in the issuance of the securities. Because Section 510(b) was enacted to close a technical loophole in the bankruptcy law that allowed

In this case, the "property" of the Series Trust is a certificate representing an equity interest in a pool of Loans held by the Master Trust, among other property, and the "operation" that generates income for the holders of the Series Note (*i.e.*, interest) is the collection of the Loans, accounting operations that allocate the collections among various lockbox accounts for the ultimate benefit of the Series Note holders, and distribution of the collected funds, all of which are delegated to CFS (*i.e.*, the Servicer), albeit in obfuscating language. The Basic Documents appear to be designed to lead a casual observer to believe that the Series Trust is operated by a Series Owner Trustee who is entirely independent of CFS, when in fact CFS was contractually obligated to perform not only all duties of the Servicer, but also the obligations of the Master Trust and the Series Trust. The Series Owner Trustee, Wilmington Trust, held the Certificate. Virtually all other activities contemplated by the Series Trust were performed by CFS.

The GREAT Servicing Agreement (CFS App. Exh. A-7), as supplemented by 1998-B Supplement (CFS App. Exh. A-3), which was an integral part of the "Series Basic Documents" governing the relationship between and among CFS, the Master Trust and the Series Trust (see 1998-B Supplement at 8 (list of "Series Basic Documents")), disclosed CFS's role in the operation of the property of the Master Trust and by extension, the Series Trust. The GREAT Servicing Agreement

---

defrauded investors to unfairly elevate the priority of their claims over creditors who did not assume the risk of fraud, it is a remedial statute that must be construed broadly in order to give effect to its purpose—that is, to close the loophole. See In re Permian Producers Drilling, Inc., 263 B.R. 510, 520 (W.D. Tex. 2000); In re Granite Partners, L.P., 208 B.R. 332, 341 (Bankr. S.D.N.Y. 1997).

The most relevant characteristics for the purpose of determining whether an entity is an affiliate of the debtor for the purpose of determining application of Section 510(b) are whether the trust issued securities, whether the trust had a business or commercial purpose rather than an estate planning or support purpose, and whether the beneficiaries are investors who voluntarily entered into a contractual relationship with the trust rather than beneficiaries chosen by a grantor with a donative intent. The level of business activity undertaken by the issuer of a security, however, is not relevant to implementing the policy of subordinating rescission claims of securities holders to avoid an unfair elevation of such rescission claims.

provided that CFS, through its affiliate SPC, transferred the Loans to the Master Trust and the

Master Trust issued a security (a Trust Certificate) representing an undivided interest those Loans

to the Series Trust, (GREAT Servicing Agreement at 2, § 2.3); the Master Trust appointed CFS to

*operate its property*, that is, service all the Loans and "manage the Assets" of the Master Trust,

including collecting on the Loans (id. at 9-10, § 3.1(a) and (b)), giving CFS "the full power and

authority . . . to do or cause to be done all things in connection with" servicing, without consulting

with or obtaining the approval of the Master Trust or any Trustee (id. at 10, § 2.3(c)); "to execute,

deliver and file, in the name and on behalf of the [Master Trust]" instruments, documents or

pleadings necessary to collect, settle, release or litigate with respect to the Loans (id. at 10, § 2.3(d)-

(e); and then to perform all the accounting and banking functions necessary to properly allocate the

moneys collected among various lockbox accounts to insure that collections of the Loans backing

the Trust Certificate, which backed the Series Note purchased by BOA, were ultimately directed to

the payment of the principal and interest due on the Series Note (id. at 11, § 2.3(g), and at 45, §

11.1). CFS also performed the monthly and annual reporting functions for the Master Trust (id. at

18, §§ 4.5, 4.7, and 30, § 6.6) and calculated, for each collection account, the total amount collected

and all fees payable  from each account to CFS for servicing and performing duties on behalf of the

trusts, and to the Series Owner Trustee and the Series Indenture Trustee (id. at 30, § 6.6). CFS was

to advise the Master Trustee and the Paying Agent of the amount to pay the Series Noteholders. Id.

CFS also was responsible for calculating, preparing and delivering to the Noteholders a detailed

monthly statement of collections and fees.  Id. at 30, § 6.7.  The Series Trust Agreement also

provided that the Series Owner Trustee, that is, Wilmington Trust, specifically had "no obligation

to administer, service or collect the Assets or to maintain, monitor or otherwise supervise the

administration, servicing or collection of the Assets." Series Trust Agreement, CFS App. Exh. A-8

at 10, § 6.2. These were generally the duties of CFS as Servicer, operating the "property" of the

Master Trust and Series Trust[41] in order to generate revenues that would ultimately result in a profit

to the Series Noteholders. The Court concludes that because CFS "operated" substantially all of the

property of the Series Trust "under an operating agreement," that being the GREAT Servicing

Agreement and the Series Trust Agreement collectively, the Series Trust is an affiliate of CFS. 11

U.S.C. § 101(2)(C).

The Court also concludes that CFS was also obligated under the GREAT Servicing

Agreement to operate the "business" of the Master Trust and Series Trust. Section 11.1 of the

GREAT Servicing Agreement stated—

> Servicer shall perform all its duties and the duties of Certificate Issuer [Master Trust]
> under the Master Trust Agreement and each Series Note Issuer [Series Trust] under
> each Series Trust Agreement and shall consult with the Master Trustee and each
> Series Owner Trustee as Servicer deems appropriate regarding the duties of
> Certificate Issuer under the Master Trust Agreement and the duties of each Series
> Note Issuer under each Series Trust Agreement. Servicer [CFS] shall monitor the
> performance of Certificate Issuer and each Series Note Issuer and shall advise the
> Master Trustee and each Series Owner Trustee when action is necessary to comply
> with Certificate Issuer's duties under the Master Trust Agreement or each Series Note
> Issuer's duties under the applicable Series Trust Agreement. Servicer [CFS] shall
> prepare for execution by Certificate Issuer and each Series Note Issuer or shall cause
> the preparation by other appropriate Persons of all such documents, reports, filings,

---

[41]The assets of the Master Trust and the Series Trust were consolidated for tax purposes and
the Series Note was treated as a debt of the Master Trust rather than the Series Trust. The Series
Trust Agreement states—

> It is the intention of the parties hereto that, for federal, state and local income and
> franchise tax purposes, the Series Note Issuer [Series Trust] will be disregarded as
> an entity separate from the Certificate Issuer [Master Trust] and the Notes will be
> treated as debt. The parties agree that unless otherwise required by appropriate tax
> authorities, the Series Note Issuer [Series Trust] will not file or cause to be filed,
> annual or other necessary returns, reports and other forms required for partnerships.

Id. at 5, § 2.6.

> instruments, certificates and opinions as it shall be the duty of Certificate Issuer or
> such Series Note Issuer to prepare, file, or deliver pursuant to the Master Trust
> Agreement or Series Trust Agreement. In furtherance of the foregoing, Servicer
> [CFS] shall take all appropriate action that is the duty of Certificate Issuer to take
> pursuant to the Master Trust Agreement or any Series Note Issuer to take pursuant
> to the applicable Series Trust Agreement.

Id. at 45, § 11.1(a). These duties included engaging in all activities set forth in the "Purposes and

Powers" provision of the Series Trust Agreement (Series Trust Agreement at 2-3, § 2.3). The duties

of the Series Owner Trustee included the execution of instruments, and oversight and approval if and

when CFS notified the Trustee that CFS intended to perform a "non-ministerial" matter, that is –

amend trust documents, initiate or compromise any litigation by or against the Series Trust, amend

the Servicing Agreement, or change or remove any trustee or paying agents. GREAT Servicing

Agreement at 45-46, § 11.1(b); Series Trust Agreement at 9, § 6.1. The Series Owner Trustee also

maintained the Delaware office of the Series Trust in order to qualify as a Delaware business trust.

Series Trust Agreement, §§ 2.1, 2.1, 2.4, 2.9, 3.8. But, the Series Owner Trustee was authorized,

*but not obligated*, to take all actions required of the Series Trust, and was authorized to take action

recommended by the Servicer, CFS, with respect to the Basic Documents. Id. at 9, § 6.1. The Series

Owner Trustee was not obligated to perform the "actions required of the Series Trust" because those

actions were the responsibility of CFS by virtue of Section 11.1 of the Servicing Agreement. Thus,

the Court concludes that the Series Trust was a "person whose business [was] operated under . . .

[an] operating agreement by the debtor" and therefore the Series Trust is an affiliate of CFS. 11

U.S.C. § 101(2)(C).

### 6.    *Application of Section 510(b).*

> For the purpose of distribution under this title, a claim arising from rescission of a
> purchase or sale of a security of the debtor or of an affiliate of the debtor, . . . shall

84

> be subordinated to all claims or interests that are senior to or equal the claim or
> interest represented by such security . . . .

11 U.S.C. § 510(b). As set forth above, the undisputed facts show that BOA's Constructive Trust

Claim is a claim arising from the rescission of its purchase of the Series Note, that the Series Note

is a security of the Series Trust, and that the Series Trust is an affiliate of CFS. Subordination of the

Constructive Trust Claim is therefore mandatory.

## VII.   Conclusion

For the reasons stated above, summary judgment is granted in favor of CFS and against BOA

on CFS's Section 510(b) subordination defense. The Constructive Trust Claim is therefore

subordinated below Class 5 claims and is determined to be a Class 6 Claim.

**SO ORDERED** this __11ʰ__ day of July, 2003.

_____

**DANA L. RASURE**
**UNITED STATES BANKRUPTCY JUDGE**