## Exhibit 12

**John J. Slain & Homer Kripke,**
***The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*,**
**48 N.Y.U. L. Rev. 261 (1973)**

# THE INTERFACE BETWEEN SECURITIES REGULATION AND BANKRUPTCY— ALLOCATING THE RISK OF ILLEGAL SECURITIES ISSUANCE BETWEEN SECURITYHOLDERS AND THE ISSUER'S CREDITORS

JOHN J. SLAIN*
HOMER KRIPKE**

*Securityholders who assert rescission claims against their issuer are presently afforded special treatment in bankruptcy. Despite the fact that they are conscious risk-takers, these claimants are allowed to share equally with, or to take before, general creditors. Professors Slain and Kripke argue that this treatment gives inadequate recognition to interests which ought to be, and are in other contexts, protected in a bankruptcy distribution. Applying traditional concepts of reliance and laches, the authors propose a system which more nearly harmonizes securities law policies with those of the Bankruptcy Act.*

NOT many doctrines have passed more fully into the collective consciousness of the legal and commercial communities than the absolute priority rule, which states this prohibition: in bankruptcy, stockholders seeking to recover their investments cannot be paid before provable creditor claims have been satisfied in full. Nevertheless, there is a class of cases not subject to this rule under current practice. In these cases a dissatisfied investor may rescind his purchase of stock or subordinated debt by proving that the transaction violated federal or state securities laws. Under such circumstances, it is currently held that the investor's claim either shares pari passu with, or is preferred to, claims of general creditors.

While rescission cases arise in a wide variety of factual contexts, they all have two characteristics in common: first, they disappoint the general creditor's expectation that in bankruptcy his claims will be paid out ahead of equity claims; secondly, they assume that the interests protected by federal and state securities regulation should take precedence over all other interests normally taken into account when dealing with claims against a distressed enterprise.

An historical irony provides a fitting backdrop to our dis-

---

* Professor of Law, The Ohio State University College of Law.
** Professor of Law, New York University School of Law.

cussion. In the 1930's the Securities and Exchange Commission argued forcefully that the absolute priority rule should govern any competition in bankruptcy between general creditors and non-rescinding securityholders. Today, in a closely analogous bankruptcy situation, the Commission argues that rescinding security-holders should share equally with general creditors, rather than take after them. Yet the reasons for distinguishing between non-rescinding and rescinding shareholders in relation to general creditors in a bankruptcy situation and for disregarding the traditional policies of bankruptcy distribution are neither clear nor compelling.

The rule that general creditors should be given absolute priority over nonrescinding shareholders was established only after a long debate over the relative positions of the two groups that originated in the late nineteenth century. The controversy was intensified after the Supreme Court's decision in *Northern Pacific Railway v. Boyd*[1] in 1913. The Court there upset a federal equity reorganization because it provided for the participation of stockholders of the distressed enterprise, but not for the participation of general creditors. The Court acknowledged that general creditor claims were senior to the claims of shareholders,[2] but left unsettled the question whether general creditors had absolute or relative priority. Under the absolutist view, junior interests may not participate in the reorganization until senior interests have been satisfied in full by the receipt of securities having a value equal to the claims surrendered by them.[3] Under the relativist view, all claimants participate in the reorganization, but senior interests are entitled to recover a higher percentage of their claims.[4]

This controversy was finally put to rest by the decisions of the Supreme Court in *Case v. Los Angeles Lumber Co.*[5] and *Consolidated Rock Products Co. v. DuBois*,[6] which held that junior claims cannot participate in a reorganization unless all senior

---

[1] 228 U.S. 482 (1913).

[2] See id. at 504.

[3] The absolutist position is argued (and both positions described) in Bonbright & Bergerman, Two Rival Theories of Priority Rights of Security Holders in a Corporate Reorganization, 28 Colum. L. Rev. 127 (1928). A very strong statement of the absolutist position was made in Frank, Some Realistic Reflections on Some Aspects of Corporate Reorganization, 19 Va. L. Rev. 541 (1933).

[4] The relative priority position was argued in Swaine, Reorganization of Corporations: Certain Developments of the Last Decade, 27 Colum. L. Rev. 901 (1927).

[5] 308 U.S. 106 (1939).

[6] 312 U.S. 510 (1941).

HeinOnline -- 48 N.Y.U. L. Rev. 262 1973
Imaged with the Permission of N.Y.U. Law Review

claims have been satisfied in full.[7] During the years immediately
preceding these cases, the main burden of advancing the absolute
priority position was borne by the staff of the Securities and Ex-
change Commission under the aegis of Jerome Frank.[8] The Com-
mission filed an amicus brief in *Consolidated Rock Products*[9] and
prepared the amicus brief filed by the United States in *Los
Angeles Lumber*.[10] In an important sense, the Commission can
claim the absolute priority rule as it is currently understood as
one of its achievements.

In view of the important role the Commission played in the
adoption of the absolute priority rule, it is ironic that the Commis-
sion's position as to the rights of rescinding securityholders in
bankruptcy should cut squarely across its work of the 1930's. In-
deed, as noted below, the Commission's present position goes
beyond anything ever asserted by the relativists, since the Com-
mission is now asserting parity between rescinding securityholders
and senior creditors.

In this article, we question the basic wisdom of treating
rescission claims any differently from equity claims in bank-
ruptcy cases. It is our thesis that the present approach is wrong
and that the problem should be reconceptualized as one of risk
allocation. In our view, in any such allocation one interest should
be weighted far more heavily than at present: the reliance interest
of persons having the normal expectation that equity investment
and junior debt will bear the first losses of the enterprise.

I

THE MIS-EN-SCENE

The inequity of allowing rescinding shareholders to share
equally in bankruptcy with general creditors can be demonstrated
by use of a hypothetical.[11] Assume that XYZ, Inc., having just

---

[7] The historical development of the absolute priority rule from federal equity
receivership reorganizations to proceedings under Chapter X of the Bankruptcy
Act, 11 U.S.C. §§ 501-676 (1970), is summarized in Caplin v. Marine Midland
Grace Trust Co., 406 U.S. 416, 436 n.2 (1972) (Douglas, J., dissenting). See also
6A W. Collier, Bankruptcy ¶¶ 9.08, 9.10 (14th ed. 1972).

[8] See Frank, supra note 3.

[9] Brief for SEC as Amicus Curiae, Consolidated Rock Products Co. v. DuBois,
312 U.S. 510 (1941).

[10] One of the authors of this article, Professor Kripke, who was then an
attorney on the Commission's staff, was of counsel in both cases and an author of
both briefs prepared by the Commission.

[11] The securities bar will recognize that the hypothetical case is based upon
the recent decision in Henderson v. Hayden, Stone Inc., 461 F.2d 1069 (5th Cir.
1972), except that in *Henderson* the investor's suit was brought against underwriters
rather than against the issuer.

been organized to engage in the widget business, requires an additional $300,000 of capital to start up. XYZ's management, either directly or through investment bankers, searches for a group of substantial investors prepared to provide the $300,000 and accept equity risks. They locate one such investor, H, who has a personal investment portfolio of several million dollars. Prior to his retirement, H was employed as a portfolio manager for a financial business and is concededly a "sophisticated investor."[12] H meets the principals in XYZ, investigates the affairs and prospects of the company to the extent he deems necessary, calls for and receives financial statements, and purchases 30,000 shares of XYZ's common stock for $180,000. Mr. H recognizes that the widget business provides both high risk and high return and is, in short, speculative. Another 20,000 shares are sold for $120,000 to others less sophisticated, who are impressed by the information that the sophisticated Mr. H is participating.

XYZ begins operations and for six months after H's stock purchase conducts an active business. The corporation quickly incurs $1,000,000 in liabilities to unsecured lenders and open-account vendors who have advanced money or credit in reliance on the general knowledge that XYZ has sold $300,000 of stock. XYZ does not prosper. Seven months after H's purchase, the corporation files a petition under Chapter XI of the Bankruptcy Act,[13] and the reorganization quickly ripens into a straight bankruptcy proceeding. In this proceeding, H asserts a claim for rescission of his $180,000 stock purchase, alleging that the issuer violated Section 5 of the Securities Act of 1933[14] (Securities Act). XYZ's trustee in bankruptcy attempts to show that the issue was exempted as a nonpublic offering under Section 4(2) of the Act,[15]

---

[12] The term "sophisticated investor" defies precise definition. Very generally, it has been used to refer to those persons who have sufficient understanding of financial matters to be able "to fend for themselves" when making an investment. See United States v. Custer Channel Wing Corp., 376 F.2d 675, 678 (4th Cir. 1967). The term becomes important when the question is raised whether a "private offering" has been made under Section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2) (1970). See note 16 infra.

[13] 11 U.S.C. §§ 701-99 (1970).

[14] 15 U.S.C. § 77e (1970). This section makes it illegal to use the "means or instruments of interstate commerce" to sell an unregistered security. For the purposes of this discussion, we assume that the jurisdictional requirement of the Act, *i.e.*, the use of such instrumentalities, has been met. In practice, it would be almost impossible to avoid triggering Securities Act jurisdiction in an offering to a number of persons in different states. See generally 1 L. Loss, Securities Regulation 207-11 (Supp. 1969); 4 id. at 2313-16 (1969).

[15] 15 U.S.C. § 77d(2) (1970). Section 4 of the Securities Act, 15 U.S.C. § 77d (1970), provides for exemptions from the provisions of section 5. Section 4(2) extends an exemption to "transactions by an issuer not involving any public offering."

but fails when he is unable to demonstrate that all the persons to
whom the $300,000 in stock had been offered were "sophisticated"
and had access to the same information that would have been
available had the stock been registered under the Securities Act.[16]

As will be demonstrated, it is probable that H has a claim
entitled to share pari passu with the claims of general creditors.
Still worse, in our view, is the possibility that based on its past
positions the SEC will fight on H's behalf for this result. More-
over, there is also a possibility that H's claim for recapture of his
$180,000 may actually be preferred to claims of general creditors!
Of course, if H is successful in rescinding because of other pur-
chasers' lack of sophistication, he will be doing so in derogation of
the Securities Act policy of protecting such persons. This is be-
cause H's rescission will put him ahead of these investors if they are
sufficiently unsophisticated not to rescind within the period of the
statute of limitations and even though they expected that H would
be sharing the equity risk with them.

The claim asserted by H in our hypothetical is unusual: a
knowledgeable buyer does not often use an issuer's Securities Act
violation to opt out of his investment if he has not actually been
prejudiced by the violation. More commonly, a stockholder seek-
ing to rescind will assert some claim of misrepresentation (or non-
disclosure) of material information in connection with his pur-
chase. Yet from the general creditor's point of view, the injustice
of assigning to him a status merely equal to, or perhaps subordi-
nate to, that of a rescinding shareholder does not depend on the
basis of the shareholder's claim. In extending credit, he has relied
on the operation of the absolute priority rule in case of bank-
ruptcy. Furthermore, in shifting his priority position, the courts
impose upon him the burden of a risk he has never assumed and
should not be made to assume—the possibility of a defective stock
issue.

To avail himself of the present exception to the absolute

---

[16] The undefined statutory term "public offering" received its most significant
marginal gloss in SEC v. Ralston Purina Co., 346 U.S. 119 (1953), which arose in
the context of an offering to employees. The Court held that the status of offerees
as "public" depended upon their need for the information which would be made
available by the registration process. The example of a nonpublic (and therefore
exempt) offering given by Justice Clark in his opinion is an offering "made to
executive personnel who because of their position have access to the same kind of
information that the act would make available in the form of a registration state-
ment." Id. at 125-26. As an extrapolation from this example, the doctrine has
developed that nonpublic offerees are persons who have both access to information
about the issuer and sufficient "sophistication" to utilize it. See, e.g., Hill York
Corp. v. American International Franchises, Inc., 448 F.2d 680, 690 (5th Cir. 1971);
United States v. Custer Channel Wing Corp., 376 F.2d 675, 678 (4th Cir. 1967).

priority rule, the shareholder may base his rescission claim on one or more of several federal and state statutes and common law rules. A transaction may violate the Securities Act in two respects: it may be an unregistered nonexempt public offering of securities or it may be effected through the use of a deceptive prospectus. Section 12(1) of the Securities Act[17] allows rescission by the purchaser in the first situation, and section 12(2)[18] allows rescission in the second. Alternatively, Section 12 of the Act affords a claim for damages to the stockholder who has sold his shares and thus cannot retender them to the corporation.[19] An issuer's conduct may also violate other sections of federal securities law, most obviously the antifraud provisions of Section 17(a) of the Securities Act[20] or rule 10b-5 under the Securities Exchange Act of 1934 (Exchange Act)[21]. Each of these may be the predicate of a private action in which either rescission or damages are claimed by a continuing stockholder or damages are claimed by a former stockholder.[22]

In addition to federal rights of action, stockholders may also have rights under state law. All states except Delaware have some type of Blue Sky law.[23] Most of these statutes require registration before a public offering can be made. In addition, most Blue Sky laws have some general antifraud provision comparable to section 17(a) and rule 10b-5. While available remedies vary widely, rescission and damages may be provided for violations of either the registration or the antifraud Blue Sky provisions, or both.

Last, but not insignificant in a misrepresentation case, is the possibility of a state common law action for deceit, an equity action for rescission, or an action in quasi-contract for return of consideration due by virtue of a previously completed rescission.[24]

---

[17] 15 U.S.C. § 77l(1) (1970).

[18] 15 U.S.C. § 77l(2) (1970).

[19] 15 U.S.C. § 77l (1970).

[20] 15 U.S.C. § 77q(a) (1970).

[21] The Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a-hh-1 (1970). The official citation for rule 10b-5 is 17 C.F.R. § 240.10b-5 (1972).

[22] As to Section 17(a) of the Securities Act, see Dack v. Shanman, 227 F. Supp. 26 (S.D.N.Y. 1964); Thiele v. Shields, 131 F. Supp. 416 (S.D.N.Y. 1955). As to rule 10b-5, see Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6 (1971); 2 A. Bromberg, Securities Law: Fraud—SEC Rule 10b-5 §§ 9.1, 9.2 (1971).

[23] See CCH Blue Sky L. Rep. for a collection of statutes by state. See generally L. Loss & E. Cowett, Blue Sky Law (1958).

[24] See Annot., 125 A.L.R. 879 (1940); Annot. 91 A.L.R. 1363 (1934); Annot., 91 A.L.R. 1295 (1934); Annot., 73 A.L.R. 1120 (1931); Annot., 68 A.L.R. 635 (1930); Annot., 51 A.L.R. 46 (1927). See also Restatement of Restitution § 8 (1937); Restatement (Second) of Torts § 252(A) (1965); 1 F. Harper & F. James, The Law of Torts 603-05 (3d ed. 1956).

These claims vary not only in their enforcement procedures, but also in the precise circumstances of their availability and the exact remedies they afford.

We are only incidentally concerned with the precise predicate of a disaffected stockholder's efforts to recapture his investment from the corporation. For present purposes it suffices to say that when the basis of the stockholder's disaffection is either the issuer's failure to comply with registration requirements or the issuer's material misrepresentations, one or more state or federal claims may be made. Our purpose is to consider the impact of such claims on the distribution of the corporation's assets in bankruptcy and the development of a plan of reorganization under Chapter X.

Conceptually, the class of potential rescission claimants includes all those whose rights may be infringed by violation of the securities law provisions mentioned above. For example, participants in arrangements subsumed under the protean term "investment contract" would arguably be able to assert rescission claims.[25] Typically, however, two classes of investors benefit most dramatically from the availability of securities law remedies in bankruptcy: stockholders and subordinated lenders such as the holders of the common type of convertible subordinated debenture.

Some securityholders may not benefit from their securities law rights, since their contracts with the issuer often provide for equal or superior remedies. For example, the note evidencing a bank loan made to an issuer is a security,[26] and if the loan has been obtained by misrepresentation, securities law remedies may be available to the bank. Since, however, the bank is already a

[25] The "investment contract" is listed as a security in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1) (1970), and in Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10) (1970). Included within the term is any transaction involving "an investment of money in a common enterprise with profits to come solely from the efforts of others." SEC v. W. J. Howey Co., 328 U.S. 293, 301 (1946).

[26] A "note" is listed as a security in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1) (1970), and in Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10) (1970). While many notes would be exempt from the registration provisions of Section 5 of the Securities Act, 15 U.S.C. § 77e (1970), either because of short maturity under section 3(a)(3) or through the private offering exception of section 4(2), 15 U.S.C. §§ 77c(a)(3), 77d(2) (1970), the registration exemption does not take them outside the antifraud provisions of the act. Section 3(a)(10) of the Exchange Act is more narrowly drawn, since a note with a maturity of nine months or less is apparently excluded from the definition of security and hence from the operation of the act. But see Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir.), cert. denied, 41 U.S.L.W. 3274 (U.S. Nov. 13, 1972). See generally 2 L. Loss, Securities Regulation 795-96 (3d ed. 1961).

Imaged with the Permission of N.Y.U. Law Review

creditor, these remedies will not ordinarily improve the bank's position vis-a-vis the issuer's general creditors. Assuming it holds documents in reasonably conventional form, the bank may demand its money by reason of an acceleration clause and may have a security interest in some assets of the issuer. Moreover, bank loan agreements usually provide for compensating balance requirements making funds of the issuer available to pay out the loan. Except in a rare case, it is unlikely that the availability of securities law remedies will add significantly to the bank's bundle of rights.

By contrast, investors in stock or in subordinated debentures may be able to bootstrap their way to parity with, or preference over, general creditors even in the absence of express contractual rights. This unexpected result is the product of the unthinking application of the policies underlying the securities laws at the expense of policies underlying bankruptcy distribution. Since this favored treatment is clearly outside the original contemplation of both the securityholders and the general creditors affected, it is with securities of this type that we are concerned. Hereafter, the discussion is focused upon the rescinding stockholder. Mutatis mutandis, the discussion is equally applicable to holders of subordinated debentures and to other creditors whose debt securities are contractually subordinated.

As we shall see, the variety of possible responses to the problem posed in bankruptcy by rescission claims is as rich as the variety of possible situations in which the claims may arise. Authority exists for each of these possibilities: (1) the rescinding stockholder may share pari passu with general claims; (2) the rescinding stockholder may be preferred to general claims; and (3) the rescinding stockholders may be subordinated to general claims or estopped from asserting any claim.

## II

### AUTHORITIES HOLDING THAT THE STOCKHOLDER SHARES PARI PASSU

The issue of rescinding shareholder competition with general creditors in a bankrupty distribution has been considered directly by the Supreme Court in only one case.[27] *Oppenheimer v. Harri-*

---

[27] In Tcherepnin v. Knight, 389 U.S. 332 (1967), the question of the rights of rescinding shareholders vis-a-vis other investors in the case of a bankruptcy distribution was presented by one of the parties. The Court found that the question had been raised prematurely and decided the case on different grounds. Id. at 346.

*man National Bank & Trust Co.*,[28] decided in 1937, involved
facts which arose before the Securities Act went into effect. Plain-
tiff shareholder, having purchased in reliance upon a misrepresen-
tation by the bank's officers, retendered his shares and brought
suit in quasi-contract for his net damages against the liquidator of
the bank, which was then insolvent. After the district court
directed a verdict for the liquidator, the Second Circuit reversed,
holding that the stockholder's rescission claim was valid, but that
judgment would be paid only out of assets remaining after satis-
faction of general creditors.[29] A unanimous Supreme Court dis-
agreed and held that the stockholder claim was allowable as a
general creditor's claim, treating the claim of the rescinding
stockholder like any other unsecured nonpriority indebtedness of
the bankrupt. The possible conflict with *Boyd* was not discussed.

During the four decades since *Oppenheimer,* the Supreme
Court has not reconsidered the priority problem posed by res-
cinding shareholders. The lower federal courts, however, have
dealt with aspects of the question quite often in recent years.
Rescission rights under Section 12 of the Securities Act are
asserted with increasing frequency in Chapter X cases. For
example, the priority issue is discussed in a 1968 case, *In re Los
Angeles Land & Investments, Ltd.*,[30] which involved a land syndi-
cation arrangement based upon unregistered publicly offered con-
tracts of the *Joiner* type.[31] For reorganization plan preparation
purposes, the rescission claims of contract holders under Section
12(1) of the Securities Act were classified with claims of "holders
of promissory notes which are unsecured [and] open account
creditors for services rendered or materials delivered."[32] The
court described these various claims as being of the same kind,
varying "in only minor details concerning primarily the manner
in which they arose."[33] This case did not, of course, involve res-
cinding stockholders and therefore did not cut squarely across the
*Boyd* doctrine.

The status of rescinding stockholders as creditors was raised,
but not determined, in the reorganization of TMT Trailer Ferry,

---

[28] 301 U.S. 206 (1937).

[29] 85 F.2d 582 (2d Cir. 1936).

[30] 282 F. Supp. 448 (D. Haw. 1968).

[31] See SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344 (1943). In that case
the defendant sold oil lease assignments which the Supreme Court held to be
"investment contracts" under Section 2(1) of the Securities Act.

[32] 282 F. Supp. at 454.

[33] Id.

Inc.[34] In that protracted and involved reorganization proceeding, one group of TMT stockholders asserted that they had been defrauded and requested that they be classified as creditors ranking "on a parity with the claims of general creditors."[35] Unfortunately for our purposes, these claims were held by the district court to be barred as untimely filed, so that the substantive issue was never decided.[36] *TMT* is of interest, however, because the position of the SEC's Division of Corporate Regulation can be inferred from its advisory report to the district court on the "Internal Plan" for reorganizing TMT. The report concluded that the plan under consideration was feasible, but not fair. One element of the alleged unfairness was that the district court would not hear the complaining stockholders on the merits of their claims.[37] The report thus suggests that the Commission concurred in the legal position of the complaining stockholders that they were entitled to participate in the reorganization as general creditors subject, of course, to the requirement that they prove the facts alleged.

The *Oppenheimer* theory of parity was also asserted in the Four Seasons reorganization.[38] In that case, the reorganization value available, after provision for secured claims, was about $30,000,000. General creditor claims plus interest thereon also aggregated about $30,000,000. Rescinding securityholders asserted claims of $100,000,000. The plan divided the $30,000,000 residual equity giving roughly two-thirds to general creditors and one-third to securities plaintiffs. This allocation, however, was not based on a theory of subordination but rather on the compromise of disputed claims. The Commission's advisory report describes the securities claims as being on a parity with "unsecured claims generally."[39]

One issue that such cases have not yet resolved relates to the extent of the damage claim which the disaffected stockholder may

---

[34] SEC Corporate Reorganization Release No. 226, In the Matter of TMT Trailer Ferry, Inc., Debtor (Mar. 8, 1965).

[35] Id. at 13-14. See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968), rev'g 364 F.2d 936 (5th Cir. 1966); Blum, Some Marginal Notes on TMT Trailer Ferry Reorganization: The New Math?, 1968 Sup. Ct. Rev. 77 (P. Kurland ed. 1968).

[36] See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 364 F.2d 936, 939-40 (5th Cir. 1966), rev'd on other grounds, 390 U.S. 414 (1968). The same untimely filing factor also cut off the SEC's efforts to raise this issue in the General United Corporation reorganization. See SEC v. Templar, 405 F.2d 126, 128 (10th Cir. 1969).

[37] See SEC Corporate Reorganization Release No. 226, at 13-14.

[38] See SEC Corporate Reorganization Release No. 310, In the Matter of Four Seasons Nursing Centers of America, Inc., Debtor (Mar. 16, 1972).

[39] Id. at 41 n.32.

assert against the debtor. *Oppenheimer* and *Los Angeles* involved restitutionary demands; the securityholders in each case were attempting to recapture consideration paid by them to the debtor. Restitution will always be the aim when the securityholder's claim is bottomed on Section 11 or Section 12 of the Securities Act: the ceiling on section 11 damages is the initial public offering price of the security, while the section 12 remedy is made expressly restitutionary. This, however, does not exhaust the possibilities for recovery. Under now-orthodox views of rule 10b-5 and Section 17 (a) of the Securities Act, an issuer's damage liability is not limited to the amount it receives upon issuance. Assume, for example, that a debtor had sold its securities for $10, utilizing a defective prospectus, but that the securities were purchased in the aftermarket for $40 by P in reliance upon the prospectus. If the securities were worthless, P's 10b-5 claim against the issuer would appear to be $40.[40] If such nonrestitutionary damage claims are within the *Oppenheimer* rule, an exponential increase in the exposure of general creditors results. A creditor who has relied, as in our hypothetical, upon the existence of a $10 equity cushion under his claim against the issuer may see the $10 equity cushion turn into a $40 competing claim. This problem appears to have been involved in *Four Seasons*, but to have been finessed by the technique of compromising the asserted claims at about 10% of face amount.

Whatever the scope of allowable claims, it is clear that some lower courts and the SEC are following the exception carved out of the absolute priority rule in *Oppenheimer* without regard to the impact it has had on general creditors. This impact has varied considerably. *Oppenheimer* involved an isolated net claim of about $12,000 in the liquidation of a substantial bank. In considering this relatively small claim, the Supreme Court may not have anticipated the fact that rescission claims in subsequent cases would be so significant as to absorb a large proportion of the assets available in a bankruptcy distribution. In *TMT* and *Four Seasons*, it became obvious that this would be the case. Nevertheless, neither the SEC nor most courts have given thought to reconsideration of the problem.

---

[40] Because so few rule 10b-5 cases reach judgment there is little actual case law on the measure of damages. Loss believes the proper measure is the tort or "out of pocket" measure, the difference between the amount paid and the value of what was received. 3 L. Loss, Securities Regulation 1792-93 (1961). See Fershtman v. Schectman, 450 F.2d 1357, 1361 (2d Cir. 1971), cert. denied, 405 U.S. 1066 (1972); Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965); Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10th Cir. 1962).

272          *NEW YORK UNIVERSITY LAW REVIEW*          [Vol. 48:261

The recent opinion in *SEC v. Insurance Investors Trust Co.*,[41] while not really presenting an analysis of the issue, did at least note the impact on creditors of the *Oppenheimer* approach. Basing their claims on Securities and Exchange Act violations, stockholders and debentureholders (presumably subordinated) sought participation pari passu with general creditors. The SEC joined the action in support of the securityholders. In a brief order allowing the securities law claims to share ratably with claims of general creditors, the court noted its initial reluctance to reach this result:

> My first reaction . . . was that, (a) stockholders invest in corporations with knowledge that under the law their claims are subservient to those of general creditors; (b) that in the fortuitous event, perhaps of an excess recovery by defrauded stockholders against those defrauding them, such could be participated in by stockholders without limit as to their total investment; and (c) that every stockholder is to some extent a speculator as he seeks equity appreciation.[42]

But the court provided for pro rata distribution, basing its decision not only on the general creditors' diffidence in asserting any priority,[43] but also on *Oppenheimer.* It offered the general creditors a counsel of perfection:

> The first law of successfully doing busines [*sic*] is for the seller to possess knowledge of the solvency of his credit buyer. To survive, tradesmen must carry such built-in antenna. They know before making a move that they must hear "the beating of the distant drum" which warns them to "take the cash and let the credit go."[44]

Why this instinctive perception of problems is more appropriately demanded of creditors than of investors is unexplained.

### III

### AUTHORITY SUGGESTING THAT THE RESCINDING STOCKHOLDER IS GIVEN PRIORITY THROUGH PROPERTY TRACING

#### A. *Straight Bankruptcy*

Whatever its policy merits, a technical case of considerable strength can be built for the proposition that a disaffected stock-

---

[41] [1971-1972 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 93,259 (W.D. Ky. 1971).

[42] Id. at 91,553.

[43] "By their conspicuous absence after notice, the general creditors must be held to have demonstrated their lack of interest in, or belief as to, the legitimacy of any claims as to priority." Id.

[44] Id.

Imaged with the Permission of N.Y.U. Law Review

holder should be preferred to the issuer's general creditors. This paradoxical result is largely dependent on the luck of the rescinding party: preferential treatment is available, if at all, only when he is able to locate in the issuer's possession the specific consideration paid over for the securities or to trace it into an identifiable res.[45]

In straight bankruptcy,[46] the rescinding stockholder who can establish a restitutionary right to specific assets held by the distressed enterprise may bring a reclamation proceeding, asserting an interest in the asset superior to that of the bankrupt. The underlying theory of reclamation is that property has come into the custody of the bankruptcy court which does not belong to the bankrupt and thus should not be administered as part of the estate.[47] In effect, a successful claimant is treated as a secured creditor.

It is clear that a rescission claimant need prove two points to reclaim assets from the bankrupt estate. First, he must establish one of the substantive grounds for which equitable relief from transactions is traditionally given: fraud, mistake sufficient for avoidance, illegality or abuse of a fiduciary relationship.[48] One

---

[45] Several alternative remedies are available to vindicate the rescinding party's property claim when property has been transferred because of fraud, mistake or illegality. A court may impose a constructive trust or an equitable lien on the assets, or in the alternative subrogate the aggrieved party to a different claim.

According to the Restatement of Restitution § 160 (1937), a *constructive trust* arises when "a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." An *equitable lien*, on the other hand, is defined by the Restatement of Restitution § 161 (1937) as arising when the "property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched." Finally, the Restatement of Restitution § 162 (1937) says that a person acquires a right of *subrogation* "to the position of . . . [an] obligee or lien-holder" when "property of one person is used in discharging an obligation owed by another . . . under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred."

[46] As noted below, different considerations are involved and different results obtain when an enterprise has gone into reorganization. See text accompanying notes 64-72 infra.

[47] See Gorman v. Littlefield, 229 U.S. 19 (1913); In re Jacob Berry & Co., 149 F. 176 (2d Cir. 1906), aff'd sub nom. Thomas v. Taggert, 209 U.S. 385 (1908); 4A W. Collier, Bankruptcy ¶¶ 70.25, 70.39 (14th ed. 1971). See also Braucher, Reclamation of Goods from a Fraudulent Buyer, 65 Mich. L. Rev. 1281 (1967); Young, Bankruptcy as an Occasion for Restitutionary Claims, 19 Vand. L. Rev. 1255, 1267-70 (1966).

[48] See 4A W. Collier, Bankruptcy ¶ 70.41[1] (14th ed. 1971). Reclamation is commonly denied unless one of the substantive grounds mentioned in the text is present. See, e.g., McKee v. Paradise, 299 U.S. 119 (1936) (failure to pay over amounts withheld from employees' pay held to create a simple contract claim); Texas & Pac. Ry. v. Pottorff, 291 U.S. 245, 261-62 (1934) (no reclamation in the absence of "special circumstances of misconduct"); Peoples Marketing Corp. v.

or more of these grounds is almost certain to underlie any claim
made by a rescinding securityholder. Secondly, the rescission
claimant must either establish that the property he transferred is
still in the debtor's possession in specie or trace the property or
its proceeds into assets held in a new form by the debtor.[49]

Conceptually, tracing is relatively straightforward; however,
apparent simplicity masks difficulties of a high order. Some of the
more intricate questions arise when the transferred property is
money which the transferee has intermingled with his general
funds by, for example, depositing them in a bank account. If the
transferee is conducting an active business, it is likely that the
funds in his account will have turned over many times between
the original transfer and the assertion of a rescission claim. Re-
calling our hypothetical, suppose that the net proceeds of XYZ's
stock sales were $300,000 and were deposited all at one time in
its general bank account, swelling the balance from $200,000 to
$500,000. If six months of active business pass before a rescission
demand is made, deposits into and withdrawals from that account
will be a daily occurrence. For present purposes, assume that dur-
ing the six-month period, total deposits of $10,000,000 were made
to the account. During the same period, however, withdrawals
equalled these deposits, leaving a balance of $500,000 at the date
of the rescission demand. Obviously, some type of flow assumption
must be made to determine whether or not the plaintiffs' money
remains in the account. Several flow assumptions have been used
by courts in this situation:

1. Some courts use a first-in, first-out (FIFO) assump-
tion.[50] Applying FIFO to our hypothetical, we see that the rescis-
sion plaintiffs' right to reclaim their $300,000 would disappear
once $500,000 had been disbursed from the account.

2. Courts using a second method assume that all intervening
deposits are first applied to restore those funds whose restitution
is sought.[51] In net effect, this flow assumption treats the funds to

---

Hackman, 347 F.2d 398 (7th Cir. 1965) (no reclamation because right to rescission
of contract for fraud was lost by affirmance of contract); Continental Grain Co. v.
First Nat'l Bank, 162 F. Supp. 814 (W.D. Tenn. 1958) (same). For a modern case
paralleling McKee v. Paradise, see United States v. Randall, 401 U.S. 513 (1971),
involving failure to pay over withheld employee taxes.

[49] Texas & Pac. Ry. v. Pottorff, 291 U.S. 245, 261-62 (1934); In re Lord's
Inc., 356 F.2d 456 (7th Cir. 1965), cert. denied, 385 U.S. 847 (1966); Sonnenschein
v. Reliance Ins. Co., 353 F.2d 935 (2d Cir. 1965); Central States Corp. v. Luther,
215 F.2d 38 (10th Cir. 1954), cert. denied, 348 U.S. 951 (1955); 4A W. Collier,
Bankruptcy ¶¶ 70.25[2], 70.39[3] (14th ed. 1971).

[50] In re Walter J. Schmidt & Co., 298 F. 314 (S.D.N.Y. 1923).

[51] See Gorman v. Littlefield, 229 U.S. 19 (1913); In re Smith, 263 F.2d 153
(2d Cir. 1959); cf. Cunningham v. Brown, 265 U.S. 1, 12-13 (1924) (refusing to

be traced as a kind of base stock inventory in the transferee's hands, and ignores any intervening balances.

3. The most common flow assumption is the lowest intervening balance rule, which posits that the rescission plaintiffs' funds are the last funds out of the transferee's account.[52] Thus, if the account balance in our hypothetical never fell below $300,000, it is assumed that the plaintiffs' money remained in the account intact. Once depleted, however, the traced funds are not restored by later deposits. Thus, on our facts, assume that the balance in the transferee's account was $500,000 on the date of transfer ($300,000 of the plaintiffs' funds and $200,000 of other funds). On the following day, the account was drawn down to $70,000; but on the next day deposits exceeded withdrawals by $430,000 and thereafter the balance did not drop below $500,000. On the lowest intervening balance asumption, the rescission claimants would be able to trace $70,000 of the original $300,000 transferred to the final $500,000 balance.[53]

The structure of a securities sale transaction may simplify tracing problems considerably, since many securities sales are made for the purpose of applying the proceeds to a specific use. Indeed, the two transactions may be joined in a simultaneous closing, so that the proceeds of the securities sale flow immediately into an identifiable asset. Such a disposition may either improve the possibility of reclamation dramatically or defeat it totally.

Assume the proceeds of a stock offering are applied to the purchase of specific assets which continue in the enterprise's possession. Applying orthodox rules, the rescission plaintiff may be

---

apply this rule where the restored funds were also derived from persons with restitutionary rights). See also G. Bogert, Trusts and Trustees § 929 (2d ed. 1962). A variant is to make restoration depend upon the intention of the debtor. In re Gottfried Baking Co., 312 F. Supp. 643 (S.D.N.Y. 1970); G. Bogert, Trusts and Trustees § 929 (2d ed. 1962).

[52] E.g., Republic Supply Co. v. Richfield Oil Co., 79 F.2d 375 (9th Cir. 1935); see Borman v. Sullivan, 77 F.2d 342 (7th Cir. 1935); In re Bogena & Williams, 76 F.2d 950 (7th Cir. 1935); 5 A. Scott, Law of Trusts § 518 (3d ed. 1967).

[53] There is also a line of authority supporting the so-called swollen assets rule. This formulation, which makes no reference to tracing, allows a rescission plaintiff to assert an equitable title in any assets the wrongdoer may have on hand at the time the action is brought. See Rackley v. Mathews, 141 Fla. 307, 193 So. 69 (1940); Nelson v. McClean's Estate, 236 Mo. App. 718, 161 S.W.2d 676 (1942). For arguments on both sides of this issue, compare Comment, 30 Mich. L. Rev. 441 (1932), with 5 A. Scott, The Law of Trusts § 521, at 3647-48 (3d ed. 1967). The swollen assets rule is not followed in bankruptcy, on the grounds that it constitutes a priority inconsistent with Section 64 of the Bankruptcy Act, 11 U.S.C. § 104 (1970). Elliott v. Bumb, 356 F.2d 749 (9th Cir.), cert. denied, 385 U.S. 829 (1966); John Deere Plow Co. v. McDavid, 137 F. 802 (8th Cir. 1905). See also In re Tate-Jones & Co., 85 F. Supp. 971 (W.D. Pa. 1949).

able to have a constructive trust or equitable lien imposed on the
property for his benefit. As another possibility, the proceeds may
be applied to the retirement of a pre-existing secured debt. Analy-
tically—policy considerations aside—there is no obvious reason
why a subrogation remedy should be unavailable to a rescinding
securityholder, a result which presents the mind-boggling pos-
sibility that a rescinding stockholder may, when the dust settles,
turn out to be a secured creditor.[54] Another equally anomalous
situation may result if the rescinding stockholder can trace his
funds into the payment of an unsecured claim entitled to priority
under Section 64 of the Bankruptcy Act.[55] As a matter of pure
analysis, it seems clear that a rescinding stockholder can claim
subrogation to any section 64 priority claim discharged with his
property.[56]

On the other hand, the shareholder's money may be traced
into some form which will defeat any claim for preference. For
example, it is not unusual for a failing business to utilize the entire
proceeds of a financing to pay past-due trade obligations. This
payment is often made immediately upon receipt of the proceeds,
under circumstances making it clear that the funds were so used.
A shareholder who can demonstrate this disposition and who has
a right to rescind may be subrogated to the discharged claims. Un-
der present doctrine, the equitable remedy will not improve the
securities plaintiff's case: subrogation will involve merely succes-
sion to an unsecured, nonpriority claim having no higher standing
than plaintiff's own.

Reclamation by claimants asserting securities law rescission
rights has been allowed in competition with general creditors. *In
re Rhine*[57] involved an unincorporated individual oil and gas
operator. During the year before he voluntarily went into bank-
ruptcy, Rhine had sold working interests to some 1000 investors,
more than 500 of whom sought reclamation against assets held by

---

[54] Subrogation to discharged secured obligations is frequently allowed in
bankruptcy. Perlman v. Reliance Ins. Co., 371 U.S. 132 (1962); In re Franklin
Saving & Loan Co., 34 F. Supp. 585 (E.D. Tenn. 1940). See also In re The West-
over, Inc., 82 F.2d 177 (2d Cir. 1936); Young, supra note 47.

[55] 11 U.S.C. § 104 (1970).

[56] Reinhard v. Raff, 83 F.2d 870 (3d Cir. 1936) (misappropriated fund used
to pay wages; owner subrogated to wage priority). Sureties are frequently sub-
rogated to the priorities of tax and wage claims which they have satisfied. Dayton
v. Stanard, 241 U.S. 588 (1916) (tax claim); Home Indemnity Co. v. F. H.
Donovan Painting Co., 325 F.2d 870 (8th Cir. 1963) (wage claim). See also 3A W.
Collier, Bankruptcy ¶¶ 64.205, 64.408 (14th ed. 1972); Note, Subrogation to Govern-
ment Priorities in Bankruptcy, 65 Colum. L. Rev. 895 (1965).

[57] 241 F. Supp. 86 (D. Col. 1965).

the trustee. These assets consisted of the balances of those bank accounts into which the investors' funds had originally been deposited. The case differs from those we have been considering, since the enterprise was a sole proprietorship, rather than a corporation, and the investors, purchasers of oil and gas interests, rather than stockholders. Nevertheless, the defenses raised by the trustee to the reclamation claims would apply equally in an action by stockholders to recapture their investment in a corporate bankruptcy. First, the trustee argued that Section 70c of the Bankruptcy Act[58] gave him rights superior to those of reclamation plaintiffs whose claims were bottomed on rescission. Secondly, the trustee argued for the application of a FIFO tracing rule to the bankrupt's deposit accounts, a result which would have wiped out all of the earlier investors' claims. The referee held for the trustee on both issues and was reversed on both. On the tracing issue, the court agreed with the trustee that state tracing rules were determinative but concluded that Colorado required the application of the lowest intervening balance rule to bank accounts. On the section 70c issue, the court again looked to state law and concluded that a judgment creditor's lien would not, in Colorado, prevail over the rights of a restitution plaintiff who could trace his property into assets in the possession of the judgment debtor.[59] Since the trustee's derivative rights were equivalent only to those of a creditor on a simple contract,[60] he could not under 70c assert

---

[58] 11 U.S.C. § 110(c) (1970).

[59] The consensus of courts and commentators is that a right of rescission "does not create a priority but rather a beneficial interest in property." Braucher, supra note 47, at 1296. See In re Prudence Bonds Corp., 79 F.2d 212 (2d Cir. 1935); 4A W. Collier, Bankruptcy ¶ 70.25 (14th ed. 1971). Since an ordinary judgment creditor is not regarded as a bona fide purchaser, the rescinding transferor generally prevails over the trustee and, of course, over general creditors. Restatement of Restitution § 173, Comment j (1937).

   A Trustee in Bankruptcy . . . is not an innocent purchaser for value, but takes title to the bankrupt's property subject to all liens, claims and equities thereon. He has the lien of an execution creditor, which is about the lowest form of security.

In re Richards, 455 F.2d 281, 284 (6th Cir. 1972).

[60] Section 70c of the Bankruptcy Act, 11 U.S.C. § 110(c) (1970), gives the trustee lien rights in respect of "all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt upon a simple contract could have obtained such a lien, whether or not such a creditor exists." The description of the type of creditor to whose rights the trustee succeeds—one with a claim arising out of a "simple contract"—was added by the 1966 amendment to the Act. Act of July 5, 1966, Pub. L. No. 89-495, § 5, 80 Stat. 269. As a result, the trustee could no longer assert that he had the rights of a hypothetical (or, for that matter, an actual) creditor with specially protected rights. See 4A W. Collier, Bankruptcy ¶ 70.49 (14th ed. 1971). The legislative history is silent as to the purpose of this amendment. See H.R. Rep. No. 686, 89th Cong., 1st Sess. (1965). The purpose was presumably to parallel the standard of the trustee's power

defenses against a rescinding plaintiff that might have been available to other types of creditors.[61]

In addition to raising state claims, some, but not all, of the *Rhine* petitioners asserted a right to rescind because of violations of the Securities Act and the Exchange Act. In determining rights as against the trustee, however, the court did not distinguish between petitioners according to the origins of their claims in federal or state law; instead, it looked to state law to determine the rights of the trustee against restitutionary plaintiffs generally. The approach may seem inelegant, since it makes the content of a federal remedy turn on state law. It is practical under the circumstances, however, since no body of federal law exists to define the relative rights of judgment creditors and restitutionary plaintiffs. The alternative to applying state law would be to develop such federal law; this seems unlikely, at least when state rules do not discriminate against the federal right, in view of the small number of cases in which bankruptcy reclamation petitioners assert federally based claims.

The *Rhine* court's application of state tracing rules is less clearly orthodox. The objection to application of state tracing rules in bankruptcy is that they may have the effect of creating priorities inconsistent with those set forth in Section 64 of the Bankruptcy Act.[62] However, the lowest intervening balance rule

---

to avoid preferences under section 60a(2), 11 U.S.C. § 96a(2) (1970), which states that:

> a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee.

[61] In general, a rescinding plaintiff will prevail over any other party claiming an interest in the property sought to be recaptured. A rescinding plaintiff will not prevail, however, against: (1) a bona fide purchaser of the property, (2) a bona fide encumbrancer, (3) a creditor who has purchased the property at an execution sale, or (4) a creditor against whom the rescission plaintiff is estopped (for example, by misrepresentation) to assert his title. See Restatement of Restitution § 173, Comments j, k (1937); Braucher, supra note 47, at 1283. An encumbrancer in this formulation would include, in addition to a mortgagee or one holding a security interest created under Article 9 of the Uniform Commercial Code, the holder of a materialman's lien or mechanic's lien. See International Refugee Organization v. Maryland Drydock Co., 179 F.2d 284 (4th Cir. 1950). Since the creditor whose judgment lien arises from a simple contract does not fall within any of these categories, the *Rhine* court's conclusion that section 70c does not give the trustee rights superior to rescinding reclamation claimants is orthodox.

[62] See In re Tate-Jones & Co., 85 F. Supp. 971 (W.D. Pa. 1949); 4A W. Collier, Bankruptcy ¶ 70.25[2] (14th ed. 1971); cf. Sonnenschein v. Reliance Ins. Co., 353 F.2d 935, 937 n.2 (2d Cir. 1965): "[T]he question of whether state or federal law governs the extent to which a trust beneficiary must identify trust property has not been authoritatively settled." See also Prudence Realization Corp. v. Geist, 316 U.S. 89, 95-97 (1942).

actually applied as Colorado law is clearly not inconsistent with bankruptcy policy, since it is the most commonly applied flow assumption.[63]

It is important to focus on the practical effects of the *Rhine* decision. In addition to the rescinding purchasers of working interests, the bankrupt had other creditors whose claims arose from the operation of the venture: open-account vendors, laborers and other suppliers of goods and services. The result of a successful reclamation would have been the payment of all traceable assets of the estate to the former owners of the equity interest in the business, with general creditors sustaining a total loss. Thus, in any situation where tracing is possible, *Rhine* suggests that rescinding equity investors have a real possibility of bootstrapping their way to secured creditor status. Yet, the same rescinding investors would have received the entire benefit of the venture had it prospered. This is an enviable posture clearly contrary to the usual rule that leveraged opportunity for gain also entails leveraged, rather than sheltered, risk of loss.

## B. *Chapter X Reorganization*

The position of the rescinding stockholder seeking reclamation of the consideration he has paid is significantly altered if the enterprise is being reorganized under Chapter X of the Bankruptcy Act.[64] Since the goal of bankruptcy liquidation is distribution of assets, no reason exists for the bankruptcy court to refuse reclamation once it is established that the bankrupt lacks an equity interest in the assets sought to be reclaimed. The situation is different in Chapter X proceedings, since the goal of reorganization is rehabilitation of the enterprise.[65] In principle, reclamation is available to withdraw assets from the trustee of an enterprise in reorganization;[66] in fact, reclamation seems to have been allowed only in two situations—either when the debtor is totally without a property interest in the reclaimed assets[67] or when the

---

[63] See text accompanying note 52 supra.

[64] 11 U.S.C. §§ 501-676 (1970).

[65] "If I were to describe [the Chandler Act] in a single line it would be 'a measure designed to promote rehabilitation of business rather than liquidation.'" 83 Cong. Rec. 8679 (1938) (remarks of Senator O'Mahoney). See also Billyou, Corporate Reorganization Under State and Federal Statutes, 1958 U. Ill. L. F. 556; Gerdes, General Principles of Plans of Corporate Reorganization, 89 U. Pa. L. Rev. 39 (1940).

[66] In re D.I.A. Sales Corp., 339 F.2d 175 (6th Cir. 1964); In re Rosenbaum Grain Corp., 112 F.2d 315 (7th Cir. 1940); 6 W. Collier, Bankruptcy ¶ 3.09 (14th ed. 1971).

[67] See In re D.I.A. Sales Corp., 339 F.2d 175 (6th Cir. 1964) (reclaimed assets held by debtor as agent for reclamation petitioner); In re Rosenbaum Grain

object of the reclamation is the foreclosure of a contractual lien.[68]
Even holders of express security interests can be restrained from
foreclosing so long as any realistic hope remains for utilizing the
collateral in developing a fair and feasible reorganization plan
consistent with the goal of Chapter X.[69] It seems extremely im-
probable that a court would jeopardize an opportunity for re-
organization by permitting a rescinding stockholder to assert an
equitable title in specific enterprise assets so as to withdraw them
from the estate. The equitable interest of a rescission plaintiff is,
after all, a remedy;[70] it hardly rises to the dignity of an estate
which could be said to preclude the debtor from having an interest
in the assets.

The significance of tracing in a reorganization case lies in its
potential impact on plan formation. As a necessary corollary of
the rules of tracing, once the rescission claimant has traced his
funds into specific assets or into the payment of a specific dis-
charged lien, he would, following *Rhine*, be treated as a secured
creditor for voting and distribution purposes.[71] Indeed, the avail-
ability of such succession in Chapter X proceedings is the foun-
dation of the recent decisions of both the Supreme Court and the
Second Circuit in the Webb & Knapp case, *Caplin v. Marine
Midland Grace Trust Co. of New York*.[72] Thus, although his

---

Corp., 112 F.2d 315 (7th Cir. 1940) (same, but reclamation denied for failure of
tracing). See also In re Commonwealth Bond Corp., 77 F.2d 308, 309 (2d Cir.
1935).

[68] See In re Burgemeister Brewing Co., 84 F.2d 388 (7th Cir. 1936) (con-
ditional sale); In re Lake's Laundry, Inc., 79 F.2d 326 (2d Cir.), cert. denied, 296
U.S. 622 (1935) (same). But see In re Yale Express System, Inc., 384 F.2d 990 (2d
Cir. 1967). See also In re Schafer's Bakeries, 155 F. Supp. 902, 910 (E.D. Mich.
1957).

[69] Chapter X of the Bankruptcy Act, 11 U.S.C. § 516(4) (1970), em-
powers the reorganization court to enjoin the enforcement of liens until a final
decree is obtained. See In re Dilbert's Quality Supermarkets, Inc., 368 F.2d 922
(2d Cir. 1966); In re United States Realty & Improvement Co., 153 F.2d 853 (2d
Cir. 1946); Lincoln-Alliance Bank & Trust Co. v. Dye, 108 F.2d 38 (2d Cir.
1939). The court in In re Yale Express System, Inc., 384 F.2d 990 (2d Cir. 1967),
denied reclamation to an equipment lessor because of the debtor's need for the
assets. This decision led knowledgeable commentators to conclude that, without
reference to the form of the transaction, an equipment financier may be unable
to reclaim the financed equipment while there is a reasonable possibility of success-
ful reorganization. Riordan & Duffy, Lease Financing, 24 Bus. Law. 763, 765-69
(1969). The constitutionality of bars to enforcement of such rights was settled in
Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry.,
294 U.S. 648 (1935).

[70] See 5 A. Scott, Law of Trusts § 462.1, at 3415 (3d ed. 1967). See also
Restatement of Restitution § 160, Comments a, c (1937).

[71] See In re The Westover, Inc., 82 F.2d 177 (2d Cir. 1936) (guarantor who
paid creditors' claims succeeds to their position for classification purposes).

[72] 439 F.2d 118, 122 (2d Cir. 1971), aff'd, 406 U.S. 416, 430-31 (1972).

reclamation claim may not enable a shareholder to withdraw funds from a bankrupt estate in reorganization, it may enable him to assume a stronger position among interested parties than he otherwise would have had.

## IV

### THE STOCKHOLDER ESTOPPED OR SUBORDINATED

The contemporary learning that rescinding stockholders share pari passu with (or, with tracing, may do better than) general creditors is the result of an unremarked change in our law. To the extent that the issue arose before *Oppenheimer*, it was consistently held that such competition was impermissible. The most straightforward statement of this position is made in *In re Racine Auto Tire Co.*[73] This case involved a corporation which, in 1919, issued preferred stock in violation of the Wisconsin Blue Sky law. In 1922, after the corporation was adjudicated bankrupt, the preferred stockholders attempted to rescind and filed a claim for recovery of the consideration paid. The claim was denied on a theory of estoppel:

> Grant that appellants, as against the Racine Auto Tire Company, would be entitled to recover the money paid for their stock does it follow that they occupy as firm footing in their stand against the general creditors?
> Even where the stockholder may repudiate the contract because of the provisions of the "Blue Sky Law," it is optional with him to do so. He may insist upon his purchase and retain his stock. Certainly the corporation that sold its stock in violation of the statutes of the state cannot later compel a rescission. How long, then, may the stockholder wait, as against creditors of the corporation, before he is estopped from asserting his right to rescind? What action, if any, can a stockholder thus take, which, as against the general creditors, would make it necessary for a court to refuse the privilege of withdrawal from the position of a preferred stockholder to become an unsecured creditor? These are the questions determinative of this issue of estoppel en pais.
> Every element necessary to make out an equitable estoppel here appears: (a) Claimants knowingly assumed a position at variance with the one they now assert. (b) They repeatedly ratified that position in accepting dividends, in attending stockholders' meetings or giving proxies to others to represent them, and in surrendering their certificates of stock and accepting new ones. They profited thereby to the extent of the dividends paid. They did not attempt to withdraw until more than two years had elapsed and an adjudication in bankruptcy had occurred. (d) [*sic*] To permit them now, when it better serves their purpose, to assume

[73] 290 F. 939 (7th Cir. 1923).

the role of creditors, would, as against these general creditors, be inequitable, unconscionable and unjust.[74]

The court's conclusion that the stockholders were estopped from asserting any claim does not follow ineluctably from this analysis—the interests of the general creditors would have been served as well by subordinating any provable rescission claims. Subordination is not discussed, probably because, as the court notes, the preferred stockholders could not have hoped to participate except as general creditors. *Racine* was followed in the next year by *In re Recording Devices Co.,*[75] which involved nearly identical facts except that the ground for rescission was misrepresentation rather than nonregistration.

*Racine* and *Recording Devices* treat the rescinding stockholder as barred from competition with all creditors, without discussion of a possible difference in treatment between prior and subsequent creditors. However, a 1932 case, *Julian v. Stewart,*[76] involving rescission for fraud, did make such a distinction. The court found rescinding stockholders "disentitled" as against supervening creditors, *i.e.,* those whose claims arose while the rescinders were stockholders.[77]

There is also some recent authority involving efforts of stockholders to assert rescission rights defensively against claims based upon statutes imposing personal liability on stockholders. In a 1970 Michigan case, *Addicott v. Upton,*[78] an action was brought by unpaid "laborers" (actually technical and supervisory personnel) against stockholders whose stock purchases were rescindable because of the issuer's violation of the state's Blue Sky law. The *Addicott* court, without discussion, held that the defendant's rescission rights might be asserted in another action, but were not a defense to the statutory claim. As in an earlier federal case, *Van Dyke v. Broadhurst,*[79] involving assessable

---

[74] Id. at 941-42.

[75] 1 F.2d 474 (S.D. Ohio 1924); accord, In re Morris Bros., 293 F. 294 (9th Cir. 1923).

[76] 56 F.2d 32 (5th Cir. 1932).

[77] In a 1938 case, based on Blue Sky registration, the rescission claimant conceded priority to subsequent creditors but claimed parity with prior creditors. The court allowed the claim as provable but subordinated to all general creditor claims. In re Groenleer-Vance Furniture Co., 23 F. Supp. 713 (W.D. Mich. 1938). A few cases have involved unsuccessful efforts by stockholder-directors to rescind their purchases of the securities of the managed companies. Horn v. Abts, 19 F.2d 350 (8th Cir. 1927); In re American Aluminum Metal Prod. Co., 15 F.2d 234 (S.D. Cal. 1926).

[78] 26 Mich. App. 523, 527, 182 N.W.2d 790, 792 (1970).

[79] 28 F. Supp. 737 (M.D. Pa. 1939).

stock of a national bank, the stockholders had not taken any steps
to effect rescission, but had attempted to use the rescission right
defensively. These cases leave open the status of the stockholder
who actually takes steps to rescind by retendering his stock or by
suing for an equity decree before any assessment is made. This
precise question is dealt with in *Oppenheimer*,[80] which also in-
volved assessable stock of a national bank. In *Oppenheimer*, the
stockholder began an action for rescission immediately after the
bank closed during the March 1933 bank holiday. During the
pendency of his rescission suit, Oppenheimer paid an assessment
on his shares upon a levy by the Controller of the Currency. The
Supreme Court's discussion of the rescission claim deals obiter
with the rescinding stockholder's liability for the assessment:

> While stockholders' liability may not be enforced before in-
> solvency and assessment by the comptroller, . . . plaintiff's position
> is the same as if the bank's insolvency had been declared and a
> receiver appointed before he rescinded. Plaintiff appeared by the
> bank's records to be a stockholder and, as against creditors for
> whose benefit the statutory liability was created, was estopped from
> denying that status. Recognizing that the bank's fraud and his
> rescission availed nothing against the comptroller's assessment,
> plaintiff paid the amount laid against him . . . . [The] [s]ubscrip-
> tion price having been fully paid to the bank, the maximum for
> which stockholders may be held for the benefit of creditors is the
> par value of their shares. By payment of the comptroller's assess-
> ments they fully discharge their liability as stockholders.[81]

The apparent teaching of these cases is that a stockholder
who rescinds after insolvency does not escape statutory liabilities
for preferred classes of creditors. The practical significance of
extending the liability of rescinding stockholders to pre-rescission
statutory liability for corporate debts is probably not great. Few
states now have statutes providing for personal stockholder lia-
bility to employees for unpaid wage claims.[82] Moreover, the

---

[80] See text accompanying notes 28-29 supra.

[81] 301 U.S. at 214-15.

[82] The most significant statute is New York's which imposes liability on the
10 largest shareholders of New York corporations for unpaid compensation (and
fringe benefits) due employees. The statute is now inapplicable to listed and
over-the-counter companies. Liability is open-ended both as to time during which
compensation recoverable under the statute may have been earned and as to
total amount for which the stockholders may be liable. N.Y. Bus. Corp. Law §
630 (McKinney Supp. 1972). Wisconsin imposes a narrower unpaid wage liability
upon all stockholders of Wisconsin corporations, limited in amount (to the par
value of the shares owned or, in the case of no-par stock, the issue price) and in
time (for services up to six months). Wis. Stat. § 180.40(6) (1967). Tennessee,
Pennsylvania and Massachusetts have recently repealed statutes of this general
type. See H. Henn, Corporations 404-05 & n.13 (2d ed. 1970).

double liability of bank stockholders like those involved in *Oppenheimer* is substantially a dead letter, since liability in respect of national bank stock finally terminated in 1953.[83]

The more significant possibility involves the situation of the stockholder who owns stock which is assessable, either because the agreed consideration has not been paid, or because less than the par value has been paid. The theory of *Oppenheimer* is consistent with requiring a rescinding stockholder to pay any assessable amount before asserting his rescission claim. Such a result would, of course, inure to the benefit of general creditors.

V

THE EQUITIES OF THE RESCINDING STOCKHOLDER AND
CREDITOR IN THE GENERAL CONTEXT OF AMERICAN LAW

*A.    The Traditional Perspective*

Under *Oppenheimer* the rescinding transferor shares pari passu in the bankrupt estate if he seeks only a money judgment or is unable to trace assets he had transferred into property in the estate which is not subject to any claim of a bona fide purchaser or encumbrancer. *Rhine* provides authority for the proposition that if the transferor can find the transferred assets or their proceeds in the estate, he can, in straight bankruptcy, either recapture them in specie or assert a security interest in them in satisfaction of his claim. Following *Rhine* it appears that the transferor who can trace may be classified as a secured creditor in reorganization.

The *Oppenheimer-Rhine* doctrines are consistent with general American rules as to restitutionary relief. Our law disfavors the general creditor whenever he competes with persons who have transferred property to a debtor in a voidable transaction.[84] Penn-

---

[83] 12 U.S.C. § 64a (1970). The statute (1) makes the double liability of 12 U.S.C. §§ 63, 64 (1970) inapplicable to shares issued after June 16, 1933; (2) permits the termination of such liability in respect of other shares six months after publication of notice to that effect; and (3) in the event that no such notice was filed prior to May 18, 1953, requires the Comptroller of the Currency to effect such publication. In practical effect 11 U.S.C. §§ 63, 64 (1970) have been repealed. See Paton's Digest of Legal Opinions § 13A:1 (Supp. 1954). About 20 states impose personal liability on bank stockholders, but most such statutes exempt stock in banks insured by the Federal Deposit Insurance Corporation. State statutes are collected in Paton's Digest of Legal Opinions § 13B (Supp. 1964).

[84] For example, when a constructive trust has been imposed in favor of a rescinding shareholder:

> equity marshalls the withdrawals against the [funds available to the wrongdoer's creditors] so long as it can because that result is deemed fairer. There is good reason for this because the [wrongdoer's] creditors have accepted the risk of his solvency, while his cestuis have accepted only the risk of his honesty.

sylvania limits the remedy of a defrauded seller as against subse-
quent general creditors,[85] and Braucher reads some ancient
Maine and New Hampshire cases as indicating that in those states
a creditor whose claim arises after the transfer will prevail over
the claim of a rescinding transferor.[86] Apart from these few shards
of authority favoring the general creditor, our law uniformly
affords the rescission claimant equality with or, perhaps more
commonly, priority over, the general creditor.

So far as we are aware, criticism of this arrangement in
American legal literature has never risen quite to the level of a
whisper. A 1935 student case note raised the question,[87] but it
seems to have disappeared into a pre-Columbian void; not an
echo has ever returned.

However, the preferential treatment afforded the claimant to
specific property is based on the assumption that the general
creditor did not, in making his decision to extend credit, rely on
the debtor's ownership of the property transferred by the rescind-
ing transferor. In contrast, in the problem under discussion, the
general creditor does in fact rely on the equity or other cushion
provided by those who consciously bought securities labelled
capital stock or subordinated debt. Yet the law has given little
recognition to considerations of general creditor reliance, even
when the facts call for it.

The time has come for a reconsideration of the preference
given to restitutionary interests, at least in the context of rescind-
ing securityholder claims. There are compelling reasons why the
general premise of American law that the victims of the wrong-
doer should prevail over his general creditors should not apply
here. To be sure, where federal or state securities legislation is
involved, the securities purchaser is, and the general creditor is not,
the beneficiary of a statutory right of rescission—but this is only
to say that as against the enterprise, each is a creditor. It does not
reach the question of their rights inter sese.

---

In re Kountze Bros., 79 F.2d 98, 102 (2d Cir.), cert. denied, 296 U.S. 640 (1935).
Restatement of Restitution § 173, Comment j (1937); G. Bogert, Trusts & Trustees
§ 887, at 147-49 (2d ed. 1962); 5 A. Scott, Law of Trusts § 481.2 (3d ed. 1967).

[85] In re Kravitz, 278 F.2d 820 (3d Cir. 1960). Pennsylvania does enforce
constructive trusts in mistake situations. See Proctor v. Sagamore Big Game
Club, 265 F.2d 196 (3d Cir.), cert. denied, 361 U.S. 831 (1959); Dubin Paper Co.
v. Insurance Co. of North America, 361 Pa. 68, 63 A.2d 85 (1949).

[86] Hurd v. Bickford, 85 Me. 217, 27 A. 107 (1892); Bradley v. Obear, 10
N.H. 477 (1840); Braucher, supra note 47, at 1283-84.

[87] Comment, 33 Mich. L. Rev. 1290 (1935). The case is Orr v. Rose, 169
Okla. 389, 37 P.2d 300 (1934). See also Lake Gogebic Lumber Co. v. Burns, 331
Mich. 315, 49 N.W.2d 310 (1951).

The *Oppenheimer-Rhine* view, which is fully supported by the SEC in *Four Seasons* and *Insurance Investors Trust,* is tunnel vision. It fails to see that in any case of issuer insolvency the claims of rescinding stockholders can be satisfied only out of assets which otherwise would be allocated to making innocent parties whole. These parties did nothing to create the rescinder's problems and in the overwhelming majority of cases advanced money, labor or credit in reliance on the existence of the equity or junior debt cushion which the rescinder purported to provide. The *Oppenheimer-Rhine* approach can be justified only if it is assumed that the policies underlying federal and state securities law are of such transcendental importance that they necessarily displace all other doctrines of law and all considerations of simple fairness. It is our thesis that no rational basis exists for such an assumption.

## B. *Allocation of Risk*

We suggest that it would advance analysis if the problem were reconceptualized as one of risk allocation. The situation with which we are concerned involves two risks: (1) the risk of business insolvency from whatever cause; and (2) the risk of illegality in securities issuance.

By their separate contracts with the issuer, both the general creditor and the stockholder accept the risk of enterprise failure. However, the law provides that in the event of insolvency the creditor's claim be given priority over the stockholder's and this is implicit in their contracts. The stockholder's greater risk is merely the downside of the phenomenon of leverage. The unsecured trade vendor and the wage claimant whose claim exceeds the priority granted by Section 64 of the Bankruptcy Act together assert the vast majority of general creditor claims in any ordinary case. In effect, these two classes of creditors are nonequity-sharing lenders to the enterprise; their money is used instead of equity so that profit will be shared over a smaller base in the event of corporate success. As a corollary, these lenders do not participate in the losses suffered by owners of equity interests. To be sure, stockholders and general creditors do not directly contract in any usual situation; however, their respective rights and obligations do, in fact, place them in a semi-contractual relation to each other. In theory, the general creditor asserts a fixed dollar claim and leaves the variable profit to the stockholder; the stockholder takes the profit and provides a cushion of security for payment of the lender's fixed dollar claim. The absolute priority rule reflects the

different degree to which each party assumes a risk of enterprise insolvency; no obvious reason exists for reallocating that risk.

Certainly it cannot be argued that the doctrine of equitable subordination formulated in *Taylor v. Standard Gas & Electric Co.*[88] (*Deep Rock*) and *Pepper v. Litton*[89] provides such a reason. These cases state that, as an exception to the absolute priority rule, a senior claimant whose conduct is a factor in a junior claimant's loss may be subordinated to the junior claimant.[90] But in our situation the creditor does not cause the shareholder's loss. Indeed, the doctrine of equitable subordination may be of more use to the general creditor, since he may well argue that the shareholder's conduct has caused him to rely on the existence of an equity cushion in case of bankruptcy.[91]

In considering allocation of the risk of business insolvency, it is useful to compare the courts' treatment of rescinding shareholders with their treatment of former shareholders who have become creditors through a stock redemption-deferred payout plan. The leading case in this area, *Robinson v. Wangemann,*[92] subordinates such payout claims to creditors' claims arising either before or after the redemption. Yet, in many ways the former shareholder seeking deferred payment as a creditor presents a considerably more appealing case for priority than does the rescinding shareholder. In the first place, the former stockholder would normally have no leverage after the surrender of his stock and thus does not benefit if the enterprise prospers. In addition, in many such cases there is no creditor reliance factor to be considered. In *Robinson,* for example, 10 years had passed between the surrender of the claimant's stock and the enterprise's insolvency; under such circumstances it is unlikely that any outstanding creditor claims would have arisen prior to redemption. Thus, unless the redemption payout obligation were shown on financial statements as subordinated, there can be no creditor reliance interest. Herwitz has argued that *Robinson* has some tendency to produce a windfall for general creditors.[93] By contrast, under the

---

[88] 306 U.S. 307 (1939).
[89] 308 U.S. 295 (1939).
[90] Cf. 3 W. Collier, Bankruptcy ¶ 57.14 (14th ed. 1972).
[91] See text accompanying notes 95-96 infra.
[92] 75 F.2d 756 (5th Cir. 1935). Accord, McConnell v. Estate of Butler, 402 F.2d 362 (9th Cir. 1968); Mountain State Steel Foundries, Inc. v. Commissioner, 284 F.2d 737, 742 (4th Cir. 1960); In re Dawson Bros. Constr. Co., 218 F. Supp. 411 (N.D.N.Y. 1963); In re Mathews Constr. Co., 120 F. Supp. 818 (S.D. Cal. 1954); Annot., 4 A.L.R. Fed. 654 (1970).
[93] Herwitz, Installment Repurchase of Stock: Surplus Limitations, 79 Harv. L. Rev. 303, 309-10 (1965).

Imaged with the Permission of N.Y.U. Law Review

*Oppenheimer-Rhine* approach, the general creditor bears the risk of debtor insolvency not only as to the credit he extended but also as to the investment of the rescinding shareholder.

The second risk is that the enterprise with which the general creditor and the shareholder are dealing has made an illegal stock offering to the shareholder. When the rescission right is enforced in bankruptcy or reorganization in the *Oppenheimer-Rhine* manner, the effect is to allocate that risk to general creditors. It is difficult to conceive of any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor, that the stock is offered.

There is a contract law analog to this aspect of our problem: the relationship between a surety and the obligee of a principal debtor. Occasionally, it occurs that the surety's undertaking is obtained in a transaction which is avoidable by the surety because of the wrongdoing (typically, fraud) of the principal debtor. The contract law result in such cases is clear and uniform. While the surety may withdraw from his undertaking as against the principal debtor, he remains liable to an innocent obligee who has detrimentally relied upon his undertaking.[94]

### C. Classification of Creditors—Reliance

The suretyship analogy suggests that a distinction be drawn between general creditors who have relied upon the stockholder's undertaking and those who have not. The strongest reliance case would thus be made by parties who became creditors after the stockholder's investment and after viewing a financial statement which reflected the stockholder's investment in equity accounts. For this purpose, it seems immaterial whether the creditor obtained the statement directly from the issuer or mediately through Dun & Bradstreet or some other commercial credit agency. Anyone making a stock investment can be held to know that an issuer's balance sheet will reflect the dollar amount of his investment and will be reviewed by credit suppliers when making credit decisions. However, even in such a case actual reliance might be hard to establish. Unless the equity transfusion were substantial enough to change the credit standing of the issuer, by providing, for example, the basis of an upgraded Dun & Brad-

---

[94] L. Simpson, Suretyship 93 (1950); see Crumrine v. Dizdar, 59 Cal. App. 2d 783, 140 P.2d 101 (1943); J.R. Watkins Co. v. Lankford, 363 Mo. 1046, 256 S.W.2d 788 (1953); Andrews v. Mollica, 53 R.I. 427, 167 A. 131 (1933); Restatement of Security § 119 (1941); cf. Reed v. Kellerman, 40 F. Supp. 46 (E.D. Pa. 1941).

street rating, the creditor might have great difficulty in establishing his reliance. However, a creditor who has seen a balance sheet can argue productively that the stockholder's failure to seek rescission created a misleading appearance of regularity in the issuer's affairs. A stockholder's attempt to recapture his investment would have indicated a potential problem account to most credit suppliers and suggested the exercise of caution and inquiry, since one expects that stockholder investment will be reflected in equity accounts and not among contingent liabilities.[95]

If a contract law reliance test is applied between the rescinding stockholder and the post-investment general creditor, we suggest that the burden of proving nonreliance be placed on the stockholder. Creditor reliance may often be genuine but not susceptible of easy proof. Consider the case of the supplier who does not see a balance sheet and is unaware of a particular stock issue. Such a creditor may, in fact, rely derivatively on the stockholders' investment. Credit managers talk to one another. Any creditor who follows an issuer's affairs with any degree of regularity, by, for example, drawing Dun & Bradstreet reports or by reviewing financial statements, is likely to reveal his impressions to fellow credit suppliers. A stockholder's failure to seek rescission thus becomes an important part of a misleading picture seen vicariously. Reliance of this kind, while difficult to demonstrate, is nonetheless real.

If reliance is to be the touchstone between creditor and rescinding stockholder, a distinction should be drawn between credit obligations incurred before and after the stockholder's investment. An occasional case may arise in which a *prior* creditor can demonstrate that he later changed his position in reliance on the stockholder's investment. For example, a creditor may release a security interest, renew a term loan or waive an event of default upon learning of an apparent improvement in the debtor's equity position. In general, however, it is unlikely that a prior creditor will be able to show even derivative reliance. Consequently, while subsequent creditors should be presumed to have relied on the rescinding stockholder's investment, prior creditors should be required to sustain the burden of proving their detrimental reliance.

The practical significance of the distinction between prior

---

[95] A stockholder's assertion of rescission rights in litigation would likely come to the attention of credit suppliers in one of two ways, either by a balance sheet footnote or by the report of a credit rating organization such as Dun & Bradstreet, since they normally scan complaints filed for the purpose of picking up material litigation affecting companies reported upon.

and subsequent creditors is probably not very great. Unless the stockholder made his investment on the eve of bankruptcy, it is likely that the general creditor's claim arose afterwards. Extended unsecured credit is relatively uncommon in American business; the bulk of general creditor claims probably arise within 180 days of the filing of a bankruptcy petition. Stockholder rescission claims, on the other hand, may originate much earlier—within three years of the violation under Section 12 of the Securities Act[96] and substantially longer if the stockholder's claim is based on section 17(a), rule 10b-5 or common law.[97]

The approach we have suggested is generally patterned on the decision of the Second Circuit in *In re Credit Industrial Corp.*[98] In that case, the bankrupt issuer, a factor, had layered debt consisting of about $10,000,000 in bank loans and about $1,000,000 in promissory notes expressly subordinated to bank loans. In the bankruptcy proceeding, the trustee sought an order subordinating the noteholders to the bank debt. The noteholders objected on a variety of theories, of which only two are of immediate interest. First, the noteholders argued that the subordination provisions be given effect only as to bank lenders who could show actual reliance on the subordination. Secondly, the noteholders asserted both common law and federal securities law defenses to enforcement of their notes, alleging that they had been induced to purchase the notes by fraud of the bankrupt. The referee dismissed the common law and statutory defenses, but held that the bank lenders would have to prove actual reliance to claim priority. While the referee was affirmed by the district court, the Second Circuit reversed completely. First, the court held that the beneficiary of a contractual subordination need not prove reliance to claim priority, if the subordination is valid against the bank-

---

[96] Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m (1970), provides that:

> In no event shall any action be brought to enforce a liability created under section 77k [section 11] or section 77l(1) [section 12(1)] of this title more than three years after the security was bona fide offered to the public, or under section 77l(2) [section 12(2)] of this title more than three years after the sale.

[97] Because there is no federal statute of limitations applicable to rule 10b-5 or section 17 cases, a statute of the state in which the court sits is applied. These typically are longer than the periods provided in the securities acts for express rights of action. See Saylor v. Lindsley, 391 F.2d 965, 970 (2d Cir. 1968); Myzel v. Fields, 386 F.2d 718, 742 (8th Cir. 1967), cert. denied, 390 U.S. 951 (1968); Turner v. Lundquist, 377 F.2d 44, 46-47 (9th Cir. 1967); A. Bromberg, Securities Law-Fraud SEC Rule 10b-5 ¶ 2.5(1) (1971).

[98] 366 F.2d 402 (2d Cir. 1966).

rupt.[99] Reliance would be significant, however, if the noteholders were able to establish a right to withdraw from their investments under the securities acts:

> Reliance may become a relevant factor where equitable considerations require its consideration, namely, where the subordination agreement itself is invalid. . . . When a junior creditor establishes that the subordination agreement is unlawful, it may be reasonable and necessary, if equity is to be done, to require a senior creditor to prove that he relied on the subordination agreement, without actual or constructive knowledge of any infirmity in the agreement, in advancing funds to the bankrupt as a condition to receiving priority in the distribution of the bankrupt's estate. In cases where the underlying subordination agreement is unlawful, a court is not confronted with the problem of enforcing express contractual provisions but, rather, with the entirely separate problem of determining which general creditors should bear a loss caused by the debtor, a problem which may have to be resolved by reference to equitable principles.
>
> . . . .
>
> Whether there be any statutory violation [of the securities acts] and, if there be, its effect, if any, on the rights and priorities of the [banks] will be dependent upon the development of such facts as are relevant to these issues. . . . The rights of all parties are adequately protected at this time by allowing this defense to remain without prejudice to an appropriate resolution thereof upon the law and facts as developed.[100]

We agree that reliance becomes important when rescission claims are advanced. We assert that it should be presumed in cases of competition between rescinding shareholders and subsequent creditors, because of the realities of commercial practice.

## D. *Laches*

Consideration should also be given to the timing of the stockholder claim. Obviously, one who has been defrauded cannot be forced to rescind by the fraudfeasor or by a third party; the

---

[99] The district court had based its decision on the doctrine of equitable estoppel, but the Second Circuit found the theory inappropriate:

> Equitable subordination, which is founded upon estoppel, is the doctrine invoked by courts to deny equal treatment to creditors based on some inequitable or unconscionable conduct in which they have engaged, or a special position which they occupy vis-a-vis the bankrupt that justifies subordination of their claims. . . . On the other hand, consensual or contractual subordination, of which the debt subordination agreements involved here are prime examples, occurs when a creditor and the bankrupt agree to create priorities among debts. Such agreements have been uniformly enforced according to their terms by bankruptcy courts.

Id. at 408-09.

[100] Id. at 408-09, 412.

choice of affirmance or rescission is with the victim. Similarly, a stockholder cannot be made to assert rescission rights created by Section 12 of the Securities Act to attack violations of Section 17 or Section 5 of the Act. If he chooses to rescind, he may exercise his right within three years of issuance and within one year of learning the facts on which his claim depends.[101] Sometimes the securities purchaser may know of his right at the time of his investment or learn of it shortly thereafter.[102] Some authorities suggest that such a purchaser (at least if he is not an active participant in the offering)[103] may abide the full period of the statute of limitations before deciding whether he wants his bargain or return of his consideration.[104]

No obvious objection can be raised to the stockholder's delay in deciding whether to affirm or rescind if the business enterprise is solvent and in no difficulty. In such a case, remaining equity suppliers will bear any loss derived from the stockholder's decision like any other business loss. In terms of the goals of the Securities Act, this rule is functional since it tends to discourage entrepreneurs from selling unregistered or misrepresented securities as a calculated risk. However, when the stockholder chooses to rescind his contract with a bankrupt issuer, his claim is in com-

---

[101] 15 U.S.C. § 77m (1970).

[102] This is most likely to be true when the securities are part of an unregistered, nonexempt public offering that violates Section 5 of the Securities Act, 15 U.S.C. § 77e (1970). Professor Loss has suggested that a security purchaser's knowledge that the offer to him violates section 5 should not bar his assertion of a section 12(1) rescission claim:

> [A]pplication of the *in pari delicto* doctrine, at least on the basis solely of the buyer's knowledge of the violation, is so foreign to the purpose of the section that there is hardly a trace of it in the decisions under § 12(2), let alone § 12(1).

3 L. Loss, Securities Regulation 1694 (2d ed. 1961). See Can-Am Petroleum Co. v. Beck, 331 F.2d 371 (10th Cir. 1964). But see Fox v. Glickman, 253 F. Supp. 1005 (S.D.N.Y. 1966).

[103] Active participation may bar any recovery. See Kuehnert v. Texstar Corp., 412 F.2d 700, 703-04 (5th Cir. 1969); Rosenberg v. Hano, 121 F.2d 818, 822 (3d Cir. 1941); 3 L. Loss, Securities Regulation 1693-94, 1723-24 n.129 (2d ed. 1961); 6 id. at 3823-29. Recent decisions suggest that a plaintiff under the Securities Act may be barred by conduct giving rise to the defenses of estoppel or waiver. See Rogen v. Ilikon Corp., 361 F.2d 260 (1st Cir. 1966); Junker v. Midterra Assoc., Inc., 49 F.R.D. 310 (S.D.N.Y. 1970); Eyman v. Marsha Development Corp., 301 F. Supp. 931 (E.D. Mo. 1969).

[104] See authorities cited in note 102 supra. As to the availability of laches as a defense to claims under section 12, compare Straley v. Universal Uranium & Milling Corp., 289 F.2d 370 (9th Cir. 1961) (laches is available as a defense when an equitable remedy is sought), with Note, Applicability of Waiver, Estoppel, and Laches Defenses to Private Suits Under The Securities Act and S.E.C. Rule 10b-5: Deterrence and Equity In Balance, 73 Yale L.J. 1477, 1487-88 (1964) (the defense of laches is inconsistent with the one-year provision of Section 13 of the Securities Act).

petition with those of general creditors. It is difficult to see any reason ex aequo et bono why a delaying stockholder should be thus preferred and the creditors thus disadvantaged.

The protection of general creditors calls for the application by bankruptcy courts of the equitable doctrine of laches, which is, essentially, an anti-straddle rule.[105] Laches, a traditional defense to equity actions, has two elements: the failure to assert a known claim and detriment to an adverse party by reason of such failure.[106] The doctrine has been applied to cut off rescission rights in cases brought under 10b-5 against conscious fraudfeasors;[107] it seems beyond rational dispute that innocent creditors of the issuer should be entitled to at least the same protection. If the shareholder has failed to assert a known rescission claim within a reasonable time after learning of his right, laches should be available to bar his claim as against all general creditors.[108]

The term "reasonable time" in the rule suggested above is not self-defining. Thus, it has the disadvantage of opening new issues to be contested in the distribution of the estates of insolvent corporations, necessarily adding the costs of litigating those issues to the total losses to be borne by participants. This consideration suggests that bankruptcy courts should limit the application of the doctrine to relatively clear cases. At a minimum, however, laches should bar a securityholder who knew of the facts underlying his claim substantially before insolvency from competing with any creditors of the enterprise in bankruptcy.

---

[105] See 2 J. Pomeroy, Equity Jurisprudence 169-81 (5th ed. 1941).

[106] Id. at 177-80.

[107] See, e.g., Baumel v. Rosen, 412 F.2d 571 (4th Cir. 1969), cert. denied, 396 U.S. 1037 (1970); Pitofsky v. Brucker, 291 F. Supp. 321 (S.D.N.Y. 1966) (mem.) (by implication); Carr v. Warner, 137 F. Supp. 611, 615 (D. Mass. 1955); Bell, How to Bar an Uninnocent Investor—The Validity of Common Law Defenses to Private Actions Under the Securities Exchange Act of 1934, 23 U. Fla. L. Rev. 1 (1970).

[108] Straley v. Universal Uranium & Milling Corp., 289 F.2d 370 (9th Cir. 1961), held that laches was not available as a defense to the claim made there because the plaintiff was not seeking an equitable remedy. However, the court remanded for consideration of the possibility that the defendant had an available defense of "waiver" and later affirmed the district court's finding of waiver. Straley v. Universal Uranium & Milling Corp., 312 F.2d 745 (9th Cir. 1962) (per curiam). Since bankruptcy jurisdiction is equitable, this technical objection to the application of laches would not be available where the stock claim was being asserted in straight bankruptcy or reorganization. As to the equitable nature of bankruptcy jurisdiction, see Bankruptcy Act § 2a, 11 U.S.C. § 11(a) (1970); Bank of Marin v. England, 385 U.S. 99, 103 (1966); Young v. Higbee Co., 324 U.S. 204, 214 (1945); Pepper v. Litton, 308 U.S. 295, 304-05 (1939); 1 W. Collier, Bankruptcy ¶ 2.09 (14th ed. 1971). The availability of laches as a bar to claims asserted against the bankrupt estate is well-recognized. See 3A W. Collier, Bankruptcy ¶ 63.07[16] (14th ed. 1971).

Imaged with the Permission of N.Y.U. Law Review

### E.  Tracing and Reclamation

Regardless of one's view as to the propriety of parity treat-
ment, it is clear that the rescinding stockholder should not wind
up as a secured party. All of the arguments advanced above
against parity are applicable a fortiori when, through tracing and
reclamation, a shareholder obtains secured status. The general
creditor should not be further prejudiced by the fortuitous fact
that the shareholder can trace the issuer's use of his investment.

The leading case upholding a reclaiming party's right to se-
cured status is *In re Rhine*.[100] *Rhine* can be distinguished, how-
ever, from cases involving corporations, since the competition in
*Rhine* was between the creditors of an individual and persons who
had purchased mineral interests from him. A creditor dealing with
an individual proprietor whose assets are in land and mineral
leases does not rely on the leaseholders to furnish an equity
cushion to the individual in the same way that a shareholder
furnishes one to a corporation. To that extent, the leaseholder is
different from the shareholder. As indicated above, the writers are
unimpressed with the *Rhine* result on its own facts; it should not
be extended into corporate security cases.

### VI
#### RECOMMENDED SOLUTION

We propose that a new approach be taken to the competition
in bankruptcy between rescinding stockholders and general credi-
tors. There are three aspects to our formulation:

1. We propose that each creditor of a distressed enterprise be
presumed to have relied upon each prior investment in equity and
junior debt. The corollary is that the rescinding investor should be
barred from competition with any subsequent creditor unless, and
to the extent that, the investor can prove nonreliance by the sub-
sequent creditor.

2. As to prior creditors, we would shift the burden of proof,
permitting the rescinding investor to share pari passu with each
prior creditor unless, and to the extent that, the prior creditor can
prove detrimental reliance upon the investor's participation.

3. We propose that a rescinding shareholder be barred by the
doctrine of laches from competing with any creditor, prior or sub-
sequent, if the investor has failed to assert his claim within a rea-
sonable time after learning of its existence.

---

[100] See text accompanying notes 57-63 supra.

## A. A Distribution Formula

To effect this system and to integrate it with the Bankruptcy Act, we make the following suggestions. Our goal is a distribution formula in which rescission claims share pari passu with those of prior creditors who have not proved reliance, and rescission claims are fully subordinate to those of subsequent creditors whose reliance has not been disproved. To achieve these ends, the bankruptcy dividend of the rescinding shareholder will be used to satisfy the claims of all those creditors who have relied. As in the case of the ordinary publicly offered subordinated debenture, the effect of subordination is an implied assignment of the dividend of the junior claim to senior claimants.

A hypothetical will clarify our proposal. Assume a straight bankruptcy proceeding in which secured parties and section 64 priority claims[110] have been paid. Remaining general creditors can be separated into three classes. Class One consists of (a) subsequent creditors against whom the rescission claimants have not sustained the burden of proving nonreliance and (b) prior creditors who have proven that they changed position in reliance on the shareholders' investment. Class Two consists of (a) prior creditors who have not sustained the burden of proving reliance upon the investments of rescission claimants and (b) subsequent creditors whose reliance has been disproved. Class Three consists of shareholders with provable rescission claims. Each class asserts a claim of $100,000, so that total creditor claims amount to $300,000. Assume that $99,000 remains to be distributed. Section 65 of the Bankruptcy Act establishes no priorities for the payment of these creditor claims, but provides instead that general creditors share pro rata in the residue of the bankrupt's estate.[111] A section 65 distribution would allocate $33,000 to each category of creditor hypothesized. Nothing in the Bankruptcy Act, however, prevents the court from ordering the equitable subordination we propose. Under this plan, the Class Three claimants' $33,000 dividend would be allocated to Class One under an implied assignment.[112] The net effect of this assignment is to leave the claimants in Class One with $66,000, those in Class Two with $33,000, and those in Class Three with nothing. Playing the hypothetical out, it becomes clear that the rescission claimants in Class Three will receive nothing

---

[110] See 11 U.S.C. § 104 (1970).

[111] 11 U.S.C. § 105 (1970).

[112] See Calligar, Subordination Agreements, 70 Yale L.J. 376 (1961); Everett, Subordinated Debt—Nature and Enforcement, 20 Bus. Law. 953 (1965).

unless the estate's residue exceeds $150,000,[113] since Class Three's liquidating distribution will first be used to make Class One whole. In practical terms, Class Three claimants will not participate at all in the overwhelming majority of straight bankruptcies.

Subordination of rescission claimants to general creditors would operate similarly in Chapter X cases. If the reorganization value of the enterprise equalled or exceeded total unsecured claims, including rescission claims, the rescission claims would be added to other unsecured claims and share ratably in the issuance of new securities. If the reorganization value were less than the aggregate of all claims, including securities rescission claims, the securities claimants would participate only to the extent their claims were not absorbed in making whole those creditors senior to them.

## *B. Cross Subordination.*

If subordination of rescinding stockholder claims is adopted, consideration must be given to the competition between equitably subordinated rescinding securityholders and creditors who hold contractually subordinated claims against the issuer. Two likely categories of contractually subordinated claims exist, at opposite ends of the inside investor-public investor continuum. At one end is the inside lender group. For any one of many reasons, inside creditors may enter into a contract providing that their claims be subordinated to all other claims in the event of issuer insolvency. At the other end of the continuum is the common type of publicly-issued subordinated debenture providing for subordination to all other claims in the event of liquidation or reorganization.[114]

Competition between the inside creditor and the rescinding stockholder should not present a problem in the ordinary case. Insiders typically either participate in the conduct giving rise to the stockholder's right to rescind or have some relationship to the issuer imposing on them a duty to see that the issuer does not commit securities law violations. Under the doctrine of *Pepper v. Litton*,[115] insider claims of this kind appear appropriate for equitable subordination to the claims of rescinding stockholders.

---

[113] The subordination proposed here of the rescinding junior claimants to senior claimants stops considerably short of the British rule which bars rescinding stockholders from any competition with creditors, and relegates them to an in personam claim against the issuer's management. See L. Gower, The Principles of Modern Company Law 326-27, 335 (3d ed. 1969).

[114] See Calligar, supra note 112, at 377-81.

[115] 308 U.S. 295 (1939). *Pepper* involved an outright disallowance of an insider claim; the principle applied is equally available to achieve subordination.

The more difficult case would arise when the subordinated
debt consists of a public issue of debentures, held by persons
against whom no *Pepper*-type argument can be made. If the de-
bentureholders have invested after the rescinding stockholder,
there runs in their favor the same reliance argument which is
made above for general creditors, *i.e.*, they put in their money
relying upon an equity base which included the rescinder's invest-
ment and arguably are entitled to protection of their reliance in-
terests. Cutting the other way is the argument that anyone who
buys a claim which is expressly subordinated to all other claims
against the issuer should be held to his bargain. Giving preference
to the securities law rescinder, who is a creditor, arguably does
nothing more than give effect to the debentureholder's contract.
Consistent with the general approach suggested here, that pre-
ference be given to the reliance interest of subsequent creditors,
we suggest that the rescission claimant be subordinated to pur-
chasers of subordinated debentures issued after the rescinder's in-
vestment, when the rescinder's own investment was in stock or in
debt which itself was expressly subordinated to the subordinated
debentures.

A different result should obtain, however, when the rescission
claimant's investment is in securities which, absent a securities
law claim, would share ratably with the remaining subordinated
debentures. Assume, for example, that the bankrupt had sold two
issues of subordinated debentures which by their terms share
ratably with each other, but are subordinated to all other claims.
Assume further that the first issue was, and the second issue was
not, tainted by a securities law violation giving rise to a rescission
right. If the rescinding purchasers of the first issue are given pri-
ority over purchasers of the second, the latter's contemplated ex-
posure has been increased to the extent of any dividend paid to the
first. On the other hand, complete protection of the second group's
reliance on the equal validity of the two issues has the practical
effect of disallowing all rescission rights, since on that basis the
first group would participate in exactly the same way whether or
not they had securities law rights. This result is not only irrecon-
cilable with the express provisions of Section 12 of the Securities
Act, but also with policies underlying implied federal actions

---

See Taylor v. Standard Gas & Elec. Co., 306 U.S. 307 (1939); 3A W. Collier,
Bankruptcy ¶ 63.08 (14th ed. 1971). Herzog & Zweibel, The Equitable Sub-
ordination of Claims in Bankruptcy, 15 Vand. L. Rev. 83 (1961). Cases are col-
lected in Annot., 51 A.L.R.2d 989 (1957), and supplements.

under section 17(a) and rule 10b-5 and state statutory and com-
mon law actions. Accordingly, it appears that creditors rescinding
purchases of subordinated debt should be preferred to holders of
other subordinated securities with whose claims they would
otherwise be in parity.

## VII
### CONCLUSION

The absolute priority rule mandates the complete subordina-
tion of equity claims against a bankrupt to the claims of general
creditors. Yet, under present law, a shareholder can escape the
effects of the rule if he can prove a right to rescind his purchase.
Establishment of such a claim will give him equality with or per-
haps priority over general creditors. Although it is arguable that
such treatment accords with policies of the securities acts, it takes
no account of the rules and policies of bankruptcy distribution.

In particular, the present exception allocates to the general
creditor risks of business insolvency and illegal stock offering
which should be borne by the equity investor. The exception does
not acknowledge the fact that the general creditor relies on the
existence of an equity cushion in case of his debtor's bankruptcy.
The exception allows a shareholder with a known rescission claim
the option of retaining his interest if an enterprise prospers or
reclaiming his investment if it fails. In sum, the exception gives
full recognition to the interests of shareholders, but neglects the
interests and expectations of laborers, lenders and trade creditors.
We suggest that the exception be reconsidered in light of these
interests.

The position of the shareholders in our problem should not be
confused with that of a consumer-creditor of a bankrupt corpora-
tion. In a recent article,[116] Schrag and Ratner have argued that
consumer claims against bankrupts should be entitled to priority,
even over administrative expenses and tax claims. This conclusion
is based importantly (although not solely) upon the observation
that most consumers are unaware of the fact that they become
creditors of an enterprise when they make down-payments or
trade-ins or enter into similar transactions. Messrs. Schrag and

---

[116] Schrag & Ratner, Caveat Emptor—Empty Coffer: The Bankruptcy Law
Has Nothing to Offer, 72 Colum. L. Rev. 1147 (1972).

Ratner believe this ignorance justifies relieving consumers of any disadvantages attendant on general creditor status.[117] Whatever the merits or demerits of this position may be, they should have no spillover effect on the allowance of securities law claims. It is obvious that the factual premise of the Schrag and Ratner argument does not apply to securities investors, who, by definition, are conscious risk-takers. While securities regulation law is sometimes described metaphorically as a type of consumer protection,[118] we think it critical to remember that purchasers of stock and subordinated debt have by their investments invited reliance by others who deal with the issuer. As against those who have so relied, such investors are in no sense "consumers."[119] They ought not be permitted to hitch rides on the Schrag and Ratner bandwagon.

The policies of state and federal securities regulation are important; they are not transcendental. In case of corporate bankruptcy, the public interest favoring private remedies for the violation of these laws must be balanced against other interests worthy of protection—notably the reliance interests of laborers, lenders and trade creditors. Adoption of the rules we have suggested would strike a more equitable balance among these interests.

## ADDENDUM

As this article goes to press, the Commission on the Bankruptcy Laws of the United States is preparing to release proposals for a significant revision of the bankruptcy laws. It is our understanding that these proposals will include specific consideration of the problem posed by the rescinding securityholder. We submitted a draft of this article to the Commission, and of course

---

[117] Id. at 1170.

[118] See, e.g., Levenson, The Role of the SEC as a Consumer Protection Agency, 27 Bus. Law. 61 (1971); Sommer, Random Thoughts on Disclosure as "Consumer Protection", 27 Bus. Law. 85 (1971).

[119] One sense in which it is meaningful to speak of a securities investor as a consumer is in describing his relationship with a broker-dealer. Congress has dealt specifically with that situation, first by giving a preferred position to a bankrupt stockbroker's customers as a class under Section 60e of the Bankruptcy Act, 11 U.S.C. § 96(e) (1970), and more recently by creation of Securities Investor Protection Corporation (SIPC), which is the security industry analog to the Federal Deposit Insurance Corporation. See 15 U.S.C. §§ 78aaa-lll (1970). However, these Congressional policies apply to the investor in his position as a creditor of a brokerage house standing in a regulated fiduciary capacity to the investor, not in his risk-taking role in the affairs of the issuer of stock or subordinated debt.

Imaged with the Permission of N.Y.U. Law Review

hope that our analysis will be reflected in their proposals. In any event, the Commission's recommendations on this subject will play an important role in any future consideration of the rescinding securityholder either by Congress or the courts. When the recommendations become available they should be consulted by all interested members of the profession.

Imaged with the Permission of N.Y.U. Law Review