**HEARING DATE:  MARCH 5, 2013 AT 10:00 A.M. EST**
**OBJECTION DEADLINE:  FEBRUARY 19, 2013 AT 4:00 P.M. EST**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999
*Special Counsel for Wilmington Trust, N.A., as*
*Indenture Trustee for the Senior Unsecured Notes*
*Issued by Residential Capital, LLC*

LOEB & LOEB LLP
Walter H. Curchack (WHC-3177)
Vadim J. Rubinstein (VJR-5896)
345 Park Avenue
New York, NY 10154
Telephone:  (212) 407-4000
Facsimile:  (212) 407-4990
*Counsel for Wilmington Trust, N.A., as Indenture*
*Trustee for the Senior Unsecured Notes Issued by*
*Residential Capital, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------X
                                                    :
**In re**                                            :
                                                    :        **Chapter 11 Case No.**
**RESIDENTIAL CAPITAL, LLC, et al.,**                :
                                                    :        **12-12020 (MG)**
                        **Debtors.**                 :
                                                    :        **(Jointly Administered)**
                                                    :
                                                    :
---------------------------------------------------X

**OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION TO THE
MOTION OF AIG ASSET MANAGEMENT (U.S.), LLC, THE ALLSTATE ENTITIES,
MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, AND THE
PRUDENTIAL ENTITIES FOR AN ORDER UNDER BANKRUPTCY RULE 3013(i)
CLASSIFYING RMBS FRAUD CLAIMS IN THE SAME CLASS AS THE
SECURITIZATION TRUSTS' CLAIMS FOR PURPOSES OF ANY CHAPTER 11 PLAN
FOR THE DEBTORS AND (ii) DIRECTING THAT MISREPRESENTATION CLAIMS
CANNOT BE PLACED IN A PLAN CLASS THAT WILL BE
<u>SUBORDINATED UNDER BANKRUPTCY CODE SECTION 510(b)</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

PROCEDURAL BACKGROUND ........................................................................ 3

OVERVIEW OF RESIDENTIAL MORTGAGE BACKED SECURITIES
AND THE SECURITIZATION PROCESS .......................................................... 4

THE INVESTOR CLAIMS ................................................................................. 6

OBJECTION ....................................................................................................... 7

    A.    The Motion Must Be Denied Because The Securities Claims Must Be
        Subordinated Under § 510(b) Of The Bankruptcy Code ..................................... 7

        i.    The Securities Claims Arise From The Purchase Of A Security ........ 7

        ii.    The RMBS Are Securities "Of The Debtor" .................................... 8

        iii.    The Securities Claimants' Position is Flawed And Unsupported ..... 12

        iv.    The RMBS Are Securities "Of An Affiliate Of The Debtor" ........... 13

        v.    The Congressional Purpose Need Not Be Determined To
            Enforce The Plain Meaning Of The Statute And
            In Any Event Does Not Support the Securities Claimants ............... 16

    B.    The Court Should Alternatively Deny The Motion Because It Is
        Procedurally Improper ..................................................................................... 17

CONCLUSION .................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Statutes</u>

11 U.S.C. § 101(2)(C) ................................................................................... 13

11 U.S.C. § 510(b) ..................................................................................... 2, 7

Fed. R. Bankr. P. 3013 ................................................................................ 18

Securities Act of 1933 § 2(4), 15 U.S.C. § 77b(a)(4) (2012) ......................... 9

Securities Act of 1933, 17 C.F.R. § 230.191(a) (2005) ............................... 9-10

Securities Exchange Act of 1934, 17 C.F.R. § 240.3b-19(a) (2010) .......................... 10

Securities Exchange Act of 1934 § 3(a)(8), 15 U.S.C. § 78c(a)(8) (2010) ........................... 9, 11

## <u>Cases</u>

*American Bus Ass'n v. Slater,*
231 F.3d 1  (D.C. Cir. 2000) ................................................................... 18

*CIT Group Inc. v. Tyco Int'l Ltd.,*
460 B.R. 633, 639 (S.D.N.Y. 2011), *aff'd*, 479 Fed. Appx. 393 (2d Cir. Sept 6, 2012) ............ 17

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.,*
858 F. Supp. 2d 306 (S.D.N.Y. 2012) ........................................................ 9

*In re 500 Fifth Ave. Assoc.,*
148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ..................................................... 19

*n re Constitution Plaza Assoc. Ltd.,*
161 B.R. 563 (Bankr. D. Conn. 1993) ....................................................... 19

*In re Del Biaggio,*
__ B.R. __, Case No. 08-30991 (TEC), 2012 WL 5467754 (Bankr. N.D. Cal. Nov. 8, 2012) . 11

*In re G&C Foundry Co., Ltd.,*
No. 06-30601, 2008 WL 4560741 (Bankr. N. D. Ohio 2008) ........................... 19

**Page(s)**

*In re Granite Partners, L.P.*,
208 B.R. 332 (Bankr. S.D.N.Y. 1997) ..................................................................... 12

*In re Med Diversified, Inc.*,
461 F.3d 251 (2d Cir. 2006) .................................................................... 7, 11, 16

*In re Norton*,
No. A11-00864-DMD, 2012 WL 479096 (Bankr. D. Alaska Feb. 14, 2012) ........... 19

*In re Semcrude, L.P.*,
436 B.R. 317 (Bankr. D. Del. 2010) ........................................................................ 15

*In re VF Brands, Inc.*,
275 B.R. 725 (Bankr. D. Del. 2002) ........................................................................ 11

*In re Washington Mut., Inc.*,
462 B.R. 137 (Bankr. D. Del. 2011) .......................................................................... 9

*U.S. v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) ................................................................................................. 16

*Waltzer v. Nisselson*,
346 F. App'x. 744, 745-46 (2d Cir. 2009) .............................................................. 16

**Other Authorities**

American Heritage Dict. (5th Ed. 2011) ................................................................... 18

*Asset-Backed Securities*, SEC Release No. 8518,
2004 WL2964659 (Dec. 22, 2004) .......................................................................... 10

H.R. Rep. No. 85, 73d Cong., 1st Sess. (1933) .................................................. 10, 11

H.R. Rep. No. 152, 73d Cong., 1st Sess. (1933) ..................................................... 11

H.R. Rep. No. 5480, 73d Cong., 1st Sess. (1933) ................................................... 10

S. 516, 73d Cong., § 2(d), 1st Sess. (1933) ............................................................. 10

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Wilmington Trust, National Association (the "Trustee"), solely in its capacity as indenture trustee for various series of senior unsecured notes in the outstanding aggregate principal amount of approximately $1 billion (the "Notes," and the holders thereof, the "Noteholders") issued by Residential Capital, LLC ("Residential Capital," and with its debtor-affiliates, the "Debtors"), under that certain indenture dated as of June 24, 2005, respectfully submits this objection to the motion of AIG Asset Management (U.S.), LLC and affiliated entities (collectively, "AIG"), Allstate Insurance Company and affiliated entities (collectively, "Allstate"), Massachusetts Mutual Life Insurance Company ("Mass Mutual"), and Prudential Insurance Company of America and affiliated entities ("Prudential") for an order under Bankruptcy Rule 3013 (i) classifying RMBS fraud claims (the "Securities Claims") in the same class as the securitization trusts' claims for purposes of any Chapter 11 plan for the Debtors and (ii) directing that misrepresentation claims cannot be placed in a plan class that will be subordinated under § 510(b) of the Bankruptcy Code (the "Motion").  The National Credit Union Administration Board ("NCUAB," and with AIG, Allstate, Mass Mutual and Prudential, the "Securities Claimants"), solely in its capacity as Liquidating Agent for Western Corp. Federal Credit Union and U.S. Central Federal Credit Union, has joined in the Motion.  In support of the objection, the Trustee represents as follows:

### PRELIMINARY STATEMENT

1.      While acknowledging they are asserting claims arising from alleged misrepresentations of the Debtors that purportedly violate "federal securities laws and state blue sky laws," *see* Motion at 2-3, the Securities Claimants nevertheless seek an advance ruling that their claims are immune from a plan treatment that recognizes such claims should be subordinated

under § 510(b).  The plain language of § 510(b) of the Bankruptcy Code provides that "a claim arising from [the] purchase . . . of a security of the debtor or of an affiliate of the debtor . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security."  11 U.S.C. § 510(b).  Section § 510(b) precludes the relief sought here.  As set forth below, the residential mortgage-backed securities (the "RMBS") giving rise to the Securities Claims are securities "of the debtor" or "of an affiliate of the debtor."  While registered in the name of a securitization trust, a non-Debtor entity, the RMBS are securities of the Debtors under the federal securities laws and/or of affiliates of the Debtors as (1) the Debtors marketed and sold the RMBS to the public, (2) the Debtors originated the mortgage loans, created and signed the offering materials for the RMBS (sometimes even before the securitization trust even existed), made the alleged misrepresentations giving rise to the Securities Claims, and deposited the loans into the securitization trust, and (3) the Debtors, and not the trustee of the trusts, (a) managed and serviced substantially all of the assets of the trust assets prior to the petition date and (b) were responsible for making distributions to RMBS holders, all pursuant to an express agreement known as a pooling and servicing agreement (the "PSA").  As described in greater detail below, the Securities Claims fall squarely within the four corners of § 510(b), and accordingly they must be subordinated.

2.       Alternatively, the Motion should be denied on a number of procedural grounds, and the issues raised therein should be resolved as part of a plan of reorganization or through an adversary proceeding.  First, the Motion impermissibly seeks a determination that the Securities Claims must be treated *pari passu* with the representation and warranty claims that are the subject of the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* (the "R&W Claims").  The Trustee and other interested parties

2

have argued that the R&W Claims, like the Securities Claims, must also be subordinated under § 510(b), and they have preserved their rights accordingly.  This Motion has the potential to make those issues ripe for decision without proper notice to and full participation by the key parties in interest.  Second, the Motion is procedurally improper because any adverse ruling to the Securities Claimants could become the law of the case and impermissibly prejudice creditors with similar claims without the procedural protections afforded by Bankruptcy Rule 7001(8), which requires an adversary proceeding to subordinate a claim outside of the plan context.  Finally, Bankruptcy Rule 3013, the purported authority under which the Motion is asserted, requires a plan of reorganization to be filed before the rule can be invoked, which is clearly not the case here.

3.      In short, the Motion should be denied on the merits, or, in the alternative, the Motion should be denied as procedurally improper and subordination issues should be resolved as part of a plan of reorganization or through an adversary proceeding.[1]

## PROCEDURAL BACKGROUND

4.      On May 14, 2012, the Debtors commenced voluntary cases under chapter 11, title 11, of the United States Bankruptcy Code (the "Bankruptcy Code").  On May 14, 2012, the Court authorized joint administration of these chapter 11 cases, and the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On  June 28, 2012, the Court directed the appointment of an examiner.  The U.S. Trustee appointed Arthur J. Gonzalez, Esq. as examiner (the "Examiner"), and the Court approved the appointment on July 3, 2012.  On July 27, 2012, the Court approved the Examiner's preliminary statement regarding the scope and timing of his investigation.  The scope of the

---

[1]      The Trustee has a unique interest in the Motion because several of the Securities Claimants have filed proofs of claim against Residential Capital, the issuer of the Notes.

Examiner's investigation is broad and encompasses all corporate relationships between or among

the Debtors, Ally Financial Inc. ("AFI"), and Ally Bank. *See Order Approving Scope of*

*Investigation of Arthur J Gonzalez, Examiner* (Doc. No. 925).  The Examiner's investigation also

includes an inquiry into all state and federal law claims or causes of action that the Debtors and

third parties possess against AFI and/or its insiders, including current and former directors, officers,

and shareholders, as well as the value of releases contemplated by the Debtors and third-party

releases with respect to those claims and causes of action.  The Examiner's investigation remains

ongoing and is unlikely to be finished until May.

      6.      On November 27, 2012, the Securities Claimants filed the Motion, and the Motion

was originally scheduled to be heard on January 29, 2013.  On December 20, 2012, the Securities

Claimants adjourned the Motion, which is now scheduled to be heard on March 5, 2013.

**OVERVIEW OF RESIDENTIAL MORTGAGE-BACKED SECURITIES
AND THE SECURITIZATION PROCESS**

      7.      A principal business of AFI and its direct and indirect subsidiaries, including the

Debtors, was the securitization of residential mortgages into RMBS.  At the beginning of the

securitization process, an entity known as an "originator" underwrote a mortgage loan, which it

acquired independently or through a mortgage "broker."  Ally Bank and GMAC Mortgage LLC

("GMACM") were often the loan originators (although the originators could be unaffiliated with

AFI), and GMACM sometimes served as a broker.  Next, the originator transferred the loan to an

entity known as a "seller" or "sponsor."  For each securitization trust created by the Debtors, either

GMACM or Residential Funding Corp. ("RFC") (both Debtor entities) acted as the seller (RFC

and GMACM will be hereinafter referred to as the "Seller").

      8.      After acquiring a mortgage loan, the Seller transferred it as part of a pool of such

loans to another entity known as a "depositor."  The depositor created the securitization trust and

4

deposited the loans into that trust. Multiple Debtors served as depositors, including Residential

Asset Mortgage Products, Inc. (RAMP), Residential Asset Securities Corporation (RASC), and

Residential Accredit Loans, Inc. (RALI) (each hereinafter referred to as the "Depositor"). Each

securitization trust was created differently, but the goal in each case was to create a trust comprised

of mortgage loans of similar quality and vintage, or of different quality and vintage with separate

tranches representing those differences.

9.    In order to fund the transfer of loans into the securitization trust, the Debtors turned

to the capital markets. A registration statement (or shelf registration statement), a prospectus, and

a prospectus supplement, which collectively detailed, among other things, the characteristics of the

RMBS, the quality of mortgage loans deposited into the trust, and the loan underwriting process,

were filed with the U.S. Securities and Exchange Commission (the "SEC"). After the Debtors

obtained the necessary regulatory approvals, they caused the securitization trust to issue RMBS to

the Depositor. The Depositor in turn sold the RMBS to underwriters or to investors directly. The

Securities Claimants incorrectly describe the issuance of the RMBS when they state that "[i]n order

to finance the acquisition of the loans, the Trust issues to investors certificates backed by the pool

of loans." *See* Motion at 5. A careful reading of the Governing Documents (defined below), in

fact, demonstrates that the Depositor—a Debtor, and not the securitization trust trustee—sold the

certificates to investors either directly or through an underwriter. *See* Winston Decl. Ex. B. at 221

(describing the methods of distribution).[2] After the process was complete, holders of RMBS began

to receive monthly distributions from cash flows received from payments made on the mortgage

loans (or foreclosures) owned by the securitization trust.

---

2       Citations to the "Winston Declaration" are to the Declaration of Eric. D. Winston in support of the Motion
(Docket No. 2285).

10.    A series of documents (collectively, the "Governing Documents") governed the

securitization process and they continue to govern the ongoing management of trust assets.  While

the Governing Documents for each trust structure are slightly different, the Governing Documents

typically include a combination of a trust indenture, a mortgage purchase agreement, an

assumption and assignment agreement, and a PSA.  *See, e.g.*, Winston Decl. Exs. A, B.  The

Governing Documents also identify which legal entity will service the loans—that is, which entity

will collect monthly principal and interest payments from borrowers and foreclose on properties

(the "Mortgage Servicer," although sometimes referred to as the "subservicer")—and which legal

entity will administer the trust assets, including distributing funds to RMBS holders (the "Master

Servicer").  Here, the Seller was typically the Master Servicer, and it signed the relevant Governing

Documents (including the PSA) in its capacity as Master Servicer.  *See, e.g.*, Winston Decl. Ex. A.

## THE INVESTOR CLAIMS

11.    There are two principal categories of claims relating to RMBS in these chapter 11

cases.  The first category relates to alleged breaches of representations and warranties contained in

the Governing Documents (defined above as the R&W Claims).  These claims are also colloquially

referred to as "putback" claims because the Governing Documents allow the trustees to "putback"

nonconforming loans to the Seller or Depositor in the event of a material breach of certain

representations and warranties.  These claims are the subject of the *Debtors' Second Supplemental

Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*,

which is scheduled to be heard in March of 2013.  The second category of claims—those at issue

here—are based on alleged violations of the federal securities laws, state blue sky laws, common

law fraud, and other similar theories of liability.  The Securities Claimants allege that the

misrepresentations they assert are the same as, or nearly identical to, the misrepresentations made

in the Governing Documents upon which the R&W Claims are based.  *See* Motion at 11-15.  By

the Motion, the Securities Claimants seek the same class and plan treatment as the trustees holding

R&W Claims based solely on these alleged misrepresentations, and explicitly seek to be treated the

same as all unsecured creditors.

## OBJECTION

**A.     The Motion Must Be Denied Because The Securities Claims Must Be Subordinated Under § 510(b) Of The Bankruptcy Code**

12.     The Motion must be denied because the Securities Claims are required to be

subordinated to the claims of general unsecured creditors under § 510 of the Bankruptcy Code.

Section 510(b) provides that, for the purpose of distribution under the Bankruptcy Code, "a claim

arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the

debtor, [or] for damages arising from the purchase or sale of such a security . . . shall be

subordinated to all claims or interests that are senior to or equal the claim or interest represented by

such security, except that if such security is common stock, such claim has the same priority as

common stock." 11 U.S.C. § 510(b).  For § 510(b) to apply, the claim to be subordinated must

satisfy each element of the statute, and the Second Circuit, like most federal appellate courts,

construes its terms broadly.  *See In re Med Diversified Inc. v. Dufrayne*, 461 F.3d 251, 255, 259

(2d Cir. 2006).  Each of the elements of § 510(b) is satisfied here.

### i.     The Securities Claims Arise From The Purchase Of A Security

13.     There is no dispute that the first element is satisfied—that is, the Securities Claims

arise from the purchase of a security (*i.e.*, the RMBS).  The Securities Claimants do not disagree.

*See* Motion at 2-3 (articulating that the Securities Claims are based on alleged misrepresentations

in the offering materials that were used to market and sell the RMBS).

### ii. The RMBS Are Securities "Of The Debtor"

14.    A key dispute is whether the RMBS are securities "of the debtor". A careful reading of the Governing Documents demonstrates that they are. As a threshold matter, there is no question that RMBS trusts are special purpose entities created, controlled, and marketed by the Seller and Depositor, both of whom are Debtors, at the end of the RMBS securitization process. Indeed, it is the Seller and Depositor—and not the trust that they created—that originated the mortgage loans, created and signed the offering materials (sometimes before the trust even existed), made the alleged misrepresentations, deposited the loans into the trust, and facilitated and marketed the sale of RMBS to the market. A simple review of the proofs of claim filed by the Securities Claimants confirms this truth. For example, in explaining the basis for its claim, one Securities Claimant stated as follows:

> This [proof of claim] arises out of the *Debtors' fraudulent sale* of residential mortgage backed securities ("RMBS") in the form of pass-through certificates to Claimant. The *Debtors were collectively engaged in* the business of, among other things, originating and acquiring residential mortgage loans and selling those loans through securitization programs. As part of that process, *the Debtors made or authorized many statements* to acquirers, including by way of registration statement, prospectuses, prospectus supplements, free writing prospectuses, presentations, term sheets, customized spreadsheets, and other written materials (the "Offering Materials"). The *Debtors, along with their affiliates* and non-affiliated trusts, *determined and approved the structure* of the securitization (such as the form the securitization would take, how the principal and interest would be allocated), determined and approved the manner in which the depositors and the trusts sold the related Certificates, controlled the disclosures made in connection with the related securitizations, and provided key data to the credit rating agencies. The *Debtors*, along with other non-debtor entities, *had joint responsibility for preparing the Offering Materials* that were used to solicit the Claimant's acquisition of the Certificates, and were identified prominently throughout the Offering Materials—including on the first page of the Prospectuses and Prospectus Supplements. The *Debtors worked collectively with others to market and sell the Certificates*, and profited from the sales. In their roles as the "speakers" in the Offering Materials, *the Debtors made many false statements* of material fact, and fraudulently omitted other material information, including with respect to the features of the mortgage loans underlying the Certificates.

*See* Proof of Claim of The Gibraltar Life Insurance Company, Ltd., at 2-3 (Claim No. 4507)

(emphasis added).[3]  To say that the RMBS are not securities "of the debtor"—particularly when

the Seller, Depositor, and other Debtors allegedly engaged in all of the conduct about which the

Securities Claimants complain—is plainly inconsistent with the English language as well as the

substantive basis for the claims.

15.    The Bankruptcy Code does not define the phrase "of the debtor," and few reported

decisions have analyzed its meaning.  Only one court has analyzed § 510(b) in the RMBS context,

and it determined that the phrase cannot mean "sold by a debtor" but must mean "issued by a

debtor."  *See generally In re Washington Mut., Inc.*, 462 B.R. 137 (Bankr. D. Del. 2011)

(hereinafter "*WaMu*").

16.    The RMBS securities were both "sold" and "issued" by the Debtors.  Congress has

determined that securities representing interests in asset-based securitization trusts—including

RMBS trusts—are "issued by" the legal entity that deposits the assets into the trust and not by the

trust itself.  *See* Securities Act of 1933, § 2(4), 15 U.S.C. § 77b(a)(4) (2012) (providing that

"issuer" means "the person or persons performing the acts and assuming the duties of *depositor* or

*manager* pursuant to the provisions of the trust or other agreement or instrument under which such

securities are issued . . . ." (emphasis added)); Securities Exchange Act of 1934, § 3(a)(8), 15

---

3    Similar statements attributing responsibility for the alleged misrepresentations to the Debtors can be found in the proofs of claim of the other Securities Claimants.  See Proof of Claim of Allstate Insurance Co. (Claim No. 4505); Proof of Claim of Allstate Life Insurance Co. (Claim No. 4656); Proof of Claim of Allstate New Jersey Insurance Co. (Claim No. 5079); Proof of Claim of American Heritage Life Insurance (Claim No. 4508); Commerce Street Investments, LLC (Claim No. 4518); Proof of Claim of First Colonial Insurance (Claim No. 4956); Proof of Claim of Kennett Capital, Inc. (Claim No. 5085); Proof of Claim of Park Place Commerce Investments, LLC (Claim No. 5088); Proof of Claim of Pru Alpha Fixed Income Opportunity Master Fund I, L.P. (Claim No. 4928); Proof of Claim of Pruco Life Insurance Company of New Jersey (Claim No. 4514); Proof of Claim of Prudential Annuities Life Assurance Corporation (Claim No. 5099); Proof of Claim of Prudential Investment Portfolios 2 (Claim No. 4683); Proof of Claim of Prudential Retirement Insurance & Annuities Company (Claim No. 5104); Proof of Claim of Prudential Total Return Bond Fund, Inc. (Claim No. 5110); Proof of Claim of Prudential Trust Company (Claim No. 4521); Proof of Claim of Prudential Annuities Life Assurance Corp., (Claim No. 5099); Proof of Claim of The Prudential Insurance Company of America (Claim No. 5124); Proof of Claim of The Prudential Series Fund, Diversified Bond Portfolio (Claim No. 4947).

U.S.C. § 78c(a)(8) (2010) (same); *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d

306, 333-34 (S.D.N.Y. 2012) (holding that the mortgage depositor (and not the RMBS trust) is the

proper defendant for alleged violations of the securities laws).  In other words, the "depositor to the

issuing entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity."  *See*

17 C.F.R. § 230.191(a) (2005) (Securities Act Rule 191); 17 C.F.R. § 240.3b-19(a) (2010); *see*

*also Asset-Backed Securities*, SEC Release No. 8518, 2004 WL 2964659, at *38, 106, 212, 222

(Dec. 22, 2004).

17.    Congress' choice to designate the depositor (or manager) as the issuer makes

perfect sense because asset-backed securitization trusts (or the RMBS) are often (1) nothing more

than investment vehicles created by sellers, sponsors, and depositors at the end of the securitization

process to offload to investors assets that they acquired and created, (2) marketed to the public by

sellers, sponsors, depositors, or their affiliates, (3) not in existence before the depositor files a

registration statement for the trust's securities pursuant to the federal securities laws, and (4)

managed throughout their life by the same sellers, sponsors, and depositors that created them.  *See*

AB Release, at *10, 84-85.  Congress therefore made the "depositor" (or manager) the "issuer" as a

way to protect trust investors from alleged violations of the federal securities laws, blue sky laws,

common law fraud, and other similar statutes (the same body of law giving rise to the claims of the

Securities Claimants) because if such investors were forced to look only to the trust for fraud

recoveries, those investors may have no recovery at all because the investors already own all of the

assets of the trust.  Indeed, the legislative history of the Securities Act of 1933 confirms this

purpose and articulates this understanding.  *See* H.R. Rep. No. 85, 73d Cong. 1st Sess. at 26

(1933).[4]  And again, the depositor here who issued the Securities Claimants' securities is a Debtor,

thus satisfying the other element of § 510(b).

18.    The logic of ascribing meaning to Congress' decision to use the phrase "of the

debtor" in § 510(b), as opposed to another phrase such as "issued by the debtor" or "sold by the

debtor," is simple and straightforward against the backdrop of the securities laws: the text of the

statute is meant to capture both the "issuer" (*i.e.*, the depositor or manager) and the "issuing entity"

(*i.e.*, the trust) within § 510(b)'s prepositional phrase "*of* the debtor."  *See In re Med Diversified*,

461 F.3d 251, 255, 259 (2d Cir. 2006) (noting that § 510(b) is to be construed broadly).

19.    Moreover, the Securities Claims must be subordinated to the general unsecured

claims against the Depositor, Seller, and any other Debtor against whom the Securities Claimants

assert a claim because such a claim would otherwise be "equal to" the claims of general unsecured

creditors of any direct or indirect parent of the Depositor, which the text of § 510(b) clearly

prohibits.  *See In re Del Biaggio*, __ B.R. __, 2012 WL 5467754 (Bankr. N.D. Cal. Nov. 8, 2012)

(holding that claims against a parent company must be subordinated under § 510(b) when the

---

4        The Senate and House of Representative bills for the Securities Act of 1933 had different definitions of the
word "issuer."  The Senate version did not include depositors and managers of asset-backed trusts within the
definition of "issuer," but the House version did.  *Compare* S. 516, 73d Cong., § 2(d) (1st Sess. 1933), *with* H.R.
5480, 73d Cong. § 2(4) (1st Sess. 1933).  The House version described the inclusion as follows:  "Special provisions
govern the definition of 'issuer' in connection with security issues of an unusual character, such as fixed investment
trusts and certificates of deposit.  In instances of this nature basic securities are acquired by a depositing committee
or corporation, which then deposits these securities with a trustee.  The trustee actually issues the new securities,
which represent an interest in the securities deposited with the trustee.  These are then delivered to the depositor and
are then distributed by the depositor to the public.  Under such an arrangement, although the actual issuer is the
trustee, the depositor is the person responsible for the flotation of the issue.  Consequently, information relative to
the depositor and to the basic securities is what chiefly concerns the investor—information respecting the assets and
liabilities of the trust rather than of the trustee.  For these reasons, the duty of furnishing this information is placed
upon the actual manager of the trust and not the passive trustee, and this purpose is accomplished by defining
'issuer' as in such instances referring to the depositor or manager."  *See* H.R. Rep. No. 85, at 12 (1933).  The
conference committee accepted the House version.  *See* H.R. Rep. 152, at 2, 26 (1933).  The Securities Exchange
Act of 1934 adopts the same definition of "issuer" from the Securities Act of 1933.  *See* 15 U.S.C. § 78c(a)(8).  The
factual pattern described in the House Report is what happened here.

claims arise from the purchase or sale of securities of a subsidiary); *In re VF Brands, Inc.*, 275 B.R. 725 (Bankr. D. Del. 2002) (same).

20.     Consequently, because the claims asserted by the Securities Claimants arise from the purchase of a security (or securities) of a debtor, the Securities Claims must be subordinated vis-à-vis any Debtor against whom such a claim was filed.

### iii.    The Securities Claimants' Position is Flawed And Unsupported

21.     The Securities Claimants' position is that the "securities *regulations*" merely require "depositor-Debtors to perform regulatory functions usually associated with the 'issuer,'" and therefore are irrelevant in determining whether the certificates are "of" the Debtors for the purposes of subordination under the Bankruptcy Code.  *See* Motion at 18.  They further claim that the *WaMu* decision supports their position.  *Id.* at 20.  Both of these propositions are plainly wrong.

22.     *First*, the Securities Claimants' argument that depositors perform mere "regulatory functions" or only make "regulatory filings," besides being factually incorrect, ignores that these entities, which in this case are Debtors, are the entities that Congress determined were the responsible parties for the Securities Claims.

23.     *Second*, the Securities Claimants improperly invoke the canon of statutory interpretation which provides that identical words in different, unrelated statutes do not necessarily have the same meaning.  That canon has no application here.  Here, the Court is asked to decide what "of the debtor" means against the backdrop of two securities statutes that unequivocally defined "depositors" and "managers" as "issuers" of asset-backed securities over *fifty* years before § 510(b) was even enacted (and over *forty-five* years before the Bankruptcy Code was enacted).  In the context of this long historical backdrop,  Congress clearly understood the context of the securities laws when it drafted the Bankruptcy Code.  *See, e.g.*, *In re Granite Partners, L.P.*, 208 B.R. 332, 339-40 (Bankr. S.D.N.Y. 1997) (noting that in the context of subordination under §

12

510(b) for fraudulent retention claims, it is appropriate that, "[i]n searching for Congress's intent, a court . . . also look to similar language in unrelated statutes that apply to similar persons, things or relationships. The use of similar language strongly indicates that the two statutes should be interpreted *pari passu*, particularly where they share the same raison d'etre").

24. *Third*, the Securities Claimants' purported reliance on *WaMu* is misplaced. First, in that case the impact of the federal securities laws on the interpretation of phrase "of the debtor" was neither raised nor briefed. Indeed, immediately after Judge Walrath issued her decision in *WaMu*, the official committee of unsecured creditors filed a motion to alter Judge Walrath's opinion to correct a clear error of law because the parties to the dispute (the debtors and the claimant) both failed to brief the court on the securities law issues. *See* Declaration of Walter H. Curchack Ex. A (motion to alter and amend the court's opinion). Judge Walrath's opinion was not revised, however, because the parties settled their dispute before the committee's motion was heard. *See id.* at Exs. B (stipulation settling claim), C (order approving settlement). But even so, *WaMu*'s language actually supports the Trustee's argument because Judge Walrath held that "of the debtor" means "issued by" the debtor.

### iv.    The RMBS Are Securities "Of An Affiliate Of The Debtor"

25. Even if the Court agrees with the *WaMu* decision and concludes that the trusts "issued" the RMBS, the Securities Claims must still be subordinated because the trusts are clearly "affiliates" of the Debtors. The definition of "affiliate," in relevant part, means a "person whose business is operated under a[n] . . . operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor." 11 U.S.C. § 101(2)(C). Thus, the question that needs to be answered is whether the trust is operated under an "operating agreement" with a Debtor.

13

26.     Although the term "operating agreement" is not defined in the Bankruptcy Code, the plain language of the term clearly has to pick up agreements granting the Debtor control over the operation of another entity.  The PSA satisfies the standard because it vests the Debtors—*and not the RMBS trustees*—with virtually all power, responsibility, and authority to administer the trust and its property for the benefit of RMBS holders.

27.     As an initial matter, each PSA is an agreement between the Depositor (a Debtor), the Master Servicer or Seller (a Debtor), and a trustee (a non-Debtor).  *See* Winston Decl. Ex. A. The PSA allocates responsibility to manage the affairs of the trust assets to the Debtors, including the following:

- The Master Servicer (a Debtor) is required to establish a custodial account into which it must deposit all payments of principal, interest, and insurance proceeds for the benefit of certificateholders.  *See* Winston Decl. Ex. A, 29 (Article III, Administration and Servicing of Mortgage Loans, Series Supplement to the Standard PSA).

- The Master Servicer or the paying agent (both on behalf of the trustee) may be required to make periodic distributions to RMBS holders.  *See id.* at 32-36  (Article IV, Payments to Certificate Holders, Series Supplement to the Standard PSA).

- The Master Servicer (a Debtor), and not the trustee, shall determine the total amount of realized losses on the trust res.  *See id.* at 36  (Article IV, Payments to Certificate Holders, Series Supplement to the Standard PSA).

- The Master Servicer (a Debtor, or acting through a subservicer—here too, most likely, a Debtor) has the responsibility to service and administer the mortgage loans.  Indeed, the Master Servicer shall have the full power and authority to do anything deemed necessary and desirable in connection with such servicing and administration.  *See id.* at 79 (Article III, Administration and Servicing of Mortgage Loans, Standard Terms of Pooling and Servicing Agreement).

- The Master Servicer (a Debtor) shall take action to protect the properties securing the mortgage loans, including maintaining fire insurance.  *See id.* at 86 (Article III, Administration and Servicing of Mortgage Loans, Standard Terms of Pooling and Servicing Agreement).

- The Master Servicer (a Debtor) shall foreclose on the mortgage loans that are in default. *See id.* at 88 (Article III, Administration and Servicing of Mortgage Loans, Standard Terms of Pooling and Servicing Agreement).

14

- The Master Servicer (a Debtor) pays the fees of and indemnifies the trustee. *See id.* at 111 (Article VIII, Administration and Servicing of Mortgage Loans, Standard Terms of Pooling and Servicing Agreement).

28.    While it is certainly true that the trustee retains some responsibilities with respect to the trust—including "examining all documents required to be provided by the depositor and servicer to ensure they are complete," "making available reports on the loans and mailing paper reports to those who request them," or "making available reports on the loans and mailing paper reports to those who request them," *see* Motion at 6 n.4—these functions are clearly administrative when compared to the active and daily management of over the billions of dollars of assets in the trusts, which is performed by a Debtor.

29.    The PSA allocates the substantive control over the property of the trust to the Debtors. For example, the trustee is limited to selling RMBS to the Depositor at the trust's inception, entering into and performing its limited obligations under the PSA, and engaging only in related activities in connection with conservation of the trust. *See id.* at 78 (Article II, Conveyance of Mortgage Loans; Original Issuance of Certificates, Standard Terms of Pooling and Servicing Agreement); *see also id.* at 109 (Article VIII, Concerning the Trustee, Standard Terms of Pooling and Servicing Agreement). Importantly, the trustee is not permitted to act with the powers of the Master Servicer—*i.e.*, to manage or control the trust res—unless the Master Servicer is unable to perform the services or an event of default occurs. *See id.* at 81.

30.    Again, the Securities Claimants' reliance on *WaMu* does not help them because their statement that it posed an "identical factual situation" is untrue. *See* Motion at 22. In *WaMu*, Judge Walrath found one important fact to be nearly dispositive, which is different here: no *WaMu* debtor was a party to the PSA, which was the asserted "operating agreement" in that case. *See also In re Semcrude L.P.*, 436 B.R. 317, 320-21 (Bankr. D. Del. 2010) (finding that no operating

agreement existed for purposes of 101(2) (C) because no debtor was a party to the agreement).

Here, unlike *WaMu*, at least two Debtors were parties to each PSA.  *See* Winston Decl. Ex. A.

31.    Accordingly, even if the Court determines that the RMBS are not securities of a

Debtor, it must conclude that the RMBS are securities "of an affiliate of the debtor" (*i.e.*, the

securitization trust) because the PSA is an operating agreement, and substantially all of the trust's

property is managed by a Debtor.  Therefore, for the same reasons as stated above the Securities

Claims must be subordinated against the Depositor, the Seller, and any other Debtor.  *See*

discussion *supra* ¶ 19.

> **v.    The Congressional Purpose Need Not Be Determined To
> Enforce The Plain Meaning Of The Statute And In Any Event
> Does Not Support the Securities Claimants**

32.    Because the plain language of § 510(b) subordinates the RMBS claims, there is no

need to divine the Congressional purpose, which, in any event, does not support the Securities

Claimants' position.  It is hornbook law that when, as is the case here, the words of a

Congressional statute are clear, the interpretative job of this Court is simply to give effect to the

plain meaning of the statute.  *See United States v. Ron Pair Enters. Inc.* (*In re Ron Pair Enters.*),

489 U.S. 235, 241 (1989); *Waltzer v. Nisselson* (*In re Marketxt Holdings Corp.*), 346 F. App'x.

744, 745-46 (2d Cir. 2009) (holding that claimants' "claim was covered by the plain meaning of

the statute was alone sufficient to require mandatory subordination" under § 510(b) of the

Bankruptcy Code).  The Securities Claimants' lengthy discussion of Congressional purpose is

therefore irrelevant.

33.    Even were policy arguments relevant, they do not help the Securities Claimants

here.  Unlike the Debtors' creditors, the Securities Claimants were not relying on the Debtors'

"equity cushion" when they made their structured investments in pools of isolated assets.

Accordingly, the Securities Claimants get no help from the Second Circuit's decision in *In re Med*

*Diversified, Inc.*, 461 F.3d 251 (2d Cir. 2006).  There, the Second Circuit addressed whether a

claim for damages based on the debtor's failure to issue shares of its common stock in exchange

for a former employee's stock in another company pursuant to a termination agreement should be

subordinated under § 510(b).  *Id.* at 254.  The court concluded that the phrase "arising from," in the

unique context of the arguments made before it, was ambiguous, and therefore, the court resorted

to legislative history.  The court relied on the statute's policy rationale in determining that the

employee's claim must be subordinated.  The litmus test was whether the claimant took on an

investment rather than a creditor risk.[5]  *Id.* at 256.  Here, unlike creditors, the Securities Claimants

were seeking to obtain an investment return.  Because the Securities Claims fall squarely within the

plain meaning of § 510(b), as well as the purpose of the statute, they must be subordinated.

**B.    The Court Should Alternatively Deny The Motion Because It Is Procedurally Improper**

34.    The Court should alternatively deny the Motion on procedural grounds.  *First*, the

Motion impermissibly seeks a determination that the Securities Claims must be treated *pari passu*

with the R&W Claims.  Implicit in this request is a consideration of a related issue—that is,

whether the R&W Claims, like the Securities Claims, must be subordinated under § 510(b).

Several parties have preserved their rights on that issue, and the Motion has the potential to make

those issues ripe for decision without proper notice to the key parties in interest.

35.    *Second*, the Motion is improper because any adverse ruling to the Securities

Claimants could become the law of the case and impermissibly prejudice creditors with similar

claims without the procedural protections afforded by Bankruptcy Rule 7001(8), which requires an

adversary proceeding to subordinate a claim unless the claim is subordinated under a plan.

---

[5]    Courts have recognized that nothing in the statute requires the security in question to be an equity interest. *See CIT Group Inc. v. Tyco Int'l Ltd.*, 460 B.R. 633, 639 (S.D.N.Y. 2011), *aff'd*, 479 Fed. Appx. 393 (2d Cir. Sept 6, 2012).

However, the Securities Claimants do not allege that the Debtors seek to subordinate their claims under a filed plan—rather, they bring the Motion on the basis of a statement made by the Debtors in a footnote in an unrelated filing.[6]  *See* Motion at 9.

36.    *Finally*, the Court should deny the Motion as procedurally improper because the plain language of Bankruptcy Rule 3013 requires the plan of reorganization to have been filed before the rule may be invoked.  Specifically, the rule provides that "[f]or purposes of the plan and its acceptance, the court may, on motion after hearing on notice as the court may direct, determine classes of creditors and equity security holders pursuant to §§ 1122, 1222(b)(1), and 1322(b)(1) of the Code."  Fed. R. Bankr. P. 3013 (emphasis added).

37.    Congress's choice to place the article "the" before the word "plan" suggests that Rule 3013 requires a plan to be filed before the rule can be invoked by a creditor, a debtor, or another party in interest.  Specifically, the article "the" is a *definite article* that is "used before singular or plural nouns and noun phrases that denote particular, specified persons or things."  *See* American Heritage Dict., at 1803 (5th Ed. 2011).  By contrast, the article "a" is an *indefinite article* that is "used before nouns and noun phrases that denote a single but unspecified person or thing."  *See id.* at 1.  By choosing to use the article "the" as opposed the "a" or "any" before the word "plan," Rule 3013 makes a distinction between an identifiable proposed plan (*i.e.*, one that is filed) and other types of plans, which (i) may or may not exist, or (ii) may or may not be public (*i.e.*, "a" plan).  To conclude otherwise—that is, that "the" does not refer to an identifiable plan that is

---

[6]      While the Debtors appended a draft plan framework to their motion seeking an extension of exclusivity, it was only submitted for the purpose of illustrating that the Debtors were "work[ing] diligently."  *See* Debtors' Motion For the Entry of an Order Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof, ¶ 32 and Ex. 1.  No disclosure statement or other writing has been filed permitting the solicitation of acceptances or rejections on a plan that may be filed at some point in the future.

filed—would impermissibly read the word "the" out of Rule 3013 and replace it with "a." This the

Court should not do.

38.     Courts generally place great significance on the difference in the use of articles

before operative words in statutes, particularly when different articles are used in different parts of

the same statutory scheme. *See American Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000)

("By preceding the words 'remedies and procedures' with the definite article 'the,' as opposed to

the more general 'a' or 'an,' Congress made clear that it understood § 2000a-3(a)'s remedies to be

exclusive. Indeed, '[i]t is a rule of law well established that the definite article "the" particularizes

the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing

force of "a" or "an."'" (internal citations omitted)); *In re Norton*, No. A11-00864-DMD, 2012 WL

479096 (Bankr. D. Alaska Feb. 14, 2012) ("Had Congress chosen to use the term 'a' rather than

'the' . . . , the subsection would have an entirely different meaning."). Accordingly, "the plan"

referenced in Rule 3013 does not yet exist because no party has filed one, and the Motion is

procedurally improper.

39.     In response to this argument, the Securities Claimants will likely argue that the

Motion is ripe for consideration because the Debtors have indicated their intention to subordinate

the Securities Claims pursuant to § 510(b) as part of *a* plan that they intend to file in the future.

There are also cases supporting their position that quote the advisory committee note to Rule 3013,

which states that Rule 3013 "recognizes that it may be desirable or necessary to establish proper

classification before *a* plan can be formulated." *See also In re G&C Foundry Co., Ltd.*, No. 06-

30601, 2008 WL 4560741, at *3 (Bankr. N. D. Ohio 2008); *In re Constitution Plaza Assoc. Ltd.*,

161 B.R. 563, 565 n.1 (Bankr. D. Conn. 1993); *In re 500 Fifth Ave. Assoc.*, 148 B.R. 1010 (Bankr.

S.D.N.Y. 1993). There is clearly a conflict between what Rule 3013 actually says (*i.e.*, "the plan")

and what the advisory committee note indicates the committee may have meant (*i.e.*, "a plan").

Importantly, no decision that cites Rule 3013 has recognized this conflict, and a plan had already

been filed in each of those cases.  Accordingly, this Court should deny the Motion and apply the

text of Rule 3013 as written.

*[The remainder of this page has been intentionally left blank.]*

## CONCLUSION

40.    For the foregoing reasons, the Trustee respectfully requests that the Court deny the

Motion and subordinate the Securities Claims, or in the alternative, deny the Motion as

procedurally improper and permit resolution of these issues as part of a plan of reorganization.

Dated:  New York, New York
February 19, 2013

Respectfully submitted,
CLEARY GOTTLIEB STEEN &
HAMILTON LLP


By:  /s/ Thomas J. Moloney
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
A Member of the Firm
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Special Counsel for Wilmington Trust, National*
*Association, as Indenture Trustee for the Senior*
*Unsecured Notes Issued by Residential Capital,*
*LLC, Solely With Respect to Claims Asserted by*
*Allstate, Mass Mutual and NCUAB*

LOEB & LOEB LLP


By:  /s/ Walter H. Curchack
Walter H. Curchack (WHC-3177)
Vadim J. Rubinstein (VJR-5896)
345 Park Avenue
New York, NY 10154
Telephone:  (212) 407-4000
Facsimile:  (212) 407-4990

*Counsel for Wilmington Trust, N.A., as*
*Indenture Trustee for the Senior Unsecured*
*Notes Issued by Residential Capital, LLC, With*
*Respect to All Securities Claims*

21