MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Gary S. Lee
Joel C. Haims
*Counsel to the Debtors and Debtors in Possession*
*With Respect to Defendants Allstate Insurance Company and affiliated entities,*
*and National Credit Union Administration Board*

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559
Steven J. Reisman
Theresa A. Foudy
Maryann Gallagher
*Conflicts Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| RESIDENTIAL CAPITAL, LLC; DITECH, LLC; DOA HOLDING PROPERTIES, LLC; DOA PROPERTIES IX (LOTS-OTHER), LLC; EPRE LLC; EQUITY INVESTMENTS I, LLC; ETS OF VIRGINIA, INC.; ETS OF WASHINGTON, INC.; EXECUTIVE TRUSTEE SERVICES LLC; GMAC – RFC HOLDING COMPANY, LLC; GMAC MODEL HOME FINANCE I, LLC; GMAC MORTGAGE USA CORPORATION; GMAC MORTGAGE, LLC; GMAC RESIDENTIAL HOLDING COMPANY, LLC; | Adv. Case No. 13-_____ (MG) |
| | **COMPLAINT** |

-------------------------------------------------------------------

|  |  |
|---|---|
| GMAC RH SETTLEMENT SERVICE, LLC; GMACM BORROWER LLC; GMACM REO LLC; GMACR MORTGAGE PRODUCTS, LLC; HFN REO SUB II, LLC; HOME CONNECTS LENDING SERVICES, LLC; HOMECOMINGS FINANCIAL REAL ESTATE HOLDINGS, LLC; HOMECOMINGS FINANCIAL, LLC; LADUE ASSOCIATES, INC.; PASSIVE ASSET TRANSACTIONS, LLC; PATI A, LLC; PATI B, LLC; PATI REAL ESTATE HOLDINGS, LLC; RAHI A, LLC; RAHI B, LLC; RAHI REAL ESTATE HOLDINGS, LLC; RCSFJV2004, LLC; RESIDENTIAL ACCREDIT LOANS, INC.; RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.; RESIDENTIAL ASSET SECURITIES CORPORATION; RESIDENTIAL CONSUMER SERVICES OF ALABAMA, LLC; RESIDENTIAL CONSUMER SERVICES OF OHIO, LLC; RESIDENTIAL CONSUMER SERVICES OF TEXAS, LLC; RESIDENTIAL CONSUMER SERVICES, LLC; RESIDENTIAL FUNDING COMPANY, LLC; RESIDENTIAL FUNDING MORTGAGE EXCHANGE, LLC; RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.; RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.; RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC; RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC; RFC – GSAP SERVICER ADVANCE, LLC; RFC ASSET HOLDINGS II, LLC; RFC ASSET MANAGEMENT, LLC; RFC BORROWER LLC; RFC CONSTRUCTION FUNDING, LLC; RFC REO LLC; and RFC SFJV- 2002, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ALLSTATE INSURANCE COMPANY; ALLSTATE LIFE INSURANCE CO.; ALLSTATE NEW JERSEY INSURANCE CO.; AIG ASSET MANAGEMENT (U.S.), LLC; | ) ) ) ) |

-------------------------------------------------------------------

14202898

---------------------------------------------------------------  )
AMERICAN HERITAGE LIFE INSURANCE  )
CO.; FIRST COLONIAL INSURANCE CO.;  )
KENNETT CAPITAL, INC.; AIG SECURITIES  )
LENDING CORPORATION; AMERICAN  )
INTERNATIONAL GROUP RETIREMENT  )
PLAN; AMERICAN INTERNATIONAL  )
GROUP, INC.; FIRST SUNAMERICA LIFE  )
INSURANCE COMPANY; LEXINGTON  )
INSURANCE COMPANY; SUNAMERICA  )
ANNUITY AND LIFE ASSURANCE  )
COMPANY; SUNAMERICA LIFE  )
INSURANCE COMPANY; THE UNITED  )
STATES LIFE INSURANCE COMPANY IN  )
THE CITY OF NEW YORK; WESTERN  )
NATIONAL LIFE INSURANCE COMPANY;  )
MASSACHUSETTS MUTUAL LIFE  )
INSURANCE COMPANY; COMMERCE  )
STREET INVESTMENTS, LLC; PARK PLACE  )
COMMERCE INVESTMENTS, LLC; PRU  )
ALPHA FIXED INCOME OPPORTUNITY  )
MASTER FUND I, L.P; PRUCO LIFE  )
INSURANCE COMPANY; PRUCO LIFE  )
INSURANCE COMPANY OF NEW JERSEY;  )
PRUDENTIAL ANNUITIES LIFE  )
ASSURANCE CORPORATION;  )
PRUDENTIAL INVESTMENT PORTFOLIOS  )
2; PRUDENTIAL RETIREMENT INSURANCE  )
& ANNUITIES COMPANY; PRUDENTIAL  )
TOTAL RETURN BOND FUND, INC.;  )
PRUDENTIAL TRUST COMPANY; THE  )
GIBRALTAR LIFE INSURANCE COMPANY,  )
LTD.; THE PRUDENTIAL INSURANCE  )
COMPANY OF AMERICA; THE  )
PRUDENTIAL SERIES FUND, DIVERSIFIED  )
BOND PORTFOLIO; AND NATIONAL  )
CREDIT UNION ADMINISTRATION BOARD  )
AS LIQUIDATING AGENT FOR WESTERN  )
CORPORATE FEDERAL CREDIT UNION  )
AND U.S. CENTRAL FEDERAL CREDIT  )
UNION,  )
  )
                Defendants.  )
---------------------------------------------------------------  )

14202898

The debtors and debtors in possession[1] (collectively, the "Debtors" or "ResCap") in the above-captioned jointly administered chapter 11 cases (these "Chapter 11 Cases"), and as the plaintiffs in the above-captioned adversary proceeding, (this "Adversary Proceeding") hereby allege for their complaint, upon knowledge of their own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.     This is an Adversary Proceeding seeking an order:  (i) declaring that securities claims asserted by the defendants, to the extent (if any) that they are ultimately allowed, are subordinated, pursuant to Section 510 of title 11 of the United States Code (the "Bankruptcy Code"), to all general unsecured claims asserted against the Debtors' estates; and/or (ii) granting subordination of the securities claims of the defendants, to the extent (if any) that they are ultimately allowed, pursuant to Section 510 of the Bankruptcy Code.

2.     On November 27, 2012, defendants AIG Asset Management (U.S.), LLC and its affiliated entities captioned above ("AIG"), Allstate Insurance Company and its affiliated entities captioned above ( "Allstate"), Massachusetts Mutual Life Insurance Company ("Mass Mutual"), and Prudential Insurance Company of America and its affiliated entities captioned above ("Prudential") moved in the Chapter 11 Cases for entry of an order declaring that their claims arising from their purchase of the Debtors' residential mortgage-backed securities ("RMBS") are not subordinated under Section 510(b) of the Bankruptcy Code.[2]  Defendant National Credit

---

[1] The Debtors are listed in the caption to this Adversary proceeding and in the Affidavit of James A. Whitlinger, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. May 15, 2012) [Docket No. 6].

[2] *See* Motion of AIG Asset Management (U.S.), LLC, the Allstate Entities, Massachusetts Mutual Life Insurance Company, and the Prudential Entities for an Order Under Bankruptcy Rule 3013 (i) Classifying RMBS Fraud Claims in the Same Class as the Securitization Trusts Claims for Purposes of any Chapter 11 Plan for the Debtors and (ii) Directing that

1

Union Administration Board ("NCUAB", and collectively, with defendants AIG, Allstate, Mass

Mutual and Prudential, the "Defendants") later moved to join the Motion.[3]

      3.      The Debtors commenced this Adversary Proceeding to address the dispute

underlying the Motion, because pursuant to Rule 7001(8) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), an adversary proceeding is the appropriate procedural

framework within which to determine the subordination of a claim or interest outside of the

chapter 11 plan process.  In addition, to the extent declaratory relief is sought, pursuant to

Bankruptcy Rule 7001(9), an adversary proceeding is the appropriate method for seeking such

relief.

      4.      This Adversary Proceeding is not an objection to any proofs of claim filed in

these Chapter 11 Cases by the Defendants or by any other parties in interest.  The Debtors hereby

reserve their rights pursuant to Bankruptcy Rule 3007 to object to the validity, amount, priority

or classification of any proof of claim filed in these Chapter 11 Cases, including the Investor

Claims (as defined below), on all grounds, whether legal, factual, procedural, substantive or non-

substantive, including whether any Defendant has standing to bring any or all of the securities

claims that each Defendant currently purports to assert, and to subsequently designate any claim

as disputed, contingent, unliquidated or undetermined.

---

Misrepresentation Claims Cannot Be Placed in a Plan Class That Will Be Subordinated Under Bankruptcy Code Section 510(b), *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Nov. 27, 2012) [Docket No. 2284] (the "Motion").  The Debtors' have filed an Opposition to the Motion.  *See In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. May 15, 2012) [Docket No. 2953] (the "Opposition").  Capitalized but undefined terms used herein shall have the meanings ascribed to them in the Opposition.

[3] *See* Joinder of National Credit Union Administration Board to the Motion of AIG Asset Management (U.S.), LLC, *et al.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jan. 4, 2013) [Docket No. 2555] (the "Joinder").

14202898

5.      The securities claims asserted by the Defendants as current or former holders of the Debtors' RMBS and arising from the Defendants' purchase or sale of the Debtors' RMBS (the "Investor Claims"), to the extent (if any) that they are ultimately allowed, are or should be, subordinated to the claims of general unsecured creditors pursuant to Section 510 of the Bankruptcy Code.

6.      Section 510(b) of the Bankruptcy Code states that "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security … shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security."  Here, all the elements of Section 510(b) subordination are met.  First, as the Defendants do not dispute, the Investor Claims arise from the purchase or sale of securities.  Second, the RMBS securities at issue are "of" the Debtors, because the Debtors were the issuers of the securities.  In the alternative, if the securities are viewed as only being "of" the Trusts (as defined below) and not "of" the Debtors, Section 510(b) of the Bankruptcy Code requires subordination because the RMBS certificates (the "Certificates") are securities of "affiliates" of the Debtors.

7.      Section 510(a) of the Bankruptcy Code also requires subordination of the Investor Claims in order to preserve the subordination agreements among certificateholders by ensuring that recovery to certificateholders flows first through the agreed-upon securitization waterfalls.

8.      Finally, "no fault" equitable subordination of the Investor Claims pursuant to Section 510(c) of the Bankruptcy Code is also appropriate in order to prevent a series of inequitable consequences that would otherwise result in the event that the Investor Claims are not subordinated.

3

14202898

9.      Not only is subordination required, it is also the only fair and equitable result.

Contractual claims by the trustees on behalf of the RMBS securitization trusts (each a "<u>Trust</u>" or

"<u>PLS Trust</u>", and collectively the "<u>Trusts</u>" or "<u>PLS Trusts</u>") against the Debtors based on alleged

breaches of representations and warranties concerning the mortgage loans (collectively, the

"<u>Trust Claims</u>") will be included within the pool of general unsecured claims.  Likewise, the

holder of each Certificate (representing an ownership interest in the corresponding Trust) will

receive its pro rata portion of that recovery according to the priority scheme expressly agreed to

among certificateholders within each securitization waterfall.  The Investor Claims, however,

seek to recover for investment losses on many of the same Certificates, based upon complaints of

fraud that mirror the Trust Claims for breaches of representations and warranties.  As a result,

elevating the Investor Claims to the same priority as that afforded to general unsecured creditors

will have numerous inequitable effects if those contingent and disputed litigation claims are

ultimately allowed.

10.     First, proceeds available to pay general unsecured creditors will be divided among

more claimants, thereby diminishing recovery for all general unsecured creditors, except for

current certificateholders with Investor Claims, who will receive two recoveries (one for their

securities claim, and the other based on the Trust Claims), with respect to their losses on the

same Certificate, based upon similar allegations that the Debtors made misrepresentations

concerning the loans sold into the securitizations.

11.     Second, treating the Investor Claims and Trust Claims as claims of equal priority

would violate the express subordination agreement between junior and senior tranches of

Certificates, because the junior certificateholders would recover on their securities claims on

14202898

equal priority with all other general unsecured creditors, before more senior tranches are made whole.

12.     Third, granting equal priority to the Investor Claims (brought on behalf of only a subset of senior certificateholders) would violate the allocation of rights within the most senior tranches.  Including those Investor Claims in the same pool would reduce the recovery that other senior certificateholders receive from the Trusts, leading to unequal recovery within the same tranche of Certificates even though the governing agreements provide for pro rata distribution in each tranche.

13.     Fourth, failure to subordinate the Investor Claims would prejudice secondary purchasers of Certificates.  Under the Certificates' governing agreements, current certificateholders are entitled to receive any recovery for past losses.  Absent subordination, the current certificateholders' recovery on account of the Trust Claims would be diluted so that former certificateholders who sold the right to recover past losses on the instruments could nevertheless share in the funds by virtue of the Investor Claims, thus depriving the secondary purchasers of the Certificates from obtaining the benefit of their bargain.

14.     Section 510 of the Bankruptcy Code expressly provides for the subordination of claims as the means to prevent these sorts of inequitable consequences.  For the reasons discussed herein, the Debtors respectfully request that the Court issue an order declaring that the Investor Claims, to the extent (if any) that they are ultimately allowed, are subordinated to the claims of unsecured creditors pursuant to Section 510 of the Bankruptcy Code, or in the alternative, an order subordinating the Investor Claims, to the extent (if any) that they are ultimately allowed.

5

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.  This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. §§

157(b)(2)(A) and (O).

16.    This Court has personal jurisdiction over each of the Defendants because each

Defendant has filed a proof of claim in the Chapter 11 Cases with respect to the Investor Claims,

and/or filed the Motion seeking affirmative relief from this Court with respect to the Investor

Claims.

17.    The Debtors hereby consent to the entry of final orders or judgment by this Court

if it is determined that this Court, absent consent of the parties, cannot enter final orders or

judgment consistent with Article III of the United States Constitution.

18.    Venue in this district is proper pursuant to 28 U.S.C. § 1409.

19.    The statutory predicates for the relief requested herein are Sections 105(a), and

510(a) through (c) of the Bankruptcy Code, and Bankruptcy Rules 7001(8) and 7001(9).

## PARTIES

20.    The Plaintiffs in this Adversary Proceeding are the Debtors in these Chapter 11

Cases.

21.    Defendant AIG Asset Management (U.S.), LLC is a movant of the Motion.

22.    Defendant AIG Securities Lending Corporation filed Proofs of Claim Nos. 4778,

5321, 5326, 5344, 5346, and 5347 in these Chapter 11 Cases and is a movant of the Motion.

23.    Defendant American International Group Retirement Plan filed Proofs of Claim

Nos. 5320, 5330, 5334, and 5339 in these Chapter 11 Cases and is a movant of the Motion.

24.    Defendant American International Group, Inc. filed Proofs of Claim Nos. 5352,

5324, 5332, 5318, 5319, and 5322 in these Chapter 11 Cases and is a movant of the Motion.

6

25.     Defendant First Sunamerica Life Insurance Company filed Proofs of Claim Nos. 5333 and 5336 in these Chapter 11 Cases and is a movant of the Motion.

26.     Defendant Lexington Insurance Company filed Proofs of Claim Nos. 5328 and 5337 in these Chapter 11 Cases and is a movant of the Motion.

27.     Defendant Sunamerica Annuity and Life Assurance Company filed Proofs of Claim Nos. 5329 and 5340 in these Chapter 11 Cases and is a movant of the Motion.

28.     Defendant Sunamerica Life Insurance Company filed Proofs of Claim Nos. 5325 and 5342 in these Chapter 11 Cases and is a movant of the Motion.

29.     Defendant The United States Life Insurance Company in the City of New York filed Proofs of Claim Nos. 5341 and 5345 in these Chapter 11 Cases and is a movant of the Motion.

30.     Defendant Western National Life Insurance Company filed Proofs of Claim Nos. 5343, 5349, 5350, 5351, 5353, and 5354 in these Chapter 11 Cases and is a movant of the Motion.

31.     Defendant Allstate Insurance Company filed Proofs of Claim Nos. 4499, 4502, 4505, 4931, 4957, 4960, 4517, and 4958 in these Chapter 11 Cases and is a movant of the Motion.

32.     Defendant Allstate Life Insurance Co. filed Proofs of Claim Nos. 4500, 4501, 4504, 4516, 4656, 4963, and 5078 in these Chapter 11 Cases and is a movant of the Motion.

33.     Defendant Allstate New Jersey Insurance Co. filed Proofs of Claim Nos. 4506, 4509, 4515, and 5079 in these Chapter 11 Cases and is a movant of the Motion.

34.     Defendant American Heritage Life Insurance Co. filed Proofs of Claim Nos. 4508, 4510, 4511, 4951, and 5080 in these Chapter 11 Cases and is a movant of the Motion.

7

35.      Defendant First Colonial Insurance Co. filed Proofs of Claim Nos. 4956, 4961,

5083, and 5084 in these Chapter 11 Cases and is a movant of the Motion.

36.      Defendant Kennett Capital, Inc. filed Proofs of Claim Nos. 4522, 4955, 5085, and

5086 in these Chapter 11 Cases and is a movant of the Motion.

37.      Defendant Mass Mutual filed Proofs of Claim Nos. 5013, 5033, 5042, and 5060 in

these Chapter 11 Cases and is a movant of the Motion.

38.      Defendant Prudential Insurance Company of America filed Proofs of Claim Nos.

4986, 5017, 5022, 5035, 5123, and 5124 in these Chapter 11 Cases and is a movant of the

Motion.

39.      Defendant Commerce Street Investments, LLC filed Proofs of Claim Nos. 4518,

5039, 5041, 5081, and 5082 in these Chapter 11 Cases and is a movant of the Motion.

40.      Defendant Park Place Commerce Investments, LLC filed Proofs of Claim Nos.

5087, 5088, 5089, and 5090 in these Chapter 11 Cases and is a movant of the Motion.

41.      Defendant Pru Alpha Fixed Income Opportunity Master Fund I, L.P. filed Proofs

of Claim Nos. 4512, 4513, 4928, 4933, and 4991 in these Chapter 11 Cases and is a movant of

the Motion.

42.      Defendant Pruco Life Insurance Company filed Proofs of Claim Nos. 4968, 5092,

5093, and 5095 in these Chapter 11 Cases and is a movant of the Motion.

43.      Defendant Pruco Life Insurance Company of New Jersey filed Proofs of Claim

Nos. 4514, 5091, 5094, and 5096 in these Chapter 11 Cases and is a movant of the Motion.

44.      Defendant Prudential Annuities Life Assurance Corporation filed Proofs of Claim

Nos. 5097, 5098, 5099, and 5100 in these Chapter 11 Cases and is a movant of the Motion.

8

14202898

45.     Defendant Prudential Investment Portfolios 2 filed Proofs of Claim Nos. 4525, 4529, 4532, 4660, 4661, 4675, and 4683 in these Chapter 11 Cases and is a movant of the Motion.

46.     Defendant Prudential Retirement Insurance & Annuities Company filed Proofs of Claim Nos. 5101, 5102, 5103, 5104, and 5105 in these Chapter 11 Cases and is a movant of the Motion.

47.     Defendant Prudential Total Return Bond Fund, Inc. filed Proofs of Claim Nos. 5108, 5110, 5112, and 5113 in these Chapter 11 Cases and is a movant of the Motion.

48.     Defendant Prudential Trust Company filed Proofs of Claim Nos. 4521, 4524, 4937, 5116, 5117, and 5119 in these Chapter 11 Cases and is a movant of the Motion.

49.     Defendant The Gibraltar Life Insurance Company, Ltd. filed Proofs of Claim Nos. 4507, 4519, 4936, and 4964 in these Chapter 11 Cases and is a movant of the Motion.

50.     Defendant The Prudential Series Fund, Diversified Bond Portfolio filed Proofs of Claim Nos. 4935, 4939, 4944, and 4947 in these Chapter 11 Cases and is a movant of the Motion.

51.     Defendant NCUAB filed Proofs of Claim Nos. 2626, 2627, 2628, 2629, 2630, 2631, 2632, 2633, 2634, 2635, and 2636 in these Chapter 11 Cases and filed a Joinder to the Motion.

## **BACKGROUND AND FACTS**

52.     From 2004 to 2007, the Debtors issued RMBS in 392 separate private label securitizations with an aggregate original principal balance of more than $226 billion.

53.     In these private label securitizations, the Debtors pooled together non-conforming mortgage loans in their own names and conveyed the pool of loans to newly formed PLS Trusts in exchange for Certificates that were then sold to investors like the Defendants. The Certificates

9

14202898

entitle their holders to receive the principal and interest collected on the mortgage loans in the PLS Trust.

***Mechanics of the Debtors' Private Label Securitizations***

54.     Conveying loan pools to the PLS Trusts and selling RMBS entailed a multistep process.  Generally, a Debtor entity acting as a sponsor would purchase the loan pool from an affiliated Debtor entity or unaffiliated mortgage-loan sellers.  The sponsor would then sell the pool of loans to another affiliated Debtor entity—a depositor—who would then convey the loans to a trustee on behalf of the PLS Trust.  In exchange, the trustee would convey to the depositor Certificates representing ownership interests in the PLS Trusts.  The depositor would then sell, either directly or through underwriters, the Certificates to investors like the Defendants.

55.     For each RMBS offering, the Debtor sponsor and depositor entities would enter into Pooling and Servicing Agreements (each a "PSA", and collectively, the "PSAs") with the PLS trustees.  Among other things, the PSAs govern the conveyance of the mortgage loans from the depositor to the trust, the issuance of Certificates to investors representing shares in the trust, and the respective rights and obligations of the parties.  In addition, the PSAs include certain representations and warranties made by the Debtors to the PLS Trust.

56.     The prospectus and prospectus supplement—the primary offering documents for each securitization—set forth the material details of the RMBS for investors including, among others:  the structure of the securitizations, the risk factors of the investment, the roles and experience of the Debtors as sponsor and Master Servicer, the characteristics of the mortgage pool, and the nature of the Certificates purchased by investors.  The Debtors prepared the

10

prospectus, prospectus supplement, and other offering documents for each of their
securitizations.[4]

### The Nature of the Debtors' RMBS

57.      The Certificates sold by the Debtors represent each certificateholder's agreement,
and thus the Defendants' agreement, to a carefully delineated interrelationship of payment
priorities among the various tranches of Certificates.  That allocation of payment rights and
priorities is commonly referred to as a "waterfall."  The central feature of the waterfall is the
separation of Certificates into "tranches."  Generally speaking, more senior tranches are paid
first, while losses are first allocated to junior tranches.  In exchange for additional risk,
Certificates in the lower tranches provide a higher rate of return to investors.

58.      The offering documents made clear that the return on the Certificates was far
from guaranteed.  The Motion's example prospectus supplement explained, for example, that the
"yield on your certificates will vary depending on the rate of prepayments" and that "the rate of
prepayments is one of the most important and least predictable" of the factors affecting yield.

59.      The governing documents for the Certificates assign priority for distributions of a
host of potential funds that flow to the trust, all of which are included within the "Available
Distribution Amount" used to make payments to certificateholders under the waterfall.  This
includes funds the Trusts receive as subsequent recoveries for any breaches of Debtors'
representations and warranties.  Specifically, the Motion's example prospectus reflects the
Defendants' agreement that if the Master Servicer or subservicer receives a subsequent recovery

---

[4] As discussed herein, the structure of, and the primary offering and securitization documents for,
each of the Debtors' securitization transactions are substantially similar in all material respects
and contain substantially similar defined terms.  Capitalized terms from the primary offering and
securitization documents used or referenced herein but not defined in the Opposition shall have
the meanings generally ascribed to them in the primary offering documents.

11

"in connection with a related breach of a representation or warranty or otherwise, such subsequent recovery shall be distributed to certificateholders in the same manner as repurchase proceeds received in the prior calendar month to the extent that the Realized Loss was allocated to any class of certificates," and then down the waterfall of tranches to which Realized Losses have been allocated.

60.    In addition, pursuant to the PSAs, the Defendants agreed that no certificateholder shall have any right to affect, disturb, or prejudice the rights of other certificateholders, or to obtain or seek to obtain priority over or preference to any other certificateholder, or to enforce any right under the applicable PSA except in the manner provided for in the PSAs and for the common benefit of all certificateholders.

*Additional Investment Features of the RMBS*

61.    The Certificates provide numerous investment benefits to certificateholders like the Defendants.  One fundamental benefit of the Certificates, as with many securities, is the liquidity provided by a secondary market.

62.    The securitization structure also provides the Defendants with numerous forms of investment protection.  First, the securitizations provide certificateholders with exclusive rights to a pool of mortgage loans segregated from the other assets available to the Debtors' general unsecured creditors.  Second, the securitizations provide three primary forms of structural protection, or "credit enhancement," to the Certificates:  excess cash flow, overcollateralization, and subordination.  The investors also benefit from servicer advances, by which the Master Servicer is enabled to advance funds to cover the amount of scheduled mortgage payments that were not made.  Certain securitizations are further benefited by mortgage pool insurance policies obtained by the Debtors.

14202898

63.    Finally, the certificateholders benefited from the Debtors' representations and

warranties backed by a repurchase obligation.  The Debtors' repurchase obligations transfer

certain risks of non-conforming mortgage loans from the certificateholders to the Debtors.  The

sponsor's expected ability, or inability, to satisfy its repurchase obligations presumably was

reflected in the price of RMBS.[5]

**The Debtors' Marketing of RMBS**

64.    The Debtors distinguished their RMBS offerings by carefully branding them and

marketing them based on a broad array of investment services the Debtors offered.  The Debtors

provided potential investors with extensive data concerning the Debtors' securitization

experience and market share, and analysis of the Debtors' various RMBS asset types and their

risk profiles.  The Debtors also marketed numerous additional services they provided to

investors, including online portfolio-management and data-access and analysis tools designed to

inform investors and enable them to better make investment decisions.

65.    The Debtors also met directly with investors and participated in events with the

investing community generally through organizations like the American Securitization Forum.

Contemporaneous records reflect that Allstate, AIG, Mass Mutual, and Prudential attended

servicing and operations reviews with the Debtors, and that ResCap met with Allstate several

times in connection with Allstate's participation in ResCap's RMBS programs.

66.    The Debtors' presentations to potential investors like the Defendants highlighted

not only their RMBS issuance history, but also the Debtors' corporate structure, including

---

[5] Beyond the fact that former certificateholders transferred their rights to recoveries based on
alleged breaches of representations and warranties, some or all of the former certificateholders
may have also transferred their rights to bring the Investor Claims to current certificateholders,
either explicitly or implicitly.  The Debtors expressly reserve the right to object to the allowance
of some or all of the Investor Claims on this basis, as well as any other basis.

ResCap's vertically integrated business model and investment-grade credit ratings.

***The Debtors' Ongoing Management of the Trusts' Business and Property***

67.     Following the RMBS offerings, the Debtors effectively controlled all of the day-to-day operations of the PLS Trusts and managed the mortgage loans as Trust property.  The RALI Series 2006-QO3 RMBS offering, in which Allstate invested, is a useful example.  In that securitization, Debtor Residential Funding Corporation ("RFC"), in addition to being the sponsor of the offering, is also the Master Servicer.

68.     Article 3 of the RALI Series 2006-QO3 PSA, as typical of most PSAs, provides that, as Master Servicer, RFC would be responsible for servicing and administering the mortgage loans in accordance with the PSAs, with full power and authority to do any and all things which it may deem necessary or desirable in connection with such servicing and administration.

69.     The Master Servicer's servicing duties include, among others, receiving funds from subservicers, reconciling servicing activity with respect to the mortgage loans, calculating remittance amounts to the certificateholders, sending remittances to the trustee for distribution to certificateholders, investor and tax reporting, coordinating loan repurchases, oversight of all servicing activity, following up with subservicers regarding delinquent mortgage loans, approving loss mitigation strategies, managing and liquidating mortgaged properties acquired by foreclosure and providing various notices.

70.     The Master Servicer also has the right to assign a subservicer.  For instance, in the RALI Series 2006-QO3 offering, RFC appointed Debtor Homecomings Financial Network, Inc. ("Homecomings") to act as "Subservicer."  As Subservicer, Homecomings is responsible for a variety of tasks related to operating the mortgage loans including, among others, communicating

14

with borrowers, collecting borrower payments, calculating and reporting payoffs and liquidations, and maintaining insurance.

71.    By contrast, the PLS Trusts have no employees of their own to operate the Trusts' business or manage Trust property.

***The Chapter 11 Cases***

72.    As of May 14, 2012, the date of the commencement of the Chapter 11 Cases, the Debtors were named in dozens of lawsuits asserting claims based upon the Debtors' sale of RMBS.  The magnitude of the Debtors' potential liability and the burden and expense of litigating those claims was one of the primary factors that led the Debtors to file these Chapter 11 Cases.

### a.    *"Trust Claims"*

73.    The trustees of the PLS Trusts have asserted Trust Claims, which are the subject of the proposed settlement between the Debtors and certain PLS Trusts (the "Trust Settlement"). The Trust Settlement would resolve Trust Claims brought by up to 392 Trusts and, if approved, would result in an allowed claim of $8.7 billion.

74.    The mechanics of the Trust Settlement are based on the structure of the PLS Trusts themselves.  Should the Trust Settlement be approved by the Court, when distributions are made by the Debtors' estates, all certificateholders of each PLS Trust that signs onto the Trust Settlement will be entitled to receive proceeds of the Trust Settlement according to the priority reflected in the PLS Trust's waterfall, regardless of whether each individual investor itself agreed to support the settlement.  Thus, the Trust Settlement is structured in a way that (a) prevents a windfall to any one Trust or institutional investor, (b) treats certificateholders equitably and in accordance with their contractual rights under the governing agreements, and (c) maximizes recoveries for all investors.

14202898

### b. *"Investor Claims"*

75.    The Defendants bring the Investor Claims as both current and former certificateholders based on their purchases of the Debtors' RMBS.  The Investor Claims allege damages arising from the purchase or sale of the Debtors' RMBS under the federal securities laws, state blue sky laws, and pursuant to tort theories, seeking to recoup investment losses allegedly suffered due to material misstatements in the offering documents.  The Defendants also seek to rescind their purchases under tort law and state securities laws.

76.    The Defendants include many of the same certificateholders who will be the beneficiaries of the Trust Claims, and their claims arise from holdings at various levels of seniority within each relevant PLS Trust.

### SUBORDINATION IS REQUIRED BY THE CODE AND NECESSARY TO PREVENT THE DILUTION OF ALL GENERAL UNSECURED CREDITOR CLAIMS

### a. *The Investor Claims Arise from the Purchase or Sale of Debtors' Securities*

77.    The Bankruptcy Code requires subordination of the Investor Claims, because the Investor Claims arise from the purchase or sale of securities of the Debtors or of the Debtors' affiliates.

78.    Under applicable securities laws, a Debtor as depositor of the RMBS is the issuer of the securities.  In addition, the Debtors are issuers not just by the technical definition, but in every practical sense as well.  The Debtors controlled the securitization process.  The Debtors acquired and pooled the mortgage loans, created the securities, and marketed and sold the Certificates.  After the Certificates were sold, the Debtors' involvement continued as Master Servicer and subservicer of the PLS Trusts pursuant to the PSAs.

79.    The Debtors managed or operated the property and business of the PLS Trusts at issuance and at the time the Investor Claims arose.  The property being held in trust for the

14202898

benefit of the certificateholders consists primarily of a pool of mortgage loans that back the securities, and the business of the PLS Trust is to manage that property for the benefit of the certificateholders. The Debtors managed every aspect of the mortgage loans under the PSAs at the time of issuance and at the time the Investor Claims arose. The trustees did not. Any responsibilities of the trustees are primarily ministerial tasks, such as examining documents, maintaining a website for investors to access SEC filings, and replacing lost or stolen Certificates. None of the responsibilities of the trustees involves operating or managing the property of the Trust—*i.e.*, the underlying mortgage loans.

80. Subordination of the Investor Claims is consistent with the principles underlying Section 510(b) of the Bankruptcy Code. Congress enacted Section 510(b) to prevent disappointed securities holders from recovering their investment losses by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding.

81. The Defendants took on the risk and return expectations of securities holders. The Certificates have all the standard features of investment risk, which risk the Debtors outlined for Defendants in the RMBS offering materials. Conversely, if the loans performed better than expected, the value of the Certificates on the secondary market could increase, creating an opportunity to sell the Certificates at a profit. Indeed, the Defendants admit that they purchased the Debtors' RMBS as investments that could be, and were, sold on the secondary market. The Defendants also knew that purchases of the Debtors' RMBS were effectively an investment in the Debtors' brand, because the Certificates were inextricably tied to the Debtors' pre- and post-securitization operations.

### b.   The Defendants are Bound by Express and Implied Subordination Agreements

82.    The Investor Claims also should be subordinated in order to preserve the express

and implied subordination agreements among certificateholders.

83.    The documents governing distributions from the Debtors' RMBS constitute

express subordination agreements among the Defendants and all certificateholders, and

subordination of the Defendants' Investor Claims is the only way to ensure that recoveries for all

certificateholders flow equitably through the PLS Trusts, in the first instance, according the

express terms of the agreements among certificateholders.  Subordination is a fundamental

principle underpinning securitization and the entire purpose of the complex waterfall of

payments to the different tranches of Certificates to which the Defendants agreed.

84.    If the Investor Claims based on *either* the subordinate *or* the senior Certificates

were granted equal priority with the Trust Claims, such a grant would frustrate the allocation of

rights set forth in the detailed subordination agreements reflected in the PSAs and other offering

documents.  If the Investor Claims based on junior Certificates are not subordinated, they will

effectively be paid out in equal priority with the most senior tranches under the Trust Claims.

This result is fundamentally at odds with those Defendants' agreement as junior

certificateholders to be subordinate to the senior tranches with respect to any Subsequent

Recoveries.

85.    The Certificates also reflect the Defendants' agreement to share pro rata with

other holders in the same tranche.  Allowing the Defendants' Investor Claims to share equally

with the Trust Claims would run afoul of this agreement, because the Investor Claims do not

include all certificateholders within any particular tranche.  Therefore, classifying Investor

Claims on par with Trust Claims would dilute the recovery of all senior certificateholders at the

18

expense of the Trust Claims in order to enhance the recovery of only the subset of

certificateholders who brought Investor Claims.

86.     Granting the Investor Claims equal priority with the Trust Claims also would

violate the implied agreement between former certificateholders and those to whom they sold

their Certificates.  Part of the value that purchasers and sellers of Certificates considered in

determining the price of the Certificates was the right to any subsequent recoveries the PLS

Trusts might obtain in connection with breaches of representations and warranties, distributed to

current certificateholders in accordance with the trust waterfalls.  Allowing former

certificateholders to share in subsequent recoveries through Investor Claims—on equal priority

with the purchasers of their Certificates, who will only recoup their losses through the Trust

Claims—will dilute the recovery to subsequent purchasers.  Allowing sellers to capture such gain

at the expense of purchasers is fundamentally at odds with any reasonable commercial standards

of fair dealing and would deprive subsequent holders of the fruits of their contracts.

### c.  *Failure to Subordinate the Investor Claims Will Cause Inequitable Results*

87.     The nature and substance of the Investor Claims also favor no-fault equitable

subordination.  The Investor Claims are precisely the sort of claim that Congress intended to

subordinate under Section 510(b) of the Bankruptcy Code, but to evade that Congressional

intent, the Defendants rely on the mechanism through which the Debtors created the securities,

seeking to exalt form over substance.

88.     As holders of Certificates, the Defendants already occupy a favored position as

compared to general unsecured creditors.  To the extent they have not already sold their

Certificates, they will receive a recovery through the Trust Claims—subject to whatever

subordination they have agreed to among themselves within each securitization waterfall—and

they maintain rights to future payments from the segregated pool of mortgage loans underlying

14202898

their securities, which remain unavailable to other general unsecured creditors of the Debtors.

Alternatively, the Defendants can sell their Certificates to receive the expected value of these

collective rights, as some already have.  Yet the Defendants would have the Court grant them a

third source of recovery on equal priority with, and thus diluting, the only payments that will go

to general unsecured creditors.

89.    In sum, failure to subordinate the Investor Claims would lead to myriad

inequitable consequences, including:  (i) enhanced recovery for subordinate Certificates at the

expense of more senior Certificates; (ii) unequal recovery within each tranche of Certificates;

and (iii) reduced recovery for subsequent purchasers of Certificates to the benefit of the sellers of

those rights to recovery.

90.    Subordination of the Investor Claims to the Trust Claims will avoid these

inequitable consequences and allow the recoveries relating to the Certificates to flow through the

PLS Trusts pursuant to the expressly agreed upon distribution waterfall.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF:  SUBORDINATION PURSUANT TO 11 U.S.C. § 510(b)

91.    The Debtors repeat and reallege the allegations contained in all prior paragraphs,

which are incorporated by reference as if set forth fully herein.

92.    Section 510(b) of the Bankruptcy Code requires that the Investor Claims be

subordinated because they are claims arising from rescission of a purchase or sale of a security of

the debtor or of an affiliate of the debtor or for damages arising from the purchase or sale of such

a security.

93.    The Debtors are the issuers of the RMBS.

94.    The RMBS are securities "of" the Debtors.

14202898

95.    In the alternative, if the RMBS are not securities "of" the Debtors, they are securities of affiliates of the Debtors.

96.    At the time the Certificates were issued and the Investors Claims arose, the Master Servicer of each Trust was a Debtor.

97.    The PLS Trusts are affiliates of the Debtors, because at the time of issuance and at the time the Investor Claims arose, the Debtors operated substantially all of the business and property of the PLS Trusts under the terms of the applicable operating agreements.

98.    Based on the foregoing, the Debtors request a declaratory judgment that the Investor Claims, to the extent (if any) that they are ultimately allowed, are subordinated, pursuant to 11 U.S.C. § 510(b), to all general unsecured claims asserted against the Debtors' estates, or in the alternative, an order subordinating the Investor Claims, to the extent (if any) that they are ultimately allowed, pursuant to Section 510(b) of the Bankruptcy Code.

**SECOND CLAIM FOR RELIEF:  SUBORDINATION PURSUANT TO 11 U.S.C. § 510(a)**

99.    The Debtors repeat and reallege the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

100.    A subordination agreement is enforceable under Section 510(a) of the Bankruptcy Code to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

101.    The express and implied subordination agreements among certificateholders are enforceable against the Defendants under applicable nonbankruptcy law, and the Investor Claims must be subordinated pursuant to Section 510(a) of the Bankruptcy Code in order to preserve those agreements.

102.    Based on the foregoing, the Debtors request a declaratory judgment that the Defendants' Investor Claims, to the extent (if any) that they are ultimately allowed, are

21

14202898

subordinated, pursuant to 11 U.S.C. § 510(a), to all general unsecured claims asserted against the

Debtors' estates, or in the alternative, an order subordinating the Investor Claims, to the extent (if

any) that they are ultimately allowed, pursuant to Section 510(a) of the Bankruptcy Code.

### THIRD CLAIM FOR RELIEF:  SUBORDINATION PURSUANT TO 11 U.S.C. § 510(c)

103.    The Debtors repeat and reallege the allegations contained in all prior paragraphs,

which are incorporated by reference as if set forth fully herein.

104.    Even if the Investor Claims do not fall within the ambit of Sections 510(a) or

510(b) of the Bankruptcy Code, the Investor Claims still should be equitably subordinated

pursuant to Section 510(c) of the Bankruptcy Code to avoid myriad inequitable consequences to

all other general unsecured creditors.

105.    A failure to subordinate the Investor Claims, to the extent (if any) that they are

ultimately allowed, would result in injury to other creditors and confer unfair advantage on the

Investors.

106.    Subordination of the Investor Claims is consistent with the provisions of the

Bankruptcy Code and established principles of bankruptcy law.

107.    Based on the foregoing, the Debtors request an order subordinating the Investor

Claims, to the extent (if any) that they are ultimately allowed, pursuant to 11 U.S.C. § 510(c), to

all general unsecured claims asserted against the Debtors' estates.

### PRAYER FOR RELIEF

WHEREFORE, the Debtors respectfully request:

(i)    on Count I, the entry of an Order declaring that the Investor Claims, to the extent

(if any) that they are ultimately allowed, are subordinate to the claims of general

unsecured creditors pursuant to Section 510(b) of the Bankruptcy Code, or in the

alternative, the entry of an Order subordinating the Investor Claims, to the extent

22

14202898

(if any) that they are ultimately allowed, to the claims of general unsecured

creditors pursuant to Section 510(b) of the Bankruptcy Code;

(ii)     on Count II, the entry of an Order declaring that the Investor Claims, to the extent

(if any) that they are ultimately allowed, are subordinate to the claims of general

unsecured creditors pursuant to Section 510(a) of the Bankruptcy Code, or in the

alternative, the entry of an Order subordinating the Investor Claims, to the extent

(if any) that they are ultimately allowed, to the claims of general unsecured

creditors pursuant to Section 510(a) of the Bankruptcy Code;

(iii)    on Count III, the entry of an Order subordinating the Investor Claims, to the

extent (if any) that they are ultimately allowed, to the claims of general unsecured

creditors pursuant to Section 510(c) of the Bankruptcy Code; and

(iv)    such other relief as the Court deems just and proper under the circumstances.


[*Remainder of page left blank intentionally*]

14202898

Dated:  February 19, 2013
           New York, New York            /s/ Gary S. Lee
_____
                                          Gary S. Lee
                                          Joel C. Haims

                                          MORRISON & FOERSTER LLP
                                          1290 Avenue of the Americas
                                          New York, New York 10104
                                          Telephone:  (212) 468-8000
                                          Facsimile:  (212) 468-7900

                                          *Counsel to the Debtors and Debtors in Possession
                                          With Respect to Defendants Allstate Insurance
                                          Company and affiliated entities,
                                          and National Credit Union Administration Board*


                                          /s/ Steven J. Reisman
_____
                                          Steven J. Reisman
                                          Theresa A. Foudy
                                          Maryann Gallagher

                                          CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
                                          101 Park Avenue
                                          New York, New York 10178-0061
                                          Telephone:  (212) 696-6000
                                          Facsimile:  (212) 697-1559

                                          *Conflicts Counsel to the Debtors and Debtors in
                                          Possession*

14202898