GIBBS & BRUNS LLP
Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Residential Capital, LLC, *et al*. | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**THE STEERING COMMITTEE INVESTORS' REPLY TO THE OBJECTIONS OF ASSURED GUARANTY AND THE JUNIOR SECURED NOTEHOLDERS TO THE RMBS TRUST SETTLEMENT AGREEMENT**

**TABLE OF CONTENTS**

I.    The $8.7 Billion Allowed Claim Is Not Unreasonably Large ......................................... 1

II.   The Settlement Would Only Compromise Trust-Based Claims, and the RMBS Trustees Have Authority to Compromise Trust-Based Claims ....................................... 2

III.  The Trusts' Repurchase Claims Do Not Require Proof of Loss Causation .................... 3

IV.   The Allocation Methodology Is Neither a Mystery Nor an Improper Delegation of Claims Administration Duties ....................................................................................... 7

V.    The JSBs' Objection Regarding Subordination is Premature and Ignores the Enormous Benefit the JSBs Received in the Platform Sale Facilitated by the Proposed Settlement ....................................................................................................... 8

VI.   Conclusion .................................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*,
  2012 WL 4373327 (S.D.N.Y. 2012) ................................................................................ 4, 5, 6

*LaSalle Bank N.A. v. Nomura Asset Capital Corp.*,
  No. 060339/2003, slip op. (N.Y. Sup. Ct. Sept. 8, 2006), *aff'd in part*, 47 A.D.3d 103, 846
  N.Y.S.2d 95 (App. Div. 2007) ................................................................................................ 7

*MBIA Ins. Co. v. Countrywide Financial Corp.*,
  936 N.Y.S.2d 513 (Sup. Ct. N.Y. Cty. 2012) .................................................................... 4, 6, 7

*Redmond v. Commerce Trust Co.*,
  144 F.2d 140 (8th Cir. 1944) ................................................................................................... 3

*Syncora Guarantee, Inc. v. EMC Mortg. Corp.*,
  2012 WL 2326068 (S.D.N.Y. 2012) ..................................................................................... 4, 6

**Other Authorities**

11 U.S.C. § 509(b)(1)(C) ................................................................................................................ 3

11 U.S.C. § 510(a) ......................................................................................................................... 3

**Rules**

Fed. R. Bankr. P. 9019 ....................................................................................... 1, 2, 3, 7, 8, 9

TO THE HONORABLE MARTIN GLENN:

The Steering Committee of Institutional Investors provides the following consolidated reply in further support of the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreement in response to the objections filed by: (i) Assured Guaranty Municipal Corp. and Certain Affiliates ("Assured") [Docket No. 2791] and (ii) the Ad Hoc Group of Junior Secured Noteholders (the "JSBs") [Docket No. 2824].

## I.     The $8.7 Billion Allowed Claim Is Not Unreasonably Large

Neither Assured nor the JSBs contend that the proposed $8.7 billion allowed claim is unreasonably large. Nor could they: Based on a loan file re-underwriting, the Official Committee of Unsecured Creditors' own expert estimated that the repurchase claims in favor of the Trusts totaled **$16.5 billion**, before applying a series of legal discounts.[1] After conducting a re-underwriting of the same files, the Debtors' expert concluded that the repurchase claim would range from **$18.9 billion** to **$21.6 billion**, before legal discounts.[2] Both of these estimates exclude *billions* of dollars in prejudgment interest that would also be due and owing on the Trusts' claims. As fully set out in the Steering Committee's Consolidated Reply to the Objections to the RMBS Trust Settlement [Docket No. 2808] (the "Consolidated Reply"), the Debtors' only chance to reduce these amounts to sums even *approaching* the $8.7 billion settlement is to prevail on a series of tenuous legal arguments, which, if unsuccessful, will expose the Estates to a claim more than *twice* the size of Debtors' proposed settlement. Faced with a settlement well within the "range of reasonableness," Assured and the JSBs retreat to a

---

[1]  *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 29.

[2]  *See* Debtors' Reply Brief Re: *Iridium* Factors in Support of Motion for Approval of RMBS Settlement Agreements [Docket No. 2803] at 42.

1

series of arguments which attempt to distract attention from the favorable settlement actually before the Court. The Steering Committee briefly responds to those arguments here.

## II. The Settlement Would Only Compromise Trust-Based Claims, and the RMBS Trustees Have Authority to Compromise Trust-Based Claims

Assured argues that the settlement is not fair to monoline insurers. This argument is based on a distinction between "claims" asserted by the Institutional Investors, on the one hand, and "claims" asserted by the monoline insurers, on the other.[3] This distinction is false and highly misleading. The only meaningful distinction here is between *Trust claims*—that is, claims that are owned by the Trusts and therefore may be asserted "by, through, or on behalf of" the Trusts or the Trustees,[4]—and claims which are not Trust claims. The proposed settlement, if accepted by the Trustees, would compromise the former, but not the latter.[5] Indeed, with respect to the monoline insurers, the Settlement Agreement explicitly preserves non-Trust claims by stating that "[t]o the extent that any third party guarantor or financial guaranty-provider . . . has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Settlement Trusts, the releases and waivers [in the Settlement] are not intended to and shall not release such rights."[6]

---

[3] *See, e.g.*, Assured Objection at 3 ("[T]he monolines have stronger direct claims than those asserted by the Institutional Investors, and similarly, the Debtors may have stronger defenses to the Institutional Investors' claims."); *id.* at 15 ("[L]umping the monoline insurers' claims with those asserted by the Institutional Investors . . . is not fair because different standards of proof may be applicable to their respective claims.").

[4] *See* Third Amended Settlement Agreement at §7.01 ("Releases"), attached as Exhibit 2 to Debtors' Notice of Hearing on Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 1887].

[5] *Id.*

[6] *See id.* at §8.03 ("Financial-Guaranty Provider Rights and Obligations") (emphasis added).

2

Assured does not contend that the RMBS Trustees lack authority to settle Trust claims. Nor could it: It is well-established that the RMBS Trustees own, and therefore have the authority to compromise, Trust claims.[7] The *economic* reality that a monoline insurer may suffer some of the harm associated with ineligible mortgages giving rise to Trust claims, does not affect the *legal* reality that the Trustees own the Trusts' repurchase claims arising out of the ineligible mortgages. Indeed, the same holds true for certificateholders in the Trusts, who have suffered, and will suffer, far more economic harm than the monolines as a result of ineligible mortgages in the Trusts,[8] yet they *also* do not own the Trusts' claims. Instead, both the certificateholders and the monoline insurers stand to benefit from the successful prosecution, or settlement, of the Trusts' claims based entirely on the contractual subordination provisions (the waterfall) under the governing PSAs, which must be enforced in this proceeding.[9]

### III. The Trusts' Repurchase Claims Do Not Require Proof of Loss Causation

The Steering Committee's Consolidated Reply addressed the general objection that the $8.7 billion settlement is insufficiently discounted for the Debtors' potential legal defense that the PSAs or New York common law imposes a loss causation requirement on the Trusts'

---

[7] *See, e.g.*, *Redmond v. Commerce Trust Co.*, 144 F.2d 140, 154-55 (8th Cir. 1944) ("It is the law that a valid compromise of an existing controversy may be made by the parties thereto, subject to their capacity to contract concerning the subject matter . . . Where it is reasonably prudent, in the exercise of good faith sound judgment, to make a contract of compromise, the trustee may do so.").

[8] Investors in the Trusts covered by the settlement have suffered more than $30 billion in realized losses, and are expected to suffer an additional $10 billion to $19 billion in losses over the life of the Trusts. *See* Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320-8]; *see also* Supplemental Declaration of Frank Sillman in Support of Debtors' Motions Pursuant to Fed. R. Bankr. P. 9019 [Docket No. 2969]. The monolines' actual and projected claim payments amount to a *small fraction* of these massive investor losses.

[9] *See* 11 U.S.C. §§ 509(b)(1)(C) and 510(a).

repurchase claims.[10] Here, the Steering Committee addresses Assured's specific argument that the monoline insurers would face a <u>weaker</u> causation defense than the Institutional Investors would face, and that therefore "the settlement is not fair to Assured and the other monolines because it is in large part a 'one size fits all' settlement."[11] Again, this argument relies on an entirely false distinction between "monoline claims" and "investor claims." The claims at issue in the settlement are *Trust* claims, being asserted by the Trustees, and therefore are subject to the same standard of review.

Moreover, the three "causation" cases cited by Assured draw no distinction between "monoline claims" and "investor claims." Instead, they interpret contractual repurchase provisions that are ***virtually identical*** to the provisions in the Debtors' PSAs governing the *Trusts'* repurchase claims. In two of the three cases (*Flagstar*[12] and *Syncora*[13]), the court held that the repurchase provision did <u>not</u> include a causation requirement, and in the third case (*MBIA*[14]), the court held that the repurchase provision was ambiguous. Although the plaintiffs in those cases were monoline insurers, that is a distinction without a difference.

In *Flagstar*, Judge Rakoff undertook the most recent—and most exhaustive—causation analysis. Judge Rakoff analyzed a repurchase provision that, like the provisions in the Debtors' PSAs, was triggered only when a breach of a representation and warranty "materially and

---

[10] *See* Consolidated Reply at §I(C)(1).

[11] *See* Assured Objection at 15-17 and 3.

[12] *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 2012 WL 4373327 (S.D.N.Y. 2012).

[13] *Syncora Guarantee, Inc. v. EMC Mortg. Corp.*, 2012 WL 2326068 (S.D.N.Y. 2012).

[14] *MBIA Ins. Co. v. Countrywide Financial Corp.*, 936 N.Y.S.2d 513, 521 (Sup. Ct. N.Y. Cty. 2012).

4

adversely" affected the interests of the Trust, the certificateholders or the monoline insurer.[15] Judge Rakoff held that this provision only required the plaintiff to "show that the breaches <u>materially increased its risk of loss</u>. Put another way, the causation that must here be shown is that the alleged breaches caused plaintiff to <u>incur an increased risk of loss</u>."[16]

Assured's Objection implies that because Judge Rakoff discusses New York insurance authorities, the holding only applies to monoline insurers.[17] It is not so limited. In rejecting a causation requirement, Judge Rakoff actually relied on four independent factors. *Three* of those four factors employed traditional tools of contract construction to interpret the operative repurchase provisions (which are virtually identical to the Debtors' provisions), and those interpretive tools have *nothing* to do with New York insurance law. First, the Court considered the "ordinary meaning" of the term "adverse" in the "material and adverse" clause, and concluded that the term's ordinary meaning—that is, "opposed to one's interests"—belied a causation requirement.[18] Second, the Court explained that the contract's cure provisions, as an alternative to repurchase, would be rendered meaningless "if a breach only occurred after the loan had already defaulted."[19] Third, the Court emphasized that the "sophisticated parties" to the contract could have included the terms "cause," "loss," or "default" in the repurchase provision,

---

[15] *See Flagstar*, 2012 WL 4373327, at *4.

[16] *Id.* at *5 (emphasis added).

[17] *See* Assured Objection at 15-16.

[18] *Flagstar*, 2012 WL 4373327, at *4.

[19] *Id.* at *5 (emphasis added).

5

but chose not to, again belying any causation requirement.[20]  *Each* of these interpretive arguments would apply in equal force to the Debtors' repurchase provisions.

Fourth, the Court noted that its interpretation was in "accord" with New York insurance statutory and case law, under which insurers have "an interest in receiving complete and accurate information before deciding whether to issue a policy," may rescind a policy made in reliance on a material representation, and the statutory definition of the term "warranty" refers to a "risk of loss" causation standard.[21]  Setting aside the fact that certificateholders have precisely the same interests as insurers in this regard—that is, to *fully allocate* the risk of loss on defective mortgages to the RMBS issuer[22]—this is the only one of the four factors that has anything to do with New York insurance law.  Therefore, Judge Rakoff's detailed and logical analysis *would* apply to the Trusts' repurchase claims against the Debtors.

Similarly, in *Syncora*, decided several months before *Flagstar*, Judge Crotty rejected a causation requirement in another repurchase case by drawing on some of these same canons of construction, as well as other interpretive tools having nothing to do with New York insurance law.[23]  Finally, in *MBIA*, decided in January 2012, Justice Bransten ruled that the plaintiff

---

[20] *Id.*

[21] *Id.*

[22] "Representations and warranties are used to allocate the risk of defective mortgage loans among the mortgage originators, issuers of the securities and investors who purchase them." American Securitization Forum News Release: ASF Releases Model Representations and Warranties to Bolster Risk Retention and Transparency in Mortgage Securitizations (Dec. 15, 2009) *available at* http://www.americansecuritization.com/ Workarea/ DownloadAsset.aspx?id= 6706.

[23] For example, Judge Crotty reasoned that "the parties' written agreements do not provide that breaches of representations or warranties must cause any . . . loan to default . . . [though] they could have included such language." *Syncora*, 2012 WL 2326068, at *5.  Judge Crotty also drew on an applicable treasury regulation which contemplated repurchase of defective loans from RMBS trusts, even if those loans were still performing.  *Id.* at *6.  Although the Court appeared to distinguish a repurchase case in a footnote because it did not involve a monoline insurer, *see* Assured Objection at 16 and *Syncora* at *8n.5, the Court also explicitly relied on a non-monoline case in ultimately rejecting any causation requirement. *See*

6

monoline insurer had failed to meet its burden on summary judgment to prove that the operative repurchase provision lacked a causation requirement.[24] In analyzing that repurchase provision, the Court did not even mention New York insurance law, and simply interpreted the contractual provision on its face.[25] Hence, contrary to Assured's argument, the court in *MBIA* drew no distinction between investors and monoline insurers in analyzing whether causation was required under the repurchase provision.[26] Instead, the Court merely found that the provision was ambiguous on its face.

**IV.    The Allocation Methodology Is Neither a Mystery Nor an Improper Delegation of Claims Administration Duties**

Assured also asserts that the allocation of the Allowed Claim is a "mystery."[27] It is not. Under the Settlement Agreement, each Accepting Trust will share in the $8.7 billion claim according to its share of the total losses borne by all Accepting Trusts.[28] The only "mystery" identified by Assured is that an independent expert will calculate projected losses using the

---

*Syncora* at *6 (citing *LaSalle Bank N.A. v. Nomura Asset Capital Corp.*, No. 060339/2003, slip op. (N.Y. Sup. Ct. Sept. 8, 2006), *aff'd in part*, 47 A.D.3d 103, 846 N.Y.S.2d 95 (App. Div. 2007)). Thus, the import of that footnote is debatable, to say the least.

[24] *See MBIA*, 936 N.Y.S.2d, at 524-26. The repurchase provision in *MBIA* arose under a "Sale and Servicing Agreement," akin to the Debtors' PSAs. *See id.*

[25] *Id.*

[26] Admittedly, the Court discussed New York insurance law in a separate part of the opinion, which held that the monoline insurer did not have to prove causation in establishing its claims for *fraud* and *breach of warranty* under the monoline insurer's insurance policy, but that analysis did not reach the scope of the repurchase obligation, and is therefore completely irrelevant in analyzing whether causation is required under the Debtors' repurchase provisions. *See MBIA*, 936 N.Y.S.2d, at 521-24.

[27] *See* Assured Objection at 13.

[28] *See* Third Amended Settlement Agreement at §6.01 ("The Allocation of the Allowed Claim"), attached as Exhibit 2 to Debtors' Notice of Hearing on Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 1887].

7

methodology described in Exhibit B.[29] Specifically, Assured argues that "without knowing today how the Expert calculates Net Losses, it is virtually impossible for Assured to determine what impact (if any) the settlement, if approved, would have on Assured's claims against the Debtors."[30] However, the dollar-for-dollar allocation of the $8.7 billion claim across all 392 Trusts is not before the Court; instead, the issue before the Court is whether the allocation <u>methodology</u>, as embodied in Section 6.01 and Exhibit B to the Settlement Agreement, is reasonable, and Assured has not challenged the reasonableness of this methodology.

Relatedly, Assured argues that assigning the projection of future losses to an independent expert amounts to an improper delegation of claim administration duties.[31] It does not. Again, the allocation <u>methodology</u>, not the dollar-for-dollar allocation, is before the Court. There is nothing improper in the Trustees settling their claims with Debtors for a fixed sum, and then dividing that sum among the individual Trusts pursuant to a methodology that is fair and reasonable.

**V.    The JSBs' Objection Regarding Subordination is Premature and Ignores the Enormous Benefit the JSBs Received in the Platform Sale Facilitated by the Proposed Settlement**

The JSBs raise issues regarding the priority of the allowed claim contemplated by the proposed settlement.[32] As discussed in the Consolidated Reply, the priority *vel non* of the allowed claim is not at issue in the Debtors' 9019 Motion, and therefore any objection regarding

---

[29] *See* Assured Objection at 13-14.

[30] *Id.* at 14.

[31] *Id.* at 21-22.

[32] *See* JSB Objection at 38-34.

8

priority is premature. The Trusts reserve all rights to respond to a motion to subordinate the allowed claim if and when it is made.

Although subordination is not before the Court at this juncture, the enormous benefits the JSBs' would obtain as a result of approval of the settlement demonstrate the futility of the JSBs' position. The JSBs' principal recovery at the conclusion of this case will be out of the proceeds of the Debtors' successful platform sale, a sale that was facilitated and enhanced by the RMBS Trust Settlement. In recognition of the cure claims the Trusts have relating to the assigned contracts (e.g., claims resulting from the Debtors' inability to "sever" the origination-related claims of the Trusts from the servicing aspects of the contracts), an administrative expense claim reserve for the Trusts' cure claims was established in the amount of $600 million.[33] To the extent that the RMBS Trust Settlement is not approved, or Trusts do not accept the Settlement, the $600 million administrative expense reserve will be available to satisfy the Trusts' cure claims. This reserve and the deferral of resolving the Trusts' cure claims permitted the platform sale to proceed, at a greatly increased price, for the benefit and enhancement of the JSBs' collateral.

The JSBs (and all other objectors) fail to acknowledge that the proposed $8.7 billion general unsecured claim includes significant value for settlement of the Trusts' administrative expense cure claims. The Trusts' cure claims, of course, cannot be subordinated pursuant to Section 510(b), nor can the allowed general unsecured claims that the Trusts are to receive in

---

[33] *See* Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements, and (II) the RMBS Trustees' Limited Objection to the Sale Motion ¶ 18 [Docket No. 945]; Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief ¶ 22 [Docket No. 2246].

compromise of these cure claims be subordinated. There is no basis upon which the JSBs may reap the benefits of the platform sale while also attempting to subordinate the administrate expense claims that made the sale possible.

## VI. Conclusion

For all the foregoing reasons, the objections of Assured and the JSBs to the Debtors' 9019 Motion should be rejected, and the RMBS Trust Settlement Agreements should be approved.

Dated: February 22, 2013
New York, New York

/s/ Kathy D. Patrick

Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

10