Hearing Date and Time: March 5, 2013 at 10:00 a.m. (ET)
Response Deadline: February 26, 2013 (by agreement)

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
In re:                                : Chapter 11
                                      :
Residential Capital, LLC, et al.,     : Case No. 12-12020 (MG)
                                      :
                    Debtors.          : Jointly Administered
                                      :
------------------------------------------------------------ x

**RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTIONS FOR (I) APPOINTMENT OF A
CHIEF RESTRUCTURING OFFICER AND (II) ENTRY OF AN ORDER
FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A
CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or "**ResCap**") hereby files this response (the "**Response**") to the Debtors' motion (the "**CRO Motion**") [Dkt. No. 2887] for appointment of a Chief Restructuring Officer ("**CRO**") and the Debtors' motion (the "**Exclusivity Motion**") [Dkt. No. 2918] for the entry of an order further extending their exclusive periods to file a chapter 11 plan and solicit acceptances thereof.[1] In support of the Response, the Committee respectfully represents as follows:

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motions.

## INTRODUCTION

1. The Committee supports the relief sought by the Motions, as described herein, at a time when these chapter 11 cases are at an important crossroads. The Debtors, with support from the Committee, have successfully accomplished the sales of a significant portion of the Debtors' operating businesses and other major assets, generating approximately $4 billion in proceeds for the Debtors' estates. With these sales complete, the purpose of these cases is now the orderly liquidation and distribution of the Debtors' remaining assets for the benefit of their creditors.

2. When the Debtors last sought an extension of exclusivity, the Debtors and the Committee were hopeful that the parties, with the assistance of Judge Peck, as mediator, could move towards a prompt consensual resolution of these cases. Until recently, there seemed to be reason for encouragement that the mediation would bear fruit. Unfortunately, that has not been the case. Despite the Committee's significant efforts over the past two months, the mediation has stalled. As a result, the Committee is now left with no alternative but to examine alternative plan structures that contemplate the Debtors' emergence from bankruptcy without a resolution of the claims against its ultimate parent, Ally Financial, Inc. ("**Ally**"). Unless this dynamic changes, the Committee expects that this plan process, and the resolution of disputed claims, will be the focus of these cases going forward.

3. Coming close on the heels of the stalled mediation, the Motions were initially received with skepticism by the Committee. The Debtors made the CRO Motion without previewing the selection and filing of the motion with the Committee, despite earlier assurances that the Committee would be consulted on a selection process. Moreover, the Exclusivity Motion, in the current context of these cases, raised the prospect that the Debtors were seeking an extension of exclusivity only to propose a non-consensual, Ally-sponsored

plan—an outcome the Committee could not support. Nevertheless, the Committee used the opportunity presented by the Motions to engage in substantial dialogue with the Debtors regarding the future direction of these cases, and the parties were ultimately able to reach consensus on the terms and conditions under which the Motions should be granted.

4. As described further below, the Committee supports a conditional extension of exclusivity and the appointment of the CRO under a revised scope of authority. It is clear that these cases could benefit from a fresh perspective in the form of an independent CRO who is prepared to work constructively with all parties towards the resolution of disputed claims and confirmation of a consensual plan, and it is in this context that the Committee is prepared to agree to a modest extension of exclusivity. For the appointment of a CRO to be productive, however, it is important that he be given decision-making power, and the Committee and the Debtors have thus agreed on a revised scope of the CRO's authority. In addition, before endorsing the appointment of the CRO and an extension of exclusivity, the Committee required assurances that the Debtors would commit to an alternative path forward in these cases that is not conditioned on satisfaction of Ally's demands, and to this end obtained the Debtors' agreement to (i) refrain from filing a nonconsensual plan during the exclusivity extension, (ii) consent to a motion by the Committee seeking standing to bring estate causes of action against Ally, (iii) adjourn for a short period of time the hearing on the RMBS Trust Settlement to facilitate negotiations with the objectors, and (iv) allow their plan support agreement with Ally to expire. Subject to these and other terms of the agreement between the Debtors and the Committee— described in more detail below and set forth in **Exhibit A**—the Committee supports the grant of the Motions.

**BACKGROUND**

5.  In late 2012, the Committee approached the Debtors with concerns about the ResCap Board's independence in light of certain pre-petition transactions with Ally, and discussed the possibility of appointing a CRO. The Committee was hopeful that the presence of an independent perspective might help to break the logjam of plan and settlement negotiations and ameliorate the general lack of confidence in management and the Board in the cases to date.

6.  At around this same time, the Debtors filed their second motion for an extension of exclusivity. In connection with the resolution of that motion and an extension of the Debtors' exclusivity period to February 28, 2013, the Debtors and the Committee agreed to the appointment of a mediator, the Honorable Judge Peck (the "**Mediator**"). The parties also agreed to adjourn consideration of the Debtors' motion to approve the settlement relating to the claims of certain residential mortgage backed securities trusts (the "**RMBS Trust Settlement**") in order to permit the Mediator and the parties to explore a global resolution of the case.

7.  In part due to the appointment of the Mediator, the adjournment of the hearing on the RMBS Trust Settlement, and an agreement among all parties to work constructively towards a global resolution of these cases, the Committee and the Debtors ultimately determined to defer the issue of appointing a CRO.

8.  After the appointment of the Mediator, the Committee and Ally agreed to prepare comprehensive legal presentations regarding the arguments for and against estate claims and causes of action that could be brought against Ally. As this Court is aware, the Committee (in addition to the Examiner) has spent a significant amount of time investigating the causes of action—including reviewing millions of pages of documents and conducting extensive legal research—and developing a lengthy and thorough exposition of the claims. Through a series of meetings held on January 8, 9, and 17, 2013, the Committee's professionals delivered their oral

and written presentation to the Mediator, Ally, and the Debtors, respectively. On January 22, 2013, Ally delivered an extensive responsive presentation to the Committee.

9. Following this exchange of presentations, on January 30, 2013, the Committee provided Ally with a global settlement proposal contemplating estate and third party releases that the Committee believed would facilitate negotiation of a consensual chapter 11 plan. In early February, the Committee was informed that mediation was stalled.

10. Shortly thereafter, the Debtors' board appointed Mr. Lewis Kruger, formerly of Stroock & Stroock & Lavan LLP, as CRO. This appointment was a surprise to the Committee, who learned of the Debtors' decision just hours before the CRO Motion was filed on February 11, 2013.

11. The Committee was disappointed that the Debtors did not preview the CRO selection and motion papers with it prior to filing the CRO Motion. Nevertheless, the Committee proceeded to engage the proposed CRO and the Debtors' professionals in discussions regarding a framework for preparing the Debtors for emergence from bankruptcy without a resolution with Ally—including the establishment of a process to resolve or litigate disputed claims and a means by which to pursue estate claims against Ally—while leaving open the possibility that Ally would elect at some point in the future to continue discussions regarding a fully consensual plan.

## THE PARTIES' AGREEMENT

12. Now that the mediation has stalled and Ally appears to be unwilling to negotiate at this time, these cases are at an important juncture. The Committee believes that an independent third party could aid in plotting a course forward, and is committed to work with the CRO to achieve the collective goals of the estates. Toward that end, the Committee and the Debtors have reached an agreement on a construct that provides the most effective means of

5

moving the case toward confirmation and emergence. The terms of the agreement are as follows:

13. <u>Extension of exclusivity</u>. The Committee has agreed to support the extension of the Debtors' exclusive period for filing a plan through April 30, 2013 (the "**Extension Period**"),[2] during which time the Debtors have agreed to refrain from filing a chapter 11 plan without the Committee's support. This 60-day window will provide the Committee and the Debtors time to work together to negotiate and formulate the terms of a chapter 11 plan that resolves claim-related disputes (including, among others, claims held by the RMBS Trustees, monolines, and securities claimants) and, if necessary, provide a process for litigation of these claims. Assuming Ally's current position on plan negotiations remains unchanged during the Extension Period, the Committee and the Debtors will also need to formulate a chapter 11 plan that preserves estate and third party claims against Ally and establishes a means by which those claims can be prosecuted.

14. <u>Debtors' consent to standing</u>. In light of the stalled mediation, the Debtors have agreed that they will consent to any motion made by the Committee seeking standing to pursue estate causes of action against Ally and its non-Debtor affiliates. The Debtors have already recognized that there are substantial estate causes of action against Ally, but committed themselves to a settlement of those claims pursuant to the prepetition Ally Settlement and Plan Sponsor Agreement (the "**Ally PSA**"). In view of their entry into the Ally PSA, the Debtors have determined that, absent a consensual resolution of claims against Ally, the Committee is in the best position to pursue the claims, and have agreed to support the Committee in a process to prosecute these claims on behalf of the estate. Accordingly, the Committee intends to seek standing to pursue claims against Ally in the near term. The Committee's standing motion will

---

[2] The Committee also supports a similar extension of the Debtors' exclusive period for soliciting votes on a plan.

6

be based largely upon the extensive analysis it has already provided to the Debtors, Ally and others in connection with the mediation, as well as its continued review of the documents in the Examiner's depository.

15. The Committee continues to believe that a negotiated resolution of these cases is preferable to litigation. In an effort to facilitate negotiations, and to leave open the possibility of continued negotiations with Ally, the Committee has agreed that it will not file a complaint asserting claims or causes of action against Ally during the Extension Period. Assuming that settlement negotiations do not progress, the Committee would plan to commence litigation against Ally in a timely manner after obtaining standing to commence these claims and vigorously pursue the varied and valuable claims on the estate's behalf.

16. <u>Termination of Ally PSA</u>. For the Debtors to engage in meaningful negotiations with the Committee regarding a non-Ally-sponsored plan, the Committee has requested that the Debtors allow the Ally PSA to expire on its own terms on February 28, 2013.[3] The Ally PSA is one of the primary means by which Ally has attempted to control these chapter 11 cases, and the Committee has been consistent in its belief that the terms of the Ally PSA—which contemplates, among other things, estate and third party releases and no plan other than one that has Ally's support—are not in the best interest of the estate. Given that the Committee and the Debtors will be considering alternative plan structures in the near future that preserve estate and third party claims, the Debtors have agreed to end their obligations under the Ally PSA in order to allow them to have meaningful negotiations on a no-release plan.

---

[3] The Debtors and Ally previously agreed to three waivers of section 7.4 of the Ally PSA (providing for an automatic termination of the Ally PSA if certain milestones are not met) through December 31, 2012, January 31, 2013 and February 28, 2013. The Ally PSA currently expires by its terms on February 28, 2013, absent any further waivers or extensions.

7

17.     <u>Revised scope of CRO authority</u>.  The Committee anticipates that the CRO will be heavily involved in the claim resolution process, and will work with the Committee to formulate a plan that will have significant creditor support and is in the best interest of the estate.  As part of the framework discussed above, the Committee is willing to support the appointment of Mr. Kruger as CRO, and recognizes that Mr. Kruger is an experienced, respected bankruptcy professional, with an understanding of the nuances of complex chapter 11 cases.[4] One of the primary purposes of a CRO is to engender confidence among creditors, and with this collective agreement the Committee is hopeful that these cases will progress constructively.  As part of the discussions with the Debtors and Mr. Kruger regarding the Motions and next steps for plan negotiations as set forth above, the Committee proposed a revised scope and authority for the proposed CRO, as set forth in the attached **Exhibit B**.

18.     Pursuant to this revised scope, the proposed CRO essentially has the duties and authority of a chief executive officer.  The CRO will report to the board of directors, and will cooperate with the Committee in negotiations with Ally regarding any potential global resolution and negotiate with all parties in interest regarding a consensual chapter 11 plan.  The CRO will also lead the Debtors' management teams and professionals in developing with the Committee an efficient liquidation strategy and negotiating, settling, or determining a manner for litigating, claims and claim-related disputes.

19.     <u>Protocol for resolution of Disputed Claims</u>.  To enable the parties' efforts to consensually resolve disputed claims, the Committee has agreed with the Debtors that the hearing on approval of the RMBS Trust Settlement should be adjourned for a brief period of time.  As this Court is well aware, the RMBS Trust Settlement presents numerous complex

---

[4] While the Committee supports the appointment of Mr. Kruger as CRO, the Committee reserves all of its rights with respect to the success fee contemplated by the CRO Engagement Letter. The Debtors and the Committee are currently working together to reach agreement on the terms of appropriate parameters for the success fee.

8

matters and raises a number of intercreditor issues that will likewise need to be resolved in connection with the motion. Since the last adjournment of the hearing on the RMBS Trust Settlement, the Committee and the Debtors have been primarily focused on achieving a global resolution predicated on an appropriate contribution from Ally. Now that this focus has shifted toward a plan that is not premised on Ally's sponsorship, the Committee and the Debtors need additional time to focus on the details of the RMBS-related claim disputes and attempt to achieve a resolution of the RMBS issues narrowly, rather than go forward with the trial on the RMBS Trust Settlement in mid-March. The Committee and the Debtors have agreed that a short further adjournment of 30 to 45 days (subject to the Court's calendar) will be productive for the case.

20. During this time, and in accordance with the process to be set forth by the CRO in consultation with the Committee, the Committee and the Debtors will also work towards a resolution of the other major categories of disputed claims in the case. To the extent a resolution cannot be reached, the CRO, in consultation with the Committee, will propose a schedule and process for the litigation of other unresolved claims, including those held by the securities claimants, the monolines, and the junior secured noteholders. The resolution of these claims disputes—whether by settlement or litigation—will be a key step towards forging a path to emergence.

## CONCLUSION

21. Subject to the terms described herein and as set forth in **Exhibit A**, the Committee supports the appointment of Mr. Kruger as CRO, with the revised scope of his appointment as set forth in **Exhibit B**, and supports a limited extension of exclusivity by approximately 60 days. The agreement with the Debtors described herein presents the best strategy to move these cases forward, and has the best chance of successfully achieving a chapter

11 plan in the near term that will have the support of the Committee and the major creditor constituencies.

WHEREFORE, the Committee respectfully requests that the Court (a) grant the Debtors' motion for appointment of a CRO, with a revised scope of the CRO's duties as set forth in **Exhibit B**; (b) grant an extension of the Exclusive Periods by approximately 60 days, subject to the terms described herein and as set forth on **Exhibit A**; and (c) grant such other relief as may be just and proper.

Dated: New York, New York
       February 26, 2013

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Douglas H. Mannal
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for the Official Committee
of Unsecured Creditors*

# **EXHIBIT A**

**Terms of Agreement between the Debtors and the Committee, dated February 26, 2013**

**Terms of Agreement between the Debtors and the Committee, dated February 26, 2013**

1. The Committee shall consent to the Debtors' plan exclusivity period being extended to April 30, 2013 (together with any further extension that is the result of a bridge order of no more than 14 days, the "Extension Period"). The Debtors' exclusive period to solicit votes on a plan will likewise be extended. During the Extension Period, the Committee and the Debtors will cooperate to develop a consensual and confirmable chapter 11 plan for each of the Debtors.

2. During the Extension Period, the Debtors shall not file a plan that is not supported by the Committee, and the Committee will not seek the appointment of a Trustee. Nothing herein shall preclude the Debtors from requesting a further extension of exclusivity beyond the Extension Period and nothing herein shall preclude the Committee from opposing any such request.

3. The Debtors will consent to any motion made by the Committee seeking standing to bring estate causes of action against AFI and its non-debtor affiliates (collectively "Ally"), provided, however, the Debtors retain the right to be heard on any motion made by a party other than the Committee which seeks standing to pursue an estate cause of action against Ally. In order to facilitate negotiations during the Extension Period, the Committee agrees not to commence a proceeding to bring estate causes of action until the Extension Period terminates; provided, however, nothing herein shall prevent the Committee from filing a motion that seeks an order of the Bankruptcy Court granting the Committee standing to pursue such claims during the Extension Period.

4. Notwithstanding the Debtors' consent to standing to bring claims against Ally, the Debtors shall retain the right to propose a chapter 11 plan that contains a settlement of estate claims against Ally, provided that the Committee consents to the proposed settlement.

5. At the request of the Committee, the Debtors will allow the AFI Plan Support Agreement to expire by its own terms on February 28th. The Committee shall acknowledge that the Committee consulted with the Debtors regarding the potential ramifications of allowing the PSA to expire or terminate and will confirm that the Committee will assert no liability to the Debtors' officers or directors as a result of such termination or expiration.

6. The Committee agrees not to oppose the relief sought in the CRO motion, subject to an agreement on the scope and authority of the CRO to be set forth in an amendment to the existing CRO engagement letter that is in form and substance reasonably satisfactory to the Committee.

7. To the extent any creditor opposes the CRO motion or the Debtors' exclusivity motion, the Committee shall support the appointment of the CRO, the proposed extension of exclusivity pursuant to the process laid out herein, and the CRO's role in such process.

8. The Debtors and the Committee will work to finalize a wind-down plan for the estates, including appropriate KEIP/KERP programs.

- 2 -

9. The CRO shall propose a framework for the prompt resolution of the major categories of disputed claims in the case, through negotiation (and possibly mediation) and, if necessary, through litigation.  The Debtors intend to use the next sixty (60) days to make significant progress toward resolving disputes over claims allowance and priority.  Toward that end, the Debtors, in consultation with the Committee, shall:

   i. Adjourn the RMBS Settlement trial for 30-45 days (subject to the Court's calendar);
   ii. Agree to work with the objectors to address issues raised in the objections to the RMBS Settlement and negotiate appropriate modifications, if any, to that settlement;
   iii. Facilitate settlement negotiations with the RMBS Investors, RMBS Trustees, securities claimants, and monolines;
   iv. Negotiate a resolution of the priority and treatment of other disputed claims, including the Junior Secured Bonds;
   v. Seek to resolve the treatment of the government's claim resulting from the Consent Order;
   vi. Explore the use of insurance to settle with borrowers, securities claimants and other parties; and
   vii. Absent a negotiated resolution of disputed claims, propose a schedule and process for the litigation of unresolved claims, including those held by the RMBS Trustees, securities claimants and monolines.

# **EXHIBIT B**

**Revised Scope of CRO Services and Authority**

# Revised Scope of CRO Services and Authority

1. **Scope of Services**

In connection with this engagement, Mr. Kruger shall serve as the Chief Restructuring Officer (the "CRO") of the Debtors. During the term of this engagement, Mr. Kruger will not take on any new engagement without the express prior written consent of the Debtors. The Services to be performed by the CRO are as follows:

i. The CRO shall report directly to the Board of Directors of Residential Capital, LLC (the "Board");

ii. Subject to subsection (i) above, the CRO shall be vested with the Debtors' powers to oversee, manage, and direct the acts, conduct, assets, liabilities and financial conditions of the Debtors, the operation of the Debtors' business and any matters relevant to the case, including, without limitation, the authority to:

   a. direct the Debtors' respective management teams and professionals in connection with the Debtors' efforts to negotiate and settle claims against the Debtors, and propose a schedule and process for the litigation of disputed claims, including, but not limited to, those held by the monolines, junior secured bonds, the RMBS Trustees, and securities claimants;

   b. direct the Debtors' executive management teams and professionals in developing and implementing an efficient liquidation of the Debtors' assets for the benefits of the Debtors' unsecured creditors;

   c. direct the litigation strategy of the Debtors including the investigation, prosecution, settlement and compromise of claims filed against the Debtors and of estate causes of action;

   d. direct the Debtors' executive management team and professionals in formulating a chapter 11 plan;

   e. communicate and negotiate with the Debtors' creditors and key stakeholders, including the Creditors' Committee, and assist such parties in working towards a consensual chapter 11 plan;

   f. make decisions on the behalf of each Debtor with respect to chapter 11 plan negotiations and formulation, in such a manner as is consistent with the business judgment rule, the provisions of applicable law, taking into account the respective fiduciary duties of the CRO to each Debtor's respective estate;

   g. cooperate with the Creditors' Committee in negotiations with Ally Financial Inc. ("AFI") to attempt to pursue a global settlement of the Debtors' claims against AFI that is acceptable to all major stakeholders;

   h. represent the Debtors' interests through counsel before this Court;

   i. select and retain professionals and advisors for the Debtors, pursuant to Court approval if, and as required by the Bankruptcy Code.

iii. The CRO shall provide testimony in Bankruptcy Court as required or appropriate during the Chapter 11 Cases;

iv. The CRO shall participate in meetings internally or with outside constituencies; and

v. The CRO shall provide such other services, advice, or assistance as may be requested by the Board from time to time in connection with this engagement.