**Hearing Date and Time: March 21, 2013 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: March 11, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Stefan W. Engelhardt
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
                                        )
In re:                                  )    Case No. 12-12020 (MG)
                                        )
RESIDENTIAL CAPITAL, LLC, et al.,       )    Chapter 11
                                        )
                          Debtors.      )    Jointly Administered
                                        )
———————————————————————————————— )

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 3013 AND
BANKRUPTCY CODE SECTION 362(A) FOR A DETERMINATION THAT (I) GMAC
MORTGAGE'S FRB FORECLOSURE REVIEW OBLIGATION IS A GENERAL
UNSECURED CLAIM AND (II) THE AUTOMATIC STAY PREVENTS
ENFORCEMENT OF THE FRB FORECLOSURE REVIEW OBLIGATION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

JURISDICTION AND VENUE ................................................................... 3

BACKGROUND ......................................................................................... 4

A.  General Background ......................................................................... 4

B.  The Consent Order ........................................................................... 4

C.  The FRB Foreclosure Review and its Costs ................................... 5

D.  The GA Servicing Motion and Order .............................................. 8

E.  The PwC, Pepper Hamilton, and Hudson Cook Retentions ........... 9

F.  The FRB and Other Governmental Entities Reach a Settlement Permitting Servicers to Pay Money in Resolution of their Foreclosure Review Obligations ...................................................... 9

RELIEF REQUESTED .............................................................................. 10

BASIS FOR RELIEF ................................................................................. 10

A.  Rule 3013 Allows the Court to Determine the Classification of a Claim Ahead of the Filing of a Plan of Reorganization ................. 10

B.  The FRB Foreclosure Review Obligation is a "Claim" Within the Meaning of Bankruptcy Code Section 101(5) ............................... 12

    1.  The FRB Foreclosure Review, an Equitable Remedy, is Not Intended to End or Ameliorate Ongoing Violations of the Law ............. 14

    2.  An Available Alternative "Right to Payment" Exists, Rendering the FRB Foreclosure Review a "Claim" ...................... 16

C.  The FRB Foreclosure Review Claim is a General Unsecured Claim Not Entitled to Priority Under the Bankruptcy Code ..................... 17

    1.  The FRB Foreclosure Review Claim is Not Entitled to Administrative Expense Priority Under Bankruptcy Code Section 503(b) ......................................................................... 17

    2.  The FRB Foreclosure Review Claim is Not Otherwise Entitled to Priority Under Bankruptcy Code section 507(a) .................... 20

D.  The FRB and FDIC are Prohibited by the Automatic Stay From Enforcing Their General Unsecured Claim Against the Debtors ......................................................... 20

EXHIBIT 1:  Proposed Order
EXHIBIT 2:  Declaration of Thomas Marano
EXHIBIT 3:  Consent Order
EXHIBIT 4:  Exemplars of Foreclosure Review Requirements

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Compass Bank v. N. Am. Petroleum Corp. USA (In re N. Am. Petroleum Corp.),
    445 B.R. 382 (Bankr. D. Del. 2011) .......................................................................19

FDIC v. Hirsch (In re Colonial Realty, Co.),
    980 F.2d 125 (1992) ..............................................................................................20, 21

Goldman, Sachs & Co. v. Esso Virgin Is., Inc. (In re Duplan Corp.),
    212 F.3d 144 (2d Cir. 2000) ..................................................................................19

Helen-May Holdings, LLC v. Geltzer (In re Kollel Mateh Efraim, LLC),
    456 B.R. 185 (S.D.N.Y. 2011) ...............................................................................18

In re 500 Fifth Ave. Assocs.,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993), aff'd, No. 93-844, 1993 WL 316183(LJF)
    (S.D.N.Y. May 21, 1993) .......................................................................................11

In re Chateaugay Corp., 944 F.2d 997 (2d Cir. 1991) ......................................... passim

In re Hemingway Transp. Inc.,
    954 F.2d 1 (1st Cir. 1992) .....................................................................................18

In re Insilco Techs., Inc.,
    309 B.R. 111 (Bankr. D. Del. 2004) ......................................................................19

In re Oldco M Corp.,
    438 B.R. 775 (Bankr. S.D.N.Y. 2010) (Glenn, J.) ......................................... passim

In re Weiss-Wolf, Inc.,
    59 B.R. 653 (Bankr. S.D.N.Y. 1986) .....................................................................11

Mark IV Indus. v. N.M. Envtl. Dep't (In re Mark IV Indus.),
    438 B.R. 460 (Bankr. S.D.NY. 2010), aff'd, 459 B.R. 173 (S.D.N.Y. 2011) .........16

Matter of Udell,
    18 F.3d 403 (7th Cir. 1994) ...................................................................................13

Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,
    474 U.S. 494 (1986) ..............................................................................................13

Nathanson v. N.L.R.B.,
    344 U.S. 25 (1952) ................................................................................................18

# TABLE OF AUTHORITIES
### (Continued)

Page(s)

NLRB v. 15th Ave. Iron Works, Inc.,
  964 F.2d 1336 (2d Cir. 1992) .................................................................21

Route 21 Assocs. Of Belleville, Inc. v. MHC, Inc.,
  No. 12 Civ. 5361 (PAE), 2012 WL 6625280 (S.D.N.Y. Dec. 19, 2012) .........................16, 17

SEC v. Brennan,
  230 F.3d 65 (2d Cir. 2000) .................................................................21

Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,
  789 F.2d 98 (2d Cir. 1986) .................................................................18, 19

STATUTES

11 U.S.C. § 362(a)(1), (3), and (6) .................................................................20

11 U.S.C. § 503(b)(1)(A) .................................................................19

11 U.S.C. § 101(5) .................................................................13

11 U.S.C. § 507(a)(2) .................................................................20

OTHER AUTHORITIES

124 Cong. Rec. 32393 (1978) .................................................................13

Fed. R. Bankr. P. 3013 .................................................................10, 11

Independent Foreclosure Review to Provide $3.3 Billion in Payments, $5.2 Billion in
  Mortgage Assistance,
  http://www.federalreserve.gov/newsevents/press/bcreg/20130107a.htm .................................9

The Federal Reserve's § 13(3) [12 U.S.C. § 343(3),
  http://www.federalreserve.gov/oig/files/FRS_Lending_Facilities_Report_final-11-23-
  10_web.pdf .................................................................20

Residential Capital, LLC ("**ResCap**") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**" and each, a "**Debtor**"), including GMAC Mortgage, LLC ("**GMAC Mortgage**," and, together with ResCap, the "**Consent Order Debtors**") submit this motion (the "**Motion**") for entry of an order, substantially in the form annexed hereto as Exhibit 1, determining that (i) for purposes of any proposed plan, GMAC Mortgage's obligation to conduct the FRB Foreclosure Review (as defined below) shall be classified as a general unsecured claim in an amount to be determined, and (ii) the automatic stay prevents the Federal Reserve Board (the "**FRB**"), the Federal Deposit Insurance Corporation (the "**FDIC**"), and other governmental entities from taking any action to enforce such claim against the Debtors outside of the Consent Order Debtors' chapter 11 cases.  In support hereof, the Debtors submit the Declaration of Thomas Marano (the "**Marano Decl.**"), attached hereto as Exhibit 2, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.    The Debtors diligently have been following the mandates imposed by the FRB Foreclosure Review (as defined below) for the past year and a half.  Indeed, the Debtors are spending approximately $300,000 per day to support that review.  That expenditure represents by far the single most costly administrative expense of the Debtors' estates.  The Debtors dutifully have been complying with the FRB Foreclosure Review obligation under the paradigm that the injunctive obligations, as viewed by the governmental entities, represented an obligation whose nature went beyond that of mere compensation to borrowers.

2.    However, on January 7, 2013, the FRB, FDIC, and other governmental entities reached a settlement, pursuant to which ten of the country's largest mortgage servicers could satisfy foreclosure review requirements in their respective consent orders – virtually identical to those requirements imposed upon the Consent Order Debtors – by making a lump

sum payment into a settlement fund to be distributed among an even larger population of borrowers than are the subject of the Foreclosure Review process, and providing certain borrower assistance.  This settlement concretely demonstrates that in fact GMAC Mortgage's FRB Foreclosure Review obligation can easily be quantified, can be satisfied by an alternative "right to payment," and represents a general unsecured claim against the Debtors.

3.      Courts have struggled to interpret the definition of "claim" in the context of analogous environmental clean-up injunctive orders, attempting to draw the line between obligations in such orders that attempt to ensure continued compliance with environmental laws (which are not bankruptcy claims) and those that simply attempt to require a debtor to pay for clean-up necessitated by past conduct (which are bankruptcy claims).  Certain facets of the Consent Order Debtors' obligations under the Consent Order (as defined below) were, to be sure, "forward looking."  Those obligations seek to ensure continued compliance with applicable law and are similar to the environmental obligations contained in clean-up injunctions that require a debtor to cease ongoing pollution.

4.      The analysis regarding the GMAC Mortgage's obligation to conduct the FRB Foreclosure Review, however, is much different.  The FRB Foreclosure Review requirement in the Consent Order, mandating a review of potential improprieties in mortgage foreclosures pending three to four years ago for the express purpose of establishing compensatory amounts for those improprieties and identifying to whom those amounts should be paid, seeks to remedy and remediate only alleged past transgressions by the Debtors.  In short, the review requirement seeks to determine who gets paid and how much gets paid.  The recent settlements provide clear evidence that the FRB Foreclosure Review requirement is not one intended to ensure future compliance with law, but rather one that requires the Consent Order

ny-1074781

Debtors to pay for "clean-up" necessitated by past conduct. Those settlements evidence that the requirement may be satisfied by a monetary payment. For these reasons, any obligation to undertake the FRB Foreclosure Review represents a claim in bankruptcy which, as described further below, is not entitled to any priority in payment.

5.    Because the FRB Foreclosure Review obligation represents nothing more than a general unsecured claim, the holders of that claim – the FRB and FDIC – may not seek to enforce that claim outside of the bankruptcy process, including by attempting to require the Debtors to continue to perform the FRB Foreclosure Review process. Instead, the automatic stay prevents any such attempt to enforce or collect upon a prepetition claim, without the need for Court intervention. Nonetheless, given the serious repercussions the FRB and FDIC may seek to impose upon the Debtors should these governmental entities disagree with the Debtors position – including daily fines potentially reaching 1% of the Debtors' assets – the Debtors respectfully seek an order confirming (i) that the FRB Foreclosure Review obligation, including any remediation payments determined to be owed to borrowers, represents a general unsecured claim and (ii) any attempt to enforce such claim is prevented by the automatic stay.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are section 362(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3013 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3

## BACKGROUND

**A.      General Background**

7.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a

voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors

are managing and operating their businesses as debtors in possession pursuant to Bankruptcy

Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to

Bankruptcy Rule 1015(b).  On June 20, 2012, the Court directed that an examiner be appointed

[Docket No. 454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner

[Docket No. 674].

8.      On May 16, 2012, the United States Trustee for the Southern District of

New York appointed a nine member official committee of unsecured creditors.

9.      The Debtors were a leading residential real estate finance company

indirectly owned by Ally Financial Inc. ("**AFI**"), which is not a Debtor.  Prior to the closing of

the Debtors' court-approved asset sales, the Debtors and their non-debtor affiliates operated the

fifth largest mortgage servicing business and the tenth largest mortgage origination business in

the United States.  A more detailed description of the Debtors, including their business

operations, their capital and debt structure, and the events leading to the filing of these

bankruptcy cases, is set forth in the *Affidavit of James Whitlinger, Chief Financial Officer of*

*Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the

"**Whitlinger Affidavit**") [Docket No. 6].

**B.      The Consent Order**

10.      Prior to the Petition Date, several of the Debtors and their affiliates were

the subjects of an examination by the FRB and the FDIC, two of the many entities regulating

companies in the banking and financial services industries.  These governmental entities were

investigating alleged abuses in the foreclosure processes employed by companies with major

mortgage servicing operations, including the Debtors.  In order to avoid further disruption to the

Debtors' businesses as a result of the examination, and to avoid the potential for lengthy

litigation, the Consent Order Debtors, along with non-debtor affiliates AFI and Ally Bank,

entered into a consent order with the FRB and the FDIC (the "**Consent Order**"), dated April 13,

2011 and attached hereto as <u>Exhibit 3</u>, that resolved the issues raised by the federal regulators in

the examination.

        11.    Without admitting fault, the Consent Order Debtors, AFI, and Ally Bank

agreed, pursuant to the Consent Order, to develop and implement certain risk management and

corporate governance procedures under the guidance of the FRB in order to ensure prospective

compliance with applicable foreclosure-related regulations and laws.  <u>See</u>, <u>generally</u>, Consent

Order.  Additionally, pursuant to the Consent Order, GMAC Mortgage agreed to pay for an

independent file review regarding certain residential foreclosure actions and foreclosure sales

prosecuted by GMAC Mortgage and its subsidiaries (the "**FRB Foreclosure Review**").  <u>See</u>

Consent Order ¶¶ 3-4; <u>see also</u> Marano Decl. ¶ 4.  The FRB Foreclosure Review ultimately was

directed at determining whether certain mortgage foreclosure improprieties occurred,

establishing remediation amounts to compensate borrowers who suffered financial harm as a

direct result of those improprieties, and identifying which borrowers were eligible for such

compensation.  <u>See</u> Consent Order ¶ 3(c); <u>see also</u> Marano Decl. ¶ 4.  At that time, the Debtors

were not provided with an option to make a lump sum payment to satisfy the obligations

imposed by the costly FRB Foreclosure Review. Marano Decl. ¶ 5.

    **C.**    **The FRB Foreclosure Review and its Costs**

        12.    The FRB Foreclosure Review requires GMAC Mortgage to "retain one or

more independent consultant(s) acceptable to the [Federal] Reserve Bank [of Chicago] to

5

conduct an independent review" [1] of residential mortgage foreclosure actions prosecuted during

the period from January 1, 2009 to December 31, 2010, as well as foreclosure sales pending or

completed during this period.  Consent Order ¶ 3(a).  PricewaterhouseCoopers, LLP ("**PwC**")

was engaged as GMAC Mortgage's independent consultant.[2]  See Marano Decl. ¶ 4.  The

independent consultant is required to review, among other things, whether: (i) the Debtors had

properly documented ownership of the promissory note and mortgage (or deed of trust) at the

time they initiated a foreclosure, (ii) the foreclosure complied with state and federal law,

including the Servicemembers Civil Relief Act, (iii) the procedures followed with respect to non-

judicial foreclosures were in accordance with the terms of the mortgage  loan and state law;

(iv) the foreclosure occurred when the borrower had a loan modification request under

consideration or while the loan was performing under a trial or permanent loan modification,

(v) impermissible charges were applied to the borrower's account, and (vi) any errors or

omissions were identified by the independent consultant that resulted in financial injury to the

borrower or owner of a loan.  See Consent Order ¶ 3(a)(i)-(vii); see also Marano Decl. ¶ 4.

13.    Upon completion of the FRB Foreclosure Review, the Consent Order

requires that the independent consultant prepare and submit a report (the "**Foreclosure Review**

**Report**") to the Debtors, AFI and the Federal Reserve Bank of Chicago.  Consent Order ¶ 3(b).

Based on the Foreclosure Review Report, GMAC Mortgage is required to prepare a plan to

---

[1] The Federal Reserve Bank of Chicago led the investigation on behalf of the FRB.

[2] Although GMAC Mortgage is primarily responsible for conducting the FRB Foreclosure Review, AFI agreed to be
secondarily liable in the event that GMAC Mortgage fails to complete the review.  See *Notice of Filing
Supplemental Exhibits to Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and
Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure
Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent
Order and (II) Reaffirming Relief Granting in the GA Servicing Order* [Docket No. 1527, Exhibit 10 at 2-3].
Additionally, AFI agreed to be jointly and severally liable with GMAC Mortgage under PwC's engagement letter.
Id., Exhibit 9 at 4.

remediate any issues discovered during the FRB Foreclosure Review.  Consent Order ¶ 3(c).

Thus, GMAC Mortgage is required to, among other things:

- Reimburse or otherwise provide appropriate remediation to the borrower for any impermissible or otherwise unreasonable penalties, fees, or expenses, or for other financial injury identified in the Consent Order;

- Make appropriate adjustments for the account of Ally Bank, the GSEs, or any other investor; and

- Make remediation payments within 60 days after the FRB's acceptance of the prepared remediation plan.

Id.

14.     Both the scope of the FRB Foreclosure Review and the costs associated

with performing the review continually have been increasing during the course of the review

process.  See Marano Decl. ¶¶ 6-7.  The Debtors estimated that, as of the Petition Date, the

performance of the FRB Foreclosure Review may cost as much as $180 million.  Whitlinger

Affidavit ¶ 87.  By August, the Debtors' estimate of the cost of the FRB Foreclosure Review had

risen to $250 million.[3]  Since August, the FRB has imposed still further changes to the scope of

the FRB Foreclosure Review, and the Debtors believe that the cost of the review (and

remediation of any borrower harm) may balloon still further if nothing is done to stem the costs,

perhaps reaching $415 to $459 million.  See Marano Decl. ¶ 8-9.

15.     The increasing costs of conducting the FRB Foreclosure Review are due,

in large part, to the continued extension of the time period during which borrowers may

"complain," or request that their loan be reviewed through the FRB Foreclosure Review process.

Marano Decl. ¶ 7.  The opt-in window was originally scheduled to close in April 2012, but was

---

[3] See Declaration of Joseph A. Pensabene in Support of Debtors' Motion for Entry of an Order Under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (i) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Federal Reserve Board Consent Order and (ii) Reaffirming Relief Granted in the GA Servicing Order ¶ 9 [Docket No. 1357, Exhibit 4].

subsequently extended at least three times through the end of 2012.  Id.  Moreover, to date the

FRB has yet to confirm with the Debtors that the opt-in window is now closed.  Id.  These

extensions resulted in receipt of approximately 20,000 additional borrower complaints[4] and the

expense attendant with evaluating those complaints.  Id.

16.     Similarly, the costs have increased substantially as a result of a lack of

clarity regarding the exact review parameters.  Marano Decl. ¶ 8.  The continuously changing

parameters of the review have increased the time required for PwC to review each file, resulting

in substantially increased costs on a per file basis.  Id.

**D.     The GA Servicing Motion and Order[5]**

17.     In their first day pleadings, including the Whitlinger Affidavit and the GA

Servicing Motion, the Debtors described the requirements for compliance with the terms of the

Consent Order.  See Whitlinger Affidavit ¶¶ 85-89.  Additionally, the Debtors provided their best

estimate regarding the potential costs of compliance with the Consent Order and certain other

regulatory obligations.  See Whitlinger Affidavit ¶ 87; GA Servicing Motion ¶ 37.  In the GA

---

[4] As of the end of April 2012, the Debtors had received approximately 8,450 complaints.  Marano Decl. ¶ 7.  By the end of December 2012, the number of complaints received reached approximately 27,000.  Id.

[5] The "**GA Servicing Motion**" refers to the *Debtors' Motion for Interim and Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief* [Docket No. 57] and the "**GA Servicing Order**" refers to the *Final Order Under Sections 105(a), 361, 362, 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Business (A) Servicing Governmental Association Loans and (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, and Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Professionals; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims and Related Counter-Claims in Foreclosure and Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; and (V) Granting Related Relief* [Docket No. 401].

8

Servicing Order, the Court authorized the Debtors to continue to comply with the Consent Order.

GA Servicing Order ¶ 3.

###### E.    The PwC, Pepper Hamilton, and Hudson Cook Retentions

18.    On September 5, 2012, the Debtors filed an application [Docket No. 1357]

seeking to retain PwC to act as independent consultant for the FRB Foreclosure Review.

Thereafter, on September 12, 2012, the Debtors filed applications to retain Hudson Cook, LLP

[Docket No. 1427], and Pepper Hamilton LLP [Docket No. 1426] to provide PwC with legal

assistance in connection with its FRB Foreclosure Review engagement.

19.    On October 11, 2012, the Court entered interim orders approving the

retention of these three professionals [Docket Nos. 1797 – 1799] and on January 14, 2013, the

Court entered second interim orders [Docket Nos. 2620 – 2622] approving the continued

engagement of these professionals on an interim basis.

20.    These professionals continue to provide costly professional services in

connection with the FRB Foreclosure Review.

###### F.    The FRB and Other Governmental Entities Reach a Settlement Permitting Servicers to Pay Money in Resolution of their Foreclosure Review Obligations

21.    On January 7, 2013, the Federal Reserve Board announced a resolution of

foreclosure review requirements contained in consent orders with ten major non-debtor mortgage

servicers.[6]  Marano Decl. ¶ 10.  The related consent orders and the foreclosure review

requirements contained in those orders are nearly identical to the Debtors' Consent Order and

FRB Foreclosure Review requirement.  Id.  A sampling of the foreclosure review requirements

---

[6] *See* Independent Foreclosure Review to Provide $3.3 Billion in Payments, $5.2 Billion in Mortgage Assistance, http://www.federalreserve.gov/newsevents/press/bcreg/20130107a.htm (the "**FRB Press Release**").

contained in five of those non-debtor mortgage servicer consent orders is attached to this Motion as Exhibit 4.

22.     Under the settlement, "fulfillment of the agreement [by the ten participating mortgage servicers] would meet the requirements of the enforcement actions that mandated that servicers retain independent consultants to conduct an Independent Foreclosure Review . . . . As a result of this agreement, the participating servicers would cease the Independent Foreclosure Review which involves case-by-case reviews, and replace it with a broader framework allowing eligible borrowers to receive compensation significantly more quickly" Id. The settlement further dictates that a payment agent will be appointed to administer payments. Id.

## RELIEF REQUESTED

23.     By this Motion, the Debtors seek entry of an order, pursuant to Bankruptcy Code section 362(a) and Bankruptcy Rule 3013, determining that (i) GMAC Mortgage's obligation to conduct the FRB Foreclosure Review represents a general unsecured claim for purposes of any chapter 11 plan proposed in the Debtors' chapter 11 cases, and (ii) the automatic stay applies to prevent the FRB, FDIC, and other governmental entities from taking any action to enforce GMAC Mortgage's obligation to continue conducting the FRB Foreclosure Review.

## BASIS FOR RELIEF

**A.     Rule 3013 Allows the Court to Determine the Classification of a Claim Ahead of the Filing of a Plan of Reorganization**

24.     Bankruptcy Rule 3013 provides, in pertinent part, "[f]or the purposes of the plan and its acceptance, the court may, on motion after hearing on notice as the court may

direct, determine classes of creditors and equity security holders pursuant to []§ 1122 . . . of the Code." Bankruptcy Rule 3013.

25.    "Issues of claim classification raised pursuant to a [Bankruptcy] Rule 3013 may be ripe for determination prior to a confirmation hearing." In re 500 Fifth Ave. Assocs., 148 B.R. 1010, 1017 (Bankr. S.D.N.Y. 1993), aff'd, No. 93-844, 1993 WL 316183(LJF) (S.D.N.Y. May 21, 1993); see also  Ad. Comm. Notes, Bankruptcy Rule 3013.  Bankruptcy Rule 3013 does "not change the standards" set forth in Section 1122, but indicates that it "may be desirable or necessary to establish proper classification before a plan can be formulated."  Ad. Comm. Notes, Bankruptcy Rule 3013; In re Weiss-Wolf, Inc., 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986) (noting that classification need not only be raised at confirmation).

26.    Given the extremely high costs of conducting the FRB Foreclosure Review, the Debtors seek a determination regarding the appropriate classification of the obligation.  The FRB Foreclosure Review is now costing GMAC Mortgage's chapter 11 estate approximately $300,000 per day, and the total cost of the FRB Foreclosure Review (and any associated remediation) is expected to reach $415 to $459 million.  Marano Decl. ¶ 9.  The funds available for other creditors of the Debtors' estates will be reduced drastically if the FRB Foreclosure Review is allowed to maintain its guise as a priority administrative expense.  As described below, the Debtors believe that the FRB Foreclosure Review obligation represents a general unsecured claim.  Payment of this claim on its proper unsecured basis would substantially increase the dividend to other general unsecured creditors and could have a considerable effect on the Debtors' ability to propose a chapter 11 plan supported by their major constituents.  Moreover, a determination now that the FRB Foreclosure Review obligation is a general unsecured claim will stem an unbelievable drain on estate funds.

27.     For these reasons, the Debtors believe it is appropriate to seek from the

Court a determination regarding the proper classification of the FRB Foreclosure Review

obligation.

**B.     The FRB Foreclosure Review Obligation is a "Claim" Within the Meaning of Bankruptcy Code Section 101(5)**

28.     This Court has noted that the Debtors must prospectively comply with all

applicable laws, and the Debtors agree.  Moreover, the Debtors generally recognize their

affirmative obligation to comply with the orders of courts and other governmental entities

designed to ensure the Debtors' prospective compliance with the law.  The FRB Foreclosure

Review obligation, on the other hand, is an obligation imposed to remediate past wrongs

allegedly committed by GMAC Mortgage and its subsidiaries.  Accordingly, the FRB

Foreclosure Review portion of the Consent Order is not afforded the same protections as other

portions of the Consent Order.[7]  Instead, the existence of a viable payment alternative to satisfy

the obligation – as evidenced by the recent settlements entered into between the FRB, FDIC,

OCC, and other mortgage servicers – renders the obligation a "claim" under the Bankruptcy

Code.

29.     Bankruptcy Code section 101(5) states, in relevant part:

The term "claim" means—

 . . . .

(B) right to an equitable remedy for breach of performance if such breach gives
rise to a right to payment, whether or not such right to an equitable remedy is

---

[7] While the Debtors recognize that, to some extent, the prospective obligations imposed by the Consent Order may have been entitled to more protection than the retrospective FRB Foreclosure Review, the Debtors implemented policies and procedures in fulfillment of the prospective obligations and continued to comply with such obligations through the closing of the sale of their servicing platform.  See Marano Decl. ¶ 3.  Therefore, the Debtors believe that they have fulfilled their prospective obligations under the Consent Order.

reduced to judgment, fixed, contingent, matured, unmatured, disputed,
undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

30. Section 101(5)(B) encompasses a "right to an equitable remedy that can be
satisfied by an 'alternative' right to payment." Matter of Udell, 18 F.3d 403, 407 (7th Cir. 1994);
see also In re Oldco M Corp., 438 B.R. 775, 782 (Bankr. S.D.N.Y. 2010) (Glenn, J.) (quoting In
re Chateaugay Corp., 944 F.2d at 1008); 124 Cong. Rec. 32393 (1978) (remarks of Rep.
Edwards) (Section 101(5) "is intended to cause the liquidation or estimation of contingent rights
of payment for which there may be an alternative equitable remedy with the result that the
equitable remedy will be susceptible to being discharged in bankruptcy.").

31. The Second Circuit, in In re Chateaugay Corp., considered the contours of
the definition of "claim" in the context of an equitable remedy analogous to the FRB Foreclosure
Review – an injunction requiring a debtor to take affirmative steps to remediate pollution. In re
Chateaugay Corp., 944 F.2d at 1008. The Debtor there, LTV Corporation ("**LTV**"), was subject
to certain prepetition environmental remediation injunctions, requiring it to pay for and conduct
remediation efforts at several of its sites. See id. at 1000-01. LTV informed the Environmental
Protection Agency ("**EPA**") upon its bankruptcy filing that it expected those obligations to be
discharged as part of a plan of reorganization. Id. at 1000. The EPA responded by seeking a
declaratory judgment that LTV's obligations under the clean-up injunctions were non-
dischargeable obligations. Id.

32. The Second Circuit concluded that a debtor has a non-dischargeable
obligation to comply with environmental laws. Thus, an injunction requiring, in part, such
compliance was also non-dischargeable. In re Chateaugay, 944 F.2d at 1008-09 (citing
Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Protection, 474 U.S. 494 (1986)); see also In re

13

Oldco M Corp., 438 B.R. at 782.  The Second Circuit explained that an environmental clean-up

order issued under the Comprehensive Environmental Response, Compensation and Liability

Act ("**CERCLA**") represented a non-dischargeable obligation  to the extent that it "accomplishes

the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing

pollution emanating from such wastes."  In re Chateaugay, 944 F.2d at 1008.

33.    The Second Circuit, however, concluded that an order to clean up a site is

a claim under Bankruptcy Code section 101(5) "to the extent that it imposes obligations distinct

from any obligation to stop or ameliorate ongoing pollution . . . if the creditor obtaining the order

had the option, which CERCLA confers, to . . . sue for response costs, thereby converting the

injunction into a monetary obligation."  Id.; see also In re Oldco M Corp., 438 B.R. at 780

(cleanup costs for contamination arising from prepetition conduct – even if those costs have not

yet been incurred – meet the definition of claims under section 101(5) and could be discharged as

part of a bankruptcy case).  In other words, an "[a]n injunction that does no more than impose an

obligation entirely as an alternative to a payment right is dischargeable."  In re Chateaugay, 944

F.2d at 1008.  Thus, any portion of an injunction requiring a debtor to do nothing more to

remediate for past transgressions is a "claim" under Bankruptcy Code section 101(5) if it could

alternatively be satisfied by a monetary payment.

1.    **The FRB Foreclosure Review, an Equitable Remedy, is Not Intended to End or Ameliorate Ongoing Violations of the Law**

34.    As with a typical environmental injunction, the Consent Order imposed a

variety of obligations with which the Consent Order Debtors complied.  Some of the Consent

Order obligations were aimed at "stopping or ameliorating" potential ongoing violations of state

and federal laws governing foreclosures of mortgage loans.  Such obligations included:

- Maintaining a single point of contact program permitting borrowers to contact a single employee with inquiries regarding their loans;

14

- Implementing processes for managing and monitoring third party vendors; and
- Implementing and maintaining controls and oversight with respect to the Mortgage Electronic Registration System ("**MERS**") and MERS' membership rules.

Consent Order ¶¶ 5, 6, and 9. These portions of the Consent Order were much like the portions of environmental injunctions aimed at stopping ongoing pollution, which the Second Circuit determined were non-claims. These obligations – which were aimed at ensuring that any past missteps were not repeated after entry into the Consent Order and that the Debtors were continuing to conduct their servicing activities in compliance with state and federal law – are not addressed by this motion. The Debtors complied with these obligations by implementing the required policies and procedures and continuing to comply with such obligations through the closing of the sale of their servicing platform. See Marano Decl. ¶ 3.

35.    The FRB Foreclosure Review, on the other hand, is aimed squarely at remediating past wrongs, which have no prospective effect on the Debtors' compliance with foreclosure laws. This obligation is like the "claim" provisions of environmental injunctions, aimed at remedying past conduct. The clear distinction between the types of obligations contained in the Consent Order makes the analysis of these obligations easier than the analysis of the environmental clean-up injunction in the Chateaugay case. The obligations imposed by the Consent Order do not involve the type of latent, overlapping obligations arising from past deposits of pollutants that may in the future leak, resulting in a violation of the law. They were either clearly prospective, or clearly retrospective.

36.    The Chateaugay court explained that injunctions that require remediation for past debtor conduct "distinct from any obligation to stop or ameliorate ongoing" violations of the law are claims in bankruptcy. In re Chateaugay, 944 F.2d at 1008. The FRB Foreclosure Review falls squarely within this category of obligations. The FRB Foreclosure Review requires

15

the independent consultant to review actions and proceedings "pending at any time from January 1, 2009 to December 31, 2010" and make remediation for any past wrongful conduct by GMAC Mortgage uncovered through the review.  Consent Order ¶¶ 3(a), 4(a).  The FRB Foreclosure Review does not have any component that looks forward, attempting to ensure continuing compliance with foreclosure laws.  The FRB Foreclosure Review obligation is entirely distinct from the other obligations imposed by the Consent Order that, as described above, were designed to ensure future compliance with foreclosure laws.

37.    The FRB Foreclosure Review requirement – intended solely to remediate for prepetition conduct and not to ensure continued prospective compliance with the law – is, therefore, a Bankruptcy Code section 101(5) claim if the FRB and FDIC had an alternative "right to payment".  See In re Chateaugay, 944 F.2d at 1008 ("to the extent that [an injunction] imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, [it] is a 'claim' if the creditor obtaining the order had the option [to] . . . sue for response costs"); see also Mark IV Indus. v. N.M. Envtl. Dep't (In re Mark IV Indus.), 438 B.R. 460, 468-69 (Bankr. S.D.N.Y. 2010) (an environmental clean-up injunction with a "discrete obligation[]" to cleanup accumulated wastes is a claim if the claimant had the option of seeking reimbursement from the debtor), aff'd, 459 B.R. 173 (S.D.N.Y. 2011).

**2.    An Available Alternative "Right to Payment" Exists, Rendering the FRB Foreclosure Review a "Claim"**

38.    As explained by the Chateaugay Court, "[a]n injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargeable." In re Chateaugay, 944 F.2d at 1008; see also Route 21 Assocs. Of Belleville, Inc. v. MHC, Inc., No. 12 Civ. 5361 (PAE), 2012 WL 6625280, at *12 (S.D.N.Y. Dec. 19, 2012) (discharging injunctions capable of being monetized furthers bankruptcy goals).  Consistent with this policy,

16

the court in <u>Route 21 Assocs. Of Belleville, Inc. v. MHC, Inc.</u> recently explained that "a

claimant's right to certain equitable remedies constitutes a 'claim' if an award of monetary

damages is a 'viable alternative' to the equitable remedy sought." 2012 WL 6625280, at **11-

12 (collecting cases). The right to an equitable remedy is a dischargeable claim where monetary

relief is neither unrealistic nor incalculable. <u>Id.</u>

        39.     Recent actions taken by the FRB and FDIC reveal that the FRB

Foreclosure Review requirement can be satisfied by a monetary payment that is neither

unrealistic nor incalculable. In recent weeks, the FRB and FDIC announced settlements with

other major mortgage servicers doing just that. On January 7, 2013, the FRB and the OCC

announced that ten major mortgage servicers would collectively make $3.3 billion in payments

to a paying agent, and providing $5.2 billion in other borrower assistance. <u>See</u> FRB Press

Release; <u>see</u> <u>also</u> Marano Decl. ¶ 10. "[F]ulfillment of the agreement [by the ten participating

mortgage servicers] would meet the requirements of the enforcement actions that mandated that

servicers retain independent consultants to conduct an Independent Foreclosure Review." <u>Id.</u>

The settlement, resolving foreclosure reviews contained in consent orders nearly identical to the

one entered into by the Consent Order Debtors, provides clear evidence that the FRB Foreclosure

Review obligation may be satisfied by an alternative "right to payment," thus rendering the

obligation a claim under Bankruptcy Code section 101(5).

    **C.**    **The FRB Foreclosure Review Claim is a General Unsecured Claim Not
Entitled to Priority Under the Bankruptcy Code**

        **1.**    **The FRB Foreclosure Review Claim is Not Entitled to Administrative
Expense Priority Under Bankruptcy Code Section 503(b)**

        40.     As this Court has noted, the determination whether an obligation is

entitled to "administrative expense priority under sections 503(b)(1)(A) and 507(a)(2) does not

depend on the definition of the term 'claim.'" <u>In re Oldco M Corp.</u>, 438 B.R. at 780. Likewise,

17

the fact that an obligation is not dischargeable does not necessarily mean it is allowable as an administrative expense.  See id. at 782-83.  Instead, in order to obtain an administrative expense priority, the claimant must show that "the expense: (1) arises out of a transaction between creditor and bankruptcy estate; and (2) that the expense was a 'necessary' expense of the bankruptcy estate by showing the debt directly and substantially benefitted the estate."  Helen-May Holdings, LLC v. Geltzer (In re Kollel Mateh Efraim, LLC), 456 B.R. 185, 192 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).

41.    "Because administrative expenses receive a priority under section 507(a)(2), they diminish the possible recovery for unsecured creditors and should not be allowed unless a creditor satisfies its burden of proof."  In re Oldco M Corp., 438 B.R. at 781-82 (quoting In re Hemingway Transp. Inc., 954 F.2d 1, 4–5 (1st Cir. 1992) ("The traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses")); see also Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.").  "'If one claimant is to be preferred over others, the purpose should be clear from the statute.'"  Id. at 101 (quoting Nathanson v. N.L.R.B., 344 U.S. 25, 29 (1952)).

42.    The claim arising out of GMAC Mortgage's FRB Foreclosure Review obligation neither arose out of a transaction between a creditor and the bankruptcy estate nor is a "necessary" expense, substantially benefiting the estate.  "A debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate."  McFarlin's, 789 F.2d at 101.  Instead in order to qualify for administrative expense

18

priority, the expense must "arise[] out of a transaction between the creditor and the . . . debtor in possession." Id. The FRB Foreclosure Review obligation arose, at the latest, when the parties entered into the Consent Order. This occurred on April 13, 2011, long before the Debtors' estates came into existence. See Goldman, Sachs & Co. v. Esso Virgin Is., Inc. (In re Duplan Corp.), 212 F.3d 144, 151 (2d Cir. 2000) (a claim arises when "the relationship between the debtor and the creditor contain[s] all of the elements necessary to give rise to a legal obligation") (internal quotation marks and citation omitted). Accordingly, the FRB Foreclosure Review obligation is not entitled to administrative expense status.

43.    Moreover, even if arising out of a transaction between a creditor and the bankruptcy estate, an expense must be actual and necessary to preserving the estate. 11 U.S.C. § 503(b)(1)(A); see also In re Oldco M Corp., 438 B.R. at 785. Continuation of the FRB Foreclosure Review is not necessary to preserving the Debtors' estates and will, instead drastically reduce estate assets available for distribution to creditors. In this regard, the Court may once again look to environmental law for direction. The Second Circuit concluded in Chateaugay that remediation costs incurred postpetition with respect to sites then owned by LTV were entitled to administrative expense priority. The clean-up was required to ensure ongoing compliance with environmental laws and, thus, preserve the estate. In re Chateaugay, 944 F.2d at 1010; see also Compass Bank v. N. Am. Petroleum Corp. USA (In re N. Am. Petroleum Corp.), 445 B.R. 382, 401-02 (Bankr. D. Del. 2011). However, where an entity no longer owns the site, the environmental agencies are not entitled to an administrative expense claim because at that point, the environmental agency seeks only monetary reimbursement. In re Insilco Techs., Inc., 309 B.R. 111, 116 (Bankr. D. Del. 2004).

19

### 2. The FRB Foreclosure Review Claim is Not Otherwise Entitled to Priority Under Bankruptcy Code section 507(a)

44. Section 507 of the Bankruptcy Code sets forth a list of claims that have priority in a bankruptcy case. Accordingly, the holders of the FRB Foreclosure Review claim may obtain priority over claims of other unsecured creditors if such holders' claim falls within the scope of any category listed in Bankruptcy Code section 507(a). However, none of the provisions of 507(a) are applicable to the FRB Foreclosure Review obligation.[8]

45. Accordingly, the FRB Foreclosure Review obligation is not entitled to administrative expense or other priority and, therefore, must be treated as a general unsecured claim.

### D. The FRB and FDIC are Prohibited by the Automatic Stay From Enforcing Their General Unsecured Claim Against the Debtors

46. Bankruptcy Code section 362(a) arises by operation of law and precludes the "commencement or continuation [of] . . . administrative, or other action[s] or proceeding[s] . . to recover a claim against the debtor," "any act to collect, assess, or recover a claim against the debtor," and "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate". 11 U.S.C. § 362(a)(1), (3), and (6).

47. In In re Colonial Realty, Co., the Second Circuit considered the applicability of the automatic stay to FDIC actions taken under 12 U.S.C. § 1821, a statute that is part of the same integrated statutory scheme dealing with the administration and enforcement of

---

[8] Bankruptcy Code section 507(a)(2) does give second priority to "unsecured claims of any Federal reserve bank related to loans made through programs or facilities authorized under section 13(3) of the Federal Reserve Act (12 U.S.C. 343) . . . ." 11 U.S.C. 507(a)(2). Section 13(3) of the Federal Reserve Act deals with unsecured claims arising from the Federal Reserve Banks' lending to bank and non-bank financial institutions during times of exigent circumstances, such as through the Troubled Asset Relief Program. See The Federal Reserve's § 13(3) [12 U.S.C. § 343(3)] Lending Facilities to Support Overall Market Liquidity: Function, Status, and Risk Management at 95 (Nov. 2010), located at http://www.federalreserve.gov/oig/files/FRS_Lending_Facilities_Report_final-11-23-10_web.pdf. It is not applicable to the Consent Order obligations.

ny-1074781

Federal deposit insurance coverage as 12 U.S.C. § 1818 (under which the Consent Order was

issued). FDIC v. Hirsch (In re Colonial Realty, Co.), 980 F.2d 125 (1992). In that case, the

FDIC brought a fraudulent transfer action in a non-bankruptcy forum under the Federal Deposit

Insurance Act, seeking to recover property allegedly fraudulently transferred by the debtors, in

partial satisfaction of debts owed to the FDIC by the debtors. Id. at 127-128, 131-132. When the

FDIC argued that the automatic stay did not apply to its action as a result of provisions of the

Federal Deposit Insurance Act, the Second Circuit disagreed. The Second Circuit explained that

"the automatic stay is imposed by Congressional mandate" and is "'applicable to all entities,'

without any need for intervention of any court or ruling." Id. at 137. As a result, the Second

Circuit concluded that the automatic stay was applicable to the FDIC and prevented the FDIC's

attempt to recover on a claim against the debtors. Id. As in Colonial Realty, any attempt by the

FRB or FDIC to take action prevented by the stay – including exercising control over estate

property by requiring GMAC Mortgage to continue to perform the FRB Foreclosure Review – is

stayed.

> 48.    Furthermore, Bankruptcy Code section 362(b)(4)'s police and regulatory

exception to the automatic stay does not apply to the FRB Foreclosure Review. While

Bankruptcy Code section 362(b)(4) preserves the rights of governmental entities to continue

prosecuting actions in the exercise of their police and regulatory powers, it specifically prevents

enforcement of money judgments imposed by governmental entities through administrative

proceedings. See NLRB v. 15th Ave. Iron Works, Inc., 964 F.2d 1336 (2d Cir. 1992) (permitting

the NLRB to continue with its administrative proceeding against an employer but indicating that

Bankruptcy Code section 362(b)(4) prevented enforcement of any money judgment); see also

SEC v. Brennan, 230 F.3d 65, 71 (2d Cir. 2000) (order directing a debtor to repatriate funds in

21

accordance with the instructions of the SEC fit within the exception to the police and regulatory

exception preventing governmental entities from collecting money judgments).

       49.    The FRB Foreclosure Review represents an effort to collect a money

judgment imposed by governmental entities through an administrative proceeding.  The

administrative proceeding leading up to the entry of the Consent Order has long since ended.  At

this point, the FRB and FDIC are attempting to enforce a claim arising out of those

administrative proceedings.  Just like a monetary or other claim arising from any court or

administrative order, enforcement of this obligation is not excepted from application of the

automatic stay by the police and regulatory exception of Bankruptcy Code section 362(b)(4).

Accordingly, the Debtors submit that the automatic stay applies to prevent the

enforcement of the FRB Foreclosure Review obligation against any of the Debtors and

respectfully request that the Court so conclude.

22

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit 1, determining (i) that GMAC Mortgage's

obligation to complete the FRB Foreclosure Review is a general unsecured claim for purposes of

any plan proposed in these chapter 11 cases and (ii) that the automatic stay applies to prevent the

FRB and FDIC from attempting to enforce their general unsecured claim against GMAC

Mortgage.

New York, New York
Dated: February 27, 2013

/s/  Gary S. Lee
Gary S. Lee
Lorenzo Marinuzzi
Stefan W. Engelhardt
James A. Newton
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
Debtors in Possession*

23