# EXHIBIT 4

**Exemplars of Foreclosure Review Requirements**

## **TABLE OF CONTENTS**

1.  **Bank of America, N.A.**

2.  **Citibank, N.A.**

3.  **JP Morgan Chase & Co. and EMC Mortgage Corporation**

4.  **SunTrust Banks, Inc., SunTrust Bank, and SunTrust Mortgage, Inc.**

5.  **Wells Fargo Bank, N.A.**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | |
| ) | AA-EC-11-12 |
| Bank of America, N.A. ) | |
| Charlotte, NC ) | |
| ) | |
| ) | |

**CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage

servicers, has conducted an examination of the residential real estate mortgage foreclosure

processes of Bank of America, N.A., Charlotte, NC ("Bank").  The OCC has identified certain

deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's

initiation and handling of foreclosure proceedings.  The OCC has informed the Bank of the

findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a Stipulation and Consent to the Issuance of a Consent Order, dated April 13, 2011

("Stipulation and Consent"), that is accepted by the Comptroller.  By this Stipulation and

Consent, which is incorporated by reference, the Bank has consented to the issuance of this

Consent Cease and Desist Order ("Order") by the Comptroller.  The Bank has committed to

taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound

practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2)  The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.


ARTICLE VII

FORECLOSURE REVIEW

(1)  Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio.  The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

(2)  Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

14

(a)  the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank.  The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b)  expertise and resources to be dedicated to the Foreclosure Review;

(c)  completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3)  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a)  whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

15

(b)  whether the foreclosure was in accordance with applicable state and federal

law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c)  whether a foreclosure sale occurred when an application for a loan

modification or other Loss Mitigation was under consideration; when the loan was performing in

accordance with a trial or permanent loan modification; or when the loan had not been in default

for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan

documents and related agreements;

(d)  whether, with respect to non-judicial foreclosures, the procedures followed

with respect to the foreclosure sale (including the calculation of the default period, the amounts

due, and compliance with notice periods) and post-sale confirmations were in accordance with

the terms of the mortgage loan and state law requirements;

(e)  whether a delinquent borrower's account was only charged fees and/or

penalties that were permissible under the terms of the borrower's loan documents, applicable

state and federal law, and were reasonable and customary;

(f)  whether the frequency that fees were assessed to any delinquent borrower's

account (including broker price opinions) was excessive under the terms of the borrower's loan

documents, and applicable state and federal law;

(g)  whether Loss Mitigation Activities with respect to foreclosed loans were

handled in accordance with the requirements of the HAMP, and consistent with the policies and

procedures applicable to the Bank's proprietary loan modifications or other loss mitigation

programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation

option or program, any such application was handled properly, a final decision was made on a

reasonable basis, and was communicated to the borrower before the foreclosure sale; and

(h)  whether any errors, misrepresentations, or other deficiencies identified in the

Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the

Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of

completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report

shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy

Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy

Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all

financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies

identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for

impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in

accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the

foreclosure was not authorized as described in this Article.

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan

set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation

payments and provide all credits required by such plan, and provide the OCC with a report

detailing such payments and credits.

## UNITED STATES OF AMERICA
## DEPARTMENT OF THE TREASURY
## COMPTROLLER OF THE CURRENCY

| | ) | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | AA-EC-11-13 |
| Citibank, N.A. | ) | |
| Las Vegas, Nevada | ) | |
| | ) | |
| | ) | |

## CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage

servicers, has conducted an examination of the residential real estate mortgage foreclosure

processes of  Citibank, N.A., Las Vegas, Nevada ("Bank").  The OCC has identified certain

deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's

initiation and handling of foreclosure proceedings.  The OCC has informed the Bank of the

findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011

("Stipulation and Consent"), that is accepted by the Comptroller.  By this Stipulation and

Consent, which is incorporated by reference, the Bank has consented to the issuance of this

Consent Cease and Desist Order ("Order") by the Comptroller.  The Bank has committed to

taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound

practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

item follow-up, and includes an annual independent test of the control structure of the system-to-

system reconciliation process, the reject/warning error correction process, and adherence to the

Bank's MERS Plan.

(2)  The Bank shall include MERS and MERSCORP in its third-party vendor

management process, which shall include a detailed analysis of potential vulnerabilities,

including information security, business continuity, and vendor viability assessments.


ARTICLE VII

FORECLOSURE REVIEW

(1)  Within forty-five (45) days of this Order, the Bank shall retain an independent

consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an

independent review of certain residential foreclosure actions regarding individual borrowers with

respect to the Bank's mortgage servicing portfolio.  The review shall include residential

foreclosure actions or proceedings (including foreclosures that were in process or completed) for

loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage

note holder, or any agent for the mortgage note holder (including MERS), that have been

pending at any time from January 1, 2009 to December 31, 2010, as well as residential

foreclosure sales that occurred during this time period ("Foreclosure Review").

(2)  Within fifteen (15) days of the engagement of the independent consultant described

in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit

to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that

sets forth:

14

(a)  the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank.  The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b)  expertise and resources to be dedicated to the Foreclosure Review;

(c)  completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3)  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a)  whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

15

(b)  whether the foreclosure was in accordance with applicable state and federal

law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c)  whether a foreclosure sale occurred when an application for a loan

modification or other Loss Mitigation was under consideration; when the loan was performing in

accordance with a trial or permanent loan modification; or when the loan had not been in default

for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan

documents and related agreements;

(d)  whether, with respect to non-judicial foreclosures, the procedures followed

with respect to the foreclosure sale (including the calculation of the default period, the amounts

due, and compliance with notice periods) and post-sale confirmations were in accordance with

the terms of the mortgage loan and state law requirements;

(e)  whether a delinquent borrower's account was only charged fees and/or

penalties that were permissible under the terms of the borrower's loan documents, applicable

state and federal law, and were reasonable and customary;

(f)  whether the frequency that fees were assessed to any delinquent borrower's

account (including broker price opinions) was excessive under the terms of the borrower's loan

documents, and applicable state and federal law;

(g)  whether Loss Mitigation Activities with respect to foreclosed loans were

handled in accordance with the requirements of the HAMP, and consistent with the policies and

procedures applicable to the Bank's proprietary loan modifications or other loss mitigation

programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation

option or program, any such application was handled properly, a final decision was made on a

reasonable basis, and was communicated to the borrower before the foreclosure sale; and

16

(h)  whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

|  |  |
|---|---|
| In the Matter of<br><br>JPMORGAN CHASE & CO.<br>New York, New York<br><br>and<br><br>EMC MORTGAGE CORPORATION<br>Lewisville, Texas | Docket No.    11-023-B-HC<br>11-023-B-DEO |

**CONSENT ORDER**

WHEREAS, JPMorgan Chase & Co., New York, New York ("JPMC"), a registered bank

holding company, owns and controls JPMorgan Chase Bank, National Association, Columbus,

Ohio (the "Bank"), a national bank, and numerous direct and indirect nonbank subsidiaries,

including EMC Mortgage Corporation, Lewisville, Texas ("EMC") and its direct and indirect

subsidiaries;

WHEREAS, JPMC has engaged in the business of servicing residential mortgage loans

through non-bank subsidiaries, including EMC and its subsidiaries (collectively, the "Mortgage

Servicing Companies"), as well as through the Bank.  The Mortgage Servicing Companies have

serviced residential mortgage loans that are held in the portfolios of: (a) EMC and its

subsidiaries; (b) the Federal National Mortgage Association, the Federal Home Loan Mortgage

Corporation, and the Government National Mortgage Association (collectively, the "GSEs"); and

(c) various investors, including securitization trusts pursuant to Pooling and Servicing

or to be taken, to remediate deficiencies in residential mortgage loan servicing, Loss Mitigation,
and foreclosure activities, and to comply with this Order.

**Foreclosure Review**

3.    (a)    Within 45 days of this Order, JPMC and EMC shall retain one or more
independent consultant(s) acceptable to the Reserve Bank to conduct an independent review of
certain residential mortgage loan foreclosure actions (including judicial and non-judicial
foreclosures and related bankruptcy proceedings, and other related litigation) regarding
individual borrowers with respect to the Servicing Portfolio that was serviced by EMC.  The
review shall include actions or proceedings (including foreclosures that were in process or
completed) for residential mortgage loans serviced by the Mortgage Servicing Companies
whether brought in the name of the JPMC, the Mortgage Servicing Companies, the investor, or
any agent for the mortgage note holder (including MERS) that have been pending at any time
from January 1, 2009, to December 31, 2010, as well as residential foreclosure sales that
occurred during this time period ("Foreclosure Review").  The purpose of the Foreclosure
Review shall be to determine, at a minimum:

(i)    whether, at the time the foreclosure action was initiated or the
pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought
by borrowers), the foreclosing party or agent of the party had properly documented ownership of
the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a
proper party to the action as a result of agency or other similar status;

(ii)    whether the foreclosure was in accordance with applicable federal
and state laws, including but not limited to, the Servicemembers Civil Relief Act and the U.S.
Bankruptcy Code;

(iii)    whether, with respect to non-judicial foreclosures, the procedures

followed with respect to the foreclosure sale (including the calculation of the default period, the

amounts due, and compliance with notice periods) and post-sale confirmation were in

accordance with the terms of the mortgage loan and state law requirements;

(iv)    whether a foreclosure sale occurred when the borrower had

requested a loan modification or other loss mitigation and the request was under consideration,

when the loan was performing in accordance with a trial or permanent loan modification, or

when the loan had  not been in default for a sufficient period to authorize foreclosure pursuant to

terms of the mortgage loan documentation and related agreements;

(v)    whether any delinquent borrower's account was charged fees or

penalties that were not permissible under the terms of the borrower's loan documents, state or

federal law, or were otherwise unreasonable.  For purposes of this Order, a fee or penalty is

"otherwise unreasonable" if it was assessed: (i) for the purpose of protecting the secured party's

interest in the mortgaged property, and the fee or penalty was assessed at a frequency or rate,

was of a type or amount, or was for a purpose that was in fact not needed to protect the secured

party's interest; (ii) for services performed and the fee charged was substantially in excess of the

fair market value of the service; (iii) for services performed, and the services were not actually

performed; or (iv) at an amount or rate that exceeds what was customarily charged in the market

for such a fee or penalty, and the mortgage instruments or other documents executed by the

borrower did not disclose the amount or rate that the lender or servicer would charge for such a

fee or penalty;

(vi)    whether Loss Mitigation Activities with respect to foreclosed loans

were handled in accordance with the requirements of HAMP, if applicable, and consistent with

9

the policies and procedures applicable to the Mortgage Servicing Companies' proprietary loan

modifications or other Loss Mitigation programs, such that each borrower had an adequate

opportunity to apply for a Loss Mitigation option or program, any such application was handled

appropriately, and a final decision was made on a reasoned basis and was communicated to the

borrower before the foreclosure sale; and

(vii)    whether any errors, misrepresentations, or other deficiencies

identified in the Foreclosure Review resulted in financial injury to the borrower or the owner of

the mortgage loan.

(b)    The independent consultant(s) shall prepare a written report detailing the

findings of the Foreclosure Review (the "Foreclosure Report").  JPMC and EMC shall provide to

the Reserve Bank a copy of the Foreclosure Report at the same time that the report is provided to

them.

(c)    Within 30 days of receipt of the Foreclosure Report, JPMC and EMC shall

submit to the Reserve Bank an acceptable plan to:

(i)    remediate, as appropriate, errors, misrepresentations, or other

deficiencies in any foreclosure filing or other proceeding;

(ii)    reimburse or otherwise provide appropriate remediation to the

borrower for any impermissible or otherwise unreasonable penalties, fees or expenses, or for

other financial injury identified in paragraph 3 of this Order;

(iii)    make appropriate adjustments for the account of JPMC, the GSEs,

or any investor; and

(iv)    take appropriate steps to remediate any foreclosure sale where the

foreclosure was not authorized as described in paragraph 3.

(d)      Within 60 days after the Reserve Bank accepts the plan described in

paragraph 3(c), the JPMC and EMC shall make all reimbursement and remediation payments and

provide all credits required by such plan, and provide the Reserve Bank with a report detailing

such payments and credits;

(e)      JPMC shall take all steps necessary to ensure that the Bank provides any

cooperation needed by the independent consultant(s) to complete the independent review.

4.      Within 5 days of the engagement of the independent consultant(s) described in

paragraph 3 of this Order, but prior to the commencement of the Foreclosure Review, JPMC and

EMC shall submit to the Reserve Bank for approval an engagement letter that sets forth:

(a)      The methodology for conducting the Foreclosure Review, including:

(i) a description of the information systems and documents to be reviewed, including the

selection criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of

fees and penalties under paragraph 3(a)(v); (iii) other procedures necessary to make the required

determinations (such as through interviews of employees and third parties and a process for the

receipt and review of borrower claims and complaints); and (iv) any proposed sampling

techniques.  In setting the scope and review methodology, the independent consultant may

consider any work already done by JPMC, EMC, or other third-parties on behalf of JPMC or

EMC.  With respect to sampling techniques, the engagement letter shall contain a full description

of the statistical basis for the sampling methods chosen, as well as procedures to increase the size

of the sample depending on the results of initial sampling;

(b)      the expertise and resources to be dedicated to the Foreclosure Review;

(c)      completion of the Foreclosure Review and the Foreclosure Report within

120 days of the start of the engagement; and

(d)    a written commitment that any workpapers associated with the Foreclosure Review will be made available to the Reserve Bank upon request.

**Compliance Program**

5.    Within 60 days of this Order, JPMC shall submit to the Reserve Bank an acceptable written plan to enhance its enterprise-wide compliance program ("ECP") with respect to its oversight of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations.  The enhanced plan shall be based on an evaluation of the effectiveness of JPMC's current ECP in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and recommendations to strengthen the ECP in these areas. The plan shall, at a minimum, be designed to:

(a)    Ensure that the fundamental elements of the ECP and any enhancements or revisions thereto, including a comprehensive annual risk assessment, encompass residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b)    ensure compliance with the Legal Requirements and supervisory guidance of the Board of Governors; and

(c)    ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of the Board of Governors.

**Audit**

6.    Within 60 days of this Order, JPMC shall submit to the Reserve Bank an acceptable written plan to enhance the internal audit program with respect to residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations.  The plan shall be based on an evaluation of the effectiveness of JPMC's current internal audit program in

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>SUNTRUST BANKS, INC.<br>Atlanta, Georgia<br><br>SUNTRUST BANK<br>Atlanta, Georgia<br><br>and<br><br>SUNTRUST MORTGAGE, INC.<br>Richmond, Virginia | Docket No.    11-021-B-HC<br>11-021-B-SM<br>11-021-B-DEO |

### CONSENT ORDER

WHEREAS, SunTrust Banks, Inc., Atlanta, Georgia ("SunTrust"), a registered bank holding company, owns and controls SunTrust Bank, Atlanta, Georgia (the "Bank"), a state-chartered bank that is a member of the Federal Reserve System, and the Bank owns SunTrust Mortgage, Inc., Richmond, Virginia ("SunTrust Mortgage");

WHEREAS, SunTrust Mortgage services residential mortgage loans that are held in the portfolios of (a) the Bank and SunTrust Mortgage; (b) the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association (collectively, the "GSEs"); and (c) various investors, including securitization trusts pursuant to Pooling and Servicing Agreements and similar agreements (collectively, the "Servicing Portfolio"). SunTrust Mortgage has substantial responsibilities with respect to the Servicing Portfolio for the initiation and handling of foreclosure proceedings and

servicing, Loss Mitigation, and foreclosure activities and operations are comprehensively

reviewed and remedied; and

        (l)      steps to improve the information and reports that will be regularly

reviewed by SunTrust's, the Bank's, and SunTrust Mortgage's boards of directors to assess the

performance of mortgage servicing, Loss Mitigation, and foreclosure activities and operations, as

well as the risk management and compliance programs and associated functions including,

compliance risk assessments, and the status and results of measures taken, or to be taken, to

remediate mortgage servicing, Loss Mitigation, and foreclosure deficiencies, and to comply with

this Order.

**Foreclosure Review**

        3.      (a)      Within 45 days of this Order, the Bank and SunTrust Mortgage shall retain

one or more independent consultant(s) acceptable to the Reserve Bank to conduct an independent

review of certain residential foreclosure actions (including judicial and non-judicial foreclosures

and related bankruptcy proceedings, and other related litigation) regarding individual borrowers

with respect to the Servicing Portfolio. The review shall include actions or proceedings

(including foreclosures that were in process or completed) for loans serviced by SunTrust

Mortgage, whether brought in the name of the Bank, SunTrust Mortgage, the investor, or any

agent for the mortgage note holder (including MERS) that have been pending at any time from

January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred

during this time period ("Foreclosure Review"). The purpose of the Foreclosure Review shall be

to determine, at a minimum:

              (i)      whether, at the time the foreclosure action was initiated or the

pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought

by borrowers), the foreclosing party or agent of the party had properly documented ownership of

the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a

proper party to the action as a result of agency or other similar status;

(ii)    whether the foreclosure was in accordance with applicable state

and federal laws, including but not limited to, the Servicemembers Civil Relief Act and the U.S.

Bankruptcy Code;

(iii)    whether, with respect to non-judicial foreclosures, the procedures

followed with respect to the foreclosure sale (including the calculation of the default period, the

amounts due, and compliance with notice periods) and post-sale confirmation were in

accordance with the terms of the mortgage loan and state law requirements;

(iv)    whether a foreclosure sale occurred when the borrower had

requested a loan modification or other loss mitigation and the request was under consideration;

when the loan was performing in accordance with a trial or permanent loan modification; or

when the loan had not been in default for a sufficient period to authorize foreclosure pursuant to

terms of the mortgage loan documentation and related agreements;

(v)    whether any delinquent borrower's account was charged fees or

penalties that were not permissible under the terms of the borrower's loan documents, state or

federal law, or were otherwise unreasonable.  For purposes of this Order, a fee or penalty is

"otherwise unreasonable" if it was assessed: (i) for the purpose of protecting the secured party's

interest in the mortgaged property, and the fee or penalty was assessed at a frequency or rate,

was of a type or amount, or was for a purpose that was in fact not needed to protect the secured

party's interest; (ii)  for services performed and the fee charged was substantially in excess of the

fair market value of the service; (iii)  for services performed, and the services were not actually

performed; or (iv) at an amount or rate that exceeds what is customarily charged in the market

for such a fee or penalty, and the mortgage instruments or other documents executed by the

borrower did not disclose the amount or rate that the lender or servicer would charge for such a

fee or penalty;

(vi)    whether Loss Mitigation Activities with respect to foreclosed loans

were handled in accordance with the requirements of HAMP, if applicable, and consistent with

the policies and procedures applicable to SunTrust Mortgage's proprietary loan modifications or

other Loss Mitigation programs, such that each borrower had an adequate opportunity to apply

for a Loss Mitigation option or program, any such application was handled appropriately, and a

final decision was made on a reasoned basis and was communicated to the borrower before the

foreclosure sale; and

(vii)    whether any errors, misrepresentations, or other deficiencies

identified in the Foreclosure Review resulted in financial injury to the borrower or the owner of

the mortgage loan.

(b)    The independent consultant(s) shall prepare a written report detailing the

findings of the Foreclosure Review (the "Foreclosure Report"). The Bank and SunTrust

Mortgage shall provide to the Reserve Bank a copy of the Foreclosure Report at the same time

that the report is provided to them.

(c)    Within 45 days of receipt of the Foreclosure Report, the Bank and

SunTrust Mortgage shall submit to the Reserve Bank an acceptable plan to:

(i)    remediate, as appropriate, errors, misrepresentations, or other

deficiencies in any foreclosure filing or other proceeding;

11

(ii)    reimburse or otherwise provide appropriate remediation to the

borrower for any impermissible or otherwise unreasonable penalties, fees or expenses, or for

other financial injury identified in paragraph 3 of this Order;

(iii)    make appropriate adjustments for the account of the Bank, the

GSEs, or any investor; and

(iv)    take appropriate steps to remediate any foreclosure sale where the

foreclosure was not authorized as described in paragraph 3.

(d)    Within 60 days after the Reserve Bank accepts the plan described in

paragraph 3(c), SunTrust Mortgage shall make all reimbursement and remediation payments and

provide all credits required by such plan, and provide the Reserve Bank with a report detailing

such payments and credits.

4.    Within 5 days of the engagement of the independent consultant(s) described in

paragraph 3 of this Order, but prior to the commencement of the Foreclosure Review, the Bank,

and SunTrust Mortgage shall submit to the Reserve Bank for approval an engagement letter that

sets forth:

(a)    The methodology for conducting the Foreclosure Review, including:

(i) a description of the information systems and documents to be reviewed, including the

selection criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of

fees and penalties under paragraph 3(a)(v); (iii) other procedures necessary to make the required

determinations (such as through interviews of employees and third parties and a process for the

receipt and review of borrower claims and complaints); and (iv) any proposed sampling

techniques.  In setting the scope and review methodology, the independent consultant may

consider any work already done by SunTrust, the Bank, SunTrust Mortgage or other third-parties

12

on behalf of SunTrust, the Bank, or SunTrust Mortgage.  With respect to sampling techniques, the engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on the results of initial sampling;

(b)      the expertise and resources to be dedicated to the Foreclosure Review;

(c)      completion of the Foreclosure Review and the Foreclosure Report within 120 days of the start of the engagement; and

(d)      a written commitment that any workpapers associated with the Foreclosure Review will be made available to the Reserve Bank upon request.

5.      Within 60 days of receipt of the Foreclosure Report, the Bank and SunTrust Mortgage shall submit to the Reserve Bank acceptable written policies and procedures for residential foreclosure actions.  The policies and procedures shall, address, consider, and include:

(a)      Foreclosure procedures for portfolio loans and each category of serviced loans;

(b)      detailed procedural guidance on all required steps in the foreclosure process;

(c)      standardized desk procedures to ensure that employees involved in the foreclosure processes have sufficient information and personal knowledge to complete assignments of mortgages, affidavits, or other legal documents required for foreclosure proceedings; and

(d)      minimum qualifications for affidavit signers.

# UNITED STATES OF AMERICA
# DEPARTMENT OF THE TREASURY
# COMPTROLLER OF THE CURRENCY

|  |  |  |
|---|---|---|
| **In the Matter of:** | ) ) ) | AA-EC-11-19 |
| Wells Fargo Bank, N.A.<br>Sioux Falls, South Dakota | ) ) ) ) | |

## CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage

servicers, has conducted an examination of the residential real estate mortgage foreclosure

processes of Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank"). The OCC has

identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing

and in the Bank's initiation and handling of foreclosure proceedings. The OCC has informed the

Bank of the findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011

("Stipulation and Consent"), that is accepted by the Comptroller. By this Stipulation and

Consent, which is incorporated by reference, the Bank has consented to the issuance of this

Consent Cease and Desist Order ("Order") by the Comptroller. The Bank has committed to

taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound

practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports.  Unresolved items must be maintained on open-item aging reports and tracked until resolution.  The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

(f)  an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2)  The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

## ARTICLE VII

## FORECLOSURE REVIEW

(1)  Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio.  The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage

note holder, or any agent for the mortgage note holder (including MERS), that have been

pending at any time from January 1, 2009 to December 31, 2010, as well as residential

foreclosure sales that occurred during this time period ("Foreclosure Review").

(2)  Within fifteen (15) days of the engagement of the independent consultant described

in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit

to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that

sets forth:

(a)  the methodology for conducting the Foreclosure Review, including: (i) a

description of the information systems and documents to be reviewed, including the selection of

criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and

penalties; (iii) other procedures necessary to make the required determinations (such as through

interviews of employees and third parties and a process for submission and review of borrower

claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and

review methodology under clause (i) of this sub-paragraph, the independent consultant may

consider any work already done by the Bank or other third-parties on behalf of the Bank.  The

engagement letter shall contain a full description of the statistical basis for the sampling methods

chosen, as well as procedures to increase the size of the sample depending on results of the initial

sampling;

(b)  expertise and resources to be dedicated to the Foreclosure Review;

(c)  completion of the Foreclosure Review within one hundred twenty (120) days

from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure

Review shall be made available to the OCC immediately upon request.

(3)  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a)  whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

(b)  whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c)  whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d)  whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e)  whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f)  whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

16

(g)  whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

(h)  whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

ARTICLE VIII

<u>MANAGEMENT INFORMATION SYSTEMS</u>

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities to ensure the timely delivery of complete and accurate information to permit effective decision-making.  The MIS plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timeframe that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The plan shall include, at a minimum:

(a)  a description of the various components of MIS used by the Bank for foreclosure and Loss Mitigation or loan modification activities;

(b)  a description of and timetable for any needed changes or upgrades to:

(i)  monitor compliance with all applicable Legal Requirements and supervisory guidance, and the requirements of this Order;

(ii)  ensure the ongoing accuracy of records for all serviced mortgages, including, but not limited to, records necessary to establish ownership and the right to foreclose by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to the borrower; and