Hearing Date and Time: March 5, 2013 at 10:00 a.m. (ET)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:   (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren

*Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' OMNIBUS REPLY TO RESPONSES TO (I) DEBTORS' MOTION
PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR
AN ORDER AUTHORIZING THE DEBTORS TO APPOINT LEWIS KRUGER AS
CHIEF RESTRUCTURING OFFICER AND (II) DEBTORS' MOTION FOR THE
ENTRY OF AN ORDER FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO
FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") submit this reply (the "Reply") to responses[1] to the (i) *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to*

---

[1] *Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2997] (the "JSB Objection"); *Response of the Official Committee of Unsecured Creditors to Debtors' Motions for (i) Appointment of a Chief Restructuring Officer and (ii) Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 3042] (the "Committee Response"); and *Statement of Wilmington Trust, National Association in Respect of the Debtors' Motions for Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and for Appointment of Lewis Kruger as Chief Restructuring Officer* [Docket No. 3043] (the "Wilmington Trust Statement," and collectively with the JSB Objection and the Committee Response, the "Responses").

ny-1079278

*Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No. 2887] (the "CRO Motion") and (ii) *Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2918] (the "Exclusivity Motion," and together with the CRO Motion, the "Motions"). In further support, the Debtors respectively allege as follows:

## REPLY

1.    During the Second Exclusivity Extension,[2] the Debtors were unwavering in their mission to create value for their estates and creditors and to develop the framework for a consensual Chapter 11 plan. The progress made in plan negotiations and resulting support for the relief requested in the Motions[3] are both noteworthy and an indication to this Court that the Debtors should continue to lead the remainder of these cases and the Chapter 11 plan process.[4] As a means to ensure continued progress, the Debtors have reached consensus with the Creditors' Committee on a roadmap for resolving important plan issues. The Debtors are confident that working in tandem with the Creditors' Committee during the next stage of these cases will result in continued meaningful progress towards a consensual and confirmable plan.

2.    Under the guidance of the Mediator, the Debtors and their major stakeholders engaged in extensive settlement discussions that primarily focused on the AFI Settlement to the exclusion of intercreditor issues that the Debtors advised this Court and all parties were critical

---

[2] Capitalized terms otherwise not defined herein shall have the meanings ascribed to them in the Motions.
[3] As discussed below, the Creditors' Committee supports a further 60-day extension of exclusivity. The Debtors have amended their request for an extension of their Exclusive Plan Period from 90 days to 60 days as part of an agreement with the Creditors' Committee.
[4] Contrary to the assertions made in the Responses, this case is not simply a garden-variety liquidation. There is still much to be done. During the next stage of these cases, the Debtors will focus on (i) negotiating a consensual and confirmable Chapter 11 plan, (ii) completing their separation from AFI, (iii) reconciling the Asset Sale proceeds (including adjustments), and (iv) administering and/or monetizing the complex assets remaining in the Debtors' estates. Even after the Asset Sales, there remain approximately $1.4 billion in value of assets to be administered. Specifically, the Debtors will need to continue to administer and monetize $1 billion of FHA/VA insured loans. Monetizing and maximizing these assets, along with reconciling and addressing the myriad of claims asserted in these cases, will require a tremendous amount of work and dedication from the Debtors and clearly demonstrates that this case does not end now merely because the Asset Sales have closed.

ny-1079278

to resolve. Although the mediation has not been successful in global resolution of the AFI Settlement thus far, and despite conflicting suggestions made by parties in the Responses, progress has in fact been made under Judge Peck's watch, and mediation is ongoing. Whatever temporary hiccups may have occurred during the Mediator's initial term, the Debtors decline to cast blame on any stakeholder. The Mediator has continued to meet with various parties in interest, and the Debtors are hopeful that the continuing mediation will result in the resolution of important plan issues.

3.  In furtherance of the plan negotiations, the Debtors selected Lewis Kruger to serve as chief restructuring officer, subject to this Court's approval, to lead the Debtors in those discussions. Mr. Kruger will play a vital role in the ongoing mediation and plan process. The Debtors believe that the appointment of Mr. Kruger as CRO will provide the Debtors with critical guidance on plan issues from an independent individual with invaluable and unquestionably vast restructuring experience. Given his credentials, it is not surprising that no party in interest has objected to Mr. Kruger's retention.[5]

4.  Mr. Kruger's goal is to drive all stakeholders towards consensus. The Debtors strongly believe that as part of this process, intercreditor disputes must also be resolved in order to achieve a consensual plan of reorganization. Given the divergent interests of the Debtors' creditors, the resolution of intercreditor issues has proven difficult. Therefore, as a means to continue progressing, Mr. Kruger and the Debtors devised, and shared with the Creditors' Committee, a work plan (the "Work Plan") that focuses on various intercreditor issues. The Work Plan will serve as a guide for the Debtors during the Amended Exclusivity Periods (defined below).

---

[5] In connection with the Progress Plan (defined below), the Debtors have agreed to amend the scope of Mr. Kruger's authority. Amendment No. 1 to the Engagement Letter (the "Amendment"), along with an electronically compared version showing the changes, is attached hereto as Exhibit 1.

3

5.      The Debtors' commitment to advance plan discussions and stimulate intercreditor negotiations has also resulted in an agreement with the Creditors' Committee on various open points (the "Progress Plan")[6] and includes the Creditors' Committee's support for a 60-day extension of the Debtors' exclusive period to file a Chapter 11 plan. The Progress Plan was the result of round-the-clock negotiations between the parties and evidences the commitment of both the Debtors and the Creditors' Committee to the plan process. Given the divergent interests of the Debtors' creditors, it is quite possible that no plan will be fully supported by all creditor constituencies. For that reason, a critical component of the Progress Plan is the Creditors' Committee's pledge to bring parties to the table to participate in negotiations on those intercreditor issues that the Debtors believe are critical for a successful conclusion to these cases.

6.      The only creditor group to oppose the Exclusivity Motion did so with the self-serving intention of attempting to gain control over these cases and enhance their undersecured position. The JSB Objection must be read side by side with the pleading filed by the JSBs just a few days prior to filing the JSB Objection in connection with a motion concerning the priority of securities claims.[7] In the Securities Objection, the JSBs promote the mediation, characterizing it as "ongoing" and request in the Securities Objection that the Court not "upset the nature of the ongoing plan mediation." *See* Securities Objection at 5. In stark contrast to the position taken in the Securities Objection, the JSBs now try to turn the plan negotiations on their head in an attempt to promote that creditor group's own agenda.

---

[6] The Progress Plan was summarized and attached as an exhibit to the Committee Response and discussed on the record at the omnibus hearing held on February 28, 2013.

[7] On February 19, 2013, the Ad Hoc Group of Junior Secured Noteholders (the "JSBs") filed the *Limited Objection of the Ad Hoc Group of Junior Secured Noteholders to the Motion of the AIG Asset Management (U.S.), LLC, the Allstate Entities, Massachusetts Mutual Life Insurance Company, and the Prudential Entities for an Order Under Bankruptcy Rule 3013 (i) Classifying RMBS Fraud Claims in the Same Class as the Securitization Trusts' Claims for the Purposes of any Chapter 11 Plan for the Debtors and (ii) Directing That Misrepresentation Claims Cannot be Placed in a Plan Class That Will be Subordinated Under Bankruptcy Code Section 501(b)* [Docket No. 2957] (the "Securities Objection").

7. The Court should approve the Exclusivity Motion over the JSB Objection. As described in the Exclusivity Motion, the Debtors' satisfaction of the Adelphia Factors warrants a further extension of exclusivity. No party objected to the CRO Motion. Accordingly, the Debtors respectfully request that the Court approve the relief requested therein as well.

<b>DEBTORS' AMENDED REQUEST FOR A<br>FURTHER EXTENSION OF THEIR EXCLUSIVE PERIODS</b>

8. As set forth in the Progress Plan, the Debtors have amended their request (the "<u>Amended Exclusivity Request</u>") for an extension to file a Chapter 11 plan from 90 days to only 60 days, through and including April 30, 2013 (the "<u>Amended Plan Exclusivity Period</u>"), and an extension of the period during which the Debtors have the exclusive right to solicit acceptances thereof through and including July 1, 2013 (the "<u>Amended Exclusive Solicitation Period</u>" and, together with the Amended Plan Exclusivity Period, the "<u>Amended Exclusivity Periods</u>"). A revised proposed order granting the relief requested in the Exclusivity Motion, which reflects the Amended Exclusivity Request, is attached hereto as <u>Exhibit 2</u>. Such extension, if approved, would be without prejudice to the Debtors' right to seek further extensions of the Amended Exclusivity Periods, or the rights of any party to seek to terminate exclusivity.

<b>THE RESPONSES</b>

**A.  The JSB Objection**

9. The JSB Objection, like the JSBs' prior objections to the Debtors' exclusivity requests, attempts to steer the Court down a path on which apparently only the JSBs are headed – one replete with competing plans and open warfare. The statements made in the JSB Objection are in direct contradiction to the statements made in their Securities Objection filed just three days earlier, in which the JSBs recognize the efforts made in mediation. In the Securities Objection, the JSBs oppose the relief requested in the underlying motion so as not to "upset the

5

ny-1079278

nature of the ongoing plan mediation." *See* Securities Objection at 5. They further state, that "Indeed, as part of the ongoing mediation process being administered by Judge Peck, there are ongoing discussions between the Debtors and their key creditor constituencies over multiple potential plan structures, and the precise contours of any plan of reorganization for these chapter 11 cases, to the extent such a plan ever arises, remain uncertain." *See* Securities Objection at 4. Conversely, in the JSB Objection, the JSBs belittle the efforts made during the mediation and state that a plan based on the AFI Settlement "remains the only show in town." *See* JSB Objection at 3.

10. The JSBs also criticize the mediation because principals of the group have not participated. But that is of their own doing. The Mediator advised all potential participants to the mediation that anyone prepared to agree to the confidentiality of the mediation process could participate in the mediation. If principals decided not to participate, it was because they were unwilling to be bound by reasonable confidentiality restrictions, not because the Debtors failed to give them an opportunity to participate. Principals apparently want flexibility to continue to trade in and out of the Debtors' securities. Mediation, however, demands commitment to the plan process.

11. Additionally, in an effort to engage and inform principals that refused to sign confidentiality agreements, the Debtors published certain business information to assist in plan negotiations. To date, the Debtors have published information including balance sheets, which segregate assets by collateral silo,[8] including trial balance sheets as of the Petition Date and as of

---

[8] On September 24, 2012, the Debtors filed the *Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Additional Disclosures* [Docket No. 1542].

December 31, 2012.[9] This information allowed the principals that did not want to become restricted to make informed decisions regarding their positions in these cases.

12. Furthermore, the JSBs' reliance on the Lehman Brothers[10] bankruptcy case is misplaced because the creditor-proposed plans in that case were not filed until after the 18-month maximum exclusivity period had expired. The Debtors' request is being made only nine months into these cases. It would be premature to allow exclusivity to expire only halfway through the maximum time allowed given the complexities of these cases. Terminating exclusivity in the face of these divergent creditor interests will only result in "nuclear war."[11]

13. Since the filing of the Committee Response, the JSBs have advised the Debtors that they are opposed to the provision in the Progress Plan that limits the Debtors' ability to file a plan that is not supported by the Creditors' Committee during the Amended Plan Exclusivity Period. The JSBs apparently believe that this is improper because only one individual member of the Creditors' Committee holds a fixed claim against the Debtors' estates, while the other members hold only disputed, unliquidated claims. Additionally, because the claims asserted by members of the Creditors' Committee are against only certain Debtor entities, the JSBs believe that requiring Creditors' Committee support for plans for all of the entities within the Debtors' capital structure should not be allowed. While it is true that individual members of the Creditors' Committee likely do not hold claims against each of the Debtor entities, they have asserted claims against the three principal Debtor entities and throughout the capital structure. Moreover, the Creditors' Committee is a fiduciary for all unsecured creditors, and the Debtors

---

[9] On February 8, 2013, the Debtors filed the *Notice of Filing of Additional Disclosures* [Docket No. 2872].
[10] *See* JSB Objection at 5.
[11] In determining whether "cause" exists to warrant an extension of exclusivity, courts consider the Adelphia Factors. The Debtors have clearly satisfied one of the most important Adelphia Factors - that of making progress in plan negotiations. The JSBs incorrectly maintain that the Debtors seek an extension of their Exclusive Periods "principally" on their belief that terminating exclusivity would result in chaos and would be hurtful towards a consensual resolution of these cases. This is not the Debtors' principal argument, but should be a consideration of the Court in its determination.

7

ny-1079278

expect that it will act in accordance with that obligation. To the extent it becomes apparent over the next 60 days that the Creditors' Committee is acting otherwise, or that getting a majority of the Creditors' Committee members to support a plan is not achievable, nothing prevents the Debtors from requesting a further extension of exclusivity to file a Chapter 11 plan without Creditors' Committee support. The Debtors hope that this will not be the case, and that the Progress Plan will serve to move the plan process forward.

14. Accordingly, the Court should see the JSB Objection for what it is – an attempt by a group of undersecured creditors to wrest control of these cases and propose a plan that provides them with payment of postpetition interest, while simultaneously retaining the option to trade out of their holdings should they decide to exit the Debtors' capital structure before any plan is confirmed. Accordingly, the Court should overrule the JSB Objection and grant the relief requested in the Exclusivity Motion.

**B.    The Committee Response and the Progress Plan**

15. That the Creditors' Committee[12] supports a further extension of exclusivity and supports the appointment of Mr. Kruger as the CRO of the Debtors are clear indications of the forward progress in these cases. The Debtors and the Creditors' Committee engaged in substantial negotiations during the Second Exclusivity Extension. In an effort to foster continued progress, the Debtors and the Creditors' Committee determined that working together over the next 60 days to achieve common goals would be the most effective means for achieving a consensual Chapter 11 plan. Because the individual members of the Creditors' Committee hold extremely divergent interests, it is the Debtors' belief that obtaining a commitment from the

---

[12] A member of the Creditors' Committee, Wilmington Trust, National Association ("Wilmington Trust"), also filed a response to the Motions. Despite supporting the relief requested in the Motions, Wilmington Trust uses this as an opportunity to sling mud at the Debtors. As discussed above, the sole purpose of the remainder of these cases is not a liquidation. The Debtors have and will continue to take steps to maximize value for creditors and act in accordance with disparate and competing creditor interests.

Creditors' Committee and its members to engage in substantive negotiations not just with respect to the AFI Settlement, but also as to their individual claims, will move the plan process forward at a much faster pace.

The Terms of the Progress Plan

16.     The terms of the Progress Plan are the result of extensive back-and-forth negotiations between the Debtors and the Creditors' Committee.  Specifically, the Debtors have agreed, at the request of the Creditors' Committee, to allow the plan support agreement with AFI (the "AFI PSA") to expire by its own terms.  While the Debtors have agreed to this result, the Debtors do not agree with the Creditors' Committee's characterization of the AFI PSA.  The Committee Response mischaracterizes the value of the AFI PSA to these estates.  The AFI PSA provided the Debtors' estates with tremendous benefits over the course of these cases.  It allowed the Debtors to originate loans in bankruptcy and sell live loan origination and servicing platforms, resulting in maximum value for the Debtors' assets.  Any suggestion that the AFI PSA could have or should have been terminated prior to the closing of the Asset Sales is imprudent, if not reckless.  Further, assertions that AFI controlled the Debtors through the AFI PSA are likewise patently false.  Following the closing of the Asset Sales, the Debtors considered whether the benefits to be received under the AFI PSA going forward warranted a further extension.  The AFI PSA has benefitted all creditors of the Debtors' estates, and any decision to allow it to expire now should not be viewed as an indication otherwise.

17.     In conjunction with the Progress Plan, the Creditors' Committee has agreed to support a further extension of exclusivity through the Amended Exclusivity Periods.  Likewise, the Debtors have agreed to adjourn the hearing on the RMBS Settlement for 30 to 45 days, subject to the Court's schedule, to allow parties to focus on plan issues.  The Debtors and their

9

advisors intend to spend the next 60 days focused on the resolution of important intercreditor issues and large disputed claims, as well as seeking to achieve a globally acceptable settlement with AFI.

Mr. Kruger's Appointment as CRO

18. No party objected to the CRO Motion. Everyone, including the Creditors' Committee, recognizes that Mr. Kruger's reputation in the restructuring field is beyond reproach. Notwithstanding expressed support for Mr. Kruger's appointment as CRO to the Debtors, the Creditors' Committee and Wilmington Trust criticize the Debtors for not consulting with them during the CRO selection process. *See* Committee Response ¶ 3; Wilmington Trust Statement ¶ 5. Prior to making the determination to appoint a CRO, the Debtors advised the Creditors' Committee that they were considering taking this course of action. In response, the Creditors' Committee suggested several names as potential candidates. The Board, in fact, considered or interviewed certain of these candidates. The Bankruptcy Code and the business judgment standard, which is applied when the Court considers the appointment of a CRO under section 363, do not require the Debtors to consult with the Creditors' Committee on all aspects of the selection process. In an effort to avoid the inference of outside influence during the selection process and any argument that a CRO could be biased toward certain creditors or creditor constituencies, the Debtors determined that it was appropriate not to engage in discussions with individual creditors. Mr. Kruger was interviewed and appointed by the independent members of the Board who went through a time consuming selection process in reaching their determination. Mr. Kruger was selected as CRO because of his stellar reputation, as is recognized by the Debtors' key stakeholders. As part of the Progress Plan, the Debtors have agreed to amend the

10

scope of Mr. Kruger's authority. The Amendment to the Engagement Letter is attached hereto as <u>Exhibit 1</u>.

19. The Debtors are confident that Mr. Kruger's appointment and a further 60-day extension of exclusivity will precipitate continued advancement in the plan process.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court overrule the JSB Objection and grant the relief requested in the Motions, and such other and further relief as is just and proper.

New York, New York
Dated: March 1, 2013

/s/ Gary S. Lee
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
Debtors in Possession*

11

ny-1079278