Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, et al. | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**STATEMENT OF ALLY FINANCIAL INC. AND
ALLY BANK REGARDING THE DEBTORS' MOTION
FOR THE ENTRY OF AN ORDER FURTHER EXTENDING
THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN
AND SOLICIT ACCEPTANCES THEREOF AND THE DEBTORS'
MOTION FOR APPOINTMENT OF A CHIEF RESTRUCTURING OFFICER**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. ("***AFI***"), on behalf of itself and its non-debtor subsidiaries and Ally Bank (together with AFI, "***Ally***"), submits this statement regarding the *Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 2918] (the "***Exclusivity Motion***"), the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [ECF No. 2887] (the "***CRO Motion***," and together with the Exclusivity Motion, the "***Motions***"), and the responses to the

Motions filed by other parties.[1]

## STATEMENT

1. Ally files this statement to respectfully present its views regarding the Motions. First, Ally is appreciative of the Court's efforts and patience in handling the difficult issues in these cases, including shepherding the Debtors' sales of much of their assets. The sale of the Debtors' servicing platform as a going concern, in particular, was a precedential feat. It significantly benefited these estates, and was the first sale by a chapter 11 debtor of an operating mortgage servicing platform and also the first chapter 11 sale of an operating servicing business within a subsidiary of a United States bank holding company.

2. Ally also believes that this Court's approval of a plan mediation process was very constructive. The appointment of Judge Peck as the mediator has been a positive and productive development, and Ally appreciates the hard work and substantial time that Judge Peck has devoted to these cases to date. Ally entered into and has participated in the plan mediation process in good faith. Both counsel for Ally and Ally's chief executive officer have met with Judge Peck on numerous occasions in person and by telephone. Ally understands from the Debtors that Judge Peck is willing to continue in this role, which will only benefit parties seeking a consensual conclusion to these cases.

---

[1] *See Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 2997] (the "**Ad Hoc Group's Objection**"); *Response of the Official Committee of Unsecured Creditors to Debtors' Motions for (I) Appointment of a Chief Restructuring Officer and (II) Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 3042] (the "**Committee's Response**"); and *Statement of Wilmington Trust, National Association in Respect of the Debtors' Motions for Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and for Appointment of Lewis Kruger as Chief Restructuring Officer* [ECF No. 3043] (the "**Trustee's Statement**" and, collectively with the Ad Hoc Group's Objection and the Committee's Response, the "**Responses**").

2

3. Ally, however, is frustrated with the Debtors' inability to move these cases forward on the chapter 11 plan front. In many instances, delay has become the operational mechanism for the Debtors to attempt to achieve progress in these cases. This delay has had an ancillary effect – mounting administrative costs, which directly reduce recoveries for the general unsecured creditors. As a result, the stakeholders of these estates face urgency given these rising administrative costs. Hard decisions must be made now.

4. Yet, Ally is still hopeful that, with the assistance of the mediator, a largely consensual plan with full third-party releases can be accomplished. If no such plan is achievable, however, Ally is prepared to discuss a modified plan or litigate these matters to judgment. Ally continues to believe that the litigation route will be costly and provide no benefit to the parties involved, other than their professionals.

5. Ally has patiently supported the Debtors and provided them enormous and indispensable value to the Debtors, creating substantial value for all stakeholders, in good faith reliance upon the Debtors' commitment to prosecute these chapter 11 cases and the Debtors' settlement with Ally. Ally appreciates and supports the Examiner's work. The Debtors, though, have purportedly spent more than the last two months pursuing plan negotiations with the key constituencies. Yet, it appears that not a single inter-creditor dispute has been addressed during this time. Put simply, it is extremely unfortunate that the parties are almost a year into these chapter 11 cases and the most important creditor issues appear to have not yet been broached. And the largest creditor constituency, the RMBS investors, in many ways has been drowned out by the divergent interests of other creditors.

6.     Further, contrary to the statements made in the Responses, Ally has not disengaged from or "stalled" the mediation process.[2] Rather, Ally has steadfastly maintained its willingness to continue negotiations and met with the mediator numerous times, as recently as last week. For there to be a consensual resolution, however, negotiations must be grounded proportionally on the merits, and creditors must be realistic about their own alleged claims and resolve their intercreditor issues. Moreover, all creditors necessary for a consensual plan must actually be at the table given the realities of the Debtors' capital structure, and the voices of the largest creditors should be afforded appropriate weight. Otherwise, respectfully, Ally does not understand the point in negotiating at this stage given the markedly different perspectives of the creditors in these cases, many of whom have expressed a clear desire to pursue a consensual resolution, rather than the litigation path espoused by certain vocal creditors with unique pecuniary interests and issues. Ally genuinely hopes the necessary creditors will come to the table. However, if the creditors necessary for a feasible plan will not come to the table now, then creditors should resolve their inter-creditor issues, and Ally will wait for the Examiner's report.

7.     For the record, Ally is not an obstacle to a consensual resolution in these cases; instead, it is undoubtedly the sole vehicle through which a resolution can be obtained. Ally has supported the Debtors, the chapter 11 process and kept its promises at every turn. This support has been recounted on the record numerous times, but suffice to say none of the sales and asset recoveries to date would have been possible without Ally's support, which has generated hundreds of millions of dollars for the estates. Two weeks after receiving the substantial benefit from Ally fulfilling its promises during the cases, though, the Debtors have now allowed their settlement with Ally to lapse while the Examiner is still conducting his work. They have also

---

[2]  *See, e.g.*, Committee's Response at ¶12; Trustee's Statement at ¶4.

consented to concede standing, all without prosecuting the settlement they fought so hard to achieve and upon which Ally relied in supporting the Debtors through these cases. This development is both disappointing and perplexing. Indeed, after going through months of discovery as part of the very thorough examination process, nothing has changed Ally's views on the merits of the alleged claims against it.

8.     Ally does not want to see the significant value that it has helped create in these cases wasted. But, creditors must do the hard work of resolving their issues immediately, rather than simply hoping for a greater contribution from Ally that is not grounded in the merits. Bluntly, there is a runway for a consensual resolution, but Ally fears it is extremely short given, among other things, the costs of these cases to date along with the current administrative burn rate and the attendant effect on plan feasibility upon creditor recoveries.

9.     The Debtors now look to another third party — the proposed chief restructuring officer — to help them address chapter 11 plan issues and intercreditor disputes (but not manage the wind down of the estates' operations post-sale, it would appear). This is a confusing approach given the past two months of mediation and the significant time before then that the Debtors have had to address such issues. To be clear, Ally is supportive of the Debtors' request for a further extension of their statutory exclusivity periods and does not oppose the appointment of the chief restructuring officer. Ally hopes that the Debtors' appointment of the chief restructuring officer, coupled with the Debtors' counsel, their financial advisor, and the mediator, will finally enable the Debtors to advance the chapter 11 plan process, after spending so much time and money to get to this point.

10.    Ally is not, however, supportive of the "global deal" reached with the Creditors' Committee, which Ally believes is inappropriate in light of the ongoing state of the Examiner's

investigation. Ally will address those issues should they come before the Court through a standing motion. Of course, Ally strongly believes that no prosecutorial actions on any alleged claims against Ally should occur while the examination is pending. The Examiner is doing his work, and not a single penny from the estates should be wasted on pursuing alleged claims until that examination is completed. Taking another course is contrary to the interests of the estates and all creditors. It is also unclear to Ally how the chief restructuring officer will truly act independently during this time period given the Debtors' agreement to refrain from filing a chapter 11 plan without the Creditors' Committee's support or settling estate claims against Ally without the Creditors' Committee's consent, which is contrary to the very notion of exclusivity.

| | |
|---|---|
| New York, New York<br>Dated: March 4, 2012 | */s/ Ray C. Schrock*<br>Richard M. Cieri<br>Ray C. Schrock<br>Stephen E. Hessler<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, New York  10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900<br><br>*Counsel for Ally Financial Inc. and Ally Bank* |