Hearing Date and Time:  March 5, 2013 at 10:00 a.m. (Prevailing Eastern Time)

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

   and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, et al., | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

**STATEMENT OF AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS IN CONNECTION WITH THE RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTIONS FOR (I) APPOINTMENT OF A CHIEF RESTRUCTURING OFFICER AND (II) ENTRY OF AN ORDER FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

   The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"),[1] by and

through its undersigned counsel, hereby files this statement (the "Statement") in connection with

---

[1] The Ad Hoc Group is comprised of certain entities that hold or manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated as of June 6, 2008.  The Junior Secured

the Committee's Response[2] to the Motions[3] of the debtors (collectively, the "<u>Debtors</u>") in the above-captioned cases (the "<u>Chapter 11 Cases</u>") (i) for the appointment of a Chief Restructuring Officer and (ii) for the entry of an order further extending their exclusive periods to file a chapter 11 plan and solicit acceptances thereof.  As and for its Statement, the Ad Hoc Group respectfully states as follows:

## STATEMENT

This pleading addresses certain significant changes occurring after the filing of the Motion and after the Ad Hoc Group filed its Objection[4] to the Motion.  In that regard, the Debtors' recent commitment to permit the expiration of their plan support agreement with Ally -- evidencing an apparent willingness to consider plan constructs other than a settlement with Ally predicated on non-consensual third party releases – constitutes an encouraging development for the prospect of meaningful plan negotiations.  <u>See</u> Committee Response at Ex. A, ¶ 5.  And the Committee's professed recognition of the need to advance alternative plan structures without a resolution of Ally's claims is belated but similarly welcome.  Committee Response ¶ 2.  In fact, the Ad Hoc Group has for some time suggested the need to explore these alternative plan structures as a way to hasten the conclusion of these costly Chapter 11 Cases (since that first

---

Noteholders' claim is now equal to 113.9% of the face amount of the bonds and is currently increasing by virtue of the accrual of post-petition interest at the rate of approximately $250 million per year.

[2] Response of the Official Committee of Unsecured Creditors (the "<u>Committee</u>") to Debtors' Motion for (I) Appointment of a Chief Restructuring Officer and (II) Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 3042] (the "<u>Committee's Response</u>").

[3] Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer [Docket No. 2887]; Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 2918] (together, the "<u>Motions</u>").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in either of the Motions, as applicable.

[4] Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 2997] (the "<u>Objection</u>").

suggestion, nearly $100 million of post-petition interest has accrued on the Junior Secured Notes). Had the Committee adopted the course of action advocated by the Ad Hoc Group at an earlier stage in these Chapter 11 Cases, these alternative plan constructs could have been pursued without prejudicing the prospect of an enhanced contribution from Ally. This is just one example of how the Ad Hoc Group has sought to expedite the resolution of these Chapter 11 Cases so as to prevent these estates from incurring ongoing interest expense on the Junior Secured Notes, despite the obstructionist efforts of other parties in interest who will ultimately suffer reduced recoveries as a result of that expense.

The Ad Hoc Group continues to believe that the most efficient path to global consensus is to enable the immediate consideration of viable alternative plan structures.[5] Parties can then evaluate each others' positions and resolve major case issues in a public forum. Moreover, the expiration of exclusivity will force parties to confront the possibility that what they covet most, whether that be an allowed claim, a release or the ability to maintain unrealistic expectations of recoveries on their balance sheets, may be fleeting.

Worse than merely extending exclusivity, the Debtors' agreement with the Committee, made under apparent threats of seeking a chapter 11 trustee, distorts the notion of exclusivity beyond anything that could be considered appropriate. The Committee, which is highly conflicted and has limited fiduciary duties, has been granted an absolute consent right over the ***Debtors'*** plan. Under normal circumstances, such an abrogation of fiduciary responsibility would be objectionable. Here, however, where the Debtors have already demonstrated their desperation to preserve exclusivity at all cost – characterizing the loss of exclusivity as

---

[5] To be clear, the Ad Hoc Group believes that permitting the expiration of exclusivity would foster consensus, rather than hostility, by prompting parties to begin narrowing their expected outcomes. The *status quo* advocated by the Debtors has not caused any party to abandon even its most extreme negotiating "asks."

"catastrophic" – there can be little doubt that the Debtors will file whatever the Committee demands of them rather than risk losing exclusivity.  Motion ¶ 11.

While an official committee has fiduciary duties, those fiduciary duties are expressly limited and run solely to the constituents for which it was formed to represent.  The Committee not only has limited fiduciary duties that do not run to all stakeholders and certainly do not run to the Junior Secured Notes, its composition calls into question which constituency it ultimately represents.   <u>First</u>, only a single member (Wilmington Trust N.A.) of the nine-member Committee has an allowed claim of any amount.  The other eight members of the Committee – two monoline insurers (MBIA and FGIC), three RMBS indenture trustees (Deutsche Bank Trust Company Americas, Bank of New York Mellon, and U.S. Bank National Association), two securities-fraud claimants (AIG Asset Management (U.S.), LLC and Allstate Life Insurance Company) and one lead plaintiff in a class action litigation (Rowena L. Drennen) – are contingent claimants, the size and allowance of whose purported claim in each instance remains subject to lengthy fact-intensive litigation.  <u>See</u> Appointment of Official Committee of Unsecured Creditors [Docket No. 102].  As it stands today, because the Committee's individual constituents largely lack any recognized stake at all, they are predisposed to more delay unless their claims are allowed in an acceptable amount and priority.

<u>Second</u>, Wilmington Trust N.A., as the lone Committee member with an allowed claim, asserts that claim against only a single Debtor - holding company Residential Capital, LLC.[6] The other 50 Debtor entities, including asset-rich operating Debtors GMAC Mortgage, LLC and Residential Funding Company, LLC, are not subject to any allowed claims from any Committee member.  Moreover, even if the claims of the remaining eight Committee members are to be

---

[6] <u>See</u> Claim No. 5256, asserted by Wilmington Trust N.A. against Residential Capital, LLC.  Wilmington Trust N.A. has not asserted another claim in these cases.

allowed, these claims would only be asserted against a handful of Debtor entities, largely GMAC Mortgage, LLC and Residential Funding Company, LLC.[7] The Junior Secured Noteholders, on the other hand, hold allowed claims not only at those major operating entities, but also against another 21 Debtors. Many of these other Debtor entities lack any material creditors other than the Junior Secured Noteholders (and Ally as lender under its pre-petition facilities). Any plan for each of these Debtors that does not pay the Junior Secured Noteholders in full, including post-petition interest, necessarily hinges on Junior Secured Noteholder support.[8]

The Debtors attempt to minimize the significance of the Committee's conflicts by emphasizing that the Committee is a fiduciary "for all unsecured creditors." Omnibus Reply ¶¶ 13-14. This justification, however, continues to ignore the distinctions between their various estates and that the Debtors' largest stakeholders with undisputed claims are in fact secured. At many of these estates, the Junior Secured Noteholders (and Ally) remain the ***only material***

---

[7] See, e.g., Claim Nos. 4778, 5321, 5326, 5344, 5346 and 5347, asserted by AIG Securities Lending Corporation c/o AIG Asset Management (U.S.) LLC; Claim Nos. 5320, 5330, 5334 and 5339, asserted by American International Group Retirement Plan c/o AIG Asset Manangement (U.S.) LLC; Claim Nos. 5318, 5319, 5322, 5324, 5332 and 5352, asserted by American International Group, Inc. c/o AIG Asset Management (U.S.) LLC; Claim Nos. 4500, 4501, 4503, 4504, 4516, 4656, 4963 and 5078, asserted by Allstate Life Insurance Co.; Claim Nos. 4868, 4870 and 4871, asserted by Financial Guaranty Insurance Company; Claim Nos. 5846 – 5851, asserted by MBIA Insurance Corporation.

[8] Parties in interest in these Chapter 11 Cases have argued that principals of certain members of the Ad Hoc Group have refused to participate in plan discussions because they are reluctant to access restricted information and/or have a desire to trade while in negotiations. Those characterizations are simply not accurate. After the hearing on the Debtors' request to extend exclusivity on December 20, 2012, the Ad Hoc Group prepared a form of proposed order in aid of mediation designed to encourage the participation in mediation of creditor principals. See, e.g., In re Vitro, S.A.B. de C.V., Case No. 11-33335-hdh-15 (Bankr. N.D. Tex. Jan. 26, 2012) [Docket No. 311] (Order in Aid of Settlement Discussions) (ordering among other things that "Settlement Proposals shall not constitute material non-public information"). After obtaining input from other parties in interest, the Ad Hoc Group presented this proposed order to the Debtors. Based on subsequent discussions, it was determined that the parties would not press forward with the restriction of pricipals at that time and that participation in mediation would instead be limited, for the time being, to the parties' advisors. To be clear, to the extent that plan discussions progress to the topic of the actual economics surrounding any consensual settlement – which discussions have to date not occurred in any meaningful way – the principals of certain members of the Ad Hoc Group remain prepared to take steps necessary to participate in those discussions, provided that the period of restriction is limited (as is customary) and that at the conclusion of such period parties are free to trade (as is customary). The suggestions by the Debtors that parties should remain restricted through a date uncertain and also through plan confirmation are not at all customary.

*creditors* whatsoever.  With respect to any potential chapter 11 plan for these Debtor entities, the Committee's views are irrelevant.

Similarly, the appointment of Lewis Kruger as Chief Restructuring Officer, albeit a step in the right direction, fails to address fully the existing inter-estate conflicts.  Committee member Wilmington Trust concedes as much.  See Wilmington Response[9] ¶ 5 ("The appointment of a CRO does nothing to alleviate the inherent conflicts facing the Debtors, as well as their officers, directors and professionals, each of whom are fiduciaries of different estates with duties to different creditors").  The Committee as a whole, however, appears to ignore these distinctions among the Debtor estates, and, as a result, its support for the appointment of a Chief Restructuring Officer fails to address the myriad inter-debtor conflicts.  See Committee Response p. 17 ("[the CRO] will work with the Committee to formulate *a plan* that … is in the best interest of the *estate*") (emphasis added).

Notwithstanding such obvious flaws, however, the appointment of a Chief Restructuring Officer -- as opposed to a chapter 11 trustee, whose responsibilities would typically resemble those assigned to Mr. Kruger  -- evidently furthers the Committee's apparent objective of

---

[9] See Statement of Wilmington Trust, National Association in Respect of the Debtors' Motions for Entry of an Order Further Extending their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and for Appointment of Lewis Kruger as Chief Restructuring Officer [Docket No. 3043] (the "Wilmington Response"). Wilmington Trust "believes there are significant claims against AFI belonging solely to Residential Capital…" the proceeds of which it evidently presumes would inure to its own benefit on behalf of the unsecured bondholders of Residential Capital, LLC.  Wilmington Response ¶ 4. However, the unsecured bondholders would receive only a small portion, if any, of the proceeds recovered on estate causes of action because nearly all funds recovered by Residential Capital, LLC inure to the benefit of the Junior Secured Noteholders – who possess all-asset liens against that Debtor entity – until the Junior Secured Noteholders have received payment in full, including post-petition interest.  Even should such funds flow instead to the general unsecured claims pool at Residential Capital, LLC, any recovery by these unsecured bondholders would be diluted substantially in favor of the Junior Secured Noteholders through among other things their lien on the recovery by Residential Funding Company, LLC on its approximately $2 billion intercompany claim against Residential Capital, LLC.  See Amended Schedules of Assets and Liabilities for Residential Capital, LLC [Docket No. 683] at p. 5.  Further, any *pro rata* recovery by the unsecured bondholders will be diluted by the assertion of general unsecured claims against Residential Capital LLC (the issuer of the Junior Secured Notes) by, among other entities, Debtor GMAC Mortgage LLC (a guarantor of the Junior Secured Notes) for contribution on account of any amounts paid by that entity in satisfaction of the claims of the Junior Secured Noteholders.

supplanting the Debtors in plan negotiations with Ally while simultaneously preserving the Debtors' exclusivity window. The Committee has publicly chastised the Debtors for seemingly lacking the independence necessary for forcefully negotiating with Ally. See Committee Response ¶ 5 ("In late 2012, the Committee approached the Debtors with concerns about the ResCap board's independence in light of certain pre-petition transactions with Ally…"). The appointment of a Chief Restructuring Officer entrusted with plan negotiation responsibilities should address that concern, without the need to grant the Committee a consent right over a plan. See Committee Response Ex. B (tasking Mr. Kruger with among other things responsibility for directing the formulation of a plan and negotiating with Ally). More revealing, however, is what the appointment of a Chief Restructuring Officer (as opposed to a chapter 11 trustee) does not do – namely, necessarily terminate the Debtors' exclusive plan period. See, e.g., 11 U.S.C. §1121(c) ("Any party in interest … may file a plan if and only if— (1) a trustee has been appointed under this chapter…"); In re Euro-American Lodging, Inc., 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007) ("The appointment of a trustee will terminate exclusivity and allow any other party in interest to file a plan.").

Meanwhile, another extension of the *status quo* imposes real costs on these estates, including the continued accrual of over $20 million a month in interest expense to the Junior Secured Notes. While those amounts may seem to some immaterial in the context of the cases as a whole, the aggregate accrued amount is already approximately $192 million and is becoming more material on a daily basis. If these amounts are allowed to continue to accrue unchecked, such amounts will be difficult to resolve without litigation and become an additional impediment to any exit from chapter 11, introducing a new and unnecessary risk to the plan process.

The Debtors currently possess at least $1 billion of cash that represents undisputed collateral of the Junior Secured Notes and is otherwise unneccesary to any reorganization. Presently, the Debtors are earning near-zero percent interest on this cash, while the Junior Secured Notes accrue post-petition interest at a rate of 10.625%. The Debtors should substantially derisk the plan process by distributing the cash in partial satisfaction of the Junior Secured Notes' claims, reducing the unpaid amounts that continue to earn interest. While the Ad Hoc Group is prepared to continue to earn interest, it wishes to avoid the situation where Junior Secured Noteholders are asked to or even expected to contribute to resolve a controversy that was foreseeable and otherwise fully avoidable. The Debtors should be narrowing the issues, not creating new ones.

Ceding absolute plan control to the Committee is also inappropriate because it upends the delicate balance memorialized by the Court's order granting the Committee standing to commence a complaint challenging certain aspects of the liens and obligations owing to the Junior Secured Noteholders. As the Debtors recognized, that order deprives the Committee of the ability to object unreasonably to the settlement of those purported claims in the Debtors' plan. See Order Authorizing the Official Committee of Unsecured Creditors to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Docket No. 2518] ¶ 5 ("The Committee shall have, in consultation with the Debtors, the exclusive right and authority to enter into settlements on behalf of the Debtors' estates with respect to the Claims; provided, however, that pursuant to a chapter 11 plan, the Debtors may, with the consent of the Committee (*such consent not to be unreasonably withheld*) propose a settlement of the Claims") (emphasis added); Transcript of Hearing of December 20, 2012 at 104:13-22 (Counsel to Debtors) ("But if there is broad support among the capital structure for a settlement that the Committee doesn't support,

*we believe we have sufficient flexibility under this language to propose that plan*, and the Committee has another potential objection to that plan…") (emphasis added).  Granting the Committee absolute veto rights over the Debtors' plan during the next 60 days, however, essentially removes that language from the Court's order and temporarily grants the Committee absolute standing to settle (or not settle) its claims against the Junior Secured Notes.

The Court should not deem the Debtors' agreement with the Commttee to be progress constituting "cause" to extend exclusivity.  The price of the Committee's consent was steep and self-serving – namely, the inclusion of plan veto rights that temporarily and inappropriately elevate the standing of the Committee in plan negotiations.  The inclusion of this flawed condition in any extension of exclusivity would dampen any momentum behind alternative viable plan structures while ensuring the continuation of the *status quo* impasse.  As such, the Motion, as modified by the Debtors' agreement with the Committee, should be denied.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Statement and in the Objection, the Ad Hoc Group requests that the Court deny the Motion as modified by the Debtors' agreement with the Committee to the extent requested herein.

Dated:  March 4, 2013
         New York, New York

Respectfully submitted,

By:  /s/ J. Christopher Shore
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JS – 6031)
Harrison L. Denman (HD – 1945)

   and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group of Junior Secured Noteholders