**Hearing Date and Time: March 28, 2013 at 2:00 p.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Todd M. Goren
James A. Newton

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
                                          )
In re:                                    )     Case No. 12-12020 (MG)
                                          )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,  )     Chapter 11
                                          )
                             Debtors.     )     Jointly Administered
-------------------------------------------------------------------  )

**DEBTORS' REPLY TO OBJECTION AND RESERVATIONS OF RIGHTS OF AMBAC
ASSURANCE CORPORATION AND THE SEGREGATED ACCOUNT OF AMBAC
ASSURANCE CORPORATION TO THE PROPOSED ASSUMPTION AND
<u>ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 4

ARGUMENT ........................................................................................................................... 7

I.    ANY RIGHTS AMBAC HAS IN CONNECTION WITH THE SERVICING
      TRIGGERS ARE PRESERVED UNDER THE SALE ORDER ..................................... 7

Termination of Master Servicing Under Section 7.05(b) of the PSA ........................................ 8

Termination of Servicing Under Section 7.05(d) of the PSA ..................................................... 9

II.   IN THE ALTERNATIVE, THE SERVICING TRIGGERS SHOULD BE
      REDUCED WITH RESPECT TO THE CURE PAID BY THE DEBTORS SO
      THAT AMBAC IS NOT PERMITTED TO RECEIVE DUPLICATIVE
      REMEDIES................................................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

CASES

In re Ionosphere Clubs, Inc.,
   85 F.3d 992 (2d Cir. 1996)....................................................................................9

In re Village Rathskeller, Inc.,
   147 B.R. 665 (Bankr. S.D.N.Y. 1992)..................................................................10

NLRB v. Bildisco & Bildisco,
   456 U.S. 513 (1984)..........................................................................................10

STATUTES

11 U.S.C. § 365 .......................................................................................... passim

11 U.S.C. § 365(a) ...........................................................................................10

11 U.S.C. § 365(b) .....................................................................................10, 12

11 U.S.C. § 365(f) ...........................................................................................10

11 U.S.C. § 1107(a) ...........................................................................................4

11 U.S.C. § 1108 ...............................................................................................4

OTHER AUTHORITIES

Bankruptcy Rule 1015(b)....................................................................................4

Fed. R. Bankr. P. 2002.......................................................................................1

Fed. R. Bankr. P. 6004.......................................................................................1

Fed. R. Bankr. P. 6006.......................................................................................1

Fed. R. Bankr. P. 9014.......................................................................................1

EXHIBITS

Exhibit 1: Excerpts of 2002-KS4 PSA

ny-1080234

Residential Capital, LLC and its affiliated debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**") hereby submit this reply (the

"**Reply**") in further support of their Sale Motion[1] in connection with (i) the *Objection and*

*Reservations of Rights of Ambac Assurance Corporation and the Segregated Account of Ambac*

*Assurance Corporation to the Proposed Assumption and Assignment of Certain Executory*

*Contracts* [Docket No. 1810] (the "**Objection**") and a reservation of rights [Docket Nos. 2015]

filed by Ambac Assurance Corporation and the Segregated Account of Ambac Assurance

Corporation (collectively, "**Ambac**").  In support hereof, the Debtors respectfully state as

follows:

## PRELIMINARY STATEMENT

1.      Ambac objects to the Debtors' assumption and assignment of

approximately sixty-four securitization deals.[2]  Ambac's argument is based solely on a

contention that (i) the Debtors' assumption and assignment of these deals should not reset certain

so-called Servicing Triggers (as defined below) and (ii) the Debtors should be required to satisfy

cure claims prior to assuming and assigning certain of the deals.  Yet, only approximately

fourteen to seventeen of the deals at issue in the Objection contain Servicing Triggers and

Ambac has raised an issue regarding cure with only one other deal.  Accordingly, Ambac's

Objection should be rejected out-of-hand with respect to the other approximately forty-six deals,

which do not contain Servicing Triggers, and for which Ambac has not asserted a cure claim.

---

[1] "**Sale Motion**" refers to the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 61].
[2] This number excludes thirteen deals which, as described below, the Debtors have agreed to transfer to a servicer of Ambac's choosing, subject to certain limitations.

2.      With respect to the Servicing Trigger deals, Ambac's Objection advances

an erroneous interpretation of the Sale Order.  At the same time, Ambac seeks to obtain a remedy

for alleged Debtor servicing deficiencies twice.  Ambac asserts a cure claim under the applicable

Pooling and Servicing Agreements (the "**PSAs**")[3] on account of the Debtors' alleged servicing

deficiencies.  Despite the Debtors' payment of cure (if appropriate), Ambac would have the

Court preserve Ambac's ability to hold the very same losses against the assignee of the

executory contracts at issue following their assignment, and thereby potentially remove Ocwen

as master servicer based on losses that have been reimbursed to Ambac.

3.      Notably, Ambac seeks these dual remedies as a result of a mistaken

reading of the breadth of the Sale Order.[4]  Specifically, Ambac points to paragraph 6 of the Sale

Order, which prevents counter-parties to executory contracts from exercising certain rights

against Ocwen with respect to "acts or omissions of the Debtors," and complains that this

provision could prevent it from exercising certain rights under the PSAs with respect to the

Servicing Triggers.  As discussed below, termination rights with respect to the Servicing

Triggers can be exercised in two, independent circumstances:  (a) upon a finding by Ambac that

the manner of servicing was a factor contributing to the accumulation of the Servicing Triggers,

and (b) a no-fault provision which permits termination solely as a result of the accumulation of

the Servicing Triggers.  With respect to the first method of termination, the Debtors payment of

---

[3] The operative document in one securitization deal is an Indenture.  However, for ease, the operative documents for all of the deals will be referred to as PSAs. Each of the relevant PSAs are referenced or included as attachments to the Joint Stipulation of Facts Regarding the Sale Objection of Ambac Assurance Corporation And the Segregated Account of Ambac Assurance Corporation (the "**Joint Stipulation**") (Dkt. No. 3094) (hereinafter Jt. Stip. at __). The parties have agreed to confer with the objective of adding additional deal documents to the Joint Stipulation by supplement or amendment.  The Reply cites to the Joint Stipulation for certain documents under the assumption they will be subsequently included in the Joint Stipulation.  To the extent agreement is not reached, the documents references herein but not included in the Joint Stipulation shall be introduced into evidence by way of supplemental declaration.

[4] "**Sale Order**" refers to the order approving the Debtors' sale of their servicing platform to Ocwen Loan Servicing, LLC ("**Ocwen**") [Docket No. 2246].

2

any applicable cure will cure any alleged servicing deficiencies, and thus would prevent Ambac

from terminating Ocwen as a result of any "acts or omissions" of the Debtors.  With respect to

the second method of termination, the Sale Order does not affect Ambac's rights, if any, to

enforce the Servicing Triggers because these rights are objective contractual provisions, which

expressly permit no fault termination of the servicer, rendering the "acts or omissions" language

of the Sale Order irrelevant.  Thus, these provisions must be taken by Ocwen along with the

benefits of the PSAs, pursuant to the terms of the Sale Order and Bankruptcy Code[5] section 365.

      4.      In the alternative, even if this Court were to agree with Ambac's

interpretation of the Sale Order, Ambac should not be permitted to terminate the master servicer

based upon accumulation of Servicing Triggers, to the extent termination is based on

accumulations attributable to the alleged "acts or omissions" of the Debtors.  Through the cure

process, the Debtors will cure defaults, if any, based on their allegedly deficient servicing.  As

described below, the allegedly deficient servicing for which Ambac seeks cure necessarily

represents the same "acts or omissions" Ambac claims could bar it from exercising its Servicing

Trigger rights under paragraph 6 of the Sale Order.  Thus, the portion of the Servicing Trigger

accumulations attributable to the Debtors' acts or omissions (if any) – which will be remedied

through a payment to cure all servicing deficiencies – should be removed from the Servicing

Trigger calculations in an amount equivalent to such cure claims (if any).  Once the Debtors have

cured completely any defaults or damages arising from their allegedly deficient servicing

through payment of an appropriate cure claim (if any) the Sale Order – which only prevents

exercise of rights with respect to the acts or omissions of the Debtors – could not be read to

prevent Ambac from exercising its Servicing Trigger rights.  Instead, any accumulations

resulting from the Debtors' "acts or omissions," by necessity, will have been removed by

---

[5] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Sale Order.

3

payment of the cure claim.  The only accumulations left on the Servicing Triggers would be those having nothing to do with the "acts or omissions" of the Debtors, and no portion of the Sale Order can be read to prevent Ambac from exercising those rights.

## BACKGROUND

5.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner [Docket No. 674].

6.      On May 16, 2012, the United States Trustee for the Southern District of New York appointed a nine member official committee of unsecured creditors.

7.      On October 12, 2012, Ambac filed the Objection.  Thereafter, on October 31, 2012, Ambac filed a further statement and reservation of rights.

8.      Prior to the closing of the Debtors' court-approved asset sales, the Debtors were a leading residential real estate finance company indirectly owned by Ally Financial Inc., which is not a Debtor.  The Debtors and their non-debtor affiliates operated the fifth largest mortgage servicing business and the tenth largest mortgage origination business in the United States.  A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 6].

4

9.      In the course of their securitization businesses, the Debtors sponsored a number of securitization deals for which Ambac provided insurance (or deals that Ambac "wrapped") for certificate holders.  The PSAs associated with a minority of the Ambac-wrapped deals contain one or more provisions (the "**Servicing Triggers**") permitting Ambac to remove or cause the removal of the master servicer based on objectively verifiable metrics related to borrower delinquencies and the accumulated losses to the deal.  Jt. Stip. at 14.  These metrics result solely from the accumulated realized losses to the securitization deal as a result of borrower defaults and the rate of borrower delinquencies.  An excerpt of the relevant portions of the PSA for the RASC 2002-KS4 deal is attached hereto as Exhibit 1; see also Jt. Stip., Ex. B.

10.      Section 7.05 of the applicable PSAs governs the process for the removal of the master servicer in those instances where an applicable Servicing Trigger has occurred.  As a first step, under section 7.05(a) the insurer (i.e. Ambac) must provide notice of such occurrence to, among other parties, the master servicer.  See, e.g., PSA to 2002-KS4 § 7.05(a), Jt. Stip. Ex.B.  Under section 7.05(b) of the PSAs, so long as the notice required by section 7.05(a) is furnished, at any time, Ambac may direct the trustee to remove the master servicer, "if [Ambac] makes a determination that the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in the Trust Fund."  Id. at § 7.05(b), Jt. Stip. Ex. B.

11.      Section 7.05(d) provides an alternative means for the removal of the master servicer.  If a Servicing Trigger is continuing, and the master servicer has not been removed in accordance with section 7.05(b), the master servicer is obligated to continue to act as master servicer through the end of the calendar quarter in which the Servicing Trigger occurs.  Id. at § 7.05(d), Jt. Stip. Ex. B.  Under section 7.05(d), Ambac, by written notice to the applicable trustee (defined in the PSA as a "Master Servicer Extension Notice"), may extend

such servicing terms for successive three-month terms.  Id.  However, in the event Ambac fails

to furnish the Master Servicer Extension Notice by the fifteenth day prior to the end of any

current three-month term, the then existing master servicer (e.g. Residential Funding

Corporation) is replaced and the trustee is obligated to act as master servicer until such time as

Ambac appoints a successor master servicer.  Id.  In contrast to section 7.05(b), under section

7.05(d), no separate finding regarding the "manner of master servicing" is required. See id.

12.      Ambac has objected to the assumption and assignment of PSAs related to

approximately seventy-seven securitization deals.  See Objection, Ex. A.  In the Objection,

Ambac asserts that thirteen of the deals, for which it claims to have exercised termination

provisions prepetition, are not property of the Debtors' estates and may not be assumed or

assigned.[6]  Objection ¶¶ 9-11.  With respect to the remaining approximately sixty-four deals (the

"**Remaining Deals**"), Ambac also raises concern that the Sale Order would prevent it from

exercising Servicing Trigger rights contained in the PSAs governing approximately fourteen to

seventeen of such Remaining Deals.  Id. ¶¶ 19-20; see also Jt Stip. ¶ 9.  Ambac indicates that it

wants to ensure that the Servicing Triggers will not be reset upon assumption and assignment of

the relevant PSA.  Objection ¶¶ 19-20.  Finally, Ambac raises cure claims in connection with

eleven of the Remaining Deals (ten of which are also included above in the Servicing Trigger

deals), which Ambac asserts arise from the Debtors' allegedly deficient servicing.  See Objection

¶ 24.  Ambac claims that this cure claim must be paid as a condition to the assumption and

assignment of the relevant PSAs.  However, Ambac has failed to clearly articulate any reason for

objecting to the assumption and assignment of PSAs associated with any of the other more than

forty Remaining Deals which do not contain Servicing Triggers and for which Ambac has not

---

[6] The parties have since agreed in principal to the transfer of these deals to a servicer of Ambac's choosing subject to terms and conditions acceptable to the Debtors and the approval of this Court.

asserted a cure claim. Accordingly, the Debtors submit that at the very least, the Court should overrule Ambac's objection as to such Remaining Deals.

## ARGUMENT

## I.    ANY RIGHTS AMBAC HAS IN CONNECTION WITH THE SERVICING TRIGGERS ARE PRESERVED UNDER THE SALE ORDER

13.    Paragraph 6 of the Sale Order states in relevant part, that upon assumption and assignment of the Assumed Contracts, contractual counterparties are "hereby forever barred, estopped, and permanently enjoined from asserting against . . . Purchaser, its Affiliates or their respective property (a) any . . . default asserted or assertable against, or otherwise delay, defer or impair any rights of the Purchaser with respect to the Purchased Assets with respect to an act or omission of, the Debtors." Sale Order ¶ 6. By its Objection, Ambac contends that this portion of the Sale Order will affect its rights to remove Ocwen as master servicer pursuant to the Servicing Triggers in the relevant PSAs. Ambac's misplaced belief is based on an improper reading of paragraph 6 of the Sale Order.

14.    Paragraph 6 of the Sale Order, in pertinent part, prevents contractual counterparties from seeking to impair any "rights" in the associated PSAs and indentures where such rights are "with respect to an act or omission of the Debtors." Sale Order ¶ 6. As noted above, section 7.05 of the PSA generally provides two separate rights of termination. The first, set forth in section 7.05(b) of the PSA, requires a finding that "the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in the Trust Fund." The second, set forth in section 7.05(d) of the PSA, is based solely on objective metrics relating to the status of the underlying loans and no separate subjective finding concerning the quality of the master servicing is required. Jt. Stip at Ex. B

Termination of Master Servicing Under Section 7.05(b) of the PSA

15.    With respect to termination under section 7.05(b), Ambac is only permitted to terminate if it finds that servicing was a factor in the Servicing Triggers being tripped.  However, Ambac has not asserted a cure with respect to approximately four to seven Servicing Trigger deals.  As to those deals, Ambac has implicitly acknowledged that the Debtors' servicing was acceptable and therefore that Ambac could not exercise termination rights under section 7.05(b) based on the Debtors' servicing.  As to the deals where Ambac has asserted cure, to the extent Ambac is legally entitled, the Debtors will be curing any prior servicing deficiencies.  Specifically, the Debtors will be paying a cure amount, if appropriate, to remedy the same alleged "acts or omissions" that Ambac alleges contributed to the Servicing Trigger accumulations.  Ambac asserts that it is entitled to a cure claim in an amount in excess of $12 million[7] for "the Debtors' failure to service the mortgage loans in these transactions in accordance with the applicable servicing standards."  Objection ¶ 24.  This cure claim is asserted for the purpose of curing any defaults, including any and all defaults related to breaches of the Debtors' servicing of the mortgage loans.[8]

16.    Similarly, by arguing that paragraph 6 of the Sale Order would prevent Ambac from exercising its Servicing Trigger rights, Ambac is necessarily arguing that the Debtors' "acts or omissions" in servicing caused, at least in part, the accumulation of the Servicing Trigger levels.  If not, paragraph 6 would not in any way implicate Ambac's Servicing

---

[7] The parties have stipulated that such amount will not exceed $12,358,651.  See *Stipulation and Order Regarding the Sale Objection of Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation* [Docket No. 2993] at ¶ 1.

[8] See *Notice of (I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal Property, and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto* [Docket No. 924] at ¶¶ 5, 11 ("Assumption Notice Parties shall be forever barred from (i) objecting to the assumption and assignment of the relevant Assumed Contract and/or Cure Amount, and (ii) asserting at any time any condition to assignment, default, claims, obligations or breach and/or any additional cure, damage or other amount with respect to the respective Assumed Contract on the basis of events of any kind or nature occurring or arising prior to the Closing Date . . . .")

8

Trigger rights. In fact, these "acts or omissions" must be the same "acts or omissions" giving

rise to Ambac's cure claim because if these were separate, Ambac would have asserted a further

cure claim based on the additional servicing deficiencies.

17.     In sum, the alleged "acts or omissions" that Ambac asserts give rise to its

cure claim are the very same "acts or omissions" that it is claiming caused the accumulation of

the Servicing Trigger levels. As a result, upon payment of the appropriate cure claim, Ambac

will be made whole for any such servicing deficiencies. Yet, even after it receives payment of an

appropriate cure, if any, Ambac would like to maintain the right to remove the master servicer

under section 7.05(b) of the PSAs as a result of the Debtors' servicing, any damages relating to

which have been cured. See Objection §§ 19-20. Providing Ambac a right of termination

relating to allegedly deficient servicing that has been cured would turn the very notion of cure on

its head. In re Ionosphere Clubs, Inc., 85 F.3d 992, 999 (2d Cir. 1996) ("Congress's intent in

imposing these conditions on the ability of the debtor to assume the contract was 'to insure that

the contracting parties receive the full benefit of their bargain if they are forced to continue

performance.'"). Thus, upon assumption and assignment and cure of any deficient servicing by

the Debtors, Ambac's ability to terminate under section 7.05(b) would be limited to situations in

which Ocwen's manner of servicing caused an accumulation of the Servicing Triggers and

would not be barred by paragraph 6 of the Sale Order.

### Termination of Servicing Under Section 7.05(d) of the PSA

18.     With respect to Ambac's alleged rights under section 7.05(d), Ambac

would have this Court read the Sale Order in a manner that would contradict the mandates of

Bankruptcy Code section 365. Specifically, section 7.05(d) is distinct from section 7.05(b) of the

PSA in that it permits the termination of the master servicer upon the objective occurrence of the

Servicing Triggers <u>notwithstanding whether the servicing in any way caused the accumulation of</u> <u>such Servicing Triggers.  That is, no subjective finding regarding the manner of servicing is</u> <u>required</u>.  Since paragraph 6 of the Sale Order only prevents Ambac from exercising rights related to the Debtors' acts or omissions, nothing in that section would prevent Ambac from exercising rights under section 7.05(d) that are expressly de-linked from anything the Debtors did or did not do.  Any other reading of the Sale Order would alter rights in a manner not permitted by section 365.

19.    Among other requirements, Bankruptcy Code section 365 permits the assumption and assignment of executory contracts upon the cure of any defaults under the contract in issue.  <u>See</u> 11 U.S.C. § 365(a), (b), & (f).  However, subject to limited exceptions, Bankruptcy Code section 365 does not permit a debtor to assume in part and reject in part a contract, or to otherwise alter the terms of the contract.  <u>In re Village Rathskeller, Inc.</u>, 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992) ("when the executory contract or lease is assumed, it is said to be assumed *cum onere*.  The defaults are cured but the agreement becomes property of the estate in the same shape as it existed prior to bankruptcy, with all of its benefits and burdens.") (citing <u>NLRB v. Bildisco & Bildisco</u>, 456 U.S. 513, 531 (1984) (superseded by statute on other grounds)).

20.    As required by Bankruptcy Code section 365, the PSAs must be assumed and assigned with all of their benefits and their burdens, subject to the Debtors' obligation to cure defaults.  The benefits and burdens will include the benefits Ocwen receives by being compensated to act as Master Servicer, but also the burdens of Ambac's explicit contractual right to remove Ocwen as master servicer upon the occurrence of objective metrics.  The Debtors respectfully submit that paragraph 6 of the Sale Order provides a means for assumption and

10

assignment of executory contracts to Ocwen free of liabilities related to the Debtors' prior acts or omissions, which will have been cured in accordance with the terms of the Sale Order.  See Sale Order ¶¶ 6 & P ("notwithstanding anything to the contrary contained in this Order . . . upon the assignment of the [PSAs] to Purchaser, Purchaser shall perform all of the obligations under the [PSAs] . . . from and after the Closing Date; provided however, that Purchaser shall not incur any liability that arises out of or relates to any act or omission of the Debtors.").  Since the Servicing Triggers are not liabilities of the Debtors and because Ambac's alleged rights under section 7.05(d) are based solely on objective criteria related to the status of loans and not any of the Debtors' "acts or omissions," the Sale Order should not be read to abridge the requirements of Bankruptcy Code section 365 that an agreement be assumed and assigned subject to all terms in that agreement.  Thus, notwithstanding Ambac's reading of paragraph 6, the Sale Order does not diminish Ambac's rights.

## II.    IN THE ALTERNATIVE, THE SERVICING TRIGGERS SHOULD BE REDUCED WITH RESPECT TO THE CURE PAID BY THE DEBTORS SO THAT AMBAC IS NOT PERMITTED TO RECEIVE DUPLICATIVE REMEDIES

21.    Even if the Court finds that the Debtors did, in fact, contribute to the accumulation of the Servicing Triggers and concludes that the deals must be assumed and assigned subject to Ambac's Servicing Trigger termination rights, the Servicing Trigger accumulations must be reduced in an amount equivalent to the cure payment made by the Debtors – thus, removing any accumulation of the Servicing Triggers related to the Debtors' acts or omissions.

22.    Ambac's position as to the Servicing Triggers would provide it with a windfall by allowing it to terminate based on Servicing Trigger accruals resulting from the Debtors' acts or omissions, notwithstanding the fact that the Debtors will have cured any conduct

11

that allegedly caused such Servicing Triggers to increase.  The Debtors do not dispute that if they are to assume and assign the PSAs containing Servicing Triggers, they must pay any cure claim to which Ambac is legally entitled, in an amount to be decided by agreement among the parties or by the Court.  See 11 U.S.C. § 365(b).  Nor do the Debtors contend that the portion of Servicing Trigger accumulations unrelated to the Debtors' acts or omissions should be reduced.  However, once the Debtors have paid Ambac the appropriate cure amount, the Debtors will have fully compensated Ambac for any servicing deficiencies for which Ambac has asserted the Debtors were responsible.  Accordingly, the Servicing Trigger accumulations should be reduced to reflect that Ambac has been compensated for any and all acts or omissions of the Debtors.  Ambac should not be permitted to terminate the master servicer based on the same servicing deficiencies – now cured – by including the amounts of those deficiencies in the Servicing Trigger calculations.

23.    Ambac claims that the Debtors' servicing deficiencies, or "acts or omissions," caused damages to the trusts in the form of losses and increasing delinquencies, both of which result from borrower defaults.  See Objection ¶ 24.  Each of the Servicing Triggers also relates to losses and delinquencies resulting from borrower defaults which, according to Ambac, are at least in part a result to the Debtors' servicing deficiencies.  See Objection ¶ 24 (cure amount results from damages resulting from "the Debtors' failure to service the mortgage loans in these transactions in accordance with the applicable servicing standards."); Jt. Stip. ¶ 14 (describing Servicing Triggers and including triggers based on borrower delinquencies and losses to the deals resulting from borrower defaults).  The Debtors' cure payment, if any, will act to cure any servicing defaults Ambac claims occurred.  The Servicing Triggers, which increase as a result of the same borrower delinquencies, are similarly susceptible to being reduced as a

12

result of any cure payment.  See, e.g., RASC 2002-KS4 at 49, 58 (describing "Servicing

Triggers" to include aggregate Realized Losses and defining "Realized Losses," generally, as the

amount of loss on a particular loan not recovered through liquidation after the borrower defaults

and fails to pay, and in some cases indicating that subsequent recoveries will reduce the amount

of the Realized Losses to the extent that they reduce the certificate principal balance on a class of

certificates); Insurance Policy for RASC 2002-KS4 at 1 – 2 (requiring Ambac to pay any Insured

Amount not paid and defining the Insured Amount to include, subject to certain adjustments,

interest and principal deficiencies owed to the Class A Certificates).  Upon receipt of any cure

payment, Ambac will have been compensated for losses and delinquencies resulting from the

Debtors' allegedly deficient servicing, which Ambac asserts led to it making additional

payments, and the Servicing Triggers – based on Realized Losses and delinquency rates – should

be reduced accordingly.

WHEREFORE, the Debtors respectfully request that the Court overrule Ambac's

objection to the Sale Motion and enter an Order permitting the Debtors to assume and assign all

Assumed Contracts referenced in Ambac's Objection and reservations of rights.

New York, New York                          /s/  Norman S. Rosenbaum
Dated: March 4, 2013                         Gary S. Lee
                                             Norman S. Rosenbaum
                                             Todd M. Goren
                                             James A. Newton
                                             MORRISON & FOERSTER LLP
                                             1290 Avenue of the Americas
                                             New York, New York 10104
                                             Telephone: (212) 468-8000
                                             Facsimile: (212) 468-7900

                                             *Counsel to the Debtors and
                                             Debtors in Possession*

**Exhibit 1**

RESIDENTIAL ASSET SECURITIES CORPORATION,

Depositor,

RESIDENTIAL FUNDING CORPORATION,

Master Servicer,

and

JPMORGAN CHASE BANK

Trustee

POOLING AND SERVICING AGREEMENT

Dated as of June 1, 2002

Home Equity Mortgage Asset-Backed Pass-Through Certificates

Series 2002-KS4

[TPW: NYLEGAL:72421.7] 16069-00693  07/17/02 10:35am

Confidential

Rating Agency: Standard & Poor's and Moody's. If any agency or a successor is no longer in existence, "Rating Agency" shall be such statistical credit rating agency, or other comparable Person, designated by the Depositor and with respect to the Class A Certificates, the Certificate Insurer, notice of which designation shall be given to the Trustee and the Master Servicer.

Realized Loss: With respect to each Mortgage Loan (or REO Property) as to which a Cash Liquidation or REO Disposition has occurred, an amount (not less than zero) equal to (i) the Stated Principal Balance of the Mortgage Loan (or REO Property) as of the date of Cash Liquidation or REO Disposition, plus (ii) interest (and REO Imputed Interest, if any) at the Net Mortgage Rate plus the sum of the applicable Mortgage Insurance Premium Rate and the Certificate Insurer Premium Modified Rate from the Due Date as to which interest was last paid or advanced to Certificateholders up to the last day of the month in which the Cash Liquidation (or REO Disposition) occurred on the Stated Principal Balance of such Mortgage Loan (or REO Property) outstanding during each Due Period that such interest was not paid or advanced, minus (iii) the proceeds, if any, received during the month in which such Cash Liquidation (or REO Disposition) occurred, to the extent applied as recoveries of interest at the Net Mortgage Rate plus the sum of the applicable Mortgage Insurance Premium Rate and the Certificate Insurer Premium Modified Rate and to principal of the Mortgage Loan, net of the portion thereof reimbursable to the Master Servicer or any Subservicer with respect to related Advances or expenses as to which the Master Servicer or Subservicer is entitled to reimbursement thereunder but which have not been previously reimbursed. With respect to each Mortgage Loan which is the subject of a Servicing Modification, (a) the amount by which the interest portion of a Monthly Payment or the principal balance of such Mortgage Loan was reduced, and (b) any such amount with respect to a Monthly Payment that was or would have been due in the month immediately following the month in which a Principal Prepayment or the Purchase Price of such Mortgage Loan is received or is deemed to have been received. With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation. With respect to each Mortgage Loan which has become the object of a Debt Service Reduction, the amount of such Debt Service Reduction. Notwithstanding the above, neither a Deficient Valuation nor a Debt Service Reduction shall be deemed a Realized Loss hereunder so long as the Master Servicer has notified the Trustee and the Certificate Insurer in writing that the Master Servicer is diligently pursuing any remedies that may exist in connection with the representations and warranties made regarding the related Mortgage Loan and either (A) the related Mortgage Loan is not in default with regard to payments due thereunder or (B) delinquent payments of principal and interest under the related Mortgage Loan and any premiums on any applicable primary hazard insurance policy and any related escrow payments in respect of such Mortgage Loan are being advanced on a current basis by the Master Servicer or a Subservicer, in either case without giving effect to any Debt Service Reduction.

Record Date: With respect to each Distribution Date and the LIBOR Certificates, the Business Day immediately preceding such Distribution Date. With respect to each Distribution Date and the Certificates (other than the LIBOR Certificates), the close of business on the last Business Day of the month next preceding the month in which the related Distribution Date occurs.

Confidential

the Servicing Fee Rate multiplied by the Stated Principal Balance of such Mortgage Loan as of the related Due Date in the related Due Period, as may be adjusted pursuant to Section 3.16(e).

Servicing Fee Rate: The per annum rate designated on the Mortgage Loan Schedule as the "MSTR SERV FEE," as may be adjusted with respect to successor Master Servicers as provided in Section 7.02.

Servicing Modification: Any reduction of the interest rate on or the outstanding principal balance of a Mortgage Loan that is in default or, in the judgment of the Master Servicer, default is reasonably foreseeable pursuant to a modification of such Mortgage Loan in accordance with Section 3.07(a).

Servicing Officer: Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name and specimen signature appear on a list of servicing officers furnished to the Trustee and the Certificate Insurer by the Master Servicer, as such list may from time to time be amended.

Servicing Trigger: As of any Distribution Date, for purposes of Section 7.05, "Servicing Trigger; Removal of Master Servicer," the occurrence of any of the following scenarios:

(a)     the Rolling Six-Month Delinquency Ratio is greater than 19.00% for the then-current Distribution Date;

(b)     the aggregate Twelve Month Loss Amount is greater than or equal to 3.00% of the average aggregate Stated Principal Balance of the Mortgage Loans for the then-current Distribution Date and the eleven preceding Distribution Dates; or

(c)     the aggregate Realized Losses on the Mortgage Loans exceed (a) with respect to the first 24 Distribution Dates, 2.25% of the aggregate Cut-off Date Principal Balance, (b) with respect to the next 12 Distribution Dates, 3.50% of the aggregate Cut-off Date Principal Balance, (c) with respect to the next 12 Distribution Dates, 4.50% of the aggregate Cut-off Date Principal Balance, and (d) with respect to all Distribution Dates thereafter, 6.00% of the aggregate Cut-off Date Principal Balance.

Special Hazard Loss: Any Realized Loss not in excess of the lesser of the cost of repair or the cost of replacement of a Mortgaged Property suffered by such Mortgaged Property on account of direct physical loss, exclusive of (i) any loss of a type covered by a hazard policy or a flood insurance policy required to be maintained in respect of such Mortgaged Property pursuant to Section 3.12(a), except to the extent of the portion of such loss not covered as a result of any coinsurance provision and (ii) any Extraordinary Loss.

Standard & Poor's: Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or its successor in interest.

Confidential

Insurer to make a required payment under the Certificate Guaranty Insurance Policy) and (b) no waiver pursuant to this Section 7.04 shall affect the Holders of Certificates in the manner set forth in Section 11.01(b)(i), (ii) or (iii). Upon any such waiver of a default or Event of Default by the Certificate Insurer or the Holders representing the requisite percentage of Voting Rights of Certificates affected by such default or Event of Default with the consent of the Certificate Insurer, which consent shall not be unreasonably withheld, such default or Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder. No such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon except to the extent expressly so waived.

Section 7.05    Servicing Trigger; Removal of Master Servicer.

(a)    Upon determination by the Certificate Insurer that a Servicing Trigger has occurred, the Certificate Insurer shall give notice of such Servicing Trigger to the Master Servicer, the Depositor, the Trustee and to each Rating Agency.

(b)    At any time after such determination and while a Servicing Trigger is continuing, the Certificate Insurer may direct the Trustee to remove the Master Servicer if the Certificate Insurer makes a determination that the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in the Trust Fund.

(c)    Upon receipt of directions to remove the Master Servicer pursuant to the preceding clause (b), the Trustee shall notify the Master Servicer that it has been terminated and the Master Servicer shall be terminated in the same manner as specified in Sections 7.01 and 7.02.

(d)    After notice of occurrence of a Servicing Trigger has been given and while a Servicing Trigger is continuing, until and unless the Master Servicer has been removed as provided in clause (b), the Master Servicer covenants and agrees to act as the Master Servicer for a term from the occurrence of the Servicing Trigger to the end of the calendar quarter in which such Servicing Trigger occurs, which term may at the Certificate Insurer's discretion be extended by notice to the Trustee and the Master Servicer for successive terms of three (3) calendar months each, until the termination of the Trust Fund. The Master Servicer will, upon the receipt of each such notice of extension (a "Master Servicer Extension Notice") become bound for the duration of the term covered by such Master Servicer Extension Notice to continue as Master Servicer subject to and in accordance with this Agreement. If, as of the fifteenth (15th) day prior to the last day of any term as the Master Servicer, the Trustee shall not have received any Master Servicer Extension Notice from the Certificate Insurer, the Trustee shall, within five (5) days thereafter, give written notice of such nonreceipt to the Certificate Insurer and the Master Servicer. If any such term expires without a Master Servicer Extension Notice then the Trustee shall act as Master Servicer as provided in Section 7.02.

(e)    No provision of this Section 7.05 shall have the effect of limiting the rights of the Depositor, the Trustee, the Certificateholders or the Certificate Insurer under Section 7.01.

Confidential