David W. Dykhouse
Brian P. Guiney
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

Attorneys for Ambac Assurance Corporation and the
Segregated Account of Ambac Assurance Corporation

**Hearing Date:  March 28, 2013 at 2:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
                                             :

In re:                                 :     Chapter 11
                                             :
RESIDENTIAL CAPITAL, LLC, *et al.*     :     Case No. 12-12020 (MG)
                                             :
              Debtors.     :     Jointly Administered
                                             :
------------------------------------- x

## SUR-REPLY OF AMBAC ASSURANCE CORPORATION AND THE SEGREGATED ACCOUNT OF AMBAC ASSURANCE CORPORATION IN FURTHER SUPPORT OF ITS OBJECTION TO PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Ambac Assurance Corporation ("Ambac Assurance") and the Segregated Account

of Ambac Assurance Corporation ("Segregated Account" and, together with Ambac Assurance,

"Ambac"), respectfully submit this sur-reply in further support of their *Objection and Reserva-*

*tion of Rights of Ambac Assurance Corporation and the Segregated Account of Ambac Assur-*

*ance Corporation to Proposed Assumption and Assignment of Certain Executory Contracts*, Dkt.

No. 1810 ("Objection") and in response to: (a) *Debtors' Reply to Objection and Reservations of*

*Rights of Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Cor-*

*poration to the Proposed Assumption and Assignment of Certain Executory Contracts* dated

March 4, 2013, Dkt. No. 3098 ("Debtors' Reply") and (b) *Joinder of the Official Committee of*

5955975v.11

*Unsecured Creditors to the Debtors' Reply to Objection and Reservations of Rights of Ambac*

*Assurance Corporation and the Segregated Account of Ambac Assurance Corporation to the*

*Proposed Assumption and Assignment of Certain Executory Contracts* dated March 4, 2013, Dkt.

No. 3099 ("Committee's Reply" and, together with the Debtors' Reply, the "Replies").

PRELIMINARY STATEMENT

1.      The Debtors sought approval of a sweeping Sale Order that appeared to

significantly reallocate the benefits and burdens between an executory contract assignee and the

contract counterparty, in violation of applicable law.  Believing that this was contrary to well-

settled law and could not be their intent, Ambac sought clarification from the Debtors and

Ocwen about the scope of the Sale Order and proposed language that would resolve its concern.

But, unable to secure any public, binding acknowledgment from the Debtors that the Sale Order

would not strip away its contractual rights – an indisputable tenet of bankruptcy law – Ambac's

concern grew.  Now that the Debtors have come around, at least in part, they feign confusion at

Ambac's "erroneous interpretation" and "improper reading"[1] of the Sale Order and take umbrage

at its refusal to voluntarily limit the scope of its Objection while this dispute remains pending.

2.      Nevertheless, the dispute arising from the Objection has been narrowed

considerably by the Debtors' belated acknowledgment that the Servicing Triggers[2] will remain

fully enforceable, at least pursuant to Section 7.05(d) of the applicable Pooling and Servicing

---

[1]  *See* Debtors' Reply ¶¶ 2, 13.

[2]  Capitalized terms used herein are defined in the *Joint Stipulation of Facts Regarding the Sale Objection of Ambac Assurance Corporation and the Segregated Account of Ambac Assurance Corporation* dated March 4, 2013, Dkt. No. 3094 ("Joint Stipulation" and cited as "Joint Stip. of Facts").

5955975v.11

Agreements, after the assignment of the Transaction Documents to Ocwen.[3]  Therefore, Ambac

files this sur-reply solely to correct the Debtors' mischaracterization of three important points.

**DISCUSSION**

A.      **Ambac, the Debtors and the Committee All Agree that the Sale Order
        Should Not Limit Ambac's Rights Under Section 7.05(d) of the Pooling and
        Servicing Agreements.**

3.      Months ago, Ambac proposed language for inclusion in the Sale Order

that would have resolved this dispute (*see* Objection ¶¶ 17, 21), but the Debtors and Ocwen re-

fused to accept it.  Now the Debtors accuse Ambac of "an erroneous interpretation of the Sale

Order" (Debtors' Reply ¶ 2), a surprising allegation in view of *the Debtors'* repeated refusal to

disabuse Ambac of this "erroneous interpretation" in any binding way.  Nevertheless, Ambac

welcomes the Debtors' long-overdue admission with respect to the post-assignment enforceabil-

ity of the Section 7.05(d) Servicing Triggers.

4.      The Debtors correctly observe that Section 7.05 of each Pooling and Ser-

vicing Agreement provides for two distinct courses of action Ambac may pursue if a Servicing

Trigger is tripped.[4]  Pursuant to Section 7.05(d), if a notice is provided that a Servicing Trigger

has been tripped but the Master Servicer is not immediately removed, the Master Servicer is ob-

ligated to continue to serve as such through the end of the then-current calendar quarter.[5]  There-

after, the term of the Master Servicer may be extended for each successive calendar quarter or,

---

[3]  *See*, *e.g.*, Debtors' Reply ¶ 3 ("[T]he Sale Order does not affect Ambac's rights, if any, to enforce the
Servicing Triggers [pursuant to Section 7.05(d)] because these rights are objective contractual provisions,
which expressly permit no fault termination of the servicer, rendering the 'acts or omissions' language of
the Sale Order irrelevant.  Thus, these provisions must be taken by Ocwen along with the benefits of the
PSAs."); Committee's Reply ¶ 3 ("Nothing in the Sale Order operates to modify any of the contractual
provisions of the Ambac Agreements").

[4]  *See Declaration of Iain H. Bruce* dated March 8, 2013 (cited as "Bruce Decl.") ¶ 3.  *See also* Joint Stip.
of Facts Exh. B and Debtors' Reply ¶¶ 10-11.

[5]  Bruce Decl. ¶ 4.  *See also* Joint Stip. of Facts Exh. B.

- 3 -

alternatively, not renewed at the end of any such calendar quarter.  In the event of non-renewal,

the Trustee or another successor Master Servicer appointed by Ambac pursuant to Section 7.02

becomes the Master Servicer.  *Id.*

        5.      Despite the clear and unambiguous contractual language and the settled

state of the law on this question, Ocwen has so far refused to acknowledge the continuing vitality

of the Servicing Triggers post-assignment.[6]  Indeed, until the Replies were filed, neither the

Debtors nor the Committee had acknowledged publicly the inescapable conclusion that the trans-

fer of RMBS Transactions to Ocwen pursuant to Section 365 of the Bankruptcy Code cannot

eliminate or alter Ambac's contractual rights.[7]  Therefore, the Debtors' eleventh-hour capitula-

tion is insufficient.  At this late stage and given the conflicting positions taken by buyer and sell-

er, Ambac respectfully requests entry of an Order of this Court confirming that Ocwen must ac-

cept assignment of these contracts, if at all, subject to all benefits and burdens (notwithstanding

anything in the Sale Order that may or may not reasonably be read to require a different out-

come).

---

[6]  And Ambac believes Ocwen might seek to exploit the broad language in the Sale Order, particularly paragraph 6, to attempt to limit Ambac's ability to enforce Servicing Triggers post-assignment.  *See* Bruce Decl. ¶ 8.

[7]  It is almost unfathomable that anyone could dispute this elementary proposition of law.  A debtor cannot "cherry pick" only the provisions of an executory contract it or its prospective assignee likes; it "must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits." *In re MF Global Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012).  *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984)(same).  An assignee can have no greater rights in the contract than the assignor. *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 126 (1975)("***It is elementary ancient law that an assignee never stands in any better position than his assignor***. He is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor")(emphasis added); *Condren, Walker & Co., Inc. v. Portnoy*, 48 A.D.2d 331 (1st Dep't 2008)("An assignee stands in the shoes of its assignor, ***subject to all the equities and burdens attached to the property acquired***")(emphasis added).

**B.       Nothing in the Documents Requires Ambac to Waive Its Rights Under Section 7.05(b) Upon Receipt of a Cure Payment from the Debtors.**

6.      The Debtors misconstrue Section 7.05(b) of the Pooling and Servicing Agreements to argue that, upon payment of the appropriate cure amount, Ambac will have been "made whole" with respect to servicing deficiencies and therefore will forfeit its rights under that section.   The documents say no such thing.

7.      Ambac may remove the Master Servicer pursuant to Section 7.05(b) of the Pooling and Servicing Agreements when a Servicing Trigger is tripped, provided it

> makes a determination that the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in" the mortgage loan pool backing the related series of mortgage-backed securities.[8]

This proviso allows Ambac to remove the Master Servicer if Ambac determines that servicing has had an adverse impact on pool performance.  The Debtors argue that Ambac's preservation of rights under Section 7.05(b), while at the same time asserting a cure claim for breaches of the Pooling and Servicing Agreements arising from servicing deficiencies, amounts to a windfall or double recovery, because "the alleged 'acts or omissions' that Ambac asserts give rise to its cure claim are the very same 'acts or omissions' that it is claiming caused the accumulation of the Servicing Trigger levels."  Debtors' Reply ¶ 17.

8.      This argument attempts to place additional limitations on Ambac's rights that are not found anywhere in the law or the documents.  Ambac's cure claim is for money damages arising from the Debtors' breach of the Pooling and Servicing Agreements and related Insurance and Indemnity Agreements.  The Servicing Triggers exist in order that Ambac may

---

[8]   Bruce Decl. ¶ 3.

5955975v.11

mitigate potential future losses resulting from servicing performance.[9]  The documents simply do not require, as the Debtors suggest, that Ambac elect between its rights under the Servicing Triggers – a *prospective* prophylactic action designed to mitigate future losses – and demanding compensation for past losses caused by the Debtors' breach of contract – a *retrospective* remedy for breach of contract and recognized by Section 365(b) of the Bankruptcy Code and applicable contract law.[10]

9.      The Debtors propose to reduce so-called "Servicing Trigger accumulations," a term not defined in any of the transaction documents, nor in the Debtors' Reply, "in an amount equivalent to the cure payment" (Debtors' Reply ¶ 21). This proposal underscores Debtors' incorrect interpretation of the relevant Transaction Documents.  First, as noted above, nothing in the transaction documents authorizes the Debtors to offset any payment made to Ambac to compensate for losses suffered as a result of the Debtors' breach of contract against "Servicing Trigger accumulations."  Even if it did, this apples-to-oranges approach would be entirely unworkable.  The Servicing Triggers measure not only losses on loans but also loan delinquencies. Delinquency-based Servicing Triggers measure the balance of delinquent loans in the transaction relative to the total outstanding balance of loans in the transaction, at one or more points in time, expressed as a percentage.[11]  The payment of cash to Ambac cannot reduce delinquencies in a transaction, nor alter the balance of loans outstanding in a transaction, either at the time of pay-

---

[9]  Bruce Decl. ¶ 5.

[10]  *See*, *e.g.*, RASC 2003-KS5, Pooling and Servicing Agreement, Art. III (governing the manner in which the Master Servicer must administer and service mortgage loans).  A copy of this agreement is included in Exhibit C of the Joint Stipulation.  *See also* RASC 2003-KS5, Insurance and Indemnity Agreement §§ 2.02(l) and 3.04(a)(iv)(requiring that mortgage loans be serviced in accordance with the applicable PSA and providing indemnity to Ambac for failure to do so).  A copy of this Insurance and Indemnity Agreement will be added to Exhibit C to the Joint Stipulation or submitted separately by Ambac.  *See* Joint Stip. of Facts ¶ 13, n.3.

[11]  Joint Stip. of Facts ¶ 14.

5955975v.11

ment or retroactive to prior measurement dates.  The Debtors offer no guidance or explanation as

to the manner in which this Court could determine or should order the reduction of a Servicing

Trigger that measures loan delinquencies on the basis of a cure amount paid in dollars.

10.     It is also unclear whether the Debtors' proposal would reduce the current

levels of the Servicing Triggers for just Section 7.05(b) of the Pooling and Servicing Agreements

or for both Section 7.05(b) and Section 7.05(d).  Neither makes any sense.  The former would

not only inject significant confusion into any attempt by Ambac to exercise its rights post-

assignment, but it is also entirely inconsistent with the plain language of the Transaction Docu-

ments, as explained above.  The latter would give Ocwen an inappropriate windfall by increasing

the Servicing Triggers with respect to Section 7.05(d) to account for the Debtors' "acts or omis-

sions" even though Section 7.05(d), as the Debtors concede, is entirely separate from any con-

cept of fault.

## C.     The Scope of the Objection Encompasses All Contracts that the Debtors Seek to Assume and Assign to Ocwen.

11.     The Debtors and the Committee complain that Ambac has not objected

with sufficient specificity regarding those securitization deals that do not have Servicing Trig-

gers.  The Objection is clear that the Sale Order is impermissibly broad, threatening to give

Ocwen grounds to argue that important rights of Ambac were curbed or eliminated altogether.

*See* Objection ¶¶ 12-18.  The Servicing Triggers represent one important *example* of such threat-

ened rights.  *Id.* ¶¶ 19-21.  But the burden does not rest with a contract counterparty to identify

each contractual right that it reasonably fears may be threatened and wishes to preserve prior to

assignment.  For months, Ambac has been requesting clarification from the Debtors and Ocwen

to confirm that the Sale Order would not be used to achieve these impermissible ends with re-

spect to any of the Ambac-wrapped RMBS Transaction, not just those with Servicing Triggers.

- 7 -

The Debtors have been unable or unwilling to provide any comfort to Ambac in this regard.

That they now appear prepared to do so is encouraging and may finally provide fertile ground for

a resolution of this dispute.

## CONCLUSION

WHEREFORE, for all of the reasons set forth herein and in the Objection, Ambac

respectfully requests that the Court sustain the Objection and grant such other and further relief

as is just and proper.

Dated:   New York, New York
         March 11, 2013

Respectfully submitted,

**PATTERSON BELKNAP WEBB & TYLER LLP**
Attorneys for Ambac Assurance Corporation and
the Segregated Account of Ambac Assurance
Corporation


By:   ____s/David W. Dykhouse_____
         David W. Dykhouse
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

5955975v.11