Hearing Date and Time: March 21, 2013 at 10:00 a.m.
Objection Deadline: March 13, 2013 at 12:00 p.m. (by agreement)

Richard M. Cieri                          Jeffrey S. Powell
Ray C. Schrock                            Daniel T. Donovan
Stephen E. Hessler                        KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS LLP                      655 15th Street, N.W., Ste. 1200
601 Lexington Avenue                      Washington, D.C. 20005
New York, New York 10022                  Telephone: (202) 879-5000
Telephone: (212) 446-4800                 Facsimile: (202) 879-5200
Facsimile: (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC., et al. | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ALLY FINANCIAL INC.'S OBJECTION TO DEBTORS' MOTION FOR A
DETERMINATION THAT (I) GMAC MORTGAGE'S FRB FORECLOSURE REVIEW
OBLIGATION IS A GENERAL UNSECURED CLAIM AND (II) THE AUTOMATIC
STAY PREVENTS ENFORCEMENT OF THE FRB FORECLOSURE REVIEW
OBLIGATIONS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................3

      A.     The Consent Order. ......................................................................................3

      B.     The Debtors Have Repeatedly Affirmed The Consent Order And Promised
           To Perform Their Obligations Under It. ...................................................6

      C.     The Debtors' Estates Have Benefitted Substantially From The Debtors'
           Promises To Comply With The Consent Order, Including Through Their
           Post-Petition Mortgage Servicing Platform Asset Purchase Agreement. ...............7

      D.     The Instant Motion. ...................................................................................10

ARGUMENT ...............................................................................................................11

I.     Under Federal Law, The Court Lacks Jurisdiction To Affect Or Prevent
      Enforcement Of The Consent Order As The Debtors' Motion Requests. ........................11

II.    The Debtors' Attempt To Re-Classify Their Foreclosure Review Obligations
      Under The Consent Order As A General Unsecured And Dischargeable Claim
      Fails Under Settled Bankruptcy Law. ................................................................13

      A.     The Debtors' Breach Of Their Obligations Under The Consent Order
           Would Not Give Rise To A Right Of Payment As Would Be Required To
           Render It A Dischargeable Claim. ........................................................13

      B.     The Debtors' Agreement To Perform The Consent Order's Foreclosure
           Review As Part Of The Platform Sale Renders Them Non-Dischargeable
           Post-Petition Obligations. ....................................................................18

III.   The Debtors Are Estopped From Avoiding Compliance With, Or Enforcement Of,
      Their Obligations Under The Consent Order....................................................19

IV.   All Costs Of Compliance With The Consent Order, Including The Foreclosure
      Review, Are Entitled To Administrative Expense Priority. ...............................22

V.    The Debtors' Motion Is Procedurally Improper And Requires An Adversary
      Proceeding....................................................................................................24

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AM Int'l, Inc. v. Datacard Corp.*,
   106 F.3d 1342 (7th Cir. 1997) ................................................................. 15

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) ................................................................. 3, 11, 12

*DeNaples v. Office of Comptroller of Currency*,
   404 F. App'x 609 (3d Cir. 2010) ................................................................. 12

*In re Am. Coastal Energy Inc.*,
   399 B.R. 805 (Bankr. S.D. Tex. 2009) ................................................................. 22

*In re Bill's Coal Co.*,
   124 B.R. 827 (D. Kan. 1991) ................................................................. 23

*In re Boston Post Rd. Ltd. P'ship*,
   21 F.3d 477 (2d Cir. 1994) ................................................................. 18

*In re Chateaugay Corp.*,
   944 F.2d 997 (2d Cir. 1991) ................................................................. 15, 16, 17, 18

*In re Colonial Realty Co.*,
   980 F.2d 125 (2d Cir. 1992) ................................................................. 12

*In re Insilco Techs., Inc.*,
   309 B.R. 111 (Bankr. D. Del. 2004) ................................................................. 23

*In re Ionosphere Clubs, Inc.*,
   85 F.3d 992 (2d Cir. 1996) ................................................................. 20

*In re Klein Sleep Prods., Inc.*,
   78 F.3d 18 (2d Cir. 1996) ................................................................. 19

*In re Lamparter Org., Inc.*,
   207 B.R. 48 (E.D.N.Y. 1997) ................................................................. 18, 19, 24

*In re Mark IV Indus., Inc.*,
   438 B.R. 460 (Bankr. S.D.N.Y. 2010),
   *aff'd*, 459 B.R. 173 (S.D.N.Y. 2011) ................................................................. 14

*In re Momentum Mfg. Corp.*,
   25 F.3d 1132 (2d Cir. 1994) ................................................................. 20

*In re Motel Invs., Inc.*,
   172 B.R. 105 (Bankr. M.D. Fla. 1994) .................................................................................. 23

*In re Oldco M Corp.*,
   438 B.R. 775 (Bankr. S.D.N.Y. 2010) ............................................................................ 16, 23

*In re Owner Mgmt. Serv., LLC*,
   Nos. 12-bk-10231-MT & 12-ap-01222-MT,
   2012 WL 4480551 (Bankr. C.D. Cal. Sept. 25, 2012) ............................................................ 12

*In re Residential Capital, LLC*,
   480 B.R. 550 (Bankr. S.D.N.Y. 2012) .................................................................................... 5

*In re Torwico Elecs., Inc.*,
   8 F.3d 146 (3d Cir. 1993) ...................................................................................................... 15

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001) .................................................................................................. 20

*Landmark Land Co. v. Office of Thrift Supervision*,
   948 F.2d 910 (5th Cir. 1991) ................................................................................................. 12

*Midlantic Nat'l Bank v. N.J. Dept. of Envtl. Prot.*,
   474 U.S. 494 (1986) .............................................................................................................. 22

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984) .............................................................................................................. 22

*Rhoades v. Casey*,
   196 F.3d 592 (5th Cir. 1999) ................................................................................................. 12

*Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*,
   789 F.2d 98 (2d Cir. 1986) .................................................................................................... 24

*United States v. Apex Oil Co.*,
   579 F.3d 734 (7th Cir. 2009) ..................................................................................... 14, 15, 18

**Statutes**

11 U.S.C. § 101(5)(B) ................................................................................................................ 14

11 U.S.C. § 362(b)(4) ................................................................................................................ 12

11 U.S.C. § 503(b)(1) ................................................................................................................ 22

12 U.S.C. § 1818(i)(1) ............................................................................................................. 3, 11

28 U.S.C. § 959(b) ................................................................................................................. 22, 23

**Rules**

Fed. R. Bankr. P. 7001(6), (9)........................................................................................................ 24

Fed. R. Bankr. P. 9024.................................................................................................................. 19

Fed. R. Civ. P. 60........................................................................................................................ 19

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. ("*AFI*"), on behalf of itself and its non-debtor subsidiaries (collectively, "*Ally*"), submits this objection (the "*Objection*") to the *Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation* [ECF No. 3055] (the "*Motion*").[1]

## PRELIMINARY STATEMENT

1.      From the beginning of these cases, the Debtors have represented to this Court and interested parties—including Ally—that they would honor their obligations under a Consent Order with the Federal Reserve.  Such representations made sense because, among other reasons, the Debtors wanted to sell a key portion of their business as a going concern.  The Debtors resolved objections to that sale by repeating their representations that they would comply with the Consent Order, and then completed the sale for approximately $3 billion.

2.      Now that the sale is complete, the Debtors seek to avoid their obligations— obligations they repeatedly represented they would comply with—under the Consent Order and orders of this Court.  This request flies in the face of statements the Debtors have made since the beginning of these cases—statements intended to ensure the Court and the parties that the Debtors would honor their obligations under the Consent Order.  The Debtors approach this Court with unclean hands, to say the least.  Equally important, the Debtors' attempt fails as a matter of law.  This Court should deny the Motion.

---

[1] Capitalized terms used in this Objection without definition have the meaning ascribed to them in the Motion.

3.    This Motion concerns a Consent Order with the Board of Governors of the Federal Reserve System ("**FRB**") into which the Debtors freely entered and which they have used to obtain substantial benefits from Ally.[2]  Under this Consent Order, the Debtors are required to undertake a Foreclosure Review designed to review past foreclosure actions for potential missteps and take definitive steps to avoid similar missteps in the future.  As the Debtors have confirmed in statements made to this Court, the Foreclosure Review concerns actions taken by the Debtors, not Ally.  As such, it is the Debtors' obligation to complete—and pay for—the Foreclosure Review.

4.    Since the first day of these bankruptcy cases, the Debtors have steadfastly maintained, in numerous representations to this Court and to Ally, their commitment "to comply with and adhere to the terms of the Consent Order."[3]  As the Debtors have repeatedly acknowledged, they are required to comply with the Consent Order,[4] and "their estates will benefit from" such compliance.[5]  Their estates have benefitted substantially, and the Debtors cannot dispute that there would have been no going-concern sale without regulatory compliance with the Consent Order.

---

[2] Although the Federal Deposit Insurance Corporation ("**FDIC**") is a signatory to this Consent Order, the Consent Order makes clear that the FDIC was ordering action as the primary federal supervisor and regulator of Ally Bank, one of the non-debtor subsidiaries of AFI.

[3] *Aff. of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Supp. of Chapter 11 Petitions & First Day Pleadings* (the "***Whitlinger First Day Affidavit***") [ECF No. 6], ¶ 87.

[4] *See, e.g., Debtors' Statement in Further Supp. of (A) Debtors' Mot. for an Order (I) To Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services & (II) Reaffirming Relief Granting in the GA Servicing Order (B) Debtors' Application to Employ & Retain Hudson Cook, LLP as Special Counsel, & (C) Debtors' Application to Employ & Retain Pepper Hamilton LLP as Special Foreclosure Review Counsel for Bankr. Issues* (the "***Debtors' PwC Statement***") [ECF No. 1749], ¶ 2.

[5] *Debtors' Mot. for Interim & Final Orders Under Sections 105(a), 361, 362, 363, 1107(a), & 1108 of the Bankr. Code (I) Authorizing the Debtors to Continue in the Ordinary Course of Bus. (A) Servicing Governmental Ass'n Loans & (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, & Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors and Foreclosure Prof'ls; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Related Counter-Claims in Foreclosure & Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; & (V) Granting Related Relief* (the "***GA Servicing Motion***") [ECF No. 57], ¶ 42.

5.     Moreover, by repeatedly representing that they will comply with the Consent Order (and, to this point, honoring those representations), the Debtors have induced Ally to, *inter alia*, provide them with $220 million in DIP financing, allow the Debtors continued use of Ally's cash collateral, and, most significantly, resolve its objections to the Debtors' sale of their mortgage loan servicing platform, thereby obtaining $3 billion for the Debtors' estates.

6.     Now, having received—and maximized—the benefits of compliance with the Consent Order, the Debtors seek to opportunistically shirk their obligations and ask this Court to prevent the enforcement of those obligations.  And they attempt to do so solely on the basis of a legally irrelevant settlement in which the FRB voluntarily resolved ***other*** obligations that ***other*** parties owed to it under ***other*** agreements.

7.     Equally important, the Debtors' Motion fails as a matter of law.  First, as the Supreme Court has held, federal statute prevents this Court from staying or taking any action that would alter or modify the Consent Order.  *See* 12 U.S.C. § 1818(i)(1); *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 42 (1991).  As the Debtors' Motion requests precisely this, it must be denied.  Second, the Debtors' obligations under the Consent Order to conduct Foreclosure Review cannot be classified as a general unsecured claim because (i) the obligations are not ones for which breach gives rise to a right of payment, and (ii) the obligations under the Consent Order are post-petition obligations that are not dischargeable as a matter of law.  The Debtors' Motion fails as a matter of law and should be denied.

## **BACKGROUND**

### A.     **The Consent Order.**

8.     On April 13, 2011, following an FRB examination of the Debtors' residential mortgage loan servicing practices, in which the FDIC participated, the FRB, FDIC, and the

Debtors, together with AFI and Ally Bank, entered into the Consent Order.[6]  Although AFI and

Ally Bank are parties to the Consent Order, the order primarily concerns the practices of the

Debtors.  The Consent Order imposes certain obligations upon the Debtors designed to both

modify their servicing practices and ensure ongoing compliance with federal and state laws.  To

that end, the Consent Order requires that the Debtors implement forward-looking plans to, *inter*

*alia*, strengthen coordination of their communications with borrowers,[7] enhance their compliance

program with respect to residential mortgage loan servicing and foreclosure,[8] manage and

monitor third-party vendors,[9] and implement and maintain controls and oversight with respect to

the Mortgage Electronic Registration System and its membership rules.[10]  Also in furtherance of

the Consent Order's dual goals of remedying past wrongs and ensuring the Debtors' future

compliance with applicable laws, the order requires the Debtors to undertake the Foreclosure

Review (as defined below) and implement changes going forward based on the findings of that

review.  Specifically, with regard to the Foreclosure Review, the Consent Order requires that,

*inter alia*, the Debtors (GMAC Mortgage, in particular):

- retain one or more independent consultant(s) to conduct an independent review of certain residential mortgage foreclosure actions and proceedings for loans serviced by Debtor GMAC Mortgage and its subsidiaries (the "***Foreclosure Review***") and prepare a written report detailing the findings of the Foreclosure Review;[11]

- submit to the FRB an acceptable plan to remediate deficiencies in any foreclosure filing or other proceeding and unauthorized foreclosure sales, and reimburse borrowers for any impermissible or unreasonable financial injury identified in the Foreclosure Review;[12] and

---

[6] *See* Consent Order, pages 3-6, *In re Ally Fin. Inc, Ally Bank, Residential Capital, LLC, & GMAC Mortg., LLC*, FRB Docket Nos. 11-020-B-HC & 11-020-B-DEO, FDIC Docket No. 11-123b (Apr. 13, 2011) (the "***Consent Order***") (attached as Ex. 1); Whitlinger First Day Affidavit, ¶ 87.
[7] Consent Order ¶ 5.
[8] *Id.* ¶ 8.
[9] *Id.* ¶ 6
[10] *Id.* ¶ 9.
[11] Consent Order, ¶ 3(a)-(b).
[12] *Id.* ¶ 3(c).

- submit to the FRB an acceptable compliance program to ensure that the operations of Debtor GMAC Mortgage and its subsidiaries comply with federal and state laws, which program must consider the findings and conclusions of the independent consultants engaged by GMAC Mortgage to conduct the Foreclosure Review.[13]

As the Debtors conceded to this Court at a prior hearing, the Foreclosure Review is focused entirely on the Debtors' conduct.[14]

9.       This Court, in denying a motion to form an official committee of borrowers, has recognized that the requirements imposed by the Consent Order constitute obligations imposed on the Debtors on a going-forward basis.[15]

10.      Under the terms of a Supplemental Agreement between the FRB and AFI, if ResCap or its subsidiaries filed for bankruptcy, AFI would become secondarily liable for the Debtors' obligation to perform the Foreclosure Review and make required remediation payments.[16]  The Debtors engaged PricewaterhouseCoopers LLP ("*PwC*") as the independent consultant to conduct the Foreclosure Review and prepare the report detailing the findings of that review, as required by the Consent Order.[17]  Under the terms of that engagement, AFI agreed to be jointly and severally liable for payment obligations owing to PwC.[18]

11.      Significantly, the Consent Order contains no provision that would authorize any monetary remedy or any alternative form of relief in lieu of performance of obligations under the Order.  It provides neither the FRB nor the FDIC any right to monetary compensation from the Debtors.

---

[13] *Id.* ¶ 8(m).
[14] Sept. 27, 2012 PwC Status Conference Tr., at 41:2-6 (attached as Ex. 2) (statement of the Debtors' counsel).
[15] *See In re Residential Capital, LLC*, 480 B.R. 550, 555-56, 560 (Bankr. S.D.N.Y. 2012).
[16] *See* Supplemental Agreement by and between Ally Financial Inc. and Federal Reserve Bank of Chicago, No. 12-030-WA/RB-HC (Apr. 26, 2012) (attached as Ex. 3).
[17] *See* Feb. 1, 2012 PwC Engagement Letter (attached as Ex. 4).
[18] *See id.* at 1.

**B.    The Debtors Have Repeatedly Affirmed The Consent Order And Promised To Perform Their Obligations Under It.**

12.    Since the commencement of these cases, the Debtors have repeatedly represented both to this Court and to Ally that they will continue to comply with their obligations under the Consent Order.  On the day these cases were filed, ResCap CEO James Whitlinger expressly acknowledged that the Consent Order imposes various ongoing obligations on the Debtors and represented to the Court that "[t]he Debtors intend to comply with and adhere to the terms of the Consent Order to the best of their abilities."[19]  The Debtors affirmed that intent, expressly asking this Court for authorization to continue to comply with the Order, explaining that they "are fully committed to complying with and adhering to the terms of the Consent Order ... to the best of their abilities."[20]  And the Court granted the Debtors' request.[21]

13.    The Debtors' expressions of intent to comply with the Consent Order have not been solely altruistic.  Rather, as the Debtors have acknowledged, their continued compliance with the Consent Order obligations, which are regulatory in nature, is *required*, and is both necessary and important to their estates.  For example, in asking this Court to authorize them to comply—and to continue to comply—with the requirements of the Consent Order, the Debtors have stated that:

- "The Debtors *must* continue to comply with the FRB Consent Order, including by ensuring the payment of PwC and the Law Firms by GMAC Mortgage."[22]

---

[19] Whitlinger First Day Affidavit, ¶ 87.
[20] GA Servicing Motion, ¶ 42.
[21] *See Final Order (I) Authorizing the Debtors to Continue in the Ordinary Course of Bus. (A) Servicing Governmental Ass'n Loans & (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, & Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors & Foreclosure Prof'ls; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims & Related Counter-Claims in Foreclosure & Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; & (V) Granting Related Relief* (June 15, 2012) [ECF No. 401].
[22] Debtors' PwC Statement, ¶ 2 (emphasis added).

- "[R]ather than risk noncompliance and violating the terms of our other agreements, ... we said let's pay [for conducting the Foreclosure Review]. Let's avoid trouble with the Fed."[23]

- "[C]ompliance with the FRB Consent Order is necessary to the smooth operation and continued viability of the Debtors' businesses and, accordingly, the Debtors intend to comply with the FRB Consent Order to the best of their abilities."[24]

- "The Debtors are fully committed to complying with and adhering to the terms of the Consent Order and the DOJ/AG Settlement to the best of their abilities and the Debtors and their estates will benefit from these activities."[25]

14.    This Court expressed agreement with the Debtors' representations and questioned an objection by the official committee of unsecured creditors (the "***Creditors' Committee***") to the Debtors' employment of PwC to continue performing the Foreclosure Review required by the Consent Order.[26]  As the Court stated, "the debtors need to comply with the consent order," explaining that it is "a regulatory -- or a police and regulatory enforcement matter," and, as such, the "[foreclosure] review has got to go forward."[27]  Consistent with this sentiment, a host of substantive orders in these cases have expressly provided that they "shall not modify or affect the terms and provisions of, nor the rights and obligations under [the Consent Order]."[28]

## C.    The Debtors' Estates Have Benefitted Substantially From The Debtors' Promises To Comply With The Consent Order, Including Through Their Post-Petition Mortgage Servicing Platform Asset Purchase Agreement.

15.    The Debtors' estates have benefitted substantially from the Debtors' continued representations that they will comply with the Consent Order and their honoring of those

---

[23] Sept. 27, 2012 PwC Status Conference Tr. 43:7-17 (statement of Debtors' counsel).

[24] *Debtors' Mot. for Entry of an Order Under Bankr. Code Section 363 & Bankr. Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Fed. Reserve Bd. Consent Order & (II) Reaffirming Relief Granted in the GA Servicing Order* [ECF No. 1357] (the "***PwC Motion***"), ¶ 6.

[25] GA Servicing Motion, ¶ 42; *see also* PwC Motion ¶ 12 n.2 (quoting same language).

[26] *See* Sept. 27, 2012 PwC Status Conference Tr. 68:9-18.

[27] *Id.*

[28] *E.g., Order Under 11 U.S.C. §§ 105, 363, & 365 & Fed. Bankr. P. 2002, 6004, 6006, & 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement With Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free & Clear of Liens, Claims, Encumbrances, & Other Interests; (C) Assumption & Assignment of Certain Executory Contracts & Unexpired Leases Thereto; (D) Related Agreements; & (II) Granting Related Relief* (the "***Sale Order***") [ECF No. 2246], ¶ 32.

7

representations, including by receiving benefits from Ally in exchange for, *inter alia*, the Debtors' promises to continue to comply with the Consent Order. For example, at the outset of these cases, the Debtors reached an agreement with Ally under which Ally agreed to provide $220 million in DIP financing to the Debtors and to allow the Debtors to use Ally's cash collateral and other collateral during the pendency of these cases.[29] As part of that agreement, which was reviewed by the Creditors' Committee and approved by the Court, the Debtors covenanted to "continue to perform and remain current with ... all of their obligations under the Consent [Order]."[30] To this day, the Debtors continue to use Ally's cash collateral and other collateral.[31]

16.    The benefit to the Debtors' estates inuring from Ally's actions taken in reliance on the Debtors' representations is best evidenced by the Debtors' recent sale of their mortgage servicing and origination platform (the "**Platform Sale**") to Ocwen Loan Servicing, LLC ("**Ocwen**") for $3 billion.[32]

17.    After the commencement of these cases, "the Debtors sought to accomplish the unprecedented task of selling a sustainable servicing and origination platform, which the Debtors hoped would result in substantially more value to creditors than prior liquidation efforts by mortgage servicers."[33] The product of the Debtors' efforts was an Asset Purchase Agreement with Ocwen (the "**Ocwen APA**"). Although Ally was generally supportive of the Platform Sale,

---

[29] *See Final Order Under Sections 105, 361, 362, 363,& 364 of the Bankr. Code & Bankr. Rules 2002, 4001, 6004, & 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, & (III) Granting Adequate Protection to Adequate Protection Parties* (the "**Final DIP & Cash Collateral Order**") [ECF No. 491].

[30] *Id.* ¶ 18(a)(iii).

[31] *See Decl. of James G. Mackey, Chief Financial Officer of Ally Financial Inc. in Supp. of Ally Financial Inc.'s Objection to Debtors' Motion Pursuant to Bankruptcy Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation* (the "**Mackey Declaration**"), ¶ 2 (attached as Ex. 5). The Debtors' use of cash collateral is currently set to expire on March 18, 2013. *See Second Stipulation & Order Amending AFI DIP & Cash Collateral Order* [ECF No. 2927].

[32] Amendment No. 1 to [Ocwen] Asset Purchase Agreement [ECF No. 2246-2], § 6.16C(a) (Ex. 2 to Sale Order).

[33] *Debtors' Omnibus Reply to Objections to Debtors' Sale Mot.* (the "**Omnibus Reply**") [ECF No. 2135], ¶ 1.

it objected to the Ocwen APA because it was concerned that the Debtors were not complying with the Consent Order (and the DOJ/AG Settlement) because the Ocwen APA did not require Ocwen to perform and be bound by such obligations.[34]  Ally noted in its objection that the Consent Order was to be binding upon successors of the Debtors and, as set forth in a supplemental agreement to the Consent Order (and Exhibit I to the DOJ/AG Settlement), the Debtors agreed with governmental authorities and regulators not to sell the servicing platform without Ally's consent, and that Ally could not consent to any sale if the Debtors did not ensure the continued performance of their regulatory obligations, including the Foreclosure Review.[35]

18.    Following Ally's (and the Department of Justice's) objection, the Debtors, the Department of Justice, Ocwen, and Ally engaged in extensive negotiations that ultimately led the Debtors to agree to modify the key provision of the Ocwen APA—Section 6.16—governing compliance with the Consent Order, so that it would require the Debtors, even after the Platform Sale, to remain bound by the Consent Order and thereby satisfy the requirements of that order (and also maximize the sale price by not requiring Ocwen to assume the obligation).[36]  As the Debtors stated in their reply to Ally's objection:

> Regarding the related Limited Objection of AFI to the Sale Motion, the Debtors have reiterated in revised Section 6.16 that they will continue to perform and be bound by the Consent Order and DOJ/[AG] Settlement Agreement, and that Ocwen will agree to perform various obligations appurtenant thereto.[37]

The Debtors further represented that "*[t]he Debtors' conduct in these cases should make it abundantly clear that the Debtors have every intention of continuing to honor their obligations under the DOJ/AG Settlement Agreement and Consent Order*."[38]

---

[34] *See generally Limited Objection of Ally Fin. Inc.& Ally Bank to the Debtors' Proposed Platform Sale Mot.* [ECF No. 2069].

[35] *Id.* ¶ 2.

[36] *See* Mackey Declaration, ¶ 6.

[37] Omnibus Reply, ¶ 99.

[38] *Id.* ¶ 100 (emphasis added).

19.    The "revised Section 6.16" was negotiated extensively among the Debtors, Ally, Ocwen, and the Department of Justice up through and during the sale hearing,[39] and expressly provided, *inter alia*, that the "ResCap Sellers must comply with and ensure the continued performance of their obligations under paragraphs 3, 4 and 22 of the Consent Order, and will comply with all terms and conditions of the DOJ/AG Settlement not included in the Assumed DOJ/AG Settlement Obligations."[40]    The Creditors' Committee was granted an additional day to review the revised Section 6.16, before they, too, signed off on it.    Because the Debtors agreed to this revised provision requiring the Debtors' continued compliance with the Consent Order (and DOJ/AG Settlement), Ally agreed that the related portion of its sale objection had been resolved so that the Platform Sale could proceed uncontested on that point.[41]

20.    After being advised that there were no objections to the revised Section 6.16, the Court entered the Sale Order approving the Ocwen APA.[42]    On or about February 15, 2013, the Debtors closed the Platform Sale for approximately $3 billion.

### D.    The Instant Motion.

21.    Now, less than one month after the Debtors closed that "unprecedented" $3 billion sale in which they again affirmed their obligations under the Consent Order, the Debtors attempt to avoid those obligations (in particular, their Foreclosure Review obligations) and ask this Court to sanction their maneuver by "reclassifying" them and preventing their enforcement.

---

[39] *See* Mackey Declaration, ¶ 6.
[40] Amendment No. 1 to [Ocwen] Asset Purchase Agreement [ECF No. 2246-2], § 6.16C(a).  Paragraphs 3, 4, and 22 of the Consent Order include the Foreclosure Review obligation.  *See* Consent Order, ¶¶ 3, 4, 22.
[41] *See* Mackey Declaration, ¶ 7.
[42] Sale Order, ¶ I.  In addition, given the Examiner's pending investigation and the previous dispute concerning the Debtors' retention of PwC, the Sale Order provided for the preservation of contribution claims against Ally for amounts paid by the Debtors in relation to the Foreclosure Review.  *See* Sale Order, ¶ 55.

22.    The Debtors seek to avoid their Consent Order obligations by alleging that because the FRB *chose* to reach settlements resolving other obligations that other parties owed to the FRB under other agreements, the Debtors are *entitled* to extract the same deal here and convert their obligations into a pre-petition claim and get injunctive relief from this Court prohibiting their enforcement.  Notably, however, the Debtors have not reached such a settlement with the FRB (or FDIC) that would cause their Consent Order obligations to cease—nor is there any evidence that they have even attempted to reach such a settlement.  As such, the Debtors' obligations under the Consent Order continue, and will continue.

## ARGUMENT

**I.    Under Federal Law, The Court Lacks Jurisdiction To Affect Or Prevent Enforcement Of The Consent Order As The Debtors' Motion Requests.**

23.    Ally respectfully submits that, pursuant to federal statute, the Court lacks jurisdiction to consider the Debtors' Motion because that Motion seeks to stay the Consent Order and would affect and prevent enforcement of the Consent Order.

24.    Section 1818 of Title 12 of the United States Code, under which the Consent Order was issued (*see* Consent Order, page 6), expressly provides that, subject to certain exceptions not relevant here, "*no court shall have jurisdiction to affect* by injunction or otherwise the issuance or enforcement of any notice or order under [section 1818], or to review, modify, suspend, terminate, or set aside any such notice or order."   12 U.S.C. § 1818(i)(1) (emphasis added).  As the Supreme Court has explained, this section trumps the jurisdictional grant in the Bankruptcy Code: "the specific preclusive language in 12 U.S.C. § 1818(i)(1) is not qualified or superseded by the general provisions governing bankruptcy proceedings." *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 42 (1991); *see also Landmark*

11

*Land Co. v. Office of Thrift Supervision*, 948 F.2d 910, 912 (5th Cir. 1991) (explaining that "section 1818(i)(1) trumps [28 U.S.C. § 1344(b)]").

25.    The statutory language of Section 1818(i) "provides ... clear and convincing evidence that Congress intended to deny ... jurisdiction to review and enjoin" enforcement by the FRB of orders enacted pursuant to this statute, even against debtors. *MCorp Fin., Inc.*, 502 U.S. at 44; *see also In re Owner Mgmt. Serv., LLC*, Nos. 12-bk-10231-MT & 12-ap-01222-MT, 2012 WL 4480551, at *1 (Bankr. C.D. Cal. Sept. 25, 2012) (granting motion to dismiss because "[section 1818(i)(1)] divests this Court of subject matter jurisdiction" over proceedings that would affect a consent order entered under section 1818)).   This jurisdictional bar applies regardless of whether a party directly challenges enforcement of such an order or raises a defense to enforcement of an order, and whether or not the enforcement action has been commenced at the time of the challenge.  *See, e.g.*, *Rhoades v. Casey*, 196 F.3d 592, 597 (5th Cir. 1999) (rejecting plaintiff's argument that "the jurisdictional scheme of § 1818(i) is inapplicable" where plaintiff "did not ask the district court to modify or suspend the [section 1818] order, but instead presented a defense to [that] order," because "if the district court had considered [plaintiff's] defense and declared the [section 1818] order void and therefore unenforceable, that decision would have been tantamount to the district court's modifying or terminating [that] order"); *DeNaples v. Office of Comptroller of Currency*, 404 F. App'x 609, 614 (3d Cir. 2010) (explaining that "the fact that [an enforcement] proceeding was commenced after [plaintiff] filed his complaint does not relieve us from the jurisdictional bar of § 1818(i)").[43]

---

[43] *In re Colonial Realty Co.*, 980 F.2d 125, 135 (2d Cir. 1992), does not alter this analysis. *Colonial Realty* involved a different statute (12 U.S.C. § 1821, as opposed to 12 U.S.C. § 1818) and involved a proceeding in which the FDIC acted as a receiver, rather than a regulator, seeking to recover property from a debtor's wife.  Any contention that *Colonial Realty* suggested (necessarily in *dicta*) that *MCorp*'s holding is limited to cases in which a "§ 362(b) exemption [to the automatic stay] is claimed to be applicable," is beside the point, as this Court has recognized that the Consent Order here is "a police and regulatory enforcement matter," Sept. 27, 2012 PwC Status Conference Tr. 68:17-18, and thus fits squarely within 11 U.S.C. § 362(b)(4).

26.    Here, the Debtors, through their Motion, seek to do exactly what the Supreme Court and other courts have held that 12 U.S.C. § 1818(i) prevents.  First, they ask this Court to prevent the enforcement of the Consent Order by invoking the automatic stay provision of the Bankruptcy Code.  Second, the Debtors ask this Court to transform their Foreclosure Review obligations under the Consent Order into a monetary claim—that is, they ask this Court to "affect" and "modify" the Consent Order.  As federal law precludes the Court from doing either, the Debtors' Motion should be denied.

**II.    The Debtors' Attempt To Re-Classify Their Foreclosure Review Obligations Under The Consent Order As A General Unsecured And Dischargeable Claim Fails Under Settled Bankruptcy Law.**

27.    Even assuming *arguendo* that this Court has jurisdiction, the Debtors' Motion to reclassify their Foreclosure Review obligations as a general unsecured and dischargeable claim fails under settled principles of bankruptcy law for two independent reasons, either one of which standing alone defeats the Motion.  *First*, the Debtors' obligations under the Consent Order are not obligations for which breach gives rise to a right of payment.  *Second*, even if a monetary payment could satisfy the Debtors' obligations under the Consent Order (and it cannot), the Debtors' obligations are ***post-petition***—not pre-petition—obligations that are not dischargeable as a matter of law.

**A.    The Debtors' Breach Of Their Obligations Under The Consent Order Would Not Give Rise To A Right Of Payment As Would Be Required To Render It A Dischargeable Claim.**

28.    The Debtors cannot reclassify their Foreclosure Review obligations as a general unsecured and dischargeable claim because the FRB has no right under the Consent Order—or any other law—to demand monetary payment in lieu of, or for breach by the Debtors of, the Debtors' obligations.

29.     The law on this point is clear.  Under section 101(5)(B) of the Bankruptcy Code, a "right to an equitable remedy for breach of performance" constitutes a dischargeable claim only where "such breach gives rise to a right to payment."   11 U.S.C. § 101(5)(B); *see also United States v. Apex Oil Co.*, 579 F.3d 734, 736 (7th Cir. 2009) (Posner, J.) ("The natural reading of [11 U.S.C. § 101(5)(B)] is that if the holder of an equitable claim can, in the event that the equitable remedy turns out to be unobtainable, obtain a money judgment instead, the claim is dischargeable.").  "Conversely, where a creditor does not have the option to accept money in lieu of the equitable remedy, the equitable obligation is not a 'claim' and is not dischargeable in bankruptcy."  *In re Mark IV Indus., Inc.*, 438 B.R. 460, 465-66 (Bankr. S.D.N.Y. 2010), *aff'd*, 459 B.R. 173 (S.D.N.Y. 2011) .

30.     Here, the terms of the Consent Order make clear that the FRB has no right to receive or demand monetary payment in lieu of the Debtors' performance of their obligations under the Consent Order.  The Consent Order contains no provision that would authorize any monetary remedy or any alternative form of relief in lieu of performance of obligations under the order or that even suggests that such relief would be available.

31.     The Debtors point to no provision of the Consent Order, or to any other law, that would entitle the FRB to a monetary payment (much less compel the FRB to accept a monetary payment) in the event of their breach of the Order.  Instead, the Debtors attempt to rely on the apparent fact that the FRB voluntarily reached a settlement with ***other*** parties that resolved ***other*** obligations that those ***other*** parties owed to it under ***other*** agreements.  But voluntary settlement agreements can provide for the exchange of forms of consideration not otherwise contractually or legally available to parties.  The fact that the FRB may have reached such a settlement with other parties to other agreements does not change the fact that there has been no settlement with

14

the Debtors, and it does not in any way alter the clear terms of the Consent Order.  As numerous courts have explained, "[o]nly orders which can be turned into a 'right to payment' are considered dischargeable 'claims' for bankruptcy purposes." *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1348 (7th Cir. 1997).  Where, as here, an obligee like the FRB has no legal ***right*** under an order to require a monetary payment from obligors like the Debtors, the order "is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.'"  *In re Torwico Elecs., Inc.*, 8 F.3d 146, 151 (3d Cir. 1993); *see also Apex Oil Co.*, 579 F.3d at 736-37.

32.     *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991), relied on by the Debtors, does not hold otherwise.  As the court there expressly acknowledged in holding that the debtors' obligation to pay EPA for cleanup costs that EPA incurred was a dischargeable claim, CERCLA expressly allowed EPA "to incur the costs of removing ... wastes and then sue[] [the debtor] to recover the response costs." *Id.* at 1009.  The same is not true here: the FRB has no right, under the Consent Order or otherwise, to itself perform the Foreclosure Review and remedy past injuries caused by the Debtors' allegedly improper servicing practices and then sue the Debtors to recover the costs of doing so.

33.     Perhaps recognizing this, the Debtors analogize to cases involving compliance with and remediation under environmental laws and argue that their Foreclosure Review obligations under the Consent Order constitute dischargeable claims because they are "not intended to end or ameliorate ongoing violations of the law."   Motion, pages 14-16 (capitalization omitted).  This argument fails both as a matter of law and as a matter of fact.

34.     ***First***, as the Second Circuit and this Court have recognized, an order that "accomplishes the dual objectives of" remedying past injuries and ensuring ongoing compliance

with legal obligations "*is not a dischargeable claim*." *Chateaugay*, 944 F.2d at 1008 (emphasis added); *accord In re Oldco M Corp.*, 438 B.R. 775, 782 (Bankr. S.D.N.Y. 2010) (Glenn, J.) (quoting *Chateaugay*).

35.     In *Chateaugay*, the Second Circuit considered the question whether an order obtained by EPA under CERCLA, requiring a debtor-polluter to both remediate contaminated property *and* ameliorate continued pollution, constituted a dischargeable claim.  *See* 944 F.2d 1007-09.  The Court first noted that because CERCLA allows EPA to itself remediate pollution and sue the polluter for the cost of remediation—an express statutorily provided alternative not available to the FRB with respect to the performance of the Foreclosure Review here—an order that does no more than require a debtor-polluter to remediate prior pollution would constitute a dischargeable claim.  *Id.* at 1008.  This is so because "[a]n injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargeable." *Id.*  But, as the Debtors concede in their Motion, because a debtor has a non-dischargeable, ongoing obligation to comply with the law, the court held that "a cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim." *Id.*; *see also* Motion, ¶ 32.  As the court explained, "[s]ince there is no option to accept payment in lieu of continued pollution, any order that *to any extent* ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.'" *Chateaugay*, 944 F.2d at 1008 (emphasis added).  This Court, citing *Chateaugay*, reached the same conclusion in *Oldco*, holding that the consent injunction there at issue "likewise implicates the 'dual objectives' of removing contaminants and stopping or ameliorating ongoing pollution," and therefore could not constitute a dischargeable claim.  438 B.R. at 782.

16

36.     Here, as the Debtors concede, the Consent Order serves the same dual corrective and forward-looking objectives that the Second Circuit explained render such orders non-dischargeable.   Indeed, the Consent Order is designed *primarily* to ensure that the Debtors comply with the law on a going-forward basis and, as the Debtors admit (*see* Motion, ¶ 34), it imposes numerous ongoing obligations on the Debtors to do precisely that.  This fact is fatal to the Debtors' Motion.

37.     The Debtors' only response is to ask this Court to sever the Consent Order's Foreclosure Review obligations from the rest of the order's obligations.  The Debtors cite no authority that would allow this—and there is none.  Indeed, allowing the severance of a single, unified injunctive order would directly contravene the Second Circuit's holding (in the context of an environmental order) that "[s]ince there is no option to accept payment in lieu of continued pollution [that is, violations of law], any order that *to any extent* ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.'" *Chateaugay*, 944 F.2d at 1008 (emphasis added).

38.     *Second,* even if the Consent Order's Foreclosure Review obligation could somehow be severed from the rest of the obligations the order imposes, the Debtors' Motion would still fail because, contrary to the Debtors' suggestion, the Foreclosure Review obligation is itself forward-looking and designed to ensure future compliance with the law.  As noted above, as part of the Foreclosure Review, the independent consultant retained by the Debtors must prepare a written report detailing the findings of its review.  (Consent Order, ¶ 3(b).)  To be sure, based on the findings in that report (which necessarily will not be prepared until *after* the completion of the Foreclosure Review), Debtor GMAC Mortgage must submit to the FRB a plan to remediate prior foreclosure-related deficiencies.  (*Id.* ¶ 3(c).)  But, Debtor GMAC Mortgage

must *also* submit to the FRB an acceptable compliance program that takes into account the

findings and conclusions of the Foreclosure Review report to ensure that its operations (and

those of its subsidiaries) comply with federal and state laws on a going-forward basis.  (*Id.*

¶ 8(m).)  In other words, the Foreclosure Review itself "accomplishes the dual objectives of"

remedying past injuries and ensuring ongoing compliance with legal obligations, and therefore

"is not a dischargeable claim."  *Chateaugay*, 944 F.2d at 1008; *Oldco*, 438 B.R. at 782.[44]

### B.    The Debtors' Agreement To Perform The Consent Order's Foreclosure Review As Part Of The Platform Sale Renders Them Non-Dischargeable Post-Petition Obligations.

39.    The Debtors' Motion also fails for the independent reason that the Debtors

expressly agreed to perform the Foreclosure Review obligations in a post-petition contract that

was approved by an order of this Court.[45]

40.    The Debtors fail to acknowledge this point in their Motion.  Instead, the Debtors

focus on the fact that they originally entered into the Consent Order (and became subject to the

obligations it imposes) on April 13, 2011, prior to the commencement of their bankruptcy cases.

But when the Debtors subsequently expressly agreed to perform certain obligations imposed by

the Consent Order, including the Foreclosure Review, in their *post-petition* Ocwen APA, such

obligations became *post-petition* obligations.  *See In re Lamparter Org., Inc.*, 207 B.R. 48, 51

(E.D.N.Y. 1997) (explaining that a "newly executed, post-petition contract and an assumed, pre-

petition contract receive similar treatment, as each is the functional equivalent of the other"); *see*

*also, e.g.*, *In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 484 (2d Cir. 1994) ("The obligations

assumed by the debtor under the continued leases constitute post-petition administrative

---

[44] Any suggestion by the Debtors that the costs of compliance with their obligations under the Consent Order could somehow render those obligations a dischargeable claim is contrary to settled law.  *See, e.g.*, *Apex Oil Co.*, 579 F.3d at 737 (citing cases and explaining that the argument that "the cost of complying with an equitable decree should be deemed a money claim, and hence dischargeable ... does not comport with the language of the Bankruptcy Code," and observing that "[a]lmost every equitable decree imposes a cost on the defendant").

[45] *See generally* Sale Order.

claims.").   Under the terms of the Ocwen APA, as approved by order of this Court, the Debtors

agreed that they "must comply with and ensure the continued performance of their obligations

under paragraphs 3, 4 and 22 of the Consent Order."[46]   It is black-letter law that such a post-

petition obligation cannot constitute a dischargeable claim.   To the contrary, such obligations "in

fact constitute a post-bankruptcy benefit to the estate," and far from being dischargeable, are in

fact entitled to administrative priority payment.   *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 25 (2d

Cir. 1996); *see also Lamparter*, 207 B.R. at 51.

41.     Moreover, the Debtors simply cannot now, through this Motion, seek to modify

the terms of this Court's Sale Order "direct[ing] [the Debtors] to perform their obligations under,

and comply with the terms of, the Ocwen APA,"[47] which, as described above, requires the

Debtors to perform the obligations imposed by the Consent Order.   Had the Debtors wished to

challenge the terms of that order, they were required to move for reconsideration of that order

under Federal Rule of Bankruptcy Procedure 9024.   *See* Fed. R. Bankr. P. 9024; *see also* Fed. R.

Civ. P. 60.  The Debtors chose not to do so.

### III.     The Debtors Are Estopped From Avoiding Compliance With, Or Enforcement Of, Their Obligations Under The Consent Order.

42.     The Debtors' Motion should also be denied for the independent reason that the

Debtors—after repeatedly representing to this Court and to Ally that they would comply with the

Consent Order and thereby inducing Ally to incur significant expenses and provide substantial

consideration to them in reliance on those representations—are estopped from disavowing those

representations and disregarding their Consent Order obligations.

---

[46] Amendment No. 1 to [Ocwen] Asset Purchase Agreement [ECF No. 2246-2], § 6.16C(a).  Paragraphs 3, 4, and 22 of the Consent Order include the Foreclosure Review obligation.  *See* Consent Order, ¶¶ 3, 4, 22.
[47] Sale Order, ¶ 3.

43.    As the Second Circuit has explained, a "bankruptcy court is essentially a court of equity." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996).   As such, "[i]ts proceedings are inherently proceedings in equity, and it applies the principles and rules of equity jurisprudence, including principles of estoppel." *Id.* (quotation marks, alterations, and citations omitted).   "The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).   Courts—including in the bankruptcy context—have not hesitated to invoke the doctrine to prevent a party that has made a representation and induced another party to rely on that representation to its detriment, from acting contrary to its prior representation. *See, e.g.*, *Ionosphere Clubs*, 85 F.3d at 1001-02 (holding that debtor who promised to perform obligations under a contract with a modification in order to induce creditor to accept that contractual modification was estopped from subsequently opposing enforcement of its obligations under that contract); *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136-37 (2d Cir. 1994) (holding that debtor who represented that employees would receive severance payments under reorganization plan and thereby obtained votes needed to confirm the plan was estopped from subsequently seeking to amend plan to eliminate severance payments).

44.    The Debtors' Motion constitutes the precise type of opportunistic attempt to avoid representations that the equitable estoppel doctrine was designed to prevent.   Since the commencement of these bankruptcy cases, the Debtors have repeatedly represented to this Court and to Ally that they would continue to comply with their obligations under the Consent Order, including the Foreclosure Review.   In exchange for and in reliance on those promises, Ally provided the Debtors with substantial financial benefits, at its own expense.   Very early in these

cases, for example, Ally entered into a $220 million DIP financing agreement with the Debtors and has allowed the Debtors to use its cash collateral and other collateral in aid of their restructuring, which the Debtors continue to do.[48]  Even more significantly and more recently, Ally agreed to resolve its objection to the Platform Sale because—and only because—the Debtors agreed to perform the Foreclosure Review obligations under the Consent Order as part of the heavily negotiated Section 6.16 amendment to the Ocwen APA.  As a result, the Debtors were able to consummate the Platform Sale and receive $3 billion for their estates.  If the Debtors were permitted to now, after having received these significant benefits, renege on their repeated representations to Ally and to this Court, Ally would be substantially prejudiced.  Yet that is precisely what the Debtors' Motion seeks to accomplish.  As such, the Debtors should be equitably estopped from obtaining the relief requested in their Motion.

45.    It is no answer for the Debtors to suggest that the FRB's voluntary settlement with other parties, which resolved those other parties' obligations to the FRB under their separate and distinct agreements with the FRB somehow changes the equation.   As discussed above, settlement agreements reached by other parties resolving their obligations under their consent orders with the FRB—even if those orders are similar to Debtors' Consent Order—have no bearing on the Debtors' obligations under the Debtors' Consent Order.  The Debtors have not reached a settlement of their own with the FRB, and those other settlements do not and cannot change the rights of the FRB or the Debtors under the Consent Order here at issue.  The Debtors' obligations under the Consent Order continue, and they are equitably estopped from running away from those obligations.

---

[48] *See generally* Final DIP & Cash Collateral Order; *see also* Mackey Declaration, ¶ 2.

**IV.   All Costs Of Compliance With The Consent Order, Including The Foreclosure Review, Are Entitled To Administrative Expense Priority.**

46.   Even if the Debtors were correct that the Foreclosure Review could be characterized as a right to payment, that claim (whether it be asserted by the FRB or by Ally in the event Ally satisfied the Debtors' obligations to the FRB and pursued the FRB's claim by subrogation or a separate claim for substantial contribution) would be entitled to administrative expense priority under section 503(b)(1) of the Bankruptcy Code.[49]

47.   *First*, costs and expenses associated with the Consent Order, including its Foreclosure Review, are entitled to administrative priority as "actual, necessary costs and expenses of preserving the estate," 11 U.S.C. § 503(b)(1), because the Debtors, as subsidiaries of a U.S. bank holding company, have a continuing obligation to comply with the Consent Order that is unchanged by their current status as debtors in possession.  *See* 28 U.S.C. § 959(b); *see also, e.g.*, *Midlantic Nat'l Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 502 (1986) ("Congress has repeatedly expressed its legislative determination that the trustee is not to have carte blanche to ignore nonbankruptcy law."); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 534 (1984) ("[T]he debtor-in-possession is not relieved of all obligations under the [Act] simply by filing a petition for bankruptcy."); *In re Am. Coastal Energy Inc.*, 399 B.R. 805, 810 (Bankr. S.D. Tex. 2009) ("A bankruptcy petition is not a grant of immunity.  Bankrupt debtors are no different from any citizen in that they must comply with state and federal laws.").

48.   To be sure, the Debtors originally entered the Consent Order pre-petition.  But that is irrelevant.  The Debtors' bankruptcy filing did not terminate their regulatory obligations, and the costs associated with the ongoing compliance with those obligations have arisen from

---

[49] Although the Debtors have briefed the issue of expense priority in their Motion, Ally notes that this issue is not yet ripe for adjudication.  Nonetheless, for avoidance of doubt, Ally briefly responds to the merits of the Debtors' expense priority argument here and reserves its right to fully brief the issue when it becomes ripe.

work performed ***post-petition*** in order for the Debtors to comply with a regulatory obligation—

the Consent Order.[50]   As this Court and others have recognized, such costs associated with

complying with regulatory obligations are a necessary cost of doing business that warrants

administrative expense treatment.  *See, e.g.*, *In re Oldco M Corp.*, 438 B.R. at 785 (citing

28 U.S.C. § 959(b) and stating that "[i]f Metaldyne had ceased remediation and the state had

been forced to step in to protect public and health and safety, the state would have been entitled

to an allowed administrative expense"); *In re Motel Invs., Inc.*, 172 B.R. 105, 107 (Bankr. M.D.

Fla. 1994) (holding that fines imposed for post-petition violations of a pre-petition consent order

are administrative expenses because "fines imposed for failure to comply with the law regulating

treatment of [the type of property involved in the case] is ordinarily incident to operating a

business"); *In re Bill's Coal Co.*, 124 B.R. 827, 830 (D. Kan. 1991) (holding that "in the

regulated atmosphere of the strip mining industry, a fine for the violation of environmental

regulations should be considered a 'cost ordinarily incident to operation of a business' ...

sufficient for administrative expense status").

     49.     Thus, unsurprisingly, the Debtors themselves have repeatedly recognized that

compliance with the law is necessary to preserve their estates.  *See supra* ¶ 13 (quoting the

Debtors' statements).  And because this obligation to comply with the Consent Order arises from

the Debtors' status as subsidiaries of a bank holding company and not from their possession of

any specific property that could be divested, the sole case on which they rely to argue that their

costs of compliance are not entitled to administrative expense priority, *In re Insilco Techs., Inc.*,

309 B.R. 111 (Bankr. D. Del. 2004), is entirely inapposite.

---

[50] There is no "Foreclosure Review Claim" as the Motion presents this issue.  The Debtors argue that their
obligation to conduct the Foreclosure Review is a pre-petition obligation based upon a hypothetical ability to enter
into a cash-out settlement with the FRB, but no such cash-out settlement exists at this time.

50.    **Second**, as discussed above, the Debtors affirmatively agreed to perform the

Foreclosure Review required by the Consent Order in their ***post-petition*** Ocwen APA.  *See supra*

Part II.B.  Although the Debtors fail to acknowledge the Ocwen APA in their Motion, they

cannot deny that under the terms of that agreement, they "must comply with and ensure the

continued performance of their obligations under paragraphs 3, 4 and 22 of the Consent

Order"—that is, the Foreclosure Review they now challenge.[51]  The Ocwen APA unquestionably

provided a substantial benefit to the Debtors' estate—$3 billion.  The agreement to perform the

Consent Order obligations through the Ocwen APA is a post-petition contract that this Court has

already found was in the best interest of the Debtors' estates.[52]  As such, the obligations are

entitled to administrative expense priority as a matter of law.  *See, e.g.*, *Trustees of Amalgamated*

*Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (describing standard for

administrative expense priority); *In re Lamparter Org.*, 207 B.R. at 51 (reversing bankruptcy

court's denial of administrative expense priority with respect to future rent obligations under a

post-petition lease that was presented to and approved by the bankruptcy court).

## V.    The Debtors' Motion Is Procedurally Improper And Requires An Adversary Proceeding.

51.    Finally, Ally notes that the Debtors' Motion is procedurally improper, as it is not

a plan classification motion but rather seeks a declaratory judgment that one part of their

obligation under the Consent Order (a single injunctive order) constitutes a pre-petition claim

subject to discharge and not a non-dischargeable injunctive obligation.  Under black-letter

bankruptcy law, the Debtors must file an adversary proceeding to seek such relief, as the Debtors

themselves have previously acknowledged.  *See* Fed. R. Bankr. P. 7001(6), (9); *see also Debtors'*

---

[51] Amendment No. 1 to [Ocwen] Asset Purchase Agreement [ECF No. 2246-2], § 6.16C(a).  Paragraphs 3, 4, and 22 of the Consent Order include the Foreclosure Review obligation.  *See* Consent Order, ¶¶ 3, 4, 22.

[52] *See* Sale Order, ¶ I.

*Opp'n to Mot. of AIG Asset Mgmt. (U.S.), LLC, the Allstate Entities, Mass. Mut. Life Ins. Co., & the Prudential Entities for an Order Under Bankr. Rule 3013 Concerning Subordination of Investors' Sec. Claims* [ECF No. 2953], at 1 (stating that "[p]ursuant to the Bankruptcy Rules, the appropriate procedural vehicle for seeking declaratory relief (as the Investors do in their Motion) ... is an adversary proceeding," and "[a]ccordingly, commencing an adversary proceeding to address [the Investors'] dispute").   Similarly, the Debtors' request for a determination as to the applicability of the automatic stay is not ripe for adjudication, as there is no pending enforcement action.   In any event, this request, too, is nothing more than an attempt to circumvent Bankruptcy Rule 7001(6) by presuming a pre-petition claim, anticipating an attempt to enforce that claim, and asking this Court to preemptively address a non-existent automatic stay violation.

## **CONCLUSION**

For the foregoing reasons, Ally respectfully requests that this Court deny the Motion.


Dated:  March 13, 2013
       New York, New York


|                                 | */s/ Ray C. Schrock*                        |
|---------------------------------|---------------------------------------------|
| Jeffrey S. Powell               | Richard M. Cieri                            |
| Daniel T. Donovan               | Ray C. Schrock                              |
| KIRKLAND & ELLIS LLP            | Stephen E. Hessler                          |
| 655 15th Street, N.W., Ste. 1200| KIRKLAND & ELLIS LLP                        |
| Washington, D.C. 20005          | 601 Lexington Avenue                        |
| Telephone: (202) 879-5000       | New York, New York 10022                    |
| Facsimile: (202) 879-5200       | Telephone: (212) 446 4800                   |
|                                 | Facsimile: (212) 446 4900                   |

*Counsel for Ally Financial Inc. and Ally Bank*

# EXHIBIT 1

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

FEDERAL DEPOSIT INSURANCE CORPORATION
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | FRB Docket No.  11-020-B-HC |
| | 11-020-B-DEO |
| ALLY FINANCIAL INC. | |
| Detroit, Michigan | FDIC-11-123b |
| | |
| ALLY BANK | |
| Midvale, Utah | |
| | |
| RESIDENTIAL CAPITAL, LLC | |
| Minneapolis, Minnesota | |
| | |
| and | |
| | |
| GMAC MORTGAGE, LLC | |
| Fort Washington, Pennsylvania | |

### CONSENT ORDER

WHEREAS, Ally Financial Inc., Detroit, Michigan ("Ally Financial"), a registered bank

holding company, indirectly owns and controls Ally Bank (f/k/a GMAC Bank), Midvale, Utah, a

state nonmember bank, and numerous direct and indirect nonbank subsidiaries, including

Residential Capital, LLC, Minneapolis, Minnesota ("ResCap"), and its direct and indirect

subsidiaries, including GMAC Mortgage, LLC, Fort Washington, Pennsylvania ("GMAC

Mortgage"), and its subsidiaries.  Ally Financial, f/k/a GMAC LLC, became a bank holding

company on December 24, 2008, following approval by the Board of Governors of the Federal

Reserve System (the "Board of Governors") pursuant to section 3(a)(1) of the Bank Holding

Company Act (12 U.S.C. § 1842(a)(1)), and conversion of Ally Bank from an industrial loan company to a state-chartered insured nonmember bank;

WHEREAS, Ally Financial engages in the business of servicing residential mortgage loans through various indirect subsidiaries, including GMAC Mortgage and its subsidiaries (collectively, the "Mortgage Servicing Companies"). The Mortgage Servicing Companies service residential mortgage loans that are held in the portfolios of (a) Ally Bank and GMAC Mortgage; (b) the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association (collectively, the "GSEs"); and (c) various investors, including securitization trusts pursuant to Pooling and Servicing Agreements and similar agreements (collectively, the "Servicing Portfolio"). The Mortgage Servicing Companies have substantial responsibilities with respect to the Servicing Portfolio for the initiation and handling of foreclosure proceedings, and loss mitigation activities ("Loss Mitigation" or "Loss Mitigation Activities" include activities related to special forbearances, repayment plans, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure);

WHEREAS, Ally Bank has entered into agreements with the Mortgage Servicing Companies with respect to the servicing of residential mortgage loans owned by Ally Bank, as well as sub-servicing agreements with respect to loans where Ally Bank retained servicing rights;

WHEREAS, the Mortgage Servicing Companies collectively are the fifth largest servicer of residential mortgages in the United States and service a portfolio of 2.5 million residential mortgage loans. During the recent financial crisis, a substantially larger number of residential mortgage loans became past due than in earlier years. Many of the past due mortgages have

2

resulted in foreclosure actions.  From January 1, 2009 to December 31, 2010, the Mortgage Servicing Companies completed 89,998 foreclosure actions, representing less than 4 percent of the Servicing Portfolio over such time period;

WHEREAS, in connection with the process leading to certain foreclosures involving the Servicing Portfolio, the Mortgage Servicing Companies allegedly:

(a)     Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts numerous affidavits executed by employees of the Mortgage Servicing Companies or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

(b)     Filed or caused to be filed in courts in various states and in connection with bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

(c)     Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;

3

(d)    Failed to respond in a sufficient and timely manner to the increased level of foreclosures by increasing financial, staffing, and managerial resources to ensure that the Mortgage Servicing Companies adequately handled the foreclosure process; and failed to respond in a sufficient and timely manner to the increased level of Loss Mitigation Activities to ensure timely, effective and efficient communication with borrowers with respect to Loss Mitigation Activities and foreclosure activities; and

(e)    Failed to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to the Servicing Portfolio.

WHEREAS, the practices set forth above allegedly constitute unsafe or unsound banking practices;

WHEREAS, as part of a horizontal review of various major residential mortgage servicers conducted by the Board of Governors, the Federal Deposit Insurance Corporation (the "FDIC"), the Office of the Comptroller of the Currency, and the Office of Thrift Supervision, examiners from the Federal Reserve Bank of Chicago (the "Reserve Bank") and the FDIC have reviewed foreclosure-related processes at the Mortgage Servicing Companies;

WHEREAS, it is the common goal of the Board of Governors, the Reserve Bank, Ally Financial, ResCap, and the Mortgage Servicing Companies to ensure that the Mortgage Servicing Companies operate in a safe and sound manner and in compliance with the terms of mortgage loan documentation and related agreements with borrowers, all applicable state and federal laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act), rules, regulations, and court orders, as well as the Membership Rules of MERSCORP, Inc. and

4

MERS, Inc. (collectively, "MERS"), servicing guides with GSEs or investors, and other contractual obligations, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation(collectively, "Legal Requirements");

WHEREAS, it is the common goal of the FDIC and Ally Bank to ensure that the residential mortgages owned or serviced by Ally Bank are serviced or sub-serviced in a safe and sound manner and in compliance with all Legal Requirements;

WHEREAS, after the conduct set forth above became known, Ally Financial, Ally Bank, ResCap, and the Mortgage Servicing Companies have been taking steps to remediate the filing of and reliance on inaccurate affidavits in foreclosure and bankruptcy proceedings;

WHEREAS, the boards of directors of Ally Financial, ResCap, and GMAC Mortgage, at duly constituted meetings, adopted resolutions authorizing and directing Michael A. Carpenter, Thomas Marano, and Steven M. Abreu to enter into this Consent Order to Cease and Desist (the ("Order") on behalf of Ally Financial, ResCap, and GMAC Mortgage, respectively, and consenting to compliance with each and every applicable provision of this Order by Ally Financial, ResCap, and GMAC Mortgage, and their institution-affiliated parties, as defined in sections 3(u) and 8(b)(3) of the Federal Deposit Insurance Act, as amended (the "FDI Act") (12 U.S.C. §§ 1813(u) and 1818(b)(3)), and waiving any and all rights that Ally Financial, ResCap, and GMAC Mortgage may have pursuant to section 8 of the FDI Act (12 U.S.C. § 1818), including, but not limited to: (i) the issuance of a notice of charges; (ii) a hearing for the purpose of taking evidence on any matters set forth in this Order; (iii) judicial review of this Order; (iv) contest the issuance of this Order by the Board of Governors; and (v) challenge or

5

contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provision hereof; and

WHEREAS, the board of directors of Ally Bank, at a duly constituted meeting adopted a resolution authorizing and directing Mark B. Hales to enter into this Order on behalf of Ally Bank and consenting to compliance with each and every applicable provision of this Order by Ally Bank and its institution-affiliated parties, as defined in section 3(u) of the FDI Act, and waiving any and all rights that Ally Bank may have pursuant to section 8 of the FDI Act, including, but not limited to: (i) the issuance of a notice of charges; (ii) a hearing for the purpose of taking evidence on any matters set forth in this Order; (iii) judicial review of this Order; (iv) contest the issuance of this Order by the FDIC; and (v) challenge or contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provision hereof.

NOW, THEREFORE, before the filing of any notices, or taking of any testimony or adjudication of or finding on any issues of fact or law herein, and without this Order constituting an admission by Ally Financial, Ally Bank, ResCap, or GMAC Mortgage or its subsidiaries of any allegation made or implied by the Board of Governors or the FDIC in connection with this matter, and solely for the purpose of settling this matter without a formal proceeding being filed and without the necessity for protracted or extended hearings or testimony, it is hereby ordered by the Board of Governors that, pursuant to sections 8(b)(1) and (3) of the FDI Act (12 U.S.C. §§1818(b)(1) and 1818(b)(3)), Ally Financial, ResCap, GMAC Mortgage, and their institution-affiliated parties shall cease and desist and take affirmative action, and it is hereby ordered by the FDIC that, pursuant to section 8(b)(1) of the FDI Act (12 U.S.C. §§1818(b)(1)), Ally Bank and its institution-affiliated parties, shall cease and desist and take affirmative action, as follows:

6

**Source of Strength**

1.      The board of directors of Ally Financial shall take appropriate steps to fully utilize Ally Financial's financial and managerial resources, pursuant to section 225.4(a) of Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)), to serve as a source of strength to Ally Bank, including, but not limited to, taking steps to ensure that Ally Bank complies with the applicable provisions of this Order that is issued by the FDIC.

**Board Oversight**

2.      Within 60 days of this Order, the boards of directors of Ally Financial and ResCap, for itself and on behalf of the Mortgage Servicing Companies shall submit to the Reserve Bank an acceptable written plan to strengthen the boards' oversight of the Mortgage Servicing Companies, including the boards' oversight of risk management, internal audit, and compliance programs concerning residential mortgage loan servicing, Loss Mitigation, and foreclosure activities conducted by the Mortgage Servicing Companies. The plan shall also describe the actions that the boards of directors will take to improve the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and a timeline for actions to be taken. The plan shall, at a minimum, address, consider, and include:

(a)      Policies to be adopted by the board of directors of Ally Financial that are designed to ensure that Ally Financial's enterprise-wide risk management ("ERM") program provides proper risk management with respect to the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities particularly with respect to compliance with the Legal Requirements, and supervisory standards and guidance of the Board of Governors as they develop;

7

(b)      policies and procedures adopted by Ally Financial to ensure that the ERM program provides proper risk management of independent contractors, consulting firms, law firms, or other third parties who are engaged to support residential mortgage loan servicing, Loss Mitigation, or foreclosure activities or operations, including their compliance with the Legal Requirements and Ally Financial's and GMAC Mortgage's internal policies and procedures, consistent with supervisory guidance of the Board of Governors;

(c)      steps to ensure that Ally Financial's ERM, audit, and compliance programs have adequate levels and types of officers and staff dedicated to overseeing the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, and that these programs have officers and staff with the requisite qualifications, skills, and ability to comply with the requirements of this Order;

(d)      steps to improve the information and reports that will be regularly reviewed by the board of directors or authorized committee of the board of directors of Ally Financial regarding residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, including, compliance risk assessments, and the status and results of measures taken, or to be taken, to remediate deficiencies in residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, and to comply with this Order;

(e)      funding for personnel, systems, and other resources as are needed to carry out the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations in full compliance with the Legal Requirements and the requirements of this Order, taking into consideration the current and expected volume of past due loans;

8

(f)    funding for personnel, systems, and other resources as are needed to operate risk management and compliance programs that are safe and sound and that are commensurate with the risk profile of the Mortgage Servicing Companies;

(g)    steps to ensure that the Mortgage Servicing Companies have adequate levels and types of officers and staff to carry out residential mortgage loan servicing, Loss Mitigation, and foreclosure activities in compliance with Legal Requirements and the requirements of this Order, and taking into account the size and complexity of the Servicing Portfolio; that they have officers and staff with the requisite qualifications, skills, and ability to comply with the requirements of this Order; and a timetable for hiring any necessary additional officers and staff.

(h)    periodic reviews of the adequacy of the levels and types of officers and staff to carry out residential mortgage loan servicing, Loss Mitigation, and foreclosure activities in light of changes in the Servicing Portfolio or the Legal Requirements.  To conduct this review, the plan shall establish metrics to measure and ensure the adequacy of staffing levels relative to existing and future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(i)    steps to ensure that the risk management, audit, and compliance programs for the Mortgage Servicing Companies have adequate levels and types of officers and staff and that they have officers and staff with the requisite qualifications, skills, and ability to comply with the requirements of this Order, and a timetable for hiring any necessary additional officers and staff;

9

(j)      workload reviews of residential mortgage loan servicing, Loss Mitigation, and foreclosure personnel who are responsible for handling individual loan issues (including single point of contact personnel), including an initial review within 90 days of this Order, and then annual reviews thereafter.  Such reviews, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of paragraphs 2(g) and 5 of this Order.  Promptly following completion of such reviews, the Mortgage Servicing Companies shall adjust workload levels to ensure compliance with the requirements of paragraphs 2(g) and 5 of this Order;

(k)      policies to ensure that the risk management, audit, and compliance programs have the requisite authorities and status within the organization to effectively operate the programs, and that there is adequate coordination with respect to these programs to ensure that any problems or deficiencies that are identified in the Mortgage Servicing Companies' residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations are comprehensively reviewed and remedied; and

(l)      steps to improve the information and reports that will be regularly reviewed by Ally Financial's and ResCap's  boards of directors to assess the performance of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, as well as the risk management and compliance programs and associated functions including, compliance risk assessments, and the status and results of measures taken, or to be taken, to remediate mortgage servicing, Loss Mitigation, and foreclosure deficiencies, and to comply with this Order.

10

**Foreclosure Review**

3.    (a)    Within 45 days of this Order, GMAC Mortgage shall retain one or more independent consultant(s) acceptable to the Reserve Bank to conduct an independent review of certain residential mortgage foreclosure actions (including judicial and non-judicial foreclosures and related bankruptcy proceedings, and other related litigation) regarding individual borrowers with respect to the Servicing Portfolio.  The review shall include actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Mortgage Servicing Companies, whether brought in the name of the Ally Bank, the Mortgage Servicing Companies, the investor, or any agent for the mortgage note holder (including MERS) that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(i)    whether, at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or other similar status;

(ii)    whether the foreclosure was in accordance with applicable state and federal laws, including but not limited to, the Servicemembers Civil Relief Act and the U.S. Bankruptcy Code;

(iii)    whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the

11

amounts due, and compliance with notice periods) and post-sale confirmation were in
accordance with the terms of the mortgage loan and state law requirements;

(iv)    whether a foreclosure sale occurred when the borrower had
requested a loan modification or other loss mitigation and the request was under consideration;
when the loan was performing in accordance with a trial or permanent loan modification; or
when the loan had not been in default for a sufficient period to authorize foreclosure pursuant to
terms of the mortgage loan documentation and related agreements;

(v)    whether any delinquent borrower's account was charged fees or
penalties that were not permissible under the terms of the borrower's loan documents, state or
federal law, or were otherwise unreasonable.  For purposes of this Order, a fee or penalty is
"otherwise unreasonable" if it was assessed: (i) for the purpose of protecting the secured party's
interest in the mortgaged property, and the fee or penalty was assessed at a frequency or rate,
was of a type or amount, or was for a purpose that was in fact not needed to protect the secured
party's interest; (ii) for services performed and the fee charged was substantially in excess of the
fair market value of the service; (iii) for services performed, and the services were not actually
performed; or (iv) at an amount or rate that exceeds what is customarily charged in the market
for such a fee or penalty, and the mortgage instruments or other documents executed by the
borrower did not disclose the amount or rate that the lender or servicer would charge for such a
fee or penalty;

(vi)    whether Loss Mitigation Activities with respect to foreclosed loans
were handled in accordance with the requirements of HAMP, if applicable, and consistent with
the policies and procedures applicable to the Mortgage Servicing Companies' proprietary loan
modifications or other Loss Mitigation programs, such that each borrower had an adequate

12

opportunity to apply for a Loss Mitigation option or program, any such application was handled appropriately, and a final decision was made on a reasoned basis and was communicated to the borrower before the foreclosure sale; and

(vii)    whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the owner of the mortgage loan.

(b)    The independent consultant(s) shall prepare a written report detailing the findings of the Foreclosure Review (the "Foreclosure Report"). GMAC Mortgage shall provide to the Reserve Bank a copy of the Foreclosure Report at the same time that the report is provided to it. Simultaneously, a copy of the portion of the Foreclosure Report that addresses Ally Bank's Servicing Portfolio shall be furnished to Ally Bank and the FDIC.

(c)    Within 45 days of receipt of the Foreclosure Report, GMAC Mortgage shall submit to the Reserve Bank an acceptable plan to:

(i)    remediate, as appropriate, errors, misrepresentations, or other deficiencies in any foreclosure filing or other proceeding;

(ii)    reimburse or otherwise provide appropriate remediation to the borrower for any impermissible or otherwise unreasonable penalties, fees or expenses, or for other financial injury identified in paragraph 3 of this Order;

(iii)    make appropriate adjustments for the account of Ally Bank, the GSEs, or any investor; and

(iv)    take appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in paragraph 3.

13

(d)      Within 60 days after the Reserve Bank accepts the plan described in paragraph 3(c), the Mortgage Servicing Companies shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the Reserve Bank with a report detailing such payments and credits.

4.      Within 15 days of the engagement of the independent consultant(s) described in paragraph 3 of this Order, but prior to the commencement of the Foreclosure Review, GMAC Mortgage shall submit to the Reserve Bank for approval an engagement letter that sets forth:

(a)      The methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties under paragraph 3(a)(v); (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for the receipt and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology, the independent consultant may consider any work already done by Ally Financial, GMAC Mortgage, or other third-parties on behalf of Ally Financial or GMAC Mortgage.  With respect to sampling techniques, the engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on the results of initial sampling;

(b)      the expertise and resources to be dedicated to the Foreclosure Review;

(c)      completion of the Foreclosure Review and the Foreclosure Report within 120 days of the start of the engagement; and

14

(d)    a written commitment that any workpapers associated with the Foreclosure Review will be made available to the Reserve Bank upon request.

**Single Point of Contact**

5.    Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank an acceptable plan, along with a timeline for actions to be taken, for strengthening coordination of communications between the Mortgage Servicing Companies and borrowers, both oral and written, related to Loss Mitigation and foreclosure activities to ensure: (i) that communications are timely and effective, and are designed to avoid confusion to borrowers; (ii) continuity in the handling of borrowers' loan files during the Loss Mitigation and foreclosure processes by personnel knowledgeable about the borrower's situation; and (iii) that decisions concerning Loss Mitigation options or programs continue to be made and communicated in a timely fashion. Prior to submitting the plan, the Mortgage Servicing Companies shall conduct a review to determine: (i) whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a Loss Mitigation option or program, and (ii) that employee incentive compensation practices do not discourage Loss Mitigation.  The plan shall, at a minimum, provide for:

(a)    Measures to ensure that staff processing a borrower's Loss Mitigation request routinely communicates and coordinates with staff processing the foreclosure on the borrower's property;

(b)    appropriate deadlines for responses to borrower communications and requests for consideration of Loss Mitigation, including deadlines for decisionmaking on Loss Mitigation Activities, with the metrics established not being less responsive than the timelines in HAMP;

15

(c)      establishment of an accessible and reliable single point of contact for the borrower so that the borrower has access to an employee of the Mortgage Servicing Companies to obtain information throughout the Loss Mitigation and foreclosure processes;

(d)      a requirement that written communications with the borrower identify by name the primary single point of contact along with one or more direct means of communication with the primary single point of contact, together with information about secondary points of contact in the event that the primary single point of contact is unavailable;

(e)      measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation and foreclosure activities;

(f)      procedures and controls to ensure that a final decision regarding a borrower's Loss Mitigation request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or permanent modification and, if applicable, the net present value calculations utilized by the Mortgage Servicing Companies, and that involve the single point of contact within a reasonable time before any foreclosure sale occurs;

(g)      procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis, (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is past due on two or more payments post-dating the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

16

(h) policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation process, denial of Loss Mitigation requests, the foreclosure process, or foreclosure activities that prevent a borrower from pursuing Loss Mitigation options, and a process for making borrowers aware of the complaint procedures;

(i) procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(j) policies and procedures to consider loan modification or other Loss Mitigation Activities with respect to junior lien loans owned by Ally Financial, ResCap, the Mortgage Servicing Companies, or Ally Bank where the Mortgage Servicing Companies service the associated first lien mortgage and become aware that such first lien mortgage is delinquent or has been modified;

(k) policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about the pendency of loan modification and foreclosure proceedings; and

(l) policies and procedures to ensure that foreclosure and related documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information.

17

**Third Party Management**

6.      Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank acceptable policies and procedures for the outsourcing of any residential mortgage loan servicing, Loss Mitigation, or foreclosure functions, by the Mortgage Servicing Companies to any independent contractor, consulting firm, law firm, property manager, or other third party (including any subsidiary or affiliate of Ally Financial) (collectively, "Third-Party Providers"). Third-Party Providers include local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of owners of mortgages in the Servicing Portfolio ("Foreclosure Counsel").  The policies and procedures shall, at a minimum, address, consider, and include:

(a)      Appropriate oversight of Third-Party Providers to ensure that they comply with the Legal Requirements, supervisory guidance of the Board of Governors, and GMAC Mortgage's policies and procedures;

(b)      processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Mortgage Servicing Companies, consistent with supervisory guidance of the Board of Governors, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(c)      measures to ensure that all original records transferred by the Mortgage Servicing Companies to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the appropriate court or the loan is otherwise transferred to another party), and are returned to the Mortgage Servicing Companies or designated custodians at the conclusion of the

18

performed service, along with all other documents necessary for the Mortgage Servicing Companies' files;

(d)    measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Mortgage Servicing Companies or the owners of mortgages in the Servicing Portfolio in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the note and right to foreclose at the time the foreclosure action is commenced;

(e)    processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability; and measures to ensure the adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(f)    processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to GMAC Mortgage foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(g)    processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements, and GMAC Mortgage's contractual obligations to GSEs and investors, and to ensure that foreclosures are conducted in a safe and sound manner;

(h)    processes to review customer complaints about Third-Party Provider services;

19

(i)      a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume or meeting processing timelines; and

(j)      a periodic certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Mortgage Servicing Companies as qualified to serve as Third-Party Providers to the Mortgage Servicing Companies, including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.

**Compliance Program**

7.      Within 60 days of this Order, Ally Financial shall submit to the Reserve Bank an acceptable written plan to enhance its enterprise-wide compliance program ("ECP") with respect to its oversight of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations.  The plan shall be based on an evaluation of the effectiveness of Ally Financial's current ECP in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and recommendations to strengthen the ECP in these areas.  The plan shall, at a minimum, be designed to:

(a)      Ensure that the fundamental elements of the ECP and any enhancements or revisions thereto, including a comprehensive annual risk assessment, encompass residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b)      ensure compliance with the Legal Requirements and supervisory guidance of the Board of Governors; and

20

(c)    ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of the Board of Governors.

8.    Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank an acceptable compliance program and timeline for implementation to ensure that the operations of the Mortgage Servicing Companies, including, but not limited to, residential mortgage loan servicing, Loss Mitigation, and foreclosure, comply with the Legal Requirements, as well as the Mortgage Servicing Companies' internal policies, procedures, and processes and are conducted in a safe and sound manner.  The program shall, at a minimum, address, consider, and include:

(a)    The duties and responsibilities of line of business staff, other staff, and Third-Party Providers regarding compliance;

(b)    policies for developing and communicating compliance-related roles and responsibilities across the Mortgage Servicing Companies' organization and to Third-Party Providers;

(c)    policies, procedures, and processes to ensure that the Mortgage Servicing Companies have the ability to locate and secure all documents, including original promissory notes, necessary to perform mortgage servicing, Loss Mitigation, and foreclosure functions and to comply with contractual obligations;

(d)    compliance with supervisory guidance of the Board of Governors, including, but not limited to, the guidance entitled, "Compliance Risk Management Programs and Oversight at Large Banking Organizations with Complex Compliance Profiles," dated October 16, 2008 (SR 08-08/CA 08-11);

21

      (e)     compliance with Legal Requirements, including:

         (i)     processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Mortgage Servicing Companies are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Mortgage Servicing Companies' books and records when the affidavit or declaration so states;

         (ii)     processes to ensure that affidavits filed in foreclosure proceedings and other foreclosure-related documents are executed and notarized in accordance with applicable state legal requirements, including jurat requirements;

         (iii)     processes to ensure that the Mortgage Servicing Companies have properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or are otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation; and

         (iv)     processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower or claimable by the investor;

      (f)     policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

22

(g)    compliance with contractual obligations to the owners of the mortgages in the Servicing Portfolio;

(h)    compliance with the contractual limitations in the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges and expenses, and compliance with Legal Requirements concerning the imposition of fees, charges, and expenses;

(i)    processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmation are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(j)    procedures to ensure compliance with bankruptcy law requirements, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order;

(k)    the scope and frequency of independent testing for compliance with the Legal Requirements, supervisory guidance of the Board of Governors, and the requirements of the Mortgage Servicing Companies' internal policies, procedures, and processes by qualified parties with requisite knowledge and ability (which may include internal audit) who are independent of the Mortgage Servicing Companies' business lines and compliance function;

(l)    measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate new or changes to Legal Requirements and supervisory guidance of the Board of Governors; and

23

(m)    the findings and conclusions of the independent consultant(s) engaged by GMAC Mortgage under paragraph 3 to review the Mortgage Servicing Companies' foreclosure processes.

**Mortgage Electronic Registration System**

9.    Within 60 days of this Order, the GMAC Mortgage shall submit an acceptable plan to ensure appropriate controls and oversight of the Mortgage Servicing Companies' activities with respect to MERS and compliance with MERS' membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan"). The MERS Plan shall include, at a minimum:

(a)    Processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Mortgage Servicing Companies out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Mortgage Servicing Companies;

(b)    processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Mortgage Servicing Companies) are executed by a certifying officer authorized by MERS and approved by the Mortgage Servicing Companies;

(c)    processes to ensure that the Mortgage Servicing Companies maintain up-to-date corporate resolutions from MERS for all Mortgage Servicing Companies employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d)    processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System;

24

(e)    processes to ensure the accuracy and reliability of data reported to MERS, including monthly system-to-system reconciliations for all MERS mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports.  Unresolved items must be maintained on open-item aging reports and tracked until resolution.  The Mortgage Servicing Companies shall determine and report whether the foreclosures for loans serviced by the Mortgage Servicing Companies that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERS system will be corrected;

(f)    an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the MERS Plan; and

(g)    inclusion of MERS in the Mortgage Servicing Companies' third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

**Management Information Systems**

10.    Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank an acceptable plan and timeline for the review and remediation, as necessary, of the Mortgage Servicing Companies' management information systems ("MIS") for their residential mortgage loan servicing, Loss Mitigation, and foreclosure activities to ensure the timely delivery of complete and accurate information to permit effective decision-making.  The plan shall, at a minimum, provide for:

25

(a)    A description of the various MIS used or to be used by the Mortgage Servicing Companies;

(b)    a timetable for completion of the review;

(c)    a timetable for the remediation of any identified deficiencies; and

(d)    new systems or enhancements to the MIS to:

(i)    monitor compliance with the Legal Requirements, supervisory guidance of the Board of Governors, and the requirements of this Order;

(ii)    ensure the ongoing accuracy of records for all serviced mortgages, including, but not limited to, records necessary to establish ownership and the right to foreclose by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to the borrower;

(iii)    ensure that the Loss Mitigation and foreclosure staffs have sufficient and timely access to information provided by the borrower regarding Loss Mitigation and foreclosure activities; and

(iv)    ensure that the single point of contact has sufficient and timely access to information provided by the borrower regarding Loss Mitigation and foreclosure activities; and

(e)    testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

**Training**

11.    Within 60 days of this Order, GMAC Mortgage shall submit to the Reserve Bank an acceptable written plan, and timeline for implementation, to improve the training of all

26

appropriate officers and staff of the Mortgage Servicing Companies regarding the Legal Requirements, supervisory guidance of the Board of Governors, and the Mortgage Servicing Companies' internal policies and procedures regarding residential mortgage servicing, Loss Mitigation, and foreclosure, and the policies and procedures adopted regarding a single point of contact described in paragraph 5 of this Order.  The plan shall also include:

   (a) A requirement that training be conducted and documented no less frequently than annually; and

   (b) procedures to timely inform appropriate officers and staff of any new or changes to the Legal Requirements and supervisory guidance of the Board of Governors related to residential mortgage loan servicing, Loss Mitigation, or foreclosure.

**Risk Assessment**

  12. Within 10 days of this Order, Ally Financial and ResCap, for itself and on behalf of the Mortgage Servicing Companies, shall retain an independent consultant acceptable to the Reserve Bank to conduct a comprehensive assessment of the Mortgage Servicing Companies' risks, including, but not limited to, operational, compliance, transaction, legal, and reputational risks particularly in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure.  The independent consultant shall prepare a written risk assessment and provide it to Ally Financial and ResCap within 90 days of this Order, and Ally Financial and ResCap shall provide it to the Reserve Bank at the same time that it is provided to Ally Financial and ResCap. The risk assessment shall, at a minimum, address, consider, and include:

   (a) The scope and complexity of the Mortgage Servicing Companies' activities and operations regarding residential mortgage loan servicing, Loss Mitigation, and foreclosure, including functions outsourced to Third-Party Providers;

27

      (b)     an evaluation of risk exposures, taking into account risks inherent in the Mortgage Servicing Companies' business activities and in outsourcing to Third-Party Providers;

      (c)     an assessment of the effectiveness of established controls designed to mitigate each type of risk and identify residual risks; and

      (d)     recommendations for improving risk management.

13.     Within 5 days of the engagement of the independent consultant described in paragraph 12 of this Order, but prior to the commencement of the comprehensive risk assessment, Ally Financial and ResCap shall submit to the Reserve Bank for approval an engagement letter that sets forth:

      (a)     The scope and methodology for conducting the risk assessment, including a detailed description of the areas to be reviewed;

      (b)     the expertise and resources to be dedicated to the risk assessment; and

      (c)     a commitment that any or workpapers associated with the risk assessment will be made available to the Reserve Bank upon request.

**Risk Management**

14.     Within 60 days of submission of the comprehensive risk assessment conducted pursuant to paragraph 12 of this Order, Ally Financial shall submit to the Reserve Bank an acceptable written plan to enhance its ERM program with respect to its oversight of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations. The plan shall be based on an evaluation of the effectiveness of Ally Financial's current ERM program in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations, and recommendations to strengthen the risk management program in these areas. The plan shall, at a minimum, be designed to:

28

(a)    Ensure that the fundamental elements of the risk management program and any enhancements or revisions thereto, including a comprehensive annual risk assessment, encompass residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b)    ensure that the risk management program complies with supervisory guidance of the Board of Governors, including, but not limited to, the guidance entitled, "Compliance Risk Management Programs and Oversight at Large Banking Organizations with Complex Compliance Profiles," dated October 16, 2008 (SR 08-08/CA 08-11); and

(c)    establish limits for compliance, legal, and reputational risks and provide for regular review of risk limits by appropriate senior management and the board of directors or an authorized committee of the board of directors.

15.    Within 60 days of submission of the comprehensive risk assessment conducted pursuant to paragraph 12 of this Order, Ally Financial and ResCap shall jointly submit to the Reserve Bank an acceptable, comprehensive risk management program for the Mortgage Servicing Companies.  The program shall provide for the oversight by Ally Financial's senior risk managers and ResCap's boards of directors and senior management of the development and implementation of formalized policies and mitigation processes for all identified risks to the Mortgage Servicing Companies.  The program shall, at a minimum, address, consider, and include:

(a)    The structure and composition of ResCap's board risk management committees and a determination of the optimum structure and composition needed to provide adequate oversight of Mortgage Servicing Companies' firm-wide risk management;

(b)    a detailed description of the responsibilities of (i) the line-of-business staff, compliance staff, and the legal department regarding risk assessment and management,

29

including, but not limited to, compliance and legal risks, and (ii) the internal audit department regarding the evaluation of the effectiveness of such risk assessment and management;

      (c)    written policies, procedures, and risk management standards;

      (d)    processes to adequately identify risk levels and trends;

      (e)    processes to adequately identify and control risks arising from incentive compensation programs;

      (f)    processes to document, measure, assess, and report key risk indicators;

      (g)    controls to mitigate risks;

      (h)    procedures for the escalation of significant matters related to risks to appropriate senior officers and board committees;

      (i)    the scope and frequency of comprehensive risk assessments;

      (j)    a formal method to ensure effective communication of established risk management policies, procedures, and standards to all appropriate business line and other staff;

      (k)    periodic testing of the effectiveness of the risk management program; and

      (l)    the findings and recommendations of the independent consultant described in paragraph 12 of this Order regarding risk management.

**Audit**

16.    Within 60 days of this Order, Ally Financial shall submit to the Reserve Bank an acceptable written plan to enhance the internal audit program with respect to residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations. The plan shall be based on an evaluation of the effectiveness of Ally Financial's current internal audit program in the areas of residential mortgage loan servicing, Loss Mitigation, and foreclosure

activities and operations, and shall include recommendations to strengthen the internal audit program in these areas.  The plan shall, at a minimum, be designed to:

(a)    Ensure that the internal audit program encompasses residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(b)    periodically review the effectiveness of the ECP and ERM with respect to residential mortgage loan servicing, Loss Mitigation, and foreclosure activities, and  compliance with the Legal Requirements and supervisory guidance of the Board of Governors;

(c)    ensure that adequate qualified staffing of the audit function is provided for residential mortgage loan servicing, Loss Mitigation, and foreclosure activities;

(d)    ensure timely resolution of audit findings and follow-up reviews to ensure completion and effectiveness of corrective measures;

(e)    ensure that comprehensive documentation, tracking, and reporting of the status and resolution of audit findings are submitted to Ally Financial's audit committee; and

(f)    establish escalation procedures for resolving any differences of opinion between audit staff and management concerning audit exceptions and recommendations, with any disputes to be resolved by the audit committee.

17.    Within 60 days of this Order, Ally Financial and ResCap shall submit to the Reserve Bank an acceptable enhanced written internal audit program to periodically review compliance with applicable Legal Requirements and supervisory guidance of the Board of Governors at the Mortgage Servicing Companies that shall, at a minimum, provide for:

(a)    An annual written, risk-based audit plan approved by ResCap's board of directors that encompasses all appropriate areas of audit coverage;

(b)    the scope and frequency of audits;

(c)    the independence of the internal auditor, audit staff, and ResCap's audit committee;

(d)    inclusion in the audit scope of reviews of internal controls, MIS, and compliance with GMAC Mortgage's internal policies, procedures, and processes, including, but not limited to, the Loss Mitigation and foreclosure processes;

(e)    adequate testing and review of MIS used in servicing, Loss Mitigation, and foreclosure activities to ensure compliance with the Legal Requirements;

(f)    controls to ensure that audits are completed on a timely basis in accordance with the approved audit plan;

(g)    adequate staffing of the audit function by qualified staff;

(h)    timely resolution of audit findings and follow-up reviews to ensure completion and effectiveness of corrective measures;

(i)    comprehensive documentation, tracking, and reporting of the status and resolution of audit findings to ResCap's audit committee, at least quarterly; and

(j)    establishment of escalation procedures for resolving any differences of opinion between audit staff and management concerning audit exceptions and recommendations, with any disputes to be resolved by ResCap's audit committee.

**Servicing Management and Oversight**

18.    Within 60 days of this Order, Ally Bank shall implement a mortgage servicing management and oversight program which shall, at a minimum:

(a)    Establish policies and procedures to create and maintain a reserve sufficient to cover identified servicing risks;

32

(b)        establish policies and procedures, including, but not limited to, revising servicing guidelines and/or contractual arrangements, to ensure that any Third Party Provider performing a mortgage servicing, Loss Mitigation or foreclosure activity or operation for a second lien on its behalf, encourages and facilitates sustainable first lien modifications, within the terms of the Legal Requirements, by performing timely financial cost-benefit analysis, taking into account various economic and market factors such as the amount of potential equity in the property and the borrower's financial strength;

(c)        establish policies and procedures for oversight and risk management of agreements with Third-Party Providers of servicing, Loss Mitigation or foreclosure activities or operations to Ally Bank, including, but not limited to, the Mortgage Servicing Companies, sufficient to ensure that mortgage servicing, Loss Mitigation or foreclosure activities and/or operations are performed in accordance with the Legal Requirements and this Order;

(d)        establish policies and procedures for oversight and risk management of agreements with Third-Party Providers of servicing, Loss Mitigation or foreclosure activities or operations to Ally Bank, including, but not limited to, the Mortgage Servicing Companies, sufficient to ensure that such Third-Party Providers have adequate levels and types of officers and staff as well as sufficient funding for personnel, systems, including, but not limited to, MIS, training and other resources to perform mortgage servicing, Loss Mitigation or foreclosure activities and/or operations on behalf of Ally Bank in a manner that complies with the Legal Requirements, satisfactorily mitigates servicing risks, is safe and sound and appropriately complies with this Order;

(e)        establish policies and procedures for oversight and risk management of agreements with Third-Party Providers of servicing, Loss Mitigation or foreclosure activities or

33

operations to Ally Bank, including, but not limited to, the Mortgage Servicing Companies,
sufficient to ensure that Ally Bank is in compliance with the "Guidance for Managing
Third-Party Risk" (FIL-44-2008, June 6, 2008);

       (f)     establish policies and procedures to enhance the information and reports
regularly provided for review by the board of directors of Ally Bank regarding agreements or
arrangements whereby any mortgage servicing, Loss Mitigation or foreclosure activity or
operation is performed on its behalf by a Third-Party Provider, including, but not limited to, one
or more of the Mortgage Servicing Companies, to include, at a minimum, compliance risk
assessments, the reserve for mortgage servicing risks, as well as the status and results of
measures taken, or to be taken, to remediate servicing, Loss Mitigation and foreclosure
deficiencies and to comply with this Order; and

       (g)     establish policies and procedures to periodically determine and provide
Ally Bank with adequate levels and types of officers and staff, systems, training and other
resources for compliance with the oversight and risk management requirements of this Order.

**Approval, Implementation, and Progress Reports**

    19.    (a)    GMAC Mortgage, Ally Financial, and ResCap, as applicable, shall submit
written plans, programs, policies, procedures, and engagement letters that are acceptable to the
Reserve Bank within the applicable time periods set forth in paragraphs 2, 3(c), 4, 5, 6, 7, 8, 9,
10, 11, 13, 14, 15, 16, and 17 of this Order.  Independent consultants acceptable to the Reserve
Bank shall be retained by GMAC Mortgage within the applicable periods set forth in paragraphs
3(a) and 12 of this Order.

       (b)    Within 10 days of approval by the Reserve Bank, GMAC Mortgage,
Ally Financial, and ResCap, as applicable, shall adopt the approved plans, programs, policies,

34

and procedures.  Upon adoption, GMAC Mortgage, Ally Financial, and ResCap, as applicable, shall implement the approved plans, programs, policies, and procedures, and thereafter fully comply with them.

(c)    During the term of this Order, the approved plans, programs, policies, procedures, and engagement letters shall not be amended or rescinded without the prior written approval of the Reserve Bank.

(d)    During the term of this Order, GMAC Mortgage, Ally Financial, and ResCap, as applicable, shall revise the approved plans, programs, policies, and procedures as necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of the Board of Governors.  The revised plans, programs, policies, and procedures shall be submitted to the Reserve Bank for approval at the same time as the progress reports described in paragraph 21 of this Order.

20.    (a)    Ally Bank shall submit a written program that is acceptable to the FDIC within the applicable time period set forth in paragraph 18 of this Order.

(b)    Within 10 days of approval by FDIC, Ally Bank shall adopt the approved program.  Upon adoption, Ally Bank shall implement the approved program, and thereafter fully comply with it.

(c)    During the term of this Order, the approved program shall not be amended or rescinded without the prior written approval of the FDIC.

(d)    During the term of this Order, Ally Bank shall revise the approved program as necessary to incorporate new or changes to the Legal Requirements and supervisory guidance of the FDIC.  The revised plan shall be submitted to the FDIC for approval at the same time as the progress reports described in paragraph 23 of this Order.

35

21.      Within 30 days after the end of each calendar quarter following the date of this Order, Ally Financial's and ResCap's, boards of directors shall jointly submit to the Reserve Bank written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The Reserve Bank may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

22.      Within 15 months after the date of this Order, Ally Financial, ResCap and GMAC Mortgage shall submit a validation report prepared by an independent third-party consultant with respect to compliance with the Order during the first year after the Order becomes effective.  The independent third-party consultant shall be acceptable to the Reserve Bank, and shall be engaged not more than nine months after the effective date of this Order.  The engagement letter retaining the independent third-party consultant shall be subject to the Reserve Bank's approval.  At a minimum the validation report shall include the results of a testing program acceptable to the Reserve Bank that, among other things, will evaluate the effectiveness of the various programs, policies and procedures implemented as a result of this Order.

23.      Within 30 days after the end of each calendar quarter following the date of this Order, Ally Bank's board of directors shall submit to the FDIC written progress reports detailing the form and manner of all actions taken to secure compliance with paragraph 18 of this Order and the results thereof.  The FDIC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

Notices

24.    All communications regarding this Order shall be sent to:

    (a)    Mr. James W. Nelson
          Senior Vice President
          Supervision and Regulation Department
          Federal Reserve Bank of Chicago
          230 South LaSalle Street
          Chicago, Illinois 60604-1413

    (b)    Regional Director
          Federal Deposit Insurance Corporation
          New York Regional Office
          350 Fifth Avenue
          New York, NY 10118-0110

    (c)    Ms. Barbara A. Yastine
          Chief Administrative Officer
          Ally Financial Inc.
          1177 Avenue of the Americas
          New York, New York 10036

          with copies to:

          Mr. Daniel Soto
          Chief Compliance Officer
          Ally Financial Inc.
          440 South Church Street
          Charlotte, NC  28202

          William B. Solomon, Jr., Esq.
          General Counsel
          Ally Financial Inc.
          200 Renaissance Center
          9th Floor
          Detroit, MI  48265

    (d)    Mr. Thomas F. Marano
          Chairman & Chief Executive Officer – ResCap
          Residential Capital, LLC
          1177 Avenue of the Americas
          New York, NY  10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC  28202

Tammy P. Hamzehpour, Esq.
General Counsel - ResCap
1100 Virginia Drive
Fort Washington, PA  19034

(e)  GMAC Mortgage, Inc.
c/o Mr. Thomas F. Marano
Chairman & Chief Executive Officer - ResCap
Residential Capital, LLC
1177 Avenue of the Americas
New York, NY  10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC  28202

Tammy P. Hamzehpour, Esq.
General Counsel - ResCap
1100 Virginia Drive
Fort Washington, PA  19034

(f)  Ms. Barbara A. Yastine
Chair
Ally Bank
1177 Avenue of the Americas
New York, NY  10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC  28202

Hu Benton, Esq.
Ally Bank
5425 Wisconsin Avenue, Suite 600
Bethesda, MD  20815

## Miscellaneous

25.    The provisions of this Order shall be binding on Ally Financial, Ally Bank, ResCap, GMAC Mortgage and each of their institution-affiliated parties in their capacities as such, and their successors and assigns.

26.    Each provision of this Order shall remain effective and enforceable until stayed, modified, terminated, or suspended in writing by the Reserve Bank or the FDIC, as applicable.

27.    Notwithstanding any provision of this Order, the Reserve Bank may, in its sole discretion, grant written extensions of time to Ally Financial, ResCap and GMAC Mortgage to comply with any provision of this Order, and the FDIC may in its sole discretion, grant written extensions of time to Ally Bank to comply with provisions 18 and 23 of this Order.

28.    If Ally Financial, ResCap or GMAC Mortgage believes that compliance with any provision of paragraphs 5, 6, 8, or 9 of this Order would not be legally permissible or would require it to breach any existing contractual obligation to an investor, Ally Financial, ResCap or GMAC Mortgage, as applicable, may make a written submission to the Board of Governors and the Reserve Bank.  The written submission shall include the following: (1) specific identification of the legal requirement or contractual or obligation that would be breached, and the likely

39

consequences of any such breach; (2) a complete description of all good faith efforts undertaken to secure a modification of the contractual obligation or a waiver of its applicability in order to avoid any conflict between the requirements of this Order and the contractual obligation; and (3) any alternative approaches to satisfying the intent of the provision of the Order involved that would not cause a breach of the legal requirement or contractual obligation.  Any such submission shall include a detailed opinion of experienced counsel with respect to the asserted conflict between compliance with this Order and the legal requirement or contractual obligation, a copy of the contract involved, and such other information as is necessary to evaluate the submission.  A submission pursuant to this paragraph shall be made no later than 30 days before the deadline for submitting an otherwise acceptable plan, policies and procedures, or program with respect to the applicable paragraph.  Such a submission in no way relieves Ally Financial, ResCap, and GMAC Mortgage from fully complying with this Order, including the applicable paragraph.  Following review of the submission, the Board of Governors, in its discretion, pursuant to authority delegated to the Director of the Division of Banking Supervision and Regulation, and the General Counsel, may modify this Order or may require that Ally Financial, ResCap or GMAC Mortgage, as applicable, comply with this Order.

29.    The provisions of this Order shall not bar, estop, or otherwise prevent the Board of Governors, the FDIC, the Reserve Bank, or any other federal or state agency from taking any further or other action affecting Ally Financial, Ally Bank, ResCap, GMAC Mortgage, or any of their current or former institution-affiliated parties or their successors or assigns.

40

30.    Nothing in this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order.

By Order of the Board of Governors effective this _____ day of _____, 2011.

By Order of the Federal Deposit Insurance Corporation effective this _____ day of _____, 2011.

ALLY FINANCIAL INC.

By: _____

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

By: _____
     Jennifer J. Johnson
     Secretary of the Board

ALLY BANK

By: _____

FEDERAL DEPOSIT INSURANCE
CORPORATION

By: _____
     Daniel E. Frye
     Acting Regional Director
     New York Region

RESIDENTIAL CAPITAL, LLC

By: _____

GMAC MORTGAGE, LLC

By: _____

41

30.   Nothing in this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order.

By Order of the Board of Governors effective this _____ day of _____, 2011.

By Order of the Federal Deposit Insurance Corporation effective this _____ day of _____, 2011.

ALLY FINANCIAL INC.

By: _____


ALLY BANK

By: _M.B. Hal_____


Mark B. Hales
Chief Executive Officer

RESIDENTIAL CAPITAL, LLC

By: _____


GMAC MORTGAGE, LLC

By: _____


BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

By: _____

Jennifer J. Johnson
Secretary of the Board


FEDERAL DEPOSIT INSURANCE
CORPORATION

By: _____

41

30.     Nothing in this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order.

By Order of the Board of Governors effective this *13 th* day of *April*, 2011.

By Order of the Federal Deposit Insurance Corporation effective this _____ day of _____, 2011.

ALLY FINANCIAL INC.

By: _____

BOARD OF GOVERNORS OF THE
    FEDERAL RESERVE SYSTEM

By: _____
    Jennifer J. Johnson
    Secretary of the Board

ALLY BANK

By: _____

FEDERAL DEPOSIT INSURANCE
CORPORATION

By: _____

RESIDENTIAL CAPITAL, LLC

By: _____

GMAC MORTGAGE, LLC

By: _____

41

30.     Nothing in this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order.

By Order of the Board of Governors effective this _____ day of _____, 2011.

By Order of the Federal Deposit Insurance Corporation effective this _____ day of _____, 2011.

ALLY FINANCIAL INC.

By: _____

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

By: _____
        Jennifer J. Johnson
        Secretary of the Board

ALLY BANK

By:_____

FEDERAL DEPOSIT INSURANCE
CORPORATION

By:_____

RESIDENTIAL CAPITAL, LLC

By: _____

GMAC MORTGAGE, LLC

By: _____

41

# EXHIBIT 2

**In Re:**

*RESIDENTIAL CAPITAL, LLC, et al.*

*Case No. 12-12020-mg*

---

*September 27, 2012*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



Min-U-Script® with Word Index

1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 12-12020-mg

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6

7  RESIDENTIAL CAPITAL, LLC, et al.,

8

9            Debtors.

10

11  - - - - - - - - - - - - - - - - - - - -x

12

13            United States Bankruptcy Court

14            One Bowling Green

15            New York, New York

16

17            September 27, 2012

18            10:02 AM

19

20  B E F O R E:

21  HON. MARTIN GLENN

22  U.S. BANKRUPTCY JUDGE

23

24

25

2

1  (Doc no. 1419) Application of the Official Committee of

2  Unsecured Creditors for Entry of an Order Authorizing the

3  Employment and Retention of J F. Morrow, as Consultant to the

4  Committee Nunc Pro Tunc to September 5, 2012 filed by Stephen

5  Zide on behalf of Official Committee Of Unsecured Creditors.

6

7  (CC: Doc no. 1228, 1321, 1341, 1326, 1228, 1077) Motion of

8  Patrick Hopper for Reconsideration of Order Authorizing

9  Employment and Retention of Bradley Arant Boult Cummings LLP as

10  Special Litigation and Compliance Counsel to the Debtors.

11

12  (CC: Doc no. 1356) Debtors' Motion for Entry of an Order Under

13  Sections 105 and 363 of the Bankruptcy Code Authorizing the

14  Reimbursement of Expenses Including Counsel Fees Incurred by

15  the Independent Directors filed by Gary S. Lee on behalf of

16  Residential Capital, LLC.

17

18  Status Conference RE: GMAC Mortgage, LLC. v. Silmon (Circuit

19  Court of Jefferson County, Alabama (Birmingham Division), Case

20  No.: CV-2009-902322)

21

22

23

24

25

3

1   (Doc no. 1418) Application of the Official Committee of

2   Unsecured Creditors for Entry of an Order Authorizing the

3   Employment and Retention of Analytic Focus, LLC as Consultant

4   to the Committee, Nunc Pro Tunc to August 28, 2012 filed by

5   Stephen Zide on behalf of Official Committee Of Unsecured

6   Creditors.

7

8   Status Conference RE: Plan Developments

9

10   Adversary proceeding: 12-01731-mg United States of America, Ex

11   Rel. et al. v. GMAC, Mortgage Co., LLC

12   Pre-trial Conference.

13

14   (CC: Doc# 14) Motion to Dismiss Adversary Proceeding / Debtors

15   Motion for Judgment on the Pleadings in Response to Yvonne D.

16   Lewis, et al. Adversary Complaint by Surplus Creditor s for

17   False Claims and RICO, 31 U.S.C.A. 3729 to 3733; 18 U.S.C. 666,

18   1962; BR Rule 7008

19

20   CC: Doc# 12 Motion for Summary Judgment By Plaintiffs; Grounded

21   On (1) Federal Preemptions For Federal Programs Under HUD (42

22   U.S.C. 3535 (i) (1)) And US DOT (49 U.S.C. 47502); And

23   "Separation Of Powers" Of Federal Agencies On 09/08/2012 In

24   State Court Case No. 05-CV-4555, FR. CNTY., Ohio.

25

4

1   (CC: Doc no. 1242, 945, 61) Status Conference RE: Pre-Auction

2   Objections of the RMBS Trustees and Related Joinders to the

3   Debtors' Sale Motion.

4

5   (CC: Doc no. 1426) Status Conference RE: Debtors' Application

6   for an Order Under Section 327(e) of the Bankruptcy Code,

7   Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the

8   Debtors to Employ and Retain Pepper Hamilton LLP as Special

9   Foreclosure Review Counsel for Bankruptcy Issues to the

10  Debtors, Nunc Pro Tunc to May 14, 2012 filed by Gary S. Lee on

11  behalf of Residential Capital, LLC.

12

13  (CC: Doc no. 1427) Status Conference RE: Debtors' Application

14  Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule

15  2014(a) and Local Rule 2014-1 for Authorization to Employ and

16  Retain Hudson Cook, LLP as Special Counsel to the Debtors, Nunc

17  Pro Tunc to May 14, 2012 filed by Gary S. Lee on behalf of

18  Residential Capital, LLC.

19

20  (CC: Doc# 1416) Debtors Motion Under Bankruptcy Code Sections

21  105(a) and 362(d) for Entry of an Order Approving Procedures by

22  Which Third Parties May Request and Obtain Stipulated Relief

23  from the Automatic Stay to Commence or Continue Actions to

24  Foreclose Senior Liens.

25  (CC: Doc# 1415, 1229) Hearing in Reference to Motion in

5

1   Reference to Stay Order Violations by GMAC - GMAC Mortgage

2   Violated/Stay Order Violation Re: GMAC Mortgage Fabricated

3   Documents and Sold Jackson Home Illegally filed by Corla

4   Jackson. (related document(s)1229)

5

6   (CC: Doc# 1357) Status Conference RE: Debtors Motion for Entry

7   of an Order Under Bankruptcy Code Section 363 and Bankruptcy

8   Rule 6004 (I) Authorizing the Debtors to Compensate

9   PricewaterhouseCoopers, LLP for Foreclosure Review Services in

10  Furtherance of the Debtors Compliance Obligations Under Federal

11  Reserve Board Consent Order and (II) Reaffirming Relief

12  Granting in the GA Servicing Order.

13

14  (CC: Doc# 1264, 1494) Motion to Appoint Committee and Motion to

15  Join in Motion to Appoint Committee.

16

17  Doc# 1591 Motion to Join Additional Homeowners to the Motion

18  for an Order Appointing an Official Committee of Borrowers.

19  (related document(s)1264)

20

21  Transcribed by:  Penina Wolicki

22  eScribers, LLC

23  700 West 192nd Street, Suite #607

24  New York, NY 10040

25  (973)406-2250; operations@escribers.net

6

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4       Attorneys for Debtors

5       1290 Avenue of the Americas

6       New York, NY 10104

7

8  BY:   GARY LEE, ESQ.

9       SAMANTHA MARTIN, ESQ.

10       LORENZO MARINUZZI, ESQ.

11       AARON M. KLEIN, ESQ.

12       NORMAN S. ROSENBAUM, ESQ.

13

14

15  MORRISON & FOERSTER

16       Attorneys for Debtors

17       2000 Pennsylvania Avenue NW

18       Suite 5500

19       Washington, DC 20006

20

21  BY:   ALEXANDRA STEINBERG BARRAGE, ESQ.

22

23

24

25

7

ORRICK, HERRINGTON & SUTCLIFFE LLP

     Special Counsel to Debtors

     777 South Figueroa Street

     Suite 3200

     Los Angeles, CA 90017


BY:   DUANE K. BEASLEY, ESQ. (TELEPHONICALLY)



ORRICK, HERRINGTON & SUTCLIFFE LLP

     Special Counsel to Debtors

     51 West 52nd Street

     New York, NY 10019


BY:   SCOTT M PEARSALL, ESQ. (TELEPHONICALLY)



UNITED STATES DEPARTMENT OF JUSTICE

     Office of the United States Trustee

     33 Whitehall Street

     21st Floor

     New York, NY 10004


BY:   BRIAN S. MASUMOTO, ESQ.

8

1

2   KRAMER, LEVIN, NAFTALIS & FRANKEL LLP

3        Attorneys for Official Creditors' Committee

4        1177 Avenue of the Americas

5        New York, NY 10036

6

7   BY:   DOUGLAS H. MANNAL, ESQ.

8         ELISE S. FREJKA, ESQ.

9         GREGORY A. HOROWITZ, ESQ.

10        KENNETH H. ECKSTEIN, ESQ.

11        STEPHEN D. ZIDE, ESQ.

12

13  KIRKLAND & ELLIS LLP

14        Attorneys for Ally Financial, Inc. & Ally Bank

15        601 Lexington Avenue

16        New York, NY 10022

17

18  BY:   RAY C. SCHROCK, ESQ.

19

20  MORGAN, LEWIS & BOCKIUS LLP

21        Attorneys for Deutsche Bank

22        1701 Market Street

23        Philadelphia, PA 19103

24

25  BY:   JOHN C. GOODCHILD, III, ESQ.

9

1

2   SEWARD & KISSEL LLP

3         Attorneys for US Bank N.A. as Securitization Trustee

4         One Battery Park Plaza

5         New York, NY 10004

6

7   BY:   ARLENE R. ALVES, ESQ.

8         LAURIE R. BINDER, ESQ.

9

10

11  SHEARMAN & STERLING LLP

12        Attorneys for Citibank, NA

13        599 Lexington Avenue

14        New York, NY 10022

15

16  BY:   EDMUND EMRICH, ESQ.

17

18

19  AKIN GUMP STRAUSS HAUER & FELD LLP

20        Attorneys for Aurelius Capital Management LP

21        One Bryant Park

22        New York, NY 10036

23

24  BY:   DANIEL H. GOLDEN, ESQ.

25

10

1

2  WHITE & CASE LLP

3       Attorneys for Ad Hoc Group of Junior Secured Noteholders

4       1155 Avenue of the Americas

5       New York, NY 10036

6

7  BY:   J. CHRISTOPHER SHORE, ESQ.

8       HARRISON DENMAN, ESQ.

9

10

11  CLEARY GOTTLIEB STEEN & HAMILTON

12       Attorneys for Wilmington Trust

13       One Liberty Plaza

14       New York, NY 10006

15

16  BY:   MARK A. LIGHTNER, ESQ.

17

18

19  ALLEN & OVERY

20       Attorneys for HSBC

21       1221 Avenue of the Americas

22       New York, NY 10020

23

24  BY:   JOHN KIBLER, ESQ.

25

11

1

2  MORRISON COHEN LLP

3        Attorneys for Independent Directors

4        909 Third Avenue

5        New York, NY 10022

6

7  BY:   JOSEPH T. MOLDOVAN, ESQ.

8

9

10  DECHERT LLP

11        Attorneys for Bank of New York Mellon

12        1095 Avenue of the Americas

13        New York, NY 10036

14

15  BY:   GLENN E. SIEGEL, ESQ.

16

17

18  TEITELBAUM & BASKIN, LLP

19        Attorneys for JPMorgan Chase Bank NA

20        1 Barker Avenue

21        Third Floor

22        White Plains, NY 10601

23

24  BY:   JAY TEITELBAUM, ESQ.

25

12

1

2    ROBERT E. BROWN ATTORNEY AT LAW

3          Attorneys for Homeowners Claimants

4          44 Wall Street

5          12th Floor

6          New York, NY 10005

7

8    BY:   ROBERT E. BROWN, ESQ.

9

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

12          Attorneys for Barclays Bank PLC

13          Four Times Square

14          New York, NY 10036

15

16   BY:   JONATHAN H. HOFER, ESQ.

17

18

19   SCHLAM STONE & DOLAN LLP

20          Attorneys for Homeowners Claimants

21          26 Broadway

22          19th Floor

23          New York, NY 10004

24

25   BY:   BENNETTE D. KRAMER, ESQ.

13

1

2   WEIL, GOTSHAL & MANGES LLP

3       Attorneys for Syncora Guarantee Inc.

4       767 Fifth Avenue

5       New York, NY 10153

6

7   BY:   SARA COELHO, ESQ.

8

9

10   SIDLEY AUSTIN LLP

11       Attorneys for Nationstar

12       One South Dearborn

13       Chicago, IL 60603

14

15   BY:   LARRY J. NYHAN, ESQ. (TELEPHONICALLY)

16       JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)

17

18

19   BRADLEY ARANT BOULT CUMMINGS LLP

20       Attorneys for GMAC Mortgage

21       1819 Fifth Avenue North

22       Birmingham, AL 35203

23

24   BY:   CHRISTY W. HANCOCK, ESQ. (TELEPHONICALLY)

25       JON H. PATTERSON, ESQ. (TELEPHONICALLY)

14

1

2   JACKSON WALKER, L.L.P.

3          Attorneys for Frost Bank

4          100 Congress Avenue

5          Suite 1100

6          Austin, TX 78701

7

8   BY:   PATRICIA TOMASCO, ESQ. (TELEPHONICALLY)

9

10

11   ROPES & GRAY LLP

12          Attorneys for RMBS Noteholders

13          1211 Avenue of the Americas

14          New York, NY 10036

15

16   BY:   KEITH H. WOFFORD, ESQ. (TELEPHONICALLY)

17

18

19   JONES DAY

20          Attorneys for FGIC

21          555 South Flower Street

22          Fiftieth Floor

23          Los Angeles, CA 90071

24

25   BY:   RICHARD L. WYNNE, ESQ. (TELEPHONICALLY)

15

1

2  POLSINELLI SHUGHART PC.

3       Attorneys for Plaintiffs

4       700 W. 47th Street

5       Suite 1000

6       Kansas City, MO 64112

7

8  BY:   DANIEL J. FLANIGAN, ESQ. (TELEPHONICALLY)

9

10  ACCESS LEGAL SERVICES

11       Attorney for Wendy Alison Nora and others

12       similarly situated

13       4675 West 80th Street Circle

14       Minneapolis, MN 55437

15

16  BY:   WENDY ALISON NORA, ESQ. (TELEPHONICALLY)

17

18

19  HOOD & LAY, LLC

20       Attorneys for Derrius Silmon

21       1117 22nd Street South

22       Birmingham, AL 35205

23

24  BY:   RHONDA S. HOOD, ESQ. (TELEPHONICALLY)

25

16

1

2  THE LAW OFFICES OF MATTHEW WEIDNER, P.A.

3       1229 Central Avenue

4       St. Petersburg, FL 33705

5

6  BY:   MATTHEW D. WEIDNER, ESQ.

7

8

9  KENNETH TAGGART

10      Pro Se

11

12

13 ALSO PRESENT:

14      ADRIAN COWAN, Analytic Focus (TELEPHONICALLY)

15      PATRICK J. HOPPER, Pro Se (TELEPHONICALLY)

16      CORLA JACKSON, Pro Se (TELEPHONICALLY)

17      J.F. MORROW, Analytic Focus (TELEPHONICALLY)

18      PAULA RUSH, Mortgage Analyst.

19

20

21

22

23

24

25

**RESIDENTIAL CAPITAL, LLC, et al.**                                    39

1  paying the freight?

2          MR. MARINUZZI:  Your Honor --

3          THE COURT:  I mean, first, I assume -- again, I am --

4  next question -- a question, whether it's next question is, I

5  can understand a certain amount of sticker shock when the

6  estimated cost rose from 180 million to 250 million.  A lot of

7  money.

8          MR. MARINUZZI:  Unquestionably.

9          THE COURT:  But what's the basis for charging the

10 debtors for any review required by the consent order, review of

11 the nondebtor affiliates?

12         MR. MARINUZZI:  Your Honor, I guess when you look at

13 the consent order, the consent order -- there's two different

14 things.  There's the consent order and the obligations that are

15 imposed on the debtors by the Board of Governors of the Federal

16 Reserve.  And then there is the obligation to pay PWC set forth

17 in the engagement letter.  And I think we need to separate the

18 two.  Because each presents different issues, although it

19 relates to the foreclosure review.

20         And the issue, as we see it, when we look at the

21 consent order, it says GMAC Mortgage must do the following.

22 And so we looked at the PWC engagement letter, and it says that

23 Ally and GMAC Mortgage are jointly and severally liable for all

24 obligations under the engagement letter.

25         THE COURT:  Well, you know, if there's a 180 million

**RESIDENTIAL CAPITAL, LLC, et al.**                                    40

1  or a 250 million dollar cost to what PWC is going to do, it

2  surprises me not in the least that PWC would want joint and

3  several liability among the parent and the debtors.  No

4  surprise about that.  Okay?  It wouldn't matter whether it was

5  a bankruptcy or not.  I mean, if they were going to do this

6  work, they want to be satisfied they're being paid.

7          So the fact of the joint and several liability for the

8  costs doesn't -- that part of the committee's argument doesn't

9  persuade me, just the fact that there is this joint and several

10 liability.  My focus -- maybe it's wrong -- this is a status

11 conference, not the ultimate hearing on it -- but when I

12 reviewed the materials, which I've done, my reaction is that

13 here's a -- this is a consent order.  The committee may think

14 it's -- I'm not sure what the committee thinks; whether -- they

15 say it -- I don't know whether it could be rejected.  But they

16 seem to think this is a bad deal and the debtor shouldn't be

17 required to comply with the requirements of it.

18         How they do that, I don't know.  But, okay, that's

19 what the co -- but there's a consent order.  And let's assume

20 for the sake of discussion that it's enforceable and that the

21 committee can't just decide, I don't like it.  Okay?  That's

22 different, in my view, than saying who should pay for the

23 review.  And if a portion of the review focuses on nondebtor

24 affiliates, why should the debtor be paying for it?

25         MR. MARINUZZI:  Your Honor, I was handed two separate

RESIDENTIAL CAPITAL, LLC, et al.                                              41

1  notes that say the same thing, so I think at least one of them

2  is correct.  And the answer I got is that the PWC review is

3  only with respect to GMAC's and Residential Capital's

4  foreclosure and servicing process, not that of Ally.  So that's

5  what PWC is doing.  Whether it's the answer we all like or not,

6  that's the answer I was given by the client.

7          So we take Your Honor's comments to heart.  And the

8  problem we have, and the reason we filed the motion is we have

9  a consent order that says we must do this.  And we know that

10 not complying with the consent order is a bad thing, not just

11 according to the Fed and regulations, but also with respect to

12 our post-petition financing facilities and our asset purchase

13 agreement.

14         Now, what we did want to do -- and Your Honor granted,

15 we believed, authority in the GA servicing order, for us to

16 comply with our obligations under the consent order.  This open

17 and notorious, a public document.  We said it was expensive

18 from day one.  It was in the Whitlinger declaration.  It's not

19 a secret.  And in the context of the dispute regarding the Ally

20 subservicing, which I'm sure Your Honor fondly remembers, we

21 said wait a second --

22         THE COURT:  Or not so fondly.

23         MR. MARINUZZI:  Not so fondly.  We said wait a second.

24 If we pay eight, ten million dollars PricewaterhouseCoopers on

25 account of the post-petition services that they've invoiced,

**RESIDENTIAL CAPITAL, LLC, et al.**                    42

1   it's going to show up in a monthly operating report.  We'll

2   tell the committee that we've done it.  And then we're afraid

3   of allegations that we shouldn't have made the payment, should

4   have done more disclosure.  And we said rather than face that

5   because it's a lose-lose situation; let's file a motion --

6           THE COURT:  How much is in the DIP budget for this

7   expense?

8           MR. MARINUZZI:  I don't remember specifically.  But

9   I'm told it's sufficient for the projected expenses through the

10  closing of the sale.

11          THE COURT:  Is there a line item in the DIP budget?

12          MR. MARINUZZI:  Yes.  There is.  And our thought

13  process, Your Honor --

14          THE COURT:  And what happens upon the closing of a

15  sale of the servicing platform?

16          MR. MARINUZZI:  Our obligations under the consent

17  order to permit for the continuation of the foreclosure review

18  stand.  We'll have access to the files to permit the review.

19  We would hope between now and the closing of the transaction

20  that given the costs of the foreclosure review versus the

21  projected remediation payments, that perhaps there'll be some

22  changes with respect to the consent order to allow for some

23  different solution to this.

24          But right now we're living in the world of what the

25  consent order requires us to do.  And we filed the motion.  And

RESIDENTIAL CAPITAL, LLC, et al.                                    43

1  our thought process was pretty straightforward.  We've got a

2  consent order that says we have to do this; if we don't, bad

3  things could happen.  We have an engagement letter that says

4  joint and several liability.  It doesn't say in accordance with

5  whatever PWC is doing for Ally, which may be nothing.  It's

6  just joint and several.

7          So we said rather than risk noncompliance and

8  violating the terms of our other agreements, we are not

9  talking, in the short term, about a lot of money.  We'll pay --

10          THE COURT:  How much is PWC burning a month?  I say

11  "burning", what's the burn rate?

12          MR. MARINUZZI:  Your Honor, I understand the amount

13  that they're currently owed is eighteen million dollars.  The

14  estimated monthly rate is about six or seven million dollars

15  per month.  The law firms are significantly less than that.

16          And we said let's pay.  Let's avoid trouble with the

17  Fed.  Let's not put any risk on the sale or the DIP financing.

18  And you go through the thought process, and you say well,

19  they're not going to call a default with the sale happening.

20  And people want the sale to go forward, so they'll look the

21  other way if the Fed says we're going to issue a cease and

22  desist and require you to respond in thirty days as to why

23  you're not complying.  But that puts a tremendous risk on the

24  process, if for example, the GSEs say well, we hear you're not

25  comporting with the requirement of the consent order, I want to

RESIDENTIAL CAPITAL, LLC, et al.                    44

1  look at this a little bit more closely.

2        Rather than risk that, we said we have contribution

3  rights; at least the right to make a contribution claim against

4  the parent for the cost, that we're preserving for everybody's

5  benefit.  And so we can get through the sale.  Whatever the

6  costs are under the consent order, they will be paid; the Fed

7  will be happy; the governmental agencies will be happy.  And to

8  the extent that there is a contribution claim that we, the

9  committee on behalf of the estates, or any other third party

10  wants to assert against the parent, those rights are not

11  affected by our payment.  We wanted to preserve those rights,

12  and that's what the proposed order would do.

13        And so we provided -- we told the committee since last

14  month, well before we filed the motion, that this is what we

15  intended to do.  And we provided them with a draft or a

16  substantially final draft of the PWC papers on August 31st or

17  29th -- the last Friday in August.  We filed it the following

18  Wednesday.  And ten days later we get an extensive document

19  demand, basically asking for any and all communications and

20  documents concerning the consent order.

21        We had a meet-and-confer the following week.  And it

22  is our intention -- and we understand that Ally was also served

23  with an extensive document demand mirroring ours -- our

24  intention to comply and try to provide them with documents

25  regarding the foreclosure proceeding.

RESIDENTIAL CAPITAL, LLC, et al.                                    45

1        But, Your Honor, I want to be very clear on something,

2   and I conveyed this to committee counsel yesterday, I'm not a

3   regulatory attorney.  I'm just a bankruptcy lawyer.  But I

4   spoke with my regulatory team, and they have told me that there

5   are significant restrictions in the ability of a regulated

6   entity to provide to a third party that requests information,

7   information the board considers -- the board of the Federal

8   Reserve -- confidential and dealing with the regulatory

9   authority of the board.

10       And so what does that mean?  Our regulators are

11   looking at that.  But we were obligated under the CFR to advise

12   the board, which we did, of the document demand.  We sent a

13   copy of document demand.  Because ultimately, at the end of the

14   day, whatever documents we or the parent produce, the Fed is

15   going to have to agree that we can produce them.  We'll ask the

16   Fed, recommend to the Fed, try to negotiate the best

17   confidentiality agreement we can with committee counsel, to

18   allow the process to go forward.  But there are restrictions.

19   And everybody needs to understand them.  And they're not

20   created by the debtors.

21       And, Your Honor, if I could approach with, just as an

22   example -- because I've never seen anything like this, Your

23   Honor, until my regulatory team told me about it.  If I could

24   approach?

25            THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                                    66

1   they're agreeing to produce -- we still have some disputes --

2   by October 8th.  And we think that the appropriate thing to do

3   is to take up Ally's suggestion in their position statement

4   that the Court schedule a telephonic status conference by which

5   point, hopefully, the parties will have agreed on a scheduling

6   order to have this matter heard.

7         I believe that the committee is still likely to be

8   asking for an evidentiary hearing on this issue, but it's

9   possible after doing the discovery that this will be something

10  that would be taken up on papers and legal argument.

11        THE COURT:  Mr. Marinuzzi, what's the status of the

12  professionals' work?  Is it stopped?  Are they --

13        MR. MARINUZZI:  No, fortunately, the last information

14  we got is that PwC is continuing to work asking for payment.

15  They're putting pressure on the Fed, which is putting pressure

16  on us to release money to pay PwC.  We didn't want to pay PwC

17  anything in the context of this hearing without being in front

18  of Your Honor first.

19        And like I said, we have a call scheduled tentatively

20  for 1 o'clock today with the Fed.  I don't know what their

21  position is going to be.  I don't know if anybody from the Fed

22  is listening in on this hearing.  They've been very cooperative

23  with us thus far.  I don't know how long we'll have their

24  cooperation.

25        But Your Honor, I did want to respond to just one or

1  two points.  We submitted, as Exhibit 10 to the motion on

2  Friday, the supplemental agreement that counsel for the

3  committee places a high degree of reliance on.  And what I'd

4  want to point out from this is that it, again, ratifies that

5  paragraphs 3 and 4 of the consent order require GMAC Mortgage

6  to conduct an independent review, again, so there's no

7  misunderstanding about whose obligation it is.

8           THE COURT:  Oh, it's just a question of who's paying

9  for it.

10          MR. MARINUZZI:  Correct.

11          Second, it says that if ResCap commences bankruptcy

12  cases, which we've done, Ally will be secondarily liable for

13  the obligations to timely pay.  And so to say that there could

14  never be a default under the consent order ignores the fact

15  that paragraph 3 says GMAC Mortgage.  And to rely on that kind

16  of an argument when the Federal Reserve Board can assess, for

17  intentional violation of their order, fines of one million

18  dollars per day, and to assume that that provision will be

19  interpreted the same way by our DIP financing providers, by

20  Nationstar is, I think, asking a little too much.

21          That's all I have, Your Honor.

22          THE COURT:  Look, let's just define who's going to

23  pay; whether you're going to pay or whether AFI's going to pay.

24  I don't want to hear -- NationStar shouldn't be particularly

25  worried about it.  AFI can pay if you can't or if the Court

RESIDENTIAL CAPITAL, LLC, et al.                                    68

1   somehow found that you shouldn't -- the debtors shouldn't be

2   paying the entire amount, that it should be split or whatever.

3          We've got a long agenda already on October 10th.  This

4   is going to be added to the agenda.  The committee hopefully

5   will come away from this hearing understanding I'm not

6   particularly moved by the position they've asserted in their

7   papers.  I will entertain at the October 10th hearing; I'll see

8   what the schedule is that the parties have endeavored to reach.

9          I'll tell you, I'm tempted today, but I'm not going to

10  do it -- I'm tempted today to enter an order saying the debtors

11  are directed to make the payments to PwC and the other

12  professionals pending further order of the Court.  This review

13  has got to go forward.  In my view, the debtors need to comply

14  with the consent order.  Nothing that I read in the committee's

15  papers convinces me otherwise.  Maybe they think they could

16  have negotiated a better deal, but it's the deal that was

17  negotiated.  It's a regulatory -- or a police and regulatory

18  enforcement matter.

19         MR. MARINUZZI:  Your Honor, my understanding is there

20  wasn't a lot of negotiation anyway.  The consent orders look

21  very much alike.

22         THE COURT:  Well, look, it wouldn't be beyond AFI to

23  have endeavored to shift the entire financial burden of doing

24  this to the debtors.  That, at least, is the allegation with

25  respect to the servicing agreement.  So don't take my comments

RESIDENTIAL CAPITAL, LLC, et al.                                    69

1   to suggest that there wasn't something inappropriate in AFI's

2   approach to the issue.  It is a review of the debtors, though,

3   principally.  Okay?

4           We'll take this up on the 10th and --

5           MR. MARINUZZI:  And Your Honor, if the Fed runs out of

6   patience --

7           THE COURT:  -- this needs to get resolved.

8           MR. MARINUZZI:  -- we'll call chambers --

9           THE COURT:  Okay.

10          MR. MARINUZZI:  -- and request an emergency hearing.

11          THE COURT:  Okay.

12          MR. MARINUZZI:  Thank you.

13          THE COURT:  All right.  Who else wants to be heard?

14          MR. LIGHTNER:  Good morning, Your Honor.  Mark

15  Lightner from Cleary Gottlieb Steen & Hamilton on behalf of

16  Wilmington Trust, the trustee and the senior unsecured notes.

17          We hear you loud and clear, Your Honor.  We filed a

18  limited objection, which I know that you've read.  We raised

19  the two issues, and the one that we think that is still

20  outstanding is which debtor is obligated to perform under the

21  consent order and which debtor is obligated to pay for it.  And

22  there's, we think, some conflation going on about who's

23  obligated.  We use the term "debtors" generically to refer to

24  all of the debtors, but we would like to make it clear that it

25  is GMAC Mortgage, and GMAC Mortgage alone, that has committed

# EXHIBIT 3

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

| | |
|---|---|
| Supplemental Agreement by and between<br><br>ALLY FINANCIAL INC.<br>Detroit, Michigan<br><br>and<br><br>FEDERAL RESERVE BANK<br> OF CHICAGO<br>Chicago, Illinois | Docket No.  12-030-WA/RB-HC |

WHEREAS, on April 13, 2011, the Board of Governors of the Federal Reserve System

("Board of Governors") and the Federal Deposit Insurance Corporation, on the one hand, and

Ally Financial Inc. ("Ally"), a registered bank holding company, its direct and indirect nonbank

subsidiaries, Residential Capital, LLC and GMAC Mortgage, LLC ("GMAC Mortgage"), and

Ally Bank, on the other hand, entered into a Consent Order under section 8 of the Federal

Deposit Insurance Act ("FDI Act") (12 U.S.C. § 1818) related to servicing of residential

mortgage loans (the "Consent Order");

WHEREAS, paragraphs 3 and 4 of the Consent Order require GMAC Mortgage to

conduct an independent review of certain residential mortgage foreclosure actions and provide

monetary reimbursement or remediation as appropriate;

WHEREAS, the Board of Directors of Residential Capital, LLC, GMAC Mortgage, or

some or all of their direct and indirect subsidiaries (individually or collectively "ResCap") may

choose to commence cases (or ResCap may otherwise become subject to protection) under the

U.S. Bankruptcy Code ("Code");

WHEREAS, it is the common goal of Ally and the Federal Reserve to ensure ResCap's completion of the foreclosure review and the payment of any monetary reimbursement and remediation if not performed by GMAC Mortgage as required by the Consent Order, and by entering into this Supplemental Agreement ("Agreement") with Ally, the Federal Reserve in no way releases, reduces or alleviates GMAC Mortgage of its obligations under the Consent Order and considers GMAC Mortgage to be primarily liabile for such obligations;

WHEREAS, the Reserve Bank and Ally have mutually agreed to enter into this Agreement in conjunction with the Consent Order; and

WHEREAS, pursuant to delegated authority, William B. Solomon, Jr., General Counsel and Group Vice President, is authorized to execute this Agreement on behalf of Ally and to consent to compliance with each and every provision of this Agreement by Ally and its institution-affiliated parties as defined in sections 3(u) and 8(b)(3) of the FDI Act (12 U.S.C. §§ 1813(u) and 1818(b)(3)).

NOW, THEREFORE, Ally and the Reserve Bank agree as follows:

**ResCap Obligations**

1.    If ResCap commences cases or is otherwise subject to protection under the Code, Ally will be secondarily liable for the obligations to timely pay any portions of:

(a) the fee that ResCap owes PricewaterhouseCoopers (or any successor consultant) to complete the foreclosure review required under paragraph 3(a) of the Consent Order, and

(b) the monetary reimbursement or remediation payments under a remediation plan approved by the Federal Reserve under paragraphs 3(c) and 3(d) of the Consent Order (clauses (a) and (b) of this paragraph 1 collectively being the "ResCap Obligations"),

2

in the event and to the extent ResCap, or any successor in interest or other acquirer of ResCap's assets or the ResCap Obligations, does not timely pay any ResCap Obligation. Before any obligation of Ally would arise regarding the ResCap Obligations, Ally may use its reasonable best efforts to ensure that an order from the Bankruptcy Court is entered to treat any obligation of Ally in respect of the obligations of ResCap under the Consent Order as administrative or priority payments of ResCap's estates. In no event shall Ally's obligation to pay on such secondary liability be delayed more than (a) 120 days from the date of ResCap's filing for or otherwise becoming subject to protection under the Code or (b) 90 days after ResCap has failed to perform or pay any ResCap Obligations, whichever is later.

2.    Neither the existence of this Agreement nor any payments that Ally makes in respect of the ResCap Obligations will prejudice Ally's right to seek reimbursement of those payments or any of Ally's rights against ResCap under the Code or otherwise.

3.    For the avoidance of doubt, Ally's obligations under this Agreement regarding provisions of paragraph 1 shall arise and become effective only if, and then only after, ResCap becomes subject to protection under the Code and then as set forth in paragraph 1; provided, that nothing in this paragraph 3 affects the authority of the Board of Governors to enforce the provisions of the Consent Order against Ally, ResCap, or any successor in interest of Ally or ResCap.

**Successor in Interest**

4.    In order to ensure compliance with the requirement in paragraph 25 of the Consent Order that its provisions shall be binding on the successors and assigns of Ally and ResCap, in the event of a transformative transaction involving ResCap, including, without limitation, a change of control transaction, a sale of all or substantially all of ResCap's assets (or

3

assets that are material to the performance of the obligations of ResCap under paragraphs 3 and 4 of the Consent Order) or a reorganization or similar transaction (including in connection with any legal or regulatory proceeding) (a "Transformative Transaction"), Ally will use all reasonable best efforts to cause ResCap to ensure the continued performance of its obligations under paragraphs 3 and 4 of the Consent Order, including requiring any successor or purchaser of substantially all of the assets (or assets that together are material to the performance of the obligations of ResCap under paragraphs 3 and 4 of the Consent Order) of ResCap to honor and perform the obligations (in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets) under paragraphs 3 and 4 of the Consent Order.

     5.     In addition, ResCap has agreed with Ally that ResCap will not enter into a Transformative Transaction without the consent of Ally; and Ally will not consent to any such Transformative Transaction (or provide financial support in connection with any such Transaction) unless ResCap (including any successor to or purchaser of substantially all the assets from ResCap) agrees to ensure the continued performance of the obligations under paragraphs 3 and 4 of the Consent Order, including without limitation completion of the independent review of foreclosure actions (in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets).

**Notices**

     6.     All communications regarding this Order shall be sent to:

     (a)     Mr. James W. Nelson
Senior Vice President
Supervision and Regulation Department
Federal Reserve Bank of Chicago
230 South LaSalle Street
Chicago, Illinois  60604-1413

4

(b)     Ms. Barbara Yastine
Chief Administrative Officer
Ally Financial Inc.
1177 Avenue of the Americas
New York, NY 10036

with copies to:

Mr. Daniel Soto
Chief Compliance Officer
Ally Financial Inc.
440 South Church Street
Charlotte, NC 28202

William B. Solomon, Jr., Esq.
General Counsel
Ally Financial Inc.
200 Renaissance Center
9th Floor
Detroit, MI 48265

Mark H. Weintraub
Executive Vice President – Mortgage Servicing Remediation Oversight
Ally Financial Inc.
440 South Church Street
Charlotte, NC 28202

**Miscellaneous**

7.      The provisions of this Agreement shall be binding on Ally and each of its

institution-affiliated parties, in their capacities as such, and their successors and assigns.

8.      Each provision of this Agreement shall remain effective and enforceable until

stayed, modified, terminated, or suspended in writing by the Reserve Bank.

9.      Notwithstanding any provision of this Agreement, the Reserve Bank may, in its

sole discretion, grant written extensions of time to Ally to comply with any provision of this

Agreement.

10.     The provisions of this Agreement shall not bar, estop, or otherwise prevent the

Board of Governors, the Reserve Bank, or any other federal or state agency from taking any

5

other action affecting Ally, Residential Capital, LLC, GMAC Mortgage, or any of their current

or former institution-affiliated parties and their successors and assigns.

11.      Pursuant to section 50 of the FDI Act (12 U.S.C. §§ 1831aa), this Agreement is

enforceable by the Board of Governors under section 8 of the FDI Act (12 U.S.C. §§ 1818).


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of

this 26 day of April, 2012.

ALLY FINANCIAL INC.                          FEDERAL RESERVE BANK
                                               OF CHICAGO

By: _____                  By: _____
       William B. Solomon, Jr.                       James W. Nelson
       General Counsel                               Senior Vice President
       Group Vice President

6

# EXHIBIT 4



February 1, 2012

Ally Financial Inc

New York, NY

GMAC Mortgage LLC

Re: Foreclosure Review

Dear

This engagement letter (the "Agreement") confirms that Ally Financial Inc. ("Ally") and GMAC Mortgage LLC ("GMACM") (Ally and GMACM, together shall be referred to herein as the "Company" or "you") have engaged PricewaterhouseCoopers LLP ("we" or "us" or "PwC" or "Independent Consultant") to perform the services described below pursuant to Section 3 of the Consent Order (the "Consent Order" or "Order") entered into on April 13, 2011 by Ally, GMACM, Ally Bank, Residential Capital, LLC ("ResCap") and the Board of Governors of the Federal Reserve System ("FRB") and the Federal Deposit Insurance Corporation ("FDIC") (FRB and FDIC, collectively the "Regulators").

Both of Ally and GMACM shall be jointly and severally liable for the fulfillment of any and all obligations, responsibilities and liabilities of the Company under this Agreement.

**Background**

In response to the Order, GMACM is required to engage independent consultant(s) acceptable to the FRB to conduct an independent evaluation of certain foreclosure actions regarding individual borrowers with respect to the GMACM's residential mortgage loan portfolio and servicing portfolio, and the Company wishes to engage PwC as one of such independent consultants. This evaluation will include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by GMACM and brought in the name of the GMACM, Ally Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including the Mortgage Electronic Registration Systems ("MERS")), that have been pending at any time from January 1, 2009 to December 31, 2010 (the "Review Period"), as well as residential foreclosure sales that occurred during the Review Period (the "Foreclosure Review").

This Agreement, which is subject to acceptance by the FRB, outlines the mutually agreed upon engagement approach that addresses the following:

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

(a)  The methodology for conducting the Foreclosure Review, including:
   (i)  a description of the information systems and documents to be evaluated, including the selection of criteria for cases to be evaluated;
   (ii)  the criteria for evaluating the reasonableness of fees and penalties;
   (iii) other procedures necessary to make the required determinations (such as interviews of employees and third parties and a process for the submission and evaluation of borrower complaints); and,
   (iv) any proposed sampling techniques.

In setting the scope and evaluation methodology under clause (i) of this sub-paragraph, PwC may consider any work already done by the Company or other third-parties on behalf of the Company. This Agreement contains a description of the statistical methods chosen, as well as procedures to increase the size of the sample depending on the results of the initial sampling included in the *Foreclosure Review Approach Overview* section below.

(b)  Timeline to complete the Foreclosure Review.  A discussion of the timelines associated with the Foreclosure Review is included in the *Timeline* section below.

**Scope of Our Services & Responsibilities**

You are engaging us to provide the professional consulting services outlined below (the "Services" or "Foreclosure Review Services").  We will perform the Services in accordance with the Standards for Consulting Services established by the American Institute of Certified Public Accountants.  Accordingly, we will not provide an audit or attest opinion or other form of assurance, and we will not verify or audit any information provided to us by the Company or on the Company's behalf, or provided to us by or on behalf of any external legal counsel retained by the Company to assist with the Foreclosure Review and whose independence as to these matters has been approved by the FRB ("external legal counsel").

We are not providing, and shall at no time provide, any legal advice or legal opinions in connection with this engagement.  PwC makes no representations or conclusions regarding questions of legal interpretation.  It is our understanding that the Company will separately engage its external legal counsel to assist the Company with respect to any legal matters or items that require legal interpretation under federal, state or other type of laws or regulations, in connection with this engagement or otherwise.

Because of PwC's role as Independent Consultant, the Company will not attempt to direct or influence PwC's factual findings that result from the Foreclosure Review.  The Company's further responsibilities in connection with this Agreement will be as set forth in the "Your Responsibilities" section hereunder, or as otherwise mutually agreed by the parties.

As mentioned above, PwC understands that the Company will retain external legal counsel to provide legal representation to it with respect to the Consent Order or legal advice concerning matters covered by the Consent Order.  PwC further understands that the Company's external legal counsel will provide the legal advice necessary for completion of the items listed in Paragraphs 3(a)(i) – (vii) of the Consent Order (the "Review Criteria"), such as (i) building the evaluation criteria and providing support for subsequent questions of legal interpretation arising during the evaluation process, and (ii) providing guidance where a Review Criterion requires a legal opinion as to compliance with law or contract.  The Company will instruct its external legal counsel to share such evaluation criteria and legal guidance with PwC as may be necessary in connection with PwC's provision of Services hereunder. PwC and the Company acknowledge that the Company provides information to the Regulators pursuant to 12 USC 1828(x), and that the Company will not assert legal privileges as a basis for withholding such evaluation criteria and legal guidance from the Regulators.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

This Agreement does not cover, and the definition of "Services" does not include, the services that will be provided by the external legal counsel, as those services will be covered by a separate agreement between the Company and the external legal counsel.  Although PwC may utilize certain evaluation criteria and other information or materials prepared by the external legal counsel in order to provide the Services hereunder, PwC disclaims any and all responsibility and liability for any such materials, information or data provided by the Company or the Company's external legal counsel in connection with this engagement. We will refer any potential matters of legal interpretation to the Company's external legal counsel, and PwC will make no representations or conclusions regarding such matters.

PwC will provide a written report detailing its factual findings and observations from the Foreclosure Review (the "Foreclosure Report") to the Company as discussed in the *Deliverable* section below.  PwC understands that the Company may provide our written report and related findings to the Company's external legal counsel for its consideration in preparing its written report that sets forth the legal conclusions that are called for by the Consent Order.

*Independence of PwC as Independent Consultant*

PwC agrees to use its best efforts to ensure that its performance of the Foreclosure Review will comply with all requirements set forth in paragraphs 3 and 4 of the Consent Order to the extent that such paragraphs do not require any legal analyses or conclusions, which PwC understands shall be performed by the Company's external legal counsel, and that it will conduct the Foreclosure Review as separate and independent from any evaluation, study, or other work performed by the Company or its other contractors or agents with respect to GMACM's applicable mortgage servicing portfolio or the Company's compliance with other requirements of the Consent Order, as set forth below:

1.  As previously indicated, the Company and/or its contractors or agents, as applicable will not attempt to direct or influence PwC's factual observations or findings. PwC shall immediately notify the FRB of any effort by the Company, directly or indirectly, to exert any such direction, control, supervision, oversight, or influence over PwC, its contractors or agents.

2.  PwC agrees that it is responsible for the conduct and results of the factual evaluation and factual findings required by the Foreclosure Review that do not require legal determinations or analysis, in accordance with the requirements of clauses 3(a)(i) through (vii) of the Consent Order.  PwC understands that the Company's external legal counsel will prepare a separate written report that sets forth the legal conclusions that are called for by the requirements of the Consent Order, which report shall be based upon the factual findings and observations provided to the Company by PwC.  PwC understands that engagement of external legal counsel by the Company is subject to FRB approval.

3.  The conduct of the Foreclosure Review shall be subject to the monitoring, oversight, and direction of the FRB. PwC agrees to use its best efforts to promptly comply with all written comments, directions, and instructions of the Regulators concerning the conduct of the Foreclosure Review consistent with professional standards, and that it will promptly provide any documents, workpapers, materials or other information requested by the Regulators.

4.  PwC agrees to provide regular progress reports, updates and information concerning the conduct of the Foreclosure Review to the Regulators, as directed by the FRB.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

5.  PwC will conduct the Foreclosure Review using only personnel employed or retained by PwC to perform the work required to complete the Foreclosure Review.  PwC shall not employ or use services provided by the Company's employees, or contractors or agents retained by the Company with respect to the Consent Order or with respect to matters addressed in the Consent Order, in order to conduct the Foreclosure Review, except where the FRB specifically provides prior written approval to do so.

6.  Subject to the requirements and restrictions of no. 5 above, including the requirement of specific approval by the FRB, PwC may utilize documents, materials or other information provided by the Company, and may communicate with the Company, its contractors or agents, in order to conduct the Foreclosure Review.  For example, PwC may communicate with the Company's employees to obtain clerical assistance, to determine if information provided is complete or accurate, to verify or confirm information concerning specific case files, or to communicate with the Company employees regarding case files such that errors or omissions may be brought to PwC's attention; however, the Company's employees may not influence or attempt to influence determinations concerning the findings or recommendations of PwC, whether regarding specific case files, categories of cases, or the Foreclosure Review more generally.

    PwC agrees that any legal advice needed in conducting the Foreclosure Review shall be provided and/or obtained by the Company's external legal counsel, whose retention for that purpose has been approved by the FRB.  As previously indicated, PwC will refer any potential matters of legal interpretation to the Company's external legal counsel, and PwC will make no representations or conclusions regarding such matters.  PwC agrees not to obtain legal advice (or other professional services) in conducting the Foreclosure Review from the Company's inside counsel, or from other counsel retained by the Company or its affiliates to provide legal advice concerning the Consent Order or matters contained in the Consent Order.

7.  The Company and PwC agree that if the FRB determines, in their sole discretion, that PwC has not been fully compliant with the foregoing standards (nos. 1-7, above), the FRB may direct the Company to dismiss PwC and retain a successor consultant, in which case the Company shall have no further obligation to PwC other than for services performed up to that date for the Company.

*Scope*

PwC will assist GMACM with the identification of any borrowers and investors who suffered financial injury as a result of errors, misrepresentations, or other deficiencies associated with pending or completed foreclosures in 2009 and 2010. For purposes of this engagement, financial injury means monetary harm to the borrower or the owner of the mortgage loan directly caused by errors, misrepresentations, or other deficiencies. Monetary harm does not include physical injury, pain and suffering, emotional distress, or other non-financial harm. Monetary harm does not include financial injury that did not result as a direct consequence of errors, misrepresentations, or other deficiencies identified in the Foreclosure Review. Errors, misrepresentations, or other deficiencies means those matters discovered during the Foreclosure Review as set forth in Paragraphs 3(a)(i)-(vii) of the Consent Order. Errors includes miscalculation of fees or other charges, where the total aggregate miscalculated fees or charges applied to and paid by the borrower exceeds $99.00 (as outlined by previous FRB guidance).

As noted above, the Foreclosure Review will include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for residential mortgage loans serviced by GMACM and brought in the name of GMACM, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that were pending or completed at any time during the Review Period. The Foreclosure Review will include loans as defined within "certain residential foreclosure actions" of the *Key Consent Order Definitions* section below.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

The primary loan servicing systems of record to be subject to the Foreclosure Review discussed herein are ██████████████████ and, in particular, the ████████ mortgage servicing platform. Data on loans subject to the Foreclosure Review may include data and information from ████████ borrower payment history, corporate advance and other fee data, late charge assessment history, third party law firm and trustee firm files, and manual and automated notes prepared during collections, bankruptcy, loss mitigation, and foreclosure activities. GMACM is responsible for the completeness and accuracy of data provided.

Imaged copies of documents for loans subject to the Foreclosure Review such as the mortgage document, promissory note (and related assignments and alonges), and loss mitigation documents may also be evaluated. In addition, legal files maintained by GMACM's vendor foreclosure attorneys containing relevant notices, court filings, affidavits, and judgments may also be evaluated.

GMACM's residential mortgage loan collections, loss mitigation, bankruptcy, and foreclosure workflow, policy, procedural, and process documentation may also be evaluated.

For purposes of the Foreclosure Review determination of risk-based segments, risk ratings, sampling methodology, Foreclosure Review consulting Services and reporting considerations further described herein, we anticipate performing various other consulting Services, including but not limited to, interviewing the Company's employees as well as third parties which may have worked on behalf of the Company, accessing files that support information included within the loan servicing systems of record, and reading the Company's policies and procedures, departmental flows and/or other information relevant to the foreclosure processes. Specifically, the Services to be provided in relation to determination of risk-based segments, risk ratings and other procedures of the Foreclosure Review may include, but are not limited to, the following:

- discussions with the Company's management with respect to self-identified or known foreclosure-related issues;

- reading of the Company's internal audit reports related to modifications or foreclosures in 2009-2010;

- reading of USAP reports for 2009-2010;

- reading of MHA-Compliance reports for 2009-2010;

- discussions with the Regulators;

- interviews with applicable Company employees to understand the customer complaint process related to foreclosure actions during the Review Period, both pre- and post-Consent Order issuance date; and,

- follow-up interviews as necessary to resolve questions uncovered during the Foreclosure Review.

We understand that the methodology for conducting the Foreclosure Review should include a process for submission and evaluation of borrower claims and complaints - to include complaints received by GMACM subsequent to the issuance of the Consent Order on April 13, 2011 that are from borrowers who believe they have been financially harmed as a result of errors, misrepresentations, or other deficiencies associated with foreclosures initiated or completed during the Review Period. Additional details associated with the proposed Foreclosure Review surrounding post-Consent Order issuance complaints received by GMACM are included in the *Submission and Review of Post-Consent Order Issuance Complaints* section below.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

*Foreclosure Review Approach Overview*

GMACM will provide the population of all loans that are subject to the Foreclosure Review per the Order. This will follow the additional guidance provided by the Regulators (see "*Key Consent Order Definitions*" section for definition of "Certain residential foreclosure actions"). GMACM's MIS Systems' "1st Legal Date", "Foreclosure Sale Held", and "Foreclosure Status-Active" fields were used to identify the Foreclosure Review population. As used by GMACM, "1st Legal Date" indicates the date that legal counsel files with the court the GMACM's intention to foreclose and comparable date in non-judicial states; "Foreclosure Sale Held" indicates that the foreclosure sale has occurred and "Foreclosure Status-Active" indicates GMACM has internally approved initiation of foreclosure process and referred the borrower to a foreclosure attorney.

GMACM used the following seven parameters to identify the Foreclosure Review population. Duplicate borrower records were only included a single time in the total Foreclosure Review population (i.e. a borrower that was indentified in multiple parameters was only included once).

    (1) "1st Legal Date" (most recent) field occurred in the Review Period
    (2) "Foreclosure Sale Held" field occurred in the Review Period
    (3) "Foreclosure Status-Active" (most recent) field as of December 31, 2008
    (4) "Foreclosure Status-Active" field as of December 31, 2010
    (5) "1st Legal Date" (historical) field occurred in the Review Period
    (6) "Foreclosure Status-Active" (historical) filed as of December 31, 2008
    (7) "1st Legal Date" (historical) field occurred in the Review Period per ████████████ records

GMACM will specifically exclude the following loans from inclusion in the Foreclosure Review population:

    a.  Non-owner occupied loans - based upon loan origination designation, not property abandonment (excluded in accordance with definition of "Certain residential foreclosure actions" (as noted in the above paragraph)) and

    b.  Second homes based upon loan origination designation.

From this Foreclosure Review population, PwC will select a sample of foreclosure actions that is designed to increase the likelihood of identifying cases where a borrower or investor suffered financial injury as a result of errors, misrepresentations, or other deficiencies. See "*Sampling Methodology Overview*" section below for description of our segmentation and sampling approach.

PwC will analyze the information in the sample for potential errors, misrepresentations, or deficiencies identified to determine if further review is needed on additional foreclosure actions.

*Sampling Methodology Overview*

The approach to the Foreclosure Review includes a sampling approach that includes the following: a) risk-based samples that are associated with elevated risk segments with respect to the potential for borrower or mortgage (investor) financial injury and that directly relate to the primary objective of the Foreclosure Review - which is the identification and remediation in respect of any borrowers or mortgagees (investors) who have incurred financial injury as a result of errors, misrepresentations, or other deficiencies associated with pending or completed foreclosures during the Review Period; and b) base samples from GMACM's overall populations of mortgage loans subject to the Consent Order requirements that are determined based on general sampling methodologies commonly utilized.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

In determining the sample segmentations for the risk-based samples, we will consider input from the Regulators, known industry issues with respect to the foreclosure process and information from the Company's management with respect to potential or identified areas of errors, misrepresentations, or other deficiencies associated with pending or completed foreclosures during the Review Period.

GMACM has or will provide the necessary data to identify the risk based segments within the Foreclosure Review population.  In certain cases, GMACM may perform the data analysis/screening to identify the risk-based segment for PwC.  In such cases, PwC will perform procedures to evaluate and provide any observations and/or recommendations with regards to the analysis prepared by the Company.

As noted below certain evaluation segments are sampled utilizing statistical sampling techniques.  In other cases, we have applied judgment on the level of evaluation or evaluation of 100% of particular segments.

*Statistical Sampling Methodology*

Where applicable, the sampling methodology to be utilized will conform to the guidance consistent with  the Office of the Comptroller of the Currency ("OCC"), Comptroller's Handbook - Sampling Methodologies, August 1998 (the "Handbook").  Statistical sampling, specifically numerical sampling, will be utilized to determine adherence to each of the Review Criteria.  Pursuant to the Handbook, with numerical sampling, each item in a given population is equally likely to be drawn and the population to be sampled is defined by the number of items.  Numerical sampling is used to reveal the presence or absence of a defined characteristic in a portfolio of items with similar characteristics.

As further discussed in the Handbook, in numerical sampling, a precision limit is set by deciding how many differences can be tolerated in the sample population; the more differences that can be tolerated, the higher the precision limit should be.  Reliability is the level of confidence in sample results.  Selecting a reliability level affects the size of a sample with the higher the reliability level, the greater the number of items within the sample population to be evaluated.

Based on the guidance contained within the Handbook as well as communications from the FRB, the sample sizes to be utilized for assessing the Review Criteria will be determined assuming a precision level of 3% and a reliability level of 95% for each applicable population.  Accordingly, the related sample size for each population must be at least 100 items.

Pursuant to the Handbook, if no differences are found in the initial sample results, the desired statistical reliability and precision levels have been attained and typically, no further evaluation is warranted.  When differences are found, further analysis is typically performed to evaluate the differences, including but not limited to the root causes of the differences and whether the differences are isolated occurrences or are reflective of any patterns and/or practices.  Given the aforementioned precision level of 3% and a reliability level of 95% for each of the populations, typically the existence of one difference would indicate that the original reliability and precision levels are no longer valid.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

*Base Samples*

We understand through discussions with the Company as well as directions provided by the Regulators, that there is a desired coverage across all states where GMACM has initiated and/or completed foreclosure sales during the Review Period.  As such, we will stratify the population of loans for the base sample by state and select our sample to be representative by all states with foreclosure initiations.  States that represent less than 1% of the foreclosure initiations will have one (1) loan selected for purposes of the base samples.  This sampling approach will result in sample sizes for certain of the Consent Order requirements being in excess of the minimum sample size of 100 per population as it relates to the base sample determinations.

A random sample generator process will be utilized for purposes of selecting the base samples.  Additionally, as it relates to the base samples, all of the Review Criteria will be evaluated as part of the Foreclosure Review Services.

The composition of the base samples selection and the overall number of sample items for each Review Criteria is summarized as follows:

1.  100 judicial foreclosure initiations
2.  100 non-judicial foreclosure initiations
3.  100 foreclosure sales

Each of the Consent Order Review Criteria will be applied to all of the loans in the three base samples.  Where the Review Criteria require the assessment of legal requirements, we will apply evaluation procedures approved by the Company's external legal counsel.

The table below illustrates potential observations that may arise from our evaluation of the Review Criteria for the base samples.

| Consent Order Requirements | **Illustrative Observations to be Reported**<br>*(Note that our evaluation will be based on the laws in effect at the date the relevant action occurred and that the examples described herein are preliminary and illustrative only.  The listing is not intended to be fully inclusive and may be subject to further revisions).* |
|---|---|
| (i) "whether, at the time the foreclosure action was initiated or the pleading of affidavit filed (including bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or other similar status;" | 1.  Observations will be reported for the following:<br>   a.  Lack of documentation/support that the foreclosing party was a "Party Entitled to Enforce" the note and mortgage under applicable state law |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

| **Consent Order Requirements** | **Illustrative Observations to be Reported**<br>*(Note that our evaluation will be based on the laws in effect at the date the relevant action occurred and that the examples described herein are preliminary and illustrative only. The listing is not intended to be fully inclusive and may be subject to further revisions).* |
|---|---|
| (ii) "whether the foreclosure was in accordance with applicable state and federal laws, including but not limited to, the Servicemembers Civil Relief Act and the US Bankruptcy Code;" | 1.  SCRA - Observations will be reported for the following:<br>   a.  Evidence that a borrower entitled to the same was not afforded the applicable protections under SCRA, including effective interest rate caps where the borrower provided the required notices to GMACM.<br><br>2.  Bankruptcy - Observations will be reported for the following:<br>   a.  Evidence that GMACM commenced foreclosure and/or conducted a foreclosure sale while the borrower was protected by the bankruptcy laws from such foreclosure actions;<br>   b.  Situations where the borrower was assessed and paid any fees or charges that are disallowed by the bankruptcy protections; and<br>   c.  Evidence that GMACM attempted to collect a deficiency after borrower discharged.<br><br>3.  State laws - Observations will be reported for the following:<br>   a.  Evidence that pre-foreclosure notice activities or borrower outreach activities were not in compliance with state requirements;<br>   b.  Evidence that the final foreclosure judgment in judicial states and comparable date in non-judicial states was inconsistent with supporting data for principal, interest through the date of judgment, pre-acceleration late fees, costs and expenses, attorney's fees, and any deductions/credits/set-offs that borrower was entitled to under the terms of the loan documents; and<br>   c.  Evidence of non-compliance with state foreclosure law requirements |
| (iii) "whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;" | 1.  As it relates to non-judicial foreclosure activities, observations will be reported for the following:<br>   a.  Evidence that pre- notice of sale notice activities or borrower outreach activities were not in compliance inconsistent with state law requirements;<br>   b.  Evidence that, without appropriate justification, the period between the legal notifications and foreclosure sales dates were not compliant with state law; and<br>   c.  Evidence that the post-sale confirmation was issued and/or executed before all legal requirements were satisfied. |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

| Consent Order Requirements | Illustrative Observations to be Reported<br>*(Note that our evaluation will be based on the laws in effect at the date the relevant action occurred and that the examples described herein are preliminary and illustrative only. The listing is not intended to be fully inclusive and may be subject to further revisions).* |
|---|---|
| (iv) "whether the foreclosure sale occurred when the borrower had requested a loan modification or other loss mitigation and the request was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period to authorize foreclosure pursuant to terms of the mortgage loan documentation and related agreements;" | 1. As it relates to loan modification activities, observations will be reported for the following:<br>a. Evidence that a modification request was not considered due to a procedural mistake on GMACM's part such as not addressing the borrower's intent to request loss mitigation;<br>b. Unless otherwise subject to investor direction or guidance, evidence that a loan was performing pursuant to a trial modification, trial payment period, or permanent modification at the time of the foreclosure sale; and<br>c. Evidence that at the time of foreclosure sale the loan had not been in default status for a sufficient period of time under the terms of the mortgage loan (or modification thereof) or as required by state law to permit GMACM to foreclose. |
| (v) "whether any delinquent borrower's account was charged fees or penalties that were not permissible under the terms of the borrower's loan documents, state or federal law, or were otherwise unreasonable." | a. As it related to charged fees or and penalties, observations will be reported for the following:<br>a. Evidence that any fees and penalties assessed against the borrower's loan account exceed the amounts or rates disclosed in the loan documents executed by the borrower;<br>b. Evidence that any fees or penalties actually charged and collected against the borrower's loan account exceeded permissible fees under state or federal law or were otherwise above rates for those fees and penalties "customarily charged;"<br>c. Evidence that any fees and penalties charged and collected exceeded the guidelines of Fannie Mae, Freddie Mac, Ginnie Mae, investors or other legal agreements, as applicable; and<br>d. Evidence that a service was not in fact performed for each fee charged and collected against the borrower's account for performance of that service. |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

| Consent Order Requirements | Illustrative Observations to be Reported<br>*(Note that our evaluation will be based on the laws in effect at the date the relevant action occurred and that the examples described herein are preliminary and illustrative only. The listing is not intended to be fully inclusive and may be subject to further revisions).* |
|---|---|
| (vi) "whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of HAMP, if applicable, and consistent with the policies and procedures applicable to Mortgage Servicing Company's proprietary loan modifications or other Loss Mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled appropriately, and a final decision was made on a reasoned basis and was communicated to the borrower before the foreclosure sale;" | 1. As it relates to the loan modifications, observations will be reported for the following:<br><br>a. Modification denials were in error (when considered under program and investor guidelines, as applicable)<br>b. Modification applications noted as incomplete were in fact complete and therefore should have been reviewed for a modification<br>c. Required communications to borrowers per program and/or investor guidelines were not performed |
| (vii) "whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the owner of the mortgage loan." | Observations related to steps performed within Consent Order requirements (i) - (vi) will be considered in relation to determining whether financial injury to the borrower occurred. |

*Risk-Based Segmentation and Samples*

PwC will identify segments through analytics and screening of the entire population of loans subject to the Foreclosure Review that are associated with potentially escalated risk segments, as discussed above.

Foreclosure actions selected for evaluation in these segments may (subject to consultation with the FRB) be targeted to increase the likelihood of identifying potential cases (if any) of financial harm as a result of GMACM's errors, deficiencies, or misrepresentations.

Attachment A identifies the risk segments and testing requirements specifically approved by the FRB for purposes of the Foreclosure Review.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

Additional segmentation may be performed by PwC during the Foreclosure Review based on findings from our evaluation, further analysis of potential segments and/or issues identified by GMACM. PwC may revise the proposed sample sizes or evaluation for each segment during the Foreclosure Review based on preliminary findings. Proposed changes to segmentation, evaluation approach or the scope of evaluation will be communicated to the Regulators and the Company for input, and any material changes will be subject to an amendment to this Agreement executed by both parties.

*Escalation and Response to Findings*

In respect of findings related to legal requirements, if the finding was not a violation of the applicable state and/or federal law, as determined by the external legal counsel, the finding will not be labeled as a difference.

In evaluating the initial sample results associated with the Review Criteria, certain assumptions will guide the overall evaluation of any preliminary findings - including but not limited to the following:

- Any findings that are determined to be differences will be evaluated to determine whether there are any underlying themes and/or causes associated with the findings (including, but not limited to, multiple findings associated with a particular mortgage product type, multiple findings associated with a particular foreclosure attorney or employee, multiple findings associated with respect to a particular state and/or related state-specific fees/penalties).

  To the extent there are any common characteristics and/or attributes of the initial difference(s), an additional sample may be performed related to the corresponding population of loans with those specific characteristics/attributes identified to determine whether there is a pervasive finding with respect to that population of loans for which specific remediation plans should be determined and put in place. Another alternative would be to perform additional sampling on the population of all items exclusive of the subset of loans with the aforementioned specific characteristics/attributes identified in the initial sample as a means of trying to further isolate the existence of difference(s) to that subset only.

  The approach to be taken for any additional samples will be based on individual facts and circumstances associated with the results of the initial sample and will be discussed with the Company, the external legal counsel, and the Regulators prior to initiating a subsequent sample.

  With respect to loan modification related testing exceptions, we will consider the specific program-prescribed tolerances in assessing testing results and evaluating the need for extended sampling.

  Any additional evaluation will be focused solely on the particular attribute(s) and/or specific Review Criteria for which differences were identified in the initial samples and will not include an evaluation of all the Review Criteria for the additional loans, and any 100% coverage decisions must be agreed to by the Company in writing.

  All findings that are determined to be differences will be reported as such, regardless of the dollar amounts involved. All differences will be further labeled to indicate whether the differences represented errors, misrepresentations, or other deficiencies resulting in financial injury to the borrower or mortgagee, or that did <u>not</u> result in such financial injury.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

*Data Quality*

As noted herein, GMACM is responsible for the accuracy of the Foreclosure Review population and the underlying data provided for segmentation and/or evaluation. However, as described below, PwC will perform certain limited procedures related to the completeness and/or accuracy of data.

- With respect to the Foreclosure Review population or other segmentation populations provided by the GMACM, PwC will:

  o obtain an understanding of the queries and logic utilized by GMACM;
  o in certain cases re-perform the queries performed;
  o evaluate the risk-based segment population data for full inclusion in the Foreclosure Review population; and/or
  o perform other procedures based upon unexpected or incompatible data attributes.

- For denied HAMP modifications, GMACM will reconcile (and PwC will evaluate GMACM's reconciliation) of the denied modifications in the Foreclosure Review population to GMACM's HAMP reporting that supports the public HAMP data.

- As the risk-based segments are identified primarily on data attributes provided by GMACM, we will compare the key data attributes utilized for risk-based segmentation and screening to available source documentation. This procedure will be based upon a random sample of 60 loans from our base samples (20 from each of the three base samples).

- Given the importance and sensitivity of risk-based segments related to potential SCRA protection, we will attempt to evaluate the SCRA status (including loans with no SCRA indication) against available third party records of military service. Our understanding is that the available third party data source(s) have limited history which may limit the ability to fully test this data attribute without additional data provided by the Department of Defense. PwC is working with the Department of Defense to obtain additional information that may assist in the identification of additional borrowers who may have been covered by SCRA protection but we make no representation as to the final outcome of this effort.

- Given the importance and sensitivity of risk-based segments related to potential bankruptcy protections, we will evaluate certain bankruptcy related data fields for all loans in the base sample (including loans with no bankruptcy indication) to third party tracking of bankruptcy activities (e.g., PACER).

- Given that non-owner occupied loans are excluded from the Foreclosure Review population, in accordance with the Consent Order, we will evaluate certain primary residence and investment property data fields based on executed loan origination documents for a sample of the loans excluded from the Foreclosure Review population based upon data attributes that indicated non-owner occupied status as of the origination date.

Data quality procedures may be expanded if data issues are identified in the procedures above.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

*Key Consent Order Definitions*

The FRB and Office of the Controller of the Currency ("OCC") have issued guidance (*OCC and FRB Guidance - Financial Injury or Other Remediation dated August 29, 2011* (the "OCC/FRB Financial Injury Guidance") that includes, but is not necessarily limited to, relevant definitions with respect to certain key terms within the Consent Order specifics to the Foreclosure Review. As directed by the FRB, PwC will use best efforts so that its determinations as part of the Foreclosure Review, including the "Submission and Evaluation of Post-Consent Order Complaints" section below, are consistent with the guidance specified by the FRB and/or OCC to serve as the basis for such determinations.

*File Evaluation Services*

PwC understands that the Company's external legal counsel will evaluate and establish File Evaluation Requirements for each of the Consent Order Review Criteria based upon legal guidance prepared by them, and such File Evaluation Requirements shall be provided to PwC. We will apply these File Evaluation Requirements to the evaluation populations as discussed above. As discussed above, we will work with the Company's external legal counsel where applicable to assess potential exceptions with respect to whether the finding is an error, misrepresentation or other deficiency that resulted in financial injury to the borrower, investor or owner of the mortgage.

*Fees Testing*

Our understanding is that as a component of testing fees, that the FRB expects that our procedures will include matching certain fees assessed to the borrower to invoices for services performed. For purposes of this element of the fees testing, we will perform this matching to invoices on a sample basis (utilizing the base samples) and not on all loans reviewed with respect to the appropriateness of fees assessed to the borrower.

**Submission and Evaluation of Post-Consent Order Complaints**

Subsequent to the issuance of the Consent Order, the Regulators have provided additional guidance requiring the development of a process for the submission and evaluation of borrower claims and complaints related to foreclosures from the Review Period. The Regulators have provided guidance regarding a borrower outreach process for complaints to be established related to foreclosure actions initiated, pending or completed during the Review Period. The borrower outreach process is to be established by GMACM and meet the objectives set forth by communications from the Regulators.

GMACM has also been instructed by the Regulators to participate in an approach to the borrower outreach and complaint intake process that is coordinated amongst the other servicers that are subject to the Consent Order ("Coordinated Approach"). The Coordinated Approach is being designed by these servicers and is intended to provide consistency in the design and execution of outreach and intake. The Coordinated Approach includes certain processes that will be executed by a common vendor on behalf of all servicers, and other processes are to be executed by each servicer's respective vendor, but in a consistent manner.

The independent consultant's role is to advise on the type of process that GMACM may use for the borrower outreach complaint process and the related ongoing quality control and oversight processes designed to meet the objectives of the Regulators' guidance using the "Advisory Process" (defined below). Specifically, the independent consultant is responsible for (i) advising on the development of the Coordinated Approach together with GMACM, (ii) advising on the development of GMACM-specific implementation of the Coordinated Approach and the aspects of the complaint process that are not covered by the Coordinated Approach, (iii) executing certain procedures to assess GMACM's and their Complaint Intake Vendor's execution of the outreach and intake processes, and (iv)

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

incorporating all applicable claims and complaints into the Foreclosure Review. The independent consultant will also provide observations and recommendations to GMACM and the Regulators designed to achieve the objectives of the notification process.

Pursuant to the Regulators' guidance as discussed herein, the Foreclosure Review must include (i) all complaints received through the borrower outreach process established per this guidance, and (ii) complaints received from borrowers through any channel (e.g. directly by GMACM, attorney generals, state banking agencies and all other regulatory agencies) since April 13, 2011, that are regarding residential mortgage foreclosure actions that were initiated, pending, or completed during the Review Period. Complaints for borrowers in active litigation must be included if they are otherwise in-scope. All in-scope complaints received through the borrower outreach process, from the launch of the outreach process (with a launch target date no later than November 1, 2011) to the cut-off date (120 calendar days from the launch date), will be subjected to the Foreclosure Review.

The borrower outreach process is expected by the Regulators to be a distinct, separate process from GMACM's existing customer service channel. GMACM will employ a Complaint Intake Vendor to assist with portions of the intake process, in line with the Coordinated Approach. The Complaint Intake Vendor will be engaged by and work at the direction of GMACM. PwC will have no contractual relationship with the Complaint Intake Vendor. All complaints received through the borrower outreach process will be logged by the Complaint Intake Vendor or GMACM. Complaints filed through the borrower outreach process cannot be excluded from remedies provided by the Foreclosure Review unless a determination is made that the complaint is not in-scope, a process which will be subject to evaluation by the independent consultant as further discussed below. The independent consultant will obtain from GMACM and evaluate the reporting to the Regulators of the nature and resolution of each complaint received regarding (i) complaints received through GMACM's borrower outreach process, (ii) GMACM's exclusions of complaints from the Foreclosure Review and GMACM's reason for exclusion, (iii) GMACM's resolution of the complaint, and (iv) other data as further described herein.

Our approach for meeting the Regulators' post-Consent Order complaint process is outlined below:

- Notification Process / Borrower Communication
  o In conjunction with the other servicers, GMACM will design, develop and execute the Coordinated Approach to notify the borrowers associated with the loans identified as responsive to the Consent Order of their right to issue a complaint and the process for doing so. At a minimum, this effort will include (1) direct mail to the best available address for the borrowers, (2) address tracing and re-mailing to those borrowers for whom mail is returned, (3) thorough tracing and reporting of all efforts used to reach borrowers, and (4) public advertising of the complaint process, to potentially reach those borrowers who are not reachable through other means, and (5) through the use of internet websites.

  o Direct mailings will be conducted by the Complaint Intake Vendor in accordance with the schedule and process outlined by the servicers' Coordinated Approach. The Complaint Intake Vendor will also provide call center support.

  o With respect to advertisements, the Regulators' guidelines are that the advertising will be included in (1) national newspapers and/or prominent publications and (2) selected local newspapers based on geographical concentration of relevant borrowers. Advertisements will be designed and distributed in accordance with the schedule and process outlined by the servicers' coordinated advertising approach.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

o GMACM anticipates that certain direct mail to in-scope borrowers could be returned if the borrower's mailing address was the same as that of the related foreclosed property. Accordingly, a skip tracing process is expected to be put in place to handle returned mail and to trace the borrower's current address. It is required that the Complaint Intake Vendor will execute this process. Related to return mail, the Regulators have the expectation that (1) there will be a dedicated post office box for receiving returned mail, (2) the Complaint Intake Vendor will use skip tracing methods to identify the borrower's current address, and (3) multiple attempts will be made to locate and contact the borrower if communication is returned. GMACM will utilize a skip tracing process to be designed as part of the Coordinated Approach.

o PwC will leverage the Advisory Process (as defined below) to provide input and assist management with GMACM's design and development of the Coordinated Approach, GMACM-specific implementation of the Coordinated Approach, and the aspects of the complaint process that are not covered by the Coordinated Approach, with respect to the notification process .

o The Regulators expectations with respect to the content of the notification material will include at a minimum, the following information:  (1) why the borrower is being contacted, (2) how eligibility for the notification/contact was determined, (3) necessary information that GMACM will need from the borrower upon response, (4) the channels available for the borrower to contact the Compliant Intake Vendor, (5) the timeframe for filing a complaint with the Complaint Intake Vendor/GMACM and, (6) what to expect from the complaint process, including when to expect a response.

- Complaint Support and Intake Process (i.e. Receipt and Processing)
  o In conjunction with the other servicers, GMACM will develop and execute the Coordinated Approach to receive the complaints and/or claims relevant to the Foreclosure Review, using the Complaint Intake Vendor and GMACM resources that are dedicated to this effort. At a minimum, this effort will include (1) establishing the means for the borrowers to gain clarity about their rights to make a complaint or claim via a website or mail, (2) providing a structured intake process that will allow the borrower to categorize the nature of complaint and provide relevant information and documentation to support the complaint, (3) developing a plan for status reporting to those borrowers who make complaints through this process, (4) providing complete tracking and reporting of all contact with borrowers relating to the Foreclosure Review effort, and (5) developing a means for all complaints received and supporting documents to be incorporated into the Foreclosure Review.

  o PwC will leverage the Advisory Process (as defined below) to provide input and assist management for GMACM's design and development of the Coordinated Approach and GMACM-specific implementation of the Coordinated Approach, with respect to handling inbound complaints. The process will use the services of the Complaint Intake Vendor to receive complaint submissions, document and store such complaints, filter the nature/extent of the complaints, forwarding/transferring the complaints to GMACM for further analyses and a borrower follow-up process.

  o PwC will advise GMACM regarding training with respect to the execution of the complaint intake process. This training may include (1) key information to be collected, (2) information on the forwarding / transferring of in-scope complaints from the normal customer service process, and (3) relevant foreclosure complaint scripts, frequently asked questions and/or other materials.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

o  GMACM and the Complaint Intake Vendor will be responsible for executing the complaint intake process and providing updates and tracking to PwC, and conducting its own procedures to test the process. The intake process should provide a consistent set of questions to be answered by the borrowers including, but not limited to (1) current contact information, (2) eligibility determination questions, (3) the specific nature of the complaint, and (4) identification of any previous complaints by the borrower, where applicable.

o  PwC will evaluate the complaint process and will provide observations and recommendations to GMACM and the Regulators designed to achieve the objectives of the complaint process. This may include providing feedback to the customer services representative team related to (1) monitoring a judgmental sample of calls by the customer service representatives to assess the appropriate handling of complaints, (2) assessing performance data such as call wait times and dropped calls to provide information to help GMACM determine the adequacy of technology resources and staffing levels, and (3) providing recommendations to update scripts and procedures for continued improvement of the complaint process.

o  GMACM will also direct the Complaint Intake Vendor to provide updates and tracking to PwC for purposes of PwC's analyses related to the Foreclosure Review.

o  With respect to the complaint resolution process, all complaints will need to be logged by the Complaint Intake Vendor and GMACM, including out-of-scope complaints. For complaints received by the Complaint Intake Vendor, the Complaint Intake Vendor will forward all complaints to GMACM. It is the responsibility of GMACM to evaluate whether the complaint is in-scope for the Review Period and/or any immediate action is necessary with respect to the complaint. PwC will perform evaluation procedures around GMACM evaluation of "out-of-scope" designations. GMACM will be responsible for assembling the documents necessary for the review of any in-scope complaints. GMACM will then forward the in-scope complaints, a summary of GMACM's immediate actions, and the assembled documents to PwC for independent assessment. PwC's assessment will be independent of any assessment previously prepared by GMACM. To the extent any immediate remedial action is required or desired by GMACM, such actions may be taken subject to subsequent independent evaluation by PwC and any additional guidance for the Foreclosure Review remediation plan approved by the Regulators.

o  If the nature of the borrower inquiry does not pertain to in-scope mortgages/foreclosures, such borrower contact will be transferred to GMACM's existing customer service channels via defined transfer/hand-off processes.

o  GMACM will be responsible for documenting and storing all complaints in a database that will be archived per GMACM's existing policies.

o  GMACM will be responsible for conducting any follow-up with a borrower, as necessary. Effective receipt and handling of complaints will necessitate the Complaint Intake Vendor and GMACM to develop program -specific training and scripting, technology configurations and other elements previously discussed herein. PwC will advise GMACM regarding such matters as discussed herein.

• Response

o  All complaints are to receive a written response within the number of days indicated in the written acknowledgement. In the written response, borrowers will be provided information that outlines the results of the analysis that addresses all issues previously raised by the borrower. GMACM will inform the borrower in a written response if remediation is required and will state that a remediation is forthcoming within a specified time period following approval by GMACM.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

- o   GMACM and the Complaint Intake Vendor will be responsible for the infrastructure required to handle the complaints, and it is the Regulators expectation that the infrastructure would include configuration of call center technology, web forms for complaints intake, and a database to document complaints received.

- o   On a monthly basis, GMACM will report to the Regulators, in a standardized format that includes loan level information and aggregate volume tracking, the following data points:  (1) number of complaints received, (2) type or nature of complaints received, (3) number of complaints in-scope and out-of-scope, (4) number of complaints acknowledged, (5) number of complaints in process, (6) number of complaints not yet analyzed, (7) number of complaints responded to, (8) complaints disposition, (9) number of complaints requiring remediation, (10) number of complaints remediated, (11) aging reports as warranted/where applicable, and (12) a comments section to provide other pertinent information, as applicable.

- •   Incorporation of Written Complaints into the Foreclosure Review Services of the Independent Consultant

- o   For all complaints received meeting the aforementioned criteria, PwC will perform only the applicable Review Criteria, as described above, that is specific to the nature of the borrower's complaint and evaluate only that specific Consent Order requirement where the nature/form of the complaint is specific to a given Consent Order requirement.  If the complaint is not specific and/or multiple Consent Order requirements are specified in the complaint, an assessment of Review Criteria will be performed.

- o   In addition to the aforementioned assessment of the applicable Foreclosure Review described previously associated with in-scope complaints, PwC will evaluate GMACM's processes for the categorization and/or filtering of in-scope versus out-of-scope complaints.

- o   PwC will request any additional documents from GMACM that may be necessary to complete the Foreclosure Review related to the in-scope complaints.  GMACM will be responsible for gathering and/or assembling these documents for PwC's evaluation purposes.

- o   To the extent any patterns across complaints that have been received are identified, PwC will provide such observations to GMACM and/or the Regulators for further discussion purposes.

- o   PwC will incorporate the results of the applicable Foreclosure Review associated with the received complaints within the deliverables associated with this engagement

- o   Quality assurance activities will be extended to the Foreclosure Review associated with the received complaints similar to the quality assurance activities related to the initial base and risk-based sample determinations as previously discussed herein.

Any direct communication with the borrower will be conducted by GMACM or the Complaint Intake Vendor.

Ancillary to the provision of services described above, PwC will use the following "Advisory Process" to advise GMACM on the documents resulting from the Coordinated Approach that will be used by GMACM specific to the complaint process:

(1)   Where available, PwC will provide initial generic examples of the document based on an initial understanding of the objectives of the assignment.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

(2) PwC will meet with GMACM management to discuss the sample document or the expected content of the first draft of a document where no sample exists, to firm up PwC's understanding of the objectives, and to discuss how the generic document should be adjusted/drafted to make it GMACM specific. In the discussions, PwC will utilize its experience and knowledge of leading practices to facilitate GMAMC's management in making the decisions, determinations, etc. that GMACM deems necessary for inclusion in the document.

(3) Following these discussions, PwC will provide observations/recommendations on GMACM's document first draft and/or a generic document for GMACM management to review.

(4) GMACM's management and other servicers in the Coordinated Approach will take the initial draft, and apply its in-house expertise and experience to either make those changes that they consider necessary or to provide comments/instructions to PwC regarding such changes.

(5) PwC will analyze the amended document or GMACM's comments/instructions and make observations/recommendations.

(6) Based upon GMACM management's and other servicers in the Coordinated Approach decisions regarding PwC's observations/recommendations, GMACM and other servicers in the Coordinated Approach will incorporate changes into the document.

(7) GMACM management and other servicers in the Coordinated Approach will decide on the final content and finalize.

**Access to Information and Privileged Information**

We understand that we will be required to execute a written agreement with the FRB providing for the FRB's prompt and complete access to documents and information created by or in the possession of PwC with respect to the Foreclosure Review. Pursuant to the applicable regulatory requirements, submission of any information required by the FRB does not waive or otherwise affect any claim of privilege by the Company, the Company's external legal counsel, PwC and/or PwC's external counsel as to any third party. The FRB will maintain requested information as confidential, non-public supervisory information, and will review any request for access to such information in accordance with the requirements of the FRB's applicable rules. Should the FRB receive a governmental or third party subpoena for such information, the FRB will notify the Company, the Company's external legal counsel, PwC and/or PwC's external counsel so that these parties may act to protect any claim of privilege with respect to such information.

**Deliverable**

The sole Deliverable that PwC expects to prepare for and deliver to you under this Agreement is the Foreclosure Report. The Company will review our draft report solely for the purposes of providing comments on factual inaccuracies. The external legal counsel will be provided with the underlying findings from our report in order for the external legal counsel to assess the legal consequences of the findings and to prepare its separate report. It is expected that immediately upon completion, the Foreclosure Report will be submitted to the FRB, Examiner-in-Charge.

In addition, it is expected that the Foreclosure Report will disclose information as to the loans included in the Foreclosure Review that are contained in Ally Bank's Servicing Portfolio, and those disclosures will be furnished to the FDIC by the FRB.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

We will make any workpapers associated with the Foreclosure Review available to the FRB upon written request, which PwC understands will be subject to the FRB's customary examination privilege, and that the provision of such materials to the Regulators will not waive any privilege or related defense that can be asserted by the Company, its affiliates, the Company's and its affiliates' respective external legal counsel, or PwC. In addition, the Regulators will not make reference to PwC or make PwC's workpapers available to the public without our written approval.

You will own the Deliverable except as follows: we own our working papers, preexisting materials and any general skills, know-how, processes, or other intellectual property (including a non-Company specific version of the Deliverable) which we may have discovered or created as a result of the Services. You have a nonexclusive, non-transferable license to use such materials included in the Deliverable for your own internal use as part of such Deliverable.  Company prepared documents, files, databases, electronic shared sites, workpapers, materials, and other information, remain the property of the Company, to be used for this Foreclosure Review as well as any other use the Company may elect.

In addition to the Deliverable, we may develop software or other electronic tools to assist us with an engagement. If we make these available to you, they are provided "as is" and your use of these tools is at your own risk.

Notwithstanding anything to the contrary in this Agreement, the Company shall retain ownership of all of its own materials, proprietary information and intellectual property, including such materials, proprietary information or intellectual property used in connection with the Foreclosure Review or in the creation of the Foreclosure Report, and we shall not obtain any right, title or interest in such materials, proprietary information or intellectual property.

**Use of Deliverable**

PwC is providing the Services and the Deliverable solely for your use and benefit pursuant to a client relationship exclusively with you. The Services and the Deliverable are not intended for a third party's use, benefit or reliance and PwC disclaims any contractual or other responsibility or duty of care to others based upon these Services or the Deliverable or advice we provide. Except as described below, neither you nor PwC may discuss the Services with or disclose the Deliverable to any third party, or otherwise disclose the Services or the Deliverable without the other party's prior written consent.

The Company's affiliates, including  Ally Bank and/or ResCap will be provided access to our Foreclosure Report solely upon execution of an Access Letter Agreement with PwC in the form attached hereto as Attachment D. These affiliates are bound by the rights, obligations and restrictions as outlined in the Access Letter Agreement.

Notwithstanding anything to the contrary in this Agreement, you and PwC may discuss the Services with, and disclose the Deliverable to the following: (i) relevant regulatory bodies with jurisdiction over you, or (ii) the Company's external legal counsel retained in connection with the Foreclosure Review, in each case without prior written consent.  The Company and PwC may provide the Deliverable to the relevant regulatory bodies, which will be granted full and timely access to the Deliverable (and PwC's related workpapers upon written request), which PwC understands will be subject to the FRB's and other relevant regulator's customary examination privilege and that the provision of such materials to the FRB or other relevant regulators will not waive any privilege or related defense that can be asserted by the Company, its affiliates, their respective external legal counsel, or by PwC.

You may disclose any materials that do not contain PwC's name or other information that could identify PwC as the source (either because PwC provided a Deliverable without identifying information or because you subsequently removed it) to any third party if you first accept and represent them as your own and you make no reference to PwC in connection with such materials.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

You shall indemnify

## Timeline

The time to complete our fieldwork and prepare our Foreclosure Report will be dictated by the sample sizes, the number of complaints received, additional guidance from the Regulators, the Company's ability to provide the necessary, complete and accurate documentation and information in a timely manner, and the ability of the Company's external legal counsel to complete the relevant legal analysis and provide the legal conclusions that may be required for PwC to complete its performance of the Services.

PwC shall not be responsible for any delay, cost increase or other consequences due to the Company's failure to perform any of its obligations under this Agreement. Any PwC deadline that is affected by a the Company default or factors beyond PwC's reasonable control shall be extended by an amount of time equal to the length of such failure plus an additional period of time to compensate for such default.

## Confidentiality

"Confidential Information" means non-public information provided by you to us or by us to you in connection with this engagement. All terms of this Agreement, including but not limited to fee and expense structure, constitute Confidential Information. Confidential Information does not include any information which (i) is rightfully known to the recipient prior to its disclosure and not subject to any confidentiality obligation to the other party or its affiliates; (ii) is released by the disclosing party without violation of this Agreement to any other person or entity (other than the Regulators) without restriction; (iii) is independently developed by the recipient without use of or reliance on Confidential Information; or (iv) is or later becomes publicly available without violation of this Agreement or may be lawfully obtained by a party from a non-party who does not owe any confidentiality obligation to the other party or its affiliates. Each party to this Agreement will protect the confidentiality of Confidential Information that it receives from the other party or on the other party's behalf, and will not disclose such Confidential Information except to perform this Agreement and/or as required by applicable law, statute, rule, regulation or professional standard, without the other party's prior consent. If disclosure is required by law, statute, rule or regulation (including any subpoena or other similar form of process), or by professional standards, the party to which the request for disclosure is made shall (other than in connection with routine supervisory examinations by regulatory authorities with jurisdiction and without breaching any legal or regulatory requirement) provide the other party with prior prompt written notice thereof – to the extent not legally prohibited – and, if practicable under the circumstances, allow the other party to seek a restraining order or other appropriate relief.

## Your Responsibilities

Our role is advisory only. You are responsible for all management functions and decisions relating to this Agreement, including evaluating and accepting the adequacy of the scope of the Services in addressing your needs. You are also responsible for the results achieved from using the Services or the Deliverable, and it is your responsibility to establish and maintain your internal controls. You will designate a competent member of management to oversee the Services. We expect that you will provide timely, accurate and complete information and reasonable assistance, and we will perform the engagement on that basis. In addition:

- GMACM will provide all necessary population information in order to facilitate sample selection during the engagement.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

- For those foreclosure actions selected in the samples, GMACM will provide all documentation necessary to evaluate the action against the Review Criteria - and such documentation will be accurate and complete in all material respects.
- GMACM is responsible for any potential resolution of findings identified as part of the engagement.
- GMACM will provide sufficient facilities and computing resources for PwC to execute its assigned tasks. This may include, but is not limited to, computers, desks, telephones and networking facilities.
- All assessments will assume that the documentation presented to the PwC team prior to the initiation of work efforts is the only available documentation, except as otherwise agreed to by the parties. All assessments will be performed based on the point in time of the initiation of our Services.

**Document retention**

We will maintain and retain the final evidential matter supporting the Deliverable (i.e., electronic and hard copy workpapers) in a manner consistent with our professional standards. GMACM will maintain the supporting documentation for the Foreclosure Review in a manner consistent with its document retention policies and procedures. The Company will segregate such materials and provide for appropriate access controls to maintain the integrity of the documents provided for the Foreclosure Review.

**Other**

The Company and PwC agree that for purposes of this Agreement, █████████ and █████████ are the designated Engagement Managers for Ally and GMACM, respectively.

- This Agreement does not contemplate the proposed 50 state Attorney General / Federal Agencies Joint Term Sheet ("Term Sheet"). Parties agree and understand that changes in scope may be required due to new or evolving requirements imposed by the Joint Term Sheet, changes in the Consent Order, or changes in Matters Requiring Attention ("MRAs") or Matters Requiring Immediate Attention ("MRIAs").

- PwC will make best effort to attend steering committee meetings with Ally, the Company, and affiliate personnel and the Company's external legal counsel and PwC will do its best to collaborate and cooperate with other consultants.

**Fees and Expenses**

Our fee estimate is based on the time required by our professionals to complete the engagement. Individual hourly rates vary according to the experience and skill required. PwC's fees are based on the time required by the individual specialists assigned to the engagement. Our fees for the above work will be billed on a time and materials basis which will not exceed the following rates:

| Hourly Rates | |
| --- | --- |
| **Title** | **Rate** |
| Partner | |
| Managing Director | |
| Senior Manager/Director | |
| Manager | |
| Senior Associate | |
| Associate | |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

All changes with regard to scope and estimated fees will be documented by Change Order. PwC also will bill for reasonable out-of-pocket expenses and internal per-ticket charges for booking travel and will comply with Ally's U.S. Contractor Expense Reimbursement Policy.

*Invoicing*

A retainer in the amount that approximates two month's projected fees and expenses will be paid to PwC. This retainer will be maintained and replenished based upon actual fees and expenses which will be billed on a regular basis and applied against the retainer. The initial retainer amount will be ██████████.

Invoices will be mailed to the address below for processing:

> GMAC ResCap
>
> 
>
> Fort Washington, PA 19034

Since invoices must go through the scanning process, standard or expedited mail is the quickest means of submitting an invoice for payment.

Invoices <u>must</u> include the following pieces of information:

- Invoice number and date
- The Client LOB:  GMAC Mortgage, LLC and Client contact name: ████████████
- If applicable, the Ally Purchase Order (PO) number. For a PO, reference the PO line item detail and description, and
- Sufficient line item detail to describe the items for which payment is being requested. (Names, titles, dates, hours of performance on services for each assigned individual during the invoicing period and detailed information relative to the expenses related to each).

There will be no change in scope without express written authorization by the Company. Any changes or modification to this Agreement will be completed through execution of a change order form in a similar format to Attachment C (Change Order Form), attached hereto. Upon execution of a change order by both parties, the changes will be deemed to be incorporated into the Agreement.

**Termination and Dispute Resolution**

Any party to this Agreement may terminate the Services by giving written notice to that effect.  Upon termination each party will return or irretrievably destroy, at the election of the other party, all Confidential Information of the other party that it has in its possession, including any information stored on its own equipment, and upon request provide the other party with a certificate attesting the destruction. Notwithstanding anything to the contrary in this Section or the Agreement, PwC may keep its working papers, and each party may retain such copies of the Deliverable and the other party's Confidential Information to comply with its document retention policies or in accordance with applicable law, rule, regulation or professional standards. Any copies of the other party's Confidential Information so kept shall be retained in accordance with the terms of this Agreement. Further, the parties will work to ensure the termination of Services or transfer of Services to another service provider selected by the Company (which may include the Company) is orderly and is non-disruptive to the business continuation of

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

each party.  Notwithstanding the foregoing, if the Company terminates the Agreement without cause, the Company will remain obligated to pay for all undisputed fees and expenses incurred prior to the effective date of termination. PwC will furnish to the Company the latest version of any work product in progress upon the effective date of termination, in the format mutually agreed to by the parties.  The Company acknowledges and agrees that any such drafts or works in progress are provided "as is" and are solely for the Company's convenience.  PwC expressly disclaims any and all responsibility and liability with respect to any drafts or works in progress provided to the Company, and such drafts or works in progress may not be relied upon or attributed to PwC unless PwC specifically reduces such draft to a final writing.

Any unresolved dispute relating in any way to the Services or this Agreement shall be resolved by arbitration. The arbitration will be conducted in accordance with the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution then in effect. The arbitration will be conducted in Philadelphia, Pennsylvania, before a panel of three arbitrators. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort. It shall also have no power to award damages inconsistent with the Limitations on Liability provisions below. Judgment on any arbitration award may be entered in any court having jurisdiction.  All aspects of the arbitration are subject to the confidentiality restrictions of this Agreement. Except for a party's express indemnification obligations hereunder, You and we accept and acknowledge that any demand for arbitration arising from or in connection with the Services must be issued within one year from the date the aggrieved party became aware or should reasonably have become aware of the facts that give rise to the alleged liability and in any event no later than two years after any such cause of action accrued.

This Agreement and any dispute relating to the Services will be governed by and construed, interpreted and enforced in accordance with the laws of the State of New York, without giving effect to any provisions relating to conflict of laws that require the laws of another jurisdiction to apply.

**Limitations on Liability**



**Other PwC Firms**

PwC is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of PwC, the "Other PwC Firms").  During its performance of the Services, PwC may (i) draw on the resources of and/or subcontract to its subsidiaries, the Other PwC Firms, and/or third party subcontractors or (ii) draw on the resources of third party contractors, which provide PwC internal business, administrative, technical, outsourcing, regulatory compliance functions or other "back office" support in connection with the Services, in each case of (i) or (ii), within or outside of the United States (and in each case of (i) or (ii), a "PwC Subcontractor").

Notwithstanding anything to the contrary in this Agreement, the Company agrees that PwC may provide information PwC receives in connection with this Agreement to the PwC Subcontractors for such purposes.  PwC will be solely responsible for the provision of the Services (including those performed by the PwC Subcontractors) and for the protection of the information provided to the PwC Subcontractors.  The PwC Subcontractors and the respective partners, principals and employees of PwC and the PwC Subcontractors (collectively the "Beneficiaries")

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

shall have no liability or obligations arising out of this Agreement.  The Company agrees to: (a) bring any claim or other legal proceeding of any nature arising from the Services against PwC and not against the Beneficiaries; and (b) ensure or procure that the any affiliates or subsidiaries of the Company do not assert any such claim or other legal proceeding against PwC or the Beneficiaries.  If any of such affiliates or subsidiaries receive Services or the benefit of the Services under this Agreement, the Company agrees to provide a copy of this Agreement to such affiliates or subsidiaries, and the Company will notify them that although the Beneficiaries may interact with them, the delivery of the Services is governed by the terms of this Agreement (including the liability limitations herein), and the affiliates or subsidiaries should notify the Company of any disputes or potential claims arising from the Services.  While PwC is entering into this Agreement on its own behalf, this section also is intended for the benefit of the Beneficiaries.

**Other Matters**

PwC is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the Services we provide, non-CPA owners may be involved in providing Services to you now or in the future.

No party to this Agreement may assign or transfer this Agreement, or any rights, obligations, claims or proceeds from claims arising under it, without the prior written consent of the other party, and any assignment without such consent shall be void and invalid. If any provision of this Agreement is found to be unenforceable, the remainder of this Agreement shall be enforced to the extent permitted by law. If we perform the Services prior to both parties executing this Agreement, this Agreement shall be effective as of the date we began the Services. You agree we may use your name in experience citations and recruiting materials. This Agreement supersedes any prior understandings, proposals or agreements with respect to the Services, and any changes must be agreed to in writing through an amendment to this Agreement or a change order, in each case signed by both parties.

By entering into this Agreement, you are binding your subsidiaries and affiliates to the extent that you have the authority to do so.  We disclaim any contractual or other responsibility or duty of care to any other subsidiaries or affiliates.

* * * * *

We are pleased to have the opportunity to provide Services to you.    If the Services and terms outlined in this Agreement are acceptable, please sign and return one copy of this Agreement in the space provided.

Very truly yours,

*PricewaterhouseCoopers, LLP*

Date:  February 1, 2012

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**ACKNOWLEDGED AND AGREED:**

**GMAC MORTGAGE, LLC**

**Signature of client official:**

**Please print name and title:** ██████████ **GMAC Mortgage LLC**

**Date: February 1, 2012**

**ALLY FINANCIAL INC.**

**Signature of client official:** _____

**Please print name and title:** ████████████████ **, Ally Financial Inc**

**Date: February 1, 2012**

**ACKNOWLEDGED AND AGREED:**

**INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE
OF RESIDENTIAL CAPITAL, LLC ("ResCap Committee")**

**BY:**_____

████████ **on behalf of the ResCap Committee**

**INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE
OF Ally Financial Inc. ("Ally Committee")**

**BY:**_____

, ████████ **on behalf of the Ally Committee**

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

ACKNOWLEDGED AND AGREED:

GMAC MORTGAGE, LLC

Signature of client official: _____

Please print name and title: ██████████████████, GMAC Mortgage LLC

Date: February 1, 2012

ALLY FINANCIAL INC.

Signature of client official: ████████████████████████████

Please print name and title: ████████████████████████, Ally Financial Inc

Date: February 1, 2012

ACKNOWLEDGED AND AGREED:

INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE
OF RESIDENTIAL CAPITAL, LLC ("ResCap Committee")

BY:_____

████████ on behalf of the ResCap Committee

INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE
OF Ally Financial Inc. ("Ally Committee")

BY:_____

██████ on behalf of the Ally Committee

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C.
§552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in
accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

ACKNOWLEDGED AND AGREED:

**GMAC MORTGAGE, LLC**

**Signature of client official:** _____

**Please print name and title:** ███████████████t, GMAC Mortgage LLC

**Date: February 1, 2012**

ALLY FINANCIAL INC.

**Signature of client official:** _____

**Please print name and title:** ████████████████████████, Ally Financial Inc

**Date: February 1, 2012**

ACKNOWLEDGED AND AGREED:

**INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE OF RESIDENTIAL CAPITAL, LLC ("ResCap Committee")**

B██████████████████████

███████t, on behalf of the ResCap Committee

**INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE OF Ally Financial Inc. ("Ally Committee")**

BY:_____

███████ on behalf of the Ally Committee

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**ACKNOWLEDGED AND AGREED:**

**GMAC MORTGAGE, LLC**

Signature of client official:  _____

Please print name and title:  ▮▮▮▮▮▮▮▮▮, GMAC Mortgage LLC

Date: February 1, 2012

**ALLY FINANCIAL INC.**

Signature of client official:  _____

Please print name and title:  ▮▮▮▮▮▮▮▮▮▮▮▮▮, Ally Financial Inc

Date: February 1, 2012

**ACKNOWLEDGED AND AGREED:**

**INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE
OF RESIDENTIAL CAPITAL, LLC ("ResCap Committee")**

BY:_____

▮▮▮▮▮▮, on behalf of the ResCap Committee

**INDEPENDENT CONSENT ORDER COMPLIANCE COMMITTEE
OF Ally Financial Inc. ("Ally Committee")**

BY:▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ on behalf of the Ally Committee

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.



May 1, 2012

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Ally Financial Inc

▇▇▇▇▇▇▇▇▇▇▇

New York, NY

▇▇▇▇▇▇▇▇▇▇

GMAC Mortgage LLC

▇▇▇▇▇▇▇▇▇▇

Re: Foreclosure Review

Dear ▇▇▇▇▇▇▇

This Amendment modifies and amends the engagement letter (the "Agreement") between GMAC Mortgage LLC and Ally Financial Inc. and PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PwC") dated February 1, 2012 and is fully incorporated therein. All terms used in this amendment but not otherwise defined will have the same meaning as in the Agreement. In the event of a conflict or inconsistency between the terms of the Agreement and this amendment, the amendment shall prevail.

Modifications

The purpose of this amendment is to confirm the parties' understanding of the following modifications to the Services the Company has requested that PwC perform in connection with the Company's evaluation of the Foreclosure Review in response to the Consent Order:

- Attachment A (page 40), Segment 20 revisions requested by the Regulators
- Attachment A (pages 27, 33 and 35), Segments 1, 9, and 14 estimated population clarifications

This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single document between the parties. Signed counterparts may be delivered by facsimile, or attached as a pdf, jpeg, or similar file type to an email.

If the Services and terms outlined in this Amendment are acceptable, please sign and return one copy of this Amendment in the space provided.

Very truly yours,

*PricewaterhouseCoopers LLP*

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.
Page 1

**ACKNOWLEDGED AND AGREED:**

Signature of official: ██████████████████

█████████████████████

**Ally Financial Inc.**


Signature of official: ████████████████

**Engagement Managers for GMAC Mortgage LLC**

**Date: May 1, 2012**

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**ACKNOWLEDGED AND AGREED:**

**Signature of official:**

**Ally Financial Inc**

**Signature of official:**

**Engagement Managers for GMAC Mortgage LLC**

**Date: May 1, 2012**

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C.
§552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in
accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.
Page 2

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

*Notes on Segmentation, Populations & Evaluation Approach:*

- The segmentation, populations and planned evaluation approach below are based upon information and analysis as of the date of this schedule.

- Loan counts are based upon information provided by GMACM and may change based upon the Company's and/or PwC's ongoing analysis and evaluation. Reference to borrower includes the primary and co borrowers.

- Segmentation and approach will be evaluated throughout the foreclosure review and may be adjusted based upon results of our procedures and/or other information, including input from Regulators.

- "Risk Rating" assignment for initial segmentation, sampling and approach is based upon a combination of qualitative views on inherent risk of GMACM error that might result in financial injury and input from the FRB. The risk rating for a particular segment may change based upon results of our procedures and/or other information.

- For risk segment purposes, we utilized activity/status up through June 30, 2011 for the majority (>98%) of the loans in the Foreclosure Review Population (unless otherwise noted) per GMACM data fields. This does not expand the Foreclosure Review population but rather is used in some cases to target segment the loans in the Foreclosure Review population.

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 1 | Base Samples | 232,132 Foreclosure Review Population | NA | Base samples include separate statistical based samples from the following three populations: | 330 | **Testing Scope** |
| | | 95,099 Foreclosure Sales (subset of above) | | 1. 115 judicial states foreclosures initiated | Random Samples | **Per guidance from the FRB, loans in this segment will be subject to the full Review Criteria specified in paragraph 3(a)(i) and (vii) of the Consent Order.** |
| | | | | 2. 115 non-judicial state foreclosures initiated | | Samples selected randomly by state by proportion of population to meet criteria of geographic representation with minimum of 1 loan per each state/DC. Note that two of the base samples were increased from 100 to 115 to add to the base samples upon a population change (< 2%) subsequent to the initial sampling. |
| | | | | 3. 100 foreclosure sales | | The population can be segmented as follows: |
| | | | | | | TOTAL |
| | | | | | | Review Population   232,132[1] |
| | | | | | | Foreclosure Sales   95,099[2] |
| | | | | | | Ally Owned/Ally MSR |
| | | | | | | [1] 10,164 / [2] 4,033 |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

## Attachment A: Foreclosure Review Segmentation & Testing Approach

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 2 | Foreclosure Sale while the Borrower is Potentially Under Bankruptcy Protection from such Sale | 62,718 loans with bankruptcy start date | High | 62,718 loans with bankruptcy start date screened to 28,458 loans with bankruptcy start date and foreclosure sale.<br><br>Data analysis identified 308 loans that appear to have a foreclosure sale while a borrower is potentially protected by the bankruptcy process based upon system data fields screening. | 308<br><br>100% of Potential Exceptions from Data Screen | These loans will be reviewed case by case to evaluate whether the foreclosure sale did in fact occur while the borrower should have been protected from such sale by bankruptcy.<br><br>The first step in the evaluation will be a loan level review of PACER data to evaluate if the issue is incomplete data in the GMACM system for the appropriate bankruptcy fields. For any of the above loans where our evaluation to PACER does not indicate that GMACM did have the legal right to move forward with the foreclosure sale when it occurred we will perform additional case by case analysis of the facts to assess the nature of the underlying exception.<br><br>**Testing Scope**<br><br>**Per guidance from the FRB, loans in this segment will be subject to full the Review Criteria specified in paragraph 3(a)(i) – (vii) of the Consent Order.** |
| 3 | Foreclosure Initiated while the Borrower is Potentially Under Bankruptcy Protection from such Action | 62,718 loans with bankruptcy start date | Medium | 62,718 loans with bankruptcy start date screened to 962 loans that appear to have foreclosure initiated during potential bankruptcy protection per GMACM data fields. | 100<br><br>Random Sample | With respect to financial injury to the borrower this population is considered medium risk as the potential error identified relates to foreclosure initiation, not completion. See separate segment related to foreclosure sale while potentially subject to bankruptcy protections.<br><br>The foreclosure process should not be initiated while a borrower is protected by the bankruptcy process. For purposes of this analysis, "initiated" is defined as an action whereby the legal attorney files any legal documents or contacts the borrower. Initiation does not include internal GMACM approval to pursue foreclosure or the act of notifying the attorney of intent to pursue foreclosure.<br><br>Note that borrowers can file bankruptcy just before or on the same date as the initiation such that the servicer may not yet have the ability to know bankruptcy has been filed. In such cases, the law and GMACM's policy are to stop foreclosure actions or rescind foreclosure sales when made aware of the bankruptcy filing. |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|
| **4** Borrowers Subject to Potential SCRA Protections | 308 with SCRA start date identified in GMAC system<br><br>87 Sales with SCRA start date and foreclosure sale (subset of above) | High/ Medium | Per guidance from the FRB, all loans identified as potentially subject to SCRA foreclosure protection will be subject to Foreclosure Review procedures. | 308<br><br>100% of SCRA Identified Loans | **Testing Scope**<br><br>**Procedures for this segment will be targeted to assessing, based upon PACER data, whether foreclosure was inappropriately initiated while the borrower was subject to bankruptcy protection and whether appropriate corrective actions were taken by GMACM to halt such activities or foreclosure actions continued.**<br><br>The FRB has designated loans with potential SCRA protections to be a high risk population which will be fully reviewed (i.e. 100% coverage of loans).<br><br>Note that SCRA does not necessarily prohibit certain foreclosure actions but does require in many cases additional actions before moving forward with certain activities.<br><br>Our initial data screen of the 87 loans with SCRA start dates against other system data attributes (e.g. SCRA end date) did not identify any exceptions. However, loan level testing is required to conclude as to any detailed findings.<br><br>**Testing Scope - All Loans with SCRA Start Date**<br><br>**Per guidance from the FRB, loans in this segment will be subject to the full Review Criteria specified in paragraph 3(a)(i) through (vii) of the Consent Order, including compliance with applicable SCRA protections**<br><br>**Department of Defense Data**<br><br>To the extent we are able to receive additional data from the Department of Defense that indicates that additional borrowers in the Foreclosure Review population are subject to SCRA protections, this segment will be expanded to include such borrowers. |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 5 | Foreclosure Sale with Potential Insufficient Period of Delinquency | 89 Loans foreclosed when delinquency was less than or equal to 105 days | High | Sorting by any foreclosure with less than (or equal to) 105 days past due as of foreclosure date (delinquency calculated based on next payment due date)<br><br>95,099 sales screened to 89 loans with foreclosure sale with < =105 delinquency | 89<br><br>100% of potential exceptions from data screen | The foreclosure process requires certain minimum time elements for different stages (includes state specific criteria). Foreclosure sales with insufficient time of delinquency represent a higher risk of potential financial injury to the borrower.<br><br>The 105 cut-off was based upon discussion with GMACM servicing with respect to typical state timelines.<br><br>The loans will be evaluated against minimum state level criteria as confirmed with the independent legal counsel. Any loans that are below specific state level minimums will be noted as exceptions.<br><br>**Testing Scope**<br><br>**Procedures for this segment will be targeted to assessing whether the applicable timeline requirements/restrictions were followed by GMACM.** |
| 6 | Foreclosure Sale With Potential Pending Modification Decision | 1,577 | High | 232,132 Review Population screened to 1,577 loans with potential pending loan modification per GMACM data fields (status as of 6/30/11) | 1,577<br><br>100% of potential exceptions from data screen | This population has been determined to be high risk by the FRB under the assumption that the modification programs and/or investor guidelines may not have been followed when moving to foreclosure sale.<br><br>The loans in this segment represent loans that have the following attributes per GMACM's servicing data:<br>• Foreclosure sale has occurred as of 6/30/11<br>• The servicer received as part of a modification request, the borrower's (a) W-2, (b) 4506-T, and (c) hardship affidavit<br>• Modification was neither approved nor denied<br><br>Additional manual procedures are required to further assess which modification were actually "pending" at the time of the foreclosure sale. To the extent loans are removed from this segment as actually being "denied" modifications, Segments 7 and 8 will be re-evaluated. |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

Page 30

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|
| | | | | | **Testing Scope** |
| | | | | | **Per guidance from the FRB, loans in this segment (after any adjustment based upon manual analysis) will be subject to the following areas of assessment:** |
| | | | | | ▪ **Compliance with requirements of the applicable modification programs and/or investor guidelines** ▪ **Evidence of borrower default** ▪ **Fees related procedures** |
| 7 | 50,030 | High/ Medium /Low | 50,030 with denied HAMP modification (an no other modification) (25,511 of overlap between denied HAMP and denied non-HAMP modifications segments) | 305  See Attachment B for Details | Heightened risk of financial injury to the borrower from not handling HAMP loss mitigation efforts appropriately. |
| Denied HAMP Modification (and no other modification) | | | | | See Attachment B for population/segmentation evaluation based on GMACM provided system denial reason codes. The supplemental column in Attachment B relates to sampling adjustments made due to changes in the sub-segment sizes since the initial sampling made for the specific sub-segment. |
| | | | | | Segment definition targeted to loans with a denied HAMP modification and no alternative modification executed. Loans that received an alternative modification were not included in this risk segment such that loans with no modification and foreclosure sale could be targeted for testing. |
| | | | | | Segment excludes Government loans that did not have a HAMP program i.e. FHA loans prior a decision date for HAMP and VA loans. |
| | | | | | **Testing Scope** |
| | | | | | **Procedures for this segment will be targeted to assessing whether the HAMP modification denial and corresponding denial communication to the borrower were consistent with the applicable HAMP guidelines or any applicable investor guidelines at the time of the denial.** |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|
| | | | | | For our sample of denied modifications, our procedures will include the following:<br><br>▪ Recalculation of DTI for cases where denial was based upon DTI. For these cases we plan to also reconcile the DTI inputs to the borrower provided records (as maintained by GMACM)<br>▪ For denials based upon other reasons, was the denial reason (including available support for the reason) consistent with HAMP guidelines?<br>▪ For any NPV related denials, we will evaluate the appropriateness of inputs to the NPV calculation and the consistency of the output with the denial<br>▪ For denials, we will assess whether required (as specified by the applicable program and/or investor) communications were made to the borrower |
| 8 | 39,789 | High/ Medium /Low Mix | 39,789 with denied non-HAMP modification (an no other modification)<br><br>(25,511 of overlap between denied HAMP and denied Non-HAMP modifications segments) | 405<br><br>See Attachment B for Details | Heightened risk of financial injury to the borrower from not handling proprietary loss mitigation efforts appropriately if ultimate foreclosure sale<br><br>See Attachment B for population/segmentation evaluation based on GMACM provided system denial reason codes.  The supplemental column in Attachment B relates to sampling adjustments made due to changes in the sub-segment since the initial sampling made for the specific sub-segment.<br><br>Segment definition targeted to loans with a denied Non-HAMP modification and no alternative modification executed.  Loans that received an alternative modification were not included in this risk segment such that loans with no modification and foreclosure sale could be targeted for testing.<br><br>**Testing Scope**<br><br>**Procedures for this segment will be targeted to assessing whether the Non-HAMP modification denial and corresponding denial communication to the borrower were consistent with the applicable investor guidelines at the time of the denial.** |

**Denied Non-HAMP Modifications (and no other modification)**

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

Page 32

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|
| | | | | | For our sample of denied modifications, our planned evaluation will include the following: |
| | | | | | ▪ Recalculation of DTI for cases where denial was based upon DTI. For these cases we plan to also reconcile the DTI inputs to the borrower provided records (as maintained by GMACM) |
| | | | | | ▪ For denials based upon other reasons, was the denial reason (including available support for the reason) consistent with HAMP guidelines? |
| | | | | | ▪ For any NPV related denials, we will evaluate the appropriateness of inputs to the NPV calculation and the consistency of the output with the denial |
| | | | | | ▪ For denials, we will assess whether required (as specified by the applicable program and/or investor) communications were made to the borrower |
| 9 | 9,950 Loans with Approved Modifications that were Not Executed | Medium /Low | See last column for description | 100 Random Sample | Approved modifications may not be executed for appropriate reasons, including borrower inaction with respect to completing the required documentation. |
| | | | | | Segment includes permanent modification approvals in 2009-2010 only. |
| | | | | | Segment also includes loans from the denied modification segments (7 and 8) noted in Attachment B, footnote (b). |
| | | | | | **Testing Scope** |
| | | | | | Procedures for this segment will be targeted to assessing whether the Company may have incorrectly handled approved modifications with respect to execution of the modification. |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 10 | Potential Foreclosure Sale Surplus | 1,179 Foreclosure Sales with Potential "Surplus" | Medium | Loans where actual proceeds are greater than the estimated total owed* | 100 Statistical Sample | The level of any potential surplus over the first lien amount should not impact the likelihood of an inappropriate fee assessed to the borrower. The potential surplus would however increase the likelihood that an inappropriate fee assessment results in actual borrower harm. Note that a "surplus" after the first lien may not be remitted to the borrower in the case of other liens (e.g. 2nd lien). **Testing Scope** **Loans in this segment will be subject to the procedures related to fees testing.** The data screen applied to identify loans with potential surplus (whereby the borrower might receive proceeds after the foreclosure sale) is based upon the first lien serviced by GMACM. This results in an inherent limitation in identifying true borrower surplus due to the fact that the system data does not capture other liens not serviced by GMACM that would be settled before the borrower was eligible to receive any surplus. Propose testing 100 samples and based on results expanding as determined required/appropriate. * Estimated total owed: sum of UPB, foreclosure related fees, delinquent interest, escrow Advance |
| 11 | Deficiency Judgment Collected Upon | NA per GMACM | High | NA per GMACM | NA | To the extent a deficiency judgment was obtained and collected upon, the risk of financial injury to the borrower due to errors with respect to amounts owed of GMACM would be escalated (as such amounts would be included in the deficiency judgment). Note that in cases where the first (and other) liens exceed the UPB and accrued interest and a deficiency judgment is not obtained (and collected upon), the determination of fees does not ultimately impact the borrower (i.e. does not impact surplus or deficiency judgment). **GMACM servicing management has asserted that GMACM does not pursue collection of deficiency judgments. As such, no such segment exists to be tested.** |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 12 | Partial Payments - Suspense Account Application and/or Timely Return of Payments | See discussion in last column | Lower | See discussion in last column | See discussion in last column | The risk that untimely application or return of partial payments would cause confusion by the borrower with respect to the prospects of foreclosure is judged to be low as these borrowers would be subject to all of the breach notification and other requirements with regard to the foreclosure process.<br><br>**Testing Scope**<br><br>**We will test GMACM's compliance with applicable laws with respect to suspense and rejected payments in our testing of the Consent Order Review Criteria in other segments. Our initial samples will not include a separate segment for this activity as it is covered in the testing of other segments.** |
| 13 | Pyramiding of Fees | NA per GMACM | NA per GMACM | NA per GMACM | NA | Per GMACM servicing management late fees are only assessed on past due contractual payments (including escrow). Payments received are applied first to past due contractual amounts.<br><br>**Testing Scope**<br><br>**We will test GMACM's compliance with its policies with regards to pyramiding of fees in our testing of the Consent Order Review Criteria in other segments. Our initial samples will not include a separate segment for this activity as it is covered in the testing of other segments.** |
| 14 | Rescinded Foreclosures | 5,625 Rescissions | Medium | Sample | 100 Random Sample | For purposes of the Foreclosure Review, a rescinded foreclosure is defined as a completed foreclosure sale that was subsequently rescinded, vacated, set aside or otherwise invalidated by the institution or by court order.<br><br>**Testing Scope**<br><br>**Testing will be targeted to fees testing for this segment.** |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 15 | Escalated Claims and Complaints | 1,144 | High | 1,144 unique loans related to escalated complaints identified by GMACM tracking as related to foreclosure activity | 1,144 100% of Foreclosure Specific Complaints | Identified through Complaints Tracking database Activity Codes in Customer Care department. Per GMACM, these represent the Company's tracking of "escalated complaints" related to foreclosure activities on loans subject to the Foreclosure Review as of November 16, 2011. This segmentation includes only escalated complaints identified by GMACM tracking codes as related to foreclosure activity (in accordance with verbal guidance from the FRB). **Testing Scope** **Per guidance from the FRB, loans in this segment will be subject to the full Review Criteria specified in paragraph 3(a)(i) - (vii) of the Consent Order.** |
| 16 | Complaints from Consent Order Complaint Process | TBD | High | NA | 100% | **Testing Scope** **Per guidance from the FRB, loans in this segment with specific complaints will be reviewed with respect to the specific complaint.** **Loans with generalized complaints will be subject to the full Review Criteria specified in paragraph 3(a)(i) - (vii) of the Consent Order.** |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 17 | Foreclosure Law Firms delisted by the GSEs and/or discontinued by GMACM | 30,235 loans | High/Medium | 232,132 review population screened to 30,235 by firms delisted or no longer receiving new cases from GMACM | 400 Random Samples | Foreclosures utilizing law firms that have been delisted and/or are no loner receiving new cases (presumably primarily due to quality concerns) would appear to have a potential escalated risk of financial injury to the borrower. While this population is considered escalated risk, these firms will also be covered in the other risk segments and the base samples.  The statistical samples below provide additional targeted coverage of foreclosures utilizing these specific law firms. |

**Segment Considerations/Evaluation Plan (continued for Segment 17):**

**Testing Scope**

Procedures for this segment will include elements of the Review Criteria that are relevant to the activities of the foreclosure firms. Loss mitigation or other activities not under the scope of the law firms' work will not be covered for loans in this segment.

Individually Selected (100 each = 300)
- 9,440 loans/4,046 sales.
- 8,588 loans/3,292 sales
- 4,017 loans/478 sales

Remaining (100 total across group)

Delisted – Two other firms 533 loans/82 sales
- 282 loans/78 sales
- 251 loans/4 sales

No New Foreclosures - Nine other firms 7,657 loans/2,760 sales
- 3,192 loans/1,014 sales
- 1,435 loans/749 sales
- 1,034 loans/655 sales
- 764 loans/237 sales
- 665 loans/14 sales
- 403 loans/39 sales
- 127 loans/44 sales
- 22 loans/7 sales
- 15 loans/1 sales

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 18 | Other Large Volume Foreclosure Firms | 88,484 loans covered by top 5 not covered in delisted or discontinued segment (see above) | Lower | 232,132 review population screened to 88,484 from top 5 firms (excluding those categorized in separate foreclosure firms category above) | 200 Sample | Segment not considered an inherently escalated risk simply due to relative proportion of foreclosures processed. However, given the proportion of loans covered by these firms, testing is being performed to evaluate the potential for systemic issues that may require additional segmentation and/or additional procedures.<br><br>Note that these loans are also subject to being included in the base samples or any of the risk segment samples.<br><br>**Testing Scope**<br><br>**Procedures for this segment will include elements of the Review Criteria that are relevant to the activities of the foreclosure firms. Loss mitigation or other activities not under the scope of the law firms' work will not be covered for loans in this segment.**<br><br>Sample of 100 from ▇ and<br>100 from other top 5 not included above segment.<br>  (31.8%) 73,736 loans/36,764 sales<br>(3.5%) 8,235 loans/4,311 sales<br>(2.8%) 6,513 loans/2,153 sales<br>■  ■<br>■  ■ |
| 19 | Incomplete Borrower Modification Request | 9,758 Loans (see last column for description) | Medium | See last column for description | 100 Random Sample | GMACM's ability to offer a modification is constrained by investor and/or program guidelines with respect to borrower information that must be obtained in order to make a modification decision.<br><br>In some cases investor and/or program guidelines may necessitate the borrower updating certain types of information previously provided if the full submission is not completed timely. Because of these rules, a borrower who delays submission of elements of the required documentation may then be requested to re-submit updated documentation for items previously submitted as the prior documents may have "expired" under the investor and/or program guidelines.<br><br>In response to the risk that the borrower had in fact submitted the required documentation but GMACM inappropriately failed to decision or explicitly denied the modification request by identifying the submission as incomplete, an initial sample of 100 from the following will be selected. |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

Page 38

## Attachment A: Foreclosure Review Segmentation & Testing Approach

| Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|
| | | | | | Modification requests that were neither approved or denied per GMAC's data fields where the system records indicate receipt of information from the borrower with respect to a modification request but were excluded from Segment 6 as not having the three documents identified in defining Segment 6 |
| | | | | | Loans included in Segments 7 & 8 for which the denial reason was an incomplete or untimely return of required documentation (See Attachment B, footnote (a)) |

The table below summarizes the components of this segment.

| Subsets from Segments | Incomplete Submission | Initial Sample |
|---|---|---|
| Denied HAMP Modifications Segment (See Attachment B    Segment 7) | 4,480 | |
| Denied Non HAMP Modifications Segment (See Attachment B    Segment 8) | 2,015 | |
| Loans identified in identification of Segment 6 | 3,461 | |
| Total Records | 9,956 | |
| Unique Loans | 9,758 | 100 |

**Testing Scope**

Procedures for this segment will be targeted to (i) whether evidence exists that a completed submission was in fact made by the borrower (as required by the investor and/or program guidelines) and (ii) whether evidence exists that required borrower communications with respect to the incomplete information were not provided by GMACM (as prescribed by the investor and/or program requirements)

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| | Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|---|
| 20 | Approved modification with a borrower payment within 30 days of a foreclosure sale or foreclosure initiation | 287 | High | See far column | 287<br><br>100% of identified loans | The FRB identified as high risk the potential that a borrower may have been current on an approved trial or permanent loan modification at the time of foreclosure initiation or foreclosure sale.<br><br>The loans in this segment represent loans identified from the data analysis noted below with regards to foreclosure sale and foreclosure initiation. As noted below, these loans require further detailed analysis to identify whether the borrower was in fact current on an approved trial or approved permanent modification at the time of the servicer action to initiate foreclosure or complete a foreclosure sale.<br><br>**Foreclosure Sale**<br><br>The 51 loans in this sub-segment represent loans that have the following attributes per GMACM's servicing data:<br><br>• A trial and/or permanent modification was approved;<br>• Foreclosure sale has occurred as of 6/30/11; and<br>• GMACM's data fields indicate any borrower payment was received within 30 days prior to the foreclosure sale (includes payments that may not be the full required payment under the modification)<br><br>The initial screen identifies any payments received. Additional manual procedures are required to further assess whether the borrower was in fact current on an approved modification, where current is defined as the full modification term amount or the borrower was making a payment that was sufficient to reinstate the loan.<br><br>**Foreclosure Initiation**<br><br>The 236 loans in this sub-segment represent loans that have the following attributes per GMACM's servicing data:<br><br>• The loan was in a trial period or approved for a permanent modification at the time of the first legal action related to foreclosure; and<br>• GMACM's data fields indicate any borrower payment was received within 30 days prior to the foreclosure initiation (includes payments that may not be the full required payment under the approved trial or permanent modification) |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment A: Foreclosure Review Segmentation & Testing Approach**

| Segment | Estimated Population | Risk Rating | Risk Based Analytical Data Screening | Initial Detail Evaluation | Segment Considerations/Evaluation Plan |
|---|---|---|---|---|---|
| | | | | | The initial screen identifies any payments received. Additional manual procedures are required to further assess whether the borrower was in fact current on a trial or approved modification, where current is defined as the full modification term amount or the borrower was making a payment that was sufficient to reinstate the loan. **Testing Scope** As noted above, further analysis is required to identify any loans that were current under a trial or approved modification at the time of the servicer action. Once this additional analysis is performed to further refine this segment to loans that were current under the approved trial or permanent terms, the following procedures will be performed: • Assessment of payments received vs. required payments under the approved trial or permanent modification terms • Fees related procedures |

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment B: Denied HAMP Modifications & No Alternative Mod (Segment 7)**

| | Denial Segmentation | Notes | Risk Rating | Estimated Population | Sample Selection | Initial Detail Evaluation | Supplemental Evaluation |
|---|---|---|---|---|---|---|---|
| A | Not Identified | System data fields do not capture specific denial code; Specific denial codes were not utilized in the early period of HAMP. | Undefined | 0 | na | na | |
| B | Ally Calculations | Includes DTI and any other calculations that could disqualify a borrower | Med - Potential for misapplication of calculations | 23,629 | Random | 100 | |
| C | Potential Ally Judgment - Non Calc | Invalid Hardship | Med - Potential for significant judgment in some cases against hardship criteria | 186 | Random | 100 | |
| D | Not Qualified, Other External Restriction or Passed to other Loss Mitigation (other than calculation driven guidelines) | Does not meet program guidelines or other external restrictions apply | Lower - objective criteria | 16,800 | Random | 100 | 5 |
| E | Incomplete Package | Denial code as incomplete package received to make modification decision per investor/program guidelines | Med - May be some judgment in application of investor/program guidelines | 4,480 | (a) | | |
| F | Permanent Mod Docs Not Received or Not Received within Required Timeframes | | Low - objective criteria | 614 | (b) | | |
| G | Other Borrower Action/Inaction | Customer rejected modification; Trial payments not made | Low - objective criteria | 4,321 | (c) | | |
| | **Total** | | | 50,030 | | 300 | 5 |
| | | | | | | | 305 |

(a) See separate Segment 19 for testing of incomplete packages designation
(b) Included in testing Segment 9 "Approved Modifications Not Executed"
(c) Not sampling for this sub-segment - Other Borrower Action/Inaction.  Tested if selected for any full file review segments and/or complaint received.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment B: Denied Non-HAMP Modifications & No Alternative Mod (Segment 8)**

| | Denial Segmentation | Notes | Risk Rating | Estimated Population | Sample Selection | Initial Detail Evaluation | Supplemental Evaluation |
|---|---|---|---|---|---|---|---|
| A | Not Identified | System data fields do not capture specific denial code; Specific denial codes were not always utilized. | Undefined | 18,921 | Random | 100 | |
| B | Ally Calculations | Includes DTI and any other calculations that could disqualify a borrower | Med - Potential for misapplication of calculations | 12,230 | Random | 100 | |
| C | Potential Ally Judgment - Non Calc | Invalid Hardship | Med - Potential for significant judgment in some cases against hardship criteria | 398 | Random | 100 | |
| D | Not Qualified, Other External Restriction or Passed to other Loss Mitigation (other than calculation driven guidelines) | Does not meet program guidelines or other external restrictions apply | Lower - straight forward and objective criteria | 3,861 | Random | 100 | 5 |
| E | Incomplete Package | Denial code as incomplete package received to make modification decision per investor/program guidelines | Med - May be some judgment in application of investor/program guidelines | 2,015 | (a) | | |
| F | Permanent Mod Docs Not Received or Not Received within Required Timeframes | | Low - objective criteria | 1,722 | (b) | | |
| G | Other Borrower Action/Inaction | Customer rejected modification; Trial payments not made | Low - objective criteria | 642 | (c) | | |
| | **Total** | | | 39,789 | | 400 | 5 |
| | | | | | | 405 | 5 |

(a) See separate Segment 19 for testing of incomplete packages designation
(b) Included in testing Segment 9 "Approved Modifications Not Executed"
(c) Not sampling for this sub-segment - Other Borrower Action/Inaction.  Tested if selected for any full file review segments and/or complaint received.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

42

**ATTACHMENT C (Change Order Form)**

[Date], 2012
Addressees

Re: Foreclosure Review

Dear ██████████,

This Amendment modifies and amends the engagement letter (the "Agreement") between GMAC Mortgage LLC and Ally Financial Inc. and PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PwC") dated February 1, 2012 and is fully incorporated therein.  All terms used in this amendment but not otherwise defined will have the same meaning as in the Agreement.  In the event of a conflict or inconsistency between the terms of the Agreement and this amendment, the amendment shall prevail.

Additional Services
The purpose of this amendment is to confirm the parties' understanding of the following additional Services [or: modifications to the Services] the Company has requested that PwC perform in connection with the Company's evaluation of the Foreclosure Review in response to the Consent Order:

•

Additional Deliverables
•

Fees and Other Matters
The estimated fee for the Services described in this Amendment is between $[X] and $[X].  If, during the course of this engagement, it appears that the fee will exceed the estimate, PwC will advise the Company promptly and will not undertake additional Services without prior approval.

This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single document between the parties.  Signed counterparts may be delivered by facsimile, or attached as a pdf, jpeg, or similar file type to an email.

If the Services and terms outlined in this Amendment are acceptable, please sign and return one copy of this Amendment in the space provided.

Very truly yours,


**ACKNOWLEDGED AND AGREED:**

**Signature of client official:**

**Please print name and title:     Company Signer**

**Date: [Date]**


The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

**Attachment D - Access Letter Template for Affiliate Not Party to the Agreement between PwC and the Company**

[Affiliate Letterhead]

[Date]

PricewaterhouseCoopers LLP

GMAC Mortgage LLC ("GMACM")  and Ally Financial Inc. ("Ally") (GMACM and Ally, together shall be referred to herein as  the "Company") has informed [Affiliate] ("Recipient") that PricewaterhouseCoopers LLP ("PwC") has performed certain advisory consulting services for the Company.  GMACM and/or Ally has requested that PwC provide Recipient with Access (as defined below) to PwC's final deliverable (the "Foreclosure Report") resulting from PwC's advisory consulting services for the Company in connection with the foreclosure review engagement.

Recipient confirms that GMACM and/or Ally has authorized PwC to provide Access (defined below) to the Foreclosure Report to Recipient.  In consideration of PwC providing Recipient with Access to the Foreclosure Report, Recipient understands, acknowledges and agrees:

1. The Foreclosure Report is prepared by PwC at the direction of and in accordance with instructions provided by the Company and exclusively for the Company's sole benefit and use and not for Recipient's purposes, use or benefit.  The Foreclosure Report may not include all information or procedures deemed necessary for Recipient's purposes and certain findings and information may have been communicated to the Company that are not included in the Foreclosure Report.  The Foreclosure Report has not been prepared or performed, and it should not be used or relied upon, as a substitute for inquiries and procedures Recipient would or should carry out.

2. Recipient does not acquire any benefits in or rights as a result of any access to, use of, reliance on, distribution or discussion of the Foreclosure Report ("Access").  PwC, its subsidiaries and the global network of separate and independent PricewaterhouseCoopers firms and their respective partners, principals, personnel and subcontractors (collectively, the "PwC Firms") involved in preparing the Foreclosure Report expressly disclaim any contractual or other duties, obligations, liabilities or responsibilities to Recipient or any parties other than the Company in connection with the Foreclosure Report.

3. Recipient releases the PwC Firms from any claims, liabilities, losses, settlements, judgments, damages, costs and expenses (including attorneys' fees) ("Claims") that may arise from or relate to Recipient's Access to the Foreclosure Report.  The foregoing release extends solely to the subject matter of this Access letter and Recipient does not waive any other rights that it may have independent of this letter and the Foreclosure Report.

4. Recipient shall maintain the confidentiality of and shall not disclose the Foreclosure Report to any third parties without PwC's prior written consent and execution of a separate Access letter by such third party, except to the extent required by law, rule, regulation, or as compelled by legal process, provided that Recipient first provides PwC with prompt written notice of a request to disclose the Foreclosure Report (so long as such notice is not prohibited by law), so that PwC may, at its option and expense, object to and/or seek an appropriate protective order (provided that, any such PwC action shall not affect Recipient's disclosure obligations).

Recipient agrees to indemnify and hold harmless PwC and the PwC Firms from and against any Claims arising from or relating to Recipient's breach of the terms of this Access letter.

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

This lette constitutes the entire agreement between the parties regarding the Foreclosure Report.  The laws of the State of New York shall govern this letter, without giving effect to any provisions that would require the laws of another jurisdiction to apply.

Acknowledged, accepted and agreed:

[Affiliate]

By:    _____
          (Name of company official)

         _____
          (Title)

         _____
          (Date)

The contents of this document contain data protected from disclosure under U.S. Freedom of Information Act 5 U.S.C. §552(b)(4), (5), (6) and/or (8) and shall not be released to a third party without providing the submitter with written notice in accordance with Executive Order 12,600 so that the submitter may consider taking further action to prevent disclosure.

# EXHIBIT 5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 12-12020 (MG) |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DECLARATION OF JAMES G. MACKEY, CHIEF FINANCIAL OFFICER OF ALLY FINANCIAL INC. IN SUPPORT OF ALLY FINANCIAL INC.'S OBJECTION TO DEBTORS' MOTION FOR A DETERMINATION THAT (I) GMAC MORTGAGE'S FRB FORECLOSURE REVIEW OBLIGATION IS A GENERAL UNSECURED CLAIM AND (II) THE AUTOMATIC STAY PREVENTS ENFORCEMENT OF THE FRB FORECLOSURE REVIEW OBLIGATIONS**

I, James G. Mackey, under penalty of perjury, hereby declare as follow:

1.      I am the Chief Financial Officer of Ally Financial Inc. ("*AFI*"), a corporation organized under the laws of the state of Delaware, the parent of the debtors in the above-captioned chapter 11 cases (the "*Debtors*") and various other non-debtor companies (AFI, together with its non-debtor subsidiaries, "*Ally*").  I have held this position since April 2010.  I make this declaration in support of *Ally Financial Inc.'s Objection to Debtors' Motion for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligations*, filed herewith.

2.      In my capacity as Chief Financial Officer of AFI, I am familiar with the agreement between Ally and the Debtors by which Ally agreed to provide $220 million in DIP Financing to the Debtors and to allow the Debtors to use Ally's cash collateral and other collateral throughout these cases, and this Court's order authorizing those arrangements.  As of

the date of this Declaration, the Debtors continue to use Ally's cash collateral and other collateral.

3.    In my capacity as Chief Financial Officer of AFI, I am also familiar with the Debtors' recent sale of their mortgage servicing and origination platform (the "***Platform Sale***") to Ocwen Loan Servicing, LLC ("***Ocwen***"), the Asset Purchase Agreement between the Debtors and Ocwen that effected that sale (the "***Ocwen APA***"), the *Limited Objection of Ally Financial Inc. and Ally Bank to the Debtors' Proposed Platform Sale Motion* (the "***Sale Objection***"), and the negotiations between AFI and the Debtors regarding the Sale Objection.

4.    Ally, although supportive of the Debtors' efforts to sell their mortgage servicing and origination platform, objected to the Platform Sale.  Ally objected because, among other things, the Consent Order provides that it is to be binding upon successors of the Debtors, but the Ocwen APA, through which Ocwen would acquire the Debtors' mortgage loan servicing and origination platform, did not require Ocwen to be bound by all of the applicable terms of the Consent Order.

5.    Ally was required to make this objection because, under the terms of a supplemental agreement to the Consent Order between AFI and the Federal Reserve Board (the "***FRB***"), Ally was prohibited from consenting to the Platform Sale unless the Debtors "agree[d] to ensure the continued performance of the obligations under paragraphs 3 and 4 of the Consent Order, including without limitation completion of the independent review of foreclosure actions."[1]

---

[1] Exhibit 10 to *Notice of Filing Supplemental Exhibits to Debtors' Mot. for Entry of an Order Under Bankr. Code Section 363 & Bankr. Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services in Furtherance of the Debtors' Compliance Obligations Under Fed. Reserve Bd. Consent Order & (II) Reaffirming Relief Granting in the GA Servicing Order* [ECF No. 1527].

2

6.    Following Ally's objection, the Debtors, Ocwen, Ally, and the Department of Justice engaged in extensive negotiations regarding the terms of the Ocwen APA aimed at resolving Ally's objection and a separate objection of the Department of Justice.  Those negotiations led to a revision of the provision of the Ocwen APA governing required continued compliance with the Consent Order (Section 6.16).  To resolve Ally's objection, the Debtors agreed to amend that section to expressly provide, among other things, that the "ResCap Sellers must comply with and ensure the continued performance of their obligations under paragraphs 3, 4 and 22 of the Consent Order, and will comply with all terms and conditions of the DOJ/AG Settlement not included in the Assumed DOJ/AG Settlement Obligations."[2]

7.    Ally would not have reached the agreement with the Debtors to resolve its Sale Objection without the Debtors' agreement that they (or Ocwen) would comply with and honor the obligations imposed by paragraphs 3, 4 and 22 of the Consent Order, which I understand include the Debtors' obligation to conduct an independent review of foreclosure actions.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated: March 13, 2013

James G. Mackey

---

[2] Amendment No. 1 to Ocwen Asset Purchase Agreement, § 6.16C(a)  (attached as Exhibit 2 to the *Order Under 11 U.S.C. §§ 105, 363, & 365 & Fed. Bankr. P. 2002, 6004, 6006, & 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement With Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; & (II) Granting Related Relief* [ECF No. 2246]).