MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Gary S. Lee
Anthony Princi
Darryl P. Rains

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------------- | ) | |

**DEBTORS' REPLY BRIEF RE OBJECTION OF ASSURED GUARANTY TO MOTION**
**FOR APPROVAL OF RMBS TRUST SETTLEMENT AGREEMENTS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

I.  SETTLEMENT APPROVAL IS GOVERNED BY *IRIDIUM*, NOT THE
    ENTIRE FAIRNESS STANDARD ............................................................... 3

II. THE SETTLEMENT FAIRLY ALLOCATES THE ALLOWED CLAIM
    AMONG PARTICIPATING TRUSTS ........................................................... 6

    A.  The Settlement Fairly Allocates the Allowed Claim Based On Losses ................ 7

    B.  The Settlement Agreement Does Not Improperly Delegate Allocation to
        an Expert ............................................................................................. 8

    C.  The Allocation Formula is Fair to Assured and Other Insurers ............................ 9

    D.  The Allocation Formula Does Not Deprive Assured of Due Process .................. 11

III. THE PROPOSED $8.7 BILLION ALLOWED CLAIM FALLS WITHIN A
     REASONABLE RANGE ............................................................................ 11

    A.  Mr. Sillman's Analysis Adequately Estimates the Aggregate Losses,
        Defect Rate, and Discount for Available Defenses and Litigation Costs ............. 13

    B.  Mr. Sillman's Comparisons to the Bank of America and Lehman Brothers
        Settlements Were Reasonable ............................................................... 14

    C.  Assured's Attacks on Mr. Sillman's Methodology and Experience
        Misstate the Bases of His Opinion ......................................................... 15

    CONCLUSION ............................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bezio v. General Elec. Co.*,
  655 F. Supp. 2d 162 (N.D.N.Y. 2009) ...................................................................... 7

*Golden Cycle, LLC v. Allan*,
  No. 16301, 1998 Del. Ch. LEXIS 237 (Del. Ch. Dec. 10, 1998) .......................... 3, 4

*Hicks v. Morgan Stanley & Co.*,
  No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 24, 2005) ............ 10

*In re Abraham*,
  163 B.R. 772 (Bankr. W.D. Tex. 1994) ...................................................................... 8

*In re AOL Time Warner ERISA Litig.*,
  No. 02 Civ. 8853 (SWK), 2006 U.S. Dist. LEXIS 70474 (S.D.N.Y. Sept. 27, 2006) ............ 10

*In re Dewey & Leboeuf, LLP*,
  478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...................................................................... 4

*In re Giant Interactive Group, Inc.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) ...................................................................... 7

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...................................................................... 7

*In re Warner Chilcott Ltd. Sec. Litig.*,
  No. 06 Civ. 11515 (WHP, 2009 WL 2025160 (S.D.N.Y. July 10, 2009) ................ 7

*In re WorldCom, Inc. ERISA Litig.*,
  No. 02 Civ. 4816, 2004 U.S. Dist. LEXIS 20671 (S.D.N.Y. Oct. 18, 2004), *vac'd in part, on other grounds*, No. 02 Civ. 4816 (DLC), 2004 U.S. Dist. LEXIS 22952 (S.D.N.Y. Nov. 16, 2004) ............................................................................ 10, 11

*Kahn v. Tremont Corp.*,
  694 A.2d 422 (Del. 1997) ...................................................................... 3

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium*),
  478 F.3d 452 (2d Cir. 2007) ...................................................................... 1, 3, 17

*R. Woolsey & Assocs. v. Gugino* (*In re R. Woolsey & Assocs.*),
  454 B.R. 782 (Bankr. D. Idaho 2011) ...................................................................... 8

## TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

STATUTES, RULES, & REGULATIONS

11 U.S.C.
§ 704(a)(5) ................................................................................................................. 8

Fed. R. Bankr. P.
3001 .......................................................................................................................... 11
3007 .......................................................................................................................... 11
9019 .............................................................................................................. 1, 3, 4, 11

Residential Capital, LLC, and its affiliated debtors and debtors-in-possession in the

above-captioned Chapter 11 cases (collectively, the "Debtors") submit this reply brief in support

of their Rule 9019 motion for approval of the RMBS Trust Settlement Agreements.

## INTRODUCTION

Assured Guaranty Municipal Corp. and certain of its affiliates (together, "Assured")

claims "the monoline insurers" are the parties "who have the economic risk as well as the control

rights" for the claims of the 392 trusts involved in the proposed settlement. (Assured Obj. ¶ 50,

ECF No. 2791.) That certainly is not true in Assured's case. Assured provided insurance for

only three of the 392 trusts, and its total payout on claims by those trusts, so far, is approximately

$67.7 million. Assured is a bit player in this drama. Its objection should be viewed in the light

of these facts.

Assured's objection largely parrots arguments made by other objectors. For example,

Assured asserts—without citing any evidence—that the proposed settlement "is an integral part

of the Debtors' efforts to obtain a third party release for parent Ally Financial, Inc." (Assured

Obj. ¶ 3.) The Debtors' other reply briefs have already demonstrated the falsity of this charge.

And events have also overtaken it. The Debtors have allowed to expire the plan support

agreement with Ally that underpins Assured's (and the other objectors') allegations. This proves

what the Debtors have said from the beginning—there is no connection between the amount of

the proposed $8.7 billion allowed claim and the third party releases sought by Ally.

Assured also copies the arguments of other objectors in saying that a higher "entire

fairness" standard, rather than the factors approved by the Second Circuit in *Motorola, Inc. v.*

*Official Comm. of Unsecured Creditors* (*In re Iridium*), 478 F.3d 452 (2d Cir. 2007), should be

applied to the settlement. (Assured Obj. ¶ 4.) This argument, of course, requires the Court to

accept the false notion that Ally is a party to the RMBS settlement, thereby making the settlement one among "insiders" (that is, between the Debtors and Ally). But no evidence supports this claim, and the settlement agreement itself proves it is false.

Assured, like other objectors, levels several criticisms at the methodology and conclusions reached by Frank Sillman, the Debtors' loan underwriting expert. But Mr. Sillman's approach is unassailable and is largely confirmed by the objectors' own experts. His calculation of total aggregate losses —from $43 to $45 billion—has been accepted by the objectors' own experts. And while his material defect rate of 42% exceeds the 28.74% rate determined by Mr. Morrow (the Committee's expert), it is right in line with defect rates found in other cases and the assertions of other objectors in this matter.

Assured also offers a number of criticisms regarding the formula for allocating the proposed allowed claim among participating trusts. The Debtors have responded to these same criticisms in their other reply briefs. All that is required, under the law, is an allocation formula that fairly allocates the settlement proceeds among participating trusts. The proposed allocation formula allocates the allowed claim based on each trust's actual losses to date and estimated future losses. The formula will be applied consistently across participating trusts. There is no need to make fine judgments about the strengths and weaknesses of each trust's claims and defenses. Perfection is not required.

Assured has not raised any valid objection to the proposed RMBS settlement. And all of its objections have been completely answered in the Debtors' other reply briefs. Its objections should be rejected and the RMBS settlement should be approved.

I.    **SETTLEMENT APPROVAL IS GOVERNED BY *IRIDIUM*, NOT THE ENTIRE FAIRNESS STANDARD.**

Assured argues the RMBS settlement should be governed by the "entire fairness standard" because the settlement is between "insiders." (Assured Obj. ¶¶ 4, 14.) The settlement, of course, is between the Debtors and two groups of institutional investors. They have no "insider" relationships.

What Assured is arguing is that a non-party to the agreement—Ally—derives some benefit from the settlement and should therefore be treated as an "insider" party to the settlement. (Assured Obj. ¶ 16.) Assured admits that Ally is not a party to the settlement agreement. (Assured Obj. ¶ 15.) But it says the settlement should be treated as one between insiders because the settlement was "entered into, in large part, to benefit insiders." (*Id.*) Assured's argument fails on both the law and the facts.

Assured does not cite any case in which a court applied the "entire fairness" standard to a 9019 motion because the proposed settlement allegedly was intended, in part, to benefit a non-party. In fact, the cases say something very different. Delaware's standards for scrutiny of corporate decisions (business judgment or entire fairness) are applied depending on the disinterestedness of a corporation's decisionmakers—its directors and officers. The business judgment standard is used when directors are disinterested. The entire fairness standard is applied when a controlling shareholder stands on both sides of the transaction, or when directors are conflicted and have a direct personal interest in the transaction. *See, e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) ("when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard"); *Golden Cycle, LLC v. Allan*, No. 16301, 1998 Del. Ch. LEXIS 237, at *34-35 (Del. Ch. Dec. 10, 1998) ("[t]he

entire fairness of a transaction will be scrutinized . . . where a majority of the directors approving

the transaction were interested or where a majority stockholder stands on both sides of the

transaction") (*quoting In re Budget Rent A Car Corp. Shareholders Litig.*, No. 10,418, 1991 Del.

Ch. LEXIS 29, at *9  (Del. Ch. Mar. 15, 1991).  Under these cases, the proper questions are

whether the Debtors stood on both sides of the transaction, and whether a majority of ResCap's

directors stood to benefit personally from the settlement.

Assured offers no cases in response to these well-established principles.  Instead, it cites

only to Delaware decisions saying, generally, that transactions among insiders must receive

higher scrutiny.  (Assured Obj. ¶ 14.)  But that misses the point:  the issue is whether a

transaction that does not involve insiders on both sides of the transaction may, nonetheless, be

subjected to the "entire fairness" test.

This Court addressed this question in *In re Dewey & Leboeuf, LLP*, 478 B.R. 627, 641

(Bankr. S.D.N.Y. 2012).  In that case, this Court considered a 9019 motion for approval of "a

series of settlement with Debtor's former partners".  478 B.R. at 632.  An objector "argue[d] that

in conducting its Rule 9019 analysis the Court should apply the heightened scrutiny of the 'entire

fairness' doctrine—as opposed to the business judgment standard—because, it allege[d], the

Debtor [was] settling claims with insiders."  *Id.* at 641.  This Court recognized that the question

was not whether the former partners had once been allied with the debtor; it was, instead,

whether they were on both sides of the proposed settlement.  *Id.* at 642 (settlements with former

partners were "not related party transactions that, in other contexts, make application of the

entire fairness doctrine appropriate").

Assured also offers no facts showing the settlement is one that involves, or was intended

to benefit, Ally.  Ally, of course, is not a party to the settlement itself.  And its one supposed

connection to the settlement—a plan support agreement with the Debtors and the investors—has

been allowed to expire.  Assured thus offers no evidence that the Debtors—and in particular, its

directors—stand on both sides of the proposed settlement.  The directors have no relationship to,

or affiliation with, the Steering Committee Group or the Talcott Franklin Group. They do not sit

on Ally's board.  And they do not stand to benefit personally from approval of the settlement.

Accordingly, there is no basis upon which to invoke "entire fairness" or "heightened scrutiny."

Assured also wrongly asserts that the RMBS settlement is "linked" to the plan support

agreement with the investors and Ally.  (Assured Obj. ¶ 18.)  But there is no connection between

the amount of the proposed $8.7 billion allowed claim and the third party releases sought by Ally

pursuant to the plan support agreement; indeed, the plan support agreement has expired.  The

now-expired plan support agreement obligated the Debtors to submit a proposed plan of

reorganization and use their "best efforts to effectuate and consummate" a plan that would

"incorporate a settlement with Ally . . . pursuant to which Ally will agree to contribute [$750

million] to the Debtors' estates for, among other things, Debtor Releases and Third Party

Releases . . . subject to Bankruptcy Court approval as part of the Plan."  The plan support

agreement obligated Ally to "consent to" the RMBS settlement and comply with the terms of its

settlement with the Debtors, including the payment of $750 million for the benefit of the

Debtors' estate.  And the plan support agreement obligated the settling investors to "use

commercially reasonable efforts" to support the Debtors' first day motions, restructuring efforts,

and stays of litigation, and to vote in favor of the plan of reorganization prepared by the Debtors.

No part of these terms, of course, addresses the amount of the proposed $8.7 billion

allowed claim.  Assured will not be able to prove any connection between the plan support

agreement and the amount of the proposed allowed claim.  The proposed settlement is not

conditioned on Ally receiving third party releases.  The evidence will show that the plan support

agreement was connected to the Ally settlement and, in particular, Ally's agreement to pay $750

million to the Debtors' estate.  The plan support agreement is thus linked to Ally's contribution

to the Debtors' estate, not to the amount of the proposed $8.7 billion allowed claim.  Indeed, the

evidence will show the investors were prepared to settle their claims without a plan support

agreement if Ally refused to make an acceptable payment in return for plan releases.

Accordingly, Assured will not be able to show how a settlement between the Debtors, on the one

hand, and investors pressing claims against them for tens of billions of dollars, on the other, can

be considered a settlement between insiders.

## II.    THE SETTLEMENT FAIRLY ALLOCATES THE ALLOWED CLAIM AMONG PARTICIPATING TRUSTS.

Assured argues that the RMBS settlement is a "one size fits all" settlement.  (*See* Assured

Obj. ¶ 5.)  By that, Assured apparently means the formula for allocating the allowed claim

among participating trusts unfairly "lumps" together trusts with different claims, different

defenses, and "different standards of proof."  (Assured Obj. ¶ 38.)

This is not a fair reading of the settlement agreement.  Under the agreement, each

participating trust will receive a share of the allowed claim based on a formula that recognizes

losses to date, estimated future losses, and losses reimbursed by insurance.  (Exs.[1] 1 and 2 at

§ 1.09.)

Moreover, as the parties have previously been informed, the trustees, among other

interested parties, have led an effort to refine the allocation formula in order to address criticisms

like those made by Assured here.  A revised allocation formula is being readied for submission

---

[1] "Ex. __" refers to the exhibits attached to the Declaration of LaShann M. DeArcy, dated March 15, 2013.

to the Court.  Assured's objections to the allocation formula are out-of-date and will largely be addressed by the amended formula.

### A.    The Settlement Fairly Allocates the Allowed Claim Based On Losses.

The proposed settlement allows a single "general unsecured claim of $8,700,000,000" in the aggregate against the Seller Entities and the Depositor Entities, which together constitute all of the Debtors except ResCap LLC.  (Exs. 1 and 2 at § 5.01.)  Under the existing allocation formula, each participating trust will receive a share of that claim based on each trust's "Net Losses," which consist of actual losses incurred to date plus an estimate of each trust's future losses.  Exhibit B to the settlement agreement provides a detailed and precise formula for calculating each trust's "Net Losses."  Each trust will be awarded a share of the allowed claim by (1) calculating that trust's net losses as a percentage of the net losses across all participating trusts, and (2) multiplying that percentage by the amount of the allowed claim.  (Exs. 1 and 2 at Ex. B.)

That the precise allocation amounts are not presently known is of no moment; it is enough that the allocation formula is fair and clear.  "An allocation formula need only have a reasonable [and] rational basis" in order to be "fair and adequate."  *In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515 (WHP), 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009); *see also In re Giant Interactive Group, Inc.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[a]n allocation formula need only have a reasonable rational basis, particularly if recommended by experienced and competent class counsel"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 479 (S.D.N.Y. 2009) (same); *accord Bezio v. General Elec. Co.*, 655 F. Supp. 2d 162, 167 (N.D.N.Y. 2009).  The allocation formula set forth in the settlement meets this standard.

The revised allocation formula goes one step further, by adding to the formula adjustments for defect rates, product type, and other criteria.  These steps will permit differentiation among the trusts based on the merits of each trust's claims.

**B.    The Settlement Agreement Does Not Improperly Delegate Allocation to an Expert.**

Assured claims the allocation will be decided by an expert outside of judicial review, and contends that the Debtors have improperly delegated claims administration duties to the expert in violation of section 704(a)(5) of the Bankruptcy Code.  (Assured Obj. ¶¶ 6, 56-61.)

But delegation of ministerial tasks, such as calculating each trust's "Net Losses," is entirely proper under section 704(a)(5).  That section permits the delegation of certain duties so long as the responsible party adequately supervises the performance of those duties.  *In re Abraham*, 163 B.R. 772, 779 (Bankr. W.D. Tex. 1994) (trustee in bankruptcy may delegate duties so long as it insures that "all those persons to whom duties have been delegated do their jobs right"); *see also R. Woolsey & Assocs. v. Gugino* (*In re R. Woolsey & Assocs.*), 454 B.R. 782, 789 (Bankr. D. Idaho 2011) (trustee not liable for damages where he "delegat[ed] his responsibilities"); U.S. Dept. of Justice Handbook for Chapter 7 Trustees at 8-21 – 8-24 (Jan. 1, 2011), *available at* http://www.justice.gov/ust/eo/private_trustee/library/chapter07/docs/ch7_handbook/ch7_handbook_2011.pdf ("chapter 7 trustee may employ professionals . . . to 'represent or assist the trustee' in performing trustee duties . . . .  It is critical that the trustee oversees the work performed by professionals").

The expert in this situation will operate under a stringent and specific formula and must apply that formula consistently to each trust's claim.  The only real area of judgment arises because the formula requires an estimate of each trust's future losses.  (*See* Assured Obj. ¶ 36.)

But the settlement agreement specifically defines "Net Losses" to be losses "that have been or are estimated to be borne by [a] trust from its inception date to its expected date of termination." (Exs. 1 and 2 at § 1.09.)  The expert will have to follow this definition in estimating net losses for each trust.

As a practical matter, the parties have not had any difficulty estimating trusts' net losses. The Debtors' expert, Frank Sillman, has estimated that aggregate net losses for the 392 trusts will be between $43.2 and $45 billion.  (Ex. 3 at ¶ 9.)  That aggregate loss estimate was calculated by adding the trusts' total losses to date and the forecasted remaining lifetime losses for those trusts.  (Ex. 3 at ¶ 8.)  Accordingly, the aggregate net loss estimate represents all realized and projected losses of the 392 trusts.  Mr. Sillman's methodology and aggregate loss estimates have been adopted, without complaint, by the objectors' experts.  (*See, e.g.*, Ex. 4 at ¶ 68; Ex. 5 at ¶ 30; Ex. 6 at 60:19-62:18; Ex. 7 at 36:9-37:8.)  In light of this, Assured's complaint that it is "virtually impossible" to apply the allocation formula must be rejected.  (*See* Assured Obj. ¶ 36.)

### C.    The Allocation Formula is Fair to Assured and Other Insurers.

Assured complains that the allocation formula does not clearly explain the effect of insurer payments on the calculation of each trust's share of the allowed claim.  (*See* Assured Obj. ¶ 33.)  This argument has no merit.  The settlement agreement provides that "a loss on a mortgage loan that has been reimbursed or indemnified by reason of applicable policies of mortgage or bond insurance shall be considered a loss on a mortgage loan and included within the calculation of 'Net Losses'."  (Exs. 1 and 2, § 1.09.)  This provision ensures that wrapped and unwrapped securities receive the same treatment under the settlement.

Paragraph 5 to Exhibit B of the settlement agreement also prevents the monolines from collecting twice on the same damages.  The provision states that "[t]o the extent any [monoline]

receives a distribution on account of the Allowed Claim, such distribution shall be credited at least dollar for dollar against the amount of any claim it files against the Debtor that does not arise under the Governing Agreements."  (Exs. 1 and 2 at Ex. B ¶ 5.)  In other words, to the extent the monolines have independent claims that are not released under the settlement, the settlement prevents any double recovery by reducing the amount of those claims by the amounts recovered by the monolines pursuant to the settlement.  (Exs. 1 and 2, § 8.03.)

Assured also argues that monoline insurers are unfairly treated under the allocation formula because different legal standards "may be applicable" to their claims.  (Assured Obj. ¶¶ 38-41.)  The proposed settlement allocates the allowed claim among participating trusts based on the losses each trust will suffer.  (Exs. 1 and 2 at Ex. B.)  Assured says this simple formula is too simple because it does not take into account the supposed strengths of monoline claims. (Assured Obj. ¶¶ 38-41.)  But the fact that some trusts' claims may prove stronger or weaker than others does not mean an allocation formula based on losses is improper.  Allocating a recovery based upon each claimant's share of losses is a widely accepted method that has been routinely approved by courts.  *See, e.g.*, *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853 (SWK), 2006 U.S. Dist. LEXIS 70474, at *31-32 (S.D.N.Y. Sept. 27, 2006) (plan of allocation distributing recovery based upon decrease in value of each class member's holdings was "fair and reasonable"); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *20-21 (S.D.N.Y. Oct. 24, 2005) (settlement proceeds "based on [*pro rata*] investment loss is reasonable"); *In re WorldCom, Inc. ERISA Litig.*, No. 02 Civ. 4816, 2004 U.S. Dist. LEXIS 20671, at *29 (S.D.N.Y. Oct. 18, 2004) (settlement approved where "plan of allocation is based on the proportional share of the loss of each participant" so that the "more a

class member lost, the more that person will receive"), *vac'd in part, on other grounds*, No. 02

Civ. 4816 (DLC), 2004 U.S. Dist. LEXIS 22952 (S.D.N.Y. Nov. 16, 2004).

Moreover, as noted, the parties have recently worked on a revised allocation formula that

takes into account defect rates, product type, and other criteria for each trust. These steps will

permit differentiation among the trusts based on the merits of each trust's claims.

### D.    The Allocation Formula Does Not Deprive Assured of Due Process.

Assured argues that the settlement will deny them "due process" because "[t]here will be

no notice or hearing on the monoline insurers' claims." (Assured Obj. ¶¶ 52-54.)  Neither

Bankruptcy Rule 3001, nor Bankruptcy Rule 3007, which discusses objections to claims,

mandates any such hearing. Rule 9019 permits the compromise of disputed claims by means of

a settlement, and sets forth the standards by which this Court must review and approve the

settlement of disputed claims. Assured (and other insurers) have had full opportunity to

participate in discovery to date and will have full opportunity to participate in the evidentiary

hearing and post-hearing briefing. This process complies with and fully protects Assured's due

process rights.

## III.    THE PROPOSED $8.7 BILLION ALLOWED CLAIM FALLS WITHIN A REASONABLE RANGE.

Assured complains that Mr. Sillman's expert analysis is inadequate to support the amount

of the proposed allowed claim. (Assured Obj. ¶¶ 20-32.) But Assured largely ignores the heart

of Mr. Sillman's analysis and makes only limited criticisms about his methodology. And even

those criticisms lack merit. Mr. Sillman's analysis is grounded in the Debtors' own historical

loan repurchase experience, their own internal post-funding audit experience, and his own

forensic review of 1,500 loan files.

Mr. Sillman's analysis fundamentally relies on three sets of numbers. The first is "aggregate losses." Aggregate losses are comprised of all of the losses, realized and projected to occur in the future, that will be suffered by the owners of mortgage-backed securities that are the subject of the settlement. Mr. Sillman has calculated that aggregate losses, for the 392 trusts, will range from $43.2 billion to $45 billion. (Ex. 3 at ¶ 8.) These numbers are not in dispute, and the objectors' experts have used these figures in their own reports. The proposed $8.7 billion claim represents 19.7% of the aggregate losses the investors could, theoretically, seek to recover at trial.

The second figure calculated by Mr. Sillman is "material defects." A "defect rate" reflects the percentage of loans as to which there has been a material breach of the Debtors' representations and warranties. The defect rate thus reflects the investors' ability to prove a *prima facie* claim. Mr. Sillman has determined that the Debtors' loans exhibit material defects in approximately 43% of cases. This figure is a little higher than the 28.74% defect rate offered by the Committee's expert, but is much lower than the defect rates alleged by the Steering Committee, MBIA and FGIC.

The third number calculated by Mr. Sillman is the range of likely litigation outcomes after adjustment for legal defenses. Defect rates, as shown above, reflect the investors' ability to prove a *prima facie* claim. But to estimate recoverable damages, those losses must be discounted to account for the Debtors' legal defenses—including loss causation, statute of limitations, and election of remedies. Mr. Sillman determined that the proposed $8.7 billion allowed claim compared reasonably to the Debtors' own loan repurchase experience (which took into account legal defenses) and other similar settlements (such as the Bank of America and Lehman Brothers settlements).

Assured does not address the reasonableness of any of these calculations, and it does not offer any competing figures.  Instead, it makes limited criticisms of the manner in which Mr. Sillman performed the calculations.  None of Assured's criticisms affects the validity or weight of Mr. Sillman's conclusions.

A.    **Mr. Sillman's Analysis Adequately Estimates the Aggregate Losses, Defect Rate, and Discount for Available Defenses and Litigation Costs.**

Assured says that, in considering the Debtors' historical loan repurchase experience, Mr. Sillman improperly considered loan repurchases from Fannie Mae and Freddie Mac, while ignoring the Debtors' repurchases of loans underlying private-label securities.  (Assured Obj. ¶¶ 25-26.)  Assured claims that the Debtors repurchased loans at a higher rate from Fannie Mae and Freddie Mac, thus skewing the data.

It is true that Mr. Sillman relied on historical repurchase data relating to Fannie Mae and Freddie Mac and rejected data involving private-label securities.  He had good reasons for doing so.  Almost all of the Debtors' repurchase experience has involved Fannie Mae and Freddie Mac.  The Debtors' repurchase data for private-label securities is incomplete and unreliable.  Moreover, 82% of repurchase demands from private-label trusts remain unresolved, many because of pending litigation.  (Debtors' Reply Br. re *Iridium* Factors at 40-41, ECF No. 2803; Ex. 8 at ¶¶ 31-34.)  Mr. Sillman wisely decided to use the robust and complete data on loan repurchases from Fannie Mae and Freddie Mac.

But Mr. Sillman was well aware of the argument that the Debtors repurchased loans from Fannie Mae and Freddie Mac at a higher rate.  (Ex. 9 at ¶ 24.)  Accordingly, Mr. Sillman made a downward adjustment to account for that difference.  The GSE data shows that the Debtors agreed to repurchase 67.56% of all demands made by Fannie Mae and Freddie Mac, and only 3.1% of those demands remained unresolved.  (*Id.*)  Mr. Sillman correctly recognized, however,

that the Fannie Mae and Freddie Mac governing agreements contained more stringent representations and warranties than the Settlement Trusts' governing agreements.  As such, Mr. Sillman took the robust GSE data and discounted it to account for the less stringent representations and warranties found in the Settlement Trusts' governing agreements.  (Ex. 9 (Original Report) at ¶ 61).

Assured also complains that Mr. Sillman relied too much on his own industry experience. There is nothing wrong, of course, with an expert relying on his own expertise.  Mr. Sillman has, after many years in the mortgage business, been involved with literally thousands of loan repurchase demands.  He has a deep knowledge of representations and warranties and the claims associated with those representations.  He also has a wealth of experience in forensic re-underwriting of loan files.  (Ex. 10 at 272:12-277:8.)  Mr. Sillman fairly applied his experience in calculating the trusts' aggregate losses and material defect rates, and in applying a realistic discount for litigation costs and available defenses.  (*Id.*)

Assured says, however, that "[v]ery little of Mr. Sillman's opinion is based upon the actual loans at issue."  (Assured Obj. ¶¶ 24, 26.)  But Mr. Sillman performed a forensic re-underwriting of 1,500 loan files from the 392 trusts in this matter.  These are the same loans selected by the Committee's experts.  (Ex. 8 at ¶¶ 23-27; Debtors' Reply Br. re *Iridium* Factors at 41-42.)  Mr. Sillman concluded that 43.5% of these loans had material defects.  (Ex. 8 at ¶ 5.) Assured's complaint ignores this significant hands-on experience with the actual loans underlying the trust's claims in this matter.

### B.    Mr. Sillman's Comparisons to the Bank of America and Lehman Brothers Settlements Were Reasonable.

Assured criticizes Mr. Sillman for referencing the Bank of America and Lehman Brothers settlements as relevant "data points."  (Assured Obj. ¶ 27.)  That recent settlements involving

representations and warranties, and, in the case of the Bank of America settlement, the same

plaintiffs and the same plaintiffs' counsel, should be considered as relevant data points seems

obvious and beyond dispute.  Assured complains, however, that Mr. Sillman "did not confirm

that the BofA Expert Report and the Lehman Excerpt Declaration were 'relevant data points'

because he did not complete a 'trust by trust' comparison of the BofA or Lehman loans."

(Assured Obj. ¶ 27.)

Mr. Sillman did not need to perform such an extensive analysis before referencing the

Bank of America and Lehman Brothers settlements.  Mr. Sillman did not "rely" on these

settlements in the manner Assured suggests.  Rather, Mr. Sillman conducted his own

independent calculations and analysis that did not rely, in any way, on the figures or calculations

used in the Bank of America or Lehman Brothers settlements.  Mr. Sillman referenced the Bank

of America and Lehman Brothers settlements only as merely relevant data points "that the

readers should or could look at in evaluating the breach rates and agree rates in my report."  (Ex.

10 at 237:12-19.)  In that conclusion Mr. Sillman was plainly correct.  Two similar settlements,

involving representation and warranty claims arising from private-label securities and involving

calculations of aggregate losses, defect rates, and discounts for litigation costs and available

defenses, are obviously relevant and informative references.  And the comparisons invited by

Mr. Sillman are helpful because they show that his conclusions are fairly in line with the

calculations performed by other experts in similar cases.  (Debtors' Reply Br. re *Iridium* Factors

at 55-57.)

### C.    Assured's Attacks on Mr. Sillman's Methodology and Experience Misstate the Bases of His Opinion.

Assured's remaining critiques of Mr. Sillman are similarly flawed.  Assured complains

that Mr. Sillman should not have considered the fact that the Debtors agreed to a claim of $8.7

billion in conducting his analysis.  (Assured Obj. ¶ 28.)  But Mr. Sillman in no way based his

analysis on the fact that an $8.7 billion settlement had already been  reached.  (Ex. 10 at 184:8-

19.)  Rather, Mr. Sillman reached his own independent conclusion as to the reasonableness of the

settlement by calculating the aggregate losses, defect rate, and discount for litigation costs and

available defenses.

Similarly, Assured's critique of Mr. Sillman's demand rate assumptions lacks merit.

(Assured Obj. ¶¶ 29-30.)  Assured neither offers an alternative methodology nor demonstrates

that those assumptions produced an incorrect outcome.

Assured ultimately offers no real critique of the reasonableness of the settlement or

Mr. Sillman's analysis.  Mr. Sillman's full body of work analyzing the aggregate losses, defect

rate, and discount for available defenses supports the reasonableness of the $8.7 billion

settlement.

## CONCLUSION

Assured's arguments are without merit.  The evidence shows that *Iridium* is the proper test, that the settlement allocation is fair, and that the allowed claim falls within the range of reasonable outcomes in light of the risks and rewards of litigation.

For these reasons, the Debtors respectfully request that their motion for approval of the RMBS settlement agreements be granted.

Dated: New York, New York
March 15, 2013

MORRISON & FOERSTER LLP


By:   /s/ Darryl P. Rains
   Gary S. Lee
   Anthony Princi
   Darryl P. Rains
   MORRISON & FOERSTER LLP
   1290 Avenue of the Americas
   New York, New York 10104
   Telephone: (212) 468-8000
   Facsimile: (212) 468-7900

   *Counsel to the Debtors and Debtors in Possession*