# Exhibit 10

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al, 12-12020(MG)

Debtors.

-----------------------------------x

DEPOSITION OF FRANK SILLMAN

New York, New York

November 20, 2012

9:35 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27687

or any other legal arguments as part of that process. So it's that work and the results of that work that's incorporated in my work, in my declaration.

Q. I understand you are drawing inferences from the debtors' put back history with the GSEs, among other things?

A. Correct.

Q. So I just want to be clear, am I correct you haven't looked at any one loan within the pool that's being settled to try to reach a view or express an opinion as to whether that loan actually breaches any reps and warranties?

A. We have not completed our loan level review work. And I'm relying on the thousands of loans that went through the debtors' repurchase process as the basis for my original declaration.

Q. So I think I'm hearing the answer to my question but I just want to be clear. In your June 11 declaration you are not expressing any opinion as to whether any particular loan breaches any

reps and warranties?

MR. RAINS: Objection. Vague and ambiguous. Asked and answered.

A. I utilized the repurchase work the debtor did with the GSEs to form the basis for my original declaration.

Q. And in reaching the conclusions in your initial declaration you didn't look at any individual loan file in the pool that's being settled?

A. I relied on the thousands of loans that were reviewed by the debtor as part of their process prelitigation.

Q. With respect, Mr. Sillman, I don't think you answered my question.

MR. BENTLEY: Let me ask the reporter to read it back.

MR. RAINS: I think you answered the question. It's been asked and answered.

MR. BENTLEY: You know, Darryl, it's a yes or no question and I got a nonanswer.

Read it back, please.

(Record read.)

MR. RAINS: Same objections.

A. I relied on the GSE repurchase work that the debtor did with Fannie and Freddie.

Q. To date have you looked at any loan file for any of the loans within the pool that's being settled?

A. We are in the process of reviewing the loan files.

Q. Have you yet looked at any loan files?

MR. RAINS: You mean him personally or Fortace?

Q. Let's break it into pieces. Have you personally looked at any loan file?

A. I have not looked at the loan files.

Q. Prior to your signing your June 11 declaration, did anybody at Fortace look at any of the loan files for the loans being settled?

A. I relied on, we relied on, the

work that the debtor did with the GSE repurchases in forming the assumptions and conclusions in my original declaration.

Q. So that's a no?

A. I relied on --

MR. BENTLEY: Read back my question.

Q. It's a very simple factual question. I'm not asking you what you relied on. I'm asking you whether you looked at any loan files?

MR. BENTLEY: Read it back, please.

(Record read.)

MR. RAINS: Objection, vague and ambiguous. Asked and answered.

A. I relied on the work that was done by the debtor as part of their GSE repurchase for the conclusions and assumptions made in my original declaration.

Q. And you didn't look at any loan files?

A. I relied on the GSE repurchase

work.

Q. Did that involve looking at any loan files?

A. It revolved relying on the loan file reviews that the debtor performed.

Q. Is there a reason you are resisting answering a simple question?

MR. RAINS: Objection. Argumentative. Asked and answered.

MR. BENTLEY: It's not asked and answered for Christ's sake, Darryl.

Read it back.

MR. RAINS: Of course it has. It's been asked 15 times and --

MR. BENTLEY: Is the answer no? Because I sure can't tell what the answer is.

MR. RAINS: I think his answer is very clear.

MR. BENTLEY: The answer is he did something else, it's not whether he did this or not.

MR. RAINS: That's his answer. You don't like his answer but it's his

answer.

MR. BENTLEY: I'm fine with his answer, he just hasn't answered my question.

Can you read it back, please.

MR. RAINS: Let's do this, let's take a quick break.

MR. BENTLEY: You know what, I want an answer to my question before you speak --

MR. RAINS: I'm going to talk to him about his answer to your question.

MR. BENTLEY: I object. You are not supposed to talk to the witness while a question is pending.

(Whereupon, there is a recess in the proceedings.)

MR. RAINS: I think we have succeeded in clearing up some of the ambiguities and confusion caused by your question. Why don't you put the question to him again.

Q. I know it's very confusing but I'll state it again. In connection with

FRANK SILLMAN

forming the opinions expressed in your June 11 declaration, did you or any of your colleagues look at any of the files for the loans in the pool being settled.

A. For the, my original declaration I relied on the work that was done by ResCap and the repurchase activity. We are now looking at loan files. We are currently looking at loan files.

Q. So let's just unpack what you just said. You relied on the work that was done by ResCap. What work are you referring to?

A. To GSE and private label repurchase activity work ResCap did.

Q. Understood. But was that as to any of the loans that are in this pool that's being settled?

A. There may be in the private label securities work loans that are included in this settlement. The vast majority of the loans were related to their GSE originations.

Q. And none of the GSE deals

overlap in any way with this settlement, right?

A. Correct.

Q. Were you relying, when you prepared this report, on any work that RFC had done in looking at the loans that are part of this settlement?

A. Yes. We did review some information regarding their private label securitization repurchase work. What we found, I think there's an exhibit, that the vast majority of those repurchase demands were unresolved.

Q. So I'm going to return to that. I know what you are referring to. Putting aside any loan reviews that RFC may have done in connection with its prepetition put back experience, did you or any of your colleagues look at any loan files in connection with the work that went into your June 11 report?

A. We relied on the company's work for the information in the original declaration and we are now looking at loan

FRANK SILLMAN

files that are contained within the 392 trusts.

Q. And when you say the company's work, are you referring to anything other than the work the company did prepetition in connection with its prepetition put back negotiations?

A. Yeah. It was prepetition work.

Q. In connection with -- done by the debtor in connection with its prepetition put back experience?

A. Yes.

Q. And no other review of loan files went into your, the conclusions expressed in your June 11 declaration?

A. That's right.

Q. Okay. We are there. We got an answer. Thank you. Let's move on.

A. I would say no additional loan work.

MR. BENTLEY: I'm about to change topics. If people want to take a break, this is fine or we can keep going.

claim for 8.7 billion. So I took into consideration the 1.3 billion and the fact that the trustees had also negotiated an allowed claim of 8.7. So I had to take into consideration the fact that there was a claim.

Q. So one of the things you took into consideration in forming your conclusion was that the debtors had agreed to an aggregate settlement of $8.7 billion?

A. We are talking about the PLS demand data. I could not ignore the fact that in addition to the 1.3 billion in demands there was also a proposed settlement of 8.7 billion. So it was a factor in the development of my declaration.

Q. Let's go back to paragraph 5 of your declaration.

MS. PATRICK: 5?

MR. BENTLEY: Correct.

MR. RAINS: I'm sorry, where?

MS. PATRICK: 5.

A. Okay.

Q. You thought it was appropriate in your report to compare the breach rate that you had computed for the trusts being settled to the breach rates used in the BofA settlement and used by the Lehman expert report, correct?

A. I thought it was informational for the readers of the report to understand other experts breach rates.

Q. You thought those other experts breach rates might have some relevance to the estimation of breach rates for the debtors?

A. I believe that they were relevant data points that the readers should or could look at in evaluating the breach rates and agree rates in my report.

Q. And what significance, if any, did you think the readers should attribute to them?

A. Well, I wasn't imposing any thought process that the readers should go through. It's just available data points

FRANK SILLMAN

anything relating in any way to agree rates on page 2 of this document?

A. No. That column referred here as formula column H is where I calculate the overall trust agree rate assumptions for the lower and higher ranges.

Q. But nothing in this document shows how you got to the lower and higher agree rate numbers shown for the various buckets?

A. That's correct. Those were based on my professional experience with agree rates for these buckets adjusted for the repurchase experience the debtor had and the higher agree rates than the industry as a whole for their GSE repurchases.

Q. Let's take it step by step. I'm going to ask you more about Exhibit 15 in a moment. But just to jump to the bottom line, does Exhibit 15 show how you computed the 41 to 47 percent agree rate range?

A. This was a validation step that

FRANK SILLMAN

I went through to validate the assumptions that I utilized in Exhibit 9, in the model in Exhibit 9, to calculate the agree rates.

Q. When did you prepare Exhibit 15?

A. This actual sheet in this condition was produced after the filing of my original declaration but based on calculations that I did prior to my original declaration.

Q. Is there any reason that this document refers in the heading to supplemental declaration?

A. I don't know whether or not timing wise when this was added to the data room. That might be during the time, you know, when the supplemental declaration was filed.

Q. Did you compute the 41 to 47 percent range in the method shown on Exhibit 15 and then back into the component parts shown on page 2 of Exhibit 9 or did you do it the other way around?

FRANK SILLMAN

A. I did it the other way around. So I first went through and input assumptions regarding the projected agree rates for the lower and higher ranges by these delinquency buckets.

Q. So how did you calc- -- and you are referring now, I believe, to Exhibit 9, page 2, column H.

A. Correct. It's column P in the spreadsheet but the calculation call it column H, yeah.

Q. So I'm going to focus on column H on page 2 of Exhibit 9. And let's focus first on the lower range. So this shows, the first number in this column is 42 percent. And the number at the bottom is 41 percent. How do those numbers relate to each other?

A. The bottom number is a weighted average. And since -- in this scenario on the estimated trusts lifetime losses the vast majority of the losses had already occurred in what I call trust liquidated losses. That number weights the weighted

average more than the other categories, the other line items.

Q. Is the 42 percent also a total and it's different from 41 just because of rounding issues?

A. No. Independently -- the 41 is just a product of the projected agree rates for each one of the buckets times the corresponding estimated trust's lifetime losses. So the 41 is just a result of those calculations.

Q. And what is the 42 percent?

A. Which 42 percent?

Q. At the top of column H.

A. So the row 21 in column P. Yeah. The one associated on the line trusts, liquidated loans 42 percent?

Q. Correct.

A. So that is my assumption for the agree rate for trusts liquidated loans. And the next is my assumption for current nonmodified loans.

Q. I see.

A. And so on down the line. So I

developed these assumptions by buckets first.

Q. How did you develop these percentages?

A. So I took my experience with agree rates by these bucket categories and I adjusted them for the higher experience, agree rate experience the debtor had with the GSEs versus the industry as a whole. And then I further adjusted it for the debtors rep and warrants overall comparative to other industry PLS reps and warrants.

Q. Now, the three steps you just described are shown on Exhibit 15, correct?

A. In aggregate, correct.

Q. And you are saying that you applied those same three steps to derive the percentage for each of the buckets in column H?

A. That's correct.

Q. Let's turn to Exhibit 15 then and go step-by-step.

A. Okay.

Q. Step one was you referred to your personal experience at Fortace advising both sell side and buy side clients?

A. Yes. Also including my experience at IndyMac Bank.

Q. And how many Fortace clients did you consider in doing this calculation?

A. Three.

Q. Can you identify them?

A. No, I cannot.

Q. Because they are confidential?

A. Yes.

Q. Okay. Can you tell me about characteristics of the loans that you advised them on and how they compare to the characteristics of the loans in the pools being settled?

A. In general they were Alt-A, jumbo A, subprime, and HELOC originators.

Q. Did you do any attempt to quantify what portion of their loans fell into each of those categories?