MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Darryl P. Rains

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' REPLY BRIEF RE OBJECTION OF JUNIOR SECURED
NOTEHOLDERS TO MOTION FOR APPROVAL OF RMBS SETTLEMENT
AGREEMENTS**

REDACTED

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 3

I.     THE SETTLEMENT PROPERLY ALLOCATES THE ALLOWED CLAIM AMONG THE AFFECTED DEBTORS. ........................................................................ 3

       A.     *Augie/Restivo* Does Not Apply to the Debtors' 9019 Motion. ............................... 4

       B.     The Settlement Reasonably Allocates the Allowed Claim Among the Debtors. ................................................................................................................... 5

       C.     The Settlement Need Not be Signed and Voted on Separately by Each Debtor's Directors. ........................................................................................... 7

II.    THE SETTLEMENT PROVIDES IMPORTANT BENEFITS TO RESCAP LLC. ........ 10

III.   THE ALLOWED CLAIM SHOULD NOT BE SUBORDINATED. ............................... 12

CONCLUSION ....................................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
    545 A.2d 1171 (Del. 1988) ................................................................................................... 8

*Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*,
    No. C.A. 3658-VCS, 2009 Del. Ch. LEXIS 54 (Del. Ch. Apr. 20, 2009) ........................... 7, 8

*Bezio v. General Elec. Co.*,
    655 F. Supp. 2d 162 (N.D.N.Y. 2009) .................................................................................. 6

*Coleman, III v. Zurich Am. Ins. Co.* (*In re Darrow Auto. Group, Inc.*),
    No. 09-11228, 2011 WL 1321504 (Bankr. S.D. Ga. Mar. 29, 2011) ..................................... 11

*Feely v. NHAOCG, LLC*,
    No. C.A. 7304-VCL, 2012 WL 6840577 (Del. Ch. Nov. 28, 2012) ....................................... 7

*In re Abraham*,
    163 B.R. 772 (Bankr. W.D. Tex. 1994) ............................................................................. 6, 7

*In re Augie/Restivo Baking Co.*,
    860 F.2d 515 (2d Cir. 1988) ........................................................................................ 2, 3, 4

*In re Capmark Fin. Group Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ..................................................................................... 4

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................................................. 4

*In re Giant Interactive Group, Inc.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ........................................................................................... 6

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ................................................................................... 6

*In re Royal Crown Bottlers of N. Alabama, Inc.*,
    23 B.R. 28 (Bankr. N.D. Ala. 1982) .................................................................................... 11

*In re Warner Chilcott Ltd. Sec. Litg.*,
    No. 06 Civ. 11515 (WHP), 2009 WL 2025160 (S.D.N.Y. July 10, 2009) .............................. 6

# TABLE OF AUTHORITIES
### *(continued)*

Page(s)

*Johnson v. First Nat'l Bank*,
  81 B.R. 87 (Bankr. N.D. Fla. 1987) ........................................................................................11

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium*),
  478 F.3d 452 (2d Cir. 2007) ............................................................................1, 3 & n.1, 4

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
  930 A.2d 92 (Del. 2007) ..........................................................................................................8

*Roselink Investors, L.L.C. v. Shenkman*,
  386 F. Supp. 2d 209 (S.D.N.Y. 2004) .....................................................................................8

*Topwater Exclusive Fund III, LLC v. SageCrest II, LLC* (*In re SageCrest II, LLC*),
  Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 U.S. Dist. LEXIS 3517 (D. Conn. Jan. 14, 2011) ..............................................................................................................9 n.4

**STATUTES, RULES, & REGULATIONS**

11 U.S.C
  § 363 .......................................................................................................................3 n.3
  § 510(b) .........................................................................................................3, 13, 14, 15

Fed. R. Bankr. P.
  9019 ................................................................................................................1, 3 & n.3, 4, 5

Residential Capital, LLC and its affiliated debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") submit this reply brief in support of their Rule 9019 motion for approval of the RMBS Trust Settlement Agreements.

## INTRODUCTION

The Junior Secured Noteholders (JSNs) do not challenge the most important term of the proposed RMBS settlement. They do not argue the proposed $8.7 billion allowed claim falls outside the range of reasonableness. (JSNs Obj. ¶ 20 n.19 ("[t]his Objection does not address whether the amount of the Allowed Claim . . . is excessively high"), ECF No. 2824.) The JSNs thus offer nothing in response to the Debtors' demonstration, under *Iridium*, that the proposed allowed claim reflects a fair "balance between the litigation's possibility of success and the settlement's future benefits." *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium*), 478 F.3d 452, 462 (2d Cir. 2007).

Instead, the JSNs largely parrot the false arguments made by other objectors. These arguments—that "Ally, not the Debtors, played the primary role in negotiating" the settlement, that ResCap LLC's directors did not exercise "due care" in approving the settlement, etc.—have already been fully refuted in the Debtors' earlier briefs. (*See* JSNs Obj. ¶¶ 1, 14.) The Debtors have already demonstrated that Ally did not control the Debtors' negotiations with the investors, and that the directors' consideration and approval of the settlement fully qualify for the protections of the business judgment rule. (Debtors' Reply Br. re *Iridium* Factors at 25-35, ECF No. 2803; Debtors' Reply Br. re Non-*Iridium* Factors at 3-14, ECF No. 2804.) The JSNs' objection adds nothing new to these issues, and the Debtors will not refute them again here.

The remainder of the JSNs' objection raises a grab bag of smaller technical issues. The issues can be organized into three groups. The first group concerns the allocation of the allowed claim among the various debtor entities. Based primarily on one inapposite case—

1

*Augie/Restivo*—the JSNs say the Debtors failed to address the settlement on an "estate-by-estate" basis. *In re Augie/Restivo Baking Co.*, 860 F.2d 515 (2d Cir. 1988). They also say the agreement should have been separately signed and approved by each separate debtor entity. (JSNs Obj. ¶¶ 3, 6, 9, 20-23, 25-28.) These arguments should be given no weight. The settlement benefits all of the Debtors, and each debtor will be charged with the appropriate share of the allowed claim based on its role in originating or selling securities to each participating trust. That is a fair and reasonable outcome for each of the Debtors. Moreover, the settlement was properly approved by ResCap LLC's directors acting on behalf of the parent company and all of its subsidiaries. There was no need for mindless formalistic board meetings at each of the fifty-one Debtors.

The second group of issues concerns ResCap LLC. The JSNs argue that the so-called "HoldCo Election" was poorly conceived and improperly adopted, and that the later removal of that provision made things even worse for ResCap LLC. (JSNs Obj. ¶¶ 29-32.) That is not a fair summary of what happened. ResCap LLC heard the criticisms of many creditors, including the JSNs, regarding the allocation of the proposed allowed claim among the various Debtors. The Debtors addressed those concerns by agreeing to revise the settlement agreement to eliminate the "HoldCo Election." As a result, the proposed settlement resolves the claims against the two entities (GMAC Mortgage and Residential Funding Corporation) with the largest exposure and the most assets, as well as all of the other Debtors, except ResCap LLC. ResCap LLC, of course, has little exposure to liability (only on alter ego or corporate veil-piercing theories) and also has no assets, and so likely will not face future litigation. The settlement thus eliminates most risks of future litigation and benefits ResCap LLC without costing it anything of value.

2

Third, and finally, the JSNs claim the allowed claim should be subordinated pursuant to Section 510(b) of the Bankruptcy Code. (JSNs Obj. ¶¶ 34-48.) The Debtors believe that subordination need not be addressed as part of the settlement approval process. But the Debtors disagree with the JSNs' underlying premise—that contractual representation and warranty claims can be properly subordinated under section 510(b). The Court should defer this issue, as the priority of the proposed allowed claim is not properly considered as part of the 9019 settlement approval process, but should ultimately conclude that the allowed claim should not be subordinated.

## ARGUMENT

**I.   THE SETTLEMENT PROPERLY ALLOCATES THE ALLOWED CLAIM AMONG THE AFFECTED DEBTORS.**

The JSNs, citing *Augie/Restivo*, contend the settlement must be analyzed by the Debtors, and the Court, "on an estate-by-estate basis." (JSNs Obj. ¶ 9.) Nothing in *Iridium*, or the cases applying it, says this must be so.[1]

On this weak reed, the JSNs then erect an entire structure of purported procedural estate-by-estate requirements. They say the settlement needs to specify precisely what portion of the allowed claim will be allocated to each of the fifty-one Debtors. They also claim the settlement agreements must be separately signed by each debtor and separately voted on and approved by each debtor's board of directors. (JSNs Obj. ¶¶ 2, 4.) No cases, and no logic, support these contentions.

---

[1] The JSNs claim that section 363, rather than Rule 9019, is the substantive provision that gives the basis for approval of a settlement. But that view was rejected by the Second Circuit in *Iridium*, which noted that Rule 9019 is "unique in that it does not have a parallel section in the Code." *Iridium*, 478 F.3d at 461. Therefore, it is not true that the Court can "only" approve the settlement if "each of the settling Debtors can satisfy its respective burden under section 363 of the Bankruptcy Code." (*See* JSNs Obj. ¶ 8.)

3

A.     *Augie/Restivo* **Does Not Apply to the Debtors' 9019 Motion.**

The JSNs' objection misstates the holding, and application, of *Augie/Restivo*. On its face, of course, *Augie/Restivo* bears no resemblance to this case. *Augie/Restivo* did not involve a Rule 9019 motion for approval of a settlement. Instead, it involved a bankruptcy court's decision to substantively consolidate two debtors involved in the wholesale bakery business. *Augie/Restivo*, 860 F.2d at 516. The Second Circuit concluded that substantive consolidation was inappropriate because creditors did not deal with the two bakeries as "a single economic unit," and the two bakeries did not completely "commingle" their assets. *Id*. at 518-19. The circuit court also rejected an argument that a failed merger between the two bakeries justified substantive consolidation. *Id.*

The Debtors here have not sought substantive consolidation. Nor does their 9019 motion have anything to do with the commingling of assets or claims. The JSNs, therefore, misapply *Augie/Restivo* when they argue that "when analyzing the propriety of this settlement the Court must do so on an estate-by-estate basis." (JSNs Obj. ¶ 9.) And they misstate the law when they argue that, in a 9019 settlement context, "*Augie/Restivo* stands for the important proposition that [every debtor and creditor] must be considered when analyzing a transaction involving multiple Debtors." (*Id*.) *Augie/Restivo* does no such thing.

The Debtors' 9019 motion is governed by the factors set out in *Iridium* and similar cases. None of those cases, to the Debtors' knowledge, cites *Augie/Restivo* or requires an "estate-by-estate" analysis of a proposed settlement. In fact, courts routinely grant 9019 motions involving multiple debtors without performing a debtor-by-debtor, or creditor-by-creditor, analysis. *See, e.g.*, *In re Chemtura Corp.*, 439 B.R. 561, 593-608 (Bankr. S.D.N.Y. 2010) (9019 settlement approved for twenty-eight debtors without an estate-by-estate analysis); *In re Capmark Fin. Group Inc.*, 438 B.R. 471, 514-520 (Bankr. D. Del. 2010) (9019 settlement approved as in the

4

best interests of forty-five debtors; no estate-by estate-analysis). Indeed, the JSNs do not cite—and the Debtors have been unable to locate—a single case in which an estate-by-estate analysis was conducted in connection with a 9019 motion.

Of course, the proposed RMBS settlement, even when analyzed on an "estate-by-estate" basis, does not " 'sacrific[e] the rights' of creditors," as the JSNs claim. (JSNs Obj. ¶ 9.) The settlement agreement allocates the proposed $8.7 billion allowed claim based on which of the Debtors sold or issued the securities sold to participating trusts. (*See* Part I.B., below.) The JSNs acknowledge that the "precise amount and allocation of the Allowed Claim is . . . driven primarily by the identity of the RMBS Trusts ultimately opting into each of the RMBS Trust Settlement Agreements." (JSNs Obj. ¶ 25.) There is, therefore, a clear framework in place regarding allocation of the allowed claim, and that allocation will be fair on an "estate-by-estate" basis.

**B.    The Settlement Reasonably Allocates the Allowed Claim Among the Debtors.**

The JSNs complain that the settlement agreement "fails to map the allocation of allowed claims between GMAC Mortgage and RFC—the two potential Debtor defendants in any RMBS litigation." (JSNs Obj. ¶ 2.) That is not correct.

The proposed settlement allows a single "general unsecured claim of $8,700,000,000" in the aggregate against the Seller Entities and the Depositor Entities, which together constitute all of the Debtors except ResCap LLC. (Exs.[2] 1 and 2 at § 5.01.) Each participating trust, in turn, will be allocated a share of the allowed claim, but only "against its Seller Entity and its Depositor Entity." (*Id.*, § 6.01.) Those terms are defined to mean the entities that the governing agreements for each trust define as the "Seller" or "Company" for that particular trust. (*Id.* §§ 1.03, 1.16.)

---

[2] "Ex. __" refers to the exhibits attached to the Declaration of LaShann M. DeArcy, dated March 15, 2013.

5

As a result, the agreement effectively allocates the allowed claim among the Debtors based on their origination and sale of securities to participating trusts. Each of the Debtors will be liable for only a portion of the allowed claim, and will be liable only to the trusts for which each debtor acted as a seller or depositor. The amount of each debtor's share of the aggregate allowed claim will be determined by adding up the claims of the individual trusts for which each debtor acted as a seller or depositor.

This allocation formula is eminently sensible—liability will be directly linked to each debtor's role in selling or originating mortgage loans to each participating trust. That is precisely what would happen if participating trusts were to commence litigation—each trust would sue the entities that originated and sold mortgage-backed securities to that particular trust. That the precise allocation amounts are not presently known is of no moment; it is enough that the allocation formula is fair and clear. "An allocation formula need only have a reasonable [and] rational basis" in order to be "fair and adequate." *In re Warner Chilcott Ltd. Sec. Litg.*, No. 06 Civ. 11515 (WHP), 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009); *see also In re Giant Interactive Group, Inc.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[a]n allocation formula need only have a reasonable rational basis, particularly if recommended by experienced and competent class counsel"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 479 (S.D.N.Y. 2009) (same); *accord Bezio v. General Elec. Co.*, 655 F. Supp. 2d 162, 167 (N.D.N.Y. 2009). The allocation formula set forth in the settlement meets this standard.

The JSNs argue, however, that the allowed claim will be allocated by a "non-judicial officer," or what the settlement agreement calls a "qualified financial advisor." (JSNs Obj. ¶ 25.) But this sort of delegation is completely proper under law. The parties need only ensure that "all those persons to whom duties have been delegated do their jobs right." *In re Abraham*, 163 B.R.

6

772, 779 (Bankr. W.D. Tex. 1994). Moreover, the qualified financial advisor must operate under a stringent financial formula. Exhibit B to the settlement agreement, which details the allocation formula, explains how each trust will be awarded a share of the allowed claim based on its share of the overall "Net Losses" incurred by all participating trusts. (Exs. 1 and 2 at Ex. B.) The advisor's main function will be to estimate total "Net Losses." But the parties have already done those calculations in connection with the Debtors' motion without any controversy. The JSNs overstate the case, then, when they suggest the qualified financial advisor will have free rein to allocate the allowed claim among participating trusts.

        C.        **The Settlement Need Not be Signed and Voted on Separately by Each Debtor's Directors.**

According to the JSNs, "GMAC Mortgage and RFC . . . have never exercised any independent business judgment concerning the RMBS Trust Settlement." (JSNs Obj. ¶ 21.) As evidence of this supposed failure, the JSNs note that the settlement agreements were not separately signed by each of the fifty-one Debtors, and were not voted on and approved by each of the fifty-one Debtors' boards of directors. Instead, as the JSNs note, the settlement was approved and executed by ResCap LLC, acting "for itself and its direct and indirect subsidiaries." (*See* JSNs Obj. ¶ 26.)

That was entirely appropriate. Prior to the filing of ResCap LLC's petition in bankruptcy, each of the subsidiaries' directors owed fiduciary duties solely to ResCap LLC, the subsidiaries' sole member (or owner). *See Feely v. NHAOCG, LLC*, No. C.A. 7304-VCL, 2012 WL 6840577, at *8 n. 1 (Del. Ch. Nov. 28, 2012) (*quoting In re Atlas Energy Res. LLC*, No. CIV. A. 4589-VCN, 2010 WL 4273122, at *6 (Del. Ch. Oct. 28, 2010)) ("'in the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors . . . apply in the [LLC] context'"); *Bay Ctr. Apartments Owner, LLC v.*

7

*Emery Bay PKI, LLC*, No. C.A. 3658-VCS, 2009 Del. Ch. LEXIS 54, at *26 (Del. Ch. Apr. 20, 2009) ("the manager of an LLC owes the traditional fiduciary duties of loyalty and care to the members of the LLC"). Moreover, when one company wholly owns another, "the directors of the subsidiary are obligated to manage the affairs of the subsidiary in the best interest only of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *see also Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004).

The directors of ResCap LLC's subsidiaries thus had only one proper objective—to further the interests of ResCap LLC. The directors of those subsidiaries could not reasonably have acted contrary to ResCap LLC's express desire to enter into the RMBS settlement.[3] ResCap LLC and each of its subsidiaries had identical interests. ResCap LLC's board thus acted properly when it approved the settlement on behalf of its subsidiaries.

The JSNs acknowledge these rules. (JSNs Obj. ¶¶ 17, 23, *citing CML V, LLC v. Bax*, 28 A.3d 1037, 1046 (Del. 2011) (only "members" have standing to assert derivative claims against directors of limited liability company); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007) (directors of limited liability company do not owe duties to creditors except by contract). The directors of ResCap LLC's many subsidiaries were thus obligated to act in the best interests of ResCap LLC, their corporate parent. Accordingly, at the time the settlement agreement was approved, the directors of all the Debtors were compelled to pursue the same interests—the interests of ResCap LLC. The directors of ResCap LLC, of course, concluded that the proposed settlement is in the best interests of the Debtors. (Debtors'

---

[3] Indeed, the JSNs assert that any approval of the settlement by ResCap LLC's subsidiaries would "have been legally deficient as a matter of state and federal law." (JSNs Obj. ¶ 23.) The JSNs cannot explain why each of ResCap LLC's subsidiaries were required to separately approve and execute the settlement if, as the JSNs contend, those approvals would have been "legally deficient."

8

Reply Br. re non-*Iridium* Factors at 3-13; *see also* Ex. 4 at 205:13-207:13 ("Well, I feel like the deals we struck were for everybody. And all of us, not only ResCap, but all of its subsidiaries got the same deal. So I was focused on getting the same deal for everybody"); *Id.* at 143:21-22 ("[w]e tried to get the best deal we could for all parties concerned"); Ex. 5 at 56:9-57:12 ("we have a duty of care and duty of loyalty to ResCap and all its affiliates or subsidiaries [a]nd we needed to consider all creditors when making any decision").)

There was no need, moreover, for each of the fifty-one Debtors to separately approve and sign the settlement. The settlement was approved unanimously by the directors of ResCap LLC. Most of the subsidiaries' boards are staffed, either completely or in part, by the very same directors. Two of the three directors of GMAC Mortgage are also ResCap LLC directors. And both of RFC's two directors are directors of ResCap LLC. Moreover, all of the directors of GMAC Mortgage and RFC were present at the May 13 board meeting at which the settlement was approved (along with a number of other critical pre-petition resolutions). (Ex. 11 at RC-9019_00054008.) None of those directors voiced any objection. Therefore, ResCap LLC could have complete confidence that it acted with authority when it approved the settlement on its own behalf and on behalf of these wholly owned subsidiaries.

The board's resolutions bear this out. They reflect that ResCap LLC's directors considered the impact of the settlement on each of the Debtors in deciding to approve the settlement: ███████████████████████████████████████████████

(Ex. 11 at RC-9019_00054016; Ex. 3.)[4]

---

[4] In any event, the Court may excuse a minor and technical disregard of corporate formalities: "[a]s a court of equity, the bankruptcy court has the power to excuse compliance with corporate governance rules that threaten the entity's reorganization or risk harming creditors and other interested parties." *Topwater Exclusive Fund III, LLC v. SageCrest II, LLC* (*In re SageCrest II, LLC*), Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 U.S. Dist. LEXIS 3517, at *16 (D. Conn. Jan. 14, 2011).

9

## II. THE SETTLEMENT PROVIDES IMPORTANT BENEFITS TO RESCAP LLC.

The JSNs' second group of criticisms focuses on the benefits of the settlement to ResCap LLC. The JSNs complain that "the extent of HoldCo's potential liability is completely unresolved," and "HoldCo actually receives no benefit." (JSNs Obj. ¶¶ 2, 5.) These arguments show a degree of confusion regarding the terms and consequences of the proposed settlement.

The JSNs assert that ResCap LLC "receives no benefit" under the settlement, largely because it will not receive a release under the proposed settlement. (JSNs Obj. ¶¶ 2, 5, 29, 32.) This should not be surprising. After all, as the JSNs acknowledge, ResCap LLC's two operating subsidiaries—GMAC Mortgage and RFC—"are the principal targets of any claims for breach of representations and warranties." (JSNs Obj. ¶ 21.) Indeed, the JSNs admit that ResCap LLC "could not expect to have any contractual liability whatsoever on the Rep and Warranty Claims and could only theoretically be exposed to veil piercing-type claims." (*Id*. ¶ 29.) ResCap LLC is not injured by not receiving a release when it could not have "any contractual liability whatsoever" and could be "only theoretically" liable on indirect liability theories. The current structure of the settlement thus accords exactly with the practical allocation of liability to the operating entities which were the contracting parties with investors.

Moreover, ResCap LLC is a holding company. Its only assets are its ownership interests in its subsidiaries. ResCap LLC thus has no meaningful way to respond to claims against it, and any "veil-piercing" claim against it will have little or no value.

The odds of ResCap LLC being required to respond to litigation, after a settlement in favor of all its subsidiaries has been approved, are quite low. No rational actor would pursue difficult alter ego or "veil-piercing" claims against an entity with no assets. The settlement thus

dramatically lowers the risk of litigation over representation and warranty claims, which inures to the benefit of ResCap LLC as well as the settling subsidiaries.

In addition, it is not true that a parent company receives no benefit when its subsidiaries end expensive litigation and receive full releases. "[T]he subsidiary corporation is an asset of the parent corporation, and what benefits the asset will ordinarily accrue to the benefit of its owner." *In re Royal Crown Bottlers of N. Alabama, Inc.*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982); *see, e.g.*, *Johnson v. First Nat'l Bank*, 81 B.R. 87, 89 (Bankr. N.D. Fla. 1987) ("[a] loan to a subsidiary corporation will almost always confer a benefit on the parent or stockholders of the corporation since they are the indirect beneficiaries of anything of value coming to the corporation"); *Coleman, III v. Zurich Am. Ins. Co.* (*In re Darrow Auto. Group, Inc.*), No. 09-11228, 2011 WL 1321504, at *6-7 (Bankr. S.D. Ga. Mar. 29, 2011).

The largest creditor constituency, by far, is the group of trusts, and investors, holding representation and warranty claims against the Debtors. The litigation costs, both direct, in terms of estate assets, and indirect, in terms of recourse allocation, management distraction, etc., of litigating those claims, would be massive. (*See* expert reports of Messrs. Nolan and Lipps, Exs. 9, 10, and 11.) Those costs would be borne by the Debtors' estates, including ResCap LLC. Just the costs of retaining counsel, experts, consultants, and employees to respond to discovery requests, would wring tens of millions of dollars from the estates. ResCap LLC benefits from a fair and reasonable settlement that allows it to avoid all these costs and expenses.

But the biggest benefit to ResCap LLC was its ability to sell, for $3 billion, the Debtors' mortgage origination and servicing business. Until the Debtors did it, no bankrupt mortgage origination and servicing business had been sold, out of bankruptcy, as a fully functioning and operating business. The proposed RMBS settlement was a key component of this successful

11

sale. Because of the settlement, the RMBS trustees agreed not to object to the assignment of pooling and servicing agreements free and clear of representation and warranty claims. Because of the settlement, the trustees agreed to defer, and cap the amount of, their cure claims. Because of the settlement, Ocwen, the winning bidder, agreed to pay a purchase price well in excess of expectations and far above what it would have offered had it faced a contested hearing, unlimited cure claims, and opposition from the RMBS trustees. The settlement also paved the way for the Debtors' DIP financing, its stalking-horse bid from Ally, and other benefits.

The JSNs also complain that the settlement currently provides that ResCap LLC will give releases to its subsidiaries of claims arising under the governing agreements. (JSNs Obj. ¶ 32.) The JSNs claim these releases are "potentially significant," although they do not explain how. In any event, the Debtors are willing to revise the settlement agreement to eliminate this provision.

Finally, the JSNs attack the process by which the so-called "HoldCo election" was added to the settlement by amendment. (JSNs Obj. ¶ 30.) They complain the amendment was "never presented for approval to the board of HoldCo." (*Id.* ¶ 31.) But the board's approval was not required. And the board was fully informed, both by email and, later, in a presentation to the board. (Ex. 6; Hamzehpour at __; Marano at __.)

### III.  THE ALLOWED CLAIM SHOULD NOT BE SUBORDINATED.

The JSNs ask the Court to preserve their right to seek subordination of the allowed claim. (JSNs Obj. ¶¶ 34-48.) The Debtors agree that subordination need not be addressed as part of the settlement approval process. (*See* Debtors' Reply Br. re Non-*Iridium* Factors at 26-27.) But it is not as simple as that.

The Debtors understand that the investors, and the RMBS trustees, analyzed the proposed settlement with the expectation that the allowed claim would not be subject to subordination. So while it is true that, as the JSNs note, "the Settling Investors did not negotiate for language that

12

the Allowed Claim would expressly not be subject to disallowance or subordination," the threat of subordination may cause certain RMBS trustees to decide to opt out of the settlement. (*See* JSNs Obj. ¶ 34.) Uncertainty and confusion about subordination could improperly prejudice the RMBS trustees' decisions regarding participation in the settlement.

Moreover, the JSNs' analysis of the subordination issue is off base. According to the JSNs, the proposed allowed claim "easily falls within" the subordination language of Section 510(b) of the Bankruptcy Code. (JSNs Obj. ¶ 39.) The Debtors believe the allowed claim easily falls *outside* section 510(b)'s purview.

Section 510(b) says a claim "for damages arising from the purchase or sale of" a "security of the debtor or of an affiliate of the debtor" "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b). The JSNs acknowledge the "arising from the purchase or sale" requirement. (*See* JSNs Obj. ¶¶ 36, 39.) But they fail to demonstrate that the allowed claim falls within that requirement.

The claims asserted by the investors do not arise out of the purchase or sale of securities because they arise out of a sale of mortgage loans, not securities. The investors' claims do not arise from the issuance of trust certificates, but rather from contractual representations and warranties made in connection with the deposit of mortgage loans into the trusts. The JSNs argue that the investors' claims involve securities because "the related RMBS certificates or bonds deposited into each RMBS Trust constitute 'securities' for purposes of Section 510(b)." (JSNs Obj. ¶ 36 n.25.) But no "RMBS certificates or bonds" were ever deposited into the trusts. The financial assets deposited into the trusts were mortgage loans, in transactions unrelated to the issuance of certificates, or "securities," that were later sold to investors.

13

The JSNs' argument fails for another reason. The JSNs acknowledge they must show the investors' claims arise "from the purchase or sale" of a security, but they ignore the actual nature of the investors' claims. The investors' claims arise, not from the initial purchase of securities, but from the Debtors' alleged failure to honor their "repurchase or replace" obligation with respect to non-conforming loans. The JSNs thus argue that the test is met because the allowed claim "would be the direct result of, and intended to compensate for, damages sustained on account of having purchased the RMBS." (*Id*. ¶ 39.) But, in so arguing, the JSNs subtly twist the language of section 510(b)—from "arising from" to "on account of"—in a way that does violence to the statutory intent.

Section 510(b) does not reach—and was never intended to cover—claims resulting from the ownership of securities. It only covers claims "arising from the purchase or sale" of securities. There is a huge difference. Under the JSNs' formulation, anyone who once "purchased" securities and, at any later point in time, suffered damages because of that ownership, would be subject to subordination. That is because, under the JSNs' formulation, those damages would have been "sustained on account of having purchased the RMBS." (*Id*. ¶ 39.) This formulation completely divorces the damages claim from the "purchase or sale" requirement of section 510(b).

The claims covered by the proposed settlement do not "arise out of the purchase or sale" of securities. This can be seen from the original demand letters sent by the investors as well as from the releases contained in the settlement agreement. The initial demand letter from the institutional investors, for example, focused on alleged breaches of contract, not claims arising from the purchase or sale of RMBS securities:

> Our clients believe that large numbers of ineligible loans were sold
> or deposited into, and remain in, the RMBS pools securing the

14

> certificates. Under the governing agreements, Ally has substantial repurchase liability for such loans. Our clients further believe that Ally's failure to observe and perform the covenants and agreements imposed on it by the governing agreements, and to meet its duty to prudently service those mortgages, may constitute a servicer event of default under the governing agreements.

(Ex. 7 at II_RESCAP0000088.) Similarly, the settlement agreement releases claims "that arise under the Governing Agreements," including claims arising from "the origination and sale of mortgage loans to the" participating trusts and the "servicing of the Mortgage Loans" by the Debtors. (Exs. 1 and 2 at § 7.01.) These alleged claims do not arise out of the purchase or sale of securities. Instead, they center on the Debtors' contractual "repurchase" obligation and post-securitization servicing obligations. Indeed, the settlement plainly carves out securities claims from its scope. Securities claims, of course, are the quintessential claims "arising from the purchase or sale of" securities that are subject to subordination under section 510(b).

The JSNs nevertheless argue that the investors' contract claims are based on the same representations and warranties as would underlie a securities claim, and therefore should be subject to subordination just like a securities claim. (JSNs Obj. ¶¶ 41-44.) It is, of course, true that a breach of contract claim based on a failure to repurchase or replace non-conforming mortgage loans will share some basic facts with a securities claim based on allegedly misleading representations and warranties about the characteristics of mortgage loans underlying a securitization. So what? The claims also have many differences, including the legal theories, available defenses (such as loss causation and statute of limitations), and different available remedies. Section 510(b), moreover, does not provide for subordination of claims arising from the purchase or sale of securities and all other claims based on similar facts and occurrences.

15

## CONCLUSION

The JSNs do not offer any new argument against approval of the RMBS settlement. They do not contest the fairness or reasonableness of the proposed $8.7 billion allowed claim, and their arguments regarding the allocation of that claim, and the process by which it was approved, should be rejected.

Dated: New York, New York
March 15, 2013

MORRISON & FOERSTER LLP

By: /s/ Darryl P. Rains
Gary S. Lee
Anthony Princi
Darryl P. Rains
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and Debtors in Possession*