# Exhibit 10

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------
| )
In re: | ) | Case No. 12-12020 (MG)
| )
RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11
| )
Debtors. | ) | Jointly Administered
| )
--------------------------------------------------------

## SUPPLEMENTAL DECLARATION OF JEFFREY A. LIPPS

I, Jeffrey A. Lipps, declare:

1.      I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215 (the "Firm").

2.      I have over thirty years' experience as a trial lawyer representing and counseling clients in complex commercial litigation matters, including commercial disputes, class action litigation, securities litigation, procurement matters, and bankruptcy litigation. I have handled cases in state and federal courts in over a dozen states. I was a partner at Jones Day before becoming a founding partner in my current firm, which is a litigation boutique with a national practice.

3.      I currently represent or have represented over the past several years a number of the debtor entities, four non-debtor affiliated entities, and several individual former directors and officers of debtor entities in over a dozen separate lawsuits involving the debtor entities' issuance of residential mortgage-backed securities. I have been representing various defendants in these matters since the spring of 2010.

4.      In addition to the cases in which the Firm is involved, I am also aware that there are additional lawsuits regarding the debtor entities' issuance of residential mortgage-backed securities that also name several debtor entities, non-debtor affiliates, and/or former directors and

officers. Although the Firm does not represent the defendants in those actions, I am aware of the cases, the plaintiffs' allegations, and the causes of action asserted against the defendants.

5.      A number of the lawsuits in which I represented the Debtors before the filing of the bankruptcy petition asserted various claims for breaches of representations and warranties made by various Debtor entities relating to the loans that form that collateral for the residential mortgage-backed securities, as well as claims for failure to repurchase any such breaching loans.

6.      These claims arise out of the same or substantially similar contract language to that giving rise to the claims at issue in the Third Amended and Restated RMBS Trust Settlement Agreements, dated as of September 21, 2012 between Residential Capital LLC and its direct and indirect subsidiaries, on the one hand, and two separate groups of institutional investors (the "RMBS Trust Settlements"). In fact, the securities at issue in the cases I handled are included in the RMBS Trust Settlements.

7.      Specifically, *MBIA Insurance Co. v. Residential Funding Company, LLC*, No. 603552/2008 (N.Y. Sup. Ct.) (involving five securitizations), *MBIA Insurance Co. v. GMAC Mortgage, LLC*, No. 600837/2010 (N.Y. Sup. Ct.) (involving three securitizations), *Assured Guaranty Mutual Corp. f/k/a Financial Securities Assurance Inc. v. GMAC Mortgage LLC et al.* No. 12-cv-03776-JPO (involving two securitizations), and the 12 cases brought by FGIC against various Debtor and affiliated entities (involving 20 securitizations, and coordinated before Judge Crotty under the lead case *FGIC v. GMAC Mortgage, LLC*, No. 11-CV-09729-PAC (S.D.N.Y.)) all involved claims of breaches of representations and warranties, and related claims of alleged failure to repurchase loans pursuant to the terms of the applicable contracts. Our Firm was counsel of record in all but the *Assured Guaranty* case, which was filed on the eve of the filing of the Debtors' bankruptcy petitions and not served until after those filings.

2

8.      In addition, the Debtors frequently called upon me and my Firm to evaluate various issues relating to repurchase demands or alleged breaches of representations and warranties that were not yet in litigation.

9.      As part of our Firm's representation of the Debtors in these matters, I have conducted extensive factual and legal analysis of the claims and defenses in these types of "representation and warranty" cases, monitored the development of the law around the country in this area of the law, and assessed the Debtors' exposure in these types of cases.  This analysis has included close review of the publicly available papers relating to similar RMBS representation and warranty settlements, including the Bank of America and Lehman Brothers settlements.

10.     I am also deeply familiar with the Debtors' history and practices with respect to RMBS securitizations.  As detailed in my May 24, 2012 Declaration, the parties in the two MBIA cases engaged in extensive fact discovery involving the exchange and analysis of millions of pages of discovery material and the completion of dozens of depositions as of the petition date, and had begun exchanging initial expert reports in the *MBIA v. Residential Funding Company* case.  In addition, we had evaluated and made initial letter submissions in the *FGIC* group of cases relating to motion to dismiss arguments, and FGIC, likewise, had submitted a letter outlining a proposed early summary judgment motion.

11.     Because of my experience with these types of representation and warranty claims – and, specifically, those asserted against the Debtors – I was asked by Morrison & Foerster to evaluate the reasonableness of the Debtors' settlement of such claims relating to 392 mortgage-backed securitization trusts upon the terms set forth in the RMBS Trust Settlements.  Based on my review of the settlement terms, my extensive knowledge of the types of claims and defenses at issue and the strengths and weaknesses in the applicable law, and my familiarity with the

3

strengths and potential weaknesses in the Debtors' defense of the claims, it is my opinion that the RMBS Trust Settlement resolves the potential claims against the Debtors in a reasonable and fair range.

12. The bases for my conclusion are outlined below.

## I.    OVERVIEW OF POTENTIAL CLAIMS

13. Claims for breaches of loan-level representations and warranties, such as those to be resolved by the RMBS Trust Settlements, generally arise out of the applicable Pooling and Servicing Agreement, Assignment and Assumption Agreement, or another applicable sale agreement (for purposes of this Declaration, "Sale Agreements") between the appropriate Debtor entity and the Trust to whom the Debtor is selling the loans.

14. These Sale Agreements typically contain or incorporate by reference a list of fairly standard representations and warranties about the loans in the collateral pool underlying the securitization. These may be representations about the pool of loans generally – for example, "97.5% of the loans in this securitization are actuarial mortgage loans, on which 30 days of interest is owed each month irrespective of the day on which the payment is received" or "no more than 25.0% of the loans are secured by Mortgaged Properties located in California", or they may be representations that apply to each and every loan in the pool, such as "All of the loans in the pool were originated in compliance with applicable state and federal law."

15. As discussed in greater detail below, additional insight regarding the interpretation of certain representations and warranties may be found in other, related transaction documents, such as the Prospectus and Prospectus Supplement.

16.     The representations and warranties most commonly claimed to have been breached in the various lawsuits that have been filed, both against the Debtors and against others, include:

    a.  Representations relating to compliance with Underwriting Guidelines;

    b.  Representations relating to compliance with state and federal law;

    c.  Representations relating to the accuracy of Loan-to-Value (LTV) or Combined Loan-to-Value (CLTV) information;

    d.  Representations relating to appraisals or the qualifications of appraisers;

    e.  Representations relating to the accuracy of Owner/Occupancy information;

    f.  Representations relating to the completeness of Loan Files; and

    g.  Representations relating to the accuracy of loan information on the Mortgage Loan Schedule or loan tapes provided in connection with the securitization.

17.     In addition to these claims for breach of the applicable representations and warranties, plaintiffs in representation and warranty litigation have often engaged in a pre-litigation negotiation process, pursuant to the repurchase process outlined in the applicable contract documents.

18.     Specifically, the transaction documents provide that, "upon discovery" of a breach of a representation or warranty, the Seller (here, the Debtor entity selling the loans to the Trust for each securitization) is obligated to repurchase or substitute Mortgage Loans sold to a Trust that breach the stated representations and warranties and "materially and adversely" affect the Certificateholders' interest in those Loans.  The substitution and cure remedies are limited, leaving repurchase of the loan as the primary remedy once the securitization has been in the market for some period of time.

19.     Under the contract documents, the Trustee for each Trust is the party authorized to pursue claims for breaches of representations and warranties.  In the case of pools wrapped by

insurance from a monoline insurer, the insurer will also have certain contractual rights to enforce breaches of representations and warranties regarding the mortgage loans.

20.     Although the right to request repurchase belongs in the first instance to the Trustees, the contract documents provide that investors with substantial holdings in a given class of certificates – typically, 25% – have the ability to direct the Trustees to take action with respect to such repurchase demands, including, if necessary, pursuing litigation against the Debtors for alleged breaches of either the representations and warranties themselves, or the obligation to repurchase a loan "upon discovery" that it does not comply with the representations and warranties.[1]

## II.     ELEMENTS OF THE CAUSE OF ACTION

21.     The claims to be asserted by the Trustees, at the direction of the Institutional Investors who are parties to the RMBS Trust Settlements, are primarily breach of contract claims.[2] There are two basic contract causes of action that may be asserted:  one for breaches of

---

[1]     The Institutional Investors themselves are likely barred from pursuing a direct action against the Debtors themselves by contractual "no action" clauses that require them to work through the Trustees, at least in the first instance. *See, e.g., Walnut Place LLC v. Countrywide Home Loans, Inc.*, 35 Misc. 3d 1207A (N.Y. Sup. Ct. 2012), *aff'd* 96 A.D.3d 684, 948 N.Y.S.2d 580, 581 (N.Y. App. Div. 1st Dept. 2012).

[2]     It is possible the Institutional Investors and/or Trustees would attempt to assert related tort claims, such as negligent misrepresentation or fraud.  As to negligent misrepresentation, however, New York requires a showing of a "special relationship of trust" between the parties that would warrant the Trustees relying on the Debtors' statements without question.  Courts have regularly rejected such claims as to the monoline insurers, which are similarly situated to the Trustees in terms of the arm's length contractual relationship to the Debtors and the information provided to them by the Debtors. *See, e.g., MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 928 N.Y.S.2d 229, 235-36 (N.Y. App. Div. 1st Dep't 2011) (upholding dismissal of negligent misrepresentation claim because no special relationship of trust or uniquely superior knowledge was established); *MBIA Insurance Corp. v. Residential Funding Company, LLC,* 26 Misc. 3d 1204A, 906 N.Y.S.2d 781, 781 (N.Y. Sup. Ct. 2009) (same).  As to fraud, similarly, the Trustees would need to establish the additional elements of scienter and justifiable reliance. *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 941 N.Y.S.2d

the representations and warranties made in the Sale Agreements themselves, and one for breach

of the obligation to repurchase defective loans that is triggered by the discovery of a breach of

representation or warranty.  Although distinct causes of action, both types of claims turn on the

question of whether a given loan breached one or more contractual representations or warranties.

22.     If the Institutional Investors or Trustees were to pursue litigation of the claims, the

elements they would need to prove include that (1) an agreement existed, (2) the agreement was

breached, (3) the breach was material, (4) the breach caused harm to the plaintiff, and (5) the

Institutional Investors suffered damages as a result.

23.     Because of the complex structure of the RMBS offerings, each of these elements

poses unique legal and evidentiary challenges, many of which have not fully developed in a

definitive way in the case law to date, and none of which have been litigated to resolution with

respect to the Debtors specifically.  I evaluate each element in more detail below, and explain

why I have concluded that there is sufficient uncertainty and risk in the outcome of these claims

to support the conclusion that the proposed settlement is reasonable.

A.     **Scope of Representations and Warranties**

24.     Although the representations and warranties for each securitization are spelled out

in a clearly identifiable section of the Sale Agreements, there remains ambiguity and dispute

about the scope of some of the representations.  Accordingly, the fundamental question of

---

59, 65 (N.Y. App. Div. 1st Dep't 2012) (collecting cases holding no justifiable reliance as to fraud claims arising from sale or agreement to provide insurance for securities where plaintiff was sophisticated, understood and accepted the risks, and could conduct its own independent investigation into the accuracy of defendant's representations before agreeing to purchase or provide insurance); *see also CIFG Assur. N.A., Inc. v. Goldman Sachs Mortg. Co.*, 2012 N.Y. Misc. LEXIS 3986, at *29-33 (N.Y. Sup. Ct. May 1, 2012) (same).  In either case, the Trustees' and Institutional Investors' burden of proof would be greater than it is for breach of contract claims.  Moreover, the Debtors would argue that any tort claims relating to the representations and warranties are duplicative of breach of contract claims.  Accordingly, I have focused my analysis on the riskiest claims for the Debtors, which are the breach of contract claims.

whether the Debtor had even made an actionable representation may be disputed, and subject to

uncertainty as to how a court might rule.

25.     Some of the representations and warranties that pose potential interpretive issues

with respect to the Debtors' Sale Agreements include (for example):

a.  "The appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in the Program Guide." 2005-EMX3 Assignment and Assumption Agreement, Sec. 4(xi)

b.  "The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects as of the date or dates which such information is furnished." *Id.* at 4(xv);

c.  "The weighted average Loan-to-Value Ratio with respect to the Mortgage Loans, by outstanding principal balance at origination, is 83.80%." *Id.* at 4(xviii);

d.  "Approximately 93.87% of the Mortgaged Properties (by outstanding principal balance as of the Cut-off Date) are secured by the owner's primary residence. Approximately 3.69% . . . of the Mortgaged Properties . . . are secured by the owner's second or vacation residence. Approximately 2.44% of the Mortgaged Properties . . . are secured by a non-owner occupied residence." *Id.* at 4(xxiii)

e.  "[T]here is no default, breach, violation or event of acceleration existing under any Mortgage Note or Mortgage and no event which, with notice and expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration . . . ." *Id.* at 4(xxviii)

f.  "Each Mortgage Loan as of the time of its origination complied in all material respects with all applicable local, state and federal laws, including, but not limited to, all applicable predatory lending laws." *Id.* at 4(xlvii)

g.  "The originator of [the relevant Loans] offered the related borrower mortgage loan products for which the borrower qualified and we are not aware that the originator encouraged or required the borrower to select a mortgage loan product that is a higher cost product designed for less creditworthy borrowers." 2007-KS3 Assignment and Assumption Agreement at 4(liv)

h.  "The originator of [the relevant Loans] adequately considered the borrower's ability to make payments by employing underwriting techniques that considered a variety of factors, such as: the borrower's income, assets and liabilities, and not solely the collateral value, in deciding to extend the credit at the time of origination." *Id.* at 4(lv)

     i.   "With respect to each Mortgage Loan originated under a 'streamlined' Mortgage Loan program (through which no new or updated appraisals of Mortgaged Properties are obtained in connection with the refinancing thereof), the related Seller has represented that either (a) the value of the related Mortgaged Property as of the date the Mortgage Loan was originated was not less than the appraised value of such property at the time of origination of the refinanced Mortgage Loan or (b) the Loan-to-Value Ratio of the Mortgage Loan as of the date of origination of the Mortgage Loan generally meets the Company's underwriting guidelines."   2006-QS5 Series Supplement to Standard Terms of Pooling & Servicing Agreement, at 2.03(b)(xv)

     j.   "No borrower . . . was charged 'points and fees' in an amount greater than (a) $1,000 or (b) 5% of the principal amount of such Mortgage Loan, whichever is greater." 2007-EMX1 Assignment and Assumption Agreement, at 4(liv)

     k.   "No fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan." *Id.* at 4(lx).

     l.   "There is no right of rescission, valid offset, defense, claim or counterclaim of any obligor under any Mortgage Note or Mortgage . . . ."   2006-HSA2 Home Equity Loan Purchase Agreement at 3.1(b)(iii)

     m.   "For each [relevant] Loan, the related Mortgage File contains or will contain each of the documents and instruments specified to be included therein" *Id.* at 3.1(b)(vi)

     n.   "All of the [relevant] Loans have been underwritten in substantial compliance with the criteria set forth in the Program Guide," *Id.* at 3.1(b)(xxxvii)

     o.   "Each Subservicer meets all applicable requirements under the Servicing Agreement, is properly qualified to service the [Loans] and has been servicing the [Loans] . . . in accordance with the terms of the respective Subservicing Agreement." *Id.* at 3.1(b)(xxiii)

26.    The representations and warranties cited above are just a sampling of the variety of loan-level representations and warranties that may be at issue, and they vary from Trust to Trust, requiring that any issues as to their scope be litigated differently for different Trusts. But the examples above all present interpretive (not to mention evidentiary) issues: How will the qualifications of an appraiser be evaluated? If some number of the appraisals are deemed flawed because of unqualified appraisers (or for other reasons), how does that impact the weighted average Loan-to-Value Ratio for the collateral pool? Did the Debtors warrant the accuracy of

the underlying appraisal, or merely the accuracy of the loan-to-value calculation based on it?
What constitutes "awareness" as to whether an originator may be "encourag[ing]" a borrower to
choose one loan product over another? What does it mean for an originator to "adequately
consider" a borrower's ability to pay, and what are the Debtors actually warranting in that
regard? What does "substantial compliance" with the underwriting guidelines mean? If granting
exceptions to the requirements of published underwriting guidelines is common across the
industry, should loans with exceptions be considered in "substantial compliance"? Will those
originators be considered to have "adequately considered" the borrower's ability to pay? Is there
a threshold number of exceptions that renders the loan not substantially compliant, or
demonstrates a failure to adequately consider the borrower's ability to pay? Or could a single
exception, if the variance is large enough (say, 40 or more points on a FICO score, or 10 or more
percentage points for a DTI or LTV), be sufficient to render a given loan out of substantial
compliance? Do such deviations constitute *prima facie* evidence that an originator has not
adequately considered a borrower's ability to pay?

27.     Further complicating the issues, other materials in the package of transaction
documents relating to each Trust shed additional light on how potentially ambiguous
representations and warranties should be interpreted, including the extensive risk disclosures
included in the Prospectus and Prospectus Supplement for each securitization. For example, the
risk disclosures explain:

> a. "Generally, the [Loans] have been originated using underwriting standards
> that are less stringent than the underwriting standards applied by certain other
> [similar] loan purchase programs." 2006-HSA4 Pro. Supp. at S-13. *See also*
> 2007-EMX1 Pro. Supp. at S-19 ("The mortgage loans have been originated
> using underwriting standards that are less restrictive than the underwriting
> requirements used as standards for other first lien and junior lien mortgage
> loan purchase programs, including other programs of Residential Funding
> Company, LLC and the programs of Fannie Mae and Freddie Mac.")

b. "Applying less stringent underwriting standards creates additional risks that losses on the [loans] will be allocated to noteholders. For example, the . . . loan pool includes . . . loans made to borrowers whose income is not required to be disclosed or verified." 2006-HSA4 Pro. Supp. at S-13. *See also* 2007-EMX1 Pro. Supp. at S-19 ("Applying less restrictive underwriting standards creates additional risks that losses on the mortgage loans will be allocated to certificateholders.")

c. "[M]ortgage loans made to borrowers whose income is not verified, including borrowers who may not be required to state their income . . . may increase the risk that the borrowers' income is less than that represented." 2007-EMX1 Pro. Supp. at S-19.

d. "The basis for any statement that a given percentage of the mortgage loans is secured by mortgaged properties that are owner-occupied will be one or more of the following:

- the making of a representation by the mortgagor at the origination of a mortgage loan that the mortgagor intends to use the mortgaged property as a primary residence;

- a representation by the originator of the mortgage loan, which may be based solely on the above clause; or

- the fact that the mailing address for the mortgagor is the same as the address of the mortgaged property.

"Any representation and warranty in the related pooling and servicing agreement regarding owner-occupancy may be based solely on that information." 2007-EMX1 Prospectus at 9.

e. "In some cases, in lieu of an appraisal, a valuation of the mortgaged property will be obtained from a service that provides an automated valuation." 2007-EMX1 Prospectus at 10.

f. "Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator." 2007-EMX1 Prospectus at 11.

g. "Appraised values may be determined by either:

- a statistical analysis;

- a broker's price opinion; or

- an automated valuation, drive-by appraisal, or other certification of value." 2007-EMX1 Prospectus at 10.

11

h. "If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program. Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated." 2007-EMX1 Prospectus at 11.

i. "[S]ome mortgage loans may have been originated under 'limited documentation,' 'stated documentation,' or 'no documentation' programs that require less documentation and verification than do traiditional 'full documentation' programs. Under [these programs], minimal investigation into the mortgagor's credit history and income profile is undertaken by the originator . . . ." 2007-EMX1 Prospectus at 11.

j. "The level of review by Residential Funding Company, LLC, if any, will vary . . . [RFC] typically will review a sample of the mortgage loans purchased . . . for conformity with the applicable underwriting standards." 2007-EMX1 Prospectus at 12.

k. "[A] mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards." 2007-EMX1 Prospectus at 12.

l. "[A] mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards." 2007-EMX1 Prospectus at 12.

m. "In the case of a Designated Seller Transaction" – such as the EMX transactions – "the applicable underwriting standards will be those of the seller or of the originator of the mortgage loans . . . ." 2007-EMX1 Prospectus at 12.

n. "In addition, the depositor purchases loans that do not conform to the underwriting standards contained in the Guide." 2006-HSA4 Prospectus at 13.

o. "The underwriting standards used in negotiated transactions and master commitments and the underwriting standards applicable to loans underlying private securities may vary substantially from the underwriting standards contained in the Guide." 2006-HSA4 Prospectus at 14.

p. "Due to the variety of underwriting standards and review procedures that may be applicable to the loans included in any pool, the accompanying prospectus supplement, in most cases, will not distinguish among the various underwriting standards applicable to the loans nor describe any review for

12

compliance with applicable underwriting standards performed by the depositor or Residential Funding Corporation." 2006-HSA4 Prospectus at 14.

q. "Because an automated underwriting system will only consider the information that it is programmed to review, which may be more limited than the information that could be considered in the course of a manual review, some mortgage loans may be approved by an automated system that would have been rejected through a manual review." 2006-HSA4 Prospectus at 14.

r. "[T]here could be programming inconsistencies between an automated underwriting system and the underwriting criteria set forth in Residential Funding Corporation's Seller Guide, which could in turn be applied to numerous mortgage loans that the system reviews." 2006-HSA4 Prospectus at 14.

s. "We cannot assure you that an automated underwriting review will in all cases result in the same determination as a manual review with respect to whether a mortgage loan satisfied Residential Funding Corporation's underwriting criteria." 2006-HSA4 Prospectus at 14.

28.    The Debtors would argue that these risk disclosures must be considered when evaluating the scope and/or interpretation of the applicable representations and warranties, and that where the disclosure clearly state the data provided elsewhere in the transaction documents is less than 100% reliable, the scope and/or interpretation of the corresponding warranties is therefore more limited. *See, e.g., Assured Guar. Mun. Corp. v. Flagstar Bank*, 2011 U.S. Dist. LEXIS 102722, at *13 (S.D.N.Y. Sept. 8, 2011), amended Oct. 27, 2011 (Rakoff, J.) ("[I]t is black letter law that the provisions of a contract or a related set of contracts should be read as a whole and every effort should be made to give them consistent meaning in their overall context") (citing *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (it is a "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other," and, accordingly, "all provisions of a contract [should] be read together as a harmonious whole, if possible.")). Thus, for example, the Debtors would argue that because the risk disclosures make clear that owner-occupancy data is frequently self-reported by borrowers, and that self-reported data is the basis for the calculations provided by Debtors, it

cannot be a breach of the owner occupancy representations if it turns out some of the self-reporting was inaccurate.

29.    The Institutional Investors, however, would likely argue that regardless of their skepticism as to the quality of the underwriting or accuracy of the data supplied, the very purpose of a warranty is that it obviates the need to do additional investigating, including by probing the discrepancies between the warranties and the risk disclosures. *See CBS, Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 997, 1001-02 (N.Y. 1990); *see also Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.) ("A warranty . . . is intended precisely to relieve the promise of any duty to ascertain the fact for himself."); *Credit Suisse Secs. (USA) LLC*, 2011 N.Y. Misc. LEXIS 4787, at *17 ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or warranty] that certain facts are true, it will often be justified in accepting that representation [or warranty] rather than making its own inquiry") (citation and emphasis omitted)).

30.    To illustrate the complexity of the issue, just one of the many key potential disputes likely to be litigated for a large number of Trusts arises with respect to alleged borrower fraud. Some transactions contain an express representation that "[n]o fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan." *See, e.g.,* 2006-QS5 Assignment and Assumption Agreement at 8, § 4(hh); 2006-S12 Assignment and Assumption Agreement at 9, § 4(xxxvii). Those representations pose their own challenges in terms of determining what constitutes "fraud or misrepresentation."

31.    Many of the Debtors' securitizations, however, do not contain an express "fraud representation," but contain language in the representations and warranties that plaintiffs have argued is the equivalent of a fraud representation.

14

32.     For example, a number of the Debtors' Sale Agreements include warranties as to
the accuracy of the Mortgage Loan Schedules accompanying the Trust documents. *See, e.g.,*
2005-EMX3 Assignment and Assumption Agreement, Sec. 4(xxviii) ("The information set forth
in the Mortgage Loan Schedule with respect to each Mortgage Loan or the Mortgage Loans is
true and correct in all material respects as of the date or dates respecting which such information
is initially furnished."); 2006-HSA2 Home Equity Loan Purchase Agreement, Sec. 3.1(b)(ii)
(similar language).

33.     The Mortgage Loan Schedules vary in complexity from one securitization to the
next, but the Schedules frequently include information about debt-to-income ratios, loan-to-value
ratios, and owner-occupancy status.

34.     In many cases, particularly for securitizations on the RALI and RFMSII shelves,
the "income" data from which the "debt to income" ratio is derived is based on a borrower's
stated income, and not on W-2s or pay stubs collected as part of the loan application process.

35.     Stated income loans were clearly permitted under various of the Debtors' loan
programs and did not require verification of the borrower's actual income.  The consequence of
not requiring income documentation meant that the incomes stated by borrowers could be
inaccurate, inflated, or even fraudulent, and the Debtors may not have any express obligation to
investigate them for accuracy.   As described above, these facts were disclosed in the
Prospectuses for securitizations containing stated income loans.

36.     Plaintiffs in representation and warranty litigation have alleged that, by
representing that the Mortgage Loan Schedules were accurate, the Debtors indirectly represented
that the underlying income data were truthful and not fraudulent. *See, e.g.,* Complaint, *Fin. Ins.
Guar. Corp. v. Residential Funding Co., LLC* (No. 1:11-cv-09736-PAC) (S.D.N.Y.), Complaint

at ¶ 81, Doc. 1 ("RFC provided information to FGIC concerning Mortgage Loans . . . . This information included schedules that set forth statistics about the loan pool. The schedules purported to describe key characteristics relevant to the assessment of risk, including weighted averages of FICO scores and DTI and CLTV ratios. . . . In turn, . . . RFC represented that all the information in those schedules 'is true and correct in all material respects as of the date or dates respecting which such information is furnished.'"); First Amended Complaint, *MBIA Ins. Corp. v. Residential Funding Co., LLC*, (No. 603552/2008) (N.Y. Sup. Ct. March 19, 2010), at ¶ 57 ("RFC's breaches of its representations and warranties establish that the information conveyed to MBIA, including the schedules in the Offering Documents containing DTI and CLTV statistics for the mortgage loan pools . . . was materially false. Notably, the DTI and CLTV statistics for the mortgage loan pools contained in the Offering Documents are based on 'stated incomes' and appraisals that are grossly inflated and unreasonable.").

37.    For such securitizations, the Debtors would vigorously dispute plaintiffs' interpretation. On the contrary, the Debtors' position is that they only warranted that the data in the Schedules was consistent with the data in their records, not that it was actually true; and that if the other transaction documents disclosed a potential reason for inaccuracy in the data, such as the use of stated income underwriting, then there is no basis for interpreting the representation otherwise.

38.    Although I have been unable to locate any case law squarely addressing the correct interpretation of this representation, there is at least some risk that a Court will accept plaintiffs' arguments that, by representing the Schedules are "accurate," the Debtors could be found to have warranted the *truth* of the information contained in them. Such a conclusion could find support in general contract principles applying the "plain meaning" of contractual language,

or in extrinsic evidence if the court deems the contractual language ambiguous. *See, e.g.,*
*LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.,* 2007 U.S. Dist. LEXIS 59303,
at *21-*25 (S.D.N.Y. Aug. 13, 2007).

39.     Likewise, as the various Prospectuses and Prospectus Supplements clearly
disclose, the property value data underlying the calculation of a loan's loan-to-value ratio (as
included on a Mortgage Loan Schedule) may be derived from drive-by appraisals, automated
valuation models, or stated values, depending on the applicable underwriting guidelines for that
loan; and owner-occupancy data is typically based on what the borrower's stated intention is at
the time of loan closing, not what actually occurs (or even what the borrower actually intends).
These other aspects of the Mortgage Loan Schedules may also be subject to attack by the
Institutional Investors for alleged breach of the "accuracy" representation, depending on what re-
underwriting of the individual loan files reveals.[3]   Other data on certain Schedules may be
subject to a similar argument.   These issues are starting to be litigated in different types of
RMBS cases around the country, but no consensus has yet emerged from the courts to review
these issues. *See, e.g., Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.,* 2012 U.S. Dist.
LEXIS 121702, at *9-10 (C.D. Cal. Aug. 17, 2012) (Pfaelzer, J.) (holding issuer cannot be liable
in investor litigation for misrepresentations of owner occupancy data where information was
furnished by borrowers); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* 843 F. Supp.
2d 191, 204-05 (D. Mass. 2012) (same).

40.     As another example, for a number of Trusts, the relevant agreements included a
representation that:

---

[3]     The Debtors did not re-underwrite substantial numbers of loans in connection with
defending the pre-petition litigation matters because the bankruptcy petition was filed on the eve
of that work beginning in earnest in the first case to reach the expert phase.

> [T]here is no material default, breach, violation or event of
> acceleration existing under the terms of any Mortgage Note or
> Mortgage and no event which . . . would constitute a material
> default, breach, violation or event of acceleration under the terms
> of any Mortgage Note or Mortgage.

2005-EMX3 Assignment and Assumption Agreement, at 4(xxviii); *see also* 2006-HSA2 Home

Equity Loan Purchase Agreement, at 3.1(b)(xix).

41.     Plaintiffs in representation and warranty litigation have argued that certain

commonly-used Notes and Loan Application forms contain a promise by the borrower that the

information provided by the borrower in obtaining the loan is true.  Where borrowers make those

representations, breach of them is typically described in the loan documents as a "material event

of default."  Thus, plaintiffs argue, if a borrower lied in his or her loan application, that is a

"material event of default" and a breach of the related representation by the issuer (here, one of

the Debtors) for which the issuer should be strictly liable, regardless of whether applicable

underwriting guidelines required it to investigate the truthfulness of the statements in the loan

application and regardless of whether it knew of the borrower's fraud.

42.     There are a number of counter-arguments the Debtors could mount (and have

mounted) to such an argument, including testimony and expert opinions that such an

interpretation is contrary to the parties' intent and the industry standard interpretation of the

"material event of default" language.  However, at least some courts have agreed with the

plaintiffs' view as to this representation. *Trust for the Certificate Holders of the Merrill Lynch

Mortg. Pass-Through Certificates Series 1991-C1 v. Love Funding Corp.*, 2005 U.S. Dist.

LEXIS 23522, at *26-30 (S.D.N.Y. Oct. 7, 2005), *reversed and remanded on other grounds*, 591

F.3d 116 (2d Cir. 2010), *judgment entered on remand*, 736 F. Supp. 2d 716 (S.D.N.Y. 2010).

43.     In *Love Funding*, the Southern District of New York granted summary judgment to the Trust/plaintiff in a commercial mortgage-backed securities case for breach of a virtually identical "material event of default" representation, concluding that the seller of the loans was "strictly liable" for an event of acceleration caused by the borrower's fraud, even if the seller lacked knowledge of the fraud. *Id.* at *29-*30. *See also Citimortgage v. OCM Bancorp, Inc.*, 2011 U.S. Dist. LEXIS 45437, at *19 (E.D. Mo. Apr. 27, 2011) (holding that, regardless of whether applicable guidelines require it, underwriters must evaluate the "reasonableness" of a borrower's income in a stated income transaction).

44.     Indeed, when MBIA, in its case against RFC, sought to issue subpoenas to thousands of borrowers' employers to try to determine whether the borrowers had committed fraud, it successfully relied on this argument to obtain the discovery, notwithstanding the absence of an express fraud representation in the applicable Sale Agreements. *MBIA Ins. Corp. v. Residential Funding Co., LLC* (603552/2008), MBIA Letter To Court, Doc. 83:6-8 (N.Y. Sup. Ct. Feb. 17, 2011); *id.*, Hr'g Tr., Doc. 118 at 34:21-26, 35-38 (N.Y. Sup. Ct. Mar. 3, 2011).

45.     There are some distinguishing features to the *Love Funding* opinion that render it not directly applicable to the claims here: the defendant in that case did not dispute either (1) whether the "material event of default" representation was intended to be limited to non-payment defaults, or (2) the correctness of a prior Louisiana state court determination that the borrower's fraud at origination constituted an "event of default" under the terms of the mortgage. Thus, the arguments Debtors might advance were not specifically tested in *Love Funding*. However, the court in *Love Funding* did find that "the meaning [of the representation at issue] was unambiguous," despite the fact that the parties "urge[d] different interpretations." *Id.* at *27-28.

46.     Accordingly, there is uncertainty in the developing case law – and certainly with respect to the Debtors' specific transaction documents – as to the correct interpretation of the scope of the representations and warranties at issue in the RMBS Trust Settlement.

**B.     Existence of a Breach**

47.     The only reliable way to determine whether a loan in fact complies with an underwriting-related representation or warranty – such as those relating to loan-to-value ratios, debt-to-income ratios, borrower misrepresentations, or compliance with federal or state law, all of which are commonly alleged to have been breached – is to review and re-underwrite the actual loan files.  This task is time-consuming, expensive, and fraught with differences in judgment and opinion, as predicting or assessing a borrower's likely ability to pay in the future is not an empirical exercise.

48.     In addition to the mortgage and the note, loan files typically contain the borrower's loan application, supporting income documentation (if required), credit report, appraisals (if required), Truth In Lending Act disclosure forms, and other documents relating to the evaluation of the borrower's creditworthiness.

49.     Debtors RFC and GMAC Mortgage, who originated and/or acquired the loans prior to securitization, each published underwriting guidelines generally governing the process of evaluating whether a loan met the respective Debtor's standards.  In addition, RFC sometimes negotiated specific contracts with third party loan sellers, or negotiated purchase terms for a specific portfolio of loans, that included additional underwriting parameters.  For individual loans, Debtors RFC or GMAC Mortgage might also grant an exception to the published guidelines, depending on the circumstances of the particular loan or borrower.  These underwriting standards, including the use of exceptions and other variances from the published guidelines, are described in the Prospectus and Prospectus Supplement for each Trust.  *See*

20

Paragraph 26, *infra* (quoting underwriting disclosures from various Prospectuses and Prospectus Supplements).

50.    There are frequently ambiguities in how to determine when there has been a breach of an underwriting-related representation or warranty, and loan underwriting and the evaluation of a borrower's creditworthiness are often judgment calls.

51.    Thus, litigating the fundamental issue of whether a representation or warranty has even been breached poses evidentiary challenges and injects a high level of uncertainty into the outcome.

52.    By way of example, some of the typical underwriting-related disputes that arise in attempting to prove a breach include the following (some of which have already arisen in pre-petition litigation against the Debtors):

    a.  **Is the granting of exceptions to underwriting guidelines consistent with representations that the underwriting "substantially complies" with the published guidelines?** *See, e.g.,* First Amended Complaint, *MBIA Insurance Corp. v. Residential Funding Company, LLC* (603552/2008) Doc. 28 at ¶¶ 58, 61, 63, 68-69, 78 (N.Y. Sup. Ct. Mar. 19, 2010); Amended Complaint, *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.* (602825/2008), Doc. 9 at ¶¶ 78-79 (N.Y. Sup. Ct. Aug. 24, 2009).

    b.  **Is the purchase of loans in bulk (a practice that is common in the industry) pursuant to a negotiated set of underwriting criteria consistent with representations that the underwriting "substantially complies" with the published guidelines?** *See, e.g.,* First Amended Complaint, *MBIA Insurance Corp. v. Residential Funding Company, LLC* (603552/2008)*,* Doc. 28 at ¶¶ 62-63, 69, 78 (N.Y. Sup. Ct. Mar. 19, 2010); Amended Complaint, *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.* (602825/2008), Doc. 9 at ¶¶ 1-4 (N.Y. Sup. Ct. Aug. 24, 2009).

    c.  **Can defects in appraisals be accurately demonstrated through the use of retroactive automated valuation tools (essentially, retroactive appraisal models)?** *See, e.g.*, Amended Complaint, *Fed. Home Loan Bank of Boston v. Ally Fin. Inc.* (1:11-cv-10952-GAO), Doc. 180 at ¶¶ 877-90 (D. Mass. June 29, 2012); Amended Complaint at ¶¶ 628-35, *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Secs. Inc.*, 49D05 10 10 PL 045071 (Marion, Indiana Sup. Ct. July 14, 2011); Corrected Amended Complaint at ¶¶

619-26, *Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*, 10
CH 45033 (Circuit Court of Cook County, Illinois Apr. 8, 2011).

d. **Do issuers who acquire and then sell stated income loans into
securitizations have a duty to evaluate whether the borrower committed
fraud in stating an inflated income, even where there is no fraud
representation in the securitization documents?** *Compare Citimortgage v.
OCM Bancorp, Inc.*, 2011 U.S. Dist. LEXIS 45437, at *19 (E.D. Mo. Apr. 27,
2011) (holding that, regardless of whether applicable guidelines require it,
underwriters must evaluate the "reasonableness" of a borrower's income in a
stated income transaction) *with New Jersey Carpenters Health Fund v.
NovaStar Mortg., Inc.*, 2012 U.S. Dist. LEXIS 56010, at *18-21 (S.D.N.Y.
Mar. 29, 2012) (finding it unreasonable for an investor to rely on statements
about the underwriting of stated income loans when the same set of
transaction documents contained extensive disclosures about the risks of such
loans).

e. **Have issuers who conducted "due diligence" on only a sample of loans
coming through the process breached their representation that loans
were underwritten according to "generally accepted" standards?**
*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576,
580-581 (E.D. Pa. 2009) (in assessing sufficiency of complaint alleging
securities fraud arising from sale of RMBS, stating that the "quality of the
issuer's due diligence examination was a material characteristic of all the
Certificates" and that, "[a]s part of its due diligence, Defendant [] reviewed a
large sample of the loan documentation and conducted a detailed statistical
analysis to ensure that the quality of the loans was consistent with the
expected yields").

f. **Where issuers have warned that owner-occupancy data is self-reported,
can they nonetheless be held liable for owner-occupancy data that turns
out to be inaccurate?** *Massachusetts Mut. Life Ins. Co. v. Countrywide Fin.
Corp.*, 2012 U.S. Dist. LEXIS 121702, at *6-10 (C.D. Cal. Aug. 17, 2012)
(Pfaelzer, J.) (holding issuer cannot be liable in investor litigation for
misrepresentations of owner occupancy data where information was furnished
by borrowers); *MassMutual v. Residential Funding Co., LLC,* 843 F. Supp. 2d
191, 204-05 (D. Mass. 2012) (same).

g. **Were points and fees correctly calculated and disclosed to borrowers (in
order to comply with state and federal requirements)?**

h. **Does the absence of certain documents in a loan file – such as a written
underwriting approval, exception request form, or Patriot Act disclosure
form – constitute a breach of a representation that the loan "substantially
complied" with applicable underwriting guidelines, even if irrelevant to
the borrower's actual creditworthiness?**

22

53.    From my experience representing the Debtors in RMBS cases over the past several years, I am aware that the Debtors face a number of factual hurdles in answering these questions, and there is great uncertainty in the outcome of any one of these issues.

54.    By way of example, the parties in the pre-petition RMBS cases involving the debtors have largely disagreed as to which were the applicable underwriting guidelines and whether the use of "exceptions" as disclosed in the Prospectus was permissible.

55.    On the one hand, RFC developed evidence, including the deposition testimony of a number of witnesses and the language of the Prospectuses, showing that RFC considered loans with exceptions, loans processed through automated underwriting systems, or loans acquired pursuant to negotiated criteria agreements all to be in "substantial compliance" with the applicable guidelines.  The evidence showed that the Debtors' underwriters, quality audit staff, and those managing the securitization process followed consistent processes, gave considerable time and attention to individual underwriting decisions, never intended or knowingly allowed "bad" loans to be securitized, often voluntarily undertook to weed out weak collateral, and made extensive efforts to fully disclose to counterparties and investors any risks present in the collateral pool, including through the creation and expansion of the "Vision" website, a "best in class" tool for tracking historical collateral performance at a loan level for each securitization and shelf.

56.    On the other hand, the Institutional Investors and/or Trustees may attempt to point to the plain language of the published RFC Client Guide to suggest that deviations from it (including exceptions and negotiated criteria) were not authorized.  They may try to develop evidence that there were either certain controls lacking in the Debtors' underwriting and securitization processes, or failures to document underwriting decision-making, that (they will

likely argue) demonstrate the process was flawed. Underwriting decisions are frequently a judgment call, so it is likely the Institutional Investors and/or Trustees will be able to find examples where reasonable underwriters may disagree, and point to those as examples of breaches.

57.     For example, the Institutional Investors and/or Trustees may look to stated income loan underwriting practices and try to advance the theory that the Debtors had an affirmative obligation routinely to evaluate the reasonableness of every stated income loan, notwithstanding the clear language of the Client Guide and the risk disclosures to the contrary. They may likewise attempt to mount an attack on the Debtors' use of automated decisioning tools, (which was externally available to loan sellers and allowed for a preliminary assessment of whether the loan was acceptable to the Debtors), arguing that because the Debtors knew that automated programs might evaluate a loan application differently than a human underwriter would (despite that this is clearly disclosed in the Prospectus and Prospectus Supplement), their use of such tools was problematic. And, as with any document-intensive complex litigation matter—particularly where the events in question are several years in the past—the Institutional Investors and/or Trustees are likely to attempt to point to the absence of documentation as evidence that proper processes were allegedly not followed.

58.     Finally, it is typical for plaintiffs to focus on the small handful of self-critical memos or emails that inevitably exist in any business process of this size and complexity, and attempt to present those out of context. I considered the potential impact of these types of random documents on a judge or jury, regardless of the weight of the evidence otherwise suggesting a generally robust and disciplined underwriting process.

59.    Thus, the Debtors' ability to meet the various representations and warranties relating to loan underwriting is an issue for which both the law and the facts are likely to be disputed. While the Debtors would hotly contest any allegation that underwriting representations were breached, there is potential risk for the Debtors of an adverse outcome on each of these issues if a representation and warranty case were to go to trial.

### C.    **Materiality of Breach**

60.    Under black-letter contract law, a breach must be "material" to be actionable.

61.    In addition, the applicable contract language for breaches of representations and warranties in these Trusts adds an express materiality component, requiring that the breach be one that "materially and adversely affects the interests of any Securityholders or the Credit Enhancer . . . in such [Loan]". *See, e.g.,* 2006-HSA2 Home Equity Loan Purchase Agreement at 3.1; 2006-QO8 Pooling and Servicing Agreement at 2.03 (actionable breach is one that "materially and adversely affects the interests of the Certificateholders in any Mortgage Loan").

62.    Under general contract principles, whether a "material" breach has occurred is typically a question of fact. 23 Williston on Contracts (4th ed.) § 63.3 (quoted in *Metro. Nat'l Bank v. Adelphi Acad.*, 886 N.Y.S.2d 68, 68 (N.Y. Sup. Ct. 2009)). To be "material," a breach must "go to the root of the agreement" and be "so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform . . . ." *Id.*

63.    To date, I am aware of no significant opinions relating to materiality issued specifically in cases brought by Trustees for breaches arising out of residential mortgage-backed securities. However, the issue of whether a breach is material or causes a material and adverse effect has been addressed a handful of times in cases involving contracts for the purchase of

loans, commercial mortgage-backed securities cases, and in residential mortgage-backed securities cases brought by monoline insurers.

64.  Generally, the most significant materiality disputes arise because the plaintiff (whether Trustee or insurer) seeks to restrict the materiality analysis to the closing date of the securitization.  Under plaintiffs' analysis, the breach of the representation or warranty has occurred as of the closing date, so, plaintiffs argue, subsequent events are irrelevant to the evaluation of whether the breach was material.

65.  Defendants argue, in contrast, that certain breaches are not material because they do not ultimately have a "material and adverse effect" on the plaintiff, and facts subsequent to the closing date are relevant to that analysis.

66.  For example, some loans may breach a representation or warranty, but if the borrower continues to pay his or her loan timely, there is no "effect" on the investor.  Similarly, if the loan is found to breach an underwriting representation related to stated income, undisclosed debts, property value, etc., but the reason the borrower ultimately stopped paying is because he passed away, then the breach itself has no "effect" on the investor.

67.  These issues overlap with causation issues, discussed further below.

68.  In two commercial mortgage-backed cases to address the issue, the dispute arose in the context of motions *in limine* to preclude evidence relating to post-closing performance of the loans.  *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n,* 2011 U.S. Dist. LEXIS 35343 (W.D. Okla. Apr. 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n,* 2011 U.S Dist. LEXIS 145026 (D. Nev. Dec. 15, 2011).  Both cases were brought by trustees seeking to enforce loan repurchase provisions for breaches of representations and warranties.

69.     The Oklahoma court addressed Wells Fargo's motion *in limine* to exclude
evidence regarding the decline of the economy and mortgage and real estate markets because "as
of the closing date of the securities, the value of the certificateholders' interests and the
underlying mortgages were materially and adversely affected by Defendant's alleged breaches of
warranties." *Wells Fargo,* 2011 U.S. Dist. LEXIS 35343, at *24.     The court held that
"[e]vidence regarding the post-securitization market meltdown is relevant only if Plaintiff asserts
material and adverse effects occurred after the securitization closing date." *Id.* at *24.  Similarly,
the Nevada court held that "[i]f plaintiff limits its material and adverse effects claim to evidence
available as of the closing date, evidence or testimony of general post-closing economic
conditions is irrelevant" and must be excluded. *Wells Fargo Bank,* 2011 U.S Dist. LEXIS
145026, at *4.

70.     Likewise, courts interpreting loan sale agreements have found evidence that a
buyer would not have purchased the loan "had they known about the negative information" that
was the basis for an alleged breach of representation and warranty sufficient to defeat summary
judgment.  *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs.,* 2007 U.S. Dist. LEXIS
76940, at *36-37 (S.D. Ind. Sept. 28, 2007).  This again suggests a risk that a court may find it is
the falsity of the information available to the buyer at the time of closing that gives rise to the
"material and adverse effect," and not the subsequent performance of the loan in question.  *See
also* Material and Adverse Opinion of Professor Barry E. Adler (relating to the action *In the
Matter of the Application of The Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct.
filed    June    29,    2011)    (pending    before    Kapnick,    J.)),    *available    at*
http://www.cwrmbssettlement.com/docs/Opinion%20Regarding%20Material%20and%20Advers
e%20Affect.pdf, at 12 (last visited September 24, 2012) (discussing interpretation of similar

language in light of *Laureate* and *Wells Fargo* decisions and concluding it "is not possible to

conclude with any confidence how a court would interpret" such language).

71. Most recently, in the monoline insurance context, Judge Rakoff issued an opinion

denying summary judgment in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,* No.

11 Civ. 2375 (JSR) (S.D.N.Y. Sept. 25, 2012), in which he relied on the "dictionary definitions"

of "material" and "adverse" to conclude that plaintiffs in breach of representation and warranty

cases need not prove that the breach "causes . . . actual loss" in order to satisfy the "material and

adverse breach" element. *Id.* at 9-10.

72. Courts interpreting this type of language in the commercial mortgage-backed

securities context have also split on the question of whether plaintiffs can be required to meet a

"double materiality" standard; that is, whether plaintiff must prove both that the breach was a

material breach *and*, as a separate element, that the breach had a "material and adverse" effect on

the Institutional Investor. *Compare Wells Fargo Bank NA v. LaSalle Bank Nat'l Ass'n*, 3:07-cv-

00449-MRM, Hr'g Tr., Doc. 366 at 5:11-15 (S.D. Ohio Nov. 13, 2009) ("I agree with

Defendant's interpretation of the relevant case law, that Plaintiff must prove as required by New

York law that there is a material breach of a representation and warranty . . . .") *with Wells Fargo*

*Bank NA v. LaSalle Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 145026, at *11 (D. Nev. Dec. 15, 2011)

("[T]he court does not endorse defendant's contention that the double materiality requirement is

well-supported by the relevant case law") and Wells Fargo Bank, N.A. v. LaSalle Nat'l Ass'n,

No. CIV-08-1125-C, Mem. Op. & Order Doc. 323:41 (W.D. Okla. Dec. 10, 2010) (declining to

follow *Wells Fargo* S.D. Ohio decision).  Thus, it is unclear what burden of proof a court in a

case between Debtors and the Trustees or Institutional Investors might place on the plaintiffs

regarding materiality.

73.     In addition to the issues discussed above, other, more mundane disputes as to "materiality" are bound to arise in any litigation concerning residential mortgage-backed securities.  For example, as noted above, it was industry standard during the relevant time period to grant "exceptions" to underwriting guidelines from time to time, based on an overall assessment of the borrower's creditworthiness.  Thus, while published guidelines might require a minimum FICO score of 680 for certain types of loans, an underwriter could approve a borrower with a lower FICO score (say, 640) based on an evaluation of other features of that borrower or loan, such as reserves in excess of the minimum required amount, or a lower debt-to-income ratio than required.  Disputes are bound to arise as to whether a 40-point FICO deviation, in the overall context of that loan, is or is not "material."  With dozens of underwriting parameters to evaluate for thousands of individual loans, any litigation over such issues is certain to be extremely costly and fraught with risk.

### D.     Causation

74.     As noted above, a hotly contested issue in representation and warranty litigation is proximate cause.  This has most recently arisen in the context of RMBS cases pursued by monoline insurers, but has also been addressed by commercial mortgage-backed cases.

75.     The primary legal dispute, which is intertwined with the materiality issues discussed above, is whether the actual cause of the loan's failure is a defect in the underwriting.

76.     Courts have confirmed that the market collapse can serve as a defense to securities claims under the federal securities laws, as well as common law claims for fraud and negligent misrepresentation.  *See, e.g., In re Washington Mut. Mortg. Backed Secs. Litig.*, 2012 U.S. Dist. LEXIS 102064, at *41-42 (W.D. Wash. July 23, 2012) (denying summary judgment on Securities Act claim where factual issues existed regarding, among other things, whether

market collapse caused plaintiffs' losses); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 2012 U.S. Dist. LEXIS 119671, at *101-103 (S.D.N.Y. Aug. 17, 2012) (same as to fraud and negligent misrepresentation claims). *But see MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296 (1st Dep't 2011) (declining to rule at motion to dismiss stage that MBIA's losses were caused by the housing and credit crisis).

77.    Furthermore, as a general matter, causation is an element of a contract claim under New York law. A plaintiff, for example, must show that the alleged breach of contract was the "direct and proximate" cause of the plaintiff's injuries. *See Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 379 (1974). Accordingly, general contract law allows defendants to present evidence of the market collapse as the cause of a plaintiff's losses in RMBS cases.

78.    Only a handful of cases, however, have examined this causation issue in the specific context of contractual breach of representation and warranty claims (or repurchase claims). While some of these cases touch on the market collapse as a defense to plaintiffs' claims, no court has issued a definitive ruling on the issue.

79.    The only two cases involving trustee repurchase demands I am aware of are the two *Wells Fargo* evidentiary decisions discussed above, in which the courts excluded *in limine* any evidence of the market collapse so long as the plaintiff trustee limited its evidence to "material and adverse effects as of the closing date." *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 35343, at *23-24 (W.D. Okla. April 1, 2011); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 145026, at *3-4 (D. Nev. Dec. 15, 2011). In both cases, however, the courts did not provide any legal analysis supporting

this conclusion.  Accordingly, these decisions appear to have limited persuasive or precedential value.

80.     In another case, *LaSalle Bank Nat'l Assn. v. Citicorp Real Estate, Inc.,* 2002 U.S. Dist. LEXIS 1730 (S.D.N.Y. Feb. 5, 2002), which is a non-trustee case involving the sale of a loan, the court stated that plaintiffs had properly pleaded a "material and adverse effect" because the alleged breaches could constitute a "partial cause" or may have "contributed" to the loan's eventual default. *Id.* at *13.  Under this analysis, even a court looking to the eventual outcome of the loan may accept a minimal showing of partial causation by plaintiff as sufficient for plaintiff to meet its burden.

81.     Courts in the monoline insurance context have addressed the causation issue – most notably Justice Bransten in the *MBIA Insurance Co. v. Countrywide Financial Corp.* case. There, Justice Bransten held that MBIA was "not required to establish a direct causal connection between proven warranty breaches by [defendant] and MBIA's claims payments made pursuant to the insurance policies at issue" in order to prove that a breach was material.  936 N.Y.S.2d 513, 527 (2012).  In the same opinion, Justice Bransten nonetheless held that MBIA must still "prove that it was damaged as a direct result of the material misrepresentations," and denied MBIA's motion to strike Countrywide's defenses based on the intervening or superseding cause of the economic crisis. *Id.* at 522, 527.  However, the court's ruling—in addition to providing mixed guidance—was based in substantial part on applicable insurance statutes, which are not relevant to the Investor- or Trustee-initiated claims at issue in the RMBS Trust Settlements. *See also Syncora Guar. Inc. v. EMC Mortg. Corp.,* 2012 U.S. Dist. LEXIS 84937, at *32 (S.D.N.Y. June 19, 2012); *Assured Guaranty v. Flagstar,* No. 11 Civ. 2375 (JSR) (S.D.N.Y. Sept. 25, 2012), at 10-12 (also noting that the contractual repurchase language does not tie the repurchase

31

obligation to default of the loan). It is unclear whether any portion of these rulings can be

imported into the Institutional Investor / Trustee litigation context, or to what extent courts will

look to the monoline insurance litigation for guidance.

82.     No court has yet addressed the issue in an Institutional Investor-initiated RMBS

representation and warranty case, so the outcome of the causation issues remains highly

uncertain.

### E.     Harm and Damages

83.     Defendants in representation and warranty litigation, including the Debtors, have

consistently maintained that the sole remedy for breaches of representations and warranties is

repurchase of the defective loan. That conclusion is supported by the plain language of the Sale

Agreements. *See, e.g.,* 2006-HSA2 Home Equity Loan Purchase Agreement at 3.1 ("Upon

discovery . . . of a breach of any representation and warranty . . . which materially and adversely

affects the interests of any Securityholders or the Credit Enhancer . . . the Seller shall, within 90

days of its discovery or receipt of notice of such breach, . . . either (i) cure such breach in all

material respects or (ii) . . . either (A) repurchase such [Loan] . . . or (B) substitute one or more

Eligible Substitute Loans . . . ; provided that the seller shall have the option to substitute . . . only

if such substitution occurs within two years following the Closing Date."); 2006-QO8 Pooling

and Servicing Agreement at 2.03 (similar language).

84.     The issue of damages has not come up in Trustee litigation involving RMBS,

except as to the Bank of New York Mellon and Lehman Brothers settlements. Meanwhile,

Plaintiffs in the monoline context have argued with some success – based in large part on

applicable insurance statutes that have no bearing on the Institutional Investors' claims – that

they are instead entitled to the monetary equivalent of rescission of their insurance agreements.
*See, e.g., MBIA Ins. Co. v. Countrywide,* 936 N.Y.S.2d 513, 522-24 (N.Y. Sup. Ct. 2012).

85.     In considering the risk to the Debtors of litigating the RMBS Trust Settlement
claims, I had to take into account the possibility—however remote—that the Institutional
Investors would attempt to import concepts of rescission into their claims here, in order to
maximize or increase their potential recovery.  Such a theory could inflate the Institutional
Investors' claimed damages by attempting to hold the Debtors responsible for all losses suffered
by the Trusts, regardless of whether they are attributable to breaches of representations and
warranties, based on the argument that the Institutional Investors would never have purchased
the certificates had they known of the alleged breaches.

86.     Even if the Institutional Investors do not attempt to pursue a rescission-like
theory, the parties will undoubtedly dispute the extent to which any losses suffered by the Trusts
are actually attributable to breaches of representations and warranties.

87.     In addition, the parties will almost certainly dispute whether the Institutional
Investors can recover for loans that breach representations and warranties, but have not
defaulted.  This dispute flows directly from the proximate cause issues discussed above.  If the
Institutional Investors can recover for loans that have not defaulted—and perhaps even loans that
have been fully paid off, as MBIA's counsel suggested in arguing the issue before Justice
Bransten in the *Countrywide* case—then their damages could theoretically exceed even the actual
and estimated losses to the Trusts.

88.     Finally, as noted in footnote 1, it is possible the Institutional Investors will pursue
some tort claims, which could expose the Debtors to a different potential damages calculation
and the prospect of having to litigate punitive damages issues.

89.    These risks and uncertainties as to the basic methodology for calculating damages

relating to the Institutional Investors' claims are an important factor I considered in reaching my

conclusion.

## III.   ADDITIONAL DEFENSES

90.    In addition to the elements of a proposed plaintiff's cause of action for breaches

of representations and warranties or breaches of the repurchase obligation, I reviewed various

potential affirmative defenses available to Debtors.    The strengths and weaknesses of these

affirmative defenses also were factors in my conclusion.    The three primary affirmative defenses

I evaluated were (1) statute of limitations, (2) plaintiff's knowledge of the risk and/or failure to

conduct appropriate due diligence, and (3) the intervening cause of the housing crisis.

### Statute of Limitations

91.    The Trusts included in the RMBS Trust Settlement were issued between 2004 and

2007.

92.    The statute of limitations for contract claims in New York is six years, and no

discovery rule that would extend the time period is available for contract claims.  NY CPLR

§ 213(2); *Hernandez v. Bank of Nova Scotia,* 908 N.Y.S.2d 45, 46 (N.Y. App. Div. 1st Dep't

2010).[4]

---

[4]    As noted at the outset of this Declaration, my analysis focuses on the breach of contract
claims because they pose the greatest risk to Debtors.    However, I note that the statute of
limitations for fraud in New York is either six years, or two years from the time the plaintiff
discovered or should have discovered the fraud.  N.Y. CPLR § 213.  The analysis as to when the
statute was triggered on fraud claims is likely highly factual; however courts have considered the
fact of widely-publicized allegations of underwriting problems as evidence that the plaintiff
"should have discovered" the fraud at that point.  *See, e.g., Stichting Pensioenfonds ABP v.
Countrywide Fin. Corp.,* 802 F. Supp.2d 1125, 1134-39 (C.D. Cal. 2011).  The analysis above
with respect to the timing of repurchase demands as a trigger will likely apply to tort claims as
well.

93.     Accordingly, one argument we likely would have considered making if the claims were litigated is that claims for breach of representation and warranty arising from securitizations issued prior to May 14, 2006 are time-barred.

94.     This argument is supported by a number of courts in a variety of breach of warranty contexts. *See, e.g., Structured Mortg. Trust 1997-2 v. Daiwa Fin. Corp.,* 2003 U.S. Dist. LEXIS 2677, *5 (S.D.N.Y. Feb. 25, 2003) (breach occurs at the moment of sale because "the facts warranted in the . . . Agreement were not true when made"); *Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.,* 793 F. Supp. 2d 1189, 1194 (W.D. Wash. 2011); *see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,* 2012 Del. Ch. LEXIS 171, at *56 (Del. Ch. Aug. 7, 2012).

95.     However, at least one court has held that the breach of the contractual repurchase obligation is a separate claim from that for breach of a representation or warranty. *Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas,* 2012 U.S. Dist. LEXIS 87265, at *12-13 (E.D. Ark. June 25, 2012). Thus, the cause of action for breach of the repurchase obligation is only complete – and the statute of limitations only begins running – once the Debtors fail to repurchase non-conforming loans upon demand.

96.     Here, the Institutional Investors have yet to direct the Trustees to make a formal repurchase demand and thus trigger the obligation to repurchase. The applicable contract documents contain no limitation on the time for the Trustees to make such a demand, and indeed, although the Debtors would dispute this in litigation, there is a facially logical argument that none should apply: if a defect is discovered, whenever or however that may be, a remedy should exist to remove that defective loan and make the investors whole.

97.     In addition, the Institutional Investors' position – and that articulated by the court in *Bank of Arkansas* – finds some support in the concept of the condition precedent. The Debtors today typically treat the repurchase obligation as only arising when there is a demand for repurchase. Thus, the Institutional Investors may argue, "where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete." NY CPLR § 206; *see also Kunstsammlungen Zu Weimar v. Elicofon,* 536 F. Supp. 829, 848-49 (E.D.N.Y. 1981).

98.     Thus, while Debtors would have argued that many of the Institutional Investors' claims are time-barred if this dispute were litigated, I must consider as part of my analysis the risk that a court hearing the issues would agree with the *Bank of Arkansas* court and allow a separate claim for breach of the repurchase obligation to proceed.

### Plaintiffs' Due Diligence

99.     A common inquiry in the monoline insurer litigation context, and under federal securities law in the investor litigation context, is whether the plaintiff undertook any diligence before entering the transaction. For claims arising under the 1933 Securities Act, the relevant inquiry is whether the investor had knowledge of the risks prior to purchasing the securities. For the monoline litigation matters, the question is whether the insurer justifiably relied on the seller's assurances.

100.    Accordingly, we considered whether any similar analysis might provide a defense in the context of the kinds of claims resolved by the RMBS Trust Settlements. We found only limited support for importing these concepts into a breach of contract setting such as this one. On the contrary, the bulk of the case law has supported the general rule that because a warranty "is intended precisely to relieve the promise of any duty to ascertain the fact for himself," it

relieves the recipient of any obligation to investigate further. *Metro. Coal Co. v. Howard*, 155

F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.); *see also CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75

N.Y.2d 496, 503-06 (N.Y. 1990); *Credit Suisse Secs. (USA) LLC*, 2011 N.Y. Misc. LEXIS 4787,

at *17 ("[W]here a plaintiff has gone to the trouble to insist on a written representation [or

warranty] that certain facts are true, it will often be justified in accepting that representation [or

warranty] rather than making its own inquiry") (citation omitted).

      101.   The general rule has a critical exception directly applicable here:  "where the

seller has disclosed at the outset facts that would constitute a breach of warranty, that is to say,

the inaccuracy of certain warranties, and the buyer closes with full knowledge and acceptance of

those inaccuracies, the buyer cannot later be said to believe he was purchasing the seller's

promise respecting the truth of the warranties." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*,

500 F.3d 171, 186 (2d Cir. 2007).  In other words, if the counterparty to the contract "candidly

disclosed" that the information supplied (and warranted in the contract to be accurate) was

actually inaccurate, the allegedly "relying" party cannot assert a claim for breach of warranty.

*Id.  See also Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992) ("Where a buyer closes on a

contract in the full knowledge and acceptance of facts *disclosed by the seller* which would

constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed

from later asserting the breach.  In that situation, unless the buyer expressly preserves his rights

under the warranties . . . , we think the buyer has waived the breach.").

      102.   However, this exception has been narrowly construed.  Indeed, the court in

*Assured Guaranty v. Flagstar* recently rejected a diligence-based argument made by Flagstar on

summary judgment, holding that *Ziff-Davis* applied and the *Galli* exception did not, because

even though Assured received diligence reports identifying actual examples of problematic loans

in the securitization, and had run its own loss models predicting certain losses would occur, that information did not come from the seller/issuer (*i.e.*, Flagstar). *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB,* No. 11 Civ. 2375 (JSR) (S.D.N.Y. Sept. 25, 2012), at 15-19. Thus, the court reasoned, "[i]f the buyer 'has been informed of the falsity of the facts by some third party,' he has not waived the representations and warranties." *Id.* at 16 (quoting *Rogath v. Siebenmann,* 129 F.3d 261, 265 (2d Cir. 1997)).

103.    Debtors would argue that their own risk disclosures are so substantial, and so directly warn against reliance on the corresponding statements in the representations and warranties, that the *Galli* exception applies.    However, there is no clear indication that the Debtors would be successful in making such an argument.

**"Housing Crisis" Defense**

104.    There is ample evidence that the true cause of the losses to these Trusts was the massive economic downturn beginning in late 2007 and escalating through 2008 and into 2009.

105.    As discussed above, Debtors had developed extensive factual and expert support for this argument.

106.    However, in light of some of the court rulings discussed above with respect to materiality and causation, it is possible a court evaluating such claims against the Debtors would preclude the evidence entirely, require the Debtors to prove these facts as an affirmative defense, rather than considering them part of plaintiff's burden to address as part of the "causation" element its claims, or consider the evidence only as a "partial" cause of the loss.

107.    Moreover, some of the Institutional Investors may attempt to argue that the housing crisis itself was propelled in part by the business practices of RMBS issuers like the Debtors.

108.    Finally, although I believe based on my analysis of the facts that the housing crisis is the greatest single cause for the poor performance of the Trusts, it is not likely the *only* cause of loan failures.

109.    Accordingly, a key factor to be considered in weighing the potential outcome of the RMBS Trust Settlement claims is the possibility that the housing crisis defense may not be permitted or may not be entirely persuasive.

**Other Intervening Causes**

110.    Debtors also would argue that a number of issues relating to loan attributes and/or non-underwriting events contributed to the Institutional Investors' losses.

111.    For example, a number of the Trusts involve loans with underwriting characteristics that increase the risk of losses. These risks are disclosed in the Prospectuses and Prospectus Supplements, and likely contributed to some of the losses experienced by the Trusts, reinforcing that breaches of representations and warranties were not the sole cause of losses. For example, some Trusts are comprised of loans that are "payment option" loans or otherwise negatively amortize, so that the amounts owed by the borrower could increase over time. Other trusts contain loans with adjustable interest rates or "teaser" rate, such that a borrower may be able to afford an introductory or lower interest rate early in the term of the loan, but later encounters difficulty timely paying when the interest rate increases.

112.    In addition, there are a number of causes of delinquencies or defaults that cannot be effectively prevented or controlled through stringent underwriting: borrowers may become disabled or die; they may unexpectedly lose their jobs; the property may be destroyed due to a fire or natural disaster and they may be unable to refinance or sell the home as a result. Some

amount of the losses to the Trusts occur as a result of these everyday, non-underwriting-related events.

113.    This type of "causation" evidence is likely to face similar challenges to the causation factors described above, because it relates to events occurring after the closing of the transaction.    I considered the likelihood that these alternative causes actually impacted the Trusts' losses, as well as the possibility that a court might not permit such evidence to be introduced (either as to causation or damages), in my analysis of the reasonableness of the RMBS Trust Settlements.

## V.    EVIDENTIARY ISSUES

114.    In reaching my conclusions regarding the reasonableness of the RMBS Trust Settlements, I also had to consider potential evidentiary issues and, as a trial lawyer, make an assessment of whether and how the proof on either side of the case would be admitted.

115.    In general, based on my evaluation of the factual record developed so far, I believe the Debtors have very strong factual defenses and solid witnesses.    None of the 60+ witnesses deposed in the *MBIA v. RFC* case, for example, testified to anything resembling fraud or knowing misrepresentation in any of the Debtors' practices.    Many described good attention to internal controls, and a meaningful effort and genuine desire to be transparent with investors about the risks of the investments.

116.    However, there are some practical challenges to the presentation of evidence, separate from the legal and factual merits discussed above.

117.    For one, there has been tremendous attrition among the Debtors' employees since the key events occurring from 2004 through about 2008.    For example, of the 76 witnesses deposed in the two MBIA cases as of the petition date, 80% were former employees.    Some who were current employees at the time of their deposition have since left the company.    Most reside

in Minnesota and Pennsylvania, beyond the reach of a New York state court trial subpoena. A
few reside as far away as California and Texas. Almost none left the company with any ongoing
contractual obligation to cooperate with future litigation.

118.    Moreover, most of the former employee witnesses were involuntarily terminated
as part of a series of mass layoffs beginning in 2007. Thus, many have a limited sense of loyalty
to the Debtors, and while they may have been willing to appear voluntarily once for a deposition
to avoid being served with a deposition subpoena, garnering their cooperation for future
depositions, let alone trial testimony in another state, would undoubtedly be challenging. Thus,
presenting evidence live at trial – which, from my perspective as a trial lawyer, is almost always
more meaningful than reading a dry transcript or even replaying videotaped testimony – would
be a challenge.

119.    Another challenge is posed by the nature of these securitizations, each of which
contains thousands of individual loans. As noted above, it has always been the Debtors' position
that a repurchase claim requires a loan-by-loan evaluation of *which* loans to repurchase.
Plaintiffs in both securitization and representation and warranty cases have argued, with some
limited success to date, that a statistical sampling approach is acceptable. *MBIA Ins. Corp. v.
Countrywide Home Loans, Inc.*, 2010 N.Y. Misc. LEXIS 6182, at *8-18 (N.Y. Sup. Ct. Dec. 22,
2010) (permitting statistical sampling); Order, Doc. 90, *Fed. Housing Fin. Agency v. UBS
Americas, Inc.*, 1:11-cv-07010 (S.D.N.Y. May 8, 2012) (same). Regardless of whether statistical
sampling can reliably be used to assess breaches and calculate damages, however, it is clear most
judges would not permit the presentation of evidence on thousands of individual loans one by
one.

120.    Thus, the evidentiary challenge for trial becomes *which* loans to present.  While it is my belief based on the available evidence to date that the overwhelming majority of the loans in each collateral pool did not breach any representations and warranties, it is easy for a plaintiff's lawyer to focus in on the relatively few loans that present egregious examples of underwriting problems – what I call the "low hanging fruit."

121.    Those examples present a risk to the Debtors that a judge or jury will form an adverse impression based on a small slice of the available evidence, placing the Debtors in the position of attempting to prove a negative.  It is often impractical and difficult to shake those kinds of initial impressions effectively.

122.    Finally, a trial of this magnitude would be lengthy and expensive, involving weeks of evidence and numerous experts on either side, including experts on the underwriting of the loans, statistical sampling, the impact of the housing crisis, and damages, to name a few.  The details of the discovery burdens and cost just to get to that point are more fully described in my prior Declaration; I estimate the burden and cost of pre-trial motion practice and trial itself in this case would easily run into the millions of dollars.

## V.    CONCLUSION

123.    Based on all of the factors described above, as well as my general professional experience, my experience working with the Debtors as my clients, and my experience defending representation and warranty and other RMBS lawsuits, I conclude that the RMBS Trust Settlements represent a fair and reasonable settlement within an appropriate range under the circumstances.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true to the best of my knowledge, information, and belief.  Executed on September 28, 2012, at Columbus, Ohio.

_____
Jeffrey A. Lipps