**Hearing Date and Time: March 21, 2013 at 10:00 a.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Stefan W. Engelhardt
James A. Newton

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————————
|                                        | )  |                          |
| In re:                                 | )  | Case No. 12-12020 (MG)   |
|                                        | )  |                          |
| RESIDENTIAL CAPITAL, LLC, et al.,      | )  | Chapter 11               |
|                                        | )  |                          |
|                        Debtors.        | )  | Jointly Administered     |
————————————————————————

**DEBTORS' OMNIBUS REPLY IN FURTHER SUPPORT OF MOTION
PURSUANT TO BANKRUPTCY RULE 3013 AND BANKRUPTCY CODE
SECTION 362(A) FOR A DETERMINATION THAT (I) GMAC MORTGAGE'S
FRB FORECLOSURE REVIEW OBLIGATION IS A GENERAL UNSECURED
CLAIM AND (II) THE AUTOMATIC STAY PREVENTS ENFORCEMENT
OF THE FRB FORECLOSURE REVIEW OBLIGATION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................ 5

A.     The FRB Foreclosure Review Obligation is Retrospective and Represents
       a General Unsecured Claim ........................................................................ 5

       1.     By Operation of Law, the Bankruptcy Code Renders the FRB
              Foreclosure Review Obligation a Bankruptcy Claim ............................... 6

       2.     The Ocwen APA and Sale Order do Not Alter the Nature of the
              Claim ............................................................................................... 9

       3.     The Ongoing Expenses Associated with the FRB Foreclosure
              Review are Not Entitled to Administrative Expense Priority ................. 12

B.     This Court has Jurisdiction to Hear and Decide the Motion ............................... 14

C.     The Police and Regulatory Exception to the Automatic Stay does Not
       Apply to Permit the FRB to Enforce its Unsecured Claim ................................. 17

D.     The Motion is Procedurally Proper ...................................................................... 19

Exhibit 1 – Supplemental Declaration of Thomas Marano

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,
   502 U.S. 32 (1991) ...........................................................................................14, 15

DeNaples v. OCC,
   404 Fed. Appx 609, 2010 WL 5135326 (3d Cir. Dec. 17, 2010) ...........................................16

E.E.O.C. v. Rath Packing Co.,
   787 F.2d 318 (8th Cir. 1986) ...................................................................................18

F.T.C. v. CompuCredit Corp.,
   No. 08-CV-1976, 2008 WL 8762850 (N.D. Ga. Oct. 8, 2008) ...............................................16

FDIC v. Hirsch (In re Colonial Realty Co.),
   980 F.2d 125 (1992) ..............................................................................................15

In re Aslan,
   65 B.R. 826 (Bankr. C.D. Cal. 1986).............................................................................8

In re Gen. Growth Props., Inc.,
   426 B.R. 71 (Bankr. S.D.N.Y. 2010) ..........................................................................19

In re Lehman Brothers Holdings Inc.,
   Case No. 08-13555 (JMP), 2009 WL 6057286 (Bankr. S.D.N.Y. Sept. 17, 2009)..................19

Kings Terrace Nursing Home & Health Related Facility v. NYS Dep't of Soc. Servcs. (In
   re Kings Terrace Nursing Home &Health Related Facility),
   184 B.R. 200 (S.D.N.Y. 1995)...................................................................................7

Landmark Land Co. v. Office of Thrift Supervision,
   948 F.2d 910 (5th Cir. 1991) ....................................................................................16

N.L.R.B. v. 15th Ave. Iron Works, Inc.,
   964 F.2d 1336 (2d Cir. 1992)....................................................................................18

Owner Mgmt. Serv., LLC v. JPMorgan Chase Bank, N.A. (In re Owner Mgmt. Serv.,
   LLC),
   No. 12-AP-01222, 2012 WL 4480551 (Bankr. C.D. Cal. Sept. 25, 2012) ..............................16

Peoples Nat'l Bank v. OCC,
   362 F.3d 333 (5th Cir. 2004) ....................................................................................15

Rhoades v. Casey,
   196 F.3d 592 (5th Cir. 1999) ....................................................................................16

ii

SEC v. Brennan,
    230 F.3d 65 (2d Cir. 2000) ........................................................................17, 18

United States v. Apex Oil Co.,
    579 F.3d 734 (7th Cir. 2009) ............................................................................8

United States v. LTV Corp. (In re Chateaugay Corp.),
    944 F.2d 997 (2d Cir. 1991) ..............................................................................6

**STATUTES**

11 U.S.C. § 105(5)(B) ............................................................................................5, 7

12 U.S.C. § 1818(i) ............................................................................................14, 18

**OTHER AUTHORITIES**

Deborah A. Rehm, OCC Defends $8.5B Foreclosure Settlement, Claims It Drove 'Hard
    Bargain', American Banker (Jan. 16, 2013), available at
    http://www.americanbanker.com/issues/178_12/occ-defends-foreclosure-settlement-
    claims-it-drove-hard-bargain-1055907-1.html ........................................................13

Remarks of Ben Bernanke, Chairman of the Federal Reserve before the House Financial
    Services Committee (Feb. 27, 2013) ...........................................................3, 7, 13

Remarks by Thomas J. Curry, Comptroller of the Currency, before Women in Housing
    and Finance (Feb. 13, 2013), available at http://www.occ.gov/news-
    issuances/speeches/2013/pub-speech-2013-28.pdf ...........................................3, 8, 13

FRB Press Release (Nov. 1, 2011), available at
    http://www.federalreserve.gov/newsevents/press/ enforcement/20111101a.htm .....................9

Fed. R. Bankr. P. 3013 ............................................................................................19

H. Rep. No. 595, 5th Cong., 2d Sess. 343 (1978) ....................................................17, 19

iii

Residential Capital, LLC ("**ResCap**") and its affiliated debtors and debtors in possession

in the above-captioned cases (collectively, the "**Debtors**" and each, a "**Debtor**"), including

GMAC Mortgage, LLC ("**GMAC Mortgage**") submit this omnibus reply (the "**Reply**") to the

objections (each an "**Objection**" and, collectively, the "**Objections**") of the Board of Governors

of the Federal Reserve System (the "**FRB**") [Docket No. 3149], Ally Financial Inc. ("**AFI**")

[Docket No. 3150] and Frank Reed ("**Reed**") [Docket No. 3152][1] to the Debtors' motion (the

"**Motion**") for entry of an order determining that (i) for purposes of any proposed plan, GMAC

Mortgage's FRB Foreclosure Review (as defined below) obligation must be classified as a

general unsecured claim in an amount to be determined, and (ii) the automatic stay prevents the

Federal Reserve Board (the "**FRB**"), the Federal Deposit Insurance Corporation (the "**FDIC**"),

and other governmental entities from taking any action to enforce such claim against the Debtors

outside of their chapter 11 cases.  In further support of the Motion, the Debtors submit the

Supplemental Declaration of Thomas Marano ("**Supp. Marano Decl.**"), attached hereto as

Exhibit 1, and respectfully state as follows:[2]

## PRELIMINARY STATEMENT

1.    Since its inception, the Debtors have complied with and have every

intention of continuing to comply with the obligations embodied in the FRB Foreclosure Review.

The Debtors brought the Motion, however, for a judicial determination on the required form of

that compliance.  In light of recent activity taken by the FRB, the Debtors believe that GMAC

Mortgage's FRB Foreclosure Review obligation constitutes a "claim" as a matter of law under

---

[1] Wilmington Trust, National Association ("**Wilmington**"), as indenture trustee for ResCap's senior
unsecured notes also filed a statement in support and limited objection [Docket No. 3139] in connection with the
Motion.  The Debtors expect to work with Wilmington to address its concerns with the proposed form of order.
However, the Debtors reserve their rights with respect to all issues raised by Wilmington.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

the Bankruptcy Code.  As a result, the Debtors further believe that the automatic stay operates as a matter of law to prevent the imposition of penalties for complying with any order of this Court.

2.      AFI and the FRB believe otherwise.  Each of these entities believes that the Debtors are required to continue to conduct the costly foreclosure review process.  The Debtors submit that the Court's jurisdiction clearly encompasses the ability to determine the classification of the FRB Foreclosure Review obligation and that such obligation fits squarely within the definition of a "claim" under the Bankruptcy Code.

3.      *First*, the Debtors have complied with, are complying with, and expect to continue to comply with the FRB Foreclosure Review obligation.  They simply seek to do so in accordance with the procedures mandated by Congress through the Bankruptcy Code.  The Debtors are fiduciaries of their estates and every decision in these chapter 11 cases is made with the goal of maximizing value for the Debtors' estates.  Circumstances have changed vastly since the beginning of these chapter 11 cases.  The Debtors have closed sales of the vast majority of their assets, no longer conduct any servicing operations, and recently permitted the AFI Plan Support Agreement to expire.  Most importantly, the FRB has agreed to (and, in fact, sought) cash settlements of other servicers' foreclosure review obligations that were identical to those of the Debtors.

4.      This changed landscape clearly has revealed, for reasons described below, that the FRB Foreclosure Review obligation is a bankruptcy "claim" within the congressionally defined scope of Bankruptcy Code section 101(5)(B) and that the congressionally mandated and automatically arising automatic stay prevents enforcement of the FRB Foreclosure Review obligation.  Thus, the Debtors believed it was appropriate to seek the relief requested in the Motion.  The classification of a claim as unsecured is within the exclusive province of the

2

bankruptcy court, and the imposition of the automatic stay arises as a matter of law without the

need for Court action. Accordingly, no jurisdictional bar to granting the relief requested in the

Motion exists. By the Motion, the Debtors simply seek confirmation regarding these two

important issues, to provide certainty to all those involved in the plan negotiation process and so

the Debtors may appropriately comply with the FRB Foreclosure Review obligation through

their bankruptcy cases.

   5. ***Second***, granting the relief requested simply makes sense. The FRB and

OCC have recognized on numerous occasions that the foreclosure review processes conducted

by major mortgage servicers, including the Debtors, are "not working"[3] and that "[i]t just doesn't

make sense for these servicers to continue funneling money to consultants that could be better

used to help distressed borrowers."[4] The Debtors agree. As set forth in the Motion, the FRB

Foreclosure Review represents the single greatest administrative expense of the Debtors' estates.

The Debtors currently estimate that the foreclosure review process costs will total perhaps an

estimated $374 million. Supp. Marano Decl. ¶ 4. The Debtors further estimate that the

foreclosure review process, if completed, would result in approximately $41-85 million of

remediation payments made to borrowers in the form of unsecured claims in these chapter 11

cases. See id. If "[i]t just doesn't make sense to continue funneling money to consultants" in the

case of servicers that are not subject to bankruptcy proceedings, it clearly makes no sense where

every dollar paid to consultants to continue the foreclosure review process will reduce the

---

[3] Remarks of Ben Bernanke, Chairman of the Federal Reserve before the House Financial Services Committee at 17 (Feb. 27, 2013).

[4] Remarks by Thomas J. Curry, Comptroller of the Currency, before Women in Housing and Finance at 5 (Feb. 13, 2013), available at http://www.occ.gov/news-issuances/speeches/2013/pub-speech-2013-28.pdf .

amount of money available to unsecured creditors, including the very borrowers the FRB

Foreclosure Review is designed to compensate.

6.      ***Third***, the Debtors were offered the opportunity to enter into the

settlement reached with other servicers, which would have required payment of cash, so the

suggestion that a settlement is "theoretical" is incorrect.  The Debtors have also expressed a

willingness to agree, with support from the Official Committee of Unsecured Creditors (the

"**Creditors' Committee**"), to a general unsecured claim in the amount of approximately $232

million.  Such a settlement would put the FRB Foreclosure Review process behind the Debtors,

comply with the FRB Foreclosure Review obligation in the manner dictated by the Bankruptcy

Code, and assist the FRB in its stated goal of ensuring that money reaches borrowers.  See Supp.

Marano Decl. ¶ 5.  The Debtors submit that such a course of action would stem the dissipation of

hundreds of millions of estate dollars, instead channeling those funds for the payment of general

unsecured claims held by borrowers, payable pro rata with other creditors. [5]

7.      ***Fourth***, because the Court need not take any action in order to relegate the

FRB Foreclosure Review obligation to its appropriate classification as a general unsecured claim

---

[5] Additionally, in order to avoid the need for continued payments to PwC and the law firms assisting PwC
pending resolution of the Motion (which would not have any associated benefit to the Debtors, their creditors, the
FRB, or borrowers), the Debtors have offered to ensure funds that are now being expended remain available to pay
for future FRB Foreclosure Review costs (if any), and also to provide a mechanism for achieving the FRB's stated
goal of ensuring money will be available for borrowers.  In that regard, the Debtors have proposed a temporary
moratorium of the FRB Foreclosure Review, which the Debtors would be willing to extend through April 30, 2013.
In exchange, the Debtors would agree to deposit an amount into escrow weekly based on the average of PWC's fees
in recent weeks.  Should the Court conclude that the FRB Foreclosure Review is entitled to administrative expense
priority or is not a bankruptcy claim, the Debtors will utilize the escrowed funds to pay for the continuation of the
FRB Foreclosure Review or to fund a cash settlement for the benefit of borrowers.  Should the Court determine that
the FRB Foreclosure Review obligation shall be classified as a general unsecured claim, the Debtors will ***still*** use the
escrowed money to fund a settlement for the benefit of borrowers, on terms agreeable to the Debtors in light of the
Court's ruling.  The Debtors believe this proposal is a win for all involved (save for the independent foreclosure
review consultants).  However, should the FRB refuse to agree to a moratorium and the Court not rule at the hearing,
the Debtors believe they will be compelled to continue to comply with the FRB Foreclosure Review pending
resolution of the Motion, burning up cash of approximately $300,000 per day, and would ask for the Court's
assistance.

4

or implement the automatic stay, the jurisdictional bar relied upon heavily by AFI is of no consequence.  The FRB has a monetary prepetition claim against the Debtors and it may not now enforce that judgment against the Debtors outside of their bankruptcy cases.

8.    Because neither bankruptcy law nor the alleged purpose of the FRB Foreclosure Review is advanced by the continued payment of millions of dollars to professional consultants, the Court should confirm the classification of the obligation now so that the Debtors may end the immense cash drain on their estates.  They will instead address the obligation through their bankruptcy cases, in the manner dictated by Congress in the Bankruptcy Code.

## ARGUMENT

### A.    The FRB Foreclosure Review Obligation is Retrospective and Represents a General Unsecured Claim

9.    By the Motion, the Debtors request that the Court classify the FRB Foreclosure Review obligation as a general unsecured claim.  Despite AFI's contention, the Debtors do not request the Court to convert, or otherwise modify or alter, the FRB Foreclosure Review or Consent Order in any manner.  Under the Bankruptcy Code, certain types of obligations are congressionally defined as "claims."  11 U.S.C. § 101(5)(B).  Here, the FRB Foreclosure Review represents just such an obligation, because it is an equitable remedy held by the FRB[6] that can be satisfied by an alternative right to payment.  No Court action is required to render the FRB Foreclosure Review obligation a bankruptcy claim; Congress has defined it as such.  The Debtors simply ask the Court to confirm that, for purposes of any chapter 11 plan that may be proposed, the FRB Foreclosure Review may be appropriately classified as a general

---

[6] Although the FRB has chosen to include a requirement that some amount of money be paid over to borrowers, the borrowers do not have a right to seek recourse against the Debtors under 12 U.S.C. § 1818.  As noted by the FRB itself in its Objection, paragraph 30 of the Consent Order specifically precludes third parties from having any rights under the Consent Order.  FRB Objection at 11.  Instead, any claim under 12 U.S.C. § 1818 in these bankruptcy cases is held by the FRB.

unsecured claim.  This will create certainty and assist the Debtors and other parties-in-interest in their ongoing negotiations to develop a confirmable chapter 11 plan.

> **1.    By Operation of Law, the Bankruptcy Code Renders the FRB Foreclosure Review Obligation a Bankruptcy Claim**

10.    Many of the objections raised by the FRB and AFI are predicated upon the conclusion that the FRB Foreclosure Review obligation is not a general unsecured claim.[7]  These contentions are misplaced.  *First*, the FRB and OCC have publicly announced amendments to other servicers' consent orders that conclusively show that an alternative right to payment exists, thus confirming that the FRB Foreclosure Review obligation is a claim.  *Second*, the FRB Foreclosure Review obligation is intended solely to remedy past alleged wrongs and any suggestion that the obligation is prospective, especially given the Debtors' circumstances, is mistaken.  As a result, by Congressional mandate, embodied in Bankruptcy Code section 101(5)(B), the FRB Foreclosure Review obligation is a bankruptcy claim.  See United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997 (2d Cir. 1991) (right to an equitable remedy held by governmental agency was a claim if claimant had an alternative right to payment and the equitable remedy was intended solely to remedy for past transgressions, as opposed to ensuring ongoing compliance with the law).

11.    As set forth in the Motion, the FRB and OCC recently announced settlements with approximately twelve other mortgage servicing businesses.  Motion ¶ 10.[8]  The

---

[7] Reed raises a similar argument in his Objection.  Reed Objection ¶¶ 3-5.  He states that "since Debtor has not converted its obligations under the consent order to solely require financial remediation," the FRB Foreclosure Review obligation is not a bankruptcy claim.  However, if the Debtors were required to "convert[]" an equitable remedy to a monetary remedy before an obligation is a bankruptcy claim, Bankruptcy Code section 101(5)(B) would be read out of the Bankruptcy Code.  Instead, all that is required is an alternative *right* to payment.

[8] The Motion mistakenly indicates that the FDIC was involved in the consent order amendments with other mortgage servicers.  Subsequently released documentation of the amendments makes clear that the FDIC was not involved in the recent consent order amendments.

6

settlements were documented in amendments to the respective servicers' original consent orders

and were intended to end the foreclosure review processes that the Fed's Chairman has since

publicly recognized "was not working."[9]  When analyzed under Second Circuit law, these

amendments belie the assertions by the FRB and AFI that the option of the payment of money in

lieu of the equitable remedy represented by the FRB Foreclosure Review is unavailable here.

        12.    Both the FRB and the AFI state that the Consent Order does not provide

the FRB with a monetary remedy in lieu of the FRB Foreclosure Review obligation.  Under

Bankruptcy Code section 101(5), however, analyzing the issue through reference to an

alternative right to payment under the ***Consent Order*** is a misplaced analysis.  Rather, the

Bankruptcy Code dictates the proper analysis – specifically, whether there exists an alternative

right to payment under the ***statute*** authorizing the imposition of the FRB Foreclosure Review,

here 12 U.S.C. § 1818(b).  Indeed, AFI's Objection recognizes this distinction.  <u>See</u> AFI

Objection ¶ 32 (explaining that the Second Circuit's <u>Chateaugay</u> decision concluded that "the

debtors' obligation to pay EPA for cleanup costs that EPA incurred was a dischargeable claim"

because "***CERCLA*** [not the clean-up injunction] expressly allowed EPA" to incur costs and seek

reimbursement) (emphasis added); <u>see</u> <u>also</u> 11 U.S.C. § 101(5)(B) (defining claim to include "a

right to an equitable remedy for breach of performance ***if such breach gives rise to a right to***

***payment . . . .***") (emphasis added); <u>Kings Terrace Nursing Home & Health Related Facility v.</u>

<u>NYS Dep't of Soc. Servcs. (In re Kings Terrace Nursing Home &Health Related Facility)</u>,

184 B.R. 200, 203 (S.D.N.Y. 1995) (right to recoupment was a bankruptcy claim because

equitable right of recoupment was just one of several alternative remedies, including monetary

---

[9] Remarks of Ben Bernanke, Chairman of the Federal Reserve before the House Financial Services Committee at 17 (Feb. 27, 2013).  The foreclosure review obligations in these consent orders were substantially identical to the FRB Foreclosure Review obligation in the Consent Order.  <u>See</u> Motion, Exhibits 3-4.

7

remedies under department of social servicers regulations, in contract, or in quasi-contract, to

remedy alleged overpayment to debtor); In re Aslan, 65 B.R. 826, 831 (Bankr. C.D. Cal. 1986)

("The question to be dealt with is whether, as a matter of state law, the non-breaching party to

the contract has a right to obtain a money judgment, even though he also has a right to obtain an

equitable judgment. If so, the remedy becomes a contingent claim and can be discharged in the

bankruptcy.").[10]

13.    With that analysis in mind, these amendments conclusively show that,

pursuant to 12 U.S.C. § 1818(b), the FRB has available to it a monetary remedy in addition to its

equitable remedy.  The amendments, which require the payment of money, were issued pursuant

to a consent order under authority granted to the FRB in 12 U.S.C. § 1818(b), the exact statutory

provision governing the FRB Foreclosure Review.  Accordingly, under 12 U.S.C. § 1818(b), the

FRB has the authority to seek an equitable remedy (as evidenced by the servicers' foreclosure

review obligations) or a monetary remedy (as evidenced by the amendments to those servicers

consent orders).  For this reason, the FRB also had the authority to seek a monetary remedy in

lieu of GMAC Mortgage's FRB Foreclosure Review obligation under 12 U.S.C. § 1818(b), thus

rendering the FRB Foreclosure Review obligation a bankruptcy claim.

14.    Finally, the FRB Foreclosure Review obligation is intended to remedy

only past alleged wrongs,[11] and any suggestion that it has a prospective component is misguided.

---

[10] Seventh Circuit case law cited by AFI, which is not binding in any event, does not suggest a contrary result.  In fact, the Seventh Circuit's Apex Oil decision held that an injunction issued pursuant to the Resource Conservation  Recovery Act ("**RCRA**") was not a claim in bankruptcy because **RCRA** "does not entitle a plaintiff to demand, in lieu of action by the defendant . . . ." a monetary payment.  United States v. Apex Oil Co., 579 F.3d 734, 736-37 (7th Cir. 2009).  Any argument that 12 U.S.C. § 1818 does not entitle the FRB to "demand, in lieu of" the Foreclosure Review obligation, a monetary payment by GMAC Mortgage is belied by the recent amendments to other servicers' consent orders, which did exactly that.  Indeed, 12 U.S.C. § 1818(b)(6) does specifically provide for an order requiring reimbursement of losses resulting from a violation of law or unsafe business practices.

[11] See, e.g., Remarks by Thomas J. Curry, Comptroller of the Currency, before Women in Housing and Finance at 5 (Feb. 13, 2013) ("The review is intended to determine if those borrowers suffered financial harm

(Footnote continues on next page.)

8

As described in the Motion, the Debtors believe they fully complied with the other terms of the Consent Order, including the prospective obligations contained therein, through closing of their asset sales.  Motion ¶ 18 n.7.[12]  Moreover, on February 16, 2013, the Debtors closed a sale of their mortgage servicing platform.  As a result, the Debtors are no longer operating a mortgage servicing business.  The Debtors no longer conduct any business practices that potentially could lead to any allegations of continuing violations of the law.  To suggest that the FRB Foreclosure Review could be utilized to ensure ongoing compliance with state and federal laws by a non-existent Debtor-operated mortgage servicing business is both factually incorrect and illogical.

15.    Based on the foregoing, the Debtors submit that the FRB Foreclosure Review is aimed solely at remedying allegedly wrongful past conduct by the Debtors and that the FRB has an alternative right to payment which it can (and has) asserted under 12 U.S.C. § 1818. Accordingly, the Foreclosure Review obligation falls squarely within the congressionally crafted definition of a bankruptcy "claim."

2.    **The Ocwen APA and Sale Order do not Alter the Nature of the Claim**

16.    AFI points to section 6.16 of the Ocwen APA[13] in support of its argument that the Debtors undertook a post-petition obligation to comply with the Consent Order and in

---

(Footnote continued from previous page.)

directly resulting from errors, misrepresentations, or other deficiencies."); FRB Press Release (Nov. 1, 2011), available at http://www.federalreserve.gov/newsevents/press/ enforcement/20111101a.htm ("The [foreclosure review process] was set up to determine whether eligible borrowers in foreclosure were afforded all of the protections they are entitled to under the law and to provide compensation where errors resulted in financial harm.").

[12] AFI, relying on Chateaugay, also argues that the Debtors cannot "sever" the FRB Foreclosure Review obligation from the other obligations contained in Consent Order.  AFI Objection ¶ 37.  This argument misses the point.  The Debtors are not requesting that the Court sever the Foreclosure Review.  Rather, the Debtors are seeking to classify the Foreclosure Review, which is the only remaining obligation under the Consent Order, as a general unsecured claim.  Moreover, AFI supports its argument with an incorrect interpretation of Chateaugay, which does not address this precise issue.

[13] The Ocwen APA refers to the Asset Purchase Agreement between Ocwen Loan Servicing, LLC ("**Ocwen**") and various Debtor entities, attached as Exhibit 1 to the Court's *Order under 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (i) approving (a) Sale of Debtors' Assets Pursuant to Asset*

(Footnote continues on next page.)

9

support of its general argument that the Debtors should not now be allowed to seek relief from

the Bankruptcy Court.  Specifically, AFI cites section 6.16C(a), which states the Debtors "must

comply with and ensure the continued performance of their obligations under paragraphs 3, 4

and 22 of the Consent Order."

17.     As an initial matter, AFI is not a party to the Ocwen APA, and section

12.8 of the Ocwen APA states, "this Agreement is solely for the benefit of the parties hereto, and

no provision of this Agreement shall be deemed to confer any remedy, claim or right upon any

third party."  While section 6.16 does confer certain limited rights to AFI, it confers those rights

only "to the extent [AFI] is performing obligations of the [Debtors] under the . . . Consent

Order."  As AFI is not currently performing the obligations of the Debtors, it currently has no

rights under section 6.16.

18.     While relying on section 6.16C(a) and generally alleging that the Debtors

affirmed their intent to continue conducting the FRB Foreclosure Review, AFI ignores other

provisions of section 6.16, which were designed to protect AFI in the event it became

responsible for the Debtors' FRB Foreclosure Review obligation.  As AFI repeatedly notes,

section 6.16 of the Ocwen APA was a heavily negotiated provision.  The Debtors, the Creditors'

Committee, AFI, Ocwen and the DOJ, as part of those negotiations, inserted the concept of

Performing Entities into section 6.16.  "'Performing Entity' means the ResCap Sellers, or one or

more successor estate fiduciaries, or AFI solely to the extent that such entity is performing

obligations of the ResCap Sellers under the DOJ/AG Settlement or the Consent Order."  The

---

(Footnote continued from previous page.)

*Purchase Agreement with Ocwen Loan Servicing, LLC (b) Sale of Purchased Assets Free and Clear of Liens,
Claims, Encumbrances, and Other Interests; (c) Assumption and Assignment of Certain Executory Contracts and
Unexpired Leases Thereto; (d) Related Agreements; and (ii) Granting Related Relief* [Docket No. 2246] (the "**Sale
Order**").

purpose of the Performing Entity concept was to protect successor estate fiduciaries or AFI in the

event those parties became responsible for the Debtors FRB Foreclosure Review obligation.

Thus, Section 6.16 specifically contemplates the possibility that AFI might become responsible

for the Debtor's obligations, a possibility AFI should have been keenly aware of given that the

corporate parent was liable for the foreclosure review obligations contained in several of the

other servicers' consent orders and that AFI had jointly retained PwC to perform the review.[14]

For these reasons, AFI's reliance on section 6.16 to suggest that the Debtors may not seek

protection from this Court is misplaced.

        19.      Additionally, paragraph 55 of the Sale Order (in addition to the previously

entered interim orders approving retention of PwC and the law firms assisting PwC) expressly

reserves the Debtors' and the Creditors' Committee's rights with respect to the costs of the FRB

Foreclosure Review.  Paragraph 55 states, in relevant part

> Notwithstanding anything herein or in the Ocwen APA (including Section 6.16)
> to the contrary and consistent with previous orders of the Court, the Ocwen APA
> and the Order shall not waive or foreclose and is without prejudice to (i) any and
> all claims, causes of action and defenses that may be asserted by the Debtors or
> any party-in-interest (including the Creditors' Committee) for any and all past or
> future costs of compliance with the FRB Consent Order . . . .

Accordingly, AFI cannot now suggest that the Debtors have not diligently reserved their

rights, "*[n]otwithstanding anything herein or in the Ocwen APA (including Section 6.16)*

*to the contrary*" in connection with the extent of GMAC Mortgage's obligation to pay for

the FRB Foreclosure Review.  Indeed, the Debtors have expressly reserved these rights

throughout the bankruptcy cases and those rights are expressly preserved in the Sale

Order.

---

[14] Here, AFI was made secondarily liable for payment of PwC and the law firms in connection with the
FRB Foreclosure Review and any associated remediation payments to borrowers pursuant to a side letter with the
FRB.  See Ally Objection, Exhibit 3.

20.     Even more importantly, however, the Debtors do not seek to absolve themselves of their FRB Foreclosure Review obligation.  Instead, as described above, the Debtors seek to honor their FRB Foreclosure Review obligation in the context of their bankruptcy case, in the manner Congress has seen fit to direct bankruptcy debtors to address claims in their bankruptcy cases.  As a result of changed circumstances since the entry into Amendment Number 1 to the Ocwen APA (including the FRB's amendment of consent orders with other mortgage servicers) the appropriate form of compliance with the FRB Foreclosure Review obligation has changed.  The Debtors do not believe that satisfaction of the FRB Foreclosure Review obligation through the bankruptcy process would result in a breach of the Ocwen APA.

21.     Lastly, this argument is an attempt by AFI to distract the Court.  Any claims arising under the Ocwen APA belong to Ocwen.  The Ocwen APA does not give rise to a new legal liability to the FRB, which is not a party to the Ocwen APA.  Discussion at this time of any claims Ocwen may or may not have under the Ocwen APA is irrelevant.

**3.      The Ongoing Expenses Associated with the FRB Foreclosure Review are Not Entitled to Administrative Expense Priority**

22.     Despite AFI's contentions, continuing to expend administrative dollars on the FRB Foreclosure Review in no way represents an "actual, necessary cost[ or] expense[] of preserving the estate."  In fact, such expenditures dissipate assets of the estate, potentially uncovering a disproportionately low number of claims in comparison to the staggering cost of the review, and leaving significantly less assets available for payments to all creditors, including any creditors uncovered through the FRB Foreclosure Review process.

23.     AFI suggests that all expenses associated with the FRB Foreclosure Review are entitled to administrative expense priority because the Debtors must comply with

regulatory obligations and "the Ocwen APA unquestionably provided a substantial benefit to the Debtors' estates." The Debtors do not quarrel with the suggestion that the sale of their servicing platform benefited their estates. However, AFI's argument in this regard fails for two separate reasons. ***First***, as described above, AFI lacks standing to assert claims held by Ocwen pursuant to the Ocwen APA. See Ocwen APA § 12.8 (stating that there are no third-party beneficiaries to the Ocwen APA); §6.16 (creating a narrow exception by allowing AFI or another performing entity to enforce rights against the Purchaser, but even then solely to the extent [Ally] is performing obligations of the [Debtors] under the . . . Consent Order.") ***Second***, the Debtors have no ongoing mortgage servicing business. Therefore, no scenario exists under which the Debtors' estates would benefit from continuing to pay administrative dollars on account of a bankruptcy claim to conduct a review that seeks solely to remedy past alleged wrongs. This is especially true in light of the FRB and OCC's conclusions that the foreclosure reviews were "not working," "d[idn't] make sense" and did not provide significant benefit to anyone except the independent foreclosure review consultants.[15]

24.     Finally, each of the cases cited by AFI to suggest that spending $374 million to uncover $41-85 million[16] in claims would benefit the Debtors' estates is inapposite, because each involved an obligation intended to ensure future compliance with laws or punish

---

[15] See, e.g., Remarks of Ben Bernanke, Chairman of the Federal Reserve before the House Financial Services Committee at 17 (Feb. 27, 2013) ("we were on a track where the money going to the consultants would be some multiple of the money going to the – to the borrowers."); Remarks by Thomas J. Curry, Comptroller of the Currency, before Women in Housing and Finance at 5 (Feb. 13, 2013) (Explaining that after 19 months, consultants had received almost $2 billion conducting the review and borrowers had received nothing); Deborah A. Rehm, OCC Defends $8.5B Foreclosure Settlement, Claims It Drove 'Hard Bargain', American Banker (Jan. 16, 2013), available at http://www.americanbanker.com/issues/178_12/occ-defends-foreclosure-settlement-claims-it-drove-hard-bargain-1055907-1.html (quoting Morris Morgan of the OCC stating that "At this point in time I don't think that [the number of people who were foreclosed on where banks did not have the legal right to foreclose] was significant . . . .").

[16] See Supp. Marano Decl. ¶ 4.

13

postpetition conduct, as opposed to the FRB Foreclosure Review, which seeks solely to remedy

allegedly wrongful past conduct.

**B.    This Court has Jurisdiction to Hear and Decide the Motion**

25.    This Court has jurisdiction to grant the relief requested by the Motion.

Contrary to AFI's contention, 12 U.S.C. § 1818(i) does not deprive this Court of jurisdiction.

Nothing in section 1818(i) prohibits this Court from determining the appropriate classification of

the FRB Foreclosure Review obligation under the Bankruptcy Code.  Rather, the plain language

of section 1818(i) provides only that this Court may not assert jurisdiction to "affect by

injunction or otherwise the issuance or enforcement of any notice or order under this section" or

to "review, modify, suspend, terminate, or set aside any such notice or order."  12 U.S.C.

§ 1818(i).  But as discussed above, Debtors have not asked this Court to prevent the "issuance or

enforcement" of any order.  Nor are Debtors asking this Court to "review, modify, suspend,

terminate, or set aside" the FRB Foreclosure Review obligation.  Because the Debtors are not

asking to alter, amend, or in any way change the Consent Order, section 1818(i) has no

application.

26.    Moreover, AFI misreads the Supreme Court's decision in Bd. of

Governors of Fed. Reserve Sys. v. MCorp Fin., Inc., 502 U.S. 32 (1991).  The Court in MCorp

did not hold that section 1818(i) "trumps the jurisdictional grant in the Bankruptcy Code."  AFI

Objection ¶ 24.  Rather, the Supreme Court held that section 1818(i) and section 364(b)(4) of the

Bankruptcy Code, together, preclude a bankruptcy court's interference with an *ongoing*

administrative proceeding.  Id. at 39-40.  The Court expressly declined to decide what AFI

presses in this case:  whether 12 U.S.C. § 1818(i) divests a bankruptcy court of jurisdiction

where, as here, there are no "on going administrative proceedings" and a final order has been

entered.  MCorp, 502 U.S. at 41 n.11.  Instead, the Supreme Court explained that "the

14

prosecution of the Board proceedings, prior to the entry of a final order and prior to the commencement of any enforcement action, seems unlikely to impair the Bankruptcy Court's exclusive jurisdiction over the property of the estate." Id. at 42.  The Court noted, however, that when an administrative proceeding "conclude[s] with the entry of an order that will affect the Bankruptcy Court's control over the property of the estate"—the precise circumstance at issue here—the Bankruptcy Court "may well … exercise its concurrent jurisdiction under 28 U.S.C. § 1334(b)." Id. at 41.

27.    The Second Circuit has confirmed that when administrative proceedings have resulted in an order affecting property of a debtor's estate, the automatic stay applies. FDIC v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125 (1992).  In In re Colonial Realty, the Second Circuit recognized that MCorp "did not reach the Board's contention that § 1818(i)(1) ousted the bankruptcy court of jurisdiction without regard to the § 362(b)(4) exemption." Id. at 135.  Thus, under that Second Circuit precedent, section 1818(i) applies only to the extent that— as was the case in MCorp—there is an ongoing "police or regulatory" matter. Id.  Because no such "police or regulatory matter" is pending here, the Court is not divested of jurisdiction.

28.    To be sure, In re Colonial Realty did not construe section 1818(i).  AFI Objection ¶ 25 n.43.  But that decision interpreted a near identical statute, which the Second Circuit even explained was "an analogue to" section 1818(i). Id. at 135.  As such, In re Colonial Realty's rationale—if not its holding—should apply with equal force to this case.  And this Court should not depart from In re Colonial Realty—particularly where AFI has identified no Second Circuit decision that applies Section 1818(i) in the manner AFI suggests.  Indeed, other courts are in accord.  E.g., Peoples Nat'l Bank v. OCC, 362 F.3d 333, 336 (5th Cir. 2004) ("If the enforcement action has terminated, section 1818(i)(1) would no longer preclude jurisdiction.");

15

F.T.C. v. CompuCredit Corp., No. 08-CV-1976, 2008 WL 8762850, at *7 (N.D. Ga. Oct. 8,

2008) ("§ 1818(i), when read in the context of the entire statute, is nothing more than an anti-

injunction provision to limit collateral attacks on federal banking agency administrative

proceedings and their results."  (Internal quotations omitted)).

29.    Nor do the out-of-circuit precedents on which AFI relies suggest a

different result.  The unpublished and non-precedential Third Circuit ruling in DeNaples v. OCC,

404 Fed. Appx 609, 2010 WL 5135326 (3d Cir. Dec. 17, 2010), involved a challenge to an

ongoing proceeding by the OCC—something that MCorp plainly precludes and is irrelevant here

because no administrative proceedings are pending.  Other decisions AFI cites involve collateral

attacks on regulatory orders issued pursuant to section 1818.  For example, Owner Mgmt. Serv.,

LLC v. JPMorgan Chase Bank, N.A. (In re Owner Mgmt. Serv., LLC), No. 12-AP-01222, 2012

WL 4480551 (Bankr. C.D. Cal. Sept. 25, 2012), involved a collateral, substantive challenge to

conduct and issues that were the subject of (and ultimately resolved by) a consent order.  2012

WL 4480551, at *1.  Likewise, the Fifth Circuit in Rhoades v. Casey, 196 F.3d 592 (5th Cir.

1999), held that section 1818(i) deprived the district court of jurisdiction to a challenge to the

propriety of an Office of Thrift Supervision order.  Neither of those decisions has application

where, as here, the Debtors do not challenge (and, in fact, accept) that FRB Foreclosure Review

obligation at issue in this case.

30.    Lastly, Landmark is entirely inapposite, as that pre-MCorp case involved

whether judicial review of a cease and desist order, as provided by 12 U.S.C. § 1818(c)(2), could

be transferred to the judicial district where bankruptcy petitions were pending.  Landmark Land

Co. v. Office of Thrift Supervision, 948 F.2d 910, 913 (5th Cir. 1991).  The Fifth Circuit there

held that Section 1818(i) precluded the transfer.  Unlike here, that case involved direct review of

the Office of Thrift Supervision's order.

> **C.**     **The Police and Regulatory Exception to the Automatic Stay does Not Apply**
> **to Permit the FRB to Enforce its Unsecured Claim**

        31.     The police and regulatory exception to the automatic stay does not apply

to any efforts by the FRB or other governmental entities to enforce the general unsecured FRB

Foreclosure Review obligation.  Despite the FRB's contentions, enforcement of the FRB

Foreclosure Review obligation represents an attempt to collect a money judgment for purposes

of Bankruptcy Code section 362(b)(4).  To conclude otherwise would allow any governmental

authority to avoid the scope of section 362(b)(4) by the simple expedience of ordering a debtor to

pay money rather than simply awarding judgment.  This outcome, which would prefer

government judgments over others, cannot be what Congress intended.  See H. Rep. No. 595, 5th

Cong., 2d Sess. 343 (1978) ("enforcement by a governmental unit of a money judgment would

give it preferential treatment to the detriment of all other creditors.")

        32.     The fact that the FRB is attempting to require the Debtors to pay over

money for the benefit of many does not change the analysis.  In fact, the Second Circuit's

decision in SEC v. Brennan, 230 F.3d 65 (2d Cir. 2000) involved just such a case.  In that case,

the SEC had obtained a judgment requiring the debtor to pay over approximately $75 million in

ill-gotten gains.  Id. at 68.  When the debtor later filed for bankruptcy, the SEC sought to force

the debtor, outside of the bankruptcy process, to repatriate funds from an off-shore trust.  Id. at

68-69.  The SEC asserted that it was not seeking to collect the funds for itself, but for the benefit

of all creditors.  Id. at 69, 73.  The Second Circuit rejected that argument, concluding that the

SEC was attempting to enforce its money judgment and, therefore, the exception to the automatic

stay's police and regulatory exception – preventing enforcement of a money judgment –

                                                    17

prevented the actions of the SEC.  Id. at 71.  The Second Circuit explained that "[w]hen the government seeks to impose financial liability on a party, it is plainly acting in its police or regulatory capacity - it is attempting to curb certain behavior . . . by making the behavior that much more expensive."  Id. at 72.  "It is this added expense that deters a party from defrauding or polluting –not the identity of the entity to which it must eventually pay."  Id. at 72-73.  Instead, once financial liability has been imposed by judgment, the police or regulatory nature of the action ends and any further actions to enforce the award violates the automatic stay.  See id.; see also E.E.O.C. v. Rath Packing Co., 787 F.2d 318, 326 (8th Cir. 1986) (district court's creation of payment plan for payment of back pay and direction to EEOC to formulate a plan for disbursement of proceeds and set up a claims system went "well beyond" entry of a monetary judgment, and violated Bankruptcy Code section 362(a)).

33.     Here as well, the FRB has already obtained an order which qualifies as a judgment for purposes of Bankruptcy Code section 362(b)(4).  N.L.R.B. v. 15th Ave. Iron Works, Inc., 964 F.2d 1336, 1337 (2d Cir. 1992) (explaining that NLRB order represented judgment for purposes of Bankruptcy Code section 362(b)(4) because the NLRB could petition for enforcement of the order under 29 U.S.C. § 160(e)); 12 U.S.C. § 1818(i) (providing a similar enforcement mechanism for orders issued under 12 U.S.C. § 1818).  The order requires GMAC Mortgage to pay money for the benefit of any number of borrowers.  At this point, the FRB seeks to have GMAC Mortgage spend approximately $374 million to identify the borrowers to whom the Debtors may owe money – an inquiry which Brennan makes clear is irrelevant for purposes of the automatic stay analysis - and to pay over money to those borrowers.  See id.  Thus, the FRB is attempting to enforce a monetary remedy against the Debtors, and such enforcement would result in preferential treatment of a small subset of creditors and professionals to the out-

18

sized detriment of all other creditors.  As a result, the police and regulatory exception does not

apply.  H. Rep. No. 595, 5th Cong., 2d Sess. 343 (1978) ("enforcement by a governmental unit

of a money judgment would give it preferential treatment to the detriment of all other

creditors.").

        **D.**       **The Motion is Procedurally Proper**

        34.     Finally, the Motion is procedurally proper.  Unlike the motion made by

AIG and others earlier in the Debtors cases, the Motion does not seek a determination regarding

the appropriateness of subordination of a claim or a declaration that should one group of claims

be subordinated a separate set of claims must be subordinated as well.  Instead, the Debtors

request a simple determination regarding the appropriate classification of a claim under the

Bankruptcy Code.  Bankruptcy Rule 3013 permits the Court, "on motion after hearing on notice

as the court may direct" to determine issues related to classification of claims or interests for

purposes of a plan.  Fed. R. Bankr. P. 3013.  The Advisory Committee Notes to Bankruptcy Rule

3013 make clear that "it may be desirable or necessary to establish proper classification before a

plan can be formulated."  Id.  Accordingly, requesting a Court determination regarding the

classification of the FRB Foreclosure Review for purposes of a plan is appropriately made by

motion.

        35.     Likewise, courts in this and other districts routinely enforce the automatic

stay on motion by a debtor.  See, e.g., In re Gen. Growth Properties, Inc., 426 B.R. 71, 76-77

(Bankr. S.D.N.Y. 2010) (granting motion to enforce the automatic stay with respect to lawsuit

against Debtors' directors); In re Lehman Brothers Holdings Inc., Case No. 08-13555 (JMP),

2009 WL 6057286, at *1 (Bankr. S.D.N.Y. Sept. 17, 2009) (granting motion requesting, in part,

enforcement of the automatic stay).  The request here, in the face of the FRB's statements that

the Debtors must continue to conduct the FRB Foreclosure Review, is no different except that

the Debtors do not otherwise seek imposition of sanctions for violation of the automatic stay.

Accordingly, the Motion is the procedurally proper avenue to seek the relief requested.

WHEREFORE, the Debtors respectfully request that the Court grant the Motion and enter an order, substantially in the form attached thereto as <u>Exhibit 1</u>, confirming (i) that GMAC Mortgage's obligation to complete the FRB Foreclosure Review is a general unsecured claim for purposes of any plan proposed in these chapter 11 cases and (ii) that the automatic stay applies to prevent the FRB and FDIC from attempting to enforce their general unsecured claim against GMAC Mortgage.

New York, New York
Dated: March 19, 2013

/s/  Gary S. Lee
Gary S. Lee
Lorenzo Marinuzzi
Stefan W. Engelhardt
James A. Newton
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
Debtors in Possession*

20