1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6                                   Case No. 12-12020-mg

7   RESIDENTIAL CAPITAL, LLC, ET AL.,

8            Debtors.

9   - - - - - - - - - - - - - - - - - - - - -x

10  SEALINK FUNDING LIMITED,

11                      Plaintiff,

12       -against-                 Adv. Proc. No. 12-02051-mg

13  DEUTSCHE BANK AG, ET AL.,

14                      Defendants.

15  - - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            March 5, 2013

21            10:02 AM

22

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

2

1

2   (CC: Doc no. 2887) Debtors' Motion Pursuant to Sections 105(a)

3   and 363(b) of the Bankruptcy Code for an Order Authorizing the

4   Debtors to Appoint Lewis Kruger as Chief Restructuring Officer

5   filed by Gary S. Lee on behalf of Residential Capital, LLC.

6

7   (CC: Doc no. 2943) Debtors' Application Under Bankruptcy Code

8   Section 327(a), 328(a) And 363 For The Entry Of An Order

9   Modifying The Retention And Employment Of FTI Consulting Inc.

10   As Financial Advisor To The Debtors Pursuant To Second

11   Addendum, Nunc Pro Tunc to December 5, 2012, And For Related

12   Relief (related document(s)526, 902) filed by Lorenzo Marinuzzi

13   on behalf of Residential Capital, LLC.

14

15   Doc# 2918 Motion to Extend Exclusivity Period for Filing a

16   Chapter 11 Plan and Disclosure Statement / Debtors' Motion for

17   the Entry of an Order Further Extending Their Exclusive Periods

18   to File a Chapter 11 Plan and Solicit Acceptances Thereof

19

20

21

22

23

24

25

3

1

2   Adversary proceeding: 12-02051-mg Sealink Funding Limited v.

3   Deutsche Bank AG et al (CC: Doc# 9, 10, 11, 21, 22) Motion to

4   Remand to New York State Supreme Court

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

4

1

2 A P P E A R A N C E S :

3 MORRISON & FOERSTER LLP

4 Attorneys for Debtors

5 1290 Avenue of the Americas

6 New York, NY 10104

7

8 BY:    LORENZO MARINUZZI, ESQ.

9 GARY S. LEE, ESQ.

10

11

12 KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP

13 Attorneys for Official Creditors' Committee

14 1177 Avenue of the Americas

15 New York, NY 10036

16

17 BY:   KENNETH H. ECKSTEIN, ESQ.

18 RACHAEL L. RINGER, ESQ.

19 DOUGLAS MANNAL, ESQ.

20

21

22

23

24

25

5

1

2   WHITE & CASE LLP

3       Attorneys for Ad Hoc Group Of Junior Secured Noteholders

4       1155 Avenue of the Americas

5       New York, NY 10036

6

7   BY:   HARRISON DENMAN, ESQ.

8         J. CHRISTOPHER SHORE, ESQ.

9         GERARD UZZI, ESQ.

10

11

12  KELLEY DRYE & WARREN LLP

13      Attorneys for UMB Bank

14      101 Park Avenue

15      New York, NY 10178

16

17  BY:   CATHERINE L. THOMPSON, ESQ.

18

19

20  KIRKLAND & ELLIS LLP

21      Attorneys for Ally Financial, Inc. and Ally Bank

22      601 Lexington Avenue

23      New York, NY 10022

24

25  BY:   RAY C. SCHROCK, ESQ.

6

1

2    BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

3          Attorneys for Sealink plaintiffs

4          1285 Avenue of the Americas

5          38th Floor

6          New York, NY 10019

7

8    BY:   REBECCA BOON, ESQ.

9          DAVID WALES, ESQ.

10

11

12    CARTER LEDYARD & MILBURN

13          Attorneys for Talcott Franklin Group Investors

14          2 Wall Street

15          New York, NY 10005

16

17    BY:   AARON R. CAHN, ESQ.

18

19

20    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

21          Court Plaza North, 25 Main Street

22          Hackensack, NJ 07601

23

24    BY:   JOHN H. DRUCKER, ESQ.

25

7

1

2  DECHERT LLP

3       Attorneys for Bank of New York Mellon

4       1095 Avenue of the Americas

5       New York, NY 10036

6

7  BY:   GLENN E. SIEGEL, ESQ. (TELEPHONICALLY)

8

9

10  SEWARD & KISSEL LLP

11       Attorneys for US Bank N.A. as RMBS Trustee

12       One Battery Park Plaza

13       New York, NY 10004

14

15  BY:     ARLENE R. ALVES, ESQ.

16         MARK D. KOTWICK, ESQ.

17

18

19  CHADBOURNE & PARKE LLP

20       Attorneys for the Examiner

21       30 Rockefeller Plaza

22       New York, NY 10112

23

24  BY:     MICHAEL G. DISTEFANO, ESQ.

25

8

1

2  CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Wilmington Trust

4         One Liberty Plaza

5         New York, NY 10006

6

7  BY:    THOMAS J. MOLONEY, ESQ.

8         SEAN A. O'NEAL, ESQ.

9

10

11  ROPES & GRAY LLP

12          Attorneys for RMBS Certificate Holders

13          800 Boylston Street

14          Boston, MA 02199

15

16  BY:     KEITH H. WOFFORD, ESQ.

17

18

19  SIMPSON THACHER & BARTLETT LLP

20          Attorneys for Deutsche Bank defendants

21          425 Lexington Avenue

22          New York, NY  10017-3954

23

24  BY:     DAVID J. WOLL, ESQ.

25          ISAAC RETHY, ESQ.

9

```
 1

 2   UNITED STATES DEPARTMENT OF JUSTICE

 3        Office of the United States Trustee

 4        33 Whitehall Street

 5        21st Floor

 6        New York, NY 10004

 7

 8   BY:   BRIAN S. MASUMOTO, ESQ.

 9

10

11   BRADLEY, ARANT, BOULT & CUMMINGS, LLP

12        Attorneys for Defendant Judy Faber

13        One Federal Place

14        1819 Fifth Avenue North

15        Birmingham, AL 35203

16

17   BY:   CHRISTOPHER L. HAWKINS, ESQ. (TELEPHONICALLY)

18

19

20   ALSO PRESENT:

21        PAMELA WEST, RESIDENTIAL CAPITAL, LLC (TELEPHONICALLY)

22        LEWIS KRUGER, Chief Restructuring Officer

23

24

25
```

**RESIDENTIAL CAPITAL, LLC, ET AL.**

10

1              P R O C E E D I N G S

2              THE COURT:  All right, please be seated.  We're here

3    in Residential Capital, number 12-12020.

4              Mr. Lee?

5              MR. LEE:  Good morning, Your Honor.  Gary Lee from

6    Morrison & Foerster on behalf of the debtors.

7              Your Honor, as I mentioned last week, during our

8    status report, we filed two motions that relate to the plan

9    process.  One is a motion to appoint Lewis Kruger as the chief

10   restructuring officer, and that's docket number 2887.  And the

11   second is a motion to extend the debtors' exclusive period to

12   file a Chapter 11 plan, and that's docket 2918.

13             Your Honor, while the parties filed joint responses to

14   both those motions and we filed a joint reply, if Your Honor

15   doesn't object, I'd address them one by one, starting with

16   docket number 2887, which is the motion to appoint Mr. Kruger.

17             THE COURT:  Please.

18             MR. LEE:  Your Honor, as you're aware, the standard

19   for approving and compensating a CRO under Section 363 of the

20   Bankruptcy Code is whether the debtors used reasonable business

21   judgment.  ResCap's board of directors engaged in a very

22   thorough selection process and determined, in good faith, that

23   the appointment of Mr. Kruger was in the best interests of

24   estates.

25             As I mentioned last week, Your Honor, Mr. Kruger has

**RESIDENTIAL CAPITAL, LLC, ET AL.**

11

1  already spent a significant amount of time meeting with the

2  debtors and the various creditor constituencies.  He's also met

3  with Judge Peck on several occasions regarding the mediation

4  process, most recently yesterday, Your Honor.

5          Your Honor, no party has objected to Mr. Kruger's

6  appointment.  The debtors believe that the absence of an

7  objection is a reflection on Mr. Kruger, his vast restructuring

8  experience, and I believe, a reflection on the fact that the

9  creditors believe that he will help to move the plan process

10 forward.  His guidance and insight has already proved very

11 valuable in getting us to where we are with the creditors'

12 committee.

13         We submitted a revised form of order to Your Honor's

14 chambers yesterday.  The only open issue is Mr. Kruger's

15 success fee, which is the subject of discussion with the board

16 and the creditors' committee.  And once the parties reach

17 consensus on that issue, we'll come back to Your Honor.

18         Accordingly, Your Honor, and in light of the absence

19 of any objections, we'd ask Your Honor to approve the

20 appointment of Mr. Kruger as the debtors' CRO pursuant to

21 Section 363 of the Code.

22         THE COURT:  Does anybody wish to be heard with respect

23 to the CRO motion?

24         Mr. Eckstein?

25         MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

1    Eckstein on behalf of the unsecured creditors' committee.

2              I can speak briefly to this.  The committee does

3    not -- did not object to this, and in fact, the committee

4    supported the appointment of a CRO and believes that Mr. Kruger

5    is well suited to play the role in this case.

6              The idea of introducing a CRO was a subject that the

7    committee had discussed with the debtor back in November.  The

8    issue was adjourned in December when Judge Peck was introduced

9    as the mediator and the parties focused on mediation while at

10   the same time focusing on the closing of the sale.

11             The decision to bring on a CRO was a decision that the

12   debtor made.  It was presented to the creditors' committee, and

13   it was somewhat surprising that it was presented without

14   discussion.  Nonetheless, we ultimately sat with the debtor and

15   with Mr. Kruger, and in short order, were able to come to what

16   we thought was a very constructive conclusion as to Mr.

17   Kruger's role.

18             We worked with the debtor on scope, and the debtors'

19   reply reflects a revised scope that the committee is

20   comfortable with.  We believe that Mr. Kruger and the scope

21   that has been assigned to him reflects his expertise and

22   experience in the restructuring field, which is clearly an

23   issue that this case has to grapple with, provides a level of

24   independence that we believe is going to be helpful and

25   important to advancing the case, and we believe will instill

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1    greater confidence on the part of the creditor constituencies

2    that the debtor is going to be guided in an independent fashion

3    that hopefully will lead to a consensual plan or to a process

4    that will lead to a resolution of the case on a, if not

5    consensual basis, then an efficient litigated basis, if that's

6    the path we have to follow.

7         I'll save the rest of my remarks for the discussion of

8    exclusivity, but we believe this is an appropriate step to be

9    taken in the case, and we think that, particularly with the

10   agreement that was reached with the creditors' committee as to

11   how we're going to proceed over the next sixty days, our hope

12   is that Mr. Kruger will use the next sixty days to try to

13   advance a negotiated plan process, either with AFI or without

14   AFI, but either way, advance a negotiated plan process.

15        So we understand that the success fee element of Mr.

16   Kruger's engagement is something that's being deferred, and we

17   intend to deal with that in a subsequent fashion, but with that

18   reservation, the committee is supportive of the retention.

19        THE COURT:  Thank you, Mr. Eckstein.

20        Anybody else wish to be heard with respect to the CRO

21   motion?

22        Mr. Lee, did you want to say something else?

23        MR. LEE:  Nothing, Your Honor.

24        THE COURT:  All right.  The Court grants the motion.

25   Let me say -- and I know we're going to separately talk about

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1  the exclusivity motion; I'm going to hear that, and maybe I

2  should save my comments for that, but I do link it to the CRO

3  motion.  When the debtor made its first motion to extend

4  exclusivity back in August of 2012, when the Court ruled on

5  that motion, I approved only a very short extension of

6  exclusivity until December 20th, 2012.  And in granting that

7  relatively short extension, I made clear that I was

8  dissatisfied with the progress in developing a plan and

9  expected the parties to begin serious negotiations, attempting

10 to develop a consensual plan.

11         There were subsequent motions to extend exclusivity.

12 In some respects, there has been good progress in the case in

13 terms of the auctions of the loan servicing platform, the

14 legacy loan portfolio, and the recent closing of those sales.

15 Where there clearly has been less progress has been in the plan

16 process.  The debtors made the motion for appointment of a

17 mediator, and that motion was granted and I appointed -- with

18 his consent, obviously, I appointed Judge Peck, my colleague

19 Judge Peck, who I know has worked tirelessly, and continues --

20 and I know various of the pleadings filed have described those

21 mediation efforts as stalled, but I know Judge Peck continues

22 to work tirelessly to try and move the parties to consensus.

23         I view the appointment of Mr. Kruger as the CRO as a

24 very important step in what I still hope will be the

25 development of a consensual plan.  Obviously, Mr. Kruger has

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1    very extensive experience as an insolvency professional, and

2    it's clear that he's very highly respected.  He has an

3    important role.  I think the changes that were made to the

4    scope of the CRO's engagement here emphasize the importance of

5    his independence in developing and trying to get the parties to

6    develop a consensual plan.  And it's certainly the Court's hope

7    that Mr. Kruger's efforts will come to fruition with a

8    consensual plan or -- I'm reluctant to sign on to something, a

9    process that's going to lead to substantial litigation; that

10    may be where this heads.

11          The costs of this case are fairly extraordinary,

12    frankly.  The sooner a plan can be developed, a disclosure

13    statement approved, voting, hopefully confirmation of a plan,

14    the sooner the substantial administrative expenses can be

15    reduced.  There are a lot of difficult issues on the Court's

16    plate right now that are important to this case, but I do view

17    the CRO as having an important role in trying to move this

18    forward.

19          I'll raise it now; I know there was a motion to extend

20    exclusivity, and there's the CRO motion, but the initial order

21    appointing Judge Peck as the mediator -- and that's ECF 2519 --

22    described an initial period for mediation through February

23    28th, 2013.  I haven't seen a motion to extend it, but I'm

24    doing it sua sponte.

25          MR. LEE:  Your Honor, I actually was going to address

1    that right after the CRO motion.  We've heard from both the

2    committee and from AFI that in their view they would obviously

3    like to see the mediation continue.  We discussed it with Judge

4    Peck, and Judge Peck said irrespective of whether the order had

5    or hadn't terminated, he was continuing as if the mediation was

6    ongoing.

7              THE COURT:  Right.

8              MR. LEE:  And all of the parties are proceeding on

9    that basis.

10             THE COURT:  Well, I think it's important -- I don't

11   expect any disputes with respect to confidentiality of the

12   mediation, but I think it's important that an order be in place

13   that makes clear that the protections associated with the

14   mediation are there.

15             So I intend to enter an order, sua sponte today, that

16   will extend the term -- Judge Peck's term as mediator to and

17   including May 31, 2013, or such earlier date as Judge Peck

18   declares in a written order that the mediation is at an impasse

19   and should be terminated forthwith.  And all of the remaining

20   terms of that December 26th, 2012 order remain in place.  The

21   order that I intend to enter is just a short order that extends

22   the mediation to the date I've given, May 31, on the same --

23   otherwise on the same terms as the earlier order.

24             I view -- we'll see what -- I know there's still

25   disputes about extension of exclusivity, and I'll hear those;

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  I'm not ruling on those.  But I view the three as inextricably

2  linked, frankly, the appointment of CRO, the continuing role of

3  and willingness -- and I checked with Judge Peck to make sure

4  he had no problems about me entering this order, and he

5  expressed his willingness to continue his efforts, as long as

6  it appears to bear any reasonable chance of success.  So while

7  people have described it as stalled, I know Judge Peck has

8  really been pretty tireless in continuing his efforts, and I

9  certainly appreciate that very much.  So I just want to say I

10  do approve the CRO motion, and I will enter an order extending

11  the appointment of Judge Peck as the mediator.

12       MR. LEE:  Thank you, Your Honor.  I turn the podium

13  now over to Mr. Marinuzzi, if I may.

14       THE COURT:  Thank you very much.

15       MR. LEE:  Thank you.

16       MR. MARINUZZI:  Good morning, Your Honor.  Lorenzo

17  Marinuzzi, Morrison & Foerster, on behalf of the debtors.

18       Your Honor, I'm going to switch gears for a second.

19  I'm on page 8 of the agenda.  And the other uncontested item on

20  the agenda for today's hearing is the debtors' application to

21  modify the terms of FTI Consulting's retention.  It's a motion

22  that we filed on February 18th.  There's been no objection.  We

23  spoke to Mr. Masumoto this morning, and he indicated he was

24  okay with the relief requested.

25       Briefly, Your Honor, around Thanksgiving, or shortly

1    after Thanksgiving, after the sale was approved, the company

2    realized that it was a challenge to get the closing done and it

3    required that FTI utilize its experience to provide some

4    project management services to Walter, at the direction of the

5    debtors, to get the transaction closed sooner rather than

6    later, recognizing that this was not something that FTI signed

7    up for, but also recognizing needing to move forward quickly.

8    FTI immediately jumped into those efforts and provided those

9    services.  Walter has agreed to reimburse the estates for the

10   costs of those services, which are approximately 900,000

11   dollars.  So it's not costing the debtors anything, but it's

12   also not penalizing FTI for providing those services.

13          So unless the Court has any questions, we'd ask that

14   the order be entered.

15          THE COURT:  Does anybody else -- anybody have anything

16   they want to say on this motion?

17          All right.  It's granted.

18          MR. MARINUZZI:  Thank you, Your Honor.

19          Your Honor, that brings us to the debtors' application

20   to extend the exclusive plan filing and solicitation periods.

21   Your Honor, the motion was filed on February 14th, originally

22   scheduled to be heard on February 28th, and Your Honor entered

23   a bridge order extending exclusivity through today.

24          Originally, as filed, the debtors were requesting a

25   ninety-day extension of the plan filing and solicitation

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**19**

1    periods.  After discussions and -- many discussions with the

2    creditors' committee, we've shortened that request to sixty

3    days, respectively.

4           Your Honor, since we were last here on December 20th,

5    requesting an extension, much has happened in the debtors'

6    cases.  Your Honor is aware, obviously, that we closed the sale

7    of substantially all of the debtor's -- well, a substantial

8    portion of the debtors' assets and netted over four billion

9    dollars in recoveries.

10          Your Honor has seen enough paper about how

11   unprecedented it was, but it really was unprecedented.  It took

12   a significant amount of effort from the committee's management,

13   its directors and its professionals, to get it closed.  Now, in

14   anticipation of closing those sales and looking forward to the

15   next chapter of these cases -- and I think Your Honor hit many

16   of the points that I'm going to present in my presentation --

17   the company recognized that to really move the case forward, we

18   had to have a mechanism for effective discussions and

19   negotiations with the creditors, the creditors' committee, and

20   AFI.  And one of the fundamental cornerstones of those efforts

21   was the debtors' application to request the appointment of a

22   mediator, which Your Honor did late last year.

23          From the debtors' perspective -- and others, I am

24   sure, will stand up and echo these comments -- the involvement

25   of the mediator has been tremendously helpful in moving things

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1   forward and helping to frame disputes.  The mediation has

2   commanded the attention of not just the debtors, but the

3   committee, it's members, other creditors not on the committee,

4   and AFI.  It's been an inclusive project.

5          In addition, another important aspect of moving these

6   cases forward, obviously, as Your Honor noted, was the

7   appointment of Mr. Kruger as the debtors' CRO.  We believe that

8   having Mr. Kruger, as the representative of the debtors'

9   estates in the mediation and negotiations, is going to be

10  incredibly helpful and an important step forward.

11         So Your Honor, focusing on the motion, I believe the

12  motion addresses properly the Adelphia factors, but I'm happy

13  to walk through each of them in the context of this case, if

14  Your Honor would like me to do so.

15         THE COURT:  No, I think the issue that I do want to

16  hear about, and if you want to let Mr. Shore speak first, it's

17  the issue that the ad hoc committee raises.  They're

18  obviously -- the debtors' motion to extend exclusivity was

19  modified, pursuant to an agreement with the creditors'

20  committee, and giving -- I'm not sure it uses these terms, but

21  in effect, for the sixty-day period, giving the creditors'

22  committee a veto right over any plan that would be proposed.

23  Mr. Shore and the ad hoc committee, whether -- you know, they

24  filed an objection, then they filed a statement, so it's in the

25  statement; it isn't denominated an objection, but it's in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1    statement.  I guess I read it as an objection of sorts to this

2    aspect of the extension of exclusivity.  So do you want to

3    address that now or do you want to wait for Mr. Shore to speak?

4              MR. MARINUZZI:  No, Your Honor.  I'm happy to explain

5    the settlement that we've reached with the committee.  Now, I

6    think we need to set the stage for what we're trying to

7    accomplish going forward.  And we all recognize the sale is

8    closed, there are some adjustments to be made, escrows to be

9    released, et cetera, but for the most part we're now in the

10   plan negotiation stage.  And --

11             THE COURT:  We're supposed to be in the plan

12   negotiation stage --

13             MR. MARINUZZI:  Well, it is now --

14             THE COURT:  -- since last year, but --

15             MR. MARINUZZI:  It is now the most important task for

16   these debtors, as opposed to closing a sale.

17             Realistically, there are three ways to get out of this

18   case with a plan, as we see it.  Others can argue there are

19   more.  But first possible plan:  we can file a plan that has

20   the support of every creditor, creditors' committee, global

21   support, AFI pays for third-party releases, everyone is happy,

22   and the confirmation hearing in front of Your Honor is largely

23   uncontested.

24             THE COURT:  From your lips.

25             MR. MARINUZZI:  Let me finish, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1          THE COURT:  That was route one.

2          MR. MARINUZZI:  Right, but unless creditors adjust

3    their expectations from what we understand their positions are,

4    I don't think there's a check big enough for AFI to write to

5    create scenario one.

6          Scenario two:  we're able to construct a plan that's

7    supported by the majority of the members of the committee.  AFI

8    writes a check that's somewhere north of 750 million dollars;

9    it's a number that AFI can defend to its board and treasury.

10   And we move forward with a slightly contested plan, maybe hotly

11   contested, but by a small number of participants.

12         Third scenario:  we have no settlement with AFI

13   whatsoever, can't get creditors to recognize the weaknesses of

14   their claims or AFI to recognize the strengths of those claims

15   that are asserted against them, and we simply file a plan that

16   reserves all of the claims against AFI, the estate's claims,

17   into a litigation trust.  Creditors retain their claims.

18   Professionals prosecute claims for a number of years.  Whether

19   there's any actual recovery is going to depend on the strength

20   of the claims; who knows when and who knows how much.  I don't

21   think anybody wants that scenario.

22         So let's focus on the next sixty days, because what we

23   really tried to accomplish through this settlement with the

24   committee is to put pressure on everybody to sit down and

25   negotiate.  We need our creditors and AFI to sit down to try to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    get a deal done before the examiner's report is actually filed,

2    which is two months from now.  On the one hand, AFI has the

3    checkbook.  On the other hand, you've got creditors, including

4    many on the creditors' committees, that have intercreditor

5    disputes between themselves, claims asserted against the

6    debtors that are still contingent and unliquidated.

7          And so in order to move the process forward, a number

8    of things have to happen that are going to require the

9    cooperation of the creditors' committee.  And at this point,

10   the debtors are actively and acutely focused on dealing with

11   the creditor claims asserted against them, with the support of

12   the committee for the first time in the case.

13         We've already commenced an adversary proceeding to get

14   the Court to address the priority of the securities claims.

15   There will be more claims objections coming shortly, that are

16   going to address some of the major issues that are part of the

17   creditors' committee and part of the dynamics of the asserted

18   claims of the members.

19         And so when we look at that issue, in order for us to

20   have progress, people need to be nervous, people need to

21   understand that there are risks, that they can't sit still.  So

22   we're addressing the creditor's claims, and the agreement we

23   reached with the committee actually gets them to affirmatively

24   commit to this process.  It's sixty days of negotiation.

25         Now, in agreeing to continue exclusivity for sixty

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1    days, which is an important component of this, we've also

2    granted the committee -- or agreed that we would not oppose

3    standing.  They'll have to file a motion, they'll have to wait

4    sixty days to bring an action.

5         Now, AFI obviously recognizes that at some point in

6    sixty-five days, or whenever that sixty-day period expires,

7    there's the possibility that litigation will be launched

8    against it, assuming Your Honor grants the standing motion, and

9    I suppose we'll hear from AFI eventually when the committee

10   files its motion.

11        And so AFI has to think hard about whether they want

12   to sit back and wait for the examiner's report or whether they

13   want to show up to a mediation.  We're encouraged that they'll

14   show up to a mediation and have a discussion with the committee

15   and with its members.  At the same time, the committee and its

16   members have to understand, if they actually do go forward with

17   litigation, what does that do to the dynamics of the

18   negotiation.  So there's risk on both sides.

19        Now, importantly, during this exclusivity period, the

20   debtors retain the right to file a plan that provides for

21   releases in favor of AFI, so long as the committee consents.

22   Now, what does that mean?  We don't see it as a veto right.

23   And -- excuse me, Your Honor.  We don't see it as a veto right,

24   because we think it reflects the reality of these cases, as we

25   look at the capital structure, we look at the players, we look

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    at the members of the committee.

2            Scenario A, easy; everybody signs up, it's not an

3    issue.  Scenario C, it doesn't matter; it's going to be a

4    liquidating plan that's going to reserve all these claims.

5    It's scenario B, it's the ability to file a plan that has the

6    agreement of a majority of the members of the committee.  And

7    we think that puts pressure, rightfully so, on the committee

8    and its members, recognizing that there can be a deal here that

9    leaves hold-outs out.  And we think that puts additional

10   pressure on them to sit down in mediation and recognize the

11   weaknesses of their claims, recognize that it's beneficial to

12   the process for creditors to sit down together and try to

13   figure out how to address their intercompany issues.

14           AFI, in its filing yesterday, we agree with them.

15   They recognize, as we do, that to move this case forward, it

16   isn't simply beating up on AFI; it's also individual committee

17   members and creditors recognizing that they have to cut their

18   own deals.  And we think this creates the proper balance.  To

19   us, it's not giving up control of the case.  To us, it's

20   recognizing the reality of where we are today and how to move

21   the case forward.

22           I'm happy to let Mr. Shore speak about his objection

23   and address anything in particular that he wants to raise with

24   the Court.  If Your Honor has any other specific questions, I'm

25   happy to answer them.

1      THE COURT:  I -- not so much a question as an

2   observation.  You focused on AFI, and I understand why you did

3   that; it's been a focus of the committee, it's been the focus

4   of other creditor constituencies as well.  The debtor, in

5   consultation with the committee, made the decision not to seek

6   to extend the plan support agreement and settlement with AFI.

7   It is what it is.

8      One thing you didn't mention in your presentation is

9   the institutional investors, the RMBS claims, and that process.

10   Trial has now been rescheduled for May 28th.  The proposed

11   settlement with the RMBS trustees would have an allowed 8.7

12   billion dollar claim.  If that trial -- you know, the sixty-day

13   exclusivity period will come to an end before the trial.  It

14   may be that the debtors and the settling parties -- I don't

15   know how to describe them, because it's a settlement with the

16   RMBS trustees if they sign on to it, otherwise it's not; I

17   commented before, it's a rather unusual structure for a

18   settlement.  But Mr. Eckstein is certainly taking the position,

19   with respect to the RMBS settlement, that the committee has

20   viewed it ought to be a subject for negotiation rather than for

21   trial.  I do consider that to be an important part of the

22   negotiation -- negotiations, plural, that need to go on during

23   the next sixty days, assuming exclusivity is extended for that

24   period.

25      I only raise that because you didn't mention it, and I

1    can't help -- I've got a room full of boxes of documents that

2    were exhibits for the trial that was supposed to start in

3    another week and that now has been put off until May 28th.  And

4    I consider that as a very -- that's an important constituency

5    and it's an important part of this case.  You know, it's

6    further complicated, because it's not just the trustees who own

7    the claims, the representation and warrantee claims, but it

8    raises the whole issue about the monoline insurers.

9        So there are -- you know, Mr. Kruger has his hands

10   full, because there are a lot of moving pieces to this:

11   intercreditor claims, claims against various -- the debtors,

12   and any consensual plan is going to have to resolve those

13   issues as well.

14       So I just raise the RMBS trustees because it's been --

15   you know, and I pass by the boxes every day and I've got all

16   this stuff on my iPad that I read.  I just about finished

17   reading everything that had been filed, to date, for the trial.

18   So that's a big allowed claim that the debtor has proposed to

19   grant.  So that clearly -- you know, whether the investors like

20   it or not, it had better be part of the negotiation that takes

21   place.

22       MR. MARINUZZI:  Your Honor, it certainly is the

23   subject of lots of negotiation.  We think it's perfect subject

24   for intercreditor settlements.  We encourage the parties, and

25   we hope they are -- in fact, we think they are having

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

1    settlement discussions, which are helpful, which has allowed us

2    to move this trial out a little bit.

3            We're sitting down with the committee and its members,

4    actually, in the event that there is an issue to litigate with

5    respect to the settlement, to try to narrow the issues that

6    we'll ask the Court to address.  That's actually part of the

7    global discussions that we're having.  And moving the trial is

8    consistent with our efforts to try a sixty-day period to sit

9    down and have people negotiate and think about their weaknesses

10   and really focus on how bad it could be for everybody, at the

11   end of the day, if we can't get a deal done.

12           Your Honor, I didn't address them because I was

13   addressing the Court's specific question.

14           THE COURT:  Okay.  Mr. Shore, do you want to be heard?

15           MR. SHORE:  Well, do you want to hear --

16           THE COURT:  Come -- you have to come up to the

17   microphone, sir.

18           MR. SHORE:  Do you want to hear from other people in

19   support of the motion first or --

20           THE COURT:  Look, you know, I've ready everybody's

21   papers.  And once the committee and the debtors came to an

22   agreement on a modified position, you sort of had the last word

23   with your statement that was filed.  So let me hear from you.

24   I'll let other people speak too, but I think -- you know, I

25   understood -- understand the points you made, but I do want to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   hear you about it.  I'm up in the air about it.  You have an

2   important constituency, and any consensual plan is going to

3   have to resolve the issue of the junior secured noteholders.

4   Go ahead.

5          MR. SHORE:  I have -- by the way, Chris Shore from

6   White & Case on behalf of the junior secured notes.

7          I have two substantive issues to address, and I'll try

8   to keep them separate.  One is a debtors' extension for sixty

9   days at all, and the second is the committee-related issues on

10  the standstill and their veto --

11         THE COURT:  Well, let me just --

12         MR. SHORE:  -- of our plan.

13         THE COURT:  You know, on the issue -- because I will

14  put this part to rest.  On the issue of the debtors' extension

15  at all, frankly, with Mr. Kruger's appointment as CRO, I'm

16  going to grant an extension of exclusivity.  The reason that

17  Mr. Kruger -- in my view, the reason Mr. Kruger -- the reason I

18  approved the retention of the CRO is so that he can actively --

19  from the debtors' standpoint, actively try and direct, manage,

20  move a plan process.  He deserves a chance to do that.  So that

21  part of it I'm pretty well resolved.  You raised a different

22  issue.  That's what I really want to hear about.

23         MR. SHORE:  All right.  Well, let me, for the record

24  then, on the issue of extending the debtors' exclusivity,

25  object on the basis that there's no evidence before the Court.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1   We've been on the debtors, as to producing evidence of this,

2   declarations, exhibits, anything to support the statements that

3   are being made about what they're doing.  We have substantial

4   issues with this notion that -- what they're going to be doing

5   over the next sixty days.  We know nothing about the details of

6   any meetings, who's going to participate, whether people are

7   engaging, who's not engaging, what commitments the trustee --

8   or sorry, the committee has made with respect to negotiating

9   over the next sixty days, whether or not they're agreeing to

10  negotiate in good faith, what threats have been made with

11  respect to a trustee, or anything else.  That all goes to the

12  debtors' extension of exclusivity, and there is no evidence in

13  the record on an issue which the debtors bear the burden of

14  proof.  They are going forward without any evidence today in

15  the hopes that Your Honor will extend exclusivity sua sponte.

16  Neither the rules nor the Code permit that, nor does Your

17  Honor's individual rules in connection with this.  They were

18  required to come forward with evidence today; they haven't done

19  that.

20          That being said, and preserving that objection, let me

21  address the issue with respect to the committee and start in a

22  further away place to talk about deal dynamics, first, to

23  respond to what Mr. Marinuzzi has said.  Second, because I

24  think that extensions of exclusivities and hearings on it are a

25  good time to apprise the Court of deal dynamics and what's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1    going on.  And third, I think it will explain our problem with

2    the bells and whistles the committee has had added to this

3    which gives them a veto right.

4            Fundamentally, in each of the three motions for

5    extending exclusivity the debtors have filed, they have made a

6    pitch to this Court that this case is complex, the issues are

7    difficult, and we can't get to a plan.  That's not really true

8    in our view.  The allowed capital structure in this case is

9    fairly simple.  There's a billion dollars of bonds up at the

10   parent that are unsecured.  There are 2.4 billion dollars of

11   unsecured -- or of secured junior secured notes under the Ally,

12   LLC and DIP claims.  There are fifty debtors.

13           THE COURT:  Fifty or fifty-one?

14           MR. SHORE:  I thought it was fifty.

15           UNIDENTIFIED SPEAKER:  Fifty-one.

16           MR. SHORE:  Fifty-one.  Fifty-one debtors with claims

17   asserted by the secured notes throughout, but the unsecured

18   notes, the only other constituency with material allowed claims

19   at this point, sit up at the parent.  The allowed capital

20   structure just sets up one debate:  how much value flows past

21   the secured claims, out of the operating companies, up to the

22   parent, and how much value of parent's litigation claims gets

23   covered by secured claims or not, the Ally claims.

24           That's a pretty simple plan.  It toggles off of, as I

25   said, one issue:  how much value flows.  The committee has

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1   filed a lawsuit saying that our secured claims don't attach to

2   certain collateral, with the idea that it will flow up, or

3   maybe it gets eaten up by a deficiency claim.  That's a simple

4   thing.

5           There are two wrinkles here.

6           THE COURT:  Ah, were it so simple.

7           MR. SHORE:  Well, that's actually a plan that could

8   get done.  If it was just that, I think that's a plan, that

9   everybody agree, would not be complex.  We might be battling,

10  but everyone would stake out their needs.

11          There are two wrinkles to that.  One, we're every day

12  fixing more of the asset side of the ledger, converting it into

13  cash, earning treasury rates.  On the other side of the ledger,

14  as Your Honor noted, the expenses --

15          THE COURT:  I'm not -- don't count on me approving the

16  distribution of funds to you -- your clients at this stage,

17  which is something you --

18          MR. SHORE:  No --

19          THE COURT:  -- suggested --

20          MR. SHORE:  No --

21          MR. SHORE:  -- in the --

22          MR. SHORE:  -- I'm just -- that's going to be -- if

23  people want to de-risk, people can de-risk; if people don't

24  want to de-risk, our view is we're clipping coupons at ten and

25  five-eighths on 2.4 billion dollars of note claims.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1          The issue, though, is that the expense side continues

2    to burn.  That's one problem, the one problem we have to fix,

3    and I think no -- well, let's put it this way, nobody's going

4    to stand up, and notwithstanding that Your Honor said it as

5    well, no one would, in the absence of Your Honor saying it, is

6    going to stand up and say this case deserves to be on a slow

7    burn.  Everybody is in agreement we need to move quickly.

8          The other problem in the case, or the wrinkle to the

9    case is that it is dominated, in large part, by litigants,

10   people who do not hold allowed claims.  And we're either in a

11   battle with the debtors in pre-petition lawsuits, or have since

12   come forward to make a stake to assets of the debtors:  the

13   RMBS litigants, the RMBS trust, the monolines, the securities

14   plaintiffs.  I'm going to add in that the senior notes, because

15   as a practical matter, senior -- the senior unsecured notes'

16   distribution is going to be dependent upon litigation

17   recoveries from Ally and the determination that those are not

18   subject to a lien.  In other words, they are just as interested

19   in litigating until they get to an allowance of a claim against

20   Ally that gives them a distribution that satisfies them.

21         So we have, in addition to the ticking time bomb of

22   expenses, you have litigants out there who are, as Your Honor

23   knows, and as has been demonstrated in this case, are going to

24   be as happy -- or are going to be happier with delay than being

25   forced into a situation in which they either have to settle

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1    their claims or take a chance in post-petition litigation with

2    fixed reserves there to satisfy their claims.

3        That's the dynamic that this case is in right now,

4    where you've got people with allowed claims:  us, some other

5    unsecured debt around the enterprise, who have a vested

6    interest in seeing that the cases move quickly and towards

7    resolution.  And you have another group out there who will

8    continue to litigate until an issue is put up on the table for

9    them to either choose a recovery or choose to litigate in

10   perpetuity.

11       That's the dynamic that sets up, and that's the

12   problem we have with the committee consent, because that

13   committee is ultimately -- not just the majority, every single

14   member of that committee, their recoveries are dependent upon a

15   lengthy and very complex and very fact-intensive litigation, or

16   a settlement on their part.  That's why we started these cases

17   out with a plan support agreement and a plan on file, and we

18   have --

19           THE COURT:  I don't -- I never saw a plan.

20           MR. SHORE:  Okay.

21           THE COURT:  I saw a plan support agreement.

22           MR. SHORE:  Well, where they -- where they --

23           THE COURT:  I've never, to this day, seen a plan.

24           MR. SHORE:  Sorry, with a plan support agreement on

25   file, very laid out, very detailed terms, exactly what was

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1    going to happen here.  We've been pushing for that.  And

2    everybody else in this case -- you don't have another creditor

3    in front of you with allowed claims at the OpCo level, where

4    everybody agrees the assets are.  You're hearing from people

5    with contingent litigation claims, and from people whose claims

6    recovery at the parent is going to be dependent upon litigation

7    at Ally.

8           So we believe, and we've said it, and I hear Your

9    Honor on you're going to extend exclusivity, that we are just

10    going to buy another sixty days when people have -- with free

11    optionality.  And we're going to come back, and now we're going

12    to say, okay, they've had another sixty days of optionality at

13    the cost of eighty plus million dollars to the estates; now

14    we're going to get serious.  I may be wrong, and if I'm proven

15    wrong, I'll be the first to stand up at the next hearing and

16    say I was wrong, people cut a deal.  But our prediction is

17    we're going to be back here, maybe one or two people have come

18    into the fold, but we're going to be going ahead with a

19    contested exclusivity over what kind of plan's going to be

20    coming out, or at least some very unhappy people as to what

21    plan is coming out.

22           The problem with the committee consent is that they're

23    forced here to take inconsistent positions about what's going

24    on.  Let's be clear about what happens, because Mr. Marinuzzi

25    said one thing but the agreement says another.  Mr. Marinuzzi

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1    said that they can withhold consent to any plan with an Ally

2    release.  That's not what their Exhibit A says; that says any

3    plan.  So they had the ability, the committee, which is -- all

4    the members are either going to have to litigate forever or

5    agree to some settlement in a highly charged environment where

6    the clock is ticking.  They get the ability to say no to a plan

7    over the next sixty days.

8           There are four inconsistencies with the committee's

9    position on that and the debtors' support of that.  But first,

10   the CRO is being appointed because he is independent.  If the

11   CRO finds that, as he's getting up to speed, there is clearly a

12   plan that can be done that in the exercise of his fiduciary

13   duties should be put out there immediately, how can the

14   committee say, on the one hand, he should be independent, but

15   only as independent as we believe he should be?  That's the

16   first inconsistency.

17          The second inconsistency is, as Your Honor noted, it's

18   not just that they say the RMBS claims are subject to dispute,

19   the RMBS claims, they say, could be zero.  They're not going to

20   stand up and state for the record, as a committee member, that

21   any member of their committee, other than the senior unsecured

22   notes, has an allowed or an allowable secured claim -- or

23   allowable claim within the enterprise.

24          So how can they say, on the one hand, that they should

25   be able to control the process, they should be elevated above

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1   any other constituency in the enterprise to say yes or no to a

2   plan, when they don't even have a committee with allowed claims

3   or even allowable claims?

4           THE COURT:  So your issue before today -- it may not

5   have been the only issue, and forgive me if I'm ascribing this

6   to -- it wasn't the junior secured noteholders alone.  I heard

7   plenty of objections that the debtors' hands were tied by the

8   pre-petition plan support agreement with Ally, which prevented

9   the debtor from offering any plan that Ally didn't approve.

10  And it wasn't -- I mean, you weren't alone in this; that was a

11  pretty -- the committee was up in arms about it, everybody was

12  up in arms about it.  Okay.  So even in your statement, you

13  express some satisfaction that the plan support agreement has

14  not been extended.

15          Frankly, my concern, Mr. Shore -- and I'm going to

16  want to hear from Mr. Eckstein about what veto role -- my term,

17  not their term -- the committee has going forward.  I'm

18  concerned about a free-for-all.  I know you say that plan

19  alternatives would drive people to consensus and agreement.  My

20  concern is that the plan alternatives you talk about -- and Mr.

21  Marinuzzi talks about three paths out, and whether it's exactly

22  the three, whether I would describe the three the same way, I

23  think that's pretty close to what the alternative paths are at

24  this point.

25          What -- and my initial comments when you got up, I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1    mean, I'm most taken by the notion that Mr. Kruger deserv --

2    and he's been getting up to speed for some time; it's not like

3    he got approved today and he's going to start looking at stuff

4    or talking to people now.  I gather he's been actively engaged

5    in that, and I'm assuming he's pretty well up to speed at this

6    point.

7            I think he deserves an opportunity to see, now that --

8    and the plan support agreement with Ally may have been

9    perfectly fine.  I know various creditor constituencies were

10   all up in arms about it.  I don't know whether it was good, bad

11   or indifferent; it's gone now, that's the reality of it.

12           And I think rather than having competing plans come

13   forward now, with disclosure statement hearings or whatever --

14   I mean, I'll control the hearing schedule, but I mean, I think

15   that Mr. Kruger working, and with the continuing tireless

16   efforts of my colleague Judge Peck, and -- I don't ascribe --

17   you question there's no evidence of good faith; I want to talk

18   about evidence in a minute, but I'm not accusing anybody of bad

19   faith, okay?  You've got a constituency, others have

20   constituencies, everybody's been arguing.  The case has got to

21   get over, or the administrative expenses are going to burn up

22   everybody's recoveries, but I'm not ascribing bad faith on

23   anybody's part, including Ally's part, for those who have

24   suggested that; I don't agree with that.  Okay.

25           But I come back to the notion that Mr. Kruger deserves

**RESIDENTIAL CAPITAL, LLC, ET AL.**

39

1    a chance.  Sixty days will be gone before you know it.  Yes,

2    the administrative expenses will continue to burn heavily

3    during that sixty-day period, but in my mind it's kind of a

4    balance because the Adelphia test of Judge Gerber, which I've

5    applied in many cases before; I think they're not necessarily

6    the exclusive factors, but I think it's a pretty good

7    cataloguing of the factors the court's supposed to take into

8    account.  I didn't see CRO in that list, but I think you can

9    fit it under quite a few of the categories.  He deserves a

10   chance to see what he can do.

11          And look, it may be that at the end of sixty days all

12   bets are off.  At that point -- you know, at this stage the

13   debtor would have an awfully hard time convincing me to extend

14   exclusivity again at that point.  I'm not ruling on it, but

15   they'd have to show very, very substantial progress.  Look, I

16   mean, from the first motion to extend exclusivity they didn't

17   get what they wanted, because I was very unhappy with the path

18   that the case was following.  And it's had its fits and starts

19   going forward.

20          But go ahead and finish up and then I'll want to hear

21   from Mr. Eckstein, because I think you raise important points.

22   I'm not enamored of giving any constituency, creditors'

23   committee -- and you raised in your statement that the

24   committee's very conflicted, they only have one member who,

25   what, has a fixed claim at this point.  And it may be that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1  members are conflicted, but I assume they'll act appropriately.

2  But --

3            MR. SHORE:  Okay.  Let me --

4            THE COURT:  -- go ahead, Mr. Shore.

5            MR. SHORE:  Sure.  Let me address -- I think there

6  were two things in Your Honor's comments, one on the free-for-

7  all, and let me touch on the evidence a little bit, and then

8  this issue of Ally control and the PSA and issues of

9  independence, which I think is the fourth inconsistency.

10           But first, let me deal with the free-for-all.  What

11 we've been looking for here is engaging by the debtors on real

12 issues going forward and a real schedule.  I would have thought

13 that, given Your Honor's first comment, much less your second

14 and -- decision on the second extension, that the debtors would

15 come in today and say we're meeting with the creditors'

16 committee on this date, we're meeting with each member on the

17 following eight days, we're meeting with this, we're doing --

18 none -- there is no commitment whatsoever --

19           THE COURT:  When would you like to meet with Mr.

20 Kruger?

21           MR. SHORE:  Well, we've met with Mr. Kruger.  We will

22 meet when Mr. Kruger wants.  And let me address one thing,

23 because I'm going to get in trouble if I don't mention one

24 thing.  The notion that we are trying to -- and the debtors

25 keep making this accusation -- take MNPI and be free to trade

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1      in anything else, that is a totally unfair characterization of

2      what's going on.  First of all, the debtors have been asking

3      for nonmarket stuff all along, but second, and most

4      importantly, we had a hearing, they stood up in front of Your

5      Honor and said there are going to be issues.  We drafted a

6      multi-page confidentiality order, socialized it with creditors,

7      took it to the debtors and took it to Judge Peck, and Judge

8      Peck said, too early, we don't need to address these issues

9      now, we're still talking about the size of the table and who's

10     going to sit at the table.  When we get to the point where

11     principals have to be involved -- we're not even to the point

12     where principals are being involved.  When we talk about these

13     meetings we're still talking about advisors meeting with the

14     debtors.

15             And with respect to the free-for-all notion, I would

16     expect the debtors to come in and say who are the people who

17     could potentially file plans in this period, who have standing

18     to file plans, or have a realistic possibility of doing

19     anything other than putting a piece of paper out that people

20     are going to promptly ignore.  There are not that many.  I

21     guess there's an Ally plan, but you can imagine how people are

22     going to respond to that.  There's a JSB plan.  There's maybe

23     an RMBS plan, or one of those plans, but they're going to have

24     to fight --

25             THE COURT:  May I ask you this?  Have you given the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1    debtors and Mr. Eckstein and now Mr. Kruger an outline of a

2    plan that your constituency will support?

3              MR. SHORE:  We have talked about -- well, constituency

4    will support -- we've talked about plans structures.  Quite

5    frankly, when we get to the committee veto, my view is the

6    committee's making an end run around that third option, and

7    this is their way --

8              THE COURT:  That's why I just -- I mean, I'm not sure

9    I got a clear answer.  You said you've talked about; have you

10   actually given the debtors and the committee a plan outline of

11   what --

12             MR. SHORE:  I don't know whether they've gotten the

13   term sheet.  Have they?  The debtors have not received a term

14   sheet.  But it has been --

15             THE COURT:  So it does -- I mean, it rings a little

16   hollow when -- I mean, because look, if the debtor got just

17   pure exclusivity, nothing that the committee negotiated with

18   them, there'd be absolutely nothing that would stop you from

19   going to the debtor -- going to Mr. Kruger, now that he's the

20   CRO, and saying, look, here's the plan outline, the proposed

21   term sheet of what not only are the ad hoc noteholders prepared

22   to support, but we believe would garner other creditor support

23   for the following six reasons.

24             MR. SHORE:  Um-hum.

25             THE COURT:  Okay?  And I would expect that now that

1    Mr. Kruger is officially in place, you'd go ahead and do that.

2            MR. SHORE:  We've had -- we've had the discussion.

3    They know the plan structure; we know the plan structure.  The

4    plan structure is option 3.  That has been talked about with

5    the debtors.  That has been talked about with the mediator.  My

6    suspicion is that has been talked about with the committee and

7    the members of the committee, although we have not had direct

8    discussions with them over that.

9            I believe that this -- so the question is when do you

10   go to option 3.  Option 3 is everybody's dug in, we're right, I

11   want a 17 billion dollar claim against Ally, I'm going to fight

12   for it, and another person says I just want not 8.7 billion

13   dollars in claims, I want 35 billion dollars in claims.  Let's

14   assume that that's where we are in the process; I have no idea

15   what people are asking for.  The only way you're going to get

16   people to engage is if option 3 is there.  The debtors have

17   said as much, and they're saying we want another sixty days to

18   convince people, and when we come down to our thirty day -- I

19   don't want to argue too much about the thirty --

20           THE COURT:  See, but you -- let me just stop you a

21   second, because until the PSA expired, from the debtors'

22   standpoint, option 3 wasn't an option.  They were committed,

23   they wouldn't support any plan other than one that passed

24   muster with Ally.  I mean, that was -- am I right on that?

25           MR. SHORE:  Well, the debtors never sought approval of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  the PSA, so --

2        THE COURT:  I --

3        MR. SHORE:  -- what the consequences were of their

4  deciding to file a plan without Ally support is an --

5        THE COURT:  Okay.

6        MR. SHORE:  -- unanswered issue.

7        THE COURT:  All right.

8        MR. SHORE:  So --

9        THE COURT:  All right.  But now they're -- it --

10        MR. SHORE:  Now they're free.

11        THE COURT:  Now they're free.

12        MR. SHORE:  Now they're free.  And as we've said in

13  our papers, that's a good development, as far as getting people

14  to engage.  But I don't want to -- let me --

15        THE COURT:  Okay.

16        MR. SHORE:  Let me move back from fighting the

17  debtors' exclusivity.  I know when I'm going uphill.  And let

18  me --

19        THE COURT:  No, but I -- look, I'll -- the debtors may

20  not like this.  There is no declaration that was submitted in

21  support of this extension of exclusivity.  Mr. Shore has

22  objected that there is no evidence before the Court and that

23  the debtors have the burden.  That's true; the debtors have the

24  burden.  So if Mr. Shore continues to adhere to that objection,

25  what I'm probably going to wind up doing is continuing a bridge

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1    order in effect and schedule an evidentiary hearing.

2         Do you really want that, Mr. Shore?

3         MR. SHORE:  I --

4         THE COURT:  Do you?

5         MR. SHORE:  -- want the --

6         THE COURT:  Do you?

7         MR. SHORE:  -- discipline --

8         THE COURT:  I mean, you stood up and you said --

9         MR. SHORE:  Yes.

10        THE COURT:  -- we object, there's no evidence, they

11   have the burden.  If you want to adhere to that objection I'm

12   going to set an evidentiary hearing.  And if you want to take

13   discovery, go ahead and take discovery on it.  But you know, do

14   you really want to do that?

15        MR. SHORE:  It comes down to -- and let me focus on

16   the committee's rights with respect to this.  If what we're

17   talking about is a bridge order, for some period of time that

18   Your Honor deems appropriate, on the existing terms of the

19   bridge order, which is exclusivity is extended until we have

20   this hearing, I, quite frankly, think the discipline of having

21   to deal with discovery and answer the questions with respect to

22   discovery drives this process forward; it just does.

23        THE COURT:  It drives administrative expenses --

24        MR. SHORE:  It does.  You know, I'm not one to spend a

25   lot of money on discovery.  I think they'll tell you that I've

1    been fairly focused in what I've been looking for from the

2    debtors with respect to this.  I think, quite frankly, that

3    that is the right answer here, rather than allowing the debtors

4    to come in and just, with an evidence-less presentation say,

5    just trust me for another sixty days.  They know what their

6    burdens are.

7         The committee extension.  There were two

8    inconsistencies.  Let me deal with three and four, and let me

9    deal with the Ally issues and people doing the right thing.

10   And Your Honor said it; you assume they're going to act in the

11   right way.  You're giving the committee the benefit of the

12   doubt they're not giving the debtors.  The first point in their

13   RMBS objection is at the time this was negotiated, the officers

14   of ResCap, LLC, who negotiated this, owed fielty to Ally and

15   they couldn't do the right thing.  That's their first basis for

16   you denying the RMBS settlement motion.

17        The STN authority issue, the officers of ResCap are

18   incapable of suing their parent corporation, and therefore we

19   have the ability to do it.  So fundamentally, they're saying,

20   when faced with an issue of fielty to one constituency and

21   fielty to another constituency, you've got to get them out of

22   there.

23        The committee has the same problem.  When we talk

24   about a pot plan, the one that may just get us out quickly,

25   that may in fact be in the best interests of the estates or

**RESIDENTIAL CAPITAL, LLC, ET AL.**

47

1    each individual estate; it's not going to be in the best

2    interest of any of those members.  And when you say I assume

3    they'll do the right thing, they will vote in favor of the pot

4    plan, because that's the best thing for people with allowed

5    claims, you're giving a benefit of the doubt that the

6    committee's not willing to give to the debtors, and is asking

7    for relief from on the debtors, and will be when they come

8    forward with the STN motion, saying the debtors are in

9    conflict.  So the problem with the committee's position right

10   here is --

11           THE COURT:  Can I ask you something?  Is the debtor in

12   conflict?

13           MR. SHORE:  The debtor in conflict with respect to

14   Ally?

15           THE COURT:  Yes.

16           MR. SHORE:  Yes.

17           THE COURT:  Okay.  So --

18           MR. SHORE:  Okay, but that --

19           THE COURT:  -- you agree with that.

20           MR. SHORE:  Yes, and I agree that -- here's the

21   problem; the committee is in conflict over option 3.  And so to

22   give them a veto -- if this said what Mr. Marinuzzi said, they

23   have the ability to withhold consent to any plan with an Ally

24   release, that's one thing.  That addresses that specific

25   conflict.  They're not saying that.  They reserve the right to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

48

1    veto option 3 even if the CRO determines it's in the best

2    interests of the estates.

3         And let me make one thing clear, and there's a little

4    language shift.  The committee members are estate fiduciaries

5    in that they are fiduciaries who are appointed by the Court;

6    they are not fiduciaries to the estate.  They are fiduciaries

7    to the unsecured creditors.  And what may be in the best

8    interests of unsecured creditors is not necessarily what's in

9    the best interests of the estate.  They are not our fiduciary,

10   and quite frankly, they have no representation on the committee

11   from the people who are really suffering the admin burn, which

12   is unsecured creditors at the OpCo level.  The assets are down

13   there, that's where the admin claims are being burned, that's

14   where the cash is coming from to burn the claims, and that

15   constituency is not represented.  So that's --

16        THE COURT:  All right.  Let me hear from the

17   committee, okay?

18        MR. SHORE:  Well, let me just put out the fourth

19   inconsistency, which is we're just here arguing about post-

20   petition interests.  We are here, in our view, arguing about

21   post-petition interests.  The committee, if they're to be

22   believed in their papers, believes we are in fact the largest

23   unsecured creditor constituency at the OpCo level.  So they

24   can't, throughout all of this, just take one position that

25   suits their needs and then come back and take another position.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**49**

1    The fact is there should not be -- whatever extension is

2    granted, whether under a bridge order or an actual order

3    extending exclusivity, you can't let the committee have a veto

4    over any kind of plan that goes forward, because what that does

5    is that shifts the case.  It takes away all those people who

6    are actually concerned about time and admin burn and gives the

7    power to the people who, when faced with either crystallizing

8    their claims at a dollar amount they don't like, or letting

9    somebody else suffer admin burn, they're going to allow the

10   people to suffer admin burn.

11           THE COURT:  Okay.  Mr. Eckstein, let me hear from

12   you.

13           MR. ECKSTEIN:  Your Honor, Kenneth Eckstein of Kramer

14   Levin on behalf of the creditors' committee.

15           I always enjoy listening to Mr. Shore because he's

16   eloquent, but I interpreted his --

17           THE COURT:  He is right; there is no evidence.  I

18   mean, I --

19           MR. ECKSTEIN:  I guess there's no formal witness or

20   declaration --

21           THE COURT:  Well, that's what we call evidence.

22           MR. ECKSTEIN:  -- so to that extent, I can't quarrel

23   with that.  But I sort of interpreted Mr. Shore's

24   presentation --

25           THE COURT:  Well, I don't know whether he's serious

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1    about the evidence; you know, he says he is, okay, and I'll --

2              MR. ECKSTEIN:  Well, I'll get to that in a moment,

3    because I --

4              THE COURT:  I mean, his real gripe is he doesn't want

5    to give the committee veto.  You say it's not veto, it's

6    something else.  But --

7              MR. ECKSTEIN:  And I think Mr. Shore knows that

8    he's -- that he's not giving the committee a veto, and that's

9    not really the point.  I sort of interpreted Mr. Shore's

10   presentation, essentially, as a lengthy motion to join the

11   creditors' committee, which I think is what he really wants to

12   do.  But maybe that's left for another day, if he believes he's

13   the largest unsecured creditor of this estate, which he may

14   well be.

15             But the fact of the matter is -- and there are a lot

16   of points that I'll try to get through fairly succinctly -- the

17   agreement that the committee reached with the debtor, I

18   thought, and I think, Your Honor, is actually a very

19   constructive step that we were able to take in the case.  And

20   it was really designed to take the temperature down and to

21   hopefully let this case proceed in as constructive a manner as

22   possible.  And I think Your Honor put your finger on it when

23   you said the arrangement between the committee and the debtor

24   was designed to try to avoid a free-for-all.  And that was

25   really the goal of the committee and the debtor over the next

**RESIDENTIAL CAPITAL, LLC, ET AL.**

51

1   sixty days, was to essentially say if we can get to a

2   consensual plan, let's file a consensual plan.

3          But given the fact that we're talking about a short

4   window of time, the goal was not to have Mr. Kruger or the

5   debtor turning around a week or two after the CRO was put in

6   place and all of a sudden have the debtor filing nonconsensual

7   plans or alternatively, if exclusivity was going to be

8   terminated, which was something that was being seriously

9   considered, to potentially have three or four different plans

10  coming out at a time when Mr. Kruger was really going to try to

11  see if he could accomplish something.  Sixty days is a short

12  amount of time.

13         The fact of the matter is, notwithstanding the

14  presentation, again, from Mr. Shore, we all know this case was

15  driven by the RMBS-related liabilities.  There are financial

16  liabilities in this case, and they're important, and they have

17  real interests in this case.  But we can't forget the fact that

18  when the case began, Mr. Shore's constituency signed a plan

19  support agreement that they were comfortable in agreeing to

20  because it paid them in full.  And there was never any mistake

21  about that.

22         They signed one of the PSAs in this case.  The other

23  PSA was signed by the RMBS investors.  The other PSA was signed

24  by AFI.  Each of them were satisfied with what was being

25  obtained for their constituencies.  And that's fine, but

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**52**

1    that -- the problem in the case was always the fact that we had

2    constituencies that were in the tent and constituencies that

3    are out of the tent.  And the challenge of this case right now

4    in particular, is to see whether or not we can expand the tent

5    sufficiently broadly to ultimately get everybody into the tent.

6         Before getting back to the discrete issue of the sixty

7    days, which I frankly do not think is the dog, it's really the

8    tail her, the real issue I want to get to is some of the

9    comments Mr. Marinuzzi made, which I largely agree with,

10    although I take one exception which I think is important.

11         He laid out three options.  And the first option was

12    whether or not we could get global consensus and have peace in

13    our time.  And that may or may not be attainable.  And I

14    recognize that it may not be attainable and it may be

15    aspirational.  The fact of the matter is, and one of the

16    reasons why it's important to create another window right now

17    to let this process play out, is that the mediation that was

18    put in place was constructive.  And in fact, parties had

19    engaged.

20         And there was -- it was taken seriously by the

21    creditors, the committee and its members, and it was taken

22    seriously by AFI.  The fact of the matter is, the mediation

23    process was not come to -- was not something that we came to

24    casually.  There were extensive meetings between the creditors'

25    committee and AFI, one-on-one, where there was in-depth,

1    substantive exchanges of views on potential legal claims.  The

2    committee made presentations; AFI made presentations.  There

3    were extensive discussions with the mediator, and I know that

4    those discussions are continuing today, even after the order,

5    even after the February 28th period had run, before the order

6    was extended.  Judge Peck has been continuing.  I spoke to

7    Judge Peck yesterday.  And I know that he has discussions on a

8    daily basis, that are substantive, with many parties.

9         And while that may not be evidenced, the fact of the

10   matter is, I believe that Judge Peck's role in this case is

11   reflective of significant progress that has been made toward a

12   plan.  There is no question.  Progress has been made in this

13   case.  And if we had to put on evidence, I have no doubt that

14   that's what the evidence would show.  And I don't believe

15   anybody in this room, neither the committee nor AFI, would

16   disagree.

17        There is one question that has not been answered, and

18   it's out there, and I struggle with it.  And that is, whether

19   or not a plan can be achieved prior to the publishing of the

20   examiner report.  And candidly, Your Honor, I believe that is

21   the single biggest hurdle that we are confronting right now is,

22   can the parties bridge their differences before the examiner's

23   report comes out.  And that's where I take some exception to

24   what Mr. Marinuzzi said.

25        It may be that the answer is no.  It may be that we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1  just have to wait for the examiner's report.  It's not simply

2  that people have to get realistic or not realistic, because

3  there was a real substantive exchange of views between AFI and

4  the committee.  And AFI wants to pay less and the committee

5  wants them to pay more.  And people had different views on the

6  claims.  And that's not unusual.

7        But the fact of the matter is, the examiner's report

8  is significant.  It's not coming out until May.  And

9  notwithstanding good-faith efforts by the parties, it may turn

10  out that we won't be able to get to a plan until the examiner's

11  report comes out.  I personally had been hopeful that we were

12  going to be able to cut through it and try to get to a point

13  where the parties were going to figure out whether or not they

14  could bridge the differences.

15        THE COURT:  Frequently uncertainty is a strong element

16  of reaching agreement.

17        MR. ECKSTEIN:  I agree.

18        THE COURT:  And the examiner's report is a great

19  question mark, uncertainty.  And the parties will either reach

20  an agreement before or not, but it may well change a lot when

21  that happens.

22        MR. ECKSTEIN:  And, Your Honor, that's precisely why

23  we all agreed to construct essentially an additional sixty-day

24  window where parties did not have to prematurely commit

25  themselves to positions.  Whether it's option 2 or option 3,

1  those are all litigation options.  We may have to get there.

2  But we specifically agreed with the debtor that with the

3  introduction of Mr. Kruger it made sense to continue Judge

4  Peck.  And while we go down the path of seeing how we resolve

5  these difficult intercreditor allocation issues and the

6  disputes relating to the claims, which like it or not, include

7  disputes relating to the JSB claims.  Mr. Shore may not

8  appreciate it, but the fact of the matter is, there is a

9  complaint out there that raises serious questions about the

10  extent of their collateral.  There are serious questions about

11  allocation of the estates' expenses going forward and the

12  extent to which those expenses will be borne by the JSBs, in

13  whole or in part.  And there is this continuing mantra of

14  they're entitled to post-petition interest.

15          THE COURT:  What is it -- those issues remain.

16          MR. ECKSTEIN:  Those are out there.

17          THE COURT:  You'll either settle them or you won't.

18          MR. ECKSTEIN:  Right.

19          THE COURT:  You'll litigate them.  But that's -- okay.

20          But specifically address the settlement, if you will,

21  on exclusivity, between the committee and the debtors, with

22  respect to -- and I read it as essentially a veto.  They can't

23  propose any plan that the committee doesn't agree with for the

24  sixty-day period.

25          MR. ECKSTEIN:  That -- and it was simply that, Your

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Honor.  It was that for the sixty-day period -- we all know,

2    there is no plan that's out there yet.  And Mr. Shore conceded

3    it.  He hasn't even circulated it.

4              THE COURT:  I understand that.

5              MR. ECKSTEIN:  Nobody has a plan, yet.

6              THE COURT:  But I mean, I --

7              MR. ECKSTEIN:  The --

8              THE COURT:  -- but I don't -- what Mr. Shore has

9    objected to -- he's objected to a couple of things, but one of

10   the things that he most seems to object to is that the

11   committee is given a veto over any plan that the debtors would

12   propose in the next sixty days.

13             MR. ECKSTEIN:  Your Honor, I don't believe it's

14   structured as a veto.  That's not --

15             THE COURT:  It is, I mean --

16             MR. ECKSTEIN:  -- but that's not the idea.

17             THE COURT:  -- they can't -- they agree, they will not

18   propose a plan that the committee doesn't support in the next

19   sixty days.  That sounds like a veto to me.

20             MR. ECKSTEIN:  I think -- but I think in substance,

21   the agreement is that a nonconsensual plan in this case is not

22   being filed in the next sixty days.  I think that was the

23   agreement.  And if you want -- to call it a veto, I think is a

24   negative way to characterize it.

25             THE COURT:  Well, consensual with whom?  Consensual

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    just with the committee?

2          MR. ECKSTEIN:  The way we articulated it was the

3    committee.  And we understand, from Mr. Shore's standpoint, he

4    simply wants to be paid in full.  He's presuming he's going to

5    get paid in full.  And I understand his interest in he doesn't

6    want -- he wants to make sure that the plan ultimately reflects

7    his views, and by definition, Mr. Shore is at the table.  His

8    constituency will be at the table, and everybody understands

9    what is needed in order to propose a plan that is satisfactory

10   or not satisfactory to the JSBs.

11         But the goal is -- notwithstanding Mr. Shore's

12   parochial concerns, the goal was, over the next sixty days, to

13   avoid a nonconsensual plan process.  That was the goal.  It was

14   very simple.  Avoid a nonconsensual plan process.  And if there

15   is --

16         THE COURT:  What you've come up with, it isn't that

17   you avoid a nonconsensual plan process, it's that you avoid the

18   debtor proposing any plan that isn't acceptable to the

19   committee.  There are many other constituencies:  Mr. Shore's

20   constituency, others in this courtroom.  There's nothing in

21   what you've agreed -- that you've proposed that said the only

22   thing that will be proposed is a consensual plan.  It's

23   something that we agree with or nothing.

24         MR. ECKSTEIN:  Well, we tried to avoid the notion of

25   saying consensual with everybody in the case, because that, at

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1   some point, becomes almost impossible.

2         THE COURT:  Right.

3         MR. ECKSTEIN:  The fact of the matter is, there aren't

4   that many constituencies outside of the committee in this case.

5   There's the JSBs, there's AFI, and then the rest of the

6   constituencies are all sitting on the committee.  I understand

7   that the committee has its challenges, because it has many

8   conflicting constituencies.  But because all of the

9   constituencies are represented within the committee roof, the

10  notion of using the committee, at least, as a fulcrum to

11  achieve what has the best context for a consensual plan was

12  viewed as a way to minimize the risk of sort of disarray over

13  the next sixty days and focus people on trying to get something

14  in place that is productive.

15        We recognize the fact -- we may make progress over the

16  next thirty days, and we may get to a point where a majority of

17  the committee and the debtor are prepared to support a plan.

18  And this arrangement contemplates that that plan can be filed.

19  As a practical matter, I think Your Honor knows, in a case like

20  this, whether or not realistically, even if we can strike a

21  business deal in the next thirty days, will a plan and a

22  disclosure statement really be ready to be filed in sixty days?

23  My experience tells me no.

24        And so I think it's somewhat academic what we're

25  debating about.  This is all directional.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**59**

1        THE COURT:  So don't debate over academic issues,

2    then.  If that's -- if you agree that this is essentially

3    academic --

4        MR. ECKSTEIN:  Your Honor, this is -- this arrangement

5    was a construct to achieve confidence.  And that's what this --

6    this was a confidence structure, and it was very successful.

7    It got everybody basically to cool down the tempers and focus

8    on how do we make progress.

9        THE COURT:  Not everybody.

10       MR. ECKSTEIN:  Well, Your Honor, I understand, because

11   Mr. Shore essentially would like to persuade the debtor to

12   propose option 3.  We're not opposed to the prospects of option

13   3.  In fact, I think by take -- we took a pretty dramatic step

14   by saying the PSA should be terminated and the debtor consented

15   to a motion that the committee will file with respect to STN

16   relief.  That is essentially option 3.  We agreed with the

17   debtor that no litigation is going to be commenced in the next

18   sixty days --

19       THE COURT:  All right.

20       MR. ECKSTEIN:  -- because we wanted to try to maintain

21   the cool-down.

22       THE COURT:  Let me -- let me hear from Mr. Wofford.

23   Do you want -- he's standing to --

24       MR. ECKSTEIN:  Yes, Your Honor.

25       MR. MOLONEY:  Your Honor, can I be heard?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1          THE COURT:  Yes, come on up, Mr. Moloney.

2          Mr. Wofford was popping up and down for a while, so,

3     I'll let you speak next, okay?

4          MR. WOFFORD:  Your Honor, I'll be brief.  For the

5     record, Keith Wofford from Ropes & Gray on behalf of the RMBS

6     steering committee.

7          Look, Your Honor, initially our group had looked at

8     this compromise that was made between the committee and the

9     debtors as potentially benign.  But having heard more about it

10    on the record, we're very concerned about the veto.  Let me

11    give you our view of this.

12         THE COURT:  I never should have used that word "veto".

13    It's not written in there.

14         MR. WOFFORD:  Well, it's appropriate, because Exhibit

15    A says what it says.  It says that the newly appointed

16    independent fiduciary of the debtors cannot --

17         THE COURT:  But you know what, Mr. Wofford, as a

18    practical matter, it makes zero difference in this case.

19    That's the reality of it.  It makes zero difference.  But go

20    ahead.

21         MR. WOFFORD:  I think I would agree with your earlier

22    view, that if it really doesn't make any difference, maybe it's

23    better if we just avoid having discovery and further estate

24    resource burn about basically an issue of evidence that isn't

25    really the issue, and just have everyone agree to take it out.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Go ahead.  What else did you want to say?

2          MR. WOFFORD:  Sure.  Look, we believe that the

3    administrative burn hurts our constituents most in this case.

4    And we believe that this window before the examiner's report

5    coming out is something that could be helpful.  And to fetter

6    that window with this, again, veto right, is potentially

7    problematic, because we understand that that examiner's report

8    could make the causes of action against Ally look better --

9          THE COURT:  Or worse.

10         MR. WOFFORD:  -- or it could make the causes of action

11   look --

12         THE COURT:  Or worse.

13         MR. WOFFORD:  -- worse.  And our constituency cut a

14   deal because frankly, we believe that there is that bundling

15   and that array of risks.  And frankly, to the extent there are

16   other parties that agree that they would like to, along with

17   the debtors and their independent fiduciaries, pursue a plan

18   that would reach some acceptable level before that report comes

19   out, that that option should be available without necessarily

20   having a veto over it.

21         THE COURT:  All right.  Thank you, Mr. Wofford.

22         Mr. Moloney, do you want to be heard?

23         MR. MOLONEY:  Thank you, Your Honor.  I'll be very

24   brief, Your Honor.  Tom Moloney on behalf of Wilmington Trust.

25   We're special counsel.  And I've very happy that we're

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    recognized that we actually are a creditor.

2            Just on the evidentiary point, Your Honor, I think

3    there are a couple matters as to which Your Honor could take

4    judicial notice today.  And I think that there's no question

5    about them.  One is that no plan can be filed within the next

6    sixty days, or at least in the short term, there's no plan

7    before you.  I think you have a consensus about that.  I think

8    you can take judicial notice that we have a brand new CRO.

9            THE COURT:  So Mr. Shore could turn around tomorrow

10   and file a plan.  I mean, it's a pretty simple construct --

11           MR. MOLONEY:  Well, yes ,but --

12           THE COURT:  -- of what he's talking about.

13           MR. MOLONEY:  Well, he hasn't given in a term sheet

14   yet.  I think you can take judicial notice of that.  I think

15   you can take judicial notice of the fact that the CRO's been

16   appointed.  Judicial notice of the support by the committee and

17   significant creditor groups, such as the trustee for the

18   bondholders.  And you could take judicial notice of the sales.

19           So if Your Honor -- there is some evidence here by

20   way -- that supports the proffer effectively, that was made in

21   terms of these four items which I think you could take judicial

22   notice of.

23           The second -- the main reason I stood up, though, is

24   to kind of explain to you -- I think you understand -- but just

25   exactly what the deal is that was reached between the

12-12020-mg    Doc 3243    Filed 03/12/13    Entered 03/19/13 12:10:00    Main Document
Pg 63 of 125
**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1    committee, which our client is the co-chair, and the debtors,

2    that's in place here.  We had an arrangement with the debtors,

3    Wilmington Trust individually, and the committee as well, that

4    we would be involved in any selection of a CRO.  That was

5    breached outright.  And I have no quarrel with Mr. Kruger.

6    I've known him for over thirty-five years.  I think he's an

7    excellent addition to the case as a person.  But he was chosen

8    in breach of the agreement.

9         We then had two options.  One simply would be to

10   appoint a trustee, which frankly, maybe would have been the

11   best option at the very beginning.  However, as Your Honor

12   started out by talking about the amount of administrative

13   expense in this case, that clearly seemed to be a very

14   unpalatable option.  So that option was not an option.

15        The second question is well, how will we work with Mr.

16   Kruger, given he's already been appointed in violation of our

17   agreement?  He's going to have to build some trust.  Okay,

18   we'll give him a window of time to build trust.  And during

19   that window of time, we're not prepared for option 3 you heard

20   about, Armageddon, to go forward.

21        So we're essentially, as a practical matter, taking

22   option 3 off the table, because the committee does represent a

23   wide --

24             THE COURT:  So, look, you know --

25             MR. MOLONEY:  -- constituency.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  -- sixty-one days after -- if this order

2     were to get entered, sixty-one days after it, Armageddon could

3     strike.

4          MR. MOLONEY:  Correct.

5          THE COURT:  And that's just --

6          MR. MOLONEY:  And there's one other aspect to this,

7     Your Honor, that Mr. Shore was not correct about either in his

8     pleading or what he said, which is that Wilmington Trust did

9     file claims against every single debtor entity, and the

10    possibility of substantive consolidation or some variant on

11    substantive consolidation is also another one of the 1 to 3, or

12    1(a), 2(a), 3(a) possibilities here.

13         So, Your Honor, I think that going forward with the

14    deal we struck, which I think was a reasonable accommodation,

15    given our doubts about -- our need to develop some trust in the

16    debtor and in a brand new fiduciary; the fact that we were

17    agreeing not to go forward and file litigation and not to go

18    forward and file committee plans, which would be the other

19    option.  You look at -- they said they violated the deal on the

20    CRO.  Your options are 1) trustee, doesn't seem too palatable;

21    file our own plan -- that means we're going right down that

22    road; or option 3 is we file a lawsuit right now, a motion and

23    file a lawsuit while -- we tried to pick a middle ground that

24    made sense, I think, in terms of where we were.

25         And as most compromises, it's not perfect.  But there

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

1   is a logic to it, and that's how we got there.

2           THE COURT:  Thank you, Mr. Moloney.  Who else wants to

3   be heard?  Anybody else before Mr. Marinuzzi?  You want to say

4   something else very briefly, Mr. Shore?

5           MR. SHORE:  Yes.

6           THE COURT:  Very briefly.  Come on up.

7           MR. SHORE:  Let me just make three points.  That kind

8   of statement that's being made is exactly what we want

9   discovery on.  If there are threats of a trustee out there or

10  anything else, we want to know about that, because that's --

11          THE COURT:  Look, if anybody wants to threaten tru --

12  you know?

13          MR. SHORE:  Okay.  I agree.

14          THE COURT:  Don't waste your time.  I'm just -- go

15  ahead.

16          MR. SHORE:  With respect to the committee, the

17  statement was made that everybody's represented on the

18  committee; that's a proxy.  That's exactly what I'm saying.

19  They're not a proxy for any holder of allowed claim who's

20  feeling the pain.

21          THE COURT:  You know, these -- you made these points

22  already.

23          MR. SHORE:  Okay.  Second with respect --

24          THE COURT:  Do you have something --

25          MR. SHORE:  Yes.  With respect to the procedural

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1   objection, we object to entry of exclusivity on the proposed

2   order on the basis that there's no evidence.  We do not object

3   to an extension of the bridge order for sixty days on --

4           THE COURT:  That isn't happening.

5           MR. SHORE:  -- the existing terms.

6           THE COURT:  So if that -- I'm not extending the bridge

7   order for sixty days.  Okay?

8           MR. SHORE:  Okay.  Then we have the objection to the

9   extension --

10          THE COURT:  Okay.

11          MR. SHORE:  -- of exclusivity.

12          THE COURT:  All right.  Mr. Marinuzzi?

13          MR. MARINUZZI:  Your Honor, just briefly.  I don't

14  quite understand the distinction between extending exclusivity

15  through a new order today for sixty days and a bridge order for

16  sixty days and what the evidentiary --

17          THE COURT:  The difference is that the bridge order

18  doesn't give the committee a veto.  It means if in the next

19  sixty days the debtors and Mr. Kruger want to file a plan, they

20  can go ahead and do that.  That's the difference.

21          MR. MARINUZZI:  Okay, Your Honor, I don't believe that

22  entry of an order -- we have a deal.  Right?  And, Your Honor,

23  you referred to it as veto rights, but just so the Court is

24  clear --

25          THE COURT:  It is.  It is veto rights.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    MR. MARINUZZI:  But in some respects, it's a

2 continuation of the arrangement that we had in connection with

3 our prior extensions of exclusivity.  And let me refresh

4 everyone's recollection, because this isn't a secret.  The

5 committee's statement in support of our request for exclusivity

6 the last round said, "The committee understands that the

7 debtors will not file a Chapter 11 plan during the extended

8 exclusive period without the support of the committee."  That's

9 what we negotiated the last time.  This is not new.  This is

10 just continuing the same arrangement going forward.

11    Now, let me respond to a couple of points that Mr.

12 Shore raised.  On evidence, we agree with Mr. Moloney.  We

13 think under RFE 201, Your Honor could take judicial notice of

14 the record and orders that the Court's already entered.

15    THE COURT:  Okay.  Let me -- Mr. Marinuzzi?  In light

16 of Mr. Shore's objection, this is a contested matter.  Under

17 our local rules, 9014 -- and I don't know whether it's -1

18 or -2, the first hearing in a contested matter isn't an

19 evidentiary hearing unless the Court has ordered it in advance.

20 Okay?  If Mr. Shore wants to stand on that objection, okay.

21    The one thing you all better know by now is, I follow

22 the rules.  Okay?  I'm not going -- I mean, he wants to stand

23 on it, fine.  He'll stand on it.  It isn't going to be a sixty-

24 day bridge order.  I'll tell you right now, what I'm doing is

25 I'm scheduling -- I'm continuing the bridge order in effect and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

68

1    scheduling a hearing on the motion to extend exclusivity for 10

2    a.m. Tuesday, March 19th.  No discovery.  Bring your witnesses.

3    They can do it the old-fashioned way, and they can seek to

4    cross-examine.

5          The only thing I will require is if the parties -- and

6    the only objection to exclusivity remains, is Mr. Shore.  Mr.

7    Shore, if he intends to call any witnesses, what he -- well,

8    two things.  By a week from today, March 12th, at 5 o'clock,

9    the debtors will submit any declarations in support of their

10   motion, including any exhibits, authenticated.  And Mr. Shore,

11   that same -- you'll do it simultaneous.  If there's any

12   evidence he wishes to introduce in opposition, as part of his

13   affirmative case, he'll have declarations at the same time.

14         Obviously he'll have the right to cross-examine any of

15   the declarants.  And if he intends to call anybody other than

16   declarants, he needs to notify you by -- the two of you ought

17   to confer so you know exactly who the declarants are going to

18   be, and if he's going to call anybody, bring them on.  Okay?

19         We were supposed to have a trial that week.  That date

20   is available.  I think you're all wasting a lot of time.  But

21   it's a contested matter.  There were no -- you know, all you

22   had to do was put in a declaration in support, and maybe I

23   would have dealt with this.  Okay?  But you didn't do that.

24         MR. MARINUZZI:  We apologize in --

25         THE COURT:  So we'll do it the hard way.  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**69**

1          All right, you can go forward on the basis of your

2     proposed order, if that's what you choose to do.  I'm still --

3     I'm not indicating how I'll rule.  I don't know how I'll rule

4     on it.  I'm -- Mr. Shore's argument has some traction, not

5     complete, over this issue of whether -- I mean, I really do

6     think this is much ado about nothing, because I think in sixty

7     days it would be a miracle if there was a disclosure statement

8     and a plan filed.  So I think, as a practical matter, I don't

9     think this makes any difference whatsoever.

10          MR. MARINUZZI:  Your Honor --

11          THE COURT:  I think that it was described as a

12     confidence-building step.  Find your confidence another way.

13     Okay?  Have some trust that Mr. Kruger is going to act as an

14     independent fiduciary in terms of any plan.  I mean, Mr.

15     Eckstein, sixty-one days from the entry of an order, if Mr.

16     Kruger decided that the debtor's going to file option 3 plan,

17     that's what they'll do.  I mean, sixty days is going to -- for

18     better or worse, is going to be here before you all know it.

19     Okay?  I'm very mindful of that.

20          If somehow after we break today you can resolve these

21     issues, please do that.  If I -- in the Court's view, the only

22     remaining objection is Mr. Shore's objection on behalf of the

23     ad hoc junior secured noteholders.  If that issue is resolved,

24     and you submit a consensual order that would extend exclusivity

25     to the dates that this current motion would do, as modified,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

70

1  the Court will enter it and cancel the hearing.  Otherwise

2  we'll go forward with an evidentiary hearing on the 19th.

3          So on the record, the bridge order is extended on the

4  same terms until the conclusion of a hearing that will begin on

5  May (sic) 19th.

6          UNIDENTIFIED SPEAKER:  March.

7          THE COURT:  March 19th, excuse me.  Thank you.  March

8  19th.

9          MR. MARINUZZI:  Thank you, Your Honor.

10          THE COURT:  Okay.

11          MR. MARINUZZI:  One additional point.  We've got some

12  time between now and then.  We're hopeful that the time is used

13  by the ad hoc committee to share with Mr. Kruger, since he's

14  asked for it, information regarding their claim.  We really

15  would like to talk to them about what --

16          THE COURT:  Mr. Kruger, when would you like to meet

17  with Mr. Shore?

18          MR. KRUGER:  Well, I called, I guess, Mr. Uzzi --

19          THE COURT:  Okay, I see he's in the back.  When would

20  you like to meet with Mr. Uzzi?

21          MR. KRUGER:  Whenever they're ready.

22          THE COURT:  No, when are you ready?

23          MR. KRUGER:  I'm ready now.

24          THE COURT:  Mr. Uzzi, when would you like to meet --

25          MR. UZZI:  Your Honor, right now --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

71

1          THE COURT:  Just identify yourself.

2          MR. UZZI:  I'm sorry, Gerard Uzzi of Milbank on be --

3   Milbank Tweed, on behalf of the ad hoc committee.

4          We have a financial advisor, Houlihan, who has a

5   model.  The debtors have a financial advisor, FTI, who has a

6   model.  They are in the process of making sure they reconcile

7   that model so that there's no disagreement on the math.

8          We don't think that there is, and we're a little bit

9   surprised to hear that there's apparent misunderstanding.  We

10  exp --

11         THE COURT:  Actually, it was a fairly simple question.

12         MR. UZZI:  -- we expect that to -- well, Your Honor, I

13  just wanted --

14         THE COURT:  It really was a simple question.

15         MR. UZZI:  Well, our conversation last night was that

16  we will -- we will make sure we don't have a disagreement on

17  the math this week --

18         THE COURT:  When will you resolve that?

19         MR. UZZI: -- this week, and meet early next week.

20         THE COURT:  Mr. Kruger, are you available early next

21  week?

22         MR. KRUGER:  Yes, I am, Your Honor.

23         THE COURT:  Okay, so meet early next week.

24         MR. UZZI:  We will, Your Honor.  We look forward to

25  it.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

72

1        THE COURT:  Okay.  Thank you very much.

2        MR. MARINUZZI:  Your Honor, the next item on the

3   agenda is on page 10 under "Adversary Proceedings".  And this

4   is the Sealink Funding adversary proceeding motion to remand.

5        THE COURT:  Yes.

6        MR. MARINUZZI:  We're not a party to the proceeding.

7        THE COURT:  I know.

8        MR. MARINUZZI:  We'll cede the podium to counsel for

9   Sealink.

10       THE COURT:  Okay.  Let me say, this is the last thing

11  on the agenda for today, right?

12       MR. MARINUZZI:  Yes, it is, Your Honor.

13       THE COURT:  So what we're going to do is we're going

14  to take a ten-minute recess.  Everybody else is excused who

15  doesn't need to be here for this.  Okay?

16       MR. MARINUZZI:  Thank you, Your Honor.

17     (Recess from 11:30 a.m. until 11:45 a.m.)

18       THE COURT:  Please be seated.  Mr. Marinuzzi?

19       MR. MARINUZZI:  Your Honor, for the record, Lorenzo

20  Marinuzzi, Morrison & Foerster, on behalf of the debtors again.

21       No surprise, Your Honor.  When we broke, we actually

22  were able to have some productive discussions without the

23  assistance of a mediator, and we were able to resolve our

24  disputes --

25       THE COURT:  If it took a mediator on this one, then

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  you'd really be in trouble.

2        MR. MARINUZZI:  Right, then we'd have big problems.

3  And we were able to resolve the objection of the ad hoc

4  committee by reading into the record certain language.  I just

5  want to note that the order that's being presented for the

6  Court doesn't incorporate or mention the settlement that's

7  attached to the committee's filing.  It's a plain vanilla order

8  that simply has the continuation of the periods.

9        The debtors presently have no intention of filing a

10  plan without the consent of the UCC.  Notwithstanding any

11  commitments the debtor has made with respect to exclusivity,

12  the debtors reserve the right, in the exercise of their

13  fiduciary duties, to file a plan without the consent of the UCC

14  during the exclusive period.

15        I wanted to make that clarification for the record.

16  It satisfies the concerns of the ad hoc committee, and it's

17  satisfactory to the committee and the debtors.

18        THE COURT:  Mr. Shore, with that addition, do you

19  withdraw your objection?

20        MR. SHORE:  Yes, Your Honor.

21        THE COURT:  Anybody else want to be heard?

22        All right.  The motion to extend exclusivity is

23  granted.

24        MR. MARINUZZI:  Thank you, Your Honor.

25        THE COURT:  Thank you.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. MARINUZZI:  May we be excused, Your Honor.

2          THE COURT:  Yes, you may.

3          MR. MARINUZZI:  Thank you.

4          THE COURT:  Absolutely.

5          MR. SHORE:  Thank you, Your Honor.

6          THE COURT:  All right, we're going to move now to

7    Sealink Funding Ltd. V. Deutsche Bank AG.  It's adversary

8    proceeding number 12-02051.

9          UNIDENTIFIED SPEAKER:  Your Honor, could we be

10   excused?

11         THE COURT:  Yes, please.

12         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

13         THE COURT:  Thank you for working it out.

14      (Pause)

15         THE COURT:  All right, let me have the appearances,

16   please.

17         MS. BOON:  Good morning, Your Honor.  Rebecca Boon

18   with Bernstein Litowitz on behalf of plaintiff Sealink Funding

19   Ltd.

20         MR. WOLL:  Good morning, Your Honor.  David Woll of

21   Simpson Thacher & Bartlett on behalf of the Deutsche Bank

22   defendants.  And with me is Isaac Rethy.

23         THE COURT:  Thank you.

24         MR. WALES:  Good morning, Your Honor.  David Wales

25   also on behalf of the plaintiffs.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

75

1          THE COURT:  Good morning.  Ms. Boon, you're going to

2    argue?

3          MS. BOON:  Yes.

4          THE COURT:  Go ahead.

5          MS. BOON:  Good morning, Your Honor.  Rebecca Boon

6    with David Wales for plaintiff, Sealink Funding Ltd. On

7    Sealink's motion to remand.

8          As is clear from the parties' papers, Your Honor,

9    we're here this morning on more of the same.  Again, we have

10   fraud claims against Deutsche Bank.  We have no originator

11   defendants, no debtors defendants, no affiliates of the debtors

12   are defendants.  Sealink currently has six RMBS cases pending

13   in the Commercial Division.  Most of those are before Judge

14   Bransten.  Two of Sealink's RMBS cases have already been

15   remanded by Judge Swain.  And there, Judge --

16         THE COURT:  I'm sorry, how many?

17         MS. BOON:  Two of Sealink's RMBS cases have been

18   remanded by Judge Swain.

19         THE COURT:  On what basis were they removed?

20         MS. BOON:  Judge Swain --

21         THE COURT:  1334?

22         MS. BOON:  -- I'm sorry?

23         THE COURT:  What was the basis for removal?

24         MS. BOON:  Yes, 1334.

25         THE COURT:  And did Judge Swain write an opinion?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

76

1          MS. BOON:  She did, Your Honor.

2          THE COURT:  Do I have that?

3          MS. BOON:  You do.

4          THE COURT:  Okay.

5          MS. BOON:  You do.

6          THE COURT:  That I haven't read.  I've read lots of

7    stuff, but that I haven't read.

8          MS. BOON:  Basically, Your Honor, she concluded there

9    was no related-to jurisdiction, because there were no timely

10   filed proofs of claim.  But then she took care to go through

11   the permissive abstention analysis.  And on facts that we think

12   are really the same as those at issue here, she concluded that

13   permissive abstention was appropriate.

14         THE COURT:  Who were the bankruptcy debtors upon which

15   1334 removal of jurisdiction was predicated?

16         MS. BOON:  I believe there were a couple, Your Honor.

17   I just need to check that.

18         The bankrupt originator -- it's a fairly long list,

19   Your Honor.  Aegis, Alliance Bancorp, American Home, Bear

20   Stearns Residential Mortgage Corporation, a subsidiary of

21   Accredited Home Lenders, First Magnus Financial Corporation,

22   Freemont, IndyMac, and Southshore Funding.

23         THE COURT:  Okay.  Has Sealink filed a proof of claim

24   in the ResCap bankruptcy?

25         MS. BOON:  Not to my knowledge, Your Honor.  Excuse

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    me, our client, yes, Sealink, has filed a proof of claim.

2              THE COURT:  That's what I -- yes.

3              MS. BOON:  Yes, Your Honor.

4              So, Your Honor, I wanted to first just address a

5    couple of points that you made last week.  The first --

6              THE COURT:  Well, let me just -- I don't know whether

7    Deutsche Bank's counsel -- since it's different counsel.  I

8    don't know.  Were you here last week during the argument?

9              MR. WOLL:  I wasn't, Your Honor, but I reviewed the

10   transcripts.

11             THE COURT:  Okay.  So I thought then, and I still

12   think now -- because Deutsche Bank has filed a proof of claim

13   in the ResCap bankruptcy.

14             MR. WOLL:  That's correct, Your Honor.

15             THE COURT:  Right.  It seemed to me then and it still

16   seems to me now, that there is related-to jurisdiction.  Claims

17   for indemnity, a timely proof of claim was filed.  Is there

18   something that distinguishes -- you said that Judge Swain

19   concluded there was no related-to jurisdiction, and I'm just --

20   what was the basis for her ruling?

21             MS. BOON:  Those proofs of claim were untimely, Your

22   Honor.  Here we have timely proofs of claim.

23             THE COURT:  Okay.

24             MS. BOON:  So I mean, the only point we would really

25   make there is that we think the most that would come out of the

1    claims process would probably be a finding of fraud on the part

2    of the debtors with respect to three out of the nineteen RMBS

3    at issue in this action.  So we respectfully submit that the

4    issues of Deutsche Bank's liability for common law fraud,

5    Deutsche Bank's knowledge, investors' reliance on Deutsche

6    Bank, are issues that are really the heart of this case.  And

7    this case is just not going to rise or fall on the outcome of

8    that proof of claim process.

9             THE COURT:  So three of the nineteen trusts include

10   ResCap --

11            MS. BOON:  Loans.

12            THE COURT:  -- mortgages?

13            MS. BOON:  Loans, Your Honor, yes.  Two of those

14   trusts are ResCap trusts, and one of those trusts is actually a

15   Deutsche Bank D-Vault (ph.) shelf trust.

16            THE COURT:  Okay.

17            MS. BOON:  Which brings me to really the first point.

18   Your Honor had raised last week a concern about burdening the

19   bankruptcy court with discovery over an entire case when only a

20   small portion of that case has anything to do with the debtors.

21   That's really the exact situation we have here, Your Honor.

22   It's undisputed that 2.4 percent of the loans at issue in this

23   case involved ResCap originators.  In other words, Your Honor.

24   97 percent of the loans in this action have nothing to do with

25   ResCap.  Stepping back from that, eighty-four percent of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

79

1    RMBS in this action have nothing to do with ResCap.  As I

2    noted, it's really three of the nineteen at issue in this case.

3    We submit that that makes this case an extremely good candidate

4    for abstention.

5              I also just wanted to touch on Your Honor's request

6    last week that the parties submit any cases where purely state

7    common law claims are at issue, RMBS cases where judges had

8    denied remand, other than Judge Rakoff's decision and the Bear

9    Stearns case.

10             First with respect to Judge Rakoff, we went back and

11   checked, and over the last couple of weeks, Judge Rakoff issued

12   his memorandum and opinion which was exclusively devoted to a

13   discussion of the Edge Act, which is of course not at issue

14   here, and which was plainly the sole basis for his denial in

15   that case.

16             There's a reason why, Your Honor, there are no other

17   cases, as defendants' letter concedes, and as our own research

18   revealed, and that's because there's really, as Judge Kaplan

19   noted in the Bayern v. Merrill Lynch and JPMorgan transcript,

20   which did involve a proof of claim filed in the ResCap

21   bankruptcy, the tides are running in favor of abstention and

22   against remand.  And I think Your Honor observed that last

23   week.

24             With that, we're going to spend our time today talking

25   about mandatory abstention and equitable abstention, which is

**RESIDENTIAL CAPITAL, LLC, ET AL.**

80

1  really the heart of this action.  With respect to mandatory,

2  defendants again concede that four out of the six relevant

3  factors are met here.  The remaining two are:  1) is there an

4  independent basis for the court to exercise jurisdiction.  And

5  here defendants assert that Deutsche Bank AG was fraudulently

6  joined, and also that Sealink, which is an Irish company owned

7  by a Channel Islands company, is really an organ of Germany.

8            THE COURT:  I thought that was interesting, yes.

9            MS. BOON:  We think that's a bit of a stretch, Your

10  Honor, and we can get into that later on.  But the second is

11  that with respect to timely adjudication in state court,

12  defendants argue that obtaining discovery through the Hague

13  Convention is slow, basically, and that therefore it would be

14  faster to move forward in federal court.  I'll address each of

15  those in turn.

16            First on the fraudulent joinder points, I think it's

17  important to step back and just revisit the standard.  And

18  that's set forth in the Pampillonia case that we provided the

19  cite to the Court last week, and that's really the burden on

20  defendants to prove by clear and convincing evidence, either

21  outright fraud in the pleadings -- which they don't even try to

22  do -- or that recovery on our claims against Deutsche Bank AG

23  in state court is legally impossible.  And I think that's an

24  important distinction just to focus on for a second, Your

25  Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

81

1          State court obviously we wouldn't be subject to 9(b)

2     in state court.  I mean, clearly we think that we've done it

3     here, but the standard is a little bit lower there in state

4     court.

5          So I think the first issue is have defendants met

6     their burden.  And here we argue that they haven't.  They cite

7     a couple of motion to dismiss decisions.  Though like a motion

8     to dismiss, all of plaintiff's allegations here are presumed to

9     be true, the courts are really in accord that the burden on

10    fraudulent joinder is much heavier than it is on a 12(b)(6)

11    motion on defendants.

12         The second issue is really is it possible.  And not

13    only do we think that it's possible, we think that we've done

14    it.  And we think that we've done that specifically in a couple

15    of ways.  With respect to AG, we reference AG expressly in over

16    a dozen allegations in our complaint.  We specifically allege

17    that AG controlled the other defendants who are actively

18    participating in the fraud, itself participated in setting

19    fraudulent policies, and 3) knew about the fraud.  And we do

20    that in a couple of ways, some of which we touched on last

21    week.

22         With respect to setting Deutsche Bank's policy of

23    securitizing egregiously defective loans, we talk about how AG

24    set up the correspondent lending program, some of the worst

25    fly-by-night lenders in the industry.  Here, Deutsche Bank

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    agreed to purchase loans from these originators before they

2    were even originated.  We talk about Deutsch Bank AG's

3    admission in the Mortgage IT settlement that it knew what was

4    going on and authorized the fraud in Mortgage IT, which is one

5    of the originators of the RMBS at issue here.  And we also talk

6    about AG's relationships with warehouse lenders, whereby it was

7    motivated to buy and securitize large numbers of loans from

8    some of the worst originators regardless of quality.  And we

9    allege that in the complaint.

10         Also with respect to policies, we allege that AG

11   actively participated in defendant's policy of shorting or

12   betting against the same RMBS at issue in this case.  And that

13   includes RMBS from the D-Vault shelves, which is one of the

14   RMBS that defendants have included within the three in their

15   argument that this is related to the ResCap bankruptcy.

16         But there, we have specific allegations that senior

17   executives kept Lippmann, who really spearheaded this entire

18   strategy on a tight leash, that Lippmann specifically discussed

19   this shorting strategy with Rajeev Misra, a senior executive at

20   AG, and also that AG was an active participant in the Gemstone

21   7 CDO, which contained RMBS from a couple of the shelves at

22   issue in this case, and which the Senate Subcommittee used as a

23   case study to really exemplify the egregious conduct of Wall

24   Street banks that caused the financial crisis.

25         And they noted from their study of Gemstone 7, a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

83

1    number of disturbing concerns.  And those are in our complaint.

2    And the exhibits to the Senate Subcommittee report reveal that

3    AG was actively involved in creating that CDO.

4         So all those allegations, we think, taken together,

5    are more than enough.  And again, it's not our burden.  But

6    they're more than enough to show that it's possible for us to

7    state a fraud claim against AG in state court.

8         Moreover -- and we argue this in our opposition papers

9    to BayernLB's motion to dismiss, and we'll do it again when

10   it's time to brief our opposition in this case -- we believe

11   that these allegations are enough to state a fraud claim in

12   federal court against AG.  And it's important here to remember

13   that in New York, New York common law fraud liability stems

14   from making, authorizing, or causing a statement to be made.

15   And that's New York Jurisprudence Section 201.  Judge Cote

16   recently observed this in her Goldman case, where she noted

17   that sometimes New York courts don't even reference the word

18   "make" when they're talking about false statements.

19        And these claims have been upheld against parent

20   entities in state court.  For example, in the MBIA v.

21   Countrywide case, fraud claims were sustained against the

22   Countrywide parent.  We also submitted to the Court Judge

23   Rakoff's decision --

24        THE COURT:  The Dexia opinion.

25        MS. BOON:  I'm sorry?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

84

1          THE COURT:  The Dexia opinion, you submitted.

2          MS. BOON:  Yes.  Sorry, I was moving there.  In the

3  state court, we have MBIA v. Country --

4          THE COURT:  Right.

5          MS. BOON:  -- just as an example.  We have submitted

6  to Your Honor Judge Rakoff's decision in Dexia v. Bear Stearns,

7  where he upheld fraud claims against parent entities under

8  similar allegations to those at issue here.

9          We also just wanted to note that here, we also have

10  claims for aiding and abetting fraud against AG, and this, of

11  course, includes fraud, knowledge, and substantial assistance

12  in the furthering of the fraud.  And again, we think our

13  allegations are enough for fraud, but obviously, we also think

14  our allegations are enough for aiding and abetting.

15          THE COURT:  Just move to the equitable abstention.

16          MS. BOON:  Sure.  Just very quickly, Your Honor,

17  before I do that, last week, defense counsel had raised this

18  sort of question about whether complete diversity applies to

19  Section A(4).  I did some digging yesterday, and I found a

20  couple more cases holding that it does.  In one -- and I have

21  copies of those, and I'm happy to submit them if that would be

22  helpful to the Court and to defense counsel.

23          In one of those cases, the plaintiff was actually the

24  German Free State of Bavaria.  So we would respectfully submit

25  that this is a classic case of even if you're right, you're

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   wrong.  And again, I mean, an Irish company as an organ of

2   Germany, it is what it is.

3            THE COURT:  When we finish the argument, just make

4   sure you give copies to counsel as well as to -- you can hand

5   them to my law clerk.

6            UNIDENTIFIED SPEAKER:  Maybe just state the name for

7   the record.

8            MS. BOON:  Oh, sure.  The case I was just talking

9   about is German Free State of Bavaria v. Toyobo Corporation,

10  Ltd.  That's 2007 WL 851872.  That's Western District of

11  Michigan.  And then I also found another Southern District of

12  New York case; that's Department of Economic Development v.

13  Arthur Andersen and that's 924 F. Supp. 449 (S.D.N.Y. 1996).

14           THE COURT:  And who wrote that?

15           MS. BOON:  Judge [Moo-ka-see].

16           THE COURT:  [Mew-kay-zee]?

17           MS. BOON:  Mukasey.

18           THE COURT:  Okay.

19           MS. BOON:  Thank you.  I meant to practice that before

20  but --

21           THE COURT:  It's okay.

22           MS. BOON:  On permissive abstention?

23           THE COURT:  Yes.

24           MS. BOON:  Permissive abstention is completely within

25  the Court's discretion.  Defendants refer to the Colorado River

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    factors but those really only kick in when there's parallel

2    litigation going on in state and federal court and we're not

3    aware of any RMBS cases.  We cite six of them in our brief that

4    address these abstention issues that haven't used our standard.

5    Just by way of an example, that includes Judge Swain in the

6    Sealink v. Bear Stearns case, Judge Kaplan in BLB v. JPMorgan

7    and Merrill, and Judge Sullivan in CitiMortgage.

8             So here we have a couple of factors, most of which we

9    think weigh in favor of the abstention and a couple of which

10   are probably arguably neutral.

11            The first is comity.  Clearly, we have only state law

12   issues in this case.

13            The second, state law predominates.  No federal or

14   bankruptcy issues involved here.

15            The third, novel state law issues.  It's probably a

16   closer question but, as Judge Kaplan noted in the BayernLB

17   decision, sometimes we think issues are settled and they become

18   unsettled down the line.  And here I'll just note that

19   defendants have raised two arguments in their motion to dismiss

20   briefing that we've never seen before in these types of cases,

21   so who knows?

22            With respect to the jury trial, obviously the parties

23   have a right to a jury trial.  We would argue that weighs in

24   favor of abstention.  The relation to the underlying --

25            THE COURT:  Who has the motion to withdraw the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

87

1    reference in this case?  Is it also Judge Gardephe?

2              MS. BOON:  No.  It's Judge Furman.

3              THE COURT:  Has -- he hasn't set argument?

4              MS. BOON:  We haven't heard anything from him, Your

5    Honor.

6              THE COURT:  Is it fully briefed?

7              MS. BOON:  It is.

8              MR. WOLL:  Perhaps they think Your Honor will decide

9    this motion and they don't have to --

10             THE COURT:  I know that Judge Gardephe has his hands

11   full at the moment.

12             MR. WOLL:  He is.

13             THE COURT:  I don't know about Judge Furman.

14             MS. BOON:  Just to finish up the permissive --

15             THE COURT:  Go ahead.

16             MS. BOON:  -- abstention factors, Your Honor.  The

17   relation to the underlying Chapter 11 proceeding, we would

18   submit that it's pretty remote; only 2.4 percent of the loans

19   at issue involve ResCap debtors.

20             And then the effect on the administration of the

21   bankruptcy estate; again, we realize that there may be some

22   discovery demands on the debtors and we would just -- we would

23   just submit that that question we don't think is really as

24   clear as perhaps defendants would like it to be because here we

25   have tons of allegations in our complaint about DBSI, the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

88

1 underwriter for all the securities, including the two ResCap

2 securities that defendants have put in their papers.

3 And, at least in our Rakoff case -- and admittedly,

4 that could be because we're an a Rakoff schedule -- but we

5 haven't had to make a motion to lift the stay in that case,

6 even though there are ResCap RMBS involved there, because it

7 turns out that all the discovery is with the debtor.  So -- or,

8 excuse me, with the underwriters.  And the same could be true

9 here.  It's probably just too soon to say.

10 THE COURT:  I didn't raise this last week but one of

11 the -- at least I don't think so.  In both Bayerische and

12 Sealink, proofs of claim filed by the plaintiffs, proofs of

13 claim filed the defendants, I am -- in all likelihood, I'm

14 going to have to deal with the -- not the underlying issues of

15 Deutsche Bank's liability, but they're going to lay it off on

16 the ResCap defendants, okay?  So remanding the case is not

17 going to eliminate at least some of the issues.  I mean, part

18 of it is that ninety-six percent or whatever of the securities

19 involved are not ResCap -- of the mortgages are not ResCap

20 mortgages.  I've got enough to deal with this ResCap.  But it's

21 not as if I'm going to totally -- unless there's some

22 consensual resolution, I'm not going to totally avoid the

23 issues in your case that relate to ResCap.

24 MS. BOON:  I think that's probably fair to say, Your

25 Honor.  But I would just note that the vast majority of the

1    issues in our case have nothing to do with ResCap and --

2            THE COURT:  That's true.

3            MS. BOON:  -- I think that's really the point.  And,

4    you know, to the extent that there's overlap or to the extent

5    that we need to discov -- that we need to ask this Court for

6    discovery, as Your Honor pointed out last week, it's a lot

7    easier to deal with a one-off request in isolation than it is

8    to manage an entire case, ninety-seven percent of which has

9    simply nothing to do with the ResCap debtors.

10            THE COURT:  That's fair.

11            MS. BOON:  With that, Your Honor, I'll just conclude

12    on permissive abstention by referring you, again, to Sealink --

13    by referring the Court to Sealink v. Bear Stearns, where Judge

14    Swain decided that equitable abstention was appropriate,

15    holding "that any effect on the bankruptcies would be so

16    attenuated and tangential that the court would exercise its

17    discretion to abstain."  And again, I would also note that

18    Kaplan also remanded one through the permissive abstention

19    analysis, even though there was a ResCap claim.

20            THE COURT:  Just tick off for me -- the judges in the

21    Southern District --

22            MS. BOON:  Yes.

23            THE COURT:  -- who had remanded on permissive

24    abstention grounds:  Judge Kaplan.

25            MS. BOON:  Judge Kaplan.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

90

1              THE COURT:  Judge Sullivan?  I mean --

2              MS. BOON:  Judge Sullivan.

3              THE COURT:  -- Judge Sullivan's decision, he sort of

4    covered -- all of them cover all of the bases but I -- at least

5    I think part of what I read in Judge Sullivan included

6    permissive abstention.

7              MS. BOON:  Judge Sullivan stuck in a footnote and said

8    but for federal claims, I'd find mandatory abstention was

9    appropriate but his focus was on permissive.

10             THE COURT:  Right.  All right.  So --

11             MS. BOON:  And then you also have, again, Judge Swain

12   in Sealink.  So permissive, it would be --

13             THE COURT:  So Swain, Sullivan, Kaplan.

14             MS. BOON:  And Kaplan.

15             THE COURT:  Anybody else?

16             MS. BOON:  And then you just -- you have a couple on

17   mandatory abstention.  Nobody else of permissive that I'm aware

18   of.

19             THE COURT:  Who else on mandatory sending it back?

20             MS. BOON:  Mandatory you have Judge Buchwald in

21   Allstate v. Credit Suisse.

22             THE COURT:  Okay.

23             MS. BOON:  You have -- and you have Judge Sand in the

24   Allstate v. --

25             THE COURT:  Right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

91

1         MS. BOON:  -- Ace Securities case.

2         THE COURT:  I thought he mentioned -- I thought that

3    Judge Sand -- didn't he mention -- I didn't bring the copy of

4    that case out; it's sitting on my desk.  I thought he mentioned

5    permissive abstention as -- I mean, typically, the judges have

6    covered their bases and indicated, yeah, I'll send it -- I'll

7    remand it on mandatory abstention grounds but -- but if I

8    didn't, I would do it on permissive abstention grounds.  I

9    don't -- I have to go back and look at Judge Sand.  And lined

10   up against those five would be Judge Rakoff?

11        MS. BOON:  Would be Judge Ra -- and again, that's just

12   the Edge Act, Your Honor.

13        THE COURT:  Right.

14        MR. WOLL:  Your Honor, I do have the Allstate v. Ace

15   and Judge Sand found both mandatory and equitable abstention.

16        THE COURT:  That was my -- that was my recollection.

17        MR. WOLL:  Yes.

18        MS. BOON:  That's right, Your Honor.

19        THE COURT:  All right.  Thank you very much.

20        MR. WOLL:  Your Honor, David Woll on behalf of

21   defendants.  Let me, if I may, let me start with equitable

22   abstention because I think that's kind of where the lines are

23   drawn here.  And I read the transcript, as I said, of the

24   argument last week and I've heard Your Honor's comments.  I

25   understand that there's --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  State court's a very nice place to be.

2          MR. WOLL:  I've been there often, Your Honor, and I do

3    agree that it's a nice place to be.  But I wanted to pick up on

4    the one comment you made, which I think is probably the best

5    argument we have for the Court not to abstain.  And that is

6    that the issues in the Sealink case that do touch upon the

7    ResCap entities will have to be addressed in this bankruptcy

8    court.  And while there are a majority of claims in the Sealink

9    case that relate to non-ResCap securitizations, in real

10   numbers, the amount of the claims that do are quite

11   significant.  We're talking about 120 million dollars' worth of

12   securities, we're talking --

13         THE COURT:  Look, I have to tell you.  The numbers in

14   all of these cases are absolutely staggering.  The appetite

15   that particularly foreign investors seem to have had for RMBS

16   securities was enormous.

17         MR. WOLL:  Yes.  And there are a lot of loans involved

18   in those securitizations.  We calculate there's, give or take,

19   4,000 loans at issue that were originated by a ResCap entity or

20   were in the deal sponsored by a ResCap --

21         THE COURT:  And how many loans originated by non-

22   ResCap entities?

23         MR. WOLL:  Well, many more than that, I concede.  I

24   don't know what the number is.  But we are going to have to

25   come to Your Honor for -- yeah.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  But I have the ability to estimate claims

2     without having a trial.  I mean whether you -- look, you -- I

3     don't know whether you took a position on the motion to

4     withdraw the reference or not.  It sounds like everybody wants

5     to be in the district court.  Whether you're in the district

6     court or this court, the cases -- barring a settlement, the

7     cases are not going to resolved any time soon.  They're just

8     not.  You know, Judge Rakoff, in Flagstar, you know, I think it

9     was kind of a test case trial; maybe cases will settle after he

10    did what he did there.  But the federal courts and the state

11    courts -- not only in New York but elsewhere -- are flooded

12    with mortgage relate -- RMBS cases.

13         MR. WOLL:  That's true, Your Honor.

14         THE COURT:  Okay.  And if the bankruptcy court had to

15    wait for those cases to be fully litigated to judge -- final

16    judgment before it could resolved claims issues, you know, it

17    might be in the next decade.  Okay.  But that's not what we do

18    or what we have to do, okay?  There are estimation proceedings

19    for both voting and allowance purposes.  So what I have to deal

20    with, with respect to the indemnity claims that Deutsche Bank

21    has filed --

22         MR. WOLL:  Right.

23         THE COURT:  -- or the plaintiff's claims that have

24    been filed -- and I guess you know that there's a subordination

25    adversary proceeding that's been filed and -- there's been a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**94**

1    motion and an adversary proceeding filed about it -- they're on

2    very different glide paths to resolve.  Okay.  Let alone the

3    fact that ninety-seven percent of the mortgages involved in

4    this case have nothing to do with ResCap.

5          MR. WOLL:  Your Honor, I --

6          THE COURT:  So, yes, I do -- I'm not -- if I remand

7    the case and if -- if I remand the case it winds up back in

8    state court, no, it doesn't end the possibility that I'll have

9    to deal with these issues at some point in the future.

10          MR. WOLL:  Right.

11          THE COURT:  That's true.  Some of the issues.

12          MR. WOLL:  Well, and that the debtors will also have

13    to deal with them because a lot if the issues involved --

14    although the allegations here are about Deutsche Bank as you

15    indicated -- there are follow-on issues that involve the

16    debtors, not just with respect to the indemnity claims but

17    the -- one of the essential elements of the allegations here is

18    that the mortgages originated by debtor entities didn't comply

19    with their underwriting guidelines.  And so discovery about how

20    the loans were originated, about the loan files, about the

21    processes all related to that, issues that the debtor, I

22    think, will have a deep and abiding interest in --

23          THE COURT:  They won't --

24          MR. WOLL:  -- all have to be dealt with for these

25    three securitizations that present significant liabilities --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Right.

2          MR. WOLL:  -- potential liabilities, albeit, but

3    they're included.

4          THE COURT:  But not for the other sixteen.

5          MR. WOLL:  True.  That's true, Your Honor.  And I

6    can't refute that.

7          With respect to mandatory abstention, let me just

8    address that quickly.  I think we are -- both sides are in

9    agreement that if there was improper or fraudulent joinder of

10   DBAG, then mandatory abstention wouldn't apply because it would

11   be a separate basis for the Court to exercise federal

12   jurisdiction.  And with respect to that -- and I read Your

13   Honor's comments at the hearing last week or your question as

14   to how are these allegations different, essentially, from the

15   basic relationship between a corporate parent and a subsidiary

16   that exists in all sorts of situations.

17         We don't think they are.  And the allegations against

18   DBAG and the complaints, although counsel did a very good job

19   of making the most of them, are actually very sparse.  And if

20   you go through the different allegations that have been made --

21   and I'll walk through them just quickly, we think it's clear

22   that they don't state any kind of viable claim against DBAG.  I

23   mean the first allegation, which is based on a FINRA filing, is

24   that DBAG is a parent and, effectively, a control entity, with

25   respect to Deutsche Bank Securities and Deutsche Bank Specialty

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Products.

2        The same filing says that Deutsche Bank AG, which is a

3  German bank and a parent company, also has the same

4  relationship with dozens of other entities.  That doesn't prove

5  anything in terms of fraud or knowledge.  The Pampillonia case,

6  which counsel cited, actually dealt with a very similar

7  circumstance and agreed that improper or fraudulent joinder

8  applied in a situation where the allegations were against a

9  parent corporation and didn't establish any basis for liability

10 against the parent corporation, other than the fact that there

11 was a relationship -- a parent-subsidiary relationship between

12 the parents and the subsidiary.

13       With respect to the settlement, the MIT settlement,

14 respectfully, there was no admission of fraud in that

15 settlement agreement at all.  And the claims there didn't

16 involve the issues here.  Those claims related to HUD and HFA

17 regulations and whether loans that were submitted for,

18 basically, an FHA guarantee complied with regulations of HUD

19 and HFA.  It's not even clear that any of those loans would be

20 part of any of the securitizations at issue here.  DBAG did not

21 admit any type of fraudulent conduct with respect to that

22 settlement.  Those loans were guaranteed by the HFA so there

23 wouldn't be any losses on them anyway.  It's a complete red

24 herring and a totally different circumstance.  It doesn't

25 support any kind of fraud against DBAG.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          Their allegations that, based on a newspaper article

2     or an article from -- I had it here someplace.  Oh, here we go;

3     the American Banker.  That DBAG is supposedly ran the

4     Correspondent Lending Group at Deutsche Bank.  Well, the

5     article -- and we address this in our motion to dismiss which

6     we've already filed -- the article says that Deutsche Bank

7     securities, which is a unit of Deutsche Bank AG, runs the

8     Correspondent Lending Group.  So the allegation's based on a

9     misreading of an article in the American Banker.  Again,

10    insufficient to state any claim for fraud.

11          The allegations about the "short position".  If you

12    look at the complaint, the -- and in their reply on this

13    motion, the plaintiffs cite the allegations in the complaint

14    that they're relying on to support their argument that DBAG is

15    a proper defendant.  They cite paragraph 139.  It doesn't even

16    mention Deutsche Bank AG.  They do drop a footnote in the

17    complaint that says that Deutsche Bank AG was "heavily involved

18    in the Gemstone 7 CDO."  That's the only mention of Deutsche

19    Bank AG with respect to this so-called shorting allegation in

20    the complaint is that it was supposedly heavily involved in

21    this Gemstone transaction.

22          Well, that transaction was actually the subject of

23    litigation in state court and there's a decision, which we

24    actually didn't cite in our papers but I would like to bring to

25    the Court's attention.  It's a claim -- a case called M&T Bank

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Corp v. Gemstone CDO 7, Ltd., in New York Supreme in Erie

2    County, where the court dismissed claims against Deutsche Bank

3    AG based specifically on that transaction and said that the

4    allegations of Deutsche Bank AG's involvement in that

5    transaction were insufficient to state a claim with respect to

6    fraud-based claims.  So we think the allegations here are even

7    less adequate than the allegations were there.  Plain --

8            THE COURT:  Just --

9            MR. WOLL:  Yeah, go ahead.

10           THE COURT:  Let me just ask you this.  Just focus on

11   permissive abstention --

12           MR. WOLL:  Oh, okay.

13           THE COURT:  -- and tell me why, in your view, I

14   shouldn't do what other judges in the Southern District have

15   done and remand -- they've remanded similar cases, similar

16   claims to state court on permissive abstention grounds.

17           MR. WOLL:  Well, some of the -- some of the decisions,

18   as I think counsel and Your Honor discussed, were based on the

19   absence of a timely proof of claim.  Some of the decisions, I

20   think, were based on, for instance, Judge Kaplan's conclusion

21   that there were potentially novel issues of law.

22           THE COURT:  Well, but Judge Kaplan, in Bayerische,

23   concluded that there was related-to jurisdiction.

24           MR. WOLL:  Yes, absolutely.  Yes.  And -- I mean, as I

25   read his decision, he mentioned that there may be novel issues

**RESIDENTIAL CAPITAL, LLC, ET AL.**

99

1   of law.  I don't see any novel issues of law here.  It's pretty

2   straightforward -- I mean, there might be novel factual

3   allegations but the law is pretty straightforward common law

4   fraud theories which this court and the district court deal

5   with on a regular basis.  So I don't think there're any novel

6   issues.

7            With respect to comity, I don't think that poses any

8   problems at all.  I don't think the New York courts would be

9   offended in the least if this court held onto this case.  I

10  also don't think the jury trial issue is really relevant

11  because, as I think Your Honor mentioned at the hearing last

12  week, if that becomes an issue at some point --

13            THE COURT:  It isn't going to be here.

14            MR. WOLL:  Right.  Exactly.  So --

15            THE COURT:  But why shouldn't this case be coordinated

16  with the two other Sealink cases that are pending in the

17  commercial division at this point?

18            UNIDENTIFIED SPEAKER:  Six others.

19            THE COURT:  Six others.  Isn't that the more efficient

20  way of litigating these cases, to have them all before one

21  judge who can regulate and coordinate discovery, assure

22  consistency or avoid inconsistency in rulings in the cases?

23            MR. WOLL:  Well, Your Honor, first of all, I don't

24  think that's necessarily the case.  I mean, the Sealink -- the

25  only thing common about the Sealink cases is the plaintiff.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   There are lots of different defendants with lots of different

2   securitizations and lots of different --

3            THE COURT:  And you think there's -- I don't even know

4   why I'm going to ask this question but I can't imagine there

5   are enormous differences in the offering documents for any of

6   those other deals.

7            MR. WOLL:  Well, they do -- I mean --

8            THE COURT:  Have you looked at them?

9            MR. WOLL:  I haven't -- I have general experience

10  with, you know, comparing different --

11           THE COURT:  How many of these types of cases are you

12  defending?

13           MR. WOLL:  I'm not sure Your Honor; twenty or so.

14  But -- so I don't know about the specific pro supps in those

15  cases.  There is a fairly wide variation in the pro supps.  But

16  I take your point.  Some of the basic issues are the same but

17  the operations of the defendants and the allegations against

18  the defendants and what they did are different.  I mean --

19           THE COURT:  How many cases involving Deutsche Bank are

20  pending in -- RMBS cases are pending in the commercial

21  division?

22           MR. WOLL:  I could guess, Your Honor, but I don't know

23  for a certainty.

24           THE COURT:  What's your estimate of the number of RMBS

25  cases involving Deutsche Bank that are currently pending in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

101

1  commercial division?

2          MR. WOLL:  Could I just --

3          THE COURT:  Sure.  Go ahead.  Yes.

4          MR. WOLL:  We're coming off with three or four that

5  involve these types of claims.  There are the put-back or

6  repurchase type claims, which Your Honor was talking about

7  earlier in terms of the trust settlement, I guess, that's --

8          THE COURT:  Correct.

9          MR. WOLL:  -- in the works here.  That's kind of a

10  different story so --

11          THE COURT:  Yes.  I understand.

12          MR. WOLL:  So three or four like this is my estimate.

13          THE COURT:  Okay.

14          MR. WOLL:  So, I mean, in terms of timeliness of

15  adjudication, I mean, if we're talking about whether this case

16  would proceed more quickly in federal court or proceed more

17  quickly if it were sent back for coordination with all those

18  different defendants in all those other different suits, I

19  don't know what the schedule would be in those other cases but

20  my hunch is that it would take longer to deal with all those --

21          THE COURT:  I don't think so.  Usually, when one judge

22  is coordinating all of the cases involving plaintiff and

23  defendant, that that's the most efficient and fastest way of

24  dealing with it.  The judge -- the commercial division is very

25  experienced in dealing with complex civil litigation, and

12-12020-mg    Doc 3243    Filed 03/12/13    Entered 03/19/13 12:10:00    Main Document
Pg 102 of 125
RESIDENTIAL CAPITAL, LLC, ET AL.

102

1   scheduling orders will be entered and the cases will proceed.

2   I mean, you know, so I'm assuming, if these cases ever end up

3   in jury trials, whether it was in the district court or in the

4   state court, it's a long time before that happens.  You know,

5   whether they'll get to that point or not, I don't know.

6         And if they stay -- if they were to stay here, they'd

7   stay here until -- in all likelihood, until they were ready for

8   a jury trial and then they'd go to the district court.  If the

9   district court wanted to withdraw the reference before, it

10   would do that.  But --

11         MR. WOLL:  Well, if this case and the Bayerische case

12   stay here, then you could coordinate the Deutsche Bank

13   allegations together.

14         THE COURT:  Sure.

15         MR. WOLL:  But, Your Honor, I hear your points and I

16   really don't think I have anything else --

17         THE COURT:  Okay.

18         MR. WOLL:  -- to offer you so --

19         THE COURT:  Thank you very much.

20         MR. WOLL:  -- thank you.

21         THE COURT:  I appreciate it.

22         Any reply?

23         MS. BOON:  No.

24         THE COURT:  Any brief reply?

25         MS. BOON:  I think we're done.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Okay.  I'm going to take it under

2    submission and I expect to get out rulings in both Bayerische

3    and this case -- and Sealink, roughly contemporaneous.  So when

4    that's going to be, I'm not quite sure yet but we'll see.

5    Okay?  Thank you very much.

6          MR. WOLL:  Thank you.

7          MS. BOON:  Thank you.

8          THE COURT:  I appreciated the briefing.

9          MR. WOLL:  Thank you, Your Honor.

10          THE COURT:  The briefing was really quite well done.

11   Both sides.  I want to make that --

12          MS. BOON:  Thank you.

13          (Whereupon these proceedings were concluded at 12:26 PM)

14

15

16

17

18

19

20

21

22

23

24

25

104

1                            I N D E X

2

3                            RULINGS

4                                        Page        Line

5    Debtor's motion for authority to appoint     13         24

6    Lewis Kruger as Chief Restructuring Officer

7    granted

8    Order entered extending appointment of Judge   17        10

9    Peck as mediator through May 31, 2013

10   Debtors' application to modify the terms of    18        17

11   FTI Consulting's retention granted

12   Motion to extend exclusivity is granted        73        23

13

14

15

16

17

18

19

20

21

22

23

24

25

105

1                        C E R T I F I C A T I O N

2

3    I, Sharona Shapiro, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    SHARONA SHAPIRO

10   AAERT Certified Electronic Transcriber CET**D-492

11

12   eScribers

13   700 West 192nd Street, Suite #607

14   New York, NY 10040

15

16   Date:  March 6, 2013

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.
Case No. 12-12020-mg

Adv. Proc. No. 12-02051-mg
March 5, 2013

## #

**#607 (1)**
3:22

## [

**[Mew-kay-zee] (1)**
85:16
**[Moo-ka-see] (1)**
85:15

## A

**A4 (1)**
84:19
**AARON (1)**
6:17
**abetting (2)**
84:10,14
**abiding (1)**
94:22
**ability (6)**
25:5;36:3,6;46:19;
47:23;93:1
**able (9)**
12:15;22:6;36:25;
50:19;54:10,12;
72:22,23;73:3
**above (1)**
36:25
**absence (4)**
11:6,18;33:5;98:19
**absolutely (4)**
42:18;74:4;92:14;
98:24
**abstain (2)**
89:17;92:5
**abstention (29)**
76:11,13;79:4,21,
25,25;84:15;85:22,
24;86:4,9,24;87:16;
89:12,14,18,24;90:6,
8,17;91:5,7,8,15,22;
95:7,10;98:11,16
**academic (3)**
58:24;59:1,3
**acceptable (2)**
57:18;61:18
**Acceptances (1)**
2:18
**accommodation (1)**
64:14
**accomplish (3)**
21:7;22:23;51:11
**accord (1)**
81:9
**Accordingly (1)**
11:18
**account (1)**
39:8
**Accredited (1)**

**76:21**
**accusation (1)**
40:25
**accusing (1)**
38:18
**Ace (2)**
91:1,14
**achieve (2)**
58:11;59:5
**achieved (1)**
53:19
**act (5)**
40:1;46:10;69:13;
79:13;91:12
**action (7)**
24:4;61:8,10;78:3,
24;79:1;80:1
**active (1)**
82:20
**actively (7)**
23:10;29:18,19;
38:4;81:17;82:11;
83:3
**actual (2)**
22:19;49:2
**actually (19)**
15:25;23:1,23;
24:16;28:4,6;32:7;
42:10;49:6;50:18;
62:1;71:11;72:21;
78:14;84:23;95:19;
96:6;97:22,24
**acutely (1)**
23:10
**Ad (9)**
5:3;20:17,23;
42:21;69:23;70:13;
71:3;73:3,16
**add (1)**
33:14
**added (1)**
31:2
**Addendum (1)**
2:11
**addition (4)**
20:5;33:21;63:7;
73:18
**additional (3)**
25:9;54:23;70:11
**address (20)**
10:15;15:25;21:3;
23:14,16;25:13,23;
28:6,12;29:7;30:21;
40:5;22;41:8;55:20;
77:4;80:14;86:4;
95:8;97:5
**addressed (1)**
92:7
**addresses (2)**
20:12;47:24
**addressing (2)**
23:22;28:13
**Adelphia (2)**

**20:12;39:4**
**adequate (1)**
98:7
**adhere (2)**
44:24;45:11
**adjourned (1)**
12:8
**adjudication (2)**
80:11;101:15
**adjust (1)**
22:2
**adjustments (1)**
21:8
**admin (5)**
48:11,13;49:6,9,10
**administration (1)**
87:20
**administrative (3)**
15:14;38:21;39:2;
45:23;61:3;63:12
**admission (2)**
82:3;96:14
**admit (1)**
96:21
**admittedly (1)**
88:3
**ado (1)**
69:6
**advance (3)**
13:13,14;67:19
**advancing (1)**
12:25
**Adversary (7)**
3:2;23:13;72:3,4;
74:7;93:25;94:1
**Advisor (3)**
2:10;71:4,5
**advisors (1)**
41:13
**Aegis (1)**
76:19
**affiliates (1)**
75:11
**affirmative (1)**
68:13
**affirmatively (1)**
23:23
**AFI (30)**
13:13,14;16:2;
19:20;20:4;21:21;
22:4,7,9,12,14,16,25;
23:2;24:5,9,11,21;
25:14,16;26:2,6;
51:24;52:22,25;53:2,
15;54:3,4;58:5
**AG (21)**
3:3;74:7;80:5,22;
81:15,15,17,23;
82:10,20,20;83:3,7,
12;84:10;96:2;97:7,
16,17,19;98:3
**again (16)**
39:14;51:14;61:6;

**72:20;75:9;80:2;**
**83:5,9;84:12;85:1;**
**87:21;89:12,17;**
**90:11;91:11;97:9**
**against (28)**
22:15,16;23:5,11;
24:8;27:11;33:19;
43:11;61:8;64:9;
75:10;79:22;80:22;
82:12;83:7,12,19,21;
84:7,10;91:10;95:17,
22;96:8,10,25;98:2;
100:17
**agenda (4)**
17:19,20;72:3,11
**agree (18)**
25:14;32:9;36:5;
38:24;47:19,20;52:9;
54:17;55:23;56:17;
57:23;59:2;60:21,25;
61:16;65:13;67:12;
92:3
**agreed (8)**
18:9;24:2;54:23;
55:2;57:21;59:16;
82:1;96:7
**agreeing (4)**
23:25;30:9;51:19;
64:17
**agreement (25)**
13:10;20:19;23:22;
25:6;26:6;28:22;
33:7;34:17,21,24;
35:25;37:8,13,19;
38:8;50:17;51:19;
54:16,20;56:21,23;
63:8,17;95:9;96:15
**agrees (1)**
35:4
**AG's (3)**
82:2,6;98:4
**Ah (1)**
32:6
**ahead (14)**
29:4;35:18;39:20;
40:4;43:1;45:13;
60:20;61:1;65:15;
66:20;75:4;87:15;
98:9;101:3
**aiding (2)**
84:10,14
**air (1)**
29:1
**al (2)**
3:3;9:15
**albeit (1)**
95:2
**allegation (2)**
95:23;97:19
**allegations (24)**
81:8,16;82:16;
83:4,11;84:8,13,14;
87:25;94:14,17;

**95:14,17,20;96:8;**
**97:1,11,13;98:4,6,7;**
**99:3;100:17;102:13**
**allegation's (1)**
97:8
**allege (3)**
81:16;82:9,10
**Alliance (1)**
76:19
**allocation (2)**
55:5,11
**allow (1)**
49:9
**allowable (3)**
36:22,23;37:3
**allowance (2)**
33:19;93:19
**allowed (13)**
26:11;27:18;28:1;
31:8,18,19;33:10;
34:4;35:3;36:22;
37:2;47:4;65:19
**allowing (1)**
46:3
**Allstate (3)**
90:21,24;91:14
**Ally (21)**
5:21,21;31:11,23;
33:17,20;35:7;36:1;
37:8,9;38:8;40:8;
41:21;43:11,24;44:4;
46:9,14;47:14,23;
61:8
**Ally's (1)**
38:23
**almost (1)**
58:1
**alone (3)**
37:6,10;94:2
**along (2)**
41:3;61:16
**alternative (1)**
37:23
**alternatively (1)**
51:7
**alternatives (2)**
37:19,20
**although (4)**
43:7;52:10;94:14;
95:18
**ALVES (1)**
7:15
**always (2)**
49:15;52:1
**American (3)**
76:19;97:3,9
**Americas (5)**
5:4;6:4;7:4
**amount (6)**
11:1;19:12;49:8;
51:12;63:12;92:10
**analysis (2)**
76:11;89:19

**Andersen (1)**
85:13
**answered (1)**
53:17
**anticipation (1)**
19:14
**apologize (1)**
68:24
**apparent (1)**
71:9
**appearances (1)**
74:15
**appears (1)**
17:6
**appetite (1)**
92:14
**Application (4)**
2:7;17:20;18:19;
19:21
**applied (2)**
39:5;96:8
**applies (1)**
84:18
**apply (1)**
95:10
**Appoint (4)**
2:4;10:9,16;63:10
**appointed (7)**
14:17,18;36:10;
48:5;60:15;62:16;
63:16
**appointing (1)**
15:21
**appointment (11)**
10:23;11:6,20;
12:4;14:16,23;17:2,
11;19:21;20:7;29:15
**appreciate (3)**
17:9;55:8;102:21
**appreciated (1)**
103:8
**apprise (1)**
30:25
**appropriate (6)**
13:8;45:18;60:14;
76:13;89:14;90:9
**appropriately (1)**
40:1
**approval (1)**
43:25
**approve (3)**
11:19;17:10;37:9
**approved (5)**
14:5;15:13;18:1;
29:18;38:3
**approving (1)**
10:19;32:15
**approximately (1)**
18:10
**ARANT (1)**
9:11
**arguably (1)**
86:10

**argue (7)**
21:18;43:19;75:2;
80:12;81:6;83:8;
86:23
**arguing (3)**
38:20;48:19,20
**argument (8)**
69:4;77:8;82:15;
85:3;87:3;91:24;
92:5;97:14
**arguments (1)**
86:19
**ARLENE (1)**
7:15
**Armageddon (2)**
63:20;64:2
**arms (3)**
37:11,12;38:10
**around (5)**
17:25;34:5;42:6;
51:5;62:9
**arrangement (6)**
50:23;58:18;59:4;
63:2;67:2,10
**array (1)**
61:15
**Arthur (1)**
85:13
**article (5)**
97:1,2,5,6,9
**articulated (1)**
57:2
**ascribe (1)**
38:16
**ascribing (2)**
37:5;38:22
**aspect (3)**
20:5;21:2;64:6
**aspirational (1)**
52:15
**assert (1)**
80:5
**asserted (5)**
22:15;23:5,11,17;
31:17
**asset (1)**
32:12
**assets (4)**
19:8;33:12;35:4;
48:12
**assigned (1)**
12:21
**assistance (2)**
72:23;84:11
**associated (1)**
16:13
**assume (4)**
40:1;43:14;46:10;
47:2
**assuming (4)**
24:8;26:23;38:5;
102:2
**assure (1)**

99:21
**attach (1)**
32:1
**attached (1)**
73:7
**attainable (2)**
52:13,14
**attempting (1)**
14:9
**attention (2)**
20:2;97:25
**attenuated (1)**
89:16
**Attorneys (12)**
5:3,13,21;6:3,13;
7:3,11,20;8:3,12,20;
9:12
**auctions (1)**
14:13
**August (1)**
14:4
**authenticated (1)**
68:10
**authority (1)**
46:17
**authorized (1)**
82:4
**Authorizing (2)**
2:3;83:14
**available (3)**
61:19;68:20;71:20
**Avenue (7)**
5:4,14,22;6:4;7:4;
8:21;9:14
**avoid (9)**
50:24;57:13,14,17,
17,24;60:23;88:22;
99:22
**aware (4)**
10:18;19:6;86:3;
90:17
**away (2)**
30:22;49:5
**awfully (1)**
39:13

---

## B

**back (18)**
11:17;12:7;14:4;
24:12;35:11,17;
38:25;44:16;48:25;
52:6;70:19;78:25;
79:10;80:17;90:19;
91:9;94:7;101:17
**bad (4)**
28:10;38:10,18,22
**balance (2)**
25:18;39:4
**Bancorp (1)**
76:19
**Bank (34)**
3:3;5:13,21;7:3,11;

8:20;74:7,21;75:10;
77:12;78:6,15;80:5,
22;81:25;82:2;93:20;
94:14;95:25,25;96:2,
3;97:4,6,7,16,17,19,
25;98:2,4;100:19,25;
102:12
**Banker (2)**
97:3,9
**bankrupt (1)**
76:18
**bankruptcies (1)**
89:15
**Bankruptcy (13)**
2:3,7;10:20;76:14,
24;77:13;78:19;
79:21;82:15;86:14;
87:21;92:7;93:14
**banks (1)**
82:24
**Bank's (5)**
77:7;78:4,5;81:22;
88:15
**barring (1)**
93:6
**BARTLETT (2)**
8:19;74:21
**based (6)**
95:23;97:1,8;98:3,
18,20
**bases (2)**
90:4;91:6
**basic (2)**
95:15;100:16
**basically (5)**
59:7;60:24;76:8;
80:13;96:18
**basis (16)**
13:5,5;16:9;29:25;
46:15;53:8;66:2;
69:1;75:19,23;77:20;
79:14;80:4;95:11;
96:9;99:5
**Battery (1)**
7:12
**battle (1)**
33:11
**battling (1)**
32:9
**Bavaria (2)**
84:24;85:9
**Bayerische (4)**
88:11;98:22;
102:11;103:2
**Bayern (1)**
79:19
**BayernLB (1)**
86:16
**BayernLB's (1)**
83:9
**bear (7)**
17:6;30:13;76:19;
79:8;84:6;86:6;89:13

**beating (1)**
25:16
**become (1)**
86:17
**becomes (2)**
58:1;99:12
**began (1)**
51:18
**begin (2)**
14:9;70:4
**beginning (1)**
63:11
**behalf (16)**
2:5,13;10:6;12:1;
17:17;29:6;49:14;
60:5;61:24;69:22;
71:3;72:20;74:18,21,
25;91:20
**believes (1)**
12:4;48:22;50:12
**bells (1)**
31:2
**beneficial (1)**
25:11
**benefit (2)**
46:11;47:5
**benign (1)**
60:9
**BERGER (1)**
6:2
**BERNSTEIN (2)**
6:2;74:18
**best (10)**
10:23;46:25;47:1,
4;48:1,7,9;58:11;
63:11;92:4
**bets (1)**
39:12
**better (5)**
27:20;60:23;61:8;
67:21;69:18
**betting (1)**
82:12
**big (3)**
22:4;27:18;73:2
**biggest (1)**
53:21
**billion (8)**
19:8;26:12;31:9,
10;32:25;43:11,12,13
**Birmingham (1)**
9:15
**bit (5)**
28:2;40:7;71:8;
80:9;81:3
**BLB (1)**
86:6
**board (3)**
10:21;11:15;22:9
**bomb (1)**
33:21
**bondholders (1)**
62:18

**bonds (1)**
31:9
**BOON (58)**
6:8;74:17,17;75:1,
3,5,5,17,20,22,24;
76:1,3,5,8,16,25;
77:3,21,24;78:11,13,
17;80:9;83:25;84:2,
5,16;85:8,15,17,19,
22,24;87:2,4,7,14,16;
88:24;89:3,11,22,25;
90:2,7,11,14,16,20,
23;91:1,11,18;
102:23,25;103:7,12
**borne (1)**
55:12
**Boston (1)**
8:14
**both (9)**
10:14;16:1;24:18;
88:11;91:15;93:19;
95:8;103:2,11
**BOULT (1)**
9:11
**boxes (2)**
27:1,15
**Boylston (1)**
8:13
**BRADLEY (1)**
9:11
**brand (2)**
62:8;64:16
**Bransten (1)**
75:14
**breach (1)**
63:8
**breached (1)**
63:5
**break (1)**
69:20
**BRIAN (1)**
9:8
**bridge (14)**
18:23;44:25;45:17,
19;49:2;53:22;54:14;
66:3,6,15,17;67:24,
25;70:3
**brief (5)**
60:4;61:24;83:10;
86:3;102:24
**briefed (1)**
87:6
**briefing (3)**
86:20;103:8,10
**briefly (5)**
12:2;17:25;65:4,6;
66:13
**bring (6)**
12:11;24:4;68:2,
18;91:3;97:24
**brings (2)**
18:19;78:17
**broadly (1)**

52:5
**broke (1)**
72:21
**Buchwald (1)**
90:20
**build (2)**
63:17,18
**bundling (1)**
61:14
**burden (8)**
30:13;44:23,24;
45:11;80:19;81:6,9;
83:5
**burdening (1)**
78:18
**burdens (1)**
46:6
**burn (1)**
33:2,7;38:21;39:2;
48:11,14;49:6,9,10;
62:24;61:3
**burned (1)**
48:13
**business (2)**
10:20;58:21
**buy (2)**
35:10;82:7

## C

**CAHN (1)**
6:17
**calculate (1)**
92:18
**call (5)**
49:21;56:23;68:7,
15,18
**called (2)**
70:18;97:25
**came (2)**
28:21;52:23
**can (36)**
12:2;15:12,14;
21:18,19;22:9;25:8;
29:18;32:23;36:1,12,
13,24;39:8,10;41:21;
47:11;51:1;52:4;
53:19,22;58:18,20;
59:25;62:5,8,14,15;
66:20;68:3,3;69:1,
20;80:10;85:4;99:21
**cancel (1)**
70:1
**candidate (1)**
79:3
**candidly (1)**
53:20
**Capital (7)**
2:5,13;9:21;10:3;
24:25;31:8,19
**care (1)**
76:10
**CARTER (1)**

6:12
**CASE (94)**
5:2;15:5,23,25;
13:4,9;14:12;15:11,
16;19:17;20:13;
21:18;23:12;25:15,
19,21;27:5;29:6;
31:6,8;33:6,8,9,23;
34:3;35:2;38:20;
39:18;49:5;50:19,21;
51:14,16,17,18,22;
52:1,3;53:10,13;
56:21;57:25;58:4,19;
60:18;61:3;63:7,13;
68:13;78:6,7,19,20,
23;79:2,3,9,15;80:18;
82:12,22,23;83:10,
16,21;84:25;85:8,12;
86:6,12;87:1;88:3,5,
16,23;89:1,8;91:1,4;
92:6,9;93:9;94:4,7,7;
96:5;97:25;99:9,15,
24;101:15;102:11,
11;103:3
**cases (37)**
19:6,15;20:6;
24:24;34:6,16;39:5;
75:12,14,17;79:6,7,
17;84:20,23;86:3,20;
92:14;93:6,7,9,12,15;
98:15;99:16,20,22,
25;100:11,15,19,20,
25;101:19,22;102:1,2
**cash (2)**
32:13;48:14
**casually (1)**
52:24
**cataloguing (1)**
39:7
**categories (1)**
39:9
**CATHERINE (1)**
5:17
**caused (1)**
82:24
**causes (2)**
61:8,10
**causing (1)**
83:14
**CC (3)**
2:2,7;3:3
**CDO (4)**
82:21;83:3;97:18;
98:1
**cede (1)**
72:8
**certain (2)**
32:2;73:4
**certainly (4)**
15:6;17:9;26:18;
27:22
**certainty (1)**
100:23

**Certificate (1)**
8:12
**cetera (1)**
21:9
**CHADBOURNE (1)**
7:19
**challenge (2)**
18:2;52:3
**challenges (1)**
58:7
**chambers (1)**
11:14
**chance (1)**
17:6;29:20;34:1;
39:1,10
**change (1)**
54:20
**changes (1)**
15:3
**Channel (1)**
80:7
**Chapter (6)**
2:16,18;10:12;
19:15;67:7;87:17
**characterization (1)**
41:1
**characterize (1)**
56:24
**charged (1)**
36:5
**check (3)**
22:4,8;76:17
**checkbook (1)**
23:3
**checked (2)**
17:3;79:11
**Chief (3)**
2:4;9:22;10:9
**choose (3)**
34:9,9;69:2
**chosen (1)**
63:7
**Chris (1)**
29:5
**CHRISTOPHER (2)**
5:8;9:17
**circulated (1)**
56:3
**circumstance (2)**
96:7,24
**cite (6)**
80:19;81:6;86:3;
97:13,15,24
**cited (1)**
96:6
**CitiMortgage (1)**
86:7
**civil (1)**
101:25
**claim (29)**
26:12;27:18;32:3;
33:19;36:22,23;
39:25;43:11;65:19;

70:14;76:10,23;77:1,
12,17,21,22;78:8;
79:20;83:7,11;88:12,
13;89:19;95:22;
97:10,25;98:5,19
**claims (75)**
22:14,14,16,16,17,
18,20;23:5,11,14,15,
18,22;25:4,11;26:9;
27:7,7,11,11;31:12,
16,18,21,22,23,23;
32:1,25;33:10;34:1,2,
4;35:3,5,5;36:18,19;
37:2,3;43:13,13;
47:5;48:13,14;49:8;
53:1;54:6;55:6,7;
64:9;75:10;77:16;
78:1;79:7;80:22;
83:19,21;84:7,10;
90:8;92:8,10;93:1,16,
20,23;94:16;96:15,
16;98:2,6,16;101:5,6
**clarification (1)**
73:15
**classic (1)**
84:25
**clear (12)**
14:7;15:2;16:13;
35:24;42:9;48:3;
66:24;75:8;80:20;
87:24;95:21;96:19
**clearly (7)**
12:22;14:15;27:19;
36:11;63:13;81:2;
86:11
**CLEARY (1)**
8:2
**clerk (1)**
85:5
**client (2)**
63:1;77:1
**clients (1)**
32:16
**clipping (1)**
32:24
**clock (1)**
36:6
**close (1)**
37:23
**closed (4)**
18:5;19:6,13;21:8
**closer (1)**
86:16
**closing (5)**
12:10;14:14;18:2;
19:14;21:16
**co-chair (1)**
63:1
**Code (5)**
2:3,7;10:20;11:21;
30:16
**COLE (1)**
6:20

collateral (2)
  32:2;55:10
colleague (2)
  14:18;38:16
Colorado (1)
  85:25
comfortable (2)
  12:20;51:19
coming (8)
  23:15;35:20,21;
  48:14;51:10;54:8;
  61:5;101:4
comity (2)
  86:11;99:7
commanded (1)
  20:2
commenced (2)
  23:13;59:17
comment (2)
  40:13;92:4
commented (1)
  26:17
comments (7)
  14:2;19:24;37:25;
  40:6;52:9;91:24;
  95:13
Commercial (5)
  75:13;99:17;
  100:20;101:1,24
commit (2)
  23:24;54:24
commitment (1)
  40:18
commitments (2)
  30:7;73:11
committed (1)
  43:22
committee (116)
  11:12,16;12:1,2,3,
  7,12,19;13:10,18;
  16:2;19:2,19;20:3,3,
  17,20,22,23;21:5,20;
  22:7,24;23:9,12,17,
  23;24:2,9,14,15,21;
  25:1,6,7,16;26:3,5,
  19;28:3,21;30:8,21;
  31:2,25;34:12,13,14;
  35:22;36:3,14,20,21;
  37:2,11,17;39:23;
  40:16;42:5,10,17;
  43:6,7;46:7,11,23;
  47:21;48:4,10,17,21;
  49:3,14;50:5,8,11,17,
  23,25;52:21,25;53:2,
  15;54:4,4;55:21,23;
  56:11,18;57:1,3,19;
  58:4,6,7,9,10,17;
  59:15;60:6,8;62:16;
  63:1,3,22;64:18;
  65:16,18;66:18;67:6,
  8;70:13;71:3;73:4,
  16,17
committee-related (1)
  29:9
committees (1)
  23:4
committee's (9)
  19:12;36:8;39:24;
  42:6;45:16;47:6,9;
  67:5;73:7
common (5)
  78:4;79:7;83:13;
  99:3,25
companies (1)
  31:21
company (6)
  18:1;19:17;80:6,7;
  85:1;96:3
comparing (1)
  100:10
compensating (1)
  10:19
competing (1)
  38:12
complaint (9)
  55:9;81:16;82:9;
  83:1;87:25;97:12,13,
  17,20
complaints (1)
  95:18
complete (3)
  69:5;84:18;96:23
completely (1)
  85:24
complex (4)
  31:6;32:9;34:15;
  101:25
complicated (1)
  27:6
complied (1)
  96:18
comply (1)
  94:18
component (1)
  24:1
compromise (1)
  60:8
compromises (1)
  64:25
concede (2)
  80:2;92:23
conceded (1)
  56:2
concedes (1)
  79:17
concern (3)
  37:15,20;78:18
concerned (3)
  37:18;49:6;60:10
concerns (3)
  57:12;73:16;83:1
conclude (1)
  89:11
concluded (5)
  76:8,12;77:19;
  98:23;103:13
conclusion (3)
  12:16;70:4;98:20
conduct (2)
  82:23;96:21
confer (1)
  68:17
confidence (4)
  13:1;59:5,6;69:12
confidence-building (1)
  69:12
confidentiality (2)
  16:11;41:6
confirmation (2)
  15:13;21:22
conflict (5)
  47:9,12,13,21,25
conflicted (2)
  39:24;40:1
conflicting (1)
  58:8
confronting (1)
  53:21
connection (2)
  30:17;67:2
consensual (17)
  13:3,5;14:10,25;
  15:6,8;27:12;29:2;
  51:2,2;56:25,25;
  57:22,25;58:11;
  69:24;88:22
consensus (5)
  11:17;14:22;37:19;
  52:12;62:7
consent (7)
  14:18;34:12;35:22;
  36:1;47:23;73:10,13
consented (1)
  59:14
consents (1)
  24:21
consequences (1)
  44:3
consider (2)
  26:21;27:4
considered (1)
  51:9
consistency (1)
  99:22
consistent (1)
  28:8
consolidation (2)
  64:10,11
constituencies (13)
  11:2;13:1;26:4;
  38:9,20;51:25;52:2,
  2;57:19;58:4,6,8,9
constituency (17)
  27:4;29:2;31:18;
  37:1;38:19;39:22;
  42:2,3;46:20,21;
  48:15,23;51:18;57:8,
  20;61:13;63:25
constituents (1)
  61:3
construct (4)
  22:6;54:23;59:5;
  62:10
constructive (4)
  12:16;50:19,21;
  52:18
consultation (1)
  26:5
Consulting (1)
  2:9
Consulting's (1)
  17:21
contained (1)
  82:21
contemplates (1)
  58:18
contemporaneous (1)
  103:3
contested (6)
  22:10,11;35:19;
  67:16,18;68:21
context (2)
  20:13;58:11
contingent (2)
  23:6;35:5
continuation (2)
  67:2;73:8
continue (6)
  16:3;17:5;23:25;
  34:8;39:2;55:3
continues (4)
  14:19,21;33:1;
  44:24
continuing (10)
  16:5;17:2,8;38:15;
  44:25;53:4,6;55:13;
  67:10,25
control (5)
  25:19;36:25;38:14;
  40:8;95:24
controlled (1)
  81:17
Convention (1)
  80:13
conversation (1)
  71:15
converting (1)
  32:12
convince (1)
  43:18
convincing (2)
  39:13;80:20
cool (1)
  59:7
cool-down (1)
  59:21
cooperation (1)
  23:9
coordinate (2)
  99:21;102:12
coordinated (1)
  99:15
coordinating (1)
  101:22
coordination (1)
  101:17
copies (2)
  84:21;85:4
copy (1)
  91:3
cornerstones (1)
  19:20
Corp (1)
  98:1
corporate (1)
  95:15
corporation (6)
  46:18;76:20,21;
  85:9;96:9,10
correspondent (3)
  81:24;97:4,8
cost (1)
  35:13
costing (1)
  18:11
costs (2)
  15:11;18:10
Cote (1)
  83:15
counsel (10)
  61:25;72:8;77:7,7;
  84:17,22;85:4;95:18;
  96:6;98:18
count (1)
  32:15
Country (1)
  84:3
Countrywide (2)
  83:21,22
County (1)
  98:2
couple (14)
  56:9;62:3;67:11;
  76:16;77:5;79:11;
  81:7,14,20;82:21;
  84:20;86:8,9;90:16
coupons (1)
  32:24
course (2)
  79:13;84:11
Court (275)
  3:4;6:21;10:2,17;
  11:22;13:19,24,24;
  14:4;16:7,10;17:14;
  18:13,15;20:15;
  21:11,14,24;22:1;
  23:14;25:24;26:1;
  28:6,14,16,20;29:11,
  13,25;30:25;31:6,13;
  32:6,15,19;34:19,21,
  23;37:4;40:4,19;
  41:25;42:8,15,25;
  43:20;44:2,5,7,9,11,
  15,19,22;45:4,6,8,10,
  23;47:11,15,17,19;

48:5,16;49:11,17,21,
25;50:4;54:15,18;
55:15,17,19;56:4,6,8,
15,17,25;57:16;58:2;
59:1,9,19,22;60:1,12,
17;61:1,9,12,21;62:9,
12;63:24;64:1,5;
65:2,6,11,14,21,24;
66:4,6,10,12,17,23,
25;67:15,19;68:25;
69:11;70:1,7,10,16,
19,22,24;71:1,11,14,
18,20,23;72:1,5,7,10,
13,18,25;73:6,18,21,
25;74:2,4,6,11,13,15,
23;75:1,4,16,19,21,
23,25;76:2,4,6,14,23;
77:2,6,11,15,23;78:9,
12,16,19;80:4,8,11,
14,19,23;81:1,2,4;
83:7,12,20,22,24;
84:1,3,4,15,22;85:3,
14,16,18,21,23;86:2,
25;87:3,6,10,13,15;
88:10;89:2,5,10,13,
16,20,23;90:1,3,10,
13,15,19,22,25;91:2,
13,16,19;92:1,5,8,13,
21;93:1,5,6,6,14,14,
23;94:6,8,11,23;95:1,
4,11;97:23;98:2,8,10,
13,16,22;99:4,4,9,13,
15,19;100:3,8,11,19,
24;101:3,8,11,13,16,
21;102:3,4,8,9,14,17,
19,21,24;103:1,8,10

**courtroom (1)**
57:20
**courts (5)**
81:9;83:17;93:10,
11;99:8
**Court's (9)**
15:6,15;28:13;
39:7;67:14;69:21;
85:25;92:1;97:25
**cover (1)**
90:4
**covered (3)**
31:23;90:4;91:6
**create (2)**
22:5;52:16
**creates (1)**
25:18
**creating (1)**
83:3
**Credit (1)**
90:21
**creditor (12)**
11:2;13:1;21:20;
23:11;26:4;35:2;
38:9;42:22;48:23;
50:13;62:1,17
**creditors (15)**

11:9;19:19;20:3;
22:2,13,17,25;23:3;
25:12,17;41:6;48:7,8,
12;52:21
**creditors' (18)**
11:11,16;12:1,12;
13:10;19:2,19;20:19,
21;21:20;23:4,9,17;
39:22;40:15;49:14;
50:11;52:24
**creditor's (1)**
23:22
**crisis (1)**
82:24
**CRO (26)**
10:19;11:20,23;
12:4,6,11;13:20;14:2,
23;15:17,20;16:1;
17:2,10;20:7;29:15,
18;36:10,11;39:8;
42:20;48:1;51:5;
62:8;63:4;64:20
**CRO's (2)**
15:4;62:15
**cross-examine (2)**
68:4,14
**crystallizing (1)**
49:7
**CUMMINGS (1)**
9:11
**current (1)**
69:25
**currently (2)**
75:12;100:25
**cut (4)**
25:17;35:16;54:12;
61:13

**D**

**daily (1)**
53:8
**date (5)**
16:17,22;27:17;
40:16;68:19
**dates (1)**
69:25
**DAVID (6)**
6:9;8:24;74:20,24;
75:6;91:20
**day (7)**
27:15;28:11;32:11;
34:23;43:18;50:12;
67:24
**days (43)**
13:11,12;19:3;
22:22;23:24;24:1,4,
6;26:23;29:9;30:5,9;
35:10,12;36:7;39:1,
11;40:17;43:17;46:5;
51:1,11;52:7;56:12,
19,22;57:12;58:13,
16,21,22;59:18;62:6;

64:1,2;66:3,7,15,16,
19;69:7,15,17
**DBAG (8)**
95:10,18,22,24;
96:20,25;97:3,14
**DBSI (1)**
87:25
**deal (26)**
13:17;23:1;25:8;
28:11;30:22,25;
35:16;40:10;45:21;
46:8,9;58:21;61:14;
62:25;64:14,19;
66:22;88:14,20;89:7;
92:20;93:19;94:9,13;
99:4;101:20
**dealing (3)**
23:10;101:24,25
**deals (2)**
25:18;100:6
**dealt (3)**
68:23;94:24;96:6
**debate (2)**
31:20;59:1
**debating (1)**
58:25
**debt (1)**
34:5
**debtor (31)**
12:7,12,14,18;
13:2;14:3;26:4;
27:18;37:9;39:13;
42:16,19;47:11,13;
50:17,23,25;51:5,6;
55:2;57:18;58:17;
59:11,14,17;64:9,16;
73:11;88:7;94:18,21
**Debtors (73)**
2:4,10;10:6,20;
11:2,6;14:16;17:17;
18:5,11,24;20:2;
21:16;23:6,10;24:20;
26:14;27:11;28:21;
30:1,13;31:5,12,16;
33:11,12;40:11,14,
24;41:2,7,14,16;42:1,
10,13;43:5,16,25;
44:19,23,23;46:2,3,
12;47:6,7,8;55:21;
56:11;60:9,16;61:17;
63:1,2;66:19;67:7;
68:9;71:5;72:20;
73:9,12,17;75:11,11;
76:14;78:2,20;87:19,
22;89:9;94:12,16
**Debtors' (24)**
2:2,7,16;10:11;
11:20;12:18;17:20;
18:19;19:5,8,21,23;
20:7,8,18;29:8,14,19,
24;30:12;36:9;37:7;
43:21;44:17
**debtor's (2)**

19:7;69:16
**decade (1)**
93:17
**December (5)**
2:11;12:8;14:6;
16:20;19:4
**DECHERT (1)**
7:2
**decide (1)**
87:8
**decided (2)**
69:16;89:14
**deciding (1)**
44:4
**decision (11)**
12:11,11;26:5;
40:14;79:8;83:23;
84:6;86:17;90:3;
97:23;98:25
**decisions (3)**
81:7;98:17,19
**declarants (3)**
68:15,16,17
**declaration (3)**
44:20;49:20;68:22
**declarations (3)**
30:2;68:9,13
**declares (1)**
16:18
**deems (1)**
45:18
**deep (1)**
94:22
**defective (1)**
81:23
**defend (1)**
22:9
**Defendant (3)**
9:12;97:15;101:23
**defendants (24)**
8:20;74:22;75:11,
11,12;80:2,5,12,20;
81:5,11,17;82:14;
85:25;86:19;87:24;
88:2,13,16;91:21;
100:1,17,18;101:18
**defendants' (1)**
79:17
**defendant's (1)**
82:11
**defending (1)**
100:12
**defense (2)**
84:17,22
**deferred (1)**
13:16
**deficiency (1)**
32:3
**definition (1)**
57:7
**delay (1)**
33:24
**demands (1)**

87:22
**demonstrated (1)**
33:23
**denial (1)**
79:14
**denied (1)**
79:8
**DENMAN (1)**
5:7
**denominated (1)**
20:25
**denying (1)**
46:16
**DEPARTMENT (2)**
9:2;85:12
**depend (1)**
22:19
**dependent (1)**
33:16;34:14;35:6
**de-risk (3)**
32:23,23,24
**describe (2)**
26:15;37:22
**described (4)**
14:20;15:22;17:7;
69:11
**deserv (1)**
38:1
**deserves (5)**
29:20;33:6;38:7,
25;39:9
**designed (1)**
50:20,24
**desk (1)**
91:4
**detailed (1)**
34:25
**details (1)**
30:5
**determination (1)**
33:17
**determined (1)**
10:22
**determines (1)**
48:1
**Deutsch (1)**
82:2
**Deutsche (32)**
3:3;8:20;74:7,21;
75:10;77:7,12;78:4,5,
5,15;80:5,22;81:22,
25;88:15;93:20;
94:14;95:25,25;96:2;
97:4,6,7,16,17,18;
98:2,4;100:19,25;
102:12
**develop (3)**
14:10;15:6;64:15
**developed (1)**
15:12
**developing (2)**
14:8;15:5
**development (3)**

14:25;44:13;85:12
**devoted (1)**
79:12
**Dexia (3)**
83:24;84:1,6
**difference (6)**
60:18,19,22;66:17,
20;69:9
**differences (3)**
53:22;54:14;100:5
**different (16)**
29:21;51:9;54:5;
77:7;94:2;95:14,20;
96:24;100:1,1,2,10,
18;101:10,18,18
**difficult (3)**
15:15;31:7;55:5
**digging (1)**
84:19
**DIP (1)**
31:12
**direct (2)**
29:19;43:7
**direction (1)**
18:4
**directional (1)**
58:25
**directors (2)**
10:21;19:13
**disagree (1)**
53:16
**disagreement (2)**
71:7,16
**disarray (1)**
58:12
**discipline (2)**
45:7,20
**Disclosure (5)**
2:16;15:12;38:13;
58:22;69:7
**discov (1)**
89:5
**discovery (15)**
45:13,13,21,22,25;
60:23;65:9;68:2;
78:19;80:12;87:22;
88:7;89:6;94:19;
99:21
**discrete (1)**
52:6
**discretion (2)**
85:25;89:17
**discussed (4)**
12:7;16:3;82:18;
98:18
**discussion (6)**
11:15;12:14;13:7;
24:14;43:2;79:13
**discussions (10)**
19:1,1,18;28:1,7;
43:8;53:3,4,7;72:22
**dismiss (5)**
81:7,8;83:9;86:19;

97:5
**dismissed (1)**
98:2
**dispute (1)**
36:18
**disputes (7)**
16:11,25;20:1;
23:5;55:6,7;72:24
**dissatisfied (1)**
14:8
**DISTEFANO (1)**
7:24
**distinction (2)**
66:14;80:24
**distinguishes (1)**
77:18
**distribution (3)**
32:16;33:16,20
**District (10)**
85:10,11;89:21;
93:5,5;98:14;99:4;
102:3,8,9
**disturbing (1)**
83:1
**diversity (1)**
84:18
**Division (5)**
75:13;99:17;
100:21;101:1,24
**Doc (2)**
2:2,7
**Doc# (2)**
2:15;3:3
**docket (3)**
10:10,12,16
**documents (2)**
27:1;100:5
**documents526 (1)**
2:12
**dog (1)**
52:7
**dollar (3)**
26:12;43:11;49:8
**dollars (9)**
18:11;19:9;22:8;
31:9,10;32:25;35:13;
43:13,13
**dollars' (1)**
92:11
**dominated (1)**
33:9
**done (12)**
18:2;23:1;28:11;
30:18;32:8;36:12;
81:2,13,14;98:15;
102:25;103:10
**doubt (3)**
46:12;47:5;53:13
**doubts (1)**
64:15
**down (15)**
22:24,25;25:10,12;
28:3,9;43:18;45:15;

48:12;50:20;55:4;
59:7;60:2;64:21;
86:18
**dozen (1)**
81:16
**dozens (1)**
96:4
**drafted (1)**
41:5
**dramatic (1)**
59:13
**drawn (1)**
91:23
**drive (1)**
37:19
**driven (1)**
51:15
**drives (2)**
45:22,23
**drop (1)**
97:16
**DRUCKER (1)**
6:24
**DRYE (1)**
5:12
**dug (1)**
43:10
**during (8)**
10:7;24:19;26:22;
39:3;63:18;67:7;
73:14;77:8
**duties (2)**
36:13;73:13
**D-Vault (2)**
78:15;82:13
**dynamic (2)**
34:3,11
**dynamics (4)**
23:17;24:17;30:22,
25

**E**

**earlier (4)**
16:17,23;60:21;
101:7
**early (4)**
41:8;71:19,20,23
**earning (1)**
32:13
**easier (1)**
89:7
**easy (1)**
25:2
**eaten (1)**
32:3
**ECF (1)**
15:21
**echo (1)**
19:24
**Eckstein (33)**
11:24,25;12:1;
13:19;26:18;37:16;

39:21;42:1;49:11,13,
13,19,22;50:2,7;
54:17,22;55:16,18,
25;56:5,7,13,16,20;
57:2,24;58:3;59:4,10,
20,24;69:15
**Economic (1)**
85:12
**Edge (2)**
79:13;91:12
**effect (5)**
20:21;45:1;67:25;
87:20;89:15
**effective (1)**
19:18
**effectively (2)**
62:20;95:24
**efficient (3)**
13:5;99:19;101:23
**effort (1)**
19:12
**efforts (9)**
14:21;15:7;17:5,8;
18:8;19:20;28:8;
38:16;54:9
**egregious (1)**
82:23
**egregiously (1)**
81:23
**eight (1)**
40:17
**eighty (1)**
35:13
**eighty-four (1)**
78:25
**either (11)**
13:13,14;33:10,25;
34:9;36:4;49:7;
54:19;55:17;64:7;
80:20
**element (2)**
13:15;54:15
**elements (1)**
94:17
**elevated (1)**
36:25
**eliminate (1)**
88:17
**ELLIS (1)**
5:20
**eloquent (1)**
49:16
**else (19)**
13:20,22;18:15;
30:11;35:2;41:1;
49:9;50:6;61:1;65:2,
3,4,10;72:14;73:21;
90:15,17,19;102:16
**elsewhere (1)**
93:11
**emphasize (1)**
15:4
**Employment (1)**

2:9
**enamored (1)**
39:22
**encourage (1)**
27:24
**encouraged (1)**
24:13
**end (6)**
26:13;28:11;39:11;
42:6;94:8;102:2
**engage (2)**
43:16;44:14
**engaged (3)**
10:21;38:4;52:19
**engagement (2)**
13:16;15:4
**engaging (3)**
30:7,7;40:11
**enjoy (1)**
49:15
**enormous (1)**
92:16;100:5
**enough (6)**
19:10;22:4;83:5,6,
11;84:13,14;88:20
**enter (4)**
16:15,21;17:10;
70:1
**entered (5)**
18:14,22;64:2;
67:14;102:1
**entering (1)**
17:4
**enterprise (3)**
34:5;36:23;37:1
**entire (3)**
78:19;82:17;89:8
**entities (6)**
83:20;84:7;92:7,
22;94:18;96:4
**entitled (1)**
55:14
**entity (3)**
64:9;92:19;95:24
**Entry (5)**
2:8,17;66:1,22;
69:15
**environment (1)**
36:5
**equitable (5)**
79:25;84:15;89:14;
91:15,21
**Erie (1)**
98:1
**eScribers (1)**
3:21
**escrows (1)**
21:8
**ESQ (20)**
5:7,8,9,17,25;6:8,9,
17,24;7:7,15,16,24;
8:7,8,16,24,25;9:8,17
**essential (1)**

94:17

**essentially (9)**
50:10;51:1;54:23;
55:22;59:2,11,16;
63:21;95:14

**establish (1)**
96:9

**estate (7)**
47:1;48:4,6,9;
50:13;60:23;87:21

**estates (6)**
10:24;18:9;20:9;
35:13;46:25;48:2

**estates' (1)**
55:11

**estate's (1)**
22:16

**estimate (3)**
93:1;100:24;
101:12

**estimation (1)**
93:18

**et (2)**
3:3;21:9

**even (19)**
37:2,3,12;41:11;
48:1;53:4,5;56:3;
58:20;80:21;82:2;
83:17;84:25;88:6;
89:19;96:19;97:15;
98:6;100:3

**event (1)**
28:4

**eventually (1)**
24:9

**everybody (15)**
22:24;25:2;28:10;
32:9;33:7;35:2,4;
37:11;52:5;57:8,25;
59:7,9;72:14;93:4

**everybody's (5)**
28:20;38:20,22;
43:10;65:17

**everyone (3)**
21:21;32:10;60:25

**everyone's (1)**
67:4

**evidence (21)**
29:25;30:1,12,14,
18;38:17,18;40:7;
44:22;45:10;49:17,
21;50:1;53:13,14;
60:24;62:19;66:2;
67:12;68:12;80:20

**evidenced (1)**
53:9

**evidence-less (1)**
46:4

**evidentiary (6)**
45:1,12;62:2;
66:16;67:19;70:2

**exact (1)**
78:21

**exactly (7)**
34:25;37:21;62:25;
65:8,18;68:17;99:14

**Examiner (2)**
7:20;53:20

**examiner's (9)**
23:1;24:12;53:22;
54:1,7,10,18;61:4,7

**example (3)**
83:20;84:5;86:5

**excellent (1)**
63:7

**exception (2)**
52:10;53:23

**exchange (1)**
54:3

**exchanges (1)**
53:1

**Exclusive (6)**
2:17;10:11;18:20;
39:6;67:8;73:14

**exclusively (1)**
79:12

**exclusivities (1)**
30:24

**Exclusivity (41)**
2:15;13:8;14:1,4,6,
11;15:20;16:25;
18:23;20:18;21:2;
23:25;24:19;26:13,
23;29:16,24;30:12,
15;31:5;35:9,19;
39:14,16;42:17;
44:17,21;45:19;49:3;
51:7;55:21;66:1,11,
14;67:3,5;68:1,6;
69:24;73:11,22

**excuse (4)**
24:23;70:7;76:25;
88:8

**excused (3)**
72:14;74:1,10

**executive (1)**
82:19

**executives (1)**
82:17

**exemplify (1)**
82:23

**exercise (5)**
36:12;73:12;80:4;
89:16;95:11

**Exhibit (2)**
36:2;60:14

**exhibits (4)**
27:2;30:2;68:10;
83:2

**existing (2)**
45:18;66:5

**exists (1)**
95:16

**exp (1)**
71:10

**expand (1)**

52:4

**expect (5)**
16:11;41:16;42:25;
71:12;103:2

**expectations (1)**
22:3

**expected (1)**
14:9

**expense (2)**
33:1;63:13

**expenses (8)**
15:14;32:14;33:22;
38:21;39:2;45:23;
55:11,12

**experience (6)**
11:8;12:2;15:1;
18:3;58:23;100:9

**experienced (1)**
101:25

**expertise (1)**
12:21

**expired (1)**
43:21

**expires (1)**
24:6

**explain (3)**
21:4;31:1;62:24

**express (1)**
37:13

**expressed (1)**
17:5

**expressly (1)**
81:15

**Extend (17)**
2:15;10:11;14:3,
11;15:19,23;16:16;
18:20;20:18;26:6;
30:15;35:9;39:13,16;
68:1;69:24;73:22

**extended (6)**
26:23;37:14;45:19;
53:6;67:7;70:3

**Extending (8)**
2:17;17:10;18:23;
29:24;31:5;49:3;
66:6,14

**extends (1)**
16:21

**extension (16)**
14:5,7;16:25;
18:25;19:5;21:2;
29:8,14,16;30:12;
40:14;44:21;46:7;
49:1;66:3,9

**extensions (2)**
30:24;67:3

**extensive (3)**
15:1;52:24;53:3

**extent (6)**
49:22;55:10,12;
61:15;89:4,4

**extraordinary (1)**
15:11

**extremely (1)**
79:3

**F**

**Faber (1)**
9:12

**faced (2)**
46:20;49:7

**fact (24)**
11:8;12:3;27:25;
46:25;48:22;49:1;
50:15;51:3,13,17;
52:1,15,18,22;53:9;
54:7;55:8;58:3,15;
59:13;62:15;64:16;
94:3;96:10

**fact-intensive (1)**
34:15

**factors (7)**
20:12;39:6,7;80:3;
86:1,8;87:16

**facts (1)**
76:11

**factual (1)**
99:2

**fair (2)**
88:24;89:10

**fairly (7)**
15:11;31:9;46:1;
50:16;71:11;76:18;
100:15

**faith (5)**
10:22;30:10;38:17,
19,22

**fall (1)**
78:7

**false (1)**
83:18

**far (1)**
44:13

**fashion (2)**
13:2,17

**faster (1)**
80:14

**fastest (1)**
101:23

**favor (5)**
24:21;47:3;79:21;
86:9,24

**February (5)**
15:22;17:22;18:21,
22;53:5

**Federal (5)**
9:13;80:14;83:12;
86:2,13;90:8;93:10;
95:11;101:16

**fee (2)**
11:15;13:15

**feeling (1)**
65:20

**fetter (1)**
61:5

**few (1)**
39:9

**FHA (1)**
96:18

**fiduciaries (5)**
48:4,5,6,6;61:17

**fiduciary (6)**
36:12;48:9;60:16;
64:16;69:14;73:13

**field (1)**
12:22

**fielty (3)**
46:14,20,21

**Fifth (1)**
9:14

**fifty (3)**
31:12,13,14

**fifty-one (4)**
31:13,15,16,16

**fight (2)**
41:24;43:11

**fighting (1)**
44:16

**figure (2)**
25:13;54:13

**File (25)**
2:18;10:12;21:19;
22:15;24:3,20;25:5;
34:17,25;41:17,18;
44:4;51:2;59:15;
62:10;64:9,17,18,21,
22,23;66:19;67:7;
69:16;73:13

**filed (34)**
2:5,12;10:8,13,14;
14:20;17:22;18:21,
24;20:24,24;23:1;
27:17;28:23;31:5;
32:1;56:22;58:18,22;
62:5;69:8;76:10,23;
77:1,12,17;79:20;
88:12,13;93:21,24,
25;94:1;97:6

**files (2)**
24:10;94:20

**Filing (9)**
2:15;18:20,25;
25:14;51:6;73:7,9;
95:23;96:2

**final (1)**
93:15

**Financial (7)**
2:10;5:21;51:15;
71:4,5;76:21;82:24

**Find (2)**
69:12;90:8

**finding (1)**
78:1

**finds (1)**
36:11

**fine (3)**
38:9;51:25;67:23

**finger (1)**

50:22
**finish (4)**
21:25;39:20;85:3;
87:14
**finished (1)**
27:16
**FINRA (1)**
95:23
**first (27)**
14:3;20:16;21:19;
23:12;28:19;30:22;
35:15;36:9,16;39:16;
40:10,13;41:2;46:12,
15;52:11;67:18;
76:21;77:4,5;78:17;
79:10;80:16;81:5;
86:11;95:23;99:23
**fit (1)**
39:9
**fits (1)**
39:18
**five (1)**
91:10
**five-eighths (1)**
32:25
**fix (1)**
33:2
**fixed (2)**
34:2;39:25
**fixing (1)**
32:12
**Flagstar (1)**
93:8
**flooded (1)**
93:11
**Floor (2)**
6:5;9:5
**flow (1)**
32:2
**flows (2)**
31:20,25
**fly-by-night (1)**
81:25
**focus (10)**
22:22;26:3,3;
28:10;45:15;58:13;
59:7;80:24;90:9;
98:10
**focused (4)**
12:9;23:10;26:2;
46:1
**focusing (2)**
12:10;20:11
**Foerster (3)**
10:6;17:17;72:20
**fold (1)**
35:18
**follow (2)**
13:6;67:21
**following (3)**
39:18;40:17;42:23
**follow-on (1)**
94:15

**footnote (2)**
90:7;97:16
**forced (2)**
33:25;35:23
**foreign (1)**
92:15
**forever (1)**
36:4
**forget (1)**
51:17
**forgive (1)**
37:5
**form (1)**
11:13
**formal (1)**
49:19
**FORMAN (1)**
6:20
**forth (1)**
80:18
**forthwith (1)**
16:19
**forward (34)**
11:10;15:18;18:7;
19:14,17;20:1,6,10;
21:7;22:10;23:7;
24:16;25:15,21;
30:14,18;33:12;
37:17;38:13;39:19;
40:12;45:22;47:8;
49:4;55:11;63:20;
64:13,17,18;67:10;
69:1;70:2;71:24;
80:14
**found (3)**
84:19;85:11;91:15
**four (8)**
19:8;36:8;46:8;
51:9;62:21;80:2;
101:4,12
**fourth (2)**
40:9;48:18
**frame (1)**
20:1
**Franklin (1)**
6:13
**frankly (12)**
15:12;17:2;29:15;
37:15;42:5;45:20;
46:2;48:10;52:7;
61:14,15;63:10
**fraud (21)**
75:10;78:1,4;
80:21;81:18,19;82:4;
83:7,11,13,21;84:7,
10,11,12,13;96:5,14,
25;97:10;99:4
**fraud-based (1)**
98:6
**fraudulent (6)**
80:16;81:10,19;
95:9;96:7,21
**fraudulently (1)**

80:5
**free (7)**
35:10;40:25;44:10,
11,12;84:24;85:9
**free-for- (1)**
40:6
**free-for-all (4)**
37:18;40:10;41:15;
50:24
**Freemont (1)**
76:22
**Frequently (1)**
54:15
**front (3)**
21:22;35:3;41:4
**fruition (1)**
15:7
**FTI (7)**
2:9;17:21;18:3,6,8,
12;71:5
**fulcrum (1)**
58:10
**full (6)**
27:1,10;51:20;
57:4,5;87:11
**fully (2)**
87:6;93:15
**fundamental (1)**
19:20
**Fundamentally (2)**
31:4;46:19
**Funding (6)**
3:2;72:4;74:7,18;
75:6;76:22
**funds (1)**
32:16
**Furman (2)**
87:2,13
**Further (4)**
2:17;27:6;30:22;
60:23
**furthering (1)**
84:12
**future (1)**
94:9

**G**

**Gardephe (2)**
87:1,10
**garner (1)**
42:22
**Gary (2)**
2:5;10:5
**gather (1)**
38:4
**gears (1)**
17:18
**Gemstone (5)**
82:20,25;97:18,21;
98:1
**general (1)**
100:9

80:5
**GERARD (2)**
5:9;71:2
**Gerber (1)**
39:4
**German (3)**
84:24;85:9;96:3
**Germany (2)**
80:7;85:2
**gets (3)**
23:23;31:22;32:3
**given (9)**
16:22;40:13;41:25;
42:10;51:3;56:11;
62:13;63:16;64:15
**gives (3)**
31:3;33:20;49:6
**giving (8)**
20:20,21;25:19;
39:22;46:11,12;47:5;
50:8
**GLENN (1)**
7:7
**glide (1)**
94:2
**global (3)**
21:20;28:7;52:12
**goal (5)**
50:25;51:4;57:11,
12,13
**goes (2)**
30:11;49:4
**Goldman (1)**
83:16
**Good (18)**
10:5,22;11:25;
14:12;17:16;30:10,
25;38:10,17;39:6;
44:13;74:17,20,24;
75:1,5;79:3;95:18
**good-faith (1)**
54:9
**GOTTLIEB (1)**
8:2
**grant (2)**
27:19;29:16
**granted (5)**
14:17;18:17;24:2;
49:2;73:23
**granting (1)**
14:6
**grants (2)**
13:24;24:8
**grapple (1)**
12:23
**GRAY (2)**
8:11;60:5
**great (1)**
54:18
**greater (1)**
13:1
**gripe (1)**
50:4
**GROSSMANN (1)**

6:2
**ground (1)**
64:23
**grounds (4)**
89:24;91:7,8;98:16
**Group (6)**
5:3;6:13;34:7;
60:7;97:4,8
**groups (1)**
62:17
**guarantee (1)**
96:18
**guaranteed (1)**
96:22
**guess (7)**
21:1;41:21;49:19;
70:18;93:24;100:22;
101:7
**guidance (1)**
11:10
**guided (1)**
13:2
**guidelines (1)**
94:19

**H**

**Hackensack (1)**
6:22
**Hague (1)**
80:12
**HAMILTON (1)**
8:2
**hand (5)**
23:2,3;36:14,24;
85:4
**hands (3)**
27:9;37:7;87:10
**happen (2)**
23:8;35:1
**happened (1)**
19:5
**happening (1)**
66:4
**happens (3)**
35:24;54:21;102:4
**happier (1)**
33:24
**happy (8)**
20:12;21:4,21;
25:22,25;33:24;
61:25;84:21
**hard (3)**
24:11;39:13;68:25
**HARRISON (1)**
5:7
**HAWKINS (1)**
9:17
**heads (1)**
15:10
**hear (17)**
14:1;16:25;20:16;
24:9;28:15,18,23;

12-12020-mg    Doc 3243    Filed 03/12/13    Entered 03/19/13 12:10:00    Main Document
RESIDENTIAL CAPITAL, LLC, ET AL.    Pg 114 of 125
Case No. 12-12020-mg

Adv. Proc. No. 12-02051-mg
March 5, 2013

29:1,22;35:8;37:16;
39:20;48:16;49:11;
59:22;71:9;102:15
**heard (14)**
11:22;13:20;16:1;
18:22;28:14;37:6;
59:25;60:9;61:22;
63:19;65:3;73:21;
87:4;91:24
**hearing (17)**
17:20;21:22;35:4,
15;38:14;41:4;45:1,
12,20;67:18,19;68:1;
70:1,2,4;95:13;99:11
**hearings (2)**
30:24;38:13
**heart (2)**
78:6;80:1
**heavier (1)**
81:10
**heavily (3)**
39:2;97:17,20
**held (1)**
99:9
**help (2)**
11:9;27:1
**helpful (6)**
12:24;19:25;20:10;
28:1;61:5;84:22
**helping (1)**
20:1
**here's (2)**
42:20;47:20
**herring (1)**
96:24
**HFA (3)**
96:16,19,22
**highly (2)**
15:2;36:5
**hit (1)**
19:15
**Hoc (9)**
5:3;20:17,23;
42:21;69:23;70:13;
71:3;73:3,16
**hold (1)**
33:10
**holder (1)**
65:19
**Holders (1)**
8:12
**holding (2)**
84:20;89:15
**hold-outs (1)**
25:9
**hollow (1)**
42:16
**Home (2)**
76:19,21
**Honor (139)**
10:5,7,13,14,18,25;
11:4,5,17,18,19,25;
13:23;15:25;17:12,

16,18,25;18:18,19,
21,22;19:4,6,10,15,
22;20:6,11,14;21:4,
22,25;24:8,23;25:24;
27:22;28:12;30:15;
32:14;33:4,5,22;
35:9;36:17;41:5;
45:18;46:10;49:13;
50:18,22;53:20;
54:22;56:1,13;58:19;
59:4,10,24,25;60:4,7;
61:23,24;62:2,3,19;
63:11;64:7,13;66:13,
21,22;67:13;69:10;
70:9,25;71:12,22,24;
72:2,12,16,19,21;
73:20,24;74:1,5,9,12,
17,20,24;75:5,8;76:1,
8,16,19,25;77:3,4,9,
14,22;78:13,18,21,
23;79:16,22;80:10,
25;84:6,16;87:5,8,16;
88:25;89:6,11;91:12,
14,18,20;92:2,25;
93:13;94:5;95:5;
98:18;99:11,23;
100:13,22;101:6;
102:15;103:9
**Honor's (7)**
11:13;30:17;40:6,
13;79:5;91:24;95:13
**hope (4)**
13:11;14:24;15:6;
27:25
**hopeful (2)**
54:11;70:12
**hopefully (3)**
13:3;15:13;50:21
**hopes (1)**
30:15
**hotly (1)**
22:10
**Houlihan (1)**
71:4
**HUD (2)**
96:16,18
**hunch (1)**
101:20
**hurdle (1)**
53:21
**hurts (1)**
61:3

**I**

**idea (4)**
12:6;32:2;43:14;
56:16
**identify (1)**
71:1
**ignore (1)**
41:20
**imagine (2)**

41:21;100:4
**immediately (2)**
18:8;36:13
**impasse (1)**
16:18
**importance (1)**
15:4
**important (22)**
12:25;14:24;15:3,
16,17;16:10,12;20:5,
10;21:15;24:1;26:21;
27:4,5;29:2;39:21;
51:16;52:10,16;
80:17,24;83:12
**importantly (2)**
24:19;41:4
**impossible (2)**
58:1;80:23
**improper (2)**
95:9;96:7
**Inc (2)**
2:9;5:21
**incapable (1)**
46:18
**include (2)**
55:6;78:9
**included (3)**
82:14;90:5;95:3
**includes (3)**
82:13;84:11;86:5
**including (5)**
16:17;23:3;38:23;
68:10;88:1
**inclusive (1)**
20:4
**inconsistencies (2)**
36:8;46:8
**inconsistency (5)**
36:16,17;40:9;
48:19;99:22
**inconsistent (1)**
35:23
**incorporate (1)**
73:6
**incredibly (1)**
20:10
**indemnity (3)**
77:17;93:20;94:16
**independence (3)**
12:24;15:5;40:9
**independent (8)**
13:2;36:10,14,15;
60:16;61:17;69:14;
80:4
**in-depth (1)**
52:25
**indicated (3)**
17:23;91:6;94:15
**indicating (1)**
69:3
**indifferent (1)**
38:11
**individual (3)**

25:16;30:17;47:1
**individually (1)**
63:3
**industry (1)**
81:25
**IndyMac (1)**
76:22
**inextricably (1)**
17:1
**information (1)**
70:14
**initial (3)**
15:20,22;37:25
**initially (1)**
60:7
**insight (1)**
11:10
**insolvency (1)**
15:1
**instance (1)**
98:20
**instill (1)**
12:25
**institutional (1)**
26:9
**insufficient (2)**
97:10;98:5
**insurers (1)**
27:8
**intend (3)**
13:17;16:15,21
**intends (2)**
68:7,15
**intention (1)**
73:9
**intercompany (1)**
25:13
**intercreditor (4)**
23:4;27:11,24;55:5
**interest (5)**
34:6;47:2;55:14;
57:5;94:22
**interested (1)**
33:18
**interesting (1)**
80:8
**interests (8)**
10:23;46:25;48:2,
8,9,20,21;51:17
**interpreted (3)**
49:16,23;50:9
**into (9)**
18:8;22:17;32:12;
33:25;35:18;39:7;
52:5;73:4;80:10
**introduce (1)**
68:12
**introduced (1)**
12:8
**introducing (1)**
12:6
**introduction (1)**
55:3

**Investors (9)**
6:13;26:9;27:19;
51:23;92:15
**investors' (1)**
78:5
**involve (3)**
79:20;87:19;94:15;
96:16;101:5
**involved (13)**
41:11,12;63:4;
78:23;83:3;86:14;
88:6,19;92:17;94:3,
13;97:17,20
**involvement (2)**
19:24;98:4
**involving (3)**
100:19,25;101:22
**iPad (1)**
27:16
**Irish (2)**
80:6;85:1
**irrespective (1)**
16:4
**ISAAC (2)**
8:25;74:22
**Islands (1)**
80:7
**isolation (1)**
89:7
**issue (49)**
11:14,17;12:8,23;
20:15,17;23:19;25:3;
27:8;28:4;29:3,13,14,
22,24;30:13,21;
31:25;33:1;34:8;
37:4,5;40:8;44:6;
46:17,20;52:6,8;
60:24,25;69:5,23;
76:12;78:3,22;79:2,7,
13;81:5,12;82:5,12,
22;84:8;87:19;92:19;
96:20;99:10,12
**issued (1)**
79:11
**issues (42)**
15:15;23:16;25:13;
27:13;28:5;29:7,9;
30:4;31:6;40:8,12;
41:5,8;46:9;55:5,15;
59:1;69:21;78:4,6;
86:4,12,14,15,17;
88:14,17,23;89:1;
92:6;93:16;94:9,11,
13,15,21;96:16;
98:21,25;99:1,6;
100:16
**item (2)**
17:19;72:2
**items (1)**
62:21

**J**

**job (1)**
95:18
**JOHN (1)**
6:24
**join (1)**
50:10
**joinder (4)**
80:16;81:10;95:9;
96:7
**joined (1)**
80:6
**joint (2)**
10:13,14
**JPMorgan (2)**
79:19;86:6
**JSB (2)**
41:22;55:7
**JSBs (3)**
55:12;57:10;58:5
**Judge (67)**
11:3;12:8;14:18,
19,21;15:21;16:3,4,
16,17;17:3,7,11;
38:16;39:4;41:7,7;
53:6,7,10;55:3;75:13,
15,15,18,20,25;
77:18;79:8,10,11,18;
83:15,22;84:6;85:15;
86:5,6,7,16;87:1,2,
10,13;89:13,24,25;
90:1,2,3,5,7,11,20,23;
91:3,9,10,11,15;93:8,
15;98:20,22;99:21;
101:21,24
**judges (4)**
79:7;89:20;91:5;
98:14
**judgment (2)**
10:21;93:16
**judicial (8)**
62:4,8,14,15,16,18,
21;67:13
**Judy (1)**
9:12
**jumped (1)**
18:8
**Junior (6)**
5:3;29:3,6;31:11;
37:6;69:23
**jurisdiction (7)**
76:9,15;77:16,19;
80:4;95:12;98:23
**Jurisprudence (1)**
83:15
**jury (5)**
86:22,23;99:10;
102:3,8
**JUSTICE (1)**
9:2

**K**

**Kaplan (9)**

**79:18;86:6,16;
89:18,24,25;90:13,
14;98:22
**Kaplan's (1)**
98:20
**keep (2)**
29:8;40:25
**KEITH (2)**
8:16;60:5
**KELLEY (1)**
5:12
**Kenneth (2)**
11:25;49:13
**kept (1)**
82:17
**kick (1)**
86:1
**kind (10)**
35:19;39:3;49:4;
62:24;65:7;91:22;
93:9;95:22;96:25;
101:9
**KIRKLAND (1)**
5:20
**KISSEL (1)**
7:10
**knew (2)**
81:19;82:3
**knowledge (4)**
76:25;78:5;84:11;
96:5
**known (1)**
63:6
**knows (6)**
22:20,20;33:23;
50:7;58:19;86:21
**KOTWICK (1)**
7:16
**Kramer (1)**
49:13
**Kruger (43)**
2:4;9:22;10:9,16,
23,25;11:7,20;12:4,
15,20;13:12;14:23,
25;20:7,8;27:9;
29:17,17;38:1,15,25;
40:20,21,22;42:1,19;
43:1;51:4,10;55:3;
63:5,16;66:19;69:13,
16;70:13,16,18,21,
23;71:20,22
**Kruger's (6)**
11:5,14;12:17;
13:16;15:7;29:15

**L**

**laid (2)**
34:25;52:11
**language (2)**
48:4;73:4
**large (2)**
33:9;82:7

**largely (2)**
21:22;52:9
**largest (2)**
48:22;50:13
**last (24)**
10:7,25;19:4,22;
21:14;28:22;67:6,9;
71:15;72:10;77:5,8;
78:18;79:6,11,22;
80:19;81:20;84:17;
88:10;89:6;91:24;
95:13;99:11
**late (1)**
19:22
**later (2)**
18:6;80:10
**launched (1)**
24:7
**law (12)**
78:4;79:7;83:13;
85:5;86:11,13,15;
98:21;99:1,1,3,3
**lawsuit (3)**
32:1;64:22,23
**lawsuits (1)**
33:11
**lay (1)**
88:15
**lead (3)**
13:3,4;15:9
**leash (1)**
82:18
**least (8)**
35:20;58:10;62:6;
88:3,11,17;90:4;99:9
**leaves (1)**
25:9
**ledger (2)**
32:12,13
**LEDYARD (1)**
6:12
**Lee (11)**
2:5;10:4,5,5,18;
13:22,23;15:25;16:8;
17:12,15
**left (1)**
50:12
**legacy (1)**
14:14
**legal (1)**
53:1
**legally (1)**
80:23
**Lenders (3)**
76:21;81:25;82:6
**lending (3)**
81:24;97:4,8
**lengthy (2)**
34:15;50:10
**LEONARD (1)**
6:20
**less (4)**
14:15;40:13;54:4;

98:7
**letter (1)**
79:17
**letting (1)**
49:8
**level (5)**
12:23;35:3;48:12,
23;61:18
**Levin (1)**
49:14
**Lewis (3)**
2:4;9:22;10:9
**Lexington (2)**
5:22;8:21
**liabilities (4)**
51:15,16;94:25;
95:2
**liability (4)**
78:4;83:13;88:15;
96:9
**Liberty (1)**
8:4
**lien (1)**
33:18
**lift (1)**
88:5
**light (2)**
11:18;67:15
**likelihood (2)**
88:13;102:7
**Limited (1)**
3:2
**line (1)**
86:18
**lined (1)**
91:9
**lines (1)**
91:22
**link (1)**
14:2
**linked (1)**
17:2
**Lippmann (2)**
82:17,18
**lips (1)**
21:24
**liquidating (1)**
25:4
**list (2)**
39:8;76:18
**listening (1)**
49:15
**litigants (3)**
3:9,13,22
**litigate (5)**
28:4;34:8,9;36:4;
55:19
**litigated (2)**
13:5;93:15
**litigating (2)**
33:19;99:20
**litigation (16)**
15:9;22:17;24:7,

17;31:22;33:16;34:1,
15;35:5,6;55:1;
59:17;64:17;86:2;
97:23;101:25
**LITOWITZ (2)**
6:2;74:18
**little (6)**
28:2;40:7;42:15;
48:3;71:8;81:3
**LLC (6)**
2:5,13;3:21;9:21;
31:12;46:14
**LLP (11)**
5:2,12,20;6:2;7:2,
10,19;8:2,11,19;9:11
**loan (2)**
14:13,14;94:20
**Loans (9)**
78:11,13,22,24;
81:23;82:1,7;87:18;
92:17,19,21;94:20;
96:17,19,22
**local (1)**
67:17
**logic (1)**
65:1
**long (4)**
17:5;24:21;76:18;
102:4
**longer (1)**
101:20
**look (22)**
23:19;24:25,25,25;
28:20;39:11,15;
42:16,20;44:19;60:7;
61:2,8,11;63:24;
64:19;65:11;71:24;
91:9;92:13;93:2;
97:12
**looked (2)**
60:7;100:8
**looking (4)**
19:14;38:3;40:11;
46:1
**Lorenzo (3)**
2:12;17:16;72:19
**losses (1)**
96:23
**lot (9)**
15:15;27:10;45:25;
50:15;54:20;68:20;
89:6;92:17;94:13
**lots (5)**
27:23;76:6;100:1,
1,2
**lower (1)**
81:3
**Ltd (5)**
74:7,19;75:6;
85:10;98:1
**Lynch (1)**
79:19

## M

**M&T (1)**
97:25
**MA (1)**
8:14
**Magnus (1)**
76:21
**Main (2)**
6:21;62:23
**maintain (1)**
59:20
**major (1)**
23:16
**majority (6)**
22:7;25:6;34:13;
58:16;88:25;92:8
**makes (5)**
16:13;60:18,19;
69:9;79:3
**making (5)**
40:25;42:6;71:6;
83:14;95:19
**manage (2)**
29:19;89:8
**management (2)**
18:4;19:12
**mandatory (10)**
79:25;80:1;90:8,
17,19,20;91:7,15;
95:7,10
**manner (1)**
50:21
**mantra (1)**
55:13
**many (14)**
19:1,15;23:4;39:5;
41:20;53:8;57:19;
58:4,7;75:16;92:21,
23;100:11,19
**March (5)**
68:2,8;70:6,7,7
**Marinuzzi (40)**
2:12;17:13,16,17;
18:18;21:4,13,15,25;
22:2;27:22;30:23;
35:24,25;37:21;
47:22;52:9;53:24;
65:3;66:12,13,21;
67:1,15;68:24;69:10;
70:9,11;72:2,6,8,12,
16,18,19,20;73:2,24;
74:1,3
**MARK (2)**
7:16;54:19
**MASUMOTO (2)**
9:8;17:23
**material (1)**
31:18
**math (2)**
71:7,17
**matter (17)**

25:3;33:15;50:15;
51:13;52:15,22;
53:10;54:7;55:8;
58:3,19;60:18;63:21;
67:16,18;68:21;69:8
**matters (1)**
62:3
**may (38)**
15:10;16:17,22;
17:13;26:10,14;27:3;
35:14;37:4;38:8;
39:11,25;41:25;
44:19;46:24,25;48:7;
50:13;52:13,13,14,
14;53:9,25,25;54:8,9,
20;55:1,7;58:15,16;
70:5;74:1,2;87:21;
91:21;98:25
**maybe (11)**
14:1;22:10;32:3;
35:17;41:22;50:12;
60:22;63:10;68:22;
85:6;93:9
**MBIA (1)**
83:20;84:3
**mean (36)**
24:22;37:10;38:1,
14,14;39:16;42:8,15,
16;43:24;45:8;49:18;
50:4;56:6,15;62:10;
67:22;69:5,14,17;
77:24;81:2;85:1;
88:17;90:1;91:5;
93:2;95:23;98:24;
99:2,24;100:7,18;
101:14,15;102:2
**means (2)**
64:21;66:18
**meant (1)**
85:19
**mechanism (1)**
19:18
**mediation (17)**
11:3;12:9;14:21;
15:22;16:3,5,12,14,
18,22;20:1,9;24:13,
14;25:10;52:17,22
**mediator (11)**
12:9;14:17;15:21;
16:16;17:11;19:22,
25;43:5;53:3;72:23,
25
**meet (7)**
40:19,22;70:16,20,
24;71:19,23
**meeting (5)**
11:1;40:15,16,17;
41:13
**meetings (3)**
30:6;41:13;52:24
**MEISEL (1)**
6:20
**Mellon (1)**

7:3
**member (5)**
34:14;36:20,21;
39:24;40:16
**members (16)**
20:3;22:7;23:18;
24:15,16;25:1,6,8,17;
28:3;36:4;40:1;43:7;
47:2;48:4;52:21
**memorandum (1)**
79:12
**mention (7)**
26:8,25;40:23;
73:6;91:3;97:16,18
**mentioned (6)**
10:7,25;91:2,4;
98:25;99:11
**Merrill (2)**
79:19;86:7
**met (4)**
11:2;40:21;80:3;
81:5
**MICHAEL (1)**
7:24
**Michigan (1)**
85:11
**microphone (1)**
28:17
**middle (1)**
64:23
**might (3)**
32:9;93:17;99:2
**Milbank (2)**
71:2,3
**MILBURN (1)**
6:12
**million (3)**
22:8;35:13;92:11
**mind (1)**
39:3
**mindful (1)**
69:19
**minimize (1)**
58:12
**minute (1)**
38:18
**miracle (1)**
69:7
**Misra (1)**
82:19
**misreading (1)**
97:9
**mistake (1)**
51:20
**misunderstanding (1)**
71:9
**MIT (1)**
96:13
**MNPI (1)**
40:25
**model (3)**
71:5,6,7
**modified (3)**

20:19;28:22;69:25
**modify (1)**
17:21
**Modifying (1)**
2:9
**MOLONEY (13)**
8:7;59:25;60:1;
61:22,23,24;62:11,
13;63:25;64:4,6;
65:2;67:12
**moment (2)**
50:2;87:11
**money (1)**
45:25
**monoline (1)**
27:8
**monolines (1)**
33:13
**months (1)**
23:2
**more (13)**
21:19;23:15;32:12;
54:5;60:9;75:9;83:5,
6;84:20;92:23;99:19;
101:16,16
**Moreover (1)**
83:8
**morning (10)**
10:5;11:25;17:16,
23;74:17,20,24;75:1,
5,9
**Morrison (3)**
10:6;17:17;72:20
**Mortgage (4)**
76:20;82:3,4;93:12
**mortgages (5)**
78:12;88:19,20;
94:3,18
**most (13)**
11:4;21:9,15;38:1;
41:3;56:10;61:3;
64:25;75:13;77:25;
86:8;95:19;101:23
**Motion (55)**
2:2,15,16;3:3;10:9,
11,16;11:23;13:21,
24;14:1,3,3,5,16,17;
17:10,21;18:16,21;
20:11,12,18;24:3,8,
10;28:19;39:16;
46:16;47:8;50:10;
59:15;64:22;68:1,10;
69:25;72:4;73:22;
75:7;81:7,7,11;83:9;
86:19,25;87:9;88:5;
93:3;94:1;97:5,13
**motions (4)**
10:8,14;14:11;31:4
**motivated (1)**
82:7
**move (17)**
11:9;14:22;15:17;

18:7;19:17;22:10;
23:7;25:15,20;28:2;
29:20;33:7;34:6;
44:16;74:6;80:14;
84:15
**moving (5)**
19:25;20:5;27:10;
28:7;84:2
**much (17)**
17:9,14;19:5;
22:20;26:1;31:20,22,
25;40:13;43:17,19;
69:6;72:1;81:10;
91:19;102:19;103:5
**Mukasey (1)**
85:17
**multi-page (1)**
41:6
**muster (1)**
43:24

## N

**NA (1)**
7:11
**name (1)**
85:6
**narrow (1)**
28:5
**necessarily (4)**
39:5;48:8;61:19;
99:24
**need (12)**
21:6;22:25;23:20,
20;26:22;33:7;41:8;
64:15;72:15;76:17;
89:5,5
**needed (1)**
57:9
**needing (1)**
18:7
**needs (3)**
32:10;48:25;68:16
**negative (1)**
56:24
**negotiate (3)**
22:25;28:9;30:10
**negotiated (6)**
13:13,14;42:17;
46:13,14;67:9
**negotiating (1)**
30:8
**negotiation (8)**
21:10,12;23:24;
24:18;26:20,22;
27:20,23
**negotiations (4)**
14:9;19:19;20:9;
26:22
**Neither (2)**
30:16;53:15
**nervous (1)**
23:20

**netted (1)**
19:8
**neutral (1)**
86:10
**New (26)**
3:4,23;5:5,15,23;
6:6,15;7:3,5,13,22;
8:5,22;9:6;62:8;
64:16;66:15;67:9;
83:13,13,15,17;
85:12;93:11;98:1;
99:8
**newly (1)**
60:15
**newspaper (1)**
97:1
**next (26)**
13:11,12;19:15;
22:22;26:23;30:5,9;
35:15;36:7;50:25;
56:12,18,22;57:12;
58:13,16,21;59:17;
60:3;62:5;66:18;
71:19,20,23;72:2;
93:17
**nice (2)**
92:1,3
**night (1)**
71:15
**nineteen (3)**
78:2,9;79:2
**ninety-day (1)**
18:25
**ninety-seven (2)**
89:8;94:3
**ninety-six (1)**
88:18
**NJ (1)**
6:22
**Nobody (2)**
56:5;90:17
**nobody's (1)**
33:3
**non- (1)**
92:21
**nonconsensual (5)**
51:6;56:21;57:13,
14,17
**none (1)**
40:18
**Nonetheless (1)**
12:14
**nonmarket (1)**
41:3
**non-ResCap (1)**
92:9
**nor (3)**
30:16,16;53:15
**North (3)**
6:21;9:14;22:8
**note (6)**
32:25;73:5;84:9;
86:18;88:25;89:17

**noted (8)**
20:6;32:14;36:17;
79:2;19;82:25;83:16;
86:16
**Noteholders (5)**
5:3;29:3;37:6;
42:21;69:23
**notes (6)**
29:6;31:11,17,18;
33:14;36:22
**notes' (1)**
33:15
**notice (8)**
62:4,8,14,15,16,18,
22;67:13
**notify (1)**
68:16
**notion (7)**
30:4;38:1,25;
40:24;41:15;57:24;
58:10
**notwithstanding (5)**
33:4;51:13;54:9;
57:11;73:10
**novel (6)**
86:15;98:21,25;
99:1,2,5
**November (1)**
12:7
**number (11)**
10:3,10,16;22:9,11,
18;23:7;74:8;83:1;
92:24;100:24
**numbers (3)**
82:7;92:10,13
**Nunc (1)**
2:11
**NY (12)**
3:23;5:5,15,23;6:6,
15;7:5,13,22;8:5,22;
9:6

**O**

**object (7)**
10:15;12:3;29:25;
45:10;56:10;66:1,2
**objected (4)**
11:5;44:22;56:9,9
**objection (19)**
11:7;17:22;20:24,
25;21:1;25:22;30:20;
44:24;45:11;46:13;
66:1,8;67:16,20;
68:6;69:22,22;73:3,
19
**objections (3)**
11:19;23:15;37:7
**observation (1)**
26:2
**observed (2)**
79:22;83:16
**obtained (1)**

51:25
**obtaining (1)**
80:12
**obviously (11)**
14:18,25;16:2;
19:6;20:6,18;24:5;
68:14;81:1;84:13;
86:22
**occasions (1)**
11:3
**o'clock (1)**
68:8
**off (7)**
27:3;31:24;39:12;
63:22;88:15;89:20;
101:4
**offended (1)**
99:9
**offer (1)**
102:18
**offering (2)**
37:9;100:5
**Office (1)**
9:3
**Officer (3)**
2:4;9:22;10:10
**officers (2)**
46:13,17
**officially (1)**
43:1
**often (1)**
92:2
**old-fashioned (1)**
68:3
**once (2)**
11:16;28:21
**One (57)**
7:12;8:4;9:13;10:9,
15,15;19:20;22:1,5;
23:2;26:8;29:8;
31:20,25;32:11;33:2,
2,5;35:17,25;36:14,
24;39:24;40:6,22,23;
41:23;43:23;45:24;
46:20,24;47:24;48:3,
24;51:22;52:10,15;
53:17;56:9;62:5;
63:9;64:6,11;67:21;
70:11;72:25;78:14;
82:4,13;84:20,23;
88:10;89:18;92:4;
94:17;99:20;101:21
**O'NEAL (1)**
8:8
**one-off (1)**
89:7
**one-on-one (1)**
52:25
**ongoing (1)**
16:6
**only (22)**
11:14;14:5;26:25;
31:18;36:15;37:5;

39:24;42:21;43:15;
57:21;68:5,6;69:21;
77:24;78:19;81:13;
86:1,11;87:18;93:11;
97:18;99:25
**onto (1)**
99:9
**OpCo (3)**
35:3;48:12,23
**open (1)**
11:14
**operating (1)**
31:21
**operations (1)**
100:17
operations@escribersnet (1)
3:25
**opinion (4)**
75:25;79:12;83:24;
84:1
**opportunity (1)**
38:7
**oppose (1)**
24:2
**opposed (2)**
21:16;59:12
**opposition (3)**
68:12;83:8,10
**option (25)**
42:6;43:4,10,10,16,
22,22;47:21;48:1;
52:11;54:25,25;
59:12,12,16;61:19;
63:11,14,14,14,19,
22;64:19,22;69:16
**optionality (2)**
35:11,12
**options (4)**
52:11;55:1;63:9;
64:20
**Order (45)**
2:3,8,17;11:13;
12:15;15:20;16:4,12,
15,18,20,21,21,23;
17:4,10;18:14,23;
23:7,19;41:6;45:1,17,
19;49:2,2,2;53:4,5;
57:9;64:1;66:2,3,7,
15,15,17,22;67:24,
25;69:2,15,24;70:3;
73:5,7
**ordered (1)**
67:19
**orders (2)**
67:14;102:1
**organ (2)**
80:7;85:1
**originally (2)**
18:21,24
**originated (5)**
82:2;92:19,21;
94:18,20
**originator (2)**

75:10;76:18
**originators (4)**
78:23;82:1,5,8
**others (6)**
19:23;21:18;38:19;
57:20;99:18,19
**otherwise (3)**
16:23;26:16;70:1
**ought (2)**
26:20;68:16
**out (44)**
21:17;25:9,13;
28:2;31:21;32:10;
33:22;34:7,17,25;
35:20,21;36:13;
37:21;41:19;46:21,
24;48:18;51:10;52:3,
11,17;53:18,23;54:8,
10,11,13;55:9,16;
56:2;60:25;61:5,19;
63:12;65:9;74:13;
77:25;78:2;80:2;
88:7;89:6;91:4;103:2
**outcome (1)**
78:7
**outline (3)**
42:1,10,20
**outright (2)**
63:5;80:21
**outside (1)**
58:4
**over (24)**
13:11;17:13;19:8;
20:22;30:5,9;35:19;
36:7;38:21;43:8;
47:21;49:4;50:25;
56:11;57:12;58:12,
15;59:1;61:20;63:6;
69:5;78:19;79:11;
81:15
**overlap (1)**
89:4
**owed (1)**
46:14
**own (4)**
25:18;27:6;64:21;
79:17
**owned (1)**
80:6

**P**

**PA (1)**
6:20
**page (2)**
17:19;72:3
**paid (3)**
51:20;57:4,5
**pain (1)**
65:20
**palatable (1)**
64:20
**PAMELA (1)**

12-12020-mg    Doc 3243    Filed 03/12/13    Entered 03/19/13 12:10:00    Main Document
RESIDENTIAL CAPITAL, LLC, ET AL.    Pg 118 of 125
Case No. 12-12020-mg

Adv. Proc. No. 12-02051-mg
March 5, 2013

9:21
**Pampillonia (2)**
80:18;96:5
**paper (2)**
19:10;41:19
**papers (7)**
28:21;44:13;48:22;
75:8;83:8;88:2;97:24
**paragraph (1)**
97:15
**parallel (1)**
86:1
**parent (13)**
31:10,19,22;35:6;
46:18;83:19,22;84:7;
95:15,24;96:3,9,10
**parents (1)**
96:12
**parent's (1)**
31:22
**parent-subsidiary (1)**
96:11
**Park (2)**
5:14;7:12
**PARKE (1)**
7:19
**parochial (1)**
57:12
**part (20)**
13:1;21:9;23:16,
17;26:21;27:5,20;
28:6;29:14,21;33:9;
34:16;38:23,23;
55:13;68:12;78:1;
88:17;90:5;96:20
**participant (1)**
82:20
**participants (1)**
22:11
**participate (1)**
30:6
**participated (2)**
81:18;82:11
**participating (1)**
81:18
**particular (2)**
25:23;52:4
**particularly (2)**
13:9;92:15
**parties (20)**
10:13;11:16;12:9;
14:9,22;15:5;16:8;
26:14;27:24;52:18;
53:8,22;54:9,13,19,
24;61:16;68:5;79:6;
86:22
**parties' (1)**
75:8
**party (2)**
11:5;72:6
**pass (1)**
27:15
**passed (1)**

43:23
**past (1)**
31:20
**path (3)**
13:6;39:17;55:4
**paths (3)**
37:21,23;94:2
**Pause (1)**
74:14
**pay (2)**
54:4,5
**pays (1)**
21:21
**peace (1)**
52:12
**Peck (18)**
11:3;12:8;14:18,
19,21;15:21;16:4,4,
17;17:3,7,11;38:16;
41:7,8;53:6,7;55:4
**Peck's (2)**
16:16;53:10
**penalizing (1)**
18:12
**pending (5)**
75:12;99:16;
100:20,20,25
**people (36)**
17:7;23:20,20;
28:9,18,24;30:6;
32:23,23,23;33:10;
34:4;35:4,5,10,16,17,
20;37:19;38:4;41:16,
19,21;43:15,16,18;
44:13;46:9;47:4;
48:11;49:5,7,10;54:2,
5;58:13
**percent (7)**
78:22,24,25;87:18;
88:18;89:8;94:3
**perfect (2)**
27:23;64:25
**perfectly (1)**
38:9
**Perhaps (2)**
87:8,24
**Period (17)**
2:15;10:11;15:22;
20:21;24:6,19;26:13,
24;28:8;39:3;41:17;
45:17;53:5;55:24;
56:1;67:8;73:14
**Periods (4)**
2:17;18:20;19:1;
73:8
**permissive (16)**
76:11,13;85:22,24;
87:14;89:12,18,23;
90:6,9,12,17;91:5,8;
98:11,16
**permit (1)**
30:16
**perpetuity (1)**

34:10
**person (2)**
43:12;63:7
**personally (1)**
54:11
**perspective (1)**
19:23
**persuade (1)**
59:11
**petition (1)**
48:20
**ph (1)**
78:15
**pick (2)**
64:23;92:3
**piece (1)**
41:19
**pieces (1)**
27:10
**pitch (1)**
31:6
**Place (12)**
9:13;16:12,20;
27:21;30:22;43:1;
51:6;52:18;58:14;
63:2;92:1,3
**plain (2)**
73:7;98:7
**plainly (1)**
79:14
**plaintiff (5)**
74:18;75:6;84:23;
99:25;101:22
**plaintiffs (5)**
6:3;33:14;74:25;
88:12;97:13
**plaintiff's (2)**
81:8;93:23
**Plan (107)**
2:16,18;10:8,12;
11:9;13:3,13,14;14:8,
10,15,25;15:6,8,12,
13;18:20,25;20:22;
21:10,11,18,19,19;
22:6,10,15;24:20;
25:4,5;26:6;27:12;
29:2,12,20;31:7,24;
32:7,8;34:17,17,19,
21,23,24;35:21;36:1,
3,6,12;37:2,8,9,13,18,
20;38:8;41:21,22,23;
42:2,10,20;43:3,3,4,
23;44:4;46:24;47:4,
23;49:4;51:2,2,18;
53:12,19;54:10;
55:23;56:2,5,11,18,
21;57:6,9,13,14,17,
18,22;58:11,17,18,
21;61:17;62:5,6,10;
64:21;66:19;67:7;
69:8,14,16;73:10,13
**plans (8)**
38:12;41:17,18,23;

42:4;51:7,9;64:18
**plan's (1)**
35:19
**plate (1)**
15:16
**platform (1)**
14:13
**play (2)**
12:5;52:17
**players (1)**
24:25
**Plaza (4)**
6:21;7:12,21;8:4
**pleading (1)**
64:8
**pleadings (2)**
14:20;80:21
**please (6)**
10:2,17;69:21;
72:18;74:11,16
**plenty (1)**
37:7
**plural (1)**
26:22
**plus (1)**
35:13
**PM (1)**
103:13
**podium (2)**
17:12;72:8
**point (25)**
23:9;24:5;31:19;
37:24;38:6;39:12,14,
25;41:10,11;46:12;
50:9;54:12;58:1,16;
62:2;70:11;77:24;
78:17;89:3;94:9;
99:12,17;100:16;
102:5
**pointed (1)**
89:6
**points (10)**
19:16;28:25;39:21;
50:16;65:7,21;67:11;
77:5;80:16;102:15
**policies (2)**
81:19;82:10
**policy (2)**
81:22;82:11
**popping (1)**
60:2
**portfolio (1)**
14:14
**portion (2)**
19:8;78:20
**poses (1)**
99:7
**position (8)**
26:18;28:22;36:9;
47:9;48:24,25;93:3;
97:11
**positions (3)**
22:3;35:23;54:25

**possibilities (1)**
64:12
**possibility (4)**
24:7;41:18;64:10;
94:8
**possible (5)**
21:19;50:22;81:12,
13;83:6
**post- (1)**
48:19
**post-petition (3)**
34:1;48:21;55:14
**pot (2)**
46:24;47:3
**potential (2)**
53:1;95:2
**potentially (5)**
41:17;51:9;60:9;
61:6;98:21
**power (1)**
49:7
**practical (5)**
33:15;58:19;60:18;
63:21;69:8
**practice (1)**
85:19
**precisely (1)**
54:22
**predicated (1)**
76:15
**prediction (1)**
35:16
**predominates (1)**
86:13
**prematurely (1)**
54:24
**prepared (3)**
42:21;58:17;63:19
**pre-petition (2)**
33:11;37:8
**PRESENT (3)**
9:20;19:16;94:25
**presentation (6)**
19:16;26:8;46:4;
49:24;50:10;51:14
**presentations (2)**
53:2,2
**presented (3)**
12:12,13;73:5
**presently (1)**
73:9
**preserving (1)**
30:20
**pressure (3)**
22:24;25:7,10
**presumed (1)**
81:8
**presuming (1)**
57:4
**pretty (12)**
17:8;29:21;31:24;
37:11,23;38:5;39:6;
59:13;62:10;87:18;

12-12020-mg    Doc 3243    Filed 03/12/13    Entered 03/19/13 12:10:00    Main Document
RESIDENTIAL CAPITAL, LLC, ET AL.    Pg 119 of 125
Case No. 12-12020-mg

Adv. Proc. No. 12-02051-mg
March 5, 2013

99:1,3
**prevented (1)**
37:8
**principals (2)**
41:11,12
**prior (2)**
53:19;67:3
**priority (1)**
23:14
**Pro (3)**
2:11;100:14,15
**probably (7)**
44:25;78:1;86:10,
15;88:9,24;92:4
**problem (10)**
31:1;33:2,2,8;
34:12;35:22;46:23;
47:9,21;52:1
**problematic (1)**
61:7
**problems (3)**
17:4;73:2;99:8
**procedural (1)**
65:25
**proceed (5)**
13:11;50:21;
101:16,16;102:1
**proceeding (9)**
3:2;16:8;23:13;
72:4,6;74:8;87:17;
93:25;94:1
**Proceedings (3)**
72:3;93:18;103:13
**process (25)**
10:9,22;11:4,9;
13:3,13,14;14:16;
15:9;23:7,24;25:12;
26:9;29:20;36:25;
43:14;45:22;52:17,
23;57:13,14,17;71:6;
78:1,8
**processes (1)**
94:21
**producing (1)**
30:1
**productive (2)**
58:14;72:22
**Products (1)**
96:1
**professional (1)**
15:1
**professionals (2)**
19:13;22:18
**proffer (1)**
62:20
**program (1)**
81:24
**progress (9)**
14:8,12,15;23:20;
39:15;53:11,12;
58:15;59:8
**project (2)**
18:4;20:4

**promptly (1)**
41:20
**proof (8)**
30:14;76:23;77:1,
12,17;78:8;79:20;
98:19
**proofs (5)**
76:10;77:21,22;
88:12,12
**proper (2)**
25:18;97:15
**properly (1)**
20:12
**propose (5)**
55:23;56:12,18;
57:9;59:12
**proposed (8)**
20:22;26:10;27:18;
42:20;57:21,22;66:1;
69:2
**proposing (1)**
57:18
**prosecute (1)**
22:18
**prospects (1)**
59:12
**protections (1)**
16:13
**prove (2)**
80:20;96:4
**proved (1)**
11:10
**proven (1)**
35:14
**provide (1)**
18:3
**provided (2)**
18:8;80:18
**provides (2)**
12:23;24:20
**providing (1)**
18:12
**proxy (2)**
65:18,19
**PSA (6)**
40:8;43:21;44:1;
51:23,23;59:14
**PSAs (1)**
51:22
**publishing (1)**
53:19
**purchase (1)**
82:1
**pure (1)**
42:17
**purely (1)**
79:6
**purposes (1)**
93:19
**Pursuant (4)**
2:2,10;11:20;20:19
**pursue (1)**
61:17

**pushing (1)**
35:1
**put (13)**
22:24;27:3;29:14;
33:3;34:8;36:13;
48:18;50:22;51:5;
52:18;53:13;68:22;
88:2
**put-back (1)**
101:5
**puts (2)**
25:7,9
**putting (1)**
41:19

# Q

**quality (1)**
82:8
**quarrel (2)**
49:22;63:5
**quickly (9)**
18:7;33:7;34:6;
46:24;84:16;95:8,21;
101:16,17
**quite (9)**
39:9;42:4;45:20;
46:2;48:10;66:14;
92:10;103:4,10

# R

**Ra (1)**
91:11
**raise (6)**
15:19;25:23;26:25;
27:14;39:21;88:10
**raised (6)**
29:21;39:23;67:12;
78:18;84:17;86:19
**raises (3)**
20:17;27:8;55:9
**Rajeev (1)**
82:19
**Rakoff (6)**
79:10,11;88:3,4;
91:10;93:8
**Rakoff's (3)**
79:8;83:23;84:6
**ran (1)**
97:3
**rates (1)**
32:13
**rather (5)**
18:5;26:17,20;
38:12;46:3
**RAY (1)**
5:25
**reach (3)**
11:16;54:19;61:18
**reached (5)**
13:10;21:5;23:23;
50:17;62:25

**reaching (1)**
54:16
**read (10)**
21:1;27:16;55:22;
76:6,6,7;90:5;91:23;
95:12;98:25
**reading (2)**
27:17;73:4
**ready (6)**
28:20;58:22;70:21,
22,23;102:7
**real (7)**
40:11,12;50:4;
51:17;52:8;54:3;92:9
**realistic (3)**
41:18;54:2,2
**Realistically (2)**
21:17;58:20
**reality (4)**
24:24;25:20;38:11;
60:19
**realize (1)**
87:21
**realized (1)**
18:2
**really (43)**
17:8;19:11,17;
22:23;28:10;29:22;
31:7;45:2,14;48:11;
50:9,11,20,25;51:10;
52:7;58:22;60:22,25;
69:5;70:14;71:14;
73:1;76:12;77:24;
78:6,17,21;79:2,18;
80:1,7,19;81:9,12;
82:17,23;86:1;87:23;
89:3;99:10;102:16;
103:10
**reason (5)**
29:16,17,17;62:23;
79:16
**reasonable (3)**
10:20;17:6;64:14
**reasons (2)**
42:23;52:16
**REBECCA (3)**
6:8;74:17;75:5
**received (1)**
42:13
**recent (1)**
14:14
**recently (2)**
11:4;83:16
**recess (2)**
72:14,17
**recognize (8)**
21:7;22:13,14;
25:10,11,15;52:14;
58:15
**recognized (2)**
19:17;62:1
**recognizes (1)**
24:5

**recognizing (5)**
18:6,7;25:8,17,20
**recollection (2)**
67:4;91:16
**reconcile (1)**
71:6
**record (11)**
29:23;30:13;36:20;
60:5,10;67:14;70:3;
72:19;73:4,15;85:7
**recoveries (4)**
19:9;33:17;34:14;
38:22
**recovery (4)**
22:19;34:9;35:6;
80:22
**red (1)**
96:23
**reduced (1)**
15:15
**refer (1)**
85:25
**reference (5)**
81:15;83:17;87:1;
93:4;102:9
**referred (1)**
66:23
**referring (2)**
89:12,13
**reflection (2)**
11:7,8
**reflective (1)**
53:11
**reflects (4)**
12:19,21;24:24;
57:6
**refresh (1)**
67:3
**refute (1)**
95:6
**regarding (2)**
11:3;70:14
**regardless (1)**
82:8
**regular (1)**
99:5
**regulate (1)**
99:21
**regulations (2)**
96:17,18
**reimburse (1)**
18:9
**relate (4)**
10:8;88:23;92:9;
93:12
**Related (5)**
2:11,12;82:15;
94:21;96:16
**related-to (4)**
76:9;77:16,19;
98:23
**relating (2)**
55:6,7

**relation (2)**
86:24;87:17

**relationship (4)**
95:15;96:4,11,11

**relationships (1)**
82:6

**relatively (1)**
14:7

**release (2)**
36:2;47:24

**released (1)**
21:9

**releases (2)**
21:21;24:21

**relevant (2)**
80:2;99:10

**reliance (1)**
78:5

**Relief (4)**
2:12;17:24;47:7;
59:16

**reluctant (1)**
15:8

**relying (1)**
97:14

**remain (2)**
16:20;55:15

**remaining (3)**
16:19;69:22;80:3

**remains (1)**
68:6

**Remand (9)**
3:4;72:4;75:7;79:8,
22;91:7;94:6,7;98:15

**remanded (5)**
75:15,18;89:18,23;
98:15

**remanding (1)**
88:16

**remarks (1)**
13:7

**remember (1)**
83:12

**remote (1)**
87:18

**removal (2)**
75:23;76:15

**removed (1)**
75:19

**reply (5)**
10:14;12:19;97:12;
102:22,24

**report (13)**
10:8;23:1;24:12;
53:20,23;54:1,7,11,
18;61:4,7,18;83:2

**represent (1)**
63:22

**representation (2)**
27:7;48:10

**representative (1)**
20:8

**represented (3)**

48:15;58:9;65:17

**repurchase (1)**
101:6

**request (5)**
19:2,21;67:5;79:5;
89:7

**requested (1)**
17:24

**requesting (2)**
18:24;19:5

**require (2)**
23:8;68:5

**required (2)**
18:3;30:18

**ResCap (27)**
46:14,17;76:24;
77:13;78:10,14,23,
25;79:1,20;82:15;
87:19;88:1,6,16,19,
19,20,23;89:1,9,19;
92:7,19,20,22;94:4

**ResCap's (1)**
10:21

**rescheduled (1)**
26:10

**research (1)**
79:17

**reservation (1)**
13:18

**reserve (3)**
25:4;47:25;73:12

**reserves (2)**
22:16;34:2

**Residential (5)**
2:5,13;9:21;10:3;
76:20

**resolution (3)**
13:4;34:7;88:22

**resolve (8)**
27:12;29:3;55:4;
69:20;71:18;72:23;
73:3;94:2

**resolved (4)**
29:21;69:23;93:7,
16

**resource (1)**
60:24

**respect (37)**
11:22;13:20;16:11;
26:19;28:5;30:8,11,
21;41:15;45:16,21;
46:2;47:13;55:22;
59:15;65:16,23,25;
73:11;78:2;79:10;
80:1,11;81:15,22;
82:10;86:22;93:20;
94:16;95:7,12,25;
96:13,21;97:19;98:5;
99:7

**respected (1)**
15:2

**respectfully (3)**
78:3;84:24;96:14

**respectively (1)**
19:3

**respects (2)**
14:12;67:1

**respond (3)**
30:23;41:22;67:11

**responses (1)**
10:13

**rest (3)**
13:7;29:14;58:5

**Restructuring (5)**
2:4;9:22;10:10;
11:7;12:22

**retain (2)**
22:17;24:20

**Retention (4)**
2:9;13:18;17:21;
29:18

**RETHY (2)**
8:25;74:22

**reveal (1)**
83:2

**revealed (1)**
79:18

**reviewed (1)**
77:9

**revised (2)**
11:13;12:19

**revisit (1)**
80:17

**RFE (1)**
67:13

**right (63)**
10:2;13:24;15:16;
16:1,7;18:17;20:22;
22:2;24:20,22,23;
29:23;31:3;34:3;
43:10,24;44:7,9;46:3,
9,11,15;47:3,9,25;
48:16;49:17;52:3,16;
53:21;55:18;58:2;
59:19;61:6,21;64:21,
22;66:12,22;67:24;
68:14;69:1;70:25;
72:11;73:2,12,22;
74:6,15;77:15;84:4,
25;86:23;90:10,10,
25;91:13,18,19;
93:22;94:10;95:1;
99:14

**rightfully (1)**
25:7

**rights (3)**
45:16;66:23,25

**rings (1)**
42:15

**rise (1)**
78:7

**risk (2)**
24:18;58:12

**risks (2)**
23:21;61:15

**River (1)**

85:25

**RMBS (33)**
7:11;8:12;26:9,11,
16,19;27:14;33:13,
13;36:18,19;41:23;
46:13,16;51:23;60:5;
75:12,14,17;78:2;
79:1,7;82:5,12,13,14,
21;86:3;88:6;92:15;
93:12;100:20,24

**RMBS-related (1)**
51:15

**road (1)**
64:22

**Rockefeller (1)**
7:21

**role (7)**
12:5,17;15:3,17;
17:2;37:16;53:10

**roof (1)**
58:9

**room (2)**
27:1;53:15

**ROPES (2)**
8:11;60:5

**roughly (1)**
103:3

**round (1)**
67:6

**route (1)**
22:1

**rule (2)**
69:3,3

**ruled (1)**
14:4

**rules (4)**
30:16,17;67:17,22

**ruling (3)**
17:1;39:14;77:20

**rulings (2)**
99:22;103:2

**run (2)**
42:6;53:5

**running (1)**
79:21

**runs (1)**
97:7

## S

**sale (5)**
12:10;18:1;19:6;
21:7,16

**sales (3)**
14:14;19:14;62:18

**same (17)**
12:10;16:22,23;
24:15;37:22;46:23;
67:10;68:11,13;70:4;
75:9;76:12;82:12;
88:8;96:2,3;100:16

**Sand (4)**
90:23;91:3,9,15

**sat (1)**
12:14

**satisfaction (1)**
37:13

**satisfactory (3)**
57:9,10;73:17

**satisfied (1)**
51:24

**satisfies (2)**
33:20;73:16

**satisfy (1)**
34:2

**save (2)**
13:7;14:2

**saw (2)**
34:19,21

**saying (10)**
32:1;33:5;42:20;
43:17;46:19;47:8,25;
57:25;59:14;65:18

**scenario (7)**
22:5,6,12,21;25:2,
3,5

**schedule (5)**
38:14;40:12;45:1;
88:4;101:19

**scheduled (1)**
18:22

**scheduling (3)**
67:25;68:1;102:1

**SCHOTZ (1)**
6:20

**SCHROCK (1)**
5:25

**scope (4)**
12:18,19,20;15:4

**SDNY (1)**
85:13

**Sealink (22)**
3:2;6:3;72:4,9;
74:7,18;75:6,12;
76:23;77:1;80:6;
86:6;88:12;89:12,13;
90:12;92:6,8;99:16,
24,25;103:3

**Sealink's (3)**
75:7,14,17

**SEAN (1)**
8:8

**seated (2)**
10:2;72:18

**Second (17)**
2:10;10:11;17:18;
29:9;30:23;36:17;
40:13,14;41:3;43:21;
62:23;63:15;65:23;
80:10,24;81:12;
86:13

**secret (1)**
67:4

**Section (5)**
2:8;10:19;11:21;
83:15;84:19

**Sections (1)**
2:2
**Secured (12)**
5:3;29:3,6;31:11,
11,17,21,23;32:1;
36:22;37:6;69:23
**securities (10)**
23:14;33:13;88:1,
2,18;91:1;92:12,16;
95:25;97:7
**securitizations (5)**
92:9,18;94:25;
96:20;100:2
**securitize (1)**
82:7
**securitizing (1)**
81:23
**seeing (2)**
34:6;55:4
**seek (2)**
26:5;68:3
**seem (2)**
64:20;92:15
**seemed (2)**
63:13;77:15
**seems (2)**
56:10;77:16
**selection (2)**
10:22;63:4
**Senate (2)**
82:22;83:2
**send (1)**
91:6
**sending (1)**
90:19
**senior (6)**
33:14,15,15;36:21;
82:16,19
**sense (2)**
55:3;64:24
**sent (1)**
101:17
**separate (2)**
29:8;95:11
**separately (1)**
13:25
**serious (5)**
14:9;35:14;49:25;
55:9,10
**seriously (3)**
51:8;52:20,22
**services (4)**
18:4,9,10,12
**servicing (1)**
14:13
**set (5)**
21:6;45:12;80:18;
81:24;87:3
**sets (2)**
31:20;34:11
**setting (2)**
81:18,22
**settle (3)**

33:25;55:17;93:9
**settled (1)**
86:17
**settlement (22)**
21:5;22:12,23;
26:6,11,15,18,19;
28:1,5;34:16;36:5;
46:16;55:20;73:6;
82:3;93:6;96:13,13,
15,22;101:7
**settlements (1)**
27:24
**settling (1)**
26:14
**several (1)**
11:3
**SEWARD (1)**
7:10
**Shapiro (1)**
3:20
**share (1)**
70:13
**Sharona (1)**
3:20
**sheet (4)**
42:13,14,21;62:13
**shelf (1)**
78:15
**shelves (2)**
82:13,21
**shift (1)**
48:4
**shifts (1)**
49:5
**SHORE (81)**
5:8;20:16,23;21:3;
25:22;28:14,15,18;
29:5,5,12,23;31:14,
16;32:7,18,20,21,22;
34:20,22,24;37:15;
40:3,4,5,21;42:3,12,
24;43:2,25;44:3,6,8,
10,12,16,21,24;45:2,
3,5,7,9,15,24;47:13,
16,18,20;48:18;
49:15;50:7;51:14;
55:7;56:2,8;57:7;
59:11;62:9;64:7;
65:4,5,7,13,16,23,25;
66:5,8,11;67:12,20;
68:6,7,10;70:17;
73:18,20;74:5
**Shore's (9)**
49:23;50:9;51:18;
57:3,11,19;67:16;
69:4,22
**short (8)**
12:15;14:5,7;
16:21;51:3,11;62:6;
97:11
**shortened (1)**
19:2
**shorting (3)**

33:25;55:17;93:9
**shortly (2)**
17:25;23:15
**show (5)**
24:13,14;39:15;
53:14;83:6
**sic (1)**
70:5
**side (3)**
32:12,13;33:1
**sides (3)**
24:18;95:8;103:11
**SIEGEL (1)**
7:7
**sign (2)**
15:8;26:16
**signed (5)**
18:6;51:18,22,23,
23
**significant (7)**
11:1;19:12;53:11;
54:8;62:17;92:11;
94:25
**signs (1)**
25:2
**similar (4)**
84:8;96:6;98:15,15
**simple (8)**
31:9,24;32:3,6;
57:14;62:10;71:11,
14
**simply (8)**
22:15;25:16;54:1;
55:25;57:4;63:9;
73:8;89:9
**SIMPSON (2)**
8:19;74:21
**simultaneous (1)**
68:11
**single (3)**
34:13;53:21;64:9
**sit (9)**
22:24,25;23:21;
24:12;25:10,12;28:8;
31:19;41:10
**sitting (3)**
28:3;58:6;91:4
**situation (3)**
33:25;78:21;96:8
**situations (1)**
95:16
**six (6)**
42:23;75:12;80:2;
86:3;99:18,19
**sixteen (1)**
95:4
**sixty (36)**
13:11,12;19:2;
22:22;23:24,25;24:4;
26:23;29:8;30:5,9;
35:10,12;36:7;39:1,
11;43:17;46:5;51:1,
11;52:6;56:12,19,22;

57:12;58:13,22;
59:18;62:6;66:3,7,15,
16,19;69:6,17
**sixty- (1)**
67:23
**sixty-day (8)**
20:21;24:6;26:12;
28:8;39:3;54:23;
55:24;56:1
**sixty-five (1)**
24:6
**sixty-one (3)**
64:1,2;69:15
**size (1)**
41:9
**slightly (1)**
22:10
**slow (2)**
33:6;80:13
**small (2)**
22:11;78:20
**so-called (1)**
97:19
**socialized (1)**
41:6
**sole (1)**
79:14
**Solicit (1)**
2:18
**solicitation (2)**
18:20,25
**somebody (1)**
49:9
**somehow (1)**
69:20
**someplace (1)**
97:2
**sometimes (2)**
83:17;86:17
**somewhat (2)**
12:13;58:24
**somewhere (1)**
22:8
**soon (2)**
88:9;93:7
**sooner (2)**
15:12,14;18:5
**sorry (7)**
30:8;34:24;71:2;
75:16,22;83:25;84:2
**sort (6)**
28:22;49:23;50:9;
58:12;84:18;90:3
**sorts (2)**
21:1;95:16
**sought (1)**
43:25
**sounds (2)**
56:19;93:4
**Southern (3)**
85:11;89:21;98:14
**Southshore (1)**
76:22

**sparse (1)**
95:19
**speak (6)**
12:2;20:16;21:3;
25:22;28:24;60:3
**SPEAKER (6)**
31:15;70:6;74:9,
12;85:6;99:18
**spearheaded (1)**
82:17
**special (1)**
61:25
**Specialty (1)**
95:25
**specific (5)**
25:24;28:13;47:24;
82:16;100:14
**specifically (6)**
55:2,20;81:14,16;
82:18;98:3
**speed (3)**
36:11;38:2,5
**spend (2)**
45:24;79:24
**spent (1)**
11:1
**spoke (2)**
17:23;53:6
**sponsored (1)**
92:20
**sponte (3)**
15:24;16:15;30:15
**stage (5)**
21:6,10,12;32:16;
39:12
**staggering (1)**
92:14
**stake (2)**
32:10;33:12
**stalled (2)**
14:21;17:7
**stand (8)**
19:24;33:4,6;
35:15;36:20;67:20,
22,23
**standard (4)**
10:18;80:17;81:3;
86:4
**standing (4)**
24:3,8;41:17;59:23
**standpoint (3)**
29:19;43:22;57:3
**standstill (1)**
29:10
**start (4)**
27:2;30:21;38:3;
91:21
**started (2)**
34:16;63:12
**starting (1)**
10:15
**starts (1)**
39:18

12-12020-mg    Doc 3243    Filed 03/12/13    Entered 03/19/13 12:10:00    Main Document
RESIDENTIAL CAPITAL, LLC, ET AL.    Pg 122 of 125
Case No. 12-12020-mg

Adv. Proc. No. 12-02051-mg
March 5, 2013

**State (29)**
3:4;36:20;79:6;
80:11,23;81:1,2,3;
83:7,7,11,20;84:3,24;
85:6,9;86:2,11,13,15;
92:1;93:10;94:8;
95:22;97:10,23;98:5,
16;102:4
**Statement (15)**
2:16;15:13;20:24,
25;21:1;28:23;37:12;
38:13;39:23;58:22;
65:8,17;67:5;69:7;
83:14
**statements (2)**
30:2;83:18
**STATES (2)**
9:2,3
**status (1)**
10:8
**stay (5)**
88:5;102:6,6,7,11
**Stearns (5)**
76:20;79:9;84:6;
86:6;89:13
**STEEN (1)**
8:2
**steering (1)**
60:6
**stems (1)**
83:13
**step (7)**
13:8;14:24;20:10;
50:19;59:13;69:12;
80:17
**Stepping (1)**
78:25
**still (9)**
14:24;16:24;23:6,
21;41:9,13;69:2;
77:11,15
**STN (3)**
46:17;47:8;59:15
**stood (3)**
41:4;45:8;62:23
**stop (2)**
42:18;43:20
**story (1)**
101:10
**straightforward (2)**
99:2,3
**strategy (2)**
82:18,19
**Street (6)**
3:22;6:14,21;8:13;
9:4;82:24
**strength (1)**
22:19
**strengths (1)**
22:14
**stretch (1)**
80:9
**strike (2)**

58:20;64:3
**strong (1)**
54:15
**struck (1)**
64:14
**structure (8)**
24:25;26:17;31:8,
20;43:3,3,4;59:6
**structured (1)**
56:14
**structures (1)**
42:4
**struggle (1)**
53:18
**stuck (1)**
90:7
**study (2)**
82:23,25
**stuff (4)**
27:16;38:3;41:3;
76:7
**sua (3)**
15:24;16:15;30:15
**Subcommittee (2)**
82:22;83:2
**subject (9)**
11:15;12:6;26:20;
27:23,23;33:18;
36:18;81:1;97:22
**submission (1)**
103:2
**submit (9)**
68:9;69:24;78:3;
79:3,6;84:21,24;
87:18,23
**submitted (6)**
11:13;44:20;83:22;
84:1,5;96:17
**subordination (1)**
93:24
**subsequent (2)**
13:17;14:11
**subsidiary (3)**
76:20;95:15;96:12
**substance (1)**
56:20
**substantial (6)**
15:9,14;19:7;30:3;
39:15;84:11
**substantially (1)**
19:7
**substantive (6)**
29:7;53:1,8;54:3;
64:10,11
**success (3)**
11:15;13:15;17:6
**successful (1)**
59:6
**succinctly (1)**
50:16
**sudden (1)**
51:6
**suffer (2)**

49:9,10
**suffering (1)**
48:11
**sufficiently (1)**
52:5
**suggested (2)**
32:19;38:24
**suing (1)**
46:18
**Suisse (1)**
90:21
**Suite (1)**
3:22
**suited (1)**
12:5
**suits (2)**
48:25;101:18
**Sullivan (6)**
86:7;90:1,2,5,7,13
**Sullivan's (1)**
90:3
**Supp (1)**
85:13
**support (30)**
21:20,21;23:11;
26:6;28:19;30:2;
34:17,21,24;36:9;
37:8,13;38:8;42:2,4,
22,22;43:23;44:4,21;
51:19;56:18;58:17;
62:16;67:5,8;68:9,
22;96:25;97:14
**supported (2)**
12:4;22:7
**supportive (1)**
13:18
**supports (1)**
62:20
**suppose (1)**
24:9
**supposed (4)**
21:11;27:2;39:7;
68:19
**supposedly (2)**
97:3,20
**supps (2)**
100:14,15
**Supreme (2)**
3:4;98:1
**sure (16)**
17:3;19:24;20:20;
40:5;42:8;57:6;61:2;
71:6,16;84:16;85:4,
8;100:13;101:3;
102:14;103:4
**surprise (1)**
72:21
**surprised (1)**
71:9
**surprising (1)**
12:13
**suspicion (1)**
43:6

**sustained (1)**
83:21
**Swain (9)**
75:15,18,20,25;
77:18;86:5;89:14;
90:11,13
**switch (1)**
17:18

**T**

**table (6)**
34:8;41:9,10;57:7,
8;63:22
**tail (1)**
52:8
**Talcott (1)**
6:13
**talk (10)**
13:25;30:22;37:20;
38:17;41:12;46:23;
70:15;81:23;82:2,5
**talked (6)**
42:3,4,9;43:4,5,6
**talking (14)**
38:4;41:9,13;
45:17;51:3;62:12;
63:12;79:24;83:18;
85:8;92:11,12;101:6,
15
**talks (1)**
37:21
**tangential (1)**
89:16
**task (1)**
21:15
**TELEPHONICALLY (3)**
7:7;9:17,21
**tells (1)**
58:23
**temperature (1)**
50:20
**tempers (1)**
59:7
**ten (1)**
32:24
**ten-minute (1)**
72:14
**tent (4)**
52:2,3,4,5
**term (9)**
16:16,16;37:16,17;
42:13,13,21;62:6,13
**terminated (4)**
16:5,19;51:8;59:14
**terms (15)**
14:13;16:20,23;
17:21;20:20;34:25;
45:18;62:21;64:24;
66:5;69:14;70:4;
96:5;101:7,14
**test (2)**
39:4;93:9

**THACHER (2)**
8:19;74:21
**Thanksgiving (2)**
17:25;18:1
**theories (1)**
99:4
**there'd (1)**
42:18
**therefore (2)**
46:18;80:13
**Thereof (1)**
2:18
**there're (1)**
99:5
**Third (4)**
22:12;31:1;42:6;
86:15
**third-party (1)**
21:21
**thirty (4)**
43:18,19;58:16,21
**thirty-five (1)**
63:6
**THOMAS (1)**
8:7
**THOMPSON (1)**
5:17
**thorough (1)**
10:22
**though (5)**
33:1;62:23;81:7;
88:6;89:19
**thought (7)**
12:16;31:14;40:12;
50:18;77:11;80:8;
91:2,2,4
**threaten (1)**
65:11
**threats (2)**
30:10;65:9
**three (17)**
17:1;21:17;31:4;
37:21,22,22;46:8;
51:9;52:11;65:7;
78:2,9;79:2;82:14;
94:25;101:4,12
**throughout (2)**
31:17;48:24
**tick (1)**
89:20
**ticking (2)**
33:21;36:6
**tides (1)**
79:21
**tied (1)**
37:7
**tight (1)**
82:18
**timeliness (1)**
101:14
**timely (5)**
76:9;77:17,22;
80:11;98:19

**tireless (2)**
17:8;38:15
**tirelessly (2)**
14:19,22
**today (15)**
16:15;18:23;25:20;
30:14,18;37:4;38:3;
40:15;53:4;62:4;
66:15;68:8;69:20;
72:11;79:24
**today's (1)**
17:20
**together (3)**
25:12;83:4;102:13
**toggles (1)**
31:24
**Tom (1)**
61:24
**tomorrow (1)**
62:9
**tons (1)**
87:25
**took (7)**
19:11;41:7,7;
59:13;72:25;76:10;
93:3
**totally (4)**
41:1;88:21,22;
96:24
**touch (3)**
40:7;79:5;92:6
**touched (1)**
81:20
**toward (1)**
53:11
**towards (1)**
34:6
**Toyobo (1)**
85:9
**traction (1)**
69:4
**trade (1)**
40:25
**transaction (5)**
18:5;97:21,22;
98:3,5
**Transcribed (1)**
3:20
**transcript (2)**
79:19;91:23
**transcripts (1)**
77:10
**treasury (2)**
22:9;32:13
**tremendously (1)**
19:25
**Trial (15)**
26:10,12,13,21;
27:2,17;28:2,7;
68:19;86:22,23;93:2,
9;99:10;102:8
**trials (1)**
102:3

**tried (3)**
22:23;57:24;64:23
**trouble (1)**
40:23;73:1
**tru (1)**
65:11
**true (9)**
31:7;44:23;81:9;
88:8;89:2;93:13;
94:11;95:5,5
**Trust (13)**
8:3;22:17;33:13;
46:5;61:24;63:3,17,
18;64:8,15;69:13;
78:15;101:7
**Trustee (8)**
7:11;9:3;30:7,11;
62:17;63:10;64:20;
65:9
**trustees (4)**
26:11,16;27:6,14
**trusts (4)**
78:9,14,14,14
**try (14)**
13:12;14:22;22:25;
25:12;28:5,8;29:7,
19;50:16,24;51:10;
54:12;59:20;80:21
**trying (5)**
15:5,17;21:6;
40:24;58:13
**Tuesday (1)**
68:2
**Tunc (1)**
2:11
**turn (4)**
17:12;54:9;62:9;
80:15
**turning (1)**
51:5
**turns (1)**
88:7
**Tweed (1)**
71:3
**twenty (1)**
100:13
**two (20)**
10:8;22:6;23:2;
29:7;32:5,11;35:17;
40:6;46:7;51:5;63:9;
68:8,16;75:14,17;
78:13;80:3;86:19;
88:1;99:16
**type (2)**
96:21;101:6
**types (3)**
86:20;100:11;
101:5
**typically (1)**
91:5

**U**

**UCC (2)**
73:10,13
**ultimately (4)**
12:14;34:13;52:5;
57:6
**UMB (1)**
5:13
**Um-hum (1)**
42:24
**unanswered (1)**
44:6
**uncertainty (2)**
54:15,19
**uncontested (2)**
17:19;21:23
**Under (10)**
2:7;10:19;31:11;
39:9;49:2;67:13,16;
72:3;84:7;103:1
**underlying (3)**
86:24;87:17;88:14
**understands (2)**
57:8;67:6
**understood (1)**
28:25
**underwriter (1)**
88:1
**underwriters (1)**
88:8
**underwriting (1)**
94:19
**undisputed (1)**
78:22
**unfair (1)**
41:1
**unhappy (2)**
35:20;39:17
**UNIDENTIFIED (6)**
31:15;70:6;74:9,
12;85:6;99:18
**unit (1)**
97:7
**UNITED (2)**
9:2,3
**unless (4)**
18:13;22:2;67:19;
88:21
**unliquidated (1)**
23:6
**unpalatable (1)**
63:14
**unprecedented (2)**
19:11,11
**unsecured (12)**
12:1;31:10,11,17;
33:15;34:5;36:21;
48:7,8,12,23;50:13
**unsettled (1)**
86:18
**untimely (1)**
77:21
**unusual (2)**
26:17;54:6

**up (44)**
18:7;19:24;24:13,
14;25:2,16,19;28:16;
29:1;31:9,19,20,21;
32:2,3;33:4,6;34:8,
11;35:15;36:11,20;
37:11,12,25;38:2,5,
10,21;39:20;41:4;
44:25;45:8;57:16;
60:1,2;62:23;65:6;
81:24;87:14;91:10;
92:3;94:7;102:2
**upheld (2)**
83:19;84:7
**uphill (1)**
44:17
**upon (5)**
33:16;34:14;35:6;
76:14;92:6
**use (1)**
13:12
**used (5)**
10:20;60:12;70:12;
82:22;86:4
**uses (1)**
20:20
**using (1)**
58:10
**Usually (1)**
101:21
**utilize (1)**
18:3
**UZZI (11)**
5:9;70:18,20,24,
25;71:2,2,12,15,19,
24

**V**

**valuable (1)**
11:11
**value (3)**
31:20,22,25
**vanilla (1)**
73:7
**variant (1)**
64:10
**variation (1)**
100:15
**various (4)**
11:2;14:20;27:11;
38:9
**vast (2)**
11:7;88:25
**vested (1)**
34:5
**veto (25)**
20:22;24:22,23;
29:10;31:3;37:16;
42:5;47:22;48:1;
49:3;50:5,5,8;55:22;
56:11,14,19,23;
60:10,12;61:6,20;

66:18,23,25
**viable (1)**
95:22
**view (14)**
14:23;15:16;16:2,
24;17:1;29:17;31:8;
32:24;42:5;48:20;
60:11,22;69:21;
98:13
**viewed (2)**
26:20;58:12
**views (4)**
53:1;54:3,5;57:7
**violated (1)**
64:19
**violation (1)**
63:16
**vote (1)**
47:3
**voting (2)**
15:13;93:19

**W**

**wait (5)**
21:3;24:3,12;54:1;
93:15
**WALES (4)**
6:9;74:24,24;75:6
**walk (2)**
20:13;95:21
**Wall (2)**
6:14;82:23
**Walter (2)**
18:4,9
**wants (13)**
22:21;25:23;40:22;
50:11;54:4,5;57:4,6;
65:2,11;67:20,22;
93:4
**warehouse (1)**
82:6
**warrantee (1)**
27:7
**WARREN (1)**
5:12
**waste (1)**
65:14
**wasting (1)**
68:20
**way (17)**
13:14;29:5;33:3;
37:22;42:7;43:15;
46:11;56:24;57:2;
58:12;62:20;68:3,25;
69:12;86:5;99:20;
101:23
**ways (3)**
21:17;81:15,20
**weaknesses (3)**
22:13;25:11;28:9
**week (24)**
10:7,25;27:3;51:5;

68:8,19;71:17,19,19,
21,23;77:5,8;78:18;
79:6,23;80:19;81:21;
84:17;88:10;89:6;
91:24;95:13;99:12
**weeks (1)**
79:11
**weigh (1)**
86:9
**weighs (1)**
86:23
**weren't (1)**
37:10
**West (2)**
3:22;9:21
**Western (1)**
85:10
**what's (5)**
30:25;35:23;41:2;
48:8;100:24
**whatsoever (3)**
22:13;40:18;69:9
**whenever (1)**
24:6;70:21
**whereby (1)**
82:6
**Whereupon (1)**
103:13
**whistles (1)**
31:2
**WHITE (2)**
5:2;29:6
**Whitehall (1)**
9:4
**whole (2)**
27:8;55:13
**who's (4)**
30:6,7;41:9;65:19
**whose (1)**
35:5
**wide (2)**
63:23;100:15
**willing (1)**
47:6
**willingness (2)**
17:3,5
**Wilmington (4)**
8:3;61:24;63:3;
64:8
**wind (1)**
44:25
**window (7)**
51:4;52:16;54:24;
61:4,6;63:18,19
**winds (1)**
94:7
**wish (2)**
11:22;13:20
**wishes (1)**
68:12
**withdraw (4)**
73:19;86:25;93:4;
102:9

**withhold (2)**
36:1;47:23
**within (5)**
36:23;58:9;62:5;
82:14;85:24
**without (10)**
12:13;13:13;30:14;
44:4;61:19;67:8;
72:22;73:10,13;93:2
**witness (1)**
49:19
**witnesses (2)**
68:2,7
**WL (1)**
85:10
**WOFFORD (12)**
8:16;59:22;60:2,4,
5,14,17,21;61:2,10,
13,21
**WOLL (43)**
8:24;74:20,20;
77:9,14;87:8,12;
91:14,17,20,20;92:2,
17,23;93:13,22;94:5,
10,12,24;95:2,5;98:9,
12,17,24;99:14,23;
100:7,9,13,22;101:2,
4,9,12,14;102:11,15,
18,20;103:6,9
**word (3)**
28:22;60:12;83:17
**words (2)**
33:18;78:23
**work (2)**
14:22;63:15
**worked (2)**
12:18;14:19
**working (2)**
38:15;74:13
**works (1)**
101:9
**worse (4)**
61:9,12,13;69:18
**worst (2)**
81:24;82:8
**worth (1)**
92:11
**wrinkle (1)**
33:8
**wrinkles (2)**
32:5,11
**write (2)**
22:4;75:25
**writes (1)**
22:8
**written (2)**
16:18;60:13
**wrong (4)**
35:14,15,16;85:1
**wrote (1)**
85:14

**Y**

**year (2)**
19:22;21:14
**years (2)**
22:18;63:6
**yesterday (5)**
11:4,14;25:14;
53:7;84:19
**York (22)**
3:4,23;5:5,15,23;
6:6,15;7:3,5,13,22;
8:5,22;9:6;83:13,13,
15,17;85:12;93:11;
98:1;99:8

**Z**

**zero (3)**
36:19;60:18,19

**0**

**02199 (1)**
8:14
**07601 (1)**
6:22

**1**

**1 (4)**
64:11,20;67:17;
80:3
**10 (3)**
3:3;68:1;72:3
**10004 (2)**
7:13;9:6
**10005 (1)**
6:15
**10006 (1)**
8:5
**10017-3954 (1)**
8:22
**10019 (1)**
6:6
**10022 (1)**
5:23
**10036 (2)**
5:5;7:5
**10040 (1)**
3:23
**101 (1)**
5:14
**10112 (1)**
7:22
**10178 (1)**
5:15
**105a (1)**
2:2
**1095 (1)**
7:4
**11 (6)**

2:16,18;3:3;10:12;
67:7;87:17
**11:30 (1)**
72:17
**11:45 (1)**
72:17
**1155 (1)**
5:4
**12:26 (1)**
103:13
**120 (1)**
92:11
**12-02051 (1)**
74:8
**12-02051-mg (1)**
3:2
**12-12020 (1)**
10:3
**1285 (1)**
6:4
**12b6 (1)**
81:10
**12th (1)**
68:8
**1334 (3)**
75:21,24;76:15
**139 (1)**
97:15
**14th (1)**
18:21
**17 (1)**
43:11
**1819 (1)**
9:14
**18th (1)**
17:22
**192nd (1)**
3:22
**1996 (1)**
85:13
**19th (5)**
68:2;70:2,5,7,8
**1a (1)**
64:12

**2**

**2 (3)**
6:14;54:25;67:18
**2.4 (4)**
31:10;32:25;78:22;
87:18
**2007 (1)**
85:10
**201 (2)**
67:13;83:15
**2012 (4)**
2:11;14:4,6;16:20
**2013 (2)**
15:23;16:17
**20th (2)**
14:6;19:4
**21 (1)**

3:3
**21st (1)**
9:5
**22 (1)**
3:3
**25 (1)**
6:21
**2519 (1)**
15:21
**26th (1)**
16:20
**2887 (3)**
2:2;10:10,16
**28th (5)**
15:23;18:22;26:10;
27:3;53:5
**2918 (2)**
2:15;10:12
**2943 (1)**
2:7
**2a (1)**
64:12

**3**

**3 (17)**
43:4,10,10,16,22;
47:21;48:1;54:25;
59:12,13,16;63:19,
22;64:11,22;69:16;
81:19
**30 (1)**
7:21
**31 (2)**
16:17,22
**327a (1)**
2:8
**328a (1)**
2:8
**33 (1)**
9:4
**35 (1)**
43:13
**35203 (1)**
9:15
**363 (3)**
2:8;10:19;11:21
**363b (1)**
2:3
**38th (1)**
6:5
**3a (1)**
64:12

**4**

**4,000 (1)**
92:19
**425 (1)**
8:21
**449 (1)**
85:13

12-12020-mg    Doc 3243    Filed 03/12/13    Entered 03/19/13 12:10:00    Main Document
RESIDENTIAL CAPITAL, LLC, ET AL.    Pg 125 of 125
Case No. 12-12020-mg

Adv. Proc. No. 12-02051-mg
March 5, 2013

**5**

**5 (2)**
    2:11;68:8

**6**

**601 (1)**
    5:22

**7**

**7 (4)**
    82:21,25;97:18;
    98:1
**700 (1)**
    3:22
**750 (1)**
    22:8

**8**

**8 (1)**
    17:19
**8.7 (2)**
    26:11;43:12
**800 (1)**
    8:13
**851872 (1)**
    85:10

**9**

**9 (1)**
    3:3
**900,000 (1)**
    18:10
**9014 (1)**
    67:17
**902 (1)**
    2:12
**924 (1)**
    85:13
**97 (1)**
    78:24
**973406-2250 (1)**
    3:24
**9b (1)**
    81:1