**Hearing Date and Time: March 21, 2013 at 10:00 a.m. (Prevailing Eastern Time)**
**Reply Deadline: March 19, 2013 at 12:00 p.m. (Prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
P. Bradley O'Neill
Gregory A. Horowitz
Craig L. Siegel
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Electronic mail: keckstein@kramerlevin.com

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, et al., | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE DEBTORS' MOTION FOR A DETERMINATION THAT (I) GMAC
MORTGAGE'S FRB FORECLOSURE REVIEW IS A GENERAL
UNSECURED CLAIM AND (II) THE AUTOMATIC STAY PREVENTS
ENFORCEMENT OF THE FRB FORECLOSURE REVIEW OBLIGATION**

REDACTED

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

Argument .......................................................................................................... 4

      A.    The Court Should Authorize The Debtors To Stop Paying PwC For A
            Foreclosure Review Process That The Government Has Admitted Is An
            Unnecessary And Costly Mistake .......................................................... 4

      B.    Any Claims Arising From the Consent Order Should Be Classified As
            General Unsecured Claims.................................................................... 10

      C.    AFI's Equitable Estoppel Argument Is Meritless ................................. 15

CONCLUSION .................................................................................................. 18

EXHIBIT A – Board of Governors of the Federal Reserve System, What You Need To Know:
Independent Foreclosure Review.

EXHIBIT B – Amendment of Consent Order, *JPMorgan Chase & Co.*, Board of Governors of
the Federal Reserve System, Docket Nos. 11-023-B-HC, 11-023-B-DEO

EXHIBIT C – (FILED UNDER SEAL)                    REDACTED

# TABLE OF AUTHORITIES

Page(s)

CASES

*United States v. LTV Corp. (In re Chateaugay Corp.),*
    944 F.2d 997 (2d Cir. 1991)...........................................................................................10, 11, 13

*Kapernekas v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.),*
    148 B.R. 207 (D. Del. 1992)..........................................................................................13

*In re Christensen,*
    167 B.R. 213 (D. Or. 1994) ...........................................................................................14

*In re Liss,*
    59 B.R. 556 (Bankr. N.D. Ill. 1986) .............................................................................14

*In re Massenzio,*
    121 B.R. 688 (Bankr. N.D.N.Y. 1990) .........................................................................14

*In re McCrory Corp.,*
    188 B.R. 763 (Bankr. S.D.N.Y. 1995) .........................................................................12

*In re Thane Dev. Assocs. L.P.,*
    143 B.R. 310 (Bankr. D. Mass. 1992) ..........................................................................14

*Ramirez Chrysler Jeep Dodge, Inc. v. Old Carco Liquidation Trust (In re Old Carco LLC),*
    2010 WL 4455648 (S.D.N.Y. Nov. 2, 2010).................................................................12,13

*NLRB v. Walsh (In re Palau Corp.),*
    18 F.3d 746 (9th Cir. 1994) ..........................................................................................12,13

STATUTES

11 U.S.C. § 362(b)(4) ...........................................................................................................4, 13,14

12 U.S.C. § 1818(i)(1) ...................................................................................................... 8,9 & n.13

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby submits this reply (the "**Reply**") to the objections of both Ally Financial Inc. ("**AFI**") [Docket No. 3150], and the Board of Governors of The Federal Reserve System (the "**FRB**") [Docket No. 3149], to the Debtors' motion (the "**Motion**") for a determination that for the purposes of a Chapter 11 plan GMAC Mortgage, LLC's ("**GMAC Mortgage**") FRB Foreclosure Review obligations give rise to a general unsecured claim, and the automatic stay prevents enforcement of that claim [Docket No. 3055].[1]  In support of the Reply and the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Committee supports the Debtors' Motion and believes that the massive expenditure of estate resources on a process recognized to be wasteful and not beneficial to borrowers should cease immediately.

2.      The circumstances that had previously led the Debtors to seek, and the Court to grant on an interim basis, permission to pay PwC have changed dramatically.  First, the Debtors no longer own any operating businesses, and thus no longer engage in mortgage servicing, foreclosure or similar activities in which there might be a legitimate public policy interest. Second, the likely total cost of the FRB Foreclosure Review has skyrocketed from initial estimates: from an already colossal $180 million at the outset of this case, to $250 million when the Committee objected to paying PwC last September, to a mind-boggling *$437 million* today, with no guarantee that the figure will not continue to rise.  Third, and most dramatically, even the federal regulators that created the Independent Foreclosure Review ("**IFR**") program have now

---

[1]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

publicly disavowed that program as a mistake, acknowledging that this massive expenditure did not benefit the borrowers subject to the alleged foreclosure abuse.  Yet the FRB persists in requiring the Debtors to continue to waste millions of dollars each month on that effort.  For these reasons, the Debtors now, quite appropriately, seek to put an end to the program, which no rational person would want to continue.

3.      After requiring GMAC Mortgage to engage professional consultants that have spent over $73 million of the estates' resources on the still-unfinished FRB Foreclosure Review, representatives of the federal government have recently publicly admitted that the IFR does not effectively serve the public's interest in remediating borrowers harmed by improper foreclosure conduct and must be replaced with a reasonable alternative.  To that end, the FRB has amended its consent orders with thirteen other mortgage servicers, terminated those servicers' obligations to continue the IFR process and imposed, in the alternative, monetary payments into a settlement fund that will provide far greater and more timely direct compensation to borrowers.  The FRB has acknowledged that these payments will provide the "greatest benefit" by allowing borrowers to receive "compensation significantly more quickly" than if the reviews were completed.[2] These amended consent orders also help ensure that the primary function of amounts paid by mortgage servicers under the consent orders is to assist harmed borrowers, rather than enrich professional consultants.  In light of these developments, it is irrational to compel GMAC Mortgage to continue paying PwC for a review process that benefits no one other than PwC.  In the best interests of the estates, the Court should allow GMAC Mortgage to cease paying PwC once the current Interim PwC Order (defined below) expires on March 21, 2013.

---

[2]     Board of Governors of the Federal Reserve System, What You Need To Know: Independent Foreclosure Review, attached hereto as **Exhibit A**.

4.      The Committee hopes that the FRB will accept the Debtors' offer to amend the Consent Order and create a settlement payment on terms similar to those agreed to with the other mortgage servicers.  The Committee can see no rational reason why the FRB would fail to do so. However, even if the FRB for some reason wants to keep the review process open for a period of time, ceasing debtor payments to PwC would not cause a breach of the Consent Order because AFI, GMAC Mortgage's solvent co-obligor, is legally bound under the Supplemental Agreement and the PwC Engagement Letter (both defined below) to timely pay PwC, and is clearly able to do so.  Other than requiring GMAC Mortgage to retain independent consultants to conduct the FRB Foreclosure review, the Consent Order is silent as to who must pay PwC, and the FRB was careful prior to the Petition Date to require AFI to commit to make any payments to the extent GMAC Mortgage fails to do so.  Thus, even after this expenditure of estate funds stops, PwC's work can continue unabated if the FRB insists that it continue; the Debtors will continue assisting PwC as necessary; and the Debtors will remain in full compliance with the Consent Order – until the Consent Order is revised.  In light of the undisputed facts now presented, however, there is no rational reason why any party would insist that the FRB Foreclosure Review process should continue for even one more day.

5.      Any claims against the Debtors' estates arising from the Consent Order, as currently written or as rationally amended by the parties, should be held to be general unsecured claims because all relate purely to the investigation and remediation of prepetition conduct. Restitution to borrowers for conduct that indisputably occurred prepetition, whether that restitution is the result of the IFR process under the existing Consent Order or pursuant to an amended Consent Order, is as pure an example of payment on account of prepetition claims as exists.   Even if certain aspects of the consent orders constituted permissible regulatory

enforcement efforts by the FRB, any order requiring the payment of prepetition borrowers where there is no continuing postpetition misconduct or harm is not subject to the police power exception to the automatic stay under 11 U.S.C. § 362(b)(4).  Similarly, to the extent that AFI makes payment under the Consent Order, whether to PwC or to remediated borrowers, in accordance with its obligations under the Supplemental Agreement, any reimbursement claims by AFI (to the extent AFI has a basis for such claims) would be no different, as they would likewise arise from an obligation to investigate and/or remediate prepetition conduct.

6.       Finally, the Court should reject AFI's equitable estoppel argument because there is no unfairness to AFI in the Debtors seeking permission to cease paying PwC.  At all times, the Debtors and the Committee have carefully reserved their rights with regard to the FRB Foreclosure Review.  In opposing continued payment to PwC, the Debtors and the Committee are fulfilling their obligations as estate fiduciaries.

## ARGUMENT

A.       **The Court Should Authorize GMAC Mortgage To Stop Paying PwC
         For A Foreclosure Review Process That The Government
         Has Admitted Is An Unnecessary And Costly Mistake**

7.       It is in no one's interests – not the FRB's, not the borrowers' who currently stand to receive minimal restitution payments, and certainly not the Debtors' or their creditors' – to compel GMAC Mortgage to continue paying PwC for a needless, unreliable, and costly historical foreclosure review.  Government officials have publicly admitted that the IFR program has been a mistake.  Through the program, the FRB and the Office of the Comptroller of the Currency (the "**OCC**") have required GMAC Mortgage, and thirteen other mortgage servicers to retain independent consultants to review foreclosures in 2009 and 2010 and determine if borrowers suffered direct financial harm from errors, misrepresentations, and deficiencies in foreclosure processes.  The foreclosure review process is inefficient, generating more than $7 in

professionals' fees for every $1 in general unsecured claims for borrowers subject to alleged foreclosure abuses.

8.      In a speech last month, nineteen months after the FRB and the OCC created the IFR program, and after consultants had been paid almost $2 billion, the Comptroller of the Currency acknowledged that "[i]t just doesn't make sense for these servicers to continue funneling money to consultants that could be better used to help distressed borrowers who have lost their homes."[3] He admitted that the review had "proved to be much more complicated than anyone anticipated," and conceded what had become obvious: "maintaining our course would significantly delay compensation without appreciable benefit to the affected borrowers."[4]

9.      Accordingly, on February 28, 2013, the FRB and OCC announced a series of amendments (the "**Amended FRB Orders**") to consent orders with thirteen mortgage servicers other than AFI and the Consent Order Debtors, replacing these servicers' IFR obligations with a total of "$3.6 billion in direct cash payments" to borrowers and "$5.7 billion in other foreclosure prevention assistance, such as loan modifications and forgiveness of deficiency judgments."[5] For these servicers, according to the FRB, the new direct cash payments will provide the "greatest benefit to consumers . . . in a more timely manner than would have occurred under the Independent Foreclosure Review process."[6] The payments will be made to a settlement fund and distributed pursuant to a plan developed by the FRB and OCC to compensate a broader range of borrowers subject to foreclosure proceedings than would have received compensation under the

---

[3]      Thomas J. Curry, Comptroller of the Currency, Remarks Before the Women In Housing & Finance, Inc. (Dec. 13, 2013), *available at* http://www.occ.gov/news-issuances/speeches/2013/pub-speech-2013-28.pdf.

[4]      *Id.*

[5]      *Id. See also, e.g.*, Amendment of Consent Order, *JPMorgan Chase & Co.*, Board of Governors of the Federal Reserve System, Docket Nos. 11-023-B-HC, 11-023-B-DEO, attached hereto as **Exhibit B**.

[6]      *Id.* (emphasis added).

original consent orders.[7]   The result is more beneficial to the servicers, whose overall cash obligations are reduced, and to the borrowers, most of whom would have received nothing through the IFR process.

10.     Unfortunately, the FRB has not yet entered into a similar amendment to the Consent Order with AFI and the Consent Order Debtors.   As a result, the GMAC Mortgage estate continues to burn through an estimated $300,000 per day to pay PwC for a process which is now projected to cost an astronomical $437 million to complete, and from which nearly every other mortgage servicing enterprise has now been effectively excused.   Even before the cost ballooned to such stratospheric heights, the Court and the Committee had expressed serious concerns about this process, which represents the Debtors' single largest "administrative" expense.

11.     In light of the recent pronouncements about the IFR program, the Amended Consent Orders, and the cost of the FRB Foreclosure Review, it is no longer justifiable for the Debtors to continue spending estate resources on the FRB Foreclosure Review.   The Court's third interim order (the "**Interim PwC Order**") authorizing GMAC Mortgage to pay PwC effectively expires on March 21, 2013.[8]   The Interim PwC Order authorizes the Debtors to pay PwC and honor their obligations under the Consent Order by using "estate resources and tak[ing] such actions as, in their reasonable business judgment, are necessary to comply with and adhere to the terms of the FRB Consent Order."[9]   The Committee believes that it is no longer reasonable

---

[7]      *See, e.g.*, Ex. B, ¶ 3.

[8]      *Third Interim Order Under Bankruptcy Code Section 363 And Bankruptcy Rule 6004 (I) Authorizing The Debtors To Compensate PricewaterhouseCoopers, LLP, for Foreclosure Review Services In Furtherance of The Debtors' Compliance Obligations Under Federal Reserve Board Consent Order And (II) Reaffirming Relief Granted In The GA Servicing Order* [Docket No. 3062].

[9]      *Id.* ¶ 3.

or necessary for the Debtors to continue paying PwC, and requests that the Court decline to enter any additional interim orders or a final order authorizing the Debtors to pay PwC.

12.    The Committee is cognizant of the Debtors' concern that the FRB might assert that failing to pay PwC out of estate funds would constitute a breach of the Consent Order exposing the Debtors to potential penalties. In light of current developments, the Committee views this scenario as punitive and serving no valid business or regulatory purpose. The FRB's adoption of monetary settlements with each of the other servicers underscores the reality of the foreclosure review. Nonetheless, even if the FRB asserts that the foreclosure review process must continue, ceasing payments to PwC from the Debtors would in no way violate the Consent Order or interrupt the FRB Foreclosure Review work required thereunder.

13.    Paragraphs 3 and 4 of the Consent Order require GMAC Mortgage to retain an independent consultant; GMAC Mortgage has complied with this requirement.[10]  As noted above, the Consent Order does not specify, other than requiring GMAC Mortgage to retain an independent consultant, who must *pay* the fees of the independent consultant.  So long as the FRB Foreclosure Review continues unimpeded, the Consent Order requirements are satisfied. To be sure, if PwC were not paid on a current basis it would justifiably stop its work, but there is no chance of this happening.  As an initial matter, the February 1, 2012 engagement letter with PwC (the "**PwC Engagement Letter**") (a copy of which is attached to the AFI Objection as Exhibit 4) provides that both AFI and GMAC Mortgage have engaged PwC to conduct the FRB Foreclosure Review, and both AFI and GMAC Mortgage "shall be jointly and severally liable

---

[10]    Consent Order ¶ 3, attached as Ex. 3 to the Motion.

for the fulfillment of any and all obligations, responsibilities and liabilities" to PwC under the letter.[11]

14.    Even more dispositively, when it became clear that the Debtors would be filing for bankruptcy the FRB took pains to require AFI unequivocally to commit that it would satisfy any financial obligation under the Consent Order to the extent the Debtors fail to do so, including the cost of the IFR process as well as any restitution to borrowers. The April 24, 2012 Supplemental Agreement between AFI and the Federal Reserve Bank of Chicago (a copy of which is attached to the AFI Objection as Exhibit 3) (the "**Supplemental Agreement**"), which the FRB and AFI entered into "in conjunction with the Consent Order" (Supp. Agr. at 2), and in express contemplation of ResCap (as defined in the Supplemental Agreement) filing for bankruptcy (*id.* at 1), provides that if ResCap commences a case under the Bankruptcy Code, then "Ally will be secondarily liable for the obligations to timely pay any portions of . . . the fee that ResCap owes PricewaterhouseCoopers . . . to complete the foreclosure review . . . [and] . . . monetary reimbursement or remediation payments" to borrowers. (*Id.*) [12]

15.    The plain language of the Consent Order does not provide either the FRB or AFI with any right to compel GMAC Mortgage to pay PwC on an ongoing basis. The FRB, for its part, has not taken any position on this issue. Neither the FRB nor AFI has offered any reason why the source of payment should make any difference to the FRB, and, particularly in light of the Supplemental Agreement, no legitimate reason exists. This is purely a financial dispute

---

[11]    PwC Engagement Letter at 1.

[12]

REDACTED

- 8 -

between AFI and its debtor subsidiary. Interactions with the FRB over the Consent Order need not be affected by this cost allocation dispute.

16.     AFI also contends that this Court lacks jurisdiction under 12 U.S.C. § 1818(i)(1) to authorize GMAC Mortgage to cease paying PwC or to treat payments owed under the consent order as general unsecured claims. Section 1818(i)(1) provides that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any . . . order under [section 1818], or to review, modify, suspend, terminate, or set aside any such . . . order." Notably, the FRB – to whom the benefit of § 1818(i)(1) inures as the federal banking agency that issued the Consent Order in question – has not yet raised § 1818(i)(1) as a defense to any Court action with respect to the Debtors' Motion, instead reserving on that question. And, of course, the FRB's approach in that respect to AFI's attempt to commandeer § 1818(i)(1) is perfectly appropriate in this case because – for all the reasons we describe above – allowing GMAC Mortgage to stop paying PwC would in no way affect, modify, or enjoin compliance with the Consent Order because, if necessary, PwC's work will continue to be timely funded and performed as long as the FRB wishes. Moreover, as described below, any payments owed by the Mortgage Servicing Companies (as defined in the Consent Order) under the Consent Order clearly relate to prepetition conduct and must be treated as general unsecured claims, and nothing in the Consent Order or § 1818(i)(1) permits the FRB to circumvent the Bankruptcy Code in that respect.[13]

---

[13]     It cannot reasonably be argued that the Court would be infringing on section 1818(i)(1) in determining that the Debtors can cease payments to PwC without violating the Consent Order. To determine whether it is "affecting," "modifying," "suspending," or otherwise improperly interfering with the Consent Order, the Court must necessarily ready and interpret the order and reach a conclusion as to its meaning. In any event, the Committee submits that there is no ambiguity in the Consent Order on the relevant issue (i.e., whether failure to pay PwC would constitute a breach), and again notes that the FRB has taken no contrary position.

**B.      Any Claims Arising From the Consent Order
         Should Be Classified As General Unsecured Claims**

17.      Any claims against GMAC Mortgage from the FRB Foreclosure Review

obligations should be classified as general unsecured claims.  Such potential claims include both:

(1) restitution claims under either the existing Consent Order or an amended Consent Order, and

(2) claims by AFI to recoup costs it may incur if GMAC Mortgage ceases to pay PwC for

compliance with the existing Consent Order.[14]

18.      The standards for determining whether a claim is dischargeable in bankruptcy,

and if so whether that claim is entitled to administrative priority treatment, are well-addressed in

the Debtors' Motion. (Motion at 17-20).  Neither the FRB nor AFI appears to take issue with the

Debtors' recitation of these legal standards.   Instead, both argue that the FRB Foreclosure

Review obligations are not dischargeable, and are entitled to administrative priority treatment,

because it is an absolute performance obligation with no alternative monetary payment

obligation.  (FRB Obj. at 6-9; AFI Obj. ¶¶ 29, 31).  For this reason, they assert, the standards set

forth in the controlling Second Circuit decision in *United States v. LTV Corp. (In re Chateaugay
Corp.)*, 944 F.2d 997 (2d Cir. 1991) – which held that costs to clean up prepetition

environmental contamination at entities no longer owned by the debtors, and not necessary to

prevent future injury, were dischargeable – do not apply.   Unlike *Chateaugay*, they contend,

there is no provision in the Consent Order or law akin to CERCLA giving the FRB the right to

perform on Debtors' behalf and assert a resulting monetary claim.  (FRB Obj. at 8; AFI Obj. ¶

31).  This argument is wrong as a factual matter: under the Supplemental Agreement, the FRB

---

[14]      AFI contends that if it incurs costs to satisfy obligations under the Consent Order that are putatively owed
by the Debtors, it can seek to recover such costs from the Debtors "by subrogation or a separate claim for
substantial contribution."  (AFI Obj. at 22).  The Committee reserves its right to contest such an AFI claim
in its entirety, and as set forth herein asserts that AFI is incorrect in its assertion that such a claim would be
entitled to administrative expense priority.

*has* the right to ensure that the FRB Foreclosure Review obligation is funded by AFI if GMAC

Mortgage fails to pay.  Doing so results in a putative monetary claim against the estate.[15]

19.     Thus, the situation presented here is precisely analogous to that of *Chateaugay*

and numerous similar cases from the perspective of both the FRB and the Debtors.  The express

terms of the Supplemental Agreement provide the FRB with the alternative right to obtain timely

payment from AFI of any fees owed PwC to complete the FRB Foreclosure Review, and of any

monetary reimbursement or remediation payments, if ResCap commences cases under the

Bankruptcy Code (which it has) and ResCap does not timely pay.  (*Id.* at 2, ¶ 1).[16]  The

agreement implicitly contemplates the possibility that a bankruptcy court would allow (if not

require) the Debtors to cease making payments to PwC postpetition, and provides the FRB with a

contingent right to full payment from AFI.  In turn, AFI would have a monetary claim against the

Debtors' estates pursuant to its admission of secondary liability in the Supplemental Agreement,

and its contractual joint and several liability under the PwC Engagement Letter.  This is precisely

the situation now presented.  ResCap has filed for bankruptcy and the Debtors seek the Court's

ruling that under the Bankruptcy Code they may stop paying PwC to complete the FRB

Foreclosure Review – justifiably so given that the federal government admits the review is a

mistake and entirely unnecessary, and the amended consent orders entered into with other

servicers provide a significantly better and more cost-effective means for compensating

---

[15]    The Debtors observe that the FRB's and OCC's recent actions in reaching settlements with other mortgage servicers converting IFR obligations into monetary restitution payments demonstrates that the Debtors' FRB Foreclosure Review obligation can similarly be satisfied by monetary payment.  The Committee agrees, and sees no logical reason why the FRB would refuse to do a similar conversion in this case.  But there is no need to engage in any degree of speculation because, as shown above, the FRB Foreclosure Review obligation is already expressly susceptible of conversion to a monetary claim from AFI.

[16]    The FRB's prepetition decision to confirm the existence of this alternative right by requiring AFI to enter into the Supplemental Agreement was an economically rational decision to shift to AFI the risk that a bankruptcy court would allow the Debtors to cease paying PwC.  It underscores that the FRB will suffer no harm from the Debtors' requested relief, and that the Consent Order will in no way be affected by an order of this Court allowing or requiring the Debtors to cease paying PwC.

borrowers.  For these reasons, the Consent Order and the Supplemental Agreement should be read together as providing the FRB with an alternative right to payment under the meaning of Bankruptcy Code section 101(5)(B), and any claims against the GMAC Mortgage estate arising from the Consent Order Defendants' FRB Foreclosure Review obligations should be recognized as general unsecured claims.

20.    The restitution claims—which relate to the Debtors' pre-petition conduct and pre-petition relationships—are general unsecured claims and are not entitled to administrative expense priority, and this conclusion does not change simply because the claims arise from an order of a government agency.  *See NLRB v. Walsh (In re Palau Corp.)*, 18 F.3d 746 (9th Cir. 1994) (rejecting NLRB's argument that back wages and contributions to employee benefit plans were entitled to administrative expense priority even though the amounts were assessed post-petition and related to pre-and post-petition violations of labor laws); *Ramirez Chrysler Jeep Dodge, Inc. v. Old Carco Liquidation Trust* (*In re Old Carco LLC*), 2010 WL 4455648, at *8 (S.D.N.Y. Nov. 2, 2010) ("[A] claim is not entitled to administrative priority, even if a state statute creates the obligation, where it arises from a pre-petition relationship between the debtor and creditor, there is no post-petition benefit to the debtor, and the debtor has ceased business operations and is merely maintaining the status quo in preparation for sale or liquidation."); *cf. Chateaugay*, 944 F.2d at 1009-10 (concluding that post-petition expenses resulting from pre-petition conduct give rise to an administrative claim only in the limited circumstance where prepetition conduct poses a continuing "significant hazard to public health"); *In re McCrory Corp.*, 188 B.R. 763, 768 (Bankr. S.D.N.Y. 1995) (observing that administrative priority may be accorded to post-petition clean-up costs based on pre-petition conduct only "if the damages constitutes an 'imminent and identifiable' harm to the public health or safety").

21.    Ignoring the prepetition nature of the restitution claims, the FRB erroneously contends that the Consent Order has somehow converted the unsecured claims of borrowers allegedly harmed by Debtors' prepetition conduct into administrative expense priority claims and suggests that it has the power — outside of a plan of reorganization and in contravention of applicable bankruptcy law priority claim treatment — to require the Debtors to make payments to a select group of prepetition creditors identified through the FRB Foreclosure Review.  But "it is the Bankruptcy Code which determines the priority and allowance of any and all claims filed in a bankruptcy proceeding," and a regulatory agency cannot by regulation or order elevate the claims of individuals in contravention of the Bankruptcy Code.  *See Kapernekas v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 148 B.R. 207, 211 (D. Del. 1992) ); *see also id.* ("[S]ince the issue in this case is not whether [the unlawfully discharged employee] has a claim for back pay but rather whether that claim should have administrative priority status, it is the Bankruptcy Code which governs the issue").  If it could, any state or federal regulatory agency could enact a regulation or enter an order and circumvent the Bankruptcy Code.  Nothing in the Bankruptcy Code or the case law supports such an outcome.[17]

22.    Indeed, to give the restitution claims preferential treatment "would require [the Court] to ignore the very purpose of bankruptcy—i.e., allowing debtors to start fresh while fairly apportioning losses among the creditors—in favor of one particular class of creditors." *Palau*, 18 F.3d at 751; *see also Old Carco*, 2010 WL 4455648, at *7 (noting that "[r]efusal to grant priority to this claim does not diminish its validity, or frustrate Texas' exercise of its police powers," and "[b]y refusing to grant administrative priority to Ramirez's claim, the Bankruptcy

---

[17]    Any effort by the FRB to seek administrative priority treatment for a substitute direct payment to a restitution fund under an amendment to the Consent Order would be equally offensive to the Bankruptcy Code.

Court did not enable avoidance of a regulatory framework. Rather, it appropriately exercised its power to determine priority among the many creditors to the estate.").

23.    As shown above, neither the FRB Foreclosure Review nor any resulting restitution obligations are entitled to treatment under the police power exception to the automatic stay, 11 U.S.C. § 362(b)(4), because both can be converted into monetary damage claims.  Police power treatment is further inappropriate because the Debtors have effectively ceased their mortgage operations and there is no continuing threat to public health or safety that would be remedied by requiring such payments by the Debtors.  *See, e.g., In re Thane Dev. Assocs. L.P.*, 143 B.R. 310, 311 (Bankr. D. Mass. 1992) ("In order to fall within the exception [of 11 U.S.C. § 362(b)(4)] the primary purpose of the state proceeding must be the conservation of public safety, health, or welfare." (internal quotation marks omitted)).  In addition, the FRB and other banking agencies have acknowledged that the Foreclosure Review process has failed as a reasonable means for identifying individuals who have suffered actual harm.  Thus, the sole remaining potential reason for the FRB to compel the Debtors to continue the Foreclosure Review process is in aid of its effort to direct special payments to a favored class of creditors. But "when [a] governmental unit seeks to go beyond the abatement of the prohibited or regulated activity and seeks monetary restitution or . . . the enforcement of pre-petition obligations of a debtor, its actions are not excepted from . . . the automatic stay." *In re Massenzio*, 121 B.R. 688, 691 (Bankr. N.D.N.Y. 1990); *see also In re Christensen*, 167 B.R. 213, 216 (D. Or. 1994) (Bankruptcy Code § 362(b)(4) did not apply to order by state board requiring debtor to pay restitution to customer injured by debtor's actions); *In re Liss*, 59 B.R. 556, 561 (Bankr. N.D. Ill. 1986) (injunction, civil penalties, and costs may be sought by governmental unit under

Bankruptcy Code § 362(b)(4), but "'restitution' to obtain financial redress for certain people may not").

### C.    AFI's Equitable Estoppel Argument Is Meritless

24.    AFI's arguments that the Debtors' postpetition statements and conduct have somehow equitably estopped them from now being able to assert that the foreclosure review obligations are unsecured claims and cease making unnecessary payments to PwC are meritless and self-serving.   There is no unfairness to AFI in the Debtors' Motion, as at all times the Committee as well as the Debtors have expressly reserved all rights with regard to compliance with the Consent Order.

25.    The Debtors' position in this regard can be no surprise to AFI in light of the Debtors' continued reservations of rights to challenge any past or future costs of compliance with the Consent Order, including by securing reservation of rights provisions in the Ocwen Sale Order and in each of the Court's three orders permitting the Debtors to make postpetition payments to PwC on an *interim* basis only.[18]

26.    Specifically, the Ocwen Sale Order provides that:

---

[18]    *See Third Interim Order Under Bankruptcy Code Section 363 And Bankruptcy Rule 6004 (I) Authorizing The Debtors To Compensate PricewaterhouseCoopers, LLP For Foreclosure Review Services In Furtherance Of The Debtors' Compliance Obligations Under Federal Reserve Board Consent Order And (II) Reaffirming Relief Granted In The GA Servicing Order* [Docket No. 3062] ("Notwithstanding anything herein or in the GA Servicing Order to the contrary, this Order shall not waive or foreclose and is without prejudice to (i) any and all claims, causes of action and defenses that may be asserted by the Debtors or any party-in-interest (including the Creditors' Committee) for any and all past or future costs of compliance with the FRB Consent Order, DOJ/AG Settlement, the Order of Assessment ('Compliance Claims') against any and all parties, including, without limitation, claims for contribution and/or indemnification arising directly or indirectly, by contract or under common law, through subrogation or otherwise."); *Second Interim Order Under Bankruptcy Code Section 363 And Bankruptcy Rule 6004 (I) Authorizing The Debtors To Compensate PricewaterhouseCoopers, LLP For Foreclosure Review Services In Furtherance Of The Debtors' Compliance Obligations Under Federal Reserve Board Consent Order And (II) Reaffirming Relief Granted In The GA Servicing Order* [Docket No. 2622] (same); *Interim Order Under Bankruptcy Code Section 363 And Bankruptcy Rule 6004 (I) Authorizing The Debtors To Compensate PricewaterhouseCoopers, LLP For Foreclosure Review Services In Furtherance Of The Debtors' Compliance Obligations Under Federal Reserve Board Consent Order And (II) Reaffirming Relief Granted In The GA Servicing Order* [Docket No. 1799] (same).

Notwithstanding anything herein *or in the Ocwen APA (including Section 6.16) to the contrary* and consistent with previous orders of the Court, the Ocwen APA and the Order *shall not waive or foreclose* and is without prejudice to (i) any and *all claims, causes of action and defenses that may be asserted by the Debtors or any party-in-interest (including the Creditors' Committee) for any and all past or future costs of compliance with the FRB Consent Order*, the Consent Judgment, DOJ/AG Settlement, the Order of Assessment, and Section 6.16 ("Compliance Claims") against any and all parties other than the Purchaser, including, without limitation, claims for contribution and/or indemnification arising directly or indirectly, by contract or under common law, through subrogation or otherwise.

Ocwen Sale Order ¶ 55 (emphasis added).

27.     Thus, AFI's reliance on the terms of section 6.16 of the Amendment to the Ocwen APA is misplaced, given that the Debtors and the Committee specifically reserved their rights to defend against the costs of compliance with the Consent Order. As discussed above, the Debtors are not seeking to breach the terms of the Consent Order. The Debtors are merely seeking to determine the proper classification of the claim arising from the cost of compliance with the Consent Order and then to implement the logical implication of this determination. As claims arising from the cost of compliance with the Consent Order are properly classified as unsecured claims, GMAC Mortgage is not permitted to continue making such payments (whether to PwC or for restitution), as this would be impermissibly favoring one unsecured creditor over another outside of a plan of reorganization in contravention of the Bankruptcy Code.

28.     Thus, AFI's statements that they would not have withdrawn their sale objection absent assurances that the Debtors would continue complying with the terms of the Consent Order are unfounded, given the clear and unambiguous reservation of rights in the Ocwen Sale Order, and the fact that the Debtors are, in fact, not seeking to breach the terms of the Consent Order by seeking the relief set forth in the Motion.

29.     Moreover, given the significant change in circumstance discussed above — including the FRB's recent recognition that the foreclosure review process is a flawed process

that should be terminated as soon as possible in favor of affected borrowers — the Debtors' actions in filing the Motion and seeking Court authorization to cease making payments on account of the claims arising from the foreclosure review are mandated by their role as an estate fiduciary. AFI cannot now argue that the Debtors should be prohibited from properly exercising their fiduciary duties to prevent a continued waste of estate assets.

30.    Even if AFI could somehow override the Debtors' ability to bring this Motion in accordance with its responsibility as an estate fiduciary — which it cannot — the Committee, as a fiduciary for all unsecured creditors, has remained steadfast in its objection to GMAC Mortgage's assuming the ongoing cost of compliance with the foreclosure review obligations set forth in the Consent Order. As set forth in its initial and supplemental objections to the Debtors' motion to make payments to PwC [Docket Nos. 1493 and 1725], the Committee has always contended that payment from the estate on account of obligations under the Consent Order was neither required under the terms of the Consent Order nor proper given that the obligations should be properly classified as unsecured claims rather than administrative expenses.

31.    In sum, the Debtors, in seeking the relief set forth in the Motion, are properly exercising their fiduciary duties. The Committee is likewise supportive of the relief requested as it is in the best interests of all unsecured creditors. Because — as now recognized by both the Debtors and the Committee — the classification of the foreclosure review obligations as unsecured claims is the only way to avoid a massive waste of estate assets, the Court should grant the relief requested in the Debtors' Motion.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court: (i) allow the

Interim PwC Order to expire without issuing any additional such interim or final order; (ii) enter

an order granting the Motion; and (ii) grant such other and further relief as the Court deems just

and proper.

Dated:    March 19, 2013
          New York, New York

                                        KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                        /s/ Kenneth H. Eckstein
                                        Kenneth H. Eckstein
                                        P. Bradley O'Neill
                                        Gregory A. Horowitz
                                        Craig L. Siegel
                                        1177 Avenue of the Americas
                                        New York, New York  10036
                                        Telephone: (212) 715-9100
                                        Facsimile: (212) 715-8000
                                        Electronic mail:  keckstein@kramerlevin.com

                                        *Counsel for the Official Committee*
                                        *of Unsecured Creditors*

# EXHIBIT A

FRB: Independent Foreclosure Review                                   Page 1 of 2



What's New · What's Next · Site Map · A-Z Index · Careers · RSS · All
Videos · Current FAQs · Contact Us                          Search | Advanced Search

**Board of Governors of the Federal Reserve System**



About | News | Monetary | Banking | Payment | Economic | Consumer | Community | Reporting | Publications
the Fed | & Events | Policy | Information | Systems | Research | Information | Development | Forms
                              | & Regulation |         | & Data

## WHAT YOU NEED TO KNOW:
## Independent Foreclosure Review

### Ip srudqw¼Xsgdwh¼

On February 28, 2013, the Federal Reserve Board and the Office of the Comptroller of the
Currency released additional details regarding the Independent Foreclosure Review.

For borrowers with mortgage loans with the following servicers: Aurora, Bank of America,
Citibank, Goldman Sachs, HSBC, JPMorgan Chase, MetLife Bank, Morgan Stanley, PNC,
Sovereign, SunTrust, U.S. Bank, and Wells Fargo,[1] see: *Payment Agreement*

For borrowers with mortgage loans with the following servicers: EverBank/EverHome Mortgage
Company, Financial Freedom (OneWest), GMAC Mortgage, and IndyMac Mortgage Services
(OneWest), the Independent Foreclosure Review process continues.

### Edfnjurxqg#

The Federal Reserve Board issued enforcement actions against four large mortgage servicers
--GMAC Mortgage, HSBC Finance Corporation, SunTrust Mortgage, and EMC Mortgage
Corporation--in April 2011. Under those actions, the four servicers were required to retain
independent consultants to review foreclosures that were initiated, pending, or completed during
2009 or 2010. The review was intended to determine if borrowers suffered financial harm directly
resulting from errors, misrepresentations, or other deficiencies that may have occurred during the
foreclosure process.

A number of servicers supervised by the Office of the Comptroller of the Currency (OCC) were
also required to conduct independent reviews. (See below for the full list of servicers.)

**The deadline to request an independent review was December 31, 2012.**

### Hdjlelew|#iru#dqghshqghqw#Iruhforvxuh#Uhylhz #

Borrowers were eligible for an independent foreclosure review if they met the following criteria:

- the property securing the loan was the borrower's primary residence;
- the mortgage was in the foreclosure process (initiated, pending, or completed) at any time
  between January 1, 2009, and December 31, 2010; and
- the mortgage was serviced by one of the following mortgage servicers:

| | | |
|---|---|---|
| America's Servicing Company* | Countrywide* | National City Mortgage* |
| Aurora Loan Services* | EMC Mortgage Corporation* | PNC Mortgage* |
| BAC Home Loans Servicing* | EverBank/EverHome Mortgage Company | Sovereign Bank* |
| Bank of America* | Financial Freedom (OneWest) | SunTrust Mortgage* |
| Beneficial* | GMAC Mortgage | U.S. Bank* |
| Chase* | HFC* | Wachovia Mortgage* |
| Citibank* | HSBC* | Washington Mutual (WaMu)* |
| CitiFinancial* | IndyMac Mortgage Services (OneWest) | Wells Fargo Bank, N.A.* |
| CitiMortgage* | MetLife Bank* | Wilshire Credit Corporation* |

*These companies are participating in the *Payment Agreement*.

Eligible borrowers were sent a Request for Review form by mail starting in November of 2011
when the program launched.

If a borrower previously filed a complaint with these servicers about foreclosures pending during
the review period, they were still eligible to file for an independent review of their foreclosure.

There were no costs associated with being included in the review; the review was a free
program. Borrowers should beware of anyone requiring payments for assistance in connection
with the Independent Foreclosure Review or any other foreclosure assistance program.

### Ihghudd#Uhvhuyh%v#Urdh#

**Related resources...**

Payment Agreement

Payment Agreement – Frequently
Asked Questions

Remediation Framework
(PDF) | Spanish (PDF)

Remediation Framework FAQ
(PDF) | Spanish (PDF)

Borrowers' Quick Reference Guide to
Remediation Framework
OCC website | Spanish (PDF)

Borrower Outreach Mailing and
Response Data

**Independent Foreclosure Review...**

Visit Site

**Useful terms...**

mortgage loan
A loan that uses your property as
collateral to guarantee repayment.

**Other resources...**

Bank Accounts and Services
Credit Cards
Identity Theft
Leasing
Mortgages
Personal Finance
Federal Agency Contacts

**More of this series...**
WHAT YOU NEED TO KNOW:

New Credit Card Rules Effective Aug. 22
New Credit Card Rules Effective Feb. 22
New Overdraft Rules for Debit and ATM
Cards
New Rules about Credit Decisions and
Notices
New Rules for Gift Cards
New Rules for Mortgage Transfers



The Federal Reserve's role is to ensure compliance with the enforcement actions issued in April 2011, including the payment process under the agreement in principle announced in January of 2013.

The OCC and Federal Reserve examiners are continuing to closely monitor the servicers' implementation of plans required by the enforcement actions issued in April 2011 to correct the unsafe and unsound mortgage servicing and foreclosure practices.

1. Although not part of the Independent Foreclosure Review, on January 16, 2013, Goldman Sachs (Litton Loan Servicing LP) and Morgan Stanley (Saxon Mortgage Services, Inc.) reached similar agreements in principle with the Federal Reserve related to enforcement actions for deficient practices in mortgage loan servicing and foreclosure processing. With the addition of Goldman Sachs (Litton Loan Servicing LP) and Morgan Stanley (Saxon Mortgage Services, Inc.), nearly 4.2 million borrowers will receive a total of $3.6 billion in cash compensation while an additional $5.7 billion will be provided by the thirteen servicers for mortgage assistance. Return to text

### Related Links

PRESS RELEASE
FEBRUARY 28, 2013
Amendments to Consent Orders Memorialize $9.3 Billion Foreclosure Agreement

PRESS RELEASE
JANUARY 18, 2013
OCC and Federal Reserve reach agreement with HSBC to provide $249 million in payments and assistance

JANUARY 7, 2013
Independent Foreclosure Review to Provide $3.3 Billion in Payments, $5.2 Billion in Mortgage Assistance

PRESS RELEASE
August 2, 2012
Deadline to request Independent Foreclosure Review extended to December 31

PRESS RELEASE
June 21, 2012
Agencies Release Financial Remediation Guidance, Extend Deadline for Requesting a Free Independent Foreclosure Review to September 30, 2012

PRESS RELEASE
March 8, 2012
Federal Reserve Board releases action plans for three supervised financial institutions to correct deficiencies in residential mortgage loan servicing and foreclosure processing

PRESS RELEASE
February 27, 2012
Federal Reserve Board releases action plans for supervised financial institutions to correct deficiencies in residential mortgage loan servicing and foreclosure processing

PRESS RELEASE
February 15, 2012
Federal Reserve Board and OCC announce deadline to request review under the Independent Foreclosure Review extended to July 31

PRESS RELEASE
November 1, 2011
Federal Reserve Board announces that borrowers from four mortgage servicers can request an independent review and potentially receive compensation

REPORT
April, 2011
Interagency Review of Foreclosure Policies and Practices

RESOURCE
June 21, 2012
OCC's Correcting Foreclosure Practices

Last update: March 1, 2013

Home | Consumer Information

Accessibility  Contact Us  Disclaimer  Website Policies  FOIA                    PDF Reader

# EXHIBIT B

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>JPMORGAN CHASE & CO.<br>New York, New York<br><br>and<br><br>EMC MORTGAGE CORPORATION<br>Lewisville, Texas | Docket No.    11-023-B-HC<br>11-023-B-DEO |

## AMENDMENT OF CONSENT ORDER

WHEREAS, on April 13, 2011, JPMorgan Chase & Co., New York, New York

("JPMC") and EMC Mortgage Corporation, Lewisville, Texas ("EMC") consented to the

issuance of a Consent Order (the "2011 Board Consent Order"), in recognition of the common

goal of the Board of Governors of the Federal Reserve System (the "Board of Governors"), the

Federal Reserve Bank of New York (the "Reserve Bank"), JPMC and its direct and indirect

subsidiaries that engaged in the business of servicing residential mortgage loans, including EMC

and its direct and indirect subsidiaries, to ensure that the consolidated organization operates in a

safe and sound manner and in compliance with all applicable Legal Requirements (as defined in

the 2011 Board Consent Order);

WHEREAS, paragraphs 3 and 4 of the 2011 Board Consent Order required JPMC and EMC, among other things, to retain an independent consultant to conduct an independent review of certain residential mortgage loan foreclosure actions or proceedings for borrowers who had a pending or completed foreclosure on their primary residence any time from January 1, 2009 to December 31, 2010 for loans serviced by EMC (the "In-Scope Borrower Population"), the purposes of which were set forth in paragraphs 3 and 4 of the 2011 Board Consent Order (the "Independent Foreclosure Review");

WHEREAS, on April 13, 2011, JPMorgan Chase Bank, National Association, Columbus, Ohio (the "Bank"), a national bank owned and controlled by JPMC, consented to the issuance of a Consent Order by the Office of the Comptroller of the Currency (the "OCC") (the "2011 OCC Consent Order");

WHEREAS, the 2011 Board Consent Order required JPMC to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies with the 2011 OCC Consent Order;

WHEREAS, JPMC and EMC have taken steps to comply with their obligations under paragraphs 1, 3, and 4 of the 2011 Board Consent Order;

WHEREAS, in the interest of providing the greatest benefit to borrowers potentially affected by the practices at JPMC and EMC addressed in the 2011 Board Consent Order in a more timely manner than would have occurred under the Independent Foreclosure Review, the Board of Governors and the OCC, within their respective jurisdictions, JPMC, EMC, the Bank, and several other financial institutions with mortgage loan servicing operations have agreed to amend their respective 2011 Consent Orders;

2

WHEREAS, JPMC, EMC, and the Board of Governors intend JPMC's and EMC's obligations under paragraphs 3 and 4 of the 2011 Board Consent Order to be replaced with the obligations specified in this amendment to the 2011 Board Consent Order (the "Amendment"), and ordered pursuant to section 8(b) of the Federal Deposit Insurance Act, as amended (the "FDI Act") (12 U.S.C. § 1818(b)), which include (i) making a cash payment in the amount specified herein to a Qualified Settlement Fund for distribution to the In-Scope Borrower Population in accordance with a distribution plan developed by the Board of Governors and the OCC in their discretion and (ii) taking other loss mitigation or other foreclosure prevention actions in the amount specified herein;

WHEREAS, the amount of any payments to borrowers made pursuant to this Amendment to the 2011 Board Consent Order does not in any manner reflect specific financial injury or harm that may have been suffered by borrowers receiving payments, except as expressly provided for in this Amendment to the 2011 Board Consent Order, nor do the payments constitute either an admission or a denial by JPMC or EMC of wrongdoing or a civil money penalty under section 8(i) of the FDI Act (12 U.S.C. § 1818(i));

WHEREAS, the boards of directors of JPMC and EMC, at duly constituted meetings, adopted resolutions authorizing and directing Frank J. Bisignano and Anthony J. Horan to enter into this Amendment to the 2011 Board Consent Order on behalf of JPMC and EMC, respectively, and consenting to compliance by JPMC and EMC, and their institution-affiliated parties, as defined in sections 3(u) and 8(b)(3) of the FDI Act (12 U.S.C. §§ 1813(u) and 1818(b)(3)), with each and every applicable provision of the 2011 Board Consent Order as amended by this Amendment.

NOW, THEREFORE, IT IS HEREBY ORDERED pursuant to section 8(b) of the FDI Act (12 U.S.C. § 1818(b)) that the 2011 Board Consent Order is amended as follows:

1.    The recitations of the 2011 Board Consent Order are not amended.

2.    Paragraph 1 of the 2011 Board Consent Order is amended in the last clause only to read as follows: "taking steps to ensure that the Bank complies with the Consent Order issued by the OCC, as amended on February 28, 2013, regarding the Bank's residential mortgage loan servicing activities."

3.    Paragraph 2 of the 2011 Board Consent Order is not amended.

4.    Except as otherwise provided in this paragraph 4, any obligations of JPMC or EMC under paragraphs 3 and 4 of the 2011 Board Consent Order are hereby terminated, and paragraphs 3 and 4, including their accompanying heading, are stricken and replaced with the following:

**"Payments to Borrowers**

3.    (a)    Within 15 days of the date of the amendment to this Order (the "Amendment"), JPMC and EMC (defined for purposes of paragraphs 3 and 4 to include EMC's direct and indirect subsidiaries) will make a cash payment that, together with any similar cash payment by the Bank pursuant to Articles I, II, and III of the February 28, 2013 amendment to the Consent Order issued by the OCC with respect to the Bank, totals $753,250,131 into a Qualified Settlement Fund (the "Fund") from which payments will be made pursuant to a distribution plan developed by the Board of Governors and the OCC (collectively, the "Regulators") in their discretion to borrowers whose residential mortgage loan on their primary residence was serviced by EMC and who were subject to a foreclosure action or proceeding that

was pending or completed any time from January 1, 2009 to December 31, 2010 (the "In-Scope Borrower Population").

     (b)     Prior to JPMC's and EMC's cash payment into the Fund required under paragraph 3(a), JPMC and EMC, in coordination with the other financial institutions with mortgage loan servicing operations that also have agreed to amend their respective Orders (collectively the "Participating Servicers"), shall ensure that the Fund is established. The Fund shall be established and is intended to be treated at all times as a Qualified Settlement Fund within the meaning of Treas. Reg. § 1.468B-1 (26 C.F.R. § 1.468B-1). Rust Consulting, Inc. (the "Paying Agent") has been retained by the Participating Servicers for the purpose of distributing payments as directed by the Regulators from the Fund to the Participating Servicers' In-Scope Borrower Population and shall serve as the "administrator" at the direction of the Regulators within the meaning of Treas. Reg. § 1.468B-2(k)(3) (26 C.F.R. § 1.468B-2(k)(3)). The agreements pursuant to which the Participating Servicers retain the Paying Agent shall be subject to the Regulators' prior no objection, and the agreements shall not be amended or modified without obtaining a prior no objection from the Regulators. JPMC and EMC will be responsible for JPMC's and EMC's proportionate share, among the Participating Servicers, of all administrative costs related to the Fund and the Paying Agent. Neither JPMC nor EMC may use any funds from their payment into the Fund or interest accrued on amounts in the Fund for such costs.

(c)    Except as provided in paragraphs 3(f) through (h), JPMC and EMC shall promptly place the In-Scope Borrower Population into categories based upon loan file characteristics as determined by the Regulators (the "Borrower Waterfall").

(d)    The Reserve Bank may direct that JPMC's and EMC's placement of the In-Scope Borrower Population into the Borrower Waterfall be reviewed independently by JPMC's and/or EMC's internal audit or compliance function. Upon verification by the Reserve Bank, the Reserve Bank will instruct JPMC and EMC to provide the Paying Agent with JPMC's and EMC's placement of the In-Scope Borrower Population within the Borrower Waterfall, and at that time JPMC's and EMC's placement of the In-Scope Borrower Population within the Borrower Waterfall shall be deemed final.

(e)    The Regulators will determine the specific payment amounts applicable to each category of borrower within the Borrower Waterfall in their sole discretion (the "Distribution Plan") and will direct the Paying Agent to distribute payments from the Fund to the In-Scope Borrower Population in accordance with the Distribution Plan established by the Regulators.

(f)    Notwithstanding paragraphs 3(d) and (e), with respect to borrowers in the In-Scope Borrower Population who may have been entitled to protection under Section 521 or Section 533 of the Servicemembers' Civil Relief Act, (the "SCRA"), 50 U.S.C. App. §§ 521 or 533, and borrowers who may not have been in default during the foreclosure process, JPMC and EMC shall either: (i) place the borrower into the applicable category within Borrower Waterfall, which will result in the borrower automatically receiving payments made from the Fund in accordance with the Distribution Plan for such category; or (ii) instruct the independent consultant (the "IC") that JPMC and EMC retained to conduct an independent review of

6

residential mortgage loan foreclosure actions or proceedings for the In-Scope Borrower

Population (the "Independent Foreclosure Review") to complete file reviews for such borrowers

to determine financial injury related to Sections 521 or 533 or to not being in default. For files

reviewed under (ii), the borrower will receive payments from the Fund in amounts specified in

the June 21, 2012 Financial Remediation Framework where the IC makes a determination of

"harm." For files reviewed under (ii) where the IC makes a determination of "no harm," JPMC

and EMC will place the borrower into the next highest Borrower Waterfall category for which

such borrower is eligible, which will result in the borrower receiving payment from the Fund in

accordance with the Distribution Plan for such category.

       (g)     Notwithstanding paragraphs 3(d) and (e), with respect to borrowers in the

In-Scope Borrower Population who may have been subject to interest rate protections under

Section 527 of the SCRA, 50 U.S.C. App. § 527, as part of the Borrower Waterfall placement,

JPMC and EMC shall either: (i) place the borrower into the highest category within the

Borrower Waterfall for which the borrower is eligible, which will result in the borrower

automatically receiving payments from the Fund in accordance with the Distribution Plan for

such category; or (ii) instruct the IC to complete file reviews for such borrowers to determine

financial injury related to Section 527. For files reviewed under (ii), the borrower will receive

payments as calculated pursuant to the methodology outlined in Department of

Justice/Department of Housing and Urban Development National Mortgage Settlement ("NMS")

Exhibit H (Consent Judgment entered April 4, 2012), where the IC makes a determination of

"harm." For files reviewed under (ii) where the IC makes a determination of "no harm," JPMC

and EMC will place the borrower into the next highest Borrower Waterfall category for which

such borrower is eligible, which will result in the borrower receiving payment from the Fund in accordance with the Distribution Plan for such category.

       (h)     If JPMC and EMC elect to have the IC continue file review work as described in paragraphs 3(f) or (g), the IC review work for such files must be completed prior to the verification specified in paragraph 3(d). If the IC review work is not completed by such time, the Board of Governors may direct payments from the Fund to such borrowers in accordance with the Distribution Plan for the highest category for which such borrower is eligible.

       (i)     Within three days of the effective date of the Amendment to this Order, JPMC and EMC shall confirm that their IC has provided the Reserve Bank with the most recent data report(s) previously provided by the IC to JPMC's and/or EMC's board(s) or appropriate board committee(s). Within three days of the effective date of the Amendment to this Order, JPMC and EMC shall confirm that their IC has completed and provided to the Board of Governors the additional reporting specified by the Board of Governors with information as of December 31, 2012. JPMC and EMC shall also take all reasonable steps to cause their IC to provide any existing information, as requested by the Reserve Bank, to assist the Reserve Bank and Board of Governors in their analysis and public reporting of Independent Foreclosure Review related activities.

       (j)     Consistent with existing examination authority, the Reserve Bank maintains the right to obtain and access all existing material, information, records and/or files used or generated by JPMC, EMC, and/or their IC (including independent counsel to the IC) in connection with the Independent Foreclosure Review and implementation of the Amendment to this Order.

8

**Foreclosure Prevention**

4.    (a)    By no later than January 7, 2015, JPMC and EMC shall collectively provide loss mitigation or other foreclosure prevention actions ("Foreclosure Prevention") that, together with the Foreclosure Prevention provided by the Bank, totals $1,205,200,210.

(b)    JPMC's and EMC's Foreclosure Prevention actions shall be in addition to, and shall not be used to fulfill, JPMC's consumer relief obligations under the NMS.

(c)    Well structured loss mitigation actions should focus on foreclosure prevention, which should typically result in benefitting the borrower. While JPMC's and EMC's actions may be affected by existing investor requirements, JPMC's and EMC's Foreclosure Prevention actions should reflect the following guiding principles:

(i)    preference should be given to activities designed to keep the borrower in the home;

(ii)    foreclosure prevention actions should emphasize affordable, sustainable, and meaningful home preservation actions for qualified borrowers;

(iii)    foreclosure prevention actions should otherwise provide significant and meaningful relief or assistance to qualified borrowers; and

(iv)    foreclosure prevention actions should not disfavor a specific geography within or among states, nor disfavor low and moderate income borrowers, and not discriminate against any protected class of borrowers.

(d)    JPMC and EMC shall receive credit using the types of creditable activity set forth in the NMS for the following Foreclosure Prevention actions set forth in the NMS:

(i)    first lien modifications;

(ii)    second lien modifications; and

(iii)    short sales/deeds-in-lieu of foreclosure.

(e)    For purposes of paragraph 4(d), crediting will be based on the unpaid principal balance of the loan and there are no maximum or minimum restrictions on the amount of any particular activity that is creditable.

(f)    JPMC and EMC may also receive credit for other Foreclosure Prevention actions, subject to no objection from the Reserve Bank (including as to participation and conditions governing such participation), including:

(i)    interest rate modifications;

(ii)    deficiency waivers (measured by the amount of deficiency judgment credited at $.10 for every dollar);

(iii)    other Foreclosure Prevention activities (measured by amounts incurred as owing to investors for such activities and including credit on JPMC's or EMC's or their affiliates' loans held-for-investment calculated using the note rate methodology as used by the Government-Sponsored Enterprises);

(iv)    additional Foreclosure Prevention actions that are not expressly specified in this paragraph 4;

(v)    the provision of additional cash payments to the Fund (measured as $7 to $10 of credit for each $1 cash commitment); and

(vi)    the provision of cash or other resource commitments to borrower counseling or education (measured as $7 to $10 of credit for each $1 cash commitment).

(g)    To the extent practicable and without prejudice to overall portfolio management, JPMC and EMC will attempt to prioritize their Foreclosure Prevention actions for the benefit of the In-Scope Borrower Population. However, all Foreclosure Prevention actions

benefiting borrowers in the portfolio of JPMC or its subsidiaries or affiliates, whether or not in the In-Scope Borrower Population and whether held-for-investment or serviced-for-others, shall be eligible for credit towards JPMC's and EMC's Foreclosure Prevention actions; provided, the creditable activity occurs on or after January 7, 2013.

(h)    By May 15, 2013, JPMC and EMC shall submit to the Reserve Bank a report, in a form and manner acceptable to the Reserve Bank, that details the Foreclosure Prevention actions taken by JPMC and EMC through April 30, 2013 to fulfill their obligations under this paragraph 4 and the amount of credit sought toward fulfilling those obligations. Thereafter, JPMC and EMC shall submit such report every 45 days. Nothing in this paragraph 4(h) shall require JPMC and EMC to report Foreclosure Prevention actions taken during a particular prior period for which JPMC and EMC may in the future seek credit or prohibit JPMC and EMC from seeking credit for the Foreclosure Prevention actions taken by JPMC and EMC during a later reporting period. Additionally, JPMC and EMC shall document their efforts to prioritize the In-Scope Borrower Population when considering creditable Foreclosure Prevention Actions."

5.    Paragraphs 5 through 7 of the 2011 Consent Order are not amended.

6.    Paragraph 8(a) of the 2011 Consent Order is stricken and replaced with the following:

"8.    (a)    JPMC and EMC, as applicable, shall submit written plans that are acceptable to the Reserve Bank and reports to the Reserve Bank within the applicable time periods set forth in paragraphs 2, 3, 4, 5, 6 and 7 of this Order."

7.    Paragraph 8(b) of the 2011 Board Consent Order is not amended.

11

8.      Paragraph 8(c) of the 2011 Board Consent Order is amended by striking "and engagement letter" and otherwise is not amended.

9.      Paragraphs 8(d) through 13 of the 2011 Board Consent Order are not amended.

10.     Paragraph 14 of the 2011 Board Consent Order is stricken and replaced with the following:

"14.    Except as otherwise provided in this paragraph 14, the Board of Governors hereby agrees to not initiate any further enforcement actions, including for civil money penalties, against JPMC, EMC, and their affiliates, successors and assigns, with respect to (a) the conduct described in the WHEREAS clauses of this Order or in Article I of the OCC Consent Order, (b) the matters addressed in paragraphs 3 through 4 of this Order or in Article VII of the OCC Consent Order, including matters relating to the work or findings of the IC or independent legal counsel to the IC, and (c) any other past mortgage servicing and foreclosure-related practices that are addressed by this Order. The preceding release and discharge in paragraph 14(c) applies only with respect to borrowers in the In-Scope Borrower Population. The foregoing release and discharge shall not preclude or affect (i) any right of the Board of Governors to determine and ensure compliance with this Order, as amended herein, or (ii) any proceedings brought by the Board of Governors to enforce the terms of the Order, as amended herein. The preceding release and discharge in no way affects the Order of Assessment of a Civil Money Penalty entered into by JPMC and EMC, on the one hand, and the Board of Governors, on the other hand, effective February 9, 2012, which shall remain in effect without modification."

11.     Paragraph 15 of the 2011 Board Consent Order is renumbered paragraph 16 and is otherwise not amended.

12.    The following is inserted before paragraph 16 of the 2011 Board Consent Order as paragraph 15 of the 2011 Board Consent Order:

"15.    In no event shall JPMC or EMC request or require any borrower to execute a waiver of any claims against JPMC or EMC (including any agent of JPMC or EMC) in connection with any payment or Foreclosure Prevention assistance provided pursuant to paragraphs 3 or 4 of this Order.  However, nothing herein shall operate to bar JPMC or EMC from asserting in the future in any separate litigation, or as part of a settlement related to JPMC's or EMC's foreclosure and servicing practices, any right that may exist under applicable law to offset the amounts received by a borrower through the distribution process set forth above. Nothing herein shall operate to amend or modify in any respect any preexisting settlement between JPMC, EMC, or an affiliate of either and a borrower in the In-Scope Borrower Population."

By Order of the Board of Governors effective this 28th day of February, 2013.

JPMORGAN CHASE & CO.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

By: /s/ Frank J. Bisignano
    Frank J. Bisignano
    Co-Chief Operating Officer

By: /s/ Robert deV. Frierson
    Robert deV. Frierson
    Secretary of the Board

EMC MORTGAGE CORPORATION

By: /s/ Anthony J. Horan
    Anthony J. Horan
    Senior Vice President

13

# EXHIBIT C
# (FILED UNDER SEAL)