1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10          Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, New York

17

18          March 15, 2013

19          10:14 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Motion to approve Motion of the Examiner for entry of an order

3   modifying the Uniform Protective Order for Examiner Discovery

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

 1

 2   A P P E A R A N C E S :

 3   MORRISON & FOERSTER, LLP

 4          Attorneys for Debtors

 5          1290 Avenue of the Americas

 6          New York, NY 10104

 7

 8   BY:   JAMIE A. LEVITT, ESQ.

 9

10

11   CHADBOURNE & PARKE LLP

12          Attorneys for the Examiner

13          30 Rockefeller Plaza

14          New York, NY 10112

15

16   BY:   THOMAS J. MCCORMACK, ESQ.

17          HOWARD SEIFE, ESQ.

18

19

20   WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

21          Conflicts Counsel to the Examiner

22          270 Madison Avenue

23          New York, NY 10016

24

25   BY:   ERIC B. LEVINE, ESQ.

1

2 KRAMER LEVIN NAFTALIS & FRANKEL LLP

3      Attorneys for Official Creditors' Committee

4      1177 Avenue of the Americas

5      New York, NY 10036

6

7 BY:   NORMAN C. SIMON, ESQ.

8

9

10 LUSKIN, STERN & EISLER LLP

11      Attorneys for Goldin Associates

12      Eleven Times Square

13      New York, NY 10036

14

15 BY:   STEPHAN E. HORNUNG, ESQ.

16

17

18 KIRKLAND & ELLIS LLP

19      Attorneys for Ally Financial Inc. & Ally Bank

20      601 Lexington Avenue

21      New York, NY 10022

22

23 BY:   ANTHONY GROSSI, ESQ.

24

25

1

2   KIRKLAND & ELLIS LLP

3         Attorneys for Ally Financial Inc. & Ally Bank

4         655 Fifteenth Street, N.W.

5         Washington, DC 20005

6

7   BY:   DANIEL T. DONOVAN, ESQ.

8

9

10  KELLEY DRYE & WARREN LLP

11        Attorneys for UMB Bank

12        101 Park Avenue

13        New York, NY 10178

14

15  BY:   CATHERINE L. THOMPSON, ESQ.

16

17

18  WHITE & CASE

19        Attorneys for Ad Hoc Group of Senior Secured Noteholders

20        1155 Avenue of the Americas

21        New York, NY 10036

22

23  BY:   HARRISON DENMAN, ESQ.

24

25

```
 1   ROPES & GRAY LLP

 2         Attorneys for Ad Hoc RMBS Holder Group

 3         800 Boylston Street

 4         Boston, MA 02199

 5

 6   BY:   ANDREW DEVORE, ESQ. (TELEPHONICALLY)

 7

 8

 9   MUNGER, TOLLES & OLSON LLP

10         Attorneys for Berkshire

11         355 South Grand Avenue

12         35th Floor

13         Los Angeles, CA 90071

14

15   BY:   THOMAS WALPER, ESQ. (TELEPHONICALLY)

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2           THE COURT:  Please be seated.  All right, we're here

3    in Residential Capital, number 12-12020.

4           MR. MCCORMACK:  Good morning, Your Honor.

5           THE COURT:  Good morning.

6           MR. MCCORMACK:  Tom McCormack from Chadbourne, on

7    behalf of the examiner.  Your Honor, I think we have two agenda

8    items today that flow from our chambers conference on February

9    28th.  The first, if I may, is to report on the status of

10   discovery generally, as a follow-up to some of the items that

11   came up during that conference.  And then the second, of

12   course, is addressing the examiner's motion seeking limitations

13   on additional claw-backs in this matter.

14          Moving to item 1, Your Honor.  On the discovery front,

15   as you know, I advised you on February 28th that working in

16   conjunction with all of our teams and also in conjunction with

17   both MOFO and Kirkland, we had prepared lists of what we

18   thought were the key documents and requests of information that

19   were outstanding at that time.  We also had asked, originally,

20   for those materials to be provided to us by February 28th.  And

21   then in the court conference I said, okay, make it March 15th.

22          I would say that in large measure we've made great

23   progress on that.  There are some additional items that we

24   don't have yet.  And let me deal with them seriatim and not

25   bogs us down on them.  But I at least wanted to bring them to

1   your attention, because we may be back.

2          But the ones with regard to ResCap, we have gotten

3   almost -- I'd say, seventy-five, eighty percent of them

4   eliminated now.  We have little small items here and there with

5   them.  But the most significant issue for us is these ongoing

6   discussions between Mesirow, our financial advisor, and FTI,

7   who is one of the people that worked with ResCap at various

8   points in time.

9          There's been some efforts to get that resolved.  I

10  know now that there is a scheduled conference next week, where

11  we're going to put a large team on the ground with FTI out at

12  ResCap's locations in Fort Washington.  And our hope is that

13  that will finally resolve one of the key issues that are on

14  Mesirow's mind, and therefore on the examiner's mind.  And we

15  don't have it by today, but what we now have, what we hope to

16  be a process in place that will get it to us next week.  If we

17  have any problems with that, we'll come back.

18          Our primary issues with Ally, again, we had a list of

19  approximately twenty.  I would say three-quarters of those are

20  now, we literally have them -- I sent the list to them with it

21  crossed out, saying "done".  We have again, some minor items

22  with some of them.  I think the key issue there is tax-related

23  issues.  Again, our people are meeting with their people.

24  They've met once.  They're going to meet again next week.

25          I just wanted to advise you that I think the parties

1     have been working hard.  We might have some disagreements about

2     whether we're there on some of them or not.  But I think the

3     parties have been working in good faith to solve those.  And if

4     we have any problems with those we'll come back to you.  But we

5     are trying to finalize those, obviously, and hopefully have

6     made a lot of progress since we were in your chambers on the

7     28th.

8              One other thing I would be remiss in saying -- not

9     saying, and I'm sure they would bring it up anyway -- we didn't

10    stop.  We have asked them for some additional information, much

11    more focused now, as our investigation is in the synthesis, in

12    writing stages.  So I know that I've sent them yesterday a

13    request for status on some of those.  But again, if we have any

14    issues with that, I know the clock is running, we'll be back to

15    talk to you about it.

16             THE COURT:  Yes.  On that score, I just want to -- I

17    think it's clear, but I want to make it crystal clear.  No

18    extensions on the examiner's report.

19             MR. MCCORMACK:  Absolutely, Your Honor.

20             THE COURT:  None.

21             MR. MCCORMACK:  We understand.

22             THE COURT:  So don't wait.  If you need to come back

23    to me, come back to me as soon as -- you know, I'm -- I think

24    everybody has been working cooperatively.  It's been a huge

25    burden on the debtors.  It's been a huge burden on you and your

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1  colleagues.  I don't underestimate the challenge.  It's got to

2  get done.  So there will be no extensions.  So I don't want to

3  hear at the last minute, there are -- we discovered we need

4  these documents, and they say it'll be three weeks before we

5  can get them.  It just isn't going to happen.

6          MR. MCCORMACK:  Your Honor, our client has been quite

7  clear on that subject matter as well, which is why our

8  colleagues at MOFO and Kirkland hear from me on almost a

9  regular daily basis on these issues.  And again, I know that if

10 we reach a point where we conclude that we can't get anything

11 from them that we think we need, we will come back and ask Your

12 Honor for it.

13         THE COURT:  Okay.  And I want to make it crystal

14 clear; it should be obvious to everybody.  Because now the RMBS

15 trial's scheduled to start May 28th.  I guess it remains to be

16 seen whether the examiner's report is going to have any impact

17 on that or not.  But I want to be sure that all of the parties

18 to that trial have received and have adequate time to digest

19 the examiner's report and determine whether that is going to

20 result in any changes in trial strategy or anything like that,

21 or whether it's going to result in renewed effort to settle the

22 matter.  I'm not moving the date of the trial again.  The trial

23 is scheduled for May 28th.  I want to be sure that, as I said,

24 that the examiner's report is done; they have time to digest

25 it.  I'm sure it's not going to be light reading.

RESIDENTIAL CAPITAL, LLC, ET AL.                    11

1              MR. MCCORMACK:  No, Your Honor.

2              THE COURT:  I want to be sure that I've had time to

3     read and digest it as well.  So that's not intended as a

4     criticism to anybody about how this process has gone.  I know

5     it's been a huge undertaking.  And I'm not questioning that.

6              Go ahead, Mr. McCormack.

7              MR. MCCORMACK:  Thank you, Your Honor.  And we

8     understand, obviously, what you've just said to us.

9              The other issues -- and I'll go through them

10    quickly -- but I just wanted you to know, as you remember, at

11    our conference on the 28th of February, we had indicated that

12    in our discussions with PWC and Deloitte, things weren't moving

13    as quickly, and so we subpoenaed them that evening.  And we

14    made the document request returnable on March 11th.  And

15    obviously, we have made great progress on that front.

16             We had them serve the 45(c) letters that you would

17    expect that they would.  Yesterday we received a production of

18    approximately 20,000 pages from Deloitte.  And Deloitte is here

19    in the courtroom today.  Also on the PWC side, they have not

20    made a production yet.  And quite frankly, we did invite them

21    to come to the court on two separate occasions today.  The

22    lawyer who's handling it in-house in Deloitte who's in San

23    Francisco said -- excuse me, at PWC is in San Francisco, and

24    said he would not come.  But he did allow us to say this to the

25    Court.

1        He said please tell the Court this.  We were served

2    with a subpoena on February 28th, made a Rule 45(c) objection.

3    Nonetheless, we expect to commence our production on or about

4    March 25th and complete our production on or about April 2nd.

5        The only question I have on that -- and again, if we

6    have any issues we'll bring them to our attention -- for both

7    Deloitte and PWC, we have been told by them that the documents

8    that we seek are being reviewed by Ally's counsel and/or

9    ResCap's counsel.  And we would ask the Court to make sure that

10   nothing about that review would slow down these processes that

11   we have started by doing the subpoenas.

12       And with regard to Deloitte in particular on that

13   subject matter, I'm going to have my colleague Eric Levine from

14   the Wolf Haldenstein firm, who's conflicts counsel, raise an

15   issue.

16       THE COURT:  All right.  Thank you.  Thank you, Mr.

17   McCormack.

18       Mr. Levine?

19       MR. LEVINE:  Good morning, Your Honor.  Just really a

20   preview of an issue.  We don't know whether it will fully

21   crystallize but we wanted to flag it, because Deloitte raised

22   it actually with us this morning before we came in.

23       It's not actually Deloitte's issue, but Deloitte is

24   being careful about protecting the ResCap-Ally privilege.  And

25   apparently ResCap-Ally -- or at least at this stage -- are

1   asserting that the so-called auditor's letters of attorneys,

2   you know, the FAS-5 letters that I'm sure --

3           THE COURT:  Yes.

4           MR. LEVINE:  -- Your Honor saw hundreds of them when

5   you were in practice, where auditors -- lawyers advise auditors

6   of risk contingencies, loss contingencies, under FAS-5.

7   Apparently, at least at this point. ResCap and Ally are taking

8   the position that those are privileged.  I assume that must

9   mean they're claiming a work-product privilege, because I don't

10  see how an attorney-client privilege could possibly, in New

11  York, apply to a transmission to an auditor.  I suspect that

12  they are thinking in terms of work product.

13          The issue could be important, because the examiner

14  might need to see when Ally or ResCap was aware of certain risk

15  contingencies.  It could relate to, obviously, numerous of the

16  issues, you know far better than I.  So that is an issue that's

17  floating around now.  We don't know -- we haven't fully

18  crystallized it yet.  It does seem like it may be something

19  that we disagree with the debtor on; and if so, we will get it

20  to you very promptly.

21          THE COURT:  All right.  I think I would just, again,

22  urge that -- if that issue is going to have to be brought

23  before the Court, it should be brought before the Court sooner

24  rather than later.

25          MR. LEVINE:  Understood.

1        THE COURT:  And I don't know whether -- well, let me

2    leave it at that.  I'm sure, Mr. Levine, that you'll try your

3    best to see if you can work it out with confidentiality

4    agreements or whatever.  There already is -- obviously, we'll

5    deal with something on the confidentiality agreement in a

6    little while.  But let's press them for a response, and if need

7    be, see if you can agree on a briefing schedule with them.  If

8    you -- you can contact my chambers.  And I'm just -- I'm

9    watching this clock tick, all this stuff just needs to get

10   resolved as soon as possible.  Okay?

11        MR. LEVINE:  Understood, Your Honor.  Thank you.

12        THE COURT:  Thank you very much, Mr. Levine.

13        MS. LEVITT:  Your Honor, if I may on that -- that

14   issue.

15        THE COURT:  Go ahead, Ms. Levitt.

16        MS. LEVITT:  This is Jamie Levitt --

17        THE COURT:  Come up to the microphone, though.

18        MS. LEVITT:  -- Jamie Levitt on behalf of the debtors.

19        THE COURT:  Okay, go ahead.

20        MS. LEVITT:  This is the first we've heard of this.  I

21   wasn't aware we had --

22      (Skip in audio)

23        MR. MCCORMACK:  In terms of discovery was our addition

24   of two additional e-mail custodial accounts.  One was a Mr.

25   Schultz, who worked at ResCap, and we were seeking the e-mail

1     accounts from the period prior to '07, because it relates to

2     some of the securitizations that were issued in '07 -- in the

3     prior years.  Mr. Schultz was an employee of ResCap.  We have

4     now the first production of that.  We expect additional

5     production to that.  That seems to be working out fine.

6              THE COURT:  Okay.

7              MS. LEVITT:  The other one was Mr. Kotray (ph.).  Mr.

8     Kotray, as you may recall, was the CFO of ResCap at one point

9     in time, and also the CFO of Ally at one point in time.  During

10    the period of time that he was CFO of ResCap, '07 forward, we

11    have his e-mail files.  From the period prior to '07, when he

12    was the CFO of Ally, we've been advised that through document

13    retention policies, et cetera, those files no longer exist.  We

14    have asked some follow-up questions of Ally's counsel that one

15    would ask in a situation like that.  And we asked those last

16    week.  I don't know -- we'll be getting answers to this,

17    presumably --

18             THE COURT:  Okay.

19             MR. MCCORMACK:  -- even quicker now that I've raised

20    it in front of Your Honor.

21             And then the last issue which is a nice bridge into

22    why we're here this morning, really, which is the motion, is

23    that at our conference on February 28th, we had talked to you

24    about where we were on the claw-back issues.  And I think, as

25    we told you that time, we had received a series of claw-back

1   requests that had been significant to us and that we were, in

2   fact, working hard to resolve some of the consequences of those

3   claw-back requests.

4         We have continued to work out those.  We have now, in

5   front of Ally's counsel, a fully-baked solution to what we

6   think would be the answer to what we got it down to in terms of

7   a manageable group of documents with regard to Ally.  And we

8   await their response on that.  We -- they said they would get

9   us a response either next week or the first part of the

10   following week.  We'd like it sooner, of course.  But that

11   hopefully will solve that cluster of issues that came from the

12   last --

13         THE COURT:  Are these examiner-related documents?

14   Bank examiner-related documents?

15         MR. MCCORMACK:  That's the basis of their claw-back,

16   yes, Your Honor.  And I think we've had efforts to try to

17   resolve that through alternative means, let's call it that way.

18         THE COURT:  All right.  Thank you .

19         MR. MCCORMACK:  And as I said, our fully-baked offer

20   is now in front of them.

21         And if we have -- and again, your point is well taken,

22   and we know it as well, we're very mindful of the clock too,

23   Your Honor.  And we've got many, many processes in place.

24   Which leads me to my claw-back motion.

25         Your Honor, as our follow-up to discussions on

1  February 28th, the examiner has moved to modify the protective

2  order to set a date after which:  1) no additional claw-backs

3  may be made for attorney-client or work-product privileges; and

4  2) any claw-back request for bank regulatory privileges may be

5  made only if certain procedural requirements are met.  We

6  respectfully ask that that you enter our proposed order on that

7  subject matter.

8          Judge, you know the problem.  I know I said it on the

9  February 28th, but it bears repeating.  We have an immense

10  amount of energy going into this process.  We have people that

11  are drafting sections of the report.  We have people that are

12  doing factual and legal analysis on an endless series of

13  transactions.  We're working with Mesirow, who is doing their

14  financial analysis in conjunction with what we're doing.  We

15  have people that are preparing for what has now been over sixty

16  examinations with documents.  We have people preparing for

17  additional examinations.

18          All of those people are using materials that come in

19  our door, are instantaneously looked at, reviewed, and then

20  decided upon as to where they're going to be used.  And as I

21  said to you last time, the claw-back problem is a significant

22  distraction and problem for the examiner in getting its job

23  done, because every time one of those comes in, none of those

24  documents that came to our shores stand still.  And every time

25  it happens, we have to go find out where they are in all of

1  these silos.  We have to find out if the information is

2  critical to us.  We have to find out if it is, if there's an

3  alternative to it.  We have to decide whether or not this, in

4  fact, is privileged.  And then we have to engage in

5  negotiations with our colleagues at Ally and ResCap over those

6  issues.

7          And that has taken an immense amount of time, money,

8  and effort, over the last month as we tried to solve those

9  problems.  Meanwhile, we have enough on our docket that we

10 don't need that distraction.  And let me give you a quick

11 background to some of this.  I thought we sort of got where we

12 were going to get on this on February 28th, but we're here

13 today in disagreement.

14         On February 28th -- excuse me -- I've now looked.  The

15 issue of the government regulatory privilege was extant in

16 October.  My team went back and saw e-mails and communications

17 they had both with ResCap and with Ally over that issue.  The

18 issue at that time was what was going to be the decision making

19 about what was going to be produced or not produced.  That

20 issue seems to have been resolved.  We got millions of pages of

21 documents.  And then on February 5th, we got the claw-back

22 request that was the subject of our prior conference.  And that

23 claw-back request, I think, showed a change in position on the

24 government regulatory issue.

25         Somebody looked at it again, what they'd done, and

1    decided no, we should now claw all these back.  So in reality

2    that is a problem.  I think let's not kid ourselves; we didn't

3    create that problem.  That was not a problem of our creation.

4    And the decision making on why it was done the way it was done,

5    not a problem of our creation.  But the problem created by it

6    has been visited upon us and continues to be visited upon us.

7              As you know, we were here on February 28th, and on

8    February 28th, we told you it was a big problem.  And well, of

9    course, notwithstanding the tone of the conference on the 28th,

10   I would say that problem hasn't stopped, it's gotten worse.

11   And on the evening of the 28th, ResCap clawed back 14,000

12   documents.  Now, in fairness, that was part of an understanding

13   to force them to give us the documents sooner than they were

14   otherwise going to give the documents on January 31, that they

15   would claw back some of these documents.  We didn't expect

16   14,000, but we knew that they would be doing some.

17             So on February 28th, we got 14,000 from them.  Two

18   days later Cerberus serves on us a claw-back request for over

19   900 documents.  And in their cover letter they say Ally has now

20   looked at our documents and they've told us to claw back these

21   documents.  So since our conference on the 28th, we've now had

22   closed to 15,000 additional claw-back requests.  So the misery

23   and the problems associated with it has continued.

24             Now, the thing that's interesting, look, we're dealing

25   with it.  We're dealing with it because we have no choice.  And

 1  so we have moved through that problem with great intensity to
 2  get it off of our plate.  And so -- and in fact, we didn't even
 3  say that the deadline had come and gone.  We said fine.  And so
 4  if you're telling people you're going to have a deadline,
 5  you're going to assume they're going to throw these at you.  So
 6  we're -- we prepared ourselves to deal with those problems.
 7  We're dealing with it.
 8          But I guess we want protection going forward.  And we
 9  want some deadlines and some obstacles imposed on further claw-
10  backs to protect the examiner's work, to protect the examiner's
11  processes, to avoid the endless stream of fire drills, which
12  has characterized our activities over the last month of dealing
13  with this, and to allow us to focus on our project, going down
14  the home stretch for the very reasons you mentioned earlier.
15          Now, when I looked at their request, when it's boiled
16  down to its essentials, their approach to the order has been,
17  honestly, when you cut through all the detail, they want to be
18  able to make claw-back requests up to and including the day we
19  file this report.  They've got some bells and whistles on that,
20  but when you read it substantively, that's what they want.
21          And our view is that if that happens to us on the home
22  stretch here, and we have to devote the resources in the next
23  two months that we've devoted in the last month to these
24  problems, we will be seriously hampered in the job that we have
25  to do.

1       And so, Your Honor, what we would like to say simply

2   is you'll see from our submissions that what we want is

3   reasonable limitations on the timing of additional claw-back

4   requests and on the scope and tenor of them and on how they

5   will proceed on the basis.  You'll see we've got cases that

6   show that reasonable limitations are certainly appropriate in a

7   circumstance like this.  You'll see that we've added provisions

8   ensuring that the failure to assert a claw-back in and of

9   itself will not constitute any type of a waiver.  And we've

10  tried our very level-headed best.  But the reason we couldn't

11  solve this problem -- and believe me, we all sort of wanted to

12  solve the problem -- is in the final analysis, they wanted to

13  be able to do this until the day of the report, and we couldn't

14  tolerate that.

15      That's where we are, Your Honor.  And we're not -- I

16  guess after what happened on February 28th, and the bonhomie

17  that occurred in the room, I'm not so sanguine about the idea

18  that this problem is already solved or behind us.  I'm not

19  convinced of that at all.  So that is one of the reasons, Your

20  Honor, why we have a job to do and we would like to do it.  And

21  as a result, our proposal, we believe, is reasonable.  It's

22  appropriate to the circumstances.  And we respectfully ask,

23  Your Honor, that you enter the order that we have submitted to

24  you.

25      THE COURT:  Let me ask you this, Mr. McCormack.  Ally

1  had proposed an addition to your form of order that would limit

2  its impact to the examiner.  The committee has filed a late

3  statement objecting to that portion of it because they say

4  we're -- we have access to the database where, as everyone has

5  known, absolutely true, they're conducting their

6  investigation -- hopefully not entirely duplicating but -- and

7  they've laid out presentations they've done to the examiner and

8  examiner's counsel.

9          What's your position about the committee's late-filed

10 statement?

11         MR. MCCORMACK:  Well, Your Honor, what I would say to

12 that -- and I had these conversations with Mr. Donovan -- if

13 you look at items A and B of the order as drafted, one could

14 argue that that is already there.  And Mr. Donovan wanted to

15 have the provision put in there, I think, because you could

16 argue it the other way.

17         I guess our view is that we thought that maybe you

18 could read A and B as being applicable to the examiner. But I

19 guess on that issue, we're neutral.  I mean, the answer is we

20 want -- what we want to do is our job and we don't want to have

21 to spend the next two months devoting the resources to fending

22 off these claw-back requests.  And I'm sure the committee can

23 speak for itself.  I understand their position.  And Mr.

24 Donovan's position, I think, was one that was based on what he

25 viewed the order already did.  And my view was I'm not going to

1   get caught necessarily in the middle of that.  So we're neutral

2   on that subject, Your Honor.

3          THE COURT:  Let me ask you this, Mr. McCormack.  Have

4   you or any of your colleagues had direct communication with

5   counsel for the bank examiners -- for want of a better term?  I

6   mean, the issue principally seems to focus on the bank

7   examination privilege, whatever that means.

8          MR. MCCORMACK:  Exactly.

9          THE COURT:  Okay.  Because it's not crystal clear --

10         MR. MCCORMACK:  Right.

11         THE COURT:  -- what would be swept within it or not.

12         And I understand your position that it's untenable for

13  the examiner and his professionals to be faced with an open-

14  ended time for claw-back requests based on bank examination

15  privilege.  Have you had communications with counsel for any of

16  the regulators with respect to the issue of bank examination?

17         MR. MCCORMACK:  We have not.  But, Your Honor, we were

18  sensitive to that.  And I think Mr. Donovan understood we were

19  sensitive to that.  So you may recall, in our meeting on

20  February 28th, I didn't set an absolute deadline for the bank

21  examiner privilege.

22         THE COURT:  Well, we had a discussion about and I

23  think, actually, I raised and issue and you sort of built that

24  in --

25         MR. MCCORMACK:  That's right.

1          THE COURT:  -- worked that into the proposal.

2          MR. MCCORMACK:  That's right.  That's exactly right.

3    And the proposal, what the proposal basically says is, okay --

4          THE COURT:  It's a little bit of an escape valve, puts

5    the burden on them to come forward --

6          MR. MCCORMACK:  That's right.

7          THE COURT:  -- with a motion --

8          MR. MCCORMACK:  I was sensitive to that very issue.  I

9    was sensitive -- and Mr. Donovan pleaded with me, I must say,

10   because of the bank examiner side of things, and I said okay,

11   so we'll create an escape valve.  But we're going to make it

12   hard for you to like easily jump through it, because we can't

13   do this.

14         So I think to your point, Your Honor, we were

15   sensitive to it.  We thought we dealt with it in an appropriate

16   manner.  And we created an escape valve that gives them the

17   right to continue to assert that bank examiner privilege.  And

18   like I said on the 28th, I got the sense that we were done with

19   the bank examiner privilege.  Maybe the question to them would

20   be how much more are we going to get on these claw-backs?  How

21   many more claw-backs are we going to get on the bank examiner's

22   side, or if they -- because I didn't know what was in the wings

23   last time.  I'd like to know what's in the wing today, Your

24   Honor.

25         THE COURT:  Thank you, Mr. McCormack.

1          MR. MCCORMACK:  Thank you very much.

2          THE COURT:  Mr. Donovan?

3          MR. DONOVAN:  Daniel Donovan for Ally Financial.  Good

4   morning, Your Honor.  I will tell Your Honor what I've already

5   told Mr. McCormack is we don't expect any more bank examination

6   claw-backs.  So he knew the answer before he asked the

7   question, which is always a good lawyer.

8          But, Your Honor, I think there is more agreement than

9   disagreement.  And I want to get into the details, because I

10  think they are important.  And as you know, Ally is extremely

11  interested in the examiner finishing their report.  The process

12  has been long.

13         THE COURT:  You say that, but we'll see.

14         MR. DONOVAN:  Well, we got to get through it, Your

15  Honor, one way or the other.  Hopefully they come out the right

16  way.

17         But what I do want to talk about is the legal

18  requirements and why the safety valve --

19         THE COURT:  I'm confident the examiner will come out

20  the right way.  We'll see which way it is.

21         MR. DONOVAN:  Right.  Fair enough.

22         So I'd like to address those points, Your Honor,

23  because I do think there's more agreement.  But I think the

24  issues we raise are important, and frankly, are important to

25  our regulator, who is important to us to keep happy.  So if I

1   may approach, Your Honor?

2           THE COURT:  Go ahead.  Thank you.

3           MR. DONOVAN:  So, Your Honor, I want to focus in, and

4   primarily I'm going to turn to page 4.  The other pages provide

5   the current claw-back, the Federal Rule -- the Federal Rule of

6   Civil Procedure that covers claw-backs, and then our proposal.

7   But page 4 is the three issues I want to raise with Your Honor

8   to explain.  And I know you have the background, so I'm not

9   going to repeat who's produced what in that issue.

10          So first, on the bank examination privilege.  I

11  believe that Mr. McCormack tried to accommodate this issue, but

12  I want to explain why I don't think the current order does.

13  The bank examination privilege, there's a lot in the brief --

14          THE COURT:  The current order as opposed to the

15  proposed order?

16          MR. DONOVAN:  Yes, Your Honor.  What is the bank

17  examination privilege?  That's not for today.  We can talk

18  about the law if it comes up.  What is important, though, and

19  why it's different than the attorney-client privilege is it's

20  not my client's privilege.  It's not Ally's privilege.  So when

21  we were notified and we talked with the examiner, and the claw-

22  back included documents, frankly, that I wanted to use with the

23  examiner as well as documents the committee wanted to use.  It

24  wasn't kind of what one would call sword-shield; it in fact

25  takes documents I wanted to use as well, because our regulators

1    demanded it.

2            So the issue comes --

3            THE COURT:  Stop for a second.

4            MR. DONOVAN:  Yes.

5            THE COURT:  You said your regulators demanded it.

6    Elaborate on that statement.  What has been the role of the

7    regulators in determining what, if any, documents need to be

8    claw-backed because of a bank examination privilege?

9            MR. DONOVAN:  Sure.  The examiner -- excuse me -- the

10   regulators have been kept up to date on weekly calls on this

11   very issue, Your Honor, both the Fed and the FDIC.  They have

12   the documents in redacted and unredacted form.  And we've had

13   conversations with them about some documents -- not all of

14   them; they've reviewed them themselves -- about the breadth of

15   the privilege.

16           So we are also in two fronts.  Mr. McCormack has

17   provided me proposed stipulations to work around that issue.

18   We're working through that now.  Hopefully that will take care

19   of that issue.  And I know the committee has sent a letter to

20   the regulators asking for a waiver under the rules.  That's

21   going through the normal process.

22           So I think the process is working.  I get it's

23   difficult for everybody.  But on the bank exam protective order

24   issue, the issue becomes it's not Ally's privilege, therefore

25   it cannot be waived.  So my only concern is --

1          THE COURT:  Well, I might -- here's where I may

2     disagree with you.  Ally may waive -- may have, by laches, have

3     foregone the ability to assert it.  If the bank examiners want

4     to come in and file a motion with this court arguing that

5     particular documents are shielded from discovery by the bank

6     examination privilege, there's nothing in the existing order or

7     the proposed order that would limit the bank examiner's -- the

8     regulator's ability to do that.  Do you agree with that?

9          MR. DONOVAN:  Well, I wasn't sure.  So I would like

10    for that to be.  Because that's my concern about the safety

11    valve.  They have to be able to come in --

12         THE COURT:  I mean, you ought to -- I mean, frankly,

13    whether it's you or Ally or some other party, the people who

14    produced the documents have had a lot of time -- I realize it's

15    a lot of documents, I'm not underestimating the challenge,

16    okay -- but you've have a lot of time.  And Mr. Donovan -- you

17    would -- I guess Mr. McCormack would argue that 14,000 requests

18    at the last minute on February 28th were a surprise.  But I'm

19    not getting into that.  Okay?  The whole notion about stopping

20    the clock --

21         MR. DONOVAN:  Sure.

22         THE COURT:  -- is to keep it from going further.  You

23    have a lot of people on your team and the ability to review the

24    documents and decide what you think should be clawed back.

25    You've made the requests, okay?  The proposed order has a bit

1  of an escape mechanism in, which would hopefully deal with a

2  very few documents, if something comes up and you can't work it

3  out.

4        If the regulators believe that, oh, there are these

5  other documents, I'll listen to them.  Okay.  But that's

6  different than listening to you, okay?  It seems to me, there

7  has to be an end.  And for you to tell me -- which is what

8  you're really telling me -- well, we can't waive the privilege;

9  you just may not be able to assert it.  If it's their

10  privilege, they can come in, make a motion, and I'll listen to

11  it.  That hopefully won't happen.  Okay?

12        If you've been transparent with your regulators about

13  what you've produced and what the issues are, you've hopefully

14  resolved those issues.  And if it comes up at all, maybe it'll

15  involve a few documents, and you'll hopefully be able to

16  resolve it, work it out, without having somebody coming back.

17  But I'm not particularly sympathetic to your argument that you

18  can't be stopped from coming to the Court seeking to claw back

19  beyond what the proposed order would provide.

20        MR. DONOVAN:  Well, Your Honor, your proposal is fine

21  with us, and we don't object to that.  We did have a concern --

22  and this was my point about it -- I didn't want an order that

23  frankly I didn't think complied with what the Fed and the FDIC

24  could do, which is come in and ask Your Honor to enforce their

25  privilege.  It sounds like it would.

1          THE COURT:  Let me ask, Mr. McCormack, do you disagree

2    that the Fed -- I mean, I don't see how you can -- the Fed

3    isn't here.  The FDIC isn't here.

4          MR. MCCORMACK:  I wouldn't have put that escape clause

5    in if I didn't think there was at least an argument.

6          THE COURT:  Well, to put everybody's mind to rest, if

7    the Fed or the FDIC come before me with a motion, I'll -- I'm

8    not going to say, well, but you didn't comply with a protective

9    order that you never signed on to.  Okay?

10         MR. MCCORMACK:  Right.  And I think that the variables

11   here are -- Dan just said, he thinks they've done the job.

12         THE COURT:  Right.

13         MR. MCCORMACK:  If he has, then we won't have a

14   problem.  We gave him an escape valve, and he does.  And but I

15   just didn't want it to keep coming fast and furious.

16         THE COURT:  I appreciate that.  So I mean, just as an

17   example, Mr. Donovan, if the Fed comes to you two days after

18   the window is supposedly closed, you may have to tell them,

19   you're going to have to file the motion rather than us filing

20   the motion, because the judge has made it pretty clear, other

21   than -- you may fall within the proposed order and be able to

22   do it, but if not, fine; let the Fed come in.  I'll listen to

23   it.  I'm sensitive to the banking examination privilege.

24         I have represented banks and I had to deal with the

25   issue.  And I don't fully understand, sometimes, what it covers

1   and what it doesn't cover.  But I'm prepared to deal with that

2   on a very expeditious basis, but not necessarily from parties

3   who've had the documents, turned them over.  You may have been

4   very diligent in communicating with your regulators to make

5   sure they're up to speed, they know what it is.

6          But go ahead, Mr. Donovan.

7          MR. DONOVAN:  Sure.  And, Your Honor, can I clarify

8   how this comes up?  Because I'm a little -- I'm concerned that

9   it's kind of getting out of hand.  It'll only take a minute.

10  But there were months and months of document production and

11  really no interaction with the examiner on witnesses or what

12  documents they were using.  So in the briefs it says, well,

13  jeez, this is coming up lately.  But what is happening lately,

14  in the last couple months, compared to before, is the

15  examiner's actually conducting interviews.

16         So just like a deposition, when one document comes up,

17  you go aha, well, I need to claw that document back.  And

18  that's exactly what led, in fact, to the last --

19         THE COURT:  I hope you haven't been yelling at your

20  associates or litigation support staff about why did you

21  produce this document.

22         MR. DONOVAN:  Not at all, Your Honor.  But the issue

23  then -- it then -- I just want you to understand.  So why has

24  it come up lately?  It's not like we suddenly decided.  It

25  comes up in an interview.  We then say, whoa, why is that one

1   in there?  We go and look, and then we address it.  So I just

2   wanted to be clear that this isn't kind of we waited.

3            THE COURT:  But at some point, that's not good enough.

4   Okay?

5            MR. DONOVAN:  Well, I --

6            THE COURT:  When I say that's not good enough --

7            MR. DONOVAN:  And I understand.  I understand that

8   point.  I'm just giving context.  I want to make sure.

9            THE COURT:  All right.

10           MR. DONOVAN:  So on the bank exam, thank you for that

11   clarification.  That's all we were concerned about is that the

12   Fed or the FDIC could come in and file their own motion.

13           Second, Your Honor, on the automatic claw-back for

14   attorney-client, that's different.  I've agreed from the

15   beginning that that is Ally or ResCap or someone else's

16   privilege.  All I've asked though is -- I get I can't

17   automatically claw anything back after the deadline -- is I'd

18   like the ability -- and I understand the hurdles I'd have -- is

19   to file a motion with Your Honor if something comes up on a

20   particular document on an expedited basis.  That's all I'm

21   asking is, I don't want to be -- which again, the order doesn't

22   address but I've had conversation with Mr. McCormack -- the

23   ability to file.

24           And frankly, this comes up -- my concern -- and I know

25   we've been trying to limit it -- is there's other parties,

 1    there's other litigation going on.  And that's where I get

 2    concerned, not so much just about the examiner --

 3            THE COURT:  I'm very unsympathetic to your argument

 4    with respect to attorney-client privilege documents.  Okay?

 5    It's your privilege and it's your burden to deal with it.  And

 6    there comes a time -- I mean, I think the law clearly

 7    authorizes me to put a stop date.  I mean, you've had a

 8    reasonable amount of time to review your own production and

 9    seek to claw back documents.  But there has to be a time when

10    it stops.

11            The issue from my standpoint is, does the proposed

12    order provide -- has it provided you with a reasonable period

13    of time to do it.  I think you've had it even without the

14    order.  Okay?  But there's got to be a stop date at this point,

15    because the clock is running.  This has to get done.  The

16    examiner can't be faced with suddenly a document that it is --

17    thinks it's important and wants to rely on, now suddenly is

18    taken away from him.

19            You think I don't have the authority to impose this

20    deadline for claw-back requests?

21            MR. DONOVAN:  No, I think you do, Your Honor.  But I

22    do think that a party -- depending on the other protections --

23    should still have the right just to file a motion,

24    understanding the burden it would face with Your Honor.  And

25    that's all I've asked.  I understand the claw-back.  That date

1    passes and I agree, Your Honor put in the protective order, you

2    can modify it.

3            The only exception I asked Mr. McCormack for and I ask

4    Your Honor for, is that there's -- look, even although you

5    can't do a claw-back, I can file a motion with Your Honor to

6    say look, this document, he can't even use it under the

7    plain -- look, it's a privileged document.  I have a high

8    hurdle at that point; I understand that.  But to be precluded

9    from even being permitted to file a motion?  I do think that

10   really pushes the edge, although I understand the claw-back.  I

11   think that's a different issue.

12           So that's all I was requesting from Mr. McCormack, and

13   I just ask for that safety valve, recognizing the obstacles I

14   would face if such a document came up.

15           Finally, Your Honor, on -- oh, and by the way, Your

16   Honor, Mr. McCormack added a provision in the reply brief under

17   Federal Rule of Evidence 502(d).  I'm supportive of that, and I

18   appreciate that he put that in there, because that's going to

19   lead to my other point, my last point, which is 3 on slide 4,

20   which is this amendment should only apply to the examiner.

21           There's a lot of litigation going out there, Judge,

22   both in this court with the committee doing its own.  I think

23   the committee is different.  It has no justification that it's

24   under any current time pressure like the examiner, which we're

25   sympathetic to.  But there's no reason that this amendment

RESIDENTIAL CAPITAL, LLC, ET AL.                      35

1  should apply or has to apply to any other party.  It really

2  doesn't.  There's no asserted claims yet by the committee.  It

3  would be different if we were getting to trial.

4         But if they assert them, Judge, it's a regular case.

5  So the whole justification by the examiner was --

6         THE COURT:  I thought there was an agreement between

7  the debtors and the committee with respect to an STN motion,

8  which I haven't yet seen, but as to a time table as to the

9  committee would not -- assuming it gets STN standing -- it

10  would not file a lawsuit against Ally before -- I don't

11  remember what the time period was.  But so they're under

12  pressure as well.  They are.

13         I mean, they're proceeding apace, apparently with the

14  expectation that they're going to sue your client if there

15  isn't a settlement of matters.  And so I do think they face

16  time pressure.  It may not be -- I'm not putting quite the same

17  time pressure on them as I am on Chadbourne and the examiner,

18  but they are faced with time pressure.  And they are -- it

19  sounds like they're proceeding apace to prepare a draft

20  complaint.  And it relies on documents that they've obtained,

21  that you've known they've had access to.  Why shouldn't this

22  apply across the board to any parties who properly received

23  access to the documents in the database?

24         MR. DONOVAN:  Because this is an extraordinary

25  amendment.  I challenged the examiner.  They weren't able to

1  provide you a single protective order that ever addressed this

2  issue.  Not a single one.

3        THE COURT:  I hope I never see this issue again.

4        MR. DONOVAN:  I'm sure.  So but I understood it.  From

5  the beginning we've said we understand.  The examiner's

6  different.  They are a neutral party who's investigating.

7  Okay?  Your Honor, there's litigation and the committee is run

8  by MBIA, FGIC, these other entities that they're in litigation

9  with other parties.  They can allege things.  They do not need

10  the documents to allege them.  That is just true.  So it would

11  be an allegation at first.  There's no claims yet.  There would

12  be a complaint.  They don't need the documents.  There's no

13  depositions.

14        THE COURT:  I don't know.  If they're alleging claims

15  that require compliance with Rule 9(b) they do need the

16  specifics.  Okay?

17        MR. DONOVAN:  But this is kind of extraordinary, isn't

18  it, that they're getting discovery before they're even filing a

19  complaint?  So the relief here, Your Honor, I would submit -- I

20  understand the rationale for the examiner.

21        THE COURT:  Look, they wanted -- they originally filed

22  a 2004 motion.  They -- before I think I had the examiner

23  motion I had the committee's 2004 motion.  So there was going

24  to be discovery, Mr. Donovan.  Ally was going to be the subject

25  of the discovery.  And the committee -- I mean, the protective

1  order and the access of the committee to the documents -- and

2  it's not just the committee; there are some other parties that

3  signed on and were given access as well -- in that sense, it

4  was a negotiated agreement.

5          But there's been no secret what they're using them for

6  or why they want them, why they need them.  They have a

7  fiduciary duty to the estate that they have to fulfill as well.

8  So you're not getting much traction from me on this.  I mean,

9  why should -- if you've got to do a claw-back, and you have a

10  deadline for the claw-back, why should it be any different with

11  respect to the committee than with respect to the examiner?

12          MR. DONOVAN:  Well, because the issue is, as I

13  understand it, the rationale is the time pressure for the

14  examiner.  There's no harm in us clawing the document back --

15  they have this right, the committee does, to file a motion.

16  That's what that original protective order envisioned.  And

17  there's no basis -- and I don't believe the committee can give

18  you one -- for why that, for them, should be altered.  There's

19  no time pressure.

20          They file a motion.  You say yea or nay, and we either

21  do or don't.  There's simply no time pressure.  For the

22  examiner, I understand.  He's going to issue his report on May

23  13th, so there's that time pressure.  Judge, there is no time

24  pressure to change what is at least settled expectations:

25  1) we produce these; 2) what is the general expectation in the

1    Federal Rules; and third, to address it in the normal course

2    for any other party other than the examiner.

3              THE COURT:  Thank you, Mr. Donovan.

4              MR. DONOVAN:  Thank you, Your Honor.

5              THE COURT:  All right, who else wants to be heard?

6    Come on up.

7              MR. SIMON:  Good morning, Your Honor.  Norm Simon from

8    Kramer Levin, for the committee.  I'd like to just clarify one

9    item on the demonstrative.  I'm happy that Mr. McCormack noted,

10   the examiner does not necessarily agree that the committee

11   should not have equal application.

12             THE COURT:  It was neutral.

13             MR. SIMON:  They're neutral.  And I understand Mr.

14   McCormack should be neutral.  He cares about his client's

15   interests, but he's certainly not opposing the committee's

16   requests.

17             I'd also like to say, Your Honor, in addition to the

18   STN need for timing here, the committee is, consistent with its

19   fiduciary duties, as Your Honor noted, conducting

20   nonduplicative investigative work.  And we have been sharing

21   the results of that work, in real time, with the examiner, the

22   examiner's counsel, the examiner's professionals.

23             We think it critical for the committee to be able to

24   express to the examiner its views of the documents.  We are

25   really prejudiced in that we are not present for interviews, we

1   are not party to those interviews.  The only means we have of

2   presenting to the examiner the committee's views, is through

3   those meetings with him, based on the documents.  And so

4   obviously it's moot if we're able to get the documents and meet

5   with him after the report's issued.  So we do think timing is

6   of the essence to the committee as well, for that independent

7   reason.

8          I wanted to just clarify something about the history

9   here.  Mr. Donovan alluded to the fact that it was interviews

10  that precipitated the claw-backs.  I think in the committee's

11  views, it was awfully coincidental that the avalanche of claw-

12  backs came right on the heels of presentations, substantive

13  legal and factual presentations, made in the context of

14  mediation, where the committee marshaled very strong

15  documentary evidence; and on the heels of that --

16          THE COURT:  I don't want to hear about the mediation.

17          MR. SIMON:  Sure, Your Honor.

18          THE COURT:  I don't want to hear about the mediation.

19          MR. SIMON:  Understood, Your Honor.

20          THE COURT:  So you can find another subject.

21          MR. SIMON:  I will do that.  The stipulation --

22          THE COURT:  More power to my colleague, Judge Peck.  I

23  hope he's successful, but I don't want to hear about what goes

24  on in mediation.

25          MR. SIMON:  I will move on, Your Honor, to the bank

1   examination point that Your Honor inquired about.  First of

2   all, I think there was a suggestion that the examiner may work

3   out an agreement that might involve stipulations of some sort

4   as to factual evidence.  I think in the committee's view, that

5   would not substitute for the actual documents that are at issue

6   here, of importance to the committee.

7           THE COURT:  Look, if the documents are protected by

8   the examination privilege, and there's been a proper claw-back

9   request, if there's a dispute about it, the Court will have to

10  deal with it.  But the bank examination privilege does not

11  belong to Ally.

12          MR. SIMON:  Absolutely, Your Honor.

13          THE COURT:  It belongs to the examiners.

14          MR. SIMON:  And, Your Honor, I was just going to

15  basically -- the only point I was going to make is to answer

16  your question earlier about the Court's authority and whether

17  Ally needs to be a party or not.  And there actually is a

18  dispute in the courts.  It is something that the Court, on its

19  own, is empowered to do.  There's a five-factor test.  And in

20  fact, some courts hold that the Court should ask regulators to

21  intervene.  Other courts hold, in fact, the Court is empowered

22  to move to compel production even without hearing from the

23  regulators.  I just wanted to make that point to the Court.

24          So respectfully, Your Honor, we would ask that it be

25  clear that any modifications that the Court issues to the

1   order, apply with equal force to the committee.  Thank you.

2              THE COURT:  Thank you very much, Mr. Simon.

3              Ms. Levitt, do you want to be heard?

4              MS. LEVITT:  Thank you.  Thank you, Your Honor.  And I

5   don't want to take up too much of the Court's time.  Actually,

6   I'm standing for a clarification which is, if the judge does

7   not agree with Ally's request that a motion be allowed to move

8   for a claw-back, that if there's no automatic claw-back, we do

9   at least have the right to move.

10              I just want to be clear that the provision that the

11   examiner added, provision E, that there will not be a deemed

12   waiver, and that's very important to the debtors as well.

13              We also think that this should only apply to the

14   examiner and does not -- that the UCC doesn't have the same

15   exigencies and need to have a report out by the 13th, but I

16   understand the Court's position.

17              THE COURT:  Okay.  Anybody else want to be heard?

18              MR. HORNUNG:  Your Honor, Stephan Hornung, Luskin

19   Stern, on behalf of Goldin Associates.  Goldin's in a bit of a

20   different position, pretty much a disinterested third party.

21              THE COURT:  Just pick the microphone up a little bit.

22              MR. HORNUNG:  Sure.  Produced a very small amount of

23   documents.  I won't belabor a lot of the points that have

24   already been addressed.  But we came up with what we thought

25   was a reasonable alternative, especially --

1          THE COURT:  I didn't think so.

2          MR. HORNUNG:  Well, I won't -- it seems the judge has

3    made your decision on that one.

4          THE COURT:  I have great respect for Mr. Goldin and

5    his firm, but he isn't getting a special deal on this.

6          MR. HORNUNG:  Very well.  Then two things that I'd

7    just like to address briefly.  With respect to some -- a

8    document that is facially privileged, we're not asking the

9    examiner to go through and do our job for us.  But what we

10   asking is, look, if they come across a document --

11         THE COURT:  I'm shaking my head no --

12         MR. HORNUNG:  Okya.

13         THE COURT:  -- so the record wouldn't reflect that.

14   But I'll say it; I'm shaking my head no.  How many documents

15   did you -- how many pages did you produce?

16         MR. HORNUNG:  I'm not sure of the page amount, but

17   it's approximately 6,000 documents.

18         THE COURT:  You know, there's six, seven million

19   documents that have been produced in this case.  Okay?  If you

20   need to, go through your documents page-by-page.  If you

21   believe that something ought to -- is privileged and needs to

22   be claw-backed, you better act promptly.

23         MR. HORNUNG:  Okay, to that.  And then the only thing

24   I would ask is that the amount of time be extended for longer

25   than a week.

1          THE COURT:  It's not.  You've known about this

2     issue -- I mean, particularly, given the volume of documents

3     that you say you produced.  Okay?  It's not -- in the context

4     of this case, that's a small burden to go through and satisfy

5     your client that any privileged documents, you've made an

6     effort to claw it back and within the time provided.  So

7     particularly -- you've heard me a bunch of times today about

8     the clock running; this has got to get done; everybody's going

9     to have to live with the same order.

10          MR. HORNUNG:  All right, thank you.

11          THE COURT:  Okay.  Anybody else want to be heard?

12          Mr. Donovan, come on up.

13          MR. DONOVAN:  Your Honor, going to the demonstrative

14     about the examiner's position.  I would submit, their order, on

15     the reply brief, actually includes subsection F.  So if we're

16     going to adopt the examiner's order, it does provide --

17          THE COURT:  Do you have -- I've got a lot of paper.

18     Do you have a copy of it so I could just look at that?

19          MR. DONOVAN:  Yes, may I approach?

20          THE COURT:  Sure.

21          MR. DONOVAN:  Yes, sure.  It's a black-line.

22          THE COURT:  Thanks.  I'll give it back to you in a

23     moment.

24          Mr. McCormack, did you add paragraph F in response to

25     conversations with Mr. Donovan?

 1        MR. MCCORMACK:  We did add paragraph F.

 2        THE COURT:  I'm taking it back out.

 3        MR. MCCORMACK:  Mr. Donovan was essentially telling me

 4   that if he -- that A and B were likely to be read to limit it

 5   the same way, and so it wasn't a major change substantively.

 6   And I figured it was going to be just fine with the committee.

 7   And as far as I'm concerned, it was fine with the committee.

 8        MS. LEVITT:  And, Your Honor, provision E is noted in

 9   theirs.

10        THE COURT:  I'm sorry, say that again, Ms. Levitt.

11        MS. LEVITT:  Provision E that was referring to, which

12   is the examiner's proposal, is in there as well.

13        THE COURT:  Yes.  And nobody's had a -- nobody's

14   raised an issue about paragraph B.  Am I right on that, Mr.

15   McCormack?

16        MR. MCCORMACK:  That's correct, Your Honor.

17        THE COURT:  All right.  The Court is very mindful of

18   the burden that both the examiner's investigation and the work

19   of the committee have had; enormous expense to the estate;

20   very, very important to the future course of this case.

21        I have made absolutely clear today, the urgency of

22   getting everything done.  No further extensions with respect to

23   the examiner's report.  The examiner needs to be able to

24   conclude his investigation, complete the report, get it filed.

25   The examiner has demonstrated good cause for the Court imposing

1  limitations on the period available for any party to seek to

2  claw back documents on grounds of any -- on any basis, whether

3  it's bank examination privilege or attorney-client or work

4  product privilege.

5          With respect to the bank examination privilege, as

6  been discussed, the privilege belongs to the regulators, not to

7  the party.  But in the Court's view, a private party can be cut

8  off in its ability to seek to claw back a document.  As I've

9  made clear, that does not prevent the regulators, if necessary,

10 from filing a motion with the court.

11         In the first instance, if the issue comes up on a

12 handful of documents, I suspect you're going to be able to work

13 out the issue with Mr. McCormack and his colleagues as, you

14 have on so many other issues, and it's never going to get on

15 the Court's radar screen.  It's only when you can't work it

16 out.  So whatever is in the four corners of the document, I

17 suspect if the issue arises and you talk to Mr. McCormack and

18 the regulators are all up in arms about a particular document,

19 you're probably going to work it out.  And if you're not, if

20 you don't fit within the little escape valve in the proposed

21 order, then the regulators could come in and make their motion.

22         With respect to the issue of whether the modification

23 to the protective order applies to documents in the possession,

24 custody, or control of the committee, the committee has

25 received them because of access to the database, and the

1    examiner's documents, the court believes that the same

2    deadlines and the same procedure should apply and will apply

3    with respect to any claw-back requests from the committee.

4              While the committee is not faced with that same May

5    13th deadline that the examiner is faced with, the committee is

6    still faced with time pressure as this case moves forward.  So

7    with respect to Ally's objection to the proposed order applying

8    to claw-back requests from the committee, that objection is

9    overruled.

10             Paragraph F in the black-line that I've been provided

11   should be stricken from the proposed order.  Paragraph E, which

12   was added in the black-line, the Court believes -- as no one's

13   objected, the Court believes that's certainly clearly

14   appropriate.

15             So the Court grants the examiner's motion to modify

16   the uniform protective order for examiner discovery, with the

17   inclusion of the new paragraph E, but exclusion of paragraph F.

18             Anything else I need to deal with on this?  Ms.

19   Levitt?

20             MS. LEVITT:  Your Honor, if I'd just ask a question.

21             THE COURT:  Sure.

22             MS. LEVITT:  With respect to paragraph F, could we

23   include it but just say that the provisions on the claw-back

24   apply only to the examiner and the committee, as opposed to all

25   other parties.

RESIDENTIAL CAPITAL, LLC, ET AL.                          47

1              THE COURT:  No, that paragraph has been stricken.

2              Okay.  Anything else for today?

3              All right.  Thank you very much.

4              MS. LEVITT:  Thank you, Your Honor.

5              THE COURT:  And whatever I rule doesn't stop you

6       from -- and what I hope will happen is you'll continue to try

7       and work out these issues in a very timely fashion.

8              All right, the Court's going to take a ten-minute

9       recess before resuming with the Olegna Fuschi matter.  Thank

10      you very much.

11          (Whereupon these proceedings were concluded at 11:09 AM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                I N D E X

3

4                                RULINGS

5                                                    Page        Line

6  Ally's objection to the order applying to the   46          7

7  committee is overruled.

8  The Court grants the examiner's motion to        46          15

9  modify the uniform protective order for

10  examiner discovery as modified on the record.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  March 18, 2013

19

20

21

22

23

24

25