**Hearing Date and Time:  April 11, 2013 at 3:00 p.m. (ET)**
**Objection Deadline:  April 4, 2013 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

---

**NOTICE OF DEBTORS' MOTION FOR AN ORDER PURSUANT
TO SECTIONS 363(b) AND 503(c)(3) OF THE BANKRUPTCY
CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY
EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS
AND (B) KEY EMPLOYEE INCENTIVE PLANS FOR CERTAIN
INSIDERS, AND (II) PAYMENT OF ANY OBLIGATIONS ARISING
THEREUNDER AS ADMINISTRATIVE EXPENSES**

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Motion*

*for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code*

*Authorizing (I) Implementation of (A) A Key Employee Retention Plan for Certain Non-*

*Insiders and (B) Key Employee Incentive Plans for Certain Insiders, and (II) Payment of*

*Any Obligations Arising Thereunder as Administrative Expenses* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will take

place on **April 11, 2013 at 3:00 p.m. (prevailing Eastern Time)** before the Honorable

Martin Glenn, at the United States Bankruptcy Court for the Southern District of New

York, Alexander Hamilton Custom House, One Bowling Green, New York, New York

10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the

Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case

Management, and Administrative Procedures approved by the Bankruptcy Court [Docket

No. 141], be filed electronically by registered users of the Bankruptcy Court's electronic

case filing system, and be served, so as to be received no later than **April 4, 2013 at 4:00**

**p.m. (Prevailing Eastern Time)**, upon (a) counsel to the Debtors, Morrison & Foerster

LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attention: Gary S. Lee,

Lorenzo Marinuzzi and Jordan A. Wishnew); (b) the Office of the United States Trustee

for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY

10004 (Attention: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the

Office of the United States Attorney General, U.S. Department of Justice, 950

Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attention: U.S. Attorney

General, Eric H. Holder, Jr.); (d) Office of the New York State Attorney General, The

Capitol, Albany, NY 12224-0341 (Attention: Nancy Lord, Esq. and Enid N. Stuart, Esq.);

(e) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews

Plaza, New York, NY 10007 (Attention: Joseph N. Cordaro, Esq.); (f) counsel for Ally

Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022

(Attention: Richard M. Cieri); (g) counsel to Barclays Bank PLC, as administrative agent

for the DIP lenders, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, NY 10036 (Attention: Ken Ziman & Jonathan H. Hofer); (h) counsel for the

committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue

of the Americas, New York, NY 10036 (Attention: Kenneth Eckstein & Greg Horowitz);

(i) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd

Street, New York, NY 10019 (Attention: Jennifer C. DeMarco and Adam Lesman);

(j) counsel for Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand

Avenue, Los Angeles, CA 90071 (Attention:  Thomas Walper and Seth Goldman);

(k) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by

overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-

5016); and (l) Securities and Exchange Commission, New York Regional Office, 3

World Financial Center, Suite 400, New York, NY 10281-1022 (Attention: George S.

Canellos, Regional Director).

      **PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a

written objection to the relief requested in the Motion, the Bankruptcy Court may deem

any opposition waived, treat the Motion as conceded, and enter an order granting the

relief requested in the Motion without further notice or hearing.

ny-1082942

Dated:  March 20, 2013
      New York, New York

Respectfully submitted,

/s/ Lorenzo Marinuzzi

Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
Debtors in Possession*

Hearing Date: April 11, 2013 at 3:00 p.m. (ET)
Objection Deadline: April 4, 2013 at 4:00 p.m. (ET)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------
| In re:                                      | )
|                                             | )
| RESIDENTIAL CAPITAL, LLC, et al.,           | )
|                                             | )
|                              Debtors.       | )
------------------------------------------------------------ )

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(b) AND
503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION
OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS
AND (B) KEY EMPLOYEE INCENTIVE PLANS FOR CERTAIN INSIDERS,
AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER
AS ADMINISTRATIVE EXPENSES**

# TABLE OF CONTENTS

**Page**

JURISDICTION ..................................................................................................1

PRELIMINARY STATEMENT ..........................................................................2

BACKGROUND .................................................................................................4

    A.    EMPLOYEES.................................................................................5

    B.    DEBTORS' ASSETS ......................................................................5

    C.    DEBTORS' RETENTION OF A CHIEF RESTRUCTURING OFFICER ..........8

    D.    2013 EMPLOYEE COMPENSATION .........................................9

    E.    THE ESTATE KEIP........................................................................9

    F.    THE ESTATE KERP .....................................................................14

    G.    THE EXECUTIVE KEIP ..............................................................15

    H.    DEBTORS' DISCUSSIONS WITH THE CREDITORS' COMMITTEE ..........19

RELIEF REQUESTED ......................................................................................20

BASIS FOR THE RELIEF REQUESTED ........................................................20

I.    THE ESTATE EMPLOYEE PLANS SHOULD BE APPROVED PURSUANT TO BANKRUPTCY CODE SECTION 503(c)(3).........................................20

    A.    THE KEIP PROGRAMS SHOULD BE EVALUATED AND APPROVED UNDER BANKRUPTCY CODE SECTION 503(c)(3) USING THE SAME STANDARD APPLICABLE UNDER BANKRUPTCY CODE SECTION 363(b)..........................................20

    B.    THE ESTATE KERP SHOULD BE APPROVED UNDER BANKRUPTCY CODE SECTION 503(c)(3) ....................................30

II.    PAYMENTS PURSUANT TO THE ESTATE EMPLOYEE PLANS ARE ADMINISTRATIVE EXPENSES ..................................................................33

NOTICE .............................................................................................................33

CONCLUSION ..................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Borders Grp., Inc.,*
   453 B.R. 459 (Bankr. S.D.N.Y. 2011) .......................................................................passim

*In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006).........................................20, 21, 26, 28

*In re Global Home Prods., LLC,*
   369 B.R. 778 (Bankr. D. Del. 2007)........................................................................27

*In re Mesa Air Grp., Inc.,*
   Case No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) .....22, 26, 27

*In re Metaldyne Corp.*, 409 B.R. 661 (Bankr. S.D.N.Y. 2009)....................................................27

*In re Quigley Co.,*
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ......................................................................27

*In re Velo Holdings, Inc.,*
   472 B.R. 201 (Bankr. S.D.N.Y. 2012) .............................................................21, 27, 30

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated*
   *Res., Inc.),*
   147 B.R. 650 (S.D.N.Y. 1992) ................................................................................27

*Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985) ......................................................................27


STATUTES

11 U.S.C. § 503(c)....................................................................................................20

11 U.S.C. § 503(c)(1) ................................................................................................21

11 U.S.C. § 503(c)(2) ................................................................................................25

11 U.S.C. § 503(c)(3) ................................................................................................27


OTHER AUTHORITIES

BLACK'S LAW DICTIONARY 1193 (7th ed.1999)....................................................................31

4 COLLIER ON BANKRUPTCY § 503.17[3] (15th ed. 1982)........................................................26

i

Transcript of Hearing, *In re Calpine Corp.*, No. 05-60200 (Lifland, J.) (Bankr. S.D.N.Y.
    Apr. 26, 2006)..................................................................................................................21

ny-1078359

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the

"**Debtors**")[1] hereby move for entry of an order (a copy of which is attached hereto as Exhibit 1),

pursuant to sections 363(b) and 503(c)(3) of title 11 of the United States Code (the "**Bankruptcy**

**Code**"), authorizing (i) implementation of (a) key employee incentive plans for certain key

executives (the "**Executive KEIP**") and estate personnel (the "**Estate KEIP**" and, together with

the Executive KEIP, the "**KEIPs**") and (b) a key employee retention plan for certain non-insiders

(the "**KERP**"), and (ii) payment of any obligations arising thereunder as administrative expenses

(the "**Motion**").  In support of the Motion, the Debtors rely upon and incorporate by reference

(i) the Declaration of Ronald Greenspan (the "**Greenspan Decl**.", (ii) the Declaration of John

Dempsey (the "**Dempsey Decl**.") and the accompanying Report, attached thereto as Exhibit 1

(the "**Report**"), (iii) the Declaration of Tammy Hamzehpour (the "**Hamzehpour Decl**.") and

(iv) the Declaration of Pamela E. West (the "**West Decl**.," together with the Greenspan Decl.,

Dempsey Decl., and Hamzehpour Decl., the "**Supporting Declarations**"), each of which is

being filed concurrently herewith.  In further support of the Motion, the Debtors, by and through

their undersigned counsel, respectfully represent:

### JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. sections 157 and

1334.  Venue is proper under 28 U.S.C. sections 1408 and 1409.  This is a core proceeding as

defined in 28 U.S.C. section 157(b)(2).  The statutory predicates for the relief requested herein

are sections 363(b) and 503(c)(3) of the Bankruptcy Code.

---

[1]     The names of the Debtors in these cases and their respective tax identification numbers are identified on
Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support
of Chapter 11 Petitions and First Day Motions (the "**Whitlinger Affidavit**") [Docket No. 6].

ny-1078359

## PRELIMINARY STATEMENT

2.      Having completed assets sales yielding over $4 billion for the Debtors' estate, the

Debtors' priorities are to preserve and maximize the value of the remaining assets of the estate

and confirm a plan acceptable to the creditors that will allow the Debtors to emerge from

bankruptcy protection in an expedient manner.

3.      One of the many significant accomplishments of the asset sales was that over

3,400 of the Debtors' employees gained employment with Ocwen and Walter; however, the

resulting challenge for the Debtors is ensuring that those employees remaining with the estate

will be compensated in a competitive and fair manner.  In the months leading up to the closing of

the asset sales, the Chief Business Officer and her five senior executives have addressed this

challenge by identifying an enormously talented pool of employees that collectively possess

extraordinary, specialized and significant historical knowledge critical to the administration of

the estate.  In addition, through the end of April (and possibly beyond), the estate has the benefit

of utilizing the knowledge and talents of two senior executives who have been intimately

involved before and throughout these Chapter 11 cases in managing and overseeing the Debtors'

financial and capital markets operations.  As a result, the Debtors' management team has a plan

in place to effectuate a smooth transition of the Debtors' operations to the core personnel who

will remain with the estate beyond 2013.  But, in order to effectuate that plan, the Debtors must

implement the proposed, market-competitive compensation plans for these critical employees.

4.      For 2013, the Debtors have simplified their compensation structure.  The Debtors

have discontinued the ResCap AIP plan, and their employees will not participate in the AFI

LTECIP plan (each defined below).  Rather, an employee's annual compensation will be

comprised of two components – base salary and either a KEIP (in the form of the Executive

KEIP or the Estate KEIP) or KERP (*i.e.*, the Estate KERP) award.  The Executive KEIP is a

2

short-term plan designed for two senior executives, and the Estate KEIP is a long-term plan

covering six senior executives, who make up the Estate's senior leadership team.  As described

in greater detail herein, the KEIP programs are structured to incentivize the participating

employees to preserve and maximize the estate's value in order to enhance the return for

creditors.  The Estate KEIP rewards employees for creating value through asset disposition and

judiciously managing the estate's administrative costs.  The Executive KEIP rewards the senior

executives for recovering restricted cash from Ginnie Mae, facilitating the delivery of modified

and newly originated FHA/VA loans to market under current Ginnie Mae authorization, and

expanding the time during which modified FHA/VA loans can continue to be pooled and

delivered.  Most importantly, the Estate KERP, which covers one hundred fifty-five key

personnel, provides those individuals with a fixed award to ensure that they work with the estate

through the end of their retention period.

5.      Each of these plans has gained the full approval of the Creditors' Committee.

Before filing the Motion, the Debtors worked closely and constructively with the Creditors'

Committee, its compensation sub-committee and its advisors on the details of these plans.  As a

result, the plans before the Court have evolved from what the Debtors originally proposed after

incorporating the comments and suggestions of the Creditors' Committee, and therefore, the

proposed compensation plans clearly align with the interests of the creditors in these Chapter 11

cases.

6.      Accordingly, the Debtors assert that it is a reasonable and sound exercise of their

business judgment to implement these compensation plans.  Therefore, the Debtors seek

authority from this Court to implement the terms of the Estate KEIP, Executive KEIP and Estate

KERP.

ny-1078359

## BACKGROUND

7.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108.  These cases are being jointly administered pursuant to Bankruptcy

Rule 1015(b).  No trustee has been appointed in these Chapter 11 cases.

8.      On May 16, 2012, the United States Trustee for the Southern District of New

York (the "**U.S. Trustee**") appointed a nine member official committee of unsecured creditors

(the "**Creditors' Committee**").

9.      On June 20, 2012, the Court directed that an examiner be appointed [Docket No.

454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner [Docket No.

674].

10.      On October 23 and 24, 2012, the Debtors successfully conducted an auction for

the sale of the Debtors' origination and servicing platforms during which Ocwen Loan Servicing,

LLC, the mortgage servicing arm of Ocwen Financial Corporation ("**Ocwen**"), was the winning

bidder at a price of $3 billion. On October 25, 2012, the Debtors conducted an auction for the

sale of the Debtors' whole loan assets, during which Berkshire Hathaway Inc. ("**Berkshire**") was

the winning bidder at a price of $1.5 billion.  *See* Hamzehpour Decl. at ¶ 4.

11.      On November 21, 2012, the Court entered orders approving the sales to Ocwen

(the "**Platform Sale**") and Berkshire (the "**Legacy Sale**") [Docket Nos. 2246 and 2247].  The

Debtors closed the Platform Sale in two stages on January 31, 2013 and February 15, 2013, and

also closed the Legacy Sale on February 5, 2013.  *See* Hamzehpour Decl. at ¶ 5.

12.      On February 11, 2013, the Debtors filed a motion seeking an order pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code authorizing the appointment of Lewis Kruger

4

as Chief Restructuring Officer for the Debtors. [Docket No. 2887], and the Court approved his

appointment on March 5, 2013 [Docket No. 3103].

### A.    EMPLOYEES

13.    Before the Platform Sale, the Debtors' workforce included over 3,800 employees.

*See* Hamzehpour Decl. at ¶ 6.

14.    As part of the Platform Sale, three thousand four hundred eighteen (3,418) of the

Debtors' employees gained employment with Ocwen and Walter Investment Management Corp.

("**Walter**"), one hundred sixty-six employees (166) have been or will be terminated in the next

four months[2] and two hundred fifty-eight employees (258) will remain to assist the Debtors'

estate in both the short-term and long-term management and wind down of the Debtors' business

affairs. *See* Hamzehpour Decl. at ¶ 6.

### B.    DEBTORS' ASSETS

15.    As of the Petition Date, the Debtors were a leading residential real estate finance

company.  The Debtors were the fifth largest servicer of residential mortgage loans in the United

States, servicing over 2.4 million domestic mortgage loans with an aggregate unpaid principal

balance of approximately $374.2 billion.  In addition, before the Petition Date, the Debtors and

their non-Debtor affiliates, including Ally Bank, were collectively the tenth largest originator of

residential mortgage loans in the United States.[3]

16.    On January 31, 2013, the Debtors closed the sale of their originations and capital

markets platform to Walter.  This sale also included the Fannie Mae mortgage servicing rights

(MSR) portion of the Debtors' servicing portfolio, representing approximately $50.4 billion in

---

[2]    This includes forty-seven individuals (the "**Transitional Employees**") who will provide transitional services for
approximately four months.  The Transitional Employees have remained in the estate to assist with finalization
of 2012 financial statements and support for some related origination pipeline loan accounting work.

[3]    A more detailed description of the Debtors, including their business operations, their capital and debt structure,
and the events leading up to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

unpaid principal balance (UPB) at August 31, 2012.  On February 5, 2013, the Debtors then sold

a whole loan portfolio, made up of approximately 28,000 whole loans, to Berkshire.  Finally, on

February 15, 2013, the Debtors closed the sale of their servicing platform assets to Ocwen.  *See*

Hamzehpour Decl. at ¶ 5.

17.    Notwithstanding the significant transfer of assets included in the Platform and

Legacy Sales, approximately $1.6 billion of assets remain in the Debtors' estate to be monetized,

and a modified operational infrastructure must be maintained in order to facilitate such

efforts.  Most significantly, there are approximately $1 billion of loans insured by the Federal

Housing Administration ("**FHA**") or the U.S. Department of Veterans Affairs (the "**VA**") that

the Debtors intend to monetize for the estate's benefit.  In addition, there are other residual

financial assets to be monetized including, but not limited to, servicer advances, non-FHA/VA

loans, trading securities and accounts receivable.  *See* Hamzehpour Decl. at ¶ 7.

18.    Beyond monetizing assets, in the months and years ahead, the Debtors will

(i) process over 10,000 loan applications remaining in the originations pipeline as of the date of

the Walter asset sale, (ii) reconcile over six thousand seven hundred (6,700) proofs of claim (and

make the corresponding distributions on allowed claims), and (iii) continue to comply with

(A) state mortgage banking licensing requirements, (B) requirements from regulators, including,

if required, the foreclosure review required by the Federal Reserve Board, and (C) the

requirements of the DOJ/AG settlement, which include conducting a foreclosure file review of

certain loans for compliance with the Servicemembers Civil Relief Act and monitoring, testing

and reporting to the Office of Mortgage Servicer Oversight of the purchasers' servicing practices

and compliance with national servicing standards during the multi-year enforcement period of

that settlement.  *See* Hamzehpour Decl. at ¶ 8.

19.    In order to most efficiently accomplish these substantial tasks, the Debtors have

developed a post-sale estate infrastructure that preserves institutional knowledge, industry

experience and critical skill sets in order to maximize the estate's value for the benefit of the

creditors.

20.    In the short term, in addition to monetizing assets and moving forward with claim

reconciliation efforts, the Debtors will also wind down existing loan and foreclosure pipelines

and complete the transition of the Debtors' day-to-day operations to the core estate personnel.

This will require the assistance of employees who will remain in the estate for approximately the

next four to six months and then either be terminated by the Debtors or transition to employment

with one of the asset purchasers.  Included in this sub-set of short-term employees are one

hundred twenty-five (125) individuals who will be winding down the origination pipeline[4] and

the Executive Trustee Services ("**ETS**") group,[5] as well as the Transitional Employees.  In

addition, James Whitlinger and Patrick Fleming, two senior executives, will facilitate the transfer

of the Debtors' remaining operations to the "core" estate personnel and assist with the estate's

asset recovery efforts.  *See* Hamzehpour Decl. at ¶ 9.

---

[4]    Ninety-two (92) individuals will be facilitating the wind down of the originations pipeline (i.e., loan applications that were taken up to January 31, 2013) and will then become employees at Walter.  The applications become funded loans or fall off along the way.  The team's activities include (i) loan set up compliance (state compliance, flood hazard notices, etc.), (ii) closing services (generate closing packages, review and approve prelim. HUD-1, complete pre-closing checklist), (iii) funding services (approving final HUD-1, completing funding checklist and initiating wire requests), (iv) wire desk services (review and process wire batches, daily reporting and reconciling of outbound and returned wires), (v) RESPA curative work (reviewing 100% of funded loans within 30 days of signing date and curing any RESPA findings) and (vi) sales support (follow up for missing documents, work with borrower to either fund loan or cancel the application).

[5]    ETS processes non-judicial foreclosure actions for GMACM and other third party clients in the states of Arizona, California, Texas, and Washington.  The group is responsible for managing loans in foreclosure to ensure applicable investor timelines are met; managing and minimizing delayed foreclosure timelines; and acquiring assets, as needed, within acceptable periods and in compliance with state and federal laws, and investor requirements.  The group manages foreclosure stoppages (i.e., holds, rescissions, reinstatements) and foreclosure sales, property preservation and valuations.  Thirty-three (33) individuals will be closing out the inventory of non-judicial foreclosures in California and Arizona, because if a new trustee is substituted, then there is a risk that the pending foreclosures would have to be re-started, which would then expose ETS to foreclosure timeline penalties.  Upon completion of this task, these 33 employees will be terminated.

21.    The other remaining employees will work with the estate for the long-term, including into 2014 and beyond.  This "core" wind down team of approximately one hundred employees will address one of five primary functions: (i) *claims resolution*: analyzing and facilitating the resolution of 6,700 proofs of claim; (ii) *legal*: providing specialized advice regarding the claims resolution process, litigation resolution, government investigations and other regulatory and licensing matters, foreclosure lookback process, licensing maintenance, corporate governance, contract management, post-closing issues under the asset sale agreements, and maintenance/dissolution of various debtor and non-debtor entities; (iii) *asset disposition and operations management*: overseeing the liquidation of debtor and non-debtor assets and managing servicing and sub-servicing relationships, custody agreements and transitional service agreements with AFI and the asset purchasers; (iv) *administrative*: managing the wind down of physical facilities, implementation of estate payroll, 401(k) and insurance and benefit programs, as well as overseeing contract sourcing and maintaining business applications to facilitate administration of the estate; and (v) *finance and accounting*: governing transition and shared services agreements, cash management and accounts payable, providing regulatory, bankruptcy and credit facility reporting, supporting the estate's asset disposition and claims reconciliation efforts, and reconciling purchase price adjustments for the section 363 asset sales.  *See* Hamzehpour Decl. at ¶ 10.

### C.    DEBTORS' RETENTION OF A CHIEF RESTRUCTURING OFFICER

22.    While true that the Debtors have retained a CRO, there will be no duplication of efforts among the CRO and the estate employees – only cooperation for the benefit of the Debtors' estate and its creditors.

ny-1078359

### D.   2013 EMPLOYEE COMPENSATION

23.     Prior to the Petition Date, the vast majority of the employees received their annual

compensation in the form of base salary and variable pay, typically in the form of awards

through the Residential Capital, LLC Annual Incentive Plan (the "**ResCap AIP**") and, for certain

employees, the Ally Financial Inc. Long-Term Equity Compensation Plan (the "**AFI LTECIP**") .

*See* Hamzehpour Decl. at ¶ 11.

24.     Beginning January 1, 2013, the Debtors will no longer participate in the AFI

LTECIP or continue the ResCap AIP.  *See* Hamzehpour Decl. at ¶ 12.

25.     Instead, individuals employed by the Debtors will receive (i) base salary and

(ii) either (A) variable pay pursuant to a pre-existing compensation program[6] or (B) a KEIP or

KERP award (described in greater detail herein), and are eligible for severance at the time they

are terminated.  *See* Hamzehpour Decl. at ¶ 13.

26.     As part of this Motion, the Debtors seek authority to have the necessary flexibility

to add new participants to the Estate KEIP and Estate KERP and adjust payments to employees

to reflect changes in job responsibility and employment terms.  In the event the Debtors

determine that the addition of a new participant is appropriate, they will provide the U.S. Trustee

and the Creditors' Committee with the name and title of the proposed employee.  The addition of

new participants is not anticipated to result in either the Estate KEIP or the Estate KERP

exceeding the current estimated costs.

### E.   THE ESTATE KEIP

27.     The Debtors seek authorization to implement the Estate KEIP for six (6) key

executives, who represent the collective leadership of the estate.

---

[6]    This variable pay is limited to ninety-one (91) individuals, including loan agents, closers, processors, managers and supervisors, who are collectively facilitating the wind down of the originations pipeline.

9

28.    The size of a KEIP award is based on each KEIP participant's achievement of the

following milestones (the "**KEIP Milestones**").

       i.    <u>Asset Recovery Metric</u>:[7] Covers activity from February 15, 2013 through
December 31, 2013, and is measured at end of period.

- **Proceeds from FHA / VA Recoveries** (55% of Asset Recovery
Metric) - two sets of incentive metrics are suggested. Scenario 1
would be triggered in the event an FHA Sale[8] occurs. In the event
the FHA Sale does <u>not</u> occur, then Scenario 2 is triggered.

    o  <u>Scenario 1</u>:

    - Threshold- If recovery efforts yield 90% of budgeted
    recoveries on the FHA / VA portfolio including advances
    (net of servicing and custodial fees), then KEIP participant
    achieves 50% of individualized year one target award.

    - Target- If recovery efforts yield 100% of budgeted
    recoveries on the FHA / VA portfolio including advances
    (net of servicing and custodial fees), then KEIP participant
    achieves 100% of individualized year one target award.

    - Maximum- If recovery efforts yield 107.5% of budgeted
    recoveries on the FHA / VA portfolio including advances
    (net of servicing and custodial fees), then KEIP participant
    achieves 125% of individualized year one target award.

    o  <u>Scenario 2</u>:

    - Threshold- If recovery efforts yield 90% of budgeted
    recoveries on the FHA / VA portfolio including advances,
    net of servicing and custodial fees, then KEIP participant
    achieves 50% of individualized year one target award.

    - Target- If recovery efforts yield 100% of budgeted
    recoveries on the FHA / VA portfolio including advances,
    net of servicing and custodial fees, then KEIP participant
    achieves 100% of individualized year one target award.

    - Maximum- If recovery efforts yield 107.5% of budgeted
    recoveries on the FHA / VA portfolio including advances,

---

[7] 50% of weight.
[8] A "**FHA Sale**" means a bulk sale, which is agreed to by the Creditors' Committee, of FHA/VA loans (similar to
the $127mm "bulk loan" sale contemplated by the Debtors earlier this year.

10

net of servicing and custodial fees, then KEIP participant
achieves 125% of individualized year one target award.

- **FHA / VA Recovery Rate** (30% of Asset Recovery Metric) - two
  sets of incentive metrics are suggested. Scenario 1 would be
  triggered in the event an FHA sale occurs.  In the event the FHA
  sale does not occur, then Scenario 2 is triggered.

  "**FHA / VA Recovery Rate**" is defined as the proceeds
  from the recovery of FHA / VA portfolio, less servicing
  and custodial fees, divided by the book value of the assets
  recovered.

  o Scenario 1:

    - Threshold- If FHA / VA Recovery Rate of 89.8% is
      achieved, then KEIP participant achieves 50% of
      individualized year one target award.

    - Target- If FHA / VA Recovery Rate of 92.8% is achieved,
      then KEIP participant achieves 100% of individualized
      year one target award.

    - Maximum- If FHA / VA Recovery Rate of 95.3% is
      achieved, then KEIP participant achieves 125% of
      individualized year one target award.

  o Scenario 2:

    - Threshold- If FHA / VA Recovery Rate of 93.4% is
      achieved, then KEIP participant achieves 50% of
      individualized year one target award.

    - Target- If FHA / VA Recovery Rate of 96.4% is achieved,
      then KEIP participant achieves 100% of individualized
      year one target award.

    - Maximum- If FHA / VA Recovery Rate of 98.9% is
      achieved, then KEIP participant achieves 125% of
      individualized year one target award.

- **Proceeds from Non FHA / VA Recoveries** (10% of Asset
  Recovery Metric).

    - Threshold- If recovery efforts yield 90% of budgeted
      recoveries on the Non FHA / VA portfolio (net of servicing
      and custodial fees), then KEIP participant achieves 50% of
      individualized year one target award.

11

- Target- If recovery efforts yield 100% of budgeted recoveries on the Non FHA / VA portfolio (net of servicing and custodial fees), then KEIP participant achieves 100% of individualized year one target award.

- Maximum- If recovery efforts yield 107.5% of budgeted recoveries on the Non FHA / VA portfolio (net of servicing and custodial fees), then KEIP participant achieves 125% of individualized year one target award.

- **Non-FHA / VA Recovery Rate** (5% of Asset Recovery Metric) –

  "**Non FHA / VA Recovery Rate**" is defined as the proceeds from the recovery of the non-government guaranteed held for sale portfolio, less servicing and custodial fees, over the book value of the assets recovered.

  - Threshold- If Non FHA / VA Recovery Rate of 57.0% is achieved, then KEIP participant achieves 50% of individualized year one target award.

  - Target- If FHA / VA Recovery Rate of 65.0% is achieved, then KEIP participant achieves 100% of individualized year one target award.

  - Maximum- If FHA / VA Recovery Rate of 73.0% is achieved, then KEIP participant achieves 125% of individualized year one target award.

ii.  <u>Performance Against Budget Metric</u>[9] – Covers activity from March 1, 2013 through December 31, 2013, and is measured at end of period.

- Threshold- If 15% variance over expense budget, then KEIP participant achieves 50% of individualized year one target award.

- Target- If in line with expense budget, then KEIP participant achieves 100% of individualized year one target award.

- Maximum- If 15% variance below expense budget, then KEIP participant achieves 125% of individualized year one target award.

Greenspan Decl. at ¶ 32.

29.    KEIP awards will vest upon the earlier of Termination Date (date stated in the employee's offer letter) or the Milestone Date (end of year one plan – December 31, 2013) so

---

[9] 50% of weight.

long as the metric has been achieved. *See* Greenspan Decl. at ¶ 39. In addition, payouts for achievement of metrics between threshold and target, and target and maximum are calculated on a sliding scale. For instance, in the Performance Against Budget metric the threshold metric is 115% of budgeted expense which earns a payout of 50% of target awards, and the target metric is 100% of budgeted expense which earns a payout of 100% of target awards. If the metric achieved is 107.5% of budgeted expenses then the payout earned would be 75% of target awards. *Id*. at ¶ 34. Finally, twenty percent of the payments under the Estate KEIP Awards will be deferred until the Termination Date. *Id*. at ¶ 40.

30. The following is an example of a hypothetical payout that assumes an Estate KEIP Participant with a $300K target award. With the Estate achieving (i) 90% of budgeted liquidation of FHA / VA portfolio, (ii) budgeted liquidation of non FHA / VA portfolio and, (iii) targeted FHA / VA recovery rate, (iv) below threshold Non FHA / VA recovery rate, and (v) 85% of annual core wind down expense budget, the participant will receive a $288,750 payout due to:

    i.    Achieving the Threshold for the FHA / VA liquidation metric (27.5% FHA / VA Sale metric as % of total award x 50% Achievement of Threshold x $300,000 target award) resulting in a $41.25K payout.

    ii.    Achieving the Target for the non FHA / VA liquidation metric (5% non FHA / VA Sale metric as % of total award x 100% Achievement of Target x $300,000 target award) resulting in a $15K payout.

    iii.    Achieving the Target for the FHA / VA recovery rate metric (15% FHA / VA recovery rate metric as % of total award x 100% Achievement of Target x $300,000 target award) resulting in a $45K payout.

    iv.    Achievement below threshold for the Non FHA / VA recovery rate metric resulting in no payout.

    v.    Achieving the Maximum for the performance against budget metric (50% Performance Against Budget metric as % of total award x 125% Achievement of Maximum x $300,000 target award) resulting in a $187.5K payout

*See* Greenspan Decl. at ¶ 33.

31.     Moreover, if a KEIP participant:

> (i)     is terminated for cause or performance, then the KEIP participant
> will forfeit all unvested awards (including any deferral);
>
> (ii)    is terminated without cause due to accelerated downsizing, then the
> KEIP participant will receive the full award at the time of
> payments to other KEIP participants; or
>
> (iii)   resigns, the KEIP participant will receive any vested awards but
> will forfeit all unvested awards.

32.     The resulting total expected amount for all "target" KEIP awards is approximately

$2.2 million.  Greenspan Decl. at ¶ 31.

### F.     THE ESTATE KERP

33.     The Debtors also seek authorization to implement the KERP for one hundred

fifty-five (155) non-insider Key Employees who are critical to the Debtors' operations and for

their ability to support the Debtors' operations during the remainder of these Chapter 11 cases.

*See* Greenspan Decl. at ¶ 11. The KERP awards are intended to provide the Key Employees with

a financial incentive to forgo seeking alternative employment during the Debtors' bankruptcy

proceeding as well as after confirmation of a chapter 11 plan.

34.     The Debtors' senior management determined that each of the Key Employees

provides critical services in areas such as finance, legal, asset disposition, claims reconciliation

and contract management and technology support.  Each of the Key Employees have been

assigned to one of three tiers, based upon their business unit, job function and the roles they have

been tasked with for the sale and transition of certain of the Debtors' businesses as a going

concern.  *See* Greenspan Decl. at ¶ 44.

ny-1078359

35.     The Estate KERP plan will have a year one cost up to $4.4 million (approximately
$4.1 million plus an additional $350,000 for administrative flexibility).[10]  Greenspan Decl. at
¶ 45.  In addition, twenty percent of the payments under the Estate KERP (the "**Estate KERP**
**Awards**") will be deferred until the earlier of the Termination Date (date for which employment
is terminated by the Estate) or one year following the award date (March 1st annually beginning
in 2014) for individuals with awards above $40,000.  *Id*. at ¶ 47.

36.     Forfeiture of KERP awards will occur in the following manner, with Key
Employees forfeiting (i) unvested awards if terminated for cause or performance, and (ii) only
unvested awards if they resign.  Greenspan Decl. at ¶ 46.

## G.    THE EXECUTIVE KEIP

37.     Finally, the Debtors seek authority to implement the Executive KEIP for James
Whitlinger and Patrick Fleming – two of the Debtors' most senior officers who did not transition
to Ocwen or Walter.  Messrs. Whitlinger and Fleming each possesses unique and significant
knowledge of the Debtors' operations and finances not possessed by others in the Estate, and as a
result, each individual has been intimately involved in the Debtors' financial and capital markets
activities throughout these Chapter 11 cases.  The Debtors believe it is prudent for these
gentlemen to work with the Debtors through the end of April 2013 (and possibly, through June)
in order to facilitate the transition of the day-to-day financial and asset disposition activities to
the core estate personnel.  *See* Hamzehpour Decl. at ¶ 14.

38.     Mr. Whitlinger, the Debtors' Chief Financial Officer, continues to lead the
Debtors' efforts to respond to the Examiner's data and information requests (which will continue

---

[10]   The incremental pool of $350,000 will be available for administrative flexibility and can be utilized for
(i) incremental retention awards that are needed or to compensate individuals with changes in job responsibility
or (ii) any additional positions that needed to be added that are not currently included in the employee pool;
subject to notification to the Creditors' Committee and the U.S. Trustee.  In addition, awards allocated to
individuals that resign or are terminated for cause can be used to compensate existing employees who take on
additional responsibilities or replace employees.  *See* Greenspan Decl. at ¶ 48.

ny-1078359

through mid-May) as well as prepare and oversee the year-end financial statement reporting and audit processes. Mr. Whitlinger is also the Debtors' designated "senior officer," of the Debtors' master servicing subsidiary, Residential Funding Company, LLC ("**RFC**"), which means he is the sole individual authorized[11] to interact with HUD and the respective state regulatory authorities. *See* Hamzehpour Decl. at ¶ 15.

39.    Mr. Fleming, the Debtors' Capital Markets Officer, continues to oversee and manage both the Shared Services Agreement with AFI, as well as the Debtors' compliance with the transition service agreements and related statements of work with Ocwen and Walter. In addition, he is overseeing the originations pipeline wind down and working to secure alternate trading lines as a backstop to the trading line that currently exists with Ally Bank. *See* Hamzehpour Decl. at ¶ 16.

40.    Beginning in January 2013 and continuing through the end of April (with the possibility of extending through June), both Mr. Fleming and Mr. Whitlinger have been and will continue participating in the third-party transition services discussions as well as negotiations involving true-ups and adjustments to the section 363 asset sale purchase prices. Moreover, each will play an active part in the estate's asset disposition and recovery efforts. For example, given their prior capital markets and regulatory experience, each will work with Ginnie Mae to recover up to $75 million of restricted cash posted as collateral to guard against future losses. In order to recover the full amount before their departure, these gentlemen will have to successfully transfer servicing related to GNMA loans to Ocwen, and also successfully wind-down of the GNMA PIIT pooling process which is used to deliver modified and newly originated loans into GNMA securities that can then be sold to the market. *See* Greenspan Decl. at ¶ 57.

---

[11]    During this interim transition period, one or more of the core estate personnel will obtain the same licenses currently held by Mr. Whitlinger so that the Debtors can continue entering into HUD securitizations and maintaining the requisite state licenses.

ny-1078359

41.    Accordingly, the Debtors have created specific metrics for these two gentlemen that correspond with their efforts between January 1, 2013 and May 3, 2013.  More specifically, the target awards are tied to achievement of the following metrics: (i) the GNMA Deliveries metric (45% of target), the GNMA Restricted Cash metric (45% of target), and the Extension of MSR Sale Agreement metric (10% of target).  If the Plan is extended through May 2013, the incremental award for May is based on the achievement of the GNMA Deliveries metric for May (85% of target) and the Extension of the GNMA Pooling Approval metric (15% of target).  If the Plan is extended through June 2013, then the incremental award for June is based on the achievement of the GNMA Restricted Cash metric for June (100% of target).  *See* Greenspan Decl. at ¶ 52.

**Metrics through April 2013**

i.    GNMA Deliveries Metric

- Threshold[12]- Receipt of $143M of proceeds from delivery to market of GNMA newly funded loans and modified loans for the period from March 1, 2013 through April 30, 2013; then, Executive KEIP participant achieves 50% of individualized target award.

- Target- Receipt of $158M of proceeds from delivery to market of GNMA newly funded loans and modified loans for the period from March 1, 2013 through April 30, 2013; then, Executive KEIP participant achieves 100% of individualized target award.

ii.    GNMA Restricted Cash Metric

- Target - Commitment for return of $55M of restricted cash from GNMA by April 30, 2013 with cash to be received no later than May 15, 2013; then, Executive KEIP participant achieves 100% of individualized target award.

iii.    Sale of MSR to Ocwen

---

[12] For those metrics that have a threshold level, payouts for achievement of metrics between threshold and target are calculated on a sliding scale, as further described in the Estate KEIP.

ny-1078359

- Target- Agreement by Ocwen, on or before April 30, 2013, to purchase MSRs on pools of recently modified GNMA loans through December 31, 2013; then, Executive KEIP participant achieves 100% of individualized target award.

**Incremental Metrics for May 2013 (_if_ Plan is Extended)[13]**

i.    GNMA Deliveries Metric

- Threshold- Receipt of $8M of proceeds from delivery to market of GNMA newly funded loans and modified loans from May 1, 2013 to May 31, 2013 then, Executive KEIP participant achieves 50% of individualized target award.

- Target- Receipt of $10M of proceeds from delivery to market of GNMA newly funded loans and modified loans from May 1, 2013 to May 31, 2013; then, Executive KEIP participant achieves 100% of individualized target award.

ii.    GNMA Pooling

- Target- Extension of GNMA Pooling approval through December 31, 2013 received by May 31, 2013; then, Executive KEIP participant achieves 100% of individualized target award.

**Incremental Metrics for June 2013 (_if_ Plan is Extended)**

i.    GNMA Restricted Cash

- Threshold- Commitment for return of $10M of restricted cash from GNMA by June 30, 2013 ($65M cumulative) with cash to be received no later than July 15, 2013 then, Executive KEIP participant achieves 50% of individualized target award.

- Target- Commitment for return of $20M of restricted cash from GNMA by June 30, 2013 ($75M cumulative) with cash to be received no later than July 15, 2013; then, Executive KEIP participant achieves 100% of individualized target award.

_See_ Greenspan Decl. at ¶ 53.

---

[13] If the Executive KEIP Plan is extended for an additional month beyond April, then the two participants become eligible for aggregate target awards of $100,000.

### H.    DEBTORS' DISCUSSIONS WITH THE CREDITORS' COMMITTEE

42.    The Debtors would have preferred to bring these matters before the Court sooner (especially in light of the short-term nature of the Executive KEIP); however, it was important to the Debtors that the details of these key employee plans were first vetted with the Creditors' Committee so that it had an adequate opportunity to provide its feedback. *See* Hamzehpour Decl. at ¶ 18.

43.    The Debtors initially previewed the general terms of these plans with the Creditors' Committee in late December.  In early February, the Debtors provided the Creditors' Committee with a more detailed version of the plans that included proposed award levels and performance metrics.  Subsequent to receiving these materials, the Creditors' Committee requested additional information and the Debtors' and Creditors' Committee's advisors continued to exchange information related to these plans. *Id.* at ¶ 19.

44.    Throughout the remainder of February and continuing into early March, the Debtors' executives and advisors both spoke and met with the Creditors' Committee's compensation sub-committee and its advisors on numerous occasions to address the Creditors' Committee's questions concerning these plans.  The Creditors' Committee provided counter-proposals to certain of the terms within the plans, and the Debtors responded in kind with further modifications to the plan terms. *Id*. at ¶ 20.

45.    Ultimately, these collaborative efforts culminated in the Creditors' Committee providing its approval of these plans earlier today. *Id*. at ¶ 21.

19

## RELIEF REQUESTED

46.     By this Motion, the Debtors seek entry of an order under Bankruptcy Code

section 503(c)(3) of the Bankruptcy Code, authorizing: (i) implementation of (a) the Estate

KERP and the KEIPs; and (ii) payment of any obligations arising thereunder as administrative

expenses.

## BASIS FOR THE RELIEF REQUESTED

### I.    THE ESTATE EMPLOYEE PLANS SHOULD BE APPROVED PURSUANT TO BANKRUPTCY CODE SECTION 503(c)(3)

#### A.    THE KEIP PROGRAMS SHOULD BE EVALUATED AND APPROVED UNDER BANKRUPTCY CODE SECTION 503(c)(3) USING THE SAME STANDARD APPLICABLE UNDER BANKRUPTCY CODE SECTION 363(b)

##### 1.    The Executive KEIP And Estate KEIP Should Not Be Evaluated Under Section 503(c)(1) Or 503(c)(2) Of The Bankruptcy Code

47.     Section 503(c) of the Bankruptcy Code provides criteria for approving certain

types of payments to insiders and "other transfers or obligations that are outside the ordinary

course of business . . . ." 11 U.S.C. §503(c).  Specifically, section 503(c) is comprised of three

subsections: (1) a prohibition against retention payments to insiders unless certain conditions are

met; (2) a prohibition against severance payments to insiders unless certain conditions are met;

and (3) standards governing "other transfers and obligations that are outside the ordinary course

of business . . . ." *Id.*

48.     Sections 503(c)(l) and 503(c)(2) do not restrict payments under the Executive

KEIP or Estate KEIP.  Pursuant to the statute's plain language, section 503(c)(l) only limits

retention plans for insiders, and section 503(c)(2) only addresses the requirements for severance

plans for insiders.  Neither section applies to performance-based incentive plans.  *See*, *e.g.*, *In re

Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) ("***Dana II***") ("By presenting an

20

executive compensation package that properly incentivizes [senior management] to produce and

increase the value of the estate, the [debtor has] established that section 503(c)(1) does not apply

to [the debtor's motion]."); Transcript of Hearing at 87, *In re Calpine Corp.*, No. 05-60200

(Lifland, J.) (Bankr. S.D.N.Y. Apr. 26, 2006).

49.     Bankruptcy Code section 503(c)(1) restricts payments made to "insider[s] of the

debtor for the purpose of inducing such person to remain with the debtor's business . . ." – *i.e.*,

those insider plans that are essentially "pay to stay" plans. 11 U.S.C. §503(c)(1); *In re Velo

Holdings, Inc.*, 472 B.R. 201, 210 (Bankr. S.D.N.Y. 2012); *In re Borders Grp., Inc.*, 453 B.R.

459, 471 (Bankr. S.D.N.Y. 2011) (quoting *Dana II*, 358 B.R. at 571).

50.     However, section 503(c) does not "foreclose a Chapter 11 debtor from *reasonably*

compensating employees, including 'insiders,' for their contribution to the debtors'

reorganization."  *In re Velo Holdings, Inc.*, 472 B.R. at 209 (citing *Dana II,* 358 B.R. at 575).  So

long as the primary purpose of an insider compensation plan is not primarily motivated by

retention or in the nature of severance, the court has discretion to approve incentive plans under

section 503(c)(3) of the Bankruptcy Code.  *See Dana II*, 358 B.R. at 577.  As described in

greater detail herein and in the Supporting Declarations, the KEIPs have been crafted with great

care to ensure they incentivize each participant to meet specific performance objectives that will

preserve and maximize the value of the Estate.

51.     With respect to section 503(c)(1), the KEIPs do not provide bonuses to "insiders"

for retention purposes.  Instead, the KEIPs are comprised of targeted incentive payments for

those individuals who have critical roles in the Debtors' management and disposition of the

remaining estate assets.  The participants in the KEIP programs are directly involved in one or

more of the following critical estate activities: overseeing the transition and management of the

21

Debtors' remaining operations, recovering restricted cash from Ginnie Mae, and monetizing and

disposing of over $1 bn of FHA / VA loans as well as hundreds of millions of dollars of related

assets. Accordingly, the incentive payments (as described in Background, Sections E-G *supra*)

reward the KEIP participants for successfully achieving milestones related to the Estate's asset

disposition efforts and the efficient management of the estate in a manner that will preserve and

create value for all stakeholders. If the KEIP participants do not achieve the designated metrics,

then they will not be entitled to receive a full award. *See* Greenspan Decl. at ¶ 35.

Consequently, the KEIPs are properly characterized as performance-based incentive

compensation plans, not retention plans for insiders subject to the requirements of section

503(c)(1) of the Bankruptcy Code. *See Borders*, 453 B.R. at 471, *citing Mesa Air Grp., Inc.*,

Case No. 10-10018 (MG), 2010 WL 3810899, *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (noting that

*Mesa*'s incentive bonus program rewarded achievement of performance goals including, for

example, maintenance of flight schedules, efficient return of aircraft and securing aircraft

equipment at reduced rates).

(i)    Executive KEIP

52.    The Executive KEIP covers two "insiders" who will assist with the Debtors'

transition from a going concern to an estate that is charged with monetizing its remaining assets.

The Executive KEIP covers an initial four-month period that can be extended on a monthly basis

for two additional months, subject to the approval of the Creditors' Committee. The Executive

KEIP was carefully designed to align the potential awards with the value to be delivered to the

Debtors' stakeholders in the four-month timeframe.

53.    The daily responsibilities of the Executive KEIP participants are extensive. Since

the beginning of the year, these gentlemen have been involved in one or both of the following

activities: (i) ensuring transitional services and statements of work are functioning, compliant

22

and cost effective; (ii) supporting closure of examiner information requests; (iii) interfacing with

and negotiating with regulators, US Treasury, GNMA, and HUD; (iv) completing year-end

financial statement audits and transitioning financial monthly close activities; as well as

(v) addressing post-closing accounting / purchase price issues.  In addition, the Executive KEIP

participants serve on the Board of Directors of Residential Capital, LLC (the "**Board**") and its

subsidiaries and hold licenses for state originations.  *See* Greenspan Decl. at ¶ 49.

54.    In addition to all of their daily responsibilities, these individuals are also being

asked to oversee the closing of the origination pipeline wind-down and oversee and support the

strategic asset disposition process for GNMA Assets.  Accordingly, the Executive KEIP's

incentive metrics are tied to winding down certain discrete asset portfolios, recovering

substantial amounts of restricted cash, and assisting with the negotiation of third-party

agreements that will create significant economic benefits for the long-term asset disposition

goals of the Estate.

55.    The Executive KEIP participants' incentive plan aligns the executives' interests

with those of creditors by rewarding individuals for the value created for the estate.  Delivery of

loans into GNMA securitizations as well as the recovery of restricted cash from GNMA will

collectively yield tens of millions of dollars for the estate at minimal cost.  The net benefit to the

estate is enormous.  The Executive KEIP participants will have to work closely with their

colleagues to ensure that the modified loans will be accepted by GNMA and delivered into the

market in a timely manner.  Moreover, the Executive KEIP participants will have to facilitate

and negotiate the transfer of servicing of GNMA loans to Ocwen, which is not a simple task.

Therefore, the performance goals in the Executive KEIP promote the creation of value for the

estate and properly reward success.

23

(ii)    Estate KEIP

56.    Likewise, the Estate KEIP is crafted to ensure that the KEIP participants remain

incentivized to meet specific financial, operational or sales performance goals that will

ultimately benefit creditors, by tying the entirety of the KEIP awards to the achievement of

specific budget and asset disposition metrics.  *See* Greenspan Decl. at ¶ 32.

57.    The participants in the Estate KEIP comprise the estate's senior leadership team.

This team's daily responsibilities include overseeing all aspects of the administration of the

estate.  *See* Greenspan Decl. at ¶ 13.  Each has unique responsibilities; however, they collectively

are working towards one overarching goal – administering the estate in the most efficient manner

in order to expedite and maximize creditor recoveries.  Therefore, the estate KEIP is designed to

incentivize the executive employees to expeditiously manage the Debtors' estate, control

expenses related to the management of the estate and achieve the best possible recoveries for the

diverse assets remaining in the estate.  Because of the challenges and complexities associated

with these Chapter 11 Cases to date, it is critical for the Debtors to motivate and encourage the

leadership team to perform at optimal levels throughout the remaining duration of the Debtors'

estate by providing appropriate incentives for such employees upon the completion and

achievement of certain metrics.

58.    The Estate KEIP metrics, including budget categories and assets disposition price

and recovery rate targets, were developed after significant discussion and consultation with the

Debtors' management, employees and advisors, as well as the Creditors' Committee.  The

metrics have been designed to reward executives only if they achieve positive results that will

benefit creditors.  For example, the executives' asset disposition efforts must not only generate

proceeds but also provide the estate with substantial returns on the underlying value of the loans.

These metrics will not be easy to achieve. *See* Greenspan Decl. at ¶ 35-36 (highlighting the

24

challenges and complexities associated with delivering modified FHA/VA loans into GNMA

securitizations and realizing value for non-FHA/VA residual assets); and ¶ 38 (summarizing the

challenges facing the KEIP participants to lower estate costs and remain within range of the

target budget figures).

59.    Moreover, each of the KEIPs is consistent with a number of other plans approved

by courts in other chapter 11 cases. *See* Dempsey Decl. at ¶ 36 (noting that the sale, financial

and wind-down milestone metrics are consistent with general market practice).

60.    Finally, the Debtors believe that the KEIPs are reasonable because the

contemplated payments under these plans collectively represent a small percentage of the

monetary benefit provided to the Debtors' creditors through the efforts of the KEIP participants.

*See* Dempsey Decl. at ¶ 34 (the single-year, annualized cost of the KEIPs falls slightly above the

50th percentile of the wind down estate in which the estimated sale proceeds range from

$300 million to $15 billion).

61.    The KEIPs do not constitute severance payments for insiders that would subject

these plans to the provisions of section 503(c)(2) of the Bankruptcy Code. The KEIPs only

provide benefits to participating "insiders" upon achievement of specific performance metrics.

The terms of the KEIPs do not contemplate providing the employees with awards tied to

termination of their employment with the Debtors. *See* 11 U.S.C. § 503(c)(2).

62.    Given that neither of the KEIPs is a retention plan or a severance plan, the only

provision of section 503(c) that is implicated is subsection (3). Indeed, as one court explained:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider
> whether the payments are permissible under section 503(c)(3), which
> limits payments made to management and employees, among others,
> outside the ordinary course, unless such payments are shown to be
> justified under the facts and circumstances of the chapter 11 case. As one
> treatise points out, the test appears to be no more stringent a test than the

25

one courts must apply in approving any administrative expense under
503(b)(1)(A).

*Dana II*, 358 B.R. at 576 (citing 4 COLLIER ON BANKRUPTCY § 503.17[3] (15th ed. 1982)).

> 2.    The Executive KEIP and Estate KEIP are Incentive Plans Properly
> Evaluated Under Section 503(c)(3) of the Bankruptcy Code

63.    The Debtors respectfully submit that the Executive KEIP and Estate KEIP

programs are governed by, and meet the standards for approval under, section 503(c)(3) of the

Bankruptcy Code.  Key employee plans outside of the ordinary course and not governed by

Bankruptcy Code section 363(b) must be analyzed under Bankruptcy Code section 503(c).[14]  *See*

*Borders*, 453 B.R. at 470-71; *In re Mesa Air Grp., Inc.*, 2010 WL 3810899.  Bankruptcy Code

section 503(c) restricts a debtor's ability to treat certain payments to "insiders" as administrative

expenses.  Although the Debtors recognize that certain of the participants under the KEIP

programs may be "insiders," as defined in section 101(31) of the Bankruptcy Code, section

503(c) of the Bankruptcy Code does not bar approval of the KEIPs.

64.    The extent of the Debtors' success managing their remaining assets is dependent

on properly leveraging the institutional knowledge of the Debtors' employees to achieve the

greatest possible recoveries for the estate's residual assets while simultaneously minimizing the

estate's costs.  The Estate KEIP and Executive KEIP are each necessary to ensure that the

Debtors' employees remain motivated to achieve these goals.  *See* West Decl. at ¶ 4.

Accordingly, the Debtors respectfully submit that the Executive KEIP and Estate KEIP should be

evaluated under Bankruptcy Code section 503(c)(3) and are "justified by the facts and

circumstances of the case."

---

[14]    The Debtors do not contend that the Estate KEIP, Executive KEIP or Estate KERP are ordinary course plans
governed by Bankruptcy Code section 363(c).

ny-1078359

65.    Ultimately, the cost effective management of the Debtors' remaining assets will preserve and protect the value of the Debtors' estate for the benefit of creditors. Accordingly, both the Executive KEIP and the Estate KEIP should be approved pursuant to section 503(c)(3) of the Bankruptcy Code.   *See Borders*, 453 B.R. at 471 (concluding that a proposed KEIP was an incentive plan, thus "alleviating the need for a section 503(c)(1) analysis," and instead analyzing the KEIP under section 503(c)(3)).

66.    Bankruptcy Code section 503(c)(3) precludes "transfers or obligations that are outside of the ordinary course of business and not justified by the facts and circumstances of the case. . ." 11 U.S.C. § 503(c)(3).  The "facts and circumstances of the case," test in section 503(c)(3) is "no different than the business judgment standard under section 363(b)."  *Borders*, 453 B.R. at 473; *see also In re Velo Holdings Inc.*, 472 B.R. at 470; *In re Mesa Air Grp., Inc.*, 2010 WL 3810899, at *3; *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.").[15]  In determining whether a compensation proposal meets the requirements of Bankruptcy Code section 503(c)(3), courts consider several factors, including:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

---

[15]    The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  The business judgment rule applies in Chapter 11 cases and shields a debtor's management from judicial second-guessing. *Integrated Res., Inc.*, 147 B.R. at 656; *see also, e.g.*, *In re Quigley Co.*, 437 B.R. 102, 157 (Bankr. S.D.N.Y. 2010) (citing *In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009).

27

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana II*, 358 B.R. at 576-77 (emphasis in original); *see also In re Borders Grp., Inc.*, 453 B.R. at 474-77 (applying *Dana II* factors).  The Executive KEIP and Estate KEIP satisfy each of these requirements and should be approved pursuant to Bankruptcy Code section 503(c)(3).

67.     First, the KEIPs are calculated to align the interests of the executive participants and the Debtors' stakeholders.  As described above, by tying award payouts to performance metrics related to (i) actual-versus-budgeted expenses, (ii) accelerating the recovery of restricted cash, (iii) recoveries on modified and originated loans delivered to GNMA, and (iv) recoveries on approximately $1.6 billion of assets to be monetized for the benefit of creditors, properly incentivizes the executives to provide value to the estate for the benefit of all creditors and move these cases closer to a conclusion.  *See* Greenspan Decl. at ¶ 62.

68.     Second, the cost of the KEIPs is reasonable and consistent with industry standards.  In total, the Debtors have targeted the cost of the KEIPs to be $2.6 million (with approximately an additional $540,000 available for upside payments for exceeding target metrics, or (in the event of the Executive KEIP), an additional $200,000 available if the plan is extended through the end of June 2013).  As a dollar amount, the annualized cost of the KEIPs falls slightly above the median (50th percentile) of the incentive plans analyzed; however, when taking size into account, Mercer concluded that, based on expected asset recoveries of $1.6 billion, the KEIPs fall below the annual cost suggested by its regression analysis.  Similarly,

ny-1078359

when analyzing the 3-year, annualized cost of the KEIPs to its market study, Mercer found that

the total cost of the KEIPs falls above the median but below the 75th percentile and the projected

cost based on its regression analysis.  *See* Dempsey Decl. at ¶34.

69.    Third, the scope of the KEIPs is fair and reasonable, as they apply to all eight (8)

executives (excluding the CEO) remaining with the Debtors' estate.  These individuals will

continue to be the primary decision-makers for the Debtors' estate.  *See* Greenspan Decl. at ¶ 28-

29.

70.    Fourth, the KEIPs were devised after extensive due diligence.  *See* Greenspan

Decl. at ¶ 27.  FTI and Mercer assisted the Debtors in devising the KEIPs after carefully

reviewing incentive-based plans instituted by comparable companies winding down their

operations in Chapter 11 and compensation plans of executives both in and out of bankruptcy.

*See* Greenspan Decl. at ¶ 26; Dempsey Decl. at ¶ 29.  Ultimately, after reviewing the results of

the due diligence produced by FTI and Mercer, the compensation committee of the Debtors'

Board (the "**Compensation Committee**") determined that the KEIPs were appropriate,

reasonable in cost and scope, and reasonably calculated to achieve the Debtors' goals.  The

Debtors have also engaged in lengthy discussions with the Creditors' Committee about the

details of the KEIPs.  As a result of such discussions, the Compensation Committee, upon the

recommendation of the Debtors' advisors, approved certain modifications to the KEIPs

suggested by the Creditors' Committee.  Specifically, the Debtors have reached an understanding

with the Committee regarding the terms of the KEIPs, and have agreed to include negotiated

award level and metrics that are acceptable to both parties.  *See* West Decl. at ¶ 6.

71.    Finally, in addition to consulting with FTI and Mercer, the Debtors engaged

counsel in discussions regarding the need for the KEIPs, their scope, and their terms and tapped

29

into counsel's experience in negotiating and devising incentive plans on behalf of both debtors and official creditors committees.  *See* West Decl. at ¶ 5.

72.     In sum, the KEIPs are necessary to realizing the Debtors' ultimate goal – maximizing the estate's value for the benefit of the Debtors' stakeholders in the most cost-efficient manner.  Accordingly, the KEIPs are "justified by the facts and circumstances" of these Chapter 11 cases and should be approved under section 503(c)(3).

**B.     THE ESTATE KERP SHOULD BE APPROVED UNDER BANKRUPTCY CODE SECTION 503(c)(3)**

73.     The Estate KERP is a retention program structured to retain Key Employees whose institutional knowledge is critical to properly managing the estate and its assets.  This Court has recognized that, "as an initial matter, the Court must determine whether each eligible key employee under a key employee plan is an 'insider' within the meaning of section 101(31)." *In re Borders Grp., Inc.*, 453 B.R. at 467.  Should a court determine that an employee is an insider, the employee may be prevented from participating in a retention plan such as the Estate KERP.  *See id.*  However, to the extent that a key employee plan applies only to non-insiders, courts analyze the propriety of the plan under Bankruptcy Code section 503(c)(3).  *Id.* at 473.

1.     The Estate KERP Participants are Not Insiders Under the Bankruptcy Code

74.     The term "insider" is defined in Bankruptcy Code section 101(31)(B) to include, among others: officers, directors, and persons in control of a corporate debtor.  However, "insider status can also be determined on a case-by-case basis from the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs." *In re Velo Holdings*, 472 B.R. at 208.  In such cases, insiders must have "at least a controlling interest in the debtor or . . . exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Id.* (citation omitted)

30

ny-1078359

75.     Neither "officer" nor "director" is defined in the Bankruptcy Code.  However, this

Court has concluded that "with respect to Bankruptcy Code section 101(31)(i) 'director' means

an individual who sits on the board of directors of a corporation." *Borders*, 453 B.R. at 468.

The term "officer" in Bankruptcy Code section 101(31) includes those persons "elected or

appointed by the board of directors to manage the daily operations of a corporation, such as the

CEO, president, secretary, or treasurer." *Id.* (quoting BLACK'S LAW DICTIONARY 1193 (7th

ed.1999)).  However, "an individual's title, by itself, is insufficient to establish that an individual

is a director or officer." *In re Borders Grp., Inc.*, 453 B.R. at 468-69.  Instead, courts must look

at the role of the employees on a case-by-case basis to determine if, for instance, the employee

has the authority to implement company policy or whether the employee reports directly to a

company's board of directors.  *See id.* at 469.

76.     As described further in the Hamzehpour Declaration, no individual eligible that

falls under the Estate KERP has the ability to dictate overall company policy.  *See* Hamzehpour

Decl. at ¶ 17.  Accordingly, the Debtors submit that none of the Key Employees is an "insider"

within the meaning of Bankruptcy Code section 101(31).  *See In re Borders Grp., Inc.*, 453 B.R.

at 469 (noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but

do not give them decision-making authority akin to an executive[]" and concluding that certain

"director-level" employees in that case were not insiders).  Under this analysis, the Key

Employees are not insiders.

2.     The Estate KERP is Justified by the Facts and Circumstances of the Case

77.     Because none of the Key Employees is an "insider" under the Bankruptcy Code,

the Bankruptcy Court need only determine whether the Estate KERP satisfies section 503(c)(3)

of the Bankruptcy Code.  *See In re Borders Grp., Inc.*, 453 B.R. at 473.  For the same reasons set

forth above regarding the KEIP, as well as those described below, the Estate KERP satisfies each

31

of the *Dana II* factors, and the Debtors therefore submit that the facts and circumstances of the case justify that the Estate KERP be approved.

78.    Going forward, the Debtors can ill afford to lose additional non-executive employees — employees who have the experience and institutional knowledge necessary to successfully manage the Debtors' estate.  Failure to retain such non-executive employees would cause the Debtors to incur significant costs replacing those employees.  This would hinder and delay the wind-down, imposing further costs upon the Debtors' estate and impairing the value of the Debtors' assets to the detriment of all stakeholders.  The continuity promoted, and the institutional knowledge preserved, by the retention of such employees will increase the chances of successfully implementing the Debtors' wind-down plan.  *See* Greenspan Decl. at ¶ 24.

79.    Additionally, the Estate KERP is reasonable in cost and in relation to market, particularly when compared with the size of the Debtors' estate.  In total, the Debtors propose to pay approximately $4.4 million under the Estate KERP.[16]  The total cost of the Estate KERP below the median of the annualized cost of KERPs implemented by other companies operating in Chapter 11.  Furthermore, the cost of the Estate KERP is well below the cost Mercer would predict given the relationship between KERP cost and asset recoveries (*see* Report, page 6).  When analyzed using the total expected cost of the plan, the Estate KERP falls above the market median but well below the cost Mercer would predict based on its regression analysis.  *See* Report, page 8; Dempsey Decl. at ¶ 35.

80.    In addition, the scope of the Estate KERP is also fair, reasonable and does not unfairly discriminate.  It applies to all of the remaining employees staying for longer than five

---

[16]    Notwithstanding the results of this analysis, the Debtors have requested authority to add participants to the extent employees resign.

(5) months, which falls within the range of market practice, especially given the complexity of the tasks remaining and limited size of the employee population.

81.      Finally, the Debtors utilized and performed the same careful and thorough analysis, with the same assistance and counsel of their professionals, in developing the Estate KERP as they did with the KEIPs.  *See* Greenspan Decl. at ¶ 27.

82.      Accordingly, the Debtors respectfully submit that the Estate KERP is justified by the facts and circumstances of the Debtors' Chapter 11 cases, and that implementation of the Estate KERP is in the best interests of the Debtors, their estate, creditors, and all other stakeholders.

## II.    PAYMENTS PURSUANT TO THE ESTATE EMPLOYEE PLANS ARE ADMINISTRATIVE EXPENSES

83.      The management of the Debtors' estate would be less efficient and more costly without the Estate Employee Plans.  The payments to the participants under each of the Plans will be actual, necessary costs and expenses of preserving the Debtors' estate, and, therefore should be afforded administrative expense priority under Bankruptcy Code section 503(b)(1)(a).

## NOTICE

84.      The Motion is being served in a manner consistent with the Court's Case Management Procedures Order [Docket No. 141].

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order

substantially in the form attached hereto as <u>Exhibit 1</u>, and grant such other and further relief to

the Debtors as the Court may deem just and proper.


Dated:  March 20, 2013
       New York, New York


                                      /s/ Lorenzo Marinuzzi
                                      Gary S. Lee
                                      Lorenzo Marinuzzi
                                      Jordan A. Wishnew
                                      MORRISON & FOERSTER LLP
                                      1290 Avenue of the Americas
                                      New York, New York 10104
                                      Telephone: (212) 468-8000
                                      Facsimile: (212) 468-7900

                                      *Counsel to the Debtors and*
                                      *Debtors in Possession*

ny-1078359

## EXHIBIT 1

**Proposed Order**

1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                                    )
In re:                                              )    Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )    Chapter 11
                                                    )
                            Debtors.                )    Jointly Administered
                                                    )
---------------------------------------------------------------

### ORDER APPROVING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) KEY EMPLOYEE INCENTIVE PLANS FOR CERTAIN INSIDERS, AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES

Upon consideration of the Debtors' motion (the "**Motion**")[1] for entry of an order

approving (i) the implementation of a key employee retention plan for certain non-insiders (the

"**Estate KERP**") and key employee incentive plans for certain insiders (the "**KEIPs**"), and

(ii) the treatment of the payment of any obligations arising thereunder as administrative

expenses; and jurisdiction existing for the Court to consider the motion; and after due

deliberation thereon; and the relief requested therein being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that notice of the Motion was adequate and proper under the

circumstances of these cases and that no further or other notice need be given; and the Court

having found that good and sufficient cause exists for granting the Motion; and upon

consideration of the Supporting Declarations, and upon the files and records in these cases; and

upon the arguments and statements in support of the Motion presented at the hearing before the

Court; and notwithstanding anything to contrary, nothing in this order shall be construed as an

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion and the Reply.

authorization for any payment that is prohibited by 12 U.S.C. § 5221 or any other TARP related statute or regulation; and it appearing that the relief requested is in the best interests of the Debtors' estate, their creditors, and other parties-in-interest; it is hereby:

**ORDERED** that the Motion is granted; and it is further

**ORDERED** that, pursuant to Bankruptcy Code section 503(c)(3), the Estate KERP, the Executive KEIP and the Estate KEIP are each approved in their entirety, and the Debtors are authorized to implement each of the plans upon the terms described in the Motion, the Supporting Declarations and in this Order and to make payments contemplated thereunder; and it is further

**ORDERED** that the authorization granted hereunder to make payments to the KEIP participants under the KEIPs and the Key Employees under the Estate KERP shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to make payments under the KEIPs or the Estate KERP unless the KEIP participants and the Key Employees meet the necessary milestones as described in the Motion; and it is further

**ORDERED** that the Debtors are authorized to change the KEIPs or the Estate KERP to adjust individual budgeted awards and to add/remove employees due to attrition or otherwise; provided, however, that before such changes are implemented, the Debtors shall provide five (5) business days' notice to the U.S. Trustee and the Creditors' Committee of the change to the budgeted award or the identity of any employees added to or removed from the KEIP or the Estate KERP, and the U.S. Trustee and Creditors' Committee shall have the right to consent to the change so long as such consent is not unreasonably withheld; and is further

**ORDERED** that any employee award letters or similar documentation issued by the Debtors implementing the KEIP and Estate KERP shall include a clawback provision that

2

complies with TARP, Federal Reserve Board, and other statutory or regulatory requirements; and it is further

**ORDERED** that the Debtors shall not make or accrue any payments under either the KEIPs and Estate KERP to employees that qualify as employees whose total compensation ranks them among the top 25 highest paid employees at Ally Financial Inc. ("**AFI**") and its subsidiaries, including the Debtors; and is further

**ORDERED** that the KEIPs and Estate KERP shall comply will all the restrictions of TARP, and the Debtors are directed to make such revisions as necessary to comply with TARP, including any future determination letter issued by the United States Department of the Treasury's Office of the Special Master (the "**OSM**"); and is further

**ORDERED** that the Debtors shall defer 50% of all KEIP or Estate KERP cash payments to a single Debtor employee that is within the Next 75 who has total cash compensation deemed earned for 2012 of greater than $500,000 for at least one year unless otherwise permitted by the OSM; and is further

**ORDERED** that the Chief Business Officer and the compensation committee of the board of directors of Residential Capital, LLC shall certify that the KEIPs and Estate KERP comply with TARP; and it is further

**ORDERED** that the Debtors shall provide AFI advance copies of the Estate KEIP, Executive KEIP and Estate KERP plan documents, any employee award letters or similar documentation, and/or any full compensation plans drafted by the Debtors for such individuals prior to the implementation of such documents for the limited purpose of AFI's review for TARP compliance; and it is further

3

**ORDERED** that the KEIPs and Estate KERP shall comply with all Federal Reserve Board requirements and all federal and state laws governing compensation, and the Debtors are directed to make revisions as necessary to comply with any future changes to such laws; and is further

**ORDERED** that notwithstanding anything herein, this Order shall not waive or foreclose and is without prejudice to any and all claims or causes of action against AFI or non-debtor affiliates of AFI that may be made by the Debtors or any party-in-interest (including the Committee) as a result of, or in relation to, transactions, programs or agreements between the Debtors, AFI, and/or affiliates of AFI, including, without limitation, in connection with employee compensation; and it is further

**ORDERED** that the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion; and it is further

**ORDERED** that the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order; and it is further

**ORDERED** that notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, Residential Capital LLC, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012, by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all

4

related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates; and it

is further

     **ORDERED** that this Court shall retain jurisdiction over all matters arising from or

related to the interpretation and implementation of this Order.

Dated: [        ], 2013
      New York, New York

                                     _____
                                     THE HONORABLE MARTIN GLENN
                                     UNITED STATES BANKRUPTCY JUDGE

5