**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- )
                                                               )
In re:                                                         )    Case No. 12-12020 (MG)
                                                               )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,                      )    Chapter 11
                                                               )
                                              Debtors.         )    Jointly Administered
                                                               )
-------------------------------------------------------------- )

**DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS' MOTION FOR
AN ORDER PURSUANT TO SECTIONS 363(b) AND 503(c)(3) OF THE BANKRUPTCY
CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE
RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) KEY EMPLOYEE
INCENTIVE PLANS FOR CERTAIN INSIDERS, AND (II) PAYMENT OF ANY
<u>OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES</u>**

I, John Dempsey, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a Partner at Mercer (US) Inc. ("**Mercer**").  My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606.  Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "**Debtors**").

2.      I respectfully submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (a) A Key Employee Retention Plan for Certain Non-Insiders and (b) Key Employee Incentive Plans for Certain Insiders, and (II) Payment of any Obligations Arising Thereunder as Administrative Expenses*, filed contemporaneously herewith.

A.    **Background Information and Qualifications**

3.        I joined Mercer following my graduation from Yale University, and have worked

in the firm's Chicago, Cleveland and London offices.  I received an MBA in 1992 from the Ohio

State University.  I have been a Principal or Partner at Mercer for approximately 12 years.

4.        I have extensive experience advising organizations undergoing major financial

transitions (including bankruptcies, IPOs, LBOs, and acquisitions) regarding compensation

issues, and also have extensive experience with designing annual and multi-year incentive

programs, change in control arrangements, and employment agreements.  My recent bankruptcy-

related engagements include Fastbucks, Borders Group, Nortel Networks, Tribune Company,

Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia

Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion,

Dana, Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation, Intermet, Venture

Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation, and FLAG Telecom.  I have

also worked on restructuring issues with Georgia Gulf, ABN AMRO, US Foodservice, Barrick

Gold, Manulife, CareMark Rx, Archipelago, and Sky Financial.

5.        Additionally, I published an article entitled *Bankruptcy Blues: Retaining Key*

*Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of

Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August

2008.  I have been frequently quoted on issues relating to effective transitional compensation

practices in such publications as HR Magazine, Cox News, and the Atlanta Journal Constitution.

In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune, and the

Milwaukee Journal Sentinel.  I have also presented at the National Meeting of the Conference

Board, the National Association of Stock Plan Professionals, and the National Center for

Employee Ownership.

ny-1078979

6.      I testified as an expert in connection with (i) a renewal of the KERP of Owens

Corning on September 8, 2004, (ii) the approval of Citation Corporation's KERP on

November 4, 2004, (iii) the approval of Intermet Corporation's KERP on December 22, 2004,

(iv) the approval of Venture Industries' KERP on March 10, 2005, (v) the approval of Allied

Holdings' KERP on October 11, 2005, and (vi) Nortel Networks' KERP on February 5, 2009.  In

addition, my testimony was proffered, or submitted by declaration, and accepted in connection

with (i) the approval of Olgebay Norton's KERP in 2004; (ii) the approval of EaglePicher's

KERP on August 9, 2005, (iii) the approval of Dana's director compensation program in 2006,

(iv) the approval of the continuation of Mesaba's Incentive and Severance plans in 2006, and

(v) the approval of the Borders Group KEIP and KERP in 2011.  In 2010, my testimony was

proffered and accepted in connection with the approval of Nortel's "Special Incentive Plan" and

Tribune's 2010 Management Incentive Plan.  On March 11, 2011, my testimony was proffered

and accepted during Tribune's confirmation hearing.  On February 2, 2013 I testified in

connection with a review of the compensation of the CEO of Fastbucks.

7.      I have examined the plans being proposed by the Debtors and performed several

analyses to assess the reasonableness and appropriateness of the plans in the context of market

practice.  As a result of my analyses, described more fully below, and my extensive experience

in designing bankruptcy compensation plans, I believe that the design and structure of the

proposed plans, and proposed payouts to be made thereunder, are generally in line with market

standards and practice and are appropriate.

## B.    Overview of the Plans

8.      The proposed plans were developed according to the context of the Debtors'

overall bankruptcy process and are specific to the Debtors' needs at this important milestone. To

date the Debtors have completed asset sales to Ocwen Loan Servicing LLC ("**Ocwen**"),

3

Berkshire Hathaway Inc ("**Berkshire**") and Walter Investment Management Corp ("**Walter**")

yielding over $4 billion.  As part of these sales, three thousand four hundred eighteen (3,418) of

the Debtors' employees gained employment with Ocwen and Walter, one hundred sixty-six

employees (166) have been or will be terminated in the next four months and two hundred fifty-

eight employees (258) will assist the Debtors' estate in both the short-term and long-term wind

down of the Debtors' business affairs.  In summation, through the sales outlined above, the

Debtors have generated significant proceeds for the benefit of creditors and have been able to

maintain the jobs of the vast majority of their pre-petition workforce (either with the Debtors or

with Ocwen or Walter) – by many measures, this has been a remarkably successful process.

9.      Notwithstanding the significant transfer of assets included in previous sales,

approximately $1.6 billion of assets remain in the Debtors' estates and must be monetized, and a

modified operational infrastructure must be maintained in order to facilitate such efforts.  In

addition, there are other residual financial assets to be monetized including, but not limited to,

servicer advances, FHA/VA loans, non-FHA/VA loans, trading securities and accounts

receivable.  Beyond monetizing assets, in the months and years ahead, the Debtors will (i)

continue winding down over 10,000 loans in the originations pipeline, (ii) reconcile over six

thousand seven hundred (6,700) proofs of claim (and make the corresponding distributions on

allowed claims), and (iii) continue to comply with (A) state licensing requirements,

(B) requirements from regulators, including the foreclosure review required by the Federal

Reserve Board, and (C) the requirements of the DOJ/AG settlement.  In order to most efficiently

accomplish these substantial tasks, the Debtors developed a post-sale estate infrastructure

(which, collectively with the assets outlined above, is referred to as the "**Estate**") that preserves

institutional knowledge, industry experience and critical skill sets in order to maximize value for

4

the benefit of the creditors.  The efficient, responsible, and value-maximizing management of the Estate is the primary objective of the proposed plans as described in more detail herein.

10.    As a result of the ongoing bankruptcy proceedings and the completed sales outlined above, the Debtors' employees have assumed responsibilities above their normal duties, as well as have been subjected to extraordinary stress and pressure. Even more importantly, the Debtors' employees remaining with the Estate are aware that their jobs will be eliminated at some point as Estate assets are monetized.  In simplified terms, the Debtors' employees are now working themselves out of a job as the Estate management progresses. Given the importance of the Company's workforce to the value of the remaining assets and operation of the Estate, retaining and motivating these employees is paramount.  A loss of key talent would jeopardize the ability of the Estate to function effectively. Furthermore, it would be near impossible to recruit a similar caliber of talent to replace any lost employees, especially with knowledge of the limited nature of these positions.  Accordingly, the Debtors have, in coordination with counsel and their restructuring advisors, designed and propose to put in place three key employee plans aimed at retaining and incentivizing the key remaining members of the Company.

11.    The three key employee plans, as described in the following sections of this declaration, were developed by the Debtors with the goal of motivating their workforce through the balance of the Estate management process.  Mercer's role in the development, design and refinement of the key employee plans was primarily to advise the Debtors on market best practices in bankruptcy incentive and retention plans, based on my extensive experience advising companies in similar situations.

12.    Important aspects of the development of the plans that Mercer was involved in are eligibility and award size determination.  To assist the Debtors in accurately identifying critical

5

talent and determining appropriate award sizes, Mercer developed a criticality tiering framework

that provided guidelines to determine if an individual should be in Tier I, II or III of the proposed

Key Employee Retention Plan based on factors such as the importance of the job to the Debtors,

the difficulty to replace the individual and the risk of attrition of the individual.  Award sizes are

determined largely based on an individual's job level (Director, Manager, Individual Contributor,

etc.) and Tier.  With this framework and the Debtors' deep knowledge of their company and

employees, I am confident that the population that has been identified for inclusion in the

proposed plans is appropriate in the context of the Debtors' current situation and market practice.

Further, the process of conducting this criticality assessment and distinguishing employees by

levels has resulted in an appropriate and equitable distribution of award sizes (See Exhibit 1,

page 3).

13.     The first of the three key employee plans is the Executive Key Employee

Incentive Plan (the "**Executive KEIP**"), which is a short-term incentive-based plan for 2 insiders

of the company.  The second of these plans is the Estate Key Employee Incentive Plan (the

"**Estate KEIP**"), which is an incentive-based plan for 6 key executives. The third of these plans

is the Estate Key Employee Retention Plan, which is a retention-based plan for 155 key

employees critical to the operation and support of the Estate (the "**Estate KERP**," together with

the aforementioned plans, collectively referred to as the "**Proposed Plans**").   It is noteworthy

that the Debtors' Chief Executive Officer (because of applicable TARP restrictions) will not

participate in any of the Proposed Plans.  Furthermore, the Proposed Plans will replace all

existing annual incentive plans.  It is my belief that these plans will effectively serve the purpose

of retaining and motivating the key talent upon which the Company relies, and thus preserve the

value of the Company for the benefit of the creditors.

14.     The possible payouts under the Proposed Plans are below, expressed as a

percentage of the applicable employees' base salaries.  For the purposes of determining plan

eligibility, employees participating in the Estate KERP were classified into three "Tiers" based

on, among other factors as previously described, level in the organization and criticality to the

organization.

| Tier | Plan | Number of Employees | KEIP/KERP Target (average % of base salary) |
|------|------|---------------------|---------------------------------------------|
| *n/a* | Executive KEIP | 2 | 120% |
| *n/a* | Estate KEIP | 6 | 123% |
| I | Estate KERP | 30 | 60% |
| II | Estate KERP | 89 | 25% |
| III | Estate KERP | 36 | 20% |
| **Total** | - | **163** | **49%** |

## C.     The Executive KEIP

15.     The Executive KEIP provides potential performance incentives for two (2) of the

Debtors' key executives (collectively, the "**Executive KEIP Participants**"), in the event they

achieve specific financial/operational and bankruptcy-related goals during a four month plan

period (the plan period may be extended an additional 2 months at the discretion of the Debtors'

Chief Restructuring Officer and with creditor approval).  This plan is intended to be a short-term

incentive plan for these two key executives as they transition out of their roles with the Estate.

Mercer reviewed the cost and terms of the Debtors' proposed Executive KEIP in aggregate and

by participant in the context of the anticipated performance to ensure conformity with the

market.

16.     The Executive KEIP includes potential awards (the "**Executive KEIP Awards**")

in connection with three metrics measured through April 30, 2013, with additional incentive

targets for May and June if the Executive KEIP is extended for those months. Target awards

7

through the Executive KEIP Plan Period are payable contingent upon achievement of three metrics, including the Ginnie Mae ("**GNMA**") Deliveries metric (45% of target), the GNMA Restricted Cash metric (45% of target), and the Extension of MSR Sale Agreement metric (10% of target).  If the Plan is extended through May 2013 the incremental award for May is based on the achievement of the GNMA Deliveries metric for May (85% of target) and the Extension of the GNMA Pooling Approval metric (15% of target).  If the Plan is extended through June 2013 the incremental award for June is based on the achievement of the GNMA Restricted Cash metric for June (100% of target).

17.    Assuming target performance over the four month plan period, the Executive KEIP will cost approximately $400,000; if the plan period is extended through May and June an additional $100,000 in Executive KEIP Awards would be eligible for payment for each of the extended periods if the aforementioned performance conditions are met.  The amount of the Executive KEIP Awards would be determined upon the date that each milestone is achieved and vests.  The Executive KEIP Awards would be paid one month after the plan period.

18.    However, the Executive KEIP Awards are subject to several limiting conditions if an Executive KEIP Participant leaves prior to a before the end of the 4 month plan period.  First, Executive KEIP Participants terminated for cause or for performance will not receive Executive KEIP Awards.  Executive KEIP Participants resigning without the Estate having eliminated their position will forfeit unvested awards related to the Executive KEIP Plan.  The Executive KEIP Participants are eligible for the full Executive KEIP Awards, and any extensions that have been agreed to, if terminated due to an accelerated downsizing.

**D.**    **The Estate KEIP**

19.    The Estate KEIP provides potential performance incentives for six (6) executives (the "**Estate KEIP Participants**"), payable in the event they achieve specific

financial/operational goals. The Estate KEIP is a multi-year plan with the initial plan period ending on December 31, 2013 and subsequent one year plan periods thereafter. Awards for the second year and subsequent years will be set with approval from the UCC three months before the end of the then-current plan period. Mercer reviewed the cost and terms of the Debtors' proposed Estate KEIP in aggregate and by participant in the context of the anticipated performance to ensure conformity with the market.

20.    The Estate KEIP includes potential awards (the "**Estate KEIP Awards**") in connection with five metrics. Specifically, the Estate KEIP Awards are composed of (i) 50% tied to a Performance against Budget metric that will pay at target if the Estate stays within the budgeted core wind-down expenses during the period of March 1, 2013 to December 31, 2013; (ii) 27.5% tied to a FHA/VA Recovery metric; (iii) 5% tied to a Non FHA/VA Recovery metric; (iv) 15% tied to a FHA/VA Recovery Rate metric; (v) 2.5% tied to a Non FHA/VA Recovery Rate metric. The initial plan period to achieve these metrics is February 15, 2013 through December 31, 2013 with subsequent one year plan periods commencing thereafter.

21.    Assuming target performance over the first year of the plan period, the Estate KEIP will cost approximately $2.2 million at target levels, with a maximum cost of approximately $2.7 million**.** KEIP awards will vest upon the achievement of each KEIP milestone and payments will be made upon the earlier of Termination Date (date stated in the employee's offer letter) or the Milestone Date (end of year one plan – 12/31/13). If an Estate KEIP Participant's employment is terminated due to accelerated downsizing, the participant is eligible for a full Estate KEIP award based on the Debtors' performance against the metrics as measured at the end of the plan period. If an Estate KEIP Participant's employment is terminated for cause or for performance reasons, the Estate KEIP Participant will forfeit all

unvested Estate KEIP Awards. If an Estate KEIP Participant resigns, all unvested Estate KEIP

Awards are forfeited.

22.    Furthermore, there is a mandatory deferral on Estate KEIP Awards. For all six

executive participants, twenty percent (20%) of the annual Estate KEIP Award will be deferred

until termination.

## E.    The Estate KERP

23.    The Estate KERP provides retention incentives for one hundred fifty five (155)

non-executive key employees who are of high talent and would be difficult, if not impossible, to

re-recruit in the current market, given the Debtors' current circumstances (collectively, the

"**Estate KERP Participants**"), payable in the event they remain employed with the Estate

through their stated Retention Date or a specified Milestone Date. The Estate KERP is a multi-

year plan with the initial plan period ending on December 31, 2013 and with subsequent one year

plan periods thereafter. Awards for the second and subsequent years will be set with approval

from the UCC three months before the end of the then-current plan period. Mercer reviewed the

cost and terms of the Debtors' proposed Estate KERP in aggregate and by participant in the

context of the anticipated performance to ensure conformity with the market.

24.    The Estate KERP includes potential awards (the "**Estate KERP Awards**") based

on Estate KERP Participants' level within the organization and criticality to the Estate, among

other factors. To determine award sizes, participants were organized into three "Tiers" (as

previously described) which, along with level in the organization (Director, Manager, Individual

Contributor, etc.), largely determine award sizes. Tier I composes approximately 19.4% of the

core Estate KERP Participants; Tier II composes approximately 57.4% of the core Estate KERP

Participants; Tier III composes approximately 23.2% of the core Estate KERP Participants. The

Estate KERP Awards will vest and become payable upon the earlier of (i) an individual's stated

10

Retention Date and (ii) the plan Milestone Date, which for the initial plan period is December 31, 2013.  It is important to note that employees with a stated Retention Date of less than four months from the beginning of the plan period are not eligible to participate in the Estate KERP.

25.    The Estate KERP will cost approximately $4.1 million in the initial plan period; and will also include an incremental pool of $350,000 to provide administrative flexibility in the event that incremental retention awards are needed or to compensate individuals for changes in job responsibilities or level (promotions), subject to notification to the UCC and US Trustee.

26.    If an Estate KERP Participant's employment is terminated due to accelerated downsizing, the full Estate KERP Awards would be paid.  If an Estate KERP Participant's employment is terminated for cause or for performance reasons, the Estate KERP Participant will forfeit all unvested Estate KERP Awards.  If an Estate KERP Participant resigns, all unvested Estate KERP Awards are forfeited.  Furthermore, for Estate KERP Participants with an award greater than $40,000, 20% of the Estate KERP Award will be deferred to the earlier of (i) the participant's termination data and (ii) one year following the award date (March 1st annually beginning in 2014).

**F.    Mercer's Analysis of the Proposed Plans**

27.    The Debtors engaged Mercer to analyze the Executive KEIP, Estate KEIP and Estate KERP programs and advise them on how the plans compare to the market.  In accordance therewith, Mercer participated in multiple meetings and discussions with the Debtors' management team and restructuring advisors, FTI Consulting, Inc., regarding the Debtors' businesses, operational history, restructuring goals, existing base salaries, and incentive compensation programs.  This enabled Mercer to evaluate the Proposed Plans with appropriate consideration of the Debtors' specific and reasonable goals and objectives.  As previously

described, Mercer also advised the Debtors on best practices for determining eligibility and

award sizes for bankruptcy incentive and retention plans.

28.      In assessing the reasonableness of the Proposed Plans, Mercer conducted a market

study that compared the Proposed Plans to market practice in terms of design features (*e.g.*

eligibility, metrics and payout timing), payout levels and total cost.  Additionally, Mercer

performed a benchmarking analysis, considering the current compensation of a sample of

participants in the Proposed Plans relative to market compensation.  Exhibit 1, attached hereto,

contains Mercer's analysis of the Proposed Plans.

29.      The Proposed Plans were compared to the retention and incentive plans

implemented by sixteen (16) companies that filed for bankruptcy since January 1, 2000[1],

underwent a section 363 sale of their asset base, subsequently managed an orderly disposition of

their remaining pre-petition asset base and implemented a compensation plan specific to such

asset management efforts.  Most of the companies analyzed filed for bankruptcy between 2008

and 2012 although two companies filed in 2001 and 2002.  The compensation plans implemented

by these companies include one or more of the following: a Key Employee Incentive Plan

("**KEIP**"), a Key Employee Retention Plan ("**KERP**") or a modified severance plan.  The

companies included in Mercer's analysis span a wide range of industries and are not specific to

the financial services or mortgage industries due to the lack of directly comparable cases in

which the company conducted a 363 sale, wound down a portion of their asset base and also

implemented a KEIP or KERP.  Further, when performing a compensation analysis in this

bankruptcy context, based on my experience, comparing companies of similar size and

complexity is equally, if not more relevant as comparing companies from the same industry.

---

[1]      A larger cut-off of bankruptcy filing dates was used due to the low prevalence of directly comparable
bankruptcies in recent years.

30.     To assess the reasonableness of the Proposed Plans in the context of market

practice, Mercer compared the aggregate cost of the plans to the cost of KEIP and KERP

programs implemented by the comparator companies.  To assess competitiveness, the Debtors'

plans are compared to the market percentiles[2] both as a dollar amount and as a percentage of

asset recoveries, which normalizes for size – this comparison  was performed for all companies

in Mercer's database as well as for a subset of larger wind-downs (with asset recoveries between

$300 million and $15 billion).

31.     The results of our analysis on the total annual cost of the Proposed Plans

compared with larger wind-downs can be found in **Table 1**.  As outlined below, both as a dollar

amount and as expressed as a percentage of asset recoveries (for the Proposed Plans, the

incremental expected asset recoveries were assumed to be $1.6 billion), the cost of the Proposed

Plans fall below the 25th percentile of the larger estates analyzed**.**  For the analysis in Table 1, all

incentive/retention plans were annualized based on their expected plan periods for accurate

comparison, since plan costs vary depending on the intended duration of the estate; for example,

although the target payout for the Executive KEIP is $400,000 for a 4 month plan period, the

plan is annualized to $1.2 million.  In addition, expressing the plan costs as a percentage of

expected asset recoveries takes into account the size and complexity of the estate management

process and the increased workload, manpower and diligence necessary to successfully execute

transactions and manage Estate obligations to the benefit of creditors.

---

[2]     The 25th percentile is defined as, given a set of numbers, the number which is greater than 25% of the numbers
in the set; the median (50th percentile) is greater than 50% of the numbers; the 75th percentile is greater than
75% of the numbers.

*Table 1: Proposed Plans Compared to Market: Total Annualized Cost*

|  | Total Annualized Cost | % Asset Recoveries |
|---|---|---|
| **Proposed Plans** | ~$7,830,000 | 0.49% |
|  | *Market Data:* | |
| **75th Percentile** | $38,800,000 | 2.33% |
| **50th Percentile** | $24,300,000 | 1.58% |
| **25th Percentile** | $11,071,429 | 0.73% |

32.    In addition to the total annualized cost of the programs, Mercer also analyzed the Proposed Plans in the context of other measures of cost: (i) cost per participant and (ii) total expected plan cost.  Measuring the Proposed Plans in these additional manners most accurately captures the position of the Proposed Plans in the context of market practice and views them in a conservative manner.  **Table 2**, below, compares the average annualized cost per participant (target annualized cost of the plans divided by the total plan participants) to market practice for all companies and plans in Mercer's database.  As Table 2 demonstrates, when viewed on the basis of the cost per participant, the Proposed Plans are still below the market median and thus well within the range of market practice.

*Table 2: Proposed Plans Compared to Market: Annualized Cost per Participant*

|  | Annualized Cost per Participant |
|---|---|
| **Proposed Plans** | ~$48,012 |
| *Market Data:* | |
| **75th Percentile** | $77,695 |
| **50th Percentile** | $59,837 |
| **25th Percentile** | $34,100 |

14

33.     Since many wind-down programs are meant to cover multi-year periods of time (because of the expected duration of the estate), Mercer also compared the expected total cost of the Proposed Plans for a 3-year period to market practice for Mercer's subset of larger wind-downs, and the results of this analysis can be found in **Table 3,** below.  For calculation of the total expected cost of the Proposed Plans, Mercer used target annual award levels and participants' expected job elimination dates to estimate the total cost of the plans over the expected wind-down.  As Table 3 outlines, the total expected cost of the Proposed Plans is below the market median (both as a dollar amount and as a percentage of expected incremental asset recoveries) and thus within the range of market practice.

*Table 3: Proposed Plans Compared to Market: Total Expected Cost*

|  | **Total Annualized Cost** | **% Asset Recoveries** |
|---|---|---|
| **Proposed Plans** | ~$16,100,000 | **1.01%** |
| *Market Data:* | | |
| **75th Percentile** | $19,400,000 | 1.58% |
| **50th Percentile** | $16,200,000 | 1.46% |
| **25th Percentile** | $5,090,000 | 0.83% |

34.     In addition to analyzing the Proposed Plans in the aggregate, Mercer also conducted analyses comparing the Executive KEIP and Estate KEIP (collectively referred to as the "**Proposed KEIPs**") to KEIPs implemented by the comparator companies; the results of this analysis can be found in **Table 4**, below.  As Table 4 outlines, as a dollar amount, the annualized cost of the Proposed KEIPs falls slightly above the median (50th percentile) of the incentive plans analyzed; however, when taking size into account, the Proposed KEIPs fall below the cost we would expect based on our analysis**.**  To analyze the effect of size, Mercer performed a

regression analysis on the cost of incentive plans compared with the asset recoveries (*See* Exhibit 1, page 5) and found that, based on expected asset recoveries of $1.6 billion, the Proposed Plans fall below the annual cost suggested by the regression relationship. Similarly, when analyzing the total expected (3-year) cost of the Proposed KEIPs to our market study, we found that the total cost of the Proposed KEIPs falls above the median but below the 75th percentile and the projected cost based on our regression analysis (*See* Exhibit 1, page 8). Therefore, when compared solely to other bankruptcy incentive plans adopted by companies in a similar scenario to the Debtors, I find the Proposed KEIPs to be reasonable in the context of market practice.

*Table 4: Proposed KEIPs Compared to Market: Annualized Cost*

|  | Total Annualized Cost |
|---|---|
| **Proposed KEIPs** | **~$3,400,000** |
| *Market Data:* | |
| **75th Percentile** | $23,850,000 |
| **Projected[3]** | $10,065,651 |
| **50th Percentile** | $3,040,879 |
| **25th Percentile** | $1,748,004 |

35.    Similarly, Mercer also analyzed the proposed Estate KERP to the KERPs implemented by the comparator companies to assess reasonableness in the context of market practice. **Table 5** outlines the results of our market analysis of the Estate KERP. The total annualized cost of the Estate KERP falls below the median of the annualized cost of KERPs implemented by the comparator companies as a dollar amount. Furthermore, the cost of the Estate KERP is well below the cost we would predict given the relationship between KERP cost and asset recoveries (*See* Exhibit 1 page 6). When analyzed using the total expected  cost of the

---

[3] Using the relationship between plan cost and asset recoveries, Mercer is able to project the cost of the Proposed KEIPs using asset recoveries of $1.6 Billion

plan, the Estate KERP falls above the market median but well below the cost we would predict based on our regression analysis (*See* Exhibit 1, page 8).  Therefore, when compared solely to other bankruptcy retention plans adopted by companies in a similar scenario to the Debtors, I find the Estate KERP to be reasonable in the context of market practice.

*Table 5: Estate KERP Compared to Market: Annualized Cost*

|  | Total Annualized Cost |
|---|---|
| **Proposed KERP** | ~$4,500,000 |
| *Market Data:* | |
| **75th Percentile** | $16,800,000 |
| **Projected[4]** | $10,325,369 |
| **50th Percentile** | $5,090,000 |
| **25th Percentile** | $2,980,000 |

36.    Furthermore, Mercer also analyzed the Proposed Plans in the context of plan design, payout metrics, and payout timing.  From its market study, Mercer found that market practice for KEIPs implemented by Estates is to condition plan payouts on a variety of metrics, the most prevalent of which being: sales metrics (for estates where subsequent asset sales were expected), individual milestones (which vary based on the participant), financial metrics (such as revenue, EBITDAR levels, or budget attainment) and wind-down milestones (such as the timely and in-budget wind-down of specific assets).  See Exhibit 1, pages 7 and 11.  Thus, the proposed Executive and Estate KEIPs are consistent with market practice, because plan payouts are earned based on satisfying metrics including performance against budget, recoveries and sale completion.

---

[4] Using the relationship between plan cost and asset recoveries, Mercer is able to project the cost of the Estate KERP using asset recoveries of $1.6 Billion

ny-1078979

37.    For KERPs, all of the plans that Mercer analyzed used continued employment as
the sole basis of payment determination.  Mercer also found that 58% of the plans analyzed for
this review made payments immediately following the plan period, and 17% used payout
deferrals of some sort, which is consistent with the designs of the Proposed Plans.  See Exhibit 1,
pages 7 and 13.  Given the Debtors' large size and the complexity of the bankruptcy process, we
find the Proposed Plans reasonable in the context of market practice.

38.    Concurrent to the analysis of the Proposed Plans in the context of current market
practice, Mercer also conducted a compensation benchmarking analysis of several key
employees included in the Proposed Plans.  Mercer analyzed the current compensation and target
KEIP or KERP amounts for thirty nine (39) positions at the Debtors by comparing them to
market compensation levels.  This includes sixteen (16) Tier I participants (i.e. participants in the
Estate KEIP and KERP), with the remainder of the individuals in the study being included in
Tiers II and III of the Estate KERP.

39.    To conduct Mercer's analysis, incumbents' positions at the Debtors were first
matched to the appropriate survey benchmark position that takes into account the individual's
roles, responsibilities, reporting relationship, and organizational importance.  Next, the
benchmark positions were scoped by industry (Finance & Banking) and asset size (using a target
asset size of $15 billion) to reflect the market for talent of the positions; where available,
mortgage servicing-specific survey data was used.  This analysis results in competitive market
compensation ranges (represented by market percentiles) for each of the benchmark positions.
These percentiles represent the range of compensation for a particular position in a particular
industry, and is what the incumbents would expect to be paid if they took the same position in
another company similar to the Debtors.  This data is compared with current compensation to

assess competitiveness to market.  The results of our benchmarking analysis and those performed

by the Debtors can be found below in **Table 6.**  This table displays the variance (percentage

difference) between the total compensation of the Debtors (composed of base salary and

KEIP/KERP target compensation), by tier.  A positive variance implies that compensation is

above a particular percentile, and a negative variance implies compensation is below the

applicable percentile; for instance, a variance of 5% at the 75th percentile means that the

incumbent compensation is 5% above the market 75th percentile.  Overall, Mercer found that

Total Compensation (base salary plus target KEIP/KERP awards) was positioned below the 75th

percentile, which I consider to be reasonable and competitive.

40.     If the analysis is conducted taking into account the maximum awards possible

under the Estate KEIP, compensation for Tier I employees would fall almost squarely at the

Market Target (0.26% below) which, considering the superior and value-maximizing

performance required to achieve maximum KEIP payouts, I find reasonable and competitive.

41.     It is important to note that in the absence of the Proposed Plans, the incumbents

analyzed for this study would fall to approximately 45% below the compensation target for total

compensation in aggregate, which reinforces the necessity of these plans.

*Table 6: Benchmarking Results*

| Variance from Compensation Target[5] | |
| --- | --- |
| **Tier** | **Total Compensation Variance** |
| **I** | -6.68% |
| **II** | -9.89% |
| **III** | -21.37% |
| **Aggregate** | **-8.87%** |

42.    In the context of the Total Compensation available to plan participants, the payments under the Proposed Plans are appropriate in the context of market practice.

43.    For the purposes of this benchmarking analysis, Mercer considered payments from base salary and KEIP/KERP awards only and did not consider other compensation such as severance.  As a practical matter it is impossible to benchmark severance payable to individual plan participants to the market since severance is determined by length of service which varies widely based on the particular incumbent; thus when analyzing annual compensation severance is not factored in.  However, I did consider incumbents' severance payments when assessing the proposed plans and determining potential payments.  I have found that allowing employees to maintain their eligibility under pre-existing severance plans is common in the market (in my analysis described above, 56% of companies had severance plans in place in addition to KEIPs or KERPs).  In the context of motivating employees to remain with the Estate and perform to the fullest of their abilities, severance has this effect and is appropriate and effective.

44.    Based upon my analysis, knowledge, and experience, I believe that the design and structure of the Proposed Plans and the proposed payouts to be made thereunder are generally in

---

[5]    The market 75th percentile is shown as the compensation target since this has been the Debtors' historical target pay positioning.

ny-1078979

line with market standards and practice.  In addition, I believe that the Proposed Plans would

serve to align the interests of the Debtors, their key employees and their financial stakeholders,

in order to best achieve the Debtors' specific restructuring-related goals.


*[Remainder of page intentionally left blank]*

21

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed on the 20th day of March, 2013.

_____
John Dempsey

**<u>Exhibit 1</u>**

ny-1078979



CONSULTING. OUTSOURCING. INVESTMENTS.

# Project Bounce
## Estate KEIP/KERP Assessment

March 20, 2013

**John Dempsey**

john.dempsey@mercer.com

This report is confidential to ResCap and its advisors. It may not be used for any other purpose. Receipt of and use of this document in connection with the ResCap bankruptcy shall serve as acceptance of the confidentiality of the material herein.



# Background & Context

- Mercer was retained to assist with the evaluation of the proposed Executive KEIP, Estate KEIP and Estate KERP (collectively referred to as the "Estate Plans" or "Proposed Plans") developed by the Debtors (ResCap) and their advisors

- To assess the appropriateness and competitiveness of the proposed Estate Plans, Mercer conducted a market study of companies that declared bankruptcy and subsequently developed incentive and/or retention plans related to the estate management process (all plans analyzed were approved by the respective Court)
  – The design and total cost of ResCap's proposed plans are compared to the market data

- The following pages outline the results of this analysis and contain Mercer's assessment and commentary of the proposed plans in the context of market practice

# Summary of the Proposed Plans

| Plan | Participants | Estimated Cost[1] | Payout Determination |
|------|--------------|-------------------|----------------------|
| **Executive KEIP** | 2 senior executives (insiders) | $1.2 M<br>(*One-year annualized cost*) | •45% GNMA deliverables<br>•45% GNMA restricted cash<br>•10% Sale of MSR to Ocwen<br>•*Additional metrics if plan is extended*[2] |
| **Estate KEIP** | 6 insiders | $2.2 M<br>(*One-year annualized cost*) | •50% Performance against budget<br>•27.5% FHA/VA recovery<br>•5% Non-FHA/VA recovery<br>•15% FHA/VA recovery rate<br>•2.5% Non-FHA/VA recovery rate |
| **Estate KERP** | Key employees critical to operation and support of Estate (155) | $4.5 M<br>(*One-year annualized cost*) | Based on retention through wind-down process |
| **TOTAL**[3] | **163 Employees** | **$7.8 M (Est.)** | |

[1] The aggregate costs of the plans (at target payout for the KEIPs) have been annualized for comparison purposes; for example an award of $100k for a 6 month plan period is expressed as $200k

[2] If the Executive KEIP is extended beyond the initial plan period (ending May 3, 2013), the metrics will be (i) for the month of May: GNMA deliveries and GNMA pooling, (ii) for the month of June: GNMA restricted cash

[3] Estimated cost figures are rounded

> ***Overall Mercer agrees with the necessity of these plans and finds them reasonable in the context of market practice for companies going through a large and complicated wind-down process***

# Award Size Development

- ResCap management, with assistance from Mercer and other advisors, conducted a criticality assessment of each employee eligible for the KEIP or KERP, and assigned each employee to either Tier 1, 2, or 3 based on that assessment

- Critical roles include:
  - Positions critical to driving the strategic objectives of the company
  - Restructuring focused (finance, legal)
  - Critical to the operations of the company and value retention of the assets being sold

- Individual criticality was measured by considering cost to backfill/replace position, value of institutional knowledge, and past performance
  - Tier 1: Most critical (high job importance, very difficult to replace, high risk of attrition)
  - Tier 2: Critical (high job importance or high risk of attrition)
  - Tier 3: Critical but could be replaced (high job importance, medium to low difficulty to replace and risk of attrition)

- The distribution below was used as a guideline for tiering; in ResCap's proposed plan, Tier 1 represents 19.4% of participants; Tier 2 represents 57.4%; Tier 3 represents 23.2%



**Target Distribution of Employee Award Sizes**

Proposed KEIP/KERP Award (% Salary)

|  | Tier 1 | Tier 2 | Tier 3 |
|---|---|---|---|
| **Directors** | 71% | 46% | 22% |
| **Managers** | 49% | 41% | 19% |
| **Ind. Contrib.** | 38% | 26% | 20% |
| **Admin/Clerical** | N/A | N/A | 17% |

# Market Analysis: Annual Cost of Proposed Plans vs. Asset Recoveries



**Annualized Plan Cost vs. Asset Recoveries**

$y = 1017.7x^{0.4512}$
$R^2 = 0.6026$

Subset of larger wind-downs
($300M-$15B)

ResCap proposed cost at
expected incremental proceeds
of $1.6B

Total Cost of Plan (Annual $ M)

Asset Recoveries ($ B)

- The chart to the left shows the relationship between the annualized cost of wind-down plans and actual asset recoveries

- Since estate plan periods vary widely based on the expected estate period, the plans have been annualized for comparison

- The aggregate annualized cost of ResCap's proposed plans is below market levels when taking the estimated asset recoveries ($1.6B) into account

- Using the relationship between asset recoveries and plan cost in the market (represented by the regression line), the projected total annual plan cost would be ~$14.5 M

MERCER

4

# Market Analysis: Annual Cost of Proposed KEIPs vs. Asset Recoveries



**Annualized KEIP Cost vs. Asset Recoveries**

$y = 212.76x^{0.4969}$
$R^2 = 0.5859$

ResCap proposed cost at expected incremental proceeds of $1.6B

- The chart to the left shows the relationship between the annualized cost of estate KEIPs and actual asset recoveries

- The aggregate annualized cost of ResCap's proposed KEIPs (Executive and Estate) is below market levels when taking the estimated asset recoveries ($1.6B) into account

- Using the relationship between asset recoveries and plan cost in the market (represented by the regression line), the projected total annual plan cost would be ~$10.6M

MERCER

5

# Market Analysis: Annual Cost of Proposed KERP vs. Asset Recoveries



- The chart to the left shows the relationship between the annualized cost of estate KERPs and actual asset recoveries

- The aggregate annualized cost of ResCap's proposed KERP is below market levels when taking the estimated asset recoveries ($1.6B) into account

- Using the relationship between asset recoveries and plan cost in the market (represented by the regression line), the projected total annual plan cost would be ~$11M

# Market Analysis: Cost of Proposed Plans (Aggregate)

- The table below compares the aggregate proposed plans to market practice based on several cost measures, shown for all companies and larger asset management estates (asset recoveries between $300M - $15B):

| Cost Measurement | ResCap Proposed | Market Practice | | Commentary |
|---|---|---|---|---|

**Aggregate Annual Cost**
*Annualized cost of KEIPs and KERP*

~$7.8M* (0.49% of $1.6B incremental asset recoveries)

| | All Companies | | $300M-$15B Proceeds | |
|---|---|---|---|---|
| | Cost | As % Asset Recoveries | Cost | As % Asset Recoveries |
| 75th Percentile | $38,800,000 | 4.29% | $38,800,000 | 2.33% |
| 50th Percentile | $6,110,000 | 1.91% | $24,300,000 | 1.58% |
| 25th Percentile | $2,400,000 | 0.22% | $11,071,429 | 0.73% |

- The proposed plans are below the market median for larger bankruptcies as expressed both in dollar amounts and as a percent of asset recoveries

**Annual Cost Per Participant**
*Annualized cost of KEIPs and KERP divided by total participants*

~$48,012

| | Cost Per Participant | |
|---|---|---|
| | All Companies | $300M-$15B Proceeds |
| 75th Percentile | $77,695 | - |
| 50th Percentile | $59,837 | $62,179 |
| 25th Percentile | $34,100 | - |
*Insufficient Data*

- The proposed plans are well below the market median

**Total Plan Cost**
*Projected cost of all plans over the total anticipated plan periods*

~$16.1M[1] (1.01% of $1.6B incremental asset recoveries)

| | All Companies | | $300M-$15B Proceeds | |
|---|---|---|---|---|
| | Cost | As % Asset Recoveries | Cost | As % Asset Recoveries |
| 75th Percentile | $17,800,000 | 2.14% | $19,400,000 | 1.58% |
| 50th Percentile | $4,400,000 | 1.17% | $16,200,000 | 1.46% |
| 25th Percentile | $1,187,494 | 0.61% | $5,090,000 | 0.83% |

- The proposed plans are below the market median for larger bankruptcies as expressed both in dollar amounts and as a percent of asset recoveries

[1] Total estimated plan costs for the proposed plans are as follows: Executive KEIP $0.6M (through June), Estate KEIP $6.5M, Estate KERP $9.1M

* Assumes the Executive KEIP is extended through June

# Market Analysis: Cost of Proposed KEIPs and KERP

- The table below compares the proposed plans to market practice based on several cost measures, separating out KEIPs and KERPs:

| Cost Measurement | ResCap Proposed | Market Practice | Commentary |
|---|---|---|---|
| **Aggregate Annual Cost**<br>*Annualized cost of KEIPs and KERP* | KEIPs:<br>~$3.4M*<br><br>KERP:<br>~$4.5M | **Annual Plan Cost**<br><br>          KEIP      KERP<br>75th Percentile  $23,850,000  $16,800,000<br>**Projected[1]  $10,065,651  $10,325,369**<br>50th Percentile  $3,040,879  $5,090,000<br>25th Percentile  $1,748,004  $2,980,000 | • The proposed KEIPs are slightly above the market 50th percentile but well below the projected cost based on asset recoveries<br>• The proposed KERP is below the market median |
| **Total Plan Cost**<br>*Projected cost of plans over the total anticipated plan periods* | KEIPs:<br>~$7.9M<br><br>KERP:<br>~$9.1M | **Total Plan Cost**<br><br>          KEIP      KERP<br>75th Percentile  $17,800,000  $51,545,000<br>**Projected[1]  $10,476,669  $14,986,531**<br>50th Percentile  $2,550,000  $4,360,000<br>25th Percentile  $1,187,494  $2,200,000 | • The proposed KEIPs are well below the market 75th percentile and its projected cost based on asset recoveries<br>• The proposed KERP is well below the market 75th percentile and its projected cost based on asset recoveries |

[1] Using the relationship between KEIP/KERP costs and asset recoveries, represents the projected cost of ResCap's KEIP/KERP based on asset recoveries of $1.6B (using the regression equations on pg 5 and 6)

* Assumes the Executive KEIP is extended through June

# Market Analysis: Total Compensation Benchmarking

- To comment on award level appropriateness in the context of the competitive market, Mercer conducted a benchmarking analysis comparing ResCap to market compensation levels using Mercer and McLagan data sources
  - Data represents aggregate compensation by Tier for all incumbents that have benchmarking data available (analysis performed by either Mercer or ResCap)
  - ResCap total compensation represents base salary and target KEIP or KERP award
- Overall, with the inclusion of Target KEIP and KERP awards, ResCap is slightly above the market target in base salary but below the market target in total compensation
- When viewed using max awards under the Estate KEIP, Tier I approximates the Market Target (-0.26%)
- In the absence of KEIP and KERP awards, ResCap incumbents would fall to approx. 45% below the market target in total compensation

| Variance to Compensation Target[1] | | |
|---|---|---|
| | Base Salary | Total Compensation |
| Tier I | 1.11% | -6.68% |
| Tier II | 6.12% | -9.89% |
| Tier III | -3.94% | -21.37% |
| Aggregate | 1.90% | -8.87% |

[1] Compensation Target represents the 75th percentile of competitive market levels, which has been ResCap's historical pay positioning

# Market Analysis: Plan Design Features

- The table below compares the proposed plans to market practice based on plan design features:

| Element | Current Proposed | Market Practice | Commentary |
|---|---|---|---|
| **Eligibility** | **Executive KEIP:** 2 insiders<br>**Estate KEIP:** 6 insiders<br>**KERP:** 155 nonexecutive wind-down staff<br>**Total:** 163 employees (~4.6% pre-petition population) | *(see table below)* | • The overall number of employees covered by ResCap's Executive & Estate KEIP/KERP plans are slightly below the market median for all bankruptcies, and well below the market median for large bankruptcies |
| **Metrics** | **Executive/Estate KEIP:**<br>•GNMA deliverables<br>•GNMA restricted cash<br>•Sale of MSR to Ocwen<br>•Performance against budget<br>•FHA/VA recovery, Non-FHA/VA recovery<br>•FHA/VA recovery rate, Non-FHA/VA recovery rate<br>**KERP:**<br>•Based on continued employment | •Financial metrics (including budget performance) were used in 42% of analyzed plans<br>•Sale metrics were used in 58% of analyzed plans<br>•Recovery metrics were used in 17% of the analyzed plans<br>•All KERPs analyzed used continued employment for payout determination | •ResCap's use of plan payout metrics align with normal market practices |
| **Payout Timing** | **Executive KEIP:** Made 1 month after plan period<br>**Estate KEIP:**<br>•Lump sum at the end of 1 year performance periods<br>•20% deferral until termination date<br>**KERP:** Earlier of Retention Date or 12/31/2013 (20% deferral for awards > $40k) | •Lump sum payments at the end of a performance period were used in 58% of the incentive plans analyzed<br>•Payout deferrals were used in 17% of the plans analyzed<br>•KERPs analyzed all paid at the end of a retention period or upon termination | •ResCap's payout timing aligns with normal market practices |

Eligibility inset table:

| | All Companies | | $300M-$15B Proceeds | |
|---|---|---|---|---|
| | Participants | As % of Pre-Petition FTE | Participants | As % of Pre-Petition FTE |
| 75th Percentile | 620 | 4.61% | 575 | 4.61% |
| 50th Percentile | 173 | 2.68% | 228 | 2.68% |
| 25th Percentile | 33 | 1.59% | 158 | 1.59% |

# Market Analysis: Plan Prevalence

**Compensation Programs**



- The chart below displays the prevalence of the following compensation programs for companies analyzed:
  - **Incentive:** Incentive-based variable compensation plan, usually for insiders and top leadership (KEIP)
  - **Retention:** Compensation plan that pays based on continued employment, usually for key employees below the top executive level (KERP)
  - **Modified Severance:** Specially-approved severance plans which pay out larger severance amounts on job elimination (usually in place of a separate retention plan)
- While the prevalence of non-insider KERPs declined following the adoption of the Bankruptcy Abuse Prevention & Consumer Protection Act of 2005 (BAPCPA), it has increased in recent years as the definition of insiders has been better refined
- Implementing multiple plans is justified and appropriate for a complex wind-down



Appendix

# Overview of Comparator Companies

| Company | Bankruptcy Start Date | Bankruptcy End Date | Pre-Petition Assets | Full time Employees (Pre-Petition) |
|---|---|---|---|---|
| Lehman Brothers | 9/15/2008 | 12/6/2011 | $691,000,000,000 | 28556 |
| Enron | 12/2/2001 | 11/18/2004 | $100,100,000,000 | 25000 |
| Adelphia Communications | 6/25/2002 | 2/13/2007 | $21,499,480,000 | 15444 |
| Capmark Financial Group, Inc. | 10/25/2009 | 9/30/2011 | $20,640,000,000 | 1000 |
| Circuit City | 11/10/2008 | 11/1/2010 | $11,740,000,000 | 39000 |
| Nortel Networks | 1/14/2009 | | $7,900,000,000 | 19148 |
| Refco | 10/17/2005 | 12/15/2006 | $3,740,000,000 | 2434 |
| BearingPoint, Inc | 2/18/2009 | 12/30/2009 | $3,200,000,000 | 17100 |
| Quebecor World, Inc. | 1/21/2008 | 6/30/2009 | $2,823,400,000 | 19531 |
| Linens 'n Things | 5/2/2008 | 6/15/2009 | $2,800,000,000 | 17500 |
| Hostess | 1/11/2012 | 1/0/1900 | $981,645,901 | 19000 |
| Pacific Energy Resources Ltd. | 3/8/2009 | 12/23/2010 | $721,973,894 | 110 |
| Movie Gallery, Inc. (2010) | 2/2/2010 | 11/18/2010 | $663,325,000 | 19082 |
| Fleetwood Enterprises, Inc. | 3/10/2009 | 8/23/2010 | $625,571,000 | 6400 |
| Gottschalks Inc. | 1/14/2009 | 3/1/2011 | $331,994,000 | 5200 |
| Penn Traffic Company, The (2009) | 11/18/2009 | 11/1/2010 | $193,714,000 | 4000 |
| **Residential Capital** | **5/14/2012** | | **$15,675,571,000** | **3500** |

MERCER

13

# Prevalence of Metrics in Wind Down Incentive Plans



**ResCap proposed metrics**

- The chart to the left shows the prevalence of the following performance metrics:

  - **Sales Metrics:** Based on the results of the sales process (*e.g. sale proceeds*)

  - **Individual Milestones:** Based on performance against individual performance measures (*e.g. division performance, special projects or objectives*)

  - **Financial Metrics:** Based on company financial performance (*e.g. EBITDAR, budget attainment*)

  - **Wind-down Milestones:** Based on milestones in the wind-down process (*e.g. wind-down of a specific asset or operation*)

  - **Recoveries Metrics:** Based on creditor recoveries

  - **Bankruptcy Milestones:** Based on events/achievements in bankruptcy (*e.g. plan filing/approval*)

MERCER

14

# Incentive Plan Design Prevalence Analysis

| Company | Payout Timing | | Payment Pool Size | | Includes Payout Deferral |
|---|---|---|---|---|---|
| | Lump Sum Payment | Interim Payments | Variable | Fixed | |
| Enron | | ✓ | ✓ | | |
| Adelphia Communications | | ✓ | ✓ | | |
| Circuit City | | ✓ | ✓ | | |
| Nortel Networks | | ✓ | ✓ | | ✓ |
| BearingPoint, Inc | ✓ | | ✓ | | |
| Hostess | ✓ | | ✓ | | ✓ |
| Pacific Energy Resources Ltd. | ✓ | | ✓ | | |
| Movie Gallery, Inc. (2010) | ✓ | | ✓ | | |
| Fleetwood Enterprises, Inc. | ✓ | | ✓ | | |
| Gottschalks Inc. | ✓ | | ✓ | | |
| Penn Traffic Company, The (2009) | ✓ | | ✓ | | |
| *Capmark Financial Group, Inc.* [1] | | ✓ | ✓ | | ✓ |
| **Residential Capital** | ✓ | | ✓ | | ✓ |
| | **58%** | **42%** | **100%** | **0%** | **17%** |

[1]Capmark PIP included for reference only and is not included in summary statistics

MERCER

# Retention Plan Design Prevalence Analysis

| Company | Retention Plans | | | | |
|---|---|---|---|---|---|
| | Payout Timing | | Payment Pool Size | | Includes Payout Deferral |
| | Lump Sum Payment | Interim Payments | Variable | Fixed | |
| Lehman Brothers | | ✓ | ✓ | | |
| Enron | | ✓ | | ✓ | |
| Circuit City | ✓ | | | ✓ | |
| Refco | | ✓ | | ✓ | ✓ |
| Linens 'n Things | ✓ | | | ✓ | |
| Hostess | ✓ | | | ✓ | |
| Gottschalks Inc. | ✓ | | | ✓ | |
| *Capmark Financial Group, Inc.* [1] | ✓ | | | ✓ | |
| **Residential Capital** | ✓ | | | ✓ | |
| | **57%** | **43%** | **14%** | **86%** | **14%** |

[1]Capmark Modified Severance Plan included for reference only and is not included in summary statistics

