**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- )
                                                                 )
In re:                                                           )    Case No. 12-12020 (MG)
                                                                 )
RESIDENTIAL CAPITAL, LLC, et al.,                                )    Chapter 11
                                                                 )
                                               Debtors.          )    Jointly Administered
                                                                 )
---------------------------------------------------------------- )

**DECLARATION OF RONALD GREENSPAN IN SUPPORT OF DEBTORS' MOTION
FOR AN ORDER PURSUANT TO SECTIONS 363(b) AND 503(c)(3) OF THE
BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY
EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS, (B) KEY
EMPLOYEE INCENTIVE PLANS FOR CERTAIN INSIDERS AND (II) PAYMENT OF
ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, Ronald Greenspan, hereby declare that the following is true and correct to the best of my

knowledge, information and belief:

1.      I am a senior managing director in the Corporate Finance/Restructuring practice

of FTI Consulting, Inc. ("**FTI**").[1] My business address is 633 West 5th Street, Suite 1600, Los

Angeles, CA 90071-2027.

2.      I respectfully submit this declaration (the "**Declaration**") in support of the

*Debtors' Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code*

*Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders,*

*(B) Key Employee Incentive Plans for Certain Insiders and (II) Payment of Any Obligations*

*Arising Thereunder as Administrative Expenses*. The Debtors have duly authorized me to do so.

---

[1] On June 27, 2012, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") submitted
an application to the Court seeking an order authorizing the engagement of FTI as financial advisor to the Debtors
[Docket No. 526]. On July 25, 2012, the Court entered the Order Authorizing the Employment and Retention of
FTI Consulting, Inc. as Financial Advisor *Nunc Pro Tunc* to May 14, 2012 [Docket No. 902].

A.    **Background Information and Qualifications**

3.      I earned my B.A degree in economics summa cum laude from University of California, Los Angeles and my J.D magna cum laude from Harvard Law School. FTI is the successor to the Corporate Finance and Restructuring Practice of PricewaterhouseCoopers LLP ("**PwC**"), which I joined in 1991 and since then have led its Global Real Estate and Real Estate-Secured Debt Restructuring Practice. Prior to that, I held senior management positions at several real estate and financial services companies: I was the chief operating officer of Los Angeles Land Companies, the executive vice president of Brookside Savings & Loan Association and the executive vice president of The Heritage Group.

4.      In my over twenty years at FTI and its predecessor PwC, I have provided consulting services regarding compensation issues to a number of debtors in possession and creditors of debtors in possession in the mortgage, housing and financial services industries; including, in several cases, incentive and retention plans similar to those proposed by the Debtors. In particular, FTI provided compensation-related consulting in the bankruptcies of ResMae Mortgage Corp.; American Home Mortgage Corp.; Mortgage Lenders Network USA; Capmark Financial Group, Inc.; People's Choice Home Loan Inc.; Credit-Based Asset Servicing & Securitization LLC; Fairfield Residential LLC; Orleans Homes, and the Residential Capital LLC Sale KEIP and KERP, amongst others.

5.      I have also provided such services in significant bankruptcies outside of the real estate and mortgage industries, including US Airways and Peregrine Systems Inc. I provided expert testimony regarding the chapter 11 employee incentive plans in Peregrine Systems, Inc., and the employee emergence compensation plans in US Airways.

ny-1082479

6.      I co-authored an article entitled *KERP's Are Out, But Incentives Are In* with Matthew Pakkala, published shortly after the adoption of BAPCPA in the August 2006 issue of the Turnaround Management Association's Journal of Corporate Renewal. In addition, I have authored numerous articles and given dozens of speeches regarding issues related to the real estate, banking and financial services industries.

7.      I am a Certified Insolvency and Restructuring Advisor, Fellow of the American College of Bankruptcy and past-President and Member of the Board of Directors of the Los Angeles Bankruptcy Forum.

**B.      FTI's Engagement as Financial Advisor**

8.      FTI has provided financial advice regarding numerous aspects of the Debtors' businesses as it pertains to the chapter 11 cases. Throughout its engagement, FTI developed a comprehensive understanding of the Debtors' businesses through our assistance in: the preparation of the first day motions; the preparation of bottom-up cash flow projections; the development of communication plans for customer, vendors, and employees; assistance in securing debtor-in-possession financing; the management of the claims reconciliation process; the development of the waterfall recovery model and subsequent updates; the monitoring of compliance with the Debtors' financing facilities; the development of the Sale KEIP and KERP; the management of due diligence for the financial advisors of various creditors and the Examiner, the preparation of Monthly Operating Reports; the preparation of the SOFA and SOAL; the sales process and the associated sale closings; and many other tasks.

9.      Such projects spanned the chapter 11 proceedings and the year leading up to the proceedings, which has resulted in FTI possessing substantial institutional knowledge regarding the specific facts and circumstances surrounding these cases.

10.     In addition to tasks described above, FTI also assisted the Debtors in their
preparation for the post-sale estate (the "**Estate**"). In this role, FTI assisted the Debtors in
defining work-plans for each functional area of the Estate; reviewing human capital plans;
developing strategies for facilities; developing IT outsourcing plans; developing expense budgets;
managing the transition of the Treasury team; and various other tasks related to the planning and
implementation of the Estate.

11.     As discussed in further detail below, the Debtors concluded that it was necessary
to enlist FTI, in coordination with Mercer (US) Inc. as compensation consultant, to advise on the
creation of (i) a Key Employee Incentive Plan (the "**Estate KEIP**") to ensure that certain insider-
level employees (the "**Estate KEIP Participants**") are incentivized to work to maximize value to
creditors while handling the challenges of the Estate, (ii) a Key Employee Retention Plan (the
"**Estate KERP**") in an effort to ensure that non-insider employees (the "**Estate KERP
Participants**") critical to the Estate remain with the company through the conclusion of the wind
down process while assisting in the Estate's key functions (as further detailed below) and (iii) an
Executive Key Employee Incentive Plan (the "**Executive KEIP**", together with the Estate KEIP
and Estate KERP the "**Plans**") in an effort to ensure that certain executive employees (the
"**Executive KEIP Participants**", together with the Estate KEIP Participants and Estate KERP
Participants the "**Plan Participants**") critical to the Estate are properly incentivized to maximize
creditor value.

| | Number of Participants | Target Award Levels |
|---|---|---|
| **Estate KERP** | 155 non-insiders | $4.1M (with additional $0.4M for administrative flexibility) |
| **Estate KEIP** | 6 insiders | $2.2 M |
| **Executive KEIP** [1] | 2 insiders | $0.6M |

(1) Cost reflected as full plan through June, if plan is not extended past April the cost is $0.4M

4

C.      **Functions of the Estate (Necessity of the Plans)**

12.      Although the Debtors have sold the majority of their assets and operations, the

remaining Estate is still a complex entity with significant assets, claims, regulatory requirements,

and operations. Over $1.6 billion in domestic and international assets (excluding $3.5 billion in

cash) remain in the Estate to be liquidated to maximize creditor recoveries. The Estate will also

have to analyze over 6,700 proofs of claims totaling more than $97 billion including complex

RMBS securities and Rep and Warranty litigation that will need to be reconciled and resolved.

The Estate will wind down over 10,000 loans in the originations pipeline as of February 1, 2013.

As a regulated entity, the Estate is required to comply with requirements from regulators,

including the FRB foreclosure review, and the requirements under the DOJ \ AG settlement. The

Estate will also be required to comply with transition service agreements and shared service

agreements with three different parties, reporting and cash segregation requirements under its

credit facilities, as well as reporting requirements and due diligence requests of the unsecured

creditors and other constituencies, including the Examiner. The Estate will also support the

development of a consensual plan of reorganization.

13.      To complete the various tasks listed above, certain support is required to maintain

the infrastructure, systems, facilities, and other support services to administer these requirements.

   **a.**  The legal functional area is required to provide specialized advice to
the claims resolution process, litigation resolutions, government
investigations, foreclosure lookback process, licensing maintenance,
examination procedures, and maintenance and dissolution of various
debtor entities.

   **b.**  The finance and accounting functional areas are required for post-
purchase price adjustments, regulatory, bankruptcy and facility
reporting, tax and claims support, legal entity liquidation support,
asset disposition financial analytics, TSA management and any ad
hoc third party reporting requests.

5

c.     The treasury functional area is required for the management of the segregation of cash, bank account oversight, closing of accounts, and cash forecasting.

d.     The human resources functional area will manage the implementation of Estate payroll, insurance, benefits and the 401(k) program and support each department in continuous staffing wind-down and other HR needs.

e.     The administration functional area will manage facilities, the sourcing of contracts and provide general administrative support.

f.     The IT functional area will evaluate over 300 business applications for the Estate and retrieve data from approximately 200 applications to serve needs of claims, litigation, and asset disposition. IT will also build several new databases to store data from systems acquired by the purchasers, re-create the application / data and / or source code for applications not staying with the Estate and transition IT services to a third party service provider within 6-12 months post-close.

14.     In order to maximize value for the creditors and handle the challenges highlighted above, the Estate requires a workforce with critical skill sets, institutional knowledge, and industry experience. In connection with FTI's role in advising the Debtors regarding the planning for the Estate and the formation of the Plans, FTI participated in numerous discussions and planning sessions with the Debtors' management regarding the Estate's needs and objectives. It is my understanding that the Plan Participants are critical to maximizing value for creditors in a cost efficient manner while handling the many challenges of the Estate; all with the knowledge that their employment has a finite timeline.

15.     The Plans are absolutely necessary and designed to: (i) ensure that critical employees are properly incentivized to assist in maximizing value for creditors, (ii) reduce potential employee attrition that would otherwise result from the uncertainty created by the wind down of operations, and (iii) retain individuals with important institutional knowledge to effectively wind down operations.

6

ny-1082479

16.     Historically, the non-insider participants of the Estate KERP have received approximately 26% of their annual compensation through variable pay, while insider participants of the Executive KEIP and Estate KEIP received approximately 65% of their annual compensation through variable pay.

17.     In 2012, variable pay was comprised of the Annual Incentive Program ("**AIP**") and for some Plan Participants the Sale KEIP and KERP plans (incentive and retention payments relating to the sale process). The Plans currently contemplated are meant to replace all forms of variable pay, and to compensate employees at levels similar to their historical compensation.

i.      The Plans are Necessary to Properly Incentivize Critical Employees

18.     The design of the Plans appropriately align the interests of the Estate's key stakeholders with the Plan Participants. The efforts of the Plan Participants through the estate management process are essential to maximize value for the benefit of key stakeholders. Without the Plans, the only direct compensation for the Plan Participants is their base salary, which is less compensation than they have historically received. The Debtors are asking Plan Participants to take on additional responsibilities with significant time commitments in order to efficiently administer and manage a complex estate comprised of unique assets and to continue to work for an entity with a finite life span. Thus, approving the Plans is extremely important to ensuring that all Plan Participants remain motivated and incentivized to commit the extraordinary time and effort required to perform all the complex tasks and maximize value for the benefit of the creditor constituencies. All the while, Plan Participants will be working for an Estate that continues to wind down, with high uncertainty of length of future employment, and almost certain layoff when convenient for the Estate.

ny-1082479

19.    The Estate KEIP and Executive KEIP metrics incorporate the Estate's core functions into a plan that motivates the KEIP participants to perform in an optimal manner that maximizes the total value of the Estate.

20.    The Estate KEIP metrics are comprised of: (i) maximizing the value from disposing of the remaining assets and (ii) comparison of the actual wind down expenses against the budgeted wind down expenses. Similarly, the Executive KEIP metrics are comprised of: (i) proceeds from the delivery of Ginnie Mae ("**GNMA**") loans, (ii) the recovery of GNMA restricted cash, (iii) the extension of the agreement for the purchase of MSRs on new GNMA pools, and (iv) the extension of the GNMA pooling approval.

21.    The Estate KERP plan is designed to retain (non-insider) employees through their expected termination dates to complete key wind down tasks in a timely manner.  Estate KERP Participants possess significant industry experience, specialized skills and institutional knowledge that would be difficult, if not impossible, to recruit in the current market, given the Debtors' current circumstances and tightness in the industry's talent pool. Thus it is critical to retain these employees in order to maximize recoveries on assets and to administer the Estate in a cost effective manner.

ii.    <u>Employee Attrition</u>

22.    Since the completion of the 363 sales the Debtors have experienced significant turnover relative to the size of the Estate population, with both the purchasers and Ally offering positions to Estate employees.  So far, in the one month after the closing of the sale transactions, the Debtors have had 7 of the 155 Estate KERP Participants voluntarily terminate – an annual rate of greater than 40%.

23.    The Debtors anticipate that the retention of employees will become increasingly difficult if the Debtors cannot offer their employees the proper incentive compensation elements.

8

It is critical for the Debtors to offer the employees a reason to stay with them for the period that their services are needed by providing appropriate retention and incentive programs.

24.    The Debtors can ill afford to lose important employees who have the experience and institutional knowledge necessary to successfully complete key wind down tasks. Employee turnover will cause the Debtors to incur significant costs to replace these employees. In addition, subsequent recruitment efforts will distract, hinder and delay the estate management efforts, thus imposing further costs upon the Debtors' estates. The continuity promoted, and the institutional knowledge preserved, by maintaining the current employees, on the other hand, facilitates the Estate's success. Moreover, the expeditious and cost-effective implementation of the Estate management plan will help the Debtors preserve and protect the value of their assets. Ultimately, the cost effective management of the Debtors' businesses will preserve and protect the value of the Debtors' estates for the benefit of creditors.

iii.    <u>Institutional Knowledge</u>

25.    The Estate is faced with the challenge of, inter alia, disposing of its remaining assets, reconciling complex claims, complying with various government regulatory requirements, and providing support for these functions. Completing these tasks is necessary and essential to maximizing value to creditors and requires significant institutional knowledge in almost every role in the Estate. This institutional knowledge is not only of internal systems, transaction history, litigation history, and financial information, but also of regulatory requirements, GNMA and HUD processes, servicing processes at Ocwen, and history of non-Debtor entities. The average Plan Participant has tenure of over six years with the Debtors and has irreplaceable institutional knowledge.

ny-1082479

D.        **Development of the Plans**

26.        In assisting the Debtors with the development of the Plans, FTI relied upon its

extensive industry expertise, its experience with the Debtors in their planning for the Estate, and

its review of the structure of employee incentive plans implemented and approved in other chapter

11 estate wind down scenarios. Specifically, FTI reviewed over 15 court-approved incentive and

retention plans implemented in cases with a wind-down estate.

27.        The Debtors, with the assistance of FTI, took a bottoms-up approach to human

capital planning for the Estate. The Estate's senior leadership, with assistance from FTI, initially

developed internal work-plans to determine key tasks required to be completed by the Estate.

These work-plans were completed for each core functional area of the Estate, including IT, legal,

finance/accounting, claims, asset disposition and administration. The business leader of each of

the Estate's functional areas then identified the positions / functions necessary to complete the

key tasks identified in the work plans, which formed the basis of the Estate's human capital

planning. Individuals best suited for the specific position were then chosen by Estate leadership,

from the available employee pool, with the assistance of the human resources group based upon

their applicable skill set, past job performance, and institutional knowledge. These position and

employee lists were then reviewed by FTI and Estate leadership, and were approved by the Estate

leadership.

E.        **The Estate KEIP**

28.        The Estate KEIP provides potential performance incentives for six Estate KEIP

Participants, in the event they achieve performance metrics that align with creditor goals. The

Estate KEIP Participants includes the Estate's Chief Business Officer plus the senior leadership

team (5 individuals) across each of the following critical functional areas: Administration /

Human Resources / IT, Legal, Claims / Claims Recovery, Asset Disposition, and Finance / Accounting.

29.      The Debtors' Chief Executive Officer is not a participant in the Estate KEIP or the Executive KEIP due to restrictions under the TARP regulations prohibiting his involvement in such a program. The Chief Financial Officer and Capital Markets Officer are not participants in the Estate KEIP due to the short-term nature of their employment, and their role within the Estate is addressed in a separate plan (the Executive KEIP).

30.      Target awards for the Estate KEIP Participants were based on an evaluation of criticality, new job function, and market comparisons provided by Mercer with a view towards historical compensation and additional responsibilities. The awards were developed by the Chief Business Officer, Mercer and FTI.

31.      The Estate KEIP will be a multi-year plan with the initial year covering the 12 month period from January 1, 2013 to December 31, 2013. Assuming target-level performance, the payments under the Estate KEIP for the first year (the "**Estate KEIP Awards**") will total approximately $2.2 million at its target incentive. The Estate KEIP Awards range from 60% to 169%, with an average annual target award of $360K. Payment of target awards is contingent upon achieving certain metrics (the "**Estate KEIP Metrics**"), including the Asset Recovery metrics and the Performance Against Budget metric (each discussed in greater detail herein). Awards and metrics for the second year and subsequent years will be set with approval from the UCC before the end of the then-current plan period.

32.      Participants in the Estate KEIP are subject to the Asset Recovery and Performance Against Budget metrics, with each metric comprising of 50% of their individualized target. Below are the details regarding the calculation of each metric.

11

      **a.**   <u>Asset Recovery Metric </u>(50% of weight). Measurement period beginning February 15, 2013 through December 31, 2013[2].

        I.   Proceeds from FHA / VA Recoveries (55% of Asset Recovery Metric) - two sets of incentive metrics are suggested. Scenario 1 would be triggered in the event an FHA sale occurs. In the event the FHA sale does not occur, then Scenario 2 is triggered.

     o  Scenario 1

- Threshold- If recovery efforts yield 90% of budgeted recoveries on the FHA / VA portfolio including advances (net of servicing and custodial fees), then KEIP participant achieves 50% of individualized year one target award.

- Target- If recovery efforts yield 100% of budgeted recoveries on the FHA / VA portfolio including advances (net of servicing and custodial fees), then KEIP participant achieves 100% of individualized year one target award.

- Maximum- If recovery efforts yield 107.5% of budgeted recoveries on the FHA / VA portfolio including advances (net of servicing and custodial fees), then KEIP participant achieves 125% of individualized year one target award.

     o  Scenario 2

- Threshold- If recovery efforts yield 90% of budgeted recoveries on the FHA / VA portfolio (excluding $127M FHA sale) including advances, net of servicing and custodial fees, then KEIP participant achieves 50% of individualized year one target award.

- Target- If recovery efforts yield 100% of budgeted recoveries on the FHA / VA portfolio (excluding $127M FHA sale) including advances, net of servicing and custodial fees, then KEIP participant achieves 100% of individualized year one target award.

- Maximum- If recovery efforts yield 107.5% of budgeted recoveries on the FHA / VA portfolio (excluding $127M FHA sale) including advances, net of servicing and custodial fees, then KEIP participant achieves 125% of individualized year one target award.

---

[2] For assets serviced by Ocwen, collections for the month are remitted by Ocwen one week after month end. For purposes of metric calculation these collections are counted in the month collected by Ocwen

ny-1082479

II.      FHA / VA Recovery Rate (30% of Asset Recovery Metric) - two sets of incentive metrics are suggested. Scenario 1 would be triggered in the event an FHA sale occurs. In the event the FHA sale does not occur, then Scenario 2 is triggered. Recovery rate is defined as the proceeds from the recovery of FHA / VA portfolio, less servicing and custodial fees, over the book value of the assets recovered ("**FHA / VA Recovery Rate**").

   o   Scenario 1

        ▪   Threshold- If FHA / VA Recovery Rate of 89.8% is achieved, then KEIP participant achieves 50% of individualized year one target award.

        ▪   Target- If FHA / VA Recovery Rate of 92.8% is achieved, then KEIP participant achieves 100% of individualized year one target award.

        ▪   Maximum- If FHA / VA Recovery Rate of 95.3% is achieved, then KEIP participant achieves 125% of individualized year one target award.

   o   Scenario 2

        ▪   Threshold- If FHA / VA Recovery Rate of 93.4% is achieved, then KEIP participant achieves 50% of individualized year one target award.

        ▪   Target- If FHA / VA Recovery Rate of 96.4% is achieved, then KEIP participant achieves 100% of individualized year one target award.

        ▪   Maximum- If FHA / VA Recovery Rate of 98.9% is achieved, then KEIP participant achieves 125% of individualized year one target award.

III.     Proceeds from Non FHA / VA Recoveries (10% of Asset Recovery Metric) -

        ▪   Threshold- If recovery efforts yield 90% of budgeted recoveries on the Non FHA / VA portfolio (net of servicing and custodial fees) , then KEIP participant achieves 50% of individualized year one target award.

        ▪   Target- If recovery efforts yield 100% of budgeted recoveries on the Non FHA / VA portfolio (net of servicing and custodial fees), then KEIP participant achieves 100% of individualized year one target award.

13

- Maximum- If recovery efforts yield 107.5% of budgeted recoveries on the Non FHA / VA portfolio (net of servicing and custodial fees), then KEIP participant achieves 125% of individualized year one target award.

IV.  Non FHA / VA Recovery Rate (5% of Asset Recovery Metric) - Recovery rate is defined as the proceeds from the recovery of the non-government guaranteed held for sale loan portfolio, less servicing and custodial fees, over the book value of the assets recovered ("**Non FHA / VA Recovery Rate**").

- Threshold- If Non FHA / VA Recovery Rate of 57.0% is achieved, then KEIP participant achieves 50% of individualized year one target award.

- Target- If FHA / VA Recovery Rate of 65.0% is achieved, then KEIP participant achieves 100% of individualized year one target award.

- Maximum- If FHA / VA Recovery Rate of 73.0% is achieved, then KEIP participant achieves 125% of individualized year one target award.

b.  <u>Performance Against Budget Metric</u> (50% weight) - Measurement period from March 1st 2013 to December 31st 2013.

I.  Threshold- If 15% variance over expense budget, then KEIP participant achieves 50% of individualized year one target award.

II.  Target- If in line with expense budget, then KEIP participant achieves 100% of individualized year one target award.

III.  Maximum- If 15% variance below expense budget, then KEIP participant achieves 125% of individualized year one target award.

33.  For example, an Estate KEIP Participant with a $300K target award, with the Estate achieving (i) 90% of budgeted liquidation of FHA / VA portfolio, (ii) budgeted liquidation of non FHA / VA portfolio and, (iii) targeted FHA / VA recovery rate, (iv) below threshold Non FHA / VA recovery rate, and (v) 85% of annual core wind down expense budget will receive a $288.75K payout due to:

14

    **a.**    Achieving the Threshold for the FHA / VA liquidation metric (27.5% FHA / VA Sale metric as % of total award x 50% Achievement of Threshold x $300,000 target award) resulting in a $41.25K payout.

    **b.**    Achieving the Target for the non FHA / VA liquidation metric (5% non FHA / VA Sale metric as % of total award x 100% Achievement of Target x $300,000 target award) resulting in a $15K payout.

    **c.**    Achieving the Target for the FHA / VA recovery rate metric (15% FHA / VA recovery rate metric as % of total award x 100% Achievement of Target x $300,000 target award) resulting in a $45K payout.

    **d.**    Achievement below threshold for the Non FHA / VA recovery rate metric resulting in no payout.

    **e.**    Achieving the Maximum for the performance against budget metric (50% Performance Against Budget metric as % of total award x 125% Achievement of Maximum x $300,000 target award) resulting in a $187.5K payout.

34.    Payouts for achievement of metrics between threshold and target, and target and maximum are calculated on a sliding scale. For instance, in the Performance Against Budget metric the threshold metric is 115% of budgeted expense which earns a payout of 50% of target awards, and the target metric is 100% of budgeted expense which earns a payout of 100% of target awards. If the metric achieved is 107.5% of budgeted expenses then the payout earned would be 75% of target awards.

35.    The Estate KEIP Participants will have to take significant action in order to achieve payments under the performance metrics; indeed, under all of the proposed performance metrics the Estate KEIP Participants will not earn an incentive payment if they do not meet the threshold levels.

36.    The Asset Recovery metrics are comprised of four separate metrics related to two different asset classes.

    **a.**    The FHA/VA recovery metric encompasses recoveries made on government guaranteed loans and associated advances and is net of servicing and custodial fees for the loans. The FHA/VA recovery

15

rate metric is based on proceeds from the recovery of FHA / VA portfolio, less servicing and custodial fees, over the book value of the assets recovered. Recoveries are made primarily through one of three methodologies:

I.    Bulk Asset Sales – The Debtors have marketed a sale of approximately $127M in FHA loans in the first quarter of this year. Although market pricing was below expectations and the sale has been delayed, the bulk sale may be revisited later in the plan period.

II.    Redelivery of Borrower Modified loans – The Debtors will securitize pools of borrower modifications (and new originations) through the GNMA pooling process called the "PIIT pooling". In this process, the Debtors utilize records management, custodial services and loan delivery services from the 363 asset purchasers and Ally Financial Inc. ("**AFI**") through Transition Service Agreements ("**TSAs**") and custodial agreements and must identify loans that can be pooled, set up a MSR sale for each pool, deliver the loans, and sell the GNMA securities. This is a complicated process that requires coordination among the Debtors, the purchasers and AFI; and greatly enhances the return on the loans compared to the alternative of selling the loans directly. The alternative to securitizing these loans via GNMA pooling would be through a whole loan sale; <u>however</u>, execution price of a whole loan trade is expected to be materially inferior to a GNMA execution by more than 10%.

III.    FHA/VA Claims Process – The Debtors seek to accelerate and maximize the recoveries of defaulted loans that are guaranteed by the government. The Debtors can pursue several different avenues to achieve this objective. For example the Debtors are in the process of implementing a servicer oversight process, whereby baseline timelines are established in each state for the various steps in the loan resolution or foreclosure process. The Debtors will then monitor performance on a loan-level basis comparing actual results against the baseline to identify negative variances. The Debtors will work with the servicer to remediate these negative variances to improve both the timing and amount of their collections. The Debtors also anticipate enhancing and designing additional campaigns to motivate borrowers to accelerate the foreclosure process. Examples of such campaigns will include motivating borrowers to go through a short sale or a "deed in lieu" rather than the foreclosure process with cash payments or other motivational actions. Finally, the Debtors will also work with the servicer to encourage borrowers to take advantage of modification programs,

16

including the Home Affordable Modification Program ("**HAMP**"). This includes working with the servicer to notify borrowers relative to new, reduced eligibility criteria for HAMP, and working with the servicer to assist them in the application process. For those borrowers that successfully complete a HAMP modification where the loan can be repooled, this process will enable the Debtors to both accelerate and enhance the recovery on these assets as compared to the normal foreclosure process and FHA/VA claim process.

    **b.**    The Non-FHA/VA recovery metric encompasses recoveries made on non-government insured loans, on-balance sheet HELOCs, REO properties and non-Debtor entities and is net of servicing and custodial fees for the loans. The Non FHA / VA recovery rate metric is based on proceeds from the recovery of the non-government guaranteed held for sale loan portfolio, less servicing and custodial fees, over the book value of the assets recovered. The Estate will be proactively pursuing recoveries through several methods, depending on the asset type. Some of the Debtors' more significant efforts include:

    I.    For non-government insured loans, the Debtors will be pursuing a bulk sale of these assets in the current calendar year. This will include having a team resolve all document deficiencies before the sale, preparing sale documentation including loan tape offering memo and purchase agreement, and running the sales and due diligence process.

    II.    For non-Debtor entities, the Debtors will assist in asset sales, collapsing securitizations, winding down entities, and settling lawsuits in order to accelerate the timing of and maximize the Debtors' residual equity recoveries from these entities.

37.    The Performance Against Budget Metric is intended to only include those core operating expenses that are directly controlled by the Estate[3].

38.    The budget underlying the Performance Against Budget metric incorporates the transition of the Estate off of higher cost transitional and shared services agreements. In order to transition off of these higher-cost agreements the Estate must, among other things, transition to a

---

[3] Exclude reorganization professional fees, interest and taxes, asset management costs, costs associated with closing out the originations pipeline, costs associated with the Executive Trustee Services ("**ETS**") pipeline wind-down, foreclosure file review and remediation expense, incentive and severance expense, non-cash charges including depreciation and amortization expense or write-offs and any expenses of the Estate incurred prior to the 363 sales that were not accrued for at that time.

17

low-cost stand-alone IT platform; secure insurance for the Estate independent of Ally; transition

to lower cost benefits and payroll administration; and develop a lower cost cash management

system independent of Ally. In addition, the Estate leadership will need to manage to the

resources laid out in the human capital plan in the budget in order to complete the complex tasks

of the Estate. All of these actions will lower the cost of the Estate and require significant effort

and coordination amongst the Estate KEIP Participants.

39.    The Estate KEIP plan vests at the earlier of the Retention Date (termination date

stated in the employee's offer letter) or the Milestone Date (end of year one plan – December 31,

2013). Employees will be eligible for a full Estate KEIP award, based upon achievement of

metrics, if they are terminated before Retention Date due to accelerated downsizing. In addition,

if an employee is terminated for cause or for performance, then the participant will forfeit

unvested awards. Moreover, termination without cause for any of the six insider Estate KEIP

Participants will require Board of Director consent. Finally, if an employee resigns, then he/she

will forfeit unvested awards. Employees will continue to be entitled to severance under the

existing Residential Capital, LLC Severance plan, which for insiders is subject to the statutory

cap prior to emergence from Chapter 11.

40.    Twenty percent of the payments under the Estate KEIP Awards for insiders will

be deferred until the Termination Date. The participant will not be eligible to receive the deferral

if they resign or are terminated for cause or performance before the end of the deferral period.

**F.    The Estate KERP**

41.    The Estate KERP is a retention plan with awards communicated to participants at

the beginning of the plan period. The Estate KERP will be a multi-year plan with the initial year

covering the 12 month period from January 1, 2013 to December 31, 2013. Awards for the

ny-1082479

second year and subsequent years will be set with approval from the UCC three months before

the end of the then-current plan period. The Estate KERP will replace all existing incentive /

commission plans with the exception of the Origination Pipeline wind down team, which will not

be eligible for the Estate KERP because they are already compensated through pre-existing

variable pay incentive plan.

42.    Payment of awards is contingent upon the employee's remaining with the Estate

through the stated retention date. As the Estate KERP is replacing all incentive programs, the

entire Estate population will be eligible for the Estate KERP except for: (i) insiders who will

participate in either the Estate or Executive KEIP; (ii) employees with a retention period of less

than four months; (iii) members of the originations pipeline wind down workstream; and

(iv) employees identified as transitional employees that are retained with the Estate for the period

of one to five months assisting in the transition of Estate operations.

43.    The Estate KERP is inclusive of individuals in the following work streams:

(i) *Executive Office*- assist and support the Transitional Executives; (ii) *Executive Management*-

overall management and support to the Estate; (iii) *Administration / HR*- general administrative

and HR support; (iv) *IT*- manage business applications and databases, and transition certain IT

services to a third party service provider; (v) *Claims*- manage the reconciliation of claims against

the Debtors; (vi) *Claims Recovery*- manage the recovery of Debtors' claims against

correspondent lenders; (vii) *Accounting*- provide financial reporting and continuity of

accounting; (viii) *Finance / Treasury*- provide analytics in liquidations and asset disposition, tax

support, TSA management, purchase price adjustments, oversee the segregation of cash, bank

account oversight, closure of accounts, and cash forecasting; (ix) *Legal*- provide specialized

advice to the claims resolution process, litigation resolution, government investigations,

ny-1082479

foreclosure lookback process, licensing maintenance, examination procedures, eventual

surrender of licenses, and maintenance / dissolution of various debtor entities; (x) *Foreclosure*

*Lookback*- foreclosure file review in compliance with regulatory bodies, (xi) *ETS*- wind down of

ETS foreclosure pipeline; and (xii) *Origination / Pipeline*- manage the wind down of the

origination pipeline.

44.     Each participant in the Estate KERP program was evaluated to determine their

criticality to the Estate and the level of their job function. The criteria used for criticality

included considerations for (i) criticality of the position to the objectives of the Estate, (ii) level

and value of institutional knowledge, (iii) past job performance, and (iv) ability to find a suitable

replacement. All participants were assigned to a criticality tier between one (most critical) and

three. The criticality, job level, and historical compensation were then used by the functional

leaders, in conjunction with Estate leadership, human resources, FTI, and Mercer to develop an

award recommendation for each participant. Below is a chart depicting the number of individuals

in each criticality tier by job level.

| | Tier 1 | | Tier 2 | | Tier 3 | | Total | |
|---|---|---|---|---|---|---|---|---|
| | # of Employees | Award as a % of Base Salary | # of Employees | Award as a % of Base Salary | # of Employees | Award as a % of Base Salary | # of Employees | Award as a % of Base Salary |
| Director | 14 | 71% | 3 | 46% | 1 | 22% | 18 | 65% |
| Manager | 9 | 49% | 8 | 41% | 1 | 19% | 18 | 43% |
| Individual Contributor | 7 | 38% | 22 | 26% | 30 | 20% | 59 | 24% |
| Admin / Clerical | - | - | - | - | 4 | 17% | 4 | 17% |
| Non-Core | - | - | 56 | 17% | - | - | 56 | 17% |
| Total | 30 | 60% | 89 | 25% | 36 | 20% | 155 | 34% |

45.     The Estate KERP plan will have a year one cost up to $4.4 million

(approximately $4.1 million plus an additional $350,000 for administrative flexibility as

described further below).

46.     The Estate KERP plan, with the exception of any deferred amount, vests at the

earlier of the Retention Date (termination date stated in the employee's offer letter) or the

Milestone Date (end of year one plan – December 31, 2013). Employees are eligible for a full

20

Estate KERP award if terminated before Retention Date due to accelerated downsizing. If an employee is terminated for cause or for performance, participant will forfeit unvested awards. If an employee resigns, they will forfeit unvested awards. Employees remain eligible for severance under the existing Residential Capital, LLC Severance Plan.

47.    For individuals with awards above $40,000, twenty percent of the payments under the Estate KERP (the "**Estate KERP Awards**") will be deferred until the earlier of the Termination Date (date for which employment is terminated by the Estate) or one year following the award date (March 1st annually beginning in 2014). However, the participant will not be eligible to receive the deferral if they resign or are terminated for cause or performance before the end of the deferral period.

48.    The incremental pool of $350,000 will be available for administrative flexibility and can be utilized for (i) incremental retention awards that are needed to compensate existing plan participants or (ii) any additional positions that needed to be added that are not currently included in the employee pool; subject to notification to the Unsecured Creditors Committee and the US Trustee. In addition, awards allocated to individuals that resign or are terminated for cause can be used to compensate existing employees who take on additional responsibilities or replace other employees.

## G.    The Executive KEIP

49.    The Executive KEIP provides potential performance incentives for two Executive KEIP Participants, in the event they achieve performance metrics that align with creditor goals. The Executive KEIP Participants are the Debtors' Chief Financial Officer and Capital Markets Officer who will each remain with the Estate for a limited duration in order to manage and transition certain critical functions, such as serving on the Board of Directors of

Residential Capital, LLC and its subsidiaries and holding licenses for state originations; overseeing the closing of the origination pipeline wind-down; overseeing and supporting the strategic asset disposition process for GNMA assets; ensuring transitional services and statements of work are functioning, compliant and cost effective; supporting the closure of examiner information requests and business understanding; interfacing and negotiating with regulators, US Treasury, GNMA, HUD, and creating counterparties; completing year-end financial statement audit and transition finance monthly close activities; supporting the development of a consensual Plan of Reorganization; and assisting in addressing post-close accounting / purchase price issues. The Executive KEIP participants have critical skill sets and institutional knowledge to complete these tasks that is not currently possessed by other members of the Estate.

50.    The Executive KEIP is a four month plan ending May 3, 2013 ("**Executive KEIP Plan Period**"), with potential extension provisions for an additional two months. One week before the end of the Executive KEIP Plan Period, or if extended, the end of the extended plan period, the Chief Restructuring Officer and the Unsecured Creditors Committee would provide in writing, by noon Eastern Time, a formal notice of a one month extension. The Executive KEIP Plan Participants would then have two business days to accept or reject the extension offer.

51.    Assuming target-level performance, the payments under the Executive KEIP (the "**Executive KEIP Awards**") will total approximately $400K at its target incentive through the Executive KEIP Plan Period. If the Executive KEIP Plan Period is extended then the award would be increased pro-rata for every additional month. For example, if the Executive KEIP Plan Period was extended from May 3, 2013 to June 3, 2013 then the target award levels would

increase from $400K to $500K. The maximum payout possible under the Executive KEIP

would be $600K which would reflect a plan period extended two months, to July 3, 2012, and

the achievement of all target awards for that time period.

52.      The incentive metrics are measured through April 30, 2013, with additional

incentive targets for May and June if the Executive KEIP is extended for those months. Target

awards through the Executive KEIP Plan Period are payable contingent upon achievement of

four metrics, including the GNMA Deliveries metric (45% of target), the GNMA Restricted

Cash metric (45% of target), and the Extension of MSR Sale Agreement metric (10% of target).

If the Plan is extended through May 2013 the incremental award for May is based on the

achievement of the GNMA Deliveries metric for May (85% of target) and the Extension of the

GNMA Pooling Approval metric (15% of target). If the Plan is extended through June 2013 the

incremental award for June is based on the achievement of the GNMA Restricted Cash metric

for June (100% of target).

53.      Below are the details regarding the calculation of each metric.

**Metrics through April 2013**

    **a.**    <u>GNMA Deliveries Metric</u>

        I.    Threshold- Receipt of $143M of proceeds from delivery of GNMA new production and modifications for the period from March 1, 2013 through April 30, 2013; then Executive KEIP Participant achieves 50% of individualized target award.

        II.    Target- Receipt of $158M of proceeds from delivery of GNMA new production and modifications for the period from March 1, 2013 through April 30, 2013; then Executive KEIP Participant achieves 100% of individualized target award.

    **b.**    <u>GNMA Restricted Cash Metric</u>

        I.    Target- Commitment for return of $55M of restricted cash by April 30, 2013 with cash to be received no later than May 15, 2013; then

Executive KEIP Participant achieves 100% of individualized target award.

    **c.**    <u>Sale of MSR to Ocwen</u>

        I.    Target- Agreement by Ocwen to purchase MSR on new pools through December 31, 2013 received by April 30, 2013; then Executive KEIP Participant achieves 100% of individualized target award.

## Incremental Metrics for May 2013 if Plan is Extended

    **d.**    <u>GNMA Deliveries Metric</u>

        I.    Threshold- Receipt of $8M of proceeds from delivery of GNMA new production and modifications from May 1, 2013 to May 31, 2013 then Executive KEIP Participant achieves 50% of individualized target award.

        II.    Target- Receipt of $10M of proceeds from delivery of GNMA new production and modifications from May 1, 2013 to May 31, 2013; then Executive KEIP Participant achieves 100% of individualized target award.

    **e.**    <u>GNMA Pooling</u>

        I.    Target- Extension of GNMA Pooling approval through December 31, 2013 received by May 31, 2013; then Executive KEIP Participant achieves 100% of individualized target award.

## Incremental Metrics for June 2013 if Plan is Extended

    **f.**    <u>GNMA Restricted Cash</u>

        I.    Threshold- Commitment for return of $10M of restricted cash by June 30, 2013 ($65M cumulative) with cash to be received no later than July 15, 2013 then Executive KEIP Participant achieves 50% of individualized target award.

        II.    Target- Commitment for return of $20M of restricted cash by June 30, 2013 ($75M cumulative) with cash to be received no later than July 15, 2013; then Executive KEIP Participant achieves 100% of individualized target award.

ny-1082479

54.     For those metrics that have a threshold level, payouts for achievement of metrics between threshold and target are calculated on a sliding scale, as further described in the Estate KEIP.

55.     The Executive KEIP Participants will have to take significant action in order to achieve payments under the performance metrics; indeed, under all of the proposed performance metrics the Executive KEIP Participants will not earn an incentive payment if they do not meet the threshold levels, and for some metrics they will not earn an incentive payment if they do not meet the target levels.

56.     The "GNMA Delivery" metric reflects the participants' roles in overseeing the wind-down of the originations pipeline and the pipeline of modified loans. The participants led the negotiations with GNMA for the extension of the pooling approval through June 30, 2013, which was set to expire upon the completion of the 363 sales. In addition, they negotiated the agreement with Ocwen to purchase the MSRs for any new GNMA pools delivered through June 30, 2013. The participants also actively oversee the management of the pipeline of modified and originated loans ensuring that all steps are met so that the loans will qualify for GNMA pooling and successfully be delivered into securitization pools. The alternative to securitizing these loans via GNMA pooling would be through a whole loan sale; however, execution price of a whole loan trade is expected to be materially inferior to a GNMA execution by more than 10%; so the delivery of these loans through the GNMA PIIT pooling process provides a significant economic benefit to the Estate.

57.     The "GNMA Restricted Cash" metric reflects the participants' roles in managing the relationship with GNMA, the successful transferring of servicing related to GNMA loans to the purchasers, and the successful wind-down of the GNMA PIIT pooling process, which is

25

used to deliver modified and originated loans into GNMA securities that can then be sold to the market. The participants have been and continue to actively work with Ocwen to ensure the transition of all GNMA loans onto one platform. In addition, the Executive KEIP Participants will be overseeing three different parties, Walter, Ally, and Ocwen to ensure the continued success of the PIIT pooling process. Finally, the participants will be working to negotiate an amendment to the escrow agreement with GNMA to ensure the timely return of the GNMA restricted cash. Without the successful management and completion of these processes, the Estate could face the loss of a portion of this cash, or litigation to ensure its return.

58.    The "Extension of MSR Sale Agreement" metric reflects the participants' roles in negotiating an extension of the agreement to purchase the master servicing rights ("**MSR**") to any additional GNMA pools through December 31, 2013. The current agreement ends June 30, 2013 and this extension benefits the Estate as it is a requirement of GNMA for the extension of the GNMA Pooling approval the benefit of which is further described under the Extension of the GNMA Pooling Approval metric.

59.    The "Extension of the GNMA Pooling Approval" metric reflects the participants' roles in negotiating an extension of the GNMA Pooling Agreement with GNMA through December 31, 2013. The current extension ends June 30, 2013. Without an extension, the Estate will not be able to deliver any incremental loan modifications into GNMA pools after this date. If that were the case, then the Estate could only achieve whole loan pricing on these modifications which, as mentioned above, would likely be at an execution price significantly lower than what could be achieved through GNMA Pooling.

60.    The Executive KEIP Plan Participants vest in each award, subject to measurement of the metrics, at the end of the Executive KEIP Plan Period, and at the end of

each extension. For example, at the end of the Executive KEIP Plan Period the metrics for that period would be measured, and the participants would be fully vested in those awards based on the performance against metrics for that period. This calculation cannot be impacted by performance against metrics for the May or June 2013 periods if the plan were extended.

61.     The Executive KEIP Participants are eligible for the full Executive KEIP award, and any extensions that have been agreed to, based upon achievement of metrics, if terminated due to an accelerated downsizing. If an employee is terminated for cause or for performance, then the participant will forfeit his award. Termination of either of the Executive KEIP Participants must be validated by the Board of Directors. If a participant resigns, without the Estate having eliminated their position, then the participant will forfeit unvested awards related to the Executive KEIP Plan. Employees remain eligible for severance under the existing Residential Capital, LLC Severance Plan.

**H.     The Reasonableness of the Plans**

62.     Based on FTI's research and my experience, the structure of these programs is consistent with those adopted under similar estate wind down scenarios. The KEIPs properly incentivize the Plan Participants to reach performance metrics that align with creditor goals, and the retention plan properly compensates individuals possessing institutional knowledge necessary to efficiently and effectively wind down operations, resolve claims against the Estate, and meet required bankruptcy and regulatory requirements. Furthermore, it is my belief that the Estate Plans proposed by the Debtors are reasonable in light of their goals of preventing attrition and incentivizing employees to effectuate a value-maximizing estate wind down, while taking on additional responsibilities.

27

63.    In a wind down entity with a finite nature of employment an employee faces high uncertainty relating to their base compensation. KEIP and KERP plans are appropriate in this context to provide a goal for employees to work towards that has the dual purpose of also creating value for the Debtors' creditors.

64.    The Plans were carefully crafted to motivate participants and ensure that the Debtors' businesses continue to operate as efficiently as possible, while also maximizing value for the Estate. The Plan Participants are critical to the Estate wind down process. Should any member of this team choose to leave, it would be extremely difficult, if not impossible, to replace him/her during the wind down process, leaving significant functional leadership and talent gaps. The Plans contemplated are designed to replace historical variable pay compensation and to compensate employees at levels vastly similar to their historical compensation, especially when considering the additional responsibilities of the Plan Participants.

65.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


*[Remainder of page intentionally left blank]*

ny-1082479

Executed on the 20th day of March, 2013

_____

Ronald F. Greenspan

ny-1082479