MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------ ) | |
| In re:                                                       ) | Case No. 12-12020 (MG) |
|                                                              ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,                     ) | Chapter 11 |
|                                                              ) | |
| Debtors.                        ) | Jointly Administered |
| ------------------------------------------------------------ ) | |

**DECLARATION OF TAMMY HAMZEHPOUR IN SUPPORT OF DEBTORS' MOTION
FOR AN ORDER PURSUANT TO SECTIONS 363(b) AND 503(c)(3) OF THE
BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY
EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) KEY
EMPLOYEE INCENTIVE PLANS FOR CERTAIN INSIDERS, AND (II) PAYMENT OF
<u>ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES</u>**

I, Tammy Hamzehpour, hereby declare:

1.       I am the Chief Business Officer of Residential Capital, LLC ("**ResCap**"),

a debtor and debtor in possession in the above-captioned Chapter 11 cases.  ResCap is the

ultimate parent of the other debtors and debtors in possession in the above-captioned Chapter 11

cases (collectively with ResCap, the "**Debtors**").  I have held my current title since February

2013, and until then had been General Counsel since October 2007.  Since joining ResCap in

1998, I have held various legal positions covering both Mergers & Acquisitions and ResCap's

International Business Group.

1

2.      I submit this declaration in support of the *Debtors' Motion for an Order
pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code Authorizing
(I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) Key
Employee Incentive Plans for Certain Insiders, and (II) Payment of Any Obligations Arising
Thereunder as Administrative Expenses* (the "**Motion**").[1]

3.      In my former capacity as General Counsel and my current capacity as
Chief Business Officer, I am familiar with the Debtors' business and day-to-day affairs during
this bankruptcy.  All statements in this Declaration are based upon my personal knowledge, the
files of the Debtors, and/or my discussions with employees and advisors of the Debtors.  If I
were called to testify as a witness in this matter, I would testify competently to the facts set forth
herein.

4.      On October 23 and 24, 2012, the Debtors successfully conducted an
auction for the sale of the Debtors' origination and servicing platforms during which Ocwen
Loan Servicing, LLC, the mortgage servicing arm of Ocwen Financial Corporation ("**Ocwen**"),
was the winning bidder at a price of $3 billion. On October 25, 2012, the Debtors conducted an
auction for the sale of the Debtors' whole loan assets, during which Berkshire Hathaway Inc.
("**Berkshire**") was the winning bidder at a price of $1.5 billion.

5.      On November 21, 2012, the Court entered orders approving the sales to
Ocwen (the "**Platform Sale**") and Berkshire (the "**Legacy Sale**").  On January 31, 2013, the
Debtors closed the sale of their originations and capital markets platform to Walter.  This sale
also included the Fannie Mae mortgage servicing rights (MSR) portion of the Debtors' servicing
portfolio, representing approximately $50.4 billion in unpaid principal balance (UPB) at

---

[1]    Unless otherwise defined, capitalized terms used herein have the meanings ascribed to them in the Motion.

ny-1082491 v3

August 31, 2012.  On February 5, 2013, the Debtors then sold a whole loan portfolio, made up of

approximately 28,000 whole loans, to Berkshire.  Finally, on February 15, 2013, the Debtors

closed the sale of their servicing platform assets to Ocwen.

6.      Before the Platform Sale, the Debtors' workforce included over 3,800

employees.  As part of the Platform Sale, three thousand four hundred eighteen (3,418) of the

Debtors' employees gained employment with Ocwen or Walter Investment Management Corp.

("**Walter**"), one hundred sixty-six employees (166) have been or will be terminated in the next

four months[2] and two hundred fifty-eight employees (258) will assist the Debtors' estate in both

the short-term and long-term wind down of the Debtors' business affairs.

7.      Notwithstanding the significant transfer of assets included in the Platform

and Legacy Sales, approximately $1.6 billion of assets remain in the Debtors' estates to be

monetized, separation from AFI and the purchasers must still be achieved, and a modified

operational infrastructure must be maintained in order to facilitate such efforts.  Most

significantly, there are approximately $1 billion of loans insured by the Federal Housing

Administration ("**FHA**") or the U.S. Department of Veterans Affairs (the "**VA**") that the Debtors

intend to monetize for the estates' benefit.  In addition, there are other residual financial assets to

be monetized including, but not limited to, servicer advances, non-FHA/VA loans, trading

securities and accounts receivable.

8.      Beyond monetizing assets, in the months and years ahead, the Debtors will

(i) process approximately 10,000 loan applications remaining in the originations pipeline as of

the date of the Walter asset sale, (ii) reconcile over six thousand seven hundred (6,700) proofs of

claim (and make the corresponding distributions on allowed claims), and (iii) continue to comply

---

[2]     This includes forty-seven individuals (the "**Transitional Employees**") who will provide transitional services for
approximately four months.  The Transitional Employees have remained in the estate to assist with finalization of
2012 financial statements and support for some related origination pipeline loan accounting work.

with (A) state mortgage banking licensing requirements, (B) requirements from regulators,

including, if required, the foreclosure review required by the Federal Reserve Board, and (C) the

requirements of the DOJ/AG settlement, which include conducting a foreclosure file review of

certain loans for compliance with the Servicemembers Civil Relief Act and monitoring, testing

and reporting to the Office of Mortgage Servicer Oversight of the purchasers' servicing practices

and compliance with national servicing standards during the multi-year enforcement period of

that settlement.

9.      In the short term, in addition to monetizing assets and moving forward

with claim reconciliation efforts, the Debtors will also wind down existing consumer lending and

foreclosure pipelines and complete the transition of the Debtors' day-to-day operations to the

estate.  This will require the assistance of employees who will remain in the estate for

approximately the next four to six months and then either be terminated by the Debtors or

transition to employment with one of the asset purchasers.  Included in this group of short-term

employees are (i) James Whitlinger and Patrick Fleming, two senior executives who will

facilitate the transfer of the Debtors' remaining operations to the "core" estate personnel and

assist with the estate's asset recovery efforts, (ii) one hundred twenty-five (125) individuals who

will be winding down the origination pipeline[3] and the Executive Trustee Services ("**ETS**")

group[4] and (iii) the Transitional Employees.

---

[3]    Ninety-two (92) individuals will be facilitating the wind down of the originations pipeline (i.e., loan
applications that were taken up to January 31, 2013) and will then become employees at Walter.  The applications
become funded loans or fall off along the way.  The team's activities include (i) loan set up compliance (ensuring
state law compliance, flood hazard noticing, etc.); (ii) closing services (generating closing packages, reviewing and
approving preliminary HUD-1s, completing  pre-closing checklists); (iii) funding services (approving final HUD-1s,
completing funding checklists and initiating wire requests); (iv) wire desk services (reviewing and processing wire
batches, daily reporting and reconciling of outbound and returned wires); (v) RESPA curative work (reviewing
100% of funded loans within 30 days of signing date and curing any RESPA findings); and (vi) sales support
(following up for missing documents, working with borrower to either fund loan or cancel the application).

[4]    ETS processes non-judicial foreclosure actions for GMACM and other third party clients in the states of
Arizona, California, Texas, and Washington.  The group is responsible for:  managing loans in foreclosure to ensure

ny-1082491 v3

10. The other remaining employees will work with the estate into 2014 and beyond. Each individual in this "core" wind down team of approximately one hundred employees will address one of five primary functions: (i) *claims resolution*: analyzing and facilitating the resolution of approximately 6,700 proofs of claim; (ii) *legal*: providing specialized advice regarding the claims resolution process, litigation resolution, government investigations and other regulatory and licensing matters, foreclosure lookback process, licensing maintenance, corporate governance, contract management, post-closing issues under the asset sale agreements, and maintenance/dissolution of various debtor and non-debtor entities; (iii) *asset disposition and operations management*: overseeing the liquidation of debtor and non-debtor assets and managing servicing and sub-servicing relationships, custody agreements and transitional service agreements with AFI and the asset purchasers; (iv) *administrative*: managing the IT infrastructure and data requirements of the estate as well as separation from AFI and asset purchasers and support of systems and applications pending migration of data out of sold data centers, managing wind down of physical facilities, implementation of estate payroll, 401(k) and insurance and benefit programs, overseeing contract sourcing, and maintaining business applications to facilitate administration of the estate; and (v) *finance and accounting*: governing transition and shared services agreements, cash management and accounts payable, providing regulatory, bankruptcy and credit facility reporting, supporting the estate's asset disposition and claims reconciliation efforts, and reconciling purchase price adjustments for the section 363 asset sales.

---

applicable investor timelines are met; managing and minimizing delayed foreclosure timelines; and acquiring assets, as needed, within acceptable periods and in compliance with state and federal laws, and investor requirements. The group also manages foreclosure stoppages (i.e., holds, rescissions, reinstatements) and foreclosure sales, property preservation and valuations. Eleven (11) individuals in this group will be released in March, with approximately thirty-three (33) individuals remaining to close out the inventory of non-judicial foreclosures in several states during the next four to six months. Upon completion of this task, these remaining employees will be terminated.

11.     Prior to the Petition Date, the vast majority of the employees received

their annual compensation in the form of base salary and variable pay, typically in the form of

awards through the Residential Capital, LLC Annual Incentive Plan (the "**ResCap AIP**") and,

for certain employees, the Ally Financial Inc. Long-Term Equity Compensation Plan (the "**AFI

LTECIP**").

12.     As of January 1, 2013, the Debtors no longer participate in the AFI

LTECIP or continue the ResCap AIP.

13.     Instead, individuals employed by the Debtors receive (i) base salary,

(ii) either (A) variable pay pursuant to a pre-existing compensation program[5] or (B) a KEIP or

KERP award, and are eligible for severance at the time they are terminated.

14.     Messrs. Whitlinger and Fleming each possess substantial legacy and

technical knowledge of the Debtors' operations and finances not possessed by others in the

estate, and, as a result, each individual has been intimately involved in the Debtors' financial and

capital markets activities throughout these Chapter 11 cases and are in the process of

transitioning their responsibilities and transferring knowledge to the core estate leadership team.

The Debtors believe it is prudent for these gentlemen to work with the Debtors through the end

of April 2013 (and, possibly, through June) in order to facilitate the transition of the day-to-day

financial and asset disposition activities to the core estate personnel.

15.     Mr. Whitlinger, the Debtors' Chief Financial Officer, continues to lead the

Debtors' efforts to respond to the Examiner's data and information requests (which will continue

through mid-May) as well as prepare and oversee the year-end financial statement reporting and

audit processes.  Mr. Whitlinger is also the designated "senior officer" of the Debtors' master

---

[5]    This variable pay is limited to ninety-one (91) individuals, including loan agents, closers, processors, managers
and supervisors, who are collectively facilitating the wind down of the originations pipeline.

ny-1082491 v3

servicing subsidiary, Residential Funding Company, LLC ("**RFC**"), which means he currently is the sole individual authorized[6] to interact with HUD and the respective state regulatory authorities on behalf of RFC.

16.     Mr. Fleming, the Debtors' Capital Markets Officer, continues to oversee and manage both the Shared Services Agreement with AFI, as well as the Debtors' compliance with the transition service agreements and related statements of work with Ocwen and Walter. In addition, he is overseeing the originations pipeline wind down and working to secure alternate trading lines as a backstop to the trading line that currently exists with Ally Investment Management.

17.     In addition, no individual eligible to receive an award under the Estate KERP has the ability to dictate overall company policy.

18.     The Debtors would have preferred to bring these matters before the Court sooner (especially in light of the short-term nature of the Executive KEIP); however, it was important to the Debtors that the details of these key employee plans were first vetted with the Creditors' Committee so that it had an adequate opportunity to provide its feedback.

19.     The Debtors initially previewed the general terms of these plans with the Creditors' Committee in late December.  In early February, the Debtors provided the Creditors' Committee with a more detailed version of the plans that included proposed award levels and performance metrics.  Subsequent to receiving these materials, the Creditors' Committee requested additional information and the Debtors' and Creditors' Committee's advisors continued to exchange information related to these plans.

---

[6] During this interim transition period, one or more of the core estate personnel will obtain the same licenses and approvals currently held by Mr. Whitlinger so that the Debtors can continue entering into HUD securitizations and maintaining the requisite state licenses for the balance of 2013, as needed in each case.

ny-1082491 v3

20.     Throughout the remainder of February and continuing into early March, the Debtors' executives and advisors both spoke and met with the Creditors' Committee's compensation sub-committee and its advisors on numerous occasions to address the Creditors' Committee's questions concerning these plans.  The Creditors' Committee provided counter-proposals to certain of the terms within the plans, and the Debtors responded in kind with further modifications to the plan terms.

21.     Ultimately, these collaborative efforts culminated in the Creditors' Committee providing its approval of these plans earlier today.

ny-1082491 v3

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on March 20, 2013 in New York, New York.

Tammy Hamzehpour
Chief Business Officer
Residential Capital, LLC

ny-1082491 v3