1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matters of:

6

7    RESIDENTIAL CAPITAL LLC, et al.,          Case No. 12-12020-mg

8

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   JENKINS, et al.,                          Case No. 12-01935-mg

12             Plaintiffs,

13            - against -

14   RESIDENTIAL FUNDING COMPANY, LLC, et al.,

15             Defendants.

16   - - - - - - - - - - - - - - - - - - - -x

17   KIMBER, et al.,                           Case No. 12-02045-mg

18             Plaintiffs,

19            - against -

20   GMAC MORTGAGE CORPORATION, et al.,

21             Defendants.

22   - - - - - - - - - - - - - - - - - - - -x

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    United States Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    March 21, 2013

19                    10:02 AM

20

21

22  B E F O R E:

23  HON. MARTIN GLENN

24  U.S. BANKRUPTCY JUDGE

25

1

2  (CC: Doc# 2994) Debtors' Motion Pursuant to 11 U.S.C. 105(a)

3  and (d), Bankruptcy Rules 1015(c), 2002(m), 7016, and 9007 and

4  Local Bankruptcy Rule 2002-2 for Entry of an Order Approving

5  (A) Supplement to Case Management Order Establishing Mandatory

6  Procedures for Management of Adversary Proceedings Commenced by

7  Borrowers and Former Borrowers and (B) Related Relief.

8

9  (CC: Doc# 3116) Debtors' Application Under Bankruptcy Code

10  Sections 327(a), 328(a) and 363 for Entry of an Order Approving

11  Third Addendum to Engagement Agreement with FTI Consulting,

12  Inc., as Financial Advisor to the Debtors.

13

14  Doc# 3123 Debtors' Motion Pursuant to Section 105(a) of the

15  Bankruptcy Code and Bankruptcy Rules 1009, 3007 and 9019(b) for

16  Approval of (I) Claim Objection Procedures, (II) Borrower Claim

17  Procedures, (III) Settlement Procedures, and (IV) Schedule

18  Amendment Procedures.

19

20  (CC: Doc# 3055) Debtors' Motion Pursuant to Bankruptcy Rule

21  3013 and Bankruptcy Code Section 362(a) for a Determination

22  That (I) GMAC Mortgages FRB Foreclosure Review Obligation Is a

23  General Unsecured Claim and (II) The Automatic Stay Prevents

24  Enforcement of the FRB Foreclosure Review Obligation.

25

1

2    (CC: Doc# 2274) Adj. Hearing RE: Motion for Relief from Stay

3    filed by Jeffrey L. Saltiel on behalf of Med&G Group, LP.

4

5    Adj. Hearing Re: Cure Objections. (Related Document no. 61)

6

7    (CC: Doc no. 1746) Status Conference RE: Limited Objection of

8    Financial Guaranty Insurance Company to the Debtors' Sale

9    Motion and Assumption Notice [Docket No. 1746]

10

11   Adversary Proceeding 12-01935-mg, Jenkins, et al. v.

12   Residential Funding Company, LLC, et al.: Doc# 10 Adj. Hearing

13   RE: Debtors Motion Pursuant to Fed. R. Bankr. P. 7012 and Fed.

14   R. Civ. P. 12(e) for a More Definitive Statement.

15

16   Adversary Proceeding 12-01935-mg, Jenkins, et al. v.

17   Residential Funding Company, LLC, et al.:  (CC: Doc no. 1)

18   Adjourned Pre-trial Conference

19

20   Adversary Proceeding 12-02045-mg, Kimber, et al. v. GMAC

21   Mortgage Corporation et al.:  (CC: Doc no. 1) Adjourned Pre-

22   trial Conference

23

24   Adversary Proceeding 12-02045-mg, Kimber, et al. v. GMAC

25   Mortgage Corporation, et al.:  (CC: Doc# 13) Motion to Dismiss

1   Adversary Proceeding / Debtors' Motion for Dismissal of

2   Adversary Proceeding Pursuant to Bankruptcy Rule 7012(b) and

3   FRCP 12(b)(5) and (6) or, in the Alternative, Permissive

4   Abstention Pursuant to 28 U.S.C. 1334(c)(1)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4         Attorneys for Debtors
 5         1290 Avenue of the Americas
 6         New York, NY 10104
 7
 8   BY:   NORMAN S. ROSENBAUM, ESQ.
 9         ERICA J. RICHARDS, ESQ.
10         LORENZO MARINUZZI, ESQ.
11         STEFAN W. ENGELHARDT, ESQ.
12         JAMES A. NEWTON, ESQ.
13         TODD M. GOREN, ESQ.
14         GARY S. LEE, ESQ.
15
16
17   MORRISON & FOERSTER LLP
18         Attorneys for Debtors
19         755 Page Mill Road
20         Palo Alto, CA 94304
21
22   BY:   DARRYL P. RAINS, ESQ.
23
24
25
```

1

2  MORRISON & FOERSTER LLP

3          Attorneys for Debtors

4          2000 Pennsylvania Avenue NW

5          Suite 6000

6          Washington, DC 20006

7

8  BY:   OLIVER I. IRELAND, ESQ.

9

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12          Attorneys for Official Creditors' Committee

13          1177 Avenue of the Americas

14          New York, NY 10036

15

16  BY:   RACHAEL L. RINGER, ESQ.

17          KENNETH H. ECKSTEIN, ESQ.

18          ELISE S. FREJKA, ESQ.

19          P. BRADLEY O'NEILL, ESQ.

20          JOSEPH A. SHIFER, ESQ.

21

22

23

24

25

1

2   SILVERMANACAMPORA LLP

3        Special Counsel to Creditors' Committee

4        100 Jericho Quadrangle

5        Suite 300

6        Jericho, NY 11753

7

8   BY:   JUSTIN S. KRELL, ESQ.

9

10

11  WILMER CUTLER PICKERING HALE AND DORR LLP

12       Special Counsel to Creditors' Committee

13       250 Greenwich Street

14       New York, NY 10007

15

16  BY:   WILLIAM J. PERLSTEIN, ESQ.

17

18

19  U.S. DEPARTMENT OF JUSTICE

20       U.S. Attorney's Office

21       86 Chambers Street

22       3rd Floor

23       New York, NY 10007

24

25  BY:   JOSEPH N. CORDARO, ESQ.

1

2 COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

3          Attorneys for FTI Consulting Inc.

4          900 Third Avenue

5          16th Floor

6          New York, NY 10022

7

8 BY:   JOHN H. DRUCKER, ESQ.

9

10

11 CLIFFORD CHANCE US LLP

12          Attorneys for Ocwen Loan Servicing, LLC

13          31 West 52nd Street

14          New York, NY 10019

15

16 BY:   JENNIFER C. DEMARCO, ESQ.

17

18

19 BOARD OF GOVERNORS OF THE FEDERAL REVIEW SYSTEM

20          20th and C Streets NW

21          Washington, DC 20051

22

23 BY:   JENNIFER L. SUTTON, ESQ.

24

25

1

2   CLEARY GOTTLIEB STEEN & HAMILTON LLP

3          Attorneys for Wilmington Trust

4          One Liberty Plaza

5          New York, NY 10006

6

7   BY:   MARK A. LIGHTNER, ESQ.

8          SEAN A. O'NEAL, ESQ.

9

10

11   KIRKLAND & ELLIS LLP

12          Attorneys for Ally Financial Inc. & Ally Bank

13          601 Lexington Avenue

14          New York, NY 10022

15

16   BY:   RAY C. SCHROCK, ESQ.

17

18

19   KIRKLAND & ELLIS LLP

20          Attorneys for Ally Financial Inc. & Ally Bank

21          655 Fifteenth Street N.W.

22          Washington, DC 20005

23

24   BY:   GREGORY L. SKIDMORE, ESQ.

25

```
 1

 2   KELLEY DRYE & WARREN LLP

 3          Attorneys for UMB Bank

 4          101 Park Avenue

 5          New York, NY 10178

 6

 7   BY:   CATHERINE L. THOMPSON, ESQ.

 8

 9

10   WHITE & CASE LLP

11          Attorneys for Ad Hoc Group of Junior Secured Noteholders

12          1155 Avenue of the Americas

13          New York, NY 10036

14

15   BY:   HARRISON DENMAN, ESQ.

16          J. CHRISTOPHER SHORE, ESQ.

17

18

19   JONES DAY

20          Attorneys for FGIC

21          222 East 41st Street

22          New York, NY 10017

23

24   BY:   RICHARD L. WYNNE, ESQ.

25
```

```
 1
 2   WEIL, GOTSHAL & MANGES LLP
 3         Attorneys for Syncora Guarantee, Inc.
 4         767 Fifth Avenue
 5         New York, NY 10153
 6
 7   BY:   SARA COELHO, ESQ.
 8
 9
10   WENIG SALTIEL LLP
11         Attorneys for MED&G Group
12         26 Court Street
13         Suite 1200
14         Brooklyn, NY 11242
15
16   BY:   WILLIAM E. BANEY, ESQ.
17
18
19   LAW OFFICES OF RICHARD SAX
20         Attorneys for Julio Solano
21         448 Sebastopol Avenue
22         Santa Rosa, CA 95401
23
24   BY:   RICHARD SAX, ESQ. (TELEPHONICALLY)
25
```

 1

 2  BRADLEY ARANT BOULT CUMMINGS LLP

 3        Attorneys for MERS & Susan Turner

 4        1819 Fifth Avenue North

 5        Birmingham, AL 35203

 6

 7  BY:   GLENN E. GLOVER, ESQ. (TELEPHONICALLY)

 8        JAMES P. WATKINS, ESQ. (TELEPHONICALLY)

 9

10

11  ALSO PRESENT:

12        SCOTT GOLDMAN, Residential Capital (TELEPHONICALLY)

13        SHARON B. JENKINS, Pro Se (TELEPHONICALLY)

14        FRANK REED, Defendant X

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  We're here in

3    Residential Capital, number 12-12020.  We also have several of

4    the adversary proceedings.  Mr. Rosenbaum?

5            MR. ROSENBAUM:  Good morning, Your Honor.  Norm

6    Rosenbaum, Morrison & Foerster, for the debtors.  Your Honor,

7    the first matter on is at page 8 of the agenda.  It's IV.

8    These are the uncontested matters.

9            THE COURT:  Go ahead.

10           MR. ROSENBAUM:  Your Honor, the first matter on is the

11   debtors' motion to approve a supplement to the case management

12   procedures --

13           THE COURT:  Right.

14           MR. ROSENBAUM:  -- to apply to borrower adversary

15   proceedings.  That's docket number 2994.  Your Honor, no

16   objections have been received to the motion.  These procedures

17   were developed closely in consultation between counsel for the

18   debtors, the committee and the special borrowers' committee,

19   SilvermanAcampora.  If Your Honor has any questions, I'd be

20   happy --

21           THE COURT:  I do.

22           MR. ROSENBAUM:  -- to address them.

23           THE COURT:  First, if there anybody else who wishes to

24   be heard with respect to this motion?

25           All right.  In the paragraph dealing with the

1    extension of answer or response deadlines, you need to make a

2    change.  It reads now, "The following extensions will apply

3    notwithstanding any other date fixed by order of the Court."

4    That needs to be changed:  "The following extensions will apply

5    except as otherwise ordered by the Court."

6              MR. ROSENBAUM:  Thank you, Your Honor.

7              THE COURT:  Anybody else have anything they want to

8    raise?

9              With that change, the motion is granted.

10             MR. ROSENBAUM:  Thank you, Your Honor.  The next

11   matter on is number 4 on page 9.  And I'll cede the podium to

12   my partner, Mr. Marinuzzi.

13             MR. MARINUZZI:  Good morning, Your Honor.  For the

14   record, Lorenzo Marinuzzi on behalf of the debtors.  Your

15   Honor, the next item on the agenda is the debtors' application

16   to amend the terms of FTI's retention.

17             As originally retained, Your Honor, FTI have this

18   concept of a monthly fee cap and a rollover provision, where to

19   the extent they incur time in excess of the monthly cap, but

20   there was some room going forward between the cap and what was

21   actually incurred, they could apply it.  And realizing that

22   this case is taking longer than the parties anticipated it was

23   going to take when they originally agreed to these retention

24   terms, and in consultation with the committee, what we're doing

25   is just extending the rollover concept through the end of the

1   year or through the confirmation of a plan.

2           Your Honor, we've modified the order, revised it in

3   accordance with the agreement between the debtors, FTI, and the

4   committee.  I'm happy to send up to Your Honor a copy of the

5   marked order if you'd like to see it?

6           THE COURT:  Sure, please.  Thank you.

7       (Pause)

8           THE COURT:  Okay, Mr. Marinuzzi.

9           MR. MARINUZZI:  Your Honor, as Your Honor notes from

10  the modifications, we've built in also this concept that it

11  extends through December 31st, subject to further agreement

12  with the committee, in which case, no further order would be

13  required from Your Honor.

14          THE COURT:  All right.  Does anybody else wish to be

15  heard with respect to the FTI engagement?  Mr. Eckstein?

16          MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

17  Eckstein of Kramer Levin.  The creditors' committee reviewed

18  this with the debtor and with FTI and is satisfied with the

19  proposed order.

20          THE COURT:  Thank you.  Anybody else want to be heard?

21          All right, it's approved.

22          MR. MARINUZZI:  Thank you very much, Your Honor.

23  We'll submit an order.

24          Your Honor, I'm going to cede the podium again to my

25  partner, Mr. Rosenbaum.

1          THE COURT:  Thank you.

2          MR. ROSENBAUM:  Your Honor, the next matter on is the

3    debtors' motion for approval of claims objection procedures,

4    borrower claim procedures, settlement procedures and schedule

5    amendment procedures.

6          Your Honor, again, this motion and proposed order was

7    developed in close cooperation with counsel for the committee

8    and special borrowers' counsel.  No objections have been

9    received, Your Honor.  If Your Honor has any questions, I'm

10   happy to address them.  We did receive one request from AFI for

11   a reservation of rights to be basically carved out of the

12   order.  That's the only change we made to the order that was

13   filed with the motion.

14         THE COURT:  All right.  Let me see if I had any

15   questions about this one.  Anybody else wish to be heard with

16   respect to this motion?

17         All right, the motion's granted.

18         MR. ROSENBAUM:  Thank you, Your Honor.  Your Honor, I

19   think that moves us to the -- oh, Your Honor, I'm sorry.  There

20   was one issue I did want to raise.  Your Honor entered the

21   supplemental case management procedures.  There are two matters

22   on.  There's a status conference and a motion to dismiss on in

23   two of the adversary proceedings.  That would obviate the need

24   to go forward.

25         THE COURT:  I didn't view it that way.  I thought

1  about that.  You had -- the two motions were in Jenkins and

2  Kimber.

3          MR. ROSENBAUM:  Yes, Your Honor.

4          THE COURT:  And my view is, we're going forward with

5  those.

6          MR. ROSENBAUM:  We're prepared to do so, Your Honor.

7  Thank you.

8          THE COURT:  We're going forward with those.  In fact,

9  I'd like to do those now.  I'd like to take them out of order

10  and deal with them now.  I think they're here.

11          MR. ROSENBAUM:  That's fine, Your Honor.

12          THE COURT:  Okay.  I don't need -- I've read all the

13  papers.  That's why I don't want to put this off any longer.

14  I've been prepared for this several times before.

15          MR. ROSENBAUM:  Your Honor, you want to take the

16  Jenkins matter first?

17          THE COURT:  I do.  I'd like to take --

18          MR. ROSENBAUM:  I'm going to cede --

19          THE COURT:  -- Jenkins and Kimber now.

20          MR. ROSENBAUM:  That's fine, Your Honor.  I'll cede

21  the podium to James --

22          THE COURT:  Actually what I'd like to do is hear from

23  the defendants' counsel first.  I may not have to hear from the

24  moving parties.  All right.  So is anybody going to argue in

25  opposition to the motion for a more definite statement in

RESIDENTIAL CAPITAL LLC, ET AL.                          19

1  Jenkins?

2          MR. NEWTON:  Your Honor, I believe Ms. Jenkins is on

3  the phone.

4          THE COURT:  Ms. Jenkins, are you on the phone?

5          MS. JENKINS:  Yes, sir.

6          THE COURT:  Would you like to be heard in opposition

7  to the motion?

8          MS. JENKINS:  I'd like to make a statement to you,

9  Your Honor, that we have not secured the proper counseling yet.

10 Even though, you know, we are definitely in process of doing

11 that.  And we appreciate the indulgence of the Court and the

12 other parties to allow us to continue to try to get the proper

13 lawyer.  And so we're not really prepared to respond at this

14 time.

15          Your Honor, if I may say, we are senior citizens with

16 limited resources.  And we only found out that there's serious

17 concerns regarding the processing of some corrected assignments

18 and all during a modification process.  We would really

19 appreciate time to get the right lawyer.

20          THE COURT:  Well, what I'm going to -- is there

21 anything else you'd like to add, Ms. Jenkins?

22          MS. JENKINS:  Not right now, sir.

23          THE COURT:  Okay.  The debtors' motion is for a more

24 definite statement.  The difficulty with the complaint is that

25 it really is not clear what relief you're seeking or why.  I'm

1   going to grant the debtors' motion for a more definite

2   statement and provide that you have sixty days in which to file

3   an amended complaint.  That amount of time, Ms. Jenkins, will

4   give you time, if you're able to do so, to find counsel to go

5   ahead and file the amended complaint.

6          So it does not, on any final basis, dispose of the

7   matter.  But the debtors' motion, which has been on file for

8   quite some time -- this matter has been adjourned before -- I

9   think pretty clearly lays out the difficulty, the problems,

10  with the complaint you filed.

11         So I'm going to go ahead and ask Mr. Newton if you

12  would prepare an order that grants the debtors' motion for a

13  more definite statement and provides that the plaintiffs shall

14  have sixty days in which to file an amended complaint.  Set

15  this down for another status conference, another case

16  management conference.  I don't know what the dates are, but in

17  advance of that sixty-day deadline.

18         And Ms. Jenkins, you can provide me with an update as

19  to whether you've been able to obtain counsel or not.  So I'm

20  sympathetic to your argument.  I mean, the case has been on

21  file for quite some time.  And --

22         MS. JENKINS:  Yes, sir.

23         THE COURT:  -- I know it's very difficult to proceed

24  with a case such as this without counsel.  So you'll have a

25  chance, still, to find counsel.  You've got to -- somebody's

1    got to fix the complaint, whether you have a lawyer or not.

2    Hopefully, if you're able to, you can get a lawyer who can do

3    that.  So you'll still have that chance.  But that's going to

4    be the Court's disposition of the motion in Jenkins.

5            Is there anything you need to add?

6            MR. NEWTON:  No, Your Honor, thank you.

7            THE COURT:  All right.  Thank you.  Ms. Jenkins,

8    you're excused, okay?

9            MS. JENKINS:  Thank you so much.

10           THE COURT:  All right.

11           MR. NEWTON:  With that, Your Honor, I'll cede the

12   podium to my colleague, Erica Richards, for the Kimber matter.

13           THE COURT:  Okay.

14           MS. RICHARDS:  Good morning, Your Honor.  For the

15   record Erica Richards of Morrison & Foerster appearing on

16   behalf of the debtors.  At your request, we'll turn now to the

17   Kimber adversary proceeding.  It's case number 12-02045.

18           THE COURT:  And I guess I should have said -- let me

19   just back up for a second, because I didn't identify the

20   Jenkins case by case number.  That's adversary -- Jenkins v.

21   Residential Funding Co., LLC, is adversary proceeding number

22   12-01935.  I should have said that for the record.

23           So now go ahead with Kimber.  Go ahead, Ms. Richards.

24           MS. RICHARDS:  Your Honor, today Kimber is scheduled

25   as both a pre-trial conference and as a hearing on two motions

RESIDENTIAL CAPITAL LLC, ET AL.                              22

1   to dismiss that were filed.

2          THE COURT:  Let's go forward with the motions to

3   dismiss.  And again, what I'd like to do is hear from the

4   defendant's counsel -- from the plaintiff's counsel first with

5   respect to any opposition to the motions to dismiss.  Is anyone

6   appearing on behalf of Kimber in response to the two motions to

7   dismiss?  Is there anybody on the phone in the Kimber case?

8          All right.  The Court is going to take the Kimber

9   motions -- the two motions to dismiss under submission and

10  issue an appropriate ruling on them.  Thank you very much.

11         MS. RICHARDS:  Your Honor, I would just also note,

12  there was one count left of the complaint in the Kimbers'

13  Chapter 13 proceeding.  The judge in that case has entered an

14  order dismissing that final count.

15         THE COURT:  All right.  Can you provide the Court with

16  a copy of the order?

17         MS. RICHARD:  Absolutely.

18         THE COURT:  Why don't you -- you can bring it up and

19  give it to one of my law clerks now.  Okay?  Thank you very

20  much.

21         All right, thank you very much.

22         MS. RICHARDS:  Thank you, Your Honor.

23         THE COURT:  All right, so we've taken care of Jenkins

24  and Kimber.  What's next?

25         MR. RAINS:  Good morning, Your Honor.  Darryl Rains of

1    Morrison & Foerster for the debtors.  And I'm here to deal with

2    the 3013 motion by the debtors to classify the Federal

3    Reserve's consent order as a pre-petition unsecured claim.

4              THE COURT:  Before we get to that, is there anything

5    else remaining on today's agenda other than the FRB motion?  I

6    don't think so.  Mr. Rosenbaum, is there anything else?

7              MR. ROSENBAUM:  There are some cure matters, Your

8    Honor.

9              THE COURT:  Those are really on just for status,

10   aren't they, or -- somebody help me out here.  Well, there was

11   a partial resolution of --

12             MR. ROSENBAUM:  I'm sorry, Your Honor.  It's Norm

13   Rosenbaum --

14             THE COURT:  -- MED&G --

15             MR. ROSENBAUM:  Yes.

16             THE COURT:  -- matters.  Why don't -- let's deal with

17   that.  I do --

18             MR. ROSENBAUM:  Understood.

19             THE COURT:  -- want to hear the argument on

20   classification of the Federal Reserve issue, but I want to

21   clear the rest of the stuff out of the way.

22             MR. ROSENBAUM:  I believe counsel for MED&G is in the

23   courtroom.

24             THE COURT:  Come on up.  And I saw from the amended

25   agenda that you have a partial -- as I understand it, a partial

RESIDENTIAL CAPITAL LLC, ET AL.                    24

1    resolution of the MED&G relief from stay motion and the
2    remainder then would carry.  Is that right?
3              MR. ROSENBAUM:  Yes, Your Honor.
4              THE COURT:  Go ahead and make your appearance.
5              MR. BANEY:  William Baney, Wenig Saltiel, for the
6    movant.
7              THE COURT:  Okay.  Somebody describe what --
8              MR. ROSENBAUM:  Sure.  The partial resolution is very
9    straightforward.  In the underlying action, MED&G has cross-
10   claims against the debtors for basically equitable relief for
11   quiet title and for a declaratory judgment.
12             We're prepared to stipulate to allow those actions to
13   go forward, so that case can proceed.  We're also a defendant
14   in that action, as the former servicer under the mortgage.
15   That will allow that portion of the case to go forward.  We're
16   not prepared to stipulate today to allow the monetary damage
17   claims portion of that action to go forward against the
18   debtors.
19             THE COURT:  As I understand from your objection to the
20   motion, no proof of claim was filed?
21             MR. ROSENBAUM:  That's correct, Your Honor.
22             THE COURT:  And no motion for a late-filed claim has
23   been -- unless maybe something's been filed and I haven't seen
24   it yet.
25             MR. ROSENBAUM:  MED&G has recently, I think, earlier

1  this week or late last week, filed a motion to file an untimely

2  proof of claim.

3           THE COURT:  Okay.  So that piece of it's --

4           MR. ROSENBAUM:  We can submit a -- pursuant to our

5  stipulation, we can agree on a scheduling and put that off.

6           THE COURT:  All right.

7           MR. ROSENBAUM:  Hopefully we'll -- this potentially

8  may provide the opportunity to come to a resolution of this

9  matter.

10          THE COURT:  All right.  Counsel, do you want to --

11  anything you want to add?

12          MR. BANEY:  No, Your Honor.  That's --

13          THE COURT:  Tell me your name again?

14          MR. BANEY:  William Baney.

15          THE COURT:  Thank you.  Okay.  All right.  That's

16  satisfactory to me.  So you'll submit a stipulation?

17          MR. ROSENBAUM:  Yes, Your Honor.

18          THE COURT:  Okay, thank you.  Appreciate it.  All

19  right.

20          MR. ROSENBAUM:  Your Honor, I think the next matter is

21  the status conference on the FGIC cure objection.  I'll cede

22  the podium to my partner Todd Goren.

23          THE COURT:  I'm sorry, your voice trailed off.

24          MR. ROSENBAUM:  Oh, I'm sorry.

25          THE COURT:  FGIC?

RESIDENTIAL CAPITAL LLC, ET AL.                          26

1        MR. ROSENBAUM:  It's the status conference on the

2    pending FGIC cure objection.

3        THE COURT:  Yes.

4        MR. ROSENBAUM:  And I'm ceding the podium to Mr.

5    Goren.

6        THE COURT:  Okay.  Mr. Goren?

7        MR. GOREN:  Thank you, Your Honor.  Todd Goren,

8    Morrison & Foerster, on behalf of the debtors.

9        I believe we have a tentative resolution on a path

10   forward.  There had been some letters exchanged and --

11       THE COURT:  Yes, I know.  I saw the letters.

12       MR. GOREN:  And the primary dispute was FGIC wants to

13   sort of keep everything together.  The debtors had an issue

14   with that because FGIC's asserting 281 million on cure on deals

15   that Ocwen's saying we can't assume and assign to them.  So we

16   had a bit of a chicken and egg problem.

17       The fix we came up with that, is FGIC has agreed to

18   cap their cure claim at the purchase price on the MSRs for

19   those term-to-term deals, so that that will allow us to go

20   forward with everything all at once and push off any cure

21   hearing with respect to those deals until we can figure out

22   whether or if they're being assumed and assigned.

23       So I think with that resolution, we were looking for

24   potentially a late May hearing date.  We could set it up for

25   the May 30th omnibus or --

1           THE COURT:  No, I don't think so.  May 28th is the

2    start of the 9019 trial.

3           MR. GOREN:  Right.

4           THE COURT:  So it isn't going to happen then.

5           MR. GOREN:  Okay.  That makes sense.  So --

6           THE COURT:  I mean, you'll get a date soon.  I'm not

7    trying to put you off, but --

8           MR. GOREN:  No, no, that --

9           THE COURT:  -- we've got a trial scheduled.

10          MR. GOREN:  Okay.  So --

11          THE COURT:  I'd be very happy, if that date opens up

12   that -- go ahead, Mr. Goren.

13          MR. GOREN:  So should we just speak with chambers

14   about a date?

15          THE COURT:  Yes, please do.

16          MR. GOREN:  Okay.

17          THE COURT:  But let me -- counsel, why don't you come

18   on up and identify yourselves for the record.

19          MR. WYNNE:  Good morning, Your Honor.  Richard Wynne

20   of Jones Day on behalf of FGIC.

21          THE COURT:  Good morning.  Anybody else?

22          MS. DEMARCO:  Good morning.  Jennifer DeMarco from

23   Clifford Chance, for Ocwen.

24          THE COURT:  Okay.  So I don't want to get into a back-

25   and-forth about it.  I've read the letters.  I guess the

1    distressing thing to me is at least what FGIC seems to believe

2    is the unresponsiveness of Ocwen in trying to get these issues

3    resolved.  Is there a process underway to do that?  Because

4    otherwise I will enter an order requiring face-to-face meetings

5    and a path forward.

6            The one thing I won't abide is ignoring the issues,

7    not responding, not negotiating, not trying to resolve it,

8    putting it off month by month by month.  So either you all work

9    out this process going forward, the path forward, with specific

10   dates when you'll exchange position statements, when you'll

11   meet, when you'll try and resolve it, but otherwise I'm going

12   to -- if you can't agree on that, I'm going to enter an order.

13           MS. DEMARCO:  Your Honor, we didn't respond to FGIC's

14   letter.  At the time --

15           THE COURT:  I don't know you didn't.

16           MS. DEMARCO:  -- it was scheduled.  We don't agree

17   with its content --

18           THE COURT:  And you probably have a different point of

19   view.

20           MS. DEMARCO:  -- we don't agree with it at all.

21           I do believe we have a process in terms of negotiating

22   going forward.  This is not about adequate assurance.  This is

23   about FGIC's request for amendments to its contracts.

24           THE COURT:  And the only way that's going to happen is

25   if you're meeting and exchanging positions and actually

1    negotiating it.

2              MS. DEMARCO:  They made a proposal yesterday.

3              THE COURT:  Okay.

4              MS. DEMARCO:  And there is a process by which we

5    are -- or at least a timeline by which we'll either agree or we

6    won't agree.

7              THE COURT:  What's the timeline?

8              MS. DEMARCO:  Four weeks.

9              THE COURT:  Okay.  Is that satisfactory?

10             MR. WYNNE:  Yes, Your Honor.  We actually did have a

11   very productive meeting yesterday.

12             THE COURT:  Okay.

13             MR. WYNNE:  And I think that we're on, I think, the

14   right path.  And, Your Honor, if we get off the path, I think

15   we've talked about a scheduling order that will have certain

16   dates --

17             THE COURT:  Okay.

18             MR. WYNNE:  -- and I think we'll be fine.

19             THE COURT:  That's fine.  Thank you very much.

20             MR. WYNNE:  Thank you, Your Honor.

21             THE COURT:  Okay.  Mr. Goren, anything else on this?

22             MR. GOREN:  That's it, Your Honor.  Thank you.

23             THE COURT:  Thank you, Mr. Goren.  Mr. Rains,

24   everything else is cleared away now?  Okay.

25             MR. RAINS:  Good morning, Your Honor.  Once again,

1    Darryl Rains of Morrison & Foerster, here to address the
2    classification motion under Rule 3013.
3            Before I begin with my remarks, I wanted to address
4    the issue of whether this should be an evidentiary hearing or
5    not.  And I'm happy to report that the creditors' committee and
6    Ally and the debtors have discussed this, and we have concluded
7    that if I can read three stipulated facts into the record,
8    there is no other need to offer additional evidence at the
9    hearing today.
10            As the Court knows, some exhibits have been offered.
11    Those came in without objection.  There are declarations from
12    our side from Mr. Marano and from Ally from Mr. Mackey.  And
13    the parties have agreed, we don't need to cross-examine those
14    witnesses unless the Court needs to have them testify.
15            THE COURT:  I don't.
16            MR. RAINS:  So with the Court's permission, I would
17    like to just read three stipulated facts that have been agreed
18    to between Ally and the debtors, which will allow us to avoid
19    live testimony.
20            One:  With consent order compliance, the debtors
21    generated substantial value to the estates.  Two:  Ally is
22    secondarily liable for the costs of the foreclosure review as
23    set out in the consent order and the supplemental agreement
24    between Ally and the Federal Reserve.  Third:  Ally is jointly
25    liable to PricewaterhouseCoopers for the costs of the

1    foreclosure file review under the terms of the Pricewaterhouse

2    engagement letter.

3            With that, Your Honor, I'd like to begin with one

4    simple idea.  The law does not and should not require the

5    debtors to waste 300 million dollars.  I say 300 million

6    dollars, because that is the projected cost from today going

7    forward of paying PricewaterhouseCoopers to do its foreclosure

8    file review.  And I use the word "waste", because all parties,

9    from Ben Bernanke on down have concluded that the foreclosure

10   file review process is a waste.  It was a mistake from the

11   beginning.  It is a waste of money.  It is a foolish process.

12           I appreciate that we're in a court of equity.  I

13   submit that it is -- well, wasting 300 million dollars is

14   neither fair nor equitable to the debtors' estate nor to the

15   creditors of the estate, and most importantly, it is not fair

16   or equitable to the borrowers, on whose behalf the consent

17   order was entered into and who are still waiting for payment.

18           As the Court knows, until now, the debtors have been

19   of the view that the foreclosure file review was properly

20   treated as an administrative expense.  It was an actual and

21   necessary cost of preserving the estate.  We felt that

22   compliance with the regulators' dictates was and is necessary.

23   And the debtors saw no alternative but to proceed with the

24   foreclosure file review.  And this Court agreed with us.

25           But several new developments have made it clear to the

 1   debtors that the foreclosure file review is no longer
 2   necessary.  It is not the only alternative available.  It is
 3   not necessary for the preservation of the estates' assets.
 4   Indeed, quite the opposite.  We've reached the conclusion that
 5   the foreclosure file review is unnecessary and that it is
 6   depleting the estates' assets.
 7            THE COURT:  If the foreclosure file review is
 8   completed, what is the resulting work product supposed to show?
 9            MR. RAINS:  The foreclosure file review, if you look
10   at paragraph 3 and 4 of the consent order, it requires the
11   preparation of a report by PricewaterhouseCoopers.  And the
12   report really only has to say two things for each borrower:
13   were they injured and by how much.
14            And so you can think of the foreclosure file review as
15   a preparatory step to the debtors' ultimate obligation to make
16   a restitution or remediation payment to injured borrowers.  It
17   is a --
18            THE COURT:  So absent the consent order requiring the
19   foreclosure review, there is no other process in place to
20   identify borrowers who have been harmed and in what amounts.
21   Is that correct?
22            MR. RAINS:  That is correct, Your Honor.  Let me say
23   two things.  The consent order and the power that the Federal
24   Reserve has under 1818 is to order remediation or
25   reimbursement.  In this particular consent order, it is a two-

1    step process.  The second step is pay reimbursement.  The first

2    step was hire PricewaterhouseCoopers to find out who was

3    injured and by what amount.

4           The alternative that is now available to us skips

5    that --

6           THE COURT:  Well, it's not available to you, because

7    you haven't negotiated an amendment to the consent order with

8    the Federal Reserve Board.

9           MR. RAINS:  I understand that that's the Federal

10   Reserve's point.  But I want to speak to you in a moment about

11   Chateaugay, because I think it doesn't require that amendment.

12   But the Court is correct that under the consent order, it's a

13   two-step process.  The alternative that has been made available

14   to everyone else turns it into a one-step process which is

15   faster, cheaper and easier, but as the Court recognizes, is

16   over-inclusive.  The new process provides money to everyone who

17   was foreclosed upon by a servicer, whether or not they can

18   demonstrate any injury.

19          Let me take up the Court's point whether it has to be

20   in a consent order.  I think first that it is -- the Court

21   needs to recognize that this is not just an amendment that has

22   been achieved by thirteen other servicers.  What we really have

23   here is a change of policy or a change in position by the

24   Federal Reserve, that does apply to everyone.

25          We know that the Federal Reserve has already entered

RESIDENTIAL CAPITAL LLC, ET AL.                    34

1  into settlements or amended consent orders with thirteen other

2  servicers.  The Court needs to appreciate that that same

3  proposal has been made to the debtors.  I'm not going to speak

4  to any of the terms or the amounts.  But it is clear that the

5  Federal Reserve -- it's now in public -- that the Federal

6  Reserve has made a cash payment option available to the debtors

7  in lieu of foreclosure file review.  So that option has been

8  made available to us, and it's clear that it is an option that

9  is available to the Federal Reserve.

10         I also wanted to highlight for the Court some of the

11  comments made by Chairman Bernanke three weeks ago before the

12  House Financial Services Committee, where he was asked tough

13  questions about why the Federal Reserve has required servicers

14  to spend over one and a half billion dollars on consultants

15  without any money going out to borrowers.

16         What Mr. Bernanke said -- and it's responsive to the

17  Court's question -- he said, "We've changed our process to a

18  much quicker, more streamlined process, which is going to cut

19  out the consultants and will have checks going out to borrowers

20  very, very quickly, within weeks."  He went on to say that,

21  under the new cash payment program, "all of which will be

22  reflected either in cash payments or in mortgage relief to

23  borrowers, none going to consultants."

24         Our conclusion from these facts is that the

25  foreclosure file review program has been ended.  It is being

1   replaced by a better alternative, lump sum restitution

2   payments; that the Fed wants to stop wasting money on

3   consultants and wants to get relief out to borrowers.  We think

4   that recognition is enough under Chateaugay to allow the Court

5   to conclude that our obligation is one for a cash payment which

6   can be classified as a pre-petition --

7              THE COURT:  How much is that cash payment?

8              MR. RAINS:  What I can tell you is we have offered --

9              THE COURT:  The Fed has cut a deal with others

10  quantifying the amount, but you don't have a deal with the Fed.

11  You don't have a signed agreement -- you may have discussions

12  with the Fed, but you don't have a signed agreement with the

13  Fed as to how much could be paid to avoid the consent.

14             MR. RAINS:  That is correct.  We don't have a signed

15  agreement.  We do have a proposal from them.

16             THE COURT:  I understand you have a proposal.

17             MR. RAINS:  But let me be more clear.  We have made a

18  counterproposal to them which I believe is in the same amount.

19  The difference between us is not the amount of the claim; it is

20  whether it is an administrative cash payment or it is an

21  unsecured claim.  That's really the difference, not the amount

22  that we would --

23             THE COURT:  Well --

24             MR. RAINS:  -- be agreeing to.

25             THE COURT:  -- you don't have an agreement with the

1  Fed --

2          MR. RAINS:  That is correct.

3          THE COURT:  -- to amend the consent order.

4          MR. RAINS:  That's absolutely correct.

5          THE COURT:  So the only -- absent an amendment of a

6  consent order there is no other obligation that would quantify

7  how much would be paid and how it would be treated in terms of

8  priority.

9          MR. RAINS:  So again, I don't think the number will be

10 in dispute, but I believe the Court has plenty of powers to

11 help us decide what the amount would be.  The Court could

12 estimate it if nothing else happens.  But what we've seen -- I

13 read this in the OldCo M Corp case that you decided -- there

14 are -- even future contingent claims, you can come to an

15 agreement or a resolution of what the amount should be.  And I

16 think we could do that here.  I don't think that's the

17 obstacle.  The obstacle is whether it's cash or a claim.

18         Now, let me address the Court's very specific point.

19 The Fed argues that the option to make a cash payment's not in

20 the consent order.  That's clearly true.  But I believe that's

21 a misreading of Chateaugay.  In the Second Circuit decision,

22 what the court said was, if you are trying to remedy a past

23 problem like an environmental spill or something else, but it

24 is clear that what you're trying to do does not affect ongoing

25 behavior, and if the regulator had the statutory authority to

RESIDENTIAL CAPITAL LLC, ET AL.                    37

1   seek as an alternative a cash payment, that is enough.

2          Let me read the key sentence from Chateaugay to you,

3   because I think it sets out this exact issue.  It's from page

4   1008 of the Second Circuit's decision.  "In order to clean up a

5   site, to the extent that it imposes obligations distinct from

6   any obligation to stop or ameliorate ongoing pollution, is a

7   claim if the creditor obtaining the order had the option, as

8   CERCLA confers, to do the cleanup work itself and sue for

9   response costs."

10          The issue here is not whether the opportunity arises

11  under the consent order.  It's whether the creditor, in this

12  case the Fed, had the option under its statute, to seek a cash

13  payment as a remedy.  That's what Chateaugay says.  And 1818(b)

14  gives the Fed that exact power.

15          THE COURT:  Where in the statute is that?

16          MR. RAINS:  1818(b).  That's Article 12, 1818(b).

17  It's the cease and desist order power that belongs to the

18  Federal Reserve, has a provision in it that gives them specific

19  power to order reimbursement or remediation payment.  It is, in

20  fact, the power by which the Federal Reserve ordered us to

21  provide remediation to our customers.  And it is the same

22  provision that allowed them to make the amendments providing

23  for cash payments that the thirteen other providers have

24  already done.  So I don't think there's any dispute under

25  1818(b) that the Fed's power to order restitution allows them

1 to order a cash payment.

2        THE COURT:  Absent an agreement between the Fed and

3 the debtors, could the Fed order the debtors to make payments

4 to every homeowner whose home was foreclosed, whether it was a

5 proper or improper foreclosure?  I mean, if the Fed ordered you

6 to make payments to a borrower whose home was foreclosed, and

7 it was all done absolutely correctly, you'd be up here opposing

8 it and say they have no authority to order that we just pay

9 money to people.  Would you agree with that?

10        MR. RAINS:  Well, I think what would happen -- and

11 forgive me for not being an expert on cease and desist

12 proceedings -- but I think what happens under 1818 is there is

13 a thirty- or sixty-day process by which the Fed can order cease

14 and desist proceedings.

15        Now what happens in practice is when your primary

16 regulator asks you to change something, they always end up in

17 consent orders.  I'm not aware of -- in fact, someone told me

18 yesterday, no one had a Fed -- a contested Fed cease and desist

19 order proceeding last year.

20        But what would, in fact, happen under their process is

21 there would be contested cease and desist proceeding.

22        THE COURT:  But they didn't -- I mean, what they

23 did -- the consent order, phase I, which turned out to be

24 incredibly expensive, is identify whose home was improperly

25 foreclosed and they'd been injured and how much do we pay

1    them -- how much do you have to pay them restitution.

2            The problem with that is, is that it's costing you 350

3    million dollars to figure out who you ought to -- might pay 50

4    million dollars to.  That makes no sense.  Okay.  But if

5    they -- it may be that you could settle the matter by saying

6    look, this makes no sense, we'll just pay everybody.  It

7    doesn't -- whether they demonstrate injury or not, we'll just

8    pay everybody, because economically that makes much more sense

9    than what's been agreed upon.

10           So it's one thing when you settle with a regulator or

11   private parties and what the structure of the settlement is.

12   The issue is, can they simply order you -- you just find

13   everybody who ever had a loan that was serviced by or

14   originated by any of the debtors; write them a check, whether

15   you did anything wrong or not.

16           MR. RAINS:  Again, I'm not an expert on how those

17   cease-and-desist proceedings go.  I don't know what position we

18   would take --

19           THE COURT:  Do you have somebody on your team who can

20   answer my question?

21           MR. RAINS:  Anyone want to tackle what would happen if

22   they tried --

23           THE COURT:  I think I know the answer to that.

24           MR. RAINS:  Well, the practical answer is the one I

25   gave, which is when the regulator --

RESIDENTIAL CAPITAL LLC, ET AL.                              40

1              THE COURT:  Well, the practical answer is that --

2              MR. RAINS:  -- you sit down and you work it out.

3              THE COURT:  Yes.  That's the practical answer.

4              MR. RAINS:  There is someone here.  My partner Oliver

5     Ireland, who is our former Fed guy and the guy who's handled

6     the discussions with the Fed is the right guy to answer --

7              THE COURT:  I don't want to know about the discussions

8     with the Fed, because that's in the nature of settlement.  Go

9     ahead.

10             MR. IRELAND:  And your question --

11             THE COURT:  Good morning.

12             MR. IRELAND:  -- could you repeat the question?

13             THE COURT:  Well, my question is, could the Fed simply

14    order you to pay everybody whose loan was foreclosed where you

15    originally originated it or any type -- ever serviced the loan,

16    that you pay them money whether there was anything wrong --

17    incorrectly?

18             MR. IRELAND:  The Fed has --

19             THE COURT:  These aren't just -- just make payments to

20    everybody because it's cheaper.

21             MR. IRELAND:  The Fed has a procedure available to

22    them under Section 1818 whereby they can begin an

23    administrative proceeding to find practices unsafe, unsound or

24    not in accordance with law, and order remediation based on

25    those findings.

1              If you went to an administrative trial, went through a

2    process of the administrative law judge recommending to the

3    Board a resolution of the Fed's complaint against the financial

4    institution, and the Board so ordered, the financial

5    institution could seek judicial review.  And there's a judicial

6    review process --

7              THE COURT:  In the D.C. Circuit?

8              MR. IRELAND:  -- in the statute for them to do that.

9              THE COURT:  Would that go to the D.C. Circuit?

10             MR. IRELAND:  I'd have to go back and look.  I used to

11   advise the Board in my former role after the administrative law

12   judge proceedings had concluded as to how to proceed in orders

13   typically --

14             THE COURT:  But restitution --

15             MR. IRELAND:  Restitution and reimbursement are

16   express options in the statute.

17             THE COURT:  But don't they require that something had

18   been done incorrectly, that someone had suffered --

19             MR. IRELAND:  Well, there --

20             THE COURT:  -- injury?

21             MR. IRELAND:  -- there is a separate power that

22   addresses illegal acts.  So you can bring an enforcement order

23   to deal with acts that are not in accordance with law.  There

24   is also a power to do thing -- to order reimbursement and

25   restitution.  The Federal Reserve also has the power under

RESIDENTIAL CAPITAL LLC, ET AL.                              42

1    Section 5 of the Federal Trade Commission Act to find certain

2    acts to be unfair or deceptive even though they are in

3    accordance with other laws such as procedural laws --

4           THE COURT:  I'm familiar with Section 5 of the --

5           MR. IRELAND:  So they could find, even though you

6    thought the mortgage foreclosure process was done properly,

7    that it was done unfairly --

8           THE COURT:  But let's assume it was done --

9           MR. IRELAND:  -- and order restitution.

10          THE COURT:  -- entirely fairly, that they did it

11   exactly right?

12          MR. IRELAND:  Can they order --

13          THE COURT:  The borrower agrees, yes my home was

14   foreclosed, but they made all the disclosures they were

15   required to make, the process was done according to state law

16   procedures, everything was done correctly, but we'd be happy to

17   take their money?

18          MR. IRELAND:  Well, I think what the Fed is trying to

19   do with the settlement orders with the other servicers and

20   their proposals to ResCap and Ally is to identify what they --

21   as best they can, the group that may have been subject to

22   unfair practices and to provide remediation for that.  Because

23   we have not gone through the file review procedure, that

24   process is necessarily imprecise.

25          In my experience in other Fed supervisory actions,

1   typically the process is imprecise, because you don't know

2   exactly -- you haven't had a trial to determine exact damages

3   in every single one of them.  But as a matter of administrative

4   practicality, this is the most efficient way to address the

5   issue.

6          THE COURT:  All right.  I think I understand the

7   issue.  Mr. Rains, do you want continue?  I don't -- unless

8   there's anything else you want to add?

9          MR. IRELAND:  No.

10          MR. RAINS:  Just briefly, Your Honor.

11          THE COURT:  Go ahead, Mr. Rains.

12          MR. RAINS:  Judge, I don't want to belabor what we've

13  been covering.  I appreciate the Court's point that under 1818

14  the Federal Reserve, if they were to litigate it, would have to

15  show some improper conduct by the debtors.  And whether they

16  would have to show causation and the degree of precision with

17  which they'd have to do that is maybe unsettled.

18          It is certainly the case, though, that the Fed's new

19  program, which we think is the one the Court should follow,

20  does involve reimbursing our customers who were foreclosed upon

21  or at least had foreclosure proceedings started against them

22  during the specified period.  And the program compensates those

23  people for their injury, and would compensate other people

24  without any need to show injury, although they are still in the

25  group of potentially affected people.

RESIDENTIAL CAPITAL LLC, ET AL.                    44

1           To us, getting caught up on the process of trying to

2   identify with precision the precise persons who should benefit

3   and the amount of money they should get, really should be

4   thought of as a preparatory step.  It is --

5           THE COURT:  Yes, but you know, let me just -- the

6   committee's reply did an effective job of arguing that

7   restitution payments would be a pre-petition unsecured claim.

8   Where the argument struggles is -- so with that, let's say

9   fifty million dollars, just hypothetically --

10          MR. RAINS:  Yes, our estimate is forty to eighty-five;

11  fifty or sixty is a nice round number.

12          THE COURT:  So assume fifty million dollars.  That

13  that -- the committee, I think, makes a strong argument that

14  that would be a pre-petition unsecured claim, unless

15  somebody -- unless there was some post-petition foreclosure or

16  something.  But let's put that aside.

17          The struggle is what you do with the cost of the

18  foreclosure review.  The lynchpin to your argument has been,

19  well the Fed has cut different deals with thirteen other

20  servicers to convert what is otherwise an absolutely wasteful

21  structure that results in the consultant being compensated

22  extremely well while homeowners get a fraction.  Okay?

23          Since I'm not even sure whether I would need to decide

24  at this point whether the restitution payments are -- would be

25  unsecured claims or not, because you're not proposing to pay

RESIDENTIAL CAPITAL LLC, ET AL.                     45

1  any of them right now -- I suppose at some point I'd have to

2  decide that -- the real thing you're trying to get out from

3  under is the independent foreclosure review which has this

4  monumental price tag.  And that's where I'm having more

5  problem.

6         MR. RAINS:  I guess I have a couple of responses.  I

7  appreciate the issue.  A couple of responses.

8         First, if our proposal is multiples of fifty million,

9  so that we can be sure that whoever was within the proper

10  restitution pre-petition claim that you've identified gets a

11  claim -- gets a claim larger than they would be entitled to as

12  a pre-petition claim, to me, that ought to be enough to allow

13  the Court to proceed to classify that restitution claim at a

14  multiple as a pre-petition claim.

15         But the more important issue for me, Your Honor, the

16  Fed acts as though, and your comments suggest, that the

17  obligation to do a pre-petition -- or excuse me, to do a

18  foreclosure file review is somehow some independent forward-

19  looking injunctive act that has some purpose to it.

20         THE COURT:  Well, look --

21         MR. RAINS:  It's not.

22         THE COURT:  -- let's assume you weren't in bankruptcy.

23  Let's assume you signed this consent and then you realized this

24  price tag is nuts, so you sell the business.  But the buyer

25  doesn't assume the obligation to do the independent foreclosure

1  review.  Do you think you get out from under a consent decree

2  you've signed with the Fed to do this independent foreclosure

3  review the result of which is going to be to identify all of

4  the borrowers on your watch who've been harmed and should

5  receive restitution or reimbursement?

6        I mean, to the extent that you argue changed

7  circumstances, we're no longer in this business -- I agree

8  you're no longer in this business -- but you signed a consent

9  decree that had two steps to it:  one, do the independent

10  foreclosure review, two, pay restitution to those who are

11  identified, okay, is it really so easy to get out from a

12  consent order with the Fed that requires you to do a complete

13  review by saying, oh, we're no longer in the business?  The

14  fact that nobody will go through and identify who was harmed,

15  how much they were harmed, too bad.

16        MR. RAINS:  I come back to Chateaugay, Your Honor,

17  because I don't think what we're saying is we want to change

18  the consent order or that we want to amend it.

19        THE COURT:  Well, you do --

20        MR. RAINS:  What I under --

21        THE COURT:  -- because you want to stop.  The consent

22  order requires you to do an independent foreclosure review, and

23  you want to stop doing the independent foreclosure review.

24        MR. RAINS:  What I think Chateaugay teaches is the Fed

25  has -- in fact has always had -- a statutory authority to just

1  order a cash payment under 1818(b).

2          THE COURT:  If they could identify who was entitled to

3  a cash payment, they could order it.  But you'd be standing --

4  if they said pay 200 million dollars total to every borrower

5  even though ten percent of them were the only ones who could

6  establish that there was anything improper, you'd be standing

7  up here arguing they can't do that.  They can't require us to

8  pay 300 million dollars when, in fact, at most the harm or

9  losses are 50 million.

10          MR. RAINS:  But in fact, Your Honor, we are here

11  saying we are prepared to agree to a multiple of the estimated

12  harm.

13          THE COURT:  So go off and negotiate with the Fed; come

14  to an agreement and then come back to me.

15          MR. RAINS:  Right.

16          THE COURT:  I don't know.  I'm not -- I don't mean

17  to -- I've got a lot of trouble with everybody's arguments in

18  this.  It's a very difficult issue in my view.

19          MR. RAINS:  Right.  I'll reserve my other comments --

20          THE COURT:  Okay.  Thank you, Mr. Rains.

21          MR. RAINS:  -- about the automatic stay and all of

22  that.  I think all of those fall away if the Court decides.

23          THE COURT:  Okay.  All right.

24          MR. RAINS:  Let me end with, if I could, Your Honor,

25  with one small other suggestion.  If the Court's not inclined

RESIDENTIAL CAPITAL LLC, ET AL.                    48

1   to grant our order today --

2           THE COURT:  I'm not ruling today.  I'll tell you --

3   I'm making that crystal clear.

4           MR. RAINS:  Okay.  We have offered and we'll offer

5   again today --

6           THE COURT:  Look, don't offer to me, offer to the Fed.

7   If you work out a deal with the Fed --

8           MR. RAINS:  What I was going to say --

9           THE COURT:  -- come back to me and tell me.

10          MR. RAINS:  What I was going to say is not a

11  settlement.  What we would like to propose is a three-day -- a

12  three-week holiday.  We would like the Pricewaterhouse people

13  to take a well-earned three-week vacation and we will take the

14  money we would've spent to them, and put it in an escrow

15  account while we try to work this out with the Fed.  And

16  however the Court ends up ruling on this whether it goes to --

17          THE COURT:  Well, you've offered that to the Fed and

18  what'd they tell you?

19          MR. RAINS:  They want us to keep spending money.

20          THE COURT:  All right.  Let me hear from the

21  committee.

22          MR. RAINS:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. O'NEILL:  Your Honor, Brad O'Neill, on behalf of

25  the committee.  I'd like to pick up where you just were on the

1    issue of restitution, because I think Your Honor correctly read

2    our brief, and we perceive the IFR process --

3           THE COURT:  Well, you made a good argument for the

4    restitution payments being general unsecured claims, but where

5    I wasn't -- and I'm not saying I'm persuaded yet with it -- but

6    where I had much more problem was about the cost to the IFR.

7           MR. O'NEILL:  Well, there are a couple of responses I

8    think, Your Honor.  First, I think it's artificial to divorce

9    the two.  Clearly the IFR was directed and participated in

10   all -- its part and parcel to an order of restitution.  So to

11   say one is an administrative expense and the other is a general

12   unsecured claim, frankly, doesn't make a heck of a lot of

13   sense.  Two, the Fed has the ability to regulate conduct, to

14   address regulated conduct.  It doesn't have the power in a

15   bankruptcy case to adjust private rights.  And this process is

16   primarily, in fact, entirely directed at adjusting private

17   rights, in particular the rights of pre-petition borrowers

18   against the debtors.

19          THE COURT:  No, the process is designed to identify

20   borrowers who in the Fed's view are entitled to relief -- to

21   payment.

22          MR. O'NEILL:  To adjudicate what are essentially

23   pre-petition claims against the debtor.  To say yes, there's a

24   claim arising out of pre-petition misconduct and to pay it.

25          THE COURT:  As you stand there today, you can't tell

1  me who is entitled to a payment or not.  The solution -- and it

2  may make perfect sense is just pay everybody because in a

3  sense, it's rough justice.  Okay.  People who weren't entitled

4  to payments will be getting payments but the total cost to the

5  debtors will be substantially less.  From a rough justice

6  standpoint it makes absolute sense.

7          MR. O'NEILL:  As an economic matter, Your Honor, that

8  may be the answer.  But here the Fed clearly is not regulating

9  the conduct of the debtor because we don't have a business

10 anymore.  And, frankly, when they wanted to regulate the

11 conduct of the debtors' business, they did so directly.  They

12 required us to implement new servicing standards.  They

13 required assorted other internal business modifications.  This,

14 however, is simply just restitutions.  That's all it is.

15         THE COURT:  So let me ask you this.  Assuming there

16 was no agreement by which Ally was secondarily liable for the

17 independent foreclosure review.  Let's assume that agreement

18 didn't exist.  You'd be standing here, you'd be making the same

19 argument and the result would be nobody would pay for the IFC.

20 The IFC would stop because nobody -- your view is facts have

21 changed; it's a pre-petition claim; there isn't any money to

22 pay for it.  So Pricewaterhouse will stop work.  The counsel

23 will stop work because nobody's going to pay them.  That's your

24 position?

25         MR. O'NEILL:  Well, obviously, that's a hypothetical

1    scenario.

2          THE COURT:  Well --

3          MR. O'NEILL:  AFI is on the hook.

4          THE COURT:  Just -- but answer my hypothetical.

5          MR. O'NEILL:  Okay.  What your positing -- yeah.  The

6    answer is we would advocate awarding PwC an unsecured claim for

7    the value of its services.

8          THE COURT:  Oh, I'm sure they would be very happy to

9    continue working.

10          MR. O'NEILL:  And I think it would be very unlikely,

11   Your Honor, that the Fed would prosecute officials of the

12   debtors here for not pursuing a policy which the Fed itself has

13   turned its back on.  And it seems to us, Your Honor, artificial

14   and irrational for the Fed to continue insisting that the

15   debtors perform under this expensive and misdirected program

16   when --

17          THE COURT:  That I agree with.

18          MR. O'NEILL:  -- when the Fed itself has acknowledged

19   it's not the Fed's policy anymore.

20          THE COURT:  That part I agree with.

21          MR. O'NEILL:  It's not the Fed's regulatory goal or

22   purpose to pursue this.

23          So the notion that they're going to turn around and

24   penalize officers of the debtor for not doing it seems to us to

25   be wildly farfetched.

1    THE COURT:  Except that they agreed in an order that

2  appears to be enforceable under statute to do exactly that, an

3  order which -- I mean, in addressing the jurisdictional

4  argument which the Fed didn't really press but Ally did, your

5  argument in response was nobody's talking about modifying the

6  consent order.  But if there isn't anybody to pay for it, there

7  is no independent foreclosure review.  Do you agree with that?

8    MR. O'NEILL:  Could you repeat that?  I'm sorry.

9    THE COURT:  You can't comply with the consent

10  requirement of the independent foreclosure review if there's

11  nobody to pay for it.  So if you take my hypothetical, and if

12  Ally wasn't secondarily liable, it's another hypothetical case.

13    MR. O'NEILL:  In your hypothetical, yes, we could not

14  comply with the order.  However, your hypothetical is counter

15  factual.

16    THE COURT:  And that's the statute -- the Fed's

17  statute.  Actually it says no court can modify their order.  Do

18  you agree with that?

19    MR. O'NEILL:  The statute says Your Honor cannot amend

20  their order, yes.

21    THE COURT:  And you agree with that?

22    MR. O'NEILL:  Yes.

23    THE COURT:  Okay.

24    MR. O'NEILL:  However, fortunately that's not the

25  state of facts we have here --

RESIDENTIAL CAPITAL LLC, ET AL.                          53

1              THE COURT:  You want Ally to pay?

2              MR. O'NEILL:  -- and the order is silent as to who has

3    to pay.  In fact --

4              THE COURT:  Well, it's not silent.

5              MR. O'NEILL:  It says the debtor will retain --

6              THE COURT:  It makes the debtors primarily liable and

7    Ally secondarily liable.

8              MR. O'NEILL:  Secondarily liable, and then in the

9    engagement letter they're jointly and severally liable.

10             THE COURT:  Well, let me ask you this because -- and

11   I'm changing the issue.  You made -- and I do want to hear the

12   Fed and Ally on this, but in your reply you made a strong

13   argument that the restitution -- any restitution payments would

14   be pre-petition unsecured claims.  In the consent order, in

15   paragraph 3(d), it requires -- I'm not going to read the

16   language.  I'll wait for everybody to get there.  It's on page

17   14.  It has a defined term, "mortgage servicing companies".

18   Ally is included within the definition of mortgage servicing

19   companies.

20             So what happens if the Court were to determine that

21   the restitution payments are pre-petition unsecured claims such

22   that they would be paid pro rata with other unsecured

23   creditors?  Would Ally be liable for the shortfall of

24   restitution payments under paragraph 3(d)?

25             MR. O'NEILL:  Under the scenario you posit, yes.

1            THE COURT:  And I'm sure Ally's going to want to
2    address that issue as well.
3            MR. O'NEILL:  I'm sure they take a different view,
4    Your Honor.
5            THE COURT:  Well, this wasn't addressed in the briefs
6    but --
7            MR. O'NEILL:  Uh-huh.
8            THE COURT:  -- it was your -- you made a pretty good
9    argument that -- whether it's a winning argument we'll see --
10   but you made a pretty good argument that the restitution
11   payments would be pre-petition unsecured claims.  But it seemed
12   to me that Ally signed on that it will make all reimbursement
13   remediation payments.
14           So let's put aside the issue of the ridiculous cost of
15   the independent foreclosure review.  But in terms of amounts
16   that borrowers would be entitled to receive, if those claims
17   are general unsecured claims -- I don't know what recovery
18   estimates are being floated at this point; but just pick a
19   number out of the air assuming that unsecured creditors will
20   recover ten percent, twenty percent; I don't know; pick a
21   number -- would Ally be liable for the shortfall in the
22   remediation or restitution payments?
23           MR. O'NEILL:  Under the language that you've
24   identified, I think the committee's position is the
25   shortfall -- it would be responsible for the shortfall.

1           THE COURT:  The -- yes.  And if one looks at page 2 of

2    the consent order, the first full "whereas" clause on the page,

3    I believe that's defining Ally Financial as one of the mortgage

4    servicing companies.  Mr. Schrock's shaking his head no, but

5    he'll address that issue.  It says, "Whereas Ally Financial

6    engages in the business of servicing residential mortgage loans

7    through varies indirect subsidiaries including GMAC Mortgage

8    and its subsidiaries, collectively the 'mortgage servicing

9    companies'."

10          So when I read the "whereas" clause on page 2 and

11   paragraph 3(d) on page 14, it looked to me that if you're

12   correct that the restitution payments would be pre-petition

13   unsecured claims, the Fed could then look to Ally to make up

14   the shortfall.

15          MR. O'NEILL:  I agree with your reading, Your Honor.

16          THE COURT:  Okay.  Anything else you want to add Mr.

17   O'Neill?

18          MR. O'NEILL:  No, I think, Your Honor, that's good

19   enough for us for now.  Thank you.

20          THE COURT:  All right.

21          Anybody else in support of the debtors' motion?  All

22   right.  Let me hear the opposition.  Who wants to speak in

23   opposition to the debtors' 3013 motion?  Mr. Schrock?

24          MR. SCHROCK:  Sure.  Good morning, Your Honor.  Ray

25   Schrock.  I've also got my partner here, Greg Skidmore with me,

1    on behalf of AFI and Ally Bank.  Your Honor, I plan to address

2    all of the issues other than jurisdiction which my partner is

3    prepared to address --

4              THE COURT:  Okay.

5              MR. SCHROCK:  -- if Your Honor has questions.  I don't

6    know in which order you'd like to proceed --

7              THE COURT:  No, go ahead.

8              MR. SCHROCK:  -- but I'm happy to just move forward.

9              THE COURT:  As you know, I don't hesitate to ask

10   questions.

11             MR. SCHROCK:  Okay.

12             THE COURT:  I didn't think it was that funny but --

13             MR. SCHROCK:  It's pretty -- it was funny.  So, Your

14   Honor, as I read the debtors' motion, just to clarify, and I

15   think you clarified this earlier, they're seeking effectively a

16   ruling that the future FRB obligations under the consent order

17   are dischargeable as unsecured claims.  That's really the

18   relief that's requested by the classification motion.  They're

19   also requesting what we think is an advisory ruling on the

20   automatic stay.

21             The debtors have clarified, I think, that's it's

22   prospective.  The nature of the order doesn't really spell that

23   out, but I want to get that out there on the record.

24             And I want to get to Your Honor's questions.  But I

25   think it's really important, Judge, that we understand the

1    context and the history in which these obligations are in place

2    in this case.  I know Your Honor's read the briefs.  I'm not

3    going to belabor it.  But this notion of regulatory compliance

4    was a hallmark, a cornerstone, of putting this case on the path

5    to saving 3,400 jobs, getting a massive value, frankly, for the

6    business that otherwise would've been liquidated -- getting the

7    consent -- and it's a regulated enterprise; the FDIC, the Fed,

8    the GSEs, the buyers -- to get everybody on board with selling

9    this business -- a bank holding company subsidiary as a going

10   concern, all predicated on regulatory compliance.  I think the

11   state regulators, the DOJ, everyone would agree with that.

12          That's why the PwC motion was initially brought.

13   That's why the debtors -- and I'm sure Your Honor's looked back

14   at the transcript.  There the debtor said that it --

15          THE COURT:   I didn't; you quoted it.  Go ahead.

16          MR. SCHROCK:   Okay.  Your Honor, I won't belabor it.

17   They think that complying with the consent order is certainly

18   paying for the cost.  And we certainly share that view.  It is

19   for that reason that regulatory compliance -- this wasn't

20   addressed in the opposition -- was in other orders in this

21   court.  For instance, it's in the cash collateral order in

22   paragraph 20(c) and paragraph 21, that's it's a termination

23   event if the consent obligations are not complied with.  It's

24   in the sub-servicing agreement that's before the Court that you

25   have to comply with consent obligations.  There's ripple

1   effects that I think really -- I really think that the debtors

2   did not think this through when bringing the motion.  There's

3   ripple effects across many aspects of this.  And we do see --

4   the debtor still has a billion dollars in loans -- FHA, VHA

5   loans.  They filed a KEIP and KERP motion last night.  They

6   talk about all of the substantial things that are going to have

7   to occur over the next year.

8           THE COURT:  Stay on the motion that's before the

9   Court.

10          MR. SCHROCK:  Sure.  Our point is, Judge, that simply

11   this -- there can be no dispute that consent order compliance

12   and regulatory compliance has generated significant value for

13   these estates.  And, in fact, in the sale order there were

14   certain obligations that Ocwen said, I understand, I'm going to

15   operate the business in compliance with all the DOJ and consent

16   order obligations.  The estate is conducting the foreclosure

17   review obligations.  Certainly that deal generated substantial

18   value for the estates by, at least, I presume -- presumably at

19   least by the amount of the PwC foreclosure obligations.

20          It also induced Ally to support the debtors through

21   these cases.  It's just not one of these issues that's unclear.

22          THE COURT:  Let me ask you this.

23          MR. SCHROCK:  Yes.

24          THE COURT:  If -- let's assume this case had taken a

25   completely different path.

RESIDENTIAL CAPITAL LLC, ET AL.                    59

1              MR. SCHROCK:  Uh-huh.

2              THE COURT:  Ally refused to provide any support for

3    the debtors.

4              MR. SCHROCK:  Uh-huh.

5              THE COURT:  Just assume the case had converted to a

6    Chapter 7 case at the start.  But the debtors had signed a

7    consent with the Federal Reserve Board and Ally had agreed to

8    be secondarily liable for the cost of doing it.  What would've

9    happened then?  I mean, what would Ally have been on the hook

10   for at that point?  I mean, the consultants would've had to

11   have been hired to do this independent foreclosure review of

12   this dead entity.  And --

13             MR. SCHROCK:  The --

14             THE COURT:  -- then Ally would've been on the hook for

15   the price tag?

16             MR. SCHROCK:  Judge, I think the -- in your

17   hypothetical there's a Chapter 7 case, the debtors are still

18   bound by the consent order, they have to conduct the review,

19   and if they --

20             THE COURT:  They don't have any money to pay any

21   consultants.

22             MR. SCHROCK:  -- if they breach their obligations

23   under the consent order by not complying --

24             THE COURT:  They say they're ready to go through with

25   the independent foreclosure review.  They just want you to pay

1    for it.

2            MR. SCHROCK:  But, Your Honor, that is not compliance

3    with the consent order.  The Fed, whose order it is, would

4    certainly never say that, that it's compliant by converting it

5    into --

6            THE COURT:  Why isn't it in compliance?

7            MR. SCHROCK:  Because performance.  There's many

8    things here.  It talks about conducting the foreclosure review,

9    retaining the consultants.  We actually addressed this issue,

10   Your Honor, at the PwC hearing and talked about this but that's

11   the whole reason the debtors brought the PwC motion in the

12   first place.  They said because it is compliance.  I don't

13   think anyone would dispute that.  And, in fact, when you look

14   at the arguments --

15           THE COURT:  Well, sure.  So they bring the motion.

16           MR. SCHROCK:  Yes.

17           THE COURT:  PwC gets engaged.

18           MR. SCHROCK:  Yes.

19           THE COURT:  The debtors don't have any money to pay

20   for it.  And you've signed an engagement letter with PwC that

21   says you're jointly and severally liable for it.

22           MR. SCHROCK:  Judge, no dispute that we signed the

23   engagement letter.  Okay.  Their professionals want to ensure

24   they get paid.  The question is are you breaching the consent

25   order when you don't pay?  The ques -- the answer to that

 1  question --

 2              THE COURT:  Would they have breached the consent order

 3  by --

 4              MR. SCHROCK:  Failing to pay --

 5              THE COURT:  -- converting to a Chapter 7 and not

 6  having the money to pay?

 7              MR. SCHROCK:  By not paying the consultants, there is

 8  a breach of the consent order.  And, in fact, when you look at

 9  101(b)(5), which is the basis of parties arguing for a claim,

10  it talks about an equitable remedy that for breach of

11  performance that gives rise to a right to payment.  It's

12  logically inconsistent, the position that's been taken.

13              But absolutely, Judge.  Yeah.  Would there be a breach

14  of the consent order?  Yes.

15              THE COURT:  Show me the paragraph.  I have the consent

16  order in front of me.

17              MR. SCHROCK:  Sure.

18              THE COURT:  I'd like to see what paragraph of the

19  consent order would be breached if the debtors just simply

20  didn't have the money to pay.

21              MR. SCHROCK:  Your Honor, our view has always been

22  that the obligation under 3(a) to retain the consultant,

23  encompassed within that is the right to be paid.  And the

24  Federal Reserve Board whose orde --

25              THE COURT:  And they assured it by having an

1    engagement letter that makes Ally jointly and severally liable

2    for the payment.  Is there something -- I don't see, I have

3    3(a) open.

4              MR. SCHROCK:  Yeah.

5              THE COURT:  Show me the language in the consent order

6    that says the failure of Residential Capital or GMAC to pay the

7    consultants as and when due, is a breach of the consent order

8    in words or in substance.  I didn't find that.

9              MR. SCHROCK:  Your Honor, I don't think it says it

10   that clearly.  But what I can tell you is the supplemental

11   agreement, the entire contemplation of that agreement is that

12   if, for whatever reason, there is a breach of the consent

13   order, and that's when Ally would have to step in -- and Ally's

14   not liable under the consent order; it's under the supplemental

15   agreement -- the Fed wanted assurances that if that happens, if

16   the cases go south, that you, as our primary regulated entity,

17   are going to step up and pay for it.  And we'll stand by our

18   commitments.  We've never -- we'll honor our commitments with

19   the Fed.

20             THE COURT:  I'm glad the case has never taken that

21   turn.

22             MR. SCHROCK:  Yes.

23             THE COURT:  And yes --

24             MR. SCHROCK:  Me too, Judge.

25             THE COURT:  A lot has been accomplished --

RESIDENTIAL CAPITAL LLC, ET AL.                    63

1              MR. SCHROCK:  Yes.

2              THE COURT:  -- in the case so far.

3              MR. SCHROCK:  Yes.  Absolutely, Judge.  But, Your

4    Honor, I think you have to look at it in the context of it's

5    the Fed's order, what the Fed has said it means, what the

6    supplemental agreement --

7              THE COURT:  That never quite said -- I read over the

8    Fed's brief on this issue, and they never really --

9              MR. SCHROCK:  Right.  Well --

10             THE COURT:  -- deal with this issue.  They say the

11   consent order has to be complied with.  The obligation to

12   conduct the independent foreclosure review is in place and it

13   must be complied with.  They didn't say whether Ally has to pay

14   for it or the debtors have to pay for it.  Did I miss

15   something?

16             MR. SCHROCK:  In their written papers?

17             THE COURT:  Yes.

18             MR. SCHROCK:  No, you didn't miss anything, Judge.

19             THE COURT:  I didn't think so.

20             MR. SCHROCK:  But, I'll tell you.  I've asked them.

21   They're here.  Certainly you can ask.

22             THE COURT:  We'll let them speak for themselves, okay?

23             MR. SCHROCK:  Yes.  Fair enough, Judge.  I can tell

24   you just what we've been told.

25             THE COURT:  I would like you to address for me this

1   issue of the appropriate treatment of restitution payments,

2   whether they're general unsecured claims or administrative

3   claims, and if they are general unsecured claims do you agree

4   that Ally Financial would be obligated under the consent to

5   make up any shortfall?  So if unsecured creditors got fifty

6   cents on the dollar or twenty cents or whatever that number is,

7   Ally, by virtue of the consent, has agreed that restitution or

8   reimbursement payments will be made in full.

9             MR. SCHROCK:  The short answer is, Judge, that's not

10  the way I read the consent.

11            THE COURT:  Well, show -- take me through it, okay?

12            MR. SCHROCK:  Okay.

13            THE COURT:  Because that --

14            MR. SCHROCK:  Yes.

15            THE COURT:  I did spend some time looking at it --

16            MR. SCHROCK:  Yes.

17            THE COURT:  -- to try to --

18            MR. SCHROCK:  Yes.  I've spent a little time with it,

19  unfortunately, as well, Your Honor.

20            It does define collectively the mortgage servicing

21  companies, right?

22            THE COURT:  Including Ally --

23            MR. SCHROCK:  But -- right.

24            THE COURT:  -- Financial.

25            MR. SCHROCK:  No, it says -- well, it says GMAC

1    Mortgage and its subsidiaries, collectively the "Mortgage

2    Servicing Companies".  And if you look at all of the

3    obligations under the consent order, those --

4            THE COURT:  No, that's not what it says.  Because it

5    says, "Ally Financial" --

6            MR. SCHROCK:  Um-hum.

7            THE COURT:  -- "engages in the business of servicing

8    residential mortgage loans through various indirect

9    subsidiaries, including GMAC Mortgage and its subsidiaries

10   (collectively, the 'Mortgage Servicing Companies')".  I don't

11   see it as excluding Ally Financial from the definition of

12   "Mortgage Servicing Companies", particularly when you

13   acknowledge that Ally Financial is secondarily liable, and

14   you've acknowledged that throughout.

15           MR. SCHROCK:  Your Honor, could you take a look at

16   page 4?

17           THE COURT:  Sure.  Just a second.

18           MR. SCHROCK:  The last whereas clause.

19           THE COURT:  Hang on.  Page 4.  Yes.  I'm on page 4.

20           MR. SCHROCK:  Okay.  It says, and I'll read it.

21           "Whereas, it is the common goal of the Board of

22   Governors, the Federal Reserve Bank, Ally Financial, ResCap,

23   and the Mortgage Servicing Companies".

24           Okay?  You can only read that whereas clause in

25   conjunction with the defined term to mean that it's the

RESIDENTIAL CAPITAL LLC, ET AL.                                66

1    subsidiaries of ResCap.

2            THE COURT:  Does that mean that ResCap is not a

3    mortgage servicing company?

4            MR. SCHROCK:  Under the defined term that's correct.

5    That's correct.  I have to check that, Your Honor, but I

6    believe that's correct.

7            But, Your Honor, when you look at the supplemental

8    agreement, it also makes clear that those obligations under

9    paragraph 3 and 4 of the consent order are those of -- I'm

10   going to say the debtors generically, and that Ally --

11           THE COURT:  What is your --

12           MR. SCHROCK:  They wanted Ally to be secondarily --

13           THE COURT:  What is your position as to whether

14   restitution payments would be general unsecured claims or

15   administrative claims?  You didn't address that in your brief.

16           MR. SCHROCK:  Well, it's in the reply as I recall,

17   Your Honor.  The restitution payment, one, I don't think that

18   Ally is liable for the reasons that --

19           THE COURT:  Let's put that --

20           MR. SCHROCK:  -- as state --

21           THE COURT:  We'll deal with that separately.

22           MR. SCHROCK:  And --

23           THE COURT:  What is it that Ally --

24           MR. SCHROCK:  -- the auth --

25           THE COURT:  What is it that Ally signed up to be

RESIDENTIAL CAPITAL LLC, ET AL.                    67

1    secondarily liable for?  I thought it was all of the

2    obligations under the consent.

3          MR. SCHROCK:  It is secondarily liable, certainly, for

4    paragraphs 3 and 4 of the consent.  If you want to pull up the

5    supplemental agreement, it's in 4 -- just a moment.

6          So the Res -- it's defined as the ResCap obligations

7    on page 2, Your Honor, if you have it handy, Judge, the

8    supplemental agreement.

9          THE COURT:  I don't.  Actually, I didn't pull that one

10   out with me.  Do you have an extra copy by any chance?

11         MR. SCHROCK:  Yes.

12         THE COURT:  Thank you, Mr. Schrock.  Go ahead.

13         MR. SCHROCK:  So this talks about the ResCap

14   obligations, and the monetary reimbursement or remediation

15   payments under paragraphs 3(c) and (d), defined as the ResCap

16   obligations.

17         THE COURT:  So ResCap is obligated to pay fifty

18   million dollars in restitution, but it's a general unsecured

19   claim so they'll only pay a fraction of that.

20         MR. SCHROCK:  Yes.

21         THE COURT:  Isn't Ally Financial obligated for the

22   balance?

23         MR. SCHROCK:  If ResCap -- I think, Judge, if ResCap

24   were to breach the --

25         THE COURT:  Well, it's not a breach.  If the Court

1   determines --

2            MR. SCHROCK:  Yes.

3            THE COURT:  -- that restitution payments are a general

4   unsecured claim, assumed, repealed, affirmed --

5            MR. SCHROCK:  I would just --

6            THE COURT:  -- wouldn't Ally be obligated --

7            MR. SCHROCK:  I --

8            THE COURT:  -- the obligation is fifty million, but

9   because the debtors pay pro rata, they pay twenty-five million,

10  twenty million -- we'll see what the number winds up being --

11  is Ally Financial obligated for the balance?  They've signed up

12  for the full amount of the obligation.  The obligation is only

13  being satisfied by the debtors to a much smaller amount.

14            I mean, this issue is important, because from the

15  Fed's standpoint --

16            MR. SCHROCK:  Um-hum.

17            THE COURT:  -- the Fed wants the money going to those

18  who are injured.

19            MR. SCHROCK:  Um-hum.

20            THE COURT:  Okay?  And I think it's important to the

21  Fed to note is that going to happen, is it not going to happen?

22            MR. SCHROCK:  Judge, the --

23            THE COURT:  Okay?

24            MR. SCHROCK:  We're, to be clear, it appears, I'm

25  standing up here at the podium, it looks like yes, Ally, if --

1  and I have to qualify this again, because it is an important

2  distinction -- if ResCap were to breach its obligations under

3  the consent order and our secondary liability kicked in under

4  this order, then --

5          THE COURT:  Can I ask?  I don't see the breach

6  language?  I don't see breach.  I just see that --

7          MR. SCHROCK:  Secondary liability.

8          THE COURT:  Secondary liability not -- you keep --

9          MR. SCHROCK:  All right.

10         THE COURT:  -- adding breach, but I don't see that.

11         MR. SCHROCK:  Well, Judge, I think that's what

12  happens.

13         THE COURT:  Well, you say that, but show it to me.

14         MR. SCHROCK:  I can't --

15         THE COURT:  You might like it to be that way.

16         MR. SCHROCK:  Judge -- Judge, if they don't comply --

17  our position is if they don't comply --

18         THE COURT:  Compliance, look.

19         MR. SCHROCK:  Okay.

20         THE COURT:  Take the hypothetical of we'll deal

21  separately with the cost of the independent foreclosure review.

22         MR. SCHROCK:  Um-hum.

23         THE COURT:  But the argument, and I'm going to give

24  you a chance to file a supplemental brief on this, because I

25  thought --

RESIDENTIAL CAPITAL LLC, ET AL.                    70

1          MR. SCHROCK:  Thank you.

2          THE COURT:  -- it really did come in the committee's

3   reply.  They didn't address this issue of what the consequences

4   of it being an unsecured claim, but that was what raised the

5   question in my mind about okay, if it's an unsecured claim what

6   do borrowers, injured borrowers receive.  Okay?  And that's

7   when it brought me back to the consent order, to Ally being

8   secondarily liable for the obligation.  The obligation, it does

9   seem to me, is the fifty million.  The satisfaction of the

10  obligation if it's a general unsecured claim is the pro rata

11  distribution.  It's less.  It's like, I mean, a guarantor.  If

12  the debtor winds up paying a fraction of the obligation the

13  guarantor is going to be liable for the balance.  It doesn't

14  get to say well, they paid what they could.  We're not liable

15  for any more than that.  Why aren't you, in essence,

16  guaranteeing the full obligation of the debtors to make

17  restitution payments?  If it turns out that's all well and

18  good, but it's a general unsecured claim, it's only being paid

19  a fraction.

20         MR. SCHROCK:  Your Honor, to be honest, it's something

21  we're -- we'd like the opportunity to brief it further.

22         THE COURT:  And I --

23         MR. SCHROCK:  I think that's fair.  It's a fair

24  question.  I do think that there are issues associated with

25  whether or not that's a breach and whether or not ResCap could

RESIDENTIAL CAPITAL LLC, ET AL.                    71

1    discharge that liability, because that's presuming that that

2    liability could be discharged.

3              THE COURT:  Well, if it's a -- yes, it does.

4              MR. SCHROCK:  Because it's --

5              THE COURT:  It presumes --

6              MR. SCHROCK:  It's including --

7              THE COURT:  -- it's a general unsecured claim and --

8              MR. SCHROCK:  Yes.  It's presuming it's a claim.  It's

9    presuming that it's not a regulatory obligation that can't be

10   discharged.  And I hate to take it piecemeal out of context

11   and, frankly, just, kind of, ad hoc at the podium.

12             THE COURT:  I may have caught you on the spot on this.

13             MR. SCHROCK:  Yes.  You got me.  I was supposed to

14   call Greg Skidmore up here when that happened, but that didn't

15   work out.

16             Okay, Judge.  Back to -- I just wanted to hit a couple

17   of more points.

18             THE COURT:  Go ahead.

19             MR. SCHROCK:  Are there any other points?

20             THE COURT:  I won't hesitate to ask if there are.

21             MR. SCHROCK:  Okay.  All right.  So I'll move on.

22             Your Honor, I think there's been a lot of discussion

23   about the efficiency of the FRB's review, but I want to point

24   out that that's really not relevant to -- this is a court of

25   equity, I admit, and I'd not sitting here defending the PwC

1   foreclosure review, but as to whether or not it is a

2   nondischargeable obligation of the debtors, I do not think it's

3   relevant.  I wish that they would reach an alternative

4   resolution.

5           THE COURT:  Join in the discussion.

6           MR. SCHROCK:  But, Judge, then there's a breach of the

7   order.

8           THE COURT:  There's nothing in the order that says you

9   can't discuss an alternative structure with the FRB.

10          MR. SCHROCK:  Right.

11          THE COURT:  I just, I understand your position, Mr.

12  Schrock, that this is the debtors' problem, not your problem.

13          MR. SCHROCK:  Um-hum.

14          THE COURT:  You've made that point quite often in the

15  case.

16          MR. SCHROCK:  Yes.

17          THE COURT:  I flagged the issue today of if the

18  committee is correct as to the restitution payments being

19  general unsecured claims which are paid pro rata, it's your

20  problem too.  So don't divorce yourself.  You can't divorce

21  yourself from the problem.

22          MR. SCHROCK:  Your Honor, we haven't divorced

23  ourselves from the discussions, and we're always willing to

24  talk to folks.  I just think that on this particular one -- I

25  don't want to get into settlement discussions, but I hear --

RESIDENTIAL CAPITAL LLC, ET AL.                              73

1           THE COURT:  No, I don't want to get in either, but --

2           MR. SCHROCK:  Heard loud and clear, judge.

3           THE COURT:  I don't know whether this issue has gotten

4      raised in the discussions.  I don't want to know what's in the

5      discussions.  Go ahead, Mr. Schrock.

6           MR. SCHROCK:  Your Honor, we do believe that the

7      consent order does have a dual purpose under Chateaugay.  It

8      has a compliance aspect, when you read through it, that's

9      forward looking, and it has a remedial portion that

10     undoubtedly, at the time the consent order was entered, was, in

11     fact, such that it should not be a claim.  The obligations

12     under the consent order should not be a claim.

13          And you have to look at this in the context of an

14     ongoing business sale, and I think the example you used was a

15     good one, but let's just use the facts we have here.  All of

16     the debtors' employees -- not all of them -- 3,400 of them are

17     now with Ocwen.  There are compliance standards that Ocwen has

18     agreed, as they must, to adhere to.  These foreclosure review

19     obligations are also -- they're instructive.  There's a report

20     prepared.  We're talking about, yes, two different entities,

21     but much like an ongoing business, a business that's still

22     operating.  This entire consent order, we believe, does have a

23     dual purpose, and we think that should be taken into account by

24     the Court.

25          Judge, we don't -- we are not big fans of the "changed

1   in circumstances" argument.  I think Your Honor has hit on that

2   a lot.  I think the changed circumstances, frankly, is that the

3   sale has closed.  Certainly the debtors, no one was here in

4   mid-January when the Federal Reserve was striking deals with

5   other institutions saying let's convert this into an unsecured

6   claim.

7            THE COURT:  So, look.  Everybody who's filed -- well,

8   almost everybody who's filed a claim has agreed that the

9   independent foreclosure review, as established by the consent

10  decree, as the testimony of Chairman Bernanke shows, makes no

11  sense.  Okay?  No one's disputing that.

12           MR. SCHROCK:  Okay.

13           THE COURT:  Okay?  The Fed doesn't really dispute it.

14  They just say that's the obligation unless an amendment is

15  agreed upon.  The question is what replaces it.  And I don't

16  have the power to replace it.  What replaces it has to be the

17  result of a consensual agreement by the parties to the consent.

18           MR. SCHROCK:  I agree with that.  I'm not going to hit

19  this.  Judge, the standing arguments on the sale order, we just

20  don't think they're correct.

21           THE COURT:  But every chance the committee had it

22  reserved its rights.  You don't dispute that.

23           MR. SCHROCK:  I don't dispute that they reserved their

24  rights.  I also don't dispute that the United States, that

25  everyone, and the debtors' statements saying we're going to

1  continue to comply, and in light of the fact that as, Your

2  Honor noted, the PwC hearing, the examiner was taking a look at

3  certain issues here, as well.  There's always a reservation of

4  rights.  We saw it as in the form of contribution.

5          I understand what the language says, and I think we

6  made our point and we'll rest on our papers.

7          THE COURT:  Okay.  Any other points, Mr. Schrock?

8          MR. SCHROCK:  Just one last one, and then I'll sit

9  down.

10          Judge, I just want to point out that I think the

11  debtors are really asking you to do something pretty unique by

12  this motion and interpret what it means to be --

13          THE COURT:  That's one of the things I agree with you

14  on today.

15          MR. SCHROCK:  -- a regulatory compliant, and it's a

16  slippery slope to, all right, we're going to go to the DOJ,

17  state regulators, if we don't like what compliance means and

18  ask the Court to look at those, as well because I think about

19  other cases in the EPA context.  I just think it's a really

20  troubling request in that regard, putting aside, and we haven't

21  even gotten into it -- I'm going to sit down -- but there's

22  unattended consequences, I think, under a lot of agreements

23  that should be reviewed by the debtors before they say that

24  they're not going to comply with the regulatory obligations

25  when they still have a billion dollars in --

RESIDENTIAL CAPITAL LLC, ET AL.                    76

1           THE COURT:  They've said clearly they're going to

2    comply unless the Court enters an order that relieves them of

3    it.  They haven't deviated from that statement.  Have they?

4           MR. SCHROCK:  No.  And you heard my position on what

5    comply means.

6           THE COURT:  Thank you, Mr. Schrock.

7           MR. SCHROCK:  Thank you.

8           THE COURT:  Who else wants to be heard?

9           MR. SKIDMORE:  Good morning, Your Honor.  Greg

10   Skidmore, Kirkland & Ellis, also on behalf of Ally.  Just two

11   brief points, Your Honor.  The first is on the stipulations

12   that Mr. Rains read into the record at the beginning of the

13   hearing.  I heard Mr. Rains say in one of the stipulations that

14   Ally's secondary liability comes under both the consent order

15   and the side agreement.  And I may have misunderstood what Mr.

16   Rains said, or we may have had a misunderstanding beforehand,

17   but I just want to clarify that Ally is secondarily liable

18   under the terms of the side agreement between Ally and Federal

19   Reserve, not under the consent agreement.  And I think the

20   debtors will agree with that, but I just want to clarify that.

21          MR. RAINS:  No objection, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          MR. SKIDMORE:  And, Your Honor, I just want to make a

24   very brief point on jurisdiction, if Your Honor wants to hear

25   it.

1          THE COURT:  Yes.  Go ahead.

2          MR. SKIDMORE:  So first, Your Honor, obviously we have

3     the plain text of the statute that Congress set forward that no

4     court may affect or modify a federal banking agency order.  And

5     that's exactly what the debtors are asking this Court to do

6     here.

7          THE COURT:  Well, let me stop you there, because they

8     say they're not asking me to do that.  Let me focus in on the

9     issue of the restitution payments.

10          They say the order is what the order is, and the

11     committee says that, but restitution payments are pre-petition

12     unsecured claims.  There's nothing in the order that addresses

13     that, nor do I think there is anything in the order that could

14     have addressed that.  That's for the bankruptcy court to

15     determine.  It simply says what it says about restitution and

16     reimbursement.

17          So if the process were carried through and it was

18     determined that homeowner X is entitled to restitution of

19     100,000 dollars, I'm not deciding at the moment, but if the

20     committee is correct that restitution payments, even resulting

21     from an administrative proceeding, if it's conduct prior to the

22     petition as a pre-petition unsecured claim, the claim is

23     allowed.  It's paid at the pro rata share.  That's not a

24     modification of the consent order, is it?

25          MR. SKIDMORE:  Your Honor, a few points on that.

1   First, we'll definitely address that in our supplemental brief

2   on this issue of the restitution payments, but what the debtors

3   are asking this Court to do is change the method of the payment

4   under the consent order.  And counsel for the debtors, when

5   they were up here earlier, said that the option to make a

6   consent payment to the Federal Reserve is not part of the

7   consent order.

8           THE COURT:  But look.  They can't make a payment

9   without the approval of this Court.

10          MR. SKIDMORE:  Correct.

11          THE COURT:  Okay.  They've not asked that that be

12  changed.  What is it that they've asked to -- I understand I'm

13  separating out and that they don't want to do that, but I'm

14  separating out the costs of the independent foreclosure review

15  versus what's supposed to happen after that's completed, the

16  restitution reimbursement payments.  I'm not deciding either

17  issue now, but the arguments for unsecured claim are stronger

18  with respect to the restitution payments.  So let's assume that

19  that's the Court's determination at the end of the day, that

20  the Court determines that unless the Fed agrees otherwise, the

21  independent foreclosure review has to be conducted and that the

22  debtor has to pay the cost of it.

23          With respect to the restitution payments, once those

24  amounts are determined it's a general unsecured claim.  It will

25  be paid in accordance with any plan, and Ally may be liable for

RESIDENTIAL CAPITAL LLC, ET AL.                                      79

1    the balance.

2           You say I don't have the power to do that?

3           MR. SKIDMORE:  Your Honor, just to be clear.  This

4    Court always has the power to decide what it can and can't do.

5           THE COURT:  No, no, no.

6           MR. SKIDMORE:  And --

7           THE COURT:  But I -- but yes, but lawyers frequently

8    tell me what I can and can't.  I may not agree with them, but

9    I'm asking you, do you agree with that, with laying the consent

10   order side by side with the Bankruptcy Code?  Everyone seems to

11   agree I can't modify the consent order.  I have no intention of

12   doing so, all right?

13          Then you look at the overlay of the bankruptcy.  What

14   is it that I can do?  What is it the consent order doesn't

15   address, makes no attempt to address.  The consent order

16   doesn't have anything in it that would override the priorities

17   of the Bankruptcy Code, correct?

18          MR. SKIDMORE:  I agree with that, that that language

19   does not appear, Your Honor.  And if Your Honor was not

20   effecting or modifying the terms of the consent order, then I

21   agree that the statute 1818 would not divest this Court of

22   jurisdiction to do so.  And I don't want to lay a lot of

23   concrete on the bankruptcy issue lest my partner come up and

24   yell at me, but we'll address that in the supplemental brief,

25   Your Honor, and that specific point.

1              THE COURT:  Thank you, Mr. Skidmore.

2              All right.  Who else wants to be heard?

3              MR. SCHROCK:  Your Honor, may -- I just have one

4    really quick point.  We reserved rights on --

5              THE COURT:  I'm getting tag-teamed.  Go ahead.

6              MR. SCHROCK:  I know.  I'm not testing you.

7              THE COURT:  Go ahead.

8              MR. SCHROCK:  We reserved rights, and we just briefed

9    the admin claim issue.  Our view on the admin claim has always

10   been it's not ripe, that if it comes to a point where we need

11   to decide -- we end up, for whatever reason, Ally had to pay,

12   there's an examiner report coming out -- I think that one's

13   going to require a lot more evidence, and there's going to have

14   to be a, frankly, a trial around it.  I just didn't want to

15   have that be misunderstood, because we do think it's premature

16   and not ripe.

17             THE COURT:  All right.  Who else wants to be heard?

18             MS. SUTTON:  I'm Jennifer Sutton with the Board of

19   Governors of the Federal Reserve System.  I'd be pleased to

20   answer some questions that may have arisen today and also to

21   make a few statements on behalf of the Board of Governors.

22             I am concerned that neither the statute under which we

23   issued our order or the order itself have been accurately

24   characterized, really, by any of the parties here today, and so

25   the Board's primary objective in objecting was to try and

1   correct any misapprehensions or mischaracterizations,

2   misapprehensions that the Court may have been left with based

3   on the statements that have been made in the other pleadings.

4              To go back to some of the earlier statements that were

5   made about Section 1818(b) of the Federal Deposit Insurance

6   Act, as I'm sure you know, Your Honor, that statute authorizes

7   the Board, when it has found that an institution it regulates

8   has engaged in unsafe or unsound practices or violations of

9   law, it gives the Board the authority to require that

10  institution to take affirmative actions to correct or to

11  ameliorate the problems that may have occurred as a result of

12  that misconduct.

13             The statute didn't specify.  This goes on to specify

14  what some of those affirmative actions can be.  They can be

15  restitution, and, as the other parties have pointed out, it can

16  also be rule of remediation, restitution and reimbursement.

17             THE COURT:  Is there anything in your governing

18  statute that says that restitution means payment in full even

19  if bankruptcy law would determine that it's a general unsecured

20  claim that's paid pro rata?

21             I mean, this is really -- I mean, you may be able

22  to -- I'm sure Ally will have something else to say about it

23  yet in a supplemental brief, but you've got an argument that if

24  there is a shortfall in any restitution payments that Ally has

25  got to pay the balance, but I don't see anything in your -- and

1  I'm not an expert on your governing statute.  I did read it.  I

2  have paid -- I've spent time.  You really didn't address this

3  issue.

4        Now, I see a difference between the restitution

5  payments on the one hand and the costs of doing the independent

6  foreclosure review, which they signed up to do.  And they

7  disagree.  The debtors disagree about that, and I'm not making

8  a final decision on it, but let's assume that that's where I

9  came out, that they have to, unless there's an amendment they

10 have to continue to perform.  They have to continue to pay

11 those costs.  But with respect to restitution payments those

12 are general unsecured claims.  Is there anything in your, any

13 case law or in your statute that address that issue?

14        MS. SUTTON:  I am not aware of anything that

15 specifically addresses that, Your Honor, but I would be pleased

16 to provide some supplemental briefing on that, as well.

17        THE COURT:  Okay.

18        MS. SUTTON:  One thing I do want to make sure this

19 Court is apprised of accurately, though, is that our order does

20 not require only restitution.  Our order, by its very terms,

21 requires GMAC Mortgage to submit to us a remedial plan to

22 correct the problems that the independent consultants

23 identified.

24        Those may be misfiled deeds.  They may be a wrongful

25 foreclosure that needs to be rescinded.  It may be a loan

1   modification that was improperly denied and now needs to be

2   offered to a borrower.  And it may be a payment, because they

3   may have overcharged someone fees and they need to reverse

4   them.  So it's not -- our order does not require a "payment" to

5   anyone, let alone the Federal Reserve.  It requires them to

6   undertake measures to correct the consequences of their

7   misconduct.

8            THE COURT:  So but do -- I don't think anybody is

9   questioning the intent of the Fed in negotiating the structure

10  that was negotiated, not just as to these debtors, but as to

11  all the other loan servicers that are parties to consent

12  decrees.

13           The program appears to have been well intentioned, but

14  subsequent events have shown it to be completely ill-conceived.

15  When these debtors would be on the hook for 350 or 400 million

16  dollars to do a foreclosure review that would result in

17  restitution payments, hypothetically, of fifty million dollars,

18  there's something wrong with that plan.

19           It seems to me that the Fed has publicly acknowledged

20  that well-intentioned, the way it's working out doesn't make so

21  much sense; the independent consultants shouldn't be the winner

22  in this.  So the Fed's been prepared to negotiate amendments.

23           The issue here is you got the counter-parties in a

24  bankruptcy proceeding.  The Fed can, certainly, stand on its

25  rights and say we're not changing anything in that consent

RESIDENTIAL CAPITAL LLC, ET AL.                        84

1   order.  This is what they signed up for; we agree it makes no

2   sense, whatsoever.  I would have to say that seems awfully

3   punitive.

4           I'll decide the legal issues.  If you're right on the

5   legal issues, you're right on the legal issues.  That wouldn't

6   make it anymore sensible from anybody's standpoint to pour 350

7   or 400 million dollars down a rabbit hole, because if the Court

8   were to determine at the end of the day that restitution or

9   reimbursement payments are general unsecured claims the pro

10  rata share of what the injured borrowers are going to recover

11  is going to go down with every other creditors' recovery, every

12  dollar spent for the foreclosure review is one less dollar

13  available to satisfy creditor claims, and that may very well

14  include the injured borrowers.

15          I don't get -- and I know I don't know what the

16  details of your discussions have been, I know there have been

17  meetings and exchanged proposals, and the parties will either

18  work it out, or they won't work it out.  I would just observe,

19  I've already done it, what exists makes absolutely no sense.  I

20  don't -- you're not really trying to defend from an economic

21  standpoint the present structure, I take it.

22          MS. SUTTON:  No.  No, Your Honor.

23          THE COURT:  Okay.

24          MS. SUTTON:  And I think our chairman has --

25          THE COURT:  He said it.

1        MS. SUTTON:  You know I won't even -- his words speak

2    for themselves.

3        THE COURT:  Yes.

4        MS. SUTTON:  What I am here defending is a lawfully

5    entered order that is enforceable in a court of law, and

6    compliance with that order.

7        THE COURT:  I understand that position completely.

8        MS. SUTTON:  And if I may, Your Honor?

9        THE COURT:  Go ahead.

10        MS. SUTTON:  It is accurate that other institutions

11    have entered into an arrangement with us to satisfy the

12    requirements of that order.

13        THE COURT:  Are any of them in bankruptcy proceedings?

14        MS. SUTTON:  I -- none of the Federal Reserve-

15    regulated entities; I'm not sure about Office of the

16    Comptroller of the currency-regulated entities, but none of the

17    Federal Reserve-regulated entities are.

18        THE COURT:  Anything else you want to add?

19        MS. SUTTON:  I just want to make clear that we believe

20    Chateaugay is also distinguishable to the extent that it's

21    relied on; it involved environmental injunctions, and statutory

22    right of an agency to get reimbursed for costs it incurred

23    itself, or to have the entity do the remedial measures itself.

24        As you've already observed, there's nothing on the

25    face of our statute that authorizes us to take the remedial

1   measures that we've ordered our institution to take and then to

2   seek reimbursement from the institution.  Likewise, there's

3   nothing in the consent order or 1818, itself, that entitles the

4   Board to any form if right to payment, nor have any of the

5   parties identified what the breach would be that would entitle

6   us to a right to payment.

7           THE COURT:  I take it that in none of the consents, as

8   amended or otherwise, has the Fed made payments to any injured

9   borrower and sought reimbursement from the mortgage servicer.

10          MS. SUTTON:  By the terms of the order?

11          THE COURT:  Yes.

12          MS. SUTTON:  No, there's nothing in the order that

13  provides for that.

14          THE COURT:  Terms or otherwise is, I mean -- it may

15  have absolutely no bearing on the legal issue, but the

16  structure of -- because I gather the structure of these amended

17  deals have been pretty much the same -- what, it creates a

18  trust fund?

19          MS. SUTTON:  Yes.  Essentially, there are -- the

20  agreements are public and I'd --

21          THE COURT:  Yes.

22          MS. SUTTON:  -- be happy to provide you a copy.

23          THE COURT:  I think I've seen some of them already.

24          MS. SUTTON:  Essentially, what it does is satisfies

25  the Independent Foreclosure Review requirements imposed on

RESIDENTIAL CAPITAL LLC, ET AL.                              87

1  those other entities by them contributing to a fund that will

2  then be used to make payments to borrowers who are in-scope

3  borrowers, and those are borrowers who were in foreclosure

4  during 2009 and 2010, based on objective loan characteristics.

5  So if it appears a borrower, for example, may have not been in

6  default at the time of the foreclosure, that objective criteria

7  is used to classify the borrower and to -- and payments out of

8  the fund will be made to the borrower.

9            THE COURT:  Okay.  Anything else you want to add?

10           MS. SUTTON:  No, unless you have further questions

11 about --

12           THE COURT:  I don't.

13           MS. SUTTON:  -- the agreement or -- okay.

14           THE COURT:  Thank you very much.

15           MS. SUTTON:  Thank you, Your Honor.

16           THE COURT:  All right.  Who else wants to be heard?

17           MR. LIGHTNER:  Good morning, Your Honor.  Mark

18 Lightner from Cleary Gottlieb Steen & Hamilton on behalf of

19 Wilmington Trust.

20           As you know we sound like kind of a broken record,

21 because every time --

22           THE COURT:  You just want to be sure that if there's a

23 payment made, that it reflects the debtor that's appropriate to

24 make it and that your client, the junior secured noteholders,

25 it doesn't come out of their hide.

RESIDENTIAL CAPITAL LLC, ET AL.                                    88

1           MR. LIGHTNER:  Senior unsecured noteholders --

2           THE COURT:  Senior -- senior unsecured --

3           MR. LIGHTNER:  -- of Residential Capital, yes.

4           THE COURT:  -- sorry.

5           MR. LIGHTNER:  This is exactly what I was afraid was

6    going to happen --

7           THE COURT:  Sorry.

8           MR. LIGHTNER:  -- which is why I wasn't going to say

9    anything.

10          THE COURT:  No.

11          MR. LIGHTNER:  Except you did raise an issue which I

12   don't think needs to be decided today, but we raised in our

13   papers, and that is the definition of Morgan Servicing

14   Companies as the obligors under the remediation payments.  And

15   it is our position that Residential Capital -- and you raised

16   this question a few minutes ago -- is not included within that

17   definition for the reason that we stated.

18          THE COURT:  Thank you.

19          Anybody else wish to be heard?  Come on up, identify

20   yourself.

21          I hope you're not carrying that briefcase up because

22   you want to read everything that's in it.

23          MR. REED:  No, no, no.  I'm afraid the guy in the

24   second row is going to take something from it.

25          THE COURT:  Okay.

1          MR. REED:  Your Honor, I am Borrower X.

2          THE COURT:  Could you identify -- you have to identify

3    your --

4          MR. REED:  Frank Reed.

5          THE COURT:  Okay, Mr. Reed, you did file an objection.

6          MR. REED:  Yes.  Yes, I did.  There's a couple of

7    things, Your Honor, I think that the parties of this motion

8    have left off that I would like to draw the Court's attention

9    to.

10         First thing is not everyone believes the IFR is bad in

11   function.  There are three other banks that continue

12   voluntarily under the IFR and the similar consent decrees; they

13   are EverBank, OneWest, and IndyMac.

14         THE COURT:  Mr. Reed, does the system that would

15   result in 350 or 400 million dollars going into the pockets of

16   very able consultants, but only, hypothetically, 50 million

17   dollars, going to borrowers, does that make sense?

18         MR. REED:  Your Honor, it does, and I would like to

19   give you a hypothetical.

20         THE COURT:  No, I don't answer questions, but go

21   ahead.

22         MR. REED:  Or present one, which you don't have to

23   answer.

24         And that is this, if an elderly woman is mugged on

25   Bowling Green after 8 o'clock at night, and she's robbed of

RESIDENTIAL CAPITAL LLC, ET AL.                          90

1    twenty dollars, does anyone look at the expense for the

2    pursuit, capture, prosecution, and then the restitution of the

3    twenty dollars, and any kind of penalty the perpetrator of that

4    offense would have to be?  So why is it that we're comparing

5    the costs for the bad behavior to be remediated.  It's not

6    relevant, it's not relevant in our judicial system in many

7    other areas.

8            And, as a matter of fact, as some of the parties to

9    this motion have pointed out, that money has been found money,

10   probably more than enough to cover the expense by the

11   agreements between Ally and GMAC ResCap.  They garnered more

12   value, I see it published constantly, unprecedented value,

13   unprecedented transaction.

14           THE COURT:  Well, you say -- yes, they describe the

15   sale as unprecedented for a loan servicer in an insolvency

16   proceeding to be sold, but talk to Mr. Eckstein about how

17   satisfied the unsecured creditors are about what the likely

18   result of the case is.  To say that the result about the sale

19   is unprecedented isn't to say that anybody is going to come out

20   of this being particularly happy at the end of the day.

21           MR. REED:  I agree, and I think that is in direct

22   contrast to say a Chapter 7 liquidation versus the sale, the

23   three billion garnered in this --

24           THE COURT:  This is, essentially, a liquidation case.

25   The businesses -- the two major businesses have been sold

1    already; they still have an FHA, I think, loan portfolio that

2    hasn't been sold yet.  But this is, essentially, a Chapter 11

3    liquidation.

4              MR. REED:  Your Honor, I don't -- it seems like that

5    is correct, but I just -- it doesn't change the position

6    that --

7              THE COURT:  Well, it's going to change the position of

8    what are creditors going to recover, whatever their relative

9    priority is, and the absolute priority rule will be followed.

10   Every dollar that gets spent on the Independent Foreclosure

11   Review is one dollar less that's going to be available to

12   satisfy creditor claims.

13             The debtors haven't disputed, the committee hasn't

14   disputed that injured borrowers should get relief.  I

15   understand your point, but you're going to have a hard time

16   persuading me that it's better to spend 350 or 400 million

17   dollars that you're going to take out of creditors' pockets at

18   this stage; they're not in the business anymore.

19             I would think that the most important thing is that

20   anybody who's a creditor, either because of an improper

21   foreclosure or they loaned money, or whatever, recovers as much

22   as they can at this point.  You're not going to have ResCap to

23   kick around at some point.

24             MR. REED:  I appreciate that, Your Honor, but you've

25   made an interesting point earlier in discussions with the other

RESIDENTIAL CAPITAL LLC, ET AL.                                              92

1   parties.  And that is how do you identify the individuals who

2   have been harmed?

3        THE COURT:  Well, but the reality is if it costs 350

4   or 400 million dollars to identify the borrowers maybe we're

5   just better off paying everybody who was involved in a

6   foreclosure.  And maybe some who some would describe as

7   undeserving will get a recovery, but they're likely to get --

8   but those who are really hurt are likely to get a greater

9   recovery than they would if this whole Independent Foreclosure

10  Review process goes forward.  So there is no --

11       MR. REED:  Your Honor, I bring up the second point to

12  that.  And that is with Ally secondarily liable for it they

13  would -- the actual injured parties stand to be made whole.

14       THE COURT:  Well, we'll see, that's going to be maybe

15  an issue between the Fed and Ally; we'll have to see.

16       MR. REED:  And I have just a couple of more points,

17  Your Honor, if you don't mind.  And that is -- this is in

18  relation to the Federal Reserve's objection, and it's also in

19  my objection.  And that is the Independent Foreclosure Review

20  has been mischaracterized as a first step to only a financial

21  remediation payment.  There are -- it is a order for specific

22  performance, a cease and desist order, that contains specific

23  performance, and at the end of the phase 1, if you will,

24  specific performance, can very well require specific

25  performance acts that are not substitutable with financial

1  remediation.

2           THE COURT:  Well, look, Mr. Reed, the Federal Reserve

3  board order says what it says.  We'll see what, if any, changes

4  occur voluntarily.  If not voluntarily whether the Court is

5  able to do any -- I think I have your -- I read your objection.

6  Any last points you want to make?

7           MR. REED:  I just think that, as a matter of public

8  policy, to be able to attack the costs, the associated costs,

9  that go along with any order of specific performance as a

10  methodology to gut specific performance orders is a de facto

11  problem, I mean it's an absurdity.  It flies in the face of the

12  purpose for a specific performance order.  And that's it.

13          THE COURT:  All right.  Thank you, Mr. Reed.  Anybody

14  else quickly?

15          Mr. Rains, you want to be heard in reply?  Thank you,

16  Mr. Reed.

17          MR. RAINS:  Your Honor, let me first address a

18  housekeeping matter.  I think the parties need to move their

19  declarations and exhibits into evidence.  I don't think there's

20  been any objection.  So we hereby move all of our evidence --

21  our exhibits into evidence.

22          THE COURT:  Any objections?

23          UNIDENTIFIED SPEAKER:  No, Your Honor.

24          THE COURT:  All right, they're in evidence.

25  (Debtors' Exhibits 1 through 5 are hereby received into

1   evidence, as of this date.)

2        MR. RAINS:  Judge, if I could have three minutes to

3   make three points:  one minute per point.

4        If I heard the Court correctly, the Court might be

5   considering the idea of classifying the restitution payments as

6   pre-petition claims.  I know the Court hasn't ruled yet, but

7   what seemed to be giving the Court trouble was the task of

8   trying to figure out who has the claim, whether there was

9   causation, whether there was liability, and what the amount of

10  the claim might be.  I don't think the Court needs to be

11  concerned about that issue.

12       First, as you heard the Federal Reserve represent,

13  even if you were to decide that there is a cash payment

14  obligation that can be classified as a claim, there would be

15  objective criteria used to allocate that claim among people

16  within the class; you know the people who had foreclosure

17  proceedings in 2009 and 2010.

18       I also think that the Court could take comfort from

19  Chateaugay, because in Chateaugay --

20       THE COURT:  You've made this argument already, don't

21  repeat the arguments you've made.

22       MR. RAINS:  I won't repeat it, but if I could just

23  emphasize this one point.  Chateaugay dealt with unmatured

24  contingent unincurred costs, and the Court was not troubled by

25  that problem.  The Court realized there could be disputes in

RESIDENTIAL CAPITAL LLC, ET AL.                    95

1  the future over causation or even whether the remediation

2  action was necessary.  Those didn't stop the Court from

3  concluding it was a claim.

4          Second -- if I could just throw out a question,

5  perhaps, as well.  What if the debtors were to represent that

6  they would not dispute causation or liability as to everyone in

7  the capturing class?  That would take away the causation and

8  liability issue, it would leave us only with an amount

9  question.  Those kind of questions are easily dealt with in the

10  claims process.

11         Second, a very quick point.  Ally argued that the

12  consent order, and in particular, the foreclosure review, is a

13  perspective ongoing obligation.  As I said before we don't

14  think there's a dual purpose to that.  All of the foregoing

15  obligations or ongoing obligations have been passed on to

16  Ocwen.  We are simply trying to figure out how to remediate

17  conduct and injury that if it occurred, occurred in 2009 and

18  2010.

19         Finally, the Court asked the question what if the

20  debtor stopped paying.  And I want to emphasize that's not the

21  relief we're asking for.  The Court has so far approved our

22  payments.  We will make them as long as the Court approves

23  them; we'll stop making them if the Court stops approving them.

24         THE COURT:  I understand that, you've been very clear

25  on that.

1          MR. RAINS:  But if I could get to the point, our

2    obligation, as the Court I think noted, under the consent

3    order, paragraph 3(a), is to retain a consultant.  We are

4    obligated to retain them.  Then we have taken on an obligation

5    of PricewaterhouseCoopers to be joint liable to pay them.  The

6    way the supplemental agreement reads, the one between Ally and

7    the Fed, is that the Fed is secondarily liable as soon as the

8    debtors -- I'm sorry, Ally is secondarily liable as soon as the

9    debtors file a Chapter 11 proceeding.  And the Court is

10   correct; what's secondarily liable means is the liability is

11   first with the primary obligor, and once that primary obligor

12   is unable to pay, the relief can be recovered from the

13   secondary obligor.  So I think the Court has that point exactly

14   right.

15         Let me close by emphasizing something that is unusual

16   in our consent order -- you may have recognized this -- we

17   are -- Ally is the only bank holding company that is not

18   jointly liable with the mortgage servicer under the consent

19   order.  All of the other parties have consent orders that make

20   the parent jointly liable; it is only ours that has the

21   secondary liability provision in it.  Thank you, Your Honor.

22         THE COURT:  Okay.  All right, Mr. Eckstein, very

23   quickly.

24         MR. ECKSTEIN:  Your Honor, if I may very quickly.

25   Just given the focus on the characterization of the claim that

1  would arise in the case under the various hypotheticals Your

2  Honor was discussing, I just want to make sure that Your Honor

3  is familiar with, and focuses on the supplemental consent order

4  that was entered into between Ally Financial and the Fed on

5  April 26th, 2012, which was approximately three weeks before

6  the bankruptcy case.

7              THE COURT:  Yeah, I have that here; yeah.

8              MR. ECKSTEIN:  I know Your Honor has seen it, but I

9  think it's very instructive because paragraph one essentially

10 anticipates the proceeding that we're having today.  And it

11 specifically contemplates that is ResCap commences a case under

12 the Bankruptcy Code, Ally will be secondarily liable for the

13 obligations to timely pay any portion of one, the ResCap fees

14 to Pricewaterhouse; and two, the monetary reimbursement or

15 remediation payments under a remediation plan approved by the

16 Federal Reserve.

17             THE COURT:  That looks pretty clear on the issue that

18 I raised earlier.

19             MR. ECKSTEIN:  And it then goes on, Your Honor, in the

20 remainder of that paragraph to say, and in fact Ally

21 contemplated the debate we were having and said they would want

22 to reserve the right to argue that it's an administrative

23 claim.

24             THE COURT:  The reason I'm going to stop you, Mr.

25 Eckstein, is because I raised the issue today because it came

RESIDENTIAL CAPITAL LLC, ET AL.                                    98

1  to mind after I read your reply.  All right?  I raised the

2  questions; it hasn't really been briefed.  Rather -- because

3  you're going to make your argument, then Mr. Schrock's going to

4  want to come back and argue, I want -- how much time does

5  everybody want -- one round, I want everybody's briefs at one

6  time.  I see two questions I want:  Are any payments for

7  restitution or reimbursement general unsecured claims?  And

8  that is addressed in Mr. Eckstein and Mr. O'Neill's brief.  And

9  two, would Ally Financial be liable for any shortfall in

10 restitution or reimbursement payments if they are general

11 unsecured claims and the pro rata share paid to unsecured

12 creditors less than the full amount?

13          I haven't decided anything; I want to make that clear.

14 How much time do people want?

15          Mr. Rains?

16          You know, the holiday of Passover starts on Monday

17 night, and there are some who are affected by it, different

18 levels of observance, some people may be going away.

19          MR. ECKSTEIN:  Your Honor, I think parties were

20 suggesting two weeks.

21          THE COURT:  Okay.  So that would be what, the 11th?

22          MR. ECKSTEIN:  Probably earlier than the 11th.

23          THE COURT:  It's the 4th.  That's the day after

24 Passover ends.  You want that Mr. Eckstein?  That's fine with

25 me.

RESIDENTIAL CAPITAL LLC, ET AL.                                         99

1          MR. ECKSTEIN:  You can make it Friday of that week,

2     maybe.

3          THE COURT:  Okay.  Friday, April 5th at 5 o'clock is

4     the deadline for supplemental briefs addressing the two issues

5     that I raised.

6          These issues remain -- I'm going to decide the issues;

7     no one should think otherwise -- but I've sort of made this

8     point clearly before, let me say it again.  This makes no

9     sense; it makes absolutely no sense because if the Court

10    determines that the debtors have to comply with the independent

11    foreclosure review and pay for it while it's going on, you just

12    watch the money go down this hole.  Everybody agrees that makes

13    no sense.

14         If the Court determines that the end result of that

15    foreclosure review are restitution payments for some general

16    unsecured claims and Ally is liable for any shortfall, the only

17    ones who will be satisfied then are the borrowers who get

18    identified for payments because they'll get what's coming to

19    them.

20         All of you need to go back and rethink your positions.

21    The Fed has shown its willingness to dispense with the

22    independent foreclosure review, but they have other

23    requirements which may not be acceptable to the unsecured

24    creditors' committee, to the debtors, to others, okay?

25         And any agreement that's struck, if it has to be

1   brought before the Court for approval, I have to review it and

2   decide, but Mr. Schrock, the point I made to you earlier -- and

3   I know Ally's position has been consistent throughout:  these

4   are all obligations of the debtor, but if in fact it turns out

5   that the hypothetical fifty million dollars in restitution

6   payments are paid at a fraction of that amount and you've

7   contractually obligated yourself to -- you, your client -- to

8   the Federal Reserve to pay the shortfall, you've got skin in

9   the game.  You may want to put it all off until there's some

10  grand bargain in the case that -- that should have happened

11  soon, I would hope, but this is a real issue now.  Okay?  And

12  the Fed needs to go back and rethink its position because it

13  may want all injured borrowers -- or all borrowers who had a

14  foreclosure -- if you conclude it makes no sense to spend 350,

15  400 million dollars to identify which borrowers when the total

16  amount that would have to be paid to them is a fraction of

17  that, but bankruptcy law is that it would be a general

18  unsecured claim -- the Fed ought to go back and rethink its

19  position.  It seems to me punitive if bankruptcy law would not

20  support payment of a claim in full, for the Fed to say well,

21  that's too bad, you know.  We expect it to be paid in full and

22  we're not willing to do a deal other than that.  So you all

23  need to go back.

24          Frankly, I think your time over the next two weeks

25  would be better spent trying to reach an agreement.  And I know

1   there have been discussions; I don't want to know what the

2   details of it are.  Your time would be better spent trying to

3   reach an agreement that resolves these issues.  If you all

4   conclude after another week that we're making some progress,

5   here, let's see if the Court would put off the date for those

6   supplemental briefs, contact chambers, and I'd consider it.  If

7   there are good-faith discussions going on to try and resolve

8   the issue, we'll put it off.  Otherwise, get the briefs in, I

9   don't need further argument, and I'll go ahead and decide.  But

10  I'm going to wait for these supplemental briefs to come in.

11          Anything else today?

12          MR. SCHROCK:  Just a quick question --

13          THE COURT:  Mr. Schrock?

14          MR. SCHROCK:  -- on that, Your Honor.  Ray Schrock, on

15  behalf of AFI and Ally Bank.

16          I'm presuming -- the PwC order expires today, and

17  while this --

18          THE COURT:  Court is approving them on an interim

19  basis; all of the compensation to PwC and the lawyer-

20  consultants are approved on interim basis.  Submit a

21  stipulation; work out a stipulation.  Don't expect me to rule

22  the same day you file the supplemental briefs, so build in a

23  little bit of a cushion, okay?

24          MR. SCHROCK:  All right; thank you, sir.

25          THE COURT:  Probably going to take me two weeks after

RESIDENTIAL CAPITAL LLC, ET AL.                    102

1    I get the last brief.

2              MR. ECKSTEIN:  Your Honor, I believe the order is

3    going to contemplate April 11th, which was the next omnibus

4    hearing date, as the date.

5              THE COURT:  Well fine, leave it -- you can put that in

6    and if I'm not ready to issue a ruling I'm going to tell you

7    right then.

8              MR. ECKSTEIN:  We understand, Your Honor.  We were

9    obviously hoping that you would suggest that Pricewaterhouse

10   maybe should participate in the Passover holiday and that we

11   should maybe create a moratorium --

12             THE COURT:  I'd be happy if they did.

13             MR. ECKSTEIN:  -- they should maybe given the

14   opportunity to enjoy.

15             THE COURT:  Talk to the Fed.

16             MR. ECKSTEIN:  We have, and we haven't been able to

17   accomplish that yet, and so --

18             THE COURT:  Try again today.  Don't --

19             MR. ECKSTEIN:  We will try --

20             THE COURT:  -- you got the whole afternoon.

21             MR. ECKSTEIN:  -- we will try immediately to see

22   whether we can put a moratorium between now and hopefully --

23             THE COURT:  Look --

24             MR. ECKSTEIN:  -- a more comprehensive resolution.

25             THE COURT:  -- every dollar -- it's a mistake to spend

 1    another dollar on this independent foreclosure review; it's

 2    just a mistake.  And it's -- I'm going to leave it.  But if you

 3    can't work anything out, I'm not ruling.

 4             Go ahead.

 5             MR. LEE:  Your Honor, Gary Lee from Morrison &

 6    Foerster.  Just to be clear, there is an open offer that --

 7             THE COURT:  I don't want to know what the offer is.

 8             MR. LEE:  No, but it's in the papers.  I just want to

 9    be absolutely clear, Your Honor, win or lose, we're prepared to

10    use the money that we will be currently spending on the

11    foreclosure review on borrowers.  If Your Honor determines that

12    the obligation is an unsecured obligation lock, stock, and

13    barrel, we will still take the money that we would otherwise be

14    spending between today and the date of Your Honor's decision

15    and earmark it for borrowers.

16             THE COURT:  Mr. Lee -- Mr. Lee, it's an offer you've

17    made to the Fed.

18             MR. LEE:  Right.

19             THE COURT:  They haven't stood up and said we accept

20    it.  Okay?  If you have an accepted offer, put it in the form

21    of a stipulation, submit it to the Court.  Fine, okay?

22             Actually, on this point, if you have an agreement, you

23    could -- I'm not sure it even requires a court order at this

24    stage.  You could -- if the Fed agreed that the independent

25    foreclosure review can be paused while you continue to

1   negotiate, or whatever, I don't think there's anything in any

2   court order that I've issued signed, that says no, go forward

3   and do it.  What I would ask is, you put in a letter that

4   reflects the agreement.  But absent an agreement between the

5   Fed and the debtors and I guess Ally as the signatory, as

6   well -- I'm not altering the obligation.

7              MR. LEE:  Thank you, Your Honor.

8              THE COURT:  That's full stop.

9              MS. SUTTON:  If I may say one thing on this point,

10  Your Honor?

11             THE COURT:  You have to identify yourself again.

12  Every time you speak --

13             MS. SUTTON:  Pardon?

14             THE COURT:  You need to identify yourself whenever you

15  speak on the record.

16             MS. SUTTON:  Of course; yes.  Jennifer Sutton, with

17  the Federal Reserve.

18             One thing the Fed is grappling with is that it's not

19  as simple as saying putting a moratorium or a halt to PwC.

20             THE COURT:  I just said a pause, but -- yeah.

21             MS. SUTTON:  Or even a pause, or a moratorium as the

22  debtors have characterized it.

23             We've consulted with the relevant people, and stopping

24  it would bring the wheels to a halt.  And start-up costs would

25  be far more -- start-up costs would be incredible.  It would be

1    almost impossible to start the machine back up again because

2    individuals would have gone on to other projects.  It's not

3    simply PwC paying people at no expense for two weeks.

4              THE COURT:  So the Fed would rather just have the

5    debtors keep pouring money down this hole?  That's what you're

6    telling me.

7              MS. SUTTON:  No, Your Honor.  We have explained what

8    our expectations are as to an alternative.

9              THE COURT:  Okay; I do not want to -- let me make it

10   clear.  I am not getting in the negotiations with the Fed.

11   I've made my observations.  It's a total waste of money.  But

12   if the Fed is insisting on the debtor pouring this money down

13   the rabbit hole, that's what is going to happen until I rule.

14   So sometimes people take absolutely irrational positions, but

15   so be it.  I'll decide the issues when the matter is fully

16   briefed.

17             MR. SKIDMORE:  Your Honor, one last procedural thing.

18   Greg Skidmore for AFI.

19             Mr. Rains moved into evidence our five exhibits

20   attached to our motion.  We'd like to move in Exhibit 6, which

21   is the Ocwen asset purchase agreement, dated November 2nd,

22   2012; Exhibit 7, the amendment to the asset purchase agreement.

23   And then if we need to, Exhibit 8, which is the sale order,

24   which is docket 2246; and Exhibit 9, which is the cash

25   collateral order, which is docket 491.

RESIDENTIAL CAPITAL LLC, ET AL.                        106

1            THE COURT:  Any objection, Mr. Rains?

2            MR. RAINS:  No, Your Honor.

3            THE COURT:  All right; they're in evidence.

4     (Ocwen asset purchase agreement, dated Novbember 2nd, 2012 was

5     hereby received into evidence as Debtor's Exhibit 6, as of this

6     date.)

7     (Amendment to the asset purchase agreement was hereby received

8     into evidence as Debtor's Exhibit 7, as of this date.)

9     (Sale order, docket 2246 was hereby received into evidence as

10    Debtor's Exhibit 8, as of this date.)

11    (Cash collateral order, docket 491 was hereby received into

12    evidence as Debtor's Exhibit 9, as of this date.)

13           MR. SKIDMORE:  Thank you, Your Honor.

14           THE COURT:  All right.  We're done, we're adjourned.

15           MR. ECKSTEIN:  Thank you, Your Honor.

16        (Whereupon these proceedings were concluded at 12:16 PM)

17

18

19

20

21

22

23

24

25

```
 1
 2                          I N D E X
 3
 4                       E X H I B I T S
 5    DEBTOR'S        DESCRIPTION                 PAGE
 6    1-5             Various Debtors' Exhibits    93
 7    6               Ocwen asset purchase        106
 8                    agreement, dated 11/2/12
 9    7               Amendment to the asset      106
10                    purchase agreement
11    8               Sale order, docket 2246     106
12    9               Cash collateral order,      106
13                    docket 491
14
15                          RULINGS
16                                         Page     Line
17    Debtors' motion to amend adversary case   15      9
18    management order granted.
19    Addendum to FTI engagement is approved    16      21
20    Debtors' motion for approval of claims    17      17
21    objection procedures granted
22    Adv. Proc. 12-01935 - Debtors' motion for 19      25
23    more definite statement is granted.
24    Partial stipulation with MED&G is approved.  25    15
25
```

1

2                        C E R T I F I C A T I O N

3

4     I, Penina Wolicki, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7

8

9     _____

10    PENINA WOLICKI

11    AAERT Certified Electronic Transcriber CET**D-569

12

13    eScribers

14    700 West 192nd Street, Suite #607

15    New York, NY 10040

16

17    Date:  March 22, 2013

18

19

20

21

22

23

24

25