

Prepared by or under the supervision of:

*[Name of Natural Person]*

*[Street Address]*

*[City, State Zip Code]*

After recording please return to:

**GMAC Bank, Attn: Records Management/1st Floor**
*[Company Name]*

*[Name of Natural Person]*

**100 Witmer Road**
*[Street Address]*

**Horsham, PA 19044**
*[City, State Zip Code]*

INSTR # 105985204
OR BK 41844 Pages 1082 - 1105
RECORDED 04/18/06 16:22:43
BROWARD COUNTY COMMISSION
DOC STMP-M: $548.80
INT TAX: f1 $313.60
DEPUTY CLERK 2160
#2, 24 Pages

_____ *[Space Above This Line For Recording Data]* _____

Loan No.: 601506083

# MORTGAGE

MIN: 100037506015060834

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated **April 12, 2006**, together with all Riders to this document.

**(B)** "Borrower" is **DONNA CHINLOY, an unmarried woman** Borrower is the mortgagor under this Security Instrument.

**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.



(D)    "Lender" is GMAC Bank.  Lender is a Federal Savings Bank organized and existing under the laws of the United States of America.  Lender's address is 100 Witmer Road, Horsham, PA 19044-0936.

(E)    "Note" means the promissory note signed by Borrower and dated April 12, 2006.  The Note states that Borrower owes Lender  One Hundred Fifty Six Thousand Eight Hundred  and 00/100ths Dollars (U.S. $156,800.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2036.

(F)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| ☒ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☒ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☐ Other(s) [specify] | | |

(I)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions; transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)    "Escrow Items" means those items that are described in Section 3.

(M)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)    "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)    "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)    "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

County          of          BROWARD
*[Type of Recording Jurisdiction],*          *[Name of Recording Jurisdiction]*

which has a legal description of:
See exhibit "A" attached hereto and made a part hereof.

which currently has the address of 9000 NW 28 DRIVE #306
*[Street]*

Coral Springs,                    Florida 33065                    ("Property Address"):
*[City]*                            *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    Charges; Liens.    Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    Property Insurance.    Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid

further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

*Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.* These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.    **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected

601506083

by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of

the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not

be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which

creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Witnesses:

_____

Bethany Luker
Printed, Typewritten, or Stamped Name:

_____

Scott Dickinson
Printed, Typewritten, or Stamped Name:

_____ (Seal)
                                  -Borrower
                    [Printed, Typewritten, or, Stamped Name]

**DONNA CHINLOY**

Post-Office Address: 2672 NW 124TH AVENUE, CORAL SPRINGS, FL 33065

_____ (Seal)
                                  -Borrower
                    [Printed, Typewritten, or, Stamped Name]

Post-Office Address:

_____ (Seal)
                                  -Borrower
                    [Printed, Typewritten, or, Stamped Name]

Post-Office Address:

_____ (Seal)
                                  -Borrower
                    [Printed, Typewritten, or, Stamped Name]

Post-Office Address:

State of Florida                         §
                                         §
County of 1,ROWARD                       §

The foreg... g instrument was acknowledged before me this *12th day of April, ll [date]* by **DONNA**
**CHINLO** ... *me of person acknowledging)*,
who is pe... ly known to me or who has produced
*[type of        atlon]* as identification.



SHAWNA J HITCHMAN
MY COMMISSION # DD530543
EXPIRES: Mar. 19, 2010
(407) 396-0153    Florida Notary Service.com

_____
Signature of Person Taking Acknowledgment

SHAWNA HITCHMAN
_____
Name Typed, Printed or Stamped

_____
Title or Rank

_____
Serial Number, if any



## Schedule A

Unit 1-306, of The Island Club at Coral Springs, a Condominium, according to the Declaration of Condominium therof, recorded in Official Records Book 41658, at Page 1407, Public Records of Broward County, Florida.

Loan No.: 601506083

# InterestFirst<sup>SM</sup> ADJUSTABLE RATE NOTE
## (One-Year LIBOR Index (As Published In
## *The Wall Street Journal*) — Rate Caps)

MIN: 100037506015060834

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| April 12, 2006 | Miami | Florida |
|:---:|:---:|:---:|
| [Date] | [City] | [State] |

**9000 NW 28 DRIVE #306, Coral Springs, FL 33065**
*[Property Address]*

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$ 156,800.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **GMAC Bank**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.875%**. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.    PAYMENTS

### (A)    Time and Place of Payments

I will make a payment on the first day of every month, beginning on **June, 2006**.

Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on **May 1, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 780, Waterloo, IA  50704-0780** or at a different place if required by the Note Holder.


601506083

**(B)    Amount of My Initial Monthly Payments**

My monthly payment will be in the amount of U.S. **898.33** before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

**(C)    Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)    Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **May, 2011**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B)    The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)    Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Two and 250/1000ths percentage points (**2.250%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)    Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.875%** or less than **2.250%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.875%**.

**(E)    Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)    Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G)    Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

5.    **BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.    **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A)    Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

    **(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.      GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.      OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.     WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)     Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)     When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited

---

to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.    DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
**DONNA CHINLOY**                    -Borrower                                                      -Borrower

_____ (Seal)          _____ (Seal)
                                     -Borrower                                                      -Borrower

PAY TO THE ORDER OF
WITHOUT RECOURSE
GMAC MORTGAGE CORPORATION

J. Vollmer
Limited Signing Officer

[Sign Original Only]

Joanne Wright, Vice President
Acting Agent for GMAC Bank

GE01 : FL-09-27955-2  08/07/2009 01:34:37pm  DOC: OR 41844/1082
CFN # 105985204, OR BK  41844  PG  1103,  Page  22 of 24

MIN: 100037506015060834                                    Loan No.: 601506083

# FIXED/ADJUSTABLE RATE RIDER
## (LIBOR One-Year Index (As Published In *The Wall Street Journal*)–Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **12th** day of **April, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to GMAC Bank ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**9000 NW 28 DRIVE #306, Coral Springs, FL 33065**
*[Property Address]*

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of 6.875%. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    (A)    Change Dates
    The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **May, 2011**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
    (B)    The Index
    Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
    (C)    Calculation of Changes
    Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and 250/1000ths** percentage points (**2.250%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
    The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

601506083

(D)    **Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **11.875%** or less than **2.250%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875%.

(E)    **Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F)    **Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
1.    Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.    When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums

GE01 : FL-09-27955-2  08/07/2009 01:34:37pm  DOC: OR 41844/1082

CFN # 705985204, OR BK  41844  PG  _105,  Page  24 of 24

secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
DONNA CHINLOY                  -Borrower                                     -Borrower

_____ (Seal)        _____ (Seal)
                               -Borrower                                     -Borrower

Multistate Fixed/Adjustable Rate Rider—WSJ One-Year LIBOR—Single Family—Fannie Mae Uniform Instrument        Form 3187 6/01
—THE COMPLIANCE SOURCE, INC.—                                      Page 3 of 3                                              34633MU 08/01
www.compliancesource.com                                                                                    ©2001, The Compliance Source, Inc.

6 0 1 5 0 6 0 6 3

**SERVICING TRANSFER ESTIMATES**

1.  The following is the best estimate of what will happen to the servicing of your mortgage loan:

    A.    ☐    We may assign, sell or transfer the servicing of your loan while the loan is outstanding.
          ☒    We are able to service your loan and we
                ☒    will service your loan
                ☐    will not service your loan
                ☐    have not decided whether to service your loan.
                            **OR**
    B.    ☐    We do not service mortgage loans, ☐ and we have not serviced mortgage loans in the
                past three years.  We presently intend to assign, sell or transfer the servicing of your mortgage
                loan.  You will be informed about your servicer.

    C.    ☐    We assign, sell or transfer the servicing of some of our loans while the loan is
                outstanding depending on the type of loan and other factors.  For the program you have applied
                for, we expect to:
                ☐    sell all of the mortgage servicing
                ☐    retain all of the mortgage servicing
                ☐    assign, sell or transfer **.000** % of the mortgage servicing.

2.  For all the first-lien mortgage loans that we make in the 12 month period after your mortgage loan is funded, we
    estimate that the percentage of such loans for which we will transfer servicing is between:

    ☒ 0% to 25%        ☐ 26% to 50%        ☐ 51% to 75%        ☐ 76% to 100%

    This estimate ☐ does ☒ does not include assignments, sales or transfers to affiliates or subsidiaries.  This is only
    our best estimate and it is not binding.  Business conditions or other circumstances may affect our future transferring
    decisions.

3.  A.    ☐    We have previously assigned, sold or transferred the servicing of first-lien mortgage
                loans.
                            **OR**
    B.    ☒    This is our record of transferring the servicing of the first-lien mortgage loans we have
                made in the past:

    | Year | Percentage of Loans Transferred (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
    |------|------|
    | 2005 | .000 % |
    | 2004 | .000 % |
    | 2003 | .000 % |

    This information ☐ does ☒ does not include assignments, sales or transfers to affiliates or subsidiaries.

Present Servicer or Lender:  **GMAC Bank**                              Date:  **March 1, 2006**

## ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT

**I/We have read this disclosure statement and understand its contents as evidenced by my/our signature(s) below.  I/We understand that this acknowledgment is a required part of the mortgage loan application.**

| | |
|---|---|
| **DONNA CHINLOY** _____ | _____ |
| (Applicant) (Date) | (Applicant) (Date) |

| | |
|---|---|
| _____ | _____ |
| (Applicant) (Date) | (Applicant) (Date) |

Servicing Disclosure Statement
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

PAGE 3 OF 3

00501MU 06/98
©2000, The Compliance Source, Inc.

6 0 1 5 0 6 0 8 3

Loan No.: 601506083

MIN: 100037506015060834

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this **12th** day of **April, 2006** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **GMAC Bank** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**9000 NW 28 DRIVE #306, Coral Springs, FL 33065**

*[Property Address]*

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

**Island Club**

*[Name of Condominium Project]*

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    Condominium Obligations.**   Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code or regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B.    Property Insurance.**   So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and

601506083

which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.   Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.   Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.   Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.   Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment,

these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____ (Seal)  _____ (Seal)
DONNA CHINLOY  -Borrower         -Borrower

_____ (Seal)  _____ (Seal)
         -Borrower         -Borrower

*[Sign Original Only]*

Loan No.: 601506083
MIN: 100037506015060834

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 12th day of **April, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to GMAC Bank (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**9000 NW 28 DRIVE #306, Coral Springs, FL 33065**

*[Property Address]*

   1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

   A.   ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

   B.   USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

   C.   SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

---

Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                     Form 3170  01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 1 of 3                            14503MU 08/00 Rev. 11/04
    www.compliancesource.com                                                                  ©2004, The Compliance Source, Inc.



   **D.   RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

   **E.   "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

   **F.   BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

   **G.   ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

   **H.   ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

   If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

   If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

   Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                 Form 3170 01/01
—THE COMPLIANCE SOURCE, INC.—                         Page 2 of 3                        14503MU 08/00 Rev. 11/04
     www.compliancesource.com                                                          ©2004, The Compliance Source, Inc.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.    CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
DONNA CHINLOY                  -Borrower                                        -Borrower


_____ (Seal)          _____ (Seal)
                               -Borrower                                        -Borrower


*[Sign Original Only]*


Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170  01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 3 of 3                    14503MU 08/00 Rev. 11/04
www.compliancesource.com                                                       ©2004, The Compliance Source, Inc.

THIS INSTRUMENT PREPARED BY AND
RETURN TO:

MICHAEL A. FURSHMAN, ESQ.
SOLOMON & FURSHMAN, LLP
1666 KENNEDY CAUSEWAY, SUITE 302
NORTH BAY VILLAGE, FLORIDA 33141

Property Identification No: __TBD_____

Social Security Number of Grantor:_____

INSTR # 105985203
OR BK 41844 Pages 1081 - 1081
RECORDED 04/18/06 16:22:43
BROWARD COUNTY COMMISSION
DOC STMP-D: $1372.70
DEPUTY CLERK 2160
#1, 1 Pages

[Space above line reserved for recording office use]

## SPECIAL WARRANTY DEED

**THIS SPECIAL WARRANTY DEED** (this "**Deed**") is made this 12th day of April , 2006, between CORAL SPRINGS 84, LLC, a Florida limited liability company ("**Grantor**"), whose post office address is: 14400 S.W. 136th Street, Miami, Florida 33186, and DONNA CHINLOY, an unmarried woman ("**Grantee**"), whose post office address is 2672 N.W. 124th Avenue, Coral Springs, Florida 33065.

### W I T N E S S E T H:

That Grantor, for and in consideration of the sum of TEN AND NO/100 ($10.00) DOLLARS and other good and valuable considerations to Grantor in hand paid by Grantee, the receipt whereof is hereby acknowledged, has granted, bargained and sold to Grantee, and Grantee's heirs, successors, and assigns forever, the following condominium unit (the "**Property**"), situate, lying and being in the County of Broward and State of Florida, to-wit:

Unit 1-306, of THE ISLAND CLUB AT CORAL SPRINGS, A CONDOMINIUM, according to the Declaration of Condominium thereof, recorded in Official Records Book 41658, Page 1407, Public Records of Broward County, Florida, as amended and/or supplemented from time to time.

The Property is conveyed subject to the following:

1) Real estate, ad valorem and non-ad valorem taxes and/or assessments for the year 2006 and subsequent years not yet due and payable;

2) The provisions of those certain Master Deed Restrictions recorded in Official Records Book 41658 at Page 1404, of the Public Records of Broward County, Florida, and any and all amendments and modifications thereto.

3) Conditions, restrictions, limitations, reservations, easements and other matters of record affecting the Property, if any, but this provision shall not operate to reimpose the same; and

4) Applicable zoning restrictions, land use, subdivision ordinances, restrictions, agreements and/or other requirements imposed by governmental authorities.

5) Special taxing district rights, obligations and any other matters including, but not limited to, assessments, charges, or taxes, if any.

6) Restrictions, covenants, conditions and easements which may include provisions for a private charge or assessment as contained in any Declaration(s) of record affecting the Property and any and all amendments and modifications thereto.

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining to the Property.

**To Have and to Hold,** the same in fee simple forever.

Grantor does hereby warrant the title to the Property, subject to the aforesaid, and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but none other.

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal the day and year first above written.

WITNESSES:

Print Name: Bethany Luker

Print Name: Scott Pichardo

GRANTOR:

CORAL SPRINGS 84, LLC, a Florida limited
liability company

By:_____
Name: Alex Galvez
Title: Authorized Signatory

STATE OF FLORIDA              }
                             }SS.:
COUNTY OF MIAMI-DADE          }

The foregoing instrument was acknowledged before me this 12 day of April , 2006 by Alex Galvez as an authorized signatory of Coral Springs 84, LLC, a Florida limited liability company, who is personally known to me or has produced _____ as identification.

My commission expires:

Shawna Hitchman
Notary Public
SHAWNA HITCHMAN
Printed Notary Name

SHAWNA J HITCHMAN
MY COMMISSION # DD530348
EXPIRES: Mar. 19, 2010
(407) 398-0153   Florida Notary Service.com

INSTR # 106268816
OR BK 42433 Pages 388 - 388
RECORDED 07/20/06 11:10:04
BROWARD COUNTY COMMISSION
DOC STMP-D: $0.70
DEPUTY CLERK 1034
#1, 1 Pages

THIS INSTRUMENT WAS PREPARED BY:

**Hemisphere Title Company**
**14160 Palmetto Frontage Road, Suite 12**
**Miami Lakes, Florida 33016**
**Ruben Padron, Esq.**
**305-558-8628**

Parcel ID Number: **4841-1907-0270**

# Quitclaim Deed

**This Quitclaim Deed,** Made this 18 day of July, 2006 A.D. **Between**
**Donna Chinloy, a single woman**
of the County of BROWARD, State of **Florida, grantor,** and
**Donna Chinloy, a single woman and Crystal Lee Chinloy, a single woman as**
**joint tenants with rights of survivorship.**
whose address is: **2672 NW 124 Avenue, CORAL SPRINGS, FL  33065**
of the County of BROWARD, State of **Florida, grantees.**

**Witnesseth** that the GRANTOR, for and in consideration of the sum of
------------------------**TEN DOLLARS ($10)** ----------------------- DOLLARS,
and other good and valuable consideration to GRANTOR in hand paid by GRANTEES, the receipt whereof is hereby acknowledged, has granted, bargained and quitclaimed to the said GRANTEES and GRANTEES' heirs, successors and assigns forever, the following described land, situate, lying and being in the County of **BROWARD** State of **Florida** to wit:

Unit 1-306 of THE ISLAND CLUB AT CORAL SPRINGS, A CONDOMINIUM, according
to the Declaration of Condominium thereof, recorded in Official Records
Book 41658, Page 1407 of the Public Records of Broward County, Florida,
as amended and or supplemented from time to time.

The preparer of this instrument was neither furnished with, nor requested to review, an abstract on the described property and therefore expresses no opinion as to condition of title.

Subject to current taxes, easements and restrictions of record.

THIS CONVEYANCE IS BETWEEN FAMILY MEMBERS FOR LOVE AND AFFECTION.

**To Have and to Hold** the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of grantor, either in law or equity, for the use, benefit and profit of the said grantees forever.

**In Witness Whereof,** the grantor has hereunto set her hand and seal the day and year first above written.

**Signed, sealed and delivered in our presence:**

JOSEPH LAUDANDO
Printed Name:
Witness

Donna Chinloy                                    (Seal)
Donna Chinloy
P.O. Address: 2672 NW 124 Avenue, CORAL SPRINGS, FL  33065

Lisa Laudando
Printed Name:
Witness

**STATE OF Florida**
**COUNTY OF BROWARD**

The foregoing instrument was acknowledged before me this 18 day of July, 2006 by
**Donna Chinloy, a single woman**
she is personally known to me or she has produced her **Florida driver's license** as identification.

Printed Name:
Notary Public
My Commission Expires: 8/05/2007

Joseph Laudando
Commission #DD238965
Expires: Aug 05, 2007
Bonded Thru
Atlantic Bonding Co., Inc.

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (RESPA Transactions)

Loan No.: 601506083
CREDITOR:  GMAC Bank                                    BORROWER'S NAME: DONNA CHINLOY
PROPERTY:  9000 NW 28 DRIVE #306, Coral Springs, FL
           33065



| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.657% | $254,548.55 | $150,804.68 | $405,353.23 |

Your monthly payment schedule will be:

| Number of Payments | Amount of Payments | When payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 60 | 898.33 | 06/01/2006 | | | | | | |
| 299 | 1,171.52 | 06/01/2011 | | | | | | |
| 1 | 1,168.95 | 05/01/2036 | | | | | | |

I OF 3

**Construction Loan:**  ☐ If checked, this loan provides for interest-only payments during the construction period. Beginning        , to        , you will make periodic interest-only payments during the construction period, followed by payments of principal and interest as scheduled above.

**Variable Rate:**  ☒ If checked, this loan contains a variable rate feature. ☒ Disclosures about the variable rate feature were provided to you earlier. ☐ Disclosures about the variable rate feature are provided in the attached Variable Rate Disclosure Addendum.

**Assumption:**  Someone buying your property ☐ cannot, unless otherwise provided by federal law, ☒ may, subject to conditions, be allowed to assume the remainder of the loan on the original terms.

**Security:**  You are giving a security interest in: 9000 NW 28 DRIVE #306, Coral Springs, FL 33065 ☒ the property being purchased ☐ your property.

**Late Charge:**  If a payment is not received by the end of 15 days after the date it is due, you will be charged 5.000% of the overdue ☐ payment ☒ payment of principal and interest, but not less than U.S. $N/A and not more than U.S. $N/A.

**Prepayment:**  If you pay this loan early you ☐ may ☒ will not have to pay a penalty. ☐ If you pay off an FHA insured loan, on a date other than the regular installment date, you may be assessed interest charges until the end of the month. You ☐ may be or ☒ will not be entitled to a refund of part of the finance charge.

**Deposit:**  ☐ If checked, the annual percentage rate does not take into account your required deposit.
**Demand:**  ☐ If checked, this loan has a demand feature.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, and any prepayment refunds.



4/11/2006 4:19:17 PM                    4/11/2006              Mortgage 4/12/2006

Truth In Lending Disclosure Statement (RESPA Transactions) (Multistate)
GMAC Bank                                   Page 1 of 2                        78845MU 09/03 Rev. 06/04

601506083

# ITEMIZATION OF AMOUNT FINANCED

**Creditor:**
GMAC Bank, 100 Witmer Road, Horsham, PA 19044-0936

**Borrower(s):**
DONNA CHINLOY

*Initial down Pymnt*
*- $2500.00*
*$193,600.00*

**Property Address:**
9000 NW 28 DRIVE #306
Coral Springs, FL 33065

**Mailing Address:**
2672 NW 124TH AVENUE
CORAL SPRINGS, FL 33065

**Loan Number:** 601506083

**Sales Price:** $ 196,100.00

**Preparation Date:** April 12, 2006

**Loan Amount:** $ 156,800.00

**THIS FORM DOES NOT COVER ALL ITEMS YOU WILL BE REQUIRED TO PAY IN CASH AT SETTLEMENT, FOR EXAMPLE, DEPOSIT IN ESCROW FOR REAL ESTATE TAXES AND INSURANCE. YOU MAY WISH TO INQUIRE AS TO THE AMOUNTS OF SUCH OTHER ITEMS. YOU MAY BE REQUIRED TO PAY OTHER ADDITIONAL AMOUNTS AT SETTLEMENT.**

| | Service/Provider | Estimated Charges | |
|---|---|---|---|
| **Amount Given to You Directly** | | | 150,454.68 |
| **Amount Paid on Your Account** | | | 0.00 |
| **Amount Paid to Others on Your Behalf** | | | 350.00 |
| 0803 Appraisal Fee Paid To Advance Capitol Mtg FBO CMA Appraisal | | 350.00 | |
| **Amount Financed** | | | 150,804.68 |
| **Prepaid Finance Charge** | | | 5,995.32 |
| 0801 Origination Fee Paid To Advance Capitol Services | | 4,312.00 | |
| 0802 Discount Fee Paid To GMAC Bank | | 89.38 | |
| 0812 Administration Fee Paid To Advance Capitol Services | | 500.00 | |
| 0813 Tax Service Fee Paid To Home Connects | | 85.00 | |
| 0829 Administrative Fee Paid To GMAC Connects | | 421.00 | |
| 0834 Flood Certification Paid To Home Connects | | 19.00 | |
| 0901 Prepaid Interest(6.875%) 04/12/2006-05/01/2006 @ $29.9444/day | | 568.94 | |
| **Total Closing Costs** | | | 6,345.32 |

The above Itemization of Amount Financed is made pursuant to the requirements of the Truth in Lending Act.

*Origination fee $ 4,312.00*
*Broker fee $ 4,812.00*
*Cash to Close $ 41,921.12*

*Financed $ 150,804.68*
*Financed $ 156,800.00*

Itemization of Amount Financed (Multistate)
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 1 of 2

02003MU 08/99
©2004, The Compliance Source, Inc.

601506083

DONNA CHINLOY

_____ (Borrower) (Date)

_____ (Borrower) (Date)

_____ (Borrower) (Date)

_____ (Borrower) (Date)

**Itemization of Amount Financed (Multistate)**
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

**Page 2 of 2**

02003MU 08/99
©2004, The Compliance Source, Inc.

601506083

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (RESPA Transactions)



**Loan No.:** 601506083
**CREDITOR: GMAC Bank**                                **BORROWER'S NAME: DONNA CHINLOY**
**PROPERTY: 9000 NW 28 DRIVE #306, Coral Springs, FL**
**33065**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| ✓  7.502% | $247,170.47 | $150,534.72 | $397,705.19 |

**Your monthly payment schedule will be:**

| Number of Payments | Amount of Payments | When payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 60 | 898.33 | 05/01/2006 | | | | | | |
| 299 | 1,146.02 | 05/01/2011 | | | | | | |
| 1 | 1,145.41 | 04/01/2036 | | | | | | |

2 OF 3

**Construction Loan:**  ☐ If checked, this loan provides for interest-only payments during the construction period. Beginning         , to         , you will make periodic interest-only payments during the construction period, followed by payments of principal and interest as scheduled above.

**Variable Rate:**  ☒ If checked, this loan contains a variable rate feature. ☐ Disclosures about the variable rate feature were provided to you earlier. ☐ Disclosures about the variable rate feature are provided in the attached Variable Rate Disclosure Addendum.

**Assumption:**  Someone buying your property ☐ cannot, unless otherwise provided by federal law, ☒ may, subject to conditions, be allowed to assume the remainder of the loan on the original terms.

**Security:**  You are giving a security interest in: 9000 NW 28 DRIVE #306, Coral Springs, FL 33065 ☒ the property being purchased ☐ your property.

**Late Charge:**  If a payment is not received by the end of 15 days after the date it is due, you will be charged 5.000% of the overdue ☐ payment ☒ payment of principal and interest, but not less than U.S. $N/A and not more than U.S. $N/A.

**Prepayment:**  If you pay this loan early you ☐ may ☒ will not have to pay a penalty. ☐ If you pay off an FHA insured loan, on a date other than the regular installment date, you may be assessed interest charges until the end of the month. You ☐ may be or ☒ will not be entitled to a refund of part of the finance charge.

**Deposit:**  ☐ If checked, the annual percentage rate does not take into account your required deposit.

**Demand:**  ☐ If checked, this loan has a demand feature

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, and any prepayment refunds.

3/1/2006 3:32:56 PM

Truth In Lending Disclosure Statement (RESPA Transactions) (Multistate)
GMAC Bank                                Page 1 of 2                                78845MU 09/03 Rev. 06/04

601506083

**Property Insurance:** Property insurance is required on this loan. Flood insurance may be required if the property is located in an area designated as an area having special flood hazards. You may obtain property insurance and, if required, flood insurance from anyone you want that is acceptable to Creditor.

**Credit Insurance**     Credit life insurance and/or credit disability insurance:

☒ is not required to obtain credit from Creditor and will not be provided by Creditor.

☐ is not required to obtain credit from Creditor, but will be provided by Creditor if you request the insurance and agree to pay the additional cost by signing below next to the coverage you want. No such insurance will be in force until the terms of your insurance contract have been fulfilled.

☐ is required to obtain credit from Creditor, but will not be provided by Creditor.

☐ is required to obtain credit from Creditor and will be provided by Creditor, as shown below.

| Type | Premium | Term | Signatures(s) | |
|------|---------|------|---------------|---|
| Single/Joint Credit Life | $N/A | N/A mos. | I/We want credit life insurance at the stated premium | _____ |
| Single/Joint Credit Disability | $N/A | N/A mos. | I/We want credit disability insurance at the stated premium | _____ |
| Single Credit Life and Disability | $N/A | N/A mos. | I/We want credit life and disability insurance at the stated premium | _____ |

**Filing Fee: $ 200.00**              (e)

"e" means estimate

☒ all dates and numerical disclosures except the late payment disclosures are estimates.

The undersigned hereby acknowledge receipt of a completed copy of this Disclosure, a Good Faith Estimate of Settlement Charges, and if this loan has a Variable Rate feature, a copy of an Adjustable/Variable Rate Loan Program Disclosure along with a copy of The Consumer Handbook on Adjustable Rate Mortgages (Charm Booklet) on or before the date an application form was furnished or on or before the payment of a non-refundable fee, whichever is earlier, unless the application reached Creditor by telephone or by way of an intermediary agent or broker. In that event the disclosure was placed in the mail or delivered not later than three (3) business days after the Creditor received the application. The undersigned further acknowledge receipt of a copy of this Disclosure for keeping prior to consummation.

**DONNA CHINLOY**                   (Borrower) (Date)                          (Borrower) (Date)

                                    (Borrower) (Date)                          (Borrower) (Date)

**NOTE:  Payments shown above do not include reserve deposits for taxes, property or flood insurance.**



# INITIAL ESCROW ACCOUNT DISCLOSURE STATEMENT

**MIN: 100037506015060834**

Disclosure Date: **April 12, 2006**

| BORROWER(S) NAME AND ADDRESS: | LENDER/SERVICER NAME AND ADDRESS: |
|---|---|
| **DONNA CHINLOY** | **GMAC Bank** |
| **9000 NW 28 DRIVE #306** | **100 Witmer Road** |
| **Coral Springs, FL 33065** | **Horsham, PA 19044-0936** |
| LOAN NO.: | MORTGAGE INSURANCE/CASE NUMBER: |
| **601506083** | |

Your first monthly payment is due **June 1, 2006** and will be $ **898.33**, of which $ **898.33** will be for principal and interest, and $ _____ will go into your escrow account.

**This is an estimate** of activity in your escrow account during the next 12 months based on payments anticipated to be made from your account.

| MONTH | PAYMENTS TO ESCROW ACCT. | PAYMENTS FROM ESCROW ACCT. | DESCRIPTION | ESCROW ACCT. BALANCE |
|---|---|---|---|---|
| Opening Deposit: | | | | $       0.00 |
| Jun, 06 | 0.00 | 0.00 | | 0.00 |
| Jul, 06 | 0.00 | 0.00 | | 0.00 |
| Aug, 06 | 0.00 | 0.00 | | 0.00 |
| Sep, 06 | 0.00 | 0.00 | | 0.00 |
| Oct, 06 | 0.00 | 0.00 | | 0.00 |
| Nov, 06 | 0.00 | 0.00 | | 0.00 |
| Dec, 06 | 0.00 | 0.00 | | 0.00 |
| Jan, 07 | 0.00 | 0.00 | | 0.00 |
| Feb, 07 | 0.00 | 0.00 | | 0.00 |
| Mar, 07 | 0.00 | 0.00 | | 0.00 |
| Apr, 07 | 0.00 | 0.00 | | 0.00 |
| May, 07 | 0.00 | 0.00 | | 0.00 |

*3 of 3*

(Please keep this statement for comparison with the actual activity in your account at the end of the escrow accounting computation year.)
**Cushion selected by servicer: $0.00 or 2 month(s)**

By signing below, I/we acknowledge receipt of a copy of this Initial Escrow Account Disclosure Statement.

| Borrower **DONNA CHINLOY** | Date | Borrower | Date |
|---|---|---|---|

| Borrower | Date | Borrower | Date |
|---|---|---|---|

**Initial Escrow Account Disclosure Statement (Multistate)**
—THE COMPLIANCE SOURCE, INC.—                    Page 1 of 1
www.compliancesource.com

06211MU 07/99 Rev. 10/03
©2003, The Compliance Source, Inc.

601506083

# GOOD FAITH ESTIMATE

| | | | | |
|---|---|---|---|---|
| Applicants: | **Donna Chinloy** | | Application No: | **0200706** |
| Property Addr: | **9000 NW 28 Drive #306, Coral Springs, FL 33065** | | Date Prepared: | **04/12/2006** |
| Prepared By: | **Advance Capital Services, Inc.  Ph. 305-595-4112** | | Loan Program: | **5/1 IO ARM NIV  GM** |
| | **10261 SW 72 St. # 103, Miami, FL  33173** | | | |

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates-actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

Total Loan Amount $    **156,800**    Interest Rate:    **6.875** %    Term:    **360 / 360** mths

| 800 | ITEMS PAYABLE IN CONNECTION WITH LOAN: | | | | | | PFC S F POC |
|---|---|---|---|---|---|---|---|
| 801 | Loan Origination Fee | **2.750% + $** | 0.00 | | $ | 4,312.00 | ✓ |
| 802 | Loan Discount | **0.057% + $** | 0.00 | | | 89.38 | ✓ |
| 803 | Appraisal Fee | | | | | 350.00 | |
| 804 | Credit Report | | | | | | |
| 805 | Lender's Inspection Fee | | | | | | |
| 808 | Mortgage Broker Fee | + $ | 500.00 | | | 500.00 | ✓ |
| 809 | Tax  Related  Service  Fee | | | | | 85.00 | ✓ |
| 810 | Processing Fee | | | | | | ✓ |
| 811 | Underwriting Fee | | | | | | ✓ |
| 812 | Wire Transfer Fee | | | | | | ✓ |
| | Administration Fee to Lender | | | | | 421.00 | ✓ |
| | Flood Certification | | | | | 19.00 | ✓ |
| | | | | | | | ✓ |

| 1100 | TITLE CHARGES: | | | PFC S F POC |
|---|---|---|---|---|
| 1101 | Closing  or  Escrow  Fee: | | $ | |
| 1105 | Document Preparation Fee | | | |
| 1106 | Notary Fees | | | |
| 1107 | Attorney Fees | | | |
| 1108 | Title Insurance: | **Title Insurance Purchase** | 1,016.50 | |
| | Title Insurance Simultaneous Issue | | 25.00 | |
| | Endorsments | | 278.30 | |
| | | | | ✓ |

| 1200 | GOVERNMENT RECORDING & TRANSFER CHARGES: | | | PFC S F POC |
|---|---|---|---|---|
| 1201 | Recording Fees: | | $ | 232.50 |
| 1202 | City/County Tax/Stamps: | **Intangible Tax** | | 313.60 |
| 1203 | State Tax/Stamps: | **Documentary Stamps on Note** | | 548.80 |

| 1300 | ADDITIONAL SETTLEMENT CHARGES: | | | PFC S F POC |
|---|---|---|---|---|
| 1302 | Pest Inspection | | $ | |
| | Capital Contriution of 2 months HOA | | 283.10 | |

| | | *Estimated Closing Costs* | 8,474.18 | |
|---|---|---|---|---|

| 900 | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | | | | PFC S F POC |
|---|---|---|---|---|---|---|
| 901 | Interest for | **19** | days @ $ | 29.9444 | per day | $ | 568.94 | ✓ |
| 902 | Mortgage Insurance Premium | | | | | |
| 903 | Hazard Insurance Premium | | | | | |
| 904 | Flood Insurance | | | | | |
| 905 | VA Funding Fee | | | | | |

| 1000 | RESERVES DEPOSITED WITH LENDER: | | | | PFC S F POC |
|---|---|---|---|---|---|
| 1001 | Hazard Insurance Premium | months @ $ | per month | $ | |
| 1002 | Mortgage Ins. Premium Reserves | months @ $ | per month | | ✓ |
| 1003 | School Tax | months @ $ | per month | | |
| 1004 | Taxes and Assessment Reserves | months @ $ | 245.00 | per month | |
| 1005 | Flood Insurance Reserves | months @ $ | per month | | |
| | | months @ $ | per month | | |
| | | months @ $ | per month | | |

| | | *Estimated Prepaid Items/Reserves* | 568.94 |
|---|---|---|---|

TOTAL  ESTIMATED  SETTLEMENT  CHARGES    9,043.12

| COMPENSATION TO BROKER   (Not  Paid  Out  of  Loan  Proceeds): | | $ |
|---|---|---|
| Yield Spread Premium to Broker from 1% to 3% | | |

| TOTAL ESTIMATED FUNDS NEEDED TO CLOSE: | | | TOTAL ESTIMATED MONTHLY PAYMENT: | |
|---|---|---|---|---|
| Purchase Price/Payoff (+) | 196,100.00 | New First Mortgage(-) | Principal & Interest | 898.33 |
| Loan Amount (-) | 156,800.00 | Sub Financing(-) | Other Financing (P & I) | |
| Est. Closing Costs (+) | 8,474.18 | New 2nd Mtg Closing Costs(+) | Hazard Insurance | |
| Est. Prepaid Items/Reserves (+) | 568.94 | | Real Estate Taxes | 245.00 |
| Amount Paid by Seller (-) | 3,922.00 | | Mortgage Insurance | |
| Deposit | -2,500.00 | | Homeowner Assn. Dues | 142.00 |
| | | | Other | |
| Total Est. Funds needed to close | 41,921.12 | | **Total Monthly Payment** | **1,285.33** |

☑ This Good Faith Estimate is being provided by   **Advance Capital Services, Inc.**                              , a mortgage broker, and no lender has been obtained.   These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property. The undersigned acknowledges receipt of the booklet "Settlement Costs," and if applicable the Consumer Handbook on ARM Mortgages.

Applicant   **Donna Chinloy**                              Date                    Applicant                              Date

Calyx Form gfe.frm 11/01

Loan No.: 601506083

# GOOD FAITH ESTIMATE

Lender: **GMAC Bank**

Lender Address: **100 Witmer Road, Horsham, PA  19044-0936**

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates; the actual charges may be more or less.  Your transaction may not involve a fee for every item listed.  The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A Settlement Statement that you will be receiving at settlement.  The HUD-1 or HUD-1A Settlement Statement will show you the actual cost for items paid at settlement.

| HUD-1 or HUD-1A | Item | Amount or Range |
|---|---|---|
| 802 | Discount Fee | 4,312.00 |
| 803 | Appraisal Fee | 400.00 |
| 813 | Tax Service Fee | 85.00 |
| 816 | Mortgage Broker Fee | 500.00 |
| 829 | Lender Administrative Fee | 421.00 |
| 834 | Flood Certification | 19.00 |
| 901.1 | Prepaid Interest(6.875%) 03/01/2006-04/01/2006 @ $29.9444/day | 928.28 |
| 1108 | Title Insurance | 1,055.00 |
| 1111 | Endorsements | 160.00 |
| 1201 | Recording Fees | 200.00 |
| 1203 | State Tax/Stamps | 548.80 |
| 1305 | Capital Contribution of 2 month HOA | 284.00 |
| 1316 | Intangible Tax | 313.60 |
| 1317 | Title Insurance Simultaneous Issue | 25.00 |

**TOTAL**                                    9,251.68

The Fee(s) or Payment(s) listed below have or will be paid to the mortgage broker by the Lender for services in connection with this loan.

811            YSP (Lender Paid Broker Compensation)                          $2,206.18

* Note: Document Preparation Fee is subject to a redraw fee per occurrence.

601506083

**DONNA CHINLOY**  (Applicant) (Date)  _____  (Applicant) (Date)

_____  (Applicant) (Date)  _____  (Applicant) (Date)

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

Borrower(s):  **DONNA CHINLOY**    Property Address:  **9000 NW 28 DRIVE #306**
**Coral Springs, FL 33065**

Mailing Address:  **2672 NW 124 AVENUE**
**Coral Springs, FL 33065**

Preparation Date:  **March 1, 2006**    Loan Amount: $  **156,800.00**



53118MU 09/03 Rev. 11/03

# MORTGAGE BROKERAGE BUSINESS CONTRACT

**Donna Chinloy**

(hereinafter called Borrower), employs **Advance Capital Services, Inc.** (hereinafter called Business) to obtain a mortgage loan commitment (hereinafter called Commitment) within **30** days from the date hereof and acknowledges that Business cannot make loans or commitments or guarantee acceptance into specific programs, terms or conditions of any loan. However, Business may issue a rate lock-in or commitment on behalf of a lender to the Borrower.

## I. PROPERTY:

Address: **9000 NW 28 Drive #306**
**Coral Springs, FL 33065**

Borrower's estimates of fair market value: $ **205,000.00**
Borrower's estimates of the balances on any existing mortgage loan: $ **0.00**

## II. TERMS OF LOAN APPLICATION:

Loan Amount: $ **156,800**      Interest Rate: **6.875** %      Loan Term/Due In: **360** months / **360** months
Monthly Payment: $ **898.33**
Loan Type: [✔] First Mortgage      [ ] Second/Junior Mortgage

## III. MORTGAGE BROKERAGE FEE

Business, in consideration of the Borrower's agreement to pay a mortgage brokerage fee along with actual costs incurred in connection with this loan, agrees to exert its best efforts to obtain a bona fide mortgage loan commitment in accordance with the terms (or better terms) and conditions set forth herein. The Business and its associates or employees shall be held harmless from any liability resulting from failure to obtain said loan commitment. Borrower hereby agrees to pay the actual costs as estimated herein and Borrower agrees to pay Business a mortgage brokerage fee of $ **4,812.00** for obtaining the commitment. Additionally, Borrower acknowledges that Business may receive additional compensation from Lender based on the mortgage program and terms Borrower has engaged Business to obtain in securing the commitment and that Business will receive a sum in range of **0.000** % to **3.000** % of the total loan amount. This additional compensation, the exact amount of which will be disclosed at the time of closing, is part of the total brokerage fee due Business. In no event will the brokerage fee, additional compensation included, exceed the maximum fee permitted by the applicable state law.

## IV. APPLICATION FEE

An application fee is charged for the initial cost of processing, verifying and preparing your loan package to submit to a lender for commitment, and will be credited against the amount the Borrower owes if closing occurs. This fee is [ ] Refundable [✔] Non-refundable [✔] Applicable to your closing costs at the time of the settlement of your loan. Business acknowledges the receipt of $ **400.00** as an Application Fee.

## V. DEPOSIT

Business acknowledge the deposit of $ **0.00** will be used toward the costs incurred by the Business, or by third party, on behalf of Borrower, to pay expenses necessary to secure the mortgage loan commitment. Actual costs incurred by the Business for items listed on Good Faith Estimate are non-refundable, even if the mortgage loan commitment is not received. In the event of default by the Borrower, Business is authorized to immediately disburse from the deposit all sums then due Business or any third party. The disbursement is not a waiver of any other sums due Business by Borrower, as more fully enumerated herein. Money retained by Business as the deposit shall be returned to the Borrower, within 60 days of disposition of the loan, in accordance with the following:

(a) the services for which the money is expended are not performed.
(b) the services for which the money is expended are performed, but there is an excess amount that would be paid as brokerage fee but this commitment is not obtained.

## VI. SERVICES TO BE PROVIDED BY MORTGAGE BROKERAGE BUSINESS

In consideration for Business earning its fee, the services to be provided by Business are: assembling information, compiling files and completing credit application for borrower(s), processing the application file including verifying of information received and ordering vendor reports, preparing and submitting the completed file for conditional loan commitment between borrower(s) and lender, and any incidental services necessary to obtain commitment including courier, express mail, photographs, and telephone toll charges.

| | | **Advance Capital Services, Inc.** | **CL 0501315** |
|---|---|---|---|
| Applicant **Donna Chinloy** | Date | Mortgage Brokerage Business | License # |
| Applicant | Date | By **Alexander Castellanos** | Date |

Calyx Form - mbbc.frm (11/98)      Page 1 of 2

## STANDARDS AND DISCLOSURES

**COMMITMENT:** Brokerage Business hereby agrees to act on behalf of Borrower to secure a mortgage loan commitment. Brokerage Business cannot guarantee acceptance into any particular loan program or promise that any specific loan terms or conditions will be obtained. Receipt of a mortgage loan commitment by Brokerage Business satisfies Brokerage Businesses obligation under the Mortgage Brokerage Business Contract and Good Faith Estimate of Borrower's Costs and the terms of this contract are deemed fulfilled upon receipt of the mortgage loan commitment. Brokerage Business cannot make a mortgage loan or a Mortgage Loan Commitment. A Commitment may, however, be passed through to the Borrower if received from a lender. The term "Commitment" shall mean a written or oral Commitment received by the Brokerage Business, unless otherwise agreed in writing between Brokerage Business and Borrower. Upon demand by the Borrower, the Brokerage Business shall produce for the Borrower's inspection evidence of the mortgage loan commitment.

**AGENCY; NON-LIABILITY FOR LENDER'S ACTS:** Borrower acknowledges that Brokerage Business is acting as an 'agent' on behalf of the Borrower in securing a mortgage commitment pursuant to this Agreement. Borrower acknowledges that Brokerage Business shall not be responsible for any errors of the Lender or Investor nor for any term or condition of the loan documentation that may be contrary to any or federal law. Brokerage Business shall not be responsible for any nonperformance of a commitment or mortgage by any Lender or Investor.

**LITIGATION:** In the event of any litigation arising out of this Agreement, Brokerage Business shall be entitled to all costs incurred, including attorney's fees, whether before trial, at trial, on appeal, or in any other administrative or quasi-judicial proceedings.

**ADDITIONAL CLAUSES:** If not precluded by the provisions of this Agreement, any loan commitment and loan obtained by Brokerage Business may contain such additional clauses or provisions as the Lender may request including but not limited to, nonassumable clauses, late fee clauses and prepayment penalties.

**TIME FOR PAYMENT:** Unless otherwise agreed between Brokerage Business and Borrower, the mortgage brokerage fee shall be due and payable in full upon delivery to the Borrower of mortgage loan commitment from the Lender or Investor, or may be paid at closing, if agreed to by Brokerage Business.

**DECISION:** In applying for this loan, Borrower acknowledges that Borrower has reviewed his personal and financial situation and that it is in Borrower's best interest to proceed with the loan. Borrower further acknowledges that Borrower has not relied on the advice of the Mortgage Brokerage Business or its colleagues as to wisdom of doing so.

**GOOD FAITH ESTIMATE OF COSTS:** The estimated costs stated may be expressed as a range of possible costs and can be charged only when such costs have actually been incurred in connection with securing the loan or loan commitment. Actual costs incurred for items which include, but are not limited to, express mail fees, long distance calls and photographs will be paid by Borrower unless otherwise stated herein.

**TITLE:** Borrower represents and warrants that he is the fee simple title holder to the property described in this Agreement and there are no liens, judgements, unpaid taxes or mortgages which will effect title to the property except

Borrower agrees to pay all costs necessary to clear any defect if status of the title differs from the representation made herein .

**DEFAULT:** If commitment is secured and title is not found to be good, marketable and insurable by the attorney or title company acting for the lender, or the Borrower refuses to execute and deliver the documents required by the lender, or in any other way fails to comply with this Agreement, or if for any reason the loan referred to herein cannot be closed through no fault of the Brokerage Business, Borrower acknowledges that the full brokerage fee has been earned by Brokerage Business and agrees to immediately pay same plus any and all costs incurred on Borrower's behalf.

**DISCLOSURE:** Borrower acknowledges that Brokerage Business has advised him any existing business relationship Brokerage Business has with any vendor. Borrower also acknowledges that Lender may require certain preapproved vendors be used exclusively for services required by this agreement. Brokerage Business has no business relationship with any vendor except as may be listed on attached Provider Relationship form.

**SEVERABILITY OF CLAUSES CONTAINED HEREIN:** In the event that any part or portion of this Agreement is held invalid or unlawful through any administrative, quasi-judicial, or judicial proceeding, the invalidity or illegality thereof shall not effect the validity of this Agreement as a whole and the other provisions and terms contained herein shall remain in full force and effect as if the illegal or invalid provision had been eliminated.

| | | | |
|---|---|---|---|
| Applicant **Donna Chinloy** | Date | Applicant | Date |

## ADDENDUM TO MORTGAGE BROKERAGE BUSINESS CONTRACT (State of Florida)

**ASSIGNMENT:** The Agreement may not be assigned by Borrower. Brokerage Business may assign his obligations and fees to any other Licensee or Registrant defined under Chapter 494, Florida Statutes, pursuant to written authorization by the Borrower.

**LITIGATION:** In the event of any litigation arising out of this Agreement, Brokerage Business shall be entitled to all costs incurred, including attorney's fees, whether before trial, at trial, on appeal, or in any other administrative or quasi-judicial proceedings. The laws of the State of Florida shall apply to any interpretation of or litigation arising under this contract unless otherwise specified by Brokerage Business. Any litigation shall, at Brokerage Businesses option, be maintained in the county where Brokerage Businesses principal place of business is located.

**You are entering into a contract with a mortgage brokerage business to obtain a bona fide mortgage loan commitment under the same terms and conditions as stated hereinabove or in a separate executed good faith estimate form. If the mortgage brokerage business obtains a bona fide commitment under the same terms and conditions, you will be obligated to pay the mortgage brokerage business fees, including, but not limited to, a mortgage brokerage fee, even if you choose not to complete the loan transaction. If the provisions of s.494.00421, Florida Statutes, are not met, the mortgage brokerage fee can only be earned upon the funding of the mortgage loan. The borrower may contact the Florida Department of Financial Services, 101 E. Gaines St. Tallahassee, Florida, 32399-0350, regarding any complaints that the borrower may have against the mortgage broker or the mortgage brokerage business. The telephone number of the department as set by rule of the department is 850-410-9805.**

| | | | |
|---|---|---|---|
| Applicant **Donna Chinloy** | Date | Applicant | Date |

Calyx Form MBBCADD 06/96                          Page 1 of 1

Loan No.: 601506083

# CORRECTION AGREEMENT

Words used in this Agreement are defined below. Words in the singular mean and include the plural and vice versa.

"Borrower" is **DONNA CHINLOY**.

"Lender" is **GMAC Bank**, and its successors or assigns.
"Loan" means the debt evidenced by the Note and all sums due under the Security Instrument.
"Note" means the promissory note(s) dated **April 12, 2006**, signed by Borrower in favor of Lender.
"Security Instrument" means the Deed of Trust/Mortgage/Security Instrument, signed by Borrower in favor of Lender, securing payment of the Note.
"Settlement Agent" is **Title Company of Florida, LLC**.



**Agreement to Correct or Provide Additional Documentation or Fees:** In consideration of Lender disbursing funds for the closing of the Loan, and regardless of the reason for any loss, misplacement, omission, misstatement or inaccuracy in any Loan documentation, Borrower agrees as follows: If any document is lost, misplaced, omitted, misstated or inaccurately reflects the true and correct terms and conditions of the Loan, upon request of Lender (including any assignee of Lender), Borrower will comply with Lender's request to execute, acknowledge, initial and/or deliver to Lender any documentation Lender deems necessary to replace and/or correct the lost, misplaced, omitted, misstated or inaccurate document(s). If the original Note is replaced, Lender hereby indemnifies Borrower against any loss associated with a demand on the original Note. All documents Lender requests of Borrower shall be referred to as "Requested Documents." Borrower agrees to deliver the Requested Documents within ten (10) days after receipt by Borrower of a written request for such replacement. Borrower also agrees that upon request Borrower will supply additional amounts and/or pay to Lender any additional sum previously disclosed to Borrower as a cost or fee associated with the Loan, which for whatever reason was not collected at closing. Borrower does hereby agree and covenant in order to assure that the Loan documentation executed this date will enable Lender to seek insurance or guaranty from the Department of Housing and Urban Development (HUD) or Department of Veteran's Affairs (VA), if applicable, or to conform with and be acceptable to the Federal National Mortgage Association (FNMA), Federal Home Loan Mortgage Corporation (FHLMC), Government National Mortgage Association (GNMA), or any other investor. 

**Quality Control Authorization:** As part of a continuing effort to assure that all mortgage loans are originated in accordance with the highest standards of professional ethics and business practices, a quality control audit is performed on a random sampling of loan closings each month. As a result of this random sampling, an audit may be performed on your Loan after closing. During this review, Lender, or its assigns, may reverify employment, deposit, credit standings, loan verification and appraisal reports. Borrower acknowledges that the Loan may be selected as part of Lender's quality control procedure and authorize the reverification of various information supplied in conjunction with obtaining the mortgage. A photocopy of this form shall be regarded as valid as the original for reverification purposes.

**Request by Lender:** Any request under this Agreement may be made by the Lender (including assignees and persons acting on behalf of the Lender) or Settlement Agent and shall be prima facie evidence of the necessity for same. A written statement addressed to Borrower at the address indicated in the Loan documentation shall be considered conclusive evidence of the necessity for Requested Documents.



601506083

**Borrower Liability:** If Borrower fails or refuses to execute, acknowledge, initial or deliver the Requested Documents or fees to Lender more than ten (10) days after being requested to do so by Lender, Borrower understands that Lender is relying on the representations contained herein and agrees to be liable for any and all loss or damage which Lender reasonably sustains thereby including, but not limited to, all reasonable attorneys' fees and costs incurred by Lender.

**This Agreement shall survive the closing of the Loan and inure to the benefit of Lender's successors and assigns and be binding upon the heirs, devises, personal representatives, successors and assigns of Borrower.**

---

**DONNA CHINLOY** _____ Borrower     _____ Borrower


_____ Borrower     _____ Borrower

Correction Agreement (Multistate)
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 2 of 2

06307MU 06/98 Rev. 12/99
©20053, The Compliance Source, Inc.

6 0 1 5 0 6 0 8 3

**Loan No.: 601506083**

# BORROWER'S CLOSING AFFIDAVIT

Words used in this Affidavit are defined below. Words in the singular mean and include the plural and vice versa.

"Borrower" is **DONNA CHINLOY**.
"Lender" is **GMAC Bank**, and its successors or assigns.
"Loan" means the debt evidenced by the Note and all sums due under the Security Instrument.
"Note" means the promissory note(s) dated **April 12, 2006**, signed by Borrower in favor of Lender.
"Property" means the property commonly known as **9000 NW 28 DRIVE #306, Coral Springs, FL 33065**.
"Security Instrument" means the Deed of Trust/Mortgage/Security Deed/Security Instrument signed by Borrower in favor of Lender, securing payment of the Note.
"Settlement Agent" is **Title Company of Florida, LLC**.

BEFORE ME, the undersigned authority, on this day, personally appeared Borrower, known to me to be the person whose name is subscribed below and after being duly sworn by me did each on his or her oath state the following:

1.  **Occupancy Status.** *[Check applicable box.]*



    ☐    **Primary Residence.** The Property is/will be Borrower's primary residence. This means at least one (1) Borrower who executes the Note and Security Instrument will take title to and occupy the Property. The Property is now occupied as Borrower's primary residence or will be occupied as Borrower's primary residence no later than sixty (60) days after this date or the date the Property shall first become ready for occupancy as a habitable dwelling. That Borrower shall continue to occupy the Property as that Borrower's primary residence for at least one (1) year after the execution of the Loan documentation unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond that Borrower's control. Furthermore, all bills for utilities, water, and/or sewerage are in that Borrower's name.



    ☐    **Secondary Residence.** The Property is/will be Borrower's secondary residence. A secondary residence is a single-family property that is currently or will be occupied by at least one (1) Borrower in addition to that Borrower's primary residence. **The property will not be income-producing.**

    ☒    **Investment Property.** The Property is/will be investment property. The Property will not be occupied or claimed as a primary or secondary residence by any Borrower, and may produce revenue. Each Borrower now owns, resides, uses, and claims another property or properties as a residential homestead.

2.  **Financial Status.** Borrower understands that Lender is granting the Loan based on the representations made in the Loan application given by Borrower to Lender. Borrower hereby certifies that all statements related to the Loan application, including but not limited to, financial, marital, and employment status, have not changed and, to the best of Borrower's knowledge, will not change in the foreseeable future. If the Property is being purchased by Borrower, the funds for down payment and closing costs are being paid from the source stated on the Loan application and there is no secondary financing in this transaction that has not been disclosed to Lender. Borrower certifies that if the Loan application states that other real estate was to be sold, that such transaction has taken place and Borrower no longer has title to that real estate. If the Property is currently owned by Borrower, Borrower certifies that there are no delinquent state, county,

**Borrower's Closing Affidavit (Multistate)**
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

**Page 1 of 3**

06303MU 12/00 Rev. 06/04
©2004, The Compliance Source, Inc.

6 0 1 5 0 6 0 8 3

city, school, water district, utility district, or other governmental taxes or assessments due or owing against the Property and that no tax suit has been filed by any state, county, municipality, water district, utility district, or other governmental agency for taxes or assessments levied against Borrower which have not been disclosed in writing to Lender. Borrower also certifies that there are no unpaid paving assessments or delinquent owner association dues. There are no suits filed by or pending against Borrower in any federal or state court which have not been disclosed in writing to Lender.

3. **Property Acceptance.** Borrower acknowledges that the Property and all of its improvements, fixtures, appliances, and other parts are in good and satisfactory working order and in the conditions contracted for. If the Property is new construction, Borrower finds that the improvements erected on the Property have been completed substantially in accordance with the plans and specifications. If this is the purchase of an existing dwelling, Borrower has accepted the condition thereof, and all terms of the sales contract (including any required repairs and inspections) have been met. If the Property is or will be initial construction, Borrower will sign an affidavit of completion once Borrower finds the improvements are completed substantially in accordance with the plans and specifications and to Borrower's satisfaction and that the terms of the contract between Borrower and the contractor have been fully carried out. The matters acknowledged in this paragraph are to the best of Borrower's knowledge and belief, and nothing in this Affidavit is to be construed as a waiver of any claims, damages, causes of action, or rights under any warranty, expressed or implied, against any party other than Lender.

4. **Survey.**

   **If a Survey is required then,** Borrower hereby certifies that Borrower has received, reviewed, and approved a copy of the survey which is incorporated herein by reference and has signed or initialed and dated same for identification purposes. Borrower is aware of the indicated encroachments, protrusions, easements, limitations, access, dimensions, and/or other conditions shown on the survey. In consideration of Lender making the Loan to Borrower, Borrower hereby indemnifies and holds Lender harmless from any claims, costs, damages, causes of action, and expenses in any way arising as a result of the Property condition or any matters indicated in the survey.

   **If a current Survey is acceptable then,** since the date of the survey provided by Borrower, which survey has been signed or initialed and dated for identification purposes, Borrower certifies and represents that no improvements or structural changes or additions to the Property have been made. Borrower is aware of the indicated encroachments, protrusions, easements, limitations, access, dimensions, and/or other conditions shown on the survey. In consideration of Lender making the Loan to Borrower, Borrower hereby indemnifies and holds Lender harmless from any claims, costs, damages, causes of action, and expenses in any way arising as a result of the Property condition or any matters indicated in the survey.

   **If a Survey is not required then,** Borrower understands that a current survey is not required by Lender for this transaction, however, if Borrower desires, Borrower may have a current survey made. Borrower represents to Lender that Borrower understands that a survey would indicate existing encroachments, protrusions, easements, limitations, access, dimensions, or other conditions.

   Borrower represents to Lender that Borrower has not received from any third party any notice or claim of any limitation of the use and enjoyment of the Property not indicated by the most recently obtained survey.

**Borrower's Closing Affidavit (Multistate)**
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 2 of 3

06303MU 12/00 Rev. 06/04
©2004, The Compliance Source, Inc.



5.    **Title Insurance.** If Title Insurance is required by Lender, Borrower certifies that Settlement Agent has provided Borrower with a copy of the Commitment for Title Insurance and that Borrower has reviewed and consents to all of the exceptions to title which would appear in an Owner's Title Policy for the Property.

In consideration of Lender making the Loan to Borrower, Borrower hereby indemnifies and holds Lender harmless from any claims, costs, damages, causes of action and expenses in any way arising as a result of the Property condition and performance under any contract at sale between Borrower and any Seller of the property, or any matters indicated as exceptions stated in the Commitment for Title Insurance, and the Owner's and Mortgagee's Title Insurance Policies.

6.    **Hold Harmless.** Borrower has been made aware of the following specific conditions affecting the Property and does hereby indemnify and hold harmless Lender from any claims, costs, damages, causes of action, and expenses in any way arising from the following conditions or other matters:

Borrower acknowledges that this Affidavit is given as a material inducement to cause Lender to make the Loan to Borrower. Borrower understands that any false statements, misrepresentations, or material omissions may result in civil and criminal penalties. The agreements and covenants contained herein shall survive the closing of this Loan transaction.

| | | |
|---|---|---|
| **DONNA CHINLOY** | (Borrower) (Date) | (Borrower) (Date) |
| | (Borrower) (Date) | (Borrower) (Date) |

Subscribed and sworn to before me on

Notary Public in and for the State of **Florida**

My Commission Expires:

**Borrower's Closing Affidavit (Multistate)**
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 3 of 3

06303MU 12/00 Rev. 06/04
©2004, The Compliance Source, Inc.

6 0 1 5 0 6 0 8 3

Loan No.: 601506083

# AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE

Date: **March 1, 2006**

To: **DONNA CHINLOY**

From: **GMAC Bank**

Property: **9000 NW 28 DRIVE #306, Coral Springs, FL 33065**

In connection with either the purchase of this Property or obtaining mortgage loan financing secured by a mortgage/deed of trust against this Property, you may need to obtain certain settlement services. We recommend the companies listed below who provide quality service at competitive rates.

We also wish to give you notice that GMAC Bank has a business relationship with these settlement service providers. In particular, General Motors Acceptance Corporation owns 100% of GMAC Residential Holding Corp. and GMAC Insurance Corporation. GMAC Residential Holding Corp. owns 100% of GMAC Bank, GMAC Mortgage Corporation and GMACRH Settlement Services, Inc. GMACRH Settlement Services, Inc. owns 100% of Home Connects Lending Services, LLC, which in turn, owns 100% of Home Connects Lending Services of Alabama, Inc. (both companies collectively referred to as "Home Connects Lending Services").

In addition, GMAC Mortgage Corporation owns 100% of Ditech Escrow Services, Inc., Residential Consumer Services, Inc. and Cap RE of Vermont, Inc. Residential Consumer Services, Inc. in turn owns 100% of Residential Consumer Services of Alabama, Inc., Residential Consumer Services of Ohio, Inc. and Residential Consumer Services of Texas, Inc. (collectively, the "RCS Companies"). In some states, Residential Consumer Services, Inc. operates under the d/b/a name of RCS of Pennsylvania Insurance Agency.

Because of these relationships, any of these referrals may provide GMAC Bank, its owners, officers and/or its affiliates with a financial or other benefit.

Set forth below is the estimated charge or range of charges for the settlement services listed. You are NOT required to use the listed providers as a condition for settlement of your loan on the subject property. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

<u>Flood Certification Services</u>.   Home Connects Lending Services provides various flood certification and management services to lenders including ordering, reviewing, analyzing flood certification reports and issuing flood certifications:

Flood Certification/Flood Certification Services                    $19.00

<u>Tax services.</u>  Home Connects Lending Services provides various tax services to lenders related to obtaining and tracking the payment of property related taxes.

Tax Services                                             $85.00

———————————— *[Signatures on Following Page]* ————————————

**Affiliated Business Disclosure**                                                                (03/03)
**GMAC**                                        **Page 1 of 2**                          23549MU Revised 09/05



6 0 1 5 0 6 0 8 3

**ACKNOWLEDGMENT**

I/We have read this disclosure form, and understand that GMAC Bank is referring me/us to the above described settlement service providers as such, it and/or its owners and/or its affiliates may receive a financial or other benefit as a result of these referrals.

| | | |
|---|---|---|
| **DONNA CHINLOY** | Borrower | Borrower |

| | | |
|---|---|---|
| | Borrower | Borrower |

**SERVICING TRANSFER ESTIMATES**

1. The following is the best estimate of what will happen to the servicing of your mortgage loan:

   A.  ☐ We may assign, sell or transfer the servicing of your loan while the loan is outstanding.
       ☒ We are able to service your loan and we
       ☒ will service your loan
       ☐ will not service your loan
       ☐ have not decided whether to service your loan.

   **OR**

   B.  ☐ We do not service mortgage loans, ☐ and we have not serviced mortgage loans in the past three years.  We presently intend to assign, sell or transfer the servicing of your mortgage loan.  You will be informed about your servicer.

   C.  ☐ We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors.  For the program you have applied for, we expect to:
       ☐ sell all of the mortgage servicing
       ☐ retain all of the mortgage servicing
       ☐ assign, sell or transfer **.000** % of the mortgage servicing.

2. For all the first-lien mortgage loans that we make in the 12 month period after your mortgage loan is funded, we estimate that the percentage of such loans for which we will transfer servicing is between:

   ☒ 0% to 25%          ☐ 26% to 50%          ☐ 51% to 75%          ☐ 76% to 100%

   This estimate ☐ does ☒ does not include assignments, sales or transfers to affiliates or subsidiaries.  This is only our best estimate and it is not binding.  Business conditions or other circumstances may affect our future transferring decisions.

3. A.  ☐ We have previously assigned, sold or transferred the servicing of first-lien mortgage loans.

   **OR**

   B.  ☒ This is our record of transferring the servicing of the first-lien mortgage loans we have made in the past:

   | Year | Percentage of Loans Transferred (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
   |------|------|
   | 2005 | **.000** % |
   | 2004 | **.000** % |
   | 2003 | **.000** % |

   This information ☐ does ☒ does not include assignments, sales or transfers to affiliates or subsidiaries.

Present Servicer or Lender: **GMAC Bank**                          Date: **April 11, 2006**



6 0 1 5 0 6 0 8 3



# Internal Revenue Service
### United States Department of the Treasury
MEMPHIS, TN 37501-1498

Tracking ID: ███████████
Date of Issue: ████████

005185.881701.0024.001 1 AT 0.365 870



DONNA CHIN LOY
████████████████
CORAL SPRINGS, FL 33065

005185

Tax Period: December, 2007

### Information about the Request We Received

In this letter, we'll report the status of the request we received.

We're enclosing the relevant information from W-2 form, or forms, and/or 1099 information for the available tax period or periods.

If you have any questions about information contained in the transcripts or other enclosed information, please call us at the IRS telephone number listed in your local directory or at 1-800-829-8374.

Sincerely Yours,

Beth Jones, Director
Electronic Products & Svcs Support

Enclosures:
Transcript