## LIMITED POWER OF ATTORNEY

This Limited Power of Attorney is made on this 29th day of November, 2011, in connection with the servicing agreement by and between DLJ Mortgage Capital, Inc. a Delaware Corporation (the "Owner"), having its principal office located at 11 Madison Avenue, New York, NY 10010 and Selene Finance LP, a Delaware limited partnership (the "Servicer"), having its office at 9990 Richmond Avenue, Suite 400 South, Houston, TX 77402, dated as of June 1, 2011 (the "Servicing Agreement").

The Owner owns certain mortgage loans secured by mortgages or deeds of trust on residential real property and certain loans secured by liens on co-op shares and the related co-op lease (the "Loans") and the servicing rights relating to such Loans.

The Servicer has agreed to service the Loans pursuant to the terms of the Servicing Agreement.

The Owner hereby makes, constitutes and appoints the Servicer, its true and lawful attorney-in-fact, with full power and authority to sign, execute, acknowledge, deliver, file or record, any instrument on its behalf and to perform such other act or acts as may be customarily and reasonably necessary and appropriate to effectuate the following enumerated transactions in respect of any of the mortgages or deeds of trust (the "Mortgages") and promissory notes secured thereby (the "Mortgage Notes") for which the Servicer is acting as Servicer under the Servicing Agreement.

This appointment shall apply to the following enumerated transactions only:

1.  The modification or re-recording of a Mortgage, where said modification or re-recording is for the purpose of correcting the Mortgage to conform to the original intent of the parties or to correct title errors discovered after such title insurance was issued and said modification or re-recording, in either instance, does not adversely affect the lien of the Mortgage as insured.

2.  The execution of partial satisfactions/releases, partial reconveyances or the execution of requests to trustees to accomplish same.

3.  With respect to a Mortgage, the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such foreclosure, including, without limitation, any and all of the following acts:

    a.  The substitution of trustee(s) serving under a deed of trust;
    b.  Statements of breach or non-performance;
    c.  Notices of default;
    d.  Cancellations/rescissions of notices of default and/or notices of sale;
    e.  The taking of a deed in lieu of foreclosure; and
    f.  Such other documents and actions as may be necessary under the terms of the Mortgage or state law to expeditiously complete said transactions.

4.  The conveyance of the properties to the mortgage insurer, or the closing of the title to the property to be acquired as real estate owned, or conveyance of title to or on real estate owned.

5.  The completion of loan assumption agreements; the modification, waiver or agreement for forbearance of any Mortgage, promissory note, or any other documents related to any Loan.

6. The full satisfaction/release of a Mortgage or full reconveyance upon payment and discharge of all sums secured thereby, including, without limitation, cancellation of the related Mortgage Note.

7. The assignment of any Mortgage and the related Mortgage Note, in connection with the repurchase of the mortgage loan secured and evidenced thereby pursuant to the requirements of the Agreement including, without limitation, by reason of a conversion or adjustable rate mortgage loan from a variable rate to a fixed rate.

8. The full assignment of a Mortgage upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including, without limitation, the endorsement of the related Mortgage Note.

9. The Endorsement or negotiation of checks, money orders, drafts, cashiers check and similar media of payment for deposit in the appropriate custodial account.

Nothing herein shall give any attorney-in-fact the rights or powers to negotiate or settle any suit, counterclaim or action against the Owner. The Owner will not be responsible for inspection of any items being executed pursuant to this Limited Power of Attorney and as such, is relying upon the Servicer to undertake whatever procedures may be necessary to confirm the accuracy of such items.

Any third party may rely upon a copy of this Limited Power of Attorney, to the same extent as if it were an original, and shall be entitled to rely on a writing signed by the Servicer to establish conclusively the identity of a particular right, power, capacity, asset, liability, obligation, property, loan or commitment of Servicer for all purposes of this Limited Power of Attorney.

Servicer shall not be obligated to furnish bond or other security in connection with its actions hereunder.

The Owner authorizes Servicer, by and through any of its directors or officers, or any other employee who is duly authorized by Servicer to certify, deliver and/or record copies and originals of this Limited Power of Attorney.

The Servicer hereby agrees to indemnify and hold the Owner and its directors, officers, employees and agents harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by reason or result of or in connection with the exercise by the Servicer of the powers granted to it hereunder. The foregoing indemnity shall survive the termination of this Limited Power of Attorney and the Agreement.

If any provision of this Limited Power of Attorney shall be held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions hereof shall not be affected thereby.



IN WITNESS WHEREOF, the Owner has caused this Limited Power of Attorney to be executed and subscribed in its name as of November 29, 2011.

DLJ MORTGAGE CAPITAL, INC.

By: _____
Name: David Neugebauer
Title: Vice President

WITNESSES:

By: _____
Name: Jason Savage

By: _____
Name: Glenn Guszkowski
Title: Vice President

By: _____
Name: Paul Davino

STATE OF NEW YORK        )
                         : ss.:
COUNTY OF NEW YORK       )

On this 29th day of November, before me, the undersigned, a Notary Public in and for said state, appeared the above named individual, David Neugebauer, personally known or proved to me on the basis of satisfactory evidence to be a Vice Presidents of DLJ Mortgage Capital, Inc., the corporation the individual(s) who(s) name is (are) subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument the individual(s), or the person on behalf of which the individual(s) acted executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[NOTARIAL SEAL]

CHRISTINE NAPOLITANO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NA6013062
Qualified in New York County
Commission Expires Jan 22, 20__

# EXHIBIT "A"

**ORIGINAL**

## NOTE

MIN #: 100159969210432509

January 9, 2004

[Date]

Maryville                                     Tennessee

[City]                                        [State]

2041 Grey Ridge Road, Maryville, TN  37801

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 161,500.00                (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  Branch Banking and Trust Company

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      5.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st       day of each month beginning on  March 1, 2004          . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  February 1, 2034          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  223 West Nash Street, Wilson, NC  27893

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 955.33

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

DOC #:516691                          APPL #:7000419737                LOAN #:6921043250
**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

DM50 0005

-5N (0006)          **Form 3200 1/01**

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3                    Initials: _MB CS_

### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   Fifteen     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be              5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

#### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

#### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described  above, the Note Holder will still have the right to do so if I am in default at a later time.

#### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to  be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in  this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Michael W Summerfield          -Borrower

_____ (Seal)
Cynthia D Summerfield          -Borrower

_____ (Seal)
                               -Borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF
BRANCH BANKING AND TRUST COMPANY
BY _____
MARCIA L PRIDGEON, AVP

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF

BRANCH BANKING AND TRUST COMPANY          *[Sign Original Only]*

BY _____
JULIE M. PALMER, VP

DOC #:516693                APPL #:7000419737                LOAN #:6921043250

-5N (0005)                      Page 3 of 3                      Form 3200 1/01

EXHIBIT "B"

Return To:

Blount Title Agency
230 High St.
Maryville, TN 37804
BT-25195



RECEIVED
JAN 1 2 2004
8:15 Am

Prepared By:

Costner & Greene, Attys.
315 High St.
Maryville, TN  37804
By:  Steven J. Greene

The Maximum Principal Indebtedness for Tennessee recording tax purposes is $ __161,500.00__ .

——————————————— [Space Above This Line For Recording Data] ———————————————

## DEED OF TRUST

MIN 100159969210432509

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   January 9, 2004               ,
together with all Riders to this document.
(B) "Borrower" is  Michael W Summerfield, Cynthia D Summerfield , husband and wife,

Borrower is the trustor under this Security Instrument.
(C) "Lender" is   Branch Banking and Trust Company

Lender is a   Corporation
organized and existing under the laws of  North Carolina

DOC  #:524121                          APPL #:7000419737                      LOAN #:6921043250
TENNESSEE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS  Form 3043 1/01
VMP® -6A(TN) (0005).02
                    0M50 0005.07
Page 1 of 15            Initials: MS CS
VMP MORTGAGE FORMS - (800)521-7291

INST: 0025873902
RECEIVED: 01/12/2004  8:15 AM
PENNY H. WHALEY
REGISTER OF DEEDS BLOUNT CO. TN

Lender's address is  223 West Nash Street, Wilson, NC  27893

**(D) "Trustee"** is  Arnold M. Weiss

a resident of   Memphis                                                              , Tennessee.
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-20216, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated   as of the date hereof
The Note states that Borrower owes Lender   One Hundred Sixty One Thousand Five
Hundred and No/100                                                            Dollars
(U.S. $ 161,500.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   February 1, 2034          . The maximum principal indebtedness for Tennessee recording tax purposes is $  161,500.00        .
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify]  EXHIBIT A |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

DOC  #:524122                    APPL #:7000419737                              LOAN #:6921043250
                                                                Initials:
ⓌⓌ -6A(TN) (0005).02                      Page 2 of 15                                Form 3043  1/01



(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (a) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (b) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

County                              of  Blount                                        :
        [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]


SEE ATTACHED EXHIBIT A.


<u>Derivation Clause</u>

The instrument constituting the source of the Borrower's interest in the foregoing described property was a                              recorded
in the Register's Office of  Blount                          County, Tennessee.
Parcel ID Number:                                which currently has the address of
2041 Grey Ridge Road                                                            [Street]
Maryville                              [City] , Tennessee  37801        [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD, the aforedescribed property, together with all the hereditaments and appurtenances thereunto belonging to, or in anywise appertaining, unto the Trustee, its successors in trust and assigns, in fee simple forever. Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

DOC #:524123                    APPL #:7000419737                              LOAN #:6921043250

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payment are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due

for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

DOC #:524125                    APPL #:7000419737                         LOAN #:6921043250

-6A(TN) (0005).02                Page 5 of 16                    Initials:                Form 3043  1/01

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the



work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there

DOC #:524127                    APPL #:7000419737                    LOAN #:6921043250

-6A(TN) (0005).02              Page 7 of 16              Initials                    Form 3043  1/01

is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).





As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if

DOC #:524129                          APPL #:7000419737                          LOAN #:6921043250

WMP®-6A(TN) (0005).02                  Page 9 of 15                          Initials: ___  Form 3043  1/01

acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be





only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of





release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Trustee shall give notice of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by Applicable Law, and Lender or Trustee shall mail a copy of the notice of sale to Borrower in the manner provided in Section 15. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant at will of the purchaser and hereby agrees to pay the purchaser the reasonable rental value of the Property after sale.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Waivers.** Borrower waives all right of homestead, equity of redemption, statutory right of redemption and relinquishes all other rights and exemptions of every kind, including, but not limited to, a statutory right to an elective share in the Property.

DOC #:524133                APPL #:7000419737                          LOAN #:6921043250

⬚ -6A(TN) (0005).02                          Page 13 of 15                    Initials:                    Form 3043 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has executed this Security Instrument.

Witnesses:

_____                     _____ (Seal)
                                                      Michael W Summerfield        -Borrower


_____                     _____ (Seal)
                                                      Cynthia D Summerfield        -Borrower


_____ (Seal)                      _____ (Seal)
                    -Borrower                                                 -Borrower


_____ (Seal)                      _____ (Seal)
                    -Borrower                                                 -Borrower


_____ (Seal)                      _____ (Seal)
                    -Borrower                                                 -Borrower


DOC #:524134                    APPL #:7000419737            LOAN #:6921043250

-6A(TN) (0005).02                   Page 14 of 16               Form 3043  1/01



**STATE OF TENNESSEE,** Blount                                    **County ss:**

On this   9th      day of   January, 2004              , before me personally appeared
Michael W Summerfield, Cynthia D Summerfield , husband and wife,

to me known to be the person(s) described in and who executed the foregoing instrument, and who
acknowledged the execution of the same to be his/her/their free act and deed. Witness my hand and official
seal.

My Commission Expires:  5-30-05

_____
Notary Public



DOC #:524135              APPL #:7000419737                LOAN #:6921043250

Initials:

-6A(TN) (0005).02          Page 15 of 15                              Form 3043  1/01

EXHIBIT A

SITUATED in District 10 of Blount County, Tennessee and being more particularly described as follows:

BEGINNING on an iron pin in the southern right of way of Grey Ridge Road, said pin being located 1080.0 feet more or less from Smoky View Estates Drive and also being corner to Daniel H. Roush, Warranty Book 492, Page 527 in the Register's Office for Blount County, Tennessee; thence leaving said right of way and with Roush South 11 deg. 53 min. East 195.89 feet to an iron pin; thence continuing with Roush South 66 deg. 06 min. East 388.26 feet to an iron pin in the line of Lot 1, Smoky View Estates; thence with Lot 1 South 11 deg. 34 min. West 543.50 feet to an existing axle corner to Delmar Word, Warranty Book 156, page 453; thence with Word South 80 deg. 50 min. West 130.24 feet to an iron pin corner to Dennis J. Campbell, Warranty Book 352, Page 274; thence with Campbell North 12 deg. 46 min. West 920.41 feet to an iron bolt in the southern right of way of Grey Ridge Road; thence with said right of way North 84 deg. 20 min. East 45.79 feet to the point of beginning and containing 3.994 acres, more or less, according to the survey of Bruce McClellan, RLS#696, 3329 W. Gov. John Sevier Hwy., Knoxville, TN 37920, dated December 30, 2003 and bearing Drawing No. 04-007; said premises improved with dwelling.

THIS conveyance is made subject to any applicable restrictions, easements, etc. of record in the Register's Office for Blount County, Tennessee and subject to right of way of record in Warranty Book 444, Page 505 and Warranty Book 482, page 183 in the said Register's Office and further subject to an easement to East Tennessee Natural Gas Company of record in Misc. Book 11, Page 461 in the said Register's Office and as shown by survey referenced herein.

BEING the same property conveyed to Grantors by warranty deed of record in Warranty Book _692_ , Page _415_ in the Register's Office for Blount County, Tennessee.

BT-25195/gw/dmo

*C.S.*



# EXHIBIT "C"

This instrument is a correction of that certain instrument described below wherein by error, mistake or scrivener's error, the name of the wrong entity was typed as Assignor and the instrument number was omitted and this instrument is made to correct said error, mistake, or scrivener's error, and in all other respects confirms and ratifies said former Instrument.

# CORRECTION ASSIGNMENT OF DEED OF TRUST

Recording Reference of Instrument being corrected:    **Book 2306 Page 2988**
**Instrument Number 654081**

This instrument was prepared by and after recording, return to:
Charles Brown
Brown & Associates
2316 Southmore
Pasadena, TX 77502
713-941-4928
Client ID: Selene/AOL

```
Phyllis Lee Crisp, Register
       Blount County Tennessee
Rec #: 434628
Rec'd:    20.00    Instrument #: 692553
State:     0.00
Clerk:     0.00        Recorded
Other:     2.00    12/10/2012 at 10:25 AM
Total:    22.00            in
          Record Book 2342 Pgs 1401-1403
```

Min: 100159969210432509      MERS Phone: 1-889-679-6377

*FOR VALUE RECEIVED,* MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR BRANCH BANKING AND TRUST COMPANY, ITS SUCCESSORS AND ASSIGNS, whose address is P.O. Box 2026, Flint, MI 48501-2026, does hereby assign and transfer to DLJ MORTGAGE CAPITAL, INC., ITS SUCCESSORS AND ASSIGNS, forever without recourse, whose address is c/o Select Portfolio Servicing, Inc. 3815 South West Temple, Salt Lake City, UT 84115, all its right, title and interest in and to a certain deed of trust from MICHAEL W SUMMERFIELD, CYNTHIA D SUMMERFIELD, HUSBAND AND WIFE to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR BRANCH BANKING AND TRUST COMPANY, ITS SUCCESSORS AND ASSIGNS for $161,500.00 dated 1/9/2004 of record on 1/12/2004 in Book 1318 Page 172 at Document Number 0025873902, in the BLOUNT County Clerk's Office, State of TENNESSEE.

Property Address: 2041 GREY RIDGE, MARYVILLE, TENNESSEE 37801
Legal description: SEE ATTACHED EXHIBIT A

Executed this ᏝᎧ. ᏝᏙ -2012.

Maximum principal indebtedness for Tennessee recording tax purposes is $0.00 (zero dollars).

1455-22279

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR BRANCH
BANKING AND TRUST COMPANY, ITS SUCCESSORS AND ASSIGNS**

By: _____
Title:    Assistant Secretary
Gina Gray

STATE OF _____ Texas

COUNTY OF _____ Harris

Before me, the undersigned officer, on this day, personally appeared _____ Gina Gray
the Assistant Secretary of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., A
DELAWARE CORPORATION,  AS NOMINEE FOR BRANCH BANKING AND TRUST
COMPANY, ITS SUCCESSORS AND ASSIGNS** known to me to be the person whose name is
subscribed to the foregoing instrument, and acknowledged to me that he/she executed the same
for the purposes and consideration therein expressed.

Given under my hand and seal this 6 - 15 -2012.

_____
Notary Public in and for the State of _____ Texas
Notary's Printed Name: Leticia m. Turner
My Commission Expires: 5-3-2013

LETICIA M. TURNER
My Commission Expires
May 3, 2013

DOT for $161,500.00 dated 1/9/2004

# EXHIBIT "D"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Residential Capital, LLC aka Residential<br>Capital Corporation<br><br><div align=right>Debtor(s)</div> | Affidavit in Support of Motion for Relief<br>From Automatic Stay<br><br>Chapter 11<br>Case Number 12-12020<br>Honorable: Martin Glenn<br>Property 2041 Grey Ridge., Maryville, TN<br>37801 |

I, *Carine Fo l*_____ an employee of Selene Finance (Hereinafter [Servicing Agent]) on behalf of DLJ Mortgage Capital, Inc (Hereinafter [Secured Creditor]), duly sworn deposes and says:

1.    I am the *Asst. Vice President* of the Servicing Agent and by virtue of the Power of Attorney executed by the Secured Creditor am authorized to submit this declaration on behalf of Secured Creditor.

2.    I have reviewed the business records of the Servicing Agent, including but not limited to the personal knowledge, books, files, electronic data, memorandum or records of any act, transaction, occurrence or event, made in the regular course of business and that it was the regular course of such business that these record be made, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter.

3.    The subject real property securing said first mortgage loan is generally described as 2041 Grey Ridge., Maryville, TN 37801.

4.    That on or about May 14, 2012, the junior lienholder holding a personal property interest under a Note and Mortgage filed a jointly administered and consolidated cases under Chapter 11 Petition in Bankruptcy with this Court.

5.    Debtor, as a lending and mortgage servicing entity appears to have a personal property interest in the junior lien and Note in regard to property generally described as 2041 Grey Ridge., Maryville, TN 37801 and the Note appears to be an asset of the joint Debtor case.

6.    This Secured Creditor is the payee of the mortgage note (See Exhibit [A]) dated January 9, 2004 in the principal amount of $161,500.00 which is secured by the above-referenced mortgage, attached hereto (See Exhibit [B.]).

7.    The above Debtors filed the joint cases on May 14, 2012, and appears to have a junior lien and Note in regard to property generally described as 2041 Grey Ridge., Maryville, TN 37801 as an asset in the jointly administered cases.

8.    The Servicing Agent is the Attorney in Fact for the Secured Creditor by virtue of a Power of Attorney. (See Exhibit ⬜C.⬜)

9.    DLJ Mortgage Capital, Inc is a creditor by virtue of the fact that the note was transferred by way of an allonge. (See Exhbit "A."). The Mortgage passes as an incident to the note.

10.    The Debtor(s) filed a bankruptcy petition in this Court, which stayed all further action by the Secured Creditor.

11.    Mortgage arrearage has accumulated for the monthly installments of September 2010 through February 2012, by failure to pay the amount(s) of $1,205.56 per month and March 2012 through March 2013 by failure to pay the amount of $1199.31, totaling $37,291.11 up to and including and through March 31, 2013 plus Mortgage Insurance Premium in the amount of $104.98.

12.    A recent Appraisal/Broker⬜s Price Opinion for the property known as 2041 Grey Ridge, Maryville, TN 37801 is attached hereto as Exhibit ⬜D.⬜ The amount currently due and owing under the mortgage is 177,003.08.  In addition, the Secured Creditor has now incurred legal fees and costs in the amount of Five Hundred and 00/100 ($500.00) Dollars.

13.    This Secured Creditor has elected to initiate foreclosure proceedings on the subject real property under its mortgage.

14.    This Secured Creditor is precluded from proceedings to publish the necessary notices and to commence said foreclosure proceedings during the pendency of this Bankruptcy.

Name: Carine Fol
Title: Asst. Vice President

Sworn to before me this
16 day of March, 2013

Notary Public

Bertha Villanueva Castillo
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 2, 2014

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re:<br><br>Residential Capital, LLC aka Residential<br>Capital Corporation<br>Social Security Number: XXX-XX-20-<br>1770738<br><br>Debtor(s) | Chapter 11<br>Case Number 12-12020<br>Honorable: Martin Glenn<br>Property 2041 Grey Ridge., Maryville, TN<br>37801 |

## RELIEF FROM STAY ☐REAL ESTATE AND COOPERATIVE APARTMENTS

I, *Carine Fol*, am the *Asst Vice President* (Name and Title) of Selene Finance, the servicing agent for DLJ Mortgage Capital, Inc (Hereinafter, ☐Movant☐) hereby declare:

## BACKGROUND INFORMATION

1. Real Property or Cooperative apartment address which is the subject of this motion: 2041 Grey Ridge., Maryville, TN 37801
2. Lenders Name: DLJ Mortgage Capital, Inc
3. Date of Mortgage: January 9, 2004
4. Post-Petition Payment Address: Post Office Box 422039, Houston, Texas 77242

## DEBT/VALUE REPRESENTATIONS

5. Total Pre-Petition and Post-Petition indebtedness of Debtor(s) to Movant at the time of filing of the motion $177,003.08 (Note: this amount may not be relied on as a ☐payoff☐ quotation.)
6. Movant☐s estimated market value of the Real Property or Cooperative Apartment: $150,000.00
7. Source of estimated valuation: Broker☐s Price Option and/or Appraisal
8. Total Pre-Petition indebtedness of Debtor(s) to Movant as of petition filing date: $177,003.08
    A. Amount of Principal: $145,417.20
    B. Amount of Interest: $21,413.19
    C. Amount of Escrow (Taxes and Insurance): $6,072.94
    D. Amount of Forced Placed Insurance expended by Movant: $
    E. Amount of Attorneys☐Fees billed to Debtor(s) Pre-Petition: $
    F. Amount of Pre-Petition Late Fees, if any, billed to Debtor(s): $47.77
9. Contractual Interest Rate: 5.88
10. Please explain any additional Pre-Petition fees, charges or amounts charged to Debtor(s) account and not listed above:

| Recoverable Balance: | $3935.00 |
|---|---|
| Total Fees: | $12.00 |

(If additional space is needed, please list the amounts on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here: 5.)

## AMOUNT OF ALLEGED POST-PETITION DEFAULT
## (AS OF March 13, 2013)

11.    Date last payment was received: August 1, 2010
12.    Alleged total number of payments due Post-Petition from filing of petition through payment due on May 14, 2012 is 11.00
13.    Please list all Post-Petition payments alleged to be in default:

| Alleged Payment Due Date | Alleged Amount Due | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Amount Applied to Escrow | Late Fee Charged (if any) |
|---|---|---|---|---|---|---|
| 5/2012 ☐ 3/2013 | $1199.31 | $0.00 | $0.00 | $0.00 | $0.00 | $ |
| TOTALS: | $13,192.41 | $0.00 | $0.00 | $0.00 | $0.00 | $ |

14.    Amount of Movant's attorneys fees billed to debtor for the preparation, filing and prosecution of this motion: $650.00
15.    Amount of Movant's filing fee for this Motion: $150.00
16.    Other Attorneys Fees billed to debtor Post-Petition: $
17.    Amount of Movant's Post-Petition Inspection Fees: $
18.    Amount of Movant's Post-Petition Appraisal/Broker's Price Opinion: $
19.    Amount of Forced Placed Insurance or insurance provided by the Movant Post-Petition: $
20.    Sum held in suspense by Movant in connection with this contract, if applicable: $
21.    Amount of other Post-Petition advances or charges, for example taxes, insurance incurred by Debtor(s), etc.: $

## REQUIRED ATTACHMENTS TO MOTION

Please attach the following documents to this motion and indicate the exhibit number associated with the documents.

(1)    Copies of documents that indicate Movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the mortgage and any assignments in the chain from the original mortgagee to the current moving party. (Exhibit ☐ ).

(2)    Copies of documents establishing proof of standing to bring this Motion. (Exhibit ☐2☐).

(3)    Copies of documents establishing that Movant's interest in the real property or cooperative apartment was perfected. For the purposes of example only, a complete and legible copy of the Financing Statement (UCC-1) filed with either the Clerk's Office or the Register of the county the property or cooperative apartment is located in. (Exhibit ☐3☐).

## CERTIFICATION FOR BUSINESS RECORDS

I certify that the information provided in this worksheet and/or any exhibits attached to this worksheet (other than the transactional documents attached as required by paragraphs 1, 2, and 3 immediately above) is derived from records that were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters, were kept in the course of the regularly conducted activity; and were made by the regularly conducted activity as a regular practice.

I further certify that all images of original documents as required by paragraphs 1, 2, and 3, immediately above, are maintained in the system of record and to the best of affiant☐s knowledge and belief; the images are true and correct copies of the originals. The originals are maintained in the ordinary course of business and can be inspected upon request.

<div align="center">DECLARATION</div>

I, _Carine Fol_____, am the _Asst Vice President_ (Name and Title) of Selene Finance, the servicing agent for DLJ Mortgage Capital, Inc (Hereinafter, ☐Movant☐) hereby declare (OR CERTIFY, VERIFY, OR STATE) PURSUANT TO 28 U.S.C. SECTION 1746 UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON PERSONAL KNOWLEDGE OF THE MOVANT☐S BOOKS AND BUSINESS RECORDS.

EXECUTED AT ____Houston____ (CITY/TOWN) _Texas____ (STATE) ON THIS _16_ DAY OF _March_ (MONTH), 20_13_____ (YEAR).

Name: _Carine Fol_
Title: _Asst. Vice President_
Address: Post Office Box 422039,
Houston, Texas 77242

STATE OF NEW YORK         )
                                  : ss.:

COUNTY OF NEW YORK     )

On this 29th day of November, before me, the undersigned, a Notary Public in and for said state, appeared the above named individual, Glenn Gusckowski, personally known or proved to me on the basis of satisfactory evidence to be a Vice President of DLJ Mortgage Capital, Inc., the corporation the individual(s) who(s) name is (are) subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument the individual(s), or the person on behalf of which the individual(s) acted executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

[NOTARIAL SEAL]

CHRISTINE NAPOLITANO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01NA6013062
Qualified in New York County
Commission Expires Jan 22, 20____

# EXHIBIT "E"



**RRReview**
VALUE TRUST RELATIONSHIP

www.RRReview.com
866-876-5095

| Account | 617365 | | Order # | 2087939 |
|---|---|---|---|---|
| Client | Selene Finance LP | | Group ID | Selene_04.11.12 |
| Inspection | Exterior | | Occupancy | Occupied - Occupant Unknown |
| Date | 04/13/2012 | | County | Blount |
| Owner | SUMMERFIELD | | | |
| Address | 2041 GREY RIDGE RD MARYVILLE TN 37801 | | | |
| Correction | | | | |

## General Information

| | | | | | |
|---|---|---|---|---|---|
| Property Type | Single Family | Employment Conditions | Stable | Vacancy Rate | 1.00 % | Neighborhood Low | $29,900 |
| Location | Rural | Housing Inventory | Increasing | Land Value | $30,000 | Neighborhood High | $699,900 |
| Ownership Type | Fee-simple | Pride of Ownership | Average | Tax Assessed Value | $201,800 | Comparable listings | 6 |
| Property Values | Declining | Predominant Occupancy | Tenant | Annual Property Tax | $1,084 | Avg. Marketing Time | 180 days |

## Listing and Sale Information

| | | | | | |
|---|---|---|---|---|---|
| Currently Listed | No | Current List Price | - | Last Sale Price | $170,000 |
| Listing Date | - | Original List Price | - | Last Sale Date | 01/01/2004 |
| Listing Broker | - | Agent Phone Number | - | Prev. List (12 Mos.) | No |

**Subject Comments**    Subject appears to be well maintained and in average condition, according to tax records it has a 2 (See Addendum)

## Comparable Information

| | Subject | Sale 1 | Sale 2 | Sale 3 | Listing 1 | Listing 2 | Listing 3 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Address | 2041 GREY RIDGE RD , 37801 | 2708 BIG SPRINGS RD , 37737 | 2928 DIXON RD , 37801 | 118 GARWOOD , 37801 | 1227 W. HUNT ROAD , 37801 | 231 PUTTERS GREEN , 37801 | 319 VERNIE LEE RD , 37737 |
| Proximity | | 1.76 Miles | 3.13 Miles | 3.78 Miles | 1.77 Miles | 11.68 Miles | 3.66 Miles |
| HOA | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Fair Market Rent | $1,200 | $1,200 | $1,200 | $1,000 | $1,000 | $1,200 | $1,000 |
| Sale Type | Fair Market | Fair Market | Fair Market | Fair Market | Fair Market | REO | Short Sale |
| Org. List Price | | $149,000 | $279,900 | $139,900 | $169,900 | $132,000 | $115,000 |
| Current List Price | | | | | $169,900 | $132,000 | $115,000 |
| Sale Price | $170,000 | $147,000 | $195,000 | $109,900 | | | |
| Concessions | $0 | $0 | $0 | $0 | | | |
| Sale Date | 01/01/2004 | 12/16/2011 | 04/06/2012 | 03/30/2012 | | | |
| Financing | Conventional | FHA | Conventional | Conventional | | | |
| DOM | | 58 | 731 | 723 | 35 | 43 | 196 |
| # of Units | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Style | Cabin | Rambler/Ranch | Cabin | Rambler/Ranch | Rambler/Ranch | Rambler/Ranch | Rambler/Ranch |
| Lot Size | 4 acres | 1.4 acres | 4.02 acres | 1.7 acres | 3 acres | 2.09 acres | 1.4 acres |
| View | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Golf Course | Neighborhood |
| Condition | Average | Average | Average | Average | Average | Average | Average |
| Year Built | 2001 | 2003 | 1990 | 1960 | 1956 | 2008 | 1998 |
| Total Room Count | Rms/Bds/Full/Half 6/2/2/0 | Rms/Bds/Full/Half 5/3/2/0 | Rms/Bds/Full/Half 5/3/2/0 | Rms/Bds/Full/Half 5/3/1/1 | Rms/Bds/Full/Half 5/3/1/0 | Rms/Bds/Full/Half 6/4/2/0 | Rms/Bds/Full/Half 5/3/2/0 |
| Above Grade Sq Ft | 1288 | 1544 | 1512 | 1186 | 1120 | 1360 | 1170 |
| Basement SF | 0 | 0 | 0 | 0 | 1120 | 0 | 0 |
| % Basement Finish | | | | | Unfinished | | |
| Garage/Carport | 2 Attached | 2 Attached | 2 Detached | 1 Attached | 2 Attached | 2 Attached | 2 Detached |
| Amenities | Por, DK, FP, A/C | Por, Pat, FP, A/C | Por, DK, FP, Other, A/C | Por, Pat, A/C | Por, Pat, Other, A/C | Por, Pat, A/C | Por, DK, Other, A/C |
| Best "As Is" | | | X | | | | |
| Best "Repaired" | | | X | | | | |
| SP / GLA Per SF | $128.11 | $95.21 | $128.97 | $91.89 | $151.70 | $97.06 | $98.29 |

## Comparable Comments

**Comments on Sales**
1: Similar: Due to the lack of closer recent closed sales that are similar to the subject in GLA, age, (See Addendum)
2: Similar: Similar in design/style, age, lot size, GLA and room count, recent sale, has barn fenced h (See Addendum)
3: Similar: Similar in GLA, location and condition, due to the lack of more comparable closed sales an (See Addendum)

**Comments on Listings**
1: Similar: Similar in location, GLA and lot size, comp has a barn and rents out the pasture land. Due (See Addendum)
2: Similar: HUD home on golf course, similar in GLA and bath count. Due tot he lack of similar listing (See Addendum)
3: Similar: Pending Short Sale, similar in GLA, age, bath count and condition. Due to active comparabl (See Addendum)

## Value Conclusion

| | | | |
|---|---|---|---|
| Quick Sale "As Is" | $150,000 | Quick Sale "Repaired" | $150,000 |
| 90 - 120 Days "As Is" | $165,000 | 90 - 120 Days "Repaired" | $165,000 |
| Estimated Repairs | $0 | (See following page for repair details) | |

Account #: 617365 · Order #: 2087939                                                                    Page: 2

## Site Improvements

| | |
|---|---|
| Neighborhood Comment | The subject neighborhood is located within an established rural area outside of Knoxville; it is within close proximity to schools, shopping, employment and major routes of travel. There were no noted adverse conditions present at the time of inspection. Estimated % of REO Homes: 1%-10%. Estimated % of Boarded Homes: 1%-10%. Vandalism Risk: Low Risk. |
| Environmental Issues | There are no known environment issues present. |
| Functional or Economic Obsolescence | Due to the large number of REO and short sale activity in the area, housing values have declined, there is no known functional obsolescence. |
| Positive / Negative Features | The subject appears to be well maintained and in average condition on 4 acres of nice rolling land with no signs of repairs needed, damages or adverse conditions at the time of inspection. |
| Sewer | Private |
| Water | Public |

## Repairs – Exterior

| Item | Description | Estimated Cost |
|---|---|---|
| 1. Exterior Finish | - | $0 |
| 2. Painting | - | $0 |
| 3. Windows | - | $0 |
| 4. Roof | - | $0 |
| 5. Structural | - | $0 |
| 6. Landscaping | - | $0 |
| 7. Outbuildings | - | $0 |
| 8. Debris Removal | - | $0 |
| 9. Utility | - | $0 |
| 10. Other | - | $0 |
| **Grand Total for Cost of Repairs** | | **$0** |

## Quality Control Review

| Item | Quick Sale | 90 - 120 Day |
|---|---|---|
| Field "As Is" Value | $150,000 | $165,000 |
| "As Is" Value Adjusted by Quality Control | $0 | $0 |
| Field "Repaired" Value | $150,000 | $165,000 |
| "Repaired" Value Adjusted by Quality Control | $0 | $0 |

### Quality Control Comment

Subject is indicated to be in average condition with no repairs required. The subject is located some distance from the road. Condition could not be verified by the provided photos. No features or influences were noted that would significantly affect value. Subject was not found to be listed in the past 12 months. Comparables fall outside the guidelines; however, due to the rural nature of the area, search criteria had to be expanded. These comparables appear to bracket the subject's dominant features with appropriate photos provided. Property characteristics found through outside sources are similar to what is in the BPO. Secondary sources provided a range of values for the subject from $145,000-161,000. The BPO value falls within this range. Agent has selected Sale #2 as the best comparable. Reviewer has selected Sale #1 and Sale #2 but agrees with the agent's value.

### Map Comments

This report has passed automated quality control criteria and map qc review.

## Addendum

1. **Subject Comments** - Subject appears to be well maintained and in average condition, according to tax records it has a 2 car attached garage, decks and a fireplace. By submitting this document, I attest to the foregoing and that I have no current or future contemplated interests in the subject property. DataSource: Tax Records. Zoning: SFR.

2. **Sale 1 Comments** - Similar: Due to the lack of closer recent closed sales that are similar to the subject in GLA, age, room count and condition, this sale was used. DataSource: MLS. Zoning: SFR.

3. **Sale 2 Comments** - Similar: Similar in design/style, age, lot size, GLA and room count, recent sale, has barn fenced horse area, detached workshop and pond. DataSource: MLS. Zoning: SFR.

4. **Sale 3 Comments** - Similar: Similar in GLA, location and condition, due to the lack of more comparable closed sales and listings,m these were used and found to be the best/most recent available. DataSource: MLS. Zoning: SFR.

5. **Listing 1 Comments** - Similar: Similar in location, GLA and lot size, comp has a barn and rents out the pasture land. Due to the lack of active listings with acreage that are more similar in age and room count, this listing was used. DataSource: MLS. Zoning: SFR.

6. **Listing 2 Comments** - Similar: HUD home on golf course, similar in GLA and bath count. Due tot he lack of similar listings in more similar location, this listing was used. DataSource: MLS. Zoning: SFR.

7. **Listing 3 Comments** - Similar: Pending Short Sale, similar in GLA, age, bath count and condition. Due to active comparable listings closer in proximity, this listing was used. DataSource: MLS. Zoning: SFR.

## Valuation Methodology

This document was created by an independent agent for RRReview. The following valuation methodology was used with consideration for RRReview policies and any specific client requirements.

**Data Collection:** Public and/or private data was collected and analyzed to determine neighborhood characteristics, local market conditions, use, zoning, tax assessments, physical characteristics, transaction history and past or current listing information. Information was then gathered on six other properties that are comparable to the subject property in location, use and dominant features: three that have been recently sold and three that are currently listed for sale.

**Site Inspection:** Per the client instructions, the subject property and surrounding neighborhood were inspected and photographed. This inspection may have been of the interior and/or exterior based on the inspection type. The inspection included a review for the condition of the dwelling, improvements, and any other positive or negative features. Any known environmental issues or functional or economic obsolescence are also taken into consideration.

**Reconciliation:** The collected data was then compiled with information collected from the site inspection and compared to the information from the selected comparables. The properties were compared to the subject using the sales comparison approach, which is primarily based upon the principle of substitution. The property condition, market conditions and any other noted positive or negative influences were also considered. The analysis resulted in the production of an estimate of value, which was recorded either as a single figure or a range of values, as ordered by the client.

**Reporting:** The summary of the results and the data collection, site inspection and reconciliation were provided on the appropriate BPO or CMA form as ordered by the client.

Account #: 617365 - Order #: 2087939                                    Page: 4



Subject Property Front View - 2041 Grey Ridge Rd, 37801

Subject Address Verification

Subject Street Scene

Sale 1 Photo - 2708 Big Springs Rd, 37737                              $147,000

Sale 2 Photo - 2928 Dixon Rd, 37801            $195,000

Sale 3 Photo - 118 Garwood, 37801                       $169,900

Account #: 617365 - Order #: 2087939



Listing 1 Photo - 1227 W. Hunt Road, 37801    $169,900    Listing 2 Photo - 231 Putters Green, 37801    $132,000



Listing 3 Photo - 319 Vernie Lee Rd, 37737    $115,000

Account #: 617365 - Order #: 2087939

**Comparable Data Map**



| Legend | Property | Distance | Street |
|---|---|---|---|
| X | Subject | 0 Miles | 2041 Grey Ridge Rd, 37801 |
| 1 | Sale 1 | 1.76 Miles | 2708 Big Springs Rd, 37737 |
| 2 | Sale 2 | 3.13 Miles | 2928 Dixon Rd, 37801 |
| 3 | Sale 3 | 3.78 Miles | 118 Garwood, 37801 |
| 4 | Listing 1 | 1.77 Miles | 1227 W. Hunt Road, 37801 |
| 5 | Listing 2 | 11.88 Miles | 231 Putters Green, 37801 |
| 6 | Listing 3 | 3.66 Miles | 319 Vernie Lee Rd, 37737 |

**Contact Information**

RRReview Contact Email: RRRClientServices@RRReview.com

Agent Name: Scott West

Agency: Scott West

Distance to Subject: 26.54 miles

RRReview Phone Number: 866-876-5095

License Number: 00320798

Electronically Signed: 4/13/2012 12:49:00 PM

**Purpose**

The purpose of this analysis is to provide a market value of the subject property. This analysis is not to be used in lieu of an appraisal for the purpose of determining whether to approve a mortgage loan. Nothing in this report should be construed as a guarantee of value or condition of the subject property. This analysis is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practices.

**Legal Disclaimer**

Notwithstanding any preprinted language to the contrary, this opinion is not an appraisal of market value of the subject property. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained.

© 2010 Residential RealEstate Review, Inc., all rights reserved.