# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2012 or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number: 1-3754

## ALLY FINANCIAL INC.
**(Exact name of registrant as specified in its charter)**

| Delaware | 38-0572512 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**200 Renaissance Center**
**P.O. Box 200 Detroit, Michigan**
**48265-2000**
(Address of principal executive offices)
(Zip Code)

**(866) 710-4623**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act (all listed on the New York Stock Exchange):

**Title of each class**

| | |
|---|---|
| 10.30% Deferred Interest Debentures due June 15, 2015 | 7.375% Notes due December 16, 2044 |
| 7.30% Public Income Notes (PINES) due March 9, 2031 | Fixed Rate/Floating Rate Perpetual Preferred Stock, Series A |
| 7.35% Notes due August 8, 2032 | 8.125% Fixed Rate/Floating Rate Trust Preferred Securities, Series 2 of GMAC Capital Trust I |
| 7.25% Notes due February 7, 2033 | |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K (§ 229.405 of this chapter) is not contained herein and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐         Accelerated filer ☐         Non-accelerated filer ☑         Smaller reporting company ☐
(Do not check if a smaller reporting)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

Aggregate market value of voting and nonvoting common equity held by nonaffiliates: Ally Financial Inc. common equity is not registered with the Securities and Exchange Commission and there is no ascertainable market value for such common equity.

At February 28, 2013, the number of shares outstanding of the Registrant's common stock was  1,330,970 shares.

Documents incorporated by reference. None.

# INDEX

Ally Financial Inc. Form 10-K

|  |  | Page |
|---|---|---|
| Part I | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 22 |
| Item 2. | Properties | 22 |
| Item 3. | Legal Proceedings | 23 |
| Item 4. | Mine Safety Disclosures | 23 |
| Part II | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 24 |
| Item 6. | Selected Financial Data | 25 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 99 |
| Item 8. | Financial Statements and Supplementary Data | 100 |
| | Management's Report on Internal Control over Financial Reporting | 100 |
| | Reports of Independent Registered Public Accounting Firm | 101 |
| | Consolidated Statement of Income | 103 |
| | Consolidated Statement of Comprehensive Income | 105 |
| | Consolidated Balance Sheet | 106 |
| | Consolidated Statement of Changes in Equity | 108 |
| | Consolidated Statement of Cash Flows | 109 |
| | Notes to Consolidated Financial Statements | 111 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 209 |
| Item 9A. | Controls and Procedures | 209 |
| Item 9B. | Other Information | 209 |
| Part III | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 210 |
| Item 11. | Executive Compensation | 214 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 226 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 226 |
| Item 14. | Principal Accountant Fees and Services | 227 |
| Part IV | | |
| Item 15. | Exhibits, Financial Statement Schedule | 229 |
| **Signatures** | | **232** |

# Part I
Ally Financial Inc. • Form 10-K

## Item 1.   Business
### General

Ally Financial Inc. (formerly GMAC Inc.) is a leading, independent, financial services firm with $182.3 billion in assets. Founded in 1919, we are a leading automotive financial services company with over 90 years of experience providing a broad array of financial products and services to automotive dealers and their customers. We became a bank holding company on December 24, 2008, under the Bank Holding Company Act of 1956, as amended (the BHC Act). Our banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally Financial Inc. and a leading franchise in the growing direct (internet, telephone, mobile, and mail) banking market, with $46.9 billion of deposits at December 31, 2012. The terms "Ally," "the Company," "we," "our," and "us" refer to Ally Financial Inc. and its subsidiaries as a consolidated entity, except where it is clear that the terms means only Ally Financial Inc.

## Our Business

Dealer Financial Services, which includes our Automotive Finance and Insurance operations, and Mortgage are our primary lines of business. Our Dealer Financial Services business is centered on our strong and longstanding relationships with automotive dealers and supports manufacturers with which we have marketing relationships and their marketing programs. Our Dealer Financial Services business serves the financial needs of almost 15,000 dealers with a wide range of financial services and insurance products. We believe our dealer-focused business model makes us the preferred automotive finance company for thousands of our automotive dealer customers. We have developed particularly strong relationships with thousands of dealers resulting from our longstanding relationship with General Motors Company (GM) and our relationship with Chrysler Group LLC (Chrysler), providing us with an extensive understanding of the operating needs of these dealers relative to other automotive finance companies. In addition, we have established specialized incentive programs that are designed to encourage dealers to direct more of their business to us.

Ally Bank, our direct banking platform, provides us with a stable and diversified low-cost funding source. Our focus is on building a stable deposit base driven by our compelling brand and strong value proposition. Ally Bank raises deposits directly from customers through the direct banking channel via the internet, over the telephone, and through mobile applications. Ally Bank offers a full spectrum of deposit product offerings including certificates of deposit, savings accounts, money market accounts, IRA (individual retirement account) deposit products, as well as an online checking product. We continue to expand the product offerings in our banking platform in order to meet customer needs. Ally Bank's assets and operating results are divided between our Automotive Finance operations and Mortgage operations based on its underlying business activities.

Our strategy is to extend our leading position in automotive finance in the United States by continuing to provide automotive dealers and their retail customers with premium service, a comprehensive product suite, consistent funding and competitive pricing, reflecting our commitment to the automotive industry. We are focused on expanding profitable dealer relationships, prudent earning asset growth, and higher risk-adjusted returns. Our growth strategy continues to focus on diversifying the franchise by expanding into different products as well as broadening our network of dealer relationships. During 2012, we continued to focus on the used vehicle market, which resulted in strong growth in used vehicle financing volume. We also seek to broaden and deepen the Ally Bank franchise, prudently growing stable, quality deposits while extending our foundation of products and providing a high level of customer service.

### Strategic Actions
#### *Subsidiaries' Bankruptcy Filings*

On May 14, 2012, Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. In connection with the filings, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan, which is subject to bankruptcy court approval and certain other conditions. As a result of the bankruptcy filing, effective May 14, 2012 the Debtors were deconsolidated from our financial statements. For further details with respect to the bankruptcy and the deconsolidation, refer to Item 1A. Risk Factors and  Note 1 to the Consolidated Financial Statements.

#### *Sale of International Businesses*

During 2012, we committed to sell substantially all of our remaining international businesses, which included automotive finance, insurance, and banking and deposit operations. On February 1, 2013, we completed the sale of our Canadian automotive finance operation to Royal Bank of Canada, and we expect the sales of our remaining international operations in Europe and Latin America, as well as our share in a joint venture in China, to close in stages throughout 2013. As a result of the sales, for all periods presented, the operating results for these operations have been removed from continuing operations. Refer to  Note 2 and Note 31 to the Consolidated Financial Statements  for more details.

### Dealer Financial Services

Dealer Financial Services includes our Automotive Finance operations and Insurance operations. Our primary customers are automotive dealers, which are independently owned businesses. As part of the process of selling a vehicle, automotive dealers typically originate loans and leases to their retail customers. Dealers then select Ally or another automotive finance provider to which they sell loans and leases. References to consumer automobile loans in this document include installment sales financing unless the context suggests otherwise.

crisis, we have reduced our overall mortgage assets from $135.1 billion in 2006 to $14.7 billion at December 31, 2012, primarily through the run-off and divestiture of noncore businesses and assets, and the deconsolidation of ResCap.

**Corporate and Other**

Corporate and Other primarily consists of our centralized corporate treasury activities, such as management of the cash and corporate investment securities portfolios, short- and long-term debt, retail and brokered deposit liabilities, derivative instruments, the amortization of the discount associated with new debt issuances and bond exchanges, most notably from the December 2008 bond exchange, and the residual impacts of our corporate funds-transfer pricing (FTP) and treasury asset liability management (ALM) activities. Corporate and Other also includes our Commercial Finance Group, certain equity investments, reclassifications and eliminations between the reportable operating segments, and overhead that was previously allocated to operations that have since been sold or classified as discontinued operations. Our Commercial Finance Group provides senior secured commercial-lending products to primarily U.S.-based middle market companies.

**Ally Bank**

Ally Bank raises deposits directly from customers through direct banking via the internet, telephone, mobile, and mail channels. Ally Bank has established a strong and growing retail banking franchise that is based on a promise of being straightforward, easy to use, and offering high-quality customer service. Ally Bank's products and services are designed to develop long-term customer relationships and capitalize on the shift in consumer preference away from branch banking in favor of direct banking.

Ally Bank provides us with a stable and diversified low-cost funding source. At December 31, 2012, we had $46.9 billion of deposits including $35.0 billion of retail deposits sourced by Ally Bank. The focus on retail deposits and growth in our deposit base from $19.2 billion at the end of 2008 to $46.9 billion at the end of 2012, combined with improving capital markets and a lower interest rate environment have contributed to a reduction in our cost of funds of approximately 95 basis points since the first quarter of 2011. We expect to continue to lower our cost of funds and diversify our overall funding as our deposit base grows.

We believe Ally Bank is well-positioned to continue to benefit from the consumer driven-shift from branch banking to direct banking. According to a 2012 American Bankers Association survey, the percentage of customers who prefer to do their banking via direct channels (internet, mail, phone, and mobile) increased from 21% to 62% between 2007 and 2012, while those who prefer branch banking declined from 39% to 18% over the same period. Ally Bank has received a positive response to innovative savings and other deposit products. Ally Bank's products include savings and money market accounts, certificates of deposit, interest-bearing checking accounts, and individual retirement accounts. Ally Bank's competitive direct banking features include online and mobile banking, electronic bill pay, remote deposit, electronic funds transfer, and no-fee debit cards.

## Industry and Competition

The markets for automotive and mortgage financing, banking, and insurance are highly competitive. The market for automotive financing has grown more competitive as more consumers are financing their vehicle purchases and as more competitors continue to enter this market as a result of how well automotive finance assets generally performed relative to other asset classes through the economic cycle during the past several years. More recently, competition for automotive financing has further intensified as a growing number of banks have become increasingly interested in automotive-finance assets. In addition, Ally Bank faces significant competition from commercial banks, savings institutions, and other financial institutions. Our insurance business also faces significant competition from automotive manufacturers, insurance carriers, third-party administrators, brokers, and other insurance-related companies. Many of our competitors have substantial positions nationally or in the markets in which they operate. Some of our competitors have lower cost structures, substantially lower costs of capital, and are much less reliant on securitization activities, unsecured debt, and other public markets. We face significant competition in most areas, including product offerings, rates, pricing and fees, and customer service. Further, there has been significant consolidation among companies in the financial services industry, which is expected to continue.

The markets for automotive securitizations and whole-loan sales are also competitive, and other issuers and originators could increase the amount of their issuances and sales. In addition, lenders and other investors within those markets often establish limits on their credit exposure to particular issuers, originators, and asset classes, or they may require higher returns to increase the amount of their exposure. Increased issuance by other participants in the market or decisions by investors to limit their credit exposure to (or to require a higher yield for) us or to automotive securitizations or whole-loan sales could negatively affect our ability and that of our subsidiaries to price our securitizations and whole-loan sales at attractive rates. The result would be lower proceeds from these activities and lower profits for our subsidiaries and us.

## Certain Regulatory Matters

We are subject to various regulatory, financial, and other requirements of the jurisdictions in which our businesses operate. In light of recent conditions in the global financial markets, regulators have increased their focus on the regulation of the financial services industry. As a result, proposals for legislation or regulations that could increase the scope and nature of regulation of the financial services industry are possible. The following is a description of some of the laws and regulations that currently affect our business.

**Bank Holding Company Status**

Ally Financial Inc. (Ally) and IB Finance Holding Company, LLC (IB Finance) are currently both bank holding companies under the BHC Act. IB Finance is the direct holding company for Ally's FDIC-insured depository institution, Ally Bank. As a bank holding company, Ally is subject to supervision, examination and regulation by the Board of Governors of the Federal Reserve System (FRB). Ally must also

Ally Financial Inc. • Form 10-K

comply with regulatory risk-based capital and leverage requirements, as well as various safety and soundness standards imposed by the FRB, and is subject to certain statutory restrictions concerning the types of assets or securities it may own and the activities in which it may engage. Ally Bank, our banking subsidiary, is currently not a member of the Federal Reserve System and is subject to supervision, examination and regulation by the Federal Deposit Insurance Corporation (FDIC) and the Utah Department of Financial Institutions (UDFI). This regulatory oversight focuses on the protection of depositors, the FDIC's Deposit Insurance Fund, and the banking system as a whole, not security holders, and in some instances may be contrary to their interests.

- *Permitted Activities* — As a bank holding company, subject to certain exceptions, Ally may not, directly or indirectly, acquire more than 5% of any class of voting shares of any nonaffiliated bank or bank holding company, or, directly or indirectly, acquire control of any other company (including by acquisition of 25% or more of a class of voting shares), without first obtaining FRB approval. Furthermore, Ally's activities must be generally limited to banking or managing or controlling banks, or to other activities deemed closely related to banking or otherwise permissible under the BHC Act. As a result, most of our insurance activities and our SmartAuction vehicle remarketing services for third parties are deemed impermissible under the BHC Act. In addition, Ally generally may not hold more than 5% of any class of voting shares of any company unless that company's activities conform with these requirements. Upon our bank holding company approval on December 24, 2008, we were permitted an initial two-year grace period to bring our activities and investments into conformity with these restrictions. This grace period expired in December 2010. The FRB then granted two one-year extensions that expired in December 2012, and recently granted a third one-year extension that expires in December 2013. We will not be permitted to apply to the FRB for any further extensions. Ally's existing activities and investments deemed impermissible under the BHC Act will need to be terminated or disposed of by December 2013. While some of these activities may be continued if Ally is able to convert to a financial holding company under the BHC Act, Ally may be unable to satisfy the requirements to enable it to convert to a financial holding company prior to that time. For further information, refer to Item 1A. Risk Factors.

- *Gramm-Leach-Bliley Act* — The enactment of the Gramm-Leach-Bliley Act of 1999 (GLB Act) eliminated large parts of a regulatory framework that had its origins in the Depression era of the 1930s. Effective with its enactment, new opportunities became available for banks, other depository institutions, insurance companies, and securities firms to enter into combinations that permit a single financial services organization to offer customers a more comprehensive array of financial products and services. To further this goal, the GLB Act amended the BHC Act by providing a new regulatory framework applicable to "financial holding companies," which are bank holding companies that meet certain qualifications and elect financial holding company status. The FRB supervises, examines, and regulates financial holding companies, as it does all bank holding companies. However, insurance and securities activities conducted by a financial holding company or its nonbank subsidiaries are regulated primarily by functional regulators. As a bank holding company, we would be eligible to elect financial holding company status upon satisfaction of certain regulatory requirements applicable to us and to Ally Bank (and any depository institution subsidiary that we may acquire in the future). We do not currently satisfy these requirements, however, we expect to apply for financial holding company status once we do. As a financial holding company, Ally would then be permitted to engage in a broader range of financial and related activities than those that are permissible for bank holding companies, in particular, securities, insurance, and merchant banking activities.

- *Dodd-Frank Wall Street Reform and Consumer Protection Act* — On July 21, 2010, the President of the United States signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). The Dodd-Frank Act represents a significant overhaul of many aspects of the regulation of the financial services industry, addressing, among other things, systemic risk, capital adequacy, deposit insurance assessments, consumer financial protection, derivatives, lending limits, and mortgage-lending practices. When fully implemented, the Dodd-Frank Act will have material implications for Ally and the entire financial services industry. Among other things, it will or potentially could:

    - result in Ally being subject to enhanced oversight and scrutiny as a result of being a bank holding company with $50 billion or more in total consolidated assets;

    - increase the levels of capital and liquidity with which Ally must operate and affect how it plans capital and liquidity levels;

    - subject Ally to new and/or higher fees paid to various regulatory entities, including but not limited to deposit insurance fees paid by Ally Bank to the FDIC;

    - impact a number of Ally's business and risk management strategies;

    - restrict the revenue that Ally generates from certain businesses;

    - require Ally to provide to the FRB and FDIC an annual plan for its rapid and orderly resolution in the event of material financial distress; and

    - subject Ally to regulation by the Consumer Financial Protection Bureau (CFPB), which has very broad rule-making, examination, and enforcement authorities.

    Many provisions of the Dodd-Frank Act will only become effective at a later date or after a rulemaking process is completed.

5

banking subsidiary or bank holding company from engaging in unsafe or unsound banking practices and, depending upon the circumstances, could find that paying a dividend or making a capital distribution would constitute an unsafe or unsound banking practice.

- *Transactions with Affiliates* — Certain transactions between Ally Bank and any of its nonbank "affiliates," including but not limited to Ally, are subject to federal statutory and regulatory restrictions. Pursuant to these restrictions, unless otherwise exempted, "covered transactions" including Ally Bank's extensions of credit to and asset purchases from its nonbank affiliates, generally (1) are limited to 10% of Ally Bank's capital stock and surplus with respect to transactions with any individual affiliate, with an aggregate limit of 20% of Ally Bank's capital stock and surplus for all affiliates and all such transactions; (2) in the case of certain credit transactions, are subject to stringent collateralization requirements; (3) in the case of asset purchases by Ally Bank, may not involve the purchase of any asset deemed to be a "low quality asset" under federal banking guidelines; and (4) must be conducted in accordance with safe-and-sound banking practices (collectively, the Affiliate Transaction Restrictions). In addition, transactions between Ally Bank and a nonbank affiliate generally must be on market terms and conditions.

  Under the Dodd-Frank Act, among other changes to the Affiliate Transaction Restrictions, credit exposures resulting from derivatives transactions, securities lending and borrowing transactions, and acceptance of affiliate-issued debt obligations (other than securities) as collateral for a loan or extension of credit will be treated as "covered transactions." The Dodd-Frank Act also expands the scope of covered transactions required to be collateralized, requires that collateral be maintained at all times for covered transactions required to be collateralized, and places limits on acceptable collateral.

  Furthermore, there is an "attribution rule" that provides that a transaction between Ally Bank and a third party must be treated as a transaction between Ally Bank and a nonbank affiliate to the extent that the proceeds of the transaction are used for the benefit of or transferred to a nonbank affiliate of Ally Bank. For example, because Ally controls Ally Bank, Ally is an affiliate of Ally Bank for purposes of the Affiliate Transaction Restrictions. Thus, retail financing transactions by Ally Bank involving vehicles for which Ally provided floorplan financing are subject to the Affiliate Transaction Restrictions because the proceeds of the retail financings are deemed to benefit, and are ultimately transferred to, Ally.

  Historically, the FRB was authorized to exempt, in its discretion, transactions or relationships from the requirements of these rules if it found such exemptions to be in the public interest and consistent with the purposes of the rules. As a result of the Dodd-Frank Act, exemptions now may be granted by the FDIC if the FDIC and FRB jointly find that the exemption is in the public interest and consistent with the purposes of the rules, and the FDIC finds that the exemption does not present an unacceptable risk to the Deposit Insurance Fund. The FRB granted several such exemptions to Ally Bank in the past. However, the existing exemptions are subject to various conditions and, particularly in light of the statutory changes made by the Dodd-Frank Act, any requests for future exemptions might not be granted. Moreover, these limited exemptions generally do not encompass consumer leasing or used vehicle financing. Since there is no assurance that Ally Bank will be able to obtain future exemptions or waivers with respect to these restrictions, the ability to grow Ally Bank's business will be affected by the Affiliate Transaction Restrictions and the conditions set forth in the existing exemption letters.

- *Source of Strength* — Pursuant to the Federal Deposit Insurance Act, FRB policy and regulations and the Parent Company Agreement and the Capital and Liquidity Maintenance Agreement described in Note 21 to the Consolidated Financial Statements, Ally is required to act as a source of financial and managerial strength to Ally Bank and is required to commit necessary capital and liquidity to support Ally Bank. This support may be required at inopportune times for Ally.

- *Enforcement Authority* — The FDIC and FRB have broad authority to issue orders to banks and bank holding companies to cease and desist from unsafe or unsound banking practices and from violations of laws, rules, regulations, or conditions imposed in writing by the banking agencies. The FDIC and FRB also are empowered to require affirmative actions to correct any violation or practice; issue administrative orders that can be judicially enforced; direct increases in capital; limit dividends and distributions; restrict growth; assess civil money penalties against institutions or individuals who violate any laws, regulations, orders, or written agreements with the banking agencies; order termination of certain activities of bank holding companies or their subsidiaries; remove officers and directors; order divestiture of ownership or control of a nonbanking subsidiary by a bank holding company (in the case of the FRB); terminate deposit insurance (in the case of the FDIC); and/or place a bank into receivership (in the case of the FDIC).

**Basel Capital Accord**

The minimum risk-based capital requirements adopted by the federal banking agencies follow the Capital Accord (Capital Accord or Basel I) of the Bank for International Settlements' Basel Committee on Banking Supervision (Basel Committee). The Capital Accord was published in 1988 and generally applies to depository institutions and their holding companies in the United States. In 2004, the Basel Committee published a revision to the Capital Accord (Basel II). The goal of the Basel II capital rules is to provide more risk-sensitive regulatory capital calculations and promote enhanced risk management practices among large, internationally active banking organizations. U.S. banking regulators published final Basel II rules in December 2007. Ally is currently required to comply with the Basel II rules as implemented by the U.S. banking regulators. Prior to full implementation of the Basel II rules, Ally is required to complete a qualification period of four consecutive quarters during which it needs to demonstrate that it meets the requirements of the rules to the satisfaction of its primary U.S. banking regulator. Pursuant to an extension that was granted to Ally, this qualification period, or parallel run, is required to begin

# Notes to Consolidated Financial Statements
Ally Financial Inc. • Form 10-K

## 1. Description of Business, Basis of Presentation, and Changes in Significant Accounting Policies

Ally Financial Inc. (formerly GMAC Inc. and referred to herein as Ally, we, our, or us) is a leading, independent, diversified, financial services firm. Founded in 1919, we are a leading automotive financial services company with over 90 years experience providing a broad array of financial products and services to automotive dealers and their customers. We became a bank holding company on December 24, 2008, under the Bank Holding Company Act of 1956, as amended. Our banking subsidiary, Ally Bank, is an indirect wholly owned subsidiary of Ally Financial Inc. and a leading franchise in the growing direct (online and telephonic) banking market.

### Residential Capital, LLC

On May 14, 2012 (the Petition Date), Residential Capital, LLC (ResCap) and certain of its wholly owned direct and indirect subsidiaries (collectively, the Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the Bankruptcy Court). In connection with the filings in May, Ally Financial Inc. and its direct and indirect subsidiaries and affiliates (excluding the Debtors) (collectively, AFI) had reached an agreement with the Debtors and certain creditor constituencies on a prearranged Chapter 11 plan (the Plan). The Plan included a proposed settlement (the Settlement) between AFI and the Debtors, which included, among other things, an obligation of AFI to make a $750 million cash contribution to the Debtors' estate, and a release of all existing or potential causes of action between AFI and the Debtors, as well as a release of all existing or potential ResCap-related causes of action against AFI held by third parties.

The Settlement contemplated certain milestone requirements that the Debtors failed to satisfy, including the Bankruptcy Court's confirmation of the Plan on or before October 31, 2012. While the failure to meet this October 31 milestone would have resulted in the Settlement's automatic termination, AFI and the Debtors agreed to monthly temporary waivers of this automatic termination through February 28, 2013. This waiver was not extended beyond this date, and therefore the Settlement has terminated.

On November 21, 2012, the Bankruptcy Court entered orders approving the sale of the Debtors' (i) mortgage servicing platform (the Platform Sale) to Ocwen Loan Servicing, LLC and Walter Investment Management Corp. and (ii) "whole-loan" portfolio (the Whole-Loan Sale) to Berkshire Hathaway Inc. under section 363 of the Bankruptcy Code, and not as part of the Plan as originally contemplated. The Whole-Loan Sale closed on February 5, 2013, and the Platform Sale closed on February 15, 2013.

As of the Petition Date, institutional investors in residential mortgage-backed securities (RMBS Investors) issued by ResCap's affiliates and holding more than 25 percent of at least one class in each of 290 securitizations agreed to settle alleged representation and warranty claims against the Debtors' estates in exchange for a total $8.7 billion allowed claim in the Debtors' bankruptcy cases, subject to the applicable securitization trustees' acceptance of the terms of the settlements (the RMBS Settlements). The RMBS Investors also signed separate plan support agreements (PSAs) with the Debtors and AFI in support of the Plan at the time of entering into the RMBS Settlements. To date, RMBS Investors holding more than 25 percent of at least one class in each of 336 securitizations have agreed to the RMBS Settlements. These 336 securitizations have an aggregate original principal balance of approximately $189 billion (out of a total of 392 outstanding securitizations with an original principal balance of $221 billion). The RMBS Settlements are subject to Bankruptcy Court approval, and the Bankruptcy Court has scheduled a hearing to consider such approval in late May 2013. The PSAs are not part of this scheduled Bankruptcy Court hearing. A number of creditors have raised objections to the RMBS Settlements, and the trustees representing the securitization trusts and AFI have filed statements in support of the Debtors' motion to approve the RMBS Settlements. Separately, the Debtors have failed to meet several Plan milestones in their bankruptcy cases, each of which has given the RMBS Investors the right to terminate the PSAs upon three business days advance written notice to the Debtors and AFI. The RMBS Investors have not given the Debtors and AFI such a notice to date, but have the right to do so at any time. If the RMBS Settlements were not approved or the RMBS Investors were to decide not to support any proposed plan, it could adversely impact the likelihood that any such proposed plan is approved by the Bankruptcy Court. AFI continues to support the RMBS Settlements at this time.

On June 4, 2012, Berkshire Hathaway Inc. filed a motion in the Bankruptcy Court for the appointment of an independent examiner to investigate, among other things, certain of the Debtors' transactions with AFI occurring prior to the Petition Date, any claims the Debtors may hold against AFI's officers and directors, and any claims the Debtors proposed to release under the Plan. On June 20, 2012, the Bankruptcy Court approved the appointment of an examiner and, subsequently, the United States Trustee for the Southern District of New York appointed former bankruptcy judge Arthur J. Gonzalez, Esq. as the examiner (the Examiner). On July 27, 2012, the Bankruptcy Court entered an order approving the scope of the Examiner's investigation. The investigation includes, among other things: (a) all material pre-petition transactions between or among the Debtors and AFI, Cerberus Capital Management, L.P. and its subsidiaries and affiliates, and/or Ally Bank; (b) certain post-petition negotiations and transactions with the Debtors, including with respect to plan sponsor, plan support, and settlement agreements, the debtor-in-possession financing with AFI, the stalking horse asset purchase agreement with AFI, and the servicing agreement with Ally Bank; (c) all state and federal law claims or causes of action the Debtors proposed to release as part of the Plan; and (d) the release of all existing or potential ResCap-related causes of action against AFI held by third parties. In the Examiner's original work plan, the Examiner estimated that his investigation and related report would be completed six months from approximately August 6, 2012. However, on February 7, 2013 the Examiner informed the Bankruptcy Court in the third supplement to the work plan that the investigation and related report will not be completed until early May 2013.

On December 26, 2012, the Bankruptcy Court, in an effort to facilitate plan negotiations, entered an order appointing bankruptcy judge James M. Peck, Esq. as mediator to assist the parties in resolving certain issues relating to the formulation and confirmation of the Plan. There can be no assurance that the mediation process will continue or will ultimately lead to a successful agreement among the parties.

# Exhibit 21
Ally Financial Inc.

### Ally Financial Inc. Subsidiaries as of December 31, 2012

| Name of subsidiary | State or sovereign power of incorporation |
|---|---|
| Ally Financial Inc. | Delaware |
| Ally Auto Assets LLC | Delaware |
| Ally Insurance Holdings Inc. | Delaware |
| Aba Seguros, S.A. de C.V. | Mexico |
| Motors Insurance Corporation | Michigan |
| Ally Wholesale Enterprises LLC | Delaware |
| Basic Credit Holding Company, L.L.C. | Delaware |
| Capital Auto Receivables LLC | Delaware |
| Central Originating Lease, LLC | Delaware |
| GMAC International Holdings BV | Netherlands |
| Ally Credit Canada Limited | Canada |
| GMAC Mortgage Group LLC | Delaware |
| IB Finance Holding Company, LLC | Delaware |
| Ally Bank | Utah |
| Ally Credit, S.A. de C.V. Sociedad Financiera de Objeto Multiple, Entidad No Regulada | Mexico |
| All Investment Management, LLC | Delaware |
| Ally Mexico Holdings LLC | Delaware |
| Ally Securities, LLC | Delaware |
| Ally Servicing, LLC | Delaware |
| GMAC International Holdings Cooperatief U.A. | Netherlands |