## Exhibit 1-H

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

2011 SEP 21  AM 8: 34

TOM LAWLER. CLERK

ALFREDIA PRUITT,
Plaintiff,

VS.

CIVIL ACTION FILE NO. ~~00000000~~

11A  10084  -3

FEDERAL NATIONAL
MORTGAGE ASSOCIATION,
GMAC, / MERS
FANNIE MAE, Savings
USAA FEDERAL ~~SERVICING~~ BANK
Defendant

## PLAINTIFF Motion TO SET ASIDE FORECLOSURE SALE AND TEMPORARY RESTRAINING ORDER

### A.COMPLAINT

COMES NOW ALFREDIA PRUITT, Plaintiff in the above-captioned matter, and respectfully states her Complaint against Defendants **FEDERAL NATIONAL MORTGAGE ASSOCIATION, GMAC, FANNIE MAE,** and **USAA FEDERAL SAVINGS BANK** as follows:

### B.JURISDICTION AND VENUE

1.     Plaintiff, Alfredia Pruitt, is an individual who resides in Gwinnett County, Georgia.

2.     Defendant, Federal National Mortgage Association is a Georgia corporation, may be served with process at, Troutman Sanders LLP, 5200 Bank of America Plaza, 600 Peachtree St., NE Suite 5200, Atlanta, GA 30308-2216.

3.     Defendant GMAC a corporation doing business in Georgia and may be served with process at 3 Ravinia Drive Atlanta, GA 30346,

4.     Defendant Fannie Mae a corporation doing business in Georgia and may be served with process at 950 E Paces Ferry Rd NE, Atlanta, GA, 30326

5.     Defendant USAA Ferderal Savings Bank a corporation doing business in Georgia and may be served with process at Terminus 200 Building, 3333 Piedmont Rd, Ste 2050, Atlanta, GA 30305.

6. Mortgage Electronic Registration Systems 1901 E. Voorhees St. Suite C Danville, IL 61834

7.     Jurisdiction is proper in this Court.

7.    Venue is proper in the Gwinnett County Superior Court of Georgia. Specifically, venue is mandatory in this county because the real property complained of is located in this county.

## C. FACTUAL ALLEGATIONS

8.    Plaintiff owned property located at 2360 Hickory Station Circle, Snellville, Georgia 30078.

9.    The Plaintiff became indebted to USAA Federal Savings Bank. Plaintiff failed to pay the debt and started negotiating the payment with USAA Federal Savings Bank.

10.    Defendant GMAC, Federal National Mortgage Association purchased Plaintiff's property at a sale in which GMAC was not the beneficiary or holder of the note. Federal National Mortgage Association filed a dispossessory proceeding complaint for eviction of Plaintiff from her property.

## D.  Cause of Action (UNLAWFUL FORECLOSURE)

11.    Plaintiff's cause of action against FEDERAL NATIONAL MORTGAGE ASSOCIATION, GMAC, FANNIE MAE, USAA FEDERAL SERVICING BANK is because the Defendants illegally assisted GMAC, Federal National Mortgage Association with the unlawful foreclosure of the plaintiff's property. Plaintiff seeks to set aside the sale of her property by GMAC and stop the eviction.

## E. Application for Temporary Restraining Order

12.    Applicant is seeking a temporary restraining order preventing the defendants from evicting the applicant from the property which is the subject of the land and title lawsuit.

13.    It is probable that the Applicant will prevail in this lawsuit.

14.    Also, the Plaintiff's claim against the Defendants is filed to preserve the status quo of the parties until the issue of title is resolved.

15.    Applicant made all payments to USAA Federal Savings Bank.

16.    Applicant was never required to make any payments to GMAC and never received any communication or notice from GMAC prior to GMAC foreclosing on the property.

17.    GMAC is not the beneficiary of the note and had no right to foreclose on the note

18.    Applicant has requested the original note.

19.    Applicant was under the belief with USAA Federal Savings Bank that USAA Federal

Savings Bank and no other defendant would foreclose on her home as long as he was negotiating

the payment on her mortgage.

20.    In the event this Court does not grant the Applicants' Application for a Temporary

Restraining Order, she will suffer irreparable harm because the real estate which is the subject of

this lawsuit is unique in character and cannot be replaced with money damages only.  Applicant

has no other adequate remedy at law.


### F. Request for Temporary Restraining Order

21.    Plaintiff asks the court to set her application for temporary restraining order for a hearing,
and after hearing the application, issue a temporary restraining order against Defendants.


### G. Prayer

22.    For these reasons, Plaintiff asks the court to grant the temporary restraining order
stopping the eviction and enforcement of her rights.

Respectfully submitted,

Alfredia Pruitt
 2360 Hickory Station Circle
Snellville, Georgia 30078
(770) 668-3915 Phone

FILED IN OFFICE
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA
2011 SEP 21   AM 8: 34

TOM LAWLER, CLERK

IN THE MAGISTRATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

ALFREDIA PRUITT,
Plaintiff,

VS.

FEDERAL NATIONAL
MORTGAGE ASSOCIATION,
GMAC, /MERS
FANNIE MAE,
USAA FEDERAL SAVINGS BANK
Defendant

CIVIL ACTION FILE NO. ~~8410012~~

11A 10084 -3

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### A. Motion

COMES NOW ALFREDIA PRUITT, Plaintiff in the above-captioned matter, and respectfully files this motion against Defendants **FEDERAL NATIONAL MORTGAGE ASSOCIATION, GMAC, FANNIE MAE, and USAA FEDERAL SAVINGS BANK** as follows:

### B.JURISDICTION AND VENUE

1.       Plaintiff, Alfredia Pruitt, is an individual who resides in Gwinnett County, Georgia.

2.       Defendant, Federal National Mortgage Association is a Georgia corporation, may be served with process at, Troutman Sanders LLP, 5200 Bank of America Plaza, 600 Peachtree St, NE Suite 5200, Atlanta, GA 30308-2216.

3.       Defendant GMAC a corporation doing business in Georgia and may be served with process at 3 Ravinia Drive Atlanta, GA 30346,

4.       Defendant Fannie Mae a corporation doing business in Georgia and may be served with process at 950 E Paces Ferry Rd NE, Atlanta, GA, 30326

5.       Defendant USAA Federal Savings Bank a corporation doing business in Georgia and may be served with process at Terminus 200 Building, 3333 Piedmont Rd, Ste 2050, Atlanta, GA 30305.
6. Mortgage Electronic Registration Systems 1901 E. Voorhees St. Suite C
Danville, IL 61834

7.     Venue is proper in this Court.

## C.FACTUAL ALLEGATIONS

8.     Plaintiff owned property located at 2360 Hickory Station Circle, Snellville, Georgia 30078.

9.     The Plaintiff became indebted to USAA Federal Savings Bank.  Plaintiff failed to pay the debt and started negotiating the payment with USAA Federal Savings Bank.

10.     Defendant GMAC, Federal National Mortgage Association purchased Plaintiff's property at a sale in which GMAC was not the beneficiary or holder of the note.  Federal National Mortgage Association filed a dispossessory proceeding complaint for eviction of Plaintiff from her property.

11.     On December 1, 2010 the lower court ruled in favor of the Defendants to evict the plaintiff from her property.

12.     Subsequently, the Plaintiff filed a lawsuit and appeal against the Defendants for unlawful foreclosure on December 6, 2010.

## D.  Cause of Action (UNLAWFUL FORECLOSURE)

13.     Plaintiff's cause of action against FEDERAL NATIONAL MORTGAGE ASSOCIATION, GMAC, FANNIE MAE, USAA FEDERAL SERVICING BANK is because the Defendants illegally assisted GMAC, Federal National Mortgage Association with the unlawful foreclosure of the plaintiff's property.

14.     Plaintiff requested information from Defendants to prove that the person signing all affidavits for foreclosure had personal knowledge of the information contained in the affidavit.

15.     In addition, Plaintiff requested that the Defendants provide evidence of the true legal holder of the note

16.     Defendants have yet to produce any documents requested.

17.     Plaintiff filed suit against the Defendants seeking to set aside the sale of her property by GMAC and stop the eviction.

## E. Motion for PRELIMINARY INJUNCTION

18.   "A motion for interlocutory injunction or a TRO is an extraordinary motion, which is time sensitive, unlike other motions, because it seeks to preserve the status quo until a full hearing can be held to avoid irreparable harm." Focus Entertainment International, Inc., v. Partridge Greene, Inc. (253 Ga. App. 121) (558 SE2d 440) (2001).

19.   Plaintiff is seeking an emergency preliminary injunction order to prevent the defendants from evicting the Plaintiff from the property which is the subject of the land and title lawsuit.

20.   Defendant is not the owner of the mortgage and note.

21.   The trustee is not properly authorized to post the sale notice and they did so illegally and with intention to deceive the borrower and the court causing the borrower and the court to reasonably rely upon upon the statements of facts and procedures used by the lender.

22.   Allowing the sale and eviction will result in Plaintiff being possible a victim of predatory lending and unlawful foreclosure.

23.   It is probable that the Plaintiff will prevail in this lawsuit.

24.   Also, the Plaintiff's claim against the Defendants is filed to preserve the status quo of the parties until the issue of title is resolved.

25.   In the event this Court does not grant the Plaintiff's Motion for preliminary injunction, she will suffer irreparable harm because the real estate which is the subject of this lawsuit is unique in character and cannot be replaced with money damages only. Applicant has no other adequate remedy at law.

26.   In addition, allowing the Sale and eviction to be completed, would not only expose Plaintiff to potentially ruinous financial liability, but would also be a direct violation of The Due Process Clause, and numerous Constitutional guarantees concerning property.

## F. Request for Preliminary Injunction

27.    Plaintiff asks the court to set her preliminary injunction order for a hearing, and after hearing the motion, issue a preliminary injunction order against Defendants and stop the eviction until or after the lawsuit has been resolved.

### G. Prayer

28.    For these reasons, Plaintiff asks the court to grant the preliminary injunction order stopping the eviction and enforcement of her rights.

Respectfully submitted,

Alfredia Pruitt
2360 Hickory Station Circle
Snellville, Georgia 30078
(770) 668-3915 Phone

### VERIFICATION

I, Plaintiff Alfredia Pruitt, having been duly sworn, under penalty of perjury, deposes and says that I am over the age of eighteen (18) and mentally competent to testify in this matter. My person and my property are in danger of immediate and irreparable injury, and loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and I hereby Certify, that the facts set forth regarding all matters stated in the above paragraphs are true and correct, therefore since this is an Emergency Petition further notice should not be required. I have read the foregoing pleading, the facts stated therein are from firsthand knowledge and are true and correct to the best of my knowledge and belief.
This 8th day of December, 2010

Alfredia Pruitt
Subscribed and sworn to before me,
this 20 day of September 2011
Seal

Notary Public
My Commission Expires:

ANTONIO PHILANTROPE
NOTARY PUBLIC, GWINNETT COUNTY, GEORGIA
MY COMMISSION EXPIRES APRIL 12, 2015

The Grantee of the deed is MERS acting solely as nominee for the lender and the lender's

successors and assigns, and who have been sent notices of foreclosure on behalf of

MERS who auctioned the property that secured the debt at a foreclosure auction. The

Plaintiff shows herein that MERS' foreclosure on Plaintiff's property was not valid and

was wrongful, as are those foreclosures by MERS on the property in the State of Georgia

of all similarly situated persons to the Plaintiff wherein MERS sent the notice of

foreclosure to the debtor and wherein MERS purports to have exercised the power of sale

and auctioned the property.  MERS does not have the authorized power to send a valid

notice of foreclosure within the State of Georgia for those deeds where it is "solely a

nominee" and does not have the authority or power under Georgia law to foreclose on a

property or engage in an auction of sale on such property where is is "solely a nominee"

on such deeds.

As a result of such uniform, wrongful conduct by MERS, the Court must, *inter*

*alia*: 1) invalidate the foreclosure sale, 2) order as void the Foreclosure Deed (or Deed

Under Power); and/or 3) restore equitable or legal title, if possible, as it existed just prior

to the foreclosure sale and award compensation for any damages suffered as a result of

MERS' actions.  Alternatively, the Court should impose a constructive trust over the

proceeds from, or the value of the property as determined by, any such foreclosure

auction.

## **PARTIES**

### 2.

The Plaintiff is Dustin Rollins.  He is the rightful owner of property located on

Memorial Drive in Atlanta, Georgia that was pledged, pursuant to the terms of a Security

Deed which is attached hereto as Exhibit B and incorporated herein by this specific

reference, as security for the repayment of a residential mortgage loan, which is

evidenced by a copy of the promissory note Plaintiff executed and which is attached

hereto as Exhibit A and incorporated herein by this specific reference. Plaintiff is a

resident and citizen of the State of Georgia.

3.

Defendant Mortgage Electronic Recording Systems, Inc. is a foreign corporation

that does business in the State of Georgia. Mortgage Electronic Recording Systems, Inc.

is not registered with the Georgia Secretary of State. Mortgage Electronic Recording

Systems, Inc. is nevertheless subject to jurisdiction by the Courts of the State of Georgia.

4.

Defendant MERSCORP is a foreign corporation thatdoes business in the State of

Georgia. MERSCORP not registered with the Georgia Secretary of State. MERSCORP

is nevertheless subject to jurisdiction by the Courts of the State of Georgia. MERSCORP

claims to be the sole shareholder in Mortgage Electronic Recording Systems, Inc.

5.

MERS is a national electronic registration and tracking system that supposedly

tracks the beneficial ownership interests and servicing rights in mortgage loans.

6.

MERS is the party that foreclosed on via a non-judicial foreclosure process, and

sold at a non-judicial public auction, the Plaintiff's home and property. At times MERS

has claimed to own (or hold) the Plaintiff's mortgage loan debt and at times MERS

-3-

purported to be a mere nominee for the lender or the successors or assigns of the lender,

whom MERS claimed was the owner (or holder) of the Plaintiff's mortgage loan debt.

## JURISDICTION AND VENUE

### 7.

Jurisdiction and venue are proper in this Court pursuant to the Georgia

Constitution and as the Plaintiff's property is located in Fulton County.

## FACTUAL ALLEGATIONS

### 8.

At base, this lawsuit revolves around the actions taken by MERS when it

foreclosed on the Plaintiff's above referenced property and the property of the putative

plaintiffs.   As a matter of routine policy and practice, MERS: a) purposely misrepresents

its status in the foreclosure process; b) purposely misrepresents the true holder of the

promissory note's status in the foreclosure process; c) knowingly records fraudulent real

estate documents and official records; and d) willfully has wrongfully foreclosed on the

Plaintiff's property and the property of the putative plaintiffs.  MERS' actions that are

discussed herein were intentional or taken without regard to the consequences and have

caused severe damages to the Plaintiff and putative plaintiffs. Furthermore, MERS'

actions constitute bad faith and stubborn litigiousness and were such that MERS is liable

for the attorney's fees associated with bringing this action.

### 9.

As discussed below, MERS had no right to foreclose on the Plaintiff

property as a matter of contract and as a matter of Georgia Law.

-4-

10.

MERS has acted pursuant to a uniform policy, practice, custom or scheme against

Plaintiff and the putative class.

11.

MERS' website says this:

MERS is an innovative process that simplifies the way mortgage ownership and
servicing rights are originated, sold and tracked. Created by the real estate finance
industry, MERS eliminates the need to prepare and record assignments when
trading residential and commercial mortgage loans.

12.

William Hultman, Secretary of MERS, has testified in another case that loans are

registered to a "MERS Member" who has entered into the MERS Membership

Agreement.

13.

MERS Members enter into a contract with MERSCORP, the parent company to

Defendant MERS to electronically register and track beneficial ownership interests and

servicing rights in MERS-registered mortgage loans.

14.

MERS Members agree to appoint MERS, which is wholly owned by

MERSCORP, to act as their "nominee" and to name MERS as the leinholder of record in

a "nominee" capacity on all recorded security instruments relating to the loans registered

on the MERS System.

15.

-5-

When a promissory note is sold by the original lender to others, the various sales

of the notes supposedly are tracked on the MERS System.

16.

MERS claims that once MERS becomes the beneficiary of record as "nominee"

regarding deeds of trust and becomes grantee of record as "nominee" with respect to

security deeds, it remains the beneficiary/grantee when the beneficial ownership interests

in the promissory note or servicing rights are transferred by one MERS Member to

another and MERS tracks the transfers electronically on the MERS System.  In other

words, with "nominee" status only, MERS nonetheless claims to be something else

entirely at the same time -- a "beneficiary" or "grantee" of a note or the servicing rights

on that note, even though (1) it never held and does not hold an ownership interest in

either the note or servicing rights at the time of the original loan transaction and even

after such note or servicing rights were subsequently sold (and potentially re-sold) in the

market, whether as a mortgage backed security or otherwise, and (2) it cannot be a trustee

under Georgia law.

17.

MERS claims that so long as the subsequent sale of the note or servicing rights

involves a member of MERS, MERS remains the "beneficiary" of record on the deed of

trust or the "grantee" on the security deed and continues to act as a "nominee" for the

new beneficial owner.

18.

Plaintiff obtained a residential mortgage loan to purchase a house and property

located on ~Hickory Station Circle Snellville Georga~ all or part of which was to be used as a

dwelling place by the Plaintiff at the time the promissory note and security deed (attached

hereto as Exhibits A&B respectively) were entered into.

19.

At the closing on the loan, Plaintiff executed a promissory note which evidenced

the debt incurred by the Plaintiff and a security deed which purported to pledge the

Plaintiff's' property located on ~Hickory Station Ci~ as security for the debt in the event that

the Plaintiff defaulted on the repayment of the debt.

20.

The promissory note executed by the Plaintiff was executed in favor of the Lender

who was identified as the note holder. (Plaintiff's promissory note attached hereto as

Exhibit ~A~ ).  MERS was not identified as the Lender or an owner of the promissory note.

21.

The Security Deed executed by the Plaintiff as Grantor purportedly named MERS,

acting solely as a "nominee" for the Lender, as Grantee.  (Plaintiff's Security Deed

attached hereto as Exhibit ~B~ ).

22.

Pursuant to the Security Deed, the Plaintiff authorized the Lender to act as

Attorney in Fact for purposes of the exercise of the Power of Sale provisions of the

Security Deed.

-7-

23.

MERS is named as the Grantee, acting solely as "nominee" for the Lender, in

hundreds or thousands for security deeds in the State or Georgia with respect to

residential mortgage loans issued by MERS Members.  All of these Security Deeds are

identical or substantially similar as to their language and terms regarding MERS' powers

and duties.  MERS is the "nominee" for its members only.

24.24.

If a note has been transferred to a non-member, then MERS cannot act as the

nominee.  One cannot assume that just because MERS was named as the initial nominee

in the deed of trust that it still retains that relationship with the actual holder of the note.

25.

MERS holds the security in a nominee capacity but without rights to the debt.

MERS has no rights to the underlying debt repayment secured by the mortgage; MERS

does not even act as the servicing agent to receive the payments and remit them to the

lender.  MERS' rights under the deed are pursuant to a nominee capacity. In its ordinary

meaning, a nominee represents the principal in only a "nominal capacity" and does not

receive any property or ownership rights of the person represented. See, *e.g.*, *Cisco v.*

*Van Lew*, 60 Cal. App. 2d 575, 583-84, 141 P.2d 433 (1943); see also *Applebaum v.*

*Avaya, Inc.*, 812 A.2d 880, 889 (Del. 2002) (referring to nominees "as agents of the

beneficial owners").

26.

The deed says that MERS acts "solely as nominee for Lender." There is no express

grant of any right to MERS to transfer or sell the mortgage or even to assign its duties as

nominee. Nor does MERS obtain any right to the borrower's payments or even a role in

receiving payments. (National Landmark Bank v. Kesler  No. 98,489 IN THE COURT

OF APPEALS OF THE STATE OF KANSAS (Sept. 2008)).

27.

MERS may not act on its own, independent of the direction of the specific Lender

who holds the repayment interest in the security instrument at the time MERS purports to

act. "An agent is authorized to do, and to do only, what is reasonable for him to infer that

the principal desires him to do *in light of the principal's manifestation* and the facts as

he knows or should know them at the time he acts. (*Hot Stuff, Inc. v. Kinko's Graphic*

*Corp.,* 50 Ark. App. 56, 59, 901 S.W. 2d 854, 856 (1995) citing Restatement (Second) of

Agency § 33 (1958)) and (*Mortgage Electronic Registration System, Inc. v. Southwest*

*Homes of Arkansas*, NO. 08-1299 (Sup. St. Ark 2009)).

28.

The Plaintiff's Deed to Secure Debt (or "Security Deed") at issue in this case is a

standard Georgia MERS Security Deed as it is a form Deed used as an instrument to

secure real property to ensure the repayment of hundreds of thousands of loans in

Georgia, including those of the putative plaintiffs.  (Security Deed attached hereto as

Exhibit "___").

29.

MERS standing alone is not the Grantee of the Security Deed signed by Plaintiff

er, MERS acting solely as

nominee for the lender and the lender's successors and assigns named as the Grantee of

the Security Deed.  MERS itself has no interest in, or authority to act under, the security

deed. Pursuant to the Security Deed, the borrower "appoints Lender the agent and

attorney-in-fact for the Borrower to exercise the power of sale." (Security Deed attached

hereto Exhibit "B" @ p. 13).  The security deed further provides that "MERS is a

separate corporation that is acting solely as a nominee for lender and lender's successors

and assigns." (Security Deed attached hereto as Exhibit "B" @ p. 1).

30.

The Security Deed does state that the Plaintiff "grants and conveys to MERS

(solely as nominee for lender and lenders successors and assigns). . . with power of sale

…" (Security Deed @ p. 3).  But the grant of power of sale is extremely limited.  It can

only be exercised in a nominee capacity and, even then, can only be exercised by MERS

as nominee if necessary to comply with law or custom. The Security Deed provides:

"MERS holds only legal title to the interest granted by borrower in this security

instrument, but, *if necessary to comply with law and custom*, MERS (as nominee for

lender and lender's successors and assigns) has a right to exercise any or all of those

interests, including, but not limited to, the right to foreclose and sell the property; and to

take any action required of lender including, but not limited to, releasing and canceling

the security instrument." (Security Deed attached hereto as Exhibit "B" @ p. 3)

-10-

(emphasis added). (As will be seen below, rather than complying with "law and custom," Georgia law actually *prevents* MERS from foreclosing on property because it is not the note owner or note holder, and Georgia law prevents MERS from acting in a fiduciary capacity relating to the loan.)

31.

Further, the Security Deed provides that if Lender invokes the power of sale:

> Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by applicable law. Lender, without further demand on borrower, shall sale the property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more partials and in any order lender determines. Lender or his designee may purchase the property at any sale. Lender shall convey to the purchaser, indefensible title to the property and borrower hereby appoints lender borrower's agent and attorney-in-fact to make such conveyance."

(Security Deed attached hereto as Exhibit "B")@ p. 10).

32.

The Plaintiff ~~and putative plaintiffs~~' Security Deeds do not purport to give MERS any greater rights than normally given a nominee. The Security Deed says that MERS acts "solely as nominee for Lender." There is no express grant of any right to MERS to transfer or sell the mortgage or even to assign its duties as nominee. Nor does MERS obtain any right to the borrower's payments or even a role in receiving payments made toward the repayment of the loan. (Security Deed attached as Exhibit B).

33.

MERS was not the owner and/or holder in due course of the Plaintiff and putative plaintiffs' Promissory Notes at the time of the foreclosure, or at any time, because MERS

-11-

"MERS is a private corporation that administers the MERS system, a national electronic registry that tracks the transfer of ownership interests and servicing rights in support of mortgage loan." citing *Mortgage Elec. Reg .Sys, Inc. v. Nebraska Department of Banking,* 270 Neb. 529, 704 N.W. 2d 784 (2005).

36.

MERS argued in another forum that it is *not* authorized to engage in the practices that would make it a party to either the enforcement of mortgages or the transfer of mortgages. In *Mortgage Elec. Reg .Sys, Inc. v. Nebraska Department of Banking,* 270 Neb. 529, 704 N.W. 2d 784 (2005), MERS challenged an administrative finding that it was a mortgage banker subject to license and registration requirements. The Nebraska Supreme Court found in favor of MERS, noting, "MERS has no independent right to collect on any debt because MERS itself has not extended any credit, and **none of the mortgage debtors owe MERS any money."** 270 Neb. at 535.

35.

The Court in Nebraska further noted the following representation made by MERS:

> MERS argues that it *does not acquire mortgage loans* and is therefore not a mortgage banker under § 45-702(6) because *it only holds legal title* to members' mortgages in a nominee capacity and is contractually prohibited from exercising any rights with respect to the mortgages (i.e., foreclosure) without the authorization of the members. Further, MERS argues that it *does not own the promissory notes* secured by the mortgages and has no right to payments made on the notes. MERS explains that it merely "immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur."

704 N.W. 2d 784, 787 (citing brief for MERS) (emphasis added). According to the Court, counsel for MERS further explained:

-13-

[T]hat MERS does not take applications, underwrite loans, make decisions on whether to extend credit, collect mortgage payments, hold escrows for taxes and insurance, or *provide any loan servicing functions whatsoever. MERS merely tracks the ownership of the lien* and is paid for its services through membership fees charged to its members.

*Id.* (emphasis added). In finding that MERS was not a "mortgage banker," the Court

stated:

In other words, through its services to its members as characterized by the district court, MERS does not acquire "any loan or extension of credit secured by a lien on real property." MERS does not itself extend credit or acquire rights to receive payments on mortgage loans. Rather, the *lenders retain the promissory notes* and servicing rights to the mortgage, while *MERS acquires legal title to the mortgage for recordation purposes.*

MERS *serves as legal title holder in a nominee capacity*, permitting lenders to sell their interests in the notes and servicing rights to investors without recording each transaction. But, simply stated, *MERS has no independent right to collect on any debt* because MERS itself has not extended credit, and none of the mortgage debtors owe MERS any money.

*Id.* at 788. (emphasis added).

## MERS' FORECLOSURES ARE INVALID IN GEORGIA BECAUSE MERS IS NOT A SECURDED CREDITOR AND THE NOTICE OF FORECLOSRE MERS' ATTORNEYS SENT TO PLAINTIFFS ~~AND PUTATIVE PLAINTIFFS~~ DOES NOT QUALIFY AS OCGA 44-14-162.2 NOTICE

37.

Under Georgia law, no sale of real estate under powers contained in security deeds are valid unless the sale is advertised and conducted at the time and place and in the usual manner of the sheriff's sales in the county in which such real estate or a part thereof is located and unless notice of the sale is given as required by Code Section  44-14-162.2.

38.

O.C.G.A. § 44-14-162.2 provides that notice of the initiation of proceedings to exercise a power of sale in a security deed is to be given to the debtor <u>by the secured creditor</u> no later than 30 days before the date of the proposed foreclosure.

39.

Pursuant to O.C.G.A. Sections 44-14-162[1] and 44-14-162.2[2] the Secured Creditor was required, in order for any non-judicial sale of the Plaintiff's property and the

---

[1] § 44-14-162. Sales Made On Foreclosure Under Power Of Sale -- Manner Of Advertisement And Conduct Necessary For Validity.

(a) No sale of real estate under powers contained in mortgages, deeds, or other lien contracts shall be valid unless the sale shall be advertised and conducted at the time and place and in the usual manner of the sheriff's sales in the county in which such real estate or a part thereof is located and unless notice of the sale shall have been given as required by Code Section 44-14-162.2. If the advertisement contains the street address, city, and ZIP Code of the property, such information shall be clearly set out in bold type. In addition to any other matter required to be included in the advertisement of the sale, if the property encumbered by the mortgage, security deed, or lien contract has been transferred or conveyed by the original debtor to a new owner and an assumption by the new owner of the debt secured by said mortgage, security deed, or lien contract has been approved in writing by the secured creditor, then the advertisement should also include a recital of the fact of such transfer or conveyance and the name of the new owner, as long as information regarding any such assumption is readily discernable by the foreclosing creditor. Failure to include such a recital in the advertisement, however, shall not invalidate an otherwise valid foreclosure sale.

(b) The security instrument **_or assignment thereof_** vesting the secured creditor with title to the security instrument **_shall be filed prior to the time of sale_** in the office of the clerk of the superior court of the county in which the real property is located.

History. Amended by 2008 Ga. Laws 576, § 1, eff. 5/13/2008. (emphasis added).

[2] § 44-14-162.2. Sales Made On Foreclosure Under Power Of Sale -- Mailing Of Notice To Debtor -- Procedure For Mailing Notice.

(a) Notice of the initiation of proceedings to exercise a power of sale in a mortgage, security deed, or other lien contract shall be given to the debtor **_by the secured creditor_** no later than 30 days before the date of the proposed foreclosure. Such notice shall be in writing, shall include the name, address, and telephone number of the individual or entity who shall have full authority to negotiate, amend, and modify all terms of the mortgage with the debtor, and shall be sent by registered or certified mail or statutory overnight delivery, return receipt requested, to the property address or to such other address as the debtor may designate by written notice to the secured creditor. The notice required by this Code section shall be deemed given on the official postmark day or day on which it is received for delivery by a commercial delivery firm. Nothing in this subsection shall be construed to require a secured creditor to negotiate, amend, or modify the terms of a mortgage instrument.

(b) The notice required by subsection (a) of this Code section shall be given by mailing or delivering to the debtor a copy of the notice of sale to be submitted to the publisher.

History. Amended by 2008 Ga. Laws 576, § 2, eff. 5/13/2008. (emphasis added).

property of the putative plaintiffs to be valid, to send notification at least 30 days prior to any intended foreclosure on the property.

40.

Georgia law, at O.C.G.A. § 23-2-114 entitled <u>Powers of sale -- To be construed strictly; manner of sale; who may exercise,</u> provides that "Powers of sale in deeds of trust, mortgages, and other instruments shall be strictly construed and shall be fairly exercised."

41.

With respect to the named Plaintiff, ~~and the putative plaintiffs~~, 30 days or more before the Foreclosure sale of the Plaintiff's property ~~and the property of the putative plaintiffs,~~ MERS sent a knowingly false and defective notice of foreclosure letter that did not comply with O.C.G.A. 44-14-162.2 and which included knowingly false information that was intended to mislead the Plaintiff and putative plaintiffs into believing that the statutory notice requirements were being complied with and into believing that MERS had authority to foreclose on the Plaintiff's property. The notices sent to the Plaintiff ~~and the putative plaintiffs~~ failed to meet the requirements of O.C.G.A. 44-14-162.2 in that it was not sent "***by the secured creditor***."

42.

MERS was not a Secured Creditor in that it neither held the security for the property and it was not a creditor as it was not the holder of the promissory notes and was not the party to whom the Plaintiff and putative plaintiffs owed money for the repayment

-16-

of their respective debts.  It also could not be the secured creditor, as it is prohibited

under Georgia law from acting as a fiduciary in regard to the note.

43.

The foreclosure/non-judicial sales of the Plaintiff

property all took place without the issuance of a foreclosure notice that complied with the

foreclosure statute.  According to O.C.G.A. 44-14-162 the foreclosure sales of the

Plaintiff's property                                  ` property are not valid by operation of law

and this Court must issue an order that declares that all Deeds under Power (i.e.

foreclosure deeds) that were prepared as a result of the invalid non-judicial sales of the

Plaintiff's property and the property of the putative plaintiffs and that were recorded on

the land records of the Georgia counties wherein the land lies are VOID.  Doing so would

restore title as it existed just prior to the invalid foreclosure sale.

## EVEN IF MERS COULD GET AROUND THE PROBLEM THAT THERE WAS NO PROPER OCGA 44-14-162.2 NOTICE, MERS STILL HAD NO AUTHORITY TO FORECLOSE BECAUSE THE SECURITY DEEDS NAMING MERS THE GRANTEE ACTUALLY CONVEYED NOTHING TO MERS AND ARE VOID

44.

MERS lacked power of sale authority to act as Attorney in Fact for the Plaintiff

. and could not legally proceed with a non-judicial sale of the

Plaintiff's property or the property

45.

MERS  lacks the capacity to act as a Trust or Corporate Fiduciary in the State of

Georgia, thereby rendering void the security deeds of the Plaintiff.

-17-

that named MERS, acting solely as "nominee" for the Lender and the Lender's successors and assigns.

46.

The term "nominee" in not defined in the security deed.

47.

Georgia law does not recognize the term "nominee" in a real estate transaction wherein the grantee holds legal title for the benefit of another.

48.

Black's Law Dictionary defines "nominee" as "[a] person designated to act in

place of another, usually in a very limited way" and as "[a] party who holds bare legal

title for the benefit of others or who receives and distributes funds for the benefit of

others." Black's Law Dictionary 1076 (8th ed. 2004).

49.

A "beneficiary" is defined as "one designated to benefit from an appointment,

disposition, or assignment . . . or to receive something as a result of a legal arrangement

or instrument." BLACK'S LAW DICTIONARY 165 (8th ed. 2004).

50.

But it is obvious from the MERS' "Terms and Conditions" that MERS is not a

beneficiary as it has no rights whatsoever to any payments, to any servicing rights, or to

any of the properties secured by the loans.

51.

With respect to a corporation, such as MERS, acting as a fiduciary,O.C.G.A § 7-1-

242 declares:

1.  No corporation, partnership, or other business association may lawfully
    act as a fiduciary in this state except:

    (1) A financial institution authorized to act in such capacity pursuant
        to the provisions of Georgia law;
    (2) A trust company;
    (3) A national bank or a state bank lawfully doing a banking
        business in this state and authorized to act as a fiduciary under
        the laws of the United States or another state;

(4) A savings bank or savings and loan association lawfully doing a banking business in this state and authorized to act as a fiduciary under the laws of the United States or another state;

(5) Attorneys at law licensed to practice in this state, whether incorporated as a professional corporation or otherwise;

(6) An investment adviser registered pursuant to the provisions of 15 U.S.C. Section 80b-3 or Chapter 5 of Title 10, provided this exception shall not authorize an investment adviser to act in any fiduciary capacity subject to the provisions of Title 53, relating to wills, trusts, and the administration of estates; or

(7) A securities broker or dealer registered pursuant to the provisions of 15 U.S.C. Section 78o or Chapter 5 of Title 10 acting in such fiduciary capacity incidental to and as a consequence of its broker or dealer activities.

2.    Acting as a fiduciary for purposes of this Code section includes but is not limited to:

(1)    *Accepting or executing trusts or otherwise acting as a trustee;*

(2)    *Administering real or tangible personal property located in Georgia or elsewhere. For the purposes of this paragraph, "administer" means to possess, purchase, sell, lease, insure, safekeep, manage, or otherwise oversee;* and (emphasis supplied)

(3)    Acting pursuant to a court order as personal representative, executor, or administrator of the estate of a deceased person or as guardian or conservator for a minor or incapacitated person.

(c)    Nothing in this chapter shall be construed to repeal or to change Part 2 of Article 16 of Chapter 12 of Title 53, dealing with foreign trustees, or Part 3 of Article 16 of Chapter 12 of Title 53, dealing with certain foreign corporations acting as fiduciaries, or any other statutes or rules of law on such subjects.

52.

The penalty for a corporation, such as MERS, unlawfully acting as a fiduciary is

found in O.C.G.A § 7-1-845:

Miscellaneous felonies; when punished as misdemeanors

-20-

(a)    Any person or corporation, including any financial institution or its
directors, officers, agents, or employees, who shall perform the
following acts or deeds *shall be guilty of a felony*:

(3) Willfully engages in the business of:

(B)    *A trust company in violation of Code Section 7-1-242...*  (emphasis
supplied)

### 53.

MERS is clearly acting as a Trust Company as its role with respect to the Deed to

Secure Debt is to hold legal title to property for the benefit of another.  The Supreme

Court of Georgia has ruled:

> "No formal words are necessary to create a trust estate. *Whenever a
> manifest intention that another person shall have the benefit of the property
> is exhibited, the grantee shall be declared a trustee.*" (emphasis supplied).

*Carmichael Tile Co. v. Yaarab Temple Bldg. Co.*, 182 Ga. 348 (Ga. 1936) (emphasis

added).

### 54.

OCGA Sec. 53-12-24(a), states that a corporation that wishes to act as trustee

"must have the power to act as a trustee in Georgia."

### 55.

OCGA Sec. 7-1-242 provides that only certain corporations or business entities

may act as a fiduciary in Georgia. These are basically banks, trust companies, and other

financial institutions.

56.

Unless a corporation receives approval to act as a bank or trust company, as set forth in OCGA Sec. 7-1-392 et. seq., it cannot lawfully act as a corporate fiduciary in the State of Georgia.

57.

MERS has never sought, nor has it been granted authority by the Georgia Department of Banking and Finance to act as a trustee or to operate as a Trust Company. It is therefore unlawful for MERS, solely as "nominee" for the lender and the lender's successors and assigns, to be the Grantee of a Security Deed wherein it is tasked with holding legal title to the property for the benefit of another.

58.

The Plaintiff~~'s and the putative class plaintiffs~~' security deed ("trust instrument")[3] clearly meets all the elements of an "express trust" [4] in Georgia.

59.

Plaintiff ~~and the putative class plaintiffs~~, as "settlor", [5] conveyed legal title to the "trust property" [6] to MERS as "trustee" [7] for the lender and its successors and assigns , the true trust "beneficiaries".[8]

---

[3] O.C.G.A. § 53-12-2 (9) "Trust instrument" means the document or documents that manifest the elements and other details of a trust.

[4] O.C.G.A. § 53-12-2 (2) "Express trust" means a trust in which the settlor's intention to create the trust is expressly stated, and which meets the requirements of Code Section 53-12-20.

[5] O.C.G.A. § 53-12-2 (7) "Settlor" means the person who creates the trust. The terms "grantor" and "trustor" mean the same as "settlor."

[6] O.C.G.A. § 53-12-2 (10) "Trust property" means property placed in trust by the settlor or property otherwise transferred to or acquired or retained by the trustee for the trust. The terms "trust corpus" and "trust res" mean the same as "trust property."

[7] O.C.G.A. § 53-12-2 (11) "Trustee" means the person holding legal title to the property in trust.

60.

Further evidence MERS is acting as a corporate fiduciary can be found in the

Exhibit "D" which is attached hereto and is incorporated herein by this specific reference.

The Attorney General, Mr. Bowers, Esq., states at ¶ 4 "An examination of the specific

persons or entities identified as fiduciaries in O.C.G.A. § 7-1-4(20) reveals that such

persons or entities are similar in nature to one another in that the role of each one

involves *taking possession of or title to the assets of another* or exercising control over

such assets for the purpose of managing those assets on behalf of the other person." This

is exactly what the Deeds to Secure Debt at issue in this Complaint attempt to require

MERS to do – take bare legal title to the property for recordation purposes.  As stated,

however, MERS lacks the capacity to act as a Trustee, operate as a Trust Company or be

a corporate fiduciary.

61.

Thus MERS is acting unlawfully as a corporate fiduciary in the State of Georgia

and the term "nominee" is merely an artifice employed to obfuscate the true relationship

between the Plaintiff, MERS and the trust beneficiaries.

62.

The security deeds at issue herein violate Georgia public policy because MERS is

not a trust company or bank, thus is operating unlawfully as a corporate fiduciary by

---

[8] O.C.G.A. § 53-12-2 (1) "Beneficiary" means a person for whose benefit property is held in trust, regardless of the nature of the interest. A beneficiary must be definitely ascertainable at the time of the creation of the trust or definitely ascertainable within the period of the rule against perpetuities.

obtaining legal title to real property in the State of Georgia as a trust or trustee for the

benefit of MERS members and non members.

### 63.

MERS has no authority to hold legal title to real property and promissory notes in

the State of Georgia as a trust or trustee.

### 64.

MERS has no authority to sell real property and/or promissory notes as a trust or

trustee for any entity.

### 65.

MERS is acting as a trust or trustee without appropriate approval from the Georgia

Department of Banking and Finance.

### 66.

MERS cannot register to act as a trust or trustee in the State of Georgia because it

does not now meet the registration requirements to be registered by the Georgia

Department of Banking and Finance.

### 67.

In addition to being void because MERS cannot lawfully be a Grantee of a

Security Deed acting solely as a nominee for a lender because MERS would be acting as

a corporate fiduciary in Georgia when it lacks the capacity to act as a corporate fiduciary,

the Security Deeds of the Plaintiff and the putative plaintiffs naming MERS, acting solely

as nominee, and thereby conveying legal title to the property to MERS, acting solely

nominee, as opposed to conveying legal title to the Lender, also causes a problem with

the ability to foreclose on the property in the event of a default in repayment of the loan.

The ability to foreclose on the property at issue is affected because the security deed has

been separated or split from the note.  Loans originated with MERS as the original

Grantee purport to separate the borrower's promissory note, which is made payable to the

originating lender, from the security deed, which contains borrower's conveyance of

legal title to MERS as nominee.

68.

With the creation of MERS, the mortgage industry has created a system whereby

the deeds or mortgages are required to be separated or split from the notes. The Mortgage

Industry decided to commit to the MERS system despite the U.S. Supreme Court's

holding that "the note and the mortgage are inseparable." Carpenter v. Longan, 83 U.S.

271, 274 (1872). *See also* Nagle v. Macy 9 Cal. 426, 1858 WL 818 (Cal. 1858) ("The

debt and the mortgage are inseparable.")  Indeed, it went on to state that a "mortgage can

have no separate existence" from a promissory note. Carpenter, 83 U.S. at 274. As such,

the MERS security agreement that purports to grant a deed independent of the promissory

note attempts to convey something that cannot exist by law.

69.

Many courts have held that a document attempting to convey an interest in realty

fails to convey that interest when an eligible grantee is not named. Disque v. Wright, 49

Iowa 538, 1878 WL 623 (Iowa 1878) ("It has been frequently held that slight omissions

in the acknowledgment of a deed destroy the effect of the record as constructive notice. *A

fortiori,* it seems to us, should so important and vital an omission as that of the name of

-25-

the grantee have that effect."); <u>Chauncey v. Arnold</u>, 24 N.Y. 330 (N.Y. 1862) ("No

mortgagee or obligee was named in [a mortgage], and no right to maintain an action

thereon, or to enforce the same, was given therein to the plaintiff or any other person. It

was, *per se,* of no more legal force than a simple piece of blank paper."); <u>Richey v.

Sinclair</u>, 47 N.E. 364 (Ill. 1897) ("The law is well settled that a deed without the name of

a grantee is invalid. It is said there must be in every grant a grantor, a grantee, and a thing

granted; and a deed wanting in either essential will be void."); <u>Allen v. Allen</u>, 51 N.W.

473, 474 (1892) (omission of name of grantee invalidated conveyance because "A legal

title to real property cannot be established by parol."); 59 CJS MORTGAGES § 306

("Notice may be deemed not present in cases of insufficient attestation or where the

instrument itself is so defective as to be void as a matter of law, as where it wholly omits

the name of the mortgagee.") (citations omitted).

70.

     Courts around the country have long held: "there must be, in every grant, a

grantor, a grantee and a thing granted, and a deed wanting in either essential is absolutely

void." <u>Whitaker v. Miller</u>, 83 Ill. 381, 1876 WL 10353 (Ill. 1876); <u>Trout v. Taylor</u>, 32

P.2d 968 (Ca. 1934); <u>Green v. MacAdam</u>, 346 P.2d 474, 485 (Cal.App. 1959); <u>Hulsether

v. Peters</u>, 167 N.W. 497, 498 (S.D. 1918); <u>Allen v. Allen</u>, 51 N.W. 473, 473 (Minn.

1892); <u>Beard v. Griggs</u>, 1 J.J.Marsh. 22, 1829 WL 1139 (Ky.App. 1829); <u>Morris v.

Stephens</u>, 46 Pa. 200, 1863 WL 4942, 10 Wr.Pa. 200 (Pa., 1863). Indeed, this common

sense rule dates back to Blackstone's Commentaries which state: "What are the requisites

of a deed? ... There must be persons able to contract and be contracted with, for purposes

-26-

intended by the deed; and also a thing, or subject matter, to be contracted for; all of which must be expressed by sufficient names." 2d Blackstone's Commentaries, 296. And more recently, Patton and Palomoar's treatise agrees that: "It is axiomatic that a deed will be inoperative as a conveyance unless it designates someone to whom the title passes. A grantee is as necessary to the validity of a grant as that there should be a grantor or a property granted." 2 PATTON AND PALOMAR ON LAND TITLES § 338 (3d ed. 2009).

71.

In *Chauncey v. Arnold, 24 N.Y. 330, 332 (N.Y. 1862)*, the trial court, intermediate appellate court and New York's highest court all agreed that the attempt to convey an "in blank" mortgage failed. The Court of Appeals explained, "No mortgagee or obligee was named in [the security agreement], and no right to maintain an action thereon, or to enforce the same, was given therein to the plaintiff or any other person. It was, *per se,* of no more legal force than a simple piece of blank paper." *Id.* at 335.

72.

The Supreme Court of California reached a similar result in a deed of trust state. In *Trout v. Taylor* 32 P.2d 968 (Cal. 1934), a shady finance company induced "an elderly woman, without business experience, and of very limited schooling and education" into signing a blank deed conveying her land. After execution and delivery of the deed, the finance company filled in the name of a company insider, took out a few loans against the land and sold them to investors. In analyzing whether the deed was enforceable the Court

pointed to the absence of a named grantee and held that "the deed in question was not

voidable, but was void *in toto*; a nullity." *Id* .at 970.

### THE MERS SYSTEM IS CONTRARY TO HUNDREDS OF YEARS OF BLACK LETTER PROPERTY LAW AND IT CRACKS THE PUBLIC RECORDING OF PROPERTY OWNERSHIP FOUNDATION UPON WHICH A PROPERLY FUNCTIONING NON-JUDICIAL FORECLOSURE SYSTEM RELIES

73.

As alluded to above, in the case of the Plaintiff ~~and putative plaintiff~~s, the

functioning of the MERS system which requires that the deed be separated, i.e. split,

from the note, if given the stamp of approval by this Court, will turn hundreds of years of

black letter property law on its head.

74.

Since the founding of the American republic each county in the United States has

maintained records of who owns the land within that county. PATTON AND

PALOMAR ON LAND TITLES § 4 (3d ed. 2003).

75.

Most states have tracked changes in ownership of land, including mortgages and

deeds of trust, by maintaining records indexed through the names of grantors and

grantees. 14 POWELL ON REAL PROPERTY §82.03[2][b]. These grantor-grantee

indexes allow individuals and businesses contemplating the purchase of land to

investigate (or hire a title insurer to investigate) whether a seller or mortgagor actually

owns the land they are offering for sale or mortgage.

-28-

76.

For centuries American mortgage lenders have recorded their mortgages loans

with county recorders because of incentives created by state land title laws. For example,

if a mortgagee fails to properly record its mortgage, and then someone subsequently buys

or lends against the home, the subsequent purchaser can often take priority over the first

mortgagee.

77.

Similarly, where a mortgagee assigns a mortgage to an investor, that investor

would eagerly record documentation reflecting the assignment to protect herself from the

possibility that the original mortgagee would assign the same mortgage to a different

investor.

78.

In the mid-1990s mortgage bankers decided they did not want to pay recording

fees for assigning mortgages anymore. Phyllis K. Slesinger & Daniel McLaughlin,

*Mortgage Electronic Registration System*, 31 ID. L. REV. 805, 810-12 (1995) (describing

an Ernst & Young study commissioned by mortgage banker to study how much money

they could avoid paying to county governments through the MERS system). This

decision was driven by securitization—a process of pooling many mortgages into a trust

and selling income from the trust to investors on Wall Street. Securitization, also

sometimes called structured finance, usually required several successive mortgage

assignments to different companies. To avoid paying county recording fees, mortgage

bankers formed a plan to create one shell company, MERS, that would pretend to own all

-29-

the mortgages in the country—that way, the mortgage bankers would never have to record assignments since the same company would always supposedly "own" all the mortgages. Peterson, *Foreclosure, supra* note 5, at 1368-73; Howard Schneider, *MERS Aids Electronic Mortgage Program*, MORTGAGE BANKING, January 1, 1997.

79.

MER was created even though not a single state legislature or appellate court had authorized this change in the real property recording.

80.

Currently about 60% of the nation's residential mortgages are recorded in the name of MERS, Inc. rather than the bank, trust, or company that actually has a meaningful economic interest in the repayment of the debt. For the first time in the nation's history, there is no longer an authoritative, public record of who owns land in each county.

81.

In boilerplate security agreements included in mortgages and deeds of trust of the Plaintiff and the putative class plaintiffs, lenders included this clause: "MERS" is Mortgage Electronic Registration Systems, Inc.   MERS is a separate corporation that is *acting solely as nominee for Lender* and Lender's successors and assigns. *MERS is the mortgagee* under this Security Instrument."

82.

On the one hand, MERS purports to be acting as a nominee—a fiduciary (which is prohibited to MERS under Georgia law). On the other hand, it also is claiming to be an

actual mortgagee, which is to say an owner of the real property right to foreclose upon the security interest.

83.

It is axiomatic that a company cannot be both an agent and a principal with respect to the same right.

84.

In litigation all across the country, attorneys representing MERS frequently take inconsistent positions on the legal status of the company, depending on the legal issue at hand.

85.

If MERS is merely an agent of the actual lender, it does not have the authority to list itself as a grantee with power of sale in the security deed, then while it may have authority to record mortgages in its own name, both MERS and financial institutions investing in MERS-recorded mortgages run afoul of longstanding precedent on the inseparability of promissory notes and mortgages.

86.

Since the 19th century a long and still vital line of cases has held that mortgages and deeds of trust may not be separated from the promissory notes that create the underlying obligation triggering foreclosure rights. *In re Bird*, 2007 WL 2684265, at ¶¶ 2-4 (Bkrtcy.D.MD. 2007) ("The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. . . . It is equally absurd to assume that

-31-

such bifurcation was intended because such a bifurcation of the note from the deed of trust would render the debt unsecured.");

(stating that "[a] security interest cannot exist, much less be transferred, independent from the obligation which it secures" and that, "[i]f the debt is not transferred, neither is the security interest");

("An assignment of a mortgage without a transfer of the underlying note is a nullity. . . . It is axiomatic that any attempt to assign the mortgage without transfer of the debt will not pass the mortgagee's interest to the assignee."); Yoi-Lee Realty Corp. v. 177th Street Realty Associates, 208 A.D.2d 185, 626 N.Y.S.2d 61, 64 (N.Y.A.D. 1 Dept.,1995) ("The mortgage note is inseparable from the mortgage, to which the note expressly refers, and from which the note incorporates provisions for default."); In re            ., 26 B.R. 358, 361 (Bkrtcy. Conn., 1982) (reaffirming that "[t]he note and mortgage are inseparable"); Barton v. Perryman, 577 S.W.2d 596, 600 (Ark., 1979) ("[A] note and mortgage are inseparable.");            . v. Wortham, 428 S.W.2d 417, 419 (Tex. Civ. App. 1968) ("The note and mortgage are inseparable. . . ."); Kirby Lumber Corp. v. Williams, 230 F.2d 330, 333 (5th Cir. 1956) ("The rule is fully recognized in this state that a mortgage to secure a negotiable promissory note is merely an incident to the debt, and passes by assignment or transfer of the note. * * * The note and mortgage are inseparable. . . .");

("In any event, Kelley's purported assignment of the mortgage without an assignment of the debt which is secured was a legal nullity."); Hill v. Favour, 52 Ariz. 561, 84 P.2d 575 (Ariz. 1938) ("The note and mortgage are inseparable; the former as

-32-

essential, the latter as an incident.)"; Denniston v. C.I.R., 37 B.T.A. 834, 1938 WL 373

(B.T.A. 1938) ("All the authorities agree that the debt is the principal thing and the

mortgage an accessory. . . The mortgage can have no separate existence."); West v.

of Taft, 123 Tex. 388, 71 S.W.2d 1090, 1098 (Tex. 1934) ("The trial

court's finding and conclusion ignore the settled principle that a mortgage securing a

negotiable note is but an incident to the note and partakes of its negotiable character. . . .

The note and mortgage are inseparable; the former as essential, the latter as an incident.")

(citations omitted); First Nat.    v. Vagg, 65 Mont. 34, 212 P. 509, 511 (Mont. 1922)

("A mortgage, as distinct from the debt it secures, is not a thing of value nor a fit subject

of transfer; hence an assignment of the mortgage alone, without the debt, is nugatory, and

confers no rights whatever upon the assignee. The note and mortgage are inseparable; the

former as essential, the latter as an incident. An assignment of the note carries the

mortgage with it, while the assignment of the latter alone is a nullity. The mortgage can

have no separate existence.") (citations omitted); Southerin v. Mendum, 5 N.H. 420, 1831

WL 1104, at ¶ 7 (N.H. 1831) ("[T]he interest of the mortgagee is not in fact real estate,

but a personal chattel, a mere security for the debt, an interest in the land inseparable

from the debt, an incident to the debt, which cannot be detached from its principal.").

### 87.

The above cases do not merely hold that mortgages follow notes as a matter of

default law, but that mortgages cannot legally be separated from notes. Thus, in

Carpenter v. Longan 83 U.S. 271, 274, (1872) the United States Supreme Court

announced the classic statement of this rule: "the note and mortgage are *inseparable*…,

the assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity."

88.

To date, every state Supreme Court that has looked at the issue has concluded that, despite its boilerplate language, MERS is not a mortgagee or deed of trust beneficiary. For example, in <u>MERS, Inc. v. Southwest Homes of Arkansas</u>, 2009 Ark. 152, 301 S.W.3d 1 (Ark. 2009) a first position lender named MERS as the beneficiary on its deed of trust. Later the family took out a second mortgage which did not use the MERS system. When the family fell behind on the second mortgage, the subsequent lender's assignee foreclosed without notifying either MERS or the real owner of the first mortgage. When MERS, acting through local counsel attempted to set aside the foreclosure, a unanimous Supreme Court of Arkansas, with its Chief Justice writing, held that MERS had no property rights with respect to the loan whatsoever. Even though MERS never had service of process, the court allowed the foreclosure to stand because MERS had lost nothing. In the Court's words, "MERS is not the beneficiary, even though it is so designated in the deed of trust."

89.

Similarly, the Kansas Supreme Court has also refused to allow MERS to set aside a first mortgagee's default judgment in a foreclosure action. <u>Landmark Nat. Bank v. Kesler</u>, 216 P.3d 158,169 (Kan. 2009). In its opinion, the Kansas Supreme Court diagnosed MERS' schizophrenic self characterization as a nominee, puzzling:

-34-

What meaning is this court to attach to MERS's designation as nominee for Millennia? The parties appear to have defined the word in much the same way that the blind men of Indian legend described an elephant—their description depended on which part they were touching at any given time.

90.

Kansas followed Arkansas' skepticism regarding whether MERS actually owns anything: "MERS did not demonstrate, in fact, did not attempt to demonstrate, that it possessed any tangible interest in the mortgage beyond a nominal designation."

91.

Likewise, the Supreme Court of Maine reached similar results when MERS itself filed a foreclosure complaint. In <u>MERS, Inc. v. Saunders,</u> Slip op. 2010 ME 79, at ¶ 1 (August 12, 2010) MERS filed a foreclosure complaint, but during the pending case, Deutsche Bank attempted to substitute itself into the action instead of MERS.34 When the trial court awarded summary judgment to Deutsche Bank the family appealed arguing that MERS lacked standing and that this jurisdictional defect could not be cured by substitution of another party during the pending case. The appeal forced the Maine Supreme Court to look at the simple question of whether MERS has standing to bring a foreclosure action on behalf of the real economic loan owner. Despite contrary boilerplate language in the security agreement, the Court flatly rejected MERS' ownership claim stating: "MERS is not a mortgagee... because it has no enforceable right in the debt obligation securing the mortgage." Because MERS lacked standing, the court reversed summary judgment to give the family an opportunity to "appropriately defend the foreclosure action against the real party in interest."

92.

In Missouri, appellate courts have gone a step further in challenging MERS'

ownership claims vis-à-vis mortgages tracked on its database. In <u>Bellistri v. Ocwen Loan

Servicing</u>, 284 S.W.3d 619 (Mo.App. E.D.,2009) MERS' involvement in the loan

effectively led to the stripping of deed of trust lien from the land. In this case, a debtor

borrowed money from a mortgage lending company named BNC Mortgage and signed a

deed of trust naming MERS as beneficiary of the trust. After the loan closed, no one paid

property taxes on the residence for several years. Eventually the local government

established a tax lien and sold the property at auction to Bellistri. Hoping to make his

rights clear, Bellistri sued in state court to quiet title on the land he had purchased.

Because the debt had still not been repaid Ocwen, a mortgage loan servicing company,

attempted to argue that the tax sale did not transfer title to the land from the original

debtor to Bellistri. Ocwen produced an assignment of the deed of trust from MERS to

Ocwen that had been recorded by an employee of Ocwen pretending to be a Vice

President of MERS. The Missouri Court of Appeals treated the recorded assignment as a

legal nullity.  Looking to the American Law Institute's Third Restatement of Property

Law the court stated:

> Typically, the same person holds both the note and the deed of trust. In the event
> that the note and the deed of trust are split, the note, as a practical matter becomes
> unsecured. Restatement (Third) of Property (Mortgages) § 5.4. Comment. The
> practical effect of splitting the deed of trust from the promissory note is to make it
> impossible for the holder of the note to foreclose, unless the holder of the deed of
> trust is the agent of the holder of the note. Id. Without the agency relationship, the
> person holding only the note lacks the power to foreclose in the event of default.
> The person holding only the deed of trust will never experience default because
> only the holder of the note is entitled to payment of the underlying obligation. Id.

-36-

The mortgage loan became ineffectual when the note holder did not also hold the deed of trust.

Ultimately, the Court held that "MERS never held the promissory note, thus its assignment of the deed of trust to Ocwen separate from the note had no force." The Court effectively quieted title in favor of Bellistri, stripping off the lien.

### 93.

The policy justifications behind recording statutes are as germane today as they were hundreds of years ago when the first American colonies began adopting the statutes. Society needs an authoritative, transparent source of information on who owns land in order to protect property rights, encourage commerce, expose fraud, and avoid disputes.

### 94.

The MERS database does not provide reliable, authoritative information on legally cognizable beneficial ownership of loans registered in its system. County real property records that hold only a reference to the MERS system now have a systemic break in chains of title. Perhaps this is what MERS means by its corporate slogan: "Process Loans, Not Paperwork." *See* Welcome to MERS,

### 95.

MERS, whose stated purpose is to track the true ownership of notes and servicing rights, knew at the time of the foreclosure on the Plaintiff's property and at the time of its foreclosure on the property of the putative plaintiffs that its statements in the notices of foreclosure were false and that it, acting on its own, had no authority to act as Attorney

-37-

in Fact for the Plaintiff or the putative plaintiffs or to accelerate the debt or exercise the

power of sale.

## MERS VIOLATED THE STATUTORILY REQUIRED OBLIGATION TO FAIRLEY EXERCISE THE POWER OF SALE

### 96.

In addition to conducting and invalid foreclosure sale as a matter of law, MERS

also violated O.C.G.A. § 23-2-114 in that is violated its duty to fairly exercise the power

of sale as concerns the Plaintiff's property and the property of the putative plaintiffs and

is therefore liable in tort for any damages resulting from its actions.

### 97.

As a result of the above described actions of MERS the Plaintiff and putative

plaintiffs have suffered tremendous injuries including, but not limited to severe emotional

pain and suffering, anger, sadness, humiliation, embarrassment, etc.

### 98.

Based on the above undisputed facts, the Plaintiff and putative plaintiffs are

therefore entitled to recover all of their damages that resulted from MERS action in

proceeding with the foreclosure, including, damages for severe emotional pain and

suffering, punitive damages and for attorney's fees.

## CLASS ACTION ALLEGATIONS

### 99.

The class of persons sought to be represented by the named Plaintiff is so

numerous that joinder of all members is impracticable, as Plaintiff believes there are

thousands of putative plaintiffs in Georgia who were subject to the same language in the deeds and the same policy and practices by MERS in the non-judicial foreclosure process and non-judicial foreclosure sale process.

100.

Questions of law and fact implicated in this action are common to the named Plaintiff and the class of persons they seek to represent.  These include the validity of the form deed used and discussed herein with Plaintiff and the putative class plaintiffs; the power (or lack thereof) for MERS to act; whether MERS is properly a fiduciary (or not); and whether MERS was a security holder when it acted to foreclose.

108.

The claims of the named Plaintiff are typical of the claims of the class of persons he seeks to represent.

109.

The named representative Plaintiff will fairly and adequately represent the interests of the class of persons he seeks to represent and he has engaged capable counsel experienced in conducting class litigation.

110.

Defendants have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief

law or custom and there is nothing about Georgia law or custom that makes it necessary for MERS, acting as nominee for a lender, to exercise the power of sale which the deed expressly granted to the lender and the lenders successors and assigns, (4) the fact that MERS cannot legally act as a corporate fiduciary in Georgia, which is what (a) the operation of the deed requires and (b) exercise of the power of sale as attorney-in-fact for the Plaintiff and putative plaintiffs requires, thus making the Security Deeds and the Foreclosure Deeds relating to the Plaintiff and putative plaintiffs void, (5) the fact that the MERS system of registration requires the note and the deed separate or split, which causes the loan to become unsecured as the deed cannot be enforced apart from the note, and (6) the fact of MERS failure in many respects to fairly exercise the power of sale under OCGA 23-2-114, MERS, whether standing alone or together, MERS actions in foreclosing on, and selling at a non-judicial auction, the property of the Plaintiff and that of the putative plaintiffs, constitute the tort of wrongful foreclosure

123.

MERS chose to proceed with the non-judicial sale of the Plaintiff's ~~and putative class plaintiffs~~' property even though it knew or should have known it lacked authority to act as attorney in fact for the Plaintiffs and putative plaintiffs and exercise the power of sale. MERS actions were willful and wanton and exercised with a complete disregard for the consequences, such that the plaintiff and putative plaintiffs are entitled to an award of punitive damages.

124.

MERS above described actions constitute the tort of wrongful foreclosure under

Georgia law entitling the Plaintiff                                      to recover from MERS all

damages that were caused by MERS tortuous conduct, including damages for severe

emotional distress and for punitive damages and attorneys' fees.

## COUNT III

## EQUITABLE RELIEF

125.

The Plaintiff incorporates by this specific reference the preceding paragraphs of

this Complaint as if stated fully herein.

126.

Because of any one of the reasons identified above, including but not

limited to (1) the fact that no notice  meeting the requirements of OCGA 44-14-162.2 was

sent to the Plaintiff                              by the secured creditor becaus, (2) the fact

that MERS was not a holder in due course of the promissory note, (3) the fact that the

security deed only granted power of sale to MERS, acting solely as nominee for the

lender, in the very limited and extraordinary circumstance that it becomes  necessary to

comply with local law or custom and there is nothing about Georgia law or custom that

makes it necessary for MERS, acting as nominee for a lender, to exercise the power of

sale which the deed  expressly granted to the lender and the lenders successors and

assigns, (4) the fact that MERS cannot legally act as a corporate fiduciary in Georgia,

which is what (a) the operation of the deed requires and (b) exercise of the power of sale

-44-

As a direct and proximate result of MERS' flagrant disregard of the rights of the

Plaintiff                                    , as explained in detail above, Plaintiff

should be awarded punitive damages pursuant to O.C.G.A. § 51-12-5.1 for

MERS willful misconduct, malice, fraud and wantonness in an amount to be proved at

trial.

as attorney-in-fact for the Plaintiff                              , thus making the

Security Deeds and the Foreclosure Deeds relating to the Plaintiff

void, (5) the fact that the MERS system of registration requires the note and the deed

separate or split, which causes the loan to become unsecured as the deed cannot be

enforced apart from the note, and (6)  the fact of MERS failure in many respects to fairly

exercise the power of sale under OCGA 23-2-114, MERS, whether standing alone or

together, the Plaintiff                              are entitled to an Order that declares that the

foreclosure actions that MERS took that make up the subject matter of this Complaint

resulted in the wrongful foreclosure with respect to the Plaintiff's and putative plaintiffs'

property  and that declares that all deeds under power (i.e. foreclosure deeds) that were

prepared as a result of the invalid non-judicial sales of the Plaintiff's property

                              ;and that were recorded on the land records of the

Georgia counties wherein the land lies are VOID and which restores title as it existed just

prior to the invalid foreclosure sale, thus reversing said foreclosure sale and returning the

parties to their respective positions and holding their respective interests in the Property

as they existed prior to the foreclosure sale.

## COUNT IV

## PUNTITIVE DAMAGES

### 127.

The Plaintiff incorporates by this specific reference the preceding paragraphs of

this Complaint as if stated fully herein.

### 128.

*Exhibit A* (handwritten)

FILED & RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA.

2008 DEC 11  PM 2: 28

TOM LAWLER, CLERK

*— Recorded just b4 the sale Date* (handwritten)
*26 day* (handwritten)

**314383**

Our File No.: 52607708-FT1
Debtor: Alfredia Pruitt
Sale Date: 01/06/2009

Return to
Prommis Solutions, LLC
1544 Old Alabama Road
Roswell, GA 30076

ASSIGNMENT

STATE OF **Pennsylvania**

COUNTY OF **Montgomery**

For value received, Mortgage Electronic Registration Systems, Inc. has this day transferred, sold, assigned, conveyed and set over to GMAC Mortgage, LLC, whose address is 1100 Virginia Drive, Fort Washington, PA 19034, as Assignee, its successors, representatives and assigns, all its right, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by Alfredia Pruitt to Mortgage Electronic Registration Systems, Inc., dated August 30, 2006, recorded in Deed Book 46975, Page 422, Gwinnett County, Georgia Records.

Property Address: 2360 Hickory Station Circle, Snellville, Georgia 30078

The Assignor herein specifically transfers, sells, conveys and assigns to the above Assignee, its successors, representatives and assigns, the aforesaid Security Deed, the property described therein, the indebtedness secured thereby together with all the powers, options, privileges and immunities therein contained.

The Assignor herein has this day sold and assigned to the Assignee herein the note secured by the aforesaid Security Deed and this transfer is made to secure the Assignee, its successors, representatives and assigns, in the payment of said note.

IN WITNESS WHEREOF, the Assignor has hereunto set its hand and seal this **Nov. 25th**, 2008.

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Susan Turner, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Nov. 9, 2011
Member: Pennsylvania Association of Notaries

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By: _____
Title: _____

**Jeffrey Stephan**
**Vice President**

By: _____
Title: _____
(Corporate Seal)

**Kristine Wilson**
**Assistant Secretary**

*No co-operat Seal* (handwritten)

**0117739**

*Susan Turner* (handwritten)





# NOTE

August 30, 2006                    Norcross                    GEORGIA
[Date]                              [City]                      [State]

2360 Hickory Station Circle, Snellville, GA  30078

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 271,330.00          (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is USAA Federal Savings Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of          6.750 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st          day of each month beginning on October 01, 2006          . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal. If, on September 01, 2036          , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at Attn: Payment Processing, P.O. Box 205, Waterloo, IA
50704-0205          or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $          1,759.84 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment
to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of
the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless
the Note Holder agrees in writing to those changes.

702113416                                                                      608146252

MULTISTATE FIXED RATE NOTE-Single Family

US5N (0104)
        VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                    Initials:

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

702113416

608146282

## 10. APPLICABLE LAW

Lender is a federally chartered savings bank governed, in part, by the Home Owner's Loan Act of 1933 and the rules and regulations promulgated pursuant thereto (the "Act"). To the extent permitted by the Act, this Note will be governed by applicable federal law and by the interest rate and usury provisions of the state of Texas.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Alfredia Pruitt                          -Borrower                                                -Borrower


_____ (Seal)          _____ (Seal)
                                         -Borrower                                                -Borrower


_____ (Seal)          _____ (Seal)
                                         -Borrower                                                -Borrower

Pay to the Order of

without recourse

USAA Federal Savings Bank _____ (Seal)          _____ (Seal)
By_____                 -Borrower                                                -Borrower
Name Heather Galida
Title Processing Supervisor

                                                                              [Sign Original Only]

702113416                                                                                608146252

US6N (0104)                          Page 3 of 3

Exhibit D

12-12020-mg    Doc 3354-2    Filed 04/04/13    Entered 04/04/13 15:11:50    Appendix
Exhibits 1-H through 1-O    Pg 54 of 152    Exhibit B

onsor & Associates
Reporting and Transcription Inc

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2008 CA 040805XXXX MB

GMAC MORTGAGE, LLC,

      Plaintiff,

-vs-

████████████████████████

███████████████████

UNKNOWN TENANT (S) IN
POSSESSION OF THE SUBJECT
PROPERTY,

      Defendants.

_____

DEPOSITION OF JEFFREY STEPHAN

Thursday, December 10, 2009
1:00 p.m. - 2:30 p.m.

Consor & Associates
1655 Palm Beach Lakes Blvd., Ste. 500
West Palm Beach, Florida 33401

Reported By:
Jamie Reynolds Bentley, Court Reporter
Notary Public, State of Florida
Consor & Associates
1655 Palm Beach Lakes Blvd., Suite 500
West Palm Beach, Florida 33401
(561)682-0905

onsor & Associates

Reporting and Transcription Inc

Page 2

```
 1      APPEARANCES:
 2      On behalf of the Plaintiff:
 3           ALEJANDRA ARROYAVE, ESQ.
             Lapin & Leichtling
 4           225 Alahamra Circle
             Suite 800
 5           Coral Gables, Florida 33134
             (305) 569-4100
 6
 7
 8      On behalf of the Defendant:
 9           CHRISTOPHER IMMEL, ESQ.
             Ice Legal, P.A.
10           1975 Sansbury's Way
             Suite 104
11           West Palm Beach, Florida 33411
             (561) 798-5658
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

onsor & Associates

Reporting and Transcription, Inc

Page 3

```
1                               -  -  -
2                           I N D E X
3                               -  -  -
4
5     WITNESS:            DIRECT      CROSS       REDIRECT    RECROSS
6     JEFFREY STEPHAN
      BY MR. IMMEL            4                                   54
7
      JEFFREY STEPHAN
8     BY MS. ARROYAVE                     51
9
10                              -  -  -
11                       E X H I B I T S
12                              -  -  -
13
      NUMBER                                   PAGE
14
15    DEFENDANT'S  EX. A                   17
      DEFENDANT'S  EX. B                   24
16    DEFENDANT'S  EX. C                   26
      DEFENDANT'S  EX. D                   30
17    DEFENDANT'S  EX. E                   32
      DEFENDANT'S  EX. F                   33
18    DEFENDANT'S  EX. G                   37
      DEFENDANT'S  EX. H                   37
19    DEFENDANT'S  EX   I                  38
      DEFENDANT'S  EX. J                   40
20    DEFENDANT'S  EX. K                   41
      DEFENDANT'S  EX. L                   44
21    DEFENDANT'S  EX. M                   46
      DEFENDANT'S EX.  N                   49
22
23
24
25
```

Onson & Associates

Reporting and Transcription Inc

Page 4

1                    P R O C E E D I N G S

2                           - - -

3        Deposition taken before Jamie Reynolds Bentley, Court

4   Reporter and Notary Public in and for the State of Florida

5   at Large, in the above cause.

6                           - - -

7             THE COURT REPORTER: Do you swear or affirm that

8        the testimony you are about to give will be the truth,

9        the whole truth and nothing but the truth?

10            THE WITNESS:  I do.

11  Thereupon,

12                    (JEFFREY STEPHAN)

13  having been first duly sworn or affirmed, was examined

14  and testified as follows:

15                    DIRECT EXAMINATION

16  BY MR. IMMEL:

17       Q.    All right.  We are here on GMAC Mortgage, LLC

18  versus ████.  This is the deposition of Jeffrey Stephan.

19  I'm sure your attorney has gone over things with you a

20  little bit.  But if you could just keep one thing in

21  mind, to answer, not to simply nod your head or anything

22  like that.  We need for your answers to be clear for the

23  court reporter that way.

24       A.    Yes.

25       Q.    Could you please state your name for the

onsor & Associates

Reporting and Transcription Inc

Page 5

1    record.

2         A.    My name is Jeffrey Stephan.

3         Q.    Okay.  And who do you work for?

4         A.    GMAC, LLC.

5         Q.    And is there a difference between GMAC, LLC

6    and GMAC Mortgage, LLC?

7         A.    GMAC, LLC -- I'm trying to think of the word

8    to use -- the most recent name.

9         Q.    Okay.

10        A.    It's GMCA Mortgage Corporation.

11        Q.    Okay.

12        A.    I'm not sure how you would word that.

13        Q.    Okay.  So are they -- does GMAC, LLC -- now

14    has that basically taken over these other entities --

15        A.    Yes.

16        Q.    -- that formerly existed?

17        A.    Yes.

18        Q.    So these entities no longer currently exist?

19        A.    Right.

20        Q.    Okay.  And how long then have you been

21    employed by GMAC, LLC?

22        A.    Five years.

23        Q.    Okay.  And prior to that, it was GMAC Mortgage

24    and GMAC Corporation?

25        A.    That was as the whole five years.

onsor & Associates

Reporting and Transcription Inc

Page 6

1        Q.   Oh, okay.

2        A.   Yes.

3        Q.   As the whole five years.  And what is your

4    title?

5        A.   I'm a team leader in the foreclosure

6    department.

7        Q.   Okay.  And what are your responsibilities?

8        A.   I am the team lead of the document execution

9    unit.

10       Q.   Okay.

11       A.   And also the service transfer unit.

12       Q.   And so what type of documents do you

13   ordinarily execute?

14       A.   I execute on a daily basis assignments of

15   mortgage, affidavits of any type that might be needed,

16   deeds.  Any type of the document that would need a

17   signature of an officer of GMAC.

18       Q.   Okay.  And who do you report to?

19       A.   I report to Margie Kwiatanowski.

20       Q.   Could you spell that?

21       A.   Yes.  It's K-W-I-A-T-A-N-O-W-S-K-I.

22       Q.   Okay.  And approximately how many employees

23   does GMAC Mortgage, LLC have?

24       A.   I couldn't guess.  I don't know.

25       Q.   Sure.  Okay.  And as part of your

onsor & Associates

Reporting and Transcription, Inc

Page 7

1    responsibilities, you execute assignments as a vice

2    president of MERS?

3         A.    Yes, that's correct.

4         Q.    And in executing affidavits as a vice

5    president, do you receive any compensation from MERS?

6         A.    No.

7         Q.    Have you had any training from MERS?

8         A.    No.

9         Q.    Okay.  How many documents would you say you

10    sign on an average week as far as executing affidavits

11    and things of that nature?

12         A.    It's very tough to estimate that to be honest

13    with you.

14         Q.    In a given month, would that be easier to say

15    --

16         A.    I would say --

17         Q.    -- one hundred, 500?

18         A.    -- in a month, my team brings to me

19    approximately, I'd say a round number of 10,000.  That's

20    just an estimate, of course.

21         Q.    Okay.  And so, 10,000 your team brings to you.

22    How many people do you oversee?

23         A.    A team of 13 people.

24         Q.    Okay.  Now, would these people be given the

25    duties of actually preparing the documents that you

onsor & Associates

Reporting and Transcription Inc

Page 8

1    ultimately sign and execute?

2         A.   They would review the document that is given

3    to them through our computer systems.

4         Q.   Okay.

5         A.   So they don't actually prepare it per se.

6    They review it for the accuracy of what type of entity

7    I'm signing as.

8         Q.   Okay.  How many different entities do you sign

9    as?

10             MS. ARROYAVE:  Objection:  Form.

11   BY MR. IMMEL:

12        Q.   Can you name what entities you sign --

13        A.   I sign presently as MERS.

14        Q.   Okay.

15        A.   And under MERS as vice president or an

16   assistant secretary.  Also, I sign for GMAC Mortgage.

17   And to be honest with you, it's too many entities for me

18   to actually quote under GMAC.  But it is as a limited

19   signing officer.

20        Q.   Okay.  And earlier you stated that right now

21   it's GMAC, LLC.

22        A.   Uh-huh.

23        Q.   You do still currently sign documents as GMAC

24   Mortgage, LLC?

25        A.   Yes, I do.

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

onsor & Associates

Reporting and Transcription Inc

Page 9

1          Q.    Okay.  And also as a corporation --

2          A.    Yes.

3          Q.    -- and some of the others that we've seen your

4     signature on?

5          A.    Yes, I do.

6          Q.    Okay.  Where then does the information that

7     goes into the system that your team reviews --

8          A.    Yes.

9          Q.    -- where does that information come from?

10          A.    The process that we use is -- and this is to

11     my knowledge -- a file is referred to a foreclosure

12     attorney stating exactly what entity would be needed

13     through the referral unit.  And at that point, the

14     attorney receives the file to proceed with the

15     foreclosure.  That foreclosure name is generated upon

16     GMAC supplying it on the referral.  I'm not 100 percent

17     sure of what that process is.

18          Q.    Okay.

19          A.    The documentation, as you stated, that you're

20     asking about, is given to us after the attorney has been

21     instructed on what name to foreclose in.

22          Q.    And who instructs the attorney as to what name

23     to foreclose it in?

24          A.    It comes to our referral unit.  Which is

25     another process to my knowledge.

onsor & Associates

Reporting and Transcription Inc

Page 10

1      Q.    Okay.  Approximately, if 10,000 are signed in

2   a given month, you know, on an average, how long would

3   you say you spend executing each one and actually

4   signing?

5      A.    It's tough to say.

6      Q.    Okay.  Would it be accurate to say that when

7   these documents have been presented to you by your team

8   --

9      A.    Uh-huh.

10     Q.    -- you take the face value that they are --

11  they have been checked by your team?

12     A.    That would be a correct statement, yes.

13     Q.    So these documents wouldn't be actually

14  executed on your own personal knowledge?

15     A.    Right.

16     Q.    It would be based on knowledge that came

17  through --

18     A.    Right.

19     Q.    -- the chain --

20     A.    I'm sorry.

21         MS. ARROYAVE:  Can I interrupt just for a

22         second?  I just want to make sure that he finishes

23         his question before you answer.

24         THE WITNESS:  Sure.  Sorry.

25

onson & Associates

Reporting and Transcription Inc

Page 11

1    BY MR. IMMEL:

2         Q.    Yes, yes, that's true, too.

3              So the information that your team obtains

4    isn't based on their personal knowledge either, it's

5    located within the computer networks?

6              MS. ARROYAVE:  Objection: Form.

7    BY MR. IMMEL:

8         Q.    The information on the documents that you

9    execute is stored within your data base?

10        A.    No, somewhere else.

11        Q.    No.  Okay.  The information then is that --

12   your team, they get that from a computer network that

13   you have, correct?

14        A.    No.

15        Q.    Where does your team get that information?

16        A.    That information is first given to the

17   attorney to foreclose under which name as needed.  If we

18   are stating some type of assignment, for example, the

19   attorney, to my knowledge, and I'm not 100 percent sure

20   of their process because I don't work for the attorney,

21   they would do a title check to verify what name the lien

22   is presently in.

23        Q.    Okay.

24        A.    At that point is when it would initial if an

25   assignment would be needed or not.

onsor & Associates

Reporting and Transcription, Inc.

Page 12

1        Q.    So at the direction of the attorney, your team

2    creates these documents and then you execute them?

3            MS. ARROYAVE:  Objection:  Form.

4    BY MR. IMMEL:

5        Q.    So your team executes documents at the request

6    of attorneys?

7            MS. ARROYAVE:  Objecting:  Form.  You can

8            still answer it if you understand the question.

9    BY MR. IMMEL:

10        Q.    Do you understand what I'm asking?

11        A.    Yes, I understand what you're asking.  My team

12    does not create any documents.

13        Q.    These documents are then sent from the

14    attorney?

15        A.    Yes.

16        Q.    Okay.  And you're -- so then the team that you

17    oversee --

18        A.    Uh-huh.

19        Q.    -- simply reviews them for accuracy?

20        A.    That's correct.

21        Q.    Okay.  And how do they verify the information

22    is accurate?

23        A.    They do not go into the system and verify the

24    information as accurate.  We are relying on our attorney

25    network to ensure that they are asking for the correct

onsor & Associates

Reporting and Transcription, Inc

1    information.

2        Q.   So the attorney creates these documents and

3    you are relying that the attorney is correct?

4        A.   Yes.

5            MS. ARROYAVE:  Objection:  Form.

6    BY MR. IMMEL:

7        Q.   Okay.  And then they are required to be

8    notarized.  Are they notarized in your office?

9        A.   Yes.

10       Q.   Is the notary present with you or is it down

11   the hall?

12       A.   The notary is in the same department.

13       Q.   Same department.  Okay.  Are they physically

14   present when you (sic) notarize this -- or when they

15   notarize and then you execute it?

16       A.   No, they are not physically present.  But I

17   will -- I do deliver them to the notary.

18       Q.   All right.

19       A.   And I wait for them to notarize it to hand

20   them back to my team.

21       Q.   Okay.  All right.  What department then?  You

22   said your department?

23       A.   Right.

24       Q.   And as part of their job responsibilities,

25   would notarizing be their sole responsibility, or do

onsor & Associates

Reporting and Transcription Inc

1    they have other responsibilities?

2        A.    They have other responsibilities.

3        Q.    Are any of the members of your team, people

4    that also notarize documents that you execute?

5        A.    Yes.

6        Q.    Yes.  Okay.  Is there a job requirement that

7    certain employees become notaries?

8        A.    I don't know.

9        Q.    Okay.  And what type of -- what level of a

10   type of employee would it typically be that is a notary?

11       A.    I don't know that either.

12       Q.    All right.  Does the company pay for the

13   process of becoming a notary or the renewal fees?

14       A.    Yes.

15       Q.    Okay.  If a notary feels that they are being

16   asked to notarize something that's done improperly, is

17   there a process which they can, you know, raise that to

18   anybody's attention?

19       A.    I honestly don't know.

20       Q.    You are not sure.  Do you notarize any

21   assignments of mortgage or other documents yourself?

22       A.    No.

23       Q.    Are you a notary?

24       A.    No.

25       Q.    How are witnesses ordinarily chosen?

onsor & Associates

Reporting and Transcription Inc

Page 15

1          MS. ARROYAVE:  Object:  Form.

2          Chosen for what?

3    BY MR. IMMEL:

4          Q.   The witnesses to, say, the assignments of the

5    mortgage, and the witnesses of things that you execute.

6          A.   They are just chosen randomly.

7          Q.   Chosen randomly.  Okay.  Approximately how

8    many days a week do you spend executing assignments,

9    affidavits, and the various documents that you execute?

10         A.   Five.

11         Q.   Five.  Okay.  Are there any specific days

12   where it's one day these types of documents, this type

13   of documents, or can it be just a mix?

14         A.   It's a mix.

15         Q.   Okay.  Approximately how many documents would

16   you say are presented to you by your team at a given

17   time?  Is it one at a time, or ten at a time?

18         A.   It is done in bulk.

19         Q.   Done in bulk.

20         A.   I could not quote you the exact number.

21         Q.   Okay.  Going back to the signing officer as

22   Mortgage Electronic Registration Systems, you said that

23   you are -- you sign as both vice president and as an

24   assistant secretary?

25         A.   That is correct.

onsor & Associates

Reporting and Transcription Inc

Page 16

1       Q.    Is there any basis for one -- you sign as one

2    versus the other?

3       A.    The majority of the time I sign as a vice

4    president.  Most times we do not need an assistant

5    secretary, unless they are asking for a second signature

6    on any type of an affidavit or assignment.

7       Q.    Okay.  And, again, you are not paid by MERS.

8    Do you hold any other responsibilities with MERS that

9    would be consistent with having the title of a vice

10   president?

11      A.    No.

12      Q.    No.  Okay.  So you don't attend any board

13   meetings for MERS?

14      A.    No.

15      Q.    You don't report to the secretary of MERS or

16   any other people at MERS?

17      A.    No.

18      Q.    How did you become a MERS representative?  Did

19   you request to be a vice president of MERS?

20      A.    I received the responsibility as being the

21   team lead for document executing.  It was assigned to me

22   by our legal area.

23      Q.    Okay.  All right.  So your responsibilities as

24   a vice president of MERS to execute the assignments is

25   really your job perspective, or an aspect of your job at

onson & Associates

Reporting and Transcription Inc

Page 17

1    GMAC Mortgage, LLC or GMAC, LLC?

2         A.   That is correct.

3         Q.   Okay.  And you've never been to any MERS

4    offices or their headquarters?

5         A.   No.

6         Q.   Are you aware of why you were given the title

7    of vice president versus assistant secretary or...

8         A.   No, I'm not aware of that.

9         Q.   Okay.  All right.  I have here the assignment

10   of mortgage which you executed in this case.

11        A.   Okay.

12             MR. IMMEL:  I'll enter that as Exhibit A.

13             (Defendant's Exhibit Letter A  was marked for

14        identification.)

15             MR. IMMEL:  I have a copy for you, as well.

16             THE WITNESS:  Thank you.

17   BY MR. IMMEL:

18        Q.   In the top left-hand corner it says, Record

19   and return to offices of Marshall C. Watson.

20             Based on your earlier statements, it's

21   accurate to say that attorneys at Marshall C. Watson

22   created the information on this document?

23             MS. ARROYAVE:  Objection:  Form.

24             THE WITNESS:  That would be correct.

25

onson & Associates

Reporting and Transcription, Inc

Page 18

1   BY MR. IMMEL:

2        Q.   Okay.  And who -- so an attorney chose the

3   date of the 4th day of March, 2009.

4             Can you tell me the date actually.  Whether

5   that's the 3rd or the 5th of March.

6        A.   To me it seems to be the 5th.

7        Q.   Okay.

8        A.   Actually, excuse me, let me change that.  It

9   would have to be the 3rd, because the notary did it on

10  the 4th.

11       Q.   Okay.  And that is your signature on this

12  document?

13       A.   That is correct.

14       Q.   Okay.  Is it commonplace then for the notary

15  to notarize a document the day after you've apparently

16  executed it?

17            MS. ARROYAVE:  Objection:  Form.

18            THE WITNESS:  I would say, yes, it would be

19            common.

20  BY MR. IMMEL:

21       Q.   Okay.  So typically when you hand these off to

22  the notary, and then they kind of catch up?

23       A.   Uh-huh.  Yes.

24       Q.   Okay.  The witnesses, Heather Reinhart, do you

25  know her personally?

onsor & Associates
Reporting and Transcription Inc

Page 19

1        A.   Yes, she is one of my employees.

2        Q.   Is she on your team?

3        A.   Yes.

4        Q.   Is it possible that she would have been one of

5    the people who reviewed this for accuracy?

6        A.   That is possible.

7        Q.   And the other person appears to be Tyra

8    Wilks --

9        A.   Wilson.

10       Q.   Tyra Wilson.  Okay.  Is she also a member of

11   your team?

12       A.   Yes.

13       Q.   And you know her personally, as well?

14       A.   Yes.

15       Q.   The notary, Susan Turner, is she a member of

16   your team?

17       A.   No, she is not.

18       Q.   Do you know her personally?

19       A.   Yes.

20       Q.   It says here that you personally appeared

21   before her on the 4th day of March.  Is it possible that

22   you executed then on the 3rd, and handed it to her and

23   then you weren't personally in front of her at the time

24   she notarized this?

25       A.   I don't know.  I can't recollect.

onsor & Associates

Reporting and Transcription, Inc

Page 20

1        Q.    All right.  And how did you determine on this

2    to execute it to GMAC Mortgage, LLC?

3                MS. ARROYAVE:  Objection:  Form.

4                THE WITNESS:  I'm not sure if I understand the

5        question.

6    BY MR. IMMEL:

7        Q.    Okay.  Did you have any say in the creation of

8    who MERS would assign this to?

9        A.    No.

10       Q.    No.  Your attorney, the Law Office of Marshall

11   C. Watson, determined that?

12       A.    No.

13       Q.    No.

14       A.    That is, as I stated earlier, when the

15   foreclosure referral goes out, the referral unit

16   determines what entity they should be foreclosing on.

17       Q.    Okay.  And the foreclosure referral unit that

18   you speak of, is that part of your department?

19       A.    Yes.

20       Q.    Okay.  So would they have records that they

21   are able to refer to to determine who the new mortgagee

22   should be according to these assignments?

23       A.    Yes.

24       Q.    And who -- do you have a name of any person

25   that keeps those documents?

onsor & Associates

Reporting and Transcription Inc

Page 21

```
 1        A.    The team lead for that would be Brenda.

 2        Q.    Brenda?

 3        A.    Her last name is Staehle, S-T-A-E-H-L-E.

 4        Q.    Okay.

 5        A.    I think that's the way it's spelled.

 6        Q.    Can you tell me -- you really don't have any

 7   knowledge or information as to who should be the

 8   mortgagee?  According to this document, you take it for

 9   face value; is that correct?

10             MS. ARROYAVE:  Objection:  Form.

11             THE WITNESS:  Can you explain that further?

12   BY MR. IMMEL:

13        Q.    You take it for face value that GMAC Mortgage,

14   LLC is expected to be the mortgagee?

15             MS. ARROYAVE:  Objection:  Form.

16   BY MR. IMMEL:

17        Q.    Who would have information who -- who MERS

18   should assign this to?  Would it be you or Brenda

19   Staehle?

20        A.    Brenda Staehle would be the individual or her

21   team to refer the files, and they determine what name

22   should be foreclosing in.

23        Q.    Okay.  So everything from that point on is

24   based on the presumption that her team has ascertained

25   those things to be correct?
```

onsor & Associates

Reporting and Transcription Inc

Page 22

1          A.   That is correct.

2               MS. ARROYAVE:  Objection:  Form.

3     BY MR. IMMEL:

4          Q.   All right.  Okay.  So on March 5th, 2009,

5     you're not aware --

6          A.   I believe it's the 3rd.

7          Q.   March 3rd.  I'm sorry.  March 3rd, 2009,

8     you're not aware of any physical transfer of the

9     mortgage?

10         A.   Can you rephrase that?  I'm not following.

11         Q.   Are you aware of any reason why the assignment

12    of mortgage had to be executed on March 5th, 2009 -- or

13    the 3rd, 2009?  I'm sorry.

14         A.   We have a process that's set up with our

15    attorney network.  And Marshall Watson is in that

16    attorney network.  The file is referred to them with a

17    certain name to proceed with the foreclosure in.  They

18    will pull title.  And whatever they see title is in, in

19    order to proceed in the proper name, they need to get an

20    assignment.  In this instance it's MERS to GMAC.

21         Q.   Okay.  Are the assignments supposed to be

22    completed prior to the filing of the foreclosure

23    lawsuit?

24              MS. ARROYAVE:  Objection:  Form.

25

onsor & Associates

Reporting and Transcription, Inc

Page 23

1    BY MR. IMMEL:

2        Q.    Are you aware if it's a company policy at

3    least?

4        A.    I don't know.

5        Q.    Okay.  So as this assignment of mortgage, on

6    the face of it, transfers from Mortgage Electronic

7    Registration Systems as nominee for Mortgage Investors

8    Corporation to GMAC Mortgage, LLC on March 3rd, 2009,

9    would it be accurate to say that prior to that, this

10   assignment, Mortgage Electronic Registration Systems was

11   the mortgagee?

12       A.    No.

13       Q.    No.  Okay.  Why would that not be accurate to

14   say?

15       A.    Mortgage Electronic Registration, to my

16   knowledge, is an origination entity to allow the passing

17   of assignments through performing loans to make it more

18   easier, I guess you would say, to transfer amongst

19   different companies.  MERS does not own loans.

20       Q.    They wouldn't own the loan.  But they would

21   own the mortgage; is that correct?

22            MS. ARROYAVE:  Objection:  Form.

23            THE WITNESS:  It's not correct, no.

24   BY MR. IMMEL:

25       Q.    No.  So they are the named mortgagee, so that

onsor & Associates

Reporting and Transcription. Inc

Page 24

1     when the note is passed from entity to entity it doesn't

2     have to be rerecorded?

3         A.    That is to my knowledge, yes.

4         Q.    All right.  On this it also says that MERS is

5     assigning the mortgage together with the note.  I don't

6     know if you see that line there.  It's right there

7     (indicating).

8               As you just stated, MERS has no interest in

9     the note ever; is that correct?

10        A.    I honestly don't know.

11        Q.    Oh, okay.  As far as you're aware --

12        A.    Yes.

13        Q.    -- MERS doesn't --

14        A.    As far as I'm aware.  (Witness nods head.)

15        Q.    Okay.  Are you aware of whether that's common

16    language to exist in the assignments that you execute?

17        A.    I honestly don't know.

18        Q.    You're not sure.  Okay.  All right.

19              MR. IMMEL:  And I have a copy of the first

20        page of the mortgage here.  Which I'll enter as

21        ExhibitB.

22              (Defendant's Exhibit Letter B was marked for

23        identification.)

24    BY MR. IMMEL:

25        Q.    If you will notice it says that the mortgagee

onsor & Associates

Reporting and Transcription Inc

Page 25

1        according to the mortgage is Mortgage Electronic

2        Registration Systems.

3                I believe it's right down there (indicating).

4        A.    I disagree with that interpretation.

5                MS. ARROYAVE:  Was there a question?

6                MR. IMMEL:  Yes.

7                MS. ARROYAVE:  What was the question?

8        BY MR. IMMEL:

9        Q.    According to the mortgage, it says that MERS

10       is the mortgagee?

11       A.    My interpretation, it says right in the same

12       paragraph, it says they are a nominee for the lender or

13       the lender successors.

14       Q.    Right.  Okay.  They are the mortgagee as

15       nominee --

16       A.    Uh-huh.

17       Q.    --  for the lenders?

18       A.    Yes.

19       Q.    Okay.  But they are a different entity from

20       the lender and lender successors and things?

21       A.    Yes.

22       Q.    Okay.  What does nominee in that regards mean?

23       A.    I don't know.

24       Q.    Okay.  We can move on from there.

25                I have here -- which I'll enter as Exhibit

onsor & Associates

Reporting and Transcription Inc

Page 26

1    C -- some discovery that we received from MERS.

2              (Defendant's Exhibit Letter C was marked for

3         identification.)

4    BY MR. IMMEL:

5         Q.   And if you will turn to the second page.  It

6    is the document entitled, Min Summary.

7              And have you ever seen these records before?

8         A.   No, I have not.

9         Q.   So in executing the assignments of mortgage on

10   behalf of MERS, do you consult any of MERS' records?

11        A.   No.

12        Q.   And you are not able to tell me what any of

13   these entries would then mean?  This is the first time

14   you have seen this type of information?

15        A.   In this format, yes.

16        Q.   Okay.  Have you seen this type of information

17   in other formats?

18        A.   Some of it.  I understand what they mean as

19   far as the acronyms in there.

20        Q.   Okay.  Based on your understanding, the

21   investor says -- the investor is identified as

22   Government National Mortgage Association - Ginnie Mae.

23   What does the word "investor" mean in MERS' acronym?

24   Are you aware?

25        A.   I'm not sure how I can explain it.  GMAC would

onsor & Associates

Reporting and Transcription Inc

Page 27

1    be the holder and the owner of the mortgage.  GMAC would

2    be the investor who is in the organization that

3    contributed the fund.  That's really the only way I can

4    explain the relationship of an investor and servicer.

5        Q.   Okay.

6        A.   But that's only to my knowledge.  I mean, I

7    don't work in that fashion.

8        Q.   Okay.  So the servicer is supposed to take on

9    the day-to-day activities of administering the mortgage

10   of loan and collecting payments and so forth?

11       A.   That would be correct.

12       Q.   And they do that on behalf of the investor who

13   loaned the monies?

14       A.   Yes.

15       Q.   Okay.  And any monies that are received from

16   the servicers, would they really be for the investor

17   then to pay him back the loan?

18       A.   I don't know.

19       Q.   Okay.  And as custodian, also, that would mean

20   that they are in possession of the mortgage file,

21   essentially, the note and any other applicable

22   documents?

23       A.   That's correct.

24       Q.   Okay.  All right.  Where it has the pool

25   number and it is blacked out.  Do you know what the pool

onsor & Associates

Reporting and Transcription Inc

Page 28

1    number refers to?

2         A.    No, I don't.

3         Q.    No.  Okay.  And what about the investor loan

4    number?

5         A.    Yes, I understand what that is.

6         Q.    And what would that relate to?

7         A.    Every investor would have their own loan

8    number.  The same as GMAC would have their own loan

9    number to classify the different files.

10        Q.    Okay.  And are you aware of how a mortgage

11   that has been securitized, a mortgage note that's been

12   securitized, would be reflected on something like this,

13   on this summary?

14        A.    I am not familiar.

15        Q.    You are not familiar.  Okay.  Are you aware of

16   anyone at GMAC Mortgage, LLC that has access to these

17   MERS documents and records?

18        A.    No, I'm not.

19        Q.    You are not aware.  Okay.  Are you aware of

20   anybody at GMAC that would have a responsibility to

21   update the MERS documentation?

22        A.    No.

23        Q.    Okay.  So the various individuals at GMAC that

24   execute assignments on behalf of MERS have no

25   responsibility to update the MERS' system that they had

onsor & Associates

Reporting and Transcription Inc

Page 29

1    actually done those assignments or anything like that?

2            A.    That would be correct.

3            Q.    Okay.  Are you aware then of how the MERS'

4    system is updated?

5            A.    No.

6            Q.    Okay.  As a vice president, do you owe a

7    fiduciary duty to the original lender to ensure that the

8    mortgage is assigned to the proper entity?

9                MS. ARROYAVE:  Objection: Form.

10               THE WITNESS:   I actually don't understand your

11               question.

12    BY MR. IMMEL:

13            Q.    Do you own any duty to the -- when you assign

14    these mortgages, you execute them as -- for MERS as

15    nominee for a particular entity, correct?

16            A.    That would be correct.

17            Q.    Do you owe any responsibility then to that

18    particular entity that MERS is nominee for to ensure

19    that the mortgage is transferred to the new correct

20    entity?

21            A.    I don't know.

22            Q.    Okay.  All right.

23               MR. IMMEL:  I have the corporate resolution

24               here.  Which I'll enter it as Exhibit D.

25

onsor & Associates

Reporting and Transcription Inc

Page 30

1          (Defendant's Exhibit Letter D was marked for

2     identification.)

3  BY MR. IMMEL:

4     Q.    Have you seen this document before?

5     A.    Yes, I have.

6     Q.    When was the first time you saw it?

7     A.    I'm sorry, I can't say.  I don't recollect.

8     Q.    You're not sure.  Is it fair to say it was

9  quite a while ago?

10     A.    Yes.

11     Q.    Did you have any role in creating it or

12  negotiating it?

13     A.    No, I did not.

14     Q.    No.  Okay.  The first paragraph says that you

15  are authorized to assign a lien of any mortgage loan

16  registered on the MERS register to the member.

17          Who would be the member according to this?

18  Would that be GMAC Mortgage, LLC?

19     A.    I don't know.

20     Q.    Okay.  Assign the lien, in paragraph 2, of any

21  mortgage loan naming MERS as the mortgagee when the

22  member is also the current promissory note-holder, or if

23  the mortgage loan is registered on the MERS system, is

24  shown to be registered to the member.

25          When you are assigning liens, you already

onsor & Associates

Reporting and Transcription Inc

Page 31

1    stated that you don't consult with any of the MERS

2    records to determine whether or not it's registered to

3    who -- whoever?

4            MS. ARROYAVE:  Objection:  Form.  Asked and

5        answered.  Mischaracterization of prior testimony.

6    BY MR. IMMEL:

7        Q.   Okay.  You don't consult MERS system when

8    assigned these liens?

9        A.   Yes.

10           MS. ARROYAVE:  Asked and answered.

11   BY MR. IMMEL:

12       Q.   All right.  Okay.  But is it fair to say that

13   you don't ascertain whether the member is the current

14   promissory note-holder when you assign the lien?

15       A.   That would be correct.

16       Q.   And you also don't know if the mortgage loan

17   is registered on the MERS system?

18       A.   We are relying on our attorney network when

19   they check the title --

20       Q.   Okay.

21       A.   -- to verify what title it is presently in.

22   If it is MERS, we would sign for MERS.

23       Q.   Okay.

24           MR. IMMEL:  Exhibit E.

25

onsor & Associates
Reporting and Transcription Inc

Page 32

1          (Defendant's Exhibit Letter E was marked for

2      identification.)

3   BY MR. IMMEL:

4      Q.   Here is the GMAC Mortgage, LLC certificate of

5   assistant secretary.  Here you go.

6          And you are considered a limited signing

7   officer giving you basically the same responsibility as

8   a junior officer?

9          MS. ARROYAVE:  Objection:  Form.

10         THE WITNESS:  I don't know if that's a correct

11     statement.

12  BY MR. IMMEL:

13     Q.   Okay.  Are you familiar with this document?

14     A.   I have a copy of this document.  Which to my

15  recollection means that next to my name it gives me the

16  authority to sign for GMAC and its entities as a limited

17  signing officer.

18     Q.   Okay.  In this case, you also filed an

19  affidavit of lost original document?

20         MS. ARROYAVE:  Objection:  Form.

21  BY MR. IMMEL:

22     Q.   Okay.  And you executed this document.  Is

23  this your signature?  Here is a copy of it.

24         MR. IMMEL:  I'll enter this as Exhibit F, I

25     believe.

onsor & Associates

Reporting and Transcription Inc

Page 33

1          (Defendant's Exhibit Letter F was marked for

2      identification.)

3          THE WITNESS:  Yes, that is my signature.

4   BY MR. IMMEL:

5      Q.   Okay.  And you signed this affidavit claiming

6   that at the time plaintiff was not presently in custody

7   or control of plaintiff or any of plaintiff's agents,

8   and that would be the note that was not in your -- their

9   custody or control?

10     A.   Yes.  Once again, we have a process in place

11  where if our attorney needs an original document, they

12  open up a request in our system.  At that time, we have

13  another unit -- which is not located in Pennsylvania

14  where I am located -- contact custodians, contact their

15  own records, go to different investors.  They do not do

16  an affidavit of this fashion unless they've exhausted

17  all efforts.

18     Q.   Okay.  Would it be fair to say that you're not

19  involved in any of those efforts?

20     A.   That is fair to say.

21     Q.   Okay.  Why then do they ask you to execute the

22  affidavit of lost document -- lost original document?

23     A.   They asked me to execute this for the

24  foreclosure department.  Because after conversations

25  between the attorney and this other department, they

onsor & Associates

Reporting and Transcription Inc

Page 34

1   determine that it is not available.  I am the

2   foreclosure team lead that handles document execution.

3        Q.   Okay.  So would it be accurate to say that the

4   department that actually searches for the lost note

5   would have a better understanding of why it's lost and

6   where the search occurred?

7        A.   That is a fair statement.

8        Q.   Okay.  It says that the copy of said note

9   attached to the complaint is a true and correct and

10  substantial copy of the lost or destroyed note.

11        Do you review any documents before executing

12  the affidavits of lost original documents?

13        A.   No, I do not.  I review this.  Let me change

14  this.  Excuse me.  I do review this.  However, I do not

15  review any documents.  I rely, once again, on my

16  attorney network who is requesting the document, and

17  communications between the departments to determine if

18  it's -- if a lost affidavit is needed.

19        Q.   Okay.  So the portion that sets claims in

20  paragraph 1:  Affiant has custody and personal knowledge

21  of the account pertaining the original mortgage loan

22  instruments.  Affiant has actual and personal knowledge

23  of the facts stated herein and is authorized to make

24  this affidavit.  Would that be accurate?

25        A.   Yes, that is accurate.

onsor & Associates
Reporting and Transcription Inc

Page 35

1        Q.    You being the affiant have custody and

2    personal knowledge of the account pertaining to the

3    original mortgage loan instruments?

4            MS. ARROYAVE:  Object to the form.  Go ahead.

5            THE WITNESS:  I do not have the specific

6            knowledge to this one account.  But I understand

7            what the other department does in general to try to

8            locate these documents.

9    BY MR. IMMEL:

10        Q.    Okay.  All right.  And so in this particular

11    case, the -- there was no note attached to the

12    complaint.  You would have no way of ascertaining that

13    because you don't actually review?

14        A.    That, once again, is determined by our

15    attorneys' office.

16        Q.    Okay.  I'm going to just -- I have a

17    substantial copy of the complaint.  And just to show

18    that there is no note attached to it, that was the

19    original filing of the complaint.

20            You have never reviewed that, nor do you

21    review any other note to determine whether it is, in

22    fact, a true, correct and substantial copy of the lost

23    or destroyed note?

24            MS. ARROYAVE:  Objection:  Form.

25            THE WITNESS:  Can you rephrase that for me?  I

onsor & Associates

Reporting and Transcription, Inc

Page 36

1           don't completely follow what you are saying.

2       BY MR. IMMEL:

3           Q.   When you execute the affidavit of lost

4       original document, and make the claim that you've seen a

5       copy of the note that is attached and that's a

6       substantial copy, you really have no basis for making

7       that claim.

8               THE WITNESS:   I'm still not following.

9               MS. ARROYAVE:   Objection:   Form.

10      BY MR. IMMEL:

11          Q.   When the complaint in this case was filed,

12      there was no note attached to the complaint, correct?

13          A.   From what you have just handed to me, there is

14      no note.

15          Q.   Okay.   Based on what I've provided you.

16          A.   Yes.

17          Q.   Do you normally review notes to make sure that

18      they are a true copy of the lost note?

19              MS. ARROYAVE:   Objection:   Form.

20              THE WITNESS:   That is -- no, I do not.   It is

21          not in my position.

22      BY MR. IMMEL:

23          Q.   It's not in your position.

24              MR. IMMEL:   All right.   I guess I can enter

25          this a Exhibit G.

onsor & Associates

Reporting and Transcription Inc

Page 37

1              (Defendant's Exhibit Letter G was marked for

2         identification.)

3    BY MR. IMMEL:

4         Q.    And going back, just for a second, to the lost

5    note affidavit.  That is your signature?

6         A.    Yes, that's correct.

7         Q.    And your understanding is that the attorney

8    representing -- from your network drafts this?

9         A.    That is correct.

10        Q.    Okay.

11             MR. IMMEL:  This is going to be Exhibit H.

12             (Defendant's Exhibit Letter H was marked for

13        identification.)

14   BY MR. IMMEL:

15        Q.    This is a copy of the note filed after the

16   complaint in this case.  I don't have the notice of

17   filing page.

18             Have you ever seen this document before?

19        A.    I have seen these documents.  I have not seen

20   this document.

21        Q.    Okay.  And this wouldn't have been the

22   document that you reviewed in executing the lost note

23   affidavit?

24        A.    No.  We do not -- once again, we do not review

25   the note.  Our attorney determines that the note is not

onsor & Associates

Reporting and Transcription Inc

Page 38

1    available through our processes.

2           Q.    Okay.

3                MR. IMMEL:  This would be Exhibit I.

4                (Defendant's Exhibit Letter I was marked for

5           identification.)

6    BY MR. IMMEL:

7           Q.    This is the newly found note.  Here.  And as

8    you can see, if you could compare the two notes, one has

9    a couple of additional endorsements.  Whereas, the

10    previous one did not.  Is that correct?

11          A.    That is what I observe here, yes.

12          Q.    Okay.  In the review of the two notes and the

13    endorsements that are on them, have you seen this type

14    of situation before where one note that's been filed in

15    the case is partially endorsed and the other is a more

16    complete record of endorsements?

17          A.    No, I have not.

18          Q.    In following along the endorsements, can you

19    determine who was the last owner of the note prior to

20    your companies?

21          A.    I'm sorry.  Can you rephrase that for me?

22          Q.    Can you determine who GMAC Mortgage, LLC has

23    acquired the mortgage note from?

24          A.    The first endorsement I see here has a date.

25    It says, Mortgage Investor Corporation.  It's signed on

onsor & Associates

Reporting and Transcription Inc

Page 39

1    February 27th, I believe, that's 2002.

2         Q.   All right.  And they were the original lender.

3    And then, as you can see, there is another endorsement

4    there to, I believe, GMAC Mortgage Corporation.  And

5    there is also one GMAC Bank.  Correct?

6         A.   That is correct according to the observation

7    that I see on this document.

8         Q.   So would you need an assignment from -- why do

9    you assign the MERS -- as a vice president of MERS, why

10   do you assign the MERS -- I'm sorry.  Let me start over

11   there.

12            Why do you execute the assignment of mortgage

13   on behalf of MERS as nominee for the original lender and

14   not the last lender?

15            MS. ARROYAVE:  Objection:  Form.

16            THE WITNESS:  Because as you stated, it's an

17        assignment of mortgage.  It's not an assignment of

18        note.

19   BY MR. IMMEL:

20        Q.   Right.

21        A.   That's the only way I can answer that.  The

22   mortgage itself, which we've both reviewed, states that

23   it's MERS as a nominee for Mortgage Investor

24   Corporation.

25        Q.   Okay.  So would you agree then that as the

onsor & Associates

Reporting and Transcription Inc

Page 40

1    note was transferred through these endorsements to new

2    note-holders and owners that MERS remained the

3    mortgagee?

4             MS. ARROYAVE:  Objection:  Form.

5             THE WITNESS:  I wouldn't have that knowledge.

6    BY MR. IMMEL:

7        Q.   Okay.  It's your understanding that MERS does

8    not assign the mortgage every time the note is

9    transferred; is that correct?

10            MS. ARROYAVE:  Objection:  Form.

11            THE WITNESS:  I wouldn't have that knowledge

12            either.

13   BY MR. IMMEL:

14       Q.   Okay.  All right.  Do you know who would have

15   that knowledge?

16       A.   No, I do not.

17       Q.   Okay.  All right.

18            MR. IMMEL:  And we have here defendant's

19            request for production regarding the Jeffrey

20            Stephan documents.  That will be Exhibit J.

21            (Defendant's Exhibit Letter J was marked for

22            identification.)

23   BY MR. IMMEL:

24       Q.   Have you seen that document before?

25       A.   I have not seen this document until recently

onsor & Associates

Reporting and Transcription Inc

Page 41

1   when I found out that I was coming here.

2        Q.    Okay.   And also we have the response to the

3   request for production regarding the Jeffrey Stephan

4   document.

5             MR. IMMEL:   That will be marked as Exhibit K.

6             (Defendant's Exhibit Letter K was marked for

7             identification.)

8   BY MR. IMMEL:

9        Q.   I'm going to direct you to paragraph 5 where

10  there has been an objection based on our request for all

11  MERS system documents, records, computer data, or other

12  MERS information reviewed by Jeffrey Stephan prior to

13  executing the assignment of mortgage filed in this case

14  to determine the proper SNE.

15            It's been objected to as vague and ambiguous

16  and improperly presumes that plaintiff has custody or

17  control over any MERS system documents.

18            As a MERS vice president, you don't have

19  access to any MERS system documents?

20       A.   No, I do not.

21       Q.   Okay.

22       A.   I do not work for MERS.

23       Q.   Okay.   And so you don't actually review any

24  documents prior to executing the assignment of mortgage?

25            MS. ARROYAVE:   Asked and answered.

onsor & Associates
Reporting and Transcription Inc

Page 42

1    BY MR. IMMEL:

2        Q.    Okay.  And are there any -- do you receive any

3    letters, e-mails, or other correspondence from other

4    departments that have given you any instruction on any

5    of the documents which you execute?

6        A.    No.

7        Q.    No.  And in paragraphs -- request No. 7, as

8    far as the search for the lost note, you didn't actually

9    partake in that search.  So you are not aware of any of

10   the locations searched, other than by other people?

11       A.    That's correct.

12       Q.    Do you know who those people would be that

13   searched for the note?

14       A.    There is a team that's in our Minnesota

15   office.  I am not familiar with who would actually

16   search for the said document.

17       Q.    What is the name of that team?  Do you know

18   the name of that team?

19       A.    I don't have a formal name for them.  I call

20   them document control.  But that's my own name for them.

21       Q.    Okay.  All right.  You said that the attorneys

22   representing you prior in this case only ask you to

23   execute the lost note affidavit after a substantial

24   effort has occurred?

25            MS. ARROYAVE:  Objection.  That goes into the

onsor & Associates

Reporting and Transcription Inc.

Page 43

1          attorney-client privilege.

2      BY MR. IMMEL:

3          Q.    As far as you understand, a substantial search

4      for the lost note has already occurred by various people

5      within your team, other teams within GMAC at the request

6      of the attorneys?

7          A.    Within GMAC the lost note affidavit or lost

8      instrument affidavit would not be executed until

9      everything has been exhausted.

10          Q.    Okay.  Is it common for a lost note affidavit

11      to be executed and then later the note to be found?

12          A.    I don't know.

13          Q.    You're not sure.  Okay.  Earlier you were

14      mentioning that now you work for GMAC, LLC; is that

15      correct?

16          A.    That is correct.

17          Q.    And you still execute documents as GMAC

18      Mortgage, LLC limited signing officers, as well?

19          A.    That's the same thing you just stated.

20          Q.    Right.  One they dropped the name -- the

21      mortgage from the name, and one they haven't; is that

22      correct?

23          A.    No.

24          Q.    No.

25          A.    One they dropped corporation and changed it to

onsor & Associates
Reporting and Transcription Inc

Page 44

1    LLC.

2         Q.    Oh, okay.

3         A.    They became a limited liability company.

4    That's what LLC stands for.

5         Q.    Okay.  You said that there was an -- initially

6    there was a referral from the referral department to the

7    attorneys?

8         A.    That would be correct.

9         Q.    Do you ever review any of those documents in

10   your duties as executing these other documents?

11        A.    No.

12        Q.    So I'm going to turn to the -- this is the

13   note of authenticity ownership interrogatories limited

14   answers.  Here you are.

15             MR. IMMEL:  That will be Exhibit L.

16             (Defendant's Exhibit Letter L was marked for

17             identification.)

18   BY MR. IMMEL:

19        Q.    Do you know, I think, it is Juan A. Aquirre?

20        A.    I do not know him.  But I am familiar with his

21   name.

22        Q.    Okay.  Are you familiar with his duties?  He's

23   a senior litigation analyst.

24        A.    Yes.

25        Q.    Do you know if he's a senior litigation

Onsor & Associates
Reporting and Transcription Inc

Page 45

1      analyst for GMAC Mortgage, LLC, or are there other

2      entities that he works for?

3          A.    I honestly do not know.

4          Q.    Okay.  Would he be part of the document team

5      in Minnesota that may find a note?

6          A.    No.

7          Q.    No.  Okay.  Would he be somebody, do you know,

8      if in his duties he's somebody that searches for lost

9      documents?

10         A.    No.

11         Q.    Okay.

12              MS. ARROYAVE:  Is that, no, you don't know?

13              THE WITNESS:  No.  He does not do that.

14     BY MR. IMMEL:

15         Q.    He doesn't do that.  Do you know what his

16     duties are?

17         A.    As it states here, he is a senior litigation

18     analyst.  I'm not sure of what his exact

19     responsibilities would be.

20         Q.    Okay.  But searching for lost documents

21     wouldn't be one of his responsibilities, more than

22     likely?

23         A.    No, it would not be.

24         Q.    Okay.  And here are plaintiff's amended

25     answers.  Okay.

onsor & Associates

Reporting and Transcription Inc

Page 46

1              MR. IMMEL:  I'll mark it as Exhibit M.

2              (Defendant's Exhibit Letter M was marked for

3         identification.)

4    BY MR. IMMEL:

5         Q.    It asks to identify all persons and/or

6    entities who are the current beneficial owners of, or

7    who have a beneficial or equitable interest in the

8    promissory note.  And Federal National Mortgage

9    Association has been identified, Fannie Mae.

10             Are you aware -- and then if you look at No.

11   3, it says, Please identify all person and/or entities

12   who are current legal owners of, or who have legal

13   interest in the promissory note.

14        A.    I don't have the same affidavit you have.

15        Q.    Okay.  Defendant's note.  Do you have the

16   mortgage loan?

17        A.    That's the mortgage loan.

18        Q.    Okay.

19             MS. ARROYAVE:  What has been introduced?  Has

20        this set of interrogatory been --

21             MR. IMMEL:  Yes.

22             MS. ARROYAVE:  But not the other?

23             MR. IMMEL:  No.  This was also entered,

24        correct?

25             THE COURT REPORTER:  I think it was the last

onsor & Associates

Reporting and Transcription Inc

Page 47

1        one.

2   BY MR. IMMEL:

3        Q.   So if you look at paragraphs 2 and 3, can you

4   explain to me why Fannie Mae would have the beneficial

5   or equitable interest in the promissory note, based on

6   your understanding?

7             MS. ARROYAVE:  Objection.  It calls for a

8        legal conclusion.

9             THE WITNESS:  No, I can't.

10   BY MR. IMMEL:

11        Q.   And earlier when we discussed the MERS

12   documentation where Ginnie Mae was identified as the

13   investor, would it be fair to say that the beneficial or

14   equitable interest would actually lie with the person

15   who made the loan?

16             MS. ARROYAVE:  Objection.  It calls for a

17        legal conclusion.

18             THE WITNESS:  I don't have that knowledge.

19   BY MR. IMMEL:

20        Q.   Okay.  And based on the MERS documentation

21   that I presented to you earlier, where the investor was

22   identified as Ginnie Mae.  In paragraph 5 here, they are

23   identifying Fannie Mae as the investor.

24             Do you have any understanding of -- as to why

25   those two things would --

onsor & Associates

Reporting and Transcription, Inc.

Page 48

1        A.   No, I don't.

2        Q.   -- there would be a discrepancy there?   Okay.

3   All right.

4             And going back to the mortgage loan ownership

5   and the interrogatories one more time.   Can you explain

6   why one entity would have the beneficial interest and

7   another entity would have a legal interest --

8             MS. ARROYAVE:   Objection.   It calls for a

9        legal conclusion.

10  BY MR. IMMEL:

11       Q.   -- based on your company's protocols?

12       A.   I don't have that knowledge.

13       Q.   Okay.   GMAC Mortgage owns some loans and

14  services other; is that correct?

15       A.   To my knowledge that would be a correct

16  statement.

17       Q.   Okay.   Do they -- and then in other instances,

18  they both own loan and service the loan?

19       A.   That would be a fair statement.

20       Q.   Okay.   Is it possible that GMAC Mortgage is

21  the servicer for this loan and another entity -- whether

22  it be Fannie Mae, Ginnie Mae, or any other entity --

23  perhaps is the owner and GMAC is just the servicer?

24       A.   That's possible.   But I'm not familiar enough

25  to say yes or no.

onsor & Associates

Reporting and Transcription Inc

Page 49

1       Q.   Okay.  All right.  I'm just going to go over

2    the notice of taking the deposition duces tecum.

3                (Defendant's Exhibit Letter N was marked for

4                identification.)

5    BY MR. IMMEL:

6       Q.   All right.  This is -- and just for the

7    record, Exhibit A, if you would turn to that.  This is a

8    list of the documents that we requested that you bring.

9    A request for production.  And you provided some of them

10   earlier.

11               I just wanted to go over it and see if you

12   brought any of these documents today, or if you were

13   just relying on what was produced in the request for

14   production.  Okay?

15               The deponent's most recent curriculum vitae?

16      A.   I didn't feel I needed to bring that.  That's

17   personal.

18      Q.   Okay.  You actually provided the corporate

19   resolution for MERS and for GMAC.  You presented the

20   list of certifying officers.  And the MERS system

21   documents records, you already stated that you don't

22   have any access.

23               Your team brings you the documents.  And you

24   don't receive any direct communication from the

25   attorneys that draft them?

onsor & Associates

Reporting and Transcription Inc

Page 50

1          A.    The only type of communication I would receive

2     from an attorney is if a document is late in being

3     returned.

4          Q.    Okay.  All right.  And it would be fair to say

5     that your primary responsibility is to create and

6     execute these documents, not to actually do any of the

7     underlying duties of ascertaining specific knowledge or

8     information about them, correct?

9               MS. ARROYAVE:  Objection:  Form.  Asked and

10              answered.

11              THE WITNESS:  And the answer to that would be,

12              no.

13              MR. IMMEL:  All right.  I think that's most of

14              it.  Just let me have on second to review, but I

15              think that's most of it.  All right.  I think that

16              should do it for today.

17              Thank you very much for traveling here.

18              MS. ARROYAVE:  I have a few questions.

19              MR. IMMEL:  Yeah.  I'm sorry about that.

20              MS. ARROYAVE:  You can't have all of the fun.

21     Can I look at the exhibits?

22                   CROSS (JEFFREY STEPHAN)

23     BY MS. ARROYAVE:

24          Q.    I'm going to show you what has been previously

25     marked as Defendant's Exhibit C to your deposition.

onsor & Associates

Reporting and Transcription, Inc

Page 51

1          Do you have any knowledge of how this document

2     is created?

3          A.   No.

4          Q.   Do you have any knowledge as to whether the

5     information in this document is accurate?

6          A.   No.

7          Q.   Do you know how this is prepared?

8          A.   No.

9          Q.   Okay.  Let me show you what has been

10    previously marked as Defendant's Exhibit A to your

11    deposition.  It is the assignment of mortgage.

12          The information that is used to prepare this

13    mortgage is kept in GMAC Mortgages' business records; is

14    that correct?

15          A.   Yes.

16          Q.   And these business records from where this

17    information came from were created by persons in GMAC

18    Mortgage, employees of GMAC Mortgage, right?

19          A.   Yes.

20          Q.   And the information was entered into the

21    computer system by these GMAC Mortgage employees at the

22    time that they became aware of the information?

23          A.   Yes.

24          Q.   And they had a business duty to enter the

25    information into the computer system; is that correct?

onsor & Associates

Reporting and Transcription Inc

Page 52

1      A.   Yes.

2      Q.   And this information, these business records

3   are kept within the course and scope of GMAC's regularly

4   conducted business activities; is that correct?

5      A.   I'm going to say yes.

6      Q.   Okay.  I'm going to show you what has been

7   previously marked as Defendant's Exhibit F to your

8   deposition.  And it's the affidavit of lost original

9   document.

10         Is the information you used to prepare this

11   lost original document kept in GMAC Mortgages' business

12   records?

13      A.   I don't understand the question.

14      Q.   Okay.  The information in the lost original

15   document, is that -- GMAC Mortgage is the owner and

16   holder of the note, correct?

17      A.   Yes.

18      Q.   Is that information kept within the course and

19   scope of GMAC's business records?

20      A.   Yes.

21      Q.   And the information in GMAC's business records

22   are entered by persons with knowledge of the information

23   that GMAC is the owner of the note?

24         MR. IMMEL:  Objection:  Leading.

25         THE WITNESS:  Can you rephrase it?  I'm not

onsor & Associates

Reporting and Transcription Inc

Page 53

1        sure if I follow what you are saying.

2   BY MS. ARROYAVE:

3        Q.   The business records that GMAC has regarding

4   whether it is the original -- whether it is the owner of

5   the note, was entered by persons that have personal

6   knowledge of whether GMAC is the owner of the note; is

7   that correct?

8        A.   I honestly don't know.  I do not work in those

9   departments.

10       Q.   Okay.

11            MS. ARROYAVE:  I have nothing further.

12                 REDIRECT (JEFFREY STEPHAN)

13   BY MR. IMMEL:

14       Q.   I would just ask:  The assignment of the

15   mortgage and the information on it, this is not created

16   by anyone at -- this specific document isn't actually

17   created by a member or a worker for GMAC Mortgage, it is

18   actually created by the attorney?

19       A.   Yes.

20       Q.   Okay.  So the attorney would have to be

21   relying on business records of GMAC Mortgage in forming

22   this?

23       A.   That would be correct.

24       Q.   Okay.  And as to the lost note, this too is

25   created by the attorney, correct?

onsor & Associates

Reporting and Transcription Inc

Page 54

1       A.    That is correct.

2       Q.    Okay.

3             MR. IMMEL:  All right.  That does it.

4             MS. ARROYAVE:  That's it.

5             MR. IMMEL:  All right.  Thank you.

6             MS. ARROYAVE:  We will read.

7             THE COURT REPORTER:  Okay.

8             (Witness excused.)

9             (Deposition was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

onsor & Associates

Reporting and Transcription Inc

Page 55

```
1                    CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4

5

6           I, the undersigned authority, certify that Jeffrey

7    Stephan personally appeared before me and was duly

8    sworn.  Dated the 10th day of December, 2009.

9

10          Dated this 22nd day of December, 2009.

11

12

13          Jamie Reynolds Bentley

14

             Jamie Reynolds Bentley, Court Reporter

15           Notary Public - State of Florida

             My Commission Expires:  7/20/2013

16           My Commission No.:  DD 453053

17

18

19

20

21

22

23

24

25
```

onsor & Associates

Reporting and Transcription Inc

Page 56

```
 1                   C E R T I F I C A T E
 2     THE STATE OF FLORIDA
 3     COUNTY OF PALM BEACH
 4
 5          I, Jamie Reynolds Bentley, Court Reporter and
       Notary Public in and for the State of Florida at
 6     large, do hereby certify that I was authorized to
       and did report said deposition in stenotype; and
 7     that the foregoing pages are a true and correct
       transcription of my shorthand notes of said
 8     deposition.
 9          I further certify that said deposition was
       taken at the time and place hereinabove set forth
10     and that the taking of said deposition was commenced
       and completed as hereinabove set out.
11
            I further certify that I am not attorney or
12     counsel of any of the parties, nor am I a relative
       or employee of any attorney or counsel of party
13     connected with the action, nor am I financially
       interested in the action.
14
            The foregoing certification of this transcript
15     does not apply to any reproduction of the same by
       any means unless under the direct control and/or
16     direction of the certifying reporter.
17          Dated this 22nd day of December, 2009.
18
19          _Jamie Reynolds Bentley_
20          _____
            Jamie Reynolds Bentley, Court Reporter
21
22
23
24
25
```

# Exhibit 1-I

FILED IN OFFICE
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

2011 SEP 22  AM 11: 42

TOM LAWLER, CLERK

| | |
|---|---|
| ALFREDIA PRUITT,<br>        Plaintiff, | *  Civil Action File No. 11-A-10084-3 |
| | * |
| v. | *  Plaintiff's *pro se* Motion to Set Aside |
| | *  Foreclosure Sale and Temporary |
| FEDERAL NATIONAL MORTGAGE | *  Restraining Order filed 9/21/2011 |
| ASSOCIATION, GMAC/MERS, | * |
| FANNIE MAE, USAA FEDERAL | * |
| SAVINGS BANK, | * |
|        Defendant. | * |
| | * |

ORDER DENYING PLAINTIFF'S *PRO SE* APPLICATION AND REQUEST FOR
TEMPORARY RESTRAINING ORDER
AND
ORDER DENYING AND DISMISSING PLAINTIFF'S *PRO SE* MOTION
TO SET ASIDE FORECLOSURE SALE AND THE ABOVE-STYLED ACTION FOR
FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Whereas the Court entered a Final Order and Judgment filed on January 31,

2011 and issued a Writ of Possession filed on January 31, 2011 in Civil Action File No.

10-A-10972-3, which addressed the same issues involved and the same parties in the

above-styled Civil Action File No. 11-A-10084-3;

Whereas on February 1, 2011, the Court filed an Order Terminating Action

Pending Bankruptcy and Order Staying Previously Entered Writ of Possession filed on

1/31/2011 in Civil Action File No. 10-A-10972-3;

Whereas on September 12, 2011, the Court filed an Order Reopening Case and

Lifting Stay and Order Reinstating Writ of Possession filed on 1/31/2011 in Civil Action

File No. 10-A-10972-3;

Whereas on September 16, 2011, Plaintiff Alfredia Pruitt filed an Emergency

Motion to Stay Writ of Possession in Civil Action File No. 10-A-10972-3, and the Court

filed an Order Denying said Motion to Stay Writ of Possession on September 16, 2011;

Whereas on September 19, 2011, Plaintiff Alfredia Pruitt filed an Emergency

Motion for Reconsideration in Civil Action File No. 10-A-10972-3, and the Court filed an

1

Order Denying said Motion for Reconsideration on September 19, 2011;

Whereas the Plaintiff, filed *pro se* the above-styled Motion to Set Aside Foreclosure Sale and Temporary Restraining Order as a new action (Civil Action File No. 11-A-10084-3) on September 21, 2011, asserting the same arguments as set forth in Civil Action File No. 10-A-10972-3, which addressed the same issues involved and the same parties in the above-styled Civil Action File No. 11-A-10084-3;

Wherefore the Court, having read and considered the afore-referenced Motion, as well as the entire record, hereby **DENIES** Plaintiff's Application and Request for a Temporary Restraining Order and **DENIES AND DISMISSES** the Defendant's Motion to Set Aside Foreclosure Sale and the above-styled action for failure to state a claim upon which relief may be granted.

SO ORDERED, this ____ day of September, 2011.

DAWSON JACKSON, Judge
Gwinnett Superior Court

Copies to:

Alfredia Pruitt, *pro se*
2360 Hickory Station Circle
Snellville, GA 30078

A.William Loeffler, Esq.
Teah N. Glenn, Esq.
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree St., NE
Suite 5200
Atlanta, GA 30308-2216

Gwinnett County Sheriff's Department

2

# **Exhibit 1-J**

IN THE SUPERIOR COURT OF GWINNETT COUNTY

STATE OF GEORGIA

FILED IN OFFICE
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA

2011 OCT -7 PM 2: 08

TOM LAWLER, CLERK

ALFREDIA PRUITT,

Plaintiff,

VS.

CIVIL ACTION FILE NO.

FEDERAL NATIONAL          **11A 10675   3**

MORTGAGE ASSOCIATION,

MERS,

GMAC,

FANNIE MAE,

USAA FEDERAL SERVICING BANK

Defendant

### A.COMPLAINT

COMES NOW ALFREDIA PRUITT, Plaintiff in the above-captioned matter, and respectfully states her Complaint against Defendants **FEDERAL NATIONAL MORTGAGE ASSOCIATION, MERS, GMAC, FANNIE MAE,** and **USAA FEDERAL SAVINGS BANK** as follows:

### B.JURISDICTION AND VENUE

1.      Plaintiff, Alfredia Pruitt, is an individual who resides in Gwinnett County, Georgia.

2.      Defendant, Federal National Mortgage Association is a Georgia corporation, may be served with process at, c/o3525 Piedmont Road NE building 6 ste. 300, Atlanta, GA 30305.

3.      Defendant GMAC a corporation doing business in Georgia and may be served with process at 3 Ravinia Drive Atlanta, GA 30346,

4.      Defendant Fannie Mae a corporation doing business in Georgia and may be served with process at 950 E Paces Ferry Rd NE, Atlanta, GA, 30326

5.      Defendant USAA Savings Bank a corporation doing business in Georgia and may be served with process at Terminus 200 Building, 3333 Piedmont Rd, Ste 2050, Atlanta, GA 30305.

6.      Defendants are individual corporations doing business in Georgia and can be served with process by their Attorney at William Loeffler, esq., Teah N. Glenn, esq. Troutman Sanders LLP., 5200 Bank of America Plaza, 600 Peachtree Street NE, Suite 5200 Atlanta, GA 30308-3218.

7.      Jurisdiction is proper in this Court.

8.      Venue is proper in the Gwinnett County Superior Court of Georgia. Specifically, venue is mandatory in this county because the real property complained of is located in this county.

## C.  Cause of Action (WRONGFUL FORECLOSURE, FRAUDULENT CONVEYANCE OF PROPERTY)

9.      Plaintiff's cause of action against FEDERAL NATIONAL MORTGAGE ASSOCIATION, MERS, GMAC, FANNIE MAE, USAA FEDERAL SERVICING BANK is under wrongful foreclosure because the Defendants illegally assisted GMAC, Federal National Mortgage Association with the unlawful foreclosure of the plaintiff's property.  Plaintiff seeks to set aside the sale of her property by GMAC and stop the eviction under *O.C.G.A. §§ 44-14-162 et seq.*

10.     Plaintiff asserts that there are several fraudulent problems with the note, including but not limited to notarial, signatures, and unlawful assignments.

## D. FACTUAL ALLEGATIONS

11.     Plaintiff owned property located at 2360 Hickory Station Circle, Snellville, Georgia 30078.

12.     The Plaintiff became indebted to USAA Federal Savings Bank.

13.     Plaintiff failed to pay the debt and started negotiating the payment with USAA Federal Savings Bank.

25.   Here, Plaintiff has asked the Defendants to produce to the original note and all authentic signatures.

26.   Defendant's failed to comply with Plaintiff's request.

27.   To date, Defendants have not produced the original note or shown that MERS was a holder that had a right to assign/enforce.

28.   Defendant's failure to produce the original note and show that MERS and Defendants were holders of the instrument brings Plaintiff's claim of wrongful foreclosure.

29.   Courts have held that if Mers is the only mortgagee, without ownership of the mortgage instrument it does not have an enforceable right."); Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619, 624 (Mo. Ct. App. 2009).

30.   Plaintiff asserts that MERS was never a holder of the note and was simply a nominee. Therefore, MERS had no  right to enforce or execute foreclosure proceedings regarding plaintiff's property.

31.   In essence, if "MERS never held the promissory note, thus its assignment of the deed of trust to GMAC or any other Defendant separate from the note had no force."); In re Agard, No. 810-77338, 2011 WL 499959, at *16.

32.   Plaintiff argues that MERS's 'nominee' status and the rights bestowed upon MERS within the Mortgage itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage to GMAC or any other Defendant.   Thus, resulting in wrongful foreclosure proceedings against Plaintiff's home.


## F. REQUEST FOR QUIET TITLE HEARING AND ISSUANCE OF TEMPORARY RESTRAINING ORDER

33.   Plaintiff asks the court to set her complaint for quiet title for a hearing, and pending hearing and outcome of the case, issue a temporary restraining order/stay against Defendants.

34.   In the event this Court does not grant the Plaintiff's quite title hearing request and Application for a Temporary Restraining Order, she will suffer irreparable harm because the real estate which is the subject of this lawsuit is unique in character and cannot be replaced with money damages only.  Applicant has no other adequate remedy at law.

## G. Prayer

35.     For these reasons, Plaintiff respectfully asks the court to, set complaint for quite title for a hearing, grant remedies clearing title, issue a temporary restraining order preventing the Defendants from evicting Plaintiff from her property and enforcement of Plaintiff's rights.

Respectfully submitted,

*Alfredia Pruitt*

Alfredia Pruitt

2360 Hickory Station Circle

Snellville, Georgia 30078

(770) 668-3915 Phone


### VERIFICATION

I, Plaintiff Alfredia Pruitt, having been duly sworn, under penalty of perjury, deposes and says that I am over the age of eighteen (18) and mentally competent to testify in this matter. My person and my property are in danger of immediate and irreparable injury, and loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and I hereby Certify, that the facts set forth regarding all matters stated in the above paragraphs are true and correct, therefore since this is an Emergency Petition further notice should not be required. I have read the foregoing pleading, the facts stated therein are from firsthand knowledge and are true and correct to the best of my knowledge and belief.

This 7th day of October, 2011

*Alfredia Pruitt*

Alfredia Pruitt

Subscribed and sworn to before me,

this 7th day of October, 2011.

Seal

*Julie a Mason*   Notary Public

JULIE A. MASON
NOTARY PUBLIC
EXPIRES
JULY 24, 2012
GWINNETT COUNTY, GA

My Commission Expires:

7/24/2012

# **Exhibit 1-K**

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

ALFREDIA PRUITT,                          *      Civil Action File No. 11-A-10675-3
    Plaintiff,                        *
                                          *
v.                                        *      Plaintiff's *pro se* Motion/Application for
                                          *      Temporary Restraining Order filed
FEDERAL NATIONAL MORTGAGE                 *      10/7/2010
ASSOCIATION, MERS, GMAC,                  *
FANNIE MAE, USAA FEDERAL                   *
SAVINGS BANK,                             *
    Defendants.                       *
                                          *



ORDER DENYING PLAINTIFF'S *PRO SE* MOTION/APPLICATION FOR
TEMPORARY RESTRAINING ORDER
AND
ORDER DENYING AND DISMISSING
THE ABOVE-STYLED ACTION FOR FAILURE TO STATE A CLAIM UPON WHICH
RELIEF MAY BE GRANTED

Whereas the Court entered a Final Order and Judgment filed on January 31,

2011 and issued a Writ of Possession filed on January 31, 2011 in Civil Action File No.

10-A-10972-3, which addressed the same issues involved and the same parties in the

above-styled Civil Action File No. 11-A-10675-3;

Whereas on February 1, 2011, the Court filed an Order Terminating Action

Pending Bankruptcy and Order Staying Previously Entered Writ of Possession filed on

1/31/2011 in Civil Action File No. 10-A-10972-3;

Whereas on September 12, 2011, the Court filed an Order Reopening Case and

Lifting Stay and Order Reinstating Writ of Possession filed on 1/31/2011 in Civil Action

File No. 10-A-10972-3;

Whereas on September 16, 2011, Plaintiff Alfredia Pruitt filed an Emergency

Motion to Stay Writ of Possession in Civil Action File No. 10-A-10972-3, and the Court

filed an Order Denying said Motion to Stay Writ of Possession on September 16, 2011;

Whereas on September 19, 2011, Plaintiff Alfredia Pruitt filed an Emergency

Motion for Reconsideration in Civil Action File No. 10-A-10972-3, and the Court filed an

1

Order Denying said Motion for Reconsideration on September 19, 2011;

Whereas the Plaintiff filed *pro se* a Motion to Set Aside Foreclosure Sale and Temporary Restraining Order as a new action (Civil Action File No. 11-A-10084-3) on September 21, 2011, asserting the same arguments as set forth in Civil Action File No. 10-A-10972-3, which addressed the same issues involved and the same parties in the above-styled Civil Action File No. 11-A-10084-3, and the Court entered an Order Denying Plaintiff's Pro Se Application and Request for Temporary Restraining Order and Order Denying and Dismissing Plaintiff's Pro Se Motion to Set Aside Foreclosure Sale and the Action for Failure to State a Claim Upon Which Relief May be Granted on September 22, 2011;

Whereas the Plaintiff filed a *pro se* Motion to Get Bond Requirement Waived on September 22, 2011 and an Emergency Motion to Amend and Reconsider Request for Temporary Restraining Order on September 26, 2011 in Civil Action File No. 11-A-10084-3, and the Court entered an Order denying said Motions on September 28, 2011;

Whereas the Plaintiff has filed Notices of Appeal in both Civil Action File No. 10-A-10972-3 and Civil Action File No. 11-A-10084-3;

Whereas on October 7, 2011, the Plaintiff, filed *pro se* the above-styled action as a new action (Civil Action File No. 11-A-10675-3) and filed the foregoing Motion/Application for Temporary Restraining Order in said new action on October 7, 2011, asserting the same arguments as set forth in Civil Action File Nos. 10-A-10972-3 and 11-A-10084-3, which addressed the same issues involved and the same parties in the above-styled Civil Action File No. 11-A-10675-3;

Wherefore the Court, having read and considered the afore-referenced Motion, as well as the entire record, hereby **DENIES** Plaintiff's Motion/Application for Temporary

2

Restraining Order and **DISMISSES** the above-styled action for failure to state a claim

upon which relief may be granted, as the same has been previously adjudicated by

Final Order and Judgment in Civil Action File No. 10-A-10972-3.  The Court notes that

the Georgia Court of Appeals denied the Plaintiff's emergency motion, finding the

Plaintiff was not entitled to maintain possession of the premises pending appeal and

that said appeal was not timely filed.  *See* Court of Appeals No. MD-12-04, October 6,

2011 and Civil Action File Nos. 10-A-10972-3 and 11-A-10084-3.

     SO ORDERED, this /0th day of October, 2011.

                                         DAWSON JACKSON, Judge
                                         Gwinnett Superior Court

Copies to:

Alfredia Pruitt, *pro se*
2360 Hickory Station Circle
Snellville, GA 30078

A.William Loeffler, Esq.
Teah N. Glenn, Esq.
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree St., NE
Suite 5200
Atlanta, GA 30308-2216

Gwinnett County Sheriff's Department

# **Exhibit 1-L**

ORIGINAL

FILED IN OFFICE
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

2012 JAN 26  AM 11: 54

RICHARD ALEXANDER, CLERK

ALFREDIA PRUITT,

       Plaintiff,

  vs.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, MERS, GMAC, FANNIE
MAE, USAA FEDERAL SAVINGS BANK

       Defendants.

)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION FILE

NO. 11-A-10675-3

## ORDER DIRECTING CLERK TO CANCEL TWO (2) LIS PENDENS

This matter comes before the Court on Defendants Federal National Mortgage

Association, MERS, GMAC, Fannie Mae, and USAA Federal Savings Bank 's Motion to Cancel

Two (2) Lis Pendens.  The Court having read and considered the entire record, and all

submissions with respect to the motion, including any supporting and opposing briefs, and for

other good cause shown, it is hereby ORDERED that Defendant's Motion is GRANTED.

    The Clerk of Court is hereby directed to file and record the attached Cancellation of Two

(2) Lis Pendens, to cancel and remove from the record that certain Lis Pendens recorded in Lien

Book 3261, Page 7, which was previously filed and recorded on March 18, 2011, and to cancel and

remove from the record that certain Lis Pendens recorded in Lien Book 3449, Page 161, which was

previously filed and recorded on October 7, 2011

SO ORDERED this 25th day of JANUARY , 2012

DAWSON JACKSON
Judge, Superior Court of Gwinnett County, Georgia

Becky Pearrow.
Court Reporter

**Copies to:**

Alfredia Pruitt, *pro se*
P.O. Box 1312
Norcross, GA 30071

Daniel K. Barbagelata, Esq.
McCurdy & Candler, LLC
Six Piedmont Center, Suite 700
3525 Piedmont Road, NE
Atlanta, GA 30305

William A. Loeffler, Esq.
Teah Glenn, Esq.
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree St., NE
Suite 5200
Atlanta, GA 30308-2216

# **Exhibit 1-M**

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) 13 5116 |
|---|---|
| **PLAINTIFFS** Alfredia Pruitt – Pro SE | **DEFENDANTS** Federal National Mortgage Associa MERS/GMAC, Fannie Mae, USAA Federal Savings Bank |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.) | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only) ☑ Debtor  ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor  ☐ Other ☐ Trustee | **PARTY** (Check One Box Only) ☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin ☑ Creditor  ☐ Other ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Unlawful foreclosure, Predatory Lending, Tila RESPA Violation
Carpenter V Longan 83 U.S. 16 Wall 271, 271, 1872

---

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☑ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☑ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8) student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☑ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

MAR 02 2011 AM 08:12

M. REGINA THOMAS, CLERK
IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
FILED

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

**B104 (FORM 104) (08/07), Page 2**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR  Alfredia Pruitt | BANKRUPTCY CASE NO.  11-52442 | |
| DISTRICT IN WHICH CASE IS PENDING  Northern | DIVISION OFFICE | NAME OF JUDGE  Diehl |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)  Alfredia Pruitt | | |
| DATE  2/28/11 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)  Alfredia Pruitt | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

FILED
IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT
OF GEORGIA

MAR 02 2011 AM08:12

M. REGINA THOMAS
CLERK

Jackie J. Dukes
DEPUTY CLERK

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALFREDIA PRUITT,
Debtor,

VS.

CASE NO. 11-52442

FEDERAL NATIONAL
MORTGAGE ASSOCIATION, MERS/
GMAC,
FANNIE MAE, SAVINGS
USAA FEDERAL SERVICING BANK
Creditor

**11-5116**

## DEBTOR'S/PLAINTIFF'S ADVERSARY PROCEEDING

### A. Motion

COMES NOW ALFREDIA PRUITT, Plaintiff in the above-captioned matter, and respectfully files this adversary proceeding against Defendants **FEDERAL NATIONAL MORTGAGE ASSOCIATION, GMAC, FANNIE MAE,** and **USAA FEDERAL SAVINGS BANK** as follows:

### B.JURISDICTION AND VENUE

1.      Plaintiff, Alfredia Pruitt, is an individual who resides in Gwinnett County, Georgia.

2.      Defendant, Federal National Mortgage Association is a Georgia corporation, may be served with process at, c/o3525 Piedmont Road NE building 6 ste. 300, Atlanta, GA 30305.

3.      Defendant GMAC a corporation doing business in Georgia and may be served with process at 3 Ravinia Drive Atlanta, GA 30346,

4.      Defendant Fannie Mae a corporation doing business in Georgia and may be served with process at 950 E Paces Ferry Rd NE, Atlanta, GA, 30326

5.      Defendant USAA Federal Savings Bank a corporation doing business in Georgia and may be served with process at Terminus 200 Building, 3333 Piedmont Rd, Ste 2050, Atlanta, GA 30305.

6.    Jurisdiction is proper in this Court.


7.    Venue is proper in this Court.


## C.FACTUAL ALLEGATIONS

8.    Plaintiff owned property located at 2360 Hickory Station Circle, Snellville,
Georgia 30078.

9.    The Plaintiff became indebted to USAA Federal Savings Bank.  Plaintiff failed to
pay the debt and started negotiating the payment with USAA Federal Savings Bank.

10.    Defendant GMAC, Federal National Mortgage Association purchased Plaintiff's
property at a sale in which GMAC was not the beneficiary or holder of the note.  Federal
National Mortgage Association filed a dispossessory proceeding complaint for eviction of
Plaintiff from her property.

11.    On December 1, 2010 the lower court ruled in favor of the Defendants to evict the
plaintiff from her property.

12.    Subsequently, the Plaintiff filed a lawsuit and appeal against the Defendants for
unlawful foreclosure on December 6, 2010.


## D.  Cause of Action (UNLAWFUL FORECLOSURE/PREDATORY LENDING)

13.    Plaintiff's cause of action against FEDERAL NATIONAL MORTGAGE
ASSOCIATION, GMAC, FANNIE MAE, USAA FEDERAL SERVICING BANK is because
the Defendants illegally assisted GMAC, Federal National Mortgage Association with the
unlawful foreclosure of the plaintiff's property.

14.    Plaintiff requested information from Defendants to prove that the person signing
all affidavits for foreclosure had personal knowledge of the information contained in the
affidavit.

15.    In addition, Plaintiff requested that the Defendants provide evidence that they are
the true legal holder of the loan/note, to validate the debt, and to prove that they are a valid and
legitimate creditor.

16.    Defendants have yet to prove any of these allegations or produce any documents
requested.

17.     Plaintiff filed suit against the Defendants seeking to set aside the sale of her property by GMAC and stop the eviction.

## E. ADVERSARY PROCEEDING

18.     Plaintiff is seeking an emergency adversary proceeding order to prevent the defendants from lifting the automatic stay and evicting the Plaintiff from the property which is the subject of the land and title lawsuit during the automatic stay.

19.     Defendant is not the owner of the mortgage and note.

20.     The trustee is not properly authorized to post the sale notice and they did so illegally and with intention to deceive the borrower and the court causing the borrower and the court to reasonably rely upon upon the statements of facts and procedures used by the lender.

21.     Allowing the sale/ eviction and lifting the automatic stay will result in Plaintiff being possible a victim of predatory lending and unlawful foreclosure.

22.     It is probable that the Plaintiff will prevail in this lawsuit.

23.     Also, the Plaintiff's claim against the Defendants is filed to preserve the status quo of the parties until the issue of title is resolved.

24.     In the event this Court does not grant the Plaintiff's Adversary proceeding, she will suffer irreparable harm because the real estate which is the subject of this lawsuit is unique in character and cannot be replaced with money damages only.  Applicant has no other adequate remedy at law.

25.     In addition, allowing the Sale and eviction to be completed, would not only expose Plaintiff to potentially ruinous financial liability, but would also be a direct violation of The Due Process Clause, and numerous Constitutional guarantees concerning property.

## F. Request for Adversary Proceeding

26.     Plaintiff asks the court to set her adversary proceeding for a hearing, and after hearing the complaint, issue a continued automatic stay order against Defendants and stop the eviction until or after the lawsuit has been resolved.

G. Prayer

27.    For these reasons, Plaintiff asks the court to grant the adversary proceeding order to prevent lifting the automatic stay and to stop the eviction and enforcement of her rights.

Respectfully submitted,

Alfredia Pruitt
 2360 Hickory Station Circle
Snellville, Georgia 30078
(770) 668-3915 Phone

Note: Your honor the Deed of Trust was signed by Jeffrey Stephan who has earned the name Robo-signer, who is not an employee of MERS, Stephan has admitted under oath he signed foreclosure documents without verifying the information.

MERS has no standing to assign my note to GMAC it has no interest in my property.

There is evidence of bifurcation. The note has been separated from the Deed. There is no Secured Instrument, it has been lost or destroyed.

## CERTIFICATE OF SERVICE

This is to certify that the undersigned served a copy of the **Adversary Proceeding** through the electronic case filing system (ECF) or by placing a copy of the same in the United States Mail, with sufficient postage thereon to ensure delivery upon all parties listed on this 28th day of February 2011.

Respectfully submitted,

Alfredia Pruitt
2360 Hickory Station Circle
Snellville, Georgia 30078
(770) 668-3915 Phone

## VERIFICATION

I, Plaintiff Alfredia Pruitt, having been duly sworn, under penalty of perjury, deposes and says that I am over the age of eighteen (18) and mentally competent to testify in this matter. My person and my property are in danger of immediate and irreparable injury, and loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition; and I hereby Certify, that the facts set forth regarding all matters stated in the above paragraphs are true and correct. therefore since this is an Emergency Petition further notice should not be required. I have read the foregoing pleading, the facts stated therein are from firsthand knowledge and are true and correct to the best of my knowledge and belief.
This 28th day of February, 2011

Alfredia Pruitt
Subscribed and sworn to before me,
this 28th day of February, 2011.
Seal

Notary Public
My Commission Expires:

Q BADWAN
NOTARY PUBLIC, GWINNETT COUNTY, GEORGIA
MY COMMISSION EXPIRES OCTOBER 7, 2011

When a promissory note is sold by the original lender to others, the various sales of the notes supposedly are tracked on the MERS System.

16.

MERS claims that once MERS becomes the beneficiary of record as "nominee" regarding deeds of trust and becomes grantee of record as "nominee" with respect to security deeds, it remains the beneficiary/grantee when the beneficial ownership interests in the promissory note or servicing rights are transferred by one MERS Member to another and MERS tracks the transfers electronically on the MERS System. In other words, with "nominee" status only, MERS nonetheless claims to be something else entirely at the same time -- a "beneficiary" or "grantee" of a note or the servicing rights on that note, even though (1) it never held and does not hold an ownership interest in either the note or servicing rights at the time of the original loan transaction and even after such note or servicing rights were subsequently sold (and potentially re-sold) in the market, whether as a mortgage backed security or otherwise, and (2) it cannot be a trustee under Georgia law.

17.

MERS claims that so long as the subsequent sale of the note or servicing rights involves a member of MERS, MERS remains the "beneficiary" of record on the deed of trust or the "grantee" on the security deed and continues to act as a "nominee" for the new beneficial owner.

such bifurcation was intended because such a bifurcation of the note from the deed of trust would render the debt unsecured."); *In re Leisure Time Sports, Inc.* 194 B.R. 859, 861 (9th Cir.1996) (stating that "[a] security interest cannot exist, much less be transferred, independent from the obligation which it secures" and that, "[i]f the debt is not transferred, neither is the security interest"); In re BNT Terminals, Inc., 125 B.R. 963 (Bankr. N.D. Ill. 1990) ("An assignment of a mortgage without a transfer of the underlying note is a nullity. . . . It is axiomatic that any attempt to assign the mortgage without transfer of the debt will not pass the mortgagee's interest to the assignee."); Yoi-Lee Realty Corp. v. 177th Street Realty Associates, 208 A.D.2d 185, 626 N.Y.S.2d 61, 64 (N.Y.A.D. 1 Dept.,1995) ("The mortgage note is inseparable from the mortgage, to which the note expressly refers, and from which the note incorporates provisions for default."); In re AMSCO, Inc ., 26 B.R. 358, 361 (Bkrtcy. Conn., 1982) (reaffirming that "[t]he note and mortgage are inseparable"); Barton v. Perryman, 577 S.W.2d 596, 600 (Ark., 1979) ("[A] note and mortgage are inseparable."); Trane Co. v. Wortham, 428 S.W.2d 417, 419 (Tex. Civ. App. 1968) ("The note and mortgage are inseparable. . . ."); Kirby Lumber Corp. v. Williams, 230 F.2d 330, 333 (5th Cir. 1956) ("The rule is fully recognized in this state that a mortgage to secure a negotiable promissory note is merely an incident to the debt, and passes by assignment or transfer of the note. * * * The note and mortgage are inseparable. . . ."); *Kelley v. Upshaw, 39 Cal.2d 179, 192, 246 P.2d 23 (1952)* ("In any event, Kelley's purported assignment of the mortgage without an assignment of the debt which is secured was a legal nullity."); Hill v. Favour, 52 Ariz. 561, 84 P.2d 575 (Ariz. 1938) ("The note and mortgage are inseparable; the former as

obtaining legal title to real property in the State of Georgia as a trust or trustee for the

benefit of MERS members and non members.

**59.**

MERS has no authority to hold legal title to real property and promissory notes in

the State of Georgia as a trust or trustee.

**60.**

MERS has no authority to sell real property and/or promissory notes as a trust or

trustee for any entity.

**61.**

MERS is acting as a trust or trustee without appropriate approval from the Georgia

Department of Banking and Finance.

**62.**

MERS cannot register to act as a trust or trustee in the State of Georgia because it

does not now meet the registration requirements to be registered by the Georgia

Department of Banking and Finance.

**63**

In addition to being void because MERS cannot lawfully be a Grantee of a

Security Deed acting solely as a nominee for a lender because MERS would be acting as

a corporate fiduciary in Georgia when it lacks the capacity to act as a corporate fiduciary,

the Security Deeds of the Plaintiff and the putative plaintiffs naming MERS, acting solely

as nominee, and thereby conveying legal title to the property to MERS, acting solely as

nominee, as opposed to conveying legal title to the Lender, also causes a problem with





Black's Law Dictionary defines "nominee" as "[a] person designated to act in place of another, usually in a very limited way" and as "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." Black's Law Dictionary 1076 (8th ed. 2004).



A "beneficiary" is defined as "one designated to benefit from an appointment, disposition, or assignment . . . or to receive something as a result of a legal arrangement or instrument." BLACK'S LAW DICTIONARY 165 (8th ed. 2004).



But it is obvious from the MERS' "Terms and Conditions" that MERS is not a beneficiary as it has no rights whatsoever to any payments, to any servicing rights, or to any of the properties secured by the loans.



With respect to a corporation, such as MERS, acting as a fiduciary, O.C.G.A § 7-1-242 declares:

    1.   No corporation, partnership, or other business association may lawfully act as a fiduciary in this state except:

        (1) A financial institution authorized to act in such capacity pursuant to the provisions of Georgia law;

        (2) A trust company;

        (3) A national bank or a state bank lawfully doing a banking business in this state and authorized to act as a fiduciary under the laws of the United States or another state;

Case 12-12020-mg Doc 8354-2 Filed 04/04/15 Entered 04/04/15 18:56:12 Appendix Exhibits A-H through P-Q Page 126 of 153 of 152

11-5116

   *(B)* *A trust company in violation of Code Section 7-1-242...* (emphasis supplied)



  MERS is clearly acting as a Trust Company as its role with respect to the Deed to Secure Debt is to hold legal title to property for the benefit of another. The Supreme Court of Georgia has ruled:

> "No formal words are necessary to create a trust estate. *Whenever a manifest intention that another person shall have the benefit of the property is exhibited, the grantee shall be declared a trustee.*" (emphasis supplied).

*Carmichael Tile Co. v. Yaarab Temple Bldg. Co.*, 182 Ga. 348 (Ga. 1936) (emphasis added).



  OCGA Sec. 53-12-24(a), states that a corporation that wishes to act as trustee "must have the power to act as a trustee in Georgia."



  OCGA Sec. 7-1-242 provides that only certain corporations or business entities may act as a fiduciary in Georgia. These are basically banks, trust companies, and other financial institutions.

-21-

issue an order that declares that all deeds under power (i.e. foreclosure deeds) that were prepared as a result of the invalid non-judicial sales of the Plaintiff's property and the property of the putative plaintiffs and that were recorded on the land records of the Georgia counties wherein the land lies are VOID and which restores title as it existed just prior to the invalid foreclosure sale.

### COUNT II

### WRONGFUL FORECLOSURE AS A TORT

The Plaintiff incorporates by this specific reference the preceding paragraphs of this Complaint as if stated fully herein.



In Georgia there exists a statutory duty upon a mortgagee to exercise fairly and in good faith the power of sale in a deed to secure debt. Although arising from a contractual right, breach of this duty is a tort compensable at law. <u>Clark v. West, 196 Ga. App. 456, 395 S.E.2d 884 (1990)</u>



Because of any one of the reasons identified above, including but not limited to (1) the fact that no notice meeting the requirements of OCGA 44-14-162.2 was sent to the Plaintiff or the putative plaintiffs by the secured creditor becaus, (2) the fact that MERS was not a holder in due course of the promissory note, (3) the fact that the security deed only granted power of sale to MERS, acting solely as nominee for the lender, in the very limited and extraordinary circumstance that it becomes necessary to comply with local



# **Exhibit 1-N**

**IT IS ORDERED as set forth below:**

**Date: August 26, 2011**

_Mary Grace Diehl_
_____
**Mary Grace Diehl**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| | : | |
| **ALFREDIA PRUITT,** | : | Case Number: **11-52442-MGD** |
| | : | |
| Debtor, | : | Judge Mary Grace Diehl |
| _____ | : | |
| | : | |
| **ALFREDIA PRUITT,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adversary Proceeding: **11-5116** |
| | : | |
| **MERS/GMAC, FANNIE MAE, USAA** | : | |
| **FEDERAL SAVINGS BANK and** | : | |
| **FEDERAL NATIONAL MORTGAGE,** | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

### ORDER DISMISSING ADVERSARY PROCEEDING

Alfredia Pruitt ("Debtor") initiated the above-styled adversary proceeding on March 2, 2011,

by filing a multiple count complaint against the above named Defendants.  Debtor's underlying

Chapter 7 was dismissed on August 25, 2011 based on Debtor's motion to voluntarily dismiss her case.[1] (Case No. 11-52442; Docket No. 49). Debtor has also filed a motion to dismiss the above-styled adversary proceeding. However, because this adversary proceeding was on appeal, this Court no longer had jurisdiction to enter a dismissal order. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402, 74 L. Ed. 2d 225 (1982); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 638 (11th Cir. 2010). On August 24, 2011, Debtor's appeal was dismissed. (Docket Nos. 24 & 25). Based on the dismissal of the appeal, Debtor's motion to dismiss this adversary action, and the dismissal of Debtor's underlying Chapter 7 case, it is

**ORDERED** that the above-styled adversary proceeding is hereby **DISMISSED**.

The Clerk is directed to serve a copy of this Order on Plaintiff, Defendants, and counsel for Defendants.

**END OF DOCUMENT**

---

[1] Debtor's Chapter 7 case was dismissed pursuant to an order under 11 U.S.C. §§ 109(g) and 349(a), and Debtor is barred from filing another bankruptcy case, under any chapter, through and including August 17, 2012.

# **Exhibit 1-O**

# IN THE SUPERIOR COURT FOR THE COUNTY OF GWINNETT
## STATE OF GEORGIA

CIVIL ACTION FILE#

**{ 2 4   0 1 3 8 8**

**ALFREDIA PRUITT** *pro se,*       **JURY TRIAL**

    **Plaintiff**       **DEMANDED**

v.

**MERS/GMAC, USAA FEDERAL SAVINGS BANK,
FEDERAL NATIONAL MORTGAGE ASSOCIATION,
FANNIE MAE,**

## COMPLAINT

## FOR WRONGFUL FORECLOSURE, DECLARATORY RELIEF AND JUDGEMENT, ASSIGNMENT AND TITLE FRAUD/SLANDER OF TITLE, VIOLATION OF DUTY OF GOOD FAITH AND FAIR DEALING.  CLAIM FOR LITIGATION FEES AND COSTS AND PUNITIVE DAMAGES

1. Plaintiff Alfredia Pruitt brings this action against the above-named Defendants for

   Wrongful foreclosure, declaratory relief and judgment, title fraud/slander of title,

   violation of duty of good faith and fair dealing and makes claims for litigation fees

   and  cost, as well as punitive damages.

2. The above-named Defendants have unlawfully and wrongfully foreclosed on Plaintiff

   home Located at 2360 Hickory Station Circle, Snellville, Georgia 30078.  This

   property was  Owned by Alfredia Pruitt(plaintiff).  It was her primary residence since

   2006.  It was auctioned on the Gwinnett County Court house steps on September 7,

   2010.

2

## INTRODUCTORY STATEMENT

3. The plaintiff signed a Security deed with USAA Federal Savings Bank on August 6,

2006, which was recorded in the office of the clerk of superior court of Gwinnett

County.

4. The Plaintiff assumed over the years of changing servicers, mortgage lenders, etc.,

that proper title and recording procedures had been followed.

5. Plaintiff spoke with HUD Counselor on June 2010 and January 2011,

Counselor told Plaintiff according to her financial Summary she was eligible for the

making home affordable plan, and they would fax documents in to USAA Federal

Savings, Plaintiff did a Follow up and was told by the HOPE advisor(Annie

Williams) the modification documents was submitted to the lender.

After faxing paper work for a loan modification to USAA Federal Savings loan

litigation department, the true lender (secured creditor) in June 2010 by USAA

Federal Housing counseling(Ability) and myself, I

was told on August 6, 2010 a complete package had been received, HUD advised me

As long as the lender receive paper work 2 least 15days in advance, that is the time

required. Plaintiff was in review for a loan modification when her home was

foreclosed on.

Plaintiff was told in August 2010, a complete package had been received only to be

told on 9/17/2010, insufficient time to review, 10/1/10, investor group did not give

them enough time to modify under program requested, HAMPP program denied

account is in review for another workout, on 1/13/2011, plaintiff was told not given

3

authority by the  investor to modify her loan, home gone into FCI sale,

Told not enough time to be reviewed and not qualified, seeking additional ways to

Aide.

6.  Therefore, Plaintiff started a documented exchange sending QWR(Qualified Written

Request) to  the Defendants asking them via  Certified letters to clarify their standing

as secured creditors, servicers, agents, related to subject property.

7.  On September 7, 2010, Plaintiff home was foreclosed on, Plaintiff filed a chapter 13,

on September 7, 2010 @ 8:30 a.m. it was dismissed on November 17,

2010, on January 28, 2011 Plaintiff filed a chapter 7 it was dismissed on August

26, 2011.  The foreclosure was not re-advertised; also Plaintiff was protected under

OCGA 9-11-65 covers injunctions and restraining orders.

8.  Over 14 months-from September 2010-August 2011, the Plaintiff repeatedly asked

The Defendants to validate their standing as required by Georgia law.

9.  On August 6, 2010 Defendant Anthony Demerol and McCurdy Candler mailed to the

Plaintiff A NOTICE OF FORECLOSURE SALE, representing GMAC  as creditor.

All letters Came from USAA Federal Savings bank, not one from GMAC.

10.  Foreclosure deed, dated Feb, 14, 2011 state GMAC was the highest bidder for cash at

and for the sum of 285,000,576.74.  Letter dated November 4, 2010 Fannie Mae own

my  loan and USAA is the servicer.

11.  The plaintiff opposed the foreclosure/eviction action and filed an appeal for a

temporary restraining order and preliminary injunction, in the Superior court of

4

Gwinnett County to force the defendants to cease foreclosure activity and to clarify
their standing to collect monies, and or to foreclose Plaintiff's home at 2360 Hickory
Station Circle, Snellville, Georgia, 30078. Under the contract of the Deed of Trust
and Civil Code Statues, only the lender or the Holder may initiate a foreclosing
proceeding, who is entitled to the payment.

12. The appeal was not heard because plaintiff had not paid the required rent into the
court registry.

13.. The Defendants was granted a dismissal of the Plaintiffs motion, all suits, because
plaintiff had not paid money for the appeal into the court registry.

14. In this current foreclosure/eviction action, Plaintiff Alfredia Pruitt alleges that
Georgia Laws were violated, and that such violation has caused undue pain and
suffering.

## FIRST CAUSE OF ACTION

## WRONGFUL FORECLOSURE

15. The contents of the paragraphs set forth above are incorporated here as if fully set
Forth herein.

16. The Plaintiff alleges that the Defendants are not the "Secured Creditors" and have
Violated O.C.G.A. 44-14-162(a-c)by commencing foreclosing on 2360 Hickory
Station Circle, Snellville, GA 30047 on September 7, 2010

17. While Defendants August 6, 2010 NOTICE OF FORECLOSURE listed Defendant
GMAC as the creditor, Please note:

   A. Examination of the Gwinnett County Real Estate Records on September

5

2010,  prior months and months thereafter, revealed that none of the

defendants had recorded any assignments of title as required by Georgia

Law.

### Doctrine of Privity of contract

Requires that only parties to a contract may

bring suit to enforce it(A) A party may assign to another a contractual

Right to collect payment, including the right to sue to enforce the right, but

an assignment must be in writing in order for the contractual right to be

enforceable by the assignee, further the writing must identify the assignor

and assignee., [Cit]Scott v. Cushman & Wakefield of Ga.Inc. App. 264,

265 9547 SE 2d 794) (2001); OCGA 9-2-10.

18. According to O.C.G.A.  44-14-64(a-c) only the documented secured creditor/Holder

In Due Course can foreclose on subject property.


19. **United States District Court Judge** (for Northern District of Georgia) Amy

**Totenburg** in Morgen vs. Ocwen Loan Servicing LLC. Not only concurs, but makes

it clear the Georgia Supreme Court view on this matter:

District court judge Amy Totenberg ruled the Georgia law means what its words say-

that is only the Secured Creditor(the rightful note Holder) can foreclose without

going to court. The key part of Georgia Law is 44-14-162 which governs non-

judicial foreclosures must receive notice before the foreclosure can happen, and not

6

just any notice will do, specifically, the notice of the initiation of proceedings to

exercise a power of sale in a mortgage, security deed, or other lien contract shall be

given to the debtor by the secured creditor no later than 30 days before the date of the

proposed foreclosure.

20. The Plaintiff's allegation of fraudulent assignments and bad faith stem from the

assignment executed on November 25th 2008, from MERS(Mortgage Electronic

Registration.

21. Plaintiff specifically avers that a frequently created Assignment confers no right

At all let alone the right to foreclose.

22. Plaintiff received a letter from USAA Federal Savings Bank the note paid in full

On September 16, 2010.

23. The August 25, Assignment from MERS to GMAC the Note and Security Deed

filed by Defendants featured the signature of known robo-signer- Jeffrey Stephan.

24. The Defendants have acted in bad faith by initiating foreclosures on the Plaintiff

home with the full knowledge that the purported assignment was signed by Jeffrey

Stephan, who had admitted in a Florida deposition that he signed thousands of

affidavit's a month without personal knowledge, and has made false statements to

courts under oath in hundred of cases.

25. Ohio judge, Margarett Russo, ordered GMAC to appear before her to provide "**proof
of integrity of all documents submitted" in the foreclosure case US Bank,
National Association as Trustee vs. James W. Renfro.  Russo made this**

7

**Requirement for US Bank and its servicer--GMACC(GMAC mortgage**

**Corporation)discovered that"….verification irregularities may have occurred in**

**connection with the execution of certain affidavits used in the judicial**

**foreclosure process.** GMACM requests that the order of sale be withdrawn until

GMACM can confirm the accuracy of the affidavit supporting judgement in this

matter…"

26. **On January 19, 2011, the Washington Post reported:**

    A. **Ally Financial, one of the nation's largest lenders, said Tuesday that**

        **It is withdrawing all of its foreclosures in Maryland that were approved**

        **By employee Jeffrey Stephan, the "robo-signer" who admitted he signed**

        **Off on thousands of files every month with little or no review.  The**

        **company,**

        **formerly known as GMAC, said about 250 active cases signed by Stephan,**

        **will be dismissed…"**

27. The Defendants operated in bad faith by not verifying and instead submitting into

    The Gwinnett County Real Estate Record a document signed by Jeffrey Stephan.

28. Though not binding in Georgia, the Defendants, aforementioned pattern of using

    Stephan's fraudulently signed documents to establish title ownership where none

    exists, combined with the defendants' early refusal to validate their standing to the

    plaintiff. And their decision to execute and file an after-the-fact assignment which is

    fraudulent on its face, leads the plaintiff to the conclusions and Plaintiff alleges:

8

A. That Jeffrey Stephan-signed ASSIGNMENT OF NOTE AND SECURITY DEED
is consistent with the thousands of other fraudulent documents he has signed, there
Is no co-operate seal affixed on the assignment.

B. Knowing this is in bad faith, the Defendants recorded it in the Gwinnett County
Real Estate Record to fraudulently vest title in the Defendant-GMAC, in order to
justify the Defendants wrongfully foreclosing on Plaintiff Alfredia Pruitt home and
property at 2360 Hickory Station Circle, Snellville, Georgia 30078.

C. Where a grantor conveys land in which he has no interest and later acquires title
after the after acquired title will vest in the first grantee against subsequent
purchasers, "Roy Brinson v Clara B Thornton, et al.220Ga 234, 138 SE 2d 268,
270(1964). Citing JL Dillard v. Christine Crane Brannan, et al. 217 GA.179, 122
SE 2d 768, 771 (1961). [2]. To foreclose mortgage lenders must be in possession
of the original mortgage note.

29. **Jeffrey Stephan has signed many assignments, all are different signatures,
even the one on Plaintiff assignment from MERS to GMAC.**

**MERS Assignment to GMAC on November 25, 2008 is the only
assignment in the Gwinnett county records, at the very least it will take
Discovery, depositions and a trial to clarify these abnormalities.**

**The Security Deed further provides: "MERS" is a separate co-corporation
that is acting solely as a nominee for lender and lenders' successors and
assigns. The security deed does state the plaintiff grants and conveys to**

9

MERS (solely as nominee for lender and lenders successors and assigns.  The

Security deed provides "MERS hold only legal title to the interest granted by

borrower in this security.  The Security deed further provides:  The Security

deed does state the plaintiff grants and conveys to MERS(solely as nominee for

lender and lenders successors and assigns.  The Security deed provides "MERS

hold only legal title to the interest granted by borrower in this security.


### Improper Mortgage Securitization

30. *A specific rule of UCC(Uniform Commercial Code) implies that a Holder of a*

*mortgage note must be a Holder in Due Course, Holder in Due Course is the*

*original subsequent transfers are referred to as holders, Holders who take with no*

*notice, of defect or default are called "Holders in Due Course3-305(b).*

### Bifurcation

31.  Plaintiff note has been bifurcated; the note and mortgage are inseparable;  the former

as essential, the latter as an incident.  An assignment of the note carries the mortgage

with it, while an assignment of the latter alone is a nullity, Carpenter v. Longan 83

U.S. 271, 274, 211., ED. 313(1873).

*On July 7, 2011, the U.S. District Court for the Northern*

*District of Georgia held that a non-judicial foreclosure may be wrongful where*

*The foreclosing party does not hold both the security Deed and the note at the time*

*of foreclosure.*

*Under US Supreme Court ruling, it is stated that the promissory note is the object*

*10*

*and the Deed of Trust is the attachment, where the Promissory note goes, the Deed of Trust must follow.*

### QUIET TITLE /SLANDER TITLE

32. The Defendants' frequently assignments create both patently and latently defective deeds, which slanders the title of any property foreclosed upon that relied upon an assignment with the fraudulent attestation causing the Plaintiff damages.

33. While Purporting to have standings, the Defendants by initiating multiple foreclosures proceedings, actually slandered the Plaintiff's title, and in violation of O.C.G.A. 44-14-162.2(A-C), the Defendants routinely refused and failed to proffer evidence to show any one of them has the capacity, standing, and authority to:

   A. accelerate Plaintiff Alfredia Note;

   B. Exercise a valid Power of Attorney to conduct a non-judicial Foreclosure sale of the property;

   C. Advertise and notice a non-judicial foreclosure action;

   D. Modify any terms or conditions of the Plaintiff's Note.

   E. Collect any fees owed to the note's defined "Note Holder,"

   F. Foreclose on subject property.

34. Uniform Commercial Code 3-309 states a person seeking to enforce a missing instrument must be a person entitled to enforce the instrument, and that person must prove the instrument's terms and that person's right to enforce the instrument 3-309(a)(1)&(b).

35. Federal rule of Civil Procedure 17(a)(1) requires that "[a]n action must be pursued in