Richard M. Cieri
Ray C. Schrock, P.C.
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| RESIDENTIAL CAPITAL, LLC, et al. | ) Case No. 12-12020 (MG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**ALLY FINANCIAL INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS
OBJECTION TO THE DEBTORS' MOTION FOR A DETERMINATION THAT
(I) GMAC MORTGAGE'S FRB FORECLOSURE REVIEW OBLIGATION IS A
GENERAL UNSECURED CLAIM AND (II) THE AUTOMATIC STAY PREVENTS
ENFORCEMENT OF THE FRB FORECLOSURE REVIEW OBLIGATIONS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ..............................................................................................................................3

I.      Any Payments For Restitution Or Reimbursement That Could Be Required By An
        FRB-Approved Foreclosure Remediation Plan Would Not Constitute General
        Unsecured Claims. ........................................................................................................3

II.     Ally Cannot Be Held Liable For Any Potential Shortfall In Any Restitution Or
        Reimbursement Payments That The Debtors May Be Required To Make As Part
        Of The Foreclosure Review. .........................................................................................10

CONCLUSION ..........................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979) ................................................................ 12

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) .................................................................. 5

*In re Boston Post Rd. Ltd. P'ship*,
   21 F.3d 477 (2d Cir. 1994) ....................................................... 9

*In re Chateaugay Corp.*,
   53 F.3d 478 (2d Cir. 1995) ....................................................... 8

*In re Chateaugay Corp.*,
   944 F.2d 997 (2d Cir. 1991) ............................................. 2, 3, 6, 7

*In re Klein Sleep Prods., Inc.*,
   78 F.3d 18 (2d Cir. 1996) ......................................................... 9

*In re Lamparter Org., Inc.*,
   207 B.R. 48 (E.D.N.Y. 1997) ................................................... 9

*In re Mazzeo*,
   131 F. 3d 295 (2d Cir. 1997) ................................................... 8

*In re McLean Indus., Inc.*,
   132 B.R. 267 (Bankr. S.D.N.Y. 1991) .................................... 12

*In re Oldco M Corp.*,
   438 B.R. 775 (Bankr. S.D.N.Y. 2010) ..................................... 7

**Statutes**

11 U.S.C. § 503(b) ...................................................................... 9

11 U.S.C. § 503(b)(1) .................................................................. 4

12 U.S.C. § 1818(i) ...................................................................... 2

12 U.S.C. § 1818(i)(1) .................................................................. 5

**Other**

Restatement (Third) of Suretyship & Guaranty §§ 37(2), 41(b) ................................................. 12

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. ("*AFI*"), on behalf of itself and its non-debtor subsidiaries

(collectively, "*Ally*"), submits this supplemental brief ("*Supplemental Brief*") in support of its

objection (the "*Objection*") [ECF No. 3150] to the *Debtors' Motion Pursuant to Bankruptcy*

*Rule 3013 and Bankruptcy Code Section 362(a) for a Determination that (I) GMAC Mortgage's*

*FRB Foreclosure Review Obligation Is a General Unsecured Claim and (II) the Automatic Stay*

*Prevents Enforcement of the FRB Foreclosure Review Obligation* [ECF No. 3055] (the

"*Motion*").[1]

## **PRELIMINARY STATEMENT[2]**

1.      The Court asked the parties to address two questions:

[1.]    Are any payments for restitution or reimbursement general unsecured
claims?

[2.]    [W]ould Ally Financial be liable for any shortfall in restitution or
reimbursement payments if they are general unsecured claims and the pro rata
share paid to unsecured creditors [is] less than the full amount?

Hr'g Tr. ("*Hr'g Tr.*") 98:6-12, Mar. 21, 2013.  For the reasons stated herein, the answer to both

of the Court's questions is no.[3]

---

[1] Capitalized terms used in this Supplemental Brief without definition have the meaning ascribed to them in the
Motion or the Objection.

[2] At the outset, AFI wishes to inform the Court that, since the Court's hearing on this matter, consistent with the
Court's statements on the record, AFI has maintained a dialogue with the FRB and the Debtors regarding the Consent
Order's obligations and compliance therewith.  Further, AFI is continuing Plan mediation discussions in
good faith.

[3] Additionally, at the hearing, a question arose over the entities included in the definition of "Mortgage Servicing
Companies" under the terms of the Consent Order.  The Order provides: "WHEREAS, Ally Financial engages in the
business of servicing residential mortgage loans through various indirect subsidiaries, including GMAC Mortgage
and its subsidiaries (collectively, the 'Mortgage Servicing Companies')."   (Consent Order, at 2 (attached to
Objection as Ex. 1))  Subsequent portions of the Consent Order make clear that "Mortgage Servicing Companies"
refers only to "GMAC Mortgage and its subsidiaries," and **not** to AFI or ResCap.  *See, e.g., id.* at page 4 (referring
separately to "Ally Financial, ResCap, and the Mortgage Servicing Companies"); *id.* at page 5 (similar); *id.* ¶ 2
(similar); *id.* ¶ 12 (similar).  The FRB's Order of Assessment, which contains the same "whereas" clause, similarly
refers separately to Ally Financial, ResCap, and the Mortgage Servicing Companies.  *See, e.g.,* Order of Assessment
of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, at page

2.      As to the Court's first question, any payments for restitution or reimbursement by

the Debtors under a foreclosure remediation plan approved by the FRB cannot be reclassified as

general unsecured claims for three reasons:

- *First*, less than payment in full of obligations under the Consent Order would "affect" the enforcement of the Consent Order (and constitute a breach of the Debtors' obligations under the Consent Order), which this Court lacks jurisdiction to do under federal statute. *See* 12 U.S.C. § 1818(i).  Indeed, if the Court were to grant the Debtors' Motion, it would be taking the unprecedented step of determining what compliance means under a Consent Order with a federal banking regulatory agency.

- *Second*, even if the Court found it had jurisdiction to reclassify any restitution or reimbursement payments by the Debtors as general unsecured claims, such payments are "part and parcel" of the Foreclosure Review process and thus constitute part of a non-severable, non-dischargeable obligation under the Second Circuit's holding in *In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2d Cir. 1991).

- *Third*, such payments cannot constitute claims because neither the FRB nor any homeowner-borrower has a relationship with the Debtors that entitles them to a "right to payment"—that is, a claim—under the Consent Order or otherwise.

3.      As to the Court's second question, assuming the Court found that it had

jurisdiction, that the Debtors' failure to pay for their obligations under the Consent Order was not

a breach of the Consent Order, that the order's obligations are severable, and that the payments

thus are dischargeable, a ruling from the Court on the Debtors' Motion would not result in

liability to Ally for any potential shortfall in those payments by the Debtors for two primary

reasons:

- *First*, because the Foreclosure Review has not yet been completed and the Debtors' obligations resulting from that Review have therefore not yet been determined, any decision by the Court on Ally's possible liability with regard to those obligations—or even as to the Debtors' own liability—would constitute an advisory opinion.

- *Second*, any modification of the Debtors' obligations under the Consent Order would in fact discharge Ally from any secondary liability with regard to the Debtors' obligations under basic principles of suretyship law.

---

4 & ¶¶ 1, 10, *In re Ally Fin. Inc., Residential Capital, LLC, & GMAC Mortg. LLC*, Nos. 12-006-CMP-HC, 12-006-CMP-DEO (Feb. 10, 2012) (the "***Order of Assessment***") (attached as Ex. 1).  And this definition makes sense, as only GMAC Mortgage and its subsidiaries—and not Ally or ResCap—service mortgage loans.

4.      Moreover, the relief sought in the Motion would have serious unintended consequences for the Debtors' estates, as the Debtors' failure to satisfy, in full, their obligations under the Consent Order would result in an immediate termination event under the cash collateral order, breach of the subservicing agreement, jeopardize the Debtors' ability to comply with relevant regulations, and may affect the Debtors' ability to realize the full value of the assets remaining in the estates.  This is particularly true while the Debtors unquestionably remain subject to the FRB's jurisdiction.

## ARGUMENT

I.      **Any Payments For Restitution Or Reimbursement That Could Be Required By An FRB-Approved Foreclosure Remediation Plan Would Not Constitute General Unsecured Claims.**

5.      The Court cannot reclassify any ultimate obligation of the Debtors to make monetary restitution or reimbursement payments under a foreclosure remediation plan approved by the FRB (*see* Consent Order ¶ 3(c)-(d)), as a general unsecured (and thus dischargeable) claim because the reclassification of such obligation would impermissibly "affect" the enforcement of the Consent Order—which this Court lacks jurisdiction to do under federal statute—and, additionally, such obligations are "part and parcel" of the entire Consent Order and thus constitute part of a non-severable, non-dischargeable obligation under the Second Circuit's holding in *In re Chateaugay*, 944 F.2d 997, 1008 (2d Cir. 1991).  Moreover, even if that were not the case, any such restitution or reimbursement payments cannot constitute "claims" under the Bankruptcy Code for the fundamental reason that neither the FRB nor any homeowner-borrower has a "right to payment"—under the Consent Order or otherwise—as is required to render an obligation a dischargeable claim.

6.      As an initial matter, the Creditors' Committee's entire argument that the Debtors' Foreclosure Review obligations are dischargeable because, at least in some circumstances,

payments for restitution or reimbursement are themselves dischargeable, proceeds from a false premise. According to the Creditors' Committee, the Debtors' Consent Order obligations (including the Foreclosure Review) simply consist of making restitution payments to injured homeowner-borrowers. (*See* Creditors' Committee Reply[4] 10-12 (discussing only "restitution claims").)[5] Not so. As the FRB explained at the hearing on the Debtors' Motion, the Consent Order does not simply require the Debtors to pay restitution for prior improper foreclosure actions. Rather, in addition to requiring performance of the Foreclosure Review itself, the Consent Order, "by its very terms, requires GMAC Mortgage to submit to [the FRB] a remedial plan to correct the problems that the independent consultants identif[y]." Hr'g Tr. 82:20-23; *see also* FRB Objection[6] 13-14 n.6 (citing Consent Order ¶¶ 3, 4, 8(m)). As the FRB further explained, those problems "may be misfiled deeds. They may be a wrongful foreclosure that needs to be rescinded. It may be a loan modification that was improperly denied and now needs to be offered to a borrower." Hr'g Tr. 82:24-83:2. To be certain, such problems may also include "a payment, because [GMAC Mortgage] may have overcharged someone fees and they need to reverse them," but "[the Consent Order] does not require a 'payment' to anyone. . . . It

---

[4] *Reply of the Official Comm. of Unsecured Creditors to the Debtors' Mot. for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Is a General Unsecured Claim & (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation* (the "**Creditors' Committee Reply**") [ECF No. 3245].

[5] The Creditors' Committee also notes, in passing, potential claims that AFI may have against the Debtors for recoupment of fees paid to PwC for conducting the Foreclosure Review. (*See* Creditors' Committee Reply ¶ 17.) As explained in Ally's Objection, such a right to recoupment—which is wholly separate from the question of the status of restitution or reimbursement payments made to borrowers based on the findings of the Foreclosure Review—whether asserted by the FRB or by Ally in the event Ally satisfied the Debtors' obligations to the FRB and pursued the FRB's claim by subrogation or by a separate claim for substantial contribution, would be entitled to administrative expense priority under section 503(b)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 503(b)(1). Additionally, any determination regarding Ally's rights would require at least an evidentiary hearing, if not a trial, and is not yet ripe for adjudication. *See* Hr'g Tr. 80:8-16. Ally continues to reserve all of its rights with respect to any claim, and the priority of any claim, against the Debtors for any payments that Ally may ultimately be required to make as a result of the Debtors' failure to perform their obligations under the Consent Order.

[6] *Bd. of Governors of the Fed. Reserve System's Objection to Debtors' Mot. for a Determination that (I) GMAC Mortgage's FRB Foreclosure Review Is a General Unsecured Claim & (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation* (the "**FRB Objection**") [ECF No. 3149].

requires [GMAC Mortgage] to undertake measures to correct the consequences of their misconduct." *Id.* at 83:2-7.  Thus, the Debtors' Consent Order obligations resulting form the Foreclosure Review will likely not consist solely of restitution payments, rendering the Creditors' Committee's argument wholly inapposite.

7.    In any event, even if certain of the Debtors' Consent Order obligations could be satisfied by simple monetary restitution payments, this Court cannot reclassify those obligations as general unsecured claims because such reclassification would excuse the Debtors from fully performing such obligations, thereby unquestionably "affecting" the enforcement of the Consent Order—which this Court lacks jurisdiction to do under federal statute.  As Ally explained in its Objection, 12 U.S.C. § 1818, under which the Consent Order was issued (*see* Consent Order, page 6), expressly provides that, subject to certain exceptions not relevant here, "***no court shall have jurisdiction to affect*** by injunction or otherwise the issuance or enforcement of any notice or order under [section 1818], or to review, modify, suspend, terminate, or set aside any such notice or order."  12 U.S.C. § 1818(i)(1) (emphasis added); *see also Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 42 (1991) (explaining that "the specific preclusive language in 12 U.S.C. § 1818(i)(1) is not qualified or superseded by the general provisions governing bankruptcy proceedings").  Yet, this is precisely what the Debtors' Motion seeks to do: affect the enforcement of the Consent Order and modify its obligations.[7]  Moreover, even the act of reclassifying any ultimate obligation of the Debtors to make monetary restitution or reimbursement payments under a foreclosure remediation plan as general unsecured claims

---

[7] Notably, the Debtors waived their ability to challenge or modify the Consent Order as part of the board of directors resolutions ratifying their entry into the Order.  (*See* Consent Order, pages 5-6 ("The boards of directors of . . . ResCap, and GMAC Mortgage . . . adopted resolutions . . . consenting to compliance with each and every applicable provision of this Order . . . and waiving any and all rights that . . . ResCap, and GMAC Mortgage may have . . . including, but not limited to . . . judicial review of this Order . . . [and to] challenge or contest, in any manner, the basis, issuance, validity, terms, effectiveness or enforceability of this Order or any provision thereof . . . .").)

would have this same effect because such reclassification would excuse the Debtors from paying

such Consent Order obligations in full—thereby thwarting the Consent Order's enforcement.

8.      Furthermore, even if this Court had jurisdiction to affect the Consent Order's

enforcement, and even if certain of the Debtors' Consent Order remedial obligations could be

satisfied by simple monetary restitution payments, those obligations could not constitute general

unsecured and dischargeable claims because such obligations are "part and parcel" of the

Consent Order's Foreclosure Review (which is itself "part and parcel" of the Consent Order).

*See* Hr'g Tr. 49:9-10 (statement of Creditors' Committee's counsel)*; see also id.* at 49:8-9

(stating that it would be "artificial to divorce the two").  As the Debtors concede, the Consent

Order serves both remedial and forward-looking objectives (*see* Motion ¶ 34)—as does the

Foreclosure Review itself.    Under the Second Circuit's decision in *Chateaugay*, the dual

objectives of the Consent Order are dispositive of the question of the dischargeability of any

restitution or reimbursement payments to be made by Debtors as a result of the Consent Order's

Foreclosure Review.  *See Chateaugay*, 944 F.2d at 1008.

9.      As explained in more detail in Ally's Objection, the Second Circuit in

*Chateaugay* considered the question whether an order obtained by EPA under CERCLA

requiring a debtor-polluter to both remediate contaminated property ***and*** ameliorate continued

pollution constituted a dischargeable claim.  *See* 944 F.2d at 1007-09.  The court held that

because a debtor has a non-dischargeable, ongoing obligation to comply with the law (which the

Debtors here do not dispute (*see* Motion ¶ 32)), "a clean-up order that accomplishes the ***dual***

***objectives*** of removing accumulated wastes and stopping or ameliorating ongoing pollution

emanating from such wastes is ***not a dischargeable claim***."  *Chateaugay*, 944 F.2d at 1008

(emphases added).  As the court explained, "[s]ince there is no option to accept payment in lieu

of continued pollution, any order that ***to any extent*** ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.'" *Id.* (emphasis added); *accord In re Oldco M Corp.*, 438 B.R. 775, 782 (Bankr. S.D.N.Y. 2010) (Glenn, J.) (same).

10. That holding controls here. The Debtors concede that the Consent Order serves the same dual corrective and forward-looking objectives that the Second Circuit explained render such orders non-dischargeable. (*See* Motion ¶ 34.) Indeed, the Consent Order, issued by the FRB pursuant to its "cease and desist" authority, is designed to ensure that the Debtors comply with the law on a going-forward basis and, as the Debtors admit, it imposes numerous ongoing obligations on the Debtors to do precisely that. (*See id.* (citing Consent Order ¶¶ 5, 6, 9); *see also* Consent Order ¶ 8). Likewise, the Foreclosure Review itself serves the "dual objectives of" remedying past injuries and ensuring ongoing compliance with legal obligations—including submitting to the FRB an acceptable compliance program to ensure the Debtors' operations comply with federal and state laws on a going-forward basis. (*See* Consent Order ¶ 8(m)).[8] Just as the Debtors' Foreclosure Review obligations cannot be severed from the rest of their obligations in the single, unified Consent Order without directly contravening the Second Circuit's holding in *Chateaugay* (*see* Objection ¶¶ 35-37), neither can any obligation of the Debtors to make restitution or reimbursement payments as a result of the Foreclosure Review (*see* Consent Order ¶ 3(d)) be severed from the Debtors' non-monetary remedial obligations or

---

[8] Nor can the Debtors escape these forward-looking obligations merely as a result of the sale of their servicing platform. Indeed, as detailed in Ally's Objection, the Debtors explicitly opted to assume these obligations in order to maintain a higher sale price to Ocwen. The Debtors could have required Ocwen to assume the performance of these obligations as part of the sale, which would have inevitably resulted in a corresponding reduction of the sale price. But they did not, and they therefore must continue to perform in accordance with their obligations under the Consent Order and the Ocwen APA.

the rest of the other obligations under the Consent Order.  Such restitution or reimbursement payments therefore cannot constitute general unsecured (and, thus, dischargeable) claims.

11.    Moreover, any restitution or reimbursement obligations that the Debtors may have under the Consent Order as a result of the Foreclosure Review cannot constitute general unsecured claims for the separate and independent reason that neither the FRB nor any homeowner-borrowers have a relationship with the Debtors that entitles them to a right to payment under the terms of the Consent Order.  As the Second Circuit has explained, "[a] claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation—'a right to payment'—under the relevant non-bankruptcy law."  *In re Chateaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995); *see also In re Mazzeo*, 131 F. 3d 295, 302 (2d Cir. 1997) ("[T]he terms 'debt' and 'claim' are coextensive:  a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor." (quotation marks omitted)).

12.    Here, neither the FRB nor any homeowner-borrower has such a relationship with the Debtors under the Consent Order, much less had one before the Debtors filed their bankruptcy petitions.  As the FRB has explained, the Consent Order does not require a payment to the Federal Reserve, *see* Hr'g Tr. 83:4-5, and no homeowner-borrower has any rights under the terms of the Consent Order, including against the FRB or any Debtor (*see* FRB Objection 10-12 (citing Consent Order ¶ 30 ("Nothing in this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy, or claim under this Order."))).  Because neither the FRB nor any homeowner-borrower can establish the required relationship with the Debtors and a right to

8

payment under non-bankruptcy law under the Consent Order, they can have no claim under the Consent Order—general unsecured or otherwise.

13.    Even if this Court determines that remediation payments required by the Consent Order are claims, those claims should be classified as administrative expense claims under section 503(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 503(b).  As Ally detailed in its Objection, the Debtors agreed in the Ocwen APA that they "must comply with and ensure the continued performance of their obligations under paragraphs 3, 4, and 22 of the Consent Order," thereby rendering such obligations post-petition obligations subject to administrative expense priority.  (*See* Objection ¶¶ 46-50 (citing, *In re Lamparter Org., Inc.*, 207 B.R. 48, 51 (E.D.N.Y. 1997), *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 25 (2d Cir. 1996); *In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 484 (2d Cir. 1994)).)

14.    The Creditors' Committee argues that this unambiguous provision of the Ocwen APA is somehow superseded by the "reservation of rights" in paragraph 55 of the Sale Order. (*See* Creditors' Committee Reply ¶ 26 (citing Sale Order ¶ 55).)  But the Creditors' Committee misreads the Sale Order and fails to acknowledge key language qualifying that "reservation of rights" in that paragraph.  Under the plain text of paragraph 55 of the Sale Order, the parties reserved their rights against each other only regarding the ultimate allocation of the *cost* of performance, not the performance itself.  Indeed, the Creditors' Committee artfully omits from its reply the title of paragraph 55 of the Sale Order: "***Preservation of Contribution Claims***." This title constitutes a substantive portion of that paragraph, which the Committee ignores.[9] Moreover, and tellingly, the Creditors' Committee's self-serving interpretation of the "reservation of rights" provision in the Sale Order squarely conflicts with its interpretation of a

---

[9] Notably, the Sale Order does ***not*** contain a provision stating that titles are used for convenience purposes only and cannot affect the interpretation of any provision of the order.

9

virtually identical "reservation of rights" paragraph in the orders granting the Debtors interim

relief to compensate the independent consultants ("***PwC***") for the ongoing Foreclosure Review.[10]

In agreeing to the PwC Interim Order, the Creditors' Committee's counsel specifically stated that

"[w]e are deferring any issues with respect to ***allocation*** between ResCap and Ally . . . and we

understand that that's an issue that will be dealt with at a later date either by the Court or by the

[E]xaminer." *See* Hr'g Tr. 84:8-12, Oct. 10, 2012 (emphasis added) (attached as Ex. 2).

## II.    **Ally Cannot Be Held Liable For Any Potential Shortfall In Any Restitution Or Reimbursement Payments That The Debtors May Be Required To Make As Part Of The Foreclosure Review.**

15.    Even if this Court were to find that any of the Debtors' obligations to make

restitution or reimbursement cash payments resulting from the Foreclosure Review constituted

general unsecured claims, this Court could not hold Ally liable for any potential shortfall in those

payments by the Debtors.[11]  Because the Foreclosure Review has not yet been completed and the

Debtors' obligations resulting from that review have therefore yet to be determined, any decision

by the Court on Ally's possible secondary liability with regard to those obligations—or even as

to the Debtors' own liability—would constitute an impermissible advisory opinion.  *See* Hr'g Tr.

44:23-45:3 ("THE COURT: . . . I'm not even sure whether I would need to decide at this point

whether the restitution payments . . . would be unsecured claims or not, because you're not

---

[10] *See e.g.*, *Interim Order under Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I) Authorizing the Debtors to Compensate PricewaterhouseCoopers, LLP for Foreclosure Review Services In Furtherance of the Debtors' Compliance Obligations under Federal Reserve Board Consent Order and (II) Reaffirming Relief Granted in the GA Servicing Order* (the "***PwC Interim Order***") [ECF No. 1799] ¶ 11.

[11] As noted above, failure by the Debtors to fulfill their obligations under the Consent Order would result in their breach of that order, and the Debtors have not acknowledged the implications and ripple effects of that breach, including whether they could successfully wind down their estate (or even have the capacity to do so without the use of cash collateral, which is only permitted so long as the Debtors remain in compliance with the Consent Order), and whether they could continue to act as Master Servicer, or servicer of record, of loans while in breach of the Consent Order.  *See* Hr'g Tr. 57:16-58:7.

proposing to pay any of them right now . . . . [T]he real thing you're trying to get out from under is the independent foreclosure review.").

16.     As an initial matter, the potential remedial obligations that the Debtors may be required to undertake as part of the Foreclosure Review process may in significant part be non-monetary.  But more importantly, the Debtors' potential remedial obligations are just that—*potential*—as they will depend on the findings in the Foreclosure Review Report prepared after the Foreclosure Review concludes.  As such, any liabilities arising from those obligations simply cannot yet be determined, and Ally cannot be held secondarily liable for them.

17.     Even for the Debtors themselves to be liable for restitution or reimbursement payments as part of the Foreclosure Review process in the first instance—and Ally potentially secondarily liable—a number of events must occur that are in no way certain to occur:

1.     The Debtors must complete the Foreclosure Review;

2.     The Foreclosure Review Plan produced by PwC must call for monetary restitution or reimbursement payments to homeowner-borrowers;

3.     The FRB must approve the Foreclosure Review Plan, including its proposed monetary restitution or reimbursement payments to homeowner-borrowers;

4.     The Court must sever the remediation obligations under the Consent Order from the rest of the obligations under the Consent Order, and then separately sever any monetary restitution or reimbursement cash obligations from the specific performance obligations required by the Foreclosure Review Plan;

5.     The Court must determine that the monetary restitution or reimbursement payments provided for in the Foreclosure Review Plan constitute general unsecured claims rather than obligations that must be complied with in their entirety, notwithstanding the plain reading of 12 U.S.C. § 1818 precluding this Court from taking any action that affects or modifies the Consent Order, and such claims must become allowed claims;

6.     This Court must confirm a chapter 11 plan or otherwise approve distributions to unsecured creditors;

11

7.    Final distributions must be made under the chapter 11 plan and only partially satisfy the monetary restitution or reimbursement payments; and

8.    The FRB must seek to exercise its rights against AFI under its Supplemental Agreement with AFI to hold AFI secondarily liable (at which point AFI could litigate its liability for any shortfall).

Only if each of these events comes to pass—which is by no means guaranteed—can the issue of Ally's potential secondary liability for any shortfall in the Debtors' potential restitution or reimbursement payments be determined without running afoul of the long-standing prohibition on the issuance of advisory opinions. *See In re McLean Indus., Inc.*, 132 B.R. 267, 270 (Bankr. S.D.N.Y. 1991) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

18.    Finally, Ally has defenses to any potential liability to the FRB.  For example, were the Debtors and the FRB to reach a settlement to substitute a payment obligation for the current Consent Order Foreclosure Review and related obligations, as the FRB appears to have done with other mortgage servicing companies that were subject to similar consent orders, such a settlement would in fact discharge Ally from any secondary liability with regard to the Debtors' obligations under the Consent Order under basic principles of suretyship law, because that settlement would have the unquestionable effect of "releasing [the Debtors] from a duty other than payment of money," and/or modifying the debt so as to create a substituted contract or impose fundamentally different risks on Ally or otherwise cause a loss to Ally.  *See* Restatement (Third) of Suretyship & Guaranty §§ 37(2), 41(b).

19.    Ultimately, because the Foreclosure Review has not yet been completed and the numerous events necessary to determine Ally's potential secondary liability have not occurred (and may not, in fact, occur), this Court cannot now hold Ally secondarily liable for any potential shortfall in potential restitution or reimbursement payments that the Debtors may potentially have to make.

## <u>CONCLUSION</u>

For the foregoing reasons, and those in its initial Objection, Ally respectfully requests that this Court deny the Motion.


Dated:  April 5, 2013
      New York, New York

|  |  |
|---|---|
|  | */s/ Ray C. Schrock, P.C.* |
| Jeffrey S. Powell | Richard M. Cieri |
| Daniel T. Donovan | Ray C. Schrock, P.C. |
| KIRKLAND & ELLIS LLP | Stephen E. Hessler |
| 655 15th Street, N.W., Ste. 1200 | KIRKLAND & ELLIS LLP |
| Washington, D.C. 20005 | 601 Lexington Avenue |
| Telephone: (202) 879-5000 | New York, New York 10022 |
| Facsimile: (202) 879-5200 | Telephone: (212) 446 4800 |
|  | Facsimile: (212) 446 4900 |

*Counsel for Ally Financial Inc. and Ally Bank*

# EXHIBIT 1

**In Re:**

*RESIDENTIAL CAPITAL, LLC, et al.*

*Case No. 12-12020-mg*

---

*March 21, 2013*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

```
 1

 2   UNITED STATES BANKRUPTCY COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   - - - - - - - - - - - - - - - - - - - -x

 5   In the Matters of:

 6

 7   RESIDENTIAL CAPITAL LLC, et al.,        Case No. 12-12020-mg

 8

 9            Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   JENKINS, et al.,                        Case No. 12-01935-mg

12            Plaintiffs,

13          - against -

14   RESIDENTIAL FUNDING COMPANY, LLC, et al.,

15            Defendants.

16   - - - - - - - - - - - - - - - - - - - -x

17   KIMBER, et al.,                         Case No. 12-02045-mg

18            Plaintiffs,

19          - against -

20   GMAC MORTGAGE CORPORATION, et al.,

21            Defendants.

22   - - - - - - - - - - - - - - - - - - - -x

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    United States Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    March 21, 2013

19                    10:02 AM

20

21

22    B E F O R E:

23    HON. MARTIN GLENN

24    U.S. BANKRUPTCY JUDGE

25

3

1

2   (CC: Doc# 2994) Debtors' Motion Pursuant to 11 U.S.C. 105(a)

3   and (d), Bankruptcy Rules 1015(c), 2002(m), 7016, and 9007 and

4   Local Bankruptcy Rule 2002-2 for Entry of an Order Approving

5   (A) Supplement to Case Management Order Establishing Mandatory

6   Procedures for Management of Adversary Proceedings Commenced by

7   Borrowers and Former Borrowers and (B) Related Relief.

8

9   (CC: Doc# 3116) Debtors' Application Under Bankruptcy Code

10  Sections 327(a), 328(a) and 363 for Entry of an Order Approving

11  Third Addendum to Engagement Agreement with FTI Consulting,

12  Inc., as Financial Advisor to the Debtors.

13

14  Doc# 3123 Debtors' Motion Pursuant to Section 105(a) of the

15  Bankruptcy Code and Bankruptcy Rules 1009, 3007 and 9019(b) for

16  Approval of (I) Claim Objection Procedures, (II) Borrower Claim

17  Procedures, (III) Settlement Procedures, and (IV) Schedule

18  Amendment Procedures.

19

20  (CC: Doc# 3055) Debtors' Motion Pursuant to Bankruptcy Rule

21  3013 and Bankruptcy Code Section 362(a) for a Determination

22  That (I) GMAC Mortgages FRB Foreclosure Review Obligation Is a

23  General Unsecured Claim and (II) The Automatic Stay Prevents

24  Enforcement of the FRB Foreclosure Review Obligation.

25

4

1

2    (CC: Doc# 2274) Adj. Hearing RE: Motion for Relief from Stay

3    filed by Jeffrey L. Saltiel on behalf of Med&G Group, LP.

4

5    Adj. Hearing Re: Cure Objections. (Related Document no. 61)

6

7    (CC: Doc no. 1746) Status Conference RE: Limited Objection of

8    Financial Guaranty Insurance Company to the Debtors' Sale

9    Motion and Assumption Notice [Docket No. 1746]

10

11   Adversary Proceeding 12-01935-mg, Jenkins, et al. v.

12   Residential Funding Company, LLC, et al.: Doc# 10 Adj. Hearing

13   RE: Debtors Motion Pursuant to Fed. R. Bankr. P. 7012 and Fed.

14   R. Civ. P. 12(e) for a More Definitive Statement.

15

16   Adversary Proceeding 12-01935-mg, Jenkins, et al. v.

17   Residential Funding Company, LLC, et al.:  (CC: Doc no. 1)

18   Adjourned Pre-trial Conference

19

20   Adversary Proceeding 12-02045-mg, Kimber, et al. v. GMAC

21   Mortgage Corporation et al.:  (CC: Doc no. 1) Adjourned Pre-

22   trial Conference

23

24   Adversary Proceeding 12-02045-mg, Kimber, et al. v. GMAC

25   Mortgage Corporation, et al.:  (CC: Doc# 13) Motion to Dismiss

1   Adversary Proceeding / Debtors' Motion for Dismissal of

2   Adversary Proceeding Pursuant to Bankruptcy Rule 7012(b) and

3   FRCP 12(b)(5) and (6) or, in the Alternative, Permissive

4   Abstention Pursuant to 28 U.S.C. 1334(c)(1)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4          Attorneys for Debtors

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8   BY:   NORMAN S. ROSENBAUM, ESQ.

9          ERICA J. RICHARDS, ESQ.

10          LORENZO MARINUZZI, ESQ.

11          STEFAN W. ENGELHARDT, ESQ.

12          JAMES A. NEWTON, ESQ.

13          TODD M. GOREN, ESQ.

14          GARY S. LEE, ESQ.

15

16

17   MORRISON & FOERSTER LLP

18          Attorneys for Debtors

19          755 Page Mill Road

20          Palo Alto, CA 94304

21

22   BY:   DARRYL P. RAINS, ESQ.

23

24

25

1

2   MORRISON & FOERSTER LLP

3         Attorneys for Debtors

4         2000 Pennsylvania Avenue NW

5         Suite 6000

6         Washington, DC 20006

7

8   BY:   OLIVER I. IRELAND, ESQ.

9

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12         Attorneys for Official Creditors' Committee

13         1177 Avenue of the Americas

14         New York, NY 10036

15

16   BY:   RACHAEL L. RINGER, ESQ.

17         KENNETH H. ECKSTEIN, ESQ.

18         ELISE S. FREJKA, ESQ.

19         P. BRADLEY O'NEILL, ESQ.

20         JOSEPH A. SHIFER, ESQ.

21

22

23

24

25

1

2    SILVERMANACAMPORA LLP

3          Special Counsel to Creditors' Committee

4          100 Jericho Quadrangle

5          Suite 300

6          Jericho, NY 11753

7

8    BY:    JUSTIN S. KRELL, ESQ.

9

10

11    WILMER CUTLER PICKERING HALE AND DORR LLP

12          Special Counsel to Creditors' Committee

13          250 Greenwich Street

14          New York, NY 10007

15

16    BY:    WILLIAM J. PERLSTEIN, ESQ.

17

18

19    U.S. DEPARTMENT OF JUSTICE

20          U.S. Attorney's Office

21          86 Chambers Street

22          3rd Floor

23          New York, NY 10007

24

25    BY:    JOSEPH N. CORDARO, ESQ.

```
 1
 2   COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
 3         Attorneys for FTI Consulting Inc.
 4         900 Third Avenue
 5         16th Floor
 6         New York, NY 10022
 7
 8   BY:   JOHN H. DRUCKER, ESQ.
 9
10
11   CLIFFORD CHANCE US LLP
12         Attorneys for Ocwen Loan Servicing, LLC
13         31 West 52nd Street
14         New York, NY 10019
15
16   BY:   JENNIFER C. DEMARCO, ESQ.
17
18
19   BOARD OF GOVERNORS OF THE FEDERAL REVIEW SYSTEM
20         20th and C Streets NW
21         Washington, DC 20051
22
23   BY:   JENNIFER L. SUTTON, ESQ.
24
25
```

1

2  CLEARY GOTTLIEB STEEN & HAMILTON LLP

3       Attorneys for Wilmington Trust

4       One Liberty Plaza

5       New York, NY 10006

6

7  BY:   MARK A. LIGHTNER, ESQ.

8        SEAN A. O'NEAL, ESQ.

9

10

11  KIRKLAND & ELLIS LLP

12       Attorneys for Ally Financial Inc. & Ally Bank

13       601 Lexington Avenue

14       New York, NY 10022

15

16  BY:   RAY C. SCHROCK, ESQ.

17

18

19  KIRKLAND & ELLIS LLP

20       Attorneys for Ally Financial Inc. & Ally Bank

21       655 Fifteenth Street N.W.

22       Washington, DC 20005

23

24  BY:   GREGORY L. SKIDMORE, ESQ.

25

```
 1
 2   KELLEY DRYE & WARREN LLP
 3         Attorneys for UMB Bank
 4         101 Park Avenue
 5         New York, NY 10178
 6
 7   BY:   CATHERINE L. THOMPSON, ESQ.
 8
 9
10   WHITE & CASE LLP
11         Attorneys for Ad Hoc Group of Junior Secured Noteholders
12         1155 Avenue of the Americas
13         New York, NY 10036
14
15   BY:   HARRISON DENMAN, ESQ.
16         J. CHRISTOPHER SHORE, ESQ.
17
18
19   JONES DAY
20         Attorneys for FGIC
21         222 East 41st Street
22         New York, NY 10017
23
24   BY:   RICHARD L. WYNNE, ESQ.
25
```

1

2  WEIL, GOTSHAL & MANGES LLP

3          Attorneys for Syncora Guarantee, Inc.

4          767 Fifth Avenue

5          New York, NY 10153

6

7  BY:   SARA COELHO, ESQ.

8

9

10  WENIG SALTIEL LLP

11          Attorneys for MED&G Group

12          26 Court Street

13          Suite 1200

14          Brooklyn, NY 11242

15

16  BY:   WILLIAM E. BANEY, ESQ.

17

18

19  LAW OFFICES OF RICHARD SAX

20          Attorneys for Julio Solano

21          448 Sebastopol Avenue

22          Santa Rosa, CA 95401

23

24  BY:   RICHARD SAX, ESQ. (TELEPHONICALLY)

25

1

2    BRADLEY ARANT BOULT CUMMINGS LLP

3        Attorneys for MERS & Susan Turner

4        1819 Fifth Avenue North

5        Birmingham, AL 35203

6

7    BY:    GLENN E. GLOVER, ESQ. (TELEPHONICALLY)

8        JAMES P. WATKINS, ESQ. (TELEPHONICALLY)

9

10

11    ALSO PRESENT:

12        SCOTT GOLDMAN, Residential Capital (TELEPHONICALLY)

13        SHARON B. JENKINS, Pro Se (TELEPHONICALLY)

14        FRANK REED, Defendant X

15

16

17

18

19

20

21

22

23

24

25

 1   Section 5 of the Federal Trade Commission Act to find certain

 2   acts to be unfair or deceptive even though they are in

 3   accordance with other laws such as procedural laws --

 4            THE COURT:  I'm familiar with Section 5 of the --

 5            MR. IRELAND:  So they could find, even though you

 6   thought the mortgage foreclosure process was done properly,

 7   that it was done unfairly --

 8            THE COURT:  But let's assume it was done --

 9            MR. IRELAND:  -- and order restitution.

10            THE COURT:  -- entirely fairly, that they did it

11   exactly right?

12            MR. IRELAND:  Can they order --

13            THE COURT:  The borrower agrees, yes my home was

14   foreclosed, but they made all the disclosures they were

15   required to make, the process was done according to state law

16   procedures, everything was done correctly, but we'd be happy to

17   take their money?

18            MR. IRELAND:  Well, I think what the Fed is trying to

19   do with the settlement orders with the other servicers and

20   their proposals to ResCap and Ally is to identify what they --

21   as best they can, the group that may have been subject to

22   unfair practices and to provide remediation for that.  Because

23   we have not gone through the file review procedure, that

24   process is necessarily imprecise.

25            In my experience in other Fed supervisory actions,

1  typically the process is imprecise, because you don't know

2  exactly -- you haven't had a trial to determine exact damages

3  in every single one of them.  But as a matter of administrative

4  practicality, this is the most efficient way to address the

5  issue.

6          THE COURT:  All right.  I think I understand the

7  issue.  Mr. Rains, do you want continue?  I don't -- unless

8  there's anything else you want to add?

9          MR. IRELAND:  No.

10         MR. RAINS:  Just briefly, Your Honor.

11         THE COURT:  Go ahead, Mr. Rains.

12         MR. RAINS:  Judge, I don't want to belabor what we've

13  been covering.  I appreciate the Court's point that under 1818

14  the Federal Reserve, if they were to litigate it, would have to

15  show some improper conduct by the debtors.  And whether they

16  would have to show causation and the degree of precision with

17  which they'd have to do that is maybe unsettled.

18         It is certainly the case, though, that the Fed's new

19  program, which we think is the one the Court should follow,

20  does involve reimbursing our customers who were foreclosed upon

21  or at least had foreclosure proceedings started against them

22  during the specified period.  And the program compensates those

23  people for their injury, and would compensate other people

24  without any need to show injury, although they are still in the

25  group of potentially affected people.

1          To us, getting caught up on the process of trying to

2     identify with precision the precise persons who should benefit

3     and the amount of money they should get, really should be

4     thought of as a preparatory step.  It is --

5          THE COURT:  Yes, but you know, let me just -- the

6     committee's reply did an effective job of arguing that

7     restitution payments would be a pre-petition unsecured claim.

8     Where the argument struggles is -- so with that, let's say

9     fifty million dollars, just hypothetically --

10         MR. RAINS:  Yes, our estimate is forty to eighty-five;

11    fifty or sixty is a nice round number.

12         THE COURT:  So assume fifty million dollars.  That

13    that -- the committee, I think, makes a strong argument that

14    that would be a pre-petition unsecured claim, unless

15    somebody -- unless there was some post-petition foreclosure or

16    something.  But let's put that aside.

17         The struggle is what you do with the cost of the

18    foreclosure review.  The lynchpin to your argument has been,

19    well the Fed has cut different deals with thirteen other

20    servicers to convert what is otherwise an absolutely wasteful

21    structure that results in the consultant being compensated

22    extremely well while homeowners get a fraction.  Okay?

23         Since I'm not even sure whether I would need to decide

24    at this point whether the restitution payments are -- would be

25    unsecured claims or not, because you're not proposing to pay

1   any of them right now -- I suppose at some point I'd have to

2   decide that -- the real thing you're trying to get out from

3   under is the independent foreclosure review which has this

4   monumental price tag.  And that's where I'm having more

5   problem.

6          MR. RAINS:  I guess I have a couple of responses.  I

7   appreciate the issue.  A couple of responses.

8          First, if our proposal is multiples of fifty million,

9   so that we can be sure that whoever was within the proper

10  restitution pre-petition claim that you've identified gets a

11  claim -- gets a claim larger than they would be entitled to as

12  a pre-petition claim, to me, that ought to be enough to allow

13  the Court to proceed to classify that restitution claim at a

14  multiple as a pre-petition claim.

15         But the more important issue for me, Your Honor, the

16  Fed acts as though, and your comments suggest, that the

17  obligation to do a pre-petition -- or excuse me, to do a

18  foreclosure file review is somehow some independent forward-

19  looking injunctive act that has some purpose to it.

20         THE COURT:  Well, look --

21         MR. RAINS:  It's not.

22         THE COURT:  -- let's assume you weren't in bankruptcy.

23  Let's assume you signed this consent and then you realized this

24  price tag is nuts, so you sell the business.  But the buyer

25  doesn't assume the obligation to do the independent foreclosure

1  review.  Do you think you get out from under a consent decree

2  you've signed with the Fed to do this independent foreclosure

3  review the result of which is going to be to identify all of

4  the borrowers on your watch who've been harmed and should

5  receive restitution or reimbursement?

6           I mean, to the extent that you argue changed

7  circumstances, we're no longer in this business -- I agree

8  you're no longer in this business -- but you signed a consent

9  decree that had two steps to it:  one, do the independent

10 foreclosure review, two, pay restitution to those who are

11 identified, okay, is it really so easy to get out from a

12 consent order with the Fed that requires you to do a complete

13 review by saying, oh, we're no longer in the business?  The

14 fact that nobody will go through and identify who was harmed,

15 how much they were harmed, too bad.

16           MR. RAINS:  I come back to Chateaugay, Your Honor,

17 because I don't think what we're saying is we want to change

18 the consent order or that we want to amend it.

19           THE COURT:  Well, you do --

20           MR. RAINS:  What I under --

21           THE COURT:  -- because you want to stop.  The consent

22 order requires you to do an independent foreclosure review, and

23 you want to stop doing the independent foreclosure review.

24           MR. RAINS:  What I think Chateaugay teaches is the Fed

25 has -- in fact has always had -- a statutory authority to just

1    order a cash payment under 1818(b).

2              THE COURT:  If they could identify who was entitled to

3    a cash payment, they could order it.  But you'd be standing --

4    if they said pay 200 million dollars total to every borrower

5    even though ten percent of them were the only ones who could

6    establish that there was anything improper, you'd be standing

7    up here arguing they can't do that.  They can't require us to

8    pay 300 million dollars when, in fact, at most the harm or

9    losses are 50 million.

10             MR. RAINS:  But in fact, Your Honor, we are here

11   saying we are prepared to agree to a multiple of the estimated

12   harm.

13             THE COURT:  So go off and negotiate with the Fed; come

14   to an agreement and then come back to me.

15             MR. RAINS:  Right.

16             THE COURT:  I don't know.  I'm not -- I don't mean

17   to -- I've got a lot of trouble with everybody's arguments in

18   this.  It's a very difficult issue in my view.

19             MR. RAINS:  Right.  I'll reserve my other comments --

20             THE COURT:  Okay.  Thank you, Mr. Rains.

21             MR. RAINS:  -- about the automatic stay and all of

22   that.  I think all of those fall away if the Court decides.

23             THE COURT:  Okay.  All right.

24             MR. RAINS:  Let me end with, if I could, Your Honor,

25   with one small other suggestion.  If the Court's not inclined

RESIDENTIAL CAPITAL LLC, ET AL.                    48

1  to grant our order today --

2          THE COURT:  I'm not ruling today.  I'll tell you --

3  I'm making that crystal clear.

4          MR. RAINS:  Okay.  We have offered and we'll offer

5  again today --

6          THE COURT:  Look, don't offer to me, offer to the Fed.

7  If you work out a deal with the Fed --

8          MR. RAINS:  What I was going to say --

9          THE COURT:  -- come back to me and tell me.

10          MR. RAINS:  What I was going to say is not a

11  settlement.  What we would like to propose is a three-day -- a

12  three-week holiday.  We would like the Pricewaterhouse people

13  to take a well-earned three-week vacation and we will take the

14  money we would've spent to them, and put it in an escrow

15  account while we try to work this out with the Fed.  And

16  however the Court ends up ruling on this whether it goes to --

17          THE COURT:  Well, you've offered that to the Fed and

18  what'd they tell you?

19          MR. RAINS:  They want us to keep spending money.

20          THE COURT:  All right.  Let me hear from the

21  committee.

22          MR. RAINS:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. O'NEILL:  Your Honor, Brad O'Neill, on behalf of

25  the committee.  I'd like to pick up where you just were on the

1   issue of restitution, because I think Your Honor correctly read

2   our brief, and we perceive the IFR process --

3         THE COURT:  Well, you made a good argument for the

4   restitution payments being general unsecured claims, but where

5   I wasn't -- and I'm not saying I'm persuaded yet with it -- but

6   where I had much more problem was about the cost to the IFR.

7         MR. O'NEILL:  Well, there are a couple of responses I

8   think, Your Honor.  First, I think it's artificial to divorce

9   the two.  Clearly the IFR was directed and participated in

10  all -- its part and parcel to an order of restitution.  So to

11  say one is an administrative expense and the other is a general

12  unsecured claim, frankly, doesn't make a heck of a lot of

13  sense.  Two, the Fed has the ability to regulate conduct, to

14  address regulated conduct.  It doesn't have the power in a

15  bankruptcy case to adjust private rights.  And this process is

16  primarily, in fact, entirely directed at adjusting private

17  rights, in particular the rights of pre-petition borrowers

18  against the debtors.

19        THE COURT:  No, the process is designed to identify

20  borrowers who in the Fed's view are entitled to relief -- to

21  payment.

22        MR. O'NEILL:  To adjudicate what are essentially

23  pre-petition claims against the debtor.  To say yes, there's a

24  claim arising out of pre-petition misconduct and to pay it.

25        THE COURT:  As you stand there today, you can't tell

1  me who is entitled to a payment or not.  The solution -- and it

2  may make perfect sense is just pay everybody because in a

3  sense, it's rough justice.  Okay.  People who weren't entitled

4  to payments will be getting payments but the total cost to the

5  debtors will be substantially less.  From a rough justice

6  standpoint it makes absolute sense.

7          MR. O'NEILL:  As an economic matter, Your Honor, that

8  may be the answer.  But here the Fed clearly is not regulating

9  the conduct of the debtor because we don't have a business

10  anymore.  And, frankly, when they wanted to regulate the

11  conduct of the debtors' business, they did so directly.  They

12  required us to implement new servicing standards.  They

13  required assorted other internal business modifications.  This,

14  however, is simply just restitutions.  That's all it is.

15          THE COURT:  So let me ask you this.  Assuming there

16  was no agreement by which Ally was secondarily liable for the

17  independent foreclosure review.  Let's assume that agreement

18  didn't exist.  You'd be standing here, you'd be making the same

19  argument and the result would be nobody would pay for the IFC.

20  The IFC would stop because nobody -- your view is facts have

21  changed; it's a pre-petition claim; there isn't any money to

22  pay for it.  So Pricewaterhouse will stop work.  The counsel

23  will stop work because nobody's going to pay them.  That's your

24  position?

25          MR. O'NEILL:  Well, obviously, that's a hypothetical

1    scenario.

2              THE COURT:  Well --

3              MR. O'NEILL:  AFI is on the hook.

4              THE COURT:  Just -- but answer my hypothetical.

5              MR. O'NEILL:  Okay.  What your positing -- yeah.  The

6    answer is we would advocate awarding PwC an unsecured claim for

7    the value of its services.

8              THE COURT:  Oh, I'm sure they would be very happy to

9    continue working.

10             MR. O'NEILL:  And I think it would be very unlikely,

11   Your Honor, that the Fed would prosecute officials of the

12   debtors here for not pursuing a policy which the Fed itself has

13   turned its back on.  And it seems to us, Your Honor, artificial

14   and irrational for the Fed to continue insisting that the

15   debtors perform under this expensive and misdirected program

16   when --

17             THE COURT:  That I agree with.

18             MR. O'NEILL:  -- when the Fed itself has acknowledged

19   it's not the Fed's policy anymore.

20             THE COURT:  That part I agree with.

21             MR. O'NEILL:  It's not the Fed's regulatory goal or

22   purpose to pursue this.

23             So the notion that they're going to turn around and

24   penalize officers of the debtor for not doing it seems to us to

25   be wildly farfetched.

1           THE COURT:  The -- yes.  And if one looks at page 2 of
2   the consent order, the first full "whereas" clause on the page,
3   I believe that's defining Ally Financial as one of the mortgage
4   servicing companies.  Mr. Schrock's shaking his head no, but
5   he'll address that issue.  It says, "Whereas Ally Financial
6   engages in the business of servicing residential mortgage loans
7   through varies indirect subsidiaries including GMAC Mortgage
8   and its subsidiaries, collectively the 'mortgage servicing
9   companies'."

10          So when I read the "whereas" clause on page 2 and
11  paragraph 3(d) on page 14, it looked to me that if you're
12  correct that the restitution payments would be pre-petition
13  unsecured claims, the Fed could then look to Ally to make up
14  the shortfall.

15          MR. O'NEILL:  I agree with your reading, Your Honor.

16          THE COURT:  Okay.  Anything else you want to add Mr.
17  O'Neill?

18          MR. O'NEILL:  No, I think, Your Honor, that's good
19  enough for us for now.  Thank you.

20          THE COURT:  All right.

21          Anybody else in support of the debtors' motion?  All
22  right.  Let me hear the opposition.  Who wants to speak in
23  opposition to the debtors' 3013 motion?  Mr. Schrock?

24          MR. SCHROCK:  Sure.  Good morning, Your Honor.  Ray
25  Schrock.  I've also got my partner here, Greg Skidmore with me,

1    on behalf of AFI and Ally Bank.  Your Honor, I plan to address

2    all of the issues other than jurisdiction which my partner is

3    prepared to address --

4             THE COURT:  Okay.

5             MR. SCHROCK:  -- if Your Honor has questions.  I don't

6    know in which order you'd like to proceed --

7             THE COURT:  No, go ahead.

8             MR. SCHROCK:  -- but I'm happy to just move forward.

9             THE COURT:  As you know, I don't hesitate to ask

10   questions.

11            MR. SCHROCK:  Okay.

12            THE COURT:  I didn't think it was that funny but --

13            MR. SCHROCK:  It's pretty -- it was funny.  So, Your

14   Honor, as I read the debtors' motion, just to clarify, and I

15   think you clarified this earlier, they're seeking effectively a

16   ruling that the future FRB obligations under the consent order

17   are dischargeable as unsecured claims.  That's really the

18   relief that's requested by the classification motion.  They're

19   also requesting what we think is an advisory ruling on the

20   automatic stay.

21            The debtors have clarified, I think, that's it's

22   prospective.  The nature of the order doesn't really spell that

23   out, but I want to get that out there on the record.

24            And I want to get to Your Honor's questions.  But I

25   think it's really important, Judge, that we understand the

1    context and the history in which these obligations are in place

2    in this case.  I know Your Honor's read the briefs.  I'm not

3    going to belabor it.  But this notion of regulatory compliance

4    was a hallmark, a cornerstone, of putting this case on the path

5    to saving 3,400 jobs, getting a massive value, frankly, for the

6    business that otherwise would've been liquidated -- getting the

7    consent -- and it's a regulated enterprise; the FDIC, the Fed,

8    the GSEs, the buyers -- to get everybody on board with selling

9    this business -- a bank holding company subsidiary as a going

10   concern, all predicated on regulatory compliance.  I think the

11   state regulators, the DOJ, everyone would agree with that.

12           That's why the PwC motion was initially brought.

13   That's why the debtors -- and I'm sure Your Honor's looked back

14   at the transcript.  There the debtor said that it --

15           THE COURT:   I didn't; you quoted it.  Go ahead.

16           MR. SCHROCK:  Okay.  Your Honor, I won't belabor it.

17   They think that complying with the consent order is certainly

18   paying for the cost.  And we certainly share that view.  It is

19   for that reason that regulatory compliance -- this wasn't

20   addressed in the opposition -- was in other orders in this

21   court.  For instance, it's in the cash collateral order in

22   paragraph 20(c) and paragraph 21, that's it's a termination

23   event if the consent obligations are not complied with.  It's

24   in the sub-servicing agreement that's before the Court that you

25   have to comply with consent obligations.  There's ripple

1    effects that I think really -- I really think that the debtors

2    did not think this through when bringing the motion.  There's

3    ripple effects across many aspects of this.  And we do see --

4    the debtor still has a billion dollars in loans -- FHA, VHA

5    loans.  They filed a KEIP and KERP motion last night.  They

6    talk about all of the substantial things that are going to have

7    to occur over the next year.

8              THE COURT:  Stay on the motion that's before the

9    Court.

10             MR. SCHROCK:  Sure.  Our point is, Judge, that simply

11   this -- there can be no dispute that consent order compliance

12   and regulatory compliance has generated significant value for

13   these estates.  And, in fact, in the sale order there were

14   certain obligations that Ocwen said, I understand, I'm going to

15   operate the business in compliance with all the DOJ and consent

16   order obligations.  The estate is conducting the foreclosure

17   review obligations.  Certainly that deal generated substantial

18   value for the estates by, at least, I presume -- presumably at

19   least by the amount of the PwC foreclosure obligations.

20             It also induced Ally to support the debtors through

21   these cases.  It's just not one of these issues that's unclear.

22             THE COURT:  Let me ask you this.

23             MR. SCHROCK:  Yes.

24             THE COURT:  If -- let's assume this case had taken a

25   completely different path.

RESIDENTIAL CAPITAL LLC, ET AL.                    59

1         MR. SCHROCK:  Uh-huh.

2         THE COURT:  Ally refused to provide any support for

3    the debtors.

4         MR. SCHROCK:  Uh-huh.

5         THE COURT:  Just assume the case had converted to a

6    Chapter 7 case at the start.  But the debtors had signed a

7    consent with the Federal Reserve Board and Ally had agreed to

8    be secondarily liable for the cost of doing it.  What would've

9    happened then?  I mean, what would Ally have been on the hook

10   for at that point?  I mean, the consultants would've had to

11   have been hired to do this independent foreclosure review of

12   this dead entity.  And --

13        MR. SCHROCK:  The --

14        THE COURT:  -- then Ally would've been on the hook for

15   the price tag?

16        MR. SCHROCK:  Judge, I think the -- in your

17   hypothetical there's a Chapter 7 case, the debtors are still

18   bound by the consent order, they have to conduct the review,

19   and if they --

20        THE COURT:  They don't have any money to pay any

21   consultants.

22        MR. SCHROCK:  -- if they breach their obligations

23   under the consent order by not complying --

24        THE COURT:  They say they're ready to go through with

25   the independent foreclosure review.  They just want you to pay

RESIDENTIAL CAPITAL LLC, ET AL.                    60

1   for it.

2           MR. SCHROCK:  But, Your Honor, that is not compliance

3   with the consent order.  The Fed, whose order it is, would

4   certainly never say that, that it's compliant by converting it

5   into --

6           THE COURT:  Why isn't it in compliance?

7           MR. SCHROCK:  Because performance.  There's many

8   things here.  It talks about conducting the foreclosure review,

9   retaining the consultants.  We actually addressed this issue,

10  Your Honor, at the PwC hearing and talked about this but that's

11  the whole reason the debtors brought the PwC motion in the

12  first place.  They said because it is compliance.  I don't

13  think anyone would dispute that.  And, in fact, when you look

14  at the arguments --

15          THE COURT:  Well, sure.  So they bring the motion.

16          MR. SCHROCK:  Yes.

17          THE COURT:  PwC gets engaged.

18          MR. SCHROCK:  Yes.

19          THE COURT:  The debtors don't have any money to pay

20  for it.  And you've signed an engagement letter with PwC that

21  says you're jointly and severally liable for it.

22          MR. SCHROCK:  Judge, no dispute that we signed the

23  engagement letter.  Okay.  Their professionals want to ensure

24  they get paid.  The question is are you breaching the consent

25  order when you don't pay?  The ques -- the answer to that

1    First, we'll definitely address that in our supplemental brief

2    on this issue of the restitution payments, but what the debtors

3    are asking this Court to do is change the method of the payment

4    under the consent order.  And counsel for the debtors, when

5    they were up here earlier, said that the option to make a

6    consent payment to the Federal Reserve is not part of the

7    consent order.

8          THE COURT:  But look.  They can't make a payment

9    without the approval of this Court.

10          MR. SKIDMORE:  Correct.

11          THE COURT:  Okay.  They've not asked that that be

12    changed.  What is it that they've asked to -- I understand I'm

13    separating out and that they don't want to do that, but I'm

14    separating out the costs of the independent foreclosure review

15    versus what's supposed to happen after that's completed, the

16    restitution reimbursement payments.  I'm not deciding either

17    issue now, but the arguments for unsecured claim are stronger

18    with respect to the restitution payments.  So let's assume that

19    that's the Court's determination at the end of the day, that

20    the Court determines that unless the Fed agrees otherwise, the

21    independent foreclosure review has to be conducted and that the

22    debtor has to pay the cost of it.

23          With respect to the restitution payments, once those

24    amounts are determined it's a general unsecured claim.  It will

25    be paid in accordance with any plan, and Ally may be liable for

1    the balance.

2              You say I don't have the power to do that?

3              MR. SKIDMORE:  Your Honor, just to be clear.  This

4    Court always has the power to decide what it can and can't do.

5              THE COURT:  No, no, no.

6              MR. SKIDMORE:  And --

7              THE COURT:  But I -- but yes, but lawyers frequently

8    tell me what I can and can't.  I may not agree with them, but

9    I'm asking you, do you agree with that, with laying the consent

10   order side by side with the Bankruptcy Code?  Everyone seems to

11   agree I can't modify the consent order.  I have no intention of

12   doing so, all right?

13             Then you look at the overlay of the bankruptcy.  What

14   is it that I can do?  What is it the consent order doesn't

15   address, makes no attempt to address.  The consent order

16   doesn't have anything in it that would override the priorities

17   of the Bankruptcy Code, correct?

18             MR. SKIDMORE:  I agree with that, that that language

19   does not appear, Your Honor.  And if Your Honor was not

20   effecting or modifying the terms of the consent order, then I

21   agree that the statute 1818 would not divest this Court of

22   jurisdiction to do so.  And I don't want to lay a lot of

23   concrete on the bankruptcy issue lest my partner come up and

24   yell at me, but we'll address that in the supplemental brief,

25   Your Honor, and that specific point.

RESIDENTIAL CAPITAL LLC, ET AL.                                    80

1              THE COURT:  Thank you, Mr. Skidmore.

2              All right.  Who else wants to be heard?

3              MR. SCHROCK:  Your Honor, may -- I just have one

4    really quick point.  We reserved rights on --

5              THE COURT:  I'm getting tag-teamed.  Go ahead.

6              MR. SCHROCK:  I know.  I'm not testing you.

7              THE COURT:  Go ahead.

8              MR. SCHROCK:  We reserved rights, and we just briefed

9    the admin claim issue.  Our view on the admin claim has always

10   been it's not ripe, that if it comes to a point where we need

11   to decide -- we end up, for whatever reason, Ally had to pay,

12   there's an examiner report coming out -- I think that one's

13   going to require a lot more evidence, and there's going to have

14   to be a, frankly, a trial around it.  I just didn't want to

15   have that be misunderstood, because we do think it's premature

16   and not ripe.

17             THE COURT:  All right.  Who else wants to be heard?

18             MS. SUTTON:  I'm Jennifer Sutton with the Board of

19   Governors of the Federal Reserve System.  I'd be pleased to

20   answer some questions that may have arisen today and also to

21   make a few statements on behalf of the Board of Governors.

22             I am concerned that neither the statute under which we

23   issued our order or the order itself have been accurately

24   characterized, really, by any of the parties here today, and so

25   the Board's primary objective in objecting was to try and

RESIDENTIAL CAPITAL LLC, ET AL.                    81

1   correct any misapprehensions or mischaracterizations,

2   misapprehensions that the Court may have been left with based

3   on the statements that have been made in the other pleadings.

4           To go back to some of the earlier statements that were

5   made about Section 1818(b) of the Federal Deposit Insurance

6   Act, as I'm sure you know, Your Honor, that statute authorizes

7   the Board, when it has found that an institution it regulates

8   has engaged in unsafe or unsound practices or violations of

9   law, it gives the Board the authority to require that

10  institution to take affirmative actions to correct or to

11  ameliorate the problems that may have occurred as a result of

12  that misconduct.

13          The statute didn't specify.  This goes on to specify

14  what some of those affirmative actions can be.  They can be

15  restitution, and, as the other parties have pointed out, it can

16  also be rule of remediation, restitution and reimbursement.

17          THE COURT:  Is there anything in your governing

18  statute that says that restitution means payment in full even

19  if bankruptcy law would determine that it's a general unsecured

20  claim that's paid pro rata?

21          I mean, this is really -- I mean, you may be able

22  to -- I'm sure Ally will have something else to say about it

23  yet in a supplemental brief, but you've got an argument that if

24  there is a shortfall in any restitution payments that Ally has

25  got to pay the balance, but I don't see anything in your -- and

1  I'm not an expert on your governing statute.  I did read it.  I

2  have paid -- I've spent time.  You really didn't address this

3  issue.

4        Now, I see a difference between the restitution

5  payments on the one hand and the costs of doing the independent

6  foreclosure review, which they signed up to do.  And they

7  disagree.  The debtors disagree about that, and I'm not making

8  a final decision on it, but let's assume that that's where I

9  came out, that they have to, unless there's an amendment they

10  have to continue to perform.  They have to continue to pay

11  those costs.  But with respect to restitution payments those

12  are general unsecured claims.  Is there anything in your, any

13  case law or in your statute that address that issue?

14        MS. SUTTON:  I am not aware of anything that

15  specifically addresses that, Your Honor, but I would be pleased

16  to provide some supplemental briefing on that, as well.

17        THE COURT:  Okay.

18        MS. SUTTON:  One thing I do want to make sure this

19  Court is apprised of accurately, though, is that our order does

20  not require only restitution.  Our order, by its very terms,

21  requires GMAC Mortgage to submit to us a remedial plan to

22  correct the problems that the independent consultants

23  identified.

24        Those may be misfiled deeds.  They may be a wrongful

25  foreclosure that needs to be rescinded.  It may be a loan

1    modification that was improperly denied and now needs to be

2    offered to a borrower.  And it may be a payment, because they

3    may have overcharged someone fees and they need to reverse

4    them.  So it's not -- our order does not require a "payment" to

5    anyone, let alone the Federal Reserve.  It requires them to

6    undertake measures to correct the consequences of their

7    misconduct.

8           THE COURT:  So but do -- I don't think anybody is

9    questioning the intent of the Fed in negotiating the structure

10   that was negotiated, not just as to these debtors, but as to

11   all the other loan servicers that are parties to consent

12   decrees.

13          The program appears to have been well intentioned, but

14   subsequent events have shown it to be completely ill-conceived.

15   When these debtors would be on the hook for 350 or 400 million

16   dollars to do a foreclosure review that would result in

17   restitution payments, hypothetically, of fifty million dollars,

18   there's something wrong with that plan.

19          It seems to me that the Fed has publicly acknowledged

20   that well-intentioned, the way it's working out doesn't make so

21   much sense; the independent consultants shouldn't be the winner

22   in this.  So the Fed's been prepared to negotiate amendments.

23          The issue here is you got the counter-parties in a

24   bankruptcy proceeding.  The Fed can, certainly, stand on its

25   rights and say we're not changing anything in that consent

1  order.  This is what they signed up for; we agree it makes no

2  sense, whatsoever.  I would have to say that seems awfully

3  punitive.

4            I'll decide the legal issues.  If you're right on the

5  legal issues, you're right on the legal issues.  That wouldn't

6  make it anymore sensible from anybody's standpoint to pour 350

7  or 400 million dollars down a rabbit hole, because if the Court

8  were to determine at the end of the day that restitution or

9  reimbursement payments are general unsecured claims the pro

10 rata share of what the injured borrowers are going to recover

11 is going to go down with every other creditors' recovery, every

12 dollar spent for the foreclosure review is one less dollar

13 available to satisfy creditor claims, and that may very well

14 include the injured borrowers.

15           I don't get -- and I know I don't know what the

16 details of your discussions have been, I know there have been

17 meetings and exchanged proposals, and the parties will either

18 work it out, or they won't work it out.  I would just observe,

19 I've already done it, what exists makes absolutely no sense.  I

20 don't -- you're not really trying to defend from an economic

21 standpoint the present structure, I take it.

22           MS. SUTTON:  No.  No, Your Honor.

23           THE COURT:  Okay.

24           MS. SUTTON:  And I think our chairman has --

25           THE COURT:  He said it.

RESIDENTIAL CAPITAL LLC, ET AL.                              85

1          MS. SUTTON:  You know I won't even -- his words speak

2    for themselves.

3          THE COURT:  Yes.

4          MS. SUTTON:  What I am here defending is a lawfully

5    entered order that is enforceable in a court of law, and

6    compliance with that order.

7          THE COURT:  I understand that position completely.

8          MS. SUTTON:  And if I may, Your Honor?

9          THE COURT:  Go ahead.

10         MS. SUTTON:  It is accurate that other institutions

11   have entered into an arrangement with us to satisfy the

12   requirements of that order.

13         THE COURT:  Are any of them in bankruptcy proceedings?

14         MS. SUTTON:  I -- none of the Federal Reserve-

15   regulated entities; I'm not sure about Office of the

16   Comptroller of the currency-regulated entities, but none of the

17   Federal Reserve-regulated entities are.

18         THE COURT:  Anything else you want to add?

19         MS. SUTTON:  I just want to make clear that we believe

20   Chateaugay is also distinguishable to the extent that it's

21   relied on; it involved environmental injunctions, and statutory

22   right of an agency to get reimbursed for costs it incurred

23   itself, or to have the entity do the remedial measures itself.

24         As you've already observed, there's nothing on the

25   face of our statute that authorizes us to take the remedial

RESIDENTIAL CAPITAL LLC, ET AL.                                     96

1        MR. RAINS:  But if I could get to the point, our

2    obligation, as the Court I think noted, under the consent

3    order, paragraph 3(a), is to retain a consultant.  We are

4    obligated to retain them.  Then we have taken on an obligation

5    of PricewaterhouseCoopers to be joint liable to pay them.  The

6    way the supplemental agreement reads, the one between Ally and

7    the Fed, is that the Fed is secondarily liable as soon as the

8    debtors -- I'm sorry, Ally is secondarily liable as soon as the

9    debtors file a Chapter 11 proceeding.  And the Court is

10   correct; what's secondarily liable means is the liability is

11   first with the primary obligor, and once that primary obligor

12   is unable to pay, the relief can be recovered from the

13   secondary obligor.  So I think the Court has that point exactly

14   right.

15       Let me close by emphasizing something that is unusual

16   in our consent order -- you may have recognized this -- we

17   are -- Ally is the only bank holding company that is not

18   jointly liable with the mortgage servicer under the consent

19   order.  All of the other parties have consent orders that make

20   the parent jointly liable; it is only ours that has the

21   secondary liability provision in it.  Thank you, Your Honor.

22       THE COURT:  Okay.  All right, Mr. Eckstein, very

23   quickly.

24       MR. ECKSTEIN:  Your Honor, if I may very quickly.

25   Just given the focus on the characterization of the claim that

1    would arise in the case under the various hypotheticals Your

2    Honor was discussing, I just want to make sure that Your Honor

3    is familiar with, and focuses on the supplemental consent order

4    that was entered into between Ally Financial and the Fed on

5    April 26th, 2012, which was approximately three weeks before

6    the bankruptcy case.

7              THE COURT:  Yeah, I have that here; yeah.

8              MR. ECKSTEIN:  I know Your Honor has seen it, but I

9    think it's very instructive because paragraph one essentially

10   anticipates the proceeding that we're having today.  And it

11   specifically contemplates that is ResCap commences a case under

12   the Bankruptcy Code, Ally will be secondarily liable for the

13   obligations to timely pay any portion of one, the ResCap fees

14   to Pricewaterhouse; and two, the monetary reimbursement or

15   remediation payments under a remediation plan approved by the

16   Federal Reserve.

17             THE COURT:  That looks pretty clear on the issue that

18   I raised earlier.

19             MR. ECKSTEIN:  And it then goes on, Your Honor, in the

20   remainder of that paragraph to say, and in fact Ally

21   contemplated the debate we were having and said they would want

22   to reserve the right to argue that it's an administrative

23   claim.

24             THE COURT:  The reason I'm going to stop you, Mr.

25   Eckstein, is because I raised the issue today because it came

1    to mind after I read your reply.  All right?  I raised the

2    questions; it hasn't really been briefed.  Rather -- because

3    you're going to make your argument, then Mr. Schrock's going to

4    want to come back and argue, I want -- how much time does

5    everybody want -- one round, I want everybody's briefs at one

6    time.  I see two questions I want:  Are any payments for

7    restitution or reimbursement general unsecured claims?  And

8    that is addressed in Mr. Eckstein and Mr. O'Neill's brief.  And

9    two, would Ally Financial be liable for any shortfall in

10   restitution or reimbursement payments if they are general

11   unsecured claims and the pro rata share paid to unsecured

12   creditors less than the full amount?

13            I haven't decided anything; I want to make that clear.

14   How much time do people want?

15            Mr. Rains?

16            You know, the holiday of Passover starts on Monday

17   night, and there are some who are affected by it, different

18   levels of observance, some people may be going away.

19            MR. ECKSTEIN:  Your Honor, I think parties were

20   suggesting two weeks.

21            THE COURT:  Okay.  So that would be what, the 11th?

22            MR. ECKSTEIN:  Probably earlier than the 11th.

23            THE COURT:  It's the 4th.  That's the day after

24   Passover ends.  You want that Mr. Eckstein?  That's fine with

25   me.

RESIDENTIAL CAPITAL LLC, ET AL.                                    99

1          MR. ECKSTEIN:  You can make it Friday of that week,

2     maybe.

3          THE COURT:  Okay.  Friday, April 5th at 5 o'clock is

4     the deadline for supplemental briefs addressing the two issues

5     that I raised.

6          These issues remain -- I'm going to decide the issues;

7     no one should think otherwise -- but I've sort of made this

8     point clearly before, let me say it again.  This makes no

9     sense; it makes absolutely no sense because if the Court

10    determines that the debtors have to comply with the independent

11    foreclosure review and pay for it while it's going on, you just

12    watch the money go down this hole.  Everybody agrees that makes

13    no sense.

14         If the Court determines that the end result of that

15    foreclosure review are restitution payments for some general

16    unsecured claims and Ally is liable for any shortfall, the only

17    ones who will be satisfied then are the borrowers who get

18    identified for payments because they'll get what's coming to

19    them.

20         All of you need to go back and rethink your positions.

21    The Fed has shown its willingness to dispense with the

22    independent foreclosure review, but they have other

23    requirements which may not be acceptable to the unsecured

24    creditors' committee, to the debtors, to others, okay?

25         And any agreement that's struck, if it has to be

1   brought before the Court for approval, I have to review it and

2   decide, but Mr. Schrock, the point I made to you earlier -- and

3   I know Ally's position has been consistent throughout:  these

4   are all obligations of the debtor, but if in fact it turns out

5   that the hypothetical fifty million dollars in restitution

6   payments are paid at a fraction of that amount and you've

7   contractually obligated yourself to -- you, your client -- to

8   the Federal Reserve to pay the shortfall, you've got skin in

9   the game.  You may want to put it all off until there's some

10  grand bargain in the case that -- that should have happened

11  soon, I would hope, but this is a real issue now.  Okay?  And

12  the Fed needs to go back and rethink its position because it

13  may want all injured borrowers -- or all borrowers who had a

14  foreclosure -- if you conclude it makes no sense to spend 350,

15  400 million dollars to identify which borrowers when the total

16  amount that would have to be paid to them is a fraction of

17  that, but bankruptcy law is that it would be a general

18  unsecured claim -- the Fed ought to go back and rethink its

19  position.  It seems to me punitive if bankruptcy law would not

20  support payment of a claim in full, for the Fed to say well,

21  that's too bad, you know.  We expect it to be paid in full and

22  we're not willing to do a deal other than that.  So you all

23  need to go back.

24          Frankly, I think your time over the next two weeks

25  would be better spent trying to reach an agreement.  And I know

RESIDENTIAL CAPITAL LLC, ET AL.                    106

1          THE COURT:  Any objection, Mr. Rains?

2          MR. RAINS:  No, Your Honor.

3          THE COURT:  All right; they're in evidence.

4  (Ocwen asset purchase agreement, dated Novbember 2nd, 2012 was

5  hereby received into evidence as Debtor's Exhibit 6, as of this

6  date.)

7  (Amendment to the asset purchase agreement was hereby received

8  into evidence as Debtor's Exhibit 7, as of this date.)

9  (Sale order, docket 2246 was hereby received into evidence as

10 Debtor's Exhibit 8, as of this date.)

11 (Cash collateral order, docket 491 was hereby received into

12 evidence as Debtor's Exhibit 9, as of this date.)

13         MR. SKIDMORE:  Thank you, Your Honor.

14         THE COURT:  All right.  We're done, we're adjourned.

15         MR. ECKSTEIN:  Thank you, Your Honor.

16     (Whereupon these proceedings were concluded at 12:16 PM)

17

18

19

20

21

22

23

24

25

```
 1
 2                       C E R T I F I C A T I O N
 3
 4   I, Penina Wolicki, certify that the foregoing transcript is a
 5   true and accurate record of the proceedings.
 6
 7
 8
 9   _____
10   PENINA WOLICKI
11   AAERT Certified Electronic Transcriber CET**D-569
12
13   eScribers
14   700 West 192nd Street, Suite #607
15   New York, NY 10040
16
17   Date:  March 22, 2013
18
19
20
21
22
23
24
25
```

# EXHIBIT 2

**In Re:**

*RESIDENTIAL CAPITAL, LLC, et al.*

*Case No. 12-12020-mg*

*October 10, 2012*

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



Min-U-Script® with Word Index

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


                Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                October 10, 2012

                10:04 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

2

1

2   (Doc no. 1242, 945, 61) Status conference RE: Pre-Auction

3   Objections of the RMBS Trustees to the Debtors' Sale Motion.

4

5   (CC: Doc no. 1586, 1587) Motion to Remove Mortgage Loan alleged

6   by Kenneth Taggart from Assets of GMAC Mortgage, LLC & Motion

7   to Prove Ownership of Mortgage Assets (Mortgages & Notes)

8   Kenneth Taggart Dispute Asset(s) of GMAC Mortgage, LLC. filed

9   by Kenneth Taggart.

10

11  (CC: Doc no. 1472) Motion to Convert Case to Chapter 7 Filed by

12  Paul Papas.

13

14  (CC: Doc no. 1427) Debtors' Application Under Section 327(e) of

15  the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule

16  2014-1 for Authorization to Employ and Retain Hudson Cook, LLP

17  as Special Counsel to the Debtors, Nunc Pro Tunc to May 14,

18  2012 filed by Gary S. Lee on behalf of Residential Capital,

19  LLC.

20

21

22

23

24

25

3

1

2    (CC: Doc no. 1426) Debtors' Application for an Order Under

3    Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a)

4    and Local Rule 2014-1 Authorizing the Debtors to Employ and

5    Retain Pepper Hamilton LLP as Special Foreclosure Review

6    Counsel for Bankruptcy Issues to the Debtors, Nunc Pro Tunc to

7    May 14, 2012 filed by Gary S. Lee on behalf of Residential

8    Capital, LLC.

9

10   (CC: Docket No. 1585) Amended Motion of Kenneth Taggart for

11   Stay to Order Regarding Limited Relief from Stay Until Order on

12   Motion to Void Pleadings & Sanctions Due to Violation of

13   Bankruptcy Code is Issued by the Court.

14

15   (CC: Doc No. 1114) Motion of Kenneth Taggart to Void Pleadings

16   & Sanctions Due to Violation of Bankruptcy Code.

17

18   (CC: Doc# 1397) Motion for Stay and Request for Hearing to

19   Order regarding Limited Relief from Stay until Order on Motion

20   to Void Pleadings & Sanctions due to violations of Bankruptcy

21   Code is Issued by the court. (RE: Montgomery Court of Common

22   Pleas-Pennsylvania 2009-35338).

23

24

25

4

1

2  (Doc no. 1431, CC: Doc# 1359) Motion to Allow For a Declaratory

3  Ruling as to Possible Violations of the Automatic Stay and to

4  Sever Defendants Protected by the Automatic Stay.

5

6  (CC: Doc# 1416) Debtors Motion Under Bankruptcy Code Sections

7  105(a) and 362(d) for Entry of an Order Approving Procedures by

8  Which Third Parties May Request and Obtain Stipulated Relief

9  from the Automatic Stay to Commence or Continue Actions to

10  Foreclose Senior Liens.

11

12  (CC: Doc# 1357) Debtors Motion for Entry of an Order Under

13  Bankruptcy Code Section 363 and Bankruptcy Rule 6004 (I)

14  Authorizing the Debtors to Compensate PricewaterhouseCoopers,

15  LLP for Foreclosure Review Services in Furtherance of the

16  Debtors Compliance Obligations Under Federal Reserve Board

17  Consent Order and (II) Reaffirming Relief Granting in the GA

18  Servicing Order.

19

20  (CC: Doc# 897) Motion for Relief from Stay 3355 Sunhaven Oval,

21  Parma, OH.

22  A stipulation will be submitted to the Court prior to the

23  hearing.

24

25

5

1

2 (CC: Doc# 1105) Motion for Relief from Stay In regards to

3 property located at 68 Hammock Lane, Staten Island, New York.

4 A stipulation will be submitted to the Court prior to the

5 hearing.

6

7 Doc# 1180 Motion for Relief from Stay in regards to property

8 located at 1700 North River Road, West Lafayette, Indiana.

9 A stipulation will be submitted to the Court prior to the

10 hearing.

11

12 (CC: Doc# 996) Motion for Relief from Stay in regards to

13 property located at 23904 Lakeside Road, Santa Clarita, CA.

14 A stipulation will be submitted to the Court prior to the

15 hearing.

16

17 (CC: Doc# 1438) Motion for Relief from Stay as it relates to

18 4601 Pocatella Avenue, North Port, FL 34287.

19 A stipulation will be submitted to the Court prior to the

20 hearing.

21

22 (CC: Doc# 677) Motion for Relief from Stay -Motion of Deborah

23 Bollinger and Bryan Bubnick for Relief from Automatic Stay as

24 to GMAC Mortgage, LLC and Residential Capital, LLC.

25

6

1

2   (CC: Doc no. 1261 ) Motion for Relief from Stay filed on behalf

3   of the People of the State of California filed by the Firm of

4   Biels Cohen.

5   A stipulation will be submitted to the Court prior to the

6   hearing.

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:   Penina Wolicki

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

7

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:   SAMANTHA MARTIN, ESQ.

9        LORENZO MARINUZZI, ESQ.

10       NORMAN S. ROSENBAUM, ESQ.

11       JAMES A. NEWTON, ESQ.

12       ERICA J. RICHARDS, ESQ.

13       ANTHONY PRINCI, ESQ.

14       DARRYL P. RAINS, ESQ.

15

16

17  MORRISON & FOERSTER

18        Attorneys for Debtors

19        2000 Pennsylvania Avenue NW

20        Suite 5500

21        Washington, DC 20006

22

23  BY:   ALEXANDRA STEINBERG BARRAGE, ESQ.

24

25

8

KRAMER, LEVIN, NAFTALIS & FRANKEL LLP

    Attorneys for Official Creditors' Committee

    1177 Avenue of the Americas

    New York, NY 10036


BY:   KENNETH H. ECKSTEIN, ESQ.

    PHILIP BENTLEY, ESQ.

    BRENDAN M. SCHULMAN, ESQ.

    PHILIP S. KAUFMAN, ESQ.


KIRKLAND & ELLIS LLP

    Attorneys for Ally Financial, Inc. & Ally Bank

    601 Lexington Avenue

    New York, NY 10022


BY:   RAY C. SCHROCK, ESQ.



KIRKLAND & ELLIS LLP

    Attorneys for Ally Financial, Inc. & Ally Bank

    855 Fifteenth Street, N.W.

    Washington, DC 20005


BY:   PATRICK M. BRYAN, ESQ.

9

MORGAN, LEWIS & BOCKIUS LLP

      Attorneys for Deutsche Bank

      101 Park Avenue

      New York, NY 10178


BY:   JAMES L. GARRITY, JR., ESQ.


SEWARD & KISSEL LLP

      Attorneys for US Bank N.A. as Securitization Trustee

      One Battery Park Plaza

      New York, NY 10004


BY:   ARLENE R. ALVES, ESQ.

      MARK D. KOTWICK, ESQ.



WHITE & CASE LLP

      Attorneys for Ad Hoc Group of Junior Secured Noteholders

      1155 Avenue of the Americas

      New York, NY 10036


BY:   J. CHRISTOPHER SHORE, ESQ.

      HARRISON DENMAN, ESQ.

10

1

2  CLEARY GOTTLIEB STEEN & HAMILTON

3       Attorneys for Wilmington Trust

4       One Liberty Plaza

5       New York, NY 10006

6

7  BY:   MARK A. LIGHTNER, ESQ.

8

9

10  ALLEN & OVERY

11       Attorneys for HSBC Bank USA, N.A.

12       1221 Avenue of the Americas

13       New York, NY 10020

14

15  BY:   JOHN KIBLER, ESQ.

16

17

18  MORRISON COHEN LLP

19       Attorneys for Independent Directors

20       909 Third Avenue

21       New York, NY 10022

22

23  BY:   JOSEPH T. MOLDOVAN, ESQ.

24       DAVID PIEDRA, ESQ.

25

11

```
 1
 2   SIDLEY AUSTIN LLP
 3         Attorneys for Nationstar
 4         One South Dearborn
 5         Chicago, IL 60603
 6
 7   BY:   LARRY J. NYHAN, ESQ. (TELEPHONICALLY)
 8         JESSICA C.K. BOELTER, ESQ. (TELEPHONICALLY)
 9
10
11   JACKSON WALKER, L.L.P.
12         Attorneys for Frost Bank
13         100 Congress Avenue
14         Suite 1100
15         Austin, TX 78701
16
17   BY:   PATRICIA TOMASCO, ESQ. (TELEPHONICALLY)
18
19
20   ROPES & GRAY LLP
21         Attorneys for RMBS Noteholders
22         1211 Avenue of the Americas
23         New York, NY 10036
24
25   BY:   KEITH H. WOFFORD, ESQ. (TELEPHONICALLY)
```

12

```
 1
 2  JONES DAY
 3        Attorneys for FGIC
 4        222 East 41st Street
 5        New York, NY 10017
 6
 7  BY:   HOWARD F. SIDMAN, ESQ.
 8
 9
10  JONES DAY
11        Attorneys for FGIC
12        555 South Flower Street
13        Fiftieth Floor
14        Los Angeles, CA 90071
15
16  BY:   RICHARD L. WYNNE, ESQ.
17
18
19  CHADBOURNE & PARKE LLP
20        Attorneys for the Examiner
21        30 Rockefeller Plaza
22        New York, NY 10112
23
24  BY:   DAVID LEMAY, ESQ.
25
```

13

1

2   GIBBS & BRUNS LLP

3        Attorneys for Steering Committee Investors

4        1100 Louisiana

5        Suite 5300

6        Houston, TX 77002

7

8   BY:   KATHY D. PATRICK, ESQ.

9

10

11  ALSTON & BIRD LLP

12        Attorneys for Wells Fargo Bank N.A.

13        1201 West Peachtree Street

14        Suite 4200

15        Atlanta, GA 30309

16

17  BY:   JOHN C. WEITNAUER, ESQ.

18

19

20  CARTER LEDYARD & MILBURN LLP

21        Attorneys for Talcott Franklin Group

22        2 Wall Street

23        New York, NY 10005

24

25  BY:   AARON R. CAHN, ESQ.

14

1

2  NICHOLS KASTER ATTORNEYS AT LAW

3        Attorneys for Deborah Bollinger

4        One Embarcadero Center

5        Suite 720

6        San Francisco, CA 94111

7

8  BY:   ROBERT L. SCHUG, ESQ.

9

10

11  CADWALADER, WICKERSHAM & TAFT LLP

12        Attorneys for MBIA Insurance Corp.

13        One World Financial Center

14        New York, NY 10281

15

16  BY:   JONATHAN HOFF, ESQ.

17

18

19  JACKSON LEWIS LLP

20        Attorneys for GMAC Mortgage

21        90 State House Square

22        8th Floor

23        Hartford, CT 06103

24

25  DAVID R. GOLDER, ESQ. (TELEPHONICALLY)

15

1

2   REED SMITH LLP

3        Pennsylvania Counsel to Debtors

4        650 Market Street

5        Suite 2500

6        Philadelphia PA, 19103

7

8   BY:   MARLA T. GUERIN, ESQ. (TELEPHONICALLY)

9

10

11  MUNGER, TOLLES & OLSON LLP

12        Attorneys for Berkshire Hathaway

13        355 South Grand Avenue

14        Los Angeles, CA 90071

15

16  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

17

18

19  DECHERT LLP

20        Attorneys for Bank of New York Mellon

21        1095 Avenue of the Americas

22        New York, NY 10036

23

24  BY:   GLENN E. SIEGEL, ESQ.

25

16

1

2    ALSO PRESENT:

3          KENNETH TAGGART, Pro Se

4          SEWIT BOCRESION, GMAC ResCap (TELEPHONICALLY)

5          JOSEPH A. CONNOR, III, Pro Se (TELEPHONICALLY)

6          PAUL N. PAPAS, II, Pro Se

7          JOSEPH PENSABENE, GMAC ResCap (TELEPHONICALLY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                                    82

1  believe we need to do.  I think this accomplishes the goals

2  that we're really trying to accomplish here, which is to comply

3  and to give the committee the opportunity, which we are going

4  to further, to have a conversation with the Fed -- we're

5  arranging for those calls -- they've already sent

6  communications to the Fed to try to arrange for this -- and see

7  if there's something we can do during this ninety-day period to

8  change the cost of this.  At the same time, we can comply;

9  we'll give the committee notice.  If they think that there's

10  something wrong with what we're trying to do, they have an

11  opportunity to come to court.  And I think it resolves our

12  concerns as best as we can.

13          THE COURT:  I read your reply; the reply described --

14  I didn't see the marked-up order, but I read the reply.  And

15  may I hear from the committee?  Mr. Eckstein.

16          MR. ECKSTEIN:  Your Honor, Kenneth Eckstein with

17  Kramer Levin, on behalf of the creditors' committee.  I'm just

18  happy to be back to work.

19          THE COURT:  Holidays are over?

20          MR. ECKSTEIN:  Holidays are over.  Your Honor, as is

21  I'm sure apparent to you, we were mindful of the Court's

22  observations at the last hearing, where Your Honor expressed

23  some interim views.  And we're also mindful, Your Honor, that

24  to the extent we can try to accomplish things without embarking

25  on discovery, we really do want to try to do that.  And so we

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                83

1  suggested this approach really as an opportunity to avoid a

2  dispute regarding whether or not the consent order does or

3  doesn't have to be applied as written.

4          We may prove to be maybe naive a bit in terms of

5  hoping to deal with the Fed, but we have delivered a letter to

6  the Fed, and the debtor has assured us that they would like to

7  work with us to try to have a conversation with the Fed.  We

8  understand that this goes beyond just the Ally/ResCap order;

9  there are many orders in place affecting many institutions.

10 And we appreciate that there may be policies that may be

11 difficult to modify.

12         That said, ResCap is a Chapter 11 debtor and we think

13 that is a unique factor that we'd like to try to --

14         THE COURT:  With the Fed --

15         MR. ECKSTEIN:  -- impress upon the Fed.

16         THE COURT:  -- you'll either get relief from the Fed

17 or you won't.  I don't --

18         MR. ECKSTEIN:  So I think that's right.

19         THE COURT:  It's --

20         MR. ECKSTEIN:  So, basically --

21         THE COURT:  It is fairly extraordinary that the fifth

22 largest mortgage servicer, at least when the case started out,

23 is going to spend probably in excess of 250 million dollars

24 just to have professionals review what's being done, as opposed

25 to granting relief to the people who needed it.  But -- you

1  know?

2          MR. ECKSTEIN:  So we're going to use our best efforts

3  to see whether or not we can have a constructive dialogue

4  and --

5          THE COURT:  Are you agreeable to the form of the order

6  that's been presented?

7          MR. ECKSTEIN:  We're agreeable to the form of the

8  order.  We are deferring any issues with respect to allocation

9  between ResCap and Ally; I think at the last hearing that was

10  reserved, and we understand that that's an issue that will be

11  dealt with at a later date either by the Court or by the

12  examiner.  But for the meanwhile, this is a process that we

13  think is in the best interests of all parties involved.

14          THE COURT:  Thank you.

15          Anybody else want to be heard?  Mr. Schrock?

16          MR. SCHROCK:  Good morning, Your Honor.

17          THE COURT:  It's still morning.

18          MR. SCHROCK:  On behalf of AFI and Ally Bank.  We're

19  agreeable to the form of order.  I just did not want Your Honor

20  to be surprised that this issue of compliance with the consent

21  order, compliance with the DOJ settlement, it also comes up in

22  the context of the sale of the platform.  We did file a limited

23  objection and reservation of rights.

24          THE COURT:  I was interested to see that you're

25  objecting to the sale to Nationstar.

RESIDENTIAL CAPITAL, LLC, ET AL.                                      85

1          MR. SCHROCK:  Well, Your Honor, I frame it mostly as a

2    reservation of rights, and we want to make sure the purchase --

3          THE COURT:  I didn't read it that way.  I read it and

4    I was surprised to see you're objecting to the sale to

5    Nationstar.  But, so be it.

6          MR. SCHROCK:  Purchaser has to pick up the obligations

7    for the consent order, that is clear, and as well as the

8    debtors have to remain compliant.  So, while we're agreeable to

9    put it off for a period of time, I just wanted the Court to be

10   mindful that it will probably come up again.

11         THE COURT:  All right.  Thank you, Mr. Schrock.

12         MR. SCHROCK:   Thank you.

13         THE COURT:  Anybody else wish to be heard?

14         MS. LIGHTNER:  Your Honor, Mark Lightner from Clearly

15   Gottlieb, on behalf of the Wilmington Trust.  We've reviewed

16   the order and it's okay.

17         THE COURT:  All right, thank you.

18         Anybody else wish to be heard?

19         All right, Mr. Marinuzzi, I'm going to grant the

20   pending motion to the extent of approving the interim order

21   that's been presented to the Court.  I have now had a chance to

22   look at it, and I'm certainly familiar with the matter, so I

23   will go ahead and approve that.

24         MR. MARINUZZI:  Thank you, Your Honor.  There's a

25   blank that we need to fill in, or chambers could fill in,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                      86

1  regarding final hearing.  The idea behind the order is that

2  it's effective for ninety days.  I don't think Your Honor has

3  anything on the calendar for January 14th, but I might be

4  mistaken.

5          THE COURT:  I'm not even going to respond to that.

6  But go ahead.

7          MR. MARINUZZI:  I don't know if Your Honor wants to

8  take the time to think of a different date to have a hearing on

9  this.

10          THE COURT:  It wouldn't be the first matter that had

11  gotten resolved by a second interim order as well.  But I'll

12  leave that initially to the parties to see whether they can

13  work that out.  You know, we're going to finish the trial day

14  at 8:45 p.m.  Would you like to take it up then, Mr. Marinuzzi?

15          MR. MARINUZZI:  Sure, Your Honor.

16          THE COURT:  That'd probably provide an incentive to

17  see whether everybody can get the issue resolved.

18          MR. MARINUZZI:  That's fine, Your Honor.

19          THE COURT:  So, schedule it for the 14th; it'll be at

20  the end of the calendar.

21          MR. MARINUZZI:  Okay.  Thank you, Your Honor.

22          MR. ECKSTEIN:  That's the Monday -- that's the first

23  trial day?

24          THE COURT:  That's the beginning, the first day of the

25  trial.

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1          THE COURT:  Yes.

2          MR. MARINUZZI:  -- where stipulations have been

3   presented.

4          THE COURT:  Right.  Anybody want to be heard?  They're

5   on the agenda.  I did review the agenda before to see what they

6   are.  These essentially are lift stays to allow the -- to lift

7   the stay so the first mortgagee can foreclose on property and

8   is that -- am I correct?

9          MR. MARINUZZI:  That's my understanding, Your Honor.

10          THE COURT:  All right.

11          MR. MARINUZZI:  Yes.

12          THE COURT:  Does anybody want to be heard?  All right.

13   Those will be granted.

14          MR. MARINUZZI:  Thank you, Your Honor.

15          THE COURT:  Okay.

16          MR. MARINUZZI:  That's all we have on the agenda.

17   We'll see you in a week.

18          THE COURT:  I guess I'm going to see some people at 2

19   o'clock.  The court's in recess.

20          MR. MARINUZZI:  Thank you.

21          THE COURT:  The 2 o'clock hearing is in chambers, not

22   on the record.

23       (Whereupon these proceedings were concluded at 1:09 PM)

24

25

132

# C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  October 11, 2012