**EXHIBIT B**

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**

**JUNE 21, 2012 (Updated November 20, 2012)**
**FINANCIAL REMEDIATION FRAMEWORK**

**FREQUENTLY ASKED QUESTIONS**

**Financial Remediation Framework Approach**

*1. What is the purpose of the Financial Remediation Framework?*

The Office of the Comptroller of the Currency (OCC) and the Board of Governors of the Federal Reserve System (FRB) have developed the financial remediation framework (the Framework) to provide examples of situations where compensation or other remediation is required for financial injury due to servicer errors, misrepresentations, or other deficiencies. The independent consultants will use the Framework to recommend remediation for financial injury identified during the Independent Foreclosure Review. The servicers will prepare remediation plans based on the independent consultants' recommendations. The federal banking regulators must approve each servicer's remediation plan. The categories included in the Framework are not intended to be exhaustive or to cover all possible situations or remediation options for borrowers who may require compensation or other remediation for financial injury.

*2. Will the regulators issue updates to the Framework periodically?*

The OCC and FRB do not plan to make updates to the Framework. We recognize that the independent consultants may identify other situations or remediation options that are not covered in the Framework. In those cases, the independent consultants may recommend other remediation or compensation for the servicers to use in preparing their remediation plans, which will be subject to regulator approval.

*3. Will the regulators issue updates to these Frequently Asked Questions periodically?*

The OCC and FRB intend to update these Frequently Asked Questions (FAQs) as appropriate.

*4. Can a borrower get remediation under more than one category in the Framework?*

Borrowers who suffered one of the injuries in categories 1 through 4 will only receive the remediation described under the category that provides the highest remediation amount because the remediation is intended to cover all financial injuries related to the foreclosure process.

Where the remediation is not intended to cover all financial injuries related to the foreclosure process, borrowers may receive remediation or compensation for more than one category if they suffered separate injury. For example, if a borrower was never solicited for a loan modification under category 7 and was improperly charged fees under category 13, they will receive remediation under both categories. On the other hand, a borrower who has been wrongfully

1

denied a loan modification under category 5 will not receive $500 for a credit reporting error under category 13 because that is already covered under category 5.

*5. If the Framework is supposed to address direct financial injury, why does it include a number of fixed dollar payments?*

The fixed dollar payments approximate an amount of direct financial injury that borrowers may have suffered as a result of a specific error. The regulators believe that payments of designated amounts for particular types of injury will avoid the need for borrowers to provide proof of the amount of the injury suffered and will avoid the delay and expense associated with an examination of the particular circumstances involved in each borrower's case. The fixed dollar payments may over compensate borrowers for the harm they suffered in some cases. Nonetheless, there may be some cases where a borrower believes that additional compensation is warranted. In those cases, borrowers may pursue other available legal remedies.

*6. What if the Independent Foreclosure Review finds that the servicer made an error relating to a borrower's loan, but the borrower did not suffer any financial injury as a result of the error? Will they receive remediation?*

If the borrower did not suffer any financial injury as a result of a servicer's error relating to the borrower's loan, the borrower will not get any remediation under the Independent Foreclosure Review. However, the servicer will have to correct any errors identified by the Independent Foreclosure Review process.

*7. Are the remediation amounts listed in the Framework fixed, or may an independent consultant recommend a different amount or form of remedy?*

The Financial Injury Framework requires fixed dollar payments for most injury categories. These fixed dollar payments approximate an amount of direct financial injury that borrowers may have suffered as a result of a specific error. The regulators believe that payments of designated amounts for particular types of injury will avoid the need for borrowers to provide proof of the amount of the injury suffered and will avoid the delay and expense associated with an examination of the particular circumstances involved in each borrower's case. The fixed dollar payments may under or over compensate borrowers for the harm they suffered in some cases, but will allow for a consistent remedy across servicers. In unique situations, and for those categories of the framework where remediation is to be determined on a case-by-case basis, the independent consultants have flexibility to recommend a remedy tailored to the individual borrower's facts and circumstances. The regulators expect that variances from the Framework will be very infrequent.

**Remediation for Violations of the Servicemembers Civil Relief Act (SCRA)**

*8. Are interest rate injuries related to SCRA covered under category 1?*

No. Interest rate related actions that violate the SCRA are covered under category 13. Only

2

foreclosure related actions that violate the SCRA are covered under category 1.

*9. For SCRA interest rate related violations, how will a correction to the servicer's record for excess interest accrued in error to a borrower's account be calculated?*

Where the servicer has not reduced the interest rate as requested by the borrower in violation of the SCRA addressed by category 13, interest will be calculated from the date the servicemember was called to military service through the earlier of the remediation date or one year after military service ended.

**Definition of "Borrower Not in Default" under the Framework**

*10. What is meant by "Borrower Not in Default" for category 2?*

Under category 2 in the Framework, the terms of the borrower's original mortgage or permanent loan modification agreement will determine whether or not the borrower is considered to be in

default.  Generally, a borrower who is current on all required payments is not considered to be in default.

**Loss Mitigation Programs**

*11. What is a "loss mitigation program"?*

Loss mitigation programs are programs intended to assist the borrower in avoiding foreclosure or otherwise minimize financial losses that occur as a result of foreclosure.  In addition to loan modifications, loss mitigation programs refer to such things as cash-for-keys programs, deeds-in-lieu of foreclosure, payment plans, short sales, or loan forbearance agreements.

*12. How will injuries related to loss mitigation programs such as cash-for-keys programs, deeds-in-lieu of foreclosure or short sales be addressed under the Framework?*

These injuries will be addressed under category 13 of the Framework.

*13. What is a written trial-period plan under category 3?*

To be covered under category 3 in the Framework, the servicer must have communicated to the borrower a written trial-period plan that would entitle the borrower, upon full satisfaction of all of the required elements of the written agreement (including submitting all documentation requested and meeting all underwriting qualifications specified), to have their loan converted into a permanent loan modification, such that the borrower would no longer be in default status upon execution of the permanent loan modification.

*14. What is a forbearance plan?  What forbearance plans are covered under category 4?*

A forbearance plan is typically an agreement by the servicer to postpone, reduce, or suspend payments due on a loan for a specified period of time.  These agreements are usually intended to provide the borrower time to resolve a short-term financial impairment.  Interest may continue to accrue at the contractual note rate during the forbearance period, in which case it remains the borrower's responsibility.

To be covered under category 4 in the Framework, the forbearance plan offered by the servicer must be documented and include specific payment terms for a specified period of time longer than one month.  In addition, the foreclosure must have been completed before the expiration of the specified timeframe while the borrower was meeting all requirements of the forbearance plan.

*15. For categories 3 and 4, the servicer is permitted to offset missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower, subject to certain limitations.  How will this offset be applied?*

For categories 3 and 4, where the foreclosure is complete and rescission is not possible, the servicer may reduce the remediation payment to the borrower for any missed and unpaid

4

principal & interest payments and property taxes paid on behalf of the borrower before the trial-period plan or forbearance plan began.

For category 3a, the servicer may also reduce the remediation payment to the borrower for missed and unpaid principal & interest payments and property taxes paid on behalf of the borrower for the period after the failure to convert the trial-period plan to a permanent modification.  The servicer's offset for missed and unpaid principal & interest payments after the failure to convert the trial-period plan may not exceed the monthly payment amounts the borrower would have owed had the conversion to a permanent modification occurred.

In all of the above situations, the servicer may only reduce remediation payments if the servicer had not previously taken some other action to recover those same amounts, such as adding the unpaid amounts to the principal balance of the loan, or including those amounts in a deficiency judgment, unless the servicer also reduces the unpaid principal balance or the deficiency judgment by an equivalent amount.

### Based on Past Documentation

*16. What does it mean to provide a loan modification "where permitted based on past documentation"?*

Some loan modification programs may allow the servicer to offer borrowers the modification they should have received based entirely on previously submitted documents.  In such cases, servicers should provide borrowers the loan modification they would have previously qualified for without requesting that the borrower submit current and/or additional information.

### Rescission

*17. What is meant by rescission of a foreclosure under the Framework?*

Under the Framework, rescission means to unwind the foreclosure action or sale and return ownership of the property to the borrower as applicable.

*18. When is rescission of a foreclosure possible under the Framework?*

For categories 1 and 2, rescission of a foreclosure is possible when the following conditions exist:

    (i)      federal law, state law, judicial, and local practice permits the action;
    (ii)     the home has not already been transferred or sold to a third-party; and
    (iii)    the servicer action does not result in underwriting a new loan if the servicer lacks legal authority to underwrite a new loan (e.g., the servicer does not currently possess loan originator licenses from the appropriate federal or state authority) or is not in the business of originating loans.

> In addition to the conditions listed above for categories 1 and 2, the borrower must also expressly indicate that they want to stay in the home or return to the home.

For categories 3, 4, and 5, rescission of a foreclosure is possible when the following conditions exist:

> (i) federal law, state law, judicial, and local practice permits the action;
> (ii) the home has not already been transferred or sold to a third-party;
> (iii) the servicer action does not result in underwriting a new loan if the servicer lacks legal authority to underwrite a new loan (e.g., the servicer does not currently possess loan originator licenses from the appropriate federal or state authority) or is not in the business of originating loans;
> (iv) the loan or related property is in the control of the servicer (versus the investor, guarantor, or insurer);
> (v) the action does not compromise the second lien position, unless the second lien is owned by the servicer or an affiliate of the servicer; and
> (vi) investor approval to modify the loan is provided where required.

> In addition to the conditions listed above for categories 3, 4, and 5, the borrower must also expressly indicate that they want to stay in the home or return to the home.

**Equity Calculation**

*19. How is the amount of a borrower's equity being calculated?*

A borrower's equity is calculated based on the estimated value of the borrower's home at the time of the servicer's error reduced by the amount the borrower still owes on the property. The estimated value of the borrower's home will be calculated as follows:

> (i) Where the servicer has an appraisal or broker price opinion (BPO) within 60 days of the date of the servicer error, the appraised value or BPO value closest to the date of the servicer error will be used;

> (ii) Where the appraisal or BPO is more than 60 days from the date of the servicer error, the appraised value or BPO value closest to the date of the servicer error adjusted by the Case-Schiller Home Price Index (which can be found at: http://www.standardandpoors.com/indices/sp-case-shiller-home-price-indices/en/us/?indexId=spusa-cashpidff--p-us----) or the Federal Home Finance Agency (FHFA) House Price Index (HPI) (which can be found at: http://www.fhfa.gov/Default.aspx?Page=14) to the date of the error will be used; or

> (iii) If there is no more recent appraisal or BPO available since the origination of the loan, the estimated value of the home at the time of error will be based on the estimated value of the home at loan origination adjusted by the Case-Schiller index or FHFA HPI to the date of the error.

6

If the home was later sold in a foreclosure sale for an amount more than the amount the borrower owed on the mortgage loan(s), the borrower's equity will be reduced by this amount if previously paid to the borrower.

**Deficiency Judgments**

*20. What is a deficiency judgment?*

Under the Framework, a deficiency judgment is a court judgment publicly recording the amount the borrower owes to another party as a result of the borrower's home being sold for less than the amount the borrower owed on their mortgage.

*21. What does it mean to "remedy deficiency" under the Framework?*

If the amount of a deficiency judgment is incorrect, the servicer will be required to take steps to ensure that the borrower is not responsible for payment of the erroneous portion of the deficiency amount.

*22. Why wouldn't the regulators just require the servicer to void all deficiency judgments?*

It is not always possible to void a deficiency judgment where an error has been found.  For example, there may be legal limitations on the servicer's ability to void a deficiency judgment or the loan may be under the control of an investor or other third party who may have rights to the deficiency balance.  Additionally, there will be cases where part of a deficiency judgment is in error and requires remedy, but the remainder of the judgment is accurate and valid.

**Excess Interest**

23. *What does the term correct "excess interest" mean in the Framework?*

Excess interest means the interest amount accrued or charged to the borrower in error by the servicer.  Under the Framework, servicers will be required to correct any excess interest by, for example, making corrections to the servicer record or reimbursing the borrower for excess interest amounts paid.

**Loan Modifications – Corrections for Excess Interest**

*24. How will excess interest be calculated for errors related to loan modifications?*

Excess accrued interest will be calculated from the date the servicer committed the error until the error is or was corrected.

7

*25. How will the independent consultants determine the date the servicer committed the error for loan modification related categories?*

- For an erroneous denial of a complete loan modification application for which the borrower would have qualified: the date the servicer should have approved the completed file according to the applicable program requirements.

- For a failure to consider and approve a complete loan modification application for which the borrower would have qualified: the date the servicer should have approved the completed file according to the applicable program requirements.

- For charging a higher interest rate than specified for a modification approved under the Home Affordable Modification Program (HAMP) or other program designated by the regulator: the effective date of the approved modification.

- For not decisioning a loan modification made under HAMP or other program designated by the regulator within the timeframe required by the applicable program: the date the servicer should have approved the completed application according to the applicable program requirements.

If the independent consultant cannot determine the exact date the error occurred, then the independent consultant will use a reasonable approximation of the date that the error occurred to calculate the amount of excess interest.

**Loan Modification Never Offered or No Follow-up Occurred**

*26. What is meant by HAMP for purposes of the Independent Foreclosure Review?*

For purposes of the Independent Foreclosure Review, HAMP refers to any government sponsored HAMP program, including, for example, the Department of the Treasury Making Home Affordable MHA HAMP, the Department of Housing and Urban Development Federal Housing Administration FHA HAMP, the Department of Veteran Affairs VA HAMP, the Department of Agriculture Rural Housing Authority RD-HAMP, and the Government Sponsored Enterprise GSE HAMP programs administered by Freddie Mac and Fannie Mae.

*27. What does it mean in category 6 that the servicer "never followed up to obtain complete loan modification documents" as required under the applicable program?*

Some loan modification programs, such as HAMP beginning in January 2010, require a servicer to send the borrower a notice, or take other actions to obtain the documents needed to modify the loan under program standards.  If the independent consultant determines that a servicer performed no required follow-up to obtain complete loan modification documents as required by program standards, the servicer will be required to provide the remediation described in the Framework.

*28. What does it mean in category 7 that the servicer "never solicited borrower loan modification option" as required under applicable program?*

Some loan modification programs, such as the HAMP, require a servicer to proactively solicit certain borrowers. If an independent consultant determines that a servicer made no effort to solicit a borrower for a loan modification as required by HAMP or other program designated by the regulators, the servicer will be required to provide the remediation described in the Framework.

**Credit Reporting**

*29. When is the servicer required to pay $500 for credit reporting errors under the Framework?*

Under the Framework, the servicer must pay $500 in cases where a servicer's erroneous negative credit reporting in an amount of $100 or more requires that a borrower's credit report be corrected. However, borrowers will not receive a separate payment of $500 for credit reporting errors where they also receive remediation under another category that is intended to cover all financial injuries related to the foreclosure process as described in FAQ # 4.

*30. Does the $500 payment for remediation of credit report errors have to be made in all cases where the servicer must correct an erroneous credit report?*

No. A servicer does not have to make the $500 payment where the total amount of erroneous fees that have been charged to a borrower's account by a servicer and reported to a credit bureau is less than $100. The servicers are required, however, to make all of the needed corrections to an individual borrower's credit report.

*31. What if the servicer made multiple errors regarding a borrower's credit report?*

The single fixed dollar payment of $500 reflects the total compensation for credit reporting injury, even if there are multiple errors.

**Erroneous Late Fees and Foreclosure Fees Actually Paid**

*32. What if the borrower has already paid late fees and other foreclosure fees that were determined to be charged in error? Does the borrower get that money back?*

Where the servicer charged the borrower erroneous fees and the borrower made a payment to the servicer for such fees, the servicer will be required to reimburse the borrower directly for those costs plus interest.

*33. How will interest be calculated for payment of erroneous fees?*

Interest will be calculated from the date the borrower paid the erroneous fee until the remediation date at 3.26 percent, the average rate paid on 10-year U.S. Treasury notes from 2009 to 2011.

9

**Waivers and Releases**

*34. Does filing a request-for-review form prevent a borrower from filing litigation or taking other action against the servicer?*

No.  Submitting a request for an Independent Foreclosure Review will not preclude borrowers from pursuing any other legal remedies available related to their foreclosure.

*35. Will the Independent Foreclosure Review process require the borrower to sign a waiver to release the servicer from any claims related to the foreclosure action in order to receive remediation?*

No.  Servicers may not ask a borrower voluntarily to release any claims in order to receive remediation payments.

However, servicers may assert in any separate litigation, or as part of future settlements related to the servicer's foreclosure and servicing practices, any right that may exist under applicable law to offset the amounts received from the servicer under the Independent Foreclosure Review, but they may only assert it in those other matters.

**National Mortgage Settlement**

*36. Is the Independent Foreclosure Review process the same as the recently announced National Mortgage Settlement involving the Department of Justice, the Department of Housing and Urban Development, other federal agencies, and States Attorneys General?*

No.  The two actions are separate and provide different forms of remedies and relief.  The Independent Foreclosure Review process results from consent orders issued on April 13, 2011 by the federal banking regulatory agencies against 14 large mortgage servicers for deficient mortgage servicing and foreclosure practices.  The National Mortgage Settlement, announced and filed in federal district court earlier this year, requires five large mortgage servicers to address mortgage loan servicing and foreclosure abuses alleged by multiple federal and state government agencies.

*37. Will a borrower be disqualified from the Independent Foreclosure Review, if they also participate in the National Mortgage Settlement?*

No.  Borrowers will not be disqualified from the Independent Foreclosure Review if they also participate in the National Mortgage Settlement.

*38. If a borrower has received payment under the Borrower Payment Fund of the National Mortgage Settlement, will their remediation be offset under the Independent Foreclosure Review?*

Remediation payments under the Independent Foreclosure Review will not be offset by payments the borrower has received under the Borrower Payment Fund of the National Mortgage Settlement.

**Debt Owed by Borrower to Servicer Does Not Prohibit Participation in the Independent Foreclosure Review**

*39. If a borrower was more than six months delinquent on their mortgage, can that borrower expect remediation?*

Remediation will be based on financial harm resulting from errors, misrepresentations, or other deficiencies in foreclosure practices by the servicer whether or not the borrower was delinquent. However, as explained in FAQ # 14, a servicer may reduce the amount of the payment by specified amounts due to the servicer under certain circumstances.

**No Remediation for Pain and Suffering**

*40. If a borrower has been diagnosed by a physician for depression and anxiety related to the stress involved with the foreclosure action, can the borrower expect remediation to cover medications and doctor bills?*

No.  The Independent Foreclosure Review is intended to compensate borrowers for financial injury and does not compensate borrowers for emotional distress, pain, suffering, or other non-financial injury.

**Taxes**

*41. Will borrowers who receive funds from the Independent Foreclosure Review be required to pay taxes on amounts received as compensation or other remediation?*

Borrowers should be aware that compensation received from the servicer pursuant to the Independent Foreclosure Review may have consequences with respect to their federal, state, or local tax liability, as well as eligibility for any public assistance benefits.  The regulators cannot give advice about the impact of settlements on an individual's tax liability or receipt of public assistance benefits.  Borrowers may wish to consult with a qualified individual or organization about any possible tax or other consequences resulting from the receipt of payments under the Independent Foreclosure Review.

**Source of Remediation Funds**

*42. Where is the money to pay borrower claims coming from? Is any taxpayer money involved?*

The servicers are financially responsible to compensate borrowers for financial injury and no taxpayer money is involved.

**Disagreement with Independent Foreclosure Review Findings**

*43. What can borrowers do if they disagree with the independent consultant's decision? Is there an appeal process?*

The results of the Independent Foreclosure Review are considered final and there is no process for appeal of either the findings or the amounts of remediation offered. The results of the Independent Foreclosure Review are not intended to have an impact on any other options the borrower may pursue related to their mortgage loan.

**Borrowers Currently Facing Foreclosure**

*44. Will the Independent Foreclosure Review affect, stop, or delay a borrower's foreclosure sale date?*

The Independent Foreclosure Review will not necessarily affect, stop, or delay the foreclosure sale date. The regulators have, however, issued guidance to the independent consultants and servicers to try to prevent any borrower who is receiving an independent foreclosure review from losing their home without their file first receiving a pre-foreclosure sale review or a review by an independent consultant. The regulators encourage borrowers who believe they have a basis to submit a request-for-review and are facing foreclosure to submit their requests as soon as possible. Additionally, borrowers should continue to work with their servicer to prevent a foreclosure sale using every avenue possible.

*45. If a borrower has submitted a request-for-review under the Independent Foreclosure Review and is waiting for a response, can he or she still work with their servicer to obtain a loan modification or other loss mitigation option in the meantime?*

Yes. In fact, borrowers should continue to work with their servicer. Participating in the review will not interfere with efforts to modify a borrower's obligations under an existing mortgage or to prevent a foreclosure sale. The Independent Foreclosure Review is not intended to replace active foreclosure prevention efforts between a borrower and a servicer.

**Process and Timing of Completion of Review**

*46. How and when will the borrower be notified of the results of the review?*

Borrowers who ask for a review of their foreclosure will receive a letter advising them of the results of the Independent Foreclosure Review. Because the review process will be a thorough

examination of many details and documents, the review could take a considerable amount of time to complete. In addition, because the servicers have to submit a remediation plan to their primary regulator for approval, the payment process may not occur immediately after completion of the file review.

*47. Could borrowers be eligible for remediation, even if they didn't file a request-for-review?*

Yes. In addition to the request-for-review process, the independent consultants are doing a separate file review to identify borrowers who suffered financial injury due to servicer errors, misrepresentations or other deficiencies in the foreclosure process. Servicers will be required to compensate all injured borrowers identified as part of that file review under the Framework.