**Supplemental Briefing Deadline: April 5, 2013 at 5:00 p.m. (Prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
P. Bradley O'Neill
Craig L. Siegel
Rachael Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Electronic mail: boneill@kramerlevin.com

*Counsel for The Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, *et al.*, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**SUPPLEMENTAL MEMORANDUM OF LAW OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF THE DEBTORS' MOTION FOR A DETERMINATION THAT (I) GMAC MORTGAGE'S FRB FORECLOSURE REVIEW IS A GENERAL UNSECURED CLAIM AND (II) THE AUTOMATIC STAY PREVENTS ENFORCEMENT OF THE FRB FORECLOSURE REVIEW OBLIGATION**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................................ii

PRELIMINARY STATEMENT ......................................................................................................... 1

ARGUMENT ....................................................................................................................................... 1

    I.     The Debtors' Payment Obligations Under the Consent
           Order Should Be Classified As General Unsecured Claims ................................... 1

    II.    AFI Is Liable for Any Shortfall in Payments
           Made by the Debtors Under The Consent Order ..................................................... 8

CONCLUSION .................................................................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Chao v. Hospital Staffing Services, Inc.*,
   270 F.3d 374 (6th Cir. 2002) ...................................................................................3, 6, 7

*Enron Corp. v. California (In re Enron Corp.)*,
   314 B.R. 524 (Bankr. S.D.N.Y. 2004) ..................................................................3, 4, 5, 7

*In re Chateaugay Corp.*,
   115 B.R. 28 (Bankr. S.D.N.Y. 1988) .........................................................................2, 3, 5

*In re Liss*,
   59 B.R. 556 (Bankr. N.D. Ill. 1986) ....................................................................................7

*In re Midway Airlines Corp.*,
   283 B.R. 846 (E.D.N.C. 2002) ........................................................................................4, 7

**STATUTES**

11 U.S.C. § 101(5)(A) ...............................................................................................................1

11 U.S.C. § 362 .........................................................................................................................7

11 U.S.C. § 362(a) ....................................................................................................................2

11 U.S.C. § 362(b)(4) ....................................................................................................2, 3, 5, 7

12 U.S.C. § 1818(i)(1) ..............................................................................................................7

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Committee respectfully submits this supplemental memorandum of law in support of the Debtors' motion (the "**Motion**") for a determination that, for the purposes of a chapter 11 plan, GMAC Mortgage's FRB Foreclosure Review obligations give rise to a general unsecured claim, and the automatic stay prevents enforcement of that obligation [Docket No. 3055].[1]

## PRELIMINARY STATEMENT

At the oral argument on the Motion on March 21, 2013 (the "**Hearing**"), the Court directed supplemental briefing on two issues: (1) whether certain claims arising under the FRB's Consent Order should be classified as general unsecured claims; and (2) if those claims were treated as general unsecured claims, whether AFI would be liable if distributions on those claims were insufficient to pay unsecured creditors in full. As explained below, the answer to both questions is "Yes."

## ARGUMENT

**I.    The Debtors' Payment Obligations Under The Consent
       Order Should Be Classified As General Unsecured Claims**

1.    In its Reply in support of the Motion, the Committee demonstrated that restitution obligations based upon prepetition conduct and relationships – like the borrower remediation or reimbursement payments required by the Consent Order – are properly treated as general unsecured claims. (Reply at 10-15).[2] That the Consent Order was entered by the FRB in the exercise of its regulatory authority did not convert those prepetition unsecured claims into administrative expenses, because the Bankruptcy Court alone has the power to determine the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion and the Committee's reply in support of the Motion ("**Reply**") [Docket No. 3245].

[2] Any purported right to borrower reimbursement payments under the Consent Order is indisputably a "claim" within the meaning of 11 U.S.C. § 101(5)(A).

priority of claims. (*Id.*). Any other rule would allow governmental agencies to dictate enhanced distributions to a favored class of creditors they deemed entitled to "restitution," and thereby upend the bedrock bankruptcy principle requiring that similarly situated creditors be treated alike. (*Id.*). The Committee will not repeat those arguments here.

2.   At the Hearing, however, the Court questioned whether, even if borrower remediation or reimbursement payments were treated as general unsecured claims for restitution, claims associated with the conduct of the FRB Foreclosure Review were also unsecured claims. The case law on this question is clear as well. The postpetition cost of compliance with the Consent Order could, in theory, constitute an administrative expense – but only if that order falls within an exception to the automatic stay. Under relevant case law, it does not. Because the FRB Foreclosure Review process, as it exists today, is primarily directed at adjusting the rights of private parties – former borrowers allegedly injured by foreclosure-related misconduct in 2009 and 2010 – an order directing the Debtors to pay for that process is subject to the automatic stay, 11 U.S.C. § 362(a), and does not fall within the "police or regulatory power" exception in 11 U.S.C. § 362(b)(4).

3.   Not all actions by a state fall within the section 362(b)(4) exception to the automatic stay. Rather, in light of the stay's fundamental protective purpose, the police power exception, like all exceptions to the stay, is construed narrowly. *See In re Chateaugay Corp.*, 115 B.R. 28, 32 (Bankr. S.D.N.Y. 1988). Two related tests govern whether a given action is an exercise of the "police and regulatory power" and falls within section 362(b)(4). Under the "pecuniary purpose" test, courts look to whether a governmental action is pursuing a pecuniary interest (stayed) rather than a matter of public safety and welfare (not stayed). *Id.* at 31. Under the "public policy" test, courts evaluate whether the governmental action is designed to

implement public policy (not stayed) as opposed to vindicate private rights (stayed). *Id.* Where a governmental action is directed primarily to the protection of a pecuniary interest or the adjudication of private rights, the section 362(b)(4) exception is inapplicable and the automatic stay applies. *See id.*; *Enron Corp. v. California (In re Enron Corp.)*, 314 B.R. 524, 535 (Bankr. S.D.N.Y. 2004) (Gonzalez, Bankr. J.).

4. The Sixth Circuit's decision in *Chao v. Hospital Staffing Services, Inc.*, 270 F.3d 374 (6th Cir. 2002), is instructive. In *Hospital Staffing Services*, the U.S. Department of Labor ("**DOL**") obtained an injunction barring a bankruptcy trustee from transporting certain patient records that the DOL asserted were "hot goods" because they had been created prepetition in violation of the minimum wage and overtime provisions of the Fair Labor Standards Act ("**FLSA**"). 270 F.3d at 378. The injunction was subject to dissolution if the debtors deposited sufficient funds with the clerk of court to compensate injured employees for the prepetition FLSA violations. *Id*. *See also id.* at 380.

5. The Sixth Circuit held that the DOL's suit failed the public policy test and therefore violated the automatic stay. In so holding, the Court recognized that all legislative acts, and lawsuits to enforce those acts, by definition, declare public policy. *Id.* at 389. Yet "[t]he existence of the public policy test naturally presumes that some suits by governmental units, even though they would effectuate certain declared public policies, will nevertheless be regarded as largely in furtherance of private interests." *Id*. Accordingly, where the primary thrust of the action "incidentally serves public interests but more substantially adjudicates private rights, courts should regard the suit as outside the police power exception." *Id.* at 390.

6. The DOL's action, the Court found, was "not in furtherance of the [DOL's] statutory powers to regulate and enforce labor standards, but rather [was] designed to and would,

- 3 -

if allowed to proceed, promote the private rights of unpaid workers vis-à-vis other creditors of the debtor's estate." *Id.* at 378. Because the patient records had no intrinsic value and could not be sold in commerce, *id.* at 392, the injunction did not serve the statutory goal of protecting other businesses by "eliminat[ing] the competitive advantage enjoyed by goods produced under substandard conditions." *Id.* at 387 (quotation marks and citation omitted). As a result, the Court held that the DOL had only a "general interest in seeing laws enforced" and deterring FLSA violations and these interests were outweighed by the focus of the DOL action on vindicating the *property* interests of the affected employees. *Id.* at 391. Thus, "the injunction [was] merely a vehicle to enforce the private rights of the employees to the minimum portion of their wages [FLSA] guaranteed," which "is not covered by the police power exception." *Id.* at 394; *accord In re Midway Airlines Corp.*, 283 B.R. 846, 851 (E.D.N.C. 2002) (automatic stay bars enforcement action by state labor department to compel payment of unpaid vacation wages where action was "undertaken principally to adjudicate the private claims of Debtor's employees" and "'serves little public purpose other than a general interest in seeing laws enforced'").

7.     Similarly, in *Enron*, the California Attorney General filed a state court action against the debtors under California consumer protection laws alleging that Enron's prepetition, fraudulent manipulation of energy markets damaged California residents and businesses. 314 B.R. at 531. The action sought to enjoin the debtors from violating California's laws, as well as an order directing the debtors to pay restitution, disgorgement, damages, civil penalties, and costs. *Id.* Judge Gonzalez held that the lawsuit failed both the pecuniary purpose and the public policy tests and was therefore barred by the automatic stay.

8. In so ruling, the Court concluded that, although the proposed injunction nominally sought to enforce compliance with state law, events surrounding Enron rendered the injunction "meaningless," *id.* at 537, and thus the action's primary aim was restitution. *Id.* at 540. In particular, the Court observed that Enron had already sold its energy trading operations and was in liquidation. There was, therefore, no reasonable possibility it would ever engage in fraudulent energy market trading again. *Id.* at 537-38. Not only could the injunction have no deterrent effect on the debtors, it would have no deterrent effect on others because other criminal and regulatory proceedings against the debtors were already serving that purpose. *Id.* at 538-39. Accordingly, Judge Gonzalez held that the primary aim of the lawsuit was insufficient to satisfy the section 362(b)(4) police power exception: "When the primary purpose of a government lawsuit is to seek money damages or other monetary relief for past conduct, and not to prevent future conduct that could harm the public health or safety, the courts hold that the police power exception to the automatic stay does not apply." *Id.* at 538.

9. Applied here, these decisions dictate that enforcement of the Consent Order falls outside the police power exception and is barred by the automatic stay. First, it is clear that the Consent Order no longer operates to prevent harmful conduct in the marketplace. While the Consent Order may at one time have regulated the Debtors' servicing operations, it no longer does so. As in *Enron*, the Debtors have sold their servicing businesses and are in the process of liquidating. 314 B.R. at 537-38; *see also Chateaugay*, 115 B.R. at 32 (rejecting contention that "the public policy of deterrence would be furthered" by allowing the government to pursue claims for damages and restitution in federal district court where the debtor "is no longer in business"). Nor will the Consent Order influence or deter other mortgage servicers because the

- 5 -

FRB and other government entities have already imposed similar orders (many of which have since been amended) on virtually all of the largest servicers in the nation.

10.     Second, enforcement of the Consent Order to require the Debtors to pay for the FRB Foreclosure Review, like enforcement of the injunction in *Hospital Staffing Services*, serves only to facilitate monetary restitution or reimbursement to private third parties based on prepetition conduct.  It is undisputed that the FRB Foreclosure Review is directed at identifying and evaluating prepetition injuries of borrowers whose mortgage loans were serviced by the Debtors in 2009-2010.  (FRB Obj. at 5) (stating that "*of most significance for present purposes*," the Consent Order is "designed to ensure . . . that those harmed by the [alleged] misconduct are identified and made whole") (emphasis added).  By the FRB's own admission, therefore, the Consent Order mandates an expenditure of estate funds to identify privately held prepetition claims that are properly addressed in the bankruptcy proceedings.

11.     Third, underscoring the lack of a cognizable public purpose, the FRB Foreclosure Review does not even reflect the prevailing regulatory policy of the FRB.  The federal government has not only abandoned that process and entered into alternative arrangements with virtually all other servicers, but at the Hearing counsel to the FRB declined even to defend the FRB Foreclosure Review on a substantive level. (Hearing Tr. at 84) ("THE COURT:  . . . I don't – you're not really trying to defend from an economic standpoint the present structure, I take it. MS. SUTTON: No. No, Your Honor.").  If the enforcement of the IFR process does not serve a public purpose for the rest of the mortgage industry, the FRB can hardly maintain that it serves some public purpose when applied to one, now defunct, liquidating servicer. In fact, the FRB conceded that its principal objective in opposing the Debtors' Motion was not enforcing regulatory policy, but rather enforcing the Consent Order for its own sake.  (*Id*. at 85) ("MS.

SUTTON: What I am here defending is a lawfully entered order that is enforceable in a court of law, and compliance with that order."). But this amounts to little more than a generalized interest in the enforcement of laws, which is insufficient to support the police power exception to the automatic stay. *See Hospital Staffing Services*, 270 B.R. at 391; *Midway*, 283 B.R. at 851.

12. For these reasons, section 362(b)(4) does not apply and the automatic stay operates as a bar to any action by the FRB outside the Court's claims resolution process to obtain payment of PwC's fees or borrower reimbursement from the Consent Order Debtors. *See Hospital Staffing Services*, 270 F.3d at 378; *Enron Corp.*, 314 B.R. at 540-41; *Midway*, 283 B.R. 846 (holding state action to recover unpaid wages (to be remitted to individual employees or state) fell outside police power exception because it was "undertaken principally to adjudicate the private claims of Debtor's employees" that should be "determined and paid through the procedures established under bankruptcy law"); *In re Liss*, 59 B.R. 556, 561 (Bankr. N.D. Ill. 1986) (applying section 362(b)(4) to refuse allowing attorney general to continue state court action seeking restitution for debtor's consumer fraud because "[a]ny state court ordering restitution for certain citizens from the debtor is certainly creating for these few citizens an advantage over other potential creditors of this debtor's estate") (quotation marks and citation omitted).³

---

³ Notably, this Court's determination concerning the applicability of the automatic stay — an act clearly within its jurisdiction — does not implicate 12 U.S.C. § 1818(i)(1). Section 1818(i)(1) does not provide a means by which the FRB can override the priority scheme provided by the Bankruptcy Code, and therefore has no applicability or impact on the classification of payments arising from the FRB Foreclosure Review as unsecured claims. If the stay is applicable, moreover, a federal statute, section 362 of the Bankruptcy Code, will prevent enforcement of the Consent Order against the Debtors, not any action of this Court. Nor will the application of the stay interfere with the operation of the Consent Order in any event. If the Debtors cannot make payments in respect of the FRB Foreclosure Review under the Consent Order, AFI will be obligated to make those payments, and the FRB Foreclosure Review will continue unaffected.

## II. AFI Is Liable for Any Shortfall in Payments Made by the Debtors Under The Consent Order

13.     In the event that the Court concludes that borrower remediation payments are properly treated as general unsecured claims, the terms of the Consent Order and the Supplemental Agreement dictate that AFI will be liable for any amounts in excess of the distribution on such claims. By its terms, the Consent Order renders AFI jointly liable for borrower remediation payments. In particular, paragraph 3(d) of the Consent Order provides that within 60 days of the FRB's acceptance of a plan of remediation and reimbursement, "the Mortgage Servicing Companies shall make all reimbursement and remediation payments and provide all creditors required by such plan." (Consent Order ¶ 3(d)). The Consent Order defines the term "Mortgage Servicing Companies" to include AFI. (*Id.* at 2) ("Ally Financial engages in the business of servicing residential mortgage loans through various indirect subsidiaries, including GMAC Mortgage and its subsidiaries (collectively, the 'Mortgage Servicing Companies')."). Accordingly, under the plain language of the Consent Order, AFI is jointly liable for these payments. If the Debtors make only a percentage distribution in respect of these payments, then AFI will remain liable for any unpaid amounts.

14.     The Consent Order, moreover, is not the only document that governs AFI's payment obligations in respect of the Consent Order. Eighteen days before the Petition Date, expressly in contemplation of the Debtors' filings, the FRB and AFI entered into the Supplemental Agreement, which clarified AFI's payment obligations under the Consent Order in the event of the Debtors' bankruptcy – and which underscores that AFI is obligated to pay both borrower remediation and PwC's fees if the Debtors do not.

15.     In particular, paragraph 1 of the Supplemental Agreement provides that AFI will be "secondarily liable" for the Debtors' remediation payment obligations to borrowers and the

- 8 -

Debtors' payments obligations to PwC in the event that the Debtors do not pay them in bankruptcy:

> If ResCap[4] commences cases or is otherwise subject to protection under the [Bankruptcy] Code, Ally will be secondarily liable for the obligations to timely pay any portions of:
>
> (a) the fee that ResCap owes PricewaterhouseCoopers . . . to complete the foreclosure review required under paragraph 3(a) of the Consent Order; and
>
> (b) the monetary reimbursement or remediation payments under a remediation plan approved by the Federal Reserve under paragraphs 3(c) and 3(d) of the Consent Order (clauses (a) and (b) of this paragraph 1 collectively being the "ResCap Obligations") . . . .

(Supplemental Agreement ¶¶ 1(a) & (b)).  Contrary to AFI's assertions at the Hearing, the Supplemental Agreement does not provide that AFI's "secondary liability" arises only upon the Debtors' "breach" of the Consent Order – a position that AFI was, tellingly, unable to support with citations.[5]  Rather, the Supplemental Agreement specifies that AFI must pay those obligations "in the event and to the extent ResCap . . . does not timely pay any ResCap Obligations." (*Id.* ¶ 1(b)).

16.    Nor does the Supplemental Agreement require that the "ResCap Obligations" be paid out of the Debtors' estates on an administrative or current basis.  Rather, it contemplates that, upon a filing, the Debtors might simply stop paying the ResCap Obligations.  In these circumstances, the Supplemental Agreement places the onus on AFI to obtain an order requiring the payment of AFI's obligations out of the estates on an administrative or priority basis:

---

[4] The Supplemental Agreement defines "ResCap" to mean "Residential Capital LLC, GMAC Mortgage, or some or all of their direct and indirect subsidiaries." (Supplemental Agreement at 1).

[5] (*See* Hearing Tr. at 69) ("THE COURT: Can I ask? I don't see the breach language? I don't see breach. I just see that -- MR SCHROCK: Secondary liability. THE COURT: Secondary liability not – you keep . . . adding breach, but I don't see that. MR. SCHROCK: Well, Judge, I think that's what happens.  THE COURT: Well, you say that, but show it to me. MR. SCHROCK: I can't.").

> Before any obligation of Ally would arise regarding the ResCap Obligations, Ally may use its reasonable best efforts to ensure that an order from the Bankruptcy Court is entered to treat any obligation of Ally in respect of the obligations of ResCap under the Consent Order as administrative or priority payments of ResCap's estates.

(*Id.*). If AFI does not obtain such an order, the Supplemental Agreement makes clear that AFI must pay the ResCap obligations within a fixed period of time:

> In no event shall Ally's obligation to pay on such secondary liability be delayed more than (a) 120 days from the date of ResCap's filing for or otherwise becoming subject to protection under the [Bankruptcy] Code or (b) 90 days after ResCap has failed to perform or pay any ResCap Obligations, whichever is later.

(*Id.*). Again, there is no requirement that the Debtors "breach" the Consent Order, only that they fail to pay the ResCap Obligations on a timely basis. While paragraph 2 of the Supplemental Agreement expressly preserves AFI's ability to assert claims against the Debtors' estates for reimbursement or contribution arising out of these payments, AFI's obligation to pay the ResCap Obligations is not contingent on the allowance of such claims or the timing of distributions.

17.  If the Court determines that the ResCap Obligations are properly treated as general unsecured claims, the impact of these provisions is plain. The Debtors cannot pay unsecured claims outside of a plan of reorganization. Accordingly, unless AFI can convince the Court to require payment by the estates, within 90 days AFI must begin paying both the PwC and any borrower remediation obligations. It may thereafter file claims in respect of these payments, and a determination as to the proper classification of those claims can be made at that time. If those claims are allowed, it will recover whatever distribution is made on those claims.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court enter an order granting the Motion and providing such other and further relief as the Court deems just and proper.

Dated: April 5, 2013
       New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ P. Bradley O'Neill
Kenneth H. Eckstein
P. Bradley O'Neill
Craig L. Siegel
Rachael Ringer
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Electronic mail:  boneill@kramerlevin.com

*Counsel for The Official Committee
of Unsecured Creditors*