Frank Reed
817 Matlack Drive
Moorestown, NJ 08057
Telephone: (856) 956-6950
E-Mail: FrankReedVA@aol.com

*Creditor, Pro Se*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**SUPPLEMENTAL BRIEF BY FRANK REED, CREDITOR, PRO SE, IN OPPOSITION TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 3013 AND BANKRUPTCY CODE SECTION 362(A) FOR A DETERMINATION THAT (I) GMAC MORTGAGE'S FRB FORECLOSURE REVIEW OBLIGATION IS A GENERAL UNSECURED CLAIM AND (II) THE AUTOMATIC STAY PREVENTS ENFORCEMENT OF THE FRB FORECLOSURE REVIEW OBLIGATION**

**BACKGROUND**

Debtor is a party to a Consent Order with the Federal Reserve Bank (FRB) to which debtor has voluntarily agreed to and continued to agree to honor and perform the obligations contained therein. Despite debtor's position, debtors have asked this Court to reclassify the payment for the fulfillment of the obligations promulgated by the Consent Order from one of administrative priority standing to that of unsecured claim status. This would cause the de facto cessation of debtor's performance of the

obligations required by the Consent Order. Objections and support were filed by numerous parties in interest and oral arguments were had by this Court on March 21, 2013. Subsequent to oral arguments, this Court asked for further briefing by those parties present on two issues. First, what is Ally Financial's (AFI) liability status as it relates to debtor's obligations under the FRB Consent Order and second, is debtor liability under the FRB Consent Order an unsecured claim, or not and why or why not is it so.

In further analysis and support of the previous objection filed by this creditor pro se against debtor's instant motion, creditor pro se sayeth the following:

## I. BINDING OBLIGATIONS – THE MOMENT OF CREATION

In the United States any legally competent individual, corporation, partnership, etc. can be bound to a course of action, inaction, payment or other obligation via numerous legal contrivances which come in a wide variety of forms. The following is a partial list of these forms: contracts, quasi contracts, judicial decrees, regulatory actions, assumption, waiver, and a variety of estoppels. The methods and preconditions which wind up binding a party under these contrivances are as varied as the contrivances themselves. However, there is one thing that they all share in common – TIME. In every one of these contrivances which can bind a party, there is a specific, discrete, moment in time where all the requirements of the contrivance coalesce to a point of no return. It is at that exact moment in time, that point of no return which is defined by one singular characteristic shared by all. The party bound can no longer act in a **unilateral manner** to alter its obligation(s) now so fixed as required.

Debtors themselves recognize the extreme importance of a temporal analysis in the determination as to when an obligation springs into existence. In debtor's instant motion, they indicate that their obligations under the Consent Order sprung into existence at a discrete moment in time pre-petition, thus affording them the relief they currently seek. As the rule for determining administrative priority standing utilizes a prong that requires that the debt be incurred with the debtor's estate POST PETITION.

In order to obtain an administrative expense priority, the claimant must show that "the expense:

*(1) arises out of a transaction between creditor and bankruptcy estate;* (emphasis added) and

(2) that the expense was a 'necessary' expense of the bankruptcy estate by showing the debt directly and substantially benefitted the estate."

Helen-May Holdings, LLC v. Geltzer (In re Kollel Mateh Efraim, LLC), 456 B.R. 185, 192 (S.D.N.Y.2011) (internal quotation marks and citation omitted).

This Court also knows that creditor pro se's previously filed objection to debtor's motion asserts that the **debtor became subsequently re-bound** to the Consent Order obligations by its acts **post petition.** This Court must take note, and should not deny, the significant fact that the very first day these cases were filed, ResCap CEO James Whitlinger unequivocally acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the Debtors and significantly, the **Debtor's DID NOT reject those obligations.** In fact, Debtor's did the exact opposite. At that moment in time, CEO James Whitlinger EXPRESSLY and *WITHOUT ANY RESERVATION OF RIGHTS*, ASSUMED THE OBLIGATIONS MANDATED BY THE CONSENT ORDER IN THEIR ENTIRETY. CEO James Whitlinger did this by stating to the Court and all parties in interest, UNDER THE PENALTY of PURGERY that "[t]he Debtors intend to comply with and adhere to the terms of the Consent Order to the best of their abilities."[1] The operational import of this fact is that from *that* moment forward, debtors have lost their ability to UNILATERALLY modify their obligations under the Consent Order. **Debtors' assertions that they "reserved" their rights are moot.** These reservations came in subsequent points in time and all parties in interest did not grant their respective approvals to debtor to modify its obligations. This singular occurrence alone is sufficient invoke and enforce the very binding legal contrivances known as Equitable Estoppel, Waiver and Assumption, and this creditor pro se does hereby assert them further.

## II. JUDICIAL ESTOPPEL – THE DOCTRINE

Now, as this court has asked for *further* analysis as to how debtor's obligations under the Consent Order are binding upon the debtor post petition in the form of an administrative expense, creditor pro se offers the ADDITIONAL independent, yet equally controlling and binding doctrine of Judicial Estoppel. Immediately below, is the Second Circuit Court of Appeals most recent articulation of the doctrine of Judicial Estoppel:

> The Supreme Court has described the doctrine of judicial estoppel in the following terms:
>
> > *Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.*
>
> New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotation marks, brackets, and citation omitted). "[C]ourts have uniformly recognized" that the purpose of the doctrine "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment," and because judicial estoppel is designed "to prevent improper use of judicial machinery," it is "an equitable doctrine invoked by a court at its discretion." Id. at 749-50 (internal quotation marks omitted). Courts have also recognized "that the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." Id. at 750 (internal quotation marks and brackets omitted); see also Young v. U.S. Dep't of Justice, 882 F.2d 633, 639 (2d Cir. 1989) ("The circumstances under which the doctrine could be applied are far from clear.").
>
> Nevertheless, in evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is "clearly inconsistent" with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party "would derive an

unfair advantage or impose an unfair detriment on the opposing party if not estopped." See New Hampshire, 532 U.S. at 750-51. But the Supreme Court has made clear that these factors do not constitute "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." Id. at 751; see also DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (noting that "[t]ypically, judicial estoppel will apply if" these factors are present). Our Court has "further limit[ed] judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." Id. (internal quotation marks omitted); see also Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011).

(INTELLIVISION v. MICROSOFT CORPORATION No. 11-1657-cv. United States Court of Appeals, Second Circuit. June 11, 2012.)

## III. JUDICIAL ESTOPPEL – PRESENT APPLICATION

As articulated by the Second Circuit Court of Appeals, and presented herein above, the doctrine of judicial estoppel may be invoked if there exists facts which satisfy the three basic prongs of the doctrine. In the case at hand it is clear that all three prongs are satisfied.

### PRONG 1 – Debtor's Contradictory Positions

As stated above, since the commencement of these cases, the Debtors have repeatedly represented both to this Court and to all parties in interest through their court filings and public statements that they would continue to comply with their obligations under the Consent Order. The very first day these cases were filed, ResCap CEO James Whitlinger unequivocally acknowledged that the Consent Order had imposed a myriad of ongoing obligations on the Debtors and significantly, the **Debtor's DID NOT reject those obligations.** In fact, Debtor's did the exact opposite. **CEO James Whitlinger EXPRESSLY and** ***WITHOUT ANY RESERVATION OF RIGHTS*, ASSUMED THE OBLIGATIONS MANDATED BY THE CONSENT ORDER.** CEO James Whitlinger did this by stating to the Court and all parties in interest, UNDER THE PENALTY of PURGERY that "[t]he Debtors intend to comply with and adhere

to the terms of the Consent Order to the best of their abilities."[1] Debtor's instant motion is in direct contradiction to its previous assertions. Debtor's attack on the associative costs of compliance with the Consent Order is a de facto attempt at an unilateral abrogation of its obligations under the Consent Order.

### PRONG 2 – This Court's Acceptance of Debtor's First Position

The Debtors affirmed the debtor's express intent, clearly and indisputably asking this Court for authorization to continue to comply with the Consent Order, proclaiming that they "are fully committed to complying with and adhering to the terms of the Consent Order ... to the best of their abilities."[2] And the Court granted the Debtors' request.[3]

### PRONG 3 – Unfair Advantage and Unfair Detriment

Currently, over 27,000 borrowers have filed for and are awaiting results of the Independent Foreclosure Review (IFR) being conducted by the debtor that is mandated by the Consent Order. That number, 27,000, is strikingly different from another number, the number of borrowers who filed proofs of claim in debtors' bankruptcy cases; that number is approximately 2,800. There is a clear and logical inference that can be drawn from those drastically different numbers: tens of thousands of borrowers may very well have specifically relied on the explicit position that debtors' took on day one of this bankruptcy that they would complete their obligations under the Consent Order, which includes the IFR.

Now, since the time for filing proofs of claim in this case has long passed, it would clearly be of a colossal unfair detriment to the THOUSANDS of borrowers who would have NO OTHER remedy available to them to seek the justice so promised. Conversely, debtors would be granted a massive unfair

---

[1] Whitlinger First Day Affidavit, ¶ 87.
[2] GA Servicing Motion, ¶ 42.
[3] See Final Order (I) Authorizing the Debtors to Continue in the Ordinary Course of Bus. (A) Servicing Governmental Ass'n Loans & (B) Foreclosure Activities Related to Certain Real Estate Owned by Fannie Mae, Freddie Mac, & Ginnie Mae; (II) Authorizing the Debtors to Pay Certain Prepetition Amounts Due to Critical Servicing Vendors & Foreclosure Prof'ls; (III) Granting Limited Stay Relief to Enable Borrowers to Assert Direct Claims & Related Counter-Claims in Foreclosure & Eviction Proceedings; (IV) Authorizing the Debtors to Use Cash Collateral Under the Fannie Mae EAF Facility; & (V) Granting Related Relief (June 15, 2012) [ECF No. 401].

advantage by purging themselves of tens of thousands of potential claimants. Claimants, one must add, that undoubtedly would have cost the debtors estate money to process if they all filed individual proofs of claim. So, if debtors prevail in their instant motion, they stand to reap a double unjust windfall, 1) the elimination of the administrative expense of processing tens of thousands of claims (prevailing or non-prevailing), and 2) the elimination of the burden of the remediation of those prevailing claims themselves.

## IV. EQUITABLE CONSIDERATIONS

It is understood that the role of a Court of Equity is to weigh and fairly balance the relative rights and prejudices to parties in interest to any actions before the Court; and in debtor's instant motion this Court may properly do so as well.

First, let it be recognized that the Debtor has tried to undermine as valid the debtor's obligations under the Consent Order by attacking as a matter of public policy the virtue of the obligations it has assumed under the Consent Order. Shocking to the senses is the fact that debtor does this in complete and utter disregard of the fact that debtor has more than TWICE VOLUNTARILY accepted those burdens, (pre and prost petition), the cost of which they now complain, AND the fact that as recent as oral arguments on March 21, 2013, before this Court, debtor has even asserted that it was committed to the obligations under the Consent Order. However, despite debtor's protests and this Court's entertainment of them, it is NOT the role of this Court to determine the validity of public policy, ostensibly, it is statutorily the auspices of the debtor's regulator, the Federal Reserve Board (FRB).

Now, if one recognizes the proper roles of the Court, the Regulator and the debtor, it is abundantly clear that the debtor and its regulator have already come to the conclusion vis-à-vis the Consent Order what is correct public policy, and this being the fact, this public policy decision in the form of the Consent Order has accorded benefits to the tens of thousands of borrowers who filed for the IFR, and these benefits SHOULD NOT BE QUESTIONED. Furthermore, given their validity, and that these borrowers are parties in interest, these benefits may be balanced against any prejudice to the debtor's estate. However, since the debtor's themselves thought that fulfilling their obligations under the Consent

Decree was the correct course of action THEN it could be said that the debtor's themselves do not question the validity of the rights of the borrowers who filed for the IFR. In essence, the weighing has been done. Therefore debtor should be JUDICIALLY ESTOPPED from their now proposed de facto abandonment of their assumed obligations under the Consent Order.

Notwithstanding the above, if this Court wishes to delve further into the possible prejudice debtor may incur if they honor their obligations under the Consent Order, then it need to look no further than the fact that there could be NO prejudice to debtor as it still has every right to pursue AFI for contribution, whole or in part, under many legal theories. So, again when balanced against the tens of thousands of borrowers who did not file proofs of claim or sat on their rights at various critical stages of this bankruptcy BECAUSE they relied on debtor's day one assertions, there should be no question in the mind of this Court, the debtors should be Judicially Estopped from de facto abandoning their assumed responsibilities under the Consent Order.

Finally, this Court should also note in equitable considerations that the current independent consultants, Price Waterhouse Cooper (PWC), can be released from their duty under the current Consent Order. The Federal Reserve can grant debtors permission to discharge PWC in favor of another consultant.

*"The Company (debtors) and PwC agree that ... the FRB ... in their sole discretion, ...may direct the Company to dismiss PwC and retain a successor consultant, in which case the Company shall have no further obligation to PwC other than for services performed up to that date for the Company."* (see: PWC Retention letter dated February 1, 2012, item 7, page 4 filed as exhibit to ALLY's Objection to this instant motion).

The net practical effect of this is debtor can go shopping for a cheaper service provider. As debtor has noted, thirteen other banks have recently released their respective independent consultants as a result of striking alternative deals with their respective regulators. It is far from being wholly inconceivable that any of those qualified independent consultants might be currently available and more than willing to undercut the costly PWC service currently being used by debtor.

## V. STATUTORILY NON DISCHARGEABLE

Section 523(a)(2)(B) of the bankruptcy code excepts from discharge any debt for money, property, services, or an extension, renewal, or refinancing **of credit**, to the extent obtained by false representation or fraud. To prove a Section 523(a)(2)(B) claim, a creditor must show the following:

(1) debtor made a statement in writing;

(2) that is materially false;

(3) respecting the debtor's or an insider's financial condition;

(4) on which the creditor to whom the debtor is liable for such money reasonably relied; and

(5) that the debtor caused to be made or published with intent to deceive.

It is creditor pro se's understanding that debtors sought and obtained credit and Debtor in Possession financing from AFI. Debtors did this by making various representations in writing about their "financial condition" (specifically as relates to the FRB consent decree) and that AFI did indeed reasonably rely on those conditions. However, debtor's actions under their instant motion contradict their statements, now proving those statements to be materially false (i.e. they had no intentions to "comply with and adhere to the terms of the FRB consent order") and that those intentions originally expressed were in fact intended to deceive AFI. If these factors indeed be true, then debtor is statutorily barred from discharging its obligation to honor the requirements of the Consent Order, as that is the form of "repayment" AFI sought in lieu of actual cash repayment.

## VI. DEBTOR'S MOTION FOR RELIEF SOUGHT SHOULD BE DENIED.

Now, whereas creditor pro se has offered good and substantial further evidence and law that Debtor's FRB Foreclosure Review obligation pursuant to the consent order is NOT a general unsecured "Claim", and that the FRB Foreclosure Review Obligation IS Entitled to Administrative Expense Priority Under Bankruptcy Code Section 503(b), and in consideration of an equitable analysis, that proof has been given that Debtor has other avenues available to them to conserve the estate in its possession as, and that debtor may even be statutorily barred from discharging its obligations, Debtor's motion should be denied.

Respectfully submitted, this 5th day of April, 2013.

_____
Frank Reed

Creditor, Pro Se