**Hearing Date and Time:  April 30, 2013 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline:  April 19, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Todd M. Goren
Samantha Martin

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------ ) | |
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | |
| Debtors. ) | Joint Administration |
| ------------------------------------------------ ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**TO PERMIT THE DEBTORS TO CONTINUE USING CASH COLLATERAL**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 2

JURISDICTION .................................................................................................................. 5

BACKGROUND ................................................................................................................. 5

I.  THE CHAPTER 11 CASES ....................................................................................... 5

II. EXISTING TERMS OF USE OF CASH COLLATERAL AND ADEQUATE
    PROTECTION ......................................................................................................... 10

III. NEGOTIATIONS REGARDING CONTINUED USE OF CASH COLLATERAL ...... 13

IV. PROPOSED REVISED TERMS OF USE OF CASH COLLATERAL AND
    ADEQUATE PROTECTION .................................................................................... 13

RELIEF REQUESTED ...................................................................................................... 15

APPLICABLE AUTHORITY ............................................................................................ 16

    A.  The Interests of the Adequate Protection Parties are Adequately Protected ....... 16

    B.  The Debtors' Proposed Use of Cash Collateral is Fair and Reasonable .............. 21

    C.  The Debtors' Use of Cash Collateral Does Not Constitute a Surcharge
        Under Section 506(c) of the Bankruptcy Code .................................................. 23

NOTICE ............................................................................................................................ 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Hartigan v Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment Co.),
    16 B.R. 750 (Bankr. S.D.N.Y. 1982)......................................................................18

In re 495 Cent. Park Ave. Corp.,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992).....................................................................16

In re 49 W. Warren St. Assocs.., Ltd P'ship.,
    142 B.R. 53 (Bankr. N.D.N.Y. 1992) ......................................................................18

In re Codesco, Inc.,
    125 B.R. 98 (Bankr. S.D.N.Y. 1991).......................................................................24

In re Constable Plaza Assocs..,
    18 B.R. 225 (Bankr. S.D.N.Y. 1982).......................................................................18

In re Cont'l Airlines, Inc.,
    154 B.R. 176 (Bankr. D. Del. 1993) ........................................................................16

In re Coventry Commons Assocs.,
    149 B.R. 109 (Bankr. E.D. Mich. 1992)..................................................................24

In re Grant Broad. of Philadelphia, Inc.,
    71 B.R. 376 (Bankr. E.D. Pa. 1987) ........................................................................18

In re JKJ Chevrolet, Inc., ,
    117 F3d 1413 (4th Cir. 1997) .................................................................................17

In re Realty Sw. Assocs.,
    140 B.R. 360 (Bankr. S.D.N.Y. 1992)................................................................16, 19

In re Salem Plaza Assocs.,
    135 B.R. 753 (Bankr. S.D.N.Y. 1992).....................................................................18

Sanders v. Tucker (In re Tucker),
    5 B.R. 180 (Bankr. S.D.N.Y. 1980).........................................................................19

Sec. Leasing Partners, LP v ProAlert, LLC (In re ProAlert, LLC),
    314 B.R. 436 (B.A.P. 9th Cir. 2004)........................................................................24

In re Snowshoe Co., Inc.,
    789 F.2d 1085 (4th Cir. 1986) ................................................................................17

ii

**STATUTES**

11 U.S.C. § 361 ................................................................................................................16, 17

11 U.S.C. § 363 ....................................................................................................................16

ny-1075966

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors")[1] hereby move this Court (the "Motion")[2] pursuant to sections 105, 361, 363, and

507(b) of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rule

4001(b) of Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule

4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the Southern District of New York ("Local Rules"), for entry of an order (a copy of

which is annexed hereto as Exhibit 1, the "Proposed Order") to (i) permit the Debtors to continue

using Cash Collateral,[3] and (ii) grant a New AP Package (as defined below) to Ally Financial

Inc. ("AFI") and the holders of the 9.625% Junior Secured Notes Due 2015, effective as of

March 19, 2013 (the "Junior Secured Noteholders," and together with AFI, the "Lenders" or the

"Adequate Protection Parties").[4]  In support of the Motion, the Debtors rely upon and

incorporate by reference the Declarations of Marc Puntus and Jill Horner (the "Puntus

Declaration" and the "Horner Declaration," respectively).[5]  In further support of the Motion, the

---

[1]   The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit
      1 to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may file
      Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Corrected Debtors'
      Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and
      Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured,
      Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate
      Protection and (IV) Scheduling A Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V)
      Granting Related Relief* [Docket No. 42] (the "AFI/JSB Cash Collateral Motion").

[3]   "Cash Collateral" means the cash collateral (as defined in section 363(a) of the Bankruptcy Code) of (i) AFI
      under the AFI Senior Secured Credit Facility (as defined below), (ii) AFI under the AFI LOC (as defined
      below), and (iii) the Junior Secured Noteholders under the Junior Secured Notes.

[4]   The Debtors, AFI, and the Junior Secured Noteholders are discussing a possible consensual extension of the
      Debtors' use of Cash Collateral to April 30, 2013 to allow for this Motion to be heard on regular notice, subject
      to the Court's availability. If a consensual extension cannot be obtained, the Debtors may require an emergency
      interim hearing on or before April 18, 2013.

[5]   A copy of the Puntus Declaration was filed contemporaneously herewith.  The Debtors anticipate filing the
      Horner Declaration shortly.  The expense allocation methodology will be annexed to the Horner Declaration.

ny-1075966

Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.      Upon the commencement of these chapter 11 cases, AFI and the Junior

Secured Noteholders consented to the Debtors' use of Cash Collateral to, among other things,

fund the cash needs related to (i) the Debtors' operations, (ii) the costs of the Debtors' chapter 11

cases, and (iii) the monetization of the Debtors' assets, each in accordance with an approved

budget.  Pursuant to that budget, AFI and the Junior Secured Noteholders agreed to

proportionately allocate the expenses among the Debtors' various collateral pools.  The

allocation and budget were reflective of the fact that a substantial portion of the Debtors' estates

consisted of the collateral of AFI and the Junior Secured Noteholders, and as a result, a

substantial portion of the Debtors' expenses were to be used to maintain and liquidate that

collateral in a value-maximizing, orderly process over the course of these cases.  Indeed, the

Debtors have used Cash Collateral in this manner throughout the chapter 11 cases to

substantially increase the value of the Lenders' collateral through the Sales (as defined below),

and will continue to maximize the value of the remaining collateral through an orderly wind

down process.

2.      Following the closing of the Sales, there remains a great deal of work in

these cases, including the disposition of approximately $1.561 billion of remaining non-cash

assets, approximately 52% of which is the collateral of the AFI Senior Secured Credit Facility

and the Junior Secured Noteholders.  Accordingly, the Debtors seek to implement an allocation

of post-Sales administrative expenses that reflect this economic reality.  However, the Junior

Secured Noteholders consistently have taken the position that the Debtors should not be

permitted to use any of their Cash Collateral to fund the disposition of their collateral.  The

2

position that unsecured creditors should bear the expense of maintaining the secured creditors'

collateral—where none of the proceeds of the collateral are likely to benefit unsecured

creditors—is simply untenable.  The Lenders initially consented to extensions through April 18,

2013, but have not consented to any further extensions.[6]

       3.      As set forth below, the Debtors propose to use Cash Collateral for only

limited purposes going forward—namely to cover the costs necessary to preserve the value of

and to dispose of the collateral securing the AFI LOC, the AFI Senior Secured Credit Facility,

and the Junior Secured Notes.  As such, the Adequate Protection Parties are adequately protected

because any use of Cash Collateral will be used solely to protect their collateral from a

diminution in value.[7]

       4.      Further, under the AFI/JSB Cash Collateral Final Order (as defined

below), the Debtors provided the Lenders with a robust adequate protection package, which

included junior liens on over $1.295 billion of **excess** value in the AFI LOC collateral.  As a

result of the Sales and the monetization of a significant portion of the AFI LOC collateral, that

package has been further enhanced and, following the closing of the Sales, consists primarily of

(i) approximately $1.115 billion in cash and (ii) approximately $450 million in whole loans

insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of

Veterans Affairs ("VA") (collectively, the "FHA Loans"), each of which constitutes valuable

---

[6]    AFI is continuing to consider the Debtors' request for consensual use of Cash Collateral during the Cash
Collateral Extension Period (as defined below).

[7]    The proposed expense allocation methodology and the Forecast (as defined below) assume that there will be no
costs associated with the Debtors' compliance with (i) the Consent Order entered into by Debtors Residential
Capital, LLC and GMAC Mortgage, LLC, non-debtor affiliates AFI and Ally Bank, the Federal Reserve Board
and the Federal Deposit Insurance Company (the "FDIC") on April 13, 2011 (the "Consent Order") after April
30, 2013.  To the extent the Debtors are required to comply with the Consent Order beyond April 30, 2013 or
have not otherwise settled the matter, the Debtors reserve the right to seek the use of Cash Collateral to fund a
portion of those costs.

collateral that is not subject to significant fluctuation in value in the hands of the Debtors.

Accordingly, the Debtors submit that they have adequately protected the claims of AFI and the

Junior Secured Noteholders and should be authorized to continue the use of Cash Collateral

through the effective date of a chapter 11 plan on a nonconsensual basis pursuant to Section 363

of the Bankruptcy Code.

        5.    Importantly, because the Lenders are adequately protected, they will not

be harmed by the Debtors' proposed use of Cash Collateral.  To the extent there is any

diminution in the value of the Lenders' collateral as a result of the Debtors' proposed use of

Cash Collateral, which the Debtors believe to be impossible in light of the proposed limited use

of such Cash Collateral, the Lenders will be able to recover such amounts from their robust

adequate protection package.[8]  If, on the other hand, the Court does not permit the Debtors to use

Cash Collateral to fund asset disposition costs, then the Debtors will have little choice but to

return certain collateral to the Lenders, including the FHA/VA loan collateral, so the Lenders can

liquidate the collateral themselves.  Alternatively, the Debtors could engage in an expedited sale

process to liquidate certain collateral for the Lenders, provided that the Lenders pay for the costs

of the such expedited sale process.  The Debtors, however, believe that it would be inconsistent

with their fiduciary duties to use the limited assets that would otherwise be available for

unsecured creditors to liquidate assets solely for the benefit of the Lenders.  Moreover, for

certain collateral that cannot be returned to the Lenders or promptly sold, the Debtors will

evaluate the cost of continuing to monetize such collateral and determine whether it is in the

Debtors' best interest to continue doing so.

---

[8]    Despite the Lenders' arguments to the contrary, the proposed use of Cash Collateral does not constitute a surcharge under section 506(c).

## JURISDICTION

6.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and

this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 507(b),

Bankruptcy Rule 4001(b), and Local Rule 4001-2.

## BACKGROUND

### I.      THE CHAPTER 11 CASES

7.       On May 14, 2012 (the "Petition Date"), each of the Debtors filed a

voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors

are managing and operating their businesses as debtors in possession pursuant to Bankruptcy

Code sections 1107(a) and 1108.  No trustee has been appointed in these Chapter 11 cases.[9]

8.       Prior to the Petition Date, the Debtors were borrowers, guarantors and/or

obligors under various credit facilities and were issuers of secured and unsecured debt, including

(but not limited to) the following:

- **AFI LOC**:  On December 30, 2009, Debtors Residential Funding Company, LLC
  ("RFC") and GMAC Mortgage, LLC ("GMACM") and certain of the other Debtors,
  as borrowers, Residential Capital, LLC ("ResCap"), as a guarantor,[10] and AFI, as
  agent and lender, entered into a $1.1 billion amended and restated secured loan
  agreement (as amended from time to time, the "AFI LOC") in order to consolidate
  under one agreement the terms and provisions of two secured credit agreements with
  AFI, entered into on November 20, 2008, and June 1, 2009, respectively, as well as
  the loans made under those agreements.  The outstanding principal amount under the

---

[9]    The Debtors are a leading residential real estate finance company indirectly owned by Ally Financial Inc.,
     which is not a Debtor.  The Debtors and their non-debtor affiliates operate the fifth largest mortgage loan
     servicing business and the tenth largest residential mortgage loan origination business in the United States.  A
     more detailed description of the Debtors, including their business operations, their capital and debt structure,
     and the events leading to the filing of these bankruptcy cases, is set forth in the Whitlinger Affidavit.

[10]   Certain of the other Debtors are also guarantors, together with ResCap, under the AFI LOC.

AFI LOC as of Petition Date was approximately $380 million.

- AFI Senior Secured Credit Facility:  On December 30, 2009, Debtors RFC and GMACM, as borrowers, and various Debtor affiliates, as guarantors, entered into a loan agreement with AFI, as agent and lender (as amended from time to time, the "AFI Senior Secured Credit Facility") amending and restating in its entirety the original loan agreement entered into on June 4, 2008.[11]   As of the Petition Date, the outstanding principal amount of the AFI Senior Secured Credit Facility was approximately $747 million.

- Junior Secured Notes:  Debtor ResCap issued the Junior Secured Notes pursuant to that certain Indenture dated as of June 6, 2008, among ResCap, as issuer, various Debtor affiliates, as guarantors, and U.S. Bank National Association, a national banking association, as the original indenture trustee (the "JSN Indenture").  As of the Petition Date, the outstanding principal amount of Junior Secured Notes was approximately $2.1 billion.  The Junior Secured Notes accrue interest at a non-default rate of 9.625% per annum, payable semi-annually in arrears, and are repayable in three equal tranches of $707 million in May of 2013, 2014 and 2015.

9.    In connection with the incurrence of the debt referenced above, the Debtors ResCap, GMACM and RFC entered into that certain Intercreditor Agreement, dated as of June 6, 2008, by and among (i) Wells Fargo Bank, N.A., as first priority collateral agent for AFI under the AFI Senior Secured Credit Facility, (ii) Wells Fargo Bank, N.A., as second priority collateral agent for the holders of the 8.5% senior secured notes due 2010 (the "Senior Secured Notes"), (iii) Wells Fargo Bank, N.A., as third priority collateral agent for the holders of the Junior Secured Notes, (iv) AFI in its capacity as agent for the lenders under the AFI Senior Secured Credit Facility, (v) U.S. Bank National Association, as Trustee under the indenture governing the Senior Secured Notes, and (vi) U.S. Bank National Association, as Trustee under the JSN Indenture.  On May 15, 2010, the Senior Secured Notes were repaid at maturity, and the Junior Secured Notes effectively stepped into the position of the Second Priority Secured Parties.

---

[11]    The AFI Senior Secured Credit Facility originally was a revolving loan facility, but the outstanding amount was converted into a term loan in connection with the amendment and restatement.

10.    On the Petition Date, the Debtors filed the *Corrected Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 507(b) and Bankruptcy Rules 4001 and 6004: (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral and Related Relief, (III) Granting Adequate Protection and (IV) Scheduling A Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief* [Docket No. 42] (the "AFI/JSB Cash Collateral Motion").[12]

11.    On May 16, 2012, the Office of the United States Trustee (the "U.S. Trustee") appointed the nine-member statutory creditors' committee (the "Committee").

12.    On May 16, 2012, the Court entered the *Interim Order Under Sections 105, 361, 361, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Adequate Protection Parties and (IV) Prescribing the Form and Manner of Notice and Setting Time for the Final Hearing* [Docket No. 89] (the "AFI/JSB Cash Collateral Interim Order").

13.    On June 20, 2012, the Court directed that an examiner be appointed [Docket No. 454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (the "Examiner") [Docket No. 674].

14.    On June 25, 2012, the Court entered the *Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and*

---

[12]    A detailed summary of the Debtors' prepetition debt arrangements is set forth in the AFI/JSB Cash Collateral Motion.

*9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties* [Docket No. 491] (the "AFI/JSB Cash Collateral Final Order").

15.    The AFI/JSB Cash Collateral Final Order provides a Carve Out to be funded upon a Termination Event under the AFI/JSB Cash Collateral Final Order in an amount equal to (i) all fees payable to the Clerk of the Court and the U.S. Trustee, (ii) the payment of accrued and unpaid fees and expenses incurred by professionals in the chapter 11 cases, and (iii) the fees and expenses that accrue for the estates' professionals after a Termination Event, in an aggregate amount not exceeding $25 million.  The AFI/JSB Cash Collateral Final Order further provides that the adequate protection liens and the superpriority administrative expense claims of the AFI and the Junior Secured Noteholders are junior and subordinate to the Carve Out.  See AFI/JSB Cash Collateral Final Order, at ¶ 16.

16.    On October 23-25, 2012, the Debtors held two auctions for the sale of their assets.   Following the auctions, the Debtors declared Ocwen Loan Servicing, LLC ("Ocwen") and Walter Investment Management Corp. ("Walter") as the winning bidders for the Debtors' mortgage loan origination and servicing platform at a price of $3 billion (the "Platform Sale"), and Berkshire Hathaway Inc. as the winning bidder for the legacy loan portfolio at a price of $1.5 billion (the "Legacy Sale," and together with the Platform Sale, the "Sales").

17.    On November 21, 2012, the Court entered orders approving each of the Sales [Docket Nos. 2246 and 2247].

18.    On December 20, 2012, the Court entered the *Stipulation and Order Amending the AFI DIP and Cash Collateral Order* [Docket No. 2495] (the "First AFI/JSB Cash Collateral Stipulation").  The First AFI/JSB Cash Collateral Stipulation, *inter alia*, extended the

Debtors' ability to use Cash Collateral to the earlier of (i) the Platform Sale closing date, and (ii) March 31, 2013.

19.    On February 5, 2013, the Legacy Sale closed, and the AFI DIP Facility was repaid in full from the proceeds of the Legacy Sale.  On February 15, 2013, the Platform Sale closed.[13]  Following the closing of the Sales, the Debtors paid off in full each of the AFI DIP Facility,[14] the Barclays DIP Facility,[15] the Citibank MSR Facility,[16] and the FNMA EAF Facility.[17]

20.    On February 8, 2013, the Debtors filed the *Notice of Filing of Additional Disclosures*, reflecting approximately $1.665 billion in book value of collateral securing the AFI LOC (the "AFI LOC Cash Collateral")[18] and approximately $2.502 billion in book value of collateral securing the AFI Senior Secured Credit Facility (the "Revolver/JSB Cash Collateral"),[19] each as of December 31, 2012 [Docket No. 2872].

---

[13]   The portion of the Platform Sale that was purchased by Walter closed on January 31, 2013.

[14]  The "AFI DIP Facility" means that certain postpetition secured superpriority financing facility in the aggregate principal amount of not more than $220 million in form of continued borrowings by the Debtors under the AFI LOC.

[15]  The "Barclays DIP Facility" means that certain postpetition secured superpriority financing facility in the total aggregate amount of $1,450,000,000, in the form of (i) a revolving facility in the amount of $190,000,000, (ii) a term loan in the amount of $1,060,000,000, and (iii) a term loan in the amount of $200,000,000.

[16]  The "Citibank MSR Facility" means that certain prepetition revolving loan facility among GMACM, as borrower, ResCap, as guarantor, and Citibank N.A., as lender.  The outstanding amount under the Citibank MSR Facility as of the Petition Date was approximately $152 million.

[17]  The "FNMA EAF Facility" means that certain prepetition funding facility for servicing advances among GMACM and Fannie Mae.  As of the Petition Date, the total commitment under the FNMA EAF Facility was $125 million, of which $40.3 million was outstanding.

[18] This amount does not include collateral specific to the AFI DIP Loan ($149 million), which was included in the balance set forth in the *Notice of Filing of Additional Disclosures*.

[19] This amount does not include $294 million in remaining equity in the DIP Borrowers.

21.    On February 15, 2013, the Court entered the *Second Stipulation and Order Amending the AFI DIP and Cash Collateral Order* [Docket No. 2927] (the "Second AFI/JSB Cash Collateral Stipulation"), pursuant to which the Lenders consented to (i) the Debtors' continued use of Cash Collateral on existing terms through March 18, 2013, and (ii) revised reporting requirements whereby, in lieu of the budgeting required under the AFI/JSB Cash Collateral Final Order, the Debtors shall provide the Lenders with a 6-month monthly forecast for the following 6-month period (each, a "Forecast"), and a monthly variance report for each prior month setting forth for such one-month period actual results, noting therein aggregate variances from amounts set forth for the one-month period in the relevant Forecast (the "Revised Reporting Requirements").

22.    On March 18, 2013, the Court entered the *Third Stipulation and Order Amending the AFI DIP and Cash Collateral Order* [Docket No. 3230] (the "Third AFI/JSB Cash Collateral Stipulation," and together with the First AFI/JSB Cash Collateral Stipulation and the Second AFI/JSB Cash Collateral Stipulation, the "AFI/JSB Cash Collateral Stipulations"), pursuant to which the Lenders consented to the Debtors' continued use of Cash Collateral on existing terms through April 18, 2013.

## II.    EXISTING TERMS OF USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

23.    Pursuant to the AFI/JSB Cash Collateral Final Order, the Debtors were granted the ability to use Cash Collateral to fund cash needs related to the Debtors' operations and assets, as set forth in the approved budget, until (i) the effective date of a chapter 11 plan for any Debtor, or (ii) written notice to the Debtors after the occurrence or continuation of a termination event beyond any applicable grace period.  See AFI/JSB Cash Collateral Final Order, ¶¶ 15, 20.

24.     In exchange, the Adequate Protection Parties were granted ample adequate protection (the "Original AP Package") in the form of (i) replacement liens (the "Adequate Protection Liens"), (ii) superpriority administrative expense claims to the extent the replacement liens are insufficient to provide adequate protection, (iii) adequate protection payments (the "Adequate Protection Payments"),[20] and (iv) the Debtors' agreement to satisfy certain reporting requirements (the "Reporting Requirements").  See AFI/JSB Cash Collateral Final Order, ¶ 16. In addition, AFI, in its capacity as lender under the AFI Senior Secured Credit Facility, and the Junior Secured Noteholders were granted Adequate Protection Liens in the form of replacement liens (subject to the Committee's challenge) on all of the equity of the borrowers under the Barclays DIP Facility (the "Barclays DIP Borrowers").  See AFI/JSB Cash Collateral Final Order, ¶ 16.  The Debtors also made certain covenants as additional adequate protection, including a covenant that required the effective date of the Debtors' chapter 11 plan to have occurred by December 15, 2012.  See AFI/JSB Cash Collateral Final Order, ¶ 18.

25.     Following the entry of the AFI/JSB Cash Collateral Final Order, the Committee requested, and the Bankruptcy Court granted, standing and authority for the Committee to commence and prosecute certain claims (the "Claims") on behalf of the Debtors' estates, including, among others, Claims related to the propriety of the replacement liens granted by the Debtors to AFI, in its capacity as lender under the AFI Senior Secured Credit Facility, and the Junior Secured Noteholders on the equity interests of the Barclays DIP Borrowers.  See

---

[20]   The Adequate Protection Payments consist of (i) with respect to AFI in its capacity as lender under the AFI LOC, accrued and unpaid prepetition and postpetition interest payments at the non-default rate set forth in the AFI LOC, (ii) with respect to AFI in its capacity as lender under the AFI Senior Secured Credit Facility, accrued and unpaid prepetition and postpetition interest payments at the non-default rate set forth in the AFI Senior Secured Credit Facility; and (iii) with respect to the Junior Secured Noteholders, the prompt payment of the reasonable fees and expenses, whether accrued prepetition or postpetition, of (y) the Trustee under the Junior Secured Notes and its counsel, and (z) the Ad Hoc Committee of Holders of Junior Secured Notes and its advisors.

*Order Authorizing the Official Committee of Unsecured Creditors to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* [Docket No. 2518].  In accordance therewith, on February 28, 2013, the Committee filed the *Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* [Docket No. 3069], against UMB Bank, N.A., as successor indenture trustee under the indenture for the Junior Secured Notes, and Wells Fargo Bank, N.A., as third priority collateral agent and collateral control agent under the pledge and security agreement for the Junior Secured Notes.

26.    In December 2012, the Debtors and the Adequate Protection Parties entered into the First AFI/JSB Cash Collateral Stipulation to, among other things, (i) remove the covenant that required the effective date of the Debtors' chapter 11 plan to have occurred by December 15, 2012, (ii) add the covenant that "the Debtors, the Junior Secured Parties, the AFI Lender, and the Committee shall negotiate in good faith to enter into an agreement, to be subject to Court approval, by January 31, 2013 or as soon as practicable thereafter on a revised expense allocation methodology that will become effective following the closing of the Platform Sale", and (iii) revise the termination date to be the earlier of (x) the effective date of a chapter 11 plan for any Debtor, (y) the earlier of (a) the closing of the Platform Sale or (b) March 31, 2013, unless extended by the AFI Lender in writing, or (z) a written notice to the Debtors after the occurrence or continuation of a termination event beyond any applicable grace period.  See First AFI/JSB Cash Collateral Stipulation, ¶¶ 1, 3, 4.

27.    In addition to the adequate protection provisions described above, the automatic stay provisions of Section 362 of the Bankruptcy Code were vacated and modified to the extent necessary to allow AFI, in its capacities as lender under the AFI LOC and the AFI Senior Secured Credit Facility, to take certain actions permitted or required under the applicable

loan documents and to enforce certain remedies against the collateral securing the AFI Senior

Secured Credit Facility and the AFI LOC without having to obtain any further order of the Court.

See AFI/JSB Cash Collateral Final Order, ¶ 21.

## III.    NEGOTIATIONS REGARDING CONTINUED USE OF CASH COLLATERAL

28.    Upon the commencement of these chapter 11 cases, the Lenders consented

to the Debtors' use of Cash Collateral based on an agreed-upon budget.  The budget was

appended to the motion and provided for the use of Cash Collateral to pay for the costs of each

collateral pool, as well as an allocated portion of the administrative expenses of the Debtors'

estates.  Prior to and throughout these cases, the Lenders have been provided with budgets that

specifically detail how the Debtors intend to use, and, in fact, have used, the Cash Collateral.

29.    Pursuant to the First AFI/JSB Cash Collateral Stipulation, the parties

agreed to negotiate in good faith regarding a revised expense allocation methodology that would

become effective following the closing of the Platform Sale.  The revised methodology was

intended to reflect the fact that a significant portion of the Lenders' collateral would be sold by

early 2013.  Accordingly, in January 2013, the month prior to the closing of the Platform Sale,

the Debtors, the Lenders and the Committee commenced discussions regarding the terms on

which the Debtors would continue to use Cash Collateral.  Unfortunately, the parties were unable

to reach an agreement on an alternative to the existing expense allocation methodology by the

Platform Sale closing date.  As a consequence, the Lenders agreed to extend their consent to the

Debtors' use of Cash Collateral through April 18, 2013 to allow the parties additional time to

continue to negotiate a revised expense allocation methodology.  As of the date hereof, the

parties still have not reached agreement and the Lenders have not consented to the Debtors' use

of Cash Collateral beyond April 18, 2013.

13

## IV.    PROPOSED REVISED TERMS OF USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

30.    For the reasons stated above, the Debtors request that this Court approve the nonconsensual use of Cash Collateral from April 18, 2013 until the effective date of a chapter 11 plan of any of the Debtors (the "Cash Collateral Extension Period") on the following terms for the types of expenses set forth in the Forecast and the Horner Declaration:

(a)    The Cash Collateral securing each of the AFI LOC, the AFI Senior Secured Credit Facility, and the Junior Secured Notes, shall be used to fund (i) the asset monetization/preservation costs related to the assets of each of the respective collateral pools (including an allocated portion of the professionals' fees and operating expenses related thereto),[21] (ii) any and all accrued and unpaid amounts payable with Cash Collateral in accordance with the AFI/JSB Cash Collateral Final Order, which accrued prior to the closing of the Platform Sale but have not yet been paid, (iii) the Carve Out,[22] as defined in and in accordance with the allocation among the Lenders as provided in paragraph 16 of the AFI/JSB Cash Collateral Final Order, and (iv) the Adequate Protection Payments to AFI, in its capacity as lender under each of the AFI LOC and the AFI Senior Secured Credit Facility;

(b)    The Cash Collateral securing the AFI Senior Secured Credit Facility shall also be used to fund (i) the wind down costs of the origination pipeline, (ii) the costs related to Debtor Executive Trustee Services, LLC ("ETS") (both of which comprise collateral of the AFI Senior Secured Credit Facility and Junior Secured Notes), and (iii) advance obligations with respect to servicing agreements remaining the estate following the closing the Sales;[23] and

---

[21]    Consistent with past practice, the costs are allocated based on the remaining assets of each of the respective collateral pools (based on the asset values within each collateral pool, excluding cash).

[22]    As a result of the AFI/JSB Cash Collateral Stipulations, April 18, 2013 is a Termination Event. Accordingly, pursuant to the AFI/JSB Cash Collateral Final Order, the Adequate Protection Parties are required to fund the Carve Out in accordance with the terms of such Order.

[23]    Specifically, the Debtors will use Cash Collateral of the AFI Senior Secured Credit Facility to fund advances that were previously funded by such facility. All other remaining advance obligations shall be funded with the cash remaining in the DIP Borrowers (including the proceeds of any advances not purchased at the closing of the sales), as such advances were previously funded with the Barclays DIP Facility.

14

(c)    The Cash Collateral securing the AFI LOC shall also be used to fund (i) indemnification payments to Ally Bank under the Ally Bank Servicing Agreement, with respect to modifications to Ally Bank loans made in accordance with the DOJ/AG Settlement, and (ii) any costs to service any servicing rights remaining the estate following the closing of the Sales;

(d)    (Items (a), (b) and (c) collectively are referred to as the "Funded Disposition Costs");

(e)    The Cash Collateral will not be used to pay for the Debtors' operating expenses or professionals' fees (other than the Funded Disposition Costs), as such expenses will be funded by the use of unencumbered cash; and

(f)    The Debtors shall comply with the Revised Reporting Requirements that the Debtors and the Lenders agreed to in the Second AFI/JSB Cash Collateral Stipulation.

31.    In exchange for this use of Cash Collateral, the Debtors propose to grant the Adequate Protection Parties with the same adequate protection as provided under the AFI/JSB Cash Collateral Final Order, provided that the Junior Secured Noteholders shall no longer be entitled to the Adequate Protection Payments (the "New AP Package").

32.    For the reasons described herein, the Debtors believe that the New AP Package, in conjunction with the substantial equity cushion that exists with respect to the AFI LOC and the AFI Senior Secured Credit Facility, is more than sufficient to protect the interests of the Adequate Protection Parties during the Cash Collateral Extension Period.

## RELIEF REQUESTED

33.    Pursuant to sections 361 and 363(c) of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Rule 4001-2, the Debtors respectfully seek entry of the Proposed Order authorizing the Debtors to continue using Cash Collateral pursuant to the terms described herein beyond the current termination date of April 18, 2013 through the Cash Collateral Extension Period.  The current forecast of anticipated cash receipts and disbursements

(the "Forecast") for the six-month period commencing on April 1, 2013, which may be modified

or supplemented, shall be Exhibit 2 hereto.[24]

## APPLICABLE AUTHORITY

### A.    The Interests of the Adequate Protection Parties are Adequately Protected

34.    The Debtors submit that the Court should authorize the Debtors' continued

use of Cash Collateral during the Cash Collateral Extension Period on a nonconsensual basis

pursuant to Section 363 of the Bankruptcy Code.  Section 363(c)(2) of the Bankruptcy Code

provides that a debtor may not use cash collateral unless "(A) each entity that has an interest in

such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use,

sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

35.    In considering whether to authorize the non-consensual use of cash

collateral, a court must find that the interests of the holder of the secured claim are adequately

protected.  See 11 U.S.C. § 363(e).  The principal purpose of adequate protection is to shield a

secured creditor from diminution in the value of its interest in the particular collateral during the

period of use by the debtor.  See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr.

S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor

from diminution in value of its interest during the Chapter 11 case); In re Cont'l Airlines, Inc.,

154 B.R. 176, 180 (Bankr. D. Del. 1993) (same).

36.    What constitutes adequate protection is determined on a case-by-case

basis.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[t]he determination of

---

[24]    In accordance with the regular monthly budgeting process, the Debtors are currently in the process of updating
the Forecast and shall file the initial Forecast by April 12, 2013.

adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . .") (citation

and quotation omitted); In re Realty Sw. Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992).[25]

37.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Adequate

Protection Parties are entitled to adequate protection of their interests in the Cash Collateral for,

and equal in amount to, the aggregate diminution in the value of such parties' security interests

in the Cash Collateral as a result of the Debtors' use, sale or lease of Cash Collateral.  See 11

U.S.C. § 363(e) ("on request of an entity that has an interest in property used, sold, or leased, or

proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall

prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of

such interest.").

38.    Here, the Debtors believe that the Adequate Protection Parties are

adequately protected.  First, the Debtors propose to use the Cash Collateral solely to preserve or

enhance the value of the Adequate Protection Parties' collateral.  As set forth above, the Cash

Collateral will be used in accordance with the Forecast solely to pay for the Funded Disposition

Costs, which will be used directly or indirectly to preserve and liquidate the remaining collateral,

inuring directly to the benefit of the Adequate Protection Parties.  Courts have routinely held that

---

[25]    Although the Bankruptcy Code does not define the term "adequate protection," it provides a non-exhaustive list
of types of adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured
creditor's interest in such property.  See 11 U.S.C. § 361.  Specifically, section 361 of the Bankruptcy Code
provides the following non-exclusive examples of what may constitute adequate protection:

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that
the . . . use . . . under section 363 . . . results in a decrease in the value of such entity's interest in such
property;

(2) providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a
decrease in the value of such entity's interest in such property; or

(3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent
of such entity's interest in such property.

11 U.S.C. § 361.

adequate protection may be demonstrated by a showing that the value of the debtors, or the value

of the lender's collateral, is preserved by the debtor's use of cash collateral.  See e.g., In re JKJ

Chevrolet, Inc., 117 F.3d 1413, 1413 (4th Cir. 1997); In re Snowshoe Co., Inc., 789 F.2d 1085,

1087 (4th Cir. 1986); In re Salem Plaza Assocs., 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992)

(holding that an oversecured creditor was adequately protected when cash collateral was used to

pay necessary operating expenses); In re 499 W. Warren St. Assocs., Ltd. P'ship, 142 B.R. 53,

56-57 (Bankr. N.D.N.Y. 1992); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105 (Bankr.

S.D.N.Y. 1991); Hartigan v Pine Lake Vill. Apartment Co. (In re Pine Lake Vill. Apartment

Co.), 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the

plaintiff-mortgagee's collateral . . . clearly ensures that the plaintiff-mortgagee's investment is

adequately protected.").

        39.     Here, the proposed cash expenditures under the Forecast solely consist of

the Funded Disposition Costs that will preserve and maintain the value of the Adequate

Protection Parties' collateral and the interests of the Adequate Protection Parties.  If the Debtors

were precluded from making expenditures necessary to maintain their assets and sustain their

operations, the Adequate Protection Parties would be harmed.  See, e.g., In re Aqua Assocs., 123

B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the

protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is

being unjustifiably jeopardized") (citing In re Grant Broad. of Philadelphia, Inc., 71 B.R. 376,

386-89 (Bankr. E.D. Pa. 1987).

        40.     Second, the Debtors believe that AFI, in its capacities as lender under the

AFI Senior Secured Credit Facility and under the AFI LOC, is adequately protected through the

existence of a substantial equity cushion in its collateral.   AFI holds the first lien with respect to

18

each of these facilities.  The Debtors have determined that there is a book value equity cushion

on the AFI Senior Secured Credit Facility of approximately $2.049 billion (including the equity

of the DIP Borrowers).  That is, $2.049 billion book value of collateral over and above the $747

million owed to AFI under the AFI Senior Secured Credit Facility.  See Exhibit 2.  Similarly, a

substantial equity cushion exists on the collateral securing the AFI LOC.  The Debtors have

determined that there is a book value equity cushion on the AFI LOC of approximately $1.285

billion.  That is, $1.285 billion book value of collateral over and above the $380 million owed to

AFI under the AFI LOC.  See Exhibit 2.  Based on these equity cushions, it is impossible that

AFI will be harmed by the limited use of Cash Collateral sought herein.  As several courts have

held, the presence of an equity cushion in encumbered collateral is itself a form of adequate

protection. See In re Realty Sw. Assocs., 140 B.R. at 366-67  (holding that creditor was

adequately protected pursuant to Bankruptcy Code section 363(e) because of substantial equity

cushion); Sanders v. Tucker (In re Tucker), 5 B.R. 180, 182 (Bankr. S.D.N.Y. 1980) ("An

adequate 'cushion' can itself constitute adequate protection with nothing more.").  In addition,

the Debtors have reserved adequate cash to repay the AFI Senior Secured Credit Facility and the

AFI LOC (the "AFI Reserved Cash"), further protecting AFI for the Debtors' use of Cash

Collateral.  The Debtors will not use such cash without further order of this Court.

      41.    Third, with respect to the Junior Secured Noteholders, notwithstanding

that the Debtors believe the Adequate Protection Parties already are adequately protected

because the Debtors intend to only use their Cash Collateral to preserve and liquidate their

collateral, the Debtors also are offering the Junior Secured Noteholders the New AP Package,

which the Debtors believe provides ample adequate protection in addition to the planned

preservation of their collateral described above.[26]  The Court already has determined that the

Original AP Package "is reasonable and sufficient to protect the interests of the Adequate

Protection Parties."  See AFI/JSB Cash Collateral Final Order, ¶ 23.  The Debtors recently have

sold a significant amount of the Junior Secured Noteholders' collateral pursuant to the Sales and

are continuing to otherwise monetize and evaluate the sale of certain additional collateral.

42.     The Debtors believe that the Junior Secured Noteholders will be

adequately protected by their Adequate Protection Lien on the collateral securing the AFI LOC

(first lien), the AFI Senior Secured Credit Facility (Adequate Protection Lien), and the Junior

Secured Notes (Adequate Protection Lien).  These Adequate Protection Liens have been

enhanced through the monetization of the underlying assets.  Indeed, instead of having Adequate

Protection Liens on loans, advances, and servicing rights, the AFI LOC Adequate Protection

Liens are now secured primarily by (i) $1.115 billion in cash, and (ii) approximately $450

million in loans insured by the FHA or guaranteed by the VA.  The cash and the FHA/VA loans

are not subject to significant fluctuation in value in the hands of the Debtors.[27]  Moreover, as

discussed above, a substantial equity cushion exists on the collateral securing the AFI LOC.  In

addition, the AFI DIP Facility has now been paid in full, thereby reducing by $190 million the

amount of debt that is senior to the Adequate Protection Liens on the AFI LOC.

---

[26]   The Debtors are also proposing to grant the New AP Package to AFI, which, as described above, is already
benefitting from significant protections.

[27]   Typically, the FHA Loans, which ordinarily would monetize over a period of approximately 30-36 months, and
the Debtors believe they likely would realize close to the carry value on the FHA Loans over time if monetized
by the Debtors in the ordinary course.  See Declaration of Marc D. Puntus in Support of the Debtors' FHA
Loan Sale [Docket No. 2545].  In January 2013, the Debtors established procedures to sell approximately $130
million of their FHA Loans (this portfolio of FHA loans had more complete documentation on average than the
other FHA loans held by the Debtors).  The Debtors received bids for the FHA loans of less than 80% of the par
amount of the loans.  Based on the bids received, the Debtors believed that monetizing the FHA loans in the
normal course would maximize their value. Because these loans are governmentally insured, the Debtors
believe that their value is relatively stable.  Id.

43.    The New AP Package is substantially similar to the Original AP Package, except the Debtors propose to terminate the Adequate Protection Payments to the Junior Secured Noteholders.  The Junior Secured Noteholders will not be harmed by this proposal.  To the extent it is ultimately determined the Junior Secured Noteholders are entitled to interest and fees, the New AP Package ensures that such amounts will be paid at the end of these cases.

44.    Finally, while no determination is sought here, the Debtors' use of Cash Collateral to date did not result in any diminution in the value of the Adequate Protection Parties' collateral.  Indeed, the value of their collateral has, in the aggregate, increased during the pendency of these chapter 11 cases.  Had the Adequate Protection Parties foreclosed on their collateral as of the Petition Date, the value realized would have been less than the value realized for such collateral through the Debtors' continued operation of their business, the administration of the chapter 11 cases (including negotiations with key counterparties), and the resulting Sales of the Adequate Protection Parties' collateral, even after payment of costs as authorized by the AFI/JSB Cash Collateral Order.  Moreover, as described above, the Adequate Protection Parties' collateral will not diminish during the Cash Collateral Extension Period because the Debtors will only be using the Cash Collateral to preserve the remaining collateral.  Accordingly, the Adequate Protection Liens are sufficient to adequately protect the Adequate Protection Parties' interest in their collateral.

45.    For the foregoing reasons, the Debtors' requested use of Cash Collateral and the protections provided to the Adequate Protection Parties are reasonable, appropriate, and sufficient to satisfy the legal standard of "adequate protection."

**B.    The Debtors' Proposed Use of Cash Collateral is Fair and Reasonable**

46.    While not a showing that the Debtors must make to continue the use of Cash Collateral, the Debtors nonetheless submit that their proposed use of Cash Collateral is fair

ny-1075966

and reasonable.  The AFI/JSB Cash Collateral Final Order allows the Debtors to use Cash Collateral pursuant to the terms of the approved budget.  Throughout these chapter 11 cases, the Cash Collateral has been used to fund the Debtors' cash needs related to the operations and assets of each of the respective collateral pools, including an allocated portion of the costs associated with operating the Debtors' business and administering the chapter 11 cases.  As a result of the effective administration of these chapter 11 cases, funded, in part, by the Cash Collateral, the Debtors were able to obtain significantly more value for the Lenders' collateral through the Sales and other actions taken and settlements obtained during the chapter 11 cases.

47.    During the Cash Collateral Extension Period, the Debtors propose to use less of the Lenders' Cash Collateral in the aggregate and to allocate such Cash Collateral to fewer uses.  Pursuant to the Forecast and the expense allocation methodology, the Debtors intend to use Cash Collateral primarily to pay for the direct and indirect costs of preserving and disposing of the collateral of AFI and the Junior Secured Noteholders, including an allocated portion of the professionals' fees and operating costs related thereto.[28]  Indeed, the Debtors believe that using Cash Collateral to fund the Lenders' asset disposition costs is inherently fair and reasonable.  In contrast, it would be unfair and unreasonable to require the unsecured creditors to bear the costs associated with disposing of the secured creditors' collateral.

48.    Most importantly, to the extent there is any diminution in the value of the collateral securing the AFI Senior Secured Credit Facility, which the Debtors believe to be impossible in light of the proposed limited use of such Cash Collateral, the AFI LOC and the

---

[28]    Other than the use of Cash Collateral to fund the direct and indirect costs of preserving and disposing of the collateral of AFI and the Junior Secured Noteholders (i.e., asset monetization activities, the wind down of the origination pipeline, and executive trustee services), including an allocated portion of the professionals' fees and operating costs related thereto, the Debtors will not be using Cash Collateral to pay for the other operating expenses associated with the wind down of the Debtors' estates (i.e., expenses related to the chapter 11 cases and the claims reconciliation process) or the related professionals' fees.

Junior Secured Notes as a result of the Debtors' use of Cash Collateral, the Lenders will be able to recover such amounts from their ample Adequate Protection Liens and superpriority claims. The Debtors believe that the proposed use of Cash Collateral—to pay for the Funded Disposition Costs, which include only the costs related to preserving and disposing of the Lenders' collateral—is eminently reasonable because the estates should not be forced to bear the costs of preserving and disposing of collateral solely for the benefit of secured creditors.  If the Debtors are unable to continue using Cash Collateral to fund asset disposition costs, the Debtors propose to return certain collateral to the Lenders, including the FHA/VA loan collateral, so the Lenders can liquidate the collateral. Alternatively, the Debtors could seek to promptly sell such collateral for the Lenders, provided that the Lenders pay for the costs of such expedited sale process.  For certain collateral that cannot be returned to the Lenders or promptly sold, the Debtors will evaluate the cost of continuing to monetize such collateral and determine whether it is in the Debtors' best interest to continue doing so.[29]

49.    Accordingly, for the foregoing reasons, the Debtors submit that the proposed use of Cash Collateral is fair and reasonable.

---

[29] There is certain collateral for which the Debtors have no choice but to continue paying expenses because such collateral cannot be returned to the Lenders and the Debtors are required under other agreements to continue the work. As the proceeds of these activities will benefit only the Lenders, (i.e., the unwinding of the origination pipeline and the Debtors' executive trustee services business), the Debtors believe it would be fundamentally inequitable to use the limited assets that would otherwise be available for unsecured creditors to liquidate these assets solely for the benefit of the secured Lenders.  Forcing the unsecured creditors to bear the costs of disposing of secured lenders' collateral is particularly unjust where, as here, the unsecured creditors will not be able to recover any of the costs due to the Debtors' prior grant of a waiver of the section 506(c) right to surcharge the Lenders' collateral.  See AFI/JSB Cash Collateral Final Order, ¶ 22.  The Lenders, on the other hand, will not suffer a loss due to the Debtors' use of Cash Collateral to fund these costs due to the grant of the New AP Package and the ability to assert diminution in value claims.

**C.    The Debtors' Use of Cash Collateral Does Not Constitute a Surcharge Under Section 506(c) of the Bankruptcy Code**

50.    Prior to the Petition Date, the Debtors, AFI, and the Junior Secured Noteholders entered into significant negotiations regarding the Debtors' postpetition use of Cash Collateral, and the parties agreed that, in exchange for the Debtors' use of Cash Collateral for the purposes described in the approved budget, the Debtors would waive the right to surcharge AFI and the Junior Secured Noteholders for the costs of disposing of their collateral, as is otherwise permitted by section 506(c) of the Bankruptcy Code.  See AFI/JSB Cash Collateral Final Order ¶¶ 20(n), 22.  In recent discussions, AFI and the Junior Secured Noteholders have argued that the use of Cash Collateral to pay for the costs set forth in the existing and proposed budgets (the "Budgeted Expenses") constitutes a surcharge of their collateral under section 506(c) of the Bankruptcy Code in violation of the AFI/JSB Cash Collateral Final Order.  The Debtors respectfully submit that the use of Cash Collateral to pay for the Budgeted Expenses does not constitute a section 506(c) surcharge.

51.    "[S]ections 363 and 506 serve distinct purposes and apply in different circumstances."  Security Leasing Partners, LP v ProAlert, LLC (In re ProAlert, LLC), 314 B.R. 436, 441 (B.A.P. 9th Cir. 2004).  Section 363 allows the debtor to use cash collateral while ensuring that the secured creditor ultimately will receive the full value of its collateral.  Id. Section 506(c), on the other hand, charges the secured creditor with the costs of disposing of its collateral so that "the general estate and unsecured creditors [are not] required to bear the cost of protecting what is not theirs."  In re Codesco, Inc., 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982). "Analytically, if the creditor's interest is adequately protected, then, by definition, there is no surcharge and section 506(c) does not come into play."  In re ProAlert, LLC, 314 B.R. at 439. See also In re Coventry Commons Assocs., 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) ("the

24

use of [creditor's] cash collateral to pay the debtor's professional fees does not constitute a surcharge.  The debtor is not asking [creditor] to pay for the debtor's professional fees.  If [creditor's] interest is adequately protected, then by definition there will be no impairment of [creditor's] interest in the nature of a surcharge, or of any other nature.").

52.    Here, the Debtors merely seek to use Cash Collateral to cover the direct and indirect costs of the preservation and disposition of such collateral, and AFI and the Junior Secured Noteholders will remain adequately protected for the Debtors' use thereof.  AFI and the Junior Secured Noteholders ultimately will not bear any loss for such use because such use is limited to the costs necessary to preserve and liquidate their collateral.  Nonetheless, due to their robust adequate protection package, which was bargained for among the parties in connection with the AFI/JSB Cash Collateral Final Order, there should be no dispute the Lenders are adequately protected here.  Thus, the Debtors' proposed use of Cash Collateral does not constitute a surcharge under section 506(c) of the Bankruptcy Code.

## NOTICE

53.    The Debtors have provided notice of this Motion in accordance with the Case Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141].

ny-1075966

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an order

substantially in the form attached hereto as <u>Exhibit 1</u>, granting certain of the relief sought herein

immediately; (ii) grant such other and further relief to the Debtors as the Court may deem just

and proper.

Dated:  April 8, 2013
         New York, New York

*/s/ Todd M. Goren*
Gary S. Lee
Todd M. Goren
Samantha Martin
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

26