MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:   (212) 468-7900
Gary S. Lee
Todd M. Goren
Samantha Martin

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Joint Administration |

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER TO PERMIT
THE DEBTORS TO CONTINUE USING CASH COLLATERAL**

I, Marc D. Puntus, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.     I am a Partner and co-head of the Restructuring Group at Centerview Partners LLC ("Centerview"), financial advisor to Residential Capital LLC ("ResCap") and the other above-captioned debtors and debtors in possession (collectively, the "Debtors"). I submit this declaration in support of the *Debtors' Motion For Entry of an Order to Permit the Debtors to Continue Using Cash Collateral*, filed contemporaneously herewith (the "Motion").[1]

---

[1]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

ny-1077668

**I.      Qualifications**

2.      I previously have conveyed to the Court my qualifications and Centerview's qualifications in my Declarations in support of the application for Centerview's retention, my Declarations in support of the motions for approval of the Debtors' debtor-in-possession financing facilities and amendments thereto, and my Declaration in support of the Debtors' motion for approval of the Sales [Docket Nos. 20, 1784, and 2137 respectively] (collectively, the "Declarations").

3.      Rather than repeat the information contained in the Declarations here, they are incorporated by reference.

**II.     Continued Use of Cash Collateral**

4.      Upon the commencement of these chapter 11 cases, the Lenders consented to the Debtors' use of Cash Collateral based on an agreed upon budget. The budget was appended to the Debtors' cash collateral motion and provided for the use of Cash Collateral to pay for the costs of each collateral pool, as well as an allocated portion of the administrative expenses of the Debtors' estates. Prior to and throughout these cases, the Lenders have been provided with budgets that specifically detail how the Debtors intend to use and, in fact, have used, the Cash Collateral.

5.      Pursuant to the AFI/JSB Cash Collateral Stipulation, the parties agreed to negotiate in good faith a revised expense allocation methodology that would become effective following the closing of the Platform Sale. The revised methodology was intended to reflect the fact that a significant portion of the Lenders' collateral would be sold by early 2013. Accordingly, in January 2013, the month prior to the closing of the Platform Sale, the Debtors, the Lenders and the Committee commenced discussions regarding the terms on which the Debtors would continue to use Cash Collateral. Unfortunately, the parties were unable to reach

2

ny-1077668

agreement on an alternative to the existing expense allocation methodology by the Platform Sale closing date. As a consequence, the Lenders agreed to extend their consent to the Debtors' use of Cash Collateral through April 18, 2013, to allow the parties additional time to continue to negotiate a revised expense allocation methodology. As of the date hereof, the parties still have not reached agreement and the Lenders have not consented to the Debtors' use of Cash Collateral beyond April 18, 2013.

6. Pursuant to the Motion, the Debtors propose to use Cash Collateral on a non-consensual basis to fund a portion of the costs associated with the wind down of the Debtors' estates, including the direct and indirect costs associated with the preservation and disposition of the substantial remaining collateral securing the AFI Senior Secured Credit Facility, the AFI LOC and the Junior Secured Notes, through and including the effective date of a chapter 11 plan for the Debtors. If the Debtors are unable to continue using Cash Collateral to fund asset disposition costs, the Debtors propose to return certain collateral to the Lenders, including the FHA/VA loan collateral, so the Lenders can liquidate the collateral. Alternatively, the Debtors could seek to promptly sell such collateral for the Lenders, provided that the Lenders pay for the costs of such expedited sale process. For certain collateral that cannot be returned to the Lenders or promptly sold, the Debtors will evaluate the cost of continuing to monetize such collateral and determine whether it is in the Debtors' best interest to continue doing so.

7. As they have done since the commencement of these chapter 11 cases, the Debtors propose to provide the Lenders with ample adequate protection in the form of (i) replacement liens, (ii) superpriority administrative expense claims to the extent the replacement liens are insufficient to provide adequate protection, (iii) Adequate Protection Payments to AFI, in its capacity as lender under the AFI LOC and the AFI Senior Secured Credit

3

ny-1077668

Facility, and (iv) the Debtors' agreement to satisfy certain reporting requirements (as described in greater detail in the Motion, the "New AP Package"). The Debtors believe that the New AP Package is more than sufficient to protect the Lenders' interests.

### III.  The Interests of the Lenders are Adequately Protected

8.  For the following reasons, I believe that the Lenders are adequately protected by the New AP Package.

9.  First, the Debtors propose to use the Cash Collateral solely to preserve or enhance the value of the Lenders' collateral. As set forth above, the Cash Collateral will be used in accordance with the Forecast solely to pay for the Funded Disposition Costs, which will be used directly or indirectly to preserve and liquidate the remaining collateral, inuring directly to the benefit of the Lenders. If the Debtors were precluded from making expenditures necessary to maintain their assets and sustain their operations, the Lenders would be harmed.

10.  Second, AFI, in its capacities as lender under the AFI Senior Secured Credit Facility and under the AFI LOC, is adequately protected through the existence of a substantial equity cushion in its collateral. AFI holds the first lien with respect to each of these facilities. The Debtors have determined that there is a book value equity cushion on the AFI Senior Secured Credit Facility of approximately $2.049 billion. That is, $2.049 billion book value of collateral over and above the $747 million owed to AFI under the AFI Senior Secured Credit Facility. See Exhibit 3. Similarly, a substantial equity cushion exists on the collateral securing the AFI LOC. The Debtors have determined that there is a book value equity cushion on the AFI LOC of approximately $1.285 billion. That is, $1.285 billion book value of collateral over and above the $380 million owed to AFI under the AFI LOC. See Exhibit 3. Based on these equity cushions, it is impossible that AFI will be harmed by the limited use of Cash Collateral sought herein. In addition, using Sale proceeds, the Debtors have reserved adequate

ny-1077668

cash to repay the AFI Senior Secured Credit Facility and the AFI LOC (the "AFI Reserved Cash"), further protecting AFI in connection with the Debtors' use of Cash Collateral.

11. Third, with respect to the Junior Secured Noteholders, notwithstanding that the Debtors believe the Lenders already are adequately protected because the Debtors intend to use their Cash Collateral only to preserve and liquidate their collateral, the Debtors also are offering the Junior Secured Noteholders the New AP Package, which the Debtors believe provides ample adequate protection in addition to the planned preservation of their collateral described above.[2] The Debtors recently have sold a significant amount of the Lenders' collateral pursuant to the Sales and are continuing to otherwise monetize and evaluate the sale of certain additional collateral. The Debtors believe that the Junior Secured Noteholders will be adequately protected by their Adequate Protection Lien on the collateral securing the AFI LOC (first lien), the AFI Senior Secured Credit Facility (Adequate Protection Lien), and the Junior Secured Notes (Adequate Protection Lien). These Adequate Protection Liens have been enhanced through the monetization of the underlying assets. Indeed, instead of having Adequate Protection Liens on loans, advances, and servicing rights, the AFI LOC Adequate Protection Liens are now secured primarily by (i) $1.115 billion in cash, and (ii) approximately $450 million in loans insured by the FHA or guaranteed by the VA. The cash and the FHA/VA loans are not subject to significant fluctuation in value in the hands of the Debtors.[3] Moreover, as discussed above, a substantial equity cushion exists on the collateral securing the AFI LOC. In addition, the AFI

---

[2] The Debtors are also proposing to grant the New AP Package to AFI, which, as described above, is already benefitting from significant protections.

[3] In January 2013, the Debtors established procedures to sell approximately $130 million of their FHA Loans (this portfolio of FHA loans had more complete documentation on average than the other FHA loans held by the Debtors). The Debtors received bids for the FHA loans of less than 80% of the par amount of the loans. Based on the bids received, the Debtors believed that monetizing the FHA loans in the normal course would maximize their value.

ny-1077668

DIP Facility has now been paid in full, thereby reducing by $190 million the amount of debt that is senior to the Adequate Protection Liens on the AFI LOC.

12. Lastly, while no determination is sought here, I would submit that the value of the Lenders' collateral has, in the aggregate, increased during the pendency of these chapter 11 cases. Had the Lenders foreclosed on their collateral as of the Petition Date, the value realized would have been less than the value realized for such collateral through the Debtors' continued operation of their business, the administration of the chapter 11 cases (including negotiations with key counterparties) and resulting Sales of the Lenders' collateral, even after payment of costs as authorized by the AFI/JSB Cash Collateral Order.

## IV. The Debtors' Proposed Use of Cash Collateral is Fair and Reasonable

13. The AFI/JSB Cash Collateral Final Order allows the Debtors to use Cash Collateral pursuant to the terms of the approved budget. Throughout these chapter 11 cases, the Cash Collateral has been used to fund the Debtors' cash needs related to the operations and assets of each of the respective collateral pools, including an allocated portion of the costs associated with operating the Debtors' business and administering the chapter 11 cases. As a result of the effective administration of these chapter 11 cases, funded, in part, by the Cash Collateral, the Debtors were able to obtain significantly more value for the Lenders' collateral through the Sales and other actions taken and settlements obtained during the chapter 11 cases.

14. During the Cash Collateral Extension Period, the Debtors propose to use less of the Lenders' Cash Collateral in the aggregate and to allocate such Cash Collateral to fewer uses. As explained in more detail in the Horner Declaration, the Debtors intend to use Cash Collateral primarily to pay for the direct and indirect costs of preserving and disposing of the collateral of AFI and the Junior Secured Noteholders, including an allocated portion of the

professionals' fees and operating costs related thereto.[4] The Debtors believe that using Cash Collateral to fund the Lenders' asset preservation and disposition costs is inherently fair and reasonable. In contrast, it would be unfair and unreasonable to require the unsecured creditors to bear the costs associated with disposing of the secured creditors' collateral.

15. For the reasons set forth herein, I believe that the Motion should be granted.

I declare, under penalty of perjury, that the foregoing is true and correct, to the best of my knowledge.

Dated: April 8, 2013
      New York, New York

*/s/ Marc D. Puntus*
Marc D. Puntus

---

[4] Other than the use of Cash Collateral to fund the direct and indirect costs of preserving and disposing of the collateral of AFI and the Junior Secured Noteholders (i.e., asset monetization activities, the wind down of the origination pipeline, and executive trustee services), including an allocated portion of the professionals' fees and operating costs related thereto, the Debtors will **not** be using Cash Collateral to pay for the other operating expenses associated with the wind down of the Debtors' estates (i.e., expenses related to the chapter 11 cases and the claims reconciliation process) or the related professionals' fees.