MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' REPLY TO THE OBJECTION BY THE UNITED STATES TRUSTEE TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(b) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) KEY EMPLOYEE INCENTIVE PLANS FOR CERTAIN INSIDERS, AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER <u>AS ADMINISTRATIVE EXPENSES</u>**

ny-1085021

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

REPLY ............................................................................................................................................3

    A.    The Incentive Plans Contain Challenging Metrics And The Plans Are Properly Evaluated Pursuant to Section 503(c)(3). ................................................3

    B.    Debtors' Responses to Certain Other Statements By the UST.............................11

    C.    Modified Form Of Order .......................................................................................12

CONCLUSION .............................................................................................................................12

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re BearingPoint Inc.*,
   Case No. 09-10691 (REG) (Bankr. S.D.N.Y. July 24, 2009) (Docket No. 1128) ..................4

*In re Dana Corp.*,
   358 B.R. 567 (Bankr. S.D.N.Y. 2006) ..............................................................................3

*In re Dewey & LeBoeuf LLP*,
   Case No. 12-12321 (MG), 2012 Bankr. LEXIS 3484 (Bankr. S.D.N.Y. July 30, 2012).........4

*In re Mesa Air Grp.*,
   Case No. 10-10018, 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) .............................4

*In re Nortel Networks, Inc.*,
   Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 5 and 20, 2009) (Docket Nos. 436,
   511)................................................................................................................................4

*In re Velo Holdings Inc.*,
   472 B.R. 201 (Bankr. S.D.N.Y. 2012) ...........................................................................3, 4, 5

**FEDERAL STATUTES**

11 U.S.C. § 503(c)(1) ...................................................................................................................3

11 U.S.C. § 503(c)(2) .................................................................................................................12

11 U.S.C. § 503(c)(3) ...................................................................................................................4

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") submit this reply (the "**Reply**"),[1] to the objection by the United States Trustee for the Southern District of New York (the "**UST**") to the Debtors' Motion Pursuant To Sections 363(b) And 503(c)(3) Of The Bankruptcy Code Authorizing (I) Implementation Of (A) A Key Employee Retention Plan For Certain Non-Insiders And (B) Key Employee Incentive Plans For Certain Insiders, And (II) Payment Of Any Obligations Arising Thereunder As Administrative Expenses [Docket No. 3280] (the "**Objection**") [Docket No. 3347].[2]  In support of the Reply, the Debtors also concurrently submit the supplemental declaration of Ronald Greenspan (the "**Greenspan Supp. Decl.**").  In further support of the Reply, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     The Debtors' goals for the remainder of these Chapter 11 cases is not only to confirm a Chapter 11 plan, but also to recover the greatest possible value for their remaining assets and manage those assets in the most efficient and cost-effective manner.  Rather than maintaining their historical annual incentive plan, for 2013 and going forward, the Debtors are replacing it with (i) a key employee retention plan for a substantial portion of the core staff remaining with the estate for the long term (i.e. the Estate KERP), and (ii) short-term (i.e. Executive KEIP) and long-term incentive plans (i.e. Estate KEIP, and together with the Executive KEIP, the "**Incentive Plans**").  These three plans enjoy the full support of the

---

[1]     Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Reply may refer to http://www.kccllc.net/rescap for additional information.

ny-1085021

Creditors' Committee.  The only party objecting to the Motion is the Office of the United States Trustee, and its objection is limited to the propriety of the Incentive Plans, not the Estate KERP.[3]

2. In a reasonable and sound exercise of their business judgment, the Debtors, with the assistance of their legal, financial and compensation advisors and consultants, constructed compensation plans that align the creditors' interests with the Debtors' employees by tying the executives' awards to both their ability to be fiscally responsible and manage the estate's core operational expenses, and to their success liquidating assets and maximizing the recoveries from the estate's substantial remaining assets.  The Incentive Plans promote the creation of hundreds of millions of dollars of value for the estate; thus, as the estate benefits, so do the participants in the Incentive Plans.

3. The Motion, the Supporting Declarations and the Supplemental Greenspan Declaration spell out in detail how the metrics in the Incentive Plans are challenging, incentivizing and geared to preserve and maximize value for the estate.  These metrics are most certainly not lay ups, and each is challenging in its own right.  Achieving the targets in the asset disposition metric requires the Debtors to efficiently manage the loan resolution process and implement initiatives to accelerate the recovery process in order to meet the designated volume and recovery rate targets.  Achieving the budget metric requires the Debtors to complete the separation from Ally Financial Inc. ("**AFI**"), stand up critical infrastructure processes and services and complete key operational changes within a specific timeframe.  Similarly, meeting

---

*(cont'd from previous page)*

[2]   Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

[3]   The UST acknowledges that the Estate KERP is subject to section 503(c)(3) of the Bankruptcy Code and defers to the judgment of the Creditors' Committee as to whether the payments under the Estate KERP are "justified under the circumstances of these cases."  *See* Objection at p.9.

the GNMA deliveries and escrow cash metrics will require senior managers to actively manage the pooling process and negotiate third party agreements to service the loans being delivered to the market, while also ensuring that the loans being delivered adhere to GNMA's standards. The Debtors' current workforce is a fraction of its pre-sale size, and there is a substantial amount of work that must be accomplished throughout the year in order to meet the designated performance targets – and extra effort and better execution will lead to better recoveries. The senior leadership team must leverage their historical knowledge, experience and working relationships with third parties to generate the anticipated value for the estate and its creditors. They are incentivized to meet and exceed these goals because they know that the proposed payments under the Incentive Plans will fairly compensate them for their efforts.

4.  Therefore, once the Court evaluates the Incentive Plans under section 503(c)(3) utilizing the *Dana II* factors, rather than section 503(c)(1) of the Bankruptcy Code, it becomes overwhelmingly evident that the Incentive Plans are justified by the facts and circumstances of these Chapter 11 cases and critical to the estate's future success.

## REPLY

**A.  The Incentive Plans Contain Challenging Metrics And The Plans Are Properly Evaluated Pursuant to Section 503(c)(3).**

5.  Contrary to the assertions of the UST, section 503(c)(1) of the Bankruptcy Code does not apply to the Incentive Plans because the payments under those plans are not being made "for the purpose of inducing such person to remain with the debtor's business…." 11 U.S.C. § 503(c)(1). As this Court noted in *In re Velo Holdings Inc.*, "[i]n *Dana II*, Judge Lifland held that 'by presenting an executive compensation package that properly incentivizes [management] to produce and increase the value of the estate, the Debtors have established that section 503(c)(1) does not apply.'" 472 B.R. 201, 210 (Bankr. S.D.N.Y. 2012), *quoting In re Dana Corp.*, 358 B.R.

567, 575 (Bankr. S.D.N.Y. 2006).  In addition, in *In re Mesa Air Grp.*, this Court "held that the debtors' incentive bonus program was not a retention bonus because it was designed to 'motivate the employees to achieve performance goals.'" *In re Velo Holdings Inc.*, citing *In re Mesa Air Grp.*, Case No. 10-10018, 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010); *see also* Greenspan Decl. at ¶¶ 28, 32 and 36; West Decl. at ¶ 7.  If the insiders achieve the contemplated performance goals, the estate will have received in excess of $700mm of asset proceeds by December 31, 2013. *See* Greenspan Supp. Decl. at ¶ 3.

6.  Courts in this district and others have found that key employee incentive programs in which employees are encouraged to "increase their pre-bankruptcy job responsibilities to achieve the bonus requirements and financial targets" alleviate the need for a section 503(c)(1) analysis. *In re Velo Holdings Inc.*, 472 B.R. at 210; *see, e.g. In re BearingPoint Inc.,* Case No. 09-10691 (REG) (Bankr. S.D.N.Y. July 24, 2009) (Docket No. 1128); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 5 and 20, 2009) (Docket Nos. 436, 511).  The insiders' respective roles have evolved significantly over the past year as a result of both the bankruptcy filing and the modified composition of the Debtors' businesses after the sale. *See* Hamzehpour Decl. at ¶¶ 6-10 (describing the pre-sale estate composition and identifying the roles of the executives and employees in managing the estate going forward).  The insiders must actively manage all aspects of the administration of the estate. *See* Motion at ¶¶ 53, 54 and 57. Accordingly, the insiders' leadership and management of the estate directly affect the overall success of the estate.  The proposed payments under the Incentive Plans motivate senior management to maximize value for stakeholders by providing for the estate's leadership to receive their incentive payments only if value is preserved and created for the estate. *See* Motion at ¶¶ 52, 56; *see also In re Dewey & LeBoeuf LLP*, Case No. 12-12321 (MG), 2012 Bankr.

LEXIS 3484, at *17 (Bankr. S.D.N.Y. July 30, 2012) (approving the debtor's incentive plan structure because it linked the employees' ability to earn bonuses to the debtor's ability to collect outstanding receivables).

7.  "Whether incentive targets require management to 'stretch' to meet performance goals is fundamentally a factual question." *See In re Velo Holdings Inc.*, 472 B.R. at 207. As set forth in detail in the Motion, the Supporting Declarations and the Greenspan Supplemental Declaration, there are numerous variables and challenges that must be addressed on a daily basis in order for the designated targets to be met. *See Id.* at 208 ("Satisfaction for the Targets is by no means assured.").

   i.  *Challenges in the Estate KEIP*

   - <u>Asset Recovery Metric</u>

8.  The UST incorrectly supposes that because the FHA/VA loans are guaranteed, the Debtors will have a "significantly easier" time achieving those metrics than they will have achieving the non-FHA/VA loan metrics. *See* Objection at pp. 10-11. Nothing could be further from the truth. In fact, there are unique challenges associated with achieving the negotiated metrics for both FHA/VA assets as well as non-FHA/VA assets.

9.  The FHA/VA loans are guaranteed by the government; however, the recovery timeline for these loans could be up to seven years depending on whether or not loans are located in judicial foreclosure states. The Debtors will be taking significant action to accelerate the collections on these loans in order to reduce the administrative costs associated with a more lengthy recovery timeline. There are numerous variables that can elongate the accelerated timeline and make achieving this metric more difficult. For example, the Debtors' management team, including members of both of the Incentive Plans, will have to try to maintain the GNMA

pooling process for modified loans; work with the servicer to ensure that loans move through the loan resolution and foreclosure process in a timely fashion and that key loss mitigation dates are met; develop borrower incentive programs to accelerate the loan resolution process; and encourage borrowers to take part in HAMP and other government loan modification programs. Finally, the Debtors will continue to explore the possibility of selling loans through a bulk sale or through GNMA private placement programs. The Debtors will be working on all of these initiatives to ensure that they meet the incentive metrics. *See* Greenspan Supp. Decl. at ¶ 5(a).

10. Similarly, with the non-FHA/VA assets, the Debtors need to dispose of a variety of different asset classes. Each class has different challenges associated with it. In addition, in order to achieve recoveries for the Debtors' estate on account of their equity interests at the non-Debtor entities, the Debtors must first manage the sale/liquidation of the remaining assets, resolve claims and lawsuits at these entities, and wind-down the entities, of which a number are international. For the non-guaranteed loan portfolio, the Debtors' monetization plan includes pursuing a bulk sale of these assets; however, these are not high-quality assets and there are limited recent comparable transactions. Therefore, it will be a challenge to execute this sale and generate significant proceeds for the Debtors' estate. There is certainly a significant risk of not achieving this sale at pricing levels forecasted in the plan, which would impact both the recovery and recovery rate metrics. *See* Id. at ¶ 5(b).

- Performance Against Budget Metric

11. This metric compares the actual wind-down expenses for core operating expenses against the budget.[4] Certain of the largest components of the Debtors' core operating expenses

---

[4] A copy of the budget will be provided separately to the Court and the UST.

include, among others, compensation and benefits, transition and shared service related costs, facilities, IT, non-restructuring professionals, and document storage charges. Managing these costs and adhering to the budget throughout the year requires the Debtors' management team to complete key operational changes in order to achieve these numbers.  For example,

- From a human capital perspective, the Debtors will need to manage their staff to complete projects on time and transition duties in order to continually reduce staffing. As mentioned above, the Debtors had over 3,800 employees prior to the 363 sales, approximately 420 employees remained with the Estate post-sale with only just over 130 employees projected to be remaining with the Estate at year-end.
- For facilities, the Debtors need to continually manage their properties in order to exit approximately 3 facilities this year, and to reduce their footprint in Fort Washington, PA and Bloomington, MN from approximately 510,000 square feet to 28,000 square feet.
- Moreover, in order to achieve the budget for transitional and shared services, the Debtors will have to transition off of the services provided by the purchasers and AFI in a timely fashion. See Greenspan Decl. ¶ 38.  This includes:
  - transitioning to a low cost, outsourced information technology platform independent of Ocwen and AFI;
  - setting up a corporate insurance program independent of AFI;
  - developing a benefits program independent of AFI;
  - setting up a payroll processor independent of AFI;
  - managing accounts payable independent of AFI;
  - developing a stand-alone cash management system independent of AFI; and
  - developing an in-house tax team independent of AFI.

*See* Greenspan Supp. Decl. at ¶ 8.

ny-1085021                                                7

12. Therefore, the Debtors' sale and budget management goals require the senior executive management team to undertake extraordinary efforts that go well beyond their pre-bankruptcy daily responsibilities.

      ii. *Challenges in the Executive KEIP*

13. The metrics in the Executive KEIP are equally challenging, but if accomplished will generate significant value for the estate.

- <u>GNMA Deliveries Metric</u>

14. Delivering loans into the securitization market is not easily accomplished. At the beginning of the plan period (i.e., January 1, 2013), the Debtors did not have the right to continue with the GNMA pooling process. *See* Greenspan Decl. at ¶ 56. The two participants in the Executive KEIP were critical in obtaining permission from GNMA to continue the GNMA pooling process through June 30, 2013, which involved not only negotiating with GNMA, but also as a condition to the extension, negotiating an agreement with Ocwen to purchase the servicing rights of all new pools after the close of the 363 sale transactions. *See* Greenspan Supp. Decl. at ¶ 11.

15. In addition, the participants must oversee the wind-down of the origination pipeline in order to ensure that the loans in the pipeline as of the sale of the originations platform to Walter are closed and funded in a timely fashion in order to be able to be placed into pools before the expiration of the GNMA pooling authority. This requires actively overseeing not only in-house staff, but also services provided by Walter through the service agreement. *See* Id. at ¶ 12.

16. The participants also need to oversee the pooling process in order to ensure that loans are eligible for the pooling process and are ultimately delivered into securitizations. This is

not a simple process because the resources required to deliver these loans and transfer the servicing are now spread among Ocwen, Walter, AFI, Ally Bank and the Debtors. *See Id.* at ¶ 13.

17. Significant management and coordination of efforts is required in order to ensure that any document defects are cured, that all loans are eligible to be pooled (consistent with GNMA standards), and that all documents and supporting files are delivered timely to the custodian. Moreover, given that there are a limited number of settlement dates each month for the pooling process, and that the authority from GNMA to continue the pooling process expires on June 30, 2013, the active and timely management of this process is critical to ensure that the Estate receives the full value from these loans. *See Id.*

18. 

*See Id.* at ¶ 14.

- **GNMA Restricted Cash Metric**

19. The "GNMA Restricted Cash" metric reflects the participants' roles in managing the relationship with GNMA and recovering restricted cash currently held by GNMA. Recovering those funds requires both the successful transfer of servicing related to GNMA loans to the purchasers (i.e., Ocwen and Walter), as well as the successful wind-down of the GNMA PIIT pooling process. *See* Greenspan Decl. at ¶ 57.

ny-1085021                              9

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ The Executive KEIP participants are two of the primary remaining personnel of the Debtors who have strong relationships with GNMA, and those relationships will be critical in these and future negotiations with GNMA.  As such, ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████ *See* Greenspan Supp. Decl. at ¶ 15.

- MSR Sale & Extension of GNMA Pooling Metrics

20.  Completing extensions of the MSR sale agreement with Ocwen and the GNMA pooling authority will allow the Debtors to continue to pool any future modifications that are completed after the expiration of the current pooling authority on June 30, 2013. *See* Greenspan Decl. at ¶¶ 58-59. ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ In addition, in order to achieve the "Extension of GNMA Pooling Approval" metric not only do the participants have to achieve the "Extension of MSR Sale Agreement" metric, which as noted above will be significantly

challenging, they also need to negotiate an extension of pooling authority with GNMA, 

███████████████. *See* Greenspan Supp. Decl. at ¶ 17.

**B.     Debtors' Responses to Certain Other Statements By the UST**.

21.     The Debtors' numerous efforts to engage the UST in discussions about the details of the Incentive Plans in the weeks ahead of the objection deadline proved futile as the UST never responded to the Debtors' invitations.

22.     Notwithstanding, before the Objection was filed, the Debtors provided the UST with a spreadsheet of base salary and variable compensation for 2011-2013 received (or expected to be received) by the 163 employees covered by the three key employee plans.[5] The UST notes that of the insiders, certain individuals had base salary increases. *See* Objection at p.10.  Certain individuals received base salary increases because they assumed different and/or more senior roles with the Debtors that required them to take on added responsibilities, and in order for the Debtors to remain competitive within the market, the Debtors adjusted salaries to reflect compensation levels consistent with the individual's current responsibilities. *See* Dempsey Decl. at ¶¶ 38-42.

23.     As noted in the Motion, employees remain eligible for severance benefits upon their termination by Debtors. *See* Motion at ¶ 25.  The UST requests "information regarding the severance arrangements available to each KEIP recipient" so as to "provide a complete picture of the compensation and benefits available to the KEIP recipients." *See* Objection at p.11.  For the members of the Estate KEIP, their current severance awards range from $68,000 - $375,000

---

[5] The Debtors also provided this spreadsheet to the Creditors' Committee's advisors and will provide a copy to the Court but not file it on the docket given the sensitivity of disclosing individuals' historical compensation. However, in response to the UST's request (*see* Objection at p. 9), attached hereto as **Exhibit 1** is a list of estimated awards to the participants in the Estate KERP, Estate KEIP and Executive KEIP.

(subject to any restriction set forth in section 503(c)(2) of the Bankruptcy Code); however, none of these six individuals will receive severance this year because each is slated to remain with the estate beyond 2013. With regard to the individuals in the Executive KEIP, they are each entitled to sums in excess of $250,000; however, their awards will be subject to the cap provided for in Bankruptcy Code section 503(c)(2). As noted in the Dempsey Declaration, these sums are certainly a benefit to which the employee is entitled, but the amounts the employee may receive is a result of their past service and dedication to the Debtors, not for work being done in 2013, because under the terms of the Residential Capital, LLC Severance Plan, the amount of the severance payment is tied to an employee's position and length of service with the company. *See* Dempsey Decl. at ¶ 43.

### C.     Modified Form Of Order

24.    After the Motion was filed, AFI asked the Debtors to add two clarifying provisions to the proposed form of order. Specifically, it asked the Debtors to add a statement that the Debtors be permitted, without further order of the Court, to reimburse AFI for payments it makes to the Debtors' employees, as payroll processor, under the Plans. In addition, as a result of certain reservation of rights language included in the original form of order, AFI asked that a provision be added affirming that its rights under pre-existing orders of the Court were not being modified by this order. The Debtors, after consulting with the Creditors' Committee, agreed to such revisions, which are now reflected in **Exhibit 2A** to this Reply (and a blackline against the filed order is attached as **Exhibit 2B**).

## CONCLUSION

Accordingly, for the reasons set forth herein the Debtors respectfully request that the Court overrule the Objection, grant the Motion and grant such other and further relief as it deems just and proper.

Dated: April 9, 2013
      New York, New York

/s/ Lorenzo Marinuzzi
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and Debtors in Possession*