**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**SUPPLEMENTAL DECLARATION OF RONALD GREENSPAN IN FURTHER SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(b) AND 503(c)(3) OF THE BANKRUPTCY CODE AUTHORIZING (I) IMPLEMENTATION OF (A) A KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDERS AND (B) KEY EMPLOYEE INCENTIVE PLANS FOR CERTAIN INSIDERS AND (II) PAYMENT OF ANY OBLIGATIONS ARISING THEREUNDER AS ADMINISTRATIVE EXPENSES**

I, Ronald Greenspan, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a senior managing director in the Corporate Finance/Restructuring practice of FTI Consulting, Inc. ("**FTI**")[1]. My business address is 633 West 5th Street, Suite 1600, Los Angeles, CA 90071-2027.

2. I respectfully submit this supplemental declaration (the "**Supplemental Declaration**") in further support of the Debtors' Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) Key Employee Incentive Plans for Certain Insiders and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses (the "**Motion**") [Docket No. 3280]. The Debtors have duly authorized me to do so.

---

[1] On July 25, 2012, the Court entered an order [Docket No. 902] approving the application of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") seeking authorization to engage FTI as their financial advisor [Docket No. 526].

ny-1085221

### A. The KEIP Milestones are Challenging and Incentivizing

3.  The U.S. Trustee's objection suggests that KEIP Milestones[2] and the Executive KEIP metrics may not be primarily incentivizing, are easily met, and do not encourage the KEIP Participants to achieve the Debtors' desired outcome. The Debtors, together with FTI, conducted an extensive analysis during the course of designing the Executive and Estate KEIP, to ensure that each of the metrics would motivate and incentivize the KEIP Participants to perform at a high level. Based on their analysis, the Debtors concluded that the milestones represented challenging metrics that would align the interest of the KEIP Participants and the Debtors' stakeholders in order to maximize the value of the Debtors' estates in a cost efficient manner. Indeed, if the insiders achieve the contemplated performance goals, the estate will have received in excess of $700 million of asset proceeds by December 31, 2013.

### ii. The Estate KEIP Milestones – Asset Recovery Metric

4.  The "Asset Recovery" metrics are comprised of four separate metrics: Proceeds from FHA / VA Recoveries, FHA / VA Recovery Rate, Proceeds from Non FHA / VA Recoveries, Non FHA / VA Recovery Rate. See Greenspan Decl. ¶ 32. Contrary to the suggestion of the U.S. Trustee, the weighting of this metric among FHA/VA and non-FHA/VA loans was not determined by the challenge of achieving said metrics. Instead, the weighting corresponds to the estimated recoveries between FHA / VA assets and non-FHA / VA assets. Specifically, the FHA / VA Recovery metric at target is based on over $500 million of net recoveries, whereas the Non FHA / VA Recovery metric at target is based on approximately $100 million of net recoveries. Therefore, the recoveries of the FHA/VA assets are given approximately 5x more weight than recoveries on the non-FHA/VA assets.

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

2

ny-1085221

5. Regardless of weighting, each of the individual metrics represents a significant challenge for the participants, and there are risks associated with achieving them. For a more comprehensive listing of the actions of the participants to achieve these metrics see Greenspan Decl. ¶ 36, but below are some of the key challenges associated with these metrics.

    b. FHA / VA Recovery and Recovery Rate Metrics – While these loans are guaranteed by the government, the recovery timeline for these loans is expected to be seven years, and the Debtors will be taking significant action to accelerate the collections on these loans. Some of the challenges the Debtors will face include maintaining the GNMA pooling process for modified loans; managing the servicer to ensure loans move through the loan resolution, foreclosure, and claims process in a timely fashion; developing borrower incentive programs to accelerate the loan resolution process; and encouraging borrowers to take part in HAMP and other government programs. In addition, the Debtors have marketed loans through a bulk sale and continue to explore the possibility of selling loans through other bulk sale initiatives, including a single-family loan initiative about which the Debtors have had several conversations with GNMA. The Debtors have been and will continue to work on all of these initiatives, and others, to ensure that they meet the incentive metrics.

    c. Non FHA / VA Recovery and Recovery Rate Metrics - In order to meet this metric, the Debtors need to execute on the disposition of a variety of different asset classes all of which have different challenges associated with them. For example, in order to achieve recoveries in the non-Debtor entities, the Debtors will need to manage the sale/liquidation of the remaining assets, resolve claims and lawsuits at these entities, and wind-down the entities. This is particularly challenging, as many of these entities are international and under various legal jurisdictions. Likewise, for the non-guaranteed loan portfolio, the Debtors' plan includes pursuing a bulk sale of these assets; however, given the quality of the remaining assets, there are not many recent comparable transactions in the market and it will be a challenge to execute on this sale. There is a significant risk of not achieving this sale at pricing levels forecasted in the plan, which would impact both the recovery and recovery rate metrics.

6. Accordingly, the insiders will have to undertake significant extra efforts to ensure the metrics are met.

3

ny-1085221

### iii. The Estate KEIP Milestones – Performance Against Budget

7. Administering the Estate in a cost-effective manner is critical to preserving value for the benefit of creditors. The Estate is not a continuation of "business as usual" for the Debtors. Rather, it is transitioning from a going-concern to an asset management estate that is charged with liquidating the remaining assets in the most cost-effective and value-maximizing fashion, reconciling and resolving claims, and complying with the requirements of regulators and creditors. See Greenspan Decl. ¶ 12 – 13. To further emphasize this point, the Debtors, prior to the platform sales, had over 3,800 employees, but are forecasted to have just over 130 employees as of the end of 2013.

8. The "Performance Against Budget" metric compares the actual wind-down expenses for core operating expenses against the budget. See Greenspan Decl. ¶ 37. Some of the largest components of the Debtors' core operating expenses include, among others, compensation and benefits, transition and shared service related costs, facilities, IT, non-restructuring professionals, and document storage charges. Managing these costs and adhering to the budget throughout the year requires the Debtors' management team to complete properly and efficiently key operational changes in order to achieve these numbers.

    b.    From a human capital perspective, the Debtors will need to manage their staff to complete projects on time and transition duties in order to continually reduce staffing. As mentioned above, the Debtors had over 3,800 employees prior to the 363 sales, approximately 420 employees remained with the Estate post-sale with only just over 130 employees remaining with the Estate at year-end.

    c.    For facilities, the Debtors need to continually manage their properties in order to exit approximately 3 facilities this year, and to reduce their footprint in Fort Washington, PA and Bloomington, MN from approximately 510,000 square feet to 28,000 square feet.

    d.    The Debtors have to evaluate all of the contracts not assumed by the purchasers to assure that those contracts no longer needed on a go forward basis are rejected or not renewed.

    e.    In order to achieve the budget for transitional and shared services the Debtors will have to transition off of the services provided by the purchasers and AFI in a timely fashion. See Greenspan Decl. ¶ 38. This includes transitioning to a low cost, outsourced IT platform independent of Ocwen and AFI; setting up a corporate insurance program independent of AFI; developing a benefits program independent of AFI; setting up a payroll processor independent of AFI; managing accounts payable independent of AFI; developing a stand-alone cash management system independent of AFI; and developing an in-house tax team independent of AFI.

    f.    For IT, as mentioned above, the Debtors will be transitioning data, applications, and networking services from Ocwen and AFI to a low-cost 3rd party provider. This is a significant effort that requires migrating over approximately 200 applications and 250 terabytes of data.

9.    All of the efforts listed above require significant coordination, management and effort on the part of the Estate KEIP Participants. The scope of transformation that needs to occur in the Estate throughout the year makes this metric especially challenging.

5

### iv. The Executive KEIP Milestones – GNMA Deliveries

10. The Executive KEIP Participants have been and continue to be actively involved in overseeing the wind-down of the originations pipeline and the pipeline of modified loans, and their ultimate delivery of such loans into GNMA securities.

11. Delivering loans into the securitization market is not easily accomplished, particularly in bankruptcy. At the beginning of the plan period (i.e., January 1, 2013), the Debtors did not have the right to continue with the GNMA pooling process. See Greenspan Decl. ¶ 56. The participants were critical in obtaining permission from GNMA to continue the GNMA pooling process through June 30, 2013, which involved not only negotiating with GNMA, but also as a condition to the extension, negotiating an agreement with Ocwen to purchase the servicing rights of all new pools after the close of the 363 sale transactions, negotiating a new 3rd party custodial agreement, establishing through the transition services agreement process to have Walter deliver loans on behalf of the Debtors, and negotiating with AFI to continue to serve as a trading partner for TBA trades.

12. In addition, the participants must oversee the wind-down of the origination pipeline in order to ensure that the loans in the pipeline as of the sale of the originations platform to Walter are closed and funded in a timely fashion in order to be able to be placed into pools before the expiration of the GNMA pooling authority. This requires actively overseeing not only in-house staff, but also services provided by Walter through the transition service agreement.

13. The participants also need to oversee the pooling process in order to ensure that loans are eligible for the pooling process and are ultimately delivered into securitizations. This is not a simple process because the resources required to deliver these loans and transfer the servicing are now spread over the purchasers, AFI, Ally Bank and the Debtors. This requires significant extra effort to manage and coordinate the process in order to ensure that

6

ny-1085221

all document defects are cured, that all loans are eligible to be pooled (consistent with GNMA standards), that all documents and supporting files are delivered timely to the custodian, that margin required to hedge collateral is exchanged and valued appropriately, and that Ocwen, as purchaser of the MSRs, approves each pool as required under the PIIT process. Moreover, given that there are a limited number of settlement dates each month for the pooling process, and that the authority from GNMA to continue the pooling process expires on June 30, 2013, the active and timely management of this process is critical to ensure that the Estate receives the full value from these loans through the pooling process.

14. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

     v.     **The Executive KEIP Milestones – GNMA Escrowed Cash**

15. The "GNMA Restricted Cash" metric reflects the participants' roles in managing the relationship with GNMA and recovering cash currently held for the benefit of GNMA under the Debtors' Special Account Agreement and Escrow Agreement (together, the "GNMA Agreements") with GNMA. Recovering those funds requires both the successful transfer of servicing related to GNMA loans to Ocwen, and the successful wind-down of the GNMA PIIT pooling process. See Greenspan Decl. ¶ 57. ████████████████████
████████████████████████████████████████████████

7

ny-1085221

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████ The participants are two of the primary remaining personnel of the Debtors who have strong relationships with GNMA, Walter, Ocwen and AFI, and those relationships will be critical in these and future negotiations with GNMA.

16.     ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

    **vi.**     **The Executive KEIP Milestones – Extension of MSR Sale Agreement and Extension of GNMA Pooling**

17.     Completing extensions of both the MSR sale agreement with Ocwen and the GNMA pooling authority will allow the Debtors to continue to pool any future modifications that are completed after the expiration of the current pooling authority on June 30, 2013. See Greenspan Decl. ¶ 58-59. ████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████ In addition, in order to achieve the "Extension of GNMA Pooling Approval" metric not only do the participants have to achieve the "Extension of MSR Sale Agreement" metric, which as noted above will be significantly challenging, they also need to negotiate an extension of pooling authority with GNMA, ████████████████████████. Finally, the extension of the GNMA pooling will also require negotiations with the purchasers and AFI to extend the transition services agreements so that they continue to provide the services needed for the pooling process. However, if obtained, the extension of these agreements would allow the Debtors to continue to pool future modifications at a pricing significantly above what could otherwise be achieved through whole loan sales. See Greenspan Decl. ¶ 36, 59.

    **B.**    **Conclusion**

    18.    Based on my review of the totality of the Estate and Executive KEIPs and the status of the Debtors' operations, it is my opinion that the KEIP Milestones and Executive KEIP metrics are incentivizing, value-creating and instrumental in preserving and maximizing value for the estate. Moreover, it is my opinion that the KEIP Milestones and Executive KEIP metrics do not simply reward management for doing the job originally contemplated by pre-petition ResCap or its employees.

9

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 9th day of April, 2013.

> */s/ Ronald F. Greenspan*
> Ronald F. Greenspan