## **EXHIBIT 3**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| **NEW CENTURY TRS HOLDINGS** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | **Re: Docket Nos. 185 & 494** |

## ORDER AUTHORIZING PAYMENT OF (i) SALE-RELATED INCENTIVE PAY TO SENIOR MANAGEMENT AND (ii) RETENTION AND INCENTIVE PAY TO CERTAIN EMPLOYEES PURSUANT TO SECTIONS 105(a), 363(b)(1) AND 503(c)(3) OF THE BANKRUPTCY CODE

Upon the motion (as amended, the "Motion") of the Debtors for an order, under

Bankruptcy Code sections 363(b), 503(c)(3) and 105 authorizing payment of (i) sale-related

incentive pay to senior management and (ii) retention and incentive pay to certain employees, as

more fully set forth in the Motion; and due and sufficient notice of the Motion having been given

under the particular circumstances; and it appearing that no other or further notice need be

provided; and the Court having convened a hearing on the Motion on May 7, 2007 (the "Hearing");

and the Court having considered the evidence and testimony introduced at the Hearing; and the

Court having heard the arguments of the proponents of, and objectors to, the Motion; and it

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc ), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (Okla JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, I800anyloan com, Anyloan com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L. P (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O Corp , a California corporation; New Century R.E.O II Corp , a California corporation; New Century R.E.O III Corp , a California corporation; New Century Mortgage Ventures, LW (c/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L. P , a Delaware limited partnership

appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefore; and for the reasons stated by the Court on the record at the Hearing;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     The Debtors' Key Employee Incentive Plan (the "KEIP") and Key Employee Incentive and Retention Plan (the "KEIRP," and collectively with the KEIP, the "Restructured Plans") are designed to appropriately compensate the Plan Participants to ensure that they remain motivated to perform the requisite tasks to effectuate the asset sales of the Debtors' businesses, given the enormous additional burdens placed upon the participants.

B.     The full experience, expertise, unique skills, and enthusiastic involvement of the Plan Participants are critical to the Debtors' ability to maximize value for their estates pursuant to asset sales.

C.     The post-petition efforts of the Plan Participants extend beyond their ordinary course responsibilities and are critical to the Debtors' efforts to maximize value for their estates pursuant to asset sales.

D.     The Plan Participants are the personnel of the Debtors with the necessary skill and experience to implement the sale process proposed by the Debtors, successfully respond to or negotiate with potential purchasers and ensure that the transactions for which the Debtors seek approval of this Court produce the best results and maximum value for the Debtors and their estates.

E.     The Debtors have demonstrated that implementation of the Restructured Plans is justified under the facts and circumstances of these cases.

F.     The KEIP is a performance-based plan that is not subject to the limitations

2

on retention and severance plans set forth in Bankruptcy Code sections 503(c)(1) and (2).

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is hereby **GRANTED** as set forth herein.

2.    The Restructured Plans are hereby **APPROVED.**

3.    The Debtors are authorized, but not directed, to make payments to the Plan Participants in accordance with the applicable guidelines for the KEIP and KEIRP set forth on Exhibit A and Exhibit B, respectively; provided, however, that the calculations of the proposed incentive payments due under the KEIP and/or the KEIRP will be provided to the professionals of the Official Committee of Unsecured Creditors (the "Committee") three (3) business days prior to such payment.

4.    The Debtors are further authorized, but not directed, to make payments to KEIRP Participants and/or non-Plan Participant employees (excluding insiders) from the Critical Retention Pool in the maximum aggregate amount of $175,000.

5.    Details of amounts paid from this pool will be provided to the professionals of the Committee on a weekly basis.

6.    All payments authorized hereunder shall be allowed administrative expenses of the Debtors' estates under Bankruptcy Code section 503(b).

7.    This Court shall retain jurisdiction over all matters set forth in the Motion, including the entitlement of any party to any payment pursuant to the Restructured Plans and any dispute regarding the calculation of the incentive payment to be made under the Restructured Plans.

8.    The Motion of the United States Trustee to Continue the Hearing on the Debtors' Emergency Motion for Order Authorizing Payment of (i) Sale-Related Incentive Pay to Senior Management and (ii) Retention and Incentive Pay to Certain Employees Pursuant to

3

Sections 105(a), 363(b)(1) and 503(c) of the Bankruptcy Code [Docket No. 524] is **DENIED**.

9.    The Debtors' oral motion for approval to: (i) file a redacted version of a chart identifying the KEIRP and KEIP participants and their potential compensation under the Plans (the "Chart") and (ii) file the unredacted Chart under seal, is **GRANTED**.

10.    Pursuant to section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1, the Debtors are authorized, and the Clerk of the Court is directed, to file and maintain the unredacted Chart under seal.


IT IS SO ORDERED,

this ___ day of May, 2007

THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

4

**EXHIBIT A**
**KEIP GUIDELINES**

# NEW CENTURY FINANCIAL CORPORATION
# KEY EMPLOYEE INCENTIVE PLAN

**PLAN OBJECTIVE:**
The New Century Financial Corporation Executive Incentive Plan (the **"Plan"**) is designed to maximize assets available for distribution to creditors by providing incentives to certain key employees of New Century Financial Corporation (the **"Company"**) to maximize the consideration received by the Company upon the consummation of the sale of the (i) Company's servicing assets and servicing platform pursuant to that certain agreement Asset Purchase Agreement with Carrington Capital Management, LLC and its affiliate, dated April 2, 2007, or the overbid process contemplated therein (the **"Servicing Assets Sale"**) (ii) certain mortgage loans originated by the Company, as well as residual interests in certain securitization trusts owned by the Company pursuant to that certain Asset Purchase Agreement with Greenwich Capital Financial Products, Inc., dated April 2, 2007, or the overbid process contemplated therein (the **"Mortgage Assets Sale"**) and (iii) the Company's wholesale, retail and other financial asset classes (other than tax refunds and assets included in the Servicing Assets Sale and the Mortgage Assets Sale) (the **"Other Assets Sale"**).

**ELIGIBLE EMPLOYEES:**
The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the **"Tier I Employees"**), "Tier II Employees" (the **"Tier II Employees"**), "Tier III Employees" (the **"Tier III Employees"**) and "Tier IV Employees" (the **"Tier IV Employees"**) (collectively, the **"Plan Participants"**), each attached as part of Exhibit A hereto (**"Exhibit A"**). Plan Participants will be eligible to participate in those Plan Pools (as defined below) for which an amount has been set forth opposite their name in the column designated for such Plan Pool on Exhibit A, with the entitlement to any award subject to the other terms and conditions of the Plan as set forth herein

All payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries (collectively, the **"Debtors"**) As a condition precedent of any obligation of the Company to make any payment to a Plan Participant under the Plan, the Plan Participant shall, prior to or upon the date that such payment is made to the Plan Participant, be required to fully execute and return to the Company a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as Exhibit B The Company shall have no obligation to make any payment under the Plan and shall not make any payment to any Plan Participant that does not satisfy such release requirement or who otherwise revokes such release within any revocation period afforded by applicable law

**PLAN POOLS:**
The amounts contributed (each a **"Contribution"**) by the Company, if any, to make payments under the Plan (the **"Plan Pools"**) shall be based on the liquidation prices received for sales (the **"Sales"**) of the Company's various assets and shall be calculated as follows:

**Servicing Assets Sale Pool**
The Contribution to the Servicing Assets Sale Pool, if any, upon the consummation of the Servicing Assets Sale (the **"Servicing Assets Sale Contribution"**) will be calculated based on the extent to which the ratio of (i) the net liquidation price to (ii) the principal amount of loans held by securitization trusts and third party whole loan purchasers for which the Company has mortgage service rights (such ratio, "BPS") equals or exceeds 50 0 There will be no Servicing Asset Sale Contribution if BPS is less than 50 0 If BPS is equal to 50 0, the Servicing Assets Sale Contribution will be $710,581 If BPS is greater than 50 0, the Servicing Assets Sale Contribution will be increased proportionately e.g. if BPS is 57 5 (115% of 50 0), the Servicing Assets Sale Contribution will be $817,168 (115% of $710,581).

**Mortgage Assets Sale Pool**

The Contribution to the Mortgage Assets Sale Pool, if any, upon the consummation of the Mortgage Assets Sale (the "**Mortgage Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Mortgage Assets Sale Price**") equals or exceeds $47,250,000  There will be no Mortgage Asset Sale Contribution if the Mortgage Assets Sale Price is less than $47,250,000.  If the Mortgage Asset Sale Price is equal to $47,250,000, the Mortgage Asset Sale Contribution will be $222,190  If the Mortgage Asset Sale Price is greater than $47,250,000, the Mortgage Assets Sale Contribution will be equal to $222,190 plus 2% of the amount by which the Mortgage Asset Sale Price exceeds $47,250,000 e g. if the Mortgage Assets Sale Price is $54,337,500, the Mortgage Assets Sale Contribution will be $363,940 ($222,190 + (($54,337,500 − $47,250,000) X 2%))

**Other Assets Sale Pool**

The Contribution to the Other Assets Sale Pool, if any, upon the consummation of the Other Assets Sale (the "**Other Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Other Assets Sale Price**") equals or exceeds the Other Assets Sale target price set forth on Exhibit C (the "**Target Price**")  There will be no Other Assets Sale Contribution if the Other Assets Sale Price is less than the Target Price.  If the Other Asset Sale Price is equal to the Target Price, the Other Asset Sale Contribution will be $786,340   If the Other Assets Sale Price is greater than the Target Price and equal to or less than $37,375,000, then the Other Assets Sale Contribution will be equal to $786,340 plus 2 5% of the amount by which the Other Assets Sale Price exceeds the Target Price, e g  if the Other Assets Sale Price is $X, which exceeds the Target Price but is equal to or less than $37,375,000, the Other Assets Sale Contribution will be calculated as follows: Other Assets Sale Contribution = $786,340 + (($X − Target Price) X 2 5%)  If the Other Assets Sale Price is greater than the Target Price and greater than  $37,375,000, then the Other Assets Sale Contribution will be equal to $786,340 plus (2 5% X ($37,375,000 − Target Price))  plus 6% of the amount by which the Other Assets Sale Price exceeds $37,375,000, e g  if the Other Assets Sale Price is $Y, which exceeds the Target Price and $37,375,000, the Other Assets Sale Contribution will be calculated as follows: Other Assets Sale Contribution = $786,340 + (2 5% X ($37,375,000 − Target Price)) + (6% X ($Y − $37,375,000))

**PLAN PAYMENTS:**

Plan Participants shall receive the portion of the minimum contribution to each Plan Pool set forth opposite their names on Exhibit A in the event that the minimum condition necessary for the Company to make a contribution to such Plan Pool (each a "Target") is satisfied but not exceeded  In the event any Target is exceeded, and the Company makes a contribution greater than the minimum contribution to any Plan Pool, Plan Participants will be eligible for the same proportion of that contribution as of the minimum contribution e g. if a hypothetical participant had $22,219.00 set forth opposite his name in the column designated for the Mortgage Assets Sale Pool, such participant would be eligible to receive 10% ($22,219 90 / $222,190) of the Mortgage Assets Sale Contribution.  Awards will be paid within 50 days following the consummation of each respective Sale; provided, however, that if any portion of the sales price for any of the asset classes is held back or subject to an escrow (each a "**Holdback**") by the purchaser thereof, a proportionate percentage of the contribution to the Plan Pool for that asset class will be held back by the Company and will be contributed to such Plan Pool, if at all, at such time as the purchaser delivers payment of the Holdback, with the related awards being paid to the Plan Participants within 50 days thereafter

**TERMINATION OF EMPLOYMENT:**

Awards under the Plan are offered as discretionary incentive amounts.  If a Plan Participant voluntarily terminates employment or is terminated "for cause", such Plan Participant will not thereafter be entitled to any unpaid awards, including unpaid awards related to Holdbacks as described above  In the event a Plan Participant's employment is terminated by the Company or one of its subsidiaries other than "for cause", the Participant will be entitled to any unpaid awards.

Additionally, if there is any ongoing investigation by the Audit Committee (the "**Audit Committee**") of the Company's Board of Directors (the "**Board**") into the actions or omissions of a Plan Participant at the time such Plan Participant becomes entitled to any Incentive Bonus under the Plan, which could result in the

Company having the right to terminate such Plan Participant "for cause", the Company will be entitled to delay payment of such bonus (without any interest accruing thereon) until the matter is determined by the Audit Committee. If the Company would have the right to terminate such Plan Participant "for cause" based on the findings of the Audit Committee, then the Company will not be obligated to make and will not make any payments of such bonus (even if such Plan Participant's employment had terminated for other reasons) to such Plan Participant

For purposes of the Plan, the term **"for cause"** means, either before or after the adoption of the Plan:

- Commission of a crime against the Company or its affiliates, customers or employees, whether prosecuted or not;

- a finding by the Audit Committee that the Plan Participant engaged in willful misconduct, or was grossly negligent, in the performance of his or her duties;

- Conviction of (or pleading guilty or *nolo contendere* to, or entering a similar plea to) any other crime or violation of law, statute or regulation that creates an inability to perform job duties;

- Failure or inability to perform job duties due to intoxication by drugs or alcohol during working hours;

- A material and direct conflict of interest, not specifically waived in advance by the Company;

- Unauthorized use or disclosure of confidential information that belongs to the Company or its affiliates, customers or employees;

- Habitual neglect of duties or repeated absences from work;

- Refusal to follow the instructions of a supervisor or the Board (or a committee thereof); or

- Other material misconduct including, but not limited to: falsification of Company records; theft; sexual harassment; or possession of firearms, controlled substances or illegal drugs on Company premises or while performing Company business.

**FURTHER ACTIONS:**
As a condition to each Plan Participants participation in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may request subsequent to the termination of such Plan Participant's employment with the Company or its subsidiaries, as the case may be, to assist the Company and its subsidiaries in the conduct of the bankruptcy cases filed under chapter 11 of the United States Bankruptcy Code to which they are currently parties.

**CHANGE OF ADDRESS:**
The Plan Participants shall be responsible for notifying the Company of any change of address before payment is made by mail notification to **[Name]**.

**NO PROMISE OF CONTINUED EMPLOYMENT, FULL-TIME ATTENTION, AND GOOD STANDING:**
The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at will employee subject to termination of employment by his or her employer at any time for any reason

**TAXES:**

All payments will be subject to standard withholding and deductions. Neither the Company nor any of its subsidiaries, officers or agents makes or has made any representation about the tax consequences of any payments or benefits offered by the Company to any Plan Participant under the Plan

**SEVERABILITY:**
If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision

**CHOICE OF LAW AND VENUE:**
The Plan will be governed by the laws of the State of California, notwithstanding that State's conflict of law provisions The Company and each of the Plan Participants shall irrevocably and unconditionally consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") The Company and each of the Plan Participants shall irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the Plan in the Bankruptcy Court and shall further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

**ENTIRE AGREEMENT AND AMENDMENT:**
This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of the Company Any agreement between any Plan Participant and the Company or any of its subsidiaries with regard to the Plan and its subject matter is superseded in its entirety by this document.

**NO ASSIGNMENT:**
The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged, or encumbered except by will or the laws of decent or distribution

## Exhibit A

## New Century Financial Corporation
## Key Employee Incentive Plan
## Participant List

| TIER I EMPLOYEES | | | |
|---|---|---|---|
| | PLAN POOLS | | |
| NAME | SERVICING ASSETS SALES POOL | MORTGAGE ASSETS SALES POOL | OTHER ASSETS SALES POOL |
| | | | |
| | | | |

| TIER II EMPLOYEES | | | |
|---|---|---|---|
| | PLAN POOLS | | |
| NAME | SERVICING ASSETS SALES POOL | MORTGAGE ASSETS SALES POOL | OTHER ASSETS SALES POOL |
| | | | |
| | | | |

| TIER III EMPLOYEES | | | |
|---|---|---|---|
| | PLAN POOLS | | |
| NAME | SERVICING ASSETS SALES POOL | MORTGAGE ASSETS SALES POOL | OTHER ASSETS SALES POOL |
| | | | |
| | | | |

| TIER IV EMPLOYEES | | | |
|---|---|---|---|
| | PLAN POOLS | | |
| NAME | SERVICING ASSETS SALES POOL | MORTGAGE ASSETS SALES POOL | OTHER ASSETS SALES POOL |
| | | | |
| | | | |

Exhibit A

**Error! Unknown document property name.**

# Exhibit B

## Form Of Release Agreement

[To Be Attached]

Exhibit B

NBI:712641.18
**Error! Unknown document property name.**

Draft Under 40 KEIP Release Agreement



## KEY EMPLOYEE INCENTIVE PLAN RELEASE AGREEMENT

To:

From:  Brad Morrice                    Robert Lambert
       Chief Executive Officer          Senior Vice President
                                        Leadership & Organizational Development

Date:  May ___, 2007

New Century views your role as critical to ongoing efforts to consummate the sale of its remaining assets and to assist in tasks necessary for liquidation. In acknowledgment of the contributions you have offered and will continue to offer by remaining a committed part of the organization, we are pleased to confirm that we have selected you as a participant in a Key Employee Incentive Plan (the "Plan") designed to appropriately compensate you for your enthusiastic involvement in assisting the New Century to achieve the business goals identified in the Plan. A copy of the Plan is attached hereto as Exhibit A.

In consideration of the provisions contained in the Plan, including but not limited to the parties' agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Employee by the Company or any of its subsidiaries, _____ ("Employee") and New Century Financial Corporation, including its affiliated entities (collectively, the "Company" or "New Century"), agree as follows:

1.  **Effective Date of Agreement.** This Agreement shall be effective as of the date signed by Employee (the "Effective Date").

2.  **Incentive Compensation.** Subject to the terms and conditions set forth in the Plan:

    (a)  The amounts contributed (each a "Contribution") by the Company, if any, to make payments (the "Awards") under the Plan (the "Plan Pools") shall be based on the liquidation prices received for sales (the "Sales") of the Company's various assets as identified in the Plan.

    (b)  Awards will be paid within 50 days following the consummation of each respective sale; provided, however, that if any portion of the sales price for any of the asset classes is held back or subject to an escrow (each a "Holdback") by the purchaser thereof, a proportionate percentage of the contribution to the Plan Pool for that asset class will be held back by the Company and will be contributed to such Plan Pool, if at all, at such time as the purchaser delivers payment of the Holdback, with the related awards being paid to the Plan Participants within 50 days thereafter.

3.  **Eligibility.** The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the "Tier I Employees"), "Tier II Employees" (the "Tier II Employees"), "Tier III Employees" (the "Tier III Employees") and "Tier IV Employees" (the "Tier IV Employees") (collectively, the "Plan Participants"), each as identified on Exhibit A to the Plan. Plan Participants will be eligible to participate in and receive that share, if any, of those Plan Pools (as defined in the Plan) as

Page 1 of 4

has been set forth opposite their name on Exhibit A, with the entitlement to any award subject to the other terms and conditions as set forth in the Plan.

4. **At-Will Employment, Full-Time Attention, and Good Standing.** This Agreement is in no manner intended to constitute a promise of employment for this or any other period of time, or to otherwise change Employee's at-will employment status. Employee shall continue to devote Employee's best efforts and full business time and attention to the performance of the services customarily incident to Employee's position, and to such other services as management may reasonably request. It is mandatory to the payment of any Incentive Compensation that the Employee is actively employed in Employee's current position in good standing, and not subject to discipline, on the date the payment is actually made. If Employee voluntarily terminates his or her employment or if Employee's employment is terminated by the Company for cause prior to payment of the Incentive Compensation, Employee's right to any Incentive Compensation payment also terminates. However, if the Company terminated Employee's employment prior to payment of the Incentive Compensation without cause, as a result of a position elimination or reduction in force, Employee remains eligible to receive the full Incentive Compensation payment.

5. **Jurisdiction.** The Company and Employee agree that the United States Bankruptcy Court for the District of Delaware shall have the exclusive jurisdiction to consider any issue related to the Employee's entitlement to, or calculation of, any payment to be made under the Plan.

6. **General Release.** In exchange for remittance of an Award described in Paragraph 2 of this Agreement, less standard withholding and authorized deductions, and for other good and valuable consideration, receipt of which is hereby acknowledged, Employee hereby covenants not to sue and, to the fullest extent permitted by law, acknowledges full and complete satisfaction of and release and discharge of New Century Financial Corporation, its subsidiaries and affiliated corporations, past and present, and each of them, as well as its and their directors, officers, agents, attorneys, its Committee of Unsecured Creditors (including agents, attorneys and contractors of its Committee of Unsecured Creditors), insurers and employees, past and present, and each of them, together and each of them collectively referred to as "Releasees," from any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, by Employee arising out of or in any way connected with Employee's employment relationship with the Company, or any other transactions, occurrences, acts or omissions or any loss, damage or injury whatever, known or unknown, suspected or unsuspected, resulting from any act or omission by or on the part of said Releasees, or any of them, committed or omitted prior to the effective date of this Release Agreement, including, without limiting the generality of the foregoing, but not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, or any other federal, state or local law, regulation or ordinance; provided, however, that such covenant not to sue and release does not apply to (1) any obligation created by or arising out of this Agreement for which receipt or satisfaction has not been acknowledged; (2) any right to indemnification that Employee may have pursuant to any articles of incorporation, certificate of incorporation, bylaws or similar governing document of any Releasee with respect to any loss, damages or expenses (including but not limited to attorneys' fees) that Employee may in the future incur with respect to Employee's service as an employee, officer or director or in any other capacity with any Releasee; (3) with respect to any rights that Employee may have to insurance coverage for such losses, damages or expenses under any directors and officers liability insurance policy of any Releasee; (4) Employee's rights to continued medical coverage under COBRA; (5) any rights to payment of benefits that Employee may have under a qualified or nonqualified retirement plan sponsored or maintained by any Releasee (including, without limitation, any 401(k), deferred compensation, and supplemental retirement benefits); (6) any wages for all legitimately worked and earned time, which has been documented and approved, which has not been paid (including, without limitation, payment for accrued, unused vacation hours), but not including any notice period covered by WARN or any applicable similar state statute; and (7) Employee's rights to

benefits or coverage under any employee welfare benefit plan (as that term is defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended).

It is a further condition of the consideration hereof and Employee's intention that in executing this General Release Agreement that it should be effective as a bar to each and every claim, demand and cause of action stated above. In furtherance of this intention, Employee hereby expressly waives any and all rights and benefits conferred upon Employee by the provisions of SECTION 1542 OF THE CALIFORNIA CIVIL CODE and expressly consents that this General Release Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected claims, demands and causes of action, if any, as well as those relating to any other claims, demands and causes of action referred to above. SECTION 1542 provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

7. **Agreement to Cooperate.** Employee agrees to respond to all inquiries of New Century about any matters concerning New Century, its affiliates or their affairs that occurred or arose during the period of Employee's employment by New Century, and Employee further agrees to cooperate fully with New Century in investigating, prosecuting and defending any charges, claims, demands, liabilities, causes of action, lawsuits or other proceedings by, against or involving New Century and/or its affiliates relating to the period during which Employee was employed by New Century or relating to matters of which Employee has or should have knowledge or information.

8. **Miscellaneous.** This Agreement is entered into, and shall be governed by and construed and interpreted in accordance with the laws of the State of California. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or application and to this end the provisions of this Agreement are declared to be severable. Any waiver of or breach of any of the terms of this Agreement shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision. Each party is entering into this Agreement voluntarily, without duress, with the consultation and advice of its legal counsel (or upon a voluntary waiver of the right to such consultation and advice), and with full understanding of its terms.

9. **Entire Agreement and Amendment.** The parties acknowledge and agree that this Agreement reflects their entire agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries. This Agreement constitutes the complete, final and exclusive embodiment of the parties' entire agreement regarding these issues and supersedes and renders null and void all prior agreements between Employee and the Company with regards to these issues. This Agreement may not be amended or modified except by a written instrument signed by both parties.

10. **Facsimile Acceptance.** A signed facsimile transmission of this Agreement shall have the same force and effect as delivery of a signed hard-copy original of the Agreement.

*Notwithstanding any other provision of this Agreement, by signing below, you acknowledge and agree that nothing contained in this Agreement is intended to be, or shall be construed to constitute, an assurance of continued employment for a definite period of time or until the occurrence of cause to*

Page 3 of 4

**Draft Under 40 KEIP Release Agreement**

*terminate employment. Subject only to the provisions relating to payment or the provision of other consideration upon any contingency or condition expressly stated herein, the Company may terminate your employment with or without cause at any time or for any lawful reason. You also acknowledge that the Company has not made, nor herein makes, any representation about the tax consequences of any payments or benefits offered by the Company to you pursuant to this Agreement.*

By signing this Agreement, Employee acknowledges and agrees that Employee has read the foregoing terms regarding the Employee's participation in the attached Key Employee Incentive Plan Agreement and understands and acknowledges the significance of the terms in this Agreement and executes this Agreement voluntarily and with full understanding of its consequences.

If the above terms are acceptable, please signify your agreement and acceptance by signing and dating this letter and returning a signed copy to New Century.

**NEW CENTURY FINANCIAL CORPORATION**

**ACCEPTED AND AGREED:**

By: _____

Its: _____

Signed: _____

Name: _____

Date: _____May ___, 2007_____

RLF1-3149457-1
NB1:715766 2
RLF1-3150892-1

Draft 40+ KEIP Release Agreement



## KEY EMPLOYEE INCENTIVE PLAN RELEASE AGREEMENT

To:

From:    Brad Morrice                    Robert Lambert
         Chief Executive Officer         Senior Vice President
                                         Leadership & Organizational Development

Date:    May __, 2007

---

New Century views your role as critical to ongoing efforts to consummate the sale of its remaining assets and to assist in tasks necessary for liquidation. In acknowledgment of the contributions you have offered and will continue to offer by remaining a committed part of the organization, we are pleased to confirm that we have selected you as a participant in a Key Employee Incentive Plan (the "Plan") designed to appropriately compensate you for your enthusiastic involvement in assisting the New Century to achieve the business goals identified in the Plan. A copy of the Plan is attached hereto as Exhibit A.

In consideration of the provisions contained in the Plan, including but not limited to the parties' agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Employee by the Company or any of its subsidiaries, _____ ("Employee") and New Century Financial Corporation, including its affiliated entities (collectively, the "Company" or "New Century"), agree as follows:

1.   **Effective Date of Agreement.** This Agreement shall be effective as of the date signed by Employee (the "Effective Date").

2.   **Incentive Compensation.** Subject to the terms and conditions set forth in the Plan:

     (a)   The amounts contributed (each a "Contribution") by the Company, if any, to make payments (the "Awards") under the Plan (the "Plan Pools") shall be based on the liquidation prices received for sales (the "Sales") of the Company's various assets as identified in the Plan.

     (b)   Awards will be paid within 50 days following the consummation of each respective sale; provided, however, that if any portion of the sales price for any of the asset classes is held back or subject to an escrow (each a "Holdback") by the purchaser thereof, a proportionate percentage of the contribution to the Plan Pool for that asset class will be held back by the Company and will be contributed to such Plan Pool, if at all, at such time as the purchaser delivers payment of the Holdback, with the related awards being paid to the Plan Participants within 50 days thereafter.

3.   **Eligibility.** The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the "Tier I Employees"), "Tier II Employees" (the "Tier II Employees"), "Tier III Employees" (the "Tier III Employees") and "Tier IV Employees" (the "Tier IV Employees") (collectively, the "Plan Participants"), each as identified on Exhibit A to the Plan. Plan Participants will be eligible to participate in and receive that share, if any, of those Plan Pools (as defined in the Plan) as

Page 1 of 5

**Draft 40+ KEIP Release Agreement**

has been set forth opposite their name on Exhibit A, with the entitlement to any award subject to the other terms and conditions as set forth in the Plan.

4. **At-Will Employment, Full-Time Attention, and Good Standing.** This Agreement is in no manner intended to constitute a promise of employment for this or any other period of time, or to otherwise change Employee's at-will employment status. Employee shall continue to devote Employee's best efforts and full business time and attention to the performance of the services customarily incident to Employee's position, and to such other services as management may reasonably request. It is mandatory to the payment of any Incentive Compensation that the Employee is actively employed in Employee's current position in good standing, and not subject to discipline, on the date the payment is actually made. If Employee voluntarily terminates his or her employment or if Employee's employment is terminated by the Company for cause prior to payment of the Incentive Compensation, Employee's right to any Incentive Compensation payment also terminates. However, if the Company terminated Employee's employment prior to payment of the Incentive Compensation without cause, as a result of a position elimination or reduction in force, Employee remains eligible to receive the full Incentive Compensation payment.

5. **Jurisdiction.** The Company and Employee agree that the United States Bankruptcy Court for the District of Delaware shall have the exclusive jurisdiction to consider any issue related to the Employee's entitlement to, or calculation of, any payment to be made under the Plan.

6. **General Release.** In exchange for remittance of an Award described in Paragraph 2 of this Agreement, less standard withholding and authorized deductions, and for other good and valuable consideration, receipt of which is hereby acknowledged, Employee hereby covenants not to sue and, to the fullest extent permitted by law, acknowledges full and complete satisfaction of and release and discharge of New Century Financial Corporation, its subsidiaries and affiliated corporations, past and present, and each of them, as well as its and their directors, officers, agents, attorneys, its Committee of Unsecured Creditors (including agents, attorneys and contractors of its Committee of Unsecured Creditors), insurers and employees, past and present, and each of them, together and each of them collectively referred to as "Releasees," from any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, by Employee arising out of or in any way connected with Employee's employment relationship with the Company, or any other transactions, occurrences, acts or omissions or any loss, damage or injury whatever, known or unknown, suspected or unsuspected, resulting from any act or omission by or on the part of said Releasees, or any of them, committed or omitted prior to the effective date of this Release Agreement, including, without limiting the generality of the foregoing, but not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, or any other federal, state or local law, regulation or ordinance; provided, however, that such covenant not to sue and release does not apply to (1) any obligation created by or arising out of this Agreement for which receipt or satisfaction has not been acknowledged; (2) any right to indemnification that Employee may have pursuant to any articles of incorporation, certificate of incorporation, bylaws or similar governing document of any Releasee with respect to any loss, damages or expenses (including but not limited to attorneys' fees) that Employee may in the future incur with respect to Employee's service as an employee, officer or director or in any other capacity with any Releasee; (3) with respect to any rights that Employee may have to insurance coverage for such losses, damages or expenses under any directors and officers liability insurance policy of any Releasee; (4) Employee's rights to continued medical coverage under COBRA; (5) any rights to payment of benefits that Employee may have under a qualified or nonqualified retirement plan sponsored or maintained by any Releasee (including, without limitation, any 401(k), deferred compensation, and supplemental retirement benefits); (6) any wages for all legitimately worked and earned time, which has been documented and approved, which has not been paid (including, without limitation, payment for accrued, unused vacation hours), but not including any notice period covered by WARN or any applicable similar state statute; and (7) Employee's rights to

Exhibit 3

**Draft 40+ KEIP Release Agreement**

benefits or coverage under any employee welfare benefit plan (as that term is defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended).

It is a further condition of the consideration hereof and Employee's intention that in executing this General Release Agreement that it should be effective as a bar to each and every claim, demand and cause of action stated above. In furtherance of this intention, Employee hereby expressly waives any and all rights and benefits conferred upon Employee by the provisions of SECTION 1542 OF THE CALIFORNIA CIVIL CODE and expressly consents that this General Release Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected claims, demands and causes of action, if any, as well as those relating to any other claims, demands and causes of action referred to above. SECTION 1542 provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

7. Employee expressly acknowledges and agrees that, by entering into this Agreement, Employee is waiving any and all rights or claims that Employee may have arising under the Age Discrimination in Employment Act of 1967, as amended, which have arisen on or before the date of execution of this Agreement. Employee further expressly acknowledges and agrees that:

(a) In return for this Agreement, Employee will receive compensation beyond that which Employee was already entitled to receive before entering into this Agreement;

(b) Employee was orally advised and is hereby advised in writing by this Agreement to consult with an attorney before signing this Agreement;

(c) Employee was given a copy of this Agreement on May __, 2007, and informed that Employee had 21 days within which to consider the Agreement; and

(d) Employee was informed that Employee has seven (7) days following the date of execution of this Agreement in which to revoke this Agreement in entirety. Any revocation of the Agreement must be in writing and hand delivered during the revocation period. This Agreement will become effective and enforceable seven (7) days following execution by Employee, unless it is revoked during the seven-day period following Employee's execution.

8. **Agreement to Cooperate.** Employee agrees to respond to all inquiries of New Century about any matters concerning New Century, its affiliates or their affairs that occurred or arose during the period of Employee's employment by New Century, and Employee further agrees to cooperate fully with New Century in investigating, prosecuting and defending any charges, claims, demands, liabilities, causes of action, lawsuits or other proceedings by, against or involving New Century and/or its affiliates relating to the period during which Employee was employed by New Century or relating to matters of which Employee has or should have knowledge or information.

9. **Miscellaneous.** This Agreement is entered into, and shall be governed by and construed and interpreted in accordance with the laws of the State of California. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or application and to this end the provisions of this Agreement are declared to be severable. Any waiver of or breach of any of the terms of this Agreement shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision. Each party is entering

**Draft 40+ KEIP Release Agreement**

into this Agreement voluntarily, without duress, with the consultation and advice of its legal counsel (or upon a voluntary waiver of the right to such consultation and advice), and with full understanding of its terms.

10. **Entire Agreement and Amendment.** The parties acknowledge and agree that this Agreement reflects their entire agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries. This Agreement constitutes the complete, final and exclusive embodiment of the parties' entire agreement regarding these issues and supersedes and renders null and void all prior agreements between Employee and the Company with regards to these issues. This Agreement may not be amended or modified except by a written instrument signed by both parties.

11. **Facsimile Acceptance.** A signed facsimile transmission of this Agreement shall have the same force and effect as delivery of a signed hard-copy original of the Agreement.

*Notwithstanding any other provision of this Agreement, by signing below, you acknowledge and agree that nothing contained in this Agreement is intended to be, or shall be construed to constitute, an assurance of continued employment for a definite period of time or until the occurrence of cause to terminate employment. Subject only to the provisions relating to payment or the provision of other consideration upon any contingency or condition expressly stated herein, the Company may terminate your employment with or without cause at any time or for any lawful reason. You also acknowledge that the Company has not made, nor herein makes, any representation about the tax consequences of any payments or benefits offered by the Company to you pursuant to this Agreement.*

By signing this Agreement, Employee acknowledges and agrees that Employee has read the foregoing terms regarding the Employee's participation in the attached Key Employee Incentive Plan Agreement and understands and acknowledges the significance of the terms in this Agreement and executes this Agreement voluntarily and with full understanding of its consequences.

If the above terms are acceptable, please signify your agreement and acceptance by signing and dating this letter and returning a signed copy to New Century.

| NEW CENTURY FINANCIAL CORPORATION | ACCEPTED AND AGREED: |
|---|---|
| By: _____ | Signed: _____ |
| Its: _____ | Name: _____ |
| | Date: ___May___ , 2007 _____ |

## ACKNOWLEDGMENT AND WAIVER

I hereby acknowledge that I was given 21 days to consider the foregoing Key Employee Incentive Retention Plan Agreement and voluntarily chose to sign the Agreement prior to the expiration of the 21-day period.

RLF1-3148205-2
NBI:715767.2
RLF1-3150895-1

**Draft 40+ KEIP Release Agreement**

I declare under penalty of perjury under the laws of the State of California, and the United States of

America that the foregoing is true and correct.

EXECUTED this _____ day of _____ 2007, at _____, California.
            [month]        [city]

       EMPLOYEE

       _____
       [Name]

RLF1-3148205-2
NB1:715767 2
RLF1-3150895-1

## Exhibit C

## Target Price

| | | |
|---|---|---|
| Other Assets Sale Target Price | = | $ |

Exhibit C

NB1:712641.18
**Error! Unknown document property name.**

**EXHIBIT B**
**KEIRP GUIDELINES**

# NEW CENTURY FINANCIAL CORPORATION
# KEY EMPLOYEE INCENTIVE RETENTION PLAN

**PLAN OBJECTIVE:**

The New Century Financial Corporation Key Employee Incentive Retention Plan (the "**Plan**") is designed to (a) assist New Century Financial Corporation (the "**Company**") to retain key personnel critical to the successful operation of the Company and its subsidiaries and (b) maximize assets available for distribution to creditors by providing incentives to certain personnel to maximize the consideration received by the Company upon the consummation of the sale of (i) the Company's servicing assets and servicing platform pursuant to that certain Asset Purchase Agreement with Carrington Capital Management, LLC and its affiliate, dated April 2, 2007, or the overbid process contemplated therein (the "**Servicing Assets Sale**"), (ii) certain mortgage loans originated by the Company, as well as residual interests in certain securitization trusts owned by the Company, pursuant to that certain Asset Purchase Agreement with Greenwich Capital Financial Products, Inc., dated April 2, 2007, or the overbid process contemplated therein (the "**Mortgage Assets Sale**") and (iii) the Company's wholesale, retail and other financial asset classes (other than tax refunds and assets included in the Servicing Assets Sale and the Mortgage Assets Sale) (the "**Other Assets Sale**").

**ELIGIBLE EMPLOYEES:**

The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the "**Tier I Employees**"), "Tier II Employees" (the "**Tier II Employees**"), "Tier III Employees" (the "**Tier III Employees**"), and "Tier IV Employees" (the "**Tier IV Employees**") (collectively, the "**Plan Participants**"), each attached as part of Exhibit A hereto. All Plan Participants will be eligible to participate in the Retention Pool (as defined below) and the Critical Retention Pool (as defined below) and receive Retention Bonuses (as defined below) and Critical Retention Bonuses (as defined below), *however*, only those employees with an amount set forth opposite their name in the column for an Incentive Pool (as defined below) will be eligible to participate in and receive Incentive Bonuses (as defined below) from that Incentive Pool. The entitlement to any bonus is subject to the other terms and conditions of the Plan as set forth herein.

All payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries (collectively, the "**Debtors**"). As a condition precedent of any obligation of the Company to pay any Retention Bonus, Critical Retention Bonus or Incentive Bonus to any Plan Participant, the Plan Participant shall, prior to or upon the date that a Retention Bonus, Critical Retention Bonus or Incentive Bonus is paid to the Plan Participant, be required to fully execute and return to the Company a general release and waiver of claims, excluding those claims specifically excepted from the release and waiver as described therein, in substantially the form attached hereto as Exhibit B. The Company shall have no obligation to pay and shall not pay any Retention Bonus, Critical Retention Bonus or Incentive Bonus to any Plan Participant that does not satisfy such release requirement or who otherwise revokes such release within any revocation period afforded by applicable law.

**PLAN POOLS:**

**Retention Pool**

The Company will contribute $1,037,952 (the "**Retention Pool**") to make retention bonuses (the "**Retention Bonuses**") to be paid under the Plan.

**Incentive Pools**

The amounts contributed (each a "**Contribution**") by the Company, if any, to make incentive bonuses (the "**Incentive Bonuses**") under the Plan (the "**Incentive Pools**") shall be based on the liquidation prices received for sales (the "**Sales**") of the Company's various assets and shall be calculated as follows:

**Servicing Assets Sale**

The Contribution, if any, upon the consummation of the Servicing Assets Sale (the "**Servicing Assets Sale Contribution**") will be calculated based on the extent to which the ratio of (i) the net liquidation price to (ii) the principal amount of loans held by securitization trusts and third party whole loan purchasers for which the Company has mortgage service rights (such ratio, "**BPS**") equals or exceeds 50.0. There will be no Servicing Asset Sale Contribution if BPS is less than 50.0. If BPS is equal to 50.0, the Servicing Assets Sale Contribution will be $119,387. If BPS is greater than 50.0, the Servicing Assets Sale Contribution will be increased proportionately e.g. if BPS is 57.5 (115% of 50.0), the Servicing Assets Sale Contribution will be $137,295 (115% of $119,387).

**Mortgage Assets Sale**

The Contribution, if any, upon the consummation of the Mortgage Assets Sale (the "**Mortgage Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Mortgage Assets Sale Price**") equals or exceeds $47,250,000. There will be no Mortgage Asset Sale Contribution if the Mortgage Assets Sale Price is less than $47,250,000. If the Mortgage Asset Sale Price is equal to $47,250,000, the Mortgage Asset Sale Contribution will be $43,044. If the Mortgage Asset Sale Price is greater than $47,250,000, the Mortgage Assets Sale Contribution will be equal to $43,044 plus 2% of the amount by which the Mortgage Asset Sale Price exceeds $47,250,000 e.g. if the Mortgage Assets Sale Price is $54,337,500, the Mortgage Assets Sale Contribution will be $184,794 ($43,044 + (($54,337,500 − $47,250,000) X 2%)).

**Other Assets Sale**

The Contribution, if any, upon the consummation of the Other Assets Sale (the "**Other Assets Sale Contribution**") will be based on the extent to which the liquidation price (the "**Other Assets Sale Price**") equals or exceeds the Other Assets Sale target price set forth on Exhibit C (the "**Target Price**") There will be no Other Assets Sale Contribution if the Other Assets Sale Price is less than the Target Price. If the Other Asset Sale Price is equal to the Target Price, the Other Asset Sale Contribution will be $121,824. If the Other Assets Sale Price is greater than the Target Price and equal to or less than $37,375,000, then the Other Assets Sale Contribution will be equal to $121,824 plus 2.5% of the amount by which the Other Assets Sale Price exceeds the Target Price, e.g. if the Other Assets Sale Price is $X, which exceeds the Target Price but is equal to or less than $37,375,000, the Other Assets Sale Contribution will be calculated as follows: Other Assets Sale Contribution = $121,824 + (($X − Target Price) X 2.5%). If the Other Assets Sale Price is greater than the Target Price and greater than $37,375,000, then the Other Assets Sale Contribution will be equal to $121,824 plus (2.5% X ($37,375,000 − Target Price)) plus 6% of the amount by which the Other Assets Sale Price exceeds $37,375,000, e.g. if the Other Assets Sale Price is $Y, which exceeds the Target Price and $37,375,000, the Other Assets Sale Contribution will be calculated as follows: Other Assets Sale Contribution = $121,824 + ((2.5% X ($37,375,000 − Target Price)) + (($Y − $37,375,000) X 6%).

**Critical Retention Pool**

The Company will contribute $175,000 (the "**Critical Retention Pool**") to make payments of bonuses (the "**Critical Retention Bonuses**") under the Plan. The Critical Retention Pool may be distributed by the Company in its sole discretion, in addition to any Retention Bonuses or Incentive Bonuses, to recognize contributions made by the Company's employees receiving such Critical Retention Bonuses toward increasing the liquidation value of the Company's assets; provided, however, that no Plan Participant will be eligible to receive a Critical Retention Bonus greater than (i) $40,000 or (ii) 20% of such Plan Participant's current annual salary at the Company without the prior approval of the creditors committee

**PLAN PAYMENTS:**

Plan Participants shall be eligible to receive that portion of the Retention Pool set forth opposite their name on Exhibit A. Retention Bonuses and Critical Retention Bonuses, if any, for Plan Participants who are designated as servicing employees on Exhibit A will be paid on June 15, 2007, and for all other Plan Participants will be paid on July 9, 2007 (the applicable date as to a particular Plan Participant is referred

2

to as his or her "**Release Date**") to all such Plan Participants (i) then actively employed in his or her then currently held position with the Company on a full-time basis in good standing (defined as not, before or after adoption of the Plan, having violated the Company's policies and procedures or otherwise engaged in conduct warranting disciplinary action, and performance and attendance at or above standards) or (ii) whose employment was terminated other than "for cause." If a Plan Participant is on approved leave status during a portion of the period beginning on the Plan implementation date and ending on the Release Date applicable to such Plan Participant (the "**Retention Period**"), such Plan Participant will remain eligible to receive a Retention Bonus, but the Retention Bonus will be pro-rated for the portion(s) of the Retention Period during which he or she was employed on active, full-time status in good standing If a Plan Participant is on leave status for the majority or the entirety of the Retention Period, such Plan Participant will not be eligible to receive any portion of the Retention Bonus.

Additionally, Tier I Employees and Tier II Employees shall receive the portion of the minimum contribution to each Incentive Pool set forth opposite their names on Exhibit A in the event that the minimum condition necessary for the Company to make a contribution to such Incentive Pool (each a "Target") is satisfied but not exceeded In the event any Target is exceeded, and the Company makes a contribution greater than the minimum contribution to any Incentive Pool, such employees will be eligible for the same proportion of that contribution as of the minimum contribution e g if a hypothetical participant had $4,304 40 set forth opposite his name in the column designated for the Mortgage Assets Sale, such participant would be eligible to receive 10% ($4,304 40 / $43,044.00) of the Mortgage Assets Sale Contribution. Incentive Bonuses will be paid to Tier I Employees and Tier II Employees within 50 days following the consummation of each respective Sale; provided, however, that if any portion of the sales price for any of the asset classes is held back or subject to an escrow (each a "**Holdback**") by the purchaser thereof, a proportionate percentage of the contribution to the Plan Pool for that asset class will be held back by the Company and will be contributed to such Plan Pool, if at all, at such time as the purchaser delivers payment of the Holdback, with the related bonuses being paid to the Plan Participants within 50 days thereafter.

### TERMINATION OF EMPLOYMENT:

Retention Bonuses and Critical Retention Bonuses under the Plan are offered as discretionary incentive amounts. If a Plan Participant voluntarily terminates employment or is involuntarily terminated "for cause" (as defined below) before such Plan Participant's Release Date, the Plan Participant will not receive any Retention Bonus or Critical Retention Bonus under the Plan In the event a Plan Participant's employment is terminated by the Company or one of its subsidiaries other than "for cause", the Participant will be entitled to the full amount of his or her Retention Bonus and Critical Retention Bonus, if any (and his or her Release Date shall be deemed to be the date of such termination of employment)

Incentive Bonuses under the Plan are offered as discretionary incentive amounts. If a Plan Participant voluntarily terminates employment or is terminated "for cause", such Plan Participant will not thereafter be entitled to any unpaid Incentive Bonuses, including unpaid bonuses related to Holdbacks as described above In the event a Plan Participant's employment is terminated by the Company or one of its subsidiaries other than "for cause", the Participant will be entitled to any unpaid Incentive Bonuses.

Additionally, if there is any ongoing investigation by the Audit Committee (the "**Audit Committee**") of the Company's Board of Directors (the "**Board**") into the actions or omissions of a Plan Participant at the time such Plan Participant becomes entitled to any Retention Bonus, Critical Retention Bonus or Incentive Bonus under the Plan, which could result in the Company having the right to terminate such Plan Participant "for cause", the Company will be entitled to delay payment of such bonus (without any interest accruing thereon) until the matter is determined by the Audit Committee If the Company would have the right to terminate such Plan Participant "for cause" based on the findings of the Audit Committee, then the Company will not be obligated to make and will not make any payments of such bonus (even if such Plan Participant's employment had terminated for other reasons) to such Plan Participant.

For purposes of the Plan, the term "**for cause**" means, either before or after the adoption of the Plan:

RLF1-3148869-2
NB1:712649 20
RLF1-3150886-1

- Commission of a crime against the Company or its affiliates, customers or employees, whether prosecuted or not;

- a finding by the Audit Committee that the Plan Participant engaged in willful misconduct, or was grossly negligent, in the performance of his or her duties;

- Conviction of (or pleading guilty or *nolo contendere* to, or entering a similar plea to) any other crime or violation of law, statute or regulation that creates an inability to perform job duties;

- Failure or inability to perform job duties due to intoxication by drugs or alcohol during working hours;

- A material and direct conflict of interest, not specifically waived in advance by the Company;

- Unauthorized use or disclosure of confidential information that belongs to the Company or its affiliates, customers or employees;

- Habitual neglect of duties or repeated absences from work;

- Refusal to follow the instructions of a supervisor or the Board (or a committee thereof); or

- Other material misconduct including, but not limited to: falsification of Company records; theft; sexual harassment; or possession of firearms, controlled substances or illegal drugs on Company premises or while performing Company business.

**FURTHER ACTIONS:**
As a condition to each Plan Participants participation in the Plan, such Plan Participant shall agree to take such further actions as are reasonably requested by the Company, including such actions as the Company may request subsequent to the termination of such Plan Participant's employment with the Company or its subsidiaries, as the case may be, to assist the Company and its subsidiaries in the conduct of the bankruptcy cases filed under chapter 11 of the United States Bankruptcy Code to which they are currently parties.

**CHANGE OF ADDRESS:**
The Plan Participants shall be responsible for notifying the Company of any change of address before payment is made by mail notification to **[Name]**.

**NO PROMISE OF CONTINUED EMPLOYMENT, FULL-TIME ATTENTION, AND GOOD STANDING:**
The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's status, if applicable, as an at will employee subject to termination of employment by his or her employer at any time for any reason.

**TAXES:**
All payments will be subject to standard withholding and deductions Neither the Company nor any of its subsidiaries, officers or agents makes or has made any representation about the tax consequences of any payments or benefits offered by the Company to any Plan Participant under the Plan.

**SEVERABILITY:**
If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to

4

enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision

**CHOICE OF LAW AND VENUE:**
The Plan will be governed by the laws of the State of California, notwithstanding that State's conflict of law provisions. The Company and each of the Plan Participants shall irrevocably and unconditionally consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The Company and each of the Plan Participants shall irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of or related to the Plan in the Bankruptcy Court and shall further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in the Bankruptcy Court has been brought in an inconvenient forum.

**ENTIRE AGREEMENT AND AMENDMENT:**
This document constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan and may only be modified in writing signed by an authorized officer of the Company. Any agreement between any Plan Participant and the Company or any of its subsidiaries with regard to the Plan and its subject matter is superseded in its entirety by this document.

**NO ASSIGNMENT:**
The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged, or encumbered except by will or the laws of decent or distribution

RLF1-3148869-2
NB1:712649 20
RLF1-3150886-1

## Exhibit A

## New Century Financial Corporation
## Key Employee Incentive Retention Plan
## Participant List

| Tier I Employees | | | | |
|---|---|---|---|---|
| | | Incentive Pools | | |
| Name | Retention Pool | Servicing Assets Sale | Mortgage Assets Sale | Other Assets Sale |
| | | | | |
| | | | | |

| Tier II Employees | | | | |
|---|---|---|---|---|
| | | Incentive Pools | | |
| Name | Retention Pool | Servicing Assets Sale | Mortgage Assets Sale | Other Assets Sale |
| | | | | |
| | | | | |

| Tier III Employees | | | | |
|---|---|---|---|---|
| | | Incentive Pools | | |
| Name | Retention Pool | Servicing Assets Sale | Mortgage Assets Sale | Other Assets Sale |
| | | | | |
| | | | | |

| Tier IV Employees | | | | |
|---|---|---|---|---|
| | | Incentive Pools | | |
| Name | Retention Pool | Servicing Assets Sale | Mortgage Assets Sale | Other Assets Sale |
| | | | | |
| | | | | |

Exhibit A

**Error! Unknown document property name.**

**Exhibit B**

**Form Of Release Agreement**

[To Be Attached]

NB1:712649.20
Error! Unknown document property name.

Draft Under 40 KEIRP Release Agreement



# KEY EMPLOYEE INCENTIVE RETENTION PLAN RELEASE AGREEMENT

To:

From:      Brad Morrice                  Robert Lambert
          Chief Executive Officer        Senior Vice President
                                           Leadership & Organizational Development

Date:      May __, 2007

New Century views your role as critical to ongoing efforts to consummate the sale of its remaining assets and to assist in tasks necessary for liquidation. In acknowledgment of the contributions you have offered and will continue to offer by remaining a committed part of the organization, we are pleased to confirm that we have selected you as a participant in a Key Employee Incentive Retention Plan (the "Plan") designed to appropriately compensate you for your enthusiastic involvement in assisting the New Century to achieve the business goals identified in the Plan and/or to aid in the retention of our key employees. A copy of the Plan is attached hereto as Exhibit A.

In consideration of the provisions contained in the Plan, including but not limited to the parties' agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Employee by the Company or any of its subsidiaries, _____ ("Employee") and New Century Financial Corporation, including its affiliated entities (collectively, the "Company" or "New Century"), agree as follows:

1.      **Effective Date of Agreement.** This Agreement shall be effective as of the date signed by Employee (the "Effective Date").

2.      **Payments:**

         (a)      **Incentive Bonus.** Certain Employees may be entitled to an Incentive Bonus subject to the terms and conditions set forth in the Plan. Such terms include, but are not limited to, the following:

                 (i)      The amounts contributed (each a "Contribution") by the Company, if any, to make payments (the "Awards") under the Plan (the "Plan Pools") shall be based on the liquidation prices received for sales (the "Sales") of the Company's various assets as identified in the Plan.

                 (ii)      Awards will be paid within 50 days following the consummation of each respective sale; provided, however, that if any portion of the sales price for any of the asset classes is held back or subject to an escrow (each a "Holdback") by the purchaser thereof, a proportionate percentage of the contribution to the Plan Pool for that asset class will be held back by the Company and will be contributed to such Plan Pool, if at all, at such time as the purchaser delivers payment of the Holdback, with the related awards being paid to the Plan Participants within 50 days thereafter.

RLF1-3149461-1
NB1:715764 2
RLF1-3150889-1

**Draft Under 40 KEIRP Release Agreement**

(b) **Retention Bonus.** Certain Employees may be entitled to a Retention Bonus subject to the terms and conditions set forth in the Plan. Such terms include, but are not limited to, the following:

(i) Retention Bonuses, if any, for Plan Participants who are designated as Servicing Division employees on Exhibit A will be paid on or about June 15, 2007, and for all other Plan Participants will be paid on or about July 9, 2007, to all such Plan Participants (i) then actively employed in his or her then currently held position with the Company on a full-time basis in good standing (defined as not, before or after adoption of the Plan, having violated the Company's policies and procedures or otherwise engaged in conduct warranting disciplinary action, and performance and attendance at or above standards) on date of payout, or (ii) whose employment was involuntarily terminated other than "for cause."

3. **Eligibility.** The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the "Tier I Employees"), "Tier II Employees" (the "Tier II Employees"), "Tier III Employees" (the "Tier III Employees"), and "Tier IV Employees" (the "Tier IV Employees") (collectively, the "Plan Participants"), each attached as Exhibit A to the Plan. All Plan Participants will be eligible to participate in the Retention Pool (as defined in the Plan) and the Critical Retention Pool (as defined in the Plan) and receive Retention Bonuses (as defined in the Plan) and Critical Retention Bonuses (as defined in the Plan), however, only those employees with an amount set forth opposite their name in the column for an Incentive Pool (as defined below) will be eligible to participate in and receive Incentive Bonuses (as defined in the Plan) from that Incentive Pool. The entitlement to any bonus is subject to the other terms and conditions of the Plan as set forth herein.

4. **At-Will Employment, Full-Time Attention, and Good Standing.** This Agreement is in no manner intended to constitute a promise of employment for this or any other period of time, or to otherwise change Employee's at-will employment status. Employee shall continue to devote Employee's best efforts and full business time and attention to the performance of the services customarily incident to Employee's position, and to such other services as management may reasonably request. It is mandatory to the payment of any Incentive or Retention Bonus that the Employee is actively employed in Employee's current position in good standing, and not subject to discipline, on the date the payment is actually made. If Employee voluntarily terminates his or her employment or if Employee's employment is terminated by the Company for cause prior to payment of the Incentive or Retention Bonus, Employee's right to any Incentive or Retention Bonus payment also terminates. However, if the Company terminated Employee's employment prior to payment of the Incentive or Retention Bonus without cause, as a result of a position elimination or reduction in force, Employee remains eligible to receive the full applicable bonus payment.

5. **Jurisdiction.** The Company and Employee agree that the United States Bankruptcy Court for the District of Delaware shall have the exclusive jurisdiction to consider any issue related to the Employee's entitlement to, or calculation of, any payment to be made under the Plan.

6. **General Release.** In exchange for remittance of all applicable payments described in Paragraph 2 of this Agreement, less standard withholding and authorized deductions, and for other good and valuable consideration, receipt of which is hereby acknowledged, Employee hereby covenants not to sue and, to the fullest extent permitted by law, acknowledges full and complete satisfaction of and release and discharge of New Century Financial Corporation, its subsidiaries and affiliated corporations, past and present, and each of them, as well as its and their directors, officers, agents, attorneys, its Committee of Unsecured Creditors (including agents, attorneys and contractors of its Committee of Unsecured Creditors), insurers and employees, past and present, and each of them, together and each of them collectively referred to as "Releasees," from any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, by Employee arising out of or in any way connected with Employee's employment relationship with the Company, or any other transactions, occurrences, acts or omissions or any loss, damage or injury whatever, known or unknown, suspected or

**Draft Under 40 KEIRP Release Agreement**

unsuspected, resulting from any act or omission by or on the part of said Releasees, or any of them, committed or omitted prior to the effective date of this Release Agreement, including, without limiting the generality of the foregoing, but not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, or any other federal, state or local law, regulation or ordinance; provided, however, that such covenant not to sue and release does not apply to (1) any obligation created by or arising out of this Agreement for which receipt or satisfaction has not been acknowledged; (2) any right to indemnification that Employee may have pursuant to any articles of incorporation, certificate of incorporation, bylaws or similar governing document of any Releasee with respect to any loss, damages or expenses (including but not limited to attorneys' fees) that Employee may in the future incur with respect to Employee's service as an employee, officer or director or in any other capacity with any Releasee; (3) with respect to any rights that Employee may have to insurance coverage for such losses, damages or expenses under any directors and officers liability insurance policy of any Releasee; (4) Employee's rights to continued medical coverage under COBRA; (5) any rights to payment of benefits that Employee may have under a qualified or nonqualified retirement plan sponsored or maintained by any Releasee (including, without limitation, any 401(k), deferred compensation, and supplemental retirement benefits); (6) any wages for all legitimately worked and earned time, which has been documented and approved, which has not been paid (including, without limitation, payment for accrued, unused vacation hours), but not including any notice period covered by WARN or any applicable similar state statute; and (7) Employee's rights to benefits or coverage under any employee welfare benefit plan (as that term is defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended).

It is a further condition of the consideration hereof and Employee's intention that in executing this General Release Agreement that it should be effective as a bar to each and every claim, demand and cause of action stated above. In furtherance of this intention, Employee hereby expressly waives any and all rights and benefits conferred upon Employee by the provisions of SECTION 1542 OF THE CALIFORNIA CIVIL CODE and expressly consents that this General Release Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected claims, demands and causes of action, if any, as well as those relating to any other claims, demands and causes of action referred to above. SECTION 1542 provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

7. **Agreement to Cooperate.** Employee agrees to respond to all inquiries of New Century about any matters concerning New Century, its affiliates or their affairs that occurred or arose during the period of Employee's employment by New Century, and Employee further agrees to cooperate fully with New Century in investigating, prosecuting and defending any charges, claims, demands, liabilities, causes of action, lawsuits or other proceedings by, against or involving New Century and/or its affiliates relating to the period during which Employee was employed by New Century or relating to matters of which Employee has or should have knowledge or information.

8. **Miscellaneous.** This Agreement is entered into, and shall be governed by and construed and interpreted in accordance with the laws of the State of California. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or application and to this end the provisions of this Agreement are declared to be severable. Any waiver of or breach of any of the terms of this Agreement shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision. Each party is entering

Page 3 of 4

Draft Under 40 KEIRP Release Agreement

into this Agreement voluntarily, without duress, with the consultation and advice of its legal counsel (or upon a voluntary waiver of the right to such consultation and advice), and with full understanding of its terms.

9. **Entire Agreement and Amendment.** The parties acknowledge and agree that this Agreement reflects their entire agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries. This Agreement constitutes the complete, final and exclusive embodiment of the parties' entire agreement regarding these issues and supersedes and renders null and void all prior agreements between Employee and the Company with regards to these issues. This Agreement may not be amended or modified except by a written instrument signed by both parties.

10. **Facsimile Acceptance.** A signed facsimile transmission of this Agreement shall have the same force and effect as delivery of a signed hard-copy original of the Agreement.

*Notwithstanding any other provision of this Agreement, by signing below, you acknowledge and agree that nothing contained in this Agreement is intended to be, or shall be construed to constitute, an assurance of continued employment for a definite period of time or until the occurrence of cause to terminate employment. Subject only to the provisions relating to payment or the provision of other consideration upon any contingency or condition expressly stated herein, the Company may terminate your employment with or without cause at any time or for any lawful reason. You also acknowledge that the Company has not made, nor herein makes, any representation about the tax consequences of any payments or benefits offered by the Company to you pursuant to this Agreement*

By signing this Agreement, Employee acknowledges and agrees that Employee has read the foregoing terms regarding the Employee's participation in the attached Key Employee Incentive Retention Plan Agreement and understands and acknowledges the significance of the terms in this Agreement and executes this Agreement voluntarily and with full understanding of its consequences.

If the above terms are acceptable, please signify your agreement and acceptance by signing and dating this letter and returning a signed copy to New Century.

**NEW CENTURY FINANCIAL CORPORATION**

**ACCEPTED AND AGREED:**

By: _____

Signed: _____

Its: _____

Name: _____

Date: May____ , 2007 _____

RLF1-3149461-1
NB1:715764 2
RLF1-3150889-1

Draft 40+ KEIRP Release Agreement



## KEY EMPLOYEE INCENTIVE RETENTION PLAN RELEASE AGREEMENT

To:

| From: | Brad Morrice | Robert Lambert |
|---|---|---|
| | Chief Executive Officer | Senior Vice President |
| | | Leadership & Organizational Development |

Date:     May __, 2007

---

New Century views your role as critical to ongoing efforts to consummate the sale of its remaining assets and to assist in tasks necessary for liquidation. In acknowledgment of the contributions you have offered and will continue to offer by remaining a committed part of the organization, we are pleased to confirm that we have selected you as a participant in a Key Employee Incentive Retention Plan (the "Plan") designed to appropriately compensate you for your enthusiastic involvement in assisting the New Century to achieve the business goals identified in the Plan and/or to aid in the retention of our key employees. A copy of the Plan is attached hereto as Exhibit A.

In consideration of the provisions contained in the Plan, including but not limited to the parties' agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Employee by the Company or any of its subsidiaries, _____ ("Employee") and New Century Financial Corporation, including its affiliated entities (collectively, the "Company" or "New Century"), agree as follows:

1.    **Effective Date of Agreement.** This Agreement shall be effective as of the date signed by Employee (the "Effective Date").

2.    **Payments:**

    (a)    **Incentive Bonus.** Certain Employees may be entitled to an Incentive Bonus subject to the terms and conditions set forth in the Plan. Such terms include, but are not limited to, the following:

        (i)    The amounts contributed (each a "Contribution") by the Company, if any, to make payments (the "Awards") under the Plan (the "Plan Pools") shall be based on the liquidation prices received for sales (the "Sales") of the Company's various assets as identified in the Plan.

        (ii)    Awards will be paid within 50 days following the consummation of each respective sale; provided, however, that if any portion of the sales price for any of the asset classes is held back or subject to an escrow (each a "Holdback") by the purchaser thereof, a proportionate percentage of the contribution to the Plan Pool for that asset class will be held back by the Company and will be contributed to such Plan Pool, if at all, at such time as the purchaser delivers payment of the Holdback, with the related awards being paid to the Plan Participants within 50 days thereafter.

Page 1 of 5

    (b)    **Retention Bonus.** Certain Employees may be entitled to a Retention Bonus subject to the terms and conditions set forth in the Plan. Such terms include, but are not limited to, the following:

    (i)    Retention Bonuses, if any, for Plan Participants who are designated as Servicing Division employees on Exhibit A will be paid on or about June 15, 2007, and for all other Plan Participants will be paid on or about July 9, 2007, to all such Plan Participants (i) then actively employed in his or her then currently held position with the Company on a full-time basis in good standing (defined as not, before or after adoption of the Plan, having violated the Company's policies and procedures or otherwise engaged in conduct warranting disciplinary action, and performance and attendance at or above standards) on date of payout or (ii) whose employment was involuntarily terminated other than "for cause."

3.    **Eligibility.** The Plan covers the employees of the Company and its subsidiaries listed on the tables titled "Tier I Employees" (the "Tier I Employees"), "Tier II Employees" (the "Tier II Employees"), "Tier III Employees" (the "Tier III Employees"), and "Tier IV Employees" (the "Tier IV Employees") (collectively, the "Plan Participants"), each attached as Exhibit A to the Plan. All Plan Participants will be eligible to participate in the Retention Pool (as defined in the Plan) and the Critical Retention Pool (as defined in the Plan) and receive Retention Bonuses (as defined in the Plan) and Critical Retention Bonuses (as defined in the Plan), however, only those employees with an amount set forth opposite their name in the column for an Incentive Pool (as defined below) will be eligible to participate in and receive Incentive Bonuses (as defined in the Plan) from that Incentive Pool. The entitlement to any bonus is subject to the other terms and conditions of the Plan as set forth herein.

4.    **At-Will Employment, Full-Time Attention, and Good Standing.** This Agreement is in no manner intended to constitute a promise of employment for this or any other period of time, or to otherwise change Employee's at-will employment status. Employee shall continue to devote Employee's best efforts and full business time and attention to the performance of the services customarily incident to Employee's position, and to such other services as management may reasonably request. It is mandatory to the payment of any Incentive or Retention Bonus that the Employee is actively employed in Employee's current position in good standing, and not subject to discipline, on the date the payment is actually made. If Employee voluntarily terminates his or her employment or if Employee's employment is terminated by the Company for cause prior to payment of the Incentive or Retention Bonus, Employee's right to any Incentive or Retention Bonus payment also terminates. However, if the Company terminated Employee's employment prior to payment of the Incentive or Retention Bonus without cause, as a result of a position elimination or reduction in force, Employee remains eligible to receive the full applicable bonus payment.

5.    **Jurisdiction.** The Company and Employee agree that the United States Bankruptcy Court for the District of Delaware shall have the exclusive jurisdiction to consider any issue related to the Employee's entitlement to, or calculation of, any payment to be made under the Plan.

6.    **General Release.** In exchange for remittance of all applicable payments described in Paragraph 2 of this Agreement, less standard withholding and authorized deductions, and for other good and valuable consideration, receipt of which is hereby acknowledged, Employee hereby covenants not to sue and, to the fullest extent permitted by law, acknowledges full and complete satisfaction of and release and discharge of New Century Financial Corporation, its subsidiaries and affiliated corporations, past and present, and each of them, as well as its and their directors, officers, agents, attorneys, its Official Committee of Unsecured Creditors (including agents, attorneys and contractors of its Committee of Unsecured Creditors), insurers and employees, past and present, and each of them, together and each of them collectively referred to as "Releasees," from any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, by Employee arising out of or in any way connected with Employee's employment relationship with the Company, or any other transactions, occurrences, acts or omissions or any loss, damage or injury whatever, known or unknown,

Page 2 of 5

**Draft 40+ KEIRP Release Agreement**

suspected or unsuspected, resulting from any act or omission by or on the part of said Releasees, or any of them, committed or omitted prior to the effective date of this Release Agreement, including, without limiting the generality of the foregoing, but not limited to, any claim under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, or any other federal, state or local law, regulation or ordinance; provided, however, that such covenant not to sue and release does not apply to (1) any obligation created by or arising out of this Agreement for which receipt or satisfaction has not been acknowledged; (2) any right to indemnification that Employee may have pursuant to any articles of incorporation, certificate of incorporation, bylaws or similar governing document of any Releasee with respect to any loss, damages or expenses (including but not limited to attorneys' fees) that Employee may in the future incur with respect to Employee's service as an employee, officer or director or in any other capacity with any Releasee; (3) with respect to any rights that Employee may have to insurance coverage for such losses, damages or expenses under any directors and officers liability insurance policy of any Releasee; (4) Employee's rights to continued medical coverage under COBRA; (5) any rights to payment of benefits that Employee may have under a qualified or nonqualified retirement plan sponsored or maintained by any Releasee (including, without limitation, any 401(k), deferred compensation, and supplemental retirement benefits); (6) any wages for all legitimately worked and earned time, which has been documented and approved, which has not been paid (including, without limitation, payment for accrued, unused vacation hours), but not including any notice period covered by WARN or any applicable similar state statute; and (7) Employee's rights to benefits or coverage under any employee welfare benefit plan (as that term is defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended).

It is a further condition of the consideration hereof and Employee's intention that in executing this General Release Agreement that it should be effective as a bar to each and every claim, demand and cause of action stated above. In furtherance of this intention, Employee hereby expressly waives any and all rights and benefits conferred upon Employee by the provisions of SECTION 1542 OF THE CALIFORNIA CIVIL CODE and expressly consents that this General Release Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected claims, demands and causes of action, if any, as well as those relating to any other claims, demands and causes of action referred to above. SECTION 1542 provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

7.  Employee expressly acknowledges and agrees that, by entering into this Agreement, Employee is waiving any and all rights or claims that Employee may have arising under the Age Discrimination in Employment Act of 1967, as amended, which have arisen on or before the date of execution of this Agreement. Employee further expressly acknowledges and agrees that:

    (a)  In return for this Agreement, Employee will receive compensation beyond that which Employee was already entitled to receive before entering into this Agreement;

    (b)  Employee was orally advised and is hereby advised in writing by this Agreement to consult with an attorney before signing this Agreement;

    (c)  Employee was given a copy of this Agreement on May __, 2007, and informed that Employee had 21 days within which to consider the Agreement; and

    (d)  Employee was informed that Employee has seven (7) days following the date of execution of this Agreement in which to revoke this Agreement in entirety. Any revocation of the

Page 3 of 5

Draft 40+ KEIRP Release Agreement

Agreement must be in writing and hand delivered during the revocation period. This Agreement will become effective and enforceable seven (7) days following execution by Employee, unless it is revoked during the seven-day period following Employee's execution.

8.     **Agreement to Cooperate.** Employee agrees to respond to all inquiries of New Century about any matters concerning New Century, its affiliates or their affairs that occurred or arose during the period of Employee's employment by New Century, and Employee further agrees to cooperate fully with New Century in investigating, prosecuting and defending any charges, claims, demands, liabilities, causes of action, lawsuits or other proceedings by, against or involving New Century and/or its affiliates relating to the period during which Employee was employed by New Century or relating to matters of which Employee has or should have knowledge or information.

9.     **Miscellaneous.** This Agreement is entered into, and shall be governed by and construed and interpreted in accordance with the laws of the State of California. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect other provisions or applications of the Agreement which can be given effect without the invalid provisions or application and to this end the provisions of this Agreement are declared to be severable. Any waiver of or breach of any of the terms of this Agreement shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision. Each party is entering into this Agreement voluntarily, without duress, with the consultation and advice of its legal counsel (or upon a voluntary waiver of the right to such consultation and advice), and with full understanding of its terms.

10.    **Entire Agreement and Amendment.** The parties acknowledge and agree that this Agreement reflects their entire agreement that all payments under the Plan shall be in lieu of any other performance bonus or retention compensation under any other plan, program, agreement, applicable law, or policy otherwise applicable to the Plan Participants by the Company or any of its subsidiaries. This Agreement constitutes the complete, final and exclusive embodiment of the parties' entire agreement regarding these issues and supersedes and renders null and void all prior agreements between Employee and the Company with regards to these issues. This Agreement may not be amended or modified except by a written instrument signed by both parties.

11.    **Facsimile Acceptance.** A signed facsimile transmission of this Agreement shall have the same force and effect as delivery of a signed hard-copy original of the Agreement.

*Notwithstanding any other provision of this Agreement, by signing below, you acknowledge and agree that nothing contained in this Agreement is intended to be, or shall be construed to constitute, an assurance of continued employment for a definite period of time or until the occurrence of cause to terminate employment. Subject only to the provisions relating to payment or the provision of other consideration upon any contingency or condition expressly stated herein, the Company may terminate your employment with or without cause at any time or for any lawful reason. You also acknowledge that the Company has not made, nor herein makes, any representation about the tax consequences of any payments or benefits offered by the Company to you pursuant to this Agreement.*

Page 4 of 5

**Draft 40+ KEIRP Release Agreement**

By signing this Agreement, Employee acknowledges and agrees that Employee has read the foregoing terms regarding the Employee's participation in the attached Key Employee Incentive Retention Plan Agreement and understands and acknowledges the significance of the terms in this Agreement and executes this Agreement voluntarily and with full understanding of its consequences.

If the above terms are acceptable, please signify your agreement and acceptance by signing and dating this letter and returning a signed copy to New Century.

NEW CENTURY FINANCIAL                ACCEPTED AND AGREED:
CORPORATION

By: _____          Signed: _____

Its: _____         Name: _____

                                    Date: May ___, 2007 _____

### ACKNOWLEDGMENT AND WAIVER

I hereby acknowledge that I was given 21 days to consider the foregoing Key Employee Incentive

Retention Plan Agreement and voluntarily chose to sign the Agreement prior to the expiration of the 21-day

period.

I declare under penalty of perjury under the laws of the State of California, and the United States of

America that the foregoing is true and correct.

EXECUTED this _____ day of _____ 2007, at _____, California.
                                        [month]                              [city]

                    EMPLOYEE

                    _____
                    [Name]

RLF1-3149458-1
NB1:715765 2
RLF1-3150891-1

## Exhibit C

## Target Price

| Other Assets Sale Target Price | = | $ |
|---|---|---|

Exhibit C

**Error! Unknown document property name.**