MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Todd M. Goren
Samantha Martin

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------
)
In re:                                                )    Case No. 12-12020 (MG)
)
RESIDENTIAL CAPITAL, LLC, et al.,    )    Chapter 11
)
                                    Debtors.    )    Joint Administration
)
-----------------------------------------------------------------

### DECLARATION OF JILL HORNER IN SUPPORT OF
### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
### TO PERMIT THE DEBTORS TO CONTINUE USING CASH COLLATERAL

I, Jill Horner, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

I serve as Chief Finance Executive at Residential Capital, LLC ("ResCap"), one of the

debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the

"Debtors").  I have been employed by ResCap and/or its affiliates for thirteen (13) years, and I

have held this position since February 2013.  In my role as Chief Finance Executive at ResCap, I

am responsible for, among other things, operational accounting, financial forecasting and

analytics, accounts payable processing, tax and treasury matters, including cash forecasting and

cash management.  In addition, I manage the various shared services and transition services

agreements among Ocwen Loan Servicing, LLC ("Ocwen"), Walter Investment Management,

Corp. ("Walter"), Ally Financial, Inc. ("AFI"), and ResCap.  I am authorized to submit this declaration (the "Declaration") in support of the *Debtors' Motion For Entry of Interim and Final Orders to Permit the Debtors to Continue Using Cash Collateral*, filed on April 8, 2013 [Docket No. 3374] (the "Motion").[1]

Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge or information supplied or verified by personnel in departments within the Debtors' various business units.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## Overview of Expense Allocation

1.     In connection with preparing the Motion, the Debtors' advisors, Centerview Partners LLC, FTI Consulting, Inc., and Morrison & Foerster LLP, requested that I conduct a review of the Debtors' ongoing wind down expenses to determine which costs relate to (i) asset disposition and claims recovery activities[2]  ("Asset Monetization," and the associated costs, the "Asset Monetization Costs"), (ii) the wind down of the origination pipeline (the "Origination Pipeline," and the associated costs, the "Origination Pipeline Costs"), (iii) executive trustee services provided by certain of the Debtors[3] ("ETS," and the associated costs, the "ETS Costs" and collectively with the Asset Monetization Costs and the Origination Pipeline Costs,

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

[2]     This reference to claims recovery activities refers to matters where the Debtors seek to recover from correspondents that sold loans to the Debtors, which the Debtors were subsequently required to buy back under one of their servicing agreements.  The recovery on these activities is allocated based on which Lender has the lien on applicable loan.

[3]     As part of the Debtors' master servicing, Executive Trustee Services, LLC, ETS of Washington, Inc. and ETS of Virginia, Inc. act as foreclosure trustees with respect to certain loans in states that allow for non-judicial foreclosures—specifically, California, Arizona, Texas, Washington, and until recently, Nevada and Virginia. These entities also provide recovery operations, which consist of debt collection in circumstances where the servicer elects not to pursue foreclosure.

ny-1084826

the "Cash Collateral Costs"), (iv) compliance with the Consent Order,[4] and (v) claims and

general wind down activities.  As set forth in the Motion, the Debtors request the authority to pay

certain of these costs with Cash Collateral.[5]

        2.      In undertaking this analysis, I began with the base three year plan (the

"Base Three Year Plan"), which is a plan that sets forth all anticipated ongoing estate wind down

costs beginning from the closing of the Sales through January 2016.  Each explanation of costs

and the amounts referenced herein relates to the costs identified in the Base Three Year Plan for

the period beginning May 1, 2013 through January 2016 (the "Allocation Period").[6]

        3.      The costs are divided into (i) direct asset-related costs (the "Direct

Costs"), and (ii) operating expenses, which include costs in each of the following expense

categories:

- Compensation and Benefits
- Facilities (Occupancy)
- Insurance
- Technology
- Document Storage and Destruction
- Ordinary Course Professionals
- Non-Income Taxes
- Transition Services Agreements
- General AP and Other
- Restructuring Professionals

---

[4]    The proposed expense allocation methodology assumes that there will be no costs associated with the Debtors' compliance with (i) the Consent Order entered into by Debtors Residential Capital, LLC and GMAC Mortgage, LLC, non-debtor affiliates AFI and Ally Bank, the Federal Reserve Board and the Federal Deposit Insurance Company on April 13, 2011 (the "Consent Order) after April 30, 2013.  To the extent the Debtors are required to comply with the Consent Order beyond April 30, 2013 or have not otherwise settled the matter, the Debtors have reserved the right to seek the use of Cash Collateral to fund a portion of those costs.

[5]    For purposes of this Declaration, we have provided rounded numbers as we deemed appropriate.

[6]    For the period beginning from the closing of the Sales through April 30, 2013, the Debtors have used Cash Collateral consistent with the expense allocation methodology that was previously approved by the AFI/JSB Cash Collateral Final Order.  The numbers in this Declaration relate to the Allocation Period and reflect the proposed new expense allocation methodology.

4.      Then, I reviewed the costs in each of these expense categories to determine how they should be allocated among the categories identified in paragraph 1.[7]  To the extent the costs are determined to be Asset Monetization Costs, Origination Pipeline Costs, or ETS Costs, the Motion proposes that such costs will be paid for using Cash Collateral.

5.      To determine the appropriate allocation of costs, I undertook the following analysis for each group.

**Direct Costs Related to Asset Monetization, the Origination Pipeline, and ETS[8]**

6.      I commenced the expense allocation analysis by allocating the following Direct Costs under the Base Three Year Plan to Asset Monetization Costs, Origination Pipeline Costs, and ETS Costs, respectively:

- Asset Monetization Costs: I identified the direct costs related to (i) the payment of servicing and subservicing fees for the remaining portfolio assets (primarily the loans insured by the Federal Housing Administration or guaranteed by the U.S. Department of Veterans Affairs), (ii) the payment of subservicing fees that relate to servicing agreements that were not transferred in connection with the Sales, (iii) custodial fees related to the custody and maintenance of certain collateral documents and related services, and (iv) expenses related to the preservation of the Debtors' real estate owned property.

---

[7]     A copy of the allocation analysis for the ongoing estate wind down costs during the Allocation Period is annexed hereto as Exhibit 1.

[8]     In addition to the expenses set forth below, as discussed in the Motion, the interest expense for AFI LOC and AFI Senior Secured Credit Facility will also be paid for using Cash Collateral.

ny-1084826

- <u>Origination Pipeline Costs</u>:  I identified the direct costs of the wind down of the origination pipeline, including, among others, loan processing fees, including title, document imaging, and document custody fees.

- <u>ETS Costs</u>:  I identified the direct costs of the Debtors' ETS activities, including, among others, third party vendor expenses (i.e., mortgage processing and foreclosure records access fees) needed to wind down the foreclosure pipeline of ETS.

7.    After reviewing the Direct Costs, I determined that (i) the direct Asset Monetization Costs related to the collateral securing the remaining facilities are approximately $19.1 million during the Allocation Period, (ii) the direct Origination Pipeline Costs are approximately $300,000 during the Allocation Period, and (iii) the direct ETS Costs are approximately $100,000 during the Allocation Period.  Thus, the total Direct Costs during the Allocation Period for which the Debtors propose to use Cash Collateral are approximately $19.5 million.

**<u>Operating Expenses Related to Asset Monetization, the Origination Pipeline, and ETS</u>**

8.    In addition to the Direct Costs related to Cash Collateral Costs, there are operating expenses related to each of these activities, as described below.

<u>Compensation and Benefits</u>:

9.    For this analysis, I identified the costs of the compensation (base salary, incentives and severance) and benefits of the employees (including employees in support functions, such as finance) whose work solely or primarily supports Asset Monetization, Origination Pipeline, and ETS activities (collectively, the "<u>Primary Employees</u>" and the costs related thereto, the "<u>Primary Employee Costs</u>") during the Allocation Period (as set forth in the Base Three Year Plan).  Compensation and benefit costs were built by person and take into

consideration the anticipated length of employment for each person.  Based on this analysis, I

identified Primary Employee Costs of approximately $11.1 million related to Asset

Monetization, approximately $1.3 million related to the Origination Pipeline, and approximately

$300,000 related to ETS.

10.      In addition to the Primary Employee Costs, each of these functions also

requires the skills and work product of other employees in the support areas, such as legal,

accounting, treasury, administration and human resources, and technology, as well as executive

management, whose work benefits to various processes related to the Debtors' ongoing business

operations (collectively, the "Support Employees," and the costs related thereto, the "Support

Employee Costs").[9]  I divided the Support Employee Costs into two parts: 50% of the costs

relate to the claims and general wind down activities, and 50% of the costs relate to Cash

Collateral Costs and consent order compliance.  With respect to the latter 50%, I analyzed the

Debtors' operating costs by function as determined by this analysis, and as a result, I allocated

approximately 40% of the Support Employee Costs to Cash Collateral Costs.  Specifically, I

allocated approximately $7.7 million to Asset Monetization Costs, approximately $700,000 to

Origination Pipeline Costs, and approximately $100,000 to ETS Costs.

---

[9] As described above, based on my assessment of each individual and whether their work primarily supports the
Debtors' asset disposition and monetization activities, claims recovery matters, the wind down of the
origination platform, and the Debtors' ETS activities, I determined that certain employees in these corporate
functions are Primary Employees, and as a result, I allocated the compensation and benefits of certain of
employees in these support areas to Primary Employee Costs.

<u>Facilities</u>:

11.     For the facilities analysis, I reviewed the gross facility costs set forth in the Base Three Year Plan by location.[10]  Specifically, I focused on the six primary locations that are included in the estates' Base Three Year Plan.

- <u>Chevy Chase, Maryland</u>: I allocated the entire cost of the Chevy Chase lease for the Allocation Period (approximately $100,000) to the Asset Monetization Costs because that facility is 100% dedicated to Asset Monetization activities.

- <u>Bloomington, Minnesota</u>: Of the total Bloomington lease costs, I calculated the cost of the facility on a per employee basis and allocated the costs associated with 11 Primary Employees (approximately $100,000) for the Allocation Period to the Asset Monetization Costs.

- <u>Fort Washington, Pennsylvania (1100 Virginia Drive)</u>:  I calculated the cost of the facility on a per employee basis and allocated the Fort Washington lease costs as follows: (i) the expenses related to 19 Primary Employees who perform Asset Monetization functions and are anticipated to remain in the space for a period of 22 months (approximately $200,000) were allocated to Asset Monetization Costs, (ii) the expenses related to 45 Primary Employees (as of the beginning of the Allocation Period) who perform Origination Pipeline functions and are anticipated to remain in the space for an average period of 2 months (approximately $35,000) were

---

[10] The Base Three Year Plan takes into account anticipated reduction in facilities footprints and a corresponding reduction in rent over time during the Allocation Period.

allocated to Origination Pipeline Costs, and (iii) the expenses related to 8

Primary Employees who perform ETS functions and are anticipated to

remain in the space for an average period of 5 months (approximately

$20,000) were allocated to ETS Costs.

- Fort Washington, Pennsylvania (1140 Virginia Drive):  The employees at

  this facility primarily work on the file foreclosure review, and as a result, I

  did not allocate any of the costs of this lease to the Asset Monetization,

  Origination Pipeline, or ETS Costs.

- Burbank, California:  Based on discussions with the Debtors' facilities

  team, I determined that the Debtors' Burbank facility net occupancy costs

  relate solely to ETS, and as a result, I allocated the expenses related to the

  Burbank lease (approximately $25,000) for the Allocation Period to the

  ETS Costs.

- Waterloo, Iowa:  The employees at this facility primarily work on the file

  foreclosure review, and as a result, I did not allocate any of the costs of

  this lease to the Asset Monetization, Origination Pipeline, or ETS Costs.

12.     In total, with respect to facilities costs, I allocated approximately $400,000

to Asset Monetization Costs, approximately $35,000 to Origination Pipeline Costs, and

approximately $45,000 to ETS Costs.

Insurance:

13.     I did not allocate any insurance costs to the Asset Monetization Costs,

Origination Pipeline Costs, or ETS Costs based on the view that there would be no material

8

change in the cost of the policies due to the inclusion of the Asset Monetization, Origination

Pipeline, and ETS activities within the estates.

Technology:

14.     Generally, the Debtors' technology costs include costs related to third

party hosts, hard assets (i.e., computers, printers), electronic data storage, communications

devices for employees and end user computing devices.  For this analysis, I allocated the direct

costs associated with the Primary Employees' communications devices and end user computing

devices for the Allocation Period as follows: (i) approximately $40,000 to the Asset

Monetization Costs, (ii) approximately $10,000 to the Origination Pipeline Costs, and

(iii) approximately $10,000 to the ETS Costs.

Document Storage and Destruction:

15.     The Debtors' overall cost of document storage and destruction is

approximately $42.5 million during the Allocation Period.  The vast majority of these costs relate

to (i) inactive loan files, (ii) files under legal hold, and (iii) loan records that the Debtors hold for

the benefit of Ocwen and Walter (which costs are being reimbursed by such parties).  With

respect to the remaining files, I determined, based on the average storage fees and the average

loan count associated with the loans remaining in the Debtors' estates, that approximately

$100,000 should be allocated to the Asset Monetization Costs over the Allocation Period.

Ordinary Course Professionals:

16.     The majority of the ordinary course professionals assist the Debtors with

respect to wind down/claims issues.  There are, however, ordinary course professionals that

assist the Debtors with the legal work related to the claims recovery work (i.e., pursuing claims

against correspondent lenders) and other fees related to asset dispositions.  Accordingly, I

identified approximately $3.4 million of ordinary course professional fees that should be allocated to the Asset Monetization Costs.

Taxes:

17.     The Debtors anticipate paying approximately $450,000 in non-income taxes, sales and use taxes, privilege taxes, and minimum fee and franchise taxes during the Allocation Period.  I determined that these taxes are unrelated to Asset Monetization, Origination Pipeline, and ETS activities, and thus, I did not allocate any taxes to the Cash Collateral Costs.

Transition Services Agreements:

18.     I evaluated each of the transition services agreements among Ocwen, Walter, AFI, and the Debtors (collectively, the "Transition Services Agreements") and reviewed which costs are (i) due and payable to the Debtors by any of Ocwen, Walter and AFI, and (ii) due and payable by the Debtors to Ocwen, Walter, or AFI.  Then, I evaluated whether each of these items related to Asset Monetization, Origination Pipeline, or ETS activities.  To the extent a cost or reimbursement is directly related to one of these activities, the full cost or reimbursement was allocated to the Asset Monetization Costs, Origination Pipeline Costs, or ETS Costs, as applicable.  To the extent a cost or reimbursement is only tangentially related to one of these activities, I used my best judgment based on my knowledge of the work being completed under each statement of work to determine an appropriate percentage of the cost or reimbursement to be allocated to the Asset Monetization Costs, Origination Pipeline Costs, or ETS Costs, as applicable.  In total, I identified approximately $2.7 million, $1.5 million, and $10,000 of the costs related to the Transition Services Agreements for the Allocation Period, which should be allocated to Asset Monetization Costs, Origination Pipeline Costs, and ETS Costs, respectively.

ny-1084826

<u>General AP and Other</u>:

19.      I reviewed the general accounts payable associated with each of the Asset Monetization, Origination Pipeline, and ETS activities for the Allocation Period as set forth in the Base Three Year Plan, including, among other things, costs related to office supplies, equipment, printing, postage, and shipping, as well as independent director fees.  I determined that approximately $700,000 should be allocated to the Asset Monetization Costs, approximately $40,000 should be allocated to the Origination Pipeline Costs, and approximately $40,000 should be allocated to the ETS Costs.

<u>Restructuring Professionals' Fees</u>

20.      For restructuring professionals' fees, I asked each of the Debtors' core restructuring professionals, Morrison & Foerster LLP, FTI Consulting, Inc. and Centerview Partners LLC, to estimate the portion of their fees that they anticipate would relate to Asset Monetization functions, which I allocated to the Asset Monetization Costs.   No professionals' fees were allocated to Origination Pipeline Costs or ETS Costs.  In addition, none of the other estate professionals' fees (including none of the Creditors' Committee's professionals' fees) will allocated to any of the Cash Collateral Costs.  Based on these estimates, in total, approximately $5.3 million in professionals' fees are anticipated to paid for using Cash Collateral.

**Conclusion**

21.      In sum, based on the foregoing analysis, there is a total of approximately $336.7 million in operating expenses projected through the Allocation Period.  I believe that the Asset Monetization Costs for the Allocation Period are approximately $31.4 million the Origination Pipeline Costs for the Allocation Period are approximately $3.6 million, and the ETS Costs for the Allocation Period are approximately $500,000, resulting in total operating costs of

approximately $35.5 million, which the Debtors' propose to use Cash Collateral to satisfy.

When combined with the Direct Costs of $19.5 million, there is a total of approximately

$55.0 million in Cash Collateral Costs (excluding interest to AFI and the Carve Out).  However,

only approximately $30.4 million[11] of this amount will be paid using the Cash Collateral related

to the AFI Senior Secured Credit Facility and the Junior Secured Notes, because the AFI LOC

(which is substantially oversecured), also has remaining collateral and thus the Cash Collateral

related to the AFI LOC, will be used to bear the remaining portion of the Cash Collateral Costs.

I declare, under penalty of perjury, that the foregoing is true and correct, to the best of my

knowledge.

Dated: April 9, 2013
        New York, New York

                                                    */s/ Jill Horner*
                                                    Jill Horner

---

[11]    This estimate is based on the Debtors' February 28, 2013 balances.  The actual allocation by facility will be
        adjusted over time as assets change.

12

**Exhibit 1**

**Residential Capital, LLC**
**Horner Declaration - Exhibit 1**
**Expense Allocation Analysis**

| ($ millions) | Asset Monetization Costs | Origination Pipeline Costs | ETS Costs | Claims & General Wind-Down Costs | Total (1) |
|---|---|---|---|---|---|
| 1 Direct Costs | $ 19.1 | $ 0.3 | $ 0.1 | $ - | $ 19.5 |
| 2 Compensation and Benefits | 18.8 | 2.0 | 0.4 | 26.8 | 48.0 |
| 3 Facilities (Occupancy) | 0.4 | 0.0 | 0.0 | 3.1 | 3.6 |
| 4 Insurance | - | - | - | 13.7 | 13.7 |
| 5 Technology | 0.0 | 0.0 | 0.0 | 12.1 | 12.1 |
| 6 Document Storage and Destruction | 0.1 | - | - | 42.5 | 42.5 |
| 7 Ordinary Course Professionals | 3.4 | - | - | 68.2 | 71.6 |
| 8 Non-Income Taxes | - | - | - | 0.4 | 0.4 |
| 9 Transition Services Agreements | 2.7 | 1.5 | 0.0 | 13.9 | 18.1 |
| 10 General AP and Other | 0.7 | 0.0 | 0.0 | 19.5 | 20.3 |
| 11 Restructuring Professional Fees (2) | 5.3 | - | - | 101.0 | 106.3 |
| 12 Interest (3) | - | - | - | 8.8 | 8.8 |
| 13 Total | **50.5** | **3.9** | **0.6** | **309.9** | **364.9** |

**Notes:**

(1) The amounts represent months 4 to 36 of the Base Three Year Plan and exclude direct costs related to compliance with the Consent Order (e.g. file foreclosure review costs, remediation payments, etc.) as well as certain employee compensation and usage costs for employees directly working to support the file foreclosure review work.
(2) Excludes the professional fees for the Junior Secured Bonds.
(3) The interest expense for Ally LOC and Ally Senior Secured Credit Facility will be paid for using Ally LOC and Ally Senior Secured Credit Facility Cash Collateral.