**Hearing Date and Time: April 30, 2013 at 10:00 am (prevailing Eastern Time)**
**Objection Deadline: April 22, 2013 at 4:00 pm (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Barry H. Berke
Jeffrey S. Trachtman
Jennifer Rochon
Norman C. Simon
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
keckstein@kramerlevin.com

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| Residential Capital, LLC, *et al.*, | : Case No. 12-12020 (MG) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

---

### NOTICE OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER AUTHORIZING THE COMMITTEE TO PROSECUTE AND SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On April 11, 2013, the Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession filed the attached Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates (the "**Motion**").

2.     A hearing (the "**Hearing**") to consider the Motion shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 501 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004, on **April 30, 2013 at 10:00 am** (prevailing Eastern Time).

3.     Any objections to the Motion must be made in writing, filed with the Court (with a copy to Chambers) and served in accordance with the Order Under Bankruptcy Code Sections

102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 and Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management and Administrative Procedures [Docket No. 141] (the "**Case Management Order**"), and served upon the Special Service List, as that term is defined in the Case Management Order, so as to be actually received no later than **April 22, 2013 at 4:00 pm** (prevailing Eastern Time).

4.    If no objections to the Motion are timely filed and served on or before the Objection Deadline, the Committee may submit to the Bankruptcy Court an order substantially in the form of the proposed order attached to the Motion as **Exhibit A** (the "**Proposed Order**").

5.    A Copy of the Motion can be obtained or viewed for a fee via PACER at www.pacer.gov or (without charge) on the Debtors' restructuring website at www.kccllc.net/rescap.

Dated:    April 11, 2013
          New York, New York

/s/  Kenneth H. Eckstein
Kenneth H. Eckstein
Barry H. Berke
Jeffrey S. Trachtman
Jennifer Rochon
Norman C. Simon
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
keckstein@kramerlevin.com

*Counsel for the Official Committee*
*of Unsecured Creditors*

<strong>Hearing Date and Time: April 30, 2013 at 10:00 a.m. (prevailing Eastern Time)<br>
Objection Deadline: April 22, 2013 at 4:00 p.m. (prevailing Eastern Time)</strong>

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Barry H. Berke
Jeffrey S. Trachtman
Jennifer L. Rochon
Norman C. Simon
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Electronic mail: keckstein@kramerlevin.com

*Counsel for The Official Committee
of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, *et al.*, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

<strong>MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR
ENTRY OF AN ORDER AUTHORIZING THE COMMITTEE TO PROSECUTE AND
SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES</strong>

## TABLE OF CONTENTS

                                                                                              **Page**

PRELIMINARY STATEMENT ...................................................................................................... 1

JURISDICTION, VENUE, AND BACKGROUND ...................................................................... 5

A.    The Status of The Committee Investigation ...................................................................... 5

B.    The Results of The Committee Investigation to Date ........................................................ 5

      1.    Overview of AFI's Integrated Mortgage Operations and Its Domination
             and Control of The Debtors ...................................................................................... 6

      2.    The Housing Bubble of The Early 2000's:  AFI Inflates Its Mortgage
             Operations With Toxic Assets ................................................................................. 10

      3.    AFI Acts To Ring-Fence Its Expanding Mortgage Operations From GM's
             Financial Problems................................................................................................... 14

      4.    AFI Disregards and Abuses ResCap's Corporate Form to Siphon Off
             Valuable Assets and Attempts To Improperly Shield Itself From Billions
             of Dollars in Mortgage-Related Liabilities ............................................................. 15

            a.    AFI Seizes Control of Old GMAC Bank ..................................................... 15

            b.    AFI Seeks to Limit Its "Rep And Warranty" Liability .............................. 16

            c.    AFI Executes The "MSR Swaps" to Foist Investment Risk on
                   ResCap ......................................................................................................... 17

            d.    AFI Strips ResCap of Its Remaining Interests in Ally Bank .................... 17

            e.    AFI Continues to Strip The Value of "Non-Core" Businesses.................. 18

            f.    AFI Expands The MSR Swap.................................................................... 19

            g.    AFI Executes a Series of Settlements and Agreements Designed
                   to Impose Liabilities on ResCap Alone ..................................................... 19

            h.    AFI's Purported Capital Infusions Further Evidence Its
                   Self-Serving Domination and Control Over ResCap................................ 21

C.    The Legal Claims Against The AFI Defendants.............................................................. 22

      1.    Veil-Piercing ............................................................................................................ 22

      2.    Fraudulent Transfer and Other Claims ................................................................ 29

**TABLE OF CONTENTS**
(cont'd)

Page

RELIEF REQUESTED.................................................................................................... 31

BASIS FOR RELIEF REQUESTED............................................................................... 31

THE COMMITTEE MEETS THE REQUIREMENTS FOR STANDING AND
AUTHORITY TO PROSECUTE THE CLAIMS AGAINST THE AFI DEFENDANTS .......... 31

    A.    The Claims Are Colorable ................................................................................ 31

    B.    The Committee's Prosecution of The Claims  Is In The Best Interests
        of The Debtors' Estates..................................................................................... 33

CONCLUSION................................................................................................................ 35

## TABLE OF EXHIBITS

Exhibit A – Proposed Order

## TABLE OF AUTHORITIES

                                                                        **Page(s)**

CASES

*Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.),*
   330 B.R. 364 (Bankr. S.D.N.Y. 2005) .................................................32, 33, 34, 35

*ASARCO LLC v. Americas Mining Corp.,*
   396 B.R. 278 (S.D. Tex. 2008) ............................................................................23

*Blair v. Infineon Techs. AG,*
   720 F. Supp. 2d 462 (D. Del. 2010) ..........................................................22, 23, 27

*Fletcher v. Atex, Inc.,*
   68 F.3d 1451 (2d Cir. 1995) ...............................................................................28

*Gibbs-Alfano v. Burton,*
   281 F.3d 12 (2d Cir. 2002)....................................................................................0

*In re Adelphia Commc'ns Corp.,*
   365 B.R. 24 (Bankr. S.D.N.Y. 2007).................................................................30, 1

*In re BH S&B Holdings LLC,*
   420 B.R. 112 (Bankr. S.D.N.Y. 2009)............................................22, 23, 27, 28

*In re Buckhead America Corp.,*
   178 B.R. 956 (D. Del. 1994)......................................................22, 24, 26, 32

*In re Commodore Int'l Ltd.,*
   262 F.3d 96 (2d Cir. 2001)..............................................................2, 31, 33

*In re Dewey & LeBoeuf LLP,*
   No. 12-12321 (MG), 2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29, 2012)................2, 31, 33

*In re Moll Indus.,*
   454 B.R. 574 (Bankr. D. Del. 2011) ................................................................24

*In re STN Enters.,*
   779 F.2d 901 (2d Cir. 1985)...................................................................................3

*In re Sunbeam Corp.,*
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ...........................................................22, 3

- iii -

*In re Verestar, Inc.,*
  343 B.R. 444 (Bankr. S.D.N.Y. 2006)..........................................................22, 24, 25, 31, 32

*Mabon, Nugent & Co. v. Texas Am. Energy Corp.,*
  CIV. A. No. 8578, 1990 WL 44267 (Del. Ch. Apr. 12, 1990) ........................ 22, 24 & n.2, 32

*Mobil Oil Corp. v. Linear Films, Inc.,*
  718 F. Supp. 260 (D. Del. 1989)..........................................................................................23

*NetJets Aviation, Inc. v. LHC Comm'ns, LLC,*
  537 F.3d 168 (2d Cir. 2008)..................................................................................................23

*Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr., Inc. (In re Am.'s Hobby
  Ctr., Inc.),* 223 B.R. 275 (Bankr. S.D.N.Y. 1998) ..............................................................33

*Pfizer, Inc. v. Stryker Corp.,*
  348 F. Supp. 2d 131 (S.D.N.Y. 2004)...................................................................................30

*Shandler v. DLJ Merchant Banking, Inc.,*
  C.A. No. 4794 VCS, 2010 WL 2929654 (Del. Ch. Feb. 1, 2010) .......................22, 24, 26, 32

*Union Carbide Corp. v. Montell N.V.,*
  944 F. Supp. 1119 (S.D.N.Y. 1996).............................................................................23, 24, 5

*William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,*
  933 F.2d 131 (2d Cir. 1991)..................................................................................................33

**STATUTES**

11 U.S.C. § 105(a) ...........................................................................................................................1

11 U.S.C. § 510(c) .........................................................................................................................30

11 U.S.C. § 544(b) .........................................................................................................................29

11 U.S.C. § 547(b) .........................................................................................................................30

11 U.S.C. § 548(a) .........................................................................................................................29

11 U.S.C. § 1103(c) .........................................................................................................................1

11 U.S.C. § 1109(b) .........................................................................................................................1

28 U.S.C. § 157...........................................................................................................................5 n.1

28 U.S.C. § 157(b)(2) ..................................................................................................................5 n.1

28 U.S.C. § 1334.........................................................................................................................5 n.1

REDACTED

28 U.S.C. § 1408 ................................................................................................................5 n.1

28 U.S.C. § 1409 ................................................................................................................5 n.1

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-caption debtors and debtors-in-possession (collectively, the "**Debtors**") hereby moves (the "**Motion**") for entry of an order, pursuant to 11 U.S.C. §§ 105(a), 1103(c), and 1109(b), in substantially the form as annexed hereto as **Exhibit A** (the "**Proposed Order**"), granting the Committee standing and authority to prosecute and settle on behalf of the Debtors' estates (the "**Estates**") all claims (the "**Claims**") arising from the Committee Investigation (defined below) and the Examiner Investigation (defined below) that the Estates may have against Ally Financial Inc. ("**AFI**") and certain of AFI's non-debtor affiliates (collectively, the "**AFI Defendants**"). In support of the Motion, the Committee states as follows:

## PRELIMINARY STATEMENT

1.      The Committee brings this Motion to obtain derivative standing and authority to prosecute estate claims against the AFI Defendants that, by AFI and the Debtors' own assertions, may be worth billions of dollars – and indeed may render AFI liable for the entire $20-25 billion of the estates' unsecured liabilities. The Debtors have consented to Committee standing to bring certain claims. The Committee continues to believe that a consensual plan resolving the Claims is the best solution for these Chapter 11 cases and is committed to seeking such a result before the expiration on April 30, 2013 of the Debtors' exclusive period in which to file a plan. However, if a negotiated resolution is not achieved, the Committee is preparing to file and litigate the Claims.[1]

---

[1] While exclusivity expires on April 30, 2013, the Committee does not intend to file a Complaint relating to the Claims prior to the issuance of the Examiner's report on May 13, 2013 (assuming that this date is not adjourned).

2.    The Claims have emerged from the Committee's comprehensive and ongoing investigation of the complex constellation of prepetition and postpetition transactions between the Debtors and AFI. The Committee's investigation, while not yet complete, reveals a troubling scheme by AFI to exploit and misuse its control over the Debtors for its own benefit. This scheme took the form of related-party transfers of assets and liabilities worth billions of dollars, some of which were designed to help minimize AFI's potential $20 billion-plus liability for creating the overall mortgage securitization mess in which the Debtors and AFI now find themselves.    When it suited AFI's purposes, it greatly expanded the Debtors' mortgage operations to support AFI's failing auto loan business.    When the housing boom ended, AFI stripped the Debtors of valuable assets and dumped all of its mortgage-related liabilities on the Debtors, seeking to shield AFI from any responsibility for the excesses of the housing boom.

3.    In short, the information available to date paints a stark picture of AFI's domination, control, and abuse of the Debtors that supports strong claims against the AFI Defendants, including for veil-piercing, fraudulent conveyance, indemnification, preferential transfer, and equitable subordination – all of which the Committee is prepared to litigate vigorously.    These claims present a real threat that AFI ultimately will be liable for unsecured liabilities of the Debtors of more than $20 billion.

4.    The Committee easily meets the requirements in this Circuit for standing and authority to prosecute the Claims on behalf of the Debtors' estates:    that the Claims are "colorable" and (where, as here, the debtor consents to committee standing for certain claims) the proposed action is both in the best interest of the estates and "necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings." *In re Dewey & LeBoeuf LLP*, No.

12-12321 (MG), 2012 WL 5985445, at *5 (Bankr. S.D.N.Y. Nov. 29, 2012) (citing *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001)).

     5.     First, without even considering the specifics of the Claims, it is clear that the Debtors and AFI believe them to be at least colorable. Even before the Debtors filed these cases, AFI had attempted to settle the claims for $750 million.     **Redacted**

     The existence of this potential liability continues to be a principal reason why AFI has failed to meet the Federal Reserve Board's capital adequacy tests.

     6.     Consideration of the evidence only serves to bolster this view. As set forth in detail below, the facts adduced to date present a textbook case for veil-piercing liability. AFI ran its mortgage securitization business as a single, integrated operation under its total direction, knowledge, domination, and control, using the near complete overlap between AFI and ResCap leadership to impose its will on the Debtors. It used this control, initially, to aggressively expand ResCap's mortgage operations during the years 2004-2006, involving itself in every aspect of the development and marketing of ResCap's mortgage products – including directing, encouraging, and facilitating allegedly wrongful underwriting and representation and warranty breaches that ultimately brought down the company. Then, anticipating the impending collapse in the housing market, AFI sought desperately to shield itself from the disaster it had created, siphoning valuable assets from ResCap and embarking on a series of transactions to which no arm's length counterparty would have agreed, designed to impose solely on the Debtors the mortgage-related

liabilities for which AFI otherwise would have been responsible. These actions included AFI's seizure from ResCap of Old GMAC Bank (defined below) for less than fair value; its entry into complicated mortgage purchase agreements and swap transactions with GMACM (defined below) designed to permit AFI to invest in profitable mortgage servicing rights while foisting all related risk upon the Debtors; its stripping of certain other businesses for less than fair value; and its entry into settlements with regulators and agreements designed to impose mortgage-related liabilities on the Debtors alone. In addition to supporting a veil-piercing claim, certain of these transactions give rise to independent causes of action (e.g., fraudulent conveyance and preference) described below.

7. Second, the Committee's prosecution of the Claims is necessary and beneficial to the fair and efficient resolution of these cases. The Committee provided its initial analysis of the Claims to the Debtors, the Examiner, and AFI. In consenting to the Committee's prosecution of the Claims, the Debtors impliedly acknowledge that the claims are both substantial and worth pursuing with estate resources. The Committee's analysis demonstrates that, even though the Committee's investigation is not complete and the Examiner has not yet issued his report, there already is ample evidence supporting more than colorable claims that could result in AFI's liability for billions of dollars of debt that otherwise would be left unsatisfied through the ResCap bankruptcy. This potentially huge recovery by the Debtors' estates for the massive damage AFI has inflicted on the Debtors over the years vastly outweighs any reasonably anticipated costs of litigation – particularly given the extensive discovery already taken to date.

8. The Debtors' consent also implicitly acknowledges that the Committee is in the best position to pursue the Claims. This is the case for several reasons, including that (1) the Debtors already had agreed to a settlement of all estate claims against AFI pursuant to the AFI

- 4 -

Plan Support Agreement ("**AFI PSA**") and, therefore, cannot be expected to pursue vigorously a more favorable deal, and (2) the Committee already has gained extensive knowledge of the operative facts and legal theories underlying the Claims as a result of the Committee Investigation (defined below). For the reasons stated herein, the Motion should be granted.

## JURISDICTION, VENUE, AND BACKGROUND[2]

### A.      The Status of The Committee Investigation

9.      The "**Committee Investigation**" began more than nine months ago in June 2012 when the Court granted the Committee authority under Federal Rule of Bankruptcy Procedure 2004 to subpoena information from the Debtors, AFI, and AFI's parent Cerberus Capital Management L.P. ("**Cerberus**") [Docket No. 217]. Soon thereafter, the Court appointed an examiner (the "**Examiner**") [Docket No. 536] and entered an order providing that the scope of the Examiner's investigation (the "**Examiner Investigation**") would be at least co-extensive with the scope of the Committee Investigation [Docket No. 925].

10.      Since then, Committee counsel has reviewed myriad documents that the Examiner has made available through a shared document depository. In addition, the Committee's financial advisors have analyzed many of the Debtors' material transactions and agreements, as well as the Debtors' historical solvency and capitalization. Although the Committee Investigation to date has been extensive and thorough, it is ongoing.

### B.      The Results of The Committee Investigation to Date

11.      As summarized below, the facts already marshaled, and those likely to be uncovered through full discovery and sworn testimony, support claims that AFI should be held

---

[2] The Court has subject matter jurisdiction over the of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this federal judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

jointly liable for most or all of the Debtors' unsecured liabilities, which are estimated at $20-$25 billion.

### 1. Overview of AFI's Integrated Mortgage Operations and Its Domination and Control of The Debtors

12.     AFI (f/k/a GMAC, LLC ("**GMAC**")) is a financial services company formed by General Motors ("**GM**") in 1919.  In addition to an automotive financing arm, AFI runs a mortgage business engaged in originating, purchasing, servicing, and selling residential mortgage loans.  Although nominally comprised of several different corporate entities, AFI's mortgage operations always have functioned as a single integrated economic unit directed by AFI and managed by AFI personnel.

13.     Starting in the 1980's but dramatically accelerating during the housing boom of the early 2000's, AFI, through Debtor entities including GMAC Mortgage LLC ("**GMACM**") and Residential Funding Company, LLC ("**RFC**"), pooled and securitized billions of dollars of mortgages in residential mortgage-backed securities ("**RMBS**") trusts of two types: (i) Government Sponsored Enterprises ("**GSE**") trusts (backed by Fannie Mae, Freddie Mac, and Ginnie Mae), and (ii) Private Label Securitization ("**PLS**") trusts.  Much of AFI's business model depended on these mortgage securitizations, which earned AFI significant fees.  For example, mortgage origination and servicing generated $933 million of AFI's $1.2 billion of total net mortgage operations revenue in 2011.

14.     In 2004, AFI formed Residential Capital Corporation ("**ResCap**"), later reorganized as a limited liability company, to act as a holding company for some of the entities involved in AFI's substantial mortgage operations.  The individual divisions of AFI's integrated mortgage operations – including GMACM and RFC, as well as a federal savings bank formerly known as GMAC Bank ("**Old GMAC Bank**") and currently known as Ally Bank – were folded

- 6 -

into the ResCap holding company in 2005. Both before and after that reorganization, AFI dominated and controlled its mortgage operations and consequently operated ResCap (and the other Debtors) as part of its single, integrated enterprise.

15.    AFI's domination and control of the Debtors is most vividly illustrated by the nearly complete overlap between AFI and the Debtors' leadership, which meant that the Debtors never had any truly independent management. Since its inception in 2004, ResCap's leadership included directors and officers who simultaneously acted as directors, officers, or insiders of AFI or its nondebtor affiliates. In particular, ResCap CEOs Bruce Paradis (2004-07), James Jones (2007-08), and Thomas Marano (2008-present) were also officers of AFI – Paradis as EVP (2006-2007), Jones as EVP (2005-2008) and Marano as Chief Capital Markets Officer (2009-2012). But this overlap with AFI extended throughout ResCap and its operating subsidiaries GMACM and RFC. In fact, the Debtors' leadership ranks were stocked with AFI personnel – with senior executives routinely holding dual roles across organizations – particularly in key positions, such as CEO, CFO, Chief Accounting Officer, Treasury Executive, board members, audit committee members, counsel, and more. This is illustrated in the attached Appendix, which contains only a partial list of these conflicted executives. Not surprisingly, ResCap's senior managers often held themselves out to the world as one with AFI, for example by using email addresses with the "ally.com" domain name.

16.    The remarkable and pervasive overlap between the leadership ranks of Debtors and AFI, and the frequent movement of top level employees from one organization to the other, undermined the independence of the Debtors' management personnel by aligning their interests with AFI. ResCap effectively had no independent management.

- 7 -

17.     To further ensure their allegiance to AFI, the Debtors' employees were awarded deferred incentive compensation based on *AFI's* value and performance, and certain senior Debtor executives were paid in AFI equity. For example, Mr. Marano's 2012 remuneration was $600,000 in salary and approximately $7.4 million in deferred compensation tied to AFI's performance. This compensation necessarily incentivized the Debtors' management to promote AFI's interests over those of the Debtors.

18.     The unified AFI enterprise not only shared officers and directors, but routinely ignored corporate formalities at ResCap and its subsidiaries. For example, the GMACM and RFC boards met rarely, if at all, and had no independent directors. While ResCap nominally had two independent directors during most of its existence, a June 24, 2005 Operating Agreement (the "**Operating Agreement**") between GM, GMAC, and ResCap called for their appointment by AFI and their removal at AFI's sole discretion, making the independent directors completely beholden to AFI. In fact, AFI had the authority to appoint and remove *all* of ResCap's directors. As a consequence of this domination and control, when critical transactions were evaluated by ResCap's board, its directors focused on the needs of AFI to the detriment of those of ResCap or its creditors.[3]

19.     Additionally, AFI dominated and controlled the Debtors' operations. AFI and ResCap historically had extensive shared services that were provided without any formal agreements or contracts, including: (i) human resources; (ii) accounting, tax, legal, and internal audit; (iii) treasury and collateral management; (iv) risk management; (v) supply chain

---

[3]                                        Redacted

- 8 -

management; (vi) government and regulatory relations and compliance; (vii) facilities management; (viii) marketing; and (ix) capital markets services relating to managing loan servicing rights. In turn, ResCap was required to provide many services to AFI and Ally Bank – particularly those relating to AFI's mortgage operations.

20.    AFI's control over ResCap was admitted in many public and private documents. For example, ResCap's public filings consistently stated that "[AFI] controls all fundamental matters affecting us, and its interests may differ from ours." SEC Form 10-K, Residential Capital, LLC, Mar. 13, 2007, at 43. Similarly, in a recent consent order that AFI and ResCap executed with the Federal Reserve Board, AFI admitted that it "indirectly owns and controls . . . Residential Capital." Consent Order, Ally Financial Inc., FRB Docket Nos. 11-020-B-HC and 11-020-B-DEO, FDIC-11-123b, Apr. 13, 2011, at 1.

21.    Numerous other documents reflect and acknowledge the unified nature of the AFI mortgage operations from the time ResCap was formed right up to bankruptcy. Internal diagrams from AFI board materials provide a virtual roadmap of the integrated nature of mortgage operations between and among AFI, ResCap, GMACM, RFC, and Ally Bank.

Redacted

Even the First-Day Affidavit of James Whitlinger [Docket No. 6] ("**Whitlinger Aff.**"), simultaneously ResCap's CFO and AFI's CFO for Mortgage Operations, states that "the mortgage and loan origination, servicing and related securitization operations of *AFI are an integrated business involving the Debtors and Ally Bank*." Whitlinger Aff. ¶¶ 187, 190 (emphasis added).

### 2.   The Housing Bubble of The Early 2000's:  AFI Inflates
### Its Mortgage Operations With Toxic Assets

22.     Early in the millennium, the American economy was experiencing a housing

bubble.   Real estate prices rose dramatically, and residential mortgage financing likewise

increased exponentially.  This spurred AFI to grow its mortgage operations more rapidly, and

they became much more profitable.  For example, AFI's net mortgage income ballooned from

$115 million in 1998, to $1.3 billion in 2005.  But in the process, it appears that AFI chose to

emphasize immediate profits at the expense of longer term stability, and the quality of its loan

originations and underwriting simply did not keep pace with the quantity and dollar value of

loans made.  In the 2004 to 2006 time frame, loans originated, underwritten, and/or securitized

by AFI's mortgage operations were allegedly fraught with problems that created a toxic brew of

contractual, securities, and other liabilities, the effects of which would be felt only years later.

23.     For example, a proof of claim (the "**AIG POC**") filed by AIG Securities Lending

Corporation ("**AIG**") against GMACM [Claim #5346] states that AIG "conducted an exhaustive

forensic investigation of the loan pools underlying the RMBS it purchased" showing, among

other things (*id.* ¶ 20), that the Debtors "dramatically understated" loan-to-value ratios; "falsely

represented that not a single mortgage had an LTV ratio above 100%"; "grossly misrepresented

the properties backing the mortgages as owner-occupied"; and made "misrepresentations in the

Offering Materials [that] were based on false metrics in a staggering 34.84% of the sampled

loans."  *Id.* ¶ 22.  In addition, according to AIG, a review of a sample of 100 loan files showed

that "over 90% of the loans did not comply with underwriting guidelines."  *Id.* ¶ 25.

24.     Other allegations suggest that the loan originators and underwriters working for

AFI's business units may have been systemically engaging in fraud to increase the volume and

value of the loans made.  In particular, some of these employees are reported to have stated that

they pushed underwriters to "loosen up on the underwriting"; "gave a lot of loans they shouldn't have"; made stated income loans that "were all lies"; and pushed quality control employees who knew of those lies "to accept" false income figures. AIG POC ¶ 16 (internal quotation marks omitted). And senior management was reported to have encouraged brokers to "manipulate data to produce a positive result" and find "ways to get any loan approved." *Id.* ¶ 15 (internal quotation marks and emphasis omitted).

25.    After such allegedly faulty loans were underwritten and originated, they generally would be securitized, including by AFI's nondebtor affiliate Ally Securities. In connection with these securitizations, AFI's Debtor and nondebtor subsidiaries issued offering materials that trumpeted the *bona fides* of the loans – including representations and warranties ("**R&Ws**") stating, among other things, that the loans had been correctly originated, the underlying properties had been properly appraised, and the homeowners' income had been correctly computed. As this Court is well aware, numerous investors have since claimed that these R&Ws frequently were false.

26.    AFI was well aware of these facts as a consequence of, among other things, the extensive overlap of AFI and Debtor officers and directors, particularly in the Debtors' senior leadership structure. Indeed, AFI declared, in its 2004 SEC Form 10-K, that it was responsible for overseeing the risk management policies and procedures of its business units, describing a "centralized enterprise risk management function" that was "responsible for ensuring that each business unit has proper policies and procedures for managing risk and for identifying, measuring and monitoring risk across the GMAC enterprise."

27.    In addition, in connection with AFI's risk management function and self-assessment process, AFI caused its mortgage operations to be regularly audited, and AFI

REDACTED

executives received copies of the audit reports. These audits reveal a series of apparent failures in AFI's mortgage operations. For example, a 2005 audit report concluded that the "validation and reviews of mortgage loan documents, file information and system data are not consistently completed." These practices were said to have "increase[d] [] the risk of acquiring loans that do not comply with applicable state and federal regulatory standards or investor guidelines." Similarly, a January 2006 audit concluded that the "system of internal control [for the mortgage operations] needs improvement."

28.    AFI and its affiliates hired third-party due diligence firms to review loans for securitizations. However, AFI and its affiliates appear to have often ignored or overruled the results. Indeed, one third-party due diligence underwriter is reported to have stated that she personally observed a GMAC representative "override" a "determination that certain loans were not suitable for securitization because the loans violated underwriting guidelines." AIG POC ¶ 18. The same underwriter also recalled "at least one occasion when the ResCap Debtors' instructed [the due diligence firm] to delete information in loan files." Id.

29.    A July 18, 2005 memorandum authored by David C. Walker, AFI's CFO of Mortgage Operations (and a ResCap board member), was circulated amongst the highest ranking executives of ResCap and AFI and disclosed that critical components of RFC's business had not kept pace with its growth. The memorandum noted that "loan systems" apparently were not developed properly to allow a rigorous analysis of RFC's assets; the policy on credit loss reserves was not up to date; and "[e]nough quality people resources were not hired in the accounting & control areas to parallel the growth in business scale and complexity." As a consequence of "obvious control deficiencies" and other failings, "[e]arly warnings [had] not been provided . . . that problems may occur despite the keen awareness within RFC of the risks."

The memorandum concluded, "RFC has had several heart attacks on the accounting and controls front since the first quarter of 2004, and miraculously it has survived . . . However, RFC is in danger of taking ResCap down with it the next time one occurs."

30.    Because AFI was driven to maximize profits at nearly all costs, it allowed – indeed, encouraged – these deficient processes to continue. In fact, AFI doubled down. As time went on, it "began to focus on shifting capital usage to higher return businesses and away from lower return businesses," embarking on a massive campaign to "aggressively" expand its mortgage operations. Thus, in 2005, one of AFI's strategic initiatives was to "build the bank" with even more high-risk mortgage-related assets. Dubbed the "First Manhattan Project," this growth strategy was driven by an apparent intent to emulate "industry benchmarks" IndyMac and Countrywide, specifically by increasing Old GMAC Bank's "leverage and increas[ing] its investment in riskier assets." A 2005 ResCap "leadership summit" document characterizes as a "summit priority" the building out of Old GMAC Bank by increasing its asset base and liquidity. Growth would be achieved partially by increased investment in residential mortgages, mortgage servicing rights ("**MSRs**"), and home equity loans. Under the contemplated rapid growth strategy, the goal was for Old GMAC Bank to increase its assets from $6 billion to $25 billion.

31.    Building Old GMAC Bank was a function of strategy and persistence, as shown by Mr. Walker's memorandum, which was copied to key personnel in the AFI corporate family. The memorandum described "the necessity to grow GMAC Bank at a faster pace" and how growing the Bank was "one of . . . three key commercial opportunities for at least [the coming] year." However, while AFI's drive to build up the mortgage operations with toxic assets may have been profitable in the short term, it led to financial disaster and vast potential liability based

- 13 -

on fraud, breach of contract, and other theories – liability that AFI would attempt to cabin with the Debtors, but that fairly lies at the doorstep of the integrated AFI enterprise.

### 3. AFI Acts To Ring-Fence Its Expanding Mortgage Operations From GM's Financial Problems

32.    While AFI's mortgage business was growing exponentially based on its flawed loan origination, underwriting, and servicing platform, its automotive financing business was deteriorating.   Due to its relationship to GM, AFI had concerns about credit downgrades affecting its mortgage operations.   AFI apparently hoped that if it walled off its successful mortgage business from its troubled automotive sector, it could continue to extract profits from the mortgage division without having that business weighed down by GM's declining credit ratings.

33.    Therefore, after incorporating ResCap as a holding company in 2004, AFI executed the Operating Agreement among it, GM, and ResCap to document ResCap's purported separation and independence. Among other things, the Operating Agreement mandated that all affiliate transactions be "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value." The Operating Agreement further included a broad provision requiring AFI to indemnify ResCap for any losses that ResCap incurred related to the businesses of AFI, GM, or their respective affiliates.

34.    Although the Operating Agreement was intended to portray an independent ResCap, provisions intended to wall off ResCap from AFI routinely were waived, amended, or simply ignored, and the indemnification provision never was enforced. Notably, in an email exchange with executives at the highest level of AFI and ResCap, Mr. Marano – ResCap's CEO and simultaneously AFI's Chief Capital Markets Officer – characterized the Operating Agreement as a "charade of a fig leaf."

- 14 -

4.  **AFI Disregards and Abuses ResCap's Corporate Form to
    Siphon Off Valuable Assets and Attempts To Improperly Shield
    Itself From Billions of Dollars in Mortgage-Related Liabilities**

35.    Ironically, the collapse of the housing market and the eventual government bailout

of the auto industry led to a reversal of AFI's problems and priorities.  As the mortgage crisis

emerged, AFI shifted strategy from a whole-hog effort to bulk up its mortgage business to a

carefully calibrated attempt to protect itself from the downside consequences of its earlier

excesses.  The Committee has examined a series of transactions, beginning in 2006, that display

a common pattern of behavior by AFI:  moving assets out of ResCap and/or dumping liabilities

into it, often without fair consideration or procedural safeguards to ensure arm's length terms,

with the ultimate goal – once the RMBS mess surfaced – of isolating AFI from the catastrophe it

created.  AFI kept ResCap barely alive through this period with measured capital infusions and

loans – not in a serious attempt to rehabilitate ResCap's business, but only to prevent a

premature bankruptcy that would cut short the harvesting of value and drag AFI down as well.

a.  **AFI Seizes Control of Old GMAC Bank**

36.    The slow bleed of ResCap began in 2006, when AFI unfairly seized control (and

later full ownership) of Old GMAC Bank at the same time Cerberus acquired a majority interest

in AFI.  Purportedly to avoid AFI becoming a federally regulated thrift holding company, AFI

compelled ResCap to transfer Old GMAC Bank's thrift charter and other assets to GM for no

consideration and simultaneously sell Old GMAC Bank's remaining assets and mortgage

business to AFI for $1.161 billion, which ResCap contributed in exchange for *non-voting*

*interests* in the entity now housing the bank.  Indeed, the consideration paid for the bank assets

was woefully inadequate: the similar assets of comparable banks were valued much higher and

no allowance was made for the fact that ResCap was left with increased regulatory capital

obligations and only non-voting shares in the new bank, eventually renamed Ally Bank.  A

contemporaneous memo by ResCap's general counsel blasted the proposed transfer as inconsistent with the Operating Agreement, among other things because it was clearly not an arm's length transaction. Despite this stinging critique, the transaction proceeded as planned, and instead the relevant portions of the Operating Agreement purportedly were waived or amended. There is no question that this transaction was not entered into for ResCap's benefit.

**b. AFI Seeks to Limit Its "Rep And Warranty" Liability**

37.     AFI next began using the new bank structure to reorganize its mortgage business and, as the RMBS situation began to unravel, to try to remove itself from the mounting exposure and further risk. Thus, contemporaneously with its transfer to AFI, Ally Bank entered into a revised version of an earlier master loan purchase and sale agreement (the "**MPA**") with GMACM. The MPA deviated from standard mortgage market practice in a number of ways,

**Redacted**

Then, in 2007, once the bank was firmly within AFI's control and as the mortgage market began to crumble, the MPA was modified again

**Redacted**

These and other amendments resulted in GMACM paying above-market prices for mortgages offered on worse-than-market terms, while purporting to assume all R&W liability – a non-market arrangement that was highly advantageous to Ally Bank. There is no indication that ResCap or GMACM were represented by independent counsel in connection with these amendments or that either of their boards even voted on them. They simply were imposed on GMACM by AFI through its total domination and control.

### c.  AFI Executes The "MSR Swaps" to Foist Investment Risk on ResCap

38.    AFI thereafter further capitalized on the relationship between Ally Bank and GMACM through an elaborate series of swap transactions that permitted the bank to invest extensively in MSRs while purporting to foist all of the resultant risk onto GMACM.  First, through the "Fair Market Value Swap," GMACM was obligated to pay Ally Bank for any decrease in the value of the MSRs based on interest rate changes or increased foreclosures. Second, under the "Net Funding Swap," GMACM would pay the bank a fixed return in exchange for net servicing fees paid under the swap – which were reduced by the full amount of the bank's expenses, including with respect to repurchase or indemnification demands. Together, these transactions created an elaborate hedge for Ally Bank that it admittedly would have been unable to recreate in the open market – guaranteeing steady income for the bank while shifting all MSR risk to GMACM on terms that no rational, arm's length counter-party would have accepted.  Indeed, Mr. Marano concluded at the time that such shifting of risk "border[ed] on an absurd transaction" for GMACM and was "silly."   These and other transactions,

Redacted

show a coordinated and integrated effort over several years to unfairly offload risk from Ally Bank onto GMACM.

### d.  AFI Strips ResCap of Its Remaining Interests in Ally Bank

39.    Continuing the pattern of shifting value from ResCap to itself, AFI proceeded in 2008 to strip ResCap even of its non-voting interest in Ally Bank.  It did so by purchasing outstanding ResCap debt at a steep discount, which it exchanged for preferred equity interests –

- 17 -

also receiving, for no additional consideration, the option to convert those interests into an equivalent amount of ResCap's non-voting interests in the entity that owned Ally Bank. Although ResCap retained Morgan Stanley and Skadden Arps to represent it in connection with these transactions, Morgan Stanley did not conduct a proper valuation of the assets or consider alternative transactions, and Skadden recognized that the terms of the deal would have to be improved to create a transaction that would be in the best interests of ResCap – but the deal nevertheless was consummated without material improvement.  Not surprisingly, ResCap's two independent directors resigned less than a month after the first of these transactions was approved, a development at least one rating agency described as "an acute governance situation." But this did not stop AFI from proceeding with additional debt-forgiveness-exchanges to complete the shift of total ownership and control of Ally Bank from ResCap to itself.

**Redacted**

### e.  AFI Continues to Strip The Value of "Non-Core" Businesses

40.    In a series of further transactions in the years leading up to ResCap's bankruptcy filing, AFI systematically extracted a series of other valuable assets and expanding business lines, under the pretext of removing ResCap's "non-core" businesses and injecting working capital – but the transactions had the effect of removing important revenue-generating sources and, in the long run, leaving ResCap severely undercapitalized.  These transactions – some of which were objectionable and unfair on their own terms – shared several common features that underscore AFI's domination and control.  First, many were negotiated and executed in unreasonably compressed time-frames, some closing in a matter of days.  Second, despite being

labeled "non-core" because they were not directly related to ResCap's domestic residential mortgage business, many of the assets were in fact profitable and valuable. Third, many of the transactions were effectuated with suspect or untimely fairness opinions. Fourth, the transactions generally were conducted without any meaningful attempt to market the assets to third parties. And finally, many of the transactions were negotiated by officers who moved back and forth between ResCap and AFI, undermining their independence.

### f.  AFI Expands The MSR Swap

41.    In 2010 and 2011, AFI further amended the MSR Swap to ResCap's detriment in an ongoing (though ultimately unsuccessful) attempt to convince bank regulators that Ally Bank was insulated sufficiently from R&W risk. These changes merely underscored what had always been AFI's intention – to shift all R&W risk away from the bank and onto ResCap. This was accomplished by amending certain definitions in the MSR Swap to clarify that GMACM's fees would be reduced by any payments Ally Bank was obligated to make to Fannie Mae or Freddie Mac. ResCap's board approved these changes without independent legal or financial advice, apparently focusing only on Ally Bank's interests. Although regulators continued to pressure AFI to create an R&W reserve at Ally Bank, this never was done because AFI was able to use its pervasive control of GMACM to ensure that Ally Bank never was called upon to reimburse either the GSEs or GMACM for any R&W-related loss.

### g.  AFI Executes a Series of Settlements and Agreements Designed to Impose Liabilities on ResCap Alone

42.    As the RMBS disaster unfolded, AFI continued to use its control over ResCap to shift liability away from itself and Ally Bank. First, in 2010, AFI caused the Debtors to enter into large-scale settlements with GSEs Freddie Mac and Fannie Mae, through which Debtors assumed liability for nearly $800 million in payments. The Debtors were made to shoulder the

- 19 -

entire burden of the settlements, even though (a) they were insolvent at the time; (b) a significant portion of the underlying liability pertained to loans originated, underwritten, or acquired by Ally Bank, and for which Ally Bank was jointly and severally liable to the GSEs as servicer of record; and (c) AFI had entered into an agreement by which it guaranteed all GSE cure payments.

43.     Second, AFI shifted to the Debtors the full costs of similar settlements (the "**Government Settlements**") entered into with federal regulators, the United States Department of Justice, and state attorneys general. Even though the authorities insisted that AFI be jointly liable in the settlement agreements, AFI required the Debtors to assume all costs of performance. It did so in part through a grossly unfair letter agreement (the "**January 30 Letter Agreement**") entered into shortly before the bankruptcy, which shifted compliance costs to ResCap and GMACM, including hard dollar penalties and indemnity for all loan modifications – rendering GMACM in essence a guarantor for the loss in value in Ally Bank's loan portfolio. Even on the very eve of bankruptcy, AFI caused ResCap to make a $49 million indemnity payment to Ally Bank, expressly recognizing that the payment was likely an avoidable preference.

44.     Finally, and also on the eve of bankruptcy, AFI used its control over ResCap to negotiate the unfair "pre-packaged" settlement – "agreeing" to contribute $750 million in return for a global release of billions of dollars in potential estate claims and billions more in third-party claims that would be wiped out through a unilaterally imposed, involuntary nondebtor release. It then tried to lock in support for this settlement by using its control of the Debtors to cause them to enter into an $8.7 billion settlement of RMBS put-back liability with certain institutional RMBS investors, which AFI authorized in return for the investors' support of AFI's bargain-priced releases. The substantive and procedural problems with these linked agreements are

- 20 -

detailed in the record of the pending Rule 9019 motion seeking approval for the "RMBS Settlement."

### h. AFI's Purported Capital Infusions Further Evidence Its Self-Serving Domination and Control Over ResCap

45.    AFI's improper domination and control is evidenced further by its careful doling out of finite capital infusions at key moments from 2007 through 2012, not with the goal of restructuring ResCap into a viable business, but rather merely to keep it on life-support for AFI's own purposes.    The infusions were made in the form of third-party and intercompany debt forgiveness, a one-time contribution of toxic assets, and as little cash as AFI could get away with.    They pale in comparison to the more than $20 billion in RMBS-related liability AFI seeks to escape, and were dribbled out over an extended period to give AFI time to harvest valuable assets and delay the inevitable ResCap bankruptcy until AFI's attempt to untangle its debtor and non-debtor businesses could be implemented to avoid also dragging down AFI and Ally Bank.

46.    Specifically, AFI infused capital in 2008 to prevent ResCap from breaching tangible net worth requirements in its funding agreements and prematurely entering bankruptcy before AFI could complete transfer of all ownership interests in Ally Bank.    It further managed the ResCap situation by extending approximately $5 billion in *secured* debt (at a time when ResCap already was insolvent), and then making sure that it was paid back the majority of that money ahead of other creditors (reducing ResCap's available credit each time it caused one of the facilities to be paid down).    **Redacted**

- 21 -

47.    Although AFI's capital contributions all but ended in 2010, AFI still had to keep

ResCap afloat while it finessed a series of other problems –    **Redacted**


and putting into place the Government Settlements on terms that shifted most

of the impact to ResCap, something that would be harder, if not impossible, to accomplish once

the Debtors were in bankruptcy.  Once AFI had its ducks in a row, it finally cut the cord and

commenced these cases in 2012 – having kept ResCap alive long enough to serve as a dumping

ground and purported liability shield for the massive RMBS mess that AFI itself created through

its pervasive domination and control of the integrated mortgage business over the prior decade.

C.    **The Legal Claims Against The AFI Defendants**

    1.  **Veil-Piercing**

48.    The veil-piercing claim, which would render AFI liable for the entire $20-25

billion in estimated unsecured claims against the estates, is based on well-settled Delaware law

holding a parent liable where a subsidiary is in fact a mere instrumentality or alter ego of its

owner.  To establish liability, the Committee must demonstrate that AFI and the Debtors

"operated as a single economic entity" and "that an overall element of injustice or unfairness is

present." *In re Sunbeam Corp.*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002).

49.    Although the case law often discusses factors to consider in determining the

"single entity" prong, no factor is controlling or dispositive, *Blair v. Infineon Techs. AG*, 720 F.

Supp. 2d 462, 471 (D. Del. 2010); *In re BH S&B Holdings LLC*, 420 B.R. 112, 134 (Bankr.

S.D.N.Y. 2009), and a number of cases focus more generally on indicia of domination and

control and a general fact pattern quite similar to that presented here: They recognize that where

the parent company uses its "domination and control . . . to cause the subsidiary to make

- 22 -

transfers for the benefit of the controlling parties (to the detriment of the subsidiary) . . . then the

controlling parties are properly treated as the subsidiary's alter ego and may be held liable for the

subsidiary's debts and obligations." *In re Buckhead Am. Corp.*, 178 B.R. 956, 974-75 (D. Del.

1994). *See also, e.g., In re Verestar, Inc.*, 343 B.R. 444, 464 (Bankr. S.D.N.Y. 2006); *Shandler*

*v. DLJ Merchant Banking, Inc.*, C.A. No. 4794 VCS, 2010 WL 2929654, at *15-16 (Del. Ch.

Feb. 1, 2010); *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, CIV. A. No. 8578, 1990 WL

44267, at *5 (Del. Ch. Apr. 12, 1990).

50.    The law provides that the "domination and control . . . may be general in nature"

and need not relate to any transaction or "'cause of action.'"  *Mobil Oil Corp. v. Linear Films,*

*Inc.*, 718 F. Supp. 260, 266 n.10 (D. Del. 1989) (citation omitted).  A "plaintiff need not prove

that [a subsidiary] was created with fraud or unfairness in mind.  It is sufficient to prove that it

was so used." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008).

51.    Under the second prong of the alter ego test, the requisite injustice or unfairness

need not amount to actual fraud "but rather [to] something that is similar in nature to fraud or a

sham." *BH S&B*, 420 B.R. at 134 (internal quotation marks and citations omitted).  The injustice

must "be found in the defendants' use of the corporate form." *Mobil Oil*, 718 F. Supp. at 269.

52.    The case law makes clear that "[o]rdinarily the determination of the nature and

extent of domination is a question of fact" that is not appropriately resolved on a motion to

dismiss or for summary judgment. *Sunbeam*, 284 B.R. at 365 (citing *Union Carbide Corp. v.*

*Montell N.V.*, 944 F. Supp. 1119, 1147 (S.D.N.Y. 1996)).  *See also id.* at 366 ("[S]etting forth

some examples of alleged domination may provide sufficiently specific factual allegations to . . .

result in denial of the motion to dismiss."); *Blair*, 720 F. Supp. 2d at 473 ("The nature and extent

of the dominion and control exercised by the [parent] over the [subsidiary] is a question of fact,

not subject to resolution on a motion to dismiss.")

53.    At trial, the Committee must prove its veil-piercing claim only by a

preponderance of the evidence, *see ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 317-18

(S.D. Tex. 2008) (applying Delaware law), and will be entitled to a jury trial. *See William*

*Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 136 (2d Cir. 1991). The

Committee need not plead or prove facts to pierce each layer of the corporate structure. *See In re*

*Moll Indus.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011); *Buckhead*, 178 B.R. at 974.

54.    Applying this law, the facts developed by the Committee thus far tell a classic

veil-piercing story of a parent corporation abusing its wholly owned subsidiary to cause the

subsidiary to act solely for the parent's benefit and to the detriment of the subsidiary and its

creditors.    Before even considering the relevant "single entity" factors, the overwhelming

evidence of AFI's undue domination and control is more than sufficient to defeat a motion to

dismiss the veil-piercing claim and raise genuine issues of material fact that must be resolved by

a jury. *See, e.g., Verestar*, 343 B.R. at 464; *Union Carbide*, 944 F. Supp. at 1145; *Buckhead*, 178

B.R. at 975; *Shandler*, 2010 WL 2929654, at *15-17; *Mabon*, 1990 WL 44267, at *5.

55.    *Mabon*, for one example, is highly instructive.    In that case, the court denied a

defendant parent corporation's motion for summary judgment to dismiss an alter ego claim

brought by a subsidiary's debenture holders after the subsidiary defaulted on the debentures.

1990 WL 44267, at *1, 5.[4]    The subsidiary was established initially as an independent oil and gas

company, but later became a wholly owned subsidiary of a newly created energy company. *Id.*

The subsidiary then guaranteed and provided security for a $23 million note the parent received

---

[4] The court also denied the debenture holders' cross-motion for summary judgment because of the existence of
genuine issues of material fact. *Id.* at *6.

from a third party lender to acquire another company. *Id.* at *2. Although the subsidiary's board minutes indicated a belief that it would benefit from the acquisition through the ability to shelter tax losses, the subsidiary received neither direct compensation for its guarantee nor any tax benefits. *Id.* at *2, 5. The court held, after reciting Delaware's two-part alter ego test but not discussing any of the "single entity" factors, that triable issues of fact were raised by the apparent lack of compensation. *Id.* at *5. This single transaction, combined with evidence that the two companies' boards were "substantially, if not wholly, identical," created an "inference" that the parent was "operating [the subsidiary] as its instrumentality." *Id.* The inference was further buttressed by evidence that the parent was using subsidiary funds to pay its officers. *Id.*

56.    The reasoning of *Mabon* applies with equal if not greater force here because the Committee's evidence of domination, control, and corporate integration is much more extensive and egregious. In comparison to the single transaction involved in *Mabon*, this case involves numerous unfair related party transactions that harmed the Debtors and its creditors by stripping the Debtors of valuable assets and sticking them with AFI and Ally Bank's mortgage-related liabilities. As in *Mabon*, the evidence here includes overlapping directors and officers and the parent's use of subsidiary funds to pay parent expenses, such as the Debtors' provision of operational services to Ally Bank. More egregious than *Mabon*, in which the subsidiary's board approved the challenged related party transaction, the evidence in this case shows that some of AFI and Ally Bank's transactions were never properly approved by ResCap or GMACM's boards, including each of the post-2006 MPA amendments, the 2007 MSR Swap, and the January 30 Letter Agreement.

57.    Several other reported cases have held allegations of undue domination and control similar to those here adequate to plead at least the "single entity" element, if not both

- 25 -

elements, of the alter ego test. *See, e.g., Verestar*, 343 B.R. at 457, 464-65 (denying motion to dismiss veil-piercing claim even though defendant parent made "strong case" it was separate from bankrupt subsidiary, because parent and subsidiary had overlapping directors and officers and parent used dominance to implement "a scheme entitled 'Project Harvest,'" through which it "siphon[ed] off [debtor's] value" and "caused [debtor] to sell certain assets to [parent] for little or no consideration"); *Union Carbide*, 944 F. Supp. at 1145 (denying motion to dismiss alter ego claim where plaintiff did not allege any "single entity" factors, because plaintiff "made numerous other allegations that support its assertion that . . . defendants dominated [their subsidiary] and forced [it] to act contrary to its own interests"); *Buckhead*, 178 B.R. at 974-75 ("Where a subsidiary corporation . . . is dominated and controlled by its parent company's parent . . . and where that domination and control is used to cause the subsidiary to make transfers for the benefit of the controlling parties (to the detriment of the subsidiary) . . . then the controlling parties are properly treated as the subsidiary's alter ego and may be held liable for the subsidiary's debts and obligations."); *Shandler*, 2010 WL 2929654, at *15-17 (denying motion to dismiss alter ego claim where plaintiff alleged defendant and affiliates used "unified power" to control debtor; direct its business strategy; cause it to hire and pay excessive fees to financial advisors; and cause it to sell subsidiary to company controlled by defendants for unfair price).

58.    These cases establish that the Committee has assembled more than enough evidence of AFI's improper domination and control to competently plead that AFI and ResCap operated as a single economic entity and that ResCap was AFI's alter ego.  Like the parent corporations or controlling shareholders in each of these cases, AFI inequitably used its dominance to cause the Debtors to act contrary to their own economic interests and those of their creditors.  Specifically, AFI caused ResCap and its subsidiaries to bulk up its mortgage business

- 26 -

with billions of dollars in toxic assets; stripped ResCap of its ownership interest in Ally Bank for less than fair consideration, thereby robbing ResCap of a valuable and strategic asset; imposed Ally Bank's mortgage-related interest rate, credit, and operational risks on GMACM through transactions that contemporaneous documents admit were commercially unreasonable and not the result of arm's length negotiations; leveraged ResCap's liquidity problems to siphon off profitable ResCap subsidiaries through questionable transactions; and forced the Debtors to pay AFI and/or Ally Bank's enormous liabilities under various governmental settlements. AFI knew that none of these transactions were fair to the Debtors or complied with ResCap's Operating Agreement. And AFI knew that by causing the Debtors to enter into these transactions it was deceiving the Debtors' creditors, including the RMBS investment community, by giving false assurance that ResCap had "legal or independent significance of its own," *BH S&B*, 420 B.R. at 141 (quotation marks and citation omitted), and that ResCap was pursuing its own economic interests – particularly by publicly touting the Operating Agreement, which in actuality did nothing to prevent AFI's domination.

59.    The conclusion that AFI and the Debtors operated as a single economic entity is only strengthened by analysis of the specific relevant "single entity" factors. The Committee need not seek to establish all of the factors, but may present evidence only on those relevant to whether AFI unduly dominated and controlled ResCap to the point of denying its distinct legal identity. *See Blair*, 720 F. Supp. 2d at 472-73 (stating "'single entity' factors only outline useful considerations for the court . . . and the absence of one or two factors may be sufficiently outweighed by the other considerations when balanced on whole").

60.    In this case, the following four factors are relevant and demonstrate that AFI and ResCap operated as a single economic entity: (1) AFI's siphoning off of ResCap's assets and

- 27 -

using ResCap to improperly shield itself from liabilities; (2) the failure of ResCap's officers and directors to function independently from AFI and to ensure the maintenance of sufficient corporate formalities; (3) ResCap's insolvency and undercapitalization; and (4) ResCap's functioning as a mere façade for AFI, which ultimately controlled all of ResCap's important business decisions, and absolutely controlled ResCap's board, management, operations, and finances. Indeed, AFI operated ResCap without regard to the interests of ResCap's creditors, including while ResCap was insolvent, and notwithstanding the provisions in the Operating Agreement designed to protect such interests.

61.    In addition, the Committee can sufficiently plead the second element of the alter ego standard, which requires a showing that AFI "used [ResCap's] corporate structure itself to further [a] fraud or injustice." *BH S&B*, 420 B.R. at 140. Where a parent uses a subsidiary to "defraud creditors and consumers or to siphon funds," this is sufficient to demonstrate an overall element of injustice or unfairness. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1461 (2d Cir. 1995).

62.    As explained above, AFI used ResCap's corporate identity as a shield for its reckless and fraudulent scheme of developing, marketing, and selling RMBS derived from allegedly defective subprime mortgages. When the housing market crashed and the scheme backfired, AFI continued to abuse ResCap by stripping its assets and using it as a dumping ground for AFI and Ally Bank's massive mortgage-related liabilities. AFI's chronic abuse of ResCap's corporate form has directly injured ResCap's unsecured creditors by siphoning assets, most importantly the "crown jewel" Ally Bank, for less than reasonably equivalent value; unfairly draining billions of dollars from, and imposing billions of dollars of R&W liabilities on, the Debtors through onerous related-party deals, including the MPA, MSR Swap, Pipeline Swap, and January 30 Letter Agreement; and causing the Debtors to agree to an inflated RMBS

- 28 -

Settlement to secure a global release for AFI of estate and third-party liability while unfairly diluting other unsecured creditors' recoveries. AFI's behavior presents the quintessential example of a parent unlawfully abusing its subsidiary and using it to injure creditors, which is precisely the situation in which the law permits the corporate veil to be pierced.

### 2. Fraudulent Transfer and Other Claims

63.     The Committee has significant constructive and intentional fraudulent transfer claims under 11 U.S.C. §544(b) and §548(a) stemming from transactions related to the Ally Bank transfer, the MPA, and the various swaps, which standing alone support damage claims against AFI well in excess of the $750 million release payment it had sought. For example, ResCap, which was undercapitalized and insolvent, received significantly less than fair value from AFI in transferring Old GMAC Bank's mortgage assets and in the related sales of its interests in the corresponding mortgage operations of Ally Bank. Had Old GMAC Bank been valued at the beginning of the transfer and properly valued at the end, ResCap would have received substantially more, including a valuable premium for the unique MPA and MSR Swap relationships when the transfer was completed in 2009. The transactions related to the Ally Bank transfer also were intentional fraudulent transfers because insiders knew they were not executed for fair consideration or at arm's length, and the transactions involved what contemporaneous documents refer to as ResCap's most significant asset.

64.     The MPA and Swap transactions similarly support both constructive and actual fraudulent transfer claims. These transactions shifted to GMACM, without fair consideration, virtually all of Ally Bank's R&W risk. While insolvent, GMACM was required to make massive overpayments to Ally Bank under the MPA; absorb substantial mark-to-market losses and asset amortization under the MSR Swap; suffer significant volatility in its earnings under the Pipeline Swap; pay all of the GSE Settlement costs; and even in bankruptcy is being made to pay

- 29 -

the GSE cure claims. The MPA and Swap transactions were conducted between insiders and executed by officers with overlapping roles at Ally Bank and GMACM, and the transactions were admitted to be "unique" to the special relationship between these entities. Moreover, the transactions occurred at a time when AFI was well aware of mounting repurchase risk, suggesting an intentional attempt to shift exposure away from Ally Bank and AFI.

65.     The Committee also is able to plead valid claims for indemnification pursuant to the Operating Agreement, which provides that AFI "will, to the fullest extent permitted by law, indemnify, defend and hold harmless ResCap and its Subsidiaries from and against any Losses related to GMAC Indemnifiable Liabilities." Both "Losses" and "GMAC Indemnifiable Liabilities" are broadly defined and encompass Debtor payments arising from (i) R&W losses related to loans originated or acquired by Old GMAC Bank and Ally Bank; (ii) the GSE settlements; and (iii) the Government Settlements. *See, e.g.*, *Gibbs-Alfano v. Burton*, 281 F.3d 12, 19 (2d Cir. 2002); *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 148 (S.D.N.Y. 2004).

66.     The Committee has a valid claim to avoid ResCap's preferential payment of $49 million to Ally Bank under the indemnity provisions of the January 30 Letter Agreement. The payment meets all of the requirements of 11 U.S.C. § 547(b): it was a transfer of ResCap's interest in property for the benefit of Ally Bank; ResCap was insolvent; the transfer was made only days before the filing of ResCap's bankruptcy petition; and Ally Bank would receive less than the full $49 million as a distribution on its unsecured claim in bankruptcy. AFI's counsel all but conceded the validity of this claim in a contemporaneous email.

67.     AFI's inequitable conduct and the resulting injury to creditors also unquestionably supports an objection based on equitable subordination to AFI's $1.1 billion secured claim under the AFI Senior Secured Credit Facility ($750 million) and AFI Letter of Credit ($380 million).

- 30 -

*See* 11 U.S.C. § 510(c); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 67 (Bankr. S.D.N.Y. 2007). The current circumstances – in which insider AFI pushed its undercapitalized subsidiaries into bankruptcy only after stripping value, imposing insurmountable liabilities, and otherwise protecting itself to the detriment of other creditors – present a textbook case for equitable subordination. *See, e.g.*, *Verestar*, 343 B.R. at 461-62; *Adelphia*, 365 B.R. at 69.[5]

## RELIEF REQUESTED

68.     The Committee requests standing and authority to commence and prosecute an adversary proceeding asserting the Claims against the AFI Defendants on or after May 1, 2013. Additionally, the Committee requests authority to settle the Claims on the same terms that the Court granted the Committee authority to settle the estate claims (the "**Lien Avoidance Claims**") the Court authorized the Committee to pursue against the Collateral Agent and the Indenture Trustee for the Junior Secured Noteholders [Docket No. 2518, ¶ 5].

## BASIS FOR RELIEF REQUESTED

### THE COMMITTEE MEETS THE REQUIREMENTS FOR STANDING AND AUTHORITY TO PROSECUTE THE CLAIMS AGAINST THE AFI DEFENDANTS

69.     Where a debtor consents to a committee suing on behalf of the estate, the Court may grant standing where (1) "the committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery," and (2) "an action is (a) in the best interest of the bankruptcy estate and (b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings." *Dewey*, 2012 WL 5985445, at *5 (citing *Commodore*, 262 F.3d at 99).

### A.     The Claims Are Colorable

70.     The showing required under the first prong is relatively easy to make:  all the

---

[5] The Estates may also have claims against other parties, including the Debtors' and the AFI Defendants' officers and directors, for breaches of fiduciary duty and aiding and abetting such breaches. The Committee does not seek authority at this time to pursue such claims but reserves its right to do so in the future.

Committee need do is "describe a facially valid claim." *Id.* at *6. The Committee "need not lay bare its complete proof" and the "[C]ourt should not conduct a mini-trial." *Id.* Even where a defendant's "legal contentions . . . will likely result in 12(b)(6) dismissal of some . . . claims" but not "the litigation as a whole," standing to sue may be granted. *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 378 (Bankr. S.D.N.Y. 2005).

71.    Under these lenient standards, each of the Claims is much more than colorable. First, the Committee can plead a facially valid veil-piercing claim, as shown in ¶¶ 48 to 62 above. Here, as in cases like *Mabon*, *Verestar*, *Buckhead*, and *Shandler*, AFI used the Debtors as mere alter egos by totally dominating their business strategies, causing them to issue faulty RMBS, and then manipulating them for AFI's own ends to seize control of Ally Bank, harvest other valuable assets and business lines, and attempt to shift both all underlying R&W risk and the impact of the eventual Government Settlements away from Ally Bank and onto the Debtors.

72.    Application of the relevant factors under the first prong of the alter ego test only underscores the veil-piercing claim here. Beyond the overarching factors of domination and asset-stripping, there is significant evidence that ResCap's officers and directors failed to function independently, and did not observe important corporate formalities; ResCap was insolvent at key points; ResCap was woefully undercapitalized for its business undertakings; and ResCap had no independence but functioned as a mere façade for AFI.

73.    The second prong of the veil-piercing test is established because, as discussed in ¶¶ 58 to 62 above, AFI abused its control over ResCap's corporate structure to perpetrate injustice, engineering an elaborate scheme to escape liability for the multi-billion dollar liabilities it created through its aggressive bulking up with toxic mortgage assets, while stripping away the assets that should have been available to satisfy that liability. Allowing AFI to retreat

- 32 -

behind the corporate veil to escape responsibility for its mortgage-related mess after playing so
fast and loose with its corporate entities would be deeply unjust. And for the reasons stated in ¶¶
63 to 67 above, the Committee can plead other colorable claims against the AFI Defendants.
Accordingly, the Committee has satisfied the first requirement of the *Commodore* standing test.

> B.   **The Committee's Prosecution of The Claims
>       Is In The Best Interests of The Debtors' Estates**

74.    Under the second prong of the standing test, the Court "must be assured that
prosecution of the [C]laims represents a sensible expenditure of the estate's resources." *Dewey*,
2012 WL 5985445, at \*6. This "means, as a practical matter, that the prospective rewards [of
litigation] can reasonably be expected to be commensurate with the litigation's foreseeable cost.
But not more than that is required." *Adelphia*, 330 B.R. at 386. Although the Court should
assess "the probability of success and financial recovery, whether it is preferable to appoint a
trustee to bring suit instead of the [C]ommittee, and the 'terms relative to attorneys' fees,"
*Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr., Inc. (In re Am.'s Hobby Ctr., Inc.)*,
223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) (quoting *In re STN Enters.*, 779 F.2d 901, 905 (2d
Cir. 1985)), the Court need not "undertake a mini-trial . . . to determine likelihood of success . . .
or the attendant fees and expenses involved." *STN Enters.*, 779 F.2d at 905-06.

75.    Here, the Court can be assured that the prospective rewards of the proposed
litigation are much more than commensurate with the litigation's foreseeable cost to the estates,
which would fund the litigation. *First*, the Debtors have asserted that the estates' claims could
be worth up to $9 billion, if not more – and a successful veil-piercing claim would make AFI
liable for many billions of dollars more. The potential recovery far exceeds AFI's prior $750
million offer, dwarfs the potential litigation costs, and justifies the conclusion that the proposed
litigation is in the best interests of the estates. *See Dewey*, 2012 WL 5985445, at \*6 ("Courts

- 33 -

have found that a suit would be in the best interests of the estate and necessary and beneficial where, if successful, it would result in a money judgment for the estate."); *Adelphia*, 330 B.R. at 384 (finding lawsuit in estate's best interest where the "potential recoveries would be enormous; the cost of prosecution will be relatively modest (by the standards of the amount at stake); and the bulk of the Creditors' Committee claims will easily withstand 12(b)(6) motions, and (to the extent the Court needs to consider this) have factual support").

76.    *Second*, the anticipated litigation costs must be discounted by the fact that the Committee has a significant head start on discovery.  Committee counsel has reviewed millions of pages of documents thus far, and the Committee's financial advisors have analyzed the Debtors' material transactions and agreements with AFI and Ally Bank and the Debtors' historical solvency and capitalization.  *Third*, a decision not to grant the Committee standing would impair unsecured creditor recoveries because the Debtors are not in a position to sue AFI. The Debtors agreed not to do so in the AFI PSA and remain subject to the disabling conflicts of that flawed deal; they have not analyzed the facts to the extent the Committee has; and the Debtors are properly focused on developing a Chapter 11 plan and winding down the estates. *Fourth*, the Committee would bring suit against AFI only when and if the Exclusive Plan Period ends without a comprehensive settlement, thereby establishing the necessity of suing the AFI Defendants as the only remaining avenue to secure a satisfactory resolution of the Claims.

77.    *Fifth*, the proposed litigation should not unduly delay the development of a Chapter 11 plan because a plan can be proposed that does not require prior resolution of the Claims.  *Finally*, the Committee's analysis – as an independent fiduciary for the real parties in interest here – that the proposed litigation is in the Estates' best interests is implicitly confirmed by the Debtors' consent. The analysis of the proposed litigation in *Adelphia*, which offered the

- 34 -

prospect of a multi-billion recovery sufficient to warrant a grant of standing, supports a similar

conclusion here: "While the Defendants plainly have defenses that will require serious

consideration . . . the substantial sums to be recovered . . . more than justify the substantial sums

that prosecuting the litigation would cost." *Adelphia*, 330 B.R. at 383 (citations omitted).

78.    In sum, the Claims are strong, supported by substantial facts, and likely to result

in a substantial benefit to the estates that greatly outweighs the anticipated cost of litigation and

AFI's current settlement offer.  As a result, the Motion should be granted.[6]

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order

granting the relief sought herein and such further relief as the Court deems just and proper.[7]

Dated:    April 11, 2013
          New York, New York

                              KRAMER LEVIN NAFTALIS & FRANKEL LLP

                              /s/ Kenneth H. Eckstein
                              Kenneth H. Eckstein
                              Barry H. Berke
                              Jeffrey S. Trachtman
                              Jennifer L. Rochon
                              Norman C. Simon
                              1177 Avenue of the Americas
                              New York, New York  10036
                              Telephone: (212) 715-9100
                              Electronic mail:  keckstein@kramerlevin.com
                              *Counsel for The Official Committee of Unsecured Creditors*

---

[6]  Notice of this Motion has been given to all parties listed on the Monthly Service List (as defined in the Case Management Order).  The Committee submits that such notice is sufficient and that no further notice of the relief requested in the Motion need be provided.

[7]  The Committee requests authority to settle the Claims similar to the authority the Court granted the Committee to settle the Lien Avoidance Claims.  This would provide the Committee, in consultation with the Debtors, with the exclusive right to enter into settlements.  Exhibit A, ¶ 5.  However, the Debtors would retain the ability to propose settlements through a plan, with the Committee's consent, both during or after the Exclusive Plan Period.  *Id.*  If exclusivity terminates, all parties other than the Debtors would retain whatever rights they otherwise would have to propose plans that settle the Claims with or without Committee consent.  *Id.*  Similar provisions have been approved in other cases.  *See e.g., In re Majestic Capital, LTD,* Case No. 11-36225 (CGM) (Bankr. S.D.N.Y. ) [Docket No. 211, ¶ 3]; *In re Old CarCo LLC* (f/k/a/ Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009) [Docket No. 5151, ¶ 2].

**Appendix**

**Partial List of Conflicted Officers and Directors**
**Redacted**

David M. Applegate has held numerous positions at AFI and its subsidiaries since at least 1995. Among the most notable were his appointments as GMACM's CEO, Chief Financial Officer, Chief Operating Officer, President, and Chairman at various times between 1999 and 2007. He served as ResCap's CEO from 2004 to 2005 and Chief Operating Officer from 2005 to 2007 and was one of ResCap's original directors, serving on its board from 2004 to 2007. From 2006 to 2007 he held simultaneous directorships at Ally Bank, GMACM, and RFC.

Hu A. Benton is a member of AFI's legal department, which provided legal services for all AFI subsidiaries, including Ally Bank, ResCap, RFC and GMACM. Benton was appointed General Counsel to Ally Bank in 2011. In 2010 Mr. Benton served as Chief Counsel for the AFI Capital Markets/Treasury Group, and a "Global Functions Report" from that time period lists him as part of the Ally Bank group. However, he held an appointment as Associate Counsel for RFC throughout that period.

David J. DeBrunner has served as Chief Accounting Officer, Corporate Controller, and Vice President of AFI since 2007. From May 2009 to 2011, he held the same three roles at Ally Bank. Mr. DeBrunner temporarily became a director of ResCap on April 21, 2008, after ResCap's two independent directors resigned, but his appointment was nullified on April 23. Mr. DeBrunner was later reappointed to the ResCap Board and its Audit Committee in June 2008, and remained in both positions through June 2009.

**Redacted**

Lisa M. Gess worked at GMACM in various positions from at least 2001 through December 2011, eventually as Executive Vice President and Senior Managing Director for Credit and Quality Risk. However, from 2009 to 2011 she worked as a Vice President at Ally Bank, while keeping her appointment at GMACM.

Adam Glassner became a Senior Vice President at Ally Bank on May 20, 2009. On July 31, 2009, he was appointed Executive Vice President of GMACM, Executive Vice President and

Senior Managing Director of ResCap, Managing Director of RFC, and as both President and

Director of over 25 ResCap subsidiaries, including certain entities whose assets are collateral for

the LOC between ResCap and AFI. Mr. Glassner remained in most of these positions until he

left Ally Bank and ResCap on January 27, 2012. Mr. Glassner was a member of AFI's Capital

Markets group.

Karin Hirtler-Garvey served as independent director of ResCap from 2008 to 2009. She

left that position to become Ally Bank's Chief Risk Officer in May 2009. She remained on the

ResCap Board until June 2009.

**Redacted**

REDACTED

**Redacted**

Mr. Marano was a Managing Director of Cerberus Capital from March 2008

until April 2009, despite his position at ResCap.        **Redacted**

Michael Rizzo joined GMACM as a Vice President, and later Senior Vice President, of

GMACM in 2004.  In November 2006, Mr. Rizzo was appointed Chief Credit Officer of GMAC

Bank.  During this period, Mr. Rizzo also served as Chief Risk Officer of ResCap's Residential

Funding Group.

**Redacted**

- 4 -

**Redacted**

Mr. Walker joined AFI in 1985.

James Whitlinger joined GMACM in 1992 and has held various positions at ResCap and its subsidiaries. He has been a Director and the Chief Financial Officer of ResCap, RFC, GMACM since 2011. He also serves as AFI's Chief Financial Officer for Mortgage Operations.

**Redacted**

Linda K. Zukauckas was a member of ResCap's Board of Directors and its audit committee from April 2005 to June 2008, and also served as Controller and Chief Accounting Officer for a period in 2007. Throughout this period, and from at least 2002 to 2011, Ms. Zukauckas held appointments at AFI as Controller and Treasurer.

**Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
In re:                                           :        Chapter 11
                                                 :
Residential Capital, LLC, et al.,                :        Case No. 12-12020 (MG)
                                                 :
                          Debtors.               :        Jointly Administered
                                                 :
-------------------------------------------------------- x

## ORDER AUTHORIZING THE OFFICIAL COMMITTEE
## OF UNSECURED CREDITORS TO PROSECUTE AND SETTLE
## CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES

Upon consideration of the motion [Docket No. _____] (the "**Motion**")[1] of the
Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors
and debtors-in-possession (the "**Debtors**"), for entry of an order, pursuant to 11 U.S.C.
§§ 105(a), 1103(c), and 1109(b), granting the Committee standing and authority to prosecute and
settle on behalf of the Debtors' estates (the "**Estates**") all claims (the "**Claims**") arising from the
Committee Investigation or the Examiner Investigation that the Estates may have against Ally
Financial Inc. ("**AFI**") and certain of AFI's non-debtor affiliates (collectively the "**AFI
Defendants**"); and of any objections thereto and the record of these Chapter 11 cases; and that
this Court has jurisdiction to order the relief provided herein in accordance with 28 U.S.C.
§§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012
(Preska, Acting C.J.); and that the Motion and the relief requested therein constitute a core
proceeding pursuant to 28 U.S.C. § 157(b); and that venue is proper before this Court pursuant to
28 U.S.C. §§ 1408 and 1409; and that due and proper notice of the Motion has been given, and
no other or further notice need be provided; and that the Court has found and determined that the
relief sought in the Motion is in the best interests of the Debtors' estates, and that the legal and

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and for good and sufficient cause appearing therefor:

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted to the extent set forth herein.

2.    All objections, if any, to the Motion or the relief requested therein, that

have not been withdrawn, waived, or settled are overruled.

3.    The Committee is granted standing, and is authorized on behalf of the

Estates, to commence and prosecute to conclusion the Claims, with the full rights and privileges

of, and in the stead of, the Debtors.

4.    The Committee may file a complaint against the AFI Defendants on or

after May 1, 2013.

5.    The Committee shall have, in consultation with the Debtors, the exclusive

right and authority to enter into settlements on behalf of the Estates with respect to the Claims;

provided, however, that pursuant to a Chapter 11 plan, the Debtors may, with the consent of the

Committee, propose a settlement of the Claims both during or after the Exclusive Plan Period;

provided further that, with respect to parties other than the Debtors, to the extent the Debtors'

exclusivity period is terminated, parties may reserve their rights with respect to the standard to

settle the Claims under a Chapter 11 plan and nothing herein shall prohibit these parties from

proposing and/or prosecuting a plan that seeks to settle the Claims.

6.    The terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

7.    Upon conversion of these Chapter 11 cases to cases under Chapter 7, the

rights of all parties-in-interest are reserved with respect to the Committee's exclusive right and

- 2 -

authority to negotiate and enter into settlements on behalf of the Estates with respect to the Claims.

        8.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

Dated: _____, 2013
       New York, New York

                                         _____
                                          MARTIN GLENN
                               United States Bankruptcy Judge