**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:

      RESIDENTIAL CAPITAL, LLC, et al,

                        Debtors.

**FOR PUBLICATION**

Chapter 11

Case No. 12-12020 (MG)

---

**MEMORANDUM OPINION AND ORDER GRANTING DEBTORS' MOTION FOR APPROVAL OF A KEY EMPLOYEE RETENTION PLAN AND KEY EMPLOYEE INCENTIVE PLANS**

*A P P E A R A N C E S:*

MORRISON & FOERSTER LLP
*Counsel for the Debtors and Debtors in Possession*
1290 Avenue of the Americas
New York, New York 10104
By:    Gary S. Lee, Esq.
        Lorenzo Marinuzzi, Esq.
        Jordan A. Wishnew, Esq.

TRACY HOPE DAVIS
*United States Trustee for Region 2*
33 Whitehall Street, 21st Floor
New York, New York 10004
By:    Brian S. Masumoto, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.
        Stephen D. Zide, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Debtors' Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) A Key Employee Retention Plan for Certain Non-Insiders and (B) Key Employee Incentive Plans for Certain Insiders, and (II) Payment of Any Obligations Arising Thereunder as Administrative Expenses* (the "Motion," ECF Doc. # 3280). The Debtors are seeking authorization to implement two incentive plans covering eight insiders, and one retention plan covering 155 non-insider employees. These bonus plans provide for bonuses of approximately $7.8 million to 163 employees, with nearly 50% being paid to the eight insiders. In support of the Motion, the Debtors submitted the Declarations of John Dempsey ("Dempsey Decl."); Ronald Greenspan ("Greenspan Decl."); Tammy Hamzehpour ("Hamzehpour Decl."); and Pamela E. West ("West Decl.") (ECF Doc. #'s 3281-3284).

The Motion is opposed by the United States Trustee (the "UST") (the "UST Objection," ECF Doc. # 3347). The UST argues that the Debtors have failed to meet their burden of showing that the KEIP payments are primarily incentivizing rather than retentive. The UST also argues that the Debtors should provide, for the record, detailed information on the amounts being paid to individual employees. The Debtors filed a redacted reply (the "Reply," ECF Doc. # 3378) and a redacted Supplemental Declaration of Ronald Greenspan (the "Greenspan Supp. Decl.," ECF Doc. # 3379) in response to the UST Objection.[1] A hearing was held on the Motion on April 11, 2013. All of the declarations were admitted into evidence at the hearing without objection. The UST agreed at the hearing that the Debtors may file redacted versions of certain information. The UST offered no evidence at the hearing.

---

[1] Unredacted versions of the Reply and the Greenspan Supp. Decl. were provided to Court, the UST and the Creditors Committee, along with a motion to seal portions of these documents.

For the following reasons, the Court overrules the UST Objection and approves the two Key Employee Incentive Plans ("KEIPs") and the Key Employee Retention Plan ("KERP").

## I.    BACKGROUND

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.    The Debtors are managing and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On the Petition Date, the Debtors filed a motion seeking authority to pay and honor prepetition wages, compensation, employee expense and employee benefit obligations, and maintain and continue employee compensation and benefit programs (the "Wages Motion") (ECF Doc. # 43).

On July 17, 2012, the Debtors filed a motion (the "KEIP/KERP Motion," ECF Doc. # 812) requesting authorization of (a) a KEIP covering seventeen senior executive insiders (the "KEIP Participants") of the Debtors and (b) a KERP covering 174 non-insiders (the "KERP Participants" and collectively, the "KEIP/KERP Participants").  On August 15, 2012, the Court entered an order approving the KERP (ECF Doc. # 1169).  On August 28, 2012, the Court issued the Memorandum Opinion and Order Denying Debtors' Motion for Approval of a Key Employee Incentive Plan.  *See In re Residential Capital, LLC*, 478 B.R. 154 (Bankr. S.D.N.Y. 2012) (the "KEIP Opinion") (ECF Doc. # 1286).   The Court found that the Debtors failed to show by a preponderance of the evidence that the KEIP was primarily incentivizing rather than retentive, as 63 percent of the KEIP awards vested if the KEIP Participant remained with the Debtors until the sales closed.  The Court ultimately approved an amended KEIP on October 18, 2012 (ECF Doc. # 1854).

On November 3, 2012, the Debtors filed an *Amended Notice of Successful Bidders at the Auctions and Sales of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to Berkshire Hathaway Inc.* and a *Notice of Filing (A) Ocwen APA and (B) Amended and*

*Restated BH Legacy APA.* (ECF Doc. # 2050.) On November 21, 2012, the Court approved the

Platform Sale (the "Platform Sale Order," ECF Doc. # 2246) and the Whole Loan Sale (the "Whole

Loan Sale Order," and together with the Platform Sale Order, the "Sale Orders," ECF Doc. # 2247).

On December 26, 2012, the Debtors filed a *Motion for a Supplemental Order Under Bankruptcy*

*Code Sections 363, 1107(a) and 1108 to the Final Wages Order Authorizing the Debtors to Make*

*Payments to their Employees Under the Residential Capital, LLC Annual Incentive Plan.* ("AIP

Motion," ECF Doc. # 2520). In the AIP Motion, the Debtors sought the Court's permission to make

customary AIP payments to their employees as an ordinary course of business transaction pursuant to

section 363(c) of the Bankruptcy Code. The Court entered an order approving the AIP Motion, in part,

on January 19, 2013. (ECF Doc. # 2750.)

### A.      The Motion

Before the Platform Sale, the Debtors' workforce included over 3,800 employees. As part of the

Platform Sale, 3,418 of the Debtors' employees were employed by Ocwen and Walter Investment

Management Corp. ("Walter"); 166 employees have been or will be terminated in the next four months;

and 258 employees will remain to assist the Debtors' estate in both the short-term and long-term

management and wind down of the Debtors' business affairs. Notwithstanding the significant transfer

of assets included in the Platform and Legacy Sales, approximately $1.6 billion of assets remain in the

Debtors' estate to be monetized, and a modified operational infrastructure must be maintained to

facilitate such efforts. Most significantly, there are approximately $1 billion of loans insured by the

Federal Housing Administration ("FHA") or the U.S. Department of Veterans Affairs (the "VA") that

the Debtors intend to monetize for the estate's benefit. In addition, there are other residual financial

assets to be monetized including, but not limited to, servicer advances, non-FHA/VA loans, trading

securities and accounts receivable. In addition to monetizing their assets, the Debtors must (i) process

over 10,000 loan applications remaining in the originations pipeline, (ii) reconcile over 3,700 proofs of claim, and (iii) continue to comply with (A) state mortgage banking licensing requirements, (B) requirements from regulators, including, if required, the foreclosure review required by the Federal Reserve Board, and (C) the requirements of the DOJ/AG settlement.

Prior to the Petition Date, most of the Debtors' employees received their annual compensation in the form of base salary and variable pay, typically in the form of awards through the ResCap Annual Incentive Plan (the "ResCap AIP") or the Ally Financial Inc. Long-Term Equity Compensation Plan (the "AFI LTECIP"). As of January 1, 2013, the Debtors discontinued the ResCap AIP and stopped participating in the AFI LTECIP. Instead, the Debtors' employees will receive a base salary and either (i) variable pay pursuant to a pre-existing compensation program (91 individuals who are facilitating the wind down of the originations pipeline), or (ii) a KEIP or KERP award as provided for in the Motion. In addition, these employees are eligible for severance at the time they are terminated.[2]

In the Motion, the Debtors seek Court approval of three plans and payment of obligations thereunder as administrative expenses pursuant to § 503(c)(3) of the Code: (i) a non-insider retention plan covering 155 employees (the "Estate KERP"); (ii) a multi-year incentive plan covering six insiders (the "Estate KEIP"); and (iii) a short-term incentive plan covering two insiders (the "Executive KEIP," together with the Estate KEIP, the "KEIPs"). The Creditors Committee negotiated with the Debtors and approves of these plans. The UST does not object to the KERP but continues to object to the KEIPs.

The Debtors argue that the KEIP programs are structured to incentivize the participating employees to preserve and maximize the estate's value in order to enhance the return for creditors. The Estate KEIP rewards employees for creating value through asset disposition and judiciously managing the estate's administrative costs. The Executive KEIP rewards the senior executives for recovering

---

[2]    At the hearing on the Motion, counsel for the Debtors assured the Court that it will seek Court approval before awarding severance payments covered by section 503(c)(2) of the Bankruptcy Code.

restricted cash from Ginnie Mae, facilitating the delivery of modified and newly originated FHA/VA loans to market under current Ginnie Mae authorization, and expanding the time during which modified FHA/VA loans can continue to be pooled and delivered.  And, the Estate KERP provides certain key employees with a fixed award to ensure that they work with the estate through the end of their retention period.

   1.  *Estate KERP*

The KERP awards are intended to provide certain Key Employees with a financial incentive to forgo seeking alternative employment during the Debtors' bankruptcy proceeding as well as after confirmation of a chapter 11 plan.  The Debtors' senior management determined that each of the Key Employees provides critical services in areas such as finance, legal, asset disposition, claims reconciliation, contract management and technology support.  Each of the Key Employees have been assigned to one of three tiers, based upon their business unit, job function and the roles they have been tasked with for the sale and transition of certain of the Debtors' businesses as a going concern.

The Estate KERP covers 155 employees and is projected to have a one year cost of $4.4 million (approximately $4.1 million plus an additional $350,000 for administrative flexibility).  In addition, twenty percent of the payments under the Estate KERP (the "Estate KERP Awards") will be deferred until the earlier of the Termination Date (date for which employment is terminated by the Estate) or one year following the award date (March 1st annually beginning in 2014) for individuals with awards above $40,000.  Forfeiture of KERP awards will occur in the following manner, with Key Employees forfeiting (i) unvested awards if terminated for cause or performance, and (ii) only unvested awards if they resign.  The Debtors seek approval of the Estate KERP under § 503(c)(3) of the Code.

2. *Estate KEIP*

The Estate KEIP provides awards to six key executives who represent the collective leadership of the estate.   The Estate KEIP includes potential awards (the "Estate KEIP Awards") in connection with five metrics.   Specifically, the Estate KEIP Awards are composed of:

(i)    50% tied to a Performance against Budget metric that will pay at target if the Estate stays within the budgeted core wind-down expenses during the period of March 1, 2013 to December 31, 2013;

(ii)    27.5% tied to a FHA/VA Recovery metric;

(iii)    5% tied to a Non FHA/VA Recovery metric;

(iv)    15% tied to a FHA/VA Recovery Rate metric;

(v)    2.5% tied to a Non FHA/VA Recovery Rate metric.

In particular, with respect to proceeds from these Recoveries, an Estate KEIP participant would receive either 50% (threshold), 100% (target), or 125% (maximum) of individualized year one target award, depending on the recovery (actual proceeds from disposition of assets) and the recovery rate (recovery amount as percentage of book value) amounts.   And, with respect to the Performance against Budget Metric, an Estate KEIP participant would receive either 50% (threshold), 100% (target), or 125% (maximum) of individualized year one target award, based on whether and to what extent the variances exceed the expense budget.

Estate KEIP awards will vest upon the earlier of the Termination Date (date stated in the employee's offer letter) or the Milestone Date (end of year one plan – December 31, 2013) so long as the metric has been achieved.   In addition, payouts for achievement of metrics between threshold and target, and target and maximum are calculated on a sliding scale.   Twenty percent of the payments under the Estate KEIP Awards will be deferred until the Termination Date.   Finally, if an Estate KEIP participant: (i) is terminated for cause or performance, then the KEIP participant will forfeit all unvested

awards (including any deferral); (ii) is terminated without cause due to accelerated downsizing, then the

KEIP participant will receive the full award at the time of payments to other KEIP participants; or (iii)

resigns, the KEIP participant will receive any vested awards but will forfeit all unvested awards.

Overall, the Estate KEIP projects a first year "target" KEIP award totaling approximately $2.2

million, with a maximum of $2.7 million.  The Debtors seek approval of the Estate KEIP pursuant to §

503(c)(3) of the Code.

3. _Executive KEIP_

The Executive KEIP covers two insiders expected to remain at least until May 3, 2013 (subject

to extension until July 3, 2013), and projects a target award (as of May 3, 2013) of $400,000 and a

maximum payout (as of July 3, 2013) of $600,000.  The Executive KEIP will cover James Whitlinger,

the Debtors' Chief Financial Officer, and Patrick Fleming, the Debtors' Capital Markets Officer.  They

are two of the Debtors' most senior officers who did not transition to Ocwen or Walter.  The Debtors'

evidence establishes that they possess unique and significant knowledge of the Debtors' operations and

finances not possessed by others in the Estate, and as a result, each individual has been intimately

involved in the Debtors' financial and capital markets activities throughout these Chapter 11 cases.  The

Debtors believe it is prudent for them to work with the Debtors through the end of April 2013 (and

possibly, through June) to facilitate the transition of the day-to-day financial and asset disposition

activities to the core estate personnel.

Target awards under the Executive KEIP through April 2013 are payable contingent upon

achievement of three metrics, including the Ginnie Mae ("GNMA") Deliveries metric (45% of target),

the GNMA Restricted Cash metric (45% of target), and the Extension of MSR Sale Agreement metric

(10% of target).  If the Executive KEIP is extended through May 2013, the incremental award for May is

based on the achievement of the GNMA Deliveries metric for May (85% of target) and the Extension of

the GNMA Pooling Approval metric (15% of target).  If the Executive KEIP is extended through June

2013, the incremental award for June is based on the achievement of the GNMA Restricted Cash metric

for June (100% of target).  The Debtors seek approval of the Executive KEIP pursuant to § 503(c)(3) of

the Code.

### B.    UST Objection

The UST objects to the Motion for two reasons.  First, the UST argues that the Debtors have

failed to meet their burden of proving that the KEIPs are not primarily retentive, and the KEIPs are

therefore subject to the restrictions imposed by § 503(c)(1).  The UST claims that incentive metrics, by

themselves, do not establish that the proposed bonus arrangement is not primarily retentive.  The

incentive metrics must not be "virtually guaranteed" and mere "lay-ups"; they must present targets that

are difficult to achieve, forcing the insiders to "stretch" in order to earn their bonuses.

With respect to the Estate KEIP, the UST asserts that 50% of the incentive award is tied to a

budget metric without sufficient information to determine whether achieving the metric will not be a

"lay-up," and 42.5% of the incentive award is tied to FHA/VA Recovery and Recovery Rate metrics as

opposed to the 7.5% of the incentive award tied to the Non-FHA/VA Recovery and Recovery Rate

metrics.  Since the FHA/VA loans are guaranteed, the UST argues that achieving the metrics associated

with those loans will be significantly easier than with respect to the Non-FHA/VA loans.  With respect

to the Executive KEIP, the UST claims that there is insufficient information to evaluate the rigor of the

GNMA metrics and the MSR Sale metrics.  The UST notes that none of the declarations address the

difficulty of achieving the metrics under the KEIPs.  Because information regarding whether the

financial and operations hurdles are challenging and incentivizing is lacking, the UST claims that the

Motion cannot be evaluated and must therefore be denied.

Second, the UST objects to the Motion because it does not provide detailed information on the amounts being paid to individual employees (though it notes that the Debtors provided a spreadsheet containing such information to the UST).[3]  In addition, the UST argues that information regarding the severance arrangements available to each KEIP recipient should be disclosed in order to provide a complete picture of the compensation and benefits available to the KEIP recipients.

The UST does not object to the Estate KERP and defers to the Creditors' Committee and the Debtors on whether the Estate KERP payments are justified under the circumstances.

### C.    The Debtors' Reply

In response to the UST, the Debtors submitted a confidential spreadsheet of total payments to KEIP and KERP participants, as requested.  In their Reply, the Debtors first argue that the KEIP plans should be evaluated pursuant to § 503(c)(3), rather than (c)(1), because there are numerous variables and challenges that the participants must achieve in order to meet the designated targets, and these accomplishments will provide material benefits to the estate.

For the Estate KEIP, for the asset recovery metric, even though the FHA/VA loans are guaranteed, the recovery timeline for these loans could be up to seven years depending on whether or not loans are located in judicial foreclosure states.  The Debtors will be taking significant action to accelerate the collections on these loans in order to reduce the administrative costs associated with a more lengthy recovery timeline.  *See* Greenspan Supp. Decl. ¶ 5.  Similarly, with respect to the non-FHA/VA assets, the Debtors need to dispose of a variety of different asset classes.  Each class has different challenges associated with it.  *See id.*  In addition, in order to achieve recoveries for the Debtors' estate on account of their equity interests in the non-Debtor entities, the Debtors must first manage the sale/liquidation of the remaining assets, resolve claims and lawsuits at these entities, and wind-down the entities, of which a number are international.  With respect to the performance against

---

[3]        The UST agreed at the hearing that the information may be filed in a redacted format.

budget metric, certain of the largest components of the Debtors' core operating expenses include, among others, compensation and benefits, transition and shared service related costs, facilities, IT, non-restructuring professionals, and document storage charges.  Managing these costs and adhering to the budget throughout the year requires the Debtors' management team to complete key operational changes.  *See id.* ¶ 8.

Similarly, with respect to the Executive KEIP, meeting the GNMA deliveries and restricted cash metrics is very challenging.  Delivering loans into the securitization market is not easily accomplished, and the two participants in the Executive KEIP were critical in obtaining permission from GNMA to continue the GNMA pooling process through June 30, 2013, which involved not only negotiating with GNMA, but also as a condition to the extension, negotiating an agreement with Ocwen to purchase the servicing rights of all new pools after the close of the 363 sale transactions.  *See* Greenspan Decl. ¶ 56.  Significant management and coordination of efforts is required in order to ensure that any document defects are cured, that all loans are eligible to be pooled (consistent with GNMA standards), and that all documents and supporting files are delivered timely to the custodian.  *See* Greenspan Supp. Decl. ¶ 13.  Last, completing extensions of the MSR sale agreement with Ocwen and the GNMA pooling authority will allow the Debtors to continue to pool any future modifications that are completed after the expiration of the current pooling authority on June 30, 2013; this is a particularly challenging task.  *See* Greenspan Decl. ¶ 56.

In addition, the Debtors further clarify the severance benefits available to KEIP recipients upon their termination by the Debtors ($68,000-$375,000 for Estate KEIP recipients; $250,000 for Executive KEIP recipients), subject to restrictions set forth in § 503(c)(2).

Last, after the Motion was filed, Ally Financial Inc. ("AFI"), the non-debtor, ultimate parent company, asked the Debtors to add two clarifying provisions to the proposed form of order.  It asked the

Debtors to add a statement that the Debtors be permitted, without further order of the Court, to

reimburse AFI for payments it makes to the Debtors' employees, as payroll processor, under the Plans.

In addition, as a result of certain reservation of rights language included in the original form of order,

AFI asked that a provision be added affirming that its rights under pre-existing orders of the Court were

not being modified by this order. The Debtors, after consulting with the Creditors Committee, agreed to

such revisions.

## II.    DISCUSSION

The Bankruptcy Code outlines two separate standards for approving compensation plans for

employees or directors, depending on whether the particular plan is made in or outside of the ordinary

course of business. *See* 11 U.S.C. §§ 363, 503(c). Transfers made in the ordinary course of business are

evaluated under section 363(c). Transfers to insiders, or transfers made outside the ordinary course of

business, are subject to the requirements of section 503(c).

Section 503(c) was added to the Bankruptcy Code as one of the BAPCPA amendments in 2005,

to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company

through the bankruptcy process." *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D.

Del. 2007). The intent of section 503(c) is to "limit the scope of 'key employee retention plans' and

other programs providing incentives to management of the debtor as a means of inducing management

to remain employed by the debtor." 4 COLLIER ON BANKRUPTCY ¶ 503.17 (15th ed. rev. 2007). In

addition to limiting payments to insiders for retention purposes, section 503 also limits severance

payments to insiders and any transaction outside the ordinary course of business that would benefit

"officers, managers, and consultants hired after the date of the filing of the petition." *Id.* The effect of

section 503(c) was to put in place "a set of challenging standards" and "high hurdles" for debtors to

overcome before retention bonuses could be paid. *Global Home Prods.*, 369 B.R. at 784-85.

### A.    Retention Payments to Insiders

Section 503(c)(1) governs payments made to insiders that are intended to incentivize the insider

to remain with the company during the reorganization.  It prohibits transfers made to:

> an insider of the debtor for the purpose of inducing such person to remain with the
> debtor's business, absent a finding by the court based on evidence in the record
> that—
>
> > (A) the transfer or obligation is essential to retention of the person because the
> > individual has a bona fide job offer from another business at the same or
> > greater rate of compensation;
> >
> > (B) the services provided by the person are essential to the survival of the
> > business; and
> >
> > (C) either—
> >
> > > (i)    the amount of the transfer made to, or obligation incurred for the
> > > benefit of, the person is not greater than an amount equal to 10 times
> > > the amount of the mean transfer or obligation of a similar kind given
> > > to nonmanagement employees for any purpose during the calendar
> > > year in which the transfer is made or the obligation is incurred; or
> > >
> > > (ii)    if no such similar transfers were made to, or obligations were
> > > incurred for the benefit of, such nonmanagement employees during
> > > such calendar year, the amount of the transfer or obligation is not
> > > greater than an amount equal to 25 percent of the amount of any
> > > similar transfer or obligation made to or incurred for the benefit of
> > > such insider for any purpose during the calendar year before the year
> > > in which such transfer is made or obligation is incurred.

11 U.S.C. § 503(c)(1).

Section 101(31)(B) defines "insider" in the context of a corporation.  The term includes a (i)

director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in

which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general

partner, director, officer, or person in control of the debtor.  11 U.S.C. § 101(31)(B).  As this Court

noted in its KEIP Opinion, the KEIP participants are all insiders of the Debtors.  478 B.R. at 170.

To the extent that section 503(c)(1) applies, the transfer cannot be justified solely on the debtor's business judgment. *See In re Borders Grp., Inc.*, 453 B.R. 459, 470-71 (Bankr. S.D.N.Y. 2011).  A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements of section 503(c)(1) in order to be subject to this subdivision's exception. *Id.*  "Attempts to characterize what are essentially prohibited retention programs as 'incentive' programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1)." *Id.* *See also In re Dana Corp.,* 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*") (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP)").

In this Court's KEIP Opinion, it found that the Debtors' originally proposed plan failed to prove by a preponderance of the evidence that the KEIP was primarily incentivizing as opposed to primarily retentive, and it was thus subject to the stringent requirements of section 503(c)(1).  Under the plan, the KEIP Participants were only required to remain with the Debtors until the closing of the platform sales, which were substantially negotiated pre-petition, in order to obtain their awards.  The Debtors essentially failed to show that the KEIP was a "pay for value" plan that offered incentives based on performance rather than a "pay to stay" plan.  478 B.R. at 170.  "When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)." *Id.* at 171.

Similarly, in *Dana I*, the debtors proposed a plan that provided for payment of awards upon "the effective date of a plan of reorganization" if the executives were still employed by the debtor, and for payment of additional awards based on the enterprise value of the debtors six months after the effective date of a plan. 351 B.R. at 99.  The court rejected the plan because it included "an amount payable to the

[plan recipients] upon the [d]ebtors' emergence from chapter 11, regardless of the outcome of these cases. Without tying this portion of the bonus to anything other than staying with the company until the [effective date of a plan]," the court refused to find that the plan was primarily incentivizing. *Id.* at 102.

On the other hand, in *Mesa Air Group*, this Court held that the debtors' incentive bonus program was not a retention bonus because it was designed to "motivate the employees to achieve performance goals." *In re Mesa Air Grp.*, No. 10 Civ. 10018 (MG), 2010 WL 3810899, *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (citation omitted). There, incentive bonuses were tied to certain performance goals, such as maintenance of flight schedules, efficient return of aircraft, securing aircraft equipment at reduced rates and negotiating reduced rates for aircraft no longer in service. *Id.* Similarly, in *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2007) ("*Dana II*"), Judge Lifland held that "[b]y presenting an executive compensation package that properly incentivizes [management] to produce and increase the value of the estate, the Debtors have established that section 503(c)(1) does not apply."

### B.      Payments Made to Employees Outside the Ordinary Course of Business

Section 503(c)(3) limits payments made to the Debtors' employees outside of the ordinary course unless such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Transactions outside the ordinary course of business and that relate to compensation must be analyzed under this provision, though courts have held that the "facts and circumstances" language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).[4] *See Borders*, 453 B.R. at 473.

In *Dana II*, Judge Lifland listed several factors that courts consider when determining if the structure of a compensation proposal and the process for its development meet the business judgment test:

---

[4]      Section 363(b)(1) provides that debtors "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment. *See Borders,* 453 B.R. at 473.

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance*?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576–77 (emphasis in original). *See also Global Home Prods.*, 369 B.R. at 786 (evaluating an incentive plan under the business judgment standard of section 363 by applying the factors listed above); *Borders*, 453 B.R. at 474 (same); *but see In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009) (standard for approval under section 503(c)(3) is higher than the business judgment test; if payments to employees outside the ordinary course were only subject to the business judgment test, then the language of section 503(c)(3) would ostensibly be rendered meaningless).

In *Mesa Air Group,* this Court found that the Debtors met their burden of showing sound business judgment with respect to an employee incentive plan under section 363.  2010 WL 3810899.  The debtors' standard compensation policy involved a lower than market base salary combined with additional compensation in the form of quarterly incentive payments, and the incentive plan supplemented the below-market base salary so the participants' total compensation was commensurate with the services they were actually providing.  The Court found that the incentive payments were consistent with past practices (they had been in place since 1998) and were vetted and approved by the

creditors' committee. Therefore, "the Debtors [ ] established that the Incentive Payments [were]

consistent with prepetition and industry practices, [were] within the expectation of creditors and [were] a

reasonable exercise of their business judgment made in good faith." *Id.* at *4. The Court additionally

stated that "[a]ssuming that these payments are not ordinary course payments under section 363 . . . they

are governed by section 503(c)(3) . . . . As noted above, the Debtors have established that the Incentive

Payments are 'justified by the facts and circumstances of the case' under section 503(c)(3) as they are

within the 'sound business judgment' of the Debtors." *Id.* (citing *Dana II*, 358 B.R. at 576-77).

**C.  The Debtors Have Met Their Burden of Showing that the Estate KERP is Justified by the Facts and Circumstances of the Case**

In determining whether to approve the KERP payments, the Court must consider the six factors

set forth in *Dana II*. The KERP participants are not insiders under § 101(31)(B) of the Code—no

individual eligible that falls under the Estate KERP has the ability to dictate overall company policy, s*ee*

Hamzehpour Decl. at ¶ 17, and the UST does not argue otherwise. *See In re Borders Grp., Inc.*, 453

B.R. at 469 (noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but do

not give them decision-making authority akin to an executive[]" and concluding that certain "director-

level" employees in that case were not insiders). Therefore, the Court need only determine whether the

Estate KERP satisfies § 503(c)(3).

First, there is a reasonable relationship between the payment proposed and the results to be

obtained.  As set forth in the Motion and supporting evidence, the payments are awarded to certain key

employees to ensure they remain with the Debtors going forward.  Failure to retain these employees

would cause the Debtors to incur significant costs replacing those employees and it would delay the

wind-down, imposing further costs on the estate. *See* Greenspan Decl. ¶ 64.  The continuity promoted,

and the institutional knowledge preserved, by the retention of such employees will increase the chances

of successfully implementing the Debtors' wind-down plan.

Second, the Estate KERP is reasonable in cost and in relation to market.  The Debtors propose to pay approximately $4.4 million in KERP payments, which is below the median of the annualized cost of KERPs implemented by other companies operating in chapter 11, and below the cost Mercer would predict.  *See* Dempsey Decl. ¶ 35.  That being said, when analyzed using the total expected cost of the plan, the Estate KERP falls above the market median.  *See id.*  The scope of the KERP is also fair and reasonable because it applies to all of the remaining employees staying for longer than five months.  Last, the Debtors engaged in adequate due diligence when setting the payment levels and they received independent advice from outside consultants (FTI Consulting Inc. and Mercer) to ensure that the payments are fair and consistent with industry standards for a company operating under bankruptcy protection.  *See* Greenspan Decl. ¶ 27.

Therefore, the Court **GRANTS** the Motion to authorize the KERP payments.  These employees—a majority of the employees of the Debtor—are being incentivized to remain with the Debtor notwithstanding its ongoing liquidation, and their skills and expertise are essential in properly and expediently winding down the company, thereby benefitting the estate and its creditors.

### D.    KEIP Payments

#### 1.    *The KEIP Payments Do Not Constitute Retention Payments Under Section 501(c)(1)*

The UST argues that KEIP payments to the KEIP Participants, who are insiders, must be evaluated under the section 503(c)(1) standard because the Motion fails to establish that the contemplated payments are primarily incentive payments rather than retention payments.  The Debtors are required to establish by a preponderance of the evidence that these payments are primarily incentivizing.  *See Residential Capital*, 478 B.R. at 170.  To determine whether a payment constitutes an incentive payment, the plan must present targets that are difficult to achieve, forcing the executives to work hard to achieve their bonuses.  *See, e.g, Dana II*, 358 B.R. at 581-83; *Residential Capital*, 478 B.R.

at 170-71 (holding that the financial and operational hurdles must be challenging and incentivizing in

order to allow KEIP awards to be judged under section 503(c)(3)); *In re Hawker Beechcraft, Inc.*, 479

B.R. 308, 315 (Bankr. S.D.N.Y. 2012) ("[T]he BAPCPA changes impose a high standard that requires

challenging goals that insiders must meet in order to earn a bonus under an incentive plan that is not

subject to § 503(c)(1).").

The evidence establishes that the KEIPs are comprised of targeted incentive payments for those

individuals who have critical roles in the Debtors' management and disposition of the remaining estate

assets.  The participants in the KEIP programs are directly involved in one or more of the following

activities: overseeing the transition and management of the Debtors' remaining operations, recovering

restricted cash from Ginnie Mae, and monetizing and disposing of over $1 billion of FHA /VA loans as

well as hundreds of millions of dollars of related assets.  According to Debtors, the incentive payments

reward the KEIP participants for successfully achieving milestones related to the Estate's asset

disposition efforts and the efficient management of the estate in a manner that will preserve and create

value for all stakeholders.  If the KEIP participants do not achieve the designated metrics, then they will

not be entitled to receive a full award.  *See* Greenspan Decl. at ¶ 35.

Based on the evidence in the record, the Court concludes that the Debtors have established by a

preponderance of the evidence that the KEIPs are properly characterized as performance-based incentive

compensation plans, and are not retention plans for insiders subject to the requirements of § 503(c)(1).

The plans differ significantly from the plan rejected in the KEIP Opinion, which rewarded the

participants based on remaining with the company until the asset sales were completed.  The plan in the

KEIP Opinion provided that only 30% of the proposed awards would be based on financial and

operational performance metrics, whereas here, the full bonus is based on financial and operational

performance metrics.  The type of payment proposed in the KEIPs more closely resembles the types of

plans approved in *Mesa Air Group* and *Dana II*, because the KEIPs are designed to motivate these employees to achieve specified performance goals and enhance production, thereby increasing the value of the estate.  In addition, the Debtors set forth in detail, in their Reply and the Supplemental Greenspan Declaration, why their targeted metrics are challenging benchmarks that will bring substantial benefits to the estate if achieved.

### 2. The Debtors Have Met Their Burden of Justifying the KEIP Payments

Having concluded that the KEIP payments are primarily incentive payments, the Court must consider the six factors set forth in *Dana II*.  First, there is a reasonable relationship between the payments proposed and the results to be obtained.  As set forth in the Motion, the payments are awarded to the employees if they reach specified goals based on (i) actual-versus-budgeted expenses, (ii) accelerating the recovery of restricted cash, (iii) recoveries on modified and originated loans delivered to GNMA, and (iv) recoveries on approximately $1.6 billion of assets to be monetized for the benefit of creditors.  *See* Greenspan Decl. ¶ 62.  As a result, these employees are incentivized to work towards enhancing the estate.  In addition, the scope of the KEIPs is fair and reasonable because they apply to all eight executives remaining with the Debtors' estate.  Moreover, the KEIPs were devised after extensive due diligence and consultations with FTI, Mercer, the Debtors' Compensation Committee, and outside counsel.  *See id.* ¶ 27.

The Court also finds that the costs of the KEIPs are reasonable and consistent with industry standards.   The Debtors have targeted the cost of the KEIPs to be $2.6 million, with an additional $540,000 available for upside payments for exceeding target metrics, and an additional $200,000 for Executive KEIP participants if the plan is extended through the end of June 2013.  While the annualized cost of the KEIPs is slightly above the median of the incentive plans analyzed, Mercer concluded that, based on expected asset recoveries of $1.6 billion, the KEIPs fall below the annual cost suggested by its

regression analysis. *See* Dempsey Decl. ¶ 34. In addition, when analyzing the 3-year, annualized cost of the KEIPs to its market study, Mercer found that the total cost of the KEIPs falls above the median but below the 75th percentile and the projected cost based on its regression analysis. *See id.*

Overall, the Court finds based on a preponderance of the evidence that the KEIP payments are justified by the facts and circumstances of the case pursuant to § 503(c)(3). A total of $3.4 million in incentive bonus payments to eight sophisticated executives attempting to complete a complicated and substantial wind-down is not necessarily too large, considering there are $1.6 billion in assets to be monetized and numerous other tasks to be completed. And, the Creditors Committee does not oppose these plans. The Court recognizes that while these key executives would only be rewarded for reaching specific goals and objectives, the amount provided to the executives is slightly above average for the industry.

The maximum payout to these executives compared to other employees will be a significant sum—14.34% of the total bonus pool for the two Executive KEIP participants ($1.1 million), and 32.35% of the total bonus pool for the six Estate KEIP participants ($2.52 million). Therefore, the allocation of benefits under the plans received close scrutiny by the Court. But in light of the complexity and challenges of the tasks remaining to be done, and the importance of executive leadership in achieving the goals that have been set, the Court concludes under all of the facts and circumstances that the plans satisfy the standards set forth in *Dana II* and subsequent cases.

### III.    CONCLUSION

For the foregoing reasons, the Debtors' Motion to approve the KERP and KEIP programs is **GRANTED**.

   **IT IS SO ORDERED.**

Dated: April 12, 2013
       New York, New York

_Martin Glenn_

MARTIN GLENN
United States Bankruptcy Judge