1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:                        Case No.

RESIDENTIAL CAPITAL, LLC, ET AL.,        12-12020-mg

          Debtors.

- - - - - - - - - - - - - - - - - - - -x

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

          Plaintiff,                Adv. Proc. No.

 - against -                             13-01277-mg

UMB BANK, N.A., et al., Defendants.

- - - - - - - - - - - - - - - - - - - -x

DEMUSTCHINE, Plaintiff,                  Adv. Proc. No.

 - against -                             12-02065-mg

RAHI REAL ESTATE HOLDINGS, LLC, Defendant.

- - - - - - - - - - - - - - - - - - - -x

          United States Bankruptcy Court

          One Bowling Green

          New York, New York

          April 11, 2013

          10:02 AM

B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2  Amended Motion for Relief from Stay (related documents 3223)

3  filed by Alfreida Pruitt.

4

5  Pre-Trial Conference (Adv. Proc.: 13-01277-mg)

6

7  Pre-Trial Conference (Adv. Proc.: 12-02065-mg)

8

9  [Docket No. 3151] Second Interim Application of Bradley Arant

10  Boult Cummings LLP as Special Litigation and Compliance Counsel

11  for the Debtors for Compensation and Reimbursement of Expenses

12  Incurred for the Period September 1, 2012 through December 31,

13  2012; fee: $4,257,795.00; expenses:  $227,136.00

14

15  [Docket No. 3174] Second Interim Application of Carpenter Lipps

16  & Leland LLP as Special Litigation Counsel for the Debtors for

17  Compensation and Reimbursement of Expenses Incurred for the

18  Period September 1, 2012 through December 31, 2012; fee:

19  $1,877,415.00; expenses:  $641,079.68

20

21  [Docket No. 3176] Second Interim Application of Centerview

22  Partners LLC as Investment Banker for the Debtors for

23  Compensation and Reimbursement of Expenses Incurred for the

24  Period September 1, 2012 through December 31, 2012; fee:

25  $1,200,000.00; expenses, $29,452.59

1

2  [Docket No. 3209] Second Interim Application of Curtis, Mallet-

3  Prevost, Colt & Mosle LLP, as Conflicts Counsel to the Debtors

4  and Debtors in Possession, for Allowance and Payment of

5  Compensation for Professional Services Rendered and for

6  Reimbursement of Actual and Necessary Expenses Incurred from

7  September 1, 2012 Through and Including December 31, 2012; fee:

8  $623,725.50; expenses:  $2,137.20

9

10 [Docket No. 3181] Second Interim Fee Application of Deloitte &

11 Touche for Compensation for Services Rendered and Reimbursement

12 of Expenses as Independent Auditor and Attest Service Provider

13 to the Debtors for the Period from September 1, 2012 through

14 December 31, 2012, fee:  $1,697,678.00; expenses:  $0.00

15

16 [Docket No. 3153] Second Interim Application of Dorsey &

17 Whitney LLP as Special Securitization and Investigatory Counsel

18 for the Debtors for Compensation and Reimbursement of Expenses

19 Incurred for the Period September 1, 2012 through December 31,

20 2012; fee:  $157,027.75; expenses:  $125.78

21

22 [Docket No. 3167] Second Interim Application of Fortace LLC as

23 Consultant for the Debtors for Compensation and Reimbursement

24 of Expenses Incurred for the Period September 1, 2012 through

25 December 31, 2012; fee:  $1,491,871.00; expenses:  $17,822.75

1

2 [Docket No. 3208] Second Interim Application of FTI Consulting,

3 Inc. as Financial Advisor for the Debtors for Compensation and

4 Reimbursement of Expenses Incurred for the Period September 1,

5 2012 through December 31, 2012; fee: $7,238,803.00; expenses:

6 $250,791.68

7

8 [Docket No. 1905] First Application for Interim Professional

9 Compensation of FTI Consulting, Inc. as Financial Advisor for

10 the Debtors for Compensation and Reimbursement of Expenses

11 Incurred for the Period May 14, 2012 through August 31, 2012

12

13 [Docket No. 3170] Second Fee Application of KPMG LLP, as Tax

14 Compliance Professionals and Information Technology Advisors to

15 the Debtors and Debtors in Possession, for Interim Allowance

16 and Compensation for Professional Services Rendered and

17 Reimbursement of Actual and Necessary Expenses Incurred from

18 September 1, 2012 through December 31, 2012; fee: $720,798.50;

19 expenses: $56,006.02

20

21 [Docket No. 3190] Second Interim Fee Application of Locke Lord

22 LLP for Compensation and Reimbursement of Expenses for the

23 Period from September 1, 2012 through December 31, 2012 as

24 Litigation Counsel for the Debtors; fee: $343,987.60;

25 expenses: $4,548.77

[Docket No. 3196] Second Interim Application of Mercer (US) Inc. as Compensation Consultant to the Debtors for the Period from September 1, 2012 through December 31, 2012; fee: $100,445.91; expenses:  $13,277.16

[Docket No. 1888] First Interim Application of Mercer (US) Inc. as Compensation Consultant to the Debtors for the Period from May 14, 2012 through August 31, 2012

[Docket No. 3173] Second Interim Application of Morrison Cohen LLP for Allowance of Interim Compensation for Professional Services Rendered and Expenses Incurred during the Period September 1, 2012 through December 31, 2012; fee:  $751,416.50; expenses:  $12,391.71

[Docket No. 3200] Second Interim Application of Morrison & Foerster LLP as Bankruptcy Counsel for the Debtors for Compensation and Reimbursement of Expenses Incurred for the Period September 1, 2012 through December 31, 2012; fee: $20,712,177.25; expenses:  $418,544.90

[Docket No. 1885] First Interim Application of Morrison & Foerster LLP as Bankruptcy Counsel for the Debtors for Compensation and Reimbursement of Expenses Incurred for the

1  Period May 14, 2012 through August 31, 2012

2

3  [Docket No. 3175] Second Interim Application of Orrick,

4  Herrington & Sutcliffe LLP as Special Securitization

5  Transactional and Litigation Counsel for the Debtors for

6  Compensation and Reimbursement of Expenses Incurred for the

7  Period September 1, 2012 through December 31, 2012 for Lorraine

8  S. McGowen, Special Counsel.

9

10  [Docket No. 3217] Second Application of Prince Lobel Tye LLP

11  for an Award of Compensation and Reimbursement of Expenses for

12  Services Rendered as an Ordinary Course Professional for the

13  Debtors for the Period of November 1, 2012 through November 30,

14  2012; fee:  $5,546.92; expenses:  $1,802.00

15

16  [Docket No. 3171] Second Interim Application of Rubenstein

17  Associates, Inc. as Corporate Communications Consultant for the

18  Debtors for Compensation and Reimbursement of Expenses Incurred

19  for the Period September 1, 2012 through December 31, 2012 for

20  Rubenstein Associates, Inc., Consultant; fee:  $10,811.25;

21  expenses:  $3,538.50

22

23  [Docket No. 3192] Second Application for Interim Professional

24  Compensation for Severson & Werson, P.C. as Special California

25  Litigation Counsel

1

2  [Docket No. 3143] Second Interim Application of Towers Watson

3  Delaware Inc. as Human Resources Consultant for the Debtors for

4  Compensation and Reimbursement of Expenses Incurred for the

5  Period August 30, 2012 through December 31, 2012; fee:

6  $138,966.79; expenses:  $9,550.01.

7

8  [Docket No. 3195] Second Application for Interim Professional

9  Compensation for Troutman Sanders LLP, Other Professional.

10

11  [Docket No. 3145] First Quarterly application of Zeichner

12  Ellman & Krause for services rendered as an ordinary Course

13  professional for the Debtors for the period May 14, 2012 to

14  November 30, 2012, filed by Jantra Van Roy.

15

16  [Docket No. 3206] Second Interim Application of AlixPartners,

17  LLP, Financial Advisor to the Official Committee of Unsecured

18  Creditors, for Compensation and Reimbursement of Expenses for

19  the Period September 1, 2012 Through December 31, 2012; fee:

20  $3,973,550.00; expenses, $41,862.83

21

22  [Docket No.  3211] First Application of Analytic Focus, LLC,

23  Consultant to the Official Committee of Unsecured Creditors,

24  for Interim Allowance of Compensation for Professional Services

25  Rendered and for Reimbursement of Actual and Necessary Expenses

1   Incurred from August 28, 2012 Through December 31, 2012; fees:

2   $608,500.25; expenses:  $216.36

3

4   [Docket No. 3205] First Interim Application of Coherent

5   Economics, LLC as Consultant to the Official Committee of

6   Unsecured Creditors for Compensation and Reimbursement of

7   Expenses Incurred for the Period August 11, 2012 Through

8   December 31, 2012; fee:  $960,003.25; expenses:  $11,592.54

9

10  [Docket No. 3199] First Interim Application of Epiq Bankruptcy

11  Solutions, LLC, as Information Agent for the Official Committee

12  of Unsecured Creditors, for Allowance and Payment of

13  Compensation for Professional Services Rendered and for

14  Reimbursement of Actual and Necessary Expenses Incurred from

15  May 22, 2012 Through December 31, 2012, fee:  $95,373.10;

16  expenses:  $189.397.75

17

18  [Docket No. 3210] First Application of J F. Morrow, Consultant

19  to the Official Committee of Unsecured Creditors, for Interim

20  Allowance of Compensation for Professional Services Rendered

21  and for Reimbursement of Actual and Necessary Expenses Incurred

22  from September 5th, 2012 Through December 31, 2012; fee:

23  $135,140.00; expenses:  $1,345.61

24

25  [Docket No. 3212] Second Application of Kramer Levin Naftalis &

1   Frankel LLP, Counsel for the Official Committee of Unsecured

2   Creditors, For Interim Allowance of Compensation for

3   Professional Services Rendered and for Reimbursement of Actual

4   and Necessary Expenses Incurred from September 1, 2012 Through

5   December 31, 2012; fee: $15,217,784.50; expenses: $385,666.94

6

7   [Docket No. 3198] Second Interim Application of Moelis &

8   Company LLC for Compensation for Professional Services Rendered

9   and Reimbursement of Actual and Necessary Expenses Incurred as

10   Investment Banker to the Official Committee of Unsecured

11   Creditors for the Period from September 1, 2012 Through

12   December 31, 2012; fee: $2,400,000.00; expenses: $197,895.04

13

14   [Docket No. 3162] First Interim Application of Pachulski Stang

15   Ziehl & Jones LLP for Compensation for Services Rendered and

16   Reimbursement of Expenses as Co-Counsel for the Official

17   Committee of Unsecured Creditors for the Period from September

18   19, 2012 through December 31, 2012; fee: $341,678.75;

19   expenses: $4,267.85

20

21   [Docket No. 3207] First Interim Application of San Marino

22   Business Partners LLC as Consultant to the Official Committee

23   of Unsecured Creditors for Compensation and Reimbursement of

24   Expenses Incurred for the Period August 11, 2012 Through

25   December 31, 2012; fee: $190,422.50; expenses: $11,287.22

1

2  [Docket No. 3182] First Interim Application of

3  SilvermanAcampora LLP, Special Counsel to Official Committee of

4  Unsecured Creditors, for Interim Allowance of Compensation for

5  Professional Services Rendered and for Reimbursement of Actual

6  and Necessary Expenses incurred from October 25, 2012 through

7  December 31, 2012

8

9  [Docket No. 3203] Second Interim Fee Application of Chadbourne

10  & Parke LLP, Counsel to the Examiner, for Allowance of

11  Compensation and Reimbursement of Expenses for the Period

12  September 1, 2012 Through and Including December 31, 2012; fee:

13  $17,301,345.50; expenses:  $563,507.73

14

15  [Docket No. 3204] Second Interim Fee Application of Arthur J.

16  Gonzalez, as Chapter 11 Examiner, for Allowance of Compensation

17  and Reimbursement of Expenses for the Period September 1, 2012

18  Through and Including December 31, 2012; fee:  $114,750.00;

19  expenses:  $0.00

20

21  [Docket No. 3193] Second Interim Fee Application of Mesirow

22  Financial Consulting, LLC for Compensation and Reimbursement of

23  Expenses as Financial Advisor to the Examiner for the Period

24  September 1, 2012 through December 31, 2012; fee:  $10,671,089;

25  expenses:  $68,482.00

1

2    [Docket No. 3178] First Interim Fee Application of Wolf

3    Haldenstein Adler Freeman & Herz LLP, Conflicts Counsel to the

4    Examiner, for Allowance of Compensation and Reimbursement of

5    Expenses for the Period From October 15, 2012 Through and

6    Including December 31, 2012; fee: $9,529.50; expenses: $47.50

7

8    Oral Motion for Relief from Stay Presented by Stephanie Harris,

9    Party Pro Se.

10

11

12

13

14

15

16

17

18

19

20    Transcribed by: Dena Page

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

1

2   A P P E A R A N C E S :

3   MORRISON FOERSTER

4           Attorneys for Debtors

5           1290 Avenue of the Americas

6           New York, NY 10104

7

8   BY:   LORENZO MARINUZZI, ESQ.

9           NORMAN S. ROSENBAUM, ESQ.

10          ERICA J. RICHARDS, ESQ.

11          SAMANTHA MARTIN, ESQ.

12          JOEL C. HAIMS, ESQ.

13

14

15  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

16          Conflicts Counsel for Debtors

17          101 Park Avenue

18          New York, NY 10178

19

20  BY:   MARYANN GALLAGHER, ESQ.

21

22

23

24

25

1

2   DORSEY & WHITNEY LLP

3          Special Counsel for the Debtors

4          51 West 52nd Street

5          New York, NY 10019

6

7   BY:   JESSICA D. MIKHAILEVICH, ESQ.

8

9

10   ORRICK, HERRINGTON & SUTCLIFFE LLP

11          Attorneys for Debtors

12          1152 15th Street, N.W.

13          Washington, D.C. 20005

14

15   BY:   DEBRA L. FELDER, ESQ. (Telephonically)

16

17

18   BRADLEY ARANT BOULT CUMMINGS LLP

19          Attorneys for Debtors

20          One Federal Place

21          1819 Fifth Avenue North

22          Birmingham, AL 35203

23

24   BY:   JAY R. BENDER, ESQ. (Telephonically)

25

1

2  CARPENTER LIPPS & LELAND LLP

3          Special Counsel to the Debtors

4          280 North High Street

5          Suite 1300

6          Columbus, OH 43215

7

8  BY:   DAVID A. BECK, ESQ.

9

10

11  SEVERSON & WERSON

12          Special Counsel to Debtors

13          One Embarcadero Center

14          26th Floor

15          San Francisco, CA 94111

16

17  BY:   DONALD H. CRAM, III, ESQ.

18

19

20  LATHAM & WATKINS LLP

21          885 Third Avenue

22          New York, NY 10022

23

24  BY:   MICHAEL RIELA, ESQ.

25

```
 1
 2   KIRKLAND & ELLIS LLP
 3           Attorneys for Ally Financial and Ally Bank
 4           601 Lexington Avenue
 5           New York, NY 10022
 6
 7   BY:   ANTHONY GROSSI, ESQ.
 8
 9
10   COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
11           Attorneys for FTI Consulting, Inc.
12           900 Third Avenue
13           16th Floor
14           New York, NY 10022
15
16   BY:   JOHN H. DRUCKER, ESQ.
17
18
19   WHITE & CASE LLP
20           Attorneys for Ad Hoc Group of Junior Secured Noteholders
21           1155 Avenue of the Americas
22           New York, NY 10036
23
24   BY:   HARRISON DENMAN, ESQ.
25
```

```
 1
 2   CHADBOURNE & PARKE LLP
 3         Attorneys for Examiner, Arthur Gonzalez
 4         30 Rockefeller Plaza
 5         New York, NY 10112
 6
 7   BY:   HOWARD SEIFE, ESQ.
 8
 9
10   AKIN GUMP STRAUSS HAUER & FELD LLP
11         Attorneys for UMB Bank
12         One Bryant Park
13         New York, NY 10036
14
15   BY:   BRIAN T. CARNEY, ESQ.
16         DAVID M. ZENSKY, ESQ.
17
18
19   MORRISON COHEN LLP
20         Attorneys for ResCap Independent Directors
21         909 Third Avenue
22         New York, NY 10022
23
24   BY:   JOSEPH T. MOLDOVAN, ESQ.
25
```

```
 1   KRAMER LEVIN NAFTALIS & FRANKEL LLP
 2        Attorneys for Creditors' Committee
 3        1177 Avenue of the Americas
 4        New York, NY 10036
 5
 6   BY:  ELISE S. FREJKA, ESQ.
 7        RACHAEL L. RINGER, ESQ.
 8        DOUGLAS MANNAL, ESQ.
 9        KENNETH H. ECKSTEIN, ESQ.
10        PHILIP S. KAUFMAN, ESQ.
11
12
13   UNITED STATES DEPARTMENT OF JUSTICE
14        Office of the United States Trustee
15        33 Whitehall Street
16        21st Floor
17        New York, NY 10004
18
19   BY:  BRIAN MASUMOTO, ESQ.
20        LINDA A. RIFFKIN, AUST
21
22
23
24
25
```

1

2    REED SMITH LLP

3          Attorneys for Wells Fargo, acting as collateral agent

4          599 Lexington Avenue

5          22nd Floor

6          New York, NY 10022

7

8    BY:   DAVID M. SCHLECKER, ESQ.

9

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12          Attorneys for Wilmington Trust

13          One Liberty Plaza

14          New York, NY 10006

15

16   BY:   MARK A. LIGHTNER, ESQ.

17

18

19   SILVERMANACAMPORA LLP

20          Special Counsel to the Creditors' Committee

21          100 Jericho Quadrangle

22          Suite 300

23          Jericho, NY 11753

24

25   BY:   JUSTIN S. KRELL, ESQ.

1

2   FREEBORN & PETERS LLP

3          Attorneys for Mercer (US) Inc.

4          311 South Wacker Drive

5          Suite 3000

6          Chicago, IL 60606

7

8   BY:   THOMAS R. FAWKES, ESQ.

9

10

11   PRINCE LOBEL TYE, LLP

12          100 Cambridge Street

13          Suite 2200

14          Boston, MA 02114

15

16   BY:   JULIE A. BRENNAN, ESQ. (Telephonically)

17

18

19   TROUTMAN SANDERS LLP

20          Attorneys for Troutman Sanders LLP

21          222 Central Park Avenue

22          Suite 2000

23          Virginia Beach, VA 23462

24

25   BY:   JASON E. MANNING, ESQ. (Telephonically)

1

2

3  THE LAW OFFICES OF THOMAS MASON, P.C.

4         Attorney for Bruce DeMustchine

5         15 New England Executive Park

6         Burlington, MA 01803

7

8  BY:   THOMAS MASON, ESQ. (Telephonically)

9

10

11  MUNGER, TOLLES & OLSON LLP

12         Attorneys for Berkshire Hathaway

13         355 South Grand Avenue

14         35th Floor

15         Los Angeles, CA 90071

16

17  BY:   THOMAS WALPER, ESQ. (Telephonically)

18

19

20  ALSO PRESENT:

21         MICHAEL AGRUSA, Towers Watson (Telephonically)

22         BRAD CORNELL, San Marino Business Partners

23           (Telephonically)

24         JOHN DEMPSEY, Mercer (US) Inc.

25         LAURA J. EISELE, AlixPartners, LLC (Telephonically)

1        ALAN FRANKEL, Coherent Economics (Telephonically)

2        STEPHANIE HARRIS, Pro Se

3        IRA HOLT, Analytic Focus (Telephonically)

4        ARNO I. IZUAGLE, Pro Se (Telephonically)

5        J. F. MORROW, Pro Se (Telephonically)

6        ALFREDIA PRUITT, Pro Se (Telephonically)

7        FRANK SILLMAN, Fortace, LLC (Telephonically)

8        GWENDOLYN B. HAWTHORNE, Pro Se (Telephonically)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE COURT:  All right, please be seated.  We're here

3    on Residential Capital, LLC.  It's number 12-12020.  And

4    there's also some adversary proceedings we'll deal with later

5    on this morning.

6           Go ahead, Mr. Marinuzzi.

7           MR. MARINUZZI:  Good morning.  Your Honor, for the

8    record, Lorenzo Marinuzzi, Morrison & Foerster on behalf of the

9    debtors.

10          Your Honor, we're going to skip through to page 14 of

11   the agenda where we begin listing the interim fee applications

12   that are on for approval this morning before the Court.

13          THE COURT:  Yes.

14          MR. MARINUZZI:  And with the Court's indulgence, since

15   all of the U.S. Trustee's objections have been resolved, if

16   it's acceptable to the Court, I'd like to skip ahead and allow

17   the examiner and the examiner's professionals to go first so

18   they could turn to the report.

19          THE COURT:  Thank you.  That's fine.

20          MR. MARINUZZI:  And that would be item number 36.

21          THE COURT:  Okay.

22          MR. SEIFE:  Good morning.  Good morning, Your Honor.

23   Howard Seife from Chadbourne & Parke, counsel for the examiner,

24   Arthur Gonzalez.  I'm here today for the interim fee

25   application of Chadbourne & Parke, as counsel to the examiner.

1  Also on for today are the interim fees for the examiner

2  himself, Mr. Gonzalez, for the examiner's financial advisor,

3  Mesirow Financial Consulting, and conflicts counsel for the

4  examiner, Wolf Haldenstein; all of these professionals and Mr.

5  Gonzalez are in the courtroom today.

6          I think our respective fee applications set forth the

7  services rendered and comply with the requirements of the

8  district.  Our fee applications have been carefully scrutinized

9  by the U.S. Trustee's office.  They raised a number of

10 objections to the applications of Chadbourne and Mesirow.

11 We've been able to resolve those objections, and Chadbourne and

12 Mesirow, respectively, have agreed to compromise and reduce

13 their fees in a manner which the U.S. Trustee's office has

14 found acceptable.

15         In the case of Chadbourne, we've agreed to reduce our

16 fee application by 175,000 dollars.  And Mesirow has agreed to

17 reduce its by 124,000 dollars.  All of these amounts are set

18 forth on the chart, which I believe was provided to you, Your

19 Honor.  I'm happy to run through the numbers in detail or

20 answer any questions the Court may have.

21         THE COURT:  Mr. Masumoto, Ms. Riffkin, are you --

22         MR. MASUMOTO:  Your Honor, that is accurate.  But if I

23 may, just for purposes of --

24         THE COURT:  Why don't you come up to the microphone so

25 we have a clearer transcript.

1          MR. MASUMOTO:  Good morning, Your Honor.  Brian

2     Masumoto for the Office of the United States Trustee.

3          Your Honor, before I turn directly to the examiner's,

4     I would like to make just a brief statement, which I believe is

5     applicable to all --

6          THE COURT:  And I have a brief statement I'm going to

7     want to make, then, to, before we get to the specifics, but go

8     ahead.

9          MR. MASUMOTO:  All right, thank you, Your Honor.

10         Your Honor, first, wanted to indicate that we did

11    reach resolution with all of the applications, and just to make

12    two minor points.  The first is that we did resolve our KEIP

13    issue with respect to Morrison & Foerster and FTI, and those

14    amounts, I believe, are listed in the chart.  We believe that,

15    based upon our discussions, that that is a reasonable reduction

16    in the amount with respect to the KEIP.  We do, however, of

17    course, defer to Your Honor as to the appropriateness of the

18    proposed reductions.

19         Second, with respect to all applications, most of the

20    objections have to do with noncompliance with either the

21    Southern District or the U.S. Trustee guidelines.  And in that

22    regard, what we wish to make clear going forward, given the

23    large number of applicants and the large amount of fees and

24    expenses being requested, that all the applicants review the

25    entire objection that's filed by the U.S. Trustee because it

1   contains objections as to many different areas that may be

2   applicable to each application, depending on the application

3   that's filed.  So whether or not a specific objection was

4   raised at a prior fee application does not necessarily govern

5   what objections will be applicable on the next interim.

6          So in fact, I'd like to focus on one particular area

7   that seems to be of continuing concern, which is the vague and

8   lumped entries that often do occur.  Oftentimes, it's a very

9   difficult objection to deal with because many people believe

10  it's subjective.  I think the examples in the objections that

11  we have raised in past and current applications should give all

12  of the applicants an idea of the areas that are problematic.

13  And as such, they are required under the guidelines to provide

14  sufficient information to allow a reader -- in this case, the

15  Court or the U.S. Trustee or any other party -- the ability to

16  determine the reasonableness of the fees and whether or not it

17  complies with the guidelines.

18         So once again, we ask that whether or not an objection

19  is specifically raised against an applicant, that they review

20  the entire objection to see if there are any other examples

21  that may apply to them in the future.  And in that regard, we

22  wish to make clear and provide notice that, based upon these

23  past interim applications, we may not necessarily agree to the

24  proposed reductions that we have stated in the past, but in

25  fact, we may request higher, if not a complete reduction on the

1  basis of objections such as vagueness, as well as some of the

2  other objections that we have raised.

3         Accordingly, once again, we know it's a difficult

4  task, but we ask that cooperation on the part of the parties

5  because the fees are quite extensive, and reviewing them is not

6  an easy chore.  Thank you.

7         And with that, I would like to indicate that the

8  settlement, with respect to Chadbourne, the examiner, and

9  Mesirow is as indicated on the sheet, and we've agreed to those

10  reductions.

11         THE COURT:  All right.  Thank you, Mr. Masumoto.

12         What I wanted to say is my chambers is filled with

13  boxes of fee applications.  My bench is filled with only a

14  portion of what is in chambers.  The burden on the Court, and

15  in particular, on the U.S. Trustee to review fee applications

16  is very, very significant.  It's an important role, and I don't

17  shirk it.  I want to express my appreciation to the very

18  careful job that the U.S. Trustee has done in this case and in

19  all others before me in reviewing fee applications.  I've made

20  clear in the past that even though the U.S. Trustee does a

21  thorough review, I have an independent duty to review the

22  applications, as well, and we do that with the assistance of my

23  law clerks and interns.  And it's a very heavy burden on

24  chambers.

25         When a resolution is reached with the U.S. Trustee, I

1  put very great weight on it because I think they take this

2  responsibility very seriously.  It's never my intention to

3  penalize a second time an applicant on a fee application.  Most

4  resolutions typically involve an agreement as to a fixed, lump

5  sum amount of reduction, so it is sometimes difficult for me to

6  know what went into that agreement.  I think that form of

7  agreement is appropriate; I'm not trying to alter that.  When I

8  am advised of agreements and resolve the U.S. Trustee's

9  objection, I certainly place great weight on it, and I

10  scrutinize my chamber's review to make sure that we're

11  satisfied that what's been covered by the U.S. Trustee's

12  resolution is an appropriate resolution of any fee dispute.

13  There are some instances, and those of you who've been here in

14  the past know that from time to time, there are issues that the

15  Court has raised, even though the U.S. Trustee has not.  And I

16  certainly may do that.

17          There are some -- as we get to some specific fee

18  applications today, to provide, perhaps, some greater

19  guidance -- I've done this in the past; I've given some

20  guidance about what my practices are with respect to what's

21  appropriate in a fee application, particularly in a case of the

22  magnitude of this one -- I'm going to give some of that

23  guidance as we get to some specific applications as we go

24  forward.

25          So again, Ms. Riffkin and Mr. Masumoto, I greatly

1    appreciate the very careful attention you and your colleagues

2    give to these issues.

3            With respect to the first applications, Chadbourne,

4    Mesirow, and Mr. Gonzalez, I would note that while the U.S.

5    Trustee had objections as to the Chadbourne and Mesirow

6    applications and a resolution has been reached, as to those,

7    there was no objection as to Mr. Gonzalez's application.  So

8    the Court is going to go ahead and approve all three of these

9    applications.

10            MR. SEIFE:  Your Honor, there's also conflict counsel,

11    Wolf Haldenstein.

12            THE COURT:  Okay, and I should have included -- theirs

13    is quite a modest amount.

14            MR. SEIFE:  Yes.

15            THE COURT:  And there was no objection to the Wolf

16    Haldenstein --

17            MR. SEIFE:  Correct.

18            THE COURT:  -- application, either.  I should have

19    included them first.  So it's a -- theirs was quite a modest

20    amount.  So all four of those applications are approved, Mr.

21    Seife.

22            MR. SEIFE:  Thank you, Your Honor.

23            And then if we could be excused to get back to work,

24    we'd appreciate it.

25            THE COURT:  You may.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    29

1        MR. SEIFE:  Thank you.

2        THE COURT:  Thank you.

3        MR. SEIFE:  And we will abide by whatever the holdback

4  requirements are.

5        THE COURT:  Okay.  Thank you, Mr. Seife.

6        MR. SEIFE:  Thank you, Your Honor.

7        THE COURT:  Mr. Marinuzzi?

8        MR. MARINUZZI:  Thank you, Your Honor.  The chart that

9  was just referenced by Mr. Masumoto I believe is the chart that

10 Your Honor has in front of him that lists alphabetically the

11 professional fee applications broken down with the debtors

12 beginning, then the committee and then the examiner.  So if

13 it's okay with the Court, I'll just proceed in alphabetical

14 order in the way the chart is structured.

15       THE COURT:  Okay.  Go ahead.

16       MR. MARINUZZI:  The first application is the

17 application of Bradley Arant Boult.  It's docket number 3151

18 requesting fees of 4,257,795 dollars and expenses of 227,136

19 dollars.

20       THE COURT:  Tell me again, the requested fees were how

21 much?

22       MR. MARINUZZI:  4,257,597 dollars.

23       THE COURT:  Okay.  Thank you.  Yep.

24       MR. MARINUZZI:  Your Honor, the U.S. Trustee's

25 objection was resolved and the fee request and expense request

1  was reduced as follows.  The fees that would be awarded, if

2  Your Honor were to grant the application, are $4,189,034.16,

3  and the expenses would be $221,385.66.

4          THE COURT:  Okay.

5          MR. MARINUZZI:  Your Honor, I should mention, to the

6  extent the representative of the firm is not here in court,

7  they're most likely participating telephonically.

8          THE COURT:  Right.

9          MR. BENDER:  Yes, Your Honor.  This is Jay Bender for

10 Bradley Arant.  And thank you, first, for letting me appear

11 telephonically.

12         THE COURT:  Certainly.  Let me -- I'm going to go

13 ahead and approve the Bradley Arant application with the agreed

14 reduction with the U.S. Trustee.  But it really -- I want to

15 reiterate a point that Mr. Masumoto made.  In some ways, I may

16 sound like a broken record on this, but we've had enough fee

17 applications at this point that there are things that are

18 showing up in these applications that shouldn't be there, and

19 the U.S. Trustee shouldn't be having to spend their time

20 flagging the specific items, and my chambers shouldn't have to

21 spend specific time flagging items.

22         In the Bradley Arant application, there was 102,000-

23 plus charged for preparation of fee applications, and it

24 included a significant amount of time reviewing monthly

25 invoices.  The monthly invoices don't have to be filed with the

1   court; the quarterly applications do.  Absent additional

2   information demonstrating that a large portion of the time

3   expended in this category is not attributable to impermissible

4   review and editing of time entries, the time shouldn't be

5   allowed.  And this has been a recurring problem.  Bradley Arant

6   has the misfortune of being the first, after the examiner.

7   They're not alone in this.  But it's a recurring problem.  I

8   would hope that the U.S. Trustee would take a harder line in

9   the future because I certainly will.

10          With respect to allowing fees for preparation of

11  bills, I've written, I think, two or three opinions that deal

12  with it.  And yet time and time again, applications show up

13  with substantial dollar amounts attributable to reviewing time

14  entries.  That should be overhead.

15          Additionally, the Bradley Arant application included

16  time entries for responding to the U.S. Trustee's objection in

17  the first interim fee application.  Professionals should not be

18  compensated for responding to inquiries or objections from the

19  U.S. Trustee regarding professional fees.  That's a second

20  recurring issue.  Okay.

21          Third, there are lumped and vague time entries that

22  total approximately 100,000 dollars, based on the Court's

23  review of the Bradley Arant fee applications.  What it

24  frequently involves, then, is the U.S. Trustee requesting more

25  detail and having to review it a second time to see whether

1   they're satisfied.  That should be unnecessary.  The Court

2   reviews it.  So we have spent an enormous amount of time when

3   there are a lot of issues pending before the Court in this

4   case.  I hope we won't see it again, and I'm confident that if

5   it occurs again, the U.S. Trustee will take an appropriate

6   position on it.  Okay.

7         It shouldn't have to come down to the U.S. Trustee

8   asking for more detail, scrutinizing categories like time spent

9   preparing fee applications.  Okay?  It has to stop.

10        So I'm approving the Bradley Arant application with

11  the agreed reduction.

12        MR. MARINUZZI:  Thank you, Your Honor.  At the

13  conclusion of this hearing, Your Honor, we will send an e-mail

14  blast out to each of the 327(e) professionals in the debtors'

15  bankruptcy case and advise them of these issues again.

16        Your Honor, the next application in the list if the

17  application of Carpenter, Lipps & Leland.  The application

18  requested fees in the amount of 1,877,415 dollars, and expenses

19  of $641,079.68.  After the U.S. Trustee's objection, the fee

20  request was reduced to $1,872,539.50; the expenses remained as

21  requested.  And this, Your Honor, is docket number 3174.

22        THE COURT:  With the agreed reduction with the U.S.

23  Trustee, the Carpenter, Lipps application is approved.  A

24  minor -- nothing's minor, in this, but what would be helpful,

25  Carpenter, Lipps included a request for reimbursement of

1   509,000 for litigation support vendors.  The invoices attached

2   to the Carpenter, Lipps fee application include disbursement

3   amounts and dates, but there are no underlying invoices for

4   these charges.  The Court expects to see the detail.

5        I gather, Mr. Masumoto, that they were provided to

6   you?

7        MR. MASUMOTO:  That's correct, Your Honor.

8        THE COURT:  All right.  The Court would like to see

9   them as well, in the future.

10        MR. MARINUZZI:  We'll convey that, Your Honor.

11        THE COURT:  All right, but I -- the application, on

12   the whole, I think, as reflected by the -- and, indeed, the

13   U.S. Trustee initially objected to 512,000 dollars in expenses;

14   it really related to this litigation support vendor.  So the

15   questions got answered, but they shouldn't have to go back and

16   ask for it.  Okay?

17        MR. MARINUZZI:  Understood.

18        Your Honor, that brings us to Centerview Partners,

19   requesting fees of 1,200,000 dollars and expenses of

20   $29,452.59.  That's docket number 3176.  After discussion with

21   the U.S. Trustee, the requested expenses have been reduced to

22   $28,433.92.

23        THE COURT:  Approved.

24        MR. MARINUZZI:  Thank you.  Next, Your Honor, is

25   Curtis, Mallet, conflicts counsel for the debtors, docket

1  number 3209.  The application requested fees in the amount of

2  $623,725.50 and expenses of $2,137.20.  The fees were reduced,

3  after discussions with the U.S. Trustee, to $617,369.55.

4          THE COURT:  Approved.

5          MR. MARINUZZI:  Next, Your Honor, is Deloitte &

6  Touche, docket number 3181.  Fees requested in the amount of

7  1,697,678 dollars; no expenses.  After discussions with the

8  U.S. Trustee, the fee request was reduced to 1,697,688 dollars.

9          THE COURT:  Approved.

10         MR. MARINUZZI:  Dorsey & Whitney, Your Honor, docket

11 number 3153, requesting fees in the amount of $157,027.75,

12 expenses of $125.78.  The fee request was reduced to

13 $156,877.45.

14         THE COURT:  Approved.

15         MR. MARINUZZI:  Your Honor, that brings us to Fortace,

16 docket number 3167, requesting fees in the amount of 1,491,871

17 dollars and expenses of $17,823.75.  After discussions with the

18 U.S. Trustee, the fees were reduced to 1,490- -- I'm sorry --

19 1,490,905 dollars, and the expenses --

20         THE COURT:  Just say it again, okay?

21         MR. MARINUZZI:  Oh, sure:  1,490,905 dollars.  And the

22 expenses were reduced -- actually, the expenses were left the

23 same.

24         THE COURT:  Let me just find my notes, okay?

25     (Pause)

1          THE COURT:  I'm going to approve the fees as revised,

2     pursuant to the agreement of the U.S. Trustee.  I would note

3     that there were many vague or inadequate time entries, and many

4     of which were identical for each day.  For instance, for each

5     workday in September, Frank Sillman charged many hours

6     "researching and drafting supplemental expert declaration

7     including the trust-level expected lifetime loss model process

8     and other related topics."  Other partners wrote essentially

9     identical descriptions for their daily activities.  In the

10    Court's view, the descriptions were inadequate; more detail is

11    required.  I am going to approve the application as modified

12    pursuant to the agreement with the U.S. Trustee.

13         MR. MARINUZZI:  Your Honor, that brings us to FTI

14    Consulting, docket number 3208 requesting fees in the amount of

15    7,238,803 dollars and expenses of $250,791.68.  Your Honor may

16    recall, not too long ago, the Court approved a modification to

17    their retention terms for some work that they were doing for

18    Walter for which the estate was being reimbursed, and there's

19    going to have to be some accounting adjustments because it

20    happened -- the approval was recently.  In any event, after

21    discussions with the U.S. Trustee, FTI has agreed to reduce the

22    amount of the fee request to 7,178,803 dollars; the expense

23    request remains the same.

24         Your Honor, one of the issues that was resolved with

25    respect to FTI, which was also the same for Morrison &

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1    Foerster, involves the time spent for the first interim

2    application in connection with the KEIP.  And I don't know if

3    Your Honor wants to address that separately.  We can do it in

4    connection with Morrison & Foerster with FTI, but it's an issue

5    that's out there from the first interim.

6           THE COURT:  Well, let me just -- let me ask.  In the

7    second amended proposed agenda that was filed last night, you

8    showed as unresolved the issue about Morrison & Foerster's fees

9    from the first interim application, which obviously related to

10   the KEIP.  And you've indicated -- when did that get resolved?

11          MR. MARINUZZI:  Your Honor, I'm sorry.  To the extent

12   that reflected that, that was in error.  Our agreement with the

13   U.S. Trustee settled all of the KEIP matters from the first

14   interim and the second interim.  And the way we approached it,

15   Your Honor, in our response, one of the exhibits was a careful

16   review of the time detail for the first interim application,

17   each of those months, as well as the first month or two of the

18   second interim period where we identified KEIP time, KEIP/KERP

19   time, and formulated with the U.S. Trustee what would be an

20   appropriate reduction.  And we quantified the time.  And then

21   when you look at the time detail, it's extremely difficult to

22   tell from any of the entries, because they were KEIP/KERP,

23   whether it was mostly KEIP, mostly KERP, and to the extent it

24   was mostly KEIP, was it with respect to a particular aspect of

25   the KEIP that the Court didn't approve, or was it something

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1  that was totally separate, apart from the metrics that were

2  established.  And so after discussions with the U.S. Trustee

3  and agreeing that what we were asking for in a reduction was

4  more than what we thought was appropriate, and what the U.S.

5  Trustee was willing to accept was less than probably what they

6  would've fought for, was one of those resolutions that neither

7  one of us was happy.

8          So to the extent the agenda led the Court to believe

9  otherwise, I apologize, but we did resolve, with respect to the

10 first and the second, the KEIP issues, and the same is true for

11 FTI.

12         THE COURT:  Mr. Masumoto, I'd just like to hear

13 briefly with -- we'll deal with FTI now, but obviously, the

14 first KEIP was a source of -- the fees in connection with the

15 first KEIP were a source of real concern to the Court.

16         MR. MASUMOTO:  Yes, Your Honor.  As indicated by

17 counsel, what happened was, unfortunately, the KEIP issue was

18 more complicated.

19         THE COURT:  Right.

20         MR. MASUMOTO:  And as a result, that resulted in the

21 need for -- we advised the parties ahead of time, and they met

22 their deadline to file their replies, I believe, this Tuesday.

23 And it was subsequent to the filing of those replies that we

24 continued our discussions and then ultimately reached a

25 resolution.  And as indicated by Your Honor, we tried to take

1  into account both the first interim time that was reserved by

2  the Court, as well as the current application.

3          And as Mr. Marinuzzi has indicated, a similar

4  procedure was also accomplished with respect to FTI, trying to

5  determine exactly how much was attributable to KEIP.

6  Unfortunately, I think getting exact allocations were difficult

7  given the nature of the time descriptions where many

8  timekeepers would record time as being applicable to both.  I

9  think both parties, both FTI and Morrison & Foerster convinced

10 our office that, in fact, they tried to be more generous in

11 allocating it to KEIP for the sake of caution and for the sake

12 of settlement.  And so based upon those explanations and

13 discussions, we believe that the respective reductions took

14 into account both the overlap between the KEIP and the KERP,

15 the amount of time spent both during the first and second

16 interim, the amount of remedial efforts that were necessary to

17 get to the revised KEIP that was approved by the Court, and

18 that was sort of the process that we went through.

19         If Your Honor would like, I believe, with respect to

20 Morrison & Foerster, we can indicate the amount --

21         THE COURT:  We'll talk a little bit more about it when

22 we get to Morrison & Foerster.

23         MR. MASUMOTO:  Right.  With respect to FTI, it was

24 a -- reached a global settlement of approximately 60,000

25 dollars.  Although that included resolution of, I believe, the

1    other issues relating to minor meal expenses and transitory
2    timekeepers, I would say the bulk of that reduction was really
3    attributable to the KEIP issue.

4          THE COURT:  All right, thank you very much, Mr.
5    Masumoto.

6          All right, with the agreed adjustment with the U.S. --
7    do you want to be heard?

8          MR. DRUCKER:  Just briefly, Your Honor.  John Drucker
9    from Cole, Schotz, Meisel, Forman & Leonard, on behalf of FTI,
10   Inc.  I acknowledge the recommendations of the U.S. Trustee and
11   adopt the statements of Mr. Marinuzzi as to how the discussions
12   evolved.  The U.S. Trustee was very thorough.  We had several
13   discussions, including as a result of the response that was
14   filed on behalf of FTI, Inc., and we reached the compromise
15   that we reached, and we obviously support that.

16         I just wanted to rise, mostly, by way of
17   clarifications to the amounts sought and with regard to the
18   issue concerning the Walter Services work.  The amount sought
19   in the application was 7,238,803, of which 238,803 was
20   attributable to what we call the Walter Project Services.  As
21   the Court may recall, in March, the retention of FTI was
22   adjusted to reflect the additional work on behalf of Walter
23   Services, which is compensation that will be paid by Walter
24   Investment Company, not by the estate.  But we do have to
25   provide them with an order that reflects the awarding if the

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1   Court is inclined to award it so that that would trigger the

2   payment by Walter Services.  So we would request that in the

3   order that there be an indication, either by footnote or

4   statement, breaking out the Walter Services work so it's clear

5   for Walter Services, as to what they have to pay.

6            THE COURT:  Mr. Drucker, confer with Mr. Marinuzzi and

7   with Mr. Masumoto.  I'm certainly fine with that.  I'm fully

8   aware of the expansion of the work and that Walter was going to

9   pay, and so I have no problem with what you're requesting.

10  Just come up with an agreed form of order.

11           MR. DRUCKER:  Thank you.  We'll do that.  And in

12  addition, the application reflected that there is a, what we

13  call a rollover amount; there is a capped compensation, as part

14  of the retention, so in addition to the amounts I reflected,

15  there was a rollover of 295,362 dollars.  And in addition, as

16  part of the first interim application, there was a deferral of

17  59,225 dollars with regard to the KEIP and is reflected by Mr.

18  Marinuzzi and the U.S. Trustee's office and is also part of the

19  compromise, so that would increase the amount indicated by Mr.

20  Marinuzzi.  But we can reflect all of that in the order.

21           THE COURT:  All right.  Mr. Masumoto, are you

22  agreeable with that?

23           MR. MASUMOTO:  That's right, Your Honor.

24           THE COURT:  All right, thank you very much.

25           MR. DRUCKER:  Thank you.

1          THE COURT:  Thank you, Mr. Drucker.

2          Mr. Marinuzzi?

3          MR. MARINUZZI:  Your Honor, thank you.  My colleague,

4     Ms. Richards, pointed out to me that although the agenda entry

5     could have been probably more clearly worded, it does, in fact,

6     say that it's been resolved with respect to Morrison &

7     Foerster's first interim.  I apologize.

8          THE COURT:  That's fine.

9          MR. MARINUZZI:  I had to read it twice myself.

10         THE COURT:  Okay.

11         MR. MARINUZZI:  Your Honor --

12         THE COURT:  It certainly differed than all the other

13    entries.

14         MR. MARINUZZI:  It's different.  Yes.  Your Honor, the

15    application of Hudson Cook, docket number 3189, has been

16    adjourned --

17         THE COURT:  Yes.

18         MR. MARINUZZI:  -- to, I believe, June 12th.

19         THE COURT:  Right.

20         MR. MARINUZZI:  That brings us to KPMG, docket number

21    3170, requesting fees in the amount of $720,798.50 and expenses

22    of $56,006.02.  Your Honor, there was no objection.

23         THE COURT:  All right, it's approved.

24         MR. MARINUZZI:  Thank you.  That brings us to Locke

25    Lord, Your Honor, docket number 3190, requesting fees in the

1   amount of $343,987.60 and expenses of $4,548.77.  Your Honor,

2   after discussions with the U.S. Trustee, the amount of the

3   requested expenses (sic) have been reduced to $342,163.80;

4   expenses remain as requested.

5          THE COURT:  Approved.

6          MR. MARINUZZI:  That brings us to Mercer, Your Honor,

7   docket number 3196, requesting fees of $100,455.91, expenses of

8   $13,277.16.  There was no objection, Your Honor, but with

9   respect to Mercer, if Your Honor recalls, in connection with

10  the first interim application, it was not approved; it was not

11  denied, but not approved and it's been carried.

12         THE COURT:  Okay.  Let me hear from Mercer's counsel.

13         Now, after he speaks, Mr. Masumoto, I'll let you

14  speak, all right?

15         MR. FAWKES:  Good morning, Your Honor.  Thomas Fawkes,

16  on behalf of Mercer (US) Inc.  With me in the courtroom today

17  is John Dempsey from Mercer, as well.

18         Your Honor, we're in a bit of a unique situation here,

19  in that the U.S. Trustee did not object to our first interim

20  application, but we are fully aware of the issues raised by

21  Your Honor with respect to the fees related to the original

22  KEIP --

23         THE COURT:  I basically said you should have known

24  better.

25         MR. FAWKES:  -- as well as the objections that were

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1  raised to Morrison & Foerster's and FTI's applications.  In

2  light of those objections, and in light of the reductions that

3  were taken by both Morrison & Foerster and FTI, notwithstanding

4  the fact that there wasn't a pending objection to our

5  application, we did agree to take a twenty percent reduction on

6  our fees related to the first interim fee application which we

7  believe would constitute a substantial percentage of the fees

8  that could be attributed directly to the KEIP.

9          THE COURT:  Mr. Masumoto?

10          MR. MASUMOTO:  Your Honor, we have no objection to

11  that.

12          THE COURT:  All right, with that agreed reduction,

13  it's satisfactory to the Court and I'll approve the

14  application.

15          MR. FAWKES:  Thank you, Your Honor.

16          MR. MARINUZZI:  Your Honor, next on the list is

17  Morrison Cohen, docket number 3173, requesting fees of

18  $751,416.50, expenses of $12,391.71.  After discussions with

19  the U.S. Trustee, the requested fees have been reduced to

20  $744,779.50 and the expenses are as requested.

21          THE COURT:  Just let me find my notes.

22     (Pause)

23          THE COURT:  I'm going to approve the fees as reduced

24  pursuant to the agreement with the U.S. Trustee.  This was,

25  once again, an application with the recurring problem of fees

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1   being charged, modest though they were, for reviewing and

2   revising billing invoices.  These services are overhead and not

3   compensable by the estate.

4          In addition, the firm sought something over 8,000

5   dollars under the project category "fee/employment objections".

6   Any time spent responding to objections by the U.S. Trustee are

7   not compensable.

8          I'm approving the application as revised.

9          MR. MARINUZZI:  Thank you, Your Honor.

10          That brings us to Morrison & Foerster, docket number

11   3200, requesting fees of $20,712,177.25 and expenses of

12   $418,554.90.  After discussions with the U.S. Trustee, Your

13   Honor, the fee request for the second interim application has

14   been reduced to $20,622,177.25, and in connection with the

15   first interim application, Your Honor, we've agreed to reduce

16   the fees that were not approved by the Court -- this is the

17   300,000-dollar reserve -- by 150,000 dollars to accommodate the

18   KEIP objection.

19          THE COURT:  Mr. Masumoto?

20          MR. MASUMOTO:  That's correct, Your Honor.

21          THE COURT:  All right.  I have a number of comments

22   that I indicated at the start that I have some guidance that I

23   want to provide with respect to future applications.

24          So I'm going to go ahead and approve the Morrison &

25   Foerster applications, both for first interim that was still

1   left open, and for the second interim application.

2           With respect to the first interim application, with

3   respect to the time involved in the KEIP motion, as everyone is

4   aware, the Court rejected the first KEIP motion in a written

5   opinion, which is reported at 478 BR 154.  And while lawyers

6   are not guarantors of success of their legal arguments, they,

7   nevertheless, owe a duty to their client and their court to

8   only assert arguments reasonably supported by the facts and the

9   law.  This is particularly so when lawyers are pressing a claim

10  for relief, rather than defending against a claim asserted by

11  others.

12          With respect to the first KEIP motion, the debtors'

13  position was not reasonably supported by the facts or the law,

14  and the estate should not bear the full cost of that misguided

15  effort.

16          While the Court doesn't believe that the position

17  asserted by Morrison & Foerster, it wouldn't have been

18  sanctionable under Rule 11, that's not the standard for

19  compensation -- awarding compensation in a bankruptcy case.

20          Where services are necessary -- whether services are

21  necessary is determined from the perspective of the time at

22  which the services were rendered.  See 3 Collier on Bankruptcy,

23  paragraph 330.04 (1)(b)(iii).

24          In the Second Circuit, the "necessary" standard in

25  Section 330 is given a broad interpretation.  Services are

1    "necessary" if they benefit the estate.  See In re Keene

2    Corporation, 205 BR 690 at 695, Bankruptcy Court, Southern

3    District of New York, 1997.  It's a decision by Judge

4    Bernstein.

5            The test considers whether services provided were

6    "reasonably likely to benefit the estate" and is an objective

7    test, considering the services that a reasonable lawyer would

8    have performed in the same circumstances.  See In re Ames

9    Department Store, Inc., 76 F.3d 66 at 72, Second Circuit, 1996.

10           The Court has an independent duty to review fee

11   applications and evaluate the compensation requested.  See In

12   re Keene, 206 BR at 695.

13           The Court may reduce or disallow or request if the

14   services provided no real benefit to the estate.  And that's

15   Keene at page 696.

16           As were certainly apparent the first time this matter

17   came on for the fee application, and the Court's opinion on the

18   KEIP, the Court does not believe that all of the services that

19   Morrison provided in connection with the first KEIP motion

20   satisfied the applicable standards.  Some of the work that was

21   done by Morrison in connection with the first KEIP motion was,

22   in the end, no doubt beneficial when the KEIP was revised and

23   approved by the Court without further objection by the United

24   States Trustee.  That work may also have provided a benefit

25   with respect to the currently pending KEIP motion that would be

1  considered by the Court later today.  Therefore, it was clearly

2  appropriate for there to be the partial allowance of the fees,

3  as appropriate, in the circumstances.

4        The Court is satisfied that the agreement reached

5  between the United States Trustee and Morrison & Foerster

6  satisfactorily resolves the issue.

7        I put that all on the record because I think, Mr.

8  Marinuzzi, your firm, the work you've done throughout the case

9  has really been of very, very high quality, and I'm certainly

10 very pleased with it.

11       It should be a reminder to all lawyers in the case,

12 whether they're asserting a position on a motion or taking a

13 position in an objection, that given the volume of what goes on

14 in this case, the Court, in the first instance, hopes that

15 counsel will fairly reflect the state of the law, particularly

16 if I've written on a subject, as I had on the KEIP.  And I

17 won't hesitate to scrutinize and, when appropriate, applying

18 the standards for review of fee applications, reduce or

19 eliminate fees entirely, if that's appropriate.  I'm perfectly

20 satisfied with the resolution that you've reached with the U.S.

21 Trustee.

22       Let me address some issues regarding the second

23 interim application.  I'm approving it as agreed with the U.S.

24 Trustee, but there are issues that I want to provide all

25 counsel with future guidance.  And I think that, given the

1    magnitude of the work of Morrison & Foerster as the debtors'

2    principal counsel, in the heavy demands the case has placed on

3    the firm, I think many of these things are particularly

4    applicable to them.  And it was in the context of my review of

5    their applications where some of these issues arose.

6            So what I'm going to describe is -- it's only

7    applicable to this case.  I don't want to generalize, although

8    I try to be consistent from case to case.  I have some

9    presumptive rules that I apply, and they can be overcome -- the

10   presumptive rules can be overcome by a showing of good cause.

11           One:  if you staff a case with lawyers from offices

12   outside of New York, airfare and hotel expenses in New York are

13   part of overhead and, absent exceptional circumstances, should

14   not be charged to the estate.

15           I know that demands of this case have -- I assume

16   that's what has resulted in very fine lawyers from other

17   offices outside of New York of Morrison & Foerster being

18   heavily involved in the case.  And I'm singling this out not to

19   adversely reflect on his work -- because it's not -- Darryl

20   Rains, I guess, is, what, from Palo Alto?

21           MR. MARINUZZI:  That's correct.

22           THE COURT:  There were substantial charges for airfare

23   and hotels in New York for his work on the case.  In my view,

24   that's overhead.

25           You have to make a decision how you're going to staff

1    the case.  I'm not criticizing that decision, particularly in a

2    case with fees of the magnitude that your firm is being

3    awarded.  It is appropriate, in my view, that I draw a careful

4    line as to what should be overhead and what's properly

5    chargeable to the estate.  If a professional is -- if their

6    bills are fairly minimal, and there's a good reason why they're

7    involved, and they're from out of town, I would certainly

8    consider those as appropriate circumstances to approve travel

9    to New York.  But particularly in the case of Morrison &

10   Foerster, I don't think it's appropriate.

11          I'm not going to -- I have a tally of what the travel

12   and hotel bills were for a number of the lawyers, which I

13   wasn't sure where they were -- where their primary office was.

14   I actually looked on your Web site and figured out where

15   they -- why were there New York hotel bills.

16          I'm not going to alter -- I'm satisfied with the

17   agreement that the U.S. Trustee has reached here.  In the

18   future, I assume that won't be there.

19          Number two:  charging for hotels in New York City for

20   late-night work by New York lawyers will only be reimbursable

21   if the work is past 11 p.m., and then only up to the amount

22   that a car service or taxi would cost to go home.

23          I know there were a fair number of entries for you,

24   Mr. Marinuzzi.  I can only imagine that you only had a few

25   hours of sleep.  I'm not questioning that, or of your

1  colleagues in the same boat.

2          For the most part, given New York hotel prices, the

3  prices that were charged were modest in comparison to what

4  other hotels in New York charged.  But again, in the context of

5  this case in particular, I'm not going to approve -- and I

6  assume that it shouldn't be there, and the U.S. Trustee will

7  flag it if it is -- my chambers will -- because it's more than

8  a couple.  I probably would have just passed it by if there

9  weren't quite a few.  I don't question that your lawyers often

10  in this case were working extraordinary hours, and it was

11  required.  But I will not approve reimbursement for hotels in

12  New York City for late-night work in New York, unless the work

13  was past 11, and then only for up to the amount that a car

14  service or taxi would charge.

15          Third:  the U.S. Trustee objected to the number of

16  Morrison lawyers who were present at omnibus hearing days.  On

17  some of those omnibus hearing days, there were ten to fifteen

18  lawyers in attendance.

19          Let me say first that I commend Morrison & Foerster

20  for having many junior lawyers, associates in counsel arguing

21  matters before the Court.  In my view, they've uniformly done

22  an excellent job.  And I think it was completely -- it is

23  completely appropriate, and I hope you'll continue to do that;

24  to have those lawyers who work on the specific matters in court

25  to argue the matters that they've worked on, or if they've

1   particularly supported the work in a matter that's being

2   argued.  It's always nice, I know, to be able to turn to the

3   associate or counsel who worked on it and make sure you don't

4   misspeak.  So it's completely appropriate.

5           MR. MARINUZZI:  They typically know the answer.

6           THE COURT:  Okay.  But where multiple lawyers attend

7   omnibus hearings, I'm drawing -- you can say this is an

8   arbitrary line -- no more than three lawyers per firm may

9   charge for the entire length of the hearing.  Other lawyers for

10  the firm, who are arguing or appearing, or specifically

11  supported work on particular matters, may charge for the time

12  in connection with those matters.

13          We've had long agendas, and I understand lawyers are

14  here.  They're sitting here for a whole morning, and it may

15  only be ten minutes that their matter is argued.  That's what

16  I'm going to permit them to charge for.

17          It doesn't have to be the same three lawyers each

18  time.  I see less lawyers on your side of the room today than

19  is often the case.

20          But the one thing -- it's a challenge for all large

21  law firms about finding meaningful roles for young lawyers, and

22  I commend you for doing it.  And the young lawyers have done a

23  terrific job, and --

24          MR. MARINUZZI:  Thank you, Your Honor.

25          THE COURT:  -- I hope I will continue to see them,

1    okay?  So this is not intended as a message -- there is

2    sometimes, though -- training and things like that are

3    overhead.  There's a real benefit to your firm in getting the

4    lawyers in court.

5             I single you out; there are other firms that have had

6    a lot of lawyers, as well, but this was something, I mean, the

7    U.S. Trustee objected on, and I looked through with care at all

8    the hearings.

9             Okay, next -- and this applies to everyone -- my

10   chambers review not only the fees in detail, but also the

11   expenses.  It would be helpful to the Court if your accounting

12   systems will accommodate it.  If you could provide a summary of

13   expenses by category; for example, meals, airfare specifically

14   indicating the class of service -- I guess if you put in there

15   that all airfare was in coach class, you don't have to list it

16   with each individual item -- hotels, things of that nature.

17   Because when my chambers go through, it can be very cumbersome

18   and difficult to go through the very lengthy fee applications

19   and find -- they will be chronological, but there will be

20   hotels here, hotels there, hotels.  I would hope, if you can

21   accommodate this request with your accounting system, it would

22   be helpful to the Court in reviewing the applications if you

23   could provide such summaries.

24            Okay, let me reiterate some guidelines that I've given

25   in the past, so if someone gets the transcript, they can find

1    it all in one place.

2              No reimbursement for travel time within New York City

3    or to or from court.

4              Next, reimbursement for fifty percent of non-work

5    travel time outside of New York.

6              Next, no reimbursement for taxicabs or car services

7    within New York or to or from court, except before 8 a.m. or

8    after 8 p.m., or when required to transport voluminous

9    documents that make public transportation impracticable.

10             And next, all meal reimbursement that is otherwise

11   appropriate needs to be limited to twenty dollars per person.

12             I think I captured what I've -- the guidance I've

13   given in the past.  Mr. Marinuzzi will probably recall if I

14   left anything out from that.

15             But I go over this list again because I think -- I

16   hope in the future that I will have to spend less time

17   reviewing fee applications, and particularly the U.S. Trustee's

18   Office will have less time that they have to devote to

19   reviewing it.  Okay.  Next.

20             MR. MARINUZZI:  Thank you, Your Honor.  We'll

21   certainly put those into an e-mail and circulate them

22   internally so that everybody is aware of this Court's rules to

23   the extent they haven't been complying.

24             Your Honor, that brings us to Orrick, Herrington &

25   Sutcliffe, docket number 3175, requesting fees of $674,764.98

1    and expenses of $611.43.  Your Honor, the fee request was

2    reduced to $671,266.15, and the expenses remain as requested.

3            THE COURT:  All right, the Orrick application is

4    approved.

5            I would note as a positive that -- and the U.S.

6    Trustee noted this -- that Orrick voluntarily reduced its

7    request for compensation, and I have the specific sum, but I

8    don't need to put it on the record.  And is not seeking

9    compensation for time expended in connection with the United

10   States Trustee's objection to the first fee application.

11   That's the point I've made earlier.  That was completely

12   appropriate, and they did that as a voluntary reduction, so

13   that was appropriately done.  So the Orrick application is

14   approved.

15           MR. MARINUZZI:  Thank you, Your Honor.

16           The Pepper Hamilton application, docket number 3187,

17   has been adjourned to --

18           THE COURT:  Is adjourned.

19           MR. MARINUZZI:  -- June 12th.

20           THE COURT:  Right.

21           MR. MARINUZZI:  And we'll be talking a little bit

22   about Pepper Hamilton shortly.

23           Next is Prince Lobel Tye, docket number 3217

24   requesting fees of $70,220.80 and expenses of $12,128.12.

25   There was no objection.

1          THE COURT:  Approved.

2          MR. MARINUZZI:  Next is Rubenstein Associates.  There

3    was no objection.

4          THE COURT:  Approved.

5          MR. MARINUZZI:  Severson & Werson, docket number 3192,

6    requesting fees in the amount of $1,144,734.04 and expenses of

7    $218,413.27.  After consultation with the U.S. Trustee, the

8    amount of requested fees has been reduced to $1,137,187.54, and

9    expenses reduced to $218,189.02.

10         THE COURT:  I'm going to approve the application.

11   This one was really screwed up.  They attached the wrong

12   documents.  It appeared that they were trying to recover twice

13   for the same thing.  It's gotten fixed.  It's approved.

14         MR. MARINUZZI:  Thank you, Your Honor.

15         THE COURT:  More care needs to be taken to make sure

16   that the application is submitted correctly the first time.

17         MR. MARINUZZI:  Understood.

18         Towers Watson Delaware, Inc., docket number 3143,

19   requesting fees in the amount of $138,966.79 and expenses of

20   $9,550.01.  After discussion with the U.S. Trustee, the amount

21   of fees have been reduced to $134,002.79.  Expenses remain the

22   same.

23      (Pause)

24         THE COURT:  What page?  Does anybody know what page

25   it's on?  Do you know what page in the middle?  9?  Okay, sorry

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1    for the delay.  All right, the Towers Watson fees are approved

2    as adjusted.  This application suffered from numerous vague and

3    lumped time entries.  It needs to be fixed in the future.

4              Go ahead.

5              MR. MARINUZZI:  Thank you, Your Honor.  That brings us

6    to Troutman Sanders, docket number 3195, requesting fees in the

7    amount of $498,063 and expenses of $9,645.92.  After

8    discussions with the U.S. Trustee, the fee request was reduced

9    to 495,750 dollars.

10             THE COURT:  Approved.

11             MR. MARINUZZI:  Thank you, Your Honor.  And that

12   brings us to the last of the debtors' advisers.  Zeichner

13   Ellman & Krause, docket number 3145, requesting fees in the

14   amount of $638,616.20 and expenses --

15             THE COURT:  Approved.

16             MR. MARINUZZI:  Thank you.

17             THE COURT:  With the adjustment.  There's a --

18             MR. MARINUZZI:  Correct.  The adjustment.  Okay.

19             THE COURT:  Right.

20             MR. MARINUZZI:  Your Honor, I will accede the podium

21   to Ms. Ringer who will present the applications of the

22   committees' professionals.

23             THE COURT:  Okay.

24             MR. MARINUZZI:  Thank you.

25             MS. RINGER:  Good morning, Your Honor.  Rachael Ringer

1  from Kramer Levin on behalf of the committee.

2          First, Your Honor, we appreciate the Court's guidance

3  with respect to fees going forward, and the guidance we

4  received from the U.S. Trustee in discussions about their

5  objection.  We will certainly let all of the committee

6  professionals know going forward.

7          THE COURT:  Thank you.

8          MS. RINGER:  If Your Honor would like, I'll follow Mr.

9  Marinuzzi's lead and just walk through each of them --

10          THE COURT:  Absolutely.

11          MS. RINGER:  -- in alphabetical order.

12          THE COURT:  Go ahead.

13          MS. RINGER:  First is AlixPartners, docket number

14  3206, requesting fees in the amount of $3,973,550 and expenses

15  in the amount of $41,862.83.  The U.S. Trustee did not have an

16  objection to that.

17          THE COURT:  Approved.

18          MS. RINGER:  Next is Analytic Focus, docket number

19  3211, requesting fees in the amount of $608,500.25 and expenses

20  in the amount of $216.36.  To resolve the U.S. Trustee's

21  objection, Analytic Focus agreed to reduce their fee request to

22  $578,705.25 and expenses remained the same.

23          THE COURT:  I'm going to approve it.  The problem here

24  is vague and duplicate time entries.  It requires a lot more

25  work by the U.S. Trustee.  So I'm going to go ahead and approve

1     it, though.

2             Go ahead.

3             MS. RINGER:  Next is Coherent Economics, docket number

4     3205, requesting fees in the amount of $960,033.25 and expenses

5     in the amount of $11,592.54.  To resolve the U.S. Trustee's

6     objection, Coherent agreed to reduce its fee request to

7     $949,385.52 and the expense requests remain the same.

8             THE COURT:  It's approved.

9             MS. RINGER:  Next is Epiq Bankruptcy Solutions, docket

10    number 3199, requesting fees in the amount of $95,373.10 and

11    expenses in the amount of $189,397.75.  The U.S. Trustee raised

12    an informal objection with respect to Epiq's fee application,

13    and they agreed to reduce their fee requests to $93,761.10 and

14    the --

15            THE COURT:  It's approved.

16            MS. RINGER:  -- expenses remain the same.

17            THE COURT:  It's approved.

18            MS. RINGER:  Next is the fee application of Mr. J. F.

19    Morrow, docket number 3210, requesting fees in the amount of

20    $135,140 and expenses in the amount of $1,345.61.  To resolve

21    the U.S. Trustee's objection, Mr. Morrow agreed to reduce his

22    fee request to $128,383 and expenses remain the same.

23            THE COURT:  It's approved.

24            MS. RINGER:  Next is the application of Kramer Levin

25    Naftalis & Frankel, docket number 3212, requesting fees in the

1  amount of $15,217,784.50 and expenses in the amount of

2  $385,666.94.  To resolve the U.S. Trustee's objections, Kramer

3  Levin agreed to reduce its fee request to $15,093,058.80 and

4  expenses remain the same.

5          THE COURT:  Okay.  First, I would note the committees'

6  counsel, Kramer Levin, has undertaken a very, very major and

7  important role in the case.  The fees are, obviously, very

8  substantial.  I've done this with all the applications, I've

9  reviewed all of them quite carefully, and particularly the

10 really large ones.  But I'm fully satisfied that -- I think

11 your firm has done a good job with fee applications generally,

12 and I think, given the magnitude of the fee application, the

13 size of the reduction I think speaks for itself.  It's quite

14 modest in relation to what you initially sought, so it's

15 approved.

16         MS. RINGER:  Thank you, Your Honor.

17         Next is Moelis & Company, docket number 3198,

18 requesting fees in the amount of $2,400,000 and expenses in the

19 amount of $197,895.04.  To resolve the U.S. Trustee's

20 objection, Moelis agreed to reduce its expense request to

21 $195,710 and fees remain the same.

22         THE COURT:  Approved.

23         MS. RINGER:  Next is Pachulski Stang Ziehl & Jones,

24 docket number 3162, requesting fees in the amount of

25 $341,678.75 and expenses in the amount of $4,267.85.  To

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1   resolve the U.S. Trustee's objections, Pachulski agreed to

2   reduce its fee request to $332,996.75 and its expense request

3   to $4,055.05.

4            THE COURT:  All right.  It's approved.

5            MS. RINGER:  Next is San Marino Business Partners,

6   docket number 3207, requesting fees in the amount of

7   $190,422.50 and expenses in the amount of $11,287.22.  To

8   resolve the U.S. Trustee's objection, San Marino agreed to

9   reduce its fee request to $188,613.37 and expenses remain the

10  same.

11           THE COURT:  It's approved.

12           MS. RINGER:  Finally, Your Honor, is

13  SilvermanAcampora, docket number 3182, requesting fees in the

14  amount of $59,525 and expenses in the amount of $129.32.  The

15  U.S. Trustee did not raise an objection.

16           THE COURT:  Approved.

17           MS. RINGER:  Thank you, Your Honor.

18           THE COURT:  Thank you very much, Ms. Ringer.  That

19  completes --

20           MR. MARINUZZI:  Thank you, Your --

21           THE COURT:  -- the fee applications, is that right?

22           MR. MARINUZZI:  I'm sorry?

23           THE COURT:  That completes the fee applications?

24           MR. MARINUZZI:  Almost, Your Honor, almost.

25           THE COURT:  Almost.

1        MR. MARINUZZI:  As Your Honor will recall, when the

2   first -- the order approving the first interim request was

3   entered, it reserved the ten percent holdback from the first

4   interim period.  We'd request that that holdback be paid, if

5   it's acceptable to the Court, for the first interim.

6        And with respect to the second, consistent with what

7   we did in the first, to the extent we could get half of the

8   holdback paid with entry of the order, we'd appreciate that, as

9   well.

10       THE COURT:  Mr. Masumoto?

11       MR. MASUMOTO:  Your Honor, we'll defer to the Court as

12  to the holdback.

13       THE COURT:  How much is the -- what's the total being

14  held back so far at this point?  Do you know?

15       MR. MARINUZZI:  Your Honor, ten percent of the first

16  interims.  I don't recall offhand what the amount is.

17       MR. MASUMOTO:  The interim was approximately fifty-

18  four million dollars.  I think the current interim is about a

19  hundred million dollars.

20       THE COURT:  Ninety-six million and change.

21       MR. MASUMOTO:  Right, with the expenses.

22       THE COURT:  My pause is the following:  I know this is

23  a large, complex, and in many ways difficult case.  At various

24  times, I've expressed my frustration that more progress has not

25  been made in moving this case to a conclusion.  The burn rate

RESIDENTIAL CAPITAL, LLC, ET AL.                                    62

1    on fees and expenses is enormous.  The longer this case goes

2    on, the worse it's going to be.

3            I have few tools available to make this message clear,

4    other than words that will be lost when everybody leaves the

5    courtroom.

6            The one thing that I can do is maintain holdbacks so

7    all of you have skin in the game with respect to getting this

8    case done.  I'm leaving all holdbacks in place.

9            MR. MARINUZZI:  Okay, Your Honor.  With that, we're

10   done with the fee applications.

11           THE COURT:  Okay.  Let's take a short recess.

12           MR. MARINUZZI:  Okay.

13           THE COURT:  We did try to stagger the calendar a

14   little bit this morning.  I want to give people who were here

15   for fee applications and don't need to remain an opportunity to

16   leave.  So we're going to take a ten-minute recess.  Then I

17   agreed -- it's not shown on the agenda that I agreed we would

18   take up the Harris matter; we'll do that at 11:20.  And then

19   there are matters -- the regular calendar in ResCap resumes at

20   11:30.  Okay?  So I'll come back on the bench at 11:20.  I want

21   to give an opportunity to anybody who doesn't need to remain is

22   free to leave.

23           MR. MARINUZZI:  Thank you, Your Honor.

24       (Recess from 11:10 a.m. until 11:22 a.m.)

25           THE COURT:  All right.  Please be seated.  All right.

1    Mr. Marinuzzi.

2           MR. MARINUZZI:  Your Honor, I believe Your Honor

3    indicated that the Court was going to hear the matter of a pro

4    se movant?

5           THE COURT:  Yes, that's correct.

6           MR. MARINUZZI:  Thank you.

7           THE COURT:  Ms. Harris, is it?  You just need to

8    identify yourself on the record.

9           MS. HARRIS:  My name is Stephanie Harris.

10          THE COURT:  Okay.

11          MS. HARRIS:  And thank you, Your Honor, for hearing

12   this case.

13          THE COURT:  Okay.

14          MS. HARRIS:  GMAC has filed as Deutsche Bank to

15   foreclose on my unit two times.  Yet, at no point -- here is a

16   letter from the Federal Reserve, from Deutsche Bank, stating

17   that they have no association with this.

18          We then have -- each time GMAC files, we have more

19   creative assignments.  We now have an assignment of a mortgage

20   in 2008 from People's Choice after they've been bankrupt in

21   2007 to Deutsche Bank.

22          We then have filed, which wasn't -- when I originally

23   hired Glasser (ph.) in 2008, GMAC did not have this note.  This

24   is a fabrication and it's artwork, it's not a note.  It has no

25   allonges, it has no seal, it's in the incorrect place.

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1          The mayor's ID does not show any of these transfers.

2          The truth, as it happened, was that People's Choice

3    was subject to a fire sale by Lehman Brothers.  All these loans

4    were removed pre-bankruptcy; in other words sold ex-pit,

5    without the allonges, by the executives, and they were scooped

6    up by these companies with no standing, with no chain of title.

7          Stacy Bressler (ph.) in federal court, and I'm loose

8    to use the word "perjured" herself, but that's what she did.

9    She claimed in front of Judge Cristol that she had the physical

10   original note for Deutsche Bank filed in camera.  But what they

11   filed in camera was an out-of-date power of attorney between

12   Deutsche Bank and Residential, pulling a trick upon the court.

13   How the court didn't go to examine what was filed in camera,

14   that had virtually no relationship to what Ms. Bressler said,

15   is a miracle.

16         We requested an evidentiary hearing.  The judge

17   insisted.  Bressler says, "I have the note."  The judge says,

18   "Well, show me the note."  She says, "No, I don't want to show

19   you the note."

20         We then scheduled the evidentiary hearing, and they

21   dismissed the foreclosure action because we'd been through

22   several lawyers, and they knew we know they have no note, and

23   they have no standing.  They then, a few days before they file

24   for bankruptcy, after the Federal Reserve and Deutsche Bank

25   told them to cease and desist using their name, they file for

1  foreclosure again as Deutsche Bank.

2         So they don't seem to really think they own my loan,

3  and they really don't own my loan, because they have so many

4  holes in the chain of title; it looks like a Swiss cheese.

5         So I am asking you not to carry this further, and to

6  accede the unit to me, held in apposition, if the true owner

7  can prove that this is their property, which they can't,

8  because there are no notes, there are no assignments.

9  Everything is reverse engineering and reverse paperwork done

10 after the fact and catering to GMAC.

11         GMAC, and I apologize for the State of Florida, has

12 six generations of white-collar fraud.  They started as the

13 biggest land sales boiler room on 79th Street.  They dug their

14 own ditches without permits.  They defiled the wetlands, et

15 cetera.  When the DBPR said that you could no longer sell

16 property that was underwater --

17         THE COURT:  Where is your property, Ms. Harris?

18         MS. HARRIS:  My property is in Florida.

19         THE COURT:  Where in Florida?

20         MS. HARRIS:  South Beach.

21         When the DBPR told GMAC they could no longer sell

22 swampland without disclosing it, they went into the timeshare

23 and the loan business.  But the tactics are identically the

24 same.  There is not one piece of paper in the assignments or in

25 the note that has any factuality.  When they were put to the

1  test in the Honorable Judge Cristol's court, filing as identity
2  theft, because Deutsche Bank did not authorize Stacy Bressler
3  to be their representative, but she files as the representative
4  for Deutsche Bank.
5         This is going beyond what I consider the point.
6         THE COURT:  Let me make sure I understand.  What is
7  the relief you're requesting from the Court?
8         MS. HARRIS:  I'm releasing (sic) that the unit be
9  acceded to me in its entirety and to be taken away from Ocwen
10  because there is virtually no chain of title on this unit.
11  They cannot show title.  They've never shown title.  They've
12  been trying since 2008.  They were kicked out of bankruptcy
13  court because they couldn't have standing, and then they filed
14  again.
15         THE COURT:  Did you have a bankruptcy proceeding?
16         MS. HARRIS:  Yeah.
17         THE COURT:  Where?  In Florida?
18         MS. HARRIS:  Yes.
19         THE COURT:  In which court?
20         MS. HARRIS:  Judge Cristol, the Southern District.
21         THE COURT:  Okay.
22         MS. HARRIS:  I specifically went to bankruptcy to
23  avoid the Florida foreclosure court.
24         THE COURT:  And are you -- is your bankruptcy
25  proceeding still open?

1          MS. HARRIS:  No; it's closed.

2          THE COURT:  When was it closed?

3          MS. HARRIS:  2010, at which point we continued

4    discussing it with GMAC.  Well, we wanted to have an

5    evidentiary hearing, produce the notes.  Of course, they

6    couldn't produce the notes.  They can't modify, because it was

7    never federally registered.  They led you on these modification

8    trails, which they couldn't deliver because they didn't have

9    the ability to do a half-modification because none of the paper

10   was federally recorded.

11         THE COURT:  May I ask you this?  Did you commence an

12   adversary proceeding in your bankruptcy case against any of the

13   parties about whom you're complaining?

14         MS. HARRIS:  Yes.  We were about to sue when they

15   released it, and we were --

16         THE COURT:  Not about to.  Did you start -- what I'm

17   trying to find out is whether in your bankruptcy case in

18   Florida --

19         MS. HARRIS:  Yes.

20         THE COURT:  -- whether you had commenced a lawsuit

21   against any of the debtors here, or Deutsche Bank, or any other

22   parties?

23         MS. HARRIS:  Deutsche Bank is an innocent victim.

24         THE COURT:  Okay.  Just come back.  Did you start a

25   lawsuit against any of the Residential Capital entities -- GMAC

RESIDENTIAL CAPITAL, LLC, ET AL.                    68

1   Mortgage, or any of them -- in your bankruptcy proceeding in

2   Florida?

3            MS. HARRIS:  We were going to, but they filed --

4            THE COURT:  Not were going to.

5            MS. HARRIS:  No, we didn't.

6            THE COURT:  Okay.  All right.

7            MS. HARRIS:  But we filed against Lincoln Mews, we

8   filed a motion against the State of Florida; yes, we did.

9   Lincoln Mews actually --

10           THE COURT:  And tell me, what is it that you filed in

11  this court?  What have you filed in this -- I'm hearing you.

12  This --

13           MS. HARRIS:  In this court, I filed --

14           THE COURT:  -- was not on the agenda for today.

15           MS. HARRIS:  -- for relief of stay to release my unit

16  based on the fact that GMAC --

17           THE COURT:  Relief from stay doesn't convey title to

18  anything.  What relief from stay would do --

19           MS. HARRIS:  I mean, I'm sorry, request --

20           THE COURT:  Let me finish.  Don't interrupt, okay?

21           If I have a properly filed motion for relief from

22  stay, it's to permit a party to proceed in another court.  It

23  does not -- with a lawsuit that's been filed in another court,

24  that's pending in another court.  It doesn't -- relief from

25  stay doesn't grant the relief you're asking for.  It doesn't

1  grant relief --

2           MS. HARRIS:  I understand.

3           THE COURT:  -- to clear title, or order that title be

4  vested in you, or anything like that.

5           So what is it that you're asking this Court to do?

6           MS. HARRIS:  To give me clear title.  What am I going

7  to do?

8           THE COURT:  I can't.  I can't --

9           MS. HARRIS:  Sue Ocwen?

10          THE COURT:  -- do that.

11          MS. HARRIS:  How can you transfer property that has no

12  assignments?  That have fraudulent assignments?  Didn't meet --

13          THE COURT:  Let me ask you this, Ms. Harris.  Have you

14  spoken -- the law firm of SilvermanAcampora was retained in

15  this case as special borrowers' counsel.  They're special

16  counsel to the creditors' committee for borrower-related

17  issues.  And they've been endeavoring to reach out and talk

18  with all borrowers who have, or believe they have claims or

19  specific problems they want to raise in this case.  Have you

20  spoken with anyone from SilvermanAcampora?  One of their

21  lawyers is here.  Have you done that?

22          MS. HARRIS:  I spoke to them, and all I've seem to

23  have heard, that he didn't want this heard.  He didn't want --

24  he said I had no hearing today.

25          THE COURT:  Well, there wasn't.  There was no hearing

 1  scheduled for today.

 2          MS. HARRIS:  Thank you for -- well --

 3          THE COURT:  But I'm hearing you.

 4          MS. HARRIS:  Thank you so much.

 5          No, I don't know what to do.  If this goes to Ocwen,

 6  who do I sue?

 7          THE COURT:  All right.  Let me -- I want to ask

 8  counsel from SilvermanAcampora to speak.  Why don't you have a

 9  seat right -- the seat next to you --

10          MS. HARRIS:  Thank you.

11          THE COURT:  -- there.  And --

12          MR. KRELL:  Good morning, Your Honor.  Justin Krell,

13  SilvermanAcampora, special counsel to the committee.

14          Your Honor, we did make several attempts to contact

15  Ms. Harris.  It wasn't until our second letter that Ms. Harris

16  responded.  We did have a telephone conversation with Ms.

17  Harris advising her that it wasn't on the calendar for today;

18  however, she was adamant about appearing.

19          Her motion really seeks to be deemed a creditor in

20  possession, not a debtor-in-possession.  We advised Ms. Harris

21  that she did file a proof of claim, which seems to be a timely

22  proof of claim; therefore, essentially, she is a creditor and

23  has filed a proof of claim.  Her motion seeks relief to file a

24  proof of claim, which she already did.  So these other issues

25  that she's raising today before the Court isn't the relief

1    requested in the motion and is kind of new upon us, as well,

2    Your Honor.

3            THE COURT:  Okay.  All right.  Let me hear from the

4    debtors' counsel.  Thank you very much.

5            MR. ROSENBAUM:  Your Honor, Norm Rosenbaum, Morrison &

6    Foerster for the debtors.

7            Your Honor, I concur with what Mr. Krell said about

8    the relief requested in the motion.  I think what we've learned

9    based on investigating this matter, the property is subject to

10   a pending foreclosure in Florida.  Ms. Harris has the rights,

11   under the supplemental servicing order, to defend the

12   foreclosure in its entirety.

13           I'm hearing things about the assignment, and we're

14   happy to, and will follow up with our client to make sure that

15   that's correct.  That has to be addressed, and if it's

16   incorrect, we'll address it in the foreclosure.

17           THE COURT:  What's your understanding, Mr. Rosenbaum,

18   about who you believe owns the loan?

19           MR. ROSENBAUM:  It was -- the servicing was assigned

20   to Ocwen, but --

21           THE COURT:  Yeah, but do you know who purports to own

22   the loan?

23           MR. ROSENBAUM:  The investor?

24           THE COURT:  Yes.

25           MR. ROSENBAUM:  Can I have one second, Your Honor?

1          THE COURT:  Is it in a securitization trust?

2          MR. ROSENBAUM:  Yes.

3          THE COURT:  Is Deutsche Bank the trustee for the

4    trust?  Do you know?

5          MR. ROSENBAUM:  Based on what we heard this morning,

6    we e-mailed some of our client contacts, and I don't believe

7    it's Deutsche.

8          THE COURT:  All right.  And Ocwen is the current

9    servicer of the loan?

10          MR. ROSENBAUM:  Yes.

11          THE COURT:  And the foreclosure proceeding is pending

12    in where?  In state court where in Florida, do you know?

13          MR. ROSENBAUM:  I'd refer to Ms. Harris.  I don't

14    think we have the specific information.

15          THE COURT:  I'll let you talk in a second.

16          But anything else you want to add, Mr. Rosenbaum?

17          MR. ROSENBAUM:  No, Your Honor.

18          THE COURT:  All right.  Thank you.

19          Go ahead, Ms. Harris, I'll hear you again.

20          MS. HARRIS:  Foreclosures in Florida have become a

21    rocket docket.  They are a one-and-a-half-minute hearing

22    where --

23          THE COURT:  You call it a rocket docket, but they're

24    about three years behind.

25          MS. HARRIS:  That's exactly what it became.

1          THE COURT:  But they're about three years behind in

2     dealing, because --

3          MS. HARRIS:  But now they're --

4          THE COURT:  -- I deal with -- I deal with foreclosure

5     issues concerning Florida property quite often.

6          MS. HARRIS:  Now they've been put on what's called the

7     rocket docket.  They give a minute-and-a-half hearing.  They do

8     not --

9          THE COURT:  Are you scheduled for hearing in Florida?

10         MS. HARRIS:  What?

11         THE COURT:  Are you scheduled for a foreclosure

12    hearing --

13         MS. HARRIS:  No.

14         THE COURT:  -- in Florida?

15         MS. HARRIS:  No.  I'm going to move out of

16    foreclosure.  The foreclosure court in Florida is a comedy.

17    Okay?  The only thing that's going on in Florida is the

18    attorney general took 200 million of the money, and she wants

19    the other 100 million, and she's scheduling at one-and-a-half-

20    minute trials without any -- I was actually told that the 14th

21    Amendment has no standing there.

22         THE COURT:  Okay.  All right.  All right.  Here's the

23    way the Court --

24         MS. HARRIS:  So who do I sue?

25         THE COURT:  Okay.

1          MS. HARRIS:  I'm not going to --

2          THE COURT:  I don't give legal advice, Ms. Harris,

3     about who you should sue.  The only thing I can tell you is you

4     can't sue the debtor in state court in Florida, or in federal

5     court in Florida.

6          This is the way we're going to proceed:  Mr. Krell,

7     could you please provide the Court with a filing that attaches

8     Ms. Harris' request for relief motion, in whatever form it

9     is?  I'm not asking for your position on the merits, but I'd

10    like to be able to -- I'd like some narrative that explains in

11    plain English, if you could, what this dispute is about and

12    what the relief.  And I know you said the relief that Ms.

13    Harris seems to be asking for today is not what she asked for

14    in the motion.

15         MR. KRELL:  Right.

16         THE COURT:  Okay.  And Mr. Rosenbaum, I'll permit you

17    to file something, as well.

18         And, Ms. Harris, I'll let you file an additional --

19         Mr. Krell, how much time do you want to be able to

20    file something?

21         MR. KRELL:  Thirty days, Your Honor?

22         THE COURT:  You've got to be sooner than that.  Let's

23    do it in a week.  I'm not looking for something really

24    elaborate.  I just want to try and move this along and see --

25    if Ms. Harris is entitled to relief from the Court, I'm going

1    to consider it.  But I want to be sure about exactly what I'm

2    being asked to do.  So I'll give you a week.

3              What I'd like, if you could, since you're special

4    counsel, is to prepare a formal order that specifically

5    provides that special counsel to the committee will file

6    within -- put a date within a week.  And that I'll give the

7    debtor a week thereafter to file, and I'll give Ms. Harris a

8    week thereafter for a final filing.  I'm not going to set

9    another hearing.  I will receive the papers, and I will resolve

10   the matter on the basis of the papers.  Okay?  So if you would

11   just submit a form of an order.  Review the form of order with

12   the debtors' counsel and with Ms. Harris, okay?

13             Ms. Harris, you need to communicate with the

14   committees' special counsel for borrower issues.

15             MS. HARRIS:  I called a hundred times.

16             THE COURT:  You need -- okay -- you need to

17   communicate.

18             MS. HARRIS:  Okay.

19             THE COURT:  And I am sure you will.  Don't leave

20   without making sure they have your contact -- do you have

21   e-mail?

22             MS. HARRIS:  Yes, I do.

23             THE COURT:  Okay.  Well, make sure that both the

24   debtors' counsel and the special committee counsel have your

25   e-mail address.  It's probably the best way to communicate.  I

1  want to make sure you get whatever pleading they file in court,

2  and whatever the debtor files.  But I'm going to limit -- I'm

3  going to limit filings to fifteen pages.

4          MS. HARRIS:  May I ask one question?

5          THE COURT:  Go ahead.

6          MS. HARRIS:  Since there is no Residential Capital

7  anymore to sue, I am not going into foreclosure court.  I'm

8  going to complex litigation on this.

9          THE COURT:  Look, you're not going into complex

10  litigation against ResCap, okay?

11          MS. HARRIS:  That's what I'm saying.

12          THE COURT:  You can't do that, okay?

13          MS. HARRIS:  That's exactly what I said.

14          THE COURT:  There's an automatic stay.  But they're

15  not servicing your loan.  They don't claim to own your loan.

16  They're not servicing your loan.  Okay?  So this is --

17          MS. HARRIS:  So then does Ocwen?

18          THE COURT:  Ms. Harris, you've asked for relief from

19  the Court.

20          MS. HARRIS:  Thank you.

21          THE COURT:  It's unclear to me what you're asking for.

22  I'm asking special borrowers' counsel to do this filing, and

23  hopefully it will lay out in a cohesive way that I can

24  understand what it is -- what you think the issue is.  I'm

25  going to give the debtor a chance to respond, and I'm going to

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1   give you the last word in writing.  And then I'm going to

2   resolve the matter on the papers, okay?  All right.  That's

3   going to be the disposition.

4           MS. HARRIS:  Thank you, sir.

5           THE COURT:  So you'll prepare the order, okay?

6           MR. KRELL:  I just want to be clear with what -- so

7   the first form of order is, basically, a scheduling order?

8           THE COURT:  Yes.  Yes.

9           MR. KRELL:  And in my pleading, is it going to lay out

10  what Ms. Harris' current motion is?

11          THE COURT:  Yes.

12          MR. KRELL:  Or what she submitted already?

13          THE COURT:  Yes.  I want to be able to understand --

14          MS. HARRIS:  Thank you.

15          MR. KRELL:  The current motion that she had filed?

16          THE COURT:  Yes.  And but also you can elaborate with

17  what --

18          MR. KRELL:  Some of the issues she raised today.

19          THE COURT:  -- she's raised here for the first time in

20  court.  Okay?

21          MR. KRELL:  Okay.  Yes.

22          THE COURT:  I'm counting on you to be able to --

23          MR. KRELL:  Decipher --

24          THE COURT:  -- present in cohesive way --

25          MR. KRELL:  I hear you.

1        THE COURT:  -- what it is --

2        MS. HARRIS:  Thank you.

3        THE COURT:  -- that's before me.  Okay?

4        MR. KRELL:  Yes, sir.

5        THE COURT:  All right.  That's going to be the --

6   thank you, Ms. Harris.

7        MS. HARRIS:  Thank you, sir.

8        THE COURT:  All right.  Let's move on.  Mr. Marinuzzi?

9        MR. MARINUZZI:  Your Honor, when we broke, there as a

10  bit of confusion on the part of the committee, the debtors, and

11  the U.S. Trustee as to the holdback for the second interim

12  period.

13        THE COURT:  Ten percent.

14        MR. MARINUZZI:  It is ten percent.

15        THE COURT:  Yes.

16        MR. MARINUZZI:  Okay.  I was wrong, and I'm happy to

17  be wrong.  Thank you.

18        THE COURT:  Okay.

19        MR. MARINUZZI:  That brings us to page 27 of the

20  agenda, contested matters.

21        THE COURT:  All right.  Let me find it.  I'm sorry if

22  I was unclear --

23        MR. MARINUZZI:  That's okay.

24        THE COURT:  -- Mr. Marinuzzi.  Okay, go ahead.

25        MR. MARINUZZI:  Your Honor, that brings us to what we

1  call the PwC motions.

2          THE COURT:  Yes.

3          MR. MARINUZZI:  This is the interim orders that have

4  been entered for PwC, Hudson Cook, and Pepper Hamilton.  I

5  believe we submitted to chambers further revised interim orders

6  that carry the final hearing out to the 30th while Your Honor

7  is considering the other.

8          THE COURT:  Yes.  Anybody else want to be heard on

9  this?

10          They're approved.

11          MR. MARINUZZI:  Thank you, Your Honor.

12          And that brings us, Your Honor, to, I believe, Mr.

13  Rosenbaum's matter which is found on page 31 of the agenda.

14          THE COURT:  Approach.

15          MR. MARINUZZI:  Yes, thank you.

16          THE COURT:  Mr. Rosenbaum.

17          MR. ROSENBAUM:  Good morning, Your Honor.  Again, Norm

18  Rosenbaum, Morrison & Foerster, for the debtors.

19          I believe Ms. Pruitt has made a telephonic appearance.

20          THE COURT:  Ms. Pruitt, are you on the telephone?  Ms.

21  Pruitt, are you on the telephone?

22          MS. PRUITT:  Yes, I am, Your Honor.

23          THE COURT:  Okay.  All right.  This is your motion.

24  Do you want to be heard?

25          MS. PRUITT:  Yes.  Yes.  Good morning, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                              80

1           THE COURT:  Good morning, Ms. Pruitt.

2           MS. PRUITT:  I'm Alfredia Pruitt.  I filed a motion

3    for lift of stay on March 13, 2013.  And the reason I'm asking

4    the Court to lift of stay motion, Your Honor, I'm listed as a

5    creditor in GMAC Chapter 11 filing.  I don't know -- it has not

6    been established how GMAC owes me money.

7           GMAC -- I signed a promissory note with USAA Federal

8    Savings Bank on August 6, 2010.  All my payments went to USAA

9    Federal Savings.  I never received a collection notice from

10   GMAC.  I never received a contract between GMAC and USAA

11   Federal Savings to even service my loan.  USAA Federal Savings

12   filed papers stating that there are no assignments.

13          I requested from GMAC on several occasions to -- well,

14   I even asked the Court to compel GMAC to prove that they were

15   the holder in due course.  Well, Your Honor, because GMAC -- I

16   was so upset, I filed numerous lawsuits.  At that time, I

17   didn't even realize I was being repetitive in the filing.  The

18   original filing, the judge would have heard my case in it, but

19   I was required to pay 5,500 dollars into the court registry

20   that I was not able to pay.  I didn't learn later until I could

21   have filed the indigence, but it was too late.  And the judge

22   stated that:  "I'm not saying you don't have a case, I just

23   can't hear it because you didn't pay the money.  If you pay it

24   now, I will hear it."  Well, Your Honor, I did not have the

25   money.

1          GMAC is stating that I'm a creditor in their

2    bankruptcy filing.  When I filed Chapter 13, GMAC filed a

3    motion for lift of stay stating they were the creditor.  Now

4    they are on the other side as the debtor.

5          Your Honor, I filed two Chapter 13s.  Because I didn't

6    know the bankruptcy law, I filed a third Chapter 13 on

7    September 7, 2010, at 8:32 a.m.  My home was foreclosed on

8    September 7, 2010, at 10 o'clock a.m.

9          The GMAC, nor their attorney, started the bankruptcy,

10   nor did they permit the bankruptcy from the lift of stay then

11   granted to them on September 21st, 2010.

12         Your Honor, there is no chain of titles.  There is

13   nothing recording in the Gwinnett County state courts showing

14   that GMAC is a creditor, or GMAC was assigned the note from

15   USAA Federal Savings.  I don't even know -- GMAC listed me, but

16   I don't even know how they owe me.  And I'm asking the Court to

17   compel them to at least let me know how they owe me.

18         Your Honor, I withdraw the proof of claim when I

19   realized -- I thought to myself, "Hey, GMAC doesn't owe me

20   money.  USAA Federal Savings is the one that owes me money."

21         I need -- I'm asking the Court, Your Honor, to compel

22   GMAC to at least let me know how they owe me money.

23         I filed so much in the Gwinnett County Court trying to

24   stay in my home.  It is not even about the home now, Your

25   Honor.  I was thrown out.  I've moved.  But they brought me

1   into your court.  I am sure I got on the judge's nerve because

2   I filed -- Lord knows, I was over there every morning trying to

3   stay in my home, trying to just pray that I'd get an

4   opportunity for the court to see these people just threw me

5   out.

6           I haven't signed one thing, Your Honor.  Every payment

7   I made, up until I started falling behind, was made to USAA

8   Federal Savings Bank.  I never received a collection notice

9   from GMAC.  I never received a phone call from GMAC.  The

10  only -- the only time I heard anything from GMAC was when they

11  filed foreclosure on my property.

12          Your Honor, the only thing that's recorded in the

13  Gwinnett County Court, GMAC filed a -- let me see, I've got it

14  right here -- GMAC filed a -- wait just a minute, Your Honor,

15  I'm sorry.  I just filled this out, and that's why I'm --

16          THE COURT:  Let me -- Ms. Pruitt, I just want to be

17  sure I understand correctly.  Your home was -- the foreclosure

18  sale occurred on September 7, 2010, is that correct?

19          MS. PRUITT:  Yes, sir.

20          THE COURT:  Okay.  And after that, you sued GMAC and

21  other parties because of the foreclosure, correct?

22          MS. PRUITT:  Yes, sir, and because --

23          THE COURT:  And so you had filed four actions in state

24  court in Georgia against them as a result of the foreclosure.

25  Am I correct in that?

1          MS. PRUITT:  Yes, sir.

2          THE COURT:  And you also --

3          MS. PRUITT:  And none of them was heard.

4          THE COURT:  -- in your bankruptcy proceeding in the

5   Northern District of Georgia, you started what's called an

6   adversary proceeding; you sued them there, as well, correct?

7          MS. PRUITT:  Well, I withdrew the adversary

8   proceeding, Your Honor, because I filed back in state court

9   against the eviction.

10         THE COURT:  Okay.

11         MS. PRUITT:  I was more concerned about staying in my

12  home and resuming payments.  I was in the process of a loan

13  modification to restart making payments, but GMAC foreclosed.

14         Your Honor, the thing is, GMAC was not the holder in

15  due course.  I don't even understand how I owe GMAC money.

16         I'm asking the Court, if nothing else -- Your Honor,

17  if I don't get a dime, if I don't get nothing, I feel it's fair

18  for GMAC to prove that they were the holder in due course and

19  they have a right to list me as their creditor.  I don't know

20  how I'm their creditor.

21         THE COURT:  Now --

22         MS. PRUITT:  I at least need to know that.  There is

23  nothing --

24         THE COURT:  When you're --

25         MS. PRUITT:  -- in the paperwork.

RESIDENTIAL CAPITAL, LLC, ET AL.                    84

1          THE COURT:  Ms. Pruitt, when you're listed as a
2     creditor, it's because they believe you're claiming that you
3     have a right to money from them, not that they have a right to
4     money from you.
5          MS. PRUITT:  I understand that.
6          THE COURT:  Okay.
7          MS. PRUITT:  But what I'm saying --
8          THE COURT:  Well, let me hear from -- okay.
9          MS. PRUITT:  -- sir --
10         THE COURT:  Let me hear from --
11         MS. PRUITT:  Oh.
12         THE COURT:  -- from Mr. Rosenbaum, the debtors' lawyer
13    now.
14         MS. PRUITT:  Okay.
15         THE COURT:  Go ahead, Mr. Rosenbaum.
16         MR. ROSENBAUM:  Thank you, Your Honor.  I don't think
17    I can respond to all of the statements that Ms. Pruitt has
18    made.
19         THE COURT:  You don't -- just --
20         MR. ROSENBAUM:  I believe that four separate courts
21    have ruled on the merits of the foreclosure and GMAC's right in
22    those underlying actions, and that's been --
23         THE COURT:  Did Ms. Pruitt file a proof of claim?
24         MR. ROSENBAUM:  Ms. Pruitt has filed a proof of claim,
25    and she filed the notice of withdrawal of claim.

1        I would suggest and would be prepared to stipulate to

2   this:  if Ms. Pruitt would withdraw this motion, we're happy to

3   reinstate the claim.  I think that might have been -- her

4   withdrawal might have been misguided, and she could have a

5   conversation with Mr. Krell and maybe understand better the

6   proof of claim process --

7        THE COURT:  Okay.  Let me ask --

8        MR. ROSENBAUM:  -- and her rights of --

9        THE COURT:  -- Mr. Krell, have you had any -- have

10  you, or anybody in your firm, had any discussions with Ms.

11  Pruitt?

12       MR. KRELL:  We have, Your Honor, and it was more in

13  the context of --

14       THE COURT:  Go up to the microphone, just so that I

15  want to be sure that Ms. Pruitt is able to hear you.

16       MR. KRELL:  We have, Your Honor, and it was more in

17  the context of, as Mr. Rosenbaum pointed out, the lower courts

18  had already ruled on this.  Ms. Pruitt had withdrawn her proof

19  of claim.  So it was more in the vein of she wanted her motion

20  to be heard before the Court.  We couldn't reach any form of

21  settlement, and she wanted her day before you, Your Honor.

22       THE COURT:  All right.

23       MS. PRUITT:  Your Honor --

24       THE COURT:  Go ahead, Ms. Pruitt, just briefly.

25       MS. PRUITT:  Okay.  Your Honor, the court -- the lower

 1   court ruled because I didn't state a claim.  The thing is,

 2   GMAC, they're trying to get around proving that they held a

 3   secured instrument and just throw people out of the home.  Your

 4   Honor, the way GMAC took my home, I can file a foreclosure

 5   against you and take your home.  They didn't prove nothing.

 6          All I'm asking them, Your Honor, is to prove that they

 7   owe me money, prove that they were the holder in due course.

 8   That's all I'm asking.  Your Honor, if they took my home right,

 9   they should be able to just hand you the paperwork.  That's all

10   I'm asking.

11          I've been evicted.  I've been thrown out.  They

12   brought me into your courtroom, and they should prove how they

13   owe me money.

14          I haven't signed a contract with GMAC.  GMAC would be

15   paying me for nothing.  I made not one payment, Your Honor, to

16   GMAC.  If this -- Your Honor, it's as simple as, "Okay, Your

17   Honor, here is the contract Ms. Pruitt signed with us.  Here is

18   the assignment from USAA Federal Savings to us.  Your Honor, we

19   were the holder in due course."  That's all I'm asking.

20          THE COURT:  Okay.  Thank you, Ms. Pruitt.

21          MS. PRUITT:  I don't care if you rule, Ms. Pruitt,

22   you'll never get a dime.  That's fine with me.

23          THE COURT:  Okay.  And the only --

24          MS. PRUITT:  It's I was mistreated and thrown on the

25   street.

1        THE COURT:  Ms. Pruitt, the only way you're going to

2   get a determination that they owe you any money is if you have

3   a proof of claim on file in the bankruptcy court.  That's the

4   only way you're able to recover from a bankruptcy debtor where

5   you're trying to recover money, which is what you're trying to

6   do now.

7        MS. PRUITT:  So they don't have to prove that they

8   owe --

9        THE COURT:  I'm going to take the matter -- Ms.

10  Pruitt, I'm going to take the matter under submission.  Mr.

11  Rosenbaum, not exactly what you propose, but in disposing of

12  this matter it's possible I may order that the proof of claim

13  be deemed timely filed.

14       Ms. Pruitt obviously believes she's entitled to

15  recover money from the debtor.  I'm not determining whether she

16  is or she isn't.  She's pro se.  The process by which she could

17  possibly do that is through the proof of claim.  She had timely

18  filed a proof of claim.  I think she may have mistakenly

19  withdrawn that proof of claim.  I would encourage Mr. Krell to

20  have another conversation with Ms. Pruitt.  I will dispose of

21  this pending motion in a written order or opinion.

22       All right.  Thank you very much, Ms. Pruitt.

23  Appreciate your --

24       MS. PRUITT:  Thank you.  Have a good day, Judge.

25       THE COURT:  All right.  Thank you very much.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    88

1          MS. PRUITT:  All right.

2          MR. ROSENBAUM:  Thank you, Your Honor.

3          THE COURT:  Okay.

4          MR. ROSENBAUM:  Your Honor, I think the next matters

5    on are two pre-trial conferences in --

6          THE COURT:  Right.

7          MR. ROSENBAUM:  -- the adversary proceedings.

8          THE COURT:  Yes.

9          MR. ROSENBAUM:  The first one is the official

10   committee, adversary number 13-1277.

11         THE COURT:  Yes.

12         MR. FEINSTEIN:  Good morning, Your Honor.  For the

13   record, Robert Feinstein, Pachulski Stang Ziehl & Jones.  We

14   are conflicts counsel to the creditors' committee and represent

15   the committee in the adversary proceeding against UMB Bank and

16   Wells Fargo Bank.

17         THE COURT:  Is anybody appearing for the defendants?

18         MR. FEINSTEIN:  I believe so, Your Honor.

19         THE COURT:  Could you make your appearances, please?

20         MR. CARNEY:  Yes, Your Honor.  Brian Carney of Akin

21   Gump Strauss Hauer & Feld on behalf of UMB Bank.

22         THE COURT:  Okay.

23         MR. SCHLECKER:  David Schlecker from the law firm of

24   Reed Smith here for Wells Fargo, acting as collateral agent.

25         THE COURT:  Thank you.  Anybody else?  Okay.  Mr.

1   Feinstein?

2          MR. FEINSTEIN:  Yes.  Thank you, Your Honor.  Your

3   Honor, as you'll recall there was an STN order authorizing the

4   committee to bring a lien challenge proceeding against the

5   indenture trustee and --

6          THE COURT:  Yes.  I reviewed the adversary complaint

7   this morning.  In fact, I went back over it this morning.

8          MR. FEINSTEIN:  Okay.  Then I will, in the interest of

9   saving time, Your Honor, not summarize the complaint and simply

10  tell you the posture of the case.

11         THE COURT:  Okay.

12         MR. FEINSTEIN:  At the request of the defendants we've

13  extended their time to respond to the complaint until April

14  30th.

15         We do have one other matter that is pending in

16  chambers, Your Honor, which is that we had filed a motion to

17  seal along with the complaint and then we filed a supplement to

18  that, because after consulting with ResCap and Ally we were

19  able to reduce the sealed information, so we filed a further

20  version of the complaint with less redacted material, and

21  there's an order approving the seal motion that's pending

22  before Your Honor.

23         THE COURT:  Okay.  And I am going to go ahead and

24  grant that.

25         MR. FEINSTEIN:  Thank you.  And, really, that's -- at

1     this point, Your Honor, given that there's been no response --

2              THE COURT:  Well, let me ask this.

3              MR. FEINSTEIN:  -- that's all I can report.

4              THE COURT:  As I say, I reviewed the complaint and

5     quickly through the attachments.  There were a lot of

6     attachments.  So what discovery, if any, is required?

7              MR. FEINSTEIN:  Well, Your Honor, we're developing a

8     discovery plan.  I think that's going to be dependent upon what

9     we see in the nature of answers and denials and what's in

10    dispute, but this is a fairly fact intensive inquiry,

11    particularly on certain of the causes of action, I would think.

12             THE COURT:  Well, I think, Mr. Feinstein, that -- I

13    guess I have a couple of reactions.

14             Whether the junior secured lenders -- that's who's

15    involved here, right?

16             MR. FEINSTEIN:  Yes.

17             THE COURT:  What their collateral position is is,

18    obviously, ultimately very important to any resolution of this

19    case.  God willing, there'll be a resolution of this case.  By

20    the case I'm talking about the whole Chapter 11 case.  And so

21    it seems to me that this necessarily has to move forward very

22    quickly.

23             You disagree with that?

24             MR. FEINSTEIN:  We absolutely agree, Your Honor.

25             THE COURT:  Okay.

1          MR. FEINSTEIN:  Which is why we --

2          THE COURT:  So --

3          MR. FEINSTEIN:  We're asked to further extend the

4    response deadline and declined, because, like Your Honor, we

5    believe this should move forward.

6          THE COURT:  Okay.  And has there been a voluntary

7    exchange of documents?  I mean, I have to assume that the

8    parties have been talking about this issue for some time.

9          Maybe I'm wrong.  I don't know.

10         MR. FEINSTEIN:  To my knowledge, Your Honor, and,

11   again, I'm conflicts counsel, so I may have limited knowledges,

12   but to my knowledge there's been no voluntary exchange.  There

13   has been an extensive investigation by the committee's

14   professionals into the underlying facts and causes of action,

15   but to my knowledge, again, which may be limited, there's --

16         THE COURT:  All right.  So the committee's

17   professionals, in order to have drafted and filed this

18   complaint, this complaint's pretty specific about --

19         MR. FEINSTEIN:  Yes.

20         THE COURT:  -- whether there are perfected security

21   interests or not perfected security interests, so the committee

22   has to have gathered a great deal of information in order to

23   draft and file this complaint.

24         MR. FEINSTEIN:  That's true.  AlixPartners has done a

25   tremendous amount of work, and there is a substantial body of

 1  data that supports the claims set forth --

 2              THE COURT:  Okay.

 3              MR. FEINSTEIN:  -- in the complaint, much of which is

 4  attached to it.

 5              THE COURT:  All right.  What I'm going to do is -- let

 6  me hear from the defendants' counsel before I respond about

 7  scheduling.

 8              MR. CARNEY:  Good morning again, Your Honor.  Brian

 9  Carney, for the record, of Akin Gump Strauss Hauer & Feld on

10  behalf of defendant UMB Bank.

11              Your Honor, I can answer one of your questions.  I do

12  know, based on an objection filed by the debtors, that there

13  has been some communication between the committee and the

14  debtors.  I understand there was some communication about --

15  not to get into the merits, but specifically about whether

16  certain collateral had been double counted or whether there was

17  a preferential transfer.

18              So, having said that, though, I also hear Your Honor

19  in terms of moving this case forward quickly.  We completely

20  support and intend to do that.

21              THE COURT:  What discovery do you need?

22              MR. CARNEY:  Right now, so you just understand, the

23  brief history.  We were retained approximately three weeks

24  ago -- or

25              THE COURT:  What discovery do you need?

1          MR. CARNEY:  Okay.  So as of right now I think

2     discovery on certain of the counts, including preferential

3     transfer, I think, the discovery, based on what I've reviewed

4     so far, is going to be limited and narrow on that.

5          THE COURT:  I'll tell you.  Let me be specific.  The

6     only issue that I'm really debating right now is whether I give

7     you 90 days for fact discovery or 120 days for fact discovery,

8     probably with no extensions, because this has to get resolved.

9          At first when I read the complaint and I said boy,

10    this is fairly complex and it's going to take some time to do

11    discovery, and then I said but it's got to get resolved,

12    because how do you resolve this case without -- unless there's

13    a consensual agreement on plan treatment that will resolve the

14    issue this has got to get litigated quickly.  So address -- are

15    you satisfied with 90 days for discovery?

16         MR. CARNEY:  Well, Your Honor, given the choice

17    between the two I think I would take --

18         THE COURT:  Well, but you have to tell me why isn't

19    ninety days enough.

20         MR. CARNEY:  And, Your Honor, I'm not prepared today

21    to give you all the reasons why, and the reason why is, as you

22    know, we have not responded yet.  We're still determine -- we

23    believe it's going to be an answer, but, having said that, we

24    just haven't responded yet, and so it's a little difficult for

25    me to stand here and say exactly what discovery we need, but if

1   Your Honor is giving us the choice we would take 120 --

2           THE COURT:  I'm not giving you the choice.  I'm

3   raising a question.  My concern about giving 120 days for fact

4   discovery and then some period for expert discovery if it's

5   needed is that I'm looking at this clock running on this case.

6   If you were here this morning you heard my comment about the

7   burn rate on professional fees and expenses.  So this case has

8   to be put into high gear.

9           And I know.  I know people have been working very

10  hard, and I still hold out hope that there'll be a consensual

11  resolution that'll resolve issues of plan treatment and will

12  encompass the issues raised in the creditors' committee

13  complaint.

14          But I have to be realistic.  If it doesn't happen, I

15  mean, this case is not going to -- I've got to -- anything that

16  looks like a major issue that would be a stumbling block to a

17  plan needs to get resolved.  It'll either get resolved

18  consensually or it'll get resolved by the Court.  And it has to

19  happen sooner rather than later.

20          MR. CARNEY:  Understood, Your Honor, and there's a --

21          THE COURT:  Okay.  So what you're telling me is you

22  haven't considered what your discovery plan is.

23          MR. CARNEY:  That's correct.

24          THE COURT:  Okay.  Let me hear from other defense

25  counsel.

 1          MR. SCHLECKER:  Thank you, Your Honor.  David
 2   Schlecker from Reed Smith.  Again, I would echo what cocounsel
 3   has indicated, which is we have gotten the complaint.  We have
 4   reviewed the complaint.  We have not yet responded to the
 5   complaint.  We haven't decided whether our response will be in
 6   the form of an answer or otherwise, but I will agree with what
 7   Your Honor said, that this case is clearly one that has lots of
 8   factual issues.  It will require, essentially, a good faith
 9   showing of whatever Alex Sill (ph.) has put together in support
10   of the claim.  These are complicated issues.  I don't think
11   ninety days will be sufficient.  It does depend upon the
12   proffer --
13          THE COURT:  Do you have a discovery plan?
14          MR. CARNEY:  I do not have a discovery plan, Your
15   Honor.
16          THE COURT:  Okay.
17          MR. CARNEY:  But if the choice was between 90 and
18   120 --
19          THE COURT:  I'm not giving you the choice.  I'm
20   listening.  I'm telling you exactly what's on my mind and
21   listening, but when you come in and you tell me you haven't
22   even thought about a discovery plan yet because you have -- I
23   mean, it's a very specific complaint.  And I'll tell you.
24   Look, if you move to dismiss, you move to dismiss.  Discovery
25   is moving forward on a very tight time schedule whether this is

RESIDENTIAL CAPITAL, LLC, ET AL.                    96

1   a motion to dismiss or not; that, frankly, I don't stay

2   discovery because of a motion to dismiss.

3            MR. CARNEY:  Understood.

4            THE COURT:  It's a serious complaint.  It may not be

5   well taken, but it's a serious complaint.

6            MR. CARNEY:  Yes, Your Honor.

7            THE COURT:  Okay.  All right.

8            MR. CARNEY:  Thank you.

9            THE COURT:  Mr. Feinstein?  Well, go ahead.

10            MR. CARNEY:  Your Honor, just --

11            THE COURT:  Let me -- no, let me hear Mr. -- yes, go

12   ahead.

13            MR. CARNEY:  Just two additional --

14            THE COURT:  Just that every time you speak you need to

15   identify yourself again.

16            MR. CARNEY:  Yes, of course.  Again, Brian Carney of

17   Akin Gump for the record.

18            THE COURT:  Okay.

19            MR. CARNEY:  So, Your Honor, one additional point,

20   and, obviously, when we respond, if it's in the form of an

21   answer, there may be counterclaims.  And so I just --

22            THE COURT:  Is that intended to scare somebody or --

23            MR. CARNEY:  No, no, no.  I just wanted to point it

24   out so that if that, indeed, happened it wasn't a surprise to

25   anybody.

1        And the final point I'll note, and you may already

2   know this, but there's a mediation scheduled for April 22nd

3   that --

4        THE COURT:  Oh, I know there's a mediation that's

5   going on in the case as a whole, and I continue to have some

6   hope that the mediation will be fruitful.  But what I'm not

7   going to do, and I really do hope the mediation is fruitful,

8   and there are a lot of issues that -- and I don't -- other than

9   knowing that there is a mediation scheduled for that day, I do

10  know that, Judge Peck and I don't discuss what's happening in

11  the mediation other than from time to time he'll tell me

12  there's a session scheduled, and at various times counsel for

13  the debtors or for one of the other parties-in-interest has

14  expressed optimism or -- optimism overstates it, okay?  Has

15  expressed some hope that things are moving in a positive

16  direction versus they're not moving anywhere.  And I've heard

17  both of those in varying increments of time, okay?

18       I hope that the mediation is successful with respect

19  to all plan issues, including the treatment of the junior

20  secured noteholders, but I'm going to assume it's not

21  successful and I'm setting firm deadlines for many things in

22  the case.  I've made it clear with some things that are already

23  scheduled on the calendar they will not be continued, and I'm

24  going to set a tight schedule in this.

25       Actually, I view as a plus is that the committee's

1   special counsel, conflicts counsel, as you say it is, is not

2   involved in the case, so they're not involved in a million

3   other issues in the case, and this is the first time I've seen

4   your firm.  So my reaction is go to it, okay?  But go to it

5   quickly, because once I set a discovery schedule you're going

6   to have to do backflips to convince me to extend it.  You're

7   going to have to show every -- the dates when things were done,

8   what you haven't been able to get scheduled.  With respect to

9   document production I have to think -- I mean, the committee

10  made a pretty thorough investigation.  Based on the complaint

11  it looks like the committee made a pretty thorough

12  investigation before it filed the complaint.  One of the things

13  that my discovery schedule provides is for initial disclosures

14  as required by Rule 26(a)(1), and the order requires that it be

15  within fourteen days of the date of the order.  The order is

16  going to get entered today.  If it hasn't been done the initial

17  disclosures from all sides are going to happen within the

18  fourteen-day period, and everybody's going to move forward very

19  rapidly.

20          I don't mean to be difficult about it, but this is an

21  important issue in the overall case.  There's either a

22  consensual resolution or there's a Court decision that'll

23  resolve it.  Either way it has to happen fairly quickly.

24          MR. CARNEY:  Well, suffice it to say the message

25  conveyed by the Court has been received loud and clear.

RESIDENTIAL CAPITAL, LLC, ET AL.                    99

1       THE COURT:  I'm sure.

2       MR. CARNEY:  And we intend to proceed in that fashion.

3  Just to be clear, if the order is entered today obviously the

4  initial disclosures will happen before the response date.  Is

5  that what the Court intends?

6       THE COURT:  Look, whether you file it -- your answer

7  is not going to come as a surprise to anybody, all right?  Yes,

8  your initial disclosures, and then you can supplement them if

9  you come up with something, some creative new idea, and you

10 have some documents to support it.  You'll do a supplemental

11 initial disclosure.

12      I am not holding the case up in any way while you work

13 through these issues.  Any further extensions of time need to

14 be raised with the Court.

15      MR. CARNEY:  Understood, Your Honor.

16      THE COURT:  Okay?

17      MR. CARNEY:  Yes.

18      THE COURT:  Mr. Feinstein?

19      MR. FEINSTEIN:  For the record, Robert Feinstein.

20 Your Honor, we have given thought to a discovery plan, and

21 getting the documents from the defendants will be the first

22 step.

23      As to many of the causes of action, I don't think

24 there's going to be a great need for discovery, but for certain

25 select ones there will, and we expect there may be a few

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1  depositions that will need to be taken.  So, having considered

2  the matter, Your Honor, we're comfortable with 120 days.

3  Ninety days would be aggressive, but certainly we appreciate

4  that Your Honor is going to move this case along, and we intend

5  to do that as well.

6          THE COURT:  All right.  I'm going to set a ninety-day

7  fact discovery period, and I expect everybody to work very

8  hard.  I expect you to work very hard in the mediation, and

9  hopefully it will bear fruit, but if necessary you'll proceed

10  on parallel tracks trying to resolve the issue by settlement.

11          My order, my standard case management order, I'm going

12  to put it in, requires that all counsel must meet face-to-face

13  to discuss settlement or alternative dispute resolution within

14  fourteen days after the date of the order and again within

15  fourteen days after the close of fact discovery.  I know

16  there's a mediation scheduled, but I'm going to leave this

17  provision in.  Obviously -- what's today date?  It's the 11th.

18  So the mediation is actually scheduled for slightly after --

19  meet before the mediation, so you'll -- because there's a lot

20  of parties in this.  Okay?

21          MR. FEINSTEIN:  We'll do that.  Thank you.

22          THE COURT:  All right.  All right.  So the order will

23  be entered.

24          MR. FEINSTEIN:  Thank you, Your Honor.

25          THE COURT:  Thank you very much, Mr. Feinstein.

1        Mr. Marinuzzi?

2        MR. MARINUZZI:  Your Honor, that concludes the --

3        UNIDENTIFIED SPEAKER:  But --

4        THE COURT:  No, there's one more.

5        MR. FEINSTEIN:  Oops.  I apologize, Your Honor.

6        MS. RICHARDS:  Good afternoon, Your Honor.  Erica

7   Richards of Morrison & Foerster appearing on behalf of the

8   debtors.  That brings us to the final matter on this agenda.

9   It's found on page 33, and is the adversary proceeding

10  commenced by Bruce DeMustchine against debtor RAHI Real Estate

11  Holdings, LLC under case number 12-02065.

12       THE COURT:  Right.  And I reviewed this morning the

13  status report that was filed on April 4th, so I have that in

14  front of me, in fact.  And as I understand it you were going to

15  propose a case management order.

16       MS. RICHARDS:  Your Honor, yes, we worked with Mr.

17  DeMustchine counsel, Mr. Mason, who I believe was going to

18  appear telephonically today.

19       THE COURT:  Mr. Mason, are you on the phone?  Mr.

20  Mason, are you present on the phone?

21       Go ahead, Ms. Richards.

22       MS. RICHARDS:  Well, it's unfortunate that he's not on

23  the phone, because I do have the joint form of order that we --

24       THE COURT:  Did you agree with him on a schedule?

25       MS. RICHARDS:  Yes.  We just followed the timing in

RESIDENTIAL CAPITAL, LLC, ET AL.                                  102

1  Your Honor's standard form of order, but before we get there

2  the debtors just wanted to flag for you --

3           THE COURT:  I've already commented on this case

4  already before.  It's not a pretty picture.

5           MS. RICHARDS:  Understood.  Notwithstanding --

6           THE COURT:  I think those are the exact words I used.

7           MS. RICHARDS:  I think they are.  We reviewed the

8  transcript before this hearing.

9           We appreciate Your Honor's thoughts on the debtors'

10  likelihood of prevailing on the First Circuit appeal, but we

11  believe that the appeal should be allowed to go forward.  If we

12  prevail, this adversary proceeding goes away.  If we lose, this

13  adversary proceeding goes away.  And the fact is that matter is

14  stayed right now.  The First Circuit issued an order staying

15  the appeal indefinitely and requiring the parties to file

16  status reports every sixty days in the apparent belief that the

17  automatic stay in this case prevented it from going forward.

18           We filed a pleading suggesting that under the

19  supplemental servicing order to the extent the stay did apply

20  it was lifted.

21           THE COURT:  Why don't you just give me a plain vanilla

22  order that lifts the stay for purposes of having the appeal go

23  forward so that the First Circuit can look at it and not have

24  to -- the supplemental servicing order, obviously, is lengthy.

25  And I take it that both you and Mr. Mason agree that the appeal

1    should go forward?

2              MS. RICHARDS:  Mr. Mason does not agree --

3              THE COURT:  He does not.

4              MS. RICHARDS:  -- which is why I would like him to be

5    on the phone.

6              THE COURT:  Oh.

7              MS. RICHARDS:  He's filed papers suggesting that the

8    stay does apply and that the appeal should not move forward.

9              THE COURT:  On this one it's easy for me.  I'm going

10   to lift the stay for purposes of the appeal, okay?

11             I've been surprised by circuit court decisions before.

12   I don't think I'm going to be surprised with what they're going

13   to do here.  You've had -- it's not you, personally, and,

14   obviously, you weren't counsel in the trial court, but somebody

15   blew it on multiple occasions, and a district court has ruled

16   on multiple occasions.  I suppose -- let's see what happens.

17             MS. RICHARDS:  Thank you, Your Honor.

18             THE COURT:  What's the schedule you've proposed

19   jointly here?

20             MS. RICHARDS:  I have a copy here.

21             THE COURT:  Can I see it?

22             MS. RICHARDS:  May I approach?

23             THE COURT:  Yes, please.

24        (Pause)

25             THE COURT:  Okay.  If you will e-mail it, or do you

1    have it on a disc, by any chance?

2              MS. RICHARDS:  I don't.  I apologize.

3              THE COURT:  Okay.  If you'll e-mail it to chambers I

4    will correct the mistake that's in my template, that in

5    paragraph 7 after each of the references to fourteen leaves out

6    the word days, but that's in my template.  You just copied it.

7              MS. RICHARDS:  We did.

8              THE COURT:  And we'll get you a date for the next case

9    management conference and we'll enter it.  Okay?

10             MS. RICHARDS:  Thank you, Your Honor.  And, so,

11   you're --

12             THE COURT:  Do a separate order.

13             MS. RICHARDS:  Okay.

14             THE COURT:  That lifts the stay for purposes of the

15   appeal.  You've told me that Mr. Mason opposes doing that.  He

16   can argue whatever he wants in connection with the appeal, but

17   I do want -- I've read all of the papers here.  I understand

18   what this is, and perhaps when the First Circuit rules you'll

19   dispose of this case.

20             MS. RICHARDS:  Thank you very much, Your Honor.  We'll

21   get those --

22             THE COURT:  Thank you.

23             MS. RICHARDS:  -- orders to your chambers.

24             THE COURT:  Okay.

25             MR. MARINUZZI:  Your Honor, now we're done.

 1              THE COURT:  Now you're done.

 2              MR. MARINUZZI:  Thank you, Your Honor.

 3              THE COURT:  Okay.  So what time do we resume?  We

 4    resume at --

 5              MR. MARINUZZI:  There's, I think, an 11 o'clock, 11:30

 6    hearing, so whenever Your Honor is ready.

 7              THE COURT:  Let's do that now.  Anybody who wants to

 8    be excused can be excused.

 9              THE COURT:  Okay.  We'll try to make some room on the

10    table.

11              THE COURT:  Sure.  I'll take a five-minute break, and

12    just five minutes.  Everybody can get ready for the -- on the

13    motion.  I'm sorry we're behind schedule.  We'll do the -- this

14    is the preclusion motion, and then this afternoon we have the

15    KEIP.

16              Can I ask you?  I don't know.  Is anybody from the

17    U.S. Trustee here still?

18              MR. MARINUZZI:  No.

19              THE COURT:  No.

20              MR. MARINUZZI:  But we're going forward.  I asked --

21              THE COURT:  I know.  Are there live witnesses for that

22    hearing?

23              MR. MARINUZZI:  We have witnesses here.  They haven't

24    indicated whether they intend to cross-examine or not.

25              THE COURT:  All right.  All right.  We're just going

RESIDENTIAL CAPITAL, LLC, ET AL.                    106

1    to have a very short recess, just to --

2              MR. MARINUZZI:  Thank you.

3              THE COURT:  -- give people a chance to leave, all

4    right?

5          (Whereupon these proceedings were concluded at 12:16 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                   I N D E X

3

4                                    RULINGS

5                                                          Page        Line

6    Fee applications of Chadbourne & Parke and      28          7

7    Mesirow Financial Consulting granted with

8    fee reductions agreed upon by the U.S. Trustee.

9    Fee application of the Examiner Arthur          28          7

10   Gonzalez approved.

11   Fee application of Wolf Haldenstein granted     28          20

12   with fee reductions as agreed upon by the

13   U.S. Trustee.

14   Fee application of Bradley Arant Boult          30          13

15   granted with fee and expense reductions

16   as agreed upon by the U.S. Trustee.

17   Fee application of Centerview Partners          33          23

18   granted with fee and expense reductions as

19   agreed upon by the U.S. Trustee.

20   Fee application of Curtis, Mallet granted       34          4

21   with fee reductions as agreed upon by the

22   U.S. Trustee.

23   Fee application of Deloitte & Touche granted    34          9

24   with fee reductions as agreed upon by the

25   U.S. Trustee.

| | | | |
|---|---|---|---|
| 1 | Fee application of Dorsey & Whitney granted | 34 | 14 |
| 2 | with fee reductions as agreed upon by the | | |
| 3 | U.S. Trustee. | | |
| 4 | Fee application of Fortace granted with fee | 35 | 1 |
| 5 | reductions as agreed upon by the U.S. Trustee. | | |
| 6 | Fee application of FTI Consulting granted | 39 | 6 |
| 7 | with fee reductions as agreed upon by the | | |
| 8 | U.S. Trustee. | | |
| 9 | Fee application of KPMG granted. | 41 | 23 |
| 10 | Fee application of Locke Lord granted with | 42 | 5 |
| 11 | fee reductions as agreed upon by the U.S. Trustee. | | |
| 12 | Fee application of Mercer (US) Inc granted | 43 | 12 |
| 13 | with fee reductions. | | |
| 14 | Fee application of Morrison Cohen granted | 44 | 8 |
| 15 | with fee reductions as agreed upon by the | | |
| 16 | U.S. Trustee. | | |
| 17 | Fee application of Morrison & Foerster | 44 | 24 |
| 18 | granted with fee reductions as agreed upon | | |
| 19 | by the U.S. Trustee. | | |
| 20 | Fee application of Orrick, Herrington & | 54 | 3 |
| 21 | Sutcliffe granted with fee reductions | | |
| 22 | as agreed upon by the U.S. Trustee. | | |
| 23 | Fee application of Prince Lobel Tye granted | 55 | 1 |
| 24 | Fee application of Rubenstein Associates | 55 | 4 |
| 25 | granted | | |

```
 1   Fee application of Severson & Werson granted    55        10
 2   with fee and expense reductions as agreed upon
 3   by the U.S. Trustee.
 4   Fee application of Towers Watson granted with   56         1
 5   fee reductions as agreed upon by the U.S. Trustee.
 6   Fee application of Troutman Sanders granted     56        10
 7   with fee reductions as agreed upon by the
 8   U.S. Trustee.
 9   Fee application of Zeichner Ellman & Krause     56        15
10   granted with fee reductions as agreed upon
11   by the U.S. Trustee.
12   Fee application of AlixPartners granted.        57        17
13   Fee application of Analytic Focus granted       57        23
14   with fee reductions as agreed upon by the
15   U.S. Trustee.
16   Fee application of Coherent Economics           58         8
17   granted with fee reductions as agreed upon
18   by the U.S. Trustee.
19   Fee application of Epiq Bankruptcy Solutions    58        17
20   granted with fee reductions as agreed upon
21   by the U.S. Trustee.
22   Fee application of J. F. Morrow granted with    58        23
23   fee reductions as agreed upon by the U.S.
24   Trustee.
25   Fee application of Kramer Levin Naftalis &      59        13
```

| | | | |
|---|---|---|---|
| 1 | Frankel granted with fee reductions as | | |
| 2 | agreed upon by the U.S. Trustee. | | |
| 3 | Fee application of Moelis & Company granted | 59 | 22 |
| 4 | with expense reductions as agreed upon by | | |
| 5 | the U.S. Trustee. | | |
| 6 | Fee application of Pachulski Stang Ziehl & | 60 | 4 |
| 7 | Jones granted with fee and expense reductions | | |
| 8 | as agreed upon by the U.S. Trustee. | | |
| 9 | Fee application of San Marino Business | 60 | 11 |
| 10 | Partners granted with fee reductions as | | |
| 11 | agreed upon by the U.S. Trustee. | | |
| 12 | Fee application of SilvermanAcampora granted | 60 | 16 |
| 13 | All holdbacks to remain in place | 62 | 8 |
| 14 | Motion to seal certain exhibits and schedules | 89 | 23 |
| 15 | in adversary proceeding 13-01277 granted | | |
| 16 | Stay on adversary proceeding 12-02065 is | 103 | 9 |
| 17 | lifted | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1

2                    C E R T I F I C A T I O N

3

4   I, Dena Page, certify that the foregoing transcript is a true

5   and accurate record of the proceedings.

6

7

8

9

10  _____

11  DENA PAGE

12  AAERT Certified Electronic Transcriber CET**D-629

13

14  eScribers

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17

18  Date:  April 12, 2013

19

20

21

22

23

24

25