1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, ET AL.,

9

10            Debtors.

11  - - - - - - - - - - - - - - - - - - - -x

12

13            United States Bankruptcy Court

14            One Bowling Green

15            New York, New York

16

17            April 11, 2013

18            3:05 PM

19

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2  [CC: Docket No.s 3280 through 3284] Debtors' Motion for an

3  Order Pursuant to Sections 363(b) and 503(c)(3) of the

4  Bankruptcy Code Authorizing (I) Implementation of (A) A Key

5  Employee Retention Plan for Certain Non-Insiders and (B) Key

6  Employee Incentive Plans for Certain Insiders, and (II) Payment

7  of Any Obligations Arising Thereunder as  Administrative

8  Expenses

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Ellen Kolman

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON FOERSTER

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8  BY:    LORENZO MARINUZZI, ESQ.

9        JORDAN A. WISHNEW, ESQ.

10

11

12  KRAMER LEVIN NAFTALIS & FRANKEL LLP

13        Attorneys for Creditors' Committee

14        1177 Avenue of the Americas

15        New York, NY 10036

16

17  BY:    STEPHEN D. ZIDE, ESQ.

18

19

20  CLEARY GOTTLIEB STEEN & HAMILTON LLP

21        Attorneys for Wilmington Trust

22        One Liberty Plaza

23        New York, NY 10006

24

25  BY:    JEREMY R. OPOLSKY, ESQ.

4

UNITED STATES DEPARTMENT OF JUSTICE

     Office of the United States Trustee

     33 Whitehall Street

     21st Floor

     New York, NY 10004

BY:    BRIAN MASUMOTO, ESQ.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

5

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  All right.  We're here

3  in Residential Capital, number 12-12020.  Mr. Marinuzzi?

4          MR. MARINUZZI:  Good afternoon, Your Honor.  For the

5  record, Lorenzo Marinuzzi, Morrison & Foerster on behalf of the

6  debtors.

7          We're here this afternoon, Your Honor, on the debtors

8  motion for an order under Section 363(b) and 503(c)(3)

9  authorizing the implementation of a key employee retention plan

10  and a key employee incentive plan and payment of obligations

11  arising thereunder as administrative expenses.  We filed a

12  motion on March 20th and there was one objection filed to the

13  motion.  That was the objection of the United States Trustee.

14          Your Honor, these programs were carefully developed

15  after considerable discussion and review with our creditors'

16  committee.  The creditors' committee is on board with these

17  KERP and KEIP programs.  It took a very lengthy period of time

18  to get the committee there and there were many discussions and

19  revisions to the program between the time we initially set

20  forth to put it together and ultimately filed and sought

21  approval from this Court.

22          And the motion is supported by the declaration of John

23  Dempsey of Mercer, the declaration of Ronald Greenspan of FTI

24  who also submitted a supplemental declaration along with our

25  reply papers, Pamela West, an independent board member and

1   member of the compensation committee of the board as well as

2   Tammy Hamzehpour, who is the chief business officer of the

3   debtors.  Each is here in court today and available to answer

4   the Court's questions or any questions the U.S. Trustee would

5   like to ask them under oath.  At some point, Your Honor, I'm

6   going to submit the affidavits, declarations into evidence.

7        And there are three aspects to this program.  The

8   first aspect, and I think the least controversial is the key

9   employee retention plan.  The purpose -- I'm sorry; the

10   expected cost of that program is 4.4 million dollars and it

11   covers 155 noninsider key employees who the debtors believe are

12   critical to their operations post-sale.  It's designed to keep

13   the employees there through the end of the year.

14        Then, there are two KEIP aspects to the program.

15   There's one that applies to six senior level employees; we

16   refer that one as the "estate KEIP".  And then there's a

17   separate KEIP that covers two individual senior officers and we

18   refer to that one as the "executive KEIP".  These key programs

19   have drawn the objection from the United States Trustee.  Let

20   me describe, generally, the estate KEIP.

21        The aggregate payments under the estate KEIP if the

22   covered employees achieve a target, is 2.1 million dollars and

23   to the extent that they have outstanding results, it could

24   climb as high as 2.7 million dollars.

25        The estate KIEP is focused on two goals:  managing

**RESIDENTIAL CAPITAL, LLC, ET AL.**

7

1  expenses and maximizing the value of the debtors' remaining

2  assets.  I don't want to get too deep into the weeds here, Your

3  Honor.  I'll try to be general but I'm happy to get into

4  specifics should the Court have any questions.

5           Now, there are --

6           THE COURT:  Just tell me, the estate KEIP, what's the

7  dollar range?  Do you know?

8           MR. MARINUZZI:  It's -- assuming target is met --

9           THE COURT:  Yes.

10          MR. MARINUZZI:  -- it's 2.1 million dollars and it

11 could go to approximately 2.7 million dollars and --

12          THE COURT:  Oh, I thought it was 2.2 but it's 2.1?

13          UNIDENTIFIED SPEAKER:  It's closer to 2.2.

14          MR. MARINUZZI:  It's closer to 2.2.?  Sorry; closer to

15 2.2.

16          And so there are two aspects of the program.  Fifty

17 percent of it is weighted towards meeting budget expenses and

18 fifty percent of it is targeted towards maximizing the value of

19 the assets that are being sold.

20          On the expense side, the company has carefully

21 prepared a wind-down budget.  The budget was vetted with the

22 committee.  The overall budget for the wind-down includes many

23 things that are beyond the control of the senior officers

24 covered by this program.  So there was a focus on those

25 expenses where they can actually have some impact on either

**RESIDENTIAL CAPITAL, LLC, ET AL.**

8

1  meeting, exceeding, or failing to meet.  So it does include,

2  for example, the cost of the foreclosure review which they just

3  can't control.

4        We provided to the Court a presentation that

5  identified the categories of expenses that are covered and it

6  really is limited to the operating expenses.  We didn't file it

7  for fear that if counterparties or other service providers that

8  management might have discussions with to try to find cost

9  savings heard of what the budget amounts were, it might make it

10  difficult to actually negotiate savings.

11        THE COURT:  Is this what was delivered to my chambers

12  yesterday?

13        MR. MARINUZZI:  It was, Your Honor.  It was.  It's

14  actually the last page of that presentation.

15        THE COURT:  Okay.

16        MR. MARINUZZI:  Which we've also provided to the U.S.

17  Trustee and the committee.

18        THE COURT:  All right.  Does anybody other than the

19  U.S. Trustee and the committee have this material?

20        MR. MARINUZZI:  They do not, Your Honor.  They do not.

21  And again, it's the sensitivity of letting --

22        THE COURT:  Yes.

23        MR. MARINUZZI:  -- the service providers know.

24        THE COURT:  You also have a sealing motion as to

25  certain materials?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

9

1          MR. MARINUZZI:  Correct, Your Honor.  And those are
2    more particular to the --
3          THE COURT:  The individuals would be recipients of
4    the --
5          MR. MARINUZZI:  The executive KEIP.
6          THE COURT:  -- awards.  Right.
7          So that takes care of the expense metric.  Then,
8    there's the sale metric.  And this was put together to
9    accomplish two goals:  monetize assets quickly but to do so in
10   a way where we're not giving away value.  In other words, let's
11   be smart about how we liquidate these assets and turn them into
12   cash for the estate.  So let me set the stage, Your Honor.
13         As of February 28th, the debtors had approximately
14   1.06 billion dollars of FHA/VA loans, matured loans, and
15   advances.  It's book value.  They also have approximately 300
16   million dollars in book value of what I'll call "other assets."
17   It's mostly scratch and dent loans, REO properties, interest in
18   foreign affiliates, equity; it's really hard -- in many
19   respects hard to value assets.
20         So this KEIP program, on the sales side, separated
21   those assets into two different pools recognizing that they're
22   just different asset classes.  The company and its advisors
23   looked at each of these two groups; the FHA/VA group of assets
24   and the other assets and said what can we strive to turn into
25   cash by year-end?  And so, with respect to the loans, they

**RESIDENTIAL CAPITAL, LLC, ET AL.**

10

1    looked at the risk profile of the loans, because some are more

2    easy to sell than others, and they picked a bucket of those

3    assets and said this is what we're going to target to sell.

4    And so they're different ways of selling these assets as the

5    Court is aware.  You can have a bulk sale or you can have a

6    process by which you either sell them in smaller bits or have

7    other ways of trying to get value out of them.  And to the

8    extent the company tries a bulk sale approach, the target

9    changes because the idea is if you're going to use bulk sales

10   you should strive for a higher target.

11          Now, depending upon how much cash is realized from the

12   sales, these participants will earn a threshold bonus, meaning

13   they've met ninety percent of the target, the target bonus or a

14   higher bonus up to 107.5 percent of target.  And this is

15   measured against the cash that actually comes in collected.

16          THE COURT:  I think the thing that -- and I'm sure

17   you're going to cover it, but the thing that I'm most

18   interested in hearing about, what I see as the core of the U.S.

19   Trustee's objection is the time they filed the objection, you

20   provided them with additional information since then, that the

21   metrics you established in both KEIPs -- in both KEIPs, are

22   they sufficiently a reach such that they're incentivizing to

23   the potential recipients to achieve those goals?

24          So I appreciate -- I've gone through them with some

25   care and I understand -- I think I understand what the various

1    thresholds in metrics you've chosen.  The thing that I'm most

2    interested in hearing about is why those -- why it is a stretch

3    to achieve the metrics such that this is incentivizing rather

4    than retentive?

5        MR. MARINUZZI:  Understood.  And, Your Honor, let's

6    start with the question what are they doing because that was

7    the question the U.S. Trustee asked them.  In the U.S.

8    Trustee's papers, there's sort of a suggestion that since these

9    are federally insured loans, the FHA/VA loans, that they're

10   collect at a hundred cents anyway.  And I guess in theory, were

11   people to want to wait around for up to seven years to actually

12   make insurance claims, and no one is advocating that, then I

13   guess that's correct.  But what the company has done has

14   implement a strategy, which they haven't done before.  These

15   loans have sat on the books.  So this is something that they're

16   trying to -- they haven't tried before; it's turning a large

17   quantity of these assets that since they were assumed to be

18   valued very highly, they just stood on the company's books as

19   they collected cash insurance, they collected it but now

20   they're being told we're done, we've got to turn this into cash

21   and get it out to our creditors.

22        And when you think about, for example, not too long

23   ago there was an attempt at a bulk sale of 125 million dollars

24   of these loans and the company looked at the risk profile, and

25   these were -- these were the ones that were supposed to be the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

12

1   most easy to sell, and the bids were just not good.  That shows

2   that this is a challenge.  And when you look at the metrics and

3   the percentage of recovery, the recovery, percentage of the

4   recovery rate is close to book that you can get because that's

5   another component of the sale metrics, that sale alone or the

6   failure to close that sale after bidding tells you how

7   difficult this process is going to be.  But it's more than

8   that.  They have to do things that they haven't done before in

9   this context.  So what are they doing?  They are now trying to

10  take these loans and put them into securitizations.  And people

11  will buy loans but they'll buy them at a price that obviously

12  makes sense for the buyer and when you look at the metrics and

13  the percentages we're trying to recover here, they're not easy

14  to meet.

15          They're also trying to accelerate the process by which

16  the government pays for these insurance claims.  So it means

17  people are going to have to be on top of the government to say

18  where's our check, we have a loss, here's the proof, here's the

19  amount, here's the principal, here's what we ultimately got for

20  it, please pay us.  They have to make a concerted effort to be

21  on top of the servicers for these mortgages.  They're on our

22  books but we don't service them.

23          THE COURT:  Is Ocwen servicing?

24          MR. MARINUZZI:  Ocwen is servicing these mortgages.

25  Correct.  And so sometimes foreclosures take a while, sometimes

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1    paperwork takes a while to get processed.  There's a deadline

2    of December 31st.  That's the measuring date for this program.

3    So these folks have to get on top of Ocwen for these

4    foreclosures and make sure that they're processed the way

5    they're supposed to be processed being time sensitive.  It's

6    not something they're used to doing.

7            They're also implementing borrower programs.  Your

8    Honor may recall in the first day pleadings there was this

9    program called cash-for-keys and it was a program designed to

10   expedite the foreclosure process and effectively pay the

11   borrower to walk away from the foreclosure process and the

12   house.  Those are the types of programs that senior management

13   is creating and implementing.  Also, part of the strategy

14   getting as much value back in to go after the insurance

15   proceeds, because you have to foreclose before you can go after

16   the insurance proceeds, that's something they haven't done

17   before in this context.

18           They're also now undertaking a more extensive review

19   of these loans or some more extensive, but they're reviewing

20   these loans to see if they qualify for HAMP and they're trying

21   to process the HAMP applications to see if they could modify

22   these loans and then once they modify them, go to the

23   government and try to get some more money out of the government

24   on account of a guarantee.

25           So this is a strategy that, in this context, they

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1   haven't implemented before.  If history tells us anything, at

2   the last bucket of loans that were put together, and these were

3   the good loans, and I don't know if the bid was actually

4   public, but I can represent to the Court that it was nowhere

5   near --

6            THE COURT:  No, I remember when you pulled --

7            MR. MARINUZZI:  Yes.

8            THE COURT:  -- the sale of the loans because the bids

9   weren't satisfied.

10           MR. MARINUZZI:  Right.

11           THE COURT:  I'm aware of that.

12           MR. MARINUZZI:  They were just bad bids.  So that's

13   what they're doing, Your Honor.  And that's why as I look at

14   this, and the declarations bear this out, this is not a slam-

15   dunk.  This is a program that they have to hit on all cylinders

16   to --

17           THE COURT:  Who set the metrics and how was that done?

18           MR. MARINUZZI:  It was done in -- it was a combination

19   of the people of the company, obviously, how have the expertise

20   and do this, Mercer and FTI.  FTI who knows this business

21   having been there for years just as well as anybody also was

22   part of setting up the metrics.  But I think also it wasn't

23   done in a vacuum.  It was done based on the information

24   available to them which included what happened with these loans

25   that they tried to sell and couldn't sell.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1        THE COURT:  I guess a fair question is it the people

2   who are going to receive the awards who set the metrics?

3        MR. MARINUZZI:  Your Honor, I'm sure they were

4   consulted but I can tell you that Jim Whitlinger who's not part

5   of this program, who is part of the executive KEIP and whose

6   metrics have nothing to do with this was one of the lawyers

7   that I spoke with extensively in connection with that loan

8   sale.  So he's not part of this but he was part of the process

9   of putting it together I'm sure.  These metrics were also

10  vetted very carefully by the UCC.  And as I said, there were

11  lots of discussions with the UCC advisors about setting these

12  targets at a level that really were a stretch and I'm sure that

13  if the committee had reservations about whether these were slam

14  dunk targets, we'd know about it.

15        So I hope that answers the question.  But I forgot a

16  metric and I just want to go back because the second aspect of

17  the sale, to make sure we get as close to book as possible, is

18  the recovery rate metric which really just measures the

19  variation against book.  And that is -- accounts for thirty

20  percent of the sale side of the KEIP award.

21        So you've got the recovery which is fifty-five, you've

22  got the recovery rate on these loans and advances which is

23  thirty percent and then we'll go to the -- what I'll call the

24  other assets.

25        THE COURT:  And how is the split between FHA/VA

**RESIDENTIAL CAPITAL, LLC, ET AL.**

16

1    recovery metric and non-FHA/VA recovery metric because you've

2    obviously separated a lot of these -- those two pools of

3    assets?

4              MR. MARINUZZI:  I think when you look at --

5              THE COURT:  The one's insured and the other's not.  Is

6    that correct?

7              MR. MARINUZZI:  When you look at the balance of the

8    assets, you've got a billion plus of FHA/VA assets and then

9    you've got 300 book value of the other assets.  So it just

10   seemed like a fair split and that's how the allocation was

11   done.

12             THE COURT:  Um-hum.

13             MR. MARINUZZI:  And so, let's turn to the other

14   assets.  They are a smaller share as I just mentioned and the

15   recovery metric for these assets is ten percent and the

16   recovery rate is five percent.  And as you would expect given

17   that they're -- they have a book value but who knows what

18   equity is worth to the extent it's sold.  And the scratch and

19   dent loans, they're not federally insured, who knows what

20   they're worth?  The metric is set at a lower percent.

21             THE COURT:  That's a term I'm really not familiar with

22   so tell me about scratch and dent.

23             MR. MARINUZZI:  Scratch and dent loans are loans that

24   they were -- we had to buy them back for lack of a better

25   description because they had some defect or deficiency and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1  we're trying to correct them.  We might not be able to correct

2  them but that's -- they refer to them as scratch and dent

3  loans.

4          Now, just as an example, the recovery rate -- I'm

5  sorry; the target recovery rate for the FHA/VA loans is in the

6  nineties -- that's the percentage -- for these assets.  And the

7  one that's actually being measured for this metric, it's sixty-

8  five percent.  And that just goes to show you the difference in

9  the asset class and the quality of the assets.

10         THE COURT:  That's in what you gave me yesterday --

11         MR. MARINUZZI:  Correct.

12         THE COURT:  -- that shows that?

13         MR. MARINUZZI:  Correct.

14         Your Honor, unless Your Honor has questions about this

15 KEIP --

16         THE COURT:  No.

17         MR. MARINUZZI:  -- I'll turn to the executive KEIP.

18         THE COURT:  Go ahead.

19         MR. MARINUZZI:  Okay.

20         So the executive KEIP, Your Honor, was put together

21 for two individuals whose experience of the company, the roles

22 each played, and the relationships with Ginnie Mae, frankly,

23 are unique to them.  And one is Jim Whitlinger, the CFO of the

24 debtors, the second is Patrick Flemmings (sic) the debtors'

25 capital markets officer.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1            THE COURT:  They're leaving May 3rd?

2            MR. MARINUZZI:  Unless they're asked to stay, they are

3   leaving at the end of April, May 3rd.  But what they're doing

4   is something they've started to do before we even filed the

5   papers.  And so one of my personal concerns as we were

6   structuring this program and going back-and-forth with the

7   committee on these metrics and we didn't want to file separate

8   motions for each KEIP was the timing.

9            THE COURT:  Yes, and I know your firm had contacted

10  chambers and wanted to get an earlier hearing on this so I'm

11  not faulting them why -- why am I hearing it today when two

12  people are supposed to leave, perhaps, in early May.  It's just

13  with my calendar, I just couldn't hear it before today.

14           MR. MARINUZZI:  Right.  And, Your Honor, as I

15  mentioned before, there were different iterations of this

16  program.  It was initially contemplated that they would stay

17  through June 30th.  And so when we devised the program

18  initially, it was a program through June 30th.  The committee

19  wanted the flexibility, and we understand that, of determining

20  at some point at the end of April that there wasn't a need to

21  keep these two individuals through May and through June and

22  that's why we have this staggered time frame for this process.

23  So it wasn't as we originally contemplated it but it was a

24  result of negotiations with the committee.

25           And so the metrics for this plan, Your Honor, really

**RESIDENTIAL CAPITAL, LLC, ET AL.**

19

1    are centralized on the Ginnie Mae relationship and the value

2    the estate receives through Ginnie Mae loans.  And the metrics

3    are broken down, as I said, by time.  So let's look at the

4    first measurement of time; it's March 1st through April 30th.

5    And there's 45 percent of this particular metric is tied to

6    receipt of 143 million dollars.  Well, the target's actually

7    158 million dollars of proceeds from the delivery of Ginnie Mae

8    new production and modifications for the period March 1st

9    through April 30th.

10         The second component for this time period is a

11   commitment from Ginnie Mae for the return of fifty-five million

12   dollars of reserves.  And, Your Honor, we filed under seal the

13   declaration of Ronald Greenspan in our reply on these points

14   because there's certain sensitivities there.  To the extent

15   Your Honor has particular questions, Mr. Greenspan's here.  I

16   don't want to ignore them but I'm just trying to be sensitive.

17        So -- and then ten percent of that is obtaining an

18   agreement by Ocwen to continue to purchase the MSRs on the new

19   pools that we actually are able to put together with Ginnie

20   Mae.  And we have to get an extension through the end of the

21   year and we have to know we have that extension by April 30th.

22        Now, importantly, the estate makes money through this

23   relationship.  So to the extent we can continue to do that and

24   it's because of the work that these individuals did before

25   today that we even have it through June 30th, we'll continue to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1    make money.  Effectively, they're paying for themselves by

2    being successful here.

3            Same kinds of metrics are carried over through April

4    or May but the amounts change.  And to be specific, if these

5    individuals meet their target, and there's no reaching above

6    the target, its target -- there's no 107.5 percent for these

7    two individuals, they collectively will earn 400,000 dollars

8    for doing this.

9            If the program is extended for an additional month

10   with the consent of the executives and the committee, it's

11   another hundred thousand dollars that they'll split.  And if

12   it's extended through June, then there's another additional

13   hundred thousand dollars that they'll share.  So the entire

14   cost of this program assuming they hit each and every one of

15   the targets, is 600,000 dollars.

16           In my view, given the value that the estate would

17   obtain if they're successful in meeting the targets, it pays

18   for itself and then some.

19           Your Honor, as far as what they're doing, it's

20   difficult for me to address that given the sensitivities.

21   They're in the papers, they've been provided in unredacted form

22   to the U.S. Trustee and to the Court.  If Your Honor has any

23   questions about what they're doing, the negotiations, the

24   sensitivities, we can discuss them but I think we just have to

25   ask people to excuse themselves from the courtroom.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1          THE COURT:  Let me hear from Mr. Masumoto.

2          MR. MARINUZZI:  Thank you.

3          THE COURT:  Well, first, I assume -- does the

4     committee want to be heard?

5          MR. ZIDE:  Very briefly, Your Honor.

6          THE COURT:  All right.

7          MR. ZIDE:  Stephen Zide from Kramer Levin on behalf of

8     the committee.

9          First off, I agree with everything Mr. Marizuni (sic)

10     said about the committees' efforts here, the process here.  The

11     committee was very actively involved.  I myself was on numerous

12     phone calls.  We had an in-person meeting going through

13     everything they had proposed.

14          With respect to --

15          THE COURT:  I thought the committee was a lay-up on

16     this.

17          MR. ZIDE:  We were not a lay-up, let me tell you.

18          THE COURT:  I'm teasing.

19          MR. ZIDE:  A lot of the people in the courtroom can

20     vouch for that.

21          THE COURT:  The vernacular and jargon that's gotten

22     caught up in --

23          MR. ZIDE:  Did you hear the laughter?

24          THE COURT:  Yes.  The vernacular and jargon that's

25     gotten caught up in KEIPs and KERPs --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1          MR. ZIDE:  Yes.  In fact, Your Honor, the program that

2   you have before you today was changed significantly from what

3   we had originally seen both in the monetary amount that would

4   be paid out and in the metrics involved here.  And just in

5   particular on two of the metrics on the estate KEIP, first,

6   they are split; asset recoveries and budget.  Every budget

7   we've seen in this case has been more than the last budget.  So

8   if the estates could keep to the budget that they have put

9   forward for these estate -- for the executive KEIP, we'd be

10  very happy with that.  We think that is a good budget if they

11  can achieve that.

12          On the FHA receivables and bringing that cash in, the

13  original program they had put together, all that was was gross

14  amount.  We had added in the entire component of a percentage

15  recovery on those assets.  We thought that was very important

16  so that these employees were not rushing to bring money in

17  without taking into account what kind of recovery they're

18  getting on that.  And that's, like, I believe thirty-five

19  percent of that metric right now.  And if they are able to

20  bring in the amount of money that they anticipate bringing in

21  with that recovery metric, we think that would be very

22  favorable and it only will benefit the estates and it will lead

23  to projections and cash in the estate on what we are

24  anticipating and what we are hoping for for plan negotiations

25  and as we look at what's going to be left here and how the

1    supply is going to be divided up.

2          So we are happy with these metrics.  We were very

3    actively involved and we do request the approval of this

4    program.

5          THE COURT:  Thank you, Mr. Zide.  Mr. Masumoto.

6          MR. MASUMOTO:  Thank you.  Good afternoon, Your Honor.

7    Brian Masumoto for the Office of the United States Trustee.

8          Your Honor, you put your finger on the exact concern

9    that our office had in dealing.  Essentially this issue

10   devolves -- falls down to the issue of whether or not the

11   metrics in this case are sufficiently incentivizing, or

12   sufficiently -- whether they're not retentive.  To the extent

13   that they're retentive our position's, obviously, that Section

14   503(c)(1) would apply and so would the restrictions thereunder.

15         THE COURT:  So I thought when you initially filed

16   your -- when I read your motion when you initially filed your

17   objection I certainly understood why you were taking -- the

18   questions you raised.  And you didn't just say no, never; you

19   raised the issue specifically, has the debtor demonstrated by a

20   preponderance of the evidence that the metrics selected are

21   sufficiently challenging -- I'll use that term for now -- such

22   that they're incentivizing, rather than retentive.  And I

23   thought you made some fair points, and the debtor has come back

24   with additional information.  And what's your position now?

25         MR. MASUMOTO:  Your Honor, at this point,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1   unfortunately, our position is that we believe that the debtor

2   still has not carried its burden of establishing that the

3   metrics are sufficiently incentivizing.

4           And if I may, there are four points that I'd certainly

5   like to address --

6           THE COURT:  Sure.

7           MR. MASUMOTO:  -- at this time.  Two are not typically

8   regarded.  But just as part of the background in this case, and

9   I'm trying to be sensitive to the materials that were given to

10  us that are not made public.

11          THE COURT:  Yeah.  I don't want to deal with that

12  issue separately; I'm sensitive to it as well.  I feel very

13  strongly in open public records in bankruptcy cases, and I

14  don't know what your position on sealing is.  I did think, you

15  know, the spreadsheet that showed the amounts that would go to

16  individuals my reaction is it's appropriately maintained as

17  confidential.  The aggregate numbers, and maybe something about

18  the breakdown, I think ought to be public, but dollars that

19  would go to specific people, what's your position on that?

20          MR. MASUMOTO:  We do realize the sensitivity of that

21  amount.  However, certain of the information, and that's why

22  even in our response -- we did have the spreadsheet prior to

23  filing our response and we alluded to, but very generally

24  without identifying individuals.

25          THE COURT:  Absolutely.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

25

1       MR. MASUMOTO:  And one of the concerns that I'd like

2   to mention is that if you look at the spreadsheet, virtually

3   everyone had an increase in base pay.  And as we mentioned in

4   our papers, we thought, although it was a little sensitive,

5   that one insider got -- received an almost sixty-six percent

6   increase in its base pay.

7       THE COURT:  I mean, on that point, Mr. Masumoto,

8   historically -- and I guess I think I dealt with this in a

9   prior KEIP opinion -- historically, the debtor had a variable

10  pay approach and complicated by the fact that at the upper

11  levels it included stock and things from Ally, which are no

12  longer part of it, and so that the fact that there were

13  increases in base level -- base pay, I mean, it seemed to me

14  the argument was that reflected the changes in corporate

15  structure relationship with Ally, the separation really from

16  Ally.

17      MR. MASUMOTO:  Your Honor, I don't dispute that

18  characterization.  The problem is that there was certainly no

19  evidence from our standpoint after looking at the spreadsheet

20  as to the justification for the increases, particularly in one

21  case where there was, you know, the two-thirds increase.

22      Now, part of the problem with such -- with the

23  increase in the base salary is that it's another way of

24  avoiding having to increase the amount of the incentive pay.

25  If you want to present your incentive pay as being somewhat

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1    minimal, one way of doing it is increase the base pay and,

2    therefore, not subject to any of the incentivizing words.

3         THE COURT:  And one of the things I looked at at the

4    time of the first KEIP motion was aggregate; what's the

5    aggregate compensation the people are going to be entitled to.

6         MR. MASUMOTO:  Right.

7         THE COURT:  Compared to historic.

8         MR. MASUMOTO:  That's correct.  And the spreadsheet

9    does, in fact, as indicated, it has 2011 and 2012, and I'll

10   note the percentages that are on there.  However, the 2012

11   compensation, the variable aspect of it, which was incentive,

12   was based on the sale which I think distorts the sort of

13   incentive base comparison and the percentage increase.

14        THE COURT:  The sale was very successful as it turned

15   out.

16        MR. MASUMOTO:  Extremely.  And, Your Honor, and that's

17   why I wanted to indicate that.

18        In comparing it to 2012, it may not be an accurate

19   sort of reflection of what should be properly incentivizing to

20   these individuals.

21        Now, the other characteristic that's not typical when

22   looking at 503(c)(1) considerations is that in this case, as

23   the reply indicated, these individuals will also receive a

24   severance.  Now, they represented that, in fact, the severance

25   payments will be subject to (c)(2).  Now, Your Honor, our

1  office and the debtors have had various discussions on this

2  because I believe chambers was copied on letters whereby they

3  were offering severance programs to various individuals

4  pursuant to the original first-day wage orders.

5       Now, one of the complications that came up for

6  purposes of severance is how do you calculate the (c)(2)

7  limitation on the first day of the year, where (c)(2) says, you

8  know, ten times the amount give within that year.  Obviously,

9  there's no comparison.  So we had some consideration.  So even

10  at this point it's not clear how the (c)(2) limitation will

11  apply and the amount that will be applicable --

12       THE COURT:  Don't ask me to decide more than I need to

13  do right now.

14       MR. MASUMOTO:  Your Honor, the only problem is that

15  we're somewhat -- we're sort of in a difficult position whereby

16  the first time they came in for a KEIP it was without reference

17  to the -- without knowing the amounts under the AIP.  And from

18  our perspective, that overall picture we thought was necessary

19  to establish what exactly the proper compensation was.  And in

20  this case -- as Your Honor knows, in many cases where there's

21  liquidation, a liquidating debtor, frequently incentive plans

22  may, essentially, replace severance payments and so forth.  So

23  here, where we know -- in fact, the debtors have represented

24  that not only will they get a KEIP for this year, but an

25  undisclosed amount for severance, which is, obviously, not

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

1    included as part of the severance package --

2          THE COURT:  Well, they won't get it unless it's

3    approved.

4          MR. MASUMOTO:  I assume that's the case, but without

5    knowing the exact amount --

6          THE COURT:  Is that true, Mr. Marinuzzi, do you agree?

7          MR. MARINUZZI:  Your Honor, we'll come back to this

8    Court for severance for these covered employees.

9          MR. MASUMOTO:  Very well, Your Honor.  Once again, I

10   did want to mention that, from our perspective, we tried to

11   look at the entire compensation picture, which includes in this

12   case the severance amounts that are likely to be awarded.

13         THE COURT:  I'm not faulting you for the position that

14   the U.S. Trustee has taken on this.  Certainly -- I mean, I

15   think the reply -- you successfully drew out a lot more

16   information.

17         MR. MASUMOTO:  Thank you, Your Honor.

18         The remaining two points that I would like to make is

19   that, as detailed, I think, both in the original motion and in

20   the reply, the KERP participants in this case are also -- also

21   have incentives.  And in fact, I would suggest that many of the

22   underlying goals that they're hoping to achieve, in terms of

23   net recoveries and recovery rates and so forth, would very

24   likely depend very much upon these employees, both, you know,

25   that are included as part of the KERP, as well as the KEIP

**RESIDENTIAL CAPITAL, LLC, ET AL.**

29

1  employees.

2      But the KERP participants are also being incentivized

3  to achieve these same recovery goals.  And so part of our

4  concern was how was there sufficient -- did they carry their

5  burden to determine that the amount of increase or the awards

6  being attributable to the KEIP for, essentially, the same

7  goals, are meritorious.  I mean, as I think indicated in our

8  chart, over forty-three percent of the entire KEIP award are

9  going to 8 individuals, as compared to 155.

10      THE COURT:  Plus the forty-seven percent.

11      MR. MASUMOTO:  Thank you, Your Honor.

12      So, once again, we felt that notwithstanding the

13  information that we did receive, we're still not -- we weren't

14  happy about the evidence that indicated that so much of the

15  benefits should accrue in favor of the key percipients (sic).

16      And I think, although, counsel, Mr. Marinuzzi did

17  address my final point, which is sort of the, from our

18  standpoint, the lack of context or historical basis, they did

19  allude to the 127 million dollar sale.  I'm not sure, again,

20  whether they can disclose the amount, but we were looking for

21  evidence of how they arrived at the metrics they did; the sixty

22  percent or ninety percent, that they were using, was there any

23  sort of historical basis or evidence to show that the current

24  metrics, as Your Honor pointed out, are especially

25  incentivizing.  We felt that we weren't entirely satisfied with

1  the information given.

2       And for example, with respect to the executive KEIP,

3  the targeted amounts I believe was 158 million dollars, and the

4  threshold amounts and so forth, these amounts are supposedly

5  for the periods March 1st through June 30th.  Well, they

6  certainly have some historical perspective or experience with

7  respect to January and February.  And I guess from our

8  standpoint that information might -- should be disclosed to be

9  able to determine whether or not the current targets are

10  sufficiently incentivizing.

11       THE COURT:  Have you asked for that information?

12       MR. MASUMOTO:  No, Your Honor, we did not.

13  Unfortunately, there were a number of things that we were

14  focused on and we did not ask for that specific information,

15  but we do believe that, certainly, that information, I presume,

16  would have had some influence in the amounts that they selected

17  as their target and threshold amounts.

18       And finally, with respect to the budget.  As Your

19  Honor knows, we received it, I guess, Tuesday; we actually

20  didn't look at it until yesterday.  Those budget amounts, which

21  haven't been disclosed, again, part of the concern is -- I

22  don't know to what extent Your Honor's been involved in sort of

23  budgeting process, but I know from my experience of

24  participating budget fee committees that the budgets are always

25  high and, yes, they get exceeded all the time.  And the concern

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1    is -- notwithstanding the representations of the parties, there

2    was concern about whether or not some of these targeted amounts

3    are with sufficient cushion.  I did not think to ask the

4    question Your Honor did, which was what role the insiders had

5    in developing the budgets.  But we did have concerns since,

6    once again, we didn't have the information, at least up until

7    yesterday, as to the specific budget expense amounts.  And

8    again, notwithstanding the statements here today, our office

9    was not entirely satisfied with the -- I guess the proof to

10   establish the rigorous standards set for the budget.

11          Thank you, Your Honor.  If you have any questions?

12          THE COURT:  Well, here's my question to both of you.

13   The debtor has put forward declarations; they need to offer

14   them in evidence.  I don't know whether you want to cross-

15   examine witnesses, whether you have other evidence that

16   you're -- I don't know.  Have you discussed this, Mr.

17   Marinuzzi, how you were going to proceed with the evidence?

18          MR. MASUMOTO:  Your Honor, I did indicate to Mr.

19   Marinuzzi that I have no intention of cross-examining the

20   witnesses.

21          THE COURT:  You're certainly free to do that.  I mean,

22   I want to make that clear.

23          MR. MASUMOTO:  Right.  Our position is that they have

24   a burden.  And from our standpoint, it's whether or not they

25   sufficiently carried it.  I believe that based upon the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1    declarations made and which, presumably, will be offered into

2    evidence, as well as some of the evidence that Your Honor and

3    our office has, which has not been made public --

4            THE COURT:  And I want to discuss how we deal with

5    that.  The debtor has provided to the Court, to the committee,

6    and to the U.S. Trustee certain information which I have

7    reviewed.  And, Mr. Masumoto, I certainly want to hear from

8    you.  My review of the information and the format in which it

9    is presented would indicate it would be entitled to be sealed

10   under 107(b).  I'm quite -- I'm always very uncomfortable about

11   deciding anything on the basis of evidence that is not part of

12   a public record, but I do see, whether it's the spreadsheets

13   that you were given earlier, that showed the amounts that would

14   be targeted to specific individuals or the most recent

15   information, which I received yesterday, and it was in the form

16   of seven pages; a cover letter and seven pages.  First is --

17   asset disposition metrics is the first section.  And then the

18   second section is performance against budget metric.  What's

19   your position about maintaining confidentiality?

20           MR. MASUMOTO:  Your Honor, if I may address the

21   spreadsheet.  I'm sorry.

22           MR. MARINUZZI:  Your Honor, on these PowerPoint

23   presentations --

24           THE COURT:  Yes.

25           MR. MARINUZZI:  -- with the exception of the last

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1    page, just -- Your Honor, the genesis of this was my hearing

2    prep, and I thought it would be useful to actually distribute

3    it.

4            THE COURT:  So you have no objection other than the

5    last page.

6            MR. MARINUZZI:  Other than the last page, where we can

7    redact the categories, I'm happy filing this, making it a

8    public document.

9            THE COURT:  All right.

10           MR. MARINUZZI:  With respect to the second separate

11   page, this is taken right out of the motion papers.

12           THE COURT:  Fine.

13           MR. MARINUZZI:  So there's nothing secretive in here.

14           THE COURT:  Fine, okay.

15           MR. MARINUZZI:  Sorry.

16           THE COURT:  I think -- Mr. Masumoto, would you be

17   satisfied with respect to that last page if it's redacted in

18   the fashion that Mr. Marinuzzi --

19           MR. MASUMOTO:  Yes, Your Honor, I believe that that's

20   satisfactory.

21           THE COURT:  Okay.  Now, you were starting to say about

22   the spreadsheet that showed the individuals.

23           MR. MASUMOTO:  Well, Judge, as to the spreadsheet, as

24   a general overall principle I do agree with the idea of

25   protecting the individual; specific compensations of particular

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1    employees to the extent that they can aggregate the figures,

2    but keep some of the statistics in place, I think that would be

3    helpful.  That may -- I mean, again --

4            THE COURT:  Here's what I want would --

5            MR. MASUMOTO:  -- the underlying principle of

6    protecting individuals is fine.

7            THE COURT:  Here's what I would like you to do with

8    respect to that, is to confer and see whether the two of you --

9    I would think that the two of you could agree on some aggregate

10   numbers from that spreadsheet that would not show amounts to

11   specific individuals, or that couldn't easily be deciphered as

12   to who the individuals were.

13           Obviously, you have the full document, I have the full

14   document, the committee has the full document, but I am

15   sensitive to that information being disclosed about each

16   individual.  One, one employee doesn't know what the other is

17   going to be getting.  They want to maintain -- keep these

18   employees for the period of time they need them.  And I have no

19   doubt that competitors might well be looking at this

20   information and use it as a basis for deciding which employees

21   they want to solicit away right now.  So I do think it's

22   market-sensitive information that would be entitled to

23   protection.

24           I do think that you probably can come to an agreement

25   on disclosure of some of the information that's there.  You're

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1  willing to try and do that, Mr. Masumoto?

2           MR. MASUMOTO:  Yes, of course, Your Honor.

3           THE COURT:  All right.  So what I'd like to do then,

4  Mr. Marinuzzi, is have you offer in evidence whatever it is

5  you're offering, and once, again, you know at that point Mr.

6  Masumoto has indicated he doesn't intend to cross-examine, but

7  I intend to just ask that question to get a clear record.

8           Have you when you put in whatever you do rest, and

9  then I'll ask Mr. Masumoto what evidence he wants to offer.

10  And if it's none, that he rest, and we'll see where we go from

11  there.

12           MR. MASUMOTO:  Very well, Your Honor.  Thank you.

13           THE COURT:  Thank you very much, Mr. Masumoto.

14           MR. MARINUZZI:  Your Honor, I'm sorry, we're just --

15           THE COURT:  That's okay.

16           MR. MARINUZZI:  We pre-marked the declarations --

17           THE COURT:  Sure.

18           MR. MARINUZZI:  -- as Debtors' Exhibit 1 through --

19           THE COURT:  Yeah.

20           MR. MARINUZZI:  -- I believe 5.  And I just want to

21  make sure I have a copy for Your Honor and a copy for one of

22  your clerks.

23           THE COURT:  Thank you.

24      (Pause)

25           MR. MARINUZZI:  Your Honor, I presented to the Court

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1  and would move into evidence the declaration of John Dempsey in

2  support of the motion; that's Debtors' Exhibit 1.

3         THE COURT:  All right.  And that's -- it was filed on

4  March 20th, 2013, and it's ECF Number 3281?

5         MR. MARINUZZI:  That's correct, Your Honor.

6         THE COURT:  Any objections?

7         MR. MASUMOTO:  No objections, Your Honor.

8         THE COURT:  All right.  The Dempsey declaration is in

9  evidence.

10  (Declaration of John Dempsey was hereby received into evidence

11  as Debtors' Exhibit 1, as of this date.)

12         MR. MARINUZZI:  I would move Debtors' Exhibit 2, which

13  is the declaration of Ronald Greenspan.

14         THE COURT:  That -- you didn't hand that to me.  I

15  have 1, 3, 4 and 5.

16         MR. MARINUZZI:  Your Honor, I was trying to make sure

17  that the Court was paying attention.

18         THE COURT:  Wait, one of my clerk's has it.  All

19  right, I got it.  All right.  I have the declaration of Ronald

20  Greenspan, filed March 20th, 2013, and it's ECF Docket 3282.

21  Mr. Masumoto?

22         MR. MASUMOTO:  No objection, Your Honor.

23         THE COURT:  All right, that's in evidence as well.

24  (Declaration of Ronald Greenspan was hereby received into

25  evidence as Debtors' Exhibit 2, as of this date.)

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1          MR. MARINUZZI:  Your Honor, I'd like to move into

2     evidence Debtors' Exhibit 3, the declaration of Tammy

3     Hamzehpour, in support of the motion, it's Docket Number 3283.

4          THE COURT:  Mr. Masumoto?

5          MR. MASUMOTO:  No objection, Your Honor.

6          THE COURT:  All right, that's in evidence as well.

7     (Declaration of Tammy Hamzehpour was hereby received into

8     evidence as Debtors' Exhibit 3, as of this date.)

9          MR. MARINUZZI:  Your Honor, Debtors' Exhibit 4, would

10    be the declaration of Pamela West in support of the motion,

11    Docket Number 3284.

12         MR. MASUMOTO:  No objection, Your Honor.

13         THE COURT:  All right, that's in evidence.

14    (Declaration of Pamela West was hereby received into evidence

15    as Debtors' Exhibit 4, as of this date.)

16         MR. MARINUZZI:  And Docket -- I'm sorry, Exhibit

17    Number 5, Debtors' Number 5, would be the supplemental

18    declaration of Ronald Greenspan, Docket Number 3379.

19         MR. MASUMOTO:  No objection, Your Honor.

20         THE COURT:  All right, that's in evidence as well.

21    (Supplemental declaration of Ronald Greenspan was hereby

22    received into evidence as Debtors' Exhibit 5, as of this date.)

23         MR. MARINUZZI:  Thank you, Your Honor.  And as it

24    relates to the PowerPoint presentation with the redaction we'll

25    redact it and submit it to chambers as Debtors' Exhibit 6, if

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1    that's okay with Mr. Masumoto.

2              THE COURT:  All right.  Mr. Masumoto, is that

3    acceptable?

4              MR. MASUMOTO:  That's acceptable.

5    (PowerPoint with redaction was hereby received into evidence as

6    Debtors' Exhibit 6, as of this date.)

7              MR. MARINUZZI:  And the separate slide, which his on

8    the -- on the executive KEIP, we'll mark that as Debtors'

9    Exhibit 7.

10             THE COURT:  Okay, thank you.

11             MR. MASUMOTO:  No objection, Your Honor.

12             THE COURT:  All right.

13   (Separate slide regarding KEIP was hereby received into

14   evidence as Debtor's Exhibit 7, as of this date.)

15             MR. MARINUZZI:  Your Honor, I don't know if Your Honor

16   would like me to respond to some of the points that Mr.

17   Masumoto raised.

18             THE COURT:  No.  First I want to know is there any

19   other evidence you want to introduce.

20             MR. MARINUZZI:  That's all we have, Your Honor.

21             THE COURT:  Do you rest?

22             MR. MARINUZZI:  Yes, we do.

23             THE COURT:  All right.  Mr. Masumoto, do you wish to

24   cross-examine any of the declarants?

25             MR. MASUMOTO:  No, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1        THE COURT:  Is there any evidence you wish to offer?

2        MR. MASUMOTO:  No, You Honor.

3        THE COURT:  Do you rest?

4        MR. MASUMOTO:  Yes, Your Honor.  Thank you.

5        THE COURT:  All right.  The one issue I would like you

6   to address -- now, it's a point that Mr. Masumoto raised near

7   the end of his presentation -- is the allocation of benefits

8   under the plans.  And I understand the complexity and

9   challenges in tasks remaining, but I think it's, by my

10  reckoning, 46.69 percent of the KEIP -- 46.69 percent of the

11  total awards would go to the recipients of the two KEIPs, with

12  14.34 for the two executive KEIP participants -- it's

13  approximately 1.1 million dollars -- and 32.35 percent for the

14  six estate KEIP participants, 2.52 million dollars.

15        And there's 155 participants in the KERP.  And is

16  that -- the question I have is is that an appropriate

17  allocation of benefits to be awarded to participants?

18        MR. MARINUZZI:  Your Honor, we submit that it is, and

19  the company's advisors and the company's management, when they

20  sat down to create this program, they looked at some of the

21  issues Your Honor referred to.  They have to keep employees at

22  the company.  This was a company that had 3,000-plus employees.

23  They are down to 280, I believe.  And they're trying to retain

24  155 that they've determined to be key.  And so, as part of the

25  analysis, they had to determine what it was that would be paid

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1    under this program to keep these employees where they were

2    through year-end.

3         And part of the breakdown is just the natural

4    breakdown of the general compensation for the individuals that

5    make up the KEIP and make up the KERP.  And while, there's

6    always, I would say, a retentive aspect to an incentive plan --

7    it's just by nature -- you have to figure out, if you create

8    incentives, the incentive has to be sufficiently valuable to

9    actually motivate the executives to try to achieve them.

10        And so, when you look at the compensation paid

11   historically to these individuals that are covered by the KEIP,

12   and we spoke a little bit about one specific example, where

13   base compensation went up sixty-three percent for one

14   individual, but what we ignore for that same individual is the

15   fact that, versus 2011 compensation where there was no sale,

16   it's flat.  Versus 2012, with understandably the KEIP award for

17   the success of the sale, it's down twenty-one percent.

18        And so if you were to say, let's just take the same

19   pot of money and split it fifty-fifty, as between the KERP and

20   the KEIP, you'd wind up having a KERP where people might be

21   overcompensated versus their traditional annual compensation,

22   and you might have executives who will say, those are really

23   terrific incentives, but I'm just -- I'm not motivated to try

24   to achieve them, because I'm not going to work triple time to

25   try to get Fannie Mae -- I'm sorry, Ginnie Mae -- to do X, Y

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1   and Z, if I'm actually not going to make any money.

2          So the reality is you've got to set your program in a

3   way that incentivizes people because there's actually something

4   to get for achieving the incentive.  I think that explains more

5   than anything the natural breakdown of the percentages.  It's

6   just the roles these individuals play.

7          THE COURT:  Okay.  Mr. Masumoto, anything you want to

8   add?  Mr. Zide --

9          MR. ZIDE:  Yes, just --

10         THE COURT:  -- go ahead.

11         MR. ZIDE:  One other point which the debtors could

12  probably elaborate on a bit more is that I think these numbers

13  are a bit skewed, because many of the KERP employees will not

14  be there by the end of the year.  So these amounts do not

15  reflect full-year payments.  Some of them reflect people who

16  ware going to be there for three months, four months, five

17  months, as long as they're needed throughout the program.  So

18  on a year-to-year basis comparison, I believe the percentages

19  you're referencing will change somewhat dramatically.

20         I think -- just going off my recollection -- I think

21  only about a hundred of those KERP employees will be there by

22  the end of the year.  If you want to elaborate or add any more,

23  but those numbers are not really reflective of what's going on.

24         MR. MASUMOTO:  Brian Masumoto of the Office of the

25  United States Trustee.  Your Honor, just one brief comment.  As

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1    in our papers, we did provide a little bit of the breakdown

2    that Your Honor referenced, and in our table, just as you

3    indicated, I do want to make clear that to Mr. Zide's point,

4    that in fact, the figures we use are based on an annualized

5    figure, because we're aware that the -- that some of the people

6    would not be there, but based upon the figures we were given,

7    we try to, on an annual basis, indicate the percentages.

8            And as Your Honor indicated, two individuals, who are

9    representing 1.2 percent of the 163-member group, is getting

10   14 -- over 14 percent.  And the six members, who are

11   representing 3.6 percent of that group, is getting about 32

12   percent.

13           One thing I would like to mention is that, in fact --

14   in terms of whether or not this is a natural breakdown or so

15   forth, if in fact we're not -- the Court were not satisfied

16   that these were sufficiently incentive-based, the 503(C)(i),

17   which has a ten percent limitation on the amount of the

18   payment, would, based upon the current figures -- I know -- I

19   don't know if it fully takes into account the departures of the

20   individuals, but if we assume award figure of 4.4 for the 155,

21   the mean calculation for 4.4 would be approximately 28,387

22   dollars.  So ten times that amount would be an annual amount

23   under that limitation of 283,870 dollars.

24           So that would be the -- in terms of whether or not

25   Congress thought was ever was appropriate for a retentive

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1    program, the limitation would be in the neighborhood on an

2    annual basis for an insider of about 283,000 dollars, so and --

3    whereas what's projected here on an annual basis as I believe,

4    2.2 million dollars to the two executives, for example.

5            So from our standpoint, I'm not sure what a natural

6    breakdown in allocation should be, but given the concerns that

7    in fact since the KERP employees are in fact highly

8    incentivized to achieve some of the same goals that are being

9    set for the executives, that perhaps the disproportion

10   allocation to the KEIP recipients are not appropriate.

11           THE COURT:  But you -- when I thought about this,

12   because I was concerned about the spread.  Given the complexity

13   of these cases and of the challenges for the tasks remaining,

14   the importance of executive leadership in achieving the goals.

15   So the fact that the same things are measured for KERP and KEIP

16   participants doesn't surprise me at all.  It does seem to me

17   that you want the goals of the enterprise aligned so that

18   everybody is trying to achieve the same set of goals.  The fact

19   that the executives are better rewarded if those goals are

20   achieved is not particularly surprising to me.

21           But that isn't going to happen unless all of the

22   employees within the enterprise are pulling in the same

23   direction trying to get those things accomplished.  And that

24   was my reaction to that.  When I thought -- because I was --

25   you made the point in your brief that I focused on this issue

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1    of the allocation.  And the more I thought about it, it did

2    seem to me that, well, that's not at all surprising.

3            MR. MASUMOTO:  Your Honor, you're exactly correct that

4    the interests should be aligned.  And part of the problem, once

5    again, I do -- I sort of revert back to the burden of proof,

6    I'm not sure that I've had sufficient -- I mean, there are

7    certain types of incentives where you could clearly say, okay,

8    we know that the executives clearly are providing the extra

9    benefit.

10           Here, where the goals are aligned, and they're in fact

11   the day-to-day on-the-ground work are being done by the

12   presumably 155 key employees, it's not quite clear to me the

13   added value that's being added by the KEIP insiders that would

14   justify the high -- the disproportionate allocation.

15           THE COURT:  All right.  Anything else you want to add?

16   All right.  I'm going to take the matter under submission.  I

17   expect to be able to rule within a couple of days, okay.  I

18   know it's important to the debtor to know one way or the other

19   what's happening here and I don't expect there'll be a long

20   delay.

21           MR. MARINUZZI:  Thank you, Your Honor.

22           THE COURT:  Okay.

23           MR. MARINUZZI:  And we'll get the additional exhibits

24   to the Court tomorrow morning.

25           THE COURT:  Okay, and thank you very much to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1    everybody, okay.

2          MR. MARINUZZI:  Thank you.

3          IN UNISON:  Thank you, Your Honor.

4          THE COURT:  Thank you, all right, we're adjourned.

5          UNIDENTIFIED SPEAKER:  For the day.

6          THE COURT:  For the day.

7      (Whereupon these proceedings were concluded at 3:57 PM)

46

I N D E X

E X H I B I T S

| DEBTOR'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Declaration of John Dempsey | 36 |
| 2 | Declaration of Ronald Greenspan | 36 |
| 3 | Declaration of Tammy Hamzehpour | 37 |
| 4 | Declaration of Pamela West | 37 |
| 5 | Supplemental declaration of Ronald Greenspan | 37 |
| 6 | PowerPoint with redaction | 38 |
| 7 | Separate slide regarding KEIP | 38 |

47

1

2                          C E R T I F I C A T I O N

3

4   I, Ellen Kolman, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9   _____

10  ELLEN KOLMAN

11  AAERT Certified Electronic Transcriber CET**D-568

12

13  eScribers

14  700 West 192nd Street, Suite #607

15  New York, NY 10040

16

17  Date:  April 12, 2013

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.
Case No. 12-12020-mg

April 11, 2013

## #

**#607 (1)**
2:22

## [

**[CC (1)**
2:2

## A

**able (5)**
17:1;19:19;22:19;
30:9;44:17
**above (1)**
20:5
**Absolutely (1)**
24:25
**accelerate (1)**
12:15
**acceptable (2)**
38:3,4
**accomplish (1)**
9:9
**accomplished (1)**
43:23
**account (3)**
13:24;22:17;42:19
**accounts (1)**
15:19
**accrue (1)**
29:15
**accurate (1)**
26:18
**achieve (10)**
6:22;10:23;11:3;
22:11;28:22;29:3;
40:9,24;43:8,18
**achieved (1)**
43:20
**achieving (2)**
41:4;43:14
**actively (2)**
21:11;23:3
**actually (14)**
7:25;8:10,14;
10:15;11:11;14:3;
17:7;19:6,19;30:19;
33:2;40:9;41:1,3
**add (3)**
41:8,22;44:15
**added (3)**
22:14;44:13,13
**additional (5)**
10:20;20:9,12;
23:24;44:23
**address (5)**
20:20;24:5;29:17;
32:20;39:6
**adjourned (1)**
45:4

**Administrative (2)**
2:7;5:11
**advances (2)**
9:15;15:22
**advisors (3)**
9:22;15:11;39:19
**advocating (1)**
11:12
**affidavits (1)**
6:6
**affiliates (1)**
9:18
**afternoon (3)**
5:4,7;23:6
**again (10)**
8:21;28:9;29:12,
19;30:21;31:6,8;
34:3;35:5;44:5
**against (3)**
10:15;15:19;32:18
**aggregate (6)**
6:21;24:17;26:4,5;
34:1,9
**ago (1)**
11:23
**agree (4)**
21:9;28:6;33:24;
34:9
**agreement (2)**
19:18;34:24
**ahead (2)**
17:18;41:10
**AIP (1)**
27:17
**aligned (3)**
43:17;44:4,10
**allocation (7)**
16:10;39:7,17;
43:6,10;44:1,14
**allude (1)**
29:19
**alluded (1)**
24:23
**Ally (3)**
25:11,15,16
**almost (1)**
25:5
**alone (1)**
12:5
**along (1)**
5:24
**although (2)**
25:4;29:16
**always (3)**
30:24;32:10;40:6
**amount (9)**
12:19;22:3,14,20;
24:21;25:24;27:8,11,
25;28:5;29:5,20;
42:17,22,22
**amounts (1)**
8:9;20:4;24:15;
27:17;28:12;30:3,4,4,

**16,17,20;31:2,7;
32:13;34:10;41:14**
**analysis (1)**
39:25
**annual (5)**
40:21;42:7,22;
43:2,3
**annualized (1)**
42:4
**anticipate (1)**
22:20
**anticipating (1)**
22:24
**applicable (1)**
27:11
**applications (1)**
13:21
**applies (1)**
6:15
**apply (2)**
23:14;27:11
**appreciate (1)**
10:24
**approach (2)**
10:8;25:10
**appropriate (3)**
39:16;42:25;43:10
**appropriately (1)**
24:16
**approval (2)**
5:21;23:3
**approved (1)**
28:3
**approximately (5)**
7:11;9:13,15;
39:13;42:21
**April (6)**
18:3,20;19:4,9,21;
20:3
**argument (1)**
25:14
**Arising (2)**
2:7;5:11
**around (1)**
11:11
**arrived (1)**
29:21
**aspect (4)**
6:8;15:16;26:11;
40:6
**aspects (3)**
6:7,14;7:16
**asset (4)**
9:22;17:9;22:6;
32:17
**assets (22)**
7:2,19;9:9,11,16,
19,21,23,24;10:3,4;
11:17;15:24;16:3,8,8,
9,14,15;17:6,9;22:15
**assume (3)**
21:3;28:4;42:20
**assumed (1)**

**11:17**
**assuming (2)**
7:8;20:14
**attempt (1)**
11:23
**attention (1)**
36:17
**attributable (1)**
29:6
**Authorizing (2)**
2:4;5:9
**available (2)**
6:3;14:24
**avoiding (1)**
25:24
**award (4)**
15:20;29:8;40:16;
42:20
**awarded (2)**
28:12;39:17
**awards (4)**
9:6;15:2;29:5;
39:11
**aware (3)**
10:5;14:11;42:5
**away (3)**
9:10;13:11;34:21

## B

**back (6)**
13:14;15:16;16:24;
23:23;28:7;44:5
**back-and-forth (1)**
18:6
**background (1)**
24:8
**bad (1)**
14:12
**balance (1)**
16:7
**Bankruptcy (2)**
2:4;24:13
**base (8)**
25:3,6,13,13,23;
26:1,13;40:13
**based (6)**
14:23;26:12;31:25;
42:4,6,18
**basis (8)**
29:18,23;32:11;
34:20;41:18;42:7;
43:2,3
**bear (1)**
14:14
**behalf (2)**
5:5;21:7
**benefit (2)**
22:22;44:9
**benefits (3)**
29:15;39:7,17
**better (2)**
16:24;43:19

**beyond (1)**
7:23
**bid (1)**
14:3
**bidding (1)**
12:6
**bids (3)**
12:1;14:8,12
**billion (2)**
9:14;16:8
**bit (4)**
40:12;41:12,13;
42:1
**bits (1)**
10:6
**board (3)**
5:16,25;6:1
**bonus (3)**
10:12,13,14
**book (7)**
9:15,16;12:4;
15:17,19;16:9,17
**books (3)**
11:15,18;12:22
**borrower (2)**
13:7,11
**both (6)**
10:21,21;22:3;
28:19,24;31:12
**breakdown (7)**
24:18;40:3,4;41:5;
42:1,14;43:6
**BRIAN (3)**
4:8;23:7;41:24
**brief (2)**
41:25;43:25
**briefly (1)**
21:5
**bring (2)**
22:16,20
**bringing (2)**
22:12,20
**broken (1)**
19:3
**bucket (2)**
10:2;14:2
**budget (16)**
7:17,21,21,22;8:9;
22:6,6,7,8,10;30:18,
20,24;31:7,10;32:18
**budgeting (1)**
30:23
**budgets (2)**
30:24;31:5
**bulk (4)**
10:5,8,9;11:23
**burden (4)**
24:2;29:5;31:24;
44:5
**business (2)**
6:2;14:20
**buy (3)**
12:11,11;16:24

**buyer (1)**
12:12

## C

**c2 (4)**
26:25;27:6,7,10
**calculate (1)**
27:6
**calculation (1)**
42:21
**calendar (1)**
18:13
**call (2)**
9:16;15:23
**called (1)**
13:9
**calls (1)**
21:12
**came (2)**
27:5,16
**can (16)**
7:25;9:24;10:5,5;
12:4;13:15;14:4;
15:4;19:23;20:24;
21:19;22:11;29:20;
33:6;34:1,24
**Capital (2)**
5:3;17:25
**care (2)**
9:7;10:25
**carefully (3)**
5:14;7:20;15:10
**carried (3)**
20:3;24:2;31:25
**carry (1)**
29:4
**case (9)**
22:7;23:11;24:8;
25:21;26:22;27:20;
28:4,12,20
**cases (3)**
24:13;27:20;43:13
**cash (8)**
9:12,25;10:11,15;
11:19,20;22:12,23
**cash-for-keys (1)**
13:9
**categories (2)**
8:5;33:7
**caught (2)**
21:22,25
**centralized (1)**
19:1
**cents (1)**
11:10
**Certain (7)**
2:5,6;8:25;19:14;
24:21;32:6;44:7
**certainly (8)**
23:17;24:4;25:18;
28:14;30:6,15;31:21;
32:7

**CFO (1)**
17:23
**challenge (1)**
12:2
**challenges (2)**
39:9;43:13
**challenging (1)**
23:21
**chambers (4)**
8:11;18:10;27:2;
37:25
**change (2)**
20:4;41:19
**changed (1)**
22:2
**changes (2)**
10:9;25:14
**characteristic (1)**
26:21
**characterization (1)**
25:18
**chart (1)**
29:8
**check (1)**
12:18
**chief (1)**
6:2
**chosen (1)**
11:1
**claims (2)**
11:12;12:16
**class (1)**
17:9
**classes (1)**
9:22
**clear (5)**
27:10;31:22;35:7;
42:3;44:12
**clearly (2)**
44:7,8
**clerks (1)**
35:22
**clerk's (1)**
36:18
**climb (1)**
6:24
**close (3)**
12:4,6;15:17
**closer (3)**
7:13,14,14
**Code (1)**
2:4
**collect (1)**
11:10
**collected (3)**
10:15;11:19,19
**collectively (1)**
20:7
**combination (1)**
14:18
**comment (1)**
41:25
**commitment (1)**

**19:11**
**committee (18)**
5:16,16,18;6:1;
7:22;8:17,19;15:13;
18:7,18,24;20:10;
21:4,8,11,15;32:5;
34:14
**committees (1)**
30:24
**committees' (1)**
21:10
**company (9)**
7:20;9:22;10:8;
11:13,24;14:19;
17:21;39:22,22
**company's (3)**
11:18;39:19,19
**Compared (2)**
26:7;29:9
**comparing (1)**
26:18
**comparison (3)**
26:13;27:9;41:18
**compensation (10)**
6:1;26:5,11;27:19;
28:11;40:4,10,13,15,
21
**compensations (1)**
33:25
**competitors (1)**
34:19
**complexity (2)**
39:8;43:12
**complicated (1)**
25:10
**complications (1)**
27:5
**component (2)**
12:5;19:10;22:14
**concern (5)**
23:8;29:4;30:21,
25;31:2
**concerned (1)**
43:12
**concerns (4)**
18:5;25:1;31:5;
43:6
**concerted (1)**
12:20
**concluded (1)**
45:7
**confer (1)**
34:8
**confidential (1)**
24:17
**confidentiality (1)**
32:19
**Congress (1)**
42:25
**connection (1)**
15:7
**consent (1)**
20:10

**considerable (1)**
5:15
**consideration (1)**
27:9
**considerations (1)**
26:22
**consulted (1)**
15:4
**contacted (1)**
18:9
**contemplated (2)**
18:16,23
**context (4)**
12:9;13:17,25;
29:18
**continue (3)**
19:18,23,25
**control (2)**
7:23;8:3
**controversial (1)**
6:8
**copied (1)**
27:2
**copy (2)**
35:21,21
**core (1)**
10:18
**corporate (1)**
25:14
**cost (4)**
6:10;8:2,8;20:14
**counsel (1)**
29:16
**counterparties (1)**
8:7
**couple (1)**
44:17
**course (1)**
35:2
**COURT (108)**
5:2,21;6:3;7:4,6,9,
12;8:4,11,15,18,22,
24;9:3,6;10:5,16;
12:23;14:4,6,8,11,17;
15:1,25;16:5,12,21;
17:10,12,16,18;18:1,
9;20:22;21:1,3,6,15,
18,21,24;23:5,15;
24:6,11,25;25:7;26:3,
7,14;27:12;28:2,6,8,
13;29:10;30:11;
31:12,21;32:4,5,24;
33:4,9,12,14,16,21;
34:4,7;35:3,13,15,17,
19,23,25;36:3,6,8,14,
17,18,23;37:4,6,13,
20;38:2,10,12,18,21,
23;39:1,3,5;41:7,10;
42:15;43:11;44:15,
22,24,25;45:4,6
**courtroom (2)**
20:25;21:19
**Court's (1)**

**6:4**
**cover (2)**
10:17;32:16
**covered (5)**
6:22;7:24;8:5;
28:8;40:11
**covers (2)**
6:11,17
**create (2)**
39:20;40:7
**creating (1)**
13:13
**creditors (1)**
11:21
**creditors' (2)**
5:15,16
**critical (1)**
6:12
**cross- (1)**
31:14
**cross-examine (1)**
35:6;38:24
**cross-examining (1)**
31:19
**current (3)**
29:23;30:9;42:18
**cushion (1)**
31:3
**cylinders (1)**
14:15

## D

**date (8)**
13:2;36:11,25;
37:8,15,22;38:6,14
**day (4)**
13:8;27:7;45:5,6
**days (1)**
44:17
**day-to-day (1)**
44:11
**deadline (1)**
13:1
**deal (2)**
24:11;32:4
**dealing (1)**
23:9
**dealt (1)**
25:8
**debtor (8)**
23:19,23;24:1;
25:9;27:21;31:13;
32:5;44:18
**debtors (9)**
5:6;7:6,3,11;9:13;
17:24;27:1,23;41:11
**Debtors' (17)**
2:2;7:1;17:24;
35:18;36:2,11,12,25;
37:2,8,9,15,17,22,25;
38:6,8
**Debtor's (1)**

38:14

**December (1)**
13:2

**decide (1)**
27:12

**deciding (2)**
32:11;34:20

**deciphered (1)**
34:11

**declarants (1)**
38:24

**declaration (16)**
5:22,23,24;19:13;
36:1,8,10,13,19,24;
37:2,7,10,14,18,21

**declarations (5)**
6:6;14:14;31:13;
32:1;35:16

**deep (1)**
7:2

**defect (1)**
16:25

**deficiency (1)**
16:25

**delay (1)**
44:20

**delivered (1)**
8:11

**delivery (1)**
19:7

**demonstrated (1)**
23:19

**Dempsey (4)**
5:23;36:1,8,10

**dent (5)**
9:17;16:19,22,23;
17:2

**DEPARTMENT (1)**
4:2

**departures (1)**
42:19

**depend (1)**
28:24

**depending (1)**
10:11

**describe (1)**
6:20

**description (1)**
16:25

**designed (2)**
6:12;13:9

**detailed (1)**
28:19

**determine (3)**
29:5;30:9;39:25

**determined (1)**
39:24

**determining (1)**
18:19

**developed (1)**
5:14

**developing (1)**
31:5

**devised (1)**
18:17

**devolves (1)**
23:10

**difference (1)**
17:8

**different (4)**
9:21,22;10:4;18:15

**difficult (4)**
8:10;12:7;20:20;
27:15

**direction (1)**
43:23

**disclose (1)**
29:20

**disclosed (3)**
30:8,21;34:15

**disclosure (1)**
34:25

**discuss (2)**
20:24;32:4

**discussed (1)**
31:16

**discussion (1)**
5:15

**discussions (4)**
5:18;8:8;15:11;
27:1

**disposition (1)**
32:17

**disproportion (1)**
43:9

**disproportionate (1)**
44:14

**dispute (1)**
25:17

**distorts (1)**
26:12

**distribute (1)**
33:2

**divided (1)**
23:1

**Docket (6)**
2:2;36:20;37:3,11,
16,18

**document (4)**
33:8;34:13,14,14

**dollar (2)**
7:7;29:19

**dollars (23)**
6:10,22,24;7:10,
11:9;14,16;11:23;
19:6,7,12;20:7,11,13,
15;24:18;30:3;39:13,
14;42:22,23;43:2,4

**done (11)**
11:13,14,20;12:8;
13:16;14:17,18,23,
23;16:11;44:11

**doubt (1)**
34:19

**down (5)**
19:3;23:10;39:20,

23;40:17

**dramatically (1)**
41:19

**drawn (1)**
6:19

**drew (1)**
28:15

**dunk (2)**
14:15;15:14

## E

**earlier (2)**
18:10;32:13

**early (1)**
18:12

**earn (2)**
10:12;20:7

**easily (1)**
34:11

**easy (3)**
10:2;12:1,13

**ECF (2)**
36:4,20

**effectively (2)**
13:10;20:1

**effort (1)**
12:20

**efforts (1)**
21:10

**either (2)**
7:25;10:6

**elaborate (2)**
41:12,22

**Ellen (1)**
2:20

**else (1)**
44:15

**Employee (6)**
2:5,6;5:9,10;6:9;
34:16

**employees (19)**
6:11,13,15,22;
22:16;28:8,24;29:1;
34:1,18,20;39:21,22;
40:1;41:13,21;43:7,
22;44:12

**end (7)**
6:13;18:3,20;
19:20;39:7;41:14,22

**enterprise (2)**
43:17,22

**entire (4)**
20:13;22:14;28:11;
29:8

**entirely (2)**
29:25;31:9

**entitled (3)**
26:5;32:9;34:22

**equity (2)**
9:18;16:18

**eScribers (1)**
2:21

**especially (1)**
29:24

**ESQ (1)**
4:8

**Essentially (3)**
23:9;27:22;29:6

**establish (2)**
27:19;31:10

**established (1)**
10:21

**establishing (1)**
24:2

**estate (13)**
6:16,20,21,25;7:6;
9:12;19:2,22;20:16;
22:5,9,23;39:14

**estates (2)**
22:8,22

**even (4)**
18:4;19:25;24:22;
27:9

**everybody (2)**
43:18;45:1

**everyone (1)**
25:3

**evidence (30)**
6:6;23:20;25:19;
29:14,21,23;31:14,
15,17;32:2,2,11;35:4,
9;36:1,9,10,23,25;
37:2,6,8,13,14,20,22;
38:5,14,19;39:1

**exact (2)**
23:8;28:5

**exactly (2)**
27:19;44:3

**examine (1)**
31:15

**example (6)**
8:2;11:22;17:4;
30:2;40:12;43:4

**exceeded (1)**
30:25

**exceeding (1)**
8:1

**exception (1)**
32:25

**excuse (1)**
20:25

**executive (10)**
6:18;9:5;15:5;
17:17,20;22:9;30:2;
38:8;39:12;43:14

**executives (7)**
20:10;40:9,22;
43:4,9,19;44:8

**Exhibit (15)**
35:18;36:2,11,12,
25;37:2,8,9,15,16,22,
25;38:6,9,14

**exhibits (1)**
44:23

**expect (3)**

16:16;44:17,19

**expected (1)**
6:10

**expedite (1)**
13:10

**expense (3)**
7:20;9:7;31:7

**Expenses (2)**
2:8;5:11;7:1,17,25;
8:5,6

**experience (3)**
17:21;30:6,23

**expertise (1)**
14:19

**explains (1)**
41:4

**extended (1)**
20:9,12

**extension (2)**
19:20,21

**extensive (2)**
13:18,19

**extensively (1)**
15:7

**extent (8)**
6:23;10:8;16:18;
19:14,23;23:12;
30:22;34:1

**extra (1)**
44:8

**Extremely (1)**
26:16

## F

**fact (16)**
22:1;25:10,12;
26:9,24;27:23;28:21;
40:15;42:4,13,15;
43:7,7,15,18;44:10

**failing (1)**
8:1

**failure (1)**
12:6

**fair (3)**
15:1;16:10;23:23

**falls (1)**
23:10

**familiar (1)**
16:21

**Fannie (1)**
40:25

**far (1)**
20:19

**fashion (1)**
33:18

**faulting (2)**
18:11;28:13

**favor (1)**
29:15

**favorable (1)**
22:22

**fear (1)**

8:7
**February (2)**
9:13;30:7
**federally (1)**
11:9;16:19
**fee (1)**
30:24
**feel (1)**
24:12
**felt (2)**
29:12,25
**FHA (1)**
22:12
**FHA/VA (6)**
9:14,23;11:9;
15:25;16:8;17:5
**Fifty (2)**
7:16,18
**fifty-fifty (1)**
40:19
**fifty-five (2)**
15:21;19:11
**figure (3)**
40:7;42:5,20
**figures (4)**
34:1;42:4,6,18
**file (2)**
8:6;18:7
**filed (10)**
5:11,12,20;10:19;
18:4;19:12;23:15,16;
36:3,20
**filing (2)**
24:23;33:7
**final (1)**
29:17
**finally (1)**
30:18
**find (1)**
8:8
**Fine (3)**
33:12,14;34:6
**finger (1)**
23:8
**firm (1)**
18:9
**first (12)**
6:8;13:8;19:4;21:3,
9;22:5;26:4;27:7,16;
32:16,17;38:18
**first-day (1)**
27:4
**five (3)**
16:16;17:8;41:16
**flat (1)**
40:16
**Flemmings (1)**
17:24
**flexibility (1)**
18:19
**Floor (1)**
4:5
**focus (1)**

7:24
**focused (3)**
6:25;30:14;43:25
**Foerster (1)**
5:5
**folks (1)**
13:3
**foreclose (1)**
13:15
**foreclosure (3)**
8:2;13:10,11
**foreclosures (2)**
12:25;13:4
**foreign (1)**
9:18
**forgot (1)**
15:15
**form (2)**
20:21;32:15
**format (1)**
32:8
**forth (5)**
5:20;27:22;28:23;
30:4;42:15
**forty-seven (1)**
29:10
**forty-three (1)**
29:8
**forward (2)**
22:9;31:13
**four (2)**
24:4;41:16
**frame (1)**
18:22
**frankly (1)**
17:22
**free (1)**
31:21
**frequently (1)**
27:21
**FTI (3)**
5:23;14:20,20
**full (3)**
34:13,13,14
**fully (1)**
42:19
**full-year (1)**
41:15

**G**

**gave (1)**
17:10
**general (3)**
7:3;33:24;40:4
**generally (2)**
6:20;24:23
**genesis (1)**
33:1
**Ginnie (7)**
17:22;19:1,2,7,11,
19;40:25
**given (9)**

16:16;20:16,20;
24:9;30:1;32:13;
42:6;43:6,12
**giving (1)**
9:10
**goals (12)**
6:25;9:9;10:23;
28:22;29:3,7;43:8,14,
17,18,19;44:10
**goes (1)**
17:8
**Good (5)**
5:4;12:1;14:3;
22:10;23:6
**government (4)**
12:16,17;13:23,23
**Greenspan (7)**
5:23;19:13;36:13,
20,24;37:18,21
**Greenspan's (1)**
19:15
**gross (1)**
22:13
**group (3)**
9:23;42:9,11
**groups (1)**
9:23
**guarantee (1)**
13:24
**guess (7)**
11:10,13;15:1;
25:8;30:7,19;31:9

**H**

**HAMP (2)**
13:20,21
**Hamzehpour (3)**
6:2;37:3,7
**hand (1)**
36:14
**happen (1)**
43:21
**happened (1)**
14:24
**happening (1)**
44:19
**happy (5)**
7:3;22:10;23:2;
29:14;33:7
**hard (2)**
9:18,19
**hear (4)**
18:13;21:1,23;32:7
**heard (2)**
8:9;21:4
**hearing (5)**
10:18;11:2;18:10,
11;33:1
**helpful (1)**
34:3
**hereby (7)**
36:10,24;37:7,14,

21;38:5,13
**here's (7)**
12:18,18,19,19;
31:12;34:4,7
**high (3)**
6:24;30:25;44:14
**higher (2)**
10:10,14
**highly (1)**
11:18;43:7
**historic (1)**
26:7
**historical (3)**
29:18,23;30:6
**historically (3)**
25:8,9;40:11
**history (1)**
14:1
**hit (2)**
14:15;20:14
**Honor (77)**
5:4,7,14;6:5;7:3;
8:13,20;9:1,12;11:5;
13:8;14:13;15:3;
17:14,14,20;18:14,
25;19:12,15;20:19,
22;21:5;22:1;23:6,8,
25;25:17;26:16,25;
27:14,20;28:7,9,17;
29:11,24;30:12,19;
31:4,11,18;32:2,20,
22;33:1,19;35:2,12,
14,21,25;36:5,7,16,
22;37:1,5,9,12,19,23;
38:11,15,15,20,25;
39:2,4,18,21;41:25;
42:2,8;44:3,21;45:3
**Honor's (1)**
30:22
**hope (1)**
15:15
**hoping (2)**
22:24;28:22
**house (1)**
13:12
**hundred (4)**
11:10;20:11,13;
41:21

**I**

**idea (2)**
10:9;33:24
**identified (1)**
8:5
**identifying (1)**
24:24
**ignore (2)**
19:16;40:14
**II (1)**
2:6
**impact (1)**
7:25

**implement (1)**
11:14
**Implementation (2)**
2:4;5:9
**implemented (1)**
14:1
**implementing (2)**
13:7,13
**importance (1)**
43:14
**important (2)**
22:15;44:18
**importantly (1)**
19:22
**Incentive (10)**
2:6;5:10;25:24,25;
26:11,13;27:21;40:6,
8;41:4
**incentive-based (1)**
42:16
**incentives (4)**
28:21;40:8,23;44:7
**incentivized (2)**
29:2;43:8
**incentivizes (1)**
41:3
**incentivizing (9)**
10:22;11:3;23:11,
22;24:3;26:2,19;
29:25;30:10
**include (1)**
8:1
**included (4)**
14:24;25:11;28:1,
25
**includes (2)**
7:22;28:11
**increase (8)**
25:3,6,21,23,24;
26:1,13;29:5
**increases (2)**
25:13,20
**independent (1)**
5:25
**indicate (4)**
26:17;31:18;32:9;
42:7
**indicated (7)**
26:9,23;29:7,14;
35:6;42:3,8
**individual (3)**
6:17;33:25;34:16;
40:14,14
**individuals (22)**
9:3;17:21;18:21;
19:24;20:5,7;24:16,
24;26:20,23;27:3;
29:9;32:14;33:22;
34:6,11,12;40:4,11;
41:6;42:8,20
**influence (1)**
30:16
**information (19)**

10:20;14:23;23:24;
24:21;28:16;29:13;
30:1,8,11,14,15;31:6;
32:6,8,15;34:15,20,
22,25
**initially (5)**
5:19;18:16,18;
23:15,16
**in-person (1)**
21:12
**insider (2)**
25:5;43:2
**Insiders (3)**
2:6;31:4;44:13
**insurance (5)**
11:12,19;12:16;
13:14,16
**insured (3)**
11:9;16:5,19
**intend (2)**
35:6,7
**intention (1)**
31:19
**interest (1)**
9:17
**interested (2)**
10:18;11:2
**interests (1)**
44:4
**into (20)**
6:6;7:2,3;9:11,21,
24;11:20;12:10;
22:17;32:1;36:1,10,
24;37:1,7,14,22;38:5,
13;42:19
**introduce (1)**
38:19
**involved (6)**
21:11;22:4;23:3;
30:22
**issue (6)**
23:9,10,19;24:12;
39:5;43:25
**issues (1)**
39:21
**iterations (1)**
18:15

## J

**January (1)**
30:7
**jargon (2)**
21:21,24
**Jim (2)**
15:4;17:23
**John (3)**
5:22;36:1,10
**Judge (1)**
33:23
**June (6)**
18:17,18,21;19:25;
20:12;30:5

**JUSTICE (1)**
4:2
**justification (1)**
25:20
**justify (1)**
44:14

## K

**keep (7)**
6:12;18:21;22:8;
34:2,17;39:21;40:1
**KEIP (38)**
5:17;6:14,16,17,18,
20,21;7:6;9:5,20;
15:5,20;17:15,17,20;
18:8;22:5,9;25:9;
26:4;27:16,24;28:25;
29:6,8;30:2;38:8,13;
39:10,12,14;40:5,11,
16,20;43:10,15;44:13
**KEIPs (4)**
10:21,21;21:25;
39:11
**KERP (12)**
5:17;28:20,25;
29:2;39:15;40:5,19,
20;41:13,21;43:7,15
**KERPs (1)**
21:25
**Key (10)**
2:4,5;5:9,10;6:8,
11,18;29:15;39:24;
44:12
**KIEP (1)**
6:25
**kind (1)**
22:17
**kinds (1)**
20:3
**knowing (2)**
27:17;28:5
**knows (5)**
14:20;16:17,19;
27:20;30:19
**Kolman (1)**
2:20
**Kramer (1)**
21:7

## L

**lack (2)**
16:24;29:18
**large (1)**
11:16
**last (7)**
8:14;14:2;22:7;
32:25;33:5,6,17
**laughter (1)**
21:23
**lawyers (1)**
15:6

**lay-up (2)**
21:15,17
**lead (1)**
22:22
**leadership (1)**
43:14
**least (2)**
6:8;31:6
**leave (1)**
18:12
**leaving (2)**
18:1,3
**left (1)**
22:25
**lengthy (1)**
5:17
**letter (1)**
32:16
**letters (1)**
27:2
**letting (1)**
8:21
**level (3)**
6:15;15:12;25:13
**levels (1)**
25:11
**Levin (1)**
21:7
**likely (2)**
28:12,24
**limitation (1)**
27:7,10;42:17,23;
43:1
**limited (1)**
8:6
**liquidate (1)**
9:11
**liquidating (1)**
27:21
**liquidation (1)**
27:21
**little (3)**
25:4;40:12;42:1
**LLC (1)**
2:21
**loan (1)**
15:7
**loans (25)**
9:14,14,17,25;
10:1;11:9,9,15,24;
12:10,11;13:19,20,
22;14:2,3,8,24;15:22;
16:19,23,23;17:3,5;
19:2
**long (3)**
11:22;41:17;44:19
**longer (1)**
25:12
**look (11)**
12:2,12;14:13;
16:4,7;19:3;22:25;
25:2;28:11;30:20;
40:10

**looked (5)**
9:23;10:1;11:24;
26:3;39:20
**looking (4)**
25:19;26:22;29:20;
34:19
**Lorenzo (1)**
5:5
**loss (1)**
12:18
**lot (3)**
16:2;21:19;28:15
**lots (1)**
15:11
**lower (1)**
16:20

## M

**Mae (8)**
17:22;19:1,2,7,11,
20;40:25,25
**maintain (1)**
34:17
**maintained (1)**
24:16
**maintaining (1)**
32:19
**makes (2)**
12:12;19:22
**making (1)**
33:7
**management (3)**
8:8;13:12;39:19
**managing (1)**
6:25
**many (6)**
5:18;7:22;9:18;
27:20;28:21;41:13
**March (6)**
5:12;19:4,8;30:5;
36:4,20
**Marinuzzi (63)**
5:3,4,5;7:8,10,14;
8:13,16,20,23;9:1,5;
11:5;12:24;14:7,10,
12,18;15:3;16:4,7,13,
23;17:11,13,17,19;
18:2,14;21:2;28:6,7;
29:16;31:17,19;
32:22,25;33:6,10,13,
15,18;35:4,14,16,18,
20,25;36:5,12,16;
37:1,9,16,23;38:7,15,
20,22;39:18;44:21,
23;45:2
**Marizuni (1)**
21:9
**mark (1)**
38:8
**markets (1)**
17:25
**market-sensitive (1)**

34:22
**MASUMOTO (55)**
4:8;21:1;23:5,6,7,
15;24:7,20;25:1,7,17;
26:6,8,16;27:14;28:4,
9,17;29:11;30:12;
31:18,23;32:7,20;
33:16,19,23;34:5;
35:1,2,6,9,12,13;
36:7,21,22;37:4,5,12,
19;38:1,2,4,11,17,23,
25;39:2,4,6;41:7,24,
24;44:3
**material (1)**
8:19
**materials (2)**
8:25;24:9
**matter (1)**
44:16
**matured (1)**
9:14
**maximizing (2)**
7:1,18
**may (11)**
13:8;18:1,3,12,21;
20:4;24:4;26:18;
27:22;32:20;34:3
**maybe (1)**
24:17
**mean (8)**
25:7,13;28:14;
29:7;31:21;34:3;
42:21;44:6
**meaning (1)**
10:12
**means (1)**
12:16
**measured (3)**
10:15;17:7;43:15
**measurement (1)**
19:4
**measures (1)**
15:18
**measuring (1)**
13:2
**meet (3)**
8:1;12:14;20:5
**meeting (4)**
7:17;8:1;20:17;
21:12
**member (2)**
5:25;6:1
**members (1)**
42:10
**mention (3)**
25:2;28:10;42:13
**mentioned (3)**
16:14;18:15;25:3
**Mercer (2)**
5:23;14:20
**meritorious (1)**
29:7
**met (2)**

7:8;10:13

**metric (13)**
9:7,8;15:16,18;
16:1,1,15,20;17:7;
19:5;22:19,21;32:18

**metrics (24)**
10:21;11:1,3;12:2,
5,12;14:17,22;15:2,6,
9;18:7,25;19:2;20:3;
22:4,5;23:2,11,20;
24:3;29:21,24;32:17

**might (7)**
8:8,9;17:1;30:8;
34:19;40:20,22

**million (15)**
6:10,22,24;7:10,
11;9:16;11:23;19:6,
7,11;29:19;30:3;
39:13,14;43:4

**minimal (1)**
26:1

**modifications (1)**
19:8

**modify (2)**
13:21,22

**monetary (1)**
22:3

**monetize (1)**
9:9

**money (7)**
13:23;19:22;20:1;
22:16,20;40:19;41:1

**month (1)**
20:9

**months (3)**
41:16,16,17

**more (13)**
9:2;10:1;12:7;
13:18,19,23;22:7;
27:12;28:15;41:4,12,
22;44:1

**morning (1)**
44:24

**Morrison (1)**
5:5

**mortgages (2)**
12:21,24

**most (4)**
10:17;11:1;12:1;
32:14

**mostly (1)**
9:17

**Motion (13)**
2:2;5:8,12,13,22;
8:24;23:16;26:4;
28:19;33:11;36:2;
37:3,10

**motions (1)**
18:8

**motivate (1)**
40:9

**motivated (1)**
40:23

**move (3)**
36:1,12;37:1

**MSRs (1)**
19:18

**much (6)**
10:11;13:14;28:24;
29:14;35:13;44:25

**myself (1)**
21:11

**N**

**natural (4)**
40:3;41:5;42:14;
43:5

**nature (1)**
40:7

**near (2)**
14:5;39:6

**necessary (1)**
27:18

**need (4)**
18:20;27:12;31:13;
34:18

**needed (1)**
41:17

**negotiate (1)**
8:10

**negotiations (3)**
18:24;20:23;22:24

**neighborhood (1)**
43:1

**net (1)**
28:23

**New (4)**
2:23;4:6;19:8,18

**nineties (1)**
17:6

**ninety (2)**
10:13;29:22

**none (1)**
35:10

**non-FHA/VA (1)**
16:1

**noninsider (1)**
6:11

**Non-Insiders (1)**
2:5

**Nos (1)**
2:2

**note (1)**
26:10

**notwithstanding (3)**
29:12;31:1,8

**nowhere (1)**
14:4

**number (8)**
5:3;30:13;36:4;
37:3,11,17,17,18

**numbers (4)**
24:17;34:10;41:12,
23

**numerous (1)**

21:11

**NY (2)**
2:23;4:6

**O**

**oath (1)**
6:5

**objection (12)**
5:12,13;6:19;
10:19,19;23:17;33:4;
36:22;37:5,12,19;
38:11

**objections (2)**
36:6,7

**Obligations (2)**
2:7;5:10

**obtain (1)**
20:17

**obtaining (1)**
19:17

**obviously (7)**
12:11;14:19;16:2;
23:13;27:8,25;34:13

**Ocwen (4)**
12:23,24;13:3;
19:18

**off (2)**
21:9;41:20

**offer (4)**
31:13;35:4,9;39:1

**offered (1)**
32:1

**offering (2)**
27:3;35:5

**Office (7)**
4:3;23:7,9;27:1;
31:8;32:3;41:24

**officer (2)**
6:2;17:25

**officers (2)**
6:17;7:23

**once (6)**
13:22;28:9;29:12;
31:6;35:5;44:4

**one (27)**
5:12;6:15,16,18;
11:12;15:6;17:7,23;
18:5;20:14;25:1,5,
20;26:1,3;27:5;
34:16,16;35:21;
36:18;39:5;40:12,13;
41:11,25;42:13;
44:18

**ones (1)**
11:25

**one's (1)**
16:5

**only (4)**
22:22;27:14,24;
41:21

**on-the-ground (1)**
44:11

**open (1)**
24:13

**operating (1)**
8:6

**operations (1)**
6:12

operations@escribersnet (1)
2:25

**opinion (1)**
25:9

**Order (2)**
2:3;5:8

**orders (1)**
27:4

**original (3)**
22:13;27:4;28:19

**originally (2)**
18:23;22:3

**others (1)**
10:2

**other's (1)**
16:5

**ought (1)**
24:18

**out (10)**
10:7;11:21;13:23;
14:14;22:4;26:15;
28:15;29:24;33:11;
40:7

**outstanding (1)**
6:23

**over (3)**
20:3;29:8;42:10

**overall (3)**
7:22;27:18;33:24

**overcompensated (1)**
40:21

**P**

**package (1)**
28:1

**page (6)**
8:14;33:1,5,6,11,17

**pages (2)**
32:16,16

**paid (3)**
22:4;39:25;40:10

**Pamela (3)**
5:25;37:10,14

**papers (7)**
5:25;11:8;18:5;
20:21;25:4;33:11;
42:1

**paperwork (1)**
13:1

**part (17)**
13:13;14:22;15:4,
5,8,8;24:8;25:12,22;
28:1,25;29:3;30:21;
32:11;39:24;40:3;
44:4

**participants (8)**

10:12;28:20;29:2;
39:12,14,15,17;43:16

**participating (1)**
30:24

**particular (5)**
9:2;19:5,15;22:5;
33:25

**particularly (2)**
25:20;43:20

**parties (1)**
31:1

**Patrick (1)**
17:24

**Pause (1)**
35:24

**pay (9)**
12:20;13:10;25:3,
6,10,13,24,25;26:1

**paying (2)**
20:1;36:17

**Payment (3)**
2:6;5:10;42:18

**payments (4)**
6:21;26:25;27:22;
41:15

**pays (2)**
12:16;20:17

**people (14)**
11:11;12:10,17;
14:19;15:1;18:12;
20:25;21:19;24:19;
26:5;40:20;41:3,15;
42:5

**percent (29)**
7:17,18;10:13,14;
15:20,23;16:15,16,
20;17:8;19:5,17;
20:6;22:19;25:5;
29:8,10,22,22;39:10,
10,13;40:13,17;42:9,
10,11,12,17

**percentage (5)**
12:3,3;17:6;22:14;
26:13

**percentages (5)**
12:13;26:10;41:5,
18;42:7

**percipients (1)**
29:15

**performance (1)**
32:18

**perhaps (2)**
18:12;43:9

**period (4)**
5:17;19:8,10;34:18

**periods (1)**
30:5

**personal (1)**
18:5

**perspective (3)**
27:18;28:10;30:6

**phone (1)**
21:12

**picked (1)**
　10:2
**picture (2)**
　27:18;28:11
**place (1)**
　34:2
**Plan (7)**
　2:5;5:9,10;6:9;
　18:25;22:24;40:6
**Plans (3)**
　2:6;27:21;39:8
**play (1)**
　41:6
**played (1)**
　17:22
**pleadings (1)**
　13:8
**Please (2)**
　5:2;12:20
**plus (2)**
　16:8;29:10
**PM (1)**
　45:7
**point (11)**
　6:5;18:20;23:25;
　25:7;27:10;29:17;
　35:5;39:6;41:11;
　42:3;43:25
**pointed (1)**
　29:24
**points (5)**
　19:13;23:23;24:4;
　28:18;38:16
**pools (3)**
　9:21;16:2;19:19
**position (8)**
　23:24;24:1,14,19;
　27:15;28:13;31:23;
　32:19
**position's (1)**
　23:13
**possible (1)**
　15:17
**post-sale (1)**
　6:12
**pot (1)**
　40:19
**potential (1)**
　10:23
**PowerPoint (3)**
　32:22;37:24;38:5
**pre-marked (1)**
　35:16
**prep (1)**
　33:2
**prepared (1)**
　7:21
**preponderance (1)**
　23:20
**present (1)**
　25:25
**presentation (4)**
　8:4,14;37:24;39:7

**presentations (1)**
　32:23
**presented (2)**
　32:9;35:25
**presumably (2)**
　32:1;44:12
**presume (1)**
　30:15
**price (1)**
　12:11
**principal (1)**
　12:19
**principle (2)**
　33:24;34:5
**prior (2)**
　24:22;25:9
**probably (2)**
　34:24;41:12
**problem (4)**
　25:18,22;27:14;
　44:4
**proceed (1)**
　31:17
**proceedings (1)**
　45:7
**proceeds (3)**
　13:15,16;19:7
**process (10)**
　10:6;12:7,15;
　13:10,11,21;15:8;
　18:22;21:10;30:23
**processed (3)**
　13:1,4,5
**production (1)**
　19:8
**profile (2)**
　10:1;11:24
**program (26)**
　5:19;6:7,10,14;
　7:16,24;9:20;13:2,9,
　9;14:15;15:5;18:6,
　16,17,18;20:9,14;
　22:1,13;23:4;39:20;
　40:1;41:2,17;43:1
**programs (6)**
　5:14,17;6:18;13:7,
　12;27:3
**projected (1)**
　43:3
**projections (1)**
　22:23
**proof (3)**
　12:18;31:9;44:5
**proper (1)**
　27:19
**properly (1)**
　26:19
**properties (1)**
　9:17
**proposed (1)**
　21:13
**protecting (2)**
　33:25;34:6

**protection (1)**
　34:23
**provide (1)**
　42:1
**provided (5)**
　8:4,16;10:20;
　20:21;32:5
**providers (2)**
　8:7,23
**providing (1)**
　44:8
**public (7)**
　14:4;24:10,13,18;
　32:3,12;33:8
**pulled (1)**
　14:6
**pulling (1)**
　43:22
**purchase (1)**
　19:18
**purpose (1)**
　6:9
**purposes (1)**
　27:6
**Pursuant (2)**
　2:3;27:4
**put (11)**
　5:20;9:8;12:10;
　14:2;17:20;19:19;
　22:8,13;23:8;31:13;
　35:8
**putting (1)**
　15:9

**Q**

**qualify (1)**
　13:20
**quality (1)**
　17:9
**quantity (1)**
　11:17
**quickly (1)**
　9:9
**quite (2)**
　32:10;44:12

**R**

**raised (4)**
　23:18,19;38:17;
　39:6
**range (1)**
　7:7
**rate (6)**
　12:4;15:18,22;
　16:16;17:4,5
**rates (1)**
　28:23
**rather (2)**
　11:3;23:22
**reach (1)**
　10:22

**reaching (1)**
　20:5
**reaction (2)**
　24:16;43:24
**read (1)**
　23:16
**reality (1)**
　41:2
**realize (1)**
　24:20
**realized (1)**
　10:11
**really (9)**
　8:6;9:18;15:12,18;
　16:21;18:25;25:15;
　40:22;41:23
**recall (1)**
　13:8
**receipt (1)**
　19:6
**receivables (1)**
　22:12
**receive (1)**
　15:2;26:23;29:13
**received (10)**
　25:5;30:19;32:15;
　36:10,24;37:7,14,22;
　38:5,13
**receives (1)**
　19:2
**recent (1)**
　32:14
**recipients (4)**
　9:3;10:23;39:11;
　43:10
**reckoning (1)**
　39:10
**recognizing (1)**
　9:21
**recollection (1)**
　41:20
**record (3)**
　5:5;32:12;35:7
**records (1)**
　24:13
**recover (1)**
　12:13
**recoveries (2)**
　22:6;28:23
**recovery (17)**
　12:3,3,4;15:18,21,
　22;16:1,1,15,16;17:4,
　5;22:15,17,21;28:23;
　29:3
**redact (2)**
　33:7;37:25
**redacted (1)**
　33:17
**redaction (2)**
　37:24;38:5
**refer (3)**
　6:16,18;17:2
**reference (1)**

**27:16**
**referenced (1)**
　42:2
**referencing (1)**
　41:19
**referred (1)**
　39:21
**reflect (2)**
　41:15,15
**reflected (1)**
　25:14
**reflection (1)**
　26:19
**reflective (1)**
　41:23
**regarded (1)**
　24:8
**regarding (1)**
　38:13
**relates (1)**
　37:24
**relationship (3)**
　19:1,23;25:15
**relationships (1)**
　17:22
**remaining (4)**
　7:1;28:18;39:9;
　43:13
**remember (1)**
　14:6
**REO (1)**
　9:17
**replace (1)**
　27:22
**reply (5)**
　5:25;19:13;26:23;
　28:15,20
**represent (1)**
　14:4
**representations (1)**
　31:1
**represented (2)**
　26:24;27:23
**representing (2)**
　42:9,11
**request (1)**
　23:3
**reservations (1)**
　15:13
**reserves (1)**
　19:12
**Residential (1)**
　5:3
**respect (8)**
　9:25;21:14;30:2,7,
　18;33:10,17;34:8
**respects (1)**
　9:19
**respond (1)**
　38:16
**response (2)**
　24:22,23
**rest (4)**

35:8,10;38:21;39:3
**restrictions (1)**
23:14
**result (1)**
18:24
**results (1)**
6:23
**retain (1)**
39:23
**Retention (3)**
2:5;5:9;6:9
**retentive (6)**
11:4;23:12,13,22;
40:6;42:25
**return (1)**
19:11
**revert (1)**
44:5
**review (4)**
5:15;8:2;13:18;
32:8
**reviewed (1)**
32:7
**reviewing (1)**
13:19
**revisions (1)**
5:19
**rewarded (1)**
43:19
**right (29)**
5:2;8:18;9:6;
14:10;18:14;21:6;
22:19;26:6;27:13;
31:23;33:9,11;34:21;
35:3;36:3,8,19,19,23;
37:6,13,20;38:2,12,
23;39:5;44:15,16;
45:4
**rigorous (1)**
31:10
**risk (2)**
10:1;11:24
**role (1)**
31:4
**roles (2)**
17:21;41:6
**Ronald (7)**
5:23;19:13;36:13,
19,24;37:18,21
**rule (1)**
44:17
**rushing (1)**
22:16

**S**

**salary (1)**
25:23
**sale (16)**
9:8;10:5,8;11:23;
12:5,5,6;14:8;15:8,
17,20;26:12,14;
29:19;40:15,17

**sales (3)**
9:20;10:9,12
**Same (9)**
20:3;29:3,6;40:14,
18;43:8,15,18,22
**sat (2)**
11:15;39:20
**satisfactory (1)**
33:20
**satisfied (5)**
14:9;29:25;31:9;
33:17;42:15
**savings (2)**
8:9,10
**scratch (5)**
9:17;16:18,22,23;
17:2
**seal (1)**
19:12
**sealed (1)**
32:9
**sealing (2)**
8:24;24:14
**seated (1)**
5:2
**second (5)**
15:16;17:24;19:10;
32:18;33:10
**secretive (1)**
33:13
**Section (4)**
5:8;23:13;32:17,18
**Sections (1)**
2:3
**securitizations (1)**
12:10
**seem (2)**
43:16;44:2
**seemed (2)**
16:10;25:13
**selected (2)**
23:20;30:16
**sell (6)**
10:2,3,6;12:1;
14:25,25
**selling (1)**
10:4
**senior (4)**
6:15,17;7:23;13:12
**sense (1)**
12:12
**sensitive (6)**
13:5;19:16;24:9,
12;25:4;34:15
**sensitivities (3)**
19:14;20:20,24
**sensitivity (2)**
8:21;24:20
**separate (5)**
6:17;18:7;33:10;
38:7,13
**separated (2)**
9:20;16:2

**separately (1)**
24:12
**separation (1)**
25:15
**service (3)**
8:7,23;12:22
**servicers (1)**
12:21
**servicing (2)**
12:23,24
**set (9)**
5:19;9:12;14:17;
15:2;16:20;31:10;
41:2;43:9,18
**setting (2)**
14:22;15:11
**seven (3)**
11:11;32:16,16
**severance (9)**
26:24,24;27:3,6,22,
25;28:1,8,12
**share (2)**
16:14;20:13
**show (3)**
17:8;29:23;34:10
**showed (3)**
24:15;32:13;33:22
**shows (2)**
12:1;17:12
**sic (3)**
17:24;21:9;29:15
**side (3)**
7:20;9:20;15:20
**significantly (1)**
22:2
**six (3)**
6:15;39:14;42:10
**sixty (1)**
29:21
**sixty- (1)**
17:7
**sixty-six (1)**
25:5
**sixty-three (1)**
40:13
**skewed (1)**
41:13
**slam (1)**
15:13
**slam- (1)**
14:14
**slide (2)**
38:7,13
**smaller (2)**
10:6;16:14
**smart (1)**
9:11
**sold (2)**
7:19;16:18
**solicit (1)**
34:21
**sometimes (2)**
12:25,25

**somewhat (3)**
25:25;27:15;41:19
**sorry (8)**
6:9;7:14;17:5;
32:21;33:15;35:14;
37:16;40:25
**sort (8)**
11:8;26:12,19;
27:15;29:17,23;
30:22;44:5
**sought (1)**
5:20
**SPEAKER (2)**
7:13;45:5
**specific (8)**
20:4;24:19;30:14;
31:7;32:14;33:25;
34:11;40:12
**specifically (1)**
23:19
**specifics (1)**
7:4
**split (5)**
15:25;16:10;20:11;
22:6;40:19
**spoke (2)**
15:7;40:12
**spread (1)**
43:12
**spreadsheet (9)**
24:15,22;25:2,19;
26:8;32:21;33:22,23;
34:10
**spreadsheets (1)**
32:12
**stage (1)**
9:12
**staggered (1)**
18:22
**standards (1)**
31:10
**standpoint (5)**
25:19;29:18;30:8;
31:24;43:5
**start (1)**
11:6
**started (1)**
18:4
**starting (1)**
33:21
**statements (1)**
31:8
**STATES (6)**
4:2,3;5:13;6:19;
23:7;41:25
**statistics (1)**
34:2
**stay (2)**
18:2,16
**Stephen (1)**
21:7
**still (2)**
24:2;29:13

**stock (1)**
25:11
**stood (1)**
11:18
**strategy (3)**
11:14;13:13,25
**Street (2)**
2:22;4:4
**stretch (2)**
11:2;15:12
**strive (2)**
9:24;10:10
**strongly (1)**
24:13
**structure (1)**
25:15
**structuring (1)**
18:6
**subject (2)**
26:2,25
**submission (1)**
44:16
**submit (3)**
6:6;37:25;39:18
**submitted (1)**
5:24
**success (1)**
40:17
**successful (3)**
20:2,17;26:14
**successfully (1)**
28:15
**sufficient (3)**
29:4;31:3;44:6
**sufficiently (9)**
10:22;23:11,12,21;
24:3;30:10;31:25;
40:8;42:16
**suggest (1)**
28:21
**suggestion (1)**
11:8
**Suite (1)**
2:22
**supplemental (3)**
5:24;37:17,21
**supply (1)**
23:1
**support (3)**
36:2;37:3,10
**supported (1)**
5:22
**supposed (3)**
11:25;13:5;18:12
**supposedly (1)**
30:4
**sure (13)**
10:16;13:4;15:3,9,
12,17;24:6;29:19;
35:17,21;36:16;43:5;
44:6
**surprise (1)**
43:16

surprising (2)
43:20;44:2

**T**

table (1)
42:2
Tammy (3)
6:2;37:2,7
target (13)
6:22;7:8;10:3,8,10,
13,13,14;17:5;20:5,6,
6;30:17
targeted (4)
7:18;30:3;31:2;
32:14
targets (5)
15:12,14;20:15,17;
30:9
target's (1)
19:6
tasks (2)
39:9;43:13
teasing (1)
21:18
tells (2)
12:6;14:1
ten (5)
16:15;19:17;27:8;
42:17,22
term (2)
16:21;23:21
terms (3)
28:22;42:14,24
terrific (1)
40:23
theory (1)
11:10
therefore (1)
26:2
there'll (1)
44:19
Thereunder (3)
2:7;5:11;23:14
thirty (2)
15:19,23
thirty-five (1)
22:18
thought (12)
7:12;21:15;22:15;
23:15,23;25:4;27:18;
33:2;42:25;43:11,24;
44:1
thousand (2)
20:11,13
three (2)
6:7;41:16
threshold (3)
10:12;30:4,17
thresholds (1)
11:1
throughout (1)
41:17

tied (1)
19:5
times (2)
27:8;42:22
timing (1)
18:8
today (6)
6:3;18:11,13;
19:25;22:2;31:8
together (7)
5:20;9:8;14:2;
15:9;17:20;19:19;
22:13
told (1)
11:20
tomorrow (1)
44:24
took (1)
5:17
top (3)
12:17,21;13:3
total (1)
39:11
towards (2)
7:17,18
traditional (1)
40:21
Transcribed (1)
2:20
tried (3)
11:16;14:25;28:10
tries (1)
10:8
triple (1)
40:24
true (1)
28:6
Trustee (12)
4:3;5:13;6:4,19;
8:17,19;11:7;20:22;
23:7;28:14;32:6;
41:25
Trustee's (2)
10:19;11:8
try (8)
7:3;8:8;13:23;
35:1;40:9,23,25;42:7
trying (13)
10:7;11:16;12:9,
13,15;13:20;17:1;
19:16;24:9;36:16;
39:23;43:18,23
Tuesday (1)
30:19
turn (5)
9:11,24;11:20;
16:13;17:17
turned (1)
26:14
turning (1)
11:16
twenty-one (1)
40:17

two (21)
6:14,17,25;7:16;
9:9,21,23;16:2;
17:21;18:11,21;20:7;
22:5;24:7;28:18;
34:8,9;39:11,12;
42:8;43:4
two-thirds (1)
25:21
types (2)
13:12;44:7
typical (1)
26:21
typically (1)
24:7

**U**

UCC (2)
15:10,11
ultimately (2)
5:20;12:19
Um-hum (1)
16:12
uncomfortable (1)
32:10
under (10)
5:8;6:5,21;19:12;
27:17;32:10;39:8;
40:1;42:23;44:16
underlying (1)
28:22;34:5
understandably (1)
40:16
Understood (2)
11:5;23:17
undertaking (1)
13:18
undisclosed (1)
27:25
unfortunately (2)
24:1;30:13
UNIDENTIFIED (2)
7:13;45:5
unique (1)
17:23
UNISON (1)
45:3
UNITED (6)
4:2,3;5:13;6:19;
23:7;41:25
unless (4)
17:14;18:2;28:2;
43:21
unredacted (1)
20:21
up (12)
10:14;11:11;14:22;
21:22,25;23:1;27:5;
31:6;40:5,5,13,20
upon (5)
10:11;28:24;31:25;
42:6,18

upper (1)
25:10
use (4)
10:9;23:21;34:20;
42:4
used (1)
13:6
useful (1)
33:2
using (1)
29:22

**V**

vacuum (1)
14:23
valuable (1)
40:8
value (13)
7:1,18;9:10,15,16,
19;10:7;13:14;16:9,
17;19:1;20:16;44:13
valued (1)
11:18
variable (2)
25:9;26:11
variation (1)
15:19
various (3)
10:25;27:1,3
vernacular (2)
21:21,24
versus (3)
40:15,16,21
vetted (2)
7:21;15:10
view (1)
20:16
virtually (1)
25:2
vouch (1)
21:20

**W**

wage (1)
27:4
wait (2)
11:11;36:18
walk (1)
13:11
wants (1)
35:9
ware (1)
41:16
way (6)
9:10;13:4;25:23;
26:1;41:3;44:18
ways (2)
10:4,7
weeds (1)
7:2
weighted (1)

7:17
weren't (3)
14:9;29:13,25
West (4)
2:22;5:25;37:10,14
what's (9)
7:6;22:25;23:24;
24:19;26:4;32:18;
41:23;43:3;44:19
whereas (1)
43:3
whereby (2)
27:2,15
where's (1)
12:18
Whereupon (1)
45:7
Whitehall (1)
4:4
Whitlinger (2)
15:4;17:23
who's (1)
15:4
whose (2)
15:5;17:21
willing (1)
35:1
wind (1)
40:20
wind-down (2)
7:21,22
wish (2)
38:23;39:1
within (3)
27:8;43:22;44:17
without (5)
22:17;24:24;27:16,
17;28:4
witnesses (1)
31:15,20
words (2)
9:10;26:2
work (3)
19:24;40:24;44:11
worth (2)
16:18,20

**Y**

year (7)
6:13;19:21;27:7,8,
24;41:14,22
year-end (2)
9:25;40:2
years (2)
11:11;14:21
year-to-year (1)
41:18
yesterday (5)
8:12;17:10;30:20;
31:7;32:15
York (2)
2:23;4:6

## Z

**ZIDE (11)**
21:5,7,7,17,19,23;
22:1;23:5;41:8,9,11
**Zide's (1)**
42:3

## 1

**1 (4)**
35:18;36:2,11,15
**1.06 (1)**
9:14
**1.1 (1)**
39:13
**1.2 (1)**
42:9
**10004 (1)**
4:6
**10040 (1)**
2:23
**107.5 (2)**
10:14;20:6
**107b (1)**
32:10
**12-12020 (1)**
5:3
**125 (1)**
11:23
**127 (1)**
29:19
**14 (2)**
42:10,10
**14.34 (1)**
39:12
**143 (1)**
19:6
**155 (6)**
6:11;29:9;39:15,
24;42:20;44:12
**158 (2)**
19:7;30:3
**163-member (1)**
42:9
**192nd (1)**
2:22
**1st (3)**
19:4,8;30:5

## 2

**2 (2)**
36:12,25
**2.1 (3)**
6:22;7:10,12
**2.2 (5)**
7:12,13,14,15;43:4
**2.52 (1)**
39:14
**2.7 (2)**
6:24;7:11

**2011 (2)**
26:9;40:15
**2012 (4)**
26:9,10,18;40:16
**2013 (2)**
36:4,20
**20th (3)**
5:12;36:4,20
**21st (1)**
4:5
**28,387 (1)**
42:21
**280 (1)**
39:23
**283,000 (1)**
43:2
**283,870 (1)**
42:23
**28th (1)**
9:13

## 3

**3 (3)**
36:15;37:2,8
**3,000-plus (1)**
39:22
**3.6 (1)**
42:11
**3:57 (1)**
45:7
**300 (2)**
9:15;16:9
**30th (7)**
18:17,18;19:4,9,21,
25;30:5
**31st (1)**
13:2
**32 (1)**
42:11
**32.35 (1)**
39:13
**3280 (1)**
2:2
**3281 (1)**
36:4
**3282 (1)**
36:20
**3283 (1)**
37:3
**3284 (1)**
37:11
**3284] (1)**
2:2
**33 (1)**
4:4
**3379 (1)**
37:18
**363b (2)**
2:3;5:8
**3rd (2)**
18:1,3

## 4

**4 (3)**
36:15;37:9,15
**4.4 (3)**
6:10;42:20,21
**400,000 (1)**
20:7
**45 (1)**
19:5
**46.69 (2)**
39:10,10

## 5

**5 (5)**
35:20;36:15;37:17,
17,22
**503c1 (2)**
23:14;26:22
**503c3 (2)**
2:3;5:8
**503Ci (1)**
42:16

## 6

**6 (2)**
37:25;38:6
**600,000 (1)**
20:15

## 7

**7 (2)**
38:9,14
**700 (1)**
2:22

## 8

**8 (1)**
29:9

## 9

**973406-2250 (1)**
2:24