**Hearing Date: May 14, 2013 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: April 30, 2013 at 4:00 p.m. (prevailing Eastern Time)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National*
*Association, as Indenture Trustee for the Senior*
*Unsecured Notes Issued by Residential Capital, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X
                                                    :
**In re**                                           :
                                                    :    **Chapter 11 Case No.**
**RESIDENTIAL CAPITAL, LLC, et al.,**               :
                                                    :    **12-12020 (MG)**
                          **Debtors.**              :
                                                    :    **(Jointly Administered)**
                                                    :
-------------------------------------------------- X

## NOTICE OF MOTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE SENIOR UNSECURED NOTES ISSUED BY RESIDENTIAL CAPITAL, LLC FOR AN ORDER AUTHORIZING IT TO PROSECUTE CLAIMS AND OTHER CAUSES OF ACTION ON BEHALF OF THE RESIDENTIAL CAPITAL, LLC ESTATE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On April 18, 2013, Wilmington Trust, National Association (the "Trustee"), solely

in its capacity as indenture trustee for various series of senior unsecured notes (the "Notes," and the

holders thereof, the "Noteholders") issued by Residential Capital, LLC ("Residential Capital," and

with its debtor-affiliates, the "Debtors") filed its Motion for an Order Authorizing it to Prosecute

Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate (the "Motion").

2.       A hearing (the "Hearing") to consider the Motion shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 501 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York, 10004, on May 7, 2013 at 10:00 am (prevailing Eastern Time).

3.       Any objections to the Motion must be made in writing (an "Objection"), filed with the Court (with a copy to Chambers) and served in accordance with the Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 and Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management and Administrative Procedures (Doc. 141) (the "Case Management Order"), and served upon the Special Service List, as that term is defined in the Case Management Order, so as to be actually received no later than **April 30, 2013** at 4:00 pm (prevailing Eastern Time) (the "Objection Deadline").

4.       If no objections to the Motion are timely filed and served on or before the Objection Deadline, the Trustee may submit to the Bankruptcy Court an order substantially in the form of the proposed order attached to the Motion as Exhibit A.

5.       A Copy of the Motion can be obtained or viewed for a fee via PACER at www.pacer.gov or (without charge) on the Debtors' restructuring website at www.kccllc.net/rescap.

*[Remainder Of Page Left Intentionally Blank ]*

2

Dated: New York, New York
April 18, 2013

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: /s/ Thomas J. Moloney
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National
Association, as Indenture Trustee for the Senior
Unsecured Notes Issued by Residential Capital, LLC*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National*
*Association, as Indenture Trustee for the Senior*
*Unsecured Notes Issued by Residential Capital, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
|  | : |  |
| **In re** | : |  |
|  | : | **Chapter 11 Case No.** |
| **RESIDENTIAL CAPITAL, LLC, et al.,** | : |  |
|  | : | **12-12020 (MG)** |
| **Debtors.** | : |  |
|  | : | **(Jointly Administered)** |
|  | : |  |
-------------------------------------------------------------X

**MOTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, SOLELY
IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE SENIOR
UNSECURED NOTES ISSUED BY RESIDENTIAL CAPITAL, LLC FOR AN
ORDER AUTHORIZING IT TO PROSECUTE CLAIMS AND OTHER CAUSES
OF ACTION ON BEHALF OF THE RESIDENTIAL CAPITAL, LLC ESTATE**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................... 1

JURISDICTION, VENUE AND OTHER PREDICATES............................. 6

BACKGROUND ......................................................................................... 6

    A.   The Chapter 11 Filing.................................................................. 6

    B.   The Complaint.............................................................................. 6

    C.   The HoldCo Claims..................................................................... 8

    D.   The Third-Party Claims............................................................... 10

RELIEF REQUESTED................................................................................. 11

BASIS FOR RELIEF .................................................................................. 11

    A.   The Trustee Is the Best Party to Bring the HoldCo Claims ........... 11

        i.   Legal Standard: the Standing is Conditioned on the Best Interests of the HoldCo Estate ................................................................. 11

        ii.   The HoldCo Estate Claims Are Colorable........................................ 15

        iii.   The Trustee's Pursuit of the Claims Will Benefit the HoldCo Estate........................................................................................ 17

        iv.   The Trustee's Standing to Bring the HoldCo Claims Is In the Best Interest of the Estate........................................................... 17

    B.   Settlement Authority ................................................................... 19

NOTICE....................................................................................................... 20

NO PRIOR REQUEST ................................................................................ 20

CONCLUSION............................................................................................ 20

## TABLE OF EXHIBITS

EXHIBIT A.       Proposed Order

EXHIBIT B.       Proposed Complaint

# TABLE OF AUTHORITIES

**Page(s)**

### Rules and Statutes

11 U.S.C. 550(a)(1) .................................................................................. 16

11 U.S.C. §1109(b) ................................................................................. 12

### Cases

*Chemical Bank v. Pilevsky,*
1994 U.S. Dist. LEXIS 18257 (S.D.N.Y. Dec. 22, 1994) ................................... 12

*In re Adelphia Commc'ns Corp.,*
285 B.R. 848 (Bankr. S.D.N.Y. 2002) ........................................................... 12

*In re Adelphia Commc'ns Corp.,*
330 B.R. 364 (Bankr. S.D.N.Y. 2005) ................................................. *passim*

*In re Commodore Int'l Ltd.*
("*Commodore*"), 262 F.3d 96 (2d Cir. 2001) ........................................... 13, 14

*In re Dewey & Leboeuf LLP,*
2012 Bankr. LEXIS 5536 (Bankr. S.D.N.Y. Nov. 29, 2012) ........................... 12, 14, 17

*In re Housecraft Indus. USA, Inc.,*
310 F.3d 64 (2d Cir. 2002) ("*Housecraft*") .......................................... 13, 17

*In re KDI Holdings, Inc.,*
277 B.R. 493 (Bankr. S.D.N.Y. 1999) ........................................................... 12

*In re STN Enters.,*
779 F.2d 901 (2d Cir. 1985) ("*STN*") ........................................................... 12

*Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank*
(*In re America's Hobby Ctr.*),
223 B.R. 275 (Bankr. S.D.N.Y. 1998) ........................................................... 13

**TO THE HONORABLE JUDGE GLENN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Wilmington Trust, National Association (the "Trustee"), solely in its capacity as indenture trustee for various series of senior unsecured notes in the outstanding aggregate principal amount of approximately $1 billion (the "Notes," and the holders thereof, the "Noteholders") issued by Residential Capital, LLC ("HoldCo," or as defined in the Complaint (defined below), "Residential Capital," and with its debtor-affiliates, the "Debtors"), under that certain indenture dated as of June 24, 2005 (as supplemented, the "Indenture"), respectfully submits this motion (the "Motion") pursuant to Sections 105 and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code") for an order, substantially in the form annexed hereto as Exhibit A, granting the Trustee leave, standing, and authority to prosecute and, if appropriate, settle certain claims and causes of action belonging to HoldCo (the "HoldCo Claims") in conjunction with certain third-party claims belonging to the Trustee (the "Third-Party Claims," and with the HoldCo Claims, the "Claims") substantially in the form set forth in the draft complaint attached hereto as Exhibit B (the "Complaint"). In support of the Motion, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    By this Motion the Trustee seeks permission to file the Complaint to ensure that the Third-Party Claims[1] and the HoldCo Claims,[2] which collectively are worth several billion dollars, are pursued by an entity whose interests align fully with the HoldCo estate.  If the relief sought

---

[1]  The "Third Party Claims" are Counts I - V in the Complaint.

[2]  The "HoldCo claims" are Counts VI - XX in the Complaint.

1

herein is granted, the Trustee will pursue the Claims in a coordinated fashion with any litigation
that may be pursued by the Official Committee of Unsecured Creditors (the "Committee") on
behalf of creditors of all the Debtors' estates. The Trustee could bring—and if the relief requested
herein is not granted, intends to bring—the Third-Party Claims in the court or courts that have
appropriate jurisdiction to hear these claims.[3] For purposes of judicial efficiency, the reduction of
cost and delay to the parties involved, and to avoid inconsistent results, it makes sense to bring
these claims in the same forum in which the HoldCo Claims are prosecuted and where closely
related claims are likely to be litigated by the Committee. In order to ensure such coordination, the
Trustee commits that it will assert the Claims in this forum (or, with respect to HoldCo claims,
such other forum as the Committee may choose to bring its action) to the fullest extent
jurisdictionally permissible so that the two cases can be coordinated as closely as possible.

2.     Although the Trustee generally supports the Committee's motion seeking standing
to pursue certain estate claims (the "Committee Motion"),[4] the Committee Motion does not
adequately protect the rights of the Noteholders and other HoldCo creditors. The Debtors' cases
have not been substantively consolidated, and there has been only one official committee
appointed to represent the interests of all creditors of the various estates. The Committee and its
counsel and advisors have performed admirably, but unless and until there has been substantive
consolidation, counsel to the Committee cannot represent the interests of all creditors
simultaneously either in litigating or settling any claims of HoldCo, particularly given that some of
these claims are against HoldCo's direct and indirect subsidiaries (the "OpCos"). The Trustee and

---

[3]     All of these claims could be filed together in the District Court for the Southern District of New York for
referral to this Court based on jurisdiction under 28 U.S.C. §§ 1334 and 1367. In the event that only the Third-Party
Claims are permitted to be pursued, certain of those claims would have to be filed in state court.

[4]     *See Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Authorizing The
Committee To Prosecute And Settle Certain Claims On Behalf Of The Debtors' Estates* (Doc. 3412).

the Noteholders it represents are the only creditors unaffiliated with HoldCo that hold a liquidated, unsecured claim against the HoldCo estate. Allowing the Trustee to jointly prosecute and settle the HoldCo Claims, for the benefit of the HoldCo estate, in coordination with the Committee, ensures that there will be an independent, non-conflicted plaintiff representing the interests of the HoldCo estate.[5]

3.      In this case, the most significant assets of HoldCo are its claims against Ally Financial, Inc. ("Ally Financial") and HoldCo's interests in, and claims against the OpCos. As the Committee Motion makes clear, the HoldCo Claims against Ally Financial are substantial. Among others, the HoldCo Claims include claims based on the fraudulent transfer of HoldCo's interest in Ally Bank, which was formerly HoldCo's most significant asset and based on breaches of the Operating Agreement (defined below), as to which the Noteholders are express third-party beneficiaries. As well, there are significant issues with intercompany payables of HoldCo and it is likely they do not constitute legitimate debts. Given the makeup of the Committee, with eight of nine members holding direct claims solely against the OpCos, it would be both imprudent and inherently improper for the Noteholders' representative not to be involved in controlling the prosecution, and directly participating in the potential settlement, of the HoldCo Claims.

4.      Throughout these cases, OpCo creditors and the Debtors have repeatedly attempted to prejudice the interest of the HoldCo estate, while favoring the interests of the OpCo estates. Even before the petition date, Ally Financial and the Debtors agreed to settle all of the claims that could be asserted against Ally Financial by the Debtors and their creditors, including the HoldCo Claims and Third-Party Claims, with no input from the Noteholders and on terms that provided the

---

[5]      Any conflict between prosecution or settlement of the Third-Party Claims and HoldCo Claims is mitigated, in turn, by the Committee's participation in this process and by the Court's ultimate control over any settlement of the HoldCo Claims.

Noteholders with little, if any, value. This pattern continued during the case, with the Debtors

proposing the HoldCo Election,[6] which would have allowed, without any justification, significant

claims against the HoldCo estate that had never been asserted or contemplated.

     5.     The HoldCo Claims are unique from those of the OpCos in a number of material

respects. First, only HoldCo can assert fraudulent conveyance claims for the loss of its interest in

Ally Bank (Counts VI & VII of the Complaint). Second, the Committee is conflicted from

bringing fraudulent transfer claims of the HoldCo estate against Ally Financial and the OpCos

relating to HoldCo's forgiveness of billions of dollars of OpCo intercompany debt at a time when

both the OpCos and HoldCo were insolvent (Counts VIII-XI of the Complaint).

     6.     The Noteholders also have unique Third-Party Claims arising from their rights

under the Indenture that cannot be asserted by the Committee. The predicates for those claims are

generally rights and duties created by the Indenture. Under various legal theories, including, but

not limited to, alter ego and successor liability (Counts I, II and IV of the Complaint), Ally

Financial is responsible for HoldCo's breach of the Indenture's prohibition against a transfer of "all

or substantially all" of HoldCo's assets to an entity that did not assume the obligation to repay the

Noteholders (the "AOSA Breach"). The events giving rise to these claims include the transfer by

HoldCo of its interest in Ally Bank to Ally Financial and the contemporary forgiveness by HoldCo

of substantial OpCo debt. The central thesis of the Complaint is that these transactions were done

to extract Ally Bank from HoldCo as part of a self-preservation plan that Ally Financial adopted in

response to the RMBS crisis it created.

---

[6]     As defined and discussed in that certain *Motion to Modify the Revised Joint Omnibus Scheduling Order
and Provision for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of
RMBS Trust Settlement Agreement, And (II) The RMBS Trustees' Limited Objection To The Sale Motion* (Doc.
1300).

7.    Importantly, these Third-Party alter ego and successor liability claims, besides

being unique to the Noteholders, are different from estate fraudulent conveyance claims. For

example, it is no defense to an AOSA Breach that HoldCo received reasonably equivalent value in

the form of debt forgiveness. Ally Financial's potential defenses to the Committee's general alter-

ego theories are also not applicable to these claims. For example, the capital contributions to the

OpCos that Ally Financial points to as evidence of its good faith and fair dealing provided no

benefit to HoldCo. Notably, Ally Financial made certain of those contributions while having a

right through its secured facilities to the first recoveries on the assets of HoldCo and OpCos, at the

same time it was causing HoldCo to convert to worthless equity the debt it was owed by the very

same entities that provided Ally Financial with significant collateral. Additionally, the alter ego

claim of the Noteholders is also different from the Committee's proposed claim in terms of Ally

Financial's conduct that is the basis for the claim. The Noteholders' claim is not, at bottom,

predicated on Ally Financial having undercapitalized HoldCo and its subsidiaries at inception (or

such later date) to engage in business that was incurring enormous risks. As the Complaint sets

out, the Trustee does not disagree that when HoldCo raised most of its public debt, including the

debt now owed to the Noteholders, HoldCo was generally separate and solvent. It was the actions

Ally Financial took after the RMBS crisis materialized in 2007 that undermined both the

separateness and financial integrity of HoldCo, which were the bases on which the Notes were sold

to the public and that are the grounds for the Trustee's alter ego claims. As noted, if the Trustee

does not receive standing to bring the HoldCo Claims, it nevertheless intends to proceed to bring

the Third-Party Claims in the court or courts with appropriate jurisdiction to hear such claims.[7]

---

[7]    For the reasons set forth above, the Third-Party Claims do not represent estate assets. To the extent,
however, any party in interest believes otherwise, presumably it will raise such concerns in opposition to this Motion
and the Court can decide that issue, if necessary. If the Court grants the relief requested herein, the issue of what
claims are personal to the Trustee and what claims are estate claims can be determined at a later date.

## JURISDICTION, VENUE AND OTHER PREDICATES

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory support for the

relief requested herein are sections 105 and 1109(b) of title 11 of the Bankruptcy Code.

9.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The Indenture gives the Trustee standing and authority to bring this Motion and

assert the Claims discussed herein.

## BACKGROUND

**A.      The Chapter 11 Filing**

11.     On May 14, 2012, the Debtors commenced voluntary cases under chapter 11 of the

Bankruptcy Code.

12.     On May 14, 2012, the Court authorized joint administration, and the Debtors

continue to operate their businesses and manage their properties as debtors in possession pursuant

to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     On June 28, 2012, the Court directed the United States Trustee to appoint an

examiner. *See Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of*

*the Bankruptcy Code* (Doc. 536). The appointment of Arthur J. Gonzalez, Esq. as examiner (the

"Examiner") was approved by the Court on July 3, 2012. *See Order Approving Appointment of*

*Arthur J. Gonzalez, Esq. as Examiner* (Doc. 674).

14.     On April 11, 2013, the Committee filed the Committee Motion.

**B.      The Complaint**

15.     The facts and allegations in the Complaint are incorporated herein by reference.  A

brief summary is set forth below.

6

16.    In 2004, Ally Financial created HoldCo as a holding company to expand its

mortgage business. HoldCo was originally designed to be separate from Ally Financial for the

purpose of ensuring higher credit ratings and lower borrowing costs for Ally Financial's mortgage

business. HoldCo raised over $19 billion in funds in the capital markets over the succeeding two

years based, in part, on the perceived separateness from Ally Financial and General Motors

pursuant to an operating agreement signed by Ally Financial, General Motors, and HoldCo that

required such separateness (as amended, the "Operating Agreement").

17.    Less than two years after creating HoldCo, Ally Financial and HoldCo permitted

corporate separateness to disappear. For example, Ally Financial took HoldCo's prized asset—its

interest in GMAC Bank (known as "Old GMAC Bank")—in violation of the Operating

Agreement. Other indicia of corporate separateness dissipated, as evidenced by the amendment of

the Operating Agreement to permit, among other things, significant and material overlapping

personnel.

18.    By 2007, the mortgage market and financial sectors had collapsed and HoldCo and

its OpCos had become hopelessly insolvent as an avalanche of liability related to shoddy mortgage

origination practices began to surface. Like many large financial institutions at the time, Ally

Financial and its subsidiaries' downward spiral in 2007 and 2008 was both rapid and dramatic. For

the first quarter of 2007 alone, the Debtors lost almost a billion dollars, which was attributable to

increases in nonprime delinquencies, a significant deterioration in the nonprime securitization

market, instability in the residential housing market, and the inverted interest rate yield curve.

19.    As massive losses began to emerge, Ally Financial began to feel the economic

fallout from its mortgage practices and embarked on a plan of self-preservation. Rather than acting

to preserve HoldCo through this difficult financial crisis, Ally Financial abused its control of its

7

subsidiaries. In breach of the Indenture, Ally Financial denuded HoldCo of substantially all its

assets and inequitably saddled HoldCo and the OpCos with further liabilities of Ally Financial's

creation. Ally Financial's many abuses included (i) entering and modifying key agreements,

serving to shift risk away from Ally Bank and to HoldCo and its subsidiaries, (ii) orchestrating an

exchange offer in June 2008 that required the Noteholders to take a substantial haircut on their

investment or risk being left with securities that carried nothing but an implicit guarantee of

repayment by Ally Financial, (iii) taking HoldCo's remaining interest in Ally Bank for less than

reasonably equivalent value and on non-arm's length terms, and (iv) causing HoldCo to forgive

billions of dollars in debt owed to it by the OpCos, for nothing in exchange, all in furtherance of

only Ally Financial's interests.

20.    As outlined in the Complaint, substantial contemporaneous evidence exists to prove

that Ally Financial was HoldCo's alter ego at all relevant times and is liable as its successor for

certain claims. As a threshold matter, Ally Financial and HoldCo have admitted and confirmed—

and in some cases, from the very beginning of HoldCo's creation—the complete business

integration of their companies and have consistently held themselves out to the public as a single

entity. Even in HoldCo's chapter 11 proceedings, HoldCo has emphasized the integrated nature of

Ally Financial's and HoldCo's business. Given this integration, it is not surprising that the market

perceived the two companies as a single economic enterprise.

**C.    The HoldCo Claims**

21.    As described fully in the Complaint, the Trustee intends to assert the following

HoldCo Claims against Ally Financial, certain directors and officers of HoldCo, Residential

Funding Co., LLC ("RFC") and GMAC Mortgage LLC ("GMAC Mortgage"):

- **Constructive fraudulent transfer against Ally Financial as to the transfer of Ally Bank (Count VI).** In 2008 and 2009, HoldCo, while insolvent, transferred to Ally Financial its remaining interests in Ally Bank without receiving reasonably equivalent

8

value from Ally Financial in exchange. HoldCo was insolvent at the time of the 2008 and 2009 Bank Transactions.

- **Intentional fraudulent transfer against Ally Financial as to the transfer of Ally Bank (Count VII)**. In 2008 and 2009, HoldCo intentionally transferred to Ally Financial its interests in Ally Bank with actual intent to hinder, delay, or defraud the Noteholders.

- **Constructive fraudulent transfer against RFC and GMAC Mortgage. related to debt forgiveness (Count VIII)**. Over the course of 2008, 2009, and 2010, HoldCo, while insolvent, forgave billions of dollars owed by certain OpCos without receiving reasonably equivalent value in exchange.

- **Intentional fraudulent transfer against RFC and GMAC Mortgage related to debt forgiveness (Count IX)**. From 2008 through 2010, HoldCo forgave billions of dollars owed to it by OpCos with actual intent to hinder, delay, or defraud the Noteholders.

- **Recovery against Ally Financial related to debt forgiveness to RFC and GMAC Mortgage for intentional and constructive fraudulent transfer (Counts X - XI)**. HoldCo is entitled to recovery from Ally Financial for debt forgiveness made to the OpCos because the transfers were made for Ally Financial's benefit. This forgiveness was with actual intent to hinder, delay, or defraud the Noteholders and the Trustee.

- **Disallowance of Proofs of Claim and Scheduled Claims of Ally Financial, RFC and GMAC Mortgage (Counts XII - XIII)**. Ally Financial, RFC and GMAC Mortgage have not paid the amount, or turned over property, for which they is liable to HoldCo under the avoidance provisions of the Bankruptcy Code and until such point, their claims must be disallowed.

- **Constructive trust against Ally Financial relating to Ally Bank (Count XIV)**. Ally Financial holds HoldCo's interests in Ally Bank in constructive trust for the benefit of HoldCo and its creditors because Ally Financial violated its promise not to engage in any transaction with HoldCo that would contravene the Operating Agreement. Ally Financial knew the bank transactions violated the Operating Agreement because they were not for fair value or transacted on arm's length terms.

- **Breach of fiduciary duties against the directors and officers of HoldCo (Count XV)**. HoldCo's directors and officers breached their fiduciary duties owed to HoldCo by approving the forgiveness of OpCo debt and the assumption of the certain liabilities ultimately owned by Ally Financial.

- **Aiding and abetting breach of fiduciary duties against Ally Financial (Count XVI)**. Ally Financial aided and abetted the directors of HoldCo in breaching their fiduciary duties owed to HoldCo.

- **Indemnification Claims Against Ally Financial (Count XVII )**. Ally Financial is liable as an indemnitor under the Operating Agreement, for losses suffered by HoldCo

9

and its subsidiaries arising from the conduct of Ally Financial, or its non-Debtor affiliates, relating to its mortgage business, including, but not limited to, losses relating to government fines, settlements with government-sponsored entities, and indemnification payments made to Ally Bank.

- **Contribution against Ally Financial arising from payments made by HoldCo (Count XVIII).** HoldCo is entitled to contribution from Ally Financial for all or part of any losses suffered by HoldCo arising from the mortgage business of Ally Financial and its subsidiaries, including, but not limited to, losses relating to government fines, settlements with government-sponsored entities, and indemnification payments made to Ally Bank.

- **Constructive trust against Ally Financial for all property inequitably held (Count XIX).** HoldCo is entitled to a constructive trust for all property held by Ally Financial including cash, tax attributes or other assets for which Ally Financial promised, either explicitly or implicitly, in writing or otherwise, to hold for the benefit for HoldCo.

- **Declaratory relief that certain intercompany payables do not constitute debt of HoldCo (Count XX).** Claims of RFC, listed on HoldCo's schedules, for approximately $2 billion against HoldCo do not represent legal debt obligations.

## D.    The Third-Party Claims

22.    As described in the Complaint, the Trustee owns and will assert the following

Third-Party Claims against Ally Financial:

- **Breach of Contract: the All or Substantially All Provision and Alter Ego (Count I).** During 2009 and 2010, HoldCo materially breached its obligations under the Indenture by transferring its remaining interests in Ally Bank to Ally Financial and engaging in significant debt forgiveness, which constituted the disposition of substantially all of HoldCo's assets. Ally Financial is liable as HoldCo's alter ego for this breach of the Indenture because, among other things, it directed and caused the stripping of all or substantially all of HoldCo's assets. Ally Financial is equitably estopped from disclaiming liability because it implicitly promised to support HoldCo's payment of the Notes on which the market relied to the determinant of the Noteholders.

- **Successor Liability (Count II).** Having caused the transfer of all or substantially all of Residential Capital's assets to itself, or for its benefit, Ally Financial is liable for all damages suffered by the Noteholders as a successor to HoldCo under the Indenture.

- **Breach of the Covenant of Good Faith and Fair Dealing and Alter Ego (Count III).** From late 2006 through 2010, at Ally Financial's direction, HoldCo engaged in a series of one-sided affiliate transactions that rendered HoldCo's performance under the Indenture impossible. These actions deprived the Noteholders of their right to receive the benefits they bargained for under the Indenture in breach of the covenant of good faith and fair dealing. Ally Financial is liable as HoldCo's alter ego for the breach of

10

the covenant of good faith and fair dealing because it caused HoldCo to enter into such one-sided transactions through its domination and control.

- **Tortious Interference with Contract (Count IV).** Ally Financial intentionally, knowingly, maliciously, willfully, improperly, and in bad faith induced, caused, and procured HoldCo's breach of the "all or substantially all" provision of the Indenture.

- **Equitable Subordination (Count V).** All claims held by Ally Financial against HoldCo, including but not limited to claims arising from certain secured facilities, should be equitably subordinated to the claims of the Noteholders and the Trustee, as a result of Ally Financial's inequitable conduct, and all liens in favor of Ally Financial at all Debtors should be transferred to the HoldCo estate.

## RELIEF REQUESTED

23.      The Trustee hereby respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, granting the Trustee standing and authority to prosecute the HoldCo Claims and, if appropriate, settle all or a portion thereof, on behalf of the HoldCo estate.

## BASIS FOR RELIEF

### A.      The Trustee Is the Best Party to Bring the HoldCo Claims

24.      The Trustee seeks standing to pursue the HoldCo Claims because it is the only unconflicted representative of the HoldCo estate and is best-placed to expeditiously and successfully prosecute the HoldCo Claims. Accordingly, the Trustee satisfies the Second Circuit's standard for standing: that is, the grant of standing is in the best interests of estate.

### i.      Legal Standard: the Standing is Conditioned on the Best Interests of the Estate

25.      When a trustee or debtor-in-possession has abdicated its responsibility to bring claims on behalf of the estate, like in this case, the bankruptcy court must adjudicate whether granting a movant standing to bring colorable claims is in the best interests of the estate.

26.      The Second Circuit has long recognized a qualified right for creditors to initiate adversary proceedings in the name of the debtor in possession with the approval of the bankruptcy

11

court. *See In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985) ("*STN*"); *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 372-73 n.16 (Bankr. S.D.N.Y. 2005); *In re Dewey & Leboeuf LLP*, 2012 Bankr. LEXIS 5536 at *15 (Bankr. S.D.N.Y. Nov. 29, 2012); 11 U.S.C. §1109(b). Permitting a creditor to vigorously pursue a claim in the debtors' absence is "permissible, not uncommon, and often desirable." *In re Adelphia Commc'ns Corp.*, 285 B.R. 848, 855 (Bankr. S.D.N.Y. 2002).

27.    In this circuit, a creditor is provided standing to prosecute certain claims when the trustee or debtor-in-possession has "unjustifiably failed to bring suit or abused its discretion in not suing" on the claims. *STN*, 779 F.2d at 904. In deciding whether a debtor has unjustifiably failed to bring suit, a court must examine whether (i) colorable claims for relief, that on appropriate proof would support a recovery, have been presented, and (ii) an action asserting such claims is likely to benefit the estate. *See STN*, 779 F.2d at 905; *Adelphia*, 330 B.R. at 374 n.19; *In re KDI Holdings, Inc.*, 277 B.R. 493, 507-508 (Bankr. S.D.N.Y. 1999).[8]

28.    *First*, the requirement that the claims be "colorable" is a "relatively easy one to make." *Adelphia*, 330 B.R. at 376. The creditor seeking standing is "required only to describe a facially valid claim, which will be evaluated under a standard 'much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.'" *In re Dewey & Leboeuf* at *16 (citing *Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998)). The

---

[8]    While some of the cases cited in this Motion deal with the ability of a committee to pursue the claims of a debtor, the ability of other creditors to pursue such claims is subject to the same test in the Second Circuit. *See Chemical Bank v. Pilevsky*, 1994 U.S. Dist. LEXIS 18257 at *5 (S.D.N.Y. Dec. 22, 1994) ("[O]ther courts have inferred that an individual creditor can be granted standing to bring suit on behalf of the estate if the same factors are met as the Second Circuit expressed in *STN*.") (citing *Minhlonggg Enter., Inc. v. New York Int'l Hostel, Inc.*, 142 B.R. 90, 95 (Bankr. S.D.N.Y. 1992); *Adelphia*, 330 B.R. at 373 ("The practice of authorizing the prosecution of actions on behalf of an estate by committees, and even by individual creditors, upon a showing that such is in the interests of the estate, is one of long standing, and nearly universally recognized.").

existence of "factual challenges, factual explanations and factual supplements" to claims do not

weigh against such claims being "colorable." *Adelphia*, 330 B.R. at 377-78.

29.     *Second*, in determining whether the proposed action would benefit the debtor's

estate, a court engages in a limited assessment on the merits to assure "that there is a sufficient

likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that

initiation and continuation of litigation will likely produce." *Adelphia*, 330 B.R. at 374 (quoting

*STN*, 779 F.2d at 905-06.). A court does not need to determine that success is more likely than not,

but simply to find that the proposed litigation is not a "hopeless fling" and that the "prospective

rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost."

*See Adelphia*, 330 B.R. at 386; *In re: America's Hobby Ctr.*, 223 B.R. 275, 284 (Bankr. S.D.N.Y.

1998).

30.     The Second Circuit has evolved its test through the so-called "*STN* trilogy": *STN*, *In

re Commodore Int'l Ltd.* ("*Commodore*"), 262 F.3d 96 (2d Cir. 2001) and *In re Housecraft Indus.

USA, Inc.*, 310 F.3d 64 (2d Cir. 2002) ("*Housecraft*"). Each case dealt with a different permutation

of debtor consent to the prosecution of the claims and resulted in a slightly different enunciation of

the applicable standard. However, each articulation distills to the same principle: the prosecution

of the proposed litigation must be "in the best interests of the estate." *See, e.g., Adelphia*, 330 B.R.

at 369 ("Though the words used by the Second Circuit in each of the cases in the *STN* Trilogy

differ slightly, they share a common underpinning requiring the bankruptcy court to satisfy itself

that the prosecution of the proposed litigation…would be in the best interest of the estate."); 

*Housecraft*, 310 F.3d at 70 (holding that standing is extended to "creditors when to do so is in the

best interests of the estate").

13

31.    It has followed that, whether or not the debtor provides its consent to have the

action brought, the Second Circuit standard is fundamentally the same. For example, under

*Commodore*, when the debtor consents to a creditor's standing to bring estate claims, a creditor

must show that the suit is "(a) in the best interest of the bankruptcy estate, and (b) is 'necessary and

beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *Commodore*, 262

F.3d at 100. This standard itself reduces to the *STN* analysis of whether the creditor presents

colorable claims and the cost-benefit analysis of whether the action is in the best interest of the

estate. *Dewey* at *16, *23 (citing *Adelphia*, 330 B.R. at 374).

32.    Here, the Debtors have consented to standing of the Committee to pursue certain of

the HoldCo Claims and accordingly, have abdicated their responsibility to bring such claims on

behalf of HoldCo. Although the Debtors' consent is significant, its effect is limited to the

relinquishment of those claims. In fact, a debtor need not even actively "consent" to satisfy this

standard because its lack of opposition itself is sufficient. *Adelphia*, 330 B.R. at 368 n.2. Once the

Debtors have relinquished their duty, it is the Court's responsibility to determine which

representative of the estate is best suited to advance such claims.

33.    It follows that where there are multiple parties seeking to bring colorable claims of

HoldCo, the Court must determine whether it would be in the best interest of the HoldCo estate for

a particular party, or more prudently, a combination of parties, to prosecute claims on behalf of the

HoldCo estate. In the extraordinary circumstances of this case, where the Committee faces

structural conflicts in prosecuting the HoldCo claims, allowing the Trustee to bring claims on

behalf of HoldCo, in coordination with the Committee's claims, satisfies this test and is the best

solution to mitigate the conflicts presented here. Similarly, granting the Trustee the authority to

14

settle the HoldCo Claims on behalf of the estate, in consultation with the Committee and the

Debtors, is necessary to mitigate those same conflicts.

### ii. The HoldCo Estate Claims Are Colorable

34.    As fully outlined in the Complaint, the Trustee is prepared to assert substantial

claims that are far more than colorable. While similar to the standard on a motion to dismiss, the

*STN* standard is not the venue to assess and dismiss claims individually; rather, so long as

sufficient colorable claims are asserted, the *STN* standard will be met. *See Adelphia*, 330 B.R. at

378 ("[T]he Defendants' legal contentions, while they will likely result in 12(b)(6) dismissal of

some of the claims, fall far short of being "show-stopper" issues that could presage defeat for . . .

the litigation as a whole, especially before factual inquiry.").

35.    Each claim individually has a high likelihood of success and easily surpasses the

low bar of 'colorable' required by the *STN* standard:

(i)    **Constructive and intentional fraudulent conveyance of Ally Bank against Ally Financial (Counts VI - VII):** Ally Financial abused its domination and control of HoldCo to extract valuable assets in several fraudulent transfers. Its receipt of HoldCo's interests in Ally Bank was accomplished through several such transfers. There is no doubt that HoldCo received considerably less than reasonably equivalent value when it exchanged its interests in its "crown jewel" for its own debt—the fair value of which was significantly below the value of HoldCo's interest in Ally Bank. At the time of the transfer, weighed down by RMBS liabilities arising out of Ally Financial's poor underwriting practices, HoldCo was insolvent. Moreover, Ally Financial knew that the below-market transactions were a clear violation of the Operating Agreement, but proceeded nonetheless to take the Bank to ensure that it would not be distributed to the Noteholders in a future bankruptcy. *See e.g.* Ex. B, ¶¶ 102 - 107, 217 – 231.

(ii)    **Constructive and intentional fraudulent conveyance of subsidiary debt forgiveness against RFC, GMAC Mortgage and Ally Financial (Counts VIII - XI):** Ally Financial orchestrated the stripping of HoldCo's other significant asset: the intercompany receivables of its subsidiaries. From 2008 through 2010, while HoldCo was insolvent, HoldCo forgave, or caused the forgiveness of, billions of dollars of the debt of OpCos. Due to the scope of the subsidiaries' insolvency, this debt forgiveness did not translate into increased equity value and HoldCo received no value from the forgiveness. Moreover, Ally Financial caused the debt forgiveness for its own benefit to shield itself from liability and protect the non-

15

HoldCo gears of its mortgage business. Accordingly, it is liable to HoldCo for the value of the forgiveness. *See* 11 U.S.C. 550(a)(1). In doing so, the forgiveness was made with actual intent to hinder, delay and defraud the Noteholders. *See e.g.* Ex. B, ¶¶ 98 – 101, 232 – 255.

(iii) **Constructive trust against Ally Financial (Counts XIV and XIX):** Ally Financial breached a series of promises it made to HoldCo and the Noteholders and, as a result, holds the property of these transactions, HoldCo's former interest in Ally Bank, in constructive trust for the benefit of HoldCo. Ally Financial and HoldCo were in a confidential relationship characterized by Ally Financial's domination and control such that Ally Financial owed an express or implied duty to HoldCo not to take an unfair advantage of HoldCo. This duty was breached when Ally Financial seized HoldCo's interest in Ally Bank through several below-market transactions on terms that were not at arm's length, violating the Operating Agreement, to which Ally Financial was a party. Ally Financial also holds in constructive trust for HoldCo all property, including cash, tax attributes or other assets for which Ally Financial promised, either explicitly or implicitly, to hold for the benefit of HoldCo. *See* Ex. B, ¶¶ 35 – 36, 42 – 52, 98 – 101, 129 – 131, 264 – 271, 292 – 297.

(iv) **Breaches of fiduciary duty against directors and officers of HoldCo and aiding and abetting breaches of fiduciary duty against Ally Financial (Counts XV – XVI ):** HoldCo's directors and officers regularly breached their duties owed to the Noteholders when they acted for the benefit of Ally Financial in lieu of HoldCo. Such duties were violated when the directors approved the forgiveness of the debt of HoldCo's subsidiaries and the shifting of Ally Financial liabilities to the Debtors. Ally Financial knowingly participated in these breaches by orchestrating, approving and reaping the benefits from each transaction. *See* Ex. B, ¶¶ 114 – 128, 264 – 276.

(v) **Disallowance of Proofs of Claim and Scheduled Claims of Ally Financial, RFC and GMAC Mortgage (Counts XII - XIII)**. Ally Financial, RFC and GMAC Mortgage are entities for which property is recoverable by HoldCo under section 550 of the Bankruptcy Code. Because they have not paid the amount or turned over such property as is recoverable, pursuant to section 502(d) of the Bankruptcy Code all claims held by Ally Financial, RFC and GMAC Mortgage against HoldCo must be disallowed. *See* Ex. B, ¶¶ 256 – 263.

(vi) **Indemnification and contribution against Ally Financial (Counts XVII - XVIII):** Ally Financial is liable to HoldCo for significant payments made by HoldCo as a result of liabilities created by the business of Ally Financial or its non-Debtor affiliates. Ally Financial regularly avoided costs arising from government investigations and settlements by shifting these burdens to HoldCo. This was in addition to the RMBS liability borne by the Debtors arising from Ally Financial and Ally Bank's poor underwriting. HoldCo is entitled to be reimbursed for such payments both under the Operating Agreement as well as under theories of common law contribution. *See* Ex. B, ¶¶ 114 – 125, 281 – 291.

(vii) **Declaratory relief against RFC (Count XX).** HoldCo's schedules show a unsecured claim of RFC for approximately $2 billion. Such claims do not represent legal debt obligations and HoldCo is entitled to appropriate declaratory relief. *See id.* ¶¶ 101, 298 – 302.

### iii. The Trustee's Pursuit of the Claims Will Benefit the HoldCo Estates

36.    Prosecution of the HoldCo Claims by the Trustee will be benefit the HoldCo estate. If successful, the HoldCo Claims would result in a significant money judgment to the benefit of all creditors of HoldCo. *See Dewey* at *17-18 ("Courts have found that a suit would be in the best interest of the estate and necessary and beneficial where, if successful, it would result in a money judgment for the estate."). Furthermore, as the Trustee is not seeking current payment of fees and expenses for prosecuting the Complaint, there are no added costs to the HoldCo estate. *See Housecraft*, 310 F.3d at 68 (finding standing pursuant to *STN* to be in the best interest of the estate where creditor bears the cost of litigation). The fundamental question in granting standing to a creditor is whether such standing benefits the bankruptcy estate, balancing the likelihood and extent of recovery of the litigation to the potential cost to ensure that the litigation is a "sensible application of estate resources." *Adelphia*, 330 B.R. at 369. With no cost to the estate and significant recovery potential, the grant of standing easily meets the test.

### iv. The Trustee's Standing to Bring the HoldCo Claims Is In the Best Interest of the Estate

37.    The best interests of the HoldCo estate are optimally served by granting the Trustee standing to prosecute the HoldCo Claims. In the absence of such standing, valuable claims will lie fallow and those that are prosecuted by the Committee will be subject to structural conflicts, all to the significant loss of the creditors of HoldCo.

38.    The Trustee seeks standing to bring a series of claims, many of which cannot, or will not, be asserted by any other party. With the exception of claims for the fraudulent transfer of

Ally Bank and indemnification, the HoldCo Claims are in addition to, instead of overlapping with, the claims for which the Committee seeks standing to assert. Due to their composition, many of the HoldCo Claims simply cannot be brought by the Committee. The Committee cannot practically bring claims against Ally Financial that implicates the liability of the OpCos. HoldCo's extremely valuable claim for fraudulent conveyance for the forgiveness of billions of dollars of intercompany debt of the OpCos—asserted against both Ally Financial, RFC and GMAC Mortgage—is one such example. Far from duplicative, if the Trustee is not given standing to prosecute these claims, the claims will be left unpursued and HoldCo will be leaving money on the table.

39.     In asserting the HoldCo Claims, the Trustee will take every effort to avoid duplication, redundancy and impediments to judicial efficiency. If the Committee brings the claims it seeks leave to assert, the Trustee will coordinate the prosecution of the claims to minimize cost and avoid delay. The Trustee has already expended significant resources to investigate the HoldCo Claims and is prepared to litigate the claims with due expediency.

40.     However, even where the HoldCo Claims and the claims sought to be asserted by the Committee appear to overlap, it is imperative to the HoldCo estate that these claims be asserted—and potentially settled—by a representative of the HoldCo estate alongside the Committee.

41.     The Committee is composed of nine members and includes only one, the Trustee, with a primary obligation owed by HoldCo. The Committee and its professionals are doing yeoman's work to advance these chapter 11 proceedings, and should be commended for their efforts. However, in seeking to assert both HoldCo and OpCo claims the Committee is subject to irreconcilable conflicts. With such intertwined claims, the manner in which they are prosecuted

can actively shift value between HoldCo and OpCo recovery. *See Adelphia*, 330 B.R. at 382

(noting that the party seeking standing must not be conflicted with the interests of the estate).

Unless a separate HoldCo representative is appointed, the Trustee is the only party who can

represent the HoldCo's interests on an unconflicted basis.

42.      As the Trustee seeks to bring colorable claims in addition to those to be asserted by

the Committee, the Motion should be weighed only against the incremental costs to the estate. *See*

*Adelphia*, 330 B.R. at 386 (holding that where the equity committee brought a standing motion in

addition to the creditors' committee, "the incremental cost of prosecuting the Equity Committee's

claims will be quite small at least in the context of the claims already to be asserted by the

Creditors' Committee"). Like *Adelphia*, the cost of an additional litigant is minimal—and in this

case, not borne by the estate—and greatly outweighed by the advantage to HoldCo of having its

claims asserted by a party who will tirelessly and exclusively represent its interests. Only by

granting such standing can HoldCo maximize the value of its estate, a factor of the "greatest

importance" for standing consideration. *Adelphia*, 330 B.R. at 382 n. 55 (citing *Liberty Mutual*

*Insurance Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co.* (*in re*

*Spaulding Composites Co., Inc.*), 207 B.R. 899 (9th Cir. BAP 1997)).

**B.      Settlement Authority**

43.      The HoldCo Claims should be resolved by settlement only if such settlement is

supported by the Trustee or a non-conflicted fiduciary of HoldCo. This Motion therefore seeks

entry of an order permitting only the Trustee, in consultation with the Committee and the Debtors,

to propose a settlement of the HoldCo claims. Any such settlement would be subject to

Bankruptcy Court approval, upon proper notice and opportunity for objection.

44.      The order sought herein provides for the Debtors, with the consent of the Trustee,

to propose a settlement of the HoldCo Claims. With respect to parties other than the Debtors, these

19

parties may reserve their rights with respect to the standard to settle the HoldCo Claims under a Chapter 11 plan and nothing herein shall prohibit these parties from proposing or prosecuting a plan that seeks to settle the HoldCo Claims.

## NOTICE

45.     The Trustee has provided notice of this Motion in accordance with the Case Management Procedures Order, approved by this Court on May 23, 2012 (Doc. 141).

## NO PRIOR REQUEST

46.     No previous request for the relief sought herein has been made by the Trustee to this or any other Court.

## CONCLUSION

47.     For the foregoing reasons, the Trustee respectfully requests that the Court (i) enter an order substantially in the form annexed hereto as Exhibit A and (ii) grant such other an further relief as the Court deems appropriate.

*[Remainder Of Page Left Intentionally Blank ]*

Dated: New York, New York
      April 18, 2013

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By:  /s/ Thomas J. Moloney
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
A Member of the Firm
One Liberty Plaza
New York, NY 10006
*(212) 225-2000*

*Special Counsel for Wilmington Trust, National
Association, as Indenture Trustee for the Senior
Unsecured Notes Issued by Residential Capital, LLC*

.

# **EXHIBIT A**

## **Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

|  |  )  |
| --- | --- |
| a | ) |
|  | ) |
|  | )   Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) |
|  | )   Chapter 11 |
| Debtors | ) |
|  | )   Jointly Administered |
|  | ) |

---------------------------------------------------------

### [PROPOSED] ORDER AUTHORIZING WILMINGTON TRUST, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE SENIOR UNSECURED NOTES ISSUED BY RESIDENTIAL CAPITAL, LLC FOR AN ORDER AUTHORIZING IT TO PROSECUTE CLAIMS AND OTHER CAUSES OF ACTION ON BEHALF OF THE  RESIDENTIAL CAPITAL, LLC ESTATE

Upon consideration of the motion Docket No. _____ ] (the "<u>Motion</u>")[1] of Wilmington Trust,

National Association, (the "<u>Trustee</u>") for entry of an order, pursuant to 11 U.S.C. §§ 105(a), and

1109(b), granting the Trustee standing and authority to prosecute and settle on behalf of the

estate of Residential Capital, LLC ("<u>HoldCo</u>") claims substantially consistent with those

outlined in the Complaint, attached to the Motion as <u>Exhibit B</u>  (the "<u>HoldCo Claims</u>"), that

HoldCo may have against Ally Financial Inc. ("<u>Ally Financial</u>"), Residential Funding Co., LLC,

GMAC Mortgage LLC and certain of HoldCo's current and former directors (collectively, the

"<u>Ally Financial Defendants</u>"); and of any objections thereto and the record of these Chapter 11

cases; and that this Court has jurisdiction to order the relief provided herein in accordance with

28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated

January 31, 2012 (Preska, Acting C.J.); and that venue is proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409; and that due and proper notice of the Motion has been given, and no

---

[1]     Capitalized terms used herein as defined terms and not otherwise defined shall have those meanings ascribed to them in the Motion.

other or further notice need be provided; and that the Court has found and determined that the relief sought in the Motion is in the best interests of HoldCo, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and for good and sufficient cause appearing therefor:

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      All objections, if any, to the Motion or the relief requested therein, that have not been withdrawn, waived, or settled are overruled.

3.      The Trustee is granted standing, and is authorized on behalf of HoldCo, to commence and prosecute to conclusion the HoldCo Claims, with the full rights and privileges of, and in the stead of, HoldCo (the "Debtors").

4.      The Trustee shall have, in consultation with the Committee and Debtors, the exclusive right and authority to enter into settlements on behalf of HoldCo with respect to the HoldCo Claims; provided, however, that pursuant to a Chapter 11 plan, the Debtors may, with the consent of the Trustee, propose a settlement of the HoldCo Claims; provided further that, with respect to parties other than the Debtors, to the extent the Debtors' exclusivity period is terminated, parties may reserve their rights with respect to the standard to settle the HoldCo Claims under a Chapter 11 plan and nothing herein shall prohibit these parties from proposing and/or prosecuting a plan that seeks to settle the HoldCo Claims.

5.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      Upon conversion of these Chapter 11 cases to cases under Chapter 7, the rights of all parties-in-interest are reserved with respect to the Trustee's exclusive right and

2

authority to negotiate and enter into settlements on behalf of HoldCo with respect to the HoldCo

Claims.

       7.    The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation of this Order.

Dated: _____, 2013
      New York, New York

                  _____
                  UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT B**

## **Proposed Complaint**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Thomas J. Moloney (TJM-9775)
Sean A. O'Neal (SAO-4067)
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Special Counsel for Wilmington Trust, National*
*Association, as Indenture Trustee for the Senior*
*Notes Issued by Residential Capital, LLC,*
*and, as Applicable, Representative of the Residential Capital,*
*LLC Estate on Behalf of Creditors of Residential Capital, LLC*

---------------------------------------------------------- X
                                :

**WILMINGTON TRUST, NATIONAL**
**ASSOCIATION, as Indenture Trustee,**    :
*and, as Applicable, On Behalf of the*
*Residential Capital, LLC Estate*       :

                          **Plaintiff,**    :

     **v.**                           :

**ALLY FINANCIAL, INC., RESIDENTIAL**  :
**FUNDING CO., LLC, GMAC MORTGAGE**  :
**LLC, STEVEN M. ABREU, JONATHAN**  :
**ILANY, JOHN E. MACK, THOMAS**    :
**MARANO, EDWARD F. SMITH, III,**    :
**PAMELA E. WEST, JAMES M.**       :
**WHITLINGER, AND JAMES N. YOUNG.**  :

                        **Defendants.**  :

                                  :
----------------------------------------------------------X

**PROPOSED COMPLAINT**

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION................................................................................... 5

THE PARTIES........................................................................................................ 6

A.    The Plaintiffs.......................................................................................... 6
      i.    The Trustee ................................................................................. 6
      ii.   The Residential Capital Estate .................................................. 6

B.    The Defendants ...................................................................................... 7
      i.    Ally Financial............................................................................. 7
      ii.   The Chapter 11 Debtors ............................................................. 7
      iii.  Directors and Officers of Residential Capital, LLC ................. 8

C.    Non-Parties ........................................................................................... 10

D.    Organizational Structure ...................................................................... 11

JURISDICTION AND VENUE.............................................................................. 12

OVERVIEW OF ALLY FINANCIAL'S MORTGAGE OPERATIONS  IMMEDIATELY
BEFORE THE DEBTORS' BANKRUPTCY FILING........................................... 12

FACTUAL ALLEGATIONS.................................................................................. 15

A.    Ally Financial Creates Residential Capital in 2004 To Expand Its Mortgage
      Business .................................................................................................. 15

B.    Residential Capital Was Designed to be Separate from Ally Financial for the
      Purpose of Ensuring Higher Credit Ratings and Lower Borrowing Costs for the
      Mortgage Business.................................................................................. 16

C.    Residential Capital Raises $19 Billion Funds in the Capital Markets Based on Its
      Perceived Separateness From Ally Financial and General Motors ................... 17

D.    The Indenture Contains Key Contractual Provisions Designed to Protect
      Noteholders, And Amendments to the Indenture Did Not Remove Those
      Protections.............................................................................................. 18

E.    Less Than Two Years After Creating Residential Capital in 2004, Ally Financial
      and Residential Capital Abandon Corporate Separateness ............................. 19

2

i.  Ally Financial Takes Control of Old GMAC Bank, Residential Capital's Prized Asset, in Violation of the Operating Agreement (the 2006 Bank Transaction) .................................................................................. 19

ii. In Conjunction with, and Even Beyond the 2006 Bank Transaction, Corporate Separateness Blurs Between Residential Capital and Ally Financial ........................ 24

F.  The Mortgage Market and Financial Sectors Collapse and Residential Capital and Its Subsidiaries Become Hopelessly Insolvent ................................................ 27

G.  The Mortgage and Financial Crises Threaten The Survival Of Ally Financial And Ally Bank .......................................................................................................... 29

H.  Ally Financial Embarks On A Plan Of Self Preservation ................................. 31

I.  As a Prelude to its Corporate Takeover of Ally Bank, Ally Financial Orchestrates a Series of Transactions Designed to Increase the Value of Ally Bank ███████ ███████ .................................................................................................... 35

i.   ████████████████████████████ .................................. 35

ii.  ████████████████████████ ........................................ 36

iii. ██████████████████████ ............................................ 38

iv.  ████████████ ......................................................... 39

v.   ███████████ ........................................................... 39

J.  Ally Financial Orchestrates An Exchange Offer in 2008 To Remove Subsidiary Guarantees and Other Provisions of the Indenture Designed To Protect Noteholders .................................................................................................... 41

K.  Ally Financial Directs Residential Capital to Forgive ████████ in Debt Owed to Residential Capital by its Subsidiaries in Order to Protect Ally Financial's Interests ....................................................................................................... 42

L.  In the First Half of 2008, Ally Financial Received an Option To Take a Material Portion of Residential Capital's Interest in Ally Bank (the 2008 Bank Transaction) ..................................................................................................... 44

M.  In January 2009, Ally Financial Completes its Taking of Ally Bank For Less Than Reasonably Equivalent Value (the 2009 Bank Transaction) ........................... 45

N.    Ally Financial Strips Residential Capital Of Substantially All of Its Assets in Violation of the Indenture ................................................................................................. 46

O.    Ally Financial's Asset Stripping and Control over Residential Capital was Hidden From the Public ................................................................................................................. 50

P.    Ally Financial Forces GMAC Mortgage to Pay the Full Cost of Government Investigations and Settlements ................................................................................... 51
    i.    Debtor Operating Subsidiaries Inequitably Bear the Burden of Settlements With Fannie Mae and Freddie Mac ................................................................ 53
    ii.   The Debtor Operating Subsidiaries Inequitably Bear the Burden of Investigations Conducted by and Settlements With the Federal Reserve, the Federal Deposit Insurance Corporation, and the U.S. Department of Justice ........... 54

Q.    Ally Financial Misuses Its Control to Obtain Broad Releases for RMBS-Related Liability on the Brink of Bankruptcy ................................................................... 56

R.    ███████████████████████████████████████████████
      ███████████████████████████████████ ....................... 58

S.    Ally Financial Receives Significant TARP Funds Intended To Support Residential Capita███████████████████████████
      ████████████████████ ................................................................ 59

T.    Ally Financial Was Residential Capital's Alter Ego At All Relevant Times ................. 60
    i.    Ally Financial and Residential Capital Have Acknowledged That They Operated as a Single Economic Unit ........................................................... 61
    ii.   Residential Capital was Inadequately Capitalized at All Relevant Times ................. 64
    iii.  Residential Capital and Ally Financial Failed to Observe Corporate Separateness ................................................................................................. 65
    iv.   Residential Capital Was a Mere Façade for Ally Financial's Mortgage Business ........................................................................................................... 67
    v.    Residential Capital Did Not Pay Legitimate Dividends ............................................. 68
    vi.   Ally Financial's Domination and Control of Residential Capital Resulted in Substantial Injustice and Unfairness to the Noteholders ........................................... 68

COUNTS ..................................................................................................................................... 69

Plaintiff Wilmington Trust, National Association (the "Trustee"), in its capacity

as indenture trustee for various series of senior unsecured notes with a current outstanding

aggregate principal balance of approximately $1 billion (the "Notes," and the current and former

holders thereof, the "Noteholders") issued by Residential Capital, LLC ("Residential Capital,"

and with its debtor-affiliates in the chapter 11 proceeding styled as *In re Residential Capital LLC,*

*et al.,* Case No. 12-12020 (MG) (Bankr. S.D.N.Y. 2012), the "Debtors"), under that certain

indenture dated as of June 24, 2005 (the "Indenture"), and in its capacity as a representative of

the Residential Capital estate for its complaint against Ally Financial, Inc., formerly known as

GMAC, LLC and General Motors Acceptance Corporation ("Ally Financial"), and others (the

"Complaint"), alleges, upon knowledge with respect to itself and its own acts, and upon

information and belief as to all other matters, the following:

## NATURE OF THE ACTION

1.    By this action, the Trustee sues in its own right to enforce the rights of the

Noteholders under the Indenture and the Operating Agreement (defined below) as well as in its

capacity as a representative of the Residential Capital estate to vindicate the rights of all creditors

of Residential Capital under relevant State and Federal law against Ally Financial and other

defendants who breached their fiduciary duties, or received, caused or benefitted from the

improper transfer of Residential Capital assets.  These transfers, which collectively are worth

several billion dollars, were all made at a time when Residential Capital was insolvent and violated

the rights of Noteholders under the Indenture or the Operating Agreement or the rights of all

creditors of Residential Capital under Federal and State laws against fraudulent transfers.  These

improper transfers were all orchestrated by Ally Financial, which at all relevant times dominated

and controlled Residential Capital and its board, as part of a plan of self-preservation to insulate

5

Ally Financial and its ownership of Ally Bank from the massive residential mortgage-backed securities liability that resulted from Ally Financial's reckless mortgage origination, servicing, and securitization activities.

## THE PARTIES

**A.    The Plaintiffs**

### i.    The Trustee

2.    The Trustee is incorporated in Delaware and has its principal place of business in Wilmington, Delaware. By Instrument of Resignation, Appointment and Acceptance, the Trustee succeeded Deutsche Bank Trust Company Americas as the trustee under the Indenture on May 15, 2012. The Trustee has the right to protect and enforce the rights existing in the Indenture, and it is authorized to bring this action.

### ii.    The Residential Capital Estate

3.    Residential Capital, formerly known as Residential Capital Corporation, is a Delaware limited liability company holding company. It is a wholly owned indirect subsidiary of Ally Financial. Residential Capital is an alter ego of Ally Financial. From 2004 through 2006, Residential Capital was a thrift holding company that owned or was affiliated with a leading real estate finance enterprise that acquired, sold, and serviced residential mortgage loans. Those businesses covered the spectrum of the U.S. residential finance industry, from origination and servicing of mortgage loans through their securitization (whereas all affiliates of Ally Financial that were involved in or connected with any mortgage-related activity are referred to as the "Ally Mortgage Companies"). At all times relevant to this Complaint, Residential Capital's day-to-day business operations were run at the direction of, and controlled by, Ally Financial. Ally Financial exercised control over Residential Capital by placing interlocking officers in key management positions, by dictating sources and uses of funds, and by becoming the sole source of Residential

6

Capital's liquidity. Ally Financial also controlled the management and board of directors of Residential Capital. On or about May 14, 2012, Residential Capital filed for bankruptcy protection and continues to operate as a debtor in possession under title 11 of the United States Code (the "Bankruptcy Code").

**B.    The Defendants**

    **i.    Ally Financial**

        4.    Ally Financial is a Delaware corporation with its principal place of business in Detroit, Michigan. Prior to 2006, Ally Financial was known as General Motors Acceptance Corporation (GMAC), and from 2006 through 2010, it was known as GMAC, LLC. In 2010, the company rebranded itself and changed its name to Ally Financial. Ally Financial is registered with the New York Department of State as a foreign business corporation. Ally Financial is the indirect parent company of the Debtors.

        5.    Ally Financial's primary business consists of automotive financing, residential mortgage financing and servicing, and insurance-related services. Ally Financial is registered as a bank holding company ("BHC") with the United States Federal Reserve (the "Federal Reserve"), which serves as its primary regulator. Ally Financial has not filed for relief under the Bankruptcy Code.

    **ii.    The Chapter 11 Debtors**

        6.    Residential Funding Company LLC ("RFC"), formerly known as Residential Funding Corporation, is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota. RFC is registered with the New York Secretary of State as a foreign limited liability company. RFC is the direct subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC"), a wholly owned direct subsidiary of Residential Capital, and a pass-through entity. At all relevant times to this Complaint, RFC engaged in the business of

7

selling mortgage loans through securitization transactions. RFC sold loans it had originated through its affiliates and acquired from third parties. In addition, RFC, by itself and through its affiliates, acted as a servicer for mortgage loans. On or about May 14, 2012, RFC filed for bankruptcy protection and continues to operate as a debtor in possession under chapter 11 of the Bankruptcy Code.

7.    GMAC Mortgage LLC ("GMAC Mortgage," and together with RFC and all other subsidiaries of Residential Capital that are Debtors, the "Debtor Operating Subsidiaries") was created in the 1980s by Ally Financial. GMAC Mortgage is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania. GMAC Mortgage is registered with the New York Secretary of State as a foreign limited liability company. GMAC Mortgage is a direct wholly owned subsidiary of GMAC Residential Holding Company, LLC ("RHC"), which is a wholly owned subsidiary of Residential Capital, and is its alter ego. At all relevant times, GMAC Mortgage acquired, originated, and serviced residential mortgage loans. GMAC Mortgage also sponsored the creation of residential mortgage backed securities ("RMBS"). GMAC Mortgage was an approved servicer and sponsor of securitizations for several government-sponsored entities including Federal Home Loan Mortgage Corporation ("Freddie Mac"), Federal National Mortgage Association ("Fannie Mae"), and Government National Mortgage Association ("Ginnie Mae," together with Freddie Mac and Fannie Mae, the "GSEs"). On or about May 14, 2012, GMAC Mortgage filed for bankruptcy protection and continues to operate as a debtor in possession under chapter 11 of the Bankruptcy Code.

iii.    **Directors and Officers of Residential Capital, LLC**

8.    Steven M. Abreu has held overlapping roles at Residential Capital and Ally Financial. Abreu has been the President of Residential Capital and a member of Residential

Capital's board of directors since 2010.    He is also a former member of Ally Financial's Management Committee.

9.    Jonathan Ilany has been an independent director for Residential Capital since 2011.

10.    John E. Mack has been an independent director for Residential Capital since 2011.

11.    Thomas Marano has held significant leadership positions at both Residential Capital and Ally Financial from 2009 until shortly before Residential Capital filed for bankruptcy. He has been the Chairman of the Residential Capital board since April 2008, and the CEO of Residential Capital since July 2008.    Marano was also Managing Director of Cerberus Capital Management, L.P. ("Cerberus"), Ally Financial's affiliate, from March 2008 until April 2009, and was appointed as Chief Mortgage Officer for Ally Financial in March 2009.

12.    Edward F. Smith, III has been an independent director for Residential Capital since 2008.

13.    Pamela E. West has been an independent director for Residential Capital since 2009.    She has also served as the Chair of the Audit Committee for the Residential Capital board of directors.

14.    James M. Whitlinger has held joint positions with Ally Financial and Residential Capital.    Whitlinger has been the CFO of Residential Capital and a member of Residential Capital's board of directors since 2011.    During this period, Whitlinger also served as the CFO for the Mortgage Operations of Ally Financial, a position he held until the date Residential Capital filed for chapter 11 relief.

9

15.    James N. Young has held overlapping leadership roles at Residential Capital and Ally Financial since 2007. Young was Residential Capital's CFO from 2007 through 2011. He also served on Residential Capital's board of directors from 2008 through 2011, and on the board's executive committee from 2009 through 2011. Young was also the CFO of Ally Financial Mortgage Operations, between 2007 and 2011. In 2011, Young became Ally Bank's CFO.

## C.    Non-Parties

16.    In March 2005, Ally Financial created a series of holding companies, including Residential Capital, to house its preexisting mortgage operation businesses. GMAC Mortgage Group, LLC ("GMACM Group") is one such holding company and it is the direct parent of Residential Capital and a wholly owned direct subsidiary of Ally Financial. GMACM Group is a pass-through entity and is an alter ego of Ally Financial. GMACM Group has not filed for bankruptcy protection.

17.    IB Finance Holding Company, LLC ("IB Finance") is a Delaware limited liability company and was created by Ally Financial in or around November 2006 in connection with Ally Financial's restructuring of Ally Bank. IB Finance is registered with the Federal Reserve as a BHC. IB Finance is a wholly owned direct subsidiary of Ally Financial and the direct parent of Ally Bank.

18.    Ally Bank is a wholly owned subsidiary of IB Finance and is a chartered bank under the laws of Utah, which uses deposits collected from bank customers to make loans to others. Ally Bank is a nonmember commercial bank that is regulated by the FDIC. Ally Bank is registered with the New York Secretary of State as a foreign business corporation. Ally Bank was founded in 2001 under the name "GMAC Automotive Bank." Through a series of restructuring transactions beginning in November 2006 (described below), Ally Financial rebranded GMAC

Automotive Bank as "GMAC Bank," and ultimately changed its name to "Ally Bank" in 2009. At all times relevant to this Complaint, Ally Bank has provided, among other things, origination and acquisition of residential mortgage loans, retail banking services, capital to third parties for residential mortgage loan origination and sales and automotive financing. Ally Bank is divided into a "mortgage division," which houses the residential mortgage business (the "Mortgage Division"), and an "automotive division," which houses automotive financing functions. IB Finance has issued general classes of units, or interests, that correspond to the Mortgage Division (known as "M" units) and the automotive division (known as "A" units). IB Finance was originally structured such that Residential Capital and its employees had significant influence and control over the management and direction of the Mortgage Division, and Ally Financial had significant influence over the management and direction of the automotive division. Ally Bank has not filed for bankruptcy protection and is not a debtor in possession under the Bankruptcy Code.

19.    Ally Securities LLC, formerly known as Residential Funding Securities, LLC ("Ally Securities"), is a Delaware limited liability company with its principal place of business in New York, New York. Ally Securities is a registered broker-dealer and member of the Financial Industry Regulatory Authority (FINRA). Ally Securities underwrote, marketed, and distributed certain of the mortgage-backed and mortgage-related asset-backed securities. Ally Securities also provided capital market liquidity in mortgage-backed securities and mortgage-related asset-backed securities sold by GMAC Mortgage and RFC to institutional investors and financial institutions in the United States. At all relevant times to this Complaint, Ally Financial controlled Ally Securities.

**D.    Organizational Structure**

20.    The following diagram illustrates the relationship among Ally Financial, Ally Securities, GMACM Group, Residential Capital, GMAC Residential Holdings Co., LLC,

11

GMAC Mortgage, GMAC-RFC Holding Co., LLC, RFC, IB Finance, and Ally Bank at the time

the Debtors filed for protection under chapter 11 of the Bankruptcy Code in May 2012:



## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this proceeding pursuant to [. . .].

22.    Venue is proper pursuant to [. . .].

## OVERVIEW OF ALLY FINANCIAL'S MORTGAGE OPERATIONS IMMEDIATELY BEFORE THE DEBTORS' BANKRUPTCY FILING

23.    Ally Financial, through the various legal entities that it owned and

controlled, including the Ally Mortgage Companies, created a structure designed to profit at each

stage in the lifecycle of a residential mortgage: (i) brokering, originating, and purchasing of loans,

(ii) securitizing loans, (iii) underwriting and syndicating RMBS to investors, and (iv) servicing

mortgage loans.

24.    The cycle began when GMAC Mortgage or Ally Bank brokered and

originated mortgage loans through a consumer lending business that consisted of internet and

telephone-based call center operations and retail networks that had direct contact with third parties. Ally Bank also collateralized lines of credit to mortgage originators other than GMAC Mortgage (known as "warehouse lending"), provided correspondent funding origination whereby Ally Bank purchased closed mortgage loans from third-party originators, and provided wholesale funding origination, whereby Ally Bank originated loans brokered to it by third parties.

25.    After the mortgage had closed and the borrower took possession of the property, the securitization process would begin.  Ally Bank, which had possession of the mortgage, would transfer the mortgage to GMAC Mortgage or RFC in their capacity as "securitization sponsor" or "sponsor."  Ally Bank would retain the legal right to service the loan, which right is known as a Mortgage Servicing Right ("MSR").

26.    GMAC Mortgage or RFC would then transfer the loan as part of a pool of such mortgage loans to another affiliate known as a "depositor" pursuant to a mortgage purchase agreement.  Multiple affiliates of Ally Financial served as depositors, including Residential Asset Mortgage Products, Inc. (RAMP), Residential Asset Securities Corporation (RASC), and Residential Accredit Loans, Inc. (RALI).  GMAC Mortgage and RFC provided the depositors with representations and warranties as to the quality of the mortgages so transferred.  The depositor created a securitization trust and "deposited" the mortgages into that trust.

27.    The securitization trusts generally fell into one of two types:  (i) GSE trusts that were backed by the GSEs, and (ii) private label securitization ("PLS") trusts.  Each trust consisted of a different blend of mortgages loans, but the goal in each case was to create a trust comprised of mortgage loans of similar quality and vintage or, alternatively, of different quality and vintage with separate tranches representing those differences.  GMAC Mortgage, RFC, and the respective depositor-affiliate also provided representation and warranties to the trust as to the

13

quality and characteristics of the loans deposited into the trust. In the event of a breach of the representations and warranties, the trust could force GMAC Mortgage, RFC, or the depositor-affiliate to repurchase mortgage loans that were deposited into the trust ("R&W Exposure"). In the case of GSE-sponsored trusts ███████████████████████████████████

███████████████████████████████████████████████████████████

28.     In order to fund the transfer of loans into the securitization trust, the Ally Mortgage Companies raised money in the capital markets. To do so they caused a registration statement (or shelf registration statement), a prospectus and a prospectus supplement, to be filed with the U.S. Securities and Exchange Commission, which collectively detailed the characteristics of the RMBS, the quality of mortgage loans deposited into the trust and the loan underwriting process. After the necessary regulatory approvals were obtained, the securitization trust issued securities known as RMBS to the depositor. The depositor in turn sold the RMBS to investors through Ally Securities or other underwriters.

29.     After the securitization process was complete, the mortgage loans were serviced by a "mortgage servicer" (sometimes referred to as the "subservicer") who collected monthly principal and interest payments from borrowers, and then the "master servicer" distributed the monies so collected to RMBS investors pursuant to the distribution and priority scheme established by the securitization trust. In addition to their role as securitization sponsor, GMAC Mortgage and RFC were also mortgage and master servicers.

30.     From the time of Residential Capital's formation through mid-2007, Residential Capital's RMBS securitization business was both extremely profitable and successful in accessing the public debt securities markets to raise financing. By contrast, during this same period Ally Financial's automotive lending divisions remained weak. The desire to obtain ever-

increasing RMBS-generated profits to offset losses from Ally Financial's automotive lending operations led the Ally Mortgage Companies, under Ally Financial's direction and control, to disregard critical quality controls in origination in order to secure a larger pipeline of business. This also led the Ally Mortgage Companies to make false representations and warranties as to the quality of mortgages and underwriting standards, and to take inappropriate risks in the securitization and servicing of these assets. For a time, a rising real estate market masked these problems, but when the real estate market began to collapse in the summer of 2007, the consequences of these reckless practices were severe as they exposed the Ally Mortgage Companies to billions of dollars of potential liabilities related to improper mortgage origination, securitization, and servicing.

## FACTUAL ALLEGATIONS

### A.    Ally Financial Creates Residential Capital in 2004 To Expand Its Mortgage Business

31.    Ally Financial has been involved in the residential mortgage business since at least the mid-1980s when it formed GMAC Mortgage to operate various mortgage loan and servicing businesses that it owned. Historically, Ally Financial and the Ally Mortgage Companies were heavily involved in the market for conforming and subprime mortgages. By 2002, Ally Financial was churning out approximately $11.5 billion in subprime RMBS, making it the top-issuer of such products in the United States. By 2004 alone, Ally Financial had more than doubled its output in the subprime market at $26 billion to maintain its position as one of the top five players in the industry.

32.    In 2004, Ally Financial created Residential Capital by consolidating several, but not all, of its then-existing mortgage origination, securitization and servicing businesses under the "Residential Capital" umbrella, including RHC, GMAC Mortgage, and RFC. ▮▮▮▮▮▮▮▮

███████████████████████████████████████████████

████████████████████████████████████

33. After creating Residential Capital in 2004, Ally Financial, through the Ally Mortgage Companies, continued to expand its mortgage business, which involved all aspects of the origination and marketing of residential mortgage-related products. Ally Financial took advantage of the then-existing housing boom and rapidly expanded into the mortgage market as a way to offset losses generated by it struggling automotive business.

**B.    Residential Capital Was Designed to be Separate from Ally Financial for the Purpose of Ensuring Higher Credit Ratings and Lower Borrowing Costs for the Mortgage Business**

34. Ally Financial created Residential Capital as a subsidiary holding company for the purpose of raising billions of dollars at lower borrowing costs than what was then available to Ally Financial. The funds raised by Residential Capital were to be used to expand Ally Financial's mortgage business and to repay pre-existing debt. To obtain lower borrowing costs, from the outset, Ally Financial took steps to ensure the separation of Residential Capital from Ally Financial's struggling automotive business and from General Motors Corporation ("GMC"), Ally Financial's struggling former indirect parent.

35. Maintaining separateness in 2004 involved "ring-fencing" Ally Financial's profitable mortgage business (housed in part under the Residential Capital umbrella) from Ally Financial and GMC through an operating agreement dated June 24, 2005 (the "Operating Agreement"). Ally Financial and Residential Capital were both parties to the Operating Agreement, which ensured corporate separateness by, *inter alia*, (i) barring Residential Capital from guaranteeing Ally Financial's indebtedness and from investing in Ally Financial or its affiliates, (ii) requiring transactions between Residential Capital and Ally Financial, and their respective affiliates, to be "on terms and conditions that are consistent with those that parties at

16

arm's-length would agree to and for fair value," (iii) requiring Residential Capital to have at least

two independent directors at all times, (iv) prohibiting the overlap of personnel between

Residential Capital and Ally Financial, and their respective affiliates, and (v) requiring Residential

Capital to hold itself out to the public as an entity separate from Ally Financial and its affiliates,

including through the use of separate stationery and business forms.

36.    Ally Financial and Residential Capital touted the Operating Agreement's

separateness provisions to allay market concerns that Residential Capital's creditworthiness would

be diluted or dragged down by the weakness of Ally Financial and GMC.  For instance, Ally

Financial stated in its 2005 Annual Report that the Operating Agreement was "entered into … to

create separation between GM[C] and ourselves, on the one hand, and ResCap, on the other …

[and that] [a]s a result of these arrangements, ResCap has obtained investment grade credit ratings

for its unsecured indebtedness that are separate from our ratings and the ratings of GM[C]."

Residential Capital also stated in its 2005 Annual Report that the Operating Agreement was

"intended to create some separation between GM[C] and [Ally Financial], on the one hand, and us,

on the other."    On the strength of this purported separateness, Residential Capital obtained

investment grade credit ratings in 2006 and was able to raise billions of dollars in the capital

markets.  At the same time, Ally Financial and GMC could not obtain a credit ratings above junk

status.

**C.    Residential Capital Raises $19 Billion Funds in the Capital Markets
Based on Its Perceived Separateness From Ally Financial and General
Motors**

37.    On the strength of the Operating Agreement and the perceived separateness

of Residential Capital from Ally Financial and GMC, Residential Capital raised approximately $19

billion in the public markets between 2005 and 2007 on an unsecured basis through the issuance of

the Notes pursuant to the Indenture.  The Notes were issued with different coupon rates, maturity

17

dates, and in different currencies. For each series of Notes, Residential Capital was the issuer and

was primarily liable for the indebtedness; several of the Debtor Operating Subsidiaries, most

notably GMAC Mortgage and RFC, guaranteed the debt. Upon issuance, Residential Capital

distributed the $19 billion in proceeds (i) up the corporate structure to Ally Financial to pay off

pre-existing debt owed by affiliates of Ally Financial before Residential Capital was created, and

(ii) down the corporate structure █████████████████████████████████████████

██████████████████████████████████ to promote the mortgage business.

     38.    Today, some of the Notes that called for the payment of interest have been

repaid according their terms and stated maturities, some were exchanged into Secured Notes

(defined below) pursuant to an exchange offer in 2008 ($2.2 billion of which remain outstanding),

and $1 billion, the amount owed to current holders of the Notes, remains outstanding.

**D.    The Indenture Contains Key Contractual Provisions Designed to
Protect Noteholders, And Amendments to the Indenture Did Not
Remove Those Protections**

     39.    The Indenture contains a number of provisions designed to protect the

Noteholders and to ensure the prompt payment of principal and interest according to the

Indenture's terms. For example, the Indenture requires Residential Capital to maintain its

existence and requires Residential Capital's officers to certify whether Residential Capital is in

default. One key protection for the Noteholders is the prohibition on Residential Capital from

transferring all or substantially all of its assets without a concomitant promise by the transferee to

assume the obligations under the Indenture. Clauses like these are standard in indentures, and they

are often referred to as "all or substantially all clauses." Section 11.01 of the Indenture contains

such a clause:

> [Residential Capital] covenants that it will not merge or consolidate with any other
> Corporation or sell, assign, transfer, lease *or otherwise convey all or substantially all
> of its property or assets to any Person, unless* (i) either [Residential Capital] shall be

18

the continuing Corporation, or the successor Person (if other than [Residential Capital]) shall be a Corporation organized and existing under the laws of the United States of America or a state thereof *and such Corporation shall expressly assume the due and punctual payment of the principal of (and premium, if any), interest, if any, and Additional Amounts, if any, on all the Securities and any Coupons*, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by [Residential Capital] by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such Corporation . . . and [(ii) Residential Capital] or such successor Corporation, as the case may be, shall not, immediately after such merger or consolidation, or such sale or conveyance, be in default in the performance of any such covenant or condition.

(emphasis added) (the "AOSA Clause").

40.    The Indenture has been amended and supplemented three times since 2005. The first and second supplements were largely technical in nature. The third amendment occurred as part of an exchange offer in 2008. The AOSA Clause remains a covenant under the Indenture and violating it gives rise to an action for breach of contract.

E.    **Less Than Two Years After Creating Residential Capital in 2004, Ally Financial and Residential Capital Abandon Corporate Separateness**

41.    After securing a higher credit rating for, and raising billions of dollars through Residential Capital, based on the separateness that was explicitly required by the Operating Agreement, Ally Financial took steps to render that separateness meaningless. Ally Financial and Residential Capital engaged in a series of preferential affiliate transactions that benefitted Ally Financial to Residential Capital's detriment, each in violation of the separateness originally required by the Operating Agreement.

i.    **Ally Financial Takes Control of Old GMAC Bank, Residential Capital's Prized Asset, in Violation of the Operating Agreement (the 2006 Bank Transaction)**

42.    In November 2006, Ally Financial seized control of Residential Capital's crown jewel: its bank. Prior to late 2006, Residential Capital owned a mortgage bank called GMAC Bank ("Old GMAC Bank"), a federally chartered thrift bank that was regulated by the

19

Office of Thrift Supervision ("OTS") with approximately ███████ in deposits.  In its early

years, ████████████████████████████████████████████████████

██████████████████████ Prior to 2006, Ally Financial owned a separate bank called GMAC

Automotive Bank ("Auto Bank"), a Utah industrial bank regulated by the Federal Deposit

Insurance Corporation (the "FDIC") and the Utah Department of Financial Institutions (the

"UDFI," and with the FDIC, the "Ally Bank Regulators").



43.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Ally Financial agreed to restructure both Old GMAC

Bank and Auto Bank in a manner that was fundamentally unfair to Residential Capital, and which

███████████████████████████ violated the Operating Agreement (the "2006 Bank

Transaction").

44.    The 2006 Bank Transaction involved several key steps that were neither at

arm's length nor for fair value, as required by the Operating Agreement.  *First*, Old GMAC Bank

transferred substantially all of its assets and liabilities to Auto Bank.  *Second*, Old GMAC Bank

received $1.161 billion in cash in exchange for the assets and liabilities so transferred.  *Third*, Old

GMAC Bank paid the $1.161 billion received from the sale to Residential Capital in the form of a

dividend.  *Fourth*, Residential Capital gave away its equity in Old GMAC Bank in the form of a

dividend to GM Finance Co. Holdings, Inc., a direct subsidiary of GMC, thereby taking FIM and

Cerberus out of the regulatory purview of OTS. *Fifth*, Old GMAC Bank was renamed as National

Motors Bank FSB. *Sixth*, Ally Financial contributed Auto Bank to a new holding company called

IB Finance. *Seventh*, Residential Capital purchased ownership units in IB Finance (the "Common

M Units") by contributing (i) the $1.161 billion it received from the dividend plus (ii) several

hundred million dollars in the form of capital contributions. The Common M Units represented

non-voting interests in IB Finance, and they gave Residential Capital a tracking interest in the

Mortgage Division of the merged bank structure. *Eighth*, after the transaction closed, the

combined bank was rebranded as "GMAC Bank," which was subsequently named Ally Bank in

2009.

45.    The following diagram illustrates the steps of the 2006 Bank Transaction:



46.     The 2006 Bank Transaction violated the Operating Agreement and eroded corporate separateness.    The scope and extent of these violations were outlined in a contemporaneous memorandum by Residential Capital's general counsel, who blasted the proposed transfer as inconsistent with the Operating Agreement, because, among other reasons, it was clearly not an arm's length transaction. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

47.     The 2006 Bank Transaction violated the Operating Agreement in multiple ways and ran afoul of the prohibition against Residential Capital's investing in affiliates of Ally Financial.  In addition, it contravened the explicit separateness requirements that underpinned the Operating Agreement. ████████████████████████████

████████████████████████████████████████

48.     The 2006 Bank Transaction also breached the requirement that all transactions between Ally Financial and Residential Capital be "on terms and conditions that are consistent with those that parties at arm's length would agree to" and for "fair value." ███

████████████████████████████████████████████████



████████████████ Residential Capital was, in effect, transferring all of Old GMAC Bank's

business, which it owned directly and had the ability to control, to IB Finance, an entity in which

Residential Capital held a minority ownership interest.

49. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ Instead, Residential Capital only received book value and

no compensation for its loss of legal control.

50. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

51. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ Ally

Financial, conscious that the prohibitions in the Operating Agreement violated by the 2006 Bank

Transaction, acted in bad faith and without good conscience.

52.    Ally Financial and Residential Capital never attempted to cure properly any of the violations of the Operating Agreement caused by the 2006 Bank Transaction but simply attempted to amend or waive its provisions, ███████████████████████████

████████████████████████████████████

### ii.    In Conjunction with, and Even Beyond the 2006 Bank Transaction, Corporate Separateness Blurs Between Residential Capital and Ally Financial

53.    In conjunction with the 2006 Bank Transaction, and at Ally Financial's direction, Residential Capital agreed to amend the Operating Agreement (the "Amended Operating Agreement") to permit, among other things, overlapping personnel between Residential Capital and Ally Financial.    After the amendment, key members of the Ally Financial leadership team filled senior positions at Residential Capital.    For example, Eric Feldstein served as both Residential Capital's Chairman and Director until 2008 and Ally Financial's CEO from 2006 to 2008, as well as holding numerous other positions within Ally Financial and the Debtors.    Bruce Paradis served as Residential Capital's CEO from 2004-2007 and as Ally Financial's Executive Vice President from 2006-2007.    James Jones served as Residential Capital CEO from 2007-2008 and Ally Financial Executive Vice President from 2007-2008.    David Walker held numerous positions in the Ally Financial family, including Group Vice President and Treasurer of Global Funding while sitting on Residential Capital's board of directors.    Linda Zukauckas served at Ally Financial in such positions as Controller and Treasurer from 2002-2011 while sitting on Residential Capital's board of directors and its Audit Committee from 2005-2008.    Sanjiv Khattri served as CFO of Ally Financial from 2004 to 2007 and Executive Vice President of Ally Financial from 2004-2008, as well as CFO of Residential Capital from 2007-2008, all while simultaneously serving on the boards of directors of both companies at the same time.    Thomas Marano was later installed ████████████████ as Chairman and CEO of Residential Capital

24

in 2008 while also serving as an officer and Chief Capital Markets Officer at Ally Financial from 2009-2012. Marano was also a Managing Director of Cerberus from 2008-2009.

54.    In addition, incentive structures were implemented to ensure that Residential Capital employees were fully aligned with Ally Financial's interests. Residential Capital's key officers and employees were compensated by Ally Financial or through Ally Financial stock incentive programs. Incentive compensation for certain key Residential Capital employees was designed to align their interests with those of Ally Financial by providing for deferred compensation based on Ally Financial's growth, profitability and success, including appreciation in its common stock, and was subject to approval by Ally Financial. As a result, Residential Capital's senior executives, several of whom were also directors on Residential Capital's board, received a material portion of their compensation in the form of Ally Financial equity.

55.    By the time Residential Capital filed for bankruptcy, senior executives for Residential Capital and its subsidiaries together held approximately $49 million in Ally Financial-linked stock units. The interests of Residential Capital employees were thus wholly aligned with Ally Financial.

56.    ██████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████

57.    Beyond employment and compensation structures, the Operating Agreement also required Residential Capital to use its own stationary, invoices, checks and business forms and to hold itself out to the public as a separate entity. Yet, Residential Capital employees often used "ally.com" e-mail addresses, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████

58.    ███████████████████████████████████████████████████████

███████████████ because key business functions, including Residential Capital's legal, risk, treasury, finance, audit, information technology, and procurement departments were controlled by, housed within, and run by Ally Financial. For example, Ally Financial, and not Residential Capital, audited the loan acquisition, distribution, servicing, and underwriting processes of the mortgage business through Ally Financial's GM Audit Services business unit. Until late April 2012, just weeks before Residential Capital filed for bankruptcy, Ally Financial operated an integrated legal department with all lawyers reporting to Ally Financial's general counsel, Bill Solomon. Outsiders, including federal regulators, treated Ally Financial and Residential Capital as a single entity and Ally Financial in response directed and controlled all litigation and investigations aimed at the Ally Mortgage Companies, including Residential Capital.

59.    The requirement for the appointment of independent directors under the Operating Agreement also proved to be an illusory protection because Ally Financial had the sole authority to select and discharge the independent directors at will. Significantly, during much of the mortgage-crisis period, when Ally Financial was making critical decisions to strip Residential Capital of all its valuable assets and saddle the Debtor Operating Subsidiaries with mortgage

26

origination, securitization and servicing liabilities, the independent director seats were either left vacant or in flux.

**F.      The Mortgage Market and Financial Sectors Collapse and Residential Capital and Its Subsidiaries Become Hopelessly Insolvent**

60.     The profits that Ally Financial had garnered during the heyday of the real estate boom became unsustainable by 2007 when the real estate market declined and problem loans could no longer be refinanced.  During the summer of 2007, the shoddy loans that Ally Financial and its Ally Mortgage Companies had originated, securitized, and serviced began to default, and the poor quality of the securitization pools and Ally Financial's clear misconduct in their creation, became evident.    An avalanche of RMBS-related liability claims began to accumulate. Compounded with the fraudulent and reckless practices of certain other players in the RMBS industry, the consequences were catastrophic and far-reaching.

61.     At the end of 2007 most, if not all, of the major financial institutions were facing billions of dollars of mortgage-related losses: $41 billion in losses at Citigroup; $38 billion at UBS; $32 billion at Merrill Lynch; $15 billion at Bank of America; and $12.6 billion at Morgan Stanley.  By mid-2008, estimated industry write-offs rose to $500 billion, and they continued to rise through the third quarter.  In March 2008, Bear Stearns required government-assisted rescue due to crushing mortgage-related losses, and was sold for a tiny fraction of the market value it held just days earlier.    Fannie Mae and Freddie Mac were both placed under government conservatorship in September 2008.

62.     On September 15, 2008, Lehman Brothers also filed for bankruptcy, due in large part to the collapse of the residential mortgage market, in which Lehman Brothers had also invested on a highly leveraged basis. The fall of Lehman alone caused the Dow to plummet more

than 500 points. Just two days later, AIG required government rescue, ultimately receiving $182 billion in taxpayer money.

63.     Residential Capital's downward spiral during this period was rapid and dramatic. For the first quarter of 2007 alone, Residential Capital lost almost a billion dollars, which it specifically attributed to "increases in nonprime delinquencies, a significant deterioration in the nonprime securitization market, instability in the residential housing market and the inverted interest rate yield curve." This significant loss represented a negative swing of over a billion dollars year-over-year from 2006, when the mortgage business had netted a $201.5 million profit, following a profit of $321.8 million for the same period in 2005. For fiscal year 2008, Residential Capital reported net losses of $5.6 billion.

64.     During the same period, massive liabilities began to emerge from Ally Financial's residential mortgage origination and securitization practices relating to billions of dollars of RMBS issuances over the prior years. As Residential Capital's CFO, Whitlinger, acknowledged, starting in 2007, Residential Capital and the Debtor Operating Subsidiaries "began to receive historically unprecedented large numbers of loan repurchase requests due to alleged breaches of representations and warranties." Neither Ally Financial nor Residential Capital ever publicly disclosed the full extent of its liabilities, but the entire mortgage business faced "substantial and continuing increases" in mortgage-related liabilities from 2007 to 2012. This culminated in Ally Financial's admission in April 2012 that it faced possible RMBS liability over $4 billion beyond its $811 million in reported reserves. Only a few days after making this admission, the Debtor Operating Subsidiaries attempted to settle those very claims for $8.7 billion.

65.     As a result of market forces and RMBS liabilities, Residential Capital was insolvent by at least the end of 2007. This was reflected in its bond prices, which started trading

28

significantly below par in the summer of 2007. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Contemporaneous

independent market advisor reports presented the same grim diagnosis. Separate reports issued by

JPMorgan and HSBC in November 2007 stated that there was a high probability of Residential

Capital defaulting in the near term. A March 3, 2008 report by Citigroup's Corporate Bond

Research Fundamental Credit group estimated recovery values for Noteholders, on the basis of

liquidation instead of a going concern, at 65 cents on the dollar, noting a decline from previous

assessments due to "the ongoing deterioration in asset quality and the difficult market conditions."

66.    Residential Capital's consolidated financial statements failed to account for

massive RMBS liability that its subsidiaries had incurred for mortgages originated and securitized

prior to the crash of the market in 2007. Had those liabilities been properly accounted for,

Residential Capital would have been balance sheet insolvent by at least the end of 2007.

## G.    The Mortgage and Financial Crises Threaten The Survival Of Ally Financial And Ally Bank

67.    As massive losses began to emerge, Ally Financial began to feel the

economic fallout from its fraudulent and reckless mortgage practices. Its securitization business

was materially changed. Ally Financial stated in its 2007 Annual Report that increasing

"[d]elinquencies and losses with respect to ResCap's nonprime mortgage loans," significant write-

downs to Residential Capital's mortgage loan held for sale portfolio, and other related factors

would "contribute to higher delinquency rates, reduce origination volumes, or reduce warehouse

lending volumes at ResCap" and "adversely affect [its] revenues, profitability, and financial

condition." At the same time, the market for subprime origination and for RMBS became

operationally extinct. As early as the first quarter of 2007, Ally Financial noted the decline of the mortgage business in "[its] ability" to securitize loans.

68.    Ally Financial's ability to access credit was also greatly constrained. By the end of 2007, Ally Financial acknowledged that the major ratings agencies had downgraded ratings for both Ally Financial and Residential Capital, and stated that future downgrades would "increase borrowing costs and constrain . . . access to unsecured debt markets." Ally Financial further acknowledged that such downgrades could also affect its existing financing arrangements with a material adverse effect on its operations and financial condition. As anticipated, loan delinquencies and related losses continued to mount, and Residential Capital and Ally Financial were subjected to further credit downgrades. Ally Financial reported in its 2008 Annual Report that its credit ratings were substantially below investment grade, which negatively impacted its access to liquidity and increased borrowing costs in the unsecured market. While Ally Financial had been able to use Residential Capital to raise over $19 billion between 2005 and 2007, Residential Capital's ability to access funding in the capital markets on behalf of Ally Financial ceased after June 2007. Residential Capital stated in its 2008 Annual Report that access to capital markets was restricted, both domestically and internationally, and it impacted the renewal of certain facilities and the cost of borrowing.

69.    In addition, although the full extent of RMBS liabilities was not publicly disclosed, such liabilities began to surface in 2007 and were recognized as a serious threat to Ally Financial as well as to Residential Capital. Ally Financial, through its domination and control over Residential Capital and the Debtor Operating Subsidiaries, as well as other non-Debtor Ally Mortgage Companies, had played a major role in the mortgage origination, securitization and servicing process, and therefore retained significant exposure for these liabilities.

70.    By 2008, the losses and liabilities generated by the RMBS securitization business threatened to collapse the Ally Financial enterprise.  In September 2008, the New York Times reported that "GMAC is trimming mortgage operations after seven consecutive losing quarters at its Residential Capital business. . . . [GMAC] has amassed $5.4 billion in losses in the last year as the mortgage market crumbled and home foreclosures rose to a record."  The New York Times noted elsewhere that losses at Residential Capital amounted to "$7.2 billion in seven straight unprofitable quarters."  The New York Times also reported that Ally Financial's reorganization plans were drastic: "GMAC, in which Cerberus holds a 51 percent stake, said it was trying to stanch the bleeding from a business that was supposed to be immune to the ups and downs of the car industry: home mortgage lending. GMAC and its home loan unit, Residential Capital, announced that they would dismiss 5,000 employees, or 60 percent of the unit's staff, and close all 200 of its retail mortgage branches."  Ally Financial reduced origination and securitization activities in the subprime market, and by October 2008, the Debtor Operating Subsidiaries had ceased sponsoring such RMBS securitizations entirely.  Ally Financial took drastic steps to reorganize its mortgage business, including "liquidat[ing] certain [Residential Capital] assets [ ] to reduce its funding needs" and "investigating various strategic alternatives related to all aspects of [Residential Capital's] business, including extensions and replacements of existing secured borrowing facilities, and establishing additional sources of secured funding for [Residential Capital's] operations."

**H.    Ally Financial Embarks On A Plan Of Self Preservation**

71.    In the wake of the financial crisis, Ally Financial realized that, although it wanted to untangle itself from Residential Capital, it could not survive the separation. ▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

███████████████████████████████████████████Ally

Financial's strong interest in keeping Residential Capital out of bankruptcy prior to 2012 is well-

documented:



- In March 2010, a Congressional Oversight Panel noted that "[Ally Financial] . . . has concerns that a [Residential Capital] bankruptcy could significantly harm it as [Residential Capital's] parent." Ally Financial had considered "the disruption a decision to discontinue support would cause for [Ally Financial's] access to the capital markets. . . . [Ally Financial had then] concluded that a separate Residential Capital bankruptcy was not in [Ally Financial's] best interests."



o 

o

72.    As the markets collapsed in late 2008, Ally Financial was left on

increasingly shaky ground. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Some ████████ in TARP

bailout funds was subsequently paid out to Ally Financial.

73.    ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

•    ████████████████████████████████████████

•    ████████████████████████████████████████

•    ████████████████████████████████████████

•    ████████████████████████████████████████

33

74.    ███████████████████████████

███████████████████████

███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

75.    Rather than simply keeping Residential Capital afloat to forestall bankruptcy, however, Ally Financial embarked on a course to denude Residential Capital of substantially all its assets while saddling Residential Capital and the Debtor Operating Subsidiaries with further liabilities. ████████████████████████████

████████████████████████████████████
██████████████████████████████

76.    As discussed below, Ally Financial's preparatory steps on the road to denudation included (1) amending and modifying key agreements between affiliates that shifted risk to Residential Capital and the Debtor Operating Subsidiaries and away from Ally Bank, (2) orchestrating an exchange offer in June 2008 that required the Noteholders to take a substantial haircut on their investment, or risk being left with securities that carried only an implicit guarantee of repayment by Ally Financial, and (3) positioning Ally Financial to be able to take Residential Capital's remaining interest in Ally Bank for less than reasonably equivalent value.

77.    At the same time, Ally Financial began selling off assets owned by the Debtor Operating Subsidiaries in rapid-sale fashion ████████████████████████ without meaningful fairness opinions or adequate marketing.

34

I.   **As a Prelude to its Corporate Takeover of Ally Bank, Ally Financial Orchestrates a Series of Transactions Designed to Increase the Value of Ally Bank** ███████████████████████████

78.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███

   i.   ████████████████████████████████

79.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

80.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

81. ████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████

82. ████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████

83. ████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████

ii. █████████████████████████████████
██████████████████████

84. ████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████





88.

iii.





92.

93.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

94.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**J.    Ally Financial Orchestrates An Exchange Offer in 2008 To Remove
Subsidiary Guarantees and Other Provisions of the Indenture
Designed To Protect Noteholders**

95.    In the early part of 2008, Ally Financial and Residential Capital made an offer designed to force the Noteholders to accept a deep discount on their investment. They were offered the choice to exchange the Notes for new secured notes at a steep discount and receive a second- or third-priority security interest in most assets owned by Residential Capital and its subsidiaries (the "Secured Notes"), or keep the Notes and lose all affiliate guarantees (collectively, the "Exchange Offer"). As a condition of the Exchange Offer, Residential Capital entered into a new $3.5 billion credit facility with Ally Financial (the "AFI Revolver"), which was senior to all other creditors. The holders of $4 billion in Notes chose not to accept the exchange.

96.    By May 2008, the separation between Ally Financial and Residential Capital, which served as the foundational premise for the Noteholders' investment, had eroded. And the removal of the guarantees further changed the nature of their investment because Residential Capital held no material assets other than its interests in the Mortgage Division of Ally Bank, and its investments in wholly owned direct and indirect subsidiaries, whose assets themselves were now subject to a lien in favor of the AFI Revolver and the Secured Notes. Moreover, significant underwriting deficiencies had essentially wiped out the value of Residential Capital's investment in its subsidiaries, which the offering materials for the Exchange Offer failed to disclose.

41

97.    Ally Financial knew that Residential Capital and its Debtor Operating Subsidiaries were deeply insolvent, and yet even as it was orchestrating the Exchange Offer, Ally Financial embarked on a course to strip Residential Capital's assets and cause it to give up significant debt receivables for no consideration.  Ally Financial understood that the Debtor Operating Subsidiaries were deeply insolvent, and, particularly after the Exchange Offer, that Residential Capital had no ability to independently fund its obligations to the Noteholders, and therefore was fully reliant on Ally Financial's support to maintain an appearance of solvency.  For almost five years, indeed up to the brink of bankruptcy, Ally Financial assumed this responsibility and supported Residential Capital in making payments under the Indenture, while at the same time failing to disclose the full extent of Residential Capital's insolvency.  It did so intentionally in order to (i) keep Residential Capital afloat long enough to obtain TARP funding for itself, (ii) assure that it could retain Ally Bank for itself, (iii) forestall a serious reduction in its own credit ratings, and (iv) saddle Residential Capital with as much liability as possible from its mortgage business and from the Ally Mortgage Companies prior to Residential Capital's bankruptcy filing, knowing all the while that Ally Financial itself should have born responsibility for this liability.  Over time, the Noteholders and other market participants came to reasonably rely on Ally Financial's implicit promise to support Residential Capital's payments on the debt.  Ally Financial was fully aware that its continued support of Residential Capital's payment obligations under the Notes would be relied upon as an implicit promise to honor such obligations and that the Noteholders would be prejudiced by its failure to continue to carry out this implicit promise.

**K.    Ally Financial Directs Residential Capital to Forgive ███████ in Debt Owed to Residential Capital by its Subsidiaries in Order to Protect Ally Financial's Interests**

98.    ███████████████████████████████████████████

███████████████████████████████████████████████

99.

As a result of the Subsidiary Debt Forgiveness, Residential Capital and its creditors substantially lost the ability to make claims on the Debtor Operating Subsidiaries' assets, and received nothing in return.

100.    The Subsidiary Debt Forgiveness was executed at Ally Financial's direction and for its benefit.

43

101. 

**L.    In the First Half of 2008, Ally Financial Received an Option To Take a Material Portion of Residential Capital's Interest in Ally Bank (the 2008 Bank Transaction)**

102.    In 2008, Ally Financial positioned itself to be able to take away Residential Capital's remaining interest in the Mortgage Division of Ally Bank through a complicated issuance of preferred interests in Residential Capital that were exchangeable, at Ally Financial's option, into interests in the Mortgage Division of Ally Bank (the "2008 Bank Transaction").

103.    In early 2008, Ally Financial caused Residential Capital to create a class of non-cumulative, non-participating, perpetual preferred membership units in itself. In March 2008, Ally Financial acquired approximately 607,000 of those preferred membership units in exchange for Notes that Ally Financial had purchased in the open market worth $607 million at fair value. In June 2008, Ally Financial acquired approximately 199,000 more preferred membership units in exchange for Notes that Ally Financial had purchased on the open market worth $199 million at fair value. Along with the membership interests, Ally Financial obtained an option, exercisable at any time after January 1, 2009, to exchange all of these units into preferred units in IB Finance, the entity that owned Ally Bank, which were senior to Residential Capital's units, the Common M Units, in the Mortgage Division of Ally Bank (the "Preferred M Units"). Ally Financial paid no consideration for this conversion option, nor was consideration required to exercise the option.

44

Upon conversion, the Preferred M Units became senior to the Common M Units, which represented Residential Capital's interest in IB Finance.   Residential Capital did not receive reasonably equivalent value for giving Ally Financial this option.

104.



With no successors in place, Residential Capital was left without the two independent directors required under the Operating Agreement. Ally Financial lacked good conscience and acted in bad faith in consummating the 2008 Bank Transaction because, among other things, its unfair and non-arm's length terms were prohibited by the Operating Agreement.

**M.      In January 2009, Ally Financial Completes its Taking of Ally Bank For Less Than Reasonably Equivalent Value (the 2009 Bank Transaction)**

105.    On January 31 2009, Ally Financial used its domination and control over Residential Capital to take Residential Capital's remaining interest in Ally Bank without providing fair consideration or reasonably equivalent value to Residential Capital.   *First*, Ally Financial exercised its option to convert its preferred units in Residential Capital into Preferred M Units. *Second*, Ally Financial acquired Residential Capital's Common M Units in IB Finance in exchange for Secured Notes that Ally Financial had purchased on the open market for $608.5 million in fair

value (whereas both steps undertaken together comprise the "2009 Bank Transaction"). The 2009

Bank Transaction left Residential Capital with no legal or financial interest in Ally Bank.

106. 

107.    Ally Financial designed the 2009 Bank Transaction to take Residential

Capital's interest in the Mortgage Division away from the reach of Residential Capital's creditors

and to place it safely outside the Residential Capital "umbrella." Ally Financial knew the

precarious position facing Residential Capital at the time of the 2009 Bank Transaction as there

███████████████████████████████████████████████. Ally

Financial was also well aware of the unique value of the Mortgage Division to Ally Financial

because it had been the architect of all the transactions enhancing the value of, ███████████

Ally Bank. Ally Financial acted in bad faith and in the absence of good conscience by pursuing

the 2009 Bank Transaction because it knew that Residential Capital was insolvent and that the

transactions were for less than fair market value and therefore in violation of the Operating

Agreement.

**N.    Ally Financial Strips Residential Capital Of Substantially All of Its
Assets in Violation of the Indenture**

102. 

103.

104.    The stripping of Residential Capital's interest in the Mortgage Division of Ally Bank and the AOSA Clause Debt Forgiveness were contemporaneous actions, both taken at Ally Financial's direction, as part of a unified plan to preserve and insulate Ally Financial and Ally Bank from the consequences of the RMBS crisis that Ally Financial had created.  These actions were inherently interdependent, since, due to the integrated nature of its mortgage business,  Ally Financial knew it could not continue to retain and extract value from Ally Bank if

47

██████████████████████████████████████████████████████

████████████████

105.    ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Ally Financial played a direct and controlling role in causing Residential Capital to transfer the

Mortgage Division of Ally Bank.  ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ These Ally Financial-driven transactions, which were neither fair nor on arm's

length terms, were contrary to the promise Ally Financial made in the Operating Agreement, and

were improper means of promoting Ally Financial's interests.  These transactions were not taken

for the preservation of Residential Capital, but rather were undertaken to benefit Ally Financial at

Residential Capital's expense at a time when Ally Financial knew that the companies' respective

interests in these transactions were diametrically opposed.  Ally Financial's actions were therefore

unjustified.

106.    The results of Ally Financial's asset-stripping were highly detrimental to the

Noteholders.  Residential Capital's interest in Ally Bank was always viewed by the market as a

critical asset because it was perceived as a source of growth and comprised a significant portion of

the balance sheet.  The Mortgage Division played a central role in the operation of Residential

Capital by providing a source of steady and readily available credit, revenue, and warehouse

lending, as well as an origination pipeline to the Debtor Operating Subsidiaries.  ████████

██████████████████████████████████████████████████████

48

██████████████████████, Residential Capital's ownership of the Mortgage Division of Ally Bank functioned to offset its increased risk and loss of equity value in the Debtor Operating Subsidiaries.

107.    Ally Financial was well aware of the importance to Residential Capital and its Noteholders of Residential Capital's ownership of Ally Bank. ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

108.    After Ally Financial stripped all of Residential Capital's assets, it became dependent on Ally Financial for survival.  Immediately after Ally Financial took the Mortgage Division, Residential Capital publicly stated that "[t]here continues to be a risk that the Company will not be able to meet its debt service obligations, default on its financial debt covenants due to insufficient capital and/or be in a negative liquidity position in 2009."  In the end, Residential Capital had no valuable assets or means to meet its obligations to the Noteholders, was rendered

49

utterly incapable of effecting an economic recovery on its own, and in some cases, actually owed money to the Debtor Operating Subsidiaries.

## O.    Ally Financial's Asset Stripping and Control over Residential Capital was Hidden From the Public

109.    The extent and significance of Ally Financial's asset stripping program in 2009 and 2010 was hidden from the public, including the Noteholders. The financial statements that were released at the end of 2008 and the third quarter of 2009 identified Residential Capital's equity interest in the Debtor Operating Subsidiaries as comprising a significant portion of Residential Capital's assets. Upon information and belief, that portion may have been as much as 45%.

110.    Prior to April 2012, Ally Financial gave no indication that Residential Capital's equity interest in the Debtor Operating Subsidiaries had been compromised by overwhelming liabilities related to Ally Financial's mortgage business. Yet Ally Financial was well aware of such liabilities. ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

111.    Until April 2012, Ally Financial's own regulatory filings reported that RMBS-related liability was limited to approximately $800 million. Yet in April 2012, Ally

Financial disclosed, for the first time, that its subsidiaries conducting the mortgage business faced a possible exposure of more than $4 billion. Then, only days later in April 2012, Ally Financial negotiated and agreed to settle its R&W Exposure for an $8.7 billion unsecured claim in the bankruptcy cases of the Debtor Operating Subsidiaries. Other claimants in the chapter 11 cases of the Debtor Operating Subsidiaries have also asserted billions of dollars in claims.

112.    Further obscuring Residential Capital's financial health, Residential Capital, under Ally Financial's direction and control, ceased disseminating unconsolidated, or standalone, financial statements beginning in mid-2009. In addition, Residential Capital officers, acting at the direction of Ally Financial, issued false statements in annual certifications that were required under the Indenture, which represented that Residential Capital was in compliance with all covenants and conditions of the Indenture, when, in fact, Residential Capital had breached the AOSA Clause. For the relevant period giving rise to the breach of the AOSA Clause, these certifications were made by James Young, who at the time was not only CFO of Residential Capital, but also CFO of Ally Financial Mortgage Operations.

113.    The lack of such information hindered creditors, investors, and other interested parties from understanding the scope of the Subsidiary Debt Forgiveness, and it was not until Residential Capital's bankruptcy that this information came to light.

**P.    Ally Financial Forces GMAC Mortgage to Pay the Full Cost of Government Investigations and Settlements**

114.    Since 2010, Residential Capital's conflicted directors and officers have consistently acted in the best interests of Ally Financial by approving agreements under which Residential Capital and the Debtor Operating Subsidiaries have been forced to bear the full costs of government investigations and settlements, despite the fact that multiple Ally Mortgage Companies, including Ally Financial, Ally Bank, and other non-Debtor affiliates, were liable for

51

such costs. Throughout this period, because Residential Capital remained hopelessly insolvent, the directors and officers were obligated, instead, to act in the best interests of Residential Capital and its creditors, including the Noteholders. There was no justification or rationale for shifting all these liabilities and costs to Residential Capital and the Debtor Operating Subsidiaries alone.

115.    Prior to Residential Capital's bankruptcy, the Debtor Operating Subsidiaries purchased loans, many of which were originated by Ally Bank, and then sold them to Fannie Mae and Freddie Mac for deposit into securitizations trusts. ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

116.    Under the Operating Agreement, Ally Financial is obligated to fully indemnify Residential Capital and the Debtor Operating Subsidiaries for all liabilities of its affiliates. The Operating Agreement's broad indemnification provision states that Ally Financial "will, to the fullest extent permitted by law, indemnify, defend and hold harmless" Residential Capital and its subsidiaries from and against any "losses, liabilities, penalties, claims, damages, demands, costs and expenses (including reasonable external attorneys' fees, investigation expenses, out-of-pocket expenses, interest and punitive or consequential damages) and other [l]iabilities of any kind ... (a) relat[ing] to, (b) aris[ing] out of or (c) result[ing] principally from ... all businesses and operations (whether or not such businesses or operations are terminated, divested or discontinued) of [Ally Financial and its affiliates]." ███████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

117.    Through various government settlements and penalties, Ally Financial has failed to honor its obligations under the Operating Agreement as well as the Ally Financial Guarantee, and it has evaded all liability by saddling Residential Capital and its creditors with additional costs and burdens.  At the same time, Residential Capital's directors and officers have failed to act in good faith to protect the interests of Residential Capital and its creditors.

i.    **Debtor Operating Subsidiaries Inequitably Bear the Burden of Settlements With Fannie Mae and Freddie Mac**

118.    In March 2010, Freddie Mac, GMAC Mortgage and RFC entered into an agreement pursuant to which Freddie Mac released GMAC Mortgage and RFC from liability for repurchase obligations relating to most mortgages sold to Freddie Mac prior to 2009 in exchange for a one-time settlement payment of $325 million.  On information and belief, Ally Financial and Ally Bank bore liability for the underlying claims, but contributed nothing towards the settlement.

119.    Similarly, in December 2010, Fannie Mae, Residential Capital, GMAC Mortgage, RFC, other Debtor Operating Subsidiaries, and Ally Securities (a non-Debtor entity owned by Ally Financial), entered into a settlement agreement whereby the Debtor Operating Subsidiaries made a one-time $461.5 million payment in exchange for a release for all the settling parties (including Ally Financial and Ally Securities, but not Ally Bank) from liability for mortgage repurchase obligations and other related claims arising from loans sold to Fannie Mae prior to June 30, 2010.  Again, while Ally Financial bore liability and gained significant benefit from this settlement, it contributed nothing.

120.    Even in bankruptcy, Residential Capital and its Debtor Operating Subsidiaries have been required to pay hundreds of millions of dollars in additional Fannie Mae

and Freddie Mac settlement costs without any support from Ally Financial, despite the fact that Ally Financial and its affiliates, including Ally Bank, retain liability for the underlying claims.

121.    On information and belief, Residential Capital has yet to request indemnification payments from Ally Financial for these costs even though it has a right to do so under the Operating Agreement.

122.    While Residential Capital and the Debtor Operating Subsidiaries have borne the full burden of these settlements, Ally Financial, the solvent and co-liable parent, and its affiliate, Ally Bank, have benefitted substantially at no cost.  Michael Carpenter (CEO, Ally Financial) stated in a press release following the December 2010 Fannie Mae settlement that the "agreement, along with prior repurchase settlements with Freddie Mac and others . . . has *significantly reduced Ally's risk related to the legacy mortgage business going forward.*" (emphasis added). ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ The directors of Residential Capital had no reasonable basis to approve such settlements, or permit Ally Financial to evade its indemnification obligations, which solely benefitted Ally Financial and burdened Residential Capital and its Debtor Operating Subsidiaries.

ii.    **The Debtor Operating Subsidiaries Inequitably Bear the Burden of Investigations Conducted by and Settlements With the Federal Reserve, the Federal Deposit Insurance Corporation, and the U.S. Department of Justice**

123.    In the period leading up to Residential Capital's bankruptcy filing, Residential Capital's conflicted officers and directors continued to put Ally Financial's interests ahead of Residential Capital's by permitting Ally Financial to impose the full costs of various government settlements and investigations on Residential Capital and the Debtor Operating

Subsidiaries, even though Ally Financial retained significant liability. These payment obligations arose out of findings by the Federal Reserve, the FDIC, and the United States Department of Justice ("DOJ") along with the attorneys general of forty-nine states, that Ally Financial's mortgage business, including Ally Bank and several Debtor Operating Subsidiaries, had engaged in, among other things, unfair, deceptive and unlawful loan origination, servicing, modification and loss mitigation processes, as well as wrongful conduct related to foreclosures.

124.   On April 13, 2011, Ally Financial, Ally Bank, Residential Capital and GMAC Mortgage entered into a consent order with the Federal Reserve and FDIC (the "FRB Consent Order"). The FRB Consent Order found that all parties, including Ally Financial and Ally Bank, were responsible for improper servicing and foreclosure practices. On February 9, 2012, Ally Financial, Residential Capital, GMAC Mortgage and RFC entered into a preliminary agreement with the DOJ and forty-nine states' attorneys general addressing the government's findings of widespread mortgage-related misconduct. In conjunction with this preliminary agreement, the Federal Reserve imposed a $207 million civil penalty on Ally Financial and its named affiliates (the "FRB Penalty"). Pursuant to a prior agreement, the FRB Penalty would be reduced in accordance with payments under the DOJ Consent Judgment (defined below).

125.   On April 4, 2012, the DOJ and attorneys general entered into a consent judgment with Ally Financial, Residential Capital, GMAC Mortgage and RFC, pursuant to which Ally Financial and its named affiliates jointly undertook to (a) provide a direct payment of approximately $110 million to fund federal and state relief efforts for mortgage borrowers and (b) provide at least $200 million in consumer relief efforts ("the DOJ Consent Judgment"). Despite the fact that Residential Capital, GMAC Mortgage and RFC were hopelessly insolvent and on the verge of bankruptcy, and that Ally Financial and Ally Bank were named as liable parties under the

55

FRB Consent Order, FRB Penalty and DOJ Consent Judgment, Residential Capital's conflicted

directors ultimately authorized a letter agreement, dated January 30, 2012, pursuant to which the

Debtor entities agreed to assume all liabilities and reimburse Ally Financial and Ally Bank for any

costs incurred as a result of these government settlements. █████████████████████

████████████████████████████████████████████████████

████████████████

By forcing Residential Capital and the Debtor Operating Subsidiaries to take on Ally Financial's

and Ally Bank's liability, on information and belief, this letter agreement cost creditors over $200

million. Residential Capital has already paid out $110 million toward the DOJ Consent Judgment,

and Ally Bank has demanded approximately $100 million in accrued indemnification payments for

related costs, with an unknown amount to be accounted for in the future. Residential Capital's

conflicted directors and officers had no rational basis for approving this letter agreement or

otherwise permitting Ally Financial and Ally Bank to evade their obligations under the government

settlements at Residential Capital's expense. Their decision to consistently do so shows their

misplaced loyalty to Ally Financial at the expense of Residential Capital and its creditors.

**Q.    Ally Financial Misuses Its Control to Obtain Broad Releases for
RMBS-Related Liability on the Brink of Bankruptcy**

126.    On the brink of bankruptcy, Residential Capital's conflicted directors and

officers continued to disregard the interests of Residential Capital and its creditors by ratifying

Ally Financial-orchestrated agreements that attempted to shield Ally Financial from RMBS

liability at the expense of Residential Capital and its creditors. In May 2012, days before the bankruptcy filing, Ally Financial caused Residential Capital to enter into a plan support agreement, pursuant to which, in exchange for a $750 million cash contribution from Ally Financial, Residential Capital allowed the Debtor Operating Subsidiaries to take on $8.7 billion in claims related to R&W Exposure, with the understanding that, under a reorganization plan, Ally Financial would receive a full release for all claims that could potentially be brought against Ally Financial, by both the Debtors and third-parties, including the Trustee and the Noteholders. The proposed $8.7 billion RMBS settlement was more than twice the high amount of R&W Exposure that Ally Financial and Residential Capital had publicly disclosed just weeks earlier.

127.    In approving the RMBS settlement and plan support agreement, Residential Capital's officers and directors acted in conscious disregard of their duties to Residential Capital and its creditors. For example, the board voted to approve the RMBS settlement on less than an hour's notice based on misleading and inaccurate information, with no advice as to what the Debtors' respective RMBS liabilities would likely be had they actually been litigated, and with no credible explanation as to why a portion of these claims should be settled for over double the amount previously estimated. The only independent director who attended the meeting, Mack, testified that the board failed to consider the unique legal claims of Residential Capital's creditors, while other directors testified that they saw their role as acting in the best interests of all Debtors, and therefore failed to recognize or address overt conflicts of interests between the various Debtors and their creditors. Mack further testified that he was unaware that Ally Financial had driven the settlement negotiations, and that, in agreeing to release claims against Ally Financial for a $750 million contribution, the directors were simply seeking a "headline number" that would appear "credible" to outsiders, ███████████████████████████████████

████████████████████████████████ Through such actions, the board failed to consider the merits of the claims being released or the fairness of such a settlement from the perspective of Residential Capital or its creditors, including the Trustee and the Noteholders.

128.   In August 2012, Residential Capital's officers also breached their duties to Residential Capital and its creditors by removing from the RMBS settlement agreement a previously held release in favor of Residential Capital, and thereby exposing Residential Capital to billions of dollars in potential liability for no consideration and with little analysis or explanation. This amendment was highly detrimental to Residential Capital and its creditors, but, although at least some of the officers knew about this amendment, it was never formally discussed or approved by the board. The fact that Residential Capital's outside directors obtained, as part of the July 2012 amendment, a personal release from liability, which had previously only been extended to inside directors, highlights the directors' and officers' conflicted and self-interested conduct and dereliction of duty.



R. ████████████████████████████████

129.   ████████████████████████████████

████████████████████████████████

████

130.   ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████



131.

**S.**    **Ally Financial Receives Significant TARP Funds Intended To Support Residential Capital**

132.    After eliminating Residential Capital's interest in the Mortgage Division and taking all interests in Ally Bank for itself, Ally Financial placed itself in an optimal position to obtain BHC status and eventually to obtain TARP funds. Although Residential Capital was a significant factor as to why Ally Financial received TARP funds, as a result of having been stripped of its interest in the Mortgage Division by Ally Financial, Residential Capital saw little benefit from TARP.

133.    In 2008 and 2009, Ally Financial received over ███████ in support under TARP. On information and belief, Ally Financial relied on the stress imposed by Residential Capital and the risk it posed to the Ally Financial enterprise to demonstrate the need required to obtain the TARP funds. However, Ally Financial kept the vast majority of TARP funds to build up

the automobile division of Ally Bank and provided very little of this money to the mortgage business.

134.    Ally Financial received three separate TARP installments.  On information and belief, each of these installments, at least in part, was intended to go to Residential Capital.



135.

**T.    Ally Financial Was Residential Capital's Alter Ego At All Relevant Times**

136.    Following the gradual dissolution of corporate separateness between Residential Capital and Ally Financial beginning in 2006, and at all times relevant to the claims asserted herein, Ally Financial was Residential Capital's alter ego.  Ally Financial and Residential Capital operated as a single economic entity, and through its improper exercise of domination and control, Ally Financial intentionally caused substantial harm to the Noteholders by denuding Residential Capital of its assets and rendering Residential Capital unable to meet its obligations

under the Indenture.  Significant injustice and unfairness would result if Ally Financial is permitted to evade alter ego liability under these circumstances.

> i.    **Ally Financial and Residential Capital Have Acknowledged That They Operated as a Single Economic Unit**

137.    Ally Financial and Residential Capital have admitted and confirmed, from the very beginning of Residential Capital's creation, the complete business integration of their companies and Ally Financial's control over the Mortgage Companies.  For example, Residential Capital articulated in its July 2005 Registration Statement that "[Ally Financial] control[s] all fundamental matters affecting [Residential Capital] . . . [Ally Financial] indirectly owns all of [Residential Capital's] outstanding common stock and has the power to elect and remove all of [Residential Capital's] directors, including the two independent directors ... [Ally Financial] is also able to approve or reject any action requiring the approval of [] stockholders, including the adoption of amendments to our certificate of incorporation and approvals of mergers or sales of all or substantially all of [Residential Capital's interests] . . . ."

138.    Representatives of Residential Capital and Ally Financial have consistently stated that Ally Financial controls Residential Capital.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

139. 

140.    Critically, Ally Financial and Residential Capital have consistently held themselves out to the public as a single entity.  In November 2010, Marano (CEO and Chairman, Residential Capital), stated to the Subcommittee of the House Financial Services Committee that "[Ally Financial's] mortgage business is conducted through GMAC Mortgage."  And again in April 2011, Ally Financial highlighted to the FRB and FDIC that it "indirectly owns and controls . . . numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC . . . and its direct and indirect subsidiaries."

141.    Ally Financial has consistently characterized the mortgage operations as an integrated business and has made no distinction between which legal entities perform what mortgage-related functions.  For example, Ally Financial stated in its 2005 Annual Report that:

- *We* operate directly and through our subsidiaries and affiliates in which we . . . have equity investments. . . .

- *We* originate, purchase, service, sell and securitize residential and commercial mortgage loans and mortgage related products.

- *We* are a leading real estate finance company with two of *our mortgage segments*, GMAC Residential and GMAC-RFC, providing residential real estate products and services. Net income from the operations of GMAC Residential and GMAC-

RFC together totaled $1,021 million, which accounted for approximately 43% of our net income in 2005.

142.    Similarly, in referring to Residential Capital in its 2007 Annual Report, Ally Financial stated that "*We* utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy." In referring to Residential Capital in its 2008 Annual Report, Ally Financial stated that "*We* are a leading real estate finance company focused primarily on the residential real estate market." In referring to Residential Capital in its 2009 Annual Report, Ally Financial stated that: "*We* engage in the origination, purchase, servicing, sale, and securitization of consumer (i.e., residential) mortgage loans and mortgage-related products."

143.    Even in Residential Capital's chapter 11 proceedings, Residential Capital and the Debtor Operating Subsidiaries have repeatedly emphasized the integrated nature of Ally Financial's and Residential Capital's business. For example, in moving for authorization to enter into a shared services agreement with Ally Financial, the Debtors acknowledged that "[t]he mortgage loan origination, servicing and related securitization operations of [Ally Financial] are an integrated business involving the Debtors and Ally Bank" and that "[t]he Debtors' and [Ally Financial's] loan origination and securitization businesses are integrated." In the same filing, Debtors acknowledged the difficulty of trying to separate Ally Financial from their mortgage business operations: "Given the integrated nature of the Debtors' and Ally Financial's businesses, the continuation of these services pursuant to the Agreement is both warranted and absolutely necessary to avoid any disruption to the Debtors' day-to-day operations."

144.    Because of the actual and acknowledged integration between Ally Financial and Residential Capital, it is not surprising that the market perceived the two companies as single economic enterprise, and often failed to recognize corporate titles and distinctions among key Ally Financial and Residential Capital executives. ███████████████████████████

63



145.    Market participants and the media at large also understood that Ally Financial had the power to decide whether and when to "put" its "mortgage unit," Residential Capital, into bankruptcy. And, when Residential Capital filed for bankruptcy, major media outlets referred to Residential Capital as Ally Financial's "mortgage arm" or "mortgage unit."

146.    In short, over several years, Residential Capital and Ally Financial have operated and consistently held themselves out as a single economic entity, and the public has come to understandably rely on and perceived them as one unit.

ii.    **Residential Capital was Inadequately Capitalized at All Relevant Times**

147.    Residential Capital was inadequately capitalized from at least the end of 2007 through its bankruptcy filing. Taking into account R&W Exposure at the Debtor Operating Subsidiaries when they accrued, Residential Capital's equity in its subsidiaries was worthless, and Residential Capital was insolvent by the end of 2007 and remained so at all relevant times. ■

148.    After 2007, Ally Financial also took additional affirmative steps to denude Residential Capital and diminish its ability to ever regain viability as a going concern. As noted,

Ally Financial stripped Residential Capital of its interest in the Mortgage Division of Ally Bank, and forced it to engage in the Subsidiary Debt Forgiveness transactions for no consideration, such that, by 2010, Residential Capital was an entity without any material assets. As Residential Capital has acknowledged in its bankruptcy filings, since at least 2010, Residential Capital's "only assets are its ownership interests in its subsidiaries," which were worthless at all relevant times.

### iii.    Residential Capital and Ally Financial Failed to Observe Corporate Separateness

149.    Residential Capital undermined corporate formalities by disregarding them, and in practice, where purportedly followed, Residential Capital and Ally Financial functioned as a unified business under Ally Financial's control.

150.    *First*, Residential Capital ostensibly maintained an independent board and management team, but in reality, its directors and officers were beholden to Ally Financial and did not act in an independent manner. For example, after the Amended Operating Agreement eliminated the prohibition against directors and officers holding positions at Ally Financial and Residential Capital, Ally Financial filled Residential Capital director and officer positions with its own personnel who received a significant part of their compensation in the form of Ally Financial equity. Ally Financial also retained the power to elect and remove all independent directors at its sole discretion for any reason it chose.

151.    Significantly, during much of the mortgage-crisis period, when Ally Financial was making critical decisions to strip Residential Capital of all its valuable assets and saddle the Debtor Operating Subsidiaries with R&W Exposure and related risk and liabilities, the independent director seats were either vacant or in a state of flux. ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████



152.    As a result, at the time of the Exchange Offer, both independent director positions were allowed to remain vacant so there was no independent check on Ally Financial's actions.  Likewise, in June 2008, when Ally Financial acquired additional membership units in Residential Capital as the second step of the 2008 Bank Transaction, one independent director seat remained vacant.  In January 2009, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

153.    ████████████████████████████████

████████████████████████████

- ████████████████████████████████████████

- ████████████████████████████████████████



Marano (Chief Capital Markets Officer, Ally Financial and CEO, Residential Capital) described the Operating Agreement as a "charade of a fig leaf."

### iv.    Residential Capital Was a Mere Façade for Ally Financial's Mortgage Business

155.    Following the collapse of the RMBS securitization market in 2007, Residential Capital no longer could perform the unique capital raising function for which it was created.    Instead, Ally Financial used Residential Capital as a pass-through entity to keep the Debtor Operating Subsidiaries afloat in order to protect Ally Financial's credit rating and to avoid tripping covenants with lenders and GSEs, and to preserve Ally Bank for itself.    Ally Financial also treated Residential Capital as  a personal pocketbook when it took away Residential Capital's

interest in the Mortgage Division of Ally Bank for inadequate consideration. Finally, Ally Financial used Residential Capital and the Debtor Operating Subsidiaries as a dumping ground, causing them to engage in a series of non-market transactions whereby Ally Financial inequitably

███████████████████████████████████████████████████████████

███████████████

v.      **Residential Capital Did Not Pay Legitimate Dividends**

156.    The payment of dividends was restricted by the Operating Agreement and limited to a narrow set of circumstances. Nevertheless, in November 2006, Residential Capital waived these restrictions to declare a dividend to Ally Financial in connection with its conversion to a limited liability company. After Residential Capital became insolvent at the end of 2007, dividends ceased entirely.

vi.     **Ally Financial's Domination and Control of Residential Capital Resulted in Substantial Injustice and Unfairness to the Noteholders**

157.    The Noteholders have suffered substantial harm as a result of Ally Financial's misuse of the corporate form. Through a series of improper transactions, Ally Financial caused Residential Capital to violate its contractual obligations to the Noteholders by (i) transferring substantially all of its assets and (ii) rendering itself unable to meet its payment obligations under the Indenture. Ally Financial used its domination and control over Residential Capital to carry out these transactions at a time when Residential Capital was insolvent in order to strengthen itself at the Noteholders' expense, and to insulate itself from the mortgage fallout that Ally Financial itself had created.

158.    Although Ally Financial made capital contributions to Residential Capital and the Debtor Operating Subsidiaries, these contributions failed to benefit Residential Capital. Rather these contributions were narrowly tailored by Ally Financial to maximize its own value

68

while devaluing Residential Capital, to minimize its mortgage-related liability while increasing Residential Capital's mortgage-related liability, and to control the timing of Residential Capital's bankruptcy. The resulting injustice and unfairness to the Noteholders is clear. Ally Financial is liable as Residential Capital's alter ego for breaches of the Indenture.

COUNTS

FIRST CAUSE OF ACTION

(Breach of Contract – All or Substantially All Assets Provision and Alter Ego)

(Against Ally Financial)

159.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 158 above.

160.    The Indenture is a valid and binding agreement between the Trustee and Residential Capital.

161.    Residential Capital's promise to perform its obligations under the Indenture was made for valuable consideration in the form of no less than $1 billion in purchases of the Notes.

162.    The Trustee is not in default under the Indenture.

163.    Residential Capital remains the obligor under the Indenture and the Notes.

164.    The Notes remain outstanding.

165.    The Indenture is governed by New York law.

166.    Section 11.01 of the Indenture, the ASOA Clause, provides that Residential Capital will not transfer "all or substantially all" of its assets unless the transferee of such assets expressly assumes Residential Capital's obligations under the Indenture. Under this section, Residential Capital "covenants that it will not merge or consolidate with any other Corporation or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to

69

any Person," unless the successor entity or transferee "shall expressly assume the due and punctual payment of the principal of (and premium, if any), interest, if any, and . . . the due and punctual performance and observance of all of the covenants and conditions of this Indenture..."

167.    A breach of this provision gives rise to an actionable default that the Trustee is empowered to enforce on behalf of the Noteholders.

168.    During 2009 and 2010, Residential Capital materially breached its obligations under the AOSA Clause by (i) transferring its interests in the Mortgage Division of Ally Bank to Ally Financial in the 2009 Bank Transaction, and (ii) engaging in the AOSA Clause Debt Forgiveness.    These transactions were interdependent and were effectuated as part of a unified plan, conceived of by Ally Financial in order to benefit itself at the expense of Residential Capital and its creditors.    These assets constituted at least approximately ██ of Residential Capital's assets.

169.    The transfer of these assets resulted in the loss of Residential Capital's status as a BHC as well as its potential direct access to TARP funds.    Coupled with the fact that Residential Capital's equity in the Debtor Operating Subsidiaries was worthless, it also left Residential Capital with no material operating assets and, without the support of Ally Financial, incapable of operating as a going concern.    Accordingly, these dispositions resulted in a fundamental change in the nature of Residential Capital's business.

170.    The 2009 Bank Transaction and the AOSA Clause Debt Forgiveness were not transactions done in the ordinary course of business, were completed without the consent of the Trustee or the Noteholders and without Ally Financial or any other entity expressly assuming Residential Capital's obligations under the AOSA Clause, and were intended to insulate Ally Financial and Ally Bank from the RMBS crisis that Ally Financial created.

70

171.    Neither the 2009 Bank Transaction nor the AOSA Clause Debt Forgiveness was undertaken in the ordinary course of Residential Capital's business.

172.    The Trustee and the Noteholders suffered substantial damages and unique injury as a result of Residential Capital's breach of section 11.01, including the nonpayment of interest and principal outstanding on the Notes and the absence of any material assets to satisfy Residential Capital's obligations under the Indenture.

173.    Ally Financial is liable as Residential Capital's alter ego, as a matter of law, for Residential Capital's breach of section 11.01 of the Indenture.

174.    Ally Financial is equitably estopped from disclaiming liability under the Indenture because it caused the transfer of all or substantially all of Residential Capital's assets to itself or for its benefit and to the detriment of the Trustee and the Noteholders, and because Ally Financial subsequently implicitly promised to support Residential Capital's payments under the Notes on which the market and the Noteholders relied to the detriment of the Noteholders.

<u>SECOND CAUSE OF ACTION</u>

**(Successor Liability)**

**(Against Ally Financial)**

175.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 174 above.

176.    Having caused the transfer of all or substantially all of Residential Capital's assets to itself or for its benefit in the AOSA Clause Debt Forgiveness and 2009 Bank Transaction, Ally Financial, as a successor to Residential Capital under the Indenture, is liable for all damages suffered by the Trustee and the Noteholders as a result of Residential Capital's breach of the AOSA Clause.

71

177.    Residential Capital and its subsidiaries were insolvent by at least 2008, and thus without Ally Financial's continued support, Residential Capital would have been unable to continue making principal and interest payments on the Notes.

178.    The AOSA Clause Debt Forgiveness and the 2009 Bank Transaction rendered Residential Capital a mere shell entity incapable of operating as a going concern or effecting a financial recovery that would enable it to make payments on the Notes without the support of Ally Financial.

179.    After stripping Residential Capital of all or substantially all of its assets, Ally Financial, for its own purposes, supported Residential Capital's payments on the Notes for five years prior to Residential Capital's bankruptcy filing.

180.    The AOSA Clause Debt Forgiveness and the 2009 Bank Transaction were fraudulent as to the Noteholders and the Trustee because they were undertaken intentionally and with the knowledge that they would render Residential Capital incapable of meeting its obligations under the Indenture.

181.    Ally Financial intended to defraud the Trustee and the Noteholders in these transactions.

182.    Ally Financial was fully aware that its continued support of Residential Capital's payment obligations under the Notes would be relied upon by the market and the Noteholders as an implicit assumption of such obligations, and that the Noteholders would be prejudiced by its failure to continue to carry out this implicit assumption of the debt.

## THIRD CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing and Alter Ego)

### (Against Ally Financial)

72

183.     The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 182 above.

184.     The Indenture is a valid and binding agreement between the Trustee and Residential Capital.

185.     Residential Capital's promise to perform its obligations under the Indenture was made for valuable consideration in the form of approximately $1 billion in purchases of the Notes.

186.     The Trustee is not in default under the Indenture.

187.     Residential Capital remains the obligor under the Indenture and the Notes.

188.     The Notes remain outstanding.

189.     The Indenture is governed by New York law.

190.     New York law implies in every contract the covenant of good faith and fair dealing.

191.



192.     These actions deprived the Noteholders of their right to receive the benefits they bargained for under the Indenture in breach of the covenant of good faith and fair dealing. As detailed above, their combined effect was to destroy Residential Capital's ability to meet its

obligations under the Indenture, which resulted in substantial damages and unique harm to the Trustee and the Noteholders, including the nonpayment of interest and principal outstanding on the Notes and the absence of any material assets to satisfy Residential Capital's obligations under the Indenture.

193.    Ally Financial is liable as Residential Capital's successor or alter ego, as a matter of law, for this breach of the covenant of good faith and fair dealing because it caused Residential Capital to enter into these one-sided transactions through its domination and control.

194.    Ally Financial is also equitably estopped from disclaiming successor or alter ego liability.

## FOURTH CAUSE OF ACTION

### (Tortious Interference with Contract)

### (Against Ally Financial)

195.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 194 above.

196.    The Indenture is a valid and binding agreement between the Trustee and Residential Capital.

197.    Residential Capital's promise to perform its obligations under the Indenture was made for valuable consideration in the form of approximately $1 billion in purchases of the Notes.

198.    The Trustee is not in default under the Indenture.

199.    Residential Capital remains the obligor under the Indenture and the Notes.

200.    The Notes remain outstanding.

201.    The Indenture is governed by New York law.

74

202.    Ally Financial, as the parent entity of Residential Capital, and as a former holder of Notes issued under the Indenture, has at all times been aware of the terms of the Indenture.

203.    Ally Financial intentionally, maliciously, willfully, improperly, and in bad faith induced, caused, and procured Residential Capital's breach of the AOSA Clause.

204.    Ally Financial intentionally, maliciously, willfully, improperly and in bad faith induced, caused, and procured Residential Capital to transfer the Mortgage Division to Ally Financial through the 2009 Bank Transaction and to engage in the AOSA Clause Debt Forgiveness transactions, all for its own benefit and to the detriment of the Trustee and the Noteholders.

205.    The stripping of these assets resulted from transactions that were not at arm's length or for fair value and were in violation of the Operating Agreement to which Ally Financial is a party.

206.    There can be no justification for Ally Financial's intentional, malicious, willful, improper, and bad faith inducement of Residential Capital's breach of the Indenture because Ally Financial contractually promised not to engage in such transactions and to deal with Residential Capital at "arm's length" under the Operating Agreement.    Additionally, these transactions were fundamentally unfair to Residential Capital and cannot be justified as being in its interests.

207.    The Noteholders and the Trustee suffered substantial pecuniary damages that were caused by Ally Financial's tortious interference with the Indenture.

208.    To the extent applicable, the applicable statute of limitations period for tortious interference has been equitably tolled as a result of Ally Financial's (i) fraudulent concealment through continuing misrepresentations concerning the extent of Residential Capital's

deteriorating financial condition resulting from R&W Exposure, (ii) causing Residential Capital to stop publishing unconsolidated financial statements from mid-2009 onwards, which concealed the Subsidiary Debt Forgiveness transactions, and (iii) continuing to support Residential Capital's payments under the Notes at a time when Residential Capital had no assets and was insolvent. It is also tolled as a result of annual certifications provided to the Trustee that falsely states that Residential Capital was in compliance with all of the conditions and covenants in the Indenture, which includes compliance with the AOSA Clause.   For the relevant period giving rise to the breach of the AOSA Clause, these certifications were made by James Young, who at the time was not only CFO of Residential Capital, but also CFO of Ally Financial mortgage operations.   Young is currently CFO of Ally Bank.

209.   Ally Financial is estopped from asserting any statute of limitations defense because of its unfair and deceptive conduct, including all of the same conduct as described in paragraph 208.

210.   As a result of Ally Financial's concealment, the Noteholders could not have discovered Ally Financial's tortious conduct and interference with the Indenture through the exercise of reasonable diligence until the Subsidiary Debt Forgiveness transactions were made public in the second half of 2012 when Residential Capital's true financial condition, including the extent of its subsidiaries' mortgage-related liabilities, was also revealed.

## FIFTH CAUSE OF ACTION

### (Equitable Subordination – 11 U.S.C. §§ 510(c))

### (Against Ally Financial)

211.   The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 210 above.

212.    All claims held by Ally Financial against Residential Capital (whether asserted by Ally Financial or scheduled by Residential Capital) in Residential Capital's chapter 11 proceedings should be equitably subordinated to the claims of the Noteholders and the Trustee, including, but not limited to, claims arising under the AFI Revolver.

213.    All liens supporting the AFI Revolver, including liens on assets at the Debtor Operating Subsidiaries, should be transferred to the Residential Capital estate pursuant to section 510(c)(2) of the Bankruptcy Code.

214.    Ally Financial's claims should be equitably subordinated to the claims of the Noteholders and the Trustee as a result of its inequitable conduct, which uniquely harmed the Noteholders and the Trustee, by, among other things, (i) causing Residential Capital to breach the Indenture by stripping it of all or substantially all of its assets through its domination and control, (ii) breaching its promise in the Operating Agreement not to engage in material transactions with Residential Capital that were not at arm's length or for fair value, and (iii) causing Residential Capital to engage in the Subsidiary Debt Forgiveness at the same time Ally Financial was obtaining collateral security from Residential Capital for the AFI Revolver.

215.    Ally Financial's inequitable conduct resulted in substantial injuries to the Trustee and the Noteholders, including rendering Residential Capital unable to meet its obligations under the Indenture by stripping Residential Capital of all or substantially all of its material assets.

216.    Equitable subordination of Ally Financial's claims would not be inconsistent with the provisions of the Bankruptcy Code.

## SIXTH CAUSE OF ACTION

**(Constructive Fraudulent Transfer – 2008 and 2009 Bank Transactions – 11 U.S.C. §§ 544 and 550 and Applicable State Fraudulent Transfer Law)**

**(Against Ally Financial)**

77

217.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 216 above.

218.    Residential Capital's transfer to Ally Financial of its interests in Ally Bank in the 2008 and 2009 Bank Transactions constitutes a constructive fraudulent transfer.

219.    Residential Capital transferred to Ally Financial its interests in Ally Bank in the 2008 and 2009 Bank Transactions without receiving reasonably equivalent value or fair consideration from Ally Financial in exchange.

220.    Residential Capital was insolvent at the time of the 2008 and 2009 Bank Transactions.

221.    Following the 2008 and 2009 Bank Transactions, Residential Capital was left with assets and capital that were unreasonably small in relation to such transactions.

222.    Ally Financial was the initial transferee of Residential Capital's interests in Ally Bank in the 2008 and 2009 Bank Transactions.

223.    The 2008 and 2009 Bank Transactions violated the Operating Agreement.

224.    Ally Financial did not act in good faith when it received Residential Capital's interests in Ally Bank in the 2008 and 2009 Bank Transaction because Ally Financial had promised not to engage in any transaction with Residential Capital that would violate the Operating Agreement.

225.    The Trustee is entitled to avoid or set aside the 2008 and 2009 Bank Transactions and recover from Ally Financial the value of the interests transferred in the 2008 and 2009 Bank Transactions.

## SEVENTH CAUSE OF ACTION

**(Intentional Fraudulent Transfer – 2008 and 2009 Bank Transactions – 11 U.S.C. §§ 544 and 550 and Applicable State Fraudulent Transfer Law)**

**(Against Ally Financial)**

226.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 225 above.

227.    Residential Capital's transfer to Ally Financial of its interests in Ally Bank in the 2008 and 2009 Bank Transactions was made with actual intent to hinder, delay, or defraud the Noteholders and the Trustee and may be avoided or set aside as a fraudulent transfer.

228.    Ally Financial was the initial transferee of Residential Capital's interests in Ally Bank in the 2008 and 2009 Bank Transaction.

229.    The 2008 and 2009 Bank Transactions violated the Operating Agreement.

230.    Ally Financial did not act in good faith when it received Residential Capital's interests in Ally Bank in the 2008 and 2009 Bank Transactions because Ally Financial had promised not to engage in any transaction with Residential Capital that would violate the Operating Agreement.

231.    The Trustee is entitled to avoid or set aside the 2008 and 2009 Bank Transactions and recover from Ally Financial the value of the interests transferred in the 2008 and 2009 Bank Transactions.

## EIGHTH CAUSE OF ACTION

**(Constructive Fraudulent Transfer – Subsidiary Debt Forgiveness – 11 U.S.C. §§ 544 and 550 and Applicable State Fraudulent Transfer Law)**

**(Against RFC and GMAC Mortgage)**

232.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 231 above.

233.    ███████████████████████████████████████

████████████████████████████████████████████████

79



## NINTH CAUSE OF ACTION

**(Intentional Fraudulent Transfer – Subsidiary Debt Forgiveness – 11 U.S.C. §§ 544 and 550 and Applicable State Fraudulent Transfer Law)**

**(Against RFC and GMAC Mortgage)**

240.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 239 above.

241. 

242.

243.

## TENTH CAUSE OF ACTION

**(Constructive Fraudulent Transfer – Subsidiary Debt Forgiveness – 11 U.S.C. §§ 544 and 550 and Applicable State Fraudulent Transfer Law)**

**(Against Ally Financial)**

244.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 243 above.

245.    Residential Capital's forgiveness of over ▋▋▋▋ of intercompany debt receivables in the Subsidiary Debt Forgiveness transactions constitutes a constructive fraudulent transfer and may be avoided or set aside.

246.    Residential Capital forgave over ▋▋▋▋ of intercompany debt receivables in the Subsidiary Debt Forgiveness transactions without receiving reasonably equivalent value or fair consideration from Ally Financial or the Debtor Operating Subsidiaries in exchange.

247.   Residential Capital was insolvent at the time of the Subsidiary Debt Forgiveness transactions.

248.   Following the Subsidiary Debt Forgiveness transactions, Residential Capital was left with assets and capital that were unreasonably small in relation to such transactions.

249.   In the Subsidiary Debt Forgiveness transactions, Residential Capital incurred, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as its debts became due.

250.   Ally Financial was the entity for whose benefit the Subsidiary Debt Forgiveness transactions were made.

251.   The Trustee is entitled to avoid or set aside the Subsidiary Debt Forgiveness transactions and recover from Ally Financial the value of the Subsidiary Debt Forgiveness.

## ELEVENTH CAUSE OF ACTION

**(Intentional Fraudulent Transfer – Subsidiary Debt Forgiveness – 11 U.S.C. §§ 544 and 550 and Applicable State Fraudulent Transfer Law)**

**(Against Ally Financial)**

252.   The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 251 above.

253.   Residential Capital's forgiveness of over ██████ of intercompany debt receivables in the Subsidiary Debt Forgiveness transactions was made with actual intent to hinder, delay, or defraud the Noteholders and the Trustee and may be avoided or set aside as a fraudulent transfer.

254.   Ally Financial was the entity for whose benefit the Subsidiary Debt Forgiveness transactions were made.

82

255.    The Trustee is entitled to avoid or set aside the Subsidiary Debt Forgiveness

transactions and recover from Ally Financial the value of the Subsidiary Debt Forgiveness.

## TWELFTH CAUSE OF ACTION

### (Disallowance of Ally Financial's Proofs of Claim and Scheduled Claims – 11 U.S.C. § 502(d))

256.    The Trustee repeats, re-alleges, and incorporates each and every allegation

contained in paragraphs 1 through 255 above.

257.    Ally Financial is an entity from which property is recoverable under section

550(a) of the Bankruptcy Code because, as set forth above, it is liable for (i) the transfer of

Residential Capital's interests in Ally Bank in the 2008 and 2009 Bank Transactions and (ii) the

Subsidiary Debt Forgiveness, as fraudulent transfers (the "Ally Financial Fraudulent Transfers").

258.    Ally Financial has not paid the amount, or turned over such property, for

which it is liable under section 550(a) of the Bankruptcy Code and applicable state fraudulent

transfer law.

259.    Pursuant to section 502(d) of the Bankruptcy Code, all claims held by Ally

Financial against Residential Capital (whether asserted by Ally Financial or scheduled by

Residential Capital) in Residential Capital's chapter 11 proceedings should be disallowed unless

and until Ally Financial repays in full to Residential Capital, pursuant to a judgment or otherwise,

the amount of the Ally Financial Fraudulent Transfers.

## THIRTEENTH CAUSE OF ACTION

### (Disallowance of RFC's and GMAC Mortgage's Respective Proofs of Claim and Scheduled Claims – 11 U.S.C. § 502(d))

260.    The Trustee repeats, re-alleges, and incorporates each and every allegation

contained in paragraphs 1 through 259 above.

83

261.    RFC and GMAC Mortgage are entities from which property is recoverable under section 550(a) of the Bankruptcy Code because, as set forth above, they are respectively liable for fraudulent transfers in connection with ▇▇▇▇▇ of debt forgiveness in the Subsidiary Debt Forgiveness transactions (the "RFC and GMAC Mortgage Fraudulent Transfers").

262.    RFC and GMAC Mortgage have not paid the amounts, or turned over such property, for which they are liable under sections 544 and 550 of the Bankruptcy Code and applicable state fraudulent transfer law.

263.    Pursuant to section 502(d) of the Bankruptcy Code, any claims asserted by RFC and GMAC Mortgage, whether arising before or after the petition date, against Residential Capital (whether asserted by RFC and GMAC Mortgage or scheduled by Residential Capital) in Residential Capital's chapter 11 proceedings should be disallowed unless and until RFC and GMAC Mortgage repay in full to Residential Capital, pursuant to a judgment or otherwise, the amount of the RFC and GMAC Mortgage Fraudulent Transfers.

## FOURTEENTH CAUSE OF ACTION

### (Constructive Trust for the Return of Residential Capital's Former Interests in Ally Bank)

### (Against Ally Financial)

264.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 263 above.

265.    Ally Financial holds Residential Capital's interests in Ally Bank, including the proceeds of any sale of any of its mortgage assets, in constructive trust for the benefit of Residential Capital because Ally Financial took such interests in violation of its promise not to engage in any material transaction with Residential Capital that would violate the Operating Agreement.

84

266.    Ally Financial caused Residential Capital to transfer its interests in Ally

Bank as part of the 2006, 2008, and 2009 Bank Transactions while knowing that these transactions

violated Section 2(b) of the Operating Agreement, which prohibits Residential Capital from

engaging in material transactions with Ally Financial or any of its affiliates that are not on arm's

length terms or for fair value.  Section 2(b) included these protections, in part, to safeguard the

Noteholders, who are express third-party beneficiaries under the Operating Agreement, from

below-market transactions on non-arm's length terms.

267.    The Operating Agreement is a valid and binding between the Residential

Capital, Ally Financial, and GMC and was made for valuable consideration.

268.    Ally Financial and Residential Capital were also in a "confidential

relationship" at the time of the 2006, 2008, and 2009 Bank Transactions by virtue of Ally

Financial's domination and control such that Ally Financial owed an express or implied duty to

Residential Capital not to gain an unfair advantage from such domination and control.  Ally

Financial breached this express or implied duty by abusing its domination and control of

Residential Capital to seize Residential Capital's interests in Ally Bank on non-arm's length terms

and for less than fair value with full knowledge that such transactions were in violation of the

Operating Agreement and at the expense of the Noteholders.

269.    Ally Financial was unjustly enriched in the 2006, 2008, and 2009 Bank

Transactions by seizing Residential Capital's interests in Ally Bank for less than fair value on non-

arm's length terms in material transactions, in violation of the Operating Agreement.

270.    Ally Financial obtained Residential Capital's remaining interests in Ally

Bank through the 2006, 2008, and 2009 Bank Transactions in bad faith, by fraud or

misrepresentation, through undue influence, duress or concealment, or with a lack of good conscience.

271.    Under such circumstances, it would be inequitable and unconscionable for Ally Financial to retain Residential Capital's former interests in Ally Bank, which is specific property that can be traced to Ally Financial's wrongful behavior.

## FIFTEENTH CAUSE OF ACTION

### (Breach of Fiduciary Duties)

**(Against Steven M. Abreu, Jonathan Ilany, John E. Mack, Thomas Marano, Edward F. Smith, III, Pamela E. West, James M. Whitlinger, James N. Young)**

272.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 271 above.

273.    At all times following Residential Capital's insolvency by at least the end of 2007, Residential Capital's directors and officers owed duties to the Residential Capital estate and its creditors.

274.    Residential Capital's directors and officers breached their fiduciary duties including their duties of loyalty, care, and good faith, to the Residential Capital estates and its creditors by acting for the benefit of Ally Financial and contrary to the interests of Residential Capital and its creditors in approving the Subsidiary Debt Forgiveness transactions and in their conflicted conduct with respect to the GSEs and government investigations, penalties, and settlements, and with respect to the settling of other RMBS-related claims.

275.    Through this unjustified and irrational conduct, Residential Capital's directors and officers demonstrated a complete lack of diligence, loyalty, and reason.

276.    The Noteholders suffered substantial damages as a result of these breaches.

## SIXTEENTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duties)

### (Against Ally Financial)

277.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 276 above.

278.    Ally Financial is liable for aiding and abetting the breaches of Residential Capital's directors' and officers' duties of loyalty and care owed to the Noteholders set forth above.

279.    Ally Financial knowingly participated in these breaches.

280.    The Noteholders suffered substantial damages as a result of these breaches.

## SEVENTEENTH CAUSE OF ACTION

### (Indemnification)

### (Against Ally Financial)

281.    The Trustee repeats, re-alleges, and incorporates each and every allegation contained in paragraphs 1 through 280 above.

282.    Ally Financial is liable, as an indemnitor, for losses suffered by Residential Capital and its subsidiaries arising from Ally Financial's and the Ally Mortgage Companies' mortgage business, including, but not limited to, losses relating to government fines, settlements with GSEs, RMBS settlements, and indemnification payments made to Ally Bank.

283.    Under the Operating Agreement, Ally Financial agreed to "indemnify, defend and hold harmless" Residential Capital and its subsidiaries from and against any "losses, liabilities, penalties, claims, damages, demands, costs and expenses (including reasonable external attorneys' fees, investigation expenses, out-of-pocket expenses, interest and punitive or

consequential damages) and other [l]iabilities of any kind" related to, arising from, or resulting

principally from all businesses and operations of Ally Financial and its affiliates.

284.    The Operating Agreement is a valid and binding agreement between

Residential Capital, Ally Financial, and GMC and was made for valuable consideration.

285.    The Operating Agreement is governed by New York law.

286.    The Noteholders are express third-party beneficiaries under the Operating

Agreement.

287.    The Noteholders and the Trustee are not in default under the Operating

Agreement.

## EIGHTEENTH CAUSE OF ACTION

### (Common Law Contribution)

### (Against Ally Financial)

288.    The Trustee repeats, re-alleges, and incorporates each and every allegation

contained in paragraphs 1 through 287 above.

289.    Residential Capital is entitled to contribution from Ally Financial for all or

part of any losses suffered by Residential Capital and its subsidiaries arising from Ally Financial's

and the Ally Mortgage Companies' mortgage business, including, but not limited to, losses relating

to government fines, settlements with GSEs, RMBS settlements, and indemnification payments

made to Ally Bank.

290.    Ally Financial and Residential Capital share common obligations or

burdens for losses and liabilities arising from Ally Financial's mortgage business.

291.    Residential Capital has borne more than its fair share of the liabilities and

losses arising from such obligations or burdens, for which Ally Financial and the Ally Mortgage

Companies were culpable, including payments made by Residential Capital and its subsidiaries to

GSEs, regulators, RMBS investors, and Ally Bank for liabilities arising from Ally Financial's and

the Ally Mortgage Companies' mortgage business, as a result of which Ally Financial has gained

an unfair advantage.

### NINTEENTH CAUSE OF ACTION

**(Constructive Trust for Property Belonging to Residential Capital)**

**(Against Ally Financial)**

292.    The Trustee repeats, re-alleges, and incorporates each and every allegation

contained in paragraphs 1 through 291 above.

293.



(on non-arm's length terms and for less than fair value in violation of the

Operating Agreement) are held in constructive trust by Ally Financial for the benefit of Residential

Capital.

294.    Ally Financial and Residential Capital were in a "confidential relationship"

at all relevant times by virtue of Ally Financial's domination and control such that Ally Financial

owed an express or implied duty to Residential Capital not to gain an unfair advantage from such

domination and control.  Ally Financial breached this express or implied duty by abusing its

domination and control of Residential Capital to seize property, including but not limited to

and other assets for which Ally Financial

promised, either explicitly or implicitly, to hold for the benefit of Residential Capital.

89

295.    Ally Financial was unjustly enriched in these transactions.

296.    Ally Financial obtained such property in bad faith, by fraud or misrepresentation, through undue influence, duress or concealment, or with a lack of good conscience.

297.    Under such circumstances, it would be inequitable and unconscionable for Ally Financial to retain such property, which is specific property that can be traced to Ally Financial's wrongful behavior.

## TWENTIETH CAUSE OF ACTION

**(Declaratory Relief That Certain Intercompany Payables Do Not Constitute Residential Capital Debt)**

**(Against RFC)**



███████████████████████████████████████████████

████████████████████████████████

### **RELIEF DEMANDED**

WHEREFORE, plaintiff Wilmington Trust demands judgment against Ally Financial as follows:

303.    Under the First Cause of Action, (i) ordering compensatory damages for the Noteholders' and Trustee's monetary losses, including any diminution in value of the Notes as well as lost principal and interest payments thereon, but in no event less than $1 billion, or (ii) declaring that Ally Financial is the successor obligor to Residential Capital under the Indenture responsible for Residential Capital's obligations under the Indenture;

304.    Under the Second Cause of Action, (i) ordering compensatory damages for the Noteholders' and Trustee's monetary losses, including any diminution in value of the Notes as well as lost principal and interest payments thereon, but in no event less than $1 billion, or (ii) declaring that Ally Financial is the successor obligor to Residential Capital under the Indenture responsible for Residential Capital's obligations under the Indenture;

305.    Under the Third and Fourth Causes of Action, ordering compensatory damages for the Noteholders' and Trustee's monetary losses, including any diminution in value of the Notes as well as lost principal and interest payments thereon, but in no event less than $1 billion;

306.    Under the Fifth Cause of Action, ordering that (i) all claims held by Ally Financial against Residential Capital (whether asserted by Ally Financial or scheduled by Residential Capital) in Residential Capital's chapter 11 proceedings shall be equitably subordinated to the claims of the Noteholders and the Trustee, including, but not limited to, claims

arising under the AFI Revolver, and (ii) all liens supporting the AFI Revolver shall be transferred to the Residential Capital estate pursuant to section 510(c)(2) of the Bankruptcy Code;

307.   Under the Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Causes of Action, an order avoiding or setting aside of the transfers described therein;

308.   Under the Sixth, Seventh, Tenth and Eleventh Causes of Action, ordering Ally Financial to pay to Residential Capital's estate the value of the transfers described therein, in an amount to be determined at trial;

309.   Under the Eighth and Ninth Causes of Action, ordering RFC and GMAC Mortgage to pay to Residential Capital's estate the value of the transfers described therein, in an amount to be determined at trial, but in no event less than ████████████████████ ████████████ ;

310.   Under the Twelfth Cause of Action, an order disallowing all claims held by Ally Financial against Residential Capital (whether asserted by Ally Financial or scheduled by Residential Capital) in Residential Capital's chapter 11 proceedings until the Ally Financial Fraudulent Transfers are repaid to Residential Capital's estate pursuant to 11 U.S.C. § 502(d);

311.   Under the Thirteenth Cause of Action, an order disallowing all claims held by RFC and GMAC Mortgage against Residential Capital (whether asserted by RFC or GMAC Mortgage or scheduled by Residential Capital) in Residential Capital's chapter 11 proceedings until the RFC and GMAC Mortgage Fraudulent Transfers are repaid to Residential Capital's estate pursuant to 11 U.S.C. § 502(d);

312.   Under the Fourteenth Cause of Action, (i) declaring that Ally Financial holds Residential Capital's former interests in Ally Bank in constructive trust for the benefit of Residential Capital, (ii) declaring that the 2008 and 2009 Bank Transactions are rescinded, and (iii)

ordering Ally Financial to transfer to Residential Capital's estate the interests Residential Capital

transferred to it in the 2008 and 2009 Bank Transactions;

313.    Under the Fifteenth Cause of Action, ordering Residential Capital's

directors jointly and severally liable to pay to Residential Capital's estate compensatory damages

for the directors' breach of their fiduciary duties in an amount to be determined at trial;

314.    Under the Sixteenth Cause of Action, ordering Ally Financial to pay to

Residential Capital's estate compensatory damages for Ally Financial's aiding and abetting the

directors' breach of their fiduciary duties in an amount to be determined at trial;

315.    Under the Seventeenth Cause of Action, ordering Ally Financial, as an

indemnitor, to pay to Residential Capital's estate an amount to be determined at trial, but no less

than ████████, for all losses suffered by Residential Capital and its subsidiaries arising from Ally

Financial's and the Ally Mortgage Companies' mortgage business, including, but not limited to,

losses relating to government fines, settlements with GSEs, RMBS settlements, and

indemnification payments made to Ally Bank;

316.    Under the Eighteenth Cause of Action, ordering Ally Financial to pay to

Residential Capital's estate an amount to be determined at trial, but no less than ████████, for all

losses suffered by Residential Capital and its subsidiaries arising from Ally Financial's and the

Ally Mortgage Companies' mortgage business, including, but not limited to, losses relating to

government fines, settlements with GSEs, RMBS settlements, and indemnification payments made

to Ally Bank;

317.    Under the Nineteenth Cause of Action, (i) declaring that Ally Financial

holds property wrongfully seized from Residential Capital, ██████████████████████████

████████████████████ in constructive trust for the benefit of Residential Capital, (ii) declaring

that such transactions are rescinded, and (iii) ordering Ally Financial to transfer to Residential

Capital's estate the property transferred to it in these transactions;

318.    Under the Twentieth Cause of Action, declaring that the Putative RFC

Payables create no legal, valid, or binding payment obligation on the part of Residential Capital.

319.    Attorney's fees and costs;

320.    Prejudgment interest at the maximum legal rate; and

321.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

322.    Wilmington Trust hereby demands a trial by jury on all issues triable by

jury.