## Exhibit 2

Westlaw.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)
**(Cite as: 1991 WL 259036 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re AMES DEPARTMENT STORES, INC., East-
ern Retailers Service Corporation, et al., Debtors.

No. M–47(PKL).
Bankruptcy Nos. 90 B 11233(JAG) to 90 B
11285(JAG).
Nov. 25, 1991.

*MEMORANDUM ORDER*

LEISURE, District Judge:

**\*1** Citibank, N.A. ("Citibank") has moved this
Court on an emergency basis for an order with-
drawing in part the reference of these cases to the
United States Bankruptcy Court for the Southern
District of New York and terminating the exclusiv-
ity periods under 11 U.S.C. § 1121. For the reasons
stated below, Citibank's motion is denied.

*Background*

On April 25, 1990, Ames Department Stores,
Inc. ("Ames Department Stores") and its 52 subsi-
diaries (collectively, the "Ames Group") filed vol-
untary petitions for reorganization under Chapter
11 of the Bankruptcy Code in the Southern District
of New York. The Ames Group continues to oper-
ate its businesses and manage its properties as debt-
ors-in-possession under 11 U.S.C. §§ 1107 and
1108. The Ames Group's bankruptcy cases were re-
ferred to the United States Bankruptcy Court for the
Southern District of New York, pursuant to 28
U.S.C. § 157(a) and a standing Order of this Court
dated July 10, 1984 (Ward, Acting C.J.). The cases
were initially assigned to the Honorable Howard
Buschman; after he resigned from the bench in
early 1991, the cases were reassigned to the Honor-
able James Goodman, a visiting bankruptcy judge
from the District of Maine.

Under 11 U.S.C. § 1121(b), the Ames Group
had the exclusive right to file a plan or plans of re-

organization for 120 days after the filing of the pe-
titions. These exclusivity periods were to expire on
August 23, 1990; the Bankruptcy Court has sub-
sequently granted nine extensions of the exclusivity
periods. The latest extension was granted on
November 13, 1991, and extends the exclusivity
periods until January 10, 1992.

Citibank, as agent for the secured lenders ("the
banks") under a $900 million Credit Agreement
dated October 28, 1988, and as amended, has
moved this Court on an emergency basis for an or-
der withdrawing the reference of these cases to the
Bankruptcy Court with respect to issues concerning
the exclusivity periods, and terminating those ex-
clusivity periods so that Citibank and the banks can
file their own plan of reorganization. Citibank ar-
gues that the Ames Group is moving too slowly in
filing its reorganization plan, and that the banks are
suffering because they cannot file their own reor-
ganization plan during the exclusivity period. Cit-
ibank maintains that with each successive extension
in the exclusivity period, the Ames Group is losing
large sums of money and incurring excessive legal,
investment banking, and other fees, and that by the
time the Ames Group does finally file a plan of re-
organization, the Ames Group's financial situation
will have deteriorated so badly that the banks will
not have any meaningful recovery.

The Ames Group opposes Citibank's motion,
and has been joined in its opposition by the Official
Committee of Unsecured Creditors of Ames De-
partment Stores (the "Unsecured Creditors' Com-
mittee") and the Official Committee of Employees
("Employees' Committee") of Ames Department
Stores. The Ames Group advances a number of ar-
guments in opposition to Citibank's motion: the de-
termination of a debtor's exclusivity period is a fun-
damental "core proceeding" and should be decided
by the Bankruptcy Court; Judge Goodman has been
intimately involved with these complicated cases
and this Court should not interfere with his decision
regarding the propriety of extending the exclusivity

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)
(Cite as: 1991 WL 259036 (S.D.N.Y.))

periods until January 10, 1992; Judge Goodman's most recent order extending the exclusivity periods states that the extension until January 10, 1992 "shall be the final extension of time" in these cases and that "no further extension shall be granted without either a showing of extraordinary cause" or upon written consent of all the parties, thus demonstrating the likelihood that the exclusivity periods will not be further extended beyond January 10, 1992; and withdrawal of the reference and termination of the exclusivity period so that the banks can file their own reorganization plan will have a disruptive effect on Ames Department Stores' all-important Christmas selling season.

*Discussion*

**\*2** These bankruptcy cases involving the Ames Group were referred to the Bankruptcy Court under 28 U.S.C. § 157(a) and a standing order of this Court dated July 10, 1984 (Ward, C.J.). Under 28 U.S.C. § 157(d), "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The burden is thus on Citibank to demonstrate why the Court should withdraw the reference with respect to issues concerning the exclusivity periods under 11 U.S.C. § 1121(b) and issue an order terminating the exclusivity periods.

The Court has discretion in deciding whether to withdraw a reference to the Bankruptcy Court "for cause shown" under 28 U.S.C. § 157(d). *Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.),* 94 B.R. 293, 295 (S.D.N.Y.1988); *Lesser v. A–Z Associates (In re Lion Capital Corp.),* 48 B.R. 329, 333 (S.D.N.Y.1985). Factors for the Court to consider include "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *Holland America Insurance Co. v. Succession of Roy,* 777 F.2d 992, 999 (5th Cir.1985).

Citibank's motion is to withdraw the reference

of these bankruptcy cases to the Bankruptcy Court with respect to issues concerning the Ames Group's exclusivity periods under 11 U.S.C. § 1121(b). Under 28 U.S.C. § 157(b)(2)(A), "core proceedings" in the bankruptcy area include "matters concerning the administration of the estate." The issue of a debtor's exclusivity period and the propriety of any extensions of the period is certainly a "core proceeding," *see, e.g., In re Texaco Inc.,* 76 B.R. 322, 328 (Bankr.S.D.N.Y.1987), and is particularly well suited for determination by the Bankruptcy Court. The Bankruptcy Court has the discretion, under 11 U.S.C. § 1121(d), to extend the debtor's exclusivity period. *See In re McLean Industries, Inc.,* 87 B.R. 830, 833 (Bankr.S.D.N.Y.1987). This Court will not lightly interfere with the Bankruptcy Judge's decision on this issue; in order to prevail on its motion, Citibank must persuade the Court that the Bankruptcy Judge's latest extension of the exclusivity periods to January 10, 1992 was an abuse of his discretion.

Judge Goodman of the Bankruptcy Court has been intimately involved with these bankruptcy cases since the beginning of this year. The decision of whether to extend the exclusivity periods under 11 U.S.C. § 1121(d) involves a careful balancing of competing factors and a consideration of the interests of the many parties involved—including the Ames Group, Citibank and the banks, the Unsecured Creditors' Committee, the Employees' Committee, the Statutory Bondholders' Committee of Ames Department Stores, and the Official Committee of Unsecured Creditors of the Subsidiaries of Ames Department Stores.

**\*3** With each extension of the exclusivity periods that Judge Goodman has granted, he has monitored the Ames Group's progress in putting together a reorganization plan. Although the speed with which the Ames Group is progressing is not satisfactory to Citibank, and the Court certainly understands Citibank's desire to have the proceedings advance more quickly, the Ames Group is nonetheless working toward filing its own reorganization plan.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)
**(Cite as: 1991 WL 259036 (S.D.N.Y.))**

Indeed, during the period from October 11, 1991 to November 14, 1991, a total of 16 meetings took place between the financial advisors working on these cases as well as between the Ames Group and the various creditor groups. *See* Affidavit of John M. Friedman, Jr., Esq. of Dewey Ballantine, counsel for the Unsecured Creditors' Committee, sworn to on November 18, 1991, ¶ 16.

Citibank and the Ames Group have presented sharply differing views of the Ames Group's financial position. Judge Goodman is in a far better position than is this Court to evaluate the Ames Group's financial position as it relates to the appropriate length of the exclusivity periods. Judge Goodman has factored such financial considerations into his decisions to extend the exclusivity periods, and Citibank has not demonstrated that Judge Goodman has acted improperly with respect to these considerations.

The Court cannot conclude that Judge Goodman's determination to extend the exclusivity periods until January 10, 1992 was inappropriate or an abuse of his discretion. The purpose of the Bankruptcy Code's exclusivity period is to allow the debtor flexibility to negotiate with its creditors. Given the complexity of these cases and the large number of creditors and other interested parties involved, it is not surprising that negotiations have been protracted and that the circumstances have warranted extensions of the exclusivity periods. Judge Goodman has carefully considered all of these factors in deciding to grant the Ames Group's requests for extensions.

An additional factor—and perhaps the most important factor of all—that justifies Judge Goodman's most recent extension to January 10, 1992, and militates against this Court's intrusion into the proceedings to terminate the exclusivity periods, is the upcoming Christmas selling season. A termination of the exclusivity periods now would likely have a disruptive effect on the Ames Group's business operations during one of the retail industry's most crucial sales periods. Giving the Ames Group

another seven weeks in which to file its own reorganization plan will not only avoid such a disruption in the Ames Group's operations but will also allow the Ames Group to factor its Christmas season sales results into a proposed reorganization plan.

The Court also notes that Judge Goodman's most recent order extending the exclusivity periods states that "[t]his Order shall be the final extension of time under Section 1121(d) of the Code granted and no further extension shall be granted without either a showing of extraordinary cause or upon the written consent of all of the official committees appointed in these cases and Citibank, N.A., as Agent for the Ames Group's pre-petition secured creditors." *See* Order Under 11 U.S.C. § 1121(d), Granting Extension of Ames Group's Exclusive Periods in Which to File Plan(s) of Reorganization and Solicit Acceptances Thereof, ¶ 3 (Bankr.S.D.N.Y. Nov. 13, 1991) (Goodman, J.). Although there is certainly no guarantee that, on or before January 10, 1992, the Ames Group will not seek yet another extension in the exclusivity periods or that Judge Goodman will not grant such a request, Judge Goodman's order makes it clear that the Ames Group will have a very heavy burden to meet should it decide to seek another extension beyond January 10, 1992. Furthermore, during oral arguments on the instant motion held on November 19, 1991, George A. Zimmerman, Esq., counsel for the Ames Group, indicated to the Court that it was most unlikely that the Ames Group would seek another extension in the exclusivity periods. There is, therefore, no compelling reason for this Court to interfere with Judge Goodman's carefully considered determination that the exclusivity periods should be extended for a comparatively brief period, until January 10, 1992.

**\*4** Matters that have been brought to the Court's attention after oral arguments do not change this result. Counsel for Citibank has informed the Court that on November 19, 1991, the Unsecured Creditors' Committee filed a motion (in which the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)
**(Cite as: 1991 WL 259036 (S.D.N.Y.))**

Ames Group has joined) in the Bankruptcy Court for substantive consolidation of the Ames Group pursuant to 11 U.S.C. § 302. Citibank contends that the filing of the motion "effectively eliminates the possibility of a consensual plan being filed" by January 10, 1992, and that the motion "will require significant discovery and its resolution will take many months." Letter of Ronald DeKoven, Esq., counsel for Citibank, dated November 21, 1991. Counsel for the Ames Group responds that significant discovery relevant to the motion for substantive consolidation has already been completed in connection with a previous adversary proceeding commenced by the Ames Group, and notes that the Ames Group's joinder in the motion proposes that the Bankruptcy Court set a schedule in order to resolve the motion within the time frame established in Judge Goodman's most recent order extending the exclusivity period. Letter of George A. Zimmerman, Esq., counsel for the Ames Group, dated November 22, 1991. Citibank has not persuaded the Court that the motion for consolidation substantially increases the likelihood that the Ames Group will seek another extension in the exclusivity periods or that Judge Goodman would grant such a request. The Bankruptcy Court is in the best position to evaluate what impact, if any, the motion will have on the Ames Group's ability to file its reorganization plan by January 10, 1992, and Judge Goodman will undoubtedly consider that in deciding the motion.

*Conclusion*

For the reasons stated above, Citibank's motion for an order withdrawing in part the reference of these cases to the Bankruptcy Court and terminating the Ames Group's exclusivity periods is denied. The cases are remanded to the Bankruptcy Court in their entirety.

SO ORDERED.

S.D.N.Y.,1991.
In re Ames Dept. Stores, Inc.
Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

H

United States Bankruptcy Court,
S.D. New York.
In re LIONEL L.L.C., et al., Debtors.

No. 04–17324.
Aug. 3, 2007.

Schulte Roth & Zabel LLP by Adam C. Harris, Abbey Walsh, Adam L. Hirsch, New York, NY, Attorneys for the Debtors and Debtors in Possession.

Kohn, Swift, & Graf, P.C. by Robert A. Swift, Robert J. LaRocca, Philadelphia, PA, Attorneys for Mike's Train House, Inc.

Stevens & Lee, P.C. by Alec P. Ostrow, New York, NY, Attorneys for Mike's Train House, Inc.

Halperin Battaglia Raicht, LLP, by Alan D. Halperin, Robert D. Raicht, New York, NY, Counsel to the Official Committee of Unsecured Creditors of Lionel L.L.C.

**MEMORANDUM DECISION REGARDING CLAIMS OBJECTIONS, ESTIMATION PROCEDURES, STAY MODIFICATION *AND EXTENSION OF EXCLUSIVITY***

BURTON R. LIFLAND, United States Bankruptcy Judge.

**\*1** Before the Court is the motion of Lionel L.L.C. and Liontech Company ("Lionel" or the "Debtors") to estimate (the "Estimation Motion") proof of claim number 55 (the "Trade Secrets Damages Claim"), filed by Mike's Train House, Inc ("MTH"), pursuant to sections 502(b) and (c) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the motion to expunge proof of claim numbers 54 (the "Interest Claim") and 56 (the "Legal Fees Claim") filed by MTH under section 502(b) of the Bankruptcy Code and Rule 3007 of the Bankruptcy

Rules. Lionel has filed objections relating to all of the above referenced filed proofs of claim. MTH objects to the Estimation Motion and cross-moves to modify the stay and permit the litigation of the Trade Secrets Damages Claim to go forward in the District Court in the Eastern District of Michigan. MTH has also moved for an order (the "Deposition Motion") authorizing the taking of videotaped depositions of three potential witnesses.

Lionel also moves for an order granting a fifth extension of the exclusive period during which only Lionel may file a plan of reorganization and solicit acceptances thereof through October 16, 2007, and December 17, 2007, respectively MTH objects to a further extension. An evidentiary hearing commenced on June 27 and continued on August 2, 2007.

**Background**

Lionel is a well-known marketer of model train products, including steam and diesel engines, rolling stock, operating and non-operating accessories, track, transformers and electronic control devices. One of Lionel's main competitors is MTH. In 2000, MTH sued Lionel in the United States District Court for the Eastern District of Michigan (the "Michigan Court") for violating the Michigan Uniform Trade Secrets Act (the "Trade Secrets Litigation"). The suit was based on allegations that one of Lionel's former suppliers stole confidential design drawings from MTH's supplier and then used that information to design and build trains for Lionel. A trial was held and on June 9, 2004, the jury returned a verdict of $38,608,305.00 in MTH's favor. Lionel filed a motion, which was denied, for a new trial. Financially unable to post a bond to stay enforcement of the judgment pending appeal, Lionel commenced their voluntary chapter 11 cases on November 15, 2004.

On May 3, 2005, MTH filed the three proofs of claim against Lionel arising out of the Trade Secrets Litigation: FN1 the Trade Secrets Damages

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159

**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

Claim in the amount of $38,608,305.00; the Interest Claim, in the amount of $28,813.44 for interest accruing between the date of the MTH Judgment (November 3, 2004) and the Petition Date, and the Legal Fees Claim, in the amount of $3,499,433.57 for legal fees incurred in connection with the Trade Secrets Litigation.

> FN1. MTH also filed claim number 53 alleging patent infringement claims relating to MTH's smoke patents in the amount of $17,467,449.06. The Debtors filed an objection to that claim but proceedings relating to that objection are stayed pursuant to a stipulation dated July 11, 2006.

After obtaining a modification of the automatic stay from this Court, Lionel appealed the verdict to the United States Court of Appeals for the Sixth Circuit. On December 14, 2006, the Sixth Circuit reversed the Michigan Court's denial of Lionel's motion for a new trial and vacated the MTH judgment. MTH filed a Petition for Panel Reconsideration and Suggestion for Rehearing *En Banc,* but the Sixth Circuit denied MTH's petition on April 19, 2007. On April 26, 2007, MTH asked the Sixth Circuit to stay issuance of the mandate to allow MTH to file a petition for a writ of certiorari to the United States Supreme Court. The stay was granted on May 16, 2007. On May 30, 2007, MTH filed a Motion to Vacate Stay of Mandate and for Issuance of Mandate. On June 15, 2007, the Sixth Circuit granted the motion and issued the mandate.

**\*2** The Trade Secrets Damages Claim asserted by MTH was filed in a liquidated dollar amount based upon the amount awarded to MTH in the MTH Judgment. Due to the Sixth Circuit's reversal of the MTH Judgment, the Trade Secrets Damages Claim is now a disputed and unliquidated claim because the Sixth Circuit's decision does not finally resolve the Trade Secrets Damages Case, but instead provides for the case to be remanded back to the Michigan Court for a new trial consistent with the decision. Therefore, the Debtors object to the Trade Secrets Damages Claim and request the entry

of an order authorizing the reclassification of such claim as disputed, contingent, and unliquidated. In addition, the Debtors contend that as long as the Trade Secrets Damages Claim remains disputed and unliquidated, it will prevent the Debtors from confirming a plan of reorganization. Thus, in order to avoid the purported delay that would result if the Debtors were required to retry the Trade Secrets Litigation in the Michigan Court and await the final outcome of the litigation, the Debtors seek to have this Court estimate the Trade Secrets Damages Claim pursuant to section 502(c) of the Bankruptcy Code. Accordingly, the Debtors seek entry of an order (i) disallowing and expunging the Legal Fees Claim and the Interest Claim, (ii) reclassifying the Trade Secrets Damages Claim as disputed, contingent and unliquidated, (iii) setting procedures for, and scheduling a hearing on, estimation of the Trade Secrets Damages Claim and (iv) extending exclusivity to allow for the resolution or estimation of such claims.

**Discussion**

Section 502(c) of the Bankruptcy Code provides that:

> (c) There shall be estimated for purpose of allowance under this section—
>
> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case;

11 U.S.C. § 502(c); *see Frito Lay, Inc. v. LTV Steel Co. ( In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993) ("A bankruptcy court must estimate 'any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.' "); *In re G–I Holdings, Inc.,* 2006 WL 2403531, *3 (Bankr.D.N.J. August 11, 2006) ("Section 502(c) of the Bankruptcy Code is drafted in mandatory terms. That is, any contingent or unliquidated claim 'shall' be estimated so long as the 'liquidation' of the particular claim would 'unduly delay the administra-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

tion of the case.' "); *In re Lane,* 68 B.R. 609, 611 (Bankr.D.Haw.1986) ("This duty of the bankruptcy court is mandatory, since the language of [ section 502(c) ] states 'shall' "). Thus, when the liquidation of a claim is premised on litigation pending in a non-bankruptcy court, and the final outcome of the matter is not forthcoming, the bankruptcy court should estimate the claim. *See Maxwell v. Seaman Furniture Company, Inc. (In re Seaman's Furniture Co. of Union Square, Inc.),* 160 B.R. 40, 42 (S.D.N.Y.1993) ( "Estimation is an expedient method for setting the amount of a claim that may receive a distributive share of the estate."); *In re Apex Oil Co.,* 107 B.R. 189, 192 (Bankr.E.D.Mo.1989) ("the key consideration in whether a bankruptcy court should estimate a claim pending in another forum is whether liquidation of that claim would unduly delay the debtor's Chapter 11 reorganization."); *In re Lane,* 68 B.R. at 611 (section 502(c) of the Bankruptcy Code requires the court to estimate any claim where failing to do so would unduly delay the administration of the case). A main goal of the Bankruptcy Code is to equitably distribute the debtor's assets among its creditors. Lengthy bankruptcy proceedings cause delayed distributions, which in turn, greatly devalue the claims of all creditors as they cannot use the assets until they receive them. *See In re Paramount Publix Corp.,* 8 F.Supp. 644, 646–47 (S.D.N.Y.1934) ("Time is of the essence in bankruptcy administration. An early distribution of the bankrupt's assets among his creditors is imperative.")

**\*3** It is more than seven years since the Trade Secrets Litigation between Lionel and MTH commenced. The MTH Judgment was the impetus for the filing of these chapter 11 proceedings that have now been pending before this court for over two and a half years awaiting the outcome of the appeal As with most chapter 11 proceedings, Lionel's status as a chapter 11 debtor has placed a strain on the company's management and employees, and their relationships with both customers and manufacturers. It has also materially affected Lionel's ability to expand its business beyond the pure "hobby" market. Mr. Calabrese, Lionel's president and CEO since September 2004, testified that he has been working diligently to develop Lionel's "mass" business such as co-branding opportunities with retailers such as Macy's, Toys–R–Us and Target. However, given the continued uncertainty surrounding Lionel's bankruptcy and the MTH claims, the willingness of the mass merchandisers to get involved in long term commitments with Lionel is limited.[FN2] Some retailers, such as Wal–Mart have "flat out refused to deal with Lionel while in bankruptcy."

> FN2. For example, Lionel has been invited to participate in the Macy's parade but Macy's has expressed uncertainty about giving Lionel that slot given "what's going on in with the bankruptcy and the long term issues regarding its viability."

In addition, the prolonged chapter 11 cases have had a negative effect on the Debtors' relationships with its employees. Mr. Calabrese testified that he has lost through resignation several key employees, including several senior employees with 20 odd years of experience in the product development area as well as the head of hobby sales. Mr. Calabrese testified further that although the company has several management positions open, including the head of mass sales, head of product development and head of business affairs, it has been extremely difficult to attract talented and experienced people under the current circumstances. Mr. Calabrese himself is laboring under a contract that expires at the end of this year.

Further, in the years since the Petition Date, Lionel has spent approximately $10 million dollars in total fees and expenses of which $5 million relates purely to the administration of the chapter 11 cases, including the company's attorneys and professionals, the committee's professionals, United States Trustee's fees and other similar fees.

Not long after the reversal of the Judgment by the Sixth Circuit, on May 21, 2007, the Debtors

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

filed their Disclosure Statement and Joint Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code. The Plan proposes to leave all creditors of the Debtors' estates unimpaired by paying them in full, in cash, plus post-petition interest, on the effective date. One of the conditions precedent to confirmation of the Plan is that the Trade Secrets Damages Claim be settled, otherwise resolved or estimated by the Bankruptcy Court. Considering the enormous dollar amounts of the claims asserted by MTH (claims which MTH asserts could result in damages of between $60 and $70 million) in comparison to the rest of the claims and the assets of the Debtors' estates, the Debtors clearly cannot confirm the Plan if this Court cannot find it feasible without the liquidation of MTH's claims. *See eg., Sherman v. Harbin (In re Harbin),* 2007 WL 1322389, *4 (9th Cir. May 8, 2007) (holding that in order to meet the feasibility requirement for confirmation of a plan under section 1129(a)(11) a court must evaluate "whether a potential future judgment may affect the debtor's ability to implement its plan."); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),* 761 F.2d 1374, 1382 (9th Cir.1985) (estimation necessary for a determination of plan feasibility).

**\*4** MTH contends there will not be an undue delay in the administration of these chapter 11 cases if the stay is modified to allow the case to be retried in the Michigan Court. That simply defies logic. An estimation proceeding in this Court can be conducted within a very short period of time versus a full-blown jury trial in Michigan which is not even calendared. In the first trial, the parties engaged in 18 days of trial resulting in the jury verdict in June 2004. Post-trial motions and briefing were not concluded until November 2004, when Lionel's motion for a new trial was denied and judgment was finally entered. The appeal to the Sixth Circuit, including MTH's Petition for Reconsideration, consumed an additional two years and three months. Under the procedures proposed by Lionel in connection with the Estimation Motion, estimation of the Trade Secrets Damages Claim could be

concluded by the end of August, 2007.

MTH also argues that any delay in retrying the case in Michigan should not be an issue because Lionel can go ahead and confirm a plan without dealing with MTH's claims which can proceed post-confirmation or simply dismiss the chapter 11 cases and pay all creditors other than MTH. This simplistic argument is unrealistic and does not even have cosmetic appeal. First, dismissal would result in the occurrence of events of default under the Debtors' DIP financing facilities, causing acceleration of approximately $45 million in obligations (and leaving the Debtors without working capital to run the business and all creditors at the mercy of the lenders' exercise of remedies), and second result in between $15 million and $20 million of pre- and postpetition obligations becoming immediately due and payable. Moreover, under the Plan, the Debtors intend to refinance these obligations through a new exit financing facility to replace its existing debtor in possession financing facilities, and new equity capital to pay all other allowed claims and exit costs. However, with the threat of $60–$70 million in additional claims being asserted by MTH, the Debtors will have no access to the capital necessary to permit the payment of those obligations and/or the confirmation of a plan. Mr. Turkington, Lionel's CFO, also explained that based upon his experience as CFO after the MTH jury verdict entered in June 2004, that any dismissal of the chapter 11 cases with the specter of the MTH litgation continuing to hang over the head of Lionel would result in trade creditors, particularly manufacturers, constricting trade credit and even insisting on cash on delivery or cash in advance.

Even if the Debtors could get exit financing to confirm a plan prior to resolving MTH's claims, having MTH's claims ride through the bankruptcy without being discharged would not satisfy section 1129(a)(11) of the Bankruptcy Code. That section requires that "confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor ... unless such

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

liquidation or reorganization is provided for in the plan." 11 U.S.C. § 1129(a)(11). A liquidation or further reorganization contingency cannot realistically be provided for in a plan, when neither the likelihood of an adverse judgment, nor the timing and amount of such a judgment, can be predicted with any certainty. *See In re Harbin, supra.*

**\*5** MTH also contends that its request for injunctive relief is not a "claim" capable of estimation under Section 101(5)(a) of the Bankruptcy Code. This argument presupposes a finding of liability on the part of Lionel. When, and if, MTH's Trade Secrets Damages Claim is estimated above $0, then a determination will be made if MTH's request for an injunction against future misappropriation can be projected into a monetary award.[FN3] Accordingly, the Debtors' request to estimate the Trade Secrets Claim is granted and MTH's motion to modify the stay to retry the case in the Michigan court is denied.

> **FN3.** In fact, previously in this case, a similar injunction in favor of the Debtor was monetized.

**Procedures**

Although the Bankruptcy Code does not explicitly detail procedures for estimating claims, a Bankruptcy Court may use whichever method is best suited to the circumstances. *Bittner v. Borne Chemical Co.,* 691 F.2d 134, 135 (3d Cir.1982); *In re Seaman's Furniture Company of Union Square, Inc.,* 160 BR at 41. In *In re Baldwin–United Corp,* 55 B.R. 885, 889 (Bankr.S.D.Ohio 1985) the court utilized a procedure akin to a summary trial where there was no jury, live testimony by one witness per party, a discovery cutoff date, and only two days for the hearing. Many courts adhere to the method set forth in the *Baldwin–United* case. *See e.g., In re MacDonald,* 128 B.R. 161, 166–67 (Bankr.W.D.Tex .1991) (employing an abbreviated procedure practically the same as *Baldwin–United*); *In re Apex Oil Co.,* 92 B.R. 843 (Bankr.E.D.Mo.1988) (utilizing a methodology analogous to *Baldwin–United*); *NLRB v. Grey-hound Lines (In re Eagle Bus Mfg.),* 158 B.R. 421 (D.Tex.1993) (two-day summary trial); *DeGeorge Fin. Corp. v. Novak (In re DeGeorge Fin. Corp.),* 2002 U.S. Dist. LEXIS 17621 (D.Conn.2002) (one-day trial). Although this is not the only method of conducting the estimation procedure (*see In re Nova Real Estate Inv. Trust,* 23 B.R. 62, 65 (Bankr.E.D.Va.1982)), a longer method, such as a full-blown trial on the merits, would "eviscerate the purpose underlying Section 502(c)." *Baldwin–United,* 55 B.R. at 899. Moreover, a more time consuming method would run counter to the "efficient administration of the bankrupt's estate ..." *Bittner,* 691 F.2d at 135. Furthermore, in estimating the value of a claim, the Court of Appeals for the Second Circuit has stated that courts should make a "speedy and rough estimation of [the] claims for purposes of determining [claimant's] voice in the Chapter 11 proceedings ..." *In re Chateaugay Corp.,* 944 F.2d 997, 1006 (2d Cir.1991).

MTH complains that the estimation procedure proposed by the Debtors fails to accord with fundamental notions of due process and deliberately tilts towards excluding evidence supportive of MTH's claims. In general, the truncated trial process that can be developed under 502(c) has been found to be consistent with the dictates of due process of law. *See In re FRG, Inc.,* 121 B.R. 451, 456 (Bankr.D.Pa.1990); *In re Apex Oil Co.,* 92 B.R. at 845–47; *In re Baldwin–United Corp.,* 55 B.R. at 899–902. In addition, when a bankruptcy creditor files a proof of claim, it submits itself to the bankruptcy court's equitable powers and thereby waives its right to a jury trial. *In re Trans Marketing* 117 F.3d 1417 (5th Cir.1997) citing *Lagenkamp v. Culp,* 498 U.S. 42, 44 (1990); *First Fidelity Bank, N.A. v. Hooker Investments, Inc. (In re Hooker Investments, Inc.)* 937 F.2d 833, 840 (2d Cir.1991) (rejecting creditor's argument that it should not be forced to make the choice between filing a proof of claim and preserving its right to a jury trial).

**\*6** However, as requested by MTH, I find that the procedures proposed by Lionel should be modi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

fied somewhat to provide for limited additional dis-
covery and presentation time, the parameters of
which shall be the subject of a chamber's confer-
ence to be scheduled. *See.* 11 U.S.C. § 105(d). Simi-
larly, I find that MTH's Deposition Motion is, at
best, premature and shall be addressed at the
scheduling conference to review the proposed pro-
cedures. *See* Local Rule 7007–1(b) ("No discovery-re-
lated motion ... shall be heard unless counsel for the
moving party first requests an informal conference
with the Court ...").

**Extension of Exclusivity**

Former section 1121(d) of the Bankruptcy
Code, as applicable to this case, permits the court to
extend a debtor's exclusive period upon a determin-
ation of cause:

> On request of a party in interest made within
> the respective periods specified in subsections
> (b) and (c) of this section and after notice and a
> hearing, the court may for cause reduce or in-
> crease the 120–day period or the 180–day peri-
> od referred to in this section.

*See* 11 U.S.C. § 1121(d)(2004). In determining
whether a debtor has had an adequate opportunity
to negotiate a plan of reorganization and solicit ac-
ceptances thereof, a court should consider a variety
of factors, addressed below, to assess the totality of
circumstances. *In re McLean Indus., Inc.,* 87 B.R.
830, 833 (Bankr.S.D.N.Y.1987).

First, although the Debtors cases are not ex-
tremely large, the MTH claims and litigation claims
add a unique complexity to the resolution of these
cases. Second, the Debtors have made good faith
progress towards reorganization. The Debtors have
improved their business operations and have filed a
Plan that proposes to pay all creditors in full with
interest. The Debtors are current on all post-petition
obligations and predict they will maintain this abil-
ity to pay their bills as they come due. In addition
the Debtors have reviewed and resolved many of
the claims filed against them. However, the
amounts of MTH's claims remain a significant un-

resolved contingency in the Debtor's cases requir-
ing further time to confirm their Plan while those
claims are liquidated and exit financing can be put
into place.

**The Interest Claim and the Legal Fees Claim**

The Debtors also object to, and seek the disal-
lowance and expungement of, the Interest Claim
and the Legal Fees Claim. The Interest Claim cal-
culates interest from the date of the MTH Judgment
until the Petition Date. Because the MTH judgment
has been vacated by the Sixth Circuit Decision,
there is no longer a valid judgment on which in-
terest could accrue, thereby rendering the Interest
Claim void. The Legal Fees Claim seeks reimburse-
ment of MTH's legal fees and expenses expended in
connection with the Trade Secrets Litigation. MTH
filed a Petition for Counsel Fees and Cost Reim-
bursement in the Michigan Court (the "Legal Fees
Petition") on November 5, 2004; however, it has
not been ruled upon because of the automatic stay
extant in this case. The Legal Fees Petition asserts
that under the Michigan Uniform Trade Secrets Act
("MUTSA"), attorney's fees can be awarded to the
prevailing party in a litigation if willful and mali-
cious misappropriation exists. Lionel argues that
the Sixth Circuit Decision vacating the MTH Judg-
ment leaves MTH ineligible to seek the reimburse-
ment of incurred legal fees and expenses under the
MUTSA and therefore, the Legal Fees Claim is also
void. However, as MTH contends, the Legal Fees
Claim stands on the same footing as MTH's Trade
Secrets Damages Claim and may be resolved along
with it. Accordingly, the objection to the Interest
Claim is granted and the claim is expunged; the
Legal Fees Claim is also expunged without preju-
dice to reassert should fees be subsequently awar-
ded.

**Conclusion**

**\*7** The litigation in the Sixth Circuit has
already consumed seven years and following the re-
versal by the Circuit Court, the litigation is now in
a position that in the vernacular would be deemed,
"a do over." As both sides have made clear their in-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159

**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

tention to appeal any adverse determination, any-
where, adding years of delay to the issue determina-
tion, this is clearly a situation contemplated by
Congress for the implementation of section 502(c).
Accordingly, the Motion to Estimate is granted
with the hearing procedures suggested by the
Movant to be reviewed in a conference to be sched-
uled with chambers. The Motion to lift the stay is
denied. The Interest Claim and the Legal Fees
Claims are expunged.

IT IS SO ORDERED.

Bkrtcy.S.D.N.Y.,2007.
In re Lionel L.L.C.
Not Reported in B.R., 2007 WL 2261539
(Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                       :

                           :

     LEXINGTON PRECISION CORP., et.al.,  :

                           :

                Debtors.    :

-----------------------------------------------------------------x

**NOT FOR PUBLICATION**

Case No. 08-11153 (MG)

(Chapter 11)

### MEMORANDUM AND ORDER GRANTING MOTION PURSUANT TO § 1121(d) TO EXTEND THE DEBTORS' EXCLUSIVITY

*A P P E A R A N C E S :*

WEIL, GOTSCHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
By:    Richard P. Krasnow
        Adam P. Strochak
*Attorneys for Debtors*

ANDREWS KURTH LLP
450 Lexington Avenue
New York, NY 10017
By:    Paul N. Silverstein
        Gerald L. Bracht
*Attorneys for Official Committee of Unsecured Creditors*

**MARTIN GLENN**
**United States Bankruptcy Judge**

Pending before this Court is the opposed motion to extend exclusivity pursuant to 11

U.S.C. § 1121(d) filed on October 7, 2008 by Lexington Precision Corporation and Lexington

Rubber Group, Inc. (collectively "Lexington" or "Debtors"). (ECF Doc. # 428.) The motion

seeks an extension of the period in which the Debtors alone may file a plan to January 26, 2009,

and the period within which the Debtors may solicit acceptances to that plan to February 25,

2009.  (*Id.* at ¶ 14.)  On October 8, 2008, the Court entered a Bridge Order extending exclusivity

until such time as the Court decided the Debtors' motion.  (ECF Doc. #430.)  The Official

Committee of Unsecured Creditors ("Committee") objected to the motion to extend exclusivity.

(ECF Doc. # 436.)  It argues that the extension should be denied because since July 2008, when

the Court granted an initial extension, (i) the Debtors have not shown they can propose a viable

plan, and (ii) the Debtors and the Committee have made no progress in negotiations because the

Debtors have not been negotiating in good faith.  The Debtors' replied that since July the

Debtors have made significant progress toward reorganization in that they have filed an amended

proposed plan and a proposed disclosure statement.  (ECF Doc. # 444.)  The Debtors also allege

that they have made progress towards securing exit financing, they have been acting good faith,

and the negotiations with the Committee, while taking longer than expected, have progressed.

An evidentiary hearing was held on October 28, 2008.  This opinion sets forth the Court's

findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## BACKGROUND

The Debtors filed for chapter 11 relief on April 1, 2008.  On August 8, 2008, the Debtors

filed an amended proposed plan and a proposed disclosure statement.  (ECF Doc. # 305, 306.)  A

hearing to approve the disclosure statement is scheduled for November 24, 2008.  (ECF Doc. #

446.)

The Debtors primarily manufacture large volumes of high-quality rubber and metal

components for use in automobiles and medical devices.  (ECF Doc. #3 at ¶ 5.)  The Debtors'

business can be divided into two sectors:  the original equipment manufacturers (or "OEM")

divisions and aftermarket divisions.  The OEM sector, which includes the metals division and the

connector seals division, supplies automotive parts to domestic car manufacturers and other parts

suppliers.  The precipitous decline in the automotive industry, particularly over the last three

months, has caused significant deterioration in this sector of the Debtors' business.  Debtors' Ex.

1; Committee's Ex. O.  The aftermarket sector, which includes the medical components and

insulators divisions, has not suffered nearly as much.  *Id.*

This is the Debtors' second motion to extend exclusivity.  Previously, on May 21, 2008,

the Committee filed a motion seeking to terminate exclusivity pursuant to 11 U.S.C. § 1121(d).

(ECF Doc. # 133.)  The Debtors opposed the motion.  (ECF Doc. # 161, 162.)  Prepetition there

were unsuccessful negotiations between the Debtors and an ad-hoc committee of creditors,

which eventually ceased with no additional prepetition communications.  The Debtors then filed

their chapter 11 petitions.  After the petitions were filed and the Committee was appointed,

largely comprised of members of the ad-hoc committee and represented by the same counsel,

neither the Debtors nor the Committee reached out to the other to begin negotiations.  (See ECF

Doc. # 263 at pg. 4.)  A hearing on the motion to terminate exclusivity was held on June 11,

2008.  The Court reserved judgment to allow the parties time to meet and begin negotiating the

terms of a reorganization plan.  The Debtors then filed a motion to extend exclusivity on July 9,

2008.  (ECF Doc. # 238.)  On July 16, 2008, the Committee withdrew its motion to terminate

exclusivity and instead opposed the Debtors' motion to extend exclusivity.  (ECF Doc. # 262.)

After an evidentiary hearing on July 21, 2008, the Court granted Debtors' motion and extended

exclusivity to October 28, 2008.  (ECF Doc. # 289.)  On October 7, 2008, Debtors filed the

instant motion seeking again to extend exclusivity.  For the reasons discussed below, the Court

grants the extension of both the Debtors' period to file a plan until January 26, 2009, and to

solicit acceptances until February 25, 2009.

# **DISCUSSION**

## **A. Exclusivity Pursuant to §1121**

The Bankruptcy Code grants a debtor the exclusive right to file a plan during the first 120

days after the order granting relief.  11 U.S.C. § 1121(b).  Once the 120-day period expires or is

terminated, any party in interest may file a plan of reorganization.  11 U.S.C. § 1121(c).  Events

explicitly recognized by statute that end the exclusivity period include a failure to file a plan

within 120 days of the order for relief or a failure to obtain acceptance of the timely filed plan

within 180 days by all impaired classes.

The Bankruptcy Code allows the exclusivity period to be terminated or extended upon a

showing of cause by a party in interest.  11 U.S.C. § 1121(d).  The burden of proving cause to

extend exclusivity is on the moving party, in this case the Debtors.  *See In re R.G. Pharm., Inc.*,

374 B.R. 484, 487 (Bankr. D. Conn. 2007) (stating debtor has burden in motion to extend); *In re*

*Texaco, Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) (finding that party seeking either an

extension or a termination of exclusivity bears the burden of proving cause).  Some courts have

held that for the moving party to meet its burden it must produce affirmative evidence to support

a finding of cause.  *See In re Parker Street Florist & Garden Center, Inc.*, 31 B.R. 206, 207

(Bankr. D. Mass. 1983) (debtor's assertion that it did not want the interference of competing

plans was found insufficient to make an affirmative showing of cause).

## **B. Cause Pursuant to § 1121(d)**

The determination of cause under section 1121(d) is a fact-specific inquiry in which the

court has broad discretion in extending or terminating exclusivity.  *See In re Adelphia*

*Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or

terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-

specific."); *see also In re Lehigh Valley Prof'l Sports Club, Inc.*, 2000 WL 290187, at *2

(Bankr. E.D. Pa. Mar. 14, 2000) (relief under §1121(d) is committed to the sound discretion of

the bankruptcy judge); *In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) ("The

decision of whether or not to extend the debtor's period of exclusivity rests with the discretion

of the Court.").

As with the first exclusivity motion, the Court will focus on the nine factors for

determining cause identified by Judge Gerber in his *Adelphia* decision: (a) the size and

complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a

plan of reorganization and prepare adequate information; (c) the existence of good faith progress

toward reorganization; (d) the fact that the debtor is paying its bills as they become due;

(e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of

time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity

in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether

an unresolved contingency exists. *In re Adelphia*, 352 B.R. at 587.

While not all of these factors are applicable in the current case, they do provide the

necessary framework in considering the relief requested. The factors that the Court considers

most relevant based on the arguments presented by the Debtors and the Committee are as

follows: (i) the existence of good faith progress toward reorganization; (ii) whether the debtor

has demonstrated reasonable prospects for filing a viable plan; and (iii) whether the debtor has

made progress in negotiations with its creditors. *In re Adelphia*, 352 B.R. at 587. The

Committee's objection similarly addresses these factors in alleging that the Debtors (1) have not

demonstrated reasonable prospects for filing a viable plan, and (2) have not engaged in good

faith negotiations with the Committee.  The Court will address each argument in turn.

As to the first argument, the Committee points to three facts to support a finding that the

Debtors do not have reasonable prospects of filing a viable plan:  Debtors' lack of exit

financing; the alleged continued diminution in value of the Debtors' business over the past

several months, including the Debtors' failure to meet forecasted earnings projections; and the

dramatic deterioration of the automotive industry in general over that same time period.  The

Court finds that none of these facts supports a denial of an extension of exclusivity.

With respect to exit financing, the Court finds that, based on the evidence at the hearing,

the Debtors have reasonable prospects of obtaining exit financing.  CapitalOne Bank previously

entered into a non-binding letter agreement with Debtors to provide exit financing.  Committee's

Ex. N.  While the term of the agreement has since expired, *id.* at 9, the Court heard

uncontroverted testimony from the Debtors' Chairman that the Debtors remain in negotiations

with CapitalOne, CapitalOne continues to perform due diligence, and CapitalOne has indicated

that it is still interested in extending exit financing.  Thus, while the Committee strenuously

argued that Debtors have "zero prospects" of securing exit financing, the evidence does not

support such a conclusion.

Nor is the decline of the Debtors' business enough to support denying an extension of

exclusivity.  As a result of the decline in business, the Debtors have missed their projected

earnings over the past several months.  Committee's Ex. O.  But the effect the decline in net

sales and EBITDA may have had on the Debtors' business's value is disputed.  While the

Committee points out that Debtors have missed projections by 18.5% on a consolidated

EBITDA basis from June through August, the Court credits the Debtors' evidence that this

diminution is primarily in the OEM businesses, and that its aftermarket businesses—the medical

components and insulators divisions—are either meeting or very close to meeting projections.[1]

Committee's Ex. O; Debtors' Ex. 1.  The testimony shows that Debtors' financial advisor, W.Y.

Campbell & Co., currently values the OEM businesses at wind-down or near-liquidation value.

Therefore, the EBITDA declines in the OEM businesses may not materially impact the value of

the entire enterprise.  In any event, as the *Adelphia* decision made clear, in evaluating cause for

extensions of exclusivity, the court should consider whether a debtor *could* present a viable plan,

not whether the currently proposed plan is viable.  352 B.R. at 588.  As a result, the Court finds

that the diminution of Debtors' business over the past few months is not a reason to deny an

extension of exclusivity.

Lastly, the Committee argues that the deterioration of the general automotive market in

the past few months also compels a finding that the Debtors cannot propose a viable plan.  The

Court disagrees.  The Court is, of course, aware of the difficult market conditions all companies,

not just the Debtors, are facing right now.  Not only has the automotive industry declined, but

the tightening credit markets have made securing exit financing very difficult.  But that is not

reason enough to deny an extension of exclusivity.  If the Court were to accept the Committee's

argument, few, if any, debtors could continue to maintain exclusivity in the current economic

climate.

The Committee's second argument opposing an extension of exclusivity is that the

Debtors are not engaging in good faith negotiations, and that the Committee and the Debtors

have not made any progress in negotiations.  In its last exclusivity order in July, the Court

---

[1]       The Committee argued that the medical components division's falling short of its June-August EBITDA projections by 5.6% is a significant miss.  Committee's Ex. O at 2.  The Court disagrees.  The 5.6% miss amounts to $59,000 in EBITDA over a three-month period.  As the Committee's financial advisor testified, and the Court so finds, this amount is not material.

indicated that it expected serious negotiations to begin in September; that obviously did not

happen, as the Debtors and the Committee did not sit down to negotiate until very recently.

Since that order, however, the Debtors prepared revised forecasts in light of comments from the

Committee's financial advisor, Stout Risius & Ross, as well as from changing conditions in their

business and the market.  The testimony shows that the Committee was not prepared to begin

negotiations until it received all of the information it requested from the Debtors, including the

updated projections and backup information related to the revised forecasts.  While the

Committee's insistence on receiving all of the information before negotiations commenced

cannot be faulted, it cannot then be turned into an argument for ending exclusivity.

In addition, the Debtors' financial advisor, W.Y. Campbell & Co., took longer than

expected to complete its draft valuation report, delaying the start of the negotiations by a month.

Debtors' Ex. 3.  The Court credits the Debtors' testimony that W.Y. Campbell's delay was not

purposeful and was the result of a good faith effort to prepare an accurate report in light of

changing industry conditions.

The Debtors have also been providing the Committee with all the documentation that the

Committee's financial advisor requested.  Indeed, the Committee's financial advisor testified

that he currently has all the documentation he has requested, although he did say that he may

need more information, as his review continues.  Documentary evidence also shows that the

Debtors have provided the Committee with numerous documents and reams of data.  Debtors'

Ex. 4.  The Committee and the Debtors have also recently met twice.  While progress has been

tentative, the uncontroverted testimony, including from the Committee's financial advisor, was

that the parties "are not at an impasse" in negotiations.  The inference and expectation is that

further negotiations could be fruitful.  The Court expects the parties to continue to negotiate in

good faith with a view towards agreeing on a viable plan for reorganization.  In sum, the Court

concludes that sufficient progress has been made in negotiations—and that Debtors have been

negotiating in good faith—such that it would be inappropriate to terminate exclusivity now.

The Court concludes that the Debtors have shown the necessary cause under section

1121(d) to further extend exclusivity.  It would not benefit the Debtors or the estate to deny an

extension of exclusivity now.  It has been clear since the start of this case that the Debtors and

the Committee have substantial differences regarding the proper valuation of the Debtors.  The

Debtors claim there is substantial value for equity.  The Committee vehemently disagrees.  The

time and place to resolve this issue will be in connection with a confirmation hearing.

The motion to extend exclusivity is granted to the extent provided herein.


**IT IS ORDERED**

Dated:  October 31, 2008
      New York, New York


                            /s/ Martin Glenn
                            UNITED STATES BANKRUPTCY JUDGE