UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**DECLARATION OF LEWIS KRUGER IN SUPPORT OF DEBTORS' MOTION FOR THE ENTRY OF AN ORDER FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

I, Lewis Kruger, being duly sworn, state the following under penalty of perjury:

1. I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors and debtors in possession (collectively, the "Debtors"). I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* (the "Exclusivity Motion"),[1] filed contemporaneously herewith. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

**BACKGROUND**

2. On February 11, 2013, I was appointed by the Debtors to serve as CRO of the Debtors and spearhead the plan process. On the same day, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer* [Docket No.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Exclusivity Motion.

ny-1084723

2887].² On March 5, 2013, the Court entered an order approving my appointment. [Docket No. 3103].

3. Prior to my role as CRO, I was a partner and Co-Chair of the Financial Restructuring Group at Stroock & Stroock & Lavan LLP, a law firm that has extensive experience in all aspects of restructuring and insolvency matters. I have over fifty years of restructuring experience. I have played a role in many significant reorganization proceedings in the United States, representing debtors, official and ad hoc creditors' committees, financial institutions and acquirers of assets.

## PLAN PROGRESS

4. On March 5, 2013, I attended the hearing on the Debtors' last exclusivity motion. I understood from the Court's instruction, and the only objection to the relief requested in that motion,³ that I, with the assistance of the Debtors' advisors, needed to make substantial progress in negotiations with key creditors on major plan issues in order for the Debtors to maintain exclusivity. With this goal in mind, I have unwaveringly tried to facilitate a plan process that involved informed substantive negotiations that would ultimately lead to prosecution of a consensual Chapter 11 plan. In my Declaration, I describe the significant progress made in the plan process since the March 5, 2013 Hearing. Progress, which I believe warrants a further extension of the Exclusive Plan Period for 64 days through July 10, 2013.

5. In order to make progress in the development of a Chapter 11 plan, I devised a work plan aimed toward resolving important plan issues (the "Work Plan"). My Work Plan

---

² The scope of the CRO's authority was modified pursuant to Amendment 1 to the Engagement Letter. A copy of Amendment 1 to the Engagement Letter as Exhibit 1 was filed with the Court on March 1, 2013 [Docket No. 3074].

³ *Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2997] (the "JSB Objection").

2

ny-1084723

includes the following objectives: (a) to provide updated business and financial information to creditors, (b) to engage each of the Debtors' key stakeholders in substantive negotiations regarding major plan issues, and (c) to make progress in mediation. Because I share in the Court's belief that resolution of complex intercreditor disputes is necessary to achieve a consensual Chapter 11 plan, I pushed parties to focus not only on the AFI Settlement, but also on the Gating Intercreditor Issues. In particular, I made the negotiations concerning the RMBS Settlement a priority because I believe that the costs to the Debtors if the RMBS Settlement is not approved – up to $600 million in additional cure costs and a $44 billion unsecured claim – could far exceed the economic outcome if the settlement is resolved. As I had not previously participated in these cases prior to my appointment, during the Third Exclusivity Extension, I continued to devote my attention to learning about the Debtors and the landscape of these cases. While challenging in and of itself, I endeavored to do so without slowing down mediation or the plan process.

6.  I believe that the Debtors are satisfying each of the Work Plan objectives. First, as described below, the Debtors have provided stakeholders updated business and financial information to assist those parties in assessing their respective positions. I, along with the Debtors' advisors, have participated in both formal and informal discussions with each of the Debtors' key stakeholders concerning all major plan issues. Finally, mediation has taken on a bilateral approach. The Mediator has met with each of the Debtors' major creditors, resulting in serious consideration of a term sheet regarding potential plan structures. Judge Peck has scheduled global mediation sessions for next week in an effort to reach consensus on important plan considerations. I believe that the significant progress made during the Third Exclusivity Extension warrants a further extension of the Debtors' Exclusive Periods.

ny-1084723

### a. The Debtors Have Provided Creditors With Updated Information

7. Since the March 5, 2013 Hearing, the Debtors' advisors have spent considerable time and effort updating business and financial analyses to assist in plan discussions. In connection with my goal to provide creditors with information, an updated "waterfall" analysis was prepared and shared with the Creditors' Committee and its members, as well as with the advisors to the Ad Hoc Group. Additionally, the Debtors prepared a presentation on intercompany claims, which presentation was shared with the Creditors' Committee and its members (including certain principals), as well as to the advisors to the Ad Hoc Group.

8. Other information, such as an analysis of the projected budget and expenses for the estate following the closing of sales of the Debtors' whole loan portfolio and their servicing and origination platform, and an analysis of the various insurance policies held by the Debtors was also provided to the Creditors' Committee.

9. I am advised that the Debtors' financial advisors have provided certain of the Debtors' major stakeholders with additional business and financial information, such as updated trial balance sheets. It is my understanding that discussions between the Debtors' financial advisors and the financial advisors to various creditor constituencies are ongoing, pursuant to which they have discussed the various analyses. I believe that this sharing of information has been helpful to aid parties to assess more accurately their respective positions, resulting in productive settlement negotiations.

### b. The Debtors Have Engaged in Numerous Meetings With Major Creditors

10. My second goal under the Work Plan was to engage in bilateral discussions with each of the Debtors' major creditor constituencies.

11.     During the Third Exclusivity Extension, I participated in numerous formal and informal meetings with each of the Debtors' major creditor constituencies. Additionally, I continue to engage in daily dialogue with key creditors, including members of the Creditors' Committee, regarding major plan issues. During these meetings, the Debtors and other parties in interest shared information and provided presentations on their respective positions. I have and will continue to update these parties, as appropriate, on my views and goals concerning their particular claims and how to address their claims as part of the plan negotiations.

12.     Specifically, I, along with the Debtors' advisors, met in person and telephonically with the advisors to the Ad Hoc Group on numerous occasions, during which the parties discussed the basis for the JSBs' claim and the terms of a proposed Chapter 11 plan. I have also engaged in informal discussions with the advisors to the Ad Hoc Group regarding plan related issues.

13.     The JSBs previously criticized the mediation because principals of that group had not participated. I believe that confidentiality is required to participate in plan discussions in order to protect sensitive information and foster frank discussions regarding the strengths and weaknesses of any particular creditor's claims. However, in an effort to engage principals, the Debtors' advisors provided the JSBs a form confidentiality agreement, which has been used in connection with plan discussions. I am hopeful that the principals of the JSBs will execute the form confidentiality agreement and participate in plan negotiations as well.

14.     Similarly, the Debtors' advisors and I engaged in countless formal and informal discussions with counsel and the advisors to the Creditors' Committee, as well as its individual members. An array of plan-related topics were discussed at these meetings. The Debtors' and

5

the Creditors' Committee have shared with one another their respective analyses on major plan issues.

15. The Debtors' advisors and I have engaged in plan negotiations with the advisors and/or business level leaders of each of the Debtors' major creditor constituencies, including, but not limited to, the following parties:

(a) AFI;

(b) Wilmington Trust;[4]

(c) Paulson & Co. Inc., as a representative of the SUNs;

(d) holders of Monoline Claims;

(e) holders of securities claims;

(f) the RMBS Trustees;[5] and

(g) the Steering Committee Group of RMBS Holders.[6]

16. With respect to this aspect of the Work Plan, I believe productive settlement negotiations have occurred and continue. Parties that previously refused to engage in settlement discussions came to the table. Notwithstanding the continued focus on the AFI Settlement, the Debtors and their major creditor constituencies also engaged in discussions regarding the Gating Intercreditor Issues.

C. **Plan Progress had Been Made in Mediation**

17. The final objective of the Work Plan was to continue making progress in the ongoing mediation. There is no question that mediation under Judge Peck's guidance has been

---

[4] Wilmington Trust, National Association, in its capacity as indenture trustee for various series of senior unsecured notes (the "SUNs").
[5] As defined in the *RMBS Trustees' Statement in Support of Appointment of a Mediator* [Docket No. 2465].
[6] As defined in the *Limited Objection of the Steering Group of RMBS Holders to Debtors' Motions (i) To Further Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof, and (ii) for Appointment of a Mediator* [Docket No. 2400].

productive and that progress has been made in mediation. It is my understanding that over the course of the Third Exclusivity Extension, Judge Peck has conducted numerous mediation sessions with each of the Debtors' key stakeholders. Since the March 5, 2013 Hearing, these negotiations have also been bilateral, and the parties have addressed the Gating Intercreditor Issues, in addition to the AFI Settlement. Judge Peck has scheduled "all hands on deck" mediation sessions for next week.

18. In consultation with the Mediator, and at the request of parties in interest, the Debtors have delayed filing certain pleadings prepared by the Debtors seeking to resolve certain of the Gating Intercreditor Issues. If the global mediation session does not result in consensus, the Debtors intend to file promptly these pleadings to request that the Court adjudicate the Gating Intercreditor Issues. Furthermore, Judge Peck has agreed to assist the Debtors and the Creditors' Committee to work together towards a consensual Chapter 11 plan even if mediation does not result in an AFI Settlement.

19. I believe that the Debtors and their key stakeholders have made substantial progress in mediation, resulting in significant movement toward global resolution of key plan issues and serious consideration of a term sheet regarding potential plan treatments.

**d.    The Debtors Have Made Significant Progress Warranting a Further Extension of Exclusivity**

20. Since my appointment as CRO, the Debtors have made strides towards a reorganization plan. I believe that satisfaction of the objectives set forth in the Work Plan, as described in my Declaration, fulfills the Court's condition for a further extension of exclusivity to "show very, very substantial progress." *See* Third Exclusivity Transcript at 39:15. This ongoing progress warrants a continuation of the Exclusive Plan Period for an additional 71 days. I am confident that a further extension of exclusivity is in the best interests of these estates. I

7

remain committed to leading the Debtors in these discussions and leading the plan process to its eventual resolution.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 19, 2013            /s/ Lewis Kruger
New York, New York              Lewis Kruger