Exhibit A

## COMMONWEALTH OF PENNSYLVANIA

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY

U. S. Bank National Association,               :
      Plaintiff/Petitioner,               :
                      : File No. 13-00923
      v.               :

Greenpoint Mortgage Funding, Inc.,               :
      Defendant               :

### SUBPOENA TO ATTEND AND TESTIFY

TO:    Custodian of Records, GMAC Mortgage Corporation, 1100 Virginia Drive, Fort Washington, PA 19034

1. You are ordered by the court to come to Montgomery County Courthouse, 2 East Airy Street, Norristown, PA 19401 -- go to Lower Plaza Level next to law library
    (Specify courtroom or other place)

at _____, Montgomery County, Pennsylvania, on February 12, 2013

at 10:00 o'clock A. M., to testify on behalf of U.S. Bank National Association

in the above case, and to remain until excused.

2. And bring with you the following the documents requested by Schedule A attached hereto

    If you fail to attend or to produce the documents or things required by this subpoena, you may be subject to the sanctions authorized by Rule 234.5 of the Pennsylvania Rules of Civil Procedure, including but not limited to costs, attorney fees and imprisonment.

**ISSUED BY A PARTY/COUNSEL IN COMPLIANCE WITH Pa.R.C.P.No.234.2 (a)**

NAME: Gregg Kanter

ADDRESS: Gregg H. Kanter Law Office LLC
              2222 Pine Street, Philadelphia PA 19103

TELEPHONE: 917 494 5317

SUPREME COURT ID #: 64789

BY THE COURT:
Mark Levy, Prothonotary

DATE: January 16, 2013
    Seal of the Court

BY: _____
              Agent/Deputy

**OFFICIAL NOTE:** This form of subpoena shall be used whenever a subpoena is issuable, including hearings in connection with depositions and before arbitrators, masters, commissioners, etc. In compliance with Pa.R.C.P.No.234.1. If a subpoena for production of documents, records or things is desired, complete paragraph 2.

**RETURN OF SERVICE:**

on the _____ day of _____, 20 ___,

I, _____

served _____

(NAME OF PLACE SERVED)

with the foregoing subpoena by:
(Describe method of service)

_____

_____

_____

I verify that the statements in this return of service are true and correct. I understand that false statements herein are made subject to the penalties of 18Pa.C.S.A.§ 4904 relating to unsworn falsification to authorities.

DATE: _____

_____

(SIGNATURE)

## SCHEDULE A

### DEFINITIONS

1.      The term "document" is used in the broadest sense of the term and includes each and every physical, tangible, magnetic or electronic embodiment of information, data or communication (as hereinafter defined) and is intended to be at least as broad in meaning and scope as the usage of this term in the New York Civil Practice Law and Rules (the "CPLR"). "Document" includes writings, drawings, graphs, charts, sound recordings, images, computer files, photographs, microfilms, audio recordings (including voicemail), video recordings, electronic mail ("email") and other electronic data (as hereinafter defined) or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form. A draft or non-identical copy is a separate document.

2.      The term "communication" means the transmittal of information, including facts, ideas, inquiries or otherwise, in any form.

3.      The term "electronic data" means information stored in electronic format and includes information created automatically by a computer, such as load files, or information created by a user using any software application, including word-processing documents, spreadsheets, databases, charts, graphs and outlines; operating systems; source code of all types; PIF, TIF and PDF files; batch files; ASCII files; SGML, HTML and XML files; originals and all copies of email; activity listings of email receipt and transmittal; voicemail; audio or video recordings of any kind; programming notes or instructions; portable hard drive; on-line repositories; social network sites;

network storage on-site; any "cloud" metadata; and all other electronic files or file fragments, regardless of the media on which they are stored and regardless of whether the data resides in an active file, a deleted file or a file fragment. Electronic data includes information stored on all primary-storage or backup-storage media, whether fixed or removable and whether permanent, write-once or rewritable, including hard drives; floppy disks; optical disks, including compact discs, DVDs and paper disks (e.g., Blu-Ray disks); Bernoulli disks and their equivalent; computer chips, including ROM chips, RAM chips and flash-memory chips; and magnetic tapes of all kinds. Electronic data also includes the file-folder tabs, containers or labels appended to any storage device containing electronic data.

4.    The terms "and" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope. "Or" is not exclusive. "Includes" and "including" are not limiting. "All" and "any," whenever used separately, shall be construed as "any and all."

5.    The use of the singular of any word includes the plural and vice versa as necessary to make the discovery request inclusive rather than exclusive.

6.    The use of a verb in any tense shall be construed as the use of that verb in all other tenses wherever necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

7.    The term "concerning" means relating to, referring to, pertaining or responding to, commenting on, regarding, with respect to, relative to, in connection with, discussing, describing, reflecting, evidencing, implying, analyzing or constituting.

2

8. The term "AARs" means the Assignment, Assumption and Recognition Agreements, dated as of July 28, 2006, among GMAC, Lehman Bank and GreenPoint.

9. The term "Complaint" means the complaint filed to commence this action on or about February 5, 2009 by the Indenture Trustee and the Insurers and attached hereto as Exhibit 1.

10. The term "GMAC" means GMAC Mortgage Corporation and includes all of its present or former Representatives. The pronoun "you" and all cognates thereof refer to GMAC.

11. The term "GreenPoint" means GreenPoint Mortgage Funding, Inc. and includes all of its present or former Representatives, GreenPoint Financial Corp. and all of the present or former Representatives of GreenPoint Financial Corp.

12. The term "Indenture Trustee" means U.S. Bank National Association, as indenture trustee of the Trust.

13. The term "Insurers" means Syncora Guarantee Inc., formerly known as XL Capital Assurance Inc. ("Syncora") and CIFG Assurance North America, Inc. ("CIFG"), insurers of certain of the Notes.

14. The term "Loans" means the residential mortgage loans transferred to the Trust in connection with the Transaction.

15. The term "Notes" means those Home Equity Loan Asset-Backed Notes, Series 2006-HE1 issued by the Trust.

16. The term "Noteholders" means the holders of the Notes.

3

14210020.2

17.    The term "Purchaser" has the meaning assigned to it in the Sale Agreements.

18.    The term "Sale Agreements" means the Flow Revolving Credit Loan Purchase and Warranties Agreement dated as of September 26, 2005, between GreenPoint and GMAC (the "HELOC Sale Agreement") and the Flow Mortgage Loan Purchase and Warranties Agreement dated as of July 26, 2006, between GreenPoint and GMAC (the "Mortgage Loan Sale Agreement").

19.    The term "Servicer" has the meaning assigned to it in the TSA.

20.    The term "Representative" of any non-natural person or entity includes all present and former directors, officers, employees, members, agents, advisors, consultants and other persons (including attorneys) acting or purporting to act on behalf of such person or entity.

21.    The term "Transaction Parties" means all of the parties to the agreements that effectuated the Transaction or which parties were otherwise involved with the Transaction, including without limitation GreenPoint, GMAC, Lehman Brothers Bank, FSB (now known as Aurora Bank, FSB) ("Lehman Bank"), Lehman Brothers Holdings, Inc. ("Lehman Holdings"), Structured Asset Securities Corporation ("SASC"), the Trust, the Insurers, the Noteholders, and includes all of their present or former Representatives.

22.    The term "Transaction" means the securitization transaction culminating in the formation of the Trust and the Trust's issuance of the Notes, including all transactions and agreements in connection with such securitization transaction, as more fully described in the Complaint.

4

14210020.2

23.    The term "Trust" means GreenPoint Mortgage Funding Trust 2006-HE1.

24.    The term "TSA" means the Transfer and Servicing Agreement, dated as of August 1, 2006, among the Trust, SASC, GMAC and the Indenture Trustee.

### INSTRUCTIONS

1.    Each request covers documents in your possession, custody or control, which extends to any documents in the possession, custody or control of any of your Representatives and includes documents that are not in your custody but are owned in whole or in part by you or those about which you have an understanding or agreement, express or implied, that you may use, inspect, examine or copy.

2.    If a document exists only in electronic form, please provide a copy thereof in a computer-readable format mutually agreed upon by GMAC and the Indenture Trustee, which format shall include multiple page PDF files, OCR at the document level, and applicable metadata to be agreed upon by GMAC and the Indenture Trustee.

3.    If any document requested was, but is no longer, in your possession, custody or control, identify the document and state what disposition was made of it and the date or dates upon which such disposition was made and, additionally, produce all documents relating to the disposition of such document.

4.    If any request (or portion thereof) is objected to, the reason for the objection shall be stated in detail. In addition, with respect to each document withheld from production, on any basis whatsoever, including any document withheld on the basis of the attorney-client privilege and/or the work-product doctrine, a separate list of all

14210020.2

such documents shall be served with the responses to the document requests herein that

states and identifies the following information:

a) the nature of the claim of privilege or immunity, including the statute, rule or decision giving rise to the claim of privilege or immunity;

b) all facts relied upon in support of the claim of privilege or immunity;

c) all persons on whose behalf the privilege or immunity is claimed;

d) the type of document (*e.g.*, letter, memorandum, note, telegram, email, chart, report, recording etc.);

e) the subject matter of the document (without revealing the information as to which privilege is claimed);

f) the document's date, author(s), sender(s), addressee(s) and recipient(s); and

g) the paragraph(s) of this request to which production of the document is responsive.

5.    When only a portion of a document is believed by you to be

privileged, the non-privileged portion shall be produced with the allegedly privileged

portion redacted and indicated as such. Any attachment to an allegedly privileged

document shall be produced unless you also contend that the attachment is privileged, in

which case the information required herein shall be provided separately for each such

attachment.

6.    In the event that you are able to produce only some of the

documents responsive to these requests within the allowed time, you are requested to

produce the documents that can be produced and to state the reason for your inability to

produce the remaining documents. Once the remaining responsive documents are

obtained and/or available, those documents should be produced promptly.

14210020.2

7.     The requested documents shall be produced in the same manner and order in which they are kept in the usual course of business, including copies of file-folder labels, etc.

8.     Documents shall be produced in such fashion as to identify the department, branch, division or office in whose possession such documents were located and, where applicable, the natural person in whose possession such documents were found and the business address of each document's custodian(s).

9.     These requests call for production of all documents pertaining to the indicated subject, including all non-identical copies and drafts of those documents. If the original of any document cannot be located, provide a copy in lieu thereof, which shall be legible and bound or stapled in the same manner as the original. Copies of otherwise identical documents should be individually produced if one contains additional markings or notations that do not appear in the other.

10.     Documents attached to one another in their original form should not be separated.

11.     All documents responsive to this request, including any responsive documents not produced for reasons of privilege or any other objection, shall be numbered by bates stamp or similar combination of letters and numbers, such that the documents can be identified as having been produced by you.

12.     The fact that a document has or will be produced by another defendant, third party or other party to this or any related action does not relieve you of the obligation to produce your copy of the same document even if the two documents are identical in all respects.

7

14210020.2

13.     The period of time covered by each of these requests is from

January 1, 2005 to the date of your response hereto.

14.     This subpoena *duces tecum* and the document requests herein are

continuing in nature and require you to promptly produce any additional responsive

documents located after the date of the initial production.

8

## DOCUMENTS TO BE PRODUCED

1.    All documents concerning the Transaction and the Loans, including without limitation all communications by, among or between you and any of the Transaction Parties, any rating agencies or any other third parties concerning the Transaction or the Loans.

2.    All documents concerning the Sale Agreements, including without limitation all documents (such as drafts and non-final versions of the documentation) concerning the preparation or execution of such documents, all documents concerning the sale of Loans pursuant to the Sale Agreements, and all documents concerning any purchase price and terms letters, and drafts thereof.

3.    All documents concerning the negotiation and structuring of the Transaction.

4.    All documents concerning your role as Purchaser in connection with the Sale Agreements and your rights and obligations in connection with the Transaction.

5.    All documents concerning the AARs, including your rights and obligations thereunder.

6.    All documents concerning any due diligence, risk assessment, fraud control and detection, or other similar practices undertaken in connection with the Transaction.

7.    Documents sufficient to identify your employees involved in any aspect of the negotiation, structuring or documentation of the Transaction or in any due-diligence, risk assessment or fraud control or detection in connection with the

9

Transaction, including the names and titles of all such persons, the dates of their

employment by you and their departments and supervisors, and their last known contact

information.

      8.    All documents concerning your role as Servicer of the Loans,

including your rights and responsibilities, and any exercise or performance thereof, in

that capacity.

      9.    Documents sufficient to show the servicing guidelines applicable

to the Transaction and the Loans.

      10.    All documents and communications concerning the valuation of, or

the actual or expected performance of, the Transaction or the Loans.

      11.    All documents and communications concerning the performance,

delinquency or default of any Loan, including without limitation all documents and

communications concerning the reasons for the delinquency or default and any quality-

control reports.

      12.    All servicing records concerning any Loan, whether relating to

periods prior to or after the closing of the Transaction, including pay history, updated

borrower income, asset or occupancy information, customer-service notes or calls,

collection comments, loss-mitigation notes, equity analyses, updated valuations and

property inspections. The Indenture Trustee asks that this request be updated at regular

intervals, no less than 60 days apart.

      13.    All loan performance metrics for the Loans, including documents

sufficient to identify for each Loan and each month: whether and to what extent such

Loan is delinquent, amounts of interest paid with respect to such Loan, amounts paid in

14210020.2

principal with respect to such Loan, outstanding principal balance, outstanding interest owed, the status of such Loan (e.g.,., whether current, delinquent, defaulted, REO, repurchased, or charged-off), any additional principal increases or draws for such Loan, the interest rate assessed on the outstanding balance of such Loan, any fees assessed or charge with respect to such Loan, any curtailments or charge-offs with respect to such Loan, any minimum payment due with respect to such Loan, and any other information regularly tracked by you for the Servicing of such Loan.  The Indenture Trustee asks that this request be updated at regular intervals, no less than 60 days apart.

14.    All documents and communications concerning monthly loan-level detail provided to the Indenture Trustee or any of the other Transaction Parties.

15.    All documents and communications concerning the repurchase or substitution, or prospective repurchase or substitution, of any of the Loans, including without limitation any repurchase demand made to GreenPoint with respect to any Loan (whether based on alleged breaches of GreenPoint's representations and warranties, early payment defaults, or any other basis) and all documents concerning any payments made by or to GMAC, or any other Transaction Party, in connection with the repurchase of any Loan, including wire transfer instructions, bank records, and any other document reflecting the repurchase of such Loans.

16.    All documents and communications concerning quality control, fraud detection, claims or repurchase demands by or against GreenPoint, concerning any of the Loans, including without limitation:

a)  Quality-control reports and policies and practices;

14210020.2

    b) Fraud-control and fraud-detection reports and policies and

       practices;

    c) Risk-assessment reports and policies and practices;

    d) Credit reports; and

    e) Management directives and reports.

17.    All documents and communications concerning any, or any efforts to identify or prevent any, errors, omissions, misrepresentations, negligence, fraud or similar occurrences on the part of any party with respect to the Loans, including without limitation, any documents concerning the breach of a representation or warranty made by GreenPoint in the Sale Agreements.

18.    All documents and communications concerning loss-mitigation efforts in connection with the Transaction and the Loans.

19.    All documents and communications concerning loan modifications considered or made with respect to the Loans, including without limitation loan-level analyses with respect to the basis for the modification and compliance with the terms of the Transaction documents relative to the making thereof, and any information obtained from the applicable borrower in connection therewith, either verbally or in writing.

20.    All documents and communications concerning the enforcement of any rights by any of the Transaction Parties in connection with the Transaction.

21.    Documents sufficient to identify your personnel involved with or participating in servicing the Loans, including the names and titles of all such persons, the dates of their employment by you, their departments and supervisors, and their last known contact information.

14210020.2

22.    All documents and communications relating to the assignment forms attached as Exhibit G to the HELOC Sale Agreement and Exhibit H to the Mortgage Loan Sale Agreement, including without limitation documents sufficient to show all instances in which GMAC utilized or tried to utilize such forms or attached such forms as exhibits to any agreements in connection with the Transaction and/or any other securitization transaction in which GMAC was involved.

23.    All closing documents or "closing sets" for each of the following transactions (the "Additional GreenPoint Transactions"):

| Transaction | Closing Date Indicated in Prospectus Supplement |
|---|---|
| GreenPoint Mortgage Funding Trust 2006-AR4 | August 31, 2006 |
| GreenPoint Mortgage Funding Trust 2006-AR5 | September 29, 2006 |
| GreenPoint Mortgage Funding Trust 2006-AR6 | October 31, 2006 |
| GreenPoint Mortgage Funding Trust 2006-AR7 | November 30, 2006 |
| GreenPoint Mortgage Funding Trust 2006-AR8 | December 29, 2006 |
| GreenPoint Mortgage Funding Trust 2007-AR1 | February 28, 2007 |
| GreenPoint Mortgage Funding Trust 2007-AR2 | April 30, 2007 |
| Greenpoint Mortgage Funding Trust 2005-HE4 (MD) | September 30, 2005 |
| Greenpoint Mortgage Funding Trust 2005-HE4 (CT) | September 30, 2005 |

24.    All documents concerning the transfer, conveyance, assignment or repurchase of any mortgage loan included in the Additional GreenPoint Transactions, including without limitation, (i) all sale agreements, assignment agreements, and purchase price and terms letters, (ii) all documents concerning the transfer, conveyance or assignment of any representations, warranties and/or repurchase obligations corresponding to such mortgage loans; (iii) all documents concerning the actual or proposed repurchase of such mortgage loans; and (iv) all documents concerning any obligation by any party to any of the Additional GreenPoint Transactions to repurchase loans not in compliance with such party's representations or warranties.

13

14210020.2

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S. BANK NATIONAL ASSOCIATION, as Inden-
ture Trustee for the Benefit of the Insurers and Note-
holders of GreenPoint Mortgage Funding Trust 2006-
HE1, Home Equity Loan Asset-Backed Notes, Series
2006-HE1; SYNCORA GUARANTEE INC., formerly
known as XL CAPITAL ASSURANCE INC., as Con-
trolling Insurer, Note Controlling Party and Class Ax
Insurer; and CIFG ASSURANCE NORTH AMERICA,
INC., as Class Ac Insurer,

                              Plaintiffs,

                - against -

GREENPOINT MORTGAGE FUNDING, INC.,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No.:

09600352

**COMPLAINT**

FILED
FEB 05 2009
NEW YORK
COUNTY CLERK'S OFFICE

The plaintiffs—(i) U.S. Bank National Association, solely in its capacity as inden-

ture trustee (the "Indenture Trustee") under the Indenture[1] for the benefit of the insurers and

holders ("Noteholders") of the notes issued by GreenPoint Mortgage Funding Trust 2006-HE1

(the "Issuer"), and at the direction of co-plaintiff Syncora Guarantee Inc., formerly known as XL

Capital Assurance Inc. ("Syncora"), as Controlling Insurer; (ii) Syncora, as Controlling Insurer,

Note Controlling Party and Class Ax Insurer under the Indenture; and (iii) CIFG Assurance

North America, Inc. ("CIFG" and, with Syncora, the "Insurers"), as Class Ac Insurer under the

Indenture—by their attorneys, Nixon Peabody LLP (for the Indenture Trustee) and Patterson

Belknap Webb & Tyler LLP (for the Insurers), for their complaint against the defendant, Green-

---

[1] The "Indenture" is that certain Indenture dated as of August 1, 2006 between GreenPoint Mortgage
Funding Trust 2006-HE1, as Issuer, and the Indenture Trustee.

1

Point Mortgage Funding, Inc. ("GreenPoint"), a wholly owned subsidiary of Capital One Financial Corporation, hereby allege as follows:

<u>NATURE OF THE ACTION</u>

1.      This is a breach-of-contract action arising from GreenPoint's blanket failure to comply with the plain and unambiguous terms of two agreements governing its sale of nearly 30,000 residential mortgage loans that it originated.  In the Sale Agreements (as defined below), GreenPoint (a) made numerous representations and warranties relating to the attributes of the loans and the policies and practices pursuant to which the loans were originated, underwritten and serviced and (b) agreed either to cure breaches of those representations and warranties that materially and adversely affected the value of the loans or to repurchase the loans at a contractually specified repurchase price.  As contemplated by the Sale Agreements, the rights to enforce GreenPoint's commitments were assigned along with the loans to the Indenture Trustee in connection with a transaction involving the issuance of $1.83 billion of securities (the "Notes") that were secured and to be paid down by the cash flows from the loans.  Certain payments on the Class Ax Notes and the Class Ac Notes were guaranteed by Syncora and CIFG, respectively.

2.      But less than two years after the close of the transaction, the loans began to default at staggering rates, prompting Syncora as the Controlling Insurer to hire a consultant to review the loan documentation for compliance with GreenPoint's representations and warranties.  As Syncora informed the Indenture Trustee, an astonishing 963 (or 93%) out of a sample of 1,030 of the loans sold, with a total principal balance of $91.8 million, did not comply with GreenPoint's representations and warranties under the Sale Agreements.  The breaches discovered primarily involve an error, omission, misrepresentation, negligence, fraud or similar occur-

2

rence in connection with the origination and underwriting of the loans, all of which were defects that GreenPoint explicitly represented did not exist and agreed to remedy if discovered. The results of the sample analysis, together with the severe underperformance of the entire pool of GreenPoint loans, indicate that such breaches were not confined to the sample of loans reviewed, but rather were pervasive. Indeed, slightly more than two years after closing, as of December 31, 2008, approximately $530 million of the loans (28.95% of the original pool balance) had either been charged off as a total loss or were severely delinquent.

3.    The Indenture Trustee promptly notified GreenPoint in writing of the breaches identified by Syncora, thereby triggering GreenPoint's extensive remedial obligations under the Sale Agreements. Specifically, the Sale Agreements require GreenPoint to repurchase *all* of the $1.83 billion of loans that it sold under those agreements upon discovery that it made untrue statements in connection with the sales, a fact that was established upon notice of the breaches identified through the sample analysis. GreenPoint has failed and continues to fail to comply with this explicit obligation, as well as its lesser-included but also explicit obligation of repurchasing the specifically identified breaching loans. GreenPoint's widespread breaches of the representations and warranties that it made in connection with the sale of the loans—as well as its failure to perform its contractually required remedial cure-or-repurchase obligation— constitute material breaches of each of the Sale Agreements as a whole.

4.    Accordingly, the Indenture Trustee, acting at the direction of Syncora, as the Controlling Insurer and Note Controlling Party, Syncora, as Class Ax Insurer, and CIFG, as Class Ac Insurer, bring this action to compel the repurchase of all of the loans sold by Green-Point, including those breaching loans, or, in the alternative, to recover as damages the contractually specified repurchase price for all the loans.

3

## THE PARTIES

5.    U.S. Bank National Association is a national banking association whose articles of association designate Ohio as the location of its main office, and whose principal place of business is in Minneapolis, Minnesota.

6.    Syncora is a New York corporation with its principal place of business in New York, New York.

7.    CIFG is a New York corporation with its principal place of business in New York, New York.

8.    Upon information and belief, GreenPoint is a New York corporation with its principal place of business at, until recently, 100 Wood Hollow Drive, Novato, California 94945 and, at present, 1100 Larkspur Landing Circle, Suite 360, Larkspur, California 94939.

## JURISDICTION AND VENUE

9.    This Court has personal jurisdiction over GreenPoint pursuant to C.P.L.R. § 301 because GreenPoint is present in the State of New York and C.P.L.R. § 302(a)(1) because the causes of action pleaded herein arise from transactions of business by GreenPoint within the State of New York.

10.    Venue is proper in New York County pursuant to C.P.L.R. § 503(a) and § 503(c) because several of the parties—namely, Syncora and CIFG—have their principal offices within New York County and therefore are deemed to reside therein.

## BACKGROUND

A.    **GreenPoint Built Its Mortgage-Loan Business on Its Assurances Concerning the Quality of Its Mortgage Loans**

11.    GreenPoint is a wholly owned subsidiary of Capital One Financial Corporation ("Capital One"), which shut down GreenPoint's mortgage-origination operations in Au-

4

gust 2007. GreenPoint had been engaged in the business of originating and selling residential

mortgage loans. GreenPoint specialized in so-called "no-doc" and "low-doc" loans, or those for

which home buyers provide no or little documentation about their income and assets.[2] These

loans, which had traditionally been designed for prime borrowers with strong credit histories, are

also known as "non-conforming" loans because they do not comply with the standards set by

Fannie Mae and Freddie Mac. As discussed below, this non-compliance and limited documenta-

tion made GreenPoint's representations and commitments regarding the loans all the more im-

portant.

       12.     Upon information and belief, the profitability of GreenPoint's "originate

and sell" business model was a function of its ability to originate a high volume of loans and then

convert those loans into cash to fund additional originations. That is, GreenPoint earned fees

from its loan originations and generated profit and funds for additional originations by selling the

loans for "securitization." The securitizations involved the sale of loans to a trust, which in turn

issued securities (or "notes") that were "backed" by the loans. The cash flow generated by the

loans was used to pay principal and interest on the notes. The better the quality of the loans (*i.e.*,

the greater the likelihood that the borrowers would make principal and interest payments when

due), the higher the price GreenPoint could command upon the sale of the loans. But because

GreenPoint specialized in the origination of loans with little or no documentation to substantiate

the borrowers' credit quality and repayment ability, and because the majority of its loans were

originated through a nationwide network of GreenPoint-approved independent mortgage brokers,

the success and viability of GreenPoint's business model depended on others' acceptance of its

representations concerning the attributes of the loans and its commitments to cover any loss re-

---

[2] Valerie Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit*, Wall St. J., Aug. 22, 2007.

5

sulting from breaches of those representations. The importance of these representations cannot
be overstated: GreenPoint's "originate and sell" model meant that it retained no interest in the
performance of the loans after their sale and securitization—*except for* the continuing validity of
the representations that it had made, and the related remedial obligations that it had assumed, in
connection with the sales. GreenPoint's representations therefore had to be sufficiently robust to
persuade the parties to the securitization that GreenPoint—not they—bore the risk of loss due to
deficient or improper origination and underwriting practices or to misleading or incorrect loan
attributes.

13.     Upon information and belief, from 2003 to 2006, when the securitization
at issue occurred, GreenPoint touted the quality of its mortgage loans and origination and under-
writing practices to dramatically increase the volume of its loan originations and sales for securi-
tizations. In its parent company's 2003 filings with the U.S. Securities and Exchange Commis-
sion ("SEC"), for example, Thomas S. Johnson, the Chairman of GreenPoint Financial Corp.,
stated as follows:

> I would like to emphasize that our mortgage production growth did
> not come at the expense of the quality of loans we originated. . . .
> In addition, I would like to emphasize that all of the loans we
> originate, including our specialty, or "Alternative A," loans are
> "A" quality loans. We are not in the business of originating sub-
> prime loans. . . . *It is difficult to conceive of any reasonable sce-*
> *nario in which GreenPoint would suffer meaningful losses on our*
> *loan portfolio.*[3]

14.     The pace and volume of GreenPoint's originations and sales for securitiza-
tions escalated following its acquisition by North Fork Bank ("North Fork") in early 2004, espe-
cially with respect to the two types of loans—so-called "Alt-A" and "HELOC" loans—that con-

---

[3] Letter of Chairman Thomas S. Johnson, incorporated into Form 10-K filed by GreenPoint Financial
Corp. with the SEC on March 28, 2003 (emphasis added).

6

stitute the majority of the loans at issue in this action.[4] From the outset, North Fork's executives promised to significantly grow GreenPoint's productivity and geographic scope.[5] Upon information and belief, North Fork's acquisition of GreenPoint therefore increased the pressure on GreenPoint management to expand its loan-origination and loan-selling business. And, indeed, the first year following the acquisition saw a greater than 41% increase in the total dollar volume of GreenPoint's production for Alt-A and HELOC loans.[6]

15.    Moreover, North Fork reiterated and reinforced the representations concerning the purported quality of GreenPoint's loan portfolio and protocols, stating that "credit underwriting procedures [at] GreenPoint specifically are excellent" and that "[GreenPoint]'s run by what [we] believe are some of the best managers in the country, they are right up there with Countrywide and others."[7] Countrywide and its management are currently subject to myriad investigations and actions, some of which have already settled, for having engaged in systematic fraud in connection with the origination of residential mortgage loans.[8]

16.    Even when the volume of originations in the industry declined, Green-Point's executives promised that it would outperform the market.[9] But, as has only recently been

---

[4] *See* Prospectus Supplement dated August 25, 2006 for GreenPoint Mortgage Funding Trust 2006-HE1, Home Equity Loan Asset-Backed Notes, Series 2006-HE1 (together with the underlying Prospectus, the "ProSupp"), at S-38.

[5] *See* Investor call with North Fork management (Feb. 17, 2004).

[6] *See* ProSupp at S-38.

[7] Investor call with North Fork management (Feb. 17, 2004).

[8] *See, e.g., In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (denying Countrywide's motion to dismiss a shareholders' derivative suit and noting that former Countrywide employees credibly "tell what is essentially the same story—a rampant disregard for underwriting standards" and "support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards").

[9] *See, e.g.,* Investor call with Jeffrey Leeds, Executive Vice President and Chief Financial Officer of GreenPoint Financial Corp. (Oct. 16, 2003).

7

learned through the loan-documentation review conducted by Syncora's consultant, contrary to GreenPoint's representations and assurances, the loans that it was originating and selling for securitizations were not quality loans and were not originated and underwritten pursuant to sound, prudent practices.

17.    Capital One, which had acquired GreenPoint, together with North Fork, in late 2006, shut down GreenPoint's mortgage-loan operations in August 2007, less than a year later and only a year after the date of the securitization involved in this action.  A GreenPoint spokesperson and Capital One's chairman both offered the same explanation for GreenPoint's demise:  tightened underwriting standards in the lending industry.[10]  Capital One publicly announced that it would "retain exposure to future repurchases of past GreenPoint production to meet representation and warranty claims."[11]

18.    Neither Capital One nor GreenPoint, however, has repurchased the loans that GreenPoint is contractually required to repurchase to address the harm that GreenPoint's practices have inflicted on the securitization at issue.  The Indenture Trustee and the Insurers bring this action to compel GreenPoint to perform its obligations under the Sale Agreements.

**B.    The Sales and Securitization**

19.    In two transactions in September 2005 and July 2006 ("Sales"), Green-Point sold nearly 30,000 residential mortgage loans that it had originated ("Loans") to GMAC Mortgage Corporation ("GMAC").  The Sales were effectuated pursuant to two agreements:  a Flow Revolving Credit Loan Purchase and Warranties Agreement dated September 26, 2005

---

[10] *See* Jed Moss, *Alt-A Mortgage Lender Closes Up Shops*, Mortgage Found., June 9, 2007 (citing Green-Point spokesperson Julie Rakes); Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit* (citing a memo circulated by Capital One Chairman and Chief Executive Richard D. Fairbanks).

[11] Press Release, Capital One, Capital One Closes GreenPoint Mortgage Wholesale Unit (Aug. 20, 2007) (as filed with the SEC).

8

("HELOC Sale Agreement") and a Flow Mortgage Loan Purchase and Warranties Agreement

dated July 26, 2006 ("Mortgage Loan Sale Agreement") (collectively, "Sale Agreements").

20.    The Sale Agreements explicitly contemplated that the Loans would be se-
curitized and used as collateral for notes issued to investors.  Section 28 of the Sale Agreements

not only authorizes GMAC, as Purchaser, to "convey the [Loans] to one or more securitized trust

structures," but requires GreenPoint to "cooperate" with GMAC in connection with any such

"Securitization Transfer."

21.    In addition, GreenPoint explicitly obligated itself to honor GMAC's rights

and remedies under the Sale Agreements (the "Purchaser's Rights and Remedies") regardless of

who ultimately acquired them through the assignments necessary to effectuate a contemplated

securitization. Section 21 of the Sale Agreements states that the Purchaser's Rights and Reme-

dies "shall bind and inure to the benefit of and be enforceable by [GreenPoint] and the Purchaser

*and the respective successors and assigns of . . . the Purchaser*." (Emphasis added.)  And Sec-

tion 21 of the HELOC Sale Agreement, which applies to 95% of the Loans, states that, "in the

case of a Securitization Transfer . . . , Purchaser shall have the right to assign its rights under this

Agreement into such Securitization Transfer . . . *after which the issuer or trustee for the issuer of*

*any such Securitization Transfer . . . shall be deemed to be a Purchaser*." (Emphasis added.)

22.    As contemplated, the Loans and the Purchaser's Rights and Remedies

were transferred into the Issuer, a Delaware statutory trust bearing GreenPoint's name, Green-

Point Mortgage Funding Trust 2006-HE1, and then granted and assigned from the Issuer to the

Indenture Trustee for the benefit of the Insurers and Noteholders, all as part of a securitization

9

transaction that closed on August 28, 2006 (the "Securitization").[12] The transfers were accomplished through a chain of assignments executed within five days of the second GreenPoint-to-GMAC Sale.

      23.      GMAC initially assigned the Purchaser's Rights and Remedies, together with the Loans, to Lehman Brothers Bank, F.S.B. ("Lehman Bank") through two Assignment, Assumption and Recognition Agreements ("AARs"), one for each of the two Sale Agreements, dated July 28, 2006. Section 6 of the AARs makes clear that Lehman Bank, as "Assignee," "shall become the 'Purchaser' under the [Sale] Agreement[s]." Accordingly, "all representations, warranties and covenants by [GreenPoint] as the 'Seller' thereunder, including, but not limited to, the representations, warranties and covenants to repurchase any [Loan] . . . , shall accrue to [Lehman Bank] by virtue of the [AARs]." AARs § 6.

      24.      Lehman Bank subsequently assigned these representations, warranties and covenants and the other Purchaser's Rights and Remedies, together with the Loans, to its parent company Lehman Brothers Holdings, Inc. ("Lehman Holdings"),[13] which, in turn, assigned them to an affiliated special-purpose entity known as the Depositor, in this case, Structured Asset Securities Corporation ("SASC").[14] Finally, SASC assigned the Purchaser's Rights and Remedies, together with the Loans, to the Issuer, which then granted and assigned the Purchaser's Rights and Remedies, together with the Loans, to the Indenture Trustee for the benefit of the Insurers

---

[12] Another company, Impac Funding Corporation, originated and also sold to GMAC a negligible percentage of the loans that were ultimately deposited into the Issuer, but only the GreenPoint loans are relevant to this action.

[13] Assignment and Assumption Agreement, dated August 1, 2006.

[14] Mortgage Loan Sale and Assignment Agreement, dated August 1, 2006.

10

and the Noteholders.[15] This is precisely the "Securitization Transfer" contemplated by the Sale Agreements.

25.    Under the Indenture, which effectuated the final step of the assignment process described above, the Insurers are granted various rights with respect to the enforcement of the Indenture Trustee's rights and remedies.  First, as noted, the Issuer's grant and assignment of the Loans and the Purchaser's Rights and Remedies to the Indenture Trustee was for the benefit of the Insurers, among others.  Section 11.10 of the Indenture explicitly names the Insurers as "third-party beneficiaries to the provisions of this Indenture," a status that entitles the Insurers "to rely upon and directly to enforce such provisions of the Indenture."  In addition, Section 5.20 of the Indenture sets forth various "Insurers' Rights Regarding Actions, Proceedings or Investigations."  These include the right of the Controlling Insurer "to participate in, to direct the enforcement . . . of, and, at the Controlling Insurer's sole option, to institute . . . any action, proceeding or investigation that could adversely affect the Issuer . . . or the rights or obligations of the Insurers . . . under the related Policy or the Operative Agreements."  Indenture § 5.20(a).  Syncora is, and at all times since the Securitization has been, the Controlling Insurer under the Indenture, and CIFG would become the Controlling Insurer if certain circumstances were to arise.  See id. § 1.01(a).  Finally, the Insurance and Indemnity Agreements that Syncora and CIFG separately entered into in connection with the Securitization grant them similar rights to direct the actions of the Indenture Trustee and the enforcement of the Indenture Trustee's rights and remedies.[16]

---

[15] Transfer and Servicing Agreement and Indenture, each dated August 1, 2006.

[16] Under Section 5.02(a)(iii) of the Insurance and Indemnity Agreement dated August 28, 2006 that Syncora entered into with, among others, the Indenture Trustee, Syncora is empowered to "exercise any rights and remedies under the Indenture in accordance with the terms thereof or direct the Indenture Trustee to exercise such remedies in accordance with the terms of the Indenture."  Section 5.02(a)(iv) also empowers Syncora to "exercise any rights and remedies under the Transfer and Servicing Agreement ['TSA'],"

11

26.    Accordingly, the Indenture Trustee, at the direction of Syncora and with both Syncora and CIFG, brings this action to exercise and enforce the Purchaser's Rights and Remedies for the benefit of the Insurers and the Noteholders. As discussed further below, these include the right to demand that GreenPoint comply with its clear contractual obligations to re-purchase the Loans upon notice that GreenPoint is in breach of one or more of its representations and warranties.

C.    **GreenPoint's Representations and Warranties
Are the Linchpin of the Sales and Securitization**

27.    GreenPoint's numerous and broad representations and warranties relating to the Loans and the practices pursuant to which the Loans were originated and underwritten were an inducement to the initial Sales, the ultimate sale of the Loans to the Issuer as part of the Securitization, and every assignment in between, as well as an inducement to the Insurers to is-sue their insurance policies for the benefit of the Noteholders. In making these representations and warranties, GreenPoint assured the Purchasers and Securitization participants that Green-Point—not they—would bear the risk of the Loans' non-compliance. The Indenture Trustee and the Insurers and, upon information and belief, the other Securitization participants, relied on GreenPoint's representations and warranties and GreenPoint's assumption of this risk in deciding to participate in the Securitization and the other transactions contemplated by the Sale Agree-ments and, in the case of the Insurers, in assessing their own risk in issuing their respective in-surance policies.

---

which include in Section 3.03 of that agreement the Indenture Trustee's right to demand from GreenPoint the repurchase of loans upon the breach of its representations and warranties. *See* TSA § 3.03. CIFG is granted the identical power under Section 5.02(a)(i) of the separate Insurance and Indemnity Agreement dated August 21, 2006.

12

*L.   GreenPoint's Representations and Warranties*

28.   GreenPoint's representations and warranties are contained in Sections 6 and 7 of the Sale Agreements. With respect to each of the Loans, GreenPoint represented and warranted, among other things, that, as of the closing date of the Sales:

- The information set forth in the Loan Schedule is complete, true and correct. (Sale Agreements § 7(a));

- Each Loan at the time it was made complied in all material respects with applicable local, state and federal laws (including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer-credit protection, equal-credit-opportunity and disclosure laws, predatory- and abusive-lending laws and unfair- and deceptive-practices laws). (Sale Agreements § 7(g));

- The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. (Sale Agreements § 7(k));

- No fraud was committed in connection with the origination of a Loan. (Sale Agreements § 7(k));

- Each Loan was underwritten in accordance with GreenPoint's underwriting guidelines in effect at the time such Loan was originated. (HELOC Sale Agreement § 7(u); Mortgage Loan Sale Agreement § 7(v));

- No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Loan has taken place on the part of any person including without limitation the Mortgagor, any appraiser, any builder or developer or any other party involved in the origination of the Loan; no predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit that has no apparent benefit to the Mortgagor, were employed in the origination of the Loan. (HELOC Sale Agreement § 7(tt); Mortgage Loan Sale Agreement § 7(yy));

- The origination and collection practices used with respect to a Loan have been in accordance with Accepted Servicing Practices, in all respects in compliance with all applicable laws and regulations and in all material respects proper and prudent in the mortgage origination and servicing business. (HELOC Sale Agreement § 7(ff); Mortgage Loan Sale Agreement § 7(hh)); and

- The methodology used in underwriting the extension of credit for each Loan employs objective mathematical principles which relate the Mortgagor's income, as-

13

sets and liabilities to the proposed payment and such underwriting methodology
does not rely on the extent of the Mortgagor's equity in the collateral as the prin-
cipal determining factor in approving such credit extension. Such underwriting
methodology confirmed that at the time of origination (application/approval) the
Mortgagor had a reasonable ability to make timely payments on the Loan.
(HELOC Sale Agreement § 7(ccc)).

29.    "[A]s a condition to the consummation of" the Sales and any other trans-

actions "contemplated by" the Sale Agreements (*i.e.*, the Securitization), GreenPoint also repre-

sented and warranted, among other things, that, as of the closing date of the Sales:

[n]either this Agreement nor any statement, report or other docu-
ment furnished or to be furnished pursuant to this Agreement or in
connection with the transactions contemplated hereby contains any
untrue statement of fact or omits to state a fact necessary to make
the statements contained therein not misleading.

(Sale Agreements § 6(h)).

30.    Among the documents furnished in connection with the Securitization was

the Prospectus Supplement (together with the underlying Prospectus, the "ProSupp") delivered to

prospective investors pursuant to the Securities Act of 1933, as amended. The ProSupp contains

additional assurances made by GreenPoint about its loan-origination and loan-underwriting

practices. The ProSupp includes, for example, an assurance to prospective investors that the

Loans were underwritten and issued in a prudent fashion and therefore were unlikely to default.[17]

Specifically, the ProSupp states that "the GreenPoint underwriting guidelines are applied to

evaluate the prospective borrower's credit standing and repayment ability and the value and

adequacy of the mortgaged property as collateral." ProSupp at S-38. The ProSupp further

specifies that, "[a]s part of its evaluation of potential borrowers, GreenPoint generally requires a

description of the borrower's income." *Id.* at S-39.

---

[17] An identical description appears in an exhibit to the August 1, 2006 Mortgage Loan Sale and Assign-
ment Agreement between Lehman Holdings and SASC.

14

31.    With respect to its "no-doc" or "low-doc" loan-origination programs,
GreenPoint assured investors that the borrowers participating in such programs had "credit histo-
ries that demonstrate an established ability to repay indebtedness in a timely fashion." *Id.*
GreenPoint also claimed to conduct a "quality control review" of a sample of the loans that it
acquired from "approved correspondent lenders." *Id.*

32.    To reinforce the absolute nature of its commitment to bear the risk in the
event that any of the Loans did not comply with the foregoing representations and warranties,
GreenPoint explicitly agreed in the Sale Agreements that a representation and warranty made to
the best of its knowledge, if proven to be inaccurate, would be deemed breached "notwithstand-
ing [GreenPoint]'s lack of knowledge with respect to the substance of such representation and
warranty." Sale Agreements § 8(b).

### ii.    *GreenPoint's Cure-or-Repurchase Obligation*

33.    GreenPoint's assumption of the risk that its representations and warranties
would prove inaccurate also included an obligation to cure any such breaches or to repurchase
Loans with respect to which breaches had been or are identified.  Section 8 of the Sale Agree-
ments provides in relevant part as follows:

> Within 60 days of the earlier of either discovery by or notice to
> [GreenPoint] of any Breach of a representation or warranty,
> [GreenPoint] shall use its best efforts promptly to cure such Breach
> in all material respects and, if such Breach cannot be cured,
> [GreenPoint] shall, at the Purchaser's option, repurchase such
> [breaching loan(s)] at the Repurchase Price.[11]

Like GreenPoint's representations and warranties, its cure-or-repurchase obligation is broad,
(i) arising upon discovery or notice and (ii) extending to the breach of any representation or war-
ranty that materially and adversely affects the value of a given Loan, the interest of any Pur-

---

[11]  The "Repurchase Price" for the various types of Loans is defined in Section 1 of the Sale Agreements.

15

chaser, or the interest of any Purchaser in the Loan. *See* Sale Agreements § 8. The breaches at

issue, which involve errors, omissions, misrepresentations, negligence, fraud or similar occur-

rences in connection with the origination and underwriting of the Loans, materially increased the

risk of loss associated with, and decreased the value of, the Loans.

34.    And if "a Breach shall involve any representation or warranty set forth in

Section 6" of the Sale Agreements, GreenPoint's remedial obligation is even broader, reflecting

the seriousness of the representations set forth in that section: If "such Breach cannot be cured

within 60 days of the earlier of either discovery by or notice to [GreenPoint] of such Breach, *all*

of the [Loans] shall, at the Purchaser's option, be repurchased by [GreenPoint] at the Repurchase

Price." Sale Agreements § 8 (emphasis added). As explained above, the Indenture Trustee, as

assignee of the Issuer, is the "Purchaser" for the purposes of these provisions and has exercised

its option to demand repurchase at the contractually specified "Repurchase Price."

**D.    GreenPoint's Breaches of Its Representations and Warranties**

35.    In early 2008, Syncora informed the Indenture Trustee that 963 of the

Loans ("Breaching Loans") purchased by the Issuer and assigned to the Indenture Trustee and

with a total principal balance of $91.8 million did not comply with GreenPoint's representations

and warranties. These Breaching Loans represented 93% of a sample of 1,030 Loans that had

been re-underwritten. The Breaching Loans contained one or, in most cases, more than one de-

fect that constituted a breach of one of more of the numerous representations and warranties

made by GreenPoint in the Sale Agreements, including:

a)    pervasive misrepresentations and/or negligence with respect to the state-
ment of the income, assets or employment of the borrower (*see, e.g.,* Sale
Agreements § 7(a), (k), (tt));

b)    misrepresentations of the borrower's intent to occupy the property as the
borrower's residence and subsequent failure to so occupy the property.
(*id.*);

16

c)    inflated and fraudulent appraisal values (*id.*); and

d)    pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships (*see, e.g.*, HELOC Sale Agreement § 7(u), (tt); Mortgage Loan Sale Agreement § 7(v), (yy)).

36.    The large number and seriousness of the breaches identified in the re-underwriting of the sample of Loans not only demonstrate deficiencies in GreenPoint's loan-underwriting practices with respect to the Breaching Loans, but also suggest a pervasive pattern of malfeasance, misconduct and/or negligence in connection with GreenPoint's loan-origination practices as a whole, and therefore call into question the origination and underwriting of all of the Loans sold to the Issuer and assigned to the Indenture Trustee.

37.    A finding of prevalent underwriting failure and fraud in the origination of the Loans is further suggested by the remarkably poor performance of the Loans following the Securitization. As of December 31, 2008, the Securitization had experienced cumulative losses of more than $387 million. Nearly 29% of the Loans either have been written off by the Issuer as total losses or are severely delinquent. The Securitization's performance has been so poor that it cannot be explained merely by adverse conditions in the housing market. This deterioration parallels that of GreenPoint itself, which, as noted, saw its mortgage-origination operations shut down in August 2007.

38.    Numerous borrowers and former GreenPoint employees have recently sued the company and made similar allegations of fraud and other pervasive failures in its origination and underwriting practices. Such actions include a "whistleblower" action filed in June of last year by a former senior underwriter, who alleged, among other things, that GreenPoint had

17

engaged in fraudulent and other unlawful activities by forcing the approval of mortgage-loan applications containing fraudulent information or by approving applications after the underwriter had either denied such applications or made approval contingent upon obtaining additional borrower documentation.[19] Multiple individual borrowers and a class of borrowers have also sued GreenPoint within approximately the last year and a half, alleging, among other things, discriminatory and predatory lending practices, fraudulent loan-origination practices based on misstated or overstated income and/or employment status, violations of the Truth in Lending Act, violations of federal anti-kickback laws and elder abuse.[20] During that same time period, the Attorney General of the State of New York had also been investigating GreenPoint for discriminatory lending practices. GreenPoint paid $1 million in July of last year to settle the State's charges against it, and two New York mortgage brokers that had worked with GreenPoint agreed earlier this year to pay an additional $665,000 in restitution to approximately 455 minority borrowers.[21] These numerous lawsuits and investigations only further suggest that GreenPoint engaged in a pattern of fraudulent and otherwise improper lending practices fraught with severe underwriting deficiencies.

39.    By making untrue representations, warranties and other statements pertaining to the Loans and the practices pursuant to which the Loans were underwritten, originated and serviced, GreenPoint breached its representation and warranty in Section 6(h) of the Sale

---

[19] *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 11, 2008).

[20] *See Ferguson v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 1:08-cv-00567-TSE-TCB (E.D. Va. June 3, 2008); *Ousiz v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 3:08-cv-02201-WHA (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 5:08-cv-01972-JW (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortgage Funding, Inc.*, Case No. 3:08-cv-00369-EDL (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortgage Funding, Inc. et al.* (E.D. Pa. May 7, 2007).

[21] *GreenPoint Brokers Targeted by New York*, MortgageDaily.com, Jan. 5, 2009.

18

Agreements that "[n]either this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading." These breaches entitle the Indenture Trustee, for the benefit of the Insurers and the Noteholders, to substantial remedies, including demanding, as it has, that GreenPoint repurchase all of the Loans.

**E.    GreenPoint's Willful Refusal to Comply with Its Contractual Cure-or-Repurchase Obligation**

40.    By letter dated March 14, 2008 ("First Breach Notice"), the Indenture Trustee notified GreenPoint of breaches of various of its representations and warranties in the Sale Agreements with respect to approximately 655 Loans in the re-underwritten sample. The Indenture Trustee requested that GreenPoint comply with Section 8 of the Sale Agreements and either cure the breaches or repurchase the Breaching Loans.

41.    GreenPoint did not respond until June 16, 2008, more than three months later, when it refused to cure any of the identified breaches or repurchase any of the Breaching Loans. GreenPoint did not offer any tenable justification for its blanket rejection of its contractual obligations. To the contrary, its objections sound in bad faith. GreenPoint asserted, for example, that the Indenture Trustee had "unreasonably delayed" notifying GreenPoint of the breached representations and warranties. There is no support for that proposition. The Indenture Trustee provided timely notice and demand upon discovery of the Breaching Loans. It is GreenPoint's delay in complying with its express contractual obligations that was and continues to be unreasonable and prejudicial to the Indenture Trustee's, as well as the Insurers' and the Noteholders', interests.

19

42.    By letter dated July 9, 2008 ("Second Breach Notice" and, together with the First Breach Notice, the "Breach Notices"), the Indenture Trustee notified GreenPoint of breaches of various of its representations and warranties in the Sale Agreements with respect to an additional group of approximately 308 Loans in the re-underwritten sample. The Indenture Trustee again requested that GreenPoint comply with Section 8 of the Sale Agreements and either cure the breaches or repurchase the Breaching Loans. To date, GreenPoint has not responded to the Second Breach Notice.

43.    Finally, by letter dated December 9, 2008 ("Breach Clarification"), the Indenture Trustee clarified that the breaches that it had previously identified in the Breach Notices necessarily also constituted breaches of Section 6(h) of the Sale Agreements and, therefore, required GreenPoint to repurchase not only the Breaching Loans, but all of the Loans. GreenPoint responded to the Breach Clarification in a letter dated January 26, 2009 by again rejecting the Indenture Trustee's requests and failing to comply in any manner with GreenPoint's express contractual obligations.

44.    In sum, despite receipt of the Breach Notices and the Breach Clarification, GreenPoint has not cured any of the breaches identified in those letters. GreenPoint therefore must repurchase all of the Loans, including the Breaching Loans. *See* Sale Agreements § 8.

### FIRST CAUSE OF ACTION

### (Breach of Contract – Representations and Warranties)

45.    The Indenture Trustee and the Insurers repeat and reallege each and every allegation set forth in paragraphs 1 through 44 above as if fully set forth herein.

46.    The Sale Agreements are valid and binding contracts between the parties thereto and their successors and assigns.

20

47.    GreenPoint is a party to the Sale Agreements.

48.    The Issuer is the ultimate assignee of the Purchaser's Rights and Remedies against GreenPoint under the Sale Agreements, which Purchaser's Rights and Remedies have been granted and assigned to, and may (and, at the direction of Syncora, must) be exercised and enforced by, the Indenture Trustee for the benefit of the Insurers and the Noteholders.

49.    The Indenture Trustee has consistently and timely performed its obligations under the Sale Agreements.

50.    By making untrue representations and warranties and statements pertaining to the Loans and the practices pursuant to which the Loans were underwritten, originated and serviced, GreenPoint breached both Sections 6 and 7 of the Sale Agreements, including, but not limited to, the specific representations and warranties that are both set forth therein and identified in the Breach Notices and the Breach Clarification.

51.    The breaches identified in the Breach Notices and the Breach Clarification materially and adversely affected the value of the Breaching Loans and the interests of the Issuer, the Indenture Trustee, the Insurers and the Noteholders.

52.    As a result of GreenPoint's breaches of representations and warranties contained in Sections 6 and 7 of the Sale Agreements and identified in the Breach Notices and the Breach Clarification, the Issuer, the Insurer and the Noteholders have suffered irreparable injury and, unless the Court orders GreenPoint to specifically perform its contractual obligations to repurchase all of the Loans, including the Breaching Loans, the Issuer, the Insurer and the Noteholders will continue to suffer irreparable injury for which they have no adequate remedy at law.

21

## SECOND CAUSE OF ACTION

### (Breach of Contract -- The Cure-or-Repurchase Obligation)

53.   The Indenture Trustee and the Insurers repeat and reallege each and every allegation set forth in paragraphs 1 through 52 above as if fully set forth herein.

54.   The Sale Agreements are valid and binding contracts between the parties thereto and their successors and assigns.

55.   GreenPoint is a party to the Sale Agreements.

56.   The Issuer is the ultimate assignee of the Purchaser's Rights and Remedies against GreenPoint under the Sale Agreements, which Purchaser's Rights and Remedies have been granted and assigned to, and may (and, at the direction of Syncora, must) be exercised and enforced by, the Indenture Trustee for the benefit of the Insurers and the Noteholders.

57.   The Indenture Trustee has consistently and timely performed its obligations under the Sale Agreements.

58.   By rejecting the Indenture Trustee's demands that GreenPoint repurchase all of the Loans or, at a minimum, cure the breaches identified in the Breach Notices or repurchase the Breaching Loans, GreenPoint has materially breached its obligations under Section 8 of the Sale Agreements.

59.   GreenPoint's material breaches of Section 8 of the Sale Agreements were and continue to be willful and have damaged and are continuing to damage the Issuer, the Insurers and the Noteholders in an amount to be determined at trial.

22

## PRAYER FOR RELIEF

WHEREFORE, the Indenture Trustee and the Insurers respectfully pray for the following relief:

A.      For an Order compelling GreenPoint to comply with its obligations under Section 8 of the Sale Agreements and repurchase all of the Loans, including the Breaching Loans, at the Repurchase Price, as that term is defined in the Sale Agreements;

B.      For an award of damages, including an amount equivalent to the Repurchase Price of all of the Loans, including the Breaching Loans, as well as any other damages to be proven at trial for GreenPoint's willful material breaches of the Sale Agreements;

C.      For an award of compensatory damages and/or reimbursement, together with interest, court costs, disbursements, attorneys' fees and other expenses;

D.      For prejudgment interest; and

E.      For such other and further relief as the Court deems just and proper.

Dated: New York, New York
      February 5, 2009

_Constance M. Boland_
Constance M. Boland

_Philip R. Forlenza_
Philip R. Forlenza
David W. Dykhouse
Erik Haas
Alexander Shapiro
Benjamin S. Litman

NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3000
Fax: (212) 940-3111

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

Attorneys for U.S. Bank National Association, as Indenture Trustee

Attorneys for Syncora Guarantee Inc. and CIFG Assurance North America, Inc.

23

☐ ORIGINAL

Index No. _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

U.S. BANK NATIONAL ASSOCIATION, as Indenture
Trustee for the Benefit of the Insurers and Noteholders of
GreenPoint Mortgage Funding Trust 2006-HE1, Home
Equity Loan Asset-Backed Notes, Series 2006-HE1;
SYNCORA GUARANTEE INC., formerly known as XL
CAPITAL ASSURANCE INC., as Controlling Insurer, Note
Controlling Party and Class Ax Insurer; and CIFG
ASSURANCE NORTH AMERICA, INC., as Class Ac
Insurer,

Plaintiffs,

-against-

GREENPOINT MORTGAGE FUNDING, INC.,

Defendant.

SUMMONS AND COMPLAINT

**Patterson Belknap Webb & Tyler LLP**
Attorneys for SYNCORA Guarantee Inc. and
CIFG Assurance North America, Inc.

1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000

Supreme Court Records OnLine Library - page 26 of 26

# COMMONWEALTH OF PENNSYLVANIA
## COUNTY OF COMMON PLEAS OF
## MONTGOMERY COUNTY

**US Bank Nat'l Assoc.**

**v.**                    :    **File No.**
                               **13-00923**

**Greenpoint Mortgage
Funding, Inc.**

## AFFIDAVIT OF SERVICE

Angela Del Popolo, a Pennsylvania State Constable, being
duly sworn according to law, deposes and says that she is a
citizen of the United States of America and is of the
appropriate age and mental state of being, served
Receptionist, by hand, at GMAC Mortgage Corp., 1100
Virginia Drive, Ft. Washington, PA on Wednesday,
January 16th, 2013 @ 2:40 PM.

## SUBPOENA TO ATTEND AND TESTIFY

Constable Angela Del Popolo declares under penalty of
perjury, under the laws of the United States of America,
and pursuant to Rule 18 PA. C.S.A. Section
4904, that the information contained in the Affidavit of
Service is true and correct.

_____ Angela Del Popolo
                        Pennsylvania State Constable