Exhibit G

FILED: NEW YORK COUNTY CLERK 03/04/2010

INDEX NO. 600352/2009

NYSCEF DOC. NO. 41

RECEIVED NYSCEF 03/04/2010

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:     BERNARD J. FRIED                          PART  60
                                          _Justice_

_____

U.S. Bank Nat'l Assn etc and et. al.,

                    **PLAINTIFFS**

E-FILE

INDEX NO.          #600352-2009

MOTION DATE       _____

- v -

GreenPoint Mortgage Funding, Inc.,,

MOTION SEQ. NO.    #001

_____  **DEFENDANT**

MOTION CAL. NO.    _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits | _____ |
| Replying Affidavits | _____ |

## Cross-Motion:  ☐ Yes   ☐ No

Upon the foregoing papers, it is ordered that this motion

This motion is decided  in accordance with the accompanying memorandum decision.

          SO ORDERED

RECEIVED

MAR 0 4 2010

MOTION SUPPORT OFFICE
NYS SUPREME COURT - CIVIL

Dated: _____3/3/2010_____                    _Bernard J. ____
                                    **HON. BERNARD J. FRIED**

Check one:  ☐ FINAL DISPOSITION    ☒ NON-FINAL DISPOSITION

Check if appropriate:    ☐ DO NOT POST    [ ] REFERENCE

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 60
------------------------------------------------------------------X
U.S. BANK NAT'L ASS'N, as Indenture
Trustee for the Benefit of the Insurers
and Noteholders of GreenPoint Mortgage
Funding Trust 2006-HE1, Home Equity
Loan Asset-backed Notes Series-HE1;
SYNCORA GUARANTEE INC., formerly known
as XL CAPITAL ASSURANCE INC., as
Controlling Insurer, Note Controlling
Party and Class Ax Insurer; and
CIFG ASSURANCE NORTH AMERICA, INC.,
as Class Ac Insurer,

                                Plaintiffs,

                                                    Index No. 600352/09
            -against-

GREENPOINT MORTGAGE FUNDING, INC.,

                                Defendant.

------------------------------------------------------------------X

For Plaintiff Syncora Guarantee Inc. and          For Defendant Greenpoint
CIFG Assurance North America, Inc.                Mortgage Funding, Inc

Paterson Belknap Webb & Tyler, LLP.               LeClair, a Professional
1133 Avenue of the Americas                       Corporation,
New York, New York 10036                          840 Third Avenue, Fifth Floor
Philip R. Forlenza, Esq.                          New York, New York 10022
(212) 336-2222                                    Michael T. Conway, Esq..
                                                  (212) 430-8032
For Plaintiff U.S. Bank Nat'l Ass'n as
Indenture Trustee

Nixon Peabody LLP
437 Madison Avenue
New York, New York 10022
Constance M. Boland, Esq.
(212) 940-3111

                                1

**FRIED, J.:**

In this beach of contract action arising out of the recent mortgage-backed securities debacle, defendant GreenPoint Mortgage Funding, Inc. (GreenPoint) moves, pursuant to CPLR 3211 (1) and (7), to dismiss the complaint.

The transaction among the parties proceeded as follows. GreenPoint originated at least 30,000 home equity lines of credit and other home mortgage loans. The loans were then sold to GMAC Mortgage Corporation (GMAC), as servicer of the loans, pursuant to a "Flow Revolving Credit Loan Purchase and Warranties Agreement" (HELOC), and a "Flow Mortgage Loan Purchase and Warranties Agreement" (Mortgage Loan Sale Agreement), dated September 26, 2005 and July 26, 2006, (together, Sales Agreements) respectively. The term of the two Sales Agreements are substantially the same. The loans were then sold to Lehman Brothers Bank, F.S.B. (Lehman Bank). Lehman Bank, in turn, assigned the loans to Lehman Brothers Holdings (Lehman Holdings), Lehman Bank's parent company, through an Assignment and Assumption Agreement.

Lehman Holdings then assigned the loans to Structured Assets Securities Corporation (SASCO), through a Mortgage Loan and Sales Assignment Agreement. The loans were then deposited by SASCO into the GreenPoint Mortgage Trust (Trust), pursuant to a Transfer and Servicing Agreement among the Trust, SASCO, GMAC and U.S. Bank (U.S. Bank) (Transfer Agreement), to form a pool of mortgages.[1] U.S. Bank is Indenture Trustee of the

---

[1]

Some of the loans in the Trust loan pool were originated by a non-party, Impac Funding Corporation (Impac).

2

Trust, pursuant to an Indenture Agreement. The total value of the loans in the mortgage pool is at least $1.8 billion.

At this point, the loans became securitized for the benefit of numerous noteholders, who stood to benefit from the interest and cash generated by the loans. The loans are insured by plaintiffs Syncora Guarantee Inc. (Syncora) and CIFG Assurance North America, Inc. (GIFG) (together, Insurers), pursuant to Insurance and Indemnification Agreements among Lehman, SASCO, the Trust and the Insurers. At this time, GreenPoint also entered into Indemnification Agreements with the Insurers. No claims have been brought under these agreements.

The Indemnification Agreements were followed by the preparation of a prospectus, which was used to sell the interest in the loans to investors. The prospectus was augmented by a document called the Prospectus Supplement (together, ProSupp), of which Lehman Holdings was the sponsor. The ProSupp contained certain other representations concerning GreenPoint's adherence to its underwriting guidelines. While the ProSupp contains representations and warranties as to the viability of the loans, it is not clear what role GreenPoint played in the preparation or execution of this document, which apparently was prepared after the original sale of the loans to GMAC, and after the creation of the Trust. GreenPoint is neither a sponsor or issuer of the ProSupp.

Between the time the loans were securitized in 2005 and 2006 and the present, the home mortgage crisis devastated the value of the loans in the Trust, to the vast detriment of the investors. In this action, plaintiffs attempt to recover the entire loss of the $1.8 billion original value of the loans, based on GreenPoint's alleged violation of representations and

3

warranties contained in the Sales Agreements and, according to the complaint, the ProSupp. U.S. Bank alleges that the home mortgage loans and lines of credit were based on faulty representations by GreenPoint of such things as the earning potential of the home buyers, and thus, their ability to afford the homes, all of which allegedly rendered the loans unstable and valueless from the time of their origination. U.S. Bank contends that GreenPoint failed to follow its own underwriting guidelines when it allowed these loans to be made.

The Sales Agreements contain numerous representations and warranties concerning the viability of the original loans. The warranties and liabilities are contained in sections 6 and 7 of the Sales Agreements, and the remedies for breach of the representations and warranties are contained in section 8.

The dispute is whether, under sections 6, 7 and 8 of the Sales Agreement, GreenPoint was in breach of the Sales Agreements, and whether the breaches require GreenPoint to pay to plaintiffs the entire cost of all of the loans before their disintegration, or merely the original value of any individual loan which might be found to have been made in breach of the representations and warranties found in the Sales Agreements.

This argument arises from the following facts. On March 14, 2008, U.S. Bank sent a letter to GreenPoint demanding that GreenPoint cure alleged breaches in 655 of the loans, or that GreenPoint repurchase the loans (the March 2008 letter).[2] The March 2008 letter alleged that there were breaches of subsection 7 of the Sales Agreements in the case of each of the individual loans. GreenPoint responded with a letter requesting information

---

[2]

A letter from Syncora to U.S. Bank, which was attached to the March 2008 letter, provided notice to U.S. Bank of the alleged breaches.

4

concerning the basis for the demand, and for copies of the various sales and assignment agreements by means of which U.S. Bank had acquired the loans, claiming that it was unaware of the progress of the loans into the Trust after they had been transferred to GMAC. GreenPoint also asked for the servicing files of each of the 655 loans.

U.S. Bank allegedly sent a further letter to GreenPoint on July 9, 2008 (July 2008 letter) concerning 308 additional loans which also were allegedly made by GreenPoint in violation of section 7 of the Sales Agreements. GreenPoint maintains that it never received this letter, and, like the 655 loans in the March 2008 letter, has no idea what specific loans are at stake.

Finally, in a letter dated December 9, 2008 (the December 2008 letter), U.S. Bank claimed that GreenPoint had breached section 6 (h) of the Sales Agreements (as opposed to 7), and, as a result, demanded that GreenPoint repurchase all of the 30,000 plus loans contained in the Trust. According to GreenPoint, U.S. Bank has never identified which loans were to be repurchased, an important lapse, because some loans in the Trust were originated by non-party Impac.

GreenPoint responded to the December 2008 letter requesting, as before, the servicing files on the loans which U.S. Bank claimed to be in breach, and, more importantly, denying that any breaches existed under section 6 (h) of the Sales Agreements.

GreenPoint argues that plaintiffs cannot, by virtue of the plain language of the Sales Agreements, establish any duty on GreenPoint's part to pay plaintiffs back for the cost of the entire pool of loans. GreenPoint also contends that the insurer plaintiffs lack standing to pursue this action, because Syncora and CIFG were never intended to benefit from the

5

representations and warranties contained in the Sales Agreements.

GreenPoint also maintains that the present action is premature under the terms of the

Sales Agreements, because plaintiffs commenced the action before the 60-day cure period

contained in the Sales Agreements, and have never provided GreenPoint with the identities

and particulars of the loans alleged to have been made in breach of the representations and

warranties in the Sales Agreements, such that GreenPoint cannot evaluate the problems

alleged to be contained in the individual loans.

> It is basic that on a motion to dismiss pursuant to CPLR 3211,
> we must accept as true the facts as alleged in the complaint
> and submissions in opposition to the motion, accord plaintiffs
> the benefit of every possible favorable inference and
> determine only whether the facts as alleged fit within any
> cognizable legal theory.

*Sokoloff v Harriman Estates Development Corp.*, 96 NY2d 409, 414 (2001); *see also Leon*

*v Martinez*, 84 NY2d 83 (1994). A motion brought pursuant to CPLR 3211 (a) (1) "may be

granted where 'documentary evidence submitted conclusively establishes a defense to the

asserted claims as a matter of law.'" *Held v Kaufman*, 91 NY2d 425, 430-431 (1998),

quoting *Leon v Martinez*, 84 NY2d at 88; *Foster v Kovner*, 44 AD3d 23, 28 (1st Dept

2007)("[t]he documentary evidence must resolve all factual issues and dispose of the

plaintiff's claim as a matter of law").

"Standing to sue is critical to the proper functioning of the judicial system. It is a

threshold issue. If standing is denied, the pathway to the courthouse is blocked." *Saratoga*

*County Chamber of Commerce, Inc. v Pataki*, 100 NY2d 801, 812 (2003). Therefore, it is

essential that the matter of the plaintiffs' standing be addressed, as a threshhold question.

6

The Insurers base their standing on a claim that they were the intended third party beneficiaries of the Sale Agreements, the ProSupp, and the Indemnification Agreements with GreenPoint. They argue that the Sales Agreements "expressly fore[saw] the type of securitization transaction that led to the Insurers' involvement" at the time the Sales Agreements were executed (Plaintiffs' Memorandum of Law, at 22), and that GreenPoint intended that the Insurers would directly benefit from the warranties and representations contained in the Sales Agreements. They also claim that the representations in the Indemnification Agreements to the effect that "[a]ll material provided in writing to the [Insurers] for inclusion in the Offering Documents ... shall be true and correct in all material respects" (Aff. David W. Dykhouse, Ex. C, at section 5 [f] and Ex B, section 3) provide the necessary intent on GreenPoint's part to benefit the Insurers in the matter of the securitization of the loans.

The Insurers argue that the rights conferred upon them by the Indemnification Agreements, the Insurers' Insurance and Indemnity Agreements, the Indenture, and the Transfer and Servicing Agreements, along with the Sales Agreements, "will allow the fact finder to determine that both GreenPoint and GMAC intended the Sales Agreements to benefit the insurers directly." Plaintiffs' Memorandum of Law, at 24.

> A party asserting rights as a third-party beneficiary must establish "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost."

*State of California Public Employees' Retirement System v Shearman & Sterling*, 95 NY2d 427, 434-435 (2000), quoting *Burns Jackson Miller Summit & Spitzer v Lindner*, 59 NY2d

314, 336 (1983). There must be a "clear intention to confer the benefit of the promised

performance." *PT. Bank Mizuho Indonesia v PT. Indah Kiat Pulp & Paper Corp.*, 25 AD3d

470, 471 (1st Dept 2006). "Absent such intent, the third party is merely an incidental

beneficiary with no right to enforce the contract." *Strauss v Belle Realty Co.*, 98 AD2d 424,

426 (2d Dept 1983), *affd* 65 NY2d 399 (1985).

    "Whether or not a writing is ambiguous is a question of law to be resolved by the

courts." *W.W.W. Associates, Inc. v Giancontieri*, 77 NY2d 157, 162 (1990); *see also*

*Nautilus Insurance Co. v Matthew David Events, Ltd.*, ___AD3d___, 2010 NY Slip Op

00296 (1st Dept 2010). It is settled that contract terms are to be construed to reflect the

parties' intent. *Greenfield v Philles Records, Inc.*, 98 NY2d 562 (2002). "Thus, a written

agreement that is complete, clear and unambiguous on its face must be enforced according

to the plain meaning of its terms." *Id.* at 569. Decidedly, "[p]arol evidence cannot be used

to create an ambiguity where the words of the parties' agreement are otherwise clear and

unambiguous." *Riverside South Planning Corp. v CRP/Extell Riverside, L.P.*, 60 AD3d 61,

66 (1st Dept 2008), *affd* 13 NY3d 398 (2009); *see also Innaphos, Inc. v Rhodia, S.A.*, 38

AD3d 368 (1st Dept 2007), *affd* 10 NY3d 25 (2008).

    The Insurers have not pointed to anything in the mass of documents, including,

especially, the Sales Agreements, which would make them direct beneficiaries to these

representations and warranties contained in these agreements. Thus, there cannot be read

into the various agreements an intent to apply the warranties and representations contained

in the Sales Agreements to the Insurers, sure it is is patently not in the documents (*see U.S.*

*Fidelity & Guarantee Company v Annunziata*, 67 NY2d 229, 232 [1986]["courts should

8

refrain from rewriting the agreement"])    Moreover, parol evidence contained in other agreements cannot alter the plain terms of the Sales Agreements. *W.W.W. Associates, Inc. v Giancontieri*, 77 NY2d 157, *supra*.    Evidence "unstated or misstated is generally inadmissible to add to or vary the writing." *Id.* at 162.    Even aside from the Sales Agreements, the Insurers' conclusory allegations that they are somehow beneficiaries of these warranties through other, later, documents, such as the ProSupp and Indemnification Agreements, fail to show that they were ever intended beneficiaries to any warranties or representations made by GreenPoint in the original Sales Agreements between GreenPoint and GMAC, or any of the later assignees. The Insurers have shown nothing that would give them direct rights to rely on the Sales Agreements' warranties emanating from GreenPoint at any stage in the transactions.  As such, they have failed to establish they have standing to appear in this action.

In GreenPoint's memorandum of law, GreenPoint only addresses the issue of whether the Insurers have standing to pursue this action.   However, at oral argument, GreenPoint argued that U.S. Bank lacks standing as well, this despite the fact that GreenPoint stated that U.S. Bank was the "real party in interest" in its Memorandum of Law.   GreenPoint's Memorandum in Support of Motion, at 24.   Since  plaintiffs have had the opportunity to respond to GreenPoint's arguments, the issue of U.S. Bank's standing is ripe for decision.

Greenpoint argues that U.S. Bank lacks standing to bring an action based on the representations and warranties contained in the Sales Agreements, because the transactions following GreenPoint sale of the loans to GMAC were made in derogation of the explicit terms of the Sales Agreements, stating that all transfers of the loans must be made to

substantially comport with the detailed form annexed to the Sales Agreements. Conway Aff.,

Ex. D, section 21. This section, which is contained in the Mortgage Loan Purchase

Agreement, states, in pertinent part, that:

> the transferee will not be deemed to be a Purchaser hereunder binding upon
> the Seller unless such transferee shall agree in writing to be bound by the
> terms of this Agreement and an original counterpart of the instrument of
> transfer and an assignment and assumption of this Agreement in the form of
> Exhibit H hereto executed be the transferee shall have been delivered to the
> Seller.

It is uncontested that (1) the Lehman entities did not use the form in question; (2) that

the forms used were not substantially in the form of Ex. H; and (3) that neither the Lehman

entities nor U.S. Bank obtained the loans, and the status of "Purchaser," pursuant to any

such form.

U.S. Bank counters that GreenPoint is raising form over substance, and that the form

supplied in the Sales Agreements was not a necessary part of the transactions which occurred

after the loans left GreenPoint's hands; that GreenPoint waived any right it had to object to

the use of other forms of transfer; and that the transaction after the sale of the loans to

GMAC, and the assignments which occurred thereafter, were part of a "securitizied

transaction," which did not require the use of any forms in particular.

U.S. Bank turns to section 21 of the HELOC, which differs, in part, from the

language in the Mortgage Loan Purchase Agreement.[3]  Section 21 also states that a sale of

the HELOC loans must be made pursuant to the attached form (Ex. G thereto), "provided that

---

[3]
    According to U.S. Bank, the HELOC accounts for "approximately 95% of the Loans
at issue in this case."  Plaintiffs' Memorandum in Response, at 3.

(i) in the case of a Securitization Transfer ... Purchaser shall have the right to assign its rights

under this Agreement into such Securitization Transfer."

U.S. Bank notes that, although a definition of "Securitized Transfer" is not contained

in section 21 of the HELOC, in section 28, a "Securitized Transfer[]" is described as a

"securitized trust structure." U.S. Bank explains that "securitized trust structure" does not

mean a single entity (such as itself), but an overall transaction with the outcome being a

securitization of the loans in question. Thus, U.S. Bank claims that the Lehman entities and

SASCO did not need to follow any particular form in transferring the loans, because the

transaction from day one always anticipated the securitization of the loans.

As a result of this argument, U.S. Bank insists that this motion must be denied, as it

has yet to be afforded such discovery as would allow a determination whether the transaction

GreenPoint instigated anticipated the eventual securitization of the loans, making the entire

HELOC transaction from its inception a "securitized trust structure." U.S. Bank maintains

that discovery would show, for example, that the Sales Agreements comported with industry

practice in the sale of securities for eventual securitization.

GreenPoint, in rebuttal, argues that there is no evidence that the sale of the loans was

intended to create a "securitized trust structure," in that the sale of the loans could have

ended in any one of three scenarios, including, but not limited to, the securitization of the

loans. According to GreenPoint, the Sales Agreements also contemplated the possibility that

GreenPoint might sell the loans as a "whole loan Sales" transaction (Transcript, at 14), or do

an "agency transfer," wherein the loans are taken to Fannie Mae or Freddie Mac, and sold

in return for securities from these entities. *Id.*; *see also* Sales Agreement, Aff. of Conway,

11

Ex. C, section 28. Thus, GreenPoint insists that the loans only became securitized as a result of the transfers which took place after GreenPoint sold the loans to GMAC, that is, after they were out of GreenPoint's hands and control.

While GreenPoint argues that the terms of the HELOC do not anticipate the securitization of the loans, the terms of this agreement fail to clarify the matter. There is an ambiguity as to whether the entire transaction from its inception was meant to be, or became, a "securitized trust structure." As a result of the ambiguity, U.S. Bank should be allowed to conduct the discovery it needs to determine the intent of the parties in respect to the matter. As a result, GreenPoint cannot, on this motion to dismiss, preclude U.S. Bank from pursuing this matter by claiming that U.S. Bank does not have standing.

U.S. Bank has afforded less time to the argument that transactions following the Mortgage Loan Purchase Agreement comport with the requirements of section 21 of this agreement, since it is not questioned that the assignments were not made using the designated form. However, at this stage in the proceedings, it cannot be determined whether the various forms used in the assignments were "substantially" the same as the designated form, incorporated the material in the forms, so as to bring the assignments in compliance with the Sales Agreements, or whether GreenPoint waived any right to require the assignments to comply with the Sales Agreements. Dismissal is not warranted on this point at this time.

Having established that the complaint sufficiently alleges U.S. Bank's standing to bring this action, I turn to the allegations in the complaint, the gist of which is that the majority of the 30,000 loans which GreenPoint originated were rife with misrepresentations as to such things as the earning potential of prospective home buyers, and their ability to

12

afford the houses which they purchased with GreenPoint loans; that is, that the loans were made without regard to the purported rigors of GreenPoint's underwriting procedures. As a result, the precipitous drop in the value of homes caused widespread defaults in the mortgages, by persons who apparently could not afford their homes in the first place, resulting in a catastrophic drop in the value of the loans originated by GreenPoint, all to the detriment of the numerous investors in the Trust.

The disagreement between the parties involves the interpretation of specific provisions in the Sales Agreements, to determine whether misrepresentation allegedly made by GreenPoint in the origination of discrete loans, however widespread, required GreenPoint merely to repurchase those loans in which fault could be found, or to repurchase the entirety of the 30,000 loans represented in the Sales Agreements.

Section 7 of the Sales Agreements is entitled "REPRESENTATION AND WARRANTIES REGARDING INDIVIDUAL MORTGAGE LOANS." The section, which runs to 12 pages, is essentially summed up in its first paragraph, which reads "[a]s to each Revolving Credit Loan [or Mortgage Loan], The Seller [GreenPoint] hereby represents and warrants to the Purchaser [GMAC] that as of the related Closing Date: (a) Revolving Credit Loans [Mortgage Loans] as Described. The information set forth in the related Revolving Credit Loan Schedule is complete, true and correct."

On the other hand, section 6 states that:

> [t]he Seller, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to the Purchaser as of each Closing Date ... (h) No Untrue Information. Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connections with the transactions contemplated hereby contains any untrue

statement of fact or omits to state a fact necessary to make the statements therein not misleading."

Section 8 of the Sales Agreements contains different remedies for breaches of section 6 or section 7. Section 8 (b) of the HELOC states, in relevant part, that:

> within 60 days of the earlier of either discovery by, or notice to, the Seller of any breach of the warranties or representations set forth in clauses (qq), (vv), (ww), (xx), (aaa), (bbb) and (ccc) of Section 7, the Seller shall repurchase such *Revolving Credit Loan* at the Repurchase Price. In the event that a Breach shall involve any representation or warranty set forth in Section 6, and such Breach cannot be cured within 60 days of the earlier of either discovery by or notice to the Seller of such Breach, *all of the Revolving Credit Loans* shall, at the Purchaser's option, be repurchased by the Seller at the Repurchase Price [emphasis added].

The language in the Mortgage Loan Purchase Agreement contains the same language in section 8 (c).

The confluence of these sections indicates, simply, that a breach of warranties or representations in an individual loan under section 7 calls for the section 8 remedy of the repurchase of that individual loan, while a breach of section 6 calls for the repurchase by GreenPoint of the entire loan pool. GreenPoint argues that U.S. Bank can only seek to compel the repurchase of the individual loans it revealed to GreenPoint as being in derogation of section 7, while U.S. Bank claims that the sheer volume of invalid loans, as indicated in its random sampling of loans,[4] amounts to misrepresentations and breaches of warranties under section 6 (h), such as compel the application of the section 8 remedy of the repurchase of all of the 30,000 loans in the loan pool. The breaches highlighted by U.S.

---

[4]

U.S. Bank conducted a random sampling of 1,030 of the GreenPoint loans, and claims to have found that 93% of those loans were made in violation of GreenPoint's underwriting guidelines.

14

Bank involve GreenPoint's allegedly "pervasive failure to follow its underwriting guidelines during the origination of the Loans" (Plaintiffs' Memorandum of Law, at 2), raising the severity of the breaches of the individual loans beyond the narrow constraints of section 7, into the overarching language of section 6 (h).[5]

The question that arises is this: under the language of the Sales Agreements, is there a point at which breaches of the representations and warranties in individual loans rise to a violation of section 6 (h), as opposed to section 7, so as to require the draconian remedy of repurchase of all 30,000 loans, and, has U.S. Bank established that such a limit, if intended by the parties, has been reached? It is evident that the language of the competing sections of the Sales Agreements creates ambiguities, which cannot be deciphered on a motion to dismiss. At the pleading stage, these questions cannot be answered, and discovery is required to address the question. Consequently, dismissal of the complaint as to U.S. Bank is inappropriate at this time.

In sum, GreenPoint has established that the Insurers have no standing as third-party beneficiaries, or under any other theory, of the Sales Agreements, and must be dismissed as plaintiffs in this action. The action will not be dismissed, however, as against U.S. Bank.

Accordingly, it is

---

[5]

U.S. Bank also argues that GreenPoint should be held liable for breach of representations made in the ProSupp as well, which, allegedly, also require the strict remedy of repurchase of the loans. However, U.S. Bank is vague as to what representations contained therein were breached, and how GreenPoint is to be held liable under that document, which was not created in the context of the origination of the loans, nor the original sale of the loans, and which does not involve sections 7, 8 and 9 of the Sales Agreements.

15

ORDERED that the motion to dismiss the complaint is granted only to the extent of dismissing the complaint as to Syncora Guarantee Inc. and CIFG Assurance North America, Inc., and is otherwise denied; and it is further

ORDERED that defendant GreenPoint Mortgage Funding, Inc. is directed to serve an answer to the complaint within 20 days of service of this order with notice of entry; and it is further

ORDERED that the remainder of the action shall continue.

Dated: March 3 , 2010

ENTER:

_____
J.S.C.

HON. BERNARD J. FRIED

16