Hearing Date and Time:  May 7, 2013 at 10:00 a.m. (Prevailing Eastern Time)

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

- and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, et al., | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO DEBTORS' MOTION FOR THE ENTRY OF AN ORDER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

      The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"),[1] by and through its undersigned counsel, hereby files this objection (the "Objection") to the motion of

---

[1] The Ad Hoc Group is comprised of certain entities that hold or manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated as of June 6, 2008 (the "Junior Secured Noteholders"). The Junior Secured Noteholders' claim is now equal to 115.7% of the face amount of the bonds and

NEWYORK 8830176

each of the debtors (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") for entry of an order further extending each estate's exclusive periods during which only each Debtor may file a chapter 11 plan or solicit acceptances thereof by an additional sixty-four (64) days [Docket No. 3485] (the "Motion").[2] In support of its Objection, the Ad Hoc Group files contemporaneously herewith the Declaration of Reid Snellenbarger (the "Snellenbarger Declaration"), which is being filed under seal to preserve the confidentiality of information which the Debtors contend is highly confidential. As and for its Objection, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

As previously noted to the Court, these Chapter 11 Cases present a challenging dynamic for negotiation of a consensual chapter 11 plan. Only three major parties currently hold allowed material claims across the Debtors' capital structure – (i) Ally Financial Inc. ("Ally"); (ii) the Junior Secured Noteholders; and (iii) the Senior Unsecured Noteholders.[3] Ally asserts secured claims against substantially all of the Debtors, but its claims and recoveries are currently subject to the examiner's investigation due May 13, 2013 and the prospect of significant claim litigation over its pre-petition activities with the Debtors. The Senior Unsecured Noteholders assert general unsecured claims against only the Debtors' holding company and, absent significant litigation, it is unclear whether they will receive any material distribution, largely on account of being structurally subordinated to the holding company's obligations to the Junior Secured Notes. The other active parties in interest in these Chapter 11 Cases are entities which purport to

---

is currently increasing by virtue of the accrual of post-petition interest at the rate of approximately $250 million per year.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

[3] Holders of notes issued by Residential Capital, LLC under that certain indenture dated June 24, 2005 (the "Senior Unsecured Noteholders")

2

hold contingent claims against one or more of the Debtors that can only be determined in the context of protracted litigation or a settlement and whose recoveries are entirely unclear. Rather than settle their claims on the timetable mandated by the Chapter 11 plan process, however, this category of contingent claimants is obviously incentivized to opt to preserve its litigation claims against the Debtors until such time as they can maximize both the size of their claims and their recoveries in these cases. Their tactical delay in these cases is toxic, as the Debtors' administrative expenses balloon and the Debtors' assets, which are largely cash, are static. Thus, delay in the prosecution of the chapter 11 plan process directly erodes the likely recoveries for general unsecured creditors and even thereafter the recoveries of secured and administrative claimants. Since the commencement of these Chapter 11 Cases, for example, professional fees of approximately $280 million through February 28, 2013 have been incurred and post-petition interest of approximately $231 million through April 29, 2013 has accrued on the Junior Secured Notes, all of which will have to be paid in connection with a chapter 11 plan.[4]

---

[4] The Ad hoc Group is aware of comments recently expressed by the Court, at a status conference in connection with the adversary proceeding filed by the Official Committee seeking to challenge certain liens securing the Junior Secured Notes, that the issues raised in that proceeding are gating issues that will have to be resolved prior to confirmation of a plan, absent a contrary consensual resolution between interested parties. See April 11 Hearing Transcript at 94:15-19. The Ad Hoc Group is concerned that the Committee may have left the Court with the misimpression that the adversary proceeding has framed all of the myriad of issues relating to the nature and extent of the Junior Secured Notes' secured claims and that, depending on the resolution of that proceeding, the Debtors might not have to fund the rapidly accruing post-petition interest claims of the Junior Secured Notes. The Committee's adversary proceeding, however, is but a small piece of the puzzle and is indisputably at the economic margins of the ongoing disputes over the collateral position of the Junior Secured Notes. The adversary proceeding is not designed to answer the ultimate question as to whether the Junior Secured Notes are over- or under-secured. In fact, there are a wide range of claim treatment issues wholly outside the scope of the adversary proceeding, most notably material disputes with respect to (i) the existence of liens which the Debtors did not concede in connection with cash collateral usage which otherwise run in favor of the Junior Secured Notes or (ii) the legality of the assumptions inherent in the Debtors' current waterfall analyses, particularly on cost allocations, that materially impact the Debtors' conclusions with respect to the secured nature of the claims. To be clear, the resolution of one or more of these disputes in the noteholders' favor could result in a judicial finding of over-secured status even if the Committee improbably prevailed on each of its causes of action asserted in the adversary proceeding. Moreover, none of these additional disputes, all of which have been discussed at various points in time with the Debtors and the Committee, have been framed, much less scheduled, for judicial resolution, even though litigation of these disputes will involve a complicated legal and factual analysis of both pre- and post-petition activities of the Debtors.

Recognizing these structural challenges to consensus, the Ad Hoc Group has consistently sought to maintain a strict timetable with respect to the chapter 11 plan process. To that end, and in an effort to curtail the "litigation play," the Ad Hoc Group has repeatedly sought to do whatever is necessary to get a plan on file, even if that means proceeding without global consensus. Indeed, at the outset of these cases, many of the Junior Secured Noteholders executed a plan support agreement supporting the Debtors' preferred plan term sheet (the "JSN Settlement"). The JSN Settlement was conditioned upon the efficient and expeditious distribution of collateral proceeds to the holders of the Junior Secured Notes that would have benefitted all creditors through the elimination of a material accrual of interest expense. That agreement was terminated when the Creditors' Committee sought to challenge the entitlements of the Junior Secured Notes – thereby forestalling any paydown and unnecessarily exposing these estates to hundreds of millions of dollars of additional post-petition interest expense.

Following the termination of the JSN Settlement, the representatives of the Ad Hoc Group have nonetheless continued to engage with the Debtors on chapter 11 plan issues and have participated in numerous formal and informal plan mediation and settlement meetings. All the while, however, the Ad Hoc Group has emphasized the futility of delaying the filing of a plan until global peace breaks out. Confronted with the lack of any meaningful plan alternative, the disparate unsecured creditor groups simply lack any incentive to abandon their hardened negotiating positions, choosing instead to maintain optionality even at the expense of administrative claimants and secured creditors. For this reason, the Ad Hoc Group has for several months repeatedly pressed the Debtors to propose or at least socialize with the other parties certain alternative chapter 11 plan structures that are confirmable without total consensus but are still capable of engendering creditor support through the threat of losing what each

4

constituency covets most – be it the prospect of an allowed claim or a third party release. The Debtors have refused, instead maintaining their tautological precept that the path to consensus can only start with consensus.

Even now, with no global peace in hand, the Debtors propose more of the same. Fresh off a two-day global mediation conference that did not generate support for a global settlement, they now seek an additional sixty-four days to achieve the consensus that has eluded them in the more than eleven months since the Petition Date. Indeed, while claiming that a termination of exclusivity will lead to chaos, the Debtors fail to consider at all that these Chapter 11 Cases now stand at the precipice of failure. Based on information provided by the Debtors, the Ad Hoc Group believes that there may be precious little time remaining to pursue negotiations prior to the filing of any chapter 11 plan that can be confirmed. At the most recent hearing on exclusivity in March, the Court appeared to recognize the urgency, cautioning the Debtors that they would "have to show very, very substantial progress" or else "would have an awfully hard time convincing me to extend exclusivity again at that point." Mar. 5, 2013 Hr'g Tr. 40:14-16 (Glenn, J.). Indeed, the Ad Hoc Group predicts that, if exclusivity is extended, the Debtors will be filing this same objection in approximately 64 days, updating it merely for the passage of time and the further approach of crisis. Even continued stagnation should be sufficient cause to deny the Motion, because extending exclusivity by another 64 days would cost these estates an additional approximately $47 million in post-petition interest on account of the Junior Secured Notes as well as expose the estates to millions of dollars in continued administrative expense costs.

Notably, termination of exclusivity is not an injunction against the Debtors or any other party in interest seeking complete global peace. Indeed, the Ad Hoc Group intends to continue

5

to work toward complete resolution of these cases with all interested parties. Importantly, however, the Ad Hoc Group believes it critical to pursue alternative plan structures so that these cases may advance.

To that end, the Ad Hoc Group is prepared to promptly prosecute a proposed plan of reorganization should the Court deny the Motion and decline to extend exclusivity. The Ad Hoc Group has already socialized with other constituencies a proposed plan construct that contemplates a feasible and confirmable chapter 11 plan structure that is not premised on global peace. As one of the only creditor constituencies with fixed and allowed claims against the Debtors' holding company and two major operating entities, the Junior Secured Noteholders are uniquely positioned to propose, support and prosecute such a confirmable chapter 11 plan. Clearly, parties in interest in these cases will undoubtedly stake out their position on such a plan, expressing doubt as to its confirmability and promising war in the face of plan prosecution. Yet, the alternatives here are simply unacceptable, particularly where there is no concrete promise of peace. In short, at each juncture of these Chapter 11 Cases, the Debtors have offered excuses for the lack of progress, and assurances that the next period would be different. The moment for these excuses has passed, and the Court should deny the Motion.

## OBJECTION

On request of a party in interest and after notice and a hearing, a bankruptcy court "may for cause . . . increase" the periods during which a chapter 11 debtor has the exclusive right to file and solicit a plan of reorganization. 11 U.S.C. § 1121(d). It is the burden of the movant to prove that "cause" exists, see In re Borders Group, Inc., 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011), and, where the movant faces opposition, the motion should be denied in the absence of a "clear showing" of cause. See In re Curry Corp., 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992).

6

The burden of proof is higher, and the showing of cause must be clearer and more detailed, at the later stages of a bankruptcy case. See Am. Network Leasing v. APEX Pharms., Inc. (In re APEX Pharms., Inc.), 203 B.R. 432, 441-42 (N.D. Ind. 1996) (cited in In re Borders Group, Inc., 460 B.R. at 825).

Whether "cause" exists is subject to the discretion of the bankruptcy court. See, e.g., In re Adelphia Commc'ns Corp., 352 B.R. 578, 588 (Bankr. S.D.N.Y. 2006) [hereinafter Adelphia II]. Bankruptcy courts typically consider a number of factors including: (1) the size and complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. See In re Adelphia Commc'ns Corp., 336 B.R. 610, 677 (Bankr. S.D.N.Y. 2006) (hereinafter Adelphia I); In re Borders Group, Inc., 460 B.R. at 822; Mar. 5, 2013 Hr'g Tr. 42:4-9 (Glenn, J) (stating that Adelphia I provides a "pretty good cataloguing of the factors the court's supposed to take into account."). For the reasons set forth below, the Debtors have failed to establish that cause exists for the Court to extend their exclusive periods for a fourth time.

7

### A. Nearly One Year After the Commencement of These Cases, No Progress Toward A Global Consensual Resolution Has Been Made

As the Court will remember, the Debtors entered these Chapter 11 Cases with the outlines of a plan structure supported by several creditor constituencies. See *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 6] [hereinafter Whitlinger Aff.], Exhibit 4 (Plan Term Sheet) of Exhibit 8 (Settlement and Plan Sponsor Agreement with AFI). This plan term sheet contemplated a chapter 11 plan containing non-consensual third party releases for the Debtors' parent, Ally, in exchange for a contribution in cash of $750 million from Ally. Id. Three of the Debtors' primary creditor constituencies – Ally, certain Junior Secured Noteholders, and the Settling RMBS Investors[5] -- committed to Plan Support Agreements in support of such a plan. See Whitlinger Aff., Exhibits 8 (Plan Support Agreement with AFI), 9 (Plan Support Agreement with Certain Junior Secured Noteholders), and 10-A (Plan Support Agreement with Certain Consenting RMBS Creditors).

The high-water mark for support for the Debtors' strategy of pursuing consensus through consensus was actually the very first day of these Chapter 11 Cases. Since the filing, however, support for that plan term sheet has eroded. Almost immediately, the Debtors' settlements with Ally and the Settling RMBS Investors were attacked from all parts of the capital structure, prompting the appointment of an examiner. In late September, as a result of the Creditors' Committee's challenge of the Junior Secured Noteholders' entitlements, the consenting Junior Secured Noteholders terminated their Plan Support Agreement. In late February, the Debtors then permitted their plan support agreement with Ally to expire. See *Debtors' Omnibus Reply to Responses to (I) Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy*

---

[5] Those institutional investors party to the RMBS Settlement (as defined in the Motion) (the "Settling RMBS Investors").

8

*Code for an Order Authorizing the Debtors to Appoint Lewis Kruger as Chief Restructuring Officer and (II) Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 3074] at ¶ 16.  The status of the Debtors' plan support agreement with the steering committee of RMBS claimants remains unclear. See June 25, 2012 Hr'g Tr. at 16:23-17:4 (Debtors' counsel) (stating that Debtors have decided to refrain from seeking court approval of the Debtors' motion to assume the plan support agreements).

Confronted with this unraveling of any consensus, and rather than pursue alternatives as would be expected, the Debtors have entrenched, dedicating significant time and resources to a series of failed attempts to resurrect their failed plan construct.  With each prior request to extend exclusivity, the Debtors presented the Court with an excuse for their lack of progress and a promise of progress going forward.  In August 2012, the Debtors requested a nine-month initial extension because they professed to be otherwise occupied with marketing the asset sales.  See First Exclusivity Motion ¶ 1 [ECF No. 1248].  Unsurprisingly, the Court rejected this request and instead opted to "keep a tight leash on it."  Sept. 11, 2012 Hr'g Tr. 62:14-15 (Glenn, J.).  In December, the Debtors, unable to make any progress on their own, sought appointment of a mediator to assist with gating plan issues contemporaneously with their second request to extend exclusivity.  See Second Exclusivity Motion at ¶¶ 7-11 [ECF No. 2355].  By February, with no consensual plan in sight and mediation having yet to bear any fruit, the Debtors requested a third extension premised in large part on the appointment of Lewis Kruger as Chief Restructuring Officer to serve as an "independent voice" in the plan mediation process.  See Third Exclusivity Motion at ¶ 12 [ECF No. 2918].  In granting that last extension, however, the Court made clear

9

that its expectations were high --- to receive any further extensions, the Debtors would have to show "very, very substantial progress." Mar. 5, 2013 Hr'g Tr. 40:14-16 (Glenn, J.).

At each juncture, the Ad Hoc Group has consistently warned parties that the lack of progress on plan negotiations threatens to decimate creditor recoveries and increase the risk that the plan process will fail.  See *Limited Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 1338] at ¶¶ 12-14; *Omnibus Response of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and Debtors' Motion for the Appointment of a Mediator* [ECF No. 2406] at p. 9; *Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 2997] at pp. 4-5.  Time and again, the Debtors have disregarded the concerns of the Ad Hoc Group and continued their single-minded pursuit of a plan construct premised around the resurrection of the plan construct contained in the original plan term sheet.

The Debtors' latest request simply seeks more of the same, this time without even any attempt at a credible excuse.  According to the Debtors, another extension is justified for three principal reasons:  (i) there is, in their view, the prospect of a meaningful negotiating breakthrough as a result of the two-day global mediation held on April 22 and 23 and the prospect of imminent litigation on several intercreditor issues; (ii) the Debtors have made progress in engaging with the Debtors' key stakeholders in substantive negotiations on major plan issues; and (iii) the expiration of exclusivity will foster chaos.  Motion ¶¶ 3, 4; Kruger Declaration ¶ 5. Each of these purported rationales fails to withstand scrutiny.

10

Most obviously, a global settlement failed to materialize as hoped for after the two-day mediation. Far from "driv[ing] creditors to compromise," as hoped for by the Debtors, these mediation meetings effectively confirmed the reality that the Ad Hoc Group has repeatedly warned against – that the Debtors' insistence upon pursuing global peace only once global peace has broken out only serves to embolden holdouts. Indeed, the only "progress" cited by the Debtors is that several "gating intercreditor issues" are now primed for litigation before the Court, including the allowance of any RMBS trustee claims and the priority of any claim asserted by securities fraud claimants. See Kruger Declaration ¶ 18; Motion ¶ 4. Surely the imminent prospect of time-consuming and expensive litigation does not constitute the "very, very substantial progress" expected by the Court or required by the case law. See, e.g., Adelphia II, 352 B.R. at 588 (finding that this factor was satisfied based, in part, on the debtors' continued cooperation with their stakeholders and their good faith efforts to achieve emergence through achieving a successful sale of certain key assets and reaching consensus with certain creditors regarding the formulation of a consensual plan).

Second, the fact that the Debtors' professionals have engaged in mediation discussions with certain creditors on plan issues does not by itself constitute "cause" for another extension of exclusivity. In that regard, the Ad Hoc Group takes issue with the Debtors' innuendo that their lack of progress can in any way be attributed to the willingness of any particular creditor body to engage. See Kruger Declaration ¶ 13. In fact, the Ad Hoc Group, among others, has been largely excluded from the discussions concerning global settlements with Ally. Both the Debtors and Creditors' Committee refused to share with the Ad Hoc Group's advisors even on a professionals-only basis the material substance of any discussions with Ally, on the premise that the Junior Secured Noteholders' issues are "narrow." If that is so, the Debtors cannot now be

11

heard to complain that their utter lack of progress is the result of the failure to reach resolution with creditor groups.

Furthermore, the suggestion that the Junior Secured Noteholders are unwilling to engage in confidential settlement discussions is seriously misleading. Pursuant to the Court's suggestions at the December 20, 2012 hearing, the Ad Hoc Group proposed to the Debtors a draft order in aid of mediation (attached hereto as Exhibit 1) – acceptable to other creditor constituencies in these cases and used in another major chapter 11/chapter 15 case that was ultimately settled – that would allow the participation in mediation of creditor principals. Dec. 20, 2013 Hr'g Tr. 71:7-16. The Debtors declined to submit that order for consideration by the Court.[6] The Debtors instead first asked that principals execute a form of confidentiality agreement which is not only prejudicial[7] -- in that it would in effect indefinitely restrict any holder that signs it – but is also significantly off market[8] in that it does not require the disclosure of any failed settlement discussions. The proposed form of confidentiality agreement is inconsistent with the confidentiality agreement the Debtors already entered into with certain Junior Secured Noteholders to conduct the prepetition settlement discussions. Even so, counsel to the Ad Hoc Group sought to resolve the issues raised prior to the mediation. After reaching an understanding with the Debtors with respect to the manner in which the Debtors would engage the Junior Secured Noteholders, the Debtors determined that they would prefer to wait to finalize

---

[6] See Jan. 16, 2013 Hr'g Tr. 12:1-9 (Counsel for Debtors) ("[the Court] asked the parties to agree on an acceptable form of mediation order. Since Judge Peck -- from speaking with him, he's still sort of getting the lay of the land, speaking to the parties, sort of determining how he wants to proceed here, we haven't yet put pen to paper on that").

[7] In fact, it appears that, aside from members of the Creditors' Committee, only a single principal for a major party in interest in these Chapter 11 Cases has executed the form of confidentiality agreement insisted upon by the Debtors.

[8] As an example, a group of bank lenders to Energy Futures Holding Corp. recently entered into a form of confidentiality agreement with the company that reportedly required the public disclosure of any failed settlement discussions. On April 15, 2013, EFH filed an 8-K that made the disclosures. See Exhibit 2 (8-K).

a confidentiality agreement, even telling counsel to the Ad Hoc Group that "[a]t that point, I'm confident we'll be able to quickly figure something out." In other words, the ball has been in the Debtors' court to respond, and they have elected not to engage at this time, presumably because they do not feel that the negotiations have advanced to the point that principals are required. In fact, despite further requests, the Debtors have still not provided any comments to the Junior Secured Noteholders' suggested revisions to the form confidentiality agreement.

Third, the Debtors argue that another extension is necessary to avoid an "armageddon" of plan-related litigation. Motion ¶ 5. As an initial matter, it is not apparent how the prosecution by third parties of feasible alternative plan structures is any more litigious or wasteful than the Debtors' proposal to promptly file and prosecute pleadings seeking to adjudicate important creditor issues. Motion ¶ 4. Moreover, the Debtors provide no evidence to support their contention. In fact, experience dictates otherwise. In the largest and most complex bankruptcy cases in United States history, the filing of competing plans of reorganization was credited with fostering ultimate global consensus. See In re Lehman Bros. Hldngs., Inc., Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.), Sept. 19, 2012 Hr'g Tr. at 29:1-20 (Peck, J.) ("the dialectic of a consolidation plan, a non-consolidation plan and a plan in the middle prove to be a useful means to putting this case to a culmination of consensus"). In any event, as discussed in detail below and in the Snellenbarger Declaration, it is another extension of exclusivity – and not the submission for consideration of alternative plan structures – that is more likely to foster chaos in these Chapter 11 Cases.

NEWYORK 8830176

### B. Another Extension of Exclusivity Will Bring These Estates to the Brink of Administrative Insolvency

The Ad Hoc Group continues to believe that the prosecution and confirmation of a chapter 11 plan is in the best interests of all parties. Any confirmable chapter 11 plan, however, will have to satisfy certain basic minimum requirements. Most critical here, any such plan must pay all administrative claim expenses in full in cash upon confirmation, 11 U.S.C. § 1129(a)(9)(A), and must satisfy secured claims in full. See generally 11 U.S.C. § 1129(b)(2)(A). The Snellenbarger Declaration at paragraphs 6 through 20, and the attachment thereto, sets forth current views as to how much cash will be needed to fund a chapter 11 plan at various points in time.

Given these facts based on information provided by the Debtors, the Ad Hoc Group believes that granting the Motion would in effect preserve exclusivity to a date beyond which it may become impractical, if not impossible, for third parties to prosecute competing plans of reorganization. See Snellenbarger Declaration. In analyzing the Snellenbarger Declaration, the Court may reach its own conclusion with respect to how much time remains for the Debtors to continue pursuing their strategy of entrusting the plan negotiation process to litigation claimants. The Ad Hoc Group believes that it is an unacceptable result for the Court to in effect extend exclusivity for the remainder of these Chapter 11 Cases.

NEWYORK 8830176

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Group requests that the Court deny the Motion and grant such other and further relief as the Court deems just.

Dated: April 29, 2013
      New York, New York

Respectfully submitted,

By: J. Christopher Shore
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore (JS – 6031)
Harrison L. Denman (HD – 1945)

  - and -

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group of Junior Secured Noteholders

-

15

NEWYORK 8830176