**Hearing Date and Time: May 7, 2013 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline: April 30, 2013 at 4:00 p.m. (prevailing Eastern time)**

| | |
|---|---|
| Richard M. Cieri | Jeffrey S. Powell |
| Ray C. Schrock, P.C. | Daniel T. Donovan |
| KIRKLAND & ELLIS LLP | Gregory L. Skidmore |
| 601 Lexington Avenue | KIRKLAND & ELLIS LLP |
| New York, New York 10022 | 655 15th Street, N.W., Ste. 1200 |
| Telephone: (212) 446-4800 | Washington, D.C. 20005 |
| Facsimile: (212) 446-4900 | Telephone: (202) 879-5000 |
| | Facsimile: (202) 879-5200 |

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al. | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ALLY FINANCIAL INC.'S LIMITED OBJECTION AND RESPONSE TO THE**
**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR**
**ENTRY OF AN ORDER AUTHORIZING THE COMMITTEE TO PROSECUTE AND**
**SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL POSTURE ....................................................................................5

ARGUMENT ..........................................................................................................6

I.      The Committee's Motion Is Premature And The Committee Should Not Be
        Granted The Sole Right To Settle Claims Against AFI.......................................6

II.     The Committee's Veil-Piercing Discussion Contains A Number Of Material
        Misstatements And Omissions............................................................................7

        A.      No Court Has Ever Pierced A Corporate Veil Based On Similar Facts. ................7

        B.      Piercing The Corporate Veil Under Delaware Law Is A Difficult Task
                Reserved For Extraordinary Circumstances. ...........................................9

        C.      AFI's Contribution To ResCap Of More Than $8 Billion Is Inconsistent
                With Any Veil-Piercing Or Asset-Siphoning Claim. ...........................................10

        D.      AFI And ResCap Did Not Operate As A "Single Economic Entity."...................12

        E.      ResCap Was Not A "Sham" Corporation That Existed For No Purpose
                Other Than Fraud.............................................................................18

III.    The Committee's Discussion Of The Affiliate Transactions Contains A Number
        Of Material Misstatements And Omissions....................................................20

        A.      The Three Independent Bank Transactions Benefited ResCap. ...........................20

        B.      The Affiliate Agreements Provided Significant Benefits To ResCap. .................23

IV.     The Committee's Other Arguments Are Equally Baseless................................24

CONCLUSION........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberto v. Diversified Grp., Inc.,*
  55 F.3d 201 (5th Cir. 1995) ................................................................. 12

*Albright v. Attorney's Title Ins. Fund,*
  504 F. Supp. 2d 1187 (D. Utah 2007) ................................................ 11

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.,*
  --- F. Supp. 2d ----, 2013 WL 1420243 (S.D.N.Y. Apr. 9, 2013) ............................. 9, 10, 17, 18

*Case Fin., Inc. v. Alden,*
  2009 WL 2581873 (Del. Ch. Aug. 21, 2009) .................................... 19

*Harco Nat'l Ins. Co. v. Green Farms, Inc.,*
  1989 WL 110537 (Del. Ch. Sept. 19, 1989) ....................................... 9

*HBE Leasing Corp. v. Frank,*
  48 F.3d 623 (2d Cir. 1995) .................................................................. 22

*In re Adelphia Commc'ns Corp.,*
  544 F.3d 420 (2d Cir. 2008) ................................................................. 7

*In re Armstrong,*
  231 B.R. 746 (Bankr. E.D. Ark. 1999) ............................................... 25

*In re Buckhead Am. Corp.,*
  178 B.R. 956 (D. Del. 1994) ................................................................. 8

*In re Commodore Int'l Ltd.,*
  262 F.3d 96 (2d Cir. 2001) .................................................................... 5

*In re Dewey & Lebouef LLP,*
  2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29, 2012) .......................... 5

*In re Digital Music Antitrust Litig.,*
  812 F. Supp. 2d 390 (S.D.N.Y. 2011) .................................................. 9

*In re Foxmeyer Corp.,*
  290 B.R. 229 (Bankr. D. Del. 2003) .......................................... 10, 18, 19

*In re Heritage Org., L.L.C.,*
  413 B.R. 438 (Bankr. N.D. Tex. 2009) ................................................ 10

*In re Lois/USA, Inc.*,
   264 B.R. 69 (Bankr. S.D.N.Y. 2001) ............................................................... 25

*In re Moll Indus., Inc.*,
   454 B.R. 574 (Bankr. D. Del. 2011) .............................................................. 6, 19

*In re RSL COM PRIMECALL, Inc.*,
   2003 WL 22989669 (Bankr. S.D.N.Y. Dec. 11, 2003) ................................. 2, 9, 19

*In re Smart World Techs., LLC*,
   423 F.3d 166 (2d Cir. 2005) ............................................................................ 6

*In re Sunbeam Corp.*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ....................................................... 12, 19, 22

*In re Ticketplanet.com*,
   313 B.R. 46 (Bankr. S.D.N.Y. 2004) ............................................................. 9, 12

*In re Verestar, Inc.*,
   343 B.R. 444 (Bankr. S.D.N.Y. 2006) ............................................................... 8

*J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*,
   131 F. Supp. 2d 544 (S.D.N.Y. 2001) ............................................................... 18

*Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*,
   1990 WL 44267 (Del. Ch. Apr. 12, 1990) ....................................................... 7, 8

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991) ........................................................................... 18

*RMS Techs., Inc. v. Nynex Computer Servs. Co.*,
   1993 WL 763469 (N.Y. Sup. Ct. June 21, 1993) ............................................... 17

*Shandler v. DLJ Merch. Banking, Inc.*,
   2010 WL 2929654 (Del. Ch. July 26, 2010) ...................................................... 8

*Trevino v. Merscorp, Inc.*,
   583 F. Supp. 2d 521 (D. Del. 2008) ................................................................. 9

*Union Carbide Corp. v. Montell N.V.*,
   944 F. Supp. 1119 (S.D.N.Y. 1996) ................................................................. 8

*United States v. Bestfoods*,
   524 U.S. 51 (1998) .................................................................................... 16, 18

**Statutes**

11 U.S.C. § 1123(b)(3)(A) ................................................................................ 7

11 U.S.C. § 547(c)(1)................................................................................................................ 25

Del. Code Ann. tit. 6, § 1309 ................................................................................................... 22

**Rules**

Fed. R. Bankr. P. 9019(a) ......................................................................................................... 6

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. ("*AFI*") and its non-debtor subsidiaries (collectively, "*Ally*"), submit this limited objection and response to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* [ECF No. 3412] (the "*Motion*").

## PRELIMINARY STATEMENT

The Debtors have consented to standing for the Committee to assert claims on the Debtors' behalf and the Committee now seeks an order establishing its standing. Based on the Debtors' consent, the standard for granting standing is relatively low. Although AFI will vigorously oppose any claims asserted by the Committee, the sufficiency of such claims should be addressed at the motion to dismiss stage and, if necessary, after discovery—including full discovery from Committee members and others. To be sure, AFI believes such claims will fail. AFI files this Limited Objection and Response to identify threshold flaws with the Committee's Motion and to respond to certain material misstatements and omissions in the Motion.

There are several threshold problems with the Motion. *First*, the Motion is premature. The parties are engaged in mediation with Judge Peck that could lead to a chapter 11 plan for the Debtors. A ruling on the Motion should be deferred until mediation is concluded. Moreover, the Examiner has taken testimony from current and former ResCap and AFI officers and directors, and is due to issue his report on May 13. Any litigation should not proceed before the Examiner issues his report. *Second*, the Committee's request for sole standing to settle claims has no basis in the law, and certainly makes no sense at a time when the Debtors, the Committee, AFI, and other parties are working on a chapter 11 plan. Against that backdrop, the Motion should at a minimum be deferred and sole settlement authority for the Committee should be denied.

The Motion contains a number of inaccuracies and material omissions. Much of the Committee's brief is focused on a claim that ResCap was the alter ego of AFI and the corporate veil between the entities should be pierced. But the "classic veil-piercing story" the Committee tells is a work of fiction and fatally flawed as a matter of law. The Committee cannot come close to alleging in good faith, must less establishing, the facts necessary to pierce the veil. The Committee is well aware of the high legal hurdle it must clear to prove a veil piercing claim; its law firm has successfully defeated veil piercing claims on motions to dismiss. *See, e.g.*, *In re BHS&B Holdings LLC*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009); *In re RSL COM PRIMECALL*, 2003 WL 22989669 (Bankr. S.D.N.Y. Dec. 11, 2003). Under Delaware law, the corporate form is "sacrosanct" and veils can be pierced only in "exceptional cases." The Committee cannot identify a single case in which a court pierced the corporate veil based on similar facts—because one does not exist. No court has *ever* pierced the corporate veil of a company of the size, corporate governance, and legal independence of ResCap.

To read the Committee's Motion, one would think that ResCap never existed—that it never had over 14,000 employees, that it never had over $130 billion in assets, that it did not have a separate credit rating and issue $20 billion of its own debt, that it did not make its own SEC filings, that it did not have a board of directors that met 169 times from 2007-2010, that it did not have net income of $1 billion in 2005, $700 million in 2006, and $575 million in 2010. These facts are inconsistent with any claim of veil piercing.

Equally important, the Committee's argument that ResCap "effectively had no independent leadership" and that its officers and directors were "completely beholden" to AFI is an absurd contention that is easily disproven by the facts. ResCap's independent directors have included Tom Melzer, the former President and CEO of the St. Louis Federal Reserve Bank, and

Tom Jacob, the former CEO of Chase Manhattan Mortgage Company.  ResCap's former Chairman, Michael Rossi, is now a special advisor to the Governor of California.  Its former CEO, Jim Jones, previously held senior leadership positions at Bank of America, Wells Fargo and Citigroup.  Its current CEO, Thomas Marano, is a former Director and Head of Global Mortgage Trading for Bear Stearns.  The list goes on from there. These witnesses and others uniformly testified that they acted only in ResCap's interests in reviewing—and approving—the transactions referenced by the Committee.  The idea that these accomplished people were "dominated and controlled" by AFI does not pass the straight-face test.

Nor can the Committee square its veil-piercing argument with the fact that from 2007-2009, AFI contributed more than *$8 billion* in capital to ResCap.  This $8 billion in contributions, including nearly $3 billion in cash, undermines the Committee's theory that AFI siphoned assets from ResCap to save itself.  In fact, the opposite is true—AFI's extraordinary contributions *saved* ResCap and kept it from failing, as so many other mortgage companies did during the Great Recession.  Instead of a bankruptcy at the height of the mortgage crisis, which would have led to a liquidation and minimal recovery for creditors, ResCap recovered, earning $575 million in profit in 2010, paying off its lenders in full, providing its bondholders two separate opportunities to exchange ResCap bonds for new debt, cash, or AFI bonds, paying off millions of dollars in creditor value, and permitting ResCap to be sold during these proceedings.

The Committee's answer to this extraordinary support is to try and ascribe an ulterior motive for it—claiming that AFI made the contributions only to keep ResCap on "life support" so that it could "strip assets" from ResCap or impose R&W liability onto ResCap.  But the witnesses have uniformly rejected this theory.  ResCap's current and former officers and directors stand behind the asset deals challenged, including the three separate bank transactions,

as unquestionably in the best interests of ResCap.  In reviewing these transactions, ResCap's board and management were advised by the nation's most sophisticated financial and legal advisors—including Dan Ammann and Jonathan Pruzan at Morgan Stanley and Tim Pohl at Skadden Arps, along with advisors from Lazard, Houlihan Lokey, Bryan Cave, and other well-respected firms.  The Committee's argument is nothing more than an effort to second-guess the business judgment and advice of highly qualified professionals, directors, and officers.

Witnesses also have testified that no R&W liability was ever foisted unfairly onto ResCap.  ResCap is and always has been responsible for the R&W liability because ResCap always received the economic benefits of the transactions that created those risks—securitizing and selling mortgage loans.  The risk followed the reward.  The conclusory (and unsupported) statements that AFI controlled the mortgage business are simply untrue.  Both ResCap and AFI witnesses have testified to the Examiner that the mortgage business, including securitizations, was run independently by ResCap and was separate from AFI's auto finance business.  Sophisticated financial service companies—including members of the Committee—dealt with ResCap as an independent entity, as established in contracts between ResCap and these entities and as internal documents from these entities, including Committee members, will show.

The Committee also argues that it will assert fraudulent conveyance claims against AFI challenging three independent transactions involving Ally Bank.  As an initial matter, these transactions are separate and cannot be conflated as a matter of law.  And the facts do not support the Committee's arguments.  For the 2006 transaction, the Committee cannot state that ResCap was insolvent—a requirement of a fraudulent conveyance claim.  ResCap was indisputably solvent in November 2006, as Committee member Wilmington Trust concedes in its separate motion.  (WT Mot. ¶ 7 [ECF No. 3475].)  Moreover, the 2006 bank transaction was

approved by the ResCap board because it concluded the benefits of the transaction (maintaining ResCap's investment-grade credit rating and access to low-cost bank funding) far outweighed any downside of obtaining Bank stock without voting rights.  For both the 2008 and 2009 bank transactions, ResCap received well more than reasonably equivalent value for what it transferred—interests in the Bank that were tied to mortgage assets described by witnesses as "worthless" and by the Committee as "toxic."  In unanimously approving these transactions, the ResCap board (including the independent directors) were advised by sophisticated advisors—including Morgan Stanley, Skadden Arps, and Goldin Associates—*all* of whom concluded that the transaction was in the best interests of ResCap, its shareholder, and its creditors.

In the end, the Committee has filed its motion for standing now—during Court-ordered mediation and in advance of the Examiner's report—to seek leverage.  The Court should defer ruling on the Motion until mediation is concluded and the Examiner's report is issued, or deny the Motion without prejudice.  Moreover, if standing is granted, the Committee should not have unfettered discretion whether to litigate or settle any potential claims that are asserted.

## PROCEDURAL POSTURE

Because the Debtors have consented to the Committee's request for standing, the Court may grant the request if it "finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings."  *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001).  This Court has previously held that a Committee must demonstrate that the claims are "colorable" in order to be granted standing.  *In re Dewey & Lebouef LLP*, 2012 WL 5985445, at *6 (Bankr. S.D.N.Y. Nov. 29, 2012).  As the Committee has not filed a draft complaint, AFI cannot fully evaluate any alleged claims that the Committee may bring.  AFI anticipates, based on the Motion and prior communications with the Committee, that many of the claims the Committee will

allege will fail to state a claim as a matter of law, and AFI intends to file a motion to dismiss.

Analysis of the legal sufficiency of the Committee's claims should be addressed at the motion-

to-dismiss stage, once the Committee has filed a complaint outlining claims that all parties can

review.  *See, e.g.*, *In re Moll Indus., Inc.*, 454 B.R. 574, 591-92 (Bankr. D. Del. 2011) (granting

motion to dismiss creditor committee's complaint after having granted committee standing);

*BHS&B*, 420 B.R. at 142 (similar).  AFI reserves all arguments regarding those claims to that

stage.[1]

## ARGUMENT

### I.    The Committee's Motion Is Premature And The Committee Should Not Be Granted The Sole Right To Settle Claims Against AFI.

AFI objects to certain aspects of the Committee's Motion.  *First*, the Motion is

premature.  The parties are engaged in mediation with Judge Peck that could lead to a chapter 11

plan for the Debtors and resolve any claims.  A ruling on the Motion should be deferred until

mediation is concluded.  In addition, the Examiner, after conducting discovery and taking

testimony from current and former ResCap and AFI officers and directors, and is due to issue his

report on May 13.  Consideration of the Motion and any litigation should not proceed before the

Examiner issues his report.

*Second*, AFI objects to the Committee's request for sole settlement authority of the

Claims.  By requesting exclusive settlement authority coupled with unqualified consent rights

over any settlement in a chapter 11 plan proposed by the Debtors, the Committee is essentially

asking for a veto power over any plan by the Debtors, contrary to settled law.  *See* Fed. R. Bankr.

P. 9019(a); *In re Smart World Techs., LLC*, 423 F.3d 166, 176-77 (2d Cir. 2005) (similar); 11

---

[1] The Committee is wrong in asserting that "AFI believe[s] [the claims] to be at least colorable."  (Mot. ¶ 5.)  AFI has never held or stated any such belief.  AFI has always valued the asserted claims at *zero*, and its proposed settlement with the Debtors reflected AFI's desire for closure and a prompt resolution of these cases—nothing more.

U.S.C. § 1123(b)(3)(A).  A debtor maintains the authority to settle claims on behalf of its estate

within a chapter 11 plan, even if derivative standing has been granted to a creditors' committee.

*See, e.g.*, *In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 424-25 (2d Cir. 2008).  The Committee

also seeks now what it failed to obtain in connection with the Debtors' extension of exclusivity.

As the Court is aware, the Debtors are conducting plan negotiations and mediation with

various parties, and are seeking an extension of exclusivity.  Granting the Committee sole

authority to settle the claims and unqualified consent rights would be inconsistent with the

Debtors' exclusivity and efforts to progress these cases to conclusion.  At minimum, any consent

rights over settlement must be subject to the qualification that consent "not be unreasonably

withheld," as with the Committee's authority regarding the Lien Avoidance Claims.  Further, it

should be clear that, to the extent exclusivity is not continued, any party in interest can file a

chapter 11 plan proposing a settlement of the Claims.

## II.    The Committee's Veil-Piercing Discussion Contains A Number Of Material Misstatements And Omissions.

### A.    No Court Has Ever Pierced A Corporate Veil Based On Similar Facts.

The Committee makes the conclusory claim that the facts here present a "textbook case"

of veil piercing (Mot. ¶ 6), and that veil piercing cases present a "general fact pattern quite

similar to that presented here" (*id.* ¶ 49).  That is wrong.  The Committee *does not cite one case*

that presented facts remotely similar to the facts here—and there is no such case.  Piercing the

corporate veil between AFI and ResCap would be unprecedented in the law.

The Committee's lead case, *Mabon, Nugent & Co. v. Texas American Energy Corp.*,

1990 WL 44267 (Del. Ch. Apr. 12, 1990), is entirely distinguishable.  In *Mabon*, a parent

corporation formed a subsidiary merely as "an acquisition vehicle" that "provided a tax shelter

for [the parent corporation]" for "no compensation" and no benefit.  *Id.* at *1, *5.  ResCap, by

7

contrast, was a sophisticated mortgage company that regularly transacted its own business with sophisticated market participants. In *Mabon*, the boards of the parent and subsidiary were exactly the same. *Id.* at *5. There is almost no overlap between AFI and ResCap board members, and ResCap had highly-qualified independent and inside directors. In *Mabon*, the subsidiary guaranteed the debt of the parent despite there being no sound business reasons in the record to do so. *Id.* at *5. Here, ResCap was contractually precluded from guaranteeing any AFI debt, and the AFI-ResCap transactions were all determined to be beneficial to ResCap by ResCap's management, board, and sophisticated independent advisors. In *Mabon*, the credit rating agencies did not distinguish the debt of the subsidiary from the debt of the parent. *Id.* at *2. ResCap was a separate SEC filer for the period in question and had a separate credit rating. In *Mabon*, the parent paid its officers from its subsidiary's bank account. *Id.* at *5. Here, AFI did not use ResCap's accounts to pay its own expenses. The other cases cited by the Committee are likewise nothing like this case.[2]

The Committee wholly ignores the many cases in which courts have *granted* motions to dismiss veil-piercing claims. For example, *In re BHS&B Holdings LLC*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009), involved allegations that the subsidiary did not have adequate capital for "beyond a couple of months" of operations; that the subsidiary held no board meetings and had no CEO until just before its bankruptcy; that "all major (and many minor) strategic and financial decisions were made by [the parent] directly," and the subsidiary's management "was generally

_____

[2] *See, e.g., In re Buckhead Am. Corp.*, 178 B.R. 956, 960 (D. Del. 1994) (subsidiary "received no consideration" for a forced transaction with the parent which "resulted in [the subsidiary's] insolvency"); *In re Verestar, Inc.*, 343 B.R. 444, 465 (Bankr. S.D.N.Y. 2006) (parent "raid[ed] the [subsidiary's] assets at will" and the subsidiary "failed to maintain its own employee records"); *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1144-45 (S.D.N.Y. 1996) (shareholders forced corporation to reduce its business activities "to further the interests of [the shareholders]"); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *2-3 (Del. Ch. July 26, 2010) (controlling shareholder "forced out" and replaced a corporation's directors with its preferred "'insider' directors," and engaged in "self-dealing").

kept in the dark"; and that the parent failed to authorize expenditures necessary for the debtor to continue as a going-concern because of a secret back-up plan to liquidate the debtor if certain sales benchmarks were not achieved. *See id.* at 130, 136-37. Despite these allegations, this Court granted a motion to dismiss veil-piercing claims. So too in *In re Ticketplanet.com*, 313 B.R. 46, 71 (Bankr. S.D.N.Y. 2004), where the court dismissed a veil-piercing claim despite allegations that the parent used the debtor as an "incorporated pocketbook," because the debtor "operated ... for a sustained period prior to bankruptcy" and "received a substantial cash infusion" from its parent. *See also, e.g.*, *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528-31 (D. Del. 2008) (similar); *In re RSL COM PRIMECALL, Inc.*, 2003 WL 22989669, at *15-17 (Bankr. S.D.N.Y. Dec. 11, 2003) (similar). The Committee is well aware of this—its counsel was defense counsel in *BHS&B* and *RSL* and won motions to dismiss veil-piercing claims in those cases.

> **B.**   **Piercing The Corporate Veil Under Delaware Law Is A Difficult Task Reserved For Extraordinary Circumstances.**

The Committee's Motion also omits any discussion of the stringent legal standard for veil-piercing claims under Delaware law, the law all parties agree applies. Because "the corporate form is sacrosanct," "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task," *BHS&B*, 420 B.R. at 133, and is reserved for "extraordinary circumstances," *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, --- F. Supp. 2d ----, 2013 WL 1420243, at *10 (S.D.N.Y. Apr. 9, 2013); *see also Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989). As such, "the proponent of disregarding a corporation's separate identity bears a heavy burden." *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011).

The Committee cannot evade this settled law by citing one Texas case stating that a veil-

piercing claim under Delaware law need only be demonstrated by a preponderance of the evidence. (*See* Mot. ¶ 53.)  As the Delaware Bankruptcy Court has held, "the relevant cases construing Delaware law seem to uniformly suggest that the standard of proof for veil piercing is at least elevated relative to the minimal preponderance of the evidence standard if not a clear and convincing evidence standard."  *In re Foxmeyer Corp.*, 290 B.R. 229, 237 (Bankr. D. Del. 2003) (citing cases).  But the Committee will not satisfy its "heavy burden" under any standard.[3]

### C.    AFI's Contribution To ResCap Of More Than $8 Billion Is Inconsistent With Any Veil-Piercing Or Asset-Siphoning Claim.

AFI contributed more than *$8 billion* to ResCap during the Great Recession.  This is inconsistent with any veil-piercing or asset-siphoning claim.  The Committee's attempt to downplay the significance of these contributions fails.

According to the Committee, AFI engaged in the "careful doling out of finite capital infusions at key moments" in order to keep ResCap "on life-support for AFI's own purposes," namely to strip assets and shed R&W liability.  (Mot. ¶ 45.)  But *all* material witnesses from ResCap and AFI have rejected this theory and testified that the capital contributions were made to benefit ResCap, because leaders at both companies believed that if ResCap could survive the Great Recession, it would emerge as a strong and profitable competitor that would "print money."  Indeed, AFI continued to make substantial contributions, including over $3 billion in late 2009, *after* all of the transactions and events the Committee cites in trying to make its pretext argument—*after* AFI achieved bank holding company status, *after* AFI received TARP funds, and *after* AFI and ResCap entered into the challenged asset transactions.  This alone disproves the Committee's "life-support" theory.

---

[3] "[T]he Delaware two-pronged [veil-piercing] test must be applied to, and satisfied at, each level or layer of ownership applicable within the multi-faceted entity structure."  *In re Heritage Org., L.L.C.*, 413 B.R. 438, 514 (Bankr. N.D. Tex. 2009) (Delaware law); *Capmark Fin. Grp.*, --- F. Supp. 2d ----, 2013 WL 1420243, at *11 (same).

Moreover, these contributions were intended to—and did—fully rejuvenate ResCap and allowed it to return to profitability in 2010. Due to AFI's support, a ResCap free-fall bankruptcy was avoided, ResCap's lenders were paid off, and its bondholders had two opportunities in 2008 to trade out of their positions in exchange for cash or AFI bonds.

The Committee's argument that AFI made $8 billion in capital contributions to "escape" "$20 billion" in RMBS claims made by Committee members makes no sense. (Mot. ¶ 45.) Witnesses have testified that R&W liability was "non-existent" in 2005-2007. Moreover, the $20 billion figure represents only self-serving *claims*—no R&W liability has been established. The idea that AFI undertook a series of complex transactions to avoid liability for claims that had not been made, were not predicted by anyone, and still have not been proven, makes no sense.

The Committee also complains that AFI contributed little cash, and instead forgave debt or contributed assets. (*Id.* ¶ 45.) Again, the Committee is wrong. AFI *did* contribute cash—a total of nearly $3 billion, including $916 million in 2009. Moreover, as witnesses have explained, AFI's contributions of ResCap bonds purchased on the open market allowed ResCap to not only receive the fair market value of the bonds, but also book a gain on extinguishment of the debt (the difference between par and fair market value) that increased its capital, and avoid future debt payments that aided its long-term liquidity.

No court has ever pierced a corporate veil to reach a shareholder that has contributed so much to its subsidiary. Indeed, as courts have explained, "'[a] shareholder's infusion of capital into the corporation actually defeats an alter ego finding because it is proof that the shareholder is not siphoning assets from the corporation and is not improperly or unjustly trying to shield its assets by undercapitalizing its subsidiary and hiding behind the corporate veil.'" *Albright v. Attorney's Title Ins. Fund*, 504 F. Supp. 2d 1187, 1211 (D. Utah 2007); *see also Alberto v.*

11

*Diversified Grp., Inc.*, 55 F.3d 201, 206-07 (5th Cir. 1995); *Ticketplanet.com*, 313 B.R. at 71.

### D.      AFI And ResCap Did Not Operate As A "Single Economic Entity."

To prove that AFI and ResCap operated as a "single economic entity," the Committee must prove that ResCap had no "legal or independent significance of its own." *BHS&B*, 420 B.R. at 134.   The Committee cannot rely on general allegations; it must show "complete domination of the corporation concerning the transaction in issue." *In re Sunbeam Corp.*, 284 B.R. 355, 366 (Bankr. S.D.N.Y. 2002).  Nothing could be further from the truth.

ResCap was a sophisticated and, for many years, successful company.   Even at formation, ResCap was not a mere "start-up," but rather was formed when an AFI subsidiary contributed the stock of two well-established and highly-profitable companies to the newly-formed ResCap.   There is no question ResCap was adequately capitalized at formation—in addition to the contributed stock, ResCap successfully raised billions in debt financing in its first 18 months, had net income of $1 billion in 2005 and $700 million in 2006, and was subject to a $5.4 billion tangible net worth covenant until June 2008.   Indeed, Committee member Wilmington Trust concedes that ResCap was adequately capitalized at formation and does not dispute that it was solvent through at least early 2007.  (WT Mot. ¶ 7.)  Any claim that ResCap was not adequately capitalized at formation thus fails. *BHS&B*, 420 B.R. at 136.  And a court need not even consider capitalization where "the allegations in the [c]omplaint do not support a finding that [the corporation] was established as a sham entity." *Id.* at 137.

ResCap unquestionably was not a "sham entity."  During the relevant period, ResCap had over $130 billion in assets; operated numerous lines of business; and transacted with JPMorgan, Barclays, Citibank, Fannie Mae and Freddie Mac, and monoline insurers who sit on the Committee.  None concluded that ResCap was a "sham" corporation that existed solely for the purpose of fraud.  And ResCap bore many other hallmarks of corporate independence:

- <u>Board of Directors.</u>  ResCap always maintained a separate board of directors, which met *169 times* from 2007-2010.  The board reviewed voluminous materials in advance of meetings, and kept official minutes that were approved at subsequent meetings.

- <u>Independent Directors.</u>  The ResCap board had two independent directors that were required to—and did—approve all significant transactions.

- <u>Separate Officers.</u>  ResCap maintained its own corporate officers.  Both documents and testimony prove these officers were fiercely independent from AFI and were focused only on the interests of ResCap.

- <u>Separate Credit Ratings and Debt.</u>  ResCap had its own credit rating that was separate from AFI's credit rating, and issued nearly $20 billion of its own debt.

- <u>SEC Filings.</u>  ResCap made its own SEC filings separate from those of AFI until 2009.[4]

- <u>Separate Operations.</u>  ResCap and AFI maintained separate corporate headquarters and facilities.  AFI and ResCap maintained separate books and records, separate bank accounts, and had separate independent auditors.

The Committee attempts to downplay the significance of ResCap's separateness by claiming that AFI "involv[ed] itself in every aspect of the development and marketing of ResCap's mortgage products."  (Mot. ¶ 6.)  This is incorrect.  AFI and ResCap witnesses are clear: ResCap was responsible for the mortgage operations.  All the Committee can point to is an unproven allegation by AIG that discusses the activities of a ResCap subsidiary (not AFI) and a memo focused on the operations of ResCap and its subsidiaries (not AFI).  Nor does it matter that AFI had global audit and risk management functions (*id.* ¶¶ 26-27); this argument calls into question the operations of every major organization with similar centralized corporate functions.

If anything, the relationship between AFI and ResCap was atypical in the *extraordinary separation* between the two companies, far beyond what is typically seen between a parent and a wholly-owned subsidiary.  The goal in forming ResCap was to insulate ResCap from AFI (and GM) so that ResCap could obtain a separate (and superior) credit rating from AFI and borrow

---

[4] ResCap ceased to be an SEC filer in 2009, at which point the SEC permitted ResCap to de-register because it had no equity investors, fewer than 300 debt holders, and was issuing no new debt.

money at a lower rate, which is critical for a finance company. To obtain this separate credit rating, the ratings agencies required heightened, verifiable, and formalized institutional measures to reinforce the separation and independence of ResCap from AFI. This reinforced separation was accomplished in part by ResCap's Operating Agreement.[5] The Agreement, among other things, required ResCap to have independent directors, and maintain finances, books, and records separate from AFI. It also prohibited ResCap from paying dividends to AFI unless certain high capital thresholds were maintained. Due in part to the Operating Agreement, ResCap was successful in obtaining a credit rating a full two levels higher than AFI and GM.

The Operating Agreement—and the binding institutional measures of separation it contractually imposed—is significant, and the Committee has no answer to it. The Operating Agreement was never breached. The Committee's only response is its conclusory and incorrect assertion that "provisions [of the Operating Agreement] intended to wall off ResCap from AFI routinely were waived, amended, or simply ignored." (Mot. ¶ 34.) Not so. ResCap's Operating Agreement was amended only once, in connection with ResCap's conversion from a corporation to an LLC, and provisions of the Agreement were waived in only a few instances. Each time, the amendment or waiver was done pursuant to the express terms of the Operating Agreement and was unanimously approved by the ResCap board and independent directors. The Committee's contention that the Operating Agreement somehow did not serve its purpose rings hollow.[6]

The attributes of AFI's relationship with ResCap that the Committee identifies as warranting veil piercing are common to many major organizations, especially large financial

---

[5] *See* Ex. 1, ResCap Operating Agreement (June 24, 2005) (ALLY_0140795-808).

[6] The Committee attempts to avoid the overwhelming evidence that ResCap's Operating Agreement was effective by referring to an email from Thomas Marano that the Committee characterizes as referring to the Operating Agreement as a "charade of a fig leaf." (Motion ¶ 34.) But, read in context, the email makes clear that the Operating Agreement *is* being complied with, despite the fact that doing so requires additional hurdles and expenses. And all evidence—from ResCap and AFI employees, and from the outside rating agencies—indicates that the Operating Agreement was a complete and genuine "firewall."

services and bank holding companies.  The Committee's argument thus does no less than call into question the operations of all such companies.

*First*, the Committee points to the fact that ResCap shared certain officers and directors with AFI.  (Mot. ¶¶ 15-16, 60, & app.)  This typical practice raises no issue.  As an initial matter, the Committee's statement that "ResCap effectively had no independent management" (*id.* ¶ 16) demonstrates how little the Committee's arguments resemble reality.   ResCap's senior executives and board members—current and former—have all rejected any notion that they were "completely beholden" to AFI, as the Committee claims.  To the contrary, these witnesses—all of whom have extraordinary credentials—have uniformly testified that ResCap operated independently from AFI and that their focus always was on protecting the interests of ResCap. The idea that these accomplished individuals did not operate independently is not plausible.

Equally important, the Committee's argument on this point is replete with incorrect or misleading statements.  Although the Committee claims that "[a]s Principal Accounting Officer of ResCap, [Jim] Young functionally reported to Mr. DeBrunner, AFI's Controller and Chief Accounting Officer," this is not correct.  Mr. Young never reported to Mr. DeBrunner, or anyone else at AFI.  As a financial officer of a wholly-owned subsidiary, Mr. Young did report *financial information* to AFI financial employees who prepared the consolidated financial reports, as required by GAAP, but he did not report to these officers.  Rather, Mr. Young reported to ResCap leadership.  Nor is it correct to say that Eric Feldstein was a "long-time member of AFI's mortgage operations team."  Mr. Feldstein was the CEO of AFI, which owned a mortgage subsidiary, but he did not run the "mortgage operations."  Indeed, the mortgage businesses had their own leaders—including David Applegate and Bruce Paradis.  Finally, David Applegate is claimed to have "held numerous positions at AFI and its subsidiaries since at least 1995."  But

the only positions listed are *ResCap* positions—Mr. Applegate never held an AFI position.

The "overlapping" officers and directors identified by the Committee—which make up only a small percentage of ResCap's overall management team—fall into several categories, none of which calls into question the legitimacy of ResCap as a separate legal entity. The first category is officers of AFI that served on the ResCap board. But, as the U.S. Supreme Court has explained, it is a "time-honored common-law rule" that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998); *see also BHS&B*, 420 B.R. at 138 (same). This settled law also renders legally irrelevant the second category—officers or directors of ResCap who held a position at a ResCap subsidiary, including the Bank when ResCap owned tracking stock in the mortgage division. The Committee plays fast and loose with these individuals—including Davee Olson and David Applegate—implying that they worked for "the Bank" without noting ResCap's ownership interest.

The Committee's third category is officers of ResCap that were also officers of AFI. But the law is clear that "wholly-owned subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent." *BHS&B*, 420 B.R. at 138. As the Supreme Court has explained, this reflects "the well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership," and "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Bestfoods*, 524 U.S. at 69-70. Here, the referenced individuals have affirmed that, when acting in a ResCap role,

16

they acted in the best interests of ResCap and have rejected any suggestion of divided loyalty.

In any event, for almost all of these individuals, the title held at AFI (*e.g.*, executive vice president) was titular only—they were functional roles designed to facilitate the reporting of operational and financial results to the parent company.  A rare instance of overlap is Sanjiv Khattri, which was a unique situation.  As Mr. Khattri has stated, the CFO of ResCap resigned suddenly in spring 2007, and in order to show continuity and reassure the market during the search for a replacement, Mr. Khattri (the CFO of AFI) became CFO of ResCap on an interim basis.  Although it took longer than expected to find a replacement (due to market turmoil), Mr. Khattri stepped down from the role as soon as a replacement was hired.

The fourth category is individuals who worked first as officers of AFI, Ally Bank, or ResCap, and then switched to a different entity.  This raises no more issue than an individual moving from Bank of America to ResCap.  The fifth category is lawyers.  But the provision of shared legal services—which is common in large organizations—does not support a veil-piercing claim.  *See RMS Techs., Inc. v. Nynex Computer Servs. Co.*, 1993 WL 763469, at *2 (N.Y. Sup. Ct. June 21, 1993).  In any event, the witnesses are clear:  Mr. Solomon always acted as AFI's lawyer and Mr. Andrews always represented the Bank.  Mr. Benton worked first for ResCap, and later for the Bank, but did not represent both entities at the same time.

The Committee's contention that some ResCap executives were paid with AFI equity also makes no difference.  (Mot. ¶ 17.)  Claims "that [a subsidiary's] employees are compensated based on the performance of the firm as a whole are insufficient to veil pierce."  *Capmark*, --- F. Supp. 2d ----, 2013 WL 1420243, at *13.  And ResCap's independent directors were not paid by AFI; they were paid by ResCap out of separate ResCap bank accounts.  It is similarly irrelevant that AFI, as ResCap's sole shareholder, could elect ResCap's directors, as it is hornbook law that

17

such authority does not justify veil piercing.  *See BHS&B*, 420 B.R. at 141.

***Second***, the fact that ResCap and AFI shared certain services (such as information technology, human resources, and accounting) (Mot. ¶ 19), generally pursuant to written agreements, is neither unusual nor inappropriate; rather, this is a "common [business] practice." *E.g.*, *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 643 n.1 (3d Cir. 1991).  The Committee's argument to the contrary calls into question similar arrangements at many, if not all, major financial companies.

***Third***, AFI's public filings do not support a veil-piercing claim.  Settled law holds that consolidated financial reporting, which is required by GAAP, is insufficient as a matter of law to sustain a veil-piercing claim.  *See, e.g.*, *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001).  And the statement in a ResCap SEC filing that "[AFI] controls all fundamental matters affecting us, and its interests may differ from ours" (Mot. ¶ 20), reflects nothing more than the "hornbook law" principle that AFI, as ResCap's sole shareholder, could "'exercise ... the control which stock ownership gives to the stockholders'"—and this is insufficient to support a claim for veil piercing.  *Capmark*, --- F. Supp. 2d ----, 2013 WL 1420243, at *12  (quoting *Bestfoods*, 524 U.S. at 61-62).

## E.    ResCap Was Not A "Sham" Corporation That Existed For No Purpose Other Than Fraud.

The Committee also points to nothing suggesting that there was a "fraud or similar injustice ... in the defendants' use of the corporate form" of ResCap, which is needed to prove a veil-piercing claim.  *See BHS&B*, 420 B.R. at 134 (granting motion to dismiss).  "'[T]he requisite injustice or unfairness is ... not simple in nature but rather something that is similar in nature to a fraud or a sham.'"  *Id.* at 134 (quoting *Foxmeyer*, 290 B.R. at 236).  Delaware courts describe this factor as "something like" fraud and have held that any difference between

18

"something like fraud" and fraud is "largely superficial." *Foxmeyer*, 290 B.R. at 236; *Moll*, 454
B.R. at 591; *see also Case Fin., Inc. v. Alden*, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009)
(requiring actual fraud).   "In other words, 'the plaintiff must plead facts showing that the
corporation is a sham and exists for no other purpose than as a vehicle for fraud.'"  *BHS&B*, 420
B.R. at 140 (quoting *RSL*, 2003 WL 22989669, at *15); *see also Sunbeam*, 284 B.R. at 365-66.
"'[T]he fraud or similar injustice that must be demonstrated to pierce the corporate veil under
Delaware law must, in particular, be found in the defendants' use of the corporate form.'"  *RSL*,
2003 WL 22989669, at *15 (quoting *Foxmeyer*, 290 B.R. at 236).   "'[T]he underlying cause of
action, at least by itself, does not supply the necessary fraud or injustice.'"  *BHS&B*, 420 B.R. at
134 (quoting *Foxmeyer*, 290 B.R. at 236).

    All the Committee can muster with respect to this critical, independent second prong are
conclusory, unsupported statements that AFI "used ResCap's corporate identity as a shield" to
develop and market fraudulent RMBS, and siphoned ResCap's assets and used ResCap as a
"dumping ground" for R&W liability.   (Mot. ¶ 62.)   This is woefully insufficient.   The
Committee does not state when this supposed "scheme" to "siphon[]" assets from ResCap and
"shield" itself from liability was formed or who exactly from AFI or ResCap was involved in this
plan.  Given the many years over which this supposed "scheme" took place, it necessarily would
have involved countless executives and board members, and yet the witnesses from both ResCap
and AFI have all emphatically rejected this theory.  Likewise, despite having "reviewed millions
of pages of documents" (*id.* ¶ 76) from both AFI and ResCap, the Committee cites no document
evidencing such a plan.  That is because there was no such plan—the Committee has created it
from whole cloth.  And given that the transactions cited indisputably benefited ResCap, were
approved by ResCap's board, and were publicly and contemporaneously disclosed, the

transactions do not come close to supporting a claim of fraud in the use of the corporate form.

### III.    The Committee's Discussion Of The Affiliate Transactions Contains A Number Of Material Misstatements And Omissions.

#### A.    The Three Independent Bank Transactions Benefited ResCap.

The Committee argues that AFI "stripped" assets from ResCap in transactions that AFI "knew" were not fair to ResCap.  (Mot. ¶¶ 35-41, 58.)  Nothing could be further from the truth.

**2006 Bank Restructuring.**  The Committee first baldly asserts that AFI "compelled" ResCap to transfer Old GMAC Bank to AFI for "woefully inadequate" consideration in a November 2006 transaction.  (Mot. ¶¶ 36, 62.)  The Committee's argument is contrary to the facts and the testimony.  As an initial matter, the transaction was necessary not to avoid *AFI* becoming a thrift holding company (as the Committee wrongly states), but so that *Cerberus* would not become a thrift holding company upon its acquisition of a 51% interest in AFI.  Additionally, ResCap was unquestionably solvent in 2006, as Wilmington Trust—a member of the Committee—concedes.  (*See* WT Mot. ¶ 7.)

Moreover, the transaction unquestionably was in ResCap's best interests.  *First*, Old GMAC Bank (the thrift) was never—in 2006 or at any other time—one of ResCap's most valuable or profitable assets.  The mortgage thrift was an indirect subsidiary of ResCap and was created solely to provide low-cost funding for mortgage operations.  Senior ResCap officers and directors have explained that the thrift was not a core part of ResCap's business in 2005 and 2006.  Indeed, the very memo relied on by the Committee states that ResCap had been discussing growing the bank for at least a year but had made little progress.  Moreover, the thrift charter that was transferred to GM (not AFI) was a requirement of the sale of GMAC to Cerberus and was a publicly disclosed dividend to GM that no party challenged then or could reasonably challenge today.

*Second*, there is no support—and the Committee cites none—for the conclusory assertion that AFI "compelled" ResCap to approve this transaction for less than reasonably equivalent value or that the transaction was not entered into for ResCap's benefit. The evidence demonstrates that the transaction was thoroughly analyzed by ResCap's management, board, and independent directors (represented by their own legal counsel, Bryan Cave) for over eight months, and all unanimously concluded that the transaction was in ResCap's best interests.

The Committee's assertion that the 2006 bank transaction was inconsistent with the terms of ResCap's Operating Agreement is belied by the very memorandum on which the Committee bases its claim. (*See* Mot. ¶ 36.) According to the Committee, this memorandum was a "stinging critique" that "blasted the proposed transfer as inconsistent with the Operating Agreement" because "it was clearly not an arm's length transaction." (*Id.*) In reality, the referenced memorandum, written seven months before the transaction occurred, explained potential steps that needed to be taken in connection with the transaction to comply with the Operating Agreement and benefit ResCap. *Those steps were taken*. And the entire transaction was disclosed contemporaneously in SEC filings.

The reason for ResCap's board's approval of the transaction is simple—the transaction was necessary for Cerberus's acquisition of AFI to close, which in turn was necessary for ResCap to maintain its investment-grade credit rating. By the time of the transaction, GM's credit rating had fallen to non-investment-grade. Had the transaction not been completed, ResCap's credit rating would have dropped below investment grade and its costs of funds would have increased, costing ResCap hundreds of millions of dollars a year. ResCap's management and the board, including the independent directors, all concluded that this benefit far outweighed the one "negative" claimed by the Committee—the fact that ResCap did not acquire new voting

21

rights in the Bank. (*See id.* ¶ 39.) Given that ResCap maintained the same economic interest in the Bank and had the same access to low-cost Bank funding as it did before the transaction, and that ResCap officers sat on the Bank's board, this decision was eminently reasonable.

The Committee's claim that ResCap did not receive reasonably equivalent value because "the similar assets of comparable banks were valued much higher" (*id.* ¶ 36) is completely unsupported (and the Committee does not cite any support in its brief). ResCap received "Class M" shares that tracked the value of the mortgage division. In other words, ResCap received shares that tracked the economic value of the very assets and liabilities it transferred to Ally Bank. As a matter of economics, ResCap received identical value for the assets and liabilities it transferred—and it preserved its investment-grade credit rating, retained access to low-cost funding, had the same operational control over the Bank's mortgage division and continued to consolidate the Bank's financial results on its financial records.[7]

**2008 and 2009 Bank Transactions.** The idea that ResCap did not receive reasonably equivalent value for the separate 2008 and 2009 Ally Bank transactions is baseless. First, although the Committee attempts to conflate these transactions with the 2006 bank restructuring, all three are distinct transactions done at different periods, for different reasons, and involving different negotiators. Any attempt to collapse these separate transactions fails under settled law. *See, e.g.*, *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635-36 (2d Cir. 1995); *Sunbeam*, 284 B.R. at 370-71. Second, ResCap received significant value in these transactions. The shares sold by ResCap were supported by the Bank's mortgage assets—which in 2008 and 2009 were worthless, as described by the witnesses and determined by Goldin Associates. Even the Committee itself acknowledges that the Bank's mortgage assets were "toxic." (Mot. ¶ 31.) And,

---

[7] In any event, a fraudulent transfer claim based on the 2006 Bank Transaction is barred by the statute of limitations. *See* Del. Code Ann. tit. 6, § 1309.

22

in unanimously approving these transactions, the ResCap board (including the independent directors) were advised by sophisticated advisors—including Jonathan Pruzan and Dan Ammann of Morgan Stanley and Tim Pohl of Skadden Arps. These advisors *all* concluded that the transaction was in the best interests of ResCap, its shareholder, and its creditors. The insinuation that the ResCap independent directors resigned because of this transaction (*id.* ¶ 39) is false— these directors voted to approve the transaction and stand behind that decision today. The Committee's argument is nothing more than unsupported second-guessing of transactions that were fair, reasonable, and beneficial to ResCap and its creditors at the time.[8]

### B.    The Affiliate Agreements Provided Significant Benefits To ResCap.

Nor is the Committee correct that AFI imposed RMBS-related R&W liability onto ResCap through affiliate agreements like the MMLPSA and MSR Swap. (*Id.* ¶¶ 37-38, 41.) The evidence is that ResCap always maintained the R&W liability related to securitizing and selling mortgage loans and that the affiliate agreements were entered into with the intent and purpose of supporting—if not sustaining—ResCap's mortgage operations.

*First*, the Committee's argument—that the MMLPSA amendments shifted R&W risk to ResCap—is based on the faulty premise that the Bank bore R&W risk to begin with. It did not, and the evidence makes clear that ResCap always was responsible for R&W liability. ResCap's subsidiary GMACM purchased mortgages from the Bank under the MMLPSA, and then securitized and sold those loans into the market. Those transactions generated gains on sale that GMACM always retained. Those transactions also led to the R&W claims that the Committee now seeks to impose on AFI, and GMACM always had (and always understood it had) the R&W

---

[8] The Committee's contention that AFI stripped assets from ResCap through purchases of certain ResCap non-core businesses also has no merit. All of the transactions were supported by third-party valuations, fairness opinions, or both, were approved by the ResCap board and independent directors, and were publicly disclosed. AFI also lost money on the transactions, including over $300 million on one transaction alone.

risk that went along with the economic benefits it obtained through the transactions.  As all witnesses have confirmed, it would make no sense for the Bank (or AFI) to take on the risk (potential R&W liability) even though it obtained no economic upside from the transactions.[9]

*Second*, the evidence demonstrates that the affiliate agreements—including the MSR Swap—provided significant value to ResCap, and facilitated ResCap's mortgage business during the Great Recession.  In fact, GMACM developed the strategy for the Bank to fund, and own, the MSR asset when it created the thrift in 2001.  It did so because the MSR Swap provided GMACM with the valuable economics of the servicing rights without having to finance the MSR asset—on terms that were unavailable to GMACM in the market.  During the Great Recession, this arrangement proved critical to ResCap, as third-party funding sources evaporated, leaving ResCap with no option to finance MSRs.  An independent analysis confirmed that the MSR Swap was greatly beneficial to ResCap and provided it with terms that it could not receive in the open market.  Along with those benefits, GMACM retained the R&W risk, and the MSR clarification about which the Committee complains (Mot. ¶ 41) did not change those economics.

Make no mistake, the Committee's arguments on the affiliate agreements are extreme.  Under the Committee's view, every transaction between affiliates, even those that are subject to (and comply with) federal regulations, can provide a basis for a veil-piercing claim.  Such a position calls into question affiliate agreements at other bank holding companies, including Citibank, Goldman Sachs, Bank of America, and many others—an untenable assertion.

## IV.    The Committee's Other Arguments Are Equally Baseless.

The Committee argues ResCap's settlement agreements with government entities indicate AFI's domination and control over the Debtors.  (Mot. ¶¶ 42-43.)  The Committee is incorrect.

---

[9] The parties' course of conduct confirms that GMACM—not the Bank—bore the R&W risk.  For example, GMACM took out repurchase reserves to fund potential put-back claims on account of breached R&Ws; the Bank never took out any such reserves.  GMACM also handled and satisfied repurchase requests; the Bank did not.

As AFI has previously explained to this Court, those settlement agreements addressed the conduct *of ResCap and its subsidiaries* and the business *of ResCap and its subsidiaries*.  (*See generally, e.g.*, ECF No. 3150.)  And the January 30 Agreement that the Committee challenges was the product of advice by ResCap's separate and independent advisors and provided substantial consideration to ResCap, including $196.5 million in debt forgiveness.

The Committee's arguments about indemnification are belied by the facts.  (Mot. ¶ 65.)  Under the terms of the Operating Agreement, AFI is responsible for reimbursing ResCap for liabilities incurred by AFI, not liabilities incurred by ResCap.  All of the liabilities alleged are ResCap's responsibility because they relate to the mortgage business, and witnesses have confirmed that *ResCap and its subsidiaries*, not AFI, conducted the mortgage business.

The Committee's argument about a potential preference fails because the $49 million payment from ResCap to Ally Bank under the terms of the January 30 Letter Agreement (which provided significant and necessary consideration to ResCap) falls squarely within the contemporaneous exchange of value exception under section 547(c)(1) of the Bankruptcy Code.  *See* 11 U.S.C. § 547(c)(1).

Finally, the Committee will have no claim for equitable subordination because (1) the transactions the Committee cites were entered into without fraud (indeed, fully at arms'-length and for more than fair consideration to ResCap), *In re Lois/USA, Inc.*, 264 B.R. 69, 134-35 (Bankr. S.D.N.Y. 2001), and (2) AFI was not an insider because AFI did not exercise "day-to-day control" over ResCap, *In re Armstrong*, 231 B.R. 746, 749-50 (Bankr. E.D. Ark. 1999).

## **CONCLUSION**

For the foregoing reasons, AFI respectfully requests that this Court deny the Motion.

Dated:  April 30, 2013
          New York, New York

|  | /s/ Ray C. Schrock, P.C. |
|---|---|
| Jeffrey S. Powell | Richard M. Cieri |
| Daniel T. Donovan | Ray C. Schrock, P.C. |
| Gregory L. Skidmore | KIRKLAND & ELLIS LLP |
| KIRKLAND & ELLIS LLP | 601 Lexington Avenue |
| 655 15th Street, N.W., Ste. 1200 | New York, New York 10022 |
| Washington, D.C. 20005 | Telephone: (212) 446 4800 |
| Telephone: (202) 879-5000 | Facsimile: (212) 446 4900 |
| Facsimile: (202) 879-5200 | |

*Counsel for Ally Financial Inc.*

# EXHIBIT 1

# OPERATING AGREEMENT

**AGREEMENT**, dated as of June 24, 2005, by and between **General Motors Corporation**, a Delaware corporation ("**GM**"), General **Motors Acceptance Corporation** ("**GMAC**"), a Delaware corporation and a wholly-owned Subsidiary of GM, and **Residential Capital Corporation** ("**ResCap**"), a Delaware corporation and an indirect wholly-owned Subsidiary of **GMAC**.

The parties agree as follows:

Section 1.  Definitions.  For purposes of this Agreement, the following terms shall have the meanings assigned in this section:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"Bank Agent" means, with respect to any senior unsecured credit facility under which ResCap is a borrower, the administrative agent under such facility, or if there is no such agent, each lender under such facility.

"Capital Stock" of any Person means any and all shares, interests, participations or other equivalents (however designated) of corporate stock, including any preferred stock.

"Class" means, with respect to any Rated Indebtedness, all such Rated Indebtedness designated as belonging to the same class, series or issue or otherwise having substantially the same material terms and governed by substantially the same instruments.

"Class Agent" means, in the case of Rated Indebtedness evidenced by an indenture or other similar agreement, the trustee or other fiduciary or agent authorized to act for such Class (upon direction or otherwise), and, in all other cases, the holders of a majority in principal amount of the outstanding Rated Indebtedness of such Class.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"Cumulative Net Income" means the net income of ResCap and its Subsidiaries on a consolidated basis determined in accordance with GAAP for the period beginning with the first day of the first fiscal quarter beginning after the date of this Agreement and ending on the last day of the fiscal quarter ending immediately preceding the date as of which a determination of Cumulative Net Income is required.

CHDB03 9022235.19   21-Jun-05 17:47

ALLY_0140795

"Disqualified Stock" means any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part.

"Dividend" means any dividend or distribution of cash or property by ResCap on account of its Capital Stock or the repurchase by ResCap of its Capital Stock (other than dividends, distributions or repurchases payable in Capital Stock (other than Disqualified Stock)).

"Excluded Prepayments" shall have the meaning set forth in Section 2(e).

"GAAP" means generally accepted accounting principles as in effect in the United States from time to time, applied on a consistent basis.

"GM Affiliate" means GM and any Person that is an Affiliate of GM, other than GMAC and its Subsidiaries.

"GM Affiliate Business" means all businesses and operations (whether or not such businesses or operations are terminated, divested or discontinued) of the GM Affiliates as conducted from time to time.

"GM Indemnifiable Liabilities" means all Liabilities of any GM Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items:

> (i)    the failure of any GM Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GM Affiliate in accordance with their terms; or

> (ii)    the GM Affiliate Business.

"GMAC Affiliate" means GM, GMAC and any Person that is an Affiliate of GM or GMAC, other than ResCap and its Subsidiaries.

"GMAC Affiliate Business" means all businesses and operations (whether or not such businesses or operations are terminated, divested or discontinued) of the GMAC Affiliates as conducted from time to time.

"GMAC Indemnifiable Liabilities" means all Liabilities of any GMAC Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items:

> (i)    the failure of any GMAC Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GMAC Affiliate in accordance with their terms; or

Confidential                                                                      ALLY_0140796

(ii)    the GMAC Affiliate Business.

"GMAC Subordinated Debt" means any indebtedness owed by ResCap or any of its Subsidiaries to any GMAC Affiliate that is subordinated to Rated Indebtedness in right of payment of principal, interest and premium, if any.

"Governmental Authority" means any supranational, international, national, federal, state or local court, government, department, commission, board, bureau, agency, official or other regulatory, administrative or governmental authority.

"Independent Director" means an individual who: (A) is not and has not been an officer, director or employee, and has no immediate family member that is or has been an officer, of any GMAC Affiliate within the three years immediately prior to such individual's appointment as an Independent Director; (B) has not received, and has no immediate family member who has received, during any twelve-month period in the three years immediately prior to such individual's appointment as an Independent Director, more than $100,000 in direct compensation from any GMAC Affiliate, other than director fees and pension and other forms of deferred compensation for prior service that is not contingent in any way on continued service; (C) is not employed by, and has no immediate family member that is an officer of, any Person that has made payments to, or received payments from, any GMAC Affiliate for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million or 2% of ResCap's consolidated gross revenues; and (D) is reasonably believed by the then current directors of ResCap to be financially sophisticated and otherwise qualified to fulfill the obligations of an Independent Director as set forth in this Agreement.  For purposes of this definition, "immediate family member" means an individual's spouse, parents and parents-in-law, siblings and siblings-in-law, children and children-in-law and anyone (other than domestic employees) who shares such individual's home.  Notwithstanding anything contained in clauses (A) through (D) above, any Independent Director may serve or have served as an Independent Director of one or more limited purpose entities organized for the purpose of acquiring, financing or otherwise investing, directly or indirectly, in assets or receivables originated, owned or serviced by any GMAC Affiliate or ResCap Subsidiary or holding equity beneficial interest in trusts formed by any GMAC Affiliate or ResCap Subsidiary.

"Investment" in any Person means any loan, advance or other extension of credit (other than in the ordinary course of business) to such Person (whether in cash or property) or any capital contribution or purchase or acquisition of any Capital Stock or indebtedness of such Person (whether in cash or property); *provided, however,* that the term "Investment" shall not include any purchase of securities issued by a GMAC Affiliate through the use of funds in a custodial account held by ResCap or its Subsidiaries relating to the sale of financial assets by ResCap or its Subsidiaries.

"Liabilities" means all debts, liabilities, obligations, responsibilities, response actions, losses, damages (whether compensatory, punitive or treble), fines, penalties and sanctions, absolute or contingent, matured or unmatured, liquidated or unliquidated, foreseen or unforeseen, joint, several or individual, asserted or unasserted, accrued or

Confidential                                                                                          ALLY_0140797

unaccrued, known or unknown, whenever arising, including those arising under or in connection with any law, statute, ordinance, regulation, rule or other pronouncements of Governmental Authorities having the effect of law, Proceeding, threatened Proceeding, order or consent decree of any Governmental Authority or any award of any arbitration tribunal, and those arising under any contract, guarantee, commitment or undertaking, whether sought to be imposed by a Governmental Authority, a party to this agreement or any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, or otherwise, and including any costs, expenses, interest, external attorneys' fees, disbursements and expense of external counsel, expert and  consulting fees and costs related thereto or to the investigation or defense thereof.

"Losses" means all losses, liabilities, penalties, claims, damages, demands, costs and expenses (including reasonable external attorneys' fees, investigation expenses, out-of-pocket expenses, interest and punitive or consequential damages) and other Liabilities of any kind.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any Governmental Authority.

"Prepayment" means any payment of principal in respect of GMAC Subordinated Debt prior to the stated maturity thereof.

"Proceeding" means any past, present or future suit, counter suit, action, arbitration, mediation, alternative dispute resolution process, claim, counterclaim, demand, proceeding, inquiry or investigation by or before any Governmental Authority or any arbitration or mediation tribunal.

"Rating Agencies" means Standard & Poor's Ratings Services, Moody's Investors Service, Inc., Fitch Ratings, Inc. and Dominion Bond Rating Service, or, if any such agency shall cease to perform the functions of a statistical rating agency, a replacement therefor that is a nationally recognized statistical rating agency in the United States and is designated by GMAC and ResCap.

"Rated Indebtedness" means any senior long-term unsecured debt of ResCap, that, at the relevant time, is outstanding and not defeased in accordance with its terms and that is at the time of its issuance rated by at least two of the Rating Agencies, unless the instruments governing such indebtedness provide that they are not entitled to the benefits of this Agreement.

"ResCap Business" means all businesses and operations (whether or not such businesses or operations are terminated, divested or discontinued) of ResCap or its Subsidiaries as conducted from time to time.

"ResCap Indemnifiable Liabilities" means all Liabilities of ResCap or any of its Subsidiaries to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items:

Confidential                                                                          ALLY_0140798

(i)     the failure of ResCap or any of its Subsidiaries to pay, perform or otherwise promptly discharge any Liabilities of ResCap or such Subsidiary, as the case may be, in accordance with their terms; or

(ii)     the ResCap Business.

"Stockholder's Equity" means, at any time of determination, the amount which would be shown as stockholder's equity on the consolidated balance sheet of ResCap as of such time prepared in accordance with GAAP.

"Subsidiary" means, with respect to any Person, any other Person of which a majority of the voting interests is owned, directly or indirectly, by such Person; *provided, however*, that the term "Subsidiary" shall not include any securitization trusts or similar Person established by any ResCap Subsidiary.

Section 2.  <u>Covenants</u>.  Each of GMAC and ResCap, as applicable, agrees as follows:

(a)    ResCap shall not, nor shall it permit any of its Subsidiaries to:

(i)     guarantee any indebtedness of any GMAC Affiliate; or

(ii)     make any Investment in any GMAC Affiliate.

(b)    Except as provided in Section 2(c), ResCap shall not, nor shall it permit any of its Subsidiaries to, engage in material transactions with or originated through any GMAC Affiliate unless such transactions are on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value; *provided* that in addition:

(i)     all financing arrangements and intercompany debt obligations between ResCap or any of its Subsidiaries and GMAC Affiliates must be in writing;

(ii)     any agreement between ResCap and/or any of its Subsidiaries and any GMAC Affiliate(s) that involve the payment by ResCap or any of its Subsidiaries or by any GMAC Affiliate of more than $25 million per year or the provisions of goods or services by ResCap and/or any of its Subsidiaries or by any GMAC Affiliate(s) valued in excess of $25 million per year must be in writing; and

(iii)     ResCap and GMAC shall maintain in effect an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap.

(c)    Notwithstanding the requirements of Section 2(b):

(i)     ResCap shall maintain in effect a licensing agreement providing for the use by ResCap and its Subsidiaries of certain trademarks, trade names and

Confidential        ALLY_0140799

other intellectual property of GMAC Affiliates on a royalty-free basis and on such terms as may be agreed to from time to time between ResCap and GMAC.

(ii)    ResCap shall maintain in effect a services and facilities agreement providing for the provision of certain services by GM and GMAC to ResCap and its Subsidiaries and the provision of certain services by ResCap to GMAC Affiliates on such terms as may be agreed from time to time among ResCap, GM and GMAC.

(iii)    ResCap and its Subsidiaries may provide residential mortgage financing and other services to employees of any GMAC Affiliate on substantially similar terms as they make to employees of ResCap and its Subsidiaries and the GMAC Affiliates may provide automobile discounts and other services or discounts to employees of ResCap or any of its Subsidiaries on substantially similar terms as they make to employees of any GMAC Affiliate.

(d)    (i)    Subject to Sections 2(d)(iii) and (iv), ResCap shall not, directly or indirectly, declare or make any Dividend unless at the time such Dividend is declared and paid Stockholder's Equity exceeds $6.5 billion.

(ii)    If ResCap is permitted to declare or make any Dividend under Section 2(d)(i) above, the cumulative amount of Dividends paid after the date of this Agreement shall not exceed:

(a) 50% of ResCap's Cumulative Net Income at the time such Dividend is declared and paid *minus*

(b) to the extent a positive number, the cumulative amount of any Prepayments made under section 2(e)(i) below, other than Excluded Prepayments, *minus* 50% of ResCap's Cumulative Net Income at the time such Dividend is declared and paid.

(iii)    The provisions of this Section 2(d) shall not prohibit the payment of any Dividend within 60 days after the date of declaration thereof if, as of such date of declaration, such payment would comply with the restrictions set forth in this Section 2(d).

(iv)    The restrictions set forth in this Section 2(d) shall cease to be effective upon the occurrence of Stockholder's Equity exceeding $12.0 billion as of the end of each of two consecutive fiscal quarters.

(vi)    Promptly after the declaration of any Dividend, the Chief Financial Officer or Treasurer of ResCap shall provide a certificate to any Class Agent or Bank Agent certifying as to ResCap's compliance with this Agreement as of such date based on the latest available published financial statements of ResCap.

(e)    Without limiting the applicable provisions in the relevant underlying loan documents, ResCap shall not make any Prepayment of any GMAC Subordinated

Confidential                                                                 ALLY_0140800

Debt, except from (i) ResCap's Cumulative Net Income at the time such Prepayment is made, less any Dividends previously paid after the date of this Agreement and any Prepayments of GMAC Subordinated Debt made after the date of this Agreement (to the extent that such Prepayment was made from ResCap's Cumulative Net Income), other than Excluded Prepayments, (ii) the net proceeds to ResCap from the issuance of Capital Stock or indebtedness to any Person (other than a GMAC Affiliate) that is subordinated in right of payment of principal, interest and premium, if any, to Rated Indebtedness, or (iii) 50% of the net proceeds to Rescap from the issuance or incurrence of indebtedness to any Person (other than a GMAC Affiliate) that ranks *pari passu* with Rated Indebtedness in right of payment of principal, interest and premium, if any. Notwithstanding the foregoing, ResCap may make Prepayments of GMAC Subordinated Debt of up to a cumulative amount of $500 million after the date of this Agreement ("Excluded Prepayments").

(f)        ResCap shall at all times (i) maintain, or cause to be maintained, books, records and financial statements for itself and its Subsidiaries separate from those of any and all GMAC Affiliates; (ii) maintain, or cause to be maintained, its assets and the assets of its Subsidiaries in such a manner that it would not be costly or difficult to segregate, ascertain or identify such assets from those of any and all GMAC Affiliates; (iii) maintain, or cause to be maintained, bank accounts and cash management and account receivable collection systems for itself and its Subsidiaries separate from those of any and all GMAC Affiliates; (iv) maintain, or cause to be maintained, its own asset investment, risk management and hedging programs and systems for itself and its Subsidiaries separate from those of any and all GMAC Affiliates (which may be similar to or the same as those maintained by GMAC); (v) pay its own liabilities only out of its own funds or promptly reimburse any GMAC Affiliate for ResCap's share of any expenses relating to amounts owing under the Services and Facilities Agreement or master vendor contracts or similar arrangements paid on behalf of ResCap by such GMAC Affiliate; (vi) use its own stationary, invoices, checks and business forms; (vii) conduct or cause to be conducted the business operations of itself and its Subsidiaries by its or their own employees and officers, who will not also be employees or officers of any GMAC Affiliates; (viii) not commingle, or permit its Subsidiaries to commingle, the funds and other assets of ResCap and its Subsidiaries with those of any GMAC Affiliate; (ix) at all times hold itself out, and cause its Subsidiaries to hold themselves out, to the public as a legal entity separate and distinct from any and all GMAC Affiliates and undertake to correct any known misunderstanding regarding its separate identity; and (x) otherwise take, or cause to be taken, such reasonable and customary action so that ResCap will maintain its separate legal existence and identity; *provided, however,* that the foregoing shall not prohibit ResCap and its Subsidiaries from using trademarks and names of GMAC Affiliates, it being understood that such use shall not be violative of or otherwise inconsistent with Section 2(f)(ix) above.

(g)        (i)        GMAC shall vote for, and ResCap shall at all times have, at least two Independent Directors.  In the event of a vacancy in the position of an

Confidential                                                                        ALLY_0140801

Independent Director, whether as a result of resignation, removal, or otherwise, GMAC shall, as promptly as practicable, elect a successor Independent Director. No appointment of an Independent Director or successor Independent Director, shall be effective until such Independent Director or successor shall have (y) accepted his or her appointment as an Independent Director by a written instrument, which may be a counterpart signature page to this Agreement, and (z) executed a counterpart to this Agreement.  In acting or otherwise voting on matters referred to in Section 2(g)(iii), to the fullest extent permitted by law, the Independent Directors shall consider only the interest of ResCap, including its creditors.  GMAC agrees that it will not bring any legal action, including actions asserting claims for breach of fiduciary duty, against any Independent Director for acting in accordance with Sections 2(g)(i), 2(g)(iii), 4 or 8, or for any claims against which such Independent Directors are exculpated pursuant to the terms of ResCap's Certificate of Incorporation, as in effect on the date hereof.

       (ii)     The chairperson of the Audit Committee of the Board of Directors shall be an Independent Director.

       (iii)     Notwithstanding ResCap's Certificate of Incorporation or Bylaws or any provision of law that otherwise so empowers ResCap, ResCap's stockholders, ResCap's Board of Directors, any officer of ResCap or any other Person, none of GMAC, ResCap or any officer of ResCap shall be authorized or empowered, nor shall they permit ResCap to (A) institute proceedings to have ResCap be adjudicated bankrupt or insolvent, (B) consent to the institution of bankruptcy or insolvency proceedings against ResCap, (C) file a petition seeking, or consent to, the appointment of a receiver, assignee, trustee, sequestrator or other similar official of ResCap or a substantial part of its assets, (D) make any assignment for the benefit of creditors of ResCap, or (E) take action in furtherance of any such action, in each case to the fullest extent permitted by law, in each case if such action is being taken in connection with the commencement or pendency of a bankruptcy or insolvency proceeding of any GMAC Affiliate, unless the action is authorized by the prior approval of ResCap's Board of Directors (including the approval of a majority of the Independent Directors).  ResCap's Board of Directors shall not vote on, or authorize the taking of, any of the foregoing actions unless there is at least one Independent Director then serving in such capacity.  Further, notwithstanding ResCap's Certificate of Incorporation or Bylaws or any provision of law that otherwise so empowers ResCap, ResCap's stockholders or ResCap's Board of Directors, ResCap shall not be authorized or empowered to amend Article VI of its Bylaws without the approval of the majority of the Independent Directors.

       (iv)     ResCap shall maintain or have in effect directors and officers insurance, errors and omissions insurance and comprehensive general liability insurance covering its Independent Directors in amounts and on such terms as are usual and customary for a company similar in size to ResCap and engaged in a business similar to that engaged in by ResCap.

CHDB03 9022235.19  21-Jun-05 17:47

Confidential

ALLY_0140802

(h)     In accordance with GAAP and the rules and regulations of the Securities and Exchange Commission, GMAC shall prepare consolidated financial statements that include ResCap. The supplemental disclosures to such financial statements shall provide that ResCap's creditors will be entitled to be satisfied out of ResCap's assets prior to ResCap's equity holders and that GMAC conducts its residential mortgage operations and related businesses through ResCap.

(i)     GMAC shall otherwise hold out ResCap and ResCap's Subsidiaries as legal entities separate and distinct and correct any known misunderstanding about ResCap's separate identity from GMAC.

Section 3.   Indemnification.

(a)     GM will, to the fullest extent permitted by law, indemnify, defend and hold harmless ResCap and its Subsidiaries from and against any Losses related to GM Indemnifiable Liabilities.

(b)     GMAC will, to the fullest extent permitted by law, indemnify, defend and hold harmless ResCap and its Subsidiaries from and against any Losses related to GMAC Indemnifiable Liabilities (other than GM Indemnifiable Liabilities).

(c)     ResCap will, to the fullest extent permitted by law, indemnify, defend and hold harmless the GM Affiliates and the GMAC Affiliates from and against any losses related to ResCap Indemnifiable Liabilities.

Section 4.   Termination.   This Agreement shall terminate at such time as ResCap ceases to be a direct or indirect Subsidiary of GMAC; *provided* that ResCap, GM and GMAC may agree to terminate this Agreement earlier if such termination has been approved by a majority of the members of ResCap's Board of Directors, including a majority of the Independent Directors. In acting or otherwise voting on matters referred to in this Section 4, to the fullest extent permitted by law, the Independent Directors shall consider only the interest of ResCap, including its creditors. To the extent that such approval is required, ResCap's Board of Directors shall not vote on or authorize, the termination of this Agreement unless there is at least one Independent Director then serving in such capacity.

Section 5.   Notices.   All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given when received at the addresses or telecopy numbers specified below (or at such other address or telecopy number for a party as shall be specified by like notice):

If to GM:

General Motors Corporation
200 Renaissance Center
Detroit, MI  48265
Attn:  Corporate Secretary
Telecopy:  (212) 418-3630
Telephone: (313) 556-5000

Confidential                                                                                ALLY_0140803

If to GMAC:

General Motors Acceptance Corporation
200 Renaissance Center
Detroit, MI 48265
Attn: Corporate Secretary
Telecopy: (313) 665-6301
Telephone: (313) 665-6308

If to ResCap:

Residential Capital Corporation
8400 Normandale Lake Boulevard
Minneapolis, MN 55437
Attn: General Counsel
Telephone: (857) 952-8700

Section 6. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties and supersedes all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matters hereof.

Section 7. <u>No Guarantee</u>. This Agreement is not, and shall not be construed to be, a guarantee by GM or GMAC of any indebtedness of ResCap or an agreement by GM or GMAC to contribute additional capital to ResCap. GMAC's sole obligation under this Agreement (except as set forth in Section 3) is to comply with the Independent Director provisions of Section 2(g) and the provisions of Sections 2(h) and 2(i) and the sole remedy against GMAC for breach of those sections is specific performance. GM's sole obligation under this Agreement is as set forth in Section 3. Under no circumstances shall GM or GMAC be liable for damages for breach of this Agreement (other than Section 3).

Section 8. <u>Amendment and Waiver</u>. The provisions of this Agreement may not be amended or waived except by an instrument in writing signed by the parties hereto; *provided* that no amendment or waiver that materially and adversely affects the rights of any Class of Rated Indebtedness shall become effective unless such amendment or waiver has been approved by a majority of the members of ResCap's Board of Directors, including a majority of the Independent Directors. In acting or otherwise voting on matters referred to in this Section 8 that materially and adversely affect the rights of any Class of Rated Indebtedness, to the fullest extent permitted by law, the Independent Directors shall consider only the interest of ResCap, including its creditors. ResCap shall provide to each Class Agent and Bank Agent a copy of any amendment or waiver of this Agreement. ResCap's Board of Directors shall not vote on, or authorize, any amendment to this Agreement unless there is at least one Independent Director then serving in such capacity.

Section 9. <u>Assignment</u>. This Agreement may not be assigned, except in connection with a merger or consolidation and except that all or any of the rights of GM hereunder may be assigned to any other GM Affiliate and any rights of GMAC hereunder may be assigned to any

Confidential                                                                 ALLY_0140804

other GMAC Affiliate.  No such assignment shall relieve the assigning party of its obligations hereunder.

Section 10.    Transfer of ResCap to a GM Affiliate.  GMAC may not sell, convey or otherwise transfer a majority ownership interest in ResCap to one or more GM Affiliates in a single transaction or series of transactions, unless GM and the applicable GM Affiliate(s) enter into an agreement substantially identical to this Agreement prior to the time that ResCap ceases to be a direct or indirect Subsidiary of GMAC.

Section 11.    Successors and Assigns.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto and its respective successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement; *provided* that the holders of Rated Indebtedness and any lenders under any credit facility under which ResCap is a borrower shall be deemed third party beneficiaries of this Agreement; *provided, further,* that the remedies of such holders or lenders hereunder shall be limited to specific enforcement of the provisions of this Agreement as the same may be amended and waived pursuant to Section 8 hereof; and, *provided, further,* that any action to enforce the rights of the holders of Rated Indebtedness of any Class or any lenders under any credit facility under which ResCap is a borrower as third party beneficiaries shall be undertaken only by the Class Agent for such Class or any Bank Agent, as applicable.

Section 12.    Delay and Waiver.  No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any agreement herein, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or of any other right.  Except as provided in Section 11, all rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any other rights or remedies that any party hereto may have.

Section 13.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York.

Section 14.    Counterparts.  This Agreement may be executed in counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

*        *        *        *

Confidential                                                                                ALLY_0140805

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**GENERAL MOTORS CORPORATION**

By: _____

Name:  Walter G. Borst
Title:   Treasurer


**GENERAL MOTORS ACCEPTANCE
CORPORATION**


By: _____

Name:  Sanjiv Khattri
Title:   Executive Vice President and Chief
            Financial Officer


**RESIDENTIAL CAPITAL
CORPORATION**


By: _____

Name:  Davee L. Olson
Title:   Chief Financial Officer and Director

Confidential

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**GENERAL MOTORS CORPORATION**

By:    _____
Name:  Walter G. Borst
Title:   Treasurer

**GENERAL MOTORS ACCEPTANCE
CORPORATION**

By:    _____
Name:  Sanjiv Khattri
Title:   Chief Financial Officer

**RESIDENTIAL CAPITAL
CORPORATION**

By:    _____
Name:  Davee L. Olson
Title:   Chief Financial Officer

CHDB03 9022235.18   17-Jun-05 16:17

Confidential

ALLY_0140807

The independent directors have, in reliance on the benefits conferred upon them under this Operating Agreement, and the obligations placed on the Corporation, accepted their appointment as Independent Directors of the Corporation, as evidenced by their signature below.

INDEPENDENT DIRECTORS:

By: _____
Name:  Thomas Jacob


By: _____
Name:  Thomas C. Melzer

CHDB03 9022235.18   17-Jun-05 16:17

- 13 -

Confidential

ALLY_0140808