**Hearing Date and Time: June 12, 2013 at 10:00 a.m. (Eastern Time)**

Richard M. Cieri                          Jeffrey S. Powell
Ray C. Schrock                            Daniel T. Donovan
Craig A. Bruens                           Judson D. Brown
KIRKLAND & ELLIS LLP                      KIRKLAND & ELLIS LLP
601 Lexington Avenue                      655 15th Street, N.W., Ste. 1200
New York, New York 10022                  Washington, D.C. 20005
Telephone: (212) 446-4800                 Telephone: (202) 879-5000
Facsimile: (212) 446-4900                 Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>. | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**REPLY OF ALLY FINANCIAL INC.**
**AND ALLY BANK IN SUPPORT OF MOTION**
**BY ALLY FINANCIAL INC. AND ALLY BANK**
**FOR AN ORDER ENFORCING THE AUTOMATIC**
**STAY PURSUANT TO 11 U.S.C. § 362(a)(3) BY (1) ENJOINING**
**PROSECUTION OF ALTER EGO AND VEIL PIERCING CLAIMS**
**IN THE CLASS ACTION ENTITLED  *LANDON ROTHSTEIN , ET AL. V. GMAC***
***MORTGAGE, LLC, ET AL.*, AND (2) DECLARING SUCH CLAIMS VOID *AB INITIO***

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................................1

REPLY .........................................................................................................................................3

    A.      Plaintiffs' Claims Against Ally Are Property of the Debtors' Estates. ...................3

    B.      In the Alternative, the Court Should Extend the Automatic Stay Pursuant to Section 105 of the Bankruptcy Code to Enjoin Prosecution of the Class Action Against Ally. ..............................................................................................6

    C.      Plaintiffs' Standing Argument Is Moot and Otherwise Incorrect. ..........................7

    D.      The Court Should Not Lift the Automatic Stay of the Class Action. ......................8

CONCLUSION...........................................................................................................................10

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*FDIC v. CoreLogic Valuation Servs., LLC*,
    2011 WL 5554324 (C.D. Cal. Nov. 14, 2011) ........................................................... 4

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995) .................................................................................... 5

*In re Best Payphones, Inc.*,
    279 B.R. 92 (Bankr. S.D.N.Y. 2002) ...................................................................... 8

*In re Leibowitz*,
    147 B.R. 341 (Bankr. S.D.N.Y. 1992) .................................................................... 8

*In re Residential Capital, LLC*,
    2012 WL 3555584 (Bankr. S.D.N.Y. Aug. 16, 2012) ......................................... 8, 9

*Mannucci v. Cabrini Med. Ctr. (In re Cabrini Medical Center)*,
    2012 WL 6629103 (S.D.N.Y. Dec. 20, 2012) ......................................................... 4

*Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*,
    365 B.R. 401 (S.D.N.Y. 2007) ................................................................................ 7

*Rexnord Holdings, Inc. v. Bidermann*,
    21 F.3d 522 (2d Cir. 1994) ...................................................................................... 8

*Robles v. Copstat Sec., Inc.*,
    2009 U.S. Dist. LEXIS 112003 (S.D.N.Y. Dec. 2, 2009) ........................................ 4

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
    907 F.2d 1280 (2d Cir. 1990) ............................................................................... 8, 9

*United States v. Bliss*,
    108 F.R.D. 127 (E.D. Mo. 1985) ............................................................................. 5

*Variable Parameter Fixture Corp. v. Morpheus Light, Inc.*,
    945 F. Supp. 603 (S.D.N.Y. 1996) .......................................................................... 4

*Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*,
    2010 WL 3238903 (Bankr. D. Del. Aug. 13, 2010) ................................................. 5

### <u>Statutes</u>

11 U.S.C. § 105 ................................................................................................................ 1

11 U.S.C. § 105(a) ........................................................................................................... 6

11 U.S.C. § 1109(b) ......................................................................................................... 8

11 U.S.C. § 362 ............................................................................................................... 6

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. ("**AFI**") and Ally Bank (together, "**Ally**") submit this Reply in further support of the *Motion by Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(A)(3) by (1) Enjoining Prosecution of Alter Ego and Veil Piercing Claims in the Class Action Entitled Landon Rothstein, et al. v. GMAC Mortgage, LLC, et al., and (2) Declaring Such Claims Void Ab Initio* [ECF No. 2511] (the "**Motion**").[1]

## PRELIMINARY STATEMENT

1.      Rather than supporting their position, Plaintiffs' Objection to the Motion [ECF No. 3343] (the "**Objection**") highlights the need to enforce or extend the automatic stay[2] to enjoin prosecution of the Class Action against Ally, by confirming that Plaintiffs' claims and the damages Plaintiffs seek in the Class Action are entirely dependent upon the underlying conduct of GMACM.  Indeed, Plaintiffs filed their Proofs of Claim against GMACM and ResCap which merely attach and incorporate their original Complaint and the Amended Complaint in the Class Action (Haddad Decl., ECF No. 2512, Exs. C and D).  Thus, the only way Plaintiffs can prove their claims in the Class Action is by proving the underlying conduct of GMACM.  Not only are Plaintiffs' claims in the Class Action identical to the claims asserted in the Proofs of Claim, but those claims undeniably overlap with the Debtors' claims against Ally that are the subject of the Examiner's investigation and that will be addressed in any chapter 11 plan.

2.      While Ally believes that Plaintiffs' veil-piercing and alter-ego claims asserted in the Class Action are utterly without merit and is prepared to litigate such claims to judgment,

---

[1]     Capitalized terms used herein without definition have the meanings set forth in the Motion.

[2]     In its Response to the Motion [ECF No. 3345] (the "**Committee Response**"), the Creditors' Committee (the "**Committee**") asserts that, regardless of the merits of the Motion, Plaintiffs should be enjoined under section 105 of the Bankruptcy Code from prosecuting the Class Action because prosecution will have a disruptive effect on prosecution of the Debtors' claims and threaten multilateral chapter 11 plan negotiations.

these claims should not be litigated piecemeal.  This is because this Court, and this Court alone, should decide whether an action is owned by the estates – a point that Plaintiffs do not dispute. The Class Action falls within that category and, as a result, is protected by the automatic stay.

3.      Moreover, it is important for the Court to recognize that the Motion could have significant implications in these chapter 11 cases.  Permitting the Class Action to proceed could spur additional lawsuits by creditors seeking to prosecute the Debtors' veil-piercing and alter-ego claims against Ally under similar unsubstantiated allegations of particularized injury thereby undermining the Debtors' ability to resolve such claims against Ally in these cases and the Court's authority to determine whether such actions involve estate property.   There is zero question that the estates would be harmed by allowing the Class Action to proceed and creating such a result, thereby stripping the estates of property and exposing the estates to decisions by other courts with respect to veil-piercing and alter-ego claims against Ally.

4.      Each of the arguments that Plaintiffs make in the Objection should be rejected, and the automatic stay should be enforced or extended so as to enjoin prosecution of the Class Action against Ally.  As demonstrated below, the automatic stay prohibits continued prosecution of Plaintiffs' veil-piercing and alter-ego claims in the Class Action and, in the alternative, cause exists to extend the stay to cover all of the claims asserted against Ally in the Class Action. Additionally, Plaintiffs' assertion that Ally lacks standing to bring this Motion is moot and otherwise incorrect.  Lastly, the Plaintiffs' request to lift the automatic stay to prosecute the Class Action has not been properly noticed and in any case should be denied for the same reasons as the Court should enforce the stay.  Accordingly, the Court should grant the Motion and enjoin continued prosecution of the Class Action against Ally.[3]

---

[3]    Ally believes the Court can decide the Motion based upon the pleadings in the Class Action and the Proofs of Claim.  To the extent the Court determines that a separate evidentiary hearing is necessary, Ally respectfully

## <u>REPLY</u>

A.    **Plaintiffs' Claims Against Ally Are Property of the Debtors' Estates.**

5.    Plaintiffs do not dispute that this Court, and this Court alone, should determine whether Plaintiffs' alter-ego, veil-piercing, and related claims in the Class Action are property of the Debtors' estates.  Instead, in the Objection, Plaintiffs argue that their veil-piercing and alter-ego claims in the Class Action are not property of the Debtors' estates because such claims are based on allegations of "particularized," rather than "generalized," injury.  (Objection ¶ 31)  That contention is without merit.

6.    Plaintiffs concede that "some of Plaintiffs' alter-ego and veil-piercing allegations involve 'generalized' injury and conceivably could support claims brought by other creditors" (Objection, ¶ 36), and a review of the Second Amended Complaint ("*SAC*," ECF No. 3343-3) confirms that Plaintiffs' veil-piercing allegations are, in fact, the very type of generalized claims that belong exclusively to the Debtors' estates.  *See, e.g.*, SAC ¶ 13 (alleging that AFI "exercised complete domination and control over the affairs, activities, and operations of its subsidiaries including, specifically, those of ResCap and GMACM such that those subsidiaries operated as mere instrumentalities or alter-egos of [AFI]," and AFI is "vicariously liable for GMACM's misconduct"); SAC ¶ 149 ("Ally Financial consolidated and held out its residential mortgage loan origination, acquisition, distribution, servicing, and securitization businesses under the ResCap banner as a single integrated corporate enterprise.").

7.    Many of the veil-piercing allegations that Plaintiffs claim show that they suffered "particularized" injury actually demonstrate that they did not, because any creditor could make such allegations.  For example, Plaintiffs claim that AFI "use[d] GMACM as a corporate shell to

---

requests that the Court permit the parties to conduct limited discovery and agree upon an additional briefing schedule given the importance of the issues raised by the Motion to the Debtors and their creditors.

unjustly shield itself from liability"; that "'[t]he day-to-day business operations of . . . GMACM were run at the direction of and controlled by Ally Financial . . . ''"; and that AFI "'controlled' the mortgage servicing activities of GMACM and 'caused GMACM to engage in the misconduct alleged . . .." (Objection, ¶ 33)  Ally disputes these bald and unsubstantiated allegations—but the point here is that any creditor could plead them.  Thus, they do not show "particularized" injury.

8.    Plaintiffs also rely on several cases which they claim stand for the proposition that a veil-piercing claim is personal to a creditor when the defendant has injured the creditor itself rather than the corporation.  *See, e.g.*, *Mannucci v. Cabrini Med. Ctr.* (*In re Cabrini Medical Center)*, 2012 WL 6629103, at *6 (S.D.N.Y. Dec. 20, 2012); *Variable Parameter Fixture Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 607-08 (S.D.N.Y. 1996).  Plaintiffs then claim, based upon carefully worded assertions, that "Ally Financial directly and actively participated in the violations while using GMACM as a corporate shell to unjustly shield itself from liability" and "'controlled' the mortgage servicing activities of GMACM," and that the SAC therefore alleges particularized injury.  (Objection, ¶ 12)  However, these assertions, and the related allegations in the SAC, are conclusory and therefore cannot support a veil-piercing claim against AFI, let alone one that is personal to Plaintiffs.  *See, e.g., Robles v. Copstat Sec., Inc.*, 2009 U.S. Dist. LEXIS 112003, at *7 (S.D.N.Y. Dec. 2, 2009) ("Mere conclusory statements that a corporation is dominated or controlled by [a parent owner] are insufficient to pierce the corporate veil . . . ."); *FDIC v. CoreLogic Valuation Servs., LLC*, 2011 WL 5554324 at *10 (C.D. Cal. Nov. 14, 2011) (plaintiff failed to adequately allege alter ego liability where it simply "'aver[red] in conclusory language that CoreLogic, First American Information Services, and First American Solutions directed and controlled EA's actions with regard to the appraisal services provided by EA to WaMu'"); *Youkelsone v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*, 2010 WL 3238903 at *13

4

(Bankr. D. Del. Aug. 13, 2010) (conclusory allegations that the holding company "'controlled, supervised, directed, and completely dominated all of the Bank's financial operations, Bank's policies and business practices in respect to all transactions generated by the Bank'" and "'completely directed, managed and controlled' the business affairs of the Bank" insufficient to support alter ego claim).

9.      The only support Plaintiffs give for their conclusory assertion that AFI "directly and actively engaged in violations," is an innocuous allegation in the SAC that funds were transferred through "AFI's 'global cash management system.'"  (Objection, ¶ 30)  The mere existence of a centralized cash management system established by a parent corporation for a consolidated group is insufficient to support an alter ego claim, *see, e.g.*, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459 (2d Cir. 1995) ("Courts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system."); *United States v. Bliss*, 108 F.R.D. 127, 132 (E.D. Mo. 1985) (cash management system indicative of the "usual parent-subsidiary relationship"), let alone a direct, plenary claim against AFI.  In fact, if the flow of funds through the AFI global cash management system were sufficient to support Plaintiffs' assertion that an alter ego claim is "personal" to them, then ***any*** veil-piercing claim against AFI by any creditor would be "personal" to that creditor.

10.     Plaintiffs also rely on the unremarkable fact that AFI made statements in a consent order and a settlement agreement with governmental entities in which they claim that AFI agreed to oversee its subsidiaries' compliance with those agreements.  (Objection, ¶ 34) Those agreements cannot possibly create a claim on behalf of Plaintiffs or show any injury (let alone particularized injury) to Plaintiffs, because they were entered into ***after*** Plaintiffs were

allegedly charged for the lender-placed insurance ("**LPI**") at issue in the Class Action.  Nor do the unremarkable statements in Ally's financial statements support Plaintiffs' claims.

11.     Lastly, Plaintiffs argue that they do not assert alter-ego or veil-piercing claims against Ally Bank, much less generalized claims and instead assert claims against Ally Bank for agency liability and contract liability.  (Objection, ¶ 21).  Plaintiffs, however, should not be permitted to dress up their alter-ego and veil-piercing claims as purported other causes of action to avoid such claims being recognized as property of the Debtors' estates.  Based upon the SAC and the procedural history of the Class Action, Ally believes that Plaintiffs filed the Class Action only because they are unable to pursue the Debtors for a meaningful recovery and that Plaintiffs' claims, no matter how they are labeled, are essentially grounded upon veil-piercing and alter-ego theories.  Tellingly, the SAC fails to allege any misconduct by Ally Bank despite Plaintiffs' assertion that their claims against Ally Bank "rest on Ally Bank's own breaches of duty." (Objection, ¶ 22)

12.     Accordingly, the SAC does not support a claim that Plaintiffs sustained "particularized" injury, and the veil-piercing and alter-ego claims they assert are, therefore, property of the Debtors' estates and can only be properly asserted by the Debtors, not Plaintiffs.

**B.     In the Alternative, the Court Should Extend the Automatic Stay Pursuant to Section 105 of the Bankruptcy Code to Enjoin Prosecution of the Class Action Against Ally.**

13.     Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]," and gives this Court broad powers to extend section 362 of the Bankruptcy Code and enjoin actions against non-debtors.  Hearing Tr. at 127, *In re Residential Capital, LLC*, No. 12-12020 (MG) (ECF No. 750) (July 10, 2012) ("Courts find the power to extend the automatic stay to

6

nondebtors in Section 105 of the Bankruptcy Code.").[4]   "Courts have consistently found that section 105 may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief."  *Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 n.20 (S.D.N.Y. 2007).   "All a bankruptcy court must find to enjoin a claim against a non-debtor under section 105(a) was that the claim would threaten to 'thwart or frustrate the debtor's reorganization efforts and that the injunction is important for reorganization.'"  Hearing Tr. at 128, *In re Residential Capital, LLC*, No. 12-12020 (MG) (ECF No. 750) (July 10, 2012).

14.    To the extent the Court does not determine that Plaintiffs' claims are property of the Debtors' estates, Ally joins in the Committee's request that the automatic stay be extended to enjoin prosecution of the Class Action for the reasons set forth in the Committee Response, and notes further that the Debtors would bear a massive burden with respect to discovery in the Class Action if it were to go forward in addition to being exposed to potentially prejudicial rulings by other courts.[5]

**C.    Plaintiffs' Standing Argument Is Moot and Otherwise Incorrect.**

15.    Plaintiffs claim that Ally lacks standing to file the Motion.  Before filing the Motion, Ally coordinated with the Debtors with respect to the relief requested, and the Debtors subsequently joined the Motion.  (*See* ECF. No. 2834).   Accordingly, Plaintiffs' standing argument is moot.  Even if the Debtors had not joined the Motion, Ally submits that it had standing to file the Motion.  Courts have held that lawsuits brought in violation of the automatic

---

[4]    An excerpt of the July 10, 2012 hearing transcript is annexed hereto as **Exhibit A**.

[5]    At a minimum, the discovery required from the Debtors would include document productions and electronic discovery, including voluminous mortgage loan files and e-mails and other communications between GMACM and borrowers and other defendants as well as depositions of present and former personnel.  The Amended Complaint includes allegations going back at least to March 2003, and asserts claims on behalf of "a nationwide putative class consisting of residential mortgage borrowers who have been charged for . . . LPI . . . in connection with loans serviced by . . . GMACM . . . at any time from March 6, 2003 to the present."  (SAC ¶¶ 1, 5, 6.)

stay are void and without legal effect. *See, e.g., In re Best Payphones, Inc.*, 279 B.R. 92, 97 (Bankr. S.D.N.Y. 2002) ("'Any proceedings or actions described in section 362(a)(1) of the Bankruptcy Code are void and without vitality if they occur after the automatic stay takes effect.'") (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 526 (2d Cir. 1994)). Ally should not have to expend significant time and resources defending itself in litigation that has no legal effect. Moreover, under section 1109(b) of the Bankruptcy Code, Ally is a party interest under the Bankruptcy Code and has a right to heard on any issues in the Debtors' chapter 11 cases, including the Motion. *See* 11 U.S.C. § 1109(b). The Motion is not a tactic to avoid litigation, and instead is intended to ensure that such litigation is handled in the proper forum by the proper parties.

**D.      The Court Should Not Lift the Automatic Stay of the Class Action.**

16.     There is no basis for Plaintiffs' request that the Court lift the automatic stay to permit Plaintiffs to prosecute their claims against Ally. As a threshold matter, Ally does not believe that Plaintiffs' request is properly before the Court insofar as Plaintiffs have never separately noticed their purported "cross motion" for stay relief. Nonetheless, Plaintiffs have failed to carry their burden to establish relief from the stay. *See In re Residential Capital, LLC*, 2012 WL 3555584, at *2 (Bankr. S.D.N.Y. Aug. 16, 2012) ("The moving party bears the initial burden to demonstrate that 'cause' exists to lift the stay.") (citing *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990)). Moreover, "'[t]he general rule is that claims [such as those here] that are not viewed as secured in the context of § 362(d)(1) should not be granted relief from the stay unless extraordinary circumstances are established to justify such relief.'" *In re Residential Capital, LLC*, 2012 WL 3555584, at *2 (quoting *In re Leibowitz*, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992)).

8

17.    Specifically, contrary to Plaintiffs' assertions, the relevant *Sonnax* factors weigh

against lifting the stay for the reasons already set forth above justifying enforcement and, in the

alternative, extension of the automatic stay and for the reasons set forth below:

- **Factors Nos. 1 and 11***:  Even if the stay is lifted to permit the prosecution of the Class Action against Ally, any potential veil-piercing and alter-ego claims of the Debtors and Plaintiffs' Proofs of Claim will still need to be addressed in the Debtors' bankruptcy cases.  Thus, lifting the stay will only result in a partial resolution of the issues, not to mention that class actions typically require years to adjudicate.  The first and eleventh factors thus weigh against lifting the stay.  *See, e.g.*, *In re Residential Capital, LLC*, 2012 WL 3555584, at *3 ("While relief may eventually result in partial or complete resolution of the issue at hand, the resolution may not be immediate.  The [Class Action] is in its early stages.  Discovery, trial preparation and, absent a settlement, trial all remain to be done.  Therefore, the first and eleventh *Sonnax* Factors weigh against lifting the stay.").

- **Factor No. 2**:  The claims in the Class Action are directly connected with these bankruptcy cases and prosecution of the Class Action will interfere with the proceedings in the bankruptcy case.  Plaintiffs' veil-piercing and alter-ego claims are generalized claims owned by the Debtors' estates.  The Committee has sought standing to assert these claims on behalf of the Debtors and their creditors.  And, Plaintiffs have filed Proofs of Claim based upon the very same wrongful conduct and seeking the very same damages as they seek from Ally in the Class Action.  Not only would the Class Action overlap with matters in these cases, but its prosecution would interfere with the potential resolution of the Debtors' claims under a chapter 11 plan and would subject the Debtors to burdensome discovery and potential adverse rulings. *See, e.g.*, *In re Residential Capital, LLC*, 2012 WL 3555584, at *7.  Accordingly, the second *Sonnax* factor strongly weighs against lifting the stay.

- **Factor No. 4**:  This Court is the appropriate court to address all veil-piercing and alter-ego claims against Ally.  This Court is "a specialized tribunal with the necessary expertise … to hear the cause of action," and this factor weighs against lifting the stay.

- **Factor No. 5**:  To date, no insurer has assumed responsibility for the Class Action.  The Debtors would need to pay any expenses in relation to their participation in the Class Action, which would include substantial discovery expenses at a minimum.  As a result, the fifth *Sonnax* Factor does not support relief from the stay.

- **Factor No. 7**:  Litigation of the Class Action in another forum (here, the District Court) would prejudice the rights of other creditors who are relying on this Court to resolve their veil-piercing and alter-ego claims while Plaintiffs are permitted to prosecute those claims elsewhere.  Consequently, this factor also weighs against lifting the stay.  *See In re Residential Capital, LLC*, 2012 WL 3555584, at *4 ("It would be unfair to other creditors who must bring their claims in this Court.

[Plaintiff] should be treated as other similarly situated unsecured creditors; doing so also minimizes the risks of inconsistent results.").

- **Factor No. 10**: The veil-piercing and alter-ego claims against Ally will be addressed in these cases. If Plaintiffs are allowed to proceed on the same claims in the Class Action, similar issues would have to be re-litigated, and witnesses would be inconvenienced with multiple depositions. Thus, the interests of judicial economy and expeditious and economical resolution of litigation weigh against lifting the stay.

- **Factor No. 12**: Plaintiffs' veil-piercing and damage claims can all be litigated in the Debtors' bankruptcy cases or resolved under a chapter 11 plan. Consequently, Plaintiffs will not suffer undue prejudice if the stay is not lifted. On the other hand, if the stay is lifted, the Debtors' ability to resolve their claims against Ally will be hindered, the Debtors will be subjected to massive discovery, and they will be forced to choose between participating in the Class Action and risking that adverse findings and decisions and an adverse record will be generated in the Class Action.

18.     Based on the foregoing, the balancing of the harms weighs against lifting the stay.

## **CONCLUSION**

19.     For the reasons set forth above, the Objection should be overruled and the Motion should be granted.

| | |
|---|---|
| New York, New York | */s/ Ray C. Schrock* |
| Dated: April 30, 2013 | Richard M. Cieri |
| | Ray C. Schrock |
| | Craig A. Bruens |
| | KIRKLAND & ELLIS LLP |
| | 601 Lexington Avenue |
| | New York, New York  10022 |
| | Telephone:     (212) 446-4800 |
| | Facsimile:     (212) 446-4900 |

- and -

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc. and Ally Bank*

## EXHIBIT A

**Excerpts From July 10, 2012 Hearing Transcript**

1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Lead Case No. 12-12020-mg  Adv. Proc. No. 12-01671-mg

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matters of:

6    RESIDENTIAL CAPITAL, LLC, et al.,

7                  Debtors.

8    - - - - - - - - - - - - - - - - - - - -x

9    RESIDENTIAL CAPITAL, LLC, et al.,

10                        Plaintiffs,

11                  - against -

12   ALLSTATE INSURANCE COMPANY, et al.,

13                        Defendants.

14   - - - - - - - - - - - - - - - - - - - -x

15

16                  United States Bankruptcy Court

17                  One Bowling Green

18                  New York, New York

19

20                  July 10, 2012

21                  10:07 AM

22

23   B E F O R E:

24   HON. MARTIN GLENN

25   U.S. BANKRUPTCY JUDGE

2

12-12020-mg   Residential Capital, LLC   Ch. 11

Adversary proceeding: 12-01671-mg   Residential Capital, LLC et

al v. Allstate Insurance Company et al.


Doc# 4,13 Evidentiary Hearing RE: Motion for Preliminary

Injunction Notice of Motion and Debtors Motion to Extend

Automatic Stay or, in the Alternative, for Injunctive Relief

Enjoining Prosecution of Certain Pending Litigation Against

Debtors Directors and Officers and Non-Debtor Corporate

Affiliates.


Adversary proceeding: 12-01671-mg Residential Capital, LLC et

al v. Allstate Insurance Company et al

Pre-trial Conference.


12-12020-mg   Residential Capital, LLC   Ch. 11


(CC: Doc no. 245) Motion for Relief from Stay Authorizing

Debtor(s) To Honor Certain Prepetition Obligations To Movants

filed by Mark and Lori Burris.


(Doc no. 456) Motion for Relief from Stay filed by Yvonne D.

Lewis, Sidney T. Lewis.

1  counsel, so they can figure out who's going to be cross-

2  examined.  And what I would suggest is then when we come -- are

3  there going to be objections to the declarations that have been

4  offered?  In other words -- because the first thing I'm going

5  to ask the debtors to do is offer the declarations in evidence.

6  Are there going to be objections to the declarations?

7         Any declaration that is offered in evidence, the

8  declarant has to be available for cross-examination.  So these

9  are all coming in, if they come in, subject to cross.  But I

10  just want to know, are there objections to the admission in

11  evidence of the declarations?

12         MR. ETKIN:  Your Honor, there'll be no objections from

13  us with respect to the factual averments in the declarations.

14  But there may be some issues that I can discuss with counsel.

15         THE COURT:  Okay.  Anybody else?

16         All right.  So we're going to take a recess until

17  11:30.  Just confer so you know who's going to be cross-

18  examined.  Are the objectors calling any witnesses?

19         MR. ETKIN:  We are not, Your Honor.

20         THE COURT:  Anybody calling any witnesses on that

21  side?

22         Okay.  We're in recess.

23      (Recess from 11:11 a.m. until 11:30 a.m.)

24         THE COURT:  Please be seated.

25         MR. HAIMS:  Good morning, Your Honor.  My name is Joel

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    58

1  Haims of Morrison & Foerster, proposed counsel to the debtors.

2          Your Honor, this is a hearing on the debtors' motion

3  to extend the automatic stay or for an injunction enjoining

4  certain cases filed against nondebtor affiliates.  With Your

5  Honor's permission, I'd first like to give an overview of the

6  motion.  Then I'd like to briefly walk through the legal and

7  factual bases for the motion.  Then I'll proffer our evidence,

8  and then I'll make our declarants available for cross-

9  examination.

10          THE COURT:  When you say proffer the evidence, you'll

11  offer the declarations into evidence?

12          MR. HAIMS:  Correct.  Correct, Your Honor.

13          I'll begin with an overview of the motion.  This

14  motion is made pursuant to both Section 362 and Section 105 of

15  the Code.  The relief we are seeking is an extension of the

16  automatic stay to affiliates of the debtor in six cases.  The

17  debtors resolved this motion with parties representing eighteen

18  of the initial twenty-seven cases, all of whom have agreed to a

19  stay through October 31.  Two additional cases were dismissed

20  entirely.  And Judge Cote withdrew the reference in the FHFA

21  case yesterday.

22          THE COURT:  And I saw the FDIC filed a motion to

23  withdraw the reference last night.

24          MR. HAIMS:  Correct.  Only six cases remain in issue

25  for the hearing today.  It's the FDIC, New Jersey Carpenters

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    59

1 | Fund, Union Central, Western & Southern, and two Cambridge

2 | Place Investment Management cases.

3 |         The procedural posture for each case is detailed in

4 | the declarations of Mr. Lipps submitted with the motion papers

5 | at ECF docket numbers 6 and 59.  All of these cases are based

6 | on the debtors' issuance of mortgage-backed securities, and are

7 | brought by investors in those securities.

8 |         The affiliates at issue in these cases are the

9 | debtors' former directors and officers and four of the debtors'

10 | corporate affiliates:  Ally Financial, the debtors' ultimate

11 | parent; GMAC Mortgage Group, the debtors' immediate parent;

12 | Ally Securities; and Ally Bank.  For the Court's convenience,

13 | an organizational chart is attached as Appendix B to our

14 | initial moving papers at ECF docket 4-2.

15 |         THE COURT:  I have that before me.

16 |         MR. HAIMS:  To put these cases in context, the

17 | original twenty-seven cases we sought to stay involved more

18 | than 660,000 loans with 83 billion dollars in original

19 | principal balance.  Even just the remaining six cases involve

20 | thirty-four separate securitizations with more than 150,000

21 | loans and an original principal balance of more than 26 billion

22 | dollars.

23 |         I'll now turn to the legal and factual bases for the

24 | motion.  To frame the issue, I just want to point out that the

25 | relief we are seeking here is well within the Court's

1  jurisdiction, is temporally limited through plan confirmation

2  only, and doesn't seek to stop the underlying cases as to any

3  other parties.  As I mentioned, the debtors seek an extension

4  of the stay under Section 362.

5        The basis for the requests are twofold.  First,

6  pursuant to Section 362(a)(1), there is such an identity of

7  interests that the actions against the nondebtors would have an

8  adverse impact on the debtors' estates and their efforts to

9  restructure.  Second, pursuant to 362(a)(3), the claims against

10  the nondebtor affiliates seek to obtain possession or exercise

11  control over the estates' property.

12        As set forth in detail in our moving papers, there are

13  four primary reasons why an extension of the stay is warranted

14  under Section 362.  First -- and I'll walk through them

15  briefly.  First, if these cases continue against the

16  nondebtors, the debtors risk being bound by factual and legal

17  findings that can significantly prejudice their rights in these

18  and other cases.  The debtors' alleged conduct, the issuance of

19  mortgage-backed securities, is the foundation for all of the

20  claims against the nondebtor affiliates.

21        All of the claims, no matter how they are titled,

22  arise out of the offering materials the debtors prepared and in

23  connection with the securitizations --

24        THE COURT:  Let me stop you.  Because in the proposed

25  stipulation you presented that settles eighteen of the cases,

RESIDENTIAL CAPITAL, LLC, ET AL.                                                      61

1   you've agreed that the motions to dismiss that are pending in

2   some of those cases, the courts in those cases are going to

3   decide the motions, motions for reconsideration, or whatever

4   can be considered.  Why shouldn't any motions to dismiss in the

5   six cases continue and allow the judges to decide those as

6   you've agreed to do in the other -- it doesn't cover all

7   eighteen, but the ones you specifically go through the recitals

8   about where there are motions to dismiss pending?

9           MR. HAIMS:  And, Your Honor, we've offered that.  So

10  we are okay with anything that -- with allowing anything to go

11  forward that doesn't involve work or the depletion of resources

12  by the debtors.  So to the extent that any motion is pending

13  before the Court we've said the Court can go ahead and decide

14  that motion.  We've offered that, to the extent --

15          THE COURT:  Well, you did more than that.  Because it

16  specifically -- the stipulation specifically contemplated

17  motions for reconsideration and things of that nature, which,

18  if they're filed, will require additional work by the nondebtor

19  affiliates, I assume, in making such motions, or opposing

20  motions.

21          MR. HAIMS:  To the extent that we offered it to any of

22  those cases, Your Honor, we're okay with it for these cases as

23  well.  We want the same terms to everybody.

24          THE COURT:  In one of the cases there were -- motions

25  to dismiss were due on July --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    62

1           MR. HAIMS:  13th.

2           THE COURT:  There was one that was due July 6th.  Did

3    that get filed?  Were the pleadings --

4           MR. HAIMS:  July 6th?

5           MR. ETKIN:  Your Honor --

6           MR. HAIMS:  That's the --

7           MR. ETKIN:  -- if I can just try to help.  Michael

8    Etkin, Lowenstein Sandler, on behalf of --

9           THE COURT:  A lot of clients, yeah.

10          MR. ETKIN:  -- the lead plaintiffs, the Union Central

11   plaintiffs, and Cambridge Place Investment.

12          The July 6th date may refer to the discovery cutoff in

13   connection with the class certification issues in the -- that's

14   the only July 6th date that I can re --

15          MR. HAIMS:  Yeah --

16          MR. ETKIN:  Oh, there was a July 6th date for --

17          MR. HAIMS:  -- that was -- I'm sorry.

18          MR. ETKIN:  -- for all motion papers to be in on the

19   Cambridge Place cases --

20          THE COURT:  That's the date.

21          MR. ETKIN:  -- and there's an oral argument scheduled

22   for July 13th.

23          THE COURT:  So all oral argument -- all papers were

24   submitted by July 6th?

25          MR. ETKIN:  As far as I understand it, all papers have

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                                   63

1  been submitted, Your Honor.

2           THE COURT:  Okay, Thank you.

3           MR. HAIMS:  On July 6th?  The West --

4           THE COURT:  I know I read something --

5           MR. HAIMS:  In Western & Southern, there was an answer

6  that was filed on July 6th.

7           THE COURT:  Okay.

8           MR. HAIMS:  Yes, and that was filed.

9           THE COURT:  All right.  Go ahead, Mr. Haims.

10          MR. HAIMS:  So in these circumstances where there is

11 an identity of interest between the debtors and the nondebtors,

12 the courts in this district, including Your Honor in McHale,

13 have stayed cases against nondebtors.

14          Second, if these cases against the nondebtors are

15 allowed to continue, the debtors will face burdensome and

16 overwhelming discovery.  Because the debtors issued the

17 mortgage-backed securities, they have virtually all of the

18 relevant documents.  The debtors have the mortgage files, the

19 loan level performance data, the underwriting guidelines, the

20 due diligence materials, the deal documents, and all of the

21 e-mails relating to the deals.  To produce these materials in

22 these cases would be extremely expensive, would be a

23 substantial drain on both the debtors' monetary and human

24 resources and tax already overtaxed employees.

25          The witnesses will also be the employees of the

1  debtors since the debtors have the knowledge of the issues

2  raised in the complaints and the nondebtor affiliates, on the

3  other hand, have few employees, if any, who could speak to any

4  of the issues.

5          The MBIA cases against the debtors, which we discuss

6  at length in our moving papers and in the Lipps declaration,

7  are illustrative of the burdens that the debtors face in these

8  cases.  That discovery from the MBIA cases, Your Honor,

9  incidentally, can't be reused in other cases, because each case

10  involves different securitizations, different mortgage loans,

11  different underwriting guidelines, different documents,

12  different witnesses, and different facts.

13          And despite the fact that the cases against the

14  debtors are stayed, plaintiffs in the underlying cases still

15  seek document discovery and documents in the debtors'

16  possession.  In fact, as mentioned in our motion papers, the

17  FHFA has asked for permission to move --

18          THE COURT:  I guess I don't want to hear about FHFA.

19  They're not before me.

20          MR. HAIMS:  Well, I think that's just -- it's an

21  example of what the parties here will face or could face --

22  what the debtors could face if --

23          THE COURT:  Judge Cote withdrew the reference with

24  respect to FHFA.  That's not before me.

25          MR. HAIMS:  The debtors -- the FHFA, like Western &

1  Southern, which is before you here, have sought loan files

2  which are in debtors' possession --

3          THE COURT:  In looking at my notes I see that it was

4  in the Western & Southern action that Ally Securities was to

5  make filings in Ohio on July 6th.  Did they do that?

6          MR. HAIMS:  They did, Your Honor.

7          And the only reason I raised the FHFA case, and which

8  is similar to the Western & Southern case, because in the

9  absence of the stay here we expect the parties to continue to

10 seek discovery of documents in the debtors' possession from the

11 nondebtor affiliates in those cases, as the FHFA in fact --

12         THE COURT:  Let me just --

13         MR. HAIMS:  -- has done.

14         THE COURT:  We'll get to the discovery issues, but let

15 me -- I see that in the Union Central action, motions to

16 dismiss the amended complaint are due on July 13th.  Which of

17 the nondebtor affiliates is the defendant in that action?

18 That's before Judge Daniels, as I understand it?

19         MR. HAIMS:  Union Central has Ally Securities, Ally

20 Financial, and one of the individuals.

21         THE COURT:  And since I'm not likely to rule from the

22 bench today and so there will be no stay in effect, are those

23 nondebtor affiliates ready to file their motions to dismiss, if

24 they're going to, on July 13th?

25         MR. HAIMS:  Your Honor, I'm not counsel in those

RESIDENTIAL CAPITAL, LLC, ET AL.                                                    66

1    cases.  My understanding is that there's no stay, and without a

2    stay in those cases the debtors would have to answer the

3    cases --

4              THE COURT:  The reason I'm --

5              MR. HAIMS:  -- or the nondebtor affiliates have to.

6              THE COURT:  The reason I'm pausing on the motions to

7    dismiss, I'm sort of -- I don't know, I haven't heard the

8    evidence and I'm not saying what I'm going to do yet on these

9    motions, but one of the things that strikes me, Mr. Haims, is

10   that looking at the end game in these cases, the debtors at

11   least have stated on the record that they intend to propose a

12   plan that would provide releases to all of the nondebtor

13   affiliates.  And that obviously presents legal and factual

14   issues not for today.

15             But at a minimum, if that's going to happen, it's

16   going to require an evaluation of the claims that are proposed

17   to be released.  And it does seem to me that central to that

18   effort is whether the claims that have been asserted, whether

19   the complaints that have been filed state claims for relief.

20   And where motions to dismiss have been made or will be made,

21   decisions by the state courts or district courts where those

22   actions are pending would certainly provide pertinent

23   information, relevant information in any evaluation of the

24   claims.

25             So even if I were persuaded to grant an injunction,

1  which remains to be seen, I would be very reluctant to do that

2  with respect to motions addressed to the pleadings, or even in

3  the cases before Judge Baer where discovery and briefing is

4  concluding on class certification -- it's not merits discovery

5  that most of your arguments are addressed to -- I would be

6  inclined to allow that to go forward.  I think the discovery

7  issues are a separate set of issues.

8          Your stipulation in the eighteen matters where you

9  have resolved obviously reflect that you're prepared to have

10  motions addressed and the pleadings go forward.  And whether it

11  requires nondebtor affiliates to file new pleadings over the

12  next couple of months or not, I'm not particularly moved by

13  your argument.

14          MR. HAIMS:  Thank you, Your Honor.  I mean, it is

15  clear, which is clear from the stipulation, that the crux of

16  the request goes to the discovery burden and it goes to the

17  costs that will be incurred to defend those, primarily as it

18  results from the cost of the discovery burden.  The discovery

19  burden is massive, and the costs of that will be massive.  You

20  know, I can't stay up here and say that briefing a motion to

21  dismiss is going to --

22          THE COURT:  Well, putting a label on it that the costs

23  would be massive is a conclusory statement.  I hear your

24  argument.

25          MR. HAIMS:  And we'll have -- Mr. Lipps will talk in

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    68

1  more detail about that later.

2          Your Honor, the debtors also have contractual

3  indemnity obligations to both the directors and officers and

4  their corporate affiliates for costs in these judgments, and

5  therefore --

6          THE COURT:  You focus on an E&O policy, and that, I

7  take it, provides entity coverage?

8          MR. HAIMS:  Yes.

9          THE COURT:  And that's a shared policy?

10          MR. HAIMS:  Yes.

11          THE COURT:  Who is the principal?  Who is the named

12  insured?

13          MR. HAIMS:  Ally Financial, Inc., the ultimate parent,

14  and it covers Ally and all its capital S subsidiaries.

15          THE COURT:  And how much is the policy for?

16          MR. HAIMS:  It --

17          THE COURT:  And is it stacked coverage?

18          MR. HAIMS:  Yeah, stacked coverage.

19          THE COURT:  What's the total?

20          MR. HAIMS:  Per -- for that year we -- I think it's

21  per year, the total coverage is -- and there's discussion

22  between the insurance -- it's a hundred million dollars per

23  year.

24          THE COURT:  Total is a hundred million?

25          MR. HAIMS:  It's a hundred million.  There's a

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                              69

1   retention of twenty-five million under the policy.  So the

2   policy that we attached is -- we attached the primary policy

3   and they all follow suit.  So there's significant coverage, but

4   these are significant claims.

5          THE COURT:  And does Ally have D&O coverage that

6   provides coverage -- I mean, you focus on E&O policy which

7   provides entity coverage, and I guess it would cover officers

8   and employees as well as officers and directors, I suppose,

9   right?

10         MR. HAIMS:  Correct.

11         THE COURT:  What I don't have a complete picture of is

12  what the total insurance picture looks like.  And so I know you

13  argue it's a wasting policy; every dollar spent is a dollar not

14  available at the end of the day.  What I don't have a good

15  understanding of, and I don't know whether the evidence will

16  address that, is: is there -- you know, I'm picking numbers out

17  of the air -- is there another 500 million dollars of D&O

18  coverage that potentially covers officers and directors who

19  were named as defendants in all of these cases?

20         MR. HAIMS: Well, there is separate D&O coverage --

21         THE COURT:  How much?

22         MR. HAIMS:  I believe the D&O tower currently is 275

23  million dollars, and I don't know how many years that goes back

24  in that increment.  At some point it was raised; I just don't

25  know what year.

1    We use the E&O policy because the insurer -- which is

2    in a letter attached in the exhibits -- the insurer

3    specifically acknowledged coverage for these cases under the

4    E&O policy.  So that's not disputed by the insurer.

5         THE COURT:  Have the D&O policies advanced or

6    reimbursed defense costs for any of the cover insureds in any

7    of the actions pending around the country?

8         MR. HAIMS:  I preface this by saying these are Ally

9    Financial policies and ResCap doesn't have the -- my

10   understanding is the answer is no to that.

11        THE COURT:  Well, let me just -- are individuals who

12   are named defendants who are officers and directors of ResCap

13   or its debtor affiliates, are they insureds under the AFI D&O

14   policies?

15        MR. HAIMS:  They are.  They're also indemnified by

16   ResCap and AFI, and currently these or these cases are -- sort

17   of, pre-bankruptcy there was a centralized fee system.  It was

18   billed to an Ally accounts payable but the costs were incurred

19   by ResCap for of these cases.  So none of them have hit the

20   policy yet.  ResCap has been paying the defense costs, to date,

21   in all of these cases.

22        THE COURT:  For all defendants?

23        MR. HAIMS:  Yes.  For all the Ally affiliated

24   defendants, that's correct.

25        THE COURT:  Why is that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    71

1          MR. HAIMS:  Because these are ResCap -- these arose

2     out of the ResCap business.

3          THE COURT:  That doesn't answer my question.  Is there

4     a --

5          MR. HAIMS:  Because there's a contractual indemnity

6     between AFI and its -- AFI affiliates and ResCap that's been

7     contained in the --

8          THE COURT:  Has ResCap been paying Ally

9     Financial's --

10          MR. HAIMS:  Yeah.

11          THE COURT:  -- defense?

12          MR. HAIMS:  Yeah.  There's a provision in the amended

13     and restated operating agreement between ResCap and Ally that

14     provides that Al --

15          THE COURT:  None of that's happened post-petition, I

16     take it?

17          MR. HAIMS:  None of that has happened post-petition.

18     But there is a provision that provides, and I'll quote:  "To

19     the fullest extent permitted by law ResCap is to indemnify

20     defendant and hold harmless nondebtor affiliates from any and

21     all losses that relate to, arise out of, or result principally

22     from the business operations of ResCap."

23          THE COURT:  You just read something to me that says

24     the nondebtor affiliates.  When was that agreed to?

25          MR. HAIMS:  No, that was bracketed.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    72

1        THE COURT:  You had bracketed that language.

2        MR. HAIMS:  Yeah, bracketed.  So they've been

3   paying -- they have a duty to indemnify and have in fact been

4   covering the costs of these cases under the amended and

5   restated operating agreement.

6        And finally, the debtors satis -- we think the debtors

7   satisfied, in the alternative, all four factors to obtain 105

8   relief.  Three of them, irreparable harm and the ability to

9   restructure, balance of harm, and public policy, I think

10  that --

11       THE COURT:  Where's the irreparable harm?

12       MR. HAIMS:  Well, I think irreparable harm is the

13  depletion of --

14       THE COURT:  I mean, Ally Financial is certainly in a

15  position to pay the defense costs if the debtors can't.  Let's

16  put the discovery issue aside for a second, just for a moment.

17       MR. HAIMS:  Um-hum.

18       THE COURT:  I see it as a big issue, but it's not as

19  if the nondebtor defendants, individual or entities, are being

20  left without someone to pick up the defense costs if the

21  actions proceed against them.

22       MR. HAIMS:  Purely from a monetary point of view

23  you're right.  However, as I said, all of the discovery, all of

24  the documents, all of the witnesses are ResCap employees,

25  they're ResCap documents, they're housed at ResCap.  And the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    73

1  burden to produce those and to make these witnesses available

2  and to make these documents available is considerable.  And in

3  this short time frame between now and confirmation of the plan

4  all of these folks are completely overtaxed and, as we have and

5  you'll hear --

6          THE COURT:  Who is the underwriter?  Ally Securities?

7          MR. HAIMS:  Yes.

8          THE COURT:  You're telling me they don't have

9  documents?

10         MR. HAIMS:  They don't have --

11         THE COURT:  They're an underwriter and they don't have

12 documents?

13         MR. HAIMS:  They don't have the loan files and they

14 don't have the -- no, that's correct, Your Honor.  They have

15 some documents but they don't have the key doc --

16         THE COURT:  Why shouldn't they be -- to the extent

17 that the discovery proceeds in any of the actions, why

18 shouldn't Ally Securities have to produce whatever documents

19 are in its possession -- custody; I'll leave control out of it.

20 From what you're saying, if they've got documents that relate

21 to their underwriting activities, which they better have, why

22 shouldn't they have to produce those?  Let's put aside -- I'm

23 putting aside the issue --

24         MR. HAIMS:  From the debtor --

25         THE COURT:  -- of the documents that are in the

RESIDENTIAL CAPITAL, LLC, ET AL.                              74

1  possession of the debtors.

2          MR. HAIMS:  From the debtors' point of view, if Ally

3  Securities is going to produce documents solely that Ally

4  Securities has, that's not of concern to the debtor.

5          THE COURT:  I'm sorry?

6          MR. HAIMS:  That's okay with the debtor; the debtors

7  don't have an issue with that.

8          THE COURT:  So you're prepared to carve that out of

9  your request for injunctive relief, that the nondebtors --

10 there's no injunction against discovery requests to the

11 nondebtors to produce any documents that are in their

12 possession?

13         MR. HAIMS:  I don't know that I'm prepared to carve it

14 out without consulting, but I think that that --

15         THE COURT:  I'm just trying to understand what --

16         MR. HAIMS:  Yeah.  I --

17         THE COURT:  You're asking for very broad relief.

18         MR. HAIMS:  Um-hum.

19         THE COURT:  And you may be entitled to it all and you

20 may not; you may not be entitled to any of it.  But what I'm

21 trying to understand is you say all of the documents are in the

22 possession of the debtors, and that's not a hundred percent

23 accurate, right?

24         MR. HAIMS:  I said virtually all of the documents are

25 in there, and I think that that is accurate.  I don't know what

1  Ally Securities has.  I don't represent Ally Securities.  I'm

2  talking from the debtors' point of view; and from the debtors'

3  point of view, if the debtor has to go --

4        THE COURT:  Have you ever represented underwriters

5  before?

6        MR. HAIMS:  I have represented underwriters.

7        THE COURT:  And do you know what documents

8  underwriters typically have in their files in connection with

9  offerings they've done?

10        MR. HAIMS:  Yeah, and I think an underwriter -- they

11  may have an underwriting file.  I just don't know.  Again, I

12  don't represent Ally Securities here.  But from the debtors'

13  point of --

14        THE COURT:  No, but you're seeking relief on their

15  behalf.

16        MR. HAIMS:  Correct.  Again, principally addressed to

17  documents and information that the debtors have.

18        THE COURT:  Okay.

19        MR. HAIMS:  So in sum, Your Honor, we believe in

20  joining these claims against the nondebtor affiliates to avoid

21  harm to the debtors and allow them the time -- and again, we're

22  only asking for a few months -- to restructure, is, we submit,

23  far greater than allowing the plaintiffs to continue to

24  prosecute these private securities litigation cases during this

25  limited period.

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1    THE COURT:  The stipulation that you -- to resolve the

2    issue as to eighteen of the cases --

3    MR. HAIMS:  Um-hum.

4    THE COURT:  -- has an October 31 --

5    MR. HAIMS:  Correct.

6    THE COURT:  -- date for expiration of the stay.  But

7    yet in the blackline order that you filed last night you're

8    still asking for an injunction or a stay through confirmation.

9    MR. HAIMS:  That's correct, Your Honor.

10    THE COURT:  Why --

11    MR. HAIMS:  Well, that --

12    THE COURT:  Why should you get any more than October

13    31 when you agreed in eighteen of the cases to the October

14    31 --

15    MR. HAIMS:  Because we consensually agreed to that.

16    This was pre-hearing, before all the work that had to go into

17    this, and this was what we requested in our initial motion.

18    The other was subject to a settlement, and without a settlement

19    I'm not sure why we should go forward --

20    THE COURT:  Well, you need to persuade me why it would

21    be appropriate, in the first instance, to extend the stay

22    through confirmation.  You know in McHale v. Alvarez --

23    MR. HAIMS:  I do.

24    THE COURT:  -- I didn't grant a stay through

25    confirmation of a plan, but a hard date subject to possible

RESIDENTIAL CAPITAL, LLC, ET AL.                                              77

1   extension, and in fact the parties agreed to an extension of it

2   before the deadline.

3            MR. HAIMS:  Right.

4            THE COURT:  I was reluctant there and reluctant here

5   to include -- to not have a specific date and leave it subject

6   to other events.  People can always come back and ask to extend

7   it or shorten it, for that matter.  If events overtake it and

8   there's some change in circumstances that would justify

9   vacating an injunction, that's always possible too.

10           MR. HAIMS:  Your Honor, I think breathing room until

11  October 31, as we agreed to with the other parties, is

12  appropriate.  We've made this motion seeking for confirmation

13  through the plan.  It's not -- you know, October 31 -- we're

14  likely to be back here October 31, but if that's what Your

15  Honor is most comfortable with --

16           THE COURT:  I don't know.

17           MR. HAIMS:  -- we'd be -- that's okay with us.

18           THE COURT:  All right.

19           MR. HAIMS:  I now turn to the evidence.

20           THE COURT:  Why don't you offer whatever evidence --

21           MR. HAIMS:  Yes.  So the first declaration we offer

22  into evidence is the declaration of Jeffrey Lipps.  That's

23  dated May 24th, 2012.  The declaration is ECF docket number 6.

24  Mr. Lipps is outside counsel to the debtor in many of these

25  cases.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    78

1      THE COURT:  Any objection to the Lipps declaration

2  being admitted into evidence?

3      MR. ETKIN:  Michael Etkin, Your Honor, Lowenstein

4  Sandler.  We have no objection.  We would just like to note for

5  the record that the Lipps declaration does contain statements

6  of law and legal argument.  We'll leave it to the Court to

7  separate the wheat from the chaff with respect to that.  I just

8  would like to note that for the record.

9      THE COURT:  Thank you, Mr. Etkin.

10      All right.  The Lipps declaration, which is ECF number

11  6, is admitted into evidence for the purposes of this hearing.

12  (Jeffrey Lipps declaration, dated May 24, 2010, ECF docket

13  number 6, was hereby received into evidence, as of this date.)

14      MR. HAIMS:  The second declaration that we offer into

15  evidence is the declaration of James Whitlinger, dated May

16  25th, 2012.  The declaration is ECF docket number 7.  Mr.

17  Whitlinger is the chief financial officer of debtor,

18  Residential Capital, LLC.

19      THE COURT:  Any objections to the Whitlinger

20  declaration?

21      All right.  The Whitlinger declaration is admitted

22  into evidence.

23  (James Whitlinger declaration, dated May 25, 2012, ECF docket

24  number 7, was hereby received into evidence, as of this date.)

25      MR. HAIMS:  The third declaration that we offer into

1  evidence is the declaration of Anne Janiczek, dated May 25th,

2  2012.  The declaration is ECF docket number 8.  Ms. Janiczek is

3  the chief human resources officer for the mortgage division at

4  ResCap.

5          THE COURT:  Any objections to the Janiczek

6  declaration?

7          All right.  The Janiczek declaration is admitted into

8  evidence.

9  (Anne Janiczek declaration, dated May 25th, 2010, ECF docket

10  number 8, was hereby received into evidence, as of this date.)

11          MR. HAIMS:  The fourth and final declaration that we

12  offer into evidence is the supplemental declaration of Jeffrey

13  Lipps dated July 6, 2012.  This declaration is ECF docket

14  number 59.

15          THE COURT:  Any objections to the supplemental Lipps

16  declaration?

17          MR. ETKIN:  No objection, Your Honor, just subject to

18  the same statement I made earlier.

19          THE COURT:  All right.  The Lipps supplemental

20  declaration is admitted into evidence.

21  (Supplemental declaration of Jeffrey Lipps, dated July 6, 2012,

22  ECF docket number 59. was hereby received into evidence, as of

23  this date.)

24          MR. HAIMS:  I next turn to the exhibits, Your Honor.

25  Your Honor should have in front of you a binder of exhibits

1 | marked 1 to 31.

2 | THE COURT:  I've got --

3 | MR. HAIMS:  Yeah, it's a black one.

4 | It is our intention to offer all of these into

5 | evidence, so with the Court's permission, I would offer into

6 | evidence Exhibits 1 to 31.

7 | THE COURT:  Have the object -- you provided copies of

8 | these to the objectors?

9 | MR. HAIMS:  Yeah, we have.  Yes.

10 | THE COURT:  Mr. Etkin, do you have objections to any

11 | of the exhibits?

12 | MR. ETKIN:  No, Your Honor.  In fact, to short circuit

13 | the process a little bit, the parties have all agreed that all

14 | exhibits set forth in the binders and the exhibit list filed

15 | with the Court will be admitted into evidence in this

16 | proceeding.

17 | THE COURT:  Okay.  Anybody else want to be heard on

18 | that point?

19 | All right.

20 | MR. HAIMS:  Thank you, Your Honor.  I have nothing

21 | further at this time.

22 | THE COURT:  In light of that statement, the debtors'

23 | Exhibits 1 through 31 are admitted into evidence.

24 | (Debtors' Exhibits 1 - 31 were hereby received into evidence,

25 | as of this date.)

1      MR. HAIMS:  Thank you, Your Honor.  I have nothing

2  further at this time.

3      THE COURT:  Who would you wish to cross-examine, Mr.

4  Etkin?

5      MR. ETKIN:  Your Honor, with your permission, I heard

6  a couple of things in Mr. Haims' opening remarks that caused me

7  to just --

8      THE COURT:  Before you do that, let me just -- Mr.

9  Haims, do you rest?

10      MR. HAIMS:  Yes.

11      THE COURT:  Okay.

12      MR. ETKIN:  Good afternoon, Your Honor.  Michael

13  Etkin, Lowenstein Sandler, on behalf of the plaintiffs in four

14  of the remaining cases before you today in connection with the

15  motion to extend the stay or enforce stay under 105.

16      There may have been some miscommunication, Your Honor.

17  It's happened to me before, so I'm not going to lay this at

18  anyone's doorstep.  But I heard some things from Mr. Haims just

19  a moment ago that tie in with some of the discussions that we

20  had in connection with a resolution of this motion, short of a

21  full-blown hearing, that I was under the impression were not

22  acceptable to the debtor, but now it appears that they are.

23      THE COURT:  Well, let me ask you this question.  I

24  don't want to get -- you know, the parties often do better when

25  they settle matters themselves because sometimes when the Court

1   decides, somebody's going to be disappointed and it may be that

2   both sides are disappointed.  So based on what you heard, do

3   you believe that there is a realistic possibility that you can

4   resolve your differences with the debtors?

5            MR. ETKIN:  Yes.

6            THE COURT:  How much time do you think you would need

7   to discuss that?  I'm only talking about a short recess, but if

8   you think -- you're an experienced lawyer, if you think there's

9   a realistic chance that you can resolve the issues -- obviously

10  eighteen of the case it was resolved.  And so how much time do

11  you think you need to do that?

12           MR. ETKIN:  From my perspective, based upon what I

13  heard, not much time, Your Honor.  Maybe ten or fifteen

14  minutes, unless I'm misreading things.  You know, sometimes

15  some of the questions posed by the Court, initially, can also

16  cause parties to maybe rethink certain aspects of a case,

17  and --

18           THE COURT:  Sometimes courts do that for a reason.

19           MR. ETKIN:  That's --

20           THE COURT:  Let me --

21           MR. ETKIN:  So I don't think that long.

22           THE COURT:  Let me suggest this.  It's five after 12

23  on the clock in the court, which is a few minutes fast, but --

24  if we proceed, you're going to cross-examine one witness, is

25  that --

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    83

1          MR. ETKIN:  Two, Your Honor.

2          THE COURT:  Two?

3          MR. ETKIN:  Yes.

4          THE COURT:  Do you have an estimate of approximately

5   how much time you think your cross would take?

6          MR. ETKIN:  I advised debtors' counsel that I thought

7   that it would be in the range of a half an hour for each --

8          THE COURT:  Okay.

9          MR. ETKIN:  -- give or take.

10         THE COURT:  All right.  Let's do this.  Let's take our

11  lunch recess now until 1:30.  All right?  And I don't want to

12  deprive you of lunch, but why don't you see -- now, there are

13  other objectors as well.  I don't know whether you can speak

14  for anybody else.

15         Any of the other objectors also think there's cause to

16  believe you can resolve issues?

17         Why don't you identify yourself?

18         MR. DEFILIPPO:  Your Honor, Paul DeFilippo for Western

19  & Southern.

20         THE COURT:  Right.

21         MR. DEFILIPPO:  I'm always willing to talk, Your

22  Honor.  We didn't hear anything about one of the key issues to

23  us, which is the need for tolling of any time periods that run

24  against us.  I presume the debtors are willing to do that since

25  they didn't oppose that request in our papers, but they haven't

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                84

1  conceded they would.

2         THE COURT:  Yeah.  I mean, I -- I'm not deciding

3  anything right now, but I have a hard time thinking that I

4  would enter an order enjoining progress of the case without

5  including a provision that tolled limitations.

6         But Mr. Haims?

7         MR. HAIMS:  Maybe if I could just refer to that.  The

8  issue with respect to the tolling here is tolling of individual

9  former officers and directors who are not named in that law

10 suit.  So we've agreed to toll the corporate defendants who

11 were in the lawsuit and even the corporate defendants who are

12 not in the lawsuit.  What we didn't agree to do is to chase

13 former directors and officers who are no longer named in those

14 lawsuits to try to get them to toll.

15        MR. DEFILIPPO:  The problem with that, of course, is,

16 Your Honor, that those people were dismissed out of our action

17 on jurisdictional grounds.  And if they are the beneficiaries

18 of a stay now, without a tolling provision, we are going to run

19 into statute of limitation problems in August.  So that issue

20 is a live one for us.

21        And in addition, Your Honor, I think we're the only

22 party that has a discovery cutoff date, at least of the parties

23 that have objected, and that's April 4th, 2013.

24        THE COURT:  Where is your action pending?

25        MR. DEFILIPPO:  Ohio.

RESIDENTIAL CAPITAL, LLC, ET AL.                                      85

1          THE COURT:  In state court?

2          MR. DEFILIPPO:  State court in Ohio.  We have a

3   discovery cutoff date.  We have nonaffiliated entities that are

4   defendants as well, underwriters like Citibank.  And we don't

5   have the means to address the problem of the discovery cutoff

6   date and the absence of a willingness on the part of the

7   debtors to provide their documents which are essential to us to

8   prosecute our claims against the parties that will not be the

9   beneficiaries of a stay under any circumstances.

10         THE COURT:  Okay.  You want -- yes?

11         MS. MATTHEWS:  Kathryn Matthews --

12         THE COURT:  Could you come up to the microphone so we

13  get a clear record?

14         MR. HAIMS:  Your Honor, if I could just address the

15  discovery stay for one second?

16         THE COURT:  Go ahead.

17         MR. HAIMS:  The discovery stay -- and we've talked

18  about it -- discovery cutoff is April of 2013, and we don't

19  think that should affect a limited stay --

20         THE COURT:  You'll talk about it --

21         MR. HAIMS:  -- through October 31.

22         THE COURT:  -- during the break.

23         Come on up.

24         MS. MATTHEWS:  Kathryn Matthews, Your Honor, from

25  Grais & Ellsworth on behalf of the FDIC as receiver for two

1  failed banks.

2          I'm not promising anything but we also think that we

3  could benefit, perhaps, from a little bit of time to talk to

4  the --

5          THE COURT:  Well, let's --

6          MS. MATTHEWS:  -- debtors' counsel.

7          THE COURT:  So I don't use up more of the time than

8  necessary, let's break until 1:30, come back, see whether

9  you're able to resolve issues.  Okay?  Let's see where we are

10 at 1:30, okay?

11         MS. MATTHEWS:  Thank you.

12         MR. HAIMS:  Thanks very much, Your Honor.

13         MR. DEFILIPPO:  Thank you, Your Honor.

14      (Recess at 12:05 p.m. until 1:35 p.m.)

15         THE COURT:  Please be seated.  All right.  We're back

16 on the record in Residential Capital, the Allstate Insurance

17 Co. adversary proceeding 12-01671.

18         MR. HAIMS:  Good afternoon, Your Honor.

19         THE COURT:  Mr. Haims.

20         MR. HAIMS:  I could report that we've had discussions

21 with all of the counsel, taken individually with Mr. Etkin and

22 his four clients -- his four cases.  We have agreed to a

23 resolution of this motion.

24         In the Cambridge Place case, two cases, we'll agree to

25 the motion to dismiss going forward to decision.

1        In the Union Central case, we'll agree to brief the

2   motion to dismiss towards decision.

3        In the New Jersey Carpenter's case, we'll agree to

4   have class certification go forward to decision.  In the New

5   Jersey Carpenter's case, if there is any cleanup discovery

6   against nondebtors under any existing discovery requests

7   relating to class certs -- and Mr. Etkin wasn't aware of any --

8   that would go forward.

9        And in the Cambridge case, we would agree to discovery

10  against Ally Securities of Ally Securities documents so long as

11  it doesn't cause the debtors expense or burden to produce those

12  documents.

13       So we have reached resolution with Mr. Etkin in these

14  four cases.

15       In the FDIC, we have -- that case was just filed after

16  the bankruptcy in May.  We have agreed that Ally Securities

17  would file a motion to dismiss.  We've agreed to the same

18  discovery with respect to Ally Securities, should that happen.

19  However, we've requested that the motion to --

20            THE COURT:  Just --

21            MR. HAIMS:  Sure.

22            THE COURT:  -- explain the discovery, how you resolved

23  the discovery issue there.

24            MR. HAIMS:  Well, we've agreed that Ally Securities*

25  would produce documents that Ally Securities* --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    88

1      THE COURT:  That it has in its possession.

2      MR. HAIMS:  -- has, and not documents that the

3  debtor --

4      THE COURT:  I assume you're going to document what

5  you're --

6      MR. HAIMS:  Yeah, we will.

7      THE COURT:  That's fine.

8      MR. HAIMS:  We'll work on language.

9      THE COURT:  Go ahead.

10     MR. HAIMS:  We just didn't have time.

11     THE COURT:  Go ahead.

12     MR. HAIMS:  For the FDIC, we've asked in return for

13  the motion to dismiss, and for the Ally Securities' production,

14  we've asked that the motion to withdraw and the motion to

15  dismiss before Your Honor be withdrawn or stayed till after the

16  discovery period -- the stay period, and we don't have

17  confirmation on that as of yet.

18     And lastly, with respect to Western & Southern, those

19  discussions were not fruitful.  Western & Southern is still

20  insisting on tolling agreements from the dismissed individuals,

21  which we cannot deliver.  And they've now asked for discovery

22  from the debtors, and we just are not going to agree to that.

23  So with respect to Western & Southern and perhaps the FDIC,

24  we're going to have to go forward with the hearing.

25     That's all I have, Your Honor.

1    THE COURT:  Okay.  Mr. Etkin, anything you want to

2    add?

3    MR. ETKIN:  Those are the general contours, Your

4    Honor, of the agreement that we've worked out.  Of course we

5    have to reduce it to a stipulation, and other aspects of the

6    existing stipulation that's filed will be baked into ours as

7    well.  And we appreciate Your Honor giving us the time to

8    attempt to work it out.

9    THE COURT:  I'm glad you were able to work it out.

10   MR. ETKIN:  Thank --

11   THE COURT:  Thank you very much.

12   MR. ETKIN:  Thank you very much, Your Honor.  And may

13   I be excused?

14   THE COURT:  You're excused.

15   And who's representing FDIC?

16   MS. MATTHEWS:  I am, Your Honor.

17   THE COURT:  Why don't you come on up to the

18   microphone?  Tell me your name again, I'm sorry.

19   MS. MATTHEWS:  Kathryn Matthews from Grais &

20   Ellsworth.

21   THE COURT:  Okay, Ms. Matthews.  So where do things

22   stand from your standpoint?

23   MS. MATTHEWS:  Well, as Mr. Haims said, we have

24   reached an agreement that Ally Securities* would go ahead and

25   make a motion to dismiss in conformance with Judge Swain's

RESIDENTIAL CAPITAL, LLC, ET AL.                                          90

 1  schedule and that should there be the opportunity --

 2         THE COURT:  I thought there was no schedule yet.

 3         MS. MATTHEWS:  Oh, there's a schedule in the motion to

 4  dismiss.  The parties are to submit their briefing by July

 5  30th.

 6         THE COURT:  Okay.

 7         MS. MATTHEWS:  And the motion is to be fully submitted

 8  by the end of October.

 9         THE COURT:  Okay.

10         MS. MATTHEWS:  There's no discovery that's pending

11  right now, but should there be the opportunity to take some

12  discovery, that we would be permitted to go ahead and serve

13  discovery on Ally Securities* itself for its own documents.  I

14  am just waiting to hear back from the client as to whether we

15  will be willing to agree to put our motion to withdraw the

16  reference and our motion to dismiss in abeyance until October

17  31st, and I just don't have an answer on that right now.

18         THE COURT:  Okay.  When do you -- so Mr. Haims, it was

19  a little unclear to me, you have the agreement on the other

20  issues, is everything dependent on -- is an agreement -- is it

21  all or nothing?  That's what I'm trying to understand.

22         MR. HAIMS:  Well, I think, Your Honor, otherwi -- I

23  mean, from our point of view, if we have to now then brief a

24  motion to dismiss, if the debtors now have to brief a motion to

25  dismiss, you know, we're here and this might as well go

RESIDENTIAL CAPITAL, LLC, ET AL.                                    91

1   forward, but you know, it's --

2          MS. MATTHEWS:  From our point of view, if the Court

3   lacks jurisdiction to go over this dispute, then that should be

4   decided, regardless of what we agree to as far as --

5          MR. HAIMS:  And we're not saying jurisdiction

6   shouldn't be decided.  All we're saying is put everything in

7   abeyance until October 31 and all of those issues can be

8   resolved then.

9          THE COURT:  Ms. Matthews, how is it that you propose

10  to proceed at this point?

11         MS. MATTHEWS:  If I cannot get my client on the phone

12  to hash this out then I will participate and cross-examine as

13  we had planned.

14         THE COURT:  And you've endeavored to get your client

15  and you can't?

16         MS. MATTHEWS:  I have.

17         THE COURT:  Are they going to be available later this

18  afternoon?

19         MS. MATTHEWS:  I would certainly think so.  It does

20  seem silly to go through with the cross-exam -- the witnesses

21  as to discovery burden when we've -- I think the parties have

22  agreed that the FDIC's action really does not --

23         THE COURT:  Right.

24         MS. MATTHEWS:  -- impose any discovery burden, and

25  nothing is really set to happen between now and October 31st

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    92

1  other than briefing on the motion to dismiss and perhaps

2  initial disclosures by the parties.

3          THE COURT:  And you think Judge Swain is going to have

4  a burning desire to deal with your motion to withdraw the

5  reference?

6          MS. MATTHEWS:  I can't speak to Judge Swain's desires.

7          THE COURT:  So you filed your motion to dismiss here.

8          MS. MATTHEWS:  We did.

9          THE COURT:  And that part of it let me make easy, I'm

10  just going to adjourn the motion -- as long as it remains here

11  in this court, I'll just simply adjourn briefing and argument

12  on the motion to dismiss until after October 31.

13          Now, you do have a motion to withdraw the reference.

14  I don't get to speak to that.

15          MS. MATTHEWS:  Shall we go ahead and hopefully in the

16  next fifteen, twenty minutes I can hear back from my client and

17  I --

18          THE COURT:  Sure.  Let me see where --

19          MS. MATTHEWS:  -- I'll, you know, perhaps I go last in

20  the line and hopefully by the time it would be my turn to

21  examine the witnesses I can report back.

22          THE COURT:  Yes, let's try and proceed that way.  It

23  does seem silly to me to go forward with your cross-

24  examination, but let's let me see where things stand.  All

25  right.

1              MS. MATTHEWS:  Thank you.

2              THE COURT:  Who's representing W&S?

3              MR. DEFILIPPO:  Good afternoon, Your Honor.  Paul

4   DeFilippo for Western & Southern.

5              Your Honor, I don't think we're going to need to

6   cross-examine any of the declarants, so if it pleases the

7   Court, I could make a closing argument.  I'd need to move in --

8              THE COURT:  Yeah, you need to move your exhibits.

9              MR. DEFILIPPO:  I need to move my exhibits in, which

10  are Western & Southern A, B, and C attached to the Fitzgerald

11  declaration.  And I'm prepared to proceed with argument at Your

12  Honor's convenience.

13             THE COURT:  Well, let me just ask, are there any

14  objections as to Exhibits A, B, and C -- Western & Southern A,

15  B, and C?

16             MR. HAIMS:  No, Your Honor.

17             THE COURT:  All right.  They're admitted into

18  evidence.

19  (Western & Southern Life Insurance Co.'s Exhibits A, B, and C,

20  attached to the Fitzgerald declaration, were hereby received

21  into evidence, as of this date.)

22             THE COURT:  Let me just -- if I have to go ahead and

23  decide I'll go ahead and decide, but let me just -- I want to

24  make sure I understand what issues are separating you in terms

25  of resolving the matter.  You raised the issue before lunch

RESIDENTIAL CAPITAL, LLC, ET AL.                                              94

1   that, as I understand it, there were some -- I don't know

2   whether they're present or former officers and directors who

3   were dismissed from the pending action.

4              MR. DEFILIPPO:  Former, Your Honor.

5              THE COURT:  Former?  Okay, who have been dismissed

6   from the -- was that pursuant to a decision of the Court?

7              MR. DEFILIPPO:  Yes, that decision is Exhibit W&S B,

8   and they were dismissed for lack of personal jurisdiction of

9   the Ohio court over them.  The debtors have informed us they

10  are unable to consent to the tolling provisions on behalf of

11  those parties.  Since they're former officers and directors,

12  the debtors don't represent them, and to my knowledge, they're

13  not otherwise represented in this proceeding.

14             THE COURT:  Well, let me stop you there.

15             Mr. Haims, you're asking -- are you asking for relief

16  as to those former officers and directors as well?

17             MR. HAIMS:  No, Your Honor.  Oh, yes -- yes, Your

18  Honor.

19             THE COURT:  Yes, you are.

20             MR. HAIMS:  I'm sorry, I --

21             THE COURT:  Well --

22             MR. HAIMS:  They were in the mo -- the motion to

23  dismiss came down after the --

24             THE COURT:  The decision on the motion to dismiss --

25             MR. HAIMS:  The decision came down after the initial

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    95

1  moving of the papers.

2       THE COURT:  I mean, I hear you about this, but if I

3  grant a preliminary injunction, in one fashion or another, I

4  would undoubtedly condition it on the agreement or consent of

5  any party for whose benefit the injunction is issued consents

6  to toll the statute of limitations.  I am not going to give --

7  I mean, it certainly -- the whole purpose of an injunction is

8  to maintain -- it's essentially to maintain the status quo.

9  And if the statute of limitations -- you know, the continuing

10  running of the statute of limitations as to any individual or

11  entity that would benefit from the injunction, that seems

12  inconsistent to me.

13       So I mean, I could understand you saying you don't

14  have the authority to agree on those individuals' behalf, since

15  you don't represent them, to a tolling of the statute of

16  limitations.  But any order that was crafted, either based on a

17  decision by me or through settlement with Mr. DeFilippo, could

18  provide that the stay applies to individuals or entities, to

19  the extent that they agree or consent to a tolling of any

20  applicable statute of limitations.  I mean, it seems -- I mean,

21  do you have any authority that says I ought to enjoin Mr.

22  DeFilippo's clients from attempting to proceed against anyone

23  but allow the statute of limitations to run in the meantime?

24       MR. HAIMS:  Your Honor, just to be -- I just want to

25  be clear.

RESIDENTIAL CAPITAL, LLC, ET AL.                                96

1          THE COURT:  Come up to the microphone so we have a

2   clear record.

3          MR. HAIMS:  I'm sorry, I just want to be clear.  And

4   you're right, I don't have -- I don't represent them, I don't

5   know them, and I don't have authority to speak on their behalf,

6   but the motion, when it was filed and the relief we were

7   seeking was only seeking to stay the Ohio action and the claims

8   in the Ohio action.  The tolling agreement that's being

9   requested is far broader than that, because they're not parties

10  in the Ohio action.  And for that, that's a compl -- I think a

11  completely different --

12         THE COURT:  That's why I asked you --

13         MR. HAIMS:  -- topic.

14         THE COURT:  -- the question:  Are you seeking to have

15  the injunction apply to them?  First you said no --

16         MR. HAIMS:  Well --

17         THE COURT:  -- then you talked to somebody in the back

18  and then you said yes.

19         MR. HAIMS:  Well, in the --

20         THE COURT:  So you can't have it both ways.  If you

21  want the injunction to apply as to them, then you may not be

22  able to agree on their behalf to toll the statute of

23  limitations, but if I issue -- if I issue the injunction, I

24  could very well condition it on their consent to toll.  So are

25  you seeking an injunction on their behalf or not?

RESIDENTIAL CAPITAL, LLC, ET AL.                          97

1    MR. HAIMS:  We certainly were when we made the motion

2    because the case was still --

3            THE COURT:  Well --

4            MR. HAIMS:  -- pending against them.

5            THE COURT:  -- but now you're here today and that's --

6            MR. HAIMS:  Now we're here today, and I -- I'd have to

7    consult.  I'd have to think about that one.  I just haven't

8    that one through.

9            THE COURT:  Well, Mr. DeFilippo, does that solve your

10   problem if --

11           MR. DEFILIPPO:  It goes a long way, Your Honor.  The

12   other issue is the Ally Securities*, which is the only

13   nondebtor affiliate that is still a defendant, and whether it's

14   appropriate to stay the action against them.  We don't think it

15   is.

16           THE COURT:  Well, look, that's -- then you may as well

17   just go ahead and fight this battle.

18           MR. DEFILIPPO:  Your Honor --

19           THE COURT:  I mean, everybody else who has agreed, and

20   now --

21           MR. DEFILIPPO:  Yes.  I hate to be -- we have the

22   deadline of April 4th, 2013 for completion of fact disc -- of

23   all discovery in that case.  I don't know if Ally Securities*

24   is going to be ultimately the beneficiary of a permanent stay

25   in a plan or otherwise, but if they're not, I can envision

RESIDENTIAL CAPITAL, LLC, ET AL.                                           98

1  difficultly complying with the Ohio court's deadlines if they

2  have to play catch-up in terms of their ability to defend that

3  action, which will proceed in their absence if you do stay it.

4  So I'm not in a position where I can consent to a stay against

5  them.  I understand that Your Honor has the power to do so and

6  the discretion to do so.  We don't think that requiring them to

7  defend themselves in any way threatens the debtors'

8  reorganization.  We don't believe there has been any showing --

9          THE COURT:  Well, that's the issue on the motion.

10         MR. DEFILIPPO:  Right.

11         THE COURT:  And you know, if it goes forward on a

12 contested basis, I'll decide that.

13         MR. DEFILIPPO:  We also ask Your Honor, if you do

14 impose a stay, not to permit it to be open ended till

15 confirmation.

16         THE COURT:  I've already -- I think I've sort of made

17 that point clear --

18         MR. DEFILIPPO:  I --

19         THE COURT:  -- before.  I didn't rule, but I pretty

20 well indicated.  That won't foreclose the debtor from coming

21 forward seeking to extend it or --

22         MR. DEFILIPPO:  Us seeking --

23         THE COURT:  -- the plaintiffs in the action coming

24 forward seeking to vacate it.  That --

25         MR. DEFILIPPO:  And I'd like to just correct one thing

1   Mr. Haims said earlier.  We understand we have to get Your

2   Honor's permission to take discovery of the debtors.  We're

3   going to file a motion to do that, so we will be back here

4   making the arguments that go to whether or not it's truly an

5   imposition on the debtors for them to produce --

6             THE COURT:  Well, we better hash that out then today.

7   You're too far apart.  I mean, if -- I mean, the issue of --

8   there is an automatic stay in place with respect to discovery

9   from the debtors.

10            MR. DEFILIPPO:  Yes, Your Honor.

11            THE COURT:  This motion has nothing to do with that.

12            MR. DEFILIPPO:  We agree with that.

13            THE COURT:  Okay.

14            MR. DEFILIPPO:  But we need the debtors --

15            THE COURT:  And if you make the motion to vacate the

16   stay, you're going to carry the burden.

17            MR. DEFILIPPO:  I understand that as well, Your Honor.

18   But we can't avoid the fact that (a), the debtor has all the

19   documents that we need and (b), we have to --

20            THE COURT:  Are you going to pay for them to produce

21   it all?

22            MR. DEFILIPPO:  I can't commit to that without talking

23   to our client, but --

24            THE COURT:  Well, I'm not going to decide -- that

25   issue is not before me today, but you or anyone else who is

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              100

1  seeking to lift the stay to launch discovery against the

2  debtors is going to carry a very heavy burden.

3          MR. DEFILIPPO:  Understood, Your Honor.

4          THE COURT:  Okay.  Ms. Matthews, do you want to try

5  and see if you can track your client down again?

6          MS. MATTHEWS:  Sure.

7          THE COURT:  I just -- because it just doesn't --

8  before we -- if we're going to go forward, that's fine, we'll

9  go forward.  We're going to go forward anyway, but I want to

10 know -- I think you ought to know whether you need to actively

11 participate.

12         MS. MATTHEWS:  Yes.  Could I just have a five-minute

13 break?

14         THE COURT:  Let's -- we'll break till a quarter after

15 2, because it doesn't sound like -- we're not going to have any

16 cross-examination of any witnesses, so we'll just have

17 argument.  If you want to cross-examine, obviously you can, if

18 we're going to go forward with it.  So let's break until a

19 quarter after 2.  Okay?  Thank you.

20     (Recess from 13:54 p.m. until 14:16 p.m.)

21         THE COURT:  Please be seated.

22         MR. HAIMS:  Your Honor, I can report some additional

23 progress.  We've agreed with the FDIC that the motion to

24 dismiss will go forward, the motion to dismiss in the

25 underlying case, the Ally Securities*, if any discovery, will

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    101

1  go forward -- could go forward.  The motion to dismiss in this

2  adversary proceeding will be put off till October 31.  And --

3          THE COURT:  By that --

4          MR. HAIMS:  Well --

5          THE COURT:  -- a date after October 31 --

6          MR. HAIMS:  Yeah.

7          THE COURT:  -- that it gets set.

8          MR. HAIMS:  And while the FD -- counsel doesn't have

9  authority to withdraw the motion to withdraw, we have agreed

10 that if Judge Swain were to grant the motion to withdraw, they

11 would agree to the same terms of the stay --

12         THE COURT:  Okay.

13         MR. HAIMS:  -- till October 31.  So with that, I think

14 we have agreement with the FDIC.

15         THE COURT:  Ms. Matthews?

16         MS. MATTHEWS:  Yes, that's right.

17         THE COURT:  Okay, thank you very much.

18         MR. HAIMS:  And there's one further clarification with

19 respect to Western & Southern and the discussion on the tolling

20 agreement.  Again, I don't represent these --

21         THE COURT:  I know.

22         MR. HAIMS:  -- these individuals, but from the

23 debtors' point of view, we won't object to the tolling

24 agreement on the same terms of a tolling agreement that we have

25 in the stipulation with all the other eighteen defendants,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    102

1  which tolls any claims that could be asserted by them in the

2  MBS action during the stay period.  That's all we ask for the

3  relief, and that's -- I think for that we wouldn't object.

4          THE COURT:  Okay.

5          MR. O'NEILL:  Your Honor, Brad O'Neill, Kramer Levin

6  on behalf of the committee.  Just a few brief comments.

7          The committee is generally supportive of the debtors'

8  application, subject to certain limitations.  We're mindful of

9  the fact that now all but one of the defendants in the

10 adversary have consented to the relief, including two members

11 of the committee or --

12         THE COURT:  I didn't understand that, but you'll

13 explain it.

14         MR. O'NEILL:  It is a fact, but our supportiveness,

15 however, is conditioned on two things which I think are

16 embodied in the stipulations that you've seen and I think

17 reflected in your comments this morning.  And that is that the

18 injunction should be finite and specifically limited through

19 October 31 and subject to a complete reservation of rights so

20 that all parties, when October 31 arrives, if there is a

21 dispute about the propriety of continuing the injunction, all

22 parties rights are reserved and all parties, including the

23 committee, can make whatever arguments are appropriate.

24         THE COURT:  Thank you.

25         MR. O'NEILL:  But on that basis -- and also, by the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    103

1    way, the additional limitations Your Honor discussed this

2    morning seem appropriate.

3              THE COURT:  The additional limitations being --

4              MR. O'NEILL:  On the scope of the injunction to allow

5    motions to dismiss to go forward.  But subject to those

6    limitations, we're supportive of the debtors' application.

7              THE COURT:  Thank you very much.

8              Anybody else want to be heard before Mr. DeFilippo?

9              Okay, we don't have any movement with respect to you

10   and your clients?

11             MR. DEFILIPPO:  I have no authority to consent to the

12   injunction, Your Honor.

13             THE COURT:  Okay.  Mr. Haims, you want to argue?

14             MR. HAIMS:  Well, I --

15             THE COURT:  Well, let me say, do you rest, Mr.

16   DeFilippo?

17             MR. DEFILIPPO:  I rest, Your Honor.

18             THE COURT:  Okay.  So both sides have rested.

19             Go ahead, Mr. Haims, you want to argue?

20             MR. HAIMS:  Your Honor, I'm not going to repeat what I

21   said this morning.  I'll keep my remarks very brief.

22             We're talking about we have one case.  That case

23   involves, as I understand it, 23,000 loans.  They're second

24   lien loans, so in addition to --

25             THE COURT:  All second liens?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    104

1    MR. HAIMS:  They're all second liens, 23,000, which

2    entail not only 23,000 second loan files, but in many cases

3    will involve first lien files as well.  The scope is large.

4    Just because it's one deal and because it's one case doesn't

5    lessen the burden at all.  We've said and we've agreed with

6    twenty-six now or twenty-five -- four of the twenty-five that

7    certain things can go forward.  The one thing that we have not

8    agreed and will not agree to go forward is discovery against

9    the debtors, and I think that's where we draw the line.

10    THE COURT:  Just so that I am clear --

11    MR. HAIMS:  Um-hum.

12    THE COURT:  -- give me the name of the case.  I just

13    want to make sure I --

14    MR. HAIMS:  Western & Southern.  It's -- I have the

15    full name here.  It's Western & Southern Life Insurance Co. v.

16    Residential Funding, Co.  It's in the Ohio -- it's in Ohio

17    state court.

18    THE COURT:  Hamilton County?

19    MR. HAIMS:  Hamilton County.

20    THE COURT:  Court of common pleas in Hamilton.

21    MR. HAIMS:  Right, and the individual defendants were

22    dismissed, and the only nondebtor affiliate in that case is

23    Ally Securities.  So we've gotten very broad discovery

24    requests.  The discovery requests -- or Ally Securities* has

25    gotten very broad discovery requests.  They request loan files.

1  As I just said, the loan files are large, notwithstanding it's

2  one deal and one case.  We think those are -- we don't think

3  those are in Ally -- we think those are not subject to

4  production by Ally Securities* but we think an injunction here

5  is necessary so that we're not litigating this issue again as

6  to the scope of Ally Securities' production and whether those

7  documents have to be produced that are in the debtors'

8  possession, custody and control by Ally Securities*.  Now,

9  other than that, there's nothing --

10          THE COURT:  Tell me, this was listed as number 27 on

11  Exhibit B to the complaint.  It's the list that I'm --

12          MR. HAIMS:  It was alphabetically --

13          THE COURT:  -- that I'm looking at in front of me and

14  it was for me to keep track.  Who are the debtor defendants?  I

15  see the lead defendant was Residential Funding, which is a

16  debtor.

17          MR. HAIMS:  There was --

18          THE COURT:  Who are the -- what are you look -- do I

19  have something that -- a chart that shows --

20          MR. HAIMS:  You just have the complaint.  And we have

21  in the Lipps declaration, which is docket number 6, on page 13,

22  paragraph 34.  And the debtor entities that are named are --

23          THE COURT:  Hang on a second.

24          MR. HAIMS:  Your Honor, would it help if I just give

25  you a copy of it?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    106

1    THE COURT:  It would be.

2    MR. HAIMS:  Yes.

3    THE COURT:  It would.

4    MR. HAIMS:  Okay.

5    THE COURT:  Thank you.  Thank you.

6    MR. HAIMS:  And because there are abbreviations, the

7  debtors' names are:  Residential Funding, Co., LLC; GMAC

8  Mortgage, LLC; Residential Accredit Loans, Inc.; Residential

9  Asset Mortgage Products, Inc.; and Residential Funding Mortgage

10  Securities I, Inc.

11    THE COURT:  Okay.  And Ally Securities* is the only

12  remaining nondebtor affiliate?

13    MR. HAIMS:  Correct.

14    THE COURT:  And are there nonaffiliate defendants in

15  the case?  Do you know, Mr. DeFilippo, can you help me on that?

16    MR. DEFILIPPO:  Pardon me, Your Honor, I didn't hear

17  your question.

18    THE COURT:  Are there --

19    MR. HAIMS:  There are.

20    THE COURT:  -- defendants who are --

21    MR. DEFILIPPO:  Nonaffiliates?

22    THE COURT:  -- nondebtors or affiliates?

23    MR. DEFILIPPO:  There are six or seven underwriters

24  that are not debtors or affiliates of the debtors.

25    THE COURT:  Okay.  Let me just finish reading this.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    107

1          MR. HAIMS:  Yes, of course, Your Honor.

2      (Pause)

3          THE COURT:  Are any of the individual former directors

4  and officers still defendants in the case?

5          MR. HAIMS:  No, Your Honor --

6          THE COURT:  Everybody -- they were all dismissed on --

7           MR. HAIMS:  They were all dismissed on the motion

8  to --

9          THE COURT:  -- jurisdiction --

10          MR. HAIMS:  Correct.

11          THE COURT:  -- personal jurisdiction grounds?

12          MR. HAIMS:  Correct.

13          THE COURT:  Are there any unaffiliated individuals who

14  remain in the case?  Do you understand what I mean, Mr.

15  DeFilippo?

16          MR. DEFILIPPO:  Yeah, there are defendants.

17          MR. HAIMS:  Individuals, Your Honor?

18          THE COURT:  Yeah, individuals.

19          MR. DEFILIPPO:  Oh, individuals?

20          THE COURT:  They're all entities that remain as

21  defendants in that case.

22          MR. DEFILIPPO:  Correct.

23      (Pause)

24          THE COURT:  Go ahead, Mr. --

25          MR. HAIMS:  So the only thing I would add is that we

1  think the injunction should be granted.  If it's not granted

2  we're going to be back here, we're going to be fighting over

3  the production of documents over the -- in the debtors'

4  possession, custody and control, and we just think --

5          THE COURT:  Well, you may be back over that anyway.

6          MR. HAIMS:  We may be anyway, but --

7          THE COURT:  Because the only -- as I understand it

8  now, the only issue is whether I grant the preliminary

9  injunction, probably the October 31 date as to Ally Financial.

10         MR. HAIMS:  Ally Securities*.

11         THE COURT:  Ally Securities*, I'm sorry, Ally

12 Securities.  Ally Financial is out of the case too?

13         MR. HAIMS:  They're not in that case.  They were never

14 in that case.

15         THE COURT:  They're not --

16         MR. HAIMS:  That's just an Ally Securities* case.

17         THE COURT:  Okay, Ally Securities.  Whether I grant

18 the injunction as to Ally Securities, other than for the

19 motions to dismiss, which are pending.

20         MR. DEFILIPPO:  Already been heard and decided.

21         MR. HAIMS:  Already been decided.

22         THE COURT:  Already been decided.

23         MR. HAIMS:  That's in discovery.  That case is in

24 discovery.

25         THE COURT:  That case is in discovery.

RESIDENTIAL CAPITAL, LLC, ET AL.                    109

1      MR. HAIMS:  And that's the one with the discovery

2   cutoff in April.  So all we're saying is --

3      THE COURT:  Let me ask this.

4      MR. HAIMS:  -- a temporary hold till April.

5      THE COURT:  Let me ask this.  Has Ally Securities*

6   produced documents that are in its possession?

7      MR. HAIMS:  No, not yet.

8      THE COURT:  When -- you've receive document requests

9   for Ally Securities.

10      MR. HAIMS:  Requests, correct.

11      THE COURT:  Have you responded to the written

12   requests?

13      MR. HAIMS:   I believe we have, Your Honor, yes, we

14   did, just recently.

15      THE COURT:  And when were the documents -- absent an

16   injunction, when are Ally Securities* documents to be produced?

17      UNIDENTIFIED SPEAKER:  It's a rolling basis.

18      MR. HAIMS:  Yeah, it's a rolling basis.  There's no

19   schedule other than the discovery cutoff at the end --

20      THE COURT:  Okay.

21      MR. HAIMS:  -- answers and written responses were put

22   in, I believe it was last week.

23      THE COURT:  Have any -- you said it was a rolling

24   production.  Have any of Ally Securities* documents been

25   produced so far?

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    110

1          MR. HAIMS:  In this case?

2          THE COURT:  In this -- in the Western & Southern case.

3          MR. HAIMS:  No, the written response was just put in

4    last week.

5          THE COURT:  Okay.

6          MR. HAIMS:  One of the issues -- as I understand it,

7    the parties are still negotiating a confidentiality agreement

8    which has been holding up the production.

9          THE COURT:  Are you able to tell me, by category or

10   type, what documents Ally Securities* has in its possession

11   that are responsive to the outstanding request?

12         MR. HAIMS:  I can't, Your Honor, because I'm not

13   counsel --

14         THE COURT:  Can any of your colleagues who are here?

15         MR. HAIMS:  Yes, yes, yes.

16         THE COURT:  Is counsel for Ally Securities* here?

17         MR. HAIMS:  Hang on.  Yes.

18         THE COURT:  Come on up to the microphone.

19         MR. HAIMS:  This is Mr. Lipps.

20         THE COURT:  The man with the declaration.

21         MR. LIPPS:  The man with two declarations.

22         THE COURT:  Two declarations, okay.

23         MR. LIPPS:  Jeff Lipps with Carpenter Lipps & Leland.

24   We are of-counsel right now for Ally Securities* but in the

25   process of transitioning out of that role.

RESIDENTIAL CAPITAL, LLC, ET AL.                              111

1          At this point in time you wanted to know what type of

2     documents --

3          THE COURT:  Yes.

4          MR. LIPPS:  -- Ally Securities* would have.  What we

5     understand they have is they typically would have a deal file

6     that would --

7          THE COURT:  They're going to have a due diligence

8     file.

9          MR. LIPPS:  Well, the deal file would have the due

10    diligence and the documentation in electronic form.  There is a

11    server that we call the Bethesda server, and there's a file

12    tree and we have to work through and identify which of those

13    files would actually relate to the particular deal at issue.

14    There's only one for Ally Securities*; it's in the Western &

15    Southern case.

16          There are also some electronic communications, either

17    instant messages or other communications like that that are

18    captured at the broker-dealer level that would probably have

19    communications that would relate to this securitization or any

20    work that they had done in it.

21          And then there is Outlook type e-mails that may or may

22    not require restoration, which are on the debtors' server, so

23    to speak.  They're on the debtors' backup tape, so there would

24    be --

25          THE COURT:  But not on your -- you don't have backup

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                        112

1    tapes?

2           MR. LIPPS:  Not for that -- not for the Outlook e-mail

3    system.  It was managed through the ResCap organization, so for

4    those Ally Securities* employees that use the Outlook, those

5    backup tapes would be in the possession of the debtors.

6           THE COURT:  Okay.  Have you endeavored to determine

7    whether any of the individuals who worked on this matter from

8    Ally Securities* have files?  I mean, has a search been made of

9    their files as well?

10          MR. LIPPS:  We have collected files from the

11   individuals that were involved in these securitizations while

12   we were representing them as Ally Securities* and then pre-

13   petition when we were involved in that.  The people that were

14   in the securitization effort at Ally Securities* have now gone,

15   so there are no current employees there that had anything to do

16   with any of the securitizations.  So it would be a historic

17   capture that we have done.

18          THE COURT:  I mean, what you say is not evidence, but

19   can you at least -- I mean, what you're saying now as opposed

20   to what was in your declarations --

21          MR. LIPPS:  I hope I'm not inconsistent.

22          THE COURT:  No, well -- I mean, I would like you to

23   address, if you could, the effort or burden that would be

24   required to produce the documents, electronic or paper, that

25   are in the possession of Ally Securities*, not what's on the

RESIDENTIAL CAPITAL, LLC, ET AL.                                         113

1    debtors' servers but what's in the possession or custody of

2    Ally Securities*.

3           MR. LIPPS:  Well, if we're going to exclude the

4    Outlook, because I can speak to that.  That is a burden because

5    that's the burden that was similar to what we were addressing

6    with respect to e-mail searches in my declaration.  But as to

7    the Bethesda server, unfortunately there are no current

8    employees, so what we have, essentially, is a file tree, and

9    it's, like, thousands of entries on there.

10          Am I right on that?

11          Yeah, there's thousands of entries, and part of it is

12   we don't have any legacy knowledge, so there is a substantial

13   effort that has to go, and a lot of it's, like, hit and miss.

14   And so you'll be having IT people sort of hitting and missing.

15   And again, the IT people are people at ResCap.  They're not --

16   the broker-dealer at Ally Securities* does not have an

17   independent team of employees that are doing this.  So it would

18   be through the debtors, again, and you have to hit and miss and

19   try and find the right file trees with the right information.

20   So it is -- it has been slow undertaking and we've been in

21   process with it in a couple of these cases because until this

22   motion was heard we had an obligation to try and participate,

23   and it's been a slow haul.

24          THE COURT:  Well, who controls the Bethesda server?

25   Is that what you're referring to?

RESIDENTIAL CAPITAL, LLC, ET AL.                    114

1    MR. LIPPS:  It's sitting there on -- well, who has

2    possession of it?

3          UNIDENTIFIED SPEAKER:  It belongs to Ally Securities.

4          MR. LIPPS:  That's what I thought.  The Bethesda

5    server, when the company was closed down, at least for the

6    securitization side of it, that is owned by Ally Securities,

7    but the actual Bethesda server documentation is being handled

8    by the eDiscovery or IT people within ResCap.

9          THE COURT:  So Mr. Haims, the agreements that were

10   further reached in court would provide for Ally Securities* to

11   produce documents that are in its possession.  How are those

12   going to be gathered?  Have those been gathered?  How are they

13   going to be gathered?  Is it any different than --

14         MR. HAIMS:  It's no different than he's just

15   described.

16         THE COURT:  Okay.  Mr. DeFilippo?

17         MR. DEFILIPPO:  Yes, Your Honor.

18         THE COURT:  I don't know whether you were in court at

19   the earlier status conference or on the phone for -- I just

20   don't recall; I apologize for that.

21         MR. DEFILIPPO:  Earlier today, Your Honor?

22         THE COURT:  No, no, earlier in the -- because there

23   was -- very early in the case with the adversary we had a --

24         MR. DEFILIPPO:  I was not.

25         THE COURT:  -- status conference, and I had indicated

1   at that point, asking counsel for permission to speak with the

2   judges in the actions.  I have not spoken with the judge in

3   Ohio.

4           I mean, I'll report briefly.  I had previously spoken

5   to Judge Cote, Judge Swain, Judge Daniels.  Judge Baer's been

6   on vacation, so I haven't spoken to him.  I haven't spoken to

7   any of the state court judges.  Most of those matters were

8   resolved by agreement, in any event, so I have not -- did not

9   speak to the judge who has the matter.

10          In the conversations I had with the judges with whom I

11  spoke was basically just to tell them that this adversary had

12  been filed, there was a motion for a preliminary injunction.

13  The day I spoke to Judge Cote was the morning after the motion

14  to withdraw the reference was filed.  I think that was the

15  first news she had about it when I told her about it.  And

16  Judge Swain, it was a similar kind of conversation; the motion

17  to withdraw the reference hadn't been filed yet when I talked

18  to him. But I mean, your state court action -- your client's

19  state court action focuses solely on -- for shorthand I'll call

20  it ResCap RBS offerings.

21          MR. DEFILIPPO:  No, Your Honor.

22          THE COURT:  It doesn't?

23          MR. DEFILIPPO:  Less than half of our offerings are

24  ResCap --

25          THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    116

1        MR. DEFILIPPO:   -- RMBS.  There are other originators

2   that are part of the lawsuit -- loans originated by others than

3   ResCap and underwritten by the nonaffiliated underwriters.

4        THE COURT:  Okay.  How much of the case is made up of

5   the ResCap.

6        MR. DEFILIPPO:  May I consult with my --

7        THE COURT:  Yes.

8        MR. DEFILIPPO:  -- colleague?

9        THE COURT:  Please go ahead.

10       MR. DEFILIPPO:  Seventy million face of ResCap loans,

11  and ninety-five million of non-ResCap.

12       THE COURT:  Okay.  What's the schedule in your case?

13       MR. DEFILIPPO:  The schedule is, all discovery must be

14  completed by April 13th -- I'm sorry, April 4th, 2013.  And

15  there's a trial date set for January of 2014.  So we have a

16  little less than nine months to complete discovery.

17       THE COURT:  Fact and expert discovery?  Everything?

18       MR. DEFILIPPO:  All discovery.  And that's set forth

19  in Exhibit 3.

20       THE COURT:  And if you were enjoined from proceeding

21  with your -- enjoined until October 31 and subject to further

22  order from proceeding with your case against Ally Securities,

23  how to you envision proceeding with the balance of your case?

24       MR. DEFILIPPO:  Well, we would proceed against the

25  unaffiliated underwriters with respect to the nondebtor

**RESIDENTIAL CAPITAL, LLC, ET AL.**                    117

 1  documents.

 2          THE COURT:  I mean, there's nothing that inextricably

 3  links the ResCap piece of the case with the non-ResCap piece of

 4  the case.

 5          MR. DEFILIPPO:  Well, Your Honor, we'd hate to have to

 6  try two cases, of course.

 7          THE COURT:  No doubt.

 8          MR. DEFILIPPO:  And I'm sure all the defendants would

 9  hate to have to try two cases.  That would be extremely

10  wasteful.

11          THE COURT:  When you say "all the defendants" --

12          MR. DEFILIPPO:  The nondebtor defendants.

13          THE COURT:  They're not going to -- the affiliated

14  nondebtor defendants are only -- you know, if I enjoin -- if I

15  stay it, they're only going to try it once.  It may not be at

16  the same trial that you try --

17          MR. DEFILIPPO:  Right.

18          THE COURT:  -- against the -- on the non-ResCap --

19          MR. DEFILIPPO:  Yes.

20          THE COURT:  -- offerings.

21          MR. DEFILIPPO:  Correct, Your Honor.  What I was

22  trying to say was that it's our assumption that the parties and

23  the Court would probably prefer -- the Court in Ohio, that

24  is --

25          THE COURT:  To do it once?

1          MR. DEFILIPPO:  -- would probably prefer to do it

2     once.

3          THE COURT:  As I would only prefer to do it once.  No

4     doubt.

5          MR. DEFILIPPO:  Yes.

6          THE COURT:  What, if any good does it do you if --

7     because there are no pending motions.  They've been decided

8     already.

9          MR. DEFILIPPO:  Yes, Your Honor.

10          THE COURT:  What good would it do you if I permitted

11     you to obtain document production from Ally Securities?  I

12     mean, without all of the loan files from the debtors, you're

13     not going to be in a position, really, to move forward against

14     them, are you?

15          MR. DEFILIPPO:  That's most likely the case, Your

16     Honor.

17          THE COURT:  I mean, what's -- do you want to address

18     the issue of the burden or expense to the debtors if the action

19     proceeds against Ally Securities?

20          MR. DEFILIPPO:  Yes, Your Honor.  The debtors have

21     submitted a substantial amount of evidence to the effect that

22     Ally Securities has very limited documents.  So there should be

23     no burden to the debtors if Ally Securities is required to

24     defend itself, because:  a) it or its parent will pay its own

25     defense costs; and it should not be burdensome or expensive for

RESIDENTIAL CAPITAL, LLC, ET AL.                                          119

1    it to produce its very limited documents.  Nor should the

2    debtors' employees -- although we've learned today for the

3    first time, apparently that Ally Securities has no employees of

4    its own -- so I suppose either an employee of Ally Financial,

5    or another nondebtor, or perhaps an employee of the debtor, may

6    have to coordinate the production of Ally Securities documents.

7    But since the debtors are -- and Ally Securities is doing that

8    for other plaintiffs, it shouldn't be an additional burden of

9    consequence in our case.

10          The costs that Ally Securities may incur to defend

11   itself do not come out of the estate; do not threaten the

12   reorganization; nor do we think they in any way impair the

13   amounts available under the insurance coverage.  Because it's

14   our understanding that the debtors have not yet -- nor has Ally

15   Financial -- consumed the entire twenty-five million dollar

16   self-insured retention under those policies.  So until Ally

17   Financial pays twenty-five million out of its pocket, the

18   insurance carriers don't have to pay anything.

19          THE COURT:  Mr. Haims argued that Ally Financial and

20   Ally Securities have a contractual indemnification right from

21   the debtors -- from ResCap.  So why -- and take the twenty-five

22   million dollar self-insured retention, which has not -- no one

23   has argued that that's been hit yet.  So why isn't the cost of

24   defending Ally Securities in your action a cost to the debtors,

25   in light of contractual indemnification?

RESIDENTIAL CAPITAL, LLC, ET AL.                    120

1        MR. DEFILIPPO:  These are securities fraud cases.  And

2   indemnity is disfavored in securities fraud cases, Your Honor.

3        THE COURT:  If Ally Securities prevailed in your

4   action, wouldn't it be entitled to contractual indemnification?

5   The point about indemnification being disfavored, that's

6   certainly true.  It may be impermissible depending on what the

7   theory of liability for Ally Securities is.

8        There's been some briefing -- I don't remember whether

9   it was in your brief or not -- but there's been some briefing

10  about the issue if it's a negligence-based claim, it's not

11  clear that indemnification would be prohibited.  If it's a

12  scienter-based claim and liability is found, indemnification

13  may be prohibited.  But if Ally Securities prevailed, wouldn't

14  it be entitled to contractual indemnification, if the contract

15  provided for it?

16       MR. DEFILIPPO:  I haven't studied the contract that

17  closely, Your Honor.  But let's assume it does for purposes of

18  this discussion.  I think there are something like fifteen

19  billion dollars' worth of claims in these cases, plus

20  potentially another eight billion for the put-back claims, if

21  the settlement's approved.  So the effect on this estate of

22  another few million dollars in indemnification claims by Ally

23  Securities is not going to be a game changer here.

24       THE COURT:  What is your theory of liability against

25  Ally Securities?

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1        MR. DEFILIPPO:  There are a number of provisions of

2   the Ohio Securities Act that --

3        THE COURT:  Control person liability --

4        MR. DEFILIPPO:  No, no.

5        THE COURT:  -- under the Ohio Securities --

6        MR. DEFILIPPO:  Direct liability of an underwriter,

7   Your Honor.  I can cite you to those provisions, if you can

8   give me a second.  But they're all in our complaint.  But these

9   are --

10       THE COURT:  Do you include 33 Act claims --

11       MR. DEFILIPPO:  No, Your Honor.

12       THE COURT:  Just the Ohio State --

13       MR. DEFILIPPO:  Just Ohio Securities Act.  And not

14  control person.  Although we concede that the debtors' actions,

15  to the extent they were the creators of the prospectuses, have

16  an impact in our case.  It is in no way a derivative claim.

17       THE COURT:  Well, when you say "have an impact" in

18  your case, if you were to prevail, first of all, you would have

19  to show misrepresentations or omissions in the offering

20  documents, correct?

21       MR. DEFILIPPO:  Yes, Your Honor.

22       THE COURT:  And whether res judicata or collateral

23  estoppel applied against the debtors, I never understood that

24  strict res judicata or collateral estoppel was the test for

25  enjoining.  I mean, wouldn't it have a significant impact on

1  claims against the debtors if you established liability against

2  Ally Securities with a finding of misrepresentations or

3  omissions in the offering documents?

4          MR. DEFILIPPO:  Your Honor, no such issue is going to

5  be presented to either the Court or the jury in that action

6  before the end of the stay period that we're talking about

7  here.  The trial date is not until January of 2014.  And the

8  debtors have represented that they're on a fast track to

9  confirmation.  So in our view, the issue of the debtors'

10 liability to us and those like us will have to be decided by

11 Your Honor as part of either an estimation process or a claims

12 objection process, long before we go to trial in the Ohio case.

13         THE COURT:  I think your colleague's trying to hand

14 you something.

15         MR. DEFILIPPO:  Oh.  Thank you.  I --

16         THE COURT:  Go ahead, if you --

17         MR. DEFILIPPO:  No, I'm prepared to answer your next

18 question, Your Honor.

19         THE COURT:  No.  Is there any other point you want to

20 raise, at this point?

21         MR. DEFILIPPO:  No, thank you, Your Honor.

22         THE COURT:  Okay.  Thank you very much.

23         MR. DEFILIPPO:  Thank you.

24         THE COURT:  Mr. Haims, do you want to respond?

25         MR. HAIMS:  I have nothing further, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    123

1    THE COURT:  I'm going to take a ten-minute recess and

2  come back and rule.  I'm going to take a ten-minute recess and

3  then come back and rule, okay?

4      (Recess from 2:48 p.m. until 3:46 p.m.)

5          THE COURT:  All right.  Please be seated.

6          All right.  The Court is going to rule.  Pending

7  before the Court is the debtors' motion to extend the automatic

8  stay, or in the alternative, for injunctive relief enjoining

9  prosecution of certain pending litigation against debtors,

10  directors, and officers, and nondebtor corporate affiliates.

11  I'll refer to it as "the motion".  It's at ECF docket number 4.

12  It's filed in the adversary proceeding styled Residential

13  Capital, LLC v. Allstate Insurance Co., et al.  It's adversary

14  proceeding number 12-01671.

15          Through the motion, the debtor seeks and extension of

16  the automatic stay, to stay or enjoin the continued prosecution

17  of what was originally twenty-seven lawsuits against the

18  debtors, nondebtor affiliates, or directors and officers, all

19  of which are based on the debtors' issuance or sale of

20  mortgage-backed securities.  Two of the twenty-seven cases were

21  dismissed before this injunction hearing was held.  Of the

22  remaining twenty-five cases, the injunction motion was resolved

23  in all but one of the cases, with terms set forth or to be set

24  forth in stipulations presented to the Court.

25          In those twenty-five cases, the cases insofar as the

RESIDENTIAL CAPITAL, LLC, ET AL.                                    124

1  debtor affiliates are concerned, are stayed until October 31,

2  2012.  The stipulations provide or will provide that certain

3  motion practice in the underlying cases will be permitted to

4  proceed, as well as certain discovery, directed solely to the

5  nondebtor affiliates.  To be clear on this point, the nondebtor

6  affiliates will only be required to produce documents that are

7  in their custody or possession.  Documents in the possession of

8  the debtors will not have to be produced.

9         The only underlying case in which a resolution among

10  the parties has not been reached is the Western & Southern

11  case.  And that is Western & Southern Life Insurance Co. v.

12  Residential Funding Co., LLC, et al., number A-110-5042 in the

13  Ohio Court of Common Pleas, in Hamilton County.  Ally

14  Securities is the only remaining nondebtor affiliate that

15  remains a defendant in the underlying case.  There are other

16  defendants remaining in the action, concerning other RMBS

17  transactions not involving ResCap.

18         For the reasons I will explain, the debtors' motion

19  will be granted on terms substantially similar to the terms of

20  the extensions of the stays to the other RMBS actions.  And to

21  be clear, the stay does not apply with respect to other RMBS

22  transactions unrelated to the ResCap transactions.

23         During the hearing today, the Court admitted in

24  evidence testimony in the form of declarations offered by the

25  debtors.  The declarants were present in court, but no parties

1  requested cross-examination.  Western & Southern offered three

2  documents in evidence that were admitted without objection.

3          Having heard and considered the evidence and arguments

4  of counsel, both in court and in their briefs, the Court now

5  rules as follows:

6          The debtors argue -- and the ruling is to grant the

7  stay on substantially the terms applied in the other matters.

8  The debtors argue that the Court should extend the automatic

9  stay to enjoin the continuation of the Western & Southern

10  action against Ally Securities with the exceptions noted for

11  the following reasons.

12          One, the debtors will be exposed to a significant risk

13  of collateral estoppel, stare decisis, and evidentiary

14  prejudice if the Western & Southern action is allowed to

15  continue.  Two, the debtors will face very substantial and

16  burdensome discovery if the action continues.  Three, the

17  debtors will face indemnification claims if the Western &

18  Southern action against Ally Securities is allowed to continue.

19  And four, property of the debtors' estates, namely shared

20  insurance policies, will be depleted if the Western & Southern

21  action against Ally Securities is allowed to continue.  See In

22  re Quigley Co. Inc., 676 F.3d 45, 58 (2nd Cir. 2012).

23          Let me discuss the standard for issuance of a

24  preliminary injunction.  Section 362(a) of the Bankruptcy Code

25  "provides for a broad stay of legal proceedings against the

RESIDENTIAL CAPITAL, LLC, ET AL.                                        126

1   debtor that were or could have been commenced prior to the

2   commencement of the bankruptcy case ...", 3 Collier on

3   Bankruptcy, Paragraph 362.03 [3].

4        The automatic stay typically does not protect

5   nondebtors.  See 3 Collier on Bankruptcy, Section 362.03(3)(d),

6   ("The stay of litigation does not protect nondebtor parties who

7   may be subjected to litigation for transactions or events

8   involving the debtor.")

9        But the Second Circuit and courts and in the Southern

10  District have found certain limited circumstances where a

11  bankruptcy court may extend a Section 362 stay to nondebtors.

12  See, e.g., Queenie Ltd. v. Nygard International, 321 F.3d 282,

13  287 (2nd Cir. 2003), ("The automatic stay can apply to

14  nondebtors, but normally does so only when a claim against the

15  nondebtor will have an immediate adverse economic consequence

16  for the debtor's estate.")

17       See also 3 Collier on Bankruptcy Section 362.03(3)(d),

18  ("Although an action against third parties such as guarantors

19  or codefendants is not stayed under Section 362(a), the court

20  retains the power to enjoin the action if continuation of the

21  action would interfere substantially with the debtor's

22  reorganization.")

23       While the Second Circuit has not specified the precise

24  situations when a bankruptcy court may extend the automatic

25  stay to a third-party non debtor, courts in this district have

1  determined that extending the automatic stay is appropriate in

2  instances where:  1) the third party has a right of absolute

3  indemnity from the debtor; 2) where a creditor's action against

4  the third party would halt the nondebtor from contributing

5  funds to the reorganization; and 3) where the action sought to

6  be enjoined would "consume time and energy of the nondebtor

7  that would otherwise be devoted to the reorganization effort."

8  That's likewise a cite to Collier.

9          Courts find the power to extend the automatic stay to

10  nondebtors in Section 105 of the Bankruptcy Code.  See In re

11  United Healthcare Org., 210 B.R. 228, 232 (S.D.N.Y. 1997) ("The

12  source of authority to issue such an injunction is 11 U.S.C.

13  Section 105, which provides bankruptcy courts with general

14  equity powers to 'issue any order, process, or judgment that is

15  necessary or appropriate to carry out the provisions of this

16  title'.")

17          Extending the automatic stay pursuant to Section 105

18  is essentially identical to granting an injunction, halting the

19  actions of third-party nondebtors.  Some courts, including this

20  Court, in 2008, have found that Section 105(a) allows them to

21  issue injunctions without complying "with the traditional

22  requirements of Federal Rule of Civil Procedure 65", In re the

23  1031 Tax Group, LLC, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008).

24  See also In re Adelphia Communications Corp., 298 B.R. 49, 54,

25  (S.D.N.Y. 2003) ("The proof required to extend the stay is not

RESIDENTIAL CAPITAL, LLC, ET AL.                                                    128

1  as rigorous as that normally required for injunctions.")

2         Indeed, this Court has previously reasoned that all "a

3  bankruptcy court must find" to enjoin a claim against a

4  nondebtor under Section 105(a) was that the claim would

5  "threaten to thwart or frustrate the debtor's reorganization

6  efforts...and that the injunction is important for

7  reorganization.", In re the 1031 Tax Group LLC, 397 B.R. 684

8  (quoting Granite Partners, 194 B.R. 337).

9         In addition, "The courts have recognized that a stay

10  should be provided to codefendants when the claims against them

11  and the claims against the debtor are 'inextricably interwoven,

12  presenting common issues of law and fact which can be resolved

13  in one proceeding'," In re Ionosphere Clubs, Inc., 111 B.R.

14  423, 434 (Bankr. S.D.N.Y. 1990) (citing Fed Life Insurance Co.

15  v. First Financial Group, Inc. 3 B.R. 375, 376 (S.D.Tx. 1980).

16         At least two district judges in the Southern District

17  disagree with this approach.  Judge Scheindlin examined and

18  rejected granting an injunction without a showing of the

19  traditional requirements needed for an injunction in In re

20  United Healthcare Organization.  Judge Scheindlin observed that

21  Section 105 injunctions may only be issued "as necessary or

22  appropriate to carry out the provisions of this title", and

23  observed that Collier suggested employing an essentially

24  traditional standard when granting injunctive relief to third-

25  party nondebtors under Section 105.  See 210 B.R. 234.

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1    Subsequent to In re United Health, Judge Castel noted

2    that injunctions under Section 105 may be used to extend the

3    automatic stay to nondebtors "where the action to be enjoined

4    is one that threatens the reorganization process." Hawaii

5    Structural Ironworkers Pension Trust Fund v. Calpine Corp.

6    06-cv-5358(PKC), 2006 WL 3755175*4 (S.D.N.Y. Dec. 20, 2006).

7         Judge Castel, however, agreed with Judge Scheindlin

8    that a more traditional standard of review should be employed

9    when granting injunctive relief to third parties.  Judge Castel

10   stated that if an action would threaten reorganization process,

11   "the threat to the reorganization process must be imminent,

12   substantial, and irreparable" for a preliminary injunction to

13   be issued on behalf of a nondebtor; Id.

14        Judge Castel then noted that there must also be a

15   showing of:  1) a "reasonable likelihood of a successful

16   reorganization"; 2) a balance of the harms; and 3) a balancing

17   of the public interest at stake, before granting injunctive

18   relief under Section 105(a) to third parties.

19        Building upon these two decisions, Judge Scheindlin,

20   in a later opinion announced four factors a court must examine

21   when determining whether to extend the automatic stay to third

22   parties.  1) whether there's a likelihood of successful

23   reorganization; 2) whether there is an imminent, irreparable

24   harm to the estate in the absence of an injunction; 3) whether

25   the balance of harms tips in favor of the moving party; and

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1   4) whether the public interest weighs in favor of an

2   injunction.  See Nevada Power Co. v. Calpine Corp., In re

3   Calpine Corp. 365 B.R. 401, 409 (S.D.N.Y. 2007).

4           Judge Gerber has recently employed the standard

5   articulated by Judge Scheindlin in the Lyondell bankruptcy.

6   See Lyondell Chemical Co. v. Centerpoint Energy Gas Services,

7   In re Lyondell Chemical Co. 402 B.R. 571, 587-89, Note 37

8   (Bankr. S.D.N.Y. 2009) (Observing that courts in this district

9   have held that "the usual grounds for injunctive relief ...

10  need not be shown for an injunction under Section 105(a)", but

11  employing the more traditional standard announced by Judge

12  Scheindlin.)

13          Collier concurs with this approach, noting that, "A

14  request for relief under Section 105 must meet traditional

15  requirements for an injunction," in noting the tests such as

16  the one articulated by Judge Scheindlin are "nothing more than

17  an evolution of the general requirements for a preliminary

18  injunction adapted for the bankruptcy context." 2 Collier on

19  Bankruptcy, paragraph 105.03(1) and (2).

20          Collier further observes that when extending the

21  automatic stay to third parties, "most courts have applied the

22  traditional test for the issuance of an injunction ...".  3

23  Collier on Bankruptcy, paragraph 362.04.

24          Let me deal with the Western & Southern objection.

25  Western & Southern, et al., are plaintiffs in an action pending

RESIDENTIAL CAPITAL, LLC, ET AL.                                    131

1  in Ohio.  On June 29th, 2011, Western & Southern filed the Ohio

2  action alleging that certain debtors, certain nondebtor

3  affiliates, and the unaffiliated underwriters, committed fraud,

4  violated the Ohio Securities Act, and committed other tortious

5  conduct in connection with the sale of 120 million dollars of

6  residential mortgage-backed securities to Western & Southern.

7          Western & Southern joined in the other objections, all

8  of which have been resolved in the motion.  In December 2011,

9  defendants in the Ohio action filed motions to dismiss, arguing

10  that the claims were time barred and that Western & Southern

11  failed to plead actionable misrepresentations or the requisite

12  fraudulent intent.  The officers -- the former officers who

13  were defendants also moved for dismissal based on lack of

14  personal jurisdiction.

15          On the defendants' motion, discovery was stayed in the

16  Ohio action pending a decision on the motions to dismiss.  The

17  stay was granted in part because counsel for the debtors and

18  the nondebtor affiliates in the Ohio action assured the Court

19  that they would provide discovery immediately following a

20  ruling in the motions to dismiss.  This is in the Fitzgerald

21  declaration, Exhibit 1 at page 15, lines 10 through 19.

22          On June 6, 2012, the motions to dismiss the Ohio

23  action as against the unaffiliated underwriters and nondebtor

24  affiliate, Ally Securities, were denied, except with respect to

25  claims barred by the statute of repose, provided for under the

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                        132

1  Ohio Securities Act.  The officer defendants were also

2  dismissed without prejudice from the case, for lack of personal

3  jurisdiction.  The Court did not rule on the motion as it

4  pertained to the debtors, because the claims against the

5  debtors were stayed.

6          The fact discovery deadline in the Ohio action is

7  April 4, 2013.  Trial in the Ohio action is set to begin on

8  January 6, 2014.  Western & Southern argues that any stay

9  should be conditioned on the nondebtor affiliates agreeing to

10  toll any applicable statute of limitations through the period

11  in which the stay is in place.  Debtors' counsel has stated

12  that he does not have authority to agree to toll the statute of

13  limitations on behalf of these former officers or directors.

14          In granting the stay, the Court determines, and any

15  order prepared embodying the ruling shall provide, that the

16  stay is effective as to the former officers and directors only

17  if they agree to toll all applicable statutes of limitations

18  from the period from today until the stay expires.

19          All right.  Let me provide my analysis of the claims

20  asserted in the Ohio action and the reasons for the stay.

21  Courts may extend the automatic stay to nondebtor litigants

22  where "there is such identity between the debtor and third-

23  party defendant that the debtor may be said to be the real

24  party defendant, in that a judgment against third-party

25  defendant will, in effect, be a judgment or a finding against

**RESIDENTIAL CAPITAL, LLC, ET AL.**                     133

1   the debtor."  A.H. Robbins Co. v. -- I can't pronounce it --

2   Piccinin, 788 F.2d 994, 999 (4th Cir. 1986).

3        However, when a party holds an independent direct

4   claim against a nondebtor for violating the federal securities

5   laws, "there is no compelling basis by which a court must

6   extend the automatic stay provisions of Section 362 to the

7   nondebtor codefendants."  See In re First Century Financial

8   Corp. 238 B.R. 18 (Bankr. E.D.N.Y. 1999).

9        That principle is limited, however, where establishing

10  liability against the nondebtors hinges on establishing facts

11  that would likewise establish liability against the debtors.

12  And that is, in fact, the case here.  In the Western & Southern

13  action, all the claims essentially require the plaintiffs to

14  establish that the RMBS offering documents contained material

15  misstatements or omissions of fact.  Such a showing, of course,

16  would be required to establish liability on the part of the

17  debtors if the action was to proceed against them.

18        Here, the claims against Ally Securities are based on

19  the same nucleus of facts as the claims against the debtors.

20  Thus, the only way for the plaintiffs to prove liability

21  against Ally Securities is to make a prima facie case that the

22  debtors violated securities laws too.  Any decisions and

23  evidence generated would thus be later used against the

24  debtors, whether in the underlying lawsuits or in claims the

25  Western & Southern plaintiffs make against the debtors' estate

RESIDENTIAL CAPITAL, LLC, ET AL.                                     134

1   in these Chapter 11 cases.  See McHale v. Alvarez, In re the

2   1031 Tax Group LLC, 397 B.R. 670, 685 (Bankr. S.D.N.Y. 2008)

3   (Staying lawsuits against debtors' former employees that could

4   lead to respondiat superior liability for debtors during the

5   reorganization.)

6          In re Johns Manville, 26 B.R. 420, 426 (Bankr.

7   S.D.N.Y. 1983) (Staying securities claims against the debtor's

8   directors and officers where claims were "in reality,

9   derivative of identical claims" that were or could be brought

10   against the debtors.)

11          The Western & Southern plaintiffs in the underlying

12   case have argued that the similarity in claims against the

13   debtors and the nondebtors will not result in stare decisis or

14   evidentiary prejudice.  In actuality, the debtors will have to

15   live with any decision in the case that was resolved as to the

16   nondebtor defendants.  See, e.g., Johns Manville, 26 B.R. 429

17   ("Even if the debtor is not so bound by collateral estoppel, it

18   may be disadvantaged in subsequent suits.")

19          Although the debtors will have the opportunity to

20   raise independent defenses to their own liability, the debtors

21   will have to live -- will have little or no chance to unring

22   the bell following a decision that could be used against them.

23   If the Court does not extend the stay in these cases, the

24   debtors will be faced with a choice of sitting on the sidelines

25   and being stuck with rulings on issues they did not litigate,

**RESIDENTIAL CAPITAL, LLC, ET AL.**                              135

1  or be forced to litigate, the very thing the automatic stay is

2  supposed to prevent.  See Hawaii Structural, 2006 WL 3755175 *5

3  ("A prudent debtor would devote managerial and financial

4  resources to assisting in the defense of its affiliates,

5  because of the potential impact upon a claim or suit against

6  the debtor.").  In re Calpine Corp. 365 B.R. 401, 412 (S.D.N.Y.

7  2007) (This is especially so in situations where the debtor's

8  liability has not yet been established and where the nondebtor

9  affiliate has the ability to assert all of the debtor's factual

10 and legal defenses to liability.")

11          Indemnification rights.  Additionally, the debtors

12 have established that Ally Securities may be entitled to a

13 contractual indemnification from the debtors.  Where a

14 nondebtor party is entitled to absolute indemnity by the debtor

15 on account of any judgment that might result against them in

16 the case, extensions of the automatic stay may be appropriate.

17 A.H. Robbins 788 F.2d 989.

18          Here, the operating agreements apply to the underlying

19 actions, including the plaintiff -- the Western & Southern

20 lawsuit.  The operating agreements require the debtors to

21 indemnify the nondebtor corporate affiliates for "losses

22 related to" the debtors' "business and operations".  See the

23 Whitlinger declaration, Exhibit B at sections 1 and 3(c).

24          Because a fundamental part of the debtors' business

25 strategy consists of securitizing and selling mortgage loans

RESIDENTIAL CAPITAL, LLC, ET AL.                                    136

1   that they purchase or originate, the debtors thus are obligated

2   to indemnify the nondebtor corporate affiliates for losses

3   stemming from the debtors' issuance or sale of mortgage-backed

4   securities.  While indemnifications for specific judgments at

5   this time is still contingent, the debtors are still obligated

6   to pay defense costs for the indemnitees.  Whitlinger

7   declaration, Exhibit A, section 18(d)(i).

8            While such obligations will become unsecured claims in

9   bankruptcy pursuant to Section 502, they nonetheless increase

10  the debtors' total liabilities and detract from the overall

11  creditor recovery.  While complete indemnification of liability

12  for violations of federal or state securities laws may be

13  contrary to public policy, it is unclear whether a defendant

14  held liable in a negligence-based claim may be entitled to

15  indemnification.  And of course, if the defendant prevails in

16  the underlying action, it would appear that it would be

17  entitled to whatever contractual indemnification is available.

18           It appears at this stage of the proceedings, that the

19  debtors have established by a preponderance of the evidence,

20  that Ally Securities is entitled to contractual indemnification

21  unless it is ultimately determined to be liable in the

22  underlying action.  Indemnification will further reduce assets

23  available for distribution from the debtors' estates.

24           We discussed the discovery burdens.  The most

25  significant factor favoring extending the stay in this case is

1  the substantial discovery burden and expense the debtors would

2  face if the Western & Southern action goes forward against Ally

3  Securities.  The debtors put forward evidence in Mr. Lipps'

4  declaration setting forth in specific detail the cost and

5  burden of discovery in these lawsuits.  See the Lipps

6  declaration, paragraphs 70 through 78.

7         Western & Southern has never challenged the statements

8  in Mr. Lipps' declaration, either in deposition or in their

9  opposition.  Western & Southern offers nothing more than pure

10  conjecture that discovery in their case will not be burdensome.

11         The debtors have provided specific examples of cases

12  that involved a small number of securitizations, but still

13  produced millions of pages in discovery and upwards of eighty

14  days' worth of depositions from the debtors' current and former

15  employees.  See the Lipps declaration, paragraphs 28 and 29.

16         Any prospective discovery will also burden current and

17  former employees of the debtors.  "It matters little that some

18  of the individual defendants are no longer affiliated with the

19  debtor."  Because the ultimate discovery burden falls on

20  current employees who are critical to restructuring.  See

21  Hawaii Structural, 2006 WL 3755175 *5,6.

22         The debtors have adequately shown the negative impact

23  of continued litigation on the debtors' key employees.  See the

24  supplemental Lipps declaration, at paragraphs 31 through 33.

25         We'll briefly discuss proceeds of insurance policies

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    138

1  covering both the debtors and the nondebtor defendants.  The

2  debtors further assert that the Western & Southern action

3  impacts property of the estate in the E&O policy, a single line

4  of coverage applicable to just one of the several years

5  relevant to the Western & Southern action, with a twenty-five

6  million dollar retention or deductible.  The E&O policy has

7  been introduced into evidence.  It provides entity coverage and

8  is a wasting policy, meaning that every dollar spent of policy

9  proceeds reduces the amount available for claims by the

10 debtors.

11         According to the debtors, the primary E&O insurer,

12 Chubb, issued a letter setting forth its preliminary coverage

13 position that dispenses with both of these arguments.  As to

14 the policy period, Chubb's coverage letter makes clear that

15 "pursuant to Section 7(a) of the relevant policies, all loss

16 associated with the MBS actions shall be deemed one loss and

17 such loss shall be deemed to have originated during the '07-'08

18 BPL policy."  That's the policy attached to the Whitlinger

19 declaration.

20         Chubb's coverage letter also makes clear that the

21 Western & Southern action claims fall within the scope of the

22 insurance policy.  The coverage letter states that "the MBS

23 actions trigger cover under the broker-dealer services

24 liability clause of the '07-'08 BPL policy, because they are

25 civil proceedings brought by or on behalf of a broker-dealer

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                   139

 1  customer against an insured for a broker-dealer wrongful act."

 2           The coverage letter also notes that the lawsuit filed

 3  by Western & Southern has been tendered and were included in

 4  the MBS actions covered by the E&O policy.

 5           The Court's conclusion.  The Court grants the

 6  motion -- the debtors' motion to extend the stay on essentially

 7  the terms agreed upon in the stipulated extensions of the stay

 8  in the other cases.  The stay shall remain in place until

 9  October 31, 2012, with all parties retaining all rights to seek

10  to extend or terminate the stay at that time.  Discovery may

11  proceed in the Western & Southern action only as to documents

12  in the possession of Ally Securities.

13           The parties shall draft and submit a proposed order

14  consistent with this oral bench opinion.  In the event the

15  parties cannot agree on the terms of the order, they may

16  arrange a telephone conference with the Court to resolve any

17  remaining issues.

18           That is the decision of the Court.

19           IN UNISON:  Thank you, Your Honor.

20           THE COURT:  Mr. Haims, is there anything else for me

21  to take up today?

22           MR. HAIMS:  No, Your Honor.

23           THE COURT:  So you have some work to do with respect

24  to the additional matters that -- as to which you were able to

25  resolve today by stipulation.  And you'll have to work with

**RESIDENTIAL CAPITAL, LLC, ET AL.**                                    140

1  counsel for Western & Southern to craft an appropriate order

2  consistent with my ruling.

3        MR. HAIMS:  We'll do that, Your Honor.

4        THE COURT:  Okay?

5        MR. HAIMS:  Thank you.

6        THE COURT:  All right.  Thank you very much,

7  everybody.

8     (Whereupon these proceedings were concluded at 4:14 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25