MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Stefan W. Engelhardt
Todd M. Goren
Samantha Martin
*Counsel for the Debtors*

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178
Telephone:    (212) 696-6000
Facsimile:    (212) 697-1559
Steven J. Reisman
Michael Moscato
*Conflicts Counsel for the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ----------------------------------------------------------------- ) | |
| In re:                                                          ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,          ) | Chapter 11 |
| ) | |
| Debtors.                   ) | Jointly Administered |
| ----------------------------------------------------------------- ) | |
| ) | |
| RESIDENTIAL CAPITAL, LLC; DITECH,           ) | |
| LLC; DOA HOLDING PROPERTIES, LLC;       ) | |
| DOA PROPERTIES IX (LOTS-OTHER),           ) | |
| LLC; EPRE LLC; EQUITY INVESTMENT I,      ) | |
| LLC; ETS OF VIRGINIA, INC.; ETS OF            ) | |
| WASHINGTON, INC.; EXECUTIVE                  ) | Adv. Case No. 13-_____ (MG) |
| TRUSTEE SERVICES LLC; GMAC – RFC          ) | |
| HOLDING COMPANY, LLC; GMAC                   ) | |
| MODEL HOME FINANCE I, LLC; GMAC         ) | **COMPLAINT** |
| MORTGAGE USA CORPORATION; GMAC        ) | |
| MORTGAGE, LLC; GMAC RESIDENTIAL         ) | |
| HOLDING COMPANY, LLC;                              ) | |
| ----------------------------------------------------------------- ) | |

GMAC RH SETTLEMENT SERVICE, LLC;      )
GMACM BORROWER LLC; GMACM REO         )
LLC; GMACR MORTGAGE PRODUCTS,          )
LLC; HFN REO SUB II, LLC; HOME         )
CONNECTS LENDING SERVICES, LLC;        )
HOMECOMINGS FINANCIAL REAL             )
ESTATE HOLDINGS, LLC; HOMECOMINGS      )
FINANCIAL, LLC; LADUE ASSOCIATES,      )
INC.; PASSIVE ASSET TRANSACTIONS,      )
LLC; PATI A, LLC; PATI B, LLC; PATI REAL )
ESTATE HOLDINGS, LLC; RAHI A, LLC;     )
RAHI B, LLC; RAHI REAL ESTATE          )
HOLDINGS, LLC; RCSFJV2004, LLC;        )
RESIDENTIAL ACCREDIT LOANS, INC.;      )
RESIDENTIAL ASSET MORTGAGE             )
PRODUCTS, INC.; RESIDENTIAL ASSET      )
SECURITIES CORPORATION;                )
RESIDENTIAL CONSUMER SERVICES OF       )
ALABAMA, LLC; RESIDENTIAL              )
CONSUMER SERVICES OF OHIO, LLC;        )
RESIDENTIAL CONSUMER SERVICES OF       )
TEXAS, LLC; RESIDENTIAL CONSUMER       )
SERVICES, LLC; RESIDENTIAL FUNDING     )
COMPANY, LLC; RESIDENTIAL FUNDING      )
MORTGAGE EXCHANGE, LLC;                )
RESIDENTIAL FUNDING MORTGAGE           )
SECURITIES I, INC.; RESIDENTIAL        )
FUNDING MORTGAGE SECURITIES II,        )
INC.; RESIDENTIAL FUNDING REAL         )
ESTATE HOLDINGS, LLC; RESIDENTIAL      )
MORTGAGE REAL ESTATE HOLDINGS,         )
LLC; RFC – GSAP SERVICER ADVANCE,      )
LLC; RFC ASSET HOLDINGS II, LLC; RFC   )
ASSET MANAGEMENT, LLC; RFC             )
BORROWER LLC; RFC CONSTRUCTION         )
FUNDING, LLC; RFC REO LLC; and RFC     )
SFJV- 2002, LLC,                       )
                                       )
                    Plaintiffs,        )
                                       )
v.                                     )
                                       )
UMB BANK, N.A., IN ITS CAPACITY AS     )
INDENTURE TRUSTEE FOR THE 9.625%       )
JUNIOR SECURED GUARANTEED NOTES        )

2

```
------------------------------------------------------------------------  )
DUE 2015 ISSUED BY DEBTOR                                                  )
RESIDENTIAL CAPITAL, LLC, WELLS                                           )
FARGO BANK, N.A., IN ITS CAPACITY AS                                      )
THIRD PRIORITY COLLATERAL AGENT                                          )
AND COLLATERAL CONTROL AGENT FOR                                        )
THE 9.625% JUNIOR SECURED                                                )
GUARANTEED NOTES DUE 2015 ISSUED                                        )
BY DEBTOR RESIDENTIAL CAPITAL, LLC,                                     )
AND THE AD HOC GROUP OF JUNIOR                                          )
SECURED NOTEHOLDERS,                                                    )
                                                                        )
                         Defendants.                                    )
                                                                        )
                                                                        )
------------------------------------------------------------------------
```

## COMPLAINT TO DETERMINE EXTENT OF LIENS
## AND FOR DECLARATORY JUDGMENT

Plaintiffs Residential Capital, LLC ("ResCap"), GMAC Mortgage LLC ("GMACM"),

Residential Funding Company, LLC ("RFC"), and each of their affiliated debtors and debtors in

possession (collectively, the "Debtors" or the "Plaintiffs") in the above-captioned Chapter 11

cases (these "Chapter 11 Cases," or the "Cases"), through their undersigned attorneys, seek a

declaratory judgment and allege as follows:

### NATURE OF ACTION

1.       This is an adversary proceeding pursuant to Rule 7001(2) and 7001(9) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), commenced by Plaintiffs

against defendants UMB Bank, N.A. ("UMB"), in its capacity as indenture trustee for the

9.625% Junior Secured Guaranteed Notes due 2015 issued by Debtor ResCap (the "Notes" or the

"Junior Secured Notes"); Wells Fargo Bank, N.A. ("Wells Fargo"), in its capacity as third

priority collateral agent and collateral agent for the Notes; and the Ad Hoc Group of Junior

Secured Noteholders (the "Ad Hoc Group" and, with UMB and Wells Fargo, the "Defendants").

Through this action, the Debtors seek to determine the extent of the liens securing the Notes.

2.      The Ad Hoc Group is advancing a position ostensibly on behalf of a group of

significantly undersecured Junior Secured Noteholders (the "JSNs") who are aggressively vying

to wrest control of these Chapter 11 Cases through the plan process.  To accomplish this task, the

Ad Hoc Group—in pleadings filed in this Court and in correspondence with the Debtors'

advisors—attempt to manufacture an oversecured position that allegedly entitles the JSNs to

postpetition interest through the misguided creation of collateral value that is premised upon

factual and legal fallacies.

3.      The JSNs collectively assert secured claims in the amount of $2.22 billion,

including principal and accrued prepetition interest.[1]  The Debtors believe that the value of the

collateral securing the Notes is approximately $1.511 billion.[2]  The Debtors' valuation is based

upon (i) the value attributed to those assets by their purchasers, Ocwen Loan Servicing, LLC

("Ocwen"), Walter Investment Management Corp. ("Walter"), and Berkshire Hathaway Inc.

("Berkshire"); and (ii) the value ascribed to those assets by the Debtors and their financial

advisors.  As such, the JSNs are not entitled to receive postpetition interest because they are

undersecured, even without giving effect to the pending adversary proceeding commenced by the

---

[1] The Ad Hoc Group has asserted that the JSNs are entitled to postpetition interest at the contractual default rate of 10.625%—the non-default rate is 9.625%.  The Debtors believe that if the JSNs were entitled to post-petition interest at all, such interest should be at the non-default rate.  The Debtors reserve all rights on the issue of the proper interest rate in the event it is determined that the JSNs are entitled to receive postpetition interest.

[2] In reaching this value, the Debtors took into account (i) the actual purchase price of the JSNs' collateral that has been sold to date, (ii) the Debtors' projections for the amount they will receive by monetizing the JSNs' remaining collateral, and (iii) the payment of expenses as authorized by the AFI/JSN Cash Collateral Order (as defined in ¶ 25) or the Revised AFI/JSN Cash Collateral Order (as defined in n.7), as applicable.

Official Committee of Unsecured Creditors (the "Committee"), which could potentially reduce the JSNs' secured claim by hundreds of millions of dollars.[3]

4.      The Ad Hoc Group has publicly contended, to the contrary, that the JSNs are oversecured.  In support of this position, the Ad Hoc Group has made the following assertions, each of which is disputed by the Debtors:

- First, the Ad Hoc Group asserts that the JSNs' lien on general intangibles entitles them to a lien on purported "goodwill" associated with the Debtors' servicing and origination platforms, and that such "goodwill" consists of any value paid for the Debtors' assets above and beyond the "market value" thereof.  This contention is contradicted by contemporaneous evidence demonstrating that, with respect to the servicing business, Ocwen and Walter paid only for the financial assets—i.e., mortgage servicing rights ("MSRs") and servicing advances—and attributed no value to the servicing and origination platforms.  Moreover, insofar as the JSNs do not have a lien on the MSRs themselves, or on the proceeds thereof, the JSNs' general intangibles lien could not extend to any purported "goodwill" generated by the sale of those MSRs, which are the primary assets required to operate the mortgage loan servicing business.

- Second, the Ad Hoc Group asserts that the JSNs are entitled to an adequate protection replacement lien in an amount equal to all of the JSNs' cash collateral the Debtors have used during the Chapter 11 Cases.  This overlooks the fact that the JSNs are entitled to such a lien only to the extent that the Debtors' use of cash

---

[3] See Complaint, *Official Comm. Of Unsecured Creditors v. UMB Bank, N.A.*, Case No. 12-12020 (MG), Adv. Pro. 13-01277 (MG) (Bankr. S.D.N.Y. Feb. 28, 2013) [Docket No. 3069, Adv. Pro. Docket No. 1].

5

collateral caused a diminution in the value of the JSN's collateral during the pendency of the Chapter 11 Cases. No such diminution in value has occurred. To the contrary, as a result of the Debtors' use of cash collateral, the value of the JSNs' collateral has increased in the aggregate during the pendency of the Cases and is worth far more as a result of the sale process conducted by the Debtors than if that collateral had been turned over to the JSNs at the outset of the Cases.

- <u>Third</u>, the Ad Hoc Group asserts that the JSNs have an equitable lien on all of the assets that secure the AFI LOC[4] despite the fact that Wells Fargo, in its capacity as collateral agent for each of the AFI Revolver and the Notes, expressly released the lien on all such assets in accordance with valid instructions provided by the Debtors. The Ad Hoc Group contends that the instructions were improper, and (presumably) that Wells Fargo should not have released the collateral. This is incorrect for the following reasons. The instruction was proper, because the JSN Indenture[5] expressly authorized the Debtors to reallocate those assets for permitted financings such as the AFI LOC. Alternatively, even if the JSNs might once have been able to assert that they had an equitable or other lien on the assets in question, they failed to perfect that lien and as a result the lien would be avoidable by operation of section 544(a) of the Bankruptcy Code.

---

[4] The "<u>AFI LOC</u>" is that certain $1.1 billion loan facility reflected by the Amended and Restated Loan Agreement, dated December 30, 2009, by and among RFC and GMACM, as borrowers, ResCap and certain other affiliates, as guarantors, and Ally Financial, Inc. ("<u>AFI</u>"), as agent and lender.

[5] The "<u>JSN Indenture</u>" is that certain Indenture dated as of June 6, 2008 among ResCap, as issuer, each of the guarantors, and U.S. Bank National Association, a national banking association, as the original indenture trustee (governing the Notes). A copy of the JSN Indenture is annexed hereto as <u>Exhibit 1</u>.

6

- **Fourth**, the Ad Hoc Group asserts that the JSNs' lien package includes a lien on any potential recoveries on avoidance actions successfully prosecuted by or on behalf of the Debtors' estates.  The Debtors submit that, to the contrary, the JSNs cannot have a lien on any recoveries resulting from avoidance actions prosecuted on behalf of the Debtors' estates. [6]

5.       For these reasons, and for the reasons discussed more fully below, the Debtors seek a declaratory judgment that (i) the JSNs' lien on general intangibles does not include any lien on the proceeds of, or value attributed to, the sale of assets to Ocwen or Walter; (ii) the JSNs are not entitled to an adequate protection replacement lien because (a) there has been no diminution in the value of the Defendants' collateral during the pendency of the Cases, and (b) the Debtors' use of cash collateral for the limited purposes set forth in the Debtors' Cash Collateral Motion[7] will not result in a diminution in the value of the Defendants' collateral; (iii) the JSNs are not entitled to a lien on the assets that secure the AFI LOC; and (iv) the JSNs are not entitled to a lien on any proceeds from avoidance actions prosecuted on behalf of the Debtors' estates. [8]  Accordingly, an actual, substantial, and justiciable controversy exists between the Plaintiffs and the Defendants sufficient to warrant the declaratory relief requested herein.

---

[6] The JSNs further assert that they have a lien on any recoveries deriving from veil-piercing or alter ego claims held by the Debtors.  Plaintiffs believe the adversary proceeding filed by the Committee against the Defendants will fully address and dispose of that issue.

[7] The "Cash Collateral Motion" is the *Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral*, filed on April 8, 2013 [Docket No. 3374] (and any order entered by the Court with respect to the Cash Collateral Motion, the "Revised AFI/JSN Cash Collateral Order").

[8] The JSNs have also asserted that their lien on intercompany claims provides additional security for their claims.  However, the JSNs' lien on intercompany claims is not a subject of this Complaint, and the Debtors are not seeking a declaratory judgment with respect thereto through this Complaint.  Contemporaneously with this Complaint, the Debtors are amending their

(Footnote continues on next page.)

## JURISDICTION AND VENUE

6.      On May 14, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for

relief commencing these Chapter 11 Cases.  The Debtors continue to operate their businesses and

manage their properties as debtors in possession.

7.      This is an adversary proceeding (an "Adversary Proceeding") pursuant to

Bankruptcy Rule 7001(2) and (9).

8.      The Court has original jurisdiction over this Adversary Proceeding pursuant to 28

U.S.C. § 1334(b), in that this is a civil proceeding arising in or related to cases under Title 11 of

the United States Code.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and

(O).

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     Pursuant to Rule 7008-1 of the Local Rules of the United States Bankruptcy Court

for the Southern District of New York, Plaintiffs consent to entry of final orders and judgment by

this Court if it is determined that this Court, absent consent of the parties, cannot enter final

orders or judgment consistent with Article III of the United States Constitution.

## THE PARTIES

11.     The above-captioned Plaintiff Debtors are debtors and debtors in possession under

Chapter 11 of the Bankruptcy Code.  The Debtors bring this action on behalf of each of their

estates.

12.     Defendant UMB is the successor Trustee under the JSN Indenture governing the

Notes.

_____

(Footnote continued from previous page.)

statements and schedules to reflect that the intercompany claims are contingent, disputed and
unliquidated, and have little, if any, value.

13.     Defendant Wells Fargo serves as the third priority Collateral Agent and Collateral Control Agent under that certain Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009 (the "JSN Pledge Agreement").

14.     The Ad Hoc Group is an unofficial group that, through counsel, has appeared in these Chapter 11 Cases and has participated in these Cases through the filing of various pleadings, the service of various discovery requests and appearances at hearings before this Court.

### NECESSITY OF DECLARATORY RELIEF

15.     An actual controversy of sufficient immediacy exists here to justify the declaratory relief sought.  Throughout these Chapter 11 Cases, the Ad Hoc Group has taken the position that the JSNs are fully secured and entitled to post-petition interest.

16.     For example, in briefing before the Court, the Ad Hoc Group has stated:

- "The Junior Secured Noteholders' claim is now equal to 115.7% of the face amount of the bonds and is currently increasing by virtue of the accrual of post-petition interest at the rate of approximately $250 million per year." *Objection of the Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* at n.1, In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Apr. 29, 2013) [Docket No. 3553].

- [T]o the extent standing is conferred on either the Committee or Wilmington, such parties cannot be granted consent rights over any settlement of the Estate Claims or Holdco Claims, particularly in light of the fact that up until the point that the Junior Secured Notes claims are paid in full including post-petition interest, the Junior Secured Noteholders are the primary beneficiaries of the claims at issue." *Omnibus Objection of the Ad Hoc Group of Junior Secured Noteholders to (I) The Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates, and (II) the Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Notes Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the*

*Residential Capital, LLC Estate* at 3, In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Apr. 30, 2013) [Docket No. 3563].

- "The Junior Secured Noteholders alone have accrued post-petition interest in the amount of more than $180 million since the petition date, including more than $100 million since the Court first extended the Debtors' exclusive periods in September." *Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof* at 6, In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Feb. 21, 2013 [Docket No. 2997].

- "Any plan for each of these Debtors that does not pay the Junior Secured Noteholders in full, including postpetition interest, necessarily hinges on Junior Secured Noteholder support." *Statement of Ad Hoc Group of Junior Secured Noteholders in Connection with the Response of the Official Committee of Unsecured Creditors to Debtors' Motions for (i) Appointment of a Chief Restructuring Officer and (ii) Entry of an Order Further Extending Their Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof* at 5, In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Mar. 4, 2013) [Docket No. 3087].

- "[T]he unsecured bondholders would receive only a small portion, if any, of the proceeds recovered on estate causes of action because nearly all funds recovered by Residential Capital, LLC inure to the benefit of the Junior Secured Noteholders—who possess all-asset liens against that Debtor entity—until the Junior Secured Noteholders have received payment in full, including post-petition interest." Id. at 6 n.9.

17.    The Ad Hoc Group thus has taken positions that the Debtors believe are flatly contrary to the facts and applicable law. The positions taken by the Ad Hoc Group have created a real and substantial barrier to plan negotiation and formulation. The Ad Hoc Group—which is believed to maintain a "blocking" position by holding approximately 51% of the Notes—will continue to assert an improper and overreaching demand for postpetition interest until resolution is reached concerning the extent of the liens held by the JSNs, and in so doing, will prevent or substantially hinder the formulation of a plan of reorganization.

## FACTUAL BACKGROUND

### The JSNs' Collateral Package

18.      On December 30, 2009, ResCap and certain of its affiliates entered into the JSN

Pledge Agreement, pursuant to which ResCap, GMACM, RFC, and certain other Debtor grantors

and guarantors granted or guaranteed all-asset liens in favor of the JSNs, including liens on

general intangibles, subject to certain specific exclusions discussed below.  See JSN Pledge

Agreement §§ 2-5.  In addition, while not relevant here, (i) various Debtor and non-debtor

entities pledged certain equity interests and interests in certain notes to the JSNs; (ii) RFC Asset

Holdings II, LLC ("RAHI") and Passive Asset Transactions, LLC ("PATI") pledged their

interests in all financial assets, including financial asset-backed securities, deposit accounts and

security accounts, to the JSNs; and (iii) various Debtor and non-debtor entities pledged their

interests in all deposit accounts identified on Schedule X of the JSN Pledge Agreement, as well

as the proceeds thereof.  See id.[9]

---

[9] The JSNs hold second priority liens on this collateral.  The first priority liens are held
by AFI, in its capacity as agent and lender under a loan agreement among Debtors RFC and
GMACM, as borrowers, various Debtor affiliates, as guarantors, and AFI, as agent and lender (as
amended from time to time, the "AFI Senior Secured Credit Facility", or the "AFI Revolver").
As of the Petition Date, the outstanding principal amount of the AFI Senior Secured Credit
Facility was approximately $747 million.  To accommodate this dual lien structure, Debtors
ResCap, GMACM and RFC entered into that certain Intercreditor Agreement, dated as of June 6,
2008, by and among (i) Wells Fargo Bank, N.A., as first priority collateral agent for AFI under
the AFI Senior Secured Credit Facility, (ii) Wells Fargo Bank, N.A., as second priority collateral
agent for the holders of the 8.5% senior secured notes due 2010 (the "Senior Secured Notes"),
(iii) Wells Fargo Bank, N.A., as third priority collateral agent for the holders of the Notes, (iv)
AFI in its capacity as agent for the lenders under the AFI Senior Secured Credit Facility, (v) U.S.
Bank National Association, as Trustee under the indenture governing the Senior Secured Notes,
and (vi) U.S. Bank National Association, as Trustee under the JSN Indenture.  On May 15, 2010,
the Senior Secured Notes were repaid at maturity, and the Junior Secured Notes effectively
stepped into the position of the Second Priority Secured Parties.

11

19.    As noted above, the JSN Pledge Agreement contains significant exclusions to the

JSNs' collateral.  As relevant here, the JSNs' lien explicitly excludes:

> (c) any asset, including any account, note, contract, lease,
> financing arrangement, general intangible, equity investment,
> interests in joint ventures or other agreement to the extent that the
> grant of a security interest therein would violate applicable
> Requirements of Law, result in the invalidation thereof or provide
> any party thereto with a right of termination or default with respect
> thereto or with respect to any Bilateral Facility to which such asset
> is subject as of the Issue Date (in each case, after giving effect to
> applicable provisions of the UCC and other applicable
> Requirements of Law and principles of equity); . . . [and]
> (f) proceeds and products of any and all of the foregoing excluded
> assets described in clause (a) through (e) above only to the extent
> such proceeds and products would constitute property or assets of
> the type described in clause (a) through (e) above.

JSN Pledge Agreement § 1 (definition of "Excluded Assets").  Under this definition, excluded

assets include, among other things, (a) the collateral securing the "Bilateral Facilities"[10] (b) the

Debtors' servicing rights and advances[11] related to mortgage loans sold into securitization trusts

guaranteed by the Government National Mortgage Association ("Ginnie Mae") (the "Ginnie Mae

Servicing Rights and Advances"), and (c) the proceeds and products of any of the foregoing.[12]

---

[10] The documents underlying each of the Bilateral Facilities prohibit additional liens on
their respective collateral.  One example of a Bilateral Facility is that certain credit facility
provided by Citibank, N.A. ("Citibank") to GMACM, pursuant to which Citibank provided the
Debtors with financing to fund the origination or acquisition of Fannie Mae and Freddie Mac
mortgage loan servicing rights (the "Fannie/Freddie MSRs"), which served as collateral under
the facility (the "Citibank MSR Facility").  Because the Citibank MSR Facility is a Bilateral
Facility and the underlying documents prohibit a second lien on Citibank's collateral, the JSNs
do not have a lien on the Fannie/Freddie MSRs.

[11] The JSNs maintain a lien on certain servicing advances other than advances that relate
to mortgage loans guaranteed by Ginnie Mae.

[12] Section 21-6 of the Ginnie Mae Mortgage-Backed Securities Guide generally provides
that pledges of servicing income related to Ginnie Mae Servicing Rights and Advances are

(Footnote continues on next page.)

20.     Thus, the assets that are currently collateral for the Bilateral Facilities that were in existence on June 6, 2008, as well as the Ginnie Mae Servicing Rights and Advances, and the proceeds thereof, are specifically excluded from the JSNs' collateral under the JSN Pledge Agreement.

**The Debtors' Asset Sales**

21.     On October 23-25, 2012, the Debtors held two auctions (collectively, the "Auctions") for the sale of their assets.  Following the Auctions, the Debtors declared Ocwen and Walter as the winning bidders for the Debtors' mortgage loan origination and servicing platforms at a price of $3 billion (the "Platform Sale"), and Berkshire as the winning bidder for the legacy loan portfolio at a price of $1.5 billion (the "Legacy Sale," and together, the "Sales").  On November 21, 2012, the Court entered orders approving each of the Sales [Docket Nos. 2246 and 2247].  A bifurcated closing of the Ocwen APA occurred on January 31, 2013 and February 15, 2013.

22.     The Platform Sale was effectuated through the Asset Purchase Agreement, dated as of November 2, 2012, between Ocwen and ResCap (along with certain other Debtors) (the "Ocwen APA").[13]

23.     Section 2.1 of the Ocwen APA identifies the assets that Ocwen purchased in the transaction (as defined in the Ocwen APA, the "Purchased Assets").  Those assets included "the goodwill and other intangible assets Related to the Business or related to the Purchased Assets." Ocwen APA § 2.1(v).

---

(Footnote continued from previous page.)

permitted with Ginnie Mae approval.  Ginnie Mae has not consented to a lien on the Ginnie Mae Servicing Rights and Advances in favor of the JSNs.

[13] A copy of the Ocwen APA (excluding certain exhibits) is annexed hereto as Exhibit 2.

24.     Rather than provide an arbitrary allocation of the total purchase price, the Ocwen

APA provides for a *methodology* for arriving at the purchase price based on the book value of

the Purchased Assets.  Section 3.1(a) of the Ocwen APA provides that the purchase price for the

Purchased Assets is to be calculated pursuant to Schedule 3.1(a) to the Ocwen APA (the

"Purchase Price Schedule").[14]  The Purchase Price Schedule, in turn, provides a specific

methodology for calculating the purchase price for each class of Purchase Asset, as follows:

- MSRs and Fee-Based Subservicing.  The purchase price for the MSRs and fee-based subservicing transferred under the Ocwen APA is calculated as the product of (i) the UPB of the underlying mortgage loans and (ii) the product of the net servicing fee earned by the Debtors for the category of MSR or third-party subservicing agreement and a certain multiplier agreed to by the Purchasers.

- Servicing Advances.  The purchase price for the Debtors' right to be reimbursed for servicing advances (as defined in the Ocwen APA, the "Servicing Advances") transferred under the Ocwen APA is calculated as the product of the outstanding amount of such Servicing Advances and an applicable percentage based on the category of Servicing Advances agreed to by the Purchasers.

- Certain Other Assets.  The purchase price for certain other receivables and prepaid expenses transferred under the Ocwen APA is calculated as the product of the book value of such assets and a certain applicable percentage.

- All Other Assets.  All other Purchased Assets, including "goodwill and other intangible assets" were allocated $0.00 of the purchase price under the Purchase Price Schedules.[15]

**Plaintiffs' Use of Defendants' Collateral**

25.     On June 25, 2012, this Court entered its *Final Order Under Sections 105, 361,*

*362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I)*

---

[14] A copy of the Purchase Price Schedule is annexed hereto as Exhibit 3.

[15] In addition, the Purchase Price Schedule provides that the purchase price for the Purchased Assets will include $125 million in "incremental value."  As part of the closing under the Ocwen APA, the purchasers provided the Debtors with a pro rata distribution of this incremental value over the Purchased Assets that were assigned value under the methodology described above.

*Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II)*

*Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to*

*Adequate Protection Parties* [Docket No. 491] (the "AFI/JSN Cash Collateral Order").[16]  The

AFI/JSN Cash Collateral Order granted the Debtors the authority to use the JSNs' cash collateral

"for the purposes detailed within the Initial 20-Week Forecast and each subsequent Forecast…."

Id. ¶ 15.  Prior to the Petition Date and throughout the Cases, the JSNs have been provided with

the Forecasts (as defined in the AFI/JSN Cash Collateral Order), and the Debtors have paid

certain administrative expenses with the JSNs' cash collateral consistent with such Forecasts.

26.    Specifically, pursuant to the AFI/JSN Cash Collateral Order, the Debtors have

used cash collateral to, among other things, fund the cash needs related to the management of the

operations and assets of the JSNs' collateral pool.  In exchange, the JSNs were granted various

forms of adequate protection in accordance with Section 363(c) of the Bankruptcy Code,

including replacement liens and a superpriority adequate protection claim to the extent of any

diminution in the value of their collateral due to the Debtors' use of their cash collateral.

27.    As a result of the Debtors' use of the JSNs' cash collateral to operate their

business in the ordinary course—thereby preserving and increasing the value of the JSNs'

collateral—the Debtors were able to achieve substantially more value for this collateral than

most thought possible as of the commencement of these Chapter 11 Cases—certainly more value

than the JSNs could have realized if their collateral was handed over to them pre-petition.

---

[16] The Debtors' authority to use cash collateral expired upon the closing of the Platform
Sale.  While the JSNs initially granted several consensual extensions, the JSNs have not
consented to the use of cash collateral beyond May 14, 2013.  As a result, on April 8, 2013, the
Debtors filed the Cash Collateral Motion requesting to continue using cash collateral under a
revised expense allocation methodology, which would become effective as of May 1, 2013.

**The AFI LOC**

28.     In late 2008, AFI as initial lender and lender agent executed a $430 million loan agreement with two ResCap subsidiaries as borrowers.  In June 2009, AFI executed another $370 million loan agreement with two ResCap subsidiaries as borrowers.  On December 30, 2009, these two credit facilities were merged into the $1.6 billion AFI LOC.

29.     Currently, the AFI LOC is secured by certain assets of the Debtors, including, without limitation, certain mortgage loans secured by properties located in the United States; certain notes and related agreements issued by third parties that are held by PATI and RFC; certain equity interests of special purpose vehicles (including a pledge by RFC of 100% of the equity of Equity Investment I, LLC; a pledge by PATI of 100% of the equity of PATI Real Estate Holdings, LLC, and a pledge by RAHI of 100% of the equity of RAHI Real Estate Holdings, LLC); certain MSRs; and certain Freddie Mac-related servicing advances.

30.     From time to time, in order to maintain the borrowing base under the AFI LOC as collateral turned over in the ordinary course, the Debtors posted additional collateral to the AFI LOC.  Beginning in 2009, Wells Fargo, in its capacity as collateral agent and collateral agent for each of the AFI Senior Secured Credit Facility and the Notes, executed releases of AFI's and the JSNs' liens on the collateral in accordance with the terms prescribed by the Intercreditor Agreement[17] and the JSN Indenture.  The released collateral was then pledged to the AFI LOC.

---

[17] The "Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of June 6, 2008, by and among (i) ResCap, (ii) GMACM, (iii) RFC, (iv) Wells Fargo Bank, N.A., as first priority collateral agent for AFI under the AFI Senior Secured Credit Facility, (v) Wells Fargo Bank, N.A., as second priority collateral agent for the holders of the Senior Secured Notes, (vi) Wells Fargo Bank, N.A., as third priority collateral agent for the holders of the Junior Secured Notes, (vii) AFI in its capacity as agent for the lenders under the AFI Senior Secured Credit Facility, (viii) U.S. Bank National Association, as Trustee under the indenture governing the Senior Secured Notes, and (ix) U.S. Bank National Association, as Trustee under the JSN Indenture.  On May 15, 2010, the Senior Secured Notes were repaid at maturity, and the Junior

(Footnote continues on next page.)

Because the AFI LOC provided the Debtors with its primary source of operational liquidity, the

Debtors would use the funds available under the AFI LOC to purchase assets (most commonly,

repurchases of mortgage loans that had been sold into securitization trusts guaranteed by Ginnie

Mae) and, once the borrowing base under the AFI LOC was met, such assets would become

collateral to the AFI Revolver and Notes, notwithstanding the fact that they had been purchased

using AFI LOC funds.  Thus, the AFI Revolver, Notes, and AFI LOC maintained a symbiotic

relationship, as each benefitted from the existence of the other.

**The Committee's Adversary Proceeding**

31.    On February 28, 2013, the Committee filed an adversary proceeding against UMB

and Wells Fargo for declaratory judgment, avoidance of liens, and disallowance of claims.  As

set forth in that complaint, the Committee brings claims for (i) declaratory judgment concerning

"released bilateral facilities collateral," (ii) declaratory judgment concerning "unencumbered real

property,"  (iii) declaratory judgment concerning "assets of non-obligor debtors," (iv) declaratory

judgment concerning "released mortgage loans," (v) declaratory judgment concerning

"characterization of the BMMZ Facility," (vi) declaratory judgment concerning the "Deposit

Accounts," (vii) declaratory judgment concerning "priority of liens of notes collateral," (viii)

declaratory judgment concerning "commercial tort claims," (ix) avoidance of unperfected liens

with respect to deposit accounts, (x) avoidance of unperfected liens with respect to other

property, (xi) avoidance of preferential transfers, (xii) objection to allowance of claims due to

pending avoidance actions, (xiii) objection to allowance of claims due to inclusion of unmatured

---

(Footnote continued from previous page.)

Secured Notes effectively stepped into the position of the Second Priority Secured Parties.  A
copy of the Intercreditor Agreement is annexed hereto as <u>Exhibit 4</u>.

interest, and (xiv) recharacterization of payment of fees, costs and expenses.  The claims asserted by the Committee in that action are wholly distinct from those set forth in this Complaint.

**Improper Lien Assertions By The JSNs**

32.    The Ad Hoc Group, through various pleadings and other communications with the Debtors and their advisors, have alleged and continue to assert that the JSNs hold certain liens that, taken together, would create an oversecured position entitling the JSNs to postpetition interest.  The Debtors dispute these assertions.

33.    Accordingly, a case and controversy exists with respect to the validity and extent of the liens asserted by the Ad Hoc Group on behalf of the JSNs.  The Ad Hoc Group has used these purported liens as the foundation for its argument that the JSNs are oversecured and thus entitled to postpetition interest in the Cases.  The Debtors seek the relief requested herein to resolve expeditiously the issues raised by the Ad Hoc Group so as to allow for the timely formulation of a Chapter 11 plan for the benefit of the estates and all parties in interest.

A.    *The JSNs' Lien on General Intangibles*

34.    The Ad Hoc Group asserts that the JSNs' lien on general intangibles under the JSN Pledge Agreement entitles the JSNs to any excess value received from the sale of the Debtors' assets that might otherwise be considered unencumbered.  Specifically, the Ad Hoc Group claims that Ocwen paid more than market value for the Purchased Assets in order to obtain Plaintiffs' servicing and origination platforms.  The Ad Hoc Group maintains that this enhanced value is "goodwill" attributable to the sale of the platforms and is covered by their lien on general intangibles.

35.    As a matter of fact, Ocwen did not pay for—and attributed no value to—anything other than financial assets.  Ocwen has its own loan servicing platform and intended to service any MSRs purchased from the Debtors using that platform.  Indeed, Ocwen's initial bid did not

18

even include the purchase of the Debtors' servicing platform.  As stated at the auction, Ocwen

bid on the platform assets only after the Debtors offered a credit to the bidders for their

agreement to acquire the servicing and origination platforms.  While these platforms were

ultimately included in Ocwen's bid, Ocwen did not need them; it had its own servicing platform

and accordingly attributed no value to the Debtors' platform.

36.     The transaction documentation supports this view.  Ocwen and Walter, in

connection with the closing of the Platform Sale, executed a Purchase Price Calculation that

contains an allocation of the purchase price by asset classes in accordance with the Purchase

Price Schedule.  As set forth above, the allocation clearly reveals that Ocwen ascribed no value

whatsoever to the "goodwill" and "other intangible assets" associated with the Purchased Assets.

Similarly, as evidenced by the purchase price allocation, Walter ascribed no value to the

origination platform that it purchased.

37.     If, contrary to fact, Ocwen had paid additional consideration for the servicing

platform, the JSNs would not have a lien on such proceeds because, as set forth above, they have

no lien on the associated MSRs—any such lien was explicitly released by Wells Fargo, as

collateral agent.  See Exhibit 5 (collateral release).  Moreover, valuation of an asset is properly

determined by assessing the value the lender could have achieved had it liquidated the collateral

itself.  The JSNs obviously could not have sold Debtors' servicing business without having a lien

on the MSRs—the primary assets needed to operate the servicing business.  Accordingly, the

JSNs' lien on general intangibles does not extend to any value attributable to the sale of the

Debtors' servicing platform to Ocwen.

### B.     *Adequate Protection Lien*

38.     While the JSNs have been granted an adequate protection lien to the extent of any

diminution in the value of their collateral due to the Debtors' use of cash collateral, such lien has

ny-1073732

no value because (a) there has been no diminution in the value of the Defendants' collateral during the pendency of the Cases, and (b) the Debtors' use of cash collateral for the limited purposes set forth in the Debtors' Cash Collateral Motion will not result in a diminution in the value of the Defendants' collateral.  In fact, the value of the JSNs' collateral has increased since the Petition Date.

39.     The proper benchmark for calculating adequate protection is the value that the creditor would have realized had it obtained possession of the collateral at the petition date and moved forward with a commercially reasonable liquidation under commercially practical and reasonable circumstances (after deducting the costs the creditor would have incurred in connection with such liquidation).  This method accurately reflects the value of the collateral from the perspective of the purpose that adequate protection is designed to serve, namely protecting the creditor's interest in the event the debtor defaults.  This method also is appropriate because the underlying assets are not typically traded on a recognized market.  As set forth above, because the JSNs do not have a lien on certain of the material assets necessary to operate the business—most notably Plaintiffs' MSRs—valuing the collateral based on what the JSNs could have received had they foreclosed and sold their collateral, rather than the value that was actually received by selling the assets as part of a going concern business, is appropriate. Finally, adequate protection is designed to prevent any degradation in a secured lending position as a result of the imposition of the automatic stay.  Courts therefore evaluate the value of a secured lender's collateral as of the imposition of the automatic stay and in light of any available remedies as of the petition date.

40.     If the JSNs had foreclosed on their collateral as of the Petition Date, the value realized by the JSNs would have been far less than the value realized through the Debtors'

continued management of these collateral assets and the resulting sale of those assets.  The

increase in value attributable to the successful management of these assets exceeds any

diminution in value caused through the use of the JSNs' cash collateral.  Moreover, the Debtors

propose to use the JSNs' cash collateral after May 1, 2013 solely to fund the costs of the

preservation, maintenance and disposition of the JSNs' remaining collateral—a use that, by its

very nature, constitutes adequate protection of the JSNs' interests.

      41.     Any argument to the contrary by the JSNs ignores the context in which the JSNs'

would have had to monetize their collateral out of Court.  If the JSNs foreclosed on their

collateral and sought to sell it in a commercially reasonable sale, much of their collateral would

have been either uncollectable or significantly diminished in value.  If the JSNs had foreclosed,

the GAs would have almost certainly pulled the Debtors' ability to continue servicing their

loans and the business would have been unable to continue operating as a going concern.  The

JSNs' collateral value would have been at extreme risk—with the Debtors no longer able to

service loans,[18] the counter-parties to the Debtors' servicing agreements would have been

required to transfer servicing and undoubtedly would have asserted setoff rights against the

Debtors, rendering the collectability of the over $800 million in servicer advances that serve as

collateral to the JSNs highly suspect.  With respect to the mortgage loans that comprise the bulk

of the JSNs' additional collateral value, because the JSNs do not have the proper licenses to

hold mortgage loans, it is unclear whether they would have been able to immediately take

---

[18] Even if the JSNs had somehow figured out a means to continue the Debtors' servicing
operations (in spite of the fact that, as discussed above, they do not have a lien on the servicing
rights), it is abundantly clear that no party would have purchased such servicing rights without
severing from them the related liabilities that were largely the cause of the Debtors' bankruptcy
filing.  Thus, under any out-of-court scenario, the JSNs would have had to attempt to sell the
servicer advances separate and apart from the servicing rights that provide the means for the
repayment of those advances.

possession of such loans and monetize them in the ordinary course. With respect to loans

owned by the Debtors that are insured by the Federal Housing Administration or guaranteed by

the Department of Veterans Affairs, because the Debtors have remained an authorized Ginnie

Mae issuer throughout the Cases, they have been able to modify many of these loans and sell

them back into Ginnie Mae securitization pools, which allows the Debtors to achieve a purchase

price above par. Had the JSNs foreclosed, this ability would have been lost, and even with the

insurance/guarantees on such loans, the JSNs would have recovered substantially less than the

Debtors have been able to recover throughout the Cases. Accordingly, the JSNs are not entitled

to any lien based upon diminution in the value of the collateral securing the Notes.

### C.    *Lien on AFI LOC Collateral*

42.    In communications with the Debtors, the Ad Hoc Group asserts that the JSNs

have a continued lien on the assets that secure the AFI LOC. The Ad Hoc Group argues that the

Debtors improperly caused the release of the collateral securing the Notes to instead serve as

collateral for the AFI LOC purportedly in violation of the JSN Indenture and the JSN Pledge

Agreement. Without contesting the undisputed fact that the collateral was indeed released by

Wells Fargo in its capacity as collateral agent, the JSNs contend that they are nonetheless entitled

to an equitable lien on the released collateral.

43.    As an initial matter, the JSN Indenture demonstrates that the AFI LOC was a

permitted financing under the JSN Indenture and that the pledge of these assets to serve as

collateral for that permitted financing did not violate the terms of the JSN Indenture.

44.    The JSN Indenture expressly permits ResCap to incur "Permitted Funding

Indebtedness," which is defined as:

> **Indebtedness incurred in the ordinary course through financing,
> securitization and hedging activities, including customary lines
> of credit**, repurchase transactions or warehouse financings

22

> involving residential mortgage loans, home equity loans or second
> lien loans (including any reasonable extension or evolution of such
> activities including for purposes of financing other types of
> financial assets) and other Indebtedness on terms at least as
> favorable to the Company or the applicable Subsidiary than [sic]
> would be available on an arms-length basis.

JSN Indenture § 1.01 (emphasis added). The AFI LOC qualifies as Permitted Funding

Indebtedness under this definition, and could qualify under other permitted financing allowances

as well. See id. § 4.09.

45.    The AFI LOC is a financing arrangement—a line of credit—that the Debtors

entered into in the ordinary course of their business. As such, it is a permitted financing under

the JSN Indenture. The terms of the AFI LOC are at least as favorable as those that would have

been available on an arms-length basis. AFI agreed to provide the Debtors with much-needed

liquidity at times when no other institution was prepared to offer credit.

46.    The instruction to release, and the subsequent release, of the collateral on which

the Ad Hoc Group claims a lien were undertaken in accordance with the terms of the JSN

Indenture. Section 8.04 of that document provides that:

> Collateral may be released from the Lien and security interest
> created by the Security Documents at any time or from time to
> time in accordance with the provisions of the Intercreditor
> Agreement. In addition, the Liens on any Collateral shall be
> released . . . upon the sale, transfer or other disposition of such
> property or assets (other than to the Company or a Guarantor) to
> the extent not prohibited under Section 4.10 hereof, the Lien of the
> Security Documents shall be released on the assets so transferred.

JSN Indenture § 8.04(a)(i).

47.    The Intercreditor Agreement to which Section 8.04 of the JSN Indenture refers

provides that the collateral agent may release the liens of the JSNs on any part of the collateral in

connection with "any sale, lease, exchange, transfer or other disposition of any Collateral (other

than to another Obligor) permitted under the terms of the [documents governing the Notes and

the AFI Revolver]". See Intercreditor Agreement § 5.1. The Intercreditor Agreement also

provides that if the first priority collateral agent (i.e., Wells Fargo) releases the lien on collateral

securing the AFI Revolver, the JSNs' liens are to "be automatically and unconditionally released

with no further consent or action of any Person[.]" Id. Here, Wells Fargo, as collateral agent

for each of AFI and the JSNs consented to, and hence effectuated such release. See Exhibit 6

(collateral release).

48.    The release of the JSNs' liens in connection with the re-pledging of the property

as collateral for the AFI LOC constitutes a "sale, lease, exchange, transfer or other disposition"

of the collateral not otherwise prohibited by the applicable provisions of the JSN Indenture.

Thus, the liens at issue were properly released under the Intercreditor Agreement and/or the JSN

Indenture.

49.    Finally, the JSN Indenture permits the Debtors to grant liens on the collateral that

was released pursuant to the terms of the JSN Indenture. Specifically, the JSN Indenture, in

Section 1, allows the Debtors to grant "Permitted Liens," which include:

> Liens on Financing Assets securing Permitted Funding
> Indebtedness; provided that such Liens on Financing Assets shall
> be deemed to be a sale of such Financing Assets for all purposes of
> this Indenture, including without limitation, Section 4.10 and
> Section 8.04 and, in the case of Primary Collateral (including any
> required placement thereof), shall be permitted only to the extent
> that such sale and the use of proceeds thereof would comply with
> Section 4.10.

JSN Indenture § 1.01 (definition of "Permitted Liens," subpart (p)).[19] The JSN Indenture defines

"Financing Assets" as "whole loan mortgages, residual interests, securities…and other [related]

financial assets…." Id.

---

[19] Liens securing the AFI LOC also could have been permitted under other provisions of
the definition of Permitted Liens. See JSN Indenture § 1.01.

50.     The collateral that was released from the Notes and pledged to AFI under the AFI

LOC—which includes mortgages loans, certain notes, equity pledges, mortgage loan servicing

rights and certain servicing advances—meets the definition of "Financing Assets" under the JSN

Indenture.  Thus, those Financing Assets can be used to secure Permitted Funding Indebtedness

(which includes the AFI LOC) as long as the Debtors meet the requirements set forth in Sections

4.10 and 8.04 of the JSN Indenture.

51.     The Debtors do meet those requirements.  Section 4.10 applies only to Primary

Collateral.[20]  The Collateral pledged to the AFI LOC did not include Primary Collateral; the

section is thus inapplicable to the pledge of that collateral.  Section 8.04 of the JSN Indenture

permits the release of collateral so long as that release is accomplished in accordance with the

terms of the Intercreditor Agreement.  As set forth in Paragraphs 47 through 48 above, the

release of the collateral was permitted by the terms of the Intercreditor Agreement, and,

therefore, satisfies Section 8.04 of the JSN Indenture.

52.     In sum, the release of the collateral securing the Notes and its subsequent pledge

to secure the AFI LOC was accomplished in accordance with the terms of the JSN Indenture and,

therefore, was wholly proper.  The JSNs cannot assert any lien—equitable or otherwise—on that

collateral.

53.     Even if the release of the collateral is deemed to have been improper, the JSNs'

lien on the AFI LOC collateral was nevertheless terminated.  The lien was released intentionally

---

[20] "Primary Collateral" means initial collateral (identified on Schedule VI of the JSN
Pledge Agreement), real estate owned property acquired as a result of foreclosures of Primary
Collateral, reinvestment collateral (which is collateral or supporting assets substantially
equivalent to the net cash proceeds received upon a sale of collateral), or any assets acquired as a
result of exercising remedies with respect to the foregoing, and all proceeds of the foregoing.
See JSN Pledge Agreement § 1.

in 2009 by Wells Fargo, the collateral agent, in strict adherence with all applicable agreements and with the full knowledge and assent of the JSNs, through their Collateral Agent, Wells Fargo, that the collateral was being released. The JSNs cannot now—some four years later—claim that any lien on the AFI LOC collateral exists. Moreover, as noted above, the AFI Revolver and the Notes benefitted from the AFI LOC because, once the borrowing base under the AFI LOC was met, the Debtors commonly used funds available under the AFI LOC to purchase assets that ultimately were pledged to the AFI Revolver and the Notes.

54.    Finally, any lien on the AFI LOC collateral that could possibly be asserted by the JSNs is subject to avoidance. The JSNs have failed to record and properly perfect any alleged equitable lien prior to the Petition Date. Any properly recorded lien, therefore—including the lien under the AFI LOC—has priority over the alleged lien. As debtors in possession, Plaintiffs stand in the shoes of a hypothetical judicial lien creditor, who may avoid equitable liens if, among other reasons, the purported lienholder did not obtain equitable lien judgments before the petition date or commence an action to impose an equitable lien. See 11 U.S.C. § 544(a). The alleged lien should, therefore, be avoided if it is determined that such equitable lien exists.

### D.    *Lien on Avoidance Actions*

55.    In communications with the Debtors, the Ad Hoc Group has asserted that its collateral package includes a lien on the recoveries of certain potential avoidance actions—e.g., preference and fraudulent conveyance actions seeking recovery of assets that may have one time been their collateral—brought by or on behalf of the Debtors.[21]

---

[21] The JSNs have also asserted that they may have a lien on the proceeds of other potential actions against AFI such as the alleged veil piercing/alter ego claims. Whether the JSNs have a lien on such actions is already the subject of an adversary proceeding filed against the JSNs by the Committee, which seeks declaratory relief that the JSNs' lien does not extend to

(Footnote continues on next page.)

56.    The Debtors submit that under applicable law, the JSNs cannot have a lien on any of the potential recoveries of a preference or fraudulent conveyance.  Section 551 of the Bankruptcy Code states that any transfer avoided under the provisions of the Bankruptcy Code is preserved for the benefit of the estate.  Moreover, under the provisions of Section 552(a) of the Bankruptcy Code, property acquired postpetition by the estate is not subject to any prepetition lien.   Accordingly, the JSNs cannot assert a lien on any of the recoveries resulting from any potential avoidance actions.

## COUNT I
### (For a Declaratory Judgment – Lien on General Intangibles)

57.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 56 as if fully set forth herein.

58.    Defendants assert that a portion of the purchase price for the assets sold pursuant to the Ocwen APA is attributable to the "intangible" value of the business to which their lien on general intangibles should attach.

59.    Plaintiffs contend that, for the reasons set forth in Paragraphs 34 through 37 above, the JSNs' lien on general intangibles does not include any lien on the proceeds of, or value attributed to, the sale of assets to Ocwen.

60.    Accordingly, an actual, substantial, and justiciable controversy exists between the Plaintiffs and Defendants regarding the extent of the Defendants' lien on proceeds of the sale of assets to Ocwen.  The resolution of this controversy will allow for the timely formulation of a

---

(Footnote continued from previous page.)

unspecified Commercial Tort Claims and seeks avoidance of any such lien to the extent it exists. Accordingly, such assertions by the JSNs are not the subject of this Complaint.

Chapter 11 plan. This Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant the declaratory relief requested in this Count.

## COUNT II
### (For a Declaratory Judgment – Adequate Protection Lien)

61.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 60 as if fully set forth herein.

62.     Defendants assert that they are entitled to an adequate protection lien premised upon, and in the amount of, the alleged diminution in the value of the collateral securing the Notes since the inception of these Chapter 11 Cases.

63.     Plaintiffs contend that, for the reasons set forth in Paragraphs 38 through 41 above, the JSNs are not entitled to an adequate protection replacement lien because (a) there has been no diminution in the value of the Defendants' collateral during the pendency of these Chapter 11 Cases, and (b) the Debtors' use of cash collateral for the limited purposes set forth in the Debtors' Cash Collateral Motion will not result in a diminution in the value of the Defendants' collateral.

64.     Accordingly, an actual, substantial and justiciable controversy exists between the Plaintiffs and the Defendants concerning the existence and extent of any adequate protection lien held by the Defendants. The resolution of this controversy will allow for the timely formulation of a Chapter 11 plan. This Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant the declaratory relief requested in this Count.

## COUNT III
### (For a Declarative Judgment – Lien on AFI LOC Collateral)

65.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 64 as if set forth fully herein.

66.    Defendants assert that they have a continued lien on certain collateral that secured the Notes but was released and subsequently pledged to secure the AFI LOC.

67.    Plaintiffs contend that, for the reasons set forth in Paragraphs 42 through 54 above, the JSNs are not entitled to a lien on the assets that secure the AFI LOC.

68.    Accordingly, an actual, substantial and justiciable controversy exists between the Plaintiffs and the Defendants concerning the existence of a lien on certain of the assets that secure the AFI LOC.  The resolution of the controversy will allow for the timely formulation of a Chapter 11 plan.  This Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant the declaratory relief requested in this Count.

## COUNT IV
### (For a Declaratory Judgment – Lien on Avoidance Actions)

69.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 68 as if fully set forth herein.

70.    Defendants assert that they are entitled to a lien on the recoveries of any potential avoidance actions brought by or on behalf of the Debtors' estates.

71.    Plaintiffs contend that, for the reasons set forth in Paragraphs 55 through 56 above, the JSNs are not entitled to a lien on any recoveries of any future avoidance actions brought by or on behalf of the Debtors' estates because these recoveries represent property acquired postpetition by the Debtors estates to which prepetition liens cannot attach.

72.    Accordingly, an actual, substantial and justiciable controversy exists between the Plaintiffs and the Defendants concerning the existence and extent of any adequate protection lien held by the Defendants.  The resolution of this controversy will allow for the timely formulation of a Chapter 11 plan.  This Court has the power to adjudicate the rights of the parties with respect

to this controversy and should grant the declaratory relief requested in this Count.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order in Plaintiffs' favor:

(1)     On Count I, declaring that the Defendants' lien on general intangibles does not include any lien on the proceeds of, or value attributed to, the sale of assets to Ocwen;

(2)     On Count II, declaring that the Defendants are not entitled to an adequate protection replacement lien because there has been no diminution in the value of the Defendants' collateral during the pendency of the Cases;

(3)     On Count III, declaring that the release of certain collateral securing the Notes and subsequent pledging of that collateral to secure the AFI LOC was proper and that the Defendants do not have a lien on any of that collateral;

(4)     On Count IV, declaring that the Defendants are not entitled to a lien on the recovery of any avoidance actions brought by or on behalf of the Debtors' estates; and

(5)     Granting such other relief as the Court deems just and proper.

Dated: New York, NY
      May 3, 2013

Respectfully submitted,

MORRISON & FOERSTER LLP


By:  /s/ Gary S. Lee
      Gary S. Lee
      Lorenzo Marinuzzi
      Stefan W. Engelhardt
      Todd M. Goren
      Samantha Martin
      1290 Avenue of the Americas
      New York, New York  10104-0050
      Telephone:   (212) 468-8000
      Facsimile:   (212) 468-7900
      *Counsel for the Debtors*

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP


By:  /s/ Steven J. Reisman
      Steven J. Reisman
      Michael Moscato
      101 Park Avenue
      New York, New York  10178
      Telephone:   (212) 696-6000
      Facsimile:   (212) 697-1559
      *Conflicts Counsel for the Debtors*

ny-1073732