SUBJECT TO CONFIDENTIALITY AGREEMENT

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) Chapter 11 ) RESIDENTIAL CAPITAL, LLC, et al., ) Case No. 12-12020 (MG) ) Debtors. ) (Jointly Administered) ) | |

**DECLARATION OF REID SNELLENBARGER IN SUPPORT OF AD HOC GROUP'S OBJECTION TO DEBTORS' MOTION FOR THE ENTRY OF AN ORDER FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

I, REID SNELLENBARGER, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1. I am a Managing Director in the Financial Restructuring Group and Real Estate Investment Banking Practice of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"). I am also a member of Houlihan Lokey's Technical Valuation Standards Committee. Houlihan Lokey serves as the financial advisor to the Ad Hoc Group in connection with the Chapter 11 Cases of the Debtors. I submit this declaration in support of the Ad Hoc Group of Junior Secured Noteholders' Objection to Debtors' Motion for the Entry of an Order Further Extending their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (the "Objection").[1]

**Qualifications**

2. Founded in 1987, Houlihan Lokey currently employs more than 900 professionals across 16 offices in the United States, Europe, and Asia. Houlihan Lokey focuses

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Objection.

on providing independent and objective advice to a wide variety of clients across multiple industries, including financial institutions, in the areas of financial restructuring, mergers and acquisitions, financial advisory / fairness opinions, and capital markets. Houlihan Lokey has one of the largest and most experienced financial restructuring groups of any investment banking firm and its team members have extensive experience advising constituents involved in complex financial restructurings, both out-of-court and in chapter 11 proceedings.

3. I joined Houlihan Lokey in 2005, prior to which I was a Vice President in PricewaterhouseCoopers' Corporate Finance and Restructuring Group. I have over 15 years of experience advising major and middle-market companies, creditors, potential investors and other parties-in-interest in a wide variety of restructurings, mergers and acquisitions, and financing transactions in the distressed and bankrupt environment. Certain of my creditor-side experience includes representing the Unsecured Creditors' Committee of General Growth Properties, the secured Op-Co debt holders of Kerzner International, the Unsecured Creditors' Committee of Saint Vincent Catholic Medical Centers, the secured lenders of Island One Resorts, and the Equity Committee of USG Corporation.

4. Houlihan Lokey was retained as financial advisor to certain holders of the Junior Secured Notes in February 2012. Since then, Houlihan Lokey has worked closely with the Ad Hoc Group and its legal professionals in connection with all aspects of these Chapter 11 Cases.

5. Accordingly I have developed substantial knowledge regarding these Chapter 11 Cases. Given Houlihan Lokey's and my background and expertise, I am qualified to provide the testimony referred to herein.

### Declaration

6. In connection with the preparation of this Declaration, and to address the issue of the timing of the ongoing plan processes in these cases, I have been asked to analyze, using materials provided to Houlihan Lokey by the Debtors:

   a. the value of the assets and expenses of the Debtors now and over the next 36 months, taking into account several variables; and

   b. the breakpoint at which the Debtors' projection of its administrative and secured obligations will exceed the Debtors' views as to the value of their collective assets.

7. In connection with the preparation of this Declaration, I have based my views on interactions with financial advisors of the Debtors and specifically my review of the following information provided by the Debtors:

   a. UCC Estate Management Plan Update dated March 20, 2013

   b. Schedule of Accrued Liabilities and Projected Wind-Down Costs as of February 15, 2013

   c. ResCap – Discussion Materials dated December 4, 2012

   d. ResCap – Cash by LE by Facility as of February 28, 2013.

8. The following analysis is subject to a number of important qualifications, including most notably the following: (1) all information as to current and projected asset values and projected expenses has been sourced entirely from the Debtors and represents solely the Debtors' current views as to such information

(and not necessarily those of Houlihan Lokey) and, as such, could be subject to material upward and downward adjustment, (2) the asset values described herein do not reflect the existence of potential additional value arising from the monetization of any of the Debtors' actual or potential causes of actions against third parties, including Ally Financial, Inc. and its affiliates, nor do the expressed projected expenses reflect all potential costs associated with pursuing such claims, (3) the analysis herein expresses no views as to the legal merits of any disputes over the allowance of claims for post-petition interest on the claims of the Junior Secured Notes, but rather assumes that a feasible chapter 11 plan construct will either have to pay, or reserve for the payment of such claims in full, pending final resolution of any dispute related thereto, and (4) while the analysis has been conducted on a consolidated basis, and not an estate-by-estate basis, this Declaration expresses no views as to the legal or factual basis for substantive consolidation of any Debtor estates, and the conclusions expressed herein could be materially different when viewed from the perspective of any particular estate.

### The Debtors' Current Projected Asset Values

9. On a consolidated basis based on the Debtors' analyses provided to me, as of February 15, 2013 the Debtors owned approximately $3.5$^2$ billion of unrestricted cash after the pay-down of the secured debt obligations commonly referred to as the Barclays DIP, Ally DIP, Citi MSR and FNMA EAF facilities.

10. On a consolidated basis based on the Debtors' analyses provided to me, as of February 15, 2013 the Debtors owned restricted cash and other un-monetized

---

[2] The Debtors have since provided a more specific balance of $3.455 billion, which is as of February 28, 2013 (ResCap – Cash by LE by Facility as of February 28, 2013)

4

assets with a carry value of approximately $1.6 billion, for which the Debtors have estimated the gross recoverable value (subject to the expenditure of projected expenses described below) to be approximately $1.6 billion. I understand these assets are comprised of:

a. $126 million of restricted cash,

b. $203 million of mortgage servicing rights and servicing advances excluded from the Debtors' recently-closed section 363 sales, and

c. $1,289 million of remaining, unsold assets, including FHA/VA loans and receivables, servicer advances, accrued interest and other receivables, trading securities and other assets.

11. With respect to cash, all amounts are being held, and are projected to be held at all times in the future, in bank accounts accruing interest at a *de minimis* interest rate. The reported value of non-monetized assets is projected to remain static over the reporting period.

### The Debtors' Current Projected Expenses

12. The following expense information, based on the Debtors' analyses provided to me, is presented on a consolidated basis. The Debtors have indicated that they do not currently track actual or projected expenses on an individual debtor basis, but rather do so on the basis of "silos" that allocate expenses to the Debtors' various funding facilities, resulting in the aggregation of the expenses of two or more Debtor estates for presentation purposes.

13. The Debtors' current secured facilities include:

5

    a. $747 million owing in respect of the AFI Revolver, with interest accruing thereon at the rate of LIBOR plus 2.75% per month,

    b. $380 million on the AFI LOC, with interest accruing thereon at the rate of LIBOR plus 3.50% per month, and

    c. $2,222 million on account of the pre-petition claims of Junior Secured Noteholders. At this time, as expressed below, the Debtors are not projecting the accrual of any interest in respect of the Junior Secured Notes.

14. The Debtors' expression of projected administrative expense claims include:[3]

    a. Accrued / unpaid administrative expenses of $476 million as of February 15, 2013,

    b. Projected future administrative expenses of $860 million to be incurred after February 15, 2013 for the purposes of monetizing remaining assets and performing a wind-down of the Debtors.

15. As noted, the information provided by the Debtors on projected expenses does not include (i) the payment of all amounts owing in respect of the Junior Secured Notes as secured claims against the Debtors (under the Debtors' "Base Case" scenario, the Debtors reflect that approximately $480 million of the Junior Secured Notes' pre-petition claim will be paid as a general unsecured claim from the estates of various Debtors), (ii) the accrual and payment of post-petition interest owing to the Junior Secured Noteholders, (iii) projected administrative expense related to the allowance of certain "cure claims" that have been, or might be, asserted against

---

[3] The figures described herein represent estimated accrued and projected amounts as of February 15, 2013, which allows for the most accurate comparison against asset values, which have been provided as February 15, 2013. From time to time, the Debtors have provided different estimates of accrued and projected figures, which have not differed materially from the figures presented herein.

6

one or more Debtors related to the assumption and assignment of any of the Debtors' executory contracts, or (iv) increased administrative costs associated with protracted litigation over a plan or plans of reorganization filed with respect to any Debtor.

**Alternative Scenarios**

16. In connection with the Debtors' request for further exclusivity, I have been informed that the Debtors and various parties in interest in these cases have expressed the view that they can, and should, be pursuing resolution of the Debtors' cases through a consensual chapter 11 plan construct. For the purposes of determining the "runway" for pursuing any chapter 11 plan, I have been asked to assume that any chapter 11 plan of reorganization in these cases would be required under law (i) to pay, absent a contrary consensual resolution, all secured claims in full with assets of a value equal to the amount of the secured claims as of the effective date of any plan, and (ii) to pay, absent a contrary consensual resolution, all accrued administrative expenses in full in cash as of the effective date of any plan. In both instances, the assumption is that holders of secured and administrative claims would not be required to compromise their claims or rights in order to permit the confirmation of a chapter 11 plan.

17. Based on the information provided above, and subject to the limitations and qualifications addressed above, utilizing the inputs in the Debtors' Base Case scenario, the Debtors will have approximately $880 million of unencumbered value available for distribution to creditors after a plan, assuming a plan can be consummated before the fourth quarter of 2013. In essence, the Debtors' Base

7

Case projects administrative solvency, on a consolidated basis, by approximately $880 million, provided that they exit before the fourth quarter of 2013. I note that a substantial portion of the projected residual value available for distribution would, under current assumptions, be in the form of non-monetized assets, not cash.

18. The conclusion of administrative solvency reflected in the Debtors' Base Case, however, is highly sensitive to the key assumptions embedded in the Debtors' models, most particularly assumptions with respect to the payment of claims of the Junior Secured Noteholders and the projected ongoing levels of administrative expense in these cases. As a result, and to demonstrate the sensitivity of the Debtors' Base Case to the accrual of secured and priority claims, I have run two alternate scenarios which could materially impact the timing of chapter 11 plans and the Debtors' conclusions with respect to the amount of assets that would be available for distribution to unsecured creditors in such a plan:

   a. **Scenario 1**: the Debtors' Base Case, but assuming that the full amount of the prepetition claims of the Junior Secured Noteholders are to be treated as secured and further that post-petition interest on such claims is accruing at the annual rate of 10.625%,

   b. **Scenario 2**: the Debtors' Base Case, but assuming (a) the full amount of the pre-petition claims of the Junior Secured Noteholders are to be treated as secured and further that post-petition interest on such claims is accruing at the annual rate of 10.625%, (b) with respect to the three months between May 2013 through July 2013, the Debtors' accrual of fees for core restructuring

8

professionals employed by the Debtors, the UCC, the RMBS Trusts and the Junior Secured Noteholders will double to account for increased costs on account of litigation associated with a contested plan process, and (c) the allowance of $200 million of potential cure claims.

19. Under Scenario 1, and subject to the qualifications listed above, the Debtors will be required to treat an additional $480 million of the claims of the Junior Secured Noteholders as secured claims to be paid in full as of the effective date of any plan and will have to pay an amount of post-petition interest that currently accrues at approximately $232 million per year and that increases materially as the assumed effective date of a plan extends into the future. Under that scenario, the combined cost of the Debtors' administrative and secured claim obligations will exceed the consolidated asset value of the Debtors at or prior to December 2013, as reflected on the attached spreadsheet.

20. Under Scenario 2, and subject to the qualifications listed above, the combined cost of the Debtors' projected administrative and secured claim obligations has already exceeded the asset value of all of the Debtors, as reflected on the attached spreadsheet, and the Debtors' ability to effect payment of such claims in a chapter 11 plan construct would be dependent upon changed assumptions with respect to asset values and/or expense projections, most notably the monetization of the Debtors' litigation claims against third parties prior to the effective date of any chapter 11 plan.

4/29/2013 5:33 PM
NEWYORK 8830255 v1 [8830255_1.DOCX]

Dated: April 29, 2013
Chicago, Illinois

/s/ *Reid Snellenbarger*
Reid Snellenbarger

12-12020-mg    Doc 3597    Filed 05/06/13    Entered 05/06/13 10:04:07    Main Document
Pg 10 of 12

**ATTACHMENT #1**

# Residential Capital, LLC
## Estate Insolvency Projection

### Estimated Unencumbered Value as of February 15, 2013 Under Debtors' Base Case ($ in millions)

**Net Unencumbered Value Calculation**

| | | |
|---|---:|---|
| Unrestricted Cash [1] | $ 3,500 | <-- Post-sale cash balance after pay-down of Barclays DIP, Ally DIP, Citi MSR and FNMA EAF |
| Value of Excluded Deal Assets [2] | 203 | <-- Carry value of assets excluded from initial Ocwen sale [3] |
| Value of Remaining Assets [4] | 1,384 | <-- Debtors' estimated recovery of un-monetized assets, including restricted cash |
| Remaining Value | $ 5,087 | |
| Less: Ally Revolver | (747) | |
| Less: Ally LOC | (380) | |
| Less: Jr. Sec. Notes Secured Recovery [5] | (1,743) | <-- Debtors' estimate of Junior Secured Notes' secured recovery |
| Remaining Value | $ 2,217 | |
| Less: Accrued and Unpaid Admin. Expenses [6] | (476) | <-- Accrued and unpaid post-petition expenses as of February 15, 2013 |
| Less: Reserve for Estimate of Future Admin. Expenses [6] | (860) | <-- Estimate of wind-down expenses to be incurred after February 15, 2013 |
| **Net Value** | **$ 880** | |

### Scenario Analysis of Projected Estate Value ($ in millions)

| Projected Unencumbered Value Calculation | Feb-13 | Apr-13 | Jun-13 | Aug-13 | Oct-13 | Dec-13 | Feb-14 | Apr-14 | Jun-14 |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| Net Value | $ 880 | $ 880 | $ 880 | $ 880 | $ 880 | $ 880 | $ 880 | $ 880 | $ 880 |
| Less: Jr. Sec. Notes Incremental Secured Recovery [7] | (480) | (480) | (480) | (480) | (480) | (480) | (480) | (480) | (480) |
| Less: Jr. Sec. Notes Post-Petition Interest | (170) | (232) | (275) | (319) | (362) | (408) | (454) | (500) | (548) |
| **Residual Value in Scenario 1** | **$ 231** | **$ 169** | **$ 126** | **$ 82** | **$ 38** | **$ (7)** | **$ (53)** | **$ (99)** | **$ (147)** |
| Less: Reserve for Additional Professional Fees [8] | (44) | (44) | (44) | (44) | (44) | (44) | (44) | (44) | (44) |
| Less: Reserve for Additional Cure Claims [9] | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) |
| **Residual Value in Scenario 2** | **$ (13)** | **$ (75)** | **$ (119)** | **$ (162)** | **$ (206)** | **$ (251)** | **$ (297)** | **$ (343)** | **$ (391)** |

(1) Per page 18 of the Debtors' "UCC Estate Management Plan Update" dated March 20, 2013; the Debtors have since provided a more specific balance of $3.455 billion, although this amount is as of February 28, 2013
(2) Per page 25 of the Debtors' "UCC Estate Management Plan Update" dated March 20, 2013
(3) Ocwen has offered approximately $239 million for these assets; however, because these assets are subject to cure disputes, the carry value has been used for recovery estimates
(4) Per page 24 of the Debtors' "UCC Estate Management Plan Update" dated March 20, 2013
(5) Per page 11 of the Debtors' "ResCap - Discussion Materials" dated December 4, 2012
(6) Per the supplement to the Debtors' trial balance provided to Houlihan Lokey on March 5, 2013; values estimated as of February 15, 2013
(7) Difference between Debtors' Base Case secured recovery for the Jr. Secured Notes and what the Jr. Secured Notes are entitled to under a fully-secured recovery, which advisors for the Ad Hoc Group believe is a more realistic scenario
(8) Assumption for doubling of projected core restructuring professional fees for the Debtors, UCC, RMBS Trusts and Jr. Secured Notes from May-July 2013; Debtors' Base Case estimate per page 32 of the Debtors' "UCC Estate Management Plan Update" dated March 20, 2013
(9) Assumption for potential incurrence of additional cure claims

HOULIHAN LOKEY    1