# Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,<br><br>                     Debtors | Case No.: 12-12020 (MG)<br><br>Chapter 11<br><br>Jointly Administered |

## <u>DECLARATION OF C.J. BROWN</u>

I, C.J. Brown, in accordance with 28 U.S.C. § 1746, declare as follows:

1.      I have been retained as an expert witness by Cadwalader, Wickersham & Taft LLP ("Cadwalader"), counsel to MBIA Insurance Corporation ("MBIA"), a creditor of Residential Capital, LLC ("ResCap") and affiliated chapter 11 debtors, including Residential Funding Company, LLC ("RFC") and GMAC Mortgage LLC ("GMAC Mortgage") (collectively, the "Debtors") in the chapter 11 proceeding captioned *In re Residential Capital, LLC*, Case No. 12-12020 (MG), pending in the United States Bankruptcy Court for the Southern District of New York, in connection with MBIA's objection to the Debtors' Motions Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket Nos. 320, 1176, and 1887] (collectively, the "Debtors' 9019 Motion").

2.      I was asked to review and assess the Declaration of Frank Sillman In Support of Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of The RMBS Trust Settlement Agreements (the "Sillman Declaration") and the Supplemental Declaration of Frank

Sillman In Support Of Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of The RMBS Trust Settlement Agreements (the "Suppl. Sillman Declaration") (together, the "Sillman Declarations"), as well as his deposition testimony, and opine as to certain assumptions and conclusions made by Mr. Sillman in connection with the amount of the $8.7 billion proposed unsecured claim (the "Total Allowed Claim") provided in the Third Amended and Restated RMBS Trust Settlement Agreements (the "RMBS Trust Settlement Agreements"), dated September 21, 2012, between ResCap and two separate groups of Institutional Investors.[1]

3.      In addition, I have been asked to review and assess (a) the allocation methodology set forth in the RMBS Trust Settlement Agreements, which methodology purports to allocate the Total Allowed Claim among Settlement Trusts on the basis of their pro rata share of aggregate collateral losses (the "Allocation Method"), and (b) the methodology by which the RMBS Trust Settlement Agreements reduce the proposed Total Allowed Claim in the event that any Settlement Trust opts out of the Settlement, which reduces the Total Allowed Claim on the basis of the opt out Trust's pro rata share of the aggregate original principal balance  (the "Total Allowed Claim Reduction Method").

4.      In connection with my analysis, I reviewed the Sillman Declarations, the Declaration of Jeffrey A. Lipps, dated May 24, 2012 (the "Lipps Declaration") and the Supplemental Declaration of Jeffrey A. Lipps, dated September 28, 2012 (the "Suppl. Lipps Declaration"), submitted on behalf of the Debtors.

---

[1]    Capitalized terms not otherwise defined herein are defined in the RMBS Trust Settlement Agreements and the Sillman Declarations.

5.       My opinions are based on my review and analysis of documents, testimony and other information.[2]  This Declaration represents my analysis, conclusions and opinions as of this date and is based on information of which I am currently aware.  I reserve the right to amend, revise or supplement my analysis, conclusions or opinions.

### Summary Of Opinions

6.       In connection with my engagement on this matter, I assessed certain of Mr. Sillman's assumptions and conclusions.  Mr. Sillman estimated the loan repurchase liability exposure faced by the Debtors (the "Sillman Potential Repurchase Requirements").  In determining the Sillman Potential Repurchase Requirements, however, Mr. Sillman used several incorrect inputs in a formula he used in his analysis.

7.       One element of Mr. Sillman's formula was an estimated percentage of loan repurchase demands that the Debtors would agree to settle or resolve (the "Sillman Agree Rate"). Mr. Sillman failed to use the Debtors' own repurchase demand experience with the Settlement Trusts.  I recalculated the Sillman Agree Rate based on a summary created by Mr. Sillman of the Debtors' repurchase demand experience with the Settlement Trusts.  The revised recalculation results in a lower Sillman Agree Rate than that set forth in the Sillman Declarations (the "Revised Sillman Agree Rate"). I then used the Revised Sillman Agree Rate to recalculate, under Mr. Sillman's methodology, the Sillman Potential Repurchase Requirements (the "Revised Sillman Potential Repurchase Requirements").  As a result of this recalculation, the Revised

---

[2] A list of the materials that I relied on in forming my opinions here can be found in Appendix AAA.

Sillman Potential Repurchase Requirements range from $2.2 billion to $2.9 billion. This revised range is significantly below Mr. Sillman's estimated, unrevised potential Debtor repurchase liability range of $6.4 billion to $9.7 billion. The $8.7 billion proposed Total Allowed Claim is considerably in excess of the Revised Sillman Potential Repurchase Requirements.

8.      A second element of Mr. Sillman's formula was an estimate of the total past and future collateral losses associated with valid claims for breaches of representations and warranties (the "Sillman Estimated Lifetime Losses"). In connection with determining the Sillman Estimated Lifetime Losses, Mr. Sillman did not account for a potential litigation defense available to the Debtors identified by another of Debtors' experts, Mr. Lipps, with respect to certain Settlement Trusts based on the statute of limitations. Mr. Lipps opined that claims by certain Settlement Trusts for breach of representations and warranties may be barred entirely by the New York six-year statute of limitations for breach of contract claims (the "Statute of Limitations Defense"). I adjusted the Sillman Estimated Lifetime Losses to discount claims by certain Settlement Trusts that, according to Mr. Lipps, could be subject to the Statute of Limitations Defense. Using the Sillman Agree Rates, this adjustment reduces the Sillman Potential Repurchase Requirements to (a) between $5.3 billion and $6.1 billion, using the low range of the Sillman Estimated Lifetime Losses, and (b) between $8.0 billion and $9.3 billion, using the high range of the Sillman Estimated Lifetime Losses. Applying a further discount to take into account the Revised Sillman Agree Rates reduces the Revised Sillman Potential Repurchase Requirements to (a) between $1.8 billion and $2.1 billion, using the low range of the Sillman Estimated Lifetime Losses, and (b) between $2.4 billion and $2.7 billion, using the high range of the Sillman Estimated Lifetime Losses.

9.      Mr. Sillman's methodology, when revised for his incorrect assumptions, does not support the Debtors' contention that the $8.7 billion proposed Total Allowed Claim is reasonable.

10.     It is also my opinion that the Allocation Method is not structured in a way to fairly or correctly distribute the proposed Total Allowed Claim in accordance with the proportionate repurchase liability exposure faced by the Debtors with respect to each Settlement Trust.  Specifically, certain Settlement Trusts that could be subject to the Statute of Limitations Defense, as identified by Mr. Lipps, will receive a disproportionate benefit under the Allocation Method relative to Settlement Trusts not subject to that Defense.

11.     It is also my opinion that the Total Allowed Claim Reduction Method is unreasonable because it is structured in a way that unfairly provides a disproportionate benefit to certain Settlement Trusts that participate in the Settlement to the detriment of certain Settlement Trusts that opt out of the Settlement.  In particular, the Total Allowed Claim Reduction Method penalizes opting out Settlement Trusts that have a relatively high share of collateral losses but a relatively low share of original principal balance.

**<u>Qualifications</u>**

12.     I am a Managing Director in Blackstone's Restructuring & Reorganization Group. Blackstone is a global alternative asset manager and provider of financial advisory services listed on the New York Stock Exchange that maintains offices at 345 Park Avenue, New York, New York 10154.

13.      I have approximately ten years of experience related to financial transactions, valuation, restructuring, and capital-raising transactions.[3]  I also have extensive experience in the marketing and sale of distressed companies and their assets, both in chapter 11 proceedings and out of court.  I have provided services to debtors and creditors in numerous restructurings, including, among others: Ambac Financial Group, Inc.; Allied Capital Corporation; Bally Total Fitness; Buffets Holding, Inc.; Countryside Power; D. Sokolin Co.; EuroTunnel; Ford Motor Co.; Granite Broadcasting; Horsehead Holdings Corp.; Hostess Brands, Inc.; LightSquared; MBIA, Inc.; Merisant Worldwide, Inc.; Movie Gallery, Inc.; The Pension Benefit Guaranty Corporation; TerreStar Corp.; and Young Broadcasting.

14.      I joined Blackstone in 2005.  Prior to joining Blackstone, I was an Associate in the Global Industries Group at Bear, Stearns & Co. Inc. where I worked on several capital raising and merger and acquisition advisory transactions.

15.      I received a Masters of Business Administration with distinction from New York University, Leonard N. Stern School of Business in 2003.  I hold Series 7 and Series 63 licenses.

### Background

**A.      The Settlement Trusts**

16.      RFC and GMAC Mortgage were wholly owned indirect subsidiaries of ResCap, which was a subsidiary of GMAC LLC, f/k/a General Motors Acceptance Corporation

---

[3] A copy of my curriculum vitae can be found in Appendix BBB.

("GMAC"). GMAC is now known as Ally Financial Inc. The Settlement Trusts were formed by

the Debtors between 2004 and 2007 and mortgage loans assigned to the Settlement Trusts by the

Debtors constitute the collateral for each Settlement Trust.

### B.    The RMBS Trust Settlement Agreements

17.    On May 13, 2012, in anticipation of the bankruptcy filing, ResCap entered into

the RMBS Trust Settlement Agreements with two groups of Institutional Investors. The RMBS

Trust Settlement Agreements, subject to final court approval, purport to resolve certain loan

repurchase claims that might be asserted against the Debtors arising from representations and

warranties provided in the Governing Agreements for the Settlement Trusts in exchange for a

proposed $8.7 billion Total Allowed Claim.[4] The RMBS Trust Settlement Agreements cover

392 Settlement Trusts with an aggregate original principal balance of $226 billion and an

aggregate unpaid principal balance of $61 billion.

18.    The Allocation Method purports to distribute the Total Allowed Claim among

participating Settlement Trusts by their *pro rata* share of "Net Losses" incurred by the

participating Settlement Trusts. RMBS Trust Settlement Agreement, Section 6.01, Ex. B. In the

event a Settlement Trust opts out of the Settlement, the Total Allowed Claim Reduction Method

reduces the Total Allowed Claim by that Trust's *pro rata* share of the aggregate original

principal balance of the Settlement Trusts. RMBS Trust Settlement Agreement, Section 5.01.

---

[4]    I express no opinion with respect to whether claims asserted by financial guaranty insurers are
excluded from the RMBS Trust Settlement Agreements.

### C.    Mr. Sillman's Opinions

19.    After the initial versions of the Settlement Agreements were executed, Mr. Sillman was asked to estimate the range of loan repurchase liability that the Debtors would agree to resolve or settle hypothetical loan repurchase demands that may have been made by each of the 392 Settlement Trusts.  Mr. Sillman utilized a methodology to estimate such "Potential Repurchase Requirements," that is premised on the use of certain assumptions, including the Sillman Estimated Lifetime Losses and the share of the Sillman Estimated Lifetime Losses that Mr. Sillman estimates that the Debtors would agree to pay, as a result of breaches of representations and warranties that would be subject to repurchase under the applicable contractual provisions (the "Sillman Loss Share Rate").  Mr. Sillman determined the Sillman Loss Share Rate by multiplying two additional assumptions – the Sillman Agree Rate and the percentage of loans that Mr. Sillman estimated would be examined by Trustees and that the Trustees would submit for repurchase (the "Sillman Breach Rate").

20.    Mr. Sillman assigned numbers to all of these assumptions and used them as inputs in a formula to calculate the Sillman Potential Repurchase Requirements.  Specifically, Mr. Sillman determined Estimated Lifetime Losses to be between $43.5 billion and $46.8 billion, the Sillman Breach Rates to be between 35% and 44% and the Sillman Agree Rates to be between 41% and 47%.  He multiplied the Sillman Breach Rates by the Sillman Agree Rates to calculate a range of Sillman Loss Share Rates of between 15% and 21%.

21.    Mr. Sillman used the Sillman Estimated Lifetime Losses and Sillman Loss Share Rate assumptions in his formula to opine that the Debtors faced Potential Repurchase

Requirements in connection with the Settlement Trusts of approximately $6.4 billion to $9.7 billion.[5]

      22.     I was asked to evaluate and revise, as I deemed appropriate, certain assumptions that Mr. Sillman used in his methodology, including the Sillman Agree Rates, Sillman Loss Share Rates and Sillman Estimated Lifetime Losses.[6]  It is my opinion that Mr. Sillman made certain incorrect assumptions in the creation of his Agree Rates, Loss Share Rates and applicable Estimated Lifetime Losses.  These incorrect assumptions caused Mr. Sillman to significantly overestimate the Sillman Potential Repurchase Requirements.  Accordingly, Mr. Sillman's analysis, when revised to address his incorrect assumptions, does not support the Debtors' assertion that the proposed Total Allowed Claim is reasonable.  My analyses revising Mr. Sillman's incorrect assumptions are set forth below.

### Opinion

---

[5]   In his initial Declaration, Mr. Sillman estimated the range of repurchase exposure to be between $6.7 billion and $10.3 billion.  Sillman Decl. ¶68.  In his Supplemental Declaration, Mr. Sillman revised his estimates of future collateral losses, but did not recalculate the "range of reasonableness" for Potential Repurchase Requirements.  I recalculated the Sillman Potential Repurchase Requirements to be between $6.4 billion and $9.7 billion by using the Sillman Estimated Lifetime Losses from his Supplemental Declaration and the Loss Share Rates identified in his initial Declaration.  *See* Appendix CCC.

[6]   I was not asked by counsel to review or assess Mr. Sillman's assumptions in calculating the range of Sillman Audit Rates, Sillman Demand Rates or Sillman Breach Rates.  Accordingly, I am not offering an opinion as to the reasonableness of the assumptions used by Mr. Sillman in determining the Sillman Audit Rates, Sillman Demand Rates or Sillman Breach Rates used by Mr. Sillman in his Declarations.  Nor was I asked to offer an opinion as to the reasonableness of Mr. Sillman's overall methodology, including his formula.

## A. Mr. Sillman Used Incorrect Agree Rates, Which Significantly Overstated His Calculation Of Potential Repurchase Requirements

23.      Mr. Sillman stated that he was unable to use the Debtors' loan repurchase experience in connection with the Settlement Trusts to determine the Sillman Agree Rates because the "actual data for the Trusts is not available" and "the vast majority of the Trusts' private label securities ("PLS") repurchase demands received by the Debtors are unresolved." Sillman Decl. ¶¶ 5, 8; Sillman Tr. at 164.  Mr. Sillman instead derived the Sillman Agree Rates by reference to his own experience and the Debtors' experience with Government Sponsored Enterprise ("GSE") repurchase demands.  Sillman Decl. ¶¶ 60-63.  However, "actual data for the Trusts" was available, and, in fact, Mr. Sillman prepared a summary of the Debtors' actual repurchase demand experience with almost 16,000 mortgage loans in connection with the Settlement Trusts.  Mr. Sillman's summary indicated that the Debtors (a) agreed to repurchase 10.36% of the loans submitted for repurchase, (b) purported to rebut 64.76% of the repurchase demands, (c) convinced the demanding party to rescind 2.33% of the demands and (d) were still in the process of reviewing 22.54% of the demands.  Sillman Tr. at 161-63; RC-9019_00045459.

24.      Counsel asked me to assume that Mr. Sillman's summary represented sufficiently robust data from which to draw conclusions as to an appropriate Agree Rate for purposes of Mr. Sillman's methodology.  I discussed this assumption with an expert in representations and warranties analysis and repurchase demand resolution, who agreed with the reasonableness of this approach. The loan underwriting expert also noted that the Debtors' repurchase demand experience with the GSEs is not a reliable source of information to calculate Agree Rates.  Mr. Sillman acknowledged this limitation in his Declaration and applied an arbitrary discount to his GSE Agree Rates because, according to Mr. Sillman, the Settlement Trusts are subject to "less

-10-

stringent representations and warranties . . . when compared to the stronger representations and
warranties found in the Fannie Mae and Freddie Mac agreements." Sillman Decl. ¶ 61.[7]  The
loan underwriting expert confirmed that the best source of information to create a reliable
assumption regarding the Debtors' Agree Rates is the Debtors' own repurchase demand
experience with the Settlement Trusts.

25.     I performed a three-step process to calculate the Revised Sillman Potential
Repurchase Requirements: (1) I recalculated the Sillman Agree Rates by using the Debtors' own
repurchase demand experience with the Settlement Trusts as set forth in Mr. Sillman's summary
document[8] (the "Revised Sillman Agree Rates"); (2) I applied the Revised Sillman Agree Rates
to Mr. Sillman's formula to adjust the Sillman Loss Share Rates; and (3) I used the Recalculated
Sillman Loss Share Rates to recalculate the Sillman Potential Repurchase Requirements.

26.     First, I calculated the Revised Sillman Agree Rate.  Mr. Sillman's summary
document identifies 15,763 repurchase requests for the Settlement Trusts under a designation of
"Non Voluntary Demands," of which the document identifies a "Status Summary" of "Agree"
for 1,713 loans, "Cancelled/Rescinded" for 534 loans, "Disagree – Rescission Requested" for
10,026 loans, and "Pending Review" for 3,490 loans.

---

[7]   Mr. Sillman referred to a document at his deposition that purportedly supported his calculation of a
discount to the GSE Agree Rates to derive the Sillman Agree Rates.  RC-9019_00066117.xls.  The
document does not provide any quantitative or qualitative support for his Agree Rate calculations.  Mr.
Sillman did not provide any analytic support for these figures in his testimony.  Sillman Tr. at 269-99.
Accordingly, I do not rely on any information contained in this document in my analysis.

[8]   For the purposes of this analysis, I used an updated version of the document that was used at Mr.
Sillman's deposition.  RC-9019_00056670.xls.

27.     I calculated the Revised Sillman Agree Rate using a formula:  Agree Loans
divided by the sum of Agree Loans, Disagree Loans and Cancelled/Rescinded Loans.  These are
the only categories on Mr. Sillman's summary document that are consistent with his definition of
the Agree Rate.   This formula allowed me to determine the percentage of loan repurchase
demands that the Debtors agreed to settle or resolve.  I assumed that the loans listed as "Pending
Review" had not been subject to a determination by the Debtors.  Therefore, I did not include
these loans in my calculation because they do not meet Mr. Sillman's definition of the Agree
Rate. [9]

28.     On the basis of these assumptions, I calculated the Revised Sillman Agree Rate of
14% by dividing the number of loans that the Debtors agreed to repurchase (1,713) by the total
number of loans for which a determination had been made (12,273).  The Revised Sillman Agree
Rate is significantly lower than the Sillman Agree Rate range of between 41% and 47%.

29.     Second, I used the Revised Sillman Agree Rate of 14% to recalculate the Sillman
Loss Share Rate to range from 5% to 6% (the "Recalculated Sillman Loss Share Rates"),
considerably lower than the unrevised Sillman Loss Share Rate range of between 15% and 21%.

---

[9]    The document also identifies certain loan repurchase demand experience under a designation of
"Voluntary Demands."  Mr. Sillman testified that "Voluntary Demands" refers to circumstances "where
they reviewed the loan file internally, possibly as part of a post funding QC process where they identified
loans that they felt met the repurchase standard and notified the appropriate trustee or insurer."  Sillman
Tr. at 142.  Loan reviews that were initiated internally by the Debtors do not appear to fit within Mr.
Sillman's definition of Agree Rate: "the percentage of Demands issued by the Trustee that the Seller
agrees to repurchase or make whole."   Sillman Decl. ¶ 59.   Accordingly, I did not consider any
information relating to Voluntary Demands in my analysis.

30.    Third, I recalculated the Sillman Potential Repurchase Requirement by multiplying the Recalculated Sillman Loss Share Rate range (5% to 6%) by the Sillman Estimated Lifetime Losses ($43.5 billion to $46.8 billion).  Thus, by revising Mr. Sillman's analysis using only a Revised Agree Rate (and making no other corrections), the Revised Sillman Potential Repurchase Requirement range is between $2.2 billion and $2.9 billion.  A summary of these calculations can be found in Appendix DDD.

31.    By not using data related to the Debtors' actual repurchase demand experience with the Settlement Trusts, Mr. Sillman significantly overstated the Potential Repurchase Requirement by using incorrect Agree Rate assumptions.  Using Mr. Sillman's methodology, but correcting for his incorrect Agree Rate assumptions, the $8.7 billion proposed Total Allowed Claim is between $5.8 billion and $6.5 billion higher than the Revised Sillman Potential Repurchase Requirements.

**B.    Mr. Sillman Overstated The Potential Repurchase Requirements By Using Estimated Lifetime Losses That Include Collateral Losses Associated With Claims Of Certain Settlement Trusts That Could Be Subject To The Statute of Limitations Defense Identified By The Debtors' Expert, Mr. Lipps**

32.    Mr. Sillman treated each of the Settlement Trusts as if they have the same facts and circumstances.  By including all collateral losses incurred by certain Settlement Trusts that could have claims that are precluded under the Statute of Limitations Defense, Mr. Sillman's analysis is inconsistent with the opinions offered by Mr. Lipps.  Mr. Lipps expressed opinions that loan repurchase claims are subject to certain defenses, including the Statute of Limitations Defense.  Mr. Lipps opined that "[t]he statute of limitations for contract claims in New York is six years, and no discovery rule that would extend the time period is available for contract claims."  Lipps Suppl. Decl. ¶ 92.  Mr. Lipps opined that courts begin to "run" the six-year

statute of limitations from the date of the false representation and warranty, *i.e.*, the date the Settlement Trust closed the purchase of the mortgage loans and the sale of the related securities to investors. *Id.* ¶ 94. Mr. Lipps opined that the Debtors would assert this defense in a litigation arising out of the Settlement Trusts' repurchase claims. *Id.* ¶ 93.

33.    I adjusted the applicable Sillman Estimated Lifetime Losses to revise for Mr. Sillman's failure to account for the Statute of Limitations Defense identified by Mr. Lipps. Mr. Sillman's incorrect assumptions caused the Sillman Potential Repurchase Requirements to be significantly overstated.

34.    Based on Mr. Lipps' Declaration, I assumed that any claims for breach of representation and warranty arising in connection with Settlement Trusts that were finalized prior to May 14, 2006 would be subject to New York's statute of limitations *unless* such claims were preserved by virtue of a timely filed litigation or entry into a tolling agreement.[10]  I further assumed that, for Settlement Trusts that closed prior to May 14, 2006, either a litigation must have commenced within six years of the closing date or a tolling agreement must have been entered into with an effective date within six years of the closing date in order for covered Settlement Trusts to avoid the Statute of Limitations Defense. I assumed that the Debtors' chapter 11 filing stayed the expiration of any tolling agreements that otherwise would have expired after the petition date.

---

[10]    Mr. Lipps opined that, in a litigation, the Debtors would contend that "claims for breach of representation and warranty arising from securitizations issued prior to May 14, 2006 are time-barred." Lipps Suppl. Decl. ¶ 98.

-14-

35.     Based on these assumptions, I developed a methodology to exclude collateral losses associated with claims subject to the Statute of Limitations Defense from the calculation of the Sillman Estimated Lifetime Losses.  My methodology involved a five-step process: (1) identifying the Settlement Trusts that closed prior to May 14, 2006; (2) assessing whether any of those Settlement Trusts were subject to a timely filed litigation or executed tolling agreement; (3) removing, in four different scenarios, 25%, 50%, 75% and 100% of the losses associated with Settlement Trusts issued prior to May 14, 2006, that were not subject to a timely litigation or tolling agreement, from the Sillman Estimated Lifetime Losses;[11] (4) applying the Sillman Loss Share Rates to the Revised Sillman Estimated Lifetime Losses as determined in each of the four scenarios; and (5) applying the Revised Sillman Loss Share Rates that I determined by reference to the Debtors' repurchase demand experience (*see* this Report, *supra*, at ¶28) to the Revised Sillman Estimated Lifetime Losses in each of the four scenarios.

36.     By this methodology, I calculated potential Litigation Discounts associated with the Statute of Limitations Defense using both the Sillman Loss Share Rates and the Revised Sillman Loss Share Rates.

---

[11]     I was asked by MBIA's counsel to estimate ranges of Litigation Discounts by using scenarios where 25%, 50%, 75% and 100% of the losses associated with affected Settlement Trusts (the "Statute of Limitations Litigation Discount") are removed from the Sillman Estimated Lifetime Losses.  By using these scenarios, I am not offering an opinion as to whether the Statute of Limitations Defense may exclude repurchase claims to the extent contemplated under the scenarios.  Rather, I am offering a range of potential discounts for consideration in the context of the litigation risk posed by the Statute of Limitations Defense to the Settlement Trusts that could be subject to that Defense as identified by Mr. Lipps.

37.    First, I identified 253 Settlement Trusts that were finalized by the Debtors prior to May 14, 2006.  These Settlement Trusts are listed in Appendix EEE.

38.    Second, I reviewed a list of complaints and tolling agreements provided to me by counsel at my request.  This list can be found in Appendix FFF.  I identified 10 Settlement Trusts that were subject to complaints filed within six years of the closing.  I also identified 99 Settlement Trusts that were subject to tolling agreements entered into with effective dates within six years of the closing.  A list of these Settlement Trusts can be found in Appendix GGG.

39.    The remainder of the Settlement Trusts issued prior to May 14, 2006 (the "Statute of Limitations Trusts") I assumed to have claims that could be subject to the Statute of Limitations Defense because they are not subject to a timely filed complaint or tolling agreement.  There are 144 Settlement Trusts with claims that potentially are subject to the Statute of Limitations Defense, with an aggregate original principal balance of $75.2 billion and estimated lifetime collateral losses of $7.6 billion to $8.2 billion, accounting for 17.6% of the collateral losses associated with all Settlement Trusts.

40.    From this analysis, I determined that the Statute of Limitations Defense disproportionately affects certain Settlement Trusts on the basis of vintage.  Claims associated with 72 of 93 Settlement Trusts that closed in 2004 could be time-barred; 59 of 117 Settlement Trusts that closed in 2005 could be time-barred; and 13 of 117 Settlement Trusts that closed in 2006 could be time-barred.

41.    Third, I created four scenarios to apply a Litigation Discount to the claims asserted by the Settlement Trusts with claims that could be subject to the Statute of Limitations

Defense.   At the request of counsel, I removed 25%, 50%, 75% and 100% of the losses associated with Statute of Limitations Trusts from the Sillman Estimated Lifetime Losses.

42.     Fourth, I applied the Sillman Loss Share Rates to each of the recalculated Sillman Estimated Lifetime Losses figures to recalculate the Sillman Potential Repurchase Requirements. The Revised Sillman Potential Repurchase Requirements range from (a) $5.3 billion to $6.1 billion, using the low range of the Sillman Estimated Lifetime Losses, and from (b) $8.0 billion to $9.3 billion, using the high range of the Sillman Estimated Lifetime Losses.

43.     Fifth, I applied the Revised Sillman Agree Rate to each of the recalculated Sillman Estimated Lifetime Losses figures to incorporate both the Statute of Limitations Litigation Discount and the Debtors' actual repurchase demand experience with the Settlement Trusts.   The Sillman Potential Repurchase Requirements that I recalculated on this basis range from (a) $1.8 billion to $2.1 billion, using the low range of the Sillman Estimated Lifetime Losses, and from (b) $2.4 billion to $2.7 billion, using the high range of the Sillman Estimated Lifetime Losses.   A summary of the Statute of Limitations Litigation Discount calculations can be found in Appendix HHH.

44.     Accordingly, Mr. Sillman's calculations significantly overstated the Sillman Potential Repurchase Requirements in light of the Statute of Limitations Defense identified by Mr. Lipps.   The $8.7 billion proposed Total Allowed Claim exceeds the Revised Sillman Potential Repurchase Requirements that I calculated under 14 of the 16 scenarios described above (and significantly exceeds the Revised Sillman Potential Repurchase Requirements in 12 of 16 scenarios).   Thus, Mr. Sillman's opinion that the proposed Total Allowed Claim is within the "range of reasonableness" is flawed and unreliable.

**C.**     **The RMBS Trust Settlement's Allocation Method Is Unreasonable Because It Does Not Distribute The Total Allowed Claim Among Settlement Trusts In Proportion To The Debtors' Repurchase Liability**

45.     The Allocation Method is not reasonably structured to allocate proceeds in accordance with the proportionate repurchase liability faced by the Debtors with respect to each Settlement Trust.  In particular, certain Settlement Trusts will receive a disproportionately large share of the Total Allowed Claim under the Allocation Method relative to other Settlement Trusts.  The Allocation Method distributes the Total Allowed Claim among participating Settlement Trusts solely on the basis of their *pro rata* share of aggregate lifetime collateral losses.  The Allocation Method does not make any attempt to discount or differentiate the claims of Settlement Trusts that are subject to the Statute of Limitations Defense as compared to Settlement Trusts that are not subject to the same litigation risk and uncertainty identified by Mr. Lipps.  This is a crucial flaw to the Allocation Method.  The Statute of Limitations Litigation Discount disproportionately impacts Settlement Trusts on the basis of vintages and whether the Settlement Trusts have asserted repurchase claims.  However, Settlement Trusts that could be subject to substantial risk, as identified by Mr. Lipps, from the Statute of Limitations Defense will receive an allocation on the same basis as Settlement Trusts that are not subject to the Statute of Limitations Defense.  For example, 77% of the Settlement Trusts that closed in 2004 could be subject to the Statute of Limitations Defense compared to none of the Settlement Trusts that closed in 2007 and are not subject to that Defense.  Nonetheless, Settlement Trusts that closed in 2004 will receive distributions on the same basis as Settlement Trusts that closed in 2007.  In addition, 53% of the Settlement Trusts never made any loan repurchase demands or commenced litigations with respect to claims for breach of representations and warranties.

-18-

Again, however, these Settlement Trusts will receive allocations on the same basis as the
Settlement Trusts that did make repurchase demands or commence litigation.

### D.    The Total Allowed Claim Reduction Method Is Unreasonable

46.    The Total Allowed Claim Reduction Method, which reduces the Total Allowed
Claim by the *pro rata* share of aggregate original principal balance held by Trusts that opt out, is
unreasonably structured so as to provide a disproportionate benefit to certain Settlement Trusts
that participate in the Settlement and unfairly penalize certain Trusts that opt out.   In particular,
Trusts opting out that have a relatively high share of aggregate collateral losses but a relatively
low share of aggregate original principal balance are penalized to the benefit of Settlement Trusts
that participate in the Settlement.   I provide the following examples of Trusts that will be
unfairly penalized if they opt out:

- 2006-EMX9 has incurred and will incur between .93% and .96% of the aggregate losses associated with all of the Settlement Trusts.  Under the Allocation Method, 2006-EMX9 will receive between .93% and .96% of the Total Allowed Claim. However, 2006-EMX9 has a relatively low share of aggregate original principal balance, constituting only .34% of the aggregate original principal balance for all Settlement Trusts.  Under the Total Allowed Claim Reduction Method, the Total Allowed Claim will only be reduced by .34% if 2006-EMX9 opts out.

- 2006-KS9 has incurred and will incur between 1.22% and 1.24% of Estimated Lifetime Losses.  2006-KS9 accounts for .55% of the aggregate original principal balance.  Under the Allocation Method, 2006-KS9 will receive between 1.22% and 1.24% of the Total Allowed Claim.  However, under the Total Allowed Claim Reduction Method, the Total Allowed Claim will only be reduced by .55% if 2006-KS9 opts out.

- 2006-QO7 has incurred and will incur between 1.35% and 1.36% of Sillman Estimated Lifetime Losses.  2006-QO7 represents .69% of the aggregate original principal balance. Under the Allocation Method, 2006-QO7 stands to receive between 1.35% and 1.36% of the Total Allowed Claim.  However, under the Total Allowed Claim Reduction Method, the Total Allowed Claim will only be reduced by .69% if 2006-QO7 opts out.

47.    Accordingly, the Total Allowed Claim Reduction Method is not structured to fairly reduce the amount of the Total Allowed Claim in the event that certain Trusts opt out.  To the contrary, the Total Allowed Claim Reduction Method benefits certain participating Trusts to the detriment of certain Trusts that opt out.

December 3, 2012

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing reflects my opinions, and is true and correct as to all factual assertions.

C.J. Brown

-20-

# APPENDIX AAA

## APPENDIX AAA:  MATERIALS INCORPORATED INTO THE
## EXPERT REPORT OF C.J. BROWN

### A.  PLEADINGS AND COURT FILINGS

BANKRUPTCY COURT FILINGS

Third Amended and Restated RMBS Trust Settlement Agreements [Docket Nos. 1887-2;
1887-3]

### B.  DISCOVERY MATERIALS

EXPERT REPORTS AND TESTIMONY

Declaration of Jeffrey A. Lipps

Supplemental Declaration of Jeffrey A. Lipps

Transcript of the Deposition of Jeffrey A. Lipps, of November 19, 2012

Declaration of Frank Sillman

Supplemental Declaration of Frank Sillman

Transcript of the Deposition of Frank Sillman, of November 20, 2012

LOAN AND SERVICING DATA

RC-9019_00000001.xls

RC-9019_00000002.xls

RC-9019_00045459.xls

RC-9019_00054000.xls

RC-9019_00056670.xls

RC-9019_00066117.xls

### C.  OTHER MATERIALS

Index of ResCap Tolling Agreements

Index of Monoline Complaints by Date and Covered Trusts

# APPENDIX BBB

12-12020-mg  Doc 3601-1  Filed 05/06/13  Entered 05/06/13 16:23:57  Exhibit 1
Document  Page 25 of 64

21 Bretwood Drive North
Colts Neck, NJ 07722
Tel: (732) 677-2073  Mobile: (917) 968-1962
cj.brown@blackstone.com

## Experience:

**THE BLACKSTONE GROUP**                                             New York, NY
**Managing Director, Restructuring & Reorganization Group**          2010-present
**Vice President, Restructuring & Reorganization Group**             2007-2009
**Associate, Restructuring & Reorganization Group**                  2005-2006

- Represent both companies and creditors in out-of-court restructurings, chapter 11 reorganizations, distressed M&A transactions and distressed capital-raising transactions across a variety of industries.
- Perform lead role in day-to-day execution of all aspects of transactions including deal structuring and analytics, providing recommendations to clients and negotiating with key stakeholders.
- Lead analysis and formulation of going-concern valuations, liquidation analyses, stakeholder recovery analyses and corporate capital structures including debt capacity and covenant packages.
- Execute transactions involving tender and exchange offers, §363 asset sales, debtor-in-possession financings and exit financings.

**BEAR, STEARNS & CO. INC.**                                         New York, NY
**Investment Banking Associate, Global Industries Group**            2003-2005

- Engaged in all aspects of corporate finance including analysis and implementation of financial initiatives – public common equity and high-yield debt issuances, sales and acquisitions and credit facility financings.
- Executed fifteen transactions comprised of three M&A deals, seven equity offerings, one debt offering and four capital commitments.
- Interacted extensively with senior management of clients, conducted financial and operational due diligence and developed financial and strategic analyses.
- Authored the Bear Stearns Standard LBO/Refinancing model used for entire Investment Banking Division.

**THE NEWS CORPORATION**                                             New York, NY
**Financial Analyst, Senior Financial Analyst**                      1999-2001

- Responsible for the budgeting, forecasting and analysis of $240 million in production expenses.
- Worked with senior management to correct forecast variances versus budget on a weekly basis.
- Developed capital expenditure analysis template including NPV, IRR and payback analyses.

**LUTRON ELECTRONICS CO., INC.**                                     Coopersburg, PA
**Project Accountant, Senior Accountant, Financial Analyst**         1996-1999

- Led review of business unit financial statements during monthly management meetings.
- Modeled company financials in conjunction with planning process and reviewed budget variances.

## Education:

**NEW YORK UNIVERSITY**                                              New York, NY
**Leonard N. Stern School of Business**                              2001-2003
Master of Business Administration with distinction (top 10%), May 2003
Majors: Finance and Accounting

- Beta Gamma Sigma honor society
- Teaching Fellow, Financial Accounting and Reporting

**MORAVIAN COLLEGE**                                                 Bethlehem, PA
Bachelor of Arts, Accounting, May 1996

## Additional:

- Public speaking engagements: 11/16/12 Hogan Lovells' Global Client Forum *The Eurozone Crisis: Uncertainty, Risk, and Opportunity*; 4/16/10 University of Chicago Restructuring Conf. *Merisant Case Study*; 1/28/11 Turnaround Management Association *Loan to Own Panel*; 2/18/11 Wharton Restructuring Conf. *Outlook for Special Dividends*; 3/4/11 NYU Stern Private Equity Conf. *Distressed Investing: Where Have All the Deals Gone*; 4/13/12 University of Chicago Restructuring Conf. *TerreStar Case Study*
- Series 7 and 63 Registered

**Chapter 11 Debtor Engagements**

Advisor to Ambac Financial Group in connection with its chapter 11 reorganization – 11/2010-present

Advisor to TerreStar Corporation in its chapter 11 reorganization – 4/2010-present

Advisor to TerreStar Networks in its chapter 11 reorganization – 4/2010-3/2012

Advisor to Merisant Worldwide in its chapter 11 reorganization – 1/2007-12/2009


**Out-of-court Debtor Engagements**

Advisor to Ambac Financial Group regarding an out-of-court restructuring – 6/2009-9/2009 and 6/2010-10/2010

Advisor to D. Sokolin Inc. regarding an out-of-court restructuring – 11/2009-8/2010

Advisor to Ambac Assurance Corporation regarding its CDO of ABS commutation transaction – 9/2009-6/2010

Advisor to Allied Capital in connection with its out-of-court restructuring of MTNs – 2/2009-9/2009

Advisor to Ford Motor Company regarding its tender and exchange offer – 12/2008-3/2009

Advisor to an undisclosed insurance company – 6/2008-2/2009

Advisor to BluePoint in connection with its restructuring efforts – 1/2008-9/2008

Advisor to Companhia do Vale do Araguaia regarding a potential capital raise – 3/2007-6/2008

Advisor to MBIA regarding Eurotunnel – 3/2006-9/2007

Advisor to Countryside regarding an expert valuation report – 12/2006-5/2007

Advisor to Bally Total Fitness in connection with a new secured credit facility – 6/2005-10/2006

Advisor to Bally Total Fitness in connection with its sale of Crunch Fitness to Angelo, Gordon & Co. – 5/2005-1/2006

Advisor to Horsehead in connection with a potential sale 6/2005 – 12/2005


**In-court Creditor Engagements**

Advisor to MBIA in connection with ResCap's chapter 11 reorganization – 5/2012-present

Advisor to counsel to secured lender group in LightSquared in connection with its chapter 11 reorganization – 5/2012-present

Advisor to the Pension Benefit Guaranty Corporation as an expert witness in connection with an undisclosed matter – 3/2012-present

Advisor to official committee of unsecured creditors in Hostess Brands, Inc.'s chapter 11 reorganization – 1/2012-present

Advisor to counsel to secured lender in Young Broadcasting regarding valuation – 10/2009-4/2010

Advisor to secured lenders of Buffets Holdings Inc. in connection with its chapter 11 reorganization – 11/2007-4/2009

Advisor to second lien lenders of Movie Gallery in its chapter 11 reorganization – 8/2007-1/2009

Advisor to counsel to secured lender in Granite regarding valuation – 2/2006-6/2007

## M&A Transactions

Penn National Gaming
*Owner and operator of gaming properties*
- $2.4 billion acquisition of Argosy Gaming – joint financial advisor
- $280 million sale of The Downs Racing Company to the Mohegan Tribal Gaming Authority – sole advisor

**Ebro Puleva, S.A.**
*Spain's largest publicly traded food company*
- $397 million acquisition of Riviana Foods, Inc. – sole financial advisor

## Equity Offerings

**Eagle Bulk Shipping Inc.**
*The largest U.S. based owner of Handymax dry bulk vessels*
- Pending initial public Common Equity offering – joint book-running manager

**AGCO Corporation**
*Manufacturer and distributor of agricultural equipment*
- $250 million follow-on Common Equity offering – co-manager

**CB Richard Ellis Group**
*A commercial real estate services firm*
- $456 million initial public Common Equity offering – co-manager
- $420 million follow-on Common Equity offering – co-manager

**WESCO International**
*Provider of electrical construction products and electrical and industrial maintenance, repair and operating (MRO) supplies*
- $263 million follow-on Common Equity offering – co-manager

**Celanese**
*An integrated global producer of value-added industrial chemicals*
- $800 million initial public Common Equity offering – co-manager

**Accuride**
*Manufacturer and supplier of commercial vehicle components*
- $99 million follow-on Common Equity offering – co-manager

## Bond Deals

**AGCO Corporation**
*Manufacturer and distributor of agricultural equipment*
- £250.0 million Euro-denominated Senior Subordinated Notes offering – joint-bookrunning manager

## Capital Commitments

**AGCO Corporation**
*Manufacturer and distributor of agricultural equipment*
- $20.0 million capital commitment in a $300 million Senior Revolving Credit Facility

**Builder's First Source**
*Supplier of structural and related building products for residential new construction in the U.S.*
- $81 million capital commitment to a $405 million Senior Secured Credit Facility

**New Center Asset Trust**
*A non-consolidated qualified special purpose entity administered by GMAC for the purpose of purchasing assets as part of GMAC's securitization and mortgage warehouse funding programs*
- $300 million capital commitment to a $19,250 million Liquidity Facility

**FCAR Owner Trust**
*An entity related to a Ford Motor Credit asset-backed commercial paper program*
- $500 million capital commitment to Liquidity Facility

# APPENDIX CCC

## Comparison of Sillman Analyses

| ($ in mm) | | Sillman Original Analysis | | Sillman Supplemental Analysis | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| (A) | Actual Losses to Date | $ 30,277.5 | $ 30,277.5 | $ 30,536.9 | $ 30,536.9 |
| (B) | Forecasted Remaining Losses | 15,258.6 | 19,539.7 | 12,957.3 | 16,282.7 |
| (C) =(A)+(B) | Total Estimated Lifetime Losses | $ 45,536.1 | $ 49,817.2 | $ 43,494.2 | $ 46,819.6 |
| (D) | Audit Rate | 65.1% | 69.0% | 65.1% | 69.0% |
| (E) | Demand Rate | 54.4% | 63.7% | 54.4% | 63.7% |
| (F) =(D)*(E) | Breach Rate (Audit Rate * Demand Rate) | 35.4% | 44.0% | 35.4% | 44.0% |
| (G) | Agree Rate | 41.4% | 47.1% | 41.4% | 47.1% |
| (H) =(F)*(G) | Loss Share Rate (Breach Rate * Agree Rate) | 14.7% | 20.7% | 14.7% | 20.7% |
| (I) =(C)*(H) | Estimated Repurchase Liability | $ 6,680.4 | $ 10,325.9 | $ 6,380.8 | $ 9,704.6 |

# APPENDIX DDD

## Agree Rate Analysis

| (S in mm) | | Sillman Analysis | | | Historical Agree Rate[1] | | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Average | Low | High | Average |
| **(A)** | Actual Losses to Date | $ 30,536.9 | $ 30,536.9 | $ 30,536.9 | $ 30,536.9 | $ 30,536.9 | $ 30,536.9 |
| **(B)** | Forecasted Remaining Losses | 12,957.3 | 16,282.7 | 14,620.0 | 12,957.3 | 16,282.7 | 14,620.0 |
| **(C)** =(A)+(B) | Total Estimated Lifetime Losses | $ 43,494.2 | $ 46,819.6 | $ 45,156.9 | $ 43,494.2 | $ 46,819.6 | $ 45,156.9 |
| **(D)** | Audit Rate | 65.1% | 69.0% | 67.1% | 65.1% | 69.0% | 67.1% |
| **(E)** | Demand Rate | 54.4% | 63.7% | 59.1% | 54.4% | 63.7% | 59.1% |
| **(F)** =(D)*(E) | Breach Rate (Audit Rate * Demand Rate) | 35.4% | 44.0% | 39.6% | 35.4% | 44.0% | 39.6% |
| **(G)** | Agree Rate | 41.4% | 47.1% | 44.3% | 14.0% | 14.0% | 14.0% |
| **(H)** =(F)*(G) | Loss Share Rate (Breach Rate * Agree Rate) | 14.7% | 20.7% | 17.5% | 4.9% | 6.1% | 5.5% |
| **(I)** =(C)*(H) | Estimated Repurchase Liability | $ 6,380.8 | $ 9,704.6 | $ 7,918.9 | $ 2,151.8 | $ 2,874.5 | $ 2,497.5 |
| | Memo: Dollar Increase/(Decrease) from Sillman | | | | $ (4,229.1) | $ (6,830.1) | $ (5,421.4) |
| | Memo: Percent Increase/(Decrease) from Sillman | | | | (66.3%) | (70.4%) | (68.5%) |

---

(1)    Revised Agree Rate calculated based on data provided in RC-9019_00056670.

# APPENDIX EEE

**Trusts Formed Prior to May 14, 2006**

| | Trust Name | Closing Date | | Trust Name | Closing Date | | Trust Name | Closing Date |
|---|---|---|---|---|---|---|---|---|
| 1 | 2004-KS1 | 1/29/2004 | 51 | 2004-KS7 | 7/29/2004 | 101 | 2005-KS2 | 2/25/2005 |
| 2 | 2004-QS1 | 1/29/2004 | 52 | 2004-QS10 | 7/29/2004 | 102 | 2005-QS2 | 2/25/2005 |
| 3 | 2004-RS1 | 1/29/2004 | 53 | 2004-RS7 | 7/29/2004 | 103 | 2005-RS2 | 2/25/2005 |
| 4 | 2004-VFT | 2/24/2004 | 54 | 2004-S7 | 7/29/2004 | 104 | 2005-S1 | 2/25/2005 |
| 5 | 2004-KS2 | 2/26/2004 | 55 | 2004-SP2 | 8/6/2004 | 105 | 2005-SA1 | 2/25/2005 |
| 6 | 2004-QS2 | 2/26/2004 | 56 | 2004-J4 | 8/17/2004 | 106 | 2005-QA2 | 2/28/2005 |
| 7 | 2004-RS2 | 2/26/2004 | 57 | 2004-KS8 | 8/30/2004 | 107 | 2005-EMX1 | 3/4/2005 |
| 8 | 2004-S1 | 2/26/2004 | 58 | 2004-QA3 | 8/30/2004 | 108 | 2005-S2 | 3/24/2005 |
| 9 | 2004-RP1 | 3/5/2004 | 59 | 2004-QS11 | 8/30/2004 | 109 | 2005-HE1 | 3/29/2005 |
| 10 | 2004-J1 | 3/16/2004 | 60 | 2004-RS8 | 8/30/2004 | 110 | 2005-RZ1 | 3/29/2005 |
| 11 | 2004-S2 | 3/26/2004 | 61 | 2004-HI3 | 9/29/2004 | 111 | 2005-QS3 | 3/30/2005 |
| 12 | 2004-HI1 | 3/29/2004 | 62 | 2004-HLTV1 | 9/29/2004 | 112 | 2005-RS3 | 3/30/2005 |
| 13 | 2004-HS1 | 3/29/2004 | 63 | 2004-HS3 | 9/29/2004 | 113 | 2005-S3 | 3/30/2005 |
| 14 | 2004-KR1 | 3/29/2004 | 64 | 2004-KR2 | 9/29/2004 | 114 | 2005-SL1 | 3/30/2005 |
| 15 | 2004-RS3 | 3/29/2004 | 65 | 2004-KS9 | 9/29/2004 | 115 | 2005-QA3 | 3/31/2005 |
| 16 | 2004-HE1 | 3/30/2004 | 66 | 2004-QA4 | 9/29/2004 | 116 | 2005-KS3 | 4/8/2005 |
| 17 | 2004-HE2 | 3/30/2004 | 67 | 2004-QS12 | 9/29/2004 | 117 | 2005-AR2 | 4/21/2005 |
| 18 | 2004-KS3 | 3/30/2004 | 68 | 2004-QS13 | 9/29/2004 | 118 | 2005-AA1 | 4/28/2005 |
| 19 | 2004-QA1 | 3/30/2004 | 69 | 2004-RS9 | 9/29/2004 | 119 | 2005-QS4 | 4/28/2005 |
| 20 | 2004-QS3 | 3/30/2004 | 70 | 2004-RZ3 | 9/29/2004 | 120 | 2005-QS5 | 4/28/2005 |
| 21 | 2004-QS4 | 3/30/2004 | 71 | 2004-S8 | 9/29/2004 | 121 | 2005-QA4 | 4/29/2005 |
| 22 | 2004-RZ1 | 3/30/2004 | 72 | 2004-SL3 | 9/29/2004 | 122 | 2005-KS4 | 5/5/2005 |
| 23 | 2004-S3 | 3/30/2004 | 73 | 2004-HE4 | 10/28/2004 | 123 | 2005-QA5 | 5/6/2005 |
| 24 | 2004-SL1 | 3/30/2004 | 74 | 2004-KS10 | 10/28/2004 | 124 | 2005-RS4 | 5/6/2005 |
| 25 | 2004-RS4 | 4/28/2004 | 75 | 2004-QS14 | 10/28/2004 | 125 | 2005-AR3 | 5/26/2005 |
| 26 | 2004-AR1 | 4/29/2004 | 76 | 2004-RS10 | 10/29/2004 | 126 | 2005-KS5 | 5/27/2005 |
| 27 | 2004-KS4 | 4/29/2004 | 77 | 2004-SP3 | 11/10/2004 | 127 | 2005-QA6 | 5/27/2005 |
| 28 | 2004-QS5 | 4/29/2004 | 78 | 2004-GH1 | 11/22/2004 | 128 | 2005-QS6 | 5/27/2005 |
| 29 | 2004-S4 | 4/29/2004 | 79 | 2004-J5 | 11/22/2004 | 129 | 2005-S4 | 5/27/2005 |
| 30 | 2004-J2 | 5/17/2004 | 80 | 2004-KS11 | 11/29/2004 | 130 | 2005-SA2 | 5/27/2005 |
| 31 | 2004-KS5 | 5/27/2004 | 81 | 2004-PS1 | 11/29/2004 | 131 | 2005-EFC1 | 5/31/2005 |
| 32 | 2004-QS6 | 5/27/2004 | 82 | 2004-QA5 | 11/29/2004 | 132 | 2005-RS5 | 5/31/2005 |
| 33 | 2004-QS7 | 5/27/2004 | 83 | 2004-QS15 | 11/29/2004 | 133 | 2005-SP1 | 5/31/2005 |
| 34 | 2004-RS5 | 5/27/2004 | 84 | 2004-RS11 | 11/29/2004 | 134 | 2005-AR4 | 6/28/2005 |
| 35 | 2004-S5 | 5/27/2004 | 85 | 2004-HE5 | 11/30/2004 | 135 | 2005-KS6 | 6/28/2005 |
| 36 | 2004-J3 | 6/15/2004 | 86 | 2004-KS12 | 12/29/2004 | 136 | 2005-AF1 | 6/29/2005 |
| 37 | 2004-SP1 | 6/25/2004 | 87 | 2004-QA6 | 12/29/2004 | 137 | 2005-EMX2 | 6/29/2005 |
| 38 | 2004-HI2 | 6/29/2004 | 88 | 2004-QS16 | 12/29/2004 | 138 | 2005-HE2 | 6/29/2005 |
| 39 | 2004-HS2 | 6/29/2004 | 89 | 2004-RS12 | 12/29/2004 | 139 | 2005-HI2 | 6/29/2005 |
| 40 | 2004-KS6 | 6/29/2004 | 90 | 2004-J6 | 12/30/2004 | 140 | 2005-QA7 | 6/29/2005 |
| 41 | 2004-QA2 | 6/29/2004 | 91 | 2004-S9 | 12/30/2004 | 141 | 2005-QS7 | 6/29/2005 |
| 42 | 2004-QS8 | 6/29/2004 | 92 | 2004-SL4 | 1/4/2005 | 142 | 2005-QS8 | 6/29/2005 |
| 43 | 2004-QS9 | 6/29/2004 | 93 | 2004-RZ4 | 1/5/2005 | 143 | 2005-QS9 | 6/29/2005 |
| 44 | 2004-RS6 | 6/29/2004 | 94 | 2005-HI1 | 1/27/2005 | 144 | 2005-SL2 | 6/30/2005 |
| 45 | 2004-RZ2 | 6/29/2004 | 95 | 2005-KS1 | 1/28/2005 | 145 | 2005-RS6 | 7/1/2005 |
| 46 | 2004-S6 | 6/29/2004 | 96 | 2005-QA1 | 1/28/2005 | 146 | 2005-EFC2 | 7/28/2005 |
| 47 | 2004-SA1 | 6/29/2004 | 97 | 2005-QS1 | 1/28/2005 | 147 | 2005-KS7 | 7/28/2005 |
| 48 | 2004-SL2 | 6/29/2004 | 98 | 2005-RS1 | 1/28/2005 | 148 | 2005-QA8 | 7/28/2005 |
| 49 | 2004-HE3 | 6/30/2004 | 99 | 2005-RP1 | 2/4/2005 | 149 | 2005-QS10 | 7/28/2005 |
| 50 | 2004-AR2 | 7/27/2004 | 100 | 2005-AR1 | 2/24/2005 | 150 | 2005-QS11 | 7/28/2005 |

**Trusts Formed Prior to May 14, 2006 (Cont'd)**

| | Trust Name | Closing Date | | Trust Name | Closing Date | | Trust Name | Closing Date |
|---|---|---|---|---|---|---|---|---|
| 151 | 2005-S5 | 7/28/2005 | 201 | 2005-EMX5 | 12/16/2005 | 251 | 2006-RP2 | 5/9/2006 |
| 152 | 2005-SA3 | 7/28/2005 | 202 | 2005-EFC7 | 12/28/2005 | 252 | 2006-RS3 | 5/9/2006 |
| 153 | 2005-RS7 | 8/5/2005 | 203 | 2005-KS12 | 12/28/2005 | 253 | 2006-SP2 | 5/9/2006 |
| 154 | 2005-RZ2 | 8/5/2005 | 204 | 2005-NC1 | 12/28/2005 | | | |
| 155 | 2005-RP2 | 8/9/2005 | 205 | 2005-HSA1 | 12/29/2005 | | | |
| 156 | 2005-AR5 | 8/17/2005 | 206 | 2005-QA13 | 12/29/2005 | | | |
| 157 | 2005-EFC3 | 8/30/2005 | 207 | 2005-QO5 | 12/29/2005 | | | |
| 158 | 2005-KS8 | 8/30/2005 | 208 | 2005-QS17 | 12/29/2005 | | | |
| 159 | 2005-QA9 | 8/30/2005 | 209 | 2005-S9 | 12/29/2005 | | | |
| 160 | 2005-QS12 | 8/30/2005 | 210 | 2005-SP3 | 12/29/2005 | | | |
| 161 | 2005-S6 | 8/30/2005 | 211 | 2006-EMX1 | 1/20/2006 | | | |
| 162 | 2005-SA4 | 8/30/2005 | 212 | 2006-RS1 | 1/25/2006 | | | |
| 163 | 2005-QO1 | 8/31/2005 | 213 | 2006-KS1 | 1/26/2006 | | | |
| 164 | 2005-EMX3 | 9/23/2005 | 214 | 2006-EFC1 | 1/27/2006 | | | |
| 165 | 2005-HS1 | 9/23/2005 | 215 | 2006-HSA1 | 1/27/2006 | | | |
| 166 | 2005-QA10 | 9/23/2005 | 216 | 2006-NC1 | 1/30/2006 | | | |
| 167 | 2005-RZ3 | 9/23/2005 | 217 | 2006-QA1 | 1/30/2006 | | | |
| 168 | 2005-KS9 | 9/27/2005 | 218 | 2006-QO1 | 1/30/2006 | | | |
| 169 | 2005-AHL1 | 9/29/2005 | 219 | 2006-QS1 | 1/30/2006 | | | |
| 170 | 2005-EFC4 | 9/29/2005 | 220 | 2006-S1 | 1/30/2006 | | | |
| 171 | 2005-HE3 | 9/29/2005 | 221 | 2006-SA1 | 1/30/2006 | | | |
| 172 | 2005-QO2 | 9/29/2005 | 222 | 2006-EMX2 | 2/23/2006 | | | |
| 173 | 2005-QS13 | 9/29/2005 | 223 | 2006-HSA2 | 2/24/2006 | | | |
| 174 | 2005-QS14 | 9/29/2005 | 224 | 2006-AR1 | 2/27/2006 | | | |
| 175 | 2005-RS8 | 9/29/2005 | 225 | 2006-J1 | 2/27/2006 | | | |
| 176 | 2005-SP2 | 10/11/2005 | 226 | 2006-KS2 | 2/27/2006 | | | |
| 177 | 2005-AHL2 | 10/25/2005 | 227 | 2006-QA2 | 2/27/2006 | | | |
| 178 | 2005-EFC5 | 10/26/2005 | 228 | 2006-QS2 | 2/27/2006 | | | |
| 179 | 2005-AR6 | 10/27/2005 | 229 | 2006-RZ1 | 2/27/2006 | | | |
| 180 | 2005-HI3 | 10/27/2005 | 230 | 2006-S2 | 2/27/2006 | | | |
| 181 | 2005-KS10 | 10/28/2005 | 231 | 2006-QO2 | 2/28/2006 | | | |
| 182 | 2005-QA11 | 10/28/2005 | 232 | 2006-NC2 | 3/2/2006 | | | |
| 183 | 2005-QO3 | 10/28/2005 | 233 | 2006-RS2 | 3/3/2006 | | | |
| 184 | 2005-QS15 | 10/28/2005 | 234 | 2006-RP1 | 3/8/2006 | | | |
| 185 | 2005-SA5 | 10/28/2005 | 235 | 2006-SP1 | 3/9/2006 | | | |
| 186 | 2005-EMX4 | 11/17/2005 | 236 | 2006-NC3 | 3/28/2006 | | | |
| 187 | 2005-AHL3 | 11/18/2005 | 237 | 2006-HI1 | 3/29/2006 | | | |
| 188 | 2005-J1 | 11/21/2005 | 238 | 2006-KS3 | 3/29/2006 | | | |
| 189 | 2005-EFC6 | 11/22/2005 | 239 | 2006-AR2 | 3/30/2006 | | | |
| 190 | 2005-S7 | 11/23/2005 | 240 | 2006-HE1 | 3/30/2006 | | | |
| 191 | 2005-AF2 | 11/29/2005 | 241 | 2006-HLTV1 | 3/30/2006 | | | |
| 192 | 2005-HS2 | 11/29/2005 | 242 | 2006-QO3 | 3/30/2006 | | | |
| 193 | 2005-KS11 | 11/29/2005 | 243 | 2006-QS3 | 3/30/2006 | | | |
| 194 | 2005-QA12 | 11/29/2005 | 244 | 2006-S3 | 3/30/2006 | | | |
| 195 | 2005-QO4 | 11/29/2005 | 245 | 2006-EMX3 | 4/21/2006 | | | |
| 196 | 2005-QS16 | 11/29/2005 | 246 | 2006-QA3 | 4/27/2006 | | | |
| 197 | 2005-RS9 | 11/29/2005 | 247 | 2006-QO4 | 4/27/2006 | | | |
| 198 | 2005-S8 | 11/29/2005 | 248 | 2006-QS4 | 4/27/2006 | | | |
| 199 | 2005-RZ4 | 12/6/2005 | 249 | 2006-S4 | 4/27/2006 | | | |
| 200 | 2005-RP3 | 12/9/2005 | 250 | 2006-RZ2 | 5/5/2006 | | | |

# APPENDIX FFF

## RESCAP TOLLING AGREEMENTS

## TOLLING AGREEMENTS WITH TRUSTS

| Signatories | Effective Date | Termination Date |
|---|---|---|
| Deutsche Bank Trust Company Americas, **"as trustee (in such capacity for each Trust, 'Trustee') for the trusts listed in Exhibit 1 attached hereto"** (with RFC, RALI)<br><br>Trust: RALI 2005-QA13 | December 23, 2011 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Deutsche Bank Trust Company Americas, **"as trustee (in such capacity for each Trust, 'Trustee') for the trusts listed in Exhibit 1 attached hereto"** (with RFC, RALI)<br><br>Trusts: GSR 2007-OA1; GSR 2007-OA2; HVMLT 2006-14; HVMLT 2006-8; HVMLT 2007-6; RALI 2005-QA11; RALI 2005-QA2; RALI 2005-QA3; RALI 2005-QA6; RALI 2005-QA9; RALI 2005-QA12; RALI 2006-QA7; RALI 2006-QO4; RALI 2006-QO8; RALI 2006-QO9; RALI 2007-QH5; RALI 2007-QH7 | April 12, 2012 | the earliest of (a) **October 12, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Deutsche Bank Trust Company Americas **"as trustee for the trust(s) listed in Exhibit 1 attached hereto"** (with RFC, RALI)<br><br>Trust: RALI 2006-QO7 | March 14, 2012 | the earliest of (a) **December 15, 2013**, (b) the first Business Day that is at least 14 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| HSBC USA, National Association, **"as trustee for the** | April 24, 2012 | the earliest of (a) **October 24, 2012**, (b) the first Business Day that is at least 120 days |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| **trust  listed in Exhibit 1 attached hereto"** (with RFC)<br><br>Trust: Luminent Mortgage Trust 2006-3 | | after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |

### TOLLING AGREEMENTS WITH INVESTORS THAT EXTEND TO TRUSTS

| Signatories | Effective Date | Termination Date | Language Extending Tolling to Trust |
|---|---|---|---|
| QA13 Investors, LLC (with RFC, RALI)<br><br>Trust: RALI 2005-QA13 | December 23, 2011 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. | The Recitals state that "a Trustee (as defined in the Governing Documents) acts as trustee for each Trust for the benefit of the Certificateholders under a pooling and servicing agreement (or other trust instrument) . . . .<br><br>Section 2(d) defines "Parties" or "Party" as "any of the **Trustee** or the RFC Parties."<br><br>Section 6 provides that "The Parties [i.e. the Trustee and the RFC Parties] agree to forbear filing a petition or complaint or initiating any lawsuit or other legal proceeding against any other Party with respect to the Claims before the expiration date." |

### TOLLING AGREEMENTS WITH INVESTORS

| Signatories | Effective Date | Termination Date |
|---|---|---|
| [Illegible]<br><br>Trusts: Illegible | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| American International Group, Inc. (with Ally Financial, Inc.; IB Finance Holding Company, LLC; Ally Bank; and GMAC Mortgage Group, LLC)<br><br>Trusts: CBASS-2004-CB2; COMM 2005-C6; CSFB 2005-C1; CSFB 2005-C5; CSMC 2006-C1; CTCDO 2004-1A; GMACC 2000-C3; GMACC 2003-C1; GMACC-2004-C3; GMACC 2005-C1; GMACM 2002-J7; GMACM 2003-AR2; GMACM 2003-GH1; GMACM 2003-HE1; GMACM 2003-J2; GMACM 2003-J7; GMACM 2003-J8; GMACM 2003-J9; GMACM 2004-AR2; GMACM 2004-HE1; GMACM 2004-HE3; GMACM 2004-HE4; GMACM 2004-HLT1; GMACM 2004-J1; GMACM 2004-J2; GMACM 2004-J4; GMACM 2004-J5; GMACM 2004-J6; GMACM 2004-JR1; GMACM 2005-AR3; GMACM 2005-AR6; GMACM 2005-HE1; GMACM 2005-HE3; GMACM 2005-J1; GMACM 2006-AR1; GMACM 2006-AR2; GMACM 2006-HE4; GMACM 2006-HE5; GMACM 2006-J1; GMACM 2007-HE2; RAAC 2006-SP2; RALI 2004-QA6; RALI 2006-QS2; RAMP 2004-SL4; RAMP 2006-NC1; RAMP 2006-RS4; RAMP 2006-RZ1; RAMP 2007-RS2; RASC 2004-KS3; RASC 2004-KS8; RASC 2005-AHL3; RASC 2005-KS12; RASC 2006-EMX3; RASC 2006-EMX4; RASC 2006 EMX5; RASC 2006-EMX6; RASC 2007-KS3; RFMS2 2005-HI3; RFMSI 2007-SA1; RFMSI | June 1, 2010 | The earlier of **December 31, 2010**, or fourteen (14) calendar days after either Party receives written notice of termination from the other Party by overnight courier |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| 2007-SA2; RFSC 2003-RM1; RFSC 2003-RM2; RMAC 2004-NS3X; and RMACS 2006-NS1X | | |
| American International Group, Inc. (with Ally Financial, Inc.; IB Finance Holding Company, LLC; Ally Bank; and GMAC Mortgage Group, LLC)<br><br>Trusts: BAFC 2005-8; DBALT 2007-RMP1; GMACM 2005-AR3; GMACM 2005-HE1; GMACM 2005-HE3; GMACM 2006-AR1; GMACM 2006-AR2; GMACM 2006-HE4; GMACM 2006-HE5; GMACM 2007-HE2; GSR 2007-AR1; GSR 2007-HEL1; GSR 2007-OA1; JPMAC 2006-WMC1; MANA 2007-OAR4; RAAC 2006-SP2; RAAC 2006-SP3; RAAC 2006-SP4; RALI 2006-QS5; RALI 2006-QS6; RALI 2006-QS8; RAMP 2005-EFC7; RAMP 2005-RS5; RAMP 2005-RS9; RAMP 2006-NC1; RAMP 2006-NC2; RAMP 2006-RS1; RAMP 2006-RS2; RAMP 2006-RS4; RAMP 2006-RZ1; RAMP 2007-RS2; RASC 2005-AHL3; RASC 2005-KS12; RASC 2006-EMX3; RASC 2006-EMX5; RASC 2006-EMX6; RASC 2006-KS4; RASC 2006-KS5; RASC 2006-KS6; RASC 2006-KS7; RASC 2006-KS9; RASC 2007-KS1; RASC 2007-KS3; RFMS2 2005-HI3; RFMS2 2006-HI1; RFMS2 2007-HSA2; RFMS2 2007-HSA3; RFMSI 2006-SA2; RFMSI 2006-SA3; RFMSI 2007-SA1; RFMSI 2007-SA2 | November 15, 2011 | The earlier of **June 30, 2012** or fourteen (14) calendar days after either Party receives written notice of termination from the other Party by overnight courier |
| Anchor Bank (with RFC, RALI)<br><br>Trust: RALI 2007-QS5 A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with |

12-12020-mg   Doc 3601-1   Filed 05/06/13   Entered 05/06/13 16:03:57   Exhibit 1
Pg 40 of 65

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Bank Hapoalim B.M. (with "Ally/GMAC Parties" as defined in a schedule)<br><br>Trusts: GMACM 2006-AR2 2A2; RALI 2006-QO3 A2; RALI 2006-QO5 3A4; RALI 2006-QO5 2A2; RALI 2006-QO6 A2; RALI 2006 QO8 1A4A; RALI 2006-QO9 1A3A; RALI 2007-QO2 A2; GMACM 2007 HE1 A4; RALI 2007-QH4 A2; RFMS2 2007-HSA3 A13; GMACM 2007-HE2 A6; RAAC 2007-SP2 A2 | March 14, 2012 | September 14, 2012 |
| Bank West, Inc. (with RFC, RALI)<br><br>Trusts: RALI 2006-QS6 1A16; RALI 2006-QS16 A7; RALI 2007-QS5 A1; RALI 2006-QS8 A1; RALI 2006-QS9 1A11; RALI 2007-QS6 A28; RALI 2004-QS5 A5; RALI 2005-QS13 1A6 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Citizens Bank & Trust Company(with RFC, RALI)<br><br>Trusts: RALI 2006-QS4 A2; RALI 2006-QS8 A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Deutsche Zentralgenossenschaftsbank and DG Holding Trust (with Ally | December 13, 2011 | September 14, 2012 |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| Financial, Inc.; GMAC Mortgage Group, Inc.; Residential Capital, LLC; GMAC-RFC Holding Company, LLC; Residential Funding Company, LLC; Ally Securities, LLC; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Accredit Loans)<br><br>Trusts: RALI 2006-QA11 A1; RALI 2007-QA1 A3; RAMP 2005-EFC7 A13; RAMP 2005-NC1 A13; RAMP 2006-EFCI A2; RAMP 2006-NC1 A2; RAMP 2006-RS4 A3; RASC 2005-EMX5 A2; RASC 2005-KS12 M1; RASC 2006-KS1 A3; RASC 2007-EMX1 A11 | | |
| Farallon Capital Management, LLC (with RFC, RALI)<br><br>Trust: RALI 2007-QH3 A1 | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Farallon Capital Management, LLC (with RFC, RALI)<br><br>Trusts: RALI 2007-QA2 (A1 and A3); RALI 2007-QO2 A1; RALI 2007-QH9 A1; RALI 2007-QA3 A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Farmers and Merchants Trust Company (with RFC, RALI) | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| Trusts: RALI 2003-QS15 A1; RALI 2004-QS4 A7; RALI 2005-QS2 A1; RALI 2006-QS4 A2; RALI 2006-QS8 A1 | | 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| First Bank (with RFC, RALI)<br><br>Trusts: RFMSI 2007-S4 A5; RALI 2005-QS13 1A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| First Farmers State Bank (with RFC, RALI)<br><br>Trusts: RALI 2006-QS16 A7; RALI 2006-QS17 A4 | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| First Federal Bank of Florida (with RFC, RALI)<br><br>Trusts: RALI 2004-QS1 A1; RALI 2004-QS3 CB | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | all Parties. |
| First National Bank & Trust Co. of Rochelle, IL (with RFC, RALI)<br><br>Trusts: RALI 2006-QS3 1A10; RALI 2006-QS8 A1; RALI 2006-QS16 A10 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| First National Bank of Wynne (with RFC, RALI)<br><br>Trust: RALI 2007-QS6 A29 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| First National Banking Company (with RFC, RALI)<br><br>Trusts: RALI 2006-QS4 A2; RALI 2006-QS6 1A16; RALI 2006-QS16 A10; RALI 2007-QS1 2A6; RALI 2007-QS2 A6; RFMSI 2007-S4 A5 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| HBK Master Fund L.P. (with RFC, RALI)<br><br>Trusts: RALI 2005-QA12 (CB1 and NB5); RALI 2005-QA2 (NB2); RALI 2005-QA8 (NB3); RALI 2005-QO1 (A1); RALI 2005-QS9 (A6); RALI 2006-QS4 (A12 and A5); RALI 2007- | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| QS6 A1; RALI 2006-QO4 (N2); RALI 2006-QS7 A4; RALI 2007-QS1 2A2 | | (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Heartland Bank (with RFC, RALI)<br><br>Trusts: RALI 2004-QS1 A1; RALI 2006-QS4 A2 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| HSH Nordbank AG (with Ally Financial, Inc.; GMAC Mortgage Group, Inc; Residential Capital, LLC; GMAC-RFC Holding Company, LLC; Residential Funding Company, LLC; Ally Securities, LLC; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation)<br><br>Trusts: RAMP 2006-NC1 A3; RAMP 2006-NC2 A2; RAMP 2006-NC2 A3; RAMP 2006-NC2 M1; RAMP 2006-NC2 M2; RAMP 2006-NC2 M4; RAMP 2006-NC2 M5; RASC 2006-EMX2 A2; RASC 2006-EMX2 A3 | December 29, 2011 | September 14, 2012 |
| IKB Deutsche Industriebank AG (with Ally Financial, Inc.; GMAC Mortgage Group, Inc; Residential Capital, LLC; GMAC-RFC Holding Company, LLC; Residential Funding Company, LLC; Ally Securities, LLC; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Money Centers, Inc., Residential Accredits Loans; GMAC Mortgage, LLC; Homecomings Financial, LLC, and | September 12, 2011 | July 20, 2012 |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| their parents or affiliates)<br><br>Trusts: CARR 06-RFC1 (M4, M5 M7, M8); RAMP 05-EFC2 M7; RAMP 05-EFC5 (M1 and M7); RAMP 05-EFC6 (M4 and M7); RAMP 06-EFC2 (M4, M5, M7 and M8); RAMP 06-RZ3 (M2 and M4); RASC 01-KS2 (MII1); RASC 05-AHL2 M5; RASC 05-AHL3 A2; RASC 05-EMX3 M7; RASC 05-EMX4 M7; RASC 05-KS11 M7; RASC 05-KS12 M7; RASC 06-EMX2 (A2 and M7); RASC 06-EMX3 (M4 and M7); RASC 06-EMX4 (M5 and M7); RASC 06-EMX7 (M4, M5, M7); RASC 06-EMX9 (M5 and M7); RASC 06-KS1 (M7); RASC 06-KS2 (M7); RFMS2 06-HI1 (M1 and M2) | | |
| John Hancock Life Insurance Company (with "Ally/GMAC Parties" listed on a schedule)<br><br>Trust: [No exhibit with trust information] | January 19, 2012 | July 20, 2012 |
| Kerndt Brothers Savings Bank (with RFC, RALI)<br><br>Trust: RALI 2006-QS4 A2 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Lee County State Bank (with RFC, RALI)<br><br>Trusts: RALI 2006-QS14 A1; RALI 2006-QS16 A7; RALI 2006-QS8 A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| LL Funds LLC (with RFC, RALI)<br><br>Trust: RALI 2004-QA1 M1 | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Mutual Savings Association, FSA<br><br>Trusts: RALI 2006-QS4 A2; RALI 2006-QS14 A1; RALI 2006-QS16 A10; RALI 2006-QS16 A10; RALI 2006-QS9 1A11; RALI 2007-QS6 A28; RALI 2002-QS19 A5; RALI 2004-QS1 1A1; RALI 2005-QS13 1A6 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Norges Bank Investment Management (with "Ally/GMAC Parties" listed on a schedule)<br><br>Trusts: GMACC 1997-C1 X; GMACC 1999-C1 A2; GMACC 2004-C2 A4; GMACC 1999-C2 A2; GMACC 2000-C1 C; GMACC 2005-C1 A2; GMACC 2006-Cl A4; GMACC 2001-C1 A2; GMACC 2005-C1 XC; GMACC 2006-C1 XC; GMACC 2005-C1 X1; GMACM 2004-HE4 A2; GMACM 2004-HE5 Al; GMACM 2005-HE3 A1; GMACM 2005-HE3 A2; GMACM 2005-AR6 2Al; GMACM | April 13, 2012 | September 1, 2012 |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| 2006-J1 A1; GMACM 2006-AR2 B2; GMACM 2005-AR2 2A; GMACM 2005-AR2 4A; GMACM 2007-HE1 A2; GMACM 2007-HE2 A2; GMACM 2006-HE3 A1; GMACM 2005-AR1 1A2; GMACM 2005-AR4 3A1; GMACM 2005-AR4 4A1; GMACM 2005-AR5 5A1; GMACM 2004-HE4 A10; RALI 2006-QS16 A10; RALI 2006-QA6 A2; RALI 2006-QA6 A3; RALI 2007-QS5 A5; RALI 2007-QO4 A2; RALI 2006-QO5 2A1; RALI 2006-QO6 A2; RALI 2006-QO7 3A2; RALI 2006-QS12 1A4; RALI 2006-QS10 A18; RALI 2006-QS8 A1; RALI 2005-QS4 A5; RALI 2005-QA4 A21; RALI 2005-QA5 M1; RALI 2003-QS10 A9; RALI 2003-QS11 AV; RALI 2003-QS11 M1; RALI 2004-QA6 NB1; RALI 2003-QS17 AV; RALI 2003-QS20 AV; RALI 2005-QS1 A5; RALI 2005-QS1 AV; RALI 2005-QR1 A; RALI 2004-QS10 AV; RALI 2004-QS11 AV; RALI 2004-QS13 AV; RALI 2005-QS9 A6; RALI 2005-QA9 M1; RALI 2005-QA10 A41; RALI 2005-QS14 1AV; RALI 2005-QS14 2AV; RALI 2005-QO3 A1; RALI 2005-QO3 A3; RALI 2005-QS16 A8; RALI 2005 QO4 2A1; RALI 2005-QA13 2A1; RALI 2005-QA13 3A2; RALI 2005-QS17 A1; RALI 2005-QO5 M3; RALI 2006-QO1 3A1; RALI 2006-QA2 1A2; RALI 2006-QS2 1A9; RALI 2006-QO3 A1; RALI 2006-QO3 A2; RALI 2006-QO3 M1; RALI 2006-QS3 1A10; RALI 2006-QO7 3A2; RALI 2005-QO3 A3; RAMP 2007-RZ1 A2; RAMP 2007-RS1 A1; RAMP 2006-NC2 A2; RAMP 2006-RZ4 A1; RAMP 2006-RS5 A2; RAMP 2003-RS11 MII1; RAMP 2003-RS1 AII; RAMP 2003-RS2 AII; RAMP 2006-NC3 A2; RAMP 2004-RS12 AI1; | | |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| RAMP 2004-RS12 AII2; RAMP 2005-RS1 MI1; RAMP 2005-RS2 M8; RAMP 2006-RS5 A2; RASC 2006-EMX7 A3; RASC 2005-KS12 A2; RASC 2005-KS10 B; RASC 2006-EMX4 A3; RASC 2005-KS8 A3; RASC 2005-AHL3 A1; RASC 2002-KS7 A2; RASC 2005-EMX1 M2; RASC 2003-KS2 AIIB; RASC 2003-KS9 A16; RASC 2003-KS10 MII1; RASC 2006-KS3 AI3; RASC 2006-KS3 AI4; RASC 2006-KS3 M1; RASC 2006-EMX7 A3; RASCN 2005-NTR1 NOTE; RFMS2 2006-HI5 A1; RFMS2 2005-HI1 A2; RFMS2 2005-HI2 A1; RFMSI 2006-SA2 3A2; RFMSI 2006-SA3 3A1; RFMSI 2006-S9 A1; RFMSI 2006-S5 A6; RFMSI 2006-S6 A15; RFMSI 2006-S8 A1; RFMSI 2006-S8 A9; RFMSI 2006-S8 A12; RFMSI 2007-S5 A4; RFMSI 2007-S5 A9; RFMSI 2007-S5 B1; RFMSI 2007-S1 M1; RFMSI 2006-S7 A3; RFMSI 2006-S7 A4; RFMSI 2007-S3 M1; RFMSI 2007-S3 M2; RFMSI 2007-S3 B1; RFMSI 2007-S3 B2; RFMSI 2007-S3 B3; RFMSI 2006-SA4 2A1; RFMSI 2006-S10 1A1; RFMSI 2007-S4 A1; RFMSI 2007-S4 M1; RFMSI 2005-S9 M1; RFMSI 2005-S9 M3; RFMSI 2006-S1 IA3; RFMSI 2004-S5 2A1; RFMSI 2004-S6 3AV; RFMSI 2006-S3 M1; RFMSI 2004-S9 2AV; RFMSI 2005-S1 2AV; RFMSI 2005-SA2 1A; RFMSI 2005-S5 A6; RFMSI 2005-SA4 1A22; RFMSI 2007-S6 1M1; RFMSI 2007-S6 1M2; RFMSI 2007-S6 1M3; RFMSI 2007-S6 2M1; RFMSI 2007-S6 2M2; RFMSI 2007-S6 1B2; RFMSI 2007-S6 1B3; RFMSI 2007-S6 2B2; RFMSI 2007-S8 1A2; RFMSI 2007-S7 M2; RFMSI 2006-S4 M1; RFMSI 2006-S7 A4; RFMSI 2004-S5 2A1; RFSC 2003-RM2 M3-2 | | |

-13-

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | |
| Northwestern Bank, N.A. (with RFC, RALI)<br><br>Trust: RALI 2005 QS13 1A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| People's [Independent?] Bank<br><br>Trusts: RALI 2005-QS13 1A1; RALI 2005-QS15 1A; RFMSI 2004-S3 M2 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Perkins State Bank (with RFC, RALI)<br><br>Trusts: RALI 2006-QS8 A1; RALI 2007-QS6 A29 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Pinnacle Bank of South Carolina<br><br>Trusts: RALI 2006-QS16 A10; RALI 2003-QS14 A1; RALI 2004-QS1 A4 | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Prudential Insurance Company of America (with Ally Financial Inc.)<br><br>Trusts: <u>See</u> Tab 43 (below) | February 28, 2012 | N/A |
| Prudential Insurance Company of America (with GMAC Mortgage, LLC; Residential Funding Co., LLC; Residential Funding Securities, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities, II, Inc.; and Residential Asset Securities Corp.)<br><br>Trusts: RAMP 2004-RS10 (MII2); RAMP 2004-RS12 (MII2 and MII4); RAMP 2004-RS2 MII1; RAMP 2004-RS9 MII2; RAMP 2004-RZ3 AI4; RAMP 2005-EFC1 M2; RAMP 2006-EFC2 A4; RAMP 2006-RZ2 MI; RAMP 2006-RZ3 A2; RAMP 2006-RZ4 A3; RAMP 2007-RS2 A2; RASC 2004-KS9 AII3; RASC 2005-AHL3 M1; RASC 2005-KS10 M2; RASC 2005-KS8 (M2 and M3); RASC 2006-EMX7 A4; RASC 2006-EMX9 1A2; RASC 2006-KS3 (AI4 and M2); RASC 2006-KS4 A4; RASC 2007-KS1 A4; RASC 2007-KS2 (AI2 and AI3); RASC 2007-KS3 (AI2); RASC 2007-KS4 (A3 and A4); RFMS2 2005-HI1 A5; RFMS2 2005-HS1 AI5; RFMS2 2005-HS2 (AI5 and AII); RFMS2 2006-HI2 A4; RFMS2 2006-HI3 A4 | January 27, 2012 | The earlier of **June 30, 2012** or ten (10) calendar days after any Party receives express written notice of termination from any other Party by overnight courier |
| QO3 Investors, LLC (with RFC, | January 27, | the earliest of (a) **June 30, 2012**, (b) |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| RALI)<br><br>Trust: RALI 2006-QO3 (A1, A2, and A3) | 2012 | the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Radian Asset Assurance, Inc. (with RFC, RALI)<br><br>Trust: RALI 2005-QS5 A-3 | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Rocky Mountain Bank & Trust (with RFC, RALI)<br><br>Trusts: RALI 2006 QS-6 1A16; RALI 2006-QS14 A1; RALI 2006-QS5 A6; RALI 2006-QS8 A1; RALI 2006-QS11 1A4; RALI 2005-QS2 A1; RALI 2004-QS1 M2; RALI 2005-QS13 1A6 | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Royal Park Investments (with RFC, RALI)<br><br>Trust: RALI 2007-QH3 A1 | February 2, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | mutually agreed to and executed by all Parties. |
| Royal Park Investments (with RFC, RALI)<br><br>Trusts: RALI 2004-QA1 A1; RALI 2005-QO4 2A1; RALI 2005-QS16 A9; RALI 2005-QS17 A3; RALI 2005-QS3 1A21; RALI 2006-QA3 A1; RALI 2006-QH1 (A1, A2, A3); RALI 2006-QO1 (3A1 and 3A2); RALI 2006-QO3 (A1, A2, A3); RALI 2006-QO5 (3A3; 2A1; 3A4); RALI 2006-QS10 A7; RALI 2006-QS17 A5; RALI 2006-QS6 1A11; RALI 2007-QH2 (A2 and A3); RALI 2007-QH3 (A2 and A3); RALI 2007-QH4 A3; RALI 2007-QH7 1A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Securities and Exchange Commission (with ResCap)<br><br>Trust: [No exhibit with trust information] | May 7, 2012 | May 7, 2013 |
| Summit Credit Union (with RFC, RALI)<br><br>Trusts: RALI 2006-QS16 A10; RALI 2006-QS8 A1; RALI 2005-QS2 A1 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Thomaston Savings Bank (with RFC, RALI)<br><br>Trusts: RALI 07-QS5 A1; RALI O6-QS5 A6 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is |

| Signatories | Effective Date | Termination Date |
|---|---|---|
| | | set forth in a written agreement mutually agreed to and executed by all Parties. |
| Union Investment Luxembourg, S.A. (with RFC, RALI)<br><br>Trust: RALI 2006-QO8 1A2A | January 27, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |
| Wells River Savings Bank (with RFC, RALI)<br><br>Trust: RALI 2006-QS16 A7 | January 20, 2012 | the earliest of (a) **June 30, 2012**, (b) the first Business Day that is at least 120 days after the date that written notice of the termination of this Agreement ("Notice Letter") has been served by any of the Parties on the other Parties in accordance with paragraph 10 of this Agreement, or (c) a different Expiration Date that is set forth in a written agreement mutually agreed to and executed by all Parties. |

12-12020-mg   Doc 2811-1   Filed 02/01/13   Entered 02/01/13 16:01:57   Main
Pg 54 of 65

THIS PAGE INTENTIONALLY

LEFT BLANK

## Index of Monoline Complaints by Date and Covered Trusts

| Assured Guaranty Complaints | | |
|---|---|---|
| **Case** | **Date** | **Covered Trusts (with closing dates)** |
| Assured Guaranty Municipal Corp. v. GMAC Mortgage, LLC, et al.<br><br>12-cv-03776<br><br>Defendants include: GMACM; RAMP; Ally Bank f/k/a GMAC Bank; RFC; ResCap; Ally; Residential Funding Mortgage Securities II, Inc. | Filed, S.D.N.Y.: 5/11/12 | RAMP 2004-HE3 (approximately[1] 6/30/04)<br><br>RFMSII 2006-HSA3 (closing date unclear from complaint) |

| FGIC Complaints | | |
|---|---|---|
| **Case** | **Date** | **Covered Trusts (with closing dates)** |
| Financial Guaranty Insurance Company v. GMAC Mortgage, LLC, et al.<br><br>11 Civ 9729<br><br>653302/2011<br><br>Defendants include: GMACM; Ally Bank f/k/a GMAC Bank; ResCap | Filed, N.Y. Sup. Ct. (N.Y. Cty.): 11/29/11<br><br>Removed to S.D.N.Y.: 12/30/12 | RAMP 2006 HE1 (3/30/06) |
| Financial Guaranty Insurance Company v. Residential Funding Company LLC, et al. | Filed, N.Y. Sup. Ct. (N.Y. Cty.): 11/29/11<br><br>Removed to S.D.N.Y.: 12/30/11 | RFMSII 2005-HS1 (09/23/2005)<br><br>RFMSII 2005-HS2 (11/29/2005) |

---

[1] The complaint does not appear to specify the date on which the 2004-HE3 insurance agreement was executed, but it specifies that the 2004-HE3 custodial agreement was executed on June 30, 2004. See § 66. It seems likely that the 2004-HE3 insurance agreement would have been executed on or around the same date as the 2004-HE3 custodial agreement.

| FGIC Complaints | | |
|---|---|---|
| **Case** | **Date** | **Covered Trusts (with closing dates)** |
| 11 Civ 9736<br><br>653303/2011<br><br>Defendants include: RFC; ResCap | | |
| Financial Guaranty Insurance Company v. Residential Funding Company LLC, et al.<br><br>11 Civ 9737<br><br>653304/2011<br><br>Defendants include: RFC; ResCap | Filed, N.Y. Sup. Ct. (N.Y. Cty.): 11/29/11<br><br>Removed to S.D.N.Y.: 12/30/11 | RAMP 2005-RS9 (11/29/2005) |
| Financial Guaranty Insurance Company v. Ally Financial, Inc., et al.<br><br>12 Civ 0341<br><br>653493/2011<br><br>Defendants include: Ally; ResCap; RFC | Filed, N.Y. Sup. Ct. (N.Y. Cty.): 12/15/11<br><br>Removed to S.D.N.Y.: 1/13/12 | RASC 2005 EMX5 (12/16/2005) |
| Financial Guaranty Insurance Company v. Ally Financial, Inc., et al.<br><br>12 Civ 0338<br><br>653623/2011<br><br>Defendants include: Ally; ResCap; RFC | Filed, N.Y. Sup. Ct. (N.Y. Cty.): 12/27/11<br><br>Removed to S.D.N.Y.: 1/13/12 | RAMP 2005 EFC7 (12/28/2005) |
| Financial Guaranty Insurance Company v. Ally | Filed, N.Y. Sup. Ct. (N.Y. Cty.): 12/27/11 | RAMP 2005-NC1 (12/28/2005) |

| FGIC Complaints | | |
|---|---|---|
| **Case** | **Date** | **Covered Trusts (with closing dates)** |
| Financial, Inc., et al.<br><br>12 Civ 0339<br><br>653622/2011<br><br>Defendants include: Ally; ResCap; RFC | Removed to S.D.N.Y.: 1/13/12 | |
| Financial Guaranty Insurance Company v. Ally Financial, Inc., et al.<br><br>12 Civ 0340<br><br>653621/2011<br><br>Defendants include: Ally; ResCap; RFC | Filed, N.Y. Sup. Ct. (N.Y. Cty.): 12/27/11<br><br>Removed to S.D.N.Y.: 1/13/12 | RFMSII 2005-HSA1 (12/29/2005)<br><br>RFMSII 2006-HSA1 (01/27/2006)<br><br>RFMSII 2006-HSA2 (02/24/2006) |
| Financial Guaranty Insurance Company v. Ally Financial, Inc., et al.<br><br>12 Civ 0780<br><br>Defendants include: Ally; ResCap; Ally Bank f/k/a GMAC Bank; GMACM | Filed, S.D.N.Y.: 1/31/12 | RAMP 2005-HE1 (3/29/05) |
| Financial Guaranty Insurance Company v. Ally Financial, Inc., et al.<br><br>12 cv 1601<br><br>Defendants include: Ally; ResCap; RFC | Filed, S.D.N.Y.: 3/5/12 | RASC 2007-EMX1 (03/12/2007) |
| Financial Guaranty Insurance Company v. Ally Financial, Inc., et al. | Filed, S.D.N.Y.: 3/6/12 | RAMP 2006-HE3 (8/30/06) |

12-12020-mg   Doc 2801-1   Filed 02/01/13   Entered 02/01/13 16:01:57   Main
Document   Pg 57 of 64

| FGIC Complaints | | |
|---|---|---|
| **Case** | **Date** | **Covered Trusts (with closing dates)** |
| 12 cv 1658<br><br>Defendants include: Ally; ResCap; AllyBank f/k/a GMAC Bank; GMACM | | |
| <u>Financial Guaranty Insurance Company v. Ally Financial, Inc., et al.</u><br><br>12 cv 1818<br><br>Defendants include: Ally; ResCap; Ally Bank f/k/a GMAC Bank; GMACM | Filed, S.D.N.Y.: 3/12/12 | RAMP 2006-HE2 (6/29/06)<br><br>RAMP 2007-HE2 (6/28/07) |
| <u>Financial Guaranty Insurance Company v. Ally Financial, Inc., et al.</u><br><br>12 Civ 1860<br><br>Defendants include: Ally; ResCap; RFC | Filed, S.D.N.Y.: 3/13/12 | RFMSII 2006-HI2 (5/25/06)<br><br>RFMSII 2006-HI3 (7/21/06)<br><br>RFMSII 2006-HI4 (9/28/06)<br><br>RFMSII 2006-HI5 (12/28/06)<br><br>RFMSII 2007-HI1 (3/30/07) |

| MBIA Complaints | | |
|---|---|---|
| **Case** | **Date** | **Covered Trusts (with closing dates)** |
| <u>MBIA Ins. Corp.  v. GMAC Mortgage, LLC,</u><br><br>10600837 | Filed, N.Y. Sup. Ct.: 4/1/10 | GMAC Mortgage Corporation Home Equity Loan Trust 2004-HE4 (10/28/04)<br><br>GMAC Mortgage Corporation Home Equity Loan Trust 2006-11E4 (9/27/06)<br><br>GMAC Mortgage Corporation Home Equity Loan Trust 2007-HE1 (3/29/07) |
| <u>MBIA Ins. Corp. v. Residential Funding Co., LLC</u> | Filed, N.Y. Sup. Ct.: 12/4/08 | Home Equity Loan Trust 2006-HSA4 (07/28/06) |

12-12020-mg   Doc 2811-1   Filed 02/01/13   Entered 02/01/13 16:01:57   Main
Document   Pg 58 of 64

| 603552/08 | | Home Equity Loan Trust 2006-HSA5 (09/28/06) |
| | | Home Equity Loan Trust 2007-HSA1 (02/27/07) |
| | | Home Equity Loan Trust 2007-HSA2 (04/27/07) |
| | | Home Equity Loan Trust 2007-HSA3 (05/30/07) |

# APPENDIX GGG

**Trusts That Closed Prior to May 14, 2006 with Timely Litigation or Tolling Agreements**

| Trusts with Timely Litigation | | Trusts with Timely Tolling Agreements | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Trust Name | | Trust Name | | Trust Name |
| 1 | 2004-HE4 | 1 | 2004-QS1 | 34 | 2005-QS4 | 67 | 2005-QS16 |
| 2 | 2005-HS2 | 2 | 2004-RS2 | 35 | 2005-QS5 | 68 | 2005-KS12 |
| 3 | 2005-RS9 | 3 | 2004-QA1 | 36 | 2005-QA4 | 69 | 2005-QA13 |
| 4 | 2005-EMX5 | 4 | 2004-QS3 | 37 | 2005-QA5 | 70 | 2005-QO5 |
| 5 | 2005-EFC7 | 5 | 2004-QS4 | 38 | 2005-AR3 | 71 | 2005-QS17 |
| 6 | 2005-NC1 | 6 | 2004-S3 | 39 | 2005-QA6 | 72 | 2005-S9 |
| 7 | 2005-HSA1 | 7 | 2004-QS5 | 40 | 2005-SA2 | 73 | 2006-RS1 |
| 8 | 2006-HSA1 | 8 | 2004-S5 | 41 | 2005-EFC1 | 74 | 2006-KS1 |
| 9 | 2006-HSA2 | 9 | 2004-S6 | 42 | 2005-RS5 | 75 | 2006-NC1 |
| 10 | 2006-HE1 | 10 | 2004-QS10 | 43 | 2005-AR4 | 76 | 2006-QO1 |
| | | 11 | 2004-QS11 | 44 | 2005-HI2 | 77 | 2006-S1 |
| | | 12 | 2004-KS9 | 45 | 2005-QS9 | 78 | 2006-EMX2 |
| | | 13 | 2004-QS13 | 46 | 2005-QA8 | 79 | 2006-AR1 |
| | | 14 | 2004-RS9 | 47 | 2005-S5 | 80 | 2006-J1 |
| | | 15 | 2004-RZ3 | 48 | 2005-AR5 | 81 | 2006-QA2 |
| | | 16 | 2004-RS10 | 49 | 2005-KS8 | 82 | 2006-QS2 |
| | | 17 | 2004-HE5 | 50 | 2005-QA9 | 83 | 2006-RZ1 |
| | | 18 | 2004-QA6 | 51 | 2005-SA4 | 84 | 2006-NC2 |
| | | 19 | 2004-RS12 | 52 | 2005-QO1 | 85 | 2006-RS2 |
| | | 20 | 2004-S9 | 53 | 2005-HS1 | 86 | 2006-NC3 |
| | | 21 | 2005-HI1 | 54 | 2005-QA10 | 87 | 2006-HI1 |
| | | 22 | 2005-QS1 | 55 | 2005-HE3 | 88 | 2006-KS3 |
| | | 23 | 2005-RS1 | 56 | 2005-QS13 | 89 | 2006-AR2 |
| | | 24 | 2005-AR1 | 57 | 2005-QS14 | 90 | 2006-QO3 |
| | | 25 | 2005-QS2 | 58 | 2005-AR6 | 91 | 2006-QS3 |
| | | 26 | 2005-RS2 | 59 | 2005-HI3 | 92 | 2006-S3 |
| | | 27 | 2005-S1 | 60 | 2005-KS10 | 93 | 2006-EMX3 |
| | | 28 | 2005-QA2 | 61 | 2005-QA11 | 94 | 2006-QA3 |
| | | 29 | 2005-EMX1 | 62 | 2005-QO3 | 95 | 2006-QO4 |
| | | 30 | 2005-HE1 | 63 | 2005-QS15 | 96 | 2006-QS4 |
| | | 31 | 2005-QS3 | 64 | 2005-AHL3 | 97 | 2006-S4 |
| | | 32 | 2005-QA3 | 65 | 2005-QA12 | 98 | 2006-RZ2 |
| | | 33 | 2005-AR2 | 66 | 2005-QO4 | 99 | 2006-SP2 |

12-12020-mg Doc 2811-1 Filed 02/01/13 Entered 02/01/13 18:01:57 Main
Document Pg 61 of 64

# APPENDIX HHH

**Statute of Limitations Analysis**
**Assumed Timely Trust Breakdown**

| ($ mm) | # of Deals | % of Total | OPB | % of Total | Current Out. Bal. | % of Total | Lifetime Losses (Sillman Low) | % of Total | Lifetime Losses (Sillman High) | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Assumed Timely Tolling | 99 | 25.3% | $ 58,552.1 | 25.9% | $ 14,743.0 | 24.1% | $ 9,045.4 | 20.8% | $ 9,740.6 | 20.8% |
| Assumed Timely Litigation | 10 | 2.6% | 8,548.4 | 3.8% | 1,811.1 | 3.0% | 1,852.4 | 4.3% | 1,975.8 | 4.2% |
| Closed After May 14, 2006 | 139 | 35.5% | 83,717.4 | 37.0% | 31,536.8 | 51.6% | 24,955.4 | 57.4% | 26,867.6 | 57.4% |
| **Total Assumed Timely Trusts** | **248** | **63.3%** | **$ 150,817.9** | **66.7%** | **$ 48,091.0** | **78.7%** | **$ 35,853.3** | **82.4%** | **$ 38,584.0** | **82.4%** |
| | | | | | | | | | | |
| Assumed Timely Trust Breakdown: | | | | | | | | | | |
| 2004 Vintage | 21 | 5.4% | $ 11,824.5 | 5.2% | $ 1,772.7 | 2.9% | $ 757.3 | 1.7% | $ 827.8 | 1.8% |
| 2005 Vintage | 58 | 14.8% | 35,557.2 | 15.7% | 8,996.5 | 14.7% | 5,276.1 | 12.1% | 5,700.3 | 12.2% |
| 2006 Vintage | 104 | 26.5% | 68,183.5 | 30.2% | 22,126.1 | 36.2% | 18,516.0 | 42.4% | 19,835.6 | 42.4% |
| 2007 Vintage | 65 | 16.6% | 35,252.7 | 15.6% | 15,195.7 | 24.9% | 11,303.9 | 26.0% | 12,220.3 | 26.1% |
| | | | | | | | | | | |
| Insured | 39 | 9.9% | $ 29,242.7 | 12.9% | $ 7,075.7 | 11.6% | $ 6,934.3 | 15.9% | $ 7,279.2 | 15.5% |
| Uninsured | 209 | 53.3% | 121,575.2 | 53.8% | 41,015.3 | 67.1% | 28,918.9 | 66.5% | 31,304.8 | 66.9% |
| | | | | | | | | | | |
| Alt-A | 102 | 26.0% | $ 59,491.6 | 26.3% | $ 22,739.0 | 37.2% | $ 14,876.7 | 34.2% | $ 16,241.6 | 34.7% |
| First Lien (107% max) | 7 | 1.8% | 3,687.1 | 1.6% | 1,084.9 | 1.8% | 1,252.0 | 2.9% | 1,333.8 | 2.8% |
| High CLTV Second Lien (125% Max) | 9 | 2.3% | 2,167.0 | 1.0% | 731.7 | 1.2% | 616.0 | 1.4% | 647.9 | 1.4% |
| Jumbo A | 45 | 11.5% | 22,289.1 | 9.9% | 8,079.4 | 13.2% | 1,639.2 | 3.8% | 1,898.5 | 4.1% |
| Non-Standard, Negotiated Conduit Assets | 22 | 5.6% | 16,991.8 | 7.5% | 3,462.1 | 5.7% | 3,811.4 | 8.8% | 4,051.7 | 8.7% |
| Seasoned Loans | 6 | 1.5% | 1,949.6 | 0.9% | 704.4 | 1.2% | 542.1 | 1.2% | 581.7 | 1.2% |
| Seasoned, Subprime, Re-performers | 6 | 1.5% | 1,940.3 | 0.9% | 735.9 | 1.2% | 885.8 | 2.0% | 968.2 | 2.1% |
| Second Lien | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| Second Lien (CES & HELOCS) | 23 | 5.9% | 20,971.4 | 9.3% | 4,816.3 | 7.9% | 4,840.3 | 11.1% | 5,042.9 | 10.8% |
| Subprime | 28 | 7.1% | 21,330.0 | 9.4% | 5,737.3 | 9.4% | 7,389.8 | 17.0% | 7,817.7 | 16.7% |
| Subprime Seasoned Loans | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |

Assumptions:

▶ Source: Sillman Supplemental Declaration

▶ Timeliness determined based on May 14, 2006 Statute of Limitations

▶ Trusts that entered into a tolling agreement or commenced a litigation within six years of the closing date are assumed to be timely

## Statute of Limitations Analysis
## Assumed Untimely Trust Breakdown

| ($ mm) | # of Deals | % of Total | OPB | % of Total | Current Out. Bal. | % of Total | Lifetime Losses (Sillman Low) | % of Total | Lifetime Losses (Sillman High) | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Assumed Untimely Tolling | 11 | 2.8% | $ 6,148.2 | 2.7% | $ 1,159.2 | 1.9% | $ 238.1 | 0.5% | $ 273.2 | 0.6% |
| Assumed Untimely Litigation | 1 | 0.3% | 1,585.9 | 0.7% | 213.5 | 0.3% | 103.3 | 0.2% | 123.4 | 0.3% |
| Closed Prior to May 14, 2006 | 132 | 33.7% | 67,477.4 | 29.9% | 11,628.1 | 19.0% | 7,299.5 | 16.8% | 7,839.0 | 16.7% |
| **Total Assumed Untimely Trusts** | **144** | **36.7%** | **$ 75,211.4** | **33.3%** | **$ 13,000.8** | **21.3%** | **$ 7,641.0** | **17.6%** | **$ 8,235.6** | **17.6%** |
| | | | | | | | | | | |
| Assumed Untimely Trust Breakdown: | | | | | | | | | | |
| 2004 Vintage | 72 | 18.4% | $ 40,760.8 | 18.0% | $ 5,169.9 | 8.5% | $ 2,317.0 | 5.3% | $ 2,506.4 | 5.4% |
| 2005 Vintage | 59 | 15.1% | 28,362.1 | 12.5% | 6,180.2 | 10.1% | 3,833.2 | 8.8% | 4,133.7 | 8.8% |
| 2006 Vintage | 13 | 3.3% | 6,088.5 | 2.7% | 1,650.8 | 2.7% | 1,490.7 | 3.4% | 1,595.5 | 3.4% |
| 2007 Vintage | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| | | | | | | | | | | |
| Insured | 22 | 5.6% | $ 14,696.1 | 6.5% | $ 1,991.5 | 3.3% | $ 946.1 | 2.2% | $ 1,037.7 | 2.2% |
| Uninsured | 122 | 31.1% | 60,515.3 | 26.8% | 11,009.3 | 18.0% | 6,694.8 | 15.4% | 7,197.9 | 15.4% |
| | | | | | | | | | | |
| Alt-A | 28 | 7.1% | $ 9,402.9 | 4.2% | $ 2,696.2 | 4.4% | $ 858.0 | 2.0% | $ 949.5 | 2.0% |
| First Lien (107% max) | 7 | 1.8% | 2,555.4 | 1.1% | 442.6 | 0.7% | 341.1 | 0.8% | 362.3 | 0.8% |
| High CLTV Second Lien (125% Max) | 3 | 0.8% | 730.0 | 0.3% | 91.6 | 0.1% | 100.8 | 0.2% | 103.1 | 0.2% |
| Jumbo A | 27 | 6.9% | 9,880.1 | 4.4% | 2,513.4 | 4.1% | 237.8 | 0.5% | 283.2 | 0.6% |
| Non-Standard, Negotiated Conduit Assets | 20 | 5.1% | 16,760.5 | 7.4% | 2,582.1 | 4.2% | 2,343.1 | 5.4% | 2,497.6 | 5.3% |
| Seasoned Loans | 7 | 1.8% | 2,587.0 | 1.1% | 533.1 | 0.9% | 178.6 | 0.4% | 190.8 | 0.4% |
| Seasoned, Subprime, Re-performers | 6 | 1.5% | 1,776.7 | 0.8% | 374.6 | 0.6% | 361.5 | 0.8% | 405.5 | 0.9% |
| Second Lien | 2 | 0.5% | 404.9 | 0.2% | 90.9 | 0.1% | 79.0 | 0.2% | 84.8 | 0.2% |
| Second Lien (CES & HELOCS) | 8 | 2.0% | 6,436.4 | 2.8% | 840.7 | 1.4% | 350.5 | 0.8% | 403.9 | 0.9% |
| Subprime | 30 | 7.7% | 22,577.2 | 10.0% | 2,563.4 | 4.2% | 2,744.7 | 6.3% | 2,904.8 | 6.2% |
| Subprime Seasoned Loans | 6 | 1.5% | 2,100.3 | 0.9% | 272.1 | 0.4% | 45.9 | 0.1% | 50.1 | 0.1% |
| | | | | | | | | | | |
| **Total Trusts** | **392** | **100.0%** | **$ 226,029.3** | **100.0%** | **$ 61,091.8** | **100.0%** | **$ 43,494.2** | **100.0%** | **$ 46,819.6** | **100.0%** |

Assumptions:

▶ Source: Sillman Supplemental Declaration

▶ Timeliness determined based on May 14, 2006 Statute of Limitations

▶ Trusts that entered into a tolling agreement or commenced a litigation within six years of the closing date are assumed to be timely

## Statute of Limitations Analysis
## Revised Sillman Repurchase Liability

| ($ mm) | Lifetime Losses (Sillman Low) | | | Lifetime Losses (Sillman High) | | |
|---|---|---|---|---|---|---|
| Total Estimated Lifetime Losses | $ 43,494.2 | | | $ 46,819.6 | | |
| Total Assumed Timely Trust Losses | $ 35,853.3 | | | $ 38,584.0 | | |
| Total Assumed Untimely Trust Losses | $ 7,641.0 | | | $ 8,235.6 | | |
| Included Assumed Untimely Trust Losses Assuming: | | | | | | |
| 25% Litigation Discount | $ 5,730.7 | | | $ 6,176.7 | | |
| 50% Litigation Discount | 3,820.5 | | | 4,117.8 | | |
| 75% Litigation Discount | 1,910.2 | | | 2,058.9 | | |
| 100% Litigation Discount | - | | | - | | |
| Total Losses Assuming: | | | | | | |
| 25% Litigation Discount | $ 41,584.0 | | | $ 44,760.7 | | |
| 50% Litigation Discount | 39,673.7 | | | 42,701.8 | | |
| 75% Litigation Discount | 37,763.5 | | | 40,642.9 | | |
| 100% Litigation Discount | 35,853.3 | | | 38,584.0 | | |
| | Sillman | Revised | Revised as % of $8.7 bn | Sillman | Revised | Revised as % of $8.7 bn |
| Loss Share Rate: | 14.7% | 4.9% | | 20.7% | 6.1% | |
| Repurchase Liability Assuming: | | | | | | |
| 25% Litigation Discount | $ 6,100.6 | $ 2,057.3 | 23.6% | $ 9,277.9 | $ 2,748.1 | 31.6% |
| 50% Litigation Discount | 5,820.4 | 1,962.8 | 22.6% | 8,851.1 | 2,621.7 | 30.1% |
| 75% Litigation Discount | 5,540.1 | 1,868.3 | 21.5% | 8,424.3 | 2,495.3 | 28.7% |
| 100% Litigation Discount | 5,259.9 | 1,773.8 | 20.4% | 7,997.6 | 2,368.9 | 27.2% |