# Exhibit 2

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

Debtors

------------------------------------------------

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

------------------------------------------------

DEPOSITION OF CHRISTOPHER JOHN BROWN

DATE: December 18, 2012

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915

TRANSCRIPT of the deposition, said
deposition being conducted pursuant to Rules
Governing Civil Practice in the Superior Court
of New Jersey, by and before MARK IUZZOLINO,
Certified Shorthand Reporter, License No.
X101103, at the offices of Morrison Foerster,
LLP, 1290 6th Avenue, New York, NY, on December
18, 2012, commencing at 9:34 a.m.

1          A.    It was.

2          Q.    Were you offered to the Court as an

3    expert witness?

4          A.    I was.

5          Q.    Was that a litigated matter?

6          A.    Yes.

7          Q.    Did you go through a qualification

8    set of questions before the Court?

9          A.    I did.   I believe it was called being

10   "voir dired" or something.

11         Q.    Uh-huh.

12         A.    Yes.

13         Q.    And Court accepted you as an expert?

14         A.    Yes.

15         Q.    And that would be an expert in

16   valuation?

17         A.    Valuation and restructuring matters.

18         Q.    Okay.   What was the general subject

19   matter of your report?

20         A.    It was the valuation of the company.

21         Q.    What was the date of that?

22         A.    That confirmation hearing was earlier

23   this year.   I don't recall the exact date.   I

24   think it may have been May.

25         Q.    Do you recall the name of the judge

1   before whom you appeared?

2        A.    Sure.  It was Judge Chapman.

3        Q.    The other matter you mentioned was

4   Pension Benefit Guaranty Corporation?

5        A.    Correct.

6        Q.    Did you prepare a report in that

7   matter?

8        A.    We did.  The matter settled before it

9   went to trial, though.

10       Q.    All right.  Were you deposed in that

11   case?

12       A.    I was.

13       Q.    Were you deposed in the Ambac matter?

14       A.    I was not.

15       Q.    But in the Pension Benefit Guaranty

16   Corporation you were deposed, but not -- you

17   didn't testify at trial?

18       A.    Correct.

19       Q.    What was the general subject matter

20   of your report for Pension Benefit Guaranty?

21       A.    It was an analysis of the risks that

22   were contained within a portfolio.

23       Q.    A portfolio of what?

24       A.    Of financial assets.

25       Q.    Bonds, stocks?

1    A.    Miscellaneous financial assets.

2    Q.    Again, you were there a valuation

3  expert?

4    A.    Yes.

5    Q.    How many times, then, have you

6  deposed in your career?

7    A.    I believe this is the fourth.

8    Q.    One of the other three was Pension

9  Benefit Guaranty?

10    A.    That's correct.

11    Q.    And what were the other two?

12    A.    One other was in Hostess.

13    Q.    What was your role there?

14    A.    We were advising the unsecured

15  creditors' committee.  And there was -- there

16  was a matter regarding a term within a

17  confidentiality agreement.  And I put in a

18  declaration that discussed whether that term

19  was standard or not in my experience in

20  connection with doing other M&A processes.

21    Q.    That wasn't a financial issue.

22  Correct?

23    A.    It was a financial issue in that it

24  had to do with the sale of an asset and how

25  you'd go about conducting a sale of an asset.

1    So if you can consider the sale of an asset a

2    financial matter, it was a financial matter in

3    that regard.

4         Q.   Okay.  Was that this year?

5         A.   That was earlier this year, yeah.

6         Q.   What judge?

7         A.   Glenn.

8         Q.   And the fourth time on which you've

9    been deposed, what was that?

10        A.   That was in connection with TerreStar

11   Corporation.

12        Q.   What was the nature of that issue?

13        A.   There was litigation with a creditor.

14   And we were advisor to the debtor.  The

15   creditor was arguing about their role or their

16   potential status as a critical vendor.  And I

17   was deposed in connection with a meeting I had

18   with the CEO of that company.

19        Q.   That was really as a fact witness,

20   then?

21        A.   Correct.

22        Q.   If I understood your testimony

23   correctly, you've actually been qualified once

24   as an expert witness in court?

25        A.   Yes.

1        Q.    What are you an expert in?

2        A.    I'm an expert in valuation and, I

3    would say, valuing assets and liabilities and

4    restructuring matters.

5        Q.    Are you an expert in mortgage-backed

6    securities?

7        A.    I wouldn't say narrowly defined -- I

8    wouldn't say narrowly defined as an expert in

9    mortgage-backed securities, no.

10        Q.    Are you an expert in what we call

11    "rep and warranty liability"?

12        A.    As it relates to potential legal

13    matters regarding rep and warranty matters, no.

14        Q.    Well, specifically rep and warranty

15    litigation or rep and warranty liability in the

16    mortgage-backed security arena.

17        A.    Much of the work that I did in

18    connection with Ambac was involving rep and

19    warranty matters, so I'm very familiar with

20    them, yeah.

21        Q.    Are you an expert in that area?

22        A.    I would say I'm very familiar with

23    the topics.

24        Q.    Are you a statistician?  Are you an

25    expert in statistics?

1      A.    I've taken several courses in

2   statistics in connection with getting my MBA,

3   but ...

4      Q.    Do you hold yourself out as a

5   statistician?

6      A.    I don't hold myself out as a

7   statistician.  I'm not sure what that actually

8   means, but I wouldn't ...

9      Q.    Well, if we went to Judge Glenn,

10  would you tell him you're an expert in

11  statistics?

12     A.    I would say that I'm very familiar

13  with statistics.

14     Q.    Have you published any papers?

15     A.    No.

16     Q.    Submitted anything to any peer review

17  journal?

18     A.    No.

19     Q.    Have you received awards or

20  recognitions by your peers indicating that

21  you're a leading light in your field?

22         MR. JURGENS:  Objection to form.

23     A.    No.

24     Q.    Have you ever taught, like, at a

25  college or continuing education classes?

1    to page 9.

2         A.    Okay.

3         Q.    And I direct your attention to

4    footnote 6 at the bottom of the page.  I want

5    to make sure, sir, that I understand first what

6    you are not doing in this matter.

7              You've read Mr. Sillman's report?

8         A.    I have.

9         Q.    You know that he calculates or

10   assumes a number of different rates in his

11   report?

12        A.    Yes.

13        Q.    You criticize one of them, his agree

14   rate.  Correct?

15             MR. JURGENS:   Objection to form.

16        A.    Correct.

17        Q.    You are not offering any opinion

18   about the audit rate that Mr. Sillman used in

19   his report, are you?

20        A.    I am not.

21        Q.    Are you offering any opinion about

22   the demand rate that forms part of his

23   calculations in his report?

24        A.    I am not.

25        Q.    Are you offering any opinion about

29

1   the breach rate that he used in his report?

2          MR. JURGENS:  Objection to form.

3      A.   I am not.

4      Q.   You're not going to offer any opinion

5   as to the reasonableness of any of the

6   assumptions he used in his report.  Correct?

7          MR. JURGENS:  Objection to form.

8      A.   That's correct.

9      Q.   Are you going to offer an opinion

10  about the overall methodology by which he chose

11  to calculate risk exposure here?

12     A.   No.

13     Q.   Do you have an opinion as to whether

14  MBIA or FGIC or other insurers, whether their

15  claims are being excluded or included in the

16  settlement?

17         MR. JURGENS:  Objection to form.

18     A.   I am not.

19         MR. SMITH:  I have the same

20     objection.

21     Q.   Pardon me?

22     A.   I am not.

23     Q.   You offer an opinion about statute of

24  limitations.  But if I understand it correctly,

25  you are not offering an opinion as to whether

1        Do you understand, sir, what the

2   motion that is before Judge Glenn here is

3   about?

4        A.   Yes.

5        Q.   What is it about?

6        A.   It's about establishing a claim size

7   for the repurchase liability.

8        Q.   Do you understand that one of the

9   things Judge Glenn will need to decide is

10  whether the proposed 8.7 billion-dollar allowed

11  claim is within a range of reasonableness?

12       A.   Yes.

13            MR. JURGENS:   Objection to form.

14       Q.   Are you going to offer any opinion as

15  to the proper method to use to determine

16  whether that claim size is within a range of

17  reasonableness?

18            MR. JURGENS:   Objection to form.

19       A.   I am not.

20       Q.   And you have no opinion as to whether

21  the proposed allowed claim of 8.7 billion is,

22  in fact, within or outside of a range of

23  reasonableness.

24            MR. JURGENS:   Objection to form.

25       Q.   Right?

1       A.   No.  I simply looked at Mr. Sillman's

2   analysis and looked at some flaws and

3   calculated a new range based on correcting

4   those flaws.

5       Q.   If I could be a little more precise,

6   I appreciate that you criticized Mr. Sillman.

7   Right?

8       A.   Yes.

9       Q.   Your conclusion is, his work doesn't

10  support the 8.7 billion-dollar allowed claim?

11      A.   Correct.

12      Q.   You don't go the next step and say,

13  "I have an opinion that that number is outside

14  the range of reasonableness"?

15      A.   That's correct.

16      Q.   You haven't gone and done your own

17  analysis of what the range of reasonableness is

18  or should be?

19      A.   No, I have not.

20      Q.   We talked about statute of

21  limitations.

22           You're aware, aren't you, that there

23  are other potential legal defenses to the

24  claims that would be asserted here by the

25  trusts and their investors?  Right?

1    in performing your work.  Right?

2         A.   Correct.  As a critique of his

3    analysis, I assumed some things about his

4    analysis that may be correct.

5         Q.   In any event, you didn't embark as

6    part of your work on reevaluating or

7    criticizing his aggregate loss calculation?

8         A.   That's correct.

9         Q.   What you did is applied discounts to

10   it based on assumptions you were given by

11   counsel?

12        A.   Correct.

13        Q.   Could I ask you to turn to paragraph

14   6 of Exhibit 1?  This is where you introduce

15   your work.  And the last sentence says,

16   "Mr. Sillman used several incorrect inputs in a

17   formula he used in his analysis."

18             If I read your report correctly,

19   you've identified two incorrect inputs.

20   Correct?

21        A.   Correct.

22        Q.   I mean, you say several, but in

23   paragraph 7 you talk about the agree rate.  In

24   paragraph 8 you talk about statute of

25   limitations.

1    "GSE loans."  Right?

2         A.    Correct.

3         Q.    And then he applied a discount to it.

4    Correct?

5         A.    Correct.

6         Q.    And you think that was the wrong

7    thing to do?

8         A.    I think the discount that he used

9    seemed somewhat arbitrary.

10        Q.    Well, you don't even like the idea

11   that he used GSE data.  Correct?

12        A.    Correct.  I believe he had actual

13   data to use, and I believe he didn't use that

14   actual data.

15        Q.    And the actual data is PLS data or

16   data from the trusts that are at issue here?

17        A.    Correct.

18        Q.    Is that really the nature of the

19   fight, whether he should have used GSE data

20   with a discount or, on the other hand, whether

21   he should have used the PLS data?

22             MR. JURGENS:  Objection to form.

23        A.    Yes.

24        Q.    I'm going to jump into that in a

25   second, but let me first ask you about the

1             MR. JURGENS:  Objection to form.

2        A.   I don't know if I cared about that.

3   I'm not sure in what sense of the word you mean

4   that.

5        Q.   If you wanted to know how many

6   material defects appeared in the population of

7   ResCap's loans, should you take into account

8   loans that ResCap voluntarily repurchased as a

9   result of material defects?

10            MR. JURGENS:  Objection to form.

11       A.   That's not the analysis that we did.

12       Q.   Why not?

13       A.   Because we were doing a critique of

14   Mr. Sillman's work.

15       Q.   You were doing a critique without

16   asking the larger question:  How many material

17   defects are there in ResCap's loans?

18            MR. JURGENS:  Objection to form.

19       A.   Correct.

20       Q.   Why did you not consider the category

21   "unknown"?

22            MR. JURGENS:  Objection to form.

23       A.   One, because it was a smaller sample

24   size, and it wasn't clear what -- just by

25   virtue of the unknown aspect of these, it was

63

1       Q.    Is Mr. Jurgens, to your knowledge, a

2    statistician?

3       A.    No.

4       Q.    He may well be.  He's a poly math,

5    he's a renaissance man.

6       A.    He may be.

7            MR. JURGENS:  I don't object to that

8       characterization.

9       Q.    Is there -- do you have any basis,

10   sir, upon which to conclude that the counsel's

11   statement to you was based on some sort of

12   statistical analysis about the robustness of

13   the data?

14      A.    Yes.  I know that 16,000 -- a 16,000

15   sample size is reasonably large with respect to

16   what you'd need to get a reasonable standard

17   error on a population.

18      Q.    Even if well over half of them have

19   not been resolved?

20           MR. JURGENS:  Objection to form.

21      A.    I don't believe that's a proper

22   characterization of the 10,026 items listed in

23   the disagree rescission requested row, as it

24   relates to Mr. Sillman's definition of agree

25   rate.

67

1       Q.    Right?

2             Did you do any statistical work to

3    conclude that the data on Exhibit 3 are a

4    sufficiently robust sample upon which to base

5    conclusions?

6             MR. JURGENS:  Objection to form.

7       A.    I had my team look at sample sizes in

8    determining other statistical populations to

9    get an understanding of whether or not this

10   size was large enough.  And one of the things

11   we looked at was the sample sizes and polls

12   that are taken when something is normally

13   distributed or assumed to be normally

14   distributed and things like political polls.

15            And this size was far larger as a

16   percentage of the total population than in

17   other robust or what are considered robust

18   analyses on sampling.  So we did some work on

19   that.  I don't have that handy but we did -- we

20   did work on sample size to get an understanding

21   of whether or not this was indeed robust.

22      Q.    Where is the work?

23      A.    What do you mean where is the work?

24      Q.    Sir, maybe you can understand my

25   confusion.  I'm reading your report and you

1    give two grounds in paragraph 24 for your

2    conclusion that the PLS data are sufficiently

3    robust.  Neither of those grounds says anything

4    about work you and your team did.  So it's

5    coming a bit of a surprise to me that you did

6    work on this.

7           MR. JURGENS:  Objection to form.

8           Is there a question?

9    Q.   Yeah, where is the work?

10          MR. JURGENS:  Objection to form.

11    A.   There's no work that went into the

12    report.  There was general background

13    information that I did to get myself

14    comfortable on some of the statements that are

15    being made.  I didn't do any work because I

16    didn't view it as something that was going to

17    be that relevant to the analysis.

18    Q.   If you did the work, why did you have

19    to rely on counsel's instructions to you to

20    assume that it was robust?

21          MR. JURGENS:  Objection to form.

22    A.   I don't understand the question.

23    Q.   When a statistician decides whether a

24    sample is sufficiently robust to predict

25    outcomes, what kind of methods do they use to

1   make that decision?

2         MR. JURGENS:  Objection to form.

3     A.   Various sampling methods.

4     Q.   Such as?

5     A.   Such as obtaining a certain size

6   given the overall population.

7     Q.   How do they decide what size is

8   needed based on the population?

9         MR. JURGENS:  Objection to form.

10    A.   They use statistical tools.

11    Q.   Such as?

12    A.   It's just mathematical formulas to

13  determine how much variability there may be in

14  any individual result given an overall

15  population size.

16    Q.   It allows you to reach a conclusion

17  about, for example, margins of error.  Right?

18    A.   Within a margin of error, correct.

19    Q.   Did you do that work here?

20    A.   No.

21    Q.   Why not?

22    A.   I relied on what I describe in

23  paragraph 23 primarily.

24        MR. JURGENS:  I think he referred to

25        23 and he meant 24.

1       A.    Correct.

2       Q.    You meant 24?

3       A.    Well, in 23 I mention that -- yes,

4   sorry, paragraph 24.

5       Q.    Are you going to offer an opinion at

6   trial that the data on Exhibit 3 are

7   sufficiently robust that they form a basis for

8   using PLS data?

9       A.    If I am asked to, I suppose I may.

10      Q.    Have you been asked to that so far?

11      A.    No.

12      Q.    And you've not offered that or you're

13  not prepared to offer that opinion today?

14      A.    No.

15      Q.    The second thing you mention in

16  paragraph 24 is you say you discussed this

17  assumption with an expert in representations

18  and warranties analysis.

19            Can you tell me who the expert is?

20      A.    May I ask counsel if I'm permitted to

21  share that information?

22            MR. JURGENS:  You could share that

23            information.

24      A.    Mr. Connolly.

25      Q.    Mister who?

1      A.    Mr. Connolly.

2      Q.    Who is he?

3      A.    He is an expert that the company has

4   used in the past.

5      Q.    What's his first name?

6      A.    Chris.

7      Q.    Chris Connolly?

8      A.    Chris Connolly.

9      Q.    Where does he work?

10     A.    I don't have his background handy.  I

11  don't know his background but I know --

12     Q.    Does he work at Blackstone?

13     A.    No, he does not work at Blackstone.

14     Q.    Does he work at MBIA?

15     A.    No, he's a consultant for MBIA.

16     Q.    How would I find this man?

17     A.    I suppose we could put you in touch

18  with him.

19     Q.    Did you meet with him in person?

20     A.    I had a telephone call with him.

21     Q.    Right.  What did you say on the call?

22     A.    We had a conversation about

23  underwriting standards and -- we had a long

24  call.

25     Q.    Did you send him Exhibits 2 or 3 or

1      Q.   Isn't that what you and Mr. Connolly

2    did, you just eyeballed the size of the sample

3    and said that must be big enough?

4           MR. JURGENS:   Objection to form.

5           MR. BENTLEY:   Objection to form.

6      A.   I can't speak for Mr. Connolly.

7      Q.   Isn't that what you did?

8      A.   That is not what I did.  I described

9    earlier that I had discussions with

10   Mr. Connolly and I got comfort that way and I

11   also did some general background reading on

12   sample sizes.

13     Q.   What are Mr. Connolly's

14   qualifications to be an expert on statistics?

15     A.   I'm not familiar with Mr. Connolly's

16   qualifications, though I presume he is well

17   qualified for him to be advising MBIA on these

18   matters.

19          MR. JURGENS:   Just note my objection

20       to the prior question.

21     Q.   What did Mr. Connolly say about the

22   large number of loans in the disagree

23   rescission requested category?

24     A.   I don't recall.

25     Q.   Did you ask Mr. Connolly to provide

1   opinion.

2       A.   Correct.

3       Q.   Right?

4            So do you have an opinion as to what

5   the right reduction method should be?

6            MR. JURGENS:  Objection to form.

7       A.   I was not asked to opine on that and

8   if I was asked to do so, I would do more work

9   on that and wouldn't want to give you an answer

10  off the cuff.

11      Q.   Is there an accepted methodology or

12  methodologies that are common in the industry

13  to use in this situation?

14           MR. JURGENS:  Objection to form.

15      A.   Not that I'm aware.  This is a unique

16  situation.

17      Q.   Is it your opinion that the way it's

18  done in the agreement is the wrong way?

19      A.   I believe it is an unfair way.

20      Q.   Is there a more fair way, sir?

21      A.   I'm sure there is.

22      Q.   What is it?

23           MR. JURGENS:  Objection to form.

24      A.   As I said earlier, if I was

25  attempting to do this, I would do much more

1

2                    C E R T I F I C A T E

3

4

5            I, MARK IUZZOLINO, a Certified Shorthand

6   Reporter and Notary Public of the State of New

7   Jersey certify that the foregoing is a true and

8   accurate transcript of the testimony of the

9   aforementioned first duly sworn by me.

10           I further certify that I am neither

11  attorney or counsel for, nor related to or employed

12  by, any of the parties to the action in which the

13  deposition is taken, and further that I am not a

14  relative or employee of any attorney or counsel

15  employed in this case, nor am I financially

16  interested in the action.

17

18

19           _____

20           CERTIFIED SHORTHAND REPORTER

21           NOTARY PUBLIC OF NEW JERSEY

22           LICENSE NO. X101103

23

24

25