# Exhibit 3

# EXHIBIT 8

## Declaration of Frank Sillman

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Gary S. Lee
Anthony Princi
Jamie Levitt

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF FRANK SILLMAN IN SUPPORT OF DEBTORS'**
**MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL**
**OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

I, Frank Sillman, being duly sworn, depose and say:

1.        I serve as Managing Partner for Fortace, LLC ("Fortace"),[1] an

advisory and consulting firm to banks, mortgage companies, insurance companies,

trustees and other investors.  I am authorized to submit this declaration (the

"Declaration") on behalf of the Debtors in connection with their motion pursuant to Rule

9019 of the Federal Rules of Bankruptcy Procedure for approval of RMBS Trust

Settlement Agreements.  This Declaration reflects the work performed to date, and I

reserve the right to augment and refine the analysis as my work is ongoing.

---

[1] Capitalized terms not otherwise defined herein are as defined in the RMBS Trust Settlement Agreement, or in the
Governing Agreements for each of the Debtors' securitizations, or in the defined terms incorporated by reference
therein.

2.      A key area of my work with Fortace relates to reviewing and

opining on the reasonableness of repurchase demands.  I have performed repurchase

demand work for insurers and lenders who have issued repurchase demands to Sellers, as

defined below, based on alleged breaches of representations and warranties.  As part of

this work I helped develop the loan audit selection criteria, reviewed contractual

obligations, performed loan-level audits, made recommendations as to whether or not a

repurchase demand should be issued and participated in the negotiations with the Sellers

on discussions to repurchase loans.  I have also performed work for Sellers who have

received repurchase demands from Trustees, insurers and lenders for alleged breaches of

representations and warranties.  As part of this work I have reviewed contractual

obligations, reviewed the repurchase demands and the related findings and supporting

evidence, performed loan level audits, made recommendations to Sellers as to whether or

not the alleged breaches were contractual breaches, and participated in the negotiations

with Trustees on discussions to repurchase loans.

3.      I have approximately 25 years of experience in the mortgage

banking industry.  I have held senior executive positions at a federally insured bank, at a

Wall Street investment bank, and at privately held mortgage banking companies.  During

those 25 years, I have managed residential mortgage origination and loan operations,

secondary marketing, capital markets, treasury and warehouse lending.  In particular, I

have extensive experience in the residential mortgage market, including origination,

securitization, loss reserves, and repurchase-related activities related to Fannie Mae,

Freddie Mac, FHA, Prime Jumbo, Alt A, Subprime, Home Equity Line of Credit

("HELOC"), and Closed End Second Lien residential mortgage loans.

4.      I am familiar and have experience with the variety of methods used to estimate potential repurchase liabilities or requirements.  I employed a methodology based on frequency and severity rates to forecast the potential Trust lifetime loss ranges and developed my repurchase-related assumptions utilizing the Debtors' historical loan loss data, current payment statuses, Shelf, mortgage loan product and the Debtors prior repurchase experience.  Frequency and severity rate-based loss forecasting and historically-based assumption development are two of the accepted methods for deriving an estimate of potential repurchase exposure.  These two methodologies are regularly used by market participants, financial institutions and experts to estimate repurchase exposures, including estimates provided by financial institutions in their regulatory filings, and independent third-party expert reports.  Accordingly, the methodology that I used in this Declaration is generally accepted in the industry as a sound means of estimating repurchase exposure.

5.      The RMBS Trust Settlement seeks to resolve a large number of breach of representation and warranty claims.  I was asked to provide an independent assessment of the Total Allowed Claim as defined in the RMBS Trust Settlement Agreements and opine as to its reasonableness.  However, I take no position on the ability of any party to prove a breach of representations and warranties under the Governing Agreements, and I assume for the purposes of this Declaration that such a showing can be made against Debtors.  To that end, and in conjunction with selected Fortace personnel under my supervision, I have therefore performed a review of the following data and agreements related to the securitization trusts identified in Exhibit A to the RMBS Trust

Settlement Agreement (the "<u>Trusts</u>"): (1) the Actual Liquidated Losses,[2] (2) the actual Severity Rates for the Trusts based on the Liquidated Loans, (3) Frequency Rates from one Trust for each of the representative Shelves (as defined below), (4) the payment status and delinquency data for the Trusts as of March 31, 2012, (5) the Debtors' repurchase experience with Freddie Mac and Fannie Mae's repurchase demand data, and (6) Governing Agreements from one Trust from each of the Shelves.  Additionally, in those areas where actual data for the Trusts is not available, such as Audit Rates, Demand Rates, Breach Rates and Agree Rates as defined and detailed below, I utilized assumptions and developed my own models based on my own experience and industry data, where available, which takes into consideration the Payment Status, Shelf and loan product types, including Prime Jumbo, Alt A, Subprime, HELOC and Second Lien (collectively, "<u>Mortgage Loan Products</u>").

      6.     The first step in estimating the range of potential repurchase liability for the Debtors ("<u>Potential Repurchase Requirements</u>") is developing the potential cumulative lifetime loss ranges for the Trusts ("<u>Estimated Lifetime Losses</u>"). The next step necessary to understand the Potential Repurchase Requirements is to determine the percentage of Estimated Lifetime Losses that the Debtors might agree to share with the Trusts ("<u>Loss Share Rate</u>") as a result of potential breaches of representations and warranties.

      7.     For purposes of this Declaration, I developed Estimated Lifetime Loss assumptions in the aggregate based on the Payment Status, Shelf, and Mortgage

---

[2] In this Declaration, all references to percentages are rounded to the nearest whole percentage (*e.g.*, 98.5% is rounded up to 99%, and 98.4% is rounded down to 98%).  Therefore, some percentage totals will not equal 100% due to this rounding convention.

Loan Product, instead of utilizing more detailed cash flow and loss assumptions for each individual Trust.

8.      For purposes of this Declaration, I developed my Demand Rate, Breach Rate and Agree Rate assumptions utilizing the Debtors' actual GSE repurchase demand data, industry repurchase demand data and my own repurchase demand experience.  Those assumptions were then applied at the Payment Status, Shelf and Mortgage Loan Product levels as defined and detailed below.  The Audit Rate, Demand Rate and Breach Rate for the Trusts were not available publicly or from the Debtors. Additionally, the vast majority of the Trusts' private label securities ("PLS") repurchase demands received by the Debtors to date are unresolved, so I could not ascertain a meaningful PLS Agree Rate or Loss Share Rate assumption for use in this Declaration. Instead I focused on the more robust, complete and reliable information available regarding the Debtors' actual GSE repurchase demand data.

9.      If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## OVERVIEW OF THE MORTGAGE SECURITIZATION PROCESS

10.      The creation, sale and servicing of a Residential Mortgage-Backed Security ("RMBS") is a multi-stage process comprising numerous steps and utilizing various entities to discharge the required duties.[3]  The RMBS securitization process detailed below is consistent with the process utilized by the Debtors in the creation, sale and servicing of the Trusts.

---

[3]  A mortgage-related Asset-Backed Security ("ABS") transaction is similar in nature and is comparable for purposes of this discussion.

11.     First, the "Seller" of the RMBS, also known as the Sponsor, Issuer and/or Depositor, accumulates or pools the mortgage loans it originated and/or purchased from other Lenders.  Various of the Debtors acted as Sellers to the Trusts.  The Seller arranges to sell those mortgage loans into a "Special Purpose Entity" created exclusively for the purpose of issuing an RMBS, often referred to as an "RMBS Trust."  If the Seller planned to offer a large quantity of a similar type of securities, the Seller would file a registration statement with the SEC to allow it to offer Trusts without SEC review of each supplement ("Shelf" or "Shelves").  The Debtors offered RMBS Trusts under eight different Shelves,[4] covering a wide range of different mortgage products.  In connection with the securitization, an Underwriter(s), Trustee, Servicer, Master Servicer, REMIC Administrator and Custodian are selected to handle various duties on behalf of the RMBS Trust.  In addition to being the Seller of Trusts, the Debtors, at times, acted as the Servicer and/or Master Servicer of the Trusts.

12.     Second, prior to the closing of the sale of loans to the RMBS Trust, the parties negotiate all the applicable RMBS Trust agreements ("Governing Agreements") involved in the creation, sale and loan servicing of the RMBS Trust. Generally, the key Governing Agreements are the Mortgage Loan Purchase Agreement ("MLPA"), the Pooling and Servicing Agreement ("PSA"), and the Assignment, Assumption and/or Indenture Agreements, as applicable.  Under the Governing Agreements, Sellers typically provide certain representations and warranties, which may vary from RMBS Trust to RMBS Trust, but can include requirements that the Sellers

---

[4] These Shelves and their corresponding products are: "RALI" (Alt-A); "RFSMI" (Jumbo A); "RASC" (subprime); "RFMSII" (second lien); "RAAC" (seasoned loans); "RAAC-RP" (subprime), "RAMP" (non-conforming products), and "GMACM" (various products).

comply with some or all of the following: a) accuracy of the loan-level data provided on the securitization data tape, b) Seller's underwriting guidelines, c) origination and loan servicing policy and procedures, d) documents required to be contained in the mortgage file, e) accuracy of the valuation of collateral, f) federal, state and local regulations, and g) various degrees of fraud provisions.  The Trusts utilized the standard Governing Agreements, which typically, but not always, contained similar representations and warranties to those detailed above.

13.     As a way to further enhance the credit rating of the Certificates, a Seller may choose to obtain bond insurance ("Bond Wrap"), from a monoline bond insurance company ("Monoline").  The Bond Wrap is a non-cancelable, irrevocable, and binding obligation of the Monoline to guarantee full, complete and timely principal and interest payments to the RMBS Trust.  For this guarantee, the Monoline charges the Seller a premium or fee for the issuance of the Bond Wrap.  The presence of the Bond Wrap is an added third-party guarantee to the Certificate Holders in addition to the underlying credit structure of the RMBS Trust, which reduces the overall risk to the Certificate Holders and allows the credit rating agencies to increase the credit ratings of the Certificates.  The Debtors utilized Bond Wraps on 61 of the 392 Trusts.

14.     One or more credit rating agencies, such as Standard & Poor's and Moody's, review the data about the underlying mortgage loans, the Seller, the Servicer, the Master Servicer, the Trustees, and Governing Agreements, and Monoline Bond Wraps, if applicable, and assign credit ratings to each of the tranches of mortgage-backed pass-through certificates ("Certificates").  The Trusts were all rated by one of more of the credit rating agencies.

15.     The Certificates are then created and sold to investors through the Underwriter(s), who are typically Wall Street investment banks but also may be an affiliate of the Seller.  With respect to the Trusts at issue here, the Sponsors/Issuers may have utilized a Wall Street investment banks and/or the Debtors' affiliate GMAC RFC Securities as such Underwriters.

16.     Finally, the Servicer administers the mortgage loans in accordance with the Governing Agreements, and the Trustee distributes the remittances to the Certificate Holders in accordance with the Governing Agreements and Certificates. Certain of the Debtors did act as Servicer, at times, for the Trusts.

## ALLEGED BREACHES OF REPRESENTATIONS AND WARRANTIES

17.     The Governing Agreements authorize certain parties, such as the Trustees, to notify the Seller of any alleged breaches of representations and warranties.  If any such party notifies the Seller of an alleged breach of one or more of the representations and warranties, the following analysis is required in order to assess the Seller's repurchase or loss reimbursement obligation under the Governing Agreements.

18.     Generally, the standard for analyzing a breach of representations and warranties requires an assessment of: (a) whether the alleged loan defect or alleged breach is an actual and material breach of representations and warranties, and (b) whether such breach was material and adverse to the interests of the Certificate Holders in the mortgage loans (cumulatively the "R&W Repurchase Standard").  If the R&W Repurchase Standard is met, the Seller is required to repurchase non-liquidated loans at the purchase price, as defined in the applicable Governing Agreements, or to reimburse the RMBS Trust for any losses incurred in the liquidation of the loan, as defined in the applicable Governing Agreements.  If the R&W Repurchase Standard is not met, the

Seller does not have an obligation to repurchase the loan or reimburse the RMBS Trust

for liquidated losses.  I offer no opinion on whether the Trusts would be able to prove

liability and/or meet the R&W Repurchase Standard.  Rather, for purposes of this

Declaration, I have assumed that the Trusts would be capable of meeting the R&W

Repurchase Standard in certain cases in order to predict the Debtors' Potential

Repurchase Requirements.

### LOAN REPURCHASE TRENDS

19.    Beginning in late 2007, the U.S. economy entered the worst

recession since the Great Depression.  This recession has inflicted tremendous damage on

all sectors of the economy including employment, credit, gross domestic product, and the

housing market.  As the recession worsened, growing unemployment and the resulting

loss of income have had a devastating effect on the housing market, loan performance

and housing prices.  Rising delinquencies and plummeting housing prices have had and

continue to have a profoundly negative impact on the performance of and resulting losses

on all mortgage securitizations.

20.    As a result, the government-sponsored entities, including Fannie

Mae and Freddie Mac ("GSEs"), Monolines, and investors with various holdings have

begun to pursue claims for alleged breach of representations and warranties at elevated

rates to help offset their RMBS losses.  The GSEs have requested sellers to repurchase

approximately $66 billion in loans as noted in their recent SEC filings as summarized in

Inside Mortgage Finance's Special Report ("IMF Special Report"),[5] while industry

---

[5]  As reported in Inside Mortgage Finance's Special Report Analyzing GSE Mortgage Buyback Demands
regarding Fannie Mae and Freddie Mac's Regulation AB 15-G repurchase-related SEC filings dated 2012.
In this Special Report, the Debtor is referred to as "GMAC Mortgage / Ally."  An excerpt of this report is
attached hereto as Exhibit A.

estimates forecast that sellers of non-GSE securities, known as PLS, will repurchase

hundreds of billions in loans, resulting in seller losses of approximately $133 billion

according to Compass Point Research.[6]

## RECENT INDUSTRY SETTLEMENTS

21.     As a way to more efficiently resolve the billions of dollars in

repurchase demands, Fannie Mae, Freddie Mac and some investors with various holdings

have reached global repurchase settlements with certain Sellers.

22.     In preparation for this Declaration, I reviewed the publicly-

available settlement information relating to the following settlements:

| Seller/Originator | Securitization Type | Settlement Amount | Date |
|---|---|---|---|
| Bank of America | PLS | $8,500,000,000 | June 2011[7] |
| Lehman | PLS | $40,000,000 | November 2011 |
| Bank of America | Fannie Mae | $1,520,000,000 | January 2012 |
| Bank of America | Freddie Mac | $1,280,000,000 | January 2012 |

23.     Both the Bank of America ("BofA") and Lehman PLS settlements

and the corresponding RMBS Trusts are similar in terms of the securitization structure,

issuance years, Mortgage Loan Product mix, Governing Agreements and R&W

Repurchase Standards.

## THE DEBTORS' REPURCHASE HISTORY

24.     I reviewed the Debtors' 2006-2008 GSE historical repurchase data,

based on both Fannie Mae and Freddie Mac's Regulation AB 15-G SEC filings, as

summarized in the IMF Special Report.[8]  The repurchase data was as follows:

---

[6]  *See* Exhibit B hereto: Compass Point Research on Mortgage Repurchases Part II: Private Label RMBS
Investors Take Aim, dated August 17, 2010.

[7]  Bank of America settlement for 530 trusts is pending court approval.

| Seller/Originators | Repurchase Demands (millions) | Repurchased ("Agree Rate") | Pending | Disputed |
|---|---|---|---|---|
| GMAC Mortgage / Ally (the Debtors) | $1,537.81 | 67.56% | 2.60% | .50% |
| All Seller / Originators | $65,836.91 | 49.54% | 12.58% | 4.15% |

## **DETERMINATION OF THE TRUSTS' ESTIMATED LIFETIME LOSSES**

25.     The "Estimated Lifetime Losses" for the Trusts are determined by
adding (a) the actual losses that are incurred when a loan is foreclosed and sold through a
short sale, REO or other final disposition and the losses are allocated to the trust ("Actual
Liquidated Losses"), and (b) the losses forecasted on the remaining outstanding unpaid
principal balance ("Outstanding UPB") for the remaining life of the Trusts ("Forecasted
Remaining Lifetime Losses").  The analysis below is based on data obtained from the
Debtors, from Intex,[9] from the Debtors' Vision website[10] ("Vision"), and from other
industry sources including SEC filings.  From these sources, I have estimated the Trusts'
Estimated Lifetime Losses and the Potential Repurchase Requirements ranges based on
Actual Liquidated Losses plus Forecasted Remaining Lifetime Losses by Payment Status,
by Shelf, and by Mortgage Loan Product utilizing "Frequency Rate" and "Severity Rate"
assumptions as described below.

26.     The Actual Liquidated Losses for the Trusts is $30.3 billion.  This
figure was obtained from Intex, and the unpaid principal balance ("UPB") of the

---

[8] As noted above, the Debtors' PLS repurchase data is incomplete due to the large number of PLS
repurchase demands that have not completed the repurchase process, largely due to pending litigation.
Accordingly, I focused on the GSE repurchase experience instead.

[9]  Intex is a subscription-based provider of RMBS loan-level data and cash flow models.  Intex data was
provided by the Debtors.

[10] The Debtors' Vision website contains RMBS Trust information, monthly servicing certificate statements,
prospectus supplements, and operating documents in addition to loan-level data files.

liquidated loans at the time of liquidation ("Trusts' Liquidated Loans") was obtained

from the Debtors.

27.     The Forecasted Remaining Lifetime Losses for the Trusts are

determined by multiplying (i) the Outstanding UPB, (ii) the Frequency Rate assumptions,

and (iii) the Severity Rate assumptions.

## A.  OUTSTANDING UPB FOR THE TRUSTS

28.     For purposes of this Declaration, the data for the Outstanding UPB

of the Trust was as of March 31, 2012 ("Cut-Off Date").

29.      Fortace obtained and stratified the Trusts' Outstanding UPB data

by Payment Status obtained from Intex and by Shelf and by Mortgage Loan Product

group obtained from both Vision and the Debtors.  The "Payment Status" buckets used

for this analysis were as follows: (a) "Current", the mortgage payments are paid up to

date, (b) "30-59 Days Delinquent": the mortgage payments are 30-59 days past due, (c)

"60-89 Days Delinquent": the mortgage payments are 60-89 days past due, (d) "90+ Days

Delinquent & REO": the mortgage payments are 90 or more days past due or the property

has been acquired through foreclosure, often referred to as real estate owned ("REO"),

and (e) "Foreclosure": the Servicer is in the legal process of acquiring the property from

the defaulted borrower.

30.     The Trusts' Outstanding UPB as of the Cut-Off Date is $62.4

billion.

## B.  FREQUENCY RATE ASSUMPTIONS

31.     The "Frequency Rate" is defined as the percentage of loans in a

mortgage portfolio that are projected to be liquidated with a loss through foreclosure sale,

REO sale, short sale or charge-off.  The Frequency Rate, also known in the industry as

the "Roll Rate", represents the projected likelihood that a group of loans will "roll" from current or delinquent status to defaulted and liquidated. The Frequency Rate and the Severity Rate are industry standards utilized to forecast future losses for an RMBS Trust and are two key assumptions utilized by credit rating agencies when rating RMBS Certificates, by mortgage investors when evaluating RMBS Certificates and by Banks when evaluating loan loss reserves.

32.     I reviewed the May 2012 Frequency Rates for one Trust from each of the eight Debtors' Shelves. I then compared the Trusts' Frequency Rates to Frequency Rates provided by other industry sources, such as the BofA Expert Report[11] and the Lehman Expert Declaration,[12] to develop our Frequency Rate assumptions. The Frequency Rate assumptions utilized in this Declaration are similar to those used in the BofA Expert Report and the Lehman Expert Declaration.

33.     These Frequency Rates were then applied first by Payment Status, then by Shelf, then by Mortgage Loan Product for both the lower and higher ranges. These Frequency Rates were then assumed to have a flat Roll Rate to liquidation, which means the Frequency Rates were not varied with the passage of time or other variables.

34.     The average Frequency Rates for the Trusts assumed in this analysis are 36% at the lower range and 41% at the higher range.

---

[11]  *See* Exhibit C hereto: The RRMS Advisors Opinion Concerning Contemplated Settlement Amount for 530 Trusts, dated June 7, 2011.

[12]  See Exhibit D hereto: The Lehman Brothers Holdings Inc. Declaration of Zachary Trumpp filed January 12, 2012.

## C.  SEVERITY RATE ASSUMPTIONS

35.     The "Severity Rate", also known as the "Default Rate", represents the percentage of losses associated with a loan or group of loans which default and are liquidated though foreclosure sale, REO sale, short sale or charge-off.

36.     I reviewed the actual Severity Rates to date, based on the Actual Liquidated Losses for the Trusts by Shelf and by Mortgage Loan Product, and adjusted them to current market conditions based on the latest three-month actual Severity Rates obtained from Intex, by Shelf and by Mortgage Loan Product.

37.     Once we determined our Severity Rates they were then applied by Shelf and by Mortgage Loan Product on a flat severity basis.

38.     The average Severity Rates for the Trusts assumed in this analysis are 68% at the lower range and 78% at the higher range.

## D.  FORECASTED REMAINING LIFETIME LOSSES

39.     Applying the Frequency Rate and Severity Rate assumptions to the Outstanding UPB, I determined a potential range for such Forecasted Remaining Lifetime Losses for the Trusts.  Assuming that this liability can be demonstrated, the lower end of the possible range for such losses, calculated using the metrics and assumptions shown in the following chart, was $15.4 billion.

| LOWER RANGE (in billions) | | | | |
|---|---|---|---|---|
| Payment Status As of March 31, 2012 | Trusts Outstanding UPB | Frequency Rate | Severity Rate | Forecasted Remaining Lifetime Loss |
| Current (Non-Modified) | $34.1 | 11% | 72% | $2.8 |
| Current (Modified) | $11.3 | 36% | 68% | $2.8 |
| 30-59 Days Delinquent | $2.2 | 15% | 68% | $0.2 |
| 60 – 89 Days Delinquent | $1.0 | 84% | 66% | $0.6 |
| 90+ Days Delinquent & REO | $6.3 | 96% | 67% | $4.0 |
| Foreclosure | $7.5 | 99% | 67% | $5.0 |
| **Total** | **$62.4** | **36%** | **68%** | **$15.3** |

14

40.     Assuming that this liability can be demonstrated, the higher end of possible range for such losses for the Trusts, calculated using the metrics and assumptions shown in the following chart, was $19.5 billion.

| HIGHER RANGE (in billions) | | | | |
|---|---|---|---|---|
| Payment Status As of March 31, 2012 | Trusts' Outstanding UPB | Frequency Rate | Severity Rate | Forecasted Remaining Lifetime Loss |
| Current (Non-Modified) | $34.1 | 17% | 80% | $4.6 |
| Current (Modified) | $11.3 | 41% | 78% | $3.6 |
| 30-59 Days Delinquent | $2.2 | 20% | 77% | $0.3 |
| 60-89 Days Delinquent | $1.0 | 87% | 75% | $0.7 |
| 90+ Days Delinquent & REO | $6.3 | 97% | 75% | $4.6 |
| Foreclosure | $7.5 | 99% | 77% | $5.7 |
| **Total** | **$62.4** | **41%** | **78%** | **$19.5** |

41.     The following chart shows a comparison of the assumptions made for the Frequency Rate and Severity Rate to those used in the BofA Expert Report and Lehman Expert Declaration.

| Description | Frequency Rate Assumptions | | Severity Rate Assumptions | |
|---|---|---|---|---|
| | Lower Range | Higher Range | Lower Range | Higher Range |
| Trusts | 36% | 41% | 68% | 78% |
| BofA Expert Report | 44% | 47% | 45% | 60% |
| Lehman Expert Declaration | 25% | 45% | 45% | 55% |

42.     The Frequency Rate assumptions for the lower range are similar in this Declaration and the BofA Expert Report, with lower range assumption in the Lehman Expert Declaration again representing a more aggressive assumption based on my experience.  The Frequency Rate assumptions for the higher range are all similar.  The Severity Rate assumptions utilized in this Declaration are primarily driven by the actual Severity Rates for the Trusts' Liquidated Loans which are meaningfully higher in both the lower ranges and the higher ranges than those used in the BofA Expert Report and the

Lehman Expert Declaration.  I assumed that the actual Severity Rates for the BofA loans

and Lehman loans must be meaningfully lower than the Trusts' actual Severity Rates,

thus justifying BofA's and Lehman's lower Severity Rate assumptions.  Based on the

actual historical Trust Frequency Rates and Severity Rates, these Frequency Rate

assumptions and Severity Rate assumptions are, in my professional opinion, reasonable

for the Trusts.

## E.  ESTIMATED LIFETIME LOSSES

43.     By adding the Actual Liquidated Losses to the range of Forecasted

Remaining Lifetime Losses, I determined that the Estimated Lifetime Losses for the

Trusts range between $45.6 billion on the lower end, and $49.8 billion on the higher end.

The calculation of these numbers is expressed in the following chart:

| (in billions) | Lower Range | Higher Range |
|---|---|---|
| Actual Liquidated Losses | $30.3 | $30.3 |
| Forecasted Remaining Lifetime Loss | $15.3 | $19.5 |
| **Trusts Estimated Lifetime Losses** | **$45.6** | **$49.8** |

## LOSS SHARE RATE

44.     As defined above, the Loss Share Rate is the percentage of

Estimated Lifetime Losses that the Debtors might agree to share with the Trusts as a

result of potential breaches of representations and warranties.

45.     For the purposes of this Declaration, the Loss Share Rate is defined

as the product of (a) the "Breach Rate," and (b) the "Agree Rate."

46.     The  Breach Rate is defined as the product of (a) the "Audit Rate"

and (b) the "Demand Rate."

## A. AUDIT RATE

47.     The  Audit Rate is defined as the percentage of loans in a given

mortgage portfolio that are audited by the Trustee or other parties authorized under the

Governing Agreements for the purpose of finding alleged representation and warranty

breaches.  To make this calculation, one must first determine the Audit Rate on a group

of loans or the Trustee loan audit selection criteria designed to identify loans with a high

likelihood of representation and warranty breaches.

48.     Since a Trustee's audit selection methodology is proprietary to the

Trustee and not shared with the Seller, there is very little publicly available information

regarding GSE or PLS Trustee Audit Rates or loan audit selection criteria.  I did find one

recent report from September 2011 from the FHFA OIG[13] that provides some unique

insight into both Fannie Mae's and Freddie Mac's Audit Rate and loan audit selection

criteria.

49.     The FHFA OIG reported that Freddie Mac reviews for repurchase

claims only those loans that go into foreclosure or experience payment problems during

the first two years following origination.  Loans that default after the first two years are

reviewed at dramatically lower rates.  The report goes on to note that a Freddie Mac

senior examiner believed that this narrower selection criterion resulted in a lower

population of loans with defects than would have been discovered if all loans that go into

foreclosure or liquidation were considered.

50.     Additionally, the FHFA OIG report contained an FHFA

Memorandum, written by Jeffrey Spohn, which stated that the longstanding business

---

[13]  *See* Exhibit E hereto: The FHFA OIG Evaluation of the Federal Housing Finance Agency's Oversight of
Freddie Mac's Repurchase Settlement with Bank of America, dated September 27, 2011.

practice for both Fannie Mae and Freddie Mac has been to review non-performing loans

principally but not exclusively on mortgages that default in the first few years.  This

business practice stems from the belief that defaults that occur in the first few years

provide the best opportunity to learn why loans go into default, while most later defaults

are unlikely to be related to manufacturing defects (they more typically reflect life events

such as unemployment, divorce or health issues), and that manufacturing defects become

harder to prove with the passage of time.

      51.     In his memo, Mr. Spohn agreed with the FHFA OIG report that

Freddie Mac and FHFA needed to reassess their loan audit selection criteria with the

potential to broaden their selection criteria to include a larger population of loans that go

into foreclosure or liquidation.

      52.     It has been my experience working with mortgage insurance

companies and for banks issuing repurchase demands to their wholesale and

correspondent sellers, that it is a standard industry practice to select more than just loans

that go to foreclosure or liquidation in the first two years for loan audits.  A more

prevalent industry practice is to first evaluate all loans that go to foreclosure or

liquidation and then exclude a portion of the loans that defaulted due to a documented

hardship (or life event as noted in the FHFA Memorandum) such as loss of a job,

reduction of income, major illness, or those loans that defaulted after 24-36 months of

perfect pay history.  The reasoning behind this reduction or discount is that these

excluded loans likely defaulted because of the borrower hardship or some reason other

than a loan defect.  This is consistent with the reasoning utilized by FHFA, Fannie Mae

and Freddie Mac in their Audit Rate selection criteria.  Even the mortgage insurance

companies, who have been among the most aggressive pursuers of insurance rescissions, have often excluded loans with perfect pay histories from their Audit Rate selection criteria.  I have observed with my clients Audit Rates ranging from approximately 65% to 90% of Forecasted Liquidated Loans with reductions in the Audit Rates for perfect loan payment histories and borrower hardships.

53.     Based on my Audit Rate experience and the FHFA OIG findings and recommendations, I have assumed for purposes of this Declaration the following Audit Rate assumptions:

| Description | Audit Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts Liquidated Loans | 70% | 75% |
| Current (Non-Modified) | 15% | 30% |
| Current (Modified) | 45% | 50% |
| 30-59 Days Delinquent | 70% | 75% |
| 60-89 Days Delinquent | 70% | 75% |
| 90+ Days Delinquent & REO | 70% | 75% |
| Foreclosure | 70% | 75% |
| **Total Average** | **65%** | **69%** |

54.     I note that neither the BofA Expert Report nor the Lehman Expert Declaration discussed its Audit Rate assumptions but simply provided the Breach Rate which, as defined above, is the product of (a) the Audit Rate and (b) the Demand Rate.

## B.  DEMAND RATE AND DEMAND PROCESS

55.     As part of the Trustee's loan-level audit and repurchase demand decision process, the Trustee requires the loan auditor to perform the following review as part of the loan-level audit: (1) identify any potential contractual breaches (such as failure to comply with the seller's underwriting guidelines), (2) document the alleged breach facts, (3) opine as to whether or not such alleged breach is material and (4) opine as to whether or not such alleged breach was adverse to the interests of the Certificate Holders.

As we discussed above, the alleged breach must meet the R&W Repurchase Standard in order to contractually require the Seller to repurchase the loan.

56.     The Demand Rates for the GSEs are not publicly available.  There are Demand Rates that have been alleged in some PLS repurchase-related litigation against various Sellers, including the Debtors.  These PLS litigation Demand Rates are unsubstantiated, appear to be inflated and are vigorously disputed by the Sellers.  Lastly, neither the BofA Expert Report nor the Lehman Expert Declaration discussed its Demand Rate assumptions.  Therefore, I based my Demand Rate assumptions on my repurchase demand experience.  I have assumed for purposes of this Declaration the following Demand Rate assumptions:

| Description | Demand Rate assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts' Liquidated Loans | 55% | 65% |
| Current (Non-Modified) | 30% | 40% |
| Current (Modified) | 50% | 60% |
| 30-59 Days Delinquent | 55% | 65% |
| 60-89 Days Delinquent | 55% | 65% |
| 90+ Days Delinquent & REO | 55% | 65% |
| Foreclosure | 55% | 65% |
| **Total Average** | **54%** | **64%** |

## C.  BREACH RATE

57.     The Breach Rate was determined by multiplying the Audit Rate assumptions by the Demand Rate assumptions.  Based on this calculation, I determined that the Breach Rate assumptions for the Trusts range between 36% and 44%.  The following chart shows a comparison of this Breach Rate to that used in the BofA Expert Report and Lehman Expert Declaration:

| Description | Breach Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts | 36% | 44% |
| BofA Expert Report | 36% | 36% |
| Lehman Expert Declaration | 30% | 35% |

58.     The Breach Rate assumptions for the lower range are the same in this Declaration and the BofA Expert Report, while the Lehman Expert Declaration lower range is a more aggressive assumption than in this Declaration or the BofA Expert Report, based on the Alt-A and Subprime mortgage loan products securitized by Lehman, which in my experience have historically yielded higher alleged representation and warranty breaches.  The Breach Rate assumptions for the higher range utilized in this Declaration are higher than those used in both the BofA Expert Report and the Lehman Expert Declaration.  I concluded that higher Breach Rate assumptions used in this Declaration are the result of my more conservative view of potential Breach Rates. Given the above, these Breach Rate assumptions are in my professional opinion reasonable for the Trusts.

**D.  AGREE RATE**

59.     The Agree Rate is the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole.  While the Trustee may issue a Demand alleging one or more representation and warranty breaches, the Seller may not agree with the alleged breach facts.  Then, even if the Seller does agree with the alleged breach facts, the Seller will not always agree that the breach meets the R&W Repurchase Standard as described above.

60.     Prior to March 2012, there was not much in terms of public disclosures with any insight into Agree Rates for alleged breaches of representations and

warranties.  However, beginning in March of 2012, Fannie Mae, Freddie Mac and over a

dozen Private Label Sellers have filed Regulation AB 15-G repurchase demand data with

the SEC, including Agree Rates.

61.    Based on the IMF Special Report, the average GSE Agree Rates

for all Sellers was 49.54% and 67.56% for the Debtors. In our assumptions, we discount

the GSE Agree Rates based on the less stringent representations and warranties found in

the Trusts' Governing Agreements when compared to the stronger representations and

warranties found in the Fannie Mae and Freddie Mac agreements.  For example, in many

of Trusts' Governing Agreements there is little to no fraud representation or warranty

language, and the requirements to conform to the Underwriting Guidelines are often

qualified with "generally" or "substantially" in compliance with the Underwriting

Guidelines, which are both lower standards than are found in Fannie Mae or Freddie Mac

agreements.

62.    Based on the above and in consideration of the costs, risks and

uncertainties if the parties do not mutually agree on the repurchase population and have

to resort to litigation to resolve their differences, we have discounted the Debtors' GSE

Agree Rates and have assumed the Trusts' Agree Rate ranges between a low of 41% and

a high of 47%.  The following chart shows a comparison of this Agree Rate to that used

in the BofA Expert Report and Lehman Expert Declaration:

| Description | Agree Rate Assumptions | |
|---|---|---|
| | Lower Range | Higher Range |
| Trusts | 41% | 47% |
| BofA Expert Report | 40% | 40% |
| Lehman Expert Declaration | 30% | 40% |

63.     The Agree Rate assumptions for the lower range are similar in this Declaration and the BofA Expert Report, while the Lehman Expert Declaration lower range assumption is a more aggressive assumption than in my Declaration or the BofA Expert Report.  The Agree Rate assumptions for the higher range utilized in this Declaration are higher than those used in both the BofA Expert Report and the Lehman Expert Declaration.  I concluded that higher Agree Rate assumptions in this Declaration are correlated to the Debtors' substantially higher actual Agree Rates with the GSEs when compared to the industry as a whole, 67.56% versus 49.54%.  Given the above, these Agree Rate assumptions are in my professional opinion reasonable for the Trusts.

### E.  LOSS SHARE RATE AND POTENTIAL LIABILITY

64.     The Loss Share Rate was determined by multiplying the Breach Rate times the Agree Rate.  Based on this calculation, I determined that the Loss Share Rate for the Trusts ranges between 15% and 21%.

65.     The following chart shows a comparison with the calculated Loss Share Rates used in the BofA Expert Report and Lehman Expert Declaration.

| Description | Loss Share Rate Assumptions | |
| --- | --- | --- |
| | Lower Range | Higher Range |
| Trusts | 15% | 21% |
| BofA Expert Report | 14% | 14% |
| Lehman Expert Declaration | 9% | 14% |

66.     The higher Loss Share Rate assumptions in this Declaration, when compared to the Loss Share Rate assumptions in both the BofA Expert Report and the Lehman Expert Declaration, are the result of the higher assumed Trust Agree Rates, which results in the higher Debtors' Loss Share Rates.

## POTENTIAL REPURCHASE REQUIREMENTS

67.    For purposes of this Declaration, I was asked to calculated the Debtors' Potential Repurchase Requirements and assume that the Trusts were capable of proving a breach of representations and warranties under the Governing Agreements in certain claims against the Debtors.  This calculation is the product of (a) the Trusts' Estimated Lifetime Losses and (b) the Loss Share Rate.

68.    Utilizing the figures stated above in this Declaration, the range of Potential Repurchase Requirements is $6.7 billion to $10.3 billion.  The following chart shows the metrics for determining the low end of the range for the Debtors' Loss Share Rate and corresponding Potential Repurchase Requirements:

| LOWER RANGE (in billions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current Outstanding Trusts' UPB | Frequency Rate | Severity Rate | Trusts' Estimated Lifetime Losses | Breach Rate | Agree Rate | Loss Share Rate | Potential Repurchase Requirements |
| Trusts' Liquidated Loans | | | | $30.3 | 39% | 42% | 16% | $4.9 |
| Current (Non-Modified) | $34.1 | 11% | 72% | $2.8 | 5% | 13% | .6% | $0.02 |
| Current (Modified) | $11.3 | 36% | 68% | $2.8 | 23% | 32% | 7% | $0.2 |
| 30-59 Days Delinquent | $2.2 | 15% | 68% | $0.2 | 39% | 42% | 16% | $0.04 |
| 60-89 Days Delinquent | $1.0 | 84% | 66% | $0.6 | 39% | 42% | 16% | $0.09 |
| 90+ Days Delinquent | $6.3 | 96% | 67% | $4.0 | 39% | 42% | 16% | $0.6 |
| Foreclosure | $7.5 | 99% | 67% | $5.0 | 39% | 42% | 16% | $0.8 |
| | | | | | | | **15%** | **$6.7** |

69.    The following chart shows the metrics for determining the high end of the range for the Debtors' Loss Share Rate and corresponding Potential Repurchase Requirements:

| HIGHER RANGE (in billions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current Outstanding Trusts' UPB | Frequency Rate | Severity Rate | Trusts' Estimated Lifetime Losses | Breach Rate | Agree Rate | Loss Share Rate | Potential Repurchase Requirements |
| Trusts' Liquidated Loans | | | | $30.3 | 49% | 48% | 23% | $7.1 |
| Current (Non-Modified) | $34.1 | 17% | 80% | $4.6 | 12% | 23% | 3% | $0.1 |
| Current (Modified) | $11.3 | 41% | 78% | $3.6 | 30% | 43% | 13% | $0.4 |
| 30-59 Days Delinquent | $2.2 | 20% | 77% | $0.3 | 49% | 48% | 23% | $0.08 |
| 60-89 Days Delinquent | $1.0 | 87% | 75% | $0.7 | 49% | 48% | 23% | $0.2 |
| 90+ Days Delinquent | $6.3 | 97% | 75% | $4.6 | 49% | 48% | 23% | $1.1 |
| Foreclosure | $7.5 | 99% | 77% | $5.7 | 49% | 48% | 23% | $1.2 |
| | | | | | | | **21%** | **$10.3** |

[The remainder of this page intentionally left blank]

## **CONCLUSION**

70.      In summary, I utilized two generally accepted methodologies for

forecasting Trust lifetime loss ranges and developing repurchase-related assumptions

based on the Debtors' historical loan loss data, including frequency and severity rates,

current payment statuses, Shelf, mortgage loan product, and the Debtors' prior repurchase

experience.  These two methodologies are regularly used by market participants, financial

institutions and experts to estimate repurchase exposures, including estimates provided

by financial institutions in their regulatory filings, and independent third-party expert

reports.  Accordingly, the methodologies that I used in this Declaration are generally

accepted in the industry as a sound means of estimating repurchase exposure.  Based on

my analysis described above, it is my opinion to a reasonable degree of certainty that the

proposed Allowed Claim of $8.7 billion appears to be in the range of reasonableness.  I

swear under penalty of perjury that the foregoing is true and correct.


Dated:  June 11, 2012

_____

Frank Sillman

EXHIBITS

<u>Exhibit A</u> - Inside Mortgage Finance's Special Report Analyzing GSE Mortgage
        Buyback Demands regarding Fannie Mae and Freddie Mac's Regulation AB
        15-G repurchase-related SEC filings dated 2012.

<u>Exhibit B</u> - Compass Point Research on Mortgage Repurchases Part II: Private Label
        RMBS Investors Take Aim, dated August 17, 2010.

<u>Exhibit C</u> - The RRMS Advisors Opinion Concerning Contemplated Settlement Amount
        for 530 Trusts, dated June 7, 2011.

<u>Exhibit D</u> - The Lehman Brothers Holdings Inc. Declaration of Zachary Trumpp filed
        January 12, 2012.

<u>Exhibit E</u> - The FHFA OIG Evaluation of the Federal Housing Finance Agency's
        Oversight of Freddie Mac's Repurchase Settlement with Bank of America,
        dated September 27, 2011.

# EXHIBIT A

Analyzing GSE Mortgage Buyback Demand: Lender Impact Varies Significantly

## GSE Buyback Demand Activity: 2006-2008

*(Dollars in Millions)*

| Rank | Seller/Originator | Repurchase Demands | | Disposition of Demands | | | |
|---|---|---|---|---|---|---|---|
| | | Volume | Pct Assets | Repurchased | Withdrawn | Disputed | Pending |
| 1 | COUNTRYWIDE | $16,216.06 | 3.13% | 47.71% | 32.40% | 5.47% | 15.45% |
| 2 | WELLS FARGO | $7,073.59 | 1.85% | 49.76% | 43.11% | 6.14% | 7.75% |
| 3 | CHASE HOME FINANCE | $6,766.26 | 3.24% | 52.06% | 40.72% | 2.86% | 8.25% |
| 4 | BANK OF AMERICA | $5,373.05 | 3.44% | 39.46% | 42.18% | 8.46% | 11.25% |
| 5 | CITIMORTGAGE | $3,966.04 | 2.43% | 53.50% | 29.72% | 1.49% | 16.22% |
| 6 | SUNTRUST MORTGAGE INC. | $3,026.11 | 3.08% | 57.39% | 32.77% | 1.81% | 12.37% |
| 7 | GMAC MORTGAGE/ALLY | $1,537.81 | 1.49% | 67.56% | 35.62% | 0.50% | 2.60% |
| 8 | TAYLOR, BEAN & WHITAKER MORTGAGE | $1,464.46 | 3.12% | 24.12% | 23.20% | 0.63% | 0.26% |
| 9 | FLAGSTAR BANK, FSB | $1,224.15 | 2.46% | 40.92% | 39.02% | 1.36% | 19.19% |
| 10 | U.S. BANK N.A. | $1,094.07 | 1.88% | 49.04% | 45.45% | 5.29% | 4.93% |
| 11 | AMSOUTH BANK | $996.93 | 2.79% | 51.47% | 36.10% | 2.37% | 10.35% |
| 12 | WASHINGTON MUTUAL | $979.84 | 0.96% | 90.33% | 36.17% | 3.77% | 12.93% |
| 13 | NATIONAL CITY BANK | $744.18 | 1.85% | 64.46% | 16.21% | 1.11% | 19.67% |
| 14 | INDYMAC BANK, FSB | $736.87 | 1.30% | 82.91% | 13.14% | 1.36% | 2.34% |
| 15 | WACHOVIA MORTGAGE, FSB | $714.08 | 1.63% | 65.92% | 20.85% | 3.72% | 9.79% |
| 16 | LEHMAN BROTHERS | $711.96 | 2.60% | 3.70% | 9.05% | 0.07% | 67.89% |
| 17 | MORGAN STANLEY | $638.70 | 6.25% | 36.65% | 70.31% | 1.74% | 4.60% |
| 18 | HSBC MORTGAGE CORPORATION (USA) | $580.65 | 2.60% | 69.43% | 21.96% | 0.74% | 9.20% |
| 19 | FIRST HORIZON HOME LOAN | $521.36 | 1.90% | 46.17% | 34.91% | 2.43% | 18.24% |
| 20 | ABN AMRO MORTGAGE GROUP, INC. | $493.62 | 1.61% | 50.10% | 40.79% | 2.88% | 12.37% |
| 21 | EMC MORTGAGE CORPORATION | $491.62 | 7.04% | 53.53% | 66.50% | 4.81% | 9.96% |
| 22 | FIFTH THIRD BANK | $490.12 | 2.15% | 56.89% | 43.02% | 0.80% | 2.99% |
| 23 | GREENPOINT MORTGAGE FUNDING, INC. | $403.94 | 9.90% | 39.33% | 38.67% | 1.18% | 25.12% |
| 24 | OHIO SAVINGS BANK | $326.03 | 1.57% | 53.25% | 38.21% | 1.72% | 7.07% |
| 25 | DB STRUCTURED PRODUCTS, INC. | $283.01 | 8.48% | 45.74% | 56.13% | 6.69% | 4.27% |
| 26 | PHH MORTGAGE/CENDANT | $279.84 | 0.79% | 34.54% | 50.84% | 1.46% | 16.01% |
| 27 | FREEDOM MORTGAGE CORPORATION | $278.35 | 4.76% | 55.89% | 25.35% | 1.11% | 18.05% |
| 28 | BRANCH BANKING & TRUST | $212.39 | 1.02% | 61.05% | 33.39% | 2.96% | 3.84% |
| 29 | GOLDMAN SACHS MORTGAGE COMPANY | $197.98 | 3.04% | 35.58% | 61.68% | 5.64% | 7.80% |
| 30 | HOMEBANC MORTGAGE CORPORATION | $110.12 | 3.59% | 45.17% | 52.76% | 3.12% | 2.35% |
| 31 | PULTE MORTGAGE LLC | $95.95 | 1.28% | 15.58% | 55.62% | 6.81% | 21.98% |
| 32 | REGIONS BANK | $90.30 | 1.14% | 72.08% | 25.39% | 2.40% | 4.74% |
| 33 | DLJ MORTGAGE CAPITAL INC. | $80.05 | 4.14% | 40.35% | 74.22% | 9.25% | 3.28% |
| 34 | BANKUNITED, FEDERAL SAVINGS BANK | $77.94 | 6.15% | 7.27% | 92.03% | 0.00% | 0.48% |
| 35 | MORTGAGE ACCESS/WEICHERT FINANCIAL | $69.79 | 1.93% | 23.72% | 58.98% | 3.51% | 15.68% |
| 36 | PROVIDENT FUNDING ASSOCIATES | $69.08 | 1.98% | 31.60% | 67.49% | 4.49% | 2.78% |
| 37 | USAA FEDERAL SAVINGS BANK | $66.81 | 0.47% | 53.97% | 36.34% | 1.91% | 7.77% |
| 38 | SOVEREIGN BANK | $65.60 | 0.84% | 55.55% | 28.33% | 2.97% | 16.06% |
| 39 | E*TRADE BANK | $53.36 | 5.88% | 22.35% | 68.29% | 9.19% | 2.50% |
| 40 | IRWIN MORTGAGE CORPORATION | $44.31 | 1.31% | 56.99% | 29.73% | 0.77% | 12.51% |
| 41 | FIRST NATIONAL BANK OF NEVADA | $42.76 | 20.11% | 57.35% | 62.91% | 0.85% | 0.00% |
| 42 | CENTEX/HARWOOD STREET FUNDING | $40.22 | 2.91% | 41.31% | 53.80% | 16.31% | 2.26% |
| 43 | CHEVY CHASE BANK FSB | $36.91 | 1.55% | 21.83% | 61.27% | 6.85% | 10.83% |
| 44 | PNC MORTGAGE | $32.23 | 0.87% | 63.61% | 33.60% | 1.17% | 6.31% |
| 45 | GOLDEN FIRST MORTGAGE CORPORATION | $30.82 | 41.97% | 0.00% | 100.00% | 0.00% | 0.00% |
| 46 | M&T MORTGAGE CORPORATION | $29.41 | 0.72% | 21.43% | 63.47% | 7.98% | 9.04% |
| 47 | CTX MORTGAGE COMPANY LLC | $27.54 | 2.12% | 29.78% | 33.05% | 15.15% | 22.01% |
| 48 | NOMURA CREDIT & CAPITAL, INC. | $26.10 | 17.08% | 55.33% | 79.41% | 0.00% | 1.24% |
| 49 | UNIVERSAL MORTGAGE CORPORATION | $25.75 | 2.75% | 35.28% | 10.37% | 0.00% | 54.35% |
| 50 | COLONIAL SAVINGS FA | $23.36 | 1.05% | 62.06% | 27.17% | 1.24% | 10.05% |
| 51 | OPTEUM FINANCIAL SERVICES, LLC | $22.55 | 3.11% | 50.28% | 31.52% | 1.66% | 16.53% |
| 52 | R&G MORTGAGE CORPORATION | $21.16 | 1.48% | 59.15% | 36.14% | 3.87% | 2.86% |
| 53 | DOWNEY SAVINGS AND LOAN ASSOCIATION | $19.75 | 0.78% | 67.88% | 17.47% | 0.00% | 14.65% |
| 54 | AMERICAN HOME MORTGAGE CORPORATION | $18.04 | 1.43% | 1.45% | 41.35% | 4.31% | 2.78% |
| 55 | MORTGAGE LENDERS NETWORK USA, INC | $17.00 | 1.65% | 23.86% | 68.72% | 15.72% | 4.77% |
| 56 | METLIFE HOME LOANS | $16.94 | 2.20% | 34.46% | 52.85% | 0.55% | 12.14% |

| Rank | Seller/Originator | Repurchase Demands | | Disposition of Demands | | | |
|---|---|---|---|---|---|---|---|
| | | Volume | Pct Assets | Repurchased | Withdrawn | Disputed | Pending |
| 646 | THE FARMERS AND MECHANICS BANK | $0.08 | 0.28% | 0.00% | 0.00% | 100.00% | 0.00% |
| 648 | MVB MORTGAGE CORPORATION | $0.08 | 5.28% | 0.00% | 100.00% | 0.00% | 0.00% |
| 649 | HERITAGE FEDERAL CREDIT UNION | $0.07 | 0.14% | 0.00% | 100.00% | 0.00% | 0.00% |
| 650 | ALTRA FEDERAL CREDIT UNION | $0.07 | 0.06% | 100.00% | 0.00% | 0.00% | 0.00% |
| 653 | COMMUNITY NATIONAL BANK | $0.07 | 0.19% | 0.00% | 0.00% | 100.00% | 0.00% |
| 652 | MINSTER BANK | $0.07 | 0.52% | 0.00% | 100.00% | 0.00% | 0.00% |
| 651 | PEOPLES COMMUNITY BANK | $0.07 | 1.08% | 0.00% | 100.00% | 0.00% | 0.00% |
| 655 | MAUCH CHUNK TRUST CO. | $0.07 | 0.37% | 100.00% | 0.00% | 0.00% | 0.00% |
| 654 | THE CITIZENS SAVINGS BANK | $0.07 | 0.45% | 0.00% | 100.00% | 0.00% | 0.00% |
| 656 | FINANCIAL PLUS FEDERAL CREDIT UNION | $0.07 | 0.86% | 0.00% | 0.00% | 100.00% | 0.00% |
| 657 | AMERICAN BANK & TRUST | $0.07 | 0.14% | 100.00% | 0.00% | 0.00% | 0.00% |
| 658 | VANDYK MORTGAGE CORPORATION | $0.07 | 11.26% | 100.00% | 0.00% | 0.00% | 0.00% |
| 659 | FARMERS CITIZENS BANK | $0.07 | 0.92% | 100.00% | 425.00% | 0.00% | 0.00% |
| 660 | CHRISTIAN COMMUNITY CREDIT UNION | $0.07 | 0.27% | 100.00% | 0.00% | 0.00% | 0.00% |
| 661 | MARKLEBANK | $0.07 | 0.37% | 0.00% | 100.00% | 0.00% | 0.00% |
| 662 | DAKOTALAND FEDERAL CREDIT UNION | $0.06 | 1.48% | 100.00% | 0.00% | 0.00% | 0.00% |
| 663 | DHCU COMMUNITY CREDIT UNION | $0.06 | 0.20% | 100.00% | 0.00% | 0.00% | 0.00% |
| 664 | CARLSBAD NATIONAL BANK | $0.06 | 0.19% | 100.00% | 0.00% | 0.00% | 0.00% |
| 665 | DELTA COUNTY CREDIT UNION | $0.06 | 0.31% | 100.00% | 0.00% | 0.00% | 0.00% |
| 666 | COMMUNITY TRUST BANK, INC | $0.06 | 0.05% | 100.00% | 0.00% | 0.00% | 0.00% |
| 668 | GOLDEN MORTGAGE BANKERS | $0.06 | 0.55% | 0.00% | 39.34% | 0.00% | 0.00% |
| 667 | THE NATIONAL BANK | $0.06 | 1.18% | 0.00% | 100.00% | 0.00% | 0.00% |
| 669 | HEARTWELL MORTGAGE CORPORATION | $0.06 | 0.78% | 0.00% | 100.00% | 0.00% | 0.00% |
| 670 | FIRST FARMERS BANK & TRUST | $0.06 | 0.08% | 0.00% | 100.00% | 0.00% | 0.00% |
| 671 | FIRST NATIONAL BANK OF GRANT PARK | $0.06 | 0.35% | 0.00% | 0.00% | 100.00% | 0.00% |
| 672 | TOWN AND COUNTRY BANC MORTGAGE SERVICES | $0.06 | 0.06% | 100.00% | 0.00% | 0.00% | 0.00% |
| 673 | MID-MISSOURI MORTGAGE COMPANY | $0.06 | 12.10% | 0.00% | 100.00% | 0.00% | 0.00% |
| 674 | NEW REPUBLIC SAVINGS BANK | $0.06 | 0.41% | 100.00% | 0.00% | 0.00% | 0.00% |
| 675 | WEST END BANK, S.B. | $0.05 | 0.28% | 0.00% | 100.00% | 0.00% | 0.00% |
| 676 | INDIANA UNIVERSITY CREDIT UNION | $0.05 | 0.41% | 100.00% | 0.00% | 0.00% | 0.00% |
| 677 | AMERICANTRUST FEDERAL SAVINGS BANK | $0.05 | 0.39% | 0.00% | 100.00% | 0.00% | 0.00% |
| 678 | THE STATE BANK AND TRUST COMPANY | $0.05 | 0.10% | 0.00% | 100.00% | 0.00% | 0.00% |
| 679 | HERGET BANK, NATIONAL ASSOCIATION | $0.05 | 0.26% | 100.00% | 0.00% | 0.00% | 0.00% |
| 680 | CHEVIOT SAVINGS BANK | $0.05 | 0.25% | 0.00% | 100.00% | 0.00% | 0.00% |
| 681 | FIRST FEDERAL SAVINGS BANK OF IOWA | $0.04 | 0.09% | 100.00% | 0.00% | 0.00% | 0.00% |
| 682 | CFCU COMMUNITY CREDIT UNION | $0.04 | 0.17% | 100.00% | 0.00% | 0.00% | 0.00% |
| 683 | BAYBANK | $0.03 | 0.24% | 100.00% | 0.00% | 0.00% | 0.00% |
| 684 | PULASKI BANK, A SAVINGS BANK | $0.03 | 0.19% | 100.00% | 0.00% | 0.00% | 0.00% |
| 685 | IDAHO CENTRAL CREDIT UNION | $0.03 | 0.18% | 0.00% | 100.00% | 0.00% | 0.00% |
| 686 | SOY CAPITAL BANK AND TRUST COMPANY | $0.03 | 0.19% | 0.00% | 100.00% | 0.00% | 0.00% |
| 687 | MACKINAC SAVINGS BANK | $0.02 | 7.75% | 0.00% | 100.00% | 0.00% | 0.00% |
| 688 | NORTHERN MICHIGAN BANK & TRUST | $0.02 | 0.03% | 100.00% | 0.00% | 0.00% | 0.00% |
| | Grand Total | $65,836.91 | 2.40% | 49.54% | 35.75% | 4.15% | 12.58% |

*Note: Data cover repurchase demands on mortgages securitized by Fannie Mae and Freddie Mac from 2006 through 2008. Seller/originator data are for sellers of*

*Source: Inside Mortgage Finance analysis of Fannie Mae and Freddie Mac SEC disclosures*

Copyright @ Inside Mortgage Finance Publications (301) 951-1240  Page 22

12-12020-mg    Doc 320-8    Filed 06/11/12    Entered 06/11/12 00:00:34    Exhibit B
Pg 32 of 110

# EXHIBIT B



# Mortgage Finance

*Mortgage Repurchases Part II: Private Label RMBS Investors Take Aim - Quantifying the Risks*

**August 17, 2010**

**Chris Gamaitoni**
202-534-1387
cgamaitoni@compasspointllc.com

**Jason Stewart**
202-540-7306
jstewart@compasspointllc.com

**Mike Turner**
202-534-1380
mturner@compasspointllc.com

## Summary

During the course of mortgage loan sales, selling lenders make certain representations and warranties to buyers such as the GSEs and bond investors that hold the securitized loans. Breaches of these representations and warranties cause the selling lender to have to repurchase the loan or indemnify the buyer against future losses. As analyzed in our March 15, 2010 report *"GSE Mortgage Repurchase Risk Poses Future Headwinds: Quantifying the Losses"*, we estimated the potential unrecognized liability related to GSE repurchase requests. **Due to increasing litigation activity by private label RMBS investors, we believe that liability may also lurk for originators/underwriters of the initial securitizations and could approach 5% to 15% of tangible book value.** As such, based upon information contained in pending lawsuits, we have analyzed securitization data in an attempt to frame the potential liability that could exist. See the table below for a summary of estimated losses.

## Key Points

- **FHLB lawsuits.** Since late 2009, several FHLBs have filed suit against multiple underwriters of Alt-A and subprime MBS deals citing inaccurate claims in the initial prospectus such as the percentage of high LTV loans, amount of investor properties, or number of underwriting exceptions. Utilizing sales information from foreclosed properties within the deal, the suits have compiled convincing data to show that the loan underwriting was materially worse than stated in the initial prospectus. Combined, the lawsuits (FHLBs of Pittsburgh, Seattle, San Francisco) are requesting rescission on about $25.6B in MBS purchases.

- **Investor syndicate with substantial clout gearing to pursue loan buybacks.** An investor group representing <u>$500B</u> in MBS securities has sent letters to Trustees of mortgage backed securitizations requesting that they enforce servicing breaches related to improperly originated loans. According to a July 21 Reuters article, the group has topped the required 25% ownership threshold needed to enforce Trustees to compel the servicers to hand over documentation (i.e. loan files), or be removed from the deal.

- **FHFA subpoenas.** On July 12, the Federal Housing Finance Agency (FHFA), issued 64 subpoenas seeking documents for MBS securities that Freddie and Fannie had invested in. Previously, the GSE's had been requesting documentation (i.e. loan files) to determine potential reps and warranty breaches; however, due to a lack of success, the FHFA was forced to use their subpoena power to compel the documentation.

- **Potential liability.** With the majority of the subprime/Alt-A originators out of business, most of the litigation is targeted at the underwriters of the initial securitizations. The suits generally claim, among other items, that the underwriters of the securitizations misrepresented the profile of loan standards within the initial prospectus.

| Total Alt-A & Subprime RMBS Repurchase Request Loss Estimates | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Worst Case** | | | **Base Case** | | | **Best Case** | | |
| Company | Ticker | Rating | Loss ($M) | Per Share* | % of TBV | Loss ($M) | Per Share* | % of TBV | Loss ($M) | Per Share* | % of TBV |
| Bank of America | BAC | NR | 44,977 | $2.69 | 22% | 35,204 | $2.11 | 17% | 16,728 | $1.00 | 8% |
| JP Morgan | JPM | NR | 32,922 | $4.93 | 19% | 23,941 | $3.59 | 13% | 9,006 | $1.35 | 5% |
| Deutsche Bank | DB | NR | 20,892 | $18.65 | 31% | 14,070 | $12.56 | 21% | 4,463 | $3.98 | 7% |
| Goldman Sachs | GS | NR | 15,103 | $16.77 | 15% | 11,194 | $12.43 | 11% | 4,197 | $4.66 | 4% |
| RBS Greenwich | RBS | NR | 15,282 | $0.16 | 19% | 9,417 | $0.10 | 12% | 1,919 | $0.02 | 2% |
| Credit Suisse | CS | NR | 12,151 | $6.15 | 30% | 8,898 | $4.50 | 22% | 3,743 | $1.89 | 9% |
| UBS | UBS.N | NR | 12,262 | $1.94 | 22% | 8,350 | $1.32 | 15% | 2,830 | $0.45 | 5% |
| Morgan Stanley | MS | NR | 8,312 | $3.56 | 15% | 7,855 | $3.37 | 14% | 4,498 | $1.93 | 8% |
| Citigroup | CS | NR | 9,964 | $0.21 | 5% | 7,819 | $0.16 | 4% | 3,729 | $0.08 | 2% |
| Barclays | BCS | NR | 3,789 | $0.19 | 4% | 3,583 | $0.18 | 3% | 2,068 | $0.10 | 2% |
| HSBC | HBC | NR | 3,555 | $0.12 | 2% | 3,515 | $0.12 | 2% | 2,071 | $0.07 | 1% |
| Total | | | 179,210 | | | 133,846 | | | 55,253 | | |
| * after-tax (assume 40%) | | | | | | | | | | | |

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS, Asset Backed Alert*

**Compass Point Research & Trading, LLC**

Mortgage Repurchases Part II: Private Label RMBS Investors Take Aim—Quantifying the Risks    2

## Litigation Background: a Brief History

Since September 2008, there have been a number of lawsuits aimed at originators of subprime and Alt-A mortgages by either investors in private label (non-government guaranteed) RMBS securities, or the companies that insured them.  In 2008 and 2009, bond insurers MBIA, Syncora, and FGIC all filed separate lawsuits against Countrywide (later amended to include Bank of America).  Generally, these lawsuits claim that a significant portion of the loans underlying the securitizations that they guaranteed failed to comply with the underwriting guidelines or other reps and warranties.

In December 2008, Greenwich Financial, on behalf of a bondholder group, filed suit against Countrywide charging that they violated securitization agreements in modifying loans as part of their $8B settlement with Attorney Generals from multiple states.

Since late 2009/early 2010, lawsuits have been filed on the behalf of the Federal Home Loan Banks of Pittsburgh, Seattle and San Francisco.  Similar to some of the mortgage insurer lawsuits, the lawsuits all claim that, among other things, a significant portion of the loans underlying the securitizations did not comply with the standards that were cited within the securitization prospectus.  However, unlike the lawsuits by the mortgage insurers which are directed at the originator, the FHLB suits are against the underwriters of the securitizations.  Accordingly, the suits believe the underwriters should be held liable since they misrepresented the information contained in the prospectus.  They are seeking rescission on approximately $25.6 billion in RMBS purchases.

In July 2010, an investor syndicate purportedly representing $500B in MBS sent letters to numerous trustees of mortgage backed securitizations requesting that they enforce servicing breaches related to improperly originated loans.  The group was formed in order to assemble enough representation to exceed the required 25% or 50% thresholds needed to compel the trustee to take action against the servicer.  For reference, the trustee technically manages the securitization trust, and has the duty to ensure the servicer complies with all requirements in the securitization documents.  Statements from the syndicate's attorneys have stated that they have 25% voting rights for over 2,300 deals, 50% in over 900 deals, and 66% in more than 450 deals.  The group is represented by Talcott Franklin, a Dallas-based firm that was founded by an attorney who previously worked on a bondholder lobbying effort that was related to the Greenwich Financial litigation.  The firm appears to have been established specifically for taking on this effort.

| Date | | Action | Amount |
|------|---|--------|--------|
| Sep-08 | a | **MBIA sues Countrywide and BAC** | **$1.4B** |
| | | Status: In April 2010, the Judge denied motion to dismiss (some counts).  All parties have appealed the Judge's ruling, and such appeals are pending.  Discovery has commenced. | |
| Dec-08 | b | **Greenwich Financial sues Countrywide** | **Decl. Jdg.** |
| | | Status: Awaiting ruling from NY State Supreme regarding Countrywide's motion to dismiss | |
| Jan-09 | c | **Syncora sues Countrywide and BAC** | **$0.4B** |
| | | Status: In April 2010, the Judge granted Defendant's motion to dismiss (some counts).  Appeals are pending.  Judge has ordered Countrywide to produce all loan files regarding 3 securitizations.  Defendants' have filed counterclaims against Syncora for breach of contract.  Syncora has agreed to stay proceedings against BAC.  Claims against Countrywide continue. | |
| Sep-09 | d | **FHLB Pittsburgh lawsuits - multiple defendants** | **$2.6B** |
| | | Status: After being removed from state court to federal court, the cases were remanded back to Court of Common Pleas in Dec. 2009.  Defendants in each lawsuit have filed motions to dismiss with the Court, and a hearing on the motions is scheduled for August 25, 2010. | |
| Dec-09 | e | **FGIC sues Countrywide (now BAC)** | **$1B** |
| | | Status: Judge granted Countrywide's motion to dismiss only as to the claims of negligent misrepresentation and breach of implied covenant of good faith and fair dealing.  The Judge denied the motion to dismiss as to the claims of fraud.  Both parties have filed appeals, which are pending. | |
| Dec-09 | f | **FHLB Seattle lawsuits - multiple defendants** | **$4B** |
| | | Status: Cases moved to Federal court.  On July 29, 2010, Plantiffs argued motion to remand all cases to State court. Awaiting decision. | |
| Mar-10 | g | **FHLB San Francisco lawsuits - mutiple defendants** | **$19B** |
| | | Status: Cases filed in state court and removed to federal court by defendants.  FHLB has filed motion to remand to state court.  Motion hearing set for 9/17/10. | |
| Jul-10 | h | **FHFA issues 64 subpoenas for loan files** | **N/A** |
| | | Status: unknown, private | |
| Jul-10 | i | **Investor group announces intentions to file suit** | **$500B** |
| | | Status: nothing publicly filed yet | |
| Aug-10 | j | **NY Federal Reserve engages in actions to enforce repurchases on faulty mortgages acquired through Bear Stearns and AIG** | **$70B** |
| | | Status: unknown, private | |

**Sources**

a. http://www.mbia.com/investor/legal_proceedings.html

b. Greenwich Financial Services, et al. v. Countrywide Finacnial Corp., et al.; SCROLL

c. Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., et al.; SCROLL

d. FHLB of Pittsburgh's Form 10-Q for the Quarter Ended June 30, 2010; PACER

e. Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc.; SCROLL

f. FHLB of Seattle 's Form 10-Q for the Quarter Ended June 30, 2010; PACER

g. FHLB of San Francisco 's Form 10-Q for the Quarter Ended June 30, 2010; PACER

h. July 12, 2010 Federal Housing Finance Agency news release

i. July 21, 2010 Reuters article "Mortgage bond holders get legal esge: buybacks seen"

j. Aug 4, 2010 Bloomerg article "N.Y. Fed May Require Banks to Buy Back faulty Mortgages, Assets"

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

Also in July 2010, the FHFA, acting on behalf of Fannie and Freddie, issued 64 subpoenas seeking documents related to private-label mortgage backed securities in which they invested.  The FHFA intends to utilize the information to determine whether the issuers (underwriters) and others may be liable for certain losses suffered.  The ultimate goal is "to determine whether misrepresentations, breaches of warranties, or other acts of omissions occurred that would require them to repurchase loans underlying the securitizations." (July 12, 2010 Federal Housing Finance Agency news release)

Most recently, the New York Federal Reserve stated in August that they are engaged in actions to enforce repurchases on faulty mortgages acquired through Bear Stearns and AIG. (August 4, 2010 Bloomberg article)

## Litigation Background: The Real Issue—Access to the Loan Files

All the lawsuits generally make similar claims—that a significant portion of the underlying loans failed to comply with the underwriting guidelines or other reps and warranties and thus misrepresentations and material omissions were made in connection with the sale of private label RMBS.  As background, during the securitization of loans, the underwriter (or originator, in the case of the mortgage insurer) makes certain representations and warranties that the underlying loans conform with the standards set forth in the securitization prospectus.  Some of the most common misrepresentations cited in the lawsuits that have been filed are:

- Stated loan-to-value ratios were lower than actual LTVs
- Failure to disclose additional liens on properties
- Property values were based on overstated valuations
- Overstating the number of mortgages on primary residences
- Originators of mortgage loans securing collateral pools departed from underwriting standards

In order to have conclusive proof that a significant portion of the underlying loans did not conform to the initial underwriting guidelines, the best source of information is loan file documentation.  This point is made clear via statements in the FHFA subpoenas; "… the Conservator is seeking the contents of loan files, which include documents used in the underwriting process, such as loan applications and property appraisals." (July 12, 2010 FHFS news release)  While the GSEs, via the FHFA, have the power to subpoena the servicers of the securitization to turn over the documentation, other RMBS investors, such as the FHLB, do not have direct access to the files and must litigate in an attempt to gain access to the loan files.  Based on the information provided, there appear to be two routes currently implemented by investors:

- *File suit against the securitization underwriter.*  Utilizing statistical analyses of trust performance, the FHLB suits have attempted to prove that the only way for the underlying loan performance to have performed as poorly as they did was if the underwriting was materially different than stated.  If a judge does not dismiss the case, the plaintiffs are likely to gain access to the loan files via the discovery phase of the litigation (there has been no decision in the FHLB cases yet).  To date, among the various lawsuits listed above, only in Syncora v. Countrywide/BAC have the defendants been ordered to produce loan files.
    or
- *Garner the required 25% or 50% voting rights* from securitization investors in order to compel the trustee to force the servicer to provide the required documentation (or be removed as acting trustee).  This is the route the $500B investor group is initially taking.  Thus, the group conceivably should have a greater chance of accessing loan files as the deciding factor may not hinge on a judge's decision.

As previously noted, the FHLB suits are requesting rescission of about $25.6B in RMBS purchases.  However, we believe these suits, the investor syndicate, the GSE's and the Fed, ultimately are looking to have the underwriter, or the originator (if they are not bankrupt), repurchase only the underlying loans that did not abide by the underwriting standards stated in the prospectus.

## Litigation Background: Do the Lawsuits Stand a Chance?

At first glance, many of the lawsuits sound like a Hail Mary by investors that have lost money on soured RMBS purchases.  Our skepticism increases substantially when you consider that the claims of "faulty" mortgages are being made by entities such as the GSEs, FHLBs or mortgage insurers that have deep access to mortgage data and are deemed experts.  However, a closer look at the FHLB lawsuits provide fairly convincing evidence that the loans were significantly worse than stated and the cases could have merit.  Recall, as stated above, one of the primary goals of the lawsuit is to gain access to the loan files, as they will likely provide more convincing proof of their claims.  Thus, the initial lawsuit only needs to provide enough evidence to convince the judge to deny motions to dismiss and enter the discovery phase which will potentially provide the plaintiffs access to the loan files.

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

Accordingly, below are two examples that were cited in the San Francisco FHLB's lawsuit of underwriting misrepresentations allegedly made in connection with the sale of Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2007-1.

**"Untrue or misleading statements about the LTVs of the mortgage loans."** Utilizing an Automated Valuation Model (AVM), the FHLB estimated the actual average loan-to-values for underlying mortgages and compared them to statements made in the prospectus. Their analysis of 2,578 loans (58% of the entire pool), found that 414 loans, or 16%, had LTVs in excess of 100%, versus the statement in the prospectus that zero loans had LTVs in excess of 100%. Below is the results of their analysis taken from the lawsuit:

**Item 62.  Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 4,345 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,578 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,741 |
| Aggregate amount by which the stated value of those properties exceeded their true market values as reported by the model | $159,299,961 |
| Number of loans on which the stated value was 95% or less of the trust market value as reported by the model | 289 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $18,366,289 |
| Number of loans with LTVs over 100% as stated by Defendants | - |
| Number of loans with LTVs over 100% , as determined by the model | 414 |
| Weighted-average LTV, as staed by Defendants (group 3) | 72.2% |
| Weighted-average LTV, as determined by the model (group 3) | 86.6% |

Source: Schedule 1 to First Amended Complaint, FHLB San Francisco v. Credit Suisse Securities (USA) LLC, et al. (emphasis added)

 **"Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans"** Based on their analysis, the FHLB estimated that among the 4,345 loans in this securitization, misstatements were made regarding 521 loans. Below is the info included in the lawsuit:

**Items 96.  Details of properties that were stated to be owner-occupied, but were not:**
   (a)  **Number of loans on which the owner of the property instructed tax authorities to send the property tax billed to him or her at a different address: 243**
   (b)  **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 325**
   (c)  **Number of loans on which the owner of the property owned three or more properties: 30**
   (d)  **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 521**

Source: Schedule 1 to First Amended Complaint, FHLB San Francisco v. Credit Suisse Securities (USA) LLC, et al.

In summary, the lawsuit claims that the defendants made untrue or misleading statements on 50.6% of the loans securitized in Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2007-1 (p. 3, First Amended Complaint, FHLB San Francisco v. Credit Suisse Securities (USA) LLC, et al.)  And, that is just one of the 116 securitizations that the San Francisco FHLB alleges were misrepresented.  Where do the FHLB lawsuits stand?  None of them have entered discovery. The Pittsburgh cases were moved from state court to federal court, then back to state court and are awaiting a ruling regarding the defendants' motions to dismiss. The Seattle and San Francisco suits have been moved to federal court, but the FHLB has pending motions to remand those proceedings to state court.  While the FHLB lawsuits are in limbo, **the lawsuit filed by MBIA has had more progress that could have negative implications for the defendants of the other suits.  In April 2010, Judge Bransten partially denied Bank of America's motion to dismiss, and held that BAC is the successor-in-interest to Countrywide and thus vicariously liable for the conduct of**

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

**Countrywide if Countrywide is ultimately found liable** (p. 15, April 29, 2010 Order of Judge Bransten, MBIA Insurance Corp. v. Coutnrywide Home Loans, Inc., et al.).  **The case was ordered to move forward on the fraud and breach of implied covenant of good faith and fair dealing causes of action**.  Since the Judge's decision in April, both Bank of America and the FHLB have appealed the ruling.

The same Judge is also sitting for the Syncora and FGIC lawsuits which are similar to the MBIA case.  Importantly, in Syncora's case against Countrywide, in May of this year Judge Bransten ordered Countrywide to produce to Syncora the loan origination files for all of the loans in three separate securitizations originated by Countrywide and insured by Syncora (May 7, 2010 Order of Judge Bransten, Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., et al.).  This ruling may set a precedent for the MBIA and FGIC lawsuits should Countrywide and BAC resist producing the loan origination files in those cases.

While these lawsuits could be extremely slow to progress, we believe the FHFA subpoenas, Fed requests, and the actions being taken on behalf of the investor syndicate may proceed at a faster pace, given they are likely to gain access to the coveted loan files much sooner. With access to loan files potentially a matter of when, not if, the next question we consider is whether access to loan files will really be the smoking gun many expect. To gain some perspective on how pervasive the problem of defective mortgages was, we refer investors to the April 7, 2010 testimony of Richard Bowen, III, before the Financial Crisis Inquiry Commission.  Mr. Bowen was the Business Chief Underwriter for Correspondent Lending in the Consumer Lending Group at Citigroup in charge of over $90B in residential mortgage production.  Below are excerpts of his testimony:

*"In mid-2006, I discovered that over 60% of these mortgages purchased and sold were defective. Because Citi had given reps and warrants to the investors that the mortgages were not defective, the investors could force Citi to repurchase many billions of dollars of these defective assets. This situation represented a large potential risk to the shareholders of Citigroup. I started issuing warnings in June of 2006 and attempted to get management to address these critical risk issues. These warnings continued through 2007 and went to all levels of the Consumer Lending Group.  We continued to purchase and sell to investors even larger volumes of mortgages through 2007. And defective mortgages increased during 2007 to over 80% of production."*
Source: http://subprimeshakeout.blogspot.com/2010/06/sec-demands-more-disclosure-from-jp.html

We defer investors to legal experts to opine on the potential outcomes of the outstanding lawsuits; however, given the potential evidence that the loan files could uncover, it would not be surprising to us to see settlements develop once data from the loan files access has been attained.

## Who is Exposed to Alt-A Underwriting Risk?

With the majority of the top Alt-A and subprime mortgage originators out of business, the litigation has largely been centered on the underwriters of the securitizations. Should investor suits ultimately be successful in recovering damages from the underwriters, we would expect the underwriters to turn to the originators of the loans (so long as they are not affiliated with the underwriter or bankrupt) and attempt to recover those damages.  Since this process is likely to take some time and we have quantifiable data points with regard to underwriter exposure, we have focused this report only on framing the potential liability of Alt-A and subprime RMBS underwriters.

We believe that there is a material risk related to the past underwriting of Alt-A loans in the banking sector due to representation and warranties underwriters made to the buyers of Alt-A RMBS.  Based on data compiled from Inside MBS & ABS, our analysis of the FHLBs suits, and actual performance data of the '05 to '07 Alt-A RMBS vintages, we estimate that the total liability for rescission requests on Alt-A RMBS to be $67.9 billion.  Our worst and best case estimates for industry wide losses is $99.1 billion and $13.4 billion, respectively.

JP Morgan (JPM—NR) tops the list with $13.1 billion of estimated losses largely due to the company's acquisition of Bear Stearns, who topped the underwriting league tables with $132.9 billion of Alt-A RMBS underwritten during that time (according to Inside MBS & ABS).  Deutsche Bank sits at the number two spot with $10.3 billion of estimated losses and Bank of America comes in third with $10.2 billion of estimated losses largely due to their acquisition of Countrywide, which underwrote $85.4 billion of Alt-A RMBS, or 86% of Bank of America's total exposure, during the time period (according to Inside MBS & ABS).  See the following table for complete details on company specific exposure.

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

**Compass Point Research & Trading, LLC**

Mortgage Repurchases Part II: Private Label RMBS Investors Take Aim—Quantifying the Risks                    6

### Alt-A RMBS Repurchase Request Loss Estimates

| Company | Ticker | Rating | Worst Case Loss ($M) | Worst Case Per Share* | Worst Case % of TBV | Base Case Loss ($M) | Base Case Per Share* | Base Case % of TBV | Best Case Loss ($M) | Best Case Per Share* | Best Case % of TBV |
|---|---|---|---|---|---|---|---|---|---|---|---|
| JP Morgan | JPM | NR | 21,080 | $3.16 | 12% | 13,110 | $1.96 | 7% | 2,718 | $0.41 | 2% |
| Deutsche Bank | DB | NR | 16,763 | $14.97 | 25% | 10,269 | $9.17 | 15% | 2,274 | $2.03 | 3% |
| Bank of America | BAC | NR | 16,386 | $0.98 | 8% | 10,187 | $0.61 | 5% | 2,188 | $0.13 | 1% |
| RBS Greenwich | RBS | NR | 15,282 | $0.16 | 19% | 9,417 | $0.10 | 12% | 1,919 | $0.02 | 2% |
| Goldman Sachs | GS | NR | 9,625 | $10.69 | 9% | 6,363 | $7.06 | 6% | 1,346 | $1.49 | 1% |
| UBS | UBS.N | NR | 8,989 | $1.42 | 16% | 5,472 | $0.87 | 10% | 1,148 | $0.18 | 2% |
| Credit Suisse | CS | NR | 6,801 | $3.44 | 17% | 4,376 | $2.21 | 11% | 1,095 | $0.55 | 3% |
| Citigroup | C | NR | 4,164 | $0.09 | 2% | 2,527 | $0.05 | 1% | 683 | $0.01 | 0% |
| Total | | | 99,090 | | | 67,920 | | | 13,371 | | |

\* after-tax (assume 40%)

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS*

## Methodology for Quantifying Risk

Using data from Inside Mortgage Finance, we start with the league tables recording the top lead underwriters of Alt-A RMBS from 2005 through 2007. Since the majority of the rescission requests in the FHLBs suits were focused on loans underwritten in the years 2005 through 2007, we confined our initial data set to Alt-A RMBS underwritten and issued during those years. Ultimate losses will be dependent on three main factors; rescission percentage, default rate, and severity of loss on repurchased loans. Since these factors will vary based on vintage (or year underwritten), we use average statistics by vintage to estimate the liability. While these factors may also vary by issuer, we have not been able to identify any meaningful public statistic that correlates to the FHLBs suits rescission request percentage. Therefore, while we acknowledge there may be slight rescission rate differences between issuers, we believe using a vintage average is a suitable data point for framing the analysis.

*Worst Case Alt-A Loss Estimate*

In the worst case scenario, we assume that the rescission requests identified in the FHLB suits are indicative of the total potential pool of loans that could be rescinded industry-wide. While we cannot opine on whether or not the suit's rescission percentage will ultimately be proven accurate, we believe that the data set forth in each particular suit is substantial enough to establish a worst case scenario. We then apply a success ratio, assuming that not all rescission requests will be honored or result in a loss. Finally, we apply a loss severity estimate to produce a net loss for loans repurchased. The mathematical equation used to estimate worst case losses is set forth below:

*(weighted average rescission request by year) x (success ratio) x (severity of loss) = loss estimate*

### Alt-A Worst Case Scenario Assumptions

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| FHLB Rescission Rate | 54.5% | 49.1% | 43.2% |
| Success Ratio | 75.0% | 60.0% | 50.0% |
| Severity of Loss | 60.0% | 55.0% | 50.0% |

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS*

### Worst Case Alt-A Net Repurchase Loss Estimates

| | '05 - '07 | % of orig. | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|
| Bear Stearns | 21,080 | 15.9% | 6,686 | 8,965 | 5,429 |
| Lehman Brothers | 20,264 | 16.6% | 8,143 | 7,545 | 4,576 |
| Deutsche Bank | 16,763 | 16.9% | 7,268 | 5,941 | 3,553 |
| *Countrywide Securities* | 13,300 | 15.6% | 3,798 | 5,852 | 3,650 |
| *Bank of America* | 3,085 | 22.1% | 2,407 | 678 | 0 |
| Total Bank of America | 16,386 | 16.5% | 6,205 | 6,530 | 3,650 |
| RBS Greenwich Capital | 15,282 | 15.5% | 4,415 | 6,485 | 4,382 |
| Goldman Sachs | 9,625 | 16.9% | 3,361 | 4,821 | 1,444 |
| UBS | 8,989 | 15.8% | 3,052 | 3,467 | 2,469 |
| Credit Suisse | 6,801 | 21.1% | 4,629 | 2,172 | 0 |
| Citigroup | 4,164 | 22.5% | 3,442 | 722 | 0 |
| Total | 119,354 | | 47,202 | 46,648 | 25,504 |

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS*

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

**Compass Point Research & Trading, LLC**

Mortgage Repurchases Part II: Private Label RMBS Investors Take Aim—Quantifying the Risks          7

*Base Case Alt-A Loss Estimate*

In the base case scenario, we assume that rescission requests are limited to all seriously delinquent and defaulted loans that have occurred **up to and including July 2010**. We then apply a success ratio, assuming that not all rescission requests will be honored or result in a loss. Finally, we apply a loss severity estimate to produce a net loss for loans repurchased. The mathematical equation used to estimate worst case losses is set forth below:

*(total 60+ day delinquent loan balance & cumulative gross defaults through July 2010) x (success ratio) x (severity) = loss estimate*

| Alt-A Base Case Estimate Assumptions | | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Balance | 71.6% | 52.1% | 38.0% |
| Net Losses | 3.8% | 5.2% | 1.0% |
| Severity | 60.0% | 55.0% | 45.0% |
| Gross Losses | 6.3% | 9.4% | 2.2% |
| REO | 2.0% | 2.4% | 1.2% |
| Foreclosure | 9.8% | 13.6% | 6.7% |
| Bankrupt | 2.2% | 3.0% | 1.8% |
| Delinquent Loans | 17.3% | 20.6% | 11.2% |
| Gross SDQ | 37.7% | 48.9% | 23.1% |
| Success Ratio | 80.0% | 80.0% | 80.0% |

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS*

| Base Case Alt-A Net Repurchase Loss Estimates | | | | | |
|---|---|---|---|---|---|
| | '05 - '07 | % of orig. | 2007 | 2006 | 2005 |
| Bear Stearns | 13,110 | 9.9% | 3,765 | 7,303 | 2,042 |
| Lehman Brothers | 12,453 | 10.2% | 4,586 | 6,146 | 1,721 |
| Deutsche Bank | 10,269 | 10.4% | 4,093 | 4,840 | 1,336 |
| *Countrywide Securities* | 8,279 | 9.7% | 2,139 | 4,767 | 1,373 |
| *Bank of America* | 1,908 | 13.6% | 1,356 | 552 | 0 |
| Total Bank of America | 10,187 | 10.2% | 3,495 | 5,320 | 1,373 |
| RBS Greenwich Capital | 9,417 | 9.5% | 2,486 | 5,283 | 1,648 |
| Goldman Sachs | 6,363 | 11.2% | 1,893 | 3,927 | 543 |
| UBS | 5,472 | 9.6% | 1,719 | 2,825 | 928 |
| Credit Suisse | 4,376 | 13.6% | 2,607 | 1,769 | 0 |
| Citigroup | 2,527 | 13.7% | 1,938 | 588 | 0 |
| Total | 74,174 | | 26,583 | 38,001 | 9,590 |

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS*

As a point of reference, First Horizon (FHN—NR) noted in the company's latest 10-Q filing that they have witnessed average rescission rates of between 40% and 50% of the repurchase and make-whole requests (similar to our "success ratio") and observed loss severities (measured as a percentage of the unpaid principal balance) ranging between 50% and 55% of the repurchased loans. This would result in an approximate loss severity of between 20% and 28%. The majority of FHN's loan repurchase requests made to date have occurred on prime loans, which should bear a lower ultimate severity than Alt-A loans. We believe this benchmark compares favorably to our base case scenario for Alt-A loan repurchase risk.

*Best Case Alt-A Loss Estimate*

In the best case scenario, we assume that rescission requests are limited to all seriously delinquent and defaulted loans that occurred **up to eighteen months after issuance**. We then apply a success ratio, assuming that not all rescission requests will be honored or result in a loss. Finally, we apply a loss severity estimate to produce a net loss for loans repurchased. The mathematical equation used to estimate worst case losses is set forth below:

*(total 60+ day delinquent loan balance & cumulative gross defaults @ 18 months after issuance) x (success ratio) x (severity) = loss estimate*

| Alt-A Best Case Estimate Assumptions | | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Balance | 88.1% | 79.4% | 71.6% |
| Net Losses | 0.3% | 0.1% | 0.0% |
| Severity | 60.0% | 55.0% | 50.0% |
| Gross Losses | 0.5% | 0.2% | 0.0% |
| REO | 1.5% | 1.4% | 0.3% |
| Foreclosure | 3.5% | 2.7% | 0.7% |
| Bankrupt | 0.6% | 0.5% | 0.2% |
| Delinquent Loans | 6.8% | 4.3% | 1.4% |
| Gross SDQ | 6.9% | 4.0% | 0.9% |
| Success Ratio | 60.0% | 60.0% | 60.0% |

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS*

| Best Case Alt-A Net Repurchase Loss Estimates | | | | | |
|---|---|---|---|---|---|
| | '05 - '07 | % of orig. | 2007 | 2006 | 2005 |
| Bear Stearns | 2,718 | 2.0% | 1,120 | 1,319 | 279 |
| Lehman Brothers | 2,709 | 2.2% | 1,364 | 1,110 | 235 |
| Deutsche Bank | 2,274 | 2.3% | 1,217 | 874 | 183 |
| *Countrywide Securities* | 1,685 | 2.0% | 636 | 861 | 188 |
| *Bank of America* | 503 | 3.6% | 403 | 100 | 0 |
| Total Bank of America | 2,188 | 2.2% | 1,039 | 961 | 188 |
| RBS Greenwich Capital | 1,919 | 1.9% | 739 | 954 | 225 |
| Goldman Sachs | 1,346 | 2.4% | 563 | 709 | 74 |
| UBS | 1,148 | 2.0% | 511 | 510 | 127 |
| Credit Suisse | 1,095 | 3.4% | 775 | 319 | 0 |
| Citigroup | 683 | 3.7% | 576 | 106 | 0 |
| Total | 16,080 | | 7,905 | 6,863 | 1,312 |

*Source: Compass Point Research & Trading LLC, Bloomberg, Inside MBS & ABS*

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

## Who is Exposed to Subprime Underwriting Risk?

We believe that there is material risk related to the past underwriting of subprime loans in the banking sector due to the representation and warranties underwriters made to the buyers of subprime RMBS.  While we have yet to see a lawsuit, we believe the consortium of investors represented by the law firm Talcott Franklin P.C. intends to pursue a strategy that ultimately results in the rescission of loans that they believe breach the underwriters representation and warranties.  Should investors be successful in recovering damages from the underwriters, we would expect the underwriters to turn to the originators of the loans (so long as they are not affiliated with the underwriter or bankrupt) and attempt to recover those damages.  Since this process is likely to take some time and we now have quantifiable data points with regard to underwriter exposure, we have focused this report only on framing the potential liability for underwriters and not originators.

| Subprime Issuance by Year ($Mil.) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rank* | Issuer | Total '05-'07 | Mkt Share | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
| 1 | Countrywide | 85,993 | 15.8% | 19,509 | 26,345 | 40,140 | 42,650 | 9,671 | 4,591 | 3,381 | 1,631 |
| 2 | Lehman Brothers | 49,597 | 9.1% | 18,652 | 17,635 | 13,310 | 13,773 | 8,774 | 10,213 | 10,702 | 8,942 |
| 3 | RBS Greenwich | 47,721 | 8.8% | 19,520 | 11,207 | 16,993 | 21,461 | 10,634 | 8,211 | 8,408 | 4,361 |
| 4 | Merrill Lynch | 45,667 | 8.4% | 21,936 | 12,019 | 11,712 | 7,318 | 2,899 | 200 | 649 | 176 |
| 5 | Morgan Stanley | 37,572 | 6.9% | 23,656 | 6,373 | 7,543 | 8,523 | 6,433 | 6,393 | 1,634 | 1,343 |
| 6 | Bear Stearns | 37,382 | 6.9% | 13,360 | 11,169 | 12,854 | 13,095 | 10,783 | 9,336 | 6,748 | 10,097 |
| 7 | Credit Suisse | 31,436 | 5.8% | 7,161 | 9,732 | 14,543 | 11,930 | 3,727 | 7,121 | 9,573 | 2,122 |
| 8 | Goldman Sachs | 31,274 | 5.8% | 6,802 | 13,166 | 11,307 | 9,506 | 2,538 | 4,314 | 0 | 346 |
| 9 | Citigroup | 28,588 | 5.3% | 14,026 | 5,888 | 8,674 | 4,368 | 12,077 | 0 | 0 | 0 |
| 10 | Bank of America | 24,487 | 4.5% | 10,179 | 3,956 | 10,352 | 14,128 | 6,368 | 4,508 | 4,792 | 2,417 |
| 11 | J.P. Morgan | 22,833 | 4.2% | 11,360 | 7,001 | 4,472 | 8,453 | 13,690 | 3,717 | 5,773 | 0 |
| 12 | Deutsche Bank | 20,066 | 3.7% | 10,169 | 4,313 | 5,584 | 9,681 | 7,785 | 5,567 | 3,120 | 0 |
| 13 | UBS | 18,068 | 3.3% | 5,366 | 5,830 | 6,873 | 5,050 | 3,580 | 3,038 | 0 | 237 |
| 14 | Barclays | 17,723 | 3.3% | 9,578 | 4,738 | 3,406 | 1,717 | 0 | 0 | 0 | 0 |
| 15 | HSBC | 16,890 | 3.1% | 6,708 | 9,678 | 504 | 0 | 0 | 0 | 0 | 0 |
| 16 | WaMu Capital | 11,284 | 2.1% | 3,488 | 2,142 | 5,655 | 3,903 | 0 | 0 | 0 | 0 |
| 17 | GMAC RFC | 5,402 | 1.0% | 987 | 2,335 | 2,080 | 497 | 242 | 0 | 0 | 0 |
| 18 | Friedman Billings Ramsey | 4,002 | 0.7% | 0 | 324 | 3,678 | 660 | 0 | 0 | 0 | 0 |
| 19 | Terwin Capital | 3,375 | 0.6% | 166 | 2,307 | 902 | 1,082 | 96 | 0 | 0 | 0 |
| 20 | Wachovia | 2,225 | 0.4% | 1,062 | 648 | 515 | 0 | 0 | 1,651 | 451 | 0 |
| 21 | Societe Generale | 991 | 0.2% | 177 | 814 | 0 | 0 | 0 | 0 | 0 | 0 |
| 22 | RBC Capital | 899 | 0.2% | 386 | 513 | 0 | 0 | 0 | 246 | 0 | 0 |
| 23 | BMO Capital | 196 | 0.0% | 106 | 90 | 0 | 0 | 0 | 0 | 0 | 0 |
| 24 | SunTrust | 185 | 0.0% | 185 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 25 | Banc One Capital | 0 | 0.0% | 0 | 0 | 0 | 0 | 892 | 100 | 0 | 0 |
|  | Total | 543,855 | | 204,540 | 158,222 | 181,093 | 177,795 | 100,190 | 69,205 | 55,229 | 31,673 |

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

Based on data compiled from Asset Backed Alert, our analysis of the FHLBs suits, and actual performance data of the '05 to '07 subprime RMBS vintages, we estimate that the total liability for rescission requests on subprime RMBS to be $80.3 billion.  Our worst and best case estimates for industry wide losses is $89.3 billion and $46.6 billion, respectively.

Bank of America (BAC—NR) tops the list with $25.0 billion of estimated losses largely due to their acquisition of Countrywide and Merrill Lynch, who underwrote $86.0 billion and $45.7 billion of subprime RMBS, respectively, during the time period.  JP Morgan (JPM—NR) sits at the number two spot with estimated losses of $10.8 billion based on subprime underwriting exposure of $60.2 billion based in part on the company's acquisition of Bear Stearns, who underwrote $37.4 billion of subprime RMBS during that time.  See the at the top of the following page for complete details on company specific loss exposure.

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

**Compass Point Research & Trading, LLC**
Mortgage Repurchases Part II: Private Label RMBS Investors Take Aim—Quantifying the Risks    9

### Subprime RMBS Repurchase Request Loss Estimates

| Company | Ticker | Rating | Worst Case Loss ($M) | Worst Case Per Share* | Worst Case % of TBV | Base Case Loss ($M) | Base Case Per Share* | Base Case % of TBV | Best Case Loss ($M) | Best Case Per Share* | Best Case % of TBV |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bank of America | BAC | NR | 28,591 | $1.71 | 14% | 25,017 | $1.50 | 12% | 14,541 | $0.87 | 7% |
| JP Morgan | JPM | NR | 11,842 | $1.77 | 7% | 10,831 | $1.62 | 6% | 6,288 | $0.94 | 4% |
| RBS Greenwich | RBS | NR | 9,189 | $0.10 | 12% | 8,205 | $0.09 | 10% | 4,744 | $0.05 | 6% |
| Morgan Stanley | MS | NR | 8,312 | $3.56 | 15% | 7,855 | $3.37 | 14% | 4,498 | $1.93 | 8% |
| Citigroup | CS | NR | 5,800 | $0.12 | 3% | 5,292 | $0.11 | 3% | 3,047 | $0.06 | 2% |
| Goldman Sachs | GS | NR | 5,478 | $6.08 | 5% | 4,831 | $5.36 | 5% | 2,851 | $3.17 | 3% |
| Credit Suisse | CS | NR | 5,350 | $2.71 | 13% | 4,522 | $2.29 | 11% | 2,648 | $1.34 | 6% |
| Deutsche Bank | DB | NR | 4,129 | $3.69 | 6% | 3,801 | $3.39 | 6% | 2,188 | $1.95 | 3% |
| Barclays | BCS | NR | 3,789 | $0.19 | 4% | 3,583 | $0.18 | 3% | 2,068 | $0.10 | 2% |
| HSBC | HBC | NR | 3,555 | $0.12 | 2% | 3,515 | $0.12 | 2% | 2,071 | $0.07 | 1% |
| UBS | UBS.N | NR | 3,273 | $0.52 | 6% | 2,878 | $0.46 | 5% | 1,681 | $0.27 | 3% |
| Total | | | 89,309 | | | 80,329 | | | 46,626 | | |

* after-tax (assume 40%)

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

## Methodology for Quantifying Risk

Using data from Asset Backed Alert, we start with the league tables recording the top lead underwriters of subprime RMBS from 2005 through 2007. Since the majority of the rescission requests in the FHLB suits were focused on loans underwritten in the years 2005 through 2007, we confined our initial data set to subprime RMBS underwritten and issued during those years. Ultimate losses will be dependent on three main factors; rescission percentage, default rate, and severity of loss on repurchased loans. Since these factors will vary based on vintage (or year underwritten), we use average statistics by vintage to estimate the liability. While these factors may also vary by issuer, we have not been able to identify any meaningful public statistic that correlates to the FHLB suits rescission request percentage. Therefore, while we acknowledge there may be slight rescission rate differences between issuers, we believe using a vintage average is a suitable data point for framing the analysis.

*Worst Case Subprime Loss Estimate*

In the worst case scenario, we assume that the rescission requests identified in the FHLB suits are a good proxy for the total potential pool of loans that could be rescinded industry-wide. While we cannot opine on whether or not the suit's rescission percentage will ultimately be proven accurate, we believe that the data set forth in each particular suit is substantial enough to establish a worst case scenario. We then apply a success ratio, assuming that not all rescission requests will be honored or result in a loss. Finally, we apply a loss severity estimate to produce a net loss for loans repurchased. The mathematical equation used to estimate worst case losses is set forth below:

*(weighted average rescission request by year) x (success ratio) x (severity of loss) = loss estimate*

### Subprime Worst Case Scenario Assumptions

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| FHLB Rescission Rate | 54.5% | 49.1% | 43.2% |
| Success Ratio | 80.0% | 80.0% | 80.0% |
| Severity of Loss | 65.0% | 55.0% | 50.0% |

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

### Worst Case Subprime Net Repurchase Loss Estimates

| | '05 - '07 | % of orig. | 2007 | 2006 | 2005 |
|---|---|---|---|---|---|
| *Countrywide* | 14,609 | 17.0% | 5,188 | 4,657 | 4,763 |
| *Merrill Lynch* | 9,348 | 20.5% | 5,834 | 2,125 | 1,390 |
| *Bank of America* | 4,635 | 18.9% | 2,707 | 699 | 1,228 |
| Total Bank of America | 28,591 | 18.3% | 13,728 | 7,481 | 7,382 |
| *Bear Stearns* | 7,052 | 18.9% | 3,553 | 1,974 | 1,525 |
| *J.P. Morgan* | 4,789 | 21.0% | 3,021 | 1,238 | 531 |
| Total J.P. Morgan | 11,842 | 19.7% | 6,574 | 3,212 | 2,056 |
| RBS Greenwich | 9,189 | 19.3% | 5,191 | 1,981 | 2,017 |
| Morgan Stanley | 8,312 | 22.1% | 6,291 | 1,127 | 895 |
| Credit Suisse | 5,350 | 17.0% | 1,904 | 1,721 | 1,726 |
| Goldman Sachs | 5,478 | 17.5% | 1,809 | 2,327 | 1,342 |
| Citigroup | 5,800 | 20.3% | 3,730 | 1,041 | 1,029 |
| Deutsche Bank | 4,129 | 20.6% | 2,704 | 763 | 663 |
| UBS | 3,273 | 18.1% | 1,427 | 1,031 | 816 |
| Barclays | 3,789 | 21.4% | 2,547 | 838 | 404 |
| HSBC | 3,555 | 21.0% | 1,784 | 1,711 | 60 |
| Total | 89,309 | | 47,689 | 23,232 | 18,388 |

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

**Compass Point Research & Trading, LLC**

Mortgage Repurchases Part II: Private Label RMBS Investors Take Aim—Quantifying the Risks                                        10

*Base Case Subprime Loss Estimate*

In the base case scenario, we assume that rescission requests are limited to all seriously delinquent and defaulted loans that have occurred **up to and including July 2010**.  We then apply a success ratio, assuming that not all rescission requests will be honored or result in a loss.  Finally, we apply a loss severity estimate to produce a net loss for loans repurchased.  The mathematical equation used to estimate worst case losses is set forth below:

*(total 60+ day delinquent loan balance & cumulative gross defaults through July 2010) x (success ratio) x (severity) = loss estimate*

| Subprime Base Case Estimate Assumptions | | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| Balance | 60.2% | 29.2% | 16.5% |
| Net Losses | 19.0% | 16.3% | 5.6% |
| Severity | 65.0% | 60.0% | 55.0% |
| Gross Losses | 29.3% | 27.1% | 10.1% |
| REO | 4.1% | 4.4% | 3.3% |
| Foreclosure | 16.4% | 15.9% | 11.5% |
| Bankrupt | 3.1% | 3.6% | 4.0% |
| Delinquent Loans | 12.3% | 9.3% | 6.2% |
| Gross SDQ | 65.2% | 60.3% | 35.0% |
| Success Ratio | 80.0% | 80.0% | 80.0% |

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

| Base Case Subprime Net Repurchase Loss Estimates | | | | | |
|---|---|---|---|---|---|
| | **'05 - '07** | **% of orig.** | **2007** | **2006** | **2005** |
| *Countrywide* | 12,321 | 14.3% | 5,161 | 4,653 | 2,508 |
| *Merrill Lynch* | 8,657 | 19.0% | 5,803 | 2,123 | 732 |
| *Bank of America* | 4,038 | 16.5% | 2,693 | 699 | 647 |
| Total Bank of America | 25,017 | 16.0% | 13,657 | 7,474 | 3,886 |
| *Bear Stearns* | 6,310 | 16.9% | 3,534 | 1,973 | 803 |
| *J.P. Morgan* | 4,521 | 19.8% | 3,005 | 1,236 | 279 |
| Total J.P. Morgan | 10,831 | 18.0% | 6,539 | 3,209 | 1,082 |
| RBS Greenwich | 8,205 | 17.2% | 5,164 | 1,979 | 1,062 |
| Morgan Stanley | 7,855 | 20.9% | 6,258 | 1,126 | 471 |
| Credit Suisse | 4,522 | 14.4% | 1,894 | 1,719 | 908 |
| Goldman Sachs | 4,831 | 15.4% | 1,799 | 2,325 | 706 |
| Citigroup | 5,292 | 18.5% | 3,710 | 1,040 | 542 |
| Deutsche Bank | 3,801 | 18.9% | 2,690 | 762 | 349 |
| UBS | 2,878 | 15.9% | 1,419 | 1,030 | 429 |
| Barclays | 3,583 | 20.2% | 2,534 | 837 | 213 |
| HSBC | 3,515 | 20.8% | 1,775 | 1,709 | 31 |
| Total | 80,329 | | 47,440 | 23,210 | 9,680 |

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

*Best Case Subprime Loss Estimate*

In the best case scenario, we assume that rescission requests are limited to all seriously delinquent and defaulted loans that occurred **up to eighteen months after issuance**.  We then apply a success ratio, assuming that not all rescission requests will be honored or result in a loss.  Finally, we apply a loss severity estimate to produce a net loss for loans repurchased.  The mathematical equation used to estimate worst case losses is set forth below:

*(total 60+ day delinquent loan balance & cumulative gross defaults @ 18 months after issuance) x (success ratio) x (severity) = loss estimate*

| Subprime Best Case Estimate Assumptions | | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| Balance | 82.1% | 78.7% | 55.5% |
| Net Losses | 4.3% | 2.0% | 0.4% |
| Severity | 60.0% | 40.0% | 40.0% |
| Gross Losses | 7.2% | 5.1% | 1.1% |
| REO | 6.0% | 5.4% | 2.1% |
| Foreclosure | 12.4% | 9.0% | 4.1% |
| Bankrupt | 1.8% | 1.7% | 1.4% |
| Delinquent Loans | 2.3% | 1.9% | 0.3% |
| Gross SDQ | 6.9% | 4.0% | 0.9% |
| Success Ratio | 60.0% | 60.0% | 60.0% |

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

| Best Case Subprime Net Repurchase Loss Estimates | | | | | |
|---|---|---|---|---|---|
| | **'05 - '07** | **% of orig.** | **2007** | **2006** | **2005** |
| *Countrywide* | 7,215 | 8.4% | 2,916 | 2,859 | 1,440 |
| *Merrill Lynch* | 5,004 | 11.0% | 3,279 | 1,304 | 420 |
| *Bank of America* | 2,322 | 9.5% | 1,522 | 429 | 371 |
| Total Bank of America | 14,541 | 9.3% | 7,717 | 4,592 | 2,231 |
| *Bear Stearns* | 3,670 | 9.8% | 1,997 | 1,212 | 461 |
| *J.P. Morgan* | 2,618 | 11.5% | 1,698 | 760 | 160 |
| Total J.P. Morgan | 6,288 | 10.4% | 3,695 | 1,972 | 621 |
| RBS Greenwich | 4,744 | 9.9% | 2,918 | 1,216 | 609 |
| Morgan Stanley | 4,498 | 12.0% | 3,536 | 692 | 271 |
| Credit Suisse | 2,648 | 8.4% | 1,070 | 1,056 | 522 |
| Goldman Sachs | 2,851 | 9.1% | 1,017 | 1,429 | 405 |
| Citigroup | 3,047 | 10.7% | 2,097 | 639 | 311 |
| Deutsche Bank | 2,188 | 10.9% | 1,520 | 468 | 200 |
| UBS | 1,681 | 9.3% | 802 | 633 | 246 |
| Barclays | 2,068 | 11.7% | 1,432 | 514 | 122 |
| HSBC | 2,071 | 12.3% | 1,003 | 1,050 | 18 |
| Total | 46,626 | | 26,808 | 14,260 | 5,557 |

*Source: Compass Point Research & Trading LLC, Bloomberg, Asset Backed Alert*

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

## What Reserves have been Recorded?

Based upon our review of quarterly filings, JPM appears to be the only underwriter that has potentially reserved for repurchases as it relates to private label litigation.  In 1Q10, JPM recorded a $2.3B charge in litigation reserves for "mortgage-related" matters.  When asked a question on their earnings call regarding the charge, management responded "to think about that as we have repurchase reserves that we've talked about related to the GSEs as an ongoing expense we've been reserving for.  This (charge) relates to the broader question of all other ideas for claims against us from private investors".  A review of the litigation section of JPM's 2009 10-K and their 1Q10 10-Q shows that the only change is the mention of the FHLB San Francisco lawsuit (the Seattle and Pittsburgh lawsuits were mentioned in the 10-K).  Interestingly, the charge was also recorded in the quarter immediately following a request from the SEC for more information regarding their repurchase reserves.  Two weeks following the release of their 4Q09 earnings, JPM received a letter on January 29, 2010 from the SEC requesting disclosures on how the company establishes repurchase reserves for various reps and warranties, including GSE's, monoline insurers and any private loan repurchase requests (http://www.sec.gov—JPM March 2, 2010 Correspondence).

Our review of quarterly filings found that BAC had a $3.9B reserve for all mortgage repurchase requests (on $11.1B in requests made), JPM had a $2.3 reserve for mortgage repurchases (which is separate from their $2.3B litigation reserve charge in 1Q10), and Citigroup had a $727MM reserve for mortgage repurchases.  Importantly, BAC's 2Q10 quarterly filing noted that they have only received $33MM in private label MBS repurchase requests thus far.  Below is a table of the applicable reserves.

| Unpaid principal bal. - *in millions* | BAC | JPM | C |
|---|---|---|---|
| **Unresolved mortgage repurchase requests** | **11,100** | **2,880** | **4,478** |
| GSEs | 5,600 | 1,400 | 4,166 |
| Monolines | 4,000 | 1,700 | 98 |
| Other investors | 1,400 | na | 214 |
| Private label MBS investors | 33 | na | na |
| | | | |
| Reserve for repurchases | **3,900** | **2,332** | **727** |
| Litigation reserve (estimate) | na | 2,300 | na |
| | | | |
| **Subtotal** | **3,900** | **4,632** | **727** |

Source: Company filings, Compass Point Research

Chris Gamaitoni | 202-540-7387 | cgamaitoni@compasspointllc.com
Jason Stewart | 202-540-7306 | jstewart@compasspointllc.com
Mike Turner | 202-534-1380 | mturner@compasspointllc.com

# Important Disclosures

## Analyst Certification

I, Chris Gamaitoni, hereby certify that the views expressed in this research report accurately reflect our personal views about the subject securities or issues. We further certify that we have not received direct or indirect compensation in exchange for expressing specific recommendations or views in this report.

## Ownership and Material Conflicts of Interest

As of the end of the month immediately preceding the date of publication of this research report (or of the second most recent month if the publication date is less than 10 calendar days after the end of the most recent month), neither Compass Point Research & Trading, LLC, nor any of its affiliates own any of the subject company(ies)'s equity securities.

The research analyst named in the certification above holds a financial interest in the common stock of Citigroup (NYSE: C), which is the subject of this report.

There are no material conflicts of interest of Compass Point Research & Trading, LLC or of the research analyst named in the certification above of which the research analyst knows or has reason to know at the time of publication of this report.

Neither the research analyst named in the certification above, any member of that analysts' household, nor any person that depends upon him for financial support, is an officer, director or advisory board member of the subject company(ies) mentioned in the research report.

The research analyst named in the certification above does not receive any compensation from Compass Point Research & Trading, LLC that is in any way related to Compass Point Research & Trading, LLC's investment banking revenues.

Compass Point Research & Trading, LLC does not compensate its research analysts for investment banking services, but rather provides research analysts with a salary and bonus based upon the research analyst's individual performance and quality of research, the correlation between the analyst's recommendations and the stock price performance, and overall ratings received from clients, sales employees, and other employees independent of Compass Point Research & Trading, LLC's investment banking department.

The research analyst named in the certification above has not received any compensation from any company that is the subject of this research report.

Compass Point Research & Trading, LLC has never managed or co-managed a public offering of securities for any company that is the subject of this research report and has never had any investment banking relationship with any company that is the subject of this research report, and therefore has not received any compensation for investment banking services from any such companies in the past 12 months of publication of this report and does not expect or intend to receive compensation for investment banking services from the subject companies with the next three months from the publication of this report.

Compass Point Research & Trading, LLC has received no compensation from any company that is the subject of this research report for any products or services rendered to such companies, and neither the research analyst named in the certification above nor any Compass Point employee with ability to influence the substance of this research report has any knowledge of such compensation to Compass Point or any affiliate.

No (none) of the company(ies) that are the subject of this research report have ever been clients of Compass Point Research & Trading, LLC.

Compass Point Research & Trading, LLC has never, and as of the publication of this research report does not, act as a market maker in the securities of any of the companies that are the subject of this report.

# Important Disclosures, cont'd

## <u>Global Disclaimer</u>

This report is based upon public information that Compass Point Research & Trading, LLC and the research analyst named in the attestation above assume to be correct.

Assumptions, opinions, forecasts, and estimates constitute the research analyst's judgment as of the date of this material and are subject to change without notice.  The research analyst's judgments may be wrong.

Neither Compass Point Research & Trading, LLC nor its affiliates, nor the research analyst, are responsible for any errors, omissions, or results obtained from the use of this information.

Past performance is not necessarily indicative of future results.

The securities and/or financial instruments mentioned in this research report, and the trading strategies related thereto, may not be suitable for all investors.  You must consider your specific investment goals and objectives prior to transacting in any security or financial instrument.  Consult with your financial advisor before making any transactions or investments.

This research report is not intended as an offer or solicitation for the purchase or sale of any security or other financial instrument.

12-12020-mg   Doc 320-8   Filed 06/11/12   Entered 06/12/12 00:00:34   Exhibit C
Pg 46 of 110

# EXHIBIT C



**RRMS ADVISORS**
*Tactical Mortgage Strategists*
10 East 40th Street New York, NY 10016
www.rrmsco.com

Brian Lin
Managing Director
RRMS Advisors
10 East 40th Street
New York, NY 10016

June 7, 2011

The Bank of New York Mellon
One Wall Street, 11th Floor
New York, NY 10286

Subject:        Opinion Concerning Contemplated Settlement Amount for 530 Trusts

Gentlemen:

Attached please find my independent opinion regarding the contemplated settlement amount for 530 Trusts rendered at the request of your counsel, Mayer Brown.

Should you have any question, please feel free to contact me at (212) 843-9413.

Yours truly,

*Brian Lin*

Brian Lin
Managing Director

## RRMS ADVISORS
### *Tactical Mortgage Strategists*

### *Settlement Amount Opinion*
### *Prepared for: The Bank of New York Mellon*
### *June 7, 2011*

**Engagement**

The Bank of New York Mellon (BNYM) currently acts as Trustee on behalf of the named Trusts and respective investors. In this capacity, BNYM has engaged me to render an independent professional opinion relating to the settlement amount of 530 Trusts (Settlement Portfolio). The underlying collateral are comprised predominately of Alt "A", Subprime, Prime and Pay-Option Arm with a diminutive amount of HELOC and Second Lien residential mortgage loans.

**Gibbs & Bruns Spreadsheet**

**Opinion Summary**

I, in conjunction with selected RRMS Advisors personnel under my supervision, have performed a review of the "All Consortium Deals" summarized in the spreadsheet provided by the Investor Group represented by Gibbs & Bruns (Investor Group). Based on the review performed and discussions with representatives from the Investor Group, the presentation appears reasonable with respect to the overall methodology utilized in calculating the settlement amount.

The pros and cons of their calculations are as follows:
**Pros:**
  ➢ Obtaining collateral information from a publicly available third party source.
  ➢ Stratification of aggregate population according to performance status.
  ➢ Logical calculations in order to determine projected losses.
  ➢ Logical calculations and utilization of "Breach Rate" and "Success Rate" haircuts.
**Cons:**
  ➢ Questionable default and loss severity assumptions.
  ➢ Aggressive "Breach Rate" and "Success Rate" assumptions.
**Assumptions:**
  ➢ Collateral information is as of the February 2011 remittance reports, and has been obtained from Intex.

**Detailed Opinion**

Using certain assumptions obtained from Intex, Bank of America (BofA) mortgage research, along with a forensic underwriting review performed by an independent third party, the Investor Group has estimated BofA's exposure amount under various scenarios.

The first step in the methodology was to stratify the Settlement Portfolio on the basis of collateral type and performance status. Up to date balances were obtained from Intex with respect to non-delinquent loans as well as loans greater than 60 days delinquent (which also included the population of loans in bankruptcy, foreclosure and REO). The population of previously modified current loans was also

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

1



**RRMS ADVISORS**

*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

obtained from LoanPerformance, courtesy of MetLife. Please note that without verification, I have accepted the balances presented within each stratification bucket as being correct, and have drawn a conclusion accordingly. In addition, categorizing the pool on this basis proved logical since it allowed for the application of various default and loss assumptions to the different performance status buckets of the portfolio.

At the core of the analysis was the utilization of default and loss severity assumptions. Loss severity, the percentage of lost principal when a loan is foreclosed or sold, was directly obtained from Intex by utilizing data for the three most recent months (averaging 66% for the entire Settlement Portfolio). While based on historical information, this data point can be considered limited since it presents a very short-term time period sample. There is no guarantee that this degree of loss severity will be consistent going forward and based on longer-term trends observed in research reports and other publications, severity rates have in actuality been lower. As for default rates, this particular data was in part taken from Amherst and BofA mortgage research reports. For the population examined in these reports, it was projected that the default rate for loans over 60 days delinquent was approximately 90%. Using this data, a default rate of 50% was derived for the remaining population of the portfolio which represented the current non-modified loans (including loans 30 days delinquent). Furthermore, a 90% default rate assumption was made for previously modified current loans. Although I categorize these calculations as logical, I did not verify any assumptions used to calculate the projected loan default and loss severity figures of the underlying collateral in the research reports.

Default and loss severity rates were then applied to each performance status bucket of the Settlement Portfolio, resulting in a calculation of aggregate actual/projected losses. The actual/estimated loss figure was derived as follows: The sum of (a) actual realized losses ($25B – obtained from Intex), (b) projected losses on loans 60+ days delinquent as well as on previously modified current loans ($50.4B), and (c) projected losses on non-modified current loans (including loans 30 days delinquent) ($32.4B) totals $107.8B. While the assumptions used to project losses can be debated, the mathematical formulas utilized to obtain the results are clear-cut and unquestionable.

After actual and estimated losses were calculated, certain haircuts were applied. The first, "Breach Rate", is the percentage of representation & warranties breached for defected loans in the portfolio; not every loan experiencing a loss was covered by the representations & warranties given to private label securities. As a result, this haircut represents the percentage of loans found defective which were submitted to BofA for repurchase. There is a possibility that BofA may offer resistance relating to some of these loans, resulting in a buyback rejection; thus the "Success Rate" represents the percentage of loans submitted to BofA which would actually be repurchased. The product of (a) the actual/estimated losses of the Settlement Portfolio, (b) the "Breach Rate", and (c) the "Success Rate", represents the expected settlement amount. In my opinion, the calculation and utilization of these particular haircuts is logical since BofA's willingness and legal obligation to repurchase certain loans represents the largest hurdle from Investor Group's perspective.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

2



**RRMS ADVISORS**

*Tactical Mortgage Strategists*

*Settlement Amount Opinion*
*Prepared for: The Bank of New York Mellon*
*June 7, 2011*

The "Breach Rate" and "Success Rate" were obtained by a third party who completed a forensic underwriting project of a non-agency whole loan portfolio. This review consisted of approximately 250,000 loans of similar product types, and of the same origination period as the Settlement Portfolio. It was observed that there was an instance of a breach in approximately 60% of the loans examined and the actual repurchase rate of these loans by the originator ranged between 50% and 75%. I was not able to verify these figures since I was not given access to any documents or specifics pertaining to this underwriting review. However, based on the limited amount of publicly available information and my industry knowledge, it is my opinion that these percentages are too high.

Utilizing a range of "Breach Rates" and "Success Rates", expected settlement amounts were calculated for each performance status bucket of the Settlement Portfolio. Using BofA's haircut assumptions provided by Investor Group, the settlement amount totals $15.5B. Using assumptions from the Investor Group's analysis which are relatively more severe, the totals range from $27.0B to $52.6B.

In conclusion, although I classify certain assumptions as disputable to some degree, the overall methodology utilized is reasonable for the purposes of Investor Group's presentation.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

## RRMS ADVISORS
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for:  The Bank of New York Mellon**
**June 7, 2011**

### April 11, 2011 BofA Presentation

### Opinion Summary

I, in conjunction with selected RRMS Advisors personnel under my supervision, have performed a review of the "Presentation to Gibbs & Bruns" dated April 11, 2011 provided by BofA.  Based on the review performed and discussions with representatives from BofA, the presentation appears reasonable with respect to the overall methodology utilized in calculating the settlement amount.

The pros and cons of their calculations are as follows:

> **Pros:**
> ➢ Utilized a reference mortgage pool representing actual repurchase experience.
> ➢ Reasonable approach in calculating "Defect Rates" for the Settlement Portfolio.

> **Cons:**
> ➢ Comparison basis between conforming and non-conforming portfolios.
> ➢ Inconsistent methodology in calculating certain percentages for the subprime portion of the Settlement Portfolio.
> ➢ Lack of historical data to confirm BofA's "Defect Rates" and "Lesser Representation" haircut assumptions.

> **Assumptions:**
> ➢ All collateral information is as of March 31, 2011.

### Detailed Opinion

Using certain assumptions based on the collateral performance of a GSE portfolio originated between 2004 and 2008, BofA has estimated their exposure as being approximately $4.0B with respect to the current negotiations with the Investor Group.  In comparing the severely delinquent and defaulted populations of the GSE and the Settlement Portfolio (which include loans 180+ days delinquent), four separate haircuts were applied to their analysis in order to support the proposed settlement amount.  I believe it would have been easier to compare two analogous portfolios rather than to utilize a comparison between conforming and non-conforming portfolios.  However, due to the lack of available information, I am of the view that utilization of a GSE portfolio based on actual repurchase experience is a proper alternative with appropriate adjustments.

Please note that without verification, I have accepted the balances for each stratification bucket as being correct.

The first haircut in their analysis is the "Defect Rate", which represents the percentage of GSE buyback requests experienced by BofA.  This information was available for the entire GSE portfolio, was categorized for each product type and further stratified by the number of payments the borrower has

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

4



**RRMS ADVISORS**
*Tactical Mortgage Strategists*

*Settlement Amount Opinion*
*Prepared for: The Bank of New York Mellon*
*June 7, 2011*

made. The "Defect Rates" for each bucket were applied to the corresponding portion of the Settlement Portfolio, and were re-weighted according to the balance of the Investor Group loans found within each bucket. Given that the subprime portion of the GSE portfolio was insignificant, these particular "Defect Rates" were not simply assigned to the subprime portion of the Settlement Portfolio, but rather were determined as described below.

In order to calculate the "Defect Rates" of the subprime portion of the Settlement Portfolio, the balances of the two aggregate portfolios were similarly stratified according to documentation type and the number of payments made by the borrower. For each of these buckets, the "Defect Rates" of the GSE portfolio were calculated based on actual loan performance. As before, these rates were then assigned to the corresponding bucket of the aggregate Settlement Portfolio, and weighted average "Defect Rates" were calculated which were assigned to the subprime portion of the Settlement Portfolio. With "Defect Rates" available for each product type, these percentages were obtained according to the number of payments made by borrowers and for the aggregate Settlement Portfolio. I find this approach for determining the "Defect Rates" of the Settlement Portfolio to be a reasonable and logical first step in their methodology.

Taking the "Defect Rates" for each bucket according to the number of payments made by the borrower, a factor was then applied to each figure to account for expected claims for the forward unsettled portion with Fannie Mae. Relatively more loans will be bought back currently found in the bucket representing borrowers making more than 36 payments compared to those who have made between zero and 12 payments; thus the rationale for applying a higher factor to the former. In my opinion, the application of a factor to the calculated "Defect Rates" is reasonable, although I cannot validate the accuracy of each individual factor due to a lack of publicly available information.

The next haircut was based on "Lesser Representation", since the GSE portfolio received stronger reps & warranties because borrower misrepresentation would not be a basis for a claim within the Settlement Portfolio. Once again, stratifying the balances of the GSE portfolio according to product type and the number of payments made by the borrower, a figure for each bucket was calculated which represented the percentage of GSE loans repurchased due to borrower misrepresentation. In also stratifying the Settlement Portfolio in a similar fashion, the "Lesser Representation" haircuts for each bucket were applied to the corresponding portion of the Settlement Portfolio, and were re-weighted according to the balance of the Investor Group loans found within each bucket. As before, since the subprime portion of the GSE portfolio is insignificant, the Alt-A "Lesser Representation" haircuts were simply applied to the subprime portion of the Settlement Portfolio. I find this approach for determining the "Lesser Representation" haircut of the Settlement Portfolio to be reasonable. Please note that I find an inconsistency in their methodology pertaining to the manner in which figures were derived for the subprime portion of the GSE portfolio. Initially, while a complex analysis was undertaken in order to assign "Defect Rates" to the subprime portfolio, the Alt-A "Lesser Representation" haircuts were just assumed for the subprime portion of the Settlement Portfolio without any further calculations. The



**RRMS ADVISORS**
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for:  The Bank of New York Mellon**
**June 7, 2011**

inconsistent methodology is still acceptable given the similarity of the two product types for these two attributes.

The "Lesser Representation" haircut is decreased since there could be instances within the Settlement Portfolio where other defects exist for a loan in addition to borrower misrepresentation.  Based on BofA's experience, approximately half of private label loans with borrower misrepresentations still need to be repurchased because of these additional defects.  This explains the 50% adjustment for each of the "Lesser Representation" haircuts.  Based on my industry experience, the application of a factor is reasonable since repurchased loans will possibly have multiple simultaneous breaches.  However, I cannot validate the accuracy of applying a factor of exactly 50%.

The third haircut is "Causation", which is based on whether there were material and adverse underwriting defects for the loans.  In the case where only 0 - 12 payments were made by the borrower, it can be implied 100% of the time that faulty underwriting contributed to the loan default.  These percentages were reduced as more payments were made on the loans, the logic being that the default for these loans was due to some factor other than the underwriting process (i.e., a borrower job loss).  Different haircuts were applied to the various product types due to their distinctive payment requirements.  A larger causation factor was applied to an option ARM making the same number of total payments as was applied to a fully amortizing loan, since the required payments are much lower.  Thus, if the two loan types default after the same number of payments, there is a higher probability of underwriting irregularities with the option ARM.  The percentages for Interest-Only loans simply take the average of the corresponding fully amortizing and option ARM percentages.  Given that the amount of publicly available information is limited, the accuracy of each of these haircuts is difficult to quantify.  In part for these reasons, I did not take these haircuts into consideration for my calculation.

The final haircut is "Presentation", which attempts to quantify whether senior certificate holders would commit to the expenses and time requirement to take action based on the projected amount of losses they would experience.  Thus, with BofA's expectations being that the less senior classes will be written down, there is a reduced likelihood that legal action will proceed.  Therefore, in the cases with no expected senior losses, BofA assumes no liability exposure whatsoever.  In my opinion, the utilization of this haircut may not be necessary, since the Investor Group has already undertaken action(s) to recover damages.

The four haircuts which have been described were utilized in order to estimate a total settlement amount.  The settlement amount results in approximately $4.0B by multiplying each of the haircuts by the projected and actual losses of the Settlement Portfolio.

In conclusion, although certain haircuts are difficult to validate and may require a proper expert to address the legal interpretation of their merits, the overall methodology utilized is reasonable for the purpose of BofA's presentation.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

6

## RRMS ADVISORS
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

### Recommendation

In calculating a reasonable settlement figure, I utilized a mix of the methodologies found in the Investor Group and BofA presentations. As per my analysis below, the settlement range of approximately $8.8 to $11 billion is reasonable without applying any legal haircuts.

### Methodology and Calculations

Given that information was obtained from publicly available third-party sources, my analysis began with the Intex / LoanPerformance collateral balances (as provided by Investor Group) of the portfolio which was stratified according to delinquency status. This consisted of (1) a $72.5 billion balance for loans greater than 60 days delinquent (which also included the population in bankruptcy, foreclosure and REO); (2) a $12.8 billion balance for previously modified current loans and (3) a $98.6 billion balance for non-modified current loans (including loans 30 days delinquent). In addition, aggregate realized losses of $25 billion were also taken into account.

Based on publicly available information pertaining to historical mortgage loan performance, I determined reasonable default and loss severity percentages which would be applied to each delinquency bucket of the portfolio. The corresponding plateaus are dependent upon product type and loan size, but when weighted according to the actual collateral composition of the portfolio, loss severity is approximately 60%. In addition, based on information provided by BofA, the historical loss severity for the loans within the Settlement Portfolio is approximately 45%. Thus, these were the ranges utilized in my assumptions.

With respect to the default of previously modified current loans, performance has improved dramatically since the first round of loan modifications in early 2009 due to more aggressive methods taken by both servicers and the government. From recent trends in applicable research reports, defaults for these loans have ranged between 20% and 60%, depending on when the modification took place. In taking an average of the two figures as well as considering the stronger recent performance, I feel that a default rate for previously modified current loans ranging from 35% to 40% is reasonable.

High default rates seem to be leveling off based on historical data and research reports with regard to non-modified current loans (including loans 30 days delinquent). As before with loss severities, these particular plateaus vary depending on product type and year of origination, but when weighted according to the actual collateral composition of the portfolio, the default rate ranges between 11% and 16%. These percentages have been utilized for this portion of the portfolio.

A default rate of 90% was utilized for loans greater than 60 days delinquent, which was supported by an industry research report. It is rational to assume that once a loan becomes severely delinquent, it is uncommon for such loan to achieve performing status once again.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

7



# RRMS ADVISORS
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

The last variables used in my analysis were the "Breach" and "Success" rates which represent the amount of loans effectively submitted to BofA for repurchase. Given the lack of meaningful public information regarding this data, I feel it would be reasonable to utilize BofA's percentages for both rates since they are based on the performance of a mortgage pool representing actual repurchase experience. Specifically, a "Breach" rate of 36% and a "Success" rate of 40% were utilized.

Please note that these were the only haircuts utilized in my analysis. The three other haircuts used in the BofA presentation were not included in my analysis due the lack of available data and furthermore, would require a proper expert to address any particular legal interpretation issues.

In conclusion, utilizing the stratified collateral balances of the portfolio and my re-calculated variables, a settlement figure somewhere between $8.8 and $11 billion is reasonable. In my opinion, given the degree of assumptions used in my analysis, a small variance to the range indicated above is still reasonable. Please see the tables below for my assumptions and settlement range.

**Low Range**

| Description | Balance[1] | Default Rate | Severity Rate | Losses | Breach Rate | Success Rate | Settlement |
|---|---|---|---|---|---|---|---|
| Liquidated Loans | | | | $25.0 | 36.0% | 40.0% | $3.6 |
| 60+ Delinquent Loans | $72.5 | 90.0% | 45.0% | $29.4 | 36.0% | 40.0% | $4.2 |
| Mod. Current Loans | $12.8 | 35.0% | 45.0% | $2.0 | 36.0% | 40.0% | $0.3 |
| Non-Mod Current Loans / D30 | $98.6 | 11.0% | 45.0% | $4.9 | 36.0% | 40.0% | $0.7 |
| | | | | | | | **$8.8** |

**High Range**

| Description | Balance[1] | Default Rate | Severity Rate | Losses | Breach Rate | Success Rate | Settlement |
|---|---|---|---|---|---|---|---|
| Liquidated Loans | | | | $25.0 | 36.0% | 40.0% | $3.6 |
| 60+ Delinquent Loans | $72.5 | 90.0% | 60.0% | $39.2 | 36.0% | 40.0% | $5.6 |
| Mod. Current Loans | $12.8 | 40.0% | 60.0% | $3.1 | 36.0% | 40.0% | $0.4 |
| Non-Mod Current Loans / D30 | $98.6 | 16.0% | 60.0% | $9.5 | 36.0% | 40.0% | $1.4 |
| | | | | | | | **$11.0** |

*Note 1: The settlement range of approximately $8.8 - $11 billion was based on the balance of 543 Trusts provided by the Investor Group. It is reasonable to assume the settlement range would be lower, given that 530 Trusts are now being considered for the contemplated settlement portfolio.*

Yours truly,

*Brian Lin*

Brian Lin
Managing Director

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

8

12-12020-mg   Doc 320-8   Filed 06/11/12   Entered 06/11/12 00:00:34   Exhibit D
Pg 57 of 111

# EXHIBIT D

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re                                             :    Chapter 11 Case No.
                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*           :    08-13555 (JMP)
                                                  :
                             Debtors.             :    (Jointly Administered)
-------------------------------------------------------------------x

<div align="center">

**DECLARATION OF ZACHARY TRUMPP IN
SUPPORT OF DEBTORS' MOTION PURSUANT TO
SECTION 8.4 OF THE MODIFIED THIRD AMENDED
JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS
HOLDINGS INC. AND ITS AFFILIATED DEBTORS AND
SECTIONS 105(a), 502(c) AND 1142(b) OF THE BANKRUPTCY CODE
TO ESTIMATE THE AMOUNTS OF CLAIMS FILED BY INDENTURE
TRUSTEES ON BEHALF OF ISSUERS OF RESIDENTIAL MORTGAGE-
BACKED SECURITIES OR PURPOSES OF ESTABLISHING RESERVES**

</div>

Pursuant to 28 U.S.C. §1746, I, Zachary Trumpp, declare:

1.      I am over 18 years of age and have personal knowledge of all of the facts set forth in this declaration and if called upon to testify as a witness, I could testify to the truth of the matters set forth herein.

2.      I submit this Declaration in support of the *Motion Pursuant to Section 8.4 of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors and Sections105(a), 502(c) and 1142(b) of the Bankruptcy Code to Estimate the Amounts of Claims Filed by Indenture Trustees on Behalf of Issuers of Residential Mortgage-Backed Securities For Purposes of Establishing Reserves*, (the "Motion").[1]

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

3.      I am currently employed by LAMCO LLC ("<u>LAMCO</u>"), a wholly-owned subsidiary of Lehman Brothers Holdings Inc. ("<u>LBHI</u>").  I was previously employed by LBHI, and before that, by Aurora Loan Services LLC ("<u>Aurora</u>").

4.      As the Vice President of Loss Management at Aurora, one of my responsibilities was the development and establishment of a department that was responsible for identifying residential mortgage loans with the potential for breaches, having the potential breaches reviewed either internally or externally by a forensic due diligence provider, determining which breaches were material and adverse, and pursuing remedies on claims on behalf of Aurora and LBHI against third-party residential mortgage loan sellers and originators.  This work was performed on LBHI's whole loan portfolio and the universe of residential mortgage backed securitizations developed by the Debtors.  During my tenure in this position, my team reviewed thousands of loans and resolved several billion dollars worth of claims on behalf of Aurora, LBHI, and Debtor developed securitizations.  As such, I have direct and personal knowledge of the claims universe and remediation thereof within the Lehman residential mortgage platform.

5.      In my role at LBHI and now LAMCO, I am responsible for the validation of the claims against the Debtors' estate as well as the pursuit and resolution of downstream claims against the entities that sold loans to LBHI.  In this role, I have continued to develop first-hand experience with the nature and quality of loans that LBHI purchased or originated, the types of breaches that exist in the loans, and the ultimate success that Lehman experiences in resolving these claim.

6.      I am familiar with the approximately 300 claims that have been filed against LBHI and Structured Assets Securities Corporation ("<u>SASCO</u>") asserting claims in the aggregate amount of approximately $37 billion (the "<u>Claims</u>").  The asserted amount of the Claims greatly

exceeds the probable liability of LBHI and SASCO for the Claims. I participated in the development of the methodology described herein for the calculation of the estimates of the amounts of the Claims for reserve purposes under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan").

## The Claims

7.      The Claims are based on alleged breaches of representations and warranties related to the origination and delivery of residential mortgage loans to securitization trusts. In connection with the transfer of the loans by SASCO to the securitization trusts, LBHI and/or SASCO made certain representations and warranties regarding the nature and quality of certain of the loans and the delivery of the loans into the securitization. The loan purchase agreements and trust agreements pursuant to which the trusts acquired the loans (the "Governing Agreements") from SASCO typically provide that the trustee may seek a contractually defined "Repurchase Price" in the event there are breaches of representations and warranties. In order to assert a claim for the "Repurchase Price," the Governing Agreements require the trustee to establish that (a) a breach of a representation and warranty exists; (b) the breach was material; (c) the breach adversely impaired the value of the mortgage loan; and (d) the trustee provided prompt notice of the breach to the Debtors.

8.      The asserted amounts of the Claims are drastically overstated for several reasons: (a) in most cases, the Indenture Trustees filed duplicate claims against LBHI and SASCO on behalf of the same securitization; (b) the Claims largely do not identify breaches of representations and warranties with respect to certain loans, nor do they set forth any of the other elements of contractual liability of the Debtors; (c) the Claims are asserted in amounts that bear no correlation to existing or expected breaches and resulting damages; (d) the Claims fail to

distinguish between Debtors' direct representations and warranties and representations and warranties by third-party sellers for which the Debtors are not liable; and (e) there is no basis for the Claims to be secured claims.

9. Prior to the Commencement Date, the Debtors and their subsidiaries acquired residential mortgages that were ultimately sold to securitization trusts in three ways: (a) loans were originated by subsidiaries of LBHI ("Lehman Originated Loans"), (b) subsidiaries of LBHI acquired loans from small banks or mortgage lenders on an ongoing basis pursuant to standardized loan purchase and broker agreements ("Bank Originated Loans"), and (c) loans were acquired by LBHI or its subsidiaries from large mortgage lenders in bulk purchases of a pool of loans ("Transferor Originated Loans"). Loans originated or acquired by subsidiaries were typically transferred to LBHI which subsequently transferred these loans to SASCO. SASCO then securitized such loans and transferred loans to various securitization trusts.

10. In connection with the transfer of loans to the securitization trusts, LBHI typically made certain representations or warranties regarding the nature or quality of the loans. While in some instances LBHI may have made a very limited number of representations and warranties for Transferor Originated Loans to the trusts, LBHI also assigned all of the representations and warranties that the originator or initial seller made when it sold the loans to a subsidiary of LBHI – which mirrored those limited number of representations and warranties made by LBHI on those same set of loans. In my experience, when a representation and warranty was made by both LBHI and the initial seller, the trust's sole recourse was to the initial seller, not LBHI. Approximately 70% of the loans in the securitization trusts subject to the Claims are Transferor Originated Loans.

11. SASCO also made representations and warranties that the loan files contained

certain documents and information.  SASCO may have potential liability if the loan files were missing required documents.  While some Trustees have provided certain "document exception" reports that may be evidence of document deficiencies in certain loan files, the Trustees have not (a) stated a claim based on document deficiencies, (b) identified which loans in these reports have the kind of deficiencies that would entitle the trusts to a remedy, or (c) otherwise complied with the contractual requirements necessary to force a cure or repurchase of any of the loans.

## The Estimated Reserve Amount

12.  LAMCO has determined a reasonable methodology for calculating the estimated liability of LBHI and SASCO under the Claims.  The Debtors propose to apply the methodology uniformly to all of the Claims.  Generally, the methodology estimates the liability of LBHI and SASCO based on assumptions regarding the percentage of loans that will ultimately default, the recovery rates on the loans that default, the percentage of defaulted loans for which a potential breach of a representation and warranty exists, and the percentage of loans for which the trustee will be able to establish that such breach is valid and materially affects the value of the mortgage loan.  I have worked with the Debtors to develop the factors, assumptions and percentages included in the methodology based on (a) my and my co-workers' extensive experience reviewing loans and breaches of representations and warranties and seeking to affirmatively collect from third parties for their breaches of representations and warranties as detailed in Paragraphs 3 and 4 above, (b) review of internal data on residential mortgage loan default rates, recovery rates, breach rates and validation rates for loans similar to the loans held by the securitization trust, and (c) internal models developed by the Debtors.  In order to calculate the reserve estimates, and given the variability of actual loan performance and potential liability for the Claims, the Debtors calculated the reserve estimates using a range of assumptions.

13.    Below is a description of the methodology utilized by the Debtors to calculate the Estimated Reserve Amounts.  The below description includes certain assumptions that result in reaching the Debtors' high end estimates (the "High Estimate") of the Claim amounts:

14.    Step 1:  In order to calculate the Estimated Reserve Amounts for each Claim, the Debtors began with the aggregate unpaid principal balance of the loans held by each securitization trust as of September 25, 2011 (the "UPB").  This amount represents the maximum potential liability of the Debtors.  The Debtors obtained this information from various sources, including Intex, which is a subscription based securitization data source.   If Intex did not contain the UPB for a particular deal, the Debtors then looked to the monthly trustee remittance statements.

15.    Step 2:  The Debtors multiplied the UPB for each securitization trust by 45% which, for the High Estimate, represents the assumption regarding the percentage of loans that have or will incur a default.

16.    Step 3: The result from Step 2 is multiplied by the "severity factor" which takes into account the estimate of losses on the loans that are currently delinquent or will go delinquent in the future.  This step is necessary because a default on a loan does not mean that the securitization trust will not recover any amounts from a sale of a defaulted loan, a foreclosure or other remedial action.  The severity factor that is used for the High Estimate is a 55% loss rate.

17.    Step 4:  The cumulative losses that have already been incurred for the loans in each securitization are added to the result of Step 3.  This adds the current and existing losses to the amount of future losses estimated by this methodology.  The Debtors obtained the cumulative losses for each securitization trust from Intex or the monthly trust remittance reports.

18.    Step 5:  The result of Step 4 is multiplied by the percentage of the UPB for each

securitization trust that relates to Lehman-Originated Loans and Bank-Originated Loans.  This calculation is necessary because as discussed above, the trusts should be seeking recourse against the originator or initial seller, and not LBHI, for the Transferor Originated Loans.  Therefore this portion of the calculation excludes from the estimated liability any losses that relate to the Transferor Originated Loans.  The Debtors were unable to identify the number of Lehman Originated Loans and Bank Originated Loans for 19 of the more than 400 securitizations subject to the Claims.  For the purposes of these calculations, an estimate of 30% was used for those deals.  This represents a close approximation to the average of Lehman-Originated Loans and Bank-Originated Loans in SASCO-issued securitizations.

19.     <u>Step 6</u>:  Not all defaults and losses are the result of breaches of representations and warranties.  In many cases when a default occurs with respect to a loan there are not breaches of representations and warranties.  To account for such scenario, the calculation of the High Rate assumes that 35% of the losses are caused by a breach of a representation or warranty.  Therefore the result of Step 5 is multiplied by 35%.

20.     <u>Step 7</u>:  Based upon my historical experience reviewing loans and my experience both pursuing and defending representation and warranty claims in my various positions of employment since 2005, following the identification of a breach of a representation or warranty, the rate of breached loans that are "validated," meaning they meet every element required for repurchase and/or indemnification under the Governing Agreements, is approximately 40% for the High Rate.  Under the Governing Agreements, the elements required for repurchase and/or indemnification are that such a breach was material, that the trustee provided notice of the breach to the Debtors, that the trust suffered damages as a result of the breach, and that the trust could seek recourse against LBHI.  *See* Trust Agreement, § 2.04.  Therefore, the result from Step 6 is

multiplied by 40%. **The result of Step 7 represents the High Rate, which the Debtors propose to use at the Estimated Reserve Amount for each Claim. The aggregate amount of the Estimated Reserve Amounts using the High Rate is approximately $2.4 billion.**

21.     As indicated, the above calculations take into account certain assumptions. The Debtors believe that such rates included in the High Rate are on the high-end of probable results and are thus conservative. Therefore, the Debtors also calculated the reserve amounts using lower rates, which may ultimately be closer to the ultimate default, severity, breach and validation rates. For the low-end of the Debtors' estimates of the range of potential liability for the Claims, the Debtors utilized a 25% default rate, 45% severity rate, 30% breach rate and 30% validation rate. **The aggregate amount of the Estimated Reserve Amounts using the Low Rate is approximately $1.1 billion.**

22.     For securitizations issued prior to January 1, 2003, the Debtors do not believe LBHI or SASCO have any liability for breaches of representations and warranty. This conclusion is based on advice of counsel that there is six year statute of limitations in the State of New York for asserting claims of this type.

23.     The methodology described above is one that we have used consistently the past several years for estimating the potential breaches in any particular securitization on behalf of LBHI and SASCO.

24.     LBHI and SASCO made separate and distinct different types of representations and warranties to the securitization trusts. LBHI typically made representations and warranties relating to the origination and quality of the loans, while SASCO typically made representations and warranties relating to the delivery of a complete loan file including any and all collateral documents (e.g., promissory notes, mortgages/deeds of trusts, title insurance policies). It is

significantly more likely that there would be breaches of the type of representations and warranties made by LBHI than of the type made by SASCO. If SASCO did breach representations regarding the delivery of documents, typically, the breaches are cured with non-monetary remedies such as re-executing certain documents and/or providing affidavits, rather than paying monetary damages. As discussed above, the Indenture Trustees generally filed a claim against both LBHI and SASCO relating to each securitization trust. As a result, the Debtors' have allocated the estimates for reserve for the claim of each securitization trust as between LBHI and SASCO, with 95% allocated to LBHI and 5% to SASCO. If a Claim for a particular securitization was filed only against LBHI and not SASCO, the Estimated Reserve Amount was allocated entirely to the Claim against LBHI. Conversely, if a Claim for a particular securitization was filed only against SASCO and not LBHI, the Estimated Reserve Amount was allocated entirely to the Claim against SASCO.

25. In my business judgment, the above methodology and all assumptions included therein represents a reasonable and fair basis to estimate the potential liability of LBHI and SASCO under the Claims. The above methodologies provide for a range of liability for LBHI from $1,103,992,894 to $2,283,140,539 and for SASCO allocation is $58,387,327 to $119,044,871. The Debtors have selected the conservative estimate on the high end of the range for the purposes of establishing the reserve amounts for the Claims.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: January 12, 2012

/s/ Zachary Trumpp
Zachary Trumpp

12-12020-mg    Doc 320-8    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 8
Pg 66 of 110

# EXHIBIT E

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

# Evaluation of the Federal Housing Finance Agency's Oversight of Freddie Mac's Repurchase Settlement with Bank of America



**EVALUATION REPORT:  EVL-2011-006**            **DATED:  September 27, 2011**

**EXPLANATION OF REDACTIONS IN THIS REPORT**

This report includes redactions requested by the Federal Housing Finance Agency
(FHFA) and the Federal Home Loan Mortgage Corporation (Freddie
Mac).  According to FHFA and Freddie Mac, the redactions are intended to
protect from disclosure material that they consider to be confidential financial,
proprietary business, and/or trade secret information, which Freddie Mac claims it
would not ordinarily publicly disclose and, if disclosed, could place it at a
competitive disadvantage.



# FEDERAL HOUSING FINANCE AGENCY
## OFFICE OF INSPECTOR GENERAL
# AT A GLANCE

## Evaluation of FHFA's Oversight of Freddie Mac's Repurchase Settlement with Bank of America

### Why FHFA-OIG Did This Evaluation

In the closing days of 2010, the Federal Housing Finance Agency (FHFA or Agency), acting in its capacity as the conservator of the Federal Home Loan Mortgage Corporation (Freddie Mac or the Enterprise) and the Federal National Mortgage Association (Fannie Mae) (collectively the Enterprises), approved two agreements totaling $2.87 billion under which the Enterprises settled mortgage repurchase claims asserted against Bank of America.

Freddie Mac and Fannie Mae have purchased millions of mortgages from loan sellers, such as Bank of America. The contracts under which the Enterprises purchased the mortgages provide them with the right to require the sellers to repurchase mortgages that do not meet the underwriting criteria represented and warranted by them. Freddie Mac's $1.35 billion settlement with Bank of America could serve as a precedent for future repurchase settlements.

The FHFA Office of Inspector General (FHFA-OIG) began a review after Members of Congress and others questioned the adequacy of the settlements. During the review, two individuals independently reported their concerns about the Freddie Mac-Bank of America settlement, and FHFA-OIG commenced this evaluation.

### What FHFA-OIG Recommends

FHFA-OIG makes two recommendations. FHFA and its senior management should promptly: (1) act on the specific and significant concerns raised by FHFA staff and Freddie Mac internal auditors about Freddie Mac's loan review process; and (2) initiate reforms to ensure more generally that senior managers are apprised of and timely act on significant concerns brought to their attention.

### What FHFA-OIG Found

FHFA-OIG found that FHFA senior management did not timely address significant concerns raised about the loan review process used by Freddie Mac and its ramifications on underlying the settlement. Specifically, FHFA-OIG makes three findings.

First, in mid-2010, prior to the Bank of America settlement, an FHFA senior examiner raised serious concerns about limitations in Freddie Mac's existing loan review process for mortgage repurchase claims, which, according to the senior examiner, could potentially cost Freddie Mac a considerable amount of money. Freddie Mac's internal auditors independently identified concerns about the process at the end of 2010. These concerns merited prompt attention by FHFA because they potentially involve significant recoveries for Freddie Mac and, ultimately, the taxpayers. Further, unless examined and addressed, the underlying problems are susceptible to recurrence.

Second, FHFA did not timely act on or test the ramifications of these concerns prior to the Bank of America settlement. FHFA-OIG did not independently validate Freddie Mac's existing loan review process and, therefore, does not reach any final conclusion about it. Nevertheless, by relying on Freddie Mac's analysis of the settlement without testing the assumptions underlying Freddie Mac's existing loan review process, FHFA senior managers may have inaccurately estimated the risk of loss to Freddie Mac.

Third, following the initiation of FHFA-OIG's evaluation, FHFA, to its credit, suspended future Enterprise mortgage repurchase settlements premised on the Freddie Mac loan review process and set in motion activities to test the assumptions underlying the loan review process. Additionally, other findings tend to support the validity of the concerns about the process. For example, on June 6, 2011, Freddie Mac's internal auditors issued an audit opinion that the Enterprise's internal governance controls over this process were "Unsatisfactory." Furthermore, at the end of 2010 and then again in mid-2011, a Freddie Mac senior manager advised the board of directors that the Enterprise could recover more in the future if it used a more expansive loan review process.

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... 4

ABBREVIATIONS ............................................................................................................ 6

PREFACE ........................................................................................................................... 7

BACKGROUND ............................................................................................................... 11

About the Enterprises and FHFA ..................................................................................... 11

Overview of the Mortgage Repurchase Process............................................................... 11

Changes in Mortgage Lending Practices During the Housing Boom ............................... 12

Chronology of Key Events and Associated Analysis ....................................................... 15

    a.    Nine Months Prior to the Bank of America Settlement, an FHFA Senior Examiner Identifies Changes in Housing Foreclosure Patterns ..................................................... 15

    b.    FHFA Senior Examiner Raises Concerns that Freddie Mac Did Not Revise Its Loan Review Process for Repurchase Claims to Account for Foreclosure Pattern Changes Among Housing Boom Mortgages .......... 18

    c.    FHFA Senior Examiner Views Freddie Mac's Continued Use of Its Loan Review Process as Potentially Costing Freddie Mac "Billions of Dollars" ....................................... 21

    d.    FHFA Senior Examiner Alerts FHFA Staff, Managers, and Senior Managers to the Concerns About Freddie Mac's Loan Review Process ....................................................... 22

    e.    Freddie Mac Reaches a Tentative Repurchase Settlement with Bank of America; Freddie Mac's Internal Auditors Independently Raise Concerns About Freddie Mac's Loan Review Process .............................. 24

    f.    Freddie Mac Management Responds.................................................................. 26

    g.    FHFA Staff Reviews and Recommends Approval of the Freddie Mac-Bank of America Settlement ... 28

    h.    FHFA's Acting Director Suspends All Future Enterprise Repurchase Settlements Pending Further Review; Freddie Mac's Internal Auditors Issue an "Unsatisfactory" Audit Opinion ................................ 29

FINDINGS ........................................................................................................................ 32

1.    An FHFA Senior Examiner Raised Significant Concerns About Freddie Mac's Loan Review Process for Mortgage Repurchase Claims ...................................................................................... 32

2.    FHFA Did Not Timely Act on or Test the Ramifications of the Senior Examiner's Concerns; Consequently, FHFA May Have Incorrectly Estimated the Risk of Loss to Freddie Mac Before Approving the Bank of America Settlement ................................................................................................................. 33

3.    FHFA's Decision to Suspend Approval of Additional Repurchase Settlements and Freddie Mac's Continuing Efforts to Address the Concerns Are Positive Steps ........................................................... 34

CONCLUSIONS ............................................................................................................. 35

RECOMMENDATIONS ................................................................................................ 35

SCOPE AND METHODOLOGY .................................................................................... 37

APPENDIX A ................................................................................................................... 38
    FHFA Management Comments ................................................................................. 38

APPENDIX B ................................................................................................................... 41
    FHFA-OIG Responses to FHFA Management Comments ....................................... 41

APPENDIX C ................................................................................................................... 42
    Timeline of Relevant Events ..................................................................................... 42

APPENDIX D ................................................................................................................... 43
    Timeline of When FHFA Staff Were Alerted to Concerns ....................................... 43

ADDITIONAL INFORMATION AND COPIES .......................................................... 44

# ABBREVIATIONS

ARM ...................................................................................... Adjustable Rate Mortgage

Countrywide ................................................................................. Countrywide Financial

DER...................................................................................... Division of Enterprise Regulation

Fannie Mae...................................................................... Federal National Mortgage Association

FHFA ........................................................................... Federal Housing Finance Agency

FHFA-OIG .....................................Federal Housing Finance Agency Office of Inspector General

Freddie Mac ............................................................Federal Home Loan Mortgage Corporation

HERA...................................................................Housing and Economic Recovery Act of 2008

MBS ........................................................................................Mortgage-Backed Securities

OCO .................................................................................... Office of Conservatorship Operations

Federal Housing Finance Agency

Office of Inspector General

Washington, DC

---

# PREFACE

FHFA-OIG was established by the Housing and Economic Recovery Act of 2008 (Public Law No. 110-289) (HERA), which amended the Inspector General Act of 1978 (Public Law No. 95-452). FHFA-OIG is authorized to conduct audits, investigations, and other activities of the programs and operations of FHFA; to recommend policies that promote economy and efficiency in the administration of such programs and operations; and to prevent and detect fraud and abuse in them. This evaluation is one in a series of audits, evaluations, and special reports published as part of FHFA-OIG's oversight responsibilities. It is intended to assess FHFA's review and approval of Freddie Mac's settlement of mortgage repurchase claims with Bank of America.

Fannie Mae and Freddie Mac are government-sponsored enterprises that support the nation's housing finance system through the secondary mortgage market. The Enterprises purchase mortgages from loan sellers, such as banks, which can then use the sales proceeds to originate additional mortgages. The Enterprises either hold the loans in their investment portfolios or pool them into mortgage-backed securities (MBS) that they sell to investors. The proceeds of such sales, in turn, fund additional purchases of loans on the secondary market. In 2010, with the housing crisis continuing, federal government-supported entities collectively controlled 96% of the secondary mortgage market.[1] The Enterprises alone accounted for 70% of the market.

In September 2008, due to mounting mortgage-related losses, the Enterprises were placed into conservatorships overseen by FHFA, pursuant to HERA. At the same time, the Department of the Treasury agreed to provide financial support to the Enterprises and, to date, has invested over $162 billion of public funds in them to offset their losses and prevent their insolvency.[2] As

---

[1] FHFA, *Conservator's Report on the Enterprises' Financial Performance: Fourth Quarter 2010*, at 5, available at www.fhfa.gov/webfiles/21169/Conservator's Report_4Q_4_20_11.pdf. The Government National Mortgage Association, the other federal government-supported entity, accounted for 26% of the secondary mortgage market.

[2] Federal Housing Finance Agency, "Data as of June 9, 2011, on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities."

conservator, FHFA has assumed responsibility for the conservation and preservation of the assets of each Enterprise.

When a lender or other entity sells a mortgage to either Enterprise, it promises that the loan complies with certain representations and warranties – principally, that the eligibility of the property and the creditworthiness of the borrower are characterized accurately in the loan documents at the time of origination.  If the purchasing Enterprise later discovers that the loan contains a defect (for instance, that the value of the property securing the loan was materially lower than described in the loan paperwork, or that the borrower did not have the income stated on the loan application), then the Enterprise has the contractual right to require the seller to repurchase the loan at its full face value or to indemnify the Enterprise for losses incurred.  The mortgage repurchase process therefore provides an important means for the Enterprises to mitigate their credit-related losses on foreclosed mortgages and potentially limit taxpayer exposure to losses as well.  Moreover, because the Enterprises typically do not examine the mortgages they purchase for such defects prior to purchasing them, their repurchase rights represent their principal defense against defective loans and the risks they pose.

In late December 2010, FHFA's Acting Director, in his capacity as the Enterprises' conservator, approved two repurchase settlement agreements between the Enterprises and Bank of America totaling $2.87 billion ($1.35 billion for Freddie Mac and $1.52 billion for Fannie Mae).  Freddie Mac's settlement resolved most past, present, and (with limited exceptions) future repurchase issues associated with 787,000 loans sold to the Enterprise by Countrywide Financial (Countrywide).  Bank of America purchased Countrywide in 2008.  By contrast, Fannie Mae's settlement with Bank of America covered only past and present claims, not future ones.  The Freddie Mac settlement could serve as a precedent for future repurchase settlements involving large financial institutions that sold significant numbers of loans to the Enterprise.

Although the Enterprises' mortgage repurchase settlements initially generated positive publicity for Bank of America, Members of Congress and others soon raised concerns about the settlement's adequacy.[3]  Accordingly, FHFA-OIG began to survey the settlements in greater detail.  While the survey was under way, two individuals independently provided FHFA-OIG with information raising significant concerns about the Freddie Mac-Bank of America settlement.  Based on those concerns, FHFA-OIG prioritized its review and commenced this evaluation.

---

[3] For example, on January 7, 2011, four Representatives on the House Financial Services Committee wrote to FHFA's Acting Director seeking greater detail on the terms of the settlements.

FHFA-OIG makes three findings:

1. In mid-2010, prior to the Bank of America settlement, an FHFA senior examiner[4] raised significant concerns about limitations in Freddie Mac's existing loan review process for mortgage repurchase claims, which, according to the senior examiner, could potentially cost Freddie Mac "billions of dollars of losses." Freddie Mac's internal auditors independently identified concerns about the process at the end of 2010. These concerns merited prompt attention by FHFA because they potentially involve considerable recoveries for Freddie Mac and, ultimately, the taxpayers. Further, unless examined and addressed, the underlying problems are susceptible to recurrence in future settlements.

2. FHFA did not timely act on or test the ramifications of the senior examiner's concerns prior to the Bank of America settlement. FHFA-OIG did not independently validate Freddie Mac's existing loan review process and, therefore, does not reach any final conclusion about it. Nevertheless, by relying on Freddie Mac's analysis of the settlement without testing the assumptions underlying the Enterprise's existing loan review process, FHFA senior managers may have inaccurately estimated the risk of loss to Freddie Mac.

3. After this evaluation began, FHFA, to its credit, suspended future Enterprise mortgage repurchase settlements premised on the Freddie Mac loan review process and set in motion activities to test the concerns raised about the process. In addition, Freddie Mac's internal auditors continued to review the issue, and on June 6, 2011, issued an audit opinion that the Enterprise's internal corporate governance controls over this process were "Unsatisfactory." Furthermore, at the end of 2010 and then again in mid-2011, a Freddie Mac senior manager advised the board of directors that the Enterprise could recover additional money in the future through a more expansive loan review process. Currently, FHFA and Freddie Mac are analyzing the loan review process to determine whether greater recoveries in the future are possible.

FHFA-OIG believes that the recommendations in this report will result in more economical, effective, and efficient operations. FHFA-OIG appreciates the assistance of all those who contributed to the preparation of this report.

---

[4] For the purpose of this evaluation, within FHFA: staffers, examiners, and senior examiners report to managers; managers report to senior managers; and senior managers report to the FHFA Acting Director. Within Freddie Mac, senior managers report to the Chief Executive Officer.

12-12020-mg    Doc 320-8    Filed 06/11/12    Entered 06/12/12 00:00:34    Exhibit 3
Pg 77 of 111

This evaluation was led by David Z. Seide, Director of Special Projects; Timothy Lee, Senior Financial Advisor; and Bruce McWilliams, Investigative Evaluator.  This evaluation report has been distributed to Congress, the Office of Management and Budget, and others and will be posted on FHFA-OIG's website, www.fhfaoig.gov.


Richard Parker
Acting Deputy Inspector General for Evaluations

# BACKGROUND

## About the Enterprises and FHFA

To fulfill their obligations to provide liquidity to the mortgage finance system, Fannie Mae and Freddie Mac support what is commonly known as the secondary mortgage market.  The Enterprises purchase from loan sellers residential mortgages that meet their underwriting criteria.  The loan sellers can then use the sales proceeds to originate additional mortgages.  The Enterprises can hold the mortgages in their portfolios or package them into MBS that are, in turn, sold to investors.  In exchange for a fee, the Enterprises guarantee that investors will receive timely payment of principal and interest on their investments.

HERA provides FHFA with broad authority as the Enterprises' conservator to conserve and preserve Enterprise assets and to control and direct their finances and operations.  FHFA has exercised that authority by, among other things, requiring FHFA pre-approval of certain categories of Enterprise business operations such as settlements of claims exceeding $50 million.  In this regard, FHFA seeks to ensure that these high-dollar settlements are in the best interests of the Enterprises and the taxpayers.

For the purpose of this evaluation, two offices within FHFA, which report to FHFA's Acting Director, are relevant: the Office of Conservatorship Operations (OCO) and the Division of Enterprise Regulation (DER).  OCO coordinates all activities concerning conservatorship issues.  In this case, it took the lead in coordinating FHFA's review and approval of the Fannie Mae and Freddie Mac repurchase settlements with Bank of America.  DER is an organizational unit comprised of FHFA examiners who have in-depth knowledge of Enterprise operations and credit risk work.

## Overview of the Mortgage Repurchase Process

Designed to mitigate potential credit losses, the Enterprises' underwriting standards for loans they purchase are established in their federal charters and company policies.  Lenders and other entities that sell mortgages to the Enterprises are contractually required to "represent and warrant" that, at the time of their origination, the loans they sell comply with the Enterprises' underwriting standards.[5]

---

[5] These representations and warranties are detailed in Freddie Mac's *Single Family Seller/Servicer Guide* and Fannie Mae's *Selling Guide*.

The Enterprises have established ongoing, post-purchase quality review processes to verify that the loans they purchase conform to their underwriting standards.  If an Enterprise determines that a loan did not conform to its underwriting standards at the time of the loan's origination, then the Enterprise may require loan seller to repurchase the loan at full face value or to indemnify the Enterprise for any losses incurred.  For example, the Enterprises review mortgages (the majority of which have gone into foreclosure) to determine whether the representations and warranties included in them were correct and in compliance with their underwriting standards.  Based on such analysis, the Enterprises determine whether to request that loan sellers repurchase defective mortgages.

To date, the Enterprises have recovered billions of dollars through their assertion of repurchase claims.  For instance, as of January 2011 Freddie Mac had received repurchase payments from loan sellers on about 8% of approximately one million loans that it had purchased that were then in foreclosure.[6]  As of June 30, 2011, Freddie Mac had outstanding repurchase claims on loans with a combined unpaid principal balance of $3.1 billion.[7]

## Changes in Mortgage Lending Practices During the Housing Boom

With the unprecedented growth in the United States housing market during the 2005 to 2007 housing boom, the quality of loans originated and sold to the Enterprises deteriorated substantially.[8]  Before the boom, the mortgage market largely consisted of fixed rate, amortizing loans, such as 30-year fixed rate mortgages requiring equal payments each month over the life of the loan, and adjustable rate mortgages (ARMs) that incorporated features to protect borrowers from excessive fluctuations in monthly payments (such as "caps" limiting the amount by which the mortgage's interest rate can rise over the life of the loan).

However, from 2005 through 2007 there was a substantial increase in non-traditional mortgage products.  These products had significantly enhanced risk profiles compared to more traditional mortgage products.  First, they often included inherently risky attributes, such as significantly curtailed verification of borrowers' incomes and assets.  Second, non-traditional loans appear to have significant percentages of representations and warranties defects.[9]

---

[6] Freddie Mac QC Disposition of Foreclosures by Funding Year, dated 1/11/11.

[7] Freddie Mac Update August 2011, at 16, available at www.freddiemac.com/investors/pdffiles/investor-presentation.pdf.

[8] Financial Crisis Inquiry Commission, *Financial Crisis Inquiry Report* (FCIC Report), at 178-79 (2011).

[9] Freddie Mac data summarizing housing boom era loans eligible for repurchase claims show that for loans originated in 2006, 2007, and 2008, 18.4%, 20.6%, and 23.4% respectively were "ineligible," meaning that Freddie Mac considered these loans potentially good candidates for repurchase claims.  Freddie Mac Document, "NPL QC

Frequently, the non-traditional loans featured "teaser" rates initially resulting in low payments, but those payments could increase dramatically two, three, or five years after origination when the rates reset and/or the repayment of principal began. Although borrowers with limited incomes and credit histories might be able to afford property purchases using such non-traditional loans during the teaser rate periods, the potential for defaults increased dramatically when the monthly payments on these loans subsequently reset at higher levels. Aggravating these conditions, defaults increased as housing prices began to fall at the end of 2006. The falling prices left many homeowners "underwater" – that is, with mortgage balances exceeding the value of the homes securing them.

Figure 1 illustrates the dramatic increase in two of the more commonly used non-traditional loan types during the housing boom years: Interest Only and Option ARM loans. Interest Only loans permit the borrower to pay only interest on the loan, not principal, for a specified period; Option ARMs are adjustable rate mortgages that permit the borrower, for a specified period, to choose among different payment options each month, ranging from traditional interest and principal payments, to interest only payments, to payments below the amount of interest owed each month.[10]

---

Review Results By Loan Characteristics Loans Funded January 2006-December 2009 QC Results as of Mar 3, 2011." Moreover, Freddie Mac's internal auditors, in a June 6, 2011, audit opinion report, cited to repurchase rates exceeding 10% among Alt-A loans from 2005 that entered foreclosure. June 6, 2011, Freddie Mac Memorandum, Re: Performing Loans Quality Control and Administration Audit (#2011-010), at 10-11.

[10] Federal Reserve Board, Consumer Handbook on Adjustable Rate Mortgages, available at www.federalreserve.gov/pubs/arms/arms_english.htm.

**Figure 1:  Significant Growth in Interest Only and Option ARM Loan Originations in the Overall Mortgage Market During 2005-2007 Housing Boom**[11]



**Percentage of All Originations**

Although some non-traditional mortgages had interest rate resets within two years after origination, many others reset at a later time.  For example, according to Freddie Mac, 80% of its Interest Only loans that originated in 2005 had their first payment adjustment five years after origination.[12]

There was also significant growth during the housing boom in higher-risk Alt-A mortgages as an alternative to lower-risk prime mortgages.  Offered to those borrowers with credit profiles approaching those of prime borrowers, Alt-A mortgages often required limited or no documentation of key borrower credit risk characteristics, such as income and assets.[13]  For example, borrowers might only have to state their annual income rather than provide verifying documentation, such as W-2 tax forms.  Such limited- or no-document loans are also referred to

---

[11] Source: Inside Mortgage Finance, *2011 Mortgage Market Statistical Annual*, "Alternative Mortgage Originations," at 32.

[12] Sept. 15, 2010, FHFA Analysis Memorandum, at 2.

[13] Government Accountability Office, *Testimony of William B. Shear Before the U.S. Congress Joint Economic Committee on Home Mortgages*, at 1 n.1 (July 28, 2009), available at www.gao.gov/new.items/d09922t.pdf.

as "stated income" (or, more colloquially, "liar") loans.  These categories of loans are not mutually exclusive; some Alt-A loans incorporated Interest Only or Option ARM payment structures.

During the housing boom, the Enterprises purchased large volumes of these non-traditional mortgages from large lenders, such as Countrywide.  Countrywide was one of the most aggressive originators of limited- or no-document Interest Only and Option ARM loans.[14]

In early 2008, with the collapse of the housing market, Bank of America purchased Countrywide, which was then on the verge of failure.[15]  Countrywide loans are the dominant component of the portfolio included within the Freddie Mac-Bank of America settlement and account for a significant number of repurchase claims asserted by Freddie Mac.  For example, prior to the Bank of America settlement, Freddie Mac reviewed 58% of all Countrywide loans in foreclosure and made repurchase claims on 24% of them.

## Chronology of Key Events and Associated Analysis[16]

*a.  Nine Months Prior to the Bank of America Settlement, an FHFA Senior Examiner Identifies Changes in Housing Foreclosure Patterns*

In March 2010, an FHFA senior examiner, who is assigned to oversee Freddie Mac, noticed in Freddie Mac-supplied housing data an unusual pattern among foreclosures of loans originated during the 2005 to 2007 housing boom years.  That pattern, as discussed in detail below, may have significant financial consequences for Freddie Mac and the taxpayers.

Before the housing boom, when the mortgage market was dominated by more traditional loans, mortgages that defaulted tended to do so during the first three years following origination.  Further, the rate of defaults declined over time as the loans seasoned.  This is reflected in Figure 2, showing when loans purchased by Freddie Mac in 2001 entered foreclosure.[17]

---

[14] FCIC Report at 105.

[15] FCIC Report at 250.

[16] A chart summarizing a timeline of key events is included at Appendix C.

[17] Freddie Mac purchases the vast majority of its loans shortly after origination.



**Figure 2:  Loans Purchased in 2001 by Freddie Mac that Entered Foreclosure[18]**



But a different pattern exists among loans that Freddie Mac purchased that were originated during the housing boom.  Rather than foreclosures declining over time, Freddie Mac-supplied housing data revealed foreclosures increasing, three, four, and five years after purchase, as reflected in Figure 3.  It shows that for Freddie Mac-owned mortgages purchased in 2006 there were relatively few foreclosures within the first two years after purchase but there were significantly higher numbers of foreclosures during years three through five.

---

[18] Source:  Freddie Mac QC Disposition of Foreclosures by Funding Year, dated 1/11/11.

**Figure 3: Loans Purchased in 2006 by Freddie Mac that Entered Foreclosure**[19]



No. of Foreclosure Starts

Loan Age at Foreclosure (in years)

Figure 3 also shows over 100,000 additional loans in default (as compared to 2001-vintage loans), likely the result of the collapsed housing market and the onset of the financial crisis.

The FHFA senior examiner attributed the reversed pattern to the end of the teaser rate period for non-traditional mortgages,[20] and he recommended further study of the issue. An FHFA staff memorandum explained:

> [I]t would be reasonable to assume that many of the borrowers, faced with
> significantly increasing payments in the near term and very little equity in their
> home, made the decision to default before their [payments reset to higher levels].
> It would also be reasonable to assume that the stated income and stated asset

---

[19] Source: Freddie Mac QC Disposition of Foreclosures by Funding Year, dated 1/11/11.

[20] Freddie Mac staff advised FHFA-OIG that they disagree with the senior examiner's causation hypothesis. Alternatively, they attribute the reversed pattern of foreclosures shown in Figure 3 to falling home prices leading to negative equity or "underwater" mortgages. However, causation is irrelevant to the issue in controversy. Regardless of the cause of these defaults, the search for representations and warranties defects is the point of the loan review process; and if the search does not begin, then the defects will not be found.

underwriting requirement played a role, but neither assumption can be tested without a review of the loans.[21]

As discussed in more detail below, FHFA did not test the loan review process to validate the senior examiner's concerns prior to its review and approval of the Bank of America settlement.

It should be noted that not all causes of foreclosure will justify a repurchase claim. For example, foreclosures may result from a borrower's subsequent loss of a job or health issues. But repurchase claims are fact-specific and based upon representations and warranties defects, such as missing or erroneous information regarding the quality of a borrower's assets or income.

b.   *FHFA Senior Examiner Raises Concerns that Freddie Mac Did Not Revise Its Loan Review Process for Repurchase Claims to Account for Foreclosure Pattern Changes Among Housing Boom Mortgages*

The FHFA senior examiner also observed that, despite the apparently changed foreclosure patterns associated with housing boom era mortgages, Freddie Mac had not adjusted its process for identifying loans that might be candidates for repurchase claims. Freddie Mac reviews intensively for repurchase claims only those loans that go into foreclosure or experience payment problems during the first two years following origination. Loans that default thereafter are reviewed at dramatically lower rates. Freddie Mac senior management believe that loan underwriting defects such as an undisclosed lien on a property – which may be an indication of a representations and warranties deficiency – are most likely to appear within the first two years following origination.[22] Moreover, Freddie Mac management has advised FHFA-OIG that they also believe that higher rates of loan defaults in later years do not necessarily equate to higher defect rates. In their view, loans that had demonstrated a consistent payment history over the first two years following origination and then defaulted in later years (i.e., years three through five after origination) likely did so for a reason such as loss of employment, which is unrelated to a representations and warranties defect.[23] Based on these assumptions, Freddie Mac does not review most loans that go into foreclosure more than two years after origination. It reviews such loans only if they had already exhibited problems such as missed or late payments during the initial two years after origination or have potential indications of value discrepancies or any indication of fraud.

---

[21] Sept. 15, 2010, FHFA Analysis Memorandum, at 2-3.

[22] November 2, 2010, FHFA Analysis Memorandum, prepared by the FHFA Division of Enterprise Regulation, at 3.

[23] As discussed later in this report, Freddie Mac's internal auditors requested and Freddie Mac management agreed to test these assertions. Such testing is currently under way.

This practice meant that most pre-housing boom loans in foreclosure were reviewed for repurchase claims.[24]  However, the shift in foreclosure patterns among housing boom loans (loans foreclosed three through five years after origination) meant most of them were not being reviewed, regardless of their potential viability for repurchase claims.  Yet, later payment resets common among housing boom loans may have temporarily hidden the impact of representations and warranties defects (e.g., erroneous information about borrower income may not have come to light until their loan payment resets if the borrowers had sufficient income to satisfy the "teaser" rate payments but not the later permanent payments).  The FHFA senior examiner shared his concerns with Freddie Mac management in June 2010 at a meeting attended by three FHFA examiners and an FHFA manager.  A June 9, 2010, FHFA memorandum summarized the issue as follows:

> It was pointed out to [Freddie Mac] that over 93% of the year-to-date [loan] foreclosures [(as of June 2010)] from the 2005 and 2006 [loan] vintages have been excluded from [loan repurchase] review, eliminating any chance to put ineligible loans back to the lenders from those years.[25]

Figure 4 demonstrates the extent to which Freddie Mac has not reviewed housing boom era mortgages that went into foreclosure during the third through fifth years after their origination.  It shows that by choosing to review intensively only those loans that defaulted within two years of origination, Freddie Mac did not examine close to 100,000 2006 vintage loans.

---

[24] For example, from 2000 through 2004 Freddie Mac reviewed 62% of the 191,853 loans in foreclosure.  Freddie Mac QC Disposition of Foreclosures by Funding Year, dated 1/11/11.

[25] July 9, 2010, FHFA Meeting Notes, at 2.

**Figure 4:  Loans Purchased in 2006 by Freddie Mac that Entered Foreclosure**[26]



No. of Foreclosure Starts

Approximately 100,000 Loans
Not Reviewed

Not Reviewed
Reviewed

Loan Age at Foreclosure (in years)

Freddie Mac data further show that for all Enterprise-owned foreclosed loans originated between 2004 and 2007, Freddie Mac has not reviewed over 300,000 loans for possible repurchase claims.[27]  Those loans that were not reviewed (hereafter referred to as "out-of-sample" loans) have a combined unpaid principal balance exceeding $50 billion.  Many of these loans are likely not candidates for repurchase.  For instance, a portion of the loans not reviewed are lower-risk prime loans, which probably have a lower incidence of representation and warranty defects.  On the other hand, Freddie Mac's portfolio of housing boom loans includes a substantial number of Interest Only and Alt-A mortgages, which have a high incidence of defects.[28]

---

[26] Source:  Freddie Mac QC Disposition of Foreclosures by Funding Year, dated 1/11/11.

[27] Id.

[28] For example, Freddie Mac's internal auditors have observed that Interest Only and Alt-A loans respectively comprise 24% and 35% of all 2006 vintage loans in foreclosure, and 38% and 36% of all 2007 vintage loans in foreclosure.  Freddie Mac 2011-010 PL Quality Control & Administration Audit Draft Audit Report Findings (05/05/11) (Draft Version 4.0), Fig. 3 and supporting data.

c. *FHFA Senior Examiner Views Freddie Mac's Continued Use of Its Loan Review Process as Potentially Costing Freddie Mac "Billions of Dollars"*

Throughout 2010, the FHFA senior examiner discussed with Freddie Mac managers his concerns about the Enterprise's continued reliance on its current loan review process. In his view, by not reviewing intensively the mortgages foreclosed upon more than two years after origination for repurchase claims, Freddie Mac could potentially lose "billions of dollars" that could be used to mitigate taxpayer losses.[29]

On June 9, 2010, during a regular monthly meeting involving four FHFA examination staff members and Freddie Mac senior managers, referenced above, the concerns about Freddie Mac's continuing use of its loan review process were discussed ("It was pointed out … that over 93% of the year-to-date [loan] foreclosures from the 2005 and 2006 [loan] vintages have been excluded from [loan repurchase] review."). A Freddie Mac senior manager said he had analyzed data on "loans defaulting 3-5 years out and concluded that [repurchase] reviews would not prove fruitful." But the manager agreed to conduct testing and "acknowledged that looking at the actual loan files would improve his analysis and so [he] agreed to call in a sample of those loans" to review.[30]

However, Freddie Mac officials ultimately did not review such a sample in 2010 or otherwise test issues related to the senior examiner's hypothesis. Moreover, FHFA did not require Freddie Mac to do so or to conduct independent testing. According to an FHFA examination staff description of a July 26, 2010, meeting of Freddie Mac's Credit Risk Subcommittee, a Freddie Mac manager told FHFA staff that loan repurchase review "was 'resource constrained' and sampling older defaults was 'not the highest and best use of his limited resources.'"[31] Weeks later, the FHFA senior examiner reported to FHFA senior managers that a Freddie Mac manager had informed him that another Freddie Mac senior manager was "vehemently against looking at more loans" but had offered "no cogent argument" explaining his resistance.[32]

---

[29] As discussed herein, the senior examiner's concerns were not confined to the Bank of America settlement, but covered all loan sellers and all potential future settlements. The issue is currently under review by FHFA and Freddie Mac.

[30] June 9, 2010, FHFA Meeting Notes, at 2.

[31] Sept. 15, 2010, FHFA Analysis Memorandum, at 3.

[32] Sept. 29, 2010, FHFA e-mail, Re: IO and OA defaults.

In a September 23, 2010, internal e-mail chain, the Freddie Mac senior manager told the Freddie Mac manager, "[w]e have spent a fair amount of time trying to help sellers forecast loan samples and repurchase request[s]. We have laid out a pretty clear sampling strategy." Sept. 23, 2010, Freddie Mac e-mail (11:04 AM), Re: NPL Sample on Older IO ARMs and Options Arms. Later in the same email chain, the senior manager told the manager, who suggested a temporary review of additional loans for two to three months, that "given the visibility and sensitivity

Senior Freddie Mac managers disagreed with the FHFA senior examiner's concerns, at least partly because they believed a change to a more aggressive approach to repurchase claims would adversely affect Freddie Mac's business relationships with Bank of America and other large loan sellers.  During the course of this evaluation, FHFA-OIG staff interviewed the relevant Freddie Mac senior managers, who asserted that the existing loan review process was appropriate and that changing the process could potentially cost Freddie Mac business.  One senior manager, who confirmed that he had recommended against further study of the default-timing anomaly, said he did not believe Freddie Mac would recover enough from a more expansive loan review process to offset losses of business from Bank of America and other loan sellers.  Another Freddie Mac senior manager also talked about the potential loss of business and emphasized that he did not believe that the number of repurchase claims would increase appreciably.

### d.  FHFA Senior Examiner Alerts FHFA Staff, Managers, and Senior Managers to the Concerns About Freddie Mac's Loan Review Process

Between June and December 2010, approximately one dozen FHFA staffers, managers, and senior managers were alerted to the FHFA senior examiner's concerns about Freddie Mac's loan review process.  See Appendix D for a timeline showing when each staffer, manager, and senior manager was first alerted.  Nonetheless, FHFA did not timely act on or test the data underlying these concerns prior to approval of the Bank of America settlement.  FHFA has advised FHFA-OIG that the senior examiner did not raise his concerns in the context of the normal FHFA examination process.  However, the record is clear that his concerns were known to FHFA senior management well in advance of the completion of the settlement.

On September 15, 2010, the FHFA senior examiner prepared and circulated to FHFA managers an Analysis Memorandum describing the concerns.  The memorandum recommended that Freddie Mac change its loan review process to analyze greater numbers of housing boom loans in foreclosure for repurchase claims.  The memorandum also disputed Freddie Mac's argument that limited resources undermined its capacity to review a larger sample of loans and concluded by noting that the Enterprise was potentially losing out on significant potential mortgage repurchase recoveries.

> By not taking a good look at these defaulted [Interest Only and Alt-A] loans over the next 2-3 years, … with a loss severity rate above 40%, Freddie [M]ac could be passively absorbing billions of dollars of losses.  Since the savings in credit losses would dwarf the incremental expenses incurred in reviewing additional loan files,

---

around [loan reviews] and repurchases, I view any change, even temporary as material.  I would prefer we lay out a proposal here, with clear goals and objectives, then do at least a rough cost benefit." Sept. 23, 2010, Freddie Mac e-mail (11:44 AM), Re: NPL Sample on Older IO ARMs and Options Arms.

> the fundamental question that Freddie Mac and FHFA should be addressing is
> this: How many of the **ineligible** loans sold to Freddie Mac in the 2005-2007
> origination years should Freddie Mac accept the loss on? (Emphasis in the
> original.)[33]

FHFA recipients of the memorandum offered differing responses to its contents. One senior
manager told FHFA-OIG that he never read the memorandum because he had never opened the
e-mail attachment containing it. Two managers (a senior manager and a manager) acknowledged
that they had reviewed the memorandum, but they did not remember that the issue could
potentially involve substantial losses to Freddie Mac. Another recipient noted that "this [issue]
is important" and observed that "[o]ver time, I have consistently been concerned about sampling
size. [Freddie Mac] appears to define sample size by the # of [full time employees] it has or
wants, rather than by the true risk in the portfolio."[34] The senior examiner, in a reply e-mail that
also copied the senior manager – who never read the memorandum – said:

> [S]taffing [for Freddie Mac] isn't an issue because [Freddie Mac] can hire or use
> vendors, or both. As I said yesterday, if you hire more underwriters, they will pay
> for themselves in the first week. This all goes away in about 2 years, but $billions
> will be lost if nothing is done.[35]

Additional e-mails describing the FHFA senior examiner's concerns were also sent to other
FHFA staff, managers, and senior managers before FHFA approved the Freddie Mac-Bank of
America settlement on December 29, 2010. In a November 23, 2010, e-mail another FHFA
senior manager was advised by the FHFA senior examiner that the concerns involved "billions of
dollars."[36] A December 9, 2010, e-mail commenting on the then-proposed Freddie Mac-Bank of
America settlement observed that "if the agreement goes as is, those losses [on loans not
reviewed] will be Freddie's and the discussion is over," and concluded that "the settlement
number is too low …."[37] And, on the eve of the settlement's approval, a December 28, 2010,
e-mail from the FHFA senior examiner to an OCO staffer again made the same point. It said that

---

[33] Sept. 15, 2010, FHFA Analysis Memorandum, at 4.

[34] Sept. 30, 2010, FHFA e-mail (8:12 AM), Re: IO and OA defaults.

[35] Sept. 30, 2010, FHFA e-mail (9:12 AM), Re: IO and OA defaults.

[36] Nov. 23, 2010, FHFA e-mail, Re: FW: FHFA AM NEWS SUMMARY 11 22 10. That senior manager told
FHFA-OIG that he did not recall knowing that the issue potentially concerned billions of dollars of losses.

[37] Dec. 9, 2010, FHFA e-mail, Re: BoA settlement with Freddie.

Freddie Mac's continued use of its loan review process was a "huge" error, and the resulting losses would be "Freddie's losses, and of course, yours and mine as taxpayers."[38]

e.   *Freddie Mac Reaches a Tentative Repurchase Settlement with Bank of America; Freddie Mac's Internal Auditors Independently Raise Concerns About Freddie Mac's Loan Review Process*

In early December 2010, Freddie Mac management agreed to a tentative settlement of repurchase claim issues with Bank of America.  The tentative settlement was subject to approval by Freddie Mac's board of directors and FHFA.  The settlement, which Bank of America wanted to finalize before the end of the year, required the bank to pay Freddie Mac $1.35 billion in exchange for relinquishment (with limited exceptions) of all pending and future repurchase claims related to 787,000 mortgage loans previously sold to Freddie Mac by Bank of America and Countrywide.

Enterprise management advised Freddie Mac's board of directors that the $1.35 billion figure was a reasonable settlement amount.  The figure was premised on the assumption that Freddie Mac would in the "expected case" likely recover about ███████[39] in repurchase claims from Bank of America from the specified portfolio of mortgage loans.[40]  Freddie Mac management further explained, however, that there was "significant uncertainty" (or significant margin of error) in this figure and that it could vary positively or negatively by ████████████.  Thus, according to Freddie Mac management, a reasonable recovery in the expected case could range from about ██████████████████.[41]  The proposed settlement of $1.35 billion was at the high end of the expected case range.  These calculations incorporated the assumptions underlying Freddie Mac's existing loan review process, as well as revisions to a financial model Freddie Mac developed to estimate repurchase claims exposure.

---

[38] Dec. 28, 2010, FHFA e-mail (12:35 PM), Re: FYI--CW I/Os.

[39] Red text signifies content that FHFA and Freddie Mac claim is confidential financial, proprietary business, or trade secret information that is redacted in the publicly available version of this report.

[40] *Bank of America Repurchase Settlement Proposal* (Dec. 17, 2010), at 3.  The precise figure given to the board of directors was ██████████.

[41] Id.  The board was further informed that the possible recovery from Bank of America in a "stress case" was ████ ████, and that a reasonable recovery in the stress case could range from about ████████████████.  The "stress case" assumed, among other things, a worsening economy to a greater extent than the "expected case," leading to greater numbers of foreclosed loans and greater losses on repurchase claims.

Freddie Mac's board of directors was also told that the settlement had a number of benefits, as follows: [42]

- Because of "uncertainty around estimates," Freddie Mac stood to recover less money if it did not settle and instead continued to pursue repurchase claims;

- The settlement would reduce Freddie Mac's counterparty exposure to Bank of America, which was consistently greater than Freddie Mac's internal risk management policy permitted;

- Lower levels of potential Bank of America counterparty exposure could permit Freddie Mac to do more "capital markets" business with Bank of America (such as issuing MBS and corporate debt);

- "If the counterparty fails," Freddie Mac would have already been paid and the "benefit of representations and warranties [payments would have been] realized before failure;"

- The settlement "[i]mproves [Freddie Mac's] ongoing relationship with Bank of America;"

- The settlement would reduce Freddie Mac's costs associated with reviewing loans for repurchase claims;

- The settlement would be "positive [for Freddie Mac's] current financial results;" and

- The settlement would reduce Freddie Mac's "ongoing litigation [expense] risk of a loan-by-loan enforcement strategy."

In late November and early December 2010, Freddie Mac's internal auditors evaluated the settlement for reasons related to Freddie Mac's counterparty exposure to Bank of America and unrelated to the issues raised by the FHFA senior examiner. During the course of their review,

---

[42] Id. at 5. The board was also told of four risks or "cons" associated with the settlement:

- "Uncertainty about [the internal] estimates could result in losses beyond [the] settlement amount;"

- The "[t]ransfer of credit risk (beyond [the] settlement amount) from Bank of America to Freddie Mac [on settled loans would be] ultimately transferred to the taxpayer;"

- "Low probability of counterparty failure;" and

- Freddie Mac would have to change its internal models to account for the settlement.

the auditors independently questioned Freddie Mac's existing loan review process and documented their questions in a December 14, 2010, memorandum. The memorandum made two recommendations concerning the effect of the loan review process on loans not being reviewed for repurchase claims. Specifically, the internal auditors recommended that Freddie Mac management should:

1. Provide an overview of [Freddie Mac's] current sampling methodology, including a description of the portion of the portfolio that is not sampled; and

2. Quantify the potential risk of loss that is not or was not the subject of sampling pursuant to current and past sampling strategies.[43]

*f.  Freddie Mac Management Responds*

In response to the internal auditors, Freddie Mac management prepared a memorandum (also dated December 14, 2010), which attempted to calculate how much money Freddie Mac would lose by not pursuing repurchase claims on loans that went into foreclosure three to five years after funding. In other words, Freddie Mac attempted to calculate how much it would be "leaving on the table" by not changing its existing loan review process to adjust for the changed circumstances brought about by the housing boom. Freddie Mac management calculated that figure to be in the range of ███████████ in the "expected case."[44] However, Freddie Mac's chief internal auditor observed that a potential ███████ loss, which is at the low end of that range, left little if any of the ███████ margin of error cushion associated with the settlement negotiations discussed above. Any amount greater than ███████ would exceed the margin of error.

In making their calculation, Freddie Mac management did not have time to undertake a fresh study based on a representative sample of the "out-of-sample" loans, as requested by the FHFA senior examiner in June 2010, given the goal of closing the settlement by year-end. Instead, management used existing data collected for another purpose. It relied on a sample of about 2,200 loans drawn from all loan seller/servicers from which Freddie Mac purchased mortgages that had gone through repurchase claim review after having gone into foreclosure more than two

---

[43] Id. at 3.

[44] Dec. 14, 2010, Memorandum from Freddie Mac Senior Management to Freddie Mac's Internal Auditors, at 3. The "expected case" assumed that the economy would worsen slightly. Management further assumed that, in a "stress case," Freddie Mac could expect to recover larger amounts, specifically ███████ – more than double the margin of error.

years after origination.[45]  However, as Freddie Mac internal auditors have acknowledged, the loan sample used by management was not representative.[46]  Among other things, the loans in the Freddie Mac management sample were drawn from all loan sellers, not only the loans found within the Bank of America settlement population.  This represents a significant difference because most of the Bank of America loans in foreclosure were originated by Countrywide, which was among the most aggressive originators of higher-risk, non-traditional loans and whose loans had significantly above-average numbers of defects subject to repurchase claims.[47]

Freddie Mac management also justified its current loan review process under a "business practices" rationale.  Freddie Mac management said that maintaining stable customer relationships that might lead to additional business with loan sellers like Bank of America justified the existing loan review process.  The December 14 memorandum states:

> [T]he sample size is also impacted by our overall business strategy.  Our sampling strategy is considering several goals, including put-backs of defective loans that create losses for the firm, providing incentives for sellers to produce well-underwritten loans, and maintaining stable customer relationships.  For the settlement negotiations with Bank of America, management made a deliberate decision not to consider changes to our sampling procedures.  Hence, the model was built on the assumption that past sampling practices are the best guide for future policies.  While there is always the possibility that sampling policies will change going forward to be either more or less stringent, we did not adjust for these explicitly in evaluating the Bank of America settlement.  However, we do have assumptions in the model that we believe account for potential risk in our valuation, in particular, our capital costs.[48]

In other words, Freddie Mac management asserted that the need to maintain relationships with loan sellers such as Bank of America was a factor weighing against implementing more expansive loan review and repurchase policies.

---

[45] These loans were purportedly a "proxy" for a random sample.  In fact, the loans in question had defaulted three, four, or five years after origination and had good pay histories in the first two post-origination years.  Ordinarily such loans would not be reviewed using Freddie Mac's current loan review process.  This group had been reviewed because Freddie Mac suspected that the loans might be defective (insofar as their values significantly exceeded local averages), but further research had found no evidence of defects.

[46] Freddie Mac notes that this fact was disclosed to its board of directors.

[47] Freddie Mac staff has advised FHFA-OIG that before 2010, Countrywide loans had 50% more representations and warranties violations than the average.

[48] Dec. 14, 2010, Memorandum from Freddie Mac's Senior Management to Freddie Mac's Internal Auditors, at 4.

Freddie Mac's board of directors approved the Bank of America settlement on December 14, 2010.

Freddie Mac's chief internal auditor advised the board of directors that management had "highlighted and quantified the enumerated key risks."[49]  At a December 17, 2010, board meeting, the chief auditor noted that management's estimate of ██████████ (which, as discussed above, was the amount Freddie Mac could lose in the settlement by not changing its loan review process) was "significant."  Given that the proposed settlement allowed only for a ██████████ margin of error in the "expected case," or low range, the auditor told the board that "[f]rom this perspective there was little, if any, cushion, left for model uncertainty, further house price declines or higher severities."  In other words, the auditor regarded management's low estimate to be at or very near the margin of error cushion.  Any estimated amount greater than ██████████ would exceed the margin of error.

g.  *FHFA Staff Reviews and Recommends Approval of the Freddie Mac-Bank of America Settlement*

Starting in early December 2010, FHFA staffers, managers, and senior managers also began to review the proposed settlement.  FHFA senior management summarized their review in a December 28, 2010, memorandum to the Acting Director that recommended he approve the settlement.  The memorandum provided significant detail about the settlement and included the package of materials supplied to the Freddie Mac board of directors prior to their approval of the settlement.  The FHFA memorandum discussed Freddie Mac's and Bank of America's motivations to settle, explained the analysis and corporate governance process conducted by Freddie Mac management, reviewed risk factors, and compared the settlement to other repurchase settlements.  Additionally, one paragraph in the memorandum identified the FHFA senior examiner's concerns about Freddie Mac's loan review process.[50]  The paragraph described the process and noted that the Freddie Mac management had estimated the risk associated with the process to be "quantified in the range of ██████████ in recoveries."  But, as discussed above, Freddie Mac's estimate had been premised on an unrepresentative sample of 2,200 loans, and it effectively equaled or offset the settlement's margin of error.[51]

---

[49] Dec. 14, 2010, Memorandum from Freddie Mac's internal auditor to the board of directors, at 4.  FHFA believed that the auditors had considered Freddie Mac's current loan review process and found it to be "appropriate and reasonable."  Dec. 28, 2010, Memorandum to the Acting Director, Re: Bank of America Recommended Settlement, at 5.  However, according to Freddie Mac's chief internal auditor, the internal auditors did not endorse or disapprove the terms of the settlement.  Rather, they raised concerns about risks associated with the settlement and advised the board of directors that Enterprise management had "highlighted and quantified the enumerated key risks."

[50] Dec. 28, 2010, Memorandum to the Acting Director, Re: Bank of America Recommended Settlement, at 5.

[51] Dec. 28, 2010, Memorandum to the Acting Director, Re: Bank of America Recommended Settlement, at 5.

Prior to conducting the settlement review, FHFA did not test the examiner's concerns (for instance, FHFA did not insist that Freddie Mac management follow through on the promise made in June 2010 to test a representative sample of loans in order to validate the senior examiner's concerns). Instead, the Agency relied on Freddie Mac's loan review process and its analysis of the settlement.

FHFA staff also faced time limitations in light of the goal of closing the settlement by the end of the month.[52] The short timetable affected what could be accomplished. For instance, FHFA staff suggested bringing in an outside expert to assist staff in their review, but FHFA senior management declined to do so because of the goal to finalize the deal by year-end.[53]

h.  *FHFA's Acting Director Suspends All Future Enterprise Repurchase Settlements Pending Further Review; Freddie Mac's Internal Auditors Issue an "Unsatisfactory" Audit Opinion*

FHFA's Acting Director approved the settlement on December 29, 2010. However, after this evaluation began, and on the basis of concerns raised by FHFA-OIG and others about Freddie Mac's loan review process and its impact on repurchase settlements, FHFA suspended, pending further review, all future Enterprise repurchase settlements affected by the methodology underlying Freddie Mac's current loan review process.

Additionally, Freddie Mac's internal auditors continued to examine Freddie Mac's loan review process and, on June 6, 2011, they delivered to Freddie Mac's senior management an opinion that the Enterprise's internal controls associated with its loan review process were "Unsatisfactory."[54] The auditors' report explained that their opinion was "primarily driven by deficiencies noted with the governance, business rationale, and objectives of the [loan review process] and oversight of the … process."

As part of their work, the internal auditors analyzed Freddie Mac-owned loans that were funded in 2005 and were in foreclosure and – like the FHFA senior examiner – observed a sharp

---

[52] For example, a December 24, 2010, e-mail from Freddie Mac to FHFA senior management reiterated:

> BofA wants certainty and we will need your [(FHFA's)] sign-off so we can proceed to finalize everything on Tuesday and sign docs on Tuesday or Wednesday with the settlement, payment and disclosure on Friday the 31st.

Dec. 24, 2010, Freddie Mac e-mail to FHFA (18:55), Re: BofA settlement.

[53] One senior manager told FHFA-OIG that he felt no time pressure to complete the review. However, others have told FHFA-OIG that they believed time pressure had an effect.

[54] June 6, 2011, Freddie Mac Memorandum, Re: Performing Loans Quality Control and Administration Audit (#2011-010), at 1. The opinion addressed the loan review process in general, not the Bank of America settlement in particular.

increase in foreclosures more than two years after origination, along with an equally dramatic fall-off in loan reviews after the second year, as shown in Figure 5 below.

**Figure 5:  Freddie Mac Internal Auditors' Depiction of Default Timing Anomaly**[55]



This observation led the internal auditors (in a June 2011 presentation to the Freddie Mac board of directors) to assert that "[o]pportunities for increasing the repurchase benefit justify an expansion of our sampling approach after year two."[56]

The auditors recommended and management agreed to put additional emphasis on tying loan review methodologies to the volume of foreclosures (to examine larger numbers of currently unreviewed loans) and to "place more emphasis on balancing the customer relationship with the ultimate cost to the company."[57]

Consistent with the internal auditors' findings, the same Freddie Mac senior manager who prepared the Freddie Mac management estimate at the end of 2010 informed the Enterprise's board of directors that he believed Freddie Mac could recover several billion additional dollars by changing its current loan review process.  On May 26, 2011, the senior manager advised the

---

[55] Id. at 9, Fig. 2.

[56] June 3, 2011, Presentation to the Freddie Mac Board of Directors, re: "Repurchase Sampling Strategy," at 3.

[57] June 6, 2011, Freddie Mac Memorandum, Re: Performing Loans Quality Control and Administration Audit (#2011-010), at 1.

board that Freddie Mac may be able to recover from ███████████████ more in future
repurchase efforts through the use of a more expansive loan review process.[58]

In addition, at the continued urging of the FHFA senior examiner, Freddie Mac management
initiated a more statistically rigorous "out-of-sample" test in February 2011.  Management
agreed to sample approximately 1,000 "out-of-sample" Interest Only foreclosed loans originated
during the housing boom era to estimate potential recoveries if a broader loan review process
were employed.  On August 31, 2011, Freddie Mac disclosed to FHFA the draft results from this
study, which indicate that at least 15% of the sample loans – a higher percentage than anticipated
by Freddie Mac management in connection with the Bank of America settlement – contain
apparent representation or warranty defects and therefore are subject to repurchase claim to loan
sellers.[59]  The figure may fall to the extent that loan sellers ultimately cure the defects identified
in some of these loans.  Freddie Mac expects to receive final results from that review in about
three months.

---

[58] May 26, 2011, Freddie Mac Memorandum to Board of Directors, Re: Single-Family Quality Control Process, at 8.
On that day, the senior manager also informed the board that he believes Freddie Mac could lose from ██████████
████████ in new business were it to adopt a more aggressive loan review procedure.  In other words, according to
Freddie Mac's rationale and as a cost-benefit exercise, the senior manager now believes that after deducting those
possible losses from an estimated ██████████████ gain, a change in the loan review strategy would leave
Freddie Mac with $500 million to $1 billion in additional revenue.

[59] August 31, 2011, Freddie Mac Memorandum, Bank of America Settlement Loan Process Assumptions Review, at
6.

# FINDINGS

On the basis of the foregoing record, FHFA-OIG finds that:

## 1. An FHFA Senior Examiner Raised Significant Concerns About Freddie Mac's Loan Review Process for Mortgage Repurchase Claims

As early as June 2010, prior to the Bank of America settlement, an FHFA senior examiner began to raise significant concerns about Freddie Mac's loan review process. Specifically, he noted that loans that Freddie Mac purchased that were originated during the housing boom defaulted at higher than expected rates during the third through fifth years after origination. However, Freddie Mac reviewed intensively only those loans that went into foreclosure or experienced payment problems during the first and second years following origination. As a result, Freddie Mac did not review over 300,000 loans for possible repurchase claims. According to the senior examiner, this could be costing Freddie Mac "billions of dollars of losses." These concerns merited further review of the loan review process in 2010, which was not forthcoming. In support of this finding, FHFA-OIG makes two initial observations.

- First, the concerns raised came from an FHFA senior examiner who had been reviewing Freddie Mac's financial and operational soundness for an extended period and continues to do so. Similar concerns were later independently raised by Freddie Mac's internal auditors.

- Second, the concerns relate to a significant risk (potentially involving substantial monetary losses) that is susceptible to recurrence in the event the Enterprise enters into future repurchase settlements.

FHFA-OIG further notes that the FHFA senior examiner's concerns were consistent with Enterprise data provided to FHFA, both before and after the Bank of America settlement. Specifically, as shown at Figures 2, 3, and 4 above, data indicate a significant shift in the mortgage default patterns on which the Enterprise's traditional loan review process was premised. That is, rather than foreclosures declining two years following their origination, mortgages originated during the housing boom era showed increasing rates of foreclosure during the third through fifth years after origination. In other words, the trend data upon which Freddie Mac's loan review process is premised appear to be at odds with actual foreclosure patterns associated with the 2005 to 2007 vintage loans included in the settlement.

These trends could be unrelated to the higher incidence of mortgage origination defects that might support repurchase claims if, for example, rising unemployment rates related to the

lingering recession caused more borrowers to default on their prime loans and led to increased home foreclosure rates.  On the other hand, data demonstrate that many of the foreclosures of loans originated during the housing boom era appear to involve non-traditional loans, which appear to contain significant percentages of underwriting defects supporting repurchase claims.  In any event, FHFA did not test issues related to the senior examiner's concerns prior to approving the Freddie Mac-Bank of America settlement.

Freddie Mac's internal auditors independently raised concerns in late 2010.  In late November and early December 2010, Freddie Mac's internal auditors evaluated the Bank of America settlement for reasons unrelated to the senior examiner's actions, and, in connection with their evaluation, they too raised questions about the loan review process.

## 2. FHFA Did Not Timely Act on or Test the Ramifications of the Senior Examiner's Concerns; Consequently, FHFA May Have Incorrectly Estimated the Risk of Loss to Freddie Mac Before Approving the Bank of America Settlement

FHFA, acting as the conservator of the Enterprises, has established a procedure under which it reviews all Enterprise settlements of more than $50 million to ensure that they preserve and conserve Enterprise assets and are in the best interests of taxpayers.  FHFA-OIG finds that senior FHFA management did not timely act on or test the ramifications of the FHFA senior examiner's concerns prior to approving the settlement, even though one dozen FHFA staffers, managers, and senior managers were aware of the concerns over a six-month period, as detailed below and as reflected in Appendix D.  FHFA has advised FHFA-OIG that the senior examiner did not raise his concerns in the context of the normal FHFA examination process.  However, the record is clear that his concerns were known to FHFA management and senior management well in advance of the completion of the settlement.  For example:

- The FHFA senior examiner repeatedly raised concerns about Freddie Mac's loan review process with his direct supervisors (two managers who report to a senior manager) within DER in regular meetings throughout 2010.  These direct supervisors did not follow up on or provide organizational support to substantiate these concerns.

- The FHFA senior examiner alerted two FHFA senior managers to the inaction of his direct supervisors.

- Two managers (a senior manager and a manager) acknowledged that they had reviewed the September 15, 2011, Analysis Memorandum, but they did not remember that the issue could potentially involve substantial losses to Freddie Mac.

FHFA-OIG did not independently validate Freddie Mac's existing loan review process and therefore does not reach any final conclusion about it.  Nevertheless, by relying on Freddie Mac's analysis of the settlement without testing the assumptions underlying Freddie Mac's existing loan review process, FHFA senior managers may have inaccurately estimated the risk of loss to Freddie Mac.  FHFA relied on a Freddie Mac management estimate that the Enterprise was forgoing no more than ████████████████ by continuing to employ its current loan review process.  That estimate was open to question because, among other reasons – and as Freddie Mac's internal auditors acknowledged, the ██████████ projected loss, which was at the low end of that estimate, left little if any cushion or margin of error, and the estimate itself was based on an unrepresentative sample of loans.

### 3.  FHFA's Decision to Suspend Approval of Additional Repurchase Settlements and Freddie Mac's Continuing Efforts to Address the Concerns Are Positive Steps

After FHFA-OIG initiated this evaluation, FHFA suspended further Enterprise mortgage repurchase settlements that are premised on Freddie Mac's current loan review process.  That is a positive step, and it may help FHFA better assure that any future repurchase claim settlements benefit the Enterprises and taxpayers.

In addition, since the close of the Bank of America settlement, Freddie Mac's internal auditors have continued to examine the matter and on June 6, 2011, issued an "Unsatisfactory" audit opinion concerning the internal corporate governance controls involving the loan review process. In response to that opinion, Freddie Mac management agreed to perform "out-of-sample" testing of loans not currently reviewed for repurchase claims.  Freddie Mac management commenced such testing before the opinion was issued.  In February 2011, at the urging of the FHFA senior examiner, management agreed to review a sample of 1,000 Interest Only loans originated during the housing boom that went into foreclosure more than two years after origination.  The draft results from that sample were disclosed to FHFA on August 31, 2011, and they revealed that at least 15% of such loans – a higher percentage than anticipated by Freddie Mac management in connection with the Bank of America settlement – include representations and warranties defects and are subject to repurchase claims to loan sellers.  However, the final repurchase rate may be lower.  Final results are expected in about three months.

Moreover, as discussed in footnote 58 and accompanying text, on May 26, 2011, a Freddie Mac senior manager – who provided management estimates to the Freddie Mac board of directors in late 2010 – advised the board of directors that the Enterprise could recover from $500 million to $1 billion net in additional revenue through the use of a more expansive loan review process.

# CONCLUSIONS

FHFA-OIG encourages FHFA and Freddie Mac to continue their efforts to gauge the impact of the default anomaly associated with housing boom loans and to take remedial actions to address problems identified. This evaluation reveals a lack of independent action by FHFA senior management, which may have led and could lead to significant losses by Freddie Mac. Had FHFA senior management required testing of the concerns raised by an FHFA senior examiner, FHFA may have been in a better position to evaluate Freddie Mac's repurchase claim settlement with Bank of America.

In the aftermath of the settlement, FHFA has suspended approving similar Enterprise repurchase claim settlements pending further review. Moreover, Freddie Mac's internal auditors continue to assess the issue, and Freddie Mac management has agreed to actions to resolve the concerns.

# RECOMMENDATIONS

FHFA-OIG makes two recommendations:

1. **FHFA and its senior management must promptly act on the significant concerns raised about the loan review process.**

To ensure that Freddie Mac is maximizing its repurchase claim recoveries:

- FHFA should continue to withhold approval of Freddie Mac repurchase settlements until such time as it is confident that the concerns about the Enterprise's loan review process have been resolved.

- FHFA senior management should ensure that Freddie Mac management resolves the concerns that prompted their internal auditors to issue an "Unsatisfactory" audit opinion.

- FHFA senior management should oversee Freddie Mac's "out-of-sample" loan testing and consider independently validating the testing.

- FHFA should evaluate whether Fannie Mae and Freddie Mac should adopt consistent review practices for repurchase claims.

12-12020-mg    Doc 3208-3    Filed 03/12/13    Entered 03/12/13 00:00:34    Exhibit 3
Pg 103 of 110

- FHFA senior management should initiate an independent assessment of Enterprise repurchase practices in order to ensure that they are maximizing their repurchase claim recoveries.

- FHFA should issue internal guidance regarding its handling of future repurchase settlements, should they arise.

**2. FHFA must promptly initiate management reforms to ensure more generally that senior management is apprised of and timely acts on significant concerns brought to its attention.**

FHFA senior management must immediately initiate reforms to avoid the kind of management process shortcomings identified in this evaluation. In particular:

- Direct supervisors must properly and timely address and act upon significant concerns brought to their attention (i.e., resolve or elevate issues that pose significant potential risks or document decisions not to do so).

- Senior managers, regardless of their position within FHFA, must timely address and act on significant concerns, particularly when they receive reports that the normal reporting and supervisory process is not working properly.

FHFA's Acting Director must establish appropriate goals, principles, and procedures at the top of the FHFA organization to guarantee that significant concerns are properly and timely addressed and acted upon.

# SCOPE AND METHODOLOGY

To conduct this evaluation FHFA-OIG staff requested and reviewed FHFA and Freddie Mac documents, including e-mails associated with Freddie Mac's settlement with Bank of America. In addition, FHFA-OIG interviewed FHFA senior management and staff, as well as current and former Freddie Mac senior managers.

FHFA-OIG reviewed HERA, FHFA regulations, and internal policies.  FHFA-OIG also obtained and reviewed publicly available data.

This evaluation was conducted under the authority of the Inspector General Act of 1978, as amended, and in accordance with the Quality Standards for Inspection and Evaluation (January 2011), which have been promulgated by the Council of Inspectors General on Integrity and Efficiency.  These standards, which are generally adopted by federal agencies, require FHFA-OIG to plan and perform evaluations so as to obtain evidence sufficient to provide reasonable bases to support findings and conclusions.

The performance period for this evaluation was from January 1, 2011, to August 30, 2011.

FHFA-OIG provided the Acting Director and FHFA senior management with briefings on this evaluation, as well as the opportunity to comment officially on the draft version of this report.

FHFA-OIG appreciates the efforts of FHFA and Freddie Mac management and staff in providing the information necessary to complete this evaluation.

# APPENDIX A

## FHFA Management Comments



### Federal Housing Finance Agency

**MEMORANDUM**

TO:        Richard Parker
            Deputy Inspector General for Evaluations (Acting)

FROM:     Jeffrey S. Spohn
            Senior Associate Director, Conservatorship Operations

SUBJECT:  FHFA Comments on Draft Report "Evaluation of FHFA's Oversight of Freddie
            Mac's Repurchase Settlement with Bank of America"

DATE:      September 19, 2011

Thank you for the opportunity to provide formal agency comments on the subject report. After
months of review regarding this particular transaction, FHFA has not changed its view that the
settlement reached in late December was appropriate and reasonable.

FHFA and Freddie Mac have previously provided numerous technical comments, corrections,
and additional documentation to the Office of Inspector General (OIG) during the report review
process. While we appreciate the opportunity afforded by these exchanges, FHFA does not
concur with all the inferences made and concerns raised in the report.

Given the extensive feedback provided by FHFA during the development of this report, in this
formal comment letter FHFA limits its response to providing the agency's comments on the
findings and recommendations contained in the report.

**Finding One:** *An FHFA Senior Examiner Raised Significant Concerns About Freddie Mac's
Loan Review Process for Mortgage Repurchase Claims*

There is no disagreement that a senior examiner in charge of examination activity involving
Freddie Mac's loan review process for non-performing loans expressed concerns regarding the
adequacy of that process for two types of mortgages. As part of regular examination activity,
about six months before the repurchase agreements were finalized and before they were being
negotiated, that FHFA senior examiner questioned Freddie Mac on a specific aspect of its loan
review process for non-performing loans and outlined a hypothesis that, if proven correct, would
suggest that the review process was inadequate for these two mortgage types. The follow-up (or
lack thereof) that ensued, and the implications of this series of events for the completeness of the
information available to FHFA and Freddie Mac at the time of the repurchase agreement with
Bank of America is the principal subject of this report.

September 19, 2011    Page **2** of **3**

Freddie Mac (like Fannie Mae) has had a long-standing business practice built on past experience of sampling defaulted mortgages. The business objective of the loan review process for non-performing loans is primarily to understand why loans go into default (particularly early payment defaults) and secondarily, to assess whether the loan sold to Freddie Mac complied with contractual requirements at the time the loan was originated. Defects related to non-compliance with contractual terms may be grounds under Freddie Mac's contract to request the loan seller to repurchase the mortgage at par, which has the effect of shifting the loss on the defaulted loan from Freddie Mac to the loan seller.

Long-standing business practice has been that reviews of non-performing loans focus principally, but not exclusively, on mortgages that default in the first few years. This business practice stems from the belief that defaults that occur in the first few years provide the best opportunity to learn why loans go into default, while most later defaults are likely to be unrelated to manufacturing defects (they more typically reflect life events of the borrower such as unemployment, divorce, or health issues) and manufacturing defects become harder to prove with the passage of time.

The senior examiner asserted a hypothesis that a certain class of higher risk mortgages – namely interest-only mortgages and pay-option adjustable rate mortgages – had loan repayment characteristics that differed from traditional mortgages, which could increase the likelihood of discovering contractual violations resulting in defaults occurring later in the life of the mortgage. Therefore, the examiner believed that Freddie Mac should alter its sampling methodology for these specific loans by reviewing more loans that default in later years.

Mortgage defaults do not equate to a basis for repurchase requests, but they may be a reason to examine a loan for possible contractual violations. This is not about the riskiness of the loans but about contractual violations at the time of loan origination.

**Finding Two:** *FHFA Did Not Timely Act on and Did No Testing of the Senior Examiner's Concerns; Consequently FHFA May Have Incorrectly Calculated the Risk of Loss to Freddie Mac Before Approving the Bank of America Settlement*

OIG concludes that Freddie Mac did not timely agree to fully test its loan review process regarding the two loan types at the request of the senior examiner and that FHFA managers were slow to support the senior examiner's request for such testing. FHFA does not share this interpretation, but we agree that there are areas for improvement for FHFA.

FHFA has determined from the issues raised by OIG that the agency lacks sufficient policies and procedures guiding examiners and managers in situations where an examiner has a safety and soundness concern but perceives resistance from a regulated entity in pursuing such concerns. FHFA has also concluded that it needs to instruct its managers on working with examiners to bring such issues to closure. As a result of OIG's work on this report and our self-identification of this as a matter to be addressed, the FHFA Acting Director has instructed that such policies and procedures be developed and implemented quickly. This is in harmony with OIG's second recommendation and the agency's work to implement this remediation is nearly complete.

**Finding Three:** *FHFA's Decision to Suspend Approval of Additional Repurchase Settlements and Freddie Mac's Continuing Efforts to Address the Concerns Are Positive Steps*

The topics and events covered under this finding, including actions by FHFA and Freddie Mac and internal audit work at Freddie Mac, reflect activities that took place in 2011 and thus are not associated with the repurchase agreement with Bank of America in late 2010. Rather, they involve continued and additional questions involving loan quality reviews by Freddie Mac.

Discussions between FHFA and Freddie Mac following the Bank of America agreement turned to broader questions of Freddie Mac's loan purchase review practices, beyond interest-only and pay-option mortgages that had been the concern of the senior examiner. Freddie Mac agreed to undertake a broader review of its sampling methodology and FHFA suspended certain future repurchase agreements pending the outcome of this review. In June 2011, nearly six months after the agreement with Bank of America, Freddie Mac's internal audit department issued an audit opinion that raised issues with the governance process employed by Freddie Mac in its sampling methodology (not the sampling methodology itself) and the company is addressing those issues now under FHFA oversight. Of course, FHFA had already taken its action to suspend certain future agreements several months earlier and Freddie Mac had already been studying the issue. That work continues today.

**OIG Draft Recommendations**

OIG makes two recommendations in the draft report.

1. *FHFA and its senior management must promptly act on the significant concerns raised about the loan review process.*

FHFA agrees in principle with the recommendation but not with each of the specific action steps outlined in the report. Specifically, given the considerable amount of ongoing review regarding loan sampling, FHFA believes that action in support of this recommendation is already well underway. This work involves both the original issue raised by the senior examiner – unique sampling issues involving interest-only loans and pay-option mortgages – and a broader set of policy questions regarding loan sampling raised earlier in 2011 by FHFA and by Freddie Mac.

2. *FHFA must promptly initiate management reforms to ensure more generally that senior management is apprised of and timely acts on significant concerns brought to its attention.*

FHFA agrees with the recommendation. As indicated above, FHFA is developing and will soon issue policies and procedures to its examiners and managers regarding the agency's expectations for how to raise and resolve critical safety and soundness concerns that arise in the course of examination work. The goal is to establish greater clarity regarding the agency's expectations for both examiners and managers when an examiner or manager believes there is a critical safety and soundness issue that has not been, and cannot be, resolved through normal examination and supervision procedures.

# APPENDIX B

## FHFA-OIG Responses to FHFA Management Comments

FHFA-OIG is pleased that FHFA has agreed to its recommendations and is already taking actions to address them.

With respect to the first recommendation on the loan review process, although FHFA accepts it in principle, it does not agree with each of the specific action steps outlined in the report.  At the same time, FHFA has not proposed a specific action plan of its own.  Under the circumstances, FHFA-OIG will continue to monitor the issues discussed in this report and the actions that FHFA is taking.

12-12020-mg Doc 320-8 Filed 06/11/12 Entered 06/12/12 00:00:34 Exhibit 8
Pg 108 of 110

# APPENDIX C

## Timeline of Relevant Events

2010

**March**: FHFA senior examiner notices shifts in foreclosure patterns among 2005-2007 vintage home loans

**June**: FHFA examination staff discuss shifts in foreclosure patterns with Freddie Mac managers

**July**: Citing resource constraints and senior management opposition, Freddie Mac managers decline to review their methodology for selecting loans to examine for repurchase claims

**September**: FHFA senior manager details concerns in a four-page memo and circulates to FHFA managers and senior managers

**December**: Freddie Mac and Bank of America agree upon terms of repurchase settlement; Freddie Mac internal auditors raise concerns about loan review process; in response, Freddie Mac management provides justification for existing process

**December**: Additional FHFA staff raise loan review process concerns; FHFA Acting Director approves settlement

2011

**January**: Settlement announced; FHFA-OIG begins review

**June**: Freddie Mac internal auditors deliver opinion that the Enterprises' corporate governance controls are "Unsatisfactory" concerning the loan review process



12-12020-mg   Doc 3607-3   Filed 05/06/13   Entered 05/06/13 16:23:31   Exhibit 3
Pg 109 of 110

# APPENDIX D

## Timeline of When FHFA Staff Were Alerted to Concerns[61]



---

[61] For the purpose of this timeline and evaluation, FHFA staffers and senior examiners report to managers; managers report to senior managers; and senior managers report to the FHFA Acting Director.

12-12020-mg    Doc 3607-3    Filed 05/06/13    Entered 05/06/13 16:23:31    Exhibit 3
Pg 110 of 110

# ADDITIONAL INFORMATION AND COPIES

For additional copies of this report:

- Call the Office of Inspector General (OIG) at:  202-408-2544

- Fax your request to:  202-445-2075

- Visit the OIG website at:  www.fhfaoig.gov

To report alleged fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

- Call our Hotline at:  1-800-793-7724

- Fax the complaint directly to:  202-445-2075

- E-mail us at:  oighotline@fhfa.gov

- Write to us at:  FHFA Office of Inspector General
  Attn:  Office of Investigation – Hotline
  1625 Eye Street, NW
  Washington, DC  20006-4001