# Exhibit 2

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

Debtors

-----------------------------------------------

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

-----------------------------------------------

DEPOSITION OF CLIFFORD ROSSI

DATE: December 19, 2012

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915

TRANSCRIPT of the deposition, said
deposition being conducted pursuant to Rules
Governing Civil Practice in the Superior Court
of New Jersey, by and before MARK IUZZOLINO,
Certified Shorthand Reporter, License No.
X101103, at the offices of Morrison & Foerster,
LLP, 1290 6th Avenue, New York, NY, on December
19, 2012, commencing at 10:36 a.m.

1        A.    I do.

2        Q.    What do you teach, sir?

3        A.    I teach masters-level courses in bank

4    management, another course on derivatives

5    pricing, and a third course on corporate risk

6    management, which is really hedging using

7    derivatives.

8        Q.    Okay.  Have you ever taught any other

9    courses at the school?

10       A.    I have.  I have taught on occasion

11   some courses, for example, in our executive MBA

12   program, which would include -- for example, we

13   had a group from the China Development Bank

14   over in which it was all about risk management,

15   best practices in risk management, this past

16   summer.  I was the academic been director for

17   that as well as an instructor, and we covered a

18   variety of different technical and nontechnical

19   aspects of things, such as what good governance

20   would be from a risk management standpoint as

21   well as various credit techniques which you

22   would use in assessing creditors.

23       Q.    How long did that teaching experience

24   last, the one you just testified to?

25       A.    That has gone -- that one course went

1    for two weeks.  They were over here for two

2    weeks.

3        Q.    And how many people were in the

4    audience for your presentations?

5        A.    They brought around 30.

6        Q.    Okay.  And that particular

7    curriculum, have you ever otherwise taught

8    anybody that curriculum?

9        A.    Not that curriculum.

10       Q.    Okay.  Have you, other than you

11   already testified, taught any other subjects

12   either at your present school or any other

13   school or university?

14       A.    I had been an adjunct -- and I think

15   that's on my CV that was provided -- for about

16   eight years when I was working full time at

17   Freddie Mac, and during that time I taught a

18   course on asset-backed securitization, but that

19   would be, to my recollection, the only other

20   one that I've taught.

21       Q.    Okay.  And when did you teach that

22   course?

23       A.    I believe that would have been -- it

24   was certainly prior to 2000 but I can't be more

25   specific than that.

1       review certain documents.

2       A.   I will follow my counsel's advice and

3   not respond.

4           MR. PRINCI:  So I'm going to need to

5       know in order to be able to understand his

6       expert opinion what his decision-making

7       process was in connection with his

8       analysis.  So I'm going to need an answer

9       to that question.  I'm going to ask

10      again -- and you can instruct him not to

11      answer and he can take your at advice or

12      not.  But I just want to be clear what

13      question I need to have answered.

14      Q.   Who made the decision as to the

15  information that you received and reviewed?

16          That choice of information, who made

17  the decision that you should review that

18  information?

19          MR. SIDMAN:  Objection.

20          Let's go off the record for one

21      second because I want to make sure I

22      understand.

23          MR. PRINCI:  Sure.

24          MR. SIDMAN:  I'm just going to talk

25      to my witness outside.

1          MR. PRINCI:  Sure.

2                    (There is a recess taken.)

3                    (Counsel requests the

4          reading of the following testimony:

5      Q.   Who made the decision as to the

6  information that you received and reviewed?

7          That choice of information, who made

8  the decision that you should review that

9  information?)

10     A.   And the answer is Jones Day.

11     Q.   Okay.  There's an Exhibit B to

12 your -- to your report that has a list of -- it

13 says it's a list of all the information that

14 you reviewed.

15          Is that, in fact, all the information

16 that you reviewed?

17          MR. SIDMAN:  Objection.

18          Exhibit B is not here in front of us.

19     The witness doesn't have a copy of it.

20          But if you can answer the question

21     based on your understanding of the

22     report --

23     Q.   I don't want -- if you're

24 uncomfortable with that without the document in

25 front of you, I'll put the document in front of

57

1    listed in Exhibit B."

2            Do you see that?

3       A.    I see it.

4       Q.    And Rossi 2 is Exhibit B.  Okay?

5            And my question is:  Are there any

6    other documents that you reviewed or relied

7    upon in connection with formulating the

8    opinions you express in your report, other than

9    what's in Exhibit B and also Exhibit A, which

10   is the OCC report.

11      A.    Right.  I see the publicly available

12   documents.  That was the only caveat I was

13   going to make.

14      Q.    Okay.

15      A.    So these are the documents I

16   reviewed.

17      Q.    And again, this is a list of

18   information that Jones Day decided to send you.

19   Correct?

20      A.    Correct.

21      Q.    Okay.  So going back to paragraph

22   one, you say you were asked to assess the

23   process.

24            What standard did you use to assess

25   the process?

1        MR. SIDMAN:  Objection.

2        A.    In part, I used as a standard to

3   assess the process, since -- since I was being

4   asked to look at this, included the materials

5   that you saw in there, certainly the Office of

6   the Comptroller of the Currency, information

7   that was provided on board of directors was

8   a -- was and is an important guidepost for best

9   practices and board performance.  As it relates

10  to issues that I call out with respect to risk

11  governance, those are largely drawn from a

12  combination of just professional experience at

13  senior-level positions that I've held and

14  having interacted with many senior-level

15  executive risk executives in the financial

16  services for many years.

17       Q.    Okay.  So correct me if I'm wrong,

18  the standards you used came from the guidance

19  you got from the OCC report and your

20  professional experience.  Correct?

21       A.    Right.

22       MR. SIDMAN:  Objection.

23       Q.    And was there any other standard that

24  you used to assess the process?

25       A.    I do call out in the document, for

1   example, some information relating to

2   PricewaterhouseCoopers' document, which was a

3   survey of board members.  And I used that as

4   part of my standard in relating to the timing

5   of certain matters with respect to board

6   deliberations on this issue.

7       Q.   And other than that, was there any

8   other standard you used to assess the process?

9            MR. SIDMAN:  Objection.

10      A.   I believe I've just described what I

11  used, yes.

12      Q.   And how long did it take you to

13  assess the process?

14      A.   Well, certainly less than 100 hours.

15           I'm not sure.  But I do know that it

16  was -- that I had a lot of material to go

17  through and consider.

18      Q.   Okay.  What percent of the 100 hours

19  do you think is fairly attributable to your

20  assessing the process?

21           MR. SIDMAN:  Objection.

22      A.   I would say approximately two-thirds

23  to three-quarters of the time.

24      Q.   Okay.  Other than reviewing the

25  information that Jones Day provided you, did

73

1          MR. SIDMAN:  Objection.

2     A.    Something other than this case and I

3 can't recall what it was, but it was not this

4 case that prompted me to prepare this.

5     Q.    Okay.  Is all the information in this

6 CV true?

7     A.    Yes.

8     Q.    Have you ever been a member of a

9 board of directors?

10    A.    I have been a member of a board of

11 directors.

12    Q.    And how many?

13    A.    I believe two.

14    Q.    What are the names of those entities

15 on whose boards you sat?

16    A.    Yes.

17         MR. SIDMAN:  Objection.

18    A.    The first was Washington Mutual.  It

19 was a subsidiary board of the company, I

20 believe.  And the other was Citigroup.  And I

21 believe it was CitiMortgage, again subsidiary

22 board.

23    Q.    Do you remember the name of the

24 entity that was affiliated with WaMu on whose

25 board you sat?

74

1           MR. SIDMAN:  Objection.

2      A.   It's been awhile and I don't believe

3 I recall specifically.

4      Q.   Okay.  Do you recall when you were

5 named to that company's board?

6      A.   I recall it may have been within the

7 first couple of months of my arrival at

8 Washington Mutual.  So it might have been

9 sometime in early 2007.

10      Q.   Okay.  And how long did you sit on

11 that board?

12      A.   I believe I was on that board for

13 several months until my departure for

14 Citigroup.

15      Q.   Okay.  And do you recall what type of

16 corporate entity that company was whose board

17 you sat on?

18           MR. SIDMAN:  Objection.

19      A.   It was -- I believe it was a mortgage

20 company.

21      Q.   Mortgage company.

22           Was it a corporation?

23      A.   I don't recall.

24      Q.   Do you recall if it was a limited

25 liability company?

1      A.    I do not recall.

2      Q.    Do you recall if it was a regulated

3   bank?

4      A.    Not sure.  Don't recall.

5      Q.    Okay.  Do you recall how many board

6   meetings you attended as a member of that

7   board?

8      A.    I don't recall.

9      Q.    Do you recall any decisions that that

10  board made?

11     A.    Not off the top of my head.

12     Q.    Do you recall any issues you

13  considered as a board member of that board?

14     A.    Not -- no, not off the top of my

15  head.

16     Q.    Okay.  Do you recall how much time

17  you spent as a board member for that board?

18     A.    I do not.

19     Q.    Okay.  Can I take it from your lack

20  of recollection that it wasn't a significant

21  engagement, if you will?

22          MR. SIDMAN:  Objection.

23     A.    It certainly was significant from the

24  standpoint that they were naming me as a

25  corporate officer of Washington Mutual to sit

1    on there, but let's face it, it's been over

2    five years and several institutions since then.

3        Q.    Understood.  So you wouldn't have

4    from that experience a fresh recollection of

5    those particulars.  Correct?

6        A.    That is correct.

7        Q.    Do you remember -- excuse me.

8            Do you know the name of the Citigroup

9    affiliated entity on whose board you sat?

10       A.    I believe it would have been related

11   to CitiMortgage.  It was one of the four

12   business interviews over which I saw this for

13   the consumer lending group.

14       Q.    Is that the name of the company,

15   CitiMortgage?

16       A.    Yes.

17       Q.    And are you aware of whether at the

18   time you sat on this board it was a

19   corporation?

20       A.    I didn't pay too much attention,

21   quite honestly, to the legal vehicle and

22   structure of it.  Just knew that I needed to --

23   I was being asked to sit on that board.

24       Q.    So, to your understanding, the nature

25   of the corporate vehicle wasn't important,

1   risk officer, and because of changes that were

2   ongoing with the organization at the time, I

3   wound up overseeing risk for their global

4   mortgage portfolio, which also included

5   CitiMortgage and CitiFinancial.  So at that

6   time, which would have been in the last six

7   months of my tenure, I removed myself or I no

8   longer was a part of that board.

9        Q.   So how long a period were you not on

10   the board during that tenure?

11        A.   Yeah, I'm thinking it was about a

12   year.

13             MR. SIDMAN:  Objection.

14        Q.   So all in, how long were you on the

15   board, to the best of your recollection?

16             MR. SIDMAN:  Objection.

17        A.   About a year.

18        Q.   And during that year when you sat on

19   the CitiMortgage board, how many board meetings

20   did you attend?

21        A.   I think these board meetings were

22   quarterly board meetings.

23        Q.   So approximately four?

24        A.   Approximately.

25        Q.   And as a member of the board were you

1  involved in the issuance of any board

2  resolutions?

3      A.   We were -- I'm not sure that I can --

4  could you define "resolutions"?

5      Q.   Sure.  It's a decision by the board.

6      A.   Right.  Oh, sure, we definitely had a

7  number of decisions that we would be asked to

8  opine on and approve.

9      Q.   Okay.  Do you recall how many such

10 decisions were made during your tenure?

11     A.   Gosh, I would not know how many that

12 we actually looked at each one of those

13 meetings.

14     Q.   Do you recall ever being given a

15 draft of board resolutions?

16         MR. SIDMAN:  Objection.

17     A.   When you say "a draft," meaning to

18 evaluate a head of the actual meeting or are

19 you actually talking about after the meeting?

20     Q.   Before it became the resolution of

21 the board.

22     A.   I see.  Yes, I believe we received

23 materials ahead of time.

24     Q.   Okay.  Do you recall approximately

25 how many board resolutions, that is

80

1   memorialized decisions of that board, were

2   issued during your tenure?

3          MR. SIDMAN:  Objection.

4      A.   Again, I think I need a clarification

5   on this --

6      Q.   Sure.

7      A.   -- because it almost sounds like

8   you're asking that same question from earlier,

9   which is how many resolutions did I actually

10  see when I was on the board.  Is that correct?

11     Q.   How many do you recall that the board

12  issued?

13     A.   I don't recall.

14     Q.   Do you recall how much time you

15  invested as a board member?

16         MR. SIDMAN:  Objection.

17     A.   It was not my primary responsibility.

18     Q.   What was, by the way?

19         MR. SIDMAN:  Objection.

20     A.   At that time, being chief risk

21  officer for the consumer lending group -- US

22  consumer lending group.

23         I would certainly say it was small

24  compared to the rest of my responsibilities

25  because we were meeting only quarterly.

1       Q.    Now, going back to WaMu, that

2    affiliate board you sat on, do you know what

3    state's law governed your actions as a board

4    member?

5              MR. SIDMAN:  Objection.

6       A.    It has been so many years, I could

7    not tell you.

8       Q.    Same question with respect to

9    CitiMortgage.

10             MR. SIDMAN:  Objection.

11      A.    I would be in the same camp there,

12   too.

13      Q.    Understood.  Now, is it your

14   understanding that a director's duties are

15   governed by the law of the state in which the

16   corporation is either registered or

17   incorporated?

18             MR. SIDMAN:  Objection.  Calls for a

19        legal conclusion.

20      A.    Yeah, I -- I'm not a legal scholar on

21   these matters --

22      Q.    Understood.

23      A.    -- so I'm not sure I'd be providing

24   you with a reasonable answer because I simply

25   don't know.

82

1      Q.   Okay.  So your lack of understanding

2   of this is such that you can't answer that

3   question?

4           MR. SIDMAN:  Objection.

5      A.   I'm not saying that.  I'm just saying

6   I don't think for me to render a legal opinion

7   on this matter probably makes the most sense.

8      Q.   Okay.  I'm not asking for your view

9   on that, first, and second of all, I'm asking

10   for your understanding.  So let me just give

11   you the question again.

12           Is it your understanding that a

13   director's duties are governed by the laws of

14   the state in which the -- the company on whose

15   board that person sits is registered or

16   incorporated?

17           MR. SIDMAN:  Same objection.

18      A.   Since you're asking me that question,

19   and we've covered this territory, I'll say

20   that's my general understanding.

21      Q.   What's your general understanding

22   based on?

23      A.   My general understanding is based on

24   materials that would have been provided to me

25   at the time I would have been involved.

84

1    just say this:  By the time I left Washington

2    Mutual, it was still an on going concern, so I

3    do not know.

4         Q.    During your tenure on the WaMu

5    affiliate board, did that board ever consider

6    the filing for Chapter 11 protection of that

7    company?

8         A.    I certainly do not recall that at any

9    time I was on board.

10        Q.    Same question with respect to

11   CitiMortgage.

12        A.    And I do not recall that they were

13   ever involved with any deliberations on Chapter

14   11 during my tenure.

15        Q.    During your tenure on the Washington

16   Mutual affiliate board, did that board ever

17   consider whether to settle a lawsuit or any

18   threatened litigation?

19             MR. SIDMAN:  Objection.

20        A.    I don't recall.

21        Q.    Same question with CitiMortgage.

22        A.    I recall vaguely that there were

23   discussions regarding put-back requests that

24   CitiMortgage was making upon other sellers that

25   it had received loans from, but it's vague.

1          Q.    Okay.  And in that regard, did -- do

2    you recall whether the board considered whether

3    to settle any lawsuit or any threatened

4    litigation?

5          MR. SIDMAN:   Objection.

6          A.    I'm not -- I don't recall that --

7    that that was discussed.

8          Q.    Other than board meetings associated

9    with the WaMu affiliate with CitiMortgage, have

10   you ever otherwise attended a meeting of a

11   board of directors?

12         A.    Yes.

13         Q.    And of what company?

14         A.    Of Countrywide.

15         Q.    And which Countrywide entity, sir?

16         A.    Both Countrywide Bank as well as

17   Countrywide Financial.

18         Q.    On how many occasions did you attend

19   any such board meetings?

20         A.    These meetings were quarterly as

21   chief credit and then chief risk officer of

22   Countrywide Bank.  I was management liaison to

23   Countrywide Bank, that was -- which was the

24   wholly-owned subsidiary of Countrywide

25   Financial, and I would have appeared at each

1    subject that you addressed at those board

2    meetings?

3           MR. SIDMAN:  Objection.

4      A.   My -- the subject that I was focused

5    on, given my role there, was on risk

6    management.

7           And let me just, again, state very

8    clearly for the record, I had that same role at

9    Washington Mutual.  I was management liaison to

10   the Washington Mutual board credit

11   subcommittee -- finance and credit

12   subcommittee.

13     Q.   Understood.  Have you ever been

14   retained to advise a board of director on how

15   to conduct himself in the fulfillment of that

16   person's board obligations?

17          MR. SIDMAN:  Objection.

18     A.   I have not.

19     Q.   Have you ever been retained by

20   anybody to provide advice regarding how a board

21   director should conduct themselves in

22   fulfillment of their board obligations?

23          MR. SIDMAN:  Objection.

24     A.   No.

25     Q.   Have you ever been a decision maker

88

1    in connection with whether a lawsuit or a

2    threatened lawsuit should be settled?

3            MR. SIDMAN:  Objection.

4        A.   I -- I'm not sure, simply because the

5    passage of time at several of those

6    institutions that we just mentioned,

7    Countrywide, Washington Mutual and Citigroup,

8    has been a while ago.  So I don't want to say

9    yes.  I'm not sure.

10       Q.   But certainly, as you sit here today,

11   you don't have any recollection of that.

12   Correct?

13       A.   One way or the other.

14       Q.   Correct.

15       A.   Correct.

16           MR. PRINCI:  Let me take another five

17       minutes.

18           THE WITNESS:  Sounds good.

19                   (There is a recess taken.)

20   BY MR. PRINCI

21       Q.   Mr. Rossi, have you ever been

22   involved in any other capacity in the decision

23   as to whether to settle a lawsuit or a

24   threatened litigation?

25       A.   I can say that, for example, at

89

1    Countrywide, in sitting at various management

2    committee meetings -- senior management

3    committee meetings we had discussed aspects

4    relating to GSE repurchase demands at times

5    made by Countrywide -- made by one of the GSEs

6    with respect to Countrywide Financial.

7        Q.    And in that regard, did you get

8    involved in a discussion as to whether to

9    settle a lawsuit or a threatened litigation?

10        MR. SIDMAN:    Objection.

11        A.    What I got involved with was a matter

12    which would -- if you want to refer to one of

13    the GSE's repurchase demands from the

14    standpoint of a settlement, however you want to

15    refer to it, it was to that extent only.

16        Q.    When was this?

17        A.    This would have been around the

18    latter -- maybe the latter part of my tenure.

19    I think around 2007.

20        Q.    Okay.    Which GSE?

21        A.    Fannie Mae.

22        Q.    What were they seeking from

23    Countrywide?

24        A.    They were seeking repurchase of some

25    loans that had been sold to Fannie Mae by

1    Countrywide at that time -- sometime in the

2    years before.

3        Q.    They were seeking to have Countrywide

4    repurchase some loans.  Correct?

5        A.    That's correct.

6        Q.    Okay.  And what was your role in that

7    discussion?

8        A.    My role in that discussion was in

9    understanding some of the -- contributing to

10   the risk profile of what those loans looked

11   like.

12       Q.    Okay.  And who's the decision maker

13   at that time for Countrywide with regard to

14   that matter.

15            MR. SIDMAN:  Objection.

16       A.    Ultimately, the senior executives at

17   Countrywide Financial.

18       Q.    Okay.  And at the time you were --

19   you were working in your capacity for the bank?

20       A.    I believe at that time I was working

21   in my capacity as what was called then -- I was

22   a dual employee at the time, between the parent

23   and the subsidiary.  I was no longer chief risk

24   officer but acting in still a senior risk

25   management role between both companies.

1        Q.    Okay.  So you didn't make the

2   decisions.  Correct?

3              MR. SIDMAN:   Objection.

4        A.    I was -- my counsel was sought in

5   part for the decision but I did not ultimately

6   carry the decision.

7        Q.    Have you ever been asked to speak or

8   address an audience on the subject of how a

9   director should conduct him or herself in the

10  fulfillment of their board obligations?

11             MR. SIDMAN:   Objection.

12       A.    Yes.

13       Q.    And when was that and where?

14       A.    I was on a panel at the -- at our

15  business school's directors institute and I was

16  requested by the head of that institute to

17  appear on a panel with other -- several other

18  experts in the field of governance, and this

19  was on risk governance in particular, and it

20  included discussions about board conduct and

21  its interrelationship to risk management.

22       Q.    Okay.  So it was primarily in risk

23  governance.  Correct?

24       A.    Primarily, but it was -- the panel

25  that I was on, but the entire conference was on

1    board -- public board participation.

2        Q.   And when was this conference?

3        A.   I believe it was last summer.

4        Q.   And where was this panel held?

5        A.   It was in Washington, DC.

6        Q.   Okay.  Other than that, any other

7    indications?

8        A.   I spoke -- yes, I prepared an

9    analysis -- actually, it was a paper that was

10   at the request of the current acting director

11   of the office of financial research last year,

12   Richard Berner, to put together a study of best

13   practices in risk management, which part of

14   that study talked about senior management and

15   board-related issues, cognitive bias, risk

16   incentives, or something like that.

17       Q.   So if you could look at what has been

18   marked as I believe Rossi 3.  That's your CV?

19       A.   Correct.

20       Q.   And could you tell me if the

21   particular study you're referring to is

22   referenced on this?

23       A.   Yes.  Actually, it was -- there are

24   two.

25       Q.   Uh-huh.

 1      A.   It's on page six.

 2      Q.   And the name?

 3      A.   Very top, incentives, behaviors and

 4   cognitive advice and the risk function --

 5      Q.   Okay.

 6      A.   -- and then forging best practices

 7   and risk management below that.

 8      Q.   Okay.  So if I go to those papers,

 9   I'll see that you addressed the topic of how a

10   director on the board should conduct him or

11   herself in the fulfillment of their board

12   obligations.  Correct?

13           MR. SIDMAN:  Objection.

14      A.   You will see in that paper what goes

15   into the thinking of senior executives and

16   boards and how that can actually cause problems

17   downstream in decision making at those

18   institutions.

19      Q.   Will I see what I just said?

20           MR. SIDMAN:  Objection.  Asked and

21      answered.

22      A.   I'm not sure how that differs from

23   what I just said.

24      Q.   Okay.  So in those papers am I

25   correct you address how a board director should

1    act in order to fulfill a board director's

2    obligations.  Correct?

3              MR. SIDMAN:  Objection.

4         A.    I talk about the behaviors and

5    expectations of what senior managers and boards

6    should have in coming to decisions --

7    significant decisions for risk management.

8         Q.    And other than that, is there

9    anything else you address relating to how a --

10   how a board member should fulfill his or her

11   obligations as a board member?

12             MR. SIDMAN:  Objection.

13             If you know.

14        A.    You know, I would take you to this

15   other -- this fourth paper down here, lessons

16   and --

17        Q.    Sir, which page is that?

18        A.    Let's see.  This is -- it's the wrong

19   one.  It's the one on the bottom of page six

20   that's called "Anatomy of risk management

21   practices in the mortgage industry" --

22        Q.    Okay.

23        A.    -- "lessons for the future."  In that

24   paper I again have a discussion -- it's largely

25   a paper about risk management practices but it

95

1   also gets at issues relating to senior

2   management, cognitive biases we call them,

3   which really relate to boards and to senior

4   executive management at large financial

5   institutions that were originating mortgages

6   during the housing boom.

7        Q.   And in that paper do you address how

8   a board director should conduct themself in

9   order to make sure they fulfill their board

10   obligations.

11            MR. SIDMAN:  Objection.

12        A.   There are not -- not in that specific

13   terms.

14        Q.   Have you ever been retained to advise

15   anyone in connection with a potential

16   settlement of a lawsuit or a threatened

17   litigation?

18            MR. SIDMAN:  Objection.

19            Other than what he's testified about

20        already?

21        A.   That was going to be my clarifying

22   question, other than what I testified to today?

23        Q.   Including what you testified today,

24   have you ever been retained to advise anyone in

25   connection with the potential settlement of a

96

1   lawsuit or a threatened litigation?

2          MR. SIDMAN:  Objection.

3      A.   Beyond today, I have not.

4      Q.   Meaning beyond representing FGIC as

5   an expert in this case?

6          MR. SIDMAN:  Objection.

7      A.   Again, let me clarify.  We're

8   precluding any prior testimony that I may have

9   provided as a fact witness.

10     Q.   Correct, yes, sir.

11     A.   So given that, I have not.

12     Q.   Why did you -- I'm looking at your

13  CV, just in case you want to reference it.  I'm

14  looking at page five.

15          You left DRS in February of 1991.

16  Why did you leave the DRS then?

17          MR. SIDMAN:  Objection.

18     A.   I left DRS to go to -- I believe I

19  may have gone to Treasury Department for

20  promotion at that time.

21     Q.   Okay.  And why did you leave Fannie

22  Mae in July of '94?

23          MR. SIDMAN:  Objection.

24     A.   To go back to OTS at a promotion.

25     Q.   Okay.  Go to page four of your CV.

1            Do you see that?

2       A.   I see that.

3       Q.   Okeydoke.  Now, what standard did you

4   use to assess the quality of the involvement

5   and interaction of key participants in

6   deliberations regarding the proposed

7   settlement?

8            MR. SIDMAN:  Objection.

9       A.   The standards that I'm using are

10  those that are based on a combination of the

11  materials that we spoke to earlier, so the OCC

12  document with respect to just the board, and

13  then also my own extensive experience in

14  overseeing risk at several of the largest

15  financial institutions originating mortgages.

16      Q.   Anything else?  Any other standard

17  against which you measured the involvement and

18  interaction of key participants in the

19  deliberations regarding the proposed

20  settlement?

21           MR. SIDMAN:  Objection.

22      A.   So that would include any of my

23  writings on these subjects that we covered

24  earlier.  It would include some of the other --

25  particularly the PricewaterhouseCoopers

1   document that I referenced regarding board.

2   And beyond that, as I said, my personal

3   experience in overseeing risk.

4        Q.   Okay.  So PricewaterhouseCoopers,

5   have they issued a standard that people should

6   follow?

7             MR. SIDMAN:  Objection.

8        A.   You know, I'm not sure, but I know

9   that they perform an annual survey of board

10  members.  And that's a fairly, you know, well

11  known -- they, in conjunction with corporate

12  board, I think it is, compile information

13  surveying best practices in boards and whatnot.

14       Q.   So they provide -- am I right --

15  statistical information?  Correct?

16       A.   Largely speaking.

17       Q.   And you're not aware, though, of

18  PricewaterhouseCoopers having published any

19  sort of standard, you know, against which you

20  would measure the involvement and interaction

21  of the key participants in the deliberations

22  regarding the proposed settlement.  Is that

23  correct?

24            MR. SIDMAN:  Objection.

25       A.   Other than the material I've looked

1    lawsuit?

2            MR. SIDMAN:  Objection.

3        A.    Could you clarify that?

4        Q.    Sure.

5            How do you know what all the things

6    are that are involved in determining whether to

7    settle a lawsuit?

8            MR. SIDMAN:  Objection.

9        A.    In terms of how to settle the

10   lawsuit?

11       Q.    Whether to settle the lawsuit.

12       A.    Whether to settle the lawsuit.

13       Q.    How do you know what all those things

14   are?

15            MR. SIDMAN:  Objection.

16       A.    How I know is simply, again, by

17   looking at the various components of each one

18   of those.  How do I know that -- that the level

19   of risk, for example, on a portfolio that

20   you're undertaking for settlement is a proper

21   level of risk?  Well, you first have to ask

22   yourself:  Do we even have the right numbers?

23   You have to ask the right questions, first of

24   all.  That's fairly commonsensical.  There's no

25   magic.  You're not going to go to school to

124

1   learn this stuff.  This is stuff that you have

2   to experience up front.  And all I'm saying is

3   that by looking at what I have observed and

4   what I have experienced at the level that I

5   have operated at, that I think I have a pretty

6   keen insight as to what it takes to be able to

7   understand the kind of risks that they're up

8   against and the timing of decisions that would

9   go on that would be prudent for them to

10  actually make a decision on these matters.

11       Q.   Do you know the legal issues, all the

12  legal issues involved?

13            MR. SIDMAN:  Objection.

14       A.   I am not being -- I have no knowledge

15  of the legal issues.

16       Q.   Have you ever tried to determine what

17  a finder of fact is driven by in making their

18  determination?

19            MR. SIDMAN:  Objection.

20       A.   Again, not having a legal background,

21  I could not opine on that.

22       Q.   Have you ever assessed what the cost

23  of a lawsuit is?

24            MR. SIDMAN:  Objection.

25       A.   I have personally not had any

125

1    involvement in assessing that cost.

2         Q.   Have you ever assessed what the

3    impact of a lawsuit is on the functioning of

4    the board or its senior management?

5              MR. SIDMAN:  Objection.

6         A.   Can you restate that, please?

7         Q.   Sure.

8              Have you ever assessed what the

9    impact is of the pendency of a lawsuit on the

10   functioning of senior management and the board

11   of a company?

12             MR. SIDMAN:  Objection.

13        A.   The reason why I -- I'm thinking

14   about this is, I go back to my experience that

15   we discussed regarding Citigroup.  And at the

16   time I was highly involved in working with the

17   various government regulatory agencies in

18   coming up with an estimate of what our

19   exposures were.  So from that standpoint, I

20   have seen and been involved with matters

21   relating to what could otherwise have put

22   Citigroup into that TARP program, which is a

23   settlement of sorts.

24        Q.   Have you ever assessed what the --

25   what the opportunity cost is associated with

1    discovery in a big case?

2              MR. SIDMAN:  Objection.  Answer if

3        you can.

4        A.   I'm thinking.

5             I'm not sure.

6        Q.   Do you have any recollection of ever

7    doing that?

8              MR. SIDMAN:  Objection.

9        A.   I have recollection.  I just can't

10   comment with specificity.

11       Q.   Okay.  And how do you know about --

12   how discovery works in a big case?

13             MR. SIDMAN:  Objection.

14       A.   Because when -- I'm going back to my

15   time again at Citigroup for a moment, because I

16   know that we worked -- I, as chief risk officer

17   of US consumer lending, had been tasked to work

18   with the senior counsel at Citigroup in looking

19   at put-back requests and put-back demands -- we

20   were working together on these things -- and

21   what sorts of information we would need to be

22   able to get our arms around that.  So that's

23   sort of where I'm trying to answer your

24   question.

25       Q.   All right.  I got you.

1          Any other experience that lends

2     itself to your understanding the impact or cost

3     of discovery in a big case?

4          A.   Beyond that, no.

5          Q.   No?

6               (There is an off-the-record

7               discussion.)

8     BY MR. PRINCI:

9          Q.   And I take it -- but just correct me

10     if I'm wrong -- that it's the same

11     qualifications that you previously testified to

12     that presumably -- again, correct me if I'm

13     wrong -- make you an expert on determining

14     whether or not there was appropriate

15     involvement and interaction of key participants

16     in the deliberations regarding the proposed

17     settlement.  Is that correct?

18          MR. SIDMAN:  Objection.  Asked and

19          answered.

20          A.   That is correct.

21          Q.   Okay.

22          MR. PRINCI:  We could take a break

23          now for lunch.  Why don't we break for

24          half an hour and change, which would bring

25          us to 1:45.  Does that work for everybody?

133

1       Q.    Is encapsulated by some degree the

2    earlier one?

3       A.    What I'm saying is that my -- that my

4    expertise that we referenced in that earlier

5    statement -- that earlier answer is -- would be

6    what I used here in saying that qualifies me as

7    an expert to comment on item number four.

8       Q.    Understood.

9            MR. SIDMAN:  Mr. Princi, let him

10           finish his answer.

11      Q.    If you turn to paragraph number 15.

12   And in the second line you reference corporate

13   governance and risk governance.

14           What is meant by "risk governance"?

15      A.    Sure.  So risk governance are the

16   practices and the processes that oversee the

17   activities that are entailed in risk

18   management.

19           So what that means is the structure,

20   the operating structure of the risk management

21   organization.  Who reports to who?  It's the

22   committee structure by which information flows

23   from analysts that are preparing, say, credit

24   losses to, say, a risk committee that's

25   reviewing them, then up to an executive

1    then, say the lower echelon of staff in

2    communicating information up the chain.

3           It's also -- corporate governance

4    also entails around the structure by which

5    shareholders are assessing the performance of

6    the company and are they active and what's

7    going on with that?

8           So from a totality of how the

9    company's actually operating, or governed,

10   corporate governance, the subsuming issues

11   around the board, their interactions with

12   shareholders or creditors as the case may be,

13   as well as the interactions between senior

14   management.

15      Q.   Okay.  With risk governance, again, I

16   believe you testified being, if you will, a

17   subset of -- a specialized subset of that?

18           MR. SIDMAN:  Objection.

19      A.   I would consider risk governance to

20   be -- I call it out separately because I'm

21   also, you know, an expert in risk management

22   issues.  But at the top of the house, looking

23   at corporate governance issues, I would tend to

24   subsume risk governance within the overall

25   discussion of corporate governance.

1      Q.   Okay.  Now, with respect to the area

2  of expertise you just referenced, if you look

3  at paragraph 12, you say, "My expertise

4  relevant to this matter relates to risk

5  governance."

6            Is that your belief?

7            MR. SIDMAN:  Objection.

8      A.   My expertise certainly is -- includes

9  that, yes.

10     Q.   Okay.  And I'm correct you're not

11  saying in paragraph 12 that I see that you're

12  an expert in the area of corporate governance.

13  Correct?

14            MR. SIDMAN:  Objection.

15     A.   I -- again, I believe that my

16  background does make me an expert in corporate

17  governance.

18     Q.   Is that referenced in paragraph 12?

19            MR. SIDMAN:  Objection.

20     A.   It's not specifically referenced.

21     Q.   Okay.  So while it's not in paragraph

22  12, you also believe you're an expert in

23  corporate governance.  Correct?

24            MR. SIDMAN:  Objection.

25     A.   I think based on my expertise I am.

1        Q.   If you look at paragraph 15, and in

2    particular look at 15 subparagraph I.

3              MR. SIDMAN:   There's two

4         subparagraphs I.

5        Q.   I'm sorry.   Let's start with the main

6    paragraph as opposed to the indented

7    paragraphs.   Okay?

8              So paragraph 15, and it's the first

9    two lines.   You say, "My opinion is that the

10   process surrounding the proposed settlement

11   suffered from, subparagraph one, numerous

12   deficiencies surrounding corporate and risk

13   governance."

14             And then you continue, and in the

15   other sub -- in the indented subparagraph one,

16   okay, you say, "The process for informing the

17   ResCap board of directors as to the negotiation

18   in terms of the proposed settlement was not

19   consistent with corporate governance best

20   practices."

21             Do you see that?

22        A.   I see that.

23        Q.   Okie doke.

24             How do you know what the corporate

25   governance best practices are?

138

1              MR. SIDMAN:  Objection.

2         A.   I refer you back to that office of

3    the controller currency document as one as

4    the -- when you asked me standards by which I

5    was measuring that.  So I'll answer by saying

6    that that OCC document is the relevant document

7    for that question.

8         Q.   For that question.  Okay.

9              And have you ever been retained to

10   advise a company on corporate governance

11   practices?

12             MR. SIDMAN:  Objection.

13        Q.   Let me rephrase it.

14             Have you ever been retained to advise

15   a company on corporate governance best

16   practices?

17             MR. SIDMAN:  Objection.

18        A.   No.

19        Q.   Has anyone asked you to advise them

20   on that?

21             MR. SIDMAN:  Objection.

22        A.   Let me -- could I get you to restate

23   the question?  I'm sorry.

24        Q.   Sure.

25             Has anybody asked you to advise them

139

1   on corporate governance best practices?

2           MR. SIDMAN:  Objection.

3      A.   Yes.

4      Q.   And who?

5      A.   I had a consultation with one of the

6   clients.  I can't remember if it was Coleman

7   Research Group or GLG, that I referenced in my

8   earlier testimony, where they were asking me to

9   provide them with guidance around what --

10  almost verbatim -- best practices of setting up

11  a risk organization.  And since we said that

12  risk governance was subsumed within corporate

13  governance, I'm referring to that.

14     Q.   Okay.  All right.

15          So that's -- in that sense, if you

16  will, that's how you've been asked.  Correct?

17     A.   That is correct.

18          MR. SIDMAN:  Objection.

19     Q.   Okay.  Have you ever taught a course

20  on corporate governance best practices?

21          MR. SIDMAN:  Objection.  Asked and

22      answered.

23     A.   I have had, as I said in earlier

24  testimony, the China Development Bank executive

25  program.

140

1      Q.   Other than that?

2      A.   Other than that, no.

3      Q.   And I take you consider yourself an

4   expert in the area of corporate governance best

5   practices?

6           MR. SIDMAN:  Objection.

7      A.   I consider myself an expert in

8   corporate governance, and so that would imply

9   that I should know something about best

10  practices.

11     Q.   Well, a lot of people know something

12  about something but aren't expert.  What I'm

13  asking you is whether you consider yourself to

14  be an expert in the area of corporate

15  governance best practices?

16          MR. SIDMAN:  Objection.

17     A.   And I would say, yes.

18     Q.   Okie doke.  Now, later on in that

19  same subparagraph you say -- you reference

20  industry norms.

21          What industry are you referring to?

22     A.   I'm talking about the financial

23  services industry.

24     Q.   Okay.  So the FIG sector so to speak.

25  Correct?

141

```
 1              MR. SIDMAN:  Objection.

 2      A.    Could you clarify?

 3      Q.    Financial industry group.  Let's use

 4   your nomenclature, not mine.

 5      A.    Financial services.

 6      Q.    Financial services industry, okay.

 7              And what was your basis for defining

 8   the industry for which you were going to assess

 9   industry norms as the financial services

10   industry as opposed to, for example, a mortgage

11   services company?

12              MR. SIDMAN:  Objection.

13      A.    Right.  So the basis for that was

14   that I -- I can find my review to the financial

15   services sector, in largely commercial banking

16   sector to be more specific, but I was not

17   looking specifically -- drilling down any more

18   specifically to mortgage servicing simply

19   because all of the -- corporate governance,

20   quite honestly, whether it's a mortgage

21   servicing institution or it's a commercial bank

22   or a thrift or a nonbank, those that are

23   publicly-traded institutions and have boards of

24   directors have governance structures that we're

25   talking about here are certainly representative
```

1            MR. SIDMAN:  Objection.

2            Misstates testimony.

3       A.    No.   Whether or not that institution

4   is in credit card securitization or automobile

5   receivable securitization or mortgage

6   securitization or none of the above, what we're

7   getting at here is that the governance

8   structure, an apparatus that's used to come at

9   decisions for these companies, is somewhat --

10   can be generalized in terms of the types of

11   decisions, the type of information that has to

12   flow to those boards, the type of interaction

13   that those boards have with senior management,

14   etc., that from that standpoint makes it --

15   makes financial institutions sector a good

16   guidepost as a means of comparison.

17       Q.    And you think the more generalized

18   industry group is better than a narrow one even

19   though that will include regulated companies.

20   Correct?

21            MR. SIDMAN:  Objection.

22       A.    I did not want to include a more

23   narrow focus because that could actually --

24   would be limiting from the standpoint of not

25   having a large enough experiential base from

144

1   which I could draw conclusions.

2        Q.   So you think that ResCap's

3   competitors, which are not banks, aren't big

4   enough to compare ResCap to.  Is that correct?

5            MR. SIDMAN:  Objection.  Misstates

6        testimony.

7        A.   I think, if we're looking at best

8   practice performance at these institutions,

9   it's better to have a broader -- a broader

10  subset by which to compare.

11       Q.   Okay.  And that for you is more

12  important than any differences that may or may

13  not exist between a regulated company and

14  ResCap.  Correct?

15           MR. SIDMAN:  Objection.

16       A.   I think that, from the standpoint of

17  a regulated entity, there are certainly some

18  differences, but the differences that relate

19  between the regulator and the board of

20  directors were not considered by me for this

21  particular situation.

22       Q.   Okay.  Do you think that they're

23  considered by the OCC in the OCC's report?

24           MR. SIDMAN:  Objection.

25       A.   I know that in that -- to clarify the

1   report that I'm citing in my testimony --

2       Q.    Uh-huh.

3       A.    -- that report does contain

4   information back there that describes what

5   regulated entities -- you know, the activities

6   that the boards need to be considering and

7   reviewing as part of a regulated entity.

8       Q.    So is the answer yes?

9           MR. SIDMAN:   Objection.

10      A.    The answer would be yes.

11      Q.    Okay.  Later on in that same

12  subparagraph you say that the process was not

13  consistent with guidelines generally applicable

14  to bank directors.  And that's the guidelines

15  contained in the OCC report.  Correct?

16      A.    Yes.

17      Q.    Okie doke.  Now, in the first page of

18  your report, look at the caption.  You see it

19  says, "Residential Capital, LLC"?

20      A.    Could you direct me to what --

21      Q.    Sure.  First page of your report,

22  very first page.

23      A.    Oh, yes.

24      Q.    And the caption, you see it says,

25  "Residential Capital, LLC"?

146

1      A.   I see that.

2      Q.   Do you know what a LLC is?

3      A.   Limited liability corporation.

4      Q.   Do you know what that is?

5      A.   I know that that is not a commercial

6   bank.

7      Q.   Okay.  So we know one thing it's not.

8           Do you know what it is?

9      A.   It is -- again, I'm not -- I am not

10  an expert on that particular structure, but I

11  will say that I understand that it is -- it's

12  an entity that does not -- I guess in my

13  parlance I would refer to it as a nonbank

14  financial institution.

15     Q.   Okay.  Now, do you know under what

16  state's law ResCap, LLC operates?

17          MR. SIDMAN:  Objection.

18     A.   No.

19     Q.   Okay.  You understand that the

20  guidelines for banks that the OCC puts out,

21  that operates under Federal law.  Correct?

22          MR. SIDMAN:  Objection.

23     A.   I understand that.

24     Q.   And you understand as well, right,

25  that corporations, including LLCs, limited

1    liability companies, operate under state laws,

2    correct?

3              MR. SIDMAN:  Objection.

4         A.   Yes.

5         Q.   Okie doke.  So you don't know what

6    state law ResCap, LLC operates under.

7              Do you know what differentiates an

8    LLC from a corporation, for example?

9              MR. SIDMAN:  Objection.

10        A.   Again, I am not an expert on specific

11   legal aspects -- legal vehicles from that

12   standpoint.

13        Q.   Do you know what the fiduciary duties

14   are of a director of an LLC?

15             MR. SIDMAN:  Objection.

16        A.   I do -- I am not aware specifically

17   of those duties and how they may or may not

18   differ from those of a commercial bank.

19        Q.   Okay.  Do you know to whom a director

20   of an LLC owes a fiduciary duty?

21             MR. SIDMAN:  Objection.

22        A.   I will answer based on the prior

23   question that I'm not sure.

24        Q.   Okie doke.  So in paragraph 15 --

25   this is now the indented subparagraph two --

150

 1    whatever time they had.  Right?  And they used

 2    that.

 3             Do you know what standards should be

 4    used to determine whether their conduct in that

 5    regard met their obligations as a board member?

 6       A.   Yes.

 7       Q.   Okay.  And what standards should that

 8    be?

 9       A.   That standard, in my opinion, should

10    be the duty-of-care provision that I cite in

11    this OCC document, again, realizing that these

12    are commercial banks, regulated entities with

13    Federal responsibilities or subject to Federal

14    law, that is.  But at the end of the day, that

15    duty-of-care provision is something that, from

16    a best-practice standpoint, board of boards of

17    directors should be adhering to.

18       Q.   So would you agree with me that the

19    standards enunciated under Federal law don't --

20    for a bank director don't apply to the ResCap

21    board?  Would you agree with that?

22             MR. SIDMAN:  Objection.

23       A.   I'm not sure I'd agree with it --

24       Q.   Okay.

25       A.   -- because what -- I want to make

1   sure I understand your question correctly.

2      Q.   Sure.

3      A.   What I -- I guess what I'm saying is

4   that, but for this duty-of-care benchmark -- we

5   were talking about originally, I thought -- and

6   you correct me if I'm wrong -- about best

7   practices.  And that is a -- that would be

8   considered a best practice.  Whether that's a

9   regulated commercial bank or a -- an LLC that's

10  subject to state law, the board, in my opinion,

11  from a best-practice standpoint, should use

12  that duty of care in determining whether or not

13  they're acquiring the right information, that

14  they're evaluating that information, and that

15  they're participating at those board meetings

16  in that matter.

17     Q.   Okay.  And you're saying that you

18  divine the best practice from the Federal law

19  guidelines, not from what it says under state

20  law.  Correct?

21     MR. SIDMAN:  Objection.

22     A.   I am not even taking into account the

23  legal aspect because I'm not being asked to

24  opine about the legal aspects of this.  I'm

25  being asked about process, governance, and

1    actually, to be more specific, best practices

2    among those.

3        Q.   Can I ask you -- you say you're not

4    opining on a legal aspect.

5             Could you take a look at footnote 4?

6             MR. SIDMAN:  Footnote?  What

7        footnote?

8             MR. PRINCI:  Footnote 4.

9        A.   What page is that?

10       Q.   It's on page 6.

11       A.   Okay.

12       Q.   Okay.  And you see there it says,

13   "Counsel has informed me that ResCap is a

14   Delaware corporation.  And Delaware corporation

15   law imposes a duty of care upon directors"?

16            Do you see that?

17       A.   I see that.

18       Q.   Would you agree with me that you had

19   to rely on that, in part, in reaching your

20   opinions here?

21            MR. SIDMAN:  Objection.

22       A.   My opinion -- if we go back to

23   actually earlier testimony in the drafting and

24   the process by which I came to my own

25   conclusions, I had already come to the

1  conclusion that, independently, that the

2  duty-of-care provision, as we saw it in the OCC

3  document, was an appropriate standard that all

4  boards of directors should be adhering to and

5  that, just as counsel had informed me, this LLC

6  was also subject to this duty-of-care provision

7  from the state level.

8      Q.   Okay.

9          I need to ask you:  Would you agree

10  that directors of banks owe fiduciary duties to

11  different parties than directors of an LLC?

12          MR. SIDMAN:  Objection.

13      A.   In my opinion, I believe that the

14  duty-of-care provision, regardless of that

15  legal vehicle -- that those boards of directors

16  should be adhering to a duty-of-care provision

17  regardless if it's a commercial bank or a

18  state-chartered entity.

19      Q.   Okay.  Let me try to clarify my

20  question.

21          Would you agree that directors of a

22  bank owe fiduciary duties to different parties

23  than a director of an LLC?

24          MR. SIDMAN:  Objection.

25      A.   Owe different?

1      Q.    Fiduciary duties.

2      A.    Fiduciary duties --

3      Q.    Yes, sir.

4      A.    -- than of an LLC?

5      Q.    Yes, sir.

6      A.    If we get into the specifics of it,

7    I'm not sure that I'd be able to say yes or no

8    on that.  But I don't know.

9      Q.    You don't know.  Okay.

10            Are you aware that bank directors owe

11   a fiduciary duty to depositors?

12     A.    They have a fiduciary responsibility

13   to shareholders and to depositors, and that's

14   probably the extent of it.

15     Q.    So the answer is yes?

16     A.    Yes.

17     Q.    Okay.  And are you aware that LLC

18   directors don't owe a duty to depositors?

19            MR. SIDMAN:  Objection.

20     A.    Well, in the case of an LLC, it's

21   unlikely that it's going to have depositors in

22   the classic case of a commercial bank.

23     Q.    So you agree with me.  Correct?

24     A.    It's a long-winded way of saying yes.

25     Q.    Okay.  Are you aware that bank

1  directors owe a fiduciary duty to the

2  regulators?

3       A.   The fiduciary responsibility of the

4  regulators is somewhat different, but there is

5  a responsibility back to adhere to what the

6  safety and soundness regulators require.

7       Q.   Okay.  And would -- as a result of

8  that, you agree with me that a director of a

9  bank owes a fiduciary duty to regulators?

10          MR. SIDMAN:  Objection.

11     A.   Yes.

12     Q.   And would you agree with me that

13  directors of an LLC do not?

14          MR. SIDMAN:  Objection.

15     A.   Yeah.  The LLCs are, again, a

16  different type of legal vehicle that are not

17  subject to the same level of regulations, so I

18  guess another long-winded way of saying yes.

19     Q.   Okay.  Are you aware that bank

20  directors owe a fiduciary duty to the

21  communities they serve?

22          MR. SIDMAN:  Objection.

23     A.   Yes.

24     Q.   Are you aware that LLC directors

25  don't?

1                    MR. SIDMAN:  Objection.

2          A.    I'm not aware.

3          Q.    Are you aware that bank directors

4    face unique challenges not faced by directors

5    of an LLC because they are different from other

6    corporations?

7                    MR. SIDMAN:  Objection.

8          A.    There are important differences in

9    their activities and focus.

10         Q.    So that would be a yes, too?

11                   MR. SIDMAN:  Objection.

12         A.    Yes.

13         Q.    Okay.  And are you aware that a

14    bank's board of directors have to make sure

15    that the board's plans and policies help to

16    meet the credit needs of the communities that

17    the bank serves?

18                   MR. SIDMAN:  Objection.

19         A.    I'm aware of that.

20         Q.    Okay.  And are you aware that that is

21    not true of an LLC?

22                   MR. SIDMAN:  Objection.

23         A.    I'm not aware of that.

24         Q.    You don't know one way or the other,

25    you're saying?

1        A.    Not one way or the other.

2        Q.    Okeydoke.  If you look back at --

3   excuse me a moment.

4              Look back at paragraph 15, indented

5   subparagraph 2.

6              What standards should be used to

7   determine how far in advance the board should

8   be given appropriate information?

9              MR. SIDMAN:  Objection.

10       A.    In my opinion, I think that's going

11  to vary by the materiality and the visibility,

12  the impact, the uniqueness of the business

13  issue being debated.

14       Q.    Okay.  And so, did you know what the

15  objective of the ResCap board was in connection

16  with considering the proposed settlement?

17             MR. SIDMAN:  Objection.

18       A.    The objective of the -- of just the

19  settlement, or are we linking it to the plan

20  support agreement?

21       Q.    The objective of -- what did you know

22  when you gave these opinions what the objective

23  of the ResCap board was in determining whether

24  to enter into the proposed settlement?

25             MR. SIDMAN:  Same objection.

1    metaphors, I think.  We're mixing legal

2    metaphors with governance metaphors.  A

3    governance metaphor is:  How much time do you

4    think is appropriate?  I doubt you're going to

5    find that in a legal statute that's going to

6    demarcate and say:  You need at least three

7    hours ahead of a board meeting.  I know of

8    nothing in my experience, by the way, that has

9    that.

10        Q.   Okay.  So you'd agree with me that

11   what is an appropriate amount of time is a

12   relative question.  Correct?

13        MR. SIDMAN:  Objection.

14        A.   I would say that is -- absolutely is

15   a relative question.

16        Q.   Okay.  And that would be true of the

17   situation facing the ResCap board when they

18   were determining whether to enter into the

19   proposed settlement.  Correct?

20        MR. SIDMAN:  Objection.

21        A.   I agree.

22        Q.   Okay.  Now, do you know what time

23   constraints they faced in connection with

24   considering the proposed settlement?

25        MR. SIDMAN:  Objection.

167

1      A.    Broadly speaking.

2      Q.    You do?

3      A.    Broadly speaking.

4      Q.    Okay.  And where did you learn that

5   from?

6      A.    By reviewing the materials that were

7   provided to me.

8      Q.    Okay.  And what's your understanding

9   of the time constraints that they were facing?

10     A.    That -- I understand that they --

11   that they -- whether or not they were

12   self-imposed or not, there were very tight

13   timelines by which to come to a decision on

14   this because it was, in some respects, linked

15   to a variety of other outcomes, such as the

16   bankruptcy decision and the plan support

17   agreement that was part of the proposed

18   settlement.

19     Q.    Okay.  So you did understand that

20   they were operating under very tight timelines?

21         MR. SIDMAN:  Objection.

22     Q.    And did you also understand what

23   benefit they -- the estate would get by

24   entering into the proposed settlement?

25         MR. SIDMAN:  Objection.  Misstates

171

1   question, but perhaps it doesn't.  You can

2   certainly tell me if it doesn't.

3       Q.   Sure.

4       A.   Yeah.  I guess I would go to page 7.

5   And on -- let's see.  On paragraph 19 where I

6   cite that, in one of the board members

7   testimony here, that he was not aware that AFI

8   played a significant role in driving the

9   negotiations.  He also believed that the

10  company's attorneys, at the very bottom of page

11  7, going over to the top of page 8, were

12  responsible for leading the settlement process

13  from the legal side and that Thomas Marano,

14  chairman of the ResCap board, was in charge on

15  a business level.

16       But then I also cite, third line down

17  on page 8, "Mr. Marano, however, testified at

18  deposition that he was only generally aware of

19  the concepts behind the proposed settlement

20  prior to receiving the board meeting documents,

21  and he was neither copied on relevant e-mails

22  nor seemingly involved in the negotiations at

23  all."  That's the basis on which I was making

24  that determination.

25       Q.   Okay.  And are you aware of whether

New York
Connecticut
Hudson Reporting & Video
Nationwide 1-800-310-1769
New Jersey
Pennsylvania

1    Morrison & Foerster updated the board members

2    with respect to this?  Other than your

3    reference to Mr. Mack's and Mr. Marano's

4    deposition, are you aware?

5              MR. SIDMAN:  Objection.

6        A.    I'm am not aware beyond that.

7        Q.    Okay.  And are you aware of

8    whether -- did you ever hear the name Tammy

9    Hamzehpour?  Does that name ring a bell?

10       A.    I am aware of who she was.

11       Q.    Okay.  And who was she?

12       A.    I believe it may have been general

13   counsel of ResCap.

14       Q.    Okay.  And are you aware whether she

15   provided anybody any updates during that time

16   period?

17             MR. SIDMAN:  Objection.

18       A.    I am not aware, other than through

19   the materials that I reviewed, that she

20   provided any updates.

21       Q.    Okay.  And do you know what FTI is?

22       A.    I know that was one of the advisory

23   companies that was brought on to facilitate

24   some of the analysis behind the settlement.

25       Q.    Okay.  And are you aware of whether

1   they provided any updates to any of the board

2   members throughout that process?

3           MR. SIDMAN:  Objection.

4       A.   I don't know the extent to what they

5   provided to the board members.

6       Q.   Okay.  And would you have wanted to

7   have known that information before forming a

8   final opinion?

9           MR. SIDMAN:  Objection.

10      A.   I would -- I felt that the

11  information that was being -- the testimony of

12  two significant board members was sufficient --

13  a sufficient factual record for me to base my

14  decision.

15      Q.   Now, you say further in that

16  paragraph that at times there appeared to be

17  conflicts of interest.

18          Do you see that?

19      A.   I see that.

20      Q.   Okeydoke.

21          Now, how do you know that?

22          MR. SIDMAN:  Objection.

23      A.   Again, the basis on which I make that

24  statement is by looking at the testimony and

25  the other materials they provided to me that

1      A.   I have not.

2      Q.   Do you know what the objectives are

3  for a board when it's preparing to enter a

4  company into Chapter 11?

5          MR. SIDMAN:  Objection.

6      A.   I'm not aware of the specifics of

7  those.

8      Q.   Do you know what the objectives are

9  for a board when it is in bankruptcy?

10     A.   I am not familiar with the specifics

11  of those issues.

12     Q.   Okay.  If you take a look again at

13  paragraph 15 in indented subparagraph three,

14  the second sentence you say, "As a result,

15  important information regarding the proposed

16  settlement does not appear to have flowed to

17  appropriate risk review committees," etc.

18          Do you see that?

19     A.   I do see that.

20     Q.   And in fact, you don't know with a

21  certainty whether all that information did or

22  didn't self flow.  Correct?

23          MR. SIDMAN:  Objection.

24     A.   I don't, based only on the

25  information I had I did not see that.

1        Q.    That's why you chose the word

2    "appear."  Correct?

3               MR. SIDMAN:  Objection.

4        A.    That is correct.

5        Q.    And then similarly if you look at

6    paragraph 16, second sentence, you say, "In

7    fact, it appears that until the settlement was

8    presented," etc., "some of the directors were

9    unaware," etc.

10              And again, you don't know that as a

11   matter of certainty.  Correct?

12              MR. SIDMAN:  Objection.

13       A.    True.

14              MR. SIDMAN:  Talking about the second

15        sentence there?

16              MR. PRINCI:  Yes, sir.

17       A.    I'm sorry.  Could you restate again?

18       Q.    Sure.

19              In the second sentence you say, "In

20   fact, it appears that until the settlement was

21   presented to the board on May 9, some of the

22   directors were unaware that a settlement

23   process was ongoing."

24              What I'm saying is you don't actually

25   know that for a certainty.  Correct?

186

1                    MR. SIDMAN:  Objection.

2          A.   I only know what I read in the

3    materials provided, but I don't know if there

4    was any other information.

5          Q.   Correct, you don't know one way or

6    the other?

7          A.   Beyond what I was asked to look at,

8    correct.

9          Q.   That's why you can't say that with

10   any certainty and that's why you had to use the

11   phrase "it appears."  Correct?

12                    MR. SIDMAN:  Objection to the

13            phrasing of the word "certainty."

14         A.   Substantially correct, yes.

15         Q.   And in fact, in paragraph 16, you

16   don't know what other persons potentially did

17   give the directors information.  Correct?

18                    MR. SIDMAN:  Objection.

19         A.   I'm not aware beyond what materials I

20   have reviewed.

21         Q.   Okay.  And in addition to not knowing

22   from whom else they may have received

23   information, you don't know what type of other

24   information they may have received.  Correct?

25                    MR. SIDMAN:  Objection.

1          Hypothetical, assumes facts not in

2      evidence.

3          A.    I'm basing my statements here that

4      you're referencing solely on the transcripts of

5      depositions from two significant board members.

6          Q.    Understood.

7          A.    Yes.

8          Q.    And based on what you have reviewed,

9      that still leaves you however unable to say

10      with certainty that they didn't receive more

11      information that would have been sufficient.

12      Correct?

13              MR. SIDMAN:   Objection.

14          A.    Correct.

15          Q.    Okay.   Do you know who Tom Marano is?

16          A.    Yes.

17          Q.    Who is he?

18          A.    He was -- he is at the time a board

19      member on ResCap and CEO.

20          Q.    Okay.   Do you understand that he has

21      extensive experience in the mortgage

22      securitization business?

23              MR. SIDMAN:   Objection.

24          A.    I completely understand that.

25          Q.    Right.   And you knew of his name

1    before he was at ResCap.  Correct?

2         A.    That's correct.

3         Q.    And you knew that because he is, and

4    has been for many, many years, one of the

5    leading "players" in that business.  Correct?

6              MR. SIDMAN:  Objection.

7         A.    I understand that he is a significant

8    individual in the mortgage business.

9         Q.    Okay.  Now, do you know whether he

10   shared any of this information with board

11   directors orally?

12             MR. SIDMAN:  Objection.

13        A.    I infer from the board meeting

14   minutes, which were very slim to begin with,

15   that there was some interaction.  But I don't

16   know the substance of that discussion at the

17   board meeting or prior -- the 20 minutes prior

18   to when the material was provided to the board

19   members.

20        Q.    Okay.  In its last sentence of 16 you

21   say, "The lack of information forwarded to and

22   the information afford by ResCap's board was

23   outside of the industry norm and led to a

24   fundamentally flawed decision-making process."

25             What is the industry norm for

1    consideration of a settlement like this prior

2    to entering into a Chapter 11 case?

3              MR. SIDMAN:  Objection.

4         A.   I know what it is not and it is not

5    20 minutes received ahead of the board meeting

6    and a 30-minute board discussion.

7         Q.   And do you know what it is?

8              MR. SIDMAN:  Objection.  Asked and

9         answered.

10        A.   We've had a conversation about this

11   earlier and there are no bright lines.  But,

12   again, I'm being asked as an expert on these

13   matters to render an opinion based on my

14   judgment on process.  And I'll tell you that it

15   certainly is not 20 minutes on a matter

16   relating to an $8.7 billion settlement.

17        Q.   Yeah, but you can't know for sure

18   whether it is because you don't know what

19   exigencies existed in connection with the

20   bankruptcy case.  Is that correct?

21             MR. SIDMAN:  Objection.  Misstates

22        testimony.

23        A.   I certainly don't understand those

24   issues and matters.

25        Q.   Okay.  If you take a look again at

1    footnote four, it's on page six.

2         Was this footnote one of the edits

3    that Jones Day gave you to content?

4         A.   Footnote four?

5         Q.   Yes, sir.

6         A.   This was -- this was an edit that I

7    believe was provided.

8         Q.   Okay.  And in the absence of

9    counsel's providing you with this information,

10   you wouldn't have been aware of this yourself.

11   Correct?

12        MR. SIDMAN:  Objection.

13        A.   I would have been aware but it

14   wouldn't have made any difference because in my

15   stated testimony here I had already made that

16   decision upfront by looking at the OCC duty of

17   care provisions.

18        Q.   Okay.  Take a look at page seven of

19   your report.  The first full sentence.  You

20   say, "It is my opinion that the board was

21   unable to render a decision consistent with the

22   duty of care requirement."

23        Do you see that?

24        A.   Yes, I do see that.

25        Q.   Right.  And then you actually

1   woefully insufficient for me to come to any

2   kind of conclusion that would have made me feel

3   comfortable about approving or not approving

4   the deal without other information.

5       Q.   But you don't know whether the board

6   members didn't have that information.  Right?

7          MR. SIDMAN:  Objection.  Calls for

8          speculation, asked and answered.

9       A.   I do know from testimony that two

10  board members had very little information about

11  the contours of the transaction until the end.

12      Q.   You don't know that Mr. Marano didn't

13  have the information about the contours of the

14  transaction in an industry where he's one of

15  the most experienced people on the street.  Is

16  that your testimony?

17         MR. SIDMAN:  Objection.  Misstates

18         his testimony, calls for speculation.

19      A.   I'd actually be surprised that it

20  wasn't in his deposition for something as

21  significant.

22      Q.   He wasn't asked the question.

23         MR. SIDMAN:  Objection.  I don't even

24         know where to begin but let's just move

25         on.

1      Q.    If this was so significant to you,

2    again why didn't you call rather than give an

3    opinion in a case when you could have spoken to

4    these people?  Why didn't you do that?

5         MR. SIDMAN:  Objection.  Asked and

6         answered.

7      A.    I relied on just the information that

8    was provided.  I don't see -- I'm not going to

9    pick up the phone to Mr. Marano and ask him a

10   question on a matter of litigation that he's

11   highly involved with.

12     Q.    You don't think, knowing what your

13   task was in this case, i.e., whether to testify

14   against the proposed settlement, that

15   Mr. Marano wouldn't have given you a

16   considerable amount of time to talk to you

17   about this?

18        MR. SIDMAN:  Objection.  Asked and

19        answered.

20     Q.    Is that your testimony?

21     A.    Highly speculative.  I don't know.

22     Q.    But do you believe that Mr. Marano

23   would have had an incentive to want to talk to

24   you about this if you had picked up the phone

25   and called him?

1          MR. SIDMAN:  Objection.  Calls for

2     speculations, hypothetical, assumes facts

3     not in evidence.

4          Answer if you can -- and asked and

5     answered.

6     A.    It is speculative.  There's no

7  question and at the end of the day, I simply

8  don't know how he would have responded one way

9  or the other.

10    Q.    All right.  You certainly can't sit

11  here in good faith and say that you think he

12  wouldn't have spoken to you.  Correct?

13         MR. SIDMAN:  Objection.

14    A.    I don't know how it would have -- how

15  it could have come down one way or the other,

16  so I probably would have preferred not to say

17  definitively since I don't know.

18    Q.    You didn't get that choice?

19    A.    I don't know.

20         MR. SIDMAN:  Objection.  Move on,

21     Counsel.

22    Q.    If you were in his shoes, would you

23  take a call from you?

24         MR. SIDMAN:  Objection.  Calls for

25     speculation, hypothetical.

1            Answer if you can.

2        A.   I don't know all the circumstances

3    behind Mr. Morano's situation.  So from that

4    standpoint I don't know.

5        Q.   Let me put you in his shoes.  Here's

6    the hypothetical.  You're the CEO of a company

7    who's got an $8.7 billion proposed settlement

8    in front of a Federal bankruptcy judge.  You

9    get a phone call from a guy with your CV.  He

10   says to you, hey, I've been hired by FGIC.

11   They're asking me to look into the process you

12   guys used and I looked at your deposition and

13   here's my understanding.  Is there anything

14   else I'm missing?

15           Now, that's the phone call you get.

16   Right?  How would you respond to that phone

17   call?

18           MR. SIDMAN:  Objection.

19       Hypothetical, assumes facts not in

20       evidence, calls for speculation.

21           Answer if you can.

22       A.   Not knowing Mr. Marano --

23       Q.   Not Mr. Marano, you, how would you

24   respond to it?

25       A.   I wouldn't take the call.

197

```
 1              MR. SIDMAN:  Objection.

 2      Q.   You wouldn't?

 3      A.   Heck no.

 4      Q.   No?

 5      A.   Absolutely.

 6      Q.   Let me ask you this.  You say that --

 7  you don't know what Mr. Divine, by the way, did

 8  or didn't do other than based on the transcript

 9  you read.  Right?

10              MR. SIDMAN:  Objection.

11      A.   That is correct.

12      Q.   And again, you didn't try to call

13  Mr. Divine and ask him.  Correct?

14              MR. SIDMAN:  Asked and answered.

15      A.   That is correct.

16      Q.   Okie doke.  So you take a look the

17  paragraph 20, please.  Okay.

18              Now, you say, first one, the board,

19  and then you say, who was kept largely in the

20  dark over the short course of settlement

21  discussions.

22              And again, you only read the

23  transcript of two board members.  Correct?

24              MR. SIDMAN:  Objection.

25      A.   Actually, I believe there was a
```

198

1    third, Mr. Whitlinger.

2         Q.   Okay.  But you didn't -- you don't

3    have any information with respect to the other

4    board members.  Correct?

5         MR. SIDMAN:  Objection.

6         A.   That is correct, I only reviewed the

7    testimony of those three.

8         Q.   So how can you say the board in an

9    unqualified way was kept largely in the dark?

10        A.   The basis of that characterization is

11   that you have three significant board members,

12   Mr. Marano, who you just said was a significant

13   name in the industry that, according to his own

14   testimony that I read, which was the

15   information that I had available to me,

16   suggests that he was not very well informed of

17   this situation.

18        Q.   How much info should they have had?

19        MR. SIDMAN:  Objection.

20        Q.   According to you.

21        They were kept in the dark.  What

22   should they have had?

23        MR. SIDMAN:  Objection.

24        A.   In my opinion, they would have had at

25   least this information -- instead of having a

1   you stated this as fact.  You said, Mr. Cushman

2   would have controlled Mr. Cancelliere's

3   compensation, employment opportunities.

4           So let me tell you, would you be

5   surprised if I told you that Mr. Cancelliere

6   actually employed by GMACM?

7           MR. SIDMAN:  Objection.

8       A.  That did not come out in the

9   statement.

10      Q.  That's why you call people and ask

11  them.  You don't make these assumptions before

12  you give these opinions, do you?

13          MR. SIDMAN:  Objection.

14          Is that a question?

15      Q.  Correct?  Isn't that a good reason to

16  make the phone calls and ask people, because

17  you don't have full information?

18          MR. SIDMAN:  Objection.  Asked and

19          answered countless times.

20      A.  My view is that a statement under

21  oath of your employment is a factual

22  statement --

23      Q.  Sure.

24      A.  -- and I'm using that as the

25  statement to form my opinion.

1      Q.   Right.  But he never testified that

2    he was employed by Ally.  You made an

3    assumption based on your professional

4    experience that because he reported to

5    Mr. Cushman, that the rest of this has to be

6    true, but it's not.  It's false.

7           MR. SIDMAN:  Is that -- there's no

8       question there.  It's a statement.

9           Are you making a representation of

10      what Jeff Cancelliere's testimony is?

11     Q.   Do you understand why it's

12   important -- let me take a step back.

13          Can you understand that you would --

14   strike that.

15          Would you agree with me that for the

16   purposes of making this statement you would

17   have been better off picking up the phone and

18   calling Mr. Cancelliere and asking him?

19          MR. SIDMAN:  Objection.

20     Q.   Do you understand -- do you agree

21   with me that you would have been better off

22   doing that rather than making these assumptions

23   you made?

24          MR. SIDMAN:  Objection.  Asked and

25      answered, assumes facts not in evidence.

205

1          Answer if you can.

2      Q.   What's your answer to that?

3      A.   My answer is I wouldn't have been

4   better off because it would have been a pure

5   waste of my time because if I'm -- as you said

6   before, hypothetically, if I'm him, I wouldn't

7   have taken my call.

8      Q.   But you don't believe that somebody

9   who's trying to support -- who works for a

10  company that's trying to support a settlement

11  wouldn't want to correct your

12  misunderstandings?

13          Why do you believe they wouldn't want

14  to correct your misunderstandings?

15          MR. SIDMAN:  Objection.

16     A.   Again, hypothetical.  I don't know

17  where he would or would not want to -- I know

18  what I would do, and I simply wouldn't take a

19  call out of the blue from somebody.

20     Q.   Okay.  Okay.

21          All right.  If you go to the bottom

22  of the page, page 12, in the middle of that

23  last sentence you say, "which allowed ResCap to

24  internally vet the amount without its employees

25  fearing reprisals."

1          Do you see that?

2     A.    Yes.

3     Q.    Now, let me take a step back.

4  You're, I'm correct, implying that the ResCap

5  employees did fear reprisals.  Correct?

6          MR. SIDMAN:  Objection.

7     A.    I'm saying that, on the basis of my

8  understanding of the information provided in

9  Mr. Cancelliere's testimony about his reporting

10 structure and on the lack of information that I

11 saw throughout this set of documents that I had

12 of no formal structure around risk committees

13 evaluating this, that I formed an opinion that

14 suggested that, yes, that in that case there

15 could be a concern where Mr. Cancelliere could

16 not actually convey the kind of risk estimates

17 that he thought were warranted that may not

18 have been supportive of the ultimate deal that

19 was put on the table.

20    Q.    So it's an assumption on your part.

21 Correct?

22         MR. SIDMAN:  Objection.

23    A.    It is -- it is an opinion that I have

24 based on reading the materials.

25    Q.    Okay.  And would that opinion change

1    range of reasonableness.  Is that correct?

2         A.   That is correct.

3              MR. SIDMAN:  Objection.

4              MR. DEVORE:  Can you state the basis

5         for your objection.

6              MR. SIDMAN:  The range of

7         reasonableness, I didn't understand what

8         you meant by that.

9         Q.   Do you understand what the range of

10   reasonableness is?

11        A.   Yes.

12        Q.   You were not engaged to provide an

13   expert opinion on whether the amount of the

14   $8.7 billion is within the range of

15   reasonableness?

16             MR. SIDMAN:  Same objection.

17        A.   That is correct.

18        Q.   And you are not, in fact, offering an

19   expert opinion on whether or not the 8.7

20   billion-dollar amount is the correct amount

21   that should have been settled?

22        A.   That is correct.

23        Q.   So when this hearing begins in what's

24   currently scheduled for March, you will not be

25   opining to the Court on whether the settlement

```
1

2                    C E R T I F I C A T E

3

4

5              I, MARK IUZZOLINO, a Certified Shorthand

6   Reporter and Notary Public of the State of New

7   Jersey certify that the foregoing is a true and

8   accurate transcript of the testimony of the

9   aforementioned first duly sworn by me.

10             I further certify that I am neither

11  attorney or counsel for, nor related to or employed

12  by, any of the parties to the action in which the

13  deposition is taken, and further that I am not a

14  relative or employee of any attorney or counsel

15  employed in this case, nor am I financially

16  interested in the action.

17

18

19             _____

20             CERTIFIED SHORTHAND REPORTER

21             NOTARY PUBLIC OF NEW JERSEY

22             LICENSE NO. X101103

23

24

25
```