# Exhibit 4



# FEDERAL REGISTER

Vol. 77        Thursday,

No. 3          January 5, 2012

Part III

Federal Reserve System

12 CFR Part 252
Enhanced Prudential Standards and Early Remediation Requirements for Covered Companies; Proposed Rule

## FEDERAL RESERVE SYSTEM

### 12 CFR Part 252

[Regulation YY; Docket No. 1438]

RIN 7100–AD–86

### Enhanced Prudential Standards and Early Remediation Requirements for Covered Companies

**AGENCY:** Board of Governors of the Federal Reserve System (Board).

**ACTION:** Proposed rule; request for public comment.

**SUMMARY:** The Board is requesting comment on proposed rules that would implement the enhanced Prudential standards required to be established under section 165 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act or Act) and the early remediation requirements established under section 166 of the Act. The enhanced standards include risk-based capital and leverage requirements, liquidity standards, requirements for overall risk management (including establishing a risk committee), single-counterparty credit limits, stress test requirements, and a debt-to-equity limit for companies that the Financial Stability Oversight Council has determined pose a grave threat to financial stability.

**DATES:** *Comments:* Comments should be received on or before March 31, 2012.

**ADDRESSES:** You may submit comments, identified by Docket No. 1438 and RIN 7100–AD–86 by any of the following methods:

• *Agency Web Site: http:// www.federalreserve.gov.* Follow the instructions for submitting comments at *http://www.federalreserve.gov/ generalinfo/foia/ProposedRegs.cfm.*

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Email: regs.comments@federalreserve.gov.* Include docket and RIN numbers in the subject line of the message.

• *Fax:* (202) 452–3819 or (202) 452–3102.

• *Mail:* Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, 20th Street and Constitution Avenue NW., Washington, DC 20551.

All public comments are available from the Board's Web site at *http:// www.federalreserve.gov/generalinfo/ foia/ProposedRegs.cfm* as submitted, unless modified for technical reasons. Accordingly, your comments will not be edited to remove any identifying or contact information. Public comments

may also be viewed electronically or in paper form in Room MP–500 of the Board's Martin Building (20th and C Streets NW.) between 9 a.m. and 5 p.m. on weekdays.

**FOR FURTHER INFORMATION CONTACT:** Mark Van Der Weide, Senior Associate Director, (202) 452–2263, or Molly E. Mahar, Senior Supervisory Financial Analyst, (202) 973–7360, Division of Banking Supervision and Regulation; or Laurie Schaffer, Associate General Counsel, (202) 452–2272, or Dominic A. Labitzky, Senior Attorney, (202) 452–3428, Legal Division.

*Risk-Based Capital Requirements and Leverage Limits:* Anna Lee Hewko, Assistant Director, (202) 530–6260, or Meg Donovan, Supervisory Financial Analyst, (202) 872–7542, Division of Banking Supervision and Regulation; or April C. Snyder, Senior Counsel, (202) 452–3099, or Benjamin W. McDonough, Senior Counsel, (202) 452–2036, Legal Division.

*Liquidity Requirements:* Mary Aiken, Manager, (202) 721–4534, or Chris Powell, Financial Analyst, (202) 921–4353, Division of Banking Supervision and Regulation; or April C. Snyder, Senior Counsel, (202) 452–3099, Legal Division.

*Single-Counterparty Credit Limits:* Mark Van Der Weide, Senior Associate Director, (202) 452–2263, or Molly E. Mahar, Senior Supervisory Financial Analyst, (202) 973–7360, Division of Banking Supervision and Regulation; or Pamela G. Nardolilli, Senior Counsel, (202) 452–3289, Patricia P. Yeh, Counsel, (202) 912–4304, or Anna M. Harrington, Attorney, (202) 452–6406, Legal Division.

*Risk Management and Risk Committee Requirements:* Pamela A. Martin, Senior Supervisory Financial Analyst, (202) 452–3442, Division of Banking Supervision and Regulation; or Jonathan D. Stoloff, Senior Counsel, (202) 452–3269, or Jeremy C. Kress, Attorney, (202) 872–7589, Legal Division.

*Stress Test Requirements:* Tim Clark, Senior Adviser, (202) 452–5264, Lisa Ryu, Assistant Director, (202) 263–4833, Constance Horsley, Manager, (202) 452–5239 or David Palmer, Senior Supervisory Financial Analyst, (202) 452–2904, Division of Banking Supervision and Regulation; Dominic A. Labitzky, Senior Attorney, (202) 452–3428, or Christine E. Graham, Senior Attorney, (202) 452–3005, Legal Division.

*Debt-to-Equity Limits for Certain Covered Companies:* Robert Motyka, Senior Project Manager, (202) 452–5231, Division of Banking Supervision and

Regulation; or April C. Snyder, Senior Counsel, (202) 452–3099, or Benjamin W. McDonough, Senior Counsel, (202) 452–2036, Legal Division.

*Early Remediation Framework:* Barbara J. Bouchard, Senior Associate Director, (202) 452–3072, or Molly E. Mahar, Senior Supervisory Financial Analyst, (202) 973–7360, Division of Banking Supervision and Regulation; or Paul F. Hannah, Counsel, (202) 452–2810, or Jay R. Schwarz, Counsel, (202) 452–2970, Legal Division.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Introduction
II. Overview of the Proposal
    A. Scope of Application
    B. Risk-Based Capital Requirements and Leverage Limits
    C. Liquidity Requirements
    D. Single-Counterparty Credit Limits
    E. Risk Management and Risk Committee Requirements
    F. Stress Testing Requirements
    G. Debt-to-Equity Limits for Certain Covered Companies
    H. Early Remediation Framework
    I. Transition Arrangements and Ongoing Compliance
    J. Reservation of Authority
    K. Common Definitions
III. Risk-Based Capital Requirements and Leverage Limits
    A. Background
    B. Overview of the Proposed Rule
    1. Capital Planning and Minimum Capital Requirements
    2. Quantitative Risk-Based Capital Surcharge
IV. Liquidity Requirements
    A. Background
    B. Overview of the Proposed Rule
    1. Key Definitions
    2. Corporate Governance Provisions
    3. Liquidity Requirements
V. Single Counterparty Exposure Limits
    A. Background
    B. Overview of the Proposed Rule
VI. Risk Management and Risk Committee Requirements
    A. Background
    B. Overview of the Proposed Rule
    1. Risk Committee Requirements
    2. Additional Enhanced Risk Management Standards for Covered Companies
VII. Stress Test Requirements
    A. Background
    B. Overview of the Proposed Rule
    1. Annual Supervisory Stress Tests Conducted by the Board
    2. Annual and Additional Stress Tests Conducted by the Companies
    C. Request for Comments
VIII. Debt-to-Equity Limit for Certain Covered Companies
    A. Background
    B. Overview of the Proposed Rule
IX. Early Remediation
    A. Background
    B. Overview of the Proposed Rule
    1. Early Remediation Requirements
    2. Early Remediation Triggering Events

X. Administrative Law Matters
  A. Solicitation of Comments and Use of
     Plain Language
  B. Paperwork Reduction Act Analysis
  C. Regulatory Flexibility Act Analysis

## I. Introduction

The recent financial crisis showed that some financial companies had grown so large, leveraged, and interconnected that their failure could pose a threat to overall financial stability. The sudden collapses or near-collapses of major financial companies were among the most destabilizing events of the crisis. The crisis also demonstrated weaknesses in the existing framework for supervising, regulating and otherwise constraining the risks of major financial companies, as well as deficiencies in the government's toolkit for managing their failure.

As a result of the imprudent risk taking of major financial companies and the severe consequences to the financial system and the economy associated with the disorderly failure of these interconnected companies, the U.S. government (and many foreign governments in their home countries) intervened on an unprecedented scale to reduce the impact of, or prevent, the failure of these companies and the attendant consequences for the broader financial system. Market participants before the crisis had assumed some probability that major financial companies would receive government assistance if they became troubled. But the actions taken by the government in response to the crisis, although necessary, have solidified that market view.

The market perception that some companies are "too big to fail" poses threats to the financial system. First, it reduces the incentives of shareholders, creditors and counterparties of these companies to discipline excessive risk-taking. Second, it produces competitive distortions because companies perceived as "too big to fail" can often fund themselves at a lower cost than other companies. This distortion is unfair to smaller companies, damaging to competition, and tends to artificially encourage further consolidation and concentration in the financial system.

A major thrust of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act or Act)[1] is mitigating the threat to financial stability posed by systemically important financial companies. The Dodd-Frank Act addresses this problem with a multi-pronged approach: a new orderly liquidation authority for financial companies (other than banks and insurance companies); the establishment of the Financial Stability Oversight Council (Council) empowered with the authority to designate nonbank financial companies for Board oversight; stronger regulation of major bank holding companies and nonbank financial companies designated for Board oversight; and enhanced regulation of over-the-counter (OTC) derivatives, other core financial markets, and financial market utilities.

*Overview of Statutory Requirements*

The focus of this proposal is stronger regulation of major bank holding companies and nonbank financial companies designated by the Council for Board supervision. In particular, sections 165 and 166 of the Dodd-Frank Act require the Board to impose a package of enhanced prudential standards on bank holding companies with total consolidated assets of $50 billion or more[2] and nonbank financial companies the Council has designated, pursuant to section 113 of the Dodd-Frank Act,[3] for supervision by the Board (together, covered companies and each a covered company). By their terms, sections 165 and 166 of the Act apply to any foreign nonbank financial company designated by the Council for supervision by the Board[4] and any foreign banking organization with total consolidated assets of $50 billion or more that is or is treated as a bank holding company for purposes of the Bank Holding Company Act of 1956 pursuant to section 8(a) of the International Banking Act of 1978.[5] However, as explained in greater detail below, this proposal does not apply to foreign banking organizations, and the Board expects to issue a separate proposal shortly that would apply the enhanced standards of sections 165 and 166 of the Act to foreign banking organizations. The definition of "covered company" for purposes of the proposal would nonetheless include a foreign banking organization's U.S.-based bank holding company subsidiary that on its own has total consolidated assets of $50 billion or more.[6] This proposal would not extend to the U.S. operations of a foreign banking organization that are conducted outside of a U.S.-based bank holding company subsidiary.

The prudential standards for covered companies required under section 165 of the Dodd-Frank Act must include enhanced risk-based capital and leverage requirements, enhanced liquidity requirements, enhanced risk management and risk committee requirements, a requirement to submit a resolution plan, single-counterparty credit limits, stress tests, and a debt-to-equity limit for covered companies that the Council has determined pose a grave threat to financial stability. In general, the Act directs the Board to implement enhanced prudential standards that strengthen existing micro-prudential supervision[7] and regulation of individual companies and incorporate macro-prudential considerations so as to reduce threats posed by covered companies to the stability of the financial system as a whole. Section 166 of the Act requires the Board to establish a regulatory framework for the early remediation of financial weaknesses of covered companies in order to minimize the probability that such companies will become insolvent and the potential harm of such insolvencies to the financial stability of the United States.[8]

In addition to the required standards, the Act authorizes but does not require the Board to establish additional enhanced standards for covered companies relating to (i) contingent capital; (ii) public disclosures; (iii) short-term debt limits; and (iv) such other prudential standards as the Board

---

[1] Public Law 111–203, 124 Stat. 1376 (2010).

[2] The Board, pursuant to a Council recommendation, may raise the $50 billion asset threshold for bank holding companies with respect to the application of certain enhanced standards. *See* 12 U.S.C. 5365(a)(2)(B).

[3] *See* 12 U.S.C. 5323. The Council proposed rules to implement its authority under section 113 in January 2011 and October 2011. *See* 76 FR 4555 (January 26, 2011) and 76 FR 64264 (October 18, 2011).

[4] *See* 12 U.S.C. 5323(b). Section 102(c) limits the application of section 165 to only the U.S. activities and subsidiaries of a foreign nonbank financial company. 12 U.S.C. 5311(c).

[5] *See* 12 U.S.C. 5311(a)(1) (defining the term "bank holding company" for purposes of Title I of the Dodd-Frank Act). A foreign banking organization is treated as a bank holding company pursuant to section 8(a) of the International Banking Act if the foreign banking organization operates a branch, agency or commercial lending company in the United States.

[6] With the exception of the proposed liquidity and enterprise-wide risk management requirements and the debt-to-equity limit for covered companies that the Council has determined pose a grave threat, the proposed rule would not apply to any bank holding company subsidiary of a foreign banking organization that has relied on Supervision and Regulation Letter SR 01–01 issued by the Board of Governors (as in effect on May 19, 2010) until July 21, 2015. This is consistent with the phase-in period for the imposition of minimum risk-based and leverage capital requirements established in section 171 of the Dodd-Frank Act.

[7] Micro-prudential supervision focuses on surveillance of the safety and soundness of individual companies, whereas macro-prudential supervision focuses on the surveillance of systemic risk posed by individual companies and systemic risks posed by interconnectedness among companies.

[8] *See* 12 U.S.C. 5366(b).

determines appropriate.[9] The Board is not proposing any of these supplemental standards at this time but continues to consider whether adopting any of these standards would be appropriate.

The Act requires the enhanced standards established by the Board for covered companies under section 165 to be more stringent than those standards applicable to other bank holding companies and nonbank financial companies that do not present similar risks to U.S. financial stability.[10] Section 165 also requires that the enhanced standards established pursuant to that section increase in stringency based on the systemic footprint and risk characteristics of individual covered companies.[11]

In prescribing prudential standards under section 165(b)(1)[12] to covered companies, the Board is required to take into account differences among bank holding companies covered by the rule and nonbank financial companies supervised by the Board, based on certain considerations.[13] The Board also has authority under section 165 to tailor the application of the standards, including differentiating among covered companies on an individual basis or by category.[14] When differentiating among companies for purposes of applying the standards established under section 165, the Board may consider the companies' size, capital structure, riskiness, complexity, financial activities, and any other risk-related factor the Board deems appropriate.

## II. Overview of the Proposal

The Board is requesting comment on proposed rules to implement certain requirements of sections 165 and 166 of the Dodd-Frank Act.[15] The Board consulted with the Council, including by providing periodic updates to members of the Council and their staff on the development of the proposed enhanced standards. The proposal reflects comments provided to the Board as a part of this consultation process. The Board also intends, before imposing prudential standards or any other requirements pursuant to section 165 that are likely to have a significant impact on a functionally regulated subsidiary or depository institution subsidiary of a covered company, to consult with each Council member that primarily supervises any such subsidiary.[16]

This proposal includes rules to implement the requirements under section 165 related to (i) risk-based capital and leverage; (ii) liquidity; (iii) single-counterparty credit limits; (iv) overall risk management and risk committees; (v) stress tests; and (vi) a debt-to-equity limit for covered companies that the Council has determined pose a grave threat to financial stability. The proposal also includes rules to implement the early remediation requirements in section 166 of the Act related to establishing measures of financial condition and remediation requirements that increase in stringency as the financial condition of a covered company declines.

Section 165(d) of the Act also establishes requirements that each covered company submit periodically to the Board and Federal Deposit Insurance Corporation (FDIC) a plan for rapid and orderly resolution under the Bankruptcy Code in the event of its material financial distress or failure, as well as a periodic report regarding credit exposures between each covered company and other significant financial companies. The Board and FDIC jointly issued a final rule to implement the resolution plan requirement that became effective on November 30, 2011 and expect to implement periodic reporting of credit exposures at a later date.[17]

By setting forth comprehensive enhanced prudential standards and an early remediation framework for covered companies, the proposal would create an integrated set of requirements that seeks to meaningfully reduce the probability of failure of systemically important companies and minimize damage to the financial system and the broader economy in the event such a company fails. The proposed rules, which increase in stringency with the level of systemic risk posed by and the risk characteristics of the covered company, would provide incentives for covered companies to reduce their systemic footprint and encourage covered companies to consider the external costs that their failure or distress would impose on the broader financial system, thus helping to offset any implicit subsidy they may have enjoyed as a result of market perceptions of implicit government support.

This proposal provides a core set of concrete rules to complement the Federal Reserve's existing efforts to enhance the supervisory framework for covered companies. The Federal Reserve, since before the passage of the Dodd-Frank Act, has been taking steps to strengthen its supervision of the largest, most complex banking companies. For example, the Federal Reserve created a centralized multidisciplinary body called the Large Institution Supervision Coordinating Committee (LISCC) to oversee the supervision of these companies. This committee uses horizontal, or cross-company, evaluations to monitor interconnectedness and common practices among companies that could lead to greater systemic risk. The committee also uses additional and improved quantitative methods for evaluating the financial condition of companies and the risks they might pose to each other and to the broader financial system.

### A. Scope of Application

The Dodd-Frank Act requires the Board to apply enhanced standards established under section 165(b)(1) and early remediation requirements under

---

[9] *See* 12 U.S.C. 5365(b)(1)(B).

[10] *See* 12 U.S.C. 5365(a)(1)(A).

[11] *See* 12 U.S.C. 5365(a)(1)(B). Under section 165(a)(1)(B), the enhanced standards must increase in stringency, based on the considerations listed in section 165(b)(3). These considerations are summarized in note 13, infra.

[12] 12 U.S.C. 5365(b)(1). The Board is separately required to issue regulations to implement the risk committee and stress test enhanced standards pursuant to sections 165(h) and 165(i), respectively.

[13] *See* 12 U.S.C. 5365(b)(3). The factors the Board must consider include—(i) The factors described in sections 113(a) and (b) of the Dodd-Frank Act (12 U.S.C. 5313(a) and (b)); (ii) whether the company owns an insured depository institution; (iii) nonfinancial activities and affiliations of the company; and (iv) any other risk-related factors that the Board determines appropriate. 12 U.S.C. 5365(b)(3)(A). The Board must, as appropriate, adapt the required standards in light of any predominant line business of a nonbank financial company for which particular standards may not be appropriate. 12 U.S.C. 5365(b)(3)(D). Section 165(b)(3) also requires the Board, to the extent possible, to ensure that small changes in the factors listed in sections 113(a) and 113(b) of the Dodd-Frank Act would not result in sharp, discontinuous changes in the prudential standards established by the Board under section 165(b)(1). 12 U.S.C. 5365(b)(3)(B). The statute also directs the Board to take into account any recommendations made by the Council pursuant to its authority under section 115 of the Dodd-Frank Act. 12 U.S.C. 5365(b)(3)(C).

[14] *See* 12 U.S.C. 5365(a)(2)(A).

[15] 12 U.S.C. 5365 and 5366.

[16] *See* 12 U.S.C. 5365(b)(4).

[17] *See* 76 FR 67323 (November 1, 2011). In response to significant concerns expressed by commenters about the clarity of key definitions and the scope of the reporting requirement of the proposed credit exposure reporting requirement, the Board and FDIC postponed finalizing the credit exposure reporting requirement. The Board believes that robust reporting of a covered company's credit exposures to other significant bank holding companies and financial companies is critical to ongoing risk management by covered companies, as well as to the Board's ongoing supervision of covered companies and financial stability responsibilities, and the FDIC's responsibility to resolve failed covered companies. However, the agencies also recognize that these reports would be most useful and complete if developed in conjunction with the Dodd-Frank Act's single counterparty credit exposure limits. *See* 12 U.S.C. 5365(e).

section 166 of the Dodd-Frank Act to covered companies. As noted above, covered companies are described in the Act as bank holding companies with total consolidated assets of $50 billion or more (which would include any foreign banking organization that has banking operations in the United States and that has global consolidated assets of $50 billion or more) and nonbank financial companies the Council has designated for supervision by the Board. The proposal incorporates this definition but, for reasons described below, at this time only covers U.S. bank holding companies and nonbank financial companies the Council has designated.

Under section 165(i)(2), the requirements to conduct annual stress tests apply to any financial company with more than $10 billion in total consolidated assets and that is regulated by a primary federal financial regulatory agency.[18] The Board, as the primary Federal financial regulatory agency for bank holding companies, savings and loan holding companies, and state member banks, proposes to apply the annual company-run stress test requirements to any bank holding company, savings and loan holding company,[19] and state member bank with more than $10 billion in total consolidated assets. Moreover, the requirement to establish a risk committee under section 165(h) of the Act applies to any publicly traded bank holding company with $10 billion or more in total consolidated assets.[20]

For purposes of the definition of a covered company, a bank holding company is deemed to have met the $50 billion asset criterion based on the average of the company's total consolidated assets as reported on its four most recent quarterly reports to the Board, i.e., the Consolidated Financial Statements for Bank Holding Companies (Federal Reserve Form FR Y–9C).[21] This

calculation will be effective as of the due date of the bank holding company's most recent FR Y–9C.[22] Under the proposal, a bank holding company that becomes a covered company would remain a covered company until its total consolidated assets, as reported to the Board on a quarterly basis on the FR Y–9C, fall and remain below $50 billion for four consecutive quarters.

This proposal would apply the same set of enhanced prudential standards to covered companies that are bank holding companies and covered companies that are nonbank financial companies. As noted above, however, in applying the enhanced prudential standards to covered companies, the Board may determine, on its own or in response to a recommendation by the Council, to tailor the application of the enhanced standards to different companies on an individual basis or by category, taking into consideration their capital structure, riskiness, complexity, financial activities, size, and any other risk-related factors that the Board deems appropriate.[23]

The Board notes that this authority will be particularly important in applying the enhanced standards to specific nonbank financial companies designated by the Council that are organized and operated differently from banking organizations.[24] Under the Act,[25] the Council generally may determine that a nonbank financial company, i.e., a company predominantly engaged in financial activities, should be subject to supervision by the Board and the enhanced standards established pursuant to section 165 and the early remediation requirements established pursuant to section 166, if material financial distress at such company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the nonbank financial company, could pose a threat to the financial stability of the United States. As such, the types of business models, capital structures, and risk

profiles of companies that would be subject to designation by the Council could vary significantly.

While this proposal was largely developed with large, complex bank holding companies in mind, some of the standards nonetheless provide sufficient flexibility to be readily implemented by covered companies that are not bank holding companies. In prescribing prudential standards under section 165(b)(1), the Board would to take into account differences among bank holding companies and nonbank financial companies supervised by the Board.[26] Following designation of a nonbank financial company by the Council, the Board would thoroughly assess the business model, capital structure, and risk profile of the designated company to determine how the proposed enhanced prudential standards and early remediation requirements should apply. The Board may, by order or regulation, tailor the application of the enhanced standards to designated nonbank financial companies on an individual basis or by category, as appropriate.[27]

The Board solicits comment on alternative approaches for applying the enhanced prudential standards and the early remediation requirements the Dodd-Frank Act requires to nonbank covered companies.

*Question 1:* What additional characteristics of a nonbank covered company—in addition to its business model, capital structure, and risk profile—should the Board consider when determining how to apply the enhanced standards and the early remediation requirements to such a company?

*Question 2:* What are the potential unintended consequences and burdens associated with subjecting a nonbank covered company to the enhanced prudential standards and the early remediation requirements?

The current proposal would apply only to U.S.-based bank holding companies that are covered companies and to nonbank covered companies, and would not apply to foreign banking

---

[18] 12 U.S.C. 5365(i)(2). The Dodd-Frank Act defines primary financial regulatory agency in section 2 of the Act. *See* 12 U.S.C. 5301(12). The Board, Office of the Comptroller of the Currency, and Federal Deposit Insurance Corporation have consulted on rules implementing section 165(i)(2).

[19] As discussed below, the Board proposes to delay the effective date of the portion of the proposal implementing section 165(i)(2) for savings and loan holding companies until such time as the Board has implemented consolidated capital rules for savings and loan holding companies.

[20] 12 U.S.C. 5365(h).

[21] With respect to a company that has been a bank holding company for less than four quarters, the Board would refer to the company's financial statements from quarters preceding the time that it began reporting on the FR Y–9C. For example, if a bank holding company had been reporting on the FR Y–9C for only one quarter, the Board would refer to its GAAP financial statements for the prior

three quarters for purposes of calculating its average total consolidated assets.

[22] For purposes of subpart E of the proposed rule, the same calculation approach would be applied to any bank holding company in determining when it becomes an over $10 billion bank holding company. For purposes of subpart G of the proposed rule, the same calculation approach would be applied to any bank holding company, savings and loan holding company, or state member bank in determining when it becomes an over $10 billion company.

[23] 12 U.S.C. 5365(a)(2).

[24] To date, the Council has not designated any nonbank financial company for supervision by the Board.

[25] *See* 12 U.S.C. 5315. *See also* 76 FR 64264 (Oct. 18, 2011) (proposing to implement the Council's authority under section 113 of the Dodd-Frank).

[26] *See* 12 U.S.C. 5365(b)(3). The factors the Board must take into consideration in prescribing the enhanced standards under section 165(b)(1) are described above. *See supra* note 13. Under section 171 of the Dodd-Frank Act, the Board is required to impose the same minimum risk-based and leverage capital requirements on bank holding companies and nonbank covered company as it imposes on insured depository institutions. 12 U.S.C. 5371.

[27] Following designation of nonbank financial companies by the FSOC, the Board also would consider the appropriate risk-based capital treatment of asset types with no explicit treatment under the current risk-based capital rules. *See generally* 76 FR 37620 (June 28, 2011).

organizations. As discussed above, however, foreign banking organizations that have U.S. banking operations (whether a U.S. branch, a U.S. agency, or a U.S. subsidiary bank holding company or bank) and have global total consolidated assets [28] of $50 billion or more are subject to sections 165 and 166 of the Dodd-Frank Act. Section 165 instructs the Board, in applying the enhanced prudential standards of section 165 to foreign financial companies, to give due regard to the principle of national treatment and equality of competitive opportunity, and to take into account the extent to which the foreign company is subject, on a consolidated basis, to home country standards that are comparable to those applied to financial companies in the United States.

Determining how to apply the enhanced prudential standards and early remediation framework established by the Dodd-Frank Act to foreign banking organizations in a manner consistent with the purposes of the statute and the Board's existing framework of supervising foreign banking organizations is difficult. The scope of enhanced prudential standards required under sections 165 and 166 extends beyond the set of prudential standards that are part of existing international agreements, and foreign banking organizations are subject to home country regulatory and supervisory regimes that employ a wide variety of approaches to prudential regulation. Further, foreign banking organizations operate in the United States through diverse structures, complicating the consistent application of the enhanced standards to the U.S. operations of a foreign banking organization. Finally, the risk posed to U.S. financial stability by foreign banking organizations that are subject to sections 165 and 166 varies widely. The Board is actively developing a proposed framework for applying the Act's enhanced prudential standards and early remediation requirement to foreign banking organizations, and expects to issue this framework for public comment shortly.

While sections 165 and 166 generally do not apply to savings and loan holding companies, section 165(i)(2) requires the Board to issue regulations pursuant to which any financial company for which the Board is the primary federal financial regulatory

agency and that has more than $10 billion in total consolidated assets must conduct an annual stress test.[29] Thus, the proposal would apply annual company-run stress test requirements to any savings and loan holding company with more than $10 billion in consolidated assets. However, because the annual stress test requirement, as proposed, is predicated on a company being subject to consolidated capital requirements, this proposal would delay the effective date of the company-run stress test requirements for savings and loan holding companies until the Board has established risk-based capital requirements for savings and loan holding companies.

While the remaining parts of section 165 and section 166 do not specifically apply to savings and loan holding companies, the Board, as the primary supervisor of savings and loan holding companies, has the authority under the Home Owners' Loan Act to apply the enhanced standards to savings and loan holding companies to ensure their safety and soundness.[30] The Board intends to issue a separate proposal for notice and comment to initially apply the enhanced standards and early remediation requirements to all savings and loan holding companies with substantial banking activities—i.e., any savings and loan holding company that (i) has total consolidated assets of $50 billion or more; and (ii)(A) has savings association subsidiaries that comprise 25 percent or more of such savings and loan holding company's total consolidated assets, or (B) controls one or more savings associations with total consolidated assets of $50 billion or more. The Board believes that applying the enhanced prudential standards of this proposal to savings and loan holding companies that satisfy these criteria is an important aspect of ensuring their safety and soundness. The Board also may determine to apply the enhanced standards to any savings and loan holding company, if appropriate to ensure the safety and soundness of such company, on a case-by-case basis.

As is the case with stress testing, many of the other enhanced standards are predicated on a covered company being subject to consolidated capital

requirements. Therefore, similar to the approach with respect to applying the annual company-run stress test requirement to savings and loan holding companies, the Board intends to impose enhanced prudential standards and early remediation requirements on savings and loan holding companies with substantial banking activities once the Board has established risk-based capital requirements for savings and loan holding companies.

*Question 3:* The Board seeks comment on its proposed approach to the application of the company-run stress test requirements, including the delayed effective date, to savings and loan holding companies. Also, what additional or alternative criteria should the Board consider for determining which savings and loan holding companies initially would be subject to the enhanced prudential standards and early remediation requirements?

*B. Risk-Based Capital Requirements and Leverage Limits*

The recent financial crisis exposed significant weaknesses in the regulatory capital requirements for large banking companies. The amount of capital held by many large, complex banking companies proved to be inadequate to cover the risks that had accumulated in the companies. For certain exposure types, such as trading positions, OTC derivatives, and securitization and re-securitization exposures, it became evident that capital requirements did not adequately cover the risk of loss from those activities. In addition, it became apparent that some of the instruments that qualified as tier 1 capital for banking companies, the core measure of capital adequacy, were not truly loss absorbing.

Section 165(b)(1)(A)(i) of the Act directs the Board to establish enhanced risk-based capital and leverage standards for covered companies to address these weaknesses. The Board plans to meet this statutory requirement with a two-part effort. Under this proposal, the Board would subject all covered companies to the Board's capital plan rule, which currently requires all bank holding companies with $50 billion or more in consolidated assets to submit an annual capital plan to the Board for review (capital plan rule).[31] Under the capital plan rule, covered companies would have to demonstrate to the Board that they have robust, forward-looking capital planning processes that account for their unique risks and that permit continued operations during times of economic

---

[28] For a foreign banking organization subject to section 165 of the Dodd-Frank Act, total consolidated assets would be based on the foreign banking organization's Capital and Asset Reports for Foreign Banking Organizations (Federal Reserve Form FR Y–7Q).

[29] Among entities covered by this part of the Dodd-Frank are state member banks, bank holding companies, and savings and loan holding companies with total consolidated assets of $10 billion or more.

[30] *See* 12 U.S.C. 1467a(g) (authorizing the Board to issue such regulations and orders as the Board deems necessary or appropriate to administer and carry out the purposes of section 10 of the Home Owners' Loan Act).

[31] 12 CFR 225.8.

and financial stress. The supervisory and company-run stress tests that are part of this proposal and discussed in detail below are important aspects of this forward-looking process.[32] The Board expects that a covered company will integrate into its capital plan, as one part of the underlying analysis, the results of the company-run stress tests conducted in accordance with section 165(i)(2) of the Dodd-Frank Act and the Board's proposed implementing rules. The results of those stress tests, as well as the annual supervisory stress test conducted by the Board under section 165(i)(1) of the Dodd-Frank, will be considered in the evaluation of a covered company's capital plan.

Under the capital plan rule, covered companies would be required to demonstrate to the Board their ability to maintain capital above existing minimum regulatory capital ratios and above a tier 1 common ratio of 5 percent under both expected and stressed conditions over a minimum nine-quarter planning horizon.[33] Covered companies with unsatisfactory capital plans would face limits on their ability to make capital distributions.

The Board intends to supplement the enhanced risk-based capital and leverage requirements included in this proposal with a subsequent proposal to implement a quantitative risk-based capital surcharge for covered companies or a subset of covered companies. Over the past few years, the Federal Reserve and other U.S. federal banking agencies

have worked together with other members of the Basel Committee on Banking Supervision (BCBS) to strengthen the regulatory capital regime for internationally active banks and develop a framework for a risk-based capital surcharge for the world's largest, most interconnected banking companies. The new regime for internationally active banks, known as Basel III,[34] materially improves the quality of regulatory capital and introduces a new minimum common equity requirement. Basel III also raises the numerical minimum capital requirements and introduces capital conservation and countercyclical buffers to induce banking organizations to hold capital in excess of regulatory minimums. In addition, Basel III establishes for the first time an international leverage standard for internationally active banks. The Board is working with the other U.S. banking regulators to implement the Basel III capital reforms in the United States.

Building on the Basel III reforms, the BCBS published a document in November 2011 entitled *Global systemically important banks: Assessment methodology and the additional loss absorbency requirement* (BCBS framework), which set forth an additional capital requirement for global systemically important banks (G–SIBs).[35]

The Basel III and BCBS frameworks, once implemented in the United States, are expected to significantly enhance risk-based capital and constrain the leverage of covered companies and will be a key part of the Board's overall approach to enhancing the risk-based capital and leverage standards applicable to these companies in accordance with section 165 of the Dodd-Frank Act. The Board intends to propose a quantitative risk-based capital surcharge in the United States based on the BCBS approach consistent with the BCBS's implementation timeframe. The

forthcoming proposal would contemplate adopting implementing rules in 2014, and requiring G–SIBs to meet the capital surcharges on a phased-in basis from 2016–2019.

*C. Liquidity Requirements*

The financial crisis revealed significant weaknesses in liquidity buffers and liquidity risk management practices throughout the financial system that directly contributed to the failure or near failure of many companies and exacerbated the crisis. Section 165(b)(1)(A)(ii) addresses inadequacies in the existing regulatory liquidity requirements by directing the Board to establish liquidity standards for covered companies. Similar to enhanced risk-based capital and leverage requirements, the Federal Reserve intends to implement this statutory requirement through a multi-stage approach.

This proposal would subject covered companies to a set of enhanced liquidity risk management standards, including liquidity stress testing.[36] The proposal builds on guidance previously adopted by the Board and other U.S. federal banking agencies and proposes higher liquidity risk management standards for covered companies.[37]

The proposal would require covered companies to conduct internal stress tests at least monthly to measure their liquidity needs at 30-day, 90-day and one-year intervals during times of instability in the financial markets and to hold liquid assets that would be sufficient to cover 30-day stressed net cash outflows under their internal stress scenarios. Covered companies also would be required to meet specified corporate governance requirements around liquidity risk management, to project cash flow needs over various time horizons, to establish internal limits on certain liquidity metrics, and

---

[32] In June 2011, the Board, along with the OCC and FDIC, issued for comment proposed supervisory guidance on stress testing for banking organizations with more than $10 billion in total assets. 76 FR 35072 (June 15, 2011). That proposed guidance contains principles for an effective stress testing framework that would cover an organization's various stress testing activities, including capital and liquidity stress testing. The agencies issued the proposed guidance for comment separately from this proposal because the proposed guidance is intended to apply broadly to organizations' use of stress testing in overall risk management, not just to capital and liquidity stress testing, as is the case for the requirements of this proposed rule. The agencies are considering comments on the proposed guidance and expect to issue a final version shortly. The Board expects that companies would follow the principles set forth in the final stress testing guidance—as well as with other relevant supervisory requirements—when conducting capital and liquidity stress testing in accordance with requirements in this proposing rule.

[33] Under the capital plan rule, tier 1 common is defined as tier 1 capital less non-common elements in tier 1 capital, including perpetual preferred stock and related surplus, minority interest in subsidiaries, trust preferred securities and mandatory convertible preferred securities. Specifically, non-common elements include the following items captured in the FR Y–9C reporting form: Schedule HC, line item 23 net of Schedule HC–R, line item 5; and Schedule HC–R, line items 6a, 6b, and 6c.

[34] *See* Basel Committee on Banking Supervision, Basel III: A global regulatory framework for more resilient banks and banking systems (revised June 2011), available at *http://www.bis.org/publ/ bcbs189.htm* (hereinafter Basel III framework). *See also* Basel Committee on Banking Supervision, *Basel III: International framework for liquidity risk measurement, standards and monitoring* (December 2010), available at *www.bis.org/publ/bcbs188.htm* (hereinafter Basel III liquidity framework); *Enhancements to the Basel II framework* (July 2009), available at *www.bis.org/publ/bcbs157.htm;* and *Revisions to the Basel II market risk framework* (July 2009), available at *www.bis.org/publ/ bcbs158.htm.*

[35] *See* Basel Committee on Banking Supervision, *Global systemically important banks: Assessment methodology and the additional loss absorbency requirement* (November 2011), available at *http:// www.bis.org/publ/bcbs207.htm* (hereinafter BCBS capital surcharge framework).

[36] *See supra* note 32.

[37] Supervision and Regulation Letter SR 10–6, Interagency Policy Statement on Funding and Liquidity Risk Management (March 17, 2010), *available at http://www.federalreserve.gov/ boarddocs/srletters/2010/sr1006.pdf;* 75 FR 13656 (March 22, 2010). The Board, the Office of the Comptroller of the Currency (OCC), the FDIC, the Office of Thrift Supervision, the National Credit Union Administration, and the Conference of State Bank Supervisors jointly issued the Interagency Liquidity Risk Policy Statement. The Interagency Liquidity Risk Policy Statement incorporates principles of sound liquidity risk management that the agencies have issued in the past, and supplements them with the principles of sound liquidity risk management established by the Basel Committee on Bank Supervision (Basel Committee) in its document entitled "Principles for Sound Liquidity Management and Supervision." *Principles for Sound Liquidity Risk Management and Supervision* (September 2008), *available at https:// ww.bis.org/publ/bcbs144.htm.*

to maintain a contingency funding plan (CFP) that identifies potential sources of liquidity strain and alternative sources of funding when usual sources of liquidity are unavailable.

In addition to the enhanced liquidity risk management standards included in this proposal, the Federal Reserve and other U.S. federal banking agencies have been working with the BCBS over the past few years to develop quantitative liquidity requirements to increase the capacity of internationally active banking firms to absorb shocks to funding relative to the liquidity risks they face. The BCBS approved two new liquidity rules as part of the Basel III reforms in December 2010. The first rule is a Liquidity Coverage Ratio (LCR), which would require banks to hold an amount of high-quality liquid assets sufficient to meet expected net cash outflows over a 30-day time horizon under a supervisory stress scenario. The second rule is the Net Stable Funding Ratio (NSFR), which would require banks to enhance their liquidity risk resiliency out to one year. Under the terms of Basel III, global banks are required to comply with the LCR by 2015 and with the NSFR by 2018.

The Basel III liquidity rules are currently in an international observation period as the U.S. federal banking agencies and other BCBS members assess the potential impact of the rules on banks and various financial markets. The Board intends, in conjunction with other federal banking agencies, to implement these standards in the United States through one or more separate rulemakings. Through implementation of these standards in the United States, the Board anticipates that the Basel III liquidity rules would then become a central component of the enhanced liquidity requirements for covered companies, or a subset of covered companies, under section 165 of the Dodd-Frank Act.

### D. Single-Counterparty Credit Limits

As demonstrated in the crisis, interconnectivity among major financial companies poses risks to financial stability. The effects of one large financial company's failure or near collapse may be transmitted and amplified by the bilateral credit exposures between large, systemically important companies. The financial crisis also revealed inadequacies in the structure of the U.S. regulatory framework for single-counterparty credit limits. Although banks were subject to single-borrower lending and investment limits, these limits did not apply to bank holding companies on a consolidated basis and did not

adequately cover credit exposures generated by derivatives and some securities financing transactions.[38]

In an effort to address concentration risk among large financial institutions, section 165(e) of the Dodd-Frank Act directs the Board to establish single-counterparty credit limits for covered companies in order to limit the risks that the failure of any individual company could pose to a covered company.[39] This section directs the Board to prescribe regulations that prohibit covered companies from having credit exposure to any unaffiliated company that exceeds 25 percent of the capital stock and surplus of the covered company.[40] This section also authorizes the Board to lower the 25 percent threshold if necessary to mitigate risks to the financial stability of the United States.[41]

Credit exposure to a company is defined broadly in section 165(e) of the Act to cover all extensions of credit to the company; all repurchase and reverse repurchase agreements, and securities borrowing and lending transactions, with the company; all guarantees and letters of credit issued on behalf of the company; all investments in securities issued by the company; counterparty credit exposure to the company in connection with derivative transactions; and any other similar transaction that the Board determines to be a credit exposure for purposes of section 165(e).[42] Section 165(e) also grants authority to the Board to exempt transactions from the definition of the term "credit exposure" if the Board finds that the exemption is in the public interest and consistent with the purposes of the subsection.[43]

The proposal implements these statutory provisions by defining key terms, such as covered company, unaffiliated counterparty, and capital stock and surplus. The proposal also targets the mutual interconnectedness of the largest financial companies by setting a stricter 10 percent limit for credit exposure between a covered

[38] Section 610 of the Dodd-Frank Act amends the term "loans and extensions of credit" for purposes of the lending limits applicable to national banks to include any credit exposure arising from a derivative transaction, repurchase agreement, reverse repurchase agreement, securities lending transaction, or securities borrowing transaction. *See* Dodd-Frank Act, Public Law 111–203, § 610, 124 Stat. 1376, 1611 (2010). As discussed in more detail below, these types of transactions are also all made subject to the single counterparty credit limits of section 165(e). 12 U.S.C. 5365(e)(3).

[39] *See* 12 U.S.C. 5365(e)(1).

[40] 12 U.S.C. 5365(e)(2).

[41] *See id.*

[42] *See* 12 U.S.C. 5365(e)(3).

[43] *See* 12 U.S.C. 5365(e)(5)–(6).

company and a counterparty that each either have more than $500 billion in total consolidated assets or are a nonbank covered company. In addition, the proposal provides rules for measuring the amount of credit exposure generated by the various types of credit transactions. Notably, the proposal would allow covered companies to reduce their credit exposure to a counterparty for purposes of the limit by obtaining credit risk mitigants such as collateral, guarantees, and credit derivative hedges. The proposal describes the types of collateral, guarantees and derivative hedges that are eligible under the rule and provides valuation rules for reflecting such credit risk mitigants.

### E. Risk Management and Risk Committee Requirements

Sound, enterprise-wide risk management by covered companies reduces the likelihood of their material distress or failure and thus promotes financial stability. In addition to adopting enhanced risk management standards for covered companies, the Board is directed by section 165(h) to require publicly traded covered companies and publicly traded bank holding companies with $10 billion or more in total consolidated assets to establish a risk committee of the board of directors that is responsible for oversight of enterprise-wide risk management, is comprised of an appropriate number of independent directors, and includes at least one risk management expert.

The proposal would require all covered companies to implement robust enterprise-wide risk management practices that are overseen by a risk committee of the board of directors and chief risk officer with appropriate levels of independence, expertise and stature. The proposal also would require any publicly traded bank holding company with $10 billion or more in total consolidated assets and that is not a covered company to establish a risk committee.

### F. Stress Testing Requirements

The crisis also revealed weaknesses in the stress testing practices of large banking organizations, as well as gaps in the regulatory community's approach to assessing capital adequacy. During the height of the crisis, the Federal Reserve began stress testing the capital adequacy of large, complex bank holding companies as a forward-looking exercise designed to estimate losses, revenues, regulatory capital ratios, and reserve needs under various macroeconomic

scenarios.[44] By looking at the broad needs of the financial system and the specific needs of individual companies, these stress tests provided valuable information to market participants and had an overall stabilizing effect.

Section 165(i)(1) directs the Board to implement rules requiring the Federal Reserve, in coordination with the appropriate primary Federal regulatory agencies and the Federal Insurance Office, to conduct an annual evaluation of whether each covered company has sufficient capital to absorb losses as a result of adverse economic conditions (supervisory stress tests). The Board is also required to publish a summary of the results of the supervisory stress tests. In addition, section 165(i)(2) directs the Board to implement rules requiring each covered company to conduct its own semi-annual stress tests and any state member bank, bank holding company or savings and loan holding company with more than $10 billion in total consolidated assets (that is not a covered company) to conduct its own annual stress tests (company-run stress tests). Companies must also publish a summary of the results of the company-run stress tests.

The proposal would implement these statutory provisions by requiring the Federal Reserve to conduct annual supervisory stress tests of covered companies under baseline, adverse, and severely adverse scenarios and by requiring companies that are subject to company-run stress test requirements to conduct their own capital adequacy stress tests on an annual or semi-annual basis, as applicable. Under the proposal, the Board would publicly disclose information on the company-specific results of the supervisory stress tests.

### G. Debt-to-Equity Limits for Certain Covered Companies

Section 165(j) of the Dodd-Frank Act provides that the Board must require a covered company to maintain a debt-to-equity ratio of no more than 15-to-1, upon a determination by the Council

that (i) such company poses a grave threat to the financial stability of the United States and (ii) the imposition of such a requirement is necessary to mitigate the risk that the company poses to U.S. financial stability. The proposal establishes procedures to notify a covered company that the Council has made a determination under section 165(j) that the company must comply with the 15-to-1 debt-to-equity ratio requirement, defines "debt" and "equity" for purposes of calculating compliance with the ratio, and provides an affected company with a transition period to come into compliance with the ratio.

### H. Early Remediation Framework

The financial crisis revealed that the condition of large banking organizations can deteriorate rapidly even during periods when their reported regulatory capital ratios are well above minimum requirements. The crisis also revealed that financial companies that addressed incipient financial problems swiftly and decisively performed much better than companies that delayed remediation work.

Section 166 of the Dodd-Frank Act directs the Board to prescribe regulations to provide for the early remediation of financial distress at covered companies so as to minimize the probability that the company will become insolvent and to reduce the potential harm of the insolvency of a covered company to the financial stability of the United States. The regulation must use measures of the financial condition of a covered company, including regulatory capital ratios, liquidity measures, and other forward-looking indicators as triggers for remediation actions. Remediation requirements must increase in stringency as the financial condition of a covered company deteriorates. Remedies must include, in the initial stages of financial decline of the covered company, limits on capital distributions, acquisitions, and asset growth. Remedies in the later stages of financial decline of the covered company must include a capital restoration plan and capital-raising requirements, limits on transactions with affiliates, management changes, and asset sales.

The proposed rule implementing section 166 establishes a regime for the early remediation of financial distress at covered companies that includes several forward-looking triggers designed to identify emerging or potential issues before they develop into larger problems. In addition to regulatory capital triggers, the proposed rule

includes triggers based on supervisory stress test results, market indicators and weaknesses in enterprise-wide and liquidity risk management. The proposed rule also describes the regulatory restrictions that a covered company must comply with in each remedial stage.

### I. Transition Arrangements and Ongoing Compliance

Another important aspect of the proposal is the timing of initial compliance and ongoing reporting to the Board in conjunction with the proposed enhanced standards. In order to reduce the burden on covered companies of coming into initial compliance with the standards, the Board is proposing to provide meaningful phase-in periods. In general, a company that is a covered company on the effective date of the final rule would be subject to the enhanced prudential standards beginning on the first day of the fifth quarter following the effective date of the final rule. A company that becomes a covered company after the effective date of the final rule generally would become subject to the enhanced standards beginning on the first day of the fifth quarter following the date that it became a covered company. For a variety of reasons, the proposed rule provides different transition arrangements for enhanced risk-based capital and leverage requirements, single-counterparty credit limits and stress testing requirements. Transition arrangements for these standards are discussed in the relevant sections of the preamble below.

To reduce the burden of ongoing compliance with the enhanced standards, the Board is also proposing to sequence the timing of required submissions. For example, the requirement that covered companies conduct stress tests is specifically timed to coordinate with the reporting requirements associated with the capital plan, and the capital plan and stress test requirements are specifically timed to minimize overlap with resolution plan update requirements.[45]

*Question 4:* Are there alternative approaches the Board should consider to phase in the proposed enhanced prudential standards for either bank holding companies or nonbank financial companies?

### J. Reservation of Authority

To address situations where compliance with the requirements of the proposed rule would not sufficiently mitigate the risks to U.S. financial

---

[44] In early 2009, the Federal Reserve led the Supervisory Capital Assessment Program (SCAP) as a key element of the plan to stabilize the U.S. financial system. Building on SCAP and other supervisory work coming out of the crisis, the Federal Reserve initiated the Comprehensive Capital Analysis and Review (CCAR) in late 2010 to evaluate the internal capital planning processes of large, complex bank holding companies. The CCAR represented a substantial strengthening of previous approaches to ensuring that large firms have thorough and robust processes for managing and allocating their capital resources. The CCAR also focused on the risk measurement and management practices supporting firms' capital adequacy assessments, including their ability to deliver credible inputs to their loss estimation techniques.

[45] *See* 12 CFR 243.3.

stability posed by the failure or material financial distress of a covered company, the proposed rule includes a reservation of authority provision. This reservation of authority would permit the Board to implement additional or further enhanced prudential standards for a covered company, including, but not limited to, additional capital or liquidity requirements, corporate governance standards, concentration limits, stress testing requirements, activity limits, or other requirements or restrictions that the Board may deem necessary to carry out the purposes of the proposal or section 165 of the Dodd-Frank Act.[46] The proposed rule also specifies that the Board may determine that a bank holding company that is not a covered company shall be subject to one or more of the standards established under the proposed rule if the Board determines that doing so is necessary or appropriate to protect the safety and soundness of the company or to promote financial stability.

In addition, the proposed rule would specifically state that nothing in the rule would limit the authority of the Board under any other provision of law or regulation to take supervisory or enforcement action, including action to address unsafe and unsound practices or conditions, deficient capital or liquidity levels, or violations of law.

### K. Common Definitions

A number of terms are used throughout the proposed rule. Some of these terms are generally given the same meaning as their definitions under other regulations issued by the Board. For example, under the proposal, the term "company" would be defined as a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization. The term "bank holding company" generally would have the same meaning as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).[47] Additional common definitions are detailed in the proposed rule.

The Board solicits comment on these proposed definitions.

## III. Risk-Based Capital Requirements and Leverage Limits

### A. Background

Section 165 of the Dodd-Frank Act directs the Board to establish risk-based

capital and leverage standards for covered companies that are more stringent than the risk-based capital and leverage standards applicable to nonbank financial companies and bank holding companies that do not present similar risks to the financial stability of the United States and increase in stringency based on the systemic footprint of the company.

As discussed above, in addition to implementing the broader Basel III capital reforms, the Board seeks to implement enhanced risk-based capital and leverage standards for covered companies in a two-stage process: (i) In this proposal, the application of the Board's capital plan rule to covered companies, including the requirement for covered companies to maintain capital above 5 percent tier 1 common risk-based capital ratio under both expected and stressed conditions; and (ii) in a separate future proposal, the introduction of a quantitative risk-based capital surcharge for covered companies or a subset of covered companies based on the BCBS capital surcharge framework for G–SIBs.

### B. Overview of the Proposed Rule

#### 1. Capital Planning and Minimum Capital Requirements

Under the proposal, all covered companies would be required to comply with, and hold capital commensurate with, the requirements of any regulations adopted by the Board relating to capital plans and stress tests. Thus, in addition to the stress testing requirements that are part of this proposal, this subpart would require all covered companies to comply with the capital plan rule recently adopted by the Board.[48] In addition, the Board is proposing that nonbank covered companies be subject to the same minimum risk-based and leverage capital requirements that apply to covered companies that are bank holding companies.

As discussed further below, the capital plan rule would enhance minimum capital standards for covered companies in several dimensions, including requiring firms to demonstrate capital adequacy over a minimum nine-quarter planning horizon under both expected and stressed conditions.[49] The Board

believes that the safety and soundness rationale that underlies the capital plan rule's enhanced risk-based capital and leverage standards for bank holding companies is also applicable to nonbank covered companies, and that compliance with this rule by such companies would help to promote their ongoing financial stability. By requiring covered companies to have robust capital plans and to hold capital commensurate with the risks they would face under stressful financial conditions, and by limiting capital distributions under certain circumstances, the proposed rule would reduce the probability of the failure of a covered company.

The current capital plan rule imposes enhanced risk-based and leverage requirements on large bank holding companies in several ways. The rule requires such companies to submit board-approved annual capital plans to the Federal Reserve in which they demonstrate their ability to maintain capital above the Board's minimum risk-based capital ratios (total capital ratio of 8 percent, tier 1 capital ratio of 4 percent) and tier 1 leverage ratio (4 percent) under both baseline and stressed conditions over a minimum nine-quarter, forward-looking planning horizon. Each such plan must include a discussion of the bank holding company's sources and uses of capital reflecting the risk profile of the firm over the planning horizon. In addition, these bank holding companies must demonstrate the ability to maintain a minimum tier 1 common risk-based capital ratio of 5 percent over the same planning horizon (under both baseline and stressed conditions).[50] The stressed scenarios must include any scenarios provided by the Federal Reserve (such as those discussed in section VII of this preamble) as well as at least one stressed scenario developed by the bank holding company appropriate to its business model. A capital plan must

---

[46] 12 U.S.C. 5365(b)(1)(B)(iv).

[47] Control would have a different meaning under the proposed rules concerning single-counterparty credit limits.

[48] 12 CFR 225.8. *See* 76 FR 74631 (December 1, 2011). The capital plan rule currently applies to all U.S. bank holding companies with $50 billion or more in total consolidated assets (large bank holding companies).

[49] At present, the Board's rules for calculating minimum capital requirements are found at 12 CFR part 225, appendix A (general risk-based capital rule), 12 CFR part 225, appendix D (leverage rule),

[50] 12 CFR part 225, appendix E (market risk rule), and 12 CFR part 225, appendix G (advanced approaches risk-based capital rule). A firm that met the applicability thresholds under the market risk rule or the advanced approaches risk-based capital rule would be required to use those rules to calculate its minimum risk-based capital requirements in addition to the general risk-based capital requirements and the leverage rule.

[50] Under the capital plan rule, tier 1 common is defined as tier 1 capital less non-common elements in tier 1 capital, including perpetual preferred stock and related surplus, minority interest in subsidiaries, trust preferred securities and mandatory convertible preferred securities. Specifically, non-common elements include the following items captured in the FR Y–9C reporting form: Schedule HC, line item 23 net of Schedule HC–R, line item 5; and Schedule HC–R, line items 6a, 6b, and 6c.

**Federal Register** / Vol. 77, No. 3 / Thursday, January 5, 2012 / Proposed Rules    **603**

also include a description of all planned capital actions over the planning horizon.

In its capital plan, a large bank holding company must provide a detailed description of its process for assessing capital adequacy, including a description of how it will, under stressful conditions, maintain capital commensurate with its risks and continue its operations by maintaining ready access to funding, meeting its obligations to creditors and other counterparties, and continuing to serve as a credit intermediary. A large bank holding company that is unable to satisfy these requirements generally may not make any capital distributions until it provides a satisfactory capital plan to the Federal Reserve.[51]

In addition, a large bank holding company must obtain prior approval from the Federal Reserve before making a capital distribution in certain circumstances where the Federal Reserve had provided a non-objection to the large bank holding company's capital plan. The bank holding company would be required to include certain information in the request, which may include, among other things, an assessment of the bank holding company's capital adequacy under a revised stress scenario provided by the Federal Reserve, a revised capital plan, and supporting data.

As stated above, a nonbank covered company would be subject to the capital plan rule under this proposal. While a bank holding company that becomes a covered company over time is subject to the requirements of the capital plan rule as provided for in that rule,[52] a nonbank covered company would become subject to the requirements of the capital plan rule in the calendar year that it was designated by the Council, if the nonbank covered company was designated by the Council more than 180 days before September 30 of that calendar year.

In addition, 180 days following its designation by the Council, a nonbank covered company would be subject to minimum risk-based capital and leverage requirements. A nonbank covered company would be required to calculate its minimum risk-based and leverage capital requirements as if it were a bank holding company in accordance with any minimum capital requirements established by the Board for bank holding companies.[53] Accordingly, the nonbank covered company would be required to hold capital sufficient to meet (i) a tier 1 risk based capital ratio of 4 percent and a total risk-based capital ratio of 8 percent, as calculated according to the Board's risk-based capital rules,[54] and (ii) a tier 1 leverage ratio of 4 percent as calculated under the leverage rule.[55] Finally, each nonbank covered company would be required to report to the Board on a quarterly basis its risk-based capital and leverage ratios. Upon ascertaining that it had failed to meet any of its minimum risk-based or leverage requirements, a nonbank covered company would be required to notify the Board immediately.[56]

Under the proposed rules' reservation of authority, the Board may require any covered company to hold additional capital or be subject to other requirements or restrictions if it determines that compliance with the requirements of the proposal does not sufficiently mitigate risks to U.S. financial stability posted by the failure or material financial distress of the covered company.

The Board seeks comment on all aspects of the proposed enhanced risk-based capital and leverage requirements.

In particular, the Board seeks comment on the appropriateness of requiring nonbank covered companies to have the same capital planning and stress testing, and regulatory capital requirements as bank holding companies.

*Question 5:* What factors should the Board consider in deciding whether to impose different capital planning or stress testing requirements on nonbank covered companies?

*Question 6:* What alternative enhanced capital requirements for nonbank covered companies should the Board consider? Should the Board consider a longer or shorter phase-in period for capital requirements for nonbank covered companies?

Conforming Amendment to Section 225.8 of Regulation Y

To make the applicability of the Board's capital plan rule consistent with the applicability of the proposed enhanced capital standards under this proposed rule, the Board is considering whether to amend the capital plan rule to provide that a bank holding company subject to that rule would remain subject to that rule until its total consolidated assets fall below $50 billion for four consecutive calendar quarters.

2. Quantitative Risk-Based Capital Surcharge

In November 2011, the BCBS agreed to require G–SIBs to hold an additional amount of common equity above the regulatory minimums to enhance their resiliency and ability to absorb losses under difficult economic conditions. The recently finalized BCBS framework establishes five capital surcharge categories, ranging from 100 to 350 basis points,[57] and allocates G–SIBs to a specific surcharge category based on a twelve-factor formula. The formula includes measures of size, interconnectedness, complexity, lack of substitutes and cross-border activity. The capital surcharge must be met with common equity only and would operate to expand the Basel III capital conservation buffer. The BCBS framework would phase-in the G–SIB surcharge requirement in equal increments from 2016 to 2019, in parallel with the capital conservation buffer.

Approximately 30 global banks would be subject initially to the G–SIB surcharge under the BCBS framework. The BCBS has noted that the number of banks subject to the framework, and the surcharge category associated with different banks, would evolve over time as the systemic risk profiles of different

---

[51] *See* section VII *supra* on the enhanced prudential requirement that a covered company conduct certain stress tests for explanation of the relation between this enhanced prudential capital requirement and the stress test requirement under section 165.

[52] *See generally* 12 CFR 225.8(b). The final capital plan rule provides that a bank holding company that becomes subject to the final rule by operation of the asset threshold after the 5th of January of a calendar year will not be subject until January 1 of the next calendar year to the final rule's requirement to file a capital plan with the Federal Reserve, resubmit a capital plan under certain circumstances, or to obtain prior approval of capital distributions in excess of those described in the firm's capital plan. A bank holding company would be subject to all other requirements under the capital plan rule immediately upon becoming subject to that rule.

[53] *See supra* note 49.

[54] 12 CFR part 225, appendix A and G.

[55] 12 CFR part 225, appendix D, section II.

[56] Under section 171 of the Dodd-Frank Act, the Board is required to impose minimum risk-based and leverage capital requirements on bank holding companies and nonbank covered companies that are not less than the generally applicable capital requirements it imposes on insured depository institutions. 12 U.S.C. 5371. The Board recognizes that some aspects of its capital requirements may not take into account the characteristics of activities and assets of nonbank covered companies that are impermissible for banks and bank holding companies. When a nonbank covered company is designated by the Council, the Board may consider whether any adjustments to the minimum capital requirements applicable to the nonbank covered company may be appropriate, within the limits of section 171 of the Dodd-Frank Act.

[57] Initially, G–SIBs would be placed in 1 of 4 categories, with surcharges ranging from 100 to 250 basis points and the fifth category, with an associated surcharge of 350 basis points, would be left empty in order to leave room to apply higher surcharges to G–SIBs that increase their systemic footprint further over time.

banks change. The BCBS expects to refine and update the framework in the coming years as additional analysis is performed.

The Board and other U.S. federal banking agencies worked closely with other members of the BCBS to develop the BCBS framework and the Board believes that it is consistent with the financial stability objectives of section 165 of the Dodd-Frank Act, including minimizing the threat to U.S. financial stability posed by systemically important financial companies. The Board believes that a U.S. capital surcharge framework based on the BCBS framework would meaningfully reduce the probability of failure of the largest, most complex financial companies and would minimize losses to the U.S. financial system and the economy if such a company should fail. A capital surcharge would help require that these companies account for the costs they impose on the broader financial system and would reduce the implicit subsidy they enjoy due to market perceptions of their systemic importance. The Board intends to issue a concrete proposal for implementation of a quantitative risk-based capital surcharge for covered companies, or a subset thereof, based on the BCBS approach consistent with the BCBS's implementation timeframe. The forthcoming proposal would contemplate adopting implementing rules in 2014, and requiring G–SIBs to meet the capital surcharges on a phased-in basis from 2016–2019.

*Question 7:* How should the Board implement the BCBS framework discussed above, or are there alternatives to the BCBS framework the Board should consider?

*Question 8:* What is the appropriate scope of application of a quantitative capital surcharge in the United States in light of section 165 of the Dodd-Frank Act? What adaptations to the BCBS framework, or alternative surcharge assessment methodologies, would be appropriate for determining a quantitative capital surcharge for covered companies that are not identified as global systemically important banks in the BCBS framework?

*Question 9:* If the BCBS framework were to be applied to nonbank covered companies, how should the framework be modified to capture the systemic footprint of those companies?

## IV. Liquidity Requirements

### A. Background

During the financial crisis that began in 2007, many solvent financial companies experienced significant

financial stress because they did not manage their liquidity in a prudent manner. In some cases, these companies had difficulty in meeting their obligations as they became due because sources of funding became severely restricted. These events followed several years of ample liquidity in the financial system, during which liquidity risk management did not receive the same level of priority and scrutiny as management of other sources of risk. The rapid reversal in market conditions and availability of liquidity during the crisis illustrated how quickly liquidity can evaporate, and that illiquidity can last for an extended period, leading to a company's insolvency before its assets experience significant deterioration in value.

Many of the liquidity-related difficulties experienced by financial companies were due to lapses in basic principles of liquidity risk management. This problem was evident from the horizontal reviews of financial companies conducted by the Senior Supervisors Group ("SSG"), which comprises senior financial supervisors from seven countries.[58] The SSG found that failure of liquidity risk management practices contributed significantly to the financial crisis. In particular, the SSG noted that firms' inappropriate reliance on short-term sources of funding and in some cases, the repo market, as well as inaccurate measurements of funding needs and lack of effective contingency funding were key factors in the liquidity crises many firms faced.[59]

Given the direct link between liquidity risk management failures and the many strains on firms and the financial system experienced during the recent crisis, the Board believes that strong liquidity risk management is crucial to ensuring a company's resiliency during periods of financial market stress and that covered companies should be held to the highest liquidity standards, as well as capital standards.

The Board also believes establishing minimum quantitative liquidity standards will improve the capacity of firms to remain viable during a liquidity stress. The Basel III Liquidity Framework establishes minimum

requirements for funding liquidity that are designed to promote the resilience of a banking organization's liquidity risk profile.[60] These minimum requirements are imposed through two ratios:

• A liquidity coverage ratio (LCR), which is designed to promote the short-term resiliency of a banking organization's liquidity risk profile by ensuring that it has sufficient high quality liquid resources to survive an acute stress scenario lasting for one month; and

• A net stable funding ratio (NSFR), which is designed to promote liquidity risk resilience over a longer time period and to create incentives for a banking organization to fund its activities with medium- and longer-term funding sources. The NSFR has a time horizon of one year, and is designed to provide a sustainable maturity structure of assets and liabilities.

Under the terms of Basel III, the LCR and NSFR are to be implemented by Basel Committee member countries by 2015 and 2018, respectively.

The Board intends to institute a liquidity regime for covered companies through a multi-stage process that would include a regulatory framework for strong liquidity risk management and quantitative liquidity requirements based on the Basel III liquidity ratios. In the first stage, covered companies would be subject to enhanced liquidity risk management standards under this proposal. The proposal builds on the core provisions of the Board's Supervision and Regulation (SR) letter 10–6, Interagency Policy Statement on Funding and Liquidity Risk Management issued in March 2010 (Interagency Liquidity Risk Policy Statement).[61] As discussed in detail below, the proposed rules would require a covered company to take a number of prudential steps to manage liquidity risk. Significantly, the proposed rules introduce liquidity stress test requirements for covered companies and require them to maintain liquid assets sufficient to meet projected net cash flows under the stress tests. The proposed rules would also require a covered company to generate comprehensive cash flow projections, to establish and monitor its liquidity risk tolerance, and maintain contingency plans for funding where normal sources of funding may not be available.

The Board believes liquidity requirements are vitally important to the

---

[58] *See* Senior Supervisors Group, *Observations on Risk Management Practices During the Recent Market Turbulence* (March 2008), *available at* http://www.newyorkfed.org/newsevents/news/banking/2008/SSG_Risk_Mgt_doc_final.pdf (hereinafter 2008 SSG Report).

[59] *See* Senior Supervisors Group, *Risk Management Lessons from the Global Banking Crisis of 2008* (October 2009), *available at* http://www.newyorkfed.org/newsevents/news_archive/banking/2009/SSG_report.pdf (hereinafter 2009 SSG Report).

[60] Basel Committee on Bank Supervision, *Basel III: International Framework for Liquidity Risk Measurement, Standards, and Monitoring* (December 20, 2010), *available at* www.bis.org/publ/bcbs188.htm.

[61] *See supra* note 37.

overall goals of section 165 of the Dodd-Frank Act, to prevent or mitigate risks to the financial stability of the United States that could arise from the material financial distress or failure, or ongoing activities, of large, interconnected financial companies. The liquidity requirements in this proposal are also more stringent than liquidity standards applied to nonbank financial companies and bank holding companies that do not present similar risks to financial stability. Currently, the Board oversees liquidity risk management at bank holding companies primarily through supervisory guidance, and generally does not impose specific regulatory liquidity requirements on bank holding companies. The proposed rules would require covered companies to implement liquidity risk management practices that are encouraged, but not required, for non-covered companies.

The requirements of the proposed rule are also designed to increase in stringency based on the systemic footprint of a company. For example, a covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors would be considered in: (i) Setting the liquidity risk tolerance of the covered company; (ii) determining the amount of detail provided in cash flow projections; (iii) tailoring liquidity stress testing to the covered company; (iv) setting the size of the liquidity buffer; (v) formulating the contingency funding plan; and (vi) setting the size of the specific limits on potential sources of liquidity risk. In addition, the Board would reserve its authority to require a covered company to be subject to additional or further enhanced prudential standards if it determines that compliance with the rules does not sufficiently mitigate the risks to U.S. financial stability posed by the failure or material financial distress of the covered company.

In addition to the enhanced liquidity risk management requirements of this proposal, the Board intends to implement the second stage of establishing a regulatory liquidity framework for covered companies through one or more future proposals that would require covered companies (or a subset of covered companies) to satisfy specific quantitative liquidity requirements that are derived from, or consistent with, the international liquidity standards incorporated into Basel III. The Board believes that the eventual introduction of the Basel III liquidity standards will be important to establish a rigorous liquidity framework and should further the important goal of buttressing systemically important

companies from the possibility of failure due to liquidity shortfalls. These metrics are currently undergoing observation by the BCBS and may be modified depending on the results of that observation. The Board and other federal banking agencies have been working with banking organizations and other members of the BCBS to gather data and study the impact of the proposed standards on the banking system. The Board is carefully considering what changes to the standards it may recommend to the BCBS based on the results of this observation. The Board also is currently considering, along with the Office of the Comptroller of the Currency and the Federal Deposit Insurance Corporation, one or more joint rulemakings that would implement the Basel Liquidity Framework in the United States.

*Question 10:* Is the Board's approach to enhanced liquidity standards for covered companies appropriate? Why or why not?

*Question 11:* Are there other approaches that would effectively enhance liquidity standards for covered companies? If so, provide detailed examples and explanations.

*Question 12:* The Dodd-Frank Act contemplates additional enhanced prudential standards, including a limit on short-term debt. Should the Board adopt a short-term debt limit in addition to or in place of the LCR and NSFR? Discuss why or why not?

### B. Overview of the Proposed Rule

#### 1. Key Definitions

Under the proposed rule, liquidity is defined as a covered company's capacity to efficiently meet its expected and unexpected cash flows and collateral needs at a reasonable cost without adversely affecting the daily operations or the financial condition of the covered company. Liquidity risk is defined as the risk that a covered company's financial condition or safety and soundness will be adversely affected by its inability or perceived inability to meet its cash and collateral obligations.

#### 2. Corporate Governance Provisions

A critical element of sound liquidity risk management is effective corporate governance, consisting of oversight of the covered company's liquidity risk management by its board of directors, as well as senior management, and an independent review function. The proposed rule includes provisions addressing these aspects of a covered company's corporate governance with respect liquidity risk management.

#### a. Board of Directors and Risk Committee Responsibilities (§ 252.52)

A covered company's board of directors is ultimately responsible for the liquidity risk assumed by the covered company. Accordingly, the proposed rule at § 252.52(a) would require that the board of directors (or the risk committee)[62] must oversee the covered company's liquidity risk management processes, and must review and approve the liquidity risk management strategies, policies, and procedures established by senior management.

The proposed rule would impose several specific duties on the board of directors. First, the board of directors would be required to establish the covered company's liquidity risk tolerance at least annually. The proposed rule would define liquidity risk tolerance as the acceptable level of liquidity risk the covered company may assume in connection with its operating strategies. In determining the liquidity risk tolerance, the board of directors would be required to consider the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors. These considerations should help to ensure that the established liquidity risk tolerance will be appropriate for the business strategy of the covered company and its role in the financial system, and will reflect the covered company's financial condition and funding capacity on an ongoing basis.

The liquidity risk tolerance should reflect the board of directors' assessment of tradeoffs between the costs and benefits of liquidity. That is, inadequate liquidity can expose the covered company to significant financial stress and endanger its ability to meet contractual obligations. Conversely, too much liquidity can entail substantial opportunity costs and have a negative impact on the covered company's profitability. In establishing the covered company's liquidity risk tolerance, the Board would expect a covered company's board of directors to articulate the liquidity risk tolerance in such a way that all levels of management clearly would: (i) Understand the board of director's policy for managing the trade-offs between the risk of insufficient liquidity and generating profit; and (ii) properly apply this approach to all aspects of

---

[62] The risk committee would be defined as the enterprise-wide committee established by a covered company's board of directors under proposed section 252.126 of the risk management rules subpart of this proposal.

liquidity risk management throughout the organization.[63] To ensure that a covered company is managed in accordance with the liquidity risk tolerance, the proposed rule would require the board of directors to review information provided by senior management at least semi-annually to determine whether the covered company is managed in accordance with the established liquidity risk tolerance.

Second, the risk committee or a designated subcommittee of the risk committee would be required to review and approve the liquidity costs, benefits, and risk of each significant new business line and each significant new product before the covered company may implement the line or offer the product. In connection with this review, the risk committee or a designated subcommittee would be required to consider whether the liquidity risk of the new strategy or product under current conditions and under a liquidity stress is within the established liquidity risk tolerance. At least annually, the risk committee or a designated subcommittee would be required to review approved significant business lines and products to determine whether each line or product has created any unanticipated liquidity risk, and to determine whether the liquidity risk of each line or product continues to be within the established liquidity risk tolerance.

Third, the proposed rule would require the board of directors to review and approve the covered company's CFP at least annually and whenever the covered company materially revises the plan. As discussed below, the CFP is the covered company's compilation of policies, procedures, and action plans for managing liquidity stress events.

Fourth, the risk committee or a designated subcommittee would be required to conduct the following reviews and approvals at least quarterly:

(i) A review of cash flow projections produced under section 252.55 of the proposed rule that use time periods in excess of 30 days to ensure that the covered company's liquidity risk is within the covered company's established liquidity risk tolerance;

(ii) A review and approval of the liquidity stress testing described in section 252.56 of the proposed rule,

including the covered company's stress testing practices, methodologies, and assumptions. The risk committee or a designated subcommittee would also be required to conduct this review and approval whenever the covered company materially revises its liquidity stress testing;

(iii) A review of the liquidity stress testing results produced under section 252.56 of the proposed rule;

(iv) Approval of the size and composition of the liquidity buffer established under section 252.57 of the proposed rule;

(v) A review and approval of the specific limits on potential sources of liquidity risk established under section 252.59 of the proposed rule, and a review of the covered company's compliance with those limits; and

(iv) A review of liquidity risk management information necessary to identify, measure, monitor, and control liquidity risk and to comply with the new liquidity rules.

In addition, the risk committee or a designated subcommittee would be required to periodically review the independent validation of the stress tests produced under section 252.56(c)(2)(ii) of the proposed rule.

The proposed rule establishes minimum requirements governing the frequency of certain reviews and approvals. It also would require the board of directors (or the risk committee) to conduct more frequent reviews and approvals as market and idiosyncratic conditions warrant.[64] The risk committee or a designated subcommittee would also be required to establish procedures governing the content of senior management reports on the liquidity risk profile of the covered company and other information described in the senior management responsibilities section below.

### b. Senior Management Responsibilities (§ 252.53)

Under the proposed rule, senior management of a covered company would be required to establish and implement liquidity risk management strategies, policies and procedures. This would include overseeing the development and implementation of liquidity risk measurement and reporting systems, the cash flow projections, the liquidity stress testing, the liquidity buffer, the CFP, the specific limits, and the monitoring

procedures required under the proposed rule.

Senior management would also be required to report regularly to the risk committee or designated subcommittee thereof on the liquidity risk profile of the covered company, and to provide other relevant and necessary information to the board of directors (or risk committee) to facilitate its oversight of the liquidity risk management process. As noted above, the proposed rule would require the risk committee or a designated subcommittee to establish procedures governing the content of management reports on the liquidity risk profile of the covered company and other information regarding compliance with the proposed rule. The Board expects that management would be required under these procedures to report as frequently as conditions warrant, but no less frequently than quarterly.

### c. Independent Review (§ 252.54)

Under the proposed rule, a covered company would be required to establish and maintain an independent review function to evaluate its liquidity risk management. Under the proposal, this review function must be independent of management functions that execute funding (the treasury function). The independent review function would be required to review and evaluate the adequacy and effectiveness of the covered company's liquidity risk management processes regularly, but no less frequently than annually. It would also be required to assess whether the covered company's liquidity risk management complies with applicable laws, regulations, supervisory guidance, and sound business practices, and to report statutory and regulatory noncompliance and other material liquidity risk management issues to the board of directors (or the risk committee) in writing for corrective action.

An appropriate internal review conducted by the independent review function should address all relevant elements of a covered company's risk management process, including adherence to its own policies and procedures, and the adequacy of its risk identification, measurement, and reporting processes. Personnel conducting these reviews should seek to understand, test, document, and evaluate the risk management processes, and recommend solutions to any identified weaknesses.

---

[63] Under the proposed rule, the established liquidity risk tolerance would be considered in assessing new business strategies and products (proposed § 252.52(b)(2)), in setting the size of the liquidity buffer (proposed § 252.57(b)), in developing the CFP (proposed § 252.58(a)), and in setting the specific limits on sources of liquidity (proposed § 252.59(b)).

[64] As used in this preamble, idiosyncratic conditions or events refer to conditions or events that are unique to the covered company. Market conditions or events refer to conditions or events that are market-wide.

## 3. Liquidity Requirements

### a. Cash Flow Projections (§ 252.55)

Comprehensive projections of a covered company's cash flows from the company's various operations are a critical tool for managing liquidity risk. To ensure that a covered company has a sound process for identifying and measuring liquidity risk, the proposed rule would require a covered company to produce comprehensive projections that forecast cash flows arising from assets, liabilities, and off-balance sheet exposures over appropriate time periods, and to identify and quantify discrete and cumulative cash flow mismatches over these time periods. The proposed rule would specifically require the covered company to provide cash flow projections over the short-term and long-term time horizons that are appropriate to the covered company's capital structure, risk profile, complexity, activities, size and other risk-related factors.[65]

To make sure that the cash flow projections will analyze liquidity risk exposure to contingent events, the proposed rule would require that projections must include cash flows arising from contractual maturities, as well as cash flows from new business, funding renewals, customer options, and other potential events that may impact liquidity. Static projections based on the contractual cash flows of assets, liabilities, and off-balance sheet items are helpful in identifying liquidity gaps. However, such static projections may inadequately quantify important aspects of potential liquidity risk because these projections ignore new business, funding renewals, customer options, and other contingent events that have a significant impact on a covered company's liquidity risk profile. A dynamic analysis that incorporates management's reasoned assumptions regarding the future behavior of assets, liabilities, and off-balance sheet items in projected cash flows is far more useful than a static projection in identifying potential liquidity risk exposure.

Under the proposed rule, a covered company would be required to develop cash flow projections that provide sufficient detail to reflect its capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors. Such detail may include projections broken down by business line, legal entity, or jurisdiction, and cash flow projections

that use more time periods than the two minimum time periods that would be required under the rule.

The proposed rule states that a covered company must establish a robust methodology for making its cash flow projections,[66] and must use reasonable assumptions regarding the future behavior of assets, liabilities, and off-balance sheet exposures in the projections. Given the critical importance that the methodology and underlying assumptions play in liquidity risk measurement, the covered company would also be required to adequately document the methodology and assumptions.[67] In addition, the Board expects senior management to periodically review and approve the assumptions used in the cash flow projections to make sure that they are reasonable and appropriate.

### b. Liquidity Stress Testing (§ 252.56)

While financial companies typically manage their liquidity under normal circumstances with regular sources of liquidity readily available, they should also be prepared to manage liquidity under adverse conditions in which liquidity sources may be limited or nonexistent. Insufficient consideration of liquidity management under the conditions that arose during the financial crisis was a major contributor to the severe liquidity problems many financial companies faced at the time. Accordingly, rigorous and regular stress testing and scenario analysis, combined with comprehensive information about an institution's funding position, is an important tool for effective liquidity risk management that should reduce the risk of a firm's failure due to adverse liquidity conditions.

To promote preparedness for adverse liquidity conditions, the proposed rule would require the covered company to regularly stress test its cash flow projections by identifying liquidity

stress scenarios and assessing the effects of these scenarios on the covered company's cash flow and liquidity. By considering how adverse events, conditions, and outcomes, including extremes, affect the covered company's exposure to liquidity risk, a covered company can identify vulnerabilities, quantify the depth, source, and degree of potential liquidity strain, and analyze the possible impacts. Under the proposed rule, the covered company would use the results of the stress testing to determine the size of its liquidity buffer, and would incorporate information generated by stress testing in the quantitative component of the CFP.

The proposed rule would require that liquidity stress testing comprehensively address a covered company's activities, exposures, and risks, including off-balance sheet exposures. To satisfy this requirement, stress testing would have to address the covered company's full set of activities, exposures and risks, both on- and off-balance sheet, and address non-contractual sources of risks, such as reputational risks. For example, stress testing should address potential liquidity issues arising from the covered company's use of sponsored vehicles that issue debt instruments periodically to the markets, such as asset-backed commercial paper and similar conduits. Under stress scenarios, the covered company may be contractually required, or compelled in the interest of mitigating reputational risk, to provide liquidity support to such a vehicle.

The proposed rule would require a covered company to conduct the liquidity stress testing at least monthly. In addition to monthly stress testing, a covered company should have the flexibility to conduct "ad hoc" stress testing to address rapidly emerging risks or consider the impact of sudden events. Accordingly, the proposed rule specifies that the covered company must have the ability to perform stress testing more frequently than monthly, and the ability to vary underlying assumptions as conditions change. To facilitate effective supervision of the sufficiency of a covered company's liquidity management, under the proposed rule, a covered company may be required by the Federal Reserve to perform additional stress testing as conditions relating to the institution or the markets generally may warrant, or to address other supervisory concerns. The Federal Reserve may, for example, require a covered company to perform additional stress testing where there has been a significant deterioration in the covered company's earnings, asset quality, or overall financial condition; are negative

---

[65] A covered company would be required to update short-term cash flow projections daily, and update long-term cash flow projections at least monthly.

[66] In its most basic form, a cash-flow-projection may be a worksheet-table with columns denoting the selected time periods or buckets for which cash flows are to be projected. The rows of this table may consist of various types of assets, liabilities, and off-balance sheet items, often grouped by their cash-flow characteristics. Different groupings may be used to achieve different objectives of the cash-flow projection. For each row, net cash flows arising from the particular asset, liability, or off-balance sheet activity may be projected across the time buckets. The detail and granularity of the rows, and thus the projections, should depend on the sophistication and complexity of the institution. Complex companies generally provide more detail, while less complex companies use higher levels of aggregation.

[67] See section 252.61 of the proposed rule, which states that a covered company must document all material aspects of its liquidity risk management process and its compliance with the requirements in the rule.

trends or heighten risk associated with a particular product line; or are increased concerns over the covered company's funding of off-balance sheet exposures.

Effective stress testing should include scenario analysis that uses historical and hypothetical scenarios to assess the impact on liquidity of various events and circumstances, including extremes. Effective liquidity stress testing should also employ a range of stress scenarios involving macroeconomic, market-wide, and idiosyncratic events, and consider interactions and feedback effects. Accordingly, the proposed rule states that a covered company's stress testing must incorporate a range of stress scenarios that may significantly affect the covered company's liquidity, taking into consideration its on- and off-balance sheet exposures, business lines, organizational structure, and other characteristics. At a minimum, the proposed rule would require a covered company to incorporate stress scenarios to account for market stress, idiosyncratic stress, and combined market and idiosyncratic stresses. Additional scenarios should be used as needed to ensure that all of the significant aspects of liquidity risks to the covered company have been modeled. The proposed rule would also require that the stress scenarios address the potential impact of market disruptions on the covered company, and the potential actions of market participants experiencing liquidity stresses under the same market disruption.

Under the proposed rule, a covered company's liquidity stress scenarios must be forward-looking and incorporate a range of potential changes to a covered company's exposures, activities, and risks as well as changes to the broader economic and financial environment. To meet this standard, the stress tests would need to be sufficiently dynamic to incorporate changes in the covered company's on- and off-balance sheet activities, portfolio composition, asset quality, operating environment, business strategy, and other risks that may arise over time from idiosyncratic events, macroeconomic and financial market developments, or some combination of thereof. The stress tests should look beyond assumptions based only on historical data, and incorporate new events and challenge conventional assumptions.

Effective liquidity stress testing should be conducted over a variety of different time horizons to adequately capture rapidly developing events, and other conditions and outcomes that may materialize in the near or long term. To

make sure that a covered company's stress testing captures such events, condition, and outcomes, the proposed rule would require that the covered company's stress scenarios use a minimum of four time horizons including an overnight, a 30-day, a 90-day, and a one-year time horizon. A covered company may be required to use more time horizons where necessary to reflect the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk-related factors.

The proposed rule further provides that liquidity stress testing must be tailored to, and provide sufficient detail to reflect a covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk-related factors. This requirement is intended to ensure that stress testing will be tied directly to the covered company's business profile and the regulatory environment in which the covered company operates,[68] and will address relevant risk areas, provide for the appropriate level of aggregation, and capture all appropriate risk drivers, internal and external influences, and other key considerations that may affect the covered company's liquidity position. This may require analyses by business line, legal entity, or jurisdiction, or stress scenarios that use time horizons in addition to the minimum number described above.

The proposed rule would require a covered company to incorporate certain assumptions designed to ensure that stress testing will provide relevant information to support the establishment of the liquidity buffer (see section 252.5b(b)(4) of the proposed rule). As discussed below, the liquidity buffer is composed of highly liquid assets that are unencumbered, and is designed to meet projected net cash outflows and the projected loss or impairment of existing funding sources for 30 days during a range of liquidity stress scenarios. To reflect this design, the proposed rule would require that the covered company must assume that, for the first 30 days of a liquidity stress scenario, only highly liquid assets that are unencumbered may be used as cash flow sources to meet projected funding needs. For time periods beyond the first 30 days of a liquidity stress scenario,

highly liquid assets that are unencumbered and other appropriate funding sources may be used.[69]

A covered company's liquidity stress testing should account for deteriorations in asset valuations when there is market stress. Accordingly, the proposed rule would require the covered company to impose a discount to the fair market value of an asset that is used as a cash flow source to offset projected funding needs in order to reflect any credit risk and market volatility of the asset. The proposed rule would also require that sources of funding used to generate cash to offset projected funding needs be sufficiently diversified throughout each stress test time horizon. Thus, if a covered company holds high quality assets other than cash and securities issued by the U.S. government, a U.S. government agency,[70] or a U.S. government-sponsored entity,[71] the assets should be diversified by collateral, counterparty, or borrowing capacity, and other liquidity risk identifiers.

The proposed rule would impose various process and system requirements for stress testing. Specifically, a covered company would be required to establish and maintain policies and procedures that outline its liquidity stress testing practices, methodologies, and assumptions; detail the use of each stress test employed; and provide for the enhancement of stress testing as risks change and techniques evolve. The proposed rule also states that a covered company must have an effective system of control and oversight over the stress test function to ensure that each stress test is designed in accordance with the rule, and the stress process and assumptions are validated. The validation function must be independent of functions that develop or design the liquidity stress testing, and independent of management functions that execute funding (e.g., the treasury function).

In addition, the proposed rule would require a covered company to rely on reasonably high-quality data and information to produce creditable

---

[68] For example, applicable statutory and regulatory restrictions on covered companies, including restrictions on the transferability of assets between legal entities, would need to be incorporated. For bank holding companies these restrictions include sections 23A and 23B of the Federal Reserve Act (12 U.S.C. 371c and 371c–1) and Regulation W (12 CFR part 223), which govern covered transactions between banks and their affiliates.

[69] The liquidity buffer is discussed more fully below, as are the definitions of "unencumbered" and "highly liquid asset."

[70] A U.S. government agency is defined in the proposed rule as an agency or instrumentality of the U.S. government whose obligations are fully and explicitly guaranteed as to the timely payment of principal and interest by the full faith and credit of the U.S. government.

[71] A U.S. government-sponsored entity is defined in the proposed rule as an entity originally established or chartered by the U.S. government to serve public purposes specified by the U.S. Congress, but whose obligations are not explicitly guaranteed by the full faith and credit of the U.S. government.

outcomes. Specifically, the proposed rule would require that the covered company must maintain management information systems and data processes sufficient to enable it to effectively and reliably collect, sort, and aggregate data and other information related to liquidity stress testing.

*Question 13:* What challenges will covered companies face in formulating and implementing liquidity stress testing described in the proposed rule? What changes, if any, should be made to the proposed liquidity stress testing requirements (including the stress scenario requirements and required assumptions) to ensure that analyses of the stress testing will provide useful information for the management of a covered company's liquidity risk? What alternatives to the proposed liquidity stress testing requirements, including the stress scenario requirements and required assumptions, should the Board consider? What additional parameters for the liquidity stress tests should the Board consider defining?

### c. Liquidity Buffer (§ 252.57)

To withstand liquidity stress under adverse conditions, a company generally needs a sufficient supply of liquid assets that can be sold or pledged to obtain funds. During the financial crisis, financial companies that experienced severe liquidity difficulties often held insufficient liquid assets to meet their liquidity needs as market sources of funding were severely curtailed. The BCBS's LCR standard was developed to promote short-term resilience of a bank's liquidity risk profile by ensuring that it has sufficient high-quality liquid assets to survive an adverse stress scenario lasting for one month, providing time for appropriate corrective actions to be taken by management or supervisors, or to allow the institution to be resolved in an orderly way.[72]

Consistent with the effort towards developing a comprehensive liquidity framework that would eventually incorporate the LCR standard, the proposed rule, in addition to requiring stress tests as described above, would require a covered company to continuously maintain a liquidity buffer of unencumbered highly liquid assets sufficient to meet projected net cash outflows and the projected loss or impairment of existing funding sources for 30 days over a range of liquidity stress scenarios.

In addition to using the results of the liquidity stress testing to size a covered company's liquidity buffer, the proposed rule would require that the liquidity buffer would also be aligned to reflect the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors, as well as the covered company's established liquidity risk tolerance. These factors, however, could not justify reducing the buffer to a point where it would be insufficient to meet projected net cash outflows and the projected impairment of existing funding sources for 30 days under the range of liquidity stress scenarios incorporated into its stress testing. As explained above, under the proposal, the risk committee or a designated subcommittee of the risk committee would be required to approve the size and composition of the liquidity buffer at least quarterly.

The proposed rule limits the type of assets that may be included in the buffer to highly liquid assets that are unencumbered. The definition of highly liquid assets would ensure that the assets in the liquidity buffer can easily and immediately be converted to cash with little or no loss of value. Thus, cash or securities issued or guaranteed by the U.S. government, a U.S. government agency, or a U.S. government-sponsored entity are included in the proposed definition of highly liquid assets. In addition, the proposed rule includes criteria that may be used to identify other assets that could be included in the buffer as highly liquid assets. Specifically, the proposed definition of highly liquid assets includes any other asset that a covered company demonstrates to the satisfaction of the Federal Reserve:

(i) Has low credit risk (low risk of default) and low market risk (little or no price volatility);[73]

(ii) Is traded in an active secondary two-way market[74] that has observable market prices, committed market makers, a large number of market participants, and a high trading volume; and

(iii) Is a type of asset that investors historically have purchased in periods of financial market distress during which liquidity is impaired (flight to quality). For example, certain "plain vanilla" corporate bonds (that is, bonds that are neither structured products nor subordinated debt) issued by a non-financial company with a strong financial profile have been reliable sources of liquidity in the repurchase and sale market during past stressed conditions. Assets with the above characteristics could, as proposed, meet the definition of a highly liquid asset.

The highly liquid assets in the liquidity buffer should be readily available at all times to meet a covered company's liquidity needs. Accordingly, the assets must be unencumbered. Under the proposed rule, unencumbered would be defined to mean, with respect to an asset, that: (i) The asset is not pledged, does not secure, collateralize or provide credit enhancement to any transaction, and is not subject to any lien; (ii) the asset is not designated as a hedge on a trading position;[75] and (iii) there are no legal or contractual restrictions on the ability of the covered company to promptly liquidate, sell, transfer, or assign the asset.

Generally, an asset would be designated as a hedge on a trading position if the asset is held by a covered company directly to offset the market risk of another trading asset or group of trading assets held by the covered company. For example, if a covered company holds a position in a corporate bond index in its trading account, corporate bonds that hedge that index position may not be included in the liquidity buffer.

To account for deteriorations in asset valuations when there is market stress, the proposed rule also would require a covered company to impose a discount to the fair market value of an asset included in the liquidity buffer to reflect the credit risk and market volatility of the asset. In addition, to ensure that the liquidity buffer is not concentrated in a particular type of highly liquid assets, the proposed rule requires that the pool of assets included in the liquidity buffer must be sufficiently diversified, as discussed above. Thus, these highly liquid assets should be diversified by instrument type, counterparties, geographic market, and other liquidity risk identifiers.

---

[72] See Basel III liquidity framework at paragraphs 4 and 15.

[73] Generally, market risk is the risk of loss that could result from broad market movements, such as changes in the general level of interest rates, credit spreads, equity prices, foreign exchange rates, or commodity prices.

[74] A two-way market would be defined as a market with independent bona fide offers to buy and sell so that a price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined within one day and settled at that price within a reasonable time period conforming to trade custom. This definition is consistent with the definition of "two-way market" contained in the interagency proposed rule on *Risk-Based Capital Guidelines; Market Risk,* 76 FR 1890 (January 11, 2011) (Market Risk NPR).

[75] A trading position would be defined as a position that is held by a covered company for the purpose of short-term resale or with the intent of benefiting from actual or expected short-term price movements, or to lock-in arbitrage profits. This definition is based on the definition of trading position in the Market Risk NPR.

*Question 14:* The Board requests comment on all aspects of the proposed definitions of ''highly liquid assets'' and ''unencumbered.'' What, if any, other assets should be specifically listed in the definition of highly liquid assets? Why should these other assets be included (that is, describe how the asset is easily and immediately convertible into cash with little or no loss in value during liquidity stress events)? Are the criteria for identifying additional assets for inclusion in the definition of highly liquid assets appropriate? If not, how and why should the Board revise the criteria?

*Question 15:* What changes, if any, should the Board make to the proposed definition of unencumbered to make sure that assets in the buffer will be readily available at all times to meet a covered company's liquidity needs? The rule would require a covered company to discount the fair market value of assets that are included in the liquidity buffer. Please describe the process that covered company will use to determine the amount of the discount.

### d. Contingency Funding Plan (§ 252.58)

The proposed rule would require a covered company to establish and maintain a CFP. A CFP is a compilation of policies, procedures, and action plans for managing liquidity stress events. The objectives of the CFP are to provide a plan for responding to a liquidity crisis, to identify alternate liquidity sources that a covered company can access during liquidity stress events, and to describe steps that should be taken to ensure that the covered company's sources of liquidity are sufficient to fund its operating costs and meet its commitments while minimizing additional costs and disruption.

The proposed rule states that a covered company must establish and maintain a CFP that sets out the covered company's strategies for addressing liquidity needs during liquidity stress events. Under the proposed rule, the CFP would be required to be commensurate with the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors, and established liquidity risk tolerance. A covered company would be required to update the CFP at least annually or whenever changes to market and idiosyncratic conditions warrant an update.

Under the proposed rule, the CFP includes four components: a quantitative assessment, an event management process, monitoring requirements, and testing requirements.

These components are discussed in detail below.

#### a. Quantitative Assessment

The first component of the CFP is the quantitative assessment of liquidity needs and funding sources. A covered company would be required to incorporate information generated by liquidity stress testing into this component of the CFP. The proposed rule would provide that the stress tests are used to: (i) Identify liquidity stress events that have a significant impact on the covered company's liquidity; (ii) assess the level and nature of impact on the covered company's liquidity that may occur during identified liquidity events; (iii) assess available funding sources and needs during the identified liquidity stress events; and (iv) identify alternative funding sources that may be used during the liquidity stress events.

i. *Identification of stress events.* A covered company would be required to identify stress events that have a significant impact on the covered company's liquidity. Possible stress events may include deterioration in asset quality, ratings downgrades, widening of credit default swap spreads, operating losses, declining financial institution equity prices, negative press coverage, or other events that call into question the covered company's ability to meet its obligations.

ii. *Assessing the level and nature of impact.* Once the liquidity stress events are identified, a covered company's CFP would incorporate an assessment of the level and nature of impact on the covered company's liquidity that may occur during the identified liquidity stress event. The CFP would delineate the various levels of stress severity that can occur during the stress event, and identify the various stages for each type of event. The events, stages, and severity levels should include temporary disruptions, as well as those that might be intermediate or longer term. The covered company may use the different levels of severity to design early warning indicators, to assess potential funding needs at various points in a developing crisis, and to specify comprehensive action plans.

iii. *Assessing available funding sources and needs.* To meet the requirement of the proposal, the CFP must assess available funding sources and needs during identified liquidity stress events. This would require an analysis of the potential erosion of available funding at alternative stages or severity levels of each stress event, as well as the identification of potential cash flow mismatches that may occur during the various stress levels. A

covered company is expected to base its analysis on realistic assessments of the behavior of funds providers during the event, and should incorporate alternative funding sources. The analysis should include all material on- and off-balance sheet cash flows and their related effects. The result should be a realistic analysis of the covered company's cash inflows, outflows, and funds availability at different time intervals during the identified liquidity stress event, which should permit the covered company to measure its ability to fund operations.

iv. *Identifying alternative funding sources.* Liquidity pressures are likely to spread from one funding source to another during significant liquidity stress events. Accordingly, the proposed rule would require a covered company to identify alternative funding sources that may be accessed during identified liquidity stress events. Since some of these alternative funding sources will rarely be used in the normal course of business, a covered company should conduct advance planning and periodic testing (see discussion below) to make sure that the funding sources are available when needed. Administrative procedures and agreements are expected to also be in place before the covered company needs to access the alternative funding sources.

Discount window credit may be incorporated into CFPs as a potential source of funds in a manner consistent with the terms provided by the Federal Reserve Banks. For example, primary credit is currently available on a collateralized basis for financially sound depository institutions as a backup source of funds for short-term funding needs. CFPs that incorporate borrowing from the discount window should specify the actions that the covered company will take to replace discount window borrowing with more permanent funding, including the proposed time frame for these actions.

#### b. Event Management Process

Under the proposed rule, the CFP must also include an event management process that sets out its procedures for managing liquidity during identified liquidity stress events. This process must include an action plan that clearly describes the strategies the covered company would use to respond to liquidity shortfalls for identified liquidity stress events, including the methods that the covered company would use to access the alternative funding sources identified in the quantitative assessment.

Under the proposed rule, the event management process must also identify

a liquidity stress event management team and specify the process, responsibilities, and triggers for invoking the CFP, escalating the responses described in the action plan, decision-making during the identified liquidity stress events, and executing contingency measures identified in the action plan.

In addition, to promote the flow of necessary information during a liquidity stress, the proposed rule would require the event management process to include a mechanism that ensures effective reporting and communication within the covered company and with outside parties, including the Federal Reserve and other relevant supervisors, counterparties, and other stakeholders.

c. Monitoring

The proposal would also impose monitoring requirements on covered companies so that they are able to proactively position themselves into progressive states of readiness as liquidity stress events evolve. Specifically, the proposed rule would require the CFP to include procedures for monitoring emerging liquidity stress events, and for identifying early warning indicators of emerging liquidity stress events that are tailored to a covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk-related factors. Such early warning indicators may include, but are not limited to, negative publicity concerning an asset class owned by covered company, potential deterioration in the covered company's financial condition, widening debt or credit default swap spreads, and increased concerns over the funding of off-balance-sheet items.

d. Testing

The proposed rule would require a covered company to periodically test the components of the CFP to assess its reliability during liquidity stress events. Such testing would include trial runs of the operational elements of the CFP to ensure that they work as intended during a liquidity stress event. These tests would include operational simulations to test communications, coordination, and decision making involving relevant managers, including managers at relevant legal entities within the corporate structure.

A covered company would also be required to periodically test the methods it will use to access alternate funding to determine whether these sources of funding will be readily available when needed. For example, the Board expects that a covered company would test the operational

elements of a CFP that are associated with lines of credit, the Federal Reserve discount window, or other secured borrowings, since efficient collateral processing during a liquidity stress event is especially important for such funding sources.

*Question 16:* Are the proposed CFP requirements appropriate for all covered companies? What alternative approaches to the CFP requirements outlined above should the Board consider? If not, how should the Board amend the requirements to make them appropriate for any covered company? Are there additional modifications the Board should make to the proposed rule to enhance the ability of a covered company to comply with the CFP and establish a viable and effective plan for the management of liquidity stress events?

e. Specific Limits (§ 252.59)

To enhance management of liquidity risk, the proposed rule would require a covered company to establish and maintain limits on potential sources of liquidity risk, including three specified sources of liquidity risk. The size of each limit must reflect the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors, and established liquidity risk tolerance. The covered company would be required to establish limits on:

(i) Concentrations of funding by instrument type, single counterparty, counterparty type, secured and unsecured funding, and other liquidity risk identifiers.

(ii) The amount of specified liabilities that mature within various time horizons.

(iii) Off-balance sheet exposures and other exposures that could create funding needs during liquidity stress events. Such exposures may be contractual or non-contractual exposures, and include such liabilities as unfunded loan commitments, lines of credit supporting asset sales or securitizations, collateral requirements for derivative transactions, and a letter of credit supporting a variable demand note.

*Question 17:* Should covered companies be required to establish and maintain limits on other potential sources of liquidity risk in addition to the three specific sources listed in the proposed rule? If so, identify these additional sources of liquidity risk.

f. Monitoring (§ 252.60)

The proposed rule would require a covered company to monitor liquidity risk related to collateral positions,

liquidity risks across the enterprise, and intraday liquidity positions. In addition, the covered company would be required to monitor compliance with the specific limits established under § 252.59.

a. Collateral Positions

Under the proposed rule, a covered company would be required to establish and maintain procedures for monitoring assets it has pledged as collateral for an obligation or position, and assets that are available to be pledged. The procedures must address the covered company's ability to:

(i) Calculate all of the covered company's collateral positions in a timely manner, including the value of assets pledged relative to the amount of security required under the contract governing the obligation for which the collateral was pledged, and the unencumbered assets available to be pledged;

(ii) Monitor the levels of available collateral by legal entity, jurisdiction, and currency exposure;

(iii) Monitor shifts between intraday, overnight, and term pledging of collateral; and

(iv) Track operational and timing requirements associated with accessing collateral at its physical location (for example, the custodian or securities settlement system that holds the collateral).

b. Legal Entities, Currencies, and Business Lines

Regardless of its organizational structure, it is critical that a covered company actively monitor and control liquidity risks at the level of individual legal entities and the group as a whole. This requires processes that aggregate data across multiple systems to develop an enterprise-wide view of liquidity risk exposure and identify constraints on the transferability of liquidity within the organization.

To promote effective monitoring across the enterprise, the proposed rule would require a covered company to establish and maintain procedures for monitoring and controlling liquidity risk exposures and funding needs within and across significant legal entities, currencies, and business lines. In addition, the proposed rule would require the covered company to maintain sufficient liquidity with respect to each significant legal entity in light of legal and regulatory restrictions on the transfer of liquidity between legal entities.[76] The covered company should

---

[76] For example, for bank holding companies such restrictions include sections 23A and 23B of the
Continued

ensure that legal distinctions and possible obstacles to cash movements between specific legal entities or between separately regulated entities are recognized. The Board expects a covered company to maintain sufficient liquidity to ensure such compliance in normal times and during liquidity stress events.

### c. Intraday Liquidity Positions

Intraday liquidity monitoring is an important component of the liquidity risk management process for a covered company engaged in significant payment, settlement, and clearing activities. Given the interdependencies that exist among payment systems, large complex organizations' inabilities to meet critical payments have the potential to lead to systemic disruptions that can prevent the smooth functioning of payments systems and money markets.

The proposed rule would require a covered company to establish and maintain procedures for monitoring their intraday liquidity risk exposure. These procedures would address how the covered company would:

(i) Monitor and measure expected daily gross liquidity inflows and outflows;

(ii) Manage and transfer collateral when necessary to obtain intraday credit;

(iii) Identify and prioritize time-specific obligations so that the covered company can meet these obligations as expected;

(iv) Settle less critical obligations as soon as possible;

(v) Control the issuance of credit to customers where necessary; and

(vi) Consider the amounts of collateral and liquidity needed to meet payment systems obligations when assessing its overall liquidity needs.

The monitoring of intraday cash flows generally is an operational risk management function. To ensure that liquidity risk is also appropriately monitored, the Board expects a covered company to provide for integrated oversight of intraday exposures within the operational risk and liquidity risk functions. The Board also expects the procedures for monitoring and managing intraday liquidity positions to reflect in stringency and complexity, and scope of operations of the covered company.

---

Federal Reserve Act (12 U.S.C. 371c and 371c–1) and Regulation W (12 CFR part 223), which govern covered transactions between banks and their affiliates.

### d. Specific Limits

The proposed rule would require a covered company to monitor compliance with the specific limits on potential sources of liquidity risk established under § 252.59.

*Question 18:* Should the Board require a covered company to monitor other areas of liquidity risk in addition to collateral positions, risk across entities, currencies, and business lines, and intraday liquidity positions? If so, what areas should be added to the list and why?

### g. Documentation (§ 252.61)

Comprehensive documentation is necessary to achieve good liquidity risk management and to support the supervisory process. The proposed rule would require a covered company to adequately document all material aspects of its liquidity risk management processes and its compliance with the requirements of the proposed rule, and submit such documentation to the risk committee. Material aspects of its liquidity risk management process would include, but would not be limited to, the methodologies and material assumptions used in cash flow projections and the liquidity stress testing, and all elements of the comprehensive CFP. The covered company must make this documentation available to the Federal Reserve upon request.

*Question 19:* The Board requests comment on all aspects of the proposed rule. Specifically, what aspects of the proposed rule present implementation challenges and why? What alternative approaches to liquidity risk management should the Board consider? Are the liquidity management requirements of this proposal too specific or too narrowly defined? If so, explain how. Responses should be detailed as to the nature and impact of these challenges and should address whether the Board should consider implementing transitional arrangements in the rule to address these challenges.

## V. Single-Counterparty Exposure Limits

### A. Background

During the recent financial crisis, some of the largest financial firms in the world collapsed or nearly did so, demonstrating the risk that the failure of large financial companies poses to the financial stability of the United States and the global financial system. The effect of one large financial institution's failure or near collapse was amplified by the interconnectedness of large, systemically important firms–the degree to which they extended each other

credit and served as over-the-counter derivative counterparties to each other. Counterparties of a failing firm were placed under severe strain when the failing firm could not meet its financial obligations resulting in the counterparties' inability to meet their own obligations.

The financial crisis also revealed inadequacies in the U.S. supervisory approach to single-counter party credit concentration limits, which failed to limit the interconnectedness among and concentration of similar risks within large financial companies that contributed to a rapid escalation of the crisis. While banks were subject to single-borrower lending and investment limits, these limits were applied at the bank level, rather than holding company level, and excluded credit exposures generated by derivatives and some securities financing transactions.[77]

In an effort to address single-counterparty concentration risk among large financial companies, section 165(e) of the Dodd-Frank Act directs the Board to establish single-counterparty credit concentration limits for covered companies in order to limit the risks that the failure of any individual firm could pose to a covered company.[78] This section directs the Board to prescribe regulations that prohibit covered companies from having credit exposure to any unaffiliated company that exceeds 25 percent of the capital stock and surplus of the covered company.[79] This section also authorizes the Board to lower the 25 percent threshold if necessary to mitigate the risks to the financial stability of the United States.[80]

Credit exposure to a company is defined in section 165(e) of the Dodd-Frank Act to mean all extensions of credit to the company, including loans, deposits, and lines of credit; all repurchase agreements, reverse repurchase agreements, securities borrowing and lending transactions with the company (to the extent that such transactions create credit exposure for the covered company); all guarantees, acceptances, or letters of

---

[77] Section 610 of the Dodd-Frank Act amends the term "loans and extensions of credit" for purposes of the lending limits applicable to national banks to include any credit exposure arising from a derivative transaction, repurchase agreement, reverse repurchase agreement, securities lending transaction, or securities borrowing transaction. *See* Dodd-Frank Act, Public Law 111–203, § 610, 124 Stat. 1376, 1611 (2010). As discussed in more detail below, these types of transactions are also all made subject to the single counterparty credit limits of section 165(e). 12 U.S.C. 5365(e)(3).

[78] *See* 12 U.S.C. 5365(e)(1).

[79] 12 U.S.C. 5365(e)(2).

[80] *See id.*

credit (including endorsement or standby letters of credit) issued on behalf of the company; all purchases of or investments in securities issued by the company; counterparty credit exposure to the company in connection with a derivative transaction between the covered company and the company; and any other similar transaction that the Board, by regulation, determines to be a credit exposure for purposes of section 165.[81]

Section 165(e) also grants authority to the Board (i) to issue such regulations and orders, including definitions consistent with section 165(e), as may be necessary to administer and carry out that section; and (ii) to exempt transactions, in whole or in part, from the definition of the term "credit exposure," if the Board finds that the exemption is in the public interest and consistent with the purposes of section 165(e).[82] Section 165(e) states that its provisions and any implementing regulations and orders of the Board will not be effective until 3 years after the date of enactment of the Dodd-Frank Act, and the Board is authorized to extend the transition period for up to an additional 2 years.[83]

The concept of single-counterparty credit limits for covered companies is similar to, but also broader than, existing limits that operate at the depository institution level of banking organizations, including the investment securities limits and the lending limits imposed on depository institutions.[84] A depository institution generally is limited, subject to certain exceptions, in the total amount of investment securities of any one obligor that it may purchase for its own account to no more than 10 percent of its capital stock and surplus.[85] In addition, a depository institution's total outstanding loans and extensions of credit to one borrower may not exceed 15 percent of the bank's capital stock and surplus, plus an additional 10 percent of the bank's capital and surplus, if the amount that exceeds the bank's 15 percent general limit is fully secured by readily marketable collateral.[86]

Section 165(e) is a separate and independent limit from the investment securities limits and lending limits in the National Bank Act, and a covered company must comply with all of the

limits that are applicable to it and its subsidiaries. The Board believes that a covered company should be able to comply with section 165(e) and the proposed rule implementing it on a consolidated basis, in addition to complying, as appropriate, with the investment securities limits and lending limits applicable to a bank subsidiary.

*Question 20:* How would the limits of section 165(e) and the proposed rule interact with the other existing limits such as the investment and lending limits applicable to banks and what other conflicts might arise in complying with these different regimes?

The financial crisis also revealed weaknesses in the large exposure limits in place in other major financial markets. These limits also failed to restrict interconnectedness among large global financial companies. In response, the BCBS has established a working group to examine challenges posed by weaknesses and inconsistencies in large exposure limit regimes across jurisdictions and to carefully evaluate the merits of reaching an international agreement on large exposure limits. If an international agreement on large exposure limits for banking firms is reached, the Board may amend this proposed rule, as necessary, to achieve consistency with the international approach.

### B. Overview of the Proposed Rule

The Board's proposal to implement section 165(e) introduces a two-tier single-counterparty credit limit, with a more stringent single-counterparty credit limit applied to the largest covered companies. The proposed rule includes limits on the exposures of the covered company as well as its subsidiaries—i.e., any company the parent company directly or indirectly controls. "Control", for purposes of this proposed rule, would exist when a covered company directly or indirectly owns or controls 25 percent or more of a class of a company's voting securities or 25 percent or more of a company's total equity, or consolidates the company for financial reporting purposes. The proposal would establish a general limit that prohibits a covered company from having aggregate net credit exposure to any single unaffiliated counterparty in excess of *25 percent* of the covered company's capital stock and surplus.[87] In addition,

the proposed rule would establish a more stringent net credit exposure limit between a major covered company and any major counterparty, i.e., a major covered company's aggregate net credit exposure to any major counterparty would be limited to *10 percent* of the capital stock and surplus of the major covered company.[88] The proposal would define a "major covered company" as any nonbank covered company or any bank holding company with total consolidated assets of $500 billion or more.[89] A "major counterparty" would be defined as any major covered company, as well as any foreign banking organization that is or is treated as a bank holding company and that has total consolidated assets of $500 billion or more.[90]

The proposed definition of a counterparty would include a natural person (including the person's immediate family), a company (including its subsidiaries); the United States (including all of its agencies and instrumentalities, but not including any State or political subdivision of a State); a State (including all of its agencies, instrumentalities, and political subdivisions); and a foreign sovereign entity (including its agencies, instrumentalities, political subdivisions). Under the proposal, credit exposures to sovereign entities are made subject to the credit exposure limits (unless specifically exempted) in the same manner as credit exposures to companies. As explained further below, the Board proposes to include sovereign entities in the definition of counterparty because the Board believes that credit exposures of a covered company to such governmental entities create risks to the covered company similar to those created by large exposures to other types of entities, e.g., privately owned companies.

Both the general and more stringent credit limits would be measured in terms of a covered company's capital stock and surplus. The proposed rule would define "capital stock and surplus" of a covered company as its total regulatory capital plus excess loan loss reserves. Under the proposed rule, the single-counterparty credit limit

---

[81] *See* 12 U.S.C. 5365(e)(3).

[82] *See* 12 U.S.C. 5365(e)(5)–(6).

[83] *See* 12 U.S.C. 5365(e)(7).

[84] *See, e.g.,* 12 U.S.C. 24(7); 12 U.S.C. 84; 12 CFR parts 1 and 32; *see also* 12 U.S.C. 335 (applying the provisions of 12 U.S.C. 24(7) to state member banks).

[85] *See* 12 U.S.C. 24(7); 12 CFR part 1.

[86] *See* 12 U.S.C. 84(a); 12 CFR part 32.

[87] *See* proposed rule § 252.93(a). This general limit in the proposed rule follows the 25 percent limit contained in section 165(e) of the Dodd-Frank Act. *See* 12 U.S.C. 5365(e)(2). Section 165(e) of the Dodd-Frank Act limits credit exposure of a covered company to any unaffiliated company. 12 U.S.C. 5365(e)(2). The proposed rule implements the statute by limiting the credit exposure of a covered company to an unaffiliated "counterparty" as defined in the proposed rule and as discussed further below. *See* proposed rule § 252.92(k) (defining "counterparty").

[88] *See* proposed rule § 252.93(b). Section 165(e)(2) grants the Board authority to lower the limit on net credit exposure below 25 percent if necessary to mitigate risks to the financial stability of the United States. *See* 12 U.S.C. 5365(e)(2).

[89] *See* proposed rule § 252.92(aa) (defining "major covered company").

[90] *See* proposed rule § 252.92(z).

would apply to a broad range of transactions with a counterparty, such as extensions of credit (including loans, deposits, and lines of credit), securities lending or securities borrowing transactions, as well as credit derivative or equity derivative transactions in which the covered company has sold protection to a third party referencing the counterparty. The proposed rule also would allow the Board to determine that any similar transaction should be a "credit transaction".

The proposal also specifies how the gross credit exposure on a credit transaction should be calculated for each type of credit transaction defined in the proposed rule. For example, the proposed rule would require that the gross credit exposure of a securities borrowing transaction be valued at the amount of cash collateral plus the market value of securities collateral transferred by the covered company to the counterparty.

The general limit (*25 percent* of capital stock and surplus) and the more stringent limit between major covered companies and major counterparties (*10 percent* of capital stock and surplus) apply to the aggregate net credit exposure between the covered company and the counterparty, or between major covered companies and major counterparties. The rule would specify how gross credit exposure amounts are converted to net credit exposure amounts by taking into account eligible collateral, eligible guarantees, eligible credit and equity derivative hedges, other eligible hedges (i.e., a short position in the counterparty's debt or equity security), and for securities financing transaction, the effect of bilateral netting agreements. Under the proposed rule, "eligible collateral" is generally defined to include cash on deposit with a covered company (including cash held for the covered company by a third-party custodian or trustee); debt securities (other than mortgage- or asset-backed securities) that are bank-eligible investments; equity securities that are publicly traded; or convertible bonds that are publicly traded.

An "eligible guarantee" is a guarantee that meets certain criteria described in the proposed rule, including being written by an eligible protection provider. Similarly, eligible credit or equity derivative hedges would also be required to be written by an eligible protection provider and meet certain other criteria. For example, an eligible credit derivative hedge would have to be in simple form, including single-name or standard, non-tranched index credit derivatives. Moreover, an eligible

equity derivative hedge would only include an equity-linked total return swap and would not include other, more complex equity derivatives, e.g., purchased equity-linked options.

Section-by-Section Analysis

a. Section 252.91: Applicability

Section 252.91 states that, in general, the proposed rule would apply to a company on the first day of the fifth quarter following the date on which it became a covered company. Initially, the proposed rule would not apply to any covered company until October 1, 2013.[91]

*Question 21:* Should the Board consider a longer phase-in for all or a subset of covered companies?

b. Section 252.92: Definitions

Section 252.92 of the proposed rule defines the key terms used in the rule. As discussed above, the limits of the proposed rule apply to credit exposure of a covered company, including its subsidiaries to any unaffiliated counterparty. A "subsidiary" of a specified company means a company that is directly or indirectly *controlled* by the specified company.[92] A company would control another company if it (i) Owns or controls with the power to vote 25 percent or more of a class of voting securities of the company; (ii) owns or controls 25 percent or more of the total equity of the company; or (iii) consolidates the company for financial reporting purposes.[93] The proposed rule's definition of control would differ from that in the Bank Holding Company Act and the Board's Regulation Y.[94] The Board proposes to vary from the Bank Holding Company Act/Regulation Y definition of control for purposes of this proposed regulation because a simpler, more objective definition of control is more consistent with the objectives of single-counterparty credit limits.

*Question 22:* Is the approach of including all subsidiaries of a covered company in the definition of covered

company for purposes of the proposed rule appropriate?[95] If not, explain why not.

*Question 23:* Should the Bank Holding Company Act/Regulation Y definition of "control" be adopted for purposes of the proposed rule? Are there alternative approaches to defining when a company is a subsidiary of another the Board should consider?

Under the proposed rule, a fund or vehicle that is sponsored or advised by a covered company would not be considered a subsidiary of the covered company unless it was "controlled" by that covered company. A covered company would not control a fund or vehicle that is sponsored or advised by the covered company if (i) it did not own or control more than 25 percent of the voting securities or total equity of the fund or vehicle; and (ii) the fund or vehicle would not be consolidated with the covered company for financial reporting purposes.[96] If a fund or vehicle is not controlled by a covered company, the exposures of such fund or vehicle to its counterparties would not be aggregated with those of the covered company.[97] Such arm's length treatment, however, may be at odds with the support that some companies provided during the financial crisis to the funds they advised and sponsored. For example, many money market mutual fund (MMMF) sponsors, including banking organizations, supported their MMMFs during the crisis in order to enable those funds to meet investor redemption requests without having to sell assets into then-fragile and illiquid markets.

*Question 24:* Since a covered company may have strong incentives to provide support in times of distress to MMMFs and certain other funds or vehicles that it sponsors or advises, the Board seeks comment on whether such funds or vehicles should be included as part of the covered company for purposes of this rule.[98] Is the proposed

---

[91] *See* proposed rule § 252.91(a)(2); *see also* 12 U.S.C. 5365(e)(7)(A) (stating that regulations and orders under section 165(e) shall not be effective until 3 years after the date of enactment of the Dodd-Frank Act).

[92] *See* proposed rule § 252.92(jj).

[93] *See* proposed rule § 252.92(i). This definition of control is similar to that in Appendix G of Regulation Y which states that a person or company controls a company if it (i) owns, controls, or holds with the power to vote 25 percent or more of a class of voting securities of the company; or (ii) consolidates the company for financial reporting purposes. *See* 12 CFR 225, App. G. The only difference between the definition from Appendix G and the proposed rule's definition of control is the addition of the prong to capture total equity in the proposed rule.

[94] *See* 12 U.S.C. 1841(a)(2); 12 CFR 225.2(e)(1).

---

[95] As described below, the same approach to subsidiaries is used for counterparties that are companies. Such counterparties are defined to include a company and its subsidiaries, thus requiring aggregation of the entire organization's credit exposures to the covered company it faces.

[96] Financial Accounting Standards Board, ASC Section 810, *Consolidation*. Further, these requirements are currently under review. The Board may review the effect any change made to these consolidation requirements has on whether a covered company is required to consolidate such fund or vehicle for financial reporting purposes and amend this rule, as necessary.

[97] Instead, a non-controlled fund or vehicle would be treated as a counterparty of the covered company and any exposure or transaction between those entities would be subject to the limits of the proposed rule.

[98] The same issued is raised with respect to the treatment of funds sponsored and advised by

rule's definition of "control" effective, and should the proposal's definition of "subsidiary" be expanded to include any investment fund or vehicle advised or sponsored by a covered company or any other entity?

The proposed rule would establish limits on the credit exposure of a covered company to a single "counterparty".[99] "Counterparty" would be defined to mean (i) With respect to a natural person, the person and members of the person's immediate family, collectively;[100] (ii) with respect to a company, the company and all of its subsidiaries, collectively; (iii) with respect to the United States, the United States and all of its agencies and instrumentalities (but not including any State or political subdivision of a State), collectively; (iv) with respect to a State, the State and all of its agencies, instrumentalities, and political subdivisions (including municipalities), collectively; and (v) with respect to a foreign sovereign entity, the foreign sovereign entity and all of its agencies, instrumentalities, and political subdivisions, collectively.[101]

Section 165(e) directs the Board to limit credit exposure of a covered company to "*any unaffiliated company*".[102] The Board included sovereign entities in the definition of counterparty to limit the vulnerability of a covered company to default by a single sovereign state, because the Board believes that credit exposures of a covered company to such governmental entities create risks to the covered company that are similar to those created by large exposures to other types of entities. The severe distress or failure of a sovereign entity could have effects on a covered company that are comparable to those caused by the failure of a financial firm or nonfinancial corporation to which the covered company has a large credit exposure. For these reasons, credit exposures to sovereign governments are made subject to the credit exposure limits in the same manner as credit exposures to companies. The Board

believes that the authority in the Dodd-Frank Act and the Board's general safety and soundness authority in associated banking laws are sufficient to encompass sovereign governments in the definition of counterparty in this manner.[103]

As discussed below, certain credit exposures of a covered company to the U.S. government are exempt from the credit exposure limits.[104] There is no similar exemption, however, for exposures to U.S. state or local governments or foreign sovereigns. Accordingly, credit exposures to U.S. state and local governments and foreign sovereigns would be subject to the proposed limits.

*Question 25:* Should the definition of "counterparty" differentiate between types of exposures to a foreign sovereign entity including exposures to local governments? Should exposures to a company controlled by a foreign sovereign entity be included in the exposure to that foreign sovereign entity?

*Question 26:* Should certain credit exposures to foreign sovereign entities be exempted from the limitations of the proposed rule—for example, exposures to foreign central banks necessary to facilitate the operation of a foreign banking business by a covered company?

The Board also notes that difficult issues are raised in connection with the valuation of credit exposure arising from direct investments in or indirect exposures to a collateralized debt obligation (CDO) or other obligation issued by a special purpose vehicle (SPV). The failure to look through an

SPV to its sponsor or to the issuer of the underlying assets may serve at times to improperly mask a covered company's exposure to those parties. Accordingly, under the proposed reservation of authority, the Board may look through some SPVs either to the issuer of the underlying assets in the vehicle or to the sponsor. In the alternative, the Board may require covered companies to look through to the underlying assets of an SPV but only if the SPV failed certain discrete concentration tests (such as having more than 20 underlying exposures).

*Question 27:* How should exposures to SPVs and their underlying assets and sponsors be treated? What other alternatives should the Board consider?

The credit exposure of a covered company to an unaffiliated counterparty is limited to a percentage of the capital stock and surplus of the covered company.[105] Under the proposed rule, "capital stock and surplus" of a bank holding company is the sum of the company's total regulatory capital as calculated under the risk-based capital adequacy guidelines applicable to that bank holding company under Regulation Y (12 CFR part 225) and the balance of the allowance for loan and lease losses of the bank holding company not included in tier 2 capital under the capital adequacy guidelines applicable to that bank holding company under Regulation Y (12 CFR part 225).[106] This definition of capital stock and surplus is generally consistent with the definition of the same term in the Board's Regulations O and W and the OCC's national bank lending limit regulation.[107] For a nonbank covered company, "capital stock and surplus" includes the total regulatory capital of such company on a consolidated basis, as determined under the risk-based capital rules the company is subject to by rule or order of the Board.[108]

An alternative measure of "capital stock and surplus" might focus on common equity and, in that respect, be consistent with the post-crisis global regulatory move toward tier 1 common equity as the primary measure of loss absorbing capital for internationally active banking firms. For example, Basel III introduces for the first time a specific tier 1 common equity requirement and uses tier 1 common equity measures in its capital conservation buffer and

---

counterparties. Such funds or vehicles similarly would not be considered to be part of the counterparty under the proposed rule's definition of control.

[99] *See* proposed rule § 252.93.

[100] "Immediate family" is defined in section 252.92(y) of the proposed rule.

[101] *See* proposed rule § 252.92(k); *see also* proposed rule § 252.92(hh) (defining "sovereign entity").

[102] 12 U.S.C. 5365(e)(2)–(3). "Company" is defined for purposes of the proposed rule to mean a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization. *See* proposed rule § 252.92(h).

[103] *See* 12 U.S.C. 5365(b)(1)(B)(iv) (allowing the Board to establish additional prudential standards for covered companies as the Board, on its own or pursuant to a recommendation made by the Council in accordance with section 115, determines are appropriate) and 5368 (providing the Board with general rulemaking authority); *see also* section 5(b) of the BHC Act of 1956, as amended (12 U.S.C. 1844(b)), and section 8(b) of FDI Act (12 U.S.C. 1818(b)). Section 5(b) of the BHC Act provides the Board with the authority to issue such regulations and orders as may be necessary to enable it to administer and carry out the purposes of the BHC Act. Section 8(b) of the FDI Act allows the Board to issue to bank holding companies an order to cease and desist from unsafe and unsound practices.

[104] *See generally* proposed rule § 252.97 (exempting direct claims on, and portions of claims that are directly and fully guaranteed as to principal and interest by, the United States and its agencies and direct claims on, and portions of claims that are directly and fully guaranteed as to principal and interest by, the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, only while operating under the conservatorship or receivership of the Federal Housing Finance Agency, and any additional obligations by a U.S. government sponsored entity as determined by the Board.)

[105] *See* 12 U.S.C. 5365(e)(2); *see also* proposed rule § 252.93.

[106] *See* proposed rule § 252.92(g); *see also* proposed rule § 252.92(kk) (defining "total capital").

[107] *See* 12 CFR 12 CFR 215.3(i); 223.3(d); *see also* 12 CFR 32.2(b).

[108] *See* proposed rule § 252.92(g).

countercyclical buffer.[109] In addition the the, the BCBS capital surcharge framework for G–SIBs builds on the tier 1 common equity requirement in Basel III.[110] In addition, the Federal Reserve focused on tier 1 common equity in the SCAP conducted in early 2009 and again in the CCAR conducted in early 2011 to assess the capacity of bank holding companies to absorb projected losses.[111]

*Question 28:* Are the measures of "capital stock and surplus" in the proposed rule effective in light of the intent and purpose of section 165(e) or would a measure of "capital stock and surplus" that focuses on tier 1 common equity be more effective? What other alternatives to the proposed definition of "capital stock and surplus" should the Board consider?

c. Section 252.93: Credit Exposure Limit

Section 252.93 of the proposed rule contains the key quantitative limitations on credit exposure of a covered company to a single counterparty.[112] As noted above, the Board has determined to limit the "aggregate net credit exposure" of a covered company to a counterparty. "Aggregate net credit exposure" is defined to mean the sum of all net credit exposures of a covered company to a single counterparty.[113] As described in detail below, sections 252.94 and 252.95 of the proposed rule explain how to calculate gross and net credit exposure in order to arrive at the aggregate net credit exposure relevant to the single-counterparty credit limit in section 252.93.[114]

There are two separate limits contained in section 252.93 of the proposed rule. The general limit provides that no covered company may have aggregate net credit exposure to any unaffiliated counterparty that exceeds 25 percent of the capital stock and surplus of the covered company.[115] There is also a second, more stringent limit for aggregate net credit exposure between major covered companies and major counterparties. Specifically, no major covered company may have aggregate net credit exposure to any unaffiliated major counterparty that exceeds 10 percent of the capital stock

and surplus of the major covered company.[116] As discussed above, the Dodd-Frank Act grants the Board authority to impose stricter limits on covered companies with a larger systemic footprint and indeed requires the Board to impose stricter single-counterparty credit limits on covered companies with a larger systemic footprint.

*Question 29:* What other limits or modifications to the proposed limits on aggregate net credit exposure should the Board consider?

In accord with the directive of section 165, the proposed rule imposes a more conservative limit on larger covered companies that have a larger systemic footprint.[117] The Board recognizes, however, that size is only a rough proxy for the systemic footprint of a company. Additional factors specific to a firm, including the nature, scope, scale, concentration, interconnectedness, mix of its activities, its leverage, and its off-balance-sheet exposures, among other factors, may be determinative of a company's systemic footprint.[118] The BCBS proposal on capital surcharges for systemically important banking organizations, for example, uses a twelve factor approach to determine the systemic importance of a global banking organization.[119] Moreover, the Board recognizes that drawing one line through the covered company population and imposing stricter limits on exposures between major covered companies and major counterparties may not take into account nuances that might be captured by other approaches.

*Question 30:* Should the Board adopt a more nuanced approach, like the BCBS approach, in determining which covered companies should be treated as major covered companies or which counterparties should be considered major counterparties?

*Question 31:* Should the Board introduce more granular categories of covered companies to determine to appropriate net credit exposure limit? If so, how could such granularity best be accomplished?

Section 165(e) provides the Board with discretion to determine how a covered company measures the amount of credit exposure in various transaction types. As noted above, the proposed rule limits *aggregate net* credit exposure of a covered company to an unaffiliated counterparty. "Aggregate net credit exposure" is defined in the proposed

rule to be a measure that recognizes certain credit risk mitigants, including netting agreements for certain types of transactions, most forms of collateral with a haircut, and guarantees and other forms of credit protection.[120] The Board recognizes that while net credit exposure limits reduce the risk that the failure of a single counterparty could significantly undermine the financial strength of a covered company, net limits also understate the level of interconnectedness among financial companies. While gross credit exposure limits might more effectively capture interconnectedness among financial companies, the Board has not proposed supplementary gross limits at this time due to the tendency of gross limits to significantly overstate the credit risk inherent in any given transaction.

*Question 32:* Should the Board supplement the net credit exposure limit with limits on gross credit exposure for all covered companies or a subset of covered company, i.e., major covered companies? Explain why or why not.

d. Section 252.94: Gross Credit Exposure

Section 252.94 of the proposed rule explains how a covered company would be required calculate its "gross credit exposure" on a credit transaction with a counterparty. "Gross credit exposure" is defined to mean, with respect to any credit transaction, the credit exposure of the covered company to the counterparty before adjusting for the effect of qualifying master netting agreements, eligible collateral, eligible guarantees, eligible credit derivatives and eligible equity derivatives, and other eligible hedges, i.e., a short position in the counterparty's debt or equity security.[121] Consistent with the statutory definition of credit exposure, the proposed rule defines "credit transaction" to mean, with respect to a counterparty, any (i) Extension of credit to the counterparty, including loans, deposits, and lines of credit, but excluding advised or other uncommitted lines of credit; (ii) repurchase or reverse repurchase agreement with the counterparty; (iii) securities lending or securities borrowing transaction with the counterparty; (iv) guarantee, acceptance, or letter of credit (including any

---

[109] See Basel III framework, *supra* note 34.
[110] See BCBS capital surcharge framework, *supra* note 35.
[111] See, e.g., The Supervisory Capital Assessment Program: Overview of Results (May 7, 2009), available at *http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20090507a1.pdf* (hereinafter SCAP Overview of Results); and 76 FR 74631, 74636 (December 1, 2011).
[112] See proposed rule § 252.93.
[113] See proposed rule § 252.92(c).
[114] See proposed rule §§ 252.94 & 252.95.
[115] See proposed rule § 252.93(a).

[116] See proposed rule § 252.93(b).
[117] See 12 U.S.C. 5365(a).
[118] See, e.g., 12 U.S.C. 5323(a).
[119] See BCBS capital surcharge framework, *supra* note 35.

[120] See proposed rule § 252.92(c) (defining "aggregate net credit exposure") and § 252.95 (describing how to calculate aggregate net credit exposure taking into accounting netting, collateral, guarantees and other forms of credit protection).
[121] See proposed rule § 252.92(x). Section 252.95 of the proposed rule explains how these adjustments are made.

confirmed letter of credit or standby letter of credit) issued on behalf of the counterparty; (v) purchase of, or investment in, securities issued by the counterparty; (vi) credit exposure to the counterparty in connection with a derivative transaction between the covered company and the counterparty; (vii) credit exposure to the counterparty in connection with a credit derivative or equity derivative transaction between the covered company and a third party, the reference asset of which is an obligation or equity security issued by the counterparty; [122] and (viii) any transaction that is the functional equivalent of the above, and any similar transaction that the Board determines to be a credit transaction for purposes of this subpart.[123]

*Question 33:* Are the definitions of "credit transaction" appropriate in light of the purpose and intent of the Dodd-Frank Act? If not, explain why not?

*Question 34:* What transactions, if any, should be exempt from the definition of credit transaction?

Section 252.94 describes how the gross credit exposure of a covered company to a counterparty on a credit transaction should be calculated for each type of credit transaction described above.[124] In particular, section 252.94(a) of the proposed rule provides that, for purposes of calculating gross credit exposure:

(i) The value of loans by a covered company to a counterparty (and leases in which the covered company is the lessor and the counterparty is the lessee) is equal to the amount owed by the counterparty to the covered company under the transaction.

(ii) The value of debt securities held by the covered company that are issued by the counterparty is equal to the greater of (i) the amortized purchase price or market value for trading and available for sale securities, or (ii) the amortized purchase price for securities held to maturity.

(iii) The value of equity securities held by the covered company that are issued by the counterparty is equal to the greater of the purchase price or market value.

(iv) The value of repurchase agreements is equal to (i) the market value of the securities transferred by the covered company to the counterparty

plus (ii) an add-on equal to the market value of the securities transferred multiplied by the collateral haircut set forth in section 252.95 (Table 2) that is applicable to the securities transferred.

(v) The value of reverse repurchase agreements is equal to the amount of cash transferred by the covered company to the counterparty.

(vi) Securities borrowing transactions are valued at the amount of cash collateral plus the market value of securities collateral transferred by the covered company to the counterparty.

(vii) Securities lending transactions are valued at (i) the market value of the securities lent by the covered company to the counterparty plus (ii) an add-on equal to the market value of the securities lent multiplied by the collateral haircut set forth in section 252.95 (Table 2) that is applicable to the securities lent.

(viii) Committed credit lines extended by a covered company to the counterparty are valued at the face amount of the credit line.

(ix) Guarantees and letters of credit issued by a covered company on behalf of the counterparty are equal to the maximum potential loss to the covered company on the transaction.

(x) Derivative transactions between the covered company and the counterparty not subject to a qualifying master netting agreement, are valued in an amount equal to the sum of (i) the current exposure of the derivatives contract equal to the greater of the mark-to-market value of the derivative contract or zero and (ii) the potential future exposure of the derivatives contract, calculated by multiplying the notional principal amount of the derivative contract by the appropriate conversion factor, set forth in section 252.94 (Table 1).

(xi) Derivative transactions between the covered company and the counterparty subject to a qualifying master netting agreement, are valued in an amount equal to the exposure at default amount calculated under 12 CFR part 225, appendix G, § 32(c)(6).

(xii) Credit or equity derivative transactions between the covered company and a third party where the covered company is the protection provider and the reference asset is an obligation or equity security of the counterparty, are valued in an amount equal to the lesser of the face amount of the transaction or the maximum potential loss to the covered company on the transaction.

*Question 35:* What alternative or additional valuation rules should the Board consider for calculating gross credit exposure?

*Question 36:* What impediments to calculating gross credit exposure in the manner described above would covered companies face?

In the valuation rules described above, trading and available-for-sale debt securities held by the covered company are valued at the greater of amortized purchase price or market value in section 252.94(a)(2) of the proposed rule. Similarly, equity securities held by the covered company are valued at the greater of purchase price or market value in section 252.94(a)(3) of the proposed rule. The valuation rule for these types of securities requires a covered company to revalue upwards the amount of an investment in such securities when the market value of the securities increases. In these circumstances, the valuation rule merely reflects the covered company's greater financial exposure to the counterparty and reduces the covered company's ability to engage in additional transactions with a counterparty as the covered company's exposure to the counterparty increases.

The valuation rules also provide that the amount of the covered company's investment in these securities can be no less than the purchase price paid by the covered company for the securities, even if the market value of the securities declines below the purchase price. Using the purchase price of the securities as a floor for valuing them would appear to be appropriate for several reasons. First, it ensures that the value of the securities never falls below the amount of funds actually transferred by the covered company to the counterparty in connection with the investment. Second, the purchase price floor would limit the ability of a covered company to provide additional funding to a counterparty as the counterparty approaches insolvency. If the proposed rule were to value investments in securities issued by a counterparty strictly at market value, the covered company could lend substantially more funds to the counterparty as the counterparty's financial condition worsened. As the financial condition of the counterparty declines, the market value of the counterparty's securities held by the covered company would also likely decline, allowing the covered company to provide additional funding to the counterparty under the proposed rule. This type of increasing support for a counterparty in distress could vitiate the public policy goals of section 165(e) by permitting a covered company to exceed the regulatory single-counterparty limits through serial credit extensions to a collapsing counterparty.

---

[122] "Credit derivative" and "equity derivative" are defined in sections 252.92(m) and (v) of the proposed rule, respectively.

[123] *See* proposed rule § 252.92 (n). The definition of "credit transaction" in the proposed rule is similar to the definition of "credit exposure" in section 165(e) of the Dodd-Frank Act. *See* 12 U.S.C. 5365(e)(3).

[124] *See* proposed rule § 252.94(a)(1)–(12).

*Question 37:* Does the requirement to use the greater of purchase price or market value introduce significant burden for covered companies? Would the use of the market value alone be consistent with the purposes of section 165(e)?

The add-on included in the gross valuation rule for repurchase agreements and securities lending transactions (set forth in sections 252.94(a)(4) and 252.94(a)(7)) of the proposed rule is intended to capture the market volatility (and associated potential increase in counterparty exposure amount) of the securities transferred or lent by the covered company in these transactions.

The final gross credit exposure calculation amounts noted in sections 252.94(a)(10)–(12) of the proposed rule address derivative transactions. The proposed rule addresses both credit exposure of a derivative counterparty, which is valued as the sum of the current exposure and the potential future exposure of the contract, and credit exposure of a covered company to the issuer of the reference obligation of certain credit and equity derivatives when the covered company is the protection provider, which is valued on a notional basis.[125]

*Question 38:* The Board seeks comment on all aspects of the proposed approach to calculating gross credit exposures for securities financing and derivative transactions, including the add-on in the proposed gross valuation rule for repurchase agreements and securities lending transactions.

• The Board recognizes that the credit risk targeted by the valuation rule for securities lending transactions and repurchase agreements—i.e., that a counterparty would fail at the same time that the underlying securities are rising in value—may be smaller than the credit risk associated with reverse repurchase agreements or securities borrowing transactions. Should the Board consider a lower add-on than the haircuts in section 252.95 (Table 2) to reflect this difference? If so, how should the Board calibrate the add-on?

• Will the proposed add-on approach to valuing credit exposure for securities lending transactions and repurchase agreements lead to significant changes in current practices in those markets?

• Is the valuation approach for a derivative transaction between a covered company and a counterparty—i.e., a combination of the current exposure and a measure of potential future exposure of the contract—appropriate? What alternative valuation approaches for derivative transactions should the Board consider?

• Is the valuation approach for a derivative transaction between a covered company and a third party appropriate in the case of a derivative transaction where the covered company is the protection provider and the reference asset is issued by the counterparty?

The proposed rule generally allows covered companies to calculate gross credit exposure to a counterparty for derivatives contracts with that counterparty subject to a qualifying master netting agreement by using the Basel II-based exposure at default calculation set forth in the Board's advanced approaches capital rules (12 CFR part 225, appendix G, § 32(c)(6)).[126]

With respect to cleared and uncleared derivatives, the amount of initial margin and excess variation margin (i.e., variation margin in excess of that needed to secure the mark-to-market value of a derivative) posted to a counterparty should be treated as credit exposure to the counterparty unless the margin is held in a segregated account at a third party custodian. In the case of cleared derivatives, a covered company's contributions to the guaranty fund of a central counterparty (CCP) would be considered a credit exposure to the CCP and valued at notional amount.[127]

*Question 39:* Should margin posted and contributions to a CCP guaranty fund be considered a credit exposure for purposes of the proposed rule? The Board recognizes that there are competing policy concerns in considering whether to limit a covered company's exposure to central counterparties. The Board seeks comment on the benefits and drawbacks of such limits.

Section 252.94(b) of the proposed rule includes the statutory attribution rule that provides that a covered company

must treat a transaction with any person as a credit exposure to a counterparty to the extent the proceeds of the transaction are used for the benefit of, or transferred to, that counterparty.[128]

The Board notes that an overly broad interpretation of the attribution rule in the context of section 165(e) would lead to inappropriate results and would create a daunting tracking exercise for covered companies. For example, if a covered company makes a loan to a counterparty that in turn uses the loan to purchase goods from a third party, the attribution rule could be read to mean that the covered company would have a credit exposure to that third party, because the proceeds of the loan with the counterparty are used for the benefit of, or transferred to, the third party. The Board recognizes the difficulty in monitoring such transactions and the limited value in tracking such money flows for purposes of maintaining the integrity of the single-counterparty credit limit regime. The Board thus proposes to minimize the scope of application of this attribution rule consistent with preventing evasion of the single-counterparty credit limit.

*Question 40:* The Board requests comment on whether the proposed scope of the attribution rule is appropriate or whether additional regulatory clarity around the attribution rule would be appropriate. What alternative approaches to applying the attribution rule should the Board consider? What is the potential cost or burden of applying the attribution rule as described above?

e. Section 252.95: Net Credit Exposure

As discussed above, the proposed rule imposes limits on a covered company's net credit exposure to a counterparty. "Net credit exposure" is defined to mean, with respect to any credit transaction, the gross credit exposure of a covered company calculated under section 252.94, as adjusted in accordance with section 252.95.[129] Section 252.95 of the proposed rule explains how to convert gross credit exposure amounts to net credit exposure amounts by taking into account eligible collateral, eligible guarantees, eligible credit and equity derivatives, other eligible hedges (i.e., a short position in the counterparty's debt or equity security), and for securities financing transactions, the effect of bilateral netting agreements.[130]

---

[125] *See* proposed rule § 252.94(a)(10)–(12). "Credit derivative" is defined in section 252.92(m) of the proposed rule, and "equity derivative" is defined in section 252.92(v) of the proposed rule. "Derivative transaction" is defined in section 252.92(p) of the proposed rule in the same manner as it is defined in section 610 of the Dodd-Frank Act. *See* Dodd-Frank Act, Public Law 111–203, § 610, 124 Stat. 1376, 1611 (2010).

[126] *See* proposed rule § 252.95(a). "Qualifying master netting agreement" is defined in section 252.92(ee) of the proposed rule in a manner consistent with the Board's advanced risk-based capital rules for bank holding companies.

[127] The Board notes that it has the authority to deem margin posted to be a credit exposure as such exposure is part of counterparty credit exposure to the covered company arising in connection with a derivative transaction. The Board also has broad authority in section 165(e) to determine that any similar transaction is a credit exposure. 12 U.S.C. 5365(e)(3)(E)–(F).

[128] *See* proposed rule § 252.94(b); *see also* 12 U.S.C. 5365(e)(4).

[129] *See* proposed rule § 252.92(bb).

[130] *See* proposed rule § 252.95.

Collateral

Section 252.95(b) of the proposed rule explains the impact of eligible collateral when calculating net credit exposure. "Eligible collateral" is defined to include (i) Cash on deposit with a covered company (including cash held for the covered company by a third-party custodian or trustee); (ii) debt securities (other than mortgage- or asset-backed securities) that are bank-eligible investments; (iii) equity securities that are publicly traded; or (iv) convertible bonds that are publicly traded.[131] For any of these asset types to count as eligible collateral for a credit transaction, the covered company generally must have a perfected, first priority security interest in the collateral (or, if outside of the United States, the legal equivalent thereof). This list of eligible collateral is similar to the list of eligible collateral in the Basel II standardized capital rules.

*Question 41:* Should the list of eligible collateral be broadened or narrowed?

In computing its net credit exposure to a counterparty for a credit transaction, a covered company may reduce its gross credit exposure on a transaction by the adjusted market value of any eligible collateral.[132] "Adjusted market value" is defined in section 252.92(a) of the proposed rule to mean, with respect to any eligible collateral, the fair market value of the eligible collateral after application of the applicable haircut specified in section 252.95 (Table 2) for that type of eligible collateral. The haircuts in Table 2 are consistent with the standard supervisory market price volatility haircuts in Appendix G to Regulation Y.

*Question 42:* Should a covered company be able to use its own internal estimates for collateral haircuts as permitted under Appendix G to Regulation Y?

A covered company *has the choice* of whether to reduce its gross credit exposure to a counterparty by the adjusted market value of any eligible collateral.[133] If a covered company chooses to reduce its gross credit exposure by the adjusted market value of eligible collateral, however, the covered company would be required to include the adjusted market value of the eligible collateral when calculating its gross credit exposure to *the issuer of the collateral.* In effect, the covered company would have shifted its credit exposure from the original counterparty to the issuer of the eligible collateral. The amount of credit exposure to the original counterparty and the issuer of the eligible collateral will fluctuate over time based on the adjusted market value of the eligible collateral. Collateral that previously met the definition of eligible collateral under the proposed rule but over time ceases to do so would no longer be eligible to reduce gross credit exposure.

A covered company would have the option of whether or not to use eligible collateral as a credit risk mitigation tool in recognition of the fact that tracking the market movements of a diverse pool of collateral can, in some circumstances, be operationally burdensome. In this respect, a covered company may opt not to recognize eligible collateral and thus avoiding potentially burdensome tracking of collateral.

*Question 43:* Is recognizing the fluctuations in the value of eligible collateral the correct approach, and what would be the burden on covered companies in calculating such changes on a daily basis?

*Question 44:* What is the burden on a covered company associated with the proposed rule's approach to changes in the eligibility of collateral? Should the Board instead consider introducing stricter collateral haircuts for collateral that ceases to be eligible collateral?

So as not to dis-incentivize overcollateralization, the credit exposure to the collateral issuer is capped so that it will never exceed the credit exposure to the original counterparty.[134] A covered company would, in every case, continue to have credit exposure to the original counterparty to the extent that the adjusted market value of the eligible collateral does not equal the full amount of the credit exposure to the original counterparty.

For example, under the proposed rule, the treatment of eligible collateral would work as follows. Assume a covered company makes a $1,000 loan to a counterparty, creating $1,000 of gross credit exposure to that counterparty, and the counterparty provides eligible collateral issued by a third party that has $700 of adjusted market value. The covered company may choose to reduce its credit exposure to the original counterparty by the adjusted market value of the eligible collateral. As a result, the covered company would have gross credit exposure of $700 to the issuer of the collateral and $300 net credit exposure to the original counterparty that posted the collateral.

As noted above, the amount of credit exposure to the original counterparty and the issuer of the eligible collateral will fluctuate over time based on movements in the adjusted market value of the eligible collateral. For example, if the adjusted market value of the eligible collateral decreases to $400 in the previous example, the covered company's net credit exposure to the original counterparty would increase to $600, and its gross credit exposure to the collateral issuer would decrease to $400. By contrast, in the event of an increase in the adjusted market value of the eligible collateral to $800, the covered company's gross credit exposure to the issuer of the eligible collateral would increase to $800 and its net credit exposure to the original counterparty would decline to $200. In each case, the covered company's credit exposure would be capped at the original amount of the exposure created by the loan or $1,000—even if the adjusted market value of the eligible collateral exceeded $1,000.

*Question 45:* Is the approach to eligible collateral that allows the covered company to choose whether or not to recognize eligible collateral and shift credit exposure to the issuer of eligible collateral appropriate? What alternatives to this approach should the Board consider?

*Question 46:* Alternatively, should eligible collateral be treated the same way eligible guarantees and eligible credit and equity derivative hedges are treated (as described below), thus requiring a mandatory look-through to eligible collateral?

Unused Credit Lines

Section 252.95(c) of the proposed rule concerns the unused portion of certain extensions of credit. In computing its net credit exposure to a counterparty for a credit line or revolving credit facility, a covered company may reduce its gross credit exposure by the amount of the unused portion of the credit extension to the extent that the covered company does not have any legal obligation to advance additional funds under the facility until the counterparty provides qualifying collateral equal to or greater than the entire used portion of the facility.[135] To qualify for this reduction, the credit contract must specify that any used portion of the credit extension must be fully secured at all times by collateral that is either (i) Cash; (ii)

---

[131] *See* proposed rule § 252.92(q); *see also* proposed rule § 252.92(dd) (defining "publicly traded").

[132] *See* proposed rule § 252.95(b).

[133] The Board notes that it has the authority to treat eligible collateral as a gross credit exposure to the collateral issuer as a consequence of the broad grant of authority to the Board in section 165(e) to determine that any other similar transaction is a credit exposure. *See* 12 U.S.C. 5365(e)(3)(F).

[134] *See* proposed rule § 252.95(b).

[135] *See* proposed rule § 252.95(c).

obligations of the United States or its agencies; or (iii) obligations directly and fully guaranteed as to principal and interest by, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, only while operating under the conservatorship or receivership of the Federal Housing Finance Agency, and any additional obligations issued by a U.S. government sponsored entity as determined by the Board.[136]

*Question 47:* What alternative approaches, if any, to the proposed treatment of the unused portion of certain credit facilities should the Board consider?

Eligible Guarantees

Section 252.95(d) of the proposed rule describes how to reflect eligible guarantees in calculations of net credit exposure to a counterparty.[137] Eligible guarantees are guarantees that meet certain conditions, including having been written by an eligible protection provider.[138] An eligible protection provider includes a sovereign entity, the Bank for International Settlements, the International Monetary Fund, the European Central Bank, the European Commission, a multilateral development bank, a Federal Home Loan Bank, the Federal Agricultural Mortgage Corporation, a depository institution, a bank holding company, a savings and loan holding company, a securities broker or dealer registered with the SEC, an insurance company that is subject to supervision by a State insurance regulator, a foreign banking organization, a non-U.S.-based securities firm or non-U.S.-based insurance company that is subject to consolidated supervision and regulation comparable to that imposed on U.S. depository institutions, securities broker-dealers, or insurance companies (as the case may be), and a qualifying central counterparty.[139]

*Question 48:* In what ways should the definition of eligible protection provider be expanded or narrowed?

*Question 49:* Are there any additional or alternative requirements the Board should place on eligible protection providers to ensure their capacity to perform on their guarantee obligations?

In calculating its net credit exposure to the counterparty, a covered company

would be required to reduce its gross credit exposure to the counterparty by the amount of any eligible guarantee from an eligible protection provider.[140] The covered company would then have to include the amount of the eligible guarantee when calculating its gross credit exposure to the eligible protection provider.[141] Also, as is the case with eligible collateral, in no event would a covered company's gross credit exposure to an eligible protection provider with respect to an eligible guarantee be in excess of its gross credit exposure to the original counterparty on the credit transaction prior to the recognition of the eligible guarantee.[142] The exposure to the eligible protection provider is effectively capped at the amount of the credit exposure to the original counterparty even if the amount of the eligible guarantee is larger than the original exposure. A covered company would continue to have credit exposure to the original counterparty to the extent that the eligible guarantee does not equal the full amount of the credit exposure to the original counterparty.

For example, assume a covered company makes a $1,000 loan to an unaffiliated counterparty and obtains a $700 eligible guarantee on the loan from an eligible protection provider. The covered company would have gross credit exposure of $700 to the protection provider as a result of the eligible guarantee and $300 net credit exposure to the original counterparty. As a second example, assume a covered company makes a $1,000 loan to an unaffiliated counterparty and obtains a $1,500 eligible guarantee from an eligible protection provider. The covered company would have $1,000 gross credit exposure to the protection provider (capped at the amount of the original exposure), but the covered company would have no net credit exposure to the original counterparty as a result of the eligible guarantee.

The Board proposes to require a covered company to reduce its gross exposure to a counterparty by the amount of an eligible guarantee in order to ensure that concentrations in exposures to guarantors are captured by the regime. This requirement is meant to limit the ability of a covered company to extend loans or other forms of credit to a large number of high risk borrowers that are guaranteed by a single guarantor. The proposed rule also would narrow the set of eligible protection providers to sovereign

entities and regulated financial companies in order to limit the ability of covered companies to arbitrage the rule by obtaining multiple small guarantees (each beneath the covered company's limit) from high-risk guarantors to offset a large exposure (exceeding the covered company's limit) to a single counterparty.

*Question 50:* Should covered companies have the choice of whether or not to fully shift exposures to eligible protection providers in the case of eligible guarantees or to divide an exposure between the original counterparty and the eligible protection provider in some manner?

*Question 51:* Would a more conservative approach to eligible guarantees be more appropriate to penalize financial sector interconnectedness–for example, one in which the covered company would be required to recognize gross credit exposure both to the original counterparty and the eligible protection provider in the full amount of the original credit exposure? What other alternative approaches to the treatment of eligible guarantees should the Board consider?

Eligible Credit and Equity Derivative Hedges

Section 252.95(e) describes the treatment of eligible credit and equity derivatives in the case where the covered company is the protection purchaser.[143] In the case where a covered company is a protection purchaser, such derivatives can be used to mitigate gross credit exposure and are treated in the same manner as an eligible guarantee. A covered company may only recognize *eligible* credit and equity derivative hedges for purposes of calculating net credit exposure.[144] These derivatives must meet certain criteria, including having been written by an eligible protection provider.[145] An eligible credit derivative hedge must be simple in form, including single-name or standard, non-tranched index credit derivatives. An eligible equity derivative hedge may only include an

---

[136] *Id.*

[137] *See* proposed rule § 252.95(d).

[138] *See* proposed rule § 252.95(t) for the definition of "eligible guarantee" and for a description of the requirements of an eligible guarantee.

[139] *See* proposed rule § 252.29(u). Eligible credit and equity derivatives, as described below, also must be written by eligible protection providers. "Qualifying central counterparty" is defined in section 252.92(ee) of the proposed rule.

[140] *See* proposed rule § 252.95(d).

[141] *See* proposed rule § 252.95(d)(1).

[142] *See* proposed rule § 252.95(d)(2).

[143] *See* proposed rule § 252.95(e).

[144] By contrast, in section 252.94(a)(12) of the proposed rule, where the covered company is the protection provider, *any* credit or equity derivative written by the covered company is included in the calculation of the covered company's gross credit exposure to the reference obligor.

[145] *See* proposed rule § 252.92(r) and (s) defining "eligible credit derivative" and "eligible equity derivative", respectively. "Eligible protection provider" is defined in § 252.92(u) of the proposed rule. The same types of organizations that are eligible protection providers for the purposes of eligible guarantees are eligible protection providers for purposes of eligible credit and equity derivatives.

equity-linked total return swap and does not include other more, complex forms of equity derivatives, such as purchased equity-linked options.

*Question 52:* What types of derivatives should be eligible for mitigating gross credit exposure and, in particular, are there are more complex forms of derivatives that should be eligible hedges?

The treatment of eligible credit and equity derivative hedges in the proposed rule is much like that of guarantees. A covered company would be required to reduce its gross credit exposure to a counterparty by the notional amount of any eligible credit or equity derivative hedge that references the counterparty if the covered company obtains the derivative from an eligible protection provider.[146] In these circumstances, the covered company would be required to include the notional amount of the eligible credit or equity derivative hedge in calculating its gross credit exposure to the eligible protection provider.[147] As is the case for eligible collateral and eligible guarantees, the gross exposure to the eligible protection provider may in no event be greater than it was to the original counterparty prior to recognition of the eligible credit or equity derivative.[148]

For example, a covered company holds $1,000 in bonds issued by Company A, and the covered company purchases an eligible credit derivative in a notional amount of $800 from Protection Provider X, which is an eligible protection provider, to hedge its exposure to Company A. The covered company would now treat Protection Provider X as its counterparty, and has an $800 credit exposure to it. The covered company also continues to have credit exposure of $200 to Company A. Similarly, consider the case of an eligible equity derivative, where a covered company holds $1,000 in equity securities issued by Company B and purchases an eligible equity-linked total return swap in a notional amount of $700 from Protection Provider Y, an eligible protection provider, to hedge its exposure to Company B. The covered company would now treat Protection Provider Y as its counterparty, and has a credit exposure to it of $700. The covered company also has credit exposure to Company B of $300.

The proposed rule generally treats eligible credit and equity derivatives in the same manner as non-derivative credit enhancement instruments such as

eligible guarantees, and requires covered companies generally to consider themselves as having credit exposure to the protection provider in an amount equal to the notional or face value of the hedge instrument. In essence, the rule only recognizes simple derivative hedges on a transaction-to-transaction basis. The rule does not accommodate proxy hedging or portfolio hedging and uses a simple substitution approach of guarantor for obligor.

*Question 53:* What alternative approaches, if any, should the Board consider to capture the risk mitigation benefits of proxy or portfolio hedges or to permit covered companies to use internal models to measure potential exposures to sellers of credit protection?

*Question 54:* Should covered companies have the choice to recognize and shift exposures to protection providers in the case of eligible credit or equity derivative hedges or to apportion the exposure between the original counterparty and the eligible protection provider?

*Question 55:* Would a more conservative approach to eligible credit or equity derivative hedges be more appropriate, such as one in which the covered company would be required to recognize gross notional credit exposure both to the original counterparty and the eligible protection provider?

Other Eligible Hedges

In addition to eligible credit and equity derivatives, a covered company may reduce exposure to a counterparty by the face amount of a short sale of the counterparty's debt or equity security.

*Question 56:* Rather than requiring firms to calculate gross trading exposures and offset that exposure with eligible credit and equity derivatives or short positions, should the Board allow covered companies to use internal pricing models to calculate the net mark-to-market loss impact of an issuer default, applying a zero percent recovery rate assumption, to all instruments and positions in the trading book? Under this approach, gains and losses would be estimated using full revaluation to the greatest extent possible, and simply summed. For derivatives products, all pricing inputs other than those directly related to the default of the issuer would remain constant. Similar to the proposed approach, only single-name and index credit default swaps, total return swaps, or equity derivatives would be included in this valuation. Would such a models-based approach better reflect traded credit exposures? If so, why?

Netting of Securities Financing Transactions

In calculating its credit exposure to a counterparty, a covered company may net the gross credit exposure amounts of (i) its repurchase and reverse repurchase transactions with a counterparty, and (ii) its securities lending and borrowing transactions with a counterparty, in each case, where the transactions are subject to a bilateral netting agreement with that counterparty.

e. Section 252.96: Compliance

Section 252.96(a) of the proposed rule indicates that a covered company must comply with the requirements of the proposed rule on a daily basis as of the end of each business day and must submit a monthly compliance report.[149] Section 252.96(b) addresses the consequences if a covered company fails to comply with the proposed rule.[150] This section states that if a covered company is not in compliance with respect to a counterparty due to a decrease in the covered company's capital, the merger of a covered company with another covered company, or the merger of two unaffiliated counterparties of the covered company, the covered company will not be subject to enforcement actions with respect to such noncompliance for a period of 90 days (or such shorter or longer period determined by the Board to be appropriate to preserve the safety and soundness of the covered company or financial stability) if the company uses reasonable efforts to return to compliance with the proposed rule during this period. The covered company may not engage in any additional credit transactions with such a counterparty in contravention of this rule during the compliance period, except in cases where the Board determines that such additional credit transactions are necessary or appropriate to preserve the safety and soundness of the covered company or financial stability. In granting approval for any such special temporary exceptions, the Board may impose supervisory oversight and reporting measures that it determines are appropriate to monitor compliance with the foregoing standards. The Board notes that section 165(e) of the Dodd-Frank Act contains a provision allowing the Board to exempt transactions, in whole or part, from the definition of the term "credit exposure" if the Board finds that the exemption is in the public

---

[146] *See* proposed rule § 252.95(e).

[147] *See* proposed rule § 252.95(e)(1).

[148] *See* proposed rule § 252.95(e)(2).

[149] *See* proposed rule § 252.96(a). Also, *see supra* note 17.

[150] *See* proposed rule § 252.96(b).

interest and is consistent with the purposes of this subsection.[151]

*Question 57:* Are there additional non-compliance circumstances for which some cure period should be provided?

*Question 58:* Is the 90-day cure period appropriate and is it appropriate to generally prohibit additional credit transactions with the affected counterparty during the cure period? If not, why not?

Section 252.97: Exemptions

Section 252.97 of the proposed rule sets forth certain exemptions.[152] Section 165(e)(6) of the Dodd-Frank Act states that the Board may, by regulation or order, exempt transactions, in whole or in part, from the definition of the term "credit exposure" for purposes of this subsection, if the Board finds that the exemption is in the public interest and is consistent with the purposes of this subsection.[153]

The first exemption is for direct claims on, and the portions of claims that are directly and fully guaranteed as to principal and interest by the United States and its agencies.[154] The exemption in section 252.97 of the proposed rule clarifies that, despite the fact that the United States is defined as a counterparty, a covered company's credit exposures to the U.S. government are exempt. Thus, exposures to the U.S. government will not be subject to the limits of the proposed rule. This includes direct holdings of securities issued by the U.S. government and indirect exposure such as the case where U.S. government securities are pledged as collateral. Section 252.95(b) of the proposed rule provides a covered company with the option to shift credit exposure to the issuer of eligible collateral.[155] Where the eligible collateral pledged is U.S. government securities that are directly and fully guaranteed as to principal and interest by the United States and its agencies, the credit exposure would be exempted.

*Question 59:* Is the scope of the exemption for direct claims on, and the portions of claims that are directly and fully guaranteed as to principal and interest by, the United States and it agencies appropriate? If not, explain the reasons why in detail and indicate whether there are alternatives the Board should consider. Are there other governmental entities that should

receive an exemption from the limits of the proposed rule?

A second exemption from the proposed rule is for direct claims on, and the portions of claims that are directly and fully guaranteed as to principal and interest by, the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, while these entities are operating under the conservatorship or receivership of the Federal Housing Finance Agency.[156] This provision reflects a policy decision that credit exposures to these government-sponsored entities should not be subject to a regulatory limit for so long as the entities are in the conservatorship or receivership of the U.S. government. As determined by the Board, obligations issued by another U.S. government-sponsored entity would also be exempt. The Board requests comment on whether these exemptions are appropriate.

The third exemption from the proposed rule is for intraday credit exposure to a counterparty.[157] As noted above, the proposed rule requires compliance on a daily end-of-business day basis.[158] This exemption would help minimize the impact of the rule on the payment and settlement of financial transactions. The Board requests comment on whether the exemption for intraday transactions is appropriate in light of the intent and purpose of the proposed rule.

The fourth exemption implements section 165(e)(6) of the Dodd-Frank Act and provides a catchall category to exempt any transaction which the Board determines to be in the public interest and consistent with the purposes of section 165(e).[159]

*Question 60:* Should other credit exposures be exempted from the limitations of the proposed rule. If so, explain why?

Section 252.97(b) of the proposed rule implements section 165(e)(6) of the Dodd-Frank Act, which provides an exemption for Federal Home Loan Banks.

## VI. Risk Management

*A. Background*

The recent financial crisis highlighted the need for large, complex financial companies to have more robust, enterprise-wide risk management. A number of companies that experienced material financial distress or failed

during the crisis had significant deficiencies in key areas of risk management. Two recent reviews of risk management practices of banking companies conducted by the Senior Supervisors Group (SSG) illustrated these deficiencies.[160]

The SSG found that effective oversight of an organization as a whole is one of the most fundamental requirements of prudent risk management. For example, the SSG found that business line and senior risk managers did not jointly act to address a company's risks on an enterprise-wide basis; business line managers made decisions in isolation and at times increased, rather than mitigated, risk; and treasury functions were not closely aligned with risk management processes, preventing market and counterparty risk positions from being readily assessed on an enterprise-wide basis.[161]

The SSG reviews also revealed that solid senior management oversight and engagement was a key factor that differentiated companies' performance during the crisis. Senior managers at successful companies were actively involved in risk management, which includes determining the company's overall risk preferences and creating the incentives and controls to induce employees to abide by those preferences. Successful risk management also depends on senior managers having access to adaptive management information systems to identify and assess risks based on a range of dynamic measures and assumptions. In addition, the SSG found that active involvement of the board of directors in determining a company's risk tolerance was critical to effective risk management and curbing of excessive risk taking. The SSG reported that "firms are more likely to maintain a risk profile consistent with the board and senior management's tolerance for risk if they establish risk management committees that discuss all significant risk exposures across the firm * * * [and] meet on a frequent basis * * *."[162]

Section 165(b)(1)(A) of the Dodd-Frank Act requires the Board to establish overall risk management requirements as part of the prudential standards to ensure that strong risk management standards are part of the regulatory and supervisory framework

---

[151] *See* 12 U.S.C. 5365(e)(6).

[152] *See* proposed rule § 252.97.

[153] *See* 12 U.S.C. 5365(e)(6).

[154] *See* proposed rule § 252.97(a)(1).

[155] *See* proposed rule § 252.95(b).

[156] *See* proposed rule § 252.97(a)(2).

[157] *See* proposed rule § 252.97(a)(3).

[158] *See* proposed rule § 252.96(a).

[159] *See* 12 U.S.C. 5365(e)(6); proposed rule § 252.97(a)(4).

[160] *See* 2008 SSG Report and 2009 SSG, *supra* notes 58 and 59.

[161] *See* 2008 SSG Report, *supra* note 58, at 3–5.

[162] *See* 2008 SSG Report, *supra* note 58, at 8; *see also* 2009 SSG Report, *supra* note 59, at 2–5.

for covered companies.[163] More generally, section 165(h) of the Dodd-Frank Act directs the Board to issue regulations requiring publicly traded nonbank covered companies and publicly traded bank holding companies with total consolidated assets of $10 billion or more to establish risk committees.[164] Under the statute, a risk committee required by section 165(h) must be responsible for the oversight of enterprise-wide risk management practices of the company, include such number of independent directors as the Board may determine appropriate, and include at least one risk management expert having experience in identifying, assessing, and managing risk exposures of large, complex financial firms.

The Board is proposing to address the risk management weaknesses observed during the recent crisis and implement the risk management requirements of the Dodd-Frank Act by establishing risk management standards for all covered companies that would (i) Require oversight of enterprise-wide risk management by a stand-alone risk committee of the board of directors and chief risk officer (CRO); (ii) reinforce the independence of a firm's risk management function; and (iii) ensure appropriate expertise and stature for the chief risk officer. The proposal would also require bank holding companies with total consolidated assets of $10 billion or more that are publicly traded and are not covered companies (over $10 billion bank holding companies) to establish an enterprise-wide risk committee of the board of directors. Over $10 billion bank holding companies that are not covered companies and are not publicly traded would not be subject to the risk management requirements in this proposal.

The proposed rule seeks to address the risk management problems noted by the SSG and others by mandating the major responsible parties within a company for its enterprise-wide risk management: the risk committee and the CRO. The proposal sets out certain responsibilities of a risk committee, which include the oversight and documentation of the enterprise-wide risk management practices of the company. The proposal also would establish various requirements for a risk committee, including membership with appropriate risk management expertise and an independent chair. The proposed rule also requires a covered company to employ a CRO who will implement appropriate enterprise-wide

risk management practices and report to the covered company's risk committee and chief executive officer.

These standards should help address the risk management failures observed during the crisis and their potential contribution to the failure or instability of financial companies by mandating an enterprise-wide structure for managing risk and identifying the responsible parties that supervisors will look to when evaluating a company's risk management practices. This should facilitate more effective identification and management of the company's risk as well as supervisors' ability to monitor the risk management of companies subject to the rule.

In addition, the proposed standards seek to meet the requirements of the Dodd-Frank Act by imposing regulatory standards for risk management on covered companies and over $10 billion bank holding companies that are publicly traded. The Board does not currently impose regulatory risk management standards on bank holding companies generally; the Board traditionally has addressed risk management through supervisory guidance. The proposed standards would be more stringent for risk committees of covered companies than for risk committees of over $10 billion bank holding companies. The Board expects the expertise of the risk committee membership to be commensurate with the complexity and risk profile of the organizations. Thus, the requirements of the proposed rule would increase in stringency with the systemic footprint of the company.

The Board emphasizes that the risk committee and overall risk management requirements contained in the proposed rule supplement the Board's existing risk management guidance and supervisory expectations.[165] All banking organizations supervised by the Board should continue to follow such guidance to ensure appropriate oversight of and limitations on risk.

*B. Overview of the Proposed Rule*

1. Risk Committee Requirements

The proposed rule would require that each covered company and each over $10 billion bank holding company establish a risk committee of the board of directors to document and oversee, on an enterprise-wide basis, the risk management practices of the company's

worldwide operations. Additional proposed requirements relating to the structure and responsibilities of such risk committees are described below.

a. Structure of Risk Committee

Section 252.126(b) of the proposed rule establishes requirements governing the membership and proceedings of a company's risk committee. Consistent with section 165(h)(3)(B) of the Act, the Board proposes that a covered company and over $10 billion bank holding company's risk committee must be chaired by an independent director. The Board views the active involvement of independent directors as vital to robust oversight of risk management and encourages companies generally to include additional independent directors as members of their risk committees.

The concept of director independence is a concept familiar in federal securities law. To promote consistency, the Board proposes to refer to the definition of "independent director" in the Securities and Exchange Commission's (SEC) Regulation S–K for companies that are publicly traded in the United States. Under this definition, the Board would not consider a director to be independent unless the company indicates in its securities filings, pursuant to the SEC's Regulation S–K, that the director satisfies the applicable independence requirements of the securities exchange on which the company's securities are listed. These independence requirements generally include limitations on compensation paid to the director or director's family members by the company and prohibitions on material business relationships between the director and the company. In all cases, and consistent with the listing standards of many securities exchanges, the proposed rule excludes from the definition of "independent director" a director who is or recently was employed by the company or whose immediate family member is or recently was an executive officer of the company.

In the case of a director of a covered company that is not publicly traded in the United States, the proposed rule would provide that the director is independent only if the company demonstrates to the satisfaction of the Federal Reserve that such director would qualify as an independent director under the listing standards of a securities exchange, if the company were publicly traded on such an exchange. The Board proposes to make these determinations on a case-by-case basis, as appropriate. At a minimum, the

---

[163] 12 U.S.C. 5365(b)(1)(A).
[164] 12 U.S.C. 5365(h).

[165] *See* Supervision and Regulation Letter SR 08–8 (Oct. 16, 2008), *available at http://www.federalreserve.gov/boarddocs/srletters/2008/SR0808.htm,* and Supervision and Regulation Letter SR 08–9 (Oct. 16, 2008), *available at http://www.federalreserve.gov/boarddocs/srletters/2008/SR0809.htm.*

proposed rule provides that the Board would not find a director to be independent if the director or a member of the director's immediate family member is or recently was an executive officer of the company. In making independence determinations, the Board expects to analyze other indicia of independence, including compensation limitations and business relationship prohibitions discussed above.

In addition to the independent director requirements, the proposed rule would require at least one member of a company's risk committee to have risk management expertise that is commensurate with the company's capital structure, risk profile, complexity, activities, size, and other appropriate risk-related factors. However, given the importance of risk management oversight, the Board expects that a risk committee's members generally will have an understanding of risk management principles and practices relevant to the company. Risk committee members should also have experience developing and applying risk management practices and procedures, measuring and identifying risks, and monitoring and testing risk controls with respect to banking organizations (or, if applicable, nonbank financial companies).

The Board believes that the requisite level of risk management expertise for a company's risk committee can vary depending on the risks posed by the company to the stability of the U.S. financial system. The Board expects that a company's risk committee members should have risk management expertise commensurate with the company's capital structure, risk profile, complexity, activities, size and other appropriate risk-related factors. Thus, the Board expects that the risk committees of covered companies that pose greater risks to the U.S. financial system would have members with commensurately greater risk management expertise than the risk committees of other companies that pose less risk.

The proposed rule also would establish certain procedural requirements for risk committees. Specifically, the proposed rule would require a company's risk committee to have a formal, written charter that is approved by the company's board of directors. In addition, the proposed rule would require that a risk committee meet regularly and as needed, and that the company fully document and maintain records of such proceedings, including risk management decisions. The Board expects that these procedural

requirements will help ensure that a company's risk management has the appropriate stature within the company's corporate governance framework.

*Question 61:* Should the Board consider specifying by regulation additional qualifications for director independence? If so, what factors should the Board consider in establishing these qualifications?

*Question 62:* Would it be appropriate for the Board to require the membership of a risk committee to include more than one independent director under certain circumstances? If so, what factors should the Board consider in establishing these requirements?

*Question 63:* Should the Board consider specifying by regulation the minimum qualifications, including educational attainment and professional experience, for risk management expertise on a risk committee?

*Question 64:* What alternatives to the requirements for the structure of the risk committee and related requirements should the Board consider?

b. Responsibilities of Risk Committee

Section 252.126(c) of the proposed rule sets out certain responsibilities of a risk committee. The proposed rule would generally require a company's risk committee to document and oversee the enterprise-wide risk management policies and practices of the company. Consistent with the enterprise-wide risk management requirement in section 165(h)(3)(A) of the Act, a company's risk committee would be required to take into account both its U.S. and foreign operations as part of its risk management oversight.

The proposed rule would require a risk committee to review and approve an appropriate risk management framework that is commensurate with the company's capital structure, risk profile, complexity, activities, size, and other appropriate risk-related factors. The proposed rule specifies that a company's risk management framework must include: Risk limitations appropriate to each business line of the company; appropriate policies and procedures relating to risk management governance, risk management practices, and risk control infrastructure; processes and systems for identifying and reporting risks, including emerging risks; monitoring compliance with the company's risk limit structure and policies and procedures relating to risk management governance, practices, and risk controls; effective and timely implementation of corrective actions; specification of management's authority and independence to carry out risk

management responsibilities; and integration of risk management and control objectives in management goals and the company's compensation structure.

In general, the Board believes that larger and more complex companies should have more robust risk management practices and frameworks than smaller, less complex companies. Accordingly, as a company grows or increases in complexity, the company's risk committee should ensure that its risk management practices and framework adapt to changes in the company's operations and the inherent level of risk posed by the company to the U.S. financial system.

*Question 65:* What is the appropriate role of the members of the risk committee in overseeing enterprise-wide risk management practices at the company and is that role effectively addressed by this proposal?

*Question 66:* Is the scope of review of enterprise-wide risk management that this proposal would require appropriate for a committee of the board of directors? Why or why not?

*Question 67:* How can the Board ensure that risk committees at companies have sufficient resources to effectively carry out the oversight role described in this proposal?

2. Additional Enhanced Risk Management Standards for Covered Companies

Consistent with section 165(b)(1)(A)(iii) of the Dodd-Frank Act, the proposed rule establishes certain overall risk management standards for covered companies. These enhanced standards are in addition to, and in some cases expand upon, the risk committee requirements discussed above that apply to covered companies and over $10 billion bank holding companies.

a. Appointment of CRO

The Board believes that, in light of the complexity and size of a covered company's operations, it is important for each covered company to have a designated executive officer in charge of implementing and maintaining the risk management framework and practices approved by the risk committee. Accordingly, section 252.126(d) of the proposed rule directs each covered company to appoint a CRO to implement and maintain appropriate enterprise-wide risk management practices for the company.

The proposed rule provides that the specific responsibilities of a covered company's CRO must include direct oversight for: allocating delegated risk

limits and monitoring compliance with such limits; establishing appropriate policies and procedures relating to risk management governance, practices, and risk controls; developing appropriate processes and systems for identifying and reporting risks, including emerging risks; managing risk exposures and risk controls; monitoring and testing risk controls; reporting risk management issues and emerging risks; and ensuring that risk management issues are effectively resolved in a timely manner. The proposed rule specifies that these responsibilities are to be executed on an enterprise-wide basis.

Under the proposed rule, a CRO would be required to have risk management expertise that is commensurate with the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors. For example, the Board would expect that an executive whose qualifications and experience are highly focused in a specific area (e.g., an executive whose primary skills relate to the risks taken by a firm engaged predominantly in consumer or commercial lending) would be unlikely to possess the expertise necessary to effectively manage the risks taken by a firm engaged in more diverse activities (e.g., a large, more complex universal banking organization).

In light of the CRO's central role in ensuring the effective implementation of a covered company's risk management practices, the proposed rule would require a covered company's CRO to report directly to the risk committee and the chief executive officer. Further, the proposed rule would require that the compensation of a covered company's CRO be appropriately structured to provide for an objective assessment of the risks taken by the covered company. This requirement supplements existing Board guidance on incentive compensation.

*Question 68:* Should the Board consider specifying by regulation the minimum qualifications, including educational attainment and professional experience, for a CRO? If so, what type of additional experience or education is generally expected in the industry for positions of this importance?

*Question 69:* What alternative approaches to implementing the risk committee requirements established pursuant to the Dodd-Frank Act should the Board consider?

b. Additional Risk Committee Requirements for Covered Companies

The Board proposes that risk committees of covered companies

should meet certain additional requirements beyond those described above to ensure that covered companies' risk committees are appropriately structured to oversee the risk of a company with a significant role in the U.S. financial system. Specifically, the Board believes that best practices for covered companies require a risk committee that reports directly to the Board and not as part of or combined with another committee. Thus, section 252.126(b)(5)(i) of the proposed rule would require that a covered company's risk committee not be housed within another committee or be part of a joint committee. In addition, section 252.126(b)(5)(ii) of the proposed rule would require a covered company's risk committee to report directly to the covered company's board of directors.

As mentioned above, the proposed rule requires a covered company's CRO to report to the company's risk committee. To ensure that a covered company's risk committee appropriately considers and evaluates the information it obtains from the CRO, the proposed rule would direct a covered company's risk committee to receive and review regular reports from the covered company's CRO.

Request for Comment

The Board requests comment on all aspects of this proposal.

## VII. Stress Test Requirements

### A. Background

As part of the effort during the recent crisis to stabilize the U.S. financial system, the Federal Reserve began stress testing large, complex bank holding companies as a forward-looking exercise designed to estimate losses, revenues, allowance for loan losses and capital needs under various economic and financial market scenarios. In early 2009, the Federal Reserve led the Supervisory Capital Assessment Program (SCAP) as a key element of the plan to stabilize the U.S. financial system. By looking at the broad capital needs of the financial system and the specific needs of individual companies, these stress tests provided valuable information to market participants and had an overall stabilizing effect.

Building on SCAP and other supervisory work coming out of the crisis, the Federal Reserve initiated the annual Comprehensive Capital Analysis and Review (CCAR) in late 2010 to assess the capital adequacy and evaluate the internal capital planning processes of large, complex bank holding companies. The CCAR represents a substantial strengthening of previous

approaches to assessing capital adequacy and aiming to ensure that large organizations have thorough and robust processes for managing and allocating their capital resources. The CCAR also focuses on the risk measurement and management practices supporting organizations' capital adequacy assessments, including their ability to deliver credible inputs to their loss estimation techniques.

Building on the SCAP and CCAR, the Board proposes to implement section 165(i)(1) of the Dodd-Frank Act, which requires the Board to conduct annual analyses of the financial condition of covered companies to evaluate the potential effect of adverse economic and financial market conditions on the capital of these companies (supervisory stress tests). The Board also proposes to implement section 165(i)(2) of the Act, which requires the Board to issue regulations that (i) require financial companies with total consolidated assets of more than $10 billion and for which the Board is the primary federal financial regulatory agency to conduct stress tests on an annual basis, and (ii) require covered companies to conduct semi-annual stress tests (together company-run stress tests).

The supervisory stress tests involve the Board's analyses of the capital of each covered company, on a total consolidated basis, and an evaluation of the ability of the covered company to absorb losses as a result of adverse economic and financial conditions. The Act requires the Board to provide for at least three different possible sets of conditions—baseline, adverse, and severely adverse conditions—under which the Board would conduct this evaluation.[166] The Act also requires the Board to publish a summary of the supervisory stress test results.[167]

For the company-run stress tests, the Act requires that the Board issue regulations that: (i) Define the term "stress test" for purposes of the regulations; (ii) establish methodologies for the conduct of the company-run stress tests that provide for at least three different sets of conditions, including baseline, adverse, and severely adverse conditions; (iii) establish the form and content of a required report on the company-run stress tests that companies subject to the regulation must submit to the Board; and (iv) require subject companies to publish a summary of the results of the required stress tests.[168]

---

[166] *See* 12 U.S.C. 5365(i)(1).
[167] *Id.*
[168] *See* 12 U.S.C. 5365(i)(2).

*B. Overview of the Proposed Rule*

1. Annual Supervisory Stress Tests Conducted by the Board

a. Purpose

The Board has long held the view that bank holding companies generally should operate with capital positions well above the minimum regulatory capital ratios, with an amount of capital that is commensurate with each bank holding company's risk profile.[169] Bank holding companies should have internal processes for assessing their capital adequacy that reflect a full understanding of the risks associated with all aspects of their operations and ensure that they hold capital commensurate with those risks.[170] Stress testing is one tool that helps both supervisors and supervised companies ensure that there is adequate capital through periods of stress.

The stress testing requirements described below are designed to work in tandem with the Board's capital plan rule[171] to allow the Federal Reserve and covered companies to better understand the full range of their risks and the potential impact of stressful events and circumstances on their overall capital adequacy and financial condition. The Board and the other federal banking agencies previously have highlighted the use of stress testing as a means to better understand the range of a banking organization's potential risk exposures.[172] The 2007–2009 financial crisis further underscored the need for banking organizations to incorporate stress testing into their risk management, as banking organizations that are unprepared for stressful events and circumstances are more vulnerable to acute threats to their financial condition and viability.[173]

The supervisory stress tests would provide supervisors with forward-looking information to help them identify downside risks and the potential impact of adverse outcomes on capital adequacy at covered companies. Supervisory stress tests would also provide a means to assess capital adequacy across companies more fully and support the Board's financial stability efforts. In addition, the publication of summary results from supervisory stress tests would enhance public disclosure of information about covered companies' financial condition and the ability of those companies to absorb losses as a result of adverse economic and financial conditions. Inputs from the supervisory stress tests, along with the results of any company-run stress tests, would be used by the Federal Reserve in its supervisory evaluation of a covered company's capital plan.

TABLE 1—PROCESS OVERVIEW OF ANNUAL SUPERVISORY STRESS TEST AND CAPITAL PLAN CYCLE

| Supervisory stress test steps | Capital plan steps | Proposed timeframe |
|---|---|---|
| Regulatory reports submitted (using data as of Sept. 30 and other required information). | .......................................................................... | By Mid-November. |
| .......................................................................... | Capital plan submitted (including individual results of company-run stress tests). | By January 5. |
| Board communicates results to each covered company ...... | .......................................................................... | By early March. |
| .......................................................................... | Federal Reserve response to capital plan ........................... | By March 31. |
| Board publishes summary results of the supervisory stress test. | .......................................................................... | By Mid-April. |

The design of the supervisory stress tests focuses on determining post-stress capital positions at covered companies to inform assessments of capital adequacy. Because the Board's supervisory stress tests would be standardized across covered companies and not adjusted for each company, they are not expected to fully capture all potential risks that may affect a specific company's capital position. Supervisory stress tests are one of several supervisory assessment tools, accordingly, a full assessment of a company's capital adequacy should be informed by a broad range of information including a covered

company's internal capital adequacy processes and the results of its own internal stress tests. In particular, a full assessment of a company's capital adequacy must take into account a range of factors, including idiosyncratic aspects of individual companies that a standardized supervisory stress test applicable across companies cannot be expected to cover as sufficiently as the companies' internal stress testing practices. Idiosyncratic factors would include evaluation of a company's internal stress testing results, its capital planning processes, the governance over those processes, regulatory capital measures, and market assessments. As

the parties primarily responsible for the financial condition of a covered company, its board of directors and senior management bear the primary responsibility for developing, implementing, and monitoring a covered company's capital planning strategies and internal capital adequacy processes and are in the best position to oversee these processes. Thus, along with the results of a covered company's capital plan, any company-run stress tests, and other supervisory information, the Board would use the results of the supervisory stress tests as one factor in the overall supervisory assessment of a covered company's capital adequacy.[174]

---

[169] *See* 12 CFR part 225, appendix A; *see also* Supervision and Regulation Letter SR 99–18 (July 1, 1999), *available at http:// www.federalreserve.gov/boarddocs/srletters/1999/ SR9918.htm* (hereinafter SR 99–18).

[170] *See* Supervision and Regulation Letter SR 09–4 (revised March 27, 2009), *available at http:// www.federalreserve.gov/boarddocs/srletters/2009/ SR0904.htm* (hereinafter SR 09–4).

[171] *See* 12 CFR 225.8.

[172] *See, e.g.,* 76 FR 35072 (June 15, 2011); Supervision and Regulation Letter SR 10–6, *Interagency Policy Statement on Funding and Liquidity Risk Management* (March 17, 2010),

*available at http://www.federalreserve.gov/ boarddocs/srletters/2010/sr1006.htm;* Supervision and Regulation Letter SR 10–1, *Interagency Advisory on Interest Rate Risk* (January 11, 2010), *available at http://www.federalreserve.gov/ boarddocs/srletters/2010/sr1001.htm; SR 09–4, supra note 170;* Supervision and Regulation Letter SR 07–1, *Interagency Guidance on Concentrations in Commercial Real Estate* (January 4, 2007), *available at http://www.federalreserve.gov/ boarddocs/srletters/2007/SR0701.htm; SR 99–18, supra note 169; Supervisory Guidance: Supervisory Review Process of Capital Adequacy (Pillar 2) Related to the Implementation of the Basel II*

*Advanced Capital Framework,* 73 FR 44620 (July 31, 2008); *SCAP Overview of Results, supra* note 111; and *Comprehensive Capital Analysis and Review: Objectives and Overview* (March 18, 2011), *available at http://www.federalreserve.gov/ newsevents/press/bcreg/bcreg20110318a1.pdf.*

[173] *See* Basel Committee on Banking Supervision, *Principles for Sound Stress Testing Practices and Supervision* (May 2009), *available at http:// www.bis.org/publ/bcbs155.htm.*

[174] The Board notes that the design of the supervisory stress tests focuses on capital adequacy and does not focus on all aspects of financial condition.

## b. Applicability

Except as otherwise provided in the proposed rule, a bank holding company that becomes a covered company no less than 90 days before September 30 of a calendar year must comply with the requirements of the proposed rule regarding stress tests, including the timing of required submissions to the Board, from that September 30 forward. With respect to initial applicability, a bank holding company that is a covered company on the effective date of the proposed rule must comply with the proposed requirements as of the effective date of the rule, including the timing of required submissions to the Board. A company that the Council designates for supervision by the Board on a date 180 days before September 30 of a calendar year must comply with the requirements of the proposed rule regarding stress tests, including the timing of required submissions to the Board, from that September 30 forward.

*Question 70:* Are the timing requirements of this proposal sufficient to allow a covered company or nonbank covered company to prepare, collect, and submit to the Board the information necessary to support the supervisory stress test? If not, what alternative timing should the Board consider?

## c. Process Overview of Annual Supervisory Stress Test Cycle

The Board expects to use the following general process and timetables in connection with the supervisory stress tests.

### i. Information Collection From Covered Companies

For a supervisory stress test conducted within any given calendar year, covered companies would be required to submit to the Board data and other information to support the conduct of that year's tests. To the greatest extent possible, the data schedules, and any other data requests, would be designed to minimize burden on the covered company and to avoid duplication, particularly in light of other reporting requirements that may be imposed by the Board. The Board envisions collecting the requisite information from covered companies primarily through the regulatory reporting process, and these reports may change from time to time. The confidentiality of any information submitted to the Board for the supervisory stress tests will be determined in accordance with the Board's rules regarding availability of information.[175] As discussed below in section e.iv., the Board proposes to publish a summary of the results the supervisory stress test, as required by the Dodd-Frank Act.[176] The Board may obtain supplemental information, as needed, through the supervisory process. The Board plans to publish for notice and comment any new or revised data requirements and related reporting instructions in a separate information collection proposal.[177]

*Question 71:* What is the potential burden on covered companies stemming from the requirements to submit internal data to support the supervisory stress tests?

### ii. Publication of Scenarios and Methodologies

The Board plans to publish the scenarios in advance of conducting the annual stress tests. The Board also plans to publish an overview of its related stress testing methodologies.

### iii. Conducting Stress Tests

The Board intends to conduct the supervisory stress tests using data collected from covered companies as well as supplemental information. In the course of conducting the stress tests, the Board intends to consult with covered companies as necessary throughout the process, particularly if the company's data submissions or other information provided are unclear or the supervisory stress test raises questions more generally. After conducting its analyses, the Board plans to communicate to each covered company the results within a reasonable period of time.

### iv. Publishing Results

Subsequent to communicating results of the analyses to each covered company, the Board would publish a summary of the supervisory stress test results, as discussed further below.

### v. Proposed Steps for Annual and Additional Stress Tests

Table 2 describes proposed steps in the Board's annual supervisory stress test cycle, including proposed general timeframes for each step. The Board devised this proposed process in conjunction with the proposed process outlined below for the company-run stress tests, given the overlap in applicability for certain companies. As noted above, the timeline is also intended to facilitate the use of supervisory stress tests to inform the Board's analysis of companies' capital plan submissions under the annual CCAR process, where applicable. The proposed timeframes are illustrative and are subject to change.

TABLE 2—PROCESS OVERVIEW OF ANNUAL SUPERVISORY STRESS TESTING CYCLE

[Using data collected as of September 30, except for trading and counterparty data, for a planning horizon of at least nine calendar quarters]

| Step | Proposed timeframe |
|---|---|
| 1. Board publishes scenarios for upcoming annual cycle .................................................................. | No later than mid-November. |
| 2. Covered companies submit regulatory reports and any other required information ............................................. | By mid-November. |
| 3. Board completes supervisory stress tests and compiles results .................................................................. | By mid-February. |

[175] *See generally* 12 CFR part 261; *see also* 5 U.S.C. 552(b).

[176] 12 U.S.C. 5365(i)(1)(B)(v).

[177] To minimize burden on covered companies, the Board plans to leverage, to the extent possible, any pre-existing data collections that are relevant for the proposed rule's stress testing purposes (for example, see the proposed agency information collection available at *http://www.federalreserve.gov/reportforms/formsreview/FRY14Q_FRY14A_20110907_ifr.pdf*).

TABLE 2—PROCESS OVERVIEW OF ANNUAL SUPERVISORY STRESS TESTING CYCLE—Continued

[Using data collected as of September 30, except for trading and counterparty data, for a planning horizon of at least nine calendar quarters]

| Step | Proposed timeframe |
|---|---|
| 4. Board communicates individual company results to covered companies ............................................................. | By early March. |
| 5. Board publishes a summary of the supervisory stress test results .................................................................. | By early April. |

### d. General Approach to Supervisory Stress Tests

The Board anticipates that its framework for conducting its annual stress test of covered companies would assess the impact of different economic and financial market scenarios on the consolidated capital of each covered company over a forward-looking planning horizon, taking into account all relevant exposures and activities of that company. The proposed rule defines the planning horizon as the period of time over which the supervisory stress test projections would extend, specifically at least nine quarters. The key feature of this framework would be an estimate of projected net income and other factors affecting capital in each quarter of the stress test planning horizon, leading to an estimate of how each covered company's capital resources would be affected under the scenarios. The primary outputs produced under the framework would be pro forma projections of capital positions (including capital levels and regulatory and other capital ratios) for each quarter-end over the planning horizon.

### i. Scenarios

Under the proposed rule, prior to conducting the analyses of covered companies, the Board would publish a minimum of three different sets of economic and financial conditions, including baseline, adverse, and severely adverse conditions ("scenarios"), under which the Board would conduct its annual analyses. As discussed above, the Board would update, make additions to, or otherwise revise these scenarios as appropriate, and would publish any such changes to the scenarios in advance of conducting each year's analyses. The Board expects that the stress test framework would produce at least three sets of projections using quarterly intervals over the planning horizon based upon the scenarios specified by the Board. The Board envisions that the scenarios would consist of future paths of a series of economic and financial variables over the stress test planning horizon, including projections for a range of macroeconomic and financial indicators, such as real GDP, the

unemployment rate, equity and property prices, and various other key financial variables. The Board recognizes that certain trading positions and trading-related exposures are highly sensitive to adverse market events, potentially leading to large short-term volatility in covered companies' earnings. As a result, to address these scenarios, the Board would supplement the scenarios in some cases with market price and rate "shocks" that are consistent with historical or other adverse market events specified by the Board. The scenarios, in some cases, may also include stress factors that may not be directly correlated to macroeconomic or financial assumptions but nevertheless can materially affect covered companies' risks, such as factors that affect operational risks.

Each year, the scenarios specified by the Board would reflect changes in the outlook for economic and financial conditions. In general, the baseline scenario would consider the most recently available views of the macroeconomic outlook expressed by government agencies, other public-sector organizations, and private-sector forecasters as of the beginning of the annual stress-test cycle. The adverse scenario could include economic and financial conditions consistent with a recession of at least moderate intensity, including a shortfall of economic activity and increase in unemployment relative to the baseline scenario, weakness in household incomes, declines in asset prices (including equities, corporate bonds, and property prices) and changes in short- and long-term yields on government bonds. The severely adverse scenario would consist of economic and financial conditions that are more unfavorable than those of the adverse scenario and that also include, in some instances, salient factors that are likely to place notable strains on at least some lines of business. For example, such severely adverse conditions could include precipitous declines in property or other asset prices; shifts in the shape of the yield curve; marked changes in the propensity of households or firms to enter bankruptcy; or strains on households, businesses, or real property

markets in particular regions of the United States.

### ii. Data and Information Requirements of Covered Companies

The Board's stress test framework would rely on consolidated data and other information supplied by each covered company. The proposed rule would require each covered company to provide data and information to the Board, generally no later than 40 days after the end of each calendar quarter, although some items may need to be collected only on an annual basis and others may need to be collected on a monthly basis. For data related to trading and counterparty exposures, the Board expects to communicate the as-of date for those exposures during the fourth quarter of each year. Covered companies would need to provide such data and other information in the manner and form prescribed by the Board to enable the Board to estimate net income, losses, and pro-forma capital levels and ratios for those companies over the planning horizon under baseline, adverse, and severely adverse scenarios (or other such conditions as determined appropriate by the Board). This data would include information:

(i) Related to the covered company's on- and off-balance sheet exposures, including in some cases information on individual items (such as loans and securities) held by the company, and including exposures in the covered company's trading portfolio, other trading-related exposures (such as counterparty-credit risk exposures) or other items sensitive to changes in market factors, including, as appropriate, information about the sensitivity of positions in the trading portfolio—including counterparty credit exposures—to changes in market prices and interest rates;

(ii) To assist the Board in estimating the sensitivity of the covered company's revenues and expenses to changes in economic and financial conditions; and

(iii) To assist the Board in estimating the likely evolution of the covered company's balance sheet (such as the composition of its loan and securities portfolios) and allowance for loan losses, in response to changes in

economic and financial conditions in each of the scenarios provided.

As noted above, the Board plans to issue a separate information collection proposal to support its annual supervisory stress test analyses.[178] The specific data requirements would be outlined in that proposal and the Board would publish any updates to its information requirements in a manner that provides covered companies with sufficient lead time to implement the changes. In addition, under the proposed rule, the Board may require a covered company to submit any other information the Board deems necessary in order to: (i) Ensure that the Board has sufficient information to conduct its analysis; and (ii) derive robust projections of a company's losses, pre-provision net revenues, allowance for loan losses, and future pro forma capital positions under the baseline, adverse, and severely adverse scenarios (or other such conditions as determined appropriate by the Board). The confidentiality of any information submitted to the Board for the supervisory stress tests will be determined in accordance with the Board's rules regarding availability of information.[179] As discussed below in section e.iv., the Board proposes to publish a summary of the results of the supervisory stress test, as required by the Dodd-Frank Act.[180]

iii. Methodology for Estimating Losses and Revenues

While the Board expects to publish an overview of its methodology for the supervisory stress tests, the Board believes it is useful to provide, as part of this proposal, a general overview of the anticipated methodology in advance of that publication. The Board would calculate each covered company's projected losses, revenues, and other factors affecting capital using a series of models and estimation techniques that relate the economic and financial variables in the baseline, adverse, and severely adverse scenarios to the company's losses and revenues. The Board would develop a series of models to estimate losses on various types of loans and securities held by the covered company, using data submitted by that company. These models may be adjusted over time. The Board would

use a separate methodology or a combination of methodologies—potentially including covered companies' internal models, if appropriate—to estimate projected losses related to covered companies' trading portfolio or counterparty credit-risk exposures in the event of an adverse market shock, taking into account the complexity and idiosyncrasy of each covered company's positions. The framework may also incorporate an approach to estimate potential losses from stress factors specifically affecting the covered companies' other risks. Finally, the framework would include a set of methodologies to assess the impact of losses, pre-provision net revenue, allowance for loan losses, and other factors on future pro forma capital levels and ratios.

Another element of the framework would be a set of models or rules to describe how a covered company's balance sheet would change over time, as well as a set of assumptions or models for other actions or decisions by the covered company that affect capital, such as its provisioning, dividend, and share repurchase policy. Information about planned future acquisitions and divestitures by the companies would also be incorporated. These projections would then be analyzed to assess their combined impact on the company's capital positions, including projected capital levels and capital ratios, at the end of each quarter in the planning horizon. The framework would thus incorporate all minimum regulatory capital requirements, including all appropriate limits and deductions. These projections used in the supervisory stress tests also would incorporate, as appropriate, any significant changes in or the significant effects of accounting requirements during the planning period.

*Question 72:* What alternative models or methodologies for estimating a covered company's losses and revenues should the Board consider?

e. Results of Annual Analyses

i. Description of Supervisory Assessment

The Board, through its annual analyses, would evaluate each covered company as to whether the covered company has the capital, on a total consolidated basis, necessary to absorb losses under economic and financial market conditions as contained in the designated scenarios. This evaluation would include, but would not be limited to, a review of the covered company's estimated losses, pre-provision net revenue, allowance for

loan losses, and the extent of their impact on the company's capital levels and ratios, including regulatory capital ratios.

ii. Communication of Results to Covered Companies

The Board notes that, under the Dodd-Frank Act, it is required to publish a summary of the results of its annual analyses.[181] Under the proposed rule, prior to publishing a summary of the results of its annual analyses, the Board would convey to each covered company the results of the Board's analyses of that company and explain to the firms information that the Board expects to make public.

iii. Post-Assessment Actions by Covered Companies

As a general matter, under the proposed rule, subsequent to receiving the results of the Board's annual analyses, each covered company must take the results of the analysis conducted by the Board under the proposed rule into account in making changes, as appropriate, to the company's capital structure (including the level and composition of capital); its exposures, concentrations, and risk positions; any plans of the company for recovery; and for improving overall risk management. In addition, each covered company must make such updates to its resolution plan (required to be submitted annually to the Board pursuant to the Board's Regulation QQ (12 CFR part 243)) as the Board, based on the results of its analyses of the company under this subpart, determines appropriate within 90 days of the Board publishing the results of its analyses. Additionally, each covered company that is subject to the requirement to submit a capital plan to the Board under section 225.8 of the Board's Regulation Y (12 CFR 225.8) would be required to consider the results of the analysis of the company conducted by the Board under the proposed rule when updating its capital plan. Stress testing results may also result in the application of early remediation requirements as described further below.

iv. Publication of Results by the Board

Under the proposed rule, within a reasonable period of time after completing the annual analyses of covered companies (but no later than mid-April of a calendar year), the Board would publish a summary of the results of such analyses. The Board emphasizes that there are certain factors to bear in mind when interpreting any published

---

[178] To the greatest extent possible, the data templates, and any other data requests, would be designed to minimize burden on the bank holding company and to avoid duplication, particularly in light of potential new reporting requirements arising from the Dodd-Frank Act.

[179] *See generally* 12 CFR part 261; *see also* 5 U.S.C. 552(b).

[180] 12 U.S.C. 5365(i)(1)(B)(v).

[181] 12 U.S.C. 5365(i)(1)(B)(v).

results from the Board's annual analyses under the proposed rule. For example, the outputs of the analyses might not align with those produced by other parties conducting similar exercises, even if a similar set of assumptions were used. In addition, the outputs under the adverse and severely adverse scenarios should not be viewed as most likely forecasts or expected outcomes or as a measure of any covered company's solvency. Instead, those outputs are the resultant estimates from forward-looking exercises that consider possible outcomes based on a set of different hypothetical scenarios.

The Board proposes to publish a high-level summary of supervisory stress test results for each covered company, i.e., company-specific results. This will support one of the key objectives of the supervisory stress tests, namely to enhance transparency of covered companies' risks and financial condition and its ability to absorb loss as a result of adverse economic and financial conditions. The annual set of published results for each company for each quarter-end over the specified planning horizon is expected to include:

• Estimated losses, including overall losses on loans by subportfolio, available-for-sale and held-to-maturity securities, trading portfolios, and counterparty exposures;

• Estimated pre-provision net revenue;

• Estimated allowance for loan losses; and

• Estimated pro forma regulatory and other capital ratios.

The Board recognizes that there are important considerations related to disclosure of such information that must be taken into account with respect to publishing company-specific results from supervisory stress tests, and has carefully analyzed the issues surrounding public disclosure of such results in formulating this proposal. The Board requests comment on its proposal to publish company-specific results.

*Question 73:* What are the benefits and drawbacks associated with company-specific disclosures? What, if any, company-specific items relating to the supervisory stress tests would present challenges or raise issues if disclosed, and what is the nature of those challenges or issues? What specific concerns about the possible release of a company's proprietary information exist? What alternatives to the company-specific disclosures being proposed should the Board consider?

## 2. Annual and Additional Stress Tests Conducted by the Companies

### a. Purpose

The Board views the company-run stress tests under the proposed rule as having a shared purpose with the supervisory stress tests. The company-run stress tests would provide forward-looking information to supervisors to assist in their overall assessments of a company's capital adequacy, help to better identify downside risks and the potential impact of adverse outcomes on the company's capital adequacy, and assist in achieving the financial stability goals of the Dodd-Frank Act. Further, the company-run stress tests are expected to improve companies' stress testing practices with respect to their own internal assessments of capital adequacy and overall capital planning.

The proposed rule would apply to two sets of companies: covered companies and over $10 billion companies, as defined below. Covered companies would be required to conduct semi-annual company-run stress tests and over $10 billion companies would be required to conduct annual company-run stress tests.

For purposes of the company-run stress tests, the proposed rule defines a stress test as a process to assess the potential impact on a covered company or an over $10 billion company of economic and financial conditions (scenarios) on the consolidated earnings, losses and capital of the company over a set planning horizon, taking into account the current condition of the company and the company's risks, exposures, business strategies, and activities.

The Board expects that the company-run stress tests required under the proposed rule would be one component of the broader stress testing activities conducted by covered companies and over $10 billion companies. The broader stress testing activities should address the impact of a broad range of potentially adverse outcomes across a wide set of risk types beyond capital adequacy, affecting other aspects of a company's financial condition (e.g., liquidity risk). In addition, a full assessment of a company's capital adequacy must take into account a range of factors, including evaluation of its capital planning processes, the governance over those processes, regulatory capital measures, results of supervisory stress tests where applicable, and market assessments, among others. The Board notes that the company-run stress tests described in this proposed rule focus on capital

adequacy and do not focus on other aspects of financial condition.

### b. Applicability

#### i. General

The proposed rule would apply to covered companies and over $10 billion companies. Over $10 billion companies are defined as any bank holding company (other than a bank holding company that is a covered company), any state member bank, or any savings and loan holding company that (i) has more than $10 billion in total consolidated assets, as determined based on the average of the total consolidated assets as reported on the bank holding company's four most recent FR Y–9C reports, the state member bank's four most recent Consolidated Report of Condition and Income (Call Report), or the savings and loan holding company's four most recent relevant quarterly regulatory reports; and (ii) since becoming an over $10 billion company, has not had $10 billion or less in total consolidated assets for four consecutive calendar quarters as reported on the bank holding company's four most recent FR Y–9C reports, the state member bank's four most recent Call Reports, or the savings and loan holding company's four most recent relevant quarterly regulatory reports.[182] This calculation will be effective as of the due date of the company's most recent regulatory report.

### c. Process Overview

Except as otherwise provided in the proposed rule, a bank holding company that becomes a covered company or a bank holding company, savings and loan holding company (subject to the delayed effective date for savings and loan holding companies) or state member bank that becomes an over $10 billion company no less than 90 days before September 30 of a calendar year must comply with the requirements, including the timing of required submissions to the Board, of the proposed rule from September 30 forward. In addition, except as otherwise provided in the rule, a bank holding company that becomes a covered company no less than 90 days before March 31 of a calendar year must

---

[182] Under section 165(i)(2), the requirements to conduct annual stress tests apply to any financial company with more than $10 billion in total consolidated assets and that is regulated by a primary federal financial regulatory agency. 12 U.S.C. 5365(i)(2). The Dodd-Frank Act defines primary financial regulatory agency in section 2 of the Act. *See* 12 U.S.C. 5301(12). The Board, Office of the Comptroller of the Currency, and Federal Deposit Insurance Corporation have consulted on rules implementing section 165(i)(2).

comply with the requirements, including timing of required submissions to the Board, of the proposed rule from March 31 forward.

A company that the Council has determined shall be supervised by the Board on a date no less than 180 days before September 30 of a calendar year must comply with the requirements of this subpart, including timing of required submissions, from September 30 of that calendar year and thereafter. Further, a company that the Council has determined shall be supervised by the Board on a date no less than 180 days before March 31 of a calendar year must comply with the requirements of this subpart, including timing of the required submissions from March 31 of that calendar year and thereafter.

With respect to initial applicability, a bank holding company that is a covered company or a bank holding company or state member bank that is an over $10 billion company on the effective date of the proposed rule would be subject to the proposed requirements as of the effective date, including timing of required submissions to the Board. Also with respect to initial applicability, a savings loan and holding company that is an over $10 billion company on or after the effective date of the rule would not be subject to the proposed requirements, including timing of required submissions to the Board, until savings and loan holding companies are subject to minimum risk-based capital and leverage requirements.

The Board expects to use the following general process and timetables in connection with the company-run stress tests.

i. Reporting by Companies

Under this proposal, the Board would collect the covered companies' and over $10 billion companies' stress test results and additional qualitative and quantitative information about the tests on a confidential basis and may require companies to provide other information on a supplemental basis. The Board plans to publish for comment both specific requirements for the report to be submitted to the Board, as described below, and related instructions in a separate information collection proposal before requiring companies to perform the company-run stress tests that would be required under the proposed rule.

Following the stress test, each covered company and each over $10 billion company would be required to publish a summary of its results as described further below.

ii. Annual Company-Run Stress Test

Each year, in advance of the annual company-run stress test required of all covered companies and over $10 billion companies on a schedule to be established, the Board would provide to such companies at least three scenarios, including baseline, adverse, and severely adverse, that each covered company and each over $10 billion company must use to conduct its annual stress test required under the proposed rule. The Board expects that these will be the same scenarios published for use in supervisory stress tests also required by the Act.

iii. Additional Company-Run Stress Test Cycle for Covered Companies

Within a given year, covered companies (but not over $10 billion companies) would be required to conduct one company-run stress test in addition to the annual stress test described above. For this additional company-run test, each covered company would be required to develop and employ scenarios reflecting a minimum of three sets of economic and financial conditions, including baseline, adverse, and severely adverse scenarios, and such additional conditions as the Board determines appropriate.

iv. Proposed Steps for Annual and Additional Company-Run Stress Tests

Table 3 below describes proposed steps for the company-run stress test cycle for covered companies and over $10 billion companies, including proposed general timeframes for each step. The proposed timeframes are illustrative and are subject to change.

TABLE 3—PROCESS OVERVIEW OF ANNUAL AND ADDITIONAL COMPANY-RUN STRESS TEST CYCLES

[With annual test using data as of September 30 and additional test using data as of March 31]

| Step | Proposed timeframe |
|---|---|
| **Annual company-run stress test cycle for all covered companies and over $10 billion companies** | |
| 1. Board provides covered companies and over $10 billion companies with scenarios for annual stress tests ...... | No later than mid-November. |
| 2. Covered companies and over $10 billion companies submit required regulatory report to the Board on their stress tests. | By January 5. |
| 3. Covered companies and over $10 billion companies make required public disclosures ..................................... | By early April. |
| **Additional company-run stress test cycle for covered companies** | |
| 4. Covered companies submit required regulatory report to the Board on their additional stress tests ................ | By July 5. |
| 5. Covered companies make required public disclosures ........................................................................... | By early October. |

d. Overview of Stress Test Requirements

i. General Requirements for Company-Run Stress Tests

Under the proposed rule, each covered company and each over $10 billion company would be required to conduct annual stress tests using the company's financial data as of September 30 of that year, with the exception of trading and counterparty exposures, to assess the potential impact of different scenarios on the consolidated earnings and capital of that company and certain related items over at least a nine-quarter forward-looking planning horizon taking into account all relevant exposures and activities.[183] The Board would communicate the required as of date for data related to trading and counterparty exposures of a company during the fourth quarter of each calendar year. Each covered company would also be required to conduct an additional stress test using the company's financial data as of March 31 of that year.

The Board recognizes that certain parent company structures of covered companies and over $10 billion companies may include one or more subsidiary banks, each with total consolidated assets greater than $10 billion. The company-run stress test requirements of Section 165(i)(2) would apply to the parent company and to each subsidiary regulated by a primary federal financial regulatory agency that

---

[183] The Board expects to communicate the as-of date for data on trading and counterparty exposures sometime in the fourth quarter of each year.

has more than $10 billion in total consolidated assets. To minimize any undue burden associated with multiple entities within one parent structure having to meet the proposed rule's requirements, the Board intends to coordinate with the other federal financial regulatory agencies, as appropriate. For example, the Board would aim to coordinate with the other federal financial regulatory agencies in providing scenarios to be used by multiple entities within a holding company structure when meeting the requirements of the annual stress tests described in the proposed rule.

ii. Scenarios

The proposed rule would require each covered company and each over $10 billion company to use a minimum of three sets of economic and financial conditions (scenarios), including baseline, adverse, and severely adverse conditions, or such additional conditions as the Board determines appropriate.

(1) Annual Company-Run Stress Tests

In advance of the annual stress tests, the Board would provide at least three scenarios (baseline, adverse, and severely adverse) that all covered companies and over $10 billion companies would be required to use to conduct the stress tests required under the proposed rule. These scenarios would be expected to be the same as the scenarios used by the Board in conducting the supervisory stress tests.

(2) Additional Company-Run Stress Tests for Covered Companies

The Board would not provide scenarios to covered companies for the additional company-run stress tests. Rather, for the additional stress test, a covered company would be required to develop and employ its own scenarios reflecting a minimum of three sets of economic and financial conditions—baseline, adverse, and severely adverse conditions—or such additional conditions as the Board determines appropriate.

iii. Methodologies and Practices

Under the proposed rule, each covered company and each over $10 billion company would be required to use the applicable scenarios discussed above in conducting its stress tests to calculate, for each quarter-end within the planning horizon, potential losses, pre-provision revenues, allowance for loan losses, and future pro forma capital positions over the planning horizon, including the impact on capital levels and ratios. Each covered company and

over $10 billion company would also be required to calculate, for each quarter-end within the planning horizon, the potential impact of the specific scenarios on its capital ratios, including regulatory and any other capital ratios specified by the Board.

The proposed rule would require each covered company and over $10 billion company to establish and maintain a system of controls, oversight, and documentation, including policies and procedures, designed to ensure that the stress testing processes used by the company are effective in meeting the requirements of the proposed rule. The company's policies and procedures must, at a minimum, outline the company's stress testing practices and methodologies, validation, use of stress test results and processes for updating the company's stress testing practices consistent with relevant supervisory guidance. Each covered company would also need to include in its policies information describing its processes for scenario development for the additional stress test required under the proposed rule. The board of directors and senior management of each covered company and each over $10 billion company must approve and annually review the controls, oversight, and documentation, including policies and procedures, of the company established pursuant to the proposed rule.

iv. Stress Test Information and Results

1. Required Report to the Board of Stress Test Results and Related Information

On or before January 5 each year, each covered company and each over $10 billion company would be required to report to the Board, in the manner and form prescribed in the proposed rule, the results of the stress tests conducted by the company. To the extent possible and where relevant, a covered company would be able to refer to information submitted in connection with capital plan rule requirements when submitting the report required under this rule. The Board plans to publish for comment a description of items to be included in the required report to the Board. The Board anticipates that the report would include (but not necessarily be limited to) the following qualitative and quantitative information.

Qualitative information:
• A general description of the use of stress tests required by the proposed rule in the company's capital planning and capital adequacy assessments;
• A description of the types of risks (e.g., credit, market, operational, etc.) being captured in the stress test;
• A general description of the methodologies employed to estimate

losses, pre-provision net revenues, allowance for loan losses, changes in capital levels and ratios, and changes in the company's balance sheet over the planning horizon;
• Assumptions about potential capital distributions over the planning horizon;
• For covered companies subject to additional stress tests, a description of scenarios developed by the company for its additional test, including key variables used; and
• Any other relevant qualitative information to facilitate supervisory assessment of the tests, upon request by the Board.

Quantitative information under each scenario:
• Estimated pro forma capital levels and capital ratios, including regulatory and any other capital ratios specified by the Board;
• Estimated losses by exposure category;
• Estimated pre-provision net revenue;
• Estimated allowance for loan losses;
• Estimated total assets and risk-weighted assets;
• Estimated aggregate loan balances;
• Potential capital distributions over the planning horizon; and
• Any other relevant quantitative information to facilitate supervisory understanding of the tests, upon request by the Board.

A covered company subject to an additional stress test would also be required to report to the Board the results of its additional test on or before July 5 each year, in a manner similar to its report required for its annual stress test. The Board may also request supplemental information as needed. Under the Dodd-Frank Act, companies are required to publish a summary of their stress test results (see discussion in section 3. below).[184]

2. Supervisory Review of Companies' Stress Test Processes and Results

Based on information submitted by a covered company or an over $10 billion company in the required report to the Board described above as well as other relevant information, the Board would conduct an analysis of the quality of the company's stress tests processes and related results. The Board envisions that feedback about such analysis would be provided to a company through the supervisory process. In addition, each covered company and each over $10 billion company would be required to take the results of the annual stress test (or additional stress tests in the case of a covered company), in conjunction

[184] 12 U.S.C. 5365(i)(2)(C)(iv).

with the Board's analyses of those results, into account in making changes, as appropriate, to the company's capital structure (including the level and composition of capital); its exposures, concentrations, and risk positions; any plans of the company for recovery and resolution; and to improve the overall risk management of the company. Additionally, each covered company would be required to consider the results of its company-run stress tests in developing and updating its capital plan. The Board may also require other actions consistent with safety and soundness of the company.

3. Publication of Results by the Company

Consistent with the requirements of the Act, the proposed rule would require each covered company and each over $10 billion company to publish a summary of the results of its annual company-run stress tests within 90 days of submitting its required report to the Board. A covered company subject to the additional stress test would also be required to publish a summary of the results of its additional test within 90 days of submitting its required report to the Board for that test. The summary may be published on a covered company's or an over $10 billion company's Web site or in any other forum that is reasonably accessible to the public; further, it is expected that an over $10 billion company that is a subsidiary of another covered company or another over $10 billion company could publish its summary on the parent company's Web site or in another form along with the parent company's summary. The required information publicly disclosed by each covered company and each over $10 billion company, as applicable, would, at a minimum, include:

(i) A description of the types of risks being included in the stress test;

(ii) For each covered company, a high-level description of scenarios developed by the company for its additional stress test, including key variables used (such as GDP, unemployment rate, housing prices);

(iii) A general description of the methodologies employed to estimate losses, revenues, allowance for loan losses, and changes in capital positions over the planning horizon;

(iv) Aggregate losses, pre-provision net revenue, allowance for loan losses, net income, and pro forma capital levels and capital ratios (including regulatory and any other capital ratios specified by the Board) over the planning horizon under each scenario;

*Question 74:* What alternative to the public disclosure requirements of the proposed rule should the Board consider? What are the potential consequences of the proposed public disclosures of the company-run stress test results?

C. Request for Comments

The Board requests comment on all aspects of the proposed rule for the annual and additional company-run stress testing cycles.

*Question 75:* Is the proposed timing of stress testing appropriate, and why? If not, what alternatives would be more appropriate? What, if any, specific challenges exist with respect to the proposed steps and timeframes? What specific alternatives exist to address these challenges that still allow the Board to meet its statutory requirements? Please comment on the use of the "as of" date of September 30 (and March 31 for additional stress tests), the January 5 reporting date (and July 5 for additional stress test) the publication date, and the sufficiency of time for completion of the stress tests.

*Question 76:* Does the immediate effectiveness of the proposed rule provide sufficient time for an institution that is covered at the effective date of the rule to conduct its first annual stress test? Would over $10 billion companies, in particular, have sufficient time to prepare for the first annual stress test, under either the proposed initial or proposed ongoing applicability rules?

**VIII. Debt-to-Equity Limits for Certain Covered Companies**

A. Background

Section 165(j) provides that the Board must require a covered company to maintain a debt-to-equity ratio of no more than 15-to-1, upon a determination by the Council that such company poses a grave threat to the financial stability of the United States and that the imposition of such requirement is necessary to mitigate the risk that such company poses to the financial stability of the Unites States.[185] The Act requires that, in making its determination, the Council must take into consideration the criteria in Dodd-Frank Act sections 113(a) and (b). These criteria include, among other things, the extent of the leverage of the company, the nature, scope, size, scale, concentration, interconnectedness, and mix of the activities of the company, and the importance of the company as a source of credit for U.S. households,

businesses, and State and local governments and as a source of liquidity for the U.S. financial system. The Board is required to promulgate regulations to establish procedures and timelines for compliance with section 165(j).[186]

The Board seeks comment on this proposed rule that would establish procedures to notify a covered company that the Council has made a determination under section 165(j) that the company must comply with the 15-to-1 debt-to-equity ratio requirement (identified company), as well as procedures for terminating the requirement. The proposed rule also defines the components of the debt-to-equity requirement and establishes a time period of 180 days for an identified company to comply with the debt-to-equity ratio requirement, and provides that the time for compliance may be extended if an extension would be in the public interest.

B. Overview of the Proposed Rule

The debt-to-equity limitation in section 165(j) applies to any covered company where the Council makes two findings: (i) That the covered company poses a grave threat to the financial stability of the United States; and (ii) that the imposition of the specified debt-to-equity requirement is necessary to mitigate that systemic risk. Under the proposal, "debt" and "equity" would have the same meaning as "total liabilities" and "total equity capital" respectively, as calculated in an identified company's reports of financial condition. The 15-to-1 debt-to-equity would be calculated as the ratio of total liabilities to total equity capital minus goodwill.

Section 252.152(a) provides for notice to the identified company and establishes the maximum debt-to-equity ratio requirement for an identified company. An identified company would receive written notice from the Board that the Council has made a determination under section 165(j) that the company poses a grave threat to the financial stability of the United States and that the imposition of the statutory debt-to-equity ratio requirement is necessary. An identified company would be permitted 180 calendar days from the date of receipt of the notice to comply with the 15-to-1 debt-to-equity ratio requirement. The proposed rule does not establish a specific set of actions to be taken by a company in order to comply with the debt-to-equity ratio requirement; however, the Board would expect a company to come into compliance with the ratio in a manner

---

[185] The statute expressly exempts any federal home loan bank from the debt-to-equity requirement. *See* 12 U.S.C. 5366(j)(1).

[186] 12 U.S.C. 5366(j)(3).

that is consistent with the company's safe and sound operation and preservation of financial stability. For example, a company generally would be expected to make a good faith effort to increase equity capital through limits on distributions, share offerings, or other capital raising efforts prior to liquidating margined assets in order to achieve the required ratio.

While it is important that a company that presents a grave threat to U.S. financial stability take prompt action to reduce risks to financial stability, section 252.152(b) provides that an identified company may request an extension of time to comply with the debt-to-equity ratio requirement for up to two additional periods of 90 days each. Requests for an extension of time to comply must be received in writing by the Board not less than 30 days prior to the expiration of the existing time period for compliance, and must provide information sufficient to demonstrate that the company has made good faith efforts to comply with the debt-to-equity ratio requirement and that each extension would be in the public interest. The proposed 180-day period is intended to provide sufficient time for an identified company to take appropriate action to comply with the debt-to-equity ratio requirement. In the event that an extension of time is requested, the Board would review the request in light of the relevant facts and circumstances, including the extent of the identified company's efforts to comply with the ratio and whether the extension would be in the public interest.

Section 252.152(c) provides that an identified company no longer be subject to the debt-to-equity ratio requirement of this subpart as of the date it receives notice of a determination by the Council that the company no longer poses a grave threat to the financial stability of the United States and that the imposition of a debt-to-equity requirement is no longer necessary.

The Board requests comment on all aspects of the proposed rule, and specifically on the definitions of debt and equity and on whether the proposed 180-day time period for compliance is appropriate.

*Question 77:* What alternatives to the definitions and procedural aspects of this proposed rule should the Board consider?

## IX. Early Remediation

### A. Background

The recent financial crisis revealed that the condition of large banking organizations can deteriorate rapidly even during periods when their reported capital ratios are well above minimum requirements. The crisis also revealed fundamental weaknesses in the U.S. regulatory community's tools to deal promptly with emerging issues. As detailed in the Government Accountability Office's (GAO) June 2011 study on the effectiveness of the prompt corrective action (PCA) regime, the PCA regime's triggers, based primarily on regulatory capital ratios, limited its ability to promptly address problems at insured depository intuitions.[187] The study also concluded that the PCA regime failed to prevent widespread losses to the deposit insurance fund, and that while supervisors had the discretion to act more quickly, they did not consistently do so.[188]

Section 166 of the Dodd-Frank Act was designed to address these problems by directing the Board to promulgate regulations providing for the early remediation of financial weaknesses at covered companies. The Dodd-Frank Act requires the Board to define measures of a covered company's financial condition, including, but not limited to, regulatory capital, liquidity measures and other forward-looking indicators that would trigger remedial action. The Act also mandates that remedial action requirements increase in stringency as the financial condition of a covered company deteriorates and include: (i) limits on capital distributions, acquisitions and asset growth in the early stages of financial decline; and (ii) capital restoration plans, capital raising requirements, limits on transactions with affiliates, management changes and asset sales in the later stages of financial decline.[189]

### B. Overview of the Proposed Rule

The proposed rule establishes a regime for the early remediation of financial distress at covered companies that includes four levels of remediation requirements and several forward-looking triggers designed to identify emerging or potential issues before they develop into larger problems. The four levels of remediation are: (i) Heightened supervisory review, in which the Board would conduct a targeted review of the covered company to determine if it should be moved to the next level of remediation; (ii) initial remediation, in which a covered company would be subject to restrictions on growth and capital distributions; (iii) recovery, in which a firm would be subject to a prohibition on growth and capital distributions, limits on executive compensation, and requirements to raise additional capital, and additional requirements on a case-by-case basis; and (iv) recommended resolution, in which the Board would consider whether to recommend to the Treasury Department and the FDIC that the firm be resolved under the orderly liquidation authority provided for in Title II of the Dodd-Frank Act.

While the proposed framework includes regulatory capital triggers, which the Board recognizes can be a lagging indicator, non-discretionary restrictions on growth and capital distributions would occur once a covered company's capital levels fall below the "well capitalized" threshold. In contrast, similar actions do not occur under the PCA regime until a depository institution falls below the "adequately capitalized" level.[190]

Further, in December 2010, the BCBS adopted a series of reforms directed at improving the quantity and quality of capital held by internationally active banking organizations. Specifically, the Basel III reforms introduce a minimum tier 1 common risk-based capital ratio, heighten the qualification standards for regulatory capital, introduce a capital conservation buffer on top of minimum regulatory capital ratios, and raise the minimum tier 1 capital risk-based requirement. In addition, under the Basel II-based advanced approaches rule, companies are required to estimate expected credit losses and deduct from capital the amount by which expected credit losses exceed eligible credit reserves, as defined in the rule.[191] The reforms are expected to result in regulatory capital ratios that provide a more accurate reflection of a company's condition. As noted above, the Board and the other federal banking agencies are in the process of developing a proposal to implement the Basel III framework in the United States. The Board expects to evaluate the interaction between the early remediation framework for covered companies and any revised capital standards as those standards are incorporated into U.S. regulation, and may propose conforming changes to the

---

[187] *See* Government Accountability Office, *Modified Prompt Corrective Action Framework Would Improve Effectiveness,* GAO–11–612 (June 23, 2011), *available at http://www.gao.gov/new.items/d11612.pdf* (hereinafter GAO Study). PCA is required by section 38 of the Federal Deposit Insurance Act. 12 U.S.C. 1831(*o*). PCA applies only to insured depository institutions, rather than to consolidated banking organizations.

[188] *See id.*

[189] 12 U.S.C. 5366.

[190] *See* 12 CFR 208.45.

[191] *See* 12 CFR part 225, appendix G.

early remediation framework at that time.

In addition to regulatory capital-based triggers, the proposed rule includes forward-looking triggers based on (i) supervisory stress tests, which provide an assessment of the covered company's ability to withstand adverse economic and financial market conditions; and (ii) market indicators, which provide a third-party assessment of the covered company's financial position. The Board also has sought to harmonize the proposed rule with the risk management and risk committee requirements as well as the liquidity risk management standards that would be applicable to covered companies under this proposed rule. Identified weakness in any of the enhanced risk management and liquidity risk management standards may also trigger supervisory actions, including non-discretionary actions specified in the early remediation regime.

The Board considered including an explicit quantitative liquidity trigger in the proposal, but is concerned that such a trigger could exacerbate funding pressures at affected covered companies, rather than provide for early remediation of issues. The Board also considered including certain balance sheet measures as triggers, including nonperforming loans and loan concentrations, in the early remediation regime. In its recent study, the GAO identified asset quality as an important predictor of future bank failure.[192] However, the Board is concerned that such triggers would be inappropriate for firms engaged predominantly in activities other than commercial banking, and therefore would provide limited value in an early remediation regime applicable to all covered companies.

In implementing the proposed rule, the Board expects to notify the primary regulators of a covered company's subsidiaries and the FDIC as the covered company enters into or changes remediation levels.

*Question 78:* The Board recognizes that liquidity ratios can provide an early indication of difficulties at a covered company and seeks comment on the costs and benefits of including a quantitative liquidity trigger in the early remediation regime. If the Board were to include a quantitative liquidity trigger in the regime, what quantitative liquidity trigger should be used and how should it be calibrated?

*Question 79:* The Board also seeks comment on the value of including balance sheet measures, such as nonperforming loans and loan concentrations, in the early remediation regime as triggers. What balance sheet measures, if any, should the Board include, and how should they be calibrated?

Tables 4 and 5 below provide a summary of all triggers and associated remediation actions in this proposed rule.

### TABLE 4—EARLY REMEDIATION TRIGGERS

| | Risk-based capital/leverage | Stress tests | Enhanced risk management and risk committee standards | Enhanced liquidity risk management standards | Market indicators |
|---|---|---|---|---|---|
| Level 1 (Heightened Supervisory Review (HSR)). | Meets all risk-based and leverage requirements for a well capitalized covered company: Tier 1 RBC ratio >6.0%. Total RBC ratio >10.0%. Tier 1 Leverage ratio >5.0%. However, the covered company has demonstrated capital structure or capital planning weaknesses. | Covered company's regulatory capital ratios exceed minimum requirements under the supervisory stress test severely adverse scenario but it is otherwise in non-compliance with the Board's capital plan or stress testing rules. | Covered company has manifested signs of weakness in meeting enhanced risk management or risk committee requirements for covered companies. | Covered company has manifested signs of weakness in meeting the enhanced liquidity risk management standards for covered companies. | The median value of any of the covered company's market indicators exceeds the trigger threshold for the entire breach period. |
| Level 2 (Initial Remediation). | Fails to meet any one of the Level 1 capital levels and maintains: Tier 1 RBC ratio >4.0% Total RBC ratio >8.0% Tier 1 Leverage ratio >4.0% | Under the supervisory stress test severely adverse scenario, the company's *Tier 1 common RBC ratio falls below 5%* during any quarter of the nine quarter planning horizon. | Covered company has demonstrated multiple deficiencies in meeting the enhanced risk management and risk committee requirements for covered companies. | Covered company has demonstrated multiple deficiencies in meeting the enhanced liquidity risk management standards for covered companies. | n.a. |

---

[192] *See* GAO Study, *supra* note 187, at 2.

TABLE 4—EARLY REMEDIATION TRIGGERS—Continued

| | Risk-based capital/leverage | Stress tests | Enhanced risk management and risk committee standards | Enhanced liquidity risk management standards | Market indicators |
|---|---|---|---|---|---|
| Level 3 (Recovery) ..... | Fails to meet any one of the Level 2 capital levels and maintains: Tier 1 RBC ratio >3.0% Total RBC ratio >6.0% Tier 1 Leverage ratio >3.0% Or institution's risk-based capital ratios remain below 6.0% Tier 1 RBC, 10.0% Total RBC, or 5.0% Leverage, for more than two complete consecutive calendar quarters. | Under the severely adverse scenario, the covered company's *Tier 1 common RBC ratio falls below 3%* during any quarter of the nine quarter planning horizon. | Covered company is in substantial non-compliance with enhanced risk management and risk committee requirements for covered companies. | Covered company is in substantial non-compliance with enhanced liquidity risk management standards for covered companies. | n.a. |
| Level 4 (Recommended resolution). | Covered company's regulatory capital ratios are below any of the following thresholds: 3.0% Tier 1 RBC 6.0% Total RBC 3.0% Tier 1 Leverage ratio | n.a ............................ | n.a ............................ | n.a ............................ | n.a. |

TABLE 5—REMEDIATION ACTIONS

| | Risk-based capital/leverage | Stress tests | Enhanced risk management and risk committee requirements | Enhanced liquidity risk management standards | Market indicators |
|---|---|---|---|---|---|
| Level 1 (Heightened Supervisory Review). | Heightened Supervisory Review (HSR): The Board will produce an internal report on the elements evidencing deterioration within 30 days of a Level 1 trigger breach and determine whether the institution should be elevated to a higher level of remediation. | HSR .......................... | HSR .......................... | HSR .......................... | HSR. |
| Level 2 (Initial Remediation). | All capital distributions (e.g., dividends and buybacks) are restricted to no more than 50% of the average of the covered company's net income in the previous two quarters. Covered company faces restrictions on growth (no more than 5% growth in total assets or total RWA per quarter or per annum), and is generally prohibited from directly or indirectly acquiring controlling interest in any company. Covered company will be subject to a non-public MOU. Covered company may be subject to other limitations and conditions on its conduct or activities as the Board deems appropriate. | | | | n.a. |

TABLE 5—REMEDIATION ACTIONS—Continued

| | Risk-based capital/ leverage | Stress tests | Enhanced risk management and risk committee requirements | Enhanced liquidity risk management standards | Market indicators |
|---|---|---|---|---|---|
| Level 3 (Recovery) ..... | Covered company is placed under a written agreement that prohibits all capital distributions, any quarterly growth of total assets or RWA, and material acquisitions. The written agreement will also include a requirement to raise additional capital to restore the covered company's capital level to or above regulatory minimums. If written agreement timeframes are not met, the covered company may be subject to divestiture requirements. Covered company will also be subject to a prohibition on discretionary bonus payments and restrictions on pay increases. Supervisors may also remove culpable senior management and limit transactions between affiliates. Covered company may be subject to other limitations and conditions on its conduct or activities as the Board deems appropriate. | | | | n.a. |
| Level 4 (Recommended Resolution). | The Board will consider whether to recommend to the Treasury Department and the FDIC that the covered company be resolved under the orderly liquidation authority provided for in Title II of the Dodd-Frank Act. | n.a. | | | n.a. |

## 1. Early Remediation Requirements

### a. Level 1 Remediation (Heightened Supervisory Review)

The proposed rule provides that the first level of remediation consists of heightened supervisory review. Level 1 remediation would be triggered when a covered company first shows signs of financial distress or material risk management weaknesses such that further decline of the company is probable. Level 1 remediation would require the Board to produce a report on the elements evidencing deterioration within 30 days and determine whether the institution should be elevated to a higher level of remediation.

In determining whether to elevate the covered company to a higher level of remediation, the Board would consider the extent to which the factors giving rise to a triggering event were caused by financial weakness or material risk management weaknesses at the covered company, such that further decline of the company is probable. The Board may also use other supervisory authority to cause the covered company to take appropriate actions to address the problems reviewed by the Board under level 1 remediation.

### b. Level 2 Remediation (Initial Remediation)

The Dodd-Frank Act provides that remedial actions required of covered companies in the initial stages of financial decline shall include limits on capital distributions, acquisitions and asset growth. The proposed rule provides that a covered company that triggers level 2 remediation (because it does not meet certain risk-based capital, leverage, or stress test thresholds, or has ongoing weaknesses in multiple requirements under the enhanced liquidity risk management standards and enterprise-wide risk management requirements included in this proposal) would be prohibited from distributing in any calendar quarter more than 50 percent of the average of its net income for the preceding two calendar quarters. The company would also be prohibited from permitting (i) its daily average total assets and daily average total risk-weighted assets in any calendar quarter to exceed daily average total assets and daily average total risk-weighted assets, respectively, during the preceding calendar quarter by more than 5 percent; and (ii) its daily average total assets and daily average total risk-weighted assets in any calendar year to exceed daily average total assets and daily average total risk-weighted assets, respectively, during the preceding calendar year by more than 5 percent.

The covered company would also be prohibited from directly or indirectly acquiring a controlling interest in any company without the prior approval of the Board. This includes controlling interests in any nonbank company and the establishment or acquisition of any office or place of business. Non-controlling acquisitions, such as the acquisition of less than 5 percent of the voting shares of a company, generally would not require prior approval. The covered company would also be required to enter into a non-public memorandum of understanding or undergo another enforcement action acceptable to the Board.

As part of level 2 remediation, the Board would also be able to impose limitations or conditions on the conduct or activities of the covered company or any of its affiliates as the Board deems appropriate and consistent with the purposes of Title I of the Dodd-Frank Act, including limitations or conditions deemed necessary to improve the safety and soundness of the covered company, promote financial stability, or limit the external costs of the potential failure of the covered company.

The restriction on capital distributions under level 2 remediation would apply to all capital distributions (common stock dividends and share repurchases) and would help to ensure that covered companies preserve capital through retained earnings during the earliest periods of financial stress, thereby building a capital cushion to absorb losses that the covered company may continue to accrue due to the weaknesses that caused it to enter level 2 remediation. This cushion is important to making the covered company's failure less likely, and also to minimize the external costs that the

covered company's distress or possible failure could impose on markets and the economy generally.

In developing this proposed rule, the Board considered the impact of the proposed restriction on capital distributions under level 2 remediation. According to data reviewed by the Board, prohibiting a weakened covered company from distributing more than 50 percent of its recent earnings should promote the important purpose of building a capital cushion at the covered company to absorb potential additional losses while still allowing the firm some room to pay dividends and repurchase shares. The Board notes that the capital conservation buffer under Basel III is similarly designed to impose increasingly stringent restrictions on capital distributions and employee bonus payments by banking organizations as their capital ratios approach regulatory minima.[193]

Furthermore, the level 2 remediation restrictions on asset growth is intended to prevent covered companies that are encountering the initial stages of financial difficulties from growing at a rate inconsistent with preserving capital and focusing on resolving material financial or risk management weaknesses. A 5 percent limit should generally be consistent with reasonable growth in the normal course of a covered company's business.

The level 2 remediation restriction on acquisitions of controlling interests in other companies without prior Board approval is also intended to prevent covered companies that are experiencing initial stages of financial difficulties from materially increasing their size or systemic interconnectedness. A company in early stages of financial stress needs to focus its energies on improving its financial condition, not on seeking major acquisition opportunities or integrating major new acquisitions. Under this provision, the Board would evaluate the materiality of acquisitions on a case-by-case basis to determine whether approval is warranted. Acquisition of non-controlling interests would continue to be permitted to allow covered companies to proceed with ordinary business functions (such as equity securities dealing) that may involve acquisitions of shares in other companies that do not rise to the level of control.

The proposed rule would also require covered companies that are subject to level 2 remediation to enter into a non-public memorandum of understanding with the Federal Reserve in order to

[193] See Basel III framework, *supra* note 34, at 60.

facilitate the establishment of a reasonable action plan for the covered company to improve its condition.

## c. Level 3 Remediation (Recovery)

The Act provides that remediation actions required of covered companies in advanced stages of financial stress shall include a capital restoration plan and capital raising requirements, limits on transactions with affiliates, management changes and asset sales. Accordingly, under the proposed rule, a covered company that has entered level 3 remediation (because the covered company did not meet certain risk-based capital, leverage or stress test thresholds, or is in substantial non-compliance with the enhanced risk management or enhanced liquidity standards of this proposal) would be subject to a number of fixed limitations. The covered company would be prohibited from making any capital distributions and from increasing the compensation of, or paying any bonus to, its senior executive officers or directors. Additionally, the covered company could not permit its average total assets or average total risk-weighted assets during any calendar quarter to exceed average total assets or average total risk-weighted assets during the previous quarter. The covered company would also be prohibited from (i) directly or indirectly acquiring any interest in any company; (ii) establishing or acquiring any office or other place of business; or (iii) engaging in any new line of business.

Furthermore, the covered company would be required to enter into a written agreement or other form of formal enforcement action with the Board that would specify that it must raise capital and take other actions to improve capital adequacy. If the covered company subsequently did not satisfy the requirements of the written agreement, the Board could require the company to divest assets identified by the Board as contributing to the covered company's financial decline or that pose substantial risk of contributing to the company's further financial decline.

Under the proposal, the Board could also require a covered company under level 3 remediation to conduct new elections for its board of directors, dismiss directors or senior executive officers that have been in office for more than 180 days, hire senior executive officers approved by the Board, or limit transactions with its affiliates.

The Board believes that these restrictions would appropriately limit a covered company's ability to increase its risk profile and ensure maximum capital conservation when its condition

or risk management failures have deteriorated to the point that it is subject to this level of remediation. These restrictions, while potentially disruptive to aspects of the company's business, are consistent with the purpose of section 166 of the Dodd-Frank Act: to arrest a covered company's decline and help to mitigate external costs associated with its potential failure.

Furthermore, to the extent that a covered company's management is a primary cause of its level 3 remediation status, the proposal would allow the Board to take appropriate action to ensure that such management could not increase the risk profile of the company or make its failure more likely. Taken together, the mandatory and optional restrictions and actions of level 3 remediation provide the Board with important tools to make a covered company's failure less likely and if failure were to occur, less costly to the financial system.

## d. Level 4 Remediation (Resolution Assessment)

Under the proposed rule, if level 4 remediation is triggered (because the covered company did not meet certain risk-based capital or leverage requirements), the Board would consider whether to recommend to the Treasury Department and the FDIC that the firm be resolved under the orderly liquidation authority provided for in Title II of the Dodd-Frank Act, based on whether the covered company is in default or in danger of default and poses a risk to the stability of the U.S. financial system pursuant to section 203 of the Dodd-Frank Act.

*Question 80:* The Board seeks comment on the proposed mandatory actions that would occur at each level of remediation. What, if any, additional or different restrictions should the Board impose on distressed covered companies?

## 2. Early Remediation Triggering Events

The proposed rule provides triggering events based on the Board's existing definitions of minimum risk-based capital and leverage ratios, the results of the Board's supervisory stress tests under this proposed rule, weaknesses in complying with enhanced risk management and liquidity standards under this proposed rule and market indicators.

## a. Risk-Based Capital and Leverage

The Act specifies that capital and leverage will be among the elements used to evaluate the financial condition of a covered company under the early

remediation framework. The risk-based capital and leverage ratios for each covered company would be measured using periodic statements, in connection with inspections of a covered company, or upon request of the Board.

Although there is no fixed capital-related threshold for level 1 remediation, weaknesses in a covered company's capital structure or capital planning processes could lead to level 1 remediation, even where the covered company's capital ratios exceed the minimum levels for level 2 remediation. Thus, if a covered company maintains a total risk-based capital ratio of 10.0 percent or greater, a tier 1 risk-based capital ratio of 6.0 percent or greater, and a tier 1 leverage ratio of 5.0 percent or greater, but the Board determines that its financial condition is not commensurate with the risks posed by its activities, then level 1 remediation would apply. Level 2 remediation (initial remediation) would apply if a covered company has a total risk-based capital ratio of less than 10.0 percent and greater than or equal to 8.0 percent, a tier 1 risk-based capital ratio of less than 6.0 percent and greater than or equal to 4.0 percent, or a tier 1 leverage ratio of less than 5.0 percent and greater than or equal to 4.0 percent.

A covered company would be subject to level 3 remediation (recovery) if:

(i) For two complete consecutive quarters, the covered company has a total risk-based capital ratio of less than 10.0 percent, a tier 1 risk-based capital ratio of less than 6.0 percent, or a tier 1 leverage ratio of less than 5.0 percent; or

(ii) The covered company has a total risk-based capital ratio of less than 8.0 percent and greater than or equal to 6.0 percent, a tier 1 risk-based capital ratio of less than 4.0 percent and greater than or equal to 3.0 percent or a tier 1 leverage ratio of less than 4.0 percent and greater than or equal to 3.0 percent.

Finally, a covered company would be subject to level 4 remediation (resolution assessment) if it has a total risk-based capital ratio of less than 6.0 percent, a tier 1 risk-based capital ratio of less than 3.0 percent or a tier 1 leverage ratio of less than 3.0 percent. The Board believes that the remediation requirements listed above are reasonable restraints on covered companies that are unable to meet these regulatory capital thresholds.

*Question 81:* The Board seeks comment on the proposed risk-based capital and leverage triggers. What alternative or additional risk-based capital or leverage triggering events, if any, should the Board adopt? Provide a

detailed explanation of such alternative triggering events with supporting data.

b. Stress Tests

As discussed more fully in section VII of this proposal, the supervisory stress test gauges a covered company's capital adequacy under baseline, adverse and severely adverse scenarios. The proposed rule would use the results of the stress test under the severely adverse scenario to trigger early remediation. A covered company whose tier 1 common risk-based capital ratio falls below certain minimum thresholds under the severely adverse scenario during any quarter of the planning horizon (which extends for at least nine quarters) would be subject to early remediation. Under the rule as proposed, the lower the tier 1 common risk-based capital ratio under the stress test, the more stringent the required remedial actions would be. Specifically:

(i) *Level 1 remediation.* A covered company would be subject to level 1 remediation if it is not in compliance with any regulations adopted by the Board relating to capital plans and stress tests.[194] The Board believes that even if a covered company meets the minimum regulatory capital requirements under the severely adverse stress scenario, noncompliance with the Board's capital plan or stress testing regulations is sufficient to warrant level 1 remediation.

(ii) *Level 2 remediation.* A covered company would be subject to level 2 remediation if, under the results of the severely adverse stress test in any quarter of the planning horizon, the covered company's tier 1 common risk-based capital ratio fell below 5.0 percent and remained above 3.0 percent.

(iii) *Level 3 remediation.* A covered company would be subject to level 3 remediation if, under the results of the severely adverse stress test in any quarter of the planning horizon, the covered company's tier 1 common risk-based capital ratio fell below 3.0 percent.

*Question 82:* What additional factors should the Board consider when incorporating stress test results into the early remediation framework? Is the severely adverse scenario appropriately incorporated as a triggering event? Why or why not?

c. Risk Management

The Board believes that material weaknesses and deficiencies in risk management could contribute significantly to a firm's decline and ultimate failure. The proposed rule

provides that, if the Board determines that a covered company has failed to comply with the enhanced risk management provisions of Subpart E of this proposed rule, it would be subject to level 1, 2, or 3 remediation, depending on the severity of the compliance failure.

Thus, for example, level 1 remediation would be appropriate if a covered company has manifested signs of weakness in meeting the proposal's enhanced risk management and risk committee requirements. Similarly, level 2 remediation would be appropriate if a covered company has demonstrated multiple deficiencies in meeting the enhanced risk management or risk committee requirements, and level 3 remediation would be appropriate if the covered company is in substantial noncompliance with the enhanced risk management and risk committee requirements.

*Question 83:* The Board seeks comment on triggers tied to risk management weaknesses. Should the Board consider specific risk management triggers tied to particular events? If so, what might such triggers involve? How should failure to promptly address material risk management weaknesses be addressed by the early remediation regime? Under such circumstances, should companies be moved to progressively more stringent levels of remediation, or are other actions more appropriate? Provide a detailed explanation.

d. Liquidity

The Dodd-Frank Act provides that the measures of financial condition to be included in the early remediation framework shall include liquidity measures. Under the proposal, a covered company would be subject to level 1, level 2, or level 3 remediation if the Board determines that the company's measurement or management of its liquidity risks is not in compliance with the requirements of Subpart C of this proposed rule. The level of remediation to which a covered company would be subject shall vary, at the discretion of the Board, depending on the severity of the compliance failure.

Thus, for example, level 1 remediation would be appropriate if a covered company has manifested signs of weakness in meeting the proposal's enhanced liquidity risk management standards. Similarly, level 2 remediation would be appropriate if a covered company has demonstrated multiple deficiencies in meeting the enhanced liquidity risk management standards, and level 3 remediation would be appropriate if the covered

---

[194] *See* 12 CFR 225.8.

company is in substantial noncompliance with the enhanced liquidity risk management standards.

e. Market Indicators

Section 166(c)(1) of the Dodd-Frank Act directs the Board, in defining measures of a covered company's condition, to utilize "other forward-looking indicators". A review of market indicators in the lead up to the recent financial crisis reveals that market-based data often provided an early signal of deterioration in a company's financial condition. Moreover, numerous academic studies have concluded that market information is complementary to supervisory information in uncovering problems at financial companies.[195] Accordingly, the Board proposes to use a variety of market-based triggers designed to capture both emerging idiosyncratic and systemic risk across covered companies in the early remediation regime. The Board proposes to implement a system of market-based triggers that prompts a heightened supervisory review (level 1 remediation) of a covered company's financial condition and risk management. The Board would produce a report on the elements evidencing deterioration within 30 days of a covered company hitting a market indicator trigger and determine whether the institution should be elevated to a higher level of remediation. In determining whether to elevate the covered company to a higher level of remediation, the Board would consider the extent the factors giving rise to a triggering event were caused by financial weakness or material risk management weaknesses at the covered company such that further decline of the company is probable. The Board may also use other supervisory authority to cause the covered company to take appropriate actions to address the problems reviewed by the Board under level 1 remediation.

The Board recognizes that market-based early remediation triggers—like all early warning metrics—have the potential to trigger remediation for firms that have no material weaknesses (false positives) and fail to trigger remediation for firms whose financial condition has

deteriorated (false negatives), depending on the sample, time period and thresholds chosen. Further, the Board notes that if market indicators are used to trigger corrective actions in a regulatory framework, market prices may adjust to reflect this use and potentially become less revealing over time. Accordingly, the Board is not proposing to use market-based triggers to subject a covered company directly to early remediation levels 2, 3, or 4 at this time. The Board expects to review this approach after gaining additional experience with the use of market data in the supervisory process.

Given that the informational content and availability of market data will change over time, the Board also proposes to publish for notice and comment the market-based triggers and thresholds on an annual basis (or less frequently depending on whether the Board determines that changes to an existing regime would be appropriate), rather than specifying these triggers in this rule. In order to ensure transparency, the Board's disclosure of market-based triggers would include sufficient detail to allow the process to be replicated in general form by market participants. The Board seeks comment on the use of market indicators described below. Before commencing use of any particular market-based indicator the Board intends to publish such indicators for notice and comment.

i. Proposed Market Indicators

In selecting market indicators to incorporate into the early remediation regime, the Board focused on indicators that have significant information content, i.e. for which prices quotes are available, and provide a sufficiently early indication of emerging or potential issues. The Board proposes to use the following or similar market-based indicators in its early remediation framework:

1. Equity-Based Indicators

*Expected default frequency (EDF).* The EDF measures the expected probability of default in the next 365 days. The Board uses EDFs calculated using Moody's KMV RISKCALC model.

*Marginal expected shortfall (MES).* The MES of a financial institution is defined as the expected loss on its equity when the overall market declines by more than a certain amount. Each financial institution's MES depends on the volatility of its stock price, the correlation between its stock price and the market return, and the co-movement of the tails of the distributions for its stock price and for the market return. The Board uses MES calculated

following the methodology of Acharya, Pederson, Phillipon, and Richardson (2010). MES data are available at *http://vlab.stern.nyu.edu/welcome/risk.*

*Market Equity Ratio.* The market equity ratio is defined as the ratio of market value of equity to market value of equity plus book value of debt.

*Option-implied volatility.* The option-implied volatility of a firm's stock price is calculated from out-of-the-money option prices using a standard option pricing model, reported as an annualized standard deviation in percentage points by Bloomberg.

2. Debt-Based Indicators

*Credit default swaps (CDS).* The Board uses CDS offering protection against default on a 5-year maturity, senior unsecured bond by a financial institution.

*Subordinated debt (bond) spreads.* The Board uses financial companies' subordinated bond spreads with a remaining maturity of at least 5 years over the Treasury rate with the same maturity or the LIBOR swap rate published by Bloomberg.

The Board recognizes that all market indicators for different covered companies are not traded with the same frequency and therefore may not contain the same level of informational content.

*Question 84:* The Board seeks comment on the proposed approach to market-based triggers detailed below, alternative specifications of market-based indicators, and the potential benefits and challenges of introducing additional market-based triggers for levels 2, 3, or 4 of the proposed early remediation regime. In addition, the Board seeks comment on the sufficiency of information content in market-based indicators generally.

ii. Proposed Trigger Design

The Board's proposed market indicator-based regime would trigger heightened supervisory review when any of the covered company's indicators cross a threshold based on different percentiles of historical distributions. The Board seeks comment on the use of both time-variant and time-invariant triggers, as follows:

Time-variant triggers capture changes in the value of a company's market-based indicator relative to its own past performance and the past performance of its peers. Peer groups would be determined on an annual basis. Current values of indicators, measured in levels and changes, would be evaluated relative to a covered company's own time series (using a rolling 5-year window) and relative to the median of a group of predetermined low-risk peers

---

[195] *See, e.g.,* Berger, Davies, and Flannery, *Comparing Market and Supervisory Assessments of Bank Performance: Who Knows What When?* Journal of Money, Credit, and Banking, 32 (3), at 641–667 (2000). Krainer and Lopez, *How Might Financial Market Information Be Used for Supervisory Purposes?,* FRBSF Economic Review, at 29–45 (2003). Furlong and Williams, *Financial Market Signals and Banking Supervision: Are Current Practices Consistent with Research Findings?,* FRBSF Economics Review, at 17–29 (2006).

(using a rolling 5-year window), and after controlling for market or systematic effects.[196] The value represented by the percentiles for each signal varies over time as data is updated for each indicator.

For all time-variant triggers, heightened supervisory review would be required when the median value of at least one market indicator over a period of 22 consecutive business days, either measured as its level, its 1-month change, or its 3-month change, both absolute and relative to the median of a group of predetermined low-risk peers, is above the 95th percentile of the firm's or the median peer's market indicator 5-year rolling window time series. The Board proposes to use time-variant triggers based on all six market indicators listed above.

Time-invariant triggers capture changes in the value of a company's market-based indicators relative to the historical distribution of market-based variables over a specific fixed period of time and across a predetermined peer group. Time-invariant triggers are used to complement time-variant triggers since time-variant triggers could lead to excessively low or high thresholds in cases where the rolling window covers only an extremely benign period or a highly disruptive financial period. The Board acknowledges that a time-invariant threshold should be subject to subsequent revisions when warranted by circumstances.

As currently contemplated, the Board would consider all pre-crisis panel data for the peer group (January 2000–December 2006), which contain observations from the subprime crisis in the late 1990s and early 2000s as well as the tranquil period of 2004–2006. For each market indicator, percentiles of the historical distributions would be computed to calibrate time-invariant thresholds. The Board would focus on five indicators for time-invariant triggers, calibrated to balance between their propensity to produce false positives and false negatives: CDS prices, subordinated debt spreads, option-implied volatility, EDF and MES. The market equity ratio is not used in the time-invariant approach because the cross-sectional variation of this variable was not found to be informative of early issues across financial companies. Time-invariant thresholds would trigger heightened supervisory review if the median value for a covered company over 22 consecutive business days was

above the threshold for any of the market indicators used in the regime.

In considering all thresholds for each time-invariant trigger, the Board evaluated the tradeoff between early signals and supervisory burden associated with potentially false signals. Data limitations in the time-invariant approach also require the construction of different thresholds for different market indicators. The Board proposes the following calibration:

*CDS.* The CDS price data used to create the distribution consist of an unbalanced panel of daily CDS price observations for 25 financial companies over the 2001- 2006 period. Taking the skewed distribution of CDS prices in the sample and persistent outliers into account, the threshold was set at 44 basis points, which corresponds to the 80th percentile of the distribution.

*Subordinated debt (bond) spreads.* The data covered an unbalanced panel of daily subordinated debt spread observations for 30 financial companies. Taking the skewed distribution into account, the threshold was set to 124 basis points, which corresponds to the 90th percentile of the distribution.

*MES.* The data covered a balanced panel of daily observations for 29 financial companies. The threshold was set to 4.7 percent, which corresponds to the 95th percentile of the distribution.

*Option-implied volatility.* The data covered a balanced panel of daily option-implied volatility observations for 29 financial companies. The threshold was set to 45.6 percent, which corresponds to the 90th percentile of the distribution.

*EDF.* The monthly EDF data cover a balanced panel of 27 financial companies. The threshold was set to 0.57 percent, which corresponds to the 90th percentile of the distribution.

The Board invites comment on the use of market indicators to prompt early remediation actions.

*Question 85:* Should the Board include market indicators described above in the early remediation regime? If not, what other forward-looking indicators should the Board include?

*Question 86:* Are the indicators outlined above the correct set of indicators to consider? Should other market-based triggers be considered?

*Question 87:* How should the Board consider the liquidity of an underlying security when it chooses indicators?

*Question 88:* The Board proposes using both absolute levels and changes in indicators. Over what period should changes be calculated?

*Question 89:* Should the Board use both time-variant and time-invariant

indicators? What are the comparative advantages of using one or the other?

*Question 90:* Is the proposed trigger time (when the median value over a period of 22 consecutive business days crosses the predetermined threshold) to trigger heightened supervisory review appropriate? What periods should be considered and why?

*Question 91:* Should the Board use a statistical threshold to trigger heightened supervisory review or some other framework?

*Question 92:* Should the Board consider using market indicators to move covered companies directly to level 2 (initial remediation)? If so, what time thresholds should be considered for such a trigger? What would be the drawbacks of such a second trigger?

*Question 93:* To what extent do these indicators convey different information about the short-term and long-term performance of covered companies that should be taken into account for the supervisory review?

*Question 94:* Should the Board use peer comparisons to trigger heightened supervisory review? If so, should the Board consider only low-risk covered companies for the peer group or a broader range of financial companies? If a broader a range is more appropriate, how should the peer group be defined?

*Question 95:* How should the Board account for overall market movements in order to isolate idiosyncratic risk of covered companies?

*C. Notice and Remedies*

The proposed rule provides that the initiation of early remediation and the transfer of a covered company from one level of remediation to another would occur upon notice from the Board. Similarly, a covered company shall remain subject to the requirements imposed by early remediation until the Board notifies the covered company that its financial condition no longer warrants application of the requirement. Covered companies have an affirmative duty to notify the Board of triggering events and other changes in circumstances that could result in changes to the early remediation provisions that apply to it.

*D. Relationship to Other Laws and Requirements*

The early remediation regime that would be established by the proposed rule would supplement rather than replace the Board's other supervisory processes with respect to covered companies. The proposed rule would not limit the existing supervisory authority vested in the Board, including the Federal Reserve's authority to

---

[196] Market or systemic effects are controlled by subtracting the median of corresponding changes from the peer group.

initiate supervisory actions to address deficiencies, unsafe or unsound conduct, practices, or conditions, or violations of law. For example, the Board may respond to signs of a covered company's financial stress by requiring corrective measures in addition to remedial actions required under the proposed rule. The Board also may use other supervisory authority to cause a covered company to take remedial actions enumerated in the early remediation regime on a basis other than a triggering event.

## X. Administrative Law Matters

*A. Solicitation of Comments on the Use of Plain Language*

Section 722 of the Gramm-Leach-Bliley Act (Pub. L. 106–102, 113 Stat. 1338, 1471, 12 U.S.C. 4809) requires the Federal banking agencies to use plain language in all proposed and final rules published after January 1, 2000. The Board has sought to present the proposed rule in a simple and straightforward manner, and invites comment on the use of plain language.

*B. Paperwork Reduction Act Analysis*

Request for Comment on Proposed Information Collection

In accordance with section 3512 of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521) (PRA), the Board may not conduct or sponsor, and a respondent is not required to respond to, an information collection unless it displays a currently valid Office of Management and Budget (OMB) control number. The Board reviewed the proposed rule under the authority delegated to the Board by OMB.

The proposed rule contains requirements subject to the PRA. The reporting requirements are found in section 252.164(b); the recordkeeping requirements are found in sections 252.61 [197] and 252.145(b)(1); [198] and the disclosure requirements are found in section 252.148. The recordkeeping burden for the following sections is accounted for in the section 252.61 burden: 252.52(b)(3), 252.56, 252.58, 252.60(a), and 252.60(c). These

---

[197] Most of the recordkeeping requirements for Subpart C—Liquidity Requirements have been addressed in the Funding and Liquidity Risk Management Guidance (FR 4198; OMB No. 7100–0326). Only new recordkeeping requirements are being addressed in this proposed rulemaking.

[198] Some of the recordkeeping requirements for Subpart G—Company-Run Stress Test Requirements have been addressed in the proposed Recordkeeping and Disclosure Provisions Associated with Stress Testing Guidance (FR 4202). See the **Federal Register** notice published on June 15, 2011 (76 FR 35072). Only new recordkeeping requirements are being addressed with this proposed rulemaking.

information collection requirements would implement sections 165 and 166 of the Dodd-Frank Act, as mentioned in the Abstract below.

The reporting requirements found in section 252.136(b) have been addressed in the Resolution Plans Required Regulation (Reg QQ). [199] The reporting requirements found in sections 252.13(a), 252.96(a), 252.134(a), 252.146(a), and 252.146(b) will be addressed in a separate **Federal Register** notice at a later date.

Comments are invited on:

(a) Whether the proposed collections of information are necessary for the proper performance of the Federal Reserve's functions, including whether the information has practical utility;

(b) The accuracy of the Federal Reserve's estimate of the burden of the proposed information collections, including the validity of the methodology and assumptions used;

(c) Ways to enhance the quality, utility, and clarity of the information to be collected;

(d) Ways to minimize the burden of the information collections on respondents, including through the use of automated collection techniques or other forms of information technology; and

(e) Estimates of capital or start up costs and costs of operation, maintenance, and purchase of services to provide information.

All comments will become a matter of public record. Comments on aspects of this notice that may affect reporting, recordkeeping, or disclosure requirements and burden estimates should be sent to the addresses listed in the **ADDRESSES** section. A copy of the comments may also be submitted to the OMB desk officer for the Federal banking agencies: By mail to U.S. Office of Management and Budget, 725 17th Street, NW., #10235, Washington, DC 20503 or by facsimile to (202) 395–5806, Attention, Commission and Federal Banking Agency Desk Officer.

Proposed Information Collection

*Title of Information Collection:* Reporting, Recordkeeping, and Disclosure Requirements Associated with Regulation YY.

*Frequency of Response:* Annual, semiannual, and on occasion.

*Affected Public:* Businesses or other for-profit.

*Respondents:* U.S. bank holding companies, savings and loan holding companies, nonbank financial companies, and state member banks.

*Abstract:* Section 165 of the Dodd-Frank Act requires the Board to

---

[199] *See* 76 FR 67323 (November 1, 2011).

implement enhanced prudential standards and section 166 requires the Board to implement an early remediation framework. The enhanced standards include risk-based capital and leverage requirements, liquidity standards, requirements for overall risk management (including establishing a risk committee), single-counterparty credit limits, stress test requirements, and debt-to-equity limits for companies that the Council has determined pose a grave threat to financial stability.

Section 252.61 would require a covered company to adequately document all material aspects of its liquidity risk management processes and its compliance with the requirements of Subpart C and submit all such documentation to the risk committee.

Section 252.145(b)(1) would require that each covered company or over $10 billion company must establish and maintain a system of controls, oversight, and documentation, including policies and procedures, designed to ensure that the stress testing processes used by the covered company or over $10 billion company are effective in meeting the requirements in Subpart G. These policies and procedures must, at a minimum, describe the covered company's or over $10 billion company's stress testing practices and methodologies, validation and use of stress tests results, and processes for updating the company's stress testing practices consistent with relevant supervisory guidance. Policies of covered companies must describe processes for scenario development for the additional stress test required under section 252.144.

Section 252.148 would require public disclosure of results required for stress tests of covered companies and over $10 billion companies. Within 90 days of submitting a report for its required stress test under section 252.143 and section 252.144, as applicable, a covered company and over $10 billion company shall disclose publicly a summary of the results of the stress tests required under section 252.143 and section 252.144, as applicable. The information disclosed by each covered company and over $10 billion company, as applicable, shall, at a minimum, include: (i) A description of the types of risks being included in the stress test; (ii) for each covered company, a high-level description of scenarios developed by the company under section 252.144(b), including key variables used (such as GDP, unemployment rate, housing prices); (iii) a general description of the methodologies employed to estimate losses, revenues, allowance for loan

losses, and changes in capital positions over the planning horizon; and (iv) aggregate losses, pre-provision net revenue, allowance for loan losses, net income, and pro forma capital levels and capital ratios (including regulatory and any other capital ratios specified by the Board) over the planning horizon, under each scenario.

Section 252.164(b) would require that when a covered company becomes aware of (i) one or more triggering events set forth in section 252.163; or (ii) a change in condition that it believes should result in a change in the remediation provisions to which it is subject, such covered company must provide notice to the Board within 5 business days, identifying the nature of the triggering event or change in circumstances.

Estimated Paperwork Burden

*Estimated Burden per Response:*
Section 252.61 recordkeeping—200 hours (Initial setup 160 hours).

Section 252.145(b)(1) recordkeeping—40 hours (Initial setup 280 hours for U.S. bank holding companies $50 billion and over in total consolidated assets; 240 hours for institutions over $10 million in total consolidated assets).

Section 252.148 disclosure—80 hour (Initial setup 200 hours).

Section 252.164(b) reporting—2 hours.

*Number of respondents:* 34 U.S. bank holding companies with total consolidated assets of $50 billion or more, 39 U.S. bank holding companies with total consolidated assets over $10 billion and less than $50 billion, 21 state member banks with total consolidated assets over $10 billion, 39 savings and loan holding companies with total consolidated assets over $10 billion.

*Total estimated annual burden:* 97,736 hours (72,188 hours for initial setup and 25,548 hours for ongoing compliance).

*C. Regulatory Flexibility Act Analysis*

In accordance with section 3(a) of the Regulatory Flexibility Act [200] (RFA), the Board is publishing an initial regulatory flexibility analysis of the proposed rule. The RFA requires an agency either to provide an initial regulatory flexibility analysis with a proposed rule for which a general notice of proposed rulemaking is required or to certify that the proposed rule will not have a significant economic impact on a substantial number of small entities. Based on its analysis and for the reasons stated below, the Board believes that this

proposed rule will not have a significant economic impact on a substantial number of small entities. Nevertheless, the Board is publishing an initial regulatory flexibility analysis. A final regulatory flexibility analysis will be conducted after comments received during the public comment period have been considered.

In accordance with sections 165 and 166 of the Dodd-Frank Act, the Board is proposing to adopt Regulation YY (12 CFR 252 *et seq.*) to establish enhanced prudential standards and early remediation requirements applicable for covered companies.[201] The enhanced standards include risk-based capital and leverage requirements, liquidity standards, requirements for overall risk management (including establishing a risk committee), single-counterparty credit limits, stress test requirements, and debt-to-equity limits for companies that the Council has determined pose a grave threat to financial stability.

Under regulations issued by the Small Business Administration (SBA), a "small entity" includes those firms within the "Finance and Insurance" sector with asset sizes that vary from $7 million or less in assets to $175 million or less in assets.[202] The Board believes that the Finance and Insurance sector constitutes a reasonable universe of firms for these purposes because such firms generally engage in actives that are financial in nature. Consequently, bank holding companies or nonbank financial companies with assets sizes of $175 million or less are small entities for purposes of the RFA.

As discussed in the **SUPPLEMENTARY INFORMATION**, the proposed rule generally would apply to a covered company, which includes only bank holding companies with $50 billion or more in total consolidated assets, and nonbank financial companies that the Council has determined under section 113 of the Dodd-Frank Act must be supervised by the Board and for which such determination is in effect. However, the enterprise wide risk committee requirements required under section 165(h) of the Act would apply to any publicly traded bank holding company with total assets of $10 billion or more. The company-run stress test requirements part of the proposal being established pursuant to section 165(i)(2) of the Act also would apply to any bank holding company, savings and loan holding company, and state member bank with more than $10 billion in total assets. Companies that are subject to the proposed rule therefore substantially

exceed the $175 million asset threshold at which a banking entity is considered a "small entity" under SBA regulations.[203] The proposed rule would apply to a nonbank financial company designated by the Council under section 113 of the Dodd-Frank Act regardless of such a company's asset size. Although the asset size of nonbank financial companies may not be the determinative factor of whether such companies may pose systemic risks and would be designated by the Council for supervision by the Board, it is an important consideration.[204] It is therefore unlikely that a financial firm that is at or below the $175 million asset threshold would be designated by the Council under section 113 of the Dodd-Frank Act because material financial distress at such firms, or the nature, scope, size, scale, concentration, interconnectedness, or mix of it activities, are not likely to pose a threat to the financial stability of the United States.

As noted above, because the proposed rule is not likely to apply to any company with assets of $175 million or less, if adopted in final form, it is not expected to apply to any small entity for purposes of the RFA. The Board does not believe that the proposed rule duplicates, overlaps, or conflicts with any other Federal rules. In light of the foregoing, the Board does not believe that the proposed rule, if adopted in final form, would have a significant economic impact on a substantial number of small entities supervised. Nonetheless, the Board seeks comment on whether the proposed rule would impose undue burdens on, or have unintended consequences for, small organizations, and whether there are ways such potential burdens or consequences could be minimized in a manner consistent with sections 165 and 166 of the Dodd-Frank Act.

**List of Subjects in 12 CFR Part 252 and 12 CFR Chapter II**

Administrative practice and procedure, Banks, Banking, Federal Reserve System, Holding companies, Reporting and recordkeeping requirements, Securities.

**Authority and Issuance**

For the reasons stated in the **SUPPLEMENTARY INFORMATION**, the Board

---

[200] 5 U.S.C. 601 *et seq.*

[201] *See* 12 U.S.C. 5365 and 5366.

[202] 13 CFR 121.201.

[203] The Dodd-Frank Act provides that the Board may, on the recommendation of the Council, increase the $50 billion asset threshold for the application of certain of the enhanced standards. *See* 12 U.S.C. 5365(a)(2)(B). However, neither the Board nor the Council has the authority to lower such threshold.

[204] *See* 76 FR 4555 (January 26, 2011).

of Governors of the Federal Reserve System proposes to add the text of the rule as set forth at the end of the **SUPPLEMENTARY INFORMATION** as part 252 to 12 CFR chapter II as follows:

## PART 252—ENHANCED PRUDENTIAL STANDARDS (REGULATION YY)

1. The authority citation for part 252 shall read as follows:

**Authority:** 12 U.S.C. 321–338a, 1467a(g), 1818, 1831p–1, 1844(b), 5365, 5366.

2. Part 252 is added to read as follows:

## PART 252—ENHANCED PRUDENTIAL STANDARDS

**Subpart A—General Provisions**

Sec.
252.1   Authority, purpose, applicability, and reservation of authority.
252.2 through 252.9   [Reserved]

**Subpart B—Risk-Based Capital Requirements and Leverage Limits**

252.11   Applicability.
252.12   Definitions.
252.13   Enhanced risk-based capital and leverage requirements.
252.14   Nonbank covered companies: reporting and enforcement.

**Subpart C—Liquidity Requirements**

252.51   Definitions.
252.52   Board of directors and risk committee responsibilities.
252.53   Senior management responsibilities.
252.54   Independent review.
252.55   Cash flow projections.
252.56   Liquidity stress testing.
252.57   Liquidity buffer.
252.58   Contingency funding plan.
252.59   Specific limits.
252.60   Monitoring.
252.61   Documentation.

**Subpart D—Single-Counterparty Credit Limits**

252.91   Applicability.
252.92   Definitions.
252.93   Credit exposure limit.
252.94   Gross credit exposure.
252.95   Net Credit Exposure.
252.96   Compliance.
252.97   Exemptions.

**Subpart E—Risk Management**

252.125   Definitions.
252.126   Establishment of risk committee and appointment of chief risk officer.

**Subpart F—Supervisory Stress Test Requirements**

252.131   Applicability.
252.132   Definitions.
252.133   Annual analysis conducted by the Board.
252.134   Data and information required to be submitted in support of the Board's analyses.
252.135   Review of the Board's analysis; publication of summary results.
252.136   Post-assessment actions by covered companies.

**Subpart G—Company-Run Stress Test Requirements**

252.141   Applicability.
252.142   Definitions.
252.143   Annual stress test.
252.144   Additional stress test for covered companies.
252.145   Methodologies and practices.
252.146   Required report to the Board of stress test results and related information.
252.147   Post-assessment actions by covered companies.
252.148   Publication of results by covered companies and over $10 billion companies.

**Subpart H—Debt-to-Equity Limits for Certain Covered Companies**

252.151   Definitions.
252.152   Debt-to-equity ratio limitation.

**Subpart I—Early Remediation Framework**

252.161   Definitions.
252.162   Remediation Actions.
252.163   Remediation triggering events.
252.164   Notice and remedies.

## Subpart A—General Provisions

**§ 252.1   Authority, purpose, applicability, and reservation of authority.**

(a) *Authority.* This part is issued by the Board of Governors of the Federal Reserve System (the Board) under sections 165 and 166 of Title I of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the Dodd-Frank Act) (Pub. L. 111–203, 124 Stat. 1376, 1423–32, 12 U.S.C. 5365 and 5366); section 9 of the Federal Reserve Act (12 U.S.C. 321–338a); section 5(b) of the Bank Holding Company Act of 1956, as amended (12 U.S.C. 1844(b)); section 10(g) of the Home Owners' Loan Act, as amended (12 U.S.C. 1467a(g)); and sections 8 and 39 of the Federal Deposit Insurance Act (12 U.S.C. 1818(b) and 1831p–1).

(b) *Purpose.* This part implements certain provisions of sections 165 and 166 of the Dodd-Frank Act (12 U.S.C. 5365 and 5366), which requires the Board to establish enhanced prudential standards for covered companies, as defined herein.

(c) *Applicability.* (1) *In general.* Except as otherwise provided in this part, a covered company is subject to the requirements of this part beginning on the first day of the fifth quarter following the date on which it became a covered company.

(2) *Initial applicability.* Except as provided in this part, a company that is a covered company on the effective date of this subpart is subject to the requirements of this subpart beginning on the first day of the fifth quarter following the effective date.

(3) *U.S. bank holding company subsidiaries of foreign banking*

*organizations.* Except with respect to the liquidity requirements in subpart C, the risk management requirements of subpart E, and the debt-to-equity limits in subpart H, the requirements of this part will not apply to any bank holding company subsidiary of a foreign banking organization that is currently relying on Supervision and Regulation Letter SR 01–01 issued by the Board (as in effect on May 19, 2010) until July 21, 2015.

(d) *Reservation of authority.* (1) *In general.* If the Board determines that compliance with the requirements of this part does not sufficiently mitigate the risks to U.S. financial stability posed by the failure or material financial distress of a covered company, the Board may require the covered company to be subject to additional or further enhanced prudential standards, including, but not limited to, additional capital or liquidity requirements, limits on exposures to single-counterparties, risk management requirements, stress tests, or other requirements or restrictions the Board deems necessary to carry out the purposes of this subpart or Title I of the Dodd-Frank Act.

(2) *Other supervisory authority.* Nothing in this part limits the authority of the Board under any other provision of law or regulation to take supervisory or enforcement action, including action to address unsafe and unsound practices or conditions, or violations of law or regulation.

(3) *Application of enhanced prudential standards to bank holding companies in general.* In order to preserve the safety and soundness of a bank holding company and thereby mitigate risks to the stability of the U.S. financial system, the Board may determine that a bank holding company that is not a covered company shall be subject to one or more of the standards established under this part based on the company's capital structure, size, complexity, risk profile, scope of operations, or financial condition and any other risk related factors that the Board deems appropriate.

## Subpart B—Risk-Based Capital Requirements and Leverage Limits

**§ 252.11   Applicability.**

(a) *Applicability.* A nonbank covered company is subject to the requirements of sections 252.13(b)(1) and (2) on the later of the effective date of this subpart or 180 days following the date on which the Council determined that the company shall be supervised by the Board. A company the Council has determined shall be supervised by the Board on a date no less than 180 days before September 30 of a calendar year

must comply with the requirements of sections 252.13(b)(3) from September 30 of that calendar year and thereafter.

### § 252.12  Definitions.

For purposes of this subpart:

(a) *Bank holding company* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(b) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(c) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(d) *Covered company* means

(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company).

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered company for purposes of this part unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the

reporting date on which it ceased to be a covered company.

(e) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(f) *Nonbank covered company* means any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect.

### § 252.13  Enhanced risk-based capital and leverage requirements.

(a) *Bank holding companies.* A covered company that is a bank holding company must comply with, and hold capital commensurate with the requirements of any regulations adopted by the Board relating to capital plans and stress tests.

(b) *Nonbank covered companies.* A nonbank covered company must:

(1) Calculate its minimum risk-based and leverage capital requirements as if it were a bank holding company in accordance with any minimum capital requirements established by the Board for bank holding companies, including 12 CFR part 225, appendix A (general risk-based capital rule), 12 CFR part 225, appendix D (leverage rule), 12 CFR part 225, appendix E (market risk rule), and 12 CFR part 225, appendix G (advanced approaches risk-based capital rule);

(2) Hold capital sufficient to meet (i) a tier 1 risk based capital ratio of 4 percent and a total risk-based capital ratio of 8 percent, as calculated according to the general risk-based capital rules, and (ii) a tier 1 leverage ratio of 4 percent as calculated under the leverage rule;[205] and

(3) Comply with, and hold capital commensurate with, the requirements of any regulations adopted by the Board relating to capital plans and stress tests as if the covered company were a bank holding company, including but not limited to section 225.8 of the Board's Regulation Y (12 CFR 225.8).

### § 252.14  Nonbank covered companies: reporting and enforcement.

(a) *Reporting.* Each nonbank financial company must report to the Board on a quarterly basis its risk-based and leverage ratios as calculated under section 252.13(b).

(b) *Notice of non-compliance.* A nonbank financial company must notify

the Board immediately upon ascertaining that it has failed to meet its enhanced risk-based capital and leverage requirements under section 252.13(b).

## Subpart C—Liquidity Requirements

### § 252.51  Definitions.

For purposes of this subpart:

(a) *Bank holding company* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(b) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(c) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(d) *Covered company* means

(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company).

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered company for purposes of this subpart unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph

---

[205] 12 CFR part 225, appendix D, section II.

(3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be a covered company.

(e) *Depository institution* has the same meaning as in section 3 of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c).

(f) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(g) *Highly liquid assets* means:

(1) Cash;

(2) Securities issued or guaranteed by the U.S. government, a U.S. government agency, or a U.S. government-sponsored entity; and

(3) Any other asset that the covered company demonstrates to the satisfaction of the Federal Reserve:

(i) Has low credit risk and low market risk;

(ii) Is traded in an active secondary two-way market that has observable market prices, committed market makers, a large number of market participants, and a high trading volume; and

(iii) Is a type of asset that investors historically have purchased in periods of financial market distress during which market liquidity is impaired.

(h) *Liquidity* means, with respect to a covered company, the covered company's capacity to efficiently meet its expected and unexpected cash flows and collateral needs at a reasonable cost without adversely affecting the daily operations or the financial condition of the covered company.

(i) *Liquidity risk* means the risk that a covered company's financial condition or safety and soundness will be adversely affected by its inability or perceived inability to meet its cash and collateral obligations.

(j) *Publicly traded* means traded on:

(1) Any exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); or

(2) Any non-U.S.-based securities exchange that:

(i) Is registered with, or approved by, a national securities regulatory authority; and

(ii) Provides a liquid, two-way market for the instrument in question, meaning that there are enough independent bona fide offers to buy and sell so that a sales price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be

determined promptly and a trade can be settled at such a price within a reasonable time period conforming with trade custom.

(k) *Risk committee* means the enterprise-wide risk committee established by a covered company's board of directors under section 252.126 of subpart E of this part.

(l) *Trading position* means a position that is held by a covered company for the purpose of short-term resale or with the intent of benefitting from actual or expected short-term price movements, or to lock-in arbitrage profits.

(m) *Two-way market* means a market with independent bona fide offers to buy and sell so that a price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined within one day and settled at that price within a reasonable time period conforming with trade custom.

(n) *Unencumbered* means, with respect to an asset, that:

(1) The asset is not pledged, does not secure, collateralize, or provide credit enhancement to any transaction, and is not subject to any lien;

(2) The asset is not designated as a hedge on a trading position; and

(3) There are no legal or contractual restrictions on the ability of the covered company to promptly liquidate, sell, transfer, or assign the asset.

(o) *U.S. government agency* means an agency or instrumentality of the U.S. government whose obligations are fully and explicitly guaranteed as to the timely payment of principal and interest by the full faith and credit of the U.S. government.

(p) *U.S. government-sponsored entity* means an entity originally established or chartered by the U.S. government to serve public purposes specified by the U.S. Congress, but whose obligations are not explicitly guaranteed by the full faith and credit of the U.S. government.

### § 252.52    Board of directors and risk committee responsibilities.

(a) *Oversight.* The covered company's board of directors (or the risk committee) must oversee the covered company's liquidity risk management processes, and must review and approve the liquidity risk management strategies, policies, and procedures established by senior management.

(b) *Actions.*

(1) *Liquidity risk tolerance.* (i) The board of directors must establish the covered company's liquidity risk tolerance at least annually. The liquidity risk tolerance is the acceptable level of liquidity risk the covered company may assume in connection with its operating

strategies. In determining the covered company's liquidity risk tolerance, the board of directors must consider the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk-related factors.

(ii) The board of directors must review information provided by senior management at least semi-annually to determine whether the covered company is managed in accordance with the established liquidity risk tolerance.

(2) *Business strategies and products.* (i) The risk committee or a designated subcommittee thereof must review and approve the liquidity costs, benefits, and risks of each significant new business line and each significant new product before the covered company implements the business line or offers the product. In connection with this review, the risk committee or a designated subcommittee thereof must consider whether the liquidity risk of the new business line or product under current conditions and under liquidity stress is within the covered company's established liquidity risk tolerance.

(ii) At least annually, the risk committee or designated subcommittee thereof must review approved significant business lines and products to determine whether each line or product has created any unanticipated liquidity risk, and to determine whether the liquidity risk of each strategy or product continues to be within the covered company's established liquidity risk tolerance.

(3) *Contingency funding plan.* The board of directors must review and approve the contingency funding plan described in section 252.58 at least annually, and whenever the covered company materially revises the plan.

(4) *Other reviews.* (i) At least quarterly, the risk committee or designated subcommittee thereof must:

(A) Review the cash flow projections produced under section 252.55 of this subpart that use time periods in excess of 30-days to ensure that the covered company's liquidity risk is within the established liquidity risk tolerance;

(B) Review and approve liquidity stress testing described in section 252.56 of this subpart, including stress testing practices, methodologies, and assumptions. The risk committee or designated subcommittee thereof must also review and approve liquidity stress testing whenever the covered company materially revises its liquidity stress testing;

(C) Review liquidity stress testing results produced under section 252.56 of this subpart;

(D) Approve the size and composition of the liquidity buffer established under section 252.57 of this subpart;

(E) Review and approve the specific limits established under section 252.59 of this subpart and review the covered company's compliance with those limits; and

(F) Review liquidity risk management information necessary to identify, measure, monitor, and control liquidity risk and to comply with this subpart.

(ii) The risk committee or designated subcommittee thereof must periodically review the independent validation of the liquidity stress tests produced under section 252.56(c)(2)(ii) of this subpart.

(iii) The risk committee or designated subcommittee thereof must establish procedures governing the content of senior management reports on the liquidity risk profile of the covered company and other information described at section 252.53(b) of this subpart.

(c) *Frequency of reviews.* Paragraph (b) of this section establishes minimum requirements for the frequency of certain reviews and approvals. The board of directors (or the risk committee) must conduct more frequent reviews and approvals as market and idiosyncratic conditions warrant.

### §252.53 Senior management responsibilities.

(a) Senior management of a covered company must establish and implement strategies, policies, and procedures for managing liquidity risk. This includes overseeing the development and implementation of liquidity risk measurement and reporting systems, cash flow projections, liquidity stress testing, liquidity buffer, contingency funding plan, specific limits, and monitoring procedures required under this subpart.

(b) Senior management must regularly report to the risk committee or designated subcommittee thereof on the liquidity risk profile of the covered company and must provide other relevant and necessary information to the board of directors (or risk committee) to facilitate its oversight of the liquidity risk management process.

### §252.54 Independent review.

(a) The covered company must establish and maintain a review function, independent of management functions that execute funding, to evaluate its liquidity risk management.

(b) The independent review function must:

(1) Regularly, but no less frequently than annually, review and evaluate the adequacy and effectiveness of the

covered company's liquidity risk management processes;

(2) Assess whether the covered company's liquidity risk management complies with applicable laws, regulations, supervisory guidance, and sound business practices; and

(3) Report statutory and regulatory noncompliance and other material liquidity risk management issues to the board of directors or the risk committee in writing for corrective action.

### §252.55 Cash flow projections.

(a) *Requirement.* The covered company must produce comprehensive cash flow projections in accordance with the requirements of this section. The covered company must update short-term cash flow projections daily and must update long-term cash flow projections at least monthly.

(b) *Methodology.* The covered company must establish a robust methodology for making cash flow projections. The methodology must include reasonable assumptions regarding the future behavior of assets, liabilities, and off-balance sheet exposures.

(c) *Cash flow projections.* The covered company must produce comprehensive cash flow projections that:

(1) Project cash flows arising from assets, liabilities, and off-balance sheet exposures over short-term and long-term periods that are appropriate to the covered company's capital structure, risk profile, complexity, activities, size, and other risk related factors;

(2) Identify and quantify discrete and cumulative cash flow mismatches over these time periods;

(3) Include cash flows arising from contractual maturities, as well as cash flows from new business, funding renewals, customer options, and other potential events that may impact liquidity; and

(4) Provide sufficient detail to reflect the covered company's capital structure, risk profile, complexity, activities, size, and any other risk related factors that are appropriate. Such detail may include cash flow projections broken down by business line, legal entity, or jurisdiction, and cash flow projections that use more time periods than the minimum required under paragraph (c)(1) of this section.

### §252.56 Liquidity stress testing.

(a) *Requirement.* (1) The covered company must regularly stress test its cash flow projections in accordance with the requirements of this section. Stress test analysis consists of identifying liquidity stress scenarios and assessing the effects of these

scenarios on the covered company's cash flow and liquidity. The covered company must use the results of stress testing to determine the size of its liquidity buffer under section 252.57 of this subpart, and must incorporate the information generated by stress testing in the quantitative component of the contingency funding plan under section 252.58(b) of this subpart.

(2) The covered company must conduct stress testing in accordance with the requirements of this section at least monthly. The covered company must be able to perform stress testing more frequently and to vary underlying assumptions as conditions change or as required by the Federal Reserve due to deterioration in the company's financial condition, market conditions, or to address other supervisory concerns.

(b) *Stress testing requirements.*

(1) *Stress scenarios.* (i) Stress testing must incorporate a range of stress scenarios that may significantly impact the covered company's liquidity, taking into consideration the covered company's balance sheet exposures, off-balance sheet exposures, business lines, organizational structure, and other characteristics.

(ii) At a minimum, stress testing must incorporate separate stress scenarios to account for market stress, idiosyncratic stress, and combined market and idiosyncratic stresses.

(iii) The stress scenarios must address the potential impact of market disruptions on the covered company and must address the potential actions of other market participants experiencing liquidity stresses under the same market disruptions.

(iv) The stress scenarios must be forward-looking and must incorporate a range of potential changes in a covered company's activities, exposures, and risks, as well as changes to the broader economic and financial environment.

(v) The stress scenarios must use a variety of time horizons. At a minimum, these time horizons must include an overnight time horizon, a 30-day time horizon, 90-day time horizon, and a one-year time horizon.

(2) Stress testing must comprehensively address the covered company's activities, exposures, and risks, including off-balance sheet exposures.

(3) Stress testing must be tailored to, and provide sufficient detail to reflect, the covered company's capital structure, risk profile, complexity, activities, size, and any other risk related factors that are appropriate. This may require analyses by business line, legal entity, or jurisdiction, and stress scenarios that use more time horizons than the

minimum required under paragraph (b)(1)(v) of this section.

(4) A covered company must incorporate the following assumptions in its stress testing:

(i) For the first 30 days of a liquidity stress scenario, only highly liquid assets that are unencumbered may be used as cash flow sources to offset projected funding needs.

(ii) For time periods beyond the first 30 days of a liquidity stress scenario, highly liquid assets that are unencumbered and other appropriate funding sources may be used as cash flow sources to offset projected funding needs.

(iii) If an asset is used as a cash flow source to offset projected funding needs, the fair market value of the asset must be discounted to reflect any credit risk and market volatility of the asset.

(iv) Throughout each stress test time horizon, assets used as sources of funding must be sufficiently diversified.

(c) *Process and systems requirements.* (1) The covered company must establish and maintain policies and procedures that outline its liquidity stress testing practices, methodologies and assumptions, detail the use of each stress test employed, and provide for the enhancement of stress testing practices as risks change and as techniques evolve.

(2) The covered company must have an effective system of control and oversight over the stress test function to ensure that:

(i) Each stress test is designed in accordance with the requirements of this section; and

(ii) The stress process and assumptions are validated. The validation function must be independent of functions that develop or design the liquidity stress testing, and independent of management functions that execute funding.

(3) The covered company must maintain management information systems and data processes sufficient to enable it to effectively and reliably collect, sort, and aggregate data and other information related to liquidity stress testing.

## § 252.57    Liquidity buffer.

(a) A covered company must maintain a liquidity buffer of highly liquid assets that are unencumbered. The liquidity buffer must be sufficient to meet projected net cash outflows and the projected loss or impairment of existing funding sources for 30 days over a range of liquidity stress scenarios.

(b) The covered company must determine the size of its liquidity buffer requirement using the results of its

liquidity stress testing under section 252.56 of this subpart, and must align the size of the buffer to the covered company's capital structure, risk profile, complexity, activities, size, and any other risk related factors that are appropriate, and established liquidity risk tolerance.

(c) In computing the amount of an asset included in the liquidity buffer, the covered company must discount the fair market value of the asset to reflect any credit risk and market volatility of the asset.

(d) The pool of unencumbered highly liquid assets included in the liquidity buffer must be sufficiently diversified.

## § 252.58    Contingency funding plan.

(a) *Contingency funding plan.* The covered company must establish and maintain a contingency funding plan that sets out the covered company's strategies for addressing liquidity needs during liquidity stress events. The contingency funding plan must be commensurate with the covered company's capital structure, risk profile, complexity, activities, size, and any other risk related factors that are appropriate, and established liquidity risk tolerance. The covered company must update the contingency funding plan at least annually, and must update the plan when changes to market and idiosyncratic conditions warrant an update.

(b) *Components of the contingency funding plan.* The contingency funding plan must include the following components:

(1) *Quantitative Assessment.* The contingency funding plan must incorporate information generated by liquidity stress testing described in section 252.56. The stress tests are used to:

(i) Identify liquidity stress events that have a significant impact on the covered company's liquidity;

(ii) Assess the level and nature of impact on the covered company's liquidity that may occur during identified liquidity stress events;

(iii) Assess available funding sources and needs during the identified liquidity stress events; and

(iv) Identify alternative funding sources that may be used during the liquidity stress events.

(2) *Event management process.* The contingency funding plan must include an event management process that sets out the covered company's procedures for managing liquidity during identified liquidity stress events. This process must:

(i) Include an action plan that clearly describes the strategies the covered

company will use to respond to liquidity shortfalls for identified liquidity stress events, including the methods that the covered company will use to access alternative funding sources;

(ii) Identify a liquidity stress event management team;

(iii) Specify the process, responsibilities, and triggers for invoking the contingency funding plan, escalating the responses described in the action plan, decision-making during the identified liquidity stress events, and executing contingency measures identified in the action plan; and

(iv) Provide a mechanism that ensures effective reporting and communication within the covered company and with outside parties, including the Federal Reserve and other relevant supervisors, counterparties, and other stakeholders.

(3) *Monitoring.* The contingency funding plan must include procedures for monitoring emerging liquidity stress events. The procedures must identify early warning indicators that are tailored to the covered company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors.

(4) *Testing.* The covered company must periodically test the components of the contingency funding plan to assess the plan's reliability during liquidity stress events.

(i) The covered company must test the operational elements of the contingency funding plan to ensure that the plan functions as intended. These tests must include operational simulations to test communications, coordination, and decision-making involving relevant managers, including managers at relevant legal entities within the corporate structure.

(ii) The covered company must periodically test the methods it will use to access alternative funding sources to determine whether these funding sources will be readily available when needed.

## § 252.59    Specific limits.

(a) *Required limits.* The covered company must establish and maintain limits on potential sources of liquidity risk including the following:

(1) Concentrations of funding by instrument type, single counterparty, counterparty type, secured and unsecured funding, and other liquidity risk identifiers;

(2) The amount of specified liabilities that mature within various time horizons; and

(3) Off-balance sheet exposures and other exposures that could create

funding needs during liquidity stress events.

(b) *Size of limits.* The size of each limit described in paragraph (a) of this section must reflect the covered company's capital structure, risk profile, complexity, activities, size, other appropriate risk related factors, and established liquidity risk tolerance.

### § 252.60  Monitoring.

(a) *Collateral monitoring requirements.* The covered company must establish and maintain procedures for monitoring assets that it has pledged as collateral for an obligation or position, and assets that are available to be pledged. These procedures must address the covered company's ability to:

(1) Calculate all of the covered company's collateral positions in a timely manner, including: (i) the value of assets pledged relative to the amount of security required under the contract governing the obligation for which the collateral was pledged; and (ii) unencumbered assets available to be pledged;

(2) Monitor the levels of available collateral by legal entity, jurisdiction, and currency exposure;

(3) Monitor shifts between intraday, overnight, and term pledging of collateral; and

(4) Track operational and timing requirements associated with accessing collateral at its physical location (for example, the custodian or securities settlement system that holds the collateral).

(b) *Legal entities, currencies and business lines.*

(1) The covered company must establish and maintain procedures for monitoring and controlling liquidity risk exposures and funding needs within and across significant legal entities, currencies, and business lines.

(2) The covered company must maintain sufficient liquidity with respect to each significant legal entity in light of legal and regulatory restrictions on the transfer of liquidity between legal entities.

(c) *Intraday liquidity positions.* The covered company must establish and maintain procedures for monitoring intraday liquidity risk exposure. These procedures must address how the covered company will:

(1) Monitor and measure expected daily gross liquidity inflows and outflows;

(2) Manage and transfer collateral when necessary to obtain intraday credit;

(3) Identify and prioritize time-specific obligations so that the covered

company can meet these obligations as expected;

(4) Settle less critical obligations as soon as possible;

(5) Control the issuance of credit to customers where necessary; and

(6) Consider the amounts of collateral and liquidity needed to meet payment systems obligations when assessing the covered company's overall liquidity needs.

(d) *Monitoring of limits.* The covered company must monitor its compliance with all limits established and maintained under section 252.59 of this subpart.

### § 252.61  Documentation.

The covered company must adequately document all material aspects of its liquidity risk management processes and its compliance with the requirements of this subpart and submit all such documentation to the risk committee.

## Subpart D—Single-Counterparty Credit Limits

### § 252.91  Applicability.

(a) *Applicability.* (1) *In general.* Except as otherwise provided in this subpart, a covered company is subject to the requirements of this subpart beginning on the first day of the fifth quarter following the date on which it became a covered company.

(2) *Initial applicability.* A company that is a covered company on the effective date of this subpart will be subject to the requirements of this subpart beginning on October 1, 2013. A company that becomes a covered company after the effective date of this part and before September 30, 2012 will be subject to the requirements of this subpart beginning on October 1, 2013.

### § 252.92  Definitions.

For purposes of this subpart:

(a) *Adjusted market value* means, with respect to any eligible collateral, the fair market value of the eligible collateral after application of the applicable haircut specified in Table 2 of this subpart for that type of eligible collateral.

(b) *Affiliate* means, with respect to a company, any company that controls, is controlled by, or is under common control with, the company.

(c) *Aggregate net credit exposure* means the sum of all net credit exposures of a covered company to a single counterparty.

(d) *Applicable accounting standards* means U.S. generally applicable accounting principles (GAAP), international financial reporting

standards (IFRS), or such other accounting standards that a company uses in the ordinary course of its business in preparing its consolidated financial statements.

(e) *Bank eligible investments* means investment securities that a national bank is permitted to purchase, sell, deal in, underwrite, and hold under 12 U.S.C. 24 (Seventh) and 12 CFR part 1.

(f) *Bank holding company* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(g) *Capital stock and surplus* means with respect to a bank holding company, the sum of the following amounts in each case as reported by the bank holding company on the most recent FR Y–9C report, or with respect to a nonbank covered company, on the most recent regulatory report required by the Board:

(1) The company's total capital, as calculated under the capital adequacy guidelines applicable to that bank holding company under Regulation Y (12 CFR part 225) or nonbank covered company under this subpart; and

(2) The balance of the allowance for loan and lease losses of the bank holding company or nonbank covered company not included in tier 2 capital under the capital adequacy guidelines applicable to that bank holding company under Regulation Y (12 CFR part 225) or that nonbank covered company under this subpart.

(h) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(i) *Control.* A company *controls* another company if it (1) owns, controls, or holds with power to vote 25 percent or more of a class of voting securities of the company; (2) owns or controls 25 percent or more of the total equity of the company; or (3) consolidates the company for financial reporting purposes.

(j) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(k) *Counterparty* means

(1) With respect to a natural person, the person, and members of the person's immediate family;

(2) With respect to a company, the company and all of its subsidiaries, collectively;

(3) With respect to the United States, the United States and all of its agencies and instrumentalities (but not including any State or political subdivision of a State) collectively;

(4) With respect to a State, the State and all of its agencies, instrumentalities, and political subdivisions (including any municipalities) collectively; and

(5) With respect to a foreign sovereign entity, the foreign sovereign entity and all of its agencies, instrumentalities, and political subdivisions, collectively;

(l) *Covered company* means:

(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company); and

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered company for purposes of this subpart unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be a covered company.

(m) *Credit derivative* means a financial contract that allows one party (the protection purchaser) to transfer the credit risk of one or more exposures (reference exposure) to another party (the protection provider).

(n) *Credit transaction* means, with respect to a counterparty:

(1) Any extension of credit to the counterparty, including loans, deposits, and lines of credit, but excluding advised or other uncommitted lines of credit;

(2) Any repurchase or reverse repurchase agreement with the counterparty;

(3) Any securities lending or securities borrowing transaction with the counterparty;

(4) Any guarantee, acceptance, or letter of credit (including any confirmed letter of credit or standby letter of credit) issued on behalf of the counterparty;

(5) Any purchase of, or investment in, securities issued by the counterparty;

(6) Any credit exposure to the counterparty in connection with a derivative transaction between the covered company and the counterparty;

(7) Any credit exposure to the counterparty in connection with a credit derivative or equity derivative transaction between the covered company and a third party, the reference asset of which is an obligation or equity security of the counterparty; and

(8) Any transaction that is the functional equivalent of the above, and any similar transaction that the Board determines to be a credit transaction for purposes of this subpart.

(o) *Depository institution* has the same meaning as in section 3 of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c).

(p) *Derivative transaction* means any transaction that is a contract, agreement, swap, warrant, note, or option that is based, in whole or in part, on the value of, any interest in, or any quantitative measure or the occurrence of any event relating to, one or more commodities, securities, currencies, interest or other rates, indices, or other assets.

(q) *Eligible collateral* means collateral in which the covered company has a perfected, first priority security interest or, outside of the United States, the legal equivalent thereof (with the exception of cash on deposit and notwithstanding the prior security interest of any custodial agent) and is in the form of:

(1) Cash on deposit with the covered company (including cash held for the covered company by a third-party custodian or trustee);

(2) Debt securities (other than mortgage- or asset-backed securities) that are bank eligible investments;

(3) Equity securities that are publicly traded; or

(4) Convertible bonds that are publicly traded.

(r) *Eligible credit derivative* means a single-name credit derivative or a standard, non-tranched index credit derivative provided that:

(1) The derivative contract meets the requirements of an eligible guarantee and has been confirmed by the protection purchaser and the protection provider;

(2) Any assignment of the derivative contract has been confirmed by all relevant parties;

(3) If the credit derivative is a credit default swap, the derivative contract includes the following credit events:

(i) Failure to pay any amount due under the terms of the reference exposure, subject to any applicable minimal payment threshold that is consistent with standard market practice and with a grace period that is closely in line with the grace period of the reference exposure; and

(ii) Bankruptcy, insolvency, or inability of the obligor on the reference exposure to pay its debts, or its failure or admission in writing of its inability generally to pay its debts as they become due and similar events;

(4) The terms and conditions dictating the manner in which the derivative contract is to be settled are incorporated into the contract;

(5) If the derivative contract allows for cash settlement, the contract incorporates a robust valuation process to estimate loss with respect to the derivative reliably and specifies a reasonable period for obtaining post-credit event valuations of the reference exposure;

(6) If the derivative contract requires the protection purchaser to transfer an exposure to the protection provider at settlement, the terms of at least one of the exposures that is permitted to be transferred under the contract provides that any required consent to transfer may not be unreasonably withheld; and

(7) If the credit derivative is a credit default swap, the derivative contract clearly identifies the parties responsible for determining whether a credit event has occurred, specifies that this determination is not the sole responsibility of the protection provider, and gives the protection purchaser the right to notify the protection provider of the occurrence of a credit event.

(s) *Eligible equity derivative* means an equity-linked total return swap, provided that:

(1) The derivative contract has been confirmed by the counterparties;

(2) Any assignment of the derivative contract has been confirmed by all relevant parties; and

(3) The terms and conditions dictating the manner in which the derivative contract is to be settled are incorporated into the contract.

(t) *Eligible guarantee* means a guarantee from an eligible protection provider that:

(1) Is written and is either unconditional or the enforceability of the guarantee is contingent only to the extent it is dependent upon affirmative action on the part of the beneficiary of the guarantee or a third party (for example, servicing requirements);

(2) Covers all or a pro rata portion of all contractual payments of the obligor on the reference entity;

(3) Gives the beneficiary a direct claim against the protection provider;

(4) Is not unilaterally cancelable by the guarantor for reasons other than the breach of the contract by the beneficiary;

(5) Is legally enforceable against the guarantor in a jurisdiction where the guarantor has sufficient assets against which a judgment may be attached and enforced;

(6) Requires the guarantor to make payment to the beneficiary on the occurrence of a default (as defined in the guarantee) of the obligor on the reference entity in a timely manner without the beneficiary first having to take legal actions to pursue the obligor for payment; and

(7) Does not increase the beneficiary's cost of credit protection on the guarantee in response to deterioration in the credit quality of the reference entity.

(u) *Eligible protection provider* means:

(1) A sovereign entity;

(2) The Bank for International Settlements, the International Monetary Fund, the European Central Bank, the European Commission, or a multilateral development bank;

(3) A Federal Home Loan Bank;

(4) The Federal Agricultural Mortgage Corporation;

(5) A depository institution;

(6) A bank holding company;

(7) A savings and loan holding company (as defined in 12 U.S.C. 1467a);

(8) A securities broker or dealer registered with the SEC under the Securities Exchange Act of 1934 (15 U.S.C. 78o *et seq.*);

(9) An insurance company that is subject to the supervision by a State insurance regulator;

(10) A foreign banking organization;

(11) A non-U.S.-based securities firm or a non-U.S.-based insurance company that is subject to consolidated supervision and regulation comparable to that imposed on U.S. depository institutions, securities broker-dealers, or insurance companies; and

(12) A qualifying central counterparty.

(v) *Equity derivative* means an equity-linked swap, purchased equity-linked option, forward equity-linked contract, or any other instrument linked to equities that gives rise to similar counterparty credit risks.

(w) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(x) *Gross credit exposure* means, with respect to any credit transaction, the credit exposure of the covered company before adjusting for the effect of qualifying master netting agreements, eligible collateral, eligible guarantees, eligible credit derivatives and eligible equity derivatives.

(y) *Immediate family* means the spouse of an individual, the individual's minor children, and any of the individual's children (including adults) residing in the individual's home.

(z) *Major counterparty* is any

(1) Major covered company and all of its subsidiaries, collectively; and

(2) Any foreign banking organization (and all of its subsidiaries, collectively) that has total consolidated assets equal to or greater than $500 billion determined based on the foreign banking organization's total consolidated assets in the most recent year, for annual filers, or the average of the four most recent quarters, for quarterly filers, as reported on the foreign banking organization's Capital and Asset Reports for Foreign Banking Organizations (Federal Reserve Form FR Y–7Q).

(aa) *Major covered company* is any

(1) Covered company that is a bank holding company and that has total consolidated assets equal to or greater than $500 billion determined based on the average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's FR Y–9C; and

(2) Nonbank covered company.

(bb) *Net credit exposure* means, with respect to any credit transaction, the gross credit exposure of a covered company calculated under section 252.94, as adjusted in accordance with section 252.95.

(cc) *Nonbank covered company* means any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect.

(dd) *Publicly traded* means traded on:

(1) Any exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); or

(2) Any non-U.S.-based securities exchange that:

(i) Is registered with, or approved by, a national securities regulatory authority; and

(ii) Provides a liquid, two-way market for the instrument in question, meaning that there are enough independent bona fide offers to buy and sell so that a sales price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined promptly and a trade can be settled at such a price within a reasonable time period conforming with trade custom.

(ee) *Qualifying central counterparty* means an entity that

(1) Facilitates trades between counterparties in one or more financial markets by either guaranteeing trades or novating contracts;

(2) Requires all participants in its arrangements to be fully collateralized on a daily basis; and

(3) Is subject to effective oversight by a national supervisory authority.

(ff) *Qualifying master netting agreement* means a legally enforceable bilateral agreement such that:

(1) The agreement creates a single legal obligation for all individual transactions covered by the agreement upon an event of default, including bankruptcy, insolvency, or similar proceeding of the counterparty;

(2) The agreement provides the covered company the right to accelerate, terminate, and close-out on a net basis all transactions under the agreement and to liquidate or set off collateral promptly upon an event of bankruptcy, insolvency, or similar proceeding, of the counterparty, provided that, in any such case, any exercise of rights under the agreement will not be stayed or avoided under applicable law in the relevant jurisdiction;

(3) The covered company has conducted sufficient legal review to conclude with a well-founded basis (and has maintained sufficient written documentation of that legal review) that the agreement meeting the requirements of paragraph (2) of this definition and that in the event of a legal challenge (including one resulting from default or from bankruptcy, insolvency or similar proceeding) the relevant court and administrative authorities would find the agreement to be legal, valid, binding, and enforceable under the law of the relevant jurisdiction;

(4) The covered company establishes and maintains procedures to monitor possible changes in relevant law and to ensure that the agreement continues to

satisfy the requirements of this definition; and

(5) The agreement does not contain a walkaway clause (that is, a provision that permits a non-defaulting counterparty to make lower payments than it would make otherwise under the agreement, or no payment at all, to a defaulter or the estate of a defaulter, even if the defaulter is a net creditor under the agreement).[206]

(gg) *Short sale* means any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller.

(hh) *Sovereign entity* means a central government (including the U.S. government) or an agency, department, ministry, or central bank.

(ii) *State* means any State, territory or possession of the United States, and the District of Columbia.

(jj) *Subsidiary* of a specified company means a company that is directly or indirectly controlled by the specified company.

(kk) *Total capital* means qualifying total capital as defined in 12 CFR part 225, appendix A or total qualifying capital as defined in 12 CFR part 225, appendix G, as applicable, or any successor regulation thereto.

### § 252.93    Credit exposure limit.

(a) *General limit on aggregate net credit exposure.* No covered company shall, together with its subsidiaries, have an aggregate net credit exposure to any unaffiliated counterparty that exceeds 25 percent of the consolidated capital stock and surplus of the covered company.

(b) *Major covered company limits on aggregate net credit exposure.* No major covered company shall, together with its subsidiaries, have aggregate net credit exposure to any unaffiliated counterparty that is a major counterparty that exceeds 10 percent of

the consolidated capital stock and surplus of the major covered company.

### § 252.94    Gross credit exposure.

(a) *Calculation of gross credit exposure.* Under this subpart, exposures of a covered company to a counterparty include the exposures of its subsidiaries to the counterparty. The amount of gross credit exposure of a covered company to a counterparty with respect to credit transactions is, in the case of:

(1) Loans by a covered company to the counterparty and leases in which the covered company is the lessor and the counterparty is the lessee, equal to the amount owed by the counterparty to the covered company under the transaction.

(2) Debt securities held by the covered company that are issued by the counterparty, equal to:

(i) The greater of the amortized purchase price or market value, for trading and available for sale securities, and

(ii) The amortized purchase price, for securities held to maturity.

(3) Equity securities held by the covered company that are issued by the counterparty, equal to the greater of the purchase price or market value.

(4) Repurchase agreements, equal to:

(i) The market value of securities transferred by the covered company to the counterparty; plus

(ii) The amount in paragraph (4)(i) multiplied by the collateral haircut in Table 2 applicable to the securities transferred by the covered company to the counterparty.

(5) Reverse repurchase agreements, equal to the amount of cash transferred by the covered company to the counterparty.

(6) Securities borrowing transactions, equal to the amount of cash collateral plus the market value of securities collateral transferred by the covered company to the counterparty.

(7) Securities lending transactions, equal to:

(i) The market value of securities lent by the covered company to the counterparty; plus

(ii) The amount in paragraph (7)(i) multiplied by the collateral haircut in Table 2 applicable to the securities lent by the covered company to the counterparty.

(8) Committed credit lines extended by a covered company to a counterparty, equal to the face amount of the credit line.

(9) Guarantees and letters of credit issued by a covered company on behalf of a counterparty, equal to the lesser of the face amount or the maximum potential loss to the covered company on the transaction.

(10) Derivative transactions between the covered company and the counterparty not subject to a qualifying master netting agreement, in an amount equal to the sum of (i) the current exposure of the derivatives contract equal to the greater of the mark-to-market value of the derivative contract or zero and (ii) the potential future exposure of the derivatives contract, calculated by multiplying the notional principal amount of the derivative contract by the appropriate conversion factor, set forth in Table 1.

(11) Derivative transactions between the covered company and the counterparty subject to a qualifying master netting agreement, in an amount equal to the exposure at default amount calculated under 12 CFR part 225, appendix G, § 32(c)(6).

(12) Credit or equity derivative transactions between the covered company and a third party where the covered company is the protection provider and the reference asset is an obligation or equity security of the counterparty, equal to the lesser of the face amount of the transaction or the maximum potential loss to the covered company on the transaction.

TABLE 1—CONVERSION FACTOR MATRIX FOR OTC DERIVATIVE CONTRACTS [1]

| Remaining maturity [2] | Interest rate | Foreign exchange rate | Credit (bank-eligible investment reference obligor) [3] | Credit (non-bank-eligible reference obligor) | Equity | Precious metals (except gold) | Other |
|---|---|---|---|---|---|---|---|
| One year or less ...... | 0.00 | 0.01 | 0.05 | 0.10 | 0.06 | 0.07 | 0.10 |
| Greater than one year and less than or equal to five years .................... | 0.005 | 0.05 | 0.05 | 0.10 | 0.08 | 0.07 | 0.12 |

---

[206] The Board considers the following jurisdictions to be relevant for a qualifying master netting agreement: The jurisdiction in which the counterparty is chartered or equivalent location in the case of non-corporate entities, and if a branch of a counterparty is involved, then also the jurisdiction in which the branch is located; the jurisdiction that governs the individual transactions covered by the agreement; and the jurisdiction that governs the agreement.

TABLE 1—CONVERSION FACTOR MATRIX FOR OTC DERIVATIVE CONTRACTS [1]—Continued

| Remaining maturity [2] | Interest rate | Foreign exchange rate | Credit (bank-eligible investment reference obligor) [3] | Credit (non-bank-eligible reference obligor) | Equity | Precious metals (except gold) | Other |
|---|---|---|---|---|---|---|---|
| Greater than 5 years | 0.015 | 0.075 | 0.05 | 0.10 | 0.10 | 0.08 | 0.15 |

[1] For an OTC derivative contract with multiple exchanges of principal, the conversion factor is multiplied by the number of remaining payments in the derivative contract.

[2] For an OTC derivative contract that is structured such that on specified dates any outstanding exposure is settled and the terms are reset so that the market value of the contract is zero, the remaining maturity equals the time until the next reset date. For an interest rate derivative contract with a remaining maturity of greater than one year that meets these criteria, the minimum conversion factor is 0.005.

[3] A company must use the column labeled "Credit (bank-eligible investment reference obligor)" for a credit derivative whose reference obligor has an outstanding unsecured debt security that is a bank eligible investment. A company must use the column labeled "Credit (non-bank-eligible investment reference obligor)" for all other credit derivatives.

(b) *Attribution rule.* A covered company must treat any of its transactions with any person as a credit exposure to a counterparty to the extent the proceeds of the transaction are used for the benefit of, or transferred to, that counterparty.

**§ 252.95   Net credit exposure.**

(a) *Calculation of initial net credit exposure for securities financing transactions.*

(1) *Repurchase and reverse repurchase transactions.* For repurchase and reverse repurchase transactions with a counterparty that are subject to a bilateral netting agreement with that counterparty, a covered company may use the net credit exposure associated with the netting agreement.

(2) *Securities lending and borrowing transactions.* For a securities lending and borrowing transactions with a counterparty that are subject to a bilateral netting agreement with that counterparty, a covered company may use the net credit exposure associated with the netting agreement.

(b) *Market value adjustments.* In computing its net credit exposure to a counterparty for any credit transaction (including securities financing transactions), a covered company may reduce its gross credit exposure (or as applicable, net credit exposure for securities financing transactions calculated under section 252.95(a)) on the transaction by the adjusted market value of any eligible collateral, provided that:

(1) The covered company includes the adjusted market value of the eligible collateral when calculating its gross credit exposure to the issuer of the collateral;

(2) The collateral used to adjust the covered company's gross credit

exposure to a counterparty cannot be used to adjust the covered company's gross credit exposure to any other counterparty; and

(3) In no event will the covered company's gross credit exposure to the issuer of collateral be in excess of its gross credit exposure to the counterparty on the credit transaction.

(c) *Unused portion of certain extensions of credit.* (1) In computing its net credit exposure to a counterparty for a credit line or revolving credit facility, a covered company may reduce its gross credit exposure by the amount of the unused portion of the credit extension to the extent that the covered company does not have any legal obligation to advance additional funds under the extension of credit, until the counterparty provides the amount of adjusted market value of collateral required with respect to the entire used portion of the extension of credit.

(2) To qualify for this reduction, the credit contract must specify that any used portion of the credit extension must be fully secured by collateral that is (i) cash, (ii) obligations of the United States or its agencies, or (iii) obligations directly and fully guaranteed as to principal and interest by, the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, while operating under the conservatorship or receivership of the Federal Housing Finance Agency, and any additional obligations issued by a U.S. government sponsored entity as determined by the Board.

(d) *Eligible guarantees.* In calculating net credit exposure to a counterparty for a credit transaction, a covered company must reduce its gross credit exposure to the counterparty by the amount of any eligible guarantees from an eligible

protection provider that covers the transaction, provided that:

(1) The covered company includes the amount of the eligible guarantees when calculating its gross credit exposure to the eligible protection provider; and

(2) In no event will the covered company's gross credit exposure to an eligible protection provider with respect to an eligible guarantee be in excess of its gross credit exposure to the counterparty on the credit transaction prior to recognition of the eligible guarantee.

(e) *Eligible credit and equity derivatives.* In calculating net credit exposure to a counterparty for a credit transaction, a covered company must reduce its gross credit exposure to the counterparty by the notional amount of any eligible credit or equity derivative from an eligible protection provider that references the counterparty, as applicable, provided that:

(1) The covered company includes the face amount of the eligible credit and equity derivative when calculating its gross credit exposure to the eligible protection provider; and

(2) In no event will the covered company's gross credit exposure to an eligible protection provider with respect to an eligible credit or equity derivative be in excess of its gross credit exposure to the counterparty on the credit transaction prior to recognition of the eligible credit or equity derivative.

(f) *Other eligible hedges.* In calculating net credit exposure to a counterparty for a credit transaction, a covered company may reduce its gross credit exposure to the counterparty by the face amount of a short sale of the counterparty's debt or equity security.

TABLE 2—COLLATERAL HAIRCUTS

[Sovereign entities]

| | Residual maturity | Haircut without currency mismatch [207] |
|---|---|---|
| OECD Country Risk Classification [208] 0–1 ................................................ | ≤ 1 year ................................................... | 0.005 |
| | >1 year, ≤ 5 years ................................. | 0.02 |
| | > 5 years .................................................. | 0.04 |
| OECD Country Risk Classification 2–3 ................................................ | ≤ 1 year ................................................... | 0.01 |
| | >1 year, ≤ 5 years ................................. | 0.03 |
| | > 5 years .................................................. | 0.06 |

CORPORATE AND MUNICIPAL BONDS THAT ARE BANK-ELIGIBLE INVESTMENTS

| | Residual maturity for debt securities | Haircut without currency mismatch |
|---|---|---|
| All .......................................................................... | ≤ 1 year .................................................. | 0.02 |
| All .......................................................................... | >1 year, ≤ 5 years ................................. | 0.06 |
| All .......................................................................... | > 5 years .................................................. | 0.12 |

OTHER ELIGIBLE COLLATERAL

| | |
|---|---|
| Main index [209] equities (including convertible bonds) .............................. | 0.15. |
| Other publicly traded equities (including convertible bonds) ................... | 0.25. |
| Mutual funds .................................................................................. | Highest haircut applicable to any security in which the fund can invest. |
| Cash collateral held .......................................................................... | 0. |

## § 252.96   Compliance.

(a) *Scope of compliance.* A covered company must comply with the requirements of this section on a daily basis at the end of each business day and submit on a monthly basis a report demonstrating its daily compliance.

(b) *Noncompliance.* Except as otherwise provided in this section, if a covered company is not in compliance with this subpart with respect to a counterparty solely due to the circumstances specified in this section 252.96, the covered company will not be subject to enforcement actions for a period of 90 days (or such other period determined by the Board to be appropriate to preserve the safety and soundness of the covered company or U.S. financial stability) if the company uses reasonable efforts to return to compliance with this subpart during this period. The covered company may not engage in any additional credit transactions with such a counterparty in contravention of this rule during the compliance period, except in cases where the Board determines that such credit transactions are necessary or

appropriate to preserve the safety and soundness of the covered company or U.S. financial stability. In granting approval for such a special temporary credit exposure limit, the Board will consider the following:

(1) A decrease in the covered company's capital stock and surplus.

(2) The merger of the covered company with another covered company.

(3) A merger of two unaffiliated counterparties.

(4) Any other circumstance the Board determines is appropriate.

The Board may impose supervisory oversight and reporting measures that it determines are appropriate to monitor compliance with the foregoing standards as set forth in this paragraph.

## § 252.97   Exemptions.

(a) *Exempted exposure categories.* The following categories of credit transactions are exempt from the limits on credit exposure under this subpart:

(1) Direct claims on, and the portions of claims that are directly and fully guaranteed as to principal and interest by, the United States and its agencies.

(2) Direct claims on, and the portions of claims that are directly and fully guaranteed as to principal and interest by, the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, only while operating under the conservatorship or receivership of the Federal Housing Finance Agency, and any additional obligations issued by a U.S. government sponsored entity as determined by the Board.

(3) Intraday credit exposure to a counterparty.

(4) Any transaction that the Board exempts if the Board finds that such exemption is in the public interest and is consistent with the purpose of this subsection.

(b) *Exemption for Federal Home Loan Banks.* For purposes of this subpart, a covered company does not include any Federal Home Loan Bank.

## Subpart E—Risk Management

## § 252.125   Definitions.

For purposes of this subpart:

(a) *Bank holding company* is defined as in section 2 of the Bank Holding

---

[207] In cases where the currency denomination of the collateral differs from the currency denomination of the credit transaction, an addition 8 percent haircut will apply.

[208] OECD Country Risk Classification means the country risk classification as defined in Article 25

of the OECD's February 2011 Arrangement on Officially Supported Export Credits Arrangement.

[209] Main index means the Standard & Poor's 500 Index, the FTSE All-World Index, and any other index for which the covered company can demonstrate to the satisfaction of the Federal

Reserve that the equities represented in the index have comparable liquidity, depth of market, and size of bid-ask spreads as equities in the Standard & Poor's 500 Index and FTSE All-World Index.

Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(b) *Chief risk officer* means a management official of a covered company who fulfills the responsibilities described in section 252.126(d) of this subpart.

(c) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(d) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(e) *Covered company* means

(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company).

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered company for purposes of this subpart unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be a covered company.

(f) *Depository institution* has the same meaning as in section 3 of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c).

(g) *Enterprise-wide risk committee* means a committee of a covered company's or over $10 billion bank holding company's board of directors that oversees the risk management practices of such company's worldwide operations.

(h) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(i) *Independent director* means

(1) In the case of a covered company or over $10 billion bank holding company that has a class of securities outstanding that is traded on a national securities exchange, a member of the board such company who:

(i) Is not an officer or employee of the company and has not been an officer or employee of the company during the previous three years; and

(ii) Is not a member of the immediate family, as defined in section 225.41(a)(3) of the Board's Regulation Y (12 CFR 225.41(a)(3)), of a person who is, or has been within the last three years, an executive officer of the company, as defined in section 215.2(e)(1) of the Board's Regulation O (12 CFR 215.2(e)(1)); and

(iii) Is an independent director under Item 407 of the Securities and Exchange Commission's Regulation S–K, 17 CFR 229.407(a).

(2) In the case of a director of a covered company or over $10 billion bank holding company that does not have a class of securities outstanding that is traded on a national securities exchange, a member of the board of directors of such company who:

(i) Meets the requirements of paragraphs (1)(i) and (ii) of this section; and

(ii) The company demonstrates to the satisfaction of the Federal Reserve would qualify as an independent director under the listing standards of a national securities exchange if the company were publicly traded on a national securities exchange.

(j) *National securities exchange* means any exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f).

(k) *Publicly traded* means traded on:

(1) A national securities exchange; or

(2) Any non-U.S.-based securities exchange that:

(i) Is registered with, or approved by, a national securities regulatory authority; and

(ii) Provides a liquid, two-way market for the instrument in question, meaning that there are enough independent bona fide offers to buy and sell so that a sales price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined promptly and a trade can be settled at such a price within a reasonable time period conforming with trade custom.

(l) *Risk management expertise* means

(1) An understanding of risk management principles and practices with respect to banking holding companies or depository institutions, or, if applicable, nonbank financial companies, and the ability to assess the general application of such principles and practices; and

(2) Experience developing and applying risk management practices and procedures, measuring and identifying risks, and monitoring and testing risk controls with respect to banking organizations or, if applicable, nonbank financial companies.

(m) *Over $10 billion bank holding company* means any bank holding company (other than a foreign banking organization) that is not a covered company, and that:

(1) Has $10 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(2) Once an over $10 billion bank holding company meets the requirements described in paragraph (1), the company shall remain an over $10 billion bank holding company for purposes of this part unless and until the company has less than $10 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(3) Nothing in paragraph (2) shall preclude a company from becoming an over $10 billion bank holding company pursuant to paragraph (1).

(4) A bank holding that has ceased to be an over $10 billion bank holding company under paragraph (2) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be an over $10 billion bank holding company.

§ 252.126   Establishment of risk committee and appointment of chief risk officer.

(a) *Risk committee.* Each covered company and each publicly-traded over $10 billion bank holding company, shall maintain an enterprise-wide risk committee consisting of members of its board of directors, and, for each covered company, that satisfies the requirements of section 252.126(d).

(b) *Structure of risk committee.* An enterprise-wide risk committee shall:

(1) Have a formal, written charter, approved by the company's board of directors;

(2) Have at least one member with risk management expertise that is commensurate with the company's capital structure, risk profile, complexity, activities, size, and other appropriate risk related factors;

(3) Be chaired by an independent director;

(4) Meet with an appropriate frequency and as needed, and fully document and maintain records of its proceedings, including risk management decisions;

(5) In addition, in the case of a covered company:

(i) Not be housed within another committee or be part of a joint committee;

(ii) Report directly to the covered company's board of directors; and

(iii) Receive and review regular reports from the covered company's chief risk officer.

(c) *Responsibilities of risk committee.* A risk committee shall document, review and approve the enterprise-wide risk management practices of the company. Specifically, the risk committee shall oversee the operation of, on an enterprise wide-basis, an appropriate risk management framework commensurate with the company's capital structure, risk profile, complexity, activities, size, and other appropriate risk-related factors. A company's risk management framework shall include:

(1) Risk limitations appropriate to each business line of the company;

(2) Appropriate policies and procedures relating to risk management governance, risk management practices, and risk control infrastructure for the enterprise as a whole;

(3) Processes and systems for identifying and reporting risks and risk-management deficiencies, including emerging risks, on an enterprise-wide basis;

(4) Monitoring of compliance with the company's risk limit structure and policies and procedures relating to risk management governance, practices, and risk controls across the enterprise;

(5) Effective and timely implementation of corrective actions to address risk management deficiencies;

(6) Specification of management and employees' authority and independence to carry out risk management responsibilities; and

(7) Integration of risk management and control objectives in management goals and the company's compensation structure.

(d) *Chief risk officer.* A covered company shall employ a chief risk officer who:

(1) Has risk management expertise that is commensurate with the company's capital structure, risk profile, complexity, activities, size, and other risk-related factors that are appropriate;

(2) Is appropriately compensated and incentivized to provide an objective assessment of the risks taken by the company;

(3) Reports directly to both the risk committee and chief executive officer of the company; and

(4) Directly oversees the following responsibilities on an enterprise-wide basis:

(i) Allocating delegated risk limits and monitoring compliance with such limits;

(ii) Implementation of and ongoing compliance with, appropriate policies and procedures relating to risk management governance, practices, and risk controls and monitoring compliance with such policies and procedures;

(iii) Developing appropriate processes and systems for identifying and reporting risks and risk-management deficiencies, including emerging risks, on an enterprise-wide basis;

(iv) Managing risk exposures and risk controls within the parameters of the company's risk control framework; and

(v) Monitoring and testing of the company's risk controls;

(vi) Reporting risk management deficiencies and emerging risks to the enterprise-wide risk committee; and

(vii) Ensuring that risk management deficiencies are effectively resolved in a timely manner.

## Subpart F—Supervisory Stress Test Requirements

§ 252.131   Applicability.

(a) *Applicability.* (1) *In general.* A bank holding company that becomes a covered company no less than 90 days before September 30 of a calendar year must comply with the requirements of this subpart from September 30 of that calendar year and thereafter. A company the Council has determined shall be supervised by the Board on a date no less than 180 days before September 30 of a calendar year must comply with the requirements of this subpart from September 30 of that calendar year and thereafter.

(2) *Initial applicability.* A bank holding company that is a covered company on the effective date of this subpart must immediately comply with the requirements, including timing of required submissions to the Board, of this subpart.

§ 252.132   Definitions.

For purposes of this subpart:

(a) *Bank holding company* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(b) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(c) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(d) *Covered company* means

(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company).

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered

company for purposes of this subpart unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be a covered company.

(e) *Depository institution* has the same meaning as in section 3 of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c).

(f) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(g) *Planning horizon* means the period of time over which stress test projections must extend. The planning horizon cannot be less than nine quarters.

(h) *Publicly traded* means traded on:

(1) Any exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); or

(2) Any non-U.S.-based securities exchange that:

(i) Is registered with, or approved by, a national securities regulatory authority; and

(ii) Provides a liquid, two-way market for the instrument in question, meaning that there are enough independent bona fide offers to buy and sell so that a sales price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined promptly and a trade can be settled at such a price within a reasonable time period conforming with trade custom.

(i) *Scenarios* are a set of economic and financial conditions that the Board publishes for the use in the supervisory stress tests annually, including baseline, adverse, and severely adverse.

### § 252.133    Annual analysis conducted by the Board.

(a) *In general.* The Board, in coordination with the appropriate primary financial regulatory agencies, as defined in section 2(12) of Dodd-Frank Act (12 U.S.C. 5301(12)), and the Federal Insurance Office, will, on an annual basis, conduct an analysis of the capital, on a total consolidated basis and taking into account all relevant exposures and activities of each covered company to evaluate the ability of the covered company to absorb losses in adverse economic and financial conditions. The analysis will include the projected net income, losses, and pro forma, post-stress capital levels and ratios for the covered company and use the analytical techniques that the Board determines are appropriate to identify, measure, and monitor risks of the covered company and to the financial stability of the United States.

(b) *Economic and financial scenarios related to analyses.* The Board will conduct its analysis under section 252.133(a) using a minimum of three different sets of economic and financial conditions (scenarios), including baseline, adverse, and severely adverse conditions. The Board will notify covered companies of the conditions the Board will apply in advance of conducting the analysis.

### § 252.134    Data and information required to be submitted in support of the Board's analyses.

(a) *Regular submissions.* The Board will require each covered company to submit the data, on a consolidated basis, that the Board determines is necessary for it to estimate relevant pro forma estimates discussed in 252.133(a), of the covered company over a period of at least 9 calendar quarters under baseline, adverse, and severely adverse scenarios, or other such conditions as determined appropriate by the Board, including:

(1) Information related to the covered company's on- and off-balance sheet exposures, including in some cases information on individual items (such as loans and securities) held by the company, and including exposures in the covered company's trading portfolio, other trading-related exposures (such as counterparty-credit risk exposures) or other items sensitive to changes in market factors, including, as appropriate, information about the sensitivity of positions in the trading portfolio to changes in market prices and interest rates.

(2) Information to assist the Board in estimating the sensitivity of the covered company's revenues and expenses to changes in economic and financial conditions.

(3) Information to assist the Board in estimating the likely evolution of the covered company's balance sheet (such as the composition of its loan and securities portfolios) and allowance for loan losses, in response to changes in economic and financial conditions.

(b) *Additional submissions required by the Board.* The Board may require a covered company to submit any other information on a consolidated basis the Board deems necessary in order to:

(1) Ensure that the Board has sufficient information to conduct its analysis under this subpart; and

(2) Derive robust projections of a company's losses, pre-provision net revenue, allowance for loan losses, and future pro forma capital positions under the baseline, adverse, and severely adverse scenarios, or other such conditions as determined appropriate by the Board.

(c) *Confidential treatment of information submitted.* The confidentiality of information submitted to the Board under this subpart and related materials shall be determined in accordance with applicable exemptions under the Freedom of Information Act (5 U.S.C. 552(b)) and the Board's Rules Regarding Availability of Information (12 CFR part 261).

### § 252.135    Review of the Board's analysis; publication of summary results.

(a) *Review of results.* Based on the results of the analysis conducted under this subpart, the Board will evaluate each covered company to determine whether the covered company has the capital, on a total consolidated basis, necessary to absorb losses and continue to function as a credit intermediary as a result of adverse and severely adverse economic and financial market conditions.

(b) *Communication of results to covered companies.* The Board will convey to each covered company the results of the Board's analyses of such covered company within a reasonable period of time.

(c) *Publication of results by the Board.* Within a reasonable period of time after completing the analyses of the covered companies under this subpart, the Board will publish a summary of the results of such analyses.

### § 252.136    Post-assessment actions by covered companies.

(a) *In general.* Each covered company shall take the results of the analysis conducted by the Board under this subpart into account in making changes, as appropriate, to the covered company's capital structure (including the level and composition of capital); its exposures, concentrations, and risk positions; any plans of the covered company for recovery; and for improving overall risk management.

(b) *Resolution plan updates.* Each covered company shall make such updates to its resolution plan as the

Board determines appropriate, based on the results of its analyses of the covered company under this subpart, within 90 days of the Board publishing the summary results of its analyses.

## Subpart G—Company-Run Stress Test Requirements

### § 252.141   Applicability.

(a) *Applicability.* (1) *In general.* (i) A bank holding company that becomes a covered company, or a bank holding company, a state member bank, or except as provided in paragraph (a)(2) of this section, a savings and loan holding company becomes an over $10 billion company no less than 90 days before September 30 of a calendar year must comply with the requirements of this subpart from September 30 of that calendar year and thereafter. A company that the Council has determined shall be supervised by the Board on a date no less than 180 days before September 30 of a calendar year must comply with the requirements of this subpart from September 30 of that calendar year and thereafter.

(ii) A bank holding company that becomes a covered company no less than 90 days before March 31 of a calendar year must comply with the requirements of this subpart from March 31 of that calendar year and thereafter. A company that the Council has determined shall be supervised by the Board on a date no less than 180 days before March 31 of a calendar year must comply with the requirements of this subpart from March 31 of that calendar year and thereafter.

(2) *Initial applicability.* (i) *In general.* A bank holding company that is a covered company or an over $10 billion company on the effective date of this subpart must immediately comply with the requirements, including timing of required submissions to the Board, of this subpart.

(ii) *Savings and loan holding companies.* A savings and loan holding company that is an over $10 billion company, before or after the effective date of this subpart, would not be subject to the proposed requirements, including timing of required submissions to the Board, until savings and loan holding companies are subject to minimum risk-based capital and leverage requirements.

### § 252.142   Definitions.

For purposes of this subpart:
(a) *Bank holding company* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(b) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(c) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(d) *Covered company* means
(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company).

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered company for purposes of this subpart unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be a covered company.

(e) *Depository institution* has the same meaning as in section 3 of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c).

(f) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(g) *Planning horizon* means the period of time over which stress test projections must extend. The planning horizon cannot be less than nine quarters.

(h) *Publicly traded* means traded on:
(1) Any exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); or

(2) Any non-U.S.-based securities exchange that:
(i) Is registered with, or approved by, a national securities regulatory authority; and

(ii) Provides a liquid, two-way market for the instrument in question, meaning that there are enough independent bona fide offers to buy and sell so that a sales price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined promptly and a trade can be settled at such a price within a reasonable time period conforming with trade custom.

(i) *Over $10 billion company* means any:
(1) Bank holding company (other than a foreign banking organization) that is not a covered company and that has more than $10 billion in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's FR Y–9C; or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters;

(2) Savings and loan holding company that is not a covered company and that has more than $10 billion in total consolidated assets, as determined based on:

(i) The average of the savings and loan holding company's total consolidated assets in the four most recent quarters as reported quarterly on the savings and loan holding company's relevant regulatory report; or

(ii) The average of the savings and loan holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the savings and loan holding company's relevant regulatory reports, if the savings and loan holding company has not filed such a report for

each of the most recent four quarters; and

(3) State member bank that has more than $10 billion in total consolidated assets, as determined based on:

(i) The average of the state member bank's total consolidated assets in the four most recent quarters as reported quarterly on the state member bank's Consolidated Report of Condition and Income (Call Report); or

(ii) The average of the state member bank's total consolidated assets in the most recent consecutive quarters as reported quarterly on the state member bank's Call Report, if the state member bank has not filed a Call Report for each of the most recent four quarters.

(4) Once a company or bank meets the requirements described in paragraphs (1), (2), or (3), the company shall remain an over $10 billion company for purposes of this part unless and until the company has $10 billion or less in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs, the savings and loan holding company's four most recent relevant regulatory reports, or the bank's four most recent Call Reports.

(5) Nothing in paragraph (2) shall preclude a company from becoming an over $10 billion company pursuant to paragraph (1).

(6) A company or bank that has ceased to be an over $10 billion company under paragraphs (1), (2), or (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be an over $10 billion company.

(j) *Scenarios* are sets of economic and financial conditions used in the companies' stress tests, including baseline, adverse, and severely adverse.

(k) *State member bank* has the same meaning as in section 208.2(g) of the Board's Regulation H (12 CFR 208.2(g)).

(l) *Stress test* is a process to assess the potential impact on a covered company or an over $10 billion company of economic and financial conditions (scenarios) on the consolidated earnings, losses and capital of the company over a set planning horizon, taking into account the current condition of the company and the company's risks, exposures, strategies, and activities.

### § 252.143    Annual stress test.

(a) *In general.*

(1) Each covered company and each over $10 billion company shall complete an annual stress test of itself based on data of the covered company or the over $10 billion company as of

September 30 of that calendar year, except for data related to the covered company's trading and counterparty exposures for which the Board will communicate the required as of date in the fourth quarter of each year.

(2) The stress test shall be conducted in accordance with this section and the methodologies and practices described in section 252.145.

(b) *Scenarios provided by the Board.* In conducting its annual stress tests under this section, each covered company and each over $10 billion company must use scenarios provided by the Board that reflect a minimum of three sets of economic and financial conditions, including a baseline, adverse, and severely adverse scenario. In advance of these stress tests, the Board will provide to all covered companies and over $10 billion companies a description of the baseline, adverse, and severely adverse scenarios that each covered company and each over $10 billion company shall use to conduct its annual stress tests under this subpart.

### § 252.144    Additional stress test for covered companies.

(a) *Additional stress test requirement.*

(1) Each covered company must complete an additional stress test each year based on data of that company as of March 31 of that calendar year except for data related to the covered company's trading and counterparty exposures for which the Board will communicate the required as of date in the fourth quarter of each year.

(2) The stress test shall be conducted in accordance with this section and the methodologies and practices described in section 252.145.

(b) *Scenarios related to additional stress tests.*

(1) *In general.* Each company subject to a stress test under this section 252.144 shall develop and employ scenarios reflecting a minimum of three sets of economic and financial conditions, including a baseline, adverse, and severely adverse scenario, or such additional conditions as the Board determines appropriate, in conducting each stress test required under this paragraph.

### § 252.145    Methodologies and practices.

(a) *Potential impact on capital.*

(1) In conducting a stress test under section 252.143 and section 252.144, each covered company and each over $10 billion company shall calculate how each of the following are impacted during each quarter of the stress test planning horizon, for each scenario:

(i) Potential losses, pre-provision net revenues, allowance for loan losses, and

future pro forma capital positions over the planning horizon; and

(ii) Capital levels and capital ratios, including regulatory and any other capital ratios specified by the Board.

(b) *Controls and oversight of stress testing processes.*

(1) Each covered company and each over $10 billion company must establish and maintain a system of controls, oversight, and documentation, including policies and procedures, designed to ensure that the stress testing processes used by the covered company or over $10 billion company are effective in meeting the requirements in this subpart. These policies and procedures must, at a minimum, describe the covered company's or over $10 billion company's stress testing practices and methodologies, validation and use of stress tests results, and processes for updating the company's stress testing practices consistent with relevant supervisory guidance. Policies of covered companies must describe processes for scenario development for the additional stress test required under section 252.144.

(2) The board of directors and senior management of each covered company and each over $10 billion company shall approve and annually review the controls, oversight, and documentation, including policies and procedures, of the covered company or the over $10 billion company established pursuant to this subpart.

### § 252.146    Required report to the Board of stress test results and related information.

(a) *Report required for stress tests.* On or before January 5 of each year, each covered company and each over $10 billion company must report the results of the stress test required under section 252.143 to the Board in accordance with section 252.146(b). On or before July 5 of each year, each covered company must report the results of the stress test required under section 252.144 to the Board, in accordance with section 252.146(b).

(b) *Content of report for both annual and additional stress tests.* Each covered company and each over $10 billion company must file a report in the manner and form established by the Board.

(c) *Confidential treatment of information submitted.* The confidentiality of information submitted to the Board under this subpart and related materials shall be determined in accordance with applicable exemptions under the Freedom of Information Act (5 U.S.C. 552(b)) and the Board's Rules Regarding Availability of Information (12 CFR part 261).

**§ 252.147  Post-assessment actions by covered companies.**

(a) Each covered company and each over $10 billion company shall take the results of the stress tests conducted under section 252.143 and, if applicable, section 252.144, into account in making changes, as appropriate, to the covered company's capital structure (including the level and composition of capital); its exposures, concentrations, and risk positions; any plans for recovery and resolution; and to improve overall risk management.

**§ 252.148  Publication of results by covered companies and over $10 billion companies.**

(a) *Public disclosure of results required for stress tests of covered companies and of over $10 billion companies.* Within 90 days of submitting a report for its required stress test under section 252.143 and section 252.144, as applicable, a covered company and an over $10 billion company shall disclose publicly a summary of the results of the stress tests required under section 252.143 and section 252.144, as applicable.

(b) *Information to be disclosed in the summary.* The information disclosed by each covered company and each over $10 billion company, as applicable, shall, at a minimum, include—

(1) A description of the types of risks being included in the stress test;

(2) For each covered company, a high-level description of scenarios developed by the company under section 252.144(b), including key variables used (such as GDP, unemployment rate, housing prices);

(3) A general description of the methodologies employed to estimate losses, pre-provision net revenue, allowance for loan losses, and changes in capital positions over the planning horizon; and

(4) Aggregate losses, pre-provision net revenue, allowance for loan losses, net income, and pro forma capital levels and capital ratios (including regulatory and any other capital ratios specified by the Board) over the planning horizon, under each scenario.

**Subpart H—Debt-to-Equity Limits for Certain Covered Companies**

**§ 252.151  Definitions.**

(a) *Bank holding company* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(b) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(c) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(d) *Covered company* means

(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company).

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered company for purposes of this part unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be a covered company.

(e) *Debt-to-equity ratio* means the ratio of a company's total liabilities to a company's total equity capital less goodwill.

(f) *Debt* and *equity* have the same meaning as "total liabilities" and "total equity capital", respectively, as reported:

(1) In the case of a nonbank financial company supervised by the Board, in a report of financial condition filed pursuant to section 161(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. 5361(a)), or otherwise as required by the Board.

(2) In the case of a bank holding company (other than a foreign banking organization), on the Federal Reserve's Form FR Y–9C (Consolidated Financial Statements for Bank Holding Companies) or any successor form.

(g) *Depository institution* has the same meaning as in section 3 of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c).

(h) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(i) *Publicly traded* means traded on:

(1) Any exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); or

(2) Any non-U.S.-based securities exchange that:

(i) Is registered with, or approved by, a national securities regulatory authority; and

(ii) Provides a liquid, two-way market for the instrument in question, meaning that there are enough independent bona fide offers to buy and sell so that a sales price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined promptly and a trade can be settled at such a price within a reasonable time period conforming with trade custom.

**§ 252.152  Debt-to-equity ratio limitation.**

(a) *Notice and maximum debt-to-equity ratio requirement.* Beginning no later than 180 days after receiving written notice from the Council that it has made a determination, pursuant to section 165(j) of the Dodd-Frank Act that a covered company poses a grave threat to the financial stability of the United States (identified company) and that the imposition of a debt to equity requirement is necessary to mitigate such risk, an identified company shall achieve and maintain a debt to equity ratio of no more than 15-to-1.

(b) *Extension.* The Board may, upon request by an identified company, extend the time period for compliance established under paragraph (a) for up to two additional periods of 90 days each, if the Board determines that the identified company has made good faith efforts to comply with the debt to equity ratio requirement and that each extension would be in the public interest.

(c) *Termination.* The debt to equity ratio requirement in paragraph (a) shall cease to apply to an identified company as of the date it receives notice from the Council of a determination, based on the factors described in subsections (a) and (b) of section 113 of the Dodd-Frank Act (12 U.S.C. 5323), that the company no longer poses a grave threat to the financial stability of the United States and that the imposition of a debt to equity requirement is no longer necessary.

## Subpart I—Early Remediation Framework

### § 252.161    Definitions.

For purposes of this subpart:

(a) *Affiliate* means, with respect to a company, any company that controls, is controlled by, or is under common control with, the company.

(b) *Bank holding company* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(c) *Capital distribution* means a redemption or repurchase of any debt or equity capital instrument, a payment of common or preferred stock dividends, a payment that may be temporarily or permanently suspended by the issuer on any instrument that is eligible for inclusion in the numerator of any minimum regulatory capital ratio, and any similar transaction that the Board determines to be in substance a distribution of capital.

(d) *Company* means a corporation, partnership, limited liability company, depository institution, business trust, special purpose entity, association, or similar organization.

(e) *Control* is defined as in section 2 of the Bank Holding Company Act, as amended (12 U.S.C. 1841), and the Board's Regulation Y (12 CFR part 225).

(f) *Council* means the Financial Stability Oversight Council established by section 111 of the Dodd-Frank Act (12 U.S.C. 5321).

(g) *Covered company* means

(1) Any company organized under the laws of the United States or any State that the Council has determined under section 113 of the Dodd-Frank Act (12 U.S.C. 5323) shall be supervised by the Board and for which such determination is still in effect (nonbank covered company).

(2) Any bank holding company (other than a foreign banking organization), that has $50 billion or more in total consolidated assets, as determined based on:

(i) The average of the bank holding company's total consolidated assets in the four most recent quarters as reported quarterly on the bank holding company's Consolidated Financial Statements for Bank Holding Companies (the Federal Reserve's FR Y–9C (FR Y–9C)); or

(ii) The average of the bank holding company's total consolidated assets in the most recent consecutive quarters as reported quarterly on the bank holding company's FR Y–9Cs, if the bank holding company has not filed an FR Y–9C for each of the most recent four quarters.

(3) Once a covered company meets the requirements described in paragraph (2), the company shall remain a covered company for purposes of this part unless and until the company has less than $50 billion in total consolidated assets as determined based on each of the bank holding company's four most recent FR Y–9Cs.

(4) Nothing in paragraph (3) shall preclude a company from becoming a covered company pursuant to paragraph (2).

(5) A bank holding that has ceased to be a covered company under paragraph (3) is not subject to the requirements of this subpart beginning on the first day of the calendar quarter following the reporting date on which it ceased to be a covered company.

(h) *Depository institution* has the same meaning as in section 3 of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c).

(i) *Foreign banking organization* means any foreign bank or company that is a bank holding company or is treated as a bank holding company under section 8(a) of the International Banking Act of 1978 (12 U.S.C. 3106(a)).

(j) *Net income* means:

(1) For a bank holding company (other than a foreign banking organization), the net income as reported on line 14 schedule HI of the company's FR Y–9C report.

(2) For a nonbank covered company that is publicly traded, the net income as reported on the company's quarterly financial statements.

(3) For a nonbank covered company that is not publicly traded, net income as reported on the company's most recent audited financial statement.

(k) *Planning horizon* means the period of time over which stress test projections must extend. The planning horizon cannot be less than nine quarters.

(l) *Publicly traded* means traded on:

(1) Any exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f); or

(2) Any non-U.S.-based securities exchange that:

(i) Is registered with, or approved by, a national securities regulatory authority; and

(ii) Provides a liquid, two-way market for the instrument in question, meaning that there are enough independent bona fide offers to buy and sell so that a sales price reasonably related to the last sales price or current bona fide competitive bid and offer quotations can be determined promptly and a trade can be settled at such a price within a reasonable time period conforming with trade custom.

(m) *Risk-weighted assets* means total weighted risk assets, as calculated in accordance with 12 CFR part 225, appendix A or 12 CFR part 225, appendix G, as applicable, or any successor regulation thereto.

(n) *Senior executive officer* of a covered company means a person who holds the title or, without regard to title, salary, or compensation, performs the function of one or more of the following positions: President, chief executive officer, executive chairman, chief operating officer, chief financial officer, chief investment officer, chief legal officer, chief lending officer, chief risk officer, or head of a major business line.

(o) *Severely adverse scenario* has the same meaning as defined in the context of Subpart F of this part.

(p) *Tier 1 capital* means tier 1 capital as defined in 12 CFR part 225, appendix A or 12 CFR part 225, appendix G, as applicable, or any successor regulation thereto.

(q) *Tier 1 common risk-based capital ratio* means the ratio of tier 1 capital less the non-common elements of tier 1 capital, including perpetual preferred stock and related surplus, minority interest in subsidiaries, trust preferred securities and mandatory convertible preferred securities, to risk-weighted assets.

(r) *Tier 1 leverage ratio* means the ratio of tier 1 capital to total assets as defined in 12 CFR part 225 appendix D, or any successor regulation thereto.

(s) *Tier 1 risk-based capital ratio* means the ratio of tier 1 capital to risk-weighted assets, as calculated in accordance with 12 CFR part 225, appendix A or 12 CFR part 225, appendix G, as applicable, or any successor regulation thereto.

(t) *Total capital* means qualifying total capital as defined in 12 CFR part 225, appendix A or total qualifying capital as defined in 12 CFR part 225, appendix G, as applicable, or any successor regulation thereto.

(u) *Total assets* means:

(1) For a bank holding company (other than a foreign banking organization), total consolidated assets as reported quarterly on the bank holding company's FR Y–9C.

(2) For a nonbank covered company that is publicly traded, total consolidated assets as reported nonbank covered company's quarterly financial statements.

(3) For a nonbank covered company that is not publicly traded, total consolidated assets as determined based on the company's audited financial statements.

(v) *Total risk-based capital ratio* means the ratio of total capital to risk-weighted assets, as calculated in accordance with 12 CFR part 225, appendix A or 12 CFR part 225, appendix G, as applicable, or any successor regulation thereto.

## § 252.162  Remediation Actions.

(a) *Level 1 remediation (heightened supervisory review).* Under level 1 remediation, the Board shall conduct a targeted supervisory review of a covered company to evaluate whether the covered company is experiencing financial distress or material risk management weaknesses such that further decline of the covered company is probable and that the covered company should be subject to initial remediation (level 2 remediation).

(1) The review required by this section 252.162(a) must be completed within 30 days of the company's entrance into level one remediation.

(2) If, upon completion of the review, the Board determines that the covered company is experiencing financial distress or material risk management weaknesses such that further decline of the covered company is probable, the covered company shall be subject to initial remediation (level 2 remediation).

(b) *Level 2 remediation (initial remediation).* A covered company subject to level 2 remediation:

(1) Shall not make capital distributions during any calendar quarter in an amount that exceeds 50 percent of the average of the covered company's net income in the preceding two calendar quarters.

(2) Shall not:

(i) Permit its daily average total assets during any calendar quarter to exceed its daily average total assets during the preceding calendar quarter by more than 5 percent; or

(ii) Permit its daily average total assets during any calendar year to exceed its daily average total assets during the

preceding calendar year by more than 5 percent; or

(iii) Permit its daily average risk-weighted assets during any calendar quarter to exceed its daily average risk-weighted assets during the preceding calendar quarter by more than 5 percent;

(iv) Permit its daily average risk-weighted assets during any calendar year to exceed its daily average risk-weighted assets during the preceding calendar year by more than 5 percent;

(v) Directly or indirectly acquire any controlling interest in any company (including an insured depository institution, establish or acquire any office or other place of business, or engage in any new line of business), without the prior approval the Board.

(3) Shall be required to enter into a non-public memorandum of understanding, or other enforcement action acceptable to the Board.

(4) In addition, may be subject to the following additional limitations imposed by the Board:

(i) Limitations or conditions on the conduct or activities of the company or any of its affiliates that the Board finds to be appropriate and consistent with the purposes of Title I of the Dodd-Frank Act.

(c) *Level 3 remediation (recovery).* A covered company subject to level 3 remediation:

(1) May not make any capital distribution.

(2) Shall not:

(i) Permit its average total assets during any calendar quarter to exceed its average total assets during the preceding calendar quarter; or

(ii) Permit its average total risk-weighted assets during any calendar quarter to exceed its average total risk-weighted assets during the preceding calendar quarter; or

(iii) Directly or indirectly acquire any interest in any company (including any insured depository institution), establish or acquire any office (or other place of business), or engage in any new line of business;

(3) Must enter into a written agreement or other form of enforcement action with the Board that specifies that the covered company must raise additional capital and take other appropriate actions to improve its capital adequacy.

(i) If a covered company fails to satisfy the requirements of such a written agreement, the covered company may be required to divest assets identified by the Board as contributing to the covered company's financial decline or posing substantial risk of contributing to further financial decline of the covered company.

(4) Shall not increase the compensation of, or pay any bonus to, its senior executive officers or directors.

(5) May also be required by the Board to:

(i) Conduct a new election for the institution's board of directors;

(ii) Dismiss from office any director or senior executive officer of the covered company who had held office for more than 180 days immediately prior to receipt of notice pursuant to section 252.164 that the covered company is subject to level 3 remediation; or

(iii) Employ qualified senior executive officers approved by the Board.

(6) The Board may place restrictions on a covered company engaging in transactions with its affiliates if it is subject to level 3 remediation.

(d) *Level 4 remediation (resolution assessment).* The Board shall consider whether the covered company poses a risk to the stability of the U.S. financial system. If the Board determines, based on the covered company's financial decline and the risk posed to U.S. financial stability by the failure of the covered company or other relevant factors, that the covered company should be placed into receivership under Title II of the Dodd-Frank Act, the Board shall make a written recommendation that the covered company be placed in resolution under Title II of the Dodd-Frank Act.

## § 252.163  Remediation triggering events.

(a) *Capital and leverage.*

(1) *Level 1 remediation triggering events.* A covered company that has a total risk-based capital ratio of 10.0 percent or greater, a tier 1 risk-based capital ratio of 6.0 percent or greater, and a tier 1 leverage ratio of 5.0 percent or greater, is subject to level 1 remediation (heightened supervisory review) if the Board determines that the covered company's capital structure, capital planning processes, or the amount of capital it holds is not commensurate with the level and nature of the risks to which it is exposed.

(2) *Level 2 remediation triggering events.* A covered company is subject to level 2 remediation (initial remediation) if it has a total risk-based capital ratio of less than 10.0 percent and greater than or equal to 8.0 percent, a tier 1 risk-based capital ratio of less than 6.0 percent and greater than or equal to 4.0 percent or a tier 1 leverage ratio of less than 5.0 percent and greater than or equal to 4.0 percent.

(3) *Level 3 remediation triggering events.* A covered company is subject to level 3 remediation (recovery) if:

(i) For two complete consecutive quarters, the covered company has a

total risk-based capital ratio of less than 10.0 percent, a tier 1 risk-based capital ratio of less than 6.0 percent or a tier 1 leverage ratio of less than 5.0 percent; or

(ii) The covered company has a total risk-based capital ratio of less than 8.0 percent and greater than or equal to 6.0 percent, a tier 1 risk-based capital ratio of less than 4.0 percent and greater than or equal to 3.0 percent or a tier 1 leverage ratio of less than 4.0 percent and greater than or equal to 3.0 percent.

(iii) *Level 4 remediation triggering events.* A covered company is subject to level 4 remediation (resolution assessment) if it has a total risk-based capital ratio of less than 6.0 percent, a tier 1 risk-based capital ratio of less than 3.0 percent or a tier 1 leverage ratio of less than 3.0 percent.

(b) *Stress Tests.*

(1) *Level 1 remedial triggering events.* A covered company is subject to level 1 remediation if it is not in compliance with any regulations adopted by the Board relating to capital plans pursuant to 12 CFR 225.8 and stress tests pursuant to Subparts F and G of this part.

(2) *Level 2 remediation triggering events.* A covered company is subject to level 2 remediation (initial remediation) if its results under the severely adverse scenario in any quarter of the planning horizon produced pursuant to a stress test executed pursuant to Subpart F of this part reflect a tier 1 common risk-based capital ratio of less than 5.0 percent and greater than or equal to 3.0 percent.

(3) *Level 3 remediation triggering events.* A covered company is subject to level 3 remediation (recovery) if its results under the severely adverse scenario in any quarter of the planning horizon produced pursuant to a stress test executed pursuant to Subpart F of this part reflect a tier 1 common risk-based capital ratio of less than 3.0 percent.

(c) *Risk Management.*

(1) *Level 1 remedial triggering events.* A covered company is subject to level 1 remediation if it has manifested signs of weakness in meeting the enhanced risk management and risk committee requirements under Subpart E of this part.

(2) *Level 2 remediation triggering events.* A covered company is subject to level 2 remediation if it has demonstrated multiple deficiencies in meeting the enhanced risk management or risk committee requirements under Subpart E of this part.

(3) *Level 3 remediation triggering events.* A covered company is subject to

level 3 remediation if it is in substantial noncompliance with the enhanced risk management and risk committee requirements under Subpart E of this part.

(d) *Liquidity.*

(1) *Level 1 remedial triggering events.* A covered company is subject to level 1 remediation if it has manifested signs of weakness in meeting the enhanced liquidity risk management requirements under Subpart C.

(2) *Level 2 remediation triggering events.* A covered company is subject to level 2 remediation if it has demonstrated multiple deficiencies in meeting the enhanced liquidity risk management requirements under Subpart C.

(3) *Level 3 remediation triggering events.* A covered company is subject to level 3 remediation if it is in substantial noncompliance with the enhanced liquidity risk management requirements under Subpart C.

(e) *Market indicators.*

(1) *Definitions.*

(i) *Market indicator* means an indicator based on publicly available market data that is identified in the annual indicator list, as specified by the Board.

(ii) *Indicator list* means a list of the market indicators and market indicator thresholds that will be used during a defined period, as specified by the Board.

(iii) *Breach period* means the number of consecutive business days, as specified by the Board, over which the median value of a market indicator must exceed the market indicator threshold to trigger remediation.

(iv) *Market indicator threshold* means, with respect to each market indicator described on the indicator list, the level, as specified by the Board, indicating that a covered company is experiencing financial distress or material risk management weaknesses such that further decline of the covered company is probable based on historic measures of data.

(2) The Board shall publish for comment annually, or less frequently as appropriate, the indicator list, market indicator thresholds, and breach period that will be used during a twelve-month period.

(3) A covered company shall be subject to level 1 remediation upon receipt of a notice indicating that the Board has found that, with respect to the covered company, any single market indicator has exceeded the market indicator threshold for the breach period.

(f) *Measurement and timing of remediation action events.*

(1) *Capital.* For the purposes of this subpart, the capital of a covered company is deemed to have been calculated as of the most recent of the following:

(i) The FR Y–9C report;

(ii) Calculations of capital by the covered company submitted to the Board, pursuant to a Board request to the covered company to calculate its ratios;

(iii) A final inspection report is delivered to the covered company that includes capital ratios calculated more recently than the most recent FR Y–9C report submitted by the covered company to the Board.

(2) *Stress tests.* For purposes of this paragraph, the ratios calculated under the supervisory stress test apply as of the date the Board's report of the test results is transmitted to the covered company pursuant to section 252.135(b) of Subpart F.

§ 252.164    Notice and remedies.

(a) *Notice to covered company of remediation action event.* If the Board ascertains that a remediation triggering event set forth in section 252.163 has occurred with respect to a covered company, the Board shall notify the covered company of the event and the remediation action under section 252.162 applicable to the covered company as a result of the event.

(b) *Notification of Change in Status.* If a covered company becomes aware of (i) one or more triggering events set forth in section 252.163; or (ii) a change in condition that it believes should result in a change in the remediation provisions to which it is subject, such covered company must provide notice to the Board within 5 business days, identifying the nature of the triggering event or change in circumstances.

(c) *Termination of remediation action.* A covered company subject to a remediation action under this subpart shall remain subject to the remediation action until the Board provides written notice to the covered company that its financial condition or risk management no longer warrants application of the requirement.

By order of the Board of Governors of the Federal Reserve System, December 22, 2011.

**Jennifer J. Johnson,**
*Secretary of the Board.*

[FR Doc. 2011–33364 Filed 1–4–12; 8:45 am]

**BILLING CODE 6210–01–P**