**Hearing Date: May 23, 2013 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: May 13, 2013 at 5:00 p.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip Bentley
David E. Blabey, Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

------------------------------------------------------------ x

**MOTION *IN LIMINE* OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO PRECLUDE THE EXPERT TESTIMONY OF JEFFREY A. LIPPS**
**IN CONNECTION WITH THE DEBTORS' MOTION FOR APPROVAL**
**OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................................ ii

Preliminary Statement ............................................................................................................1

Mr. Lipps' Three Declarations................................................................................................3

Argument ................................................................................................................................5

I.    The Opinions Expressed in Mr. Lipps' September 28 and January 15 Declarations
      Are Inadmissible ...........................................................................................................5

      A.    Mr. Lipps' Opinions as to Legal Issues are Inadmissible .......................................5

      B.    Mr. Lipps' Opinion That The Settlement Is Reasonable Does Not Satisfy
            *Daubert* ...............................................................................................................9

            1.    The September 28 Declaration Employs No Reliable Methodology ..........10

            2.    The Improper Supplementation Contained in the January 15
                  Declaration Fails to Correct the Deficiencies of the Original Report .........12

II.   The Opinions Expressed in Mr. Lipps' May 24 Declaration Do Not Satisfy
      *Daubert's* "Fit" Requirement ...............................................................................14

III.  Mr. Lipps' Dual Role as Expert and Counsel to the Debtors Provides Additional
      Grounds to Preclude His Expert Testimony ...................................................................15

      A.    Mr. Lipps is Serving as Counsel to the Debtors On The Very Issues as to
            Which He Seeks to Give Expert Testimony .........................................................15

      B.    Mr. Lipps' Proposed Expert Testimony Would Serve As an End-Run
            Around This Court's Preclusion Order ...............................................................19

CONCLUSION.....................................................................................................................20

# TABLE OF AUTHORITIES

Page

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)................................................................................................10

*Cage v. City of Chi.*,
No. 09-C-3078, 2012 WL 5557410 (N.D. Ill. Nov. 14, 2012) ................................................13

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
424 F. Supp. 2d 1229 (E.D. Cal. 2005)....................................................................................7

*CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*,
815 F. Supp. 2d 673 (S.D.N.Y. 2011).....................................................................................12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..........................................................................................................1, 13, 14

*Donnelly v. Ford Motor Co.*,
80 F. Supp. 2d 45, 49 (E.D.N.Y. 1999) ................................................................................14

*Durkin v. Equifax Check Servs., Inc.*,
406 F.3d 410 (7th Cir. 2005) ................................................................................................12

*E.E.O.C. v. Bloomberg L.P.*,
No. 07 Civ. 8383, 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) .........................................12

*Ebbert v. Nassau County*,
No. CV 05-5445, 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008)..........................................13

*F.H. Krear & Co. v. Nineteen Named Trustees*,
810 F.2d 1250 (2d Cir. 1987)..................................................................................................7

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997)................................................................................................................12

*Highland Capital Management, L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005)................................................................................6, 12

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992)....................................................................................................5

*In re Initial Public Offering Securities Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001)........................................................................................6

*In re Residential Capital, LLC*,
    No. 12-12020, 2013 WL 1497203 (Bankr. S.D.N.Y. April 12, 2013) ........................3, 19, 20

*Larson v. Wis. Cent. Ltd.*,
    No. 10-C-446, 2012 WL 368379 (E.D. Wis. Feb. 3, 2012)....................................................13

*Lippe v. Bairnco Corp.*,
    288 B.R. 678. (S.D.N.Y. 2003)..................................................................................... passim

*Marx & Co., Inc. v. The Diners' Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977)....................................................................................................5, 6

*Music Sales Corp. v. Morris*,
    73 F. Supp. 2d 364 (S.D.N.Y. 1999).....................................................................................7

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)..................................................................................................5

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*.
    395 F.3d 416 (7th Cir. 2005) ................................................................................................12

## STATUTES

28 U.S.C. § 455...........................................................................................................................6

## OTHER AUTHORITIES

Fed. R. Evid. 702 ...........................................................................................................9, 10, 14

Rule 26(a)(2)..................................................................................................................................3

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby files this motion *in limine* to preclude the expert testimony of Jeffrey A. Lipps in connection with the Debtors' motion (the "**9019 Motion**") [Dkt. Nos. 320, 1176, 1887] for approval of the RMBS Trust Settlement.

## Preliminary Statement

Mr. Lipps, the Debtors' lead RMBS defense counsel, has submitted three declarations setting forth purported expert opinions that he may give in connection with the 9019 Motion. These opinions do not pass muster under the rules governing expert testimony. They should be stricken, and Mr. Lipps should be precluded from giving expert testimony on these or any other topics in this contested matter, for multiple reasons.

In the first place, the opinions that Mr. Lipps proposes to give contravene the most basic principles of expert testimony. Two of the three expert reports he has submitted – his September 28, 2012 and January 15, 2013 declarations – are nothing but legal briefs wrapped in the guise of expert testimony. These reports, which Mr. Lipps himself characterizes as "legal analysis," violate the settled rule that expert testimony on matters of domestic law is inadmissible. Moreover, the ultimate conclusion set forth in these reports – that the RMBS Trust Settlement is reasonable – rests on no analysis or methodology whatsoever, but just Mr. Lipps' unsupported say-so. The conclusion rests on exactly the sort of subjective and unexplained "expert" *ipse dixit* that is barred by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Mr. Lipps' other expert report – his May 24, 2012 declaration – is inadmissible for a different reason. That declaration was drafted and filed in support of a prior motion, namely, the Debtors' Section 105 motion to extend the automatic stay to bar suits against non-Debtor parties in a variety of non-bankruptcy courts. Not surprisingly, that declaration addressed issues pertinent to that prior motion (the burdens caused by those *non*-bankruptcy-court suits against *non*-Debtors), rather than the issues pertinent to the 9019 Motion – i.e., the burdens that would be caused by an estimation or other resolution of the put-back claims against the Debtors in this Court. Given the powerful tools at this Court's disposal to streamline the put-back litigation against the Debtors through estimation or otherwise, and given Mr. Lipps' admission that he has no knowledge or expertise concerning those bankruptcy procedures, the procedural details of put-back litigation in *other* courts are simply not relevant to the 9019 Motion. Mr. Lipps' opinion on that subject therefore does not satisfy *Daubert*'s requirement that an expert opinion "fit" the facts and issues in the case, and it should be precluded on that ground.

In addition to these glaring substantive deficiencies, Mr. Lipps' proposed expert testimony is highly problematic for two independent procedural reasons, each of which provides a further ground for precluding his testimony. First, Mr. Lipps' ability to testify with the detachment and independence required of an expert is severely compromised by his simultaneous role as the Debtors' counsel in this very matter. Mr. Lipps not only has long served as the Debtors' lead defense counsel in RMBS litigation; he also has been, and continues to be, deeply involved in the prosecution of the 9019 Motion, including the formulation of strategy and even the drafting of the Debtors' briefs on the very issues as to which he proposes to testify. As Judge Chin observed when he excluded a lawyer-expert's testimony on similar grounds, "[i]t would be most inappropriate to permit him now to testify as an expert witness

about the very matters he helped develop as a lawyer-advocate." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688. (S.D.N.Y. 2003).

Second, as the Debtors' lead RMBS defense counsel, Mr. Lipps undoubtedly has advised the Debtors from time to time concerning the strengths and weaknesses of the put-back claims. Permitting Mr. Lipps to give expert testimony on this subject would give the Debtors a "back door" way to put before this Court the very advice that the Court recently precluded the Debtors from offering, *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 1497203 (Bankr. S.D.N.Y. April 12, 2013) – since the Debtors presumably will ask the Court to infer that the advice Mr. Lipps gave to the Debtors is at least broadly similar to the opinions he will be giving on the witness stand. Such an end-run around the Court's preclusion decision should not be permitted.

### Mr. Lipps' Three Declarations

Mr. Lipps has submitted three declarations setting forth the nature of and bases for the expert opinions as to which he may testify in connection with the 9019 Motion: the Declaration of Jeffrey A. Lipps dated May 24, 2012 (the "**May 24 Declaration**") [Dkt. No. 320-9], the Supplemental Declaration of Jeffrey A. Lipps dated September 28, 2012 (the "**September 28 Declaration**") [Dkt. No. 1712-8-9], and the Reply Declaration of Jeffrey A. Lipps dated January 15, 2013 (the "**January 15 Declaration**") [Dkt. No. 2805]. The May 24 Declaration and the September 28 Declaration were submitted as part of the expert disclosures that the Debtors filed on September 28, 2012 pursuant to Rule 26(a)(2). [Dkt. No. 1664.]

#### *The May 24 Declaration*

The May 24 Declaration makes no mention of the RMBS Trust Settlement and was originally submitted in connection with an adversary proceeding [Adv. No. 12-1671, Dkt. No. 6] in which the Debtors sought to stay certain actions pending against non-Debtor third

parties.  In addition to providing an overview of those pending lawsuits against non-Debtors and a description of the discovery burdens associated with those suits, the Declaration expresses the opinion that the lawsuits, if allowed to proceed, would impose substantial discovery burdens on the Debtors.  Although the suits described in the May 24 Declaration are not part of the RMBS Trust Settlement, the Debtors have nevertheless indicated that Mr. Lipps may testify with respect to certain matters addressed in the Declaration.  *See* Debtors' Reply Brief re *Iridium* Factors in Support of Motion for Approval of RMBS Settlement Agreements at 58 [Dkt. No. 2803]; *see also* Lipps Tr. at 23:22-24:24.[1]

### The September 28 Declaration

The September 28 Declaration consists almost entirely of a discussion of legal issues applicable to RMBS representation and warranty claims.  Specifically, the Declaration discusses the elements of the cause of action (¶¶ 21-23); the general scope and meaning of certain representations and warranties (¶¶ 24-46), the legal and evidentiary challenges in determining whether a representation or warranty has been breached (¶¶ 47-59); the meaning of "material" breach in this context (¶¶ 60-73); causation and the validity of the "market collapse" defense (¶¶ 74-82, 104-113); damages and the appropriate remedy for breach (¶¶ 83-89); the defenses of statute of limitations (¶¶ 91-98) and justifiable reliance (¶¶ 99-103); and evidentiary challenges and the burden of discovery (¶¶ 114-122).

On the basis of this legal discussion, and with no quantitative or other analysis of any sort (let alone any trust-specific analysis), Mr. Lipps concludes that "the RMBS Trust Settlement resolves the potential claims against the Debtors in a reasonable and fair range." September 28 Declaration ¶ 11; *see also ¶* 123.  Mr. Lipps states that his opinion in this regard is

---

[1] References to "Lipps Tr." are to the transcript of Mr. Lipps' deposition of November 19, 2012.  Relevant excerpts are attached hereto as **Exhibit A**.

"[b]ased on my review of the settlement terms, my extensive knowledge of the types of claims and defenses at issue and the strengths and weaknesses in the applicable law, and my familiarity with the strengths and potential weaknesses in the Debtors' defense of the claims." *Id.* at ¶ 11.

### The January 15 Reply Declaration

The January 15 Declaration, submitted after the Committee and other parties had served their objections to the RMBS Trust Settlement and after Mr. Lipps had been deposed, replies to two legal issues raised by objectors – namely, whether a foreclosed mortgage loan is eligible for repurchase (¶¶ 3-13), and the strength of the statute of limitations defense (¶¶ 14-22). The declaration also attempts to defend Mr. Lipps' decision not to undertake a "litigation risk analysis" (¶¶ 23-27) and briefly addresses the report submitted by one of the Committee's experts, Dr. Brad Cornell (¶¶ 35-40).  Finally, the declaration belatedly supplements the bases for Mr. Lipps' opinion that the RMBS Trust Settlement is reasonable, discussing several additional data points that allegedly support that opinion (¶¶ 28-34), even though the September 28 Declaration did not include these points among the stated bases for that opinion.

### ARGUMENT

I.    **The Opinions Expressed in Mr. Lipps' September 28
      and January 15 Declarations Are Inadmissible**

A.    **Mr. Lipps' Opinions as to Legal Issues are Inadmissible**

The Second Circuit Court of Appeals has repeatedly held that "[a]s a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  *Accord, e.g.*, *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *Marx & Co., Inc. v. The Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("The special legal knowledge of the judge makes the witness' testimony

superfluous."); *see also In re Initial Public Offering Securities Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("This Court has repeatedly held that the testimony of an expert on matters of domestic law is inadmissible for *any* purpose.") (citation omitted).

On the basis of this rule, courts in this Circuit have consistently precluded experts from testifying as to the statutes and case law governing a particular area of the law, the interpretation of the law, and the application of the law to the facts.  For instance, in *Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005), the plaintiffs in a breach of contract action sought to introduce expert testimony to the effect that certain parties involved in the challenged transaction had violated securities laws.  The expert report "set[] forth the governing statutes and case law that underlie criminal violations of the securities laws" and "discusse[d], though reference to case law, the type of conduct that [the expert] believe[d] would constitute a criminal violation of [securities laws]."  *Id.* at 465-66.  In reliance on the Second Circuit cases cited above, the court excluded the report, holding that it was improper for a witness to discuss governing law, apply legal principles to the facts, or reach ultimate conclusions of law.  *Id.* at 470-72.

Similarly, in *Initial Public Offering Securities Litigation*, defendants in securities litigation attempted to introduce affidavits from law professors opining on whether 28 U.S.C. § 455 required recusal of the presiding judge.  The court excluded the declarations as improper "legal opinions and analyses," 174 F. Supp. at 66, and went on to note:  "In our adversarial system, lawyers make arguments, judges write legal opinions – and there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court."  *Id.* at 69-70.

Cases excluding expert testimony of this sort are legion.  *See, e.g., Marx*, 550 F.2d at 509-10 (testimony of expert who "gave his opinion as to the legal standards which he

believed to be derived from the contract and which should have governed [defendants']
conduct," provided "legal opinions as to the meaning of the contract terms at issue," and
"repeatedly gave his conclusions as to the legal significance of various facts adduced at trial"
should have been excluded); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250,
1258 (2d Cir. 1987) (affirming lower court's exclusion of expert-attorney's proposed testimony
that contracts were unenforceable for lack of essential terms); *Music Sales Corp. v. Morris*, 73 F.
Supp. 2d 364, 381 (S.D.N.Y. 1999) (excluding expert affidavit that "almost wholly expresses
legal conclusions on the meaning of the 1976 [Copyright] Act"); *CFM Commc'ns, LLC v. Mitts
Telecasting Co.*, 424 F. Supp. 2d 1229, 1235-37 (E.D. Cal. 2005) (excluding expert report that
read "like a legal brief," "features numerous citations to federal court opinions," and "applies a
variety of regulatory law to facts," and noting that the court "is perfectly able to review FCC
decisions and regulations to decide how the law applies to the present facts").

Here, the September 28 and January 15 Declarations seek to do precisely what the
case law proscribes.  Indeed, Mr. Lipps himself describes the September 28 Declaration as a
"legal analysis."  January 15 Declaration ¶ 28.  The declarations provide legal analysis of three
sorts, none the proper province of expert opinion:

### *(a)    Descriptions of case law and governing legal standards:*

- "If the Institutional Investors or Trustees were to pursue litigation of the claims, the
  elements they would need to prove include that (1) an agreement existed, (2) the
  agreement was breached, (3) the breach was material, (4) the breach caused harm to
  the plaintiff, and (5) the Institutional Investors suffered damages as a result."
  September 28 Declaration ¶ 22.

- "Courts interpreting this type of language in the commercial mortgage-backed
  securities context have also split on the question of whether plaintiffs can be required
  to meet a 'double materiality' standard."  September 28 Declaration ¶ 72 (citing
  cases).

- "Equitable tolling is recognized by courts in New York and is available to extend the statute of limitations period for certain claims, including claims for breach of contract." January 15 Declaration ¶ 17 (citing cases).

*(b)    Interpretation of disputed legal issues:*

- "Accordingly, these decisions appear to have limited persuasive or precedential value." September 28 Declaration ¶ 79.

- "However, the court's ruling – in addition to providing mixed guidance – was based in substantial part on applicable insurance statutes, which are not relevant to the Investor- or Trustee-initiated claims at issue in the RMBS Trust Settlements." September 28 Declaration ¶ 81 (citing cases).

- "The court's holding in *MASTR Asset* was based heavily on the fact that the specific language of the repurchase provisions in that case did not clearly provide for repurchase of foreclosed mortgages." January 15 Declaration ¶ 5.

- "[I]t is my opinion that the court [in *MASTR Asset*] incorrectly assumed that a loan is always merged out of existence by a foreclosure, and the court's analysis will not be directly applicable to many of the mortgage loans in the Debtors' securitizations." January 15 Declaration ¶ 11.

- "This practice suggests that a mortgage loan continues to have at least some post-foreclosure existence." January 15 Declaration ¶ 12.

- "While an argument could be made that liquidated loans cannot be repurchased under the decision in *MASTR Asset*, there remains substantial uncertainty whether other courts considering representation and warranty claims would agree with the decision in *MASTR Asset*." January 15 Declaration ¶ 13.

*(c)    Application of law to fact:*

- "[T]here is at least some risk that a Court will accept plaintiffs' arguments that, by representing the Schedules as 'accurate,' the Debtors could be found to have warranted the *truth* of the information contained in them." September 28 Declaration ¶ 38 (emphasis in original).

- "There are some distinguishing features to the *Love Funding* opinion that render it not directly applicable to the claims here." September 28 Declaration ¶ 45.

- "While the Debtors would hotly contest any allegation that underwriting representations were breached, there is potential risk for the Debtors of an adverse outcome on each of these issues if a representation and warranty case were to go to trial." September 28 Declaration ¶ 59.

- "That conclusion is supported by the plain language of the Sale Agreements." September 28 Declaration ¶ 83.

- "The applicable contract documents contain no limitation on the time for the Trustees to make such a demand, and indeed, although the Debtors would dispute this in litigation, there is a facially logical argument that none should apply."  September 28 Declaration ¶ 96.

- "[I]t is my belief based on the available evidence to date that the overwhelming majority of the loans in each collateral pool did not breach any representations and warranties."  September 28 Declaration ¶ 120.

- "In contrast, a review of the Debtors' transaction documents reveals that they have express language that appears to contemplate the repurchase of liquidated loans." January 15 Declaration ¶ 6.

- "Because the Debtors' transaction documents arguably provide a contractual mechanism for repurchase of loans that have been through the foreclosure process, the Debtors may have difficulty arguing that the *MASTR Asset* holding applies to their securitizations."  January 15 Declaration ¶ 10.

- "While the Debtors' transaction documents provide that their interpretation is governed by New York law, the effect of foreclosure on a loan would be governed by the real property law of each jurisdiction where a foreclosure occurred."  January 15 Declaration ¶ 11.

In sum, in nearly every respect the September 28 and January 15 Declarations are

indistinguishable from legal briefs and are violative of the well-settled Second Circuit authority

set forth above.

### B.    Mr. Lipps' Opinion That The Settlement Is Reasonable Does Not Satisfy *Daubert*

A motion to exclude the testimony of an expert witness is governed by Federal

Rule of Evidence 702, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.  Although there is no definitive test for determining the reliability of expert testimony, the Supreme Court has identified a number of factors bearing on reliability, including "(1) whether a theory or technique 'can be (and has been) tested,' (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993)) (internal citation omitted).  Mr. Lipps' proposed expert opinions meet none of the foregoing indicia of reliability and utterly fail to satisfy the requirements of Rule 702.

### 1.    The September 28 Declaration Employs No Reliable Methodology

Based on the legal analysis discussed in Point I.A above, Mr. Lipps' September 28 expert report concludes that the Settlement "resolves the potential claims against the Debtors in a reasonable and fair range."  September 28 Declaration ¶ 11; *see also id*. ¶ 123.  No other bases for this conclusion are stated.  Consequently, if the Court precludes Mr. Lipps from testifying as to legal matters, his conclusion that the Settlement is reasonable will rest upon no reasoned analysis whatsoever, and it should be stricken on that ground.

Even if Mr. Lipps' testimony on legal matters were not precluded, it still would provide no support for his conclusion that a settlement of $8.7 billion is reasonable, because his analysis is devoid of any quantitative component – e.g., any analysis of the extent of the Debtors' breaches or of the losses associated with those breaches, much less any trust-specific analysis.  Instead, the opinion expressed in his September 28 Declaration was based solely on Mr. Lipps' "review of the settlement terms, [his] extensive knowledge of the types of claims and defenses at issue and the strengths and weaknesses in the applicable law, and [his] familiarity with the

strengths and potential weaknesses in the Debtors' defense of the claims." September 28 Declaration ¶ 11.

Thus, Mr. Lipps has made no attempt to value the Trusts' put-back claims by developing a litigation risk analysis of the sort lawyers often prepare, assigning dollar amounts and percentage likelihoods to a range of potential outcomes. Lipps Tr. 30-34; January 15 Declaration ¶¶ 23-27. He makes no attempt to assign probabilities to any of the disputed legal issues. To the contrary, he states in his later declaration that, in his view, "an attorney cannot reliably or meaningfully assign probabilities to the potential outcomes" of that litigation; rather, the end result of such an endeavor would be "little better than guesswork." January 15 Declaration ¶¶ 25. Compounding the problem, Mr. Lipps makes no attempt to assign probabilities to any of the myriad factual issues that will also drive the outcome of the put-back litigation. For example, he make no attempt to quantify either the extent of R&W breaches or the magnitude of the Trusts' resulting collateral losses, Lipps Tr. 136-42, beyond stating that, in his view, "the overwhelming majority of the loans in each collateral pool did not breach any representations and warranties," September 28 Declaration ¶ 120, and "the true cause of the losses to these Trusts was the massive economic downturn beginning in late 2007," *id.* ¶ 104 – views that are difficult to square with an $8.7 billion settlement. Absent any analysis of probabilities or of potential dollar outcomes, Mr. Lipps has no proper basis to opine that an $8.7 billion settlement amount is any more reasonable than a settlement of $4 billion or even $2 billion.[2] Put differently, Mr. Lipps' legal analysis might support the conclusion that it is reasonable *to settle* the put-back claims against the Debtors (a view that no-one would dispute), but his analysis provides no insight as to the proper *amount* of a settlement.

---

[2] It is worth noting that Mr. Lipps' initial declaration contains no mention of the $8.7 billion settlement amount, and his reply declaration mentions it only once in passing (at ¶ 3). Mr. Lipps could have submitted the exact same declarations to support very different settlement amounts, without having to change anything but the final number.

The Supreme Court has condemned this sort of unsupported expert opinion, which is "connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). And for good reason. The role of an expert is to aid the trier of fact, not usurp its function. *See, e.g.*, *CIT Group/Business Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) (noting, in excluding expert testimony in bench trial, that "expert testimony must not usurp the role of the fact-finder, and an expert 'may not give testimony stating ultimate legal conclusions'") (citation omitted). The September 28 Declaration is entirely unhelpful because it purports to tell the Court *what* result to reach, not why or how to reach it. There is nothing in Mr. Lipps' analysis – other than his untestable say-so – to link his consideration of the relevant factors to his conclusory determination that the settlement amount is reasonable. *See Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 421 (7th Cir. 2005) (affirming exclusion of testimony of linguistics expert whose conclusion was based on his "untestable say-so"); *E.E.O.C. v. Bloomberg L.P.*, No. 07 Civ. 8383, 2010 WL 3466370, *15 (S.D.N.Y. Aug. 31, 2010) (excluding expert opinions "supported by what appears to be a 'because I said so' explanation").[3]

### 2.    The Improper Supplementation Contained in the January 15 Declaration Fails to Correct the Deficiencies of the Original Report

Following his deposition, Mr. Lipps submitted a reply report – his January 15 Declaration – that purported to supplement the bases for his September 28 opinion. Specifically, he stated that, in forming his prior opinion, he "considered settlements of similar claims,"

___

[3] *See also, e.g., Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*. 395 F.3d 416, 419 (7th Cir. 2005) ("Shapiro's method, 'expert intuition,' is neither normal among social scientists nor testable – and conclusions that are not falsifiable aren't worth much to either science or the judiciary."); *Highland Capital*, 379 F. Supp. 2d at 473 n.2 (rejecting conclusory testimony and noting "one factor for courts to consider in determining reliability is 'whether the expert's technique can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability'") (citing *U.S. Info Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3, AFL-CIO*, 313 F. Supp. 2d 213, 227 (S.D.N.Y. 2004)); *Lippe v. Bairnco*, 288 B.R. 678, 686 (S.D.N.Y. 2003) (expert "must do more than aver conclusorily that his experience led to his opinion") (citing *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001)).

"considered [the Debtors'] repurchase data," and "considered the allegations lodged by plaintiffs in RMBS cases against the Debtors," January 15 Declaration ¶¶ 29-34 – even though his September 28 Declaration listed none of these points as bases for his opinion.  But Mr. Lipps' attempt to correct the deficiencies of his September 28 Declaration by the addition of a few isolated quantitative observations is entirely inadequate.  Even if this belated supplementation were permissible – and it is not[4] – Mr. Lipps' cursory consideration of these additional data points would not come close to meeting *Daubert* standards.

Aside from briefly listing the relevant considerations, Mr. Lipps provides no further analysis.  No description of how he processed or evaluated or *applied* the information is provided.  His "technique," in other words, was to "consider" factors and reach conclusions, with nothing to link the two.  The complete lack of transparency inherent in this process is acknowledged by Mr. Lipps himself, who stated at deposition that he "weighed the importance of the legal issue in my own mind to the case" and the factors "created the legal environment within which I evaluated the settlement."  Lipps Tr.142:25-143:6.

Moreover, Mr. Lipps' "consideration" of miscellaneous non-legal "data points" was woefully incomplete and lacking in rigor.  Mr. Lipps says he "considered settlements of similar claims," January 15 Declaration ¶¶ 29-31, but he fails to explain how he determined that the settlements were similar and how (or whether) he was able to compare the specifics of the securitizations at issue in those cases with the Debtors'.  Likewise, he "considered [the Debtors'] repurchase data," January 15 Declaration ¶¶ 32, but he describes only a single example and

---

[4] *See, e.g., Ebbert v. Nassau County*, No. CV 05-5445, 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) ("A rebuttal expert report is not the proper 'place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice.'") (string cite omitted); *Larson v. Wis. Cent. Ltd.*, No. 10-C-446, 2012 WL 368379, at *4 (E.D. Wis. Feb. 3, 2012) (rebuttal report "cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions"); *Cage v. City of Chi.*, No. 09-C-3078, 2012 WL 5557410, at *2 (N.D. Ill. Nov. 14, 2012) (party cannot "offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief").

provides no explanation as to how this example may be extrapolated to the universe of the Debtors' loans.  Finally, while Mr. Lipps indicated he "considered the allegations lodged by plaintiffs in RMBS cases against the Debtors," including alleged defect rates between 30% and 97%, January 15 Declaration ¶ 34, Mr. Lipps himself opined that "such allegations grossly exaggerate the defect rate of loans in the Debtors' securitizations," *id*. – yet he made no attempt to determine the actual defect rate, a necessary element of any proper analysis.

## II.    The Opinions Expressed in Mr. Lipps' May 24 Declaration Do Not Satisfy *Daubert*'s "Fit" Requirement

*Daubert* requires, in addition to the factors discussed above, that an expert's testimony be relevant – i.e., that it must "fit" the facts of the case.  *Daubert*, 509 U.S. at 591; *see also* Fed. R. Evid. 702(a) (requiring that "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"); *Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 49 (E.D.N.Y. 1999) (same).

Here, the May 24 Declaration has no relevance to the approval of the 9019 Motion.  The Declaration was drafted in connection with an adversary proceeding seeking to stay a number of lawsuits against non-Debtor parties.  It contains no mention of the 9019 Motion and does not discuss the claims being settled.  The discovery burdens discussed in the Declaration relate entirely to litigation of claims against non-Debtors outside of bankruptcy.  *See generally* May 24 Declaration ¶ 4 (opining that "it is highly likely that very substantial discovery burdens will be imposed on the debtor entities and their employees if any of the lawsuits proceed against the non-debtor affiliate defendants or the individual defendants").  The Declaration has no bearing on the costs of a litigated resolution of the RMBS claims against the Debtors in bankruptcy, which is the only issue of potential relevance to the amount of the RMBS Trust Settlement.

Equally important, Mr. Lipps nowhere addresses what the discovery and litigation burdens would be if the claims were estimated. Indeed, Mr. Lipps has acknowledged he has no relevant experience with the bankruptcy courts' powers to estimate and otherwise streamline claim allowance litigation against debtors. *See* Lipps Tr. 38:9-43:12. Therefore he would not be competent to testify as to such issues.

**III.    Mr. Lipps' Dual Role as Expert and Counsel to the Debtors Provides Additional Grounds to Preclude His Expert Testimony**

**A.    Mr. Lipps is Serving as Counsel to the Debtors On The Very Issues as to Which He Seeks to Give Expert Testimony**

It is widely recognized that "[t]he single most important obligation of an expert witness is to approach every question with independence and objectivity." Steven Lubet & Elizabeth I. Boals, *Expert Testimony: A Guide for Expert Witnesses and the Lawyers Who Examine Them* 163 (2d ed. 2009). Mr. Lipps' role as the Debtors' counsel of record precludes him from meeting that obligation. In addition to serving as the Debtors' lead defense counsel in RMBS litigation for the past three years, *see* Lipps Initial Decl. ¶ 3; Lipps Tr. ¶ 55:6-13, Mr. Lipps has been deeply involved in the prosecution of the 9019 Motion, including drafting briefs for the Debtors on the very issues as to which he proposes to testify. It simply is not realistic to expect Mr. Lipps to appear before the Court and give impartial expert testimony on issues central to the 9019 Motion, knowing that his candid testimony on these issues could damage his client's cause. Not only would this dual role pose a sharp conflict of interest for Mr. Lipps – potentially forcing him to choose between his duties as a lawyer (to zealously represent his client) and his duties as an expert (to be independent and objective) – it would also taint these proceedings by creating a glaring appearance of impropriety. The Court need not and should not permit such a situation. Instead, the Court should preclude Mr. Lipps from serving as an expert witness in this case.

In *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), the District Court imposed just such a remedy when faced with similar facts.  In that fraudulent transfer case, Judge Chin excluded the expert testimony of a law professor who sought to provide an opinion as to the business purpose of the challenged transaction.  The court observed that the professor had been engaged as counsel by plaintiffs and their attorneys of record, *id.* at 683, and in that role had "helped plaintiffs 'explore and develop legal theories,' 'identify the legal issues and the facts – the kinds of facts that would be necessary to support various claims,' 'formulat[e] and develop [] issues and theories in the case,' and 'evaluat[e] the defense that would be put up in this case,'" *id.* at 684.  In language equally applicable to Mr. Lipps, Judge Chin held that this dual role as counsel and expert made proper expert testimony impossible:

> . . . Carney acted as counsel for plaintiffs.  He functioned not just as an expert witness providing information, but he carried on the traditional functions of a lawyer-advocate – developing arguments and theories, anticipating and preparing responses to defendants' defenses, and preparing lines of cross examination.  Carney saw himself as 'counsel' to plaintiffs' lawyers and he acted in a completely partisan manner.  It would be most inappropriate to permit him now to testify as an expert witness about the very matters he helped develop as a lawyer-advocate.

*Id.* at 688; *see also id.* ("because of his advocacy on behalf of plaintiffs as counsel and legal advisor, I do not believe that he can now testify with the detachment and independence that one would expect from an expert witness offering views as a professional").[5]

Mr. Lipps' testimony suffers from the same problems.  Like the expert in *Lippe*, Mr. Lipps has been engaged not only as an expert but also as counsel to the Debtors.  *See generally* Debtors' Application to Employ and Retain Carpenter Lipps & Leland LLP as Special

---

[5] Judge Chin made clear that the mere existence of bias is not sufficient to exclude an expert's testimony, but held preclusion to be appropriate because of the extent of the bias in the case before him:  "Of course, many expert witnesses are biased and the lack of bias is not required for expert testimony to be admissible.  But here plaintiffs have gone too far, for they seek to call as a witness someone who has acted as their attorney, with a 'duty . . . to represent [his] client[s] zealously within the bounds of the law.'"  *Id.* (citations omitted).

Litigation Counsel (the "**Retention Application**") [Dkt. No. 508].  Indeed, Mr. Lipps' firm has been awarded approximately $3.8 million in fees and expenses in this case to date, including fees of approximately $450,000 in connection with the RMBS Trust Settlement.[6]  In addition, Mr. Lipps and his firm have been involved in developing and even briefing legal theories in connection with the very litigation that is the subject of his proposed expert testimony.  Among other things, as reflected in the Retention Application and the first [Dkt. No. 1889] and second [Dkt. No. 3174] interim fee applications filed by Carpenter Lipps & Leland:

- "Both in the lead up to these bankruptcy cases and in the brief period since they have been filed, CLL has collaborated heavily with Morrison & Foerster to help the Debtors address . . . the [RMBS 9019] motion."   Retention Application ¶ 16.

- Carpenter Lipps & Leland has "assisted in responding to the discovery requests that the Debtors have received related to the RMBS Trust Settlement," and has engaged in such tasks as "commenting on drafts of some of the court pleadings related to the RMBS Trust Settlement."  First Interim Fee Application ¶ 20.

- Carpenter Lipps & Leland has "assisted Morrison & Foerster LLP [] in the Debtors' efforts to seek approval of Debtors' proposed settlement," including "researching and drafting work in support of the Settlement."  Second Interim Fee Application ¶ 18.

- Morrison & Foerster has "regularly consulted with [Carpenter Lipps & Leland] regarding the issues involved in the settlement," and has "requested [Carpenter Lipps & Leland] research certain legal or factual issues related to the settlement."  Second Interim Fee Application ¶ 20.

- Carpenter Lipps & Leland has "assisted Morrison & Foerster in working on the reply briefing in support of the RMBS Trust Settlement," and has "researched certain issues relevant to the reply briefing and prepared drafts of sections of the brief in close coordination with Morrison & Foerster."  Second Interim Fee Application ¶ 23.

---

[6] *See* Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses [Dkt. No. 2530]; Order Granting Applications for Allowance of Interim Compensation and Reimbursement of Expenses [Dkt. No. 3556]; First Interim Application of Carpenter Lipps & Leland LLP as Special Litigation Counsel for the Debtors for Compensation and Reimbursement of Expenses Incurred for the Period May 14, 2012 Through August 31, 2012 [Dkt. No. 1889]; Second Interim Application of Carpenter Lipps & Leland LLP as Special Litigation Counsel for the Debtors for Compensation and Reimbursement of Expenses Incurred for the Period September 1, 2012 Through December 31, 2012 [Dkt. No. 3174].

Time entries for Mr. Lipps and other Carpenter Lipps & Leland attorneys confirm the firm's role in prosecuting the 9019 Motion extended far beyond the preparation of expert reports, including drafting pleadings, strategizing and conducting discovery. The time entries include the following:[7]

- Jennifer A.L. Battle, 5/15/2012 ("Discussions and calls with Ms. Levitt, Mr. Lee (Morrison & Foerster), Mr. Lipps and Mr. Beck regarding potential strategy to support RMBS settlement");

- Jennifer A.L. Battle, 5/17/2012 ("Discussions with clients . . . and Morrison and Foerster . . . regarding strategy and next steps on supporting RMBS settlement");

- Jeffrey A. Lipps, 5/23/2012 ("Further review and redrafting of 9019 motion");

- Jennifer A.L. Battle, 5/23/2012 ("Revise and comment on 9019 motion papers at request of Morrison & Foerster");

- Jeffrey A. Lipps, 5/25/2012 ("Review and redraft 9019 motion");

- Jeffrey A. Lipps, 5/27/2012 ("Further review and revision of motion");

- Jennifer A.L. Battle, 9/13/2012 ("Incorporate veil-piercing research into analysis of Holdco election");

- Jeffrey A. Lipps, 11/29/2012 ("Review creditor objections to 9019 motion [] Conference with Ms. Battle regarding strategy on same");

- Jennifer A.L. Battle, 12/03/2012 ("Meet with Mr. Lipps regarding preparation of sections of draft reply brief");

- Jeffrey A. Lipps, 12/05/2012 ("Review and redraft memorandum regarding Aurelius subordination argument");

- Jennifer A.L. Battle, 12/13/2012 ("Meeting with Mr. Lipps regarding strategy for 9019 reply brief");

- Jeffrey A. Lipps, 12/31/2012 ("Review and redraft portions of reply memorandum in support of 9019").[8]

---

[7] Excerpts from the First and Second Interim Fee Applications reflecting relevant time entries are attached as **Exhibits B and C** hereto.

[8] *See also* David A. Beck, 7/24/2012 ("Research Daubert issues related to Sillman declaration at request of Ms. Levitt of Morrison & Foerster"); David A. Beck, 9/13/2012 ("Update memorandum on veil piercing issues related to RMBS based on analysis of contractual provisions"); Jennifer A.L. Battle, 9/21/2012 ("Prepare 'key points' list of subjects for potential Marano deposition"); David J. Barthel, 9/24/2012 ("Research case law regarding use of legal expert testimony and declarations in support of settlements in S.D.N.Y." and "Draft e-mail to Ms. Battle regarding case law regarding use of legal expert testimony and declarations in support of settlements in S.D.N.Y."); David A. Beck, 10/15/2012 ("Analyze opinion approving Dewey settlement to understand Judge Glenn analysis on 9019 approval factors"); Jennifer A.L. Battle, 10/16/2012 ("Meet with Mr. Rains, Ms. Levitt, Ms. DeArcy (all Morrison

In sum, just like the expert in *Lippe*, Mr. Lipps is serving actively as counsel in the very matter in which he seeks to serve as expert. The suggestion that Mr. Lipps is in a position to take off his advocate's hat and to give objective and disinterested testimony on matters of legal judgment – including giving testimony that could potentially undermine his client's prospects of prevailing on this Motion – strains credulity, to say the least. As in *Lippe*, "[i]t would be most inappropriate to permit [Mr. Lipps] now to testify as an expert witness about the very matters he helped develop as a lawyer-advocate." *Lippe*, 288 B.R. at 688. He should be precluded from giving any expert testimony in this contested matter.

**B.    Mr. Lipps' Proposed Expert Testimony Would Serve As an End-Run Around This Court's Preclusion Order**

Mr. Lipps should not be permitted to testify concerning RMBS-related legal issues in light of the Court's preclusion order as such testimony places in the record the substance of the legal advice received by the Debtors concerning RMBS litigation, and by extension, the substance of what the ResCap board learned about such legal issues.

As noted above, Mr. Lipps has long served as lead counsel at the principal litigation firm for the Debtors with respect to RMBS litigation. *See* September 28 Declaration ¶ 3; Lipps Tr. 55:6-13. It was in this role that he developed the knowledge and experience cited as a basis of his opinion. *See* September 28 Declaration¶¶ 9-11. Even if Mr. Lipps could permissibly opine as to the reasonableness of the settlement – and he cannot, for the reasons discussed above – his testimony cannot be admitted for purposes of establishing the legal considerations that led to the Debtors' decision to enter into the settlement.

---

& Foerster) regarding preparation for defense of 9019 motion"); David J. Barthel, 10/24/2012 ("Quality check Morrison & Foerster reviewers' privilege coding in Concordance for Set 4 withheld log of RMBS Settlement Agreement and Plan Support Negotiation documents to assist Morrison & Foerster with productions to the UCC"); David A. Beck, 11/26/2012 ("Meeting with Mr. Lee, Mr. Princi (Morrison & Foerster) and Mr. Lipps regarding strategy on RMBS settlement litigation and other case issues"); Steven C. Moeller, 11/30/2012 ("Legal research regarding availability of pre-confirmation motion to determine the classification of claims of security holders").

The Court has already ruled that the Debtors are "precluded from offering *any* evidence of the legal advice provided to the Debtors' officers and directors that was considered in connection with the decision to enter into the RMBS Trust Settlement." *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 1497203, *6 (Bankr. S.D.N.Y. April 12, 2013) (emphasis in original); *see also id.* at *8 ("the Debtors cannot now introduce the substance of whatever advice it sought and received in order to demonstrate that it exercised proper business judgment in approving the RMBS Trust Settlement").  Mr. Lipps' testimony regarding the strength and weaknesses of the settled claims, together with statements that he had previously advised the Company and/or the Board, cannot be used as an end-run around the Court's April 12 preclusion order.  Indeed, the Court explicitly cautioned that though Board members' personal experience with R&W liability might not be subject to preclusion, "such evidence may not be used as a back door to introduce legal advice given by ResCap's attorneys." *Id.* at *8.  With respect to Mr. Lipps, the Court further noted that his testimony would be excluded to the extent he "attempts to testify as to any legal advice he himself gave to the Debtors' officers or Board members." *Id.* at *9.  Because Mr. Lipps' proposed testimony threatens to do just that, it must be excluded.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an Order precluding Mr. Lipps from offering expert testimony at the trial of the 9019 Motion.

Dated: New York, New York
       May 6, 2013

                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

                    /s/ Philip Bentley
                    Kenneth H. Eckstein
                    Philip Bentley
                    David E. Blabey, Jr.
                    1177 Avenue of the Americas
                    New York, New York 10036
                    Telephone: (212) 715-9100
                    Facsimile: (212) 715-8000

                    *Counsel for the Official Committee*
                    *of Unsecured Creditors*

**EXHIBIT A**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. Al,

12-12020(MG)

Debtors.

------------------------------------x




        DEPOSITION OF JEFFREY A. LIPPS

            New York, New York

             November 19, 2012

               10:13 a.m.




Reported by:
JENNIFER OCAMPO-GUZMAN, CRR, CLR
JOB NO: 27971

2

```
1

2

3

4

5

6

7

8                    November 15, 2012

9                    10:13 a.m.

10

11        Deposition of JEFFREY A. LIPPS,

12    held at the offices of Kramer, Levin,

13    Naftalis & Frankel, 1177 Avenue of the

14    Americas, New York, New York, pursuant

15    to Notice, before Jennifer

16    Ocampo-Guzman, a Certified Real-Time

17    Shorthand Reporter and Notary Public of

18    the State of New York.

19

20

21

22

23

24

25
```

3

```
 1

 2          A P P E A R A N C E S:

 3

 4      FOR THE OFFICIAL COMMITTEE

 5      OF UNSECURED CREDITORS:

 6          KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP

 7              1177 Avenue of the Americas

 8              New York, New York 10036

 9          BY:   PHILIP BENTLEY, ESQ.

10          pbentley@kramerlevin.com

11              JEFFREY DUNLAP, ESQ.

12          jdunlap@kramerlevin.com

13              SAMANTHA KAGAN

14              LAWRENCE PETTIT

15

16      FOR THE DEBTORS AND MR. WHITLINGER:

17          MORRISON & FOERSTER, LLP

18              755 Page Mill Road

19              Palo Alto, CA 94304-1018

20          BY:   DARRYL RAINS, ESQ.

21          drains@mofo.com

22

23

24

25
```

4

```
 1
 2          A P P E A R A N C E S: (Cont'd.)
 3
 4      FOR THE AD HOC GROUP OF
 5      JUNIOR SECURED NOTEHOLDERS:
 6          WHITE & CASE, LLP
 7                  1155 Avenue of the Americas
 8                  New York, New York 10036
 9          BY:   IAN J. SILVERBAND, ESQ.
10          isilverband@whitecase.com
11
12
13      FOR BANK OF NEW YORK MELLON:
14          DECHERT, LLP
15                  1095 Avenue of the Americas
16                  New York, New York 10036
17          BY:   SCOTT C. KESSENICK, ESQ.
18          scott.kessenick@dechert.com
19
20
21
22
23
24
25
```

5

1

2          A P P E A R A N C E S: (Cont'd.)

3

4      FOR MBIA:

5          CADWALADER, WICKERSHAM & TAFT, LLP

6              One World Financial Center

7              New York, New York 10281

8          BY:   WILLIAM J. NATBONY, ESQ.

9          bill.natbony@cwt.com

10

11     FOR THE EXAMINER:

12         CHADBOURNE & PARKE, LLP

13             30 Rockefeller Plaza

14             New York, New York 10112

15         BY:   POOJA ASNAMI, ESQ.

16         psasnami@chadbourne.com

17

18

19

20

21

22

23

24

25

6

1

2          A P P E A R A N C E S: (Cont'd)

3

4          FOR DEUTSCHE BANK:

5              MORGAN, LEWIS & BOCKIUS, LLP

6                  1701 Market Street

7                  Philadelphia, PA 19103-2921

8          BY:   JOHN C. GOODCHILD, III, ESQ.

9              jgoochild@morganlewis.com

10

11          FOR THE LAW DEBENTURE:

12              SEWARD & KISSEL, LLP

13                  One Battery Park Plaza

14                  New York, New York 10004

15          BY:   BENAY L. JOSSELSON, ESQ.

16              josselson@sewkis.com

17

18          FOR THE U.S. BANK:

19              SEWARD & KISSEL, LLP

20                  One Battery Park Plaza

21                  New York, New York 10004

22          BY:   MARK D. KOTWICK, ESQ.

23              kotwick@sewkis.com

24

25

7

1

2          A P P E A R A N C E S: (Cont'd.)

3          FOR THE POTENTIAL OBJECTOR FGIC:

4              JONES DAY

5                  222 East 41st Street

6                  New York, New York 10017-6702

7              BY:   HOWARD F. SIDMAN, ESQ.

8              hfsidman@jonesday.com

9                  PATRICK J. SMITH, ESQ.

10             patsmith@jonesday.com

11

12         FOR THE STEERING COMMITTEE INVESTORS:

13             GIBBS & BRUNS LLP

14                 1100 Louisiana

15                 Houston, Texas 77002

16             BY:   KATHY PATRICK, ESQ.

17             kpatrick@gibbsbruns.com

18

19         FOR WILMINGTON TRUST:

20             LOEB & LOEB, LLP

21                 345 Park Avenue

22                 New York, New York 10154

23             BY:   P. GREGORY SCHWED, ESQ.

24             gschwed@loeb.com

25

8

1

2          A P P E A R A N C E S: (Cont'd)

3

4     FOR ASSURED GUARANTY:

5          PROSKAUER ROSE

6               11 Times Square

7               New York, New York 10036

8          BY:   IRENA GOLDSTEIN, ESQ.

9          igoldstein@proskauer.com

10

11

12     ALSO PRESENT:

13     JENNIFER BATTLE, ESQ.

14          (Carpenter, Lippe & Leland LLP)

15

16     Via telephone:

17     JERRY PHELPS, ESQ. (Talcott Franklin)

18

19

20

21

22

23

24

25

9

1

2          J E F F R E Y   A.   L I P P S, called as a

3          witness, having been duly sworn by a Notary

4          Public, was examined and testified as

5          follows:

6          EXAMINATION BY

7          MR. BENTLEY:

8               Q.   Good morning, Mr. Lipps.

9    00:00     A.   Good morning, Mr. Bentley.

10   10:13     Q.   For the record, I'm Philip Bentley

11   10:13  of the Kramer Levin law firm, representing

12   10:13  the official creditor committee in this

13   10:13  bankruptcy.

14   10:13          MR. BENTLEY:  Let's start by

15   10:13       marking the first exhibit.

16   10:13          (Exhibit Expert 9019-1, Website

17             printout of Jeffrey A. Lipps biography,

18             [not Bates stamped], marked for

19   10:13       identification, this date.)

20   10:13     Q.   We've marked as Exhibit 1 a copy of

21   10:13  your web bio that was filed by the debtors as

22   10:13  part of their Rule 26 disclosure.

23   10:13          Do you recognize Exhibit 1?

24   10:13     A.   I do.

25   10:13     Q.   And is it a reasonably current and

21

```
 1                              Lipps
 2    10:27    "fixed," but it is clearly the declaration
 3    10:27    that I prepared and executed in May of this
 4    10:27    year.
 5    10:27         Q.   When I say "fixed," I mean we
 6    10:27    removed the appended additional declaration.
 7    10:27         A.   Fair enough.
 8    10:27              MR. BENTLEY:  And let's mark that
 9    10:27         other declaration as Exhibit 3.
10    10:28              (Exhibit Expert 9019-3,
11                       Supplemental Declaration of Jeffrey A.
12                       Lipps, [not Bates stamped], marked for
13    10:28         identification, this date.)
14    10:28              MR. BENTLEY:  Let's just go off the
15    10:28         record for a second.
16    10:28              (Discussion off the record.)
17    10:29         Q.   Mr. Lipps, I've handed you
18    10:29    Exhibit 3, which appears to be your
19    10:29    September 28, 2012 supplemental declaration
20    10:29    filed in this case.
21    10:29              Do you recognize it to be that?
22    10:29         A.   I do.
23    10:29         Q.   Let's turn back to Exhibit 2 and
24    10:29    talk for a few minutes about your May 24th
25    10:29    declaration.
```

22

Lipps

1    10:29        You prepared and filed this in

2    10:29    connection with a motion by the debtors to

3    10:30    extend the automatic stay, correct?

4    10:30        A.    Correct.

5    10:30        Q.    And then are you aware that this

6    10:30    declaration was filed again, in support of

7    10:30    the debtors' Rule 9019 motion in support of

8    10:30    the RMBS trust settlement?

9    10:30        A.    I am aware that this is another

10   10:30    instance in which the debtors did file that

11   10:30    declaration.

12   10:30        Q.    And let's just talk for a minute

13   10:30    about terminology, so we make sure we

14   10:30    understand each other.

15   10:30        If I refer to the Rule 9019 motion

16   10:30    or the 9019 motion, will you understand me to

17   10:30    be talking about the debtors' motion seeking

18   10:30    approval of the RMBS trust settlement?

19   10:30        A.    I will understand, if we're talking

20   10:30    about the trust settlement, that I looked at

21   10:30    in my third declaration -- or Exhibit 3, my

22   10:30    supplemental declaration.

23   10:30        Q.    And if I use the words "the

24   10:31    settlement" for that, for that settlement,

23

|    |       |                                             |
|----|-------|---------------------------------------------|
| 1  |       | Lipps                                       |
| 2  | 10:31 | you'll understand me?                       |
| 3  | 10:31 | MR. RAINS:  Well, I'll object, if           |
| 4  | 10:31 | it's vague and ambiguous, no matter         |
| 5  | 10:31 | what.                                       |
| 6  | 10:31 | Go ahead.                                   |
| 7  | 10:31 | A.    I will try and ask for                |
| 8  | 10:31 | clarification, if I don't understand you.  I |
| 9  | 10:31 | understand what I am here to discuss is the |
| 10 | 10:31 | settlement terms that I looked at, in       |
| 11 | 10:31 | connection with my supplemental declaration. |
| 12 | 10:31 | If that's how you are going to use the word |
| 13 | 10:31 | "settlement," then I'll understand it.      |
| 14 | 10:31 | Q.    That's correct.  And technically      |
| 15 | 10:31 | it's actually two settlements, but I think  |
| 16 | 10:31 | you refer sometimes in your declaration to  |
| 17 | 10:31 | them collectively as "the settlement."      |
| 18 | 10:31 | A.    I don't know how to answer that.      |
| 19 | 10:31 | Q.    It's not a question.  I just want     |
| 20 | 10:31 | to make sure we're on the same page.        |
| 21 | 10:31 | Let me ask you about Exhibit 2.             |
| 22 | 10:31 | Do you expect to be offering expert         |
| 23 | 10:31 | testimony at the hearing on the Rule 9019   |
| 24 | 10:31 | motion on any of the subjects addressed in  |
| 25 | 10:31 | your May 24th declaration?                  |

24

Lipps

1    10:32    A.   I could -- well, I haven't,

2    10:32    obviously, testified at the hearing

3    10:32    yesterday, but I could envision that the

4    10:32    debtor may want me to discuss matters that

5    10:32    are raised in the May declaration.

6    10:32    Q.   And can you identify any opinions

7    10:32    that are expressed in that declaration that

8    10:32    you expect you may express as expert opinions

9    10:32    at the hearing?

10   10:32    A.   Well, I mean the declaration itself

11   10:32    identifies the cases that I had experience

12   10:32    with, as well as the discovery burdens and

13   10:32    complexity and costs associated with

14   10:32    defending those cases, from the litigation

15   10:32    standpoint.  And I can imagine that I may be

16   10:33    asked to present to the court, as I have done

17   10:33    through the declaration on at least two other

18   10:33    instances that I recall, those facts.

19   10:33    Q.   And your expert opinion would

20   10:33    relate to the costs and burden relating to

21   10:33    the discovery matters addressed in this

22   10:33    declaration?

23   10:33    A.   Yes.

24   10:33    Q.   Let's turn now to your second

25

Lipps

1

2   10:33   declaration.  And by the way, if I sometimes

3   10:33   refer to the May 24th declaration as your

4   10:33   initial declaration, you will understand me?

5   10:33      A.   I will.

6   10:33      Q.   And I may refer to the

7   10:33   September 28th declaration as your

8   10:33   supplemental declaration or your second

9   10:33   declaration, and I trust you will understand

10  10:33   that?

11  10:33      A.   It would be easier if you called it

12  10:33   the supplemental declaration.

13  10:33      Q.   I'll try to do that.  I'll try to

14  10:34   do that.

15  10:34         The supplemental declaration you

16  10:34   prepared in support of the Rule 9019 motion,

17  10:34   correct?

18  10:34      A.   Yes.

19  10:34      Q.   And does this set forth the

20  10:34   opinions that you expect to express at the

21  10:34   9019 hearing and the basis and reasons for

22  10:34   those opinions?

23  10:34      A.   Yes, with one qualification.

24  10:34   Obviously, this area of the law is not

25  10:34   frozen, it's dynamic; and so I have had

27

1                          Lipps

2   10:35        your experts say, we may ask him to

3   10:35        respond to that.  And that would be the

4   10:35        subject of a supplemental report, Rule

5   10:35        26 report, as required by the rules.

6   10:36             MR. BENTLEY:  Fair enough.

7   10:36        Q.   As you sit here today, do you

8   10:36   expect to present any additional bases or

9   10:36   reasons for the opinions in your

10  10:36   declarations, other than the bases and

11  10:36   opinions stated in those declarations, as

12  10:36   supplemented by later developments?

13  10:36        A.   As I sit here today, I don't expect

14  10:36   so, as long as you add the qualifier

15  10:36   supplementation, because there are

16  10:36   developments that have occurred and will

17  10:36   likely occur by January.

18  10:36        Q.   Let's talk about what you consider

19  10:36   to be your areas of expertise that support

20  10:36   the expert opinions that you will be

21  10:36   presenting.

22  10:37             What do you consider to be those

23  10:37   areas of expertise?

24  10:37        A.   Well, I have experience and

25  10:37   expertise in litigating, defending and

28

1                          Lipps

2    10:37    prosecuting complex commercial cases, and I

3    10:37    have direct experience of a substantial

4    10:37    nature in defending RMBS litigation.  I have,

5    10:37    over the years, been called upon to assess

6    10:37    potential settlements in complex cases and

7    10:37    evaluate whether that would be an appropriate

8    10:37    range for a settlement in that case.

9    10:37        Q.    And so you're bringing that

10   10:37    expertise in assessing settlements, among

11   10:37    other things, to bear on the opinions you're

12   10:38    expressing here?

13   10:38        A.    That's part of the expertise and

14   10:38    experience that I'm relying on in offering my

15   10:38    opinion.

16   10:38        Q.    When you assess a settlement,

17   10:38    generally speaking, is there any particular

18   10:38    methodology or approach that you apply?

19   10:38        A.    It would depend on the

20   10:38    circumstances of the case, but you certainly

21   10:38    have to evaluate the state of the law and

22   10:38    evaluate potential exposure, both on the top

23   10:38    side and the bottom side, and make an

24   10:38    assessment as to where, within a range, you

25   10:38    expect a fair settlement would be.

29

Lipps

| | | |
|---|---|---|
| 1 | | Lipps |
| 2 | 10:38 | Q.   So is it fair to say that -- |
| 3 | 10:39 | A.   I would also add, there is one |
| 4 | 10:39 | other, there is one other thing that you |
| 5 | 10:39 | would take into account.  To the extent the |
| 6 | 10:39 | information is available, you would also want |
| 7 | 10:39 | to have an understanding as to what value is |
| 8 | 10:39 | being experienced in other, similar |
| 9 | 10:39 | litigation. |
| 10 | 10:39 | For example, just take a very |
| 11 | 10:39 | simple situation, if you have a broken leg |
| 12 | 10:39 | case, you would want to know what values or |
| 13 | 10:39 | ranges of exposure and/or settlements are out |
| 14 | 10:39 | there on broken leg cases. |
| 15 | 10:39 | So in addition to the law and |
| 16 | 10:39 | looking at exposure, if you have that data, |
| 17 | 10:39 | then you would factor that in. |
| 18 | 10:39 | Q.   And generally speaking, how do you |
| 19 | 10:39 | go about making your assessment as to where |
| 20 | 10:39 | in the range between top and bottom a fair |
| 21 | 10:40 | settlement would be? |
| 22 | 10:40 | A.   Well, it would depend on the |
| 23 | 10:40 | circumstances of the individual matter and |
| 24 | 10:40 | the cases. |
| 25 | 10:40 | I mean here, I sort of described |

30

1                              Lipps

2     10:40   how, well, I actually have described how I

3     10:40   went about assessing the reasonableness.    I

4     10:40   surveyed the issues and tried to determine

5     10:40   whether or not there were dispositive rulings

6     10:40   out there that would impact what your likely

7     10:40   exposure was, and then you evaluate what the

8     10:40   top line exposure is and a baseline exposure,

9     10:40   which could be, if you want to approach it

10    10:40   from a pure defense verdict standpoint, zero.

11    10:40         Q.    So in this methodology that you

12    10:40   typically apply in evaluating a settlement,

13    10:41   do you assign numbers to any issues?

14    10:41             MR. RAINS:   Objection, vague and

15    10:41         ambiguous.

16    10:41         A.    I'm not sure what you mean by

17    10:41   numbers, do I assign numbers.

18    10:41         Q.    Are you familiar with the term

19    10:41   "litigation risk analysis"?

20    10:41         A.    I don't know.  I may.  Just depends

21    10:41   on what you mean by that term.

22    10:41         Q.    Are you familiar with --

23              MR. BENTLEY:   Strike that.

24    10:41         Q.    In analyzing a settlement, one

25    10:41   thing you do, I think, is you try to

31

1                                Lipps

2   10:41   determine possible outcomes, right?

3   10:41        A.   That's a way that you do that.

4   10:41   That's certainly what I looked at here.

5   10:41        Q.   And you mentioned a broken leg

6   10:41   case.  Possible outcomes might have different

7   10:41   dollar figures associated with them, right?

8   10:41        A.   There could be different verdicts,

9   10:41   there could be different settlements,

10  10:42   correct.

11  10:42        Q.   Do you then sometimes assign

12  10:42   percentage likelihoods to different possible

13  10:42   outcomes?

14  10:42        A.   Do I sometimes do that?

15  10:42        Q.   Correct.

16  10:42        A.   I've done that before in

17  10:42   settlements.

18  10:42        Q.   Do you have a term that you use to

19  10:42   describe that kind of approach?

20  10:42        A.   No.

21  10:42        Q.   Would litigation risk analysis be,

22  10:42   if I used the term "litigation risk

23  10:42   analysis," would you recognize it to relate

24  10:42   to that kind of analysis?

25  10:42             MR. RAINS:  Objection, no

32

1                              Lipps

2    10:42         foundation.

3    10:42         A.   No, I can't associate that word

4    10:42    with what you've described.

5    10:42              I mean I have been in situations

6    10:42    with judges, where they try and force you to

7    10:42    say you have a 90 percent chance, and you

8    10:42    could lose X percent or 10 percent chance, if

9    10:42    that's what you're talking about, there are

10   10:42    certainly various judges or mediators that

11   10:42    have approached it that way.

12   10:43         Q.   And do you sometimes find it's

13   10:43    useful to use that kind of approach?

14   10:43         A.   Depending on the case and the

15   10:43    certainty that you could have associated with

16   10:43    the numbers, numbers can be used.

17   10:43         Q.   And is that an approach that's

18   10:43    commonly used among litigators?

19   10:43         A.   I can't speak as to how other

20   10:43    litigators approach analyzing settlements.

21   10:43         Q.   Have clients sometimes asked you to

22   10:43    prepare that kind of an analysis of a

23   10:43    proposed, of a potential settlement?

24   10:43         A.   I'm not going to have perfect

25   10:43    memory of what clients ask me to do, but I

33

1                              Lipps

2   10:43   don't have a clear recollection of going

3   10:43   through that type of an analysis,

4   10:43   specifically, in a request from a client.

5   10:43       Q.   Have you ever done that kind of an

6   10:43   analysis in an RMBS-related matter?

7   10:43       A.   No.

8   10:44       Q.   And I take it you didn't do that

9   10:44   kind of an analysis, in connection with this

10  10:44   settlement?

11  10:44           MR. RAINS:  Objection, vague and

12  10:44       ambiguous.

13  10:44       A.   I don't know that I can say that.

14  10:44   I don't know that I can say that.

15  10:44       Q.   Did you assign any percentage

16  10:44   likelihoods to different, to any different

17  10:44   possible outcomes in this case?

18  10:44       A.   I don't think, as you can tell in

19  10:44   this report, I don't think -- let me take a

20  10:44   step back.

21  10:44           As you can tell in this report,

22  10:44   this area of the law is in, at best, its

23  10:44   formative stages.  It's -- it's still

24  10:44   evolving, it's still developing.  And there

25  10:44   is so much uncertainty on so many issues that

34

1                         Lipps

2    10:44   I don't think it would be meaningful to sit

3    10:44   and try and assess a percentage attached to a

4    10:44   particular outcome.

5    10:45            I think you have to look at the

6    10:45   two points, which is, what's your maximum

7    10:45   exposure out there and then what is your

8    10:45   likely exposure, to try and evaluate a range

9    10:45   of reasonableness.

10   10:45        Q.   And --

11            MR. BENTLEY:   Strike that.

12   10:45        Q.   Do you claim to have any expertise

13   10:45   in quantitative matters?

14   10:45            MR. RAINS:   Objection, vague and

15   10:45        ambiguous.

16   10:45        A.   I don't know what it is.

17   10:45        Q.   Do you claim to have any expertise

18   10:45   in the field of statistics?

19   10:46        A.   I don't think I'm offering myself

20   10:46   as an expert statistician, if that's what

21   10:46   you're asking.

22   10:46        Q.   Do you have any education or

23   10:46   training in statistics?

24   10:46        A.   I certainly, I took statistics back

25   10:46   when I was in school, and I've also been

35

1                              Lipps

2     10:46    involved actively in issues with respect to

3     10:46    the use of statisticians and statistics, in

4     10:46    the defense of RMBS cases.

5     10:46       Q.   So is it your testimony that you

6     10:46    think you have a grasp of certain statistical

7     10:46    issues, but you don't claim to be an expert

8     10:46    in statistics?

9     10:46       A.   I think a better way to say it is

10    10:46    I'm not offering myself as a statistician

11    10:46    with a statistical-based opinion.  I have

12    10:46    familiarity with how experts have been

13    10:46    presented in other proceedings that would

14    10:47    have statistical expertise in RMBS cases.

15    10:47       Q.   Other than your experience as a

16    10:47    litigator, do you have any post-college

17    10:47    training in any statistical matters?

18    10:47       A.   If I understand the question, no, I

19    10:47    do not have any formal training in statistics

20    10:47    since my graduation from college.

21    10:47       Q.   Or any education or formal training

22    10:47    in any other methods of quantitative

23    10:47    analysis?

24    10:47       A.   I don't know what you include

25    10:47    within quantitative analysis.  Kind of like

36

1                          Lipps

2    10:47   circled back now, you started with that

3    10:47   quantitative analysis.  I didn't understand

4    10:47   it, then you defined it as statistics, so.

5    10:47        Q.   Do you have any post-college

6    10:48   education or training in any fields of

7    10:48   economics?

8    10:48        A.   Not in terms of direct academic

9    10:48   education.  Now, as we all know around the

10   10:48   table that have been involved in litigation,

11   10:48   you wind up having graduate courses in

12   10:48   economics, statistics, you name it, once you

13   10:48   sit with an expert and you bring them into a

14   10:48   case.

15   10:48        Q.   I understand that you have the same

16   10:48   sort of extensive experience that many of us

17   10:48   litigators have in these matters.

18   10:48        A.   Right.

19   10:48        Q.   I'm just trying to get it clear

20   10:48   whether you have any formal training in

21   10:48   economic matters.

22   10:48        A.   No, I think I've answered that; no,

23   10:48   not beyond college.

24   10:48        Q.   And the same question for any

25   10:48   matters of finance?

37

1                              Lipps

2    10:48        A.    Not beyond college.

3    10:48        Q.    Do you claim any expertise in

4    10:48    bankruptcy law or any aspect of the

5    10:49    bankruptcy process?

6    10:49        A.    I think the expertise I'm claiming

7    10:49    and identifying in this case is in the report

8    10:49    itself.  I don't know that I've opined on any

9    10:49    particular bankruptcy procedure or rule here

10   10:49    in this supplemental declaration.

11   10:49        Q.    Do you have any particular

12   10:49    expertise in bankruptcy law?

13   10:49        A.    Well, as I told you, I litigated

14   10:49    issues in the context of bankruptcies,

15   10:49    specifically in some of my younger years

16   10:49    where I looked more like my picture, for

17   10:49    Federated Department Stores.  And we have, my

18   10:50    firm has been approved for retention in this

19   10:50    bankruptcy, so we have some experience in

20   10:50    that context.

21   10:50        Q.    Are you offering yourself as an

22   10:50    expert in any matters of bankruptcy law or

23   10:50    practice?

24   10:50        A.    Actually, I'm offering myself as an

25   10:50    expert of what's in the supplemental

38

Lipps

1    10:50    declaration.  And, you know, it's in the

2    10:50    context of a settlement that will have an

3    10:50    impact on the estate and creditors, so to

4    10:50    that extent, yes, I am offering an opinion as

5    10:50    to whether or not this is a fair and

6    10:50    reasonable settlement, within an acceptable

7    10:50    range.

8    10:50         Q.   Are you familiar with the

9    10:50    bankruptcy court's powers under bankruptcy

10   10:50    code section 502(c)?

11   10:50         A.   What are you asking me, whether

12   10:51    I've heard of 502(c)?

13   10:51         Q.   Let's start with that.

14   10:51         A.   I may or may not have.

15   10:51         Q.   You can't tell me what it is?

16   10:51         A.   Off the top of my head, no.  I

17   10:51    would have to go look.

18   10:51         Q.   Are you familiar with the

19   10:51    bankruptcy court's estimation powers?

20   10:51         A.   I am aware of that procedure being

21   10:51    available, and in fact, I think it was

22   10:51    utilized in the Lehman bankruptcy, with

23   10:51    respect to RMBS clients.

24   10:51         Q.   You're not sitting here claiming

39

                              Lipps

1

2   10:51   any expertise, are you, in what the

3   10:51   bankruptcy court's -- sorry -- what

4   10:51   principles would govern an estimation

5   10:51   proceeding, are you?

6   10:51       A.   I don't believe I've offered any

7   10:51   opinions on that.

8   10:51       Q.   Do you have an understanding as to

9   10:51   what legal rules a bankruptcy court would

10  10:51   apply in estimating a claim against the

11  10:52   debtors?

12  10:52       A.   I don't believe I'm offering any

13  10:52   opinion on this.

14  10:52       Q.   Do you have any familiarity with

15  10:52   that?

16  10:52       A.   I have not been involved in

17  10:52   advising or analyzing the legal powers in the

18  10:52   estimation process in a bankruptcy.

19  10:52       Q.   And you don't know in any detail

20  10:52   what they are, do you?

21  10:52       A.   Not beyond what I've looked at in

22  10:52   connection with the Lehman estimation

23  10:52   process.

24  10:52       Q.   Do you have any knowledge of the

25  10:52   sorts of procedures bankruptcy courts have

40

                              Lipps

1

2    10:52    applied to estimate mass tort claims?

3    10:52         A.   Now I'm getting into your

4    10:52    wheelhouse with asbestos.

5    10:52              No, I don't have any direct

6    10:52    involvement in that.

7    10:52         Q.   You wouldn't claim to have any

8    10:52    expertise in that area, correct?

9    10:52         A.   Not on the powers of the bankruptcy

10   10:52    court with respect to those.

11   10:52         Q.   Or how the process would likely

12   10:52    play out in bankruptcy, an estimation

13   10:52    process?

14   10:52         A.   I have not been directly involved

15   10:53    in it.

16   10:53         Q.   Do you have any understanding --

17   10:53              MR. BENTLEY:  Strike that.

18   10:53         Q.   In this case, is it your

19   10:53    understanding that if the settlement were to

20   10:53    be rejected and this matter were to be

21   10:53    litigated --

22   10:53              MR. BENTLEY:  Sorry.  Let me start

23   10:53         again.

24   10:53         Q.   Let me ask you to assume that the

25   10:53    bankruptcy court rejects this settlement and

41

1                         Lipps

2    10:53    the matter is then adjudicated in bankruptcy

3    10:53    court.

4    10:53            In that scenario, do you have any

5    10:53    understanding of what process the bankruptcy

6    10:53    court might apply to adjudicate the claims?

7    10:53            MR. RAINS:  Objection, incomplete

8    10:53        hypothetical.

9    10:53        A.   I haven't looked into those issues,

10   10:53    and I haven't been asked to opine or even

11   10:53    advise on it, so I can't answer your

12   10:53    question.

13   10:53        Q.   And you don't claim any particular

14   10:53    expertise in what principles a bankruptcy

15   10:54    court might apply or what processes it might

16   10:54    follow in that connection?

17   10:54        A.   If the settlement that I think is

18   10:54    fair and reasonable and within a range of

19   10:54    acceptability is rejected by the bankruptcy

20   10:54    court --

21   10:54        Q.   Correct.

22   10:54        A.   -- what the options are after that?

23   10:54        Q.   Correct.

24   10:54        A.   I'm not offering any opinion on

25   10:54    that.  I haven't even looked into that.

42

Lipps

1    10:54         Now, some of my expertise may

2    10:54    translate into such procedures, if somebody

3    10:54    were to present procedural options to me and

4    10:54    ask me to assess and evaluate what, for

5    10:54    example, what burdens and costs would be

6    10:54    associated with that, what risks would be

7    10:54    associated with it; but I'm not here offering

8    10:54    any opinion on what happens, if the

9    10:54    bankruptcy court were to reject the

10   10:54    settlement.

11   10:54         Q.   For example, do you have any

12   10:54    understanding whether the bankruptcy court

13   10:54    would itself rule on any of the disputed

14   10:54    substantive legal issues governing the RMBS

15   10:55    claims?

16   10:55         A.   Can you ask me that again?

17   10:55         MR. BENTLEY:   Can you read that

18   10:55         back.

19   10:55         (A portion of the record was read.)

20   10:55         A.   What do you mean, some of the

21   10:55    substantive issues?  You mean some of the

22   10:55    legal issues that I've identified in here?

23   10:55         Q.   Yes.

24   10:55         A.   Are you asking me whether, in any

43

```
 1                        Lipps

 2    10:55   context, the bankruptcy judge could rule on

 3    10:55   those issues?

 4    10:55        Q.   In connection with a litigation of

 5    10:55   the RMBS claims in the bankruptcy court.

 6    10:55        A.   I'm not here offering an opinion on

 7    10:55   that, but I would suspect that in the claims

 8    10:55   process or some other process where there is

 9    10:55   trying to be, reach a determination on a

10    10:56   claim or a group of claims, that there would

11    10:56   be the potential for the court to make

12    10:56   decisions on substantive legal issues.

13    10:56        Q.   Let's turn to a different topic.

14    10:56             Let me ask you to turn to your

15    10:56   second declaration, your supplemental

16    10:56   declaration.  And I'm going to be asking you

17    10:56   some questions about --

18    10:57             MR. BENTLEY:  I'm sorry.  Let me

19    10:57        start again.

20    10:57        Q.   I want to ask you about your first

21    10:57   declaration.

22    10:57        A.   Okay.

23    10:57        Q.   And I'm going to be asking you some

24    10:57   questions about paragraphs 7 through 10.

25    10:57             MR. RAINS:  Take a minute, then, to
```

54

Lipps

1    11:10   cases, where we were transitioning off to

2    11:11   them.  So there may have been some interim

3    11:11   reporting.  But I didn't do much direct

4    11:11   reporting, frankly, into Tim because he had

5    11:11   brought Tricia Dennis to do some of the

6    11:11   day-to-day supervision.

7    11:11       Q.   She reported to Mr. Devine?

8    11:11       A.   I don't know for sure, but I would

9    11:11   assume so.

10   11:11       Q.   Is your firm the principal outside

11   11:11   counsel for the debtors, with respect to RMBS

12   11:11   litigation?

13   11:11           MR. RAINS:  Vague as to time.

14   11:11       A.   I'm having a hard time with that,

15   11:11   because you've conditioned it on debtors, and

16   11:11   I understand Morrison & Foerster is the

17   11:11   principal counsel for the debtors.  And I'm

18   11:11   not sure that I would describe any RMBS

19   11:11   litigation as being RMBS litigation post

20   11:11   petition, as it relates to the debtors, so

21   11:11   that's why I'm having problems grappling with

22   11:11   that question.

23   11:11       Q.   So let me try to make it easier for

24   11:12   you.  Let's focus on the prebankruptcy

55

1                          Lipps

2   11:12   period.

3   11:12          Who was your principal outside

4   11:12   counsel for the debtors, with respect to RMBS

5   11:12   litigation?

6   11:12          A.   With respect to the entities that

7   11:12   are now debtors, I would say that we probably

8   11:12   were the principal litigation firm.  There

9   11:12   were some areas of the country or some groups

10  11:12   of cases, other counsel would have been

11  11:12   responsible for them.  But the high exposure

12  11:12   and most active cases, we were representing,

13  11:12   what are now the debtor entities.

14  11:12          Q.   And are you Ally's principal

15  11:12   outside counsel, with respect to RMBS

16  11:12   litigation?

17  11:12          A.   I'm not representing Ally at all

18  11:12   right now in any post-petition RMBS

19  11:12   litigation.  There was the period of

20  11:12   transition.

21  11:12          Q.   Prior to the bankruptcy, was --

22  11:13          A.   Prior to the bankruptcy?  Ask me

23  11:13   the question, then, in that time period.

24  11:13          Q.   Yes.  Prior to the bankruptcy was

25  11:13   your firm Ally's principal outside counsel

135

1                          Lipps

2    13:40              MR. RAINS:  120 and 121 express the

3    13:40      same thought.  It would be incomplete to

4    13:40      have him look at just one paragraph.

5    13:40          Q.   Does paragraph 120 accurately state

6    13:40   your belief about the number of loans in the

7    13:40   collateral pool that breached reps and

8    13:40   warranties?

9    13:40          A.   When I wrote those words and said

10   13:40   "it is my belief," that was my belief.

11   13:40          Q.   Is it still your belief?

12   13:40          A.   What?  That a 90, 100 percent

13   13:40   breach rate?

14   13:41          Q.   No, that the overwhelming majority

15   13:41   of the loans in each collateral pool did not

16   13:41   breach any reps and warranties?

17   13:41          A.   I stand by that view as my own

18   13:41   belief, but --

19   13:41          Q.   Okay.

20   13:41          A.   -- you know, my own belief isn't

21   13:41   what I began -- that I ended with in terms of

22   13:41   evaluating the fairness of this settlement.

23   13:41          Q.   Did you make any attempt to

24   13:41   determine where the breach rate for the loans

25   13:41   in the 392 trusts fell as between the

136

1                          Lipps

2    13:41   plaintiffs' position on the one hand and your

3    13:41   view on the other hand?

4    13:41        A.    I think that's what I've been

5    13:41   describing most of the morning is that you, I

6    13:41   took into account at the low end the

7    13:42   voluntary repurchase experience and the fact

8    13:42   that if I hit every one of these issues that

9    13:42   I've identified from a defense standpoint,

10   13:42   there would still be liability out there, and

11   13:42   then I, you know, considered the top in range

12   13:42   and then evaluated whether 8.7 billion or 19

13   13:42   to 20 percent was a fair and reasonable

14   13:42   settlement given the totality of the

15   13:42   circumstances surrounding the prosecution and

16   13:42   defense of these claims.

17   13:42        Q.    You didn't look at any loan files

18   13:42   to determine where on this spectrum the

19   13:42   breach rates were, the recovered loans would

20   13:42   fall, did you?

21   13:42        A.    I think I indicated I did not look

22   13:42   at loan files, and I did not need to for

23   13:42   purposes of this opinion.

24   13:42        Q.    Did you form any quantitative

25   13:42   analysis to determine where on this spectrum

137

1                              Lipps

2    13:43    the breach rate for these loans fell?

3    13:43              MR. RAINS:  Objection, vague and

4    13:43        ambiguous.

5    13:43        A.    Mr. Bentley, I don't know how I can

6    13:43    be any more responsive with respect to

7    13:43    quantitative analysis than what I have.  I've

8    13:43    identified the various data points that may

9    13:43    in some people's minds be the byproduct of

10   13:43    the quantitative analysis that I took into

11   13:43    account.  I did not look at individual loan

12   13:43    files, nor did I go into trying to determine

13   13:43    what a particular breach rate was in a

14   13:43    particular trust or whether a breach was

15   13:43    material or not.

16   13:43        Q.    You do believe, don't you, that the

17   13:43    only reliable way to determine whether a loan

18   13:43    in fact complies with a rep or warranty is to

19   13:43    review and re-underwrite the actual loan

20   13:43    file?

21   13:44              MS. PATRICK:  Objection, form.

22   13:44        A.    That's certainly a position that I

23   13:44    have taken in defending these cases --

24   13:44        Q.    Is it your view --

25   13:44        A.    -- but I will tell you -- well --

138

1                          Lipps

2    13:44         Q.    And let me ask you to look at

3    13:44    paragraph 47 of your supplemental

4    13:44    declaration.

5    13:44         A.    And I will do that, but in the

6    13:44    question you asking me, is it my view --

7    13:44    well, let me look at paragraph 47.  Maybe I

8    13:44    will answer my own question.

9    13:44              MR. RAINS:  Which paragraph?

10   13:44              MR. BENTLEY:  47.

11   13:44         Q.    When you are finished reviewing it,

12   13:44    let me know and I will ask my next question.

13   13:44         A.    I have reviewed it.

14   13:44         Q.    Is the first sentence of this

15   13:45    paragraph an accurate statement of your view?

16   13:45         A.    I would stand by what I said in

17   13:45    this statement.

18   13:45         Q.    Let me ask you a related subject.

19   13:45              In forming your opinion, did you

20   13:45    make any attempt to quantify the losses

21   13:45    suffered by the trusts with respect to the

22   13:45    loans covered by the settlement?

23   13:45         A.    You mean losses at an individual

24   13:45    trust level?

25   13:45              MR. BENTLEY:  Actually let me start

139

1                              Lipps

2    13:45        again because that was a bad question.

3    13:45        Q.   Did you make any attempt to

4    13:45   quantify the losses suffered by the trust

5    13:45   with respect to any loans in the pool that

6    13:45   had material breaches?

7    13:46        MS. PATRICK:  Objection, form.

8    13:46        A.   I'm still not sure I understand

9    13:46   what the question is.  I clearly took into

10   13:46   account the losses --

11   13:46        Q.   The $45 billion?

12   13:46        A.   -- that were being projected the 45

13   13:46   billion.

14   13:46        Q.   But I'm asking --

15   13:46        A.   But it was an aggregate number

16   13:46   based on projections with respect of 392

17   13:46   trusts.

18   13:46        Q.   And what I'm asking -- did you make

19   13:46   any attempt --

20   13:46        MR. BENTLEY:  And apologies,

21   13:46        because it was a bad question.

22   13:46        Q.   Did you make any attempt to

23   13:46   determine what portion of that $45 billion

24   13:46   was suffered with respect to loans that had

25   13:46   material breaches?

140

1                           Lipps

2     13:46          A.    Probably, because I started with

3     13:46     about the maximum exposure, which was the 45

4     13:46     billion and if, in the claim, it could be

5     13:47     proven that all 45 billion was based on a

6     13:47     material breach, then that would be what

7     13:47     would happen were you to litigate those

8     13:47     claims.

9     13:47          Q.    But I'm not asking you to tell me

10    13:47     what the plaintiffs' position was.  I'm

11    13:47     asking whether you made any attempt to reach

12    13:47     a conclusion about what losses were actually

13    13:47     suffered by loans with material breaches?

14    13:47          A.    I didn't do a loan-by-loan analysis

15    13:47     to reach a definitive conclusion as to

16    13:47     whether or not a loan that had losses had

17    13:47     material breaches or not.  What I did was

18    13:47     look at the aggregate of the maximum exposure

19    13:47     being advanced by the plaintiffs and looked

20    13:47     at the experience, the data points with

21    13:48     respect to voluntary repurchase, and knowing

22    13:48     that somewhere in between is where I had to

23    13:48     assess whether or not the 8.7 billion was

24    13:48     reasonable and fair.

25    13:48          Q.    Did you make any attempt to

141

                                        Lipps

1

2    13:48    quantify the portion of the 45 billion that

3    13:48    was caused by material breaches of reps and

4    13:48    warranties?

5    13:48            MR. RAINS:  Objection, asked and

6    13:48        answered.

7    13:48            MR. BENTLEY:  Absolutely not,

8    13:48        Darryl.

9    13:48            MR. RAINS:  Listen, I'm going to

10   13:48        make my objections, whether you like

11   13:48        them or not.  I'm not going to withdraw

12   13:48        it because you find it objectionable.

13   13:48        A.   Can you read back the question?

14   13:48        Q.   Sure.

15   13:48            Did you make any attempt to

16   13:48    quantify what portion of the $45 billion was

17   13:48    caused by material breaches of reps and

18   13:48    warranties?

19   13:48        A.   I did not make a specific

20   13:48    determination as to what amount of that 45

21   13:48    billion was, was caused by material breaches.

22   13:49    What I did was take into account that as the

23   13:49    maximum exposure, and then evaluated based on

24   13:49    that and other data points and in an

25   13:49    understanding of the state of the law,

142

Lipps

13:49    1    whether or not 8.7 billion was a fair and

13:49    2    reasonable resolution of that exposure.

13:49    3        Q.    In reaching your conclusion, I take

13:49    4    it, you considered a number of disputed legal

13:49    5    issues?

13:49    6        A.    I did.

13:49    7        Q.    And you identified in your

13:49    8    supplemental declaration the principal legal

13:49    9    issues you considered, correct?

13:49    10       A.    I wrote extensively on the various

13:49    11   issues that I took into account.

13:49    12       Q.    You certainly did.

13:49    13            Did you assign percentages to the

13:49    14   potential outcomes on any of these issues?

13:50    15       A.    I don't think, I don't think that

13:50    16   would have been meaningful to do that,

13:50    17   because I don't think any of those were a

13:50    18   legal issue that would be dispositive on the

13:50    19   entirety of the settlement in determining

13:50    20   whether or not it was fair and reasonable.

13:50    21       Q.    So is the simple answer to my

13:50    22   question you did not assign any such

13:50    23   percentages?

13:50    24       A.    Well, I weighed the importance of

143

Lipps

1    13:50    the legal issue in my own mind to the case,

2    13:50    and as I said, I didn't conclude any of them

3    13:50    was dispositive, but in combination, they

4    13:50    created the legal environment within which I

5    13:50    evaluated the settlement.

6    13:50        Q.    I'm not asking you about the

7    13:50    relative importance of different issues.  I'm

8    13:51    asking you about your assessment of different

9    13:51    outcomes.

10   13:51        Did you assign percentages to any

11   13:51    potential outcomes on these disputed legal

12   13:51    issues?

13   13:51        A.    Are we back to what you called

14   13:51    litigation risk analysis?

15   13:51        Q.    It's sort of like that.

16   13:51        A.    I did not engage in that, no.

17   13:51        Q.    You didn't assign any percentages

18   13:51    to any possible outcomes?

19   13:51        A.    No.  If you're saying whether I

20   13:51    believe that I could prevail on causation at

21   13:51    a certain percentage or certain amount of

22   13:51    times, I did not do that.

23   13:51        Q.    Did you, as part of your analysis,

24   13:51    merely identify disputed issues or did you

25

144

Lipps

| | |
|---|---|
| 1 | |
| 2 | 13:51   take into account probabilities, if not |
| 3 | 13:51   actual percentages, but probabilities of some |
| 4 | 13:51   sort as to the potential outcomes? |
| 5 | 13:51       A.   I mean I considered probabilities |
| 6 | 13:52   to the extent that I identified the issue, |
| 7 | 13:52   and then I surveyed, based on my own |
| 8 | 13:52   experience in the state of the law, what was |
| 9 | 13:52   evolving on that issue and tried to assess |
| 10 | 13:52   whether or not it was decided, for example, |
| 11 | 13:52   in a way that would allow for some certainty |
| 12 | 13:52   in evaluating that issue, or whether it was |
| 13 | 13:52   undecided, and I think on all the key issues, |
| 14 | 13:52   the state of the law was such, there were |
| 15 | 13:52   good arguments or at least arguments that had |
| 16 | 13:52   been presented and not dispositively ruled on |
| 17 | 13:52   on both sides of the issue.  So assigning |
| 18 | 13:52   probabilities would have been meaningless to |
| 19 | 13:52   evaluating the reasonableness itself. |
| 20 | 13:52       Q.   So you didn't try to assign any |
| 21 | 13:52   probabilities? |
| 22 | 13:52       A.   Based on the analysis I just |
| 23 | 13:52   described, I concluded that assigning |
| 24 | 13:52   probabilities would have been meaningless. |
| 25 | 13:52       Q.   Is that true -- |

**EXHIBIT B**

**Hearing Date:  December 20, 2012 at 10:00 am**
**Objection Deadline:  TBD**

CARPENTER LIPPS & LELAND LLP

280 Plaza, Suite 1300

280 North High Street

Columbus, Ohio  43215

Phone:  (614) 365-4100

Fax:  (614) 365-9145

Jeffrey A. Lipps

Jennifer A.L. Battle

David A. Beck

*Special Litigation Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------ | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ------------------------------------------------ | ) | |

**SUMMARY OF FIRST INTERIM APPLICATION OF CARPENTER
LIPPS & LELAND LLP AS SPECIAL LITIGATION COUNSEL FOR THE
DEBTORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
<u>INCURRED FOR THE PERIOD MAY 14, 2012 THROUGH AUGUST 31, 2012</u>**

{00331187-4}

This is a(n): ___ monthly   x   interim ___ final application.

| | |
|---|---|
| Name of Applicant: | Carpenter Lipps & Leland LLP ("**Applicant**") |
| Authorized to Provide Professional Services to: | Residential Capital, LLC, *et al*. (collectively, the "**Debtors**") |
| Date of Retention: | Order entered on July 25, 2012 retaining Applicant *nunc pro tunc* to May 14, 2012 |
| Period for which Compensation and Reimbursement is sought: | May 14, 2012 through August 31, 2012 (the "**Application Period**") |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $955,735.00 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $334,924.08 |

## Summary of Monthly Applications for Application Period:

| Date Filed | Compensation Period | Requested Fees | Requested Expenses | Fees Paid | Expenses Paid | 20% Holdback |
|---|---|---|---|---|---|---|
| 8/17/2012 | 05/14/2012 – 06/30/2012 | $305,358.00[1] | $150,243.77 | $244,094.40 | $150,243.77 | $61,023.60 |
| 8/31/2012 | 07/01/2012- 07/31/2012 | $261,462.50[2] | $81,773.78 | $205,514.00 | $81,454.73 | $52,288.90 |
| 10/03/2012 | 08/01/2012- 08/31/2012 | $390,986.50 | $102,906.53 | $0.00[3] | $0.00 | $77,834.50 |
| **TOTAL** | 05/15/2012- 08/31/2012 | $957,807.00[4] | $334,924.08 | $449,608.40 | $231,698.50 | $221,147.00 |

---

[1] Owing to a clerical error, the cover letter served out with the May/June invoice incorrectly listed the total fees as $305,564.00 and the total expenses of $149,668.37 instead of the totals listed above which reflect the correct total of the individual invoices that were served out under the Interim Compensation Order.

[2] Owing to a clerical error, the cover letter served out with the July invoice incorrectly listed the total fees as $262,741.00 and the total expenses as $81,630.71 instead of the totals listed above which reflect the correct total of the individual invoices that were served out under the Interim Compensation Order.

[3] The objection deadline on the August invoice will not run until October 24, 2012. Absent objection, Applicant anticipates receiving 80% of the fees and 100% of the expenses for that Application prior to the hearing on this Application. The holdback amount is calculated assuming that no objection is made and those amounts are paid prior to the hearing.

[4] After reviewing the monthly fee applications, the Debtors requested a reduction of $240.00 in fees for the May/June Fee Application, $18.00 in fees for the July Fee Application, and $1,814.00 in fees for the August Fee Application. This total is based on the monthly totals before making these reductions. The aggregate request of Applicant on the cover reflects Applicant's agreement to these reductions.

Hearing Date:  December 20, 2012 at 10:00 am
Objection Deadline:  TBD

Jeffrey A. Lipps
Jennifer A.L. Battle
David A. Beck
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio  43215
Phone:  (614) 365-4100
Fax:  (614) 365-9145

*Special Litigation Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------- ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| | ) | Jointly Administered |
| Debtors. ------------------------------------- | ) | |

**FIRST INTERIM APPLICATION OF CARPENTER
LIPPS & LELAND LLP AS SPECIAL LITIGATION COUNSEL FOR THE
DEBTORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES
<u>INCURRED FOR THE PERIOD MAY 14, 2012 THROUGH AUGUST 31, 2012</u>**

For its first interim application for compensation and reimbursement of expenses

(the "**Application**") for the period May 14, 2012 through August 31, 2012 ("**Applicant**"),

special litigation counsel to Residential Capital, LLC., *et al.*, as debtors and debtors in possession

(collectively, the "**Debtors**"), respectfully represents as follows:

**<u>JURISDICTION, VENUE AND STATUTORY PREDICATES</u>**

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue

of this proceeding and this Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 330, 331, and 1103 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2016-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"). This Application has been prepared in accordance with General Order M-389, *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, entered December 21, 2010 (the "**Local Guidelines**"), and the *United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330* effective January 30, 1996 (the "**UST Guidelines**" and, together with the Local Guidelines, the "**Guidelines**"). Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as <u>Exhibit A</u>.

## BACKGROUND

### A.     The Chapter 11 Cases

3.     On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). No trustee has been appointed in these Chapter 11 cases.

4.     On May 16, 2012, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed a nine member official committee of unsecured creditors (the "**Creditors' Committee**").

5.      On June 20, 2012, the Court directed that an examiner be appointed, and on

July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner [Docket Nos. 454, 674].

**B.      Applicant's Retention and Interim Compensation**

6.      On July 25, 2012, the Court entered the Order Under Section 327(e) of the

Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the

Employment and Retention of Carpenter Lipps & Leland LLP as Special Litigation Counsel to

the Debtors, *Nunc Pro Tunc*, to May 14, 2012 [Docket No. 907], approving Applicant's

retention.

7.      On July 17, 2012, the Court entered the *Order Establishing Procedures for

Interim Compensation and Reimbursement of Expenses of Professionals* (the "**Interim

Compensation Order**") [Docket No. 797].  Pursuant to the terms of the Interim Compensation

Order, Applicant, among others, is authorized to file and submit monthly fee applications to the

Debtors and their counsel, counsel for the Creditors' Committee, counsel for Ally Financial Inc.,

counsel for Barclays Bank PLC, and the United States Trustee (collectively, the "**Notice

Parties**").

8.      On August 17, 2012, Applicant served its first monthly fee application covering

the period from May 15, 2012 through June 30, 2012 (the "**May/June Monthly Fee

Application**") on the Notice Parties.  On August 31, 2012, Applicant served its second monthly

fee application covering the period from July 1, 2012 through July 31, 2012 (the "**July Monthly

Fee Application**") on the Notice Parties.  On October 3, 2012, Applicant served its third

monthly fee application covering the period from August 1, 2012 through August 31, 2012 (the

"**August Monthly Fee Application**" and, together with the May/June Monthly Fee Application

and the July Monthly Fee Application, the "**Monthly Fee Applications**") on the Notice Parties.

The Applicant did not receive any formal objections to the Monthly Fee Applications, although the Debtors did request reductions based on their ordinary course review of Applicant's fees and expenses of (a) $240.00 in the amount of compensation sought by the May/June Monthly Fee Application; (b) $18.00 in fees for the July Monthly Fee Application; and (c) $1,814.00 for the August Monthly Fee Application. Applicant has agreed to those adjustments and the total sought for allowance herein reflects that disallowance.

9.    For the convenience of this Court and all parties in interest, attached hereto as Exhibit B is a schedule of the total amount of fees incurred under each of Applicant's internal task codes during the Application Period.

10.    To date, the Applicant has received payments (including retainer draws) totaling $681,306.90, representing $449,608.40 in fees and $231,698.50 in expenses on account of the Monthly Fee Applications.[1] This represents 80% of the fees and 100% of the expenses for the May/June and July Fee Applications (subject to the agreed reductions described above and minus certain small July invoices the Debtors are still reviewing). The notice period under the Interim Compensation Order for the August Monthly Fee Application has not yet run and the Applicant has received no payments on account of that Monthly Fee Application.

11.    Applicant maintains computerized records of the time expended in the rendering of the professional services required by the Committee. These records are maintained in the ordinary course of Applicant's practice. For the convenience of this Court and all parties in interest, attached hereto as Exhibit C is a billing summary for the Application Period, setting

---

[1] The Debtors also inadvertently made an overpayment by wire to the Applicant of post-petition fees and expenses payable under the Interim Compensation Order, which were already satisfied by Applicant, drawing on its prepetition retainer. Applicant is in the process of returning those funds, but will in any event have returned them to the Debtors well before the hearing on the Application.

{00331187-4}                              4

forth the name of each attorney and paraprofessional who rendered services during the

Application Period, each attorney's year of bar admission, the aggregate time expended by each

attorney and each paraprofessional, the hourly billing rate for each attorney and each

paraprofessional at Applicant's current billing rates, and the individual amounts requested for

each professional.  The compensation requested by Applicant is based on the agreed hourly rates

it had in place with the Debtors prior to their filing for bankruptcy, which are discounted from

Applicant's standard hourly rates.

      12.    Applicant also maintains computerized records of all expenses incurred in

connection with the performance of professional services.  A summary of the amounts and

categories of expenses for which reimbursement is sought is attached hereto as <u>Exhibit D</u>.

      13.    Copies of Applicant's computerized records of fees and expenses in the format

specified by the Guidelines have been served on the Notice Parties with each of the Monthly Fee

Applications and are attached hereto as <u>Exhibit E</u>.

      14.    There is no agreement or understanding between Applicant and any other person,

other than partners of the firm, for the sharing of compensation to be received for services

rendered in the Chapter 11 Cases.

      15.    The Monthly Fee Applications submitted by Applicant are subject to a 20%

holdback (as is customary in this District) imposed by the Court on the allowance of fees.  The

aggregate amount of Applicant's holdback during the Application Period is $221,147.  Applicant

respectfully requests, in connection with the relief requested herein, that the Court allow this

holdback amount on an interim basis pursuant to sections 330 and 331 of the Bankruptcy Code

and authorize the Debtors to satisfy such amounts.

## DESCRIPTION OF SERVICES AND
## <u>EXPENSES AND RELIEF REQUESTED</u>

16.     In general, Applicant has represented the Debtors in connection with the

following aspects of the Chapter 11 Cases:

> (a)     Applicant has assisted Morrison & Foerster LLP
> (**"Morrison & Foerster"**) in the litigation to extend the
> protections of the automatic stay to the Debtors' nondebtor
> affiliates, including having Jeffrey Lipps serve as a key
> Debtors' factual witness in support of that motion by
> preparing a declaration and preparing for and attending
> multiple hearings to be available for cross examination;
>
> (b)     Applicant has assisted Morrison & Foerster in the efforts to
> seek approval of Debtors' proposed settlement of claims
> related to securitizations sponsored by the Debtors between
> 2004 and 2007 approved;
>
> (c)     Applicant has analyzed issues relating to the claims of the
> monoline insurers and participated in meetings with certain
> of the insurers;
>
> (d)     Applicant has assisted the Debtors and Morrison & Foerster
> in responding to numerous discovery requests in the
> bankruptcy case, including  discovery from the Official
> Committee of Unsecured Creditors and the Examiner;
>
> (e)     Applicant has supported Morrison & Foerster in responding
> to FHFA's motion requesting documents and has been
> primarily responsible for responding to third party
> subpoenas promulgated by other parties;
>
> (f)     Applicant has helped the Debtors respond to the ongoing
> investigation by the Securities and Exchange Commission;
> and
>
> (g)     Applicant has represented the Debtors in numerous suits in
> the state of Ohio arising out of their servicing of mortgage
> loans.

17.     To provide an orderly and meaningful summary of the services rendered by

Applicant on behalf of the Debtors during the Application Period, Applicant established, in

accordance with the Guidelines and its internal billing procedures, separate task codes in

connection with the Chapter 11 Cases.  The following is a summary of the most significant

professional services rendered by Applicant during the Application Period organized in

accordance with Applicant's internal system of task codes:

      (a)    **Stay Motion (932-051)**

      Fees:  $53,174.00; Total Hours:  196.90

18.    This is the task code Applicant used to report time and expenses related to

*Residential Capital, LLC et al. v. Allstate Insurance Co., et al.*, Adversary Proceeding Case No.

12-01671.  Prior to the Petition Date, Applicant had been representing the Debtors in many of

the actions that this adversary proceeding sought the stay of.  Because of this background, and at

the request of Morrison & Foerster, Applicant assisted Morrison & Foerster in numerous ways in

this litigation:

- Jeffrey Lipps of the Applicant provided a factual declaration and a supplemental declaration explaining the current status of each the actions involved in this adversary proceeding and the likely burdens on the Debtors if these actions proceeded against their nondebtor affiliates.

- Applicant reviewed and commented on drafts of the extend stay motions papers and the later briefs filed by the Debtors in this proceeding.

- Applicant assisted with the preparations for the various status conferences and hearings in this adversary proceeding.

- Applicant helped Morrison & Foerster respond to the discovery requests the Debtors received in connection with this adversary proceeding.

      (b)    **SEC Post-Petition (932-054)**

      Fees:  $306,016.00; Total Hours:  1,558.50;

19.    Prior to the Petition Date, Applicant had been assisting the Debtors in responding

to an ongoing SEC investigation by assisting in the collection and production of documents to

the SEC.  Since the Petition Date, Applicant has continued to work on the collection, review and

production of documents for this investigation. Applicant's activities with respect to the SEC

during the First Compensation Period included:

- Applicant worked with the Debtors to locate electronic sources of information responsive to the SEC's requests;

- Applicant participated in frequent calls with the Debtors and Morrison & Foerster's securities litigation team regarding the SEC investigation and responding to the SEC's document requests;

- Applicant trained and supervised contract reviewers on the review of materials collected production to the SEC;

- Applicant conducted substantial quality reviews of the work of the contract reviewers in order to ensure that the production was being made efficiently;

- Applicant helped Morrison & Foerster prepare for potential interviews by the SEC of personnel of the Debtors;

- Applicant helped Morrison & Foerster prepare for meetings with SEC personnel; and

- Applicant participated in periodic calls with the SEC during the First Compensation Period.

Because of these efforts, during the First Compensation Period Applicant helped review over

200,000 documents, which resulted in the production of over 3,000,000 pages of documents to

the Securities and Exchange Commission.

    (c)  **RMBS Trust Settlement (932-057)**

    Fees:  $92,293.00; Total Hours:  373.20

   20.  Because of Applicant's representation of the Debtors in prepetition representation

and warranty litigation, Morrison & Foerster has regularly consulted with Applicant regarding

the issues involved in the settlement.  Applicant also assisted in responding to the discovery

requests that the Debtors have received related to the RMBS Trust Settlement.  The tasks

Applicant has taken in coordination with Morrison & Forester include commenting on drafts of

some of the court pleadings related to the RMBS Trust Settlement, including the review of

expert reports, and participating in calls with advisors to the Creditors' Committee and advisors

to the Indenture Trustees regarding the settlement. Applicant also conducted certain preparatory

work for the expert report of Jeffrey Lipps which was filed following the conclusion of the First

Compensation Period. At Morrison & Foerster's request, Applicant also participated in

meetings with interested parties regarding the RMBS Trust Settlement and the representation

and warranty litigation brought against the Debtors. Applicant also participated in periodic calls

with the advisors to the Creditors' Committee and Trustees concerning various discovery

requests and evaluation activities related to the RMBS Trust Settlement.

> (d)  **Monoline Claims (932-059)**
>
> Fees: $30,749.50; Total Hours: 152.10.

21.     Prior to the Petition Date, Applicant represented the Debtors in the cases brought

by monoline insurers MBIA and FGIC. Since the Petition Date and at the request of Morrison &

Foerster, Applicant analyzed certain issues related to the claims that monolines were likely to

assert in these cases. Applicant also participated in meetings with MBIA and Assured related to

their claims and the RMBS settlement during the Compensation Period that were reported under

this Task Code.

> (e)  **ResCap Discovery Issues (932-060).**
>
> Fees: $118,965.00; Total Hours: 568.30

22.     Applicant used this matter for work on discovery issues not reported under

another specific matter. At the request of the Debtors, the Applicant examined the current state

of the law concerning the impact of the automatic stay against third-party discovery requests that

the Debtors were likely to receive. While the Applicant coordinated these responses with

Morrison & Foerster, Applicant was primarily responsible for responding to these requests. A

substantial amount of time was spent by Applicant responding to litigation brought by CMFG in Wisconsin and Pennsylvania with respect to the third-party subpoenas it served on certain of the Debtors.  Applicant was able to successfully negotiate a resolution of CMFG's subpoenas that resulted in CMFG ceasing to prosecute the litigation in other forums and an agreement to modify the automatic stay to allow CMFG to receive targeted discovery, which CMFG would cover the costs of production for.  Applicant assisted Morrison & Foerster in responding to the motion brought by the Federal Housing Finance Agency ("**FHFA**") seeking loan files by providing factual expertise concerning Applicant's experience in producing loan files prior to the Petition Date and Mr. Lipps of the Applicant provided a Declaration to support the Debtors' objection to FHFA's motion.

23.     Applicant also used this matter for reporting time and expenses in connection with helping Morrison & Foerster respond to various discovery requests made on the Debtors within the bankruptcy and develop consistent positions on privilege and confidentiality issues. Applicant spent substantial time during the First Compensation Period helping review documents on an expedited basis for production in connection with the disputes regarding the Ally Bank subservicing motion that ultimately resulted in the production of over 52,000 pages of documents on an expedited basis**.**

(f)     **2004 Exam (932-063).**

Fees:  $36,942.50; Total Hours:  213.40.

24.     On June 5, 2012, the Court entered its Order Authorizing the Official Committee of Unsecured Creditors to Issue Subpoenas Compelling the Production of Documents and Provision of Testimony by the Debtors and Others Pursuant to Federal Rule of Bankruptcy Procedure 2004 [Docket No. 217] (the **"2004 Exam Order"**).  The 2004 Exam Order authorized

{00331187-4}                              10

the Creditors' Committee to conduct an investigation of the Debtors' relationship with Ally

Financial, Inc. ("**AFI**") and the proposed settlement of claims between the Debtors and AFI.  At

the request of Morrison & Foerster, Applicant worked on the production of information to the

Creditors' Committee based on the documents that it requested.  Before the Examiner was

appointed and the production of documents under the 2004 Exam Order was ceased, Applicant

was involved in the review and production of over 22,637 pages to the Creditors' Committee in

addition to the reproduction to the Creditors' Committee of over 6.5 million pages produced in

other litigations.

> (g)   **Examiner (932-064).**

> Fees:  $38,397.00; Total Hours:  198.10

25.     Following the appointment of the Examiner, he took over from the Creditors'

Committee the responsibility of investigating the Debtors' relationship with AFI and the

proposed settlement of claims related to the Examiner.  Applicant spent substantial time during

the First Compensation Period responding to this investigation.  Work in this area included:

- Reproduction of documents to the Examiner that had been produced in other cases;

- Collection and review of document based on the Examiner's document requests;

- Establishing procedures and training of contract reviewers to review documents for production to the Examiner;

- Researching privilege issues related to the Examiner's document requests; and

- Analysis in preparation for examiner interviews.

      (h)     **Ohio Litigation Matters (Matters starting with 096 or 621).**

Fees: $222,313.00; Total Hours: 1,037.30

26.     Applicant spent substantial time during the First Compensation Period representing the Debtors in litigation related to their servicing of mortgage loans in the state of Ohio. Applicant has been representing the Debtors for a number of years with respect to contested foreclosures or other servicing related litigation in Ohio. Applicant spent significant time dealing with unstayed claims and claims for which the stay was modified pursuant to the servicing orders entered in this case. Substantial time was spent notifying individual courts and opposing counsel concerning the provisions of the orders providing stay relief and explaining how those orders affected the relief requested in each pending case. In aggregate, Applicant billed time to representing the Debtors in over 100 separate actions in the state of Ohio during the First Compensation Period, including conducting a trial in one unstayed matter.

27.     The foregoing descriptions of services rendered by Applicant in specific areas are not intended to be exhaustive of the scope of Applicant's activities in the Chapter 11 Cases. The time records attached hereto as <u>Exhibit E</u> present more completely the work performed by Applicant in each billing category during the Application Period.

**<u>REQUEST TO DRAW RETAINER FOR PREPETITION FEES AND EXPENSES</u>**

28.     Applicant disclosed prior to the Petition Date that it had drawn $118,865.15 of its $500,000 retainer on account of fees prior to the Petition Date. <u>See</u> Declaration of Jennifer A.L. Battle [Docket No. 742]. Some of that retainer draw was for estimated fees and expenses. Since that time, Applicant has worked with the Debtors to reconcile Applicant's prepetition bills. Applicant has discovered that the actual fees and expenses exceeded the estimated amount by $43,928.61, in substantial part because of trailing invoices for expert witness fees. After discussions with the Debtors, Applicant has applied the remaining $337,185.24 of the retainer to

post-petition fees and expenses as they become payable under the Interim Compensation Order.

Applicant requests that it be authorized to draw the remaining $43,928.61 amount of the retainer

to satisfy the prepetition fees and expenses. Similar relief has previously been authorized in these

cases. <u>See</u> Order Under Section 327(e) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and

Local Rule 2014-1 Authorizing the Employment and Retention of Dorsey & Whitney as Special

Securitization and Investigatory Counsel to the Debtors, Nunc Pro Tunc to May 14, 2012

[Docket No. 929].

<u>**CONCLUSION**</u>

29.     Applicant believes that the services rendered during the Application Period on

behalf of the Debtors were reasonable and necessary within the meaning of Bankruptcy Code

section 330.  Further, the expenses requested were actual and necessary to the performance of

Applicant's services.

30.     Applicant therefore requests an order (i) approving interim compensation in the

amount of $955,735.00 and interim reimbursement of expenses in the amount of $334,924.08,[2]

(ii) directing payment of all compensation held back in connection with the Monthly Fee

Applications, (iii) authorizing it to apply the remaining $43,928.61 of its prepetition retainer to

satisfy outstanding prepetition fees and expenses; and (iv) granting such other and further relief

as may be just and proper.

---

[2] The rates charged for such expenses (i) are based on Applicant's policies used with the Debtors prior to these cases
being filed; (ii) do not charge for certain expenses such as in house copying or phone calls which are chargeable
under the Guidelines; and (iii) are calculated to compensate Applicant for only the actual costs of the expenses.

Dated: October 19, 2012          /s/ David A. Beck
                                 Jeffrey A. Lipps (pro hac pending)
                                 Jennifer A.L. Battle (pro hac pending)
                                 David A. Beck (pro hac pending)
                                 CARPENTER LIPPS & LELAND LLP
                                 280 Plaza, Suite 1300
                                 280 North High Street
                                 Columbus, Ohio  43215
                                 Phone:  (614) 365-4100
                                 Fax:  (614) 365-9145

                                 *Special Litigation Counsel to the Debtors and
                                 Debtors in Possession*

12-12020-mg    Doc 1889    Filed 05/06/13    Entered 05/06/13 17:09:42    Main Document
Pg 88 of 882

**EXHIBIT E**

# CARPENTER LIPPS & LELAND LLP

280 Plaza, Suite 1300
280 North High Street
Columbus, OH 43215
(614) 365-4100
Federal ID # 31-1401115

---

September 05, 2012

Tammy Hamzehpour
Residential Capital, LLC
1100 Virginia Drive
190-FTW-L95
Fort Washington, PA 19034

Billed through  05/31/2012
Invoice #  50938      JAL
Our file #  932   00057

Re:  RMBS Trust Settlement
Matter No.: 721750

## PROFESSIONAL SERVICES

| | | | | | |
|---|---|---|---|---|---|
| 05/14/2012 | JALB | Review history of expert analyses and types of claims from underlying litigation to access applicability to RMBS settlement (per discussion with Ms. Levitt and Mr. Lipps). (.70)  Prepare summary of same. (.30)  Communicate with Ms. Levitt (Morrison and Foerster) and Mr. Lipps regarding same. (.20) | L340 | 1.20 | hrs |
| 05/14/2012 | DAB | Communicate with Ms. Levitt (Morrison and Foerster) regarding expert reports. | L120 | 0.20 | hrs |
| 05/15/2012 | JALB | Discussions and calls with Ms. Levitt, Mr. Lee (Morrison and Foerster), Mr. Lipps and Mr. Beck regarding potential strategy to support RMBS settlement. | L420 | 1.40 | hrs |
| 05/15/2012 | DAB | Research approval of RMBS settlements by other courts. | L120 | 3.40 | hrs |
| 05/15/2012 | DAB | Analyze MBIA expert reports at request of Ms. Battle for potential usage in supporting RMBS settlement. | L120 | 1.90 | hrs |
| 05/15/2012 | DAB | Attend meeting with Mr. Lee, Ms. Levitt and Mr. Princi (MoFo) and Mr. Lipps and Ms. Battle regarding prepetiton work on claims and strategy on RMBS settlement. | L120 | 1.50 | hrs |
| 05/16/2012 | JAL | Review materials regarding Sillman. | L120 | 0.30 | hrs |

12-12020-mg    Doc 3689    Filed 05/09/13    Entered 05/09/13 13:56    Main Document
Pg 93 of 882

932    00057                                                         Invoice # 50938              Page  2

| | | | | | |
|---|---|---|---|---|---|
| 05/16/2012 | JALB | Gather materials relating to prior Fortace work at Ms. Levitt's (Morrision & Foerster) request. | L420 | 0.40 | hrs |
| 05/16/2012 | JALB | Discussions with Mr. Sillman (Fortace) regarding analysis of settlement parameters. (.40) Communicate with Mr. Lipps and Ms. Levitt regarding same. (.20) | L120 | 0.60 | hrs |
| 05/17/2012 | DAW | Review Horn, Littleton and Neira descriptions for use for extend stay issues. (.20)  Review e-mails regarding same from Ms. Battle. (.10) | L120 | 0.30 | hrs |
| 05/17/2012 | JALB | Prepare analysis and e-mail memorandum regarding the role of Fortace in MBIA v. RFC. | L120 | 0.80 | hrs |
| 05/17/2012 | JALB | Discussions with client (Ms. Hamzehpour, Mr. Thompson, Ms. Delehey) and Morrison and Foerster (Mr. Lee, Ms. Levitt, Mr. Princi) regarding strategy and next steps on supporting RMBS settlement. | L120 | 0.40 | hrs |
| 05/18/2012 | JAL | Prepare for conference call with Mr. Sillman regarding Ms. Patrick's settlement. (.10) Telephone conference with Ms. Battle and Mr. Sillman regarding meeting to discuss expert work. (1.00)  Review research regarding standard for 9019 motion. (.20)  Review Lehman and BOFA settlement materials. (.10) | L120 | 1.50 | hrs |
| 05/18/2012 | JALB | Telephone conference with Mr. Sillman (Fortace) and Mr. Lipps regarding potential expert engagement. | L420 | 1.00 | hrs |
| 05/19/2012 | DAB | Research current Second Circuit standard for 9019 motions. | L120 | 1.10 | hrs |
| 05/20/2012 | JAL | Review Bank of America settlement and Lehman estimating procedure. (1.20)  Prepare for Sillman meeting. (2.30) | L120 | 3.50 | hrs |
| 05/21/2012 | JAL | Prepare for meeting with Morrison Foerster and Mr. Sillman. (.30)  Conference with Mr. Sillman regarding expert engagement. (.20)  Conference with Mr. Sillman, Ms. Battle and Morrison Foerster team regarding same. (1.50) | L120 | 2.00 | hrs |
| 05/21/2012 | JALB | Prepare for and participate (by phone) in meeting with Morrison Foerster team, Mr. Lipps, Mr. Sillman, and Ms. Minier regarding expert analysis and support of 9019 motion. (1.50)  Provide follow-up analysis regarding same. (.30) | L420 | 1.80 | hrs |
| 05/21/2012 | DAB | Communicate with Mr. Lipps regarding issues on | L120 | 0.20 | hrs |

noteholder settlement.

| 05/21/2012 | DAB | Research approval standard for RMBS Trust settlement at request of Ms. Levitt (Morrison & Foerster). | L120 | 0.20 | hrs |
|---|---|---|---|---|---|
| 05/22/2012 | JALB | Correspondence with Mr. Beck, Mr. Lipps & Ms. Levitt (Morrison & Foerster) regarding 9019 motion draft. (.3)  Review and comment on same at request of Ms. Levitt. (.90) | L120 | 1.20 | hrs |
| 05/22/2012 | JALB | Review potential involvement of NERA witness at request of Ms. Levitt (Morrison & Foerster). (.40) Correspondence with Ms. Levitt and Mr. Lipps regarding same. (.20) | L120 | 0.60 | hrs |
| 05/22/2012 | DAB | Review and analyze draft 9019 motion on RMBS trust settlement. | L120 | 2.10 | hrs |
| 05/23/2012 | JAL | Further review and redrafting of 9019 motion. (.70) Communicate with Ms. Battle and Mr. Beck regarding same.  (.30)  Review and finalize communication to Morrison Foerster regarding motion revisions. (.20) | L250 | 1.20 | hrs |
| 05/23/2012 | JAL | Review and redraft declaration and motion to extend stay. (.80) | L120 | 0.80 | hrs |
| 05/23/2012 | JALB | Revise note to Mr. Lee with comments on 9019 motion papers. (.30)  Revise and comment on 9019 motion papers at request of Morrison & Foerster. (1.40) | L120 | 1.70 | hrs |
| 05/23/2012 | JALB | Correspondence with Mr. Lipps and Mr. Beck regarding NERA conflicts issue. | L120 | 0.30 | hrs |
| 05/23/2012 | DAB | Review draft RMBS settlement motion from Ropes & Gray. | L120 | 1.00 | hrs |
| 05/23/2012 | DAB | Review and provide comments to Morrison & Foerester regarding new draft of settlement motion. | L120 | 0.80 | hrs |
| 05/24/2012 | JAL | Prepare for multiple conference calls regarding 9019 motions. (.30)  Participate on such calls. (.50) Review and redraft 9019 motion. (.30) | L120 | 1.10 | hrs |
| 05/24/2012 | DAB | Revise multiple drafts of RMBS settlement motion to assist Morrison & Foerster. | L120 | 5.20 | hrs |
| 05/25/2012 | JAL | Review and redraft 9019 motion. (1.20) Communicate with ResCap personnel, Morrison Foerster team, Ms. Battle and Mr. Beck regarding | L120 | 3.00 | hrs |

| | | | | | |
|---|---|---|---|---|---|
| | | same. (1.00)  Review e-mails regarding same. (.50)  Review and respond to multiple e-mails regarding KP settlement and 2003 vintage deals. (.20)  Review and respond to e-mails regarding litigation holds and Ambac servicing triggers. (.10) | | | |
| 05/25/2012 | JALB | Discussion with expert (Fortace) and Morrison & Foerster team (Ms. Levitt and Mr. Clark) regarding analytical support for 9019 motion. | L420 | 1.00 | hrs |
| 05/25/2012 | JALB | Discussion with Morrison & Foerster team (Mr. Princi, Mr. Lee, Ms. Levitt, and Mr. Clark) regarding revisions to 9019 motion draft. | L120 | 1.70 | hrs |
| 05/25/2012 | JALB | Correspondence with Mr. Clark and Ms. Levitt regarding impact of RMBS Trust Settlement on monolines. (.30)  Review insurance agreements in connection with same. (.30)  Review and comment on 9019 drafts. (.30)  Discussion with Ms. Levitt and Mr. Clark regarding impact on older transactions. (.10) | L120 | 1.60 | hrs |
| 05/25/2012 | DAB | Conference with Ms. Battle regarding revisions to RMBS motion. | L120 | 0.20 | hrs |
| 05/25/2012 | DAB | Communicate with Ms. Levitt, Mr. Lee, Mr. Clark (Morrison Foerster), Mr. Lipps and Ms. Battle regarding RMBS motion revisions. | L120 | 0.80 | hrs |
| 05/25/2012 | DAB | Call with ResCap Clients, Mr. Lee, Mr. Princi, Ms. Levitt (Morrison Foerster) and Ms. Battle regarding RMBS motion revisions. | L120 | 1.00 | hrs |
| 05/25/2012 | DAB | Multiple calls with Mr. Lipps regarding revisions to RMBS settlement motion. | L120 | 0.20 | hrs |
| 05/25/2012 | DAB | Review and revise multiple drafts of settlement motion. | L120 | 6.90 | hrs |
| 05/27/2012 | JAL | Review Mr. Beck's edits to 9019 motion. (.20)  Further review and revision of motion. (.80) | L250 | 1.00 | hrs |
| 05/27/2012 | JALB | Review and comment on draft of 9019 motion papers. | L210 | 0.80 | hrs |
| 05/29/2012 | JAL | Review and revise 9019 motion. (.60)  Review and respond to e-mails regarding same. (.10)  Review and respond to e-mails regarding Ms. Patrick's meeting. (.30) | L120 | 1.00 | hrs |
| 05/29/2012 | JALB | Correspondence with Ms. Levitt regarding scope of monoline representation and warranty enforcement authority. | L120 | 0.20 | hrs |

| | | | | | |
|---|---|---|---|---|---|
| 07/19/2012 | DAB | Analyze additional press reports on Syncora settlement with Bank of America. | L120 | 0.20 | hrs |
| 07/20/2012 | DAB | Communicate with Ms. Levitt, Mr. Clark (Morrison & Foerster) and Ms. Battle regarding creditor comments on RMBS settlement agreements. | L120 | 0.10 | hrs |
| 07/20/2012 | DAB | Review comments of creditors on confidentiality agreements for RMBS trust settlement motion. | L120 | 0.20 | hrs |
| 07/20/2012 | DAB | Analyze materials from Mr. Corcoran regarding Syncora settlement with Bank of America. | L120 | 0.20 | hrs |
| 07/23/2012 | DAB | Analyze pleadings on RMBS motion scheduling dispute. | L120 | 0.30 | hrs |
| 07/23/2012 | DAB | Communicate with Mr. Lipps and Ms. Battle regarding RMBS scheduling issues. | L120 | 0.20 | hrs |
| 07/24/2012 | DAB | Investigate developments in Bank of America settlement litigation with Bank of New York. | L120 | 0.10 | hrs |
| 07/24/2012 | DAB | Communicate with Mr. Lee and Ms. Levitt (Morrison & Foerster), Mr. Lipps and Ms. Battle regarding developments in Bank of America litigation. | L120 | 0.10 | hrs |
| 07/24/2012 | DAB | Research Daubert issues related to Sillman declaration at request of Ms. Levitt of Morrison & Foerster. | L120 | 2.20 | hrs |
| 07/25/2012 | DAB | Review Intralinks dataroom for RMBS settlement for items containing nonpublic borrower information. | L120 | 2.70 | hrs |
| 07/25/2012 | DAB | Research reunderwriting analyses in other pending private label securities cases. | L120 | 3.70 | hrs |
| 07/25/2012 | DAB | Communicate with Mr. Clark (ResCap) regarding potential for non public borrower information to be included in dataroom on RMBS settlement. | L120 | 0.10 | hrs |
| 07/26/2012 | DAB | Communicate with Ms. Levitt (Morrison & Foerster) regarding Committee questions on Sillman declaration. | L120 | 0.20 | hrs |
| 07/26/2012 | DAB | Communicate with Ms. Levitt and Mr. Clark (Morrison & Foerster) regarding issues on FGIC confidentiality agreement. | L120 | 0.10 | hrs |
| 07/28/2012 | JALB | Correspondence with Mr. Lipps and Mr. Beck | L120 | 0.20 | hrs |

**EXHIBIT C**

12-12020-mg   Doc 3174   Filed 03/14/13
Pg 1 of 18

Docket #3174   Date Filed: 3/14/2013

**Hearing Date:  April 11, 2013 at 10:00 am**
**Objection Deadline:  March 25, 2013 at 4:00 pm**

CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio  43215
Phone:  (614) 365-4100
Fax:  (614) 365-9145
Jeffrey A. Lipps
Jennifer A.L. Battle
David A. Beck

*Special Litigation Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| _____ ) | |
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | |
| ) | Jointly Administered |
| Debtors. _____ ) | |

### SUMMARY OF SECOND INTERIM APPLICATION OF CARPENTER LIPPS & LELAND LLP AS SPECIAL LITIGATION COUNSEL FOR THE DEBTORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD SEPTEMBER 1, 2012 THROUGH DECEMBER 31, 2012

{00346529-1}

1212020130314000000000016

This is a(n): ___ monthly   x   interim ___ final application.

| | |
|---|---|
| Name of Applicant: | Carpenter Lipps & Leland LLP ("**Applicant**") |
| Authorized to Provide Professional Services to: | Residential Capital, LLC, *et al*. (collectively, the "**Debtors**") |
| Date of Retention: | Order entered on July 25, 2012 retaining Applicant *nunc pro tunc* to May 14, 2012 |
| Period for which Compensation and Reimbursement is sought: | September 1, 2012 through December 31, 2012 (the "**Second Compensation Period**") |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $1,877,415.00 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $641,079.68 |
| Previous Compensation awarded on an interim basis: | $949,060.00 |
| Previous Reimbursement of Expenses awarded on an interim basis: | $334,034.08 |

**Summary of Monthly Applications for Application Period:**

| Date Filed | Compensation Period | Requested Fees | Requested Expenses | Fees Paid | Expenses Paid | 20% Holdback |
|---|---|---|---|---|---|---|
| 11/02/2012 | 09/01/2012 – 09/30/2012 | $418,747.00 | $161,637.90 | $334,804.00[1] | $161,637.90 | $80,540.33[2] |
| 11/15/2012 | 10/01/2012- 10/31/2012 | $500,888.00 | $244,759.30 | $400,638.40[3] | $244,759.30 | $96,713.88[4] |
| 01/02/2013 | 11/01/2012- 11/30/2012 | $539,027.50 | $126,643.65 | $431,180.40[5] | $126,643.65 | $107,657.32[6] |
| 01/25/2013 | 12/01/2012- 12/31/2012 | $424,996.50 | $108,923.00 | $207,700.80 | $84,314.22 | $84,999.30 |
| **TOTAL** | 09/01/2012- 12/31/2012 | $1,883,659.00[7] | $641,963.85[8] | $1,374,323.60 | $617,355.07 | $369,910.83 |

---

[1] After reviewing the application, the Debtors requested a reduction of $242.00 in fees for the September Application. This total represents 80% of the requested fees less the $242.00 reduction.

[2] This total represents the 20% holdback based on the fees originally requested minus the Debtors' requested reduction of $242.00. This then subtracts the $2,697.00 in invoice review related fees, $385.25 in meal expenses and $78.42 in taxi expenses that Applicant is voluntarily reducing its requested compensation and reimbursement of expenses by based on the comments of the Court at the December 20, 2120 hearing to show the remaining compensation that would be awarded if the compensation and reimbursement of expenses requested in this application is granted.

[3] After reviewing the application, the Debtors requested a reduction of $90.00 in fees for the October Application. This total represents 80% of the requested fees less the $90.00 reduction.

[4] In the same manner as described in footnote 2, this represents the remaining amount outstanding after taking into account the reduction described in footnote 3 and $3,163.00 in invoice review related fees, $274.35 in meal expenses and $8.37 in taxi expenses that Applicant is voluntarily reducing its requested compensation and reimbursement of expenses by.

[5] After reviewing the application, the Debtors requested a reduction of $52.00 in fees for the November Application. This total represents 80% of the requested fees less the $52.00 reduction.

[6] This is 20% of the fees originally requested less the Debtors' requested reduction and $137.78 in meal expenses that Applicant is voluntarily reducing its requested compensation and reimbursement of expenses by.

[7] This total is based on the monthly totals before making the reductions in fees described above. The aggregate request of Applicant on the cover for $1,877,415.00 in fees reflects these reductions.

[8] This total is based on the monthly totals before making the reductions in expense reimbursement described above. The aggregate request of Applicant on the cover for reimbursement of expenses of $641,079.68 reflects Applicant's agreement to these reductions.

Jeffrey A. Lipps (admitted *pro hac vice*)
Jennifer A.L. Battle (admitted *pro hac vice*)
David A. Beck (admitted *pro hac vice*)
CARPENTER LIPPS & LELAND LLP
280 Plaza, Suite 1300
280 North High Street
Columbus, Ohio 43215
Phone: (614) 365-4100
Fax: (614) 365-9145

*Special Litigation Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ----------------------------------------------------------- ) | |
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, ) | Chapter 11 |
| ) | |
| ) | Jointly Administered |
| Debtors. ------------------------------------------------- ) | |

**SECOND INTERIM APPLICATION OF CARPENTER LIPPS & LELAND
LLP AS SPECIAL LITIGATION COUNSEL FOR THE DEBTORS FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES INCURRED
<u>FOR THE PERIOD SEPTEMBER 1, 2012 THROUGH DECEMBER 31, 2012</u>**

For its second interim application for compensation and reimbursement of

expenses (the "**Application**") for the period September 1, 2012 through December 31, 2012 (the

"**Second Compensation Period**") Carpenter Lipps & Leland LLP ("**Applicant**"), special

litigation counsel to Residential Capital, LLC., *et al.*, as debtors and debtors in possession

(collectively, the "**Debtors**"), respectfully represents as follows:

<u>**JURISDICTION, VENUE AND STATUTORY PREDICATES**</u>

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of

this proceeding and this Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

2.    The statutory bases for the relief requested herein are sections 330, 331, and 1103

of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2016 of the Federal Rules

of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2016-1 of the Local Rules for the

United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**").

This Application has been prepared in accordance with General Order M-447, *Amended

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases*, entered December 21, 2010 (the "**Local Guidelines**"), and the *United States

Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of

Expenses Filed Under 11 U.S.C. § 330* effective January 30, 1996 (the "**UST Guidelines**" and,

together with the Local Guidelines, the "**Guidelines**"). Pursuant to the Local Guidelines, a

certification regarding compliance with the Local Guidelines is attached hereto as <u>Exhibit A</u>.

## <u>BACKGROUND</u>

### <u>The Chapter 11 Cases</u>

3.    On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors are

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108. These cases are being jointly administered pursuant to Bankruptcy

Rule 1015(b). No trustee has been appointed in these Chapter 11 cases.

4.    On May 16, 2012, the United States Trustee for the Southern District of New

York (the "**U.S. Trustee**") appointed a nine member official committee of unsecured creditors

(the "**Creditors' Committee**").

5.      On June 20, 2012, the Court directed that an examiner be appointed, and on

July 3, 2012, the Court approved Arthur J. Gonzalez as the examiner (Docket Nos. 454, 674).

**Applicant's Retention and Interim Compensation**

6.      On July 25, 2012, the Court entered the Order Under Section 327(e) of the

Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 Authorizing the

Employment and Retention of Carpenter Lipps & Leland LLP as Special Litigation Counsel to

the Debtors, *Nunc Pro Tunc*, to May 14, 2012 (Docket No. 907), approving Applicant's

retention.

7.      On July 17, 2012, the Court entered the *Order Establishing Procedures for*

*Interim Compensation and Reimbursement of Expenses of Professionals* (the "**Interim**

**Compensation Order**") (Docket No. 797).  Pursuant to the terms of the Interim Compensation

Order, Applicant, among others, is authorized to file and submit monthly fee applications to the

Debtors and their counsel, counsel for the Creditors' Committee, counsel for Ally Financial Inc.,

counsel for Barclays Bank PLC, and the United States Trustee (collectively, the "**Notice**

**Parties**").

8.      On October 19, 2012, Applicant filed its first interim fee application (Docket

No. 1889) (the "**First Interim Application**").  On December 28, 2012, the Court entered its

Omnibus Order (Docket No. 2530) (the "**First Fee Order**") concerning the first fee applications

filed for retained professionals.  As part of the First Fee Order, the Court authorized on an

interim basis $949,060 in fees and $334,034.08 in expenses for Applicant, which reflected

certain consensual reductions from the amounts requested in the First Interim Application agreed

to between the Applicant and the United States Trustee.

9.      On November 2, 2012, Applicant served its monthly fee application covering the

period from September 1, 2012 to September 30, 2012 (the "**September Monthly Fee**

**Application**") on the Notice Parties.  On November 16, 2012, Applicant served its monthly fee

application covering the period from October 1, 2012 to October 31, 2012 (the "**October**

**Monthly Fee Application**") on the Notice Parties.  On January 2, 2013, Applicant served its

monthly fee application covering the period from November 1, 2012 to November 30, 2012 (the

"**November Monthly Fee Application**") on the Notice Parties.  On January 25, 2013, Applicant

served its monthly fee application covering the period from December 1, 2012 to December 31,

2012 (the "**December Monthly Fee Application**" and, together with the September Monthly

Fee Application, the October Monthly Fee Application and the November Monthly Fee

Application, the "**Monthly Fee Applications**") on the Notice Parties.  The Applicant did not

receive any formal objections to the Monthly Fee Applications, although the Debtors did request

reductions based on their ordinary course review of Applicant's fees of $384.00.  Applicant has

agreed to those reductions.  In addition, based on the Court's comments at the December 20,

2012 fee hearing, Applicant has reduced its requested compensation by $5,860.00 to reflect the

writeoff of all time spent in revising monthly invoices for compliance with the United States

Trustee's Guidelines and has reduced its requested reimbursement of expenses by $884.17

related to meal expenses over the $20.00 limit and certain taxi or cab fares within New York

City.  The totals sought on the cover sheet reflect all of these reductions.

10.     For the convenience of this Court and all parties in interest, attached hereto as

Exhibit B is a schedule of the total amount of fees incurred under each of Applicant's internal

task codes during the Second Compensation Period.

11.     To date, the Applicant has received payments totaling $1,991,678.67, representing $1,374,323.60 in fees and $617,355.07 in expenses on account of the Monthly Fee Applications. This represents 80% of the fees and 100% of the expenses for the September, October and November Fee Applications (subject to the agreed reductions described above).  Applicant has to date been paid only a portion of the amounts requested for the December Fee Applications.

12.     Applicant maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Applicant's practice.  For the convenience of this Court and all parties in interest, attached hereto as <u>Exhibit C</u> is a billing summary for the Second Compensation Period, setting forth the name of each attorney and paraprofessional who rendered services during the Second Compensation Period, each attorney's year of bar admission, the aggregate time expended by each attorney and each paraprofessional, the hourly billing rate for each attorney and each paraprofessional at Applicant's current billing rates, and the individual amounts requested for each professional.  Exhibit C also provides the blended hourly rate for Applicant's attorneys during the Second Compensation Period.  The compensation requested by Applicant is based on the agreed hourly rates it had in place with the Debtors prior to their filing for bankruptcy, which are discounted from Applicant's standard hourly rates.

13.     Applicant also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought is attached hereto as <u>Exhibit D</u>. Exhibit D also includes breakdowns showing the detail on the contract document reviewer expenses incurred by the Applicant, the cab and car service expenses for which the Applicant is requesting reimbursement (showing the reductions Applicant is making in response to the

Court's directives at the December 19, 2012 fee hearing) and meal reimbursements (again

showing the reductions Applicant is making in response to the Court's directives at the

December 19, 2012 fee hearing).

14.    In connection with the requested reimbursement of expenses for the fees incurred

by contract document reviewers, Applicant wishes to provide the following additional detail.

The use of these reviewers was essential for the review of over 500,000 documents and the

production of over 2.6 million pages during the Second Compensation Period.  Using contract

reviewers resulted in substantial savings to the Debtors' estates over alternative forms of

production.  The electronic review platforms Applicant uses track the number of hours each

contract reviewer is logged in and the average number of documents coded per hour for each

reviewer.  On a weekly basis, Applicant reviews the time cards submitted by the staffing

agencies for each contract attorney and compares these against the reports produced by the

review platform.  This is used to verify that hours on time cards are actually worked and that the

reviewer is being productive based on the number of documents reviewed per hour.  If based on

this review the time spent by the contract attorney appears unreasonable, the time card is

rejected.  The benchmarks for what is reasonable are based on both years of experience in

conducting complex document reviews for Residential Capital and industry standards and are

adjusted based on the complexity of the documents which each reviewer is assigned to review.

Applicant only bills Residential Capital for contract reviewer time which is approved through

this process.

15.    Copies of Applicant's computerized records of fees and expenses in the format

specified by the Guidelines have been served on the Notice Parties with each of the Monthly Fee

Applications and are attached hereto as Exhibit E. Applicant's subsequent writeoff of bill review time is noted on the applicable invoices attached as Exhibit E.

16.    There is no agreement or understanding between Applicant and any other person, other than partners and of counsel of the firm, for the sharing of compensation to be received for services rendered in the Chapter 11 Cases.

17.    The Monthly Fee Applications submitted by Applicant are subject to a 20% holdback (as is customary in this District) imposed by the Court on the allowance of fees. The aggregate amount of Applicant's holdback during the Second Compensation Period is $369,910.83 (the "**Second Holdback**"). In addition, as part of the First Fee Order, the Court directed that $95,796.00 in compensation (the "**First Holdback**") approved on an interim basis be withheld by the Debtors as part of the general withholding of 10% of allowed compensation for all professionals. Applicant respectfully requests, in connection with the relief requested herein, that the Court allow both the Second Holdback on an interim basis pursuant to sections 330 and 331 of the Bankruptcy Code and authorize the Debtors to satisfy both the First Holdback and the Second Holdback.

## DESCRIPTION OF SERVICES AND
## EXPENSES AND RELIEF REQUESTED

18.    In general, Applicant has represented the Debtors in connection with the following aspects of the Chapter 11 Cases during the Second Compensation Period:

- Applicant has assisted in the production of over 1,700,000 pages of documents, the research and drafting of submission papers to the Examiner and in the preparation of 11 witnesses who were interviewed by the Examiner;

- Applicant has assisted Morrison & Foerster LLP ("**Morrison & Foerster**") in the Debtors' efforts to obtain approval of the Debtors' proposed settlement of claims related to securitizations sponsored by the Debtors between 2004 and 2007, including researching and drafting work in support of the Settlement, review of documents in connection with the settlement and having Jeffrey Lipps serve as an expert witness and be deposed in connection with that proceeding;

- Applicant has assisted the Debtors and Morrison & Foerster in responding to numerous discovery requests in the bankruptcy cases, including discovery from the Official Committee of Unsecured Creditors and third parties and provided advice on e-discovery and record retention issues;

- Applicant has analyzed issues relating to the claims of the monoline insurers and participated in meetings related to these claims;

- Applicant has analyzed issues relating to the securities claims being asserted against the Debtors;

- Applicant has helped the Debtors respond to the ongoing investigation by the Securities and Exchange Commission; and

- Applicant has represented the Debtors in numerous suits in the state of Ohio arising out of their servicing of mortgage loans.

To provide an orderly and meaningful summary of the services rendered by Applicant on behalf of the Debtors during the Second Compensation Period, Applicant established, in accordance with the Guidelines and its internal billing procedures, separate task codes in connection with the Chapter 11 Cases.[1]  The following is a summary of the most significant professional services rendered by Applicant during the Second Compensation Period organized in accordance with Applicant's internal system of task codes:

**SEC Post-Petition (932-054)**

Fees:  $122,001.00; Total Hours:  671.20;

19.    Prior to the Petition Date, Applicant had represented the Debtors in responding to an ongoing SEC investigation by assisting in the collection and production of documents to the

---

[1] Because almost all of CLL's services as special litigation counsel would either fit within the claims administration or litigation matter categories in the United States Trustee's standard list of matters, CLL has created specific matter numbers by particular litigation project to help better track the time and expenses it is incurring in these cases.  The categories are the same ones used in connection with the First Fee Application, but with the addition of certain additional matters for specific litigation cases for which it is representing the Debtors on in the State of Ohio related to the Debtors' servicing of mortgage loans.

SEC.  Since the Petition Date, Applicant has continued to work on the collection, review and

production of documents for this investigation. Applicant's activities with respect to the SEC

during the Second Compensation Period included:

- Applicant worked with the Debtors and Morrison & Foerster to locate sources of information responsive to the SEC's requests, including visiting the Debtors' facilities in Minnesota and Pennsylvania to investigate possible sources of information;

- Applicant participated in frequent calls with the Debtors and Morrison & Foerster's securities litigation team regarding the SEC investigation and responding to the SEC's document requests;

- Applicant trained and supervised contract reviewers on the review of materials collected production to the SEC;

- Applicant conducted substantial quality reviews of the work of the contract reviewers in order to ensure that the production was being made efficiently;

- Applicant helped Morrison & Foerster prepare for potential depositions by the SEC of current and former personnel of the Debtors;

- Applicant helped Morrison & Foerster prepare for meetings with SEC personnel; and

- Applicant participated in periodic calls with the SEC during the Second Compensation Period.

Because of these efforts, during the Second Compensation Period Applicant helped review over

390,000 documents, which resulted in the production of over 900,000 pages of documents to the

Securities and Exchange Commission.

**RMBS Trust Settlement (932-057)**
Fees:  $356,937.00; Total Hours:  1,671.00

20.    Because of Applicant's representation of the Debtors in prepetition representation

and warranty litigation, Morrison & Foerster has regularly consulted with Applicant regarding

the issues involved in the settlement.  As part of this consultation, Morrison & Foerster requested

Applicant research certain legal or factual issues related to the settlement.  Jeffrey Lipps of the

Applicant provided an expert report in support of the settlement during the Second

Compensation Period, which required substantial work on the part of Applicant during the

Second Compensation Period.  Applicant then prepared for Mr. Lipps's deposition regarding his

expert report during the Second Compensation Period.

       21.      Applicant worked on identifying additional potential experts to support the

settlement, participated in discussion with experts and commented on drafts of expert reports in

favor of the settlement.  Applicant then assisted in preparing witnesses for depositions in this

litigation.  Applicant researched the backgrounds of the various expert witnesses identified by

interested parties and helped Morrison & Foerster prepare for the depositions of these experts.

       22.      During the Compensation Period, Applicant and the contract attorneys it

supervised reviewed over 45,000 documents for production in connection with the RMBS Trust

Settlement litigation.  Applicant also helped produce privilege logs for both these productions

and the productions made prior to the Second Compensation Period.

       23.      Applicant also assisted Morrison & Foerster in working on the reply briefing in

support of the RMBS Trust Settlement**.**  Applicant researched certain issues relevant to the reply

briefing and prepared drafts of sections of the brief in close coordination with Morrison &

Foerster.  At Morrison & Foerster's request, Applicant also participated in meetings with

interested parties regarding the RMBS Trust Settlement and the representation and warranty

litigation brought against the Debtors.  Applicant also participated in periodic calls with the

advisors to the Creditors' Committee and Trustees concerning various discovery requests and

evaluation activities related to the RMBS Trust Settlement.

**Securities Claims (932-058)**
Fees:  $15,007.50; Total Hours:  81.40

24.      To prepare for the litigation concerning security claims in these cases, Applicant

monitored developments in other securities cases.  Applicant also researched certain potential

defenses to the securities claims being asserted against the Debtors and consulted with Morrison

& Forester regarding potential defenses to these claims.

**Monoline Claims (932-059)**
Fees:  $82,951.00; Total Hours:  356.30.

25.      Prior to the Petition Date, Applicant represented the Debtors in the cases brought

by monoline insurers MBIA and FGIC.  Since the Petition Date and at the request of Morrison &

Foerster, Applicant analyzed certain issues related to the claims that these and other monolines

insurers asserted in these cases and the validity of those claims.  Applicant also participated in

meetings with MBIA related to its claims and the RMBS settlement during the Second

Compensation Period that were reported under this Task Code.  Applicant also periodically

provided advice and assistance to Morrison & Forester dealing with complications posed by the

monolines to the sale of the servicing platform, including assistance in analyzing the cure claims

asserted by the monolines in connection with the servicing platform sale and in discussions with

the monolines on their asserted cure claims.

**ResCap Discovery Issues (932-060)**
Fees:  $118,067.00; Total Hours:  593.50

26.      Applicant used this matter for work on discovery issues not reported under

another specific matter.  Specifically, Applicant has assisted the Debtors in responding to various

requests of the Creditors' Committee for discovery related to various contested matters,

including the production of documents relating to the Creditors' Committee's  review of the

perfection of the liens being asserted in the Debtors' assets. This involved the review of over

77,000 documents and the ultimate production of over 145,000 pages worth of material.

This matter was also used for time and expenses related to assisting the Debtors in responding to

third party subpoenas during this time period, including the response to the Federal Housing

Finance Agency's request for information which led to the Court staying certain third party

discovery requests during the Second Compensation Period. Applicant also advised the Debtors

concerning certain e-discovery and record retention issues as it prepared for the sale of their

servicing platform.

**Examiner (932-064)**
Fees: $958,345.00; Total Hours: 4,786.90

27.     Applicant spent substantial time during the Second Compensation Period

responding to the Examiner's investigation of the Debtors. Applicant's work in responding to

the Examiner can be broken into three broad categories.

28.     The first category was the ongoing collection, review and production of

documents to the Examiner. While contract attorneys were generally used by the Applicant for

the first level of review to keep costs down, Applicant's own employees engaged in extensive

quality control reviews of the work of the contract attorneys to insure that documents were

reviewed and coded properly. In order for this review to be conducted properly, Applicant had

to research the factual backgrounds and roles of various current and former employees of the

Debtors and advisors to the Debtors and others to insure that joint privilege and other review

issues were analyzed correctly. During the Second Compensation Period, Applicant assisted the

Debtors in producing over 1.3 million pages of documents to the Examiner and conducted

review work on additional documents produced following the end of the Second Compensation

Period.

29.     A second major category of Applicant's efforts during the Second Compensation Period was in assisting the Debtors' current and former employees in preparing for examiner interviews.  Because of Applicant's deep history of representing the Debtors, Morrison & Foerster requested the Debtors' assistance in this area.  The two firms collaborated closely in preparing these witnesses and divided up the preparation tasks for the various witnesses being interviewed by the Examiner.  Applicant assisted in the preparation of 11 witnesses who were interviewed by the Examiner during the Second Compensation Period and conducted early preparation work for numerous additional witnesses who have been interviewed since the conclusion of the Second Compensation Period.

30.     The third major focus category of Applicant's efforts during the Second Compensation Period was related to the Examiner's requests for submission from parties with positions on the proposed release of third party claims.  Early in the Second Compensation Period, the Examiner sent out a letter to many of the Debtors' largest purported creditors providing the opportunity for them to make submissions regarding the appropriateness of the release of third party claims contemplated by the plan support agreement with Ally Financial Inc.  Ultimately, eight separate papers were submitted to the Examiner either by individual creditors or by groups of creditors acting jointly.  Each of these papers was a significant brief raising different and complex issues in relation to the proposed release and also included a discussion of the claims of the creditor or creditors who submitted the paper.

31.     Because Applicant had been involved in defending the Debtors in many of the prepetition litigations brought by parties who submitted position papers, Morrison & Foerster requested Applicant's assistance.  Applicant helped review and analyze the arguments made in many of the submissions to the Examiner, with a particular focus on the creditors' assertions

regarding the merits of their underlying claims.  The underlying claims were based on a wide

variety of theories ranging from breach of contract to securities and tort based claims.  Morrison

& Foerster requested the Applicant take the lead on preparing parts of the reply briefs

responding to the portions of the submissions discussing the merits of certain monoline,

securities and contractual representation claims covered by the proposed release.  Applicant

conducted research regarding the merits of each of these creditors' claims.  Applicant then

prepared significant sections of the Debtors' responses, which addressed the merits of the

underlying claims that would be covered by the third-party release.

**Ohio Litigation Matters (Matters starting with 096 or 621).**
Fees:  $203,421.50; Total Hours: 990.70

32.    Applicant spent substantial time during the Second Compensation Period

representing the Debtors in litigation related to their servicing of mortgage loans in the state of

Ohio.  Applicant has been representing the Debtors for a number of years with respect to

contested foreclosures or other servicing related litigation in Ohio.  Applicant spent significant

time dealing with unstayed claims and claims for which the stay was modified pursuant to the

servicing orders entered in this case.  Substantial time was spent notifying individual courts and

opposing counsel concerning the provisions of the orders providing stay relief and explaining

how those orders affected the relief requested in each pending case.  In aggregate, Applicant

billed time to representing the Debtors in over 90 separate actions in the state of Ohio during the

Second Compensation Period.

33.    The foregoing descriptions of services rendered by Applicant in specific areas are

not intended to be exhaustive of the scope of Applicant's activities in the Chapter 11 Cases.  The

time records attached hereto as <u>Exhibit E</u> present more completely the work performed by

Applicant in each billing category during the Second Compensation Period.

## **CONCLUSION**

34.     Applicant believes that the services rendered during the Second Compensation

Period on behalf of the Debtors were reasonable and necessary within the meaning of

Bankruptcy Code section 330.  Further, the expenses requested were actual and necessary to the

performance of Applicant's services.

        Applicant therefore requests an order (i) approving interim compensation in the

amount of $1,877,415.00 and interim reimbursement of expenses in the amount of $641,079.68,[2]

(ii) directing payment of the Second Holdback and any other amounts outstanding in connection

with the Monthly Fee Applications, (iii) authorizing payment of the First Holdback withheld

under the First Fee Order; and (iv) granting such other and further relief as may be just and

proper.

Dated: March 14, 2012                /s/ David A. Beck_____
                                     Jeffrey A. Lipps (admitted *pro hac vice*)
                                     lipps@carpenterlipps.com
                                     Jennifer A.L. Battle (admitted *pro hac vice*)
                                     battle@carpenterlipps.com
                                     David A. Beck (admitted *pro hac vice*)
                                     beck@carpenterlipps.com
                                     CARPENTER LIPPS & LELAND LLP
                                     280 Plaza, Suite 1300
                                     280 North High Street
                                     Columbus, Ohio  43215
                                     Phone:  (614) 365-4100
                                     Fax:  (614) 365-9145

                                     *Special Litigation Counsel to the Debtors and
                                     Debtors in Possession*

---

[2] The rates charged for such expenses (i) are based on Applicant's policies used with the Debtors prior to these cases being filed; (ii) do not charge for certain expenses such as in house copying or phone calls which are chargeable under the Guidelines; and (iii) are calculated to compensate Applicant for only the actual costs of the expenses.

**EXHIBIT E**

| | | | | | |
|---|---|---|---|---|---|
| 09/11/2012 | JAL | Review settlement agreement with KP group. | L160 | 0.50 | hrs |
| 09/11/2012 | JAL | Review discovery status filings of various parties related to 9019 discovery. | L250 | 0.30 | hrs |
| 09/11/2012 | JALB | Continued revisions to affirmative defenses section of Lipps Declaration. | L210 | 2.40 | hrs |
| 09/12/2012 | JAL | Further drafting of disclosure of opinions regarding KP settlement. | L250 | 3.50 | hrs |
| 09/12/2012 | VLS | Conferences and e-mail exchange with Mr. Bergelson at Morrison and Foerster regarding production of Underwriting Guides. | L320 | 0.30 | hrs |
| 09/12/2012 | JALB | Correspondence with Ms. Levitt (Morrison & Foerster) regarding discovery issues, status of seller file production,and loan file analysis. | L120 | 0.30 | hrs |
| 09/12/2012 | JALB | Draft causation section of Lipps declaration. (.90) Revise other sections of same. (.30) | L210 | 1.20 | hrs |
| 09/13/2012 | JAL | Further review and revision to disclosure of opinions on KP settlement. (.90)  Communicate with Ms. Battle and Mr. Beck regarding report. (.40) | L250 | 1.30 | hrs |
| 09/13/2012 | JALB | Incorporate veil-piercing research into analysis of Holdco election. | L120 | 1.40 | hrs |
| 09/13/2012 | JALB | Continue work on draft of background, material and adverse, and affirmative defenses sections of Lipps Declaration. | L210 | 3.60 | hrs |
| 09/13/2012 | JALB | Discussions with Ms. Zellmann and Ms. Sholl regarding matchup of seller IDs (Residential Capital) and research on location of seller files. | L120 | 0.40 | hrs |
| 09/13/2012 | JALB | Prepare update memorandum for Ms. Levitt (Morrison & Foerster) on status of locating missing seller files. | L120 | 0.30 | hrs |
| 09/13/2012 | JALB | Follow up correspondence with Ms. Levitt (Morrison & Foerster) regarding location of missing seller files. | L120 | 0.20 | hrs |
| 09/13/2012 | JALB | Discussion with Mr. Lipps and Mr. Beck regarding report. (.40)  Review of applicable contract language. (.30) | L120 | 0.70 | hrs |
| 09/13/2012 | DAB | Analyze contractual provisions related to veil piercing claims. | L120 | 1.10 | hrs |

| 09/13/2012 | DAB | Update memorandum on veil piercing issues related to RMBS based on analysis of contractual provisions. | L120 | 0.80 hrs |
|---|---|---|---|---|
| 09/13/2012 | DAB | Communicate with Mr. Phillips regarding arguments against FGIC claims. | L120 | 0.10 hrs |
| 09/13/2012 | DAB | Conference with Mr. Lipps and Ms. Battle regarding expert report and other issues on RMBS settlement. | L120 | 0.40 hrs |
| 09/13/2012 | DAB | Create chart with information regarding MBIA discovery at request of Ms. Levitt (Morrison & Foerster) for use in status conference. | L320 | 0.40 hrs |
| 09/14/2012 | JAL | Review revisions to RMBS settlement agreement. (.40)  Review and respond to e-mails regarding same. (.60) | L160 | 1.00 hrs |
| 09/14/2012 | VLS | E-mail exchanges with Ms. Battle, Ms. Zellman at Residential Capital and Mr. Walter at Ally regarding retrieval and review of Seller files. | L320 | 0.50 hrs |
| 09/14/2012 | VLS | E-mail exchanges with Ms. Battle, Ms. Marty, Mr. Bergelson and Mr. Clark at Morrison and Foerster regarding reproduction and delivery of Underwriting Guides. | L320 | 0.80 hrs |
| 09/14/2012 | VLS | E-mail exchange with Ms. Battle and Ms. Marty regarding assembly and production of Servicer Guides. | L320 | 0.40 hrs |
| 09/14/2012 | VLS | Quality control review of Underwriting Guide reproduction received from vendor. Upload to Morrison and Foerster's FTP site. | L320 | 1.20 hrs |
| 09/14/2012 | VLS | Download Services Guides and deliver to vendor for production. | L320 | 0.50 hrs |
| 09/14/2012 | JALB | Various calls and e-mails with Ms. Levitt and Mr. Clark (Morrison & Foerster), Mr. Mongelluzzo (Residential Capital), Ms. Sholl and Ms. Marty regarding collection and production of servicer guides, underwriting guidelines, historical servicing data, loan files, and other materials requested by UCC. | L120 | 1.30 hrs |
| 09/14/2012 | DAB | Analyze amended RMBS settlement agreement. | L120 | 0.20 hrs |
| 09/14/2012 | GNM | Telephone communications with Mr. Clark (Morrison & Foerster) regarding production of servicing guidelines for 9019 dataroom. | L120 | 0.20 hrs |
| 09/14/2012 | GNM | Meeting with Ms. Sholl regarding underwriting | L120 | 0.70 hrs |

| 09/21/2012 | JALB | Revise legal discussion for Lipps Declaration. | L210 | 1.20 hrs |
|---|---|---|---|---|
| 09/21/2012 | JALB | Revise discussion of tort claims for Lipps declaration. | L210 | 0.50 hrs |
| 09/21/2012 | JALB | Prepare "key points" list of subjects for potential Marano deposition. | L330 | 0.80 hrs |
| 09/21/2012 | JALB | Telephone conference with Mr. Rains and Mr. Clark (Morrison & Foerster) regarding status of Lipps declaration. | L120 | 0.50 hrs |
| 09/21/2012 | JALB | Communicate with Mr. Corcoran and Mr. Beck regarding reserve calculations. | L120 | 0.20 hrs |
| 09/21/2012 | SCM | Legal research regarding trigger event for discovery of fraud in RMBS cases. | L110 | 0.60 hrs |
| 09/21/2012 | SCM | Compose e-mail to Ms. Battle regarding legal research. | L190 | 0.20 hrs |
| 09/23/2012 | AMP | Attention to review of documents designated as privileged from RMBS settlement production. | L120 | 2.10 hrs |
| 09/23/2012 | AMP | Attention to redactions on documents previously marked withhold entirely. | L120 | 1.80 hrs |
| 09/23/2012 | AMP | Attention to issues regarding consultants or testifying experts and scope of privilege. | L120 | 0.30 hrs |
| 09/23/2012 | AMP | Multiple e-mails with Mr. Clark (Morrison and Foerster) regarding privilege and redaction designation issues. | L120 | 0.20 hrs |
| 09/23/2012 | AMP | Draft e-mail to Mr. Harris (Morrison and Foerster) and Mr. Clark (Morrison and Foerster) regarding likely areas of challenge by UCC of privilege designations. | L120 | 0.40 hrs |
| 09/23/2012 | JALB | Add citations to draft Lipps Declaration. | L210 | 0.60 hrs |
| 09/23/2012 | JALB | E-mail to Mr. Barthel regarding cite-checking and pin cite cleanup of Lipps Declaration. | L120 | 0.10 hrs |
| 09/23/2012 | DJB | Research and edit supporting materials citations to Lipps Supplemental Declaration in support of RMBS settlement. | L120 | 3.80 hrs |

| | | | | | |
|---|---|---|---|---|---|
| 09/24/2012 | JAL | Review e-mails regarding finalizing litigation case list. | L120 | 0.20 | hrs |
| 09/24/2012 | JALB | Discussion with Mr. Clark (Morrison & Foerster), Mr. Rains (Morrison & Foerster), Ms. Levitt (Morrison & Foerster), Mr. Sillman (Fortace) and Ms. Minier (Fortace) regarding status of loan files produced to date. | L120 | 0.70 | hrs |
| 09/24/2012 | JALB | Investigation of prior loan file pulls to assist with review of current status of loan files. | L120 | 0.40 | hrs |
| 09/24/2012 | JALB | Telephone conference with Mr. Lipps regarding deposition schedule and preparation for witness testimony in connection with 9019 motion. | L120 | 0.30 | hrs |
| 09/24/2012 | JALB | Discussion with Mr. Barthel regarding research on legal expert admissibility. | L120 | 0.20 | hrs |
| 09/24/2012 | JALB | Correspondence with Mr. Rains (Morrison & Foerster), discussion with Ms. Levitt (Morrison & Foerster) regarding preparation of Lipps Declaration. | L120 | 0.20 | hrs |
| 09/24/2012 | DJB | Research and edit supporting materials citations to Lipps Supplemental Declaration in support of RMBS settlement. | L120 | 5.60 | hrs |
| 09/24/2012 | DJB | Research case law regarding use of legal expert testimony and declarations in support of settlements in S.D.N.Y. | L120 | 2.10 | hrs |
| 09/24/2012 | DJB | Draft e-mail to Ms. Battle regarding case law regarding use of legal expert testimony and declarations in support of settlements in S.D.N.Y. | L120 | 0.80 | hrs |
| 09/24/2012 | DAB | Call with Mr. Sillman (Fortace), Mr. Rains (Morrison & Foerster) and Ms. Battle regarding issues on loan file lists produced in RMBS dispute. | L120 | 0.70 | hrs |
| 09/25/2012 | AMP | Attention to further review of Morrison and Foerster custodian documents designated as withhold entirely for privilege quality control. | L120 | 0.90 | hrs |
| 09/25/2012 | AMP | Attention to redactions on documents previously marked withhold entirely. | L120 | 0.80 | hrs |
| 09/25/2012 | AMP | Attention to revising and redrafting privilege log. | L120 | 0.70 | hrs |
| 09/25/2012 | AMP | Review research memorandums relating to privilege issues for purposes of preparation of privilege log. | L120 | 0.60 | hrs |

| 09/25/2012 | AMP | Multiple e-mails with Mr. Clark (Morrison and Foerster) regarding privilege and redaction designation issues. | L120 | 0.20 | hrs |
|---|---|---|---|---|---|
| 09/25/2012 | AMP | Telephone conference with Mr. Clark regarding withheld privilege log for Part 1 (Morrison and Foerster custodians) of review. | L120 | 0.30 | hrs |
| 09/25/2012 | JAL | Review motion to compel Institutional Investors to produce settlement communications. | L250 | 0.50 | hrs |
| 09/25/2012 | JAL | Communicate with Mr. Beck regarding motion to compel. | L250 | 0.20 | hrs |
| 09/25/2012 | JAL | Review and respond to e-mails regarding deposition schedule. | L330 | 0.20 | hrs |
| 09/25/2012 | VLS | E-mail exchange with Mr. Copple at RICOH regarding delivery of scanned material to DTI for processing and uploading. | L320 | 0.30 | hrs |
| 09/25/2012 | VLS | E-mail exchanges with Ms. Battle and Ms. Zellmann at ResCap regarding status of scanning and delivery of additional Seller files to be produced to the UCC. | L320 | 0.40 | hrs |
| 09/25/2012 | JALB | Correspondence regarding deposition schedule and logistics for 9019 motion. | L120 | 0.30 | hrs |
| 09/25/2012 | JALB | Prepare revisions to Lipps Declaration. | L210 | 1.70 | hrs |
| 09/25/2012 | JALB | Discussion with Mr. Fons and Mr. Clark (both Morrison & Foerster) regarding feasibility of collecting seller files. | L120 | 0.20 | hrs |
| 09/25/2012 | JALB | Correspondence with Ms. Levitt (Morrison & Foerster), and Mr. Moeller regarding follow-up research on statute of limitations issue. | L120 | 0.60 | hrs |
| 09/25/2012 | JALB | Telephone conference with Mr. Rains (Morrison & Foerster) regarding status of Lipps Declaration. | L120 | 0.50 | hrs |
| 09/25/2012 | DJB | Research case law nationwide regarding use of legal expert testimony and declarations in support of settlements. (4.20)  Research caselaw on defenses against use of legal expert testimony. (2.60) | L120 | 6.80 | hrs |
| 09/25/2012 | DJB | Draft e-mail to Ms. Battle regarding findings related to use of legal expert testimony and declarations. | L120 | 0.80 | hrs |
| 09/25/2012 | DAB | Communicate with Mr. Moeller regarding | L120 | 0.20 | hrs |

for 9019 review.

| Date | Timekeeper | Description | Task | Hours | |
|---|---|---|---|---|---|
| 10/12/2012 | GNM | Drafting and sending e-mail communications to Mr. Bergleson (Morrison & Foerster) regarding new reviewer training for 9019 project. | L320 | 0.50 | hrs |
| 10/12/2012 | SCM | Revise Statute of Limitations memorandum and transmit same to Mr. Beck. | L190 | 1.40 | hrs |
| 10/13/2012 | AMP | Multiple e-mails with Mr. Clark (Morrison & Foerster) regarding status of review of documents to begin privilege log for second round of productions to the UCC. | L320 | 0.20 | hrs |
| 10/13/2012 | AMP | Analyze status of review of documents to begin privilege log for second round of productions to the UCC. | L320 | 0.30 | hrs |
| 10/14/2012 | AMP | Attention to privilege log issues for second round of logging to assist Morrison & Foerster in productions to UCC. | L320 | 0.60 | hrs |
| 10/15/2012 | AMP | Review red-lined log reflecting additional information requested by UCC's counsel. | L120 | 0.60 | hrs |
| 10/15/2012 | AMP | Review e-mail from Mr. Clark (Morrison & Foerster) regarding privilege log and anticipated changes in light of meeting with UCC's counsel for upcoming log. | L120 | 0.40 | hrs |
| 10/15/2012 | RBS | Prepare report of findings regarding Mr. Keys' professional articles for Mr. Corcoran. | L310 | 0.30 | hrs |
| 10/15/2012 | JALB | Correspondence with Ms. Levitt (Morrison & Foerster) regarding new questions on loan files and Homecomings servicing. | L120 | 0.30 | hrs |
| 10/15/2012 | JALB | Follow-up with Ms. Zellmann (Residential Capital) regarding new questions on loan file and Homecomings servicing. | L120 | 0.20 | hrs |
| 10/15/2012 | JALB | Review background materials on expert witnesses. (.30) Prepare outline of topics for meeting with Mr. Rains and Ms. Levitt (Morrison & Foerster). (.30) | L330 | 0.60 | hrs |
| 10/15/2012 | JALB | Telephone conference with Ms. Levitt (Morrison & Foerster) regarding new questions on loan files and Homecomings servicing. | L120 | 0.10 | hrs |
| 10/15/2012 | DAB | Analyze opinion approving Dewey settlement to understand Judge Glenn analysis on 9019 approval factors. | L120 | 1.10 | hrs |
| 10/15/2012 | GNM | New reviewer training for 9019 review. | L320 | 2.10 | hrs |

| 10/15/2012 | GNM | Telephone communications with Mr. Shaw (Contract Reviewer) regarding 9019 protocol. | L120 | 0.20 hrs |
|---|---|---|---|---|
| 10/16/2012 | JAL | Prepare for meeting with Morrison Foerster regarding expert testimony and expert depositions (.30).  Conference with Ms. Battle regarding same (.20).  Conference with Mr. Levitt and Mr. Rains (Morrison & Foerster) regarding same (.80). Review and respond to e-mails regarding deposition schedule (.20). | L130 | 1.50 hrs |
| 10/16/2012 | JALB | Meet with Mr. Rains, Ms. Levitt, Ms. DeArcy (all Morrison & Foerster) regarding preparation for defense of 9019 motion. | L120 | 1.40 hrs |
| 10/17/2012 | AMP | Attention to privilege log issues and new deadline. | L120 | 0.30 hrs |
| 10/17/2012 | AMP | Attention to privilege log issues. | L120 | 0.40 hrs |
| 10/17/2012 | AMP | Multiple e-mails with Mr. Clark (Morrison & Foerster) regarding status of responsiveness review. | L120 | 0.30 hrs |
| 10/17/2012 | AMP | Review e-mails from Mr. Raines (Morrison & Foerster) and Ms. Battle regarding privilege log issues and new deadlines. | L120 | 0.20 hrs |
| 10/17/2012 | JAL | Review and respond to e-mails regarding deposition scheduling. | L330 | 0.30 hrs |
| 10/17/2012 | JDR | Draft correspondence to Ms. Battle and Mr. Corcoran regarding expert diligence. | L120 | 0.20 hrs |
| 10/17/2012 | JDR | Prepare documents  for designated expert diligence meeting. | L120 | 0.30 hrs |
| 10/18/2012 | AMP | Review Ally's clawback letter request. | L120 | 0.10 hrs |
| 10/18/2012 | AMP | Conference with Ms. Battle regarding common interest issues. | L120 | 0.20 hrs |
| 10/18/2012 | AMP | Telephone conference with Mr. Clark (Morrison & Foerster) regarding same and status of document review to begin privilege log review. | L120 | 0.30 hrs |
| 10/18/2012 | AMP | Analyze common interest issues. | L120 | 0.30 hrs |

| 10/24/2012 | JALB | Draft preparation outline for expert, Mr. Sillman. | L330 | 2.10 | hrs |
| 10/24/2012 | DJB | Quality check Morrison & Foerster reviewers' privilege coding in Concordance for Set 4 withheld log of RMBS Settlement Agreement and Plan Support Negotiation documents to assist Morrison & Foester with productions to the UCC. | L120 | 7.90 | hrs |
| 10/24/2012 | DJB | Draft, edit, and develop privilege log entries for documents in Concordance for Set 4 withheld log of RMBS Settlement Agreement documents that are being withheld for attorney-client, work product, and common interest privilege to assist Morrison &Foerster in its production to the UCC. | L120 | 7.80 | hrs |
| 10/24/2012 | DAB | Review MBIA response to RMBS clawback letter and communicate with Mr. Lipps, Ms. Battle and Ms. Paul-Whitfield regarding same. | L120 | 0.10 | hrs |
| 10/24/2012 | DAB | Communicate with Mr. Corcoran regarding discussions with MBIA on major issues for RMBS settlement. | L120 | 0.10 | hrs |
| 10/24/2012 | JRC | Prepare materials regarding MBIA's experts in advance of meeting with Mr. Lipps and Ms. Battle. | L120 | 0.10 | hrs |
| 10/24/2012 | JRC | Conference with Mr. Lipps, Ms. Battle, and Mr. Rhode regarding research on experts designated to testify regarding the RMBS Trust Settlement. | L340 | 1.30 | hrs |
| 10/24/2012 | JRC | Review and analyze pleadings relating to the RMBS Trust Settlement in order to draft memoranda on the expert witnesses designated by MBIA. | L210 | 0.60 | hrs |
| 10/24/2012 | JRC | Research case law regarding the standard of approval of a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure. | L120 | 0.70 | hrs |
| 10/24/2012 | JRC | Revise memorandum analyzing potential expert testimony of Mr. Keys (expert designated by MBIA) based on suggestions of Mr. Lipps and Ms. Battle. | L340 | 1.90 | hrs |
| 10/24/2012 | JRC | Revise memorandum analyzing potential expert testimony of Mr. John (expert designated by MBIA) based on suggestions of Mr. Lipps and Ms. Battle. | L340 | 0.60 | hrs |
| 10/24/2012 | JRC | Review and analyze research articles written by Mr. John (expert designated by MBIA) in order to revise memorandum analyzing his potential expert testimony. | L340 | 0.90 | hrs |
| 10/24/2012 | JRC | Review and analyze research articles written by | L340 | 1.20 | hrs |

| 11/25/2012 | JDR | Draft memorandum to Ms. Battle regarding defect rates, board approval process, and expert diligence. | L120 | 1.30 | hrs |
|---|---|---|---|---|---|
| 11/26/2012 | JAL | Prepare for meeting to discuss securitization claims (1.80). Conference with Ms. Battle regarding same (.50). Participate in meeting with creditors and Morrison Foerster to discuss same (2.40). Conference with Mr. Lee, Mr. Princi (Morrison & Foerster) and Mr. Beck regarding RMBS issues. (.30)  Participate on conference call to discuss claims resolution procedures (.80). Review chart regarding MBIA/FGIC claims (.20). Conference with Ms. Battle and Mr. Beck regarding same (.30). | L120 | 6.30 | hrs |
| 11/26/2012 | JALB | Review master trial brief outline prepared by Mr. Rains (Morrison & Foerster) in advance of trial team meeting. | L330 | 0.30 | hrs |
| 11/26/2012 | JALB | Prepare memorandum to Mr. Beck and Mr. Lipps regarding tasks to be done for trial preparation and trial brief. | L120 | 0.70 | hrs |
| 11/26/2012 | JALB | Follow-up correspondence with Mr. Ziegler (Morrison & Foerster) regarding factual analysis for 9019 trial preparation and briefing. | L120 | 0.20 | hrs |
| 11/26/2012 | JALB | Begin review of Sillman deposition transcript. | L330 | 0.30 | hrs |
| 11/26/2012 | JALB | Attend meeting with Morrison & Foerster 9019 trial team regarding tasks and analysis for trial preparation. | L120 | 3.20 | hrs |
| 11/26/2012 | DAB | Prepare for meeting with creditors regarding claims. | L120 | 2.30 | hrs |
| 11/26/2012 | DAB | Multiple conferences with Mr. Lipps and Ms. Battle regarding major issues on 9019 litigation. | L120 | 0.50 | hrs |
| 11/26/2012 | DAB | Meeting with Mr. Lee, Mr. Princi (Morrison & Foerster) and Mr. Lipps regarding strategy on RMBS settlement litigation and other case issues. | L120 | 0.30 | hrs |
| 11/26/2012 | DAB | Meeting with Mr. Lee, Mr. Princi (Morrison Foerster), Mr. Lipps and creditors regarding claims. | L120 | 2.40 | hrs |
| 11/26/2012 | JDR | Prepare designated expert witness deposition examination materials and outline of responses to areas of anticipated testimony. | L420 | 0.70 | hrs |

and deposition in preparation for teleconference.

| | | | | | |
|---|---|---|---|---|---|
| 11/28/2012 | SP | Review board and audit committee meeting minutes and materials for discussion of PLS litigation activity and reserves. | L120 | 2.30 | hrs |
| 11/28/2012 | SP | Draft analysis for Ms. Battle and Mr. Beck regarding discussion of PLS litigation in board and audit committee meeting materials and minutes. | L120 | 0.30 | hrs |
| 11/29/2012 | AMP | Attention to issues regarding supplemental production. | L320 | 0.90 | hrs |
| 11/29/2012 | AMP | Compare what was produced versus identified for potential production in light of meet-and-confer. | L320 | 1.10 | hrs |
| 11/29/2012 | AMP | E-mails with Mr. Ziegler (Morrison & Foerster) regarding what was produced versus identified for potential production in light of meet-and-confer. | L320 | 0.70 | hrs |
| 11/29/2012 | JAL | Review and redraft second supplemental declaration (1.0). Review research memorandum regarding WMC decision and related issues (.30). Review creditor objections to 9019 motion (.60). Conference with Ms. Battle regarding strategy on same. (.40)  Review expert declarations (.30). Conference with Ms. Battle regarding supplemental declaration (.20). | L120 | 2.80 | hrs |
| 11/29/2012 | RBS | Compile pleadings from Scroll pertaining to motion to strike Butler report for Mr. Beck. | L310 | 3.20 | hrs |
| 11/29/2012 | JALB | Telephone conference with Mr. Rains (Morrison & Foerster) regarding objections and revised schedule. | L120 | 0.40 | hrs |
| 11/29/2012 | JALB | Review and analyze proposed objections and materials regarding proposed objectors' experts. | L330 | 2.20 | hrs |
| 11/29/2012 | JALB | Meet with Mr. Rhode regarding proposed objections and materials regarding proposed objectors' experts. | L120 | 0.60 | hrs |
| 11/29/2012 | JALB | Discussion with Mr. Lipps regarding objections of MBIA, FGIC and UCC. | L120 | 0.40 | hrs |
| 11/29/2012 | JALB | Telephone conference with Mr. Rains and Mr. Princi (both Morrison & Foerster) regarding expert triage. | L120 | 0.40 | hrs |
| 11/29/2012 | JALB | Prepare summary of key expert opinions for Mr. Rains of Morrison & Foerster. | L330 | 0.90 | hrs |

regarding Insurance Policies previously produced
in MBIA litigation for Ms. Tice (Morrison &
Foerster).

| 11/30/2012 | GNM | Telephone communications with Mr. Sholl regarding Insurance Policies previously produced in MBIA litigation for Ms. Tice (Morrison & Foerster). | L120 | 0.30 | hrs |
| 11/30/2012 | GNM | Meeting with Ms. Battle regarding Insurance Policies previously produced in MBIA litigation for Ms. Tice (Morrison & Foerster). | L120 | 0.30 | hrs |
| 11/30/2012 | GNM | Drafting and sending e-mail communications to Ms. Tice (Morrison & Foerster) regarding Insurance policies previously produced in MBIA litigation. | L120 | 0.20 | hrs |
| 11/30/2012 | SCM | Legal research regarding availability of pre-confirmation motion to determine the classification of claims of security holders. | L110 | 2.90 | hrs |
| 11/30/2012 | SCM | E-mail to Mr. Beck regarding availability of pre-confirmation motion to determine the classification of claims of security holders. | L190 | 0.90 | hrs |

TOTAL FEES FOR THIS MATTER                              $102,947.00

<u>EXPENSES</u>

| 11/15/2012 | Delivery Service/Messengers - Federal Express to Ms. Battle from Ms. LeBeau | $73.82 |
| 11/20/2012 | (TRIP-JAL-11/15-20/12) Out-of-Town Travel/Hotel - travel to New York City to attend 9019 deposition and Examiner Investigation | $1,231.83 |
| 11/20/2012 | (TRIP-JAL-11/15-20/12) Out-of-Town Travel/Taxi - travel to New York City to attend 9019 deposition and Examiner Investigation | $26.73 |
| 11/20/2012 | (TRIP-JAL-11/15-20/12) Out-of-Town Travel/Car Service - travel to New York City to attend 9019 deposition and Examiner Investigation | $40.00 |
| 11/20/2012 | (TRIP-JAL-11/15-20/12) Out-of-Town Travel/Parking @ Port Columbus - travel to New York City to attend 9019 deposition and Examiner Investigation | $56.66 |
| 11/20/2012 | (TRIP-JAL-11/15-20/12) Out-of-Town Travel/Mileage to/from Port Columbus - travel to New York City to attend 9019 deposition and Examiner Investigation | $4.03 |

expert depositions.

| | | | | | |
|---|---|---|---|---|---|
| 12/01/2012 | JDR | Review analogous litigation challenges to 9019 underwriting experts in preparation for depositions. | L330 | 0.30 | hrs |
| 12/01/2012 | JDR | Draft memorandum regarding Sillman reply declaration and hearing testimony. | L210 | 2.70 | hrs |
| 12/02/2012 | JDR | Review and analyze updated memorandum and materials on reserves in preparation for 9019 reply brief. | L210 | 1.00 | hrs |
| 12/02/2012 | JDR | Draft memorandum regarding Sillman reply declaration and hearing testimony. | L210 | 4.40 | hrs |
| 12/03/2012 | AMP | Attention to review of Ally's second set of documents for key or significant documents to assist Morrison & Foerster in hearing/witness preparations. | L320 | 0.70 | hrs |
| 12/03/2012 | AMP | Multiple e-mails with reviewers regarding Ally's second set of documents. | L320 | 0.20 | hrs |
| 12/03/2012 | AMP | Attention to review for Mr. Devine's specific documents. | L320 | 1.10 | hrs |
| 12/03/2012 | AMP | Determining difference between what was produced post meet and confer and what was identified pre-meet and confer. | L320 | 0.60 | hrs |
| 12/03/2012 | AMP | E-mail exchanges with Mr. Ziegler (Morrison & Foerster) regarding outcome of special review project and 67 documents tagged as potentially relevant. | L320 | 0.80 | hrs |
| 12/03/2012 | AMP | E-mail exchanges with Mr. Ziegler (Morrison & Foerster) regarding production off original logs based on meet and confer. | L320 | 0.40 | hrs |
| 12/03/2012 | AMP | Review e-mail from Mr. Ziegler (Morrison & Foerster) regarding review of Rescap's productions for references to Mr. Devine. | L320 | 0.30 | hrs |
| 12/03/2012 | AMP | Multiple e-mails with reviewers regarding review of Rescap's productions for references to Mr. Devine. | L120 | 0.60 | hrs |
| 12/03/2012 | JAL | Review chart of claims released in settlement (.20). Conference with Ms. Battle regarding same (.20). Review e-mails regarding same (.10). | L160 | 0.50 | hrs |
| 12/03/2012 | JALB | Meet with Mr. Lipps regarding preparation of sections of draft reply brief. | L120 | 0.30 | hrs |

| | | | | | |
|---|---|---|---|---|---|
| 12/04/2012 | JDR | Draft reply brief section regarding reserves. | L210 | 1.90 | hrs |
| 12/04/2012 | JDR | Review fact depositions to assist in 9019 reply reserves section. | L330 | 1.30 | hrs |
| 12/04/2012 | JDR | Conference with Ms. Battle regarding 9019 reply brief and expert issues. | L120 | 0.20 | hrs |
| 12/04/2012 | JDR | Revise reply brief section regarding range of reasonableness for 9019 settlement. | L210 | 0.90 | hrs |
| 12/04/2012 | JDR | Review and analyze expert report of UCC expert Cornell. | L420 | 1.70 | hrs |
| 12/04/2012 | JDR | Review and analyze expert report of UCC expert Morrow. | L420 | 1.30 | hrs |
| 12/04/2012 | JDR | Review and analyze expert report of FGIC expert Rossi. | L420 | 0.60 | hrs |
| 12/04/2012 | JDR | Review and analyze expert report of MBIA expert Brown. | L420 | 1.80 | hrs |
| 12/04/2012 | JDR | Draft memorandum regarding expert report of UCC expert Cornell. | L210 | 1.40 | hrs |
| 12/04/2012 | JDR | Draft memorandum regarding expert report of UCC expert Morrow and MBIA expert Brown. | L210 | 0.90 | hrs |
| 12/05/2012 | AMP | Attention to status of review of 26,000 additional Ally documents for key issues. | L320 | 0.80 | hrs |
| 12/05/2012 | AMP | E-mails with Ms. Chinn (document reviewer) regarding status of review of 26,000 additional Ally documents for key issues. | L320 | 0.30 | hrs |
| 12/05/2012 | AMP | Attention to technical issues with Mr. Bergelson (Morrison & Foerster) and Mr. Ziegler (Morrison & Foerster). | L120 | 0.30 | hrs |
| 12/05/2012 | JAL | Review and redraft memorandum regarding Aurelius subordination argument (.40). Conference with Mr. Beck regarding same (.10). Review e-mails regarding same (.10). Review Mr. Beck's claims chart (.30). Conference with Mr. Beck regarding same (.10). Review Mr. Beck's subordination analysis memo (.40). Conference with Mr. Beck regarding same (.20). Review | L120 | 1.70 | hrs |

RMBS Trial brief.

| | | | | | |
|---|---|---|---|---|---|
| 12/12/2012 | DAB | Draft inserts for RMBS trial brief. | L120 | 3.80 | hrs |
| 12/12/2012 | JDR | Draft memorandum regarding underwriting issues. | L210 | 3.80 | hrs |
| 12/12/2012 | JDR | Review and prepare select 9019 documents produced related to settlement releases. | L320 | 1.00 | hrs |
| 12/12/2012 | JDR | Prepare binder with objector materials and expert reports. | L420 | 0.70 | hrs |
| 12/12/2012 | JDR | Review and analyze analogous RMBS filings for rebuttal expert diligence. | L420 | 0.50 | hrs |
| 12/13/2012 | AMP | Review e-mail from Mr. Ziegler (Morrison & Foerster) regarding priority review on exposure on repurchase claims. | L120 | 0.30 | hrs |
| 12/13/2012 | AMP | Multiple e-mails with Mr. Ziegler and review team regarding priority review on exposure on repurchase claims. | L120 | 1.30 | hrs |
| 12/13/2012 | AMP | Attention to search terms for priority review on exposure on repurchase claims. | L320 | 2.40 | hrs |
| 12/13/2012 | JAL | Conference with Mr. Beck regarding Mr. Rossi's deposition support (.10). | L120 | 0.10 | hrs |
| 12/13/2012 | JALB | Discussion with Mr. Lipps regarding Rossi corporate governance expert cross and analysis. | L120 | 0.60 | hrs |
| 12/13/2012 | JALB | Various discussions and correspondence with Mr. Rains (Morrison & Foerster) regarding status of reply brief drafting and rebuttal expert strategy. | L120 | 0.90 | hrs |
| 12/13/2012 | JALB | Prepare analysis at request of Mr. Rains (Morrison & Foerster) of repurchase price calculation versus Dr. Cornell's loss analysis. | L120 | 0.80 | hrs |
| 12/13/2012 | JALB | Telephone conference with Mr. Rains (Morrison & Foerster) and potential rebuttal expert regarding scope of potential rebuttal report. | L120 | 0.80 | hrs |
| 12/13/2012 | JALB | Draft assigned sections of 9019 reply brief. | L120 | 0.60 | hrs |
| 12/13/2012 | JALB | Revise draft sections of 9019 reply brief. | L120 | 0.40 | hrs |

| | | | | | |
|---|---|---|---|---|---|
| 12/13/2012 | JALB | Meeting with Mr. Lipps regarding strategy for 9019 reply brief. | L120 | 0.40 | hrs |
| 12/13/2012 | JALB | Discussion with Mr. Beck regarding issues on RMBS litigation. (.30)  E-mails with Mr. Rhode on expert diligence. (.20) | L120 | 0.50 | hrs |
| 12/13/2012 | JALB | Meet with Ms. DeArcy (Morrison & Foerster) regarding strategy for reserves briefing and overall strategy for 9019 reply brief drafting. | L120 | 0.50 | hrs |
| 12/13/2012 | DAB | Call with Ms. Battle regarding issues on RMBS litigation. | L120 | 0.30 | hrs |
| 12/13/2012 | DAB | Conference with Mr. Rhode regarding revisions to RMBS trial brief. | L120 | 0.20 | hrs |
| 12/13/2012 | DAB | Revise trial brief. | L120 | 2.70 | hrs |
| 12/13/2012 | DAB | E-mail Ms. Battle regarding indenture trustees involved in the RMBS settlement. | L120 | 0.10 | hrs |
| 12/13/2012 | DAB | Research questions relating to indenture trustees involved in the RMBS settlement. | L120 | 0.20 | hrs |
| 12/13/2012 | DAB | Review e-mail and associated materials from Ms. Moloff of Morrison & Foerster regarding e-mails to support RMBS brief. | L120 | 0.20 | hrs |
| 12/13/2012 | DAB | Revise RMBS brief based on additional materials from Ms. Moloff of Morrison & Foerster. | L120 | 0.40 | hrs |
| 12/13/2012 | JDR | Draft memorandum regarding potential challenges to Sillman declaration. | L210 | 2.00 | hrs |
| 12/13/2012 | JDR | Draft memorandum regarding underwriting issues. | L210 | 4.50 | hrs |
| 12/13/2012 | JDR | Correspondence with Ms. Castro  (Morrison & Foerster) regarding prepetition complaints analysis. | L120 | 0.20 | hrs |
| 12/13/2012 | JDR | Discuss expert report of Rossi to analyze permissible conclusions and opinions with Ms. Battle. | L420 | 0.60 | hrs |
| 12/13/2012 | JDR | Draft memorandum regarding Sillman reply declaration. | L210 | 1.50 | hrs |

| | | | | | |
|---|---|---|---|---|---|
| 12/13/2012 | JDR | Draft memorandum regarding key aspects of FGIC expert Rossi testimony. | L420 | 0.50 | hrs |
| 12/13/2012 | JDR | Prepare documents and data for 9019 rebuttal expert diligence. | L420 | 0.90 | hrs |
| 12/13/2012 | JDR | Prepare memorandum of research regarding permissibility of corporate governance expert testimony. | L420 | 0.80 | hrs |
| 12/13/2012 | JDR | Revise 9019 reply brief draft. | L210 | 0.30 | hrs |
| 12/13/2012 | JDR | Draft correspondence to Ms. Battle and Ms. Lipps regarding 9019 expert diligence. | L420 | 0.30 | hrs |
| 12/14/2012 | AMP | Multiple e-mails with review team regarding search results. | L120 | 0.40 | hrs |
| 12/14/2012 | AMP | Attention to priority review as to exposure on repurchase claims. | L120 | 1.70 | hrs |
| 12/14/2012 | AMP | Draft e-mail to Mr. Ziegler (Morrison & Foerster) regarding documents found and tagged and potentially significant on repurchase claims. | L120 | 0.50 | hrs |
| 12/14/2012 | JALB | Review and revise Carpenter Lipps & Leland sections of 9019 reply brief. | L120 | 2.20 | hrs |
| 12/14/2012 | JALB | Correspondence with Mr. Rhode and Mr. Corcoran regarding breakdown of Dr. Cornell's analysis. | L120 | 0.30 | hrs |
| 12/14/2012 | JALB | Follow-up regarding outlines for Lipps and Sillman rebuttal declarations. | L120 | 0.40 | hrs |
| 12/14/2012 | JALB | Discussion with Mr. Rains (Morrison & Foerster) regarding potential rebuttal experts. | L120 | 0.40 | hrs |
| 12/14/2012 | JALB | Discussion with Mr. Corcoran regarding Lipps Supplemental Declaration research. | L120 | 0.30 | hrs |
| 12/14/2012 | JALB | Integrate drafts of sections of 9019 reply brief for Mr. Rains (Morrison & Foerster). | L120 | 1.30 | hrs |
| 12/14/2012 | JALB | Integrate CLL sections of reply brief into single draft for review by Mr. Rains (Morrison & Foerster). | L120 | 0.40 | hrs |
| 12/14/2012 | JDR | Draft correspondence to Ms. Battle regarding UCC | L330 | 0.30 | hrs |

| | | | | | |
|---|---|---|---|---|---|
| | | documents in order to draft second supplemental declaration of Mr. Lipps in support of RMBS Trust Settlement. | | | |
| 12/28/2012 | JRC | Review objections to the RMBS Trust Settlement in order to draft second supplemental declaration of Mr. Lipps in support of RMBS Trust Settlement. | L210 | 0.60 | hrs |
| 12/28/2012 | JDR | Review and analyze deposition transcript of expert Mr. Brown to assist in preparation of 9019 reply briefings. | L120 | 0.80 | hrs |
| 12/28/2012 | JDR | Review and analyze deposition transcript of expert Mr. Rossi to assist in preparation of 9019 reply briefings. | L120 | 0.70 | hrs |
| 12/28/2012 | JDR | Review and analyze deposition transcript of expert Cornell to assist in preparation of 9019 reply briefings. | L120 | 1.90 | hrs |
| 12/29/2012 | JAL | Review deposition transcripts for objector experts Mr. Rossi and Mr. Brown. | L130 | 1.80 | hrs |
| 12/29/2012 | JALB | Follow-up regarding questions from rebuttal expert. | L120 | 0.20 | hrs |
| 12/29/2012 | JDR | Prepare materials for rebuttal expert review and 9019 reply brief. | L210 | 2.20 | hrs |
| 12/30/2012 | JAL | Review deposition transcripts of objector experts Mr. Morrow and Mr. Cornell. | L130 | 2.00 | hrs |
| 12/30/2012 | JALB | Respond to questions from Mr. Rains (Morrison & Foerster) regarding status of supplemental/rebuttal expert declarations. | L120 | 0.30 | hrs |
| 12/30/2012 | JRC | Draft second supplemental declaration of Mr. Lipps in support of RMBS Trust Settlement. | L210 | 2.30 | hrs |
| 12/30/2012 | JRC | Review and analyze ResCap's securitization documents in order to draft second supplemental declaration of Mr. Lipps in support of RMBS Trust Settlement. | L320 | 0.90 | hrs |
| 12/30/2012 | JRC | Review pleadings from ResCap's RMBS cases in order to draft second supplemental declaration of Mr. Lipps in support of RMBS Trust Settlement. | L210 | 0.60 | hrs |
| 12/31/2012 | JAL | Review and redraft portions of reply memorandum in support of 9019 (1.3).  Telephone conference with Ms. Battle regarding same (.20). | L250 | 1.50 | hrs |
| 12/31/2012 | JAL | Further review of 4 objector expert deposition transcripts (1.2).  Review and revise supplemental expert declaration (1.6). | L130 | 2.80 | hrs |