**Hearing Date and Time:  May 14, 2013 at 10:00 a.m. (Prevailing Eastern Time)**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

　　　　and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS**
**TO DEBTORS' MOTION FOR ENTRY OF AN ORDER TO PERMIT**
**THE DEBTORS TO CONTINUE USING CASH COLLATERAL**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

　　　　The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"),[1] by and

through its undersigned counsel, hereby files this objection (the "Objection") to the Motion[2] of

---

[1] The Ad Hoc Group is comprised of certain entities that hold or manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated as of June 6, 2008 (the "Junior Secured Notes").  The Junior Secured Noteholders' claim is now equal to approximately 116.0% of the face amount of the bonds and is currently increasing by virtue of the accrual of post-petition interest at the rate of approximately $250 million per year.

the debtors (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases")

for entry of an order to permit the Debtors to continue using Cash Collateral.  As and for its

Objection, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

During the past eleven months of these Chapter 11 Cases, the Debtors have used

hundreds of millions of dollars of Cash Collateral of the Junior Secured Notes to administer

these estates.  The terms governing this use of Cash Collateral, as set forth in the consensual

Final Cash Collateral Order,[3] are straightforward and crystal clear – the Debtors were permitted

to use Cash Collateral to maximize the value of the Debtors' various assets, including the assets

pledged as security for the Junior Secured Notes.  To the extent, however, that the Junior

Secured Notes' collateral diminished in value, the Final Cash Collateral Order was designed to

render the Junior Secured Notes indifferent – first, by granting adequate protection liens to the

Junior Secured Noteholders; second, by providing for the payment of fees and expenses to the

advisors of the Ad Hoc Group; and, third, by waiving the Debtors' surcharge rights under section

506(c) of the Bankruptcy Code.  Despite having benefitted from the use of hundreds of millions

of dollars of Cash Collateral during the past year to pay costs of administration, the Debtors now

refuse to operate on that basis and instead seek to shift all future costs of collateral protection to

---

[2] Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3374] (the "Motion").  In support of the Motion, the Debtors submitted two declarations – Declaration of Marc D. Puntus in Support of Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3375] and Declaration of Jill Horner in Support of Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3394] (together, the "Declarations") -- as well as a forecast. Notice of Filing of Exhibit 2 to Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3437] (the "Forecast").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion and the Declarations.

[3] Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties [Docket No. 491] (as subsequently amended, the "Final Cash Collateral Order").

the Junior Secured Noteholders, regardless of whether the Debtors actually maximize value

going forward.  That result is both inequitable and contrary to law.

At this juncture, the Debtors have three primary classes of remaining assets – contingent

litigation claims, cash, and financial instruments and contracts subject to ongoing collection

efforts.  Of the remaining cash, the Debtors concede that (i) certain amounts fit within the

definition of "Collateral" supporting the Junior Secured Notes under the relevant documents (the

"Cash Collateral") and (ii) certain other cash is arguably not subject to liens granted to the Junior

Secured Notes (the "Unencumbered Cash").

By the Motion, the Debtors now seek to use $30.4 million of Cash Collateral (the

"Allocated Costs") to support their efforts to monetize those remaining unsold assets which

constitute "Collateral" for the Junior Secured Notes (the "Unsold Collateral") and a completely

indeterminate amount of Cash Collateral to pay prior administrative expenses incurred but

unpaid through the expiry of the Final Cash Collateral Order.  In so doing, they steadfastly

maintain that they will realize more proceeds from the Unsold Collateral than if these assets were

abandoned or sold at "fire sale" prices.  Indeed, as the Debtors have repeatedly made clear –

most recently in connection with their motion for approval of a Key Employee Incentive Plan –

the very purpose of the administrative infrastructure which has been perpetuated in these cases

has been premised on the view that the Debtors can, in fact, maximize the value of all unsold

assets for the benefit of all creditors.  See, e.g., Transcript of Hearing held April 11, 2013 at 6:25

– 7:2 (Counsel for Debtors) ("The estate KEIP is focused on two goals: managing expenses and

maximizing the value of the debtors' remaining assets").

The concept of spending cash to create more value is not, in and of itself, particularly

controversial.  What is controversial, and indeed stunning, are the Debtors' arguments that they

2K

can (i) isolate Unencumbered Cash from the costs of asset dispositions and (ii) compel the Junior

Secured Notes to pay a prospective surcharge of their Cash Collateral in order to induce the

Debtors to maximize the value of the Unsold Collateral.  At its core, the Debtors' argument is

that their professionals would be breaching their fiduciary duties if, in the course of monetizing

Unsold Collateral, they incurred administrative expenses that had to be paid out of

Unencumbered Cash.  In other words, they contend, without citing a single case or authority, that

they would be violating their duties if unsecured creditors' recoveries were reduced on account

of the cost of preserving estate assets that happen to be collateral for a secured lender. Then, in

their *coup de grace*, the Debtors go on to threaten that, unless the Junior Secured Notes commit

to fund $30.4 million in prospective administrative expenses, and perhaps hundreds of millions

of dollars of accrued but unpaid expenses, the Debtors will cease any efforts to maximize the

value of the Unsold Collateral and instead abandon it or conduct a fire sale.  These statements are

simply wrong in three respects.

First, the fiduciary duties of an estate professional run to maximizing value of *all* assets

for the benefit of *all* stakeholders, not just one constituency.  In the absence of an administrative

insolvency, it is indisputable that each estate and all of its constituents benefit from the

maximization of proceeds of Unsold Collateral, regardless of whether the Junior Secured Notes

are under or oversecured (the latter is the case).  In the unlikely event that the Junior Secured

Notes are undersecured, every additional dollar received on the Unsold Collateral increases the

assets of the estates available for distribution and reduces the deficiency claims of the Junior

Secured Notes.  And, given the multiple Debtor guarantors of that deficiency claim, all

unsecured creditors can benefit from minimizing claims that are structurally senior to their own

unsecured claims.  Moreover, if the Junior Secured Notes are oversecured, every additional

dollar received on the sale of Unsold Collateral over and above the costs of collecting that dollar increases the amount of the estate's Unencumbered Cash, which again inures to the benefit of the estates and all of their creditors.

Second, a fiduciary cannot simply abdicate out of spite his or her duties to maximize value of a debtor's assets. The Debtors insist they have a plan for liquidating Unsold Collateral at a profit. It makes no sense, then, to abandon those assets or to dispose of them in a fire sale, particularly where they have Unencumbered Cash. Again, in the absence of an administrative insolvency, every dollar lost in the sale of Unsold Collateral reduces an estate's assets and either increases the size of a deficiency claim by that dollar or requires another dollar of collateral from an alternate source to pay secured claims, all at the expense of the estates. In any event, the Ad Hoc Group would be amenable to accepting Unsold Collateral outside of a plan of reorganization provided that the parties could agree on an appropriate procedure for valuing the abandoned property and that the Debtors agree to provide adequate protection to the Junior Secured Noteholders on account of any diminution in value since the Petition Date on the to-be-abandoned collateral.

Third, there is no provision in these cases, much less the Bankruptcy Code, for the prospective allocation of indeterminate costs against collateral. The Debtors have expressly and irrevocably waived their rights under section 506(c) in the Final Cash Collateral Order. Even then, section 506(c) is retrospective only, to be applied *after* costs of disposition are incurred. The Motion is simply silent as to what happens if actual costs are either greater or lesser than forecast. Essentially what the Debtors propose is adequate protection of *unsecured* and *administrative* claims. There is simply nothing in the Bankruptcy Code or caselaw which allows for adequate protection of claims that are not secured.

Recognizing the Debtors' significant secured and administrative expense obligations and the interplay between those costs and creditor recoveries, the Ad Hoc Group has repeatedly sought to bring about an expedited resolution of these Chapter 11 Cases. For this reason, the Ad Hoc Group has repeatedly requested that the Debtors mitigate the potential accrual of post-petition interest expense by immediately distributing at least the undisputed Cash Collateral to the Junior Secured Noteholders, thereby preserving funds for others. The Debtors have consistently obstructed these efforts to mitigate the accrual of administrative expenses, both by frustrating third parties' ability to file competing plans of reorganization and by reneging on their prior agreements to move for authority to make an interim distribution on the Junior Secured Notes at an earlier stage of these Chapter 11 Cases.

The Ad Hoc Group has likewise endeavored to work with the Debtors' professionals to understand the projected allocation of costs. Contrary to the discovery schedule set forth in the Final Cash Collateral Order, however, the Debtors did not timely produce their witnesses for deposition. Accordingly the Ad Hoc Group reserves its rights to supplement this Objection after gaining a more full understanding of the Allocated Costs from depositions of the Debtors' witnesses. As throughout these Chapter 11 Cases, the Ad Hoc Group will continue to work constructively to solve the difficult problems of a case in which assets are largely being reduced to cash while the administrative expenses continue to accrete, but there must be limits.

## THE PROPOSED USE OF CASH COLLATERAL

By the Motion, the Debtors propose to use the Cash Collateral of the Junior Secured Notes from May 1, 2013 through January 2016 (the "Allocation Period") for several purposes:

    i.    The asset monetization/preservation costs related to the assets of the Collateral (including an allocated portion of the professionals' fees and operating expenses related thereto);

    ii.      Accrued and unpaid amounts payable with Cash Collateral in accordance with the Final Cash Collateral Order, which accrued prior to the closing of the Asset Sales but which have not yet been paid;[4]

    iii.     The Carve Out;

    iv.     The Adequate Protection payments to AFI under the Revolver and the LOC;

    v.      The wind-down costs of the origination pipeline;

    vi.     The costs relating to Debtor Executive Trustee Services LLC;

    vii.     Advance obligations with respect to servicing agreements remaining in the estate following the closing of the Asset Sales;

Motion ¶ 30.  The Debtors estimate that the combined costs of using all Cash Collateral over the Allocation Period will total $55 million, of which $30.4 million is to be paid using the Cash Collateral of the Junior Secured Notes (the "Allocated Costs").  Horner Dec. ¶ 21.  There appears to be no dispute, however, that the Debtors have sufficient Unencumbered Cash to pay Allocated Costs, regardless of whether or not the Junior Secured Notes are oversecured or undersecured.

## ARGUMENT

The Debtors propose to use the Cash Collateral to fund Allocated Costs during the Allocation Period, as well as unpaid expenses accrued during prior periods, notwithstanding the objection of the Junior Secured Notes.  Motion ¶ 34.  To do so, the Debtors bear the burden of demonstrating that their secured creditors' security interests are adequately protected, and must detail how such interests are protected. See 11 U.S.C. §§ 363(e), 363(p)(1); Fed. R. Bankr. P. 4001(b)(iv).  Implicit in this requirement is the burden of showing that the use of such cash collateral is actually necessary to the reorganization of the estate.  See, e.g., In re MF Global Holdings Ltd., 2011 WL 6210374 at *3 (Bankr. S.D.N.Y. 2011) (Glenn, J.) (unpublished)

---

[4] To date, the Debtors have not provided any information as to this quantum of expense or why, if the Final Cash Collateral Order authorized the expenditure, the new cash collateral order, if entered, needs to address prior expenses.

(granting a debtor's non-consensual use of cash collateral and observing, "the Chapter 11

Trustee's need for the use of cash collateral is obvious."); *Collier on Bankruptcy* ¶ 363.05.

> I.      **The Debtors' Proposed Use of Cash Collateral is Inconsistent With Their
> Fiduciary Duties**

As noted above, the gravamen of the Motion is the Debtors' erroneous claim that their

fiduciary duties require them to use the Cash Collateral, as opposed to Unencumbered Cash, to

pay the Allocated Costs and prior expenses.[5]  See Motion ¶ 5 ("The Debtors, however, believe it

would be inconsistent with their fiduciary duties to use the limited assets that would otherwise be

available for unsecured creditors to liquidate assets solely for the benefit of the Lenders").  The

Debtors' position is wrong as a matter of fact and law.

The reason that a debtor must look to unencumbered property for payment of

administrative expenses is because its fiduciary duty is to first maximize value for its entire

estate, not just for its general unsecured claimants.  It is well established that a debtor owes its

fiduciary duties to its entire estate and must preserve estate property for the benefit of all

stakeholders.  See, e.g., In re MF Global Holdings, Ltd., 2011 WL 6210374 at *3 (Bankr.

S.D.N.Y. 2011) (Glenn, J.) (unpublished) ("The Chapter 11 Trustee must operate the Debtors'

estate with the goal of maximizing the recovery of all creditors"); Hirsch v. Penn. Textile Corp.

(In re Centennial Textiles, Inc.), 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998).  The Debtors

themselves have recognized the estate-wide scope of these duties in these Chapter 11 Cases.

See, e.g., Debtors' Omnibus Reply to Responses to Debtors' Motion for the Entry of an Order

Further Extending their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances

---

[5] With respect to the need to use Cash Collateral to maintain and enhance the value of the Unsold Collateral, the Debtors have embraced an inherently conflicting position.  On the one hand, the Debtors argue that the Junior Secured Notes are undersecured – an outcome that would by extension free up hundreds of millions of dollars of cash that would then be unencumbered and available for distribution to general unsecured creditors.  At the same time, the Debtors argue that they need to use the Cash Collateral to operate these estates – presumably because there is otherwise a dearth of unencumbered cash and there exists a large collateral cushion with respect to the Junior Secured Notes' collateral that would allow for this.

Thereof (ECF 3593), ¶ 2 ("The Debtors … are the only party with fiduciary responsibilities to all creditors in these cases");  Debtors' Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of (A) a Key Employee Retention Plan for Certain Non-Insiders and (B) a Key Employee Incentive Plan for Certain Insiders, and (II) Payment of any Obligations Arising Thereunder as Administrative Expenses (ECF 3280), at 3. ("The KEIP programs are structured to incentivize the participating employees to preserve <u>and maximize the estate's value in order to enhance the return for creditors</u>") (emphasis added).  In carrying out this duty, the Debtors may not to seek to enhance the recoveries of one group of claimants at the expense of another.  <u>See</u> <u>In re Central Ice Cream Co.</u>, 836 F.2d 1068, 1072 (7th Cir. 1988) (recognizing that the "duty is to maximize the value of the estate, not a particular group of claimants").  Thus, the correct viewpoint here is from the estate, not a particular creditor body.

<u>Second</u>, as far as the interplay between secured, administrative, and unsecured claims, courts in the Second Circuit have long recognized that a debtor must use unencumbered cash to fund its administrative expenses until such unencumbered cash is exhausted.  <u>General Elec.</u> <u>Credit Corp. v. Levin & Weintraub (In re Flagstaff Food Service Corp.)</u> ("<u>Flagstaff I</u>"), 739 F.2d 73 (2d Cir. 1984) ("Payment of administration expenses traditionally has been the responsibility of the debtor's estate, not its secured creditors"); *Collier on Bankruptcy* ¶ 506.05  (16th ed. Rev. 2012) ("The general bankruptcy rule is that, absent an express agreement to the contrary, the expenses associated with administering a bankruptcy estate are not chargeable to a secured creditor's collateral or claim, but must be borne out of the unencumbered assets of the estate").  In <u>Flagstaff I</u>, the Second Circuit rejected a bankruptcy court's conclusion that section 330 of the Bankruptcy Code empowered the award of interim professional fees out of a secured creditor's

cash collateral.  Id. at 75.  Concluding instead that the lender's security interest had priority over the administrative expense claims, the Second Circuit held that "the lack of sufficient unencumbered assets to pay appellee's fees is not an adequate basis for denying [lender] its super-priority status."  Id. at 77.

Indeed, the fact that administrative expenses are to be paid from unencumbered cash, and not from a secured creditor's cash collateral, is the very reason that the Debtors and Committee negotiated for the carve-out provision in the Final Cash Collateral Order.  An administratively insolvent estate by definition lacks unencumbered cash sufficient to satisfy its administrative expense obligations.  In the event of an administrative insolvency, however, the Final Cash Collateral Order "carves out" of the Junior Secured Notes' Cash Collateral sufficient funds to satisfy a capped amount of administrative expenses.  Final Cash Collateral Order ¶ 16(g).  By the Debtors' present logic, such protection would be unnecessary -- if administrative expenses could ordinarily be charged to the Cash Collateral and not to unencumbered cash, then a carve out would be superfluous.

The only exception to the general rule of paying administrative expenses from unencumbered property is a surcharge permissible within the narrow contours of section 506(c), discussed in Section III, infra.  See, e.g. In re Kohl, 421 B.R. 115, 123 (Bankr. S.D.N.Y. 2009) (Glenn, J.) ("Section 506(c) is an exception to the general principle that the expenses incurred administering an estate are not chargeable to the secured creditor's collateral."); Richard Levin, Almost All You Ever Wanted to Know About Carve-Out,  76 Am. Bankr. L. J. 445, 446 (2002) (recognizing that section 506(c) "departs from the general rule that a secured creditor's collateral is not subject to administrative expenses in a bankruptcy case").  On this narrow basis, bankruptcy courts have on occasion permitted the payment of administrative expenses out of a

secured lender's cash collateral.  See, e.g., In re PRC, LLC, Case No. 08-10239, Tr. of Hearing

Feb. 27, 2008, at 82:19-22, 85:21-25, 137:12-21 (Glenn, J.) (at a hearing on final approval of a

proposed DIP loan, declining to approve a proposed waiver of a debtor's rights under section

506(c), given that "the unsecured creditors are being asked to bear the costs of maintaining what

is virtually all of the value in the case").  For the reasons set forth infra in Section III, however,

the determination of the applicability of any such surcharge of the Allocated Costs is premature,

and in any event such relief is unavailable and inappropriate in these cases.

The Debtors' expressed view as to the fulfillment of their fiduciary duties is incorrect as a

matter of fact as well.  If the Junior Secured Notes are oversecured (as the Ad Hoc Group

believes to be the case), expending unencumbered funds to enhance the ultimate value on the

Unsold Collateral in fact benefits the estates and all of their creditors by (1) increasing the value

of assets for distribution and (2) decreasing secured claims and indirectly enabling general

unsecured creditors to recover from otherwise encumbered assets. If the Junior Secured Notes

are found to be undersecured, as the Committee and Debtors allege, the use of unencumbered

funds to recover Unsold Collateral would still benefit the Debtors' estates (1) by increasing the

value of assets and (2) decreasing the size of the Junior Secured Noteholders' deficiency claim

(and avoiding corresponding dilution of the recoveries of general unsecured creditors).  See Adv.

Pro. No. 13-01277-mg [Docket No. 1] (Committee Complaint);  Adv. Pro. No. 13-01343-mg

[Docket No. 1] (Debtors' Complaint).  Even the Debtors admit, as they must, that at the very

least the Junior Secured Notes assert an undisputed claim in the amount of $2.22 billion on

account of outstanding principal and accrued but unpaid pre-petition interest.  Debtors'

Complaint ¶ 3.  The Junior Secured Notes assert that full $2.22 billion claim against each and

every grantor entity, including operating companies GMAC Mortgage, LLC and Residential

Funding Company, LLC.  Should the Junior Secured Notes be undersecured by as much as $709

million, as now argued by the Debtors, then the Junior Secured Notes would assert that

deficiency claim – and accordingly dilute general unsecured creditor recoveries – at each of

those entities as well as the other guarantor Debtors.  See id.  Unless these Chapter 11 Cases are

administratively insolvent, the Debtors' fiduciary duties require them to pay the Allocated Costs

from unencumbered cash.

**II.    The Debtors Cannot Abandon the Unsold Collateral Without Conceding That the Junior Secured Notes are Oversecured at a Rate of Post-Petition Interest Higher Than the Expected Enhancement in Unsold Asset Value**

Absent the ability to allocate the Allocated Costs to the Cash Collateral, the Debtors

threaten that "they will have little choice but to return certain collateral to the Lenders ... so the

Lenders can liquidate the collateral themselves" or, in the alternative, "engage in an expedited

sale process" to liquidate that collateral.  Motion ¶ 5.  The implicit threat, then, is that unless

administrative and unsecured creditors are held harmless from collection risk, the Debtors'

management does not intend to proceed with their plan to maximize the value of estate assets.

The Debtors, however, fail to articulate a legal justification for abandoning or conducting a "fire"

sale of this collateral beyond their unsupported assertions that such action would be consistent

with their fiduciary duties and that "it would be unfair and unreasonable to require the unsecured

creditors to bear the costs associated with disposing of the secured creditor's collateral."  Motion

¶ 47.

These unsupported assertions fall far short of the legal standard for abandonment of

estate property.  A debtor may only abandon estate property prior to the closing of its chapter 11

case if (a) the property is burdensome to the estate or (b) the property is of inconsequential value

and benefit to the estate.  See 11 U.S.C. § 554.  Additionally, a debtor in a chapter 11 case must

also demonstrate a "good business reason" for abandoning the property, similar to the burden

required for the disposal of property under section 363(b)(1).  See In re Beker Indus. Corp., 64

B.R. 900, 909 (Bankr. S.D.N.Y. 1986).  The Motion does not even purport to satisfy this legal

standard for abandonment.[6]

Absent the ability to abandon estate property, the Debtors' fiduciary duties continue to

obligate them to preserve and maintain that estate property, even if encumbered.  See, e.g., In re

Chief Executive Officer's Clubs, 359 B.R. 527, 540 n. 6 (Bankr. S.D.N.Y. 2007) (Glenn, J.) ("As

fiduciaries, the debtor in possession and its managers are obligated to protect and preserve the

debtor's property.  Accordingly, a debtor in possession's fiduciary obligation to its creditors

includes refraining from acting in a manner that could damage the estate or waste its assets.").

In any event, the *only* factual scenario under which the Debtors could satisfy the legal

standard to abandon the Unsold Collateral is in the event that the Junior Secured Notes are

oversecured and earning post-petition interest at an annual interest rate that exceeds the expected

enhancement to the value of the Unsold Collateral over the same period.  That scenario,

however, is directly contrary to the Debtors' position on the Motion as well as other pleadings

recently filed by the Court.  The Debtors cannot have it all ways, arguing that the Junior Secured

Notes are both undersecured and oversecured as the occasion warrants.

In short, being unable to abandon the Unsold Collateral, the Debtors' fiduciary duties

require them to expend time and resources to maximize its value.  And, as discussed above, these

same fiduciary duties require that all such costs be allocated to unencumbered property absent a

valid surcharge.  For the reasons set forth below, the Court cannot address the applicability of

---

[6] In any event, the Ad Hoc Group would not be opposed to the abandonment of such Unsold Collateral by the
Debtors, if the parties agree to a procedure to govern the valuation of the abandoned collateral and the Debtors
provide the Junior Secured Noteholders with adequate protection on account of any diminution in value of the to-be-
abandoned collateral.

surcharge of the Allocated Costs at this time, and, in any event, such relief is unavailable in these

Chapter 11 Cases.

> **III.    The Debtors' Ability to Surcharge the Allocated Costs to the Cash Collateral is Not Ripe for Determination, and, In Any Event, Surcharge is Inapplicable to These Chapter 11 Cases**

In seeking to use the Junior Secured Notes' Cash Collateral to fund the Allocated Costs

as well as prior accrued but unpaid expenses, the Debtors in essence seek to surcharge the Cash

Collateral under section 506(c) of the Bankruptcy Code.

As an initial matter, the issue of whether the Debtors may surcharge the Cash Collateral

for prior or future expenses is not ripe for determination at this time given that the prospective

costs have yet to even be incurred, and a request for surcharge must be brought as a separate

motion for retrospective relief. See e.g., In re Wydner, 454 B.R. 565, 570 n. 9 (Bankr. W.D.N.Y.

2011) (declining to consider Trustee's request for surcharge until it was brought by separate

motion); In re Int'l Communications Group, Inc., 2006 WL 2385242 (Bankr. N.D. Tex. July 28,

2006) at *2 ("Any section 506(c) surcharge or disgorgement proceeding must be brought by

separate motion"); In re K&L Lakeland, Inc., 128 F.3d 203, 209 (4th Cir. 1997) (collecting

cases, and concluding same).  Given the overall lack of progress to date in resolving plan issues

in these cases, it is eminently sensible to defer any analysis of the benefits attributable to

expending the Allocated Costs.

Although deferring the consideration of surcharging the Allocated Costs may, in fact,

cause general unsecured creditors to bear the risk during the Allocation Period that such

Allocated Costs fail to generate sufficient incremental value to benefit unsecured creditors, that

reality comports with the risk-sharing regime established by the Bankruptcy Code.   It is a

fundamental precept of chapter 11 that any such valuation risk be borne by a debtor, not its

secured lenders.  See *Collier on Bankruptcy* ¶ 506.03[6][a][i] (16th ed. Rev. 2012) ("[T]he Code

adopts a general equivalent value approach in the sense of requiring the preservation and

protection of the value (if not the substance) of the rights bargained for by the secured

creditor.").  To compensate a secured lender for its inability to take possession of its collateral as

a result of the chapter 11 automatic stay, the Bankruptcy Code protects a secured creditor's

downside (through the requirement of adequate protection to compensate for any in diminution

in value after the petition date) while preserving the secured creditor's upside (by permitting the

secured creditor to enjoy the run-up in collateral value over the course of a bankruptcy case).

See H.R. Rep. No. 95-595, at 338-40 (1977) ("Secured creditors should not be deprived of the

benefit of their bargain…"); see also Dewsnup v. Timm, 502 U.S. 410, 416-17 (1992) ("Any

increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit

of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured

creditors").

     Even if the surcharge was properly presented to the Court, it is undisputed that the

Debtors waived their right to surcharge the Allocated Costs or prior expenses to the Junior

Secured Noteholders' Unsold Collateral.  Paragraph 22 of the Final Cash Collateral Order

provides:

> Except to the extent of the Carve Out, no expenses of administration of the
> Chapter 11 Cases or any future proceeding that may result therefrom, including
> liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall
> be charged against or recovered from the Prepetition Collateral and AFI DIP Loan
> Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or any
> similar principle of law, without the prior written consent of the Adequate
> Protection Parties or AFI DIP Lender, as applicable and no such consent shall be
> implied from any other action, inaction, or acquiescence by the Adequate
> Protection Parties or AFI DIP Lender, as applicable.

Id.[7]  This waiver remains in effect with respect to the surcharge of any Cash Collateral for the

duration of these Chapter 11 Cases notwithstanding the termination of the Final Cash Collateral

Order.  Id.  ¶ 27(h) ("The terms and provisions of this Final Order and the Prepetition

Obligations shall continue in the Chapter 11 Cases, in any successor cases, or in any superseding

chapter 7 cases under the Bankruptcy Code… and all other rights and remedies of the Adequate

Protection Parties granted by the provisions of this Final Order … shall continue in full force and

effect until all Adequate Protection Obligations are indefeasibly paid in full in cash").

The Debtors concede that paragraph 22 of the Final Cash Collateral Order constitutes an

enforceable waiver of their right to surcharge Cash Collateral under section 506(c).  See Motion

n. 29 ("Forcing the unsecured creditors to bear the costs of disposing of secured lenders'

collateral is particularly unjust where, as here, the unsecured creditors will not be able to recover

any of the costs due to the Debtors' prior grant of a waiver of the section 506(c) right to

surcharge the Lenders' collateral.").  Such a surcharge waiver, once included in a cash collateral

order, is routinely enforced.  See e.g., Nat'l Westminster Bank v. Zindler (In re Film Equip.

Rental Co., Inc.), 1991 U.S. Dist. LEXIS 1795 (S.D.N.Y. Dec. 10, 1991); Weinstein v. Gill (In re

Cooper Commons LLC), 512 F.3d 533 (9th Cir. 2008); Inteliquest Media Corp. v. Miller (In re

Inteliquest Media Corp.), 326 B.R. 825 (B.A.P. 10th Cir. 2005).  The Junior Secured Noteholders

have relied on this waiver during these Chapter 11 Cases, and it would be unfair for such a

waiver to be retroactively stricken or modified.

Confronted with this enforceable waiver, the Debtors insist that the proposed use of Cash

Collateral to pay the Allocated Costs or prior expenses does not constitute a surcharge pursuant

---

[7] The Ad Hoc Group further objects to the Motion to the extent the Debtors seek to modify the Final Cash Collateral Order in any way,  including with respect to that order's waiver of any right to surcharge Cash Collateral.  There is no basis whatsoever in the record for the Court to modify that order, particularly where Cash Collateral has already been spent, and consented to, in reliance on the order's provisions.

to section 506(c) of the Bankruptcy Code.[8]  Motion n. 8 ("Despite the Lenders' arguments to the

contrary, the proposed use of Cash Collateral does not constitute a surcharge under section

506(c)").   This is so, they argue, for two reasons – first, that the Junior Secured Notes will not

suffer any diminution in the value of their collateral, and second, that to the extent there is any

diminution in value, the Junior Secured Notes may recover such a shortfall from their robust

adequate protection package.  Motion ¶ 5.

       The Debtors' first argument fails, however, because allocating the Allocated Costs to the

Cash Collateral will quite plainly cause a diminution in the value of the Junior Secured Notes'

collateral by at least the $30.4 million in proposed costs and potentially a far greater amount of

accrued and unpaid expenses.  See Horner Dec. ¶ 21.  Paradoxically, it appears that the Debtors

argue that this direct charge will not diminish the value of the Junior Secured Notes' Cash

Collateral because it is of a relatively small amount that will be exceeded by the overall increase

in the value of the Collateral over the same period.  Motion ¶ 5 ("To the extent there is any

diminution in the value of the Lenders' collateral as a result of the Debtors' proposed use of

Cash Collateral, which the Debtors believe to be impossible in light of the proposed limited use

of such Cash Collateral …") (emphasis added).

       That is not what the law provides.  See In re 680 Fifth Avenue Associates, 154 B.R. 38,

43 (Bankr. S.D.N.Y. 1993) (Brozman, J.) (denying a debtor's request to use a secured creditor's

cash collateral to pay professionals fees, because "where a lender is undersecured, the debtor's

---

[8] The propriety of any *past* allocation of expenses to the Cash Collateral under the Final Cash Collateral Order is not presented for determination by the Court at this time.   Motion ¶ 44 ("Finally, while no determination is sought here, the Debtors' use of Cash Collateral to date did not result in any diminution in the value of the Adequate Protection Parties' collateral").  The Debtors expressly agreed to waive any rights to surcharge the Cash Collateral in the Final Cash Collateral Order.  The members of the Ad Hoc Group have relied on that waiver during the pendency of these cases.  The Ad Hoc Group has repeatedly informed the Debtors that it believes that any attempted historical allocation of expenses by the Debtors to the Cash Collateral would constitute a surcharge in violation of paragraph 22 of the Final Cash Collateral Order and section 506(c) of the Bankruptcy Code.  The Ad Hoc Group reserves all rights with respect to that issue.

use of that lender's cash collateral, absent adequate protection, would clearly cause a decrease in

the value of that creditor's property in which the debtor had an interest … and would constitute

an improper taking of the secured creditor's collateral").  As a result, even if the aggregate value

of the cumulative Junior Secured Notes ultimately increases over the course of the Allocation

Period, the payment of any administrative costs out of Cash Collateral would still constitute a

diminution in Cash Collateral.  Indeed, "by definition, the use of the lender's cash collateral will

diminish the lender's lien on its cash even if the lender is over-secured with respect to its overall

collateral position." John W. Kozyak & Laurel M. Isicoff, *Consensual Use of Cash Collateral, A*

*Practical Overview*, Southeastern Bankruptcy Law Institute, Thirteenth Annual Seminar on

Bankruptcy Law, p.16  (2004).

   The primary case relied on by the Debtors -- In re ProAlert, LLC, 314 B.R.436 (BAP 9th

Cir. 2004) -- confirms this point.  See Motion ¶ 51 (discussing ProAlert).  In that decision, an

appeals court approved a bankruptcy court order permitting a debtor to use its secured creditor's

cash collateral without complying with section 506(c) because such secured creditor was

adequately protected.  Id. at 439.   Left unsaid by the Debtors, however, is what that court

concluded "adequate protection" on account of "diminution in value" must include:  namely, that

the debtor replenish the cash collateral used to pay administrative expenses on a dollar for dollar

basis.  In re ProAlert, LLC, 314 B.R. at 439.

   As the Ad Hoc Group advised the Court in its objection to the Debtors' motion to extend

exclusivity, there is a real prospect of administrative insolvency in these cases, even when the

estates are viewed on a consolidated basis.  To that end, the Ad Hoc Group has diligently

attempted to understand the nature of the Allocated Costs and other projected estate expenses

during the Allocation Period.  Indeed, the Ad Hoc Group agreed to extend the consensual use of

Cash Collateral pursuant to the Fifth Amendment in reliance on the Debtors' agreement to produce supporting documents and testifying witnesses pursuant to a tightly constrained timetable. Fifth Amendment to Final Cash Collateral Order (ECF 3534). That amendment, however, required the Debtors to produce substantially all responsive documents by April 26, and to make available for deposition any testifying witnesses by Friday May 3.

The Debtors have failed to comply with either discovery deadline. The Debtors produced only 87 documents, including many unhelpful duplicates. Only a handful of these documents consisted of emails, and even then only from an incomplete amount of Morrison & Foerster custodians. Many of the emails were heavily redacted -- including several emails between professionals for the Debtors and the Committee, which were redacted in apparently misplaced reliance on the common interest privilege. In further disregard for the discovery timetable, the Debtors only offered one declarant, Marc Puntus, for a three-hour deposition late on the afternoon of Friday, May 3 (the final date for depositions under the scheduling order). Given that the Debtors only offered Mr. Puntus for that limited amount of time, the Ad Hoc Group was forced to take his deposition on the next available business day. The Debtors adjourned the deposition of the second declarant, Jill Horner, from her scheduled deposition last week – without leave of Court and without offering any substitute witness to be deposed within the time limits of the order.

While the Debtors may or may not have had legitimate reasons for moving the deposition dates for these witnesses, the Ad Hoc Group is not in position at this point to address fully the quantum of Allocated Costs that might be appropriate here, and seriously doubts whether any such expenses are capable of satisfying the strict requirements of section 506(c) of the Bankruptcy Code. See In re 680 Fifth Ave. Assocs., 154 B.R. 38, 44 (citing Flagstaff I and

noting that one of the criteria for a section 506(c) recovery is that "the secured creditor benefits

directly from the expenditure").  As such, the Ad Hoc Group reserves its right to supplement this

Objection to address an appropriate amount of Allocated Costs, if any, after deposing the

Debtors' witnesses.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Objection, the Ad Hoc Group requests

that the Court deny the Motion and grant such further relief as it may deem appropriate.

Dated:  May 6, 2013
      New York, New York

Respectfully submitted,

By: /s/ J. Christopher Shore___
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JS – 6031)
Harrison L. Denman (HD – 1945)

   and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group of Junior
Secured Noteholders