**Hearing Date and Time: May 14, 2013 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline: May 7, 2013 at 4:00 p.m. (prevailing Eastern time)**

Richard M. Cieri
Ray C. Schrock, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Mark E. McKane
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>. | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**ALLY FINANCIAL INC.'S OBJECTION TO THE MOTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS INDENTURE TRUSTEE FOR THE SENIOR UNSECURED NOTES ISSUED BY RESIDENTIAL CAPITAL, LLC FOR AN ORDER AUTHORIZING IT TO PROSECUTE CLAIMS AND OTHER CAUSES OF ACTION ON BEHALF OF THE RESIDENTIAL CAPITAL, ESTATE**

**REDACTED**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

LEGAL STANDARD...............................................................................................4

ARGUMENT ........................................................................................................4

I.      Wilmington Trust's Claims Are Substantially And Materially Duplicative Of The
        Claims The Committee Seeks Standing To Assert. ................................................4

II.     Wilmington Trust's Motion And Proposed Complaint Are Filled With
        Inaccuracies And Material Omissions. ...............................................................7

        A.      AFI's Contribution Of More Than $8 Billion To ResCap Undermines Any
                Argument That AFI Sought To Siphon Funds From ResCap. ............................7

        B.      The Cited Transactions Between AFI And ResCap Were Entered Into At
                Arms'-Length And For More Than Reasonably Equivalent Value........................9

                1.      The 2006 Bank Restructuring Provided Significant Value To
                        ResCap. ............................................................................9
                2.      ResCap Received Significant Value In The Separate 2008 And
                        2009 Bank Transactions..........................................................13
                3.      The Affiliate Agreements Provided Significant Benefits To
                        ResCap. ...........................................................................16

        C.      Wilmington Trust Makes A Number Of Unsupported Statements
                Regarding The Alleged Breach Of The "All Or Substantially All"
                Provision. ......................................................................................19

        D.      Like The Committee, Wilmington Trust Must Misstate The Facts To
                Assert A Veil-Piercing Claim. ............................................................23

III.    Wilmington Trust Cannot Lawfully Obtain The Sole Right To Settle Certain
        Claims Against AFI. ..........................................................................25

CONCLUSION.......................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*,
    29 A.3d 225 (Del. 2011)...............................................................20, 21, 22

*In re BHS&B Holdings LLC*,
    420 B.R. 112 (Bankr. S.D.N.Y. 2009) ...........................................5, 24

*In re Commodore Int'l Ltd.*,
    262 F.3d 96 (2d Cir. 2001) ............................................................ 6

*In re Housecraft Indus. USA, Inc.*,
    310 F.3d 64 (2d Cir. 2002) ............................................................ 4

*In re Leap Wireless Int'l, Inc.*,
    295 B.R. 135 (Bankr. S.D. Cal. 2003) ........................................... 5

*In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) ................... 5

*In re Smart World Techs., LLC*,
    423 F.3d 166 (2d Cir. 2005)...........................................................25

*In re STN Enters.*,
    779 F.2d 901 (2d Cir. 1985)........................................................4, 6

*In re Sunbeam Corp.*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002) ........................................4, 14

*In re V. Savino Oil & Heating Co.*,
    91 B.R. 655 (Bankr. E.D.N.Y. 1988) ............................................. 6

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
    8 F.3d 130 (2d Cir. 1993)............................................................. 7

*Labarbera v. United Crane & Rigging Servs., Inc.*,
    2011 WL 1303146 (E.D.N.Y. Mar. 2, 2011) ................................... 7

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982)........................................................20

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ......................................................................24

**Statutes**

11 U.S.C. § 1123(b)(3)(A) ................................................................................................. 25

11 U.S.C. § 548 ................................................................................................................... 9

Del. Code Ann. tit. 6, § 1309 ............................................................................................. 9

**Rules**

Fed. R. Bankr. P. 9019(a) ................................................................................................. 25

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. ("*AFI*") and its non-debtor subsidiaries (collectively, "*Ally*"), submit this objection (the "*Objection*") to the *Motion of Wilmington Trust, National Association, Solely in Its Capacity as Indenture Trustee for the Senior Unsecured Notes Issued by Residential Capital, LLC for an Order Authorizing It to Prosecute Claims and Other Causes of Action on Behalf of The Residential Capital, LLC Estate* [ECF No. 3475] (the "*Motion*").

## PRELIMINARY STATEMENT

AFI objects to Wilmington Trust's Motion. Wilmington Trust's request for standing should be denied because it would create a duplicative, inefficient process whereby substantially similar claims are being litigated by two different entities—the Creditors' Committee and one of its members. Wilmington Trust's arguments are nearly identical to those made by the Committee, as are the claims it describes. There is no reason to litigate the claims in two different proceedings (if they are litigated at all). Wilmington Trust has offered no substantiation of its concern that the Committee will not protect the interests of Wilmington Trust; after all, Wilmington Trust is a member of the Committee, and, in any case, the Committee legally must act for all of the unsecured creditors. Granting Wilmington Trust standing will do nothing other than prolong these cases and further deplete the finite (and ever shrinking) estate assets that otherwise would be available for distribution to claimants, with no additional value for the estates.

In addition to the issues noted above, the Motion should be denied for legally substantive reasons. Like the Motion filed by the Committee of which it is a member, Wilmington Trust's Motion is rife with material inaccuracies and omissions. In its Motion and proposed complaint, Wilmington Trust weaves a tale of alleged AFI misdeeds that has no basis in reality.

Wilmington Trust's argument is that AFI used ResCap to make money when times were good, and then stripped assets from ResCap when the market crisis hit. No part of this is accurate. ResCap operated independently from AFI, and witnesses have confirmed that AFI was not involved in the day-to-day operations of the mortgage business. In its first few years, ResCap raised its own debt (nearly $20 billion) based on its separate credit rating that was better than AFI's credit rating. AFI did not use and did not have immediate access to these funds. Pursuant to the Operating Agreement (which was never breached), ResCap was prohibited from issuing a dividend to AFI unless it had a certain level of capital. To suggest that AFI used ResCap to raise money ignores (at best), if not outright misrepresents, the facts.

Once the mortgage crisis hit, AFI did anything but "strip assets" from ResCap. To the contrary, AFI contributed more than *$8 billion* in capital to ResCap from 2007-2009, in the form of cash, debt forgiveness, and assets. Wilmington Trust has no answer for this $8 billion in contributions, which is wholly inconsistent with its arguments. On top of these contributions, AFI engaged in a series of arms'-length transactions that were designed to—and did—support ResCap financially. While some of these transactions provided certain benefits to AFI, the more critical point is that ResCap benefited, and the benefits to ResCap far exceeded the benefits to AFI. And in approving these transactions, the ResCap board was advised not only by ResCap management, but also by sophisticated advisors at Morgan Stanley, Lazard, Houlihan Lokey, and Skadden Arps.

Wilmington Trust's argument appears to be that ResCap should not have done these transactions, and instead it should have filed for bankruptcy in 2008, in the heart of the mortgage crisis. But all of ResCap's sophisticated advisors cautioned that a bankruptcy at that time would have resulted in a liquidation that would have been a disaster for ResCap's creditors—including

its unsecured noteholders. Instead, AFI's support allowed ResCap to survive, pay off its lenders, make over $500 million in profits in 2010, pay off many of its noteholders and pay interest on those notes in the interim, and position itself to be sold as a going concern for billions of dollars in a managed Chapter 11.

In addition to being contrary to the evidence, Wilmington Trust's arguments are in conflict with the actions of the noteholders it represents. Wilmington Trust is the indenture trustee for the current holders of senior unsecured notes issued by ResCap in 2005. ResCap earned more than $1 billion in that year, and more than $700 million the following year. ResCap never missed an interest payment on those notes until it filed for bankruptcy in May 2012. And the reason ResCap was able to make interest payments through May 2012 was the over $8 billion in capital contributions that AFI made to ResCap. Tellingly, in June 2008, the holders of these unsecured notes had the opportunity to exchange their unsecured notes for ResCap secured notes or cash. Although these noteholders now claim ResCap was "hopelessly insolvent" in 2007, had unreasonably small capital, and was unable to pay debts as they became due, they chose not to convert into secured notes or cash out in June 2008. The noteholders' current arguments conflict with their own knowing, voluntary actions in 2008.

Ultimately, Wilmington Trust's Motion is nothing more than an attempt to second guess the business judgment of ResCap's accomplished officers, directors, and professionals—and get a "do over" for the noteholders' choices not to participate in exchange offers over four years ago. Not only does that not provide a sound basis for a claim, it also disregards the fundamental fact that the noteholders have known about these transactions for years—and did nothing. These transactions were publicly disclosed in contemporaneous SEC filings by AFI, ResCap, or both. No one, including the noteholders, challenged these transactions at the time. And any noteholder

3

that bought into its position after these transactions did so with full knowledge of the transactions, including their terms.  Indeed, the remaining ResCap noteholders either (1) elected not to participate in one of the two bond exchanges in 2008, in which they could have received cash, new ResCap bonds, or AFI bonds, or (2) bought into their position during or after these exchanges, when ResCap's condition was well known to the market.  Put another way, the noteholders knowingly and voluntarily took a risk, that risk materialized, and now they do not want to take responsibility for the consequences of their actions.  Instead, they want AFI to be responsible.  This does not meet the applicable standard for granting the Motion.

## LEGAL STANDARD

The Debtors do not consent to the Motion.  There is an implied, but qualified, right for a creditors' committee or individual creditor to initiate adversary proceedings in the name of the debtor in possession if the debtor "unjustifiably failed to bring suit or abused its discretion in not suing."  *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985); *In re Housecraft Indus. USA, Inc.*, 310 F.3d 64, 71 (2d Cir. 2002).  Before standings granted, the court must determine that "the action is likely to benefit the reorganization estate."  *In re Sunbeam Corp.*, 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002) (citing *STN*, 779 F.2d at 905).  This standard is not met here.

## ARGUMENT[1]

I.    **Wilmington Trust's Claims Are Substantially And Materially Duplicative Of The Claims The Committee Seeks Standing To Assert.**

Wilmington Trust's proposed claims are substantially duplicative of the claims proposed by the Committee.  As such, granting Wilmington Trust—a member of the Committee—standing to bring claims on behalf of ResCap would create a substantial duplication of efforts, thereby

---

[1] Due to page limitations, AFI does not address all of Wilmington Trust's legal arguments and factual assertions in this Objection.  AFI reserves all of its rights to challenge any and all arguments and assertions of Wilmington Trust contained in its Motion or otherwise at the appropriate time.

further depleting the Debtors' estates and consuming the Court's time and resources, for no additional benefit to the estates. Accordingly, the Motion should be denied.

Wilmington Trust seeks to recover based on a variety of legal theories, the principal ones being that AFI is the alter-ego of ResCap and alleged fraudulent transfers by ResCap to AFI— the same bases of relief sought by the Committee. Wilmington Trust's veil-piercing and fraudulent transfer claims are not colorable, and certainly subject to a motion to dismiss. *See, e.g.*, *In re BHS&B Holdings LLC*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009); *In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010). In addition, the claims require identical proof and, even if they were viable and somehow resulted in recovery, would have the identical effect of generally enriching the Debtors' estates. As such, the interests of Wilmington Trust and the Committee as a whole are aligned. *See In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 139-40 (Bankr. S.D. Cal. 2003) (finding that creditors' committee adequately represented the interests of equity holder of debtor because "[t]he economic interests of the bondholders and shareholders appear to be the same—that is, to find the highest realistic value for the company[,] [a]nd it is the fiduciary duty of the [creditors' committee] to do so").

Although it weakens Wilmington Trust's arguments, the fact that Wilmington Trust and the Committee often take different positions on the facts of these cases does not change the standing inquiry. For example, Wilmington Trust concedes that ResCap was not inadequately capitalized or insolvent at formation (Mot. ¶ 7), and that ResCap "was generally separate [from AFI] and solvent ... when [ResCap] raised most of its public debt, including the debt now owed to the Noteholders" (*id.*), whereas the Committee does not. Similarly, the fact that any underlying cause of action may differ (which in large part they do not) is irrelevant: any such claims would be derivatively asserted on behalf of ResCap.

Because of the significant overlap in the issues and claims that Wilmington Trust and the Committee—of which it is a member—seek standing to assert, granting Wilmington Trust's Motion would do no more than create a substantial duplication of efforts and impose significant costs on the estates and the Court. It would create additional discovery, duplicative briefing, and untold unnecessary attorney hours and fees, which would be entirely wasteful and certainly not "'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001). Indeed, the result would be the precise type of "delay and expense to the bankruptcy estate" that weighs against granting standing. *STN*, 779 F.2d at 906.

Moreover, to the extent that Wilmington Trust seeks to assert claims for fraudulent conveyance, it is wrong as a matter of law in asserting that it is the correct party to do so: "[a]s a rule, individual creditors ... lack the authority to institute avoidance actions," and absent "extraordinary circumstances," "such actions must be instituted by a trustee, debtor-in-possession or, with court approval, by a creditors' committee upon demonstrating that the trustee or debtor-in-possession unjustifiably declines to sue." *In re V. Savino Oil & Heating Co.*, 91 B.R. 655, 657 (Bankr. E.D.N.Y. 1988). As such, at least six of the fifteen causes of action in Wilmington Trust's proposed complaint would have to be dismissed for lack of standing.

II.    **Wilmington Trust's Motion And Proposed Complaint Are Filled With Inaccuracies And Material Omissions.[2]**

A.    **AFI's Contribution Of More Than $8 Billion To ResCap Undermines Any Argument That AFI Sought To Siphon Funds From ResCap.**

According to Wilmington Trust, AFI did everything *but* help ResCap: AFI used ResCap to make money when times were good, and then, when the mortgage crisis set in, "[AFI] embarked on a course to denude [ResCap] of substantially all its assets while saddling [ResCap] and [its subsidiaries] with further liabilities." (Mot. Ex. B ("*WT Compl.*") ¶ 75.) AFI's plan, according to Wilmington Trust, was to save itself—at ResCap's expense—through a series of transactions that were materially unfair to ResCap. Nothing could be further from the truth.

As an initial matter, the contribution by AFI of more than *$8 billion* to ResCap during the mortgage crisis—and at the same time that Wilmington Trust claims that AFI was "denud[ing] ResCap"—undermines any claim of asset siphoning or stripping. Wilmington Trust closes its eyes to AFI's substantial support of ResCap—which inured to the benefit of *the very ResCap noteholders it represents*—but it cannot escape the import of that support.

According to Wilmington Trust, AFI sought only to "stabilize" ResCap long enough to receive TARP funding, strip ResCap's assets, and shed AFI's liabilities. (*See* WT Compl. ¶¶ 72-73, 97.) But *all* material witnesses from ResCap and AFI have rejected that theory. The capital contributions were made to benefit ResCap, because leaders at both companies believed that if ResCap could survive the mortgage crisis, it would emerge as a strong and profitable competitor on the other end. As the former ResCap Chairman (and current advisor to the Governor of California) stated, the belief was that ResCap would "print money" when the market recovered.

---

[2] Wilmington Trust asserts, in a footnote, that the "Third-Party Claims"—although consisting almost entirely of general veil-piercing claims—do not represent estate claims. (Mot. 5 n.7.) Wilmington Trust is incorrect as a matter of law. *See, e.g., Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Labarbera v. United Crane & Rigging Servs., Inc.*, 2011 WL 1303146, at *5-9 (E.D.N.Y. Mar. 2, 2011). AFI reserves its right to dispute Wilmington Trust's contention and fully brief the issue at the appropriate time.

Indeed, AFI continued to make substantial contributions, including over $3 billion in late 2009, *after* all of the transactions and events Wilmington Trust points to in trying to make its pretext argument—*after* AFI achieved bank holding company status, *after* AFI received TARP funds, and *after* AFI and ResCap entered into the challenged asset transactions. While some of the transactions also benefited AFI, that does not mean the transactions were detrimental to ResCap. As both AFI and ResCap witnesses have explained, these were win-win transactions, and, in fact, ResCap's benefits far exceeded any AFI benefits. Although it makes numerous assertions, Wilmington Trust offers no facts that substantiate an asset-stripping theory.

Moreover, AFI's substantial contribution of more than $8 billion in capital to ResCap served the intended purpose of saving ResCap from a disastrous liquidation. AFI's significant contributions rejuvenated ResCap and allowed it to "weather the storm," as many AFI and ResCap employees put it, and emerge as a strong market leader in 2010, seeing an increase in its bond prices and actually earning $575 million in profits. Due to AFI's support, a ResCap bankruptcy was avoided, many of ResCap's lenders were paid off, and with *more* AFI support, Debtors in this Chapter 11 were able to sell a substantial portion of their business to Ocwen for $3 billion and their Whole Loan portfolio to Berkshire Hathaway for $1.5 billion. In short, there is no question that creditors enjoyed substantial benefit from the support provided by AFI that allowed ResCap to stay out of bankruptcy for four additional years.

Equally important, ResCap's noteholders had two opportunities—in June 2008 and November 2008—to trade out of their positions in exchange for cash, ResCap secured bonds, or AFI bonds. The noteholders that remained were fully informed and so chose to remain, and many of those noteholders have been paid in full or will be paid nearly in full through the plan of

reorganization. As such, the remaining noteholders are those who elected not to participate in an exchange or purchased bonds *after* ResCap's financial condition was fully disclosed.

### B.    The Cited Transactions Between AFI And ResCap Were Entered Into At Arms'-Length And For More Than Reasonably Equivalent Value.

The transactions between ResCap and AFI that Wilmington Trust argues constitute asset stripping and fraudulent conveyances were more than fair to ResCap from both a substantive and procedural perspective. Wilmington Trust's arguments represent nothing more than a disgruntled investor's after-the-fact disagreement with the business judgment of ResCap's accomplished officers, directors, and sophisticated advisors—including Morgan Stanley, Lazard, and Skadden Arps.

### 1.    The 2006 Bank Restructuring Provided Significant Value To ResCap.

As an initial matter, any claim for fraudulent transfer based on the 2006 bank transaction would fail for two threshold reasons. One, a fraudulent transfer claim based on the 2006 bank transaction is barred by the statute of limitations. *See* Del. Code Ann. tit. 6, § 1309. Two, even if the claim were not time-barred, it fails because ResCap was unquestionably solvent in 2006, and the transaction did not render it insolvent. Indeed, Wilmington Trust concedes this point. (*See* Mot. ¶ 7.) As such, Wilmington Trust will never establish a necessary element of a fraudulent conveyance claim for the 2006 Bank Transaction: that the transferor was insolvent at the time of the transaction or that the transaction rendered it insolvent. *See* 11 U.S.C. § 548.

But even more fundamentally, Wilmington Trust's assertion that AFI "seized control" of Old GMAC Bank for inadequate consideration in a November 2006 transaction (WT Compl. ¶ 42) is demonstrably incorrect in every respect.

The Old GMAC Bank (the thrift) was never—in 2006 or at any other time—one of ResCap's most valuable or profitable assets, let alone its "prized asset." (Mot. ¶ 17; *see also* WT

9

Compl. ¶ 42.)   In 2006, ResCap had three primary business units, one of which, its U.S. residential real estate finance business, was divided into two separate operating entities, GMACM and RFC.  The thrift was merely a subsidiary of GMACM, and its purpose was to provide low-cost funding for GMACM's mortgage operations.  Senior ResCap officers and ResCap directors have explained that, although there had been many discussions about potentially growing the thrift in 2005 and 2006, these plans were never implemented, and the thrift was not a core part of ResCap's business.

There also is no support for Wilmington Trust's conclusory assertion that AFI "seized" ResCap's interest in the bank or otherwise compelled ResCap to approve the bank restructuring transaction, and for "less than fair value."  (WT Compl. ¶¶ 42, 49.)  To the contrary, the proposed transaction was brought before the ResCap board, including its independent directors, for approval, and several aspects required independent director approval.  ResCap's independent directors analyzed the transaction for nearly eight months, including seeking advice from their own lawyers at Bryan Cave.  In May 2006, ResCap's independent directors, Tom Melzer and Tom Jacob, were fully informed of the bank restructuring by a thorough memorandum that

████████████████████████████████████[3]  They were informed that ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████[4]

They were advised of ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

---

[3] *See* Ex. 1, █████████████████████████████████████████████████████
████████████████████.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[5]  And they were advised

that ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████[6]

   The transaction *saved* ResCap considerable money. Before the transaction, ResCap's credit rating was on the brink of downgrade to non-investment grade because it was linked to GM's already non-investment grade credit rating. ResCap calculated in a contemporaneous document that had the transaction not occurred, ResCap's credit rating would have been downgraded and its cost of funds would have increased, reducing pre-tax earnings by approximately $250 million per year. Because of the transaction, however, ResCap maintained its investment-grade credit rating (and its concomitant benefits), and continued to receive the same economic benefit in and access to the bank that it had before the transaction.[7] Wilmington Trust's suggestion that the transaction was unfair because ResCap received non-voting interests in the Bank also fails. (*See* WT Compl. ¶ 44.)

   After conducting thorough diligence, ResCap's board, including its independent directors, voted unanimously to approve the transaction, concluding that the transaction would

---

[5] ████████████████████

[6] ████████████████

[7] Wilmington Trust's claim that the 2006 Bank Transaction was unfair to ResCap because ResCap needed to make a $600 million capital contribution to the bank to complete the sale is incorrect as a matter of fact. Although regulatory authorities required ResCap to make a capital contribution to the bank to close the deal, ResCap did not lose that capital, as it maintained its economic interest in the bank, which was the same both before and after the transaction. And, underscoring Wilmington Trust's lack of knowledge about the transaction, ResCap's capital contribution was $360 million, not $600 million. (*Compare* WT Compl. ¶ 50, *with* Ex. 2, ████████████████████████ ▌ *and* Ex. 3, ████████████.)

significantly benefit ResCap.  Wilmington Trust's bald assertion that the 2006 bank transaction "increased funding costs and added substantial expenses to [ResCap]" is flat wrong.  (WT Compl. ¶ 50.)  The 2006 bank transaction in fact *preserved* ResCap's access to low-cost funding, which would have been lost had the transaction not occurred and ResCap been left without access to any bank.

After the transaction, ResCap officers sat on the Bank board, ResCap received the same economic benefits based on the Bank's mortgage activities, and ResCap maintained its access to low-cost funding.  As numerous witnesses, including the ResCap independent directors that approved the transaction and ResCap's former CEO, David Applegate, have stated, the 2006 bank transaction's benefits dwarfed any minimal downside of receiving non-voting interests, and the transaction undeniably was in the best interests of ResCap.

Wilmington Trust ignores these benefits to ResCap and asserts that the transaction "was effectuated for less than fair value" because "[c]omparable bank values, as prepared by Cerberus contemporaneously with the 2006 Bank Transaction, showed that [ResCap] should have received at least two times book value for the assets transferred plus a premium to compensate for its loss of legal control." (*Id.*)  But Wilmington Trust's claim, which is misleadingly stated, is based on its misconstruction of an analysis (which it conveniently fails to cite), that ███████████████

████████████████████████████████████████████████████████████

████████████████████████ The express language of the analysis makes that clear, providing ████████████████████████████████████████████████████

████████████████████████████████[8] The fact that companies comparable to *ResCap* were trading at 1.7 times book in January 2006 has no bearing on the

---

[8] Ex. 4, ████████████████████████████████████████████
████████████████████.

value of *the thrift* on a stand-alone basis in November 2006.  Indeed, the very income streams that made Countrywide and IndyMac comparable to ResCap made them unlike the thrift: both Countrywide and IndyMac generated more than 50% of their revenue through gains on sale, whereas the thrift received none of the gains on sale; Countrywide and IndyMac also earned servicing fees unlike the thrift.

Wilmington Trust's assertion that the 2006 bank transaction was inconsistent with the terms of ResCap's Operating Agreement is belied by the very memorandum on which Wilmington Trust bases its claim.  (*See* WT Compl. ¶¶ 46-48.)  According to Wilmington Trust, this memorandum, prepared by ResCap's General Counsel, Dave Marple, "blasted the proposed transfer as inconsistent with the Operating Agreement" because "it was clearly not an arm's length transaction." (*Id.* ¶ 46.)  But in fact, the memorandum, authored seven months before the transaction, simply explained steps that needed to be taken in order to comply with the Operating Agreement.  *Those steps were taken.*  As David Applegate has explained, he asked Mr. Marple to identify any potential issue with the bank restructuring in order to ensure that the negotiations were thorough, transparent, and complete.  Mr. Marple, in turn, prepared his memorandum and outlined four potential issues for consideration in light of the Operating Agreement—issues that ResCap in fact addressed.  A memorandum that identifies legal requirements and risks and provides recommendations on how to address them does not constitute a judgment about the business merits of the transaction, as Wilmington Trust tries to portray.

## 2.    ResCap Received Significant Value In The Separate 2008 And 2009 Bank Transactions.

The idea that ResCap did not receive reasonably equivalent value for the separate 2008 and 2009 Bank Transactions is similarly baseless.  First, although Wilmington Trust attempts to conflate these transactions with the 2006 bank restructuring, all three are distinct transactions

done at different periods, for different reasons, and involving different negotiators. Any attempt to collapse these separate transactions fails under settled law. *See, e.g.*, *Sunbeam*, 284 B.R. at 370-71.

Second, ResCap unquestionably received more than fair value for its interests in IB Finance in each of the transactions. In the 2008 transaction, AFI paid book value for a preferred interest in ResCap that was later convertible into a preferred interest in IB Finance, the immediate parent holding company for the Bank. Once the conversion right was exercised, the transaction gave AFI a portion of ResCap's Class M shares in IB Finance, a tracking stock to the Bank's mortgage assets. As AFI and ResCap witnesses have explained, these interests were not worth anywhere near book value in the market at that time. Even the Committee—of which Wilmington Trust is a member—acknowledges that the Bank's mortgage assets were "toxic." (UCC Mot. ¶ 31 [ECF 3412].) The better-than-market price paid by AFI renders irrelevant Wilmington Trust's complaint that no additional consideration was paid for the conversion option. (*See* WT Compl. ¶ 103.) Indeed, there is no evidence that the price paid did *not* take into account this conversion right, especially given that the underlying mortgage assets were not worth anything near book value in March 2008. Moreover, Wilmington Trust ignores the fact that ResCap had a redemption right, and AFI's conversion right could not be exercised at all if ResCap filed for bankruptcy in 2008 (a protection ResCap negotiated to include). In approving this transaction, the ResCap board (including the independent directors) was advised by sophisticated advisors—including Jonathan Pruzan and Dan Ammann of Morgan Stanley and Tim Pohl of Skadden Arps. These advisors *all* concluded that the transaction was in the best interests of ResCap, its shareholder, and its creditors.

14

ResCap also received more than fair value when it separately sold its remaining Class M shares in January 2009. According to Wilmington Trust, "[t]he Mortgage Division of Ally Bank ... had a book value of over $1.8 billion at the end of 2008 and a market value significantly in excess of that amount." (WT Compl. ¶ 106.) Wilmington Trust provides no citation for this claim about market value, and it is wrong. Indeed, Goldin Associates performed a detailed analysis on the transaction (from ResCap's perspective) and concluded that ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████[9] Despite this, AFI paid substantial consideration—more than $600 million—for these interests. ██████████ ████████████████████████████████████████████████████████ ██████████████[10] ████████████████████████████████████████ ████████████████████[11] Moreover, the 2009 transaction was subject to a 60-day shop period conducted by UBS—and no bids were received.

Finally, Wilmington Trust insinuates that the two ResCap independent directors resigned as a result of the March 2008 transaction. (*See* WT Compl. ¶ 104.) Again, this is flat wrong. The independent directors have both stated that they did *not* resign because of this transaction. To the contrary, both of the independent directors voted to approve this transaction, and both continue to support the transaction today.

---

[9] Ex. 5, ████████████████████████████████████████████████████.

[10] ████████████████████.

[11] Ex. 6, ████████████████████████████████████████████████.

### 3.    The Affiliate Agreements Provided Significant Benefits To ResCap.

Wilmington Trust baldly asserts that AFI "coordinated a series of transactions to insulate Ally Bank from mortgage-related risks, including interest-rate risk, market risk, and the risk of repurchase liability," and points to the MMLPSA, and MSR Swap as the means by which AFI foisted that risk onto ResCap. (*Id.* ¶¶ 78-88.) To make such a bold assertion that AFI rendered ResCap a "dumping ground for these risks" (*id.* ¶ 78), Wilmington Trust strings together misstatements and mischaracterizations of fact and leaps of logic—but it nowhere cites any support for the proposition that the MMLPSA, the MSR Swap, or any other affiliate agreement or amendment thereto was entered with the intent or purpose of shifting R&W liability from AFI or the Bank to ResCap. Nor is there any such evidence. To the contrary, the affiliate agreements between the Bank and GMACM were all entered with the intent and purpose of supporting—if not sustaining—GMACM's mortgage operations, and enabling it to earn more profits.

*First*, Wilmington Trust argues that the MMLPSA and its 2007 amendment were a primary mechanism by which AFI and the Bank shifted the R&W risk to ResCap. (*Id.* ¶¶ 79-83.) Its argument is based on the faulty premise that there was risk to shift—that AFI or the Bank bore some R&W risk to begin with. This is not so. To the contrary, all of the evidence makes clear that neither GMACM nor the thrift intended for the 2001 MMLPSA to saddle the thrift with any R&W risk. GMACM created the thrift in 2001, as its direct subsidiary, to serve as a funding vehicle for GMACM's mortgage business—and, to be clear, it was GMACM, and *not* the Bank, that was in the mortgage business. The 2001 MMLPSA was simply the initial mechanism by which the thrift provided low-cost funding to GMACM.

The parties' economic relationship confirms this understanding. GMACM securitized and sold the loans purchased under the MMLPSA into the market. That sale generated the financial upside—the gains on sale—and GMACM always retained that benefit. These gains

generated substantial income for ResCap, and they were critical to ResCap's business. Those transactions also led to the R&W claims that Wilmington Trust now seeks to impose on AFI. Those downsides—the R&W risk—resided with GMACM, too. GMACM got the risks to match the reward, and it always believed that the gains on sale justified this potential R&W liability. In short, the reward to GMACM was well worth the risk. Moreover, the thrift served only as a low-cost source of funds in exchange for minor compensation. It never received the rewards—the gains on sale or securitization—and it did not take on any of the risks either. As Al Celini, the thrift's first CFO and an architect of its relationship with GMACM, has explained, there was no way the thrift would have accepted the R&W risk without having the upside of owning and selling the loans in the market—the full gain on sale—because not even a portion of that gain would warrant the thrift taking the R&W risks. Every other witness has uniformly confirmed that fact.

GMACM's course of conduct further confirms that it—not the thrift—bore the R&W risk, and that it understood as much. For example, GMACM had repurchase reserves on its books to fund potential put-back claims on account of breached R&Ws. By contrast, the Bank never took had any reserves for any R&W claims. Further, GMACM handled and satisfied repurchase requests, while the Bank did not. Thus, consistent with the parties' intent from the outset, GMACM always treated the R&W liability as a risk it knowingly and voluntarily undertook in order to receive the rewards of the loan sales and securitizations.

*Second*, Wilmington Trust boldly asserts that, through the MSR Swap, AFI "immuniz[ed] Ally Bank from the market risk inherent in its MSR portfolio ... at GMAC Mortgage's expense." (WT Compl. ¶ 85.) But Wilmington Trust cites no evidence for its conclusory assertion. And there is none. Indeed, AFI did not devise the MSR Swap strategy in the first place. To the

contrary, *GMACM developed the strategy* in 2001 when the thrift was created *and while the thrift was owned by GMACM*. The idea was to utilize the thrift's low-cost funding to finance the MSR asset while still passing all of the economics of servicing back to GMACM. At the time, the thrift's regulator, the OTS, was not comfortable having the thrift own—and grow—an asset like MSRs. GMACM and the thrift elected not to pursue the MSR Swap strategy further at that time.

When the MSR Swap was eventually executed, ResCap was eager to implement it—because it provided GMACM with terms that were unavailable to it from any third party.[12] GMACM did not have to finance the MSR asset, either for bank-originated loans or for loans the Bank purchased from a third-party correspondent, but it nonetheless received all of the economics of the servicing rights. For bank-originated loans, GMACM would actually receive the capitalized value of the MSR through the swap. For correspondent loans, the Bank would pay a servicing released premium (SRP) to the correspondent, in exchange for the servicing rights—and when the Bank sold the loans to GMACM, the price to GMACM did not include the SRP. As a result, ResCap described this arrangement as one in which ███████████████

███████████[13]

A Goldin Associates' analysis of the MSR Swap in April 2011—well after the parties agreed to clarify its terms—███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████ Goldin specifically noted that ████████████████████

---

[12] *See* Ex. 7, ███████████████████████████████; *see also* Ex. 8, ███████████████████████████.

[13] Ex. 9, ████████████████████████.

[14] *See* Ex. 10, ██████████████████████████.

████████████████████████████████████████████[15]   Goldin

further found that ███████████████████████████████████████████

████████████████████████████████████[16]   As was clear to

Goldin, the MSR Swap's terms█████████████████████████████████

████████████████████████████████████████████████████

██████████

Against the uncontroverted evidence reflecting the MSR Swap's value to GMACM, Wilmington Trust references an April 2010 e-mail in which Thomas Marano, ResCap's CEO, states that the MSR Swap "borders on an absurd transaction." (WT Compl. ¶ 92.)   But Wilmington Trust cites this statement out of context, thereby distorting the facts.  The context is that in April 2010, the Bank's regulators were questioning whether the LIBOR +100 bps rate that the Bank received under the MSR Swap satisfied the Bank's regulatory requirements, or was *too beneficial to ResCap*.  In the referenced email chain, the Bank and ResCap were addressing the appropriate LIBOR-based rate that GMACM would pay the Bank.  As Mr. Marano has since explained, his comments regarding the MSR Swap were made in the course of discussions and reflected a negotiating position.   Indeed, ███████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████[17]

## C.    Wilmington Trust Makes A Number Of Unsupported Statements Regarding The Alleged Breach Of The "All Or Substantially All" Provision.

Wilmington Trust argues that through a series of transactions consisting of the 2009 Bank Transaction and certain debt forgiveness transactions between ResCap and various subsidiaries,

---

[15] █████

[16] █████

[17] Ex. 11, ██████████████████████.

ResCap conveyed substantially all of its assets in violation of the "all or substantially all" provision of the Indenture ("AOSA Provision"). This is incorrect.[18] At no time prior to the commencement of these cases did ResCap sell or otherwise transfer substantially all of its assets in breach of the Indenture, whether through the transactions identified by Wilmington Trust or otherwise.

*First*, Wilmington Trust argues that the 2009 Bank Transaction and Subsidiary Debt Forgiveness Transactions should be aggregated for purposes of the AOSA Provision. This dooms its claim because, under settled law, the transactions Wilmington Trust identifies cannot be aggregated in determining whether ResCap transferred substantially all of its assets. To aggregate transactions for purposes of the "all or substantially all" analysis, a plaintiff must prove that there was a preconceived "overall scheme to liquidate" the company's assets "piecemeal" outside of the ordinary course of business, *see Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049-50 (2d Cir. 1982), under one of three tests: (1) the "end result test," which applies if "a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result"; (2) the "interdependence test," which applies if the transactions are "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series"; or (3) the "binding commitment test," which applies if "at the time the first [transaction] is entered into, there was a binding commitment to undertake the later [transactions]," *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 239-40 (Del. 2011) (applying New York law) (quotation marks omitted). The transactions relied upon by Wilmington Trust do not satisfy any of these three tests.

---

[18] As AFI will explain at the appropriate time, AFI cannot be held liable for any breach of the AOSA provision.

The end result test is not satisfied for the simple reason that the 2009 Bank Transaction and Subsidiary Debt Forgiveness Transactions were not in any way related, much less "prearranged parts of what was a single transaction" "to dispose of [ResCap's] assets piecemeal with a goal of liquidating." *Id.* at 240 (quotation marks omitted). The 2009 Bank Transaction was completely separate from the Subsidiary Debt Forgiveness Transactions, and all of these transactions were implemented for unrelated purposes. The purpose of the Subsidiary Debt Forgiveness Transactions was for ResCap to infuse capital into its subsidiaries to prevent them from breaching certain minimum net worth covenants—these transactions had nothing to do with AFI's acquisition of ResCap's interest in IB Finance. In short, Wilmington Trust offers no facts in support of its claim, because there are none. There was no plan to liquidate ResCap at any time, and Wilmington Trust cannot point to anything supporting its suggestion that the Bank Transactions and Subsidiary Debt Forgiveness Transactions had anything to do with one another, let alone that they were part of some grand scheme by AFI.[19] To the contrary, these transactions were implemented in connection with preserving ResCap, not liquidating it.

Indeed, the only document to which Wilmington Trust refers (but does not cite) in support of its conclusory assertion that AFI somehow "controlled" the Subsidiary Debt Forgiveness Transactions — ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[19] Wilmington Trust's arguments about the June 2008 bond exchange are meritless. AFI did not "orchestrat[e]" this bond exchange, as Wilmington Trust claims. (WT Compl. ¶¶ 76, 95-97.) To the contrary, ResCap's management and board put in place the bond exchange to extend the maturities on ResCap's notes and prevent a disastrous ResCap bankruptcy.



Wilmington Trust fares no better under the interdependence test, because, as explained above, each challenged transaction was "a distinct corporate event" that "stood on its own merits" and "[n]one was so interdependent on another that it would have been fruitless in isolation." *Liberty Media*, 29 A.3d at 240 (quotation marks omitted).  ResCap's sale of its interest in IB Finance was not connected to, let alone "fruitless" without, the Subsidiary Debt Forgiveness Transactions.  ResCap could have sold its interest in IB Finance whether or not it forgave its subsidiaries' debt, and vice versa.  And Wilmington Trust does not meet the binding commitment test because the IB Finance sale did not give rise to a contractual requirement to enter into any of the Subsidiary Debt Forgiveness Transactions, and none of these transactions were otherwise contractually tied to one another.

*Second*, putting aside whether the transactions may be aggregated, Wilmington Trust's claim boils down to the argument that ResCap had virtually no assets of value remaining after the 2008 and 2009 Bank Transactions and the Subsidiary Debt Forgiveness Transactions.  Nothing could be further from the truth.  As a holding company, ResCap's primary assets have

---

[20] *See* Ex. 12, ██████████████████████████████████.

always been its ownership interests in its Mortgage Operating Subsidiaries, and that was just as true after the bank and Subsidiary Debt Forgiveness Transactions as it was before them. Indeed, the Court need look no further than ResCap's sale of those assets in these cases to see the fatal defect in Wilmington Trust's argument. The Debtors sold their mortgage servicing and origination platform to Ocwen Loan Servicing, LLC for *$3 billion*, and sold their Whole Loan portfolio to Berkshire Hathaway for *$1.5 billion*. These sales of Debtors' assets for significant consideration prove that the Debtors could not have already sold substantially all of their assets prior to the Petition Date. Moreover, the Debtors *still* own approximately $1 billion of FHA loans in addition to other assets that the Debtors have received Court approval to sell.

**D.    Like The Committee, Wilmington Trust Must Misstate The Facts To Assert A Veil-Piercing Claim.**

Wilmington Trust makes many of the same material misstatements and omissions made by the Committee in its Motion. AFI thus incorporates by reference its Limited Objection and Response to the Committee's motion for standing. (*See* AFI Limited Objection & Response 7-20 [ECF 3560].)

Wilmington Trust makes additional material misstatements in its Motion regarding ResCap's Operating Agreement and independent directors, on which it bases its veil-piercing claims. *First*, Wilmington Trust asserts that the amendment of ResCap's Operating Agreement permitted AFI executives to serve as ResCap directors. (Mot. ¶ 17.) But the amendment—approved in conjunction with ResCap's conversion to an LLC—was completely unrelated to the question of who could serve as ResCap directors. And, as the U.S. Supreme Court has explained, it is a "time-honored common-law rule" that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods*,

524 U.S. 51, 69-70 (1998) (quotation marks omitted); *see also In re BHS&B Holdings LLC*, 420

B.R. 112, 138 (Bankr. S.D.N.Y. 2009) (same).

*Second*, Wilmington Trust asserts that ResCap's Operating Agreement required that

ResCap's two independent director positions always be filled, and that ResCap breached its

Operating Agreement when its independent directors resigned in 2008.[21]  (WT Compl. ¶ 153.)

Not so.  To the contrary, ResCap's Operating Agreement expressly contemplates the very

realistic possibility of vacancies in the independent director positions and provides procedures

for electing successor independent directors *after* any such vacancies.[22]  And Wilmington Trust's

conclusory assertion that, after ResCap's independent directors resigned in 2008, "both

independent director positions were allowed to remain vacant so there was no independent check

on [AFI's] actions" (WT Compl. ¶ 152), is likewise false: ResCap's independent director

positions were promptly filled, within approximately a month.

*Finally*, Wilmington Trust's unsupported suggestion that ResCap effected any material

transaction with AFI without the required independent director approval (*see id.*) is simply

wrong.  All such transactions had the required independent director approval, and all but one

transaction—the June 2008 exchange offer (which was approved by ResCap's independent

director, in compliance with the Operating Agreement)—were approved by two independent

directors.[23]  Wilmington Trust fares no better in attempting to support its claims by asserting

that, at the time of the 2009 bank transaction, "the new independent directors had essentially no

---

[21] Wilmington Trust's insinuation that ResCap independent directors Tom Melzer and Tom Jacob resigned because the 2008 bank transaction was not in ResCap's best interests—which it bases solely on an e-mail from a person *guessing* that they would like to leave the board—is false: Messrs. Melzer and Jacob have both stated that they did *not* resign because of that transaction and that they continue to support the transaction today.

[22] *See* Ex. 13, ResCap Operating Agreement (June 24, 2005) (ALLY_0140795-808, at ALLY_0140801-02).

[23] Of course, it is irrelevant that one independent director's seat was vacant during the second step of the 2008 bank transaction, and Wilmington Trust concedes that this was simply the second step of a transaction that was already approved—by two independent directors.

context or experience" upon which to base their decisions. (*Id.*) At the time of that transaction, the independent directors—both of whom had impeccable credentials and significant experience—had been in the position for seven months and were familiar with ResCap and its business.

### III.    Wilmington Trust Cannot Lawfully Obtain The Sole Right To Settle Certain Claims Against AFI.

Lastly, for the same reasons stated in AFI's Limited Objection and Response to the Committee's Motion, AFI objects to Wilmington Trust's Motion because, as Wilmington Trust's Proposed Order—and its Limited Objection to the Committee's Motion—make clear, Wilmington Trust, like the Committee, asks for unchecked veto power over any and all settlements, in contravention of settled law.[24] *See* Fed. R. Bankr. P. 9019(a); *In re Smart World Techs., LLC*, 423 F.3d 166, 176-77 (2d Cir. 2005); 11 U.S.C. § 1123(b)(3)(A); *see also* AFI Limited Objection & Response 6-7.

### CONCLUSION

For the foregoing reasons, AFI respectfully requests that this Court deny the Motion.

---

[24] *See* Motion, Ex. A (Proposed Order) ¶ 4 (providing that Debtors may only settle the HoldCo Claims pursuant to a Chapter 11 plan, "with the consent of [Wilmington Trust]"); *Limited Objection to Mot. of the Official Comm. of Unsecured Creditors for Entry of an Order Authorizing the Comm. to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* [ECF. No. 3561] ¶ 6 (arguing that Wilmington Trust should have "exclusive authority to settle [ResCap's] claims, upon consultation with the Committee and Debtors).

Dated:  May 7, 2013
         New York, New York

                                          /s/ Ray C. Schrock, P.C.

Jeffrey S. Powell                         Richard M. Cieri
Daniel T. Donovan                         Ray C. Schrock, P.C.
Mark McKane                               KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS LLP                      601 Lexington Avenue
655 15th Street, N.W., Ste. 1200          New York, New York 10022
Washington, D.C. 20005                    Telephone: (212) 446 4800
Telephone: (202) 879-5000                 Facsimile: (212) 446 4900
Facsimile: (202) 879-5200


*Counsel for Ally Financial Inc.*