1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10            Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            May 7, 2013

19            10:04 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2 Motion of the Official Committee of Unsecured Creditors for

3 Entry of an Order Authorizing the Committee to Prosecute and

4 Settle Certain Claims on Behalf of the Debtors' Estates

5

6 Debtors' Motion for the Entry of an Order Further Extending

7 Their Exclusive Periods to File a Chapter 11 Plan and Solicit

8 Acceptances Thereof

9

10

11

12

13

14

15

16

17

18

19

20 Transcribed by:  Lisa Bar-Leib

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4      Attorneys for Debtors

5      1290 Avenue of the Americas

6      New York, NY 10104

7

8  BY:   GARY S. LEE, ESQ.

9      TODD M. GOREN, ESQ.

10      STEFAN W. ENGELHARDT, ESQ.

11

12

13  KRAMER LEVIN NAFTALIS & FRANKEL LLP

14      Attorneys for the Official Committee of Unsecured

15       Creditors

16      1177 Avenue of the Americas

17      New York, NY 10036

18

19  BY:   NORMAN SIMON, ESQ.

20      KENNETH H. ECKSTEIN, ESQ.

21      STEPHEN D. ZIDE, ESQ.

22      RACHAEL L. RINGER, ESQ.

23      CRAIG L. SIEGEL, ESQ.

24

25

1

2   U.S. DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Avenue

5        21st Floor

6        New York, NY 10004

7

8   BY:   BRIAN S. MASUMOTO, ESQ.

9

10

11  ACCESS LEGAL SERVICES

12        4675 West 80th Street Circle

13        #210

14        Minneapolis, MN 55437

15

16  BY:   WENDY ALLISON NORA, ESQ.

17

18

19  CLEARY GOTTLIEB STEIN & HAMILTON LLP

20        Attorneys for Wilmington Trust

21        One Liberty Plaza

22        New York, NY 10006

23

24  BY:   THOMAS J. MOLONEY, ESQ.

25        SEAN O'NEAL, ESQ.

1

2  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3          Conflicts counsel to the Debtors

4          101 Park Avenue

5          New York, NY 10178

6

7  BY:   THERESA A. FOUDY, ESQ.

8

9

10  KIRKLAND & ELLIS LLP

11          Attorneys for Ally Financial and Ally Bank

12          655 Fifteenth Street, N.W.

13          Washington, DC 20005

14

15  BY:   NOAH ORENSTEIN, ESQ.

16          DANIEL T. DONOVAN, ESQ.

17

18

19  LOWENSTEIN SANDLER LLP

20          Attorneys for New Jersey Carpenters

21          1251 Avenue of the Americas

22          New York, NY 10020

23

24  BY:   MICHAEL S. ETKIN, ESQ.

25

1

2   MILBANK, TWEED, HADLEY & MCCLOY LLP

3          Attorneys for

4          One Chase Manhattan Plaza

5          New York, NY 10005

6

7   BY:   GERARD UZZI, ESQ.

8

9

10  PROSKAUER ROSE LLP

11         Attorneys for Assured Guaranty

12         Eleven Times Square

13         New York, NY 10036

14

15  BY:   IRENA M. GOLDSTEIN, ESQ.

16

17

18  ROPES & GRAY LLP

19         Attorneys for

20         1211 Avenue of the Americas

21         New York, NY 10036

22

23  BY:   KEITH H. WOFFORD, ESQ.

24

25

1

2  WHITE & CASE LLP

3         Attorneys for the Ad Hoc Group of Junior Secured

4          Noteholders

5         1155 Avenue of the Americas

6         New York, NY 10036

7

8  BY:   J. CHRISTOPHER SHORE, ESQ.

9         HARRISON DENMAN, ESQ.

10

11

12  JONES DAY

13         Attorneys for Financial Guaranty Insurance Company

14         555 South Flower Street

15         Fiftieth Floor

16         Los Angeles, CA 90071

17

18  BY:   RICHARD L. WYNNE, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

1

2  MUNGER, TOLLES & OLSON, LLP

3        Attorneys for Berkshire Hathaway Inc.

4        355 South Grand Ave.

5        35th Floor

6        Los Angeles, CA 90071

7

8  BY:    THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  All right.  Please be seated.  We're here

3   in Residential Capital, number 12-12020.  Mr. Lee

4            MR. LEE:  Good morning, Your Honor.  Gary Lee from

5   Morrison & Foerster for the debtors.  The first item on the

6   agenda which is docket number 3412 is the unsecured creditors'

7   committee standing motion.  Before I cede the podium to Mr.

8   Zide on behalf of the committee, I'd like, if I may, Your

9   Honor, add some comments from the debtors' perspective.

10           THE COURT:  Sure.

11           MR. LEE:  As Your Honor will recall at the last

12  exclusivity motion when we sought to extend exclusivity and

13  appoint Mr. Kruger as CRO, we noted that the debtors had agreed

14  to consent to the committee's motion to seek standing to pursue

15  all claims against Ally.  And at that time, we retained the

16  right to propose a settlement of the claims against the AFI as

17  part of the plan.

18           Just some relevant background, Your Honor, as

19  everybody's acutely aware, prior to the debtors' Chapter 11

20  filing, the debtors had negotiated and entered into a plan

21  support agreement with AFI.  And the debtors had determined at

22  that time that the plan support agreement offered ResCap the

23  best possible lifeline for a self-landing into Chapter 11.

24           The debtors' view is that the AFI plan support

25  agreement served that purpose very well.  And in retrospect and

1  in prospect, proved to be the basis upon which we were able to

2  obtain about four and a half billion dollars of recoveries for

3  creditors from the asset sales.

4          Once the sales had closed, it proved obvious to us and

5  to everybody else that the plan support agreement had become a

6  roadblock that was really preventing advancement of plan

7  negotiations.  Along that basis, the debtors chose to let the

8  plan support agreement expire.

9          There were then very extensive negotiations with the

10  committee which included some of the committee members on the

11  terms on which the debtors were prepared to see the committee

12  have standing to bring all potential causes of action against

13  the AFI.

14          I just want to note for the record, Your Honor, that

15  that was not due to a conflict on the part of the debtors or

16  any lack of willingness on the part of the debtors to pursue

17  the claims but rather there was a very strong perception, Your

18  Honor, that the committee would more aggressively pursue the

19  claims than the debtors.

20          Given the committee's status as an estate fiduciary,

21  the debtors' view is that the committee is the preferable party

22  to prosecute these claims rather than a single creditor of a

23  single estate.  And as I said, what we're concerned, and we

24  addressed this in the statement that we filed yesterday, are

25  the positions taken by Wilmington Trust and the ad hoc

1  bondholder group.

2         With respect to Wilmington, I just want to dispel one
3  myth which is that they hold a unique position at the Holdco
4  that makes them a more appropriate party to litigate claims
5  rather than the committee.

6         I think, first and most important, Your Honor, is that
7  there are more than 2,000 proofs of claim asserting billions of
8  dollars in claims that have been filed against the Holdco.
9  That includes tens of billions of dollars of claims that have
10 been asserted by other members of the creditors' committee on
11 which Wilmington sits.  And those claims allege many of the
12 very same things that Wilmington does.

13        Second, as Your Honor might be aware, the debtors
14 filed an adversary proceeding on Friday seeking a determination
15 as to whether the junior secured noteholders are oversecured.
16 And should the debtors prevail in that position, the junior
17 secured noteholders would be substantially undersecured and
18 therefore would have, arguably, an unsecured deficiency claim
19 of about two billion dollars.  That claim would be more than
20 double the size of the claim that the senior noteholders have.

21        So, Your Honor, until a determination is made with
22 respect to the lien issue and until there's clarity on who
23 holds what claims at the Holdco, our position is that it would
24 be premature to grant any single creditor and any single debtor
25 standing to prosecute claims.

1       With respect to the ad hoc group's objection, our

2   position is that the junior secured noteholders do not have a

3   lien on claims against the AFI including the claims that they

4   enumerated:  breach of contract, tortious interference and

5   equitable subordination because their lien is on commercial

6   tort claims and those are not commercial tort claims.  And I

7   think we've addressed that in our adversary proceeding.

8       So, Your Honor, with all that being said, the debtors'

9   view is that the committee's motion should be granted.  And

10  with that, I will cede the podium to Mr. Simon.

11          THE COURT:  Thank you.

12          MR. LEE:  Thank you.

13          MR. SIMON:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. SIMON:  Norm Simon with Kramer Levin on behalf of

16  the committee.  Your Honor, there's really no opposition to

17  this motion of substance.  It is made now by the committee as a

18  procedural step designed to enable the committee to move

19  expeditiously in the event that litigation against AFI is

20  necessary after the issuance of the examiner's report.  Mr. Lee

21  has just informed the Court, as it knows, that the debtors

22  consent to this, to standing by the committee to assert these

23  claims.  And for its part, AFI concedes that as a consequence

24  of that consent, the standard for granting standing is

25  relatively low.  And, frankly, while AFI's papers do present a

RESIDENTIAL CAPITAL, LLC, et al.                    13

1    counter narrative from its perspective, it concedes that the

2    sufficiency of the claims should be addressed at the motion to

3    dismiss stage or possibly even after discovery.

4            So, essentially, today we're all on the same page.

5    AFI and the other objectors, either implicitly or explicitly,

6    concede that the standard for granting the motion is readily

7    satisfied.  And, frankly, in any event, as to AFI, to the

8    extent they had a real objection, it should be taken with a

9    grain of salt for, after all, AFI is the defendant against

10   which the committee seeks to prosecute these real and

11   substantial claims.

12           The principal objection, to the extent there is one,

13   is procedural in nature that's raised today.  And that is that

14   the motion is premature because negotiations for global

15   resolution of the claims are ongoing and the examiner's report,

16   as Your Honor well knows, is forthcoming.

17           THE COURT:  Mr. Simon, let me --

18           MR. SIMON:  Yes, Your Honor.

19           THE COURT:  -- dispense with the mystery right now.

20   I'm waiting till I see the examiner's report before I decide

21   the motion.  Just nothing -- it is not intended as any adverse

22   reflection on the arguments you make in support of the motion.

23   But we've all waited a long time for the examiner's report.

24   It's about to be issued no later than Monday.  And I'm taking

25   this under submission today until I have an opportunity.  I

RESIDENTIAL CAPITAL, LLC, et al.                    14

1  gather it's going to be very long.  I don't know how long yet

2  but I gather very long.  I'm waiting -- so I want to hear your

3  arguments.  I want to hear everybody else's arguments but this

4  isn't necessarily a reflection that I agree with the position

5  that it's premature to go ahead with the motion.  But since

6  it's only a matter of days before the Court has the benefit of

7  the examiner's report, I'm waiting to get it.  But go ahead.

8         MR. SIMON:  Yes, Your Honor.  I appreciate that and

9  with somewhat lack of suspense then I will proceed.  I would

10  remain --

11         THE COURT:  I don't want to hide the ball.  I would

12  just put it right out now.

13         MR. SIMON:  I appreciate that.  And let me explain,

14  Your Honor, why the committee, though, did feel it appropriate

15  to make the motion when it did.  The thinking of the committee

16  was in the event of a failed consensual resolution that this

17  issue would --

18         THE COURT:  That would be my best hope of all.  But --

19         MR. SIMON:  And the committee's, Your Honor, as well.

20  And we continue to work very hard in that regard towards the

21  hope of reaching that resolution.  But in the event that it was

22  unsuccessful, the committee's view was that it was best to have

23  this issue briefed, argued to the Court, presented so that

24  procedural hurdle is sort of put behind us and we can promptly

25  proceed, if necessary, to the litigation.

1        THE COURT:  May I ask you this?  And I know you agreed

2   to hold off filing a complaint.  Is one drafted?

3        MR. SIMON:  There is a complaint in process, Your

4   Honor, yes.  But, Your Honor, the committee --

5        THE COURT:  But just -- let me --

6        MR. SIMON:  Yes.

7        THE COURT:  Have you shared a draft complaint with

8   AFI's counsel?

9        MR. SIMON:  Your Honor, we have not --

10        THE COURT:  Okay.

11        MR. SIMON:  -- although I will say we have shared in

12   great detail the factual predicate for the claims in a

13   submission of over 100 pages to the examiner which was then

14   shared with AFI.

15        THE COURT:  Okay.  Go ahead.

16        MR. SIMON:  Your Honor, the committee, too, wants the

17   benefit of the report before filing the complaint.  And for

18   that reason, we've reserved filing the complaint until that

19   point.  But we do think it important procedurally that we can

20   move expeditiously so as not to drain any further resources or

21   waste any further time after the issuance of the report.  And

22   that's why we're here today.

23        Let me address briefly --

24        THE COURT:  All I would say is the last creditors'

25   committee that filed a complaint in one of my cases involving

1    alter ego piercing the corporate veil wound up very

2    disappointed.

3            MR. SIMON:  Your Honor, we --

4            THE COURT:  I'm sure you're aware of that.

5            MR. SIMON:  We are very aware of that, Your Honor.

6            THE COURT:  Your firm was involved in the case.

7            MR. SIMON:  Your Honor, we're aware of that.  And I

8    was not going to address the merits unless you wanted me

9    today --

10           THE COURT:  No.  I don't want to.  I don't want to.

11   But I just -- but go ahead.

12           MR. SIMON:  Yes.  Your Honor, we are certainly aware

13   of the case.  We do think the facts are dramatically different

14   than the facts in the case which Your Honor refers.  And we do

15   think that upon seeing the complaint, if you ever do -- and we

16   may not get to that point -- Your Honor will be convinced that

17   this is the unique case that does warrant piercing of the veil.

18   We know it's a high standard.  We're well aware of that, Your

19   Honor.

20           With respect to the merits here, the test, as Your

21   Honor knows, is two-pronged.  With respect to colorability, the

22   committee strongly believes it will be able to plead colorable

23   claims for veil piercing as well as others including fraudulent

24   conveyance preference, equitable subordination and others.

25   There can be no doubt that they are at least colorable claims.

1   And, frankly, all of the objectors recognize that fact.

2          Exhibit A, frankly, is that AFI, at the inception of

3   these cases was willing to pay 750 million to release the

4   claims.  Now they suggest now that that was somewhat of a

5   nuisance payment.  That's a suggestion in their papers.  Now

6   the committee certainly believes that figure inadequate for the

7   value of these claims, but by no means can it be deemed de

8   minimis or nuisance, that amount of money.

9          And as I noted, while there's a long competing

10  narrative presented by AFI, it itself concedes --

11         THE COURT:  You're suggesting that no one should ever

12  put a number on the table for fear of a committee, in your

13  case, saying, see, they recognize that these claims are strong.

14  We think that number's inadequate.  I mean, I -- there are a

15  lot of reasons for AFI to be prepared to spend a substantial

16  amount of money to try and resolve all of the issues in the

17  case.  That's the -- in any event, the plan support agreement

18  is gone.

19         MR. SIMON:  And so I'll move on.  I'll move on,

20  frankly, to the second prong.  And that is that the prosecution

21  of the claims clearly is in the best interest of the estate and

22  is necessary and beneficial to the fair and efficient

23  resolution of the proceedings.

24         The potential recovery in the committee's view vastly

25  exceeds the 750 million dollar offer and warrants the potential

 1  litigation costs.

 2          We think it also important to note that the

 3  litigations costs should be discounted by the fact that the

 4  committee has made significant headway on discovery.  I could

 5  personally attest that millions of pages of documents have been

 6  digested and reviewed and analyzed by the committee.  The

 7  committee's advisors have analyzed the material transactions

 8  and agreements.  The committee is poised to depose witnesses

 9  based on its extensive knowledge of the facts to date.  And nor

10  would any proposed litigation unduly delay the development of a

11  Chapter 11 plan because that plan can be proposed and does not

12  require a prior resolution of the claims.

13          THE COURT:  Let me ask you this.  You cite my Dewey

14  opinion but I think what's not apparent in the Dewey opinion --

15  this came up during the argument -- the committee, with the

16  debtors' consent, filed the STN motion and it was granted.  But

17  it was clear from the start -- it was in the context of there

18  was a proposed plan of liquidation.  We were headed toward the

19  confirmation hearing.  And when I asked Mr. Weisfelner who

20  represented the committee who was going to prosecute the

21  claims, he acknowledged that the committee -- granting the

22  committee the standing motion was a mere weigh station on the

23  way to these claims being transferred to a liquidation trust.

24  And it would be the trust that would be prosecuting the claim.

25  We don't have a plan here but from reading the papers on the

1  exclusivity motion, the case is obviously really -- it's sort

2  of a watershed motion that's going to go in one of two

3  directions.  Either there's going to be a consensual plan with

4  broad support of all creditor groups.  And I think that would

5  encompass AFI being a party to it.  Or, a plan is going to be

6  proposed that includes a litigation trust.  That's -- I mean,

7  unless I'm missing something, those are the two options.  And

8  if it's option one, if there's a consensual agreement, and I

9  hope there is, I think you've acknowledged this motion that

10 you're making now, the issue may become moot.  If there is no

11 global piece and a plan that includes a litigation trust -- I

12 mean, I don't think it's going to be the committee that's going

13 to be prosecuting the claims.  I mean, there's no -- you're not

14 faced with an immediate impending statute of limitations that

15 would require you to file a complaint immediately.  Isn't that

16 true?

17        MR. SIMON:  That's correct, Your Honor.

18        THE COURT:  So, I mean, that's -- those are things

19 that are on my mind about this motion.  I think we'll know --

20 there's a lot that's going to happen in this case one way or

21 another in the next month.  And I think things will become

22 clearer when we see how things transpire, hopefully soon, and

23 if not, the Court's calendar is pretty full with ResCap

24 matters.

25        MR. SIMON:  I hear the point, Your Honor.

1           THE COURT:  Go ahead.

2           MR. SIMON:  Your Honor, would you like me to address

3    the Wilmington Trust and JSN objections?

4           THE COURT:  Well, here's the -- but the one issue --

5    let me -- I accept for this argument, particularly where

6    there's consent of the debtor, which there is, the standard is

7    lower -- I wouldn't say low -- is lower.  Some cases, including

8    my own, talk about applying a motion to dismiss standard.  I

9    don't have a complaint in front of me and I'm not going to do

10   that today.  The one aspect -- so let me assume that the

11   committee is -- the estate fiduciary is an appropriate party to

12   prosecute the claims.  It's the settlement issue that's really

13   on my mind.  This came up the last time we had an exclusivity

14   hearing because the committee conditioned its -- initially

15   conditioned its consent to an extension of exclusivity -- this

16   is not the terms that Mr. Eckstein used but essentially giving

17   it a veto over any plan that the debtors would propose.  And

18   whatever the actual language in the order would reflect -- and

19   he was pretty clear on the record that I wasn't giving the

20   committee the veto over a plan that might be proposed.  I have

21   great respect for the committee and what it's accomplished in

22   the case.  But as long as the debtor had exclusivity, I wasn't

23   giving any other party a veto.

24           I'm concerned with respect to the settlement issue.  I

25   purposely didn't put the Wilmington Trust motion -- they asked

1    to shorten time and have it on for today.  I didn't want to

2    hear it at the same time.  I'll get to them when it's

3    scheduled.  But they certainly argued that only one

4    representative, Wilmington Trust, on the committee reflects

5    their constituency.  The committee is still the fiduciary for

6    the estate.  And if it's the committee that's prosecuting the

7    claims, we'll see how that plays out.  But I'm very concerned

8    about -- with a complicated capital structure -- and Wilmington

9    Trust does point out that -- they're complaining about the

10   release of OpCo's obligations to the parent.  Can the committee

11   fairly prosecute those claims?  Can it settle those claims?  I

12   mean, I've been troubled in other cases about the settlement

13   issue when it's come up.

14          So I want you to focus on the issue of if I grant your

15   motion, what authority the committee has to settle claims to

16   the exclusion of any other party.

17          MR. SIMON:  Yes, Your Honor.  First of all, thank you

18   for your kind words about the committee's work to date.

19          With respect to the settlement authority that we're

20   seeking today, Your Honor, it essentially is tracking the

21   settlement authority that the Court granted with respect to

22   litigation against the JSNs.  What we would seek would be the

23   exclusive right to enter into settlements in consultation with

24   the debtors while reserving for the debtors the right to settle

25   claims through a plan with the committee's consent.

1        Other parties --

2        THE COURT:  But that's the veto point.  That's the

3   veto point which I was -- I didn't go back to look at the

4   precise language in the last extension of exclusivity, but we

5   had this colloquy in court and I wasn't hamstringing the debtor

6   from proposing a plan that the committee didn't support.  It

7   probably would have been foolish to do so, but nevertheless.

8   It's this point about as soon as you add the words "any plan

9   the debtor would propose with the consent of the committee",

10  that's the veto.  That's what I have trouble with.

11       MR. SIMON:  And, Your Honor, the language came out of

12  the negotiations with the debtors over the CRO issue -- the

13  spirit of the language is intended to mirror --

14       THE COURT:  Well --

15       MR. SIMON: -- the colloquy before the Court before.

16       THE COURT:  -- you know, we're getting down to this --

17  I'm reluctant about an order that has spirit.  I mean, it ought

18  to be in the four corners of the document.

19       MR. SIMON:  Fair enough, Your Honor.  We are happy

20  to --

21       THE COURT:  Just 'cause I don't want to hear later

22  on --

23       MR. SIMON:  -- track the language --

24       THE COURT:  I don't want to hear later on, but, Judge,

25  you signed an order that said any settlement has to be with the

1   consent, even if it's in a plan, has to be with the consent of

2   the committee.  It may have a hard time getting a settlement

3   approved if the committee opposes and for good reason.

4              MR. SIMON:  Right.

5              THE COURT:  But that's a different ---

6              MR. SIMON:  And Mr. Eckstein informs me we did agree

7   to a fiduciary out.  That was always contemplated.  And, Your

8   Honor, we're willing, frankly, to track the exact language.

9   There's nothing magical about having different wording from

10  before.  Your Honor, I think in the JSN motion had language not

11  unreasonably unheld (sic).  That is the committee's intent.

12  And if Your Honor -- if the Court thinks it appropriate to

13  track the language of the last settlement authority, I think

14  the committee thinks that's appropriate to do.  That was

15  certainly the intent and spirit.  And to Your Honor's point, we

16  are happy to have the words match what was stated on the record

17  last time and mirror the language of the last order.

18              And with that, Your Honor, unless the Court has

19  further questions, I'll yield the podium.

20              THE COURT:  Now do I have the transcript from the last

21  hearing?  I don't --

22              MR. SIMON:  There is one.

23              THE COURT:  I'm sure it's on ECF --

24              MR. SIMON:  Yeah.

25              THE COURT:  -- but it would be helpful if you could --

1          MR. SIMON:  We can certainly get that --

2          THE COURT:  -- provide it --

3          MR. SIMON:  -- to you, Your Honor, yes.

4          THE COURT:  Okay.  All right.  Mr. Moloney, you want

5     to be heard?

6          MR. MOLONEY:  Good morning, Your Honor.  For the

7     record, Tom Moloney on behalf of Wilmington Trust which is the

8     indenture trustee for the senior unsecured notes of Residential

9     Capital or the holding company.  And, Your Honor, we generally

10    support the relief and our issue is the one -- precisely the

11    one you identified.

12          As Your Honor is aware, we had filed our own motion

13    which is -- I'm not going to argue today.  It's for a week from

14    now.  But the only aspect of the relief sought today that is

15    potentially -- that is in consistent with the relief sought in

16    our motion relates to the settlement authority of the

17    committee.  We seek permission to jointly prosecute the

18    operating claims.  We don't seek exclusive right to do that.

19          THE COURT:  Does your client want to pay the entire

20    cost of your efforts in prosecuting the claims?  I mean, look -

21    -

22          MR. MOLONEY:  Well --

23          THE COURT:  -- we'll deal with it when we get to your

24    motion but I've commented on other issues that this case has

25    been enormously expensive.  And what I am very reluctant to do

1   is enter any order that results in additional unnecessary

2   expense.  And I know you would say it's necessary but, you

3   know, one of the things that no one has really addressed in

4   their papers -- at least I don't remember seeing it -- and I

5   think that the STN trilogy from the Second Circuit identifies

6   this as a relevant issue is the likely cost of prosecuting the

7   claims and how that's going to be done.  So -- and I raised

8   this issue in Dewey before I granted the STN approval.  But no

9   one's really addressed the issue here.  I have no doubt that

10  you and your colleagues could very ably prosecute and work

11  cooperatively with the committee's counsel in prosecuting it.

12  I still have a question.  If the case heads in this direction

13  of not resolving all of the claims through a consensual plan,

14  whether it's going to be the committee or Wilmington Trust

15  that's going to wind up prosecuting the claims, the claims are

16  going to go into a -- I assume into a litigation trust.

17  They're not going to get resolved overnight.  And in many cases

18  where that's happened, counsel have been retained on a

19  combination time charge contingency or some other basis.  But

20  the cost of expense of prosecuting the claims is a very

21  relevant issue.  And I am concerned with duplication.  I'm sort

22  of previewing for you what you're going to have to address next

23  week.  But --

24          MR. MOLONEY:  Which is good.  And if I may make two

25  points, Your Honor.  One is, I think we have something of a

1    track record in this case over the last ten months.  You don't

2    see us on issues where we're not required.  We've not tried to

3    replicate the committee on the RMBS settlement where they've

4    taken the lead.  You've not seen us involved in a lot of

5    issues.  So I think we've been judicious in kind of picking our

6    fights.  And we would not be picking this fight if it was at

7    all avoidable.

8              On the cost issue, we did address that in our papers.

9    If -- a week from now but --

10             THE COURT:  Well, yeah.  I read it twice to look at

11   it.  And I'm not sure you --

12             MR. MOLONEY:  Well, but in a sense that -- the estate

13   is not picking up our expenses.

14             THE COURT:  Now.

15             MR. MOLONEY:  Correct.

16             THE COURT:  But if an STN motion is -

17             MR. MOLONEY:  If we assume --

18             THE COURT:  -- granted --

19             MR. MOLONEY:  That's not part of the relief we're

20   seeking is to have the estate pay our expenses.

21             THE COURT:  So you're saying now that you're not going

22   to ask the estate to pay your expenses if your STN motion is

23   granted?

24             MR. MOLONEY:  We're not as a precondition to the

25   motion.  At some point down the line, we're successful in

1    bringing several billion dollars, that'll be a different story.

2    But part of the reason why we think we are an appropriate

3    representative is that we're not asking the estate to pay our

4    expenses upfront or on an ongoing basis as with other parties.

5    And if that wasn't clear in our papers, that is our position.

6              THE COURT:  All right.

7              MR. MOLONEY:  We'll talk about it next week.

8              MR. MOLONEY:  But I have a -- I had a college

9    professor, Wally Sear (ph.), who said that -- in political

10   science, he said the way you stand depends on where you sit.

11   And it's really profoundly truthful and provides an insight

12   into where we are in this case which is at the holding company

13   level where we are.  The only asset -- the only asset available

14   for unsecured creditors are the claims we've outlined in that

15   detailed complaint which we did file, Your Honor.  That's the

16   only asset.  Then we have a committee structure which is, in my

17   experience, unusual.  It's kind of a hybrid torts

18   committee/creditor committee.  And the only representative on

19   the committee of the holdco company is our client.  And the

20   only representative on the committee with a liquidated claim

21   against anybody is our client.  Everyone else on the committee

22   is basically a tort claimant of one sort or the other.  We have

23   three RMBS trustees who have these R&W claims which you're

24   going to be hearing about.  We have two monoline insurers with

25   their own lawsuits in other states that they're pursuing

RESIDENTIAL CAPITAL, LLC, et al.                    28

1    vigorously which they see as their primary source of recovery.

2    We have two securities plaintiffs who are also pursuing their

3    own lawsuits which they see as their primary source of

4    recovery.  And we have a representative of a putative borrower

5    class action who has his own lawsuit which he's going to try to

6    settle through an insurance company.  So the only people who

7    are really looking at the estate as a source of recovery in

8    this case is us.  So we have the anomaly where we're the only

9    member of this non-person committee and we have the most acute

10   interest in these claims.  We've spent an enormous amount of

11   time in this case actually presenting our issues to the

12   examiner.  So, obviously, Your Honor will be guided by what the

13   examiner finds.  But that's where we've spent our ammunition.

14       THE COURT:  Kramer Levin's obligation as counsel to

15   the creditors' committee is the entire creditors' committee and

16   all of the constituents of it.  And those that have claims --

17   where there are claims against the OpCos for debt because there

18   was debt forgiveness if that was a fraudulent conveyance or

19   whatever other theory, isn't Kramer Levin obligated to pursue

20   the interests of all of the constituents of the creditors'

21   committee.

22       MR. MOLONEY:  I think Kramer Levin's done a fabulous

23   job in this case.  And I think that the only way this committee

24   has been functional is because of --

25       THE COURT:  They're going to put this transcript up on

1  their wall.

2          MR. MOLONEY:  Well, I think it's absolutely true.  The

3  only way this committee has been functional and as successful

4  as we have been is because of the tremendous job they've done.

5  However, we have -- one occasion is highly public that they've

6  talked about.  There are occasions which I will not get into

7  where the other operating creditors, in order to settle their

8  individual lawsuits with AFI have proposed to settle our claims

9  along that for a song.  And if they get a committee vote 8 to 1

10  to do that or 6 to 3 to do that, what is the committee counsel

11  supposed to do at that point in time?

12          Now we may -- they'll be in --

13          THE COURT:  The Court may have to do something.

14          MR. MOLONEY:  -- quite a difficult situation at that

15  point in time.

16          THE COURT:  Yeah.  The Court may have to do something

17  at that point if --

18          MR. MOLONEY:  So we're trying to avoid putting my good

19  friend, Mr. Eckstein, in that position.  He's done a yeoman job

20  protecting us against a number of efforts to do things like

21  this and we're trying to help him out.  At least we have an

22  obligation --

23          THE COURT:  I'm sure he appreciates it greatly.

24          MR. MOLONEY:  Well, we have an obligation to step

25  forward to do that, Your Honor.  And so, our suggestion is that

1   obviously, we can deal next week with our right to have co-

2   standing to prosecute which I think we certainly -- the OpCo

3   claims which I think would deal with at least one major

4   concern.  And we think we should have a seat at the table if

5   these claims are going to be settled outside of a plan.

6         THE COURT:  Address the issue of -- that's the one

7   issue, and I raised it with Mr. Simon.  It's the issue that's

8   really primarily on my mind is the issue of authority to settle

9   claims.  I mean --

10         MR. MOLONEY:  I think, Your Honor, the problem on that

11   -- and just to preview --

12         THE COURT:  I'm sure I'll hear from you if the

13   committee's counsel proposes to settle claims for an amount

14   that you believe is too low or they don't sufficiently pursue

15   claims against the OpCos, for example.

16         MR. MOLONEY:  I think --

17         THE COURT:  You're not shy.  I'll hear from you about

18   it.

19         MR. MOLONEY:  I'm not shy.  But as Your Honor knows,

20   going back to the W.T. Grant case way back when, the Second

21   Circuit announced a very lenient standard for bankruptcy court

22   settlements:  lowest range of reasonableness.  And the premise

23   of that was there was a trustee in that case.  And there was a

24   fiduciary.  And the idea is that a fiduciary settles a

25   bankruptcy case -- be any kind, a debtor fiduciary, some other

 1   fiduciary -- you're going to have extremely deferential

 2   standard.  And I think --

 3        THE COURT:  Smartwell sort of may have a different

 4   take on that, though, in my view.

 5        MR. MOLONEY:  My take on it is that there's a -- is

 6   that you need to have assurance of the process or of the

 7   outcome.  You do not give deference -- if you don't have a

 8   process that's deserving of deference then you can

 9   independently, as a judge, look at -- but then it's just

10   whether it's a good settlement.  It's not a deferential

11   standard.  If there's a fair process, that process is entitled

12   to deference.

13        THE COURT:  A fair process, in my view, would

14   necessarily involve some inquiry as to whether counsel in

15   proposing a settlement was conflicted in some way because the

16   creditors' committee constituency was broad and there hasn't

17   been substantive consolidation in the case.  You know, I don't

18   know.  I haven't thought that all the way through, Mr. Moloney.

19   I'm mindful of this issue.  That's the one aspect of --

20        MR. MOLONEY:  Right.

21        THE COURT:  -- the request for STN authority that is

22   giving me some pause.  I don't -- anyway, let me stop there.

23        MR. MOLONEY:  I can say, Your Honor, that it's not a

24   complete answer but it's a partial answer.  That issue doesn't

25   necessarily have to be resolved in order to give the committee

RESIDENTIAL CAPITAL, LLC, et al.                    32

1    authority and to give us hopefully authority a week from now to

2    work with them to bring these claims.  And then to give us

3    both -- reserve the right as to what standard you're going to

4    use to review it and who can propose settlements until we reach

5    the day.  And maybe we'll reach a global settlement which we're

6    all working on and hopefully that obviates the issue.  But I do

7    think that if you're going to allow a settlement of the OpCo

8    company's claims, which are the only assets to the OpCo

9    creditors -- and they're significant assets.  I believe the

10   examiner report will say there's significant assets -- that

11   it's just -- it would be unconscionable not to allow the

12   noteholders to have a strong say in that and to be outvoted by

13   people who have collateral sources of recovery that they're

14   pursuing outside of the estates.

15            THE COURT:  Thank you, Mr. Moloney.

16            MR. MOLONEY:  Thank you.

17            THE COURT:  Mr. Shore?

18            MR. SHORE:  Thank you, Your Honor.  Chris Shore from

19   White & Case on behalf of the junior secured noteholders.

20   We're just going to make a request echoing what Your Honor has

21   said to defer any ruling on this not just to the issuance of

22   the examiner's report but until we get a little more clarity as

23   to where these cases are going.

24            We are --

25            THE COURT:  Well, that's going to happen pretty soon.

1           MR. SHORE:  Right.  We are at an inflection point in

2     the case, we think at the precipice of a cliff.  And the exit

3     strategy for the cases and who's going to be controlling what

4     assets going forward is completely undetermined at this time.

5           Here's our issue.  The right to control the asset, the

6     litigation claims, is in and of itself an asset.  It's not just

7     the right to propose a settlement.  It's the right not to

8     propose a settlement.  To have something on the table and say,

9     uh-uh, we're not going for that.  I want a much larger number.

10    Which has a, depending on how you look at the capital structure

11    of the company, has a dramatic impact on a divergence which

12    I'll talk about in exclusivity between those parties who are

13    benefited by delay and those parties who are hurt by delay.

14          So the question is why does it have to be done now.

15    The answer, I think, was admitted:  this is just a procedural

16    issue right now.  We don't need to do this.  There is no

17    statute of limitations problem.  I'd also say there's no

18    question that there are document preservations going on.

19    There's no question that the estate asset bringing the claims

20    is a wasting asset at all.  There has been no record made on

21    whether or not it's appropriate for the debtors to abandon that

22    asset essentially to the committee other than the statement

23    that was made is we traded that for sixty days of exclusivity

24    which, ultimately, didn't result in a deal.

25          The question is why wait is there are a number of

1    options out here.  There is an Ally-sponsored plan.  There is a

2    liquidation trust.  There is potentially a conversion in these

3    cases.  We are at a point in the cases where it is entirely

4    unclear which estates are and are not administratively

5    insolvent.  We've seen some evidence that we'll see in the

6    connection with exclusivity that on an accrual basis, things

7    may be okay.  But we don't know where we are on a cash basis

8    with respect to the debtors' ability to pay its administrative

9    claims as and when due.

10           The committee -- so the question is why now.  The

11   issue is we're going to get to a point where it's either going

12   to belong to -- it's either going to be resolved.  It's going

13   to belong to a liquidation trust or it's going to belong to a

14   Chapter 7 trustee.  The committee isn't doing any of that work

15   unless the creditors want that.  That is an asset which is

16   going to have to be either disposed of pursuant to a plan or

17   gets transferred to a Chapter 7 trustee.

18           We have a problem with respect to interim control over

19   that asset.  The committee, as Mr. Moloney so ably laid out, is

20   made up of people who are -- whose only recoveries are going to

21   be litigation assets.  And they, based on other pleadings that

22   have been filed with the court, are completely indifferent to

23   the accrual of admin expense because they're not going to get

24   paid anyway unless they hit a homerun.

25           So turning the litigation over at this period of time

1   to someone who is incented to hit for the fences and has a

2   committee whose every single member is looking to get paid out

3   of a litigation is just pitting administrative and secured

4   creditors against unsecured creditors with contingent claims or

5   creditors with -- unsecured creditors with allowed claims whose

6   recoveries, as Mr. Moloney said, only come from assets.

7           THE COURT:  I just find it very interesting that you

8   representing the junior secured noteholders are coming forward

9   as the champion of the unsecured creditors.

10          MR. SHORE:  If the debtors are correct, regardless --

11  regardless of where we are right now, we are the largest

12  economic stakeholder in these cases.  Whether we're oversecured

13  or undersecured is completely indisputable.  We have the

14  largest claims into these estates.  And whether they are

15  secured claims or unsecured claims, there are assets to pay

16  those claims now.  There may not be assets to pay those claims

17  later.  So when we come in and say we're champion for unsecured

18  cre -- we're not.  We are credit -- we are championing getting

19  our claims paid, our allowed claims paid for which there are

20  estate assets which can be used to pay those claims.  What we

21  are not championing right now is unlimited optionality on the

22  part of people whose only recovery is a homerun.

23          That's the problem in this case.  You can't turn the

24  ability to propose a settlement over to the committee because,

25  as they said, there may be offers that come in.  We're not

1    going to talk about that.  But the right to say, no, don't want

2    that offer, that doesn't get me enough to distribute out to ten

3    billion dollars of unsecured claims.  It might get -- and this

4    a key point here -- if we are unsecured, our unsecured claim,

5    deficiency claim, not only as Mr. Lee said, is sort of at the

6    parent, it gets asserted at all the debtors who have

7    guaranties.  So our unsecured claim is structurally senior to

8    all these other unsecured claims that are out there.  So the

9    risk we have going forward is that structurally senior position

10   is just going to be taken away because people want delay.

11          THE COURT:  So you're advocating put this off.  And

12   yet, you're saying all they -- referring to everybody else --

13   want is delay.  It seems to me you're the one who's advocating

14   delay.

15          MR. SHORE:  No.  I'm --

16          THE COURT:  Let me finish.

17          MR. SHORE:  Sure.

18          THE COURT:  Okay.  We'll get to the exclusivity

19   motion.  But in the debtors' -- in the negotiations that have

20   gone on, your position being the only one in the filed papers

21   that opposes the extension of exclusivity, but the debtor at

22   least committed that if it gets the thirty day extension of

23   exclusivity, it's going to propose a plan.  And if it's --

24   maybe I'm being too simplistic but it seems to me there are two

25   choices now.  It's either a consensual -- global consensual

1  plan or it's a plan that leaves the AFI claims out there and

2  they go into a litigation trust.  Those -- unless I'm missing

3  something, those are the two options at this point.

4          MR. SHORE:  Correct.

5          THE COURT:  So the case is moving forward one way or

6  another.  I hope it moves forward on the consensual front.

7  That's out of my control.  Okay?  So -- but I come back to the

8  point.  You're telling me put this off but you're blaming

9  everybody else for delay.

10          MR. SHORE:  No.  I'm saying don't impair the asset

11  right now.  There is an asset that is clear here that the

12  debtors have, the right to control the litigation.  That is an

13  asset which Your Honor has seen in confirmation fights --

14  confirmation hearings people fight about not only because it's

15  the right to accept the settlement; it's the right to propose a

16  settlement and it's the right to come in, as Mr. Moloney says,

17  and say as the fiduciary, my settlement, if it falls within the

18  range of reasonableness, is the one that's done.

19          I'm just saying don't encumber that asset.  That asset

20  has to be disposed of.  And we are saying dispose of it.  Put

21  it in the plan and get it done.  But the debtors, if they're

22  saying they're going to do their plan B in thirty days, they

23  should be free to write whatever they want in there.  That

24  asset goes to the RMBS claimants, that goes to the senior

25  unsecured notes, that goes to the junior unsecured notes, that

1    goes wherever.  But that is an asset of the estate which Your

2    Honor shouldn't encumber by getting into this drafting argument

3    that the committee wants to have in real time about, well, what

4    does it mean, what real control do they have over the asset.

5    I'm just saying, if there's going to be exclusivity or even if

6    there isn't going to be exclusivity, whoever's writing the plan

7    for the disposition of that plan asset should be given a blank

8    slate.

9            The only argument that could be made as to why that

10   slate should be encumbered by the need to get committee consent

11   or the need to socialize it with the committee or anything else

12   is because they want it resolved as a procedural issue.

13           THE COURT:  All right.  I have your argument.

14           MR. SHORE:  Thank you, Your Honor.

15           THE COURT:   Thank you, Mr. Shore.  Anybody else want

16   to be heard?

17           MR. DONOVAN:  Good morning, Your Honor.  Daniel

18   Donovan for Ally.

19           THE COURT:  Good morning, Mr. Donovan.

20           MR. DONOVAN:  Your Honor, we'll be brief.  The other

21   parties have addressed our threshold issues.  We obviously have

22   a dispute of law and fact with the committee but I believe, as

23   we said, that's for another day.

24           THE COURT:  Thank you, Mr. Donovan.

25           MR. DONOVAN:  Thank you, Your Honor.

1           THE COURT:  Mr. Masumoto -- before you get up, Mr.
2   Eckstein --
3           Can you provide me with any help with respect to
4   relief granted in other cases with STN motions?  My major
5   concern which I expressed already is over the settlement
6   authority issue.  And I don't know whether your experience,
7   whether you've seen something different done, a way of dealing
8   with the settlement authority issue.  If you haven't, you
9   haven't.  But --
10          MR. MASUMOTO:  I --
11          THE COURT:  Could you go up to the microphone?  I
12  appreciate it.
13          MR. MASUMOTO:  Your Honor, Brian Masumoto for the
14  Office of the United States Trustee.  Your Honor, I'm sorry to
15  say that I don't know as to how the settlement authority has
16  been implicated in other STN motions.  As Your Honor knows, the
17  STN motion is not fairly typical in all cases.  It comes up
18  relatively rarely.  And I haven't seen the settlement aspect
19  that Your Honor has raised as being a matter of --
20          THE COURT:  Thank you.
21          MR. MASUMOTO:  -- a lot of litigation.
22          THE COURT:  Thank you, Mr. Masumoto.
23          MR. MASUMOTO:  Sorry.
24          THE COURT:  Mr. Eckstein?
25          MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

1    Eckstein.  There was just one point I felt needed clarification

2    based on Mr. Shore's comments.  Mr. Shore made a representation

3    that there are no assets in the estates that are available for

4    distribution to unsecured creditors.  That is a material and

5    gross misstatement of the facts.  And I didn't want the record

6    to be left standing with that misrepresentation.  At the

7    appropriate time, the debtor may have to present those facts to

8    the Court but I did not want the Court to have the impression

9    that there are no assets in these estates that are not

10   available for distribution nor should the Court have the

11   impression that the creditors of the estate are not mindful of

12   the expense associated with administration of the case.  And

13   that's a significant factor here.

14           And so --

15           THE COURT:  Let me ask.  And if you want to defer to

16   Mr. Simon, that's fine.  I want one of you to deal with it.  I

17   am concerned, as I've expressed, on the settlement issue.  And

18   Mr. Moloney, in his papers, and we'll hear more next week, he

19   raises the issue of the forgiveness of the OpCo debt.  Is that

20   something that you feel, as counsel to the committee, you can

21   pursue?

22           MR. ECKSTEIN:  Your Honor, we actually are going to

23   submit papers today and we're going to be speaking further with

24   Mr. Moloney about this issue.  I think at this juncture, what

25   our proposal is going to be is that there are significant

1    claims at both the OpCo and the Holdco level against AFI that

2    should be pursued by a single entity.  To the extent there are

3    actually intercompany disputes where there are conflicts

4    between true conflicts between the Holdco creditors and the

5    OpCo creditors -- and there may be some limited issues -- right

6    now, our sense is that those issues do not need to be pursued

7    at least immediately.  And it may be that those particular

8    issues do need to be carved out.  But since there are such

9    significant causes of action that reside at the Holdco and the

10   OpCo that should be essentially presented through a complaint

11   where discovery needs to be taken, those claims, we certainly

12   think, need to be pursued officially.  We understand the need

13   for Wilmington to be involved and participate.  And we think,

14   as they've done in other matters in this case, that can be

15   accomplished in order to protect their interests.  At the end

16   of the day, the biggest concern that I think people will have

17   here will be ultimately settlement of claims because, as a

18   practical matter, settlements often happen collectively and not

19   just individually.  And how claims are settled and how the

20   proceeds of settlement are allocated between creditors is going

21   to be really the tough issue.  And it's, frankly, it's a tough

22   issue that we're having right now in connection with current

23   settlement negotiations because, invariably, you have to

24   combine the estate recoveries and a resolution of a myriad of

25   intercredTor issues and you need to try to come out with a

1    global solution that combines both a resolution dealing with

2    your third party and a resolution of the intercreditor issues

3    because only then do you know both how much do you need to

4    bring in and how you allocate it.

5            THE COURT:  So this issue arose last month in MF

6    Global Holdings.  The creditor co-proponents filed an STN

7    motion.  And JPMorgan Chase was going to file an STN motion

8    because of the intercompany claims.  And different creditors

9    had particular interests at different levels.  The Chapter 11

10   trustee, Louis Freeh, conceded that he couldn't pursue the

11   intercompany claims.  He was the trustee for all of the estate.

12   Fortunately, the issue got resolved in a settlement and that

13   was incorporated in the plan that settled the issue of the

14   intercompany claims and distributions.  But otherwise, in all

15   likelihood, I was going to have -- I won't say competing

16   because they agreed -- the parties who were making the STN

17   motions agreed that there were different positions of different

18   groups of creditors.  And, I mean, it got settled.  I hope this

19   one gets settled, too.  But it was --

20           What I would encourage you to do, Mr. Eckstein,

21   because I am --I'm not sure I got a clear answer from you about

22   whether you, as counsel to the committee, are prepared to

23   pursue the OpCo claims.  I'm not going to hear Mr. Moloney's

24   motion until next week.  Your time would be best spent trying

25   to get to a consensual plan for the whole case.  We don't get

1    there -- you or one of your colleagues ought to work with Mr.

2    Moloney to see if you can come to an agreement as to how to

3    deal with this issue of Holdco claims, OpCo claims.  I'm

4    shorthanding it because it may be more complicated than that.

5            MR. ECKSTEIN:  We will spend time speaking with Mr.

6    Moloney and his colleagues about what I call the -- how to best

7    deal with the intercompany claims.  But I think -- I'm

8    distinguishing between claims against AFI and then the

9    intercompany --

10           THE COURT:  Yes.

11           MR. ECKSTEIN:  -- claims, essentially.

12           THE COURT:  Yes.  And as I say --

13           MR. ECKSTEIN:  And I think the intercompany claims --

14           THE COURT:  -- in MF Global, they were able to

15   negotiate in the last -- in a crazy week, they got the

16   negotiation done.  It got incorporated into the plan that was

17   proposed.  That plan got confirmed.  There was only one

18   creditor who opposed confirmation of the plan.

19           MR. ECKSTEIN:  We'll definitely spend some time

20   although I agree with Your Honor, there are other places where

21   we probably should be devoting --

22           THE COURT:  I think so.

23           MR. ECKSTEIN:  -- our energy right at this moment.

24           The only other observation I'll make is based upon the

25   discussions.  I think there are -- I think either there'll be a

RESIDENTIAL CAPITAL, LLC, et al.                    44

1   global settlement in which case there won't be prosecution of

2   the claims.  There could be a plan proposed that could be

3   confirmed that will allow the debtors to emerge from bankruptcy

4   relatively quickly in which case I would agree that under that

5   scenario, it would be logical for the claims to be transferred

6   to a litigation trust.  We'll have to sort through many of

7   these same issues in connection with a litigation trust because

8   you will have -- you will have intercreditor disputes --

9           THE COURT:  Yes.

10          MR. ECKSTEIN:  -- as well as -- or intercompany

11  disputes as well as third party disputes.

12          It's also possible that if people can't resolve items

13  that they need to be significant what the debtor calls gaining

14  issues litigation before confirmation of a plan.  And in that

15  context, it might be sensible for litigation to proceed through

16  the committee in the Chapter 11 case and for litigation to make

17  progress both in the motion process and in discovery.  And that

18  litigation can then be transferred wherever it is into a

19  litigation trust once we get to confirmation.  From my

20  perspective at least, I don't think it will be useful for the

21  litigation to idle on the side while we just work though

22  intercreditor litigations.  And for that reason, I think that

23  it may, in fact, be very sensible for -- and if Your Honor's

24  going to wait for the examiner's report, I appreciate that, but

25  I think, from our perspective, we will be of the view that it

1    makes sense to proceed with the STN relief so that this

2    litigation can at least move forward in the event we find that

3    we are going to remain longer in Chapter 11 than people might

4    like.

5            THE COURT:  Okay.  Thank you, Mr. Eckstein.  Anybody

6    else want to be heard?  All right.  I'm going to take it under

7    submission.

8            Mr. Lee?

9            MR. LEE:  Good morning, Your Honor, again.  Gary Lee

10   from Morrison & Foerster on behalf of the debtors.  The next

11   motion on the agenda is the debtors' motion seeking an

12   extension of exclusivity to file a plan and solicit

13   acceptances.  And that's docket number 3485.

14           As requested, Your Honor, the individuals who

15   submitted declarations in support of our motion, Mr. Kruger,

16   the debtors' CRO, and Mr. Nolan, the financial advisor for the

17   debtors, are both here today.

18           Your Honor, at the last exclusivity hearing, I think

19   you suggested that it would be a miracle if the debtors filed a

20   plan and disclosure statement before the now expiring

21   exclusivity period was up.

22           THE COURT:  Did I say that?

23           MR. LEE:  You did use those words, Your Honor.

24           THE COURT:  I guess the miracle didn't come to pass.

25           MR. LEE:  And I was going to say, Your Honor, I can't

1    say that Judge Peck managed to perform a miracle with a staff

2    but we are standing on the banks of the Red Sea.  I'm not sure

3    if that's close enough, Your Honor.  But we'll see in the next

4    couple of weeks.

5         In that regard, as filed, the original motion sought a

6    sixty-four extension of the plan filing period.  We had a

7    number of discussions with counsel to the creditors' committee

8    and also with counsel to the ad hoc group of junior secured

9    noteholders.  And based on those discussions, and given all

10   that we're seeing and hearing, we made a determination to

11   reduce the plan filing period to thirty days.

12        And before I address the progress that's made since

13   the last exclusivity motion, what I'd like to do is just make

14   it quite clear to the Court that the debtors are prepared to

15   file the plan within the next thirty days.  We are hopeful that

16   it will be a plan that is entirely consensual.  The parties are

17   still exchanging proposals and Judge Peck has set another

18   mediation session for Thursday of this week.

19        THE COURT:  I thought that's all he does is mediate.

20   But -- he and I don't discuss it.  He, from time to time,

21   comments that he's got another meeting scheduled.

22        MR. LEE:  I don't think, Your Honor, I've ever seen

23   anybody put quite as much effort into the process.  I believe

24   there are about 140 different people at the last mediation

25   session.  And Judge Peck has worked day and night and on

1    weekends to move this forward.  So, as I said, I think that we

2    owe it to ourselves the process and the effort that he's put in

3    to see whether we can get to an entirely consensual deal.  But

4    the commitment from the debtors is if we can't do a consensual

5    deal, fully consensual deal, we'll file a plan.  And what we

6    will spend the next thirty days on if we can't get a fully

7    consensual deal is to file a plan with as many consensual

8    elements in it as we can.  And that, really, Your Honor, takes

9    me to the gating issues which Mr. Eckstein referred to.

10              In its objection, the ad hoc group alleges that the

11   plan discussions have been limited to the AFI settlement and to

12   achieving the nirvana of global peace.  But that, Your Honor,

13   is actually a myth.  And it's one of several myths that really,

14   I think, underpin the objection.  As described in Mr. Kruger's

15   declaration, there have been daily bilateral and multilateral

16   negotiations with the creditors to address precisely what will

17   happen in the event that there's no AFI settlement.  And those

18   negotiations have focused exquisitely on the gating issues in

19   this case.  That includes, Your Honor, several discussions with

20   creditors regarding some very complicated interdebtor and

21   intercreditor issues.  There have been a number of

22   presentations by the debtors, the committee, counsel to the

23   junior bonds, the senior unsecured notes on how to work your

24   way through those issues.

25              There have been extensive ongoing discussions with the

RESIDENTIAL CAPITAL, LLC, et al.                    48

1    RMBS investors.  We've had several discussions about the RMBS

2    trial with the creditors' committee and other parties who

3    objected to the RMBS settlement.  There have been innumerable

4    discussions with the securities claimants regarding the

5    priority of their claims.

6           And just to address Ms. Nora's objection, there have

7    been extensive negotiations and mediation sessions with

8    representatives of borrower claimants not just regarding their

9    own claims but significant discussions with committee counsel

10   regarding borrower claims generally and really trying to think

11   about processes to streamline the borrower claim process.

12          So, Your Honor --

13          THE COURT:  Has the Federal Reserve Board been part of

14   the -- has the Federal Reserve Board been part of the

15   discussions?

16          MR. LEE:  Your Honor, I've got at least another page

17   and a half --

18          THE COURT:  Go ahead.

19          MR. LEE:  -- of lists of people that we've spoken to,

20   but, yes, Your Honor, the Federal Reserve Board has been part

21   of those discussions as well.  Unfortunately, Your Honor, I

22   can't at this time report any progress with respect to them.

23   But that is part of the mediation process.

24          So, Your Honor, I think the point that I'd like to

25   make is that we are really proceeding on a dual track.  Either

1    we'll have consensus or we will try to bring about consensus.

2    And if we don't have consensus, I think, Your Honor, we will

3    have set up all of the issues to be adjudicated to the extent

4    that they can't be resolved through negotiation.

5          I think the first gating issue, Your Honor, was the

6    position of the monolines.  There's been an exchange of

7    position papers, hours of discussion about whether those claims

8    are subordinated, the relative priority.  Those discussions are

9    ongoing.  This past week, the debtors filed their complaint

10   against the junior secured noteholders to address the extent

11   and value of their liens.  Your Honor, I think we might be

12   criticized for leaving that a little late in the process, but

13   the objective, Your Honor, was to try to achieve consensus.

14   But that gating issue has now been framed.

15         And as Your Honor is painfully aware, the trial of the

16   RMBS settlement is steamrollering towards a conclusion at the

17   end of this month with a trial.  And if that settlement is not

18   approved then the dynamics of this change will change

19   completely once again because the trustees will then allege

20   billions of dollars of servicing cure claims.  They'll allege

21   600 million dollars of rep and warranty claims.  And we'll be

22   dealing with forty billion plus dollar RMBS claim which we'll

23   have to figure out how to adjudicate.

24         We've also commenced, Your Honor, the adversary

25   proceeding against the securities claimants and that's also

1   scheduled to be heard this month.

2           So, Your Honor, I think we address in our papers all

3   of the Adelphia factors.  And I'm happy to highlight just a

4   couple of points, if I may, and to address some of the argument

5   that occurred at the last exclusivity hearing.

6           So first, Your Honor, the size and complexity of the

7   case.  And I think this really goes to myth number 2 which is

8   that the debtors have a very simple capital structure.  I don't

9   think there's anything simple about the debtors' capital

10  structure at all, Your Honor.  I don't think it's simple where

11  the claims lie.  I don't think it's simple as between which

12  estates the claims exist as between each other.  And I think I

13  touched on just one example of that complexity in relation to

14  the STN motion when we just talked about the claims that sit at

15  the Holdco which is relevant to the motion that Wilmington's

16  going to make next week.

17          I think that the senior noteholders take the position

18  that they're the only fixed claimant at the Holdco.  If the

19  junior secured noteholders are indeed undersecured, they will

20  have a claim that will be twice the size of the creditors, the

21  senior note creditors.  And the different members of the

22  creditors' committee have launched tens of billions of dollars

23  of claims against the Holdco.  So just simply trying to unravel

24  in that in and of itself, I think, really belies the myth that

25  there is something simple about the claims or the capital

RESIDENTIAL CAPITAL, LLC, et al.                    51

1  structure here, Your Honor.

2          The next issue, Your Honor, is have we had sufficient

3  time to negotiate a plan.  Your Honor, I think that we're

4  asking for thirty days here.  And I think that, Your Honor,

5  leads to what really is the third myth in the ad hoc objection.

6  The chaos now will breed consensus.  I think that the notion

7  that we should be terminating exclusivity on what everybody

8  concedes is really the crossroads in this case, we will know

9  within the next thirty days whether we have global peace or

10 consensual elements in a plan or, as Your Honor noted, a

11 litigation trust.  And those are effectively the three

12 outcomes.

13         Filing a plan that's not premised on any one of those

14 three elements but filing a plan that pays the junior secured

15 noteholders post-petition in trust is, in my view, something

16 that will just simply lead to additional cost, additional

17 litigation.  I accept it's a plan confirmation issue, Your

18 Honor.  I think we've teed up the issue but we're just simply

19 filing a plan that no creditor will support.  There is no

20 credit support for a junior secured noteholder post-petition

21 interest plan.

22         So, Your Honor, have we been acting in good faith?  I

23 don't think there's any question that the debtors have

24 demonstrated good faith progress.  I take issue with Mr.

25 Shore's statement that there was a trade for exclusivity.  The

1    fact of the matter is, Your Honor, the debtors were not viewed

2    as the most credible and aggressive party to pursue litigation

3    claims against the AFI by virtue of the AFI PSA.

4            We believe, Your Honor, that the AFI PSA and the STN

5    motion stood in the way of mediation.  We were told that by the

6    creditors.  You need -- the debtors need to be able to pursue

7    that mediation in good faith.  And that requires termination of

8    the PSA but was not the trade.

9            Your Honor, I think the other issue is that we are

10   paying our bills as they become due.  And I think that leads to

11   myth number 4 which is the ad hoc group's assertion that

12   another extension of exclusivity will drive the debtors to the

13   brink of administrative insolvency.  There are too many ifs in

14   the declaration that were submitted for that to occur.  To name

15   just three, the ad hoc group presumes that they are -- the

16   junior secured noteholders are oversecured and we and the

17   committee obviously dispute that.

18           The assumption embedded in that affidavit is that the

19   wind-down costs three years of wind-down costs totaling 877

20   million dollars are, in effect, incurred on the effective date.

21           They also do not consider that the numbers --

22   obviously, the wind-down costs can and hopefully will change or

23   that there will be additional litigation recoveries on assets

24   that belong to the estate.

25           So, Your Honor, I think that the point is that while

1    it may impact in extending this process beyond any time frame

2    that the debtors are comfortable with, will have an impact on

3    the wind-down and the amount of money available for it.  As a

4    practical matter, it does not lead to administrative

5    insolvency.

6           Last night, with the committee's consent, we filed a

7    motion seeking to pay the junior secured noteholders 800

8    million dollars on account of their secured claim.  We ran a

9    scenario based on that payment.  And under that scenario, even

10   assuming that the junior secured noteholders are correct, that

11   they are entitled to post-petition interest, the debtors still

12   have sufficient cash to administer these estates through May

13   of --

14          THE COURT:  What's the significance of the 800

15   million?  They have a two billion dollar claim.

16          MR. LEE:  Well, Your Honor, the significance of 800

17   million really is framed by the debate about the level and

18   quantity to which they're oversecured.  That's the first issue.

19   The second is that a big part of the assets that remain in the

20   estate are the FA/VA loans which are monetized over time.  And

21   so, what the debtors in consultation with the committee decided

22   to do was what amount can we -- that we will comfortably agree

23   we can pay that will really have no material impact on the

24   wind-down or payments to the creditors.  So that was the basis

25   on which it was determined.

RESIDENTIAL CAPITAL, LLC, et al.                    54

1          Your Honor, I think we've also demonstrated reasonable

2    prospects of filing a plan.  I think you've heard the

3    commitment from everybody that a plan will be filed within the

4    next thirty days.

5          THE COURT:  Let me just stop.  If a consensual plan

6    occurs, I think the thirty days is a reasonable time for doing

7    it.  If it's not a consensual plan or entirely consensual plan,

8    if the litigation claims are ultimately going to go into a

9    litigation trust, can you file a plan -- you refer to them as

10   the gating issues but I got the RMBS trial scheduled for May

11   28th.  I've got a mountain of papers were delivered to my

12   chambers this morning on motions in limine.  What's the date

13   for that?  24th or something like, a hearing on the motions in

14   limine.  I think it's the 24th -- the cross-motions for summary

15   judgment on the securities claimants.  So you're probably not

16   going to know in thirty days what the outcome of the RMBS trial

17   is.  That's the reality.  I mean, unless it's so crystal clear

18   to me when the evidence closes and I -- you know, I agreed that

19   there'd be post-trial briefing and argument.  So you're not

20   going to have a result in the RMBS trial.  So how do you file a

21   plan without knowing the outcome?

22         MR. LEE:  Your Honor, my view is that if we don't have

23   an AFI sponsored plan -- we'll call it that -- it makes

24   relatively little sense for the parties that are objecting to

25   the RMBS settlement to continue to object to that.  And

1   equally, I think for a number of reasons, Your Honor, it

2   effectively exposes --

3           THE COURT:  Did you ask Mr. Eckstein that question?  I

4   don't know -- you know.

5           MR. LEE:  What we are actively dealing with is a

6   determination amongst the creditors to divide up a relatively

7   limited amount of cash as between them, I mean, 700 million

8   dollars, but that's not the recoveries that anybody is

9   anticipating in this proceeding absent litigation recovery.  So

10   as a practical matter, it seems to me almost incomprehensible -

11   - or the creditors, the creditors collectively, will want to

12   continue to pursue or object to, in effect, what really amounts

13   to the fixing of a claim.  It seems to me that what we will do

14   with Judge Peck's assistance over the next thirty days is, in

15   essence --

16           THE COURT:  Well, you better do it a lot sooner than

17   the next thirty days.  May 28th I'm starting a trial to

18   determine whether the claim is fixed at 8.7 billion dollars.

19   And my chambers are filled with paper, box after box after box.

20   I am devoting an incredible amount of my personal time and

21   resources to preparing for a trial.  And fine.

22           MR. LEE:  Those discussions --

23           THE COURT:  But I don't want to get to May 27th,

24   Memorial Day, and be told, oh, by the way, we're not -- no one

25   wants to go ahead.

1        MR. LEE:  I appreciate that.  And, Your Honor, going

2   back to the time when Judge Peck was first appointed in this

3   matter to act as mediator, there have been innumerable

4   discussions about what we will do in the event that we are

5   unable to achieve a global consensus with an AFI contribution.

6   I think people's attention, at least for the next very short

7   period of time this week and beginning of next, they're really

8   focused on a purely consensual outcome involving AFI.  But if

9   that doesn't occur, there have been hundreds of man hours,

10  women hours devoted to trying to reach consensus on those

11  issues to --

12        THE COURT:  I don't doubt that.  I know what the

13  exception of the JSNs' papers for this hearing -- it's the

14  first time everybody is sort of -- the papers that were all

15  filed in connection with exclusivity have said, you know, great

16  progress, we're not there but substantial progress, people are

17  proceeding in good faith, et cetera.  And Mr. Kruger's

18  declaration, supplemental declaration that was filed.  I don't

19  doubt that.  I really -- I think everybody's proceeding in good

20  faith.  I hope you get there.

21        MR. LEE:  And, Your Honor, I don't want to leave the

22  Court with the impression that we don't think that the junior

23  secured noteholders are also not acting in good faith.  There

24  have been a number of meetings --

25        THE COURT:  And I'm not accusing them --

1          MR. LEE:  But from the debtors' perspective, we've

2     also had number of very productive discussions with them.  The

3     fact that we don't agree with each other, I don't take any

4     discomfort from that.

5          I think that where we depart from the position that

6     the ad hoc group is their view that they have managed to

7     socialize a confirmable plan.  And I view that as a very

8     strange form of socialism because it pays them in full plus

9     post-petition interest.  And I don't know how you socialize

10    that with creditors particularly in the absence of AFI

11    settlement that you'll concede or anybody's going to be

12    prepared to concede that issue.

13         THE COURT:  Or even with an AFI settlement.  But --

14         MR. LEE:  So, I think, Your Honor -- I think that I'm

15    not going to address the progress we've made.  I think it's

16    apparent.  The unresolved contingency has been hanging out

17    there and we now have a date flashing in front of us, Monday,

18    I'm assuming.

19         So with that, Your Honor, I think I'll rest.  Thank

20    you.

21         THE COURT:  Okay.  All right.  Mr. Eckstein?

22         MR. ECKSTEIN:  Your Honor, I think you correctly noted

23    that I guess with the exception of the JSN submission, there

24    was a fair amount of consensus in terms of how parties in the

25    case believe it makes sense to proceed in the near term.

1          Let me take an opportunity to try to give a little
2    more color here without going too far into the details of
3    what's actually happening.  And I'll try to give the best
4    description I can without testifying.

5          Based upon, I think, all of our collective experience,
6    the mediation that Judge Peck has led, has been an extremely
7    effective mediation.  Judge Peck really has devoted an
8    extraordinary level of energy and time and insight into trying
9    to help corral very disparate parties and issues.  And the
10   capital structure and the multiplicity of issues in this case,
11   are really quite challenging.

12         And I don't think anybody would disagree that
13   tremendous progress has been made.  And I believe that whether
14   or not the efforts that are currently underway and are quite
15   intense lead to a resolution by the end of this week, I don't
16   believe anybody would be able to credibly suggest that the
17   parties have not made tremendous progress.

18         And that's one of the reasons we believe why it makes
19   sense for a further extension of exclusivity, because the fact
20   of the matter is, if we are fortunate enough to actually reach
21   a consensus -- and I would not preclude that possibility at
22   all -- but if we're able to reach that consensus, I don't think
23   there is any realistic suggestion that we are going to be in a
24   position to file a plan and disclosure statement next week.
25   That's not going to happen.

1        We'll be very fortunate if we could actually put
2   together a term sheet that everybody can really sign off on.
3   And Your Honor can imagine the number of parties that truly
4   would have to sign off.  We have many, many constituencies.
5   Because you have -- you're dealing with five or six groups, and
6   they go well beyond members of the creditors' committee.

7        You have multiple holders of securities claims, you
8   have multiple holders of HoldCo notes, you have multiple
9   holders of JSB securities, you have a lot of constituencies out
10  there who are not even necessarily involved in the process that
11  at some point we have to figure out a way to fold them into
12  consensus.  So there's clearly going to be time.

13       And I would honestly say that if we could file a plan
14  within thirty days after reaching an agreement, that would be
15  fantastic.  We're talking about a plan and disclosure statement
16  that's going to have to deal with third party litigations that
17  need to be resolved.  These are not going to be simple.  And
18  we're very conscious of the need to construct a plan that Your
19  Honor will find confirmable.  And so that takes a lot of
20  thought and a lot of work.

21       So one path is we can reach an agreement, in which
22  case we're going to need more time and -- but in that case, I
23  guess we can come back and we can make a more comprehensive
24  presentation.

25       THE COURT:  If you reach an agreement and you --

1          MR. ECKSTEIN:  We will --

2          THE COURT:  -- have a term sheet that's been signed

3    onto by -- maybe not literally, but signed on -- supported by

4    major constituencies, come back and ask me for more time.

5    Okay?

6          MR. ECKSTEIN:  That's the working assumption we have.

7          Now, second scenario is we do not reach a resolution.

8    The question is what's going to happen if we don't reach a

9    resolution.  From our perspective, Your Honor, just throwing

10   documents on the file that say "plan" is not necessarily the

11   right move.  The fact of the matter is, if we don't reach a

12   resolution, the examiner's report will come out.  The

13   examiner's report is, by definition, going to be informative to

14   a lot of issues in the case.

15         And it doesn't necessarily mean that all of the work

16   that has gone into the last four months is for waste.  It may

17   well be that if we don't reach a resolution, the examiner's

18   report will come out and parties will continue to make progress

19   on the negotiation path.  That is not unheard of and it's not

20   impossible.  I don't think it's anybody's first choice right

21   now because it will invariably take time to read and digest and

22   for everybody to go back and sort of restart the process.  It's

23   not easy.

24         But that said, that's one possibility.  Second

25   possibility, as Mr. Lee described is that we will --

RESIDENTIAL CAPITAL, LLC, et al.                    61

1           THE COURT:  You were the one who opposed sixty-four

2    days.  So they -- you know, you negotiated down to thirty days,

3    recognizing that what are you going to get done in thirty days?

4           MR. ECKSTEIN:  I have been conditioned --

5           THE COURT:  You may have -- you're shooting yourself

6    in the foot, but --

7           MR. ECKSTEIN:  -- I've been conditioned to appreciate

8    the fact that we all need to be working with as much intensity

9    as possible, and if we need to come back and update the Court

10   at the beginning of June, so be it.

11          But I appreciate that, Your Honor.  I would personally

12   be just as happy to have a little more flexibility.  But the

13   fact of the matter is that we -- if we don't reach a

14   resolution, the focus really needs to be on whether or not a

15   plan can be confirmed that essentially reflects consensus among

16   creditors, so that you can essentially have the estates emerge

17   from bankruptcy and deal with the litigation later.  But that

18   does require a fair amount of consensus.

19          Your Honor correctly points out, you have the RMBS

20   issues; you have the monoline issues; you have the securities

21   claims issues; you have other issues affecting creditors

22   that -- you have the HoldCo/OpCo issues.  They need to be

23   resolved if we're going to have a confirmable plan.

24          And we're very mindful of the fact that Your Honor

25   needs clarity, for example, on the RMBS trial.  And you have

RESIDENTIAL CAPITAL, LLC, et al.                    62

1    different types of settlements that would need to be

2    considered, and nobody wants to end up with having to -- the

3    need to shift gears is a possibility, and people appreciate

4    that.  There may be real time deadlines to shift gears if we're

5    going to go into a resolution that is different from a global

6    resolution.

7          And the May 28th trial is a significant near-term

8    deadline in terms of how parties are going to deal with whether

9    or not the RMBS claims and the related disputes can be

10   resolved.  But in that case, we would think thirty days is the

11   minimum that people are going to need to work that out and be

12   in a position to have a term sheet for a plan that does not

13   involve a resolution with AFI.

14         So either way, it seemed to us that having some amount

15   of time beyond where we are right now is sort of the obvious

16   conclusion, and that's really without even getting into the JSN

17   issues.  The JSN issues -- I don't want to minimize their

18   issues; I respect their issues.  And they have a right to want

19   to push as hard as possible.  But the reality is, absent a

20   global resolution of this case, there are significant issues

21   with the JSNs.  And to suggest that because we can't reach a

22   resolution of all the issues in the case, that somehow we're

23   going to default to a plan that's going to pay the JSNs in full

24   with post-petition interest, while at the same time they're

25   warning everybody about administrative insolvency, seems to

1  lack credibility from our perspective and doesn't seem like an

2  approach that's going to advance the ball.

3          The JSNs have very, very significant interests in this

4  case.  And regardless of what direction we go in, I'm sure the

5  JSNs are going to be making sure that their rights are

6  protected.  And their rights are very different if we have a

7  settled plan, if we don't have a settled plan.  But we believe

8  that all of the evidence in this case would support a

9  conclusion that at least a thirty-day extension makes sense.

10          And you're correct, Your Honor, to warn that we may

11  find that thirty days may not even be enough.  But right now,

12  it seems like a sensible way station to let us get through

13  where we are right now.

14          THE COURT:  Okay.  Mr. Shore?

15          MR. SHORE:  Thank you, Your Honor.  Chris Shore from

16  White & Case, on behalf of the junior secured notes.  If I may

17  approach, Your Honor, I'm just going to give you a copy of the

18  Nolan declaration, unless you have one.

19          THE COURT:  Thank you.  I gather the Snellenbarger

20  declaration that you've handed me, that's what you're referring

21  to?

22          MR. SHORE:  This is the Nolan declaration.

23          THE COURT:  You just --

24          MR. SHORE:  This is the one done by the debtors.

25          THE COURT:  You just --

1          MR. SHORE:  Oh, did I hand you Snellenbarger?  I'm

2     sorry.

3          THE COURT:  -- handed me Snellenbarger.  I read the

4     Nolan declaration.

5          MR. SHORE:  Okay.  We -- I'll give you a copy.

6          THE COURT:  I read both declarations.  Let me just --

7     with respect to the Snellenbarger declaration, I gather you

8     resolved the issue about filing it -- whether it had to be

9     filed under seal or not.  But you withdrew the motion to file

10    it under seal.  It's been -- I guess the debtor didn't have an

11    objection to it being filed unredacted, correct?

12         MR. SHORE:  That's correct, Your Honor.

13         THE COURT:  All right.  Go ahead.  So I've read both

14    the Snellenbarger and the Nolan declaration.

15         MR. SHORE:  Your Honor, I'm just going to return to a

16    theme I've raised in the past with the Court on a number of

17    different motions and I do see today, as a referendum on what I

18    call good optionality and bad optionality.

19         We're on an exclusivity extension.  The purpose of an

20    exclusivity extension, it seems to us, should be the

21    preservation of good optionality.  Are we maintaining the

22    ability to be as flexible as possible with respect to the

23    filing of a plan as we can be, or is the extension of

24    exclusivity being used as a way of reducing the amount of

25    optionality that exists?

1        What I refer to as bad optionality is the impetus of

2   people, creditors, sometimes debtors, sometimes professionals,

3   to move towards the exit of a case, to keep open the

4   possibility that the case will continue to exist for an

5   indeterminate period of time.  The reason I've handed you Nolan

6   and I'll go through it, bad optionality is terrible in this

7   case.  We do not have the ability to continue to operate with

8   maximum optionality on a confirmation date.  And every day that

9   we move forward we lose good optionality.

10        Potential plan structures that exist get taken off the

11   table.  And I'll go through that.  Fundamentally, the debtors

12   have been of the view in this case and during the exclusive

13   periods that Your Honor has given them, they have gone forward

14   on the premise that people will just avoid bad optionality and

15   want good optionality.  That isn't the case here.

16        There are people who want bad optionality and who will

17   continue to operate to hold bad optionality as long as

18   possible, until someone stays stop.  You have no more -- we

19   don't have a confirmation hearing on February, March, next

20   year, April, August, whenever.  There's going to be resolution

21   of this case within a defined period of time.

22        The only way you set the deadline for bad optionality

23   is to get a confirmation hearing scheduled, to get the process

24   started, get a plan on, set dates for a hearing on a disclosure

25   statement, set solicitation dates.  That's the only tool the

 1  Court has to control bad optionality.

 2           And I think we're at the point, or I wouldn't be up

 3  here objecting, where good optionality is being sacrificed.  We

 4  are clearly at a significant point in the case.  I don't think

 5  the Red Sea analogy is a good one, because someone gets drowned

 6  in that.  But we are in a place where something's going to

 7  happen.  There are a ton of motions on for Your Honor:  the

 8  RMBS, we got the committee motion for standing, the Wilmington

 9  motion for standing, the debtors' complaint against us, the

10  motion for pay-down.  None of that has to do with --

11           THE COURT:  You don't have to remind me about it.

12           MR. SHORE:  -- exclusivity.

13           THE COURT:  I know exactly what I have in front of me.

14           MR. SHORE:  Okay.  All we're talking about today, is

15  have the debtors provided evidence to the Court of cause for a

16  further extension.  And it is law of the case, based upon Your

17  Honor's last comments, that they must show very, very

18  substantial process to getting towards closure.  We don't think

19  they are there.

20           In a pleading filed with the Court back in December of

21  last year, we didn't tell the Court it was an easy capital

22  structure.  We said the plan negotiation isn't that hard.  You

23  need to get people in the room and you need to find out who's

24  here for bad optionality and who's here for good optionality.

25  The debtors have never accepted that proposition and have never

1    accepted the challenge.  They came in and said no, the only

2    time people are going to deal with -- trade bad optionality for

3    good optionality is if we have a mediator appointed.  So they

4    had a mediator appointed.

5            That didn't get people to give up their hope that

6    these cases will go on interminably.  They said no, we need a

7    CRO.  And that was the next exclusivity hearing; emergency

8    hearing held on that on the appointment of a CRO.  And they

9    said that's what's going to get people to go.  And then they

10   said we're going to have mediation --

11           THE COURT:  Mr. Shore, why is it that you're the only

12   one who has filed a piece of paper objecting to an extension of

13   exclusivity?  Every other creditor group has either remained

14   silent or supports the application.

15           MR. SHORE:  Right.  So let's --

16           THE COURT:  Could it be that you represent the one

17   secured group of creditors that is seeking post-petition

18   interest -- and that's fine.  That's your position.  If I have

19   to litigate it I will go ahead and decide it.  But, you know,

20   you don't have the most credibility standing there arguing that

21   there's been no progress, that people are trying to drag this

22   case out interminably.  Okay?  That's where I come from.

23           You said essentially the same thing the last time we

24   had it.  Okay?  The one thing that seems to me has -- and Judge

25   Gerber's Adelphia factors -- and I apply them regularly and

1   expect to do so again -- but there isn't a separate one for

2   whether there's a mediation going on and are parties proceeding

3   in good faith with respect to the mediation.

4           Everybody but you seems to think there's been progress

5   in the mediation.  I'm sorry that you don't seem to think so.

6           MR. SHORE:  Okay.

7           THE COURT:  But, you know, you're not driving this

8   boat.  You're not getting control of this case.

9           MR. SHORE:  Okay, let me --

10          THE COURT:  Simple as that.

11          MR. SHORE:  Let me walk, Your Honor through the Nolan

12  declaration, and I will answer your questions --

13          THE COURT:  I've read the Nolan declaration.

14          MR. SHORE:  I will -- I will --

15          THE COURT:  I read the Snellenbarger declaration.

16          MR. SHORE:  I will answer Your Honor's question as to

17  why we're the only one --

18          THE COURT:  Answer my question now, and then you can

19  walk through the declaration.

20          MR. SHORE:  The only reason why we are the party

21  standing up here objecting to exclusivity is because given the

22  current status of allowance of claims and assertion of claims

23  at various entities, we are the only entity who feels the pain

24  of the continued administrative burn.  Our view in these cases

25  is comm --

1          THE COURT:  How is that?  I mean, if you're

2   oversecured and your clients are going to be entitled to post-

3   petition interest, and the unsecureds, they're the ones who are

4   going to feel the pain if the case becomes administratively

5   insolvent, that's -- I made this comment before.  I mean,

6   you're coming forward as the champion of the unsecureds when

7   you're saying you're oversecured.

8          MR. SHORE:  I am coming as the champion of people with

9   allowed claims right now, who have certain recoveries, whose

10  recoveries are not dependent upon an Ally contribution.  And

11  let me just, if I can, explain why that is the case.

12         On the Nolan declaration in the last page, his

13  chart -- and we appreciate that the debtors have now made

14  public disclosure of this information -- there is 3.463 billion

15  dollars in cash as of February 15th, which is earning Treasury

16  rates.  The next two entries, there is 1,620,000,000 of assets,

17  that haven't been liquidated yet.  And if you look down to the

18  lines 9 and 10, there is approximately 1.3 billion dollars of

19  administrative expense that's going to have to be paid, both on

20  account of liquidation that's occurred or future liquidation of

21  that 1.6 billion dollars of unsold assets.

22         Our claim, that which the debtors are conceding now,

23  and it's been a moving target a bit, 1.5 billion dollars.  It

24  is the debtors' position right now that of our claim, if you go

25  down to line 13, 712 million dollars of our claim is an

1  unsecured deficiency claim.  That is a claim which is asserted

2  at debtors which have no or materially no allowed claims --

3  unsecured claims against them.

4          So to the extent that there are debtors out there who

5  have assets, any of that cash or the unsold assets that are

6  sitting at those debtor estates, whether we are secured or

7  unsecured, that value flows to us.  Those are not Ally claims.

8  Those are the cash, the contracts, the securities.  That's what

9  sits there.

10         The committee doesn't represent a single creditor who

11  now holds an allowed claim at an OpCo level.

12         THE COURT:  The committee represents all unsecured

13  creditors.  Whether there's a member of the committee that fits

14  that category or not is a different important issue.  But the

15  committee represents all unsecured creditors in the estate.

16         MR. SHORE:  Okay.

17         THE COURT:  You disagree with that?

18         MR. SHORE:  I do not disagree.  But you get to that

19  very difficult issue of whether committee members understand

20  that their fiduciary duties run exactly that way, or whether

21  they are voting in their own economic interest as --

22         THE COURT:  I guess if we don't get to --

23         MR. SHORE:  -- they're represented.

24         THE COURT:  -- consensual plan and I go ahead and

25  decide the issue of whether you're oversecured or undersecured

1    if you wind up undersecured, go talk to Mr. Masumoto as to

2    whether your client can get appointed to a committee.

3              MR. SHORE:  I understand that.

4              Now, line 10 -- and this just clarifies something that

5    Mr. Lee just said with respect to that.  873 million in future

6    admin expenses.  That number, in our view, is at risk.  I don't

7    think that contains a lot of the admin expense associated with

8    the Plan B scenario.  So your numbers may run off quicker.

9              But more important, the idea is that we don't have

10   to -- I think he said, we don't have to incur all that

11   administrative expense, because we may come to a different

12   conclusion.  But if you change that number, you have to change

13   the unsold asset value.  In other words, if the debtors take

14   the position we're not going to incur more administrative

15   expense to liquidate collateral, you can't leave the collateral

16   value up at the top.

17             So those numbers -- those numbers right there which

18   the debtors have on an accrual basis -- not a cash basis -- are

19   what they are.  So if you look at the line "August '13" or the

20   column "August '13", at August '13 -- and we're just talking

21   about what plan structures are -- the debtors show that they

22   will have value to satisfy the 1.15 billion dollar secured

23   claim they say exists.  They say they will have value to pay

24   the -- or the incremental secured recovery.  That's our

25   deficiency claim.

1     People can argue about how much of that deficiency

2  claim gets paid.  I don't think anybody's going to argue that

3  we don't get a material piece of that as an unsecured recovery,

4  even if we're unsecured.  Then you have post-petition interest

5  and you have 120 left.  Let's talk about a plan structure.

6     If there were plan structure on that date, there would

7  be 120 million dollars of value to distribute, unless one of

8  two things happened.  Administrative claimants compromise their

9  claims, agree to a treatment less than payment in cash in full

10  at or about the effective date of a plan, or secured creditors

11  were required to get less than what they contend is paid, with

12  no reserve.  So it doesn't have to be a resolution of the

13  secured creditors' claim, but there better be a reserve there

14  for the secured creditors' claim.

15     So there's 120 million dollars of value.  That is,

16  Your Honor, under the debtors' numbers.  Your Honor's

17  conducting an RMBS trial to determine whether it's 8.7, 8.9,

18  9.1, 2.2 billion dollars of unsecured claim.  That's what's

19  left over to distribute, ex of the Ally claims.  And that's not

20  just for the RMBS claimants.  That's for the RMBS claimants;

21  that's for the senior unsecured notes; that's for the

22  monolines; that's everybody else.

23     So unsecured cred -- these numbers aren't -- when you

24  get to December, you've got thirty -- which is probably the

25  earliest anybody's talking about getting a plan up for

1  confirmation.  If we're really talking about a Plan B, one that

2  doesn't just wait around for Ally to settle, there's thirty-one

3  million dollars of value to distribute.  That's not cash.

4  That's the unsold assets that are there.  That's assets that

5  are going to be monetized over two or three years.  That's the

6  value to distribute ex of the Ally claims.

7          So when I said -- and Mr. Eckstein corrected me on

8  there isn't much to distribute to unsecured creditors, I'm just

9  talking about a plan structure.  When we get to December, the

10  plan structure, that optionality, the good optionality, the

11  optionality that pays admin claimants in full and at least

12  reserves the secured creditors' claim, goes away in December.

13  And the longer we wait to get a plan on file and set days, the

14  harder it's going to be to maintain that optionality.

15          And quite frankly, the unsecured creditors of these

16  cases have seen that.  That's why they're fighting for the

17  control of the Ally case.  And they are indifferent as -- I'll

18  explain this -- they're indifferent to the accrual of admin

19  expenses and secured claims, because at the end of the day,

20  they're just hitting for a home run.

21          If you're holding out for a twenty-five billion dollar

22  claim against Ally, what do you care if in the meantime the

23  secured creditors aren't getting paid in full or reserved, or

24  the professionals aren't getting paid.  And that's the problem

25  we have right now.  We're just -- every day we go by we lose

1    optionality on getting out and the plan structures that can

2    exist to get out.  And quite frankly, those who don't want good

3    optionality --

4            THE COURT:  Mr. Shore, you say you've socialized your

5    plan.  Do you have any support among any other creditor groups

6    for a plan that would provide the JSNs with principal plus --

7    principal, pre-petition interest, post-petition interest?

8            MR. SHORE:  Let me clarify, first of all.  That's not

9    the proposal on the table.  I don't know why Mr. Lee said that.

10   The term sheet that's on the table would be a give-up of

11   interest in exchange for some kind of closure from creditors,

12   or a reserve of the claims.  That's it.  That's the optionality

13   we're trying to preserve.  We wait much longer, there's not

14   going to be the ability to reserve for the claims or pay the

15   admin claimants in full.

16           THE COURT:  Reserve for which claims?

17           MR. SHORE:  Reserve for the post-petition interest.

18           THE COURT:  Ah.  That's -- do you have any support

19   from any creditor constituents in the case for a plan that

20   would reserve post-petition interest for the JSNs?

21           MR. SHORE:  If I can reveal what's been said in

22   mediation, I'm more than happy to --

23           THE COURT:  I don't want to know what's been said in

24   mediation.

25           MR. SHORE:  Okay.  Well, then I can't answer your

RESIDENTIAL CAPITAL, LLC, et al.                    75

1  question, Your Honor.

2          THE COURT:  Well, you say in your papers you've

3  socialized a structure.

4          MR. SHORE:  There is a structure.  There are

5  structures.  There may be multiple structures.  The problem is,

6  the longer we wait, the more of those structures go away.

7          THE COURT:  All right, thank you, Mr. Shore.

8          Anybody else want to be heard?

9          MS. NORA:  Yes, Your Honor.

10          THE COURT:  Go ahead.

11          MS. NORA:  Wendy Alison Nora, with respect to my

12  objection.

13          THE COURT:  Go ahead, Ms. Nora.

14          MS. NORA:  Thank you, Your Honor.  I just wanted to

15  let the Court know that the way that the homeowners are being

16  treated in this case is simply not at all fair.  And I'm giving

17  notice to the committee of unsecured creditors that I believe

18  that they're breaching their fiduciary duty to the homeowner

19  claimants.  And at this time, I'm going to withdraw my

20  objection to the thirty-day extension.  But I just want to be

21  on record that there is simply unfair treatment being directed

22  towards the homeowner claimants, and it will be addressed at

23  another point.

24          THE COURT:  All right, thank you.  Anything else, Ms.

25  Nora?

1        MS. NORA:  No, thank you, Your Honor.

2        THE COURT:  Okay.  Mr. Lee?

3        MR. LEE:  I just would like to address Ms. Nora's

4   comment briefly.  The --

5        THE COURT:  Go ahead.

6        MR. LEE:  -- the committee and the debtors actually

7   spent an enormous amount of time trying to think about ways to

8   streamline borrower claims and to make the process easier.  And

9   in every plan construct we've discussed that's been one of the

10  principal objectives.  And there has been very, very active

11  participation on the part of the borrower representative and

12  borrower counsel, both in the mediation sessions and outside of

13  it as well.  So it really is at the forefront of everybody's

14  mind and a plan construct.

15       It's obviously, Your Honor, far more relevant in a

16  consensual plan construct when there's actually something to

17  distribute to -- in a more fulsome way.

18       THE COURT:  The only thing I would say in addition to

19  that, Mr. Lee; I've been giving a lot of thought to the FRB

20  motion, but I'm not rushing to decide it.  You can conclude

21  what you want from that.

22       MR. LEE:  Thank you, Your Honor.

23       THE COURT:  Okay.  Because I think that's an important

24  issue with respect to borrowers.

25       MR. LEE:  It is.  And it is a significant part of any

1   construct that involves overall global settlement and peace,

2   Your Honor.

3           THE COURT:  Okay.  Anybody else want to be heard?  All

4   right.

5           Pending before the Court is the debtors' motion for

6   entry of an order further extending their exclusive periods to

7   file a Chapter 11 plan and solicit acceptances thereof.  The

8   motion is at ECF 3485.  It's supported by the declaration and

9   supplemental declaration of Mr. Kruger.  The ad hoc group of

10  junior secured noteholders filed an objection -- that's at

11  3553 -- supported by the declaration of Reid Snellenbarger.

12          Wendy Alison Nora also filed an objection, but she's

13  just indicated on the record that she's withdrawing her

14  objection as to a thirty-day extension.  The creditors'

15  committee filed a statement -- that's at 3569 -- as did

16  Wilmington Trust, 3568, supporting the motion.  The debtors

17  filed an omnibus reply.  It's at ECF 3593.  And that does have

18  the supplemental declaration of Mr. Kruger.  It's at 3594.  And

19  the declaration of William Nolan we've just been looking at is

20  at 3595.  If I didn't say, the Snellenbarger declaration, which

21  the Court did consider, is at 3551.

22          The burden of proving cause to extend exclusivity is

23  on the moving party, in this case, the debtors.  The decision

24  to extend exclusivity for cause is a fact-specific inquiry, and

25  the Court has broad discretion in granting such requests.  See

1    In re Borders Group, Inc. 460 B.R. 818, 821-22 (Bankr. S.D.N.Y.

2    2011).  The purpose of the Bankruptcy Code's exclusivity period

3    is to allow the debtor flexibility to negotiate with its

4    creditors.  See In re Ames Department Store, 1991 WL 259036

5    (S.D.N.Y. Nov. 25, 1991).

6             In In re Adelphia Communications Corp., 352 B.R. 578,

7    587 (Bankr. S.D.N.Y. 2006), Judge Gerber laid out nine factors

8    to consider in determining whether cause exists to extend or

9    terminate exclusivity.  The factors laid out by Judge Gerber in

10   Adelphia are not always relevant in each case and may not be

11   given equal weight.  Depending on the facts and circumstances

12   of a given case, certain factors will be much more important in

13   a court's decision whether to extend or terminate exclusivity.

14            At least three of the Adelphia factors weigh heavily

15   in favor of granting the request for an extension of

16   exclusivity here:  the size and complexity of the case; the

17   existence of good-faith progress towards reorganization; and

18   whether there are any unresolved -- whether any unresolved

19   contingencies exist.

20            As the colloquy during today's hearing has focused on,

21   the case really is at a significant moment.  Moment may not be

22   the right word to apply to it -- significant period of time.

23   There is an enormous amount, as I've said, that's on the

24   Court's docket over the next month, at least, what parties have

25   referred to as gating issues in the case.  Obviously, the

1   decision to extend or deny an extension or shorten exclusivity

2   is a fact-specific inquiry.  And Judge Gerber's nine factors

3   are certainly appropriate in the circumstances of Adelphia, and

4   I've applied them in many other cases, including here.

5          What's not specifically identified, I guess you could

6   say, is it's factor (c) of Judge Gerber's list, the existence

7   of good-faith progress toward reorganization.  In this case, it

8   has to be placed in the context of the mediation that my

9   colleague, Judge James Peck, has been conducting in this case.

10   The current order extends the period of mediation through May

11   31st, I believe is the current deadline.  There may be

12   circumstances that would merit extending it beyond that, but I

13   think as the parties have recognized in their papers and in

14   court today, Judge Peck has been working tirelessly to try and,

15   if possible, reach agreement on a consensual plan, and if not a

16   fully consensual plan, to see whether there can be consensus of

17   something less, whether it leaves Ally claims to be resolved at

18   a later time in another context or not.

19          I think that the ongoing mediation is the single most

20   important factor supporting the continuation -- the extension

21   of exclusivity in this case.  It may be incorrect, and I may

22   have used this term before, that I was concerned about -- that

23   the case would go into free-fall if various creditor

24   constituencies started filing plans.  I don't think it would be

25   productive at this stage.  I think all of the effort needs to

1  be concentrated on the negotiations between the parties, with

2  or without the mediator, but certainly with the aid of the

3  mediator, to see if a consensual plan can be reached and if not

4  an entirely consensual plan, then one that would create a

5  structure for what would be a confirmable -- is likely to be a

6  confirmable plan.

7           I'm very concerned about -- and I've expressed this

8  before -- about the costs of this case.  A lot has been

9  accomplished so far, but a lot really remains to be

10  accomplished.  If unsecured creditors are going to get any

11  significant recovery, there is an enormous amount of work that

12  needs to be done.

13           So I am -- and I expressed this to Mr. Eckstein -- the

14  parties, the committee and the debtors, and supported by

15  Wilmington Trust, have agreed on a thirty-day extension of

16  exclusivity.  That falls right at the end of the RMBS trial,

17  one of the gating issues.  And unless the parties, with a

18  global resolution or something less than that, resolve the

19  issue, that case is going forward on May 28th.  I've made clear

20  I'm not going to continue the trial.

21           I'll go forward with the other gating issues that have

22  been described, the issue about whether the claims of the

23  securities holders are subordinated or not.  You just filed

24  your case against the JSNs.  And I'm sure we'll have a pre-

25  trial, initial case conference soon.  You should be working

1   with Mr. Shore.  You can't -- I mean, all the efforts in the

2   next week ought to be devoted to seeing whether a consensual

3   plan can be reached.  But if not, you better figure out how

4   you're going to go ahead and litigate that case.  It's

5   obviously an important case.

6          For the reasons I've explained, the debtors' motion to

7   extend exclusivity for thirty days, both the period for filing

8   a plan and solicitation, is granted.

9          MR. LEE:  Thank you, Your Honor.

10         I understand from chambers, Your Honor, that you

11  wanted to have a status report on the cash collateral --

12         THE COURT:  I do.

13         MR. LEE:  -- motion.  I'll turn the podium over to Mr.

14  Goren.

15         THE COURT:  Mr. Goren?

16         MR. GOREN:  Thank you, Your Honor.  Todd Goren,

17  Morrison & Foerster, on behalf of the debtors.

18         We've been working closely with the junior secured

19  bonds and the committee to give the junior secured bonds as

20  much information as they need.  We've had calls or meetings on

21  a daily or every-other-day basis to try and give them out --

22  information outside of the formal discovery process, as to

23  what -- in terms of the go-forward expense allocation that

24  everybody believes is reasonable.  That is continuing to

25  proceed.  There's no resolution yet.  We're still awaiting a

RESIDENTIAL CAPITAL, LLC, et al.                                    82

1   counter-proposal from the junior secured bonds.

2            In terms of the scheduling for the trial, I think the

3   main issue is whether we believe May 14th is going to need to

4   be an evidentiary hearing, in which case Your Honor has

5   indicated that it would not proceed on that date, and it would

6   need to proceed on a later date.

7            The last communication with the junior secured bonds

8   on the issue, they indicated -- and I'm sure they'll fill in

9   now whether they still believe this to be the case -- that they

10  didn't see many evidentiary issues that would need to be

11  resolved.  And so they were hopeful it could go forward on the

12  14th.  That's certainly our position and we think these are

13  really legal issues.  The facts are more or less undisputed, I

14  think.

15           They did raise, for the first time in their objection

16  which was filed last night, some issues with our -- with the

17  way discovery's been proceeding.  That was the first we had

18  heard of there being issues.  So there's been no meet-and-

19  confer on that.  We need to have that done.

20           So at this point, I'll let either the committee or the

21  junior secured bonds or if Ally has anything to say, step in.

22  At this point, I'm assuming we're proceeding on the 14th unless

23  I'm told that we believe there needs to be an evidentiary

24  hearing, in which case, we'll ask for a short bridge extension

25  of the use of cash collateral until that -- for that to be

1  accommodated.

2          THE COURT:  All right.  Anybody from the committee

3  want to be heard?

4          MR. ZIDE:  Stephen Zide from Kramer Levin, on behalf

5  of the committee.

6          At this point, Your Honor, we don't think an

7  evidentiary hearing is needed.  We haven't heard from the two

8  other objectors, the JSNs or AFI.  We're going to rely on the

9  debtors' evidence that they're putting forward in connection

10 with our limited objection.

11         To the extent that either AFI or the JSNs do want to

12 put forward a witness, we would seek the opportunity to depose

13 that witness, and if necessary, cross that witness at the

14 hearing, although at this point, we don't know if they're

15 putting anyone forward.

16         THE COURT:  All right.  Mr. Shore are you going to --

17         MR. SHORE:  Chris Shore from White & Case, on behalf

18 of the junior secured notes.  I don't have an answer for you

19 yet, Your Honor, as to whether it needs to be an evidentiary

20 hearing.  And let me explain a little bit.

21         For the last extension we had agreed to extend the old

22 cash collateral order for a period to allow us discovery.  And

23 in Your Honor's order -- bridge order, the debtors were

24 required to produce their witnesses by last Friday.  It didn't

25 happen.

1          We had our objection deadline last night at 11:59.

2     The debtors were adamant about that deadline.  So we filed the

3     objection.  We took Mr. Puntus' deposition.  They had offered

4     him last Friday for three hours, limited.  So we took him last

5     night.  And we have scheduled the other declarant, Ms. Horner's

6     deposition for Wednesday.  I don't know whether there's going

7     to be an evidentiary issue or not.

8          I will raise an issue with the Court and maybe we can

9     get there with the debtors.  But the headline number that the

10    debtors have been using in connection with cash collateral is a

11    thirty-million-dollar number of disposition costs.  Your Honor

12    may have noticed that.  It turns out that I -- well, the

13    witness last night didn't know, and he was their 30(b)(6)

14    witness -- one of two.  And we still haven't gotten an answer

15    of what's happening with expenses that were accrued during the

16    operation of the last cash collateral order and when they're

17    going to be paid.

18         It sounded like the debtors were saying that if they

19    accrued expenses during the last cash collateral order period,

20    they were seeking authority to get those expenses paid under

21    the new cash collateral order, which I don't even have a

22    quantum.  If the debtors' position is that there're 200 million

23    dollars of expenses that they want to charge to the junior

24    secured notes on a go-forward basis, based upon expenses that

25    were accrued under the old order after the use of cash

1    collateral under that order is terminated, we may have an

2    evidentiary hearing.  I just got to work through that with

3    them.

4           As I said before, whether it's thirty million or

5    twenty million or some other number, we may be able to get

6    that.  But if, in fact, it is a significantly larger number, we

7    may have an issue.

8           So I apologize.  I'm not in a position to respond as

9    to whether it's going to be an evidentiary hearing or not.  I

10   will endeavor to advise the Court either by letter or we can

11   set up a call after we complete the deposition on Wednesday of

12   their other 30(b)(6).

13          THE COURT:  I'm out of town Thursday and Friday.

14          MR. SHORE:  Okay.

15          THE COURT:  I'm not here.

16          MR. SHORE:  All right.  So we'll get back to you as

17   soon as we can on that.

18          THE COURT:  Okay.

19          MR. SHORE:  Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Shore.

21          Anybody else want to be heard?

22          All right.  Mr. Lee, anything else for today?

23          MS. NORA:  Nothing further, Your Honor.  Thank you.

24          THE COURT:  All right, we're adjourned.  Thank you.

25       (Whereupon these proceedings were concluded at 11:57 AM)

1

2                                  I N D E X

3

4                                R U L I N G S

5   DESCRIPTION                                    PAGE    LINE

6   Debtors' motion to extend exclusivity for       81       8

7   thirty days is granted

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a true and accurate record of the proceedings.



_____

LISA BAR-LEIB (CET**D 486)

AAERT Certified Electronic Transcriber

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  May 8, 2013