Hearing Date and Time:  May 14, 2013 at 10:00 a.m. (Prevailing Eastern Time)

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

      and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, et al., | Case No. 12-12020 (MG) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL OBJECTION OF AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER TO PERMIT THE DEBTORS TO CONTINUE USING CASH COLLATERAL**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

      The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"),[1] by and

through its undersigned counsel, hereby files this supplement (the "Supplemental Objection") to

---

[1] The Ad Hoc Group is comprised of certain entities that hold or manage holders of 9.625% Junior Secured Guaranteed Notes due 2015 issued under that certain Indenture dated as of June 6, 2008 (the "Junior Secured Notes").  The Junior Secured Noteholders' claim is now equal to approximately 116.1% of the face amount of the bonds and is currently increasing by virtue of the accrual of post-petition interest at the rate of approximately $250 million per year.

its Objection[2] to the Motion[3] of the debtors (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") for entry of an order permitting the Debtors to use Cash Collateral. As and for its Supplemental Objection to the Motion, the Ad Hoc Group respectfully states as follows: [4]

## PRELIMINARY STATEMENT

By this Supplemental Objection, the Ad Hoc Group seeks (i) to provide the Court with relevant evidence with respect to the Motion that was first obtained from the Debtors after May 6, 2013, the objecton deadline with respect to the Motion (the "Objection Deadline"), and (ii) to advise the Court that the Ad Hoc Group believes that the parties and the Court can and should proceed with the cash collateral hearing scheduled for May 14, 2013 on a non-evidentiary basis and, only if necessary, schedule a later evidentiary hearing.

After the filing of the Objection, there have been three material developments regarding discovery on the Motion: (i) the Ad Hoc Group obtained a transcript of the deposition of Marc Puntus (that deposition was completed on the evening of the Objection Deadline); (ii) the Debtors produced, at 11:30 p.m. on the day after the Objection Deadline, a draft schedule listing the detailed breakdown of each of the categories of expenses for which the Debtors are seeking

---

[2] Objection of Ad Hoc Group to Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3625] (the "Objection"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

[3] Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3374] (the "Motion"). In support of the Motion, the Debtors submitted two declarations – Declaration of Marc D. Puntus in Support of Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3375] and Declaration of Jill Horner in Support of Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3394] (the "Horner Declaration") -- as well as a forecast. Notice of Filing of Exhibit 2 to Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3437] (the "Forecast").

[4] Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties [Docket No. 491] (as subsequently amended, the "Final Cash Collateral Order").

the use of Cash Collateral (the "Expense Schedule"), and (iii) the Debtors produced Jill Horner, the Chief Financial Executive of the Debtors, for a depositon on May 8th. These three developments, all of which should have occurred by no later than May 3rd,[5] lay bare a key reason why the Debtors persist in their mistaken assertions that the Junior Secured Notes are becoming increasingly undersecured as these cases progress, necessitating this Supplemental Objection.

As set forth below, the Ad Hoc Group is prepared to consent to the use of Cash Collateral to fund approximately $30.4 million in projected administrative expenses, subject to the terms and conditions as more fully set forth below. The Ad Hoc Group continues to object, however, to the use of Cash Collateral for any other purpose, including the Debtors' proposal to pay $█ million in other accrued administrative expenses, consisting of amounts that the Debtors' witnesses admitted bear no relation to the preservation or disposition of Collateral.

## SUPPLEMENTAL OBJECTION

In the Proposed Order, the Debtors seek to use Cash Collateral on a prospective basis for four uses: (i) paying the anticipated future costs of liquidating Unsold Collateral, (ii) paying prior accrued expenses most of which do not relate to disposition of Collateral, (iii) funding a Carve Out in cash, and (iv) funding a certain portion of adequate protection payments to Ally. The Debtors did not quantify in the Motion, however, the exact amount of the expenses sought in the Motion, and in discussions with counsel maintained that cash collateral usage was a "thirty million dollar issue." Discovery has now shown that it is a ███████████ million dollar issue, and the Court should understand the full impact of exactly what the Debtors are asking in connection with the Motion.

---

[5] See Fifth Stipulation and Order Amending the AFI DIP and Cash Collateral Order [Docket No. 3534].

The Debtors maintain in the Motion that the Junior Secured Noteholders will receive adequate protection liens in return for use of the Cash Collateral while at the same time saying that the adequate protection liens are worthless because the use of the Cash Collateral will not constitute a "diminution in value."  In this regard, the Debtors' proposed adequate protection package is illusory and an attempted end run around section 506(c) of the Bankruptcy Code and their prior waiver thereof pursuant to the final, non-appealable, consensual cash collateral order, which the Junior Secured Noteholders have relied upon to allow the Debtors to use our Collateral and gave concessions to obtain.  But the Debtors seek to go beyond what is provided under the Bankruptcy Code even <u>absent</u> a section 506(c) waiver, which is to use the Collateral <u>not</u> for the benefit of the Junior Secured Notes.  And they are doing so even though there exists other cash in the estate.  And, as as set forth herein, the Debtors are seeking authority from this Court, without the consent of any Junior Secured Noteholder, to use Cash Collateral to transform as much as ▉ million in existing secured claims of the Junior Secured Notes into general unsecured claims against the Debtors.  The Court cannot grant that relief within the bounds of the U.S. Constitution, much less the factual record created by the Debtors in discovery.  There is no legal basis to support this blatant gamesmanship.

1. **<u>The Debtors Do Not Need to Use Any Cash Collateral</u>**.  Ms. Jill Horner is the Debtors' current Chief Financial Executive.  The Debtors produced Ms. Horner for a deposition on May 8th and, at that deposition, designated her as a corporate representative of the Debtors pursuant to Fed. R. Bankr. P. 7030 and Fed. R. Civ. P. 30(b)(6) on six topics requested by the Ad Hoc Group.[6]  The Debtors specifically designated Ms. Horner to testify as to "Each Debtor's basis for determining that its estate requires the use of Cash Collateral during the Cash Collateral

---

[6] A copy of the relevant excerpts from the transcript of Ms. Horner's deposition ("<u>Horner Dep.</u>") is attached hereto as <u>Ex.</u> 2.  A copy of the relevant excerpts from the transcript of Mr. Puntus' deposition ("<u>Puntus Dep.</u>") is attached hereto as <u>Ex.</u> 3.

Extension Period." Horner Dep. Tr. at 6:8-23 (Ms. Horner and Debtors' counsel confirm that Ms. Horner is designated to so testify). In response to questions regarding that topic, Ms. Horner authenticated a schedule of accounts, prepared by counsel and produced by the Debtors in discovery, which reflects that as of February 28, 2013, the Debtors had approximately $▮ million in cash which they believe is not subject to any lien. Id. at 55:11 – 56:13. Ms Horner further testified that she believed that the Debtors' current aggregate cash balances were consistent with that figure. Id. at 65:24 – 66:6. Given the amount of unencumbered cash, Ms. Horner freely admitted that the Debtors have sufficient unencumbered cash to pay all of the expenses that are the subject of the Motion without resort to the Cash Collateral. Id. at 69:13 – 70:9 ("Q: Is it your belief that that amount of [unencumbered] cash is sufficient to pay all of the expenses, the full quantum of expenses that are projected both accrued and projected over the, over the forecast period…A: Right…"). Mr. Puntus, the Debtors' lead financial advisor, agreed with that fact in his deposition. See Puntus Dep. at 15:8-11 ("Technically I believe we have sufficient unencumbered cash today to administer that collateral if we chose to do so."). The Debtors have provided no evidence that would establish a need to use Cash Collateral.

**2. The Ad Hoc Group Consents to the Use of Approximately $30.4 Million of Cash Collateral to Fund Costs of Liquidating Unsold Collateral.** Having now taken Ms. Horner's deposition and understood her analysis, the Ad Hoc Group consents to the use of $30.4 million of Cash Collateral to monetize Unsold Collateral on the terms proposed by the Debtors in their Motion (i.e., that the Junior Secured Notes receive adequate protection liens to the extent of the diminution in value of their collateral), provided that such expenditures must be made pursuant to a detailed budget which allocates expenses to the particular categories of expense identified in the Horner Declaration, and the rights of the Junior Secured Notes are otherwise reserved. The

Ad Hoc Group will submit a proposed form of order prior to the commencement of the hearing, blacklined against the Debtors' proposed form of order, which reflects necessary changes.

The Ad Hoc Group's consent, however, should not be construed as a validation of the Debtors' legal justifications set forth in the Motion or to the factual record they have attempted to create on their request to spend $30.4 million of Cash Collateral. The evidence that the Debtors have offered with respect to the $30.4 million request is clearly deficient to establish that $30.4 million correctly reflects the direct costs to dispose of Unsold Collateral.[7] Nonetheless, as stated, the Ad Hoc Group consents to payment of these expenses.

The Ad Hoc Group cannot consent to any use of Cash Collateral beyond $30.4 million as the estates careen toward administrative insolvency. Nor does the Ad Hoc Group consent to the Debtors' back-door attempt to circumvent the section 506(c) waiver by asserting there is no diminution in value to invalidate the afore-granted adequate protection replacement liens. Said another way, the Debtors are attempting to use the Cash Collateral <u>without</u> compensation, which is contrary to the Bankruptcy Code and the Constitution.

**3. The Ad Hoc Group Objects to the Payment, Pursuant to a Prospective Cash Collateral Order, of $▇ Million in Unpaid Administrative Expenses that the Debtors Accrued Prior to the Termination of the Final Cash Collateral Order.** To a great extent, the present dispute over Cash Collateral usage has nothing to do with $30.4 million of *future* costs of preserving and collecting Unsold Collateral. The present dispute is over *prior* accrued expenses

---

[7] First, Ms. Horner's expense analysis was performed on a consolidated basis only and therefore does not match any of the Debtors' proposed uses of their Cash Collateral to its projected expenses -- a fact that could adversely impact the Junior Secured Notes if one or more estates is, or becomes, administratively insolvent.. See Horner Dep. Tr. at 36:11-22. Second, Ms. Horner's analysis does not map actual expenses to particular assets or classes of assets – meaning that the Debtors could spend more collecting a class of assets than what is actually received from doing so. See Horner Dep. Tr. at 74:16 – 76:25 ("Q: So, for example, if you had – can you look at line ten, 'Other,' ▇ Can you testify under oath that there aren't more than $▇ million of costs in your 30.4 that are attributable to collection of those assets? A: No, I cannot."). Third, certain expenses detailed in Ms. Horner's analysis fall far short of constituting actual direct expenses of maintaining Collateral. See Horner Dep. Tr. at 83:5-23; Horner Dep. Tr. at 79:23 – 80; Horner Dep. Tr. at 64:3-8.

almost the entirety of which have nothing to do with the Collateral, which the Debtors seek to pay without any evidence of actual adequate protection. To the contrary, the Debtors have asserted the position that the adequate protection package with respect to prior expenses has zero value.

In the Debtors' midnight production of the Expense Schedule, the Debtors make clear that they are now seeking access to Cash Collateral to pay $▬ million of unpaid administrative expenses accrued prior to the entry of the proposed cash collateral order. See Ex. 1 at Column A.

What accounts for that $▬ million? It is a collection of professional fees, Consent Order compliance costs, employee expense, interest expense, and other administrative expenses that the Debtors incurred during the term of the Final Cash Collateral Order, but that will be unpaid prior to the expiry of that order. See Ex. 1 (Expense Schedule). Those expenses do not, however, represent the Debtors' view of direct costs of preserving Unsold Collateral. Instead, they represent the Debtors' prior allocations of all of their administrative expenses in these cases pursuant to an arbitrary methodology in which particular groups of assets of the Debtors, including the Collateral, were allocated a proportional amount of total estate expenses based upon a ratio of book value of assets. Horner Dep. Tr. at 43:8 – 44:15. In sum, Exhibit 1 sets forth an arbitrary allocation of a static fraction of the overall prior administrative expenses in these cases, including general expenses of case administration, not costs of collateral preservation.

Ms. Horner had little to say with respect to any of these prior expenses. Because she became CFE in February 2013, she was not involved in developing the methodology for allocating expense that results in the $▬ million figure. Id. at 43:2 – 44:13. Nor was she

involved in, or responsible for, the booking of those expenses as they were incurred. Id. at 43:2-11. In fact, after becoming CFE and in consultation with her advisors, she determined that the direct cost allocation she used in her Declaration was the "right" way to determine what costs and expenses actually relate to the preservation of Unsold Collateral. Id. at 47:18 – 48:13. Ms. Horner did express the view that she thought that a portion of the $▮ million in prior expenses could be considered the direct costs of preserving Collateral, but had not done any direct cost analysis and could only swear that $▮ of the $▮ million actually constituted a direct expense of preserving Collateral. Id. at 106:16 – 108:8. Ms. Horner further admitted that she could perform an analysis of direct costs embedded in the $▮ million, but it was not a "priorit[y]." Horner Dep. Tr. at 48:21 – 49:9 ("Q: …the $▮ million that is listed in column A of Horner Number 2, has there been any attempt, as far as you know, to perform an allocation of expenses based on the direct expense methodology? A: Not for column A, no. Q: But that's an analysis you could do; right? A: We could do. Q: Why haven't you done it? A: Where it is on the priorities."). Ms. Horner finally testified that she could not swear that payment of any of the $▮ million would actually benefit the Junior Secured Noteholders. Horner Dep. Tr. at 62:21 – 63:2 ("Q: Going back to Horner Number 2, column A, can you tell me how payment of the $▮ million in column A would benefit the junior secured notes? A: No, I cannot.").

    This Court cannot simply authorize the payment of the $▮ million out of Cash Collateral subject to the Debtors' illusory offer of adequate protection. As a practical matter, the Ad Hoc Group does not consent to the payment of any of that sum in the prospective cash collateral order, and the Debtors have to meet their burden of proving that there will be adequate protection for any payments out of Cash Collateral. Simply put, there will have to be an evidentiary hearing with respect to the bona fides of $▮ million in the absence of the Court

ruling against the Debtors as a matter of law. There are, however, two monumental legal deficiencies to the Debtors' request to pay the $▮ million (even beyond the fact that the sum can be paid out of Unencumbered Cash) that fail to create a triable issue of fact. <u>First</u>, the $▮ million represents expenses that have been accrued under the Final Cash Collateral Order and are already the subject of the Debtors' pending JSN Adversary Proceeding. At Count II of the Debtors' complaint in that proceeding, the Debtors seek a determination that payment of expenses accrued under the prior order using Cash Collateral are not, in fact, entitled to adequate protection liens: "the JSNs are not entitled to an adequate protection replacement lien because (a) there has been no diminution in the value of the Defendants' collateral during the pendency of these Chapter 11 Cases and (b) the Debtors' use of cash collateral for the limited purposes set forth in the Debtors' cash collateral motion will not result in a diminution in the value of the Defendants' collateral." JSN Adversary Proceeding [Docket No. 1] at ¶ 63. There is simply no basis for the Debtors to place a legal issue before the Court in an adversary proceeding and then to seek relief in a motion that not only overlaps, but seemingly contradicts, the declaratory relief sought. Whatever rights the Debtors may have under the prior order, they do not need to have those rights modified or expanded under the proposed prospective order.

<u>Second</u>, and more critically, the JSN Adversary Proceeding and the testimony of the two Debtor deponents exposes the extremely misleading nature of the Motion. Throughout the Motion, the Debtors insist that the Junior Secured Noteholders will receive "adequate protection" for any usage of Cash Collateral in the form of replacement liens and therefore "the Junior Secured Noteholders will not be harmed by this proposal." Motion at 21. In fact, however, the Debtors propose to harm the Junior Secured Noteholders by converting at least $▮ million in

secured claims to $███ million in prepetition, unsecured deficiency claims as they spend Cash Collateral without providing actual adequate protection.

The Motion and the Debtors' proposed order certainly pay lip service to the constitutional requirement that the Debtors' provide adequate protection for the diminution in the value of the Collateral caused by the use of Cash Collateral. The fundamental issue here is how the Debtors purport to define "diminution" and "value." In the JSN Adversary Proceeding, the Debtors have sought a determination that the Collateral had "minimal" or "fire sale" value at the petition date. See JSN Adversary Proceeding [Docket No. 1] ¶¶ 38-41, 63. They then allege that all of the "value" created after that date, in the form of billions of dollars of proceeds from post-petition Collateral dispositions, was accretive to the estates as a whole, not to the Junior Secured Notes. Based on those allegations, they seek a determination from this Court that there has been no "diminution" in the fire sale value of the Collateral under the Final Cash Collateral Order, despite their having spent hundreds of millions of dollars of Cash Collateral. In sum, the Debtors' theory is that if the fire sale value of the Collateral was $1.0 billion on the petition date, and the Collateral is now worth $1.5 billion, no adequate protection liens will arise until the Debtors spend more than $500 million in Cash Collateral. That financial chicanery, we believe, is the reason why the Debtors presented a schedule to the Court which reflects a view that the secured recoveries of the Junior Secured Noteholders have actually decreased over time while the value of the Collateral has risen. See Declaration of William J. Nolan in Support of Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 3595] at Ex. 1. In short, while the Debtors "offer" adequate protection liens in their proposed form of order, those liens are entirely

hypothetical in the Debtors' world unless and until the aggregate value of the Unsold Collateral and Cash Collateral diminishes to the Debtors' fire sale value.

The Ad Hoc Group sought to explore this misplaced theory by seeking discovery as to the Debtors' contentions on adequate protection and Collateral valuation. Both Mr. Puntus and Ms. Horner were proffered as representatives of the Debtors on their "basis for pursuing non-censensual use of Cash Collateral." Both were specifically asked about the adequate protection package being offered by the Debtors, particularly the provision of adequate protection liens to compensate for the "diminution" in value of Collateral as referenced in paragraph 9 of the proposed order. Ms. Horner professed that she had no understanding at all of the concept of "adequate protection." Horner Dep. Tr. at 14:19 – 15:4 ("Q: Have you ever heard the concept of adequate protection? A: I did. Q: …what have you heard about what adequate protection is? A: I have no understanding what it is."). Mr. Puntus, a seasoned restructuring advisor, was familiar with the concept of adequate protection but was not able to answer the question as to exactly what "diminution" the Debtors were offering to protect with liens. See Puntus Dep. Tr. at 76:18-25 ("Q: Over what period? Diminution over what period under this order? A: I haven't read the whole order. I don't know what it says…I don't know for sure.").

Both witnesses were also proffered on the issue of "Valuation of the Junior Secured Notes Collateral." Ms. Horner could provide no information at all as to valuation. See Horner Dep. Tr. at 114:4-9 ("Q: And again, even though Mr. Engelhardt designated you as a 30(b)(6) witness on the topic of valuation of the junior secured noteholders' collateral, you have no information to provide me on that. A: I do not."). Nor could Mr. Puntus. See Puntus Dep. Tr. 10:18-21 ("…I am not today prepared to have an extensive and detailed discussion about the hows, wheres and whys of the value of each component of [the JSN] collateral"). Moreover, the

Debtors produced no documents with respect to any valuations of the Collateral, despite a specific request on that topic. See Ex. 4 (Notice of Deposition and Request for Production of Documents).

Based upon positions that the Debtors are taking in their pleadings, which are without support in any law that we have seen, the Ad Hoc Group simply cannot consent to the spending of any Cash Collateral for the $▇ million in accrued but unpaid costs without obtaining real, not hypothetical, adequate protection liens that attach to real, not hypothetical, assets. Nor can the Debtors obtain non-consensual usage thereof on the record that they have presented to the Court which lacks any competent evidence of the value of the Unsold Collateral or a clear statement of what constitutes "diminution" under the proposed order. Thus, any authorization to use Cash Collateral to pay any portion of the $▇ million at this time would be both contrary to the Bankruptcy Code and unconstitutional.[8]

Again, the Junior Secured Noteholders have no desire to see administrative claimants go unpaid in these cases. That is exactly why the Ad Hoc Group has been steadfast in its efforts to move these cases forward towards conclusion as rapidly as possible. But secured creditors cannot be asked to trade away their legal rights merely to insure the recoveries of creditors of lower priorities. The Debtors currently have the Unencumbered Cash to pay the $▇ million of accrued expenses, and they can and should do so.

---

[8] See In re Townley, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment. Before the plan is confirmed, that property right is protected by the requirement of Code section 361 ." (citation omitted); Lend Lease v. Briggs Transp. Co. (In re Briggs Transp. Co.), 780 F.2d 1339 , 1342 (8th Cir. 1985) ("By providing a creditor with a means of protecting its interest through [the Code]'s adequate protection requirement, the competing interests of the debtor's need to reorganize and the secured creditor's entitlement to constitutional protection of its bargained-for property interests are reconciled."). See also Dewsnup v. Timm, 502 U.S. 410, 419 (1992) (expressing Court's concern with an involuntary reduction of the amount of a creditor's lien).

**4. The Rights of the Junior Secured Notes with Respect to the Use of $▆ Million of Cash Collateral to Pay Interest on the Ally Revolver Must be Completely Reserved.** The Debtors' Expense Schedule shows that the Debtors seek to use $▆ million of Cash Collateral through October 31, 2013 to pay interest on the Ally Revolver, which is currently outstanding in the amount of $747.1 million. To the extent that the Debtors strategically decide not to pay off the Ally Revolver, as they are presently capable of doing, and instead determine to use Cash Collateral to pay interest, such use of Cash Collateral must receive meaningful replacement liens, and the issues of whether the Junior Secured Notes received any benefit therefrom and whether there has been a diminution in the value of the Junior Secured Notes' interest in such Cash Collateral as a consequence thereof must be completely reserved.

Beyond the fact that the Debtors do not need to use Cash Collateral to pay that interest expense, see supra at 1, Ms. Horner's testimony as the Debtors' corporate designee completely undermines the Debtors' statement in the Motion that the proposed use of Cash Collateral, including to pay interest expense, are "solely to preserve or enhance the value of the Adequate Protection Parties' collateral." Motion ¶¶ 3, 38, 39. When asked whether paying interest to Ally "benefits the Junior Secured Noteholders at all," Ms. Horner testified "I can't express an opinion." Horner Dep. Tr. 19:5-10; see also Horner Dep. Tr.at 106:6-15 ("Q: . . . If you will look at column C [of the Expense Schedule]. You are expressing no view one way or the other as to whether . . . line items eight or ten [including interest on the Ally Revolver] are necessary to preserve the value of and to dispose of the collateral securing the junior secured notes? . . . A: No, I do not have an opinion on if they are adding value to the junior secured notes.").

Ms. Horner's admissions of "no benefit" are not surprising given the Debtors' positions taken in other contexts with respect to expenses of loans from Ally. In the Debtors' Motion for

Entry of an Order Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Partially Satisfy Certain Secured Claims [Docket No. 3626] at ¶ 34, the Debtors acknowledge that they have the wherewithal to escrow all amounts due to Ally under the Ally Revolver, but have determined not to pay down Ally "while the broader case issues with AFI are still being resolved." In other words, the Debtors can pay down the Ally Revolver, but they want to reserve repayment for purposes of liigation against Ally and shift the burden of the corresponding interest payments to the Junior Secured Notes. In another pleading filed with this Court – the Debtors' recent adversary proceeding against Junior Secured Noteholders[9] (the "JSN Adversary Proceeding") – the Debtors maintain that none of the Debtors' claims against Ally constitute Unsold Collateral. See Complaint to Determine Extent of Liens and For Declaratory Judgment [Docket No. 3592] ¶ 56 ("Accordingly, the JSNs cannot assert a lien on any of the recoveries resulting from any potential avoidance actions."). The Debtors are clearly taking inconsistent positions here, on the one hand seeking to use Cash Collateral to pay interest on the Ally Revolver as a "cost" of preserving the Unsold Collateral, and on the other hand refusing to pay down the Ally Revolver to preserve rights in a litigation which they contend is not Unsold Collateral.

**5. There is No Need, At This Time, to Cash-Fund Carve Out Expenses with Cash Collateral.** Per the Debtors' Expense Schedule, the Debtors have now detailed that they propose to use $███ million of Cash Collateral to fund a Carve Out prospectively, on the basis that such amount represents the Junior Secured Noteholders' allocable share of the $25 million carve-out contained in the prior Final Cash Collateral Order. See Ex. 1 (Expense Schedule) at Column C, Line 10; Horner Dep. at 20:19 – 21:8. Given the Debtors' current balances of Unencumbered Cash, the professionals' expenses that are the subject of the Carve Out are simply not at risk at this time. Contrary to the Debtors' contentions, there is no requirement that the Carve Out be

---

[9] Adversary Case No. 13-01343.

prefunded upon termination of the prior Final Order.  Instead, the Carve Out provides a $█ million priority to Cash Collateral above that of the Junior Secured Notes to the extent there is otherwise insufficient unencumbered value to pay the Carve Out obligations.  While such outcome is possible, given that the Debtors presently have sufficient Unencumbered Cash to fund their obligations, it is premature to fund the Carve Out now.

**CONCLUSION**

WHEREFORE, for the reasons set forth in the Objection and in this Supplemental Objection, the Ad Hoc Group requests that the Court deny the Motion and grant such further relief as it may deem appropriate.

Dated: May 11, 2013
      New York, New York

Respectfully submitted,

By: /s/ J. Christopher Shore
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore (JS – 6031)
Harrison L. Denman (HD – 1945)

    and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group of Junior Secured Noteholders