## I. SUMMARY OF THE EXAMINER'S PRINCIPAL FINDINGS AND CONCLUSIONS

## A. APPOINTMENT OF THE EXAMINER AND ISSUES PRESENTED IN THE REPORT

Arthur J. Gonzalez, Esq. was appointed as Examiner[1] in the Chapter 11 Cases on July 3, 2012. Shortly after his appointment, the Examiner retained Chadbourne & Parke LLP and Mesirow Financial Consulting LLC, and such retentions were subsequently approved by appropriate orders of the Bankruptcy Court.

The Examiner Order was entered as a result of the Examiner Motion, filed on June 4, 2012 by Berkshire Hathaway, which sought the appointment of an examiner to conduct an investigation pursuant to Bankruptcy Code section 1104(c) of, among other things: (1) prepetition transactions and agreements between the Debtors and AFI and its affiliates, including the sale, transfer, or dividend of assets or legal entities, the extension of credit, the contribution of capital, and any claims or causes of action arising therefrom; (2) the decision of the Debtors and AFI to commence the Chapter 11 Cases and pursue a sale of substantially all assets; (3) the negotiation and entry into the Plan Support Agreements, the AFI DIP Financing Agreement, and the stalking horse asset purchase agreement with AFI; (4) the recruitment, compensation, and indemnification of the Independent Directors of ResCap; (5) all state law or bankruptcy claims or causes of action of the Debtors against current or former directors and officers of the Debtors, and against AFI and its affiliates and insiders, including current and former directors, officers, and shareholders; (6) all state law or bankruptcy claims or causes of action that were subject to being released or barred under the terms of the Plan Term Sheet; and (7) any other matters as determined by an examiner and approved by the Bankruptcy Court.[2] The Bankruptcy Court entered the Examiner Order on June 28, 2012, directing the U.S. Trustee to appoint an examiner in the Chapter 11 Cases. On July 3, 2012, the Bankruptcy Court entered the Examiner Approval Order approving the appointment of the Examiner.

On July 27, 2012, the Bankruptcy Court entered the Examiner Scope Approval Order and, on August 6, 2012, the Examiner filed the Examiner Work Plan. As set forth in the Examiner Scope Approval Order and the Examiner Work Plan, after review of the Committee Rule 2004 Order and discussions with various parties in interest, the Examiner determined (with the Bankruptcy Court's approval) that, at a minimum, he would examine the following in the Report:

> a. all material prepetition transactions and all material verbal or written agreements or contracts between or among the Debtors on the one hand and any one or more of Ally Financial Inc., f/k/a GMAC LLC, and any of its current and former, direct and indirect affiliates and subsidiaries (collectively, "AFI"), Cerberus Capital Management, L.P. and any of its current and former direct and indirect affiliates and subsidiaries including Cerberus FIM, LLC,

---

[1]   Unless otherwise indicated, the capitalized terms used in the Report are intended to have the meanings set forth in the Glossary. *See* Appendix I.

[2]   Examiner Motion, Ex. A, at 2.

Cerberus FIM Investors LLC, and FIM Holdings LLC (collectively, "Cerberus") and/or Ally Bank, a commercial state non-member bank chartered under the laws of the State of Utah (f/k/a GMAC Bank) ("Ally Bank") on the other hand including (i) material agreements concerning transfers of cash, assets, property, stock, contracts, or other items of value including any servicing agreements, repurchase transactions, exchange offers, hedging arrangements, derivative agreements or contracts, swap agreements or contracts, or foreign exchange agreements or contracts, (ii) any payments, dividends or capital contributions, (iii) any extension of loans or lines of credit including any factoring arrangements, (iv) any debt, or liens related thereto, or the transfer, assignment, repayment or forgiveness of such debt, (v) any claims and all payments made on account of such claims, and (vi) any transfers of cash, assets, property, stock, contracts, or other items of value (collectively, the "Prepetition Transactions and Agreements");[3]

b.  the negotiation and entry into any plan sponsor, plan support, or settlement agreement, the debtor-in-possession financing with AFI, and the stalking horse asset purchase agreement with AFI, and any servicing agreement with Ally Bank (collectively, the "Postpetition Transactions and Agreements");

c.  (i) the activities of the Debtors' officers and board of directors (including any subcommittee thereof) concerning (A) the Prepetition Transactions and Agreements, (B) the Postpetition Transactions and Agreements, and (C) the investigation of the validity of claims against AFI, and (ii) the recruitment, compensation and indemnification of the Debtors' officers and the members of the Debtors' board of directors (including any subcommittee thereof);

d.  the corporate relationships between or among the Debtors, AFI, Cerberus and/or Ally Bank and the conduct of each of these entities in connection with the Debtors' decisions (i) to file (or to refrain from filing, or delaying the filing of) voluntary petitions under Chapter 11 of the United States Bankruptcy Code, (ii) to pursue (or refrain from pursuing) a sale of substantially all of their assets, and (iii) to enter into the Prepetition Transactions and Agreements and the Postpetition Transactions and Agreements;

_____

[3]  The Examiner's Investigation of certain of the Debtors' entry into and performance under the "Consent Order," "DOJ/AG Settlement" and "CMP," each as defined and described in paragraphs 86 through 90 of the of the "Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petition and First Day Pleadings," dated May 14, 2012 will be limited to the propriety of the allocation of obligations as among the Debtors and AFI under the "Consent Order," "DOJ/AG Settlement" and "CMP." (footnote appears in original).

e. all state and federal law claims or causes of action of the Debtors against current or former directors and officers of the Debtors, and against AFI and/or its insiders including current and former directors, officers, and shareholders;

f. all state and federal law claims or causes of action the Debtors propose to release or to be released as part of their plan including (i) preference and fraudulent transfer claims, (ii) equitable subordination claims, (iii) alter ego and veil piercing claims, (iv) debt recharacterization claims, (v) constructive trust and unjust enrichment claims, (vi) breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, (vii) securities law claims, and (viii) claims held by third parties, i.e., parties that are not affiliates of the Debtors, against current and former directors and officers of the Debtors and against AFI and its insiders including current and former directors, officers, and shareholders; and in respect of the claims identified in subclause (viii) of this paragraph f, the Examiner will (A) investigate the merits of such claims, (B) analyze the sufficiency of the consideration to be provided for such third party releases, and (C) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising from such claims, but the Examiner will not attempt to independently quantify such damages;

g. the value of the releases contemplated by the Debtors including the releases by the Debtors' estates of all claims against current or former directors and officers of the Debtors, and against AFI and its insiders including current and former directors, officers, and shareholders, and the proposed releases by third parties of claims against AFI; and

h. other matters affecting the Debtors' assets, liabilities, and financial condition including all intercompany claims and the Debtors' solvency, capital adequacy and ability to pay debts as such debts become due at various dates prior to the Petition Date.[4]

## B. ORGANIZATION OF THE REPORT

The Report consists of nine Sections and an Appendix.[5] Section I summarizes the Examiner's principal findings and conclusions. Section II presents the manner in which the Investigation was conducted. Section III contains a chronological presentation of transactions and events relevant to the Investigation, and the Examiner's conclusions with respect to certain postpetition transactions and agreements. Section IV addresses the activities of the Debtors' directors and officers. Section V describes certain material Affiliate Transactions.

---

[4]   Examiner Scope Approval Order, Ex. A, at 3–5.

[5]   The Report is issued in a number of volumes and totals over 1,800 pages.

Section VI examines ResCap's financial condition, including solvency, over time. Section VII analyzes Estate Causes of Action implicated by the Affiliate Transactions and the relationship and course of dealing between ResCap, AFI, Ally Bank, and Cerberus. Section VIII discusses the Third-Party Claims. Section IX evaluates whether the proposed consideration under the now-terminated AFI Settlement and Plan Sponsor Agreement would have been sufficient for Bankruptcy Court approval of the proposed releases.

## C. THE INVESTIGATION

As requested in the Examiner Motion and agreed upon by the parties in interest, the scope of the Investigation was exceptionally broad. The Examiner was asked to investigate the entire course of conduct and all material intercompany dealings involving ResCap, AFI, Ally Bank, and Cerberus over a period of almost a decade. In the years preceding the Chapter 11 Cases, there were dozens of Affiliate Transactions between the Debtors on the one hand and AFI, Ally Bank, Cerberus, and other affiliates of AFI on the other hand. These included discrete, one-time transactions, ongoing intercompany business arrangements, and various types of capital support including, but not limited to, asset purchases and sales, service agreements, swap agreements, financings, capital contributions, and dividends. These transactions included transfers involving many billions of dollars of value. The Examiner investigated the activities of the Debtors' directors and officers in connection with all of those transactions spanning the entire period subject to the Investigation.

The Examiner's Professionals gathered and analyzed almost nine million pages of documents, produced by twenty-three different parties.[6] The Examiner's Professionals conducted ninety-nine formal interviews (one of which was under oath) of eighty-three witnesses, including witnesses from ResCap, AFI, Ally Bank, Cerberus, and various counsel and advisors. In addition, the Examiner and/or his Professionals met on approximately sixty-six occasions with interested parties, including representatives of the Debtors, AFI, the Creditors' Committee, certain individual members of the Creditors' Committee, the Steering Committee Group, the Ad Hoc Group of Junior Secured Noteholders, and Berkshire Hathaway. The Examiner and/or his Professionals met with all parties that requested a meeting. The Examiner's Professionals also had an ongoing dialogue with the Debtors, their advisors, and various other parties to address pertinent topics and information requests. Finally, the Examiner solicited and reviewed multiple written submissions from at least a dozen parties with respect to Estate and Third-Party Claims.

The Examiner was also asked to investigate the negotiation and entry into any plan sponsor, plan support, or settlement agreement. The Investigation of proposed postpetition transactions was fact-intensive, and involved a review of the process underlying multiple settlement negotiations. In addition to the interviews, the Examiner's Counsel monitored the pending litigation regarding the RMBS Trust Settlement Agreements, attended the Rule 2004 depositions of twelve witnesses, and reviewed the transcripts of the depositions of at least six other witnesses.

---

[6] For a detailed accounting of discovery conducted in furtherance of the Investigation, including document requests and subpoenas, interviews, and meetings with interested parties, see Section II.

As required by the Examiner Scope Approval Order, the Examiner considered and evaluated a wide array of potential state and federal law claims and Causes of Action. These claims and Causes of Action were proposed to be released pursuant to various agreements entered into in connection with the Debtors' Chapter 11 Cases, including a proposed broad and nonconsensual release of claims against AFI and its affiliates held by third parties. At the outset of the Investigation, many of these parties had not developed well-articulated positions on the merits of the Third-Party Claims or the potential damages that might be attributable to those claims. The briefing process instituted by the Examiner moved the process forward significantly, but left the Examiner to assess widely disparate views on a number of major issues. While the Examiner Scope Approval Order provided that the Examiner would not attempt to quantify independently the potential amount of damages attributable to Third-Party Claims, the Examiner did consider the legal merits of the Third-Party Claims.

The Examiner's review of the transactions required the Examiner's Professionals to perform discrete quantitative financial, accounting, tax, economic, and valuation analyses, as well as qualitative analyses regarding ResCap's strategy, decision making, and governance. The Examiner's Financial Advisors analyzed the financial condition of ResCap and its principal subsidiaries throughout the relevant time period, and assessed balance sheet solvency, adequacy of capital, and ability to pay debts. The Examiner's Professionals also determined whether reasonably equivalent value was exchanged in numerous transactions and analyzed damages related to potential claims.

In short, as observed by the Bankruptcy Court, the Investigation was "an enormous undertaking."[7] The Report contains dozens of discrete factual findings and legal conclusions. This summary does not attempt to describe each and every finding and conclusion in turn, nor is it a comprehensive mini-report. Instead, the summary is intended to serve only as a broad and general overview of the Examiner's *principal* findings and conclusions. The Examiner cautions that many of the issues discussed in the Report are complex and not conducive to summary treatment. Any reader wishing to obtain a thorough understanding of the Investigation and the Examiner's analytical processes, and the reasoning supporting the conclusions in the Report (including a discussion of inherent uncertainties and qualifications), should review the Report in its entirety and should not rely on this summary as a substitute for doing so.

## D. EXAMINER'S METHODOLOGY FOR PRESENTATION OF FINDINGS AND CONCLUSIONS

The Examiner believes it is important for the Report to use a generally consistent formulation of his findings and conclusions. The Examiner considered presenting his analyses in terms of whether legal claims would likely survive motions to dismiss or motions for summary judgment. However, given the circumstances of the Examiner's appointment and the status of the cases, and having performed an extensive factual investigation, the Examiner believes his conclusions should reflect his best and considered view on the ultimate merits of each issue examined in the Report. Accordingly, with the exception of the Examiner's conclusions with

---

7    Order Denying Oral Application By Ally Financial Inc. To Clawback Documents Produced By Cerberus To The Examiner [Docket No. 3516] at 2.

respect to evidentiary support for Third-Party Claims,[8] the Examiner's conclusions are generally presented in the Report in a uniform fashion in the following manner:

---

EXHIBIT I.D—1
**Examiner's Legal Conclusions and Factual Findings**

| Legal Conclusions | Factual Findings |
| --- | --- |
| 1. The Examiner concludes it is likely that the [claim or defense] would prevail. | 1. The Examiner concludes that the evidence supports the proposition that . . . |
| 2. While a close question, the Examiner concludes it is more likely than not that the [claim or defense] would prevail. | 2. While a close question, the Examiner concludes it is more likely than not that a court would find . . . |
| 3. While a close question, the Examiner concludes it is more likely than not that the [claim or defense] would not prevail. | 3. While a close question, the Examiner concludes it is more likely than not that a court would not find . . . |
| 4. The Examiner concludes it is unlikely that the [claim or defense] would prevail. | 4. The Examiner concludes that the evidence does not support the proposition that . . . |

---

The Examiner's conclusions with respect to evidentiary support for Third-Party Claims are generally presented in the following manner:

---

EXHIBIT I.D—2
**Examiner's Conclusions Regarding Evidentiary Support for Third-Party Claims**

**Evidentiary Support**

1. The Investigation has revealed significant evidence that supports the Third-Party Claimants' assertions that . . .

2. The Investigation has revealed evidence that supports the Third-Party Claimants' assertions that . . .

3. The Investigation has revealed no evidence that supports the Third-Party Claimants' assertions that . . .

4. The Investigation has revealed evidence that is inconsistent with the Third-Party Claimants' assertions that . . .

---

The methodology described above is meant to provide some appropriate level of consistency to an inherently imprecise exercise. Given the complex array of underlying evidence and data and the difficult and sometimes unsettled legal issues raised by many of the claims analyzed in the Report, the Examiner's conclusions are by necessity nuanced. The Examiner does not express his conclusions with

---

[8]    The Examiner did not have the benefit of comprehensive discovery in connection with the investigation of Third-Party Claims. Accordingly, the Examiner's conclusions with respect to evidentiary support for Third-Party Claims are presented using a different continuum.

the expectation that readers will assign probabilities or apply mathematical models to the Examiner's individual findings and conclusions, and the Examiner does not endorse any effort to do so. Except where specifically noted, the Examiner does not attempt to identify the extent to which his various findings or conclusions may be interdependent. The Examiner does not reach definitive conclusions regarding every issue considered in the Report because some issues examined are not susceptible to definitive conclusions under the circumstances. The Report does contain the Examiner's considered assessment, following a legal and factual review, of all the significant issues presented by the Examiner Scope Approval Order.

## E. EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING ESTATE CAUSES OF ACTION

This Section summarizes the most significant potential Estate Causes of Action the Examiner investigated and presents the Examiner's principal conclusions regarding: (1) Estate Causes of Action that the Examiner believes have significant potential value; and (2) certain Estate Causes of Action that have been identified by parties in interest as having significant importance, but which the Examiner concludes are unlikely to succeed. The Examiner's full analysis of material Estate Causes of Action, including Causes of Action that are not reviewed in this summary, is contained in Section VII.[9]

Certain of the Estate Causes of Action rely on the Examiner's conclusions regarding financial condition. As summarized later in this Section, and as set forth in Section VI of the Report, the Examiner concludes that the evidence supports the proposition that ResCap, RFC, and GMAC Mortgage each: (1) was balance sheet solvent on May 4, 2005, the date that AFI announced the initial capitalization of ResCap, and was balance sheet insolvent from December 31, 2007 through the Petition Date; (2) was adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was left with unreasonably small capital from August 15, 2007 through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

### 1. Claims Of GMAC Mortgage And ResCap Relating To The MMLPSA, Pipeline Swap, MSR Swap, And Broker Agreement

GMAC Mortgage historically focused on purchasing and originating conforming loans with the intent to sell them to government-sponsored enterprises (GSEs) while retaining the associated mortgage servicing rights (MSRs). Since 2001, a portion of GMAC Mortgage's production had involved the use of Old GMAC Bank and, subsequently, Ally Bank as a funding source. From and after 2007, Ally Bank came to account for an increasing proportion of GMAC Mortgage's loan production. By January 1, 2009, almost all of the production was being channeled through Ally Bank, which by then was also retaining title to MSRs on loans sold to Fannie Mae and Freddie Mac (but not to Ginnie Mae).

---

[9]    The Report discusses all material transactions identified by the parties in interest, or independently by the Examiner, that arguably give rise to colorable Causes of Action, including those that the Examiner believes are unlikely to succeed. Given the volume of transactions in which one or more of the Debtors have been involved, the Investigation only addresses transactions of sufficient monetary value to be deemed material by the Examiner.

GMAC Mortgage and the Bank (either Old GMAC Bank or Ally Bank, depending on the time period) were parties to six principal agreements related to this business in effect at various times from 2001 forward:

- The Correspondent Agreement, which governed GMAC Mortgage's sale of loans to the Bank;

- The Master Mortgage Loan Purchase and Sale Agreement (MMLPSA), which governed GMAC Mortgage's purchase of loans from the Bank;

- The Pipeline Swap, a derivative transaction under which GMAC Mortgage assumed certain risks and rewards related to changes in the market value of certain Bank loans;

- The Broker Agreement, by which GMAC Mortgage ceased originating loans (in all but a few states) and instead began brokering loans to Ally Bank;

- The Original Servicing Agreement pursuant to which GMAC Mortgage serviced mortgage loans for the Bank; and

- The MSR Swap, another derivative transaction, under which GMAC Mortgage assumed certain risks and rewards related to the fluctuation in the value of Ally Bank's MSR portfolio.[10]

These agreements, particularly the MMLPSA, Pipeline Swap, Correspondent Agreement, and Broker Agreement, were interconnected. Certain of these agreements, particularly the MSR Swap and the Pipeline Swap, have attracted particular suspicion and concern that they were cogs in a scheme to impose losses on GMAC Mortgage/ResCap while insulating Ally Bank. The evidence of the history and purpose of these transactions, however, does not support this theory. Moreover, the Examiner's review and analysis of the pertinent accounting and financial records leads the Examiner to conclude that GMAC Mortgage was near break-even on the Pipeline Swap, and "in the money" on the MSR Swap and the market hedges relating to the two Swaps. In assessing the entirety of the economics of these transactions, GMAC Mortgage received a net benefit.

Nevertheless, the implementation of these agreements gives rise to potential claims on behalf of the Estates of GMAC Mortgage and/or ResCap, as set forth below.

### a. Misallocation Of Net Revenues On Loans Brokered By GMAC Mortgage

In 2008, ResCap and Ally Bank personnel undertook the "Brokering Consumer Loans to Bank" project. The project culminated in an arrangement implemented in January 2009 under which GMAC Mortgage brokered its loan production to Ally Bank, which originated (funded) the loans. GMAC Mortgage provided a hedge for the loans while they were held by the Bank through the Pipeline Swap. When GMAC Mortgage was ready to securitize the loans, it purchased them from the Bank under the MMLPSA. In the course of the Brokering Consumer

---

[10] For the Examiner's full analysis of these transactions, see Sections V.B and VII.L.2.

Loans to Bank project, GMAC Mortgage and Ally Bank agreed to a specific allocation of revenues on the brokered loans. Specifically, GMAC Mortgage was to retain the gain on sale and the P&L (profit and loss) impact of origination fees and expenses for loans brokered to Ally Bank, while Ally Bank would have no gains or losses, earning only net interest carry. This allocation mirrored the parties' historical approach to revenue allocation under the MMLPSA and Pipeline Swap, in which GMAC Mortgage received the gain on sale and, in return, accepted representation and warranty and other risks, while Ally Bank provided conduit funding, earning coupon interest.

From January 1, 2009 to July 31, 2009, the Brokering Consumer Loans to Bank project proceeded as agreed, with Ally Bank realizing only net interest carry on the loans. On August 1, 2009, Ally Bank implemented an accounting change to convert to fair-value accounting. As a consequence of this accounting change, beginning August 1, 2009, Ally Bank began keeping a significant portion of the gain on sale and other revenues that had been allocated, while still assuming no representation and warranty exposure or hedge exposure, and paying a below-market, cost-based broker fee to GMAC Mortgage. The parties appear not to have recognized at the time that the fair-value election would have this effect (and, in fact, apparently did not comprehend that the revenue reallocation had occurred until December 2011). In any event, there was no agreement to this reallocation of revenues, and the Examiner has determined it is likely that Ally Bank's August 1, 2009 conversion to fair-value accounting resulted in a straightforward breach by Ally Bank of the parties' agreement, even if the breach was unintentional.

After the misallocation issue came to light in December 2011, the January 1, 2009 to July 31, 2009 allocation of revenues (the allocation the parties had agreed to) was labeled an "accounting error." In March 2012, GMAC Mortgage, at the insistence of Ally Bank, paid Ally Bank approximately $51.4 million on account of payments received during that period, including interest.

The Examiner concludes it is likely that GMAC Mortgage would prevail on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is therefore entitled to payment of the revenues misallocated to Ally Bank from and after August 1, 2009. Accordingly, it is likely that GMAC Mortgage would prevail on a claim for: (1) payment of approximately $469.1 million in additional revenues (net of expenses including the below-market broker fee) that it would have received had the parties' agreed-upon revenue allocation been respected from August 1, 2009 to April 30, 2012; and (2) recovery of the approximately $51.4 million paid to Ally Bank in March 2012 as a matter of contractual right.

The misallocation of brokered loan revenues involves breach of the MMLPSA (which is governed by Delaware law) and the Pipeline Swap (which is governed by New York law), and the parties' agreement about the combined effect of those contracts. New York law would call for the application of interest at the rate of 9% per annum. Under Delaware law, the applicable rate would be 5% above the Federal Reserve discount rate. Precisely which rate a court would apply in these circumstances is unclear, but the pertinent rate would be applied to the $51.4 million component repaid to Ally Bank from the repayment date, and to the $469.1 million in revenues retained by the Bank for the period August 1, 2009 through April 30, 2012, from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage (i.e., the sale date of the pertinent loan).

### b. *Failure To Pay The Value Of Purchased MSRs And Correspondent Loan MSRs To GMAC Mortgage Under The MSR Swap*

Under the MSR Swap, Ally Bank paid to GMAC Mortgage, among other things, the value of MSRs arising from Bank-originated loans upon their initial capitalization, but never did so for MSRs purchased separately or for MSRs arising from correspondent loans the Bank purchased. The Bank recognized a gain when it capitalized MSRs arising from Bank-originated loans, but did not do so for purchased MSRs or for MSRs arising from purchased loans (since it paid to acquire these MSRs). However, the language of the MSR Swap as written applied to the value of *all* MSRs owned by Ally Bank as reported on its accounting general ledger, regardless of whether the Bank recognized a gain when it recorded the MSR on its balance sheet.

GMAC Mortgage has a potential claim that Ally Bank breached the MSR Swap's requirements by failing to pay to GMAC Mortgage the value of purchased MSRs and newly recognized MSRs arising from purchased loans. The value of such MSRs not paid by Ally Bank to GMAC Mortgage is approximately $1.725 billion, approximately $1.3 billion of which relates to the period after the 2009 Bank Transaction. The Examiner concludes that, while it is a close question, it is more likely than not that the MSR Swap would be reformed under the doctrine of mistake to require payment to GMAC Mortgage only for MSRs arising from loans originated by Ally Bank, and not for the $1.725 billion attributable to purchased MSRs and purchased-loan MSRs.

### c. *Representation And Warranty Liabilities Under The 2001 And 2006 MMLPSAs*

Under the 2001 MMLPSA, according to the language of the agreement, Old GMAC Bank provided representations and warranties for all mortgage loans, while under the 2006 MMLPSA, Ally Bank provided representations and warranties only for second lien loans.

The Examiner concludes it is unlikely that any claim against AFI or Ally Bank for loan representations and warranties under the 2001 MMLPSA would prevail because: (1) Ally Bank was not a party to, and did not assume, the 2001 MMLPSA, and is unlikely to be held liable on successor liability or indemnification theories; (2) it is likely that representation and warranty claims would be time-barred under the 2001 MMLPSA's two-year "survival" provision; and (3) for first lien loans (but not second lien loans), the evidence supports the proposition that the 2001 MMLPSA was modified to eliminate representation and warranty liability.

The Examiner concludes that, while Ally Bank likely would be held to have provided representations and warranties for second lien loans under the 2006 MMLPSA, representation and warranty (or indemnification) claims against Ally Bank for second lien loans sold under the 2006 MMLPSA are unlikely to prevail because they would be time-barred under the two-year "survival" provision in the 2006 MMLPSA.

### d. *Application Of The Pipeline Swap To The "Funding To Sale" Period And To Ally Bank-Originated Loans*

When HFS loans were added to the Pipeline Swap in July 2008, GMAC Mortgage and Ally Bank did not revise the terms of the Pipeline Swap to apply to: (1) the "funding to sale"

period for HFS loans; and (2) brokered loans originated by Ally Bank. However, from and after July 2008, the Pipeline Swap was implemented as though such changes to the terms of the agreement had been made. Despite the unambiguous language of the agreements, under governing law a contract may be: (1) reformed under the doctrine of mutual mistake; or (2) modified by implied agreement.

With respect to "funding to sale," while a close question, the Examiner concludes it is more likely than not that a court would find the doctrine of mistake to be applicable and that the Pipeline Swap would therefore be reformed to include coverage of the "funding to sale" period. In addition, based particularly on evidence relating to the Brokering Consumer Loans to Bank project, the Examiner concludes it is likely that an implied agreement existed to modify the Pipeline Swap to cover "funding to sale."

With respect to application of the Pipeline Swap to Ally Bank-originated loans, the Examiner concludes it is unlikely that the doctrine of mistake would apply. However, the Examiner concludes, based particularly on evidence relating to the Brokering Consumer Loans to Bank project, that it is likely that the Pipeline Swap was modified to apply to brokered loans originated by Ally Bank.

Accordingly, the Examiner concludes it is unlikely that breach of contract claims relating to the Pipeline Swap would prevail.

### e.   Failure To Obtain Independent Director Approval

The 2005 Operating Agreement and the 2006 Amended Operating Agreement barred ResCap from entering into (or permitting any of its subsidiaries to enter into) any transaction with an AFI Affiliate unless the proposed transaction was at arm's length and for fair value. The arm's-length and fair-value requirements were permitted to be waived, provided that a majority of ResCap's directors (including a majority of Independent Directors) approved any such waiver that materially and adversely affected the rights of a class of rated indebtedness. The evidence shows that the original MSR Swap, and certain amendments to the MMLPSA, Pipeline Swap, and MSR Swap, were not approved by a majority of the Independent Directors, nor were these agreements on terms that were available in the market to which parties at arm's length would have agreed.

With respect to the MMLPSA, Pipeline Swap, and MSR Swap, the Examiner concludes it is unlikely that any claims against AFI relating to breaches of the 2005 Operating Agreement or the 2006 Amended Operating Agreement would prevail because: (1) the agreements at issue do not appear to have resulted in significant losses to GMAC Mortgage, or to have materially or adversely affected any class of rated indebtedness; (2) the information obtained in the Investigation does not suggest that AFI or Ally Bank was responsible for determining whether the agreements in question were submitted to the ResCap Board or Independent Directors for review; and (3) the remedies of third-party beneficiary creditors are limited to specific enforcement of the provisions of the Operating Agreements.

## 2. *Government Settlements*

The Examiner was asked to investigate the propriety of the allocation of obligations as between the Debtors and AFI with respect to two settlements between governmental entities and AFI, ResCap, and certain of their subsidiaries: (1) the FRB/FDIC Settlement, as memorialized by the FRB/FDIC Consent Order and related civil money penalty (CMP), between the FRB and the FDIC on the one hand and AFI, Ally Bank, ResCap, and GMAC Mortgage on the other (though Ally Bank was not a party to the CMP); and (2) the DOJ/AG Settlement, as memorialized in the DOJ/AG Consent Judgment, between the Department of Justice and various state Attorneys General on the one hand and AFI, ResCap, and GMAC Mortgage on the other.[11]

The Examiner considered various formal and informal agreements between AFI and ResCap allocating the costs, both direct and indirect, of the government settlements and providing for sufficient support, financial and otherwise, to ensure compliance with the government settlements. The aggregate effect of these agreements was that the vast majority of the costs of the settlements were allocated to ResCap entities, while AFI provided certain financial support so that the ResCap entities could comply with their obligations. While certain aspects of the process by which the Debtors and AFI internally allocated the burden of the government settlements are problematic, AFI ultimately bore the financial burden for a significant portion of the settlements by forgiving secured debt owed by the ResCap entities. Furthermore, it is beyond dispute that ResCap and its subsidiaries, as the mortgage servicers, were responsible for many of the actionable issues that were the subject of the FRB/FDIC Settlement and the DOJ/AG Settlement.

The Examiner evaluated whether the approximately $109.6 million payment made by GMAC Mortgage on March 14, 2012 pursuant to the DOJ/AG Consent Judgment may be avoidable as a preference under Bankruptcy Code section 547 and recoverable from AFI as "the entity for whose benefit such transfer was made" pursuant to Bankruptcy Code section 550. The Examiner concludes that the evidence supports the proposition that AFI was liable, together with ResCap, RFC, and GMAC Mortgage, for the full amount of $109.6 million, and that AFI therefore received a direct, ascertainable, and quantifiable benefit commensurate with the full amount of the value transferred by being relieved of its obligation to make the payment in the event ResCap did not. AFI also benefited by obtaining a release from certain claims and remedies that could have been asserted by the Department of Justice and the state Attorneys General. Accordingly, the Examiner concludes it is likely that an action on behalf of GMAC Mortgage against AFI to recover the March 14, 2012 payment as a preferential transfer under Bankruptcy Code sections 547 and 550 would prevail.

The Examiner also reviewed payments totaling approximately $48.4 million made by GMAC Mortgage to Ally Bank on May 10 and 11, 2012 pursuant to the terms of the January 30 Letter Agreement and the A&R Servicing Agreement, which required GMAC Mortgage to

---

[11] For the Examiner's full analysis of the government settlements, see Sections V.C and VII.F.5.

indemnify Ally Bank for losses incurred as a result of certain loan modifications undertaken in connection with the government settlements. The Examiner concludes it is likely that an action on behalf of GMAC Mortgage against Ally Bank to avoid and recover the May 10 and 11, 2012 payments as preferential transfers under Bankruptcy Code sections 547 and 550 would prevail.

In addition, the Examiner considered whether the postpetition payment of $12.9 million to Ally Bank relating to prepetition indemnification obligations under the terms of the A&R Servicing Agreement would be avoidable under Bankruptcy Code section 549. The Examiner concludes that the payment was not made in the ordinary course of the Debtors' business, and therefore could only be made if authorized by the Bankruptcy Court. While it is a close question, based on the Debtors' express representations in the related motion and the lack of complete disclosure, it appears more likely than not that the interim order authorizing continued performance under the A&R Servicing Agreement did not authorize the Debtors to make payments to satisfy prepetition obligations. Accordingly, the Examiner concludes that, while a close question, it is more likely than not that an action to avoid and recover the $12.9 million payment under Bankruptcy Code sections 549(a) and 550 would prevail.

### 3.  Causes Of Action Relating To Use And Allocation Of ResCap's Tax Attributes

The Examiner reviewed the historical and prospective use and allocation, as between ResCap and AFI, of ResCap's tax attributes.[12] A primary focus of the Examiner's tax-related analysis was on ResCap's entry into a tax allocation agreement that was effective beginning in the 2009 tax year.[13] A first version of the tax allocation agreement (the First 2009 Tax Allocation Agreement) was drafted to treat ResCap as if it were a stand-alone taxpayer, with an additional proviso that was very favorable to ResCap—AFI would pay ResCap for ResCap's tax benefits that AFI could use even if ResCap could not yet use the tax benefits on a stand-alone basis.

The First 2009 Tax Allocation Agreement was signed by AFI and unanimously approved by the ResCap Board on August 6, 2010. But it was never signed by James Young, ResCap's officer who was meant to sign the agreement on behalf of ResCap. Sometime in October 2010, AFI asked Young not to sign the agreement. AFI had a change of heart after it calculated what it would owe ResCap under the agreement and realized it would owe ResCap hundreds of millions of dollars.

AFI then proposed a second version of the tax allocation agreement (the Second 2009 Tax Allocation Agreement) that not only removed ResCap's right to receive payments from AFI for AFI's use of ResCap's tax benefits, but resulted in ResCap having to pay AFI for tax on excess inclusion income, which from 2009 through 2012 totaled approximately $50 million. This Second 2009 Tax Allocation Agreement, portions of which counsel for the Independent Directors had described as being "very unfair" to ResCap, was nevertheless approved by the ResCap Board and signed by all parties. The Second 2009 Tax Allocation Agreement is still putatively in effect today.

_____

[12]  For the Examiner's full analysis of tax sharing and allocation issues, see Sections V.D and VII.K.

[13]  The Examiner also reviewed the Implemented 2005 Tax Allocation Agreement and concludes it is likely that ResCap would prevail on a contractual claim to receive compensation of up to $15.1 million.

Among other issues, the Examiner considered whether the First 2009 Tax Allocation Agreement is a valid and enforceable contract, despite not having been signed by a ResCap officer. Under Michigan contract law (the law governing both 2009 Tax Allocation Agreements), approval by the ResCap Board, after AFI and ResCap officers completed extensive negotiations over the terms of the agreement, constituted ResCap's consent to the contract. The Examiner concludes that, while a close question, it is more likely than not that the First 2009 Tax Allocation Agreement that was approved by the ResCap Board and signed by AFI was a valid and enforceable contract.

The Examiner also considered whether the Second 2009 Tax Allocation Agreement could be set aside as a fraudulent transfer. ResCap was insolvent when it entered into the Second 2009 Tax Allocation Agreement and did not receive reasonably equivalent value from AFI for entering into the agreement. Accordingly, the Examiner concludes it is likely that the Second 2009 Tax Allocation Agreement, which purports to supersede the First 2009 Tax Allocation Agreement, can be avoided as a constructive fraudulent transfer.

Based on the Examiner's conclusions, upon the avoidance of the Second 2009 Tax Allocation Agreement, ResCap would have a contractual claim against AFI under the First 2009 Tax Allocation Agreement based on AFI's use of ResCap's tax benefits that have passed since the 2009 tax year. Based on the anticipated use by AFI of ResCap's tax benefits, ResCap's contract claim against AFI is estimated to be $1.77 billion.

### 4. Minnesota Insider Preference Claims

After performing a choice of law analysis, the Examiner concludes that Minnesota's substantive fraudulent transfer law is likely to govern claims brought by the respective Estates of ResCap and RFC under Bankruptcy Code section 544(b). Minnesota's adoption of the Uniform Fraudulent Transfer Act contains an "Insider Preference" Cause of Action.[14] A transfer is fraudulent under the Insider Preference statute if: (1) there exists a creditor of the transferor-debtor whose claim arose before the transfer; (2) the transfer was made to an insider of the debtor; (3) the transfer was made for an antecedent debt; (4) the debtor was insolvent at the time of the transfer; and (5) the insider had reasonable cause to believe the debtor was insolvent. The premise of this Cause of Action "is that an insolvent debtor is obliged to pay debts to creditors not related to him before paying those who are insiders."[15]

Although this Cause of Action resembles the preference-avoidance provisions of Bankruptcy Code section 547, it does not contain a "hypothetical chapter 7" test to determine which transfers could be avoided. Accordingly, the Examiner concludes that—with certain limitations—the Insider Preference statute likely could be used to avoid payments made to a

---

[14]   *See* Minn. Stat. Ann. § 513.45(b). For the Examiner's full analysis of the Minnesota Insider Preference statute, see Section VII.F.4. For the Examiner's full analysis of potential actual and constructive fraudulent transfer claims that might be asserted on behalf of the Debtors' Estates pursuant to Bankruptcy Code sections 544(b) and 548, see Section VII.F.6.

[15]   UFTA, Prefatory Note, at 4.

secured creditor. The Insider Preference statute is, however, subject to three affirmative defenses: "new value"; "ordinary course"; and "good faith effort to rehabilitate." The first two defenses are derived from Bankruptcy Code sections 547(c)(2) and 547(c)(4), respectively, and are generally applied in a similar manner. The third defense has no Bankruptcy Code corollary, and protects transfers in which: (1) the transferee makes a good faith effort to rehabilitate a debtor; (2) the transferee provides present value with the goal of achieving that rehabilitation; and (3) the debtor grants the transferee a security interest with respect to an antecedent debt.

The Insider Preference cause of action is a standard feature of the Uniform Fraudulent Transfer Act, but in most states is coupled with a one-year statute of limitations. Under Minnesota law, however, the applicable statute of limitations is six years.[16] Once a bankruptcy petition is filed, section 546 of the Bankruptcy Code converts that statute of limitations into a six-year reach-back period from the petition date.

The Examiner reviewed a number of transactions between ResCap or RFC, on the one hand, and insiders of those Debtors, including AFI, on the other, and concludes that several of those transactions likely meet all of the prima facie elements for avoidance under the Minnesota Insider Preference statute.[17] The Examiner also concludes that the "ordinary course" and "good faith effort to rehabilitate" defenses likely do not protect any of the transactions at issue from avoidance. However, the Examiner concludes that AFI likely contributed substantial new value on December 30, 2009, that (subject to the resolution of potential valuation issues relating to new value that was contributed in forms other than cash) would likely offset any Insider Preference liability that it incurred before that date.

All of AFI's potential Insider Preference liability arising after December 30, 2009 stems from repayments made on the A&R Line of Credit Facility. Because the A&R Line of Credit Facility and its predecessor facilities continuously revolved on a secured basis, literal application of the statute—which would seemingly call for avoidance of every payment made by ResCap or RFC while not acknowledging amounts reborrowed as new value (because such reborrowings were secured by valid liens)—would lead to an absurd result in which AFI's Insider Preference liability with respect to the A&R Line of Credit Facility would vastly exceed the maximum amount to which AFI was ever exposed under the facility. After consultation with Examiner's Counsel and his Minnesota counsel, the Examiner concludes that such a result would not likely be upheld by any court interpreting Minnesota law.

The Examiner concludes that a court would instead likely resolve this issue in a way that comports with the premise of the statute. The highest balance drawn on the A&R Line of Credit Facility after December 30, 2009 was approximately $1.03 billion, which occurred on February 23, 2011. Deducting from that amount the balance that remained unpaid on the Petition Date—approximately $380 million—would yield a post-2009 Insider Preference

---

[16] New York also applies a six-year statute of limitations to fraudulent transfer actions. Accordingly, application of New York's borrowing statute would not shorten this limitations period.

[17] Because insolvency of the debtor-transferor is an element of the Insider Preference Cause of Action, the Examiner limited his review to transactions that took place on or after December 31, 2007, the date on which the Examiner's Financial Advisors have determined that the Debtors became insolvent under the Balance Sheet Test.

liability on the A&R Line of Credit Facility of $650 million. That liability would then be further reduced by approximately $116 million on account of additional contributions of new value made by AFI after February 23, 2011, yielding a final estimated Insider Preference liability for AFI of approximately $534 million. However, the Examiner notes that the particular manner in which a court would treat debt forgiveness for calculating Insider Preference liability in the context of a continuously revolving secured line of credit is uncertain. The Examiner stresses that a court could reasonably calculate AFI's ultimate Insider Preference liability in a variety of ways that would yield different results than those presented in this Report.

The Examiner also concludes that GMAC CF, a wholly owned indirect subsidiary of AFI, would likely have Insider Preference liability to RFC[18] for certain transfers made by RFC to GMAC CF in connection with the Servicing Advance Factoring Facility. The maximum amount of that liability is approximately $32 million, but the liability would be subject to reduction (to not less than $1.5 million) to the extent that GMAC CF could establish it provided new value in connection with the return of certain accounts receivable to RFC.

### 5. Ally Bank Transactions

Between November 2006 and January 2009, AFI and ResCap entered into a series of transactions that ultimately consolidated their mortgage and automotive banking operations under a single entity, Ally Bank, and transferred full ownership of Ally Bank to AFI. Before these transactions, AFI's automotive banking operations rested with GMAC Automotive Bank, a Utah industrial bank and a direct wholly owned subsidiary of AFI, and ResCap's mortgage banking operations were performed by Old GMAC Bank, a federal savings bank and an indirect wholly owned subsidiary of ResCap.[19]

#### a. 2006 Bank Restructuring

In 2005, AFI officials succeeded, after substantial efforts, in persuading AFI's parent, GM, that it should sell a majority interest in AFI to insulate AFI (and ResCap) from the impact, particularly the credit rating impact, of GM's continuing financial difficulties. GM entered into an agreement in March 2006 to sell 51% of AFI to an investment group led by Cerberus. To facilitate the sale, it was necessary for ResCap to divest its interest in Old GMAC Bank so that Cerberus would not become subject to federal Bank Holding Company Act (BHCA) regulations incident to ownership of a federal savings bank (but not to ownership of an industrial bank such as Ally Bank). To maintain ResCap's access to bank funding, the parties determined to transfer the assets of Old GMAC Bank to Ally Bank (then GMAC Automotive Bank), which would not trigger the BHCA regulations. Ally Bank would then house both AFI's automotive banking operations and ResCap's mortgage banking operations (which then accounted for about three-quarters of the combined operations).

---

[18] The Debtors' records are unclear as to whether the transfers in question were made by RFC or GMAC Mortgage. Because Pennsylvania law would likely govern fraudulent transfer claims brought by GMAC Mortgage, and because Pennsylvania has not adopted an Insider Preference statute, to the extent any of the transfers under the Servicing Advance Factoring Facility were in fact made by GMAC Mortgage rather than RFC, the Insider Preference liability of GMAC CF on this claim would be reduced dollar-for-dollar.

[19] For the Examiner's full analysis of the Ally Bank Transactions, see Sections V.A, VII.F.6, VII.L.1, and VIII.C–D.

While the Cerberus PSA required this restructuring, the PSA expressly contemplated that either ResCap or AFI (or both) could own Ally Bank. Thus, for ResCap to obtain the anticipated credit rating benefit (that is, to avoid the rating downgrade and increased cost of funds that were likely if the Cerberus transaction did not close), it was not mandatory, under the terms of the Cerberus PSA, that ResCap surrender a voting interest in the banking operations. In discussions among AFI and ResCap insiders (many of whom were affiliated with both entities), a variety of structures were considered. However, in an apparent effort to accommodate GM's interest in potentially exercising a call right concerning the Bank, AFI settled on the structure ultimately adopted, in which AFI retained 100% of the voting control of Ally Bank's newly created parent, IB Finance, and ResCap exchanged its interest in Old GMAC Bank at book value for non-voting interests in IB Finance tied to the economic performance of the Ally Bank mortgage operations.

ResCap's General Counsel, in an April 2006 memorandum circulated widely among the AFI and ResCap directors and management involved in these matters, concluded that, absent a waiver by ResCap's Independent Directors, this arrangement would violate several provisions of the 2005 Operating Agreement. In particular, he concluded that ResCap's surrender of its voting interest in the Bank would run afoul of the Operating Agreement requirement that Affiliate Transactions be "on terms and conditions that are consistent with those that parties at arm's length would agree to and for fair value."[20] He also pointed out that the Independent Directors were obligated to consider only the interests of ResCap and its creditors, and if either of the Independent Directors viewed the matter as a "close call" under the 2005 Operating Agreement, they would "likely veto" the transaction.[21] ResCap's CEO then submitted a proposal to AFI's President and others, along with the General Counsel's memorandum, voicing his misgivings about the loss of a "controlling interest in a bank" and proposing that ResCap retain a majority voting interest in the restructured bank. This proposal apparently was rejected by AFI.

Instead, a few days later, in the first communication to the Independent Directors about the contemplated restructuring, AFI's Chairman (who was also ResCap's Chairman) described the proposed transaction under which AFI would retain 100% of the IB Finance voting interests. Neither this communication nor, it appears, any subsequent communication to the Independent Directors, disclosed that this structure was not required by the Cerberus PSA or that alternative structures were permissible. While the other potential conflicts between the proposed transaction and the 2005 Operating Agreement that ResCap's General Counsel had noted were disclosed, the communications to the Independent Directors conspicuously failed to mention his conclusion that the loss of voting rights violated the Operating Agreement's arm's-length and fair-value requirements, or the concerns voiced by ResCap's CEO. Instead, incomplete and misleading information was provided—the Independent Directors were led to believe that failure to execute the 2006 Bank Restructuring in the proposed manner would cause the Cerberus PSA to fail, to the detriment of ResCap and AFI.

---

[20]   2005 Operating Agreement, § 2(b) [ALLY_0140795].

[21]   *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

Further, the Examiner concludes that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring (for which no contemporaneous valuation was performed, and no fairness opinion was obtained). The value of the interest in Old GMAC Bank that ResCap surrendered exceeded the value of the IB Finance Class M Shares it received by $533 million to $608 million. Giving credit for the value of a de-linked credit rating for ResCap (an indirect benefit of the 2006 Bank Restructuring) leaves a Fair Market Value shortfall of $390 million to $465 million.

The Examiner has considered several potential Estate Causes of Action against AFI arising from these troubling facts, including fraud, breach of the 2005 Operating Agreement, tortious interference with contract, and fraudulent transfer.

### (1) Fraud

These facts arguably give rise to a claim of fraud. There are a number of obstacles to such a claim, however, including the *in pari delicto* doctrine and its Second Circuit analogue, the *Wagoner* Rule,[22] which generally precludes the estate of a debtor whose agents have engaged in wrongdoing from recovering from another wrongdoer. To the extent the circumstances here suggest wrongdoing by AFI through its agents, the same circumstances suggest wrongdoing by ResCap agents (many of whom had a dual AFI-ResCap affiliation). There is an "adverse interest" exception to the *in pari delicto* defense and the *Wagoner* Rule, under which an entity's agents' acts are not imputed to it where the agent has abandoned its principal's interests and is acting entirely for its own or another's purposes. One might argue that this was the case here, and that ResCap's officials had abandoned ResCap's interests for those of AFI, particularly if the 2006 Bank Restructuring is considered in isolation from the anticipated benefits of the larger Cerberus transaction. But, on balance, rather than viewing the restructuring in this manner, it appears more reasonable to take the view that the ResCap officials, having been motivated at least in part by the anticipated credit rating benefit, had not totally abandoned ResCap's interests so as to trigger the adverse interest exception. Considering these and all of the other facts and circumstances, the Examiner concludes that, while a close question, it is more likely than not that such a fraud claim by ResCap against AFI would not prevail.

### (2) Breach Of The 2005 Operating Agreement

ResCap might also assert a claim that the conduct of AFI's agents constituted a breach of the 2005 Operating Agreement, which is governed by New York law. Under that Agreement, compliance with certain requirements concerning the appointment of Independent Directors is identified as AFI's "sole obligation."[23] Despite these provisions, under New York law, a duty of good faith and fair dealing is implied into every contract, and that obligation was arguably breached here. Further, the 2005 Operating Agreement also explicitly states that the "sole remedy" available from AFI is "specific performance," and that "[u]nder no circumstances" is AFI to be subject to damages.[24] Nonetheless, under New York law, compliance with such

---

[22]   *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118–20 (2d Cir. 1991).

[23]   2005 Operating Agreement, § 7 [ALLY_0140795].

[24]   *Id.*

limitations may be excused in cases of bad faith or intentional wrongdoing. Ultimately, however, contractual claims that involve the same underlying facts as a fraud claim are also subject to the *Wagoner* Rule and the *in pari delicto* doctrine. Consequently, for reasons similar to those articulated concerning ResCap's potential fraud claim, the Examiner concludes that, while a close question, it is more likely than not that a claim for breach of the 2005 Operating Agreement would not prevail.

### (3) Tortious Interference With Contract

The Examiner concludes it is unlikely that a claim against AFI for tortious interference with contract would prevail because only a third party, unrelated to the contract, may be held liable for tortious interference.

### (4) Fraudulent Transfer

The Examiner concludes that a fraudulent transfer claim based on actual intent to hinder, delay, or defraud creditors within the meaning of the applicable statutes is unlikely to prevail with respect to the 2006 Bank Restructuring. The evidence does not support the proposition that the 2006 Bank Restructuring was entered into with actual intent to hinder, delay, or defraud either present or future creditors.

As noted above, ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring. However, the Examiner concludes it is unlikely that a constructive fraudulent transfer claim would prevail with respect to the 2006 Bank Restructuring because ResCap was not financially distressed within the meaning of the relevant statutes at the time of the transaction.[25]

### b. 2008 Bank Transaction And 2009 Bank Transaction

The Examiner concludes it is unlikely that actual fraudulent transfer claims would prevail with respect to either the 2008 Bank Transaction or 2009 Bank Transaction because the Investigation did not uncover the requisite "badges of fraud" or any evidence suggesting an actual intent by any party to hinder, delay, or defraud either present or future creditors with respect to these transactions.

Because these transactions occurred while ResCap was financially distressed within the meaning of applicable fraudulent transfer statutes, the Examiner's Professionals evaluated whether ResCap received reasonably equivalent value to determine whether the elements of a constructive fraudulent transfer claim were present.

The value transferred from ResCap in connection with the 2008 Bank Transaction consisted of: (1) the issuance of the ResCap Preferred Interests; and (2) the exchange option granted to AFI whereby it could convert the ResCap Preferred Interests into IB Finance Preferred Interests after January 1, 2009. The Examiner's Financial Advisors estimated that the

---

[25]   As discussed in Section VII.F.6(d)(4), the Examiner concludes that the evidence does not support the proposition that the Ally Bank Transactions should be collapsed for purposes of a fraudulent transfer analysis.

value transferred from ResCap was approximately $571 million to $714 million. The consideration received by ResCap was: (1) certain bonds contributed by AFI to ResCap; and (2) the retention of the right to redeem the IB Finance Preferred Interests at redemption value in the event that AFI exercised its exchange option. The Examiner's Financial Advisors estimated that the value received by ResCap was approximately $841 million. Accordingly, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value in the 2008 Bank Transaction. Therefore, it is unlikely that a constructive fraudulent transfer claim with respect to the 2008 Bank Transaction would prevail.

The value transferred from ResCap in connection with the 2009 Bank Transaction consisted of: (1) ResCap's remaining IB Finance Class M Shares; and (2) the right to redeem the IB Finance Preferred Interests at redemption value. The Examiner's Financial Advisors estimated that the value transferred from ResCap was approximately $106.5 million to $217.5 million. The consideration received by ResCap was: (1) certain bonds contributed by AFI; and (2) a sixty-day extension of the maturity of the Initial Line of Credit Facility. The Examiner's Financial Advisors estimated that the value of the bonds contributed by AFI to ResCap was approximately $600 million. Accordingly, the Examiner concludes that the evidence supports the proposition that ResCap received reasonably equivalent value in the 2009 Bank Transaction. Therefore, it is unlikely that a constructive fraudulent transfer claim with respect to the 2009 Bank Transaction would prevail.

### 6. ResCap's Directors And Officers

#### a. Examiner's Observations Regarding Protocol And Functioning Of The ResCap Board

Although the ResCap Board was industrious, it was not consistently effective. The ResCap Board met frequently in response to a variety of challenging circumstances, was subject to formal governance protocols, and had access to numerous sophisticated legal and financial advisors. But several factors diminished the ResCap Board's overall effectiveness. An onerous schedule, substantial inside director turnover, dual affiliations of ResCap Board members, underlying conflicts, and information management issues all contributed to a level of dysfunction in the processes of the ResCap Board. Quantity of meetings did not always correlate with quality. Overall, the ResCap Board's efficacy was compromised, and Independent Director decision making was handicapped by structural issues that beset the ResCap Board.[26]

#### b. Indemnification And Exculpation

Under Delaware law, a director is subject to the fiduciary duties of care and loyalty. A director can breach the duty of care through gross negligence, without having acted in bad faith. Under Delaware law, a director can be exculpated and/or indemnified for liability and expenses incurred as a result of a breach of the duty of care, but only if such breach was in good faith. A director cannot be exculpated or indemnified for a breach of the duty of loyalty.[27]

---

[26] For the Examiner's full analysis of the protocol and functioning of the ResCap Board, see Section IV.A.

[27] For the Examiner's full analysis of indemnification and exculpation issues relating to the ResCap Board, see Section IV.B.

The 2006 ResCap LLC Agreement and the 2008 ResCap Amended LLC Agreement both provide for indemnification and exculpation of directors for acts or omissions in good faith on behalf of ResCap that were reasonably believed to be within the scope of the director's authority. This indemnification and exculpation is subject to certain exclusions, such as for acts or omissions as a result of the director's willful misconduct or bad faith. AFI's certificate of incorporation generally provides for indemnification of directors serving on the boards of other entities at the request of AFI, if the directors acted in good faith and in a manner reasonably believed to be aligned with the best interests of AFI.

### c. Breach Of Fiduciary Duty Claims Against ResCap's Directors And Officers

As ResCap faced increasingly challenging circumstances over time, ResCap fiduciaries often operated under stressful conditions and within a tangled relationship with AFI. Despite the volume and intensity of the ResCap Board's activities, the protocol, processes, and functioning of the ResCap Board were far from optimal.

Yet there exist only a few potentially actionable claims for breaches of fiduciary duties against ResCap's directors and officers.[28] A threshold hurdle for any such claims is that, prior to August 15, 2007—the date at which the Examiner concludes that ResCap was left with unreasonably small capital and reasonably should have believed that it would incur debts beyond its ability to pay—ResCap fiduciaries owed duties to ResCap's parent shareholder and not to its creditors. The Examiner concludes that no potential claims for breach of fiduciary duty are likely, or more likely than not, to prevail, although troubling facts in connection with fiduciary conduct do exist.

The facts surrounding the ResCap Board's approval of the 2006 Bank Restructuring give rise to potential fiduciary duty claims that, although unlikely to prevail because of legal impediments, are close questions. The evidence indicates that certain material information, relating to ResCap's potential negotiating leverage with respect to obtaining a voting interest in the restructured bank, was purposefully withheld from ResCap's Independent Directors by inside managers in an effort to secure approval of the transaction on the proposed terms. The Independent Directors' approval of the 2006 Bank Restructuring, therefore, was arguably procured on false premises. However, several formidable legal obstacles exist to any related claim for breach of fiduciary duty, including the absence of a definitive fiduciary duty to disclose the withheld information, as well as a possible timeliness deficiency.

Similarly, the facts underlying approval of the Second 2009 Tax Allocation Agreement by the ResCap Board are troubling because the agreement imposed an obligation on ResCap to make certain payments to AFI that ResCap was not otherwise obligated to make as a disregarded entity, and did not contain any provisions providing for the possibility of any payments being made by AFI to ResCap for AFI's use of ResCap's tax benefits.[29] Despite the

---

[28] For the Examiner's full analysis of potential Causes of Action against ResCap's current or former directors and officers, see Section VII.E and VII.K. Potential fiduciary duty claims relating to transactions that the Examiner determined were not problematic are not addressed.

[29] For the Examiner's full analysis of tax sharing and allocation issues, see Sections V.D and VII.K.

unfair nature of the Second 2009 Tax Allocation Agreement, the evidence established that the agreement went through a thorough review process by the ResCap Board, including review and comment by the Independent Directors and their counsel. These and other relevant facts lead the Examiner to conclude that, while a close question, it is more likely than not that a breach of fiduciary duty claim based on the ResCap Board's approval of the Second 2009 Tax Allocation Agreement would not prevail.

The Examiner also analyzed whether Young violated a fiduciary duty for failing to sign the First 2009 Tax Allocation Agreement after it was approved by the ResCap Board and signed by AFI. Although the Examiner found evidence suggesting that Young did not advocate strongly for ResCap's interests in seeking to enforce or preserve the First 2009 Tax Allocation Agreement, the evidence does not establish that Young intentionally failed to advance ResCap's interests or failed to act in a way that would demonstrate a conscious disregard for his duties. Accordingly, the Examiner concludes that, while a close question, it is more likely than not that a claim for breach of fiduciary duty against Young would not prevail.

The Examiner concludes it is unlikely that potential claims for breach of fiduciary duty related to the Prepetition Asset Sales would prevail. In addition, while a close question, the Examiner concludes it is more likely than not that potential breach of fiduciary duty claims would not prevail with respect to the $48.4 million payment under the January 30 Letter Agreement and A&R Servicing Agreement in May 2012. Those various Affiliate Transactions were generally the product of extensive, arm's-length negotiations and informed decision making by ResCap fiduciaries, even if carried out in harried circumstances.

Finally, while the efforts of the ResCap Board in connection with approval of the AFI Settlement and Plan Sponsor Agreement and the RMBS Trust Settlement Agreements were flawed, the Examiner concludes that no viable claims exist for breaches of fiduciary duties tied to those Board approval processes. The performance of the Independent Directors who comprised the Special Review Committee responsible for the claims investigation that led to the now-terminated AFI Settlement and Plan Sponsor Agreement was incomplete, tainted by certain counsel conflicts, and otherwise flawed, thus creating a close question. But it is more likely than not that a related claim for breach of fiduciary duty would not prevail. Based on the investigation performed by its legal counsel, the ResCap Board concluded that the proposed settlement with AFI was a reasonable resolution of challenging litigation claims. Similarly, the process that led to approval by the ResCap Board of the RMBS Trust Settlement Agreements within a condensed timeframe was not optimal. However, the Examiner also concludes that, while a close question, it is more likely than not that a claim for breach of fiduciary duty against the ResCap Board related to its approval of the RMBS Trust Settlement Agreements would not prevail. The ResCap Board acted on a sufficiently informed basis and with a good-faith belief that the settlement of major claims embodied in the agreements would facilitate the interests of ResCap and its creditors.

### d.  Aiding And Abetting Breach Of Fiduciary Duty Claims Against AFI

As noted above, the Examiner concludes that, although ResCap fiduciaries engaged in certain problematic conduct in connection with particular transactions, no related fiduciary

duty claims are likely, or more likely than not, to prevail. In the absence of a viable predicate claim of breach of fiduciary duty, it is unlikely as a matter of law that any associated aiding and abetting claim against AFI could survive.[30]

Thus, although AFI insiders participated in an apparent effort to withhold certain material information from the Independent Directors relating to the 2006 Bank Restructuring, while a close question, it is more likely than not that a related aiding and abetting claim would likely fail because, on balance, it is more likely than not that an underlying claim for breach of duty against ResCap fiduciaries would not prevail. Further, even if an underlying fiduciary duty claim related to the 2006 Bank Restructuring could overcome the legal impediments to its success, a corollary aiding and abetting claim would confront its own obstacles. Similarly, any aiding and abetting claims tied to the Prepetition Asset Sales, January 30 Letter Agreement, the A&R Servicing Agreement, or the $48.4 million payment under the January 30 Letter Agreement and A&R Servicing Agreement would likely not prevail in the absence of any viable underlying claims for breaches of duties by ResCap fiduciaries. Finally, AFI cannot be held legally responsible for any sub-optimal work of the Special Review Committee of the ResCap Board with respect to the investigation and settlement of potential claims against AFI, or for the ResCap Board's approval of the RMBS Trust Settlement Agreements, and therefore any related aiding and abetting claims against AFI are unlikely to prevail.

### 7. Single Entity Theories Of Liability

#### a. Piercing The Corporate Veil

The Examiner reviewed whether, under Delaware law (which would govern this issue), a claim could successfully be asserted on behalf of ResCap to pierce its corporate veil.[31] Such a claim could result in a judgment holding AFI liable for all of ResCap's debts. The Examiner concludes, however, that it is unlikely that any such potential veil-piercing claim would prevail. Courts do not lightly pierce the corporate veil. A successful veil-piercing claim would require proof both: (1) that ResCap and AFI operated as a single economic entity; and (2) of the presence of an overall element of injustice or unfairness. There is insufficient evidence to surmount these high legal hurdles.

##### (1) Single Economic Entity

The Investigation has uncovered evidence of certain indicia that ResCap and AFI operated as a single economic entity. ResCap's conduct in connection with a number of the Affiliate Transactions (e.g., the 2006 Bank Restructuring, the MSR Swap, the Pipeline Swap, the First 2009 Tax Allocation Agreement, the Second 2009 Tax Allocation Agreement, and the allocation of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement) departed in some important respects from appropriate corporate formalities, including the requirements of ResCap's operating agreements. For example, in the 2006 Bank Restructuring, ResCap transferred its 100% controlling interest in Old GMAC Bank for a non-

---

[30] For the Examiner's full analysis of potential Causes of Action against AFI for aiding and abetting breach of fiduciary duty, see Section VII.G.

[31] For the Examiner's full analysis of piercing the corporate veil, see Section VII.A.1.

voting interest in IB Finance. The Examiner concludes that the value of the non-voting interest was approximately $533 million to $608 million less than the value of the controlling interest in Old GMAC Bank that ResCap parted with and, considering the credit rating benefits to ResCap associated with the transaction, ResCap received $390 million to $465 million less than the Fair Market Value of the controlling interest it parted with. The 2006 Bank Restructuring was approved by the ResCap Board without any formal fairness opinion or valuation and without the Independent Directors being informed of potential alternatives that would have been more favorable to ResCap. Moreover, there is evidence—in particular after the closing of the Cerberus PSA—of interference by AFI and Cerberus outside the normal lines of corporate authority in the day-to-day operations of ResCap and its subsidiaries.

The Investigation also revealed evidence that could be used to attempt to prove that certain Affiliate Transactions constituted a "siphoning" of assets from ResCap, including with respect to the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement. Affiliate Transactions where ResCap received less than reasonably equivalent value appear, however, to have been the exception—not the rule. Apart from those exceptions, the various asset sales, financings, and derivatives transactions ResCap entered into with AFI and its affiliates provided ResCap with essential liquidity and resulted in ResCap's receipt of at least—and sometimes more than—fair value. Moreover, any inference of "siphoning" that could otherwise arise would be undermined by the approximately $8 billion in capital support that ResCap received from AFI beginning in 2007 in the form of cash contributions, debt forgiveness, and contributions of other assets.

There is also other evidence in the factual record that appears inconsistent with the theory that ResCap and AFI operated as a single economic entity. For example, rather than being set up for financial failure, ResCap was neither inadequately capitalized nor insolvent at the time of its formation. ResCap is also unlikely to be considered a "mere façade" for AFI, given that ResCap and its subsidiaries operated multiple businesses, employed thousands of people, and entered into independent contractual relationships with a wide variety of outside parties.

### *(2) Injustice Or Unfairness*

Even assuming, arguendo, that ResCap and AFI were proven to be a single economic entity, the Examiner concludes it is unlikely that a plaintiff would prevail in establishing the "injustice or unfairness" element of any veil-piercing claim.

The evidence supports the proposition that ResCap became unable to satisfy its creditors because of the billions of dollars in operating losses it recorded beginning in the fourth quarter of 2006—not because of an abuse of the corporate form by AFI. The evidence supports the proposition that ResCap was not undercapitalized at formation, and that those Affiliate Transactions where ResCap received less than reasonably equivalent value were dwarfed in size by the $8 billion in contemporaneous capital support provided by AFI.

The Examiner does not expect any potential alternative theories of "injustice or unfairness" to fare better. For example, although the evidence supports the proposition that AFI's capital support of ResCap was at all times self-interested and generally inadequate to do more than maintain ResCap on "life support," the Investigation has uncovered no significant evidence that

ResCap or its creditors were harmed as a result. That AFI may have continued to support ResCap as a means to the end of achieving bank holding company status and obtaining TARP funds does not change the effect of that support on ResCap's financial condition. Without more, the Examiner expects that such theories would prove insufficient to warrant piercing the corporate veil and therefore concludes it is unlikely that such claims would prevail.

### b. Substantive Consolidation

The Examiner concludes it is unlikely that a motion for substantive consolidation of AFI with and into the Estate of any Debtor would prevail.[32] In the Second Circuit, substantive consolidation is warranted if either of the two following tests is met:

- whether creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit (corporate separateness test); or
- whether the entities' affairs are so entangled and confused that substantive consolidation will benefit all creditors (entanglement test).

The evidence does not support the proposition that either of these two tests is met such that substantive consolidation is warranted in these bankruptcy cases. The evidence does not support the proposition that entities reasonably relied on ResCap and AFI as a single economic unit at the time the entities extended credit to ResCap. Actions by creditors after they extended credit to ResCap that demonstrate a hope or expectation that such debt will be satisfied by AFI does not trigger application of the corporate separateness test. In addition, the Examiner concludes that the evidence does not support the proposition that AFI's and ResCap's affairs are so entangled and confused that substantive consolidation would benefit all creditors. While it may be argued that ResCap did not fully comply with all provisions of the 2005 Operating Agreement and 2006 Amended Operating Agreement (particularly in connection with entering into Affiliate Transactions), the Investigation has not uncovered any material evidence that ResCap failed to account for its assets and liabilities separately from those of AFI. There is a difference between financial affairs that are "entangled and confused" and those that are interrelated. The Investigation has shown that ResCap's and AFI's financial affairs were interrelated. For example, ResCap received billions of dollars in capital contributions from AFI, the two were parties to numerous transactions (including many specifically addressed in the Report), AFI and ResCap maintained an understanding of federal income tax allocations, and AFI and ResCap engaged in other transactions identified in the Report. However, the Debtors maintained separate accounts, books, and records at all relevant times. The Examiner's Professionals have not found the Debtors' financial affairs to be "so entangled and confused" as to warrant substantive consolidation.

### 8. Debt Recharacterization

The Examiner analyzed two categories of claims held by AFI for possible recharacterization to equity: (1) claims held by AFI that were outstanding as of the Petition Date under the A&R Secured Revolver Loan Agreement (approximately $747 million) and under the A&R Line of Credit Agreement (approximately $380 million); and (2) claims represented by Unsecured Notes

---

[32] For the Examiner's full analysis of substantive consolidation, see Section VII.A.2.

and Senior Secured Notes (aggregating $2.4 billion in face principal amount) that were exchanged by AFI for, among other things, ResCap Preferred Interests in the 2008 Bank Transaction and ResCap's remaining IB Finance Class M Shares in the 2009 Bank Transaction.[33]

In determining whether to recharacterize an asserted loan as an equity investment, courts, including those in the Southern District of New York, generally consider the following:

- the names given to the instruments;

- the presence or absence of a fixed maturity date and schedule of payments;

- the presence or absence of a specified rate of interest and interest payments;

- the source of repayments;

- the adequacy or inadequacy of capitalization;

- the identity of interest between the creditor and shareholder;

- the security for the advances;

- the corporation's ability to obtain financing elsewhere;

- the extent to which the advances were subordinated;

- the extent to which the advances were used to acquire capital assets; and

- the presence or absence of a sinking fund to provide repayment.

The determination of whether an asserted debt should be recharacterized as equity depends on the facts and circumstances as they existed at the time of the issuance of the alleged debt.

The archetypal debt recharacterization case involves a situation where the same party controls both the putative obligor and obligee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims. The Examiner concludes that the evidence relating to the factors identified above supports the proposition that the indebtedness, under the A&R Secured Revolver Loan Agreement, the A&R Line of Credit Agreement, the Unsecured Notes, and the Senior Secured Notes, is debt that may not appropriately be recharacterized as equity. The evidence does not support the proposition that funds advanced to ResCap pursuant to the A&R Secured Revolver Loan Agreement, the A&R Line of Credit Agreement, the Unsecured Notes, or the Senior Secured Notes were put into ResCap with the expectation that they would not be repaid. Accordingly, the Examiner concludes that a party seeking to recharacterize ResCap debt held by AFI or used by AFI as currency to acquire ResCap assets is unlikely to prevail.

*9.  Equitable Subordination*

The Examiner reviewed AFI's outstanding claims as of the Petition Date including, without limitation, claims under the A&R Secured Revolver Loan Agreement (approximately

---

[33]   For the Examiner's full analysis of debt recharacterization, see Section VII.B.

$747 million) and under the A&R Line of Credit Agreement (approximately $380 million) to assess whether they would be subject to equitable subordination.[34]

At all times relevant to the Investigation, ResCap was a wholly owned indirect subsidiary of AFI. Therefore, AFI was and is an "insider" of ResCap as that term is defined in the Bankruptcy Code. As an insider, AFI's conduct with respect to ResCap is subject to a higher degree of scrutiny than would be the conduct of a non-insider. During the course of the Investigation, the Examiner analyzed the Affiliate Transactions individually and collectively, as well as AFI's general course of conduct and dealings with ResCap, for any evidence of: (1) fraud; (2) illegality; (3) breach of fiduciary duty; (4) unconscionable, inequitable, unjust, or unfair conduct; (5) undercapitalization; or (6) AFI's control or use of ResCap as an alter ego for AFI's benefit. The Investigation also explored whether ResCap's creditors were harmed by AFI's conduct.

Specifically, the Examiner analyzed the conduct of AFI and, where appropriate, Ally Bank in connection with: (1) the 2006 Bank Restructuring; (2) the Second 2009 Tax Allocation Agreement; (3) the misallocation of net revenues on loans brokered by GMAC Mortgage; (4) ResCap's forgiveness of subsidiary indebtedness and the 2009 Bank Transaction; (5) the Line of Credit Facilities; and (6) AFI's general course of conduct and dealing with ResCap in light of alter ego, asset stripping, and aiding and abetting breach of fiduciary duty allegations.

The Examiner concludes that AFI engaged in unfair and inequitable conduct in connection with the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement, and that, while a close question, it is more likely than not that a court would find that AFI and Ally Bank engaged in unfair and inequitable conduct in connection with the misallocation of revenues on loans brokered by GMAC Mortgage. ResCap and its creditors were harmed by AFI's inequitable and unfair conduct in connection with the 2006 Bank Restructuring in an amount not less than $390 million and perhaps as much as $608 million as measured by the difference between the Fair Market Value of what ResCap parted with and the Fair Market Value of what it received. The Examiner also concludes that ResCap and its creditors were harmed in the approximate amount of up to $50 million in connection with AFI's inequitable and unfair conduct in connection with the Second 2009 Tax Allocation Agreement. Finally, the Examiner concludes that GMAC Mortgage was harmed in the amount of approximately $520.5 million in connection with the inequitable and unfair conduct of AFI and Ally Bank with respect to the misallocation of revenues on loans brokered by GMAC Mortgage.

A principal narrative that emerges from the available evidence is that, from 2007 through 2012, AFI provided ResCap with capital support in excess of $8 billion in the form of cash contributions, debt forgiveness, and contributions of other assets. Indeed, absent AFI's contributions, ResCap could not have met its liquidity needs or satisfied its tangible net worth covenants. The Investigation uncovered no evidence that AFI's capital support of ResCap had the intent or effect of disguising or making possible further harm to ResCap and its creditors. The scale of AFI's capital support outweighs the harm that was caused by AFI's conduct.

---

[34]   For the Examiner's full analysis of equitable subordination, see Section VII.C.

Because equitable subordination is remedial and not punitive, and is a drastic and unusual remedy that should be applied in limited circumstances, the Examiner concludes that, while a close question, it is more likely than not that a proponent of equitable subordination of AFI's claims would not prevail.

Because equitable disallowance requires a showing of more serious misconduct than necessary for equitable subordination, the Examiner concludes that is unlikely that a proponent of equitable disallowance of AFI's claims would prevail.[35]

### 10. Constructive Trust Claims

Certain parties have argued that a constructive trust should be imposed on: (1) ResCap's interest in the "mortgage division" of Ally Bank, which AFI allegedly obtained by violating a "confidential relationship" with ResCap; and (2) proceeds of TARP funds that AFI received by virtue of its relationship to ResCap.[36]

A constructive trust is an equitable device a court may impose when the holder of legal title to property acquired the property under such circumstances that the holder "in good conscience" should not be allowed to retain it. A claim for constructive trust is a remedy, often to a corresponding unjust enrichment claim. When a constructive trust is imposed, the holder becomes a trustee, holding the property for the benefit of the plaintiff. When considering such equitable relief, however, a court is constrained by two considerations: (1) the property must be discernible and traceable to the plaintiff; and (2) the requested relief may not be in lieu of damages—constructive trust is only available to prevent the title holder from being unjustly enriched, not to provide a second avenue to an award otherwise available under a breach of contract claim. Given that a constructive trust is designed to address a gap that could be remedied by a contract if one existed, a court also will not impose a constructive trust if an enforceable contract governs the parties' relationship.

Because the 2005 Operating Agreement, the 2006 Amended Operating Agreement, and the indenture that governs the Unsecured Notes control the parties' relationship, the Examiner concludes that there can be no constructive trust claim in connection with the Ally Bank Transactions. Further, there is no identifiable, discrete res on which to impose a constructive trust. As discussed in Section V.A.2.e, the Examiner's Financial Advisors concluded that there was no equity value remaining in the mortgage division of Ally Bank after December 31, 2009 that could have been attributed to ResCap's legacy equity interest in IB Finance.

In addition, the Examiner concludes it is unlikely that a party can demonstrate that ResCap had a legitimate expectation that TARP funds provided to AFI were earmarked for ResCap or that ResCap had an identifiable interest in TARP funding provided to AFI.

---

[35] For the Examiner's full analysis of equitable disallowance, see Section VII.D.

[36] For the Examiner's full analysis of constructive trust, see Section VII.I.

*11. Prepetition Asset Sales*

The Examiner reviewed the Prepetition Asset Sales to identify possible constructive fraudulent transfer claims and to factor the transactions into the Examiner's analysis of single entity theories of liability.[37] Because the Prepetition Asset Sales occurred while ResCap was financially distressed within the meaning of applicable fraudulent transfer statutes, the Examiner's Professionals evaluated whether ResCap received reasonably equivalent value in these transactions. The Examiner concludes that the evidence supports the proposition that ResCap and its affiliate sellers received reasonably equivalent value in each of the Prepetition Asset Sales, with the possible exception of the June 2008 Model Home Sale to a Cerberus subsidiary. With respect to the June 2008 Model Home Sale, the Examiner's Financial Advisors concluded that RFC received at least $30 million less than Fair Market Value. While a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under prevailing law because, based on the totality of the circumstances, it is more likely than not that a court would find that the value exchanged in the June 2008 Model Home Sale constituted reasonably equivalent value.

*12. Financing Affiliate Transactions*

The Examiner reviewed the terms of material prepetition financing Affiliate Transactions[38]—including the Resort Finance Facility, Secured MSR Facility, Secured Revolver Facility, Servicing Advance Factoring Facility, Initial Line of Credit Facility, ResMor Loan Facility, Second Line of Credit Facility, A&R Line of Credit Facility, and BMMZ Repo Facility—and concludes that all such transactions were entered into at arm's length and on balance were more favorable to ResCap than would have been obtained in third-party financings of comparable size and nature.[39]

## F.  EXAMINER'S EVALUATION OF ESTATE CLAIMS

As described above, the Debtors' Estates could assert claims seeking:

- Up to approximately $1.31 billion in damages with respect to claims the Examiner believes are likely to prevail;

- Up to approximately $1.78 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to prevail;

- Up to approximately $2.36 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to fail; and

- Equitable subordination of AFI's claims (totaling approximately $1.13 billion), with respect to which the Examiner concludes, while a close question, is more likely than not to fail.

---

[37]  For the Examiner's full analysis of the Prepetition Asset Sales, see Sections V.F and VII.F.6.

[38]  For the Examiner's full analysis of financing Affiliate Transactions, see Section V.E.

[39]  Notwithstanding that conclusion, as discussed in Section VII.F, certain of the financing Affiliate Transactions implicate potential Estate Causes of Action.

The following four charts group the Estate Causes of Action according to the methodology set forth above in Section I.D. Except as otherwise noted, the potential defendant for each claim in the following charts is either AFI, Ally Bank, or another subsidiary of AFI.

EXHIBIT I.F—1
**Estate Causes of Action the Examiner Concludes are Likely to Prevail**
*($ in Millions)*

| Description | Potential Damages [1] |
|---|---|
| Claims relating to Minnesota Insider Preference statute | $   566.0 [2] |
| Claim relating to misallocation of net revenues on loans brokered by GMAC Mortgage | 520.5 |
| Preferential transfer in connection with March 2012 payment under the DOJ/AG Consent Judgment | 109.6 |
| Constructive fraudulent transfer in connection with Second 2009 Tax Allocation Agreement | 50.0 |
| Preferential transfer in connection with May 2012 payments under January 30 Letter Agreement and A&R Servicing Agreement | 48.4 |
| Contractual claim pursuant to Implemented 2005 Tax Allocation Agreement | 15.1 |
| Total | $  1,309.6 |

[1] *Potential damages amounts are approximate, represent the upper end of the range considered reasonably possible, and do not account for interest.*

[2] *As set forth in Section VII.F.4.g(2)(d), the Examiner concludes that AFI likely has substantial Insider Preference liability with respect to payments that it received under the A&R Line of Credit Facility that would not be subject to offset based on new value contributed by AFI. However, because of the unique facts presented, the Examiner is unable to definitively determine how AFI's Insider Preference liability would be calculated. A court could reasonably calculate AFI's Insider Preference liability in a variety of ways that would yield different results. In particular, the Examiner notes that the manner in which a court would treat debt forgiveness for calculating Insider Preference liability in the context of a continuously revolving secured line of credit is uncertain.*

*As set forth in Section VII.F.4.g(4)(b), transfers to GMAC CF of approximately $32 million in connection with the Servicing Advance Factoring Facility, to the extent they were made by RFC, are likely to satisfy the prima facie elements of the Minnesota Insider Preference statute. $1.5 million of that amount will not likely be subject to any new value defense. The balance may be subject to reduction to the extent that GMAC CF can establish that it provided new value in connection with the return of certain receivables.*

EXHIBIT I.F—2

**Estate Causes of Action the Examiner Concludes are Close Questions, but More Likely to Prevail**
*($ in Millions)*

| Description | Potential Damages[1] |
|---|---|
| Enforcement of First 2009 Tax Allocation Agreement | $ 1,770.0 |
| Unauthorized postpetition transfer in connection with indemnification obligations under the terms of the A&R Servicing Agreement | 12.9 |
| Total | $ 1,782.9 |

[1]*Potential damages amounts are approximate, represent the upper end of the range considered reasonably possible, and do not account for interest.*

EXHIBIT I.F—3
**Estate Causes of Action the Examiner Concludes are Close Questions, but More Likely Not to Prevail**
*($ in Millions)*

| Description | Potential Damages [1] |
|---|---|
| Failure to pay the value of purchased MSRs and correspondent loan MSRs to GMAC Mortgage under the MSR Swap | $ 1,725.0 |
| Fraud in connection with 2006 Bank Restructuring | 608.0 |
| Constructive fraudulent transfer against Cerberus in connection with June 2008 Model Home Sale | 30.0 |
| Total | $ 2,363.0 |

*Claims with Duplicative Potential Damages Not Included in Total* [2]

| | |
|---|---|
| Breach of 2005 Operating Agreement in connection with 2006 Bank Restructuring | $    608.0 |
| Breach of fiduciary duty against ResCap's directors and officers in connection with: | |
| • Failure to execute the ResCap Board-approved First 2009 Tax Allocation Agreement | 1,770.0 |
| • 2006 Bank Restructuring | 608.0 |
| • Approval of Second 2009 Tax Allocation Agreement | 50.0 |
| • May 2012 payment under January 30 Letter Agreement and A&R Servicing Agreement | 48.4 |
| • Investigation and negotiations that led to AFI Settlement and Plan Sponsor Agreement and approval of RMBS Trust Settlement Agreements | Unknown |
| Aiding and abetting breach of fiduciary duty claims against AFI in connection with the 2006 Bank Restructuring | 608.0 |

*Bankruptcy Claims Not Involving Affirmative Recovery*

Equitable subordination of AFI's Claims totaling $1.127 billion

[1] *Potential damages amounts are approximate, represent the upper end of the range considered reasonably possible, and do not account for interest.*
[2] *Potential damages amounts are not included in the total because they are duplicative of potential damages associated with other claims.*

EXHIBIT I.F—4

**Estate Causes of Action the Examiner Concludes are Unlikely to Prevail**

**Description**

Aiding and abetting breach of fiduciary duty claims against AFI other than in connection with the 2006 Bank Restructuring

Breach of contract claims relating to the Pipeline Swap

Breach of the 2005 Operating Agreement or the 2006 Amended Operating Agreement in connection with the MMLPSA, Pipeline Swap, or MSR Swap

Constructive trust

Debt recharacterization

Equitable disallowance

Fraudulent transfer in connection with Ally Bank Transactions

Fraudulent transfer in connection with Prepetition Asset Sales other than June 2008 Model Home Sale

Miscellaneous breach of fiduciary duty claims against ResCap's directors and officers

Representation and warranty liability under the 2001 and 2006 MMLPSAs

Single entity theories of liability with respect to AFI and ResCap and/or its affiliates, including piercing the corporate veil and substantive consolidation

Tortious interference with contract in connection with 2006 Bank Restructuring

## G. EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING PROPOSED POSTPETITION TRANSACTIONS AND AGREEMENTS

### 1. Negotiation And Entry Into AFI Settlement And Plan Sponsor Agreement

The Examiner reviewed the process that resulted in the AFI Settlement and Plan Sponsor Agreement, including the activities of the ResCap Board in connection with that agreement.[40] Although the AFI Settlement and Plan Sponsor Agreement has been terminated, a review of the settlement process remains relevant. AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' Estates "if an acceptable settlement can be reached."[41] As described below, the Investigation identified a number of issues that raise significant doubts as to whether ResCap's process reaching the AFI Settlement and Plan Sponsor Agreement was adequate. While a

---

[40] For the Examiner's full analysis of the negotiation and entry into the AFI Settlement and Plan Sponsor Agreement, see Section III.J.3.

[41] Ally Financial Inc., Quarterly Report (Form 10-Q) (May 1, 2013), at 11.

close question, the Examiner concludes it is more likely than not that a court would have found that the now-terminated AFI Settlement and Plan Sponsor Agreement was the product of a defective or deficient process.

In November 2011, ResCap appointed two new independent directors, Jonathan Ilany and John Mack, to act as the Special Review Committee of the ResCap Board and implement a process and procedure for the review and assessment of Affiliate Transactions, the historical course of dealing between ResCap and AFI, and potential claims arising therefrom. Despite authorization to engage independent counsel at the expense of ResCap, Ilany and Mack relied on Morrison & Foerster to perform that review. Morrison & Foerster's decision that it could independently assess the financial and operational course of dealing between AFI and ResCap is questionable in light of the firm's significant involvement in that very course of dealing during the preceding years. Given Morrison & Foerster's history of advising the ResCap Board, the fact that neither Ilany nor Mack raised any concerns with respect to the potential conflicts of their advisors is itself cause for concern.

In addition, Morrison & Foerster's investigation was conducted within a relatively compressed period, and the scope of Morrison & Foerster's written materials to the ResCap Board was limited. Ilany and Mack were unprepared to conduct an effective negotiation. They had limited understanding of Third-Party Claims and therefore did not ascribe appropriate value to the requested Third-Party Release. Instead, Ilany and Mack sought to achieve a "headline number" of approximately $1 billion and, to get to that number, likely ascribed too much value to the non-cash contributions from AFI.

Ilany was the primary negotiator for ResCap with respect to the AFI Settlement and Plan Sponsor Agreement, although Mack was also involved in portions of the negotiations. In early May 2012, after ResCap and AFI had already apparently reached agreement on an $850 million cash contribution by AFI to settle claims against it, AFI inexplicably reduced its proposed contribution to $750 million. Mack testified that the draft settlement agreements exchanged between AFI and ResCap with an apparently agreed-upon $850 million contribution were merely attempts by ResCap to extract additional settlement value above $750 million. The documentary evidence does not support that recollection. The sudden reduction of AFI's settlement amount by $100 million, with no record of any real protest from ResCap's representatives, raises serious questions as to ResCap's settlement process. It would appear that, whether by miscommunication or lack of aggressive negotiation, ResCap left that value on the table.

The deficiencies in the process leading to the AFI Settlement and Plan Sponsor Agreement are perhaps mitigated by ResCap's understanding that AFI's cash contribution was not the most important aspect of the "elegant" bankruptcy ResCap was seeking. ResCap understood that it would have "another bite at the apple" with respect to the amount of AFI's cash contribution. Viewed in that light, with the benefit of hindsight, and considering the termination of the settlement by the Debtors and the ongoing settlement negotiations in the Chapter 11 Cases, the pre-negotiated amount of AFI's cash contribution may be of less importance.

## 2. Negotiation And Entry Into RMBS Trust Settlement Agreements And RMBS Plan Support Agreements

Consistent with the scope of the Investigation, the Examiner reviewed the process that resulted in the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements, including the

activities of the ResCap Board in connection with such agreements, and whether such agreements were negotiated at arm's length.[42] As set forth in the Examiner Scope Approval Order, the Examiner is not opining on whether the $8.7 billion unsecured claim proposed to be allowed by the RMBS Trust Settlement Agreements falls within the range of reasonableness. In connection with the pending contested motion before the Bankruptcy Court to approve the RMBS Trust Settlement Agreements under Bankruptcy Rule 9019, the parties engaged numerous experts to perform loan re-underwriting analyses and to estimate potential cumulative lifetime loss ranges, among other things, to evaluate the proposed allowed claim amount. The Examiner did not seek to duplicate the work of the parties' experts.

The objectors to the RMBS Trust Settlement Agreements argue that the Bankruptcy Court should decline to approve the settlement because it was not the product of arm's-length bargaining. The principal theory underlying the objections is that AFI "dominated and controlled" the negotiations to obtain a Third-Party Release, essentially "trading" an "excessive" $8.7 billion allowed claim against ResCap for an "inadequate" $750 million plan contribution by AFI.[43]

The objectors focus on the involvement of Tim Devine, AFI's Chief Counsel of Litigation, arguing that he "dominated" the settlement negotiations. The objectors rightly point out that Devine played one of the central roles in the settlement negotiation process. However, the totality of the evidence suggests that Devine advocated consistently in negotiations for as low an allowed claim amount as was achievable. AFI had good reasons to negotiate with that objective, including: (1) AFI would potentially be liable for all of the Debtors' debts if an Estate representative successfully pierced the corporate veil between AFI and the ResCap entities; (2) AFI had publicly disclosed on April 27, 2012 that "ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations . . . could be between $0 and $4 billion over existing accruals [of $811 million],"[44] and was concerned that agreeing to an allowed claim well in excess of that amount could create potential liability; and (3) AFI was under pressure from federal regulators to settle at a defect rate that would not put stress on other banks.

The Examiner concludes that AFI was motivated to and did advocate consistently throughout the negotiations for a lower claim amount and, ultimately, AFI's involvement in the negotiations helped drive down the proposed allowed claim amount. The Examiner concludes that the evidence supports the proposition that the process underlying the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements satisfied the "arm's length bargaining" factor under Rule 9019.

---

[42] For the Examiner's full analysis of the negotiation and entry into the RMBS Trust Settlement Agreements and RMBS Plan Support Agreements, see Section III.J.4.

[43] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 1, 20–21.

[44] *See* Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 69, 73. As discussed in Section III.J.4.h(3), the Examiner believes that AFI's SEC disclosures for the first quarter of 2012 offer relatively little guidance in the Investigation as to whether the negotiations between AFI, ResCap, and the Steering Committee Group were at arm's length.

The objectors also argue that the ResCap Board "rubber-stamped" the RMBS Trust Settlement Agreements on May 9, 2012 after reviewing a "cursory" and "flawed" presentation.[45] The presentation showed that the proposed $8.7 billion allowed claim amount implied a 19.72% defect rate, and presented a comparison suggesting that if the "BofA Baseline—36%" defect rate had been applied to the approximately $44.1 billion estimated lifetime losses for ResCap's RMBS issuance, the allowed claim amount would have been approximately $15.9 billion.[46] But the 36% comparative defect rate was not "apples to apples" with the ResCap settlement defect rate. If the analogous defect rate—approximately 14.4%— had been applied, the comparative allowed claim amount would have been approximately $6.35 billion.

The presence of flawed comparative data points in the May 9, 2012 presentation does not, by itself, render the ResCap Board approval process inadequate. The May 9, 2012 presentation set forth in detail other information that the ResCap Board needed to make an informed decision to approve the RMBS Trust Settlement Agreements and the RMBS Plan Support Agreements. In addition, the ResCap Board had significant experience and familiarity with the issues underlying the settlements. The Examiner concludes that, while a close question, it is more likely than not that a court would find that the ResCap Board had a sufficient understanding of the underlying Trust R&W Claims to vote on an informed basis with respect to the RMBS Trust Settlement Agreements.

Importantly, when the ResCap Board voted to approve the RMBS Trust Settlement Agreements, it understood that a settlement with the RMBS Institutional Investors on the allowed amount of Trust R&W Claims was critical to achieving a successful sale of ResCap's mortgage loan origination and servicing platform. Accordingly, the Examiner concludes that the evidence supports the proposition that the ResCap Board had a rational business purpose in mind when it approved the RMBS Trust Settlement Agreements.

While the May 9, 2012 presentation to the ResCap Board was flawed, the Examiner does not believe that such flaws undermine the conclusion that the settlement negotiations between ResCap, AFI, and the Steering Committee Group were conducted at arm's length.

## H. EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING THIRD-PARTY CLAIMS

The AFI Settlement and Plan Sponsor Agreement originally provided for, among other things, a broad Third-Party Release of AFI and its affiliates from any and all Causes of Action arising from or related in any way to the Debtors. The Examiner Scope Approval Order

---

[45] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 2825] at 18; *see also* Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2819] at 2, 15–16; Objection of Wilmington Trust, National Association to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 2814] at 2.

[46] *See* ResCap Private Label Securities Rep & Warrant Settlement Discussion Supporting Information, dated May 9, 2012, at RC40020578 [RC40020575].

directed the Examiner to: (1) investigate the merits of the claims to be released pursuant to the Third-Party Release; (2) analyze the sufficiency of the consideration to be provided for the Third-Party Release; and (3) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising therefrom (but not to quantify independently such damages). Following the expiration of the AFI Settlement and Plan Sponsor Agreement, the Examiner determined, after participating in a February 28, 2013 chambers conference with the Bankruptcy Court and representatives of the Debtors, the Creditors' Committee, and AFI, that an analysis of Third-Party Claims remained important to any potential future global settlement and plan of reorganization.[47]

The RMBS Claims represent the single largest source of potential liability against the AFI Defendants. The lawsuits related to the RMBS Claims are large-scale, complex litigations, some of which have been pending in state or federal courts for years. The claims are based upon various legal theories, including breach of contract, fraud, and violation of state and federal securities laws. These claims arise from the same general body of facts as the Trust R&W Claims that are the subject of the RMBS Trust Settlement Agreements, but differ with respect to the Causes of Action asserted and the parties asserting them.

Given the Examiner's original charge to determine the sufficiency of the consideration to be provided for the Third-Party Release, the Investigation focused on the extent to which the AFI Defendants might be held liable for the Debtors' RMBS-related conduct if the Debtors were ultimately found liable in the first instance. Accordingly, the Examiner's Professionals did not undertake certain activities necessary to resolve the Debtors' primary liability, such as loan-level diligence, re-underwriting of loan files, or calculation of breach rates, loss-share rates, or the securitization trusts' estimated lifetime losses. While these issues are contested and could significantly affect any ultimate findings of liability and/or damages, a full investigation into the Debtors' underlying liability and the corresponding defenses would have dwarfed the already broad scope of the Investigation. Accordingly, the Examiner's findings with respect to the RMBS Claims are not meant to represent a dispositive analysis of all outstanding issues. Rather, they represent a limited evaluation of the claims most likely to affect the value of any future global settlement with AFI. Unless otherwise noted, the Examiner has not reached any final conclusions with respect to the Third-Party Claims, all of which would require further factual development before final determinations of liability are made.

## 1. Third-Party Claims Against AFI

### a. RMBS Claims

A variety of Third-Party Claimants either have asserted or may assert claims against AFI seeking to impose liability on it based upon RMBS Claims asserted against one or more of the Debtors and/or Ally Securities. Such claims against AFI are premised upon three principal theories of liability: (1) piercing the corporate veil of the Debtors to hold AFI liable

_____

[47]   For the Examiner's full analysis of Third-Party Claims, see Section VIII.

for underlying claims asserted against those Debtors; (2) "control person" claims seeking to hold AFI liable under federal or state securities laws for alleged primary securities law violations by the Debtors and/or Ally Securities in connection with their sale of RMBS to investors; and (3) common law aiding and abetting claims to hold AFI liable for alleged fraud or fraudulent inducement by the Debtors and/or Ally Securities in connection with their sale of RMBS to investors or their procurement of financial guaranty insurance for RMBS. The Examiner reaches conclusions concerning certain factual and legal issues that, if Third-Party Claimants were to succeed in proving underlying claims against the Debtors or Ally Securities, would affect Third-Party Claimants' likelihood of recovery from AFI under one or more of those three theories.

First, the Examiner concludes it is unlikely that any pending or potential claims by Third-Party Claimants seeking to hold AFI liable on a veil-piercing or alter ego theory of liability for RMBS Claims asserted against the Debtors would prevail. For the reasons explained above, the Examiner concludes that a potential veil-piercing claim asserted on behalf of the Debtors to hold AFI liable for all of those Debtors' debts is unlikely to prevail. Veil-piercing claims asserted by Third-Party Claimants would be governed by Delaware law and would face many of the same legal and factual hurdles as a potential veil-piercing claim asserted on behalf of the Debtors. Moreover, any such veil-piercing claim seeking to hold AFI liable for RMBS Claims against the Debtors would also appear vulnerable to an argument that such claim constitutes property of the Estates and Third-Party Claimants would lack standing to pursue it.

Second, several "control person" claims asserted against AFI under federal or state securities laws have survived motions to dismiss. However, the totality of the evidence indicates that it would be difficult to prove the necessary degree of control during the relevant period, from 2004 to 2007. The Investigation has not uncovered evidence that AFI—notwithstanding the existence of overlapping officers and directors and certain shared corporate functions and services—had any direct involvement in any of the Debtors' securitizations. Accordingly, while a close question, the Examiner concludes it is more likely than not that a court would not find the requisite control by AFI over the alleged primary securities violators. Moreover, were Third-Party Claimants to succeed in proving a prima facie case for control person liability, certain of those securities claims appear subject to potential statute of limitations or other affirmative defenses.

Third, in general, Third-Party Claimants face higher pleading standards and burdens of proof with respect to common law aiding and abetting fraud claims asserted against AFI than with respect to many of the claims asserted under state and federal securities laws. Despite the need to plead with particularity to meet those standards, at least one claimant's aiding and abetting fraud claims have survived the pleading stage and proceeded to discovery. Although the existence of overlapping officers and directors and the audits AFI conducted of the Debtors' securitization process provide some support for these claims, Third-Party Claimants have not produced to the Examiner nor has the Investigation revealed any evidence to establish that AFI possessed actual knowledge of the fraud alleged by Third-Party Claimants. Moreover, the Investigation has revealed no evidence that supports the assertion that AFI provided substantial assistance to the conduct alleged to give rise to Third-Party Claimants'

fraud claims. The available evidence does not indicate that AFI had any direct involvement in any of the securitizations at issue that could be considered the proximate cause of the Debtors' alleged fraud. Evidence concerning the capital support that AFI provided to the Debtors and the corporate functions and services that became increasingly integrated with AFI over time is not likely to suffice. Not only is such general assistance to the Debtors' businesses unlikely to be deemed the proximate cause of the Debtors' alleged fraud, but much of that assistance came after the Debtors ceased private label securitizations in 2007. While a plaintiff who undertakes the factual review necessary to conclusively determine liability for RMBS-related conduct might be able to prove otherwise, the Investigation has revealed no evidence that supports the Third-Party Claimant's assertions that AFI should be held liable for the alleged fraud of its subsidiaries.

### b. Fraudulent Transfer Claim

The Investigation revealed two transfers made by Ally Securities to AFI, one in April 2012 for $200 million and the other in August 2012 for $25.5 million. Ally Securities characterized these transfers as "distributions of excess capital." Immediately after the April 2012 transfer, Ally Securities had approximately $49.5 million in equity, while facing several pending RMBS Actions asserting billions of dollars in potential liability. Any reasonable quantification of this liability as of the time of transfer would likely overwhelm Ally Securities' $49.5 million in equity, as well as the $16.3 million in equity at the time of the August transfer. Accordingly, the Examiner has concluded that Ally Securities was insolvent as of the date of each transfer. Given the nature of the distributions, which were dividends to Ally Securities' sole member, they were not made for reasonably equivalent value.

The Examiner also concludes that, while a close question, it is more likely than not that an actual fraudulent transfer claim would prevail with respect to the transfers. While there is no direct evidence of fraudulent intent, there are a number of badges of fraud present. The transfers were made: (1) for no consideration; (2) between a parent and its wholly owned subsidiary; (3) while Ally Securities was likely insolvent; and (4) under the threat of massive pending litigation. Additionally, the circumstances surrounding the transfers support an inference of fraud. Just prior to the transfers, AFI offered to include the equity of Ally Securities in a settlement with ResCap. ResCap refused this offer based on the belief that the equity of Ally Securities was worthless. Shortly after this offer was rejected, Ally Securities began transferring its "excess capital" to its parent and sole member, AFI. Thus, while Ally Securities has asserted that the transfers were made because it had ceased all mortgage-related underwriting and trading activities, it is more likely than not that a court would find that the strong inference of fraudulent intent outweighs this stated business purpose.

### 2. Third-Party Claims Against Ally Securities

Based on Ally Securities' activities as securities underwriter, Third-Party Claimants assert that Ally Securities is directly liable for false statements in the RMBS Offering Documents. These claimants allege that Ally Securities provided critical underwriting services in connection with the securitizations, including reviewing, marketing, and distributing the Debtors' false and misleading Offering Documents. Claimants have asserted several causes of

action against Ally Securities including claims based on: (1) federal and state securities law; (2) common law fraud and fraudulent inducement; (3) aiding and abetting fraud; and (4) negligent misrepresentation.

In their Submission Papers, the Debtors and AFI do not challenge the Third-Party Claimants' standing to bring the asserted securities law claims, nor do they challenge that Ally Securities participated in the RMBS offerings in a manner sufficient to give rise to potential liability under pertinent securities laws. Thus, two central elements to the Third-Party Claimants' securities law claims remain, both of which must be demonstrated by a preponderance of the evidence: (1) that the RMBS Offering Documents contained an untrue or misleading statement; and (2) that the statement was material. In most of the actions asserting securities law claims against Ally Securities (or the Debtors), courts have held that the Third-Party Claimants have adequately alleged material misrepresentations in the RMBS Offering Documents. Generally, Third-Party Claimants also have adequately alleged that, if proven to be untrue or misleading, these misrepresentations would be material. Accordingly, the success of these claims will ultimately hinge upon whether the Third-Party Claimants can effectively demonstrate that untrue statements were made. In an attempt to prove that the statements at issue were indeed untrue or misleading, Third-Party Claimants allege to have conducted loan-level diligence, review of loan files, and interviews of confidential witnesses, among other undertakings. As noted above, however, the scope of the Investigation did not require such a granular analysis. While, within those limitations, the Investigation has revealed no evidence that supports the Third-Party Claimant's assertions, it appears that the Third-Party Claimants' securities law claims may have at least some viability based upon the pleadings and the current trends in case law. In subsequent stages of litigation, however, Ally Securities will also be able to advance several affirmative defenses, including due diligence and loss causation defenses, which may prove difficult hurdles for claimants to overcome.

Like Third-Party Claimants' securities law claims, their claims for fraud and fraudulent inducement allege material misrepresentations in the RMBS Offering Documents. In support of their fraud claims, Third-Party Claimants assert that Ally Securities knew these alleged misrepresentations were false. Third-Party Claimants state that they justifiably relied upon these misrepresentations and were damaged as a result. As with the securities law claims discussed above, however, the Investigation has revealed no evidence that supports the Third-Party Claimant's assertions that Ally Securities knowingly made untrue or misleading material statements. The Examiner notes that fraud and fraudulent inducement claims will be more difficult to prove than many securities law claims, as fraud claims require showing Ally Securities' knowledge of the fraud, intent to defraud, and damages causation, among the other elements. While it is possible that a plaintiff could prove such elements, this would require additional factual development.

With respect to claims against Ally Securities for aiding and abetting fraud, Third-Party Claimants must first show that there was an underlying fraud and that Ally Securities knew of that fraud and provided substantial assistance to the Debtors in perpetrating that fraud. Generally, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Securities was intrinsically involved in the securitization

process. Given Ally Securities' position as underwriter, it is probable that Ally Securities would have had knowledge of the Debtors' fraudulent conduct to the extent such fraud existed. And it could possibly be determined through additional discovery that Ally Securities substantially assisted in the alleged fraud in its marketing of the RMBS.

Finally, the negligent misrepresentation claims against Ally Securities turn upon whether Third-Party Claimants can demonstrate a special relationship of trust and confidence with the defendant. The Investigation did not include an examination of the individual relationships between Third-Party Claimants and Ally Securities. Based upon a review of the existing RMBS Actions, however, while some negligent misrepresentation claims against Ally Securities have survived motions to dismiss, these rulings only allow plaintiffs to proceed to discovery and are not necessarily indicative of potential future success. In most cases where the court conducted a more thorough analysis regarding the nature of the parties' relationship in an RMBS transaction, the court concluded that a special relationship did not exist.

### 3. Third-Party Claims Against Ally Bank

The Investigation has revealed no evidence to support the Third-Party Claimants' assertions that Ally Bank breached its custodial obligations to obtain, review, and certify mortgage notes. However, because the Examiner's Professionals did not conduct an audit of individual mortgage notes held by Ally Bank pursuant to the custodial agreements, this conclusion should not be considered dispositive of these Third-Party Claims. Further, the Investigation has revealed no evidence to support the Third-Party Claimants' assertions that Ally Bank breached its obligation to alert the trustees and monolines to breaches of representation and warranties related to the securitizations. Given that Ally Bank custodial associates only performed a limited review of mortgage notes held in Ally Bank's custody, not entire loan files, it is unlikely that this review would have alerted Ally Bank's custodial division to the broad breaches of representations and warranties alleged by Third-Party Claimants.

Third-Party Claimants solicited by the Examiner were unable to identify any evidence of Ally Bank having actual knowledge of ResCap's alleged fraud. This lack of evidence is not wholly determinative, however, given the limited discovery conducted by most of the Submitting Parties. Generally, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank was profoundly knowledgeable as to ResCap's operations. This evidence includes overlap between Ally Bank and ResCap leadership, the existence of several inter-company committees designed to centralize product and risk management, and shared information systems. Similarly, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank's financing activities would be considered a form of substantial assistance if ResCap is found to have engaged in the alleged fraud. This finding is primarily supported by the fact that Ally Bank was created to serve as a conduit for funding GMAC Mortgage's securitization activity, which the entities carried out through a series of atypical and non-arm's-length financing transactions. While Ally Bank represented only one of many sources of loan origination for GMAC Mortgage, it was a strategic and steady source nonetheless.

A final and important consideration with respect to the RMBS Claims against Ally Bank is that such claims may be limited by the Examiner's conclusion that, under Utah law, a court is unlikely to find that Ally Bank is the successor in liability to Old GMAC Bank. If a court were to agree with this conclusion, RMBS Claims against Ally Bank may be limited to only those securitizations that contain loans sold by Ally Bank after the 2006 Bank Restructuring.

### 4. Unsecured Noteholder Causes Of Action

#### a. Tortious Interference Under 2005 Indenture

In connection with the Unsecured Noteholder Causes of Action, the Examiner investigated whether AFI tortiously interfered with the 2005 Indenture as a result of ResCap's alleged breach of the "all or substantially all" covenant included in the 2005 Indenture (the covenant prohibits the borrower from transferring all or substantially all of its assets without the transferee assuming the borrower's obligations under the agreement). The Unsecured Noteholders assert that by the end of 2008, ResCap's only operating assets of value were its equity interest in IB Finance and certain intercompany receivables owed to it by its operating subsidiaries. ResCap also possessed equity interests in its operating subsidiaries, but the Unsecured Noteholders argue that such interests were worthless given that those subsidiaries were insolvent at the time. The Unsecured Noteholders contend that, by the end of 2009, ResCap breached the covenant when AFI induced ResCap, as part of a pre-arranged plan that effectively left ResCap with no material assets, to enter into: (1) the 2009 Bank Transaction; and (2) a series of intercompany debt forgiveness transactions.

Because none of the transactions by themselves would trigger the covenant, the Investigation first considered whether all of these transactions could be aggregated for purposes of determining whether all of these transactions could be aggregated for "substantially all" of its assets. If the transactions were entered into as part of a preexisting plan of liquidation, then under prevailing case law they may be properly aggregated. The Investigation, however, did not uncover evidence of any such plan. As a result, while a close question, the Examiner concludes it is more likely than not that a court would not find that all of the transactions should be aggregated for purposes of determining whether the "substantially all" provision in the 2005 Indenture was breached.

Notwithstanding that conclusion, the Examiner also considered whether the transactions, in the aggregate, constituted a transfer of "substantially all" of ResCap's assets. When conducting that analysis, courts apply both a quantitative and qualitative analysis. A quantitative analysis may look to, among other things, the percentage of operating assets and total assets transferred. A qualitative analysis, on the other hand, considers whether the transfer violated the intent of the lenders and whether the transfers rendered the issuer incapable of operating as a going concern. After considering the quantitative and qualitative factors of the transactions at issue as a totality, the Examiner concludes, while a close question, it is more likely than not that a court would not find there was a breach of the "all or substantially all" covenant of the 2005 Indenture.

Given the possibility, although somewhat unlikely, that a court could find a breach of the "substantially all" covenant of the 2005 Indenture, the Examiner considered whether AFI could be found to have tortiously interfered with the contract by intentionally procuring ResCap's breach of the 2005 Indenture without justification. The Investigation did not uncover any evidence that AFI intended the 2009 Bank Transaction and the intercompany debt forgiveness transactions to cause a breach of the 2005 Indenture. Even if intentional procurement of the breach were established, the Investigation revealed evidence that AFI acted to protect its own legal or financial stake in ResCap's business and would have a viable economic justification defense to a tortious interference with contract claim. Therefore, the Examiner concludes it is unlikely that the Unsecured Noteholders' claim against AFI for tortious interference with the 2005 Indenture would prevail.

### b. Claims Related To The 2006 Bank Restructuring

As described above, the Examiner concluded that AFI engaged in questionable conduct in connection with the 2006 Bank Restructuring, including with respect to the waiver by the ResCap Board of certain provisions of the 2005 Operating Agreement. Because the Unsecured Noteholders are intended third-party beneficiaries of the 2005 Operating Agreement, the Examiner considered the Unsecured Noteholders' potential claims against AFI arising from the 2006 Bank Restructuring.

The Unsecured Noteholders might assert a claim that the conduct of AFI's agents constituted a breach of the 2005 Operating Agreement, which is governed by New York law. However, it appears that such a claim would be time-barred under the six-year statute of limitations. The Examiner therefore concludes it is unlikely that a claim by the Unsecured Noteholders arising from the 2006 Bank Restructuring for breach of either the express terms of the 2005 Operating Agreement and/or the covenant of good faith and fair dealing implied thereunder would prevail.

The Examiner considered whether the facts surrounding the 2006 Bank Restructuring would give rise to a claim of fraud. While likely not time-barred, the Unsecured Noteholders would face challenges in establishing reliance on any alleged misrepresentations by agents of AFI. It is possible that such a claim could be premised upon New York's "third-party reliance" doctrine, but the law is unsettled. Weighing these considerations and all of the facts and circumstances, the Examiner concludes that, while it is a close question, it is more likely than not that the Unsecured Noteholders' fraud claim would not prevail.

### 5. Junior Secured Noteholder Causes Of Action

The Examiner concludes that the evidence does not support the allegations made by the Ad Hoc Group of Junior Secured Noteholders that either: (1) entering into the Line of Credit

Facilities; or (2) releasing the liens on certain assets securing the Secured Revolver Facility, the Junior Secured Notes, and the Senior Secured Notes, and having such assets secure the Line of Credit Facilities, violated the terms of the Secured Revolver Loan Agreement, the Junior Secured Notes Indenture, the Senior Secured Notes Indenture, or the Intercreditor Agreement.[48]

## I. EXAMINER'S EVALUATION OF CONSIDERATION FOR RELEASES

To provide some guidance to parties in connection with any future settlement discussions, the Examiner has reviewed the terms of the now-terminated AFI Settlement and Plan Sponsor Agreement to determine whether the Debtor Release and Third-Party Release contemplated by that agreement would have been warranted based on AFI's financial and non-financial contributions to the Debtors contemplated by that proposed but now-terminated settlement.[49]

The AFI Settlement and Plan Sponsor Agreement proposed to settle all Estate Causes of Action and Third-Party Claims against the AFI Released Parties. AFI proposed a cash contribution of $750 million (plus other non-cash contributions to the Debtors) to achieve the settlement of Estate Causes of Action *and* Third-Party Claims.

The Examiner concludes it is unlikely that a court would have approved a settlement of the Estate Causes of Action against AFI in exchange for AFI's contribution of $750 million in cash (and other non-cash contributions), as contemplated by the now-terminated AFI Settlement and Plan Sponsor Agreement. Given the Examiner's conclusion that the proposed consideration under the AFI Settlement and Plan Sponsor Agreement would not have been adequate to support a release of the Estate Causes of Action against AFI, the Examiner further concludes that a court would a fortiori not have approved the Third-Party Release contemplated by that agreement.

Although a Plan embodying a nonconsensual Third-Party Release is not categorically prohibited in the Second Circuit (as it effectively is in certain others), by far the best course for AFI to seek to achieve a Third-Party Release is to negotiate a Plan that enjoys very broad creditor support. In the absence of such support, and given that the Debtors no longer have a substantial ongoing business to reorganize and operate, Second Circuit law would make it quite difficult but not impossible to confirm a nonconsensual Plan that deprives third parties of their right to pursue their own claims in court.

## J. EXAMINER'S PRINCIPAL CONCLUSIONS REGARDING FINANCIAL CONDITION

The Examiner and his Professionals analyzed the financial condition of ResCap, RFC, and GMAC Mortgage over time using the three tests embodied in the law applicable to

---

[48] For the Examiner's full analysis of the Junior Secured Notes and the Line of Credit Facilities and Secured Revolver Facility, see Section V.E.

[49] For the Examiner's full analysis of consideration for proposed releases, see Section IX.

constructive fraudulent transfers: (1) whether the sum of the debtor's debts (including its contingent and/or unliquidated liabilities) is greater than all of the debtor's assets, at a fair valuation (the Balance Sheet Test); (2) whether the debtor was left with "unreasonably small capital" to carry on its business (the "inadequate capital" test); or (3) whether the debtor intended or believed—or reasonably should have believed—that it was or would become unable to pay its debts as they became due (the "inability to pay" test).[50]

The Examiner's conclusions regarding each of these three conditions of financial distress are summarized below.

### 1.   Balance Sheet Test

The Examiner concludes that the evidence supports the proposition that ResCap was balance sheet solvent on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was balance sheet insolvent from December 31, 2007 through the Petition Date. The Examiner's conclusions are based on the results of the Balance Sheet Test prepared by the Examiner's Financial Advisors and consideration of the contemporaneous facts and circumstances underlying the changes in ResCap's financial condition from 2005 through the Petition Date.

The Examiner's Financial Advisors estimated the Fair Market Value of ResCap using a Market Approach and an Asset-Based Approach under a going concern premise of value. The Examiner's Financial Advisors employed the Market Approach using the Guideline Publicly Traded Company Method to value ResCap's equity and the Observable Market Value Method to value ResCap's interest-bearing debt. These values were then combined to yield the Fair Market Value of ResCap's invested capital. Under the Market Approach, ResCap's total interest-bearing debt was subtracted from the Fair Market Value of ResCap's invested capital to determine the Fair Market Value surplus/(deficit). The Examiner's Financial Advisors also employed the Asset-Based Approach using the Adjusted Book Value Method to estimate the Fair Market Value of ResCap's assets. Under the Asset-Based Approach, ResCap's total liabilities were subtracted from the Fair Market Value of ResCap's total assets to determine the Fair Market Value surplus/(deficit). The Examiner's Financial Advisors performed the Balance Sheet Test on a quarterly basis from December 31, 2005 through December 31, 2011.

The results of the Balance Sheet Test indicate insolvency for ResCap from December 31, 2007 through the Petition Date.

### 2.   Unreasonably Small Capital

The Examiner concludes that the evidence supports the proposition that ResCap was adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was left with unreasonably small capital from August 15, 2007 through the Petition Date. The Examiner's conclusions are based upon a detailed quantitative and qualitative analysis of ResCap's historical and projected financial and performance characteristics, focusing upon the evolution in ResCap's business model and capitalization needs in response to rapidly changing market conditions from 2005 through the Petition Date.

_____

[50]   For the Examiner's full analysis of ResCap's financial condition, see Section VI.

This analysis included an assessment of ResCap's profitability and performance, operating cash flows, liquidity, leverage, and debt capacity. Additionally, the Examiner considered all reasonable external and internal sources of funds available to ResCap, including its ability to access capital markets through debt or equity issuances, and ResCap's ability to monetize assets to fund imminent financial needs. The Examiner considered the viability of ResCap's business model over time, including the reasonableness of ResCap's financial projections, liquidity forecasts, and business plans. The Examiner also considered the capital support received by ResCap from AFI in the form of intercompany loans, cash equity infusions, contributions of ResCap bond debt in the form of equity, and other forms of related-party support including purchases of certain ResCap assets by affiliates. Furthermore, the Examiner considered events occurring within the mortgage industry and the economy.

### 3. Ability To Pay Debts As Due

The Investigation has not uncovered evidence that ResCap possessed a subjective intent to incur, or belief that it would incur, debts beyond its ability to pay as they became due. The Investigation also revealed no evidence that any officer or ResCap Board member possessed a subjective intent for ResCap to incur (or belief that ResCap would incur) debts beyond its ability to pay at the time from 2005 through the Petition Date.

However, with respect to the objective intent element, the Examiner concludes that the evidence supports the proposition that ResCap reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date. The Examiner rests this conclusion on a detailed quantitative and qualitative analysis of ResCap's ability to service its debts from 2005 through the Petition Date, giving full consideration to resources reasonably available to ResCap (such as available liquidity, cash flows, committed credit lines, reasonable sources of capital, and monetization of non-core assets through sales) to meet its imminent financial needs and to repay or refinance its longer term obligations.

### 4. Financial Condition Tests As Applied To ResCap's Subsidiaries

The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each was balance sheet solvent and adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap. The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each: (1) was balance sheet insolvent from December 31, 2007 through the Petition Date; (2) had unreasonably small capital (assets) from August 15, 2007 through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

Based on an analysis of certain financial and factual information made available to the Examiner, the Examiner determined that the financial condition of RFC and GMAC Mortgage could be reasonably estimated from 2005 through the Petition Date through: (1) a detailed analysis of the financial condition and operating results of ResCap on a consolidated basis, recognizing ResCap had no significant operations separate and apart from its subsidiaries; (2) an assessment as to the relative size and operating performance of RFC and GMAC Mortgage, as reflected in ResCap's consolidated financial statements and subsidiary trial

balances; (3) an assessment of various intercompany receivables and/or payables, between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (4) an evaluation of the nature and timing of certain intercompany account activity between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (5) consideration of potential contingent and/or unliquidated liabilities, including those arising from certain RFC and GMAC Mortgage guarantee obligations; and (6) consideration of the effects of industry and economic conditions on RFC and GMAC Mortgage over the relevant time period.