## III. CHRONOLOGICAL PRESENTATION OF TRANSACTIONS AND EVENTS RELEVANT TO THE ISSUES INVESTIGATED BY THE EXAMINER

The ResCap story spans approximately eight years—beginning with the concept that AFI's mortgage operations might attract lower cost funding if ring-fenced from AFI and its parent GM, and ending, at least nominally, with the commencement of the Chapter 11 Cases. A lot happened in that time frame—at ResCap and AFI—and within the mortgage lending industry, the capital markets, and the global economy. The analysis of the various related-party transactions and course of dealing by and among ResCap, AFI, and Cerberus are at the center of the Investigation and this Report; that analysis is best understood in the context of the chronological narrative set forth in this Section.[1]

### A. GM'S DECLINING BUSINESS LEADS TO THE FORMATION OF RESCAP AND, ULTIMATELY, TO GM'S SALE OF A MAJORITY INTEREST IN AFI/RESCAP TO CERBERUS

#### 1. Background

##### a. General Motors Corporation

ResCap's saga begins with GM, the automobile manufacturer founded in 1908 as a holding company for Buick Motor Company.[2] By 1916, GM had been incorporated in Delaware[3] and included Chevrolet, Pontiac, GMC, Oldsmobile and Cadillac.[4] Over the course of almost 100 years, GM grew into a multi-national conglomerate of over 450 direct and indirect subsidiaries operating in two business segments: (1) automotive and other operations, which engaged in the worldwide development, production and marketing of cars, trucks, and parts, with operations in almost every country;[5] and (2) financing and insurance operations, which, as discussed below, operated primarily through AFI.

Based on overall market capitalization, GM was the largest U.S. corporation from 1985 to 1999. But GM's fortunes dimmed thereafter. GM's market capitalization of $66 billion in May 2000 had eroded to approximately $25 billion by May 2004 amid a shrinking share of the automotive market and diminishing income. In 2004, GM's automotive segment generated a net loss of $89 million while its financing and insurance segment reported record net income of $2.9 billion.[6]

---

[1]  A timeline of significant events is set forth in Appendix III.

[2]  Aff. of F. A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, *In re General Motors Corp.*, Case No. 09-50026, Docket No. 21, at 5.

[3]  General Motors Corp., Annual Report (Form 10-K) (Mar.16, 2005), at I-1.

[4]  Aff. of F. A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, *In re General Motors Corp.*, Case No. 09-50026, Docket No. 21, at 5.

[5]  *Id.*

[6]  *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-5.

*b.   AFI*

AFI was founded in 1919 as a wholly owned subsidiary of GM.[7] AFI was originally established to provide GM dealers with the automotive financing necessary for the dealers to acquire and maintain vehicle inventories and to provide retail customers the means by which to finance vehicle purchases through GM dealers.[8] Well before 2004, AFI's business had expanded to include insurance, online banking, mortgage operations, and commercial finance. AFI's entry into the mortgage industry dates back to 1985 when AFI formed GMAC Mortgage after it acquired the mortgage loan operations of the Colonial Mortgage Service companies and the servicing arm of the former Norwest Mortgage, Inc. In 1990, AFI acquired RFC.[9] In subsequent years, AFI acquired additional mortgage-related operations, including ditech.com.[10]

At the time of ResCap's incorporation in 2004, AFI's mortgage operations consisted of three separate operating and reporting segments: GMAC Residential Holding Corp. (GMAC Residential); GMAC-RFC Holding Corp. (GMAC-RFC); and GMAC Commercial Holding Corp. (GMAC Commercial Mortgage). The principal activities of the three segments included the origination, purchase, servicing, sale and securitization of residential and commercial mortgage loans and other real estate services. Each of these business segments is described in greater detail later in this report.[11]

---

[7]   General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18.

[8]   General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18.

[9]   *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 65.

[10]   In 2001, AFI (1) formed Old GMAC Bank, a federally chartered savings bank, and (2) acquired its healthcare finance business. *See* Section V.A.1 (discussing Old GMAC Bank). In 2002, AFI established its resort financing business. AFI entered the U.K. and Mexican residential mortgage loan markets in 1998. It also entered the residential real estate finance markets in The Netherlands in 2001 and in Canada and Germany in 2002. *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 65.

[11]   *See* Section III.C (discussing ResCap's post-formation funding, management, and business profile).

### 2. GM's Declining Fortunes Led To Credit Rating Downgrades That Adversely Affected AFI's Access To Competitively Priced Funding

In the several years before ResCap's incorporation, continued automotive pricing pressure, and increasing pension and post-retirement benefit expenses caused GM's net income to decline.[12] Lower levels of profitability led to a series of credit rating downgrades for GM[13] and AFI[14] that, while initially of only mild concern, became the impetus for the formation of ResCap[15] and, ultimately, for GM's sale of a controlling interest in AFI to a consortium of investors led by Cerberus.[16]

#### a. Low-Cost Funding Is Critical To Mortgage Finance Operations

The mortgage origination and securitization business is a low-margin, high-volume operation with each broker, originator, and servicer taking a small fee for their service as each

---

[12]  *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 13, 2003), at II-8–9.

[13]  Commenting on the Rating Agencies' downgrades in late 2001 and 2002, GM noted:

> Downgrades to GM's and [AFI's] credit ratings in October 2002 have reduced GM's long-term credit rating by Standard & Poor's to BBB and A3 by Moody's ([AFI] is rated A2 by Moody's). Despite these downgrades GM's and [AFI's] access to the commercial paper and unsecured debt markets remains sufficient to meet the Corporation's capital needs. Moreover, the downgrades have not had a significant adverse effect on GM's and [AFI's] ability to obtain bank credit or to sell asset-backed securities. Accordingly, GM and [AFI's] expect that they will continue to have adequate access to the capital markets sufficient to meet the Corporation's needs for financial flexibility.

> *Id.* at II-8.

[14]  AFI noted the importance of credit ratings to the cost of funding in its 2002 Annual Report:

> The cost and availability of unsecured financing is influenced by credit ratings, which are intended to be an indicator of the creditworthiness of a particular company, security, or obligation. Lower ratings generally result in higher borrowing costs as well as reduced access to capital markets. This is particularly true with respect to the Company's commercial paper ratings as certain institutional investors (money market funds in particular) are limited to investing only in securities carrying the two highest rating categories for short-term debt.

> *Id.* at 29.

[15]  ResCap was initially formed because GM was having issues with declining credit ratings and AFI, as a wholly owned subsidiary of GM, was linked to GM. *See* Int. of J. Young, Sept. 28, 2012, at 9:2–10:3; *see also* Int. of T. Melzer, Oct. 10, 2012, at 42:6–11.

[16]  *See* Section III.E (discussing GM's sale of a 51% interest in AFI to Cerberus). Cerberus is a private equity firm founded in 1992 and headquartered in New York, New York. Cerberus specializes in investing in undervalued companies and distressed debt and pursues control and non-control private equity investment strategies in a variety of industries, including manufacturing, industrial, automotive, health care, financial services, and business services. Cerberus also focuses on investment strategies in commercial lending through Cerberus Business Finance, LLC and Ableco Finance LLC, and real estate, through Cerberus Real Estate Capital Management, LLC. THE FIRM, CERBERUS CAPITAL MANAGEMENT, L.P., www.cerberuscapital.com/ thefirm (see links for more information on the four primary business strategies). Cerberus generally refers to its controlled investments as "portfolio companies" and referred to ResCap as a Cerberus portfolio company. Cerberus Capital Management, L.P., U.S. Mortgage Market Distressed Opportunity, Preliminary Draft, at 25, 28 [CCM00525455].

loan is processed. The basic business model is to borrow at low short-term rates of interest and lend at higher long-term rates of interest.[17] The originator/securitizor will hold the loans for a short period of time as they aggregate similar loans to be sold or securitized.[18] During this holding (or aggregation) period,[19] it is important that the originator/securitizor receive more interest from its borrowers than it is paying to its lenders. Because the spread between short- and long-term rates is typically quite small, an originator/securitizor seeks to hold loans for a very short time, and make up for the low margin by processing large volumes. To finance the business model, originators/securitizors use many different funding sources, including the gains on sales of loans or securitization proceeds, secured aggregation facilities, asset-backed commercial paper, repurchase agreements, bank credit facilities, note or bond issuances and, in the case of banks and their affiliates, customer deposits, borrowings from the FRB, and advances from the FHLB.[20]

### b.    GM's Credit Rating Downgrades

Downgrades to GM's and AFI's credit ratings in October 2002 reduced GM's long-term credit rating by S&P's to BBB and by Moody's to A3 (AFI was rated A2).[21] GM reported that, notwithstanding these downgrades, GM's and AFI's access to the commercial paper and

---

[17] *See* Int. of E. Feldstein, Dec. 14, 2012, at 14:13–16 ("And [AFI] was a large-scale borrower. The business was to borrow at one rate, lend at a slightly higher rate, and make something on the spread.").

[18] *See* Residential Capital Corp., General Form (Form 10) (July 15, 2005), at 12.

> The length of time from the origination or purchase of a mortgage loan to its sale or securitization generally ranges from 10 to 100 days, depending on a variety of factors including loan volume by product type, interest rates and other capital market conditions. During 2004, we typically sold loans within 20 to 60 days of purchase or origination. We generally sell or securitize mortgage loans in the secondary market when we have accumulated a sufficient volume of mortgage loans with similar characteristics, usually $150 million to $1.5 billion in principal amount.

> *Id.*

[19] The "aggregation period" is the time period between the acquisition or origination of a loan and its subsequent sale or securitization. *Id.*

[20] S*ee* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 51–55. Likewise, the servicing business is also a low-margin, high-volume operation requiring a large infrastructure of personnel and information systems to process transactions. A servicing platform typically includes loan accounting, claims administration, oversight of primary servicers, loss mitigation, bond administration, cash-flow waterfall calculations, investor reporting, and tax reporting compliance. In return, a primary or master servicer is typically entitled to receive a fee equal to a specified percentage of the outstanding principal balance of the loans being serviced, as well as other compensation, including late payment fees and prepayment penalties. The servicer typically also receives interest income on the "float," or the number of days cash payments from borrowers are held prior to being distributed to securitization investors. *Id.* at 71–72.

[21] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 13, 2003), at II-8; General Motors Acceptance Corp., Current Report (Form 8-K) (Oct. 17, 2002).

unsecured debt markets remained sufficient to meet their capital needs.[22] GM further reported that these downgrades did not have a significant adverse effect on GM's and AFI's ability to obtain bank credit or to sell asset-backed securities.[23]

Rating pressure continued mid-year in 2003 when on June 13, 2003, Moody's lowered GM's long-term rating to Baa1 from A3; AFI's to A3 from A2, with a rating outlook of negative; and AFI's short-term rating to Prime-2 from Prime-1.[24] By year end 2004, GM acknowledged that additional rating downgrades would be problematic for GM and AFI:

> A further decline in the long-term ratings assigned by any one of the agencies to non-investment grade could temporarily limit GM's and [AFI]'s access to the unsecured debt markets and could severely limit GM's and [AFI']'s ability to access the retail debt market for a period of time. Additionally, GM may not be assured reliable future access to the unsecured debt markets subsequent to being assigned a non-investment grade rating by one or more agencies.[25]

AFI's credit ratings were linked to those of GM because the Rating Agencies believed that AFI's fortunes were inextricably tied to those of GM. As such, GM's declining ratings were of increasing concern to AFI's senior management. Eric Feldstein, AFI's Chairman and CEO, had several discussions with the rating agencies concerning ways to delink AFI's credit rating from that of GM. The goal was to get AFI "a credit rating that was not inextricably linked to that of GM," which was at that time "under pressure due to operating challenges."[26] Although Feldstein characterized those discussions as "constructive,"[27] and focused on how governance, outside directors, dividend limitations, and operating agreements might promote delinkage,[28] the efforts to delink AFI from GM were not successful.[29] The Rating Agencies told Feldstein that AFI's business was too highly correlated with GM: "the predominantly auto finance business was highly correlated to the auto business."[30]

Although Feldstein was not able to convince the Rating Agencies to untether AFI's credit rating from GM's, Feldstein nevertheless thought he had a "better argument" that AFI's mortgage business was "not necessarily correlated to that of the auto business or the auto

---

[22] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 13, 2003), at II-8.

[23] *See id.*

[24] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 11, 2004), at II-10.

[25] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-12.

[26] Int. of E. Feldstein, Dec. 14, 2012, at 31:10–14.

[27] *Id.* at 31:19–23.

[28] *Id.*

[29] *Id.* at 31:24–32:5.

[30] *Id.*

finance business.[31] Feldstein thought that governance and dividend limitations and operating agreements, coupled with a business that was not correlated with GM's automotive business might be able to free AFI's mortgage business from the drag of GM's relatively poor credit ratings.[32]

With the help of several senior managers of AFI and AFI's mortgage operations, Feldstein worked to "structure [an] entity such that it could command a rating that might be higher than that of [AFI], by virtue of governance, dividend limitations and certain elements [of] an operating agreement."[33] Although there could be no assurance, the thought was a higher credit rating for the mortgage operations might lead to a lower cost of funds.[34]

## B. RESCAP WAS FORMED TO ISOLATE AFI'S RESIDENTIAL MORTGAGE OPERATIONS FROM THE FINANCIAL INSTABILITY OF ITS PARENT, GM

ResCap was incorporated in 2004 to combine AFI's two separate, fast-growing residential mortgage entities with the intention of de-linking the credit ratings of those businesses from AFI and, ultimately, GM by creating "some separation between GM and [AFI], on the one hand, and [ResCap], on the other."[35] It was critical to accomplish this quickly, because GM was facing challenges to its business on many fronts.

### 1. August 2004 Incorporation

ResCap was incorporated in Delaware as "Residential Capital Corporation" in August of 2004.[36] At its formation, ResCap was a wholly owned subsidiary of GMAC Mortgage Group, Inc., which was a wholly owned subsidiary of AFI.[37] AFI was then wholly owned by GM.[38]

---

[31] *Id.* at 32:11–14.

[32] *Id.* at 32:15–20. On this topic, David Walker, the CFO of GMAC Mortgage Group at the time of ResCap's formation, said the following:

> So we said, why don't we put residential and RFC together, put a firewall around them so that they can access the market perhaps at a different rating from either [AFI] or certainly from GM, and allow them to continue to grow while maintaining 100 percent economic benefit. Because we saw an upside in the business.

Int. of D. Walker, Nov, 28, 2012, at 15:24–16:5, 16:14–21.

[33] Int. of E. Feldstein, Dec. 14, 2012, at 29:12–18.

[34] *Id.* at 30:17–21.

[35] *See* Residential Capital Corp., General Form (Form 10) (July 15, 2005), at 46.

[36] *Id.* at 3.

[37] *Id.*

[38] *Id.* James Young, ResCap's Chief Accounting Officer and Controller, described the formation of ResCap as a "structured separation" of ResCap from AFI. Int. of J. Young, Sept. 28, 2012, at 14:21–25.

*2. The ResCap By-Laws*

The ResCap By-Laws called for ResCap's business to be managed by a board of directors consisting of at least one director. The ResCap By-Laws did not impose any limit on the number of directors and did not require the appointment of Independent Directors.[39] The By-Laws required that the chairman and president of the company serve on the ResCap Board. While ResCap's president had the power under the By-Laws to suspend any officer, no ResCap officer or director could be terminated without ResCap Board approval.[40]

_____

[39] While ResCap's By-Laws do not require the appointment of Independent Directors, the 2005 Operating Agreement did contain such a requirement. *See* Section III.B.3.f (discussing the Independent Director provisions of the 2005 Operating Agreement).

[40] The ResCap By-Laws were superseded by the 2006 ResCap LLC Agreement that was executed in furtherance of ResCap's conversion from a corporation to a limited liability company. *See* Section III.E.5 (discussing ResCap's conversion from a corporation to a limited liability company); Section III.E.6 (discussing the 2006 ResCap LLC Agreement).

### 3. The 2005 Operating Agreement

ResCap, GM, and AFI entered into the 2005 Operating Agreement on June 24, 2005.[41] The 2005 Operating Agreement was structured in consultation with the Rating Agencies[42] and was designed to isolate ResCap's residential mortgage operations from AFI's automotive

---

[41]  *See* 2005 Operating Agreement [ALLY_0140795]. On June 24, 2005, GM, AFI, and ResCap also entered into a Services and Facilities Agreement, under which the parties agreed to certain services being provided at cost. The services listed on the accompanying schedule were: (1) legal, regulatory, and corporate secretary services; (2) employee benefits administration; (3) tax services; (4) real estate services, including office facilities and related support services; (5) strategic sourcing; (6) government relations; (7) accounting and internal audit services; and (8) risk management, including insurance. The Agreement is silent as to who shall provide what service to whom. *See* Services and Facilities Agreement, dated June 24, 2005 [RC00028306]; Schedule to Services and Facilities Agreement, dated June 24, 2005 [RC00028311].

[42]  In his interview, Walker stated:

> [B]ut we presented them the idea of ResCap. "Here's what we would like to do to get a different rating than [AFI]." "Okay, and you're going to need to do certain things." "Fine. We'll go back and work on that." One of them was an operating agreement, so we put together an operating agreement that encompassed what we thought the rating agencies, and in working with our bankers that we're going to be selling debt, what did they think investors were going to be looking for in terms of an operating agreement. What types of clauses would be necessary?

> We drafted a document. We had, obviously, ResCap folks look at it. We had [AFI] folks look at it. And, ultimately, obviously, the rating agencies required to see it in order to rate the bonds of ResCap and give them a rating. And obviously, you need to get the rating and then tell the investors, "These bonds are going to be rated X by the agencies. Now, would you like to buy them?" So, that was all sort of part of the process that took [a] period of time to get to the conclusion.

Int. of D. Walker, Nov. 28, 2012, at 21:1–24. In addition, ResCap, primarily through investment bankers, discussed the 2005 Operating Agreement with large institutional investors. *See id.* at 22:7–21 (stating that ResCap had discussions with market participants and that "we don't actually spend a lot of time directly with the investors" and "most of it was done by [investment bankers] saying, 'The market's telling us THIS. You will need THAT.'").

> In his interview, David Applegate, a former co-CEO of ResCap, stated:

> The need for an operating agreement. I became aware of. In the formation process. Obviously, the rating agencies were a big driver of that. And that was part of the foundation of the separation of the organizations.

Int. of D. Applegate, Dec. 7, 2012, at 89:6–11; *see also* Int. of T. Melzer, Oct. 10, 2012, at 36:5–9.

finance and insurance business and from GM's automotive manufacturing operations.[43] According to Bruce Paradis, a former co-CEO of ResCap, "the finance businesses that were unaffiliated with the automobile business could likely raise capital more cheaply, at a lower price than our parent."[44] Thus, the 2005 Operating Agreement was intended to erect a "firewall" between GM and AFI, and ResCap.[45] The 2005 Operating Agreement, according to Young, was critical to ResCap's ability to issue debt rated separately from AFI.[46]

AFI publicly stated that the purpose of the 2005 Operating Agreement was to "create separation between GM and [AFI], on the one hand, and ResCap, on the other," by restricting "ResCap's ability to declare dividends or prepay subordinated indebtedness" to AFI.[47] As a result, ResCap was able to obtain "investment grade credit ratings for its unsecured

---

[43] In her interview, Tammy Hamzehpour, Associate Counsel for RFC at the time of ResCap's formation, stated:

> So what kinds of separation would you have to have to convince a rating agency that you weren't going to be sucked into that downward spiral of the auto company? So that's why ResCap was created. We have an operating agreement, which I'm sure you've seen, with [AFI] and GM used to be a party to it when they [owned 100% of AFI]. That operating agreement was referred to as the firewall which set up the mechanisms by which we would maintain separateness with this company.

Int. of T. Hamzehpour, Oct. 5, 2012, at 128:6–16.

In his interview, Sanjiv Khattri, Executive Vice President and CFO of AFI at the time of ResCap's formation, observed:

> So, the [Independent Director] ring-fencing, firewall, operating agreement were all meant to convey the same message that ResCap was a quasi-independent standalone company with its own board, with its own plans. And the fact that it was a 100 [percent] owned subsidiary of [AFI] was just a by the way, and that it was independent. So things like ring-fencing, operating agreement, firewall were all used to convey that message.

Int. of S. Khattri, Oct. 25, 2012, at 21:19–22:2.

James Young, Chief Accounting Officer and Controller of ResCap at the time of its formation, remembered:

> And so, given the profitability of the mortgage business, the initiative, the strategic initiative was to create ResCap. And it was—operationally, through the operating agreement, separate it from [AFI]. So, even though it's a wholly owned sub, the operating agreement was effective at separating it through certain operational aspects . . . .

Int. of J. Young, Sept. 28, 2012, at 9:17–24.

[44] Int. of B. Paradis, Dec. 14, 2012, at 33:4–8.

[45] *Id.* at 40:14–17 ("[T]he primary objection or concern regarding the rating agencies, was the firewall or the independence between [AFI] and ResCap."); *see also* Int. of J. Young, Sept. 28, 2012, at 14:21–25 (describing the formation of ResCap as a "structured separation" of ResCap from AFI); Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 3 [EXAM11248642] (noting that "the Operating Agreement lays the foundation for creating the legal and business separation between ResCap and its subsidiaries (on the one hand) and GM/[AFI] (on the other)").

[46] *See* Int. of J. Young, Sept. 28, 2012, at 15:2–18.

[47] *See* General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 5.

indebtedness" that were separate from the ratings of GM and AFI.[48] Nevertheless, ResCap's ratings remained tied to those of GM and AFI given that ResCap was still a wholly owned, indirect subsidiary of AFI and GM.[49]

_____

[48] *Id.*

[49] Although "notching" refers primarily to a credit rating agency's assessment regarding the relative recovery prospects of different instruments issued by the same issuer, in common parlance notching may also refer to the Rating Agencies' views as to the relative recovery prospects of debt instruments issued by affiliated entities. In that regard, Rating Agencies are generally resistant to varying credit ratings of affiliated issuers beyond a certain number of levels or notches. Given that ResCap remained an indirect, wholly owned subsidiary of AFI and GM, ResCap's ratings could not be totally de-linked from those of AFI or GM. According to Feldstein:

> We didn't get a perfect delinking, meaning that we will look at ResCap completely independent of [AFI]. But I think it was a victory in that they were no longer inextricably linked.

> I don't remember which agency said what, but one said, you know, "Yes, we'll rate them independently, but can't have more than, you know, two notches above [AFI]." So, there's still a linkage, but not, you know, a mirror image. We viewed it as a success, and a mini-breakthrough.

Int. of E. Feldstein, Dec. 14, 2012, at 34:25–35:10; *see also* Int. of D, Walker, Nov. 28, 2012, at 127:15–129:2; Int. of S. Khattri, Oct. 25, 2012, at 59:18–60:3; Moody's, Press Release, *Moody's Downgrades Residential Capital's Senior Debt to Baa3; Rating Outlook is Negative* (Aug. 24, 2005) [EXAM11377860]. As further evidence that ResCap's credit rating remained linked to GMAC and GM, Moody's, when downgrading ResCap's rating in August 2005, stated:

> The rating downgrade of ResCap is not a result of any change in Moody's views regarding ResCap's intrinsic creditworthiness, which the rating agency deems to be "high Baa" on a stand-alone basis, but rather reflect the ratings of its parent, [AFI], and ultimate parent, GM. Although the residential real estate finance business of ResCap, and auto finance business of [AFI], are separate from an operating perspective, ResCap continues to be substantially dependent on the support of [AFI] in regards to its capital structure, though such support should continue to diminish. ResCap is also a wholly owned subsidiary of [AFI].

*Id.* Referring to a downgrade in September 2005, Fitch Ratings similarly stated:

> The rating action on ResCap solely reflects its ownership by [AFI]. While Fitch continues to believe that ResCap maintains investment grade fundamentals, its ownership by [AFI] is a limiting factor in terms of rating notching. At present, Fitch would allow for up to two notches between the ratings of ResCap and [AFI]. Although Fitch does not differentiate the ratings of GM and [AFI] currently, Fitch would consider a ratings distinction similar to ResCap in accordance with Fitch's criteria for parent and financial subsidiary relationships.

Fitch, Press Release, *Fitch Lowers GMAC & ResCap Ratings; Rating Outlook Remains Negative* (Sept. 26, 2005) [EXAM11700280].

a. *The 2005 Operating Agreement Provides Separation By, Among Other Things, Placing Limitations On Affiliate Transactions.[50]*

Section 2 of the 2005 Operating Agreement is among the more important provisions of the Agreement. That section sought to promote separation between ResCap and GMAC Affiliates[51] by, inter alia:

1. Prohibiting the guarantee by ResCap or by any of its subsidiaries of any indebtedness of any GMAC Affiliate;

2. Prohibiting any Investment[52] by ResCap in any GMAC Affiliate;

3. Restricting ResCap's "material" transactions with GMAC Affiliates;

4. Limiting the circumstances in which ResCap might declare and pay any Dividend,[53] and capping the amount of dividends that might be paid if declaration and payment of dividends is permitted; and

5. Limiting the ability of ResCap to prepay indebtedness owing to any GMAC Affiliate.[54]

_____

[50] The 2005 Operating Agreement was amended and restated pursuant to the 2006 Amended Operating Agreement, dated November 27, 2006. *See* Section III.E.9 (discussing the 2006 Amended Operating Agreement).

[51] Under the 2005 Operating Agreement, "'GMAC Affiliate' means GM, [AFI] and any [p]erson that is an [a]ffiliate of GM or [AFI], other than ResCap and its [s]ubsidiaries." 2005 Operating Agreement, § 1 [ALLY_0140795].

[52] Pursuant to the 2005 Operating Agreement, "'Investment' in any [p]erson means any loan, advance or other extension of credit (other than in the ordinary course of business) to such [p]erson (whether in cash or property) or any capital contribution or purchase or acquisition of any [c]apital [s]tock or indebtedness of such [p]erson (whether in cash or property); *provided, however,* that the terms 'Investment' shall not include any purchase of securities issued by a GMAC Affiliate through the use of funds in a custodial account held by ResCap or its [s]ubsidiaries relating to the sale of financial assets by ResCap or its [s]ubsidiaries." *Id.*

Notwithstanding the prohibition on Investments set forth in the 2005 Operating Agreement, section 8 of that Agreement authorized the waiver of the provisions of the Agreement with ResCap Board approval. *See* Section III.B.3.b (discussing the process to amend or waive provisions of the 2005 Operating Agreement); *see also* Section V.A.1.a (discussing how the Investment prohibition in the 2005 Operating Agreement was waived, purportedly in compliance with section 8 of the 2005 Operating Agreement, to approve the 2006 Bank Restructuring).

[53] *See* Section III.B.3.d (defining Dividend for the purposes of the 2005 Operating Agreement).

[54] The prohibitions and limitations imposed by section 2 of the 2005 Operating Agreement were subject to amendment or waiver under certain circumstances. *See* Section III.B.3.b (discussing the process to amend or waive provisions of the 2005 Operating Agreement).

### b.   Amendment And Waiver Of The 2005 Operating Agreement

The 2005 Operating Agreement specified the procedures and requirements for the amendment or waiver of its provisions. An amendment or waiver of any provision of the 2005 Operating Agreement was required to be in writing and signed by GM, AFI, and ResCap.[55] Any amendment or waiver that would "materially and adversely" affect the rights of any Class[56] of Rated Indebtedness[57] required approval by the majority of the ResCap Board, including a majority of the Independent Directors.[58] Pursuant to the 2005 Operating Agreement, the Independent Directors were required to consider "only the interest of ResCap, including its creditors," in considering an amendment or waiver that would materially and adversely affect the rights of any Class of Rated Indebtedness.[59] In addition, the 2005 Operating Agreement required approval by the majority of the Independent Directors to amend article VI of ResCap's By-Laws, the article that provided for the indemnification of and advancement of expenses to ResCap directors and officers.[60]

### c.   The Arm's-Length And Fair Value Requirements For Material Transactions With GMAC Affiliates

The 2005 Operating Agreement forbade ResCap and its subsidiaries from guaranteeing the indebtedness of any GMAC Affiliate, and prohibited Investments by ResCap in any GMAC Affiliates. ResCap was nevertheless permitted under the 2005 Operating Agreement to

_____

[55]  2005 Operating Agreement, § 8 [ALLY_0140795].

[56]  Under the 2005 Operating Agreement, "'Class' means, with respect to any Rated Indebtedness, all such Rated Indebtedness designated as belonging to the same class, series or issue or otherwise having substantially the same material terms and governed by substantially the same instruments." *Id*. § 1.

[57]  Under the 2005 Operating Agreement, "'Rated Indebtedness' means any senior long-term unsecured debt of ResCap, that, at the relevant time, is outstanding and not defeased in accordance with its terms and that is at the time of its issuance rated by at least two of the Rating Agencies, unless the instruments governing such indebtedness provide that they are not entitled to the benefits of this [a]greement." *Id*.

[58]  *Id*. § 8. Pursuant to the 2005 Operating Agreement, ResCap was required to provide a copy of any amendment or waiver to any trustee, administrative agent, or fiduciary responsible for any senior unsecured credit facility under which ResCap was a borrower or for any Class of Rated Indebtedness. *Id*. The 2005 Operating Agreement required that ResCap have at all times at least two Independent Directors. *Id*. § 2(g)(i); *see also* Section III.B.3.f (discussing of the Independent Director requirement imposed by the 2005 Operating Agreement).

[59]  2005 Operating Agreement, § 8 [ALLY_0140795].

[60]  *Id*. § 2(g)(iii); *see also* Section III.B.3.j (discussing indemnification under the 2005 Operating Agreement).

"engage in material transactions" with any GMAC Affiliate provided that "such transactions [were] on terms and conditions that [were] consistent with those that parties at arm's length would agree to and for fair value."[61]

By its terms, the 2005 Operating Agreement did not mandate Independent Director review of all Affiliate Transactions, much less a general "veto right" with respect to all such transactions. Instead, the 2005 Operating Agreement prohibited material Affiliate Transactions that were not compliant with the arm's length and fair value requirements, while providing a mechanism for waiver of this requirement by a majority of the Independent Directors. Affiliate Transactions that were not material, or which were compliant with the arm's length and fair value requirements, were not prohibited by the agreement, regardless of whether they were reviewed or approved by the Independent Directors.[62] The 2005 Operating Agreement did not explicitly prohibit the ResCap Board from itself determining that an Affiliate Transaction was not material or that it met the arm's length and fair value requirements. However, if the ResCap Board were to make such a determination, and a reviewing court concluded that the Affiliate Transaction in fact was material and did not meet the arm's-length and fair-value requirements, the court would likely reject the Board's determination as inconsistent with the Operating Agreement's requirement of Independent

_____

[61] *See* 2005 Operating Agreement, § 2(b) [ALLY_0140795]. The 2005 Operating Agreement also required that financing agreements and intercompany debt obligations with any GMAC Affiliate must be in writing, and any agreements that involve the transfer by ResCap of cash in an amount greater than $25 million per year or goods or services with a value in excess $25 million per year must be in writing. *See* 2005 Operating Agreement, § (2)(b)(i)–(ii) [ALLY_0140795]. In addition, notwithstanding the limitation on transactions with GMAC Affiliates, certain licensing, servicing and facilities, and employee financing accommodations were excepted from the limitations imposed by section 2(b) of the 2005 Operating Agreement. *See* 2005 Operating Agreement, § 2(c) [ALLY_0140795].

[62] See Section III.B.3.b (discussing the process to amend the 2005 Operating Agreement). Jacob, one of the initial Independent Directors of ResCap, stated:

> But in terms of some of these related party transaction, unless and until Tom Melzer [an Independent Director of ResCap] and I granted, you know, agreed on a specific waiver, you know, they could not do anything about it. They really could not carry the transaction forward.

Int. of T. Jacob, Nov. 7, 2012, at 176:22–177:4

Director approval of any waiver.[63] In any event, there do not appear to have been any occasions on which the ResCap Board approved an Affiliate Transaction without the approval of a majority of the Independent Directors. There were, however, occasions on which it

_____

[63] In discussing the prohibition of material transactions with GMAC Affiliates and the determination of whether a transaction was consistent with those that parties at arm's length would agree to and for fair value, Melzer stated, "I think it was really up to the two of us to make sure it was observed." Int. of T. Melzer, Oct. 10, 2012, at 97:8–9. Melzer further stated that "if you looked at the parties involved in that, who else was a disinterested party that could make that judgment but Tom Jacob and I?" *Id.* at 97:15–18. Although the 2005 Operating Agreement did not explicitly require the Independent Directors to confirm whether a particular transaction met the arm's length and fair value tests, according to Melzer, "to me it was pretty explicit in terms of our broader responsibilities with respect to the stakeholders, if you will, in ResCap." *Id.* at 98:1–3. Similarly, Jacob stated:

> If we have to engage in any transaction involving an affiliate, I really needed to get expert opinion which would satisfy me that this transaction—in terms of the condition of this transaction, is comparable to what is a similar transaction in the market, okay? So, that was my understanding of that. So, whenever a related party transaction was brought to us, the independent directors, you know, we basically said, you know, it needs opinion on both the arm's length terms and conditions as well as the fairness of the valuation.

Int. of T. Jacob, Nov. 7, 2012, at 130:18–131:7. Moreover, when it was pointed out that the 2005 Operating Agreement did not explicitly require the Independent Directors to analyze whether a particular transaction met the arm's length and fair value tests, Jacob stated:

> Because I'll tell you, I mean, that was my understanding. But also whenever there are related party transactions, you know, we had—Tom Melzer and I constituted a special committee of the board to review that, that related party transaction. So it was an established governance practice.

*Id.* at 134:16–22.

III-14

appears that one or more members of ResCap's management apparently concluded that it was unnecessary to submit an Affiliate Transaction for scrutiny and approval by the ResCap Board or by the Independent Directors.

As discussed more fully in Section V.B, several of the derivative transactions between ResCap and GMAC Affiliates included terms and conditions that were *not consistent* with those between parties at arm's length (a fact acknowledged by the parties at the time). The Investigation did not reveal any evidence that the Independent Directors were notified of these inconsistencies, or afforded the opportunity to waive the requirements as permitted by section 8 of the 2005 Operating Agreement or that the transactions were even presented to the ResCap Board.

### d. *Dividend Limitations*

The 2005 Operating Agreement prohibited ResCap from declaring or paying a Dividend,[64] unless at the time a Dividend was declared and paid ResCap's Stockholder's Equity[65] exceeded $6.5 billion.[66] Assuming ResCap's Stockholder Equity exceeded the $6.5 billion threshold at the time of a dividend declaration and payment, the 2005 Operating Agreement further provided that the cumulative amount of dividends from and after the date of the 2005 Operating Agreement could not exceed (1) 50% of ResCap's Cumulative Net Income[67] at the time of the Dividend, minus (2) (to the extent a positive number) the cumulative amount of any Prepayments[68] (other than Excluded Prepayments[69]), minus 50% of

---

[64] Under the 2005 Operating Agreement, "'Dividend' means any dividend or distribution of cash or property by ResCap on account of its [c]apital [s]tock or the repurchase by ResCap of its [c]apital [s]tock (other than dividends, distributions or repurchases payable in [c]apital [s]tock (other than Disqualified Stock))." 2005 Operating Agreement, § 1 [ALLY_0140795].

[65] Under the 2005 Operating Agreement, "'Stockholder's Equity' means, at any time of determination, the amount which would be shown as stockholder's equity on the consolidated balance sheet of ResCap as of such time prepared in accordance with GAAP." *Id.*

[66] *See id.* § 2(d). The 2005 Operating Agreement provided that the dividend restrictions would terminate when ResCap's Stockholder's Equity exceeded $12 billion as of the end of each of two consecutive quarters. *See id.* § 2(d)(iv).

[67] Under the 2005 Operating Agreement, "'Cumulative Net Income' means the net income of ResCap and its [s]ubsidiaries on a consolidated basis determined in accordance with GAAP for the period beginning with the first day of the first fiscal quarter beginning after the date of this Agreement and ending on the last day of the fiscal quarter ending immediately preceding the date as of which a determination of Cumulative Net Income is required." *Id.* § 1.

[68] Under the 2005 Operating Agreement, "'Prepayment' means any payment of principal in respect of GMAC Subordinated Debt prior to the stated maturity thereof." *Id.* The 2005 Operating Agreement defines "GMAC Subordinated Debt" as "any indebtedness owed by ResCap or any of its [s]ubsidiaries to any GMAC Affiliate that is subordinated to Rated Indebtedness in right of payment of principal, interest and premium, if any." *Id.*; *see* Section III.B.3.a.b (defining GMAC Affiliate and Rated Indebtedness, respectively).

[69] Under the 2005 Operating Agreement, "Excluded Prepayments" means "Prepayments [by ResCap] of GMAC Subordinated Debt of up to a cumulative amount of $500 million after the date of this Agreement." 2005 Operating Agreement, § 1, 2(e) [ALLY_0140795].

ResCap's Cumulative Net Income at the time such dividend is declared and paid.[70] The 2005 Operating Agreement did not require that dividend declarations and payments be approved by the vote of any Independent Director. As previously discussed, any waiver of the dividend limitation required the approval by a majority of the ResCap Board, including a majority of the Independent Directors.

### e. Limitations On The Prepayment Of GMAC Subordinated Debt Under The 2005 Operating Agreement

The 2005 Operating Agreement permitted ResCap to make Prepayments of GMAC Subordinated Debt of up to a cumulative amount of $500 million after the date of the Agreement (i.e., the Excluded Prepayments).[71] Any Prepayment of GMAC Subordinated Debt in excess of that amount could, however, only be made from: (1) ResCap's Cumulative Net Income at the time of such Prepayment less Dividends and Prepayments (other than Excluded Prepayments) made after the date of the 2005 Operating Agreement; (2) the net proceeds to ResCap from the issuance of Capital Stock[72] or indebtedness to any Person (other than a GMAC Affiliate) that was subordinated in right of payment to Rated Indebtedness; or (3) 50% of the net proceeds to ResCap from the issuance of indebtedness to any Person (other than a GMAC Affiliate) that was ranked pari passu in right of payment with Rated Indebtedness.[73] Independent Director approval was not required for the making of any Prepayment that was otherwise authorized under the 2005 Operating Agreement.

---

[70] *See id.* § 2(d). According to AFI's 2006 Annual Report, "as of Dec. 31, 2005, ResCap had consolidated stockholder's equity of approximately $7.5 billion," and owed AFI "$4.1 billion pursuant to a Subordinated Note Agreement, under which interest is payable quarterly and all outstanding principal is due at maturity on September 30, 2015." General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 5.

[71] *See* 2005 Operating Agreement, § 2(e) [ALLY_0140795].

[72] Under the 2005 Operating Agreement, "'Capital Stock' of any [p]erson means any and all shares, interests, participations or other equivalents (however designated) of corporate stock, including any preferred stock." *Id.* § 1.

[73] *See id.* § 2(e); Section III.B.3.b (defining Rated Indebtedness).

### f.   The Independent Directors Requirement

Pursuant to the 2005 Operating Agreement, AFI was required to vote for, and ResCap was required to have, at least two Independent Directors[74] at all times.[75] In the event of a vacancy in the position of an Independent Director, AFI was required "as promptly as practicable" to elect a successor Independent Director.[76]

### g.   ResCap Actions That Required The Approval Of A Majority Of The ResCap Board, Including A Majority Of The Independent Directors

The 2005 Operating Agreement provided that ResCap could not, in connection with the commencement or pendency of a bankruptcy or insolvency proceeding of any GMAC Affiliate: (1) commence a bankruptcy or insolvency proceeding for ResCap; (2) consent to any involuntary bankruptcy or insolvency proceeding for ResCap; (3) file any petition seeking or consenting to the appointment of a receiver, assignee, trustee, sequestrator or other similar official of ResCap or for a substantial part of ResCap's assets; or (4) make an assignment for the benefit of creditors, unless the action was authorized by the prior approval of the ResCap Board, including the approval of a majority of the Independent Directors.[77]

---

[74]  The 2005 Operating Agreement defines an "Independent Director" as a person who:

> (A) is not and has not been an officer, director or employee, and has no immediate family member that is or has been an officer, of any GMAC Affiliate within the three years immediately prior to [being appointed];
>
> (B) has not received, and has no immediate family member who has received . . . more than $100,000 in direct compensation from any GMAC Affiliate, other than director fees and pension and other forms of deferred compensation for prior service that is not contingent in any way on continued service [in the immediately prior three years];
>
> (C) is not employed by, and has no immediate family member that is an officer of, any Person that has made payments to, or received payments from, any GMAC Affiliate for property or services in an amount which, in any of the last three fiscal years, exceeds the greater of $1 million or 2% of ResCap's consolidated gross revenues; and
>
> (D) is reasonably believed by the then current directors of ResCap to be financially sophisticated and otherwise qualified to fulfill the obligations [described in the Operating Agreement].

2005 Operating Agreement, § 1 [ALLY_0140795]; *see also* Section IV.B.1 (discussing Independent Director history).

[75]  *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]. Melzer, one of the two initial Independent Directors of ResCap, believed that the Independent Director requirement in the 2005 Operating Agreement was critical to achieving a higher rating for ResCap. Int. of T. Melzer, Oct. 10, 2012, at 39:1–3, 39:25–40:1.

[76]  *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795].

[77]  *See id.* § 2(g)(iii). The 2005 Operating Agreement did not prohibit ResCap from taking any of the bankruptcy or insolvency actions without the affirmative vote of the Independent Directors if such was to be taken independently of the commencement or pendency of a bankruptcy or insolvency proceeding of any GMAC Affiliate. *Id.*

Indeed, the 2005 Operating Agreement forbade the ResCap Board from voting on or authorizing any such action unless there was at the time at least one Independent Director then serving in such capacity.[78] Similarly, the 2005 Operating Agreement provided that early termination of the Agreement required the approval of a majority of the ResCap Board, including a majority of the Independent Directors.[79]

As previously noted, the 2005 Operating Agreement provided a procedure to amend or waive the provisions thereof. In particular, the provisions of the 2005 Operating Agreement could not be amended or waived if the amendment or waiver would materially and adversely affect the rights of any Class of Rated Indebtedness unless such amendment or waiver was approved by a majority of the ResCap Board, including a majority of the Independent Directors.[80]

### h. The Independent Directors Were Required In Certain Circumstances To Consider Only The Interest Of ResCap, Including Its Creditors

The 2005 Operating Agreement provided that the Independent Directors "shall," when voting on bankruptcy and insolvency relief, early termination of the Agreement, or waiver or amendment of provisions that would materially and adversely affect the interests of any Class of Rated Indebtedness, "to the fullest extent permitted by law . . . consider only the interest of ResCap, including its creditors."[81] The Independent Directors' independence from AFI and its Affiliates was further underscored by a provision in the 2005 Operating Agreement that barred AFI from bringing any legal action against any Independent Director for considering only the interest of ResCap and its creditors when voting on the debtor relief measures set forth therein, early termination of the 2005 Operating Agreement, and amendments and waivers.[82] Melzer stated that he always considered only the interest of ResCap and its creditors while serving on the ResCap Board, notwithstanding that the requirement was applicable only in limited circumstances.[83]

---

[78] *See id.*

[79] *See id.* § 4. The Operating Agreement provided that it would terminate when ResCap ceased to be a direct or indirect subsidiary of AFI. The Operating Agreement was subject to termination beforehand upon agreement by ResCap, GM, and AFI and approval by a majority of the ResCap Board, including a majority of the Independent Directors. *See id.*

[80] *See id.* § 8. The 2005 Operating Agreement, however, "[did] not provide express guidance as to what constitutes a waiver that materially and adversely affects senior noteholders—nor [did] it prohibit the independent directors from approving any such waiver." Walker Report, at 6 [RC40008925].

[81] 2005 Operating Agreement, §§ 2(g)(i), 8 [ALLY_0140795].

[82] *Id.* § 2(g)(i).

[83] *See* Int. of T. Melzer, Oct. 10, 2012, at 104:10–16.

### i. *Separateness Provisions*

Section 2(f) of the 2005 Operating Agreement included a full array of provisions commonly employed in structured financings to mitigate the risk of substantive consolidation or to otherwise isolate or ring-fence the assets and operations of an entity from the bankruptcy risks of its affiliates. The 2005 Operating Agreement separateness covenants provided, inter alia, that ResCap should, at all times:

1.  Maintain its books, records and financial statements separate from those of any and all GMAC Affiliates;

2.  Maintain its assets in a manner such that it would not be costly to segregate and identify such assets from those of any and all GMAC Affiliates;

3.  Maintain bank accounts and cash management and account receivable collections systems separate from any and all GMAC Affiliates;

4.  Maintain its own asset investment, risk management and hedging programs separate for those of any and all GMAC Affiliates;

5.  Pay its own liabilities out of its own funds;

6.  Conduct the business operations of ResCap and its Subsidiaries by its or their own employees and officers, who would not also be employees or officers of any GMAC Affiliate;[84]

7.  Not commingle funds or other assets with those of any GMAC Affiliate; and

8.  Otherwise take such action so that ResCap would maintain its separate legal existence and identity.[85]

The requirement under section 2(f) of the 2005 Operating Agreement that ResCap conduct its business operations by its own employees and officers who were not also employees or officers of any GMAC Affiliate was later eliminated by an amendment approved by the two Independent Directors.[86]

---

[84] This separateness provision was deleted in the 2006 Amended Operating Agreement. *See* Section III.E.9 (discussing the 2006 Amended Operating Agreement). One might question the efficacy of such a provision to promote separateness during its abbreviated like span given that ResCap's employees and officers were subject to termination by the ResCap Board, which at all times relevant to the Investigation was dominated by AFI employees. Independent Director Melzer, however, never questioned the provision, but rather assumed that ResCap was in compliance at all relevant times. Int. of T. Melzer, Oct. 10, 2012, at 100:22–101:14, 102:4–9.

[85] 2005 Operating Agreement, § 2(f) [ALLY_0140795].

[86] *See* Section III.E.9 (discussing the 2006 Amended Operating Agreement).

### j. Indemnification Provisions

Each party to the 2005 Operating Agreement agreed to indemnify the other parties from losses sustained as the result of the indemnifying party's indemnifiable liabilities.[87] In particular, GM agreed to indemnify ResCap and its subsidiaries from GM Indemnifiable Liabilities[88] and AFI agreed to indemnify ResCap and its subsidiaries from GMAC Indemnifiable Liabilities (other than GM Indemnifiable Liabilities).[89] Under the 2005 Operating Agreement, ResCap had a reciprocal obligation to indemnify GM Affiliates and GMAC Affiliates for ResCap Indemnifiable Liabilities.[90] The parties also limited the ability to assign rights under the 2005 Operating Agreement, with GM being permitted to assign its rights "to any other GM Affiliate," and AFI being permitted to assign its rights "to any other GMAC Affiliate." Such assignments were not to have any effect on the parties' obligations under the 2005 Operating Agreement.[91]

### k. Termination Of The 2005 Operating Agreement

The 2005 Operating Agreement provided that it would terminate automatically if ResCap ceased to be a direct or indirect AFI subsidiary.[92] The 2005 Operating Agreement was also terminable by agreement of the parties, which, as noted above, required not just the approval of a majority of the members of the ResCap Board, but also the approval of the majority of the Independent Directors, who in considering termination of the 2005 Operating Agreement were required pursuant to its terms to consider to the fullest extent permitted by law only the interest of ResCap and its creditors.[93]

---

[87] *See* 2005 Operating Agreement, § 3 [ALLY_0140795].

[88] Under the 2005 Operating Agreement, "'GM Indemnifiable Liabilities' means all Liabilities of any GM [a]ffiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any GM [a]ffiliate to pay, perform or otherwise promptly discharge any Liabilities of such GM [a]ffiliate in accordance with their terms; or (ii) the GM [a]ffiliate Business." *Id.* § 1.

[89] Under the 2005 Operating Agreement, "'GMAC Indemnifiable Liabilities' means all Liabilities of any GMAC [a]ffiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of any GMAC [a]ffiliate to pay, perform or otherwise promptly discharge any Liabilities of such GMAC [a]ffiliate in accordance with their terms; or (ii) the GMAC [a]ffiliate Business." *Id.*; *see also* Section L.2.a(1)(a)(ii)(B) (discussing whether a claim may be asserted by ResCap against AFI for indemnification under either the 2005 Operating Agreement or the 2006 Amended Operating Agreement for the breach of representations and warranties by Old GMAC Bank).

[90] Under the 2005 Operating Agreement, "ResCap Indemnifiable Liabilities' means all Liabilities ResCap or any of its [s]ubsidiaries to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items: (i) the failure of ResCap or any of its [s]ubsidiaries to pay, perform or otherwise promptly discharge any Liabilities of ResCap or such [s]ubsidiary, as the case may be, in accordance with their terms; or (ii) the ResCap Business." 2005 Operating Agreement, § 1 [ALLY_0140795].

[91] *See id.* § 9.

[92] *See id.* § 4.

[93] *See id.*

### l.   *Guarantee And Third-Party Beneficiaries*

The 2005 Operating Agreement expressly stated that it was not a guarantee by GM or AFI of ResCap's indebtedness.[94] Pursuant to section 7 of the 2005 Operating Agreement, AFI's "sole obligation[s]" were limited to those set forth in:

1. Section 3, which required AFI to indemnify ResCap from GMAC Indemnifiable Liabilities (other than GM Indemnifiable Liabilities);

2. Section 2(g), which required ResCap to have two or more Independent Directors at all times, and required AFI to promptly elect a new Independent Director upon a vacancy;

3. Section 2(h), which required AFI to prepare consolidated financial statements, in accordance with GAAP and SEC rules, including with respect to ResCap;[95] and

4. Section 2(i), which required AFI to hold out ResCap and its subsidiaries as "legal entities separate and distinct" from AFI, and to "correct any known misunderstanding about ResCap's separate identity."[96]

GM's "sole obligation" under the 2005 Operating Agreement was to indemnify ResCap from and against GM Indemnifiable Liabilities.[97] The 2005 Operating Agreement further provided that "[u]nder no circumstances shall GM or [AFI] be liable for damages for breach of this Agreement (other than Section 3 [indemnification provision])."[98]

In addition, the 2005 Operating Agreement provided that it inured solely to the benefit of GM, AFI, and ResCap.[99] The holders of Rated Indebtedness and any lenders under any credit facility under which ResCap was a borrower, however, were deemed to be third-party beneficiaries.[100] Pursuant to the 2005 Operating Agreement "the remedies of such holders or lenders [under the 2005 Operating Agreement] shall be limited to specific enforcement of the provisions of [the 2005 Operating Agreement] as the same may be amended and waived

---

[94] *Id.* § 7 ("This Agreement is not, and shall not be construed to be, a guarantee by GM or [AFI] of any indebtedness of ResCap or an agreement by GM or [AFI] to contribute additional capital to ResCap.").

[95] "The supplemental disclosures to such financial statements shall provide that ResCap's creditors will be entitled to be satisfied out of ResCap's assets prior to ResCap's equity holders and that [AFI] conducts its residential mortgage operations and related businesses through ResCap." *Id.* § 2(h).

[96] *Id.* § 2(i).

[97] ResCap had a reciprocal obligation to indemnify GM for ResCap Indemnifiable Liabilities. *See* Section III.B.3.j (discussing indemnification under the 2005 Operating Agreement); *see also* 2005 Operating Agreement, § 3(c) [ALLY_0140795].

[98] 2005 Operating Agreement, § 7 [ALLY_0140795].

[99] *See id.* § 11.

[100] *See id.*

pursuant to [s]ection 8 [of the 2005 Operating Agreement] . . . ."[101] The 2005 Operating Agreement did not contemplate or require that notice or other communications given or made pursuant to the 2005 Operating Agreement be given to the holders of Rated Indebtedness or lenders under any credit facility.[102]

## C. RESCAP'S POST-FORMATION FUNDING, MANAGEMENT, AND BUSINESS PROFILE

### 1. GMAC Mortgage Group Inc. Contributes GMAC Residential Holding Corp. And GMAC-RFC Holding Corp. To ResCap

Although incorporated in 2004, ResCap conducted no operations until March 2005, when AFI's wholly owned subsidiaries GMAC Residential (based in Horsham, Pennsylvania) and GMAC-RFC (based in Minneapolis, Minnesota) were transferred to ResCap.[103]

### 2. ResCap's Initial Funding And Capitalization

Before their transfer to ResCap in March 2005, AFI's residential mortgage-finance subsidiaries funded their operations primarily through sales and securitizations of mortgage loans, and borrowings under secured and unsecured lines of credit. AFI was the lender under the majority of the unsecured lines of credit, including a $20 billion domestic revolving credit facility that the mortgage subsidiaries shared with other AFI subsidiaries.[104]

In the second quarter of 2005, upon the commencement of operations, ResCap restructured its subsidiaries' domestic credit facility with AFI. AFI contributed $2 billion of equity to ResCap by forgiving a portion of the existing borrowings. The remaining domestic intercompany borrowings were converted from a single revolving facility to a $5 billion ten-year subordinated note; a $1.5 billion, one-year term loan; and a $2.5 billion, two-year revolving line of credit. In the second quarter of 2005, the subordinated note and the term loan were funded.[105] ResCap then issued $4 billion of senior unsecured debt through a private placement in June 2005.[106] The proceeds from the notes were used to repay a portion of

---

[101] *Id.*

[102] *See id.* (noting that "any action to enforce the rights of the holders of Rated Indebtedness of any Class or any lenders under any credit facility under which ResCap is a borrower as third-party beneficiaries shall be undertaken only by the Class Agent for such Class or any Bank Agent, as applicable"); Section V.A.1.a (discussing how the 2005 Operating Agreement may have been breached in connection with the 2006 Bank Restructuring and other material issues brought to the ResCap Board for approval).

[103] *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 62.

[104] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[105] *See id.*

[106] *See* General Motors Acceptance Corp., Current Report (Form 8-K) (Aug. 3, 2005). On June 24, 2005, ResCap closed a private placement of $4 billion in senior unsecured bonds, utilizing the proceeds to repay borrowings under the initial capitalization by AFI. *Id.*; *see also* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

ResCap's domestic AFI credit facility as well as for general corporate purposes.[107] Thereafter, the privately placed notes were exchanged for new notes issued pursuant to an indenture dated June 24, 2005.[108] The issuance of the new notes was registered under the Securities Act. The form and terms of the new notes were intended to be identical in all material respects to those of the old notes, except that the transfer restrictions and registration rights provisions relating to the old notes did not apply to the new notes.[109]

In July 2005, ResCap obtained $3.5 billion in syndicated bank credit facilities. These credit facilities included a $1.75 billion term loan due in 2008, an $875 million revolving credit facility due in 2006, and an $875 million revolving credit facility due in 2008. At the closing of the credit facilities in July 2005, ResCap borrowed the entire $1.75 billion under the term loan, and repaid all amounts then outstanding under the $1.5 billion term loan from AFI, plus accrued interest.[110]

On September 29, 2005, ResCap filed a $12 billion shelf registration statement so that it could offer, from time to time, senior and/or subordinated debt securities.[111] ResCap issued $1.25 billion of unsecured debt from this shelf registration statement in November 2005, and used the proceeds to repay $620 million under the subordinated note held by AFI and the remainder for general corporate purposes.[112] ResCap terminated its $2.5 billion two-year revolving line of credit with AFI in December 2005.[113] In addition, ResCap made a $250 million payment on the subordinated note held by AFI in December 2005. The balance of this note was $4.1 billion as of December 31, 2005.

In February 2006, ResCap issued $1.75 billion of unsecured debt from the shelf registration, and stated its intent to use the proceeds for general corporate purposes. ResCap made a $500 million payment on the subordinated note to reduce the balance to $3.6 billion.[114]

In April 2006, ResCap issued $3.5 billion of unsecured debt to investors. The issued debt included $2.5 billion of senior unsecured debt from the $12 billion shelf registration and $1 billion of unregistered subordinated unsecured debt.[115] A portion of the proceeds of both the senior unsecured and the unregistered subordinated issuances were used to further prepay the subordinated GMAC note.[116] In May 2006, ResCap issued the following senior long-term

---

[107] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[108] Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 119.

[109] *Id.* at 136.

[110] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[111] *See* Residential Capital Corp., Registration Statement (Form S-3) (Sept. 29, 2005).

[112] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[113] *See id.*

[114] *See id.*

[115] *See* Residential Capital Corp., Quarterly Report (Form 10-Q) (May 12, 2006), at 39.

[116] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

unsecured notes: a May 2006 issuance of €750 million 5.125% six-year notes and £400 million 6.375% seven-year fixed rate notes ($1.7 billion U.S. dollars).[117]

The funding sources used by ResCap upon formation were primarily determined by the type and volume of the assets that it sought to finance. In general, short-term funding was used to finance: (1) mortgage loans pending permanent sale or securitization; and (2) lending receivables.[118] ResCap required longer-term funding to finance mortgage loans HFI and other assets related to securitization activities.[119] ResCap's sources of funding included asset securitization programs, asset-backed financing vehicles, whole-loan and securities repurchase agreements and other secured lending facilities, issuances of publicly-traded senior unsecured notes, unsecured lines of credit and borrowings, and bank deposits, as described in more detail below.

### a. Collateralized Borrowings In Securitization Trusts

As part of its funding and risk-management practices, ResCap established secondary market trading and securitization arrangements that provided long-term financing primarily for its mortgage loans.[120]

### b. Short-Term Secured Borrowings

ResCap used both committed and uncommitted secured facilities to fund inventories of mortgage loans, whether HFI or HFS, lending receivables, mortgage servicing cash flows and securities. ResCap used such facilities to provide funding for residential mortgage loans prior to their subsequent sale or securitization. These facilities, generally referred to as aggregation facilities, were funded primarily through the issuance of asset-backed commercial paper or similar short-term securities issued by vehicles administered by third parties. Other short-term secured borrowings were funded by transactions under repurchase agreements or similar arrangements or secured bank loans.[121]

### c. Long-Term Unsecured Borrowings

ResCap met its long-term unsecured financing needs from a variety of sources, including public corporate debt and bank credit facilities. ResCap primarily used its long-term unsecured borrowings to fund: (1) its long-term assets (MSRs and other retained interests); (2) over collateralization required to support ResCap's conduits; (3) the liquidity portfolio; and (4) the continued growth of ResCap's mortgage loan investment portfolio.[122]

---

[117] *See* Residential Capital Corp., Free Writing Prospectus (Mar. 28, 2006).

[118] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 72.

[119] *See id.*

[120] *See id.* at 74.

[121] *See id.*

[122] *See id.* at 77.

### d.  Bank Deposits And FHLB Advances

ResCap's sources of liquidity also included Old GMAC Bank.[123] Old GMAC Bank, in turn, obtained access to funding by, among other things, accepting deposits[124] under an agreement with FHLB.[125] ResCap was able to use the proceeds of this arrangement to fund mortgage loans, investments securities, and certain lending receivables.[126]

### e.  Affiliate Borrowings

ResCap obtained some funding from its affiliates through domestic and international intercompany credit lines. Before June 24, 2005, as previously noted, ResCap had access to a $20 billion domestic line provided by AFI to ResCap and certain other AFI subsidiaries. From January 1, 2003 through June 24, 2005, borrowings by these entities under this line averaged approximately $10.3 billion. On May 4, 2005, AFI forgave $2 billion of these borrowings resulting in a corresponding increase to ResCap's capital. Under international lines of credit from certain affiliates, ResCap had access to a total of approximately $2.6 billion as of December 31, 2005.[127]

### f.  Off-Balance Sheet Financings

ResCap's total off-balance sheet financings were $6.1 billion as of December 31, 2004 and increased to $78.3 billion as of December 31, 2005. A significant portion of such financing related to securitizations issued in off-balance-sheet trusts. As of December 31, 2005, these trusts had aggregate outstanding balances of $77.6 billion.[128]

ResCap, through off-balance sheet structured facilities, also funded mortgage loans during the aggregation period and warehouse lending receivables. Such off-balance sheet structured facilities provided funding for these assets through the issuance of commercial paper from multi- and single-seller asset-backed commercial paper conduits.[129]

---

[123] *See* Section V.B.3 (discussing the MMLPSA and related transactions).

[124] A significant percentage of Old GMAC Bank's deposits were escrows related to ResCap's mortgage loans. *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 77 ("As of December 31, 2005, [Old] GMAC Bank had approximately $4.1 billion of deposits, $1.4 billion of which were escrows related to our servicing of mortgage loans.").

[125] *See id.* (noting that as of December 31, 2005, Old GMAC Bank had a "total borrowing capacity of $7.1 billion under this agreement").

[126] *See id.*

[127] *See id.*

[128] *See id.* at 78.

[129] *See id.*

### 3. Initial ResCap Officers And Directors

The initial directors of ResCap were: (1) Eric A. Feldstein, Chairman; (2) David M. Applegate, Co-CEO; (3) Bruce J. Paradis, Co-CEO; (4) Davee L. Olson, CFO; (5) Sanjiv Khattri, VP; (6) Jerome B. Van Orman, Jr., VP; and (7) David Walker, VP.[130] Subsequently, the directors elected members of the executive committee, all of whom were also AFI officers,[131] and certain officers. The following is a list of ResCap's initial directors and officers and their association with GM and AFI:

EXHIBIT III.C.3
**ResCap's Initial Directors and Officers**

| Individual | Position [(1)] | GM/AFI Association [(2)] |
|---|---|---|
| Eric Feldstein | • Chairman<br>• Member of Executive Committee | • Group Vice President of GM<br>• Chairman of AFI<br>• Chairman of GMAC Mortgage Group, Inc.<br>• Former Vice President and Treasurer of GM<br>• Former Executive Vice President and CFO of AFI |
| David M. Applegate | • Co-Chief Executive Officer | • None |
| Bruce J. Paradis | • Co-Chief Executive Officer | • None |
| Davee L. Olson | • CFO | • None |
| Sanjiv Khattri | • Vice President<br>  Member of Executive Committee | • Executive Vice President and CFO of AFI<br>• Director of GMAC Mortgage Group<br>• Former Assistant Treasurer of GM<br>• Former Comptroller of sales, marketing and consumer care of a GM subsidiary in the UK |
| Jerome B. Van Orman, Jr. | • Vice President<br>  Member of Executive Committee | • None |
| David C. Walker | • Vice President<br>  Member of Executive Committee | • Group Vice President of AFI<br>• Former Managing Director, CFO and director of GMAC Mortgage Group<br>• Former Director of U.S. funding and securitizations at AFI |
| Louise M. Herrle | • Treasurer | • None |
| Charmain T. Uy | • Assistant Treasurer | • Former Director of domestic finance in charge of capital markets, foreign exchange and commodities for GM<br>• Former Director of special project in GM's treasurer's office<br>• Former Managing Director and Vice President of Finance at GMAC Mortgage Group, Inc. |
| Cathy L. Quenneville | • Secretary | • Secretary of AFI [(3)] |
| Justine M. Lantgios | • Assistant Secretary | • None |

[(1)] Unless otherwise noted, the source of the information in this column is Consent of the Directors of Residential Capital Corporation, dated Sept.15, 2004, at 1-2 [RC40006721]; see also Residential Capital Corporation, Registration Statement (Form S-4) (July 15, 2005), at 98.
[(2)] Unless otherwise noted, the source of the information in this column is Residential Capital Corporation, Registration Statement (Form S-4) (July 15, 2005), at 99 -100.
[(3)] See Int. of B. Paradis, Dec. 14, 2012, at 182:25–183:2 (stating that "[Quenneville] was, I think, [an AFI] secretary").

---

[130] See Statement of Organization of the Incorporator of Residential Capital Corporation, dated Aug. 21, 2004, at RC40006726 [RC40006721]; Consent of the Directors of Residential Capital Corporation, dated Sept. 15, 2004, at 1 [RC40006721].

[131] Int. of D. Applegate, Dec. 7, 2012, at 121:7–12.

On April 20, 2005, the number of ResCap directors was increased from seven to nine.[132] On the same day, Independent Directors Jacob and Melzer were elected to the ResCap Board.[133] Neither Jacob nor Melzer appear to have had any prior relationship to GMAC Affiliates.[134] In addition, Van Orman resigned from the ResCap Board and was replaced, on the Board and the Executive Committee, by Linda Zukauckas, a Vice President, Corporate Controller, and Chief Accounting Officer of AFI.[135]

---

[132] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Apr. 20, 2005, at RC40005473 [RC40005468].

[133] *See id.* Jacob joined the ResCap Board as the result of a recruiting search initially conducted by a firm in Chicago. In the first quarter of 2005, Jacob met with and was "screened" by an AFI executive. He subsequently met with Feldstein, then CEO of AFI, who asked him to join the ResCap Board. *See* Int. of T. Jacob, Nov. 7, 2012, at 25:10–28:4. At the time of his appointment, Jacob understood that the retention by ResCap of Independent Directors was necessary to obtaining an independent credit rating for ResCap. According to Jacob:

> Basically they were concerned about retaining the investment grade of ResCap because GM was being downgraded and it was affecting [AFI]. So they really were looking for a way to obtain an independent credit rating for ResCap. I believe credit rating agencies probably said hey, the only way we can do that is if you have independent directors.

Int. of T. Jacob, Nov. 7, 2012, at 32:4–11. Similarly, Melzer joined the ResCap Board after being approached by a search firm. Thereafter, he was interviewed by, among others, AFI executives Jerry Van Orman and Feldstein and ResCap co-CEOs Applegate and Paradis. Int. of T. Melzer, Oct. 10, 2012, at 32:24–34:21. Melzer also understood that independent directors were necessary to obtaining an independent credit rating for ResCap. Melzer stated:

> You know, I understood—certainly they explained the rationale of why they were doing this, that ResCap was growing rapidly, you know, had a tremendous appetite for capital. If independently rated from [AFI], it probably could raise capital at a lower rate than [AFI]. They had met with the rating agencies and, you know, worked out the details of what an operating—the operating agreement would have to provide to give the rating agencies the comfort to rate—you know, independently rate the debt. So, you know, I understood the—sort of the strategic rationale of what they were doing and, you know, why it was important to have truly independent directors.

*Id.* at 35:23–36:13.

[134] Jacob served as chairman of Chase Manhattan Mortgage Corporation (and its predecessor Chemical Residential Mortgage Corporation) from 1992 until 2003, and as chief executive officer from 1992 until 2001. Prior to becoming chairman and chief executive officer of Chemical Residential Mortgage Corporation, Jacob held various other positions with Chemical Bank, including as head of its credit card operations. Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 100. Melzer is the co-founder and has served as managing director of RiverVest Venture Partners, a venture capital firm focused on investments in medical device and biopharmaceutical companies. Prior to founding RiverVest Venture Partners, Melzer served as president and chief executive officer of the Federal Reserve Bank of St. Louis from 1985 until 1998 and, in that capacity, served on the Federal Open Market Committee during that time. Prior to joining the Federal Reserve Bank, Melzer spent sixteen years in the corporate finance, real estate and securities businesses of Morgan Stanley & Co., including service as a managing director and as head of its U.S. government securities department. *Id.*

[135] *See id.* at 99 ("Prior to becoming chief accounting officer of [AFI], Zukauckas served as head of audit for [AFI] from January 2000 until May 2002.").

On June 15, 2005, the ResCap Board established the ResCap Audit Committee.[136] The ResCap Audit Committee initially consisted of Zukauckas and the Independent Directors, Jacob and Melzer.[137] The 2005 Operating Agreement provided that the chairperson of the ResCap Audit Committee had to be an Independent Director.[138] Accordingly, Jacob, one of the Independent Directors, was appointed as chairperson of the ResCap Audit Committee.[139]

Initially, ResCap had two CEOs: Applegate and Paradis.[140] Before serving as co-CEO of ResCap, (1) Applegate was, among other things, the President and CEO of GMAC Holding and (2) Paradis was, among other things, President and CEO of RFC.[141] This co-CEO structure was purportedly installed to avoid conflict between GMAC Residential and GMAC-RFC, and to ensure that their operations were unaffected after their contribution into ResCap.[142] The co-CEO structure ended on October 19, 2005, when Paradis was named CEO

---

[136] *See* Residential Capital Corporation Unanimous Consent to Action, dated June 15, 2005, at RC40005493 [RC40005468].

[137] *See id.*

[138] *See* 2005 Operating Agreement, § 2(g)(iii) [ALLY_0140795]; Section III.B.3.f (discussing the Independent Director requirement imposed by the 2005 Operating Agreement).

[139] *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 100.

[140] Initially, ResCap had two of everything. "[E]ssentially you had two companies that had two of everything. We called it Noah's Ark. You know, two finance departments, two servicing platforms, 13 origination platforms." Int. of J. Whitlinger, Nov. 30, 2012, at 11:4–7; *see also* Int. of R. Flees, Jan. 18, 2013, at 135:19–25.

[141] *See* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 98.

[142] Int. of D. Applegate, Dec. 7, 2012, at 106:9–15 ("Well, the initial structure was put in place so that GMAC Residential and RFC really ran pretty consistently as they had in the past. So there was not a lot of inherent business conflict, because it was really a business-as-usual situation."). David Walker, CFO of GMAC Mortgage Group at the time of ResCap's formation, recalled that there were some personality and cultural issues involved in combining GMAC Mortgage and RFC to form ResCap. Walker explained:

> Well, as I said, we sort of hatched the idea in June of '03 to put them together. We didn't get to the debt market until June of '05. Part of that was, literally, combining accounting, scrubbing the data for three years and all of that. But part of was, literally, some of that integration. Because even, again, even though the equity's being retained, the creditors putting up money, buying ResCap bonds at a different price than they would buy GMAC bonds, was a story that had to be told.
>
> And, you know, it was a challenge to get everybody to sort of be more harmonious with each other. So, I would say something similar. That reflected the independence of the two units. It was not unlike any sort of merger of banks, where sort of on high they're going to merge, but, you know, in the trenches, there's a lot of in-fighting going on because people protect turf or ideas that they need for capital or whatever. And you had Philadelphia. You had Minnesota. You know. We knew that was a risk in putting them together. We weighed that against just selling one or the other, and ultimately decided that we should do that.
>
> We talked. It wasn't like we came in and said, "You're going to do this, guys." There was a lot of discussion. "Do you think it can work?" "Can we get it to work?" And then I think it was, I don't know, sometime, maybe the fall of '05, we got Dave and Bruce. They sort of restructured a couple of the management levels to sort of get a little bit more harmony. And, you know, it grew on them a bit.

Int. of D. Walker, Nov. 28, 2012, at 40:15– 41:23.

of ResCap.[143] Applegate was named Chief Operating Officer of ResCap, and President of ResCap's U.S. Residential Finance Group, responsible for ResCap's "U.S. residential real estate finance segments—the Residential Capital Group and GMAC Residential."[144]

### 4.  ResCap's Post-Formation Businesses

#### a.  Business Overview

Upon formation, ResCap was a real estate finance company focused primarily on the residential real estate market.[145] ResCap's businesses included:

> US Residential Real Estate Finance, operated through two segments, GMAC Residential and Residential Capital Group, through which ResCap (i) originated, purchased, sold and securitized residential mortgage loans in the United States; (ii) provided primary and master servicing to investors in ResCap's residential mortgage loans and securitizations; (iii) provided warehouse lending facilities to other originators of residential mortgage loans; (iv) held a portfolio of residential mortgage loans for investment and retained interests from its securitization activities; and (v) conducted limited banking activities through Old GMAC Bank;

> Business Capital, through which ResCap provided financing and equity capital to residential land developers and homebuilders and financing to resort developers and healthcare related enterprises; and International, through which ResCap originated, purchased, sold and securitized residential mortgage loans in the United Kingdom, The Netherlands, Germany, Canada and Mexico.[146]

---

[143] *See* ResCap, Press Release, *Residential Capital Corporation Refines Executive Leadership* (Oct. 19, 2005) [EXAM11830536] ("[T]he executive changes are the next logical step in the launch of ResCap."). According to ResCap's press release:

> After successfully accomplishing several key milestones in launching ResCap, including raising $4 billion in a recent private bond offering," says Feldstein, "ResCap needs to focus on attacking market opportunities." Bruce [Paradis] will be charged with leading all of ResCap's businesses and its 14,000 employees. One of his key roles will be to drive ResCap's growth in real estate markets worldwide and to secure the capital resources to fuel that growth.

*Id.*

[144] *Id.* According to ResCap's press release:

> Dave [Paradis] will leverage the strengths of the company's U.S. real estate finance business," says Feldstein. "By integrating the skills, talents and resources of two premier organizations, ResCap will be better able to capitalize on market opportunities and provide ResCap's consumer and business clients with superior products and service.

*Id.*

[145] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 2.

[146] *Id.*

### b.  U.S. Residential Real Estate Finance

#### (1) Principal Activities

ResCap's principal activities in its U.S. residential real estate finance business included:

(a) Originating, purchasing, selling and securitizing residential mortgage loans;

(b) Servicing residential mortgage loans for itself and others;

(c) Providing warehouse financing to residential mortgage loan originators and correspondent lenders to originate residential mortgage loans;

(d) Creating a portfolio of mortgage loans and retained interests from its securitization activities;

(e) Conducting limited banking activities through Old GMAC Bank; and

(f) Providing real estate closing services.[147]

#### (2) Loan Origination And Acquisition

Initially, ResCap had three principal sources for residential mortgage loan production: (a) the origination of loans through its direct lending network; (b) the origination of loans through its mortgage brokerage network; and (c) the purchase of loans in the secondary market primarily through correspondent lenders.[148]

##### (a) Direct Lending Network

ResCap's direct lending network consisted of retail branches, internet and telephone-based operations. ResCap's retail network was targeted at customers desiring face-to-face service.[149]

##### (b) Mortgage Brokerage Network

In addition to mortgage loans originated through its direct lending network, ResCap originated residential mortgage loans through mortgage brokers. Most loans sourced by mortgage brokers were funded by ResCap and closed in ResCap's name.[150] ResCap also purchased loans from Old GMAC Bank pursuant to the 2001 MMLPSA. See Section V.B.3 for a discussion of the MMLPSA.

---

[147] See id. at 3.

[148] See id.

[149] See id. at 4. ("Typical referral sources are realtors, homebuilders, credit unions, small banks and affinity groups.").

[150] See id. ("Loans sourced by mortgage brokers are funded by us and generally closed in our name.").

### (c) Correspondent Lender And Other Secondary Market Purchases

Loans purchased from correspondent lenders were originated or purchased by the correspondent lenders, and subsequently sold to ResCap. ResCap also purchased pools of residential mortgage loans from entities other than correspondent lenders, mostly large financial institutions.[151]

### (3) Types Of Mortgage Loans

ResCap originated or purchased five categories of loans:

(a) *Prime Conforming Mortgage Loans*—prime credit quality first-lien mortgage loans secured by single-family residences that met or "conformed" to the underwriting standards established by Fannie Mae or Freddie Mac for inclusion in their guaranteed mortgage securities programs.

(b) *Prime Non-Conforming Mortgage Loans*—prime credit quality first-lien mortgage loans secured by single-family residences that either (1) did not conform to the underwriting standards established by Fannie Mae or Freddie Mac, because they had original principal amounts exceeding Fannie Mae and Freddie Mac limits, which are commonly referred to as jumbo mortgage loans, or (2) had alternative documentation requirements and property or credit-related features (e.g., higher loan-to-value or debt-to-income ratios) but were otherwise considered prime credit quality due to other compensating factors.

(c) *Government Mortgage Loans*—first-lien mortgage loans secured by single-family residences that were insured by the FHA or guaranteed by the VA.

(d) *Nonprime Mortgage Loans*—first-lien and certain junior lien mortgage loans secured by single-family residences, made to individuals that did not qualify for a prime loan, had credit-related features that fell outside the parameters of traditional prime mortgage products or had performance characteristics that otherwise exposed ResCap to comparatively higher risk of loss.

(e) *Prime Second-Lien Mortgage Loans*—open and closed-end mortgage loans secured by a second or more junior lien on single-family residences, including home equity mortgage loans.[152]

### (4) Sale And Securitization Activities

Initially, ResCap sold most of the mortgage loans it originated or purchased. According to James Young, ResCap's Chief Accounting Officer and Controller at the time of ResCap's

---

[151] *See id.*

[152] *See id.* at 5.

formation, this was the "core mortgage business."[153] This part of the business (and servicing) was "heavily dependent upon market forces."[154] Indeed, according to Young:

> The more—this is a flow business. Originating with the intent to sell, sell through securitization, retain the servicing. This is obviously heavily dependent upon market forces. When refis are going, you're making a ton of money. When they're not, you know, the rates are high, you're struggling. It is a very volatile business at its core. It's volatile because of that. And, its core and it's volatile, particularly from a financial perspective, speaking as a financial guy, because we record these gains when we sell these loans. And so, we are doing really—you know, you're doing really well when you're selling loans for gains. And when it dries up, you don't have your gains anymore. Again, it's a financial services company, so the only thing you really gotta look at is your variable of people costs.[155]

In 2005, ResCap sold $149.2 billion in mortgage loans.[156] ResCap typically sold: (1) its Prime Conforming Mortgage Loans through securitizations guaranteed by Fannie Mae or Freddie Mac; and (2) its Government Mortgage Loans through securitizations guaranteed by Ginnie Mae.[157] In 2005, ResCap sold $50.6 billion of mortgage loans, or 34% of the total loans ResCap sold, to GSEs and $98.6 billion to other investors through whole-loan sales and securitizations, including both on-balance sheet and off-balance sheet securitizations. ResCap held the mortgage loans that it did not sell, and the securities and subordinated interests that it retained in its securitizations, as part of its investment portfolio. Until 2008, ResCap generally retained the servicing rights for the loans that it sold or securitized.[158]

---

[153] Int. of J. Young, Sept. 28, 2012, at 30:20–31:8 ("This is the core mortgage business, which is you originate loans with the intent to sell. And you sell the loans primarily in securitizations and you retain the servicing because your primary business is you have the servicing platform.").

[154] *Id.* at 38:7–8.

[155] *Id.* at 38:4–25.

[156] Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7.

[157] *Id.* In general, according to Young,

> [W]hen you do a securitization, you pool all these loans and you give 'em to the underwriter and the underwriter's going to help you sell these loans in the form of securitization, which is where you pool all the loans and then you issue your securities, and the securities are sort of not whole loans. They're actually securities that can be traded on the market. And the underwriter, you know, helps pool and package the nonconforming securitizations. When you put—when you originate with the intent to sell, you'll hold 'em on your balance sheet, you'll gather them up till you've got enough. You got an aggregation period. Sometimes during that aggregation period, somebody's not going to pay their mortgage. And so, it may take 60 or 90 days to aggregate a pool for securitization.

Int. of J. Young, Sept. 28, 2012, at 73:16–74:9.

[158] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7–8; Section V.B.9 (discussing the MSR Swaps).

In conducting its securitizations, ResCap typically sold the related pool of mortgage loans to one of its wholly owned special-purpose entities, which then sold the loans to a separate, transaction-specific securitization trust in exchange for cash and, in certain cases, trust interests that ResCap retained.[159] The securitization trust issued and sold interests, generally represented by notes or certificates, to third-party investors that entitled the investors to cash flows generated from the securitized loans.[160]

In general, the securitization trust and the third-party investor had no recourse against ResCap or its assets.[161] Their recourse was generally limited to the trust's assets. Nevertheless, in the event ResCap breached certain representations or warranties concerning the mortgage loans being securitized, ResCap could be required to repurchase the loan from the securitization trust.[162] Although ResCap did not guarantee any securities issued by the securitization trusts, ResCap had, in certain instances, issued guarantees or pledged collateral to third-party credit-enhancement providers in support of certain securitization activities.[163]

---

[159] *See* Int. of J. Young, Sept. 28, 2012, at 143:3–13. Young stated that:

> Keep in mind the securitization is in a separate legal entity. All these are special purpose entities, these are all legal entities. So, the loans drop into the special purpose entity and securities are taken out the back, right? So, loans go in to the SPE, and then secure certificates are issued at the back end. And this is, of course, a legal entity and this is how the economics work. The loans go in there, certificates are sold, cash comes back through. It pays for the loans.

*Id.*

[160] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7 ("These interests were usually represented by notes or certificates with various interest rates and were supported by the payments on the loans acquired by the trust."). According to Young:

> Now, securitization structures always include a residual, that is, basically acts as collateral support. So, in other words, these certificates generally come out of this rated—there's tranches, but, you know, you've got a triple A tranche and so far down the line, and then a residual at the back end—at the bottom of this waterfall. The residual is generally owned by the issuer of the securitization, which in our case is ResCap. So, the economics again are always the same. The real risk, so it's a way of funding the loan sale so that we can retain the servicing, capitalize the MSR and retain the servicing for that core business. So it's a funding mechanism.

Int. of J. Young, Sept. 28, 2012, at 143:14–144:14. Further, ResCap, as the residual holder, was "at the bottom." *Id.* at 144:21. Young provided the following example to describe the securitization risk:

> [I]f there's $100,000 worth of loans, you're only going to sell $90—or 90,000 of securities. Let's just use 100. There's $100 loan, you sell 90 of securities, so in this transaction it's an effective 90 percent advance rate but that $10 is a residual risk and it's high—it's risky because as these loans deteriorate everybody else gets paid but the residual holder is—it's not pari passu, it's not pro-rata.

*Id.* at 144:22–145:6.

[161] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 7.

[162] *See id.* In particular, ResCap made representations and warranties regarding the lien status or mortgage insurance coverage of the securitized mortgage loans. *Id.*

[163] *See id.*

According to ResCap's 2005 Annual Report, no claims had been made under these guarantees, nor had any of the collateral been subject to any claims.[164]

In addition to cash, ResCap often retained interests in the securitization trust to which it sold loans as partial payment for the loans. ResCap generally held these retained interests in its investment portfolio. These retained interests included mortgage-backed and mortgage-related asset-backed securities[165] (including senior and subordinated interests), interest-only, principal-only, investment-grade, non-investment grade and unrated securities. With respect to subordinated retained interests, ResCap was entitled to receive payment only after the investors holding more senior interests were repaid their investment plus interest and there was excess cash remaining in the securitization trust.[166] Accordingly, ResCap's subordinated retained interests served as a credit enhancement for the more senior securities issued by the securitization trust.[167]

### (5) Servicing Activities

ResCap generally retained the rights to service the loans it sold.[168] MSRs generally consist of (a) primary or (b) master servicing rights.[169]

### (a) Primary Servicing

Primary servicing rights refer to: (1) a mortgagor's right to service certain mortgage loans originated or purchased and later sold on a servicing-retained basis through securitizations and whole-loan sales; and (2) primary servicing rights purchased from other mortgage industry participants.[170] As a primary servicer, ResCap collected and remitted mortgage payments, responded to borrower inquiries, accounted for principal and interest, held custodial and escrow funds, worked with delinquent borrowers, supervised foreclosures

---

[164] *See id.*

[165] *See id.* at 8.

[166] *See id.* ResCap's ability to receive payment on its subordinated retained interests "depended on the performance of the underlying mortgage loans, and material adverse changes in performance of the loans, including actual credit losses and prepayment speeds, could have a material adverse effect on the value of these retained interests." *Id.*

[167] *See id.*

[168] *See* First Day Affidavit, ¶ 25; *see also* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8. According to Young, "you retain the servicing because your primary business is you have the servicing platform. That's the group of people, thousands of people who take the payments and process the payments." Int. of J. Young, Sept. 28, 2012, at 30:23–31:1.

[169] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8. In addition to retaining primary servicing rights on the loans it produced, ResCap purchased primary servicing rights from other mortgage industry participants or agreed to provide primary mortgage servicing as a subservicer. *Id.*

[170] *See id.*; *see also* First Day Affidavit, ¶ 26.

and property dispositions, and generally administered the mortgage loans.[171] As a primary servicer, ResCap was required to make certain advances, including in the foreclosure context: (1) fees and expenses to servicing vendors, including property inspectors and maintenance contractors; (2) fees and expenses associated with enforcement or judicial proceedings, including foreclosure, bankruptcy, and eviction actions; and (3) costs and expenses associated with the management, maintenance, preservation, and liquidation of the property.[172] Such advances are generally reimbursed from the sale proceeds and from the applicable GSE to the extent the sale proceeds are insufficient to cover the advances.[173]

In addition, ResCap, as primary servicer, was required to advance funds to investors and other parties with respect to MBS and mortgage-related asset-backed securities and whole-loan packages to pay the principal and interest on the related pool of mortgage loans and other charges, including taxes and insurance premiums.[174] In general, ResCap was required to use its own funds to pay such advances, which were reimbursable.[175] Nevertheless, "the primary servicer is responsible for any loss in excess of the guarantee on an FHA-insured, VA- or USDA-guaranteed mortgage loan."[176] In addition, the primary servicer may incur other losses, including "costs of services exceeding expense caps or allowable amounts set forth in servicing agreements, making certain interest payments, penalties for failure to comply with require foreclosure timelines, costs related to restarting suspended foreclosures and assuming losses relating to Fannie Mae loans if the loss resulted from a rescinded mortgage insurance policy."[177]

---

[171] *See id.* According to Whitlinger:

> Once it's securitized, then it flips over into the servicing side, when I say [Forecasting Planning and Analysis group] for servicing, and now we're servicing a loan and I'm in that world of—you know, the MSR got created, I'm getting service fees every month, I have to call the borrowers and collect payments, make their taxes and insurance. If they go delinquent, we have to make sure that we follow the servicing guides for following what the processes they require in a loan that's delinquent, etc. So, to me origination is from app till sale.

Int. of J. Whitlinger, Nov. 30, 2012, at 28:12–23. The First Day Affidavit stated that:

> As a primary servicer, the Debtors collect and remit mortgage loan payments, respond to borrower inquiries, account for and apply principal and interest, hold custodial and escrow funds for payment of property taxes and insurance premiums, provide ancillary products, counsel or otherwise work with delinquent borrowers (including helping borrowers modify their loans in accordance with federal programs and public policy intended to assist homeowners' efforts to remain in their homes in the face of the recession and housing market collapse), supervise foreclosures and property dispositions and generally administer the mortgage loans consistent with contractual undertakings and business practices.

First Day Affidavit, ¶ 26.

[172] *See* First Day Affidavit, ¶ 27.

[173] *See id.*

[174] *Id.* ¶ 28.

[175] *Id.* ¶ 29–30.

[176] *Id.* ¶ 30.

[177] *Id.*

### (b) Master Servicing

Master servicing rights generally refer to a mortgagor's right to service mortgage-backed and mortgage-related asset-backed securities and whole-loan packages sold to investors.[178] As master servicer, ResCap collected mortgage loan payments from primary servicers and distributed those funds to investors in mortgage-backed and mortgage-related asset-backed securities and whole-loan packages.[179] In addition, ResCap, as master servicer, provided loan accounting, claims administration, oversight of primary servicers, loss mitigation, bond administration, cash flow waterfall calculation, investor reporting, and tax reporting compliance.[180] As master servicer, ResCap advanced certain amounts, including the principal and interest on "real estate owned" or "REO" properties, which generally refers to properties that have been foreclosed and will remain on the master servicer's balance sheet until sold to a third-party, to the extent the primary servicer did not make such advances.[181] Master servicing advances are generally recoverable, because they are "priority cash flows in the event of a default by the underlying borrower."[182]

In exchange for acting as primary or master servicer, ResCap was paid fees equal to a percentage of the outstanding principal balance of the loans being serviced, and was entitled to other forms of ancillary compensation, including late payment fees, prepayment penalties and interest income (i.e., the "float" earned on collections deposited in custodial accounts between the date of receipt and ResCap's distribution of such funds to investors).[183] The value of MSRs generally depends on interest rates and other factors.[184] This part of ResCap's business was

---

[178] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8.

[179] *See id.*; First Day Affidavit, ¶ 32 ("In this capacity, the Debtors interact with investors, not homeowners.").

[180] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 8.

[181] *See* First Day Affidavit, ¶ 32.

[182] *Id.*

[183] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 9. In describing the servicing platform, Young stated:

> That's the group of people, thousands of people who take the payments and process the payments. And there's value to that course because you get servicing fees and you get float from the MSR . . . . But this is the core of these businesses. They all did the same thing, with this side of the house dealing with the GSE's and this side of the house doing the non-GSE.

Int. of J. Young, Sept. 28, 2012, at 30:25–31:8.

[184] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 9.

volatile.[185] To mitigate the overall risk of loss due to a change in the fair value of the MSRs, ResCap implemented a hedge program.[186]

### *(6) Warehouse Lending*

In its 2005 Annual Report, ResCap stated that it believed it was "the largest provider of warehouse-lending facilities to correspondent lenders and other mortgage originators in the United States."[187] These warehouse lending facilities enabled lenders and originators to finance a full complement of residential mortgage loans, including loans acquired by ResCap through correspondent lenders, until the loans were sold in the secondary market (sometime to ResCap). Advances under the warehouse lending facilities were generally secured by the underlying mortgage loans.[188]

### *(7) HFI Loans And Retained Interests*

ResCap held a portfolio of assets consisting of (1) residential mortgage loans HFI, including residential mortgage loans sold in on-balance sheet securitizations and (2) retained interests from its securitization activities. As of December 31, 2005, the principal balance of ResCap's mortgage loan portfolio was approximately $67.9 billion and the fair value of its retained interests was approximately $1.3 billion.[189] This portfolio provided ResCap with a source of revenue as it recognized interest income over the life of the underlying mortgage loans.[190]

---

[185] *See* Int. of J. Young, Sept. 28, 2012, at 129:19–25 ("We need to keep in mind it's a profitable business but also adds to the volatility—if you do sell the loan, you capitalize the MSR, it's on your balance sheet and you've got this big infrastructure of thousands of people processing these payments and making money on that.").

[186] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 9; *see* Section V.B.9 (discussing the MSR Swap and derivative transactions). MSRs related to HFI loans were not hedged, because, according to Young:

> [W]hen you hold the loan, you originate it, pay off, it's in HFI the entire time and there is no MSR on the balance sheet. So, you only hedge the MSR when it's on your balance sheet. So there's no—so, if things are going down into HFI because we can't sell them—it never gets to the point of sale, and there's no MSR ever put on the balance sheet, there's no hedging of any MSR, which is in a sense kind of beautiful because you get the economics with servicing but you don't have to deal with the ugly asset that's on your books.

Int. of J. Young, Sept. 28, 2012, at 132:6–20.

[187] Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 10.

[188] *See id.*; Int. of A. Celini, Feb. 18, 2013, at 23:21–24:11 (discussing transfer of mortgage lending to Old GMAC Bank).

[189] These amounts include assets held by Old GMAC Bank.

[190] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 11.

### 5. Old GMAC Bank

As an extension of its real estate finance business, ResCap owned, at the time of its formation through the November 2006 consummation of the Cerberus PSA,[191] Old GMAC Bank, a federally chartered savings bank, which provided ResCap with an additional source of funding for ResCap's U.S. residential real-estate finance business. In addition, Old GMAC Bank provided collateral/pool certification and collateral document custodial services to ResCap's U.S. residential real-estate finance business and third-party customers.[192] As of December 31, 2005, Old GMAC Bank had $9.6 billion in assets, with approximately $4.1 billion in customer deposits, approximately 33% of which consisted of custodial funds deposited by other parts of ResCap's business.[193]

### 6. Residential Finance Group Consisted Of GMAC Residential And Residential Capital Group

Initially, ResCap carried out its U.S. residential real estate finance operations through two operating entities: GMAC Residential (GMAC Mortgage and its subsidiaries)[194] and Residential Capital Group (RFC and its subsidiaries).[195]

#### a. GMAC Residential (GMAC Mortgage)

GMAC Mortgage, headquartered in Horsham, Pennsylvania, offered residential mortgage and mortgage-related products and services to consumers and businesses throughout the United States.[196] GMAC Mortgage, was the parent of Old GMAC Bank.[197]

GMAC Mortgage focused on the direct origination of mortgage loans with consumers of prime credit quality that generally conformed to the underwriting requirements of Fannie Mae or Freddie Mac (i.e., "conforming loans").[198] GMAC Mortgage also sold some non-conforming loans (e.g., HELOCs). Substantially all of GMAC Mortgage's direct origination

---

[191] *See* Section V.A.1.a (discussing the 2006 Bank Restructuring).

[192] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 11.

[193] *See id.* at 12.

[194] GMAC Residential is the term ResCap sometimes used to refer to the operations of GMAC Mortgage. Int. of J. Young, Sept. 28, 2012, at 29:9–18.

[195] Residential Capital Group is the term ResCap sometimes used to refer to the operations of RFC. *See, e.g.,* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 12.

[196] *See id.*

[197] *See id.*; *see also* Section V.A.1 (discussing Old GMAC Bank).

[198] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2007), at 12; *see also* Residential Capital Corp., Registration Statement (Form S-4) (July 15, 2005), at 62 (describing conforming mortgage loans as "prime credit quality first-lien mortgage loans secured by single-family residences that meet or 'conform' to the underwriting standards established by Fannie Mae or Freddie Mac for inclusion in their guaranteed mortgage securities programs").

of mortgage loans was conducted through retail branches and a direct lending network.[199] GMAC Mortgage did, however, originate certain mortgage loans sourced from mortgage brokers, and it purchased mortgage loans from correspondent lenders.[200] GMAC Mortgage produced approximately $91.5 billion in residential mortgage loans in 2005.[201]

GMAC Mortgage sold most of the mortgage loans it originated or purchased. Such sales were generally in the form of securitizations guaranteed by a GSE, primarily Fannie Mae or Freddie Mac.[202] GMAC Mortgage also sold mortgage loans to other investors through whole-loan sales or securitizations.[203] The loans that GMAC Mortgage did not sell were generally held by Old GMAC Bank as part of a portfolio of HFI mortgage loans.[204]

GMAC Mortgage typically retained the MSRs with respect to loans it sold or securitized.[205] GMAC Mortgage also purchased MSRs from other servicers or acted as a subservicer of mortgage loans.[206] In addition, GMAC Mortgage, primarily through Old GMAC Bank, provided warehouse lending facilities to mortgage originators to finance residential mortgage loans.[207]

### b. Residential Capital Group (RFC)

RFC was headquartered in Minneapolis, Minnesota and focused primarily on the purchase of residential mortgage loans in the secondary market and the origination of loans through mortgage brokers.[208] Unlike GMAC Mortgage, RFC originated mortgage loans that covered a broad spectrum of the credit scale, from prime to nonprime.[209] RFC's mortgage loans generally did not conform to the underwriting requirements of Fannie Mae or Freddie Mac.[210]

---

[199] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 12.

[200] *See id.*

[201] *See id.*

[202] *See id.* 13–14.

[203] *See id.* at 14.

[204] *See id.*

[205] *See id.*

[206] *See id.*

[207] *See id.*

[208] *See id.*

[209] *See id.*

[210] *See id.* Residential Capital Group's loans were generally considered non-conforming because (1) of the size of the loans or (2) they had more expansive documentation, property or credit-related features (e.g., higher debt-to-income or loan-to-value ratios), and therefore did not fit within the Fannie Mae or Freddie Mac guidelines. *See id.*

RFC purchased and originated first-lien and second-lien residential mortgage loans from correspondent lenders throughout the United States and through mortgage brokers to whom it provided wholesale funding.[211] RFC also purchased both "seasoned" mortgage loans that had been funded for more than twelve months and "distressed" mortgage loans that were in default or otherwise not performing.[212] RFC retained the MSRs for most of the loans it obtained or securitized.[213] In addition, RFC provided: (1) wholesale funding services to U.S. mortgage brokers for the origination of residential mortgage loans; and (2) warehouse lending to the residential mortgage lending industry in the United States.[214] According to ResCap's 2005 Annual Report:

> Our Residential Capital Group was the fifth-largest non-agency issuer of mortgage-backed and mortgage-related asset-backed securities in the United States in 2005. The Residential Capital Group issued approximately $56.7 billion of mortgage-backed and mortgage-related asset-backed securities in 2005. The Residential Capital Group is also a leading provider of wholesale funding services to U.S. mortgage brokers for the origination of residential mortgage loans and, as of December 31, 2005, we believe the Residential Capital Group was the largest provider of warehouse lending to the residential mortgage lending industry in the United States. The Residential Capital Group is also a leading primary and master servicer of residential mortgage loans and serves in that capacity for most of the loans it originates or purchases.[215]

### (1) Sale And Securitization Activities Of RFC

Like GMAC Mortgage, RFC sold nearly all of the mortgage loans it produced. Such sales were primarily through ResCap's securitization programs or in whole-loan sales to third-party investors. In general, RFC segregated the types of mortgage loans it acquired into specific securitization programs, each having distinct underlying collateral characteristics. According to ResCap, this process of securitizing mortgage loans with similar prepayment and credit-related characteristics through dedicated securitization programs resulted in RFC being able to more efficiently obtain funding for those assets through the capital markets.[216]

### (2) Servicing Activities Of RFC

RFC acted as the primary servicer of most of the residential mortgage loans it obtained, and as the master servicer of substantially all of the loans it sold in whole-loan sales or securitizations.[217] As of December 31, 2005, as primary servicer, RFC managed a portfolio of approximately   792,000   loans   with   an   aggregate   unpaid   principal   balance   of

---

[211] *See id.* at 15.

[212] *See id.* at 17.

[213] *See id.* at 16.

[214] *See id.* at 15.

[215] *See id*.

[216] *See id.* at 16.

[217] *See id*.

approximately $105 billion, and, as master servicer, a portfolio of approximately 826,000 loans with an aggregate unpaid principal balance of approximately $115 billion, which amounts included loans for which RFC also served as primary servicer.[218]

### (3) Seasoned And Distressed Mortgage Loans

RFC purchased seasoned and distressed residential mortgage loans.[219] RFC purchased many seasoned loans "from previously sold or securitized pools that had been paid down to less than 10% of their original aggregate principal balance, and were therefore 'called' out of these deals because administering such a small pool is economically inefficient."[220] Other seasoned loans were purchased in the secondary market. RFC purchased distressed residential mortgage loans with the goal of resolving or restructuring them and then selling them through securitizations or whole-loan transactions.[221] In 2005, RFC: (1) acquired more than $5.4 billion of face-amount seasoned mortgage loans, of which $1.9 billion were called loans and $3.5 billion were seasoned or distressed mortgage loans; and (2) securitized approximately $2.6 billion of seasoned and performing distressed mortgage loans.[222]

### (4) Business Capital Group

In 2005, ResCap's BCG conducted various business activities including residential construction finance; residential equity; and model home finance, pursuant to which ResCap provided capital to residential land developers and homebuilders to finance real estate projects. In addition, ResCap's BCG engaged in: (1) the resort finance business, which provided debt capital to resort and timeshare developers;[223] and (2) the health capital business; which provided debt capital to health care providers, primarily in the health care services sector.[224] Loans by ResCap's BCG were generally HFI.[225]

---

[218] *See id.*

[219] *See id.*

[220] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 17.

[221] *See id.* The Residential Capital Group obtained resolution of these mortgage loans "by working with the borrower to return the loan to performing status (in some cases under renegotiated terms), obtaining a payoff of the loan or selling the underlying residential property." *See id.*

[222] *See id.*

[223] *See id.* at 19. ResCap's BCG provided "revolving lines of credit secured by eligible timeshare receivables consisting of consumer timeshare notes." *See id.* The proceeds of such lines of credit were generally used to fund operations. In addition, ResCap's BCG made "loans to finance the acquisition, development and construction of the timeshare resort themselves, which are secured by a first lien on the real estate." *See id.*

[224] *See id.* at 17.

[225] *See* Int. of J. Young, Sept. 28, 2012, at 51:8–15.

### (a) Residential Construction Finance

ResCap's BCG provided capital to homebuilders, residential land developers and related market participants for the acquisition, development and construction of residential housing developments in the United States. It also provided debt capital, primarily in the form of first-lien loans and working capital loans, to finance specific projects for joint ventures that developed land into for sale lots. As of December 31, 2005, ResCap had total first-lien and working capital commitments of approximately $3.3 billion, with $2.2 billion in outstanding principal.[226]

ResCap's BCG also made equity investments with certain customers in specially created single-purpose entities to acquire residential projects and a certain other types of real estate. In addition, the BCG owned a significant amount of equity in a large regional homebuilder. As of December 31, 2005, the BCG had total equity investments of approximately $420 million.[227]

### (b) Residential Equity

The BCG provided mezzanine debt financing to homebuilders and residential land developers.[228] Such financings generally covered 80% to 90% of the homebuilder's or developer's required equity contribution for a particular real estate project, typically single- and multi-family housing or conversions of properties to condominiums. The BCG usually: (1) made these loans to single-purpose entities specifically formed to acquire and own a single project; and (2) obtained a security interest in the homebuilder's or developer's equity interest in the single-purpose entity. As of December 31, 2005, the BCG had mezzanine financing commitments of approximately $398 million with $341 million in principal outstanding.[229]

### (c) Model Home Finance

The BCG offered two major model-home products: (1) a model-home lease program; and (2) a lot option program. Under the model-home lease program, a homebuilder built a model home for the BCG, which would lease the model home to the homebuilder at a lease

---

[226] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18.

[227] *See id.*

[228] *See* Int. of J. Young, Sept. 28, 2012, at 50:21–51:2. According to Young,

> The [Business Capital Group], completely different, structured mezzanine financing to businesses that just happened to be in the home building business, so that was the strategic connection. Of course, in hindsight, you know, it was—I'm doubling down on the—you know, it's the housing market, but— . . . .

*Id.*

[229] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 18–19.

rate tied to a monthly floating interest rate.[230] The homebuilder would use the model home as a sales model. In exchange for a market commission, the homebuilder would sell the model home on behalf of the BCG. As of December 31, 2005, the BCG had more than 3,150 model homes with a net book value of approximately $776.5 million under lease.[231]

Under the lot option program, the BCG purchased land that a homebuilder designated. Simultaneously, the BCG entered into a contract with the homebuilder to develop the land into completed lots and an option contract with the homebuilder to purchase the finished lots. As of December 31, 2005, the BCG owned approximately 11,900 residential lots with a book value of approximately $543.8 million through the lot option program.[232]

### (d) Resort Finance

The BCG provided revolving lines of credit secured by eligible timeshare receivables consisting of consumer timeshare notes, generally to mid-size resort and timeshare developers. The developers typically used these loan proceeds to fund operations. In certain instances, the BCG made loans secured by the underlying real estate to developers to finance the acquisition, development and construction of the actual timeshare resorts. As of December 31, 2005, the BCG had: (1) total committed working capital lines of credit of approximately $1 billion, with $545.6 million in principal outstanding; and (2) total committed facilities for the acquisition, development and construction of resort and timeshare facilities of approximately $425 million, with approximately $146 million in principal outstanding.[233]

### (e) Health Capital

The BCG also provided financing to healthcare-related enterprises, including physician groups, hospitals, in-home service providers, medical staffing companies, medical equipment manufacturers and distributors, in patient/out patient care facilities, other healthcare service providers, and similar businesses, for working capital and for acquiring other healthcare-related enterprises. The health capital loans primarily took the form of: (1) working capital lines of credit secured by accounts receivable; (2) loans based primarily on

---

[230] *See* Int. of J. Young, Sept. 28, 2012, at 52:16–53:2. According to Young,

> The model home was—we owned the home—and leased it back to the builder, which was like, sort of an offshoot again of federal issue with the builder, we get all the financing, of some kind you know, and the business group, you know, was creative and talked to them about, "Well, you got model home needs. So, we'll buy a little bit more—build or buy the model home and lease it back to you." So, they took it off their balance sheet basically.

*Id.*

[231] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 19.

[232] *See id.*

[233] *See id.*

the cash flow generated by the healthcare-related enterprise; or (3) short-term loans secured by real estate.[234] As of December 31, 2005, the BCG had total committed facilities related to its health capital business of approximately \$792.5 million with \$598.2 million in principal outstanding.[235]

### (5) International Business Group

In 2005, ResCap's IBG conducted operations in the United Kingdom, The Netherlands, Germany, Canada, and Mexico.[236] According to Young, ResCap's International Business Group conducted the functional equivalent of non-conforming business in those countries.[237]

#### (a) United Kingdom

ResCap's U.K. operations included residential mortgage loan origination, acquisition, sale and securitization. Although ResCap retained the right to service the loans it securitized in the U.K., it outsourced the servicing activities to a third party. In 2005, ResCap originated approximately \$12.5 billion of residential mortgage loans in the U.K. making it, according to ResCap, "the largest originator of nonprime residential mortgage loans in the" U.K.[238] In addition, ResCap issued residential mortgage-backed securities of approximately \$5.3 billion in 2005 making it the "third largest issuer" of such securities in the U.K.[239]

#### (b) Continental Europe

The IBG operated in The Netherlands and Germany. In 2005, the IBG originated approximately \$2.8 billion in mortgage loans in Continental Europe.[240]

---

[234] *See id.* at 19–20. In connection with its health capital business, the BCG offered cash flow loans to certain healthcare-related enterprises with better credit quality than the customers of its accounts receivable secured lines of credit. These loans were usually secured by all the assets of the enterprise, including equity stakes in all related entities and cash flow. The real estate loans offered through the BCG's health capital business were generally short-term loans that served as bridge financing while the borrower sought financing insured by HUD. *See id.* at 20.

[235] *See id.*; *see also* Section V.F.4.a (discussing the August 2007 sale of the Health Capital business to GMAC CF).

[236] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 20.

[237] *See* Int. of J. Young, Sept. 28, 2012, at 46:3–13, (noting that the IBG "was basically non-conforming, the same business model . . . from the U.S., taken internationally, on the non-conforming side, because they don't have Fannie and Freddie and things like that"); *id.* at 48:18–21 ("So, yeah, the same basic business model, but outside the U.S., nonconforming, originate, sell, retain the servicing."). IBG's business, however, was "not nonprime." *Id.* at 47:3–6.

[238] *See* Residential Capital Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 20–21.

[239] *See id.*

[240] *See id.* at 21.

### *(c) Canada*

In April 2002, the IBG acquired the largest non-bank owned mortgage brokerage network in Canada. This mortgage brokerage network brokered loans to other lenders in Canada. Through its Canadian operations, the IBG (1) received approximately $10.8 million in brokerage fees and (2) originated approximately $1 billion of mortgage loans through its mortgage broker network in 2005.[241]

### *(d) Mexico*

In 2000, the IBG began its Mexican lending operations. In Mexico, the IBG provided (1) capital to developers to acquire and develop land and build homes; (2) mortgage lending; and (3) warehouse facilities to financial intermediaries in Mexico to create an origination network. As of December 31, 2005, the IBG had approximately $42 million in outstanding loans from its operations in Mexico.[242]

### *(6) Other*

ResCap provided real-estate brokerage in markets including New England, Chicago, the New York City metropolitan area, and San Francisco. In 2005, ResCap's networks of real-estate brokerage offices, including franchised and company-owned, were among the ten largest in the United States. In addition, ResCap provided full-service global relocation to consumers. ResCap's global relocation services business was one of the largest providers of global relocation services.[243]

## D. HOUSING AND MORTGAGE MARKETS EXPERIENCE RAPID GROWTH IN THE YEARS LEADING TO RESCAP'S FORMATION

Beginning in the late 1990's, the housing and related mortgage markets experienced rapid growth. A number of factors contributed to this growth including, most significantly: (1) historically low interest rates; (2) promotion of home ownership by the Federal Government through various programs; and (3) growth of owner's equity attributable to increasing real-estate prices in hot markets, such as southern California.[244] Home prices in the United States experienced a historic boom from 2001 through 2005. "Nationally, real home prices rose 86% [corrected for inflation] between the bottom in the fourth quarter of 1996 and

---

[241] *See id.*

[242] *See id.*

[243] *See id.* at 21–22.

[244] *See* Anna J. Schwartz, *Origins of the Financial Market Crisis of 2008*, 29 Cato J. 19 (Winter 2009); *see also* Office of Federal Housing Enterprise Oversight, U.S. House Prices Continue to Rise Rapidly (June 1, 2005), http://www.fhfa.gov/webfiles/1184/1q05hpi.pdf.

the peak 9.25 years later in the first quarter of 2006."[245] By other estimates, the price of a typical American house increased by 124% between 1997 and 2006.[246]

In 2002 and 2003, fueled by demand from private-label MBS investors, mortgage lenders created numerous alternative loan products,[247] many of which traded traditional risk-based pricing (i.e., higher interest rates and LTV ratios) for premium pricing and upfront fees.[248] Increasingly, lenders and borrowers turned to more exotic mortgage products, most significantly the "2/28 Option ARM" in 2004 and 2005, combined with lower and lower credit and documentation standards to qualify.[249]

The MBS market evolved as a means for mortgage originators to finance their business by selling pools of loans to a special purpose entity known as an investment trust.[250] The investment trust would then rank the mortgages into credit quality strips or tranches, and sell interests to private investors. The better credit quality tranches received the first right to payment, while investors in the lower graded tranches received higher rates of return for accepting greater risk.[251] Investors from around the globe flocked to the MBS market.

> The private label market grew dramatically, with issuances rising from $586 billion in 2003 to $1.2 trillion in 2005. A large share of the growth came from the subprime and Alt-A markets, whose share of the private label market grew from 41% to 76% . . . .[252]

_____

[245] Robert J. Shiller, the Federal Reserve Bank of Kansas City, Understanding Recent Trends in House Prices and Homeownership (Sept. 14, 2007), at 4, http://www.nber.org/papers/w13553.pdf.

[246] *CSI: Credit Crunch, Central Banks have Played a Starring Role*, The Economist, Oct. 18, 2007.

[247] Cynthia Angell & Clare D. Rowley, FDIC, FDIC Outlook, Breaking New Ground in U.S. Mortgage Lending (last updated Mar. 21, 2007), http://www.fdic.gov/bank/analytical/regional/ro20062q/na/2006_summer04.html.

[248] *Id.*

[249] *See id.*; *see also* Chris Isidore, *Liar Loans: Mortgage Woes Beyond Subprime*, CNNMoney.com, Mar. 19, 2007, http://money.cnn.com/2007/03/19/news/economy/next_subprime/?postversion=2007031913; *see also* The Subprime Mortgage Crisis Explained, Stock Market Investors, http://www.stock-market-investors.com/stock-investment-risk/the-subprime-mortgage-crisis-explained.html.

[250] The Bond Market Association, International Swaps & Derivatives Association, Securities Industry Association, Special Purpose Entities and the Securitization Market (Feb. 1, 2002), at 1, http://www.isda.org/speeches/pdf/SPV-Discussion-Piece-Final-Feb01.pdf.

[251] Working Group, Committee on the Global Financial System, The Role of Ratings in Structured Finance; Issues and Implications (Jan. 2005), at 1, http://www.bis.org/publ/cgfs23.pdf.

[252] Richard K. Green & Susan M. Wachter, Federal Reserve Bank of Kansas City, The Housing Finance Revolution (Aug. 31, 2007), at 34, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21.WachterandGreen.pdf.

As developing economies and emerging markets grew, so did the global supply of money to be invested.[253] With the Fed Funds Rate—the rate of interest at which banks lend available cash at the Federal Reserve to each other—pegged at 1% after the economic downturns caused by the burst of the "dot-com" bubble and the tragedies of September 11, 2001, MBS increased in appeal to this global money pool.[254] By 2003, there were insufficient loans produced by traditional lending standards to meet investor demand. With demand remaining strong, lending standards began to weaken.[255]

### 1. The Subprime Mortgage Market Expands

The subprime mortgage market, which was virtually nonexistent before the mid 1990's, rose to account for a fifth of all new mortgages by 2005.[256] New loan denial rates fell sharply after 2000, with these newly available mortgages going to lower-income borrowers.[257] Along with the growth of subprime mortgages, new products were developed and introduced to the market over time included ones with acronyms such as:

- "*SIVA*"—Stated Income, Verified Assets;

- "*NIVA*"—No Income, Verified Assets;

- "*NINA*"—No Income, No Assets (a/k/a "Liar Loans"); and, later,

- "*NINJA*"—No Income, No Job or Assets.[258]

_____

[253] Ben S. Bernanke, Governor, FRB, Remarks at the Sandridge Lecture, Virginia Association of Economists (Mar. 10, 2005), http://www.federalreserve.gov/boarddocs/speeches/2005/200503102/.

[254] *Id.*

[255] This American Life: The Giant Pool of Money, National Public Radio (May 9, 2008); *see also* Dr. Faten Sabry & Dr. Chudozie Okongwu, *How Did We Get Here? The Story of the Credit Crisis*, J. OF STRUCTURED FIN. (Spring 2009), at 6 ("According to annual surveys conducted by the Office of the Comptroller of the Currency (OCC), credit underwriting standards were eased during the years 2004 to 2006.").

[256] NIKOLA KOJUCHAROV, CLYDE F. MARTIN, ROBERT F. MARTIN, & LILI XU, THE FEDERAL RESERVE BANK OF SAN FRANCISCO, THE SUBPRIME MORTGAGE CRISIS: IRRATIONAL EXUBERANCE OR RATIONAL ERROR? (July 2008), at 6, http://www.frbsf.org/economics/conferences/0901/Kojucharov-Martin-Martin-Xu.pdf.

[257] ROBERT J. SHILLER, THE FEDERAL RESERVE BANK OF KANSAS CITY, UNDERSTANDING RECENT TRENDS IN HOUSE PRICES AND HOMEOWNERSHIP (Sept. 14, 2007), at 17–18, http://www.nber.org/papers/w13553.pdf.

[258] *See* THE SUBPRIME MORTGAGE CRISIS EXPLAINED, STOCK MARKET INVESTORS, http://www.stock-market-investors.com/stock-investment-risk/the-subprime-mortgage-crisis-explained.html; *see also* CHARLES R. MORRIS, THE TWO TRILLION DOLLAR MELTDOWN: EASY MONEY, HIGH ROLLERS, AND THE GREAT CREDIT CRASH (2008).

In a NINJA loan, the borrower needed only a qualifying credit score; the lender was not required to verify any other information.[259] These lower underwriting standards were further coupled with riskier structures such as the "2/28" or "3/27" (two or three year low teaser rate followed by twenty-seven or twenty-eight years of adjustable rates).[260] Adjustable rate mortgages were not new. The practice of qualifying the borrower based on the lower teaser rate payment amount not the future adjusted rate, however, was an innovation.[261]

By 2004, lenders began placing substantial prepayment penalty clauses into loans to ensure that the loan either remained outstanding through the first reset date, or the borrower paid a premium to retire the loan.[262] As low teaser rates became more common, so did optional products allowing borrowers to choose to pay interest only or even something less, creating a negative amortization loan.[263] Increasing risk even further, lenders also began to combine the exotic mortgage products with a means for little or no down payment.[264] LTV of 80%, long considered the minimum lending standard, were quickly being replaced with 90% LTV, or the "80/20" loan, where the lender made an 80% first mortgage coupled with a 20% second mortgage that could be used as the down payment to avoid requiring personal mortgage insurance also known as PMI.[265]

By 2005, 22% of new loans were considered subprime, up from 8% in 2003.[266] Further, at the peak of the lending frenzy in 2006, subprime loans had an average cumulative LTV of 95% and more than one half were low or no documentation loans. In addition, 55% were

---

[259] *See id.*

[260] RICHARD K. GREEN & SUSAN M. WACHTER, FEDERAL RESERVE BANK OF KANSAS CITY, THE HOUSING FINANCE REVOLUTION (Aug. 31, 2007), at 37, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21. WachterandGreen.pdf.

[261] *Id.* at 37–38.

[262] *Id.*

[263] CYNTHIA ANGELL & CLARE D. ROWLEY, FDIC, FDIC OUTLOOK, BREAKING NEW GROUND IN U.S. MORTGAGE LENDING (last updated Mar. 21, 2007), at 37–38, http://www.fdic.gov/bank/analytical/regional/ ro20062q/na/ 2006_summer04.html.

[264] *Id.*

[265] THE FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT (Jan. 2011), at 109–110, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf; *see also* Glenn Setzer, *Piggybacks Arouse Interest—and Concerns*, MORTGAGE NEWS DAILY, Aug. 9, 2005, http://www.mortgagenewsdaily.com/892005_Piggyback_Loans.asp; Jody Shen, *Subprime Second-Mortgage Bond Downgrades Surging, Moody's Says*, BLOOMBERG, June 12, 2007, http://www.bloomberg.com/apps/ news?pid=newsarchive&sid=aJHB7OMXxFT4.

[266] RICHARD K. GREEN & SUSAN M. WACHTER, FEDERAL RESERVE BANK OF KANSAS CITY, THE HOUSING FINANCE REVOLUTION (Aug. 31, 2007), at 36, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21. WachterandGreen.pdf.

accompanied by a piggyback second loan, thereby permitting the borrower to avoid paying PMI.[267] In 2006, as interest rates began to reset on early vintage 2/28 Option ARM's, the subprime market began to see a significant rise in defaults.[268] Borrowers' interest rates reset from initial low teaser rates of 2% to 3% to market rates as high as 8% to 9% in some cases. At the same time, home prices were leveling off or, in some markets, declining, further hampering homeowners' ability to sell their home or refinance their loans. In 2006, the median price of new homes dropped 3% from January to August, while the Dow Jones U.S. Home Construction Index was down 35% in August 2006 from the prior year.[269] Subsequent research shows that the housing bubble peaked in 2006.[270]

## 2. As Interest Rates Increase, Some Begin To Predict A Housing Slowdown

By 2004, the FRB and other monetary fund leaders around the world began to see signs of looming inflation and introduced increasing interest rates to combat these signs.[271] LIBOR and Fed Funds rates increased from historic lows of 1% in 2002, to 2.3% by the end of 2004.[272] By the end of 2005, the continued rate increases brought LIBOR and the Fed Funds

---

[267] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, MOODY'S ECONOMY.COM, Dec. 2007, at 21, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake-Mortgage-Meltdown.pdf.

[268] Noelle Knox, *Some Homeowners Struggle to Keep Up With Adjustable Rates*, USA TODAY, Apr. 3, 2006, http://usatoday30.usatoday.com/money/perfi/housing/2006-04-03-arms-cover-usat_x.htm.

[269] John Spence, *More Builders Lower Expectations,* MARKETWATCH (WALL ST. J.), July 27, 2006, http://articles.marketwatch.com/2006-07-27/news/30812021_1_meritage-homes-corp-orders-for-new-homes-housing-market.

[270] Henry M. Paulosn, Jr., Sec'y, U.S. Dep't of the Treasury, Remarks on Current Housing and Mortgage Market Developments, Georgetown Law Center (Oct. 16, 2007), http://blogs.wsj.com/economics/2007/10/16/text-of-paulsons-remarks-on-housing/.

[271] THE FEDERAL RESERVE AND INTEREST RATES, BRANCH BANKING AND TRUST COMPANY, http://www.bbt.com/bbtdotcom/financial-education/PLANNING/federal-reserve-and-interest-rates.page.

[272] LIBOR RATES HISTORY: HISTORICAL LIBOR RATES INFORMATION, FEDPRIMERATE.COM, http://www.fedprimerate.com/libor/libor_rates_history.htm#liborpreviousmonth; FEDERAL FUNDS TARGET RATE HISTORY, FEDPRIMERATE.COM, http://www.fedprimerate.com/fedfundsrate/federal_funds_rate_history.htm.

Rate up to 4.25%,[273] and by August 2006, both rates were at 5.3%.[274] As Moody's economists Mark Zandi and Celia Chen pointed out:

> The tightening in monetary policy between mid-2004 and early 2006 was the catalyst for the rapid shift from boom to bust in the housing market. . . . Long term rates ultimately rose in response, although more modestly. . . . Rates on adjustable mortgages and fixed mortgage rates moved higher in response . . . . Higher mortgage rates, when mixed with very lofty house prices, undermined housing affordability.[275]

Further, Federal Reserve Bank of Dallas President Richard Fisher noted:

> In retrospect, the real fed funds rate turned out to be lower than what was deemed appropriate at the time and was held lower longer that it should have been. In this case, poor data led to a policy action that amplified speculative activity in the housing and other markets. Today, as anybody not from the former planet of Pluto knows, the housing market is undergoing a substantial correction and inflicting real costs to millions of homeowners across the country.[276]

In addition, the U.S. current account deficit also peaked in 2006.[277] FRB President Ben Bernanke explained how trade deficits required the U.S. to borrow from abroad, in the process bidding up bond prices and lowering interest rates. In April 2005 he stated: "The greater the extent to which [foreign] capital inflows act to augment residential construction and especially current consumption spending, the greater the future economic burden of repaying the foreign debt is likely to be."[278]

---

[273] *Id.*

[274] *Id.*

[275] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, MOODY'S ECONOMY.COM, Dec. 2007, at 23, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake-Mortgage-Meltdown.pdf.

[276] Richard W Fisher, President, The FRB of Dallas, Speech to the New York Association for Business Economics: Confessions of a Data Dependent (Nov. 2, 2006), http://www.dallasfed.org/news/speeches/fisher/2006/fs061102.cfm.

[277] THE FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT (Jan. 2011), at 104, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf

[278] Ben S. Bernanke, Chairman, The FRB, Remarks At the Sandridge Lecture, Virginia Association of Economists, Richmond, Virginia: The Global Saving Glut and the U.S. Current Account Deficit (Apr. 14, 2005), http://www.bis.org/review/r050318d.pdf.

Though few foresaw the looming crisis, Yale University Professor Robert Shiller was one of the earliest to sound the warnings in 2005, followed in August/September 2006 by several other voices expressing grave concern. Prof. Shiller stated:

> In 2005, in the second edition of my book "Irrational Exuberance," I stated clearly that a catastrophic collapse of the housing and stock markets could be on its way. I wrote that "significant further rises in these markets could lead, eventually, to even more significant declines," and that this might "result in a substantial increase in the rate of personal bankruptcies, which could lead to a secondary string of bankruptcies of financial institutions as well," and said that this could result in "another, possibly worldwide, recession.[279]

In August 2006, *Barron's* included a warning of the approaching housing crisis noting that 32.6% of new mortgages were interest only and that 43% of first time home buyers in 2005 put no money down.[280] Further, *Barron's* noted that "[e]ven a relatively brief period of rising mortgage payments, rising debt and falling home values will collapse the system."[281] These stresses were not just on home owners. In 2001, approximately 54% of subprime loans were bundled and securitized to third-party investors. By 2006, this percentage increased to 75%.[282] During the period when interest rates were low, refinancing was an option to relieve stress on home owners. For example, "[i]n 2005, when mortgage interest rates were low, around 40% of existing mortgages were refinanced in a single year."[283] In September 2006, Professor Nouriel Roubini noted:

> We have a glut of housing stock . . . . Whenever you have a glut … demand for these goods becomes interest insensitive . . . . The market consensus is still that there will be a soft landing. My concern today is that the bursting of the housing bubble—we haven't seen it yet—is going to lead to broader systemic banking problems. It's going to start with subprime lenders—they are already in trouble because of increased delinquencies and foreclosures—and then it is going to be transmitted to other banks and financial institutions.[284]

---

[279] Robert J. Shiller, *Challenging the Crowd in Whispers, Not Shouts*, N.Y. Times, Nov. 1, 2008, http://www.nytimes.com/2008/11/02/business/02view.html?pagewanted=all&_r=0.

[280] Lon Witter, *The No Money Down Disaster*, Barron's, Aug. 21, 2006.

[281] *Id.*

[282] Katalina M. Bianco, The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown, CCH Federal Banking Law Reporter, CCH Mortgage Compliance Guide and Bank Digest (2008), http://www.business.cch.com/bankingfinance/focus/news/Subprime_WP_rev.pdf.

[283] Richard K. Green & Susan M. Wachter, Federal Reserve Bank of Kansas City, The Housing Finance Revolution (Aug. 31, 2007), at 32, http://www.kc.frb.org/publicat/sympos/2007/PDF/2007.08.21.WachterandGreen.pdf.

[284] Nouriel Roubini, Stern School of Business, NYU, Featured Speaker at the International Monetary Fund Seminar: Nouriel Roubini on the U.S. and Global Outlook, Washington, D.C. (Sept. 7, 2006), http://www.economonitor.com/nouriel/2010/09/02/economonitor-flashback-roubinis-imf-speech-september-7-2006/.

Roubini also noted "credit supply conditions have not tightened. You do not see any signal of a real tightening of the standards."[285] At an IMF symposium, economist Anirvan Banerji noted Roubini had predicted a slowdown in 2005 and that he was "concerned that [Roubini's] approach amounts to subjective forecasting by selective analogy."[286] *The New York Times* reported that:

> The audience seemed skeptical, even dismissive. As Roubini stepped down from the lectern after his talk, the moderator of the event quipped, "I think perhaps we will need a stiff drink after that." People laughed—and not without reason. At the time, unemployment and inflation remained low, and the economy, while weak, was still growing, despite rising oil prices and a softening housing market. And then there was the espouser of doom himself: Roubini was known to be a perpetual pessimist, what economists call a "permabear."[287]

The markets were enjoying healthy investment returns on MBSs, so these few individuals were easily overshadowed by the majority who believed the boom would continue. Indeed, many others continued to see opportunity even in late 2006, as illustrated in an August 2006 *Barron's* article claiming housing and construction related stocks look very attractive as they were trading around book value.[288]

## E.  GM'S SALE OF A 51% INTEREST IN AFI TO CERBERUS

### 1.  GM's Ratings Continue To Decline

GM's operational problems and credit rating issues continued relatively unabated after ResCap's incorporation. On October 14, 2004, S&P downgraded GM's and AFI's long-term credit rating from BBB with a negative outlook to BBB- with a stable outlook and, at the same time, downgraded GM's and AFI's commercial paper rating from A-2 with a negative outlook to A-3 with a stable outlook.[289]

---

[285] *Id.*

[286] Anirvan Banerji, Chief Research Officer, Economic Cycle Research Institute, Discussant at the International Monetary Fund Seminar: Nouriel Roubini on the U.S. and Global Outlook, Washington, D.C. (Sept. 7, 2006), http://www.economonitor.com/nouriel/2010/09/02/economonitor-flashback-roubinis-imf-speech-september-7-2006/.

[287] Stephen Mihm, *Dr. Doom,* N.Y. Times, Aug. 15, 2008, http://www.nytimes.com/2008/08/17/magazine/17pessimist-t.html.

[288] Lon Witter, *The No Money Down Disaster*, Barron's, Aug. 21, 2006.

[289] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-12; *see also* Section III.A.2 (discussing the declining credit ratings of GM and AFI).

On November 4, 2004, Moody's downgraded GM's long-term credit rating from Baa1 with a negative outlook to Baa2 with a stable outlook and, at the same time, downgraded AFI's long-term credit rating from A3 with a negative outlook to Baa1 with a stable outlook.[290] Moody's affirmed GM's and AFI's commercial paper rating at Prime-2 with a stable outlook. On February 14, 2005, Moody's lowered the outlook on GM's and AFI's long-term credit ratings of Baa2 and Baa1, respectively, to negative from stable and, at the same time, lowered the outlook on GM's and AFI's commercial paper rating of Prime-2 to negative from stable.[291] Refer to the tables below for a summary of GM's, AFI's, and ResCap's credit ratings subsequent to these rating actions:

---

[290] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 16, 2005), at II-12.

[291] *See id.*

EXHIBIT III.E.1—1

**GM Historical Credit Ratings**

December 2004 – May 2012



*Source: Moody's; Fitch; S&P.*

EXHIBIT III.E.1—2
**AFI Historical Credit Ratings**
December 2004 – May 2012



*Source: Moody's; Fitch; S&P.*

EXHIBIT III.E.1—3
**ResCap Historical Credit Ratings**
December 2004 – May 2012



*Source: Moody's; Fitch; S&P.*

GM's long-term credit rating fell from BBB (high) on February 14, 2005[292] to BB on October 17, 2005. On October 11, 2005, DBRS placed the ratings of AFI and ResCap under review with developing implications. Fitch later downgraded GM's senior unsecured rating from B+ to B. Fitch maintained the rating watch negative outlook for GM's ratings.[293]

### 2. AFI's Concerns Regarding GM's Ratings And The Affect On AFI Grows, Leading To Consideration Of Its Separation From GM

Although Eric Feldstein, AFI's Chairman and CEO, could not pinpoint the exact time frame for his mounting concerns regarding GM's ratings erosion and AFI's concomitant ratings slide, he did recall that GM's ratings were under constant pressure in 2003, 2004, and 2005.[294] Moreover, although he could not recall the precise rating, Feldstein did remember that when there was a ratings change, it was always a downward change and GM was often on credit watch.[295]

Feldstein "felt that it was [his] responsibility and [AFI's main] responsibility to anticipate, given the trajectory . . . . that [GM's credit rating] could one day become noninvestment grade."[296] While Feldstein believed that GM, without enormous borrowing requirements, could withstand a noninvestment grade rating, he thought that a financial services company, like AFI, with borrowings between $125 and $175 billion, might well suffocate unless its credit rating remained at investment grade because liquidity was like "oxygen" for a financial services company.[297] Feldstein believed that if AFI were "to become noninvestment grade," it would have "transform[ed] the junk market."[298] Feldstein's concerns prompted him to approach GM in 2005 about possible steps to delink the credit rating of AFI and GM.[299]

Feldstein believed that when GM was an A-rated company or better, it made sense for AFI to be wholly owned by GM,[300] but when GM was approaching noninvestment grade, he thought that GM should think about separating AFI in some way "and maybe even ced[e] a majority interest."[301] Accordingly, Feldstein approached GM with the thought of separating the two companies. GM's senior management was "not enamored in the first instance with

---

[292] *See id.*

[293] *See id.* at II-32–33.

[294] Int. of E. Feldstein, Dec, 14, 2012, at 61:10–14.

[295] *Id.* at 61:15–21.

[296] *Id.* at 61:24–62:3.

[297] *Id.* at 62:8–23.

[298] *Id.* at 63:8–11.

[299] *Id.* at 64:1–17.

[300] *Id.* at 64:23–25.

[301] *Id.* at 64:23–65:5. One or more investment banks were of the same view because they presented to Feldstein why it made sense for GM and AFI to consider separating. *See id.* at 77:9–11.

this proposal because [AFI] was considered the 'crown jewel' of GM."[302] According to Feldstein, GM could have at one time achieved a de-linking with a sale of a 20% interest in AFI,[303] but things got progressively worse at GM and by the time GM became comfortable selling 20% of AFI, that was no longer enough to de-link AFI's credit rating from that of GM.[304] In order to de-link the rating, GM would have to sell 51%.[305]

GM's initial hesitation gave way to practical reality. Feldstein believes that GM's senior management ultimately came to understand that not parting with a majority interest in AFI was worse than a sale of its captive automobile finance business.[306] Feldstein speculated "that ultimately, [GM] determined that it was better to own 49 percent of a viable, economically viable, profitable company than 100 percent of a company that could be at risk."[307] Feldstein did not recall the precise date of GM's decision to pursue a sale of AFI but believes the process began in earnest in mid- to late-2005[308] when GM formed a team led by the CFO and Treasurer to explore a sale of GM's interest in AFI.[309]

On October 17, 2005, GM announced that it was exploring the possible sale of a controlling interest in AFI, with the goal of de-linking AFI's credit rating from GM's credit rating and renewing its access to low-cost financing. In it is 2005 Annual Report, GM acknowledged the steps it had taken to separate ResCap from GM's credit rating noting the 2005 Operating Agreement between AFI and ResCap and the limitations the 2005 Operating Agreement imposed on the payment of dividends to AFI and repayment of subordinated debt.[310] Additionally, after being pressured by AFI's management and the investment

_____

[302] *Id.* at 67:24–68:2.

[303] *Id.* at 69:20–22.

[304] *Id.* at 70:12–14. Walker noted:

> [A]s much as we wanted ResCap to be distinct from GMAC, we also wanted GMAC to be distinct from GM, distinct in the agencies' minds. They would allow less linkage than they would between ResCap and GMAC, but there was still some element of de-linkage, and these guys are clearly stating that if we don't get this deal done, they're going to equalize our ratings and that's going to be bad news for everybody in the GMAC family relative to getting this deal done.

Int. of D. Walker, Nov. 28, 2012, at 120:2–13.

[305] Int. of E. Feldstein, Dec. 14, 2012, at 70:21–22.

[306] *Id.* at 78:4–9.

[307] *Id.* at 78:10–15. Similarly Walker noted: "GM had owned GMAC for 80 years, was selling 51 percent because they had financial distress." Int. of D. Walker, Nov. 28, 2012, at 117:7–9.

[308] Int. of E. Feldstein, Dec. 14, 2012, at 79:12–14.

[309] *Id.* at 85:2–6.

[310] General Motors Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at I-22–I-23.

community to improve the debt ratings and lower the cost of borrowings at AFI and ResCap, GM announced:

> We are considering the sale of a controlling interest in [AFI] as well as exploring strategic and structural alternatives for ResCap.
>
> \*      \*      \*
>
> The extent of the effect on [AFI's] and ResCap's credit ratings, if any, will depend on the structure and other terms of any potential transaction as well as the extent of [AFI's] ongoing credit exposure to GM.
>
> \*      \*      \*
>
> Failure to execute a AFI strategic transaction will place further pressure on both GM's and [AFI's] credit profiles, potentially resulting in further downgrades with [AFI's] credit ratings explicitly re-linked to those of GM.
>
> \*      \*      \*
>
> In the absence of a transaction:

- [AFI's] access to capital may be seriously constrained, as most unsecured funding sources may decline, including bank funding;

- The cost of funds related to borrowings that are secured by assets may increase, leading to a reduction in liquidity for certain asset classes;

- It may be increasingly difficult to securitize assets, resulting in reduced capacity to support overall automotive originations;

- Uncompetitive funding costs may result in a lower return on capital and significantly lower earnings and dividends; and

- [AFI] may need to consider divesting certain businesses in order to maintain adequate liquidity to fund new originations or otherwise preserve the value of its businesses.[311]

---

[311] *Id.* at I-20–I-21. GM further reported:

> Although any transaction involving [AFI] would reduce our interest in the earnings of [AFI], it is expected that the financial effects of that reduction would be offset by the value of any consideration we receive from a purchaser. We are working to finalize a transaction as rapidly as we can. Structuring a [AFI] transaction is a complex endeavor and we cannot predict whether any transaction with respect to [AFI] will occur, the terms of any transaction, the identity of any purchaser, or whether and over what period a transaction could achieve the principal strategic goals.

*Id.* at II-26.

### 3. Despite GM's Consideration Of Sale Of AFI, GM's Ratings Continue To Decline

On December 12, 2005, S&P resolved GM's issuer credit rating by downgrading the rating from BB minus, CreditWatch with negative implications to B, outlook negative, and downgraded GM's short-term ratings from B-2, CreditWatch with negative implications to B-3 outlook negative. GM's ratings were removed from CreditWatch. The long-term ratings of AFI and ResCap were unchanged at BB and BBB minus, respectively, both under CreditWatch with developing implications. On December 16, 2005, DBRS downgraded GM's long-term debt to B (high) and GM's short-term rating to R-3 (mid), both with negative trends.[312]

While GM experienced limited access to the capital markets in 2005 as a result of deterioration in its credit ratings, it was able to use available liquidity to meet its capital requirements. Similarly, due to the downgrade of its unsecured debt to non-investment grade, AFI's access to the unsecured capital markets was limited. AFI was able to meet its capital requirements by accessing alternative funding sources, with a focus on secured funding and automotive whole loan sales.

On February 21, 2006, Moody's downgraded GM's senior unsecured debt to B2 with a negative outlook from B1 under review for a possible downgrade. On March 16, 2006, Moody's placed the senior unsecured ratings of GM, AFI, and ResCap under review for a possible downgrade.[313]

### 4. Execution Of The Cerberus PSA

On April 3, 2006, GM announced the sale of a 51% stake in AFI to FIM Holdings, an investment vehicle formed by a group led by Cerberus.[314] AFI, GM, GM Finance Co. Holdings Inc. (a wholly owned subsidiary of GM), and FIM Holdings had entered into the Cerberus PSA on April 2, 2006.[315] The Cerberus PSA contemplated a series of transactions to accomplish the sale of 51% of GM's interest in AFI to FIM Holdings. The sale ultimately closed in November 2006.[316]

---

[312] *Id.* at II-31–II-3.

[313] General Motors Corp., Quarterly Report (Form 10-Q) (June 8, 2006), at I-53–I-54.

[314] *See* GM, Press Release, *GM Reaches Agreement to Sell Controlling Stake in GMAC* (Apr. 3, 2006) [EXAM11496076]; *see also* GMAC LLC, Current Report (Form 8-K) (July 26, 2006) ("In addition to continuing to enable [AFI] to support the sale of GM vehicles, the transaction is intended to support [AFI]'s strategic goal of a stable investment grade credit rating and profitable growth."); Int. of L. Tessler, Nov. 16, 2012, at 16:14–17:3 ("Cerberus' [sic] whole investment strategy in private equity is focused on operationally challenged and operationally distressed businesses. . . . So, there's always an operational orientation with regard to the type of investments we make where we believe that we will be able to go in to a company and improve its quality of operations and its profitability."); *id.* at 18:16–19 ("[Cerberus] felt . . . there were operational improvements [at AFI]. After all, it was owned by General Motors."); *id.* at 20:11–21:13 ("[Q:] Were you interested principally in the automotive side, or were you interested in the mortgage side of the business, as well? [A:] We were interested in the totality of [AFI].").

[315] *See* General Motors Acceptance Corp., Current Report (Form 8-K) (Apr. 3, 2006). Pursuant to the Cerberus PSA, HoldCo acquired the Call Option. *See* Section V.A.1 (discussing the Call Option and HoldCo's acquisition of the Call Option).

[316] *See* General Motors Corp., Current Report (Form 8-K) (Nov. 30, 2006), at 3.

In particular, the Cerberus PSA provided that certain entities, including AFI, ResCap, and RFC, would be converted into limited liability companies.[317] In addition, the Cerberus PSA required Old GMAC Bank to be removed from the Cerberus ownership chain so that Cerberus would not become subject to regulations relating to thrift holding companies.[318] Thereafter, GM would sell 51% of the common limited liability company interests in AFI to FIM Holdings in exchange for $7.353 billion, the Cerberus PSA Equity Purchase Price.

According to AFI, the sale to FIM Holdings "strengthens [AFI's] ability to support GM's automotive operations, improves [AFI's] access to cost-effective funding, provides significant liquidity to GM and allows GM to continue to participate in the profitability of AFI over the long term through its 49-percent ownership stake."[319] Moreover, it was anticipated that the sale would "reduce [AFI's] cost of funds as [AFI's] ratings are delinked from GM's and improve over time. Under the [Cerberus PSA and related] agreements, GM will directly benefit from [AFI's] lower cost of funds."[320] At the time the sale was announced, both GM and Cerberus publicly expressed expectations as to the emergence of a stronger AFI.

> We look forward to working with Cerberus to maintain and grow [AFI's] traditional strong performance and contribution to the GM family, said GM Chairman and Chief Executive Officer Rick Wagoner. This agreement is another important milestone in the turnaround of General Motors. It creates a stronger [AFI] while preserving the mutually beneficial relationship between GM and [AFI]. At the same time, it provides significant liquidity to support our North American turnaround plan, finance future GM growth initiatives, strengthen our balance sheet and fund other corporate priorities.

> We are committed to helping [AFI] compete even more effectively and continuing its tradition of strong growth and success," added Lenard Tessler, Cerberus' head of Private Equity and senior managing director. We recognize that GM's dealers are a cornerstone for growth in this business, and we are committed to maintaining the strong support that [AFI] provides to its dealer customers. Moreover, we have great confidence and respect for the people of

---

[317] Cerberus PSA, § 2.3(a) [CERB000521]; Cerberus PSA, Disclosure Schedules, at Sched. 2.3(a) [CERB000731].

[318] The Cerberus PSA was silent as to the mechanics to remove Old GMAC Bank from the Cerberus chain of ownership. Indeed, as of April 4, 2006, ResCap's management was exploring three potential ownership structures: (1) AFI owning 100% of voting control of IB Finance with proportional earnings distribution to ResCap; (2) proportional voting control and earning distribution; and (3) formation of ResCap's own industrial bank. *See* Section V.A.1.a (discussing the 2006 Bank Restructuring). The Cerberus PSA, however, did provide that "[a]fter the Bank Restructuring, [AFI] or ResCap will wholly own [GMAC Automotive Bank], or it will be co-owned by [AFI] and ResCap." Cerberus PSA, Ex. H, at 2 [CERB039811].

[319] GM, Press Release, *GM Reaches Agreement to Sell Controlling Stake in GMAC* (Apr. 3, 2006) [EXAM11496076].

[320] General Motors Acceptance Corp., Current Report (Form 8-K) (Apr. 10, 2006).

III-61

[AFI], and look forward to the continued success of the [AFI] automotive financing, mortgage and insurance, banking, and real estate services businesses around the globe.[321]

Following GM's announcement that it agreed to sell a 51% interest in AFI, Fitch revised AFI's rating watch status to Positive from Evolving, indicating that the ratings may be upgraded or maintained at current levels.[322]

### 5. *ResCap Converts To A Limited Liability Company*

As required by the Cerberus PSA, ResCap converted from a corporation to a single member limited liability company. Effective as of the conversion, the ResCap By-Laws were superseded by the ResCap LLC Agreement.[323] Although ResCap initially chose to remain treated as a corporation for tax purposes, it later elected to change its classification to a disregarded entity effective November 21, 2006. A discussion of tax issues is contained in Section V.D.

### 6. *2006 ResCap LLC Agreement*

In connection with the conversion of ResCap to a limited liability company, a certificate of conversion and a certificate of formation was filed with the Secretary of State of Delaware. In addition, GMAC Mortgage Group LLC, as the sole member of ResCap, entered into and executed the 2006 ResCap LLC Agreement.[324]

Pursuant to the 2006 ResCap LLC Agreement, the management of ResCap was vested exclusively with the ResCap Board subject to any delegation to officers as provided or contemplated by the Agreement.[325] The 2006 ResCap LLC Agreement further provided that the directors serving on the ResCap Board before the conversion of ResCap to a limited

---

[321] GM, Press Release, *GM Reaches Agreement to Sell Controlling Stake in GMAC* (Apr. 3, 2006) [EXAM11496076]. When Cerberus began considering the acquisition of a controlling interest in AFI, it viewed ResCap as a unique, well-run, and profitable asset. Int. of L. Tessler, Nov. 16, 2012, at 22:17–23:17 ("Our initial interest in [AFI] was based upon a view that the mortgage business was very large, fairly unique one of the few assets that was, of its type, that was not part of a bank at [sic] our initial impressions were that it was well-run and very profitable.").

[322] *See* GMAC LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2006), at 37.

[323] 2006 ResCap LLC Agreement, at 1 [ALLY_0255865].

[324] *Id.*

[325] *Id.* § 14 ("Subject to the delegation to the Officers of the Company provided herein and any delegation otherwise herein contemplated the business and affairs of the Company shall be managed by or under the direction of the Board."). The 2006 ResCap LLC Agreement contemplated meetings of the ResCap Board, during which a majority of the directors present (assuming a quorum was present) could authorize ResCap to act. *See id.* § 15(b). The ResCap Board could act without meeting if a written consent to act was signed by a majority of the directors entitled to vote at a ResCap Board meeting. *See id.* § 15(d).

liability company would continue to serve on the ResCap Board.[326] Because the 2006 ResCap LLC Agreement did not delegate management to any officers, the full ResCap Board was entrusted with the management of ResCap, including the review and consideration of any transaction with any GMAC Affiliate.

### 7. 2006 AFI Amended LLC Operating Agreement

In connection with the Cerberus acquisition of a 51% interest in AFI on November 30, 2006, GM and Cerberus entered into the 2006 AFI Amended LLC Operating Agreement,[327] which gave Cerberus the right to appoint six representatives and two independent managers to the thirteen person AFI Board.[328] Also on November 30, 2006, Cerberus appointed, as its representatives, Frank Bruno, Lenard Tessler, Mark Neporent, Seth Plattus, J. Ezra Merkin, and Michael Klein, with Merkin serving as Chairman.[329] Bruno, Tessler, Neporent, and Plattus also held executive positions at Cerberus.[330]

### 8. The 2006 Bank Restructuring[331]

As part of the sale of a 51% interest in GMAC to the Cerberus-led consortium, Cerberus required[332] ResCap to divest Old GMAC Bank so that Cerberus could avoid bank holding company status and the restrictions on non-banking activities that would have been triggered by ownership of a federal savings bank.[333] In order to comply with this requirement, AFI and ResCap undertook a fundamental restructuring of their automotive and mortgage banking operations. Substantially all of the assets and liabilities of Old GMAC Bank were transferred to GMAC Automotive Bank while the Old GMAC Bank entity and its remaining assets and liabilities were transferred to GM.[334] Full ownership of GMAC Automotive Bank was then transferred to IB Finance, a newly created wholly owned direct subsidiary of AFI.[335] By

---

[326] *See id.* § 14(b).

[327] *See* 2006 AFI Amended LLC Operating Agreement [CERB001063].

[328] Written Consent of the Initial Class A and Initial Class B Holders to Action in Lieu of Meeting of GMAC LLC, dated Nov. 30, 2006, at 1 [CERB003011].

[329] *Id* at 1–2. In his role at Cerberus, Tessler led the due diligence on the acquisition. Int. of L. Tessler, Nov. 16, 2012, at 22:5–8.

[330] SENIOR   EXECUTIVES/MANAGING   DIRECTORS,   CERBERUS   CAPITAL   MANAGEMENT,   L.P., www.cerberuscapital.com/team/senior_executives_managing_directors.

[331] *See* Section V.A.1.a (discussing details of the 2006 Bank Restructuring).

[332] Cerberus PSA, Ex. H [CERB039811].

[333] Walker Report, at 2 [RC40008925].

[334] Certificate of Share Transfer, dated Nov. 21, 2006 [ALLY_0401265]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

[335] Share Contribution Agreement [CERB001521].

conveying Old GMAC Bank's assets and operations to GMAC Automotive Bank and transferring the Old GMAC Bank entity to GM, ResCap maintained, through membership interests in IB Finance, the benefits of bank funding while the possibility that Cerberus would become subject to federal regulations related to ownership of a federal savings bank was eliminated.[336]

### 9. The 2006 Amended Operating Agreement

On November 27, 2006, GM, AFI, and ResCap entered into the 2006 Amended Operating Agreement, which amended and superseded the 2005 Operating Agreement.[337] The amendments reflected by the 2006 Amended Operating Agreement were approved by the ResCap Board, including the Independent Directors.[338] Melzer, however, does not recall having any discussions regarding the 2006 Amended Operating Agreement in connection with its approval.[339]

---

[336] The transaction's structure (specifically, the use of an industrial loan bank, instead of a federal savings and loan bank or "thrift") was driven by Cerberus's desire to avoid bank holding company regulations. Under a "loophole" in the Bank Holding Company Act, ownership of an industrial loan bank did not trigger bank holding company status. Debate over this "loophole" prompted the FDIC, on July 28, 2006, to issue a six-month moratorium on deposit insurance and change of control approvals for industrial loan banks. Despite the moratorium, Cerberus received FDIC approval in November, 2006 for its acquisition of 51% of AFI by agreeing that Ally Bank would be subject to any changes that the FDIC might make to the regulation and supervision of industrial loan banks once the moratorium was lifted (agreeing, if necessary, to sell its interest in the bank, to convert the bank to a thrift or to obtain a waiver from the FDIC). *See, e.g.*, FDIC, Press Release, *FDIC Places Six-Month Moratorium on Industrial Loan Company Applications and Notices* (July 28, 2006), http://www.fdic.gov/news/news/press/2006/pr06073.html; FDIC, Press Release, *FDIC Board Approves Change in Control Notice for GMAC Automotive Bank, Midvale, Utah* (Nov. 15, 2006) [EXAM10241413]; *see also* Section V.A.1.a (discussing the 2006 Bank Restructuring).

[337] According to the ResCap Board minutes, it was unanimously resolved that the 2005 Operating Agreement is amended to "(a) permit the LLC Tax Dividend and not subject it to the dividend restrictions contained in the [2005] Operating Agreement; (b) amend certain other provisions of the [2005] Operating Agreement related to the conversion of the Company to a limited liability company; and (c) implement other amendments the [2005] Operating Agreement, including amendments related to the conversion of the Company to become a limited liability company." Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2006, at 1–2 [RC00016852].

[338] *See* Residential Capital, LLC Written Consent in Lieu of Meeting, dated Nov. 29, 2006, RC4006849–55 [RC40006748].

[339] *See* Int. of T. Melzer, Oct. 10, 2012, at 121:2–12.

The 2006 Amended Operating Agreement largely followed the 2005 Operating Agreement. There are a few notable exceptions. In particular, the 2006 Amended Operating Agreement enabled the declaration and payment of a dividend[340] that would have not been permitted under the 2005 Operating Agreement; eliminated section 2(e) of the 2005 Operating Agreement, which established parameters for prepaying subordinated debt;[341] and deleted section 2(f)(vii), which required ResCap to employ individuals and have officers who were not also employees or officers of any GMAC Affiliate.[342]

The 2006 Amended Operating Agreement sections pertaining to the appointment and rights and obligations of the Independent Directors are largely consistent with the 2005 Operating Agreement.[343] Like the 2005 Operating Agreement, the 2006 Amended Operating Agreement prohibited transactions with GMAC Affiliates unless such transactions were at arm's length and for fair value.

---

[340] As a result of the conversion of ResCap and certain domestic subsidiaries, and their election to be treated as a "multi-member limited liability company" for tax purposes, ResCap's equity increased. *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 2. ResCap desired to pay a dividend in the amount of such increase. On November 27, 2006, ResCap declared a dividend in an amount equal to the net increase of its equity. *See id.* ResCap, GM, and AFI entered into the 2006 Amended Operating Agreement to permit, inter alia, the declaration and payment of this dividend. *See id.*; *see also* Section V.D.3.b (discussing the tax considerations).

[341] The full text of § 2(e) in the 2005 Operating Agreement states:

> Without limiting the applicable provisions in the relevant underlying loan documents, ResCap shall not make any Prepayment of any GMAC Subordinated Debt, except from (i) ResCap's Cumulative Net Income at the time such Prepayment is made, less any Dividends previously paid after the date of this Agreement and any Prepayments of GMAC Subordinated Debt mad after the date of this Agreement (to the extent that such Prepayment was made from ResCap's Cumulative Net Income), other than Excluded Prepayments, (ii) the net proceeds to ResCap from the issuance of Capital Stock or indebtedness to any Person (other than a GMAC Affiliate) that is subordinated in right of payment of principal, interest and premium, if any, to Rated Indebtedness, or (iii) 50% of the net proceeds to ResCap from the issuance or incurrence of indebtedness to any Person (other than a GMAC Affiliate) that ranks *pari passu* with Rated Indebtedness in right of payment of principal, interest and premium, if any. Notwithstanding the foregoing, ResCap may make Prepayments of GMAC Subordinated Debt of up to a cumulative amount of $500 million after the date of this Agreement ('Excluded Prepayments').

2005 Operating Agreement, § 2(e) [ALLY_0140795].

[342] *Compare* 2006 Amended Operating Agreement, §§ 2(e)(i)–(ix) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1), *with* 2005 Operating Agreement, §§ 2(f)(i)–(x) [ALLY_0140795]. Eliminating the prohibition on shared employees allowed Cerberus to pursue its investment strategy of imbedding Cerberus and COAC employees throughout the companies it controlled to implement operational improvements. *See* Consulting Agreement, Recital B [ALLY_0401248].

[343] *Compare* 2006 Amended Operating Agreement, § 2(f) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1), *with* 2005 Operating Agreement, § 2(g) [ALLY_0140795]. Indeed, Melzer did not believe the 2006 ResCap LLC Agreement affected his duties as an Independent Director. *See* Int. of T. Melzer, Oct. 10, 2012, at 114:9–12. According to him, the Independent Director provisions were left unchanged by the 2006 Amended Operating Agreement. *See id.* at 106:14–18. Note also that a typographical error in the 2006 Amended Operating Agreement fails to modify internal references within section 2(f) and instead refers to section 2(g), which relates back to the wording of the 2005 Operating Agreement.

In addition the 2006 Amended Operating Agreement released GM from all of its obligations under the Agreement from and after November 30, 2006.[344] GM remained liable, however, for any obligations related to the pre-November 30, 2006 period.[345]

### 10. Purchase Price Adjustment

Pursuant to the Cerberus PSA, the Equity Purchase Price was subject to two adjustments.[346] The first adjustment was calculated based on the Initial Tangible Net Book Value[347] calculated at least two days prior to the closing date minus $14.4 billion, with GM receiving any Initial Tangible Net Book Value in excess of $14.4 billion and paying AFI any shortfall.[348]

The second and final adjustment was based on a closing balance sheet prepared within ninety days following the closing date.[349] The amount of the adjustment was calculated based on the difference between the Adjusted Final Tangible Net Book Value[350] and the Initial Tangible Net Book Value.[351] GM Finance Co. Holdings, Inc. would have received the amount by which the Adjusted Final Tangible Net Book Value exceeded the Initial Tangible Net Book Value as a distribution.[352] Because the Adjusted Final Closing Balance Sheet was less than the Initial Tangible Net Book Value, GM Finance Co. Holdings, Inc. made a capital contribution to AFI in the amount of the shortfall, without adjusting the capital accounts of AFI's

---

[344] 2006 Amended Operating Agreement, § 9 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1). In connection with the consummation of the transactions contemplated by the Cerberus PSA, ResCap and AFI released GM from its obligations under a Services Facilities Agreement and a Trademark License Agreement. *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 2. The Services Facilities Agreement was amended and restated to release GM from its obligations and to provide for certain services to ResCap by AFI and vice-versa. *See* Amended and Restated Services Facilities Agreement, dated Nov. 30, 2006 [ALLY_0013267]. The Trademark License Agreement was terminated because the parties agreed to an alternative arrangement for the use of certain intellectual property. *See* Termination Agreement, dated Nov. 30, 2006 [CERB002157].

[345] *See* 2006 Amended Operating Agreement, § 9 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[346] Cerberus PSA, §§ 3.3, 3.4 [CERB000521].

[347] "Initial Tangible Net Book Value" is defined in the Cerberus PSA as the amount resulting from subtracting the Tangible Adjustment Amount from an amount equal to total assets less total liabilities of the FinanceCo Companies on a consolidated basis as shown on the schedule to the Initial Closing Balance Sheet. *Id.* § 1.1.

[348] *Id.* § 3.3.

[349] *Id.* § 3.4(a).

[350] "Adjusted Final Tangible Net Book Value" is defined in the Cerberus PSA as the amount resulting from subtracting the Tangible Adjustment Amount from an amount equal to the total assets less total liabilities of the FinanceCo Companies on a consolidated basis as shown on the schedule to the Adjusted Final Closing Balance Sheet. *Id.* § 1.1.

[351] *Id.* § 3.4(e).

[352] *Id.*

members.[353] As a result of the final purchase price adjustment, GM contributed approximately $1 billion in equity to AFI during the first quarter of 2007.[354]

### 11. Consulting Agreement

AFI, Cerberus, and COAC entered into a Consulting Agreement, effective as of April 1, 2007 (the "Consulting Agreement"),[355] pursuant to which Cerberus was granted the right to place consultants at AFI.[356] The Consulting Agreement does not include ResCap and other AFI subsidiaries and affiliates unless they "opt-in" to the agreement by executing a copy of an addendum to the agreement.[357] The "Company's Direct and Indirect Subsidiaries" provision states that AFI's direct and indirect subsidiaries are not parties to the Consulting Agreement, but gives AFI subsidiaries the option to become parties to the Consulting Agreement by filling out and executing the Opt-in Letter attached as Exhibit B to the Agreement.[358] It does not appear that ResCap or any other AFI affiliate executed an "opt-in" letter. Indeed, Melzer stated that he never saw the Consulting Agreement.[359] Nevertheless, Cerberus also placed COAC consultants at ResCap.[360]

A list of consultants serving under the Consulting Agreement is attached as an Exhibit to the Agreement. Under the heading, "Cerberus Capital Management, L.P." there are 29 consultants listed and under the heading "Cerberus Operations Advisory Company, L.L.C." there are 44, for a total of 73 consultants. According to the column headed, "Primary functional area/business line," there were at any one time 59 consultants at ResCap, 11 consultants at AFI, one consultant at Ally, and one consultant at "Auto." According to the column, "Type of Advisory Services Provided," three of the consultants are "Legal."

Cerberus advisors at AFI consulted in areas including information technology, human resources, risk management, financial planning and analysis, and finance and treasury.[361]

---

[353] *Id.*; GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[354] GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 17.

[355] Although effective as of April 1, 2007, the Consulting Agreement was not signed by the parties until late October 2007. *See* Consulting Agreement, at 1, 8 [ALLY_0401248].

[356] *Id.* § 1. In addition to having upper level executives from Cerberus sit on the boards of portfolio companies, Cerberus uses a subsidiary, COAC, to assist Cerberus in running its portfolio companies.

[357] *Id.* § 19, Ex. B.

[358] *Id.*

[359] Int. of T. Melzer, Mar. 22, 2013, at 55:2–56:14.

[360] *See* Consulting Agreement, Ex. A [ALLY_0401248]. As noted above, the 2005 Operating Agreement prohibited employees from filling dual roles at ResCap and any AFI affiliate, including Cerberus; however, the November 27, 2006 amendments eliminated this prohibition. *Compare* 2005 Operating Agreement, § 2(f)(vii) [ALLY_0140795], *with* 2006 Amended Operating Agreement, § 2(e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[361] Consulting Agreement, Ex. A [ALLY_0401248].

Cerberus advisors at ResCap provided consulting services in areas including credit management, financial planning and analysis, legal, restructuring and monetization, cash management, work out, risk management, assessment management, finance, treasury, lending, and human resources.[362]

Upon consummation of the transactions contemplated by the Cerberus PSA, Cerberus took an active role in the management of AFI and its subsidiaries, including ResCap.[363] Indeed, Cerberus's initial interest in acquiring a majority position in GM was predicated on improving AFI's operations.[364] After acquiring control of AFI, Cerberus began implementing its strategy of imbedding Cerberus and COAC employees throughout AFI and ResCap to implement operational improvements.[365] Soon after the acquisition, however, ResCap began experiencing liquidity problems.[366]

Following Cerberus's acquisition of AFI, Eric A. Feldstein, William F. Muir, Sanjiv Khattri, Barbara J. Stokel, and Mark F. Bole resigned from the AFI Board of Managers.[367] G. Richard Wagoner, Jr., Frederick A. Henderson, Mark R. LaNeve, and Walter G. Borst

---

[362] *Id.* The Consulting Agreement also recognized that Cerberus advisors might gain access to confidential AFI and ResCap information. *Id.* § 3. The Consulting Agreement permitted advisors to disclose confidential information to any member, partner, manager, director, officer, employee, financial or legal advisor of Cerberus or any of its affiliates to the extent a legitimate business need to know existed. *Id.* §§ 3.1(a), 3.4. Furthermore, the Consulting Agreement specified that:

> Notwithstanding the foregoing or any other provision of this Agreement, the parties understand and agree that nothing set forth in this Agreement shall operate or be construed to operate to restrict in any manner the rights of Cerberus and/or its affiliates under the Operating Agreement, including the ability of Cerberus to consider Confidential Information in connection with corporate governance, oversight and investment management activities.

*Id.* § 3.2. Thus, the Consulting Agreement explicitly gave Cerberus the right to access information from all of its consultants at both AFI and ResCap in order to manage its investment in those Cerberus portfolio companies.

[363] Int. of P. Bossidy, Dec. 14, 2012, at 53:2–4.

[364] Int. of L. Tessler, Nov. 16, 2012, at 18:8–19.

[365] *See* Consulting Agreement, Recitals, Ex. A [ALLY_0401248]. Through AFI's ability to appoint ResCap Board members and officers and the Consulting Agreement with AFI, Cerberus placed employees in executive and director positions at ResCap. *See* Ex. A (listing fifty-nine Cerberus employees providing consulting services to ResCap); Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Mar. 23, 2007, at RC40005567–68 [RC40005558] (appointing Cerberus employees as ResCap directors and Jim Jones as ResCap CEO).

[366] *See* Section V.F (discussing asset sales due to liquidity crisis). In May, 2007, only about six months after acquiring a controlling stake in AFI in November 2006, Cerberus also acquired 80.1% of Chrysler Holdings from Daimler Benz for $7.8 billion (about ten years after Daimler paid $36 billion for Chrysler). The Chrysler acquisition also gave Cerberus control of Chrysler Financial. As Tessler noted, "We had a unique window into the capital markets at that time as a result of also owning Chrysler Automotive and Chrysler Financial. So, our window was not simply through a [AFI] lens." Int. of L. Tessler, Feb. 28, 2013, at 38:20–24.

[367] *See* GMAC LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 5.

remained as GM-appointed members of the AFI Board of Managers.[368] FIM Holdings elected Frank W. Bruno, Lenard B. Tessler, Mark A. Neporent, Seth P. Plattus, J. Ezra Merkin, and Michael Klein to the AFI Board of Managers.[369] In addition, (1) FIM Holdings elected T.K. Duggan and Douglas A. Hirsch as independent managers, and (2) GM Holdco elected Robert Scully of Mortgage Stanley as the third independent manager.[370] Merkin was elected chairman of the board of managers.[371] AFI's existing management team remained and Feldstein, Muir, and Khattri continued serving as Chief Executive Officer, President, and Chief Financial Officer, respectively.[372]

### 12. Other Agreements

In connection with the consummation of the Cerberus PSA, GM, and AFI entered into a number of agreements that were purportedly consistent with their historical practices that were intended to continue the global relationship between GM and AFI,[373] including the United States Consumer Financing Agreement, pursuant to which AFI preserved its exclusive relationship with GM for vehicle financing and leasing incentives.[374]

---

[368] *See id.* Pursuant to the GMAC LLC Agreement, GM Holdco elected these individuals to the AFI board of managers. *See* Written Consent of the Initial Class A and Initial Class B Holders to Action in Lieu of Meeting of GMAC LLC, dated Nov. 30, 2006 [CERB003011].

[369] *See* Written Consent of the Initial Class A and Initial Class B Holders to Action in Lieu of Meeting of GMAC LLC, dated Nov. 30, 2006 [CERB003011].

[370] *See id.*

[371] *See* GMAC LLC, Current Report (Form 8-K) (Nov. 30, 2006), at 5.

[372] *See* GMAC LLC, Press Release, *GMAC Financial Services Begins New Era as an Independent Global Financial Services Company* (Nov. 30, 2006) [EXAM10016428].

[373] *See* General Motors Corp., Annual Report (Form 10-K) (Mar. 15, 2007), at 9.

[374] *See* GMAC LLC, Current Report (Form 8-K) (Nov. 30, 2006), at .2.

The following diagram illustrates AFI ownership as of November 30, 2006:

EXHIBIT III.E.12
**AFI Ownership**
As of November 30, 2006



Source: See Amended and Restated LLC Operating Agreement of GMAC LLC, dated Nov. 30, 2006, Schedule of Members, at CERB001165-66 [CERB001063].

## F. INDUSTRY DISLOCATION LED BY SUBPRIME DISTRESS (DECEMBER 2006 THROUGH AUGUST 2007)

### 1. The Subprime Mortgage Industry Faced Significant Challenges

By year-end 2006, subprime mortgage originations had decreased by 4% from 2005 and numerous factors signaled that the decline in subprime mortgage loans would continue in 2007.

#### a. Housing Appreciation Showed The Largest Decline In Three Decades

Signs of trouble in the housing market became more evident as 2006 progressed. Home price appreciation began to slow almost to the point of stagnation.[375] The second quarter of 2006 exhibited the slowest rate of appreciation since the fourth quarter of 1999.[376] The S&P Case-Shiller 20-City Composite Home Price Appreciation Index, after having risen nearly every month for six years, remained flat through 2006, and even declined in several markets.[377]

During 2006, new housing starts fell significantly below prior-year levels and the supply of homes on the market began to grow.

EXHIBIT III.F.1.a—1
**Industry Data: Case Shiller 20 City Composite Home Price Appreciation Index**
2002 – 2012
*($ in Thousands)*



*Source: Standard & Poor's / Case-Shiller Home Price Index.*

---

[375] *See generally* Robert J. Shiller, Understanding Recent Trends in House Prices and Homeownership, Yale Economics Department Working Paper No. 28, Cowles Foundation Discussion Paper No. 1630, Oct. 18, 2007, http://ssrn.com/abstract=1017546.

[376] Office of Federal Housing Enterprise Oversight (OFHEO), Press Release, *House Price Appreciation Slows: OFHEO House Price Index Shows Largest Decline in Three Decades* (Sept. 5, 2006), http://www.fhfa.gov/webfiles/1179/2q06hpi.pdf.

[377] S&P/Case-Shiller Home Price Indices 2008, A Year In Review (Jan. 13, 2009), at 2–3, https://www.standardandpoors.com/indices/index-research/en/us/?type=All&category=Economic.



EXHIBIT III.F.1.a—2
**Industry Data: Housing Starts**
March 2002 – July 2012
*($ in Thousands)*

*Source: Housing starts data per Census Bureau.*

EXHIBIT III.F.1.a—3
**Industry Data: Existing and New Home Inventory**
**Months of Supply**
2002 – 2012

— — — Existing Home Inventory - Months of Supply     ——— New Home Inventory - Months of Supply

*Source: Home inventory data per Census Bureau.*

### b.  Interest Rates Rise

Well before the subprime distress began, the FRB, fearing inflation, began raising interest rates in June 2004. By mid-December 2004, the prime interest rate was at 5.25% and it continued to climb, reaching 8.25% by June 2006.[378] The combination of rising interest rates, waning home appreciation rates, and increasing inventories of homes for sale made it difficult for borrowers to continue refinancing and servicing their debts by using home equity.[379]

### c.  Mortgage Delinquencies

A large number of ARMs that had originated in earlier years were reaching the point at which their interest rates reset, often to a rate that was higher than the already increased prevailing interest rates. The resulting increase in monthly mortgage payments meant many borrowers were unable to make their new monthly payments. In 2006, delinquencies on subprime mortgages began to grow, increasing from 10% to almost 15%.[380]

EXHIBIT III.F.1.c
**Industry Data: Prime and Subprime Mortgage Delinquencies**
2002 – 2012



*Note: A mortgage delinquency is defined as being at least 90 days past due.*
*Source: Mortgage Bankers Association.*

[378] Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates, (Dec. 17, 2008), http://research.stlouisfed.org/fred2/data/PRIME.txt.

[379] David Muir, *Americans in Debt: 'Using Home Equity as an ATM Machine'*, ABC News, June 17, 2008, http://abcnews.go.com/Business/story?id=5187754&page=1—.UV24DL91-Gs.

[380] U.S. Census Bureau, Statistical Abstract of the United States (2012).

In the fourth quarter of 2006, the delinquency rate was 14.4% for subprime ARMs and 13.3% for all subprime mortgage loans, the highest in four years.[381] In the first quarter of 2007, the delinquency rate for all subprime mortgage loans rose to 13.77%, compared to only 2.58% for prime mortgage loans.[382] In the second quarter of 2007, the delinquency rate for subprime mortgages jumped again, to 14.82%, compared to 2.73% for prime mortgage loans.[383] In the third quarter of 2007, the delinquency rate for subprime mortgages increased yet again, to 16.31%, compared to 3.12% for prime mortgage loans.[384] One in every five subprime ARM loans had a late payment in third quarter 2007, and that did not include the one in every ten subprime ARM loans in foreclosure.[385]

Mortgage foreclosures also soared to record highs, with 0.54% of all outstanding mortgages entering the foreclosure process in the fourth quarter of 2006.[386] The percentage of all outstanding mortgages entering the foreclosure process rose to new records of 0.58% in first quarter 2007, 0.65% in second quarter 2007, and 0.78% in third quarter 2007.[387] While subprime ARMs represented only 6.8% of all mortgage loans outstanding in the third quarter of 2007, they represented 43% of the foreclosures started during that quarter.[388]

### d. Early Payment Defaults And Repurchases

Many of the subprime mortgage loan payment delinquencies and defaults occurred in the first few months after their origination. The FRB Chair pointed to such EPDs as likely evidence that lenders had loosened underwriting standards to continue increasing loan volume

---

[381] Douglas Dyer & Sarah Woo, *Analyzing the Subprime Market Fallout Using EDF Credit Measures*, MOODY'S K.M.V. COMPANY (Apr. 16, 2007), at 7, https://riskcalc.moodysrms.com/us/research/docs/General/Analyzing Sub-Prime Fallout Using EDF Credit Measures Apr 2007.pdf.

[382] Mortgage Bankers Ass'n, Press Release, *Delinquencies Decrease in Latest MBA National Delinquency Survey,* (June 14, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/55132.htm.

[383] *Id*.

[384] Mortgage Bankers Ass'n, Press Release, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey* (Dec. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/58758.htm.

[385] *Id*.

[386] *See* Statement of Roger T. Cole, Dir., Div. of Banking Supervision and Regulation, Before the U.S. Senate Committee on Banking, Housing and Urban Affairs (Mar. 22, 2007), http://www.federalreserve.gov/newsevents/testimony/cole20070322a.htm.

[387] Mortgage Bankers Ass'n, Press Release, *Delinquencies Decrease in Latest MBA National Delinquency Survey,* (June 14, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/55132.htm; Mortgage Bankers Ass'n, Press Release, *Delinquencies Increase in Latest MBA National Delinquency Survey* (Sept. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/56555.htm; Mortgage Bankers Ass'n, Press Release, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey* (Dec. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/58758.htm.

[388] Mortgage Bankers Ass'n, Press Release, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey* (Dec. 6, 2007), http://www.mortgagebankers.org/NewsandMedia/PressCenter/58758.htm.

when mortgage loan originations began to slow.[389] The rise in EPDs had adverse consequences for subprime mortgage lenders, including ResCap. In connection with secondary mortgage market sales—both whole loan sales and securitizations—lenders typically commit to repurchasing loans upon an EPD. Thus, as EPDs rose, many lenders were forced to repurchase loans.

By the first quarter of 2007, the handwriting began to appear on the wall. Reuters, documenting the toll EPDs and related repurchases would have on lenders, reported that "[l]enders have been battered by rising defaults and demands from their own lenders to take back soured loans at a loss."[390] In April 2007, *The New York Times* further documented the problem:

> Some of the problems afflicting mortgages sold to borrowers with weak, or subprime, credit increasingly appear to be cropping up in loans made to homeowners who were thought to be less risky. The latest sign of possible further deterioration in the credit market came yesterday as American Home Mortgage, a lender based in Melville, N.Y., said that it would earn less and pay out a smaller dividend because it was being asked to buy back and write down the value of certain loans . . . . Reports that Wall Street, which made millions of dollars securitizing mortgages in recent years, is becoming more wary of Alt-A by putting loans back to lenders or by bidding less for them could be an indication that default rates will worsen before they improve.[391]

By the summer of 2007, "[s]everal mortgage lenders—particularly monoline subprime lenders—experienced substantial losses, as they had to repurchase larger-than-expected volumes of previously securitized loans because of so-called early payment defaults."[392]

Subprime mortgage lenders' short-term lending arrangements with warehouse lenders also took a hit because of EPDs when warehouse lenders began to exercise rights to compel the subprime mortgage lenders to repurchase loans that did not satisfy contractual

---

[389] Speech of Ben S. Bernanke, Chairman, at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition, The Subprime Mortgage Market (May 17, 2007), http://www.federalreserve.gov/newsevents/speech/bernanke20070517a.htm.

[390] Jonathan Stempel & Dan Wilchins, *Accredited, New Century Lead Subprime Meltdown*, REUTERS, Mar. 13, 2007, http://www.reuters.com/article/2007/03/13/us-newcentury-inquiry-idUSN1342127420070313.

[391] Vikas Bajaj, *Defaults Rise in Next Level of Mortgages*, N.Y. TIMES, Apr. 10, 2007, http://www.nytimes.com/2007/04/10/business/10lend.html.

[392] FRB., MONETARY POLICY AND THE ECONOMIC OUTLOOK (July 18, 2007), at 22, http://www.federalreserve.gov/monetarypolicy/mpr_20070718_part1.htm.

representations. The repurchase demands by warehouse lenders exacerbated the strain on the subprime mortgage lenders' liquidity.[393] As explained by the head of the specialty finance team at S&P:

> Warehouse lenders are the lifelines for a lot of these subprime originators because they don't have the financial capacity to fund these loans by themselves . . . . To the extent that these warehouse lenders go away, the whole process starts to unravel.[394]

In addition to exercising repurchase rights, "warehouse lenders [worried] about the quality of subprime loans . . . originated in recent years . . . began asking subprime specialists for bigger haircuts, putting the originators in financial peril and forcing some into bankruptcy."[395]

At the same time, investors became more reluctant to purchase subprime MBS in light of the increasingly poor performance of the underlying loans, driving total MBS issuance in 2006 down to $1.93 trillion, from a peak of $3 trillion in 2003.[396] To the extent subprime lenders were able to securitize loans, it was on conditions much less favorable to them.

### e. First Quarter 2007 Mortgage Company Bankruptcies

As subprime mortgage delinquencies increased, credit markets as well as underwriting criteria began to tighten. In the first quarter of 2007, the first wave of mortgage company bankruptcies began. Ownit Mortgage Solutions,[397] American Freedom Mortgage,[398] and Mortgage Lenders Network[399] filed bankruptcy petitions on December 28, 2006, January 30, 2007, and February 5, 2007, respectively. By the end of first quarter of 2007, "[m]ore than two

---

[393] Alistair Barr, *Big Banks Control Fate of Subprime Lenders*, WALL ST. J. MARKETWATCH, Feb. 16, 2007, http://articles.marketwatch.com/2007-02-16/news/30722912_1_subprime-loans-ownit-mortgage-solutions-warehouse-lenders.

[394] *Id.* (quoting Emie Napier, head of the specialty finance team at Standard & Poor's).

[395] *Id.* ("It usually takes at least several weeks for subprime specialists to sell their loans. During that time, big banks provide a 'warehouse' in which to store them. In return for passing the loan onto these warehouse lenders, the originators get cash equal to the value of the asset, minus a fee, called a 'haircut', which provides a cushion against late payments and delinquencies.").

[396] Gretchen Morgenson, *Crisis Looms in Market for Mortgages,* N.Y. TIMES, Mar. 11, 2007, http://www.nytimes.com/2007/03/11/business/11mortgage.html?pagewanted=all&_r=0.

[397] Bradley Keoun, *Ownit Files for Bankruptcy as Merrill Seeks to Return Bad Loans*, BLOOMBERG, Jan. 2, 2007, http://www.bloomberg.com/apps/news?pid=conewsstory&refer=conews&tkr=MER:US&sid=akwzqnZA.euU.

[398] Joe Rauch, *Ad Bill Forces Mortgage Lender Out of Business*, ATLANTA BUS. CHRONICLE, Feb. 19, 2007, http://www.bizjournals.com/atlanta/stories/2007/02/19/newscolumn3.html?page=all.

[399] *Mortgage Lenders Network Files for Chapter 11*, REUTERS, Feb. 5, 2007, http://www.reuters.com/article/2007/02/05/mortgagelendersnetwork-bankruptcy-idUSN0546894120070205.

dozen subprime lenders ha[d] quit the industry" in a year's time.[400] In March 2007, New Century Mortgage announced it would be unable to timely file its 10-K,[401] and ultimately filed a bankruptcy petition on April 2, 2007.[402]

### f.   Capital Market Response

On June 7, 2007, Bear Stearns halted redemptions for two of its CDO hedge funds. On June 22, 2007, it was widely reported that Bear Stearns pledged up to $3.2 billion to bail out one of the two troubled hedge funds because of subprime mortgages.[403] Reporting analysts noted:

> Bear may have prevented a wider meltdown—and kept many of the subprime bonds from plunging in value in a fire sale. Its injection of money also will help bring order to the market and pay back loans made by other big Wall Street banks to the Bear-managed hedge fund . . . . The firm, whose move helps preserve its reputation, eventually might even make some money from the struggling investments.[404]

Less than a month later—July 18, 2007—Bear Stearns announced its two hedge funds were essentially worthless, having lost over 90% of their value, a loss equal to over $1.4 billion.[405] On August 1, 2007, the hedge funds filed for bankruptcy protection and investors in the funds filed suit against Bear Stearns alleging that the investment bank misled them about the extent of the funds' exposure.[406]  It was noted at that time:

> After Bear Stearns was forced to write off the value of two large hedge funds that had invested heavily in securities backed by subprime debt, it could take just one more "Bear-like event" for

---

[400] Jonathan Stempel & Dan Wilchins, *Accredited, New Century Lead Subprime Meltdown*, REUTERS, Mar. 13, 2007, http://www.reuters.com/article/2007/03/13/us-newcentury-inquiry-idUSN1342127420070313.

[401] Compl., *SEC v. Morrice*, Case No. 8:09-CV-01426-DDP-FMP, Docket No. 1, at 3.

[402] *Id*. at 4.

[403] Kate Kelly and Serena NG, *Bear Stearns Bails Out Fund With Big Loan: Injection of $3.2 Billion Caps Days of Drama; Subprime Sector Fears*, WALL ST. J., June 23, 2007, http://online.wsj.com/article/SB118252387194844899-search.html.

[404] *Id*.

[405] THE JOINT ECONOMIC COMMITTEE: SUBPRIME MORTGAGE MARKET CRISIS TIMELINE (July 2008), at 21, http://www.jec.senate.gov/public/?a=Files.Serve&File_id=4cdd7384-dbf6-40e6-adbc-789f69131903.

[406] *Id*.

> the financial system to freeze up. "If there's another major hedge fund that does stumble, that could elicit a crisis of confidence and a global shock."[407]

On August 9, 2007, the "one more Bear Stearns-like event" happened: BNP Paribas suspended three subprime investment funds because of liquidity concerns.[408] Meanwhile, Alan Greenspan, in an editorial entitled *The Roots of the Mortgage Crisis*, noted:

> On Aug. 9, 2007, and the days immediately following, financial markets in much of the world seized up. Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged. Interest rates on a wide range of asset classes, especially interbank lending, asset-backed commercial paper and junk bonds, rose sharply relative to riskless U.S. Treasury securities. Over the past five years, risk had become increasingly underpriced as market euphoria, fostered by an unprecedented global growth rate, gained cumulative traction. The crisis was thus an accident waiting to happen.[409]

In an effort to soothe credit markets, "[c]entral banks around the world injected more cash into the international banking system as problems that began with U.S. subprime mortgages rattle[d] the world economy.[410] This marked "the first time U.S., European, and Japanese central banks had taken such action together since the aftermath of the September 11 terrorist attacks," and resulted in banks calling in "notes from hedge funds and denying private equity funds new loans for questionable investments."[411] It was described as a "modern-day run on the bank."[412]

---

[407] Rex Nutting, *Subprime Could Create Global Crisis, Economist Says*, WALL ST. J. MARKETWATCH, July 26, 2007, http://articles.marketwatch.com/2007-07-26/news/30730663_1_financial-crisis-mark-zandi-housing-crisis (quoting economist Mark Zandi, who stated that "global financial shock" was just one "Bear-like" event away); *see also* Rex Nutting, *Financial crisis just one 'Bear-like' event away*, WALL ST. J. MARKETWATCH, July 26, 2007, http://articles.marketwatch.com/2007-07-26/news/30971052_1_financial-crisis-bear-stearns-funds-mark-zandi.

[408] *CSI: Credit Crunch*, ECONOMIST, Oct. 18, 2007, http://www.economist.com/node/9972489; *see also* Matt Moore (Associated Press), *ECB, Fed Inject More Cash to Ease Fears*, WASH. POST, Aug. 10, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/08/10/AR2007081000500_pf.html.

[409] Alan Greenspan, *The Roots of the Mortgage Crisis*, WALL ST. J., Dec. 12, 2007.

[410] Matt Moore (Associated Press), *ECB, Fed Inject More Cash to Ease Fears*, WASH. POST, Aug. 10, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/08/10/AR2007081000500_pf.html.

[411] *Id.* (noting that "WestLB Mellon Asset Management . . . suspended redemptions from its asset-backed securities ABS Fund" and "French bank BNP Paribas SA announced the suspension of three asset-backed securities funds").

[412] *Id.*

The moves by the Central Bankers only slowed the downward spiral. On August 14, 2007, Sentinel Management Group suspended redemptions.[413] About this same time AIG warned that mortgage defaults were spreading beyond the subprime sector, with delinquencies becoming more common in the mortgage category just above subprime.[414] A new wave of mortgage company bankruptcies occurred thereafter.[415]

### g.  *Mortgage Company Bankruptcies Increased Throughout 2007*

By mid-2007, fifteen of the top twenty-five subprime lenders in 2006 had shut down, been acquired, or were seeking buyers.[416] On August 16, 2007, Countrywide needed an \$11.5 billion rescue-financing package to survive.[417] On August 31, 2007, Ameriquest ceased operations.[418]

_____

[413] Jenny Strasburg and Matthew Leising, *Sentinel Management Group Halts Client Redemptions (Update5)*, BLOOMBERG, Aug. 14, 2007, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a_af.hVzN_Ys.

[414] THE JOINT ECONOMIC COMMITTEE: SUBPRIME MORTGAGE MARKET CRISIS TIMELINE (July 2008), at 21, http://www.jec.senate.gov/public/?a=Files.Serve&File_id=4cdd7384-dbf6-40e6-adbc-789f69131903.

[415] *Id*. (By way of example, American Home Mortgage filed for bankruptcy on August 6, 2007; Aegis Mortgage filed for bankruptcy on August 13, 2007; and Countrywide Financial, the nations's then-largest mortgage lender, drew down \$11.5 billion from its credit lines on August 16, 2007.).

[416] *The Subprime Lending Industry: A Look At The Restructuring of a Market in Turmoil*, prepared for ABA Annual Meeting, Business Law Section, Aug. 11, 2007, at 6, http://www.abanet.org/buslaw/newsletter/ 0063/materials/ ppla.pdf.

[417] FEDERAL RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (Apr. 13, 2011), http://timeline.stlouisfed.org/pdf/CrisisTimeline.pdf.

[418] Mathew Padilla, *Ameriquest to Shut Down*, ORANGE COUNTY REG., Aug. 31, 2007, http://mortgage.ocregister.com/2007/08/31/ameriquest-to-shut-down/.

Four of the top five largest bankruptcy filings in the United States in 2007, measured by the amount of the debtors' prepetition assets, were made by subprime mortgage lenders, and the fifth was a prime mortgage lender. The aggregate total of prepetition assets reported by these mortgage lender-debtors was in excess of $63 billion, as shown in the following table:[419]

EXHIBIT III.F.1.g
**Mortgage Lender Debtors**
*($ in Millions)*

| Mortgage Lender | Bankruptcy Date | Prepetition Assets |
|---|---|---|
| New Century Financial Corp. | 04/02/07 | $ 26,147 |
| American Home Mortgage Investment Corporation | 08/06/07 | $ 18,829 |
| HomeBanc Corp. | 08/09/07 | $ 6,823 |
| Delta Financial Corp. | 12/17/07 | $ 6,589 |
| NetBank, Inc. | 09/28/07 | $ 4,772 |

Source:    *BankruptcyData.com, Press Release, Number of Public Bankruptcies Slightly up in 2007, Fifth Lowest Ever, According to BankrupcyData.com (Jan. 16, 2007), http://www.businesswire.com/portal!site/home/index.jsp?epi_ menuItem1D=887566059a3aedb6efaaa9e27a808a0c&ndm ViewId=news_view&ndmConfigid=I 0089I8&newsId =20080II6006I69&newsLang=en.*

## 2.    *ResCap's Returns Began To Reflect The Troubled Market*

Analysts were bullish on ResCap debt in early 2006, calling "ResCap one of the more attractive opportunities in the investment grade market,"[420] and noting:

> We remain buyers of Residential Capital paper. As the GM story becomes less ominous, the likelihood of the sale of a controlling stake in [AFI] to Cerberus in a credit-improving transaction increases.[421]

As the year progressed and the subprime mortgage market began to deteriorate, analysts continued to comment favorably regarding ResCap, forecasting that ResCap would weather any downturn in the long term:

> ResCap also cited competitive pricing pressure leading to lower margins; we expect the industry to produce subpar results into 2007; we continue to like ResCap paper particularly for investors with longer term investment horizon.[422]

---

[419] BankruptcyData.com, Press Release, N*umber of Public Bankruptcies Slightly up in 2007, Fifth Lowest Ever, According to BankrupcyData.com* (Jan. 16, 2007), http://www.businesswire.com/portal!site/home/ index.jsp?epi_menuItem1D=887566059a3aedb6efaaa9e27a808a0c&ndm_ViewId=news_view&ndmConfigid=I 0089I8&newsId =20080II6006I69&newsLang=en.

[420] Van Hesser and Daphne Feng, HSBC Global Research, Inc., *Credit Research US Financials: Residential Capital Corp.*, dated Apr. 20, 2006, at 1.

[421] *Id*. at 5.

[422] *Id.* at 1.

With the pending Cerberus acquisition and credit rating delinkage from GM, analysts noted at the time that "[r]atings are set to move higher, which will likely produce a stronger technical bid for ResCap over the near term,"[423] and that "[t]he rally in the Treasury market has given a boost to the refinance market in particular, which should increase the probability of an industry soft landing."[424]

### a. Pre-Closing Indicators Showed That ResCap Was Vulnerable To The Deteriorating Conditions For Subprime Lenders

Before the Cerberus PSA transactions closed in November 2006, Cerberus received information indicating that ResCap was beginning to evidence vulnerability to the deteriorating conditions for sub-prime lenders. In a mid-September 2006 e-mail to Cerberus, ResCap CEO David Applegate advised that "RFG's August [2006] results were poor and deviated significantly from forecast."[425] The "ResCap 2006 Earnings Update" stated that "RFG missed its forecast for August by $42mm on a[n] after-tax basis ($70mm pre-tax)."[426] The document explained the reasons for the $70 million unfavorable pre-tax variance:

> *Net Interest Income*
>
> The unfavorable variance is primarily due to spread compression. The yield on loans held for sale and loans held for investment was 24 bps lower than forecast, due to lower base mortgage rates, and the average cost of funds was approximating 23 bps higher than forecast.
>
> *Provision For Credit Losses*
>
> The negative variance related to RFG's provision for loan losses was largely attributable to an increase in observed delinquencies when compared to forecast;
>
> Early look at September delinquencies show levels slightly below August, September provisions are expected to be in line with the prior forecast;
>
> Charge-offs (severity) are exceeding forecasted levels; may be reflective of slower home price appreciation; and

---

[423] *Id.*

[424] *Id.* at 2.

[425] E-mail from D. Applegate (Sept. 12, 2006) [CCM00065049].

[426] ResCap 2006 Earnings Update, at 2 [CCM00065050] (attached to E-mail from J. Jones (Sept. 13, 2006) [CCM00065049]).

> Our provision forecast anticipated normal property appreciation
> levels and is now being stress tested for more challenging
> scenarios; newer originations are more susceptible to severity
> risk.
>
> . . .
>
> *Gain On Sale Of Loans*
>
> The negative variance in gain on sale primarily reflects timing
> differences as hedge losses for certain loans accounted for at the
> lower of cost or market were recorded in August while the gain
> on sale will not be recorded until the loans are sold.[427]

Two weeks later, ResCap's September 2006 pre-close operating results again reflected an unfavorable variance to the forecast. A September 29, 2006 internal ResCap e-mail reported:

> Estimated net income for September 2006 is 56.7 million, which
> is 22.1 million unfavorable to the [ResCap] September forecast
> of $78.8 million and $21.4 million unfavorable to the [AFI]
> September forecast of $78.1 million.[428]

RCG contributed $12.2 million to the unfavorable variance due to:

> $8.3 million unfavorable net interest income primarily due to
> unfavorable shared execution revaluation and speed and loss
> model updates ($4.9 million) and lower average HFI asset
> balances of $882 million ($3.1 million) . . . ;
>
> 10.2 million unfavorable provision for loan losses due to higher
> delinquencies than forecasted.[429]

AFI's October 25, 2006 Form 8-K described AFI's Preliminary Third Quarter 2006 Earnings Summary, including ResCap's contribution to its performance, as:

> ResCap's net income was $76 million in the third quarter of
> 2006, down from $280 million earned in the third quarter of
> 2005. The decrease in earnings was the result of a number of
> factors in ResCap's U.S. residential mortgage business. In
> particular, competitive pricing pressures negatively impacted
> margins, which led to lower gains despite year-over-year
> increases in production. Results were also affected by higher
> credit provisions resulting from increases in delinquencies,

---

[427] *Id*. at 23.

[428] E-mail from L. Hankom (Sept. 29, 2006) [EXAM10194958].

[429] *Id*.

lower net interest margins as a result of a flatter yield curve, and a decrease in net servicing income due to the effect of lower long-term rates on expected prepayments of mortgages. Mortgage originations were $51.5 billion for the third quarter of 2006, representing a slight increase from $51.3 billion in the same period in the prior year.[430]

Lenard Tessler, Cerberus's lead negotiator in the acquisition of a 51% interest in AFI, acknowledged that Cerberus recognized before the closing that "there was a deterioration in the quality of new originations in the mortgage business that was manifesting itself in early payment defaults."[431] Cerberus also appeared to have earlier indicators of the profitability and liquidity issues at ResCap. Cerberus's due diligence on ResCap from January and February 2006 included a downward adjustment to ResCap's September 2005 book value, noting that ResCap had a weak fourth quarter in 2005 and was losing money on its retail operations, and observed that the industry as a whole was experiencing a downturn.[432] Additionally, communications between Cerberus and AFI personnel indicate that Cerberus was concerned about ResCap's performance prior to completing the acquisition.[433]

Tessler, however, stated that those concerns did not cause Cerberus to reconsider its purchase of AFI because Cerberus "believed in the unique value" of AFI, ResCap, and the insurance company and thought Cerberus could "provide the appropriate guidance to the investment to be successful post-closing."[434] Cerberus believed that there were opportunity areas, which would help guarantee success even if ResCap's projected growth in its core U.S. mortgage business proved difficult to maintain.[435] Cerberus's due diligence focused on three key areas:

- Integration of RCG and RFC: Integration of these two mortgage origination units was viewed as having the potential to generate upwards of $100 million in savings annually;[436]

_____

[430] GMAC LLC, Current Report (Form 8-K) (Oct. 25, 2006), Item 2.02.

[431] Int. of L. Tessler, Nov. 16, 2012, 71:15–17.

[432] Memorandum, ResCap Update, dated Feb. 28, 2006, at 2–3 [CCM00524428]; Cerberus Capital Management GMAC ResCap Investment Committee Presentation Draft, dated Jan. 2006, at 22 [CCM00524735].

[433] E-mail from E. Feldstein (Nov. 19, 2006), at EXAM10166717 [EXAM10166716]. ("I had a frank conversation with Lenard regarding Friday's Cerberus/ResCap call and the upcoming meetings this week. . . . I advised Lenard whether they are underwhelmed with our operating results and earnings power or whether they are extremely impressed by our earnings power in this tough market. It doesn't matter right now, because there is nothing much they can do about it between now and 11/30.").

[434] Int. of L. Tessler, Nov. 16, 2012, at 72:21–25.

[435] Draft Memorandum, Cerberus Capital Management L.P. Acquisition Evaluation, at 12 [CCM00496103].

[436] *Id.*

- Improvement of ResCap's Credit Rating: An upgrade of ResCap's corporate credit rating [would] allow it to access lower cost capital and according to ResCap management could generate an additional $100 million in pre-tax savings . . .;[437] and

- Growth opportunities related to BCG and IBG.[438]

### b. *Post-Closing Revelations Of Distressed Warehouse Lending Clients*

Cerberus viewed the market downturn as temporary.[439] Cerberus believed ResCap had a powerful platform that, combined with Cerberus's ability to operate more efficiently than GM, positioned ResCap for profitability once the market recovered.[440] Hence, despite the warning signals exhibited in the third quarter earnings report, Cerberus forged ahead with the transaction, and on November 30, 2006, the transactions contemplated by the Cerberus PSA closed, FIM Holdings acquired 51% of the common limited liability interests in AFI in exchange for $7.353 billion, and certain preferred membership interests in AFI in exchange for $500 million.[441]

The ResCap Board held its first regular meeting after the Cerberus transaction on December 12, 2006.[442] Various members of the Cerberus Investment Team, including Jones, Kravit, and Yaghoobzadeh, attended. During the meeting, Applegate, COO of ResCap, presented the RFG market update, during which he "discussed the competitive challenges and overall U.S. residential real estate market conditions."[443] The ResCap Board discussed the status of the MLN/EMX warehouse lending accounts.[444] According to Jones, Applegate reported there being a $50–$100 million loss with regard to the MLN/EMAX account.

---

[437] *Id*.

[438] *Id*.

[439] Memorandum, ResCap Update, dated Feb. 28, 2006, at 2–3 [CCM00524428]; Int. of M. Neporent, Feb. 6, 2013, at 18:5–19.

[440] Int. of M. Neporent, Feb. 6, 2013 at 17:17–23; 18:7–19:3.

[441] General Motors Corp. Current Report (Form 8-K) (Nov. 30, 2006), Item 2.01.

> On November 30, 2006, GM, GMAC, GM Finance Co. Holdings LLC, a Delaware limited liability company and a wholly owned subsidiary of GM ("Holdco"), and FIM Holdings LLC, a Delaware limited liability company ("Purchaser"), successfully completed a series of transactions pursuant to which GM has sold to Purchaser common limited liability company interests of GMAC representing 51% of the aggregate common limited liability company interests of GMAC for a purchase price of approximately $7.353 billion (the "Transactions") subject to the terms and conditions set forth in the Purchase and Sale Agreement Residential Capital 10K for year ended 12/31/06.

> *Id.; see also* Cerberus PSA, §§ 2.1, 2.2 [CERB000521]. "In addition, certain officers and directors of ResCap and its subsidiaries also became officers and/or directors of the new GMAC Bank." Residential Capital, LLC Current Report (Form 8-K) (Nov. 27, 2006), at 2.

[442] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Dec. 12, 2006, at RC4000685664 [RC40006748].

[443] *Id*. at RC40006857.

[444] *Id*.

Applegate reported that, during October, these related companies were added to the Credit Watch List due to concerns over liquidity and underwriting standards. Combined commitments and outstandings for MLN and EMAX were reported as $1.6 billion and $1.5 billion, respectively. MLN/EMAX was ResCap's largest warehouse lending client, largest volume client for all products, and the largest servicing exposure/counterparty exposure within ResCap's portfolio.[445]

---

[445] E-mail from B. Cleary (Oct. 20, 2006) [EXAM11331654].

Jones recalled that this disclosure created a fair amount of commotion because it came as a "surprise."[446] Jones also recalled that Applegate described the problem as specific to MLN, as opposed to a market-wide category problem. Jones believes that, as of the date of the Board meeting, Applegate still felt that ResCap's warehouse lending sector "was largely secure in terms of the assets at that point in time—and while there may be some amount of loss, [Applegate did not believe] that it was a particularly large exposure."[447] Nevertheless,

---

[446] Jones described the revelation of the problems with MLN/EMAX as a "surprise" during his interview Int. of J. Jones, Nov. 30, 2012, at 20:7–20. While the exposure ResCap faced due to the distressed state of MLN/EMAX may have been a surprise to Cerberus, it is not as clear that ResCap was surprised. On November 17, 2006, less than two weeks before the Cerberus transaction closed, Stenger forwarded an e-mail authored by Klun to ResCap's CEO, Giertz, because Stenger thought Giertz would want to be "up to speed on ResCap's largest commercial exposure." E-mail from T. Stenger (Nov. 17, 2006) [EXAM11605863] (forwarding e-mail from Kuhn). The original e-mail authored by Kuhn stated in part:

> Background: MLN/EMAX combined are ResCap's largest customer. Basically, MLN originates prime and subprime loans domestically. Most or all subprime volume is purchased by EMAX, a US Virgin Island domiciled company. This arrangement provides tax benefits that in theory allows EMAX to operate more aggressively. We had been buying 100% of EMAX production, which we have securitized in pools labeled EMAX 1, 2 etc. Historically, there have been no collateral quality issues with the pools and MLN/EMAX operations have not been a concern despite high growth. The companies have been profitable.

> Current situation: RFG purchases EMAX loans out of the warehouse for securitization stripped of 3 cash flow components-residual, servicing, and prepayment penalty, each of which are kept on the EMAX balance sheet. We finance these components via an advancing term loan. The residual piece is subject to a 75% advance rate on new advances and up to 85% on existing advances. At present, the blended effective advance is 83%. Structure/advances around the servicing component appear to be less formal, with periodic advances made at 75% of value. "Value" may be determined by RVA or we may use an outside resource. The client of course has their own valuation ideas and techniques which usually yield a bigger number. We do not presently advance against prepayment penalty, instead viewing it as a cushion. RVA recently changed their model components to reflect lower home value appreciation. Simply put, this causes the EMAX collateral we hold (the capitalized value of residuals, servicing, etc) to decline. As the arrangement currently stands, we are looking at a collateral shortfall upward of $15 million in December. RVA has apparently gone through their proper governance in approving the new model assumptions.

> Another factor to consider in general and with respect to the margin issue has been a recent general deterioration of underwriting standards (lower FICO, higher LTV), admitted to by the client to fuel their substantial growth. Recent securitization pools (EMAX 7, 8, 9, 10) have been affected. The client has agreed to revert to more conservative standards going forward.

> Nonetheless, rapid growth has stressed cash and capital. This, and to a lesser degree the underwriting issue, has caused MLN/EMAX to end up on the watch list. It is generally agreed that more capital is needed to sustain future growth.

> Ultimately, warehouse lending and ResCap will have to decide if we want our exposure to increase beyond $1.6 billion, but that is another matter. There are some warehouse personnel who feel that we may be under financing a rapidly growing customer by not advancing against prepayment penalties. It is projected that the potential December shortfall goes away if we factor in an advance against prepayment penalty capitalized cash flows. Problem is, this may not address the issue beyond December if collateral continues to deteriorate.

E-mail from E. Klun (Nov. 17, 2006) [EXAM11605863].

[447] Int. of J. Jones, Nov. 30, 2012, at 20:15–20.

Applegate's disclosure of warehouse lending problems at the meeting led Cerberus to form a
"SWAT team" to assess and address problems as ResCap.[448]

### c. Cerberus PSA Post-Closing Adjustment Was Principally Attributable To Poor ResCap Performance

Applegate's disclosure resulted in immediate action by Cerberus to undertake a
comprehensive analysis of non-prime collateral supporting warehouse advances.[449]
Additionally, Cerberus analyzed ResCap's (1) MLHFI; (2) MLHFS; (3) MSRs; (4) residuals;
(5) lending receivables; and (6) reserves for liabilities related to representation and warranties
and early payment defaults, in part for the purpose of determining whether the Cerberus PSA
closing balance sheet should be adjusted.[450]

In early January 2007, GM announced that it would not report its results as scheduled, in
part, because of the need to finalize AFI's numbers, the report of which had been delayed
while GM and Cerberus reviewed the $14.4 billion tangible net book value ascribed to AFI at
November 30, 2006, the date on which GM sold 51% of AFI to Cerberus. In March 2007, GM
made a "capital contribution to AFI of approximately $1 billion to restore its adjusted tangible
equity balance to the contractually required amount of $14.4 billion, due to the decrease in the
adjusted tangible equity balance of GMAC as of November 30, 2006."[451] Nearly all of the $1
billion adjustment was ResCap-related with close to 90% of the ResCap portion of the
adjustment being attributable to RCG.

### d. ResCap Reported A Loss For The Fourth Quarter Of 2006

ResCap reported an operating loss of $651 million for fourth quarter 2006, compared to
net income of $118 million in the fourth quarter of 2005. According to ResCap, the loss
reflected increased reserves related to both higher delinquencies and greater loss severity in
the nonprime HFI portfolio, difficult market conditions for mortgages, and HFS and credit
losses related to lending relationships with certain third-party nonprime market participants. In
addition, rising short-term interest rates and market volatility suppressed the value of
mortgage servicing assets, and the slowdown in new home construction negatively affected
financial performance.[452]

---

[448] Int. of R. Kravit, Mar. 4, 2013, at 13:5–15; 14:13–15; 15:21–16:5.

[449] *See* Minutes of a Regular Meeting of the Board of GMAC LLC, Mar. 15, 2007, at ALLY_PEO_000088992
[ALLY_PEO_0000860].

[450] *See generally* ResCap Discussion Document, dated Jan. 30, 2007 [CCM00355071]; GMAC ResCap Audit
Committee Materials Recent Events, dated Mar. 6, 2007 [EXAM12341494].

[451] General Motors Corp., Annual Report (Form 10-K) (Mar. 15, 2007), at 120.

[452] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1; *see also* Residential Capital,
LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 34–36.

ResCap reported 2006 net income of $705 million, compared to net income of $1 billion in 2005. Net income in 2006 was significantly affected by a one-time tax benefit of $523 million in the fourth quarter from the conversion of ResCap to a limited liability company in connection with the Cerberus PSA. ResCap's 2006 operating earnings, excluding the LLC conversion benefit, were $182 million, compared to $1 billion of operating earnings in 2005. The challenging market environment—including pressure on home prices and weakening consumer credit—severely depressed the value of ResCap's large nonprime asset portfolio, resulting in significant operating losses at its operating segment. These losses more than offset the record earnings achieved at ResCap's IBG and BCG, including a one time $259 million after-tax gain on the second quarter sale of an equity investment in a regional homebuilder.

Eric Feldstein, CEO of AFI, ascribed the disappointing 2006 results to "[t]he sharp downturn in the U.S. mortgage market in the fourth quarter," noting that the industry as a whole was left to deal with enormous challenges including a decrease in origination volume, narrowing margins, rising delinquencies, and increased pressure on home prices. Feldstein noted that a profitable year was achieved amidst the turmoil in the U.S. mortgage markets because of ResCap's geographic and product diversity: "At ResCap, net losses were incurred in its core U.S. mortgage business in the wake of this difficult industry environment. Nonetheless, ResCap's geographic and product diversity helped the company maintain a profitable bottom line overall for the year."[453]

### (1) Losses Reported For 1st Quarter 2007

Deterioration in the nonprime mortgage market resulted in ResCap incurring a net loss for first quarter 2007, despite increased prime originations and strong international performance. A January 28, 2007 e-mail from Sanjiv Khattri to Bruce Paradis, ResCap Director and CEO, and David Applegate, ResCap Director and COO, reflected a belief that ResCap's poor results resulted from more than poor industry fundamentals. Khattri noted that management "really let our shareholders down in a very big way."[454] Khattri faulted Paradis and Applegate for not being "much more involved" and recounted that he had heard that "there were traders in RCG who were buying paper based on model pricing even though they knew [the] model couldn't be right."[455] Khattri opined that the finance group let Applegate and Paradis down by not providing the "the succin[c]t analysis for [the] forecasting knowledge/tools to help the business."[456]

---

[453] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1.

[454] E-mail from S. Khattri (Jan. 28, 2007) [EXAM10163216].

[455] *Id*.

[456] *Id*.

*(2) Business Plan Modifications Following The Disappointing Year-End 2006
And First Quarter 2007 Results Focused On Establishing Cerberus-
Designated Management Ranks*

In his interview, Tessler stated that Cerberus had targeted Applegate and Paradis as necessary casualties of the Cerberus purchase even before the transaction closed. According to Tessler, Cerberus lacked confidence in the ability of Paradis and Applegate to execute the necessary underwriting discipline and believed that Paradis and Applegate "were not as in touch with the market in their business as they should [have been] given the changing environment."[457] Mark Neporent, COO and General Counsel of Cerberus and a member of AFI's Board from 2006 to March 2009, echoed Tessler's sentiments, indicating that even before consummation of the Ceberus PSA, Cerberus identified Applegate and Paradis as "not the strongest possible people in these markets."[458] Subsequently, the decision to force the resignations of Applegate and Paradis was made by the AFI Board in early 2007.[459] Cerberus's view was that "a change in leadership at ResCap" was necessary.[460] Shortly before 2006 earnings were released, David Applegate resigned as a director and as COO of ResCap.[461]

Applegate's departure was an early example of Cerberus taking an active role in the management of AFI and its subsidiaries, including ResCap.[462] After acquiring control of AFI, Cerberus began imbedding Cerberus and COAC employees throughout AFI and ResCap to implement operational improvements.[463] On March 23, 2007, Jim Jones was elected a member of the ResCap Board and COO. Additionally, the composition of the ResCap Board was increased by two additional members, and Paul T. Bossidy and Ronald J. Kravit were appointed to the newly created memberships.[464] Bossidy, Kravit, and Jones were all affiliated with Cerberus. Kravit and Jones had been members of the Cerberus investment team responsible for putting together and conducting the due diligence related to the Cerberus transaction. Prior to Bossidy joining the ResCap Board, a position was proposed for Bossidy at an AFI Board meeting that would have allowed Bossidy "the opportunity to go anyplace that [he] wanted to go and operate on Steve[] [Feinberg's] behalf."[465] According to Bossidy,

---

[457] Int. of L. Tessler, Nov. 16, 2012, at 87:23–88:1.

[458] Int. of M. Neporent, Feb. 6, 2013, at 55:11–56:20.

[459] *Id*.

[460] Int. of L. Tessler, Nov. 16, 2012, 89:13–19.

[461] Walden, Siew, *Bond investors bet on bankruptcy for ResCap*, REUTERS, Nov. 20, 2007 (noting that "ResCap's chief executive Bruce Paradis and co-chief executive David Applegate left the company this year, as did its chief financial officer in the wake of the global credit crunch this summer), http://www.reuters.com/article/2007/11/20/us-rescap-bonds-idUSN1962256020071120.

[462] Int. of P. Bossidy, Dec. 14, 2012, at 53:2–4.

[463] *See* Consulting Agreement, effective as of April 1, 2007, by and among Cerberus, COAC, and AFI, Recitals, Ex. A [ALLY_0401248]. Cerberus's initial interest in acquiring a majority interest in AFI was predicated on improving AFI's operations. Int. of L. Tessler, Nov. 16, 2012, at 18:8–19.

[464] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, Mar. 23, 2007, at RC40005567 [RC40005558].

[465] Int. of P. Bossidy, Dec. 14, 2012, at 66:21–67:10. Steven Feinberg is the founder and head of Cerberus.

his formal involvement in ResCap was a result of Feinberg's perception that ResCap was a risk to Cerberus's investment in AFI.[466] Bossidy stated that when he joined the ResCap Board, he "began to focus intensely on behalf of Steve [Feinberg] on trying to diagnose some of the issues that [were] affecting ResCap."[467]

It also was not uncommon for a Cerberus employee to hold positions at or advise on multiple AFI entities simultaneously.[468] Cerberus employees moved between AFI, ResCap, and other AFI or ResCap subsidiaries as a need arose.[469] As a result, it was not always clear to employees as for whom they were working, Cerberus, AFI, or ResCap.[470] And employees, themselves, occasionally felt conflicted.[471] Some ResCap employees working at ResCap reported to Cerberus or AFI management in addition to, or instead of, reporting to ResCap management.[472] For example, as Vice Chairman of ResCap, Weintraub reported to AFI CEO Alvaro de Molina.[473]

Employee discomfort with Cerberus's management style surfaced quickly, and remained a theme at least through 2008. By way of example, in a late March 2007 e-mail explaining his resignation, James Giertz, ResCap CFO, wrote:

> First, the random management style of Cerberus makes me very uncomfortable, especially as the Chief Financial Officer of this company. It isn't clear to me who is making the key decisions within the business but certainly the official management structure and decision making processes are not being respected frequently. . . . Second, the drive to dismantle the ResCap structure and replace it with a more substantial infrastructure within the parent company [AFI] is not attractive to me personally and I'm not sure if it is the best strategy for the ResCap business.[474]

---

[466] *Id.* at 22:10–13.

[467] *Id.* at 22:13–17.

[468] *See* Cerberus Capital Management GMAC Investment Oversight Key Initiatives Presentation, dated Apr. 23, 2007, at 1 [CCM00271744]; Int. of P. Bossidy, Dec. 14, 2012, at 24:13–25.

[469] Int. of J. Lombardo, Sept. 17, 2012, at 45:14–47:17.

[470] Int. of P. Bossidy, Dec. 14, 2012, at 190:23–191:6.

[471] E-mail from J. Lombardo (Aug. 7, 2009) [EXAM20033432].

[472] *See, e.g.*, Memorandum, ResCap Leadership Changes, July 28, 2008, at 1 [CCM00148289]; Int. of E. Feldstein, Dec. 14, 2012, at 200:17–201:4; Int. of P. Bossidy, Dec. 14, 2012, at 190:23–191:6; Int. of J. Lombardo, Mar. 18, 2013, at 31:20–32:1 ("On a daily basis, I was reporting to Mike Rossi, but I was also communicating with Paul Bossidy, who is the senior operational person from COAC or Cerberus Ops, and certainly, I was keeping Scott Parker in the loop as well, because he was also involved in ResCap.").

[473] Memorandum, ResCap Leadership Changes, dated Jul. 28, 2008, at 1 [CCM00148289].

[474] E-mail from J. Giertz (Mar. 26, 2007) [EXAM11606784].

Sanjiv Khattri became the newly elected CFO and Craig Chapman was elected a member of the ResCap Board.[475] Khattri would eventually voice similar concerns and took issue with the degree to which Cerberus expected AFI management to perform work at the ResCap level.[476] Khattri stated that "[Cerberus] had little respect for organizations."[477]

In May 2007, Bruce J. Paradis "resigned" as Director and CEO.[478] Jim Jones was appointed President and CEO of ResCap in lieu of COO, and joined AFI as an Executive Vice President and member of the Executive Committee.[479] According to Bossidy, Feinberg made the decision to hire Jones as CEO.[480]

Linda Zukauckas was elected Chief Accounting Officer and Controller.[481] Additionally, Louise M. Herrle resigned as Treasurer effective June 1, 2007; William Casey became the newly elected Treasurer. Although his resignation would occur much later, Casey would echo the concerns about Ceberus and AFI involvement before departing.[482]

With new management in place, ResCap embarked upon a "Business Plan Reset." Key objectives for the reset were:

- Diversification of earnings domestically and internationally through production, servicing, investment portfolio, and fee based businesses;

- Returning RFG to profitability;

- Improving credit controls;

- Maintaining fundamental BCG marketing position while reducing risk and exposure; and

- Expanding existing IBG businesses and selectively exporting BCG's capabilities internationally.[483]

---

[475] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Apr. 20, 2007, at RC40005577–78 [RC40005558].

[476] Int. of S. Khattri, Apr. 5, 2013, at 119:23–120:17.

[477] *Id.* at 120:12–13.

[478] *Jones to succeed Paradis as ResCap CEO*, Reuters, Apr. 17, 2007, http://www.reuters.com/article/2007/04/17/rescap-ceo-idUSN1725565320070417.

[479] *See, e.g.*, Individual Profiles, dated June 25, 2012 [ALLY_0004637].

[480] Int. of P. Bossidy, Dec. 14, 2012, at 17:11–20.

[481] *See* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, May 11, 2007, at RC40005587 [RC40005558].

[482] *See* Section III. G.3.e(2) (discussing ResCap management resignations).

[483] *Id*.

### 3. Further Market Dislocation In 2007; ResCap Begins An Era Of Parental Support And Affiliated Transactions

By mid-2007, AFI and ResCap were striving to avoid the hate met by fifteen of the top twenty-five mortgage lenders, described earlier in this section.[484] In AFI and ResCap entered an era of parental support involving numerous affiliated transactions; the goal was to weather the storm and still be standing when the markets improved.[485] Tessler acknowledged that he knew ResCap was in "desperate" need of capital starting in early 2007, and found itself in such a position "on a somewhat continuous basis, whether it was primarily to meet the net worth covenant."[486] Tessler also explained, however, that Cerberus felt it had a unique window into the capital markets at this time and was well-suited to see ResCap through the storm. Tessler attributed this "unique window into the capital markets" to the fact that Cerberus also owned Chrysler Automotive and Chrysler Financial during this time period. As Tessler explained, "our window was not simply through [an AFI] lens."[487]

#### a. Funding Initiatives[488]

In March 2007, AFI made a $500 million cash equity contribution to ResCap. It made another $500 million cash equity contribution in April 2007. In May 2007, ResCap entered into a $2.25 billion dual tranche transaction that included $1 billion two-year floating rate debt and $1.25 billion five-year fixed rate debt. In June, ResCap issued an EU 600 million three-year floating rate note, a GBP 400 million seven-year fixed rate note, and an MXP 1.8 billion five-year fixed rate note.

#### b. Amended And Restated Master Mortgage Loan Purchase And Sale Agreement

Effective June 1, 2007, GMAC Mortgage and Ally Bank entered into an "Amended and Restated" MMLPSA.[489] This version of the MMLPSA, adopted as ResCap was confronting worsening market conditions, made several key revisions.[490]

---

[484] The American Bar Association, Annual Meeting Presentation, *The Subprime Lending Industry: A Look At The Restructuring of a Market in Turmoil*, dated Aug. 11, 2007, http://apps.americanbar.org/buslaw/newsletter/0063/materials/pp1a.pdf; *see also* Section III.F.1.g.

[485] *See* Int. of J. Jones, Nov. 30, 2012, at 59:20–60:21 (noting the amount of support AFI had provided prior to 2008).

[486] Int. of L. Tessler, Feb. 28, 2013, at 15:20–22.

[487] *Id*. at 38:20–24. In May, 2007, only six months after acquiring a controlling stake in AFI in November, 2006, Cerberus also acquired 80.1 percent of Chrysler Holdings from Daimler Benz for $7.8 billion (about ten years after Daimler paid $36 billion for Chrysler). The Chrysler acquisition also gave Cerberus control of Chrysler Financial.

[488] *See* Section V.E (discussing these funding initiatives).

[489] 2007 MMLPSA [ALLY_0018275].

[490] *See* Section V.B (discussing the 2007 MMLPSA).

### c.  MSR Swaps

In 2007, Ally Bank and GMAC Mortgage entered into two swap transactions related to mortgage servicing rights (i.e., the MSR Swap). One was based on a net funding component and exchanged all servicing fees received by the Bank to GMAC Mortgage for a LIBOR-based fixed income stream;[491] the second was based on a FMV component and swapped the risks of changes in the FMV of MSRs to GMAC Mortgage by obligating GMAC Mortgage to pay Ally Bank for any decrease in the value of the MSRs (e.g., decrease in interest rates or increases in delinquencies or foreclosures would decrease the value of MSRs). The MSR Swap protected the Bank from market and credit risk.[492]

### d.  August 2007 Severe Liquidity Crisis And The Health Capital Sale

According to Tessler, by the summer of 2007, cracks were becoming visible in the U.S. economy, which were largely connected to the downturn in the housing market and the impending subprime mortgage crisis. Tessler described the situation as a "storm" until August 2007 when it became a "global catastrophe."[493] While the downturn in the housing market was not a sudden, unexpected event, the adverse impact was greater than ResCap, AFI, or Cerberus anticipated. Liquidity was drying up in the capital markets and for a business such as ResCap, not having access to capital meant that it could not operate.

At the end of June 2007, there was an urgent need to take steps to address the current pending liquidity problem at ResCap and to do so quickly, while at the same time starting the process to make more permanent changes to ResCap's operations to address liquidity. The belief within AFI and Cerberus was that ResCap was still a viable and valuable business but that changes were needed to its business model to focus more on the prime mortgage market rather than the non-prime market. Tessler noted that in August and September 2007 it was Cerberus's view that ResCap was valuable and unique and should receive support during the crisis because it would remain one of the few surviving mortgage service companies and would make a lot of money.[494]

To address the immediate liquidity problem that ResCap was facing in August 2007, one option involved ResCap selling BCG's Health Capital business to GMAC CF because this could be done quickly. Moreover, from a business standpoint, the Health Capital business arguably was a better fit for GMAC CF than for ResCap.[495]

---

[491] A December 2010 Ally Bank internal memo indicates that costs incurred on account of GSE repurchase requests were deducted from GMAC Mortgage's net servicing fees paid under the MSR Swap. The memo states "[s]ince implementation of the MSR swap in 2007, the Bank has never been required to pay a repurchase or indemnification demand from Fannie Mae or Freddie Mac. All such demands have been administered and satisfied by GMACM, either as direct recipient of the investor demand, or pursuant to its obligations under the MSR swap." Draft Memorandum, Evolution Of Ally Bank Processes For Purchase, Origination, Sale, And Servicing Of Mortgage Loans, dated Dec. 2, 2010, at 6–7 [EXAM11216070].

[492] *See* Section V.B.9 (discussing the MSR Swaps).

[493] Int. of L. Tessler, Nov. 16, 2012, at 95:25–97:11.

[494] Int. of L. Tessler, Nov. 16, 2012, at 143:24–147:4.

[495] Int. of S. Khattri, Oct. 25, 2012, at 212:23–223:24.

The Health Capital Sale was conceived, and an agreement executed, in one month. The Health Capital Sale closed in August 2007 and the post-closing true-up payment was made before the end of September 2007 so that the cash could be shown on ResCap's September 30, 2007 balance sheet.[496] On August 21, 2007, prior to the close of the transaction, ResCap CFO, Sanjiv Khattri expressed concern regarding the "rush and scope" of the transaction and stated at that time that he did "not support [the] plan."[497]

---

[496] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2007) ("On August 27, 2007, . . . wholly owned subsidiaries of [ResCap], sold substantially all of the assets and operations comprising their healthcare finance business to GMAC [CF], a wholly owned subsidiary of [AFI], pursuant to an asset purchase agreement. [ResCap] received $900.5 million, which represents the fair value of the business as valued by an independent third-party valuation. Net book value totaling $876.8 million was transferred as part of the sale resulting in a capital contribution from [AFI] of $23.7 million.").

[497] E-mail from S. Khattri (Aug. 21, 2007) [ALLY_0110176].

## G. RESCAP'S MOUNTING LIQUIDITY AND COVENANT ISSUES (SEPTEMBER 2007 THROUGH JULY 2008)

### 1. Summary Of Industry Data And Environment

During the first half of 2007, market dislocation was mostly confined to the subprime mortgage markets.[498] These problems, however, migrated quickly to other areas including employment and the capital markets.

#### a. Housing Market

The near elimination of nonprime mortgage originations and the tightening of lending standards in early 2007 exacerbated the contraction in housing demand and construction in the latter part of 2007 and in 2008.[499] According to the National Association of Realtors, the number of detached single family homes on the market in October 2007 was sufficient inventory for approximately 10.5 months, "more than double the level of two years [before] and the highest since 1985."[500] Moody's noted that in addition to the number of detached, single family homes, there was "over 11 months of unsold condo inventory, nine months of existing single family homes and eight months of new homes (vacant for sale inventory)."[501] Housing starts were off from their previous year peak.[502] The FRB reported that new construction in the fourth quarter of 2007 had been cut dramatically and was off 50% from the high in the first quarter of 2006.[503]

---

[498] Alister Bull, et al., *Fed Missed Warning Signs in 2007 as Crisis Gained Steam*, REUTERS, Jan. 18, 2013, http://www.reuters.com/article/2013/01/19/us-usa-fedidUSBRE90H13Q20130119?feedType=RSS&feedName=businessNews.

[499] FRB MONETARY POLICY REPORT TO CONGRESS (Feb. 27, 2008), at 5, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[500] James Hagerty, *Home Listings in 18 Metro Areas Decline*, WALL ST. J., Dec. 6, 2007, http://biz.yahoo.com/wallstreet/071206/sb119691376974115539_id.html.

[501] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, MOODY'S ECONOMY.COM, Dec. 2007, at 18, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake Mortgage-Meltdown.pdf.

[502] *Id.*

[503] FRB MONETARY POLICY REPORT TO CONGRESS (Feb. 27, 2008), at 1, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

The housing sector continued to look dismal as early 2008 numbers were reported. "U.S. home prices fell another 11.4% in January 2008, the housing market's steepest drop since S&P started collecting data in 1987."[504] The numbers looked no better in February with new home sales falling for "a fourth straight month, pushing activity down to a 13-year low. . . ."[505]

In addition to the weakness in home sales and the decline in home prices, foreclosures continued to rise. In early 2008, RealtyTrac reported that the foreclosure process had begun on 1.3 million properties in 2007, a 79% increase over 2006.[506] It became apparent that the 2006 and 2007 vintages of mortgages would pose the greatest risks for lenders. According to a 2008 report:

> For subprime ARMs originated in 2006, about 10 percent had defaulted in the first twelve months, more than double the fraction for mortgages originated in earlier years. Furthermore, the path of the default rate for subprime ARMs originated in 2007 has run even higher. For subprime mortgages with fixed interest rates, delinquency rates have moved up significantly in recent months, to the upper end of their historical range.[507]

Additionally, LIBOR had risen to 6.8%, its highest point since 1998.[508] Rising interest rates caused an increase in monthly loan payments after teaser rates expired; for example, "[t]he average subprime borrower [would] experience an increase in their monthly payment at the first reset of approximately $350, lifting the payment from $1,200 to $1,550."[509] These types of increases were expected to lead to an increase in defaults. Industry expert Marc Zandi, testifying before Congress, stated:

> I expect 2.8 million mortgage loan defaults (the first step in the foreclosure process) in 2008 and 2009. Of these, 1.9 million

---

[504] Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown*, CCH FED. BANKING L. REP., CCH MORTGAGE COMPLIANCE GUIDE & BANK DIG. 2008, at 18, http://www.business.cch.com/bankingfinance/focus/news/Subprime_WP_rev.pdf.

[505] *Id.*

[506] Associated Press, *Number of Foreclosures Soared in 2007*; *Stage is Set for More Foreclosures in Year Ahead, Data Show,* NBCNEWS.COM, Jan. 29, 2008, http://www.nbcnews.com/id/22893703/ns/business-real_estate/t/number-foreclosures-soared/.

[507] FRB MONETARY POLICY REPORT TO CONGRESS (Feb. 27, 2008), at 6, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[508] Mauro F. Guillen, *The Global Economic & Financial Crisis: A Timeline*, THE LAUDER INST., U. PA., at 2, http://unpan1.un.org/intradoc/groups/public/documents/apcity/ unpan033507.pdf.

[509] Mark Zandi & Celia Chen, *Aftershock: Housing in the Wake of the Mortgage Meltdown*, MOODY'S ECONOMY.COM, Dec. 2007, at 9–10, http://www.economy.com/home/products/samples/2007-12-01-Aftershock-Housing-Wake-Mortgage-Meltdown.pdf.

homeowners will go through the entire foreclosure process and ultimately lose their homes.[510]

### b. Unemployment

In September 2007, the Department of Labor reported the first month of negative job growth since 2003.[511] This was only the beginning as data in subsequent months worsened. The Department of Labor announced in December 2007 that the economy had gained only 94,000 jobs in November.[512] This was significantly below the 125,000 non-farm new jobs the economy needed to absorb new workers and those losing their jobs on a monthly basis.[513] While in the previous year, jobs in the financial services and construction were stable, by the middle of 2007 these areas were experiencing losses in excess of 25,000 jobs a month, increasing to 50,000 jobs lost in October and 75,000 jobs in November.[514] By the Summer of 2008, the Department of Labor reported that unemployment rates had moved upward from 4.7% in September 2007 to 5.8% in July 2008.[515]

### c. Capital Markets

With the considerable uncertainty in the investment markets caused by the sheer dollar amount of subprime mortgage-backed securities, by January 2008, the lending system had effectively closed. The FRB continued to react to the growing crisis by cutting an additional 125 basis points from the Federal Funds Rate in an attempt to keep banks lending, and lower long-term rates to more affordable levels.[516] The market forces were moving faster, however, and in January 2008, ABX stopped issuing subprime indices[517] and S&P downgraded or placed on credit watch more than 8,000 RMBS and CDO securities, further affecting the

---

[510] HEARING BEFORE THE SENATE COMMITTEE ON THE JUDICIARY, THE LOOMING FORECLOSURE CRISIS: HOW TO HELP FAMILIES SAVE THEIR HOMES (Dec. 5, 2007) (written testimony of Mark Zandi, Chief Economist and Co-founder, Moody'sEconomy.com), http://townhall.abiworld.org/node/281.

[511] Tom Redburn, *Bernanke, The Fed and 2008*, N.Y. TIMES, Sep. 9, 2007, http://www.nytimes.com/2007/09/09/weekinreview/09redburn.html?_r=0.

[512] Peter Goodman & Michael Grynbaum, *Slowing Growth in Jobs Seen as Ominous Sign for Economy*, N.Y. TIMES, Dec. 8, 2007, http://www.nytimes.com/2007/12/08/business/08econ.html?pagewanted=.

[513] Peter Goodman, *Wall St. Sees Silver Lining*, N.Y. TIMES, Dec. 1, 2007, http://www.nytimes.com/2007/12/01/business/01econ.html.

[514] Peter Goodman & Michael Grynbaum, *Slowing Growth in Jobs Seen as Ominous Sign for Economy*, N.Y. TIMES, Dec. 8, 2007, http://www.nytimes.com/2007/12/08/business/08econ.html?pagewanted&_r=0.

[515] DATABASES, TABLES & CALCULATORS BY SUBJECT, LABOR FORCE STATISTICS FROM THE CURRENT POPULATION SURVEY (from 2003 to 2013), http://data.bls.gov/timeseries/LNS14000000.

[516] FRB MONETARY POLICY REPORT TO CONGRESS (Feb. 27, 2008), at 2, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[517] Liang Simon, An Examination of the Subprime Crisis, Implications from the ABX Index (B.S. thesis, Leonard N. Stern School of Business, New York University) at 3, http://w4.stern.nyu.edu/emplibrary/Simon%20Liang_Thesis_Honors%202008.pdf.

balance sheets of those invested in MBS markets.[518] A report from market analysts at UBS in late February 2008 showed that losses within the financial sector from subprime MBS could reach $600 billion. This new report on expected losses marked a 50% rise from previous estimates made just months earlier.

By March 2008, mounting subprime issues had taken their toll on U.S. investment bank Bear Stearns.[519] By the end of the month, working with the FRB, JP Morgan acquired Bear Stearns.[520] The news would continue to get worse as the year progressed. Federal regulators seized IndyMac Bank in July on fears of subprime issues consuming depositors' funds.[521]

### d. Contingency Funding Plans Employed By ResCap To Prevent Market Turmoil From Having A Negative Effect On Liquidity

As a result of the domestic and international mortgage and capital markets dislocation,[522] ResCap experienced margin calls, changes to advance rates on its secured facilities, and a loss of significant asset-backed commercial paper conduit financing capacity, all of which negatively affected ResCap's liquidity.[523] Consequently, ResCap took several important

––––––––––––––––––––––––––––––––––––––

[518] U.S. SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, COMMITTEE ON HOMELAND SECURITY & GOVERNMENT AFFAIRS, WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE (Apr. 13, 2011), at 45, http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2.

[519] *CSI: Credit Crunch, Central Banks Have Played a Starring Role*, ECONOMIST, Oct. 18, 2007, http://www.economist.com/node/9972489; *see also* FEDERAL RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (Sept. 21, 2008), at 5, http://www.stlouisfed.org/timeline/pdf/CrisisTimeline.pdf.

[520] FEDERAL RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (Sept. 21, 2008), at 5, http://www.stlouisfed.org/timeline/pdf/CrisisTimeline.pdf.

[521] Ari Levy & David Mildenberg, *IndyMac Seized by U.S. Regulators: Schumer Blamed for Failure,* BLOOMBERG, July 12, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aAYLeK3YAie4.

[522] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 32. According to ResCap:

> During the third quarter, the mortgage and capital markets have continued to experience stress due to credit concerns and housing market contractions in the United States. The reduced accessibility to cost efficient capital in the secondary markets has made the residential mortgage industry even more capital intensive. In the short-term, it is probable the mortgage industry will continue to experience both declining mortgage origination volumes and reduced total mortgage indebtedness due to the deterioration of the nonprime and non-conforming mortgage market and a challenging interest rate environment. Due to these market factors, particularly interest rates, the business of acquiring and selling mortgage loans is cyclical. The industry is experiencing a downturn in this cycle.

> *Id*.

[523] *Id.* at 50.

measures in third quarter 2007 to augment cash balances during the mortgage and capital markets turmoil. The extensive contingency funding plans that enabled ResCap to meet its significant liquidity demands included:

> (1) The elimination of exposure to extendable commercial paper conduit liquidity due to market dislocation by the movement of collateral to alternative financing sources including ResCap's Mortgage Asset Lending Agreement (MALA)/Receivables Lending Agreement (RLA) facilities and repurchase agreements;[524]

> (2) The securing of $2 billion of new committed repurchase agreements to fund conforming mortgage production;[525]

> (3) The sale of substantially all of the assets and operations comprising ResCap's healthcare finance business to [GMAC CF], for $900.5 million;[526]

> (4) The receipt of capital contributions totaling $1 billion from AFI in the third quarter of 2007;[527] and

> (5) The increase of funding at Ally Bank, which offered a competitive cost of funding, in anticipation of ResCap increasing its loan production through Ally Bank.[528]

Additionally, AFI entered into an agreement with Citibank, effective September 6, 2007, pursuant to which Citibank committed to provide up to $21.4 billion in various asset-backed funding facilities through September 2008.[529] A total of $14.4 billion became available for immediate funding upon execution of such facilities, with the additional $7 billion becoming available if and when certain conditions were met, including the syndication of the facility to other lenders. Up to $8 billion of the facilities, depending on AFI's usage of the facilities,

---

[524] *Id.*

[525] *Id.*

[526] *Id.*; *see also* Section III.F.3.d (discussing the Health Capital transaction in greater detail).

[527] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 50 ("GMAC also contributed $256.0 million of capital to GMAC Bank isolated to its auto division. [As of September 30, 2007], we have received $2.0 billion in capital contributions from [AFI], excluding the contribution to the auto division of GMAC Bank").

[528] *Id.*

[529] *Id.*; GMAC LLC, Current Report (Form 8-K) (Sept. 11, 2007). These facilities replaced a $10 billion asset-backed funding facility that had been entered into with Citibank in August 2006. *Id.*

could be made available to ResCap to fund mortgage assets.[530] As of September 30, 2007, ResCap had a net increase in secured committed funding capacity for its MSRs of $950 million from AFI's new facilities.

### e. Third Quarter 2007's Loss Marked ResCap's Fourth Consecutive Quarterly Loss

As a result of the measures taken by ResCap to stave off a negative liquidity event, its equity base stood at $6.2 billion as of September 30, 2007.[531] ResCap's improved equity position, however, was not accompanied by operating profit. Indeed, the third quarter of 2007 marked ResCap's fourth consecutive quarterly loss with ResCap incurring a net loss of $2.3 billion,[532] as compared to net income of $83 million in the third quarter of 2006.[533] ResCap reported that the losses in 2007 were not caused by competitive pricing pressures as had been the case in 2006,[534] but rather were the result of "i) higher provision for credit losses; ii) mark-to-market adjustments on trading securities and mortgage loans held for sale; iii) tighter

---

[530] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 50; *see also* GMAC LLC, Current Report (Form 8-K) (Sept. 11, 2007) (noting that the Citi facilities included "commitments to provide funding for U.S. automobile related assets, mortgage assets, and other assets across GMAC and its subsidiaries").

[531] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 3; *see also* GMAC LLC, Current Report (Form 8-K) (Nov. 1, 2007) ("In the third quarter, GMAC injected $1 billion of equity into ResCap to bolster the company's capital base. As of Sept. 30, 2007, ResCap's equity base stood at $6.2 billion.").

[532] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 1.

[533] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 33 ("Our net loss was $2.3 billion for the three months ended September 30, 2007, compared to net income of $83.4 million for the same period in 2006, and our net loss was $3.4 billion for the nine months ended September 30, 2007, compared to net income of $833.1 million for the same period in 2006."); *see also* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 1; Residential Capital, LLC, Current Report (Form 8-K) (Oct. 25, 2006) (noting that ResCap's "preliminary net income was $76 million in the third quarter of 2006, down from $280 million earned in the third quarter of 2005").

[534] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 25, 2006). According to ResCap:

> The decrease in earnings [in 2006] was the result of a number of factors in ResCap's U.S. residential mortgage business. In particular, competitive pricing pressures negatively impacted margins, which led to lower gains despite year-over-year increases in production. Results were also affected by higher credit provisions resulting from increases in delinquencies, lower net interest margins as a result of a flatter yield curve, and a decrease in net servicing income due to the effect of lower long-term rates on expected prepayments of mortgages.

margins on the sale of mortgage loans; iv) a decrease in net financing revenue driven by higher borrowing costs; and v) lower production levels."[535] AFI CEO Eric Feldstein pronounced ResCap's third quarter 2007 financial performance "a major disappointment."[536]

### 2. *Responses To Third Quarter 2007 Loss*

#### a. *ResCap Leadership Changes In Third Quarter 2007*

With two dismal months in the third quarter 2007 nearly completed, ResCap announced leadership changes as it entered the final month of the third quarter. On August 21, 2007, Alvaro de Molina was nominated and elected to the ResCap Board.[537] At the same time, de Molina, who had joined Cerberus in June 2007, was named Chief Operating Officer of AFI.[538] "In this newly created role, de Molina [was] responsible for AFI's real estate finance and commercial finance businesses, and for all of AFI's global finance and risk functions."[539]

A little over two weeks after de Molina's appointment, the ResCap Board accepted AFI CEO Eric Feldstein's resignation as Chairman of the ResCap Board. Feldstein described these changes in leadership at ResCap and AFI as the result of Cerberus's growing criticism of AFI management.[540] Michael Rossi was elected Chairman of the ResCap Board immediately

---

[535] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 1; *see also* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 33–34 ("Our 2007 results continued to be adversely affected by domestic economic conditions, including increases in delinquencies on our mortgage loans held for investment portfolio and a significant deterioration in the securitization and residential housing markets. In addition, during the third quarter of 2007 we began to experience a downturn in certain foreign mortgage credit markets.").

[536] GMAC LLC, Current Report (Form 8-K) (Nov. 1, 2007), at 2.

[537] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005615 [RC40005558].

[538] *See* GMAC LLC, Current Report (Form 8-K) (Aug. 20, 2007).

[539] *Id.*

[540] Int. of E. Feldstein, Nov. 16, 2012, at 188:7–193:19. Around this time, Sanjiv Khattri, who was serving as CFO for both AFI and ResCap, was named to a new position as AFI Executive VP of Corporate Development and Strategy, and Robert Hull was named AFI CFO. *See* E-mail from J. Young, Nov. 14, 2007 [EXAM10175200] (forwarding Feldstein e-mail announcing changes). Khattri remained CFO of ResCap. *Id.* Again, Feldstein described this change in management to be the result of Cerberus's critical view of Khattri's performance. *See* Int. of E. Feldstein, Nov. 16, 2012, at 188:7–193:19; *see also* GMAC LLC, Current Report (Form 8 K) (Nov. 14, 2007) ("Sanjiv Khattri, [CFO], will be named to a new position as executive vice president of Corporate Development and Strategy, effective Dec. 3. He will continue to report to [AFI] Chief Executive Officer Eric Feldstein. In this new position, Khattri will have responsibility for strategic planning and business development as well as continuing as [CFO] of [ResCap]. He will remain a member of the [AFI] Executive Committee and the ResCap Board of Directors.").

thereafter.[541] Rossi, a former member of Cerberus's senior advisory board, was chosen by Cerberus to lead a turnaround and restructuring at ResCap.[542]

When asked how serious the ResCap situation was, Rossi responded:

> We're not going to sugarcoat it. ResCap reported a net loss for the third quarter of $2.3 billion, as weakness in the housing market and mortgage industry continued to prevail. As of 12 weeks ago, the subprime and non-conforming markets in the U.S. had pretty much melted down, and the international mortgage and capital markets had begun to experience extreme dislocation. These market pressures revealed weaknesses in [ResCap's] controls and risk management processes and put unprecedented stress on our cash position and ability to fund our business.[543]

### b. *Board Discussions Indicating Insolvency Concerns*

During the September 7, 2007 ResCap Board meeting at which Rossi was elected as a director and Chairman of the ResCap Board, outside counsel Fredrick Thomas of Mayer Brown made a presentation on the fiduciary duties of directors of a Delaware corporation.[544] During the presentation, the ResCap Board engaged in a discussion of the fiduciary duties owed by directors of a company that is or becomes financially distressed. Thomas, as well as in-house counsel, William Solomon and David Marple, "participated in the discussion and commented on the duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[545]

Later in the meeting, during a discussion on a proposed sale of warehouse lending receivables from certain ResCap affiliates to Ally Bank, one of the ResCap Independent Directors, Thomas Melzer, questioned whether the transaction would affect adversely ResCap bondholders' economic rights should ResCap become financially distressed.

---

[541] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558].

[542] *See* Memorandum, November MD Meeting-Follow-up Q&A for Associates, dated Nov. 14, 2007, at EXAM10125766 [EXAM10125763] ("GMAC and our shareholders have put into place a team that has turnaround experience and works well together."). Despite a plethora of material referring to efforts undertaken to affect a turnaround at ResCap in late 2007 and Rossi's role in spear-heading those efforts, Rossi was adamant during his interview that no one ever described to him a desire that he lead a "ResCap turnaround" or "ResCap restructuring." *See* Int. of M. Rossi, Nov. 27, 2012, at 20:21–21:3.

[543] Int. of M. Rossi, Nov. 27, 2012, at 20:21–21:3.

[544] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558]

[545] *Id.*

Melzer was specifically concerned with an aspect of the transaction that would require ResCap to provide four-year credit warranties on the transferred assets.[546]

### c.  In Fall 2007, ResCap Announced Major Restructuring Plans

On October 17, 2007, ResCap announced that it was restructuring its mortgage operations, as severe weakness in the housing market and mortgage industry continued to prevail.[547] ResCap planned to streamline operations and revise its cost structure in an attempt to enhance its flexibility to meet changing market conditions.[548] ResCap recognized that the "[s]uccessful execution of these plans [was] essential to restoring the mortgage business to profitability."[549] The restructuring of the mortgage operations included plans to:

- Reduce product offerings;[550]

- Eliminate 25% (approximately 3,000) of the company's existing positions, with the majority of the reduction in force taking place in the remainder of 2007. These planned reductions were intended to be in addition to the elimination of 2,000 positions announced earlier in the year;[551]

- Close 50 sales and servicing locations;[552]

- Shift more towards direct consumer origination channels with operations focusing on originating and servicing prime conforming and high quality jumbo product with leveraging of [Ally Bank];[553]

---

[546] *See id.*

[547] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), at 1.

[548] *Id.*

[549] GMAC LLC, Current Report (Form 8-K) (Nov. 1, 2007).

[550] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007) ("ResCap will continue to modify its product offerings based on market conditions, and has sharply reduced its exposure to nonprime and prime non-conforming loans this year. Nevertheless, ResCap will continue to offer a broad and competitive menu of high quality products and will pursue growth plans opportunistically in areas where the company maintains a competitive advantage.").

[551] *See id.* ("On Oct. 15, 2007, a restructuring plan was approved that will include ResCap reducing its current worldwide workforce of 12,000 associates by approximately 25 percent, or by approximately 3,000 associates, with the majority of reductions occurring in the fourth quarter of 2007. This reduction in workforce is in addition to the measures undertaken in the first half of 2007 in which 2,000 positions were eliminated.").

[552] ResCap Review Presentation prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Sept. 26, 2007, at RC40012910 [RC40012907]

[553] *Id.*

- Reduce risk and income volatility by balance sheet restructuring that results in reduction of HFS inventories and the sale of nonprime HFI residuals;[554] and

- Expand credit and control environment to manage risk while simplifying control process and systems.[555]

The planned workforce reductions were estimated to result in ResCap incurring restructuring charges ranging between $90 and $100 million in fourth quarter 2007.[556]

Although not publicly reported, the presentation made to the ResCap Board on September 26, 2007 that outlined the restructuring plan and ResCap's potential options made clear that while attempting to execute the restructuring plan, ResCap was also preparing contingency plans which included exploring the "viability and economics of an orderly liquidation."[557]

---

EXHIBIT III.G.2.c
**ResCap Options**
**ResCap Board of Directors Meeting Presentation**
September 26, 2007

| Current Path | JV/Sale | Orderly Liquidation |
|---|---|---|
| • Aggressively restructure<br>• Achieve profitability in 2008<br>• Inject $725M equity<br>• Stabilize operations, preserve the franchise and fight for survival until conditions improve<br>• Return to Board within 60 days to discuss capital situation and other business options | • Explore opportunities to sell ResCap in whole or in part<br>• Understand valuation for whole business/part of the business (i.e., RFG, IBG, BCG, Servicing) in the current environment<br>• Identify potential acquisitions and/or JV partners<br>• Discuss potential M&A options with Board within 60 days | • Explore viability and economics of an orderly liquidation<br>• Explore viability and economics of other exit or partial exit options |

*Source: See ResCap Review Presentation prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, Sept. 26, 2007 [RC40012910].*

---

[554] *Id.*

[555] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 1, 2007), Ex. 99.2, at 18.

[556] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007). This estimate included "costs related to severance and other employee-related costs of approximately $55 to $65 million and the closure of facilities of approximately $35 to $45 million" the majority of which were anticipated to occur in the fourth quarter of 2007. *Id.*

[557] ResCap Review Presentation prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Sept. 26, 2007 [RC40012907].

### d.  November 1, 2007 Ratings Downgrade

ResCap's announced restructuring and improved equity position was not enough to prevent a ratings downgrade. On November 1, 2007, Moody's announced it was downgrading its ratings on ResCap's senior debt to Ba3 from Ba1, with a negative outlook. Moody's explained:

> This rating action follows ResCap's $2.3 billion loss in Q307. The loss was primarily driven by marks on the company's residential mortgage held-for-sale inventory and mortgage backed securities, high levels of provisioning and an impairment of goodwill of $455 million. This represents ResCap's fourth consecutive quarterly loss. As a result of this loss the company received a $1.0 billion capital injection from its parent to avoid violating its minimum net worth covenant of $5.4 billion at September 30, 2007.

> The downgrade and negative outlook reflect the company's significant asset quality issues and potential franchise impairment. The non-performing level of ResCap's held-for-investment portfolio is well above its rated peer group across loan types, and Moody's expects elevated provisioning levels for several more quarters. "The company's continued exposure to held-for-sale loan write-downs and high provisioning could result in operating losses in the fourth quarter and beyond that reduce capital below the minimum net worth covenant without further support from its parent," said Moody's Vice President Craig Emrick.

> Additionally, Moody's has concerns about potential franchise impairment at ResCap. Emrick added that "the current market disruption requires ResCap to shift its origination channel, product mix, and secondary marketing strategies. The business model that will return ResCap to adequate profitability is unclear."

> In regards to liquidity, the company is inherently weaker than many of its mortgage banking peers due to its focus on secured market funding versus retail deposits and Federal Home Loan Bank advances. As a result, the company has a very low level of unencumbered assets which leave it vulnerable to disruptions in the wholesale markets. However, the company ... plans to utilize its bank, and the related deposit and Federal Home Loan Bank funding, to a much larger degree going forward.[558]

---

[558] *Moody's Downgrades ResCap to Ba3, from Ba1; Outlook Negative*, MOODY'S INVESTORS SERVICE, Nov. 1, 2007, http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba3-from-Ba1-outlook-negative—PR_143543.

### e. *Analysts' Bankruptcy Speculation/ResCap And AFI Public Debt Repurchase Plans*

ResCap's November ratings downgrade resulted in numerous press reports speculating as to the willingness of AFI and Cerberus to allow ResCap to fail. A November 15, 2007 Bloomberg article reported that "[t]raders [were] speculating that Cerberus Capital Management LP and General Motors Corp. may allow the Minneapolis unit of [AFI] to fall into bankruptcy as the U.S. housing slump continue[d] to deepen."[559] Four days later, in a November 19, 2007 article, Bloomberg reported that Kathleen Shanley, an analyst at independent bond research firm GimmeCredit Publications, Inc., had issued a report recommending that investors sell ResCap debt in light of "significant risks embedded in the portfolio." Shanley advised that "GM/Cerberus may elect to put ResCap into bankruptcy given its exposures to homebuilders, and recoveries given defaults may be even lower than implied by current distressed levels."[560] Shanley speculated that ResCap's announcement that investments in model homes and lots may be "impaired at any time" coupled with the third quarter 2007 $2.3 billion in losses—the largest loss in AFI's 88-year history—could "lead [ResCap] to violate terms of its debt agreements."[561]

Investors' confidence in ResCap faltered with these reports;[562] the price of ResCap's bonds decreased throughout 2008 and ResCap CDS prices reflected a correlated increase.[563] ResCap bonds declined from approximately 70 cents on the dollar in August 2007 after being downgraded to below investment grade, to approximately 41.5 cents in June 2008. Bloomberg reported in November 2007 that the bond-pricing service for the main U.S. brokerage watchdog, the Financial Industry Regulatory Authority, had announced that ResCap's $2.5 billion of 6.375 percent notes due in 2010 fell 0.2 cents to 55.4 cents on the dollar. According to Bloomberg, "[t]he implied probability of default assumes funds would be worth 40 cents on the dollar in the event of bankruptcy."[564] As bond prices decreased, ResCap CDS prices

_____

[559] Shannon D. Harrington, *ResCap Credit Swaps Soar on Concern It May Default*, BLOOMBERG, Nov. 15, 2007, http://www.bloomberg.com/apps/news/?pid=newsarchive &sid=aTXFFjlPAPUk.

[560] *See* E-mail from S. Cohen to L. Tessler (Nov. 19, 2007) [CCM00176101] (attaching the article); *see also* Caroline Salas & Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007, http://www.safehaven.com/article/8904/no-regrets.

[561] Caroline Salas & Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007, http://www.safehaven.com/article/8904/no-regrets.

[562] *See* Section VI (discussing ResCap's overall financial condition, including solvency).

[563] A Credit Default Swap or CDS is a derivative financial instrument used to hedge investments against potential default. When CDS prices rise, it indicates that market participants are becoming more concerned about a potential default.

[564] Caroline Salas & Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007, http://www.safehaven.com/article/8904/no-regrets.

increased significantly, rising from approximately 2% in June 2007, to 30% in November 2007, and further still to over 57% by March 2008.[565]

The press reports and investor response did not go unnoticed by AFI management. On November 15, 2007, AFI CEO Eric Feldstein, citing press reports indicating that GM/Cerberus/AFI were "potentially willing to allow ResCap to fail," stated in an e-mail to then AFI COO de Molina that the "[m]arket has completely lost confidence in ResCap."[566] That same day Feldstein sent an e-mail to Cerberus-appointed non-executive AFI Chairman, Ezra Merkin stating:

> It is compelling that we execute a $1 billion + tender offer for the 2008 and possibly 2009 Rescap bonds. Not only would this be economically attractive, it would halt the erosion in market confidence, it would alleviate the anxiety among ResCap banks (currently lending us significant sums of money under bank lines maturing over the coming months), and would begin to address the employee panic which has set in amid reports that GM/Cerberus/GMAC may let ResCap default on its obligations.[567]

On November 21, 2007, ResCap announced that it commenced a cash tender offer for several of its debt securities. ResCap offered to purchase up to $750 million aggregate principal amount (the maximum tender amount) of the notes. Upon the offer's expiration (12:00 midnight EST Dec. 19, 2007), $389.1 million face value was tendered and accepted for payment. Total cash outflow (principal and accrued interest) to the bondholders totaled $240.8 million.

During this same time (November/December 2007), AFI executed a program of open market repurchases of ResCap's publicly traded debt. The open market repurchase program resulted in the repurchase of debt with a book value of approximately $1.3 billion for a cost of $895 million, including accrued interest. On December 28, 2007, ResCap's debt with a face value of approximately $1.1 billion and a AFI cost basis of approximately $740 million was contributed to ResCap by AFI as a capital injection. As a result, ResCap recorded a gain on extinguishment of debt of $369 million.

### f. By December 2007, ResCap Needed Additional Cash; Fourth Quarter 2007 Operating Loss Totaled $921 Million

Having purchased outstanding ResCap debt at a steep discount to face value when ResCap turned to AFI for assistance in overcoming a TNW shortfall at year-end 2007, AFI

---

[565] Market analysts reported in August 2008 that "ResCap's credit default swaps ha[d] been trading at levels that indicate investors have been expecting bankruptcy since the fall of 2007." *See* Cynthia Koons, *ResCap Bonds Command Pricey Insurance*, WALL ST. J., Aug. 2, 2008, http://online.wsj.com/article/SB121759683223604485.html.

[566] *See* E-mail from E. Feldstein (Nov. 15, 2007), at CCM00496802 [CCM00496800].

[567] *See id.*

contributed equity to ResCap in the form of bonds with carrying value of $1.1 billion, which AFI had acquired in the open market for $763 million. AFI forgave the debt in exchange for common equity.[568] Even after including the gain ResCap experienced upon extinguishment of debt resulting from the $1.1 billion in bonds contributed by AFI, ResCap incurred an operating loss of $921 million in the fourth quarter of 2007[569] and reported a net loss for the year of $4.3 billion.[570]

 3. *Liquidity And TNW Concerns Continued Into 2008*

  *a. Significant Unsecured Debt Maturities On The Horizon*

 ResCap began the fourth quarter of 2007 in an improved liquidity position as a result of the sale of its healthcare business and the $1 billion cash contribution from AFI. Nevertheless, ResCap's access to capital markets continued to be "restricted, both domestically and internationally, impacting the renewal of certain facilities and [its] cost of funding."[571] Consequently, during the fourth quarter of 2007, ResCap recorded further asset write-downs and impairments, and higher credit provisions and restructuring costs.[572] This led to a TNW deficiency, thereby requiring an additional capital contribution from AFI. In addition to the concerns presented by the TNW deficiency, ResCap faced significant unsecured debt maturities in the coming quarters. Approximately $4.4 billion of ResCap's $18 billion in unsecured debt was scheduled to mature in 2008:

EXHIBIT III.G.3.a
**ResCap Debt Maturities Schedule**
September 1, 2007 – December 31, 2008
*($ in Billions)*

| | 2007 | 2008 | | | | |
| | Sep - Dec | Q1 | Q2 | Q3 | Q4 | Total 2008 |
| Debt | | | | | | |
|---|---|---|---|---|---|---|
| Unsecured | $    0.1 | | $    1.5 | $    1.8 | $    1.3 | $    4.5 |
| Secured | 12.1 | 7.4 | 5.4 | | 6.7 | 19.5 |
| Total | $  12.2 | $  7.4 | $  6.9 | $  1.8 | $  8.0 | $  24.0 |

*Source: D. Walker & B. Casey Treasury/Funding Analysis Presentation, dated Sept. 7, 2007, at RC40012731 [RC40012695].*

 ResCap thus found itself in the position of having to continue to work aggressively to maintain adequate liquidity, including having to negotiate renewals of credit facilities, asset sales, strategic initiatives, and replacement facilities as well as having to consider the possibility of using existing alternative liquidity sources.

---

[568] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40005687 [RC40005652]

[569] Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008), Ex. 99.1, at 1.

[570] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101.

[571] *Id.* at 48.

[572] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008) (announcing operating results for fourth quarter 2007 and the full year ended December 31, 2007).

### b.  AFI Provided A $750 Million Advance Facility

In February 2008, to address a liquidity shortfall, AFI provided a $750 million advance facility to ResCap, which was to be repaid from proceeds of the sale of Resort Finance, a business unit of ResCap's BCG. Ultimately, with no unaffiliated buyers located, GMAC CF purchased the unit in July 2008.[573]

### c.  ResCap's CEO Had Questions Regarding ResCap's Solvency As The Second Quarter Of 2008 Approached

Jones explained that while the possibility of ResCap's insolvency had not occurred to him prior to 2008, by the second quarter of that year, he considered insolvency a serious issue, "given the obligations of the parent and the amount of support that [AFI] had provided and the amount of ongoing global market pressures that ResCap continued to experience . . . ."[574] Moreover, various debt maturities were looming in the near-term. ResCap needed to roll the debt, or find alternative sources, or dispose of assets.

Jones stated that he planned to retain Lazard and another firm (a firm "that assists in bankruptcy activities operationally")[575] sometime in the second quarter of 2008. The firms were retained as a contingency: if ResCap was not successful in rolling the debt maturities, ResCap was going to face a serious wall. Jones was concerned that something would happen that would trigger a cross-default or a "very visible lack of ability to meet debt maturities on any rational terms."[576] According to Jones, he wanted to make sure that ResCap's only option was not a "disorderly liquidation."[577] Morgan Stanley had been retained to work on debt restructuring. Lazard knew that Morgan Stanley was involved; Morgan Stanley did not know that Lazard and the other firm were there.[578] Jones was concerned that "the very fact of retaining people" and planning for an orderly liquidation would make debt refinancing harder, if not impossible. So Lazard and the other firm "stayed down the hall and in the dark."[579]

---

[573] *See* Section V.E.1 (discussing the Resort Finance Facility); *see also* Section V.F.4.c (discussing the Resort Finance Sale).

[574] *See* Int. of J. Jones, Nov. 30, 2012, at 60:10–17.

[575] *See id.* at 64:5–6.

[576] *See id.* at 61:10–62:7.

[577] *See id.* at 62:4–6.

[578] *See id.* at 62:20–63:1.

[579] *See id.* at 61:10–65:17.

### d. Amendment Of ResCap's LLC Agreement Created A Class Of Preferred Membership Shares, Which Would Be Transferred To AFI In Exchange For ResCap Notes Purchased by AFI In Open Market Transactions

As first quarter 2008 was drawing to a close, ResCap again was in jeopardy of breaching its TNW covenant. A proposal for increasing ResCap's consolidated TNW to ensure ResCap's compliance with certain covenants was presented to the Special Committee of the Independent Directors of the ResCap Board on March 24, 25, and 26, 2008, and the ResCap Board on March 28, 2008. Pursuant to the proposal, AFI would contribute approximately $1.18 billion face amount of ResCap unsecured bonds to ResCap, with an observed market value at the time of contribution of approximately $583 million in exchange for approximately $583 million of ResCap preferred membership interests.[580] As discussed below, AFI's unwillingness in March 2008 to accept a common equity position in exchange for debt forgiveness as it had done in December 2007, and instead to require preferred interests in ResCap with an option to convert the preferred interests into ResCap's non-voting Class M Interests in Ally Bank, was identified by Independent Directors Melzer and Jacob as a concern.[581]

#### (1) Concerns Raised By ResCap Independent Directors

During the special meetings, Melzer and Jacob raised certain issues that seemed to echo Jones's concerns regarding ResCap's likelihood of insolvency. The questions recited in the minutes of the various ResCap Board meetings reflect concerns about preferences, fraudulent conveyances, and an acknowledgment of the effect of looming insolvency on fiduciary duties. The Independent Directors pointed out that the relative values of the ResCap bonds and interest in Ally Bank had not been assessed[582] for purposes of the transaction and expressed concern that AFI was converting unsecured bonds into preferred interest in Ally Bank that would be "structurally senior" to ResCap's unsecured creditors.[583] Jacob also inquired as to whether the transaction was likely to provide ResCap with needed liquidity beyond the first quarter of 2008.[584]

---

[580] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 24, 2008 at RC40006615 [RC40006611]; Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 25, 2008 at RC40006620 [RC40006611]; Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 26, 2008 at RC40006623 [RC40006611]; Minutes of a Special Meeting of the Board of Directors of Residential Capital LLC, Mar. 28, 2008 at RC40017152 [RC40017140]

[581] *See* Section V.A.2 (discussing further this transaction).

[582] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 24, 2008 at RC40006615 [RC40006611].

[583] *Id.*; see also Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 25, 2008 at RC40006620 [RC40006611].

[584] Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital LLC, Mar. 25, 2008 at RC40006620 [RC40006611].

The Independent Directors were advised that Morgan Stanley would be consulted regarding the relative values of the ResCap bonds and interest in Ally Bank.[585] As to the concern that unsecured bonds were being transformed into a preferred interest, the advisors noted that AFI could have sold the bonds for FMV in the open market. Additionally, outside counsel from Skadden advised that absent the transaction, there certainly would be a breach of the TNW covenant as of March 31, 2008, and that absent prior reorganization planning there would be a "terrible outcome for all constituencies."[586]

> (2) AFI Rejected A Proposal That AFI Take An Equity Interest In ResCap
> Similar To The December 2007 Equity Infusion Due To Purported Pressure
> From AFI Shareholders And Bondholders

During a March 25, 2008 Special Meeting of the ResCap Board, a discussion ensued as to whether there were means by which the preferred conversion features of the transaction could be removed. Melzer proposed that AFI instead take an equity interest in ResCap similar to the December 2007 equity infusion.[587] ResCap CEO Jones explained that he had made such a proposal to AFI, and it had been rejected by the AFI Board because of significant pressure the AFI Board faced from shareholders and bondholders who believed AFI should get more than common equity for future capital infusions into ResCap.[588]

During this same discussion, Timothy Pohl, outside counsel from Skadden, explained to the Independent Directors that he "believed that the opportunity exist[ed] to improve the terms for ResCap and create a substantive transaction that [was] in the best interest of [ResCap] its shareholders and its creditors and bondholders."[589] Additional discussion thereafter resulted in

---

[585] The retention of Morgan Stanley presented conflict concerns in light of the fact that Morgan Stanley officer R. Scully was a director on the AFI Board. To remedy this concern, Morgan Stanley reported that an ethical wall between Scully and the ResCap valuation team would be established. For purposes of valuing the ResCap bonds, Morgan Stanley observed Market Value; for purposes of the valuation of ResCap Preferred Interests, Morgan Stanley compared existing short-term debt to determine interest rate; and as respects IB Finance Class M Shares Morgan Stanley looked to other regional bank preferred to determine interest rate. The transaction was ultimately presented and approved on March 31, 2008; thus, Morgan Stanley had a very short period of time in which to conduct the valuation. Morgan Stanley did not provide a formal valuation or written fairness opinion.

[586] Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 25, 2008, at RC40006620 [RC40006611].

[587] Id.

[588] Id.

[589] See id. at RC40005687.

a proposal to eliminate the conversion right.[590] Ultimately, after further negotiations with AFI and Cerberus, the only substantive change made to the original proposal was a provision prohibiting AFI from exercising the conversion right if ResCap filed for bankruptcy prior to year-end 2008.[591]

### (3) Proposal Approved By Unanimous Written Consent On March 31, 2008

Effective March 31, 2008, the ResCap LLC Agreement was amended and restated to create the ResCap Preferred Interests, a class of non-cumulative, non-participating, perpetual preferred membership interests consisting of up to 872,971 units with an aggregate liquidation preference of up to \$872.971 million. Also, on March 31, 2008, AFI contributed notes of ResCap that AFI had previously purchased in open market purchase transactions with a face amount of approximately \$1.2 billion and a fair value of approximately \$607.192 million to ResCap in exchange for 607,192 ResCap Preferred Interests with a liquidation preference of \$1,000 per unit. ResCap cancelled the \$1.2 billion face amount of the notes. In addition, AFI retained the option to contribute—in its sole discretion, on or before May 31, 2008—up to additional \$340 million of ResCap notes, having a fair value of approximately \$265.779 million, in exchange for additional ResCap Preferred Interests.[592]

### e. ResCap's \$750 Million Credit Facility Secured By MSRs[593]

On April 9, 2008, a Meeting of the Special Committee of the Independent Directors of ResCap was held to discuss a proposal whereby AFI would provide ResCap a \$750 million line of credit secured by certain MSRs.[594] At the beginning of the meeting, Jim Young gave an overview of ResCap's projected first quarter 2008 results, explaining that ResCap was

_____

[590] Before giving final approval, the Independent Directors insisted that the consummation of the conversion transaction be scheduled for January 2009. At the time that the controversial deal was put before the Independent Directors, ResCap was planning a debt restructuring, the result of which would be evident in the 2008 period. The Independent Directors did not want to risk putting AFI in a position ahead of other creditors in the event the restructuring plan did not work and ResCap was forced into bankruptcy. See Int. of T. Melzer, Oct. 10, 2012, at 256–76.

[591] Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Apr. 9, 2008, at RC40006626 [RC40006611].

[592] See Section V.A.1.b (discussing the 2008 Bank Transaction).

[593] See Section V.E.2 (discussing further this transaction).

[594] See Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 24, 2008, at RC40006615 [RC40006611]; Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Mar. 25, 2008, at RC40006620 [RC40006611].

expected to report net income of approximately negative $850 million.[595] Young explained that the funding facility under consideration was necessary to support April 2008 servicing advances. Morgan Stanley advised that, given the state of the economy and the disruption in the mortgage markets, there was no longer a significant availability of the type of funding being proposed. The Morgan Stanley representative further advised that the proposed AFI funding facility was reasonably priced and consistent with market terms and other similar transactions.[596]

The proposed facility was intended to be bridge financing while ResCap negotiated with Barclays Bank on a lending facility secured by unencumbered MSR assets backed by non-agency mortgage backed securities. Because several months of negotiations could be required before the Barclays Facility was finalized, the proposal for the Secured MSR Facility was necessary. The facility was approved during a Special Meeting of the Board of Directors of ResCap on April 14, 2008.[597]

On June 2, 2008, the Secured MSR Facility was amended to increase the facility size from $750 million to $1.2 billion and the advance rate was increased from 50% to 85%, giving ResCap even more liquidity.[598] Unwilling to accept more than a 60% advance rate,[599] in addition to having growing concerns with its overall exposure to ResCap, Barclays backed out of the originally contemplated facility.[600]

### (1) In April 2008, ResCap's Independent Directors Resigned

As part of a debt restructuring taking place at approximately the same time, the ResCap Board was asked to approve a proposed $3.5 billion AFI credit facility, which would place AFI in a senior position to all other ResCap creditors. The Independent Directors were not comfortable approving such a transaction and thought it was not in the best interests of all of ResCap's stakeholders.[601]

Both Independent Directors resigned from the ResCap board on April 20, 2008. Melzer identified three reasons for the resignation: (1) the growing time commitment to the board and his inability to sustain it because of other career responsibilities; (2) the "merry-go-round"

---

[595] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of Residential Capital, LLC, Apr. 9, 2008, at RC40006626 [RC40006611].

[596] *Id.*

[597] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 14, 2008, at RC40005712 [RC40005652].

[598] *See* Amendment No. 3 to the Loan and Security Agreement, dated June 2, 2008, at RC40006474 [RC40006437].

[599] *See* E-mail from J. Peterson to J. Weintraub (June 12, 2008) [EXAM10172519].

[600] *See* Section V.E (discussing the Secured MSR Facility).

[601] *See* Int. of T. Melzer, Oct. 10, 2012, at 159–62, 171–72; Int. of T. Jacob, Nov. 7, 2012, at 216–18.

changes in company management and his lack of familiarity with new executives; and (3) his concern with and refusal to approve the proposed AFI credit facility because of his concerns regarding AFI's seniority vis-à-vis ResCap's existing bondholders.[602]

Jones predicted the resignation of the Independent Directors in an earlier e-mail:

> [The Independent Directors are] being advised by their counsel that solvency is a real issue, and that they in particular must assure that the creditors have not been disadvantaged in any way by related party transactions. I think they would love to be off the board at this point and avoid any potential liabilities, but realize that their leaving could also be seen as damaging at this time.[603]

In this same e-mail, Jones appears to caution de Molina that he should expect that going forward the Independent Directors would be more assertive:

> Expect strict attention to related party transactions as to terms, and they are beginning to raise increasing questions about the individuals in combined roles with both companies and the potential conflicts that may arise.[604]

Apparently, the Independent Directors' concerns over conflicts prompted Jones to relinquish his officer title with AFI as he concluded his e-mail by stating, "[t]o that end I have told Bill Soloman that I wish to resign as a[n] [AFI] officer to solely focus on my role at ResCap."[605]

### (2) Management Resignations

The resignation of the Independent Directors came within a month or less of the resignation of AFI CEO, Eric Feldstein, the resignation of ResCap Chairman Mike Rossi and the announcements of intentions to resign by Jim Jones and James Redmond.

There are indications that many if all not all of these departures were at least in part related to discontent with the amount of involvement Cerberus interjected into the running of AFI and ResCap. Feldstein acknowledged that his departure was in part because his authority at AFI had been "pretty well diminished" and because he "didn't feel like [he] was really running the company anymore." Feldstein explained that previously he had been "running the business day to day . . . And now, [he] felt there were several people at Cerberus who really were calling all the major shots . . . Cerberus had injected people into ResCap and other places who felt like they were reporting to Cerberus not to [Feldstein].[606]

---

[602] *See* Int. of T. Melzer, Oct. 10, 2012, at 159–62, 171–72.

[603] E-mail from J. Jones (Apr. 14, 2008) [EXAM12381623].

[604] *Id.*

[605] *Id.*

[606] *See* Int. of E. Feldstein, Dec. 14, 2012, at 199–200.

Rossi left in March 2008 for health reasons.[607] However, certain e-mails indicate that the relationships between Rossi and others at Cerberus had become strained, and that Cerberus did not always respect the independence Rossi believed he should have in operating ResCap.[608] Thomas Marano, a Cerberus employee who first replaced Rossi as Chairman and then Jones as CEO noted that Jones was a nice guy but not aggressive enough at the pace at which things needed to occur.[609] Marano conceded that prior to Jones leaving ResCap, Jones was unhappy with the level at which Marano interceded as a non-executive chairman.[610]

Alvaro de Molina replaced Feldstein as AFI CEO, but even before becoming CEO, de Molina brought in "many, many new people," making personnel and operational changes viewed as drastic by "legacy" AFI employees.[611] Among de Molina's recruits to AFI was Sam Ramsey, who controlled the type and amount of support ResCap received from AFI during ResCap's liquidity problems.[612] He also recruited Karin Hirtler-Garvey, with whom he had worked at Bank of America, initially as a ResCap Independent Director and later as an AFI employee.[613] Concerns expressed by COAC's COO, Keith Tietjen, during this time period suggest that AFI was wielding a heavy hand in ResCap management, and that de Molina was a big part of that control. Tietjen wrote in an April 17, 2008 e-mail: "I'm fearful that there will be a mass exodus of the leadership team at the ResCap & RFG level at some point if Al [de Molina]'s team continues to treat them like second class citizens [and] impose the corporate agenda without their input."[614] Less than a week thereafter, Paul Bossidy, RescCap director and RFG President, resigned. Shortly after Bossidy's resignation, ResCap Treasurer, Bill Casey, sent an e-mail to Jones detailing his frustration with AFI's involvement in ResCap decisions. Casey complained, "ResCap did not have a seat at the table and... [AFI] was negotiating on [ResCap's] behalf."[615]

---

[607] *See* Int. of M. Rossi, Nov. 27, 2012, at 9–10.

[608] *See, e.g.*, E-mail from L. Tessler to F. Bruno (Mar. 22, 2008) [CCM00049165]; *see also* E-mail from P. Bossidy to L. Tessler (Sept. 12, 2007) [CCM00119095]; E-mail from J. D'Ascoli to J. Lombardo (Jan. 15, 2008) [CCM00150783].

[609] Int. of T. Marano, Nov. 26, 2012, at 17.

[610] *Id.*

[611] Int. of E. Feldstein, Dec. 14, 2012, at 190:7–9, 194:1–8.

[612] Int. of A. de Molina, Nov. 20, 2012, at 18:21–25, 33:24–34:11.

[613] Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 67:20–24.

[614] E-mail from K. Tietjen (Apr. 17, 2008) [CCM00005242]. Casey expressed his frustration over AFI siphoning away the handling of ResCap's "Funding and Bank Relations" and, thus, diminishing significantly the role he felt he had been placed in by the ResCap Board. *Id.*

[615] *See* E-mail from B. Casey (Apr. 28, 2008) [EXAM10173943].